## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| MALLINCKRODT PLC, *et al.*,[1] | Case No. 20-12522 (JTD) |
| Debtor. | (Jointly Administered) |
| | **Re: D.I. 3405, 3406** |

## NOTICE OF APPEAL

**PLEASE TAKE NOTICE** that Attestor Limited, on behalf of itself and its affiliated

entities, including Avon Holdings I, LLC ("Attestor"), and Humana, Inc. ("Humana", and together

with Attestor, the "Acthar Insurance Claimants"), creditors in the above-captioned chapter 11

cases, hereby appeal to the United States District Court for the District of Delaware, pursuant to

28 U.S.C. § 158(a) and Rules 8002(a)(1) and 8003 of the Federal Rules of Bankruptcy Procedure,

from the order (D.I. 3406) (the "Order") sustaining the *Debtors' First Omnibus Objection to*

*Unsubstantiated Claims (Substantive)* (D.I. 2165), entered on July 23, 2021, by the United States

Bankruptcy Court for the District of Delaware, and the oral bench ruling issued in connection with

the Order (the "Bench Ruling"), as so ordered at D.I. 3405.[2]

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinkrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2] Attestor entered into an agreement with Humana to pursue and participate in any proceeds of Humana's claims against the Debtors with respect to the distribution, marketing, and sale of Acthar. *See* Verified Statement of Willkie Farr & Gallagher LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure, D.I. 2066. Attestor is also the transferee and owner of additional Acthar-related claims subject to the Order and Bench Ruling, which were filed by United Healthcare Services, Inc. ("United") and OptumRx Group Holdings and OptumRx Holdings, LLC (together, "OptumRx"). *See* Transfer/Assignment of Claim, D.I. 2317. For the avoidance of doubt, this notice of appeal includes all of the aforementioned claims.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Order is attached hereto as

**Exhibit A** and copies of the Bench Ruling and the so ordered docket entry are attached hereto as

**Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that the names of all parties to the Order and

Bench Ruling appealed from and the names, addresses, and telephone numbers of their respective

attorneys are as follows:

| Counsel to the Acthar Insurance Claimants | Counsel to Mallinckrodt PLC and its affiliated debtors |
|---|---|
| MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>Donna L. Culver (Bar No. 2983)<br>Robert J. Dehney (Bar No. 3578)<br>Matthew B. Harvey (Bar No. 5186)<br>1201 North Market Street, 16th Floor<br>P.O. Box 1347<br>Wilmington, DE 19899-1347<br>Telephone: (302) 658-9200<br>Facsimile: (302) 658-3989<br>Email: dculver@morrisnichols.com<br>　　　rdehney@morrisnichols.com<br>　　　mharvey@morrisnichols.com<br><br>WILLKIE FARR & GALLAGHER LLP<br>Matthew A. Feldman<br>Matthew Freimuth<br>Benjamin P. McCallen<br>Richard Choi<br>Philip F. DiSanto<br>787 Seventh Avenue<br>New York, NY 10019<br>Telephone: (212) 728-8000<br>Email: mfeldman@willkie.com<br>　　　mfreimuth@willkie.com<br>　　　bmccallen@willkie.com<br>　　　rchoi@willkie.com<br>　　　pdisanto@willkie.com | RICHARDS, LAYTON & FINGER, P.A.<br>Mark D. Collins (No. 2981)<br>Robert J. Stearn, Jr. (No. 2915)<br>Michael J. Merchant (No. 3854)<br>Amanda R. Steele (No. 5530)<br>Brendan J. Schlauch (No. 6115)<br>One Rodney Square<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 651-7700<br>Facsimile: (302) 651-7701<br>Email: collins@rlf.com<br>　　　stearn@rlf.com<br>　　　merchant@rlf.com<br>　　　steele@rlf.com<br>　　　schlauch@rlf.com<br><br>LATHAM & WATKINS LLP<br>George A. Davis<br>George Klidonas<br>Andrew Sorkin<br>Anupama Yerramalli<br>885 Third Avenue<br>New York, New York 10022<br>Telephone: (212) 906-1200<br>Facsimile: (212) 751-4864<br>Email: george.davis@lw.com<br>　　　george.klidonas@lw.com<br>　　　andrew.sorkin@lw.com |

| | |
|---|---|
| EIMER STAHL LLP<br>Benjamin E. Waldin<br>Scott C. Solberg<br>James W. Joseph<br>Sarah H. Catalano<br>224 South Michigan Avenue<br>Suite 1100<br>Chicago, IL 60604<br>Telephone: (312) 660-7600<br>Email: bwaldin@eimerstahl.com<br>      ssolberg@eimerstahl.com<br>      jjoseph@eimerstahl.com<br>      scatalano@eimerstahl.com | Jeffrey E. Bjork<br>355 South Grand Avenue, Suite 100<br>Los Angeles, California 90071<br>Telephone: (213) 485-1234<br>Facsimile: (213) 891-8763<br>Email: jeff.bjork@lw.com<br><br>Jason B. Gott<br>330 North Wabash Avenue, Suite 2800<br>Chicago, Illinois 60611<br>Telephone: (312) 876-7700<br>Facsimile: (312) 993-9767<br>Email: jason.gott@lw.com |

Dated: July 28, 2021
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Matthew B. Harvey*
Donna L. Culver (Bar No. 2983)
Robert J. Dehney (Bar No. 3578)
Matthew B. Harvey (Bar No. 5186)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Email: dculver@morrisnichols.com
      rdehney@morrisnichols.com
      mharvey@morrisnichols.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (admitted *pro hac vice*)
Matthew Freimuth (admitted *pro hac vice*)
Benjamin P. McCallen (admitted *pro hac vice*)
Richard Choi (admitted *pro hac vice*)
Philip F. DiSanto (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Email: mfeldman@willkie.com
      mfreimuth@willkie.com
      bmccallen@willkie.com
      rchoi@willkie.com
      pdisanto@willkie.com

-and-

**EIMER STAHL LLP**
Benjamin E. Waldin (admitted *pro hac vice*)
Scott C. Solberg (admitted *pro hac vice*)
James W. Joseph (admitted *pro hac vice*)
Sarah H. Catalano (admitted *pro hac vice*)
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Email: bwaldin@eimerstahl.com
      ssolberg@eimerstahl.com
      jjoseph@eimerstahl.com
      scatalano@eimerstahl.com

*Counsel to the Acthar Insurance Claimants*

<u>**Exhibit A**</u>

**Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MALLINCKRODT PLC, *et al.*, | ) | Case No. 20-12522 (JTD) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) | **Re: Docket No. 2165** |

## <u>ORDER</u>

For the reasons stated on the record at the hearing held on this day, the Debtors' First

Omnibus Objection to Unsubstantiated Claims (Substantive) (D.I. 2165) is sustained.

SO ORDERED.

**Dated: July 23rd, 2021**
**Wilmington, Delaware**

**JOHN T. DORSEY**
**UNITED STATES BANKRUPTCY JUDGE**

## Exhibit B

**Bench Ruling and Docket Entry**

```
1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2
                                       .   Chapter 11
3   IN RE:                             .
                                       .   Case No. 20-12522 (JTD)
4   MALLINCKRODT PLC, et al.,          .
                                       .
5                                      .   Courtroom No. 5
                                       .   824 North Market Street
6                                      .   Wilmington, Delaware 19801
                                       .
7                                      .
                         Debtors.      .   July 23, 2021
8   . . . . . . . . . . . . . . . . .      9:03 A.M.

9                    TRANSCRIPT OF TELEPHONIC HEARING
                     BEFORE THE HONORABLE JOHN T. DORSEY
10                     UNITED STATES BANKRUPTCY JUDGE

11  TELEPHONIC APPEARANCES:

12
    For the Debtor:          Michael J. Merchant, Esquire
13                           RICHARDS, LAYTON & FINGER, P.A.
                             Rodney Square
14                           920 N. King Street
                             Wilmington, Delaware 19801
15
                             - and -
16
                             George Klidonas, Esquire
17                           Hugh Murtagh, Esquire
                             Christopher Harris, Esquire
18                           Keith Simon, Esquire
                             LATHAM & WATKINS LLP
19                           885 Third Avenue
                             New York, New York 10022
20

21  Audio Operator:          Sherry J. Stiles, ECRO

22  Transcription Company:   Reliable
                             1007 N. Orange Street
23                           Wilmington, Delaware 19801
                             (302)654-8080
24                           Email: gmatthews@reliable-co.com

25
    Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
```

```
 1   TELEPHONIC APPEARANCES (Cont'd):

 2   For Opioid Claimants:      Arik Preis, Esquire
                                Mitchell Hurley, Esquire
 3                              AKIN GUMP STRAUSS HAUER & FELD LLP
                                One Bryant Park
 4                              Bank of America Tower
                                New York, New York 10036
 5
 6   For Acthar Group:          Daniel Astin, Esquire
                                CIARDI CIARDI & ASTIN
 7                              1204 North King Street
                                Wilmington, Delaware 19801
 8
                                - and -
 9
                                Donald Haviland, Esquire
10                              HAVILAND HUGHES LLC
                                111 S. Independence Mall E Unit 1000
11                              Philadelphia, Pennsylvania 19106

12
     For Humana:                Benjamin McCallen, Esquire
13                              Matthew Freimuth, Esquire
                                WILLKIE FARR & GALLAGHER LLP
14                              787 Seventh Avenue
                                New York, New York 10019
15

16

17

18

19

20

21

22

23

24

25
```

<u>MATTERS GOING FORWARD</u>:

7. [SEALED] Debtors' Motion to Quash (A) Ad Hoc Acthar Group's Notice of Deposition of Melissa Falconi and (B) Ad Hoc Acthar Group's Notice of Deposition of Hugh M O'Neill [Docket No. 3289 – filed July 20, 2021]

8. Ad Hoc Acthar Group's Motion to Compel Discovery and Response to Debtors' Motion to Quash [Docket No. 3385 – filed July 22, 2021]

1   (Proceedings commence at 9:03 a.m.)

2          THE COURT:  Good morning, everyone.  This is Judge

3   Dorsey.  We're on the record in Mallinckrodt PLC, Case Number

4   20-12522.

5          For those who haven't seen this before, this is

6   the new look for our Zoom calls.  This is in anticipation of

7   getting ready to go back to live hearings, but because we

8   will continue to use Zoom instead of CourtCall even when we

9   have live hearings, this is how things will look going

10  forward.

11         So, with that, I'll turn it over to debtors'

12  counsel to run the agenda.

13         MR. MERCHANT:  Thank you, Your Honor.  Michael

14  Merchant of Richards, Layton & Finger on behalf of the

15  debtors.

16         Your Honor, before turning to the agenda, I

17  believe Mr. Alberto sent chambers an email on July 15th,

18  relating to an agreement with respect to payments pursuant to

19  the KEIP order, and the OCC wanted to make certain statements

20  on the record regarding that agreement.  So, if acceptable to

21  the Court, I'd like to turn the podium over to Mr. Preis to

22  make those statements now, and then Mr. Klidonas will then be

23  making a brief statement on behalf of the debtors.

24         THE COURT:  All right.  Mr. Preis, go ahead.

25         MR. PREIS:  Good morning, Your Honor.  This is

1  Arik Preis from Akin Gump.  Can you hear me?

2              THE COURT:  I can, thank you.

3              MR. PREIS:  Okay.  I like the new look.

4              Good morning, Your Honor.  Arik Preis, Akin, Gump,

5  Straus, Hauer & Feld, LLP on behalf of the Official Committee

6  of Opioid Related Claimants.

7              Your Honor, as agreed with the debtors, the OCC

8  wanted to take a few minutes at the outset of the hearing to

9  update the Court with regard to the KEIP.  My remarks will be

10 (indiscernible) into four parts:

11             First, a reminder of what the KEIP order stated

12 with regard to our investigation (indiscernible)

13             Second, a brief summary of what we have done to

14 date.

15             Third, a very brief overview of what we've

16 preliminarily found.

17             And fourth (indiscernible)

18             THE COURT:  Mr. Preis.

19             MR. PREIS:  (Indiscernible)

20             THE COURT:  Mr. Preis --

21             MR. PREIS:  Yes.

22             THE COURT:  -- you're breaking up a little bit on

23 your presentation.  You're skipping out a little bit.  I

24 think your voice is dropping and it's not picking up on the

25 microphone, maybe.

1    MR. PREIS:  Oh, okay.  Oh (indiscernible) is that

2  any better?

3    THE COURT:  That's better.

4    MR. PREIS:  Okay.  Okay.  I promise this

5  presentation will not take more than five minutes.

6    First, a reminder of what is in the KEIP order.

7  In accordance with Paragraph 4 of the KEIP order, the OCC and

8  the debtors agreed that the OCC would conduct (indiscernible)

9  investigation to the 12 individuals who are part of the KEIP.

10  In connection with the investigation, the debtors would

11  review and, as appropriate, produce up to an additional

12  50,000 (indiscernible) in other words, in addition to the

13  documents that we're already producing under our Rule 2004

14  investigation, that were specifically targeted to the

15  individuals in the KEIP.

16    The debtors also agreed to produce privilege logs

17  and witnesses for deposition (indiscernible) our

18  investigation, subject to the debtors' right to object to any

19  such deposition.  In return, we agreed to inform the debtors

20  of any facts we found that would lead us to believe that the

21  KEIP participants engaged in wrongdoing that might

22  (indiscernible) by us to withhold (indiscernible) KEIP

23  payment.

24    We were also permitted, by agreement and in the

25  order, that, by no later than July 15th, which was obviously

1  last week, in our discretion, to file a motion to enjoin any

2  future payment and/or claw back any Q4 2020 payments

3  previously made to KEIP participants under the 2020 KEIP,

4  based on any findings that we uncovered in our investigation.

5          Those rights, which are under Paragraph 4 of the

6  KEIP order, are in addition to those in Paragraph 3 of the

7  KEIP order, which states that, under certain circumstances,

8  KEIP participants are not eligible to receive any

9  (indiscernible) payments and that all parties' rights are

10  reserved to seek disgorgement of previous payments under

11  certain circumstances.

12          As everyone knows, as Your Honor knows, we didn't

13  file anything on July 15th, but instead, we decided to

14  continue our investigation in light of the items I'm going to

15  mention in a moment.

16          We also, of course, reserve our rights under

17  Paragraph 3 of the KEIP order, as well as our right to object

18  to the debtor (indiscernible) releases being sought pursuant

19  to the proposed plan, some of the KEIP (indiscernible)

20          Okay.  Second, our investigation.  Although we

21  have vigorously pursued our investigation of potential

22  misconduct by the KEIP participants over the past few months,

23  that investigation was not complete by July 15th, nor could

24  it be.  Although the debtors, to their credit, have produced

25  a significant amount of documents, the reason that the

1  investigation could not have been complete by July 15th was

2  that discovery was not complete by (indiscernible) for

3  instance, just yesterday, we received -- the debtors produced

4  more than 12,000 documents in response to our 2004 request.

5  And we understand that further productions are still

6  contemplated.

7       In addition, just one week before the July 15th

8  deadline, the debtors produced approximately 37,000

9  documents.  It was obviously impossible to review and

10  consider that information before July 15th.  That production

11  included (indiscernible) specific communications that the

12  debtors had previously withheld as privileged, but had

13  downgraded.

14       Moreover, we have found that many documents that

15  the debtors produced in response to our 2004 investigation

16  have been important in our analysis of the debtors' practices

17  concerning opioids and (indiscernible) analysis of the KEIP.

18       As of July 15th, the debtors had also not

19  completed production of privilege logs the OCC needs to

20  analyze in connection with our investigation.  While the

21  debtors, to their credit, again, provided certain interim

22  privilege logs, metadata logs in response to our requests for

23  information on a rolling basis, the metadata logs lacked

24  standard information, the basis of which (indiscernible)

25  withheld.

1        Furthermore, the majority of the log documents --

2   or the log information, including several thousand entries

3   involving KEIP participants, was provided just days before

4   July 15th.

5        In addition -- and this, again, we -- is by

6   agreement -- no depositions have taken place yet, which makes

7   sense, given that the debtors' document production is not

8   complete.  The debtors have been adamant that the

9   (indiscernible) witnesses be the (indiscernible) to

10  understand (indiscernible) all parties and all subject

11  matter.  And the Court recently entered a confirmation

12  schedule and protocol calling for fact witnesses to continue

13  through August 13th.

14        We agreed to the July 15th deadline back in April,

15  when the OCC anticipated that all the debtors' document

16  production would be substantially completed in June, with

17  depositions to be completed (indiscernible) in July, in

18  anticipation of a confirmation hearing in August.  That was

19  the schedule back then.  Obviously, that's not

20  (indiscernible) anymore.

21        In light of the shifting time line, in early July,

22  the OCC, we reached out to the debtors, described what we had

23  found to date, and to seek an extension of the time to

24  complete our investigation and potentially file a motion.

25  The debtors refused, which was fine.  Notwithstanding this

1  refusal and given that our investigation is still ongoing, we

2  made the determination not to file a motion on July 15th, but

3  to reserve our rights (indiscernible)

4          Third, a very, very brief update as to what we

5  have found to date.  And we've conveyed this update, both

6  orally and in writing and in much greater detail to the

7  debtors outside professionals, the outside professionals to

8  the governmental ad hoc group and their Attorneys General,

9  subject in each case to the terms of the protective order.

10         We've reviewed the documents and we believe some

11 of the documents raise concerns regarding some, but not

12 nearly all of the KEIP participants in connection with the

13 sale, marketing, and distribution of prescription opioids

14 (indiscernible) such conduct comes in the form of certain

15 (indiscernible) the marketing and sale of the debtors'

16 branded prescription opioid medication, as well as in the

17 monitoring of specific orders of the debtors' (indiscernible)

18 opioid products.

19         We believe the debtors' practices included the

20 targeting of doctors known to prescribe (indiscernible)

21 quantities of opioid pills and focus on achieving

22 prescription metrics and incentivizing sales reps

23 (indiscernible) we believe that the debtors and these

24 individuals engaged in these practices at a time when the

25 addictive properties of opioids were completely understood

1  and widely known.

2         While we believe that the documents discovered to

3  date raise significant concerns, we also recognize that our

4  investigation is not complete.  As I noted, documents still

5  must be produced and reviewed and we still must depose

6  certain key participants to learn more.  Filing a motion at

7  this time would be premature (indiscernible)

8         Finally, our next steps.  In addition to

9  establishing whether grounds exist to claw back or enjoin

10  KEIP payments, the investigation will establish whether we

11  have a basis to object to the proposed releases that the

12  debtors are proposing to offer (indiscernible) at the

13  appropriate time, and if we determine that doing so is in the

14  best interests of the opioid defendants, we will raise these

15  issues.

16         That's the extent of our statement.  I understand

17  that the debtors would like to make some statements, as well.

18  But before we do that, do you have any questions for me?

19         THE COURT:  No questions.  Thank you, Mr. Preis.

20         MR. PREIS:  Thank you.

21         THE COURT:  Who is speaking on behalf of the

22  debtors?  I'm sorry, I forgot.  Mr. Klidonas, go ahead.

23         MR. KLIDONAS:  Good morning, Your Honor.  George

24  Klidonas of Latham & Watkins on behalf of Mallinckrodt PLC

25  and its affiliated debtors.

1          The debtors' professionals, as Mr. Preis

2    mentioned, have discussed with the OCC their preliminary

3    findings and the relevance of such preliminary findings on

4    the key employee incentive plan or the "KEIP," as we call it,

5    and the releases proposed under the Chapter 11 plan.  But the

6    debtors do feel compelled to respond to the OCC's statement.

7          First, the debtors have fully participated and

8    continue to fully participate in the discovery process with

9    the OCC.  We've worked as quickly as possible to produce

10   documents to the OCC.  That said, the debtors, as mentioned

11   earlier, did not agree to the OCC's request to extend their

12   deadline to file a motion under the KEIP order because the

13   requested extension would not -- would have been after the

14   payment of the first half of the 2021 keep.  And our position

15   is those payments should be made when the company is

16   obligated to make those payments.

17          Regarding the substance of the OCC statement, the

18   debtors disagree with the OCC's interpretation of the small

19   set of documents that they provided, about 60 that they

20   showed us.  Many of these documents have already been

21   produced to the states and other multi-district litigation

22   plaintiffs; and, therefore, these same allegations were

23   raised pre-petition in a variety of different complaints.

24          The company has defended those pre-petition

25   allegations vigorously in the past and the proposed opioid

1   settlement resolves all of those claims and allegations in

2   their totality.  The debtors believe that conflating the

3   entitlement to KEIP payments is really sort of a veiled

4   attempt at calling into question the entire settlement

5   reached and the releases set forth in the plan.

6          If what the OCC wants to do is re-litigate these

7   allegations that have been settled, then debtors believe that

8   the proposed opioid settlement could have the potential of

9   unraveling.  But we decided, on balance, having a fight on

10  this issue right now would just be a complete waste of estate

11  resources and addressing confirmation of related issues in a

12  vacuum this early would just be unproductive.

13         To put this into context, the debtors believe that

14  the OCC's preliminary findings regarding the actions of a

15  small subset of KEIP participants -- as of today, our

16  understanding, it's about three of them -- and certain

17  aspects of the monitoring and marketing practices are

18  generally misguided.

19         The documents raised by the OCC are about from

20  2011 to 2015, when the companies produced and sold the

21  branded pain products.  We believe that Mallinckrodt branded

22  pain medication never made up more than about .5 percent of

23  the opioid pain market.  In addition, the debtors contend

24  that every Mallinckrodt pain product was FDA approved, every

25  milligram of such product and distributed was and is

1 authorized in advance by the DEA and then reported back to
2 the DEA in accordance with compliance protocols.

3 The debtors also believe and contend that the
4 purpose of the branded opioid marketing strategy was to
5 inform prescribers of the benefits of its longer lasting,
6 extending relief pain products, that serve generally as an
7 alternative, to allow patients to take these medications less
8 frequently.

9 And finally, with respect to the SOM -- the
10 suspicious order monitoring -- Mallinckrodt's historical
11 controls have been lauded by the DEA as exemplary and
12 consistent with what the DEA expects for Mallinckrodt as an
13 industry leader. But as Mr. Preis mentioned, you know, just
14 as the OCC is continuing its review, we, the debtors -- you
15 know, the investigations being conducted by the independent
16 directors, more specifically, in connection with the plan
17 releases are still ongoing and are assessing the conduct that
18 the OCC is alleging.

19 So the last point I just want to raise on
20 discovery, Your Honor, is we just want to sort of clarify the
21 record a little bit. The OCC has been the beneficiary of
22 extensive discovery in these Chapter 11 cases. As of July
23 14th, the OCC has received 95 percent of the documents
24 responsive to their requests. The vast majority of these
25 were produced by the end of June.

1          The negotiated discovery with respect to the OCC's

2   KEIP review was produced by the end of April, as contemplated

3   by the KEIP order.

4          And then I think it was mentioned earlier, interim

5   privilege logs have been provided and metadata for all

6   privileged documents was sent while the final privilege logs

7   are being completed.

8          And no depositions have been sought or noticed in

9   connection with the KEIP to date, nor was there any discovery

10  about any documents found by the OCC until almost two months

11  after the KEIP (indiscernible) was provided.

12         So, just to circle back and close the loop, you

13  know, neither the OCC, nor the debtors, as we both mentioned,

14  are looking to have this argument today on these issues.  We

15  both felt the need to at least provide the Court with some

16  context and with their perspectives of where things stand.

17         With that, Your Honor, I think we can turn to the

18  agenda today.

19         THE COURT:  All right.  Thank you, Mr. Klidonas.

20         MR. KLIDONAS:  You're welcome.

21         THE COURT:  Mr. Merchant, back to the agenda.

22         MR. MERCHANT:  Yes, Your Honor.  Turning to the

23  agenda, I think, based on the dialogue with chambers this

24  week, it probably makes sense to turn to Agenda Items 7 and 8

25  first, which are the discovery-related motions related to the

1  unsubstantiated claims objection going forward today.  So,

2  with that, I'll cede the podium to Mr. Murtagh to address the

3  debtors' motion to quash.

4            THE COURT:  Mr. Murtagh.

5            MR. MURTAGH:  Good morning, Your Honor.  It's Hugh

6  Murtagh from Latham & Watkins on behalf of the debtors.  Can

7  you hear me okay?

8            THE COURT:  Yes, thank you.

9            MR. MURTAGH:  Your Honor, I'll lay out where I

10  think we are on discovery disputes and then tell you how I

11  plan to go through it, subject to the Court's approval.  My

12  understanding based on the filings by the Ad Hoc Acthar Group

13  yesterday are as follows:

14            We have a live motion to quash as to depositions

15  noticed for Mr. O'Neill and Ms. Falcone.  I don't believe the

16  Ad Hoc Acthar Group is continuing to press requests for a

17  deposition of Ms. Falcone.  So, as to the motion to quash, I

18  will focus on the request to depose Mr. O'Neill.

19            The Ad Hoc Acthar Group also filed its motion to

20  compel production of certain documents, and that remains

21  open.  And I understand that's a portion of the motion to

22  compel.  But if it's more expedient for Your Honor, I'll

23  address that also while I'm addressing the motion to quash

24  Mr. O'Neill's deposition.

25            THE COURT:  Yeah, let's do them all at once.

1          MR. MURTAGH:  Okay, Your Honor.

2          Your Honor, the headline on all of this is that

3   these discovery requests are months late, irrelevant, and

4   unnecessary.  The background, as Your Honor knows, is that

5   the debtors filed their objection to the Ad Hoc Acthar

6   Group's claims nearly three months ago, on April 30th.  And

7   as Your Honor also knows, we had a discovery dispute at that

8   time about the scope of discovery in this matter and Your

9   Honor made a ruling on the proper scope of discovery in this

10  matter.

11         The debtors, thereafter, provided extremely broad

12  discovery to the ad hoc group and also provided additional

13  new discovery with targeted responses to questions asked,

14  relating specifically to the subject matter here, which is

15  substantiation for what we view as the unsubstantiated

16  claims.

17         Thereafter, Your Honor, the ad hoc group had the

18  opportunity to file two responses, and the second came over

19  two months after the filing of the objection.  The ad hoc

20  group never, until last Friday, weeks after the filing of

21  their second response and a week after the debtors' reply,

22  even suggested that it had insufficient discovery.

23         Now the ad hoc group asserts that the debtors'

24  reply somehow revealed to them an urgent need to depose Mr.

25  O'Neill and to receive more documents.  And they appear to

1  give two reasons, neither of which is persuasive, and I'll go

2  through each of them, first dealing with Mr. O'Neill.

3  　　　　The first reason they give is that our reply

4  somehow alerted them to the existence of a publicly reported

5  opinion issued two years ago in the opioid MDL litigation.

6  And in respect of that opinion, the ad hoc group argues that

7  this belated discovered opinion is important because, first,

8  it allegedly validates an alter ego theory of liability

9  against PLC, and second, that Mr. O'Neill's testimony is

10 critical to that supposed validation.  Well, neither of those

11 assertions is true, Your Honor.

12 　　　　First, to be clear, the opinion states only that

13 the parties dispute and offer conflicting evidence on alter

14 ego and the matter should be litigated at a later date.  And

15 that later litigation never occurred.

16 　　　　The second is that Mr. O'Neill's name is not even

17 mentioned anywhere in the opinion.

18 　　　　So, apparently, on this, what the ad hoc group has

19 in mind is a statement in the plaintiffs' brief that Mr.

20 O'Neill did not recall details about certain Mallinckrodt

21 entities' board composition.  But Your Honor, on this

22 supposed reason for deposing Mr. O'Neill, if the ad hoc group

23 had wanted to explore alter ego theories and board

24 composition, they could have done so over the last three

25 months.  They could have sought additional discovery.  They

1   could have asked questions of Mr. Welch in deposition, and

2   they can attempt to do so with Mr. Welch on the stand today.

3   They do not need Mr. O'Neill for that.  So the belated

4   discovery of the MDL opinion and Mr. O'Neill's supposed

5   importance to it is not a grounds for deposing Mr. O'Neill.

6           The second reason that the ad hoc group has given

7   for deposing Mr. O'Neill is that he has allegedly become

8   relevant because his name appears on a single document cited

9   in the debtors' reply.  That document is a board deck

10  discussing Mallinckrodt Pharmaceutical International -- sorry

11  -- Mallinckrodt Pharmaceutical Ireland Limited's decision-

12  making responsibilities with regard to Acthar.  And it was

13  produced to Rockford pre-petition and it was offered in the

14  brief to demonstrate that the ad hoc group had notice pre-

15  petition of the involvement of Mallinckrodt Pharmaceuticals

16  Ireland Limited with Acthar.

17          It does not make relevant anything Mr. O'Neill did

18  or said.  The only connection between that document and Mr.

19  O'Neill is that his name appears I believe on an email cover

20  sheet to the transmission of the document, that's it.  So,

21  having not made Mr. O'Neill irrelevant in any way, in any new

22  way in the reply, this supposed second reason, his name is

23  mentioned as a name attached to a document, also is not a

24  reason to depose Mr. O'Neill.

25          And with regard to the deposition of Mr. O'Neill

1  in general, before turning to the RFPs, Your Honor, the

2  bottom line is that the ad hoc group has repeatedly noticed

3  Mr. O'Neill for deposition in these cases on what appears to

4  be tactical grounds, and this is no different.  I believe

5  this is the third time they've done so.  And now it appears

6  to be an attempt to disrupt a hearing that's been three

7  months in the making.  And the delay in the timing on this is

8  inexcusable and the deposition is wholly unnecessary.

9         With regard to the RFPs, Your Honor, the story is

10  much the same.  They are also inexcusably late, irrelevant,

11  and unnecessary.  Nevertheless, to be clear, in an attempt to

12  avoid having a dispute before the Court, Your Honor, the

13  debtors agreed to produce documents responsive to several of

14  the requests and responsive to the requests on which we

15  thought the ad hoc group was focused.

16         So, specifically, the debtors agreed to production

17  of the O'Neill deposition in the 2019 opioid MDL proceedings

18  and all exhibits, and also the entire record of the

19  jurisdictional motion to dismiss dispute in that litigation,

20  on which the ad hoc group is focused, and they now have those

21  documents.

22         We also responded and made clear that all of the

23  support -- all of the documents supporting our reply are

24  attached to our reply.  So that took care of three of the

25  requests, Your Honor.  And we maintained objection to four of

1   the requests.

2          Now one of those requests is for all of the

3   documents used to prepare Mr. O'Neill for his deposition in

4   2019.  And we object on the basis that that is work product

5   and attorney/client privilege and not subject to production.

6   The remaining three requests, Your Honor, are hopelessly

7   over-broad and burdensome, in addition to being irrelevant

8   and inappropriate.  And what they comprise, Your Honor, is a

9   request for all communications, documents, agreements and any

10  other material relating to Acthar by, with, or about 32

11  different Mallinckrodt entities from the beginning of time to

12  today.

13         Now, plainly, that request is hopelessly over-

14  broad.  But even if it were more limited, the request would

15  still be hopelessly late and made without any attempt to

16  discern whether there's a specific need or any documents that

17  are sought are already in the voluminous productions that

18  have been made to the Ad Hoc Acthar Group.

19         So, much like the request to depose Mr. O'Neill,

20  Your Honor, the -- these requests have no basis to be made

21  now.  They're made without considering whether the

22  information the ad hoc group requests is actually relevant or

23  needed or even in their possession already.  And it appears

24  to be another attempt to insert a tactical delay into these

25  proceedings.  And in short, Your Honor, the time for this is

1   up, and the time to litigate these issues is now, on the full

2   and complete opportunity and record that have been made over

3   the last three months.

4              THE COURT:  Okay.  Thank you, Mr. Murtagh.

5              Let me hear from the ad hoc group.

6              MR. ASTIN:  Good morning, Your Honor.  Daniel

7   Astin for Ciardi, Ciardi & Astin.  My co-counsel Mr. Haviland

8   will be presenting this morning.  And we thank the Court for

9   accommodating us this early, before the regularly scheduled

10  hearing.

11             THE COURT:  Mr. Haviland, go ahead.

12             MR. HAVILAND:  Good morning, Your Honor.  It seems

13  to me that the debtors' objections and motion bases for both

14  the depositions and the documents are three:  The discovery

15  is late, it's irrelevant and unnecessary.  I don't know where

16  the third prong comes in the rules, other than Rule 26 up to

17  Rule 37, so I'll focus on the timing and the relevancy

18  arguments.

19             I have to give a little context, Your Honor, so

20  you can understand how this dispute came about.  The debtors

21  have known about the Acthar Plaintiffs' desire to take Steve

22  O'Neill's -- or Hugh O'Neill's deposition since prior to the

23  bankruptcy.  You'll recall the first time we met, Your Honor,

24  was on an emergent basis to quash the court-ordered

25  deposition of Mr. O'Neill out of the Rockford Court.

1        The debtors prevail upon the Court, saying that

2   they needed a breathing spell, and that Mr. O'Neill and Mr.

3   Trudeau were critical to the reorganization function.  I

4   remember Mr. Stearn arguing for an hour at the end of that

5   hearing, only to have it resolved with the Court directing

6   the parties to meet and confer to schedule that deposition.

7   And we've attempted to do that -- and Mr. Astin can attest --

8   multiple times over the last ten-plus months, and never once

9   have the debtors offered to provide a deposition date for Mr.

10  Trudeau or Mr. O'Neill.

11       So the context is important.  We had court-ordered

12  deposition dates coming into this bankruptcy.  The debtors,

13  in the personages of Mallinckrodt PLC and ARD had filed

14  motions to quash for Apex Protection, and they were denied on

15  a full record by a Federal Judge.

16       And the reason why this issue has come to the fore

17  today, Judge, is we got a reply brief after hours on July

18  9th, a Friday night.  It was almost 50 pages, well beyond the

19  page limit provided under the rule.  The Court granted leave

20  to the debtors to put that volume before the Court.  And in

21  that volume -- on a reply, mind you, this is a reply to the

22  response to their objections -- they proceeded down a number

23  of paths that weren't raised in the initial objection, and

24  that's why this is important.  There's nothing late about

25  inquiring about a position of the debtors that's newly framed

1  in a fifty-page filing on reply.

2          Now we noticed Mr. O'Neill's deposition last

3  Thursday.  We asked -- and we also noticed his one-time

4  executive assistant, Melissa Falcone, who then become a Vice

5  President of Patient Services, and we now know through Arnold

6  & Porter is no longer with the company.  And I point that

7  out, Judge, because, last Friday, Arnold & Porter

8  represented, on behalf of the debtors, they don't represent

9  Ms. Falcone.  She's a former executive employee.  I have an

10  email at four o'clock last Friday to that effect:

11          "Don, Ms. Falcone left the company shortly after

12  you deposed her in February 2020, we do not currently

13  represent her."

14          The debtors have not demonstrated to this Court

15  how they have a right to move for a protective order on a

16  former employee.  And when we got that notice, Judge, we

17  expedited a subpoena.  And you'll see in our filings, we

18  provided not one, but two affidavits of service of Ms.

19  Falcone in Illinois, where she currently resides, at her

20  place of business, at AbbVie, and her home address.

21          So, since the time of service, last Friday, we

22  haven't heard from Ms. Falcone or counsel.  All we heard from

23  the debtors was they don't represent her.  So they have a

24  procedural problem in saying that they can quash a subpoena

25  of a former employee more than a hundred miles from this

1   Court.

2           And realizing that it was more than a hundred

3   miles, we issued the subpoena under the Northern District of

4   Illinois caption, the Rockford case, so that that court would

5   have jurisdiction over any discovery disputes.  I'm not

6   suggesting Your Honor doesn't, but we hadn't heard from the

7   debtors at all until late in the day, when they filed the

8   motion for a protective order on Wednesday, taking this

9   position.  There's a fundamental problem with their approach

10  in trying to prevent Ms. Falcone's deposition, and I'll get

11  to the relevancy in a moment.

12          But as further background, the Court should also

13  understand that the Ad Hoc Acthar Group has produced four,

14  four clients for depositions:  The City of Rockford; this

15  Acument Global Technologies, whose designee sits as the chair

16  of the committee; Teamsters Local 830; and Dakota County,

17  Nebraska.  Four.  We also produced an expert for deposition.

18  That's five depositions.

19          The debtors have yet to produce one executive for

20  deposition.  Mr. Welch, who I see -- good morning, Mr. Welch

21  -- we've had the opportunity to depose him too many times.

22  I'm sure he's tired of it; we are, as well.  He seems to be

23  their go-to witness.  And I credit him for his ability to try

24  to answer questions.  But Judge, he worked in the specialty

25  generics division of the company.

1          Mr. O'Neill is the Executive Vice President of

2   Commercial Operations of the brand business.  And what you're

3   going to hear about today in the hearing is whether or not

4   we're entitled to claim against entities in the brand

5   business.

6          Now the reason why we looked to see whether there

7   had been any issue involving alter-ego was because in those

8   notices I just referenced the debtors asked my clients, at

9   request number nine, all the basis for a theory of alter-ego.

10  And it caused plaintiff's counsel to scratch heads saying why

11  are they asking this question.  It seems like they know

12  something we don't.

13         Sure enough we look and we see Judge Dorsey -- I'm

14  sorry, you're Judge Dorsey -- Judge Polster -- I'm a little

15  tired, Your Honor, it's a Friday -- in the City of Summit

16  case, the In Re National Opioid Litigation, 2019 ruled on a

17  similar motion by Mallinckrodt PLC seeking to prevent its

18  jurisdiction in conjunction with two subsidiaries, the SpecGx

19  generic company and then an entity by the name of

20  Mallinckrodt LLC which the debtors say is a generic company;

21  we have evidence to say that it's a brand company.  It signed

22  contracts on behalf of the Acthar business.  So that is a

23  factual dispute.

24         We're only getting to the issue of whether or not

25  we can avail ourselves of the same theory that the generic

1   opioid plaintiffs have viewed. And in the ruling by Judge

2   Polster he found, and I'm at star of the Lexus case 92, the

3   court finds that the issue of whether SpecGx LLC and/or

4   Mallinckrodt LLC are the alter-egos of Mallinckrodt PLC

5   should be litigated in the track one trial. Mr. Murtagh says

6   it was kicked down the road. No, the judge found enough

7   evidence of alter-ego and it was evidenced.

8        Here is the problem, Judge, everything was filed

9   under seal. We asked the debtors will you give us that

10   material so we can understand the basis of the ruling. They

11   said -- well, they didn't respond initially. They eventually

12   had us go back to plaintiff's counsel (indiscernible), we

13   did. We needed their consent to have those under seal

14   pleadings and documents produced. We finally just got them

15   the other day. In fact, late yesterday. We added them to

16   our exhibit list.

17        Counsel is right that Judge Polster doesn't detail

18   the evidence because it was under seal and counsel is correct

19   that plaintiff's counsel, in their brief, repeatedly cited to

20   the deposition transcript of the head of commercial

21   operations, Mr. O'Neil. And why it's evidentiary here,

22   Judge, and why his deposition here is so critical the senior

23   most person in charge of the entire brand side business said

24   I don't differentiate companies. To me it's Mallinckrodt,

25   its Mallinckrodt Pharmaceuticals. I don't know who pays my

1 check, I don't think PLC, LLC, any subsidiary company, I am

2 in charge of all of it; operations are mine.  I make those

3 decisions.

4          We put that transcript before the court for later,

5 but, Judge, that is just a snapshot of the issue that the

6 debtors are presenting to the court.  Now remember it's the

7 debtor's objecting to our claims against entities like

8 Mallinckrodt LLC who signed contracts.  That is why the

9 ruling by Judge Polster is so important because LLC is also

10 on the generic side business in opioids and the judge there

11 said that goes to trial.

12          Now I'm not going to pre-argue today's issues, but

13 that is the backdrop of what began in October with Mr. O'Neil

14 has continued since came to a head this past week and last

15 week because of the importance of his deposition.

16 Unbeknownst to us, but fully known by the debtors who were

17 litigating over the opioid litigation.

18          Now we also know that Arnold & Porter has

19 represented Mr. O'Neill because at Exhibit 48 of our exhibits

20 today that we shared with Your Honor Arnold & Porter abruptly

21 adjourned Mr. O'Neil's deposition.  It had been scheduled for

22 November citing that he had a problem and that he couldn't

23 appear.  At some point the debtor has to put up a witness

24 other than Mr. Welsh.  I'm sure Mr. Welsh will appreciate

25 that.  I noticed, Judge, that others have noticed Mr. O'Neil,

1  the committees have noticed Mr. O'Neil.

2          The debtors are unwilling to negotiate a date,

3  they have been unwilling to talk about an omnibus schedule

4  for discovery.  Mr. Astin has tried repeatedly to get there

5  to be an omnibus approach to discovery and not just plan

6  discovery, discoveries relating to our issues.  When I say

7  our issues their objections, the objection today, but they

8  say you don't get them here because he's irrelevant and I

9  suppose we will hear weeks from now whether or not they're

10 going to produce him later.

11         Relevancy is not a grounds to quash a deposition

12 notice.  Counsel has only argued relevancy and timing.  I

13 have given you the timing.  He's relevant.  There is no one

14 more relevant then Mr. O'Neill when it comes to the

15 commercial operations of the brand side business.  I think

16 Mr. Welsh would freely admit that if asked.  So he should be

17 deposed, he should be asked -- forced to answer questions

18 about these distinct entities that the debtors are now

19 claiming for the first time have independence of the PLC.

20         Why that is important, Judge, and you probably

21 read this in the papers, they're now arguing this dual

22 position that in some senses they're a single entity, that

23 Mallinckrodt is Mallinckrodt.  In response to the Humana

24 brief they raised the Copperweld antitrust decision which

25 says that a parent cannot conspire and agree with a

1  subsidiary.  Well that is right, but they don't show the
2  court, and we will show the court later, that <u>Copperweld</u> was
3  further to say because it's a single enterprise because
4  there's a purpose between a parent and a sub, and that's why
5  you can't have a conspiracy between those entities.
6           The debtors are trying to do that now by saying
7  that somehow we had to sue every single disparate subsidiary,
8  but they never made that argument in Rockford.  They never
9  made that argument 420.  They never made that argument in
10 322.  In fact, they never objected to our suing the PLC.  I
11 note that they did object in the Human case, but not in our
12 case.
13          So we're being pushed to a point where now all of
14 a sudden the debtor is taking a completely different approach
15 and they're saying you don't get to depose the one witness
16 who can speak to that issue whether or not there's
17 independence of form, function, decision making of all these
18 disparate entities and the head of commercial operations
19 knows that better than anybody else.
20          The reason why it's important, Judge, is they put
21 it in their reply.  They are arguing we should have known.
22 The Ad hoc Acthar group should have known better, should have
23 done more and all I'm going to cite to, Your Honor, is what
24 we put in the record (indiscernible) 147 through 162 is the
25 discovery in Rockford.  We issued four sets of discovery.  We

1 asked for all contracts, and this is important the defendants

2 and any third-party relating to distribution, pricing,

3 marketing, sales of Acthar. Repeatedly Mallinckrodt said

4 they complied.

5 The court ordered no less than three times

6 compliance. In ECF 171, 224 and 354 which are Exhibits 152,

7 153, and 154 of the evidence we put in. Court orders and

8 repeatedly they say we produced the documents. We propounded

9 the request last week to say, okay, to Mr. Murtagh's point.

10 If the record is what the record is and they did respond to

11 the one request give us all the evidence that supports your

12 reply. Mr. Murtagh responded you have it. Well then we said

13 we want to make sure we have all the evidence of the

14 discussions, the contracts, presentations, communications,

15 discussions of Acthar between the non-debtor entities.

16 The response is interesting, burden. Burdon

17 denotes we investigated, we've seen that it's too much, it's

18 too difficult. They haven't put an affidavit of burden

19 forward, that's why I couldn't discuss with Mr. Murtagh how

20 do we get past that objection. He didn't articulate to us.

21 He didn't say, Mr. Haviland, you have 100,000 pages of

22 documents is there some way we can give you (indiscernible)

23 to say, okay, this one speaks to all the other documents. We

24 never had that discussion. They simply say no. They say no

25 that it's irrelevant and burdensome. It's relevant because,

1   Your Honor, we did have that hearing on the motion to compel

2   and Your Honor said that we can follow the money and follow

3   the function.  That is what we are trying to do.

4          When we got the reply and we see them putting

5   documents in from the Rockford litigation which are, frankly,

6   cherry-picked out of the record Ms. Falconi's emails, Mr.

7   O'Neil's emails, and then trying to ascribe some meaning to

8   that that we should have known that this ARD entity that we

9   sued under the parent, PLC, the entire form and function was

10  blown up and all the functions went to a UK company and an

11  Irish company.

12         Your Honor, no witness ever said that.  We deposed

13  William Hillmer as a corporate -- well the FDC deposed him as

14  a corporate designee in 2016, that's 159. The corporate

15  designee of Mallinckrodt.  He never said that.  And by the

16  way, he was designated one month after this company adopted

17  the (indiscernible) process where they're having these two

18  foreign parents make decision making.  Did he perjure himself

19  he certainly did tell the truth.

20         Then we deposed him later on July 21st, 2020.  I

21  asked him, did you testify truthfully, that's Exhibit 162, he

22  said yes.  Has anything changed; no.  We deposed Ms. Falconi

23  February 28th, 2020, Exhibit 160, who do you work for;

24  Mallinckrodt Pharmaceuticals.  That entity doesn't exist.

25  She was the right-hand to Mr. O'Neil.  Never once did she

say, when asked about pricing distribution, Acthar, Mr. Haviland, we go to Ireland. We have to get the Irish company's approval.

Then we deposed Mike Close [phonetic], the "closer" they call him, the contract guy, the guy actually involved in all the contracts, not once did he ever say here's what happens, by the way, that's Exhibit 161, we have to go to Ireland and the UK to get approval for all pricing, distributions, decision-making on Acthar. They are telling us, through this court, that we failed in our job.

Your Honor, we have four sets of written discovery, three court orders, fifteen depositions only four of which are current employees of Mallinckrodt. We have got the debtor moving repeatedly to prevent depositions starting with Mr. O'Neil and continuing through today. The question is when are we going to get due process, when are we going to get the discovery.

These debtors want to have an objection where they get to put Mr. Welsh up and say what they want him to say. And I'm not suggesting that he's not testifying as an informed witness for the company, but he doesn't have direct personal knowledge of those issues. He's not on the emails. He wasn't at the presentations. He's not part of those organizations.

When are we going to get the discovery. Now I'm

1  not suggesting that we adjourn today. I think we use today.

2  But I am suggesting we can't close, not with the record the

3  way it is as created by these debtors.

4       Thank you.

5       THE COURT: Mr. Murtagh?

6       MR. MURTAGH: Yes, Your Honor. Just to try to

7  bring some clarity I don't understand Mr. Haviland to still

8  be requesting a deposition of Ms. Falconi and it was not made

9  part of the motion to compel. I didn't hear any reason why

10 he needs Ms. Falconi. So I am going to assume that that's

11 not part of the motion. I am going to leave Ms. Falconi out

12 of this for now. That would take care of one of the

13 disputes.

14      The second with regard to Mr. O'Neil's deposition.

15 I understand from Mr. Havilland, as he's told the court

16 repeatedly, that he would like an opportunity to examine Mr.

17 O'Neil. Mr. O'Neil will be put up for examination at the

18 beginning of August as part of plan confirmation. There are

19 many people who have an interest in deposing Mr. O'Neil and

20 there will be an opportunity to depose Mr. O'Neil.

21      There have been repeated occasions in this case in

22 which Mr. Haviland has done what he's done today which is to

23 say in the context of a separate specific matter it's unfair

24 that he has not been allowed to depose Mr. O'Neil. He, in

25 fact, had raised this question back in May and asserted, in

1  court, that he needed to depose Mr. O'Neil as part of his

2  response to the unsubstantiated claims objection.  He later

3  left off of that and did not pursue it.  That was over two

4  months ago.

5         This briefing commenced three months ago.  When

6  Mr. Haviland did not say that I could follow him in his

7  argument was any reason why Mr. O'Neil has now become

8  relevant for the first time three months after these

9  objections were put in place.  Again, Your Honor, the fact

10 that Mr. O'Neil was deposed in an MDL proceeding two years

11 ago and the proceeding, itself, are not new.  They did not

12 become new in our reply and they were not referenced in our

13 reply.

14         We did not raise alter-ego for the first time in

15 our reply.  As Your Honor knows, we have been arguing alter-

16 ego issues before this court for months in the context of

17 estimation, in the context of discovery disputes.  It is not

18 a surprise to hear that the debtors want to know whether

19 there is any assertion of alter-ego because that could be a

20 ground on which claimants are attempting to create claims and

21 the as the debtors have said repeatedly believe those to be

22 estate causes of action.  That is patent in the record for

23 months.  So that is not new.

24         The single document about Mallinckrodt

25 Pharmaceuticals Ireland Ltd., having decision making

1   authority also is not new.  The point of putting in the reply

2   was to demonstrate that Rockford had it prepetition.  There

3   is just nothing new today, Your Honor.  There is no reason

4   that has become apparent in the past week for a need to

5   depose Mr. O'Neil in the context of these proceedings.

6           If Mr. Haviland felt that he needed Mr. O'Neil to

7   defend his claims he had that need three months ago and the

8   time to argue about it was three months ago.  He didn't and

9   he never asked for it.  Today is the day of the hearing on

10  the objection.  It's just inexcusable to be raising it at

11  this stage.

12          As I said at the beginning, Your Honor, that is

13  exactly the same for the RFP's.  We gave the discovery after

14  discovery discussions before Your Honor that was ordered and

15  we have not heard for months that there is anything

16  insufficient about it.  The new request is for, literally,

17  every document that exists relating to Acthar for all time

18  among thirty-three separate entities.  It is not targeted at

19  all.  It is just an attempt to disrupt.

20          These are both just attempts to disrupt and they

21  should be denied.  The argument can proceed today and at the

22  close of today's hearing, if we can finish today, the record

23  and the argument on this proceeding should be closed.  It's

24  been going on for three months.

25          THE COURT:  Alright, well the only issue before me

1 today is the issue of whether or not the proofs of claim

2 filed by the ad hoc group and the insurance group of Acthar

3 claimants complies with the code, the rules, and the Third

4 Circuit's ruling in Allegheny. As Mr. Murtagh pointed out, I

5 did give leeway on taking discovery with regard to these

6 claims, as Mr. Haviland pointed out, to follow the money and

7 see where that took them.

8 The issues about whether or not -- well, let me

9 back up. I allowed that discovery because I was under the

10 impression that the Acthar claimants were going to seek to

11 amend their proofs of claim. For whatever reason they

12 decided not to do theat. So the only thing I have before me

13 today are the proofs of claim and the only thing I'm going to

14 rule on today are whether or not those proofs of claim, as

15 written, state facts sufficient to allege a claim against the

16 debtors against whom those proofs of claim were filed.

17 I am not going to get into whether or not there is

18 other evidence that might have been used to -- that could

19 have been included in those proofs of claim because, again,

20 there is no motion to amend, so there is nothing for me to

21 decide on that issue. The only issue -- again, I am going to

22 make this very clear, the only issue before me today is are

23 the proofs of claim, as written, sufficient to state a claim

24 against the debtors against whom those proofs of claim were

25 filed.

1       This discovery may go to the question of whether

2   or not there could be an amendment to those proofs of claim,

3   but that issue is not before me.  So we're going to get to --

4   I'm going to set this motion aside for now.  We're going to

5   go to the underlying merits of the only substantive issue

6   before me which is the proofs of claim and we will go forward

7   from there, then I will make my ruling and we'll see whether

8   or not the additional discovery might be allowed somewhere

9   down the road.  For now that issue is moot as far as I am

10  concerned.

11      MR. MURTAGH:  Understood, Your Honor.  Based on

12  your instructions just now do you mind if we take a moment or

13  two just to confer among our team on how to proceed?

14      THE COURT:  Yes.  We will take a ten minute

15  recess.  We will reconvene at 10:05.

16      MR. MURTAGH:  Thank you, Your Honor.

17      (Recess taken at 9:53 a.m.)

18      (Proceedings resumed at 10:05 a.m.)

19      THE COURT:  We're back on the record.  Mr.

20  Murtagh, are you ready to proceed?

21      MR. MURTAGH:  Yes, Your Honor.  I will go ahead

22  and turn the podium over to Mr. Harris.

23      THE COURT:  Mr. Harris?

24      (No verbal response)

25      THE COURT:  Mr. Harris, can you hear me?

1          MR. MURTAGH:  Can you hear us?

2     (No verbal response)

3          MR. MURTAGH:  He may have lost audio.  Let me send

4  him a text.

5          MR. HAVILAND:  Your Honor, before we begin, may I

6  be heard?

7          THE COURT:  On what?

8          MR. HAVILAND:  On the issue that came up toward

9  the end of the last session, the issue about leave to amend.

10  I am only offering a potential solution to a protracted

11  hearing today.  In our brief, at Docket 2529, we requested

12  leave to amend at Pages 15 through 18.  We would be willing

13  to forego any examination of Mr. Welsh today if the debtors

14  would agree to the admissibility of the documents that were

15  produced and that are part of our file.

16          That would, at least, make the issue more acute

17  for the court.  Of course, those documents are not attached

18  to our proof of claim; only the complaints were.  We do point

19  out in our opposition to the objections we're seeking leave

20  to amend through this process to put the factual detail

21  before the court.  I'm suggesting that that is a way to short

22  change today not to take away anyone's ability to present

23  evidence, but I am going to suspect that Mr. Welsh hasn't

24  seen a number of the documents and the examination is going

25  to be lengthy.

1        If the debtor is amenable to the admission of

2   those exhibits they're in the court file and we can move onto

3   the next issue of whether or not (indiscernible).

4        THE COURT:  I'm not sure if Mr. Harris heard all

5   of that.

6        MR. HARRIS:  I'm sorry, Your Honor, I was having

7   audio problems. I apologize, I did not.

8        THE COURT:  Mr. Haviland, do you want to repeat

9   that?

10       MR. HAVILAND:  Sure.  I'm sorry, Chris, I didn't

11  realize you were out.  Mr.  Harris, I just said to the court

12  that as a point of order, based on the court's observations

13  of the issues before the court today in terms of the existing

14  proofs of claim, the existing proofs of claim, as everyone

15  knows, at least for the ad hoc Acthar group, consist of an

16  addendum which describes the claims, a complaint which talks

17  about the conduct of the named defendants, the PLC and ARD,

18  and unnamed co-conspirators and others, then it provides, as

19  Exhibits B and C, the damages claim and the actual proof that

20  the claimant is included in the claim within the complaint.

21       None of the exhibits that we're about to examine

22  Mr. Welsh on, as a corporate designee, are included in the

23  proofs of claim.  It seems to me the court has framed the

24  issue, and I'm not suggesting that Judge Dorsey has done

25  anything other than set the pace of play for today, we have a

1  number of exhibits, as you can see from our exhibit list,
2  that are not in our proofs of claim.  The issue is whether
3  they should be and if so when.
4          In our opposition brief I just pointed out that
5  its filed May 21st at Docket 2529 beginning on Page 15 of 19
6  we say leave to amend the proofs of claim should be granted.
7  We cite Federal Rule of Civil Procedure 15(d), we cite cases
8  in the Third Circuit and the District of Delaware that leave
9  to amend should freely be given.  That was two months ago.
10 We haven't gotten leave to amend and we would like leave to
11 amend.  And we are willing to forego any examination of Mr.
12 Welsh today provided that the debtors agree to the
13 admissibility in this record today of the documents that we
14 put in that are Mallinckrodt documents that were produced
15 either in the context of the bankruptcy, which most of them
16 are, or some which come from the underlying Rockford file and
17 that is why they haven't made publicly available.
18         This is going to be a long hearing today.  It
19 seems to me that that is the issue before the court whether
20 or not leave to amend should be granted.
21         MR. MCCALLEN:  Your Honor, may I be heard on that
22 briefly?
23         THE COURT:  Your cross talking here.  Who -- let
24 me -- was it Mr. McCallen?  Go ahead.
25         MR. MCCALLEN:  Thank you, Your Honor.  I think it

1 might make sense for me to go first as the other Acthar
2 private -- private Acthar plaintiff here and then maybe Mr.
3 Harris can respond to both of us if that works for you, Your
4 Honor.

5          THE COURT:  That's fine.

6          MR. MCCALLEN:  So I guess with regard to the
7 statements that Mr. Haviland just made, you know, from my
8 perspective, Your Honor, we might get some day to the
9 question of whether or not leave to amend should be granted.
10 That is leave to amend the pleadings, but I don't think we're
11 there yet.

12          You know, I think, Your Honor, a little bit of a
13 history here might put some context and be helpful at least
14 with respect to my clients.  You know, when we filed our
15 claims in this bankruptcy proceeding we did so without the
16 benefit of any discovery in this case or in the prepetition
17 litigation.

18          Humana, which is one of my clients, filed its
19 lawsuit in 2019 and it had no significant discovery in that
20 case at the time that the bankruptcy cases were filed. I
21 think that, in fact, Humana's motion to dismiss was decided
22 in Mallinckrodt.  It just answered, literally, a couple weeks
23 before the bankruptcy petition in this case.

24          It was really part of these cases that information
25 that Mr. Welsh testified to at his deposition, in which I

1  think you will hear about today, started to come to light.

2  You know, as Your Honor recalls, on the same day, April 30th,

3  we filed a motion to estimate.  The debtors filed this claims

4  objection; what they style the unsubstantiated claims

5  objection.  Your Honor, I am going to have a lot to say about

6  what that means in the context of Allegheny.  I think Your

7  Honor is spot on whenever you said Allegheny governs here.  I

8  think they're way out side of it in terms of the second and

9  third prongs of Allegheny.

10         With regard to the first prong of Allegheny, Your

11  Honor, the -- when we filed those cross motions, you know,

12  the debtor said your claims are unsubstantiated.  There is --

13  you have cited no evidence against these specific boxes and

14  we basically said at that point everything we know we have

15  either learned about from public filings which was very

16  little, frankly, or we had got pursuant to a very restrictive

17  NDA at the outset of the case.

18         So we said to them, okay, fine, you're putting an

19  issue -- the claims, you know, we served them with discovery.

20  I'm not going to belabor the history there.  Your Honor

21  remembers.  We were in front of you on a 30(b)(6).  My

22  colleague, Mr. Freimuth, was in front of you asking for

23  discovery on our estimation motion.  You know, the debtors

24  pushed back and they said, no, we can hear this issue, this

25  unsubstantiated claims objection on just this limited factual

1  record.

2      I believe then and I continue to believe now it
3  was an exercise and artificial line drawn, Your Honor,
4  because you just can't disentangle the issues about corporate
5  structure that they offered Mr. Welsh for and that we deposed
6  him on from questions about did something wrongful happen and
7  if so where it happened.

8      So from our perspective, Your Honor, you know, all
9  of those issues are tied together.  We now find ourselves
10 three months into this process and, candidly, exactly where I
11 was afraid we would be when we started this which is we have
12 this factual record which we are prepared to move forward on
13 today and, you know, cross-examine Mr. Welsh.  I'm sure the
14 debtors are prepared to move forward and give the direct
15 examination of Mr. Welsh.

16     Candidly, I think, Your Honor, whenever you look
17 at the governing law not only Allegheny, but when we get to
18 the evidence, Your Honor, about the second and third prong of
19 Allegheny as well as the Copperweld and other cases you're
20 clearly going to see today, just even on the limited record
21 that we have put together for Mr. Welsh, that our claims
22 would withstand a motion to dismiss and they withstand, from
23 an evidentiary perspective, whatever it is that the debtors
24 are putting forward with this unsubstantiated claims
25 objection.  That is what I won't get into right now.  I do

1  want to talk about it later because it's not clear to me

2  exactly what it is.

3        I guess what I am trying to say, Your Honor, is I

4  didn't get a chance to confer with Mr. Haviland on the break,

5  We will, obviously, seek guidance from Your Honor and proceed

6  in a way that Your Honor thinks is effective in light of the

7  way Your Honor is seeing the pleadings thus far, but we are

8  prepared to move forward with the evidence today.

9        I think we are going to do enough today that's

10 going to get Your Honor comfortable that our pleading

11 survives whatever this unsubstantiated claims objection

12 really is.

13       THE COURT:  Well here is the problem I have with

14 your client's proofs of claim, Mr. McCallen; they filed them

15 and they include a footnote that says we're filing these out

16 of an abundance of caution because we don't actually know

17 whether we have claims against these debtors and we think

18 discovery in the future will show that we do.  That is not

19 how the claims process is supposed to work.

20       What should have happened here is as soon as this

21 case was filed and certainly as soon as the bar date was set

22 back in March -- no, when was it set?

23       MR. HARRIS:  The bar date was in February, Your

24 Honor.

25       THE COURT:  The bar date was in February.  I

1 entered the order in, what, October?  November 30th I set the

2 bar date order.  The bar date was set for February, so you

3 had 78 days.  The way the process is supposed to work in

4 bankruptcy is if you're not sure you have a claim against a

5 debtor then you seek 2004 discovery to find out if you do,

6 but neither one of the groups of Acthar claimants here

7 decided to do that, for whatever reason.  Instead, they just

8 filed blanket proofs of claim against every single creditor -

9 - excuse me, every single debtor in the corporate structure

10 not knowing whether they had claims or not.

11           I got a problem with that.  I got a huge problem

12 with that.  I think its bad faith.  I also have a problem

13 with the fact that folks actually filed these proofs of claim

14 under penalty of perjury not knowing whether they had a

15 claim.  So those are the issues that I have with this whole

16 process.  The proper procedure was not filed.  It could have

17 been and you didn't do it.

18           So having read these papers, having looked at the

19 proofs of claim I will tell you exactly where I am on this.

20 My view is all of these claims should be dismissed.  If you

21 want to say, well, we want a leave to file a late claim then

22 you can file a late claim and I will decide it then under the

23 Pioneer factors the Supreme Court set forth for excusable

24 neglect because you had the time to do your investigation,

25 you had the time to request 2004 discovery to find out

1  whether you actually had claims against these particular

2  debtors and you chose not to do it.

3          I see that as gamesmanship.  I see that as let's

4  put pressure on the debtors by bringing claims against every

5  single debtor in the corporate structure, including the

6  generic side and the specialty side, because that is going to

7  screw up the debtor's plan of reorganization.

8          So that is where I am on all of this.  So you are

9  going to have to convince me otherwise today.  And I don't

10 need to hear the evidence as to whether or not there is

11 claims against these debtors.  I want to know why you didn't

12 seek 2004 discovery, why you didn't seek to amend.

13         Mr. Haviland, I don't think saying you want leave

14 to amend in your response to the motion is sufficient because

15 there are specific requirements for a motion to amend that I

16 have to make rulings on and it's not in the papers.

17         Mr. Harris, what is your position?  Go ahead.

18         MR. HARRIS:  Thank you, Your Honor.  That is

19 exactly our view of things.  With your helpful guidance that

20 the issue before the court is what we said it was which is

21 whether the proofs of claim, as written, substantiate claims

22 against the non-debtor defendants and there is not a need for

23 an evidentiary hearing for that.  I don't know if the

24 claimants are implicitly conceding as they seem to be that as

25 written they do not substantiate a claim.  If so we could

1  probably just go forward to a ruling on dismissing them.

2         If they do still dispute that then I would suggest

3  we have oral argument on whether the claims, as written,

4  substantiate a claim.  I think it will be abundantly clear,

5  maybe not, that that's the issue of the parties.  No one has

6  moved to amend and so that is not before the court.

7         If and when they file we will respond, but our

8  view is we will be able to defeat that.  It is extremely

9  prejudicial for them to have laid in wait and to raise a new

10 amended proof of claim later so close to confirmation, but

11 that is not an issue Your Honor has to decide today.  As you

12 said today all that is before you is those proofs of claim as

13 written and we are happy to argue that if they are still

14 disputing that they are sufficient on their face.  If not,

15 you know, the court understands the issues.

16        THE COURT:  Mr. Haviland, you raised your hand.

17        MR. HAVILAND:  Your Honor, I'd just like some

18 guidance in terms of whether we should file a formal motion

19 on the heels of the May 21st request.  I have been practicing

20 in the Federal District Courts for 31 years and when there is

21 a motion filed, motion to dismiss under Rule 12, which is

22 what I deem the objections to (b), they cite Twombly and

23 Iqbal even though I agree the Allegheny standard applies and

24 is not the same level of pleading (indiscernible).  That is

25 how I read the cases.

1      I didn't think that we needed a formal motion when

2 we moved to dismiss with the alternative request leave to

3 amend. The debtors responded in their reply, a week ago, to

4 say leave should not be granted. I would just like to know,

5 if the court is inclined to tell us today, should we file a

6 formal motion.

7      I don't agree with Mr. Harris that we have

8 conceded that the proofs of claim that we filed in some

9 thirty branded debtor cases, Judge, and we tried to be very

10 careful and judicious about the claims we filed and we did

11 not file on all sixty-four cases. I think the court will see

12 that. We did not file, at least to my knowledge, any claim

13 against any generic company that is clearly a generic; SpecGx

14 being the obvious one.

15      We did file as to entities that were at a time

16 part of the brand business, Mallinckrodt LLC for instance,

17 Mr. Hillmer signed contracts. So we tried to be very careful

18 and deliberate about claiming on the brand side business

19 because our view, Your Honor, is when Questcor and

20 Mallinckrodt merged in August of 2014, and it was not an

21 acquisition, it was a merger 50.5 percent of the shares went

22 to Mallinckrodt shareholders, 49.5 went to Questcor; two

23 companies became one. Later this ARD subsidiary was stripped

24 of its assets and found to be insolvent internally back in

25 2018. The rest is just the maneuvers of the corporation with

1  respect to its subsidiary.  We think they are just divisions.

2  To me, Your Honor, that is just a question of

3  facts that can be decided on the papers.  Mr. Welsh certainly

4  has a lot of knowledge about the reasons why those things

5  were done for tax purposes, but doesn't have a lot of

6  knowledge about the functional aspects of it which is why we

7  asked for the witnesses we did.

8  So I am speaking at length here to find guidance

9  as to whether or not a formal motion at this point should be

10  filed today in which case we will do it so that the issue can

11  be brought to the floor and the court can rule on timing,

12  substance, any issue that goes into what was done back on

13  February 16th, what was done in the context of the April 30th

14  objection and the May 21st response.

15  It seems to me that the parties are coalescing

16  around an approach that the documents are the documents.

17  That is why I made the suggestion, and I'm glad we're

18  discussing it, because we can probably short change the

19  hearing at length by not having to ask Mr. Welsh a number of

20  things he doesn't know about documents he hasn't seen.  Then

21  the court can rule on the papers in terms of the proffer.

22  Given where we are I can't leave the fact that

23  we've made a request for leave to amend two months ago and if

24  it's a formal motion that's required, even though there's

25  been a response, then we will file that so that the court can

1  clearly see that that is set for a hearing date and we can

2  decide that because we will certainly put more information in

3  the motion to give the court context based on discussion

4  about the timing and all the material we received in the wake

5  of the court's ruling on a motion to compel.

6         THE COURT:  Mr. McCallen, do you have a response?

7     (No verbal response)

8         THE COURT:  You're muted, Mr. McCallen.

9         MR. MCCALLEN:  Sorry about that, Your Honor.  I do

10 have a couple points.  Your Honor, thank you for the guidance

11 at the outset of the hearing. I do always think it's

12 instructive and helpful to understand where the court is

13 viewing issues at an early stage of the case.

14        I do want to make a couple points because having

15 heard what Your Honor said I want to let you know why we are

16 where we are from our perspective so you understand.  I hope

17 that we are here in good faith.

18        The -- this goes to the point that we, sort of,

19 laid in wait to see what would happen.  Your Honor, we tried

20 extensively during these cases and on many occasions to get

21 information from the debtors informally.  That did not -- we

22 do not always get what we wanted when we wanted it.  In fact,

23 we did not get the level of information we thought we needed.

24 We also -- as you know, the UCC was pursuing a Rule 2004

25 request.  We joined in that request and, you know, in

1   retrospect, Your Honor, in light of what Your Honor has said
2   today perhaps we should have been more aggressive in bringing
3   to the court what we felt was informational stonewalling by
4   the debtors.

5          Having heard what Your Honor said today I think
6   that that is something we would have done if we would have
7   known then the way Your Honor was going to view this issue
8   now.  You know, the reality is that we largely learned about
9   these entities upon the filing of bankruptcy cases.  Your
10  Honor, we really learned, for the first time, that, from my
11  perspective at least, on April 30th whenever the debtors
12  filed this objection that, really, this kind of box by box
13  level scrutiny was going to be a basis to attack our claims.

14         Your Honor has to recall, and this is in Mr.
15  Welsh's first day declaration he talks about this, the reason
16  that the company filed for bankruptcy they had an opioid
17  settlement on the generic side of the business and then they
18  had certain liabilities, Acthar related liabilities coming on
19  the brand side.  It was that that led them to file the
20  specialty brand side of the business; not just PLC and ARD,
21  they filed the entire specialty brand side of the business.

22         So from our perspective, you know, Your Honor, we
23  -- in pursuing these claims we thought, you know, I think at
24  the filing of the bankruptcy the expectation among people on
25  our side of the case was ARD and PLC, you know, these are the

1 main entities and maybe some of these other ones are, sort
2 of, related, but that is sort of where the conduct took
3 place, but, in fact, it turned out, Your Honor, that ARD and
4 PLC are a very small part of the story and other entities are
5 a larger part of the story.
6        So, you know, that is just background, Your Honor,
7 that I wanted to try to put that on the record to address
8 Your Honor's comments about how we got here and, you know,
9 the procedure around what we did and whether we brought our
10 plans in good faith.
11        In terms of next steps, Your Honor, I actually
12 think it might -- I know the last thing we want to do is
13 start with another break, but if we're going to do anything
14 other than proceed the way that I think we all envision,
15 which is opening statements, short opening statements
16 followed by Mr. Welsh and cross, followed by closings, I
17 would like the opportunity to confer with my colleagues.  I
18 think there has been a lot of information here that has been
19 conveyed from the court to the parties.  I think I would like
20 an opportunity to absorb that and discuss it with my clients
21 if that is possible.
22        THE COURT:  Alright, let me hear from Mr. Harris
23 first.
24        MR. HARRIS:  Thank you, Your Honor.  Again, our
25 view is there is not a need for an evidentiary hearing at

1  this point.  The issue is what do the proofs of claim say and
2  assuming the facts are true did they substantiate a claim
3  against each debtor against whom it was filed.  That can be
4  determined on the basis of pleadings, the proofs of claim,
5  and the law which is in the briefs.  We're happy to go to
6  oral argument on that.

7          In terms of a few points that were made the ad hoc
8  group did not move (indiscernible).  What they said in a
9  motion to dismiss is that in the future they would seek leave
10 to amend at some unspecified point when unspecified discovery
11 is completed and I don't even know what that amendment would
12 be because they didn't file an amended proof of claim.  So
13 the thought that they had actually moved to amend in some
14 unspecified way at some unspecified time is just not
15 accurate.

16         In terms of Humana they have not sought leave to
17 amend and Attestor.  I actually received hundreds of
18 thousands of documents prepetition.  They received millions
19 of documents in the bankruptcy.  They saw pleadings in the
20 bankruptcy filing case in the early stages that indicated the
21 ownership of IP, the licensing structure, many things, all of
22 which would put them on notice as to what entities are
23 involved.  It had gotten the entire Acthar production, the
24 prepetition lawsuit, which is millions of pages and they have
25 all the facts currently about Acthar entities do what.  In

1  fact, they stipulated with us that they would rely on the

2  facts in their reply brief in exchange for us not pursuing

3  further discovery from them.  And despite that they chose not

4  to amend.

5          The idea that you just heard that somehow

6  respecting corporate formalities and limiting each corporate

7  entities liabilities to its own liabilities was a surprise to

8  them.  They view that that was somehow surprising to them is

9  incredible.  That is the foundation of corporate law.  It is

10 the foundation of how Chapter 11's are run.  The thought that

11 this did not occur to them until they saw our omnibus

12 objection that they would have to substantiate a claim

13 against each entity is just not credible.

14          So at this point we would propose that we go to

15 oral arguments on whether the proofs of claim as written

16 substantiate unless the court views that it does not need the

17 argument because the paper are sufficient.

18          THE COURT:  Thank you, Mr. Harris.

19          Mr. Haviland?

20          MR. HAVILAND:  Judge, one final point and it's

21 what I started with.  We do have a substantial record that we

22 supplied to the court and the parties and that is now before

23 the court.  I can't let Mr. Harris's comment about some

24 stipulation to rely upon what was in the papers go

25 unanswered.  We did not -- we, the ad hoc Acthar group, did

1   not make that agreement.  I know counsel is aware of that.

2           They had asked in exchange for agreeing not to

3   take our client's depositions, which I pointed out to the

4   court, (indiscernible) was deposed just the other day.  We

5   put our clients up.  And so we did not make any agreement

6   that we would rely upon simply the response papers because

7   there is more to it than that.  And whether the court is

8   going to go forward with an evidentiary hearing or some other

9   vehicle to get these issues properly framed and before the

10  court we're not resting on our opposition to the objections

11  without making that substantial proffer of those exhibits.

12          THE COURT:  Mr. McCallen, in your papers you

13  actually state flat out that you were going to -- after

14  discovery was completed you were going to make a

15  determination and work with the debtors to see whether you

16  could dismiss the claims against the generic brand debtors.

17  Have you made that determination?

18          MR. MCCALLEN:  I think what our -- we have not

19  yet, Your Honor.  The short answer is we have not.  To the

20  point that Mr. Murtagh was making earlier there has been no

21  further discovery on this motion after the deposition of Mr.

22  Welsh.

23          We have documents from the debtors that represent

24  which those entities are and we would, you know, like the

25  opportunity, as we anticipated doing during discovery, is

1  taking further discovery, confirming the fact that the

2  generic side is the generic side, the debtors -- the

3  specialty brand side is the specialty brand side.  Then we're

4  going to dismiss those generic claims.

5          We have no -- we have been very clear about that.

6  The debtors have also, you know, not reached out to us to

7  say, well, let's talk about how we can do this.  So, Your

8  Honor, we haven't had that conversation with them.  I do

9  think we would want some more confirmatory discovery, but it

10 is our intention to do that, Your Honor.

11         THE COURT:  You see that's another problem because

12 you have had months do that and I don't understand why you

13 haven't.  The only reason I could think of as to why you

14 wouldn't is for hold up factor because you're holding up the

15 debtor's proposed plan of reorganization by maintaining

16 claims against the generic side without any basis for knowing

17 whether you -- you've had months to take discovery on that

18 issue.  I am just really frustrated with where this process

19 stands.

20         Mr. McCallen, I am going to give you the

21 opportunity to take a break.  I am not going to hear any

22 evidence today.  I don't think I need to.  I will hear brief

23 arguments as to why, as written, these proofs of claims

24 should not be dismissed or whether or not I should grant

25 leave or grant leave to seek leave to amend because I'm not

1  going to grant leave to amend based on the record I have

2  before me.  We will take it from there.  That is what I want

3  to hear about when we come back.

4          So let's take -- let's recess until -- how much

5  time do you think you will need, Mr. McCallen?

6          MR. MCCALLEN:  Ten minutes should be fine, Your

7  Honor.

8          THE COURT:  Alright, well let's take a little bit

9  longer.  Let's recess until eleven o'clock.

10          MR. MCCALLEN:  Thank you, Your Honor.

11      (Recess taken at 10:35 a.m.)

12      (Proceedings resumed at 11:05 a.m.)

13          THE COURT:  Alright, we are back in the record.

14  Mr. McCallen, did you have an opportunity to discuss the

15  issues and do you have anything to add?

16          MR. MCCALLEN:  No, Your Honor.  I think in light

17  of the court's guidance we would proceed directly to

18  argument.  I don't think there's anything further that we

19  need to discuss at this point.

20          THE COURT:  Alright, so the argument that I want

21  to hear is do these proofs of claim, as drafted, allege facts

22  sufficient to establish a claim against the debtors against

23  whom those proofs of claim were filed.  If they do not is the

24  proper way to proceed to dismiss those claims or is it to

25  grant leave to amend those claims?

1          So with that, Mr. Harris, you raised your hand.

2          MR. HARRIS:  Thank you, Your Honor.  I will

3 address those two points in order.  I will first talk about

4 why each challenged claim should be disallowed under the

5 first step of _Allegheny_ and then I will talk about why that

6 disallowance should be with prejudice given where we are in

7 the case today.

8          So I don't believe this first question is

9 difficult.  Under _Allegheny_ which governs here, no one

10 disputes that, before there is a _prima facie_ valid proof of

11 claim, so in order to assert a _prima facie_ valid proof of

12 claim the claimants have to satisfy the first step of

13 _Allegheny_ which is,

14          "The claimant must allege facts sufficient to

15 support the claim."

16          That is the standard and that also means that the

17 factual allegations in the proof of claim there must be

18 allegations of specific wrongful conduct attributable to the

19 debtor in question and we cited several cases applying that

20 standard to disallow claims.  It was the _In Re Tribune_ case,

21 the _Hilton v. Hongisto_ case as examples.

22          So just attaching a prepetition complaint to a

23 proof of claim, if the complaint doesn't allege any facts

24 about that debtor does not satisfy the standard.  There is no

25 magic to the words of calling something a complaint.  The

1  complaint actually has to say something about the debtor

2  against whom the claim is filed.

3       The main case that the claimants rely on, <u>F-</u>

4  <u>Squared</u> just confirms that. I am going to quote it,

5       "Multiple courts and commentators also require

6  that a proof of claim allege facts sufficient to support the

7  claim. A reviewing court will assume the allegations are

8  true and ask whether the facts established are the necessary

9  elements of a claim."

10      That's <u>F-Squared</u>, that is what <u>Allegheny</u> says. So

11  you look at what are the facts alleged in the proof of claim.

12      Here, the challenge proofs of claim, including all

13  the facts in the complaints appended thereto, fail that

14  threshold. So the issue isn't assertion of facts. It's not

15  about whether they documented or proved those facts. For

16  today we're assuming they have.

17      So here is where we are, there are zero facts

18  asserted against each of the non-defendant debtors, no facts

19  at all. I heard -- I saw in the briefs two responses to

20  that. One is that there is a small set of proof of claims,

21  in particular those that were filed by United Healthcare and

22  Optum RX, claims that Attestor has now bought, that define

23  Mallinckrodt to include every debtor, but that is just

24  impermissible group pleading. It doesn't satisfy the

25  obligation to allege facts about the specific against whom

1 the claim was filed.

2        We cited several cases to that effect in our brief

3 including In Re Frohoff [phonetic], <u>In Re Conex Holdings</u>, and

4 <u>In Re PennySaver</u>.  Notably, the claimants don't cite any case

5 saying that it's sufficient to make a group pleading against

6 60 defendants together because there are no such cases.  It

7 also violates the requirement that a proof of claim must

8 clearly identify the debtor and make a demand specifically

9 against that debtor.  That is the (indiscernible) case we

10 cite.

11        So clearly those couple of proofs of claim that

12 just lump 60 debtors together and make statements about

13 Mallinckrodt's generics they are not sufficient.  The only

14 other defense to the wording of these proof of claims that

15 any claimant makes is that their proof of claims refer

16 "unnamed" co-conspirators. That is insufficient for at least

17 three reasons.

18        First, the reference to an unnamed co-conspirator

19 is not a reference to the non-defendant debtors and that is

20 because a corporation can't conspire with its own affiliates.

21 <u>Copperweld</u>, the case that Humana and Attestor rely on and

22 that you heard the ad hoc group mention as well, confirms

23 that.  You cannot conspire with your affiliates.

24        Second problem with this argument is that even

25 this -- even if this was supposed to be a reference, the

1  unnamed co-conspirators were supposed to be a reference to

2  the non-defendant debtors the failure to actually name them

3  is a failure to properly identify them and, thus, violates

4  the requirements that a specific debtor be individually

5  identified.  We cited the Springer case to that effect and we

6  cited others as well; Smith v. Department of Corrections New

7  Jersey, and In Re PennySaver.

8       The third problem with this argument about the

9  reference to unnamed co-conspirators is that even if the

10 proofs of claim had actually said that the particular debtor

11 was a co-conspirator that would still not be nearly enough

12 because all that is, is a legal conclusion.  That is not a

13 factual allegation.

14       We cited several cases holding that, for example,

15 Bell Atlantic v. Twombly, "A bare assertion of conspiracy

16 will not suffice."  (Indiscernible), Third Circuit case.  It

17 is, "Not enough for a complaint to simply make conclusory

18 allegations of concerted action, but be devoid of facts

19 actually reflected in a joint action."

20       The In Re (indiscernible) Group antitrust

21 litigation which hold that an antitrust complaint "Fails to

22 adequately plead the existence of a conspiracy where

23 plaintiffs never state that any or all of the defendants have

24 joined the actual conspiracy.  That case also noted that in

25 the City of Rockford case against ARD, so the actual case the

1  ad hoc group brought pre-conspiracy,

2          "Plaintiffs conspiracy claim was dismissed for

3  conclusory pleading against an unidentified co-conspirator

4  where the complaint contained scant mentions of the co-

5  conspirator in its role as a part of the dealing

6  arrangement."

7          So it is Black Letter Law that just saying someone

8  is a co-conspirator is insufficient.  So that is not a

9  defense to these proofs of claim either.  So because the

10 private Acthar plaintiffs did not meet their initial burden

11 under the first step of Allegheny their proofs of claim never

12 achieved validity, you never get to the second or third steps

13 of Allegheny and the claims should be disallowed.

14         I do want to, just to confirm that, make some

15 general points of law that support this.  These are all in

16 our brief.

17         First, the fact that the non-debtor defendants are

18 affiliates of ARD and PLC does not create liability in any

19 way.  That is Black Letter corporate and bankruptcy law.  We

20 cited several cases for that.  In Re HH Liquidation, that's a

21 Bankruptcy District of Delaware, it is axiomatic that parents

22 and subsidiary corporations are separate entities having

23 separate assets and liabilities; hence, the parent's

24 creditors have no claim for the subsidiaries assets and vice

25 versa.  We also cited In Re Regency Holdings, Southern

1  District of New York bankruptcy case,

2          "A part seeking to overcome the presumption of

3  separateness must pierce the corporate veil or prove the two

4  entities should be substantively consolidated."

5          So a corporate entity is liable only for its own

6  debts and its own (indiscernible).  To the extent that the

7  claimants here are trying to articulate theories of alter-ego

8  or veil piercing those are estate claims, they cannot be a

9  part of the proof of claim of an individual creditor against

10  an estate.  We cited several cases to that effect; Emerald,

11  In Re Buildings by Jami [phonetic], In Re Tronics.  So the

12  fact that they are affiliates is not enough.

13          Specific to the actual claims that they have

14  raised that is true as well.  If you look at antitrust law,

15  and we cited several cases to this effect, you know, Attestor

16  and Humana seem to be relying on a theory that asserting

17  claims against one member of the corporate enterprise is

18  sufficient to establish antitrust claims against the rest of

19  the corporate enterprise.  That is completely wrong. It is a

20  deep mischaracterization of the cases that Attestor actually

21  cites which instead votes the plaintiffs are required to show

22  that each defendant independently participated in an

23  enterprise scheme.

24          So if you look at the main case they rely on,

25  Copperweld, it actually rejects intercorporate liability

1 under Section 1 of the Sherman Act,

2        "If a parent and a wholly-owned subsidiary do

3 agree on a course of action there is no sudden joining of

4 economic resources that it previously served different

5 interests."

6        Courts can uniformly reject it, Attestor's

7 argument, that under Copperweld the plaintiff does not need

8 to allege the anti-competitive actions of each separate

9 corporate defendant.  We cited several cases to that effect;

10 there's the In Re Insurance Brokerage Antitrust Litigation

11 Third Circuit case,

12        "Contrary to plaintiff's suggestion it does not

13 follow through Copperweld that subsidiary entities are

14 automatically liable under Section 1 for any agreements which

15 the parent is the party."

16        We also cited (indiscernible), Tenth Circuit case

17 where the plaintiff sought to extend Copperweld to hold

18 parent and sibling entities as one reliability even when

19 there is no evidence that each were involved in the challenge

20 conduct.  The court rejected this.  So it is the law in the

21 antitrust liability.  It is that the plaintiff must allege

22 facts that each defendant independently participated in any

23 alleged antitrust scheme.

24        We cited the Lennox case for that.  All these are

25 cases that Humana cite.  The Lennox case said that Lennox was

1  still required to come forward with evidence that each

2  defendant independently participated in the enterprise scheme

3  to justify holding that defendant liable as part of the

4  enterprise.  Arandell, the Ninth Circuit case,

5         "Copperweld does not support holding a subsidiary

6  liable for the parent's independent conduct."

7         That is with any antitrust defendant plaintiffs

8  must report evidence that CES, a particular defendant,

9  engaged in competitive conduct.  Or the Insurance Brokerage

10 Antitrust case Third Circuit again where,

11        "Defendants are not plausibly alleged to have,

12 themselves, entered into unlawful agreements.  The antitrust

13 claims against these entities must fail."

14        So that is the law.  They have to allege facts

15 that each defendant engaged in anti-competitive conduct.

16 These proofs of claim allege nothing about the anti-

17 competitive conduct of each of the debtors that they are

18 filed against.  And it's not surprising because of that

19 because there are only two types of anti-competitive conduct

20 alleged; the 2013 acquisition of Synacthen and the exclusive

21 distributorship arrangement with (indiscernible).  There is

22 no allegation in the proofs of claim that any of the non-

23 defendant debtors engaged in either of those activities.  In

24 fact, both of those activities started before Mallinckrodt

25 even acquired Acthar, acquired Questcor.  So it's not

1   surprising that there are no allegations that other

2   Mallinckrodt entities were involved in these.

3           Antitrust liability, the same thing is true for

4   RICO liability.  The cases are clear you have to allege that

5   each defendant, each debtor independently engaged in a

6   racketeering activity either by conducting it or directing

7   it.  That is the reason the (indiscernible) case, the Supreme

8   Court case 1993,

9           "It is clear that Congress did not intend to

10  extent RICO liability under 1962(c) beyond those who

11  participate in the operation or management of an enterprise

12  for pattern of racketeering activity."

13          So the cases are very clear that just associating

14  or doing business with a related entity is insufficient to

15  create RICO liability.  That is the In Re Insurance Broker

16  Antitrust case again,

17          "Mere association with an enterprise does not

18  violate 1962(c)."

19          Likewise, we cited cases saying merely providing

20  goods and services that benefit the alleged RICO enterprise

21  is not liability.  That is University of Maryland v. Peat

22  Marwick case, Third Circuit, and the James Streibich

23  Revocable Trust case.  Likewise, we cited cases saying merely

24  receiving revenues that are derived from a RICO scheme is

25  also not enough for RICO liability.  That is the James

1 <u>Streibich Revocable Trust</u> case again where it granted a

2 motion to dismiss where the plaintiff provided "nothing to

3 suggest that wholly-owned corporate defendants were anything

4 more than pass-through vehicles for funding."

5       Likewise, we cited the <u>Lerner v. Colman</u> case which

6 found that an alleged rule consisting of "passive reception

7 of fraudulently acquired stock and promissory notes did not

8 constitute RICO liability." We also cited cases that just

9 providing a license that someone else uses in racketeering

10 activity is not enough. That is the <u>Goran</u> case. Then we

11 cited cases that provided financing is not enough, that is

12 the (indiscernible) case, "Passive financing arrangements are

13 insufficient to give rise to liability."

14       And the same thing is true for unjust enrichment.

15 I make just two points about that. First off is the extent

16 that there is any unjust enrichment claim that is cognizable

17 in the proofs of claim, it is a disguised alter-ego veil

18 piercing claim that somehow value has flowed up to, I guess,

19 all debtors somehow and, therefore, the claimant should be

20 able to access that value wherever it went. That is just a

21 disguised veil piercing claim attempting to disregard

22 corporate formalities.

23       We cited several cases saying that unjust

24 enrichment cannot be used to nullify corporate separateness

25 without satisfying the elements of alter-ego and veil

1 piercing. That includes the QVC case which is a Third

2 Circuit 2016 case. We also cited In Re Citizens and Bank of

3 New York Mellon. And because they are really just alter-ego

4 and veil piercing claims claimants cannot put them in their

5 proof of claim. They are not a valid claim against these

6 entities.

7          The second problem with these is that even if they

8 had standing to bring them an unjust enrichment claim also

9 requires conduct by the actual debtor. Even if it doesn't

10 require wrongful conduct it does require that the defendant,

11 itself, engaged in conduct and that that conduct had a direct

12 relationship with the plaintiff's loss. We cited the Shubert

13 (indiscernible) case, New York Superior Court 2020,

14          "There must be a causal connection between the

15 plaintiff's claimed loss and defendant's actions."

16          We also cited Betty v. BMW, (indiscernible), and

17 the Kagan [phonetic] case. So unjust enrichment as well

18 requires an allegation of conduct by the defendant and that

19 that conduct directly caused the plaintiff's loss. Here

20 there are no facts alleged as to any conduct by the non-

21 defendant debtors.

22          So where does that leave us? Clearly on their

23 face these claims do not substantiate a claim against the

24 non-defendant debtors. They should be disallowed. So the

25 real issue is whether that disallowance should be with

1  prejudice.  We argue it should because there is no excusable

2  neglect here for the failure to properly file proofs of claim

3  or, at least, amend them by now.  It would be highly

4  prejudicial to allow an amendment now so close to

5  confirmation, so disruptive to do that now.

6           So the courts apply an equitable test focusing on

7  prejudice, delay and bad faith to determine whether to permit

8  a proposed amendment after the bar date.  So we cited In Re

9  Exide and In Re Brown.  Prejudice is the most heavily

10  weighted factor of this.  Here there is no excusable neglect

11  for failure to have filed a proof of claim or, at least,

12  amended them by now.  They certainly would be highly

13  prejudicial.

14           Let me just review the facts for the court.  Prior

15  to the bar date both sets of claimants were aware of, at

16  least the material facts in the case that other -- that other

17  entities had some role if they wanted to substantiate those

18  claims.

19           In terms of the Acthar claimants they were given

20  over one million documents in prepetition discovery, fifteen

21  depositions including many documents that described the role

22  of other Mallinckrodt entities.  They had documents and we

23  attached those documents to our brief including slides that

24  showed that MPIL was the contracting entity for Acthar

25  management, that other entities owed the IP and engaged

1  licensing agreements.  We showed there were attached
2  documents indicating that MPIL approved the strategic plan,
3  documents indicating that MPIL was involved in setting the
4  price for Acthar.  Humana received several of those documents
5  as well prepetition.

6          In addition, there were bankruptcy filings in this
7  case before the bar date.  The IP restructuring motion, which
8  is Docket No. 385, was filed in November 2020 showed the
9  Acthar ownership and licensing structure as of the bar date;
10 in particular that Mallinckrodt ARD owed the Acthar related
11 IP, that it licensed it to Lux IP S.a.r.l., sub-licensed it
12 to MPIL which then owed Lux IP S.a.r.l. licensing fees.
13 Those are the facts that I imagine they would try and amend.
14 Those are the key facts they were aware of the bar date
15 whether they paid attention to it or not.

16         Then after the bar date, but well before this
17 hearing, we provided extensive discovery to both sets of
18 claimants.  Millions of pages of documents, all the data that
19 is needed to establish the Acthar related conduct of each of
20 the non-defendant debtors and they chose not to amend.  So
21 there is not excusable neglect for failing to file a proper
22 proof of claim or, at least, amending it before this hearing.

23         It would also be highly prejudicial to allow that
24 amendment now.  It would be a hugely wasteful and inefficient
25 use of the party's resources and the court's resources.  We

1 have a hearing today.  This motion was filed three months
2 ago.  We have already extended the hearing date twice to
3 allow them to conduct discovery and incorporate those facts
4 wherever they chose to be.  It would be hugely wasteful to
5 the estate and the court to repeat this whole process later.

6 It would also be extremely prejudicial to allow
7 the claimants to amend later, to string out the claims filing
8 process after the bar date and after this hearing.  I'm sure
9 Your Honor remembers we brought this objection in April and
10 we're very clear about why we did this.  We did this in order
11 to provide clarity to the estate and the court in advance of
12 confirmations so we would know whether there were surviving
13 claims against other boxes and if so whether we had to
14 conduct an estimation hearing on those surviving claims
15 against other boxes.

16 If you recall, Humana told you that if we do have
17 to go that route it would be extremely lengthy and timely.
18 They estimate it will take four months for discovery and at
19 the end of trial.  We tried to avoid all this by fronting
20 these issues and filing this estimation motion.  It would be
21 highly prejudicial for them now, months later, to file a
22 motion to amend which, itself, will take a month to deal
23 with.  And if they're permitted to amend then we have a
24 hearing on the legal sufficiency of those amended claims
25 under Allegheny step one.  And if any are legally sufficient

1  then we have to go through an estimation process at that

2  point possibly.

3          They told repeatedly that they knew that we are

4  somehow the bottleneck, that we have not been providing

5  discovery.  They have the discovery.  They are the ones who

6  are now slowing down this process and keeping these claims

7  open apparently for leverage purposes.  They should have

8  started whenever they needed back at the beginning of the

9  bankruptcy process.

10          They should have come to court if they were

11  unhappy with the discovery that they had gotten.  We

12  repeatedly invited them to do so.  They had gotten the

13  discovery that they need.  They did not amend the claims.  It

14  is way too late and would be highly prejudicial to not just

15  the debtors, but to this entire bankruptcy process for them

16  to amend in the future.  So we believe that disallowance of

17  these claims should be with prejudice.

18          With that I will pause, unless the court

19  questions, to allow my colleagues to speak.

20          THE COURT:  Well, Mr. Harris, if I dismiss the

21  claims, does that give, is it because of the fact that they

22  failed to allege facts sufficient to show that there's a

23  claim against these debtors, is there anything that stops

24  them from then filing a motion to file a late-filed claim?

25          MR. HARRIS:  Obviously, anyone can file a motion.

```
 1  If it disallowances with prejudice, they would have to
 2  satisfy the standard for that.  I don't think even if they
 3  file a motion for a late-filed claim, they would be able to
 4  satisfy it for the reasons I just described.  I think the
 5  same standards would apply, which is was there excusable
 6  neglect, and is there prejudice to the debtors for the late
 7  filing.  So, I think that issue can be decided now in the
 8  context of determining to disallow these claims with
 9  prejudice.
10          But, of course, they could file a motion if they
11  choose to.
12          THE COURT:  Okay.  Thank you, Mr. Harris.
13          Mr. McCallen, I'll let you go first and then I'll
14  go for Mr. Haviland.
15          MR. MCCALLEN:  Okay.  Thank you, Your Honor.
16          Mr. Harris made a lot of points and I'm going to
17  try to hit them, or most of them, as many as I could make
18  note of, and I'll try to do efficiently, Your Honor.
19          Your Honor, I think Mr. Harris acknowledges in his
20  presentation that really the standard on this motion is that
21  of notice of pleading.  The case law is clear that it's not
22  even a 12(b)(6) type standard, but under for a bankruptcy
23  proof of claim, there's actually even a lower threshold.
24          I don't think they can -- and I don't think they
25  do argue that they're not on notice of the relevant conduct,
```

1  because we have a 50-page pre-petition complaint, at least on

2  behalf of Humana, we do, and that's survived two motions to

3  dismiss in terms of, does it allege valid claims under the

4  antitrust RICO and unjust enrichment and other state laws.

5          It's really a group-leading argument and Mr.

6  Harris alluded to this.  So, it's not so much is there

7  sufficient allegations of conduct, but do you have

8  allegations against the boxes for conduct in each of those

9  boxes.

10         And when it comes to that issue, Your Honor, I

11  think, obviously, the complaint that we've attached to our

12  proofs of claim, it was filed pre-petition, it was before we

13  knew what we know now, so there was just literally impossible

14  for those documents to contain the allegations of the facts

15  that are put in our objection.

16         But, again, when you come back to the idea of

17  notice, there's really no argument the debtors can make from

18  a pleading perspective, hey, we don't have notice of what you

19  guys think happened.  All of the facts that we have were

20  obtained from them via discovery.

21         They know the corporate structure.  They know the

22  divisions, and that gives them argument.  Then they made them

23  in their pleading, you know, they made evidentiary arguments

24  and they made other arguments about what that means, and we

25  didn't get to those today, but from a first step of Allegheny

1   or even, frankly, a 12(b)(6) standard, and I think the debtor

2   unfairly mix them up at times, but under either circumstance,

3   the purpose of that is to give the defendant, or here the

4   debtors, fair notice of the allegations.

5          And I think when it comes to that, they might have

6   arguments down the road that we can't prove-up those claims,

7   and, again, then maybe there's certain boxes those claims

8   shouldn't be against, but in terms of a notice standard, I

9   don't think they can really make that claim.

10         And they cited, Mr. Harris cited the F-Squared

11  case, that's  F-Squared Investment Management; that's a case

12  from this Court.  And what the Court said there, I think is

13  important.  The Court said that it's a relatively low

14  threshold that is less burdensome in the federal, civil

15  pleading standard, when talking about standard under proofs

16  of claim, and, again, re-emphasized the fact that as long as

17  a proof of claim provides fair notice and the Court can glean

18  an actionable claim from the complaint, then it should

19  entertain the parties' case.

20         THE COURT:  Well, if the actionable claim in the

21  complaint is against debtors A and B, how does that give

22  notice to debtors C, D, E, F, G, H, I, J, K that there's a

23  claim against them?  How does it give the Court the

24  opportunity to know that there are claims against those other

25  debtors?

1       MR. MCCALLEN:  So, Your Honor, I think, and this

2   comes back -- this goes to the other point that I think Mr.

3   Harris was speaking to, which is that the case law

4   construing, particularly on the antitrust side, claims

5   against multiple entities within a single enterprise, and

6   this was the Copperweld case which he alluded to, and then

7   the progeny, I think various circuit courts have now

8   interpreted Copperweld.

9       THE COURT:  Well, then, why didn't Humana, pre-

10  petition, sue all of them?  If it's that easy, if it's easy

11  to say if you're in the corporate structure, we can sue you

12  for antitrust liability, why didn't you sue them pre-

13  petition?

14      MR. MCCALLEN:  Well, two things, Your Honor.

15  First, we didn't know about them.

16      THE COURT:  Well, it's a publicly traded company.

17  You could certainly look at their SEC filings and know who

18  was in the corporate structure.

19      MR. MCCALLEN:  In this situation, Your Honor, the

20  level of detail we have here and the additional entities, we

21  did not know that.  And, actually, Your Honor, I respectfully

22  disagree, the information we presented to the Court, via our

23  objection, that we obtained through discovery in this case

24  about, you know, the division between holding the IP in a

25  box, that being licensed to different boxes, which are the

1 | ones who make the decisions about marketing, sales,
2 | distribution, and, then, you know, funneling that down to ARD
3 | and various other facts that we talked about in our
4 | objection, that was not public information.
5 | THE COURT: Well, here's the --
6 | MR. MCCALLEN: And I don't think the debtors ever
7 | claimed that it was.
8 | THE COURT: Well, here's the problem. It's not
9 | included in the proof of claim that's before me. You
10 | included it in your objection, but it's not in your proof of
11 | claim and you didn't move to amend the proof of claim.
12 | MR. MCCALLEN: Understood, Your Honor.
13 | And I can address the amendment point now or I can
14 | finish out on the pleading argument and then move on to that
15 | point.
16 | THE COURT: Go ahead. I don't want to interrupt
17 | your flow.
18 | MR. MCCALLEN: Sure. Thank you, Your Honor.
19 | So, coming back, I was talking about Copperweld.
20 | So, let's talk about what Copperweld says. In that case, the
21 | Court held that a parent and its subsidiary cannot be co-
22 | conspirators for purposes of establishing conspiracy under
23 | Section 1 of the Sherman Act.
24 | I think me and Mr. Harris agree about that. I
25 | don't think we disagree about the holding of it. And the

Court explained that the reason for this is that the parent

and its related subsidiaries share the same corporate

consciousness and have a unit of interest, and as a result,

the Court said -- and I'll just use one quote -- the Court

said:

"The coordinated activity of a parent and fully

owned subsidiary must be viewed as that of a single

enterprise."

And what courts that have interpreted Copperweld

have said is that the reasoning of Copperweld permit pursuit

of antitrust claims, based on the coordinated conduct of

multiple entities, functioning as a single enterprise and

that in some circumstances, proof about each entity's

separate (indiscernible) is not necessarily relevant.

And what I want to say, Your Honor, is that Mr.

Harris, I believe, mischaracterizes our argument.  They say

that we miscite these cases, but I think they miscite us,

because we're not saying, and we've never said that an entity

can be held liable solely by virtue of their corporate

affiliation with other debtor entities.  That's not our

argument.  It's never been our argument.

And all of the cases, and the pieces of Copperweld

and Lennox (phonetic), and Arandell (phonetic) and the other

cases that Mr. Harris and his attempted pointed you to in

their brief and (indiscernible) argument, that's what they're

1  all saying.  They're all making that point, that, hey, just

2  by (indiscernible) of being a sister corporation, that's not

3  enough.

4        And our point is, we're not saying that's all

5  there is.  We think at the end of the day there is a set of

6  core entities, and, Your Honor, I think, you know, this is

7  maybe a good time to tell you how I sort of think that the

8  discovery that we've obtained from the debtors and how the

9  corporate structure works, I almost think of it as a set of

10 three concentric circles.  You have the inner-most core of

11 entities that we now know about who are integrally involved

12 in the manufacture or the creation of intellectual property

13 through research and development, manufacture, based upon

14 that research and development, then distribution and sale of

15 that product.  And that's about 10 or so entities that fit

16 within that core group of entities that are involved in that

17 concept.

18        And then, thereafter, you have another set of

19 entities, what I like to think of as sort of a second

20 concentric circle, which are entities that benefited from

21 that or we believe may have benefited from that, because the

22 discovery from that is still ongoing.  The debtors are

23 producing documents to us, no doubt, and we're reviewing them

24 as quickly as we can -- there's been a lot of production --

25 and we are setting depositions to comply with.  We haven't

1   had any additional depositions yet. We've set them to comply

2   with the Court's scheduling order for plan confirmation, but

3   we've been planning to take those depositions in early

4   August.

5         But we know that a lot of entities benefited from

6   the proceeds of Acthar, which is, by far, the debtors' most

7   profitable and the largest revenue generator for the debtors.

8   You know, when you actually look at the first day

9   declaration, I think in 2019, the year before the bankruptcy

10   petition, Acthar earned for the debtors something just shy of

11   a billion dollars. And when you look at the entire

12   enterprise, Specialty Brands and Generics, their revenue was

13   about $3.1 billion. So, Acthar is a third of this business

14   and it's the reason that they've said that they ultimately

15   put this entire Specialty Brands business into bankruptcy.

16         And so, this Acthar revenue, once it got taken in

17   through ARD and distributed up the corporate chain, it was

18   used, we believe, for a variety of corporate purposes. It

19   was used to pay down debt. It was used for purposes

20   unrelated to Acthar, and purposes related to Acthar,

21   distributed throughout that very complicated corporate

22   structure.

23         And, you know, beyond that, Your Honor, I think

24   the third circle of entities are the rest of the Specialty

25   Brands, because like I said, we don't have any intention of

1  going after the Generics entities.  It would be the remainder

2  of the Specialty Brands entities.

3          And it may turn out, Your Honor, that the some or

4  all of those Specialty Brands entities, at least with respect

5  to our direct claims, putting aside substantive consolidation

6  for a minute, that some of those should be dismissed.  But

7  when I come back to that, Your Honor, that is a level of

8  detail and level of interconnectedness among entities that no

9  SEC filings pre-petition anywhere near to describing.  And

10 that's what we've been untangling as part of the discovery

11 process.

12          THE COURT:  Well, what you just described to me,

13 Mr. McCallen, the transfer of funds amongst the various

14 debtor entities, that sounds like a fraudulent conveyance

15 claim, which does not belong to you; it belongings to the

16 estate.

17          MR. MCCALLEN:  So, let me address, that Your

18 Honor, because that's one of the points that the debtors made

19 and Mr. Harris made in his presentation just now.  And I want

20 to say a couple of things.

21          First, we are not pursuing alter-ego claims.  They

22 keep trying to say that.  And every time we look at any

23 entity, they say that's alter-ego.  That's veil-piercing.

24 That's not what we're saying.

25          The same conduct can give rise to multiple

1   different claims at the same time.  There could be conduct

2   about moving (indiscernible) that's between the debtor

3   entities that gives rise to veil-piercing or fraudulent

4   transfer claims, true.  But that same conduct can also give

5   rise to other causes of action; for instance, an unjust

6   enrichment claim.  That's a direct claim we would have

7   against that entity and that's an equitable claim under state

8   law designed to allow parties to get proceeds that were

9   improperly, or without a valid basis, distributed to other

10  entities.

11          Now, what Mr. Harris says in response to that is,

12  but there's got to be some level of culpable conduct at that

13  entity, and I have a couple of responses to that.  One, and

14  it's kind of difficult, Your Honor, because we're talking, I

15  think, literally, about dozens of entities, but number one, a

16  lot of those entities, I believe are run by the same

17  individuals that are making decisions about the transfers

18  themselves and are involved in the entity that we would view

19  as concentric circle number one.  There's incredible overlap

20  here among decision-making among the debtors.

21          Number two, a lot of the entities that Mr. Harris

22  is going to point out is he's going to say, that's a passive

23  entity.  It doesn't do anything.  It's just a boxed asset.

24  There's no employees.  There's no business operations there.

25          And for that, Your Honor, I would say that is a

1  really problematic position for the debtors to take and if

2  the Court were to ultimately adopt it, because what the

3  debtors have done, and, Your Honor, at some point, we

4  ultimately hear the evidence on, this we'll get into this in

5  much more detail, but I think it's important that Your Honor

6  understand.

7          The two entities that they are saying we can have

8  claims against, ARD and PLC, have very little value relative

9  to the overall value that Acthar provided to the debtors'

10 business.  According to their liquidation analysis, they say

11 that most of the value related to Acthar resides in an entity

12 or at least pre-petition it resided in an entity called

13 Mallinckrodt ARD IP, and that's the entity that holds their

14 intellectual property.

15         And intellectual property consists -- it's not a

16 patent-protected drug at this point, so the supposedly

17 valuable intellectual property consists of research and

18 development about potential use for Acthar, how to make

19 Acthar, things like that.  That is a passive entity that has

20 no business praising.  It has no employees.  It does nothing,

21 other than hold the Acthar IP.

22         And the position that the debtors are taking that,

23 hey, you need to have actionable conduct at every entity, if

24 that were true in this situation, not only this debtor, but

25 every debtor.  This would be a roadmap for every corporation

1   in America, put your assets in a passive entity that cannot

2   engage in any conduct, because it doesn't have any employees.

3   It doesn't have business operations, other than holding the

4   things that you care most about, and you can't touch it in a

5   litigation.

6          You can't touch it in a bankruptcy, certainly, but

7   you couldn't touch it in a litigation, according to them,

8   either, because if there had been no bankruptcy and we took

9   discovery and did all this in California Federal Court, they

10  would say, we can't (indiscernible) claims against the entity

11  that holds the IP, for instance, because it's just a passive

12  entity and it didn't do anything.

13         THE COURT:  Well, two observations, Mr. McCallen.

14  One, you quoted to me the Copperweld case, and the quote you

15  gave me was that you have to show coordinated activity

16  between the entities.  So, there has to be some activity,

17  even under Copperweld.

18         Your proofs of claim don't allege any activity by

19  any of these debtors that you've asserted these proofs of

20  claim against, beyond the entity that you sued pre-petition,

21  and, again, you're describing to me fraudulent transfer.

22         If the debtor set this up so they could funnel the

23  money into a passive entity for purposes of protecting it,

24  perhaps there are claims against them for fraudulent

25  transfer, but, again, that is not your claim; that belongs to

1   the estate.

2           MR. MCCALLEN:  So, thank you, Your Honor.  I have

3   a couple of responses.  I think it may be fraudulent

4   transfer.  I also believe for the reasons I've stated, it

5   would also be a claim for unjust enrichment.  And also, under

6   Copperweld, I think they would be included within a

7   coordinated enterprise.

8           Because, remember, Your Honor, the structure that

9   was put together was put together solely for tax reasons for

10  the debtors, and the debtors make a lot of that.  They say

11  that we're suggesting that the structure, itself, was done

12  some nefarious reasons.  That hasn't been our argument now.

13  I mean, obviously, it is later on.  We found out through

14  discovery that it was done to protect assets in a certain

15  way, then maybe our view on that would be change.

16          So, we're not criticizing them for setting up

17  their business in a tax-efficient way, but what we're saying

18  is that when those decisions come down from the top, or at

19  least from the same place, wherever it's coming from in the

20  debtors' organization, because it's the same individuals who

21  are making these decisions -- it's employees of, you know, ST

22  Shared Services that do the work on the tax side for the

23  debtors -- you can't use this structure, which was done for

24  these tax-efficiency purposes, as a basis to when you get

25  into bankruptcy, to shield recovery from creditors.

1    And, Your Honor, it's not all creditor; it's just

2  certain creditors, and this is a really important point,

3  which when I talk about the leave to amend point, I'll hit on

4  it again, but I want to make it now.  It's really important

5  that Your Honor understand, this effectively, the dispute

6  that's between -- Your Honor, this is between -- this is an

7  intercreditor dispute.

8    When these cases were filed, when the bankruptcy

9  cases were filed, they came in with a deal with the opioid

10  plaintiffs and certain other RSA parties, including the

11  bondholders, and then eventually there's going to be a

12  settlement with the government.

13    We've been very clear, and I want to be clear

14  about it, again, Your Honor, we are not challenging the

15  opioid settlement, and certainly by having our proofs of

16  claim filed against the Generics entity, we were not in any

17  way, Your Honor, and this is really true, we were not in any

18  way attempting to gum up the works on the Generics side of

19  the business for their bankruptcy.

20    But, Your Honor, what we are fighting about at

21  this point is the value that's left over and who's going to

22  get it, because under the debtors' proposed plan, you pay the

23  opioid settlement, you pay the Government, and you have a

24  very limited amount left over on the Specialty Brands side,

25  and so you've got to split it up amongst the unsecured

1  creditors.  And the debtors have proposed a plan that gives
2  us claims only at two boxes, whereas the bondholders have
3  claims everywhere.

4       So, really, this is, effectively, an intercreditor
5  dispute between us and the other Acthar Plaintiffs and the
6  bondholders, about who, on the unsecured side on the
7  Specialty Brands, gets what's left over after you pay the
8  opioid settlement and after you pay the Government.  That's
9  what this is really about.

10       But let me come back, Your Honor, because I just
11  want to make sure I hit any other points that I had.  I think
12  I hit everything I had on the pleading standard.

13       Oh, there's one other thing I wanted to say.
14  Look, Your Honor pointed out the fact that the fact that are
15  in our objection are not in our complaint.  I'm not going to
16  fight that.  I can't.  That was filed in 2019 before we knew
17  those facts but let me talk in the context of if Your Honor
18  feels that the pleading is insufficient, whether or not we
19  should, at this point, be given, granted permission to file a
20  motion for leave to amend.

21       And I think, Your Honor, it's clear that we should
22  for a couple of reasons.  First, when looking at the
23  standards and the factors the courts will consider whenever
24  deciding to ultimate grant a motion for leave to amend -- I
25  understand Your Honor is just asking us now to argue whether

1   we should be permitted to do so, but I think looking at what
2   the ultimate standard will be is formative for the decision
3   in front of the Court now -- one factor is whether there was
4   a timely assertion of similar claims or demand evidencing
5   intention to hold the estate liable.

6   And I don't think they can reasonably contest that
7   there was a similar claim filed, such as the one we have
8   here.  Obviously, if the Court determines that it's
9   insufficient or inadequate as a pleading matter, that's
10  another thing, but I think what this factor speaks to is,
11  again, this idea of notice, and they clearly had notice of
12  our claim.

13  Another factor the courts will look at is whether
14  other creditors would receive a windfall if the Court refused
15  to allow the amendment.  And I think this goes to the point
16  that I was speaking to a few minutes ago, Your Honor, about
17  whether or not there would be a windfall.

18  In this situation, whenever you look at the
19  dynamics of the case, like I said, at this point, this isn't
20  about dipping into the pockets of any of those opioid
21  plaintiffs or the Government; this is a fight amongst
22  creditors on the unsecured side about who gets what left
23  over.  And so, in terms of prejudice to the debtors, there is
24  no prejudice, Your Honor.  This is a pot plan and so, you
25  know, we should be allowed to continue to litigate those

1  claims.

2        The reality is, and the equities of this are, and

3  I think the courts also will look at the equities when

4  deciding whether to grant leave to amend, the equities of

5  this are that Humana and the other insurers who have claims

6  in these cases are some of the largest payors into the debtor

7  structure for years.  I've talked about the fact that Acthar

8  is its biggest drug, is its most profitable drug.

9        You know, these entities have paid billions of

10  dollars of claims and if we do have valid antitrust, RICO, or

11  other state law claims, if we do, and that'll be decided

12  later -- I'm not assuming it right now -- but if Your Honor

13  assumes that we do have valid claims, then it is only fair

14  and equitable that we have an opportunity to recover against

15  the entity that holds all of the different assets that those

16  -- that our proceeds supported for all of those years as part

17  of the debtors' Specialty Brands business.

18        In terms of the question about the reason for the

19  failure to amend and whether it would be equitable at this

20  point to allow us to amend, again, I just want to remind Your

21  Honor of the timing.  I mentioned earlier -- I won't go back

22  to it -- but our pre-petition complaint.  We got the

23  discovery in this case.  We -- Mr. Harris said that we've

24  adjourned this hearing two times, he said, to allow us to

25  take more discovery.  That's right in part.  We did adjourn

1  it the first time because the debtors were producing

2  documents, a relatively limited universe of documents that

3  they said was are relevant to this motion, and so we pushed

4  it back a week to allow us an opportunity to review those

5  corporate organizational documents and to prepare to depose

6  Mr. Welch.

7  We took that deposition in mid-June, and we filed

8  our objection a week later.  That was a pretty significant

9  undertaking to pull that information together within the week

10 and put the brief together that we did, but we did that and

11 we put that before the Court.

12 Thereafter, the debtor were set to file their

13 reply brief the following week and we were going to have a

14 hearing the following week, but it was set for the same day

15 as the proof of claim hearing that was going to be -- I'm

16 sorry -- the class claim hearing for Mr. Haviland's client

17 and we weren't going to get to it all in one day.  So, we

18 agreed to extend the deadline for the debtors to file their

19 reply brief and, ultimately, we pushed even further because

20 Mr. Welch had, I believe he was out of the office last week.

21 We originally talked about doing it the 13th and we pushed it

22 to the 23rd.

23 So, this last month was extended, you know, for

24 reasons -- there was never any expectation or understanding

25 from the debtors' perspective that we were going to continue

1  to take discovery on this issue.  We have always said, and I

2  recall saying this to Your Honor here in front of you on our

3  30(b)(6) motion for quash, we've always believed you cannot

4  disentangle the issues that the debtors put forward in this

5  motion, this objection, from the broader merits of our

6  claims.  That's why we, right away, when we filed the

7  estimation motion, we sought that discovery.

8         And the debtors took the position on this motion,

9  on this objection, rather, they said, it's not relevant here.

10  The question is who actually did what, the merits of the

11  claim.  That goes, if ever, to confirmation.

12         And then whenever we got in front of Your Honor to

13  argue for discovery on estimation, again, the debtor said,

14  that's for another day.  You'll get that discovery later.

15         So, we were limited when we came in on this

16  objection to the universe of information that they said this

17  was about.  And I told Your Honor back when we were in front

18  of you on the 30(b)(6) argument, I said, they're drawing

19  artificial lines and distinctions here, because you can't

20  disentangle, you know, documents about what the different

21  corporate entities are supposed to do or don't do, and who's

22  involved on that level from questions about who is involved

23  on a more substantive level, and do our claims have merit and

24  if so, in what boxes.

25         So, Your Honor, I just want to put that on the

1   record, because I believe that goes to the issue of the

2   reasons for the failure to amend.  I appreciate Your Honor

3   understood that we were always going to move for leave to

4   amend.  We thought the purpose of the objection, Your Honor,

5   was to tee up this dispute to the Court via a contested

6   matter, which we were obviously prepared to do today.

7            You know, if Your Honor believes that the

8   complaint does not withstand the standards of the first wrung

9   of Allegheny, then we think under the circumstances, Your

10  Honor, it would be fair and would not prejudice the debtors

11  to allow us to leave to amend.  They know the facts.  They

12  know what we're going to say.  It's not like they have to do

13  anything new to prepare themselves for that case.

14           It's just a matter of them making us jump through

15  these hoops to try to prove-up the claims that, you know, we

16  have had and that they have known about for years.  And it's

17  really just a question at this point about, do we get to --

18  if we have valid claims, because one way or another, we're

19  entitled to ultimately try to prove-up our claims.  If those

20  claims are valid, do we get to go after the entities who are,

21  at the very least, involved in the Acthar-related conduct,

22  and maybe, ultimately, the entire Specialty Brands, or are we

23  stuck with ARD and PLC.

24           PLC is the parent company -- virtually no assets

25  in comparison to the overall enterprise value of the debtors,

1  and ARD, as well.  ARD is an entity that has brought in

2  billions of dollars over the years from the sale of Acthar

3  and about 95 percent of it has been removed.  And I'm not

4  saying it's a fraudulent transfer or anything like that, but

5  the reality is that what it reflects is that these entities

6  are treated as a single enterprise.  And I use that word

7  because that's what the Copperweld Court talks about, it's

8  coordinated conduct amongst those entities by the same people

9  who largely sit in either officer or director positions in

10  most of the boxes.

11        And if it turns out that this Court decides, via

12  estimation or at confirmation or whenever it occurs, that we

13  have valid claims, both the equity and the law require that

14  we should be able to go at the boxes that have that value,

15  and that's what this is really about.  Are we going to be

16  allowed to do that or is that value going to be allowed to go

17  to the other unsecured creditors of the Specialty Brands

18  business.

19        I don't have anything further, Your Honor.  If you

20  have any questions, I'm obviously happy to answer them.

21        THE COURT:  No questions.  Thank you, Mr.

22  McCallen.

23        Mr. Haviland, before I go to you, we're going to

24  take a lunch break.  So, let's recess until 12:45.

25     (Recess taken at 11:59 a.m.)

1          (Proceedings resumed at 12:45 p.m.)

2               THE COURT:  Good afternoon.  We're back on the

3   record.

4               Mr. Haviland, you may proceed.

5               MR. HAVILAND:  Thank you, Your Honor.

6               It's a little difficult to close in a hearing when

7   the record hasn't been fully discovered and presented, so I'm

8   going to try to do so succinctly, based on all that you've

9   heard.

10              At the outset, I agree with Mr. McCallen on the

11  law.  I think he adequately and appropriately explained the

12  Allegheny standard and we agree that it's not as robust as

13  Rule 12, which we faced no less than five times in the

14  underlying litigations.  But at the outset, I want to address

15  a couple of open issues.

16              Number one, the Court had asked about the issue of

17  claiming against Brands and Generics and I just want to

18  reiterate that we, the ad hoc Acthar group, and, it is

19  important, Judge, to differentiate claimants.  Too many

20  times, I think there's a one-size-fits-all with the debtors'

21  objections and they do toggle between our positions and our

22  claims in their papers, but I want to be crystal clear with

23  the Court that we make no claims against the Generics side of

24  the business.  We haven't attempted to do so.

25              To the extent the debtors may point to a claim

1  against Mallinckrodt, LLC, which is in the Brands -- the

2  Generics side hierarchy, and I'll show in a moment, that the

3  substantial evidence that we have shows that Bill Hilmer

4  (phonetic), Hugh O'Neill (phonetic), and other executives in

5  the Brands business signed documents in the name of that

6  entity for Acthar.  So, they can call it a generic today.

7  But it wasn't before, and when that changed is what discovery

8  is all about.  So, I just want to be crystal clear, we are

9  seeking to claim only against the Brands entities that are

10 involved in and responsible for Acthar.

11        Number two, we did not file prophylactic proofs of

12 claim.  We specifically demarcated those debtors whom we

13 believed were involved in Acthar.  There's no footnote in our

14 proofs of claim that say we're unsure; we were very sure

15 about who we claimed against.

16        And we, unlike most claimants -- and we haven't

17 heard from Mr. Eisenberg, who has a declaration talking about

18 45,000 unsecured claimants who have zero value -- well,

19 that's not us.  We had claims that had very clear addenda to

20 explain our position and had three attachments.  Number one,

21 the complaint, and I want to pause on that for a moment just

22 to point out to the Court that the debtor has put into

23 evidence before you, Exhibit Numbers 9, 10, 11, 12, 14, 19,

24 20, 23, 25, 26, and 27, which are the complaints of the ad

25 hoc Acthar group litigants, and almost all of the orders

1 denying Mallinckrodt's motions to dismiss, both under Federal

2 Rule 12 in three instances and the State Court Rules in

3 Pennsylvania and Tennessee.

4          And that's important.  I know Your Honor has

5 several times observed that Rule 12 isn't the end, but it is

6 at this point in terms of pleading.  We have pled claims and

7 the debtors address antitrust, RICO, and unjust enrichment,

8 but they haven't addressed consumer fraud, which is in the

9 Pennsylvania cases, both before Judge Schuller in the federal

10 court, and in the state court case now before Your Honor, the

11 542 cases before you under the Pennsylvania UTPCPL.  They

12 haven't addressed that at all, nor have they addressed fraud

13 or conspiracy, causes of action which have survived their

14 motions.  So, they haven't attempted to demarcate their

15 position among the various claimants.

16          And then, finally, Your Honor made a comment about

17 bad faith and lack of support.  If that was directed at us, I

18 respect the Court's observation, but we can't agree that what

19 we've attempted to do by providing that support was done in

20 bad faith.  We, unlike, anyone, gave a damage model and a

21 quantification, based on actual purchases of Acthar.  That's

22 our Exhibit B.  Actual purchases.  In fact, that so incensed

23 Express Scripts that they moved to suppress and put under

24 seal all of our claims, and they currently are all sealed.

25 No one can see them, except the Court and the debtors.

1          And then the third thing we did to substantiate,

2  and this is about substance, substantiate, we gave the

3  complaint that five judges have said it passes muster under

4  Rule 12.  Then we said this claimant, and there are over 70,

5  this claimant fits this claim because there is an ASAP form,

6  Acthar support and access program form.  Now, if you read any

7  of our complaints, we allege that beginning in 2007, that's

8  how this company changed the world.  That's how they created

9  a distribution model, a marketing and sales paradigm that

10 allowed them to take the price from $40 to nearly $50,000,

11 the ASAP form.

12         And by showing the Court through our claims that

13 every single claimant had a beneficiary with one of those

14 forms, we took that claimant and put them within the

15 complaint.  Now, that's the overarching approach.

16         I want to get to the issues that the Court raised

17 about these other entities and I want to walk through it a

18 little differently.  I won't repeat the Allegheny standards.

19         I will point out that those Rule 12, the PO

20 rulings and the Tennessee ruling demonstrate that we

21 satisfied Twombly and Iqbal and that we did not group-plead.

22 And why that's important is because Mallinckrodt never made

23 that argument, even though we sued the PLC and ARD.  They

24 never made that argument; Express Scripts did, and it was

25 rejected because, and counsel pointed out we've amended our

1  complaints because at times when the Court said, we want you

2  to differentiate your cause of action as between these

3  various entities, we didn't and as to the five Express

4  Scripts entities, we survived that.

5         We argued the single-entity doctrine of the

6  antitrust.  Mallinckrodt did not.  And we submit, Judge, the

7  law of the case which comes up to the claim is that they

8  don't get a do-over.  They don't get to now say, we're not a

9  single entity, but that's what they're doing, but they're

10 doing it very carefully and very cautiously because they

11 don't want to create this situation where they have these

12 disparate corporate entities that can be sued.  They want it

13 to be an enterprise, one PLC.

14        So, we take the entity as an enterprise, as one,

15 and I'll get to that in a moment.  The evidence strongly

16 supports that, overwhelmingly supports that.

17        But even if you look at it the way they want you

18 to and break up this single enterprise into these buckets

19 that, yes, they existed in a federal filing to the SEC, but

20 nowhere do they say what the record in this case has shown,

21 is they took the Acthar function and business and broke it

22 up.  Sent it to the U.K.  Sent it to Ireland.  Sent it to

23 Luxembourg.

24        Nowhere, and I'll show you why that's true, all

25 the documents are stamped highly confidential.  No one gets

1  to see them.  They don't put that business model out there.

2  They haven't cited you any evidence where it's publicly

3  available that MPL and MPIL had a collaboration agreement

4  over the Acthar business where all the decision-making was

5  done overseas.  Nowhere has that been publicly divulged.

6           It only came in the last two months.  It only came

7  through Mr. Welch who's on the camera right now, telling us

8  that's how it operated when he instituted DEMPE, D-e-m-p-e,

9  decision-making for the company, as a tax convenience, so

10 they get the benefit of Irish tax laws, the U.K. tax laws.

11 They toggle back and forth, moved functions when it

12 advantaged the corporation.

13          And I agree with Mr. McCallen, we're not saying

14 that was evil.  They can do what's in their best tax

15 interests, but don't argue to us that because you've moved

16 function over there, we can't follow the money, as Your Honor

17 pointed out, and the function -- and I'll get to that in a

18 moment.

19          But even if they are independent entities, and we

20 don't accept that, we look at the independent entities as

21 potential co-conspirators.  And there's a reason why single

22 enterprises don't argue this, because now, all of a sudden,

23 you've got a horizontal conspiracy.  You've got an entity on

24 one plane that has functions, conspiring with one another to

25 set prices to have a monopolization on a product.  Boy,

1 that's an interesting proposition the debtors want us to

2 have, that the PLC in conspiracy with the MPL and MPIL to

3 maintain the monopoly for Acthar by suppressing Synacthen, by

4 maintaining the distribution scheme.  But if that's where

5 they want to go, that's where I'm going to go.

6    We say in paragraph 212 of the Rockford complaint

7 that beginning as early as 2007, the exact date being unknown

8 not plaintiffs, and continuing thereafter until the present,

9 the defendants and other unnamed co-conspirators between and

10 among themselves, entered into an agreement and, otherwise,

11 continuing conspiracy to cause my clients to overpay for

12 Acthar.  The rest is laid out in the complaint, which five

13 courts, five, have found plead specific -- by the way, they

14 argued 9(b), not specific enough in time, place, and manner -

15 - rejected.

16    I don't think this Court can rule on what they're

17 suggesting without going into those court's opinions and

18 saying, I've looked at the pleading.  We have tested it under

19 9(b).  We tested it under group pleading.  We tested it under

20 Twombly and Iqbal and it survived.  It goes to the next level

21 of discovery, and that's important.

22    THE COURT:  Well, Mr. Haviland, the complaints

23 that you're talking about were only against PLC and ARD, so,

24 to the extent the courts in those cases found that you

25 survived the Rule 12 motion, it's only as to those two

1  entities.

2  And in Delaware, the corporate structure is

3  sacrosanct and it is observed, unless proven otherwise.  So,

4  you had an obligation to come forward in your proofs of claim

5  and allege facts that would show me and show the debtors that

6  there were claims against these other entities, other than

7  PLC and ARD.  So, let's focus on that issue.

8  MR. HAVILAND:  Certainly, Judge.

9  So, let's talk about the antitrust and let's talk

10  about the facts.  I want to start with the fact that in a

11  price-fixing case, and we have that, the United States

12  Supreme Court said in 1898 in the Joint Traffic case, as

13  reiterated in the New Jersey case, 211 U.S. 1, there's a rule

14  of reason that requires the fact-finder to decide whether

15  under all the circumstances of the case, the practice imposes

16  a restraint.

17  And I point that out, Judge, because Judge

18  Capello, who ruled on this issue, said clearly that I am not

19  going to decide whether a rule of reason applies.

20  They're asking you to essentially accept

21  everything Mr. Harris said is true.  Well, that's not the way

22  it works.

23  Everything we say is true in terms of conduct.

24  The judge did not decide whether it's per se -- by the way,

25  per se, if they fix the pricing, we get right to damages --

1  he said at <u>Rockford</u>, 360 F.Supp. 3rd 754, the Court need not

2  make this determination at this time.  They're asking you to

3  make that determination right now, what standard applies.

4          Do you take this conduct, which was described?  We

5  didn't know all the players and actors at that time.

6          And, Judge, I've got to point out an obvious

7  thing.  Mr. Welch hasn't testified, but a company like Petten

8  Holdings, and I'll show you in a moment, a contract signed

9  June 2020, didn't exist until February of 2020.  I would have

10  asked Mr. Welch this question:  Mr. Welch, how is it possible

11  that the City of Rockford can sue an entity that didn't exist

12  until three years later?

13          Well, it's not possible.  They created that

14  entity.  They moved the distribution function out of ARD to

15  Petten Holdings.  Now, how do we know about that?

16          We got the contract two months ago, not in the

17  underlying litigation where the Court ordered all contracts

18  to be produced, where Arnold & Porter reported to the Judge

19  that they had done it, repeatedly said they'd done it, and

20  they hadn't done it.  That's a contract involving Acthar

21  distribution with Petten Holdings never produced.  That's

22  Section 1.

23          Section 2, monopolization, and the judge in the

24  <u>Rockford</u> case, at 360 F.Supp. 3rd 755-56, points out that a

25  conspiracy to monopolize consists of a combination or a

1   conspiracy.  We allege there was a conspiracy and there were

2   many actors, many of which we didn't know.  We talked about

3   all the different entities with Express Scripts, but this

4   debtor never once said there are other actors.

5         They hid behind the enterprise of PLC and

6   represented repeatedly through discovery sponsor that

7   Mallinckrodt took the position.  Now, the judge, at page 747,

8   described our claims as follows:

9         "The gravamen of the Plaintiffs' antitrust claims

10  is that the defendants acted and conspired to raise prices

11  exorbitantly high as part of a vertical price-fixing scheme."

12        Let me pause there.  The price-fixing function has

13  moved.  We did not know that.  I deposed Mr. Hilmer.  He was

14  asked by the FTC one month after DEMPE decision-making was

15  put in place, who and how is the decision-making on pricing

16  done?

17        He said, Mallinckrodt.  He never said that MPL and

18  MPIL-n a collaboration agreement, decide that.  They go up to

19  the executive committee of the PLC.  That Mr. O'Neill has to

20  fly over there.  He never said that.

21        Now, the Court is being asked to fault the

22  Plaintiffs for not doing our job, but what do you do when a

23  witness doesn't tell the truth?  That was the FTC.

24        Two years later, in 2020 -- three years later -- I

25  asked him the same question.  He said he testified truthfully

1   and never once under oath did he say, Mr. Haviland, I need

2   you to know something.  It's July of 2020.  We've had DEMPE

3   for a long time at this company.  MPL and MPIL are deciding

4   all these things.  ARD is insolvent.

5       We learned through the document in this case,

6   Project Easter, Project Gemini, Project Apollo, and a Project

7   Creed (phonetic), we don't even know what it's about because

8   it's all under privilege --  I'll show you the documents --

9   that they moved those functions out.  Now, they did it for

10  tax reasons, but Your Honor said we get the following

11  conduct.

12      In the last two months, we've learned more than

13  we've learned in the last four years about how this

14  enterprise operates.  They never told us that the entity that

15  we sued was insolvent.  Insolvent.  Couldn't write debt.  Had

16  its debt-writing function taken away because it all got moved

17  overseas.  And the Court is going to fault us for not asking

18  the right questions.

19      We never got to ask the senior (indiscernible),

20  Mr. Trudeau, Mr. O'Neill, Mr. Phillips, who was never

21  disclosed as a custodian, Dr. Romano, who I tried to depose

22  months ago.  They constantly, constantly run interference and

23  argue with the blinders on that it doesn't relate to this

24  issue.  They don't want to put these witnesses up because

25  it's their documents.

1       This company is only run by five to seven

2   executives, Judge.  I can name them for you right now -- I

3   just did.  They could have a hundred entities.  It's a same

4   people.

5       If you read the SOFAs, it's Brian Reasons, Ian

6   Watkins, occasionally Mr. Welch comes in as executive

7   secretary.  It's the same people, and why that matters is

8   because a part that they don't talk to you about when you

9   have Copperweld.

10      By the way, they never said Copperweld to us,

11  because that would have begged the question for the judge in

12  Rockford, all right, let's examine the PLC and the ARD and

13  whether they're conspiring with one another, parent and sub.

14  They didn't want to make that argument.

15      But here's what Copperweld actually says, and it's

16  out of Rockford in the context of ex Express Scripts arguing

17  that it should not be held liable for the acts of its

18  subsidiaries.  Copperweld holds that the single entity cannot

19  conspire with itself, either with its employees or its

20  wholly-owned subsidiaries, 467 U.S. 769-770.  I'm going to

21  read to you what the Court says, so you don't have to take my

22  word for what it says:

23      "The officers of a single firm are not separate

24  actors.  There can be little doubt that the operations of a

25  corporate enterprise organized into divisions must be judged

1  as the conduct of a single actor."

2          Now, why is that important?

3          Because Mr. O'Neill, when he was deposed over in

4  the opioid case, said I don't treat these entities as

5  distinct entities.  They're all just divisions.  They're all

6  part of the same enterprise.  And I'm going to read to you

7  what he says, and by the way, this is in the record, because

8  I finally got the deposition and we put it before the Court.

9  We didn't get his deposition, but we got the documents that

10 were produced in the opioid litigation.  It's Exhibit 157 is

11 his CV and he was asked about and he says -- I'm trying to

12 streamline, Judge, and it's taking me out of order.  I

13 apologize.  I'll paraphrase.  He says in his CV, and this is

14 -- he had just updated a month before he was deposed, that

15 there's one enterprise, there's one organization, and that

16 these other entities he was asked about, and he was asked

17 about SpecGX, the Generics company, but he was asked about

18 Mallinckrodt, LLC, the entity that wrote contracts involving

19 Acthar.  I don't see those corporate forms.  They're all

20 divisions.

21         And there's something that Mr. McCallen said that

22 I agree with, but I want to give a different flavor for.

23 This enterprise decided to create, instead of divisions and

24 departments like some entities do, Judge, they created

25 separate corporations:  holding companies, operating

1  companies, cash pools.  That's a different way to do it, but
2  the result is the same.
3        If they're operating as a single enterprise, you
4  don't get to break up your liabilities and move functions and
5  assets around, and if that's the position, then that's a
6  legal question for this Court and any reviewing Court going
7  down the road.
8        I want to go through, Your Honor, the proof, and
9  the proof being what we had and what we didn't have, because
10  that's really what is at the heart of the matter.  It goes to
11  the underlying claims as they were stated and as to our
12  request for leave to amend.  We put in the record, and,
13  Judge, I am just going to make an overall proffer that
14  defense counsel can respond to, the debtors' counsel, AHG1
15  all the way through AHG174, which consists of the debtors'
16  documents with the exception of a handful of Express Scripts
17  documents that the debtors didn't have and were pointing out
18  they didn't produce, because they're in the files.  They're
19  documents that were shared between the companies but were
20  never produced.
21        Now, Express Scripts yesterday agreed we could
22  introduce those documents under the protective order in this
23  case, as long as they remained under seal.  So, I wanted to
24  make sure that that is the proffer, that we're not asking
25  that they be put in the public record.  But I want to walk

1   through that evidence, Judge, because when you review the

2   discovery that was conducted in the underlying litigation and

3   what's attempted to be conducted here, you get to the same

4   result.

5           We only knew what we knew and couldn't know what

6   we didn't know.  And let's not lose sight of the fact, our

7   cases were stayed and we were enjoined.  We were prevented,

8   because of the freezing spell, from taking any discovery of

9   either the debtors, third parties, or importantly, Express

10  Scripts to find out how the relationship had changed.

11          THE COURT:  Well, that's not true, Mr. Haviland.

12  You had the opportunity to take 2004 discovery in connection

13  with this bankruptcy case.

14          MR. HAVILAND:  Well, Judge, it's interesting that

15  you say that, because -- and my co-counsel, local counsel,

16  Dan Astin is on -- we sought 2004 discovery and Mr. Stearn

17  said we weren't entitled to it.  He said that we had to work

18  through the UCC.  We then contacted the UCC to find out about

19  producing discovery that they had.  We just got that within

20  the last month or so.  We have attempted to take 2004

21  discovery.  We've been denied it.

22          THE COURT:  Well, you should have brought that to

23  the Court's attention.  It wasn't brought to my attention

24  that you were denied 2004 discovery.

25          And I'll point out that you did, in fact, join,

1  filed a motion to join the UCC's 2004 discovery and then

2  later withdrew it -- I don't know why -- but you withdrew

3  your 2004 discovery request to join the UCC.

4           And why you didn't get it up until now, again,

5  that's -- you know, you have an obligation to come forward

6  and notify the Court if you're not getting what you think

7  you're entitled to.

8           MR. HAVILAND:  Well, Judge, we have repeatedly

9  tried to follow your Court's admonition to write and ask for

10 an audience.  I don't think we've had an audience with you

11 till since months ago when I was called at five o'clock to

12 get on the call.  Just this week we sought to have this issue

13 of the depositions decided and then the debtors filed a five

14 o'clock motion for a protective order that got moved to

15 today.  So, we've attempted to do that, but we've been

16 unsuccessful.

17          I note that when the debtors write and ask to put

18 the Shenk motion off, it gets granted.  We don't get to

19 comment on it.  We don't get to talk about the implications

20 to the plan or our claims, but --

21          THE COURT:  Hold on right there, Mr. Haviland,

22 because I left open that motion to give you the opportunity

23 to respond.  You filed nothing in response to that, so that's

24 why I granted that motion.

25          Number two, you have never, ever, ever come to me

1   and said, we want 2004 discovery and the debtors are denying

2   it to us -- ever -- and if you had, I would have heard it.

3   So, don't put this on me, Mr. Haviland.

4           MR. HAVILAND:  I'm not putting it on you, Judge.

5   I'm pointing out that if there are tactics, it's the debtors.

6           THE COURT:  No, the tactics are yours, because

7   you're waiting until the last minute to then seek discovery

8   and then file motions to compel and that's what's screwing up

9   this process, not the debtors.  You have an obligation to

10  move the case forward, as well as the debtors do.  You have

11  an obligation to come forward if you're not getting discovery

12  and you didn't do it.

13          MR. HAVILAND:  Judge, that is just not the case,

14  okay.  We have, prior to this bankruptcy, aggressively sought

15  discovery --

16          THE COURT:  I don't care what happened before the

17  bankruptcy, Mr. Haviland.  I'm talking about what's happening

18  in this case.

19          MR. HAVILAND:  Well, context is important, Judge,

20  because we're being faulted for what we knew about and didn't

21  do before October 12th.  Let's not lose sight of the debtors'

22  position, that we should be faulted for all the little things

23  they have taken out of the record from the Rockford case,

24  which none of them say what I just said.  They didn't produce

25  any of the 2020 contracts, the collaboration agreements, any

1 | of those documents were produced, even they were squarely
2 | asked for:  all contracts, all communications.
3 |       We then asked again in this context and we're told
4 | it's overbroad.  When they represented to judges -- and not
5 | just one judge -- that they had done it.  Now, it's not these
6 | lawyers.  I noticed that Ms. Shores was on in her hoodie a
7 | little while ago.  It was Arnold & Porter.  Repeatedly
8 | reported to judges that they had done what they were supposed
9 | to do.
10 |       You know, Judge, at some point in time, that is
11 | going to have to be dealt with.  And whether -- you know, the
12 | bankruptcy can't stop a federal judge from dealing with
13 | misrepresentations in their courts and those representations
14 | were made to judge up in Rockford --
15 |       THE COURT:  Mr. Haviland, I don't want to hear any
16 | of this.  I want to hear what happened in this court.
17 | Because you have the opportunity to take 2004 discovery.  You
18 | did not do so.  You joined the UCC's, but then withdrew your
19 | joinder.  You waited until just days before this hearing to
20 | seek additional discovery and you haven't shown me any reason
21 | why that discovery would have given you -- you've told me now
22 | you have all this evidence, you have all this information
23 | that would have allowed you to amend your proofs of claim,
24 | but you didn't do it.
25 |       MR. HAVILAND:  So, Your Honor, I want to tell you

1  about --

2          THE COURT:  You lost your -- I can't hear you, Mr.

3  Haviland.

4          MR. HAVILAND:  I, inadvertently, hit my mouse,

5  Your Honor.

6          So, Your Honor made a comment to Mr. McCallen that

7  you can look at the public filings and you can see all these

8  entities.  Well, one of the first things that Judge Johnston,

9  as a magistrate, now a district judge in Rockford, ordered

10 even before the Rule 12 motions, he said, and he asked me,

11 Mr. Haviland, you know, if you had your wish list, what would

12 you like?

13         I said, Judge, I'd like the organization charts.

14 I'd like to see how this company is organized.  And we put in

15 the record, Judge, at ECF 171, that order.  That order was

16 2018.  Produce all those organization charts so we can see

17 what they're talking about today.  It was never done.

18         What was not produced, and I'm going to reel these

19 things off just so you can have the record for it, it was

20 never produced in response to that order.

21         THE COURT:  If this is pre-petition stuff, Mr.

22 Haviland, I don't want to hear it.

23         MR. HAVILAND:  No, Judge, it's Mallinckrodt

24 ACTH00000047, produced in this case.  We have marked these as

25 AHAG61, a 2016 organization chart which shows how the Acthar

1   ARD business was moved from a top-line position directly

2   reporting into the PLC, all the way down to where it exists

3   right now as a defunct entity.  That's AHAG Exhibit 61, page

4   47.  If you go to page 44, it's the 2017 chart.  If you go to

5   page 45, it's the 2018 chart.  If you go to the next page,

6   69, it's the 2019 chart.

7           We never got the chart that Mr. Welch did at the

8   first day hearing which lays out all the debtor

9   organizations, because you have to go through the

10   machinations of all these moves to see how the Acthar

11   business was moved down, subordinated, and stripped of all of

12   its assets.

13           This company merged with QuestCor.  It didn't

14   acquire QuestCor.  They created the Mallinckrodt PLC as a

15   49/50 shareholder.  We only had to sue the PLC, Judge.

16   That's all we had to do in 2017.

17           THE COURT:  Again, it doesn't matter what you did

18   before the bankruptcy, Mr. Haviland.

19           What is at issue today is whether the proofs of

20   claim that you have filed against the debtors, other than PLC

21   and ARD, state sufficient facts to establish that there is a

22   claim against those debtors, and that's what I want to focus

23   on.

24           MR. HAVILAND:  And I'm going to focus on that with

25   you, Your Honor.

1    Mallinckrodt has proffered as an exhibit, two

2  exhibits, that were marked in Mr. Welch's deposition, first

3  produced in this case --

4    THE COURT:  None of those exhibits have been

5  admitted into evidence.  I told you I wasn't having an

6  evidentiary hearing today.

7    MR. HAVILAND:  Well, Judge, I'm making a proffer

8  now and I would like to offer them to be admitted.  And

9  Exhibit 60 and 61 are the collaboration agreements signed by

10  Mallinckrodt Pharmaceuticals Ltd. and Mallinckrodt

11  Pharmaceuticals Ireland Ltd., and in that document just

12  produced in this case in the last couple of months, it

13  details how the function of Acthar, the decision-making on

14  manufacturing, distribution, pricing, marketing, and sales,

15  was moved between Ireland and the U.K.; those two entities.

16    That document was created October 1, 2016.  It was

17  never produced in the underlying litigation.  It was only

18  produced two months ago.

19    THE COURT:  So, you had it two months ago.  Why

20  didn't you amend your proofs of claim to add that to your

21  proofs of claim against these other entities?

22    MR. HAVILAND:  Because two months ago, Judge, I

23  sought leave.  May 21, I asked this Court for leave.

24    THE COURT:  No, you didn't ask for leave.  I went

25  back and looked at your -- you filed a motion to dismiss the

1  claim objection and in that, the only thing you asked for was
2  for leave to file a motion to amend later in the future and
3  you didn't do that.
4      MR. HAVILAND:  Your Honor, that's why I ask you,
5  are we going to exalt form over substance?
6      Do you want a motion on that very issue when we
7  haven't had the issue of whether or not their objections have
8  been carried?
9      You know, it's a chicken-and-egg problem in my
10 mind, and I don't really practice in the bankruptcy arena,
11 but it seems to me that when we put forward a complaint that
12 has passed muster by five courts and talks about conduct, now
13 the debtor says, well, we broke up the band, Mr. Haviland, we
14 moved all of these functions around, Mr. Haviland, catch us
15 if you can, Mr. Haviland, figure out that we created entities
16 in 2020 that you maybe should've known about even though they
17 weren't described anywhere that they were doing Acthar, but
18 you should have done something about that, even though we got
19 documents two months ago.
20     So, I say in our response, and it's a group that
21 filed it, if that's true, then we seek leave to amend to
22 bring those facts to the Court.
23     Judge, if you're inclined to say under Rule 15
24 that the door is shut today, then just shut the door.  I
25 don't think the Supreme Court or the Third Circuit says that

1 when it comes to Rule 15.  We're supposed to be getting to

2 the facts and the truth.  It seems to me we're just

3 getting -- it's a game of time and running out the clock.

4        These debtors have stonewalled us repeatedly and

5 if granted leave to file that motion, which I sought, and

6 we'll file it next week.  I'm not looking to put this off.

7 We want that hearing on September 1, 2021, Judge.  Let me say

8 that again:  we want that hearing.  But we want to get there

9 -- I know it's funny, Mr. Welch, but I don't think it's funny

10 -- we want to get there, because we want to be able to prove

11 our claims, okay.  And we don't want to get caught in these

12 traps that you've got the discovery.

13        We did not get those collaboration agreements;

14 they were withheld.  And if Your Honor doesn't want to look

15 at what the other judges ordered, that's fine; that's your

16 prerogative, I suppose, but in context of faulting us for not

17 asking the right questions at the right time, coming in, we

18 had.

19        What we also didn't know is all these projects,

20 which repeatedly talk about Acthar-function moving, and Mr.

21 Welch's deposition 13, MNK's Exhibit 62, Bates number 1558,

22 produced two months ago, Project Easter, how they moved

23 functions.  And Mr. Welch repeatedly said it was for tax

24 purposes, but the fact is it's more than that.

25        In this context, they're saying, you don't get to

1  claim against them because we did this machination.  And,

2  Judge, you should go through, and I'm proffering these

3  documents because I have them now, and today is the day,

4  Exhibit 62, Exhibit 55, Exhibit 56, Exhibit 57, Exhibit 58,

5  Exhibit 59, Exhibit 63 are all the projects produced by the

6  debtor two months ago, which it would take a team of people

7  to figure out what all of those corporate maneuvers mean.

8          We've barely scratched the surface with Mr. Welch,

9  in terms of all the different functions and move.  What's

10 clear to me as I sit back, I see the PLC, I see MIFSA

11 (phonetic), I see CV.  The two entities that financed Acthar,

12 not with anybody within Mallinckrodt, no, no, the documents

13 are clear, and they're in my proffer, the documents are

14 clear.  They gave equity and they're out of the money, and

15 they took the borrowing capacity of QuestCor and financed

16 against it.

17         QuestCor came in as a billion-dollar enterprise.

18 By the way, they paid $5.8 billion.  At the time, this

19 company was only worth two.  A two-billion-dollar company

20 buys a six-billion-dollar company.  Who had the stronger

21 position?

22         So, MIFSA and CV created that debt instrument.

23 And, by the way, that's how all the general unsecured

24 noteholders are claiming now against everybody beneath them.

25 But if you look at those document, Judge, and they're in the

1   record, I'm proffering them, the PLC did not give any

2   guaranty to those noteholders, none.  We sued the PLC.

3          So if you're going to look at these claims and we

4   can't discriminate among unsecured claimants, because we're

5   in the same position other than under the RSA they're getting

6   $375 million and 80 percent ownership of the company.  So

7   they are getting that.  We are getting some share of $100

8   million broken up among 64 different entities, most of which

9   have no revenue, no assets, no money, no function, but

10  somehow they're getting a share of that money and we're being

11  told you get a little share of ARD, an insolvent entity that

12  nobody knew about, and the PLC.  Thank you very much, let's

13  all go home because if that's the way that is going to play

14  out then I think it's time for someone else to review it

15  because that to me just shows you what is going on here,

16  Judge.  They took a company that was making a billion dollars

17  a year and they stripped it dry.

18          Now I want to point out our discovery so you can

19  have a clear record in terms of deciding whether to give us

20  leave to file a motion for leave.  We have put in the record

21  the court's orders in Rockford's at A8-AG 152, 153 and 154.

22  We have put in the record our multiple discovery requests 1,

23  2, 3 and 4, AH 149, 148, 150 and 151.  We have put into the

24  record correspondence between counsel for the City of

25  Rockford and Arnold & Porter about their discovery

1 deficiencies AH 157 and 155. We have also put into the

2 record, Judge, Mallinckrodt's custodian list in Rockford AH

3 156. You will find it interesting that people who were

4 talking about it are not on it. Mr. Phillips is not on

5 there.

6         Now Rule 26, I'm pretty sure, was amended a long,

7 long time ago where the defendant has to tell us the people

8 with knowledge. They didn't do it. In fact, we got a letter

9 on August 12th, 2019 right before Bryan Cave left AH 158

10 giving a very short list of people that did not include the

11 following important people that drive the decision making in

12 this company.

13         Kathy Schaefer, the president of virtually every

14 brand company sometimes Brian Reasons, Brian Reasons isn't on

15 there. Gary Phillips, the head of MPIL, who with Dr. Romano

16 makes all of the decision makings under the collaboration

17 agreement. Mark Tradeau, the CEO, is not on there. You know

18 who else isn't on there, Mr. Welsh the person most

19 knowledgeable in this bankruptcy; he's not on the list. It's

20 not our job to catch them, that is their 26 obligation. They

21 should have told us these people were relevant.

22         Now we got from the debtors a document that I'm

23 going to proffer, (indiscernible) 5, Welsh Exhibit 5, a

24 summary of legal entities and it purports to explain what is

25 a brand and what's a generic. The problem with that, Judge,

1   is the debtor decided what is brand and what is generic

2   without any regard to the history that I just told you about

3   that's in those documents. Mallinckrodt LLC, and I'm going to

4   go through them, clearly signed documents on behalf of this

5   entity that is the brand entity time and time, and time and

6   time again.

7          I want to point out another fact that is relevant

8   to the issues of whether or not we get to go after these

9   entities.  There's two documents you put in, the Irish

10  statutory account filings, AHG 9 and 11, and a cover at 10.

11  In those filings, Judge, the brand entities exist in one

12  location.  675 James S. McDonnell Boulevard, Hazelwood,

13  Missouri.

14         One of the factors the courts look to is do they

15  have different offices.  They have one.  That is their

16  office.  We didn't know that.  We didn't know we shouldn't be

17  looking at all these other entities.  All these now brand

18  entities that are working the Acthar business.  The point is,

19  Judge, the person that knew this the most was never deposed.

20  He was ordered in Rockford to appear.  The first time you and

21  I spoke was to quash that subpoena of Mr. O'Neill.  He has

22  yet to testify.  We deposed the people they put-up, Mr.

23  Hillmer, the executive assistant, Ms. Falconi, and Mr. Close

24  [sic], but that's it.  That is all we got.

25         Why that matters, Judge, in the record we put in

1 | the opioid litigation which these debtors are involved in,

2 | AHD 63 and the pleadings that follow 62 which frame the issue

3 | for Judge Polster about whether or not this PLC, whom we sued

4 | -- by the way, I don't want to cast aspersions on anyone, but

5 | none of the blues, the insurance claimants, sued anybody.

6 | Let me repeat that, they didn't sue anybody.  There is no

7 | complaint.

8 | So if you're going to judge claims in terms of

9 | whose where in the pecking order we sued, we litigated

10 | (indiscernible) 12, we framed the conduct that courts have

11 | agreed with.  Those blues entities they haven't explained why

12 | they have a claim.  Most of them, from what I can tell,

13 | Judge, are third-party administrators.  They don't even pay

14 | for Acthar.  They administer for my clients.  It seems to me

15 | that is a double DIP.  Humana, and I'm not going to pick on

16 | Humana, but they sued the PLC then dismissed the PLC.  We

17 | didn't.  So we have claims against the PLC and ARD.

18 | The reason why the judge, and I won't repeat the

19 | citation to the unreported case of Judge Polster, he looked

20 | at the plaintiffs' proffer and Mr. O'Neill's transcript which

21 | was under seal, but it's at 171, he testified:

22 | Question,

23 | "What's your job?"

24 | Answer,

25 | "I am in charge of the brands.  I am the executive

vice president."

Question,

"For what organization?"

Answer,

"Mallinckrodt Pharmaceuticals."

Let me pause there. There is no Mallinckrodt Pharmaceuticals. You can look at that list there is no entity called Mallinckrodt Pharmaceuticals. Every single witness we deposed curiously said they work for Mallinckrodt Pharmaceuticals.

He is then asked,

"What is the PLC?"

Answer,

"I believe that is the holding company."

Question,

"Who pays your salary?"

Answer,

"I don't know."

Then he goes onto say, when they were asked about the PLC again, the entity we sued, "You think of it as all one company, counsel," and I'm on Page 18 at Line 5, "Well, I think about it as Mallinckrodt Pharmaceutical and then the way I think about it there's subsidiaries attached to it." That is the highest ranking officer in this company testifying under oath that he thinks about it as one company.

1          What you are getting today, though is lawyers.

2   Latham & Watkins, Wachtell who were part of the original

3   merger agreement, they both represented those entities,

4   they're arguing to you now that it's different.  They're not

5   letting the executives come forward, Judge, and testifying

6   under oath what I just read to you.  Then he is asked,

7          "What do you do?"

8          Answer,

9          "The operational piece is run by myself and an

10  operating committee."

11         That is on Page 19.  That is the record.  In his

12  CV, and I pointed this out, its Exhibit 172 he says its "One

13  commercial organization."  There is a franchise.  The ARD

14  franchise.  Then he talks about in communication with

15  outsiders including investors and key stakeholders the ARD

16  "division."  He doesn't say Inc., LLC, he doesn't say it has

17  to go all the way up this hierarchy to get to MEH, to get to

18  the PLC.  He says I am the highest ranking officer, it's a

19  division.

20         By the way, separate witnesses would depose Mr.

21  Kilper who is in finance.  Mr. Welsh may know him.  His

22  deposition is now in the record at 173.  He says, again,

23         "Who do you work for?"

24         Answer,

25         "I work for Mallinckrodt."

1          Question,

2          "Which Mallinckrodt entity is your employer?"

3          Answer,

4          "I don't know.  I work for Mallinckrodt."

5          Question,

6          "Who pays your check?"

7          Answer,

8          "I don't know."

9          Question,

10         "Where does the money come from?"

11         Answer,

12         "I don't know."

13         Then he talks about,

14         "What position do other executives, Mr. Harbaugh,

15 have?"

16         Answer,

17         "You're talking about legal entities.  I don't

18 know."

19         Question,

20         "From an operational standpoint do you make

21 distinctions between the legal entities in Mallinckrodt?"

22         Answer,

23         "From an operational perspective I do not."

24         That is Page 12 of Exhibit 173.  His CV says the

25 same thing at 174.  Mallinckrodt Pharmaceuticals.  This is

 1   the evidence, Judge.  You're now being shown this chart --
 2   and I understand corporate law, we all get that in law
 3   school, but these debtors are trying to hide assets and
 4   liabilities, and shield an insolvent corporation.  Judge, if
 5   you read those projects that I read Easter [phonetic] and
 6   Gemini we only found out that ARD was insolvent as of the
 7   fall of 2018 from Mr. Welsh, insolvent.  It had no ability to
 8   write anything.  Every single function got moved out; HR,
 9   legal, finance, manufacturing, IP, research and development,
10   distribution, pricing, marketing, sales.
11          I want to turn to that right now and then I will
12   conclude.  All those functions no longer reside in ARD, none
13   of them.  We litigated the issue of the contract, the
14   exclusive distribution contract which is in the record.  Your
15   Honor has seen it a couple times, Exhibit 170; it's the 2007
16   agreement signed by then Questcor.  It was only amended 12
17   times and the last time was 2017, Exhibit 169.
18          I asked Mr. Welsh I that agreement is still
19   operative and he said yes.  Here is the problem, we didn't
20   get these documents.  There's a warehousing agreement signed
21   June 10th, 2020. It's produced in this case two months ago at
22   MK ACTH 1762.  It's in your record, Your Honor, as Exhibit
23   53.  We didn't get the transmittal from Wachtell, Exhibit 51
24   which was signed off by the MPIL organization.  There it's
25   signed by Mr. Pio [phonetic], that's Exhibit 51.

1    We didn't get the bill of sale which transferred

2    $561 million from ARD -- by the way, don't take my word from

3    it, the ARD SOFA in the record at 969, Docket 969, at 4.2

4    MPIL received $561,654,617 as an intercompany commercial

5    chain transfer.  That is why it matters.  June that happened.

6    The bill of sale produced, which is Exhibit 52, references a

7    third amended and restated distribution agreement from

8    September 2019 between MPIL and ARD.  It's a distribution

9    agreement.

10    I can't tell you how many times we asked for

11    distribution agreements because the lead document from '07 is

12    a distribution agreement, never produced.  ARD document

13    signed with MPIL never produced.  No excuse.  There is an

14    assumption agreement MPIL where the operations were turned

15    over to SD Operations, a new entity.  Judge, you don't have

16    any record in front of you, but if you look at our LEHB

17    complaint, and I put that in the record, that is the one we

18    filed for post-petition conduct, we detailed all these

19    entities and when they were formed.  And most of the ones

20    we're going after were formed after Rockford sued.

21    So Exhibit 55 is the assumption agreement, never

22    produced.  Exhibit 56 is the transmittal, never produced.

23    Exhibit 54 a distribution agreement, never produced.  As to

24    the (indiscernible) operation manager is 59, never produced.

25    Exhibit 58 SD Operations transmittal, never produced.  A

1    services agreement at Exhibit 82 -- by the way, these are all

2    in June of 2020, all signed in June of 2020.

3         Now we're to July, July 8th now all of a sudden we

4    see Petna Holdings [phonetic] signs an agreement with ARD,

5    this is Exhibit 2, and it seems to me, Judge, all the

6    functions get transferred out.  ARD says it doesn't possess

7    the knowhow to do the things it's been doing since Questcor

8    did them in '07 and now all of a sudden they're getting

9    transferred by an entity that was formed in February called

10   Petna Holdings, Exhibit 2.

11        Exhibit 94, those functions are now transferred to

12   a company called SDE Services, never existed before 2020.

13   September 8th, 2020 that happened.  September 8th, but we're

14   supposed to know that and sue SP Shared Services because of a

15   contract that was signed on September 8th.

16        I am going to just point out, Judge, that there

17   are a litany of documents that go to the issue of

18   Mallinckrodt LLC and the reason why I keep to this is if you

19   look down to what the debtors described as the brand side

20   business which goes from NIFSA, you've got CV, and then you

21   come down and you see NEH, a Nevada Corporation, which

22   historically was the entity that controlled all the US brand

23   business.  It goes to the left, to the Mallinckrodt ARD

24   Holding Company and then it goes to the right, to the

25   generics.  I'm sure Your Honor has seen the chart a number of

1  times.

2  THE COURT:  Hold on one second, Mr. Haviland.

3  I've got a technical issue here.

4  MR. HAVILAND:  No worries.

5  (Pause)

6  THE COURT:  All right.  I've lost my courtroom

7  camera, so I'm going to switch -- oh, now it's back.  Never

8  mind.  Go ahead, Mr. Hughes -- or, excuse me, Mr. Haviland.

9  MR. HAVILAND:  I see Your Honor.  I'm going to

10 finish up here.  I'm trying to point out to the Court as

11 quickly as possible how the functions are moved.  We walked

12 through distribution; we talked about the collaboration

13 agreement which deals with pricing.

14 I do want to touch upon R&D because, Your Honor,

15 when you rule denying our motion to compel, but granting

16 limited leave, you said follow the money -- and I'm going to

17 paraphrase -- but follow the function as well.  Research and

18 development, an important part of this, had been transferred

19 in 2014, shortly after the merger.  That document is revealed

20 by AHG No. 100, a document signed by MPIL and Mallinckrodt

21 ARD, Inc., the defendant in our case.

22 And I can't say it enough, Judge, if Arnold &

23 Porter were litigating with us right here, they'd say, yes,

24 we asked for it five different ways.  It's not over-broad to

25 ask for the research and development services agreement, it

1   was only produced two months ago.  That's how we know that

2   R&D got transferred.

3           Now, I did say I wanted to touch upon Mallinckrodt

4   LLC because there are a few entities when you look at those

5   projects that moved over from the brand side to the generic

6   side -- and they may be generic-oriented today, but they

7   weren't -- Mallinckrodt LLC is the one that stands out,

8   Judge, because repeatedly they signed contracts, beginning

9   with a document in 2015.  That exclusive wholesale product

10  purchase agreement that we've described was modified by Todd

11  Killian, the vice president of market access for Mallinckrodt

12  LLC, using the same address on McConnell Boulevard up in St.

13  Louis.  That's at Bates number 109.

14          Exhibit 34 is a rebate agreement signed by LLC;

15  Exhibit 35 is a distribution agreement with Caremark signed

16  by LLC; an inflation agreement signed with Express Scripts at

17  Exhibit 8, signed with LLC; Caremark again, Exhibit 36.

18          The rebate agreements, I think they say in their

19  papers that these are just isolated PBM agreements, they're

20  not.  The distribution, the sales, and the financing in terms

21  of inflation and rebates are signed by Mallinckrodt LLC.

22          And by the way, Judge, the one I'm pausing on,

23  number 49, here's what the read says at the beginning, the

24  third amendment to the rebate agreement with Caremark,

25  "Mallinckrodt LLC, the manufacturer."

1          Now, these are legal documents.  You've got -- you

2     want to respect the entity, I do.  So if the LLC says,

3     Mallinckrodt LLC on the generic side says we are the

4     manufacturer of Acthar -- and, by the way, this is signed by

5     Hugh O'Neill, SVP President, U.S. Specialty Services -- I

6     take him at his word that they're the manufacturer.

7          Price increases, that's another important

8     function.  That function got moved and the discussion begins

9     at Exhibit 20.  And then there are a series of price

10    announcements, which we point to under the exclusive

11    agreement, where they announce the prices in concert with

12    Express Scripts.  And these documents were all signed by

13    Mallinckrodt LLC, not ARD; 44, the December 2014 price

14    announcement; 73, the June 2015 price announcement.

15         And by the way, I'm glossing over, but each time

16    Acthar is going up thousands of dollars.  In 2015, it went

17    from 32,000 to 34,000.  On Exhibit 68, 2016 price increase,

18    it goes from 34 to 36,000.  Exhibit 39, it goes from 34 to

19    37,000.  All signed by Bill Hilmer, Senior Director,

20    Strategic Pricing and Contracts, Mallinckrodt LLC, not ARD.

21    And he was deposed and asked these questions.

22         I'm going to finish with a couple of other points.

23    The legal, which is a function.  We've shown you, Judge, in

24    the prior issues with Arnold & Porter, there was one

25    engagement.  And there was an issue about whether or not

Arnold & Porter represented all the different entities and I think the ruling was, well, they can represent the affiliates, but where a single entity engages one lawyer in one engagement, well, that denotes the fact that it's one single enterprise because they're going to do a conflicts check.  If they're different enterprises and Arnold & Porter represents one and some other company represents another, there may be adversity there.  But those exhibits, 164, 165, and 166 we'll maintain under seal, but that points out to us that the company is acting as a single entity.

Finance, Mr. McCallen touched upon that, but the cash management system was done through one function through these holdcos.  We put in the record Exhibit 7 and then, importantly, the agreements, the master cash agreements at Exhibit 5 from August of 2020, and Exhibit 6, it's September 2021.  The signatories of all the different entities we're talking about and their right to get cash, one person, Brian Riesen signs for all those entities to give them the right.

My point being there's only a couple of people that are running this entire company.  The Mallinckrodt Pharmaceuticals brand, undifferentiated, shows up in their balance sheet, Exhibit 21 and 22.  Their actual balance sheets, if you look at all the money coming into the organization and denotes it as Mallinckrodt Pharmaceuticals, it doesn't put it in these different buckets, these cash

1  pools, it looks at it as an enterprise, money coming into one
2  organization, and then the organization reallocates those
3  monies.

4         Finally, Your Honor, we put into the record to
5  give you direction in terms of where we would go with an
6  amended pleading.  Well, we've already done it.  We filed a
7  complaint on behalf of the Law Enforcement Health Benefits
8  Fund, it's at Exhibit 168, that lays out these entities and
9  who they are and what they do.  So the debtor has known about
10  that since May 26th, 2021.  We sought leave to amend May 21,
11  but that pleading was filed, it's now in the record before
12  you.

13         And I'm going to finish with that, Judge.  And I
14  want to loop in the committee because they filed a pleading
15  last night, it's at Docket 3316.  And we have worked by and
16  through the committee, who is the committee for the general
17  unsecured creditors, including our group, especially our
18  group, our client sits as the chair.  And as counsel now
19  knows -- we haven't had contact with her until this last week
20  -- because she has a fiduciary obligation to all creditors,
21  but the committee came out and took a position and I think
22  it's important, they said, "Since the commencement of the
23  cases" -- I'm at paragraph 1 -- "the UCC has worked
24  diligently to understand the enterprise threatening
25  litigation and how this enterprise works."

1         And the UCC's own independent analysis, quote,

2   "They cannot make sense of the debtors' assertion that the

3   private claimant, Acthar claimants' claim for liability

4   exclusively sits in ARD because the debtor entities were

5   involved in the debtors' Acthar operations."

6         This is their discovery.  They got this discovery

7   with their professionals.  That's their conclusion at

8   paragraph 3.  And they're coming out and saying they can't

9   take a position at this point because they're not done their

10  work, but you're being asked to say shut the door on any

11  amendment.  And I respectfully submit, Judge, there's only so

12  many different ways you can ask, but if it's going to require

13  a motion, we'll file it, we'll file it tonight.  But to have

14  the debtors argue that you should not allow an amendment in

15  the face of all this evidence -- and I mean all this evidence

16  -- what was not produced in the underlying litigation, what

17  was dumped upon us in the last 60 days, and we said, if

18  you're going to look to that, Judge, and rely upon that,

19  then, please, give us leave to amend.

20        And maybe it was inartful to say we'll file a

21  motion -- or we want leave to file a motion, I'm amending

22  that now to say, Judge, we want to file a motion, because

23  Your Honor should not have to rule in a vacuum simply upon

24  proofs of claim that were filed February 16 which have this

25  bona fides to them.  This company is committing antitrust

violations, RICO violations, consumer fraud, and it doesn't
seem like we're ever going to get that point. I'm not asking
you to litigate the underlying question, but you can't ignore
the fact that we have viable claims against the PLC and ARD,
and they want to shut the door as to everybody else by their
creation through some tax vehicle.

So we ask for leave to amend, Judge. Thank you.

But I want to admit these exhibits, Exhibits 1
through 174, and the Debtors' Exhibits that I've referenced,
because this is the hearing. I believe Mr. Murtagh said at
the beginning, now is the time. That's my proffer and I ask
the Court to admit them.

THE COURT: All right. You've made your proffer,
but I'm not going to admit them into evidence at this time.

Mr. Harris?

MR. HARRIS: Thank you, Your Honor.

We are not here to discuss whether there are valid
claims against ARD or PLC. We do not object to them for
today's purposes. We're here to determine whether these
proofs of claims against the non-defendant debtors are
sufficiently alleged. All these claimants chose not to
amend, that was their call. Collectively, what you heard is
one single attempt to defend the existing proofs of claim,
that is attestor saying that this is just a notice pleading
standard. That's not an answer.

1          The standard under <u>Allegheny</u> is, quote, "The

2     claimants must allege facts sufficient to support the claim."

3     There's no dispute they allege no facts as to any non-

4     defendant debtor.

5          And as to notice pleading, the proofs of claim do

6     put the debtors on notice of alleged conduct of ARD and PLC,

7     but there's no notice of alleged conduct by any non-defendant

8     debtor, there's no notice of what facts supposedly make these

9     debtors liable.  So there is -- you've heard no real defense

10    of these proofs of claim.  All this discussion is really

11    about is the plea about whether the disallowance of these

12    proofs of claim should be with prejudice or not.

13         So what did you hear to support essentially the

14    request to allow them to amend that is extremely late?  Well,

15    attestor said a bunch of things about what they believe some

16    of the non-defendant debtors did.  And I guess they did that

17    to preview what their amended proofs of claim would say in

18    order to encourage allowance of this late amendment.  But if

19    you listen to what they said, everything they said is clearly

20    insufficient.  None of the activities they mention that they

21    say these other entities did are the alleged wrongful acts

22    here.  None of them are what they claim to be the tortious

23    wrongful acts.

24         They said some debtors were involved in

25    manufacturing Acthar.  Well, there's nothing wrong with

1  manufacturing Acthar.  The second category, some defendants

2  are engaged in R&D of Acthar.  There's nothing alleged to be

3  wrongful about R&D of Acthar.  They said some are engaged in

4  distribution, but what you didn't hear is that any of these

5  entities are engaged in the only supposedly wrongful part of

6  the distribution, which is the exclusive CuraScript

7  distribution contract.  If you look at the proof of claims

8  and you look at what you heard today, that contract is only

9  with ARD.

10          So what did you really hear is that other entities

11  benefited from the proceeds of Acthar.  That is insufficient

12  as a matter of law for all of these claims.  I noted the

13  cases holding that as black letter law under antitrust law,

14  RICO, unjust enrichment.  You heard nothing in response, not

15  one case other than a discussion of Copperweld.  But what

16  Copperweld just says is that affiliates share a state of

17  mind, but you still have to allege that each affiliate

18  engaged in antitrust conduct, and that's what all the cases I

19  went through in my opening support.  There are no cases that

20  support this theory that just because revenue goes to an

21  affiliate that affiliate is directly liable for antitrust,

22  RICO, or unjust enrichment, you heard no case in response.

23          When are they going to come forward with a case

24  that supports these theories?  Well, today was the day.  They

25  filed -- they each filed two different briefs in response to

1  this -- to our objection.  There is not one case they cite to

2  support that the mere receipt of revenue by an affiliate is

3  enough for direct liability under any of their theories.

4          We have had enough delay, it is time to let these

5  issues be decided.

6          In terms of what you also heard is that there's

7  overlapping employees or that some employees view

8  Mallinckrodt as operating as one entity or as one business.

9  That's not an argument for direct liability.  I'm sure you

10 will hear that in the context of substantive consolidation or

11 veil piercing, but there's not one case that you heard that

12 supports that those facts would create direct liability under

13 any of these theories.

14         You heard Mr. Haviland mention that there have

15 been prepetition motions to dismiss, some granted, some

16 denied, but of course none of those were claims against the

17 non-defendant debtors.  No court has ever said that the

18 allegations in those complaints are sufficient to support a

19 claim against the non-defendant debtors.

20         You heard him mention consumer fraud claims.  That

21 wasn't mentioned in any of the briefs he filed and in fact he

22 admitted in response to his interrogatories -- or the City of

23 Rockford did that the City of Rockford had no contact with

24 any non-defendant debtors.  It's hard to see how that would

25 substantiate a fraud claim against those entities if they

1  never even communicated.

2  You also heard the ad hoc group a mid-level

3  employee, Mr. Bill Hilmer, as supposedly perjuring himself.

4  That is outrageous and there's no basis and it's

5  inappropriate to do live in a courtroom like that.

6  The other thing you heard was talk about shifting

7  of corporate assets.  Well, that is a fraudulent conveyance

8  claim and, if it's supported and they want to argue it, or if

9  they want to argue for veil piercing in response to

10  confirmation, you will hear it then, but it is not a direct

11  claim they can bring.

12  What is really going on?  Well, you heard the

13  truth.  They want to go against entities other than the ones

14  that they actually substantiated a claim against because the

15  entities that they did put details about those things against

16  they believe are now valuable and they're worried about value

17  having shifted out of those entities.  That is fraudulent

18  conveyance.

19  So they've had materials before the bar date that

20  would have allowed them to state facts about these entities.

21  They have the 10-Ks that list every subsidiary in Schedule

22  21, just like every 10-K does.  Our organization chart was

23  part of the first day filing.  The IP restructuring memo we

24  filed in November 2020 said who owns the Acthar IP, what

25  entities it was licensed to, and who paid and received

1  royalties.  Why was not in that in the proofs of claim they

2  filed months later?

3            You heard both sets of claimants run through all

4  the evidence that they now have, but they've had that for

5  months.  Why didn't they amend their proofs of claim?  There

6  is no excuse provided by either of them why they did not

7  amend before this hearing.  No one has explained why they

8  didn't pursue Rule 2004 discovery before the bar date, no one

9  has explained why they didn't incorporate what they knew

10  about these other entities before the bar date, and no one

11  has explained why they didn't amend the proofs of claim after

12  the bar date and before this hearing.  They have known from

13  day one that they have to substantiate their claims against

14  each debtor.  They could have amended and it is extremely

15  prejudicial to the debtors and to this restructuring for this

16  late amendment to happen now.  They would have to file a

17  motion to amend, we would have to hear it; we would then have

18  to redo this hearing with their newly amended proofs of

19  claim.  If those in fact were to survive, we would then need

20  to have an estimation process perhaps and a hearing on that.

21  All of that pushing back and prejudicing the estate, the

22  other creditors, and this Court.

23            It is too late, it is too prejudicial.  They

24  should have acted in the way in which the rules require, they

25  should have supported their proofs of claim when filed or

1  they should have amended them when they had the information

2  to do so.

3          With that, I'll pause.

4          THE COURT:  Thank you, Mr. Harris.

5          All right, I'm going to take a recess so I can

6  consider the issues.  We'll recess until 3 o'clock.  I'll

7  come back on and I'll give you my ruling at that time.

8          (Recess taken at 1:55 p.m.)

9          (Proceedings resumed at 3:03 p.m.)

10         THE COURT:  All right, this is Judge Dorsey.  We

11 are back on the record.  I'm going to give you my ruling on

12 the motion to dismiss the unsubstantiated claims.

13         Retired Judge Gross once wrote that "the bar date

14 is important to the administration of a bankruptcy case as it

15 brings certainty to the debtor's case by enabling the debtor

16 and its creditors to know the amount of claims that exist.

17 It is akin to a statute of limitations and must be followed."

18 That's In re Nortel Networks, Inc., 573 B.R. 522 (Bankr. D.

19 Del. 2017).

20         It's plain to me based upon a review of the proofs

21 of claim at issue and the objections, as well as the parties'

22 pleadings and the arguments presented today, that those

23 claims were filed with a complete disregard for whether or

24 not any claims actually existed against those debtor entities

25 and in some instances with actual knowledge that either no

1 claim existed or likely existed at all.  The strategy was

2 obviously:  file proofs of claim against as many debtors as

3 possible in a corporate structure, assert that the proofs of

4 claim constitute prima facie evidence of the validity of the

5 claims, force the debtors to object due to the destruction

6 caused to the debtors' plan of reorganization process,

7 thereby gaining leverage against the debtors, then seek

8 discovery on the claims in the hope of finding facts to

9 support them.  Those actions constitute bad faith and an

10 abuse of the claims process established by the bankruptcy

11 code and the bankruptcy rules.  Therefore, I will sustain the

12 objections to the claims and they will all be dismissed.

13          The proper procedure here, as I stated at the

14 beginning of this hearing, would have been to seek Rule 2004

15 discovery, seeking information on whether or not potential

16 claims existed against any of the debtors other than

17 Mallinckrodt PLC or Mallinckrodt ARD, claims against which

18 the debtors are not objecting, prior to the filing of the

19 proofs of claim.  For whatever reason, neither of the Acthar

20 groups chose that path.

21          The bar date order was entered on November 30,

22 2020, setting a bar date of February 16th, 2021, giving the

23 Acthar claimants 78 days to investigate whether or not they

24 had claims against any other debtor entities.  The only

25 parties that sought 2004 discovery were the UCC and the OCC.

1   The insurance claimants didn't join the UCC discovery until
2   March 16th, 2021, a month after the bar date.  The Acthar
3   group didn't join until March 3rd of 2021, again, after the
4   bar date, but later withdrew that joinder for reasons that
5   are perplexing to me.
6           The proofs of claim as filed failed to assert
7   facts sufficient to support claims against the debtors.
8   Therefore, those proofs of claim do not meet the sufficiency
9   requirements under the Third Circuit's decision in Allegheny
10  International 954 F.2d 167, 173, a 1992 decision.
11          The proofs of claim only assert claims against PLC
12  and ARD, with in some cases vague references to alleged
13  unknown co-conspirators and in other instances where they
14  outright admit that the proof of claim is being filed, quote,
15  "out of an abundance of caution," close quote, just in case
16  they do have claims that can be substantiated through
17  discovery.  Those types of allegations are not sufficient to
18  put the debtor, the Court, or the parties in interest on
19  notice of a claim.
20          I will note that, despite the failure to seek 2004
21  discovery prior to filing the claims, the debtors did engage
22  with discovery with the claimants after the objection had
23  been filed, and I made rulings on that discovery indicating
24  what was permissible and what was not permissible.
25  Interestingly enough, that was in connection with a motion

1    brought by the debtors for a protective order, not a motion
2    to compel brought by the parties -- the claimants.  Neither
3    group sought a motion to compel discovery, believing that
4    they had -- that the information that they were seeking was
5    being withheld.  They waited until the Acthar -- the ad hoc
6    group waited until just days before this hearing to seek a
7    motion to compel, which was too late.  Instead, the Acthar
8    plaintiffs simply rested on their proofs of claim as filed
9    and attempted to argue new facts in their responses to the
10   objection.

11         Those responses do not qualify as motions to amend
12   and I do not find that any of the facts alleged in the
13   responses somehow modify the proofs of claim as filed.  If
14   the claimants believed that they had uncovered facts that
15   would allow them to amend, they should have filed the
16   appropriate motion and I could have evaluated those motions
17   under the appropriate standards for amending a proof of
18   claim.

19         Now, the ad hoc group claims that they requested
20   leave to amend in their motion to dismiss, but, as I noted
21   previously, all they asked for was leave to file a motion for
22   leave to amend, not asking to amend the actual complaints --
23   or, excuse me, proofs of claim, and that would require me to
24   engage in a factual finding that simply was not before the
25   Court at this time.

1    So even if I granted a motion to leave at this

2 time, because I find that the proofs of claim as filed fail

3 to state any claim whatsoever against the debtor entities,

4 motion to leave would actually be akin to a motion to file a

5 late claim.  And as noted in the <u>Enron</u> decision of the

6 Southern District of New York, "the decision to grant or deny

7 an amendment to a timely-filed proof of claim rests with the

8 sound discretion of the bankruptcy judge."  That is <u>In re</u>

9 <u>Enron Corp.</u>, 328 B.R. 75 at 86, a 2005 decision.

10    The court went on to say it's important to make

11 sure that the amendment is not in actuality a new claim and,

12 given that no claims were asserted against the debtors in the

13 proofs of claim that I am dismissing, any amendment at this

14 point would in fact be a new claim against those debtors.

15 Because it is a new claim, it would require use of the

16 excusable neglect standard in <u>Pioneer</u>.  And, as Judge Gross

17 noted in the <u>Nortel</u> decision, "Courts take a hard line when

18 applying <u>Pioneer</u>," and particularly in emphasizing the reason

19 for the delay.

20    I'll also make a note here on the Rule 15 relation

21 back because that was raised by the ad hoc group.  Relation

22 back only applies under Rule 15 not -- does not apply, I

23 should say, to adding a party, but only to amendments to the

24 party against whom the claim is asserted.  Well, again,

25 there's no claims asserted here, so Rule 15 would be

1 inapplicable.

2  So what's the standard under _Pioneer_ for allowing

3 a late-filed claim?  You have to show excusable neglect.  And

4 the factors are you have to show danger or prejudice to the

5 estate; length of delay and impact upon judicial proceedings;

6 the reasons for the delay, including whether it was within

7 the reasonable control of the movant who acted in good faith;

8 and all of those factors have to be balanced.  And it's _Hefta_

9 _v. Official Committee of Unsecured Creditors_, _In re American_

10 _Classic Voyages Company_, 405 F.3d 127 at 133 (3d. Cir. 2005).

11  In this case, I find that allowing the filing of

12 the late-filed claims would not comply with the _Pioneer_

13 standard.  It would require an estimation hearing to

14 determine the validity of those claims, extensive discovery

15 on the merits of those claims that would take months and

16 would be followed by a days-long, if not months-long,

17 evidentiary hearing before the debtors could move forward

18 with their confirmation.  That clearly has an adverse impact

19 on these cases, particularly in light of the fact that I

20 believe the debtors have indicated to me in the past the cost

21 of this bankruptcy is about $20 million a month.

22  It's been nine months since these cases were

23 filed, eight months since the bar date notice went out,

24 almost six months since the bar date passed, with no attempt

25 to seek to amend the proofs of claim.  Allowing late-filed

1  claims now would have a significant impact on these cases.

2          The reasons for delay also do not favor allowing

3  the late-filed claims.  The movants never asked for 2004

4  discovery before the bar date, they never moved to compel

5  discovery they claimed was not forthcoming.  And, curiously,

6  Mr. Haviland went through a litany of documents that he

7  wanted to introduce into evidence that he indicated were

8  produced two months ago.  And yet, again, no motion to amend

9  was filed.

10          So it's clear to me that these proofs of claim do

11  not meet the standard for allowing an amendment, so I will

12  dismiss them with prejudice at this point.

13          All right?  With that, Mr. Merchant, do we have

14  anything else on the agenda for today?

15          MR. MERCHANT:  Thank you, Your Honor.  I believe

16  two other things.  First of all, I think the debtors and some

17  of the other parties had filed motions to leave in -- I mean

18  motions to seal in connection with the various pleadings

19  related to the unsubstantiated claim objection.  I don't

20  believe there's been any objection to any of those motions,

21  though, consistent with the local rules, the objection

22  deadlines were set for this hearing.

23          So, unless Your Honor has any concerns, you know,

24  I would propose having the parties just upload orders with

25  respect to each of those procedural motions.

1      THE COURT:  I don't have any questions or

2  concerns.  Does anyone else wish to be heard on that issue?

3      (No verbal response)

4      THE COURT:  Okay.

5      MR. MCCALLEN:  Your Honor, and --

6      THE COURT:  Oh, go ahead, Mr. McCallen.

7      MR. MCCALLEN:  I'm sorry, Your Honor.  I think

8  it's actually the issue we just covered a minute ago.  I

9  understand Your Honor's order, but just for purposes of the

10  record, can we consider that Your Honor has read the decision

11  on the record and that's so order and there won't be a final

12  written order of any sort, and we can proceed from there from

13  today's record?

14      THE COURT:  Is there any objection to just having

15  it so ordered on the record or do you want to have a written

16  order submitted under seal?  I'll open it up, if anybody has

17  a preference.

18      (No verbal response)

19      THE COURT:  All right, nobody has a preference.

20  All right, so I will just so order the record.

21      MR. MCCALLEN:  Thank you, Your Honor.

22      MR. MERCHANT:  Thank you, Your Honor.  So, getting

23  back to the motions to seal, may we proceed in the manner in

24  which I proposed?

25      THE COURT:  Yes, nobody has an objection.  I don't

1  have any problem with them, so I will -- if you want to

2  upload those orders, we'll get them entered.

3           MR. MERCHANT:  Thank you, Your Honor.

4           The one remaining matter that was on the agenda

5  for today was the debtors' preliminary objection to Humana's

6  motion for substantive consolidation of these cases.  I know

7  that there was an agreement that that would go forward today

8  and Keith Simon from Latham & Watkins will be addressing that

9  on behalf of the debtors.

10          THE COURT:  All right.  Mr. Simon?

11          MR. SIMON:  Good afternoon, Your Honor.  It's

12 Keith Simon of Latham & Watkins for the company.  Can you

13 hear me okay?

14          THE COURT:  I can.  Thank you.

15          MR. SIMON:  Great.  So, Your Honor, before we get

16 into the details of Humana's request for an August 24th

17 stand-alone sub-con hearing, I'd like to explain at a high

18 level how I see this playing out.

19          First, I'm pleased to report that we've resolved

20 our issues with the OCC.  They agree with us that there's no

21 need for a separate stand-alone sub-con hearing, and I

22 believe someone from Akin Gump will be reading some

23 statements on the record to confirm our understanding.  They

24 previewed that with us and we're on board with the concepts

25 that they're going to lay out.

1    So, Your Honor, as everyone knows, our Chapter 11

2  plan does not contemplate substantive consolidation; rather,

3  it respects the prepetition boxes and allocates value based

4  on the assets and liabilities of those separate boxes.  So we

5  have teed up the issue.  As part of our case in chief during

6  the confirmation, we will show why respecting those boxes is

7  appropriate under Section 1129 of the code.  And if we can

8  show that the boxes can and should be respected, then by

9  definition we defeat and moot on the merits that the boxes

10  should not be respected for whatever reason.  Consolidated,

11  merged, ignored, overlooked, pierced, it doesn't matter what

12  the basis is, they're either respected or not, because those

13  are mutually-exclusive positions.

14    And so our resolution with the committee, which

15  they'll read on the record, is that for a confirmation

16  objection, for them or anyone really to be able to argue the

17  boxes shouldn't be respected, for whatever reason, A, B, and

18  C, you don't need standing for a confirmation objection, you

19  don't need standing -- or to file an adversary proceeding to

20  make those arguments.  But, again, they're just confirmation

21  objections, they're not stand-alone causes of action, they're

22  not stand-alone proceedings.

23    The committee was concerned that they would have

24  to jump through a bunch of hoops just to say the magic words

25  "alter ego," they don't.  They can raise that as confirmation

1   objections, but that's all they are.

2           So, to be clear, people can file whatever

3   confirmation objections they believe are appropriate and we

4   will respond to those on the merits when it comes to

5   respecting the boxes.

6           So, Your Honor, I did just want to raise a couple

7   of issues that Humana asserted about the need for an August

8   25th sub-con-only hearing.  First, in paragraph 11 of their

9   reply, they say sub-con will have a substantial impact on

10  plan negotiation and confirmation issues, so those should be

11  heard first.  Well, Your Honor, you could say that about any

12  number of confirmation issues.  Best interest tests,

13  feasibility, unfair discrimination, a channeling injunction,

14  releases, all of those have a substantial impact on the

15  process, that's why they're heard together.  And since we're

16  the plan proponents, to be honest, we would like to present

17  our arguments in the way that gives us the greatest chance of

18  success.  We think that is our right, unless Your Honor has

19  different views, that we should present the arguments in the

20  way that we think is most appropriate and it's not up for a

21  creditor to say this should be decided first, unless Your

22  Honor has preferences on the order we present arguments.

23          We of course believe an August hearing is a waste

24  of time because sub-con is inappropriate and we will deal

25  with the merits at the confirmation hearing.

1    The second point they make -- and this is the last
2 point I wanted to respond to -- is they say, you know, what's
3 the harm?  We're all doing all of this discovery, there's no
4 prejudice, so let's just have the hearing in August.  Well,
5 as my litigators will tell you, we're doing all of this
6 discovery, all of the documents, all of the emails, all of
7 the depositions, all of the expert reports for a confirmation
8 hearing scheduled September 21st, not August 25th, and you
9 can't separate sub-con from these other issues because it --
10 sub-con goes to where do assets and liabilities sit.  That is
11 fundamentally going to impact best interests and unfair
12 discrimination at a minimum.  So you can't just say this
13 disclosure statement is only for sub-con, it's relevant to
14 all of these confirmation issues, which is why you can't
15 slice and dice all of the discovery.  We're doing all of this
16 now for a September 21st hearing, not August 25th.
17    So, with that, Your Honor, I believe that covered
18 my points that we will address the boxes as part of our case
19 in chief and people can object on whatever basis they want as
20 confirmation objections.  So, unless Your Honor has anything
21 for me, I'll turn the podium over I think to Akin Gump and go
22 from there.
23    THE COURT:  All right.  Who's speaking for Akin?
24    MR. HURLEY:  Your Honor, Mitch Hurley with Akin
25 Gump on behalf of the OCC.

1          THE COURT:  Okay.  Go ahead, Mr. Hurley.

2          MR. HURLEY:  Thank you.  So, Your Honor, Mr. Simon

3  I think has accurately described the nature of our agreement

4  in broad strokes.  I do want to provide just a bit of context

5  that I hope will eliminate why the OCC filed its statement in

6  the first place and the significance of the agreement that it

7  believes it's reached with the debtors.

8          So, as the Court is aware, the deadline for

9  parties to file objections to the plan is September 3rd.  As

10  Mr. Price outlined for the Court on June 16th, while the

11  OCC's investigation is ongoing, at present the OCC believes

12  that the plan may substantially under-compensate opioid

13  creditors on a number of grounds, and the OCC is considering

14  a number of potential arguments it may raise in connection

15  with objecting to confirmation of the debtors' plan.  That

16  process is not complete and we don't know yet exactly what

17  form the OCC's objection, if any, will take, but certainly

18  the OCC's intention always has been to raise all arguments

19  and objections it may have to the plan at confirmation rather

20  than by some separate motion or in some separate proceeding.

21          Among the potential grounds we're considering is

22  investigating whether doctrines like substantive

23  consolidation, or alter ego or agency or veil piercing, might

24  be applicable in these cases in a way that would render the

25  plan un-confirmable.  We've sought discovery on these points

1   and intend to continue to take discovery on these points.

2   But certainly to the extent that we determine to raise

3   arguments like that, it has always been the OCC's intention,

4   as I said, to raise those kind of points at confirmation and

5   in a manner and at a time that's consistent with the schedule

6   and protocols that have been entered by the Court already.

7   So that would include in the OCC's written plan objection,

8   which currently is due on September 3rd, and that I think

9   brings us to where we are now.

10          As you know, the Acthar insurance claimants moved

11  the Court for an order substantively consolidating the assets

12  and liabilities of certain debtor entities and set a hearing

13  on the motion of August 25th.  The debtors filed their

14  preliminary objection, arguing the motion to consolidate

15  shouldn't be heard on the 25th and, among other things, they

16  argued that a creditor can't seek an order to substantively

17  consolidate debtor estates without first obtaining derivative

18  standing to do so and filing an adversary complaint.

19          The debtors' procedural arguments drew the

20  attention of the OCC because, as I just got through

21  explaining, we're considering raising arguments of that kind

22  in objection to the debtors' plan.  If we do invoke sub-con

23  or other doctrines of the kind mentioned in the debtors'

24  papers -- and that's still an if -- the OCC may do it in a

25  way that's very different than proposed by the Acthar

1  plaintiffs who seek to substantively consolidate only a

2  subset of the debtor entities.

3         But for now what the OCC is concerned about is

4  really only that we're going to be relying on theories of

5  that kind as bases for objecting to the plan at confirmation

6  if we determine it's appropriate to so object, even if we

7  don't first file a motion either in connection with a

8  contested matter or obtain derivative standing.

9         We were first reassured by some statements in the

10  debtors' papers that suggested they agreed.  You know, they

11  argued that it would be wasteful to go forward on the 25th in

12  part because it's inevitable that issues like sub-con will be

13  litigated at objection to confirmation, whether named

14  substantive consolidation, alter ego, or veil piercing, that

15  was reassuring.  During a subsequent discovery meet-and-

16  confer, the debtors took a different position and that's why

17  we filed our statement is really we just wanted to make sure

18  that we got clarity, if possible.

19         Now, the debtors had taken the position in meet-

20  and-confer conversations that in fact we wouldn't be allowed

21  to argue sub-con or any of those other doctrines at

22  confirmation without making a motion first.  As we explained

23  in our papers, that's not the OCC's view of the law.  We

24  believe that those kinds of arguments absolutely can be

25  raised validly as plan objections and that, for example, just

1  to be really clear about what we mean by that, the OCC's view

2  is, if it were to persuade the Court in connection with

3  confirmation that debtor entities are subject to substantive

4  consolidation and that, as a result, the plan does not

5  satisfy aspects of Section 1129 because, for example, in a

6  sub-con scenario, opioid creditors arguably would be entitled

7  to more consideration than contemplated under the plan, the

8  OCC would contend that would be an absolutely appropriate

9  basis for the Court to reject the plan, even though the OCC

10  did not first make a separate motion for substantive

11  consolidation in advance of confirmation.

12             Now, of course, we want to do what the Court

13  thinks we need to do and if the Court were to conclude that a

14  motion or some other kind of procedural step is required for

15  the OCC to raise arguments of that kind, we want to make sure

16  those steps get taken and they get taken on a timely basis.

17  So, again, that's really why we filed our statement.

18             Now, since filing the statement, the debtors

19  reached out to us and, based on conversations that we have

20  had with them, one on July 21st and again yesterday, we

21  understand that the OCC and the debtors are now in agreement

22  on those procedural issues.  And this is our specific

23  understanding of the agreement.  We understand the debtors

24  agree that substantive consolidation and theories like alter

25  ego, veil piercing, and agency can appropriately be raised as

1 objections to the plan at confirmation without the need for

2 any separate motion practice or other procedural steps by the

3 OCC as a predicate to asserting those arguments.

4          For its part, provided that they can be raised and

5 adjudicated on the merits as appropriate plan objections at

6 confirmation, the OCC will not seek to have claims or

7 arguments of that kind determined prior to the confirmation

8 hearing in these cases.

9          Now, to be crystal clear and to perhaps state the

10 obvious, the debtors are not conceding that substantive

11 consolidation or alter ego or agency or doctrines that, if

12 asserted by the OCC, should be applied in these cases.

13 Presumably, if we raise those kinds of arguments, they're

14 going to say just the opposite that those doctrines do not

15 apply.  But what we do understand the debtors to be agreeing

16 to is that the OCC can appropriately raise those kinds of

17 arguments as appropriate objections to the debtors' proposed

18 plan and, if those kinds of arguments are raised by the OCC

19 in connection with objecting to the plan, they must be

20 resolved on the merits before the plan can be confirmed one

21 way or the other, and that the Court may rely on those kinds

22 of doctrines, if raised and proven, as bases potentially for

23 denying plan confirmation, again, even though the OCC didn't

24 first raise the doctrines by motion.

25          So that's the understanding, our understanding of

1  the agreement.  We are still hoping, Your Honor, to get the

2  Court's guidance because, of course, ultimately, it's going

3  to be up to Your Honor regardless of what the parties agree.

4  I will say, to be clear, if the Court prefers the OCC to

5  proceed in some other way, if the Court would like the OCC to

6  work with the debtors to come up with a written stipulation

7  for presentation to Your Honor to be so ordered, we would be

8  happy to do that.

9        The one thing that the OCC wants to avoid is to

10  find itself in some kind of procedural "gotcha" situation.

11  And so we would be very grateful for any guidance that the

12  Court might be willing to provide, so we can hopefully avoid

13  such a situation.

14        Thank you, Your Honor.

15        THE COURT:  Thank you, Mr. Hurley.

16        Well, I can't say off the top of my head whether

17  or not it's required to file a motion for substantive

18  consolidation rather than just including -- I assume you

19  would include it within your objection to confirmation, which

20  in effect is the motion -- is a motion, you -- or response to

21  a motion, I guess.  So you're objecting to plan confirmation

22  because the debtor should be substantively consolidated and I

23  think that is sufficient.  I don't think you need to file a

24  separate motion at this time, I don't think there's anything

25  in the rules or the law that requires you to file a separate

1    motion for substantive consolidation.  You might need to file

2    one for standing to bring a substantive consolidation motion,

3    but if you are bringing that motion in connection with

4    objection to confirmation, I think that is fine.  But if the

5    parties want to make certain there's no -- nobody tries to

6    raise later on the gotcha, you didn't file a motion, I'm

7    happy to enter whatever stipulation the parties wish to enter

8    into.

9            MR. HURLEY:  Thank you, Your Honor.

10           THE COURT:  Mr. Freimuth?

11           MR. FREIMUTH:  Good afternoon, Your Honor.  This

12   is Matthew Freimuth from Willkie Farr on behalf of attestor

13   and Humana.  Can you hear me okay?

14           THE COURT:  I can.  Thank you.

15           MR. FREIMUTH:  Fundamentally, what we have now

16   after the filing of the preliminary objection by the debtors

17   is I believe a dispute about timing, whether our motion for

18   substantive consolidation should be heard in advance of

19   confirmation, as it's been noticed, or at or in connection

20   with confirmation.

21           Our view, Your Honor, is that we filed the motion

22   seeking substantive consolidation of the debtors' specialty

23   brands business and the Acthar entities on June 18th and

24   noticed it for a hearing more than two months later.  There

25   was nothing improper about the filing of the motion, the

1   cases are clear that creditors have standing to pursue

2   substantive consolidation.  The debtors cite no case finding

3   that a creditor needs to seek derivative standing to bring a

4   sub-con motion.  And the cases are clear that substantive

5   consolidation can be sought by motion and that no adversary

6   proceeding is required.

7          The filing of the motion and the timing for the

8   hearing that we've set provide all parties in interest an

9   opportunity to be heard on our request and, consistent with

10  the dates in the confirmation discovery protocol, we've been

11  pressing for discovery relevant to the sub-con motion, and I

12  want to circle back to that.  There have been some disputes

13  that will likely require the Court's attention, but documents

14  have been produced, depositions have been requested, they're

15  in the process of being scheduled and noticed.  And so the

16  discovery needed and being sought coincides with and complies

17  with the discovery provisions of the confirmation protocol

18  and that fact discovery should be done in advance of August

19  25th when the motion is currently noticed.

20         It's not true, from our perspective, that hearing

21  the motion before confirmation is going to create some sort

22  of significant additional burden, the work is already

23  underway.  We think there's great benefit in getting to the

24  merits of the sub-con issue promptly.

25         Mr. Harris in his remarks earlier today suggested

1  that we were engaging in an effort to slow these proceedings

2  now, we're not.  We want this issue heard and resolved

3  promptly, Your Honor.  He also alluded to the need to bring

4  clarity to the debtors and the various constituencies about

5  certain issues before confirmation, we think this is one.

6         So with that said, Your Honor, we think that it

7  would be perfectly appropriate and efficient for this Court

8  to hear the sub-con motion that we filed in advance of

9  confirmation on the date we noticed of August 25th.

10         I did allude, Your Honor, to one issue with

11  respect to certain discovery disputes.  Whether you'd like me

12  to sort of address that now or later, the mere point I want

13  to make is we do have some disputes with respect to documents

14  that we're seeking in connection with sub-con and, frankly,

15  they cut across other confirmation and estimation issues as

16  well.  I understand the process is to request a conference

17  with Your Honor.  We would with respect to those issues, Your

18  Honor, like to file a short letter early next week, perhaps

19  by close of business Monday, teeing up the issues that exist

20  today.  We've heard the Court loud and clear that, to the

21  extent that there are discovery disputes and issues that need

22  the Court's attention, it's on us to file the motion to

23  compel.  So we would like to proceed on that basis.

24         THE COURT:  All right.  Well, let me hear -- Mr.

25  Simon, what's the debtors' view?

1      MR. SIMON:  Well, Your Honor, I don't have -- I

2  defer to Mr. Harris or my litigators on the discovery

3  disputes, but I kind of do go back to the idea of you can't

4  just say discovery is underway and so we can have a hearing

5  on the 25th because, again, all of the confirmation protocol

6  dates and deadlines were with a September 21st hearing in

7  mind.  And it's no surprise that our plan doesn't have

8  substantive consolidation, it never has.  So the original

9  plan, I believe, was filed in April, and there was various

10 updates to the documents and the order was approving the DS

11 and the plan for solicitation I believe was June 25th,

12 roughly at that time frame.

13      So this issue about not seeking substantive

14 consolidation has always been our position.  I mean, we teed

15 up that issue.  So the idea that we could have a plan on file

16 that's always been no sub-con and then a creditor can say,

17 well, let's decide sub-con early, that's literally what we

18 have scheduled for hearing on the 21st.  So, again, like it's

19 not just enough to say, well, discovery is underway; that's

20 true, but it won't be done.  That's the point is we need this

21 time frame to have these issues decided together because, if

22 anything is relevant to sub-con or not relevant to sub-con,

23 it's going to impact other issues.  Best interests and unfair

24 discrimination come right to mind.

25      So if someone wants to depose a witness about an

1  intercompany agreement, assets moved from A to be, that's

2  going to be relevant for sub-con.  It's also going to be

3  relevant for best interests and unfair discrimination

4  because, if those intercompany agreements are properly

5  documented and formalities are fulfilled, that negates sub-

6  con by definition and now people have the facts about best

7  interests and unfair discrimination, because if they sit at

8  certain boxes where the notes are and not other claims, that

9  is unbelievably relevant to best interests and unfair

10 discrimination.  So everyone is going to have to show up and

11 argue every issue about where assets sit.

12            So it's not just this isolated issue that can be

13 decided on its own on the 25th.

14            THE COURT:  Mr. Freimuth, I was taken by one thing

15 that you said that the discovery you're seeking does overlap

16 other issues that relate to confirmation.  So I guess I'm

17 struggling with what's -- why not wait until we get to

18 confirmation?  We could have -- we could start off the

19 confirmation hearing with the question of whether or not

20 substantive consolidation is appropriate and then I can

21 perhaps make a ruling on that before we go further into the

22 confirmation hearing, which would resolve the issue one way

23 or the other.  Either the plan is not going to get confirmed

24 or I'll overrule it and we go on with the other issues.

25            MR. FREIMUTH:  All I meant to suggest by that

1 comment, Your Honor, is some of the specific categories of

2 documents and data that we're seeking where we have disputes

3 could very well be relevant to issues related to substantive

4 consolidation.  They may come up in the context of estimation

5 of our prepetition claim or they -- you know, they may be

6 relevant to various confirmation issues.  So I was speaking

7 specifically with respect to -- one of the categories, for

8 example, is subsidiary minutes of the various boards of

9 directors.

10 So, to your point, we think that getting clarity

11 on these issues prior to confirmation makes good sense, it's

12 an efficient way to resolve the question up front, so that

13 we're not headed to a confirmation hearing months later with

14 questions about whether or not the Acthar entities or the

15 specialty brands entities should be consolidated or not.

16 And in response to the point about whether

17 discovery is ongoing, the fact of the matter is the fact

18 depositions and the witnesses that are going to be testifying

19 about these issues, we understand from the debtor they're

20 going to be made available for deposition in the first two

21 weeks of August.  So the record ought to be developed and

22 ready to present to Your Honor in advance of confirmation.

23 MR. SIMON:  Your Honor, it's Keith Simon.  Could I

24 say one thing, though, just to put this in context, which is

25 if you scheduled a hearing for the 25th, I'm not sure if that

1  means that the OCC has to say we agree with sub-con right

2  now, like are we going to do this hearing twice?

3         So, again, like I just don't -- I feel like it's

4  going to be an inefficient use of this Court's time because

5  that means that everyone will have to argue it.  Otherwise,

6  if Humana argues it and you agree with us, then does the OCC

7  get bound by that as law of the case because you found that

8  formalities were fulfilled and properly followed, but because

9  Akin Gump didn't raise it they are now bound by that?  It

10 just -- I don't see how it practically works to have a

11 hearing on this issue in advance of confirmation when you

12 could say those exact same arguments about every confirmation

13 requirement.  This plan can't go forward if you think it

14 violates the best interests test --

15         THE COURT:  Well, I --

16         MR. SIMON:  -- that's just one example.

17         THE COURT:  Well, I think that's a good point.  I

18 mean, I can't -- if we go forward on a separate motion on

19 sub-con, anybody who has a sub-con objection is going to have

20 to participate in that.  And because the discovery issues

21 overlap one another, it just doesn't -- it doesn't seem to be

22 efficient -- the efficiencies actually go the other way, I

23 think.  I think it's less efficient to go forward on August

24 25th with a sub-con, a separate sub-con hearing that's going

25 to require everybody's participation just weeks before we get

1  to the confirmation hearing.  It is a confirmation-type

2  issue.

3           So I just think the efficiencies here would be

4  let's do this on the first day of the confirmation hearing.

5  We'll hear the motion for sub-con on day one of the

6  confirmation hearing, and I can rule on that and then we can

7  move into other issues.  And maybe there's other issues that

8  will come up along the way that we need to -- we could do

9  this, you know, rule on them as we go rather than doing a

10  week-long hearing and then have me try to write an 80-page

11  opinion about all these different issues.

12           I'll open it -- I mean, what do people think about

13  that?  Mr. Freimuth, because it's your motion, so --

14           MR. FREIMUTH:  Yeah, Your Honor, that would be

15  acceptable to us to have that motion heard at the first day

16  of confirmation, as you've just described.

17           THE COURT:  All right.  That allows us to get

18  through all the discovery.  There may be overlapping

19  discovery issues, everybody is going to want to participate

20  in those depositions, so I think that makes sense to do it

21  that way.

22           Mr. Simon, does that cause any concerns on your

23  part?

24           MR. SIMON:  Your Honor, obviously, ultimately, if

25  that's what Your Honor prefers, we will of course go with

1  that. But, again, you know, our initial idea was that our

2  case in chief would moot this issue, but if it's Humana's

3  independent motion, then obviously it's their burden to prove

4  sub-con. It's their motion and, if they're the proponent,

5  they're going to have to satisfy it by Owens Corning and it's

6  their burden. So, if they want to have it heard first

7  outside of plan confirmation the day of, it's their burden.

8  I just want to make sure that that's crystal clear.

9          THE COURT:  It is.  It is your burden, Mr.

10  Freimuth, you're going to have to meet the requirements of

11  Corning to show sub-con.

12          MR. FREIMUTH:  We understand, Your Honor.

13          THE COURT:  All right.  Okay.

14          MR. FREIMUTH:  Apologies, Your Honor.  There was

15  the issue that I did raise with respect to some discovery

16  disputes --

17          THE COURT:  Yes.

18          MR. FREIMUTH:  -- that have arisen that, frankly,

19  have ripened up just, I would say, within the last 12 hours

20  or so.  So it's a few categories of documents, one relates to

21  a request that we have outstanding for minutes of subsidiary

22  boards, another relates to some outstanding data requests we

23  have.  My proposal, Your Honor, is that we just set a

24  schedule today where we could file a short letter with the

25  Court indicating what the disputes are and indicating the

1  relief we're requesting.  We could be prepared to do that

2  very early in the week next week.

3      THE COURT:  Well, the one problem with very early

4  in the week next is I'm going to be on vacation next week.

5  I'm not going to disappoint my granddaughter.  So I'm not

6  going to do any work while I'm vacation.  So I wouldn't be

7  able to address it until the week after next.

8      Have the parties met and conferred on these issues

9  and you're at an impasse, is that where you are at this

10  point?

11     MR. FREIMUTH:  We have met and conferred, Your

12  Honor, I do believe we're at an impasse with respect to at

13  least the request for subsidiary board minutes.

14     THE COURT:  Well, that sounds like a pretty

15  discrete issue.  Why don't we -- go ahead and file it next

16  week.  I'll try to get to it as soon as possible.  It may not

17  be until I get back on August 2nd, but if the parties -- if

18  you want to file a -- if it's just that one discrete issue,

19  that sounds like it could be done in just a few pages, a few-

20  page letter.

21     MR. FREIMUTH:  Yeah.  And to be clear, Your Honor,

22  the other issue relates to data that we're requesting that we

23  believe supports the liquidation analysis and valuation that

24  underlies the debtor's disclosure statement.  It is also a

25  very discrete issue, so I think we could present both to you

1 | within two pages.

2 |        THE COURT:  Okay.  Then why don't you go ahead and

3 | file yours Monday or Tuesday, whenever you are ready.  I'll

4 | give the debtors an opportunity to reply by -- you know, I'll

5 | give you two days to reply, Mr. Simon or Mr. Harris, whoever

6 | is going to reply, and then we'll take it from there.

7 |        MR. FREIMUTH:  Okay.

8 |        THE COURT:  And I may just look at them and pass

9 | on to my courtroom deputy what my ruling is and he can let

10 | you know -- or let you know at least what I'm thinking.

11 | Maybe that will help move things along.

12 |        MR. FREIMUTH:  Okay.  We appreciate that, Your

13 | Honor.

14 |        THE COURT:  All right.  Okay.

15 |        Mr. Hurley, you raised your hand.

16 |        MR. HURLEY:  Thank you, Your Honor.  I just wanted

17 | to hopefully make something clear in terms of our timing.  So

18 | it sounds like what we're contemplating is that the OCC will

19 | be able to make whatever arguments it has on sub-con or

20 | similar, if any, in its objection, and then also will have an

21 | opportunity to be heard on those issues at the outset of the

22 | hearing, and I guess alongside attestor or other parties that

23 | are making similar arguments.  Do I have that right?

24 |        THE COURT:  Yes, absolutely.  Yes.

25 |        MR. HURLEY:  Okay.  And it may make sense, as you

1  suggested, Your Honor, for us to try and get that

2  memorialized in a stipulation, and I'll reach out separately

3  to Mr. Simon on that.

4          THE COURT:  Okay.

5          MR. HURLEY:  Thank you.

6          THE COURT:  All right.

7          MR. SIMON:  And, Your Honor, just procedurally,

8  Mr. Hurley reminded me of a very good point.  I mean, the

9  hearing was originally scheduled for August 25th with an

10  objection deadline of August 6th.  So because it's going to

11  be heard at confirmation, when I assumed our response would

12  be part of our confirmation brief, but I wanted to make sure

13  that was what Your Honor was thinking as well.  I just want

14  to know when our objection deadline is -- I know when the

15  hearing is, but I want to know when we have to respond.

16          THE COURT:  Well, if you make it a part of your

17  confirmation brief, then Mr. Freimuth isn't going to get a

18  reply.

19          MR. SIMON:  Okay.

20          THE COURT:  So I think we're going to have to set

21  that as a separate schedule.

22          MR. SIMON:  Okay.

23          THE COURT:  So -- just so that he has the

24  opportunity to file his reply.  But I'll let the parties work

25  that out in terms of timing.

1          MR. SIMON:  We'll talk.  Maybe the idea will be

2    they have their plan objections due on September 3rd, maybe

3    ours is due September 3rd for this, and then they reply at

4    the same time as our confirmation brief, maybe something like

5    that.  But we'll talk and that's fine.

6          THE COURT:  Yeah.  Hopefully, you can get that

7    worked out.  I think that should be able to be resolved.

8          MR. SIMON:  Okay.

9          THE COURT:  All right.  Anything else for today?

10          MR. MERCHANT:  Your Honor, the only other thing I

11    failed -- I neglected to mention that is on the agenda is the

12    attestor and Humana asked that there be a status conference

13    on their estimation motion, and that is the one remaining

14    item on today's hearing agenda.

15          THE COURT:  All right.  Let me hear from attestor.

16          MR. FREIMUTH:  Sure, Your Honor.  You'll recall

17    that when we had our estimation motion heard on the 7th we

18    asked for a status conference to be set for the day on which

19    Your Honor was going to hear argument on the unsubstantiated

20    claims objection.  Just by way of update, since June 7th, on

21    June 21st, the debtors advised us that they would engage with

22    us on discovery on the underlying merits of the claims in

23    anticipation that estimation may be necessary, and so that

24    process has been underway.  Arnold & Porter, who represents

25    the debtors in the underlying Humana case, has appeared,

1  we've engaged in meet-and-confers.

2          Practically, what that has meant is that since

3  June 21st, when the debtors agreed to begin providing us

4  merits discovery, they provided us with 1.8 million

5  documents, some of which has taken weeks to load onto our

6  review platform, but we are moving through that material as

7  quickly as we possibly can.

8          On Tuesday of this week, the debtors advised us

9  that they would anticipate that, to the extent that we have

10 questions of their witnesses related to the merits of either

11 the prepetition claims or the admin claims, that we would be

12 prepared to ask those witnesses questions during the first

13 two weeks of August.  Obviously, with respect to the document

14 flow, we have some serious concerns about that schedule.

15 Obviously, whatever the debtors propose with respect to a

16 schedule we'll consider, but there may well be issues to the

17 extent that depositions get scheduled and documents related

18 to the merits of either the prepetition claim or the admin

19 claim remain outstanding.

20          So we're working through those issues.  There's

21 nothing, I think, ripe to present to Your Honor today, but I

22 just wanted to alert you that that process is ongoing and we

23 are getting quite a volume of documents.  We've gotten

24 commitments from the debtors to produce additional documents

25 with no clear indication yet as to exactly when those are

1  coming.  So we just wanted to alert Your Honor that that

2  process is underway.

3          THE COURT:  All right.  Thank you.  That's the

4  problem with discovery is sometimes you get what you ask for.

5  You've got too many documents to review.

6          Mr. Harris?

7          MR. HARRIS:  And, Your Honor, just to follow up

8  and clarify.  Mr. Freimuth is right, we have been going

9  forward with full discovery on the merits of the underlying

10  claims against PLC and ARD to be prepared if we decided that

11  estimation is needed, all that was awaiting a decision on our

12  omnibus objection.  So we will take this time and think about

13  over the weekend whether we believe estimation is needed.

14  You know, likely, I think we may decide it is not, and we can

15  talk again and we're happy to talk again with attestor about

16  our views on that, you know, next week.

17          I just didn't want to leave hanging out there that

18  there was any decision made that in fact now estimation is

19  needed, it may well be the debtors' view that it is not.

20  But, as he said, we have been producing discovery regardless

21  so the parties would be prepared in the event that we do need

22  to estimate.

23          THE COURT:  Thank you, Mr. Harris.

24          All right, anything else for today, Mr. Merchant?

25          MR. MERCHANT:  I believe that's all for today.  I

1  thank the Court for its time and have a great vacation, Your

2  Honor.

3          THE COURT:  All right.  Thank you all very much.

4  Have a good weekend, and I know my week will be better than

5  yours.

6      (Laughter)

7          THE COURT:  All right.  We're adjourned.

8          COUNSEL:  Thank you, Your Honor.

9          THE COURT:  Thank you.

10      (Proceedings concluded at 3:52 p.m.)

<u>CERTIFICATE</u>

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Mary Zajaczkowski   June 24, 2021
Mary Zajaczkowski, CET**D-531

/s/William J. Garling   June 24, 2021
William J. Garling, CE/T 543

/s/ Tracey J. Williams   June 24, 2021
Tracey J. Williams, CET-914

**LEAD, SealedDoc(s), MEGA, STANDOrder, CLMSAGNT, APPEAL**

# U.S. Bankruptcy Court
## District of Delaware (Delaware)
## Bankruptcy Petition #: 20-12522-JTD

*Date filed:* 10/12/2020
*341 meeting:* 02/12/2021
*Deadline for filing claims:* 02/16/2021

*Assigned to:* John T. Dorsey
Chapter 11
Voluntary
Asset

*Debtor*
**Mallinckrodt plc**
675 McDonnell Blvd.
Hazelwood, MO 63042
ST. LOUIS-MO
Tax ID / EIN: 98-1088325

represented by **Justin A. Allen**
Ogletree, Deakins, Nash, Smoak & Stewart
111 Monument Circle, Suite 4600
Indianapolis, IN 46204
(317) 916-2533
Email: justin.allen@ogletree.com

**Michael B. Bernstein**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
202-942-5000
Email: michael.b.bernstein@arnoldporter.com

**Jeffrey E. Bjork**
Latham & Watkins
335 South Grand Avenue
Suite 100
Los Angeles, CA 90071-1560
213-485-1234
Fax : 213-891-8763
Email: jeff.bjork@lw.com

**Sara A. Brown**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
212-906-1200
Fax : 212-751-4854
Email: sara.brown@lw.com

**Liza L. Burton**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020

**Michael H. Cassel**
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street

New York, NY 10019
212-403-1000
Fax : 212-403-2000
Email: mhcassel@wlrk.com

**Andrew J.H. Cheung**
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
212-403-1000
Fax : 212-403-2000
Email: ajhcheung@wlrk.com

**Mark D. Collins**
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302 651-7700
Fax : 302-651-7701
Email: collins@RLF.com

**George A Davis**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
212-906-1200
Fax : 212-751-4864
Email: george.davis@lw.com

**Garrett Spencer Eggen**
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
Fax : 302-651-7701
Email: Eggen@rlf.com

**Rosa Jean Evergreen**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001
202-942-5000
Fax : 202-942-5999
Email: rosa.evergreen@arnoldporter.com

**Victor Goldfield**
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
(212) 403-1000
Fax : 212-403-2000
Email: VGoldfeld@wlrk.com

**Jason B. Gott**
Latham & Watkins LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
312-876-7700
Fax : 312-993-9767
Email: jason.gott@lw.com

**Christopher R. Harris**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
212-906-1200
Fax : 212-751-4864
Email: christopher.harris@lw.com

**Matthew B. Harvey**
Morris Nichols Arsht & Tunnell, LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
302-351-9393
Fax : 302-225-2571
Email: mharvey@mnat.com

**Justin S. Kirschner**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
Email: justin.kirschner@lw.com

**Emil A. Kleinhaus**
Wachtell Lipton Rosen & Katz
51 West 52nd Street
New York, NY 10019
212-403-1000
Fax : 212-403-2000
Email: eakleinhaus@wlrk.com

**George Klidonas**
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200
Email: george.klidonas@lw.com

**Kiet Lam**
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
(212) 403-1000

Email: KTLam@wlrk.com

**Garrett S. Long**
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
Email: garrett.long@lw.com

**Arthur Luk**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
202-942-5000
Fax : 202-942-5999
Email: arthur.luk@arnoldporter.com

**John F. Lynch**
Wachtell Lipton Rosen & Katz
51 West 52nd Street
New York, NY 10019
212-403-1000
Fax : 212-403-2000
Email: jlynch@wlrk.com

**Robert Charles Maddox**
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
302-651-7551
Fax : 302-498-7551
Email: maddox@rlf.com

**Michael Joseph Merchant**
Richards Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
usa
302-651-7700
Fax : 302-651-7701
Email: merchant@rlf.com

**Phillip Mindlin**
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
212-403-1000
Fax : 212-403-2000
Email: pmindlin@wlrk.com

**Jason Moehlmann**
Latham & Watkins LLP

330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
312-876-7700
Fax : 312-993-9767
Email: jason.moehlmann@lw.com

**Hugh K. Murtagh**
Latham & Watkins
1271 Avenue of the Americas
New York, NY 10020
212-906-1200
Fax : 212-751-4864
Email: hugh.murtagh@lw.com

**Arielle Nagel**
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200
Email: arielle.nagel@lw.com

**Dan O'Meara**
Ogletree, Deakins, Nash, Smoak & Stewart
1735 Market Street
Suite 3000
Philadelphia, PA 19103
215-995-2833
Fax : 215-995-2801
Email: dan.omeara@ogletreeedeakins.com

**Sonia Kuester Pfaffenroth**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001
202-942-5000
Fax : 202-942-5999
Email: sonia.pfaffenroth@arnoldporter.com

**Amy Christine Quartarolo**
Latham & Watkins LLP
355 South Grand Avenue
Suite 100
Los Angeles, CA 90071
213-485-1234
Fax : 213-891-8763
Email: amy.quartarolo@lw.com

**Brendan Joseph Schlauch**
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700 x7749

Fax : 302-651-7701
Email: schlauch@rlf.com

**Eric Shapland**
Arnold & Porter Kaye Scholer LLP
44th Floor
777 South Figueroa Street
Los Angeles, CA 90017
(213) 243-4000
Email: eric.shapland@arnoldporter.com

**Laura Shores**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001-3743
202-942-5000
Fax : 202-942-5999
Email: laura.shores@arnoldporter.com

**Sarah Silveira**
Richards Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
Fax : 302-651-7701
Email: silveira@rlf.com

**Keith A. Simon**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
212-906-1372
Fax : 212-751-4864
Email: keith.simon@lw.com

**Neil M. Snyder**
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
212-403-1000
Fax : 212-403-2000
Email: skcharles@wlrk.com

**Andrew Sorkin**
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
202-637-2200
Fax : 202-637-2201
Email: andrew.sorkin@lw.com

**Robert J. Stearn, Jr.**

Richards, Layton & Finger, P. A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
Fax : 302-651-7701
Email: stearn@rlf.com

**Amanda R. Steele**
Richards, Layton and Finger
920 N. King Street
Wilmington, DE 19801
302-651-7838
Fax : 302-428-7838
Email: steele@rlf.com

**Randall Carl Weber-Levine**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
Email: randall.weber-levine@lw.com

**Matthew Wolf**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
202-942-5000
Fax : 202-942-5999
Email: matthew.wolf@arnoldporter.com

**Anupama Yerramalli**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
Fax : (212) 751-4864
Email: anu.yerramalli@lw.com

**Kelsey Zottnick**
Latham & Watkins LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
(312) 876-7700
Email: kelsey.zottnick@lw.com

*U.S. Trustee*
**U.S. Trustee**
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801

represented by **Jane M. Leamy**
Office of the U.S. Trustee
844 King St.
Suite 2207
Wilmington, DE 19801
302-573-6491
Fax : 302-573-6497

(302)-573-6491

Email: jane.m.leamy@usdoj.gov

**Richard L. Schepacarter**
Office of the United States Trustee
U. S. Department of Justice
844 King Street, Suite 2207
Lockbox #35
Wilmington, DE 19801
usa
302-573-6491
Fax : 302-573-6497
Email: richard.schepacarter@usdoj.gov

*Mediator*
**Kenneth R. Feinberg**

*Claims Agent*                                     represented by **Benjamin Joseph Steele**
**Prime Clerk LLC**                                              Prime Clerk LLC
www.primeclerk.com                                              One Grand Central Place
One Grand Central Place                                         60 East 42nd Street
60 East 42nd St, Suite 1440                                     Suite 1440
New York, NY 10165                                              New York, NY 10165
212-257-5450                                                    212-257-5490
                                                                Fax : 212-257-5452
                                                                Email: bsteele@primeclerk.com

*Transcriber*
**Reliable Companies**
Attn: Gene Matthews
1007 North Orange Street
Suite 110
Wilmington, DE 19801
302-654-8080

*Creditor Committee*                               represented by **Patrick M. Birney**
**Official Committee of Unsecured Creditors**                    Robinson & Cole
**Mallinckrodt plc**                                             280 Trumbull Street
                                                                 Hartford, CT 06103
                                                                 860-275-8275
                                                                 Email: pbirney@rc.com

                                                                 **Joseph W Brown**
                                                                 Cooley, LLP
                                                                 1299 Pennsylvania Ave., NW
                                                                 Suite 700
                                                                 Washington, DC 20004
                                                                 202-776-2060
                                                                 Fax : 202-842-7899
                                                                 Email: jbrown@cooley.com

                                                                 **John D. Cordani, Jr.**
                                                                 Robinson & Cole LLP
                                                                 280 Trumbull Street

Hartford, CT 06103
(860) 275-8287
Email: jcordani@rc.com

**Jamie Lynne Edmonson**
Robinson+Cole LLP
1201 North Market Street
Suite 1406
Wilmington, DE 19801
302-516-1705
Fax : 302-516-1699
Email: jedmonson@rc.com

**Weiru Fang**
Cooley LLP
1299 Pennyslvania Avenue, NW
Suite 700
Washington, DC 20004
202-776-2110
Fax : 202-842-7899
Email: wfang@cooley.com

**Allegra Flamm**
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
(202) 776-2985
Email: aflamm@cooley.com

**Cathy Hershcopf**
Cooley LLP
55 Hudson Yards
New York, NY 10001
212-479-6000
Fax : 212-479-6275
Email: chershcopf@cooley.com

**Jonathan J. Kim**
55 Hudson Yards
New York, NY 10001
(212) 479-6000
Fax : 212-479-6275
Email: jkim@cooley.com

**Michael Klein**
Cooley LLP
55 Hudson Yards
New York, NY 10001
212-479-6461
Fax : 212-479-6275
Email: mklein@cooley.com

**David H. Kupfer**
Cooley LLP

55 Hudson Yards
New York, NY 10001
212.479.6530
Fax : 212.479.6275
Email: dkupfer@cooley.com

**James F. Lathrop**
Robinson & Cole LLP
1201 North Market Street, Suite 1406
Wilmington, DE 19801
302-516-1700
Fax : 302-516-1699
Email: jlathrop@rc.com

**Evan M. Lazerowitz**
Cooley LLP
55 Hudson Yards
New York, NY 10001
212-479-6000
Fax : 212-479-6275
Email: elazerowitz@cooley.com

**Summer M McKee**
Cooley LLP
55 Hudson Yards
New York, NY 10001
212-479-6000
Email: smckee@cooley.com

**Dana Moss**
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
(202) 842-7135vvv
Email: dmoss@cooley.com

**Natalie D. Ramsey**
Robinson & Cole LLP
1201 North Market Street
Suite 1406
Wilmington, DE 19801
302-516-1702
Fax : 302-516-1699
Email: NRamsey@rc.com

**Lauren Reichardt**
Cooley LLP
55 Hudson Yards
New York, NY 10001
212-479-6515
Email: lreichardt@cooley.com

**Erica Richards**
Cooley LLP

55 Hudson Yards
New York, NY 10001
212-479-6000
Fax : 212-479-6275
Email: erichards@cooley.com

**Joshua Siegel**
Cooley, LLP
1299 Pennsylvania Ave., NW
Suite 700
Washington, DC 20004
202-842-7891
Fax : 202-842-7899
Email: jsiegel@cooley.com

**Cullen Drescher Speckhart**
Cooley LLP
1299 Pennsylvania Ave NW
Suite 700
Washington, DC 20004
(202) 776-2052
Email: cspeckhart@cooley.com

**Aric H. Wu**
Cooley LLP
55 Hudson Yards
New York, NY 10001
212-479-6000
Fax : 212-479-6275
Email: ahwu@cooley.com

| Filing Date | # | Docket Text |
|---|---|---|
| 07/23/2021 | 3405 (6 pgs) | Minute Entry Re: 3389 ; Telephonic Hearing Held Re: 2165 , 2578 , 3228 ; debtors' first omnibus objection to unsubstantiated claims ( 2165 ) is SUSTAINED (***The record for this hearing is SO ORDERED***); order to follow; motions to seal ( 2578 and 3228 ) are GRANTED; orders to be uploaded for signing; Appearances: (See Attached Registration Sheets) (RC) (Entered: 07/23/2021) |

**PACER Service Center**

**Transaction Receipt**

07/28/2021 15:45:48

| PACER Login: | mnat0009 | Client Code: | 49895-0003 |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 20-12522-JTD Fil or Ent: filed From: 5/28/2021 To: 7/28/2021 Doc From: 3405 Doc To: 3405 Term: included |

| | | | Headers: included Format: html Page counts for documents: included |
|---|---|---|---|
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

## CERTIFICATE OF SERVICE

I, Matthew O. Talmo, hereby certify that I am not less than 18 years of age and that service of the foregoing was caused to be made on July 28, 2021 via CM/ECF upon those parties registered to receive such electronic notifications and via email upon counsel to Mallinckrodt PLC and its affiliated debtors.

Dated: July 28, 2021

*/s/ Matthew O. Talmo*
Matthew O. Talmo (Bar No. 6333)