Case No. 21-cv-01093-LPS
_____

**UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**
_____


**In re**

**MALLINCKRODT PLC,** *et al.*

**Debtors.**

----------------------------------------------


**ATTESTOR LIMITED AND HUMANA INC.,**

*Appellants,*

**v.**

**MALLINCKRODT PLC,** *et al.*,

*Appellees.*

_____

**APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**
_____

**APPENDIX VOL. 2 (A-0577- A-0992) TO APPELLANT'S OPENING BRIEF**

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Donna L. Culver (No. 2983)
Robert J. Dehney (No. 3578)
Matthew B. Harvey (No. 5186)
Matthew O. Talmo (No. 6333)
Taylor M. Haga (No. 6549)
1201 N. Market St., 16th Floor
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
dculver@morrisnichols.com
rdehney@morrisnichols.com
mharvey@morrisnichols.com
mtalmo@morrisnichols.com
thaga@morrisnichols.com

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (admitted *pro hac vice*)
Matthew Freimuth (admitted *pro hac vice*)
Benjamin P. McCallen (admitted *pro hac vice*)
Richard Choi (admitted *pro hac vice*)
Philip F. DiSanto (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
mfeldman@willkie.com
mfreimuth@willkie.com
bmccallen@willkie.com
rchoi1@willkie.com
pdisanto@willkie.com

**EIMER STAHL LLP**
Benjamin E. Waldin (admitted *pro hac vice*)
Scott C. Solberg (admitted *pro hac vice*)
James W. Joseph (admitted *pro hac vice*)
Sarah H. Catalano (admitted *pro hac vice*)
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
bwaldin@eimerstahl.com
ssolberg@eimerstahl.com
jjoseph@eimerstahl.com
scatalano@eimerstahl.com

# APPENDIX
# TABLE OF CONTENTS

| Document | Page No. |
|---|---|
| Relevant Filings | |
| Proof of Claim No. 4217 of Humana Inc. (February 15, 2021)[1] | A0001 |
| Proof of Claim No. 4144 of Avon Holdings I LLC as Transferee of United Healthcare Services Inc. (February 15, 2021)[2] | A0075 |
| Proof of Claim No. 5812 of Avon Holdings I LLC as Transferee of OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC (February 16, 2021)[3] | A0100 |
| Motion of Debtors for Interim and Final Orders (A) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (B) Authorizing Continuation of Existing Deposit Practices, (C) Waiving Certain U.S. Trustee Guidelines, (D) Authorizing Continuation of Intercompany Transactions, and (E) Granting Superpriority Status to Postpetition Intercompany Claims, Case No. 20-12522, D.I. 23 (October 12, 2020) | A0119 |

---

[1] This is an exemplar of the proofs of claim of Humana Inc. subject to this appeal.  The remaining proofs of claim of Humana Inc. subject to this appeal are substantially identical to this proof of claim and have been assigned the following claim numbers: 3344, 3420, 4175, 4201, 4196, 4203, 4366, 5099, 4542, 4556, and 4565.  These claims have been omitted due to their voluminous nature and can be accessed at: https://restructuring.primeclerk.com/mallinckrodt/Home-ClaimInfo.

[2] This is an exemplar of the proofs of claim of Avon Holdings I LLC as Transferee of United HealthCare Services Inc. subject to this appeal.  The remaining proofs of claim of Avon Holdings I LLC as Transferee of United HealthCare Services Inc. subject to this appeal are substantially identical to this proof of claim and have been assigned the following claim numbers: 5171, 5717, 5638, 4335, 4314, 4288, 4211, 4593, 4219, and 4131.  These claims have been omitted due to their voluminous nature and can be accessed at: https://restructuring.primeclerk.com/mallinckrodt/Home-ClaimInfo.

[3] This is an exemplar of the proofs of claim of Avon Holdings I LLC as Transferee of OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC subject to this appeal.  The remaining proofs of claim of Avon Holdings I LLC as Transferee of OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC subject to this appeal are substantially identical to this proof of claim and have been assigned the following claim numbers: 5309, 5288, 5010, 5787, 5805, 5825, 5803, 5790, 5908, and 5938. These claims have been omitted due to their voluminous nature and can be accessed at: https://restructuring.primeclerk.com/mallinckrodt/Home-ClaimInfo.

| Document | Page No. |
|---|---|
| Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petition and First Day Motions, Case No. 20-12522, D.I. 128 (October 12, 2020) | A0194 |
| Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof, Case No. 20-12522, D.I. 667 (November 30, 2020) | A0450 |
| Excerpt of Affidavit of Service, Case No. 20-12522, D.I. 1131 (January 11, 2021) | A0463 |
| Humana Inc.'s Joinder to the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Actions, Case No. 20-12522, D.I. 1755 (March 16, 2021) | A0465 |
| Notice of Humana Inc.'s Joinder to the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as set forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Action, Case No. 20-12522, D.I. 1768 (March 16, 2021) | A0489 |
| Debtors' Omnibus Objection to the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Actions and to Humana Inc.'s Joinder Thereto, Case No. 20-12522, D.I. 1944 (April 5, 2021) | A0492 |

| Document | Page No. |
|---|---|
| Humana Inc.'s Reply in Support of the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Action and Humana Inc.'s Joinder thereto, Case No. 20-12522, D.I. 1987 (April 8, 2021) | A0531 |
| Excerpt of Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for all Purposes in these Bankruptcy Cases, Case No. 20-12522, D.I. 2157 (April 30, 2021) | A0540 |
| Motion of Attestor Limited and Humana Inc. for Entry of an Order Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code, Case No. 20-12522, D.I. 2159 (April 30, 2021) | A0577 |
| Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 2165 (April 30, 2021) | A0901 |
| Declaration of Randall S. Eisenberg in Support of Debtors' Motion for Scheduling Order and Objections to Claims, Case No. 20-12522, D.I. 2166 (May 1, 2021) | A0960 |
| Notice of Service of Attestor Limited and Humana Inc.'s First Request for Production of Documents in Connection with Contested Matters, Case No. 20-12522, D.I. 2211 (May 6, 2021) | A0966 |
| Attestor Limited and Humana Inc.'s First Request for Production of Documents in Connection with Contested Matters (May 6, 2021) | A0968 |

| Document | Page No. |
|---|---|
| Letter from Matthew Freimuth to the Honorable John T. Dorsey, Regarding Scheduling Issues, Case No. 20-12522, D.I. 2243 (May 10, 2021) | A0983 |
| Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed. R. Civ. P. 30(b)(6) and Fed. R. Bankr. P. 7030, Case No. 20-12522, D.I. 2284 (May 12, 2021) | A0986 |
| Opposition of Attestor Limited and Humana Inc. to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims, Case No. 20-12522, D.I. 2512 (May 21, 2021) [UNDER SEAL] | A0993 |
| Debtors' Omnibus Objection to Motions of Attestor Limited and Humana Inc. for Entry of Orders (A) Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for all Purposes in these Bankruptcy Cases and (B) Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code, Case No. 20-12522, D.I. 2521 (May 21, 2021) | A2023 |
| Debtors' Motion to Quash (A) Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed. R. Civ. P. 30(b)(6) and Fed. R. Bankr. P. 7030; (B) Acthar Plaintiffs' Notice of Deposition *Duces Tecum* of Corporate Designee(s) of Debtors; and (C) Acthar Plaintiffs' Notice of Deposition of Kathleen Breton, Case No. 20-12522, D.I. 2583 (May 26, 2021) | A2077 |
| Attestor Limited and Humana Inc.'s Limited Objection to Debtors' Motion to Quash (A) Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed R. Civ. P. 30(b)(6) and Fed R. Bankr. P. 7030; (B) Acthar Plaintiffs' Notice of Deposition *Duces Tecum* of Corporate Designees of Debtors; and (C) Acthar Plaintiffs' Notice of Deposition of Kathleen Breton, Case No. 20-12522, D.I. 2633 (June 1, 2021) | A2157 |
| Attestor Limited and Humana Inc.'s Reply in Further Support of Motions to Estimate Acthar-Related Claims and Allow | A2203 |

| Document | Page No. |
|---|---|
| Administrative Claims for all Purposes in these Bankruptcy Cases, Case No. 20-12522, D.I. 2657 (June 2, 2021) | |
| Excerpt of Order (I) Approving the Disclosure Statement and Form and Manner of Notice of Hearing Thereon; (II) Establishing Solicitation Procedures, (III) Approving the Form and Manner of Notice to Attorneys and Solicitation Directive, (IV) Approving the Form of Ballots, (V) Approving the Form, Manner, and Scope of Confirmation Notices, (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan and (VII) Granting Related Relief, Case No. 20-12522, D.I. 2911 (June 17, 2021) | A2221 |
| Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Case No. 20-12522, D.I. 2916 (June 18, 2021) | A2240 |
| Disclosure Statement for Joint Plan of Reorganization of Mallinckrodt PLC and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Case No. 20-12522, D.I. 2917 (June 18, 2021) | A2387 |
| Acthar Insurance Claimants' Revised and Supplemental Opposition to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims and Acthar Insurance Claimants' Motion for Substantive Consolidation, Case No. 20-12522, D.I. 2924 (June 18, 2021) [UNDER SEAL] | A3222 |
| Order Establishing Confirmation Schedule and Protocols, Case No. 20-12522, D.I. 2988 (June 24, 2021) | A4718 |
| Notice of Amended Agenda for Video Hearing Scheduled for June 24, 2021 at 1:00 p.m. (ET), Case No. 20-12522, D.I. 2989 (June 24, 2021) | A4730 |
| Debtors' Omnibus Reply in Support of First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 3177 (July 9, 2021) [UNDER SEAL] | A4762 |

| Document | Page No. |
|---|---|
| Statement of the Official Committee of Unsecured Creditors in Connection with the Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 3316 (July 21, 2021) | A6184 |
| Notice of Agenda of Matters Scheduled for Hearing on July 23, 2021 at 10:00 a.m., Case No. 20-12522, D.I. 3309 (July 21, 2021) | A6206 |
| Amended Notice of Agenda of Matters Scheduled for Hearing on July 23, 2021 at 9:00 a.m., Case No. 20-12522, D.I. 3389 (July 22, 2021) | A6213 |
| Transcripts, Order Appealed, and Notice of Appeal | |
| Transcript of Video Hearing [Zoom videoconference] on May 5, 2021 Regarding Motion for Scheduling Order, Adv. Pro. No. 21-50428, D.I. 2204 | A6221 |
| Transcript of Telephonic Hearing [Zoom videoconference] on May 12, 2021 Regarding Scheduling, Case No. 20-12522, D.I. 2303 | A6255 |
| Transcript of Video Hearing [Zoom videoconference] on May 20, 2021 Regarding Administrative Claims Bar Date, Case No. 20-12522, D.I. 2506 | A6293 |
| Transcript of Video Hearing [Zoom videoconference] on May 26, 2021 Regarding Scheduling, Case No. 20-12522, D.I. 2586 | A6331 |
| Transcript of Video Omnibus Hearing [Zoom videoconference] on June 2, 2021, Case No. 20-12522, D.I. 2683 | A6372 |
| Transcript of Telephonic Omnibus Hearing [Zoom videoconference] on June 7, 2021, Case No. 20-12522, D.I. 2752 | A6453 |

| Document | Page No. |
|---|---|
| Transcript of Telephonic Disclosure Statement Hearing [Zoom videoconference] on June 15, 2021, Case No. 20-12522, D.I. 2887 | A6563 |
| Transcript of Telephonic Disclosure Statement Hearing [Zoom videoconference] on June 16, 2021, Case No. 20-12522, D.I. 2930 | A6641 |
| Transcript of Telephonic Hearing [Zoom videoconference] on July 23, 2021 Regarding Unsubstantiated Claims Objection, Case No. 20-12522, D.I. 3414 | A6775 |
| Order Sustaining Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 3406 (July 23, 2021) | A6950 |
| Notice of Appeal, Case No. 20-12522, D.I. 3457 (July 28, 2021) | A6951 |
| Other Items | |
| Creditor's Claims in Bankruptcy Proceedings – The Debtor-Creditor Relationship in Bankruptcy – Allowance and Payment of Claims, Civil Resource Manual, Department of Justice (June 1998), available at https://www.justice.gov/jm/civil-resource-manual-64-creditors-claims-bankruptcy-proceedings | A7146 |
| Press Release, Mallinckrodt Will Pay $100 Million to Settle FTC, State Charges It Illegally Maintained its Monopoly of Specialty Drug Used to Treat Infants, FTC (Jan. 18. 2017), available at https://www.ftc.gov/news-events/press-releases/2017/01/mallinckrodt-will-pay-100-million-settle-ftc-state-charges-it | A7153 |
| Drug Maker Mallinckrodt Agrees to Pay Over $15 Million to Resolve Alleged False Claims Act Liability for "Wining and Dining" Doctors, Department of Justice (Sept. 4, 2019), available at https://www.justice.gov/opa/pr/drug-maker- | A7156 |

| Document | Page No. |
|---|---|
| mallinckrodt-agrees-pay-over-15-million-resolve-alleged-false-claims-act-liability | |
| Second Amended Complaint ¶¶ 7-8, *Humana Inc. v. Mallinckrodt ARD LLC*, No. 2:19-cv-06926 (C.D. Cal. Apr. 24, 2020) [D.I. 60] | A7158 |
| Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, *Humana Inc. v. Mallinckrodt ARD LLC*, No. 2:19-cv-06926 (C.D. Cal. Aug. 14, 2020) [D.I. 80] | A7442 |
| May 24, 2021 Emails Regarding Omnibus Unsubstantiated Claims Objection | A7471 |
| June 23, 2021 Emails Regarding Status Conference; Unsubstantiated Claims Hearing | A7473 |
| July 1, 2021 Emails Regarding Unsubstantiated Claims Objection | A7478 |
| Joint Debtors and Attestor/Humana Exhibit & Witness List for July 23, 2021 Hearing (July 22, 2021) | A7479 |

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>MALLINCKRODT PLC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 20-12522 (JTD)<br><br>(Jointly Administered)<br>**Hearing Date:**<br>**May 26, 2021, 3:00 p.m. (ET)**<br><br>**Obj. Deadline:**<br>**May 14, 2021, 4:00 p.m. (ET)** |

## MOTION OF ATTESTOR LIMITED AND HUMANA INC. FOR ENTRY OF AN ORDER ALLOWING AND COMPELLING PAYMENT OF ADMINISTRATIVE CLAIMS PURSUANT TO SECTION 503(b) OF THE BANKRUPTCY CODE

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Boulevard, Hazelwood, Missouri 63042.

A-0577

<u>**TABLE OF AUTHORITIES**</u>

**Cases**                                                                                                            **Page(s)**

*In re Blanchard*,
    547 B.R. 347 (Bankr. C.D. Cal. 2016) .............................................................................. 10

*Carter-Wallace Inc. v. Davis-Edwards Pharmacal Corp.*,
    443 F.2d 867 (2nd Cir. 1971).......................................................................................... 11

*In re Charlesbank Laundry, Inc.*,
    755 F.2d 200 (1st Cir. 1985) ........................................................................................... 11

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
    747 F.3d (2d Cir. 2014).  ................................................................................................ 12

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
    246 F. Supp. 3d 680 (E.D.N.Y. 2017) ........................................................................... 12

*In re Garden Ridge Corp.*,
    321 B.R. 669 (Bankr. D. Del. 2005) ................................................................................. 8

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968).......................................................................................................... 11

*In re Hayes Lemmerz Int'l, Inc.*,
    340 B.R. 461 (Bankr. D. Del. 2006) ......................................................................... 10, 11

*Institut Pasteur v. Cambridge Biotech Corp. (In re Cambridge Biotech Corp.)*,
    186 B.R. 9 (Bankr. D. Mass. 1995) ................................................................................. 11

*In re Kmart Corp.*,
    No. 08C2101, 2008 WL 5070306, (N.D. Ill. Nov. 20, 2008).......................................... 10

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    968 F. Supp. 2d 367, 400 (D. Mass. 2013) ..................................................................... 11

*In re O'Brien Env't Energy, Inc.*,
    181 F.3d 527 (3d Cir. 1999).............................................................................................. 8

*Myers v. Am. Dental Ass'n*,
    695 F.2d 716 (3d Cir. 1982)............................................................................................ 12

*Ramirez Chrysler Jeep Dodge, Inc. v. Old Carco Liquid.*
    No. 10 Civ. 2800 (PKC), 2010 WL 4455648 (S.D.N.Y. Nov. 2, 2010)........................... 10

A-0578

*Reading Co. v. Brown,*
    391 U.S. 471 (1968) ........................................................................................ 9, 10, 12

*Texas Indus., Inc. v. Radcliff Materials, Inc.,*
    451 U.S. 630 (1981) ................................................................................................. 12

*In re Women First Healthcare, Inc.,*
    332 B.R. 115 (Bankr. D. Del. 2005) ........................................................................ 11

**Statutes**

11 U.S.C. § 105(a) ........................................................................................................ 7

11 U.S.C. § 502(c) ...................................................................................................... 12

11 U.S.C. § 502(d) ........................................................................................................ 7

11 U.S.C. § 503(b) .................................................................................................... 1, 8

11 U.S.C. § 507(a) ........................................................................................................ 8

28 U.S.C. § 157 ............................................................................................................. 2

28 U.S.C. § 1334 ........................................................................................................... 2

28 U.S.C. § 1408 ........................................................................................................... 2

28 U.S.C. § 1409 ........................................................................................................... 2

A-0579

Attestor Limited, on behalf of itself and its affiliated entities, including Avon Holdings I, LLC (collectively, "Attestor"),[2] and Humana, Inc. ("Humana"), creditors of the above-captioned debtors (collectively, the "Debtors" or "Mallinckrodt"), by and through their undersigned counsel, hereby submit this motion (the "Motion"), for entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order"), (a) pursuant to 11 U.S.C. § 503(b), allowing Humana an administrative claim in an amount to be determined by the Court; (b) directing that such amounts be paid in full, and (c) granting such other and further relief as is just and proper. In support of this Motion, Attestor and Humana respectfully state as follows:

**PRELIMINARY STATEMENT**

1.      The Debtors initiated these chapter 11 cases largely because of their potentially crushing legal liabilities related to the marketing and sale of H.P. Acthar Gel ("Acthar"), their flagship Specialty Brands pharmaceutical product, over the past decade. Much of this Acthar-related liability arises from Mallinckrodt's exploitation of its monopoly power over the U.S. market for Acthar while, at the same time, running marketing and distribution schemes in violation of federal and state antitrust and racketeering laws. At the same time, the Debtors have become increasingly reliant on the continued sale of Acthar at artificially inflated volumes and prices to power their business plan.

2.      In 2019, Humana, like many other private litigants and government agencies, filed litigation against Mallinckrodt seeking to recover damages for the hundreds of millions of dollars that it has paid to Mallinckrodt for artificially inflated Acthar prescriptions. Before Humana

---

[2]      Attestor, through affiliated entities, has entered into an agreement with Humana to pursue and participate in any proceeds of Humana's claims against the Debtors with respect to the distribution, marketing, and sale of Acthar. *See* Verified Statement of Willkie Farr & Gallagher LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure, *In re Mallinckrodt plc*, Case No. 1:20-bk-12522-(JTD) (Bankr. D. Del. Apr. 19, 2021) [Dkt. No. 2066].

proceeded to trial on its claims, or even engaged in substantial discovery, the Debtors initiated these chapter 11 cases, automatically stayed Humana's case, and sought to transfer it to the District of Delaware for reference to this Court. Despite the Debtors' admission that Acthar-related liabilities could amount to approximately $15 billion, a restructuring support agreement that they negotiated with *other* creditors allocates to all general unsecured creditors—including Acthar claimants, generics antitrust claimants, investors in unsecured debt, and many others—only a $100 million pot.

3.      At the same time, Mallinckrodt appears to have continued selling Acthar at artificially inflated prices to the tune of approximately $51 million each month and $255.8 million since the Petition Date (as defined herein). As such, Humana has been forced to continue reimbursing its members for astronomical, artificially inflated Acthar prices and volumes that arise from Mallinckrodt's illegal, anti-competitive conduct. Because any damages arising from such post-petition misconduct give rise to administrative claims, Attestor and Humana now move to allow such claims pursuant to section 503(b) of the Bankruptcy Code. Moreover, Attestor and Humana request by separate motion that the Court estimate Humana's Acthar-related claims pursuant to sections 105(a) and 502(c) of the Bankruptcy Code.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157. Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A. Humana's Acthar-Related Claims Against Mallinckrodt.

5.      Humana and its subsidiaries provide healthcare services, including insuring the risk of prescription drug costs, to more than seventeen million members throughout the United States.

A-0581

Since 2010, Humana has paid nearly $1 billion for prescriptions for Acthar, a specialty branded pharmaceutical drug manufactured by Mallinckrodt, for its members.  Acthar is a natural adrenocorticotropic hormone ("ACTH") drug invented in the late 1940s and first licensed by the FDA in 1952 to treat a wide range of ailments, at a time when manufacturers were not required to provide substantial support for efficacy for broad approval.[3]

6.       On August 8, 2019, Humana initiated litigation against Mallinckrodt alleging, among other things, that Mallinckrodt had engaged in a decade-long scheme to inflate the price of Acthar in violation of sections 1 and 2 of the Sherman Act, the federal Racketeering Influenced and Corrupt Organizations (RICO) Act, and various state laws.  In particular, Humana alleges that Mallinckrodt ARD LLC's predecessor, Questcor Pharmaceuticals, Inc., acquired the exclusive right to manufacture and sell Acthar from Aventis Pharmaceuticals for $100,000 in 2001 and then, through its monopoly power, rapidly and repeatedly increased the price of Acthar to an artificially inflated, supracompetitive level.[4]

7.       Humana also alleges that Mallinckrodt took steps to preserve its monopoly power over the market for Acthar.   In particular, Mallinckrodt acquired exclusive U.S. rights to Synacthen, the only potential competitor to Acthar in the United States, from Novartis in 2013 (the "Synacthen Acquisition").[5]  In connection with the Synacthen Acquisition, Mallinckrodt agreed to pay between $135 million and $300 million to Novartis with annual cash payments of $25 million

---

[3]       Second Amended Complaint ¶¶ 5-6, *Humana Inc. v. Mallinckrodt ARD LLC*, No. 2:19-cv-06926 (C.D. Cal. Apr. 24, 2020) ("Complaint"), attached hereto as Exhibit B.

[4]       Second Amended Complaint ¶¶ 7-8, 47, 53-69, *Humana Inc. v. Mallinckrodt ARD LLC*, No. 2:19-cv-06926 (C.D. Cal. Apr. 24, 2020) ("Complaint"), attached hereto as Exhibit B.

[5]       Complaint ¶¶ 70-82.

until Mallinckrodt obtained FDA approval of its U.S. version of Synacthen.[6]  Humana further alleges that neither Mallinckrodt nor Novartis ever expected that Mallinckrodt would actually seek such FDA approval.[7]

8.      Mallinckrodt and its predecessor leveraged their monopoly power to increase the price of a single Acthar vial from $40 in 2001 to $38,892 in 2018, or by approximately 97,500%.[8] At the same time, Acthar has become the flagship product of Mallinckrodt's Specialty Brands business.  In 2019, Acthar net sales totaled nearly $1 billion and constituted 40% of Mallinckrodt's Specialty Brands business and over 30% of its overall business.[9]

9.      Humana also alleges that Mallinckrodt engaged in an illegal kickback, bribery, and racketeering scheme to drive increased demand for its product through two categories of misconduct.  *First*, Humana alleges that Mallinckrodt illegally paid patient co-pays for Acthar through certain funds controlled by the Chronic Disease Fund Inc. in violation of the federal Anti-Kickback Statute and the False Claims Act, largely to inflate Acthar prescription volume despite the drug's artificially inflated price.[10]  Indeed, Humana's Complaint alleges that, "[o]n information and belief, Mallinckrodt continued to pay or substantially subsidize required patient co-payments for Acthar after 2014 and continues to do so until today."[11]   *Second*, Humana alleges that

---

[6]      Questcor Pharmaceuticals, Inc., Current Report (Form 8-K), Item 1.01 (June 11, 2013), attached hereto as Exhibit C.

[7]      Complaint ¶ 78.

[8]      Complaint ¶¶ 7-8.

[9]      Mallinckrodt Pharmaceuticals: Discussion Materials (Oct. 2020), attached hereto as Exhibit D.

[10]      Complaint ¶¶ 93-111.

[11]      Complaint ¶ 111.

A-0583

Mallinckrodt illegally paid kickbacks and bribes to physicians in exchange for prescribing Acthar as part of an aggressive push to increase prescription volume.[12]

10.    The cost to Acthar purchasers as a result of these schemes has been enormous: Humana alone has paid nearly $1 billion for Acthar prescribed at artificially inflated prices.[13] Moreover, Mallinckrodt has maintained the artificially high pricing for Acthar that gave rise to Humana's pre-petition litigation in the first place.  Humana continues to suffer injury as a result of Mallinckrodt's illegal conduct.  Indeed, Humana has paid $230 million for Acthar prescriptions since it first commenced litigation, an additional $45.1 million since the Petition Date, and an average of approximately $7.5 million per month since the Petition Date.

### B.  Mallinckrodt's Chapter 11 Proceedings.

11.    On October 12, 2020 (the "Petition Date"), the Debtors filed voluntary petitions in this Court commencing cases for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").[14]  As explained in greater detail in Humana's Estimation Motion and the Debtors' First Day Declaration, Mallinckrodt eventually pursued an enterprise-wide chapter 11 filing, as opposed to a Specialty Generics-only filing, due to its significant (and accelerating) Acthar-related liabilities.[15]  If Humana were to proceed to trial outside of these chapter 11 proceedings, for example, it would have sought trebling of its damages and would have threatened Mallinckrodt with the risk of a multi-billion-dollar jury verdict.

---

[12]     Complaint ¶¶ 97-108.

[13]     Complaint ¶ 14.

[14]     *See Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 128].

[15]     Estimation Motion ¶¶ 15-18; First Day Declaration ¶ 22.

A-0584

12.     On October 20, 2020, the Debtors filed the *Motion of Debtors for Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* (the "Bar Date Motion") [Docket No. 270]. This Court entered an *Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* (the "Bar Date Order") [Docket No. 667]. The Bar Date Motion and Order did not provide an administrative claims bar date and instead provided:[16]

> All administrative claims under section 503(b) of the Bankruptcy Code, other than claims under section 503(b)(9) of the Bankruptcy Code, must be made by separate requests for payment in accordance with section 503(a) of the Bankruptcy Code and shall not be deemed proper if made by proof of claim.

13.     In February 2021, Humana filed proofs of claims against all of the Debtors on the basis of its Acthar-related litigation.[17]  Since the Petition Date, Humana has paid an additional $45.1 million for Acthar prescriptions, which appears to be approximately 18% of Mallinckrodt's total post-petition net sales of Acthar, and continues to pay approximately $7.5 million per month for those prescriptions on an ongoing basis.  As discussed in greater detail below, to the extent Humana's claims arise from Mallinckrodt's ongoing illegality, such claims constitute administrative claims under section 503(b) of the Bankruptcy Code.

14.     On April 20, 2021, the Debtors filed their *Joint Plan of Reorganization* (the "Plan") [Docket No. 2074] and *Disclosure Statement for Joint Chapter 11 Plan of Reorganization* (the "Disclosure Statement") [Docket No. 2075].  The Plan closely tracked the terms of the Debtors' pre-petition restructuring support agreement, including by allocating to all general unsecured

---

[16]     Bar Date Motion, Exhibit B at 8.

[17]     *See, e.g.,* Proof of Claim Nos. 3133, 3219, 3220, 3221, 3223, 3225, 3226, 3344, 3362, 3379, 3386, 3393, 3394, 3396, 3403, 3406, 3411, 3417, 3420, 3423, 3433, 3438.

A-0585

creditors, including Acthar-related claimants, a combined cash pool of $100 million.  (Plan § I.A.112.)  The Plan also separately classified certain federal and state government Acthar-related claims and allocated to those claims a distinct $260 million cash payment, while continuing to classify private Acthar-related claimants as general unsecured creditors restricted to the $100 million cash pool.  (Plan § III.A.)  In addition, the Plan proposed an "Administrative Claims Bar Date" that is "the earlier of (a) the bar date established for any such Administrative Claims by separate order of the Bankruptcy Court and (b) the date that is the 60th day after the Effective Date [of the Plan]."  (Plan § I.A.23.)  The Debtors' most recent publicly available strategic plan projects that those administrative and priority claims will total approximately $160 million.[18]

15.     On April 30, 2021, Humana filed two motions concerning the scope and value of its Acthar-related claims.  *First*, Humana filed this Motion to allow its administrative claims arising from Mallinckrodt's ongoing illegality and to allow those claims under Section 503(b) of the Bankruptcy Code.  *Second*, Humana has filed a *Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 502(d) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in the Bankruptcy Cases* (the "Estimation Motion"), pursuant to which Humana requests that the Court estimate its Acthar-related claims, including both unsecured claims and administrative claims pursuant to section 502(c) of the Bankruptcy Code.[19]

---

[18]     Mallinckrodt plc, Current Report (Form 8-K) at 167 (Mar. 10, 2021), attached hereto as Exhibit E.

[19]     The factual background on Humana and its claims against the Debtors, including those for damages resulting from both the pre-petition and post-petition sales of Acthar by the Debtors at prices that violate federal RICO and antitrust law, is set forth in more detail in the Estimation Motion.  Humana reserves all rights to make additional objections to the Plan and Disclosure Statement, other than those explicitly described in this Motion and the Estimation Motion.

A-0586

16.     The Estimation Motion sets forth a proposed procedure pursuant to which this Court should estimate Humana's claims pursuant to section 502(c) of the Bankruptcy Code.  To the extent the Court determines that any part of the claims' value arises from post-petition payments by Humana, the damages that Humana suffered should be entitled to priority treatment and allowed as an administrative claim.

## RELIEF REQUESTED

17.     By this Motion, Attestor and Humana seek entry of an order: (a) allowing Humana an administrative claim in an amount determined by the Court; (b) compelling the Debtors to pay such amount; and (c) granting such other and further relief as is just and proper under the circumstances.

## BASIS FOR RELIEF

### I.   HUMANA'S POST-PETITION ACTHAR-RELATED DAMAGES QUALIFY FOR ADMINISTRATIVE PRIORITY TREATMENT.

18.     Section 503(b)(1) of the Bankruptcy Code provides, in relevant part, that, "there shall be allowed administrative expenses . . . including . . . the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).  Administrative claims are entitled to priority payment under section 507(a)(2) of the Bankruptcy Code and are required to be paid in full once allowed pursuant to section 1129(a)(9) of the Bankruptcy Code.  *See id*. §§ 507(a)(2), 1129(a)(9).

19.     To establish an administrative claim, the claimant must typically show that (1) there was "a post-petition transaction between the creditor and the debtor," and (2) "the estate . . . receive[d] a benefit from the transaction." *In re Garden Ridge Corp.*, 321 B.R. 669, 676 (Bankr. D. Del. 2005) (quoting *In re Waste Systems Int'l, Inc.*, 280 B.R. 824, 826 (Bankr. D. Del. 2002)); *see also In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 532–33 (3d Cir. 1999) ("For a claim in its

A-0587

entirety to be entitled to first priority under [§ 503(b)(1)(A)], the debt must arise from a transaction with the debtor-in-possession . . . . [and] the consideration supporting the claimant's right to payment [must be] beneficial to the debtor-in-possession in the operation of the business.").

20.     In this case, Humana's wholly owned pharmacy has continued to purchase Acthar at inflated prices from Mallinckrodt's exclusive sales agent, over which Mallinckrodt continues to exercise control, since the Petition Date.  In fact, Humana has spent approximately $45.1 million on Acthar prescriptions—or approximately $7.5 million per month—since the Petition Date. Humana's Acthar purchases confer a very substantial benefit on the estates.  The Debtors consider Acthar to be their "most valuable" product and appear to be relying on Acthar-related revenue to fund their reorganization and prompt emergence from chapter 11 proceedings.[20]  Since the Petition Date, Debtor Mallinckrodt ARD LLC appears to have made aggregate net sales of approximately $255.8 million and continues to make average monthly net sales of approximately $51 million. Humana reasonably believes that substantially all of that revenue arises from Acthar-related net sales.[21]  Indeed, the Debtors' long-term, post-emergence business plan appears to rely partly on Acthar innovation and pricing stabilization between 2022 and 2024.[22]

21.     At the same time, Mallinckrodt appears to be maintaining Acthar's supracompetitive pricing in violation of federal and state antitrust laws, thereby causing significant, ongoing harm to Humana and other Acthar purchasers.  The U.S. Supreme Court has recognized that post-petition tort claims may be allowed as administrative claims.  *See Reading*

---

[20]     First Day Declaration ¶ 38.

[21]     *See Debtor-In-Possession Monthly Operating Report for Filing Period October 12, 2020 – November 27, 2020* [Docket No. 1079]; *Debtor-In-Possession Monthly Operating Report for Filing Period December 26, 2020 – January 22, 2021* [Docket No. 1478]; *Debtor-In-Possession Monthly Operating Report for Filing Period January 23, 2021 – February 26, 2021* [Docket No. 1901]; *Debtor-In-Possession Monthly Operating Report for Filing Period February 27, 2021 – March 26, 2021* [Docket No. 2118].

[22]     Ex. D, Mallinckrodt Pharmaceuticals: Discussion Materials (Oct. 2020).

A-0588

*Co. v. Brown*, 391 U.S. 471 (1968) (holding that post-petition damages arising from receiver's negligently caused fire were administrative claims); *In re Hayes Lemmerz Int'l, Inc.,* 340 B.R. 461, 480 (Bankr. D. Del. 2006) ("Damages arising from a post-petition tort committed by a debtor are entitled to administrative expense status").  In *Reading Co. v. Brown*, the Supreme Court held that consideration of "fundamental fairness and logic" sometimes requires the allowance of an administrative claim, and that "actual and necessary" costs should include "costs ordinarily incident to operation of a business." *Reading*, 391 U.S. at 483.  The Court concluded that the statutory objective of fairness dictated the result, as the injured party "did not merely suffer injury at the hands of the business: it had an insolvent business thrust upon it by operation of law." *Id.* at 478.

22.     Specifically, the *Reading* doctrine "provides that a post-petition tort committed by a debtor-in-possession within the course and scope of its continued operation of the estate's business may, itself, be considered a cost of doing business and is, therefore, entitled to administrative expense priority under section 503(b)(1)(A)." *In re Blanchard,* 547 B.R. 347, 353 (Bankr. C.D. Cal. 2016).  Pursuant to *Reading*'s modified torts approach, a claimed tort debt is administrative where the debt (1) "arise[s] from a transaction with the debtor-in-possession" and (2) is "ordinarily incident to operation of a business" and fairness dictates that the claim receive administrative priority.  *See Ramirez Chrysler Jeep Dodge, Inc. v. Old Carco Liquid. Tr. (In re Old Carco LLC)*, No. 10 Civ. 2800 (PKC),  2010 WL 4455648, at *4 (S.D.N.Y. Nov. 2, 2010) (quoting *Reading*, 391 U.S. at 483); *see also In re Kmart Corp.*, No. 08 C 2101 2008 WL 5070306, at *3 (N.D. Ill. Nov. 20, 2008).

23.     Courts across jurisdictions, including this one, have consistently followed the *Reading* doctrine, finding that damages resulting from post-petition torts committed by the debtor

A-0589

are entitled to administrative priority under section 503(b)(1) of the Bankruptcy Code. *E.g., In re Women First Healthcare, Inc.*, 332 B.R. 115, 123 (Bankr. D. Del. 2005) (stating that a post-petition tort can create an administrative claim); *Carter-Wallace Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 874 (2nd Cir. 1971) (holding that a post-petition patent infringement seems to qualify for administrative priority treatment); *Institut Pasteur v. Cambridge Biotech Corp.* (*In re Cambridge Biotech Corp.*), 186 B.R. 9, 14 (Bankr. D. Mass. 1995) (same).

24.     In *In re Hayes Lemmerz International, Inc.*, for example, the Delaware Bankruptcy Court considered whether a claim that the debtor, after the petition date, stripped machine parts from the creditor's own machines could qualify for administrative priority treatment. *See* 340 B.R. 461, 480 (Bankr. D. Del. 2006). Because the machine stripping arose in the course of the debtor's business and was done to keep the debtor's own machines operating for the benefit of the business (and therefore the estate), the court found that it qualified as an administrative claim. *Id.* at 481.

25.     Courts have also found that it does not matter if the claim originates from conduct that began prior to the petition date. In *In re Charlesbank Laundry, Inc.*, the administrative claim, a civil fine for damages based on a continuing nuisance in violation of an injunction, was allowed in an amount equal to the post-petition portion of the fine. 755 F.2d 200, 202 (1st Cir. 1985). The wrongful behavior commenced pre-petition, but continued post-petition. *Id.* This is consistent with how courts treat continuing antitrust violations generally. In particular, courts have held that a person suffers a cognizable injury every time that person is overcharged for a monopolized product, even though the conduct that gave rise to the monopoly in the first place occurred at some point in the past. *See, e.g., Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 (1968) (finding that complainant who was overcharged for goods due to monopolistic conduct was entitled to sue the first time that person was overcharged or years later when the person was still

A-0590

being overcharged); *see also In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 400 (D. Mass. 2013) ("[I]t is reasonable to assume here that, every time the Direct Purchasers were overcharged for brand Nexium, they suffered a cognizable injury.").

26.   Moreover, courts have expressly indicated that antitrust claims, such as those Humana is asserting against the Debtors, may be entitled to administrative priority under the *Reading* doctrine.  In *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, for example, the defendant, United Airlines, Inc. ("United"), sought dismissal of pre-petition and post-petition, pre-confirmation antitrust claims that plaintiff DPWN Holdings (USA), Inc. ("DHL") had brought against it, on the basis that the challenged portion of the claim was discharged upon confirmation of United's Chapter 11 plan of reorganization.  747 F.3d 145 (2d Cir. 2014).  On an initial appeal, the Second Circuit directed the district court to determine whether the bankruptcy court would have "entertained" DHL's antitrust claim.  *See DPWN Holdings (USA), Inc.* 747 F.3d at 153.  On remand, the district court held that there were "no procedural impediments to the consideration of DHL's administrative claim except that DHL never filed it" and that the bankruptcy court "would . . . have considered the claim on the merits or for purposes of estimation under 11 U.S.C. § 502(c), and not disallowed it for timeliness or other procedural reasons."  *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 246 F. Supp. 3d 680, 696 (E.D.N.Y. 2017) (on remand).  This is consistent with the Third Circuit's position that antitrust claims are "in essence a form of tort alleging business injury,"  *Myers v. Am. Dental Ass'n*, 695 F.2d 716, 723 (3d Cir. 1982); *see also DPWN Holdings (USA), Inc.*, 246 F. Supp. 3d at 694 ("Antitrust claims are considered tort claims.") (citing *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 634 (1981)).

A-0591

27.     As discussed in greater detail in the Estimation Motion, Humana has asserted both pre-petition and post-petition claims against the Debtors for their tortious anticompetitive conduct relating to their sale and distribution of Acthar.[23]  The Debtors' unlawful business practices, as well as the resulting artificially inflated price of and demand for Acthar, originated prior to the commencement of these chapter 11 cases.  But certain of the Debtors' unlawful conduct, as well as the effects of their pre-petition unlawful conduct, continue to this day.  In particular, Mallinckrodt continues to maintain a virtual monopoly over the U.S. market for long-acting ACTH analogues as a result of its acquisition of Synacthen.  Because the Synacthen Acquisition and resulting monopoly have enabled Mallinckrodt to maintain its artificially high pricing of Acthar, the Debtors are continuing to substantially profit at Humana's expense post-petition.  As noted above, since the Petition Date, Mallinckrodt ARD LLC, which has exclusive rights to market and sell Acthar in the United States, appears to have made aggregate net sales of $255.8 million, and continues to make average monthly net sales of approximately $51 million.[24]  Humana reasonably believes that most, if not all, such sales are of Acthar at supracompetitive prices.

28.     As noted above, the Debtors also appear to be relying on the profits that they generate from continued sales of Acthar, which remains their most profitable product, to fund their reorganization and successfully emerge from these chapter 11 proceedings.  For example, the Debtors have referred to Acthar as their "most valuable product" and have presented a post-confirmation business plan that is driven in part by Acthar product development and pricing

---

[23]     Estimation Motion ¶¶ 25-39.

[24]     *See Debtor-In-Possession Monthly Operating Report for Filing Period October 12, 2020 – November 27, 2020* [Docket No. 1079]; *Debtor-In-Possession Monthly Operating Report for Filing Period December 26, 2020 – January 22, 2021* [Docket No. 1478]; *Debtor-In-Possession Monthly Operating Report for Filing Period January 23, 2021 – February 26, 2021* [Docket No. 1901]; *Debtor-In-Possession Monthly Operating Report for Filing Period February 27, 2021 – March 26, 2021* [Docket No. 2118].

A-0592

stabilization between 2022 and 2024.[25]  Simply put, the Debtors are continuing to profit from their wrongdoing in the ordinary course of their post-petition business and, in fact, appear to be relying on that wrongdoing to buy support for a reorganization plan that largely excludes private Acthar-related claimants.  At the same time, Humana, one of the largest Acthar-related claimants, has paid nearly $1 billion since 2010 and $45.1 million since the Petition Date, and continues to pay an average of $7.5 million each month after the Petition Date, for the Debtors' artificially inflated Acthar treatments for its members.

29.     In summary, Humana has suffered (and continues to suffer) substantial damages due to the Debtors' tortious anticompetitive conduct since they filed for bankruptcy relief.  At the same time, the Debtors and their stakeholders have benefitted and continue to benefit from the inflated prices that the Debtors charge Humana for Acthar in the ordinary course of business. Attestor and Humana are making this Motion, as well as the Estimation Motion, well in advance of confirmation so that the Court can determine the amount of post-petition administrative claims that needs to be paid by the Debtors, an issue critical to the advancement of these chapter 11 cases. Accordingly, the Court can and should find that Humana's claim be afforded administrative priority pursuant to section 503(b) of the Bankruptcy Code.

## RESERVATION OF RIGHTS

30.     The filing of this Motion shall not be construed as a waiver or release of any of Attestor's or Humana's claims, rights, or remedies.  Attestor and Humana reserve the right to supplement or amend this Motion in any manner and for any purpose including without limitation to assert additional administrative claims for any period.

---

[25]     *See, e.g.,* First Day Declaration ¶ 38 (referring to Acthar as "the Debtor's most valuable product"); Ex. D at 24, Mallinckrodt Pharmaceuticals: Discussion Materials (Oct. 2020) (reflecting "preliminary consolidated business plan" driven, in part, by "Acthar stabilization" between 2022 and 2024).

A-0593

**NOTICE**

31.     Notice of this Motion will be provided to the Debtors and other parties entitled to notice pursuant to Local Bankruptcy Rule 2002-1(b).  Attestor and Humana submit that, under the circumstances, no other or further notice is required.

32.     A copy of this Motion is available on (a) the Court's website, www.deb.uscourts.gov, and (b) the website maintained by the Debtors' claims and noticing agent, Prime Clerk LLC, at http://restructuring.primeclerk.com/Mallinckrodt.

**CONCLUSION**

33.     Attestor and Humana respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit A, (a) allowing Humana an administrative claim in an amount to be determined by the Court, plus additional amounts for expenses paid or incurred in connection with the administration of this Motion, including professional fees and expenses; (b) compelling the Debtors to pay such amounts within thirty (30) days of entry of an order approving this Motion; and (c) granting such other and further relief as the Court may deem just and appropriate.

A-0594

Dated: April 30, 2021
    Wilmington, Delaware       **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Matthew B. Harvey*
Donna L. Culver (Bar No. 2983)
Robert J. Dehney (Bar No. 3578)
Matthew B. Harvey (Bar No. 5186)
Nader A. Amer (Bar No. 6635)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email:    dculver@morrisnichols.com
          rdehney@morrisnichols.com
          mharvey@morrisnichols.com
          namer@morrisnichols.com

- and -

Matthew A. Feldman (*pro hac vice* admission pending)
Joseph G. Minias (*pro hac vice* admission pending)
Matthew Freimuth (*pro hac vice* admission pending)
Richard Choi (*pro hac vice* admission pending)
Philip F. DiSanto (*pro hac vice* admission pending)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Email:    mfeldman@willkie.com
          jminias@willkie.com
          mfreimuth@willkie.com
          rchoi1@willkie.com
          pdisanto@willkie.com

*Counsel to Attestor and Humana*

A-0595

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MALLINCKRODT PLC., *et al.*,[1] | Case No. 20-12522 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Objection Deadline:** <br> May 14, 2021, 4:00 p.m. (ET) |
| | **Hearing Date:** <br> May 26, 2021, 3:00 p.m. (ET) |

**NOTICE OF MOTION OF ATTESTOR LIMITED AND HUMANA INC. FOR ENTRY
OF AN ORDER ALLOWING AND COMPELLING PAYMENT OF ADMINISTRATIVE
CLAIMS PURSUANT TO SECTION 503(b) OF THE BANKRUPTCY CODE**

      **PLEASE TAKE NOTICE** that on April 30, 2021, Attestor Limited, on behalf of itself and its affiliated entities, including Avon Holdings I, LLC (collectively, "Attestor"), and Humana, Inc. ("Humana"), filed the *Motion of Attestor Limited and Humana Inc. for Entry of an Order Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code* (the "Motion") in the above-captioned chapter 11 cases.

      **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in the Motion must be: (a) in writing; (b) filed with the Clerk of the United States Bankruptcy Court for the District of Delaware (the "Court"), 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, on or before **May 14, 2021, at 4:00 p.m. (Eastern Time)** (the "Objection Deadline"); and (c) served so as to be received on or before the Objection Deadline by the undersigned counsel to Attestor and Humana.

      **PLEASE TAKE FURTHER NOTICE** that if any objections to the relief requested in the Motion are received, the Motion and such objection shall be considered at a hearing before The Honorable John T. Dorsey, United States Bankruptcy Judge for the District of Delaware, at the Court, 824 North Market Street, 5th Floor, Courtroom 5, Wilmington, Delaware 19801 or by video using the Zoom meeting information that will be provided by the Court, on **MAY 26, 2021, AT 3:00 P.M. (EASTERN TIME).**

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Boulevard, Hazelwood, Missouri 63042.

**PLEASE TAKE FURTHER NOTICE** that only objections made in writing and timely filed and received, in accordance with the procedures above, will be considered by the Court at such hearing.

**PLEASE TAKE FURTHER NOTICE THAT IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.**

Dated: April 30, 2021
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Matthew B. Harvey*

Donna L. Culver (Bar No. 2983)
Robert J. Dehney (Bar No. 3578)
Matthew B. Harvey (Bar No. 5186)
Nader A. Amer (Bar No. 6635)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email:    dculver@morrisnichols.com
              rdehney@morrisnichols.com
              mharvey@morrisnichols.com
              namer@morrisnichols.com

- and -

Matthew A. Feldman (admitted *pro hac vice*)
Joseph G. Minias (admitted *pro hac vice*)
Matthew Freimuth (admitted *pro hac vice*)
Richard Choi (admitted *pro hac vice*)
Philip F. DiSanto (admitted *pro hac vice*)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Email:   mfeldman@willkie.com
             jminias@willkie.com
             mfreimuth@willkie.com
             rchoi1@willkie.com
             pdisanto@willkie.com

*Counsel to Attestor and Humana*

A-0597

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>MALLINCKRODT PLC., *et al.*,[1]<br><br><br>Debtors. | Chapter 11<br>Case No. 20-12522 (JTD)<br><br>(Jointly Administered) |

**ORDER ALLOWING AND COMPELLING PAYMENT OF HUMANA'S ACTHAR-
RELATED ADMINISTRATIVE CLAIMS PURSUANT TO
<u>SECTION 503(b) OF THE BANKRUPTCY CODE</u>**

Upon the *Motion for Entry of an Order Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code*, dated April 30, 2021 (the "<u>Motion</u>"),[2] filed by Attestor Limited, on behalf of itself and its affiliated entities, including Avon Holdings I, LLC (collectively, "<u>Attestor</u>"), and Humana, Inc. ("<u>Humana</u>"), by and through their undersigned counsel, as creditors of the above-captioned debtors in the above-captioned chapter 11 cases; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having reviewed the Motion and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Boulevard, Hazelwood, Missouri 63042.

[2]     Capitalized terms not defined herein are used as defined in the Motion.

proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      Humana is hereby allowed an administrative claim against the Debtors' estates. The amount of such claim shall be determined pursuant to the procedures proposed in the Estimation Motion and so-ordered by this Court.

3.      Within third (30) days of the Court's estimating the value of Humana's administrative claims, the Debtors shall pay such amount to Humana and shall continue to pay administrative claims that accrue due to the Debtors' post-petition sales of Acthar on a monthly basis thereafter.

4.      This Order is without prejudice to Humana's rights under its proofs of claims or its rights to file, pursue, or recover under any other claims, whether administrative or otherwise, or any other rights of Attestor or Humana.

5.      The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2021

Wilmington, Delaware                          _____
                                              THE HONORABLE JOHN T. DORSEY
                                              UNITED STATES BANKRUPTCY JUDGE

**A-0600**

# EXHIBIT B

Gary S. Lincenberg
Jeremy D. Matz
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW P.C.
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067
Telephone: 310−201−2100
Fax: 310−201−2110
Email: glincenberg@birdmarella.com
       jmatz@birdmarella.com

Scott C. Solberg (admitted *pro hac vice*)
James W Joseph (admitted *pro hac vice*)
Benjamin E. Waldin (admitted *pro hac vice*)
EIMER STAHL LLP
224 South Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
Email: ssolberg@eimerstahl.com
       jjoseph@eimerstahl.com
       bwaldin@eimerstahl.com

*Attorneys for Plaintiff Humana Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| HUMANA INC., <br><br>      Plaintiff, <br><br>   v. <br><br> MALLINCKRODT ARD LLC (f/k/a Mallinckrodt ARD Inc., f/k/a Questcor Pharmaceuticals, Inc.), <br><br>      Defendant. | Case No. 2:19-cv-06926-DSF-MRW <br><br> **DEMAND FOR JURY TRIAL** <br><br> Honorable Dale S. Fischer <br> United States District Judge |

A-0602

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................1

II.     PARTIES ......................................................................................5

III.    JURISDICTION AND VENUE.......................................................9

IV.     FACTUAL ALLEGATIONS .........................................................10

  A.   Humana.................................................................................10

  B.   Acthar ..................................................................................11

  C.   Medical Use of Acthar and Other Adrenal Hormone Drugs .....................13

  D.   Mallinckrodt's Monopoly Power with Acthar ...........................16

   1.   Direct Evidence of Monopoly Power..........................................16

   2.   Further Evidence of Monopoly Power ........................................17

   3.   Anticompetitive Conduct in the Acquisition of Synacthen ........................19

   4.   Mallinckrodt's Sales of Acthar to Humana and its Members....................22

   5.   Scope of the Antitrust Allegations ..............................................24

  E.   Mallinckrodt's Kickback and Racketeering Schemes ................................29

   1.   Patient Co-Pay Subsidies Through Sham Charitable Funds......................29

   2.   Physician Kickbacks.................................................................33

   3.   False Representations and Certifications ....................................36

   4.   Use of the Mails and Wires.......................................................38

  F.   Mallinckrodt's Fraudulent Concealment of the Illegal Scheme ................38

  G.   Damages ...............................................................................39

Count I  Violation of the Sherman Antitrust Act, 15 U.S.C. § 2...........................40

Count II  Violation of the Sherman Antitrust Act, 15 U.S.C. § 1 ..........................41

Count III Violation of State Antitrust Laws .............................................42

Count IV Violation of the RICO Act, 18 U.S.C. § 1962(c) ...................................43

Count V Conspiracy to Violate the RICO Act, 18 U.S.C. § 1962(d)....................45

Count VI State Unfair Competition Law Claims .........................................47

Count VII State Consumer Fraud and Deceptive Trade Practice Law Claims .......49

A-0603

Count VIII  State Insurance Fraud Claims..................................................................51

Count IX Tortious Interference with Contractual Relations....................................52

Count X Unjust Enrichment........................................................................................54

V.      PRAYER FOR RELIEF ................................................................................54

VI.     JURY DEMAND............................................................................................55

SECOND AMENDED COMPLAINT

A-0604

**<u>SECOND AMENDED COMPLAINT</u>**

Plaintiff Humana Inc. ("Plaintiff" or "Humana"), complains against Defendant, Mallinckrodt ARD LLC, formerly known as Questcor Pharmaceuticals, Inc. ("Questcor")("Defendant," "Mallinckrodt," or the "Company"), as follows:

## I.   INTRODUCTION

1.      This action arises from one of the most outrageous price-gouging schemes in the history of American medicine.

2.      H.P. Acthar Gel ("Acthar") is a drug that has been available since 1952, and for nearly half a century, its price was modest. In 2001, a vial of the drug cost $40.

3.      But by 2018, the same vial cost over $39,000. This is a 97,500% price increase. It is as if the price of milk increased from $3 to over $2,900 per gallon, or a mortgage payment rose from $2,000 to over $2 million per month.

4.      These eye-popping price increases are not an accident, a market anomaly, or a necessary byproduct of legislation. They are the intended result of purposeful and illegal conduct by Acthar's producers, Mallinckrodt and its predecessor Questcor. This conduct consists of a complex, multipart scheme involving monopoly, bribery, racketeering, fraud, and other deceptive and unfair practices that have imposed exorbitant and pointless costs on those financially responsible for the costs of the drug, including not just patients but also health and Medicare insurers like Humana, the plaintiff here.

5.      Though Acthar may be a billion-dollar golden goose for Mallinckrodt today, its origins were humble. The drug is an adrenocorticotropic hormone ("ACTH") analogue produced from the pituitary gland of pigs. It was invented in the late 1940s by the meat company Armour, as a byproduct of pork-processing operations. At the time, Acthar was considered a miracle drug because it stimulated the body's production of cortisol, provoking a natural anti-inflammatory response that was beneficial for the treatment of various conditions. Acthar was given broad approval by the FDA in 1952

A-0605

to treat a wide range of ailments at a time when such broad approvals were commonplace and did not require support from clinical trials.

6.      This also occurred before the commercial development of synthetic steroid drugs (corticosteroids) and many popular non-steroidal anti-inflammatory drugs (NSAIDs), such as ibuprofen. The advent of these safe, cheap alternative treatments in pill form reduced the need for an injectable drug derived from the pituitary gland of pigs. These developments completely redefined the economic market for Acthar and rendered it a niche, specialty drug. By the 1990s, Acthar remained medically and economically viable for only a few key uses. For example, Acthar remains the standard of care for infantile spasms, a rare but catastrophic epileptic syndrome affecting babies and toddlers two years old or younger. But other than this and a handful of similarly rare conditions, Acthar is—especially for older patients who are Medicare beneficiaries, such as Humana members—either a drug of last resort or not known to be clinically effective.

7.      Consequently, the drug became unprofitable for its manufacturer, Aventis Pharmaceuticals, Inc., which had considered stopping production. But the drug was saved in 2001, when Mallinckrodt's predecessor Questcor purchased the right to produce this unprofitable and largely outdated drug for $100,000 plus modest royalties, seeing it as a potential gold mine for exploitation.

8.      Thereafter began a run of outrageous price increases. The cost of Acthar ballooned from $40 in 2001, to $750 immediately after it was acquired, to $1,650 by 2007. In that year the price was jacked up to $23,269 per vial. But the increases did not stop or reverse course: instead the price of Acthar was increased eight more times so that by 2018, the drug cost $38,892 per vial. And since treatment with Acthar usually requires at least three vials, a single course of treatment can cost nearly $120,000. The following charts the course of Acthar pricing:



9.      In just over a decade, Acthar went from a nearly extinct, financial sinkhole to a billion-dollar cash machine. In August 2014—in the midst of this meteoric price rise—Questcor merged into Mallinckrodt in a deal worth approximately $5.6 billion. At the time, Acthar was the only drug product sold by Questcor.

10.      Mallinckrodt has been able to inflate and maintain the shocking price increases of Acthar mainly through three types of improper conduct.

11.      *First*, Mallinckrodt eliminated the competition. It did so by acquiring and then shelving the rights to Acthar's much cheaper synthetic equivalent ACTH, a drug called Synacthen Depot ("Synacthen"). Drug giant Novartis AG ("Novartis") was already selling Synacthen in Europe, Asia, and Latin America, but the drug was not approved for use in the United States. After Novartis launched an auction for Synacthen, Mallinckrodt substantially outbid the competition for the rights to Synacthen in the U.S. But rather than undertake the process of obtaining FDA approval for the only drug that was a direct competitor of its best-selling product, Mallinckrodt never seriously attempted to bring Synacthen to market for any clinical use for which Acthar was approved. This kept the price of Acthar artificially high. In addition, Mallinckrodt vertically integrated its sales by distributing Acthar exclusively through

A-0607

the specialty pharmacy CuraScript. CuraScript had no role in decisions on Acthar's pricing. Because of Mallinckrodt's anticompetitive behavior, the FTC and several states sued it for antitrust violations and later reached a $100 million settlement, as well as an agreement that Mallinckrodt would sublicense its Synacthen rights to a third party.

12.   *Second*, Mallinckrodt increased and then maintained artificially high demand for Acthar by using a charitable foundation for the illegal purpose of paying patient co-pays. This fund—initially called the Chronic Disease Fund, now doing business as Good Days—provided "patient assistance" funds for Acthar only, and not for other drugs. Mallinckrodt financed the foundation, directed patients to the fund, paid their co-pays as "donations," and then marketed the drug as "free." In other words, it was a bribe to patients and a vehicle through which Mallinckrodt could persuade physicians that the astronomical price of the drug should not be a barrier to prescribing it. It also constituted a fraud on Medicare, which is why the Department of Justice recently brought claims against Mallinckrodt under two federal statutes, the False Claims Act, 31 U.S.C. §§ 3729-3733, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). In addition, this conduct constituted a fraud on Humana (one of the nation's largest sponsors of Medicare Advantage plans) and an intentional interference in Humana's relationship with its insureds, because it removed the incentive for patients to exercise the responsibility ordinarily imposed by co-pays, deductible limits, and other out-of-pocket costs set forth in Humana's agreements with its insureds.

13.   *Third*, Defendant simultaneously maintained this artificially high demand through a pervasive bribery scheme to doctors. It should go without saying that doctors would not otherwise be inclined to prescribe, what for most purposes is an antiquated and expensive drug that requires refrigeration and injection, when cheaper, more effective pills and remedies were available. Furthermore, though Acthar is a first-line treatment for infantile spasms, that market is small and Mallinckrodt sought to redirect its marketing efforts away from the poor public-relations consequences of earning billions of dollars off the backs of sick children. Consequently, Mallinckrodt

A-0608

1    aggressively marketed the drug for the treatment of conditions more common among

2    adult patients, including those eligible for Medicare. So under the guise of "education"

3    and "marketing," Mallinckrodt paid millions of dollars to thousands of doctors to

4    encourage the use of Acthar even for conditions where it is not the first-line treatment.

5    Though payment of modest expenses to doctors by pharmaceutical companies may

6    frequently be lawful and harmless, here Mallinckrodt crossed well over the line by

7    paying thinly disguised bribes to at least 20 doctors—mainly rheumatologists,

8    neurologists, and nephrologists—responsible for a significant number of prescriptions.

9    Mallinckrodt paid this group of physicians at least $250,000 each over a three-year

10   period. Not surprisingly, physicians who received more than $10,000 from

11   Mallinckrodt prescribed more than double the amount of Acthar as those who received

12   $25 or less. Also not surprising: fewer than 10% of Acthar prescriptions are now for

13   treatment of infantile spasms.

14        14.    Humana, a Medicare Part D provider, has paid more than $700 million

15   over more than eight years for Acthar. It paid an inflated price due to Mallinckrodt's

16   monopolization and racketeering, and reimbursed unnecessary Acthar treatments due to

17   the prescribing doctors' misrepresentations that they had not received any illegal

18   kickbacks. By this action, Humana seeks to recoup from Mallinckrodt its ill-gotten

19   gains.

20                          **II.   PARTIES**

21        15.    **Humana.** Plaintiff Humana Inc. ("Humana") is a Delaware corporation

22   with its principal place of business at 500 West Main Street, Louisville, Kentucky.

23   Humana and its subsidiaries are providers of healthcare related services, including

24   insuring risk for prescription drug costs for more than eight million members in all 50

25   states, the District of Columbia, and Puerto Rico. More than 75% of Humana's total

26   premium revenues in the year 2012 were derived from contracts with the federal

27   government, including Medicare Part D prescription drug coverage and Medicare

28   Advantage plans. Humana operates its insurance businesses through a variety of wholly

A-0609

owned subsidiaries, all of which have assigned their relevant claims in this action to Humana.[1]

16. **Mallinckrodt.** Defendant Mallinckrodt ARD LLC has its principal place of business at 1425 Route 206, Bedminster, NJ, 07921. Mallinckrodt ARD LLC was previously named Mallinckrodt ARD, Inc., and before that was named Questcor Pharmaceuticals, Inc.

17. Mallinckrodt ARD LLC is a subsidiary of Mallinckrodt plc, an Irish public limited company. On April 4, 2014, Mallinckrodt plc entered into an Agreement and Plan of Merger with Questcor and absorbed Questcor as a wholly owned subsidiary on August 14, 2014 for approximately $5.6 billion.

18. Questcor survived the merger as a wholly owned indirect subsidiary of Mallinckrodt plc and continued to market Acthar thereafter, until changing its name to Mallinckrodt ARD, Inc. on July 27, 2015.

19. On January 26, 2019, Mallinckrodt ARD, Inc. converted to Mallinckrodt ARD LLC and it continues to market Acthar to this day.

20. **Mallinckrodt's Unnamed Agents and Co-Conspirators.** Mallinckrodt was joined in its scheme by several persons or groups of persons who served as agents,

---

[1] Some of the subsidiaries through which Humana conducts insurance business include: Arcadian Health Plan, Inc., CarePlus Health Plans, Inc., Cariten Health Plan, Inc., Cariten Insurance Company, CHA HMO, Inc., CompBenefits Insurance Company, Emphesys Insurance Company, Health Value Management, Inc. d/b/a ChoiceCare Network, Humana Behavioral Health, Inc., HumanaDental, Inc., Humana Benefit Plan of Illinois, Inc., Humana Employers Health Plan of Georgia, Inc., Humana Health Benefit Plan of Louisiana, Inc., Humana Health Company of New York, Inc., Humana Health Insurance Company of Florida, Inc., Humana Health Plan of California, Inc., Humana Health Plan of Ohio, Inc., Humana Health Plan of Texas, Inc., Humana Health Plan, Inc., Humana Health Plans of Puerto Rico, Inc., Humana Insurance Company, Humana Insurance Company of Kentucky, Humana Insurance Company of New York, Humana Medical Plan of Michigan, Inc., Humana Insurance of Puerto Rico, Inc., Humana Medical Plan of Pennsylvania, Inc., Humana Medical Plan of Utah, Inc., Humana Medical Plan, Inc., Humana Pharmacy Solutions, Inc., Humana Regional Health Plan, Inc., and Humana Wisconsin Health Organization Insurance Corporation.

SECOND AMENDED COMPLAINT

A-0610

co-conspirators, aiders and abettors, or otherwise acted in concert in connection with Mallinckrodt's Acthar price schemes that have not been named as defendants in this matter but are nonetheless important to the claims herein.

21.    <u>The Competitor</u>. Novartis marketed and sold Synacthen outside of the United States, and owned exclusive rights to sell Synacthen in the U.S. On information and belief, Novartis agreed to sell the Synacthen U.S. rights to Questcor with knowledge that Questcor did not intend to bring Synacthen to market to compete with Acthar.

22.    <u>The Consultant</u>. BioSolutia Inc., now known as CareMetx, LLC ("BioSolutia") is a Maryland-based firm that provided health-care consulting services to Mallinckrodt, including through an individual consultant (the "BioSolutia Consultant") who was retained full time to work on Acthar, and who helped design and implement Mallinckrodt's schemes.

23.    <u>The Agents</u>. Acthar is a "specialty pharmaceutical" and generally unavailable at most retail pharmacies. It is instead available primarily through specialty pharmacies, which focus on high-cost, high-complexity, and/or high-touch medication therapy for patients with complex disease states.

24.    Because of this, in June 2007, Mallinckrodt agreed with Express Scripts Holding Company ("Express Scripts"), a Missouri-based pharmacy benefit management company, to provide integrated services critical to the scheme and to do so through certain of Express Scripts' subsidiaries. Each of these subsidiaries had separate functions, but their coordinated purpose was to support and maintain Mallinckrodt's inflated Acthar prices, including by acting as Mallinckrodt's agent for purposes of pricing.

25.    Priority Healthcare Distribution Inc., doing business as CuraScript SD ("CuraScript"), a Florida-based specialty pharmacy distributor, served as Mallinckrodt's exclusive distributor for Acthar. CuraScript was engaged by Mallinckrodt to deliver Acthar to the network of specialty pharmacies (including

A-0611

Case 1:21-cv-01093-LPS  Document 30  Filed 12/13/21  Page 46 of 426 PageID #: 2180
Case 2:19-cv-02882-WTD  Document 2159-3 Filed 04/30/21  Page 12 of 60
Case 2:20-st-12582-JTD  Document 30-3 Filed 04/24/21  Page 12 of 50  Page ID #:1193

Humana Pharmacy), who then deliver the medicine to patients' homes. CuraScript may have been aided in this function by CuraScript, Inc., doing business as CuraScript SP Specialty Pharmacy, which itself operates specialty pharmacies in the United States. Both CuraScript and CuraScript SP Specialty Pharmacy were subsidiaries of Express Scripts.

26.     United BioSource Corporation, formerly known as HealthBridge and now known as United BioSource LLC ("UBC"), a Pennsylvania-based company, provided pharmaceutical support services. During most of the relevant time period, UBC was also an Express Scripts subsidiary, though Express Scripts completed its sale of UBC to a private equity firm in 2018. UBC designed and operationalized patient access centers that assist patients and prescribers with navigating prescription drug coverage and pharmacy options through patient access programs, including patient assistance programs, reimbursement, alternate funding, and compliance services. UBC was engaged by Mallinckrodt to act as the administrator for the reimbursement of Acthar, interacting directly with patients and third-party payors by coordinating various patient-assistance programs, including the ASAP and PAP programs described further below.

27.     Accredo Health Group, Inc., doing business as Liberty Pennsylvania, Medco Health Solutions, Liberty Texas, Gentiva, or Gentiva Health Services ("Accredo"), is also an Express Scripts subsidiary. Accredo is a specialty pharmacy services company that assists patients in obtaining medications, including by advocating for insurance coverage of the drug.

28.     As applied to Acthar, UBC acted as the hub between these entities, designing and coordinating Acthar's sale, distribution, and reimbursement through its patient access programs. So, for example, when a doctor prescribes an initial or renewal course of Acthar to a patient, the prescription is sent to the "Acthar Hub" and a case manager is assigned to the patient through UBC or Accredo, which performs administrative services associated with obtaining insurance coverage of the drug from insurers such as Humana. Payment by the insurer or other payor is then made to

A-0612

CuraScript, which ships the medication to specialty pharmacies or directly to the patient. As set forth further below, CuraScript has no role in setting the price, which is functionally set by Mallinckrodt alone. CuraScript merely acts as Mallinckrodt's agent, collecting payment and shipping the medication.

29.   The Charity. Chronic Disease Fund, Inc. ("CDF") is a Texas-based 501(c)(3) organization that now goes by the name Good Days From CDF or simply Good Days. Its putative mission is to provide co-pay assistance and other financial support to patients who meet the charity's application criteria.

30.   The Prescribing Doctors. Mallinckrodt paid certain physicians (the "Prescribing Doctors") substantial sums to promote Acthar over other treatments. The Prescribing Doctors agreed with Mallinckrodt to promote and prescribe Acthar without disclosing to Humana or other payors their remuneration from Mallinckrodt. Not all of the Prescribing Doctors are known to Humana, and discovery is needed to identify them fully.

### III.   JURISDICTION AND VENUE

31.   This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, including the Sherman Act, 15 U.S.C. § 1, *et seq.*, and 28 U.S.C. §1964(c), because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

32.   This Court has personal jurisdiction over the Defendant pursuant to 15 U.S.C. § 22 because it transacts business in this district and may be found here.

33.   This court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over violations of state law, including state common law claims.

34.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), and 18 U.S.C. § 1965.

35.   A substantial part of the events giving rise to this action occurred in this judicial district. Questcor Pharmaceuticals Inc.—later renamed Mallinckrodt ARD

A-0613

1  Inc.—was until January 26, 2019 a California corporation. The successor to

2  Mallinckrodt ARD Inc., Mallinckrodt ARD LLC is a limited liability corporation

3  organized under the laws of California.  Prior to its 2014 acquisition by Mallinckrodt,

4  Questcor was headquartered in Anaheim, California, in this judicial district. Several of

5  the co-conspirator Prescribing Doctors are also located in the state of California,

6  including one Prescribing Doctor whose offices are located in Los Angeles, California

7  in this judicial district. Furthermore, Humana has more than 575,000 insureds in the

8  state of California. Humana's operating subsidiary in California, Humana Health Plan

9  of California, is located in Irvine, California in this judicial district.

### IV.    FACTUAL ALLEGATIONS

#### A.    Humana

12  36.    Congress established Medicare in 1965 to provide health insurance

13  coverage for people aged sixty-five or older and for people with certain disabilities or

14  afflictions. In 2003, Congress established a voluntary prescription drug benefit program

15  for Medicare enrollees known as Medicare Part D. Under Medicare Part D, Medicare

16  contracts with private entities, known as Part D Plan Sponsors, to administer

17  prescription drug plans.

18  37.    Under the Medicare statute, a Part D beneficiary may be required to make

19  a partial payment for the cost of prescription drugs in the form of a co-payment,

20  coinsurance, or deductible (collectively "co-pays"). The co-pays can be substantial for

21  expensive medications and vary throughout the year, depending on a beneficiary's total

22  Part D covered expenses incurred that year up to that point.

23  38.    Medicare co-pays exist to encourage physicians and beneficiaries to be

24  efficient consumers of federally reimbursed health care products, while also

25  encouraging those manufacturing such products to price them based on market forces

26  such as consumer sensitivity and competition. Manufacturers paying the Medicare co-

27  pays of those seeking to buy their drug circumvent this congressionally designed check

28  on health care costs. As the United States Department of Health and Human Services,

A-0614

Office of the Inspector General has observed, drug manufacturers paying the Medicare Part D co-pays of patients taking their products "eliminat[e] a market safeguard against inflated prices." HHS-OIG, Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623, 70625 (Nov. 22, 2005).

39.    Humana operates or administers Medicare Part D plans on behalf of the federal and state governments for millions of members. Humana also provides coverage for pharmaceuticals, including Acthar, through other plans, including medical insurance (Medicare Part B), Medicare Advantage (Medicare Part C), Medicaid, and commercial healthcare plans. Through its administration of these plans, Humana bears significant risk that the costs and utilization of healthcare services will rise. When Humana assumes these risks it relies in large part on the protections afforded by law against submissions of false or fraudulent claims to government healthcare providers.

40.    Humana's agreements with its providers include a provision that requires the provider to certify its compliance with state and federal law, as well as rules promulgated by government entities such as the Centers for Medicare & Medicaid Services ("CMS"), a division of the Department of Health and Human Services that administers Medicare and Medicaid. These contractual provisions are essential for Humana to ensure that it receives prompt payments and reimbursements from CMS for valid claims, and to ensure that it does not pay invalid claims that might increase costs to both itself and Medicare.

**B.    Acthar**

41.    Acthar is an ACTH analogue used as an anti-inflammatory. Though its exact mechanism of operation is unclear, it is believed to stimulate the body's own steroidal hormones (such as cortisol and corticosterone), as well as to affect the body's steroid-independent immunomodulatory and anti-inflammatory pathways.

42.    Acthar's active ingredient is extracted from pig pituitary glands. It was invented in 1948 by the pharmaceutical division of the Armour meatpacking and processing company. The original form of ACTH has a half-life of only 10 minutes, so

A-0615

Acthar was developed for clinical use by creating a repository gel tailored to a patient's individual needs. The gel must be refrigerated and is applied through either an intramuscular or a subcutaneous depot injection (i.e., an injection that deposits the drug in a localized mass, which is gradually absorbed by the body over an extended period).

43.     Acthar's invention either was roughly contemporaneous with, or preceded, the development of certain corticosteroids, a class of steroids that can also be used to fight inflammation. Well-known examples of corticosteroids include hydrocortisone and prednisone. Acthar's invention also predated the discovery of ibuprofen and certain over-the-counter NSAIDs in pill form that are also used to combat inflammation.

44.     The U.S. Food and Drug Administration ("FDA") first approved Acthar for marketing in the United States in 1952. This was before drugs were required to demonstrate "substantial evidence" of the efficacy for a marketed indication. Its original label lacked evidence from controlled clinical trials.

45.     Acthar was approved to treat multiple sclerosis ("MS") in 1979. Today, it is approved for treatment of exacerbations of MS and also for indications of diseases and disorders that include rheumatic, collagen, dermatologic, and allergic states, as well as ophthalmic, respiratory, and edematous states. Specifically, these include idiopathic membranous nephropathy, the largest single cause of nephrotic syndrome, a kidney disorder; rheumatoid arthritis; dermatomyositis and polymyositis (inflammatory diseases of the skin and muscles); symptoms of sarcoidosis (a disease that mainly affects the lungs and lymph glands); and inflammatory conditions of the eye.

46.     However, there remains a lack of evidence to support the use of Acthar for most indications. The clinical evidence supporting the effectiveness of Acthar in treating some of these conditions consists of small (fewer than 25 participants) uncontrolled trials and case reports. For many of these conditions, Acthar is not considered the first-line treatment.

47.     Acthar was owned first by Armour Pharmaceutical Company, then by Rhone-Poulenc Rorer, and until 2001 by Aventis (now Sanofi). To that point, the drug

A-0616

was priced relatively more competitively with other anti-inflammatories.[2] But since it was expensive to produce, difficult to apply, and (except for certain indications such as infantile spasms) not known to be more effective than simpler, cheaper, and more widely available drugs, Aventis considered discontinuing production. Questcor acquired worldwide rights to sell and manufacture Acthar from Aventis in July 2001. In view of what would come, the price was a pittance: $100,000, plus modest royalties.

### C.   Medical Use of Acthar and Other Adrenal Hormone Drugs

48.   Corticotropin, the active ingredient in Acthar, is classified by United States Pharmacopeia (USP) in its Drug Classification system under "Hormonal Agents, Stimulant/ Replacement/ Modifying (Adrenal)." Among the other drugs in this category are prednisone, hydrocortisone, dexamethasone, and other corticosteroids. Each of these drugs affects the levels of the hormone cortisol in the body. This broad class of drugs is the one from which medical providers may choose a drug with the same basic biological mechanism of action.

49.   For example, with the sole exception of infantile spasms,[3] prednisone is approved by the FDA to treat all of the same diseases and disorders as Acthar. Therefore it is not surprising that when Acthar is compared with other drugs by the medical research community, those comparisons are almost universally made to

---

[2] Even then, Acthar was still more than quadruple the cost of corticosteroids, making it far less than a perfect economic substitute. When purchased from Aventis, a two-to-three vial course of Acthar treatment cost approximately $80 to $120, whereas a course of treatment with corticosteroids typically costs $20 or less.

[3] Only one other drug, Sabril (vigabatrin), has FDA approval for treatment of infantile spasms. Sabril is not a steroid, but is instead in a class of anticonvulsant drugs that are used to treat epilepsy. Sabril works by inhibiting the breakdown of a particular neural transmitter. Sabril may be used in combination with long-acting ACTH drugs, or it may be suitable where long-acting ACTH drugs have been ineffective at controlling infantile spasms or were not well tolerated by the patient. Although long-acting ACTH drugs and Sabril may both be used to treat infantile spasms, they are not medical substitutes for one another because of their different biological mechanisms of action.

A-0617

1   corticosteroids.  Indeed, Mallinckrodt itself prominently references a comparative study

2   between Acthar and prednisone for the treatment of infantile spasms on its website.

3   Additionally, Acthar has been compared to intravenous methylprednisolone for

4   treatment of MS relapses and to prednisone for treatment of sarcoidosis.

5       50.     For most of Acthar's indications, there is a lack of medical evidence to

6   support its use over prednisone or any other corticosteroid medication.  Acthar has

7   similar pharmacodynamic effects as corticosteroids, but it must be administered through

8   an injection, as opposed to a pill, and it must be refrigerated.  Although this difference

9   alone would be enough to make Acthar an undesirable substitute for corticosteroids, its

10  astronomical cost is also a major factor in the medical community's preference for

11  corticosteroids over Acthar. Prednisone, which is available as a generic medication

12  made by many manufacturers, can cost as little as $0.20 per pill (less than $20 for a

13  typical course of treatment) as compared to the $39,000 per-vial cost of Acthar (or

14  $117,000 for a three-vial treatment).  Due to the lack of medical data supporting the use

15  of Acthar over more convenient and cheaper corticosteroids, a question remains why

16  Acthar or other long-acting ACTH drugs are prescribed at all.  Part of the answer to that

17  question is certainly the illegal co-payment and bribery schemes described below, but

18  that does not appear to be the full story.  Acthar also appears to be viewed by certain

19  providers or patients as distinct from corticosteroids.

20      51.     Despite its classification within a broad group of "Hormonal Agents"

21  acting on the adrenal system by USP, Acthar is considered to be distinct from the

22  corticosteroid drugs within the classification for several reasons.  First, Acthar's

23  mechanism of action is slightly different from that of corticosteroids.  As Mallinckrodt

24  describes in its marketing literature for Acthar: "Acthar is not a steroid. But one of the

25  ways it is thought to work is by helping your body produce its own natural steroid

26  hormones." Second, studies funded by Mallinckrodt have been published that claim to

27  show clinical evidence supporting the superiority of Acthar compared with

28  corticosteroid drugs. Mallinckrodt has aggressively marketed these studies and their

A-0618

conclusions to physicians.  Third, Acthar is supposed to be a last-line treatment

alternative that may be tried after corticosteroids have failed in the hope that Acthar,

through its slightly different mechanism of action, may be effective where similar drugs

have not been. In language on Acthar's label required by the FDA, it was noted that

"corticosteroid therapy is considered to be the treatment of choice" relative to Acthar,

unless the condition is unresponsive to corticosteroid therapy.  Mallinckrodt further

explains to its investors that Acthar "may not be prescribed unless a clear benefit in

efficacy or safety is demonstrated or until alternatives have failed to provide positive

patient outcomes or are not well tolerated by the patient."[4]  Humana, similar to many

other insurers, likewise limits approved use of Acthar (other than for infantile spasms)

under its policies to patients who have "contraindications or intolerance to

corticosteroids that are not expected to also occur with" Acthar.

52.    These distinctions are further evidenced by Acthar's assignment to a

different Standard Therapeutic Class than corticosteroids in the widely-used First Data

Bank (FDB) drug database.[5]  Corticosteroids like prednisone are in FDB's

"Glucocorticoids" Standard Therapeutic Class.   In contrast, FDB classifies Acthar in

the "Adrenocorticotrophic Hormones" Standard Therapeutic Class.  The only other

drugs in the "Adrenocorticotrophic Hormones" Standard Therapeutic Class are

Synacthen and several short-acting (non-depot) formulations of natural and synthetic

ACTH which are approved by the FDA only for use in the testing of adrenal function.[6]

[4] The only exception is that Acthar may be considered the most effective, "first-line"
treatment for infantile spasms.

[5] Humana utilizes information from both FDB and USP to classify drugs according to
their therapeutic class in the normal course of its business.

[6] These short-acting ACTH drugs (Acthrel and Cortrosyn) are not appropriate medical
substitutes for Acthar because there is no overlap in the medical conditions that the
drugs are approved to treat or diagnose. Acthar is not indicated to diagnose adrenal
insufficiency and the short-acting ACTH drugs are indicated only for use in that
diagnosis. Moreover, the short-acting nature of these drugs makes them impractical for

A-0619

1

**D.     Mallinckrodt's Monopoly Power with Acthar**

2

**1.     Direct Evidence of Monopoly Power**

3      53.     Mallinckrodt has exercised monopoly power in the United States with

4  Acthar. Ever since its acquisition of marketing rights in 2001, Mallinckrodt has charged

5  supracompetitive prices for the drug.

6      54.     Immediately after acquiring the rights to sell Acthar, Mallinckrodt's

7  predecessor company Questcor increased the price from approximately $40 per vial to

8  nearly $750 per vial.

9      55.     By the end of 2006, Acthar accounted for 94 percent of Questcor's net

10  sales. On August 27, 2007, Questcor increased the price of Acthar by more than 1,300%

11  overnight, from $1,650 to $23,269 per vial. The decision to charge tens of thousands for

12  a vial of Acthar was spearheaded by Questcor's chief executive, Don Bailey, who spent

13  most of his career as an executive with a defense contractor, not in the pharmaceutical

14  industry.

15      56.     Questor has since raised the price of Acthar on multiple occasions since

16  2011 to $38,892 in 2018.

17      57.     Acthar net sales increased from $218 million in 2011 to more than $1

18  billion in 2015.

19      58.     Medicare spending on Acthar increased geometrically from 2011 to 2015,

20  with total spending of nearly $2 billion and more than $600 million in 2016 alone. The

21  following chart reveals how the number of Medicare Part D claims for Acthar has

22  grown by more than 700% from 2011 to 2016:

23

24

25  _____

26  treatment of the chronic or persistent conditions that long-acting ACTH drugs are
designed to treat. Short-acting ACTH drugs would need to be given intravenously or at

27  frequent intervals in order to have the same effect. Therefore only long-acting ACTH
drug formulations can be considered medically appropriate substitutes for Acthar.

28

A-0620

| Year | Claim Count | Total Spending |
|------|-------------|----------------|
| 2011 | 1,471 | $49,456,911 |
| 2012 | 3,387 | $141,451,608 |
| 2013 | 6,752 | $262,581,602 |
| 2014 | 9,611 | $391,189,653 |
| 2015 | 11,209 | $503,999,371 |
| 2016 | 12,867 | $636,174,840 |
| Total: | 45,297 | $1,984,853,985 |

## 2.    Further Evidence of Monopoly Power

59.    Several factors constitute further evidence of Mallinckrodt's monopoly power.

60.    <u>Lack of Competition</u>. Mallinckrodt does not set the price of Acthar by reference to other adrenal hormone drugs prescribed to treat the same indications that Acthar treats. Acthar is priced substantially higher than corticosteroid drugs used to treat the same indications. This suggests that there is no competitive constraint on Mallinckrodt's ability to set prices. Indeed, Acthar represents 100% of the sub-market for long-acting ACTH drugs available in the United States.

61.    Although Acthar may face limited competition at the margin from other drugs in the broader adrenal hormone class, in practice it competes almost entirely in a separate market (or submarket) for long-acting ACTH drugs.  In the United States, Acthar is the only long-acting ACTH drug approved by the FDA. Mallinckrodt acknowledges this in its own financial filings, stating that "Acthar Gel has limited direct competition due to the unique nature of the product." Acthar may have some medical similarity to other drugs in the adrenal hormone class, but economically it is in a distinct market.

62.    This lack of competition is further evidenced by Acthar's low rates of substitution for other adrenal hormone drugs.  Humana's data on prescriptions of Acthar show that from 2011 to 2019, the price of Acthar increased 59% while the price of Glucocorticoid drugs *decreased* by 5%. During the same period, the quantity of

A-0621

Acthar reimbursed by Humana increased 273%, while the quantity of Glucocorticoid drugs reimbursed *decreased* by 22%.  This shows that while Glucocorticoid drugs got cheaper relative to Acthar, the amount of Acthar prescribed increased.  If Acthar were viewed as an economic substitute for Glucocorticoid drugs, users of Acthar would have switched as Glucocorticoids became relatively cheaper.  In practice, it appears that there was little or no substitution from Acthar to Glucocorticoid drugs as a result of Acthar's rising prices.  Glucocorticoid drugs are Acthar's closest medical substitute but Acthar's use grew completely independently of their pricing, indicating that Glucocorticoids operate as part of a separate economic market.

63.     This measure of substitution is expressed in economic terms as the cross-price elasticity of demand.  In order for products to be considered close economic substitutes, they should have a cross-price elasticity above the value 2.0 (positive).  Values close to zero or negative indicate little or no economic substitution.  The cross-price elasticity demand for Acthar versus the Standard Therapeutic Class of Glucocorticoids is *negative* 0.1, showing a very low degree of substitution between Acthar and Glucocorticoid drugs.

64.     Acthar also has a low cross-price elasticity of demand with the short-acting ACTH diagnostic agents included in its Standard Therapeutic Class.  Humana's data show that the cross-price elasticity between Acthar and these drugs is *negative* 1.0.  These short-acting drugs are also rarely used.  Acthar represented more than 99% of all drugs purchased for Humana members within the Standard Therapeutic Class of Adrenocorticotrophic Hormones from 2011 to 2019.

65.     One of the main reasons for the absence of competition with Acthar is the unavailability of Synacthen, a close medical and economic substitute. Mallinckrodt's conduct with respect to Synacthen is addressed further below.

66.     Enhanced Profitability. Acthar's post-2011 price increases were effective, however, at increasing Mallinckrodt's profits because they did not result in much, if any, loss of volume to drugs that are potential medical substitutes such as

SECOND AMENDED COMPLAINT

A-0622

Glucocorticoids. Mallinckrodt's revenues on Acthar grew from $218 million in 2011 to $953 million in 2019. Mallinckrodt's profits on Acthar likewise increased by hundreds of millions of dollars per year during the period from 2011 to 2019. Mallinckrodt therefore exercised its monopoly power by profitably pushing through significant and durable price increases on Acthar after 2011.

67. Mallinckrodt restricted output of Acthar in order to achieve this pricing. Had Acthar been offered at a lower price, similar to the price Synacthen is sold at in other countries or similar to the price Acthar used to be sold at by Aventis, demand for the product would increase because more people who want long-acting ACTH drugs would be able (or willing) to afford them. Instead, Mallinckrodt has upped the price of Acthar each year such that its price increased by nearly 60% since 2011, suppressing demand and output of Acthar relative to what it would have been if Synacthen or Acthar were widely available at competitive prices.

68. <u>High Barriers to Entry</u>. Despite the lack of patent protection for Acthar, the U.S. ACTH market is still characterized by high barriers to entry. This includes FDA approval, which is required to market drugs to U.S. consumers. Drugs sold outside of the U.S. are therefore not viable substitutes.

69. Furthermore, developing a safe, effective, and reliable substitute would require substantial investments of resources and time, with no guarantee of success. One would have to source the active ingredient, develop a sustained-release depot-injection formulation, scale production, and conduct clinical trials, particularly because Acthar is derived from a biological and not a chemical process. Mallinckrodt's CEO has assured investors that Acthar "has significant durability in the marketplace" because "it will be very difficult for this product to be replicated in any way [by] a generic."

### 3. Anticompetitive Conduct in the Acquisition of Synacthen

70. Synacthen is a synthetic ACTH drug with similar biological activities and pharmacological effects as Acthar. In Europe, Canada, and other parts of the world, doctors treat patients with Synacthen for the same conditions that are treated with

19

A-0623

Acthar in the U.S. Acthar is not marketed outside of the United States. On information and belief, the reason Acthar is not marketed internationally is because it is not cost competitive with Synacthen.

71.     Questcor itself considered the drugs so similar that it submitted Synacthen information to support its application to the FDA to expand the label indications for Acthar. It also cited Synacthen studies in its Acthar marketing materials.

72.     Before June 2013, Novartis marketed and sold Synacthen abroad. For years, Questcor viewed Synacthen as a significant potential competitive threat to its monopoly. Questcor therefore sought to acquire the rights to Synacthen as a defensive move to prevent competitors from acquiring it and developing it as a competitor to Acthar.

73.     In late 2011, Novartis decided to divest exclusive rights to seek FDA approval for Synacthen and commercialize it in the United States. Dozens of companies contacted Novartis and expressed interest in acquiring Synacthen. Three firms proceeded through several rounds of negotiations with Novartis, submitted formal offers, and drafted near-final agreements.

74.     Each of the three firms planned to develop and use Synacthen to compete directly with Acthar, and to price Synacthen well below Acthar. The three firms had the necessary expertise and financing, as well as sufficient business and regulatory plans, to develop Synacthen for the U.S. market. The identity of the firms that were denied the development rights to Synacthen on account of Mallinckrodt's anticompetitive conduct were not publicly disclosed by Novartis.

75.     The Synacthen asset package sold by Novartis included valuable trade secrets, including technical documentation detailing both the precise formulation for the Synacthen drug product and the manufacturing process. Because Synacthen had a long history of safe and effective use abroad, a buyer would not need to begin the research,

A-0624

Case 1:21-cv-01093-LPS   Document 30   Filed 12/13/21   Page 59 of 426 PageID #: 2193
Case 2:19-cv-06082-JMV-MF   Document 2159-3   Filed 04/30/21   Page 25 of 60   Page ID #:1206
Case 2:20-cv-12582-WJM-MF   Document 30-3   Filed 04/24/20   Page 25 of 59 Page ID #:1206

development, testing, or manufacturing process from scratch. The asset package would therefore substantially lower the barriers to entry in the U.S. ACTH market.[7]

76.    The bidding process occurred in late 2012 and early 2013. Questcor signed a confidentiality agreement with Novartis and submitted an offer for Synacthen. Novartis negotiated with the three alternative bidders in parallel with Questcor, and each company had exchanged deal terms with Novartis and had submitted a formal offer. The offers by the three alternative bidders were comparable to each other in value and structured similarly, and included an upfront payment, milestone payments upon FDA approval, and significant royalties on U.S. Synacthen sales. Unlike the three alternative bidders, however, Questcor had only inchoate plans for Synacthen and conducted limited due diligence when it submitted its initial offer to Novartis. It nevertheless submitted a bid several multiples higher than the other bidders.

77.    On June 11, 2013, Questcor and Novartis entered into a Licensing Agreement, Asset Purchase Agreement, and Supply Agreement (collectively, "the Agreements"), that gave Questcor exclusive rights to develop, market, and sell Synacthen in the United States. Under the Agreements, Questcor is obligated to pay a minimum of $135 million to Novartis for Synacthen.

78.    On information and belief, Novartis knew and understood that Questcor did not intend to develop Synacthen. This may be inferred from the fact that Questcor's bid for Synacthen was substantially higher than that of its competitors, even though Questcor had done far less, and was in a worse position, to bring Synacthen to market. In addition, Novartis was not naïve, and could be expected to understand that Questcor would have little interest in developing the only synthetic competitor to Acthar, its extraordinarily lucrative non-synthetic product.

---

[7] It is also important to note that a short-acting version of Synacthen, sold under the brand name Cortrosyn, has been approved by the FDA for sale in the United States since 2009. This fact makes it far more likely that the FDA would approve a long-acting version of the same drug.

79. Questcor claimed that it acquired Synacthen to develop it for new, non-Acthar indications, but given the drugs' similarities, any therapeutic indication that Questcor might have pursued with Synacthen could have been pursued with Acthar.

80. Fourteen months after acquiring Synacthen, Mallinckrodt acquired Questcor for $5.6 billion, an amount almost entirely attributable to the value of Acthar.

81. Neither Questcor nor Mallinckrodt made more than superficial efforts to pursue commercialization of Synacthen, however. Instead Mallinckrodt chose to shelve the asset and thereby to protect Acthar monopoly pricing.

82. This conduct led the U.S. Federal Trade Commission ("FTC"), joined by the states of Alaska, Maryland, New York, Texas, and Washington, to bring an action against Mallinckrodt under the FTC Act, Section 2 of the Sherman Act, and state antitrust laws. On January 18, 2017, the FTC announced that Mallinckrodt had agreed to pay $100 million to settle the suit. The parties also filed and the court approved a stipulated court order requiring Questcor to grant a license to develop Synacthen to treat infantile spasms and nephrotic syndrome to a licensee approved by the FTC. On July 14, 2017, the FTC announced that it had approved a sublicense granting West Therapeutic Development, LLC certain rights to develop and market Synacthen in the United States.

### 4. Mallinckrodt's Sales of Acthar to Humana and its Members

83. Mallinckrodt has complete control over the price of Acthar and has on many occasions increased its price without negotiating with any of the purchasers or consumers of Acthar. Mallinckrodt is the sole entity with control over the wholesale acquisition cost (WAC) of Acthar that determines the price at which Acthar is sold throughout the pharmaceutical distribution chain. No other company has any influence over the price of Acthar in the marketplace.

84. Humana is obligated to and does pay the price of Acthar that Mallinckrodt sets. Mallinckrodt has purposefully sought to insulate itself from liability for the pricing of Acthar by engaging its co-conspirator Express Scripts as an intermediary in the sale

A-0626

of Acthar to all other purchasers. Express Scripts' CuraScript SD unit serves as the exclusive distributor of Acthar. But CuraScript SD has no independent authority to set the price of Acthar and bears no risk from Acthar sales. CuraScript bears no pricing risk for Acthar because it is guaranteed an adjustment in its acquisition costs if Mallinckrodt changes the price of Acthar. Furthermore, CuraScript is paid a fixed fee for each vial of Acthar that is sold by Mallinckrodt (CuraScript SD does no marketing or selling of Acthar) so it does not incur any benefit or cost based on the price of Acthar. In 2009 that fixed fee was set at $230 per vial. CuraScript bears no risk of holding Acthar in inventory because Mallinckrodt has agreed to accept returns of any Acthar which goes unsold before its expiration date. With respect to sales of Acthar, CuraScript is completely controlled by Mallinckrodt and acts merely as its agent.

85.   In addition to dictating its actions through contractual terms, Mallinckrodt confirmed that CuraScript SD was subject to its control by telling the SEC that if CuraScript SD were to fail to perform in the way that it wished, it could quickly and easily switch to a distributor who would provide "equivalent services." CuraScript SD had no choice but to comply with Mallinckrodt's directives because it was at risk of being terminated and replaced with a distributor that would. Furthermore, CuraScript SD's parent, Express Scripts, had many other lucrative consulting, administrative services, and specialty pharmacy sales arrangements with Mallinckrodt that would also be at risk if CuraScript SD did not perform at Mallinckrodt's command. CuraScript SD and its parent Express Scripts were not only complicit in, but actively took part in Mallinckrodt's scheme to further its monopoly in the ACTH drug market. As a co-conspirator and beneficiary of Mallinckrodt's scheme, there was no realistic possibility that CuraScript SD or its parent Express Scripts would ever bring suit against Mallinckrodt based on its anticompetitive actions.

86.   Humana paid for almost $800 million worth of Acthar during the relevant period. Humana's Acthar purchases were made according to the wholesale cost that Mallinckrodt set and controlled. Humana purchased Acthar from Mallinckrodt's agent

A-0627

Case 1:21-cv-01093-LPS   Document 30   Filed 12/13/21   Page 62 of 426 PageID #: 2196
Case 2:19-cv-06926-JMR-WTD   Document 59-3   Filed 04/24/20   Page 28 of 60   Page ID #:1209
Case 2:19-cv-12582-JTD   Doc 2159-3   Filed 04/30/21   Page 27 of 50

1  CuraScript SD and also from other specialty pharmacies that fulfilled prescriptions for

2  its members.

3       87.    In 2015, Humana's commercial insurance division directly contracted with

4  Mallinckrodt for rebates based on its Acthar purchases made for members of Humana's

5  commercial insurance plans. In January 2017, Humana's Medicare business entered

6  into a second rebate agreement with Mallinckrodt covering purchases made for

7  members on Humana's Medicare plans. The claims and causes of action asserted in this

8  complaint do not arise out of or relate to those agreements, and Humana is not asserting

9  any claims or seeking any damages for breach of either of these agreements.

10        **5.    Scope of the Antitrust Allegations**

11       88.   <u>Product Market</u>. The relevant product market is long-acting ACTH drugs,

12  consisting of Acthar and Synacthen.  During the relevant time period, Acthar was the

13  only long-acting ACTH drug approved by the FDA for sale in the United States.

14       89.    Alternatively, long-acting ACTH drugs are a valid submarket within a

15  broader market for adrenal hormone drugs.

16      a.  Public Recognition – Long-acting ACTH drugs are recognized by

17          Mallinckrodt, medical providers, and the public as differentiated from

18          other adrenal hormone drugs.

19          i.  Acthar is publicly touted by Mallinckrodt as being "unique" and

20             facing limited competition from other drugs, including

21             corticosteroids.  Additionally, medical providers and the public

22             generally view Acthar as distinct from other adrenal hormone drugs

23             such as corticosteroids. One basis for such a view may be that

24             certain medical researchers, mostly funded by Mallinckrodt, have

25             published studies that recognize long-acting ACTH drugs as

26             medically distinct from corticosteroids.

27          ii.  The FTC recognized "ACTH drugs" as a relevant antitrust market

28             when evaluating Mallinckrodt's acquisition of Synacthen.  The FTC

<div align="center">

24

SECOND AMENDED COMPLAINT

</div>

A-0628

alleged in its complaint against Mallinckrodt related to that acquisition that Acthar had "a 100% share of the market for ACTH drugs in the United States" because "[n]o other ACTH drug is FDA-approved for therapeutic use."

   iii.  Mallinckrodt's predecessor identified Synacthen as a potential competitive threat in its SEC filings before it licensed the rights to sell that drug in the United States. Mallinckrodt has relied upon studies using Synacthen to support its requests for certain label indications to the FDA.

   iv.  The size of the long-acting ACTH drug market is significant relative to total spending on adrenal hormone drugs.  From 2011 through the end of 2019, Humana and its members spent more than $800 million on Acthar.  During that same period, Humana and its members spent less than $500 million on Glucocorticoid drugs and less than $35,000 on short-acting adrenocorticotrophic hormones.

b.  Product characteristics and uses – Long-acting ACTH drugs' composition and method of action are distinct from other adrenal hormone drugs.

   i.  Long-acting ACTH drugs' biological mechanism of action is distinct from other drugs in that they stimulate the adrenal gland to produce cortisol.  Glucocorticoid drugs are synthetic forms of cortisol that do not work through the adrenal gland.

   ii.  Long-acting ACTH drugs are believed by some medical providers to be differentiated from other adrenal hormone drugs because of this distinction in its biological method of action. Certain medical research, sponsored by Mallinckrodt, also claim that Acthar achieves superior results to corticosteroids and/or support differing effects of Acthar on the body relative to corticosteroids.

A-0629

c. Unique production facilities – Long-acting ACTH drugs are made in different facilities and using different processes than other adrenal hormone drugs.

    i. Acthar is produced at only one facility in Prince Edward Island, Canada.  Acthar is produced using a complex, biologic process that is difficult to replicate.

    ii. Glucocorticoid drugs are synthesized by manufacturers of chemicals for pharmaceuticals in a variety of facilities throughout the world. These facilities are not equipped to produce Acthar, nor could they be easily modified in order to do so.

d. Distinct Customers – Long-acting ACTH drug customers are distinct from customers for other adrenal hormones.

    i. Users of Acthar are distinct from users of other adrenal hormone drugs because those drugs have either failed to treat their conditions, or those drugs are contraindicated for that patient.  Therefore corticosteroid drugs are not a viable option for that patient.

    ii. In some instances, Acthar is inappropriately prescribed as a result of bribes paid to doctors (as described further below) for patients for whom corticosteroids are an appropriate medical and economic substitute.  Absent the illegal bribe, Acthar would not be prescribed for these patients, therefore any substitution between corticosteroids and Acthar for this subset of patients was induced and would not have occurred in a market absent this conduct.

    iii. The FDA has instructed that Acthar be labeled as "having limited therapeutic value in those conditions responsive to corticosteroid therapy." Humana limits approved use of Acthar (other than for infantile spasms) under its policies to patients who have "contraindications or intolerance to corticosteroids that are not

SECOND AMENDED COMPLAINT

A-0630

expected to also occur with" Acthar. Other insurers impose very similar restrictions on Acthar's use.  Mallinckrodt acknowledges that Acthar "may not be prescribed unless a clear benefit in efficacy or safety is demonstrated or until alternatives have failed to provide positive patient outcomes or are not well tolerated by the patient."

    iv.  Synacthen is not offered for sale in the United States because of Mallinckrodt's anticompetitive conduct

e.  Distinct Prices – Prices for long-acting ACTH drugs are distinct from prices for other adrenal hormone drugs.

    i.  Acthar's price is distinct from that of other adrenal hormone drugs.  Prices of drugs to payors, such as Humana, are the full cost of the drug, less any portion of the cost for which the member is responsible.  Acthar's price to Humana in 2019 averaged more than $65,000 per prescription, more than 650,000% of the average prescription price for a glucocorticoid drug ($9.79).

    ii.  Acthar's price to patients in the form of co-insurance or co-payments is substantially higher than the price for other adrenal hormone drugs.  For Medicare members, Humana's co-insurance amounts averaged approximately $1,500 per Acthar prescription in 2019.  Comparatively, the average Humana Medicare member co-payment or co-insurance for a glucocorticoid prescription averaged approximately $3.93. Thus, Acthar's "price" in the form of co-insurance to Humana's Medicare members in 2019 averaged 35,000% higher than the price for glucocorticoid drugs.

    iii.  Even if a Humana member's co-payment were subsidized by a co-payment charity (as described further below), the amount that member was responsible for (their price) remained unchanged.

SECOND AMENDED COMPLAINT

A-0631

1    Assumption of payment by co-payment charities did not alter the

2    price of the drug in the market.

3    iv.  Synacthen is not offered for sale in the United States because of

4    Mallinckrodt's anticompetitive conduct.

5    f.  Sensitivity to price changes - Prices and quantities of long-acting ACTH

6    drugs are not sensitive to changes in prices of other adrenal hormone

7    drugs.

8    i.  The price of Acthar has increased repeatedly and substantially while

9    the price of other Glucocorticoid drugs has decreased.

10   ii.  The cross-price elasticity between Acthar and Glucocorticoid drugs

11   is extremely small. The cross-price elasticity between Acthar and

12   short-acting adrenocorticotrophic hormones is extremely small.

13   iii.  The cross-price elasticity between Synacthen and Acthar is believed

14   to be highly significant (above 2.0).

15   iv.  Synacthen is not offered for sale in the United States because of

16   Mallinckrodt's anticompetitive conduct

17   g.  Distinct vendors - Long-acting ACTH drugs are sold by vendors that are

18   distinct from those that sell other adrenal hormone drugs.

19   i.  Acthar is distributed only through a limited network of specialty

20   pharmacies (e.g. Accredo, BriovaRx, Senderra), while other adrenal

21   hormone drugs are widely available through tens of thousands of

22   retail and other mainstream pharmacies throughout the country (e.g.

23   CVS, Rite Aid, Walgreens.  Acthar requires special handling that

24   retail pharmacies are not well equipped to provide.

25   ii.  Synacthen is not offered for sale in the United States because of

26   Mallinckrodt's anticompetitive conduct.

27   90.  <u>Geographic Market</u>. The relevant market is the entire United States.

28

SECOND AMENDED COMPLAINT

A-0632

Case 1:21-cv-01093-LPS   Document 30   Filed 12/13/21   Page 67 of 426 PageID #: 2201
Case 2:19-cv-06552- JMV-TWD   Doc 2159-3   Filed 04/30/21   Page 33 of 60
Case 2:19-cv-06552-MRW-TWD   Document 56-3   Filed 04/24/20   Page 33 of 60   Page ID #:1214

91.   <u>Time</u>. The relevant period is from 2011 through the present. Humana specifically alleges that the conduct and patterns of conduct alleged here occurred and continued to occur throughout this period.

**E.   Mallinckrodt's Kickback and Racketeering Schemes**

92.   Mallinckrodt designed and coordinated a multifaceted scheme (the "Acthar Enterprise") intended to charge and maintain inflated prices for Acthar, including through a conspiracy to defraud payors such as Humana. Built on Mallinckrodt's monopolistic practices, the scheme consisted of two subsidiary schemes: (1) illicit patient co-pay subsidies through sham charitable funds; and (2) kickbacks to the Prescribing Doctors.

**1.   Patient Co-Pay Subsidies Through Sham Charitable Funds**

93.   Not long after raising Acthar's price to over $23,000 per vial in 2007, Questcor knew that it might have priced itself out of the MS market. Questcor also understood that, for some insurance plans, the over-$23,000 price could lead to very high patient costs. Medicare Part D beneficiaries, in particular, could owe thousands of dollars in co-pays for one vial of Acthar.

94.   Questcor realized that it could overcome doctor and patient cost concerns by subsidizing patient co-pay obligations, and thereby defrauding Medicare Part D payors like Humana. Questcor knew that it was illegal to subsidize Medicare co-pays directly, so it sought to accomplish the same result through a "co-pay assistance fund" that it designed, created, and used as a money conduit to pay patient co-pay subsidies for Acthar (but no other drug).

95.   The operation was spearheaded by the executives of Questcor and aided by the BioSolutia Consultant, who was retained full-time specifically for the purpose of assisting with Acthar reimbursement.

96.   By the spring of 2010, Questcor had tried one foundation ("NORD") but was dissatisfied with what it considered to be the small scale of the operation, and looked instead for a foundation where it could fund co-pays on a much larger scale.

A-0633

This effort resulted in Questcor connecting with CDF to discuss starting a new fund for Questcor.

97.     Though CDF already had a fund for MS patients, Questcor sought to establish an "MS Exacerbation Co-pay Fund" distinct from CDF's existing fund because Questcor did not want to make payments to a fund that might pay the co-pays of MS drugs other than Acthar.

98.     After a presentation by CDF, Questcor moved its co-pay programs from NORD to CDF. Questcor and CDF established a new "MS Acute Exacerbation Fund" just for patients with government insurance, such as Medicare Part D, and just for the co-pays of Acthar but no other drugs. For patients with private insurance, Questcor had CDF open a separate Acthar "Private Fund" for Mallinckrodt to send private insurance patients to CDF to have Acthar co-pays paid. That fund also exclusively covered Acthar and Questcor financed that fund. Questcor's donation agreement falsely represented that the funds were generally for treatment of patients with acute exacerbations of MS, when in fact Questcor knew it was just for patients using Acthar. Questcor thereafter made co-pay assistance an important part of its sales and marketing program.

99.     Questcor sent patients to CDF through Questcor's "reimbursement hub" for Acthar, called the Acthar Support and Access Program ("ASAP"), which was administered by UBC under Mallinckrodt's direction and control. Questcor and UBC controlled ASAP, which included a call center that received referrals for Acthar from physician offices and patients. Questcor's sales force took steps to ensure that any Acthar prescriptions were routed through ASAP so that Questcor could track them. Patients sometimes had their co-pays paid for months or years through the fund.

100.    In 2011, Questcor repeated this scheme in connection with a "Lupus Exacerbation" fund. Questcor financed the fund. It falsely stated that the fund was for "any medically appropriate therapy," when in fact Questcor intended to fund only Acthar and exclude other therapies. Questcor and UBC referred patients to the fund through ASAP and tracked the patients thereafter. And through 2014, the Lupus

A-0634

Exacerbation fund paid the co-pays of Acthar but no other drug, again often for months or years.

101.   In 2012, Questcor repeated the scheme yet again for rheumatoid arthritis patients. It created an "RA Exacerbation Fund" at CDF, financed the fund, sent patients to the fund through ASAP with UBC's assistance, tracked the patients, and paid subsidies for sometimes months' or years' worth of refills of Acthar but no other drug.

102.   That same year, Questcor became concerned that it would lose referrals to the fund for lack of co-pay assistance. Questcor therefore implemented an "automatic offering" of co-pay assistance to all patients with co-pays greater than $150, administered by UBC through the reimbursement hub. The ASAP program referred over 98 percent of the patients who received co-pay subsidies from the MS, Lupus, or RA Exacerbation funds at CDF.

103.   During the same period that Questcor sent Acthar patients to CDF to receive Medicare co-pay subsidies, Questcor also retained NORD to operate a "Patient Assistance Program" ("PAP") that offered free Acthar to patients who met certain financial criteria and could not afford the drug's high price. ASAP also sent certain patients to NORD for that purpose. As with ASAP, the PAP program was administered by UBC under Mallinckrodt's direction and control. But Questcor intentionally did not send Acthar patients with Medicare or other insurance coverage for the drug to the NORD PAP. Instead, Questcor sent those patients to CDF, where they received co-pay subsidies to cover their costs and triggered insurance reimbursement for Acthar. Questcor also required patients to appeal insurance coverage denials of Acthar before referring them to the PAP. In other words, whenever possible, Mallinckrodt sought to cause Medicare claims to be submitted for Acthar so that Mallinckrodt could get paid from a sale of the drug as opposed to giving it away for free through the NORD PAP.

104.   Questcor marketed guaranteed co-pay assistance to physicians and patients as a way to neutralize concerns about the price and to induce sales and Medicare reimbursement. This began immediately after establishing the MS Acute Exacerbation

A-0635

Fund at CDF and continued throughout the relevant time period. For example, company training materials instructed the sales force: "DO NOT APOLOGIZE FOR THE PRICE." The training instead directed sales representatives to "[r]eview [the] co-pay coverage program" with prescribers who expressed concern about the drug's price.

105.   Furthermore, after Questcor conducted research and discovered that price was an obstacle to more prescriptions, Questcor's internal remediation plan noted the importance of co-pay support.

106.   Questcor's sales force continued to promote guaranteed Acthar co-pay subsidies through CDF in this manner, with the intent to induce Medicare Part D claims.

107.   Questcor monitored its co-pay support programs by receiving detailed financial reports from CDF containing information about how many patients were enrolled in the fund, how much the fund had already paid out, and how much had been allocated to enrolled patients. The reports also stated the percentage of patients approved to receive co-pay subsidies, the average co-pay amount paid by the fund, the total number of resulting drug "dispenses" (broken out by new dispenses vs. refills), and the remaining fund balance. Because these funds paid Acthar co-pays only, all of these reported metrics were specific to Acthar. This gave Questcor the ability to monitor its fund balances and confirm the amount of future payments to CDF necessary to keep paying Acthar co-pay subsidies smoothly.

108.   The funds worked as planned. After Questcor established the co-pay conduit at CDF, Questcor achieved significant growth in Acthar MS sales and corporate revenue. For example, Acthar MS sales nearly quadrupled between the third quarter of 2010 (when Questcor established the MS "acute exacerbation" fund) and the third quarter of 2013.

109.   Questcor also intensified its dramatic price increases. On January 3, 2011 Questcor raised Acthar's price to over $24,430 per vial. Under six months later, it raised the price again to over $25,600 per vial. In December 2011, it raised the price to

A-0636

over $27,300 per vial. In May 2012, it raised the price to over $28,680 per vial. In June 2013, it raised the price to over $30,100 per vial. In January 2014, it raised the price to over $31,600 per vial. In December 2014 it raised the price to over $32,200 per vial.

110. The Company knowingly and willfully violated the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), by paying illegal Acthar co-pay subsidies as described above to induce prescriptions and sales of Acthar reimbursed by Medicare, and knowingly and willfully violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, and its prohibition on submitting, or causing to be submitted, false claims to federal health care programs, including Medicare. The Company's knowledge and willfulness is evidenced by internal training materials that instructed its employees on these laws and their relevant prohibitions; corporate policies reflecting the Company's knowledge of its illegality; trade publications and articles circulated among the key executives and consultants warning against the practice; and longstanding and repeated warnings about the practice from the Office of the Inspector General of the United States Department of Health and Human Services.

111. On information and belief, Mallinckrodt continued to pay or substantially subsidize required patient co-payments for Acthar after 2014 and continues to do so until today.[8]

## 2. Physician Kickbacks

112. The second part of the Acthar Enterprise consisted of kickbacks to the Prescribing Doctors in exchange for increased prescriptions of Acthar.

113. Mallinckrodt's co-pay subsidies were one way to prop up demand and receive payment from third-party payors such as Humana. Another was Mallinckrodt's aggressive push to move away from prescriptions for infantile spasms and towards conditions affecting elderly patients, and therefore to increase reimbursement by

---

[8] Mallinckrodt, "Acthar Reimbursement and Copayment Support," https://www.actharishcp.com/reimbursement-and-copay (last visited August 4, 2019).

A-0637

Medicare and third-party payors like Humana. Mallinckrodt has heavily marketed Acthar to neurologists (for MS), to nephrologists (for idiopathic membranous nephropathy and nephrotic syndrome), to rheumatologists (for a variety of conditions including rheumatoid arthritis), to pulmonologists (for sarcoidosis), and to ophthalmologists (for severe allergic or inflammatory eye conditions).

114.   In 2014 the president of the autoimmune and rare-disease business selling Acthar made a presentation to investors detailing a strategy to expand Acthar's sales to patients in rheumatology, pulmonology, ophthalmology, dermatology, and kidney disease. In the several decades prior, Acthar had not been prescribed in large quantities for these conditions despite having been FDA approved for such treatments. Although there were no new medical studies suggesting Acthar was needed to treat any of these conditions, the president pledged to "expand significantly" Acthar's sales force in the fields of rheumatology and pulmonology in the upcoming year. That sales effort was wildly successful at expanding the market for Acthar beyond infantile spasms. Now fewer than 10% of Acthar's sales come from prescriptions for infantile spasms, and more than 98% of Humana's expenditures for Acthar were made for insureds over the age of 18.

115.   A 2018 study published in JAMA Network Open concluded that "[a]ggressive sales tactics and payments from [Mallinckrodt] may influence prescribing behavior for [Acthar]." Indeed their "findings suggest that financial conflicts of interest may be driving use of corticotropin in the Medicare program." The study examined Medicare data about the providers who submitted more than ten claims for Acthar. It noted that "[a]mong the 50 prescribers (21.3%) who received more than $10 000 in payments during the year [2015], corticotropin expenditures per prescriber (mean [SD], $1 304 884 [$1 022 937]) were more than double that of the 45 prescribers (19.2%) who received $25 or less (mean [SD], $594 976 [$256 357])." The study's invariable regression analysis further showed that "Medicare spending on [Acthar] increased by 7.9% (approximately $53 000) for every $10 000 increase in payments to prescribers,"

A-0638

1   or a return of investment of approximately 5:1. The study further noted that 207 of 235

2   frequent corticotropin prescribers (88%) who submitted more than 10 claims received a

3   corticotropin-related payment from Mallinckrodt. By contrast, a recent study found that

4   among all specialists, only 35% receive payments from the pharmaceutical industry.

5       116.   From 2013 to 2016, Mallinckrodt paid doctors nearly $27.5 million in

6   Acthar-related payments. A handful of doctors received unusually large sums of money:

7   during the same period, Mallinckrodt paid more than $6.5 million to only 288

8   prescribers for consulting, promotional speaking, and other services related to Acthar.

9       117.   Many of the top prescribers to Humana's members have been paid

10  substantial fees by Mallinckrodt. These include the following:

| Prescribing Doctor | Specialty | Amount Paid By Mallinckrodt to the Prescribing Doctor (Payment Dates) | Amount Humana Paid for Acthar Prescriptions by These Doctors |
|---|---|---|---|
| 1 | Int. Med./Sarcoidosis | $116,000 (2013-2015) | $10,672,325 |
| 2 | Rheumatology | $22,762 (2013-2015) | $4,841,709 |
| 3 | Rheumatology | $273,937 (2013-2016) | $3,459,480 |
| 4 | Neurology | $142,978 (2013) | $2,723,683 |
| 5 | Rheumatology | $267,701 (2013-2016) | $1,928,838 |
| 6 | Rheumatology | $370,970 (2013-2016) | $778,060 |
| 7 | Psychiatry/Neurology | $345,913 (2013-2016) | $739,894 |
| 8 | Rheumatology | $224,713 (2013-2016) | $612,561 |
| 9 | Neurology | $332,393 (2013-2016) | $379,250 |

The goal of Mallinckrodt's scheme was to increase its sales of Acthar at the expense of

those who paid for it—primarily health insurers such as Humana. Mallinckrodt required

the assistance and complicity of the Prescribing Doctors to achieve its ends. It knew

that in order to increase the prescription rates of Acthar, the Prescribing Doctors would

need to prescribe Acthar in situations in which it was not called for and in lieu of

considerably more cost-effective medications.

    118.   On September 3, 2019, Mallinckrodt paid more than $15 million to the

United States Department of Justice to settle claims that it paid illegal kickbacks to

doctors to prescribe Acthar.

SECOND AMENDED COMPLAINT

A-0639

### 3.   False Representations and Certifications

119.   In order to effectuate its scheme, Mallinckrodt either made or caused to be made three kinds of false representations and certifications directly to Humana.

120.   *First*, Mallinckrodt directly misrepresented to Humana that it was complying with state and federal law, including laws related bribery, kickbacks, and false claims.

121.   When a pharmacy dispenses drugs to a Humana Part D member, the pharmacy submits a claim to Humana, which in turn submits an electronic record of the claim, called a Prescription Drug Event ("PDE"), to CMS. After dispensing the drug, the pharmacy receives reimbursement from Humana for the portion of the drug cost not paid by the Part D member at the point of sale.

122.   PDE claims data are necessary for CMS to administer the Part D program and to reimburse Part D Plan Sponsors such as Humana. Generating and submitting PDE data is a condition of payment for CMS' provision of Medicare funds to Part D Plan sponsors. *See* 42 C.F.R. § 423.322.

123.   Part D Plan Sponsors must comply with "[f]ederal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. § 3729, *et seq*.), and the anti-kickback statute (§ 1127B(b)) of the Act)." 42 C.F.R. § 423.505(h)(l). Any "downstream" or "related" entities that Part D Plans subcontract with (including pharmacies dispensing medication and manufacturers selling medication) must also comply with these, and any other, contractual obligations of the Part D Plan and with all applicable federal laws, regulations, and CMS instructions. *See* 42 C.F.R. § 423.505(i)(3).

124.   CMS regulations require Part D Plan Sponsors and related "downstream" entities that generate and submit PDE claims data to certify that such data is true, accurate, and complete and that the PDE data is the basis for obtaining federal reimbursement for the health care products or services reflected therein. *Id*.

---

A-0640

§ 423.505(k). Congress has determined that any Medicare claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).

125.   Mallinckrodt and its captive agent CuraScript made such certifications and therefore directly misrepresented to Humana that they were complying with federal law.

126.   *Second*, when providers, including the Prescribing Doctors, prescribe pharmaceutical treatment, they must generally obtain prior authorization from insurers such as Humana. By going through the prior authorization process, the Prescribing Doctors represent to Humana that the prescription medication is medically necessary, up-to-date, and non-duplicative. They are further representing that they are not violating state or federal law applicable to the provision of their services.

127.   Mallinckrodt, CDF, and the Prescribing Doctors knew that offering or accepting money or other consideration in exchange for prescriptions was a violation of the law and CMS policies and procedures. Mallinckrodt, CDF, and the Prescribing Doctors knew that their enterprise was a violation of these rules because it involved a payment in exchange for an increased rate of prescriptions.

128.   Through its unlawful payments to the Prescribing Doctors and its payments to patients through the CDF funds, Mallinckrodt caused false certifications and representations to be made to Humana during the prior authorization process.

129.   *Third*, Humana members are required to pay what they owe for drug coverage under Medicare Part D and other kinds of plans, and they are advised in their evidence of coverage documents that they must pay their share of the cost when they obtain prescription drugs. Through its illegal scheme to pay patient co-pays through phony charitable funds at CDF, Mallinckrodt caused Humana members to unintentionally misrepresent that they had paid their contractual share of prescription drug coverage.

A-0641

### 4.   Use of the Mails and Wires

130.   Throughout the relevant period, Mallinckrodt, CDF, and the Prescribing Doctors used thousands of mail and interstate wire communications to create and manage their scheme, which involved nationwide distribution of Acthar through the Prescribing Doctors and CuraScript at the direction of Mallinckrodt. Mallinckrodt communicated with the Prescribing Doctors through the mails and wires, caused thousands of reimbursement requests to be submitted by the Prescribing Doctors over the wires or by mail, and made illegal kickback payments to the Prescribing Doctors over the wires or by mail.

### F.   Mallinckrodt's Fraudulent Concealment of the Illegal Scheme

131.   Mallinckrodt actively concealed the existence of its illegal scheme and the acts underlying it through false or misleading statements to Humana and to the public. Mallinckrodt falsely maintained that it would develop and seek FDA approval of Synacthen when in reality it purposefully failed to put the effort and resources into obtaining a broad FDA approval of Synacthen as an alternative to Acthar. Mallinckrodt also failed to disclose to Humana its arrangements with CDF that created specialized funds that were used to illegally reimburse co-payments for Acthar, despite its certifications to Humana that it was following federal law and CMS rules that prohibited such co-payment subsidies for Medicare patients. Finally, Mallinckrodt also failed to disclose its kickback payments to doctors that violated federal law and CMS rules despite its certifications to Humana that it was abiding by such laws and CMS rules.

132.   Due to Mallinckrodt's fraudulent concealment, Humana could not have discovered and remained unaware of the foregoing conduct until the Federal Trade Commission and the United States Department of Justice brought these acts and practices to light through investigations, legal actions, and/or settlements.

SECOND AMENDED COMPLAINT

A-0642

Case 1:21-cv-01093-LPS   Document 30   Filed 12/13/21   Page 77 of 426 PageID #: 2211
Case 2:19-cv-06632-JS-MRW   Document 59-3   Filed 04/30/21   Page 43 of 60
Case 2:19-cv-12582-WJM   Document 50-3   Filed 04/24/20   Page 43 of 59   Page ID #:1224

### G.    Damages

133.    As a result of Mallinckrodt's multipronged scheme to inflate Acthar's price and utilization, Humana incurred significant losses. A substantial portion of Humana's business is evaluating, underwriting, and managing risks involved in insuring healthcare costs. As a commercial insurer, Humana bears significant risk of utilization of unnecessary, ineffective, or uneconomical medical care. The same is true for Humana's Medicare plans.

134.    For Humana's Medicare business, Humana bears the risk of rising prescription drug prices and utilization in part through Part D "risk corridors" and Medicare Advantage capitation payments. Both of these Medicare provisions shift risk from the federal government to Humana to pay for some or all of the increased costs of prescription drugs for the Medicare members it covers. As such, Humana benefits financially when costs and utilization of prescription drugs are lower than expected and conversely it is harmed when costs and utilization of prescription drugs are higher than expected. In addition, for the portion of costs covered by the government under these programs, Humana bears a risk of non-payment if claims are found to be false or fraudulent by the government.

135.    The risk of fraudulent claims is one that is shared by Humana and the government sponsors of healthcare plans that Humana administers. Therefore the claims of the government and the claims of Humana against Mallinckrodt are substantially the same.

136.    Mallinckrodt's scheme was designed to cause and did cause Humana and others to pay for Acthar prescriptions that they would otherwise not have reimbursed and to pay more for those prescriptions than they otherwise would have paid. Humana was among the group of health insurers who were the targets of Mallinckrodt's scheme. Mallinckrodt knew that nearly all of its sales of Acthar in the United States would be sold to patients who carried prescription drug insurance that would bear the majority of

A-0643

Acthar's cost. Humana's insurance plans bore the majority of Acthar's costs for its members and was directly injured as a result of Mallinckrodt's illegal conduct.

137.   But for Mallinckrodt's scheme to perpetuate its monopoly over long-acting ACTH drugs, illegally subsidize Humana's members' co-pays, and pay kickbacks to Prescribing Doctors, Humana would have paid for fewer Acthar prescriptions and it would have paid less for those prescriptions that it otherwise would have covered. Specifically, but for Mallinckrodt's monopolistic conduct, including its acquisition of Synacthen, Humana would have benefitted from increased competition in the market for long-acting ACTH drugs and would have either paid lower prices for Acthar or it would have steered its members to lower priced Synacthen. Similarly, but for Mallinckrodt's kickbacks, Mallinckrodt and the Prescribing Doctors would not have defrauded Humana by falsely certifying their compliance with federal and state law through submissions for reimbursements for Acthar prescriptions. Finally, but for Mallinckrodt's kickback scheme and illegal co-pay assistance through CDF, prescription rates for Acthar would have been lower, and Humana members would have received different care from their physicians that was more effective, less harmful, or more cost effective than doses of Acthar.

138.   As a consequence of Mallinckrodt's conduct, Humana paid almost $800 million for Acthar prescriptions. In the absence of such conduct, Humana would have paid a small fraction of that amount. Humana has also incurred administrative, investigative, legal, and other costs as a result of Mallinckrodt's conduct.

## Count I

### Violation of the Sherman Antitrust Act, 15 U.S.C. § 2

139.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

140.   Mallinckrodt has, and at all relevant times, had monopoly power in the market for the sale of long-acting ACTH drugs in the United States.

A-0644

141.   By intervening in the bidding process for Synacthen and purchasing the exclusive license to market Synacthen in the United States, Mallinckrodt eliminated the potential competitive threat posed by an independently owned Synacthen license. Mallinckrodt's conduct was reasonably capable of contributing significantly to the preservation of Mallinckrodt's monopoly power and monopoly pricing of Acthar in the United States.

142.   The effect of Mallinckrodt's actions to maintain its monopoly was to stabilize or raise the price of Acthar to a higher level than it would have commanded in the absence of the monopolistic conduct. Mallinckrodt's actions also had the effect of suppressing the output of long-acting ACTH drugs below the level of output which would have been produced absent its monopolistic conduct.

143.   Humana suffered injuries when it paid those higher prices.

144.   Defendant's acts and practices constitute monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## Count II

### Violation of the Sherman Antitrust Act, 15 U.S.C. § 1

145.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

146.   Mallinckrodt entered into an exclusive agreement with Novartis to license the right to market Synacthen in the United States.

147.   That agreement restrained trade in the market for the sale of long-acting ACTH drugs in the United States.

148.   The effect of that agreement was to maintain or raise the price of Acthar to a higher level than it would have commanded in the absence of the agreement and to suppress the output of long-acting ACTH drugs below that which would have prevailed in the absence of the agreement.

149.   Humana suffered injuries when it paid those higher prices.

41

A-0645

150.   The agreement between Mallinckrodt and Novartis constitutes an anticompetitive agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

<u>**Count III**</u>

**Violation of State Antitrust Laws**

151.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

152.   The aforementioned practices by the Defendant that violate Sections 1 and 2 of the Sherman Act were and are also violations of the following states' antitrust laws:

a.   Ala. Code § 6-5-60, *et seq.* (Alabama);

b.   Ariz. Rev. Stat. Ann. § 44-1401, *et seq.* (Arizona);

c.   Cal. Bus. & Prof. Code § 16750, *et seq.* (California);

d.   Conn. Gen. Stat. Ann. § 35-24, *et seq.* (Connecticut);

e.   D.C. Code Ann. § 28-4501, *et seq.* (D.C.);

f.   Fla. Stat. Ann. § 501.201, *et seq.* (Florida);

g.   Haw. Rev. Stat. Ann. § 480-1, *et seq.* (Hawaii);

h.   740 Ill. Comp. Stat. Ann. 10/1, *et seq.* (Illinois);

i.   Iowa Code Ann. § 553.1, *et seq.* (Iowa);

j.   Kan. Stat. Ann. § 50-101, *et seq.* (Kansas);

k.   Me. Rev. Stat. tit. 10, § 1101, *et seq.* (Maine);

l.   Mich. Comp. Laws Ann. § 445.771, *et seq.* (Michigan);

m.   Minn. Stat. Ann. § 325D.49, *et seq.* (Minnesota);

n.   Miss. Code. Ann. § 75-21-1, *et seq.* (Mississippi);

o.   Neb. Rev. Stat. Ann. § 59-801, *et seq.* (Nebraska);

p.   Nev. Rev. Stat. Ann. § 598A.010, *et seq.* (Nevada);

q.   N.M. Stat. Ann. § 57-1-1, *et seq.* (New Mexico);

r.   N.Y. Gen. Bus. Law § 340, *et seq.* (New York);

42

A-0646

Case 1:21-cv-01093-LPS   Document 30   Filed 12/13/21   Page 81 of 426 PageID #: 2215
Case 2:19-cv-06353-SI-MRW   Document 59-3   Filed 04/24/20   Page 47 of 60 Page ID #:1228
Case 2:19-cv-12582-WTD   Doc. 2159-3   Filed 04/30/21   Page 46 of 59

| | | |
|---|---|---|
| 1 | s. | N.C. Gen. Stat. § 75-1, *et seq.* (North Carolina); |
| 2 | t. | Or. Rev. Stat. Ann. § 646.705, *et seq.* (Oregon); |
| 3 | u. | S.D. Codified Laws § 37-1-3.1, *et seq.* (South Dakota); |
| 4 | v. | Tenn. Code Ann. § 47-25-101, *et seq.* (Tennessee); |
| 5 | w. | Utah Code Ann. § 76-10-3101, *et seq.* (Utah); |
| 6 | x. | Vt. Stat. Ann. tit. 9, § 2451, *et seq.* (Vermont); |
| 7 | y. | Wis. Stat. Ann. § 133.01, *et seq.* (Wisconsin). |

## Count IV

### Violation of the RICO Act, 18 U.S.C. § 1962(c)

153.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

154.   Mallinckrodt is a "person" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

155.   The Acthar Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Mallinckrodt, Express Scripts and its relevant subsidiaries (including CuraScript), CDF, and the Prescribing Doctors—including their corporate parents, siblings, subsidiaries, employees, and agents. The Acthar Enterprise was an ongoing organization that functioned as a continuing unit. The Acthar Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity. Mallinckrodt, Express Scripts, CuraScript, CDF, and the Prescribing Doctors are each "persons" distinct from the Acthar Enterprise.

156.   Mallinckrodt established the Acthar Enterprise to fraudulently increase its sales of Acthar. Mallinckrodt subsidized co-pays through CDF, and paid the Prescribing Doctors, in exchange for an increased rate of prescriptions of Acthar in lieu of less expensive alternative treatment. Mallinckrodt, CDF, and the Prescribing Doctors knew that their scheme violated federal and state laws.

A-0647

157.   Such payments also violated state commercial bribery statutes which prohibit offering anything of value to a fiduciary for the purpose of altering the fiduciary's conduct towards those to whom he owes fiduciary duties. Doctors, like the Prescribing Doctors, owe fiduciary duties to their patients to offer medical advice and counseling based on the best interest of the patient, not what is in their own pecuniary interest.

158.   False representations of compliance with federal and state laws were made to Humana for payment over the wires or by mail. These false representations were made directly to Humana and were a condition of reimbursement by Humana for all Acthar claims submitted by the Prescribing Doctors. The illegal payments were sent over the wires or by mail to the Prescribing Doctors and to CDF.

159.   The Acthar Enterprise engaged in and affected interstate commerce because, among other things, it marketed, sold, purchased, or provided Acthar to thousands of individuals throughout the United States.

160.   Mallinckrodt has asserted control over the Acthar Enterprise by issuing payments to doctors who prescribed Acthar as treatment for conditions for which more affordable alternative treatments were readily available. Mallinckrodt asserted control over the enterprise by utilizing one exclusive distributor, CuraScript, and setting the price of Acthar paid by Humana.

161.   Mallinckrodt has asserted control over the Acthar Enterprise by designing, organizing, and funding the phony charitable funds at CDF used for Acthar co-pays.

162.   Mallinckrodt has conducted and participated in the affairs of the Acthar Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1952 (use of interstate facilities to conduct unlawful activity), and state bribery statutes.

163.   The effect of Mallinckrodt's racketeering activity was to induce sales of Acthar that otherwise would not have been made in the absence of the illegal conduct

A-0648

and to maintain or raise the price of Acthar to a higher level than it would have commanded in the absence of the illegal conduct.

164.   Humana suffered injuries when it reimbursed those prescriptions for Acthar that otherwise would not have been made and/or paid the higher prices that resulted from the illegal conduct.

165.   Humana's injuries were directly and proximately caused by Mallinckrodt's racketeering activities as described above.

166.   By virtue of these violations of 18 U.S.C. § 1962(c), Mallinckrodt is jointly and severally liable to Humana for three times the damages Humana has sustained, plus the cost of this suit, including reasonable attorneys' fees.

<u>**Count V**</u>

**Conspiracy to Violate the RICO Act, 18 U.S.C. § 1962(d)**

167.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

168.   Title 18 U.S.C. § 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

169.   Mallinckrodt has violated 18 U.S.C. § 1962(d) by conspiring with the Prescribing Doctors, CuraScript, and CDF to violate 18 U.S.C. §1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Acthar Enterprise described previously through a pattern of racketeering activity.

170.   Mallinckrodt and its co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Humana of money.

171.   The nature of the above-described Mallinckrodt's co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware

A-0649

that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

172.   As a direct and proximate result of Mallinckrodt's overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Humana has been injured in its business and property as set forth more fully above.

173.   Mallinckrodt and its co-conspirators have sought to and have engaged in the commission of overt acts, including the following unlawful racketeering predicate acts:

a.   Multiple instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1342;

b.   Multiple instances of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346;

c.   Multiple instances of wire fraud in violation of 18 U.S.C. §§ 1343 and 1346;

d.   Multiple instances of unlawful activity in violation of 18 U.S.C. §1952;

e.   Multiple instances of bribery in violation of state statutes, including but not limited to Cal. Penal Code § 641.3, 720 Ill. Comp. Stat. 5/29A-1, Tex. Penal Code § 32.43, N.J. Stat. § 2C:21-10, and N.Y. Penal Law § 180.00.

174.   The purpose and effect of the conspiracy was to induce sales of Acthar that otherwise would not have been made in the absence of the illegal conduct and to maintain or raise the price of Acthar to a higher level than it would have commanded in the absence of the illegal conduct.

175.   Humana suffered injuries when it reimbursed those prescriptions for Acthar that otherwise would not have been made and/or paid the higher prices that resulted from the illegal, conspiratorial conduct.

A-0650

176.   Humana's injuries were directly and proximately caused by Mallinckrodt's racketeering activities as described above.

177.   By virtue of these violations of 18 U.S.C. § 1962(d), Mallinckrodt is jointly and severally liable to Humana for three times the damages Humana has sustained, plus the cost of this suit, including reasonable attorneys' fees.

### Count VI

### State Unfair Competition Law Claims

178.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

179.   Mallinckrodt and its co-conspirators have engaged in fraudulent and deceptive business practices that violate the state unfair competition laws of Alaska, Arizona, Arkansas, California, Connecticut, Florida, Idaho, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Nebraska, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Oregon, South Carolina, Tennessee, Washington, Wisconsin, and Wyoming.

180.   Mallinckrodt and its co-conspirators have engaged in unfair competition under the states' laws by unlawfully making and accepting remuneration in exchange for the sale of Acthar to Humana and its members in consumer transactions. This conduct violated the federal AKS and equivalent state statutes and caused the certifications of compliance with law provided by the Prescribing Doctors to Humana to be fraudulent.

181.   Plaintiff Humana was directly and proximately injured by Mallinckrodt and its co-conspirators' conduct and would not have paid what it did for Acthar had Mallinckrodt fully disclosed its schemes.

182.   Mallinckrodt engaged in wrongful conduct while at the same time obtaining under false pretenses a significant sum of money from plaintiff Humana. Humana suffered injury in fact and actual damages including lost money and property as a result of Mallinckrodt's violations of:

a.   A.S. § 45.50.471(a), *et seq.* (Alaska);

b.   Ariz. Rev. Stat. Ann. § 44-1521, *et seq.* (Arizona);

c.   Ark. Code Ann. § 4-88-101, *et seq.* (Arkansas);

d.   Cal. Bus. & Prof. Code § 17200, *et seq.* (California);

e.   Conn. Gen. Stat. § 42-110a, *et seq.* (Connecticut);

f.   Fla. Stat. § 501.201, *et seq.* (Florida);

g.   Idaho Code Ann. § 48-601, *et seq.* (Idaho);

h.   815 Ill. Comp. Stat. 505/1, *et seq.* (Illinois);

i.   Ind. Code § 24-5-0.5-1, *et seq.* (Indiana);

j.   La. Rev. Stat. Ann. § 51:1401, *et seq.* (Louisiana);

k.   Md. Code Ann., Com. Law § 13-101, *et seq.* (Maryland);

l.   Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.* (Massachusetts);

m.   Mich. Comp. Laws § 445.901, *et seq.* (Michigan);

n.   Neb. Rev. Stat. § 59-1601, *et seq.* (Nebraska);

o.   N.H. Rev. Stat. Ann. § 358-A:1, *et seq.* (New Hampshire);

p.   N.J. Stat. Ann. § 56:8-1, *et seq.* (New Jersey);

q.   N.M. Stat. § 57-12-1, *et seq.* (New Mexico);

r.   N.C. Gen. Stat. § 75-1.1, *et seq.* (North Carolina);

s.   N.D. Cent. Code § 51-15-01, *et seq.* (North Dakota);

t.   O.R.S. 646.607, *et seq.* (Oregon);

u.   S.C. Code Ann. § 39-5-10, *et seq.* (South Carolina);

v.   Tenn. Code Ann. § 47-18-101, *et seq.* (Tennessee);

w.   Wash. Rev. Code § 19.86.010, *et seq.* (Washington);

x.   Wis. Stat. § 100.18, *et seq.* (Wisconsin);

y.   Wyo. Stat. Ann. § 40-12-101, *et seq.* (Wyoming).

183.   Pursuant to these states' laws, Humana seeks judgment in its favor and against Mallinckrodt requiring Mallinckrodt to pay restitution of wrongful profits, revenues, and benefits received as a result of the Acthar schemes.

A-0652

## Count VII

### State Consumer Fraud and Deceptive Trade Practice Law Claims

184.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

185.   Mallinckrodt and its co-conspirators have engaged in fraudulent and deceptive business practices that violate the state consumer fraud, consumer protection, and/or deceptive trade practices laws of Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, North Carolina, South Carolina, Tennessee, and Wisconsin, and in particular the following laws:

a.   Ariz. Rev. Stat. Ann. § 44-1521, *et seq.* (Arizona);

b.   Ark. Code Ann. § 4-88-101, *et seq.* (Arkansas);

c.   Cal. Bus. & Prof. Code § 17200, *et seq.* (California);

d.   Colo. Rev. Stat. § 6-1-101, *et seq.* (Colorado);

e.   Conn. Gen. Stat. § 42-110a, *et seq.* (Connecticut);

f.   Fla. Stat. § 501.201, *et seq.* (Florida);

g.   Ga. Code Ann. § 10-1-390, *et seq.* (Georgia);

h.   815 Ill. Comp. Stat. 505/1, *et seq.* (Illinois);

i.   Ind. Code § 24-5-0.5-1, *et seq.* (Indiana);

j.   La. Rev. Stat. Ann. § 51:1401, *et seq.* (Louisiana);

k.   Md. Code Ann., Com. Law § 13-101, *et seq.* (Maryland);

l.   Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.* (Massachusetts);

m.   Mich. Comp. Laws § 445.901, *et seq.* (Michigan);

n.   Minn. Stat. § 325F.68, *et seq.* (Minnesota);

o.   Neb. Rev. Stat. § 59-1601, *et seq.* (Nebraska);

p.   Nev. Rev. Stat. § 41.600, *et seq.* (Nevada);

q.   N.H. Rev. Stat. Ann. § 358-A:1, *et seq.* (New Hampshire);

r.   N.C. Gen. Stat. § 75-1.1, *et seq.* (North Carolina);

A-0653

s.   S.C. Code Ann. § 39-5-10, *et seq.* (South Carolina);

t.   Tenn. Code Ann. § 47-18-101, *et seq.* (Tennessee);

u.   Wis. Stat. § 100.18, *et seq.* (Wisconsin).

186.   Humana is a person or consumer entitled to protection under the foregoing state laws.

187.   Mallinckrodt directly misrepresented to Humana that it was complying with federal and state laws, including laws against bribery, kickbacks, and false claims to the government. In addition, through its payments to doctors, Mallinckrodt induced the Prescribing Doctors to falsely certify to Humana through the prior authorization process that they had not received any illegal kickbacks from manufacturers.

188.   Mallinckrodt intended payors such as Humana to rely on these certifications. The intention may be inferred by the very nature of the representation, whose sole purpose is to procure payment for Acthar.

189.   These representations and certifications were made in an effort by Mallinckrodt to sell Acthar to the consuming public, and were addressed to the market generally by having Acthar paid for at inflated prices by Medicare, Medicaid, and third-party payors such as Humana. The ultimate consequence of this conduct is a significant injury to the consuming public by, among other things, imposing additional costs on the taxpaying public for Medicare, raising the cost of insurance, and obstructing the availability of Acthar and its synthetic substitute to consumers.

190.   Humana relied on these misrepresentations to its detriment, which were material to its decision to pay for Acthar treatments.

191.   Humana was directly and proximately injured by Mallinckrodt and its co-conspirators' conduct, suffered an injury in fact, and suffered actual, ascertainable damages. Humana would not have paid for Acthar, or would have paid only a small fraction of the amount it actually did pay, had Mallinckrodt refrained from engineering the false representations or otherwise disclosed its schemes.

A-0654

192.   Mallinckrodt's conduct offends established public policy and the public interest, and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

## Count VIII

### State Insurance Fraud Claims

193.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

194.   Mallinckrodt and its co-conspirators have committed insurance fraud in violation of the laws of Illinois, Kentucky, Pennsylvania, New Jersey, and Tennessee, and in particular the following laws:

    a.   720 ILCS 5/17-10.5(Illinois);

    b.    Ky. Rev. Stat. § 304.47-010, *et seq.* (Kentucky);

    c.   18 Pa. Cons. Stat. Ann. § 4117 (Pennsylvania);

    d.   N.J. Stat. § 17:33A, *et seq.* (New Jersey);

    e.   Tenn. Code Ann. §§ 56-53-101 (Tennessee).

195.   Mallinckrodt knowingly presented or caused to be presented to Humana statements in support of claims for insurance benefits for Acthar that it knew contained false and/or misleading information. Mallinckrodt knew and intended that by engaging in its schemes to pay kickbacks to doctors and illegally subsidize co-payments through phony charitable funds that misleading and/or false information would be submitted to Humana and other Medicare payors in connection with insurance claims.

196.   The statements of the co-conspirator doctors who prescribed Acthar and the pharmacies who filled Acthar prescriptions to Humana were false because they certified compliance with federal and state laws and regulations that were not, in fact, complied with. Among the laws which the doctors and pharmacies were not in compliance with were the anti-kickback statutes.

197.   The compliance certifications were material to Humana's decision to reimburse claims for Acthar that Mallinckrodt caused to be submitted. Had the

SECOND AMENDED COMPLAINT

A-0655

1   certification of compliance with federal and state laws and regulations been withheld or

2   corrected by the doctors or pharmacies, Humana would not to have paid these claims.

3       198.   Humana's injuries were directly and proximately caused by the false or

4   misleading statements that Mallinckrodt made to it, or caused to be submitted to it, as

5   described above.

<div align="center">

**<u>Count IX</u>**

**Tortious Interference with Contractual Relations**

</div>

8       199.   Humana incorporates by reference each of the above paragraphs of this

9   Complaint as though fully stated herein.

10      200.   Humana had valid and enforceable written contracts with each of its

11  members who were prescribed Acthar during the relevant period. These agreements

12  specify that members will pay their share of the costs for prescription drugs. The

13  purpose of this co-payment obligation is to provide an incentive to members to exercise

14  patient responsibility for health care costs, and so to help control health care and health

15  insurance costs on a larger scale.

16      201.   This co-payment obligation was known to Mallinckrodt, not only because

17  this is how most medical insurance generally works but also because Medicare policy

18  documents are largely prescribed by federal law.  CMS mandates that insurers use

19  approved language in their Medicare policy documents, including the pertinent

20  Evidence of Coverage ("EOC") document.  Those materials are publicly available and

21  well known in the pharmaceutical industry.[9]  Humana adopts these materials as issued

22  by CMS for its own EOC documents.

23

24

---

25  [9] *See*, *e.g.*, https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Mark

26  etngModelsStandardDocumentsandEducationalMaterial (CMS website collecting
    model EOC documents) and https://www.cms.gov/Medicare/Prescription-Drug-

27  Coverage/PrescriptionDrugCovContra/Part-D-Model-Materials (model Part D

28  materials).

<div align="center">

52

SECOND AMENDED COMPLAINT

</div>

A-0656

202.   For example, attached as **Exhibit A** is an Evidence of Coverage from Humana written for a 2014 California plan incorporating Medicare's model language. That document provides that an insured is "responsible for" copayments and "must pay [their] share of the cost when [they] get [a] service or drug." *Id*. at 153.  With respect to PAPs in particular, the coverage document states:

---

**2. When you get a drug through a patient assistance program offered by a drug manufacturer**

Some members are enrolled in a patient assistance program offered by a drug manufacturer that is outside the plan benefits. If you get any drugs through a program offered by a drug manufacturer, you may pay a copayment to the patient assistance program.

- Save your receipt and send a copy to us so that we can have your out-of-pocket expenses count toward qualifying you for the Catastrophic Coverage Stage.
- **Please note:** Because you are getting your drug through the patient assistance program and not through the plan's benefits, we will not pay for any share of these drug costs. But sending a copy of the receipt allows us to calculate your out-of-pocket costs correctly and may help you qualify for the Catastrophic Coverage Stage more quickly.

---

*Id*. at 141 (highlighting added); *see also id*. at 122 (advising members to provide receipts for their co-pays to PAPs to "[m]ake sure that we have that information we need" when the member "made a copayment for drugs that are provided under a drug manufacturer patient assistance program").

203.   As the highlighted language makes plain to members, Humana does not pay for drugs provided through a PAP, but the member's expenses may affect the computation of that member's out-of-pocket costs.  If the PAP uses its funds to pay the member's co-pay, however, then both the letter and the purpose of the EOC provision are subverted.  Mallinckrodt's scheme to pay those patient co-pays through the sham charitable funds at CDF did precisely that, causing members to unintentionally

A-0657

represent that were paying their share of a covered drug when in fact they were not paying and the drug was not covered.

204.   Mallinckrodt intended to and did induce Humana members to breach their obligations by subsidizing their co-pays.

205.   Humana was harmed by these breaches because it reimbursed claims for Acthar that otherwise would not have been made.

206.   Mallinckrodt has intentionally interfered with the contracts between Humana and its members.

207.   Humana seeks judgment in its favor and against Mallinckrodt, requiring Mallinckrodt to pay monetary and punitive damages for the conduct described herein.

## Count X

### Unjust Enrichment

208.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

209.   As the intended and expected result of their conscious wrongdoing as set forth in this Complaint, Mallinckrodt has profited and benefited from payments Humana made for Acthar as a result of its schemes.

210.   The circumstances of Mallinckrodt's receipt of monies based on the conduct set forth in this Complaint are such that, in equity and good conscience, Mallinckrodt should not retain such monies, the amount of which is to be determined at trial.

211.   Humana is entitled in equity to seek restitution of Mallinckrodt's wrongful profits, revenues, and benefits received as a result of its schemes.

212.   Humana states this claim to the extent that it is deemed not to have an adequate legal remedy.

## V.   PRAYER FOR RELIEF

213.   Based on the foregoing, Humana requests that the Court enter an order that:

54
SECOND AMENDED COMPLAINT

1       a.      Enters judgment in favor of Humana and against the Defendant;

2       b.      Awards Humana its actual damages in an amount to be determined

3             at trial;

4       c.      Awards Humana punitive damages;

5       d.      Awards Humana treble damages under 15 U.S.C. § 15(a), 18 U.S.C.

6             § 1964(c), or any other provision of law, including state law, that

7             permits doubling or trebling of damages;

8       e.      Awards Humana its attorneys' fees and litigation costs under 15

9             U.S.C. § 15(a), 18 U.S.C. § 1964(c), or any other provision of law,

10            including state law, that permits recovery of such costs and fees;

11       f.      Awards Humana pre-and post-judgment interest; and

12       g.      Provides any other relief that the Court deems proper.

13                     **VI.    JURY DEMAND**

14      214.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial

15 by jury on all issues so triable.

16

17 Dated:      April 24, 2020        By:    /s/ *Scott C. Solberg*

18                                   Gary S. Lincenberg
19                                   Jeremy D. Matz
                                  BIRD, MARELLA, BOXER,
20                                   WOLPERT, NESSIM, DROOKS,
                                  LINCENBERG & RHOW P.C.
21                                   1875 Century Park East, 23rd Floor
                                  Los Angeles, CA 90067
22                                   Telephone: 310−201−2100
                                  Fax: 310−201−2110
23                                   Email: glincenberg@birdmarella.com
                                         jmatz@birdmarella.com
24

25                                   Scott C. Solberg
                                  (admitted *pro hac vice*)
26                                   James W Joseph
                                  (admitted *pro hac vice*)
27                                   Benjamin E. Waldin
                                  (admitted *pro hac vice*)
28                                   EIMER STAHL LLP
                                  224 South Michigan Ave., Suite 1100

SECOND AMENDED COMPLAINT

1

Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
Email: ssolberg@eimerstahl.com
         jjoseph@eimerstahl.com
         bwaldin@eimerstahl.com

*Attorneys for Plaintiff Humana Inc.*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A-0660

# EXHIBIT C

Case 20-12522-JTD    Doc 2159-4    Filed 04/30/21    Page 2 of 9

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

_____

## FORM 8-K

_____

**CURRENT REPORT**
Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): June 11, 2013**

_____

# QUESTCOR PHARMACEUTICALS, INC.
**(Exact Name of Registrant as Specified in Charter)**

_____

| California | 001-14758 | 33-0476164 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 1300 Kellogg Drive, Suite D, Anaheim, California | 92807 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

**Registrant's telephone number, including area code: (714) 786-4200**

_____

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Case 20-12522-JTD    Doc 2159-4    Filed 04/30/21    Page 3 of 9

**Item 1.01       Entry into a Material Definitive Agreement.**

On June 11, 2013, Questcor Pharmaceuticals, Inc., a California corporation ("**Questcor**"), and its wholly-owned subsidiary ("**Purchaser**"), entered into the following agreements with Novartis AG, a corporation organized under the laws of Switzerland ("**NAG**"), and Novartis Pharma AG, a corporation organized under the laws of Switzerland ("**NPHAG**" and, together with NAG, "**Novartis**"):

- A License Agreement (the "**License Agreement**"), under which Purchaser acquired from Novartis a license (the "**License**") to use certain intellectual property and know-how owned by Novartis to develop, market, manufacture, distribute, sell and commercialize Novartis' Synacthen and Synacthen Depot products (the "**Product**") for all uses in humans in the United States. Subject to certain conditions and limitations in the License Agreement, the License is exclusive, perpetual and irrevocable.

- An Asset Purchase Agreement (the "**APA**"), under which Purchaser will acquire from Novartis (i) a license to use certain intellectual property and know-how owned by Novartis and (ii) certain assets, to develop, market, manufacture, distribute, sell and commercialize the Product in all the countries in the world, other than the United States and 13 European countries in which Novartis has previously granted rights to another third party, for all uses in humans (the "**Asset Purchase**"). Subject to certain conditions and limitations in the APA, the rights and assets acquired under the APA are exclusive, perpetual and irrevocable.

Collectively, the License Agreement and APA are referred to below as the "**Agreements**" and the License and Asset Purchase are referred to below as the "**Transaction**."

The closing of the transactions contemplated by the License Agreement occurred concurrently with the execution thereof on June 11, 2013 (the "**Effective Date**"). Novartis has the right to terminate the License under certain circumstances, including if Questcor fails within time periods set forth in the License Agreement to achieve certain development milestones related to (i) conducting a pre-IND meeting with the United States Food and Drug Administration (the "**FDA**") with respect to the Product, (ii) commencing a clinical trial with respect to the Product and (iii) submitting an NDA for the Product for filing with the FDA.

The rights under the APA will transfer to Purchaser within two years of the Effective Date so long as certain closing conditions are met (the "**APA Closing Date**"). Novartis has the right to terminate the rights granted to Purchaser and recover the assets for a specific country if Purchaser fails to obtain the necessary regulatory approvals for such country or fails to make the Product available in such country for a period of time following the transfer of the applicable marketing authorization.

In consideration for the License and Asset Purchase, Questcor paid Novartis an upfront cash payment of $60 million on the Effective Date and agreed to pay annual cash payments of $25 million on each of the first, second and third anniversaries of the Effective Date, an additional annual cash payment on each anniversary subsequent to the third anniversary until Questcor obtains the first approval of the FDA related to the Product (the "**FDA Approval**"), and a milestone payment upon Questcor's receipt of the FDA Approval. If Questcor successfully obtains the FDA Approval, Questcor will pay an annual royalty to Novartis based on a percentage of the net sales of the Product in the United States market until the maximum payment described below is met. Under the terms of the Agreements, Questcor is required to pay each of the first three annual payments, which are secured by a letter of credit, but may, in certain circumstances, be excused from the remaining payments. In no event will the total payments to Novartis under the Agreements be less than $135 million nor exceed $300 million.

As of June 7, 2013, prior to giving effect to the Transaction, Questcor had $218.9 million in cash, cash equivalents and short-term investments. As discussed above, Questcor has paid $60 million in upfront consideration. Additionally, as discussed in item 2.03 below, Questcor has granted a security interest in $75 million of cash to secure a letter of credit in connection with the Transaction.

In connection with the Transaction, Novartis agreed to provide certain sales, distribution and manufacturing support services for the Product for those non-United States markets in which Novartis currently sells the Product for a limited period of time following the APA Closing Date, and the parties entered into a supply agreement under which Novartis agreed to manufacture and supply, either directly or indirectly through a third party, the Product to Purchaser for those non-United States markets in which Novartis currently sells the Product for a limited period of time following the APA Closing Date.

The foregoing description of the Agreements does not purport to be complete and is qualified in its entirety by reference to the Agreements, which will be filed as an exhibit to Questcor's Quarterly Report on Form 10-Q for the quarter ending June 30, 2013. The Company intends to submit a FOIA confidential treatment request to the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended, requesting that it be permitted to redact certain portions of the Agreements. The omitted material will be included in the request for confidential treatment.

**Item 2.03      Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

Pursuant to the Agreements, Questcor is obligated to pay Novartis future consideration of not less than $75 million. This minimum future payment amount has been secured through the issuance by Union Bank of a letter of credit in the amount of $75 million. Questcor has granted Union Bank a security interest in $75 million of cash collateral in connection with the bank's issuance of the letter of credit. As disclosed in Item 1.01 above, Questcor may be required to make other future payments to Novartis under the Agreements. A summary of the material terms of the Agreements and the transactions contemplated thereunder is set forth in Item 1.01 above and is incorporated herein by reference.

**Item 8.01      Other Events.**

On June 11, 2013, Questcor issued a press release announcing the closing of the transactions contemplated by the Agreements. A copy of the press release is attached hereto as Exhibit 99.1 and is incorporated herein by reference.

**A-0664**

**SIGNATURES**

Pursuant to the requirements of the Exchange Act, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: June 11, 2013

QUESTCOR PHARMACEUTICALS, INC.

By: /s/ Michael H. Mulroy
Michael H. Mulroy
Senior Vice President, Chief Financial Officer, and
General Counsel

**EXHIBIT INDEX**

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release issued on June 11, 2013. |

A-0666

EXHIBIT 99.1



**Questcor Pharmaceuticals Acquires Rights to Synacthen®**

– Expands Questcor's Presence in Inflammatory and Autoimmune Disorders –

– Provides Foundation for Next Generation Melanocortin Receptor Agonist Therapeutics –

– Initiates Global Footprint, Diversifies Business, Enhances Long-term Growth Prospects –

**ANAHEIM, CA, June 11, 2013** — Questcor Pharmaceuticals, Inc. (NASDAQ: QCOR) today announced it has acquired rights to develop Synacthen® and Synacthen Depot in the U.S. from Novartis Pharma AG and Novartis AG. Subject to certain closing conditions, Questcor has also acquired rights to Synacthen® and Synacthen Depot® in certain countries outside the U.S. Available in more than forty countries for multiple indications, Synacthen (tetracosactide) is a synthetic 24 amino acid melanocortin receptor agonist. Synacthen Depot is a depot formulation of Synacthen. The products are approved outside the U.S. for certain autoimmune and inflammatory conditions, but have never been developed or approved for patients in the U.S.

"As an emerging leader in melanocortin research, we now have the opportunity with Synacthen to expand and accelerate our product development activities. We believe such efforts will enhance our expanding R&D program," said Don M. Bailey, President and CEO of Questcor. "In addition, this key acquisition provides an opportunity to initiate our presence in more than three dozen international markets, giving us an opportunity to reinvigorate Synacthen in these markets and providing us a platform for potential international growth."

"This transaction leverages our rapidly growing understanding of the different characteristics and biological activity of melanocortin receptor agonists such as Synacthen, a synthetic ACTH-related agonist, and naturally derived Acthar, as well as the potential use of melanocortin receptor agonists in the treatment of serious and difficult-to-treat autoimmune and inflammatory disorders," said David Young, Pharm.D., Ph.D, Chief Scientific Officer of Questcor. "We intend to develop and seek FDA approval for Synacthen and are committed to developing this product not only in conditions different than Acthar but also in conditions where Synacthen would potentially provide a clinical benefit over Acthar."

Under the terms of the transaction agreements, Questcor has paid Novartis an upfront consideration of $60.0 million. Questcor will make additional payments of at least $75.0 million in the aggregate over the next several years, as well as potential milestone payments prior to FDA approval. Upon FDA approval of Synacthen in the U.S., Questcor will pay Novartis another milestone and royalties based on net sales in the U.S. As is common in the acquisition of development programs, the transaction agreements include mechanisms to ensure that Questcor pursues FDA approval and commercializes Synacthen in the U.S. upon approval. Questcor will immediately take over the rights in the U.S. Subject to certain closing conditions that must be satisfied within the next two years, Questcor will also take over rights in over three dozen countries outside the U.S. "Together with our previous acquisition of BioVectra, this transaction provides Questcor with an opportunity for both an international presence and a more robust business model," said Mr. Bailey. "We anticipate establishing a base of operations in Europe to manage and optimize the world-wide Synacthen brand."



**About Synacthen**

Synacthen and Synacthen Depot are available in more than forty countries to treat a number of conditions including some rheumatoid diseases, ulcerative colitis, chronic skin conditions responsive to corticosteroids, nephrotic syndrome, acute exacerbations in patients suffering from multiple sclerosis or retrobulbar neuritis. Synacthen and Synacthen Depot are also used as a diagnostic test for adrenal insufficiency. Synacthen and Synacthen Depot are not approved in the U.S.

**About Questcor**

Questcor Pharmaceuticals, Inc. is a biopharmaceutical company focused on the treatment of patients with serious, difficult-to-treat autoimmune and inflammatory disorders. Questcor also provides specialty contract manufacturing services to the global pharmaceutical industry through its wholly-owned subsidiary BioVectra Inc. Questcor's primary product is H.P. Acthar® Gel (repository corticotropin injection), an injectable drug that is approved by the FDA for the treatment of 19 indications. Of these 19 indications, Questcor currently generates substantially all of its net sales from the following on-label indications: the treatment of proteinuria in the nephrotic syndrome of the idiopathic type, or NS, the treatment of acute exacerbations of multiple sclerosis, or MS, in adults, the treatment of infantile spasms, or IS, in infants and children under two years of age, and the treatment of certain rheumatology related conditions, including the treatment of the rare and closely related neuromuscular disorders dermatomyositis and polymyositis. With respect to nephrotic syndrome, the FDA has approved Acthar to "induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus." Questcor is also exploring the possibility of developing markets for other on-label indications and the possibility of pursuing FDA approval of additional indications not currently on the Acthar label where there is high unmet medical need. For more information about Questcor, please visit www.questcor.com.

**Forward Looking Statement**

Note: Except for the historical information contained herein, this press release contains forward-looking statements that have been made pursuant to the Private Securities Litigation Reform Act of 1995. These statements relate to future events or our future financial performance. In some cases, you can identify forward-looking statements by terminology such as "believes," "continue," "could," "ensuring," "estimates," "expects," "growth," "may," "momentum," "plans," "potential," "remain," "should," "start," "substantial," "sustainable" or "will" or the negative of such terms and other comparable terminology. These statements are only predictions. Actual events or results may differ materially. Factors that could cause or contribute to such differences include, but are not limited to, the following:

- Research and development risks, including risks associated with efforts to develop and obtain FDA approval of Synacthen, our reliance on third-parties to conduct research and development, and the ability of research and development to generate successful results;

A-0668



- Our ability to comply with federal and state regulations, including regulations relating to pharmaceutical sales and marketing practices;

- Regulatory changes or other policy actions by governmental authorities and other third parties in connection with U.S. health care reform or efforts to reduce federal and state government deficits;

- Our ability to effectively manage our growth, including planned international expansion, and our reliance on key personnel;

- Our ability to comply with foreign regulations related to the international sales of Synacthen; and

- Other risks discussed in Questcor's annual report on Form 10-K for the year ended December 31, 2012 as filed with the Securities and Exchange Commission, or SEC, on February 27, 2013, and other documents filed with the SEC.

The risk factors and other information contained in these documents should be considered in evaluating Questcor's prospects and future financial performance.

Questcor undertakes no obligation to publicly release the result of any revisions to these forward-looking statements, which may be made to reflect events or circumstances after the date of this release.

For more information, please visit www.questcor.com or www.acthar.com.

**Contacts**

EVC Group

Gregory Gin/Patty Eisenhaur                          Janine McCargo

646-445-4801/951-316-0577                          646-688-0425

A-0669

# EXHIBIT D

SUBJECT TO FRE 408 & STATE LAW EQUIVALENTS



**Mallinckrodt** Pharmaceuticals:

Discussion Materials

October 2020



A-0671

# Table of Contents

### Section

1    Situation Update

2    Specialty Brands Business

3    Specialty Generics Business

4    Additional Company Detail

5    Restructuring Term Sheet Update

6    Overview of Intercompany Considerations

A-0672

*SUBJECT TO FRE 408, STATE LAW EQUIVALENTS*



# 1. Situation Update



A-0673

# Situation Overview



**Since 2019, Mallinckrodt plc (the "Company") and its advisors have pursued a global resolution through a comprehensive settlement with Opioid Plaintiffs, a surgical filing of Specialty Generics ("SGx" or "Generics") subsidiaries and certain other refinancing transactions to extend the Company's capital structure (collectively, "Balboa")**

➤ While negotiating Balboa, the Company proactively executed multiple exchange offers that sought to deleverage the business and address near-term maturities

- December 2019 exchange of $706 million of unsecured notes into $323 million of 2L notes due 2025

- April 2020 par exchange of $495 million of unsecured notes due 2020 into 1L notes due 2025

➤ In February 2020, the Company announced an agreement in principle pertaining to a global opioid resolution with a broad-based group of governmental opioid plaintiffs ("Opioid Plaintiffs")

- The settlement contemplated $1.6 billion in structured payments, warrants for 19.99% of the Company's equity, and would be effectuated through a chapter 11 filing of the SGx subsidiaries

- The settlement was also subject to numerous conditions and contingencies, including the satisfactory exchange of 2022 notes and resolution of certain other potential DOJ claims

A-0674

# Situation Overview (cont'd)

**However, recent litigation, operational and capital structure headwinds have created challenges for Balboa, which could be overcome through broad consensus from all constituencies**

**Litigation Environment**

- Acthar ruling of $650mm, subject to potential settlement with CMS / DOJ in the amount of $260 million in structured payments

- Deal with Opioid Plaintiffs needs to be reaffirmed

- Company must also contend with other litigation liabilities, including shareholder litigation

**Operating Performance**

- Decline in revenues and profits due to multiple factors including COVID-19

- Resulting increase in expected leverage and decrease in projected cash flows

**Capital Structure**

- Current liquidity sources limited to cash, given full draw of revolving commitments under secured credit facility

- Need to refinance upcoming maturities across multiple lending tiers despite elevated leverage

➢ These operational, legal and balance sheet related challenges have increased the potential need for a restructuring through a chapter 11 of Mallinckrodt plc, guarantors under its funded debt and certain other subsidiaries ("WholeCo")

A-0675

# Litigation Environment

**The Company continues to face significant litigation risks, and the ability to reach a settlement with CMS / DOJ as well as the Opioid Plaintiffs remains critical for a pathway forward**

I.  The recent decision by the U.S. Court of Appeals for D.C. to deny a temporary injunction against CMS will lead to $650 million of retroactive cash payments expected to be due in September or October 2020

   • Recently, the Company has reached a settlement in principle with CMS / DOJ which would provide $260 million in structured cash payments over 7 years to satisfy potential CMS / DOJ claims

II.  Opioid settlement requiring $1.6 billion in structured payments needs to be reaffirmed

   • The Company continues to negotiate on potential modifications of a settlement with the Opioid Plaintiffs that would be acceptable to its creditor constituencies

   • Potential settlement with private Opioid Plaintiffs not yet reached and discussions remain ongoing

III.  The Company also faces other lawsuits related to Acthar, payments to charitable foundations, shareholder litigation and various other matters

A-0676

# Operating Performance

**Increased competition and potential opioid settlement payments create a drain on near-term projected cash flows while significant debt maturities remain on the horizon**

➢ Higher leverage and increasing payouts from settlements will impact lenders' willingness to support refinancings



| | 2020 | 2021 | 2022 |
|---|---|---|---|
| Unlevered Free Cash Flow[1] | $393 | $218 | $548 |
| Maturities[2] | — | — | $1,521 |

_____
(1)  Projections are preliminary estimates. Unlevered free cash flow before cash taxes and after opioid settlement payments, opioid-related litigation expenses and restructuring execution costs.
(2)  Illustratively represents current debt balances by maturity, excluding the impact of term loan amortization.

A-0677

# Mallinckrodt Pharmaceuticals:
# Managing complexity. Improving lives.

A-0678

# Mallinckrodt operates two scaled, profitable business segments



~$2.4 billion

Innovative branded drug development and commercialization

Pure play branded pharmaceutical growth company focused on meeting the needs of underserved patients with severe and critical conditions in two primary segments – autoimmune and critical care – adding value through drug development and commercialization.

~$0.7 billion

Producing high-quality generic medicines in complex markets

Separately-operated segment driving near-term performance and cash flows from manufacturing controlled substances and APIs[2] while establishing a diversified portfolio of complex ANDAs[3] capable of delevering long-term value"

_____
(1)   2019 net sales excluding BioVectra.
(2)   Active Pharmaceutical Ingredients.
(3)   Abbreviated New Drug Application.

A-0679

SUBJECT TO FRE 408 - SETTLEMENT DISCUSSIONS



# 2. Specialty Brands Business



A-0680



# Mallinckrodt's commercial portfolio is comprised of diversified brands with strong clinical evidence and commercial performance

**Scaled branded pharmaceuticals platform** with $2.4B net sales

Diversified portfolio with **Acthar <50% of net sales**, significant critical care sales and growing international revenue

**Consistent revenue generation and growth** driven by long-term demand, new clinical and HEOR[1] data generation, geographic and label expansion

**Strong cash flow generation** to support life cycle management and growth initiatives



**2019 Net Sales[2] of Key In-Line Products ($B)**

amitiza lubiprostone $0.2

Therakos PHOTOPHERESIS $0.2

Other <$0.1

H.P. Acthar GEL (repository corticotropin injection) 80 U/mL $1.0

OFIRMEV (acetaminophen) injection $0.4

INOmax (nitric oxide) GAS FOR INHALATION $0.6

2019 Net Sales: **$2.4 billion**

---

(1) Health Economic Outcomes Research.
(2) 2019 net sales excluding BioVectra.

10

A-0681

SUBJECT TO FRE 408 – SETTLEMENT COMMUNICATIONS

# We have built a highly profitable Specialty Brands business by optimizing and driving commercial outperformance



| Product | Net Sales: Fiscal Yr. Prior to Acquisition ($MM) | Net Sales: 2019 ($MM) | Absolute Growth | CAGR | Long-Term Strategy |
|---|---|---|---|---|---|
| H.P. Acthar GEL (repository corticotropin injection) 80 U/mL | $761 (2013) | $953 | 25% | 4% | • Advance payor engagement and contracting<br>• Completed critical life cycle studies<br>• Develop new product presentation – pre-filled injector |
| INOmax* (nitric oxide) FOR INHALATION | $396 (2014) | $571 | 44% | 8% | • Leverage unique service offering and commercial model<br>• Develop next generation device (EVOLVE)<br>• Expand indicated uses and geographic presence<br>• Manage hospital relationships – flexible, multi-year contracts |
| OFIRMEV* (acetaminophen) injection 1000 mg/100 mL (10 mg/mL) | $111 (2013) | $384 | 246% | 23% | • Optimize cash flow generation through LOE[1]<br>• Leverage existing hospital sales force to drive new product launches (e.g., Terlivaz) |
| Therakos* PHOTOPHERESIS | $174 (2014) | $247 | 42% | 7% | • Complete conversion to advanced CELLEX devices<br>• Expand label in chronic and acute GVHD[2]<br>• Enlarge footprint and extend geographic focus |

\* Critical Care

_____
(1)  Loss of exclusivity.
(2)  Graft versus Host Disease.
(3)  Health Economic Outcomes Research.

A-0682

# We continue to innovate within the commercial portfolio to optimize revenue generation for each franchise and extend life cycle

## New **INOmax EVOLVE** delivery device designed to improve operational efficiency and advance nitric oxide delivery in the hospital setting

**Current product**



**EVOLVE**



**INOmax EVOLVE** designed to:
- Reduce human error potential through automation
- Provide improved technological and safety features
- Reduce time between diagnosis and treatment through quick, automated set-up
- Increase number of patients and settings for treatment
- Increase mobility and transportability ease



**EVOLVE:**
~1lb per cylinder

**Current product:**
~45lb per cylinder

INOmax EVOLVE creates potential to expand nitric oxide platform for other therapeutic uses

## **Acthar Gel self-injector** designed for improved patient convenience and flexibility



- **Acthar Gel self-injector** designed to enhance customer-focused delivery:
  - Easier use for patients with dexterity or vision challenges
  - Single patient-specific dose; no need to draw the product from the current multi-dose vial
- Expected to offer subcutaneous injection system for all currently approved indications except Infantile Spasms
- Provides potential benefit over future competitive ACTH agents, if approved

Acthar Gel self-injector expected to further clinical use and patient experience with the product

12

A-0683

# Additionally, we have built a robust late-stage pipeline aligned with therapeutic areas of focus and existing commercial infrastructure



| Product | PreClinical | Phase 1 | Phase 2 | Phase 3 | Registration | Indication Under Study | Diseases/Therapeutic Areas |
|---|---|---|---|---|---|---|---|
| UVADEX® (methoxsalen) sterile solution (Therakos) | | | | | | Chronic GVHD[1] (Japan) | Immune mediated |
| ▲ TERLIVAZ (terlipressin) vasopressin analog | | | | | | HRS[2] Type-1 | Hepato-Renal |
| ▲ STRATAGRAFT® regenerative skin tissue | | | | | | Severe Burns, DPT[3] | Critical Care |
| ▲ MNK-6105 (OCR-002) (ornithine phenylacetate) intravenous | | | | | | Hepatic Encephalopathy | Hepato-Renal |
| ▲ STRATAGRAFT regenerative skin tissue | | | | | | Severe Burns, FT[4] | Critical Care |
| ▲ MNK-6106 (OCR-002) (ornithine phenylacetate) oral | | | | | | Hepatic Encephalopathy | Hepato-Renal |
| ▲ EXPRESSGRAFT™ anti-infective (cathelicidin) | | | | | | DFU[5] | Critical Care |
| ▲ EXPRESSGRAFT pro-angiogenic (VEGF[6]) | | | | | | TBD - Chronic Non-healing Wounds | Critical Care |
| ▲ EXPRESSGRAFT anti-tumor (IL-12[7]) | | | | | | TBD - Skin Cancer Recurrence | Critical Care |
| ▲ MP-3964 (TLR9[8] antagonist) | | | | | | TBD | Critical Care |
| ▲ SLN500 (RNAi[9])* | | | | | | Complement-mediated Diseases | Rare Disease |

| Device | Concept | Planning | Development | Qualification | Registration | Details | Diseases/Therapeutic Areas |
|---|---|---|---|---|---|---|---|
| INOMAX® (EVOLVE™) (Nitric Oxide) gas | | | | | | Next Generation Device | Critical Care |
| ACTHAR® GEL (repository corticotropin injection) | | | | | | Alternative Delivery Device | Immune mediated |

▲ New Product

(1) Graft versus Host Disease.
(2) Hepatorenal Syndrome.
(3) Deep Partial Thickness.
(4) Full Thickness.
(5) Diabetic Foot Ulcers.

(6) Vascular Endothelial Growth Factor.
(7) Interleukin.
(8) Toll-like Receptor.
(9) RNA Interference
*   Collaboration with Silence Therapeutics.

A-0684

Case 20-12522-JTD   Doc 21895   Filed 04/30/21   Page 16 of 44
SUBJECT TO FRE 408 STATE OF LAW EQUIVALENTS

# We remain focused on underserved patients with immune-mediated diseases and in the critical care setting, and advancing scientific platforms to drive future growth



| **Primary criteria** | **Underserved Patients** |
|---|---|

| **Secondary criteria** | **Autoimmune / Immune Mediated Diseases** *(non-exhaustive)* | **Critical care** |
|---|---|---|

| **Potential areas** | **Neurology** | **Nephrology** | **Hepatology** | **Rheumatology** |
|---|---|---|---|---|

**Scientific Technology Platforms**
*Acquire, license and develop platform technologies microbiome, NO[1], ECP[2], RNAi[3]*
*(e.g., Silence Therapeutics, TransImmune)*

_____
(1)  Nitric Oxide.
(2)  Extracorporeal Photopheresis.
(3)  Ribonucleic Acid interference.

A-0685

SUBJECT TO FRE 408 AND ALL STATE LAW EQUIVALENTS

# We have assembled leading talent and capabilities to support our strategic vision



| ▶ Key Capabilities | | ▶ Description |
|---|---|---|
| **Commercial (US and Int'l)** | | ▪ Experienced and productive critical care and specialty salesforces with substantial reach and depth<br>▪ Comprehensive patient and account team enabling Total Care offering, patient identification, physician targeting and therapy demand generation<br>▪ Right-sized OUS commercial organization with infrastructure and talent to drive growth across Canada, western Europe and Japan |
| **Manufacturing and Supply Chain** | | ▪ Manufacturing expertise for both complex biologics (Acthar, StrataGraft) and device plus consumables products<br>▪ Fully owned or managed supply chains (INOmax, Therakos, StrataGraft)<br>▪ End to end operations and quality capabilities including product labeling and release |
| **R&D and Device Manufacturing** | | ▪ Significant R&D organization with >400 employees and ~$300M of annual spend ranging across research to life cycle management functions<br>▪ Key capabilities include clinical, regulatory, medical and HEOR expertise<br>▪ Extensive device manufacturing capabilities |
| **Business Development** | | ▪ First call and BD&L partner of choice for hospital-focused partners given substantial existing infrastructure<br>▪ Partnerships leveraging immune-mediated and critical care leadership<br>▪ Innovative scientific platform collaborations including NO[1], ECP[2] and RNAi[3]<br>▪ Favorable tax structure allows for enhanced value capture in transactions |

(1)   Nitric Oxide.
(2)   Extracorporeal Photopheresis.
(3)   Ribonucleic Acid interference.

A-0686

Case 20-12522-JTD   Doc 483   Filed 04/30/21   Page 18 of 44
SUBJECT TO FRE 408 – SETTLEMENT DISCUSSIONS

# Our Specialty Brands business is multinational with over 1,800 employees



**Commercial**
*~710 employees*

**Science & Technology**
*~440 employees*

**Operations**
*~380 employees*

**Finance**
*~120 employees*

**Information Technology**
*~90 employees*

**Legal / Compliance**
*~35 employees*

**HR / Communications**
*~50 employees*

**Strategy**
*~20 employees*

**Administrative Offices**

- Bedminster, NJ
- Hazelwood, MO
- Washington, DC
- Staines-Upon-Thames, UK
- Tokyo, Japan
- Mississauga, ON Canada
- Montreal, Canada
- Bonn, Germany
- Luxembourg

**Manufacturing Facilities**

- Madison, WI
- Port Allen, LA
- Sanda, Japan
- Dublin, Ireland

A-0687

# Properly capitalized, Mallinckrodt has the opportunity to build a highly differentiated branded biopharma business



**Pure play biopharma innovator, with highly profitable product portfolio**

**Advanced-to-intermediate stage pipeline supported by internal R&D organization**

**Scaled commercial platform to drive growth and launch future branded drugs**

**World class Science & Technology, and Operations organizations**

**Established BD&L team with proven track record**

**Strong cash flow generation to support growth**

17

A-0688

SUBJECT TO FRE 408 & STATE LAW EQUIVALENTS



# 3. Specialty Generics Business



A-0689

SUBJECT TO FRE 408 & STATE LAW EQUIVALENTS

# Differentiated U.S. Based Specialty Generics Business with Strong Leadership Position in Controlled Substances





**~1,600**

Employees

**2 Core Platforms**

✓ Complex Generics
✓ Active Pharmaceutical Ingredients



**#3**

Worldwide and only remaining U.S. Acetaminophen[1] supplier



**Leading R&D Org.**

✓ World-leading formulation and analytical R&D capabilities
✓ Vertically integrated



**~56%**

Share in addiction treatment clinics



**~38%**

2018 U.S. DEA[2] total controlled substance quota



**~$171**

2019 Adjusted EBITDA ($MM)

 

**#18**

2018 U.S. generics company by Extended Units



**5**

Manufacturing Sites

**~$739**

2019 Total Net Sales ($MM)

 

**4 Key Product Segments**

✓ Addiction Treatment
✓ ADHD[3]
✓ APAP[4]
✓ Opioids

---

(1)  The active ingredient used in Tylenol®.
(2)  Drug Enforcement Administration.
(3)  Attention deficit hyperactivity disorder.
(4)  N-acetyl-para-aminophenol, the primary active ingredient in acetaminophen.

A-0690

SUBJECT TO FRE 408 AND STATE LAW EQUIVALENTS

# Vertically Integrated, High Quality, U.S.-based Manufacturing Infrastructure





**Greenville, IL**
Compressible acetaminophen facility

**Hobart, NY**
Complex generics facility

**Webster Groves, MO**
Headquarters
- Commercial ready, R&D facility with pilot plant and R&D suites

**St. Louis, MO**
Multi-purpose API facility with manufacturing and Lifecycle Science for complex small molecules

**Raleigh, NC**
Acetaminophen API facility

● Owned
○ Leased

20

**A-0691**



# Niche U.S.-based Specialty Generics Business with Leadership Position in Controlled Substances

### KEY HIGHLIGHTS

#### *Generics Finish Dose*
- ✓ Deep product portfolio in controlled substances
- ✓ ~30 product families (~20 in controlled substances)
- ✓ 150+ SKUs (~140 in controlled substances)
- ✓ 10 dosage forms
- ✓ Strength in oral solid dosage as well as alternate dosage forms, including
  - – Extended release
  - – Patch

#### *API*
- ✓ ~30 product families (~20 in controlled substances)
- ✓ ~120 SKUs (~55 in controlled substances)
- ✓ Scaled platform supplying significant volumes for internal and external use

#### *Vertical Integration*
- ✓ Differentiated quality and consistency of supply
- ✓ Increased visibility, enabling a portfolio approach across finished dose and API opportunities
- ✓ Highly efficient cost structure
- ✓ Synergies between API and formulation development

### 2019 Net Sales by Product ($MM)



Oxycodone and Hydrocodone make up 21% of 2019 Net Sales

**2019 Generics Net Sales: $739MM**

21

A-0692

SUBJECT TO FRE 408 & STATE LAW EQUIVALENTS

# Leader in Niche Complex Generics Markets



SMALLER PLAYER IN TOTAL US GENERICS…          …BUT LEADER IN THE MARKETS IN WHICH WE PLAY



**#1** in Addiction Treatment

**#3** in ADHD

## KEY HIGHLIGHTS

✓ **Broad, deep controlled substance portfolio**

✓ **Successful track record in:**

– Product innovation (Concerta)

– Fast response to changing market conditions (hydrocodone combination product reclass)

✓ **Established share of DEA quotas**

– Well positioned for tightening quota environment

✓ **~90% of products are backward integrated into API – assures consistent, reliable supply of high quality product**

A-0693

SUBJECT TO FRE 408 & STATE LAW EQUIVALENTS



# 4. Additional Company Detail



A-0694

SUBJECT TO FRE 408 & SETTLEMENT EQUIVALENTS

# Overview and Key Assumptions of Preliminary Consolidated Business Plan



## Overview and Key Assumptions

**Overview**

➢ Brands net sales decline in 2021 from Acthar pricing pressure, INOmax competition and Ofirmev loss of exclusivity
  - INOmax sales moderately stabilized from EVOLVE device launch in 2021
  - Sales plateau from 2022 to 2024 driven by Acthar stabilization and new product launches (terlipressin in Q4 2020 & StrataGraft in Q1 2021) to offset impact of competition on existing portfolio (Ofirmev & INOmax)
➢ Negative EBITDA trends in 2021 largely driven by pressure on Generics gross profits due to competitive pressure from new entrants impacting both price and volume
  - Partially offset by Brands cost-savings initiatives to cut SG&A expenses as well as R&D spend declines due to completion of cycle management projects for Acthar and INOmax
➢ Unlevered free cash flow declines due to restructuring costs and opioid-related litigation expenses occurring in 2020 and 2021, in addition to significant cash outflows from a reduction in trade credit in 2020

**Key Assumptions**

➢ Unlevered free cash flow excludes potential settlement of CMS claims[1], debt service and cash taxes
  - Current year cash taxes is approximately $50 million with projected cash taxes estimated to be 10% to 15% on a consolidated basis, consistent with current levels
➢ Unlevered free cash flow includes the following:
  - $1.6 billion of opioid settlement payments assumed to be begin with $300 million upfront in 2021, $200 million in 2022 and 2023 and $150 million per annum thereafter (as announced in Feb 2020)
  - Certain restructuring execution costs in 2020 and 2021
  - Growth capex required in 2020 and 2021 for terlipressin and StrataGraft launches
  - Product-related contingent payments include various milestone obligations related to pipeline products
  - Severance costs related to execution of current and future headcount reductions

**Other**

➢ The forecast shown on the next page is the Company's forecast as of June 2020 and does not reflect potential updates including a settlement with CMS / DOJ, modifications to the settlement with Opioid Plaintiffs, the impact of the terlipressin Complete Response Letter as announced on 9/14/20, ~$100 million of additional tax refunds related to the CARES Act legislation, and certain other updates

Source: MNK Preliminary Consolidated Business Plan as of June 2020.
(1)   Related to retroactive AMP pricing.

24

A-0695



# Summary Preliminary Consolidated Business Plan

**The Company's preliminary business plan forecast through 2024 is outlined below**

| Preliminary Consolidated Business Plan | | | | | ($MM) |
|---|---|---|---|---|---|
| **Metric** | **2020E** | **2021E** | **2022E** | **2023E** | **2024E** |
| **Net Sales** | | | | | |
| Specialty Brands Net Sales | $1,964 | $1,760 | $1,848 | $1,867 | $1,859 |
| Specialty Generics Net Sales | 735 | 735 | 743 | 785 | 878 |
| **Consolidated Net Sales** | **$2,699** | **$2,495** | **$2,591** | **$2,652** | **$2,737** |
| *% Growth Y/Y* | *(13.6%)* | *(7.6%)* | *3.9%* | *2.4%* | *3.2%* |
| **EBITDA** | | | | | |
| Specialty Brands EBITDA | $725 | $695 | $746 | $719 | $707 |
| Specialty Generics EBITDA | 194 | 139 | 134 | 154 | 181 |
| **Consolidated EBITDA** | **$920** | **$834** | **$880** | **$873** | **$888** |
| *EBITDA Margin* | *34.1%* | *33.4%* | *34.0%* | *32.9%* | *32.5%* |
| **Unlevered Free Cash Flow** | | | | | |
| Consolidated Adjusted Unlevered Free Cash Flow[1] | $554 | $596 | $748 | $785 | $763 |
| Consolidated Unlevered Free Cash Flow[2] | 393 | 218 | 548 | 585 | 613 |
| *Memo: Additional Cash Flow Items* | | | | | |
| *Change in Net Working Capital & Other* | *($211)* | *($86)* | *($45)* | *($26)* | *($63)* |
| *Capital Expenditures* | *73* | *72* | *62* | *62* | *62* |

Source: MNK Preliminary Consolidated Business Plan as of June 2020.
Note: Projections are preliminary estimates.
(1) Unlevered free cash flow before cash taxes, opioid settlement payments, opioid-related litigation expenses and restructuring execution costs.
(2) Unlevered free cash flow before cash taxes and after opioid settlement payments, opioid-related litigation expenses and restructuring execution costs.

25

A-0696

SUBJECT TO FRE 408 AND SETTLEMENT EQUIVALENTS

# Overview of MNK Pipeline by Segment



**The following provides an overview and update of the Company's pipeline products**

## Brands Pipeline: StrataGraft

➤ StrataGraft regenerative skin tissue is an investigational treatment being developed to reduce autograft in patients with severe thermal burns

- StrataGraft is also in Phase 3 clinical status and, if approved, is expected to launch in Q1 2021 with estimated exclusivity through 2032

- StrataGraft assumes current critical care field teams will handle sales efforts, leveraging in-hospital knowledge and access

- StrataGraft has estimated global peak sales opportunity of greater than $150 million

## Brands Pipeline: Terlipressin Update

➤ FDA has issued a Complete Response Letter (CRL) regarding the company's New Drug Application (NDA) seeking approval for the investigational agent terlipressin to treat adults with hepatorenal syndrome type 1 (HRS-1)

➤ Company remains committed, as evidenced by more than a decade of development, to working with the FDA toward approval of terlipressin and helping address this difficult and life-threatening syndrome

➤ The Company is also evaluating cost mitigation in order to remain cash flow neutral as to its projections in 2020 and 2021

➤ Regarding another development update, Company is evaluating further development of and outlines of possible submission for VTS-270 based on communications with the FDA

## Specialty Generics Pipeline

➤ Generics segment forecasts 17 new products launching between 2021 and 2024

- Two to five new products launched per year from 2020 to 2024

➤ New products expected to generate net sales of ~$250 million by 2024

- Revenues are risk-adjusted based on technical probability of success and exclude international sales

➤ Approximately 60% of pipeline revenue is concentrated in top five pipeline products

➤ Diversity of the portfolio mix is driven by increasing (i) non-controlled API based / complex formulations projects and (ii) injections and other non-solid oral dosage forms

A-0697

SUBJECT TO FRE 408 AND STATE LAW EQUIVALENTS

# Illustrative Emergence Sources and Uses



➢ The following illustrative emergence sources and uses are based on an approximate 12-month bankruptcy filing commencing in August 2020 to implement the Company's proposed restructuring plan

➢ Note that the Company expects an incremental ~$100 million of additional tax refunds related to CARES Act legislation that would be realized in 2022

*($ in millions)*

| Sources | | Uses | |
|---|---|---|---|
| Cash from Balance Sheet[1][2] | $1,150 | Opioid Settlement - Upfront Cash Payment[3] | $450 |
| | | CMS/DOJ Settlement - Upfront Cash Payment[4] | 15 |
| | | Admin and Priority Claims | 160 |
| | | Trade/GUC Claims | 150 |
| | | Cash to Balance Sheet | 375 |
| **Total Sources** | **$1,150** | **Total Uses** | **$1,150** |

Note: Analysis is preliminary and excludes certain other potential costs including adequate protection fees, consent fees and other items.
(1)   Preliminary estimated cash at August 31, 2021, subject to further review.
(2)   Includes the CARES Act related tax refunds as disclosed in Form 10-Q dated August 4, 2020.
(3)   Upfront cash payment for opioid settlement as part of $1.6 billion of structured cash payments over seven years, per term sheet on following pages.
(4)   Upfront cash payment for Acthar plaintiffs (CMS, DOJ and government entities) as part of $260 million of structured cash payments over seven years.

A-0698



# 5. Restructuring Term Sheet Update



SUBJECT TO FRE 408 & STATE LAW EQUIVALENTS

# Illustrative Restructuring Summary Term Sheet



| | **Latest Framework**(1) |
|---|---|
| **Credit Agreement Claims** | ▪ Reinstated at existing rates and maturities |
| **1L Notes** | ▪ Reinstated at existing rates and maturities |
| **2L Notes** | ▪ Reinstated at existing rates and maturities |
| **Unsecured Notes** | ▪ 100% of reorganized equity, prior to dilution from MIP and Opioid Plaintiff Warrants<br><br>▪ $375MM of takeback 10.0% New 2L Notes due 7 years after emergence |
| **PLC Notes / Debentures** | ▪ No recovery |
| **General Unsecured Claims / Trade Claims** | ▪ Up to $150MM cash payment |
| **Acthar Plaintiffs: CMS, DOJ, Government** | ▪ $260MM of structured cash payments over 7 years |
| **Existing Equity** | ▪ No recovery |
| **Management Compensation** | ▪ 10% of fully diluted equity reserved as part of management incentive plan ("MIP") |
| **Company Status Upon Emergence** | ▪ On or as soon as reasonably practicable after emergence, the reorganized equity shall be listed for trading on The NASDAQ Capital Market, the NASDAQ Global Market, or the New York Stock Exchange |

Note: Terms are illustrative, subject to material change and for discussion purposes only.
(1)    Subject to review by Company, ad hoc group of noteholders and Opioid Plaintiffs.



A-0700

SUBJECT TO FRE 408 AND ALL APPLICABLE STATE LAW EQUIVALENTS

# Illustrative Restructuring Summary Term Sheet (cont.)



| | Latest Framework[1] |
|---|---|
| **Opioid Plaintiffs** | ▪ $1.6BN of structured cash payments over 7 years, adjusted as follows:<br><br>• $450MM at emergence<br>• $200MM on each of the 1st and 2nd anniversaries of emergence<br>• $150MM on each of the 3rd through 7th anniversaries of emergence<br>• For 12-months post-emergence, ability to partially or entirely prepay deferred payments excl. $450MM (partial payment to be funded only with the net proceeds of an equity raise and to be applied in inverse order beginning with payment due on the 7th anniversary)<br>   ○ Prepayment price equal to the present value of the amounts to be prepaid, at the date of prepayment, discounted at the discount rate that would be required for (x) the present value of the deferred payments at the prepayment date plus $450MM to equal (y) the present value of the payments under the original schedule as of Feb 2020, discounted at 12%, plus $300MM<br>   ○ *If option were exercised at emergence, the total payment would equate to $1,130MM ($450MM + $680MM); if exercised at end of year 1, total payments would equate to $1,229MM ($450MM + $779MM)*<br><br>▪ Warrants for 19.99% of equity, prior to dilution from MIP ("Opioid Plaintiff Warrants")<br><br>• Struck at equity value of $1,551MM[2]<br>• 7-year life; however, life is reduced to 5 years if the full prepayment option described above is exercised |

---

Note: Terms are illustrative, subject to material change and for discussion purposes only.
(1)   Subject to review by Company, ad hoc group of noteholders and Opioid Plaintiffs.
(2)   Calculated as (i) $3.15 multiplied by 84.1MM shares, plus (ii) $1,661MM of unsecured principal equitized or retired, less (iii) $375MM of 2L Notes.

A-0701

SUBJECT TO FRE 408 & STATE LAW EQUIVALENTS



# 6. Overview of Intercompany Considerations



**A-0702**

SUBJECT TO FRE 408 STATEMENTS AND EQUIVALENTS

# Introduction



- Mallinckrodt plc and its subsidiaries operate a complex global business within an optimized multinational legal entity structure (the "Legal Entity Structure")

- The Legal Entity Structure was developed to conduct business, control risks, and manage tax liabilities arising from the manufacturing and distribution of pharmaceuticals through the Company's Specialty Brands and Specialty Generics business segments

- Intercompany transactions are governed by distribution agreements (primarily for cross-border activities), service agreements, Cash Management Agreements ("CMA"), and loan documents

- Transfer pricing used for product transfers, services, loan interest, and intellectual property royalties is governed by tax law arms-length standards and complies with debt document requirements for arms-length transactions
    - Any transfer pricing used is monitored and documented regularly

- The Company records each intercompany transaction and its accounting records reflect the amounts due between the various global legal entities

- Intercompany transactions are settled either by book entry and / or through a transfer of cash through the Company's cash pools

- Indebtedness owed by loan parties to non-loan parties is subordinated to the extent required by the credit documents

- In connection with the restructuring term sheet, the Company discussed with advisors to the steering committee of the ad hoc group of unsecured noteholders historic and ongoing intercompany relationships and activity.  To the extent based on public information, the Company also discussed such relationships and activity with the members of the steering committee.  Any issues considered are now subsumed within the restructuring term sheet

A-0703

SUBJECT TO FRE 408; STATE LAW EQUIVALENTS

# Mallinckrodt Organizational Structure

Note: This chart reflects the anticipated structure as of the projected filing date.

A-0704



# Intercompany Overview



**Mallinckrodt engages in three types of intercompany activities which are summarized below and in additional detail on the following slides**

**① Intercompany Trade**
- ➢ Includes the sale and purchase of goods between entities, payment for management & corporate services, royalties, research & development, and marketing services
- ➢ Intercompany trade activity is governed by intercompany distribution, service, and license agreements

**② Intercompany Cash Management**
- ➢ Cash is managed globally through four primary cash pooling entities in the U.S. and in foreign jurisdictions and all activity is governed by cash management agreements
- ➢ There are various foreign entities that manage cash on a standalone basis and do not participate with a cash pool
- ➢ Before November 2019, domestic Brands and Generics entities were participants in the same U.S. cash pool. In November 2019, new cash accounts were established under a domestic Generics entity, which manages cash flows for the domestic Generics entities
- ➢ In July 2020, a new U.S. Brands only cash pool was created
- ➢ Intercompany cash management for each cash pool is governed by Cash Management Agreements with the respective legal entity participants

**③ Intercompany Loans**
- ➢ Originate from acquisition or financing activities, movement of intellectual property or other assets, and other related activity
- ➢ Intercompany loans are governed by Intercompany Note Agreements

A-0705



# ① **Intercompany Trade Overview**

Intercompany trade activities include the following types of transactions:

➢ **Intercompany invoice flows:**

– The Specialty Brands segment utilizes a limited risk distributor structure in which the Limited Risk Distributor ("LRD" or "LRDs") entities market and distribute branded products under a limited risk distributor agreement. All intercompany trade purchases are governed by these Intercompany Distribution Agreements

– Specialty Generics' domestic operating activities, both manufacturing and distribution, are contained within the domestic Generics entities. For Specialty Generics' international business, Generics' Limited Risk Distributor entities market and distribute products in Canada, UK, and Europe under Intercompany Distribution Agreements

➢ **Intercompany cost allocations for Specialty Brands:**

– **Direct employee costs:** Brands employees are employed by a corporate shared service entity. This shared service entity charges these employee costs directly to the Brands entities based on the employee's functional area, such as a LRDs' sales team

– **Management & corporate services:** On a quarterly basis, the shared service entity charges a management & corporate service fee allocated to both Brands and Specialty Generics entities based on corporate overhead costs incurred for the following services: IT, Marketing, Human Resources, Finance, Legal and other corporate overhead costs

A-0706

SUBJECT TO FRE 408 SETTLEMENT EQUIVALENTS

**1 Intercompany Trade Overview** (cont.)



– **Royalties:** Royalties, in consideration of the Intellectual Property used, are charged under a royalty license agreement between the licensor ("IP Licensor") and licensee ("IP Licensee")

– **Research & Development (R&D):** Various LRD entities engage in R&D projects and costs are charged to the IP Licensee. These services are governed by R&D Service Agreements between the respective entities. In addition to these R&D costs, there is also R&D incurred at the shared service entity that is charged through the quarterly management fee

➢ **Intercompany cost allocations for Specialty Generics:**

– **Employee costs:** Specialty Generics' employees are employees of a domestic Generics entities and payroll is funded by the domestic Generics cash pool. Employee benefits and 401(k) costs are managed and paid by a Brands entity and reimbursed by Specialty Generics on a monthly basis

– **Management & corporate services:** On a quarterly basis, the shared service entity charges a management & corporate service fee allocated to both Brands and Specialty Generics entities based on corporate overhead costs incurred for the following services: IT, Marketing, Human Resources, Finance, Legal and other corporate overhead costs. Limited shared services are provided by Generics to Brands entities

A-0707

**① Intercompany Trade Matrix**



| | Counterparty Legal Entity | | | | | | | | | | | | |
| Lending / (Borrowing) Entity | Shared Services Entity 1 | Generics Entity 1 | Branded Entity 1 | ARD 1 | Branded Entity 2 | Branded Entity 3 | Parent 1 | Branded Cash Pool | Branded Entity 4 | Branded Entity 5 | Branded Entity 6 | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shared Services Entity 1 | – | Plus | – | – | – | – | Plus | – | (Minus) | – | – | (Minus) | Plus |
| Generics Entity 1 | (Minus) | – | (Minus) | – | Plus | – | (Minus) | – | – | – | – | (Minus) | (Minus) |
| Branded Entity 1 | – | Plus | – | – | – | – | – | – | (Minus) | – | – | (Minus) | (Minus) |
| ARD 1 | – | – | – | – | – | (Minus) | Plus | – | Plus | – | Plus | (Minus) | (Minus) |
| Branded Entity 2 | – | (Minus) | – | – | – | – | – | – | (Minus) | – | – | Plus | (Minus) |
| Branded Entity 3 | – | – | – | Plus | – | – | – | – | (Minus) | – | – | – | (Minus) |
| Parent 1 | (Minus) | Plus | – | (Minus) | – | – | – | – | Plus | – | Plus | (Minus) | (Minus) |
| Branded Cash Pool | – | – | – | – | – | – | – | – | Plus | – | – | (Minus) | Plus |
| Branded Entity 4 | Plus | – | Plus | (Minus) | Plus | Plus | (Minus) | (Minus) | – | Plus | – | Plus | Plus |
| Branded Entity 5 | – | – | – | – | – | – | – | – | (Minus) | – | – | Plus | (Minus) |
| Branded Entity 6 | – | – | – | (Minus) | – | (Minus) | – | – | – | – | – | Plus | (Minus) |
| Other | Plus | Plus | Plus | Plus | (Minus) | – | Plus | Plus | (Minus) | (Minus) | (Minus) | – | Plus |
| Total | (Minus) | Plus | Plus | Plus | Plus | Plus | Plus | (Minus) | (Minus) | Plus | Plus | (Minus) | |

Legend:
☐ US Entity
☐ Non-US Entity
⌐ Generics Entity

Note: Positive values in the matrix above represent receivables balances owed to the entities on the left, from the entities across the top. Negative balances represent payables balances owed to the entities across the top, from the entities on the left.

A-0708

SUBJECT TO FRE 408 & ALL EQUIVALENTS

# Simplified Intercompany Activity Flows



**Overview**

The Specialty Brands segment utilizes an LRD structure under which the Manufacturer retains most of the economic value from manufacturing and distribution activities. The profits earned are used to pay a royalty to IP Licensor through a royalty license agreement.

The Specialty Generics segment operates a simplified legal structure utilizing only LRD entities for foreign distribution. Manufacturing and domestic distribution activities are conducted out of the primary operating entity (not depicted).

| No | Flow Description |
|----|------------------|
| 1 | The Brands Manufacturer ("Manufacturer") utilizes third-party manufacturers to produce Ofirmev, Therakos, and Acthar under manufacturing agreements as well as an internal manufacturer to produce Inomax under a cost-plus agreement. |
| 2 | Domestic Limited Risk Distributors market and distribute products in the US for the Manufacturer under a limited risk distributor agreement in which the LRDs earn a margin on sales. (International sales are distributed through separate foreign LRD entities). The LRD entities will perform R&D services on behalf of the Manufacturer under R&D intercompany agreements.<br><br>The LRD entities will collect on their receivables from their customers and deposit the funds with the cash pool. The LRD entities will also withdraw funds from the cash pool to make payments to external vendors or direct the cash pool to settle intercompany obligations (not depicted). |
| 3 | The profits from the manufacturing and distribution activity of the limited risk entities are used to pay royalties to the IP Licensor through a royalty license agreement, whereby the Manufacturer's net profit as compensation for commercialization and manufacturing activities are equal to cost-plus for certain strategic costs. |
| 4 | The IP Licensor is licensed to use the intellectual property owned by the IP Holding Companies through a royalty-free license agreement (no transfer of economic value). |
| 5 | Management & corporate services are allocated and charged by the corporate services entity to Brands & Generics entities. The fees are allocated and charged based upon established methodologies using cost centers across segments such as IT, Marketing, Employees & Human Resources, Finance, Internal Legal, and other corporate overhead. |

A-0709

*SUBJECT TO FRE 408 & STATE LAW EQUIVALENTS*

## ② **Intercompany CMA Overview**



➢ As a global operator, Mallinckrodt utilizes a centralized banking and cash management system which is largely maintained through four operating cash pools in the U.S. and in foreign jurisdictions. These cash pools engage in intercompany activity to facilitate global operations, intellectual property economics, and tax efficiencies

➢ Cash Management Agreements allow the Company to manage cash requirements in an efficient manner

➢ Intercompany CMA activity is mainly driven by the following types of activity:

  – CMA participant deposits and withdrawals

  – Intercompany trade activity between U.S. and OUS foreign entities

  – R&D service activity incurred at U.S. and OUS foreign entities

  – Corporate & Management fees charged by shared service entity to U.S. and OUS entities

  – Royalty fees between licensee and licensor

A-0710

## **2** Summary of Cash Pools

**The following table represents intercompany CMA balances by Pool Entity; balances are unaudited and are as of June 26, 2020**

1.  Positive values in the matrix represent balances owed to the entities on the top, from the entities on the left. Negative balances represent payables owed from the entities across the top, to the entities on the left

2.  In July 2020, Branded Entity 4 partially settled its CMA payable due to Branded Cash Pool

| Counterparty Legal Entity | | Cash Pool Entities | | |
|---|---|---|---|---|
| | US Cash Pool | Generics Cash Pool | Branded Cash Pool | Parent 2 |
| Branded Entity 7 | Plus | - | - | - |
| Generics Entity 1 | (Minus) | Plus | - | - |
| Generics Entity 2 | (Minus) | (Minus) | - | - |
| Branded Entity 8 | (Minus) | - | - | - |
| Branded Entity 9 | Plus | - | - | - |
| Branded Entity 10 | (Minus) | - | - | - |
| Branded Entity 11 | (Minus) | - | - | - |
| Parent 1 | - | - | - | (Minus) |
| Branded Entity 12 | - | - | (Minus) | (Minus) |
| Branded Entity 4 | - | - | Plus | - |
| ARD Holdco 2 | - | - | Plus | (Minus) |
| Other | Plus | (Minus) | (Minus) | (Minus) |
| **Total** | **(Minus)** | **(Minus)** | **Plus** | **(Minus)** |

US Entity

Non-US Entity

Generics Entity

A-0711

SUBJECT TO FRE 408 – SETTLEMENT COMMUNICATIONS

**3** ## Intercompany Loan Overview



➢ In addition to intercompany trade and CMA activity, the Company documents long-term intercompany loans, which originated primarily for the following reasons:

– Acquisition or financing activities (allocation of debt)

– Movement of Intellectual Property and other related activity

– Other transactions

➢ The current loan balances and loan detail reflect the current borrower and lender entities, which may differ from the borrower and lender entities involved at loan origination

A-0712

SUBJECT TO FRE 408 AND ALL EQUIVALENTS



# 3  Summary of Intercompany Loans

**Summary of Branded Intercompany Loans**[1]

| Borrower | Brand / Gx | Lender | Brand / Gx |
|---|---|---|---|
| Branded Entity 10 | Brands | Branded Entity 16 | Brands |
| Branded Entity 10 | Brands | Branded Entity 8 | Brands |
| IP Entity 1 | Brands | IP Entity Parent | Brands |
| IP Entity 2 | Brands | IP Entity Parent | Brands |
| IP Entity 3 | Brands | IP Entity Parent | Brands |
| IP Entity 4 | Brands | IP Entity Parent | Brands |
| Branded Entity 14 | Brands | Branded Entity 11 | Brands |
| Branded Entity 15 | Brands | US Cash Pool | Cash Pool |
| Branded Entity 15 | Brands | US Cash Pool | Cash Pool |
| **Subtotal: Branded** | | | |

**Summary of Generics Intercompany Loans**

| Borrower | Brand / Gx | Lender | Brand / Gx |
|---|---|---|---|
| Generics Entity 3 | Generics | Generics Entity 2 | Generics |
| Generics Entity 3 | Generics | Generics Entity 2 | Generics |
| Generics Entity 3[2] | Generics | Generics Entity 2 | Generics |
| **Subtotal: Generics** | | | |

**Summary of Parent Intercompany Loans**

| Borrower | Brand / Gx | Lender | Brand / Gx |
|---|---|---|---|
| Parent 1 | Parent | Parent 3 | Parent |
| Parent 3 | Parent | Branded Entity 17 | Brands |
| **Subtotal: Parent** | | | |

---

(1)  As of 6/26/2020; subject to change.
(2)  Note guaranteed by Branded Entity.

A-0713

# EXHIBIT E

A-0714

**UNITED STATES**
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 8-K

---

**CURRENT REPORT**
Pursuant to Section 13 OR 15(d)
of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): March 10, 2021**

---

# Mallinckrodt plc
(Exact name of registrant as specified in its charter)

---

| **Ireland** | **001-35803** | **98-1088325** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File No.) | (I.R.S. Employer Identification No.) |

**College Business & Technology Park, Cruiserath,**
**Blanchardstown, Dublin 15, Ireland**
(Address of principal executive offices) (Zip Code)

**Registrant's telephone number, including area code: +353 1 696 0000**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12(g) of the Act:

| **(Title of each class)** |
|---|
| **Ordinary shares, par value $0.20 per share** |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company   ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.   ☐

On March 10, 2021, Mallinckrodt filed Presentation Materials (as defined below) furnished as Exhibit 99.3 to this Current Report on Form 8-K, slide 19 of which includes certain non-public information regarding Mallinckrodt's results of operations for the first half of fiscal year 2020, the third quarter of fiscal year 2020 and the fourth quarter of fiscal year 2020. Such information is incorporated into this Item 2.02 by reference.

The information contained in this Item 2.02, including Exhibit 99.3, shall be deemed to be "furnished" and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that Section, nor shall such information be deemed incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act.

**Item 7.01.       Regulation FD Disclosure.**

*Joinder and Amendment to the Restructuring Support Agreement*

As previously disclosed in the Current Report on Form 8-K filed with the U.S. Securities and Exchange Commission by Mallinckrodt plc, an Irish public limited company ("Mallinckrodt"), on October 13, 2020, in connection with the filing by Mallinckrodt and certain of its subsidiaries (collectively, the "Debtors") of proceedings (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Mallinckrodt entered into a Restructuring Support Agreement (the "RSA") with creditors holding approximately 84%, by aggregate principal amount, of Mallinckrodt's outstanding guaranteed unsecured senior notes and with a group of governmental plaintiffs in the opioid litigation pending against Mallinckrodt and certain of its subsidiaries, including 50 state and territory attorneys general and the court-appointed plaintiffs' executive committee in the opioid multidistrict litigation. After the filing of the Chapter 11 Cases, a multi-state governmental entities group, which represents approximately 1,300 counties, municipalities, tribes and other governmental entities, across 38 states and territories, with opioid-related claims against the Company, amongst others, entered into a joinder to the RSA.

On March 10, 2021, Mallinckrodt announced that the Debtors have agreed to a joinder and amendment to the RSA (the "Joinder and Amendment") whereby an ad hoc group of lenders holding approximately $1,300 million, by aggregate principal amount, of Mallinckrodt's outstanding senior secured term loan due 2024 and outstanding senior secured term loan due 2025 (the "Supporting Term Lenders") have agreed to join the RSA as supporting parties and certain of the existing supporting parties have agreed to certain amendments thereto. Pursuant to the terms of the Joinder and Amendment, the RSA will be amended as follows:

- The supporting parties under the RSA, including the Supporting Term Lenders, will support a plan of reorganization providing for distributions to lenders holding allowed claims in respect of Mallinckrodt's senior secured term loans a mandatory prepayment in an amount equal to $114 million arising from excess cash flow with respect to the fiscal year ending December 25, 2020 (if not previously paid following Bankruptcy Court approval thereof) (the "ECF Payment") and either (1) new senior secured term loans in an amount equal to the remaining principal amount of such loans (as reduced by, inter alia, the ECF Payment) bearing interest at a rate per annum equal to LIBOR plus 5.25% (with respect to the senior secured term loan due 2024) or LIBOR plus 5.50% (with respect to the senior secured term loan due 2025) (the "Adjusted Interest Rate"), maturing on the earlier of September 30, 2027 and 5.75 years after emergence and without any financial maintenance covenant or (2) payment in full in cash.

- The Debtors will seek bankruptcy court approval to make ongoing adequate protection interest payments in respect of the senior secured term loans at the Adjusted Interest Rate.

- The Debtors will seek bankruptcy court approval to pay an exit fee equal to 0.5% of the principal amount of the senior secured term loans (after giving effect to the ECF Payment), which fee will increase to 1.0% of such principal amount if the senior secured term loans are not paid in full in cash through the plan.

- Certain milestones were adjusted with the consent of the supporting parties.

The Joinder and Amendment provided for herein shall become effective upon execution hereof by parties holding 66.7% of each of Mallinckrodt's outstanding senior secured term loan due 2024 and its outstanding senior secured term loan due 2025, (ii) the required supporting unsecured noteholders, (iii) the governmental plaintiff ad hoc committee and (iv) the multi-state governmental entities group.

The foregoing summary of the Joinder and Amendment is not complete and is qualified in its entirety by reference to the Joinder and Amendment, which is filed as Exhibit 99.1 to this Current Report on Form 8-K and incorporated into this Item 7.01 by reference.

*Press Release*

In connection with entering into the Joinder and Amendment, the Company issued a press release on March 10, 2021, a copy of which is furnished as Exhibit 99.2 to this Current Report on Form 8-K and incorporated into this Item 7.01 by reference.

*Disclosure of Presentation Material in connection with the Joinder and Amendment*

The Company is also furnishing as Exhibit 99.3 to this Current Report on Form 8-K certain presentation materials previously shared with certain creditors of the Company during the course of the discussions leading up to entering into the Joinder and Amendment (the "Presentation Materials"), which are incorporated into this Item 7.01 by reference.

The information contained in this Item 7.01, including Exhibits 99.1, 99.2 and 99.3, shall be deemed to be "furnished" and shall not be deemed "filed" for purposes of Section 18 of the Exchange Act, or otherwise subject to the liabilities of that Section, nor shall such information be deemed incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act.

**Cautionary Statements Related to Forward-Looking Statements**

Statements in this Current Report on Form 8-K that are not strictly historical, including statements regarding future financial condition and operating results, legal, economic, business, competitive and/or regulatory factors affecting Mallinckrodt's businesses, and any other statements regarding events or developments the company believes or anticipates will or may occur in the future, may be "forward-looking" statements within the meaning of the Private Securities Litigation Reform Act of 1995, and involve a number of risks and uncertainties.

There are a number of important factors that could cause actual events to differ materially from those suggested or indicated by such forward-looking statements and you should not place undue reliance on any such forward-looking statements. These factors include risks and uncertainties related to, among other things: Mallinckrodt's ongoing Chapter 11 cases; the ability of Mallinckrodt and its subsidiaries to obtain approval from the bankruptcy court with respect to motions or other requests made to the bankruptcy court throughout the course of the Chapter 11 cases and to negotiate, develop, obtain court approval of, confirm and consummate the plan of reorganization contemplated by the restructuring support agreement or any other plan that may be proposed, the effects of the Chapter 11 cases, including increased professional costs, on the liquidity, results of operations and businesses of Mallinckrodt and its subsidiaries; the consummation of the transactions contemplated by the restructuring support agreement and the amendment and joinder to the restructuring support agreement, including the amendment and joinder becoming effective, ability of the parties to negotiate definitive agreements with respect to the matters covered by the term sheets included in the restructuring support agreement, the occurrence of events that may give rise to a right of any of the parties to terminate the restructuring support agreement and the ability of the parties to receive the required approval by the bankruptcy court and to satisfy the other conditions of the restructuring support agreement, including satisfying the milestones specified in the restructuring support agreement; governmental investigations and inquiries, regulatory actions and lawsuits brought against Mallinckrodt by government agencies and private parties with respect to its historical commercialization of opioids, including the amended non-binding agreement in principle reached by Mallinckrodt in connection with the announcement of its filing of the Chapter 11 petitions regarding the terms and conditions of a global settlement to resolve all current and future opioid-related claims; potential delays in Mallinckrodt's Chapter 11 process; the proposed settlement with governmental parties to resolve

certain disputes relating to such debt; the possibility that Document 159 will not achieve any or all of the risks referred to under 12 dated thereto, including the time and expense of continuing to litigate this dispute and the impact of this dispute on Mallinckrodt's financial condition and expectations for performance; the ability to maintain relationships with Mallinckrodt's suppliers, customers, employees and other third parties as a result of the Chapter 11 cases; the availability of operating capital during the pendency of the Chapter 11 cases, including events that could terminate Mallinckrodt's right to continue to access the cash collateral of Mallinckrodt's lenders; the possibility that Mallinckrodt may be unable to achieve its business and strategic goals even if the Chapter 11 plan is successfully consummated; the possibility that Mallinckrodt's Chapter 11 cases may be converted into Chapter 7 cases under the bankruptcy code; the potential termination of Mallinckrodt's exclusive right to file a Chapter 11 plan; the possibility that certain claims against Mallinckrodt may not be discharged as part of the bankruptcy process; developing, funding and executing Mallinckrodt's business plan and continuing as a going concern; Mallinckrodt's post-bankruptcy capital structure; scrutiny from governments, legislative bodies and enforcement agencies related to sales, marketing and pricing practices; pricing pressure on certain of Mallinckrodt's products due to legal changes or changes in insurers' reimbursement practices resulting from recent increased public scrutiny of healthcare and pharmaceutical costs; the impact of the outbreak of the COVID-19 coronavirus; the reimbursement practices of governmental health administration authorities, private health coverage insurers and other third-party payers; complex reporting and payment obligations under the Medicare and Medicaid rebate programs and other governmental purchasing and rebate programs; cost containment efforts of customers, purchasing groups, third-party payers and governmental organizations; changes in or failure to comply with relevant laws and regulations; Mallinckrodt's and its partners' ability to successfully develop or commercialize new products or expand commercial opportunities; Mallinckrodt's ability to navigate price fluctuations; competition; Mallinckrodt's and its partners' ability to protect intellectual property rights; limited clinical trial data for Acthar Gel; clinical studies and related regulatory processes; product liability losses and other litigation liability; material health, safety and environmental liabilities; potential indemnification liabilities to Covidien pursuant to the separation and distribution agreement; business development activities; retention of key personnel; the effectiveness of information technology infrastructure including cybersecurity and data leakage risks; customer concentration; Mallinckrodt's reliance on certain individual products that are material to its financial performance; Mallinckrodt's ability to receive procurement and production quotas granted by the U.S. Drug Enforcement Administration; complex manufacturing processes; conducting business internationally; Mallinckrodt's ability to achieve expected benefits from restructuring activities; Mallinckrodt's significant levels of intangible assets and related impairment testing; labor and employment laws and regulations; natural disasters or other catastrophic events; Mallinckrodt's substantial indebtedness and its ability to generate sufficient cash to reduce its indebtedness; Mallinckrodt's ability to generate sufficient cash to service indebtedness even if the existing indebtedness is restructured; future changes to U.S. and foreign tax laws or the impact of disputes with governmental tax authorities; and the impact of Irish laws.

These and other factors are identified and described in more detail in the "Risk Factors" section of Mallinckrodt's Annual Report on Form 10-K for the fiscal year ended December 27, 2019 and Form 10-Q for the fiscal quarters ended September 25, 2020, June 26, 2020 and March 27, 2020. The forward-looking statements made herein speak only as of the date hereof and Mallinckrodt does not assume any obligation to update or revise any forward-looking statement, whether as a result of new information, future events and developments or otherwise, except as required by law.

**Item 9.01.    Financial Statements and Exhibits.**

    (d)    Exhibits.

| Exhibit No. | Description of Exhibit |
|---|---|
| 99.1 | Joinder Agreement and Amendment to Restructuring Support Agreement, dated as of March 10, 2021 |
| 99.2 | Press Release, dated March 10, 2021 |
| 99.3 | Certain Presentation Materials |
| 104 | Cover Page Interactive Data File (embedded within the inline XBRL document). |

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**MALLINCKRODT PLC**

By:  /s/ Bryan M. Reasons
       Bryan M. Reasons
       Executive Vice President & Chief Financial Officer
       (principal financial officer)

Date: March 10, 2021

Execution Version

**Joinder Agreement and Amendment to Restructuring Support Agreement**

**THIS JOINDER AGREEMENT AND AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT** dated as of March 10, 2021 (this "*Joinder Agreement*") is entered into by and among the Debtors, the Required Supporting Unsecured Noteholders, the Governmental Plaintiff Ad Hoc Committee (each as defined in the Agreement (as defined below)), the MSGE Group (as defined below), and the undersigned holders of First Lien Term Loan Claims (as defined in the First Lien Settlement Term Sheet (as defined below)) (such undersigned holders, the "*Supporting Term Lenders*" and, together with the Debtors, the Required Supporting Unsecured Noteholders, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group, the "*Joinder Parties*") on behalf of the Debtors, the Supporting Unsecured Noteholders, the Supporting Governmental Opioid Claimants, the MSGE Signatories (as defined in the MSGE Group Joinder Agreement (as defined below)), and the Supporting Term Lenders (together, the "*Agreement Parties*").

**WHEREAS**, the Debtors, the Supporting Unsecured Noteholders, and the Supporting Governmental Opioid Claimants entered into a certain Restructuring Support Agreement dated as of October 11, 2020 (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, together with the Term Sheet (as defined therein) and First Lien Settlement Term Sheet (as defined below), the "*Agreement*");[1]

**WHEREAS**, the MSGE Group (as defined in the MSGE Group Joinder Agreement (as defined below)) joined the Agreement pursuant to that certain Joinder Agreement dated November 13, 2020 (the "**MSGE Group Joinder Agreement**");

**WHEREAS**, as of the date hereof, Counsel to the MSGE Group, Caplin & Drysdale, Chartered ("*MSGE Group Counsel*") has obtained over 1,200 executed signature pages of the members of the MSGE Group to the MSGE Group Joinder Agreement;

**WHEREAS**, MSGE Group Counsel requests additional time to obtain executed signature pages from the remaining members of the MSGE Group;

**WHEREAS**, the Debtors, the Supporting Unsecured Noteholders, the Supporting Governmental Opioid Claimants, the MSGE Group, and the Supporting Term Lenders have agreed to a settlement (the "*First Lien Term Loans Settlement*") on the terms set forth in that certain First Lien Settlement Term Sheet attached as **Schedule 3** to the Term Sheet (as amended and restated herein) (the "*First Lien Settlement Term Sheet*");

**WHEREAS**, in furtherance of the First Lien Term Loans Settlement, the Joinder Parties wish for the Supporting Term Lenders to join the Agreement;

---

[1]    Defined terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement, as amended by this Joinder Agreement (including the Term Sheet, Opioid Settlement Term Sheet, and First Lien Settlement Term Sheet), or the MSGE Group Joinder Agreement, as applicable.

WHEREAS, pursuant to and in accordance with certain provisions of the Agreement and the MSGE Group Joinder Agreement, and to take such actions necessary to give effect to the foregoing.

**NOW, THEREFORE**, in consideration of the foregoing, the warranties, covenants, and agreements contained herein, in the Agreement, and in the MSGE Group Joinder Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Joinder Parties agree as follows:

**I. Joinder.**

A. Each of the Supporting Term Lenders hereby acknowledges that it has reviewed and understands the Agreement.

B. In addition to the foregoing, each of the Supporting Term Lenders agrees as follows:

1. Restructuring Support: The Supporting Term Lenders shall have the rights and be subject to the support and other obligations of Supporting Parties and Supporting Unsecured Noteholders, as applicable, set forth in Sections 2, 4 (other than clause (g), as added by this Joinder Agreement), 5(a) (other than clause (vii) except to the extent of the DOJ/Opioid Settlement Cash Consent Right (as defined in the First Lien Settlement Term Sheet) and clause (viii) unless (A) the applicable Alternative Transaction does not propose the Payment in Full of First Lien Term Loan Claims (as defined in the First Lien Settlement Term Sheet) upon consummation thereof and results in (i) less favorable treatment of the First Lien Term Loan Claims as compared to the treatment for such First Lien Term Loan Claims set forth in the First Lien Settlement Term Sheet or (ii) a Prohibited Ownership Change[2] or (B) would be reasonably expected to have a materially adverse effect on the holders of First Lien Term Loan Claims (acting in such capacity)), 5(b), 6(a) (other than clauses (vi)(C) (unless (A) the applicable Alternative Transaction does not propose the Payment in Full of First Lien Term Loan Claims upon consummation thereof and results in (i) less favorable treatment of the First Lien Term Loan Claims as compared to the treatment for such First Lien Term Loan Claims set forth in the First Lien Settlement Term Sheet or (ii) a Prohibited Ownership Change or (B) would be reasonably expected to have a materially adverse effect on the holders of First Lien Term Loan Claims (acting in such capacity)), (vi)(D) (unless (A) the applicable Alternative Transaction does not propose the Payment in Full of First Lien Term Loan Claims upon consummation thereof and results in (i) less favorable treatment of the First Lien

---

[2]    "***Prohibited Ownership Change***" means, at any time on or prior to the Plan Effective Date, (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC thereunder as in effect on the date hereof) of Equity Interests (as defined in the Term Sheet) representing more than 50% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests, provided, that, solely for the purposes of this Joinder Agreement and the Agreement and subject to Article I.B.9 of this Joinder Agreement, (i) the transactions contemplated under this Joinder Agreement, the Agreement, the Term Sheet (including the First Lien Settlement Term Sheet and the Opioid Settlement Term Sheet) shall not constitute a Prohibited Ownership Change and (ii) neither the Unsecured Notes Ad Hoc Group nor the Supporting Unsecured Noteholders shall constitute a group (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC thereunder as in effect on the date hereof).

2

Term Loan Claims (acting in such capacity)) and such Section 6(a) First Lien Term Loan Claim holder or (ii) a Prohibited Ownership Change or (B) would be reasonably expected to have a materially adverse effect on the holders of First Lien Term Loan Claims (acting in such capacity)), (xvi) (provided that, any action by the Company that triggers a Supporting Party Termination Event under Section 6(a)(xvi) shall also apply to the Supporting Term Lenders to the extent such action is in breach of the DOJ/Opioid Settlement Cash Consent Right (as defined in the First Lien Settlement Term Sheet) and the Required Supporting Term Lenders have not previously consented to such action by the Company), (xix) (provided that Section 6(a)(xix) shall also apply to the Supporting Term Lenders to the extent both the Supporting Unsecured Noteholders and the Governmental Plaintiff Ad Hoc Committee terminate their obligations under the Agreement in accordance with Section 6(a)), (xx), (xxi), (xxii), and (xxiii)(B), (D), (E), (F), and (G) (provided that, any extension of the Milestone contained in Section 6(a)(xxiii)(G) beyond March 15, 2022, shall also require the consent of the Required Supporting Term Lenders, and provided, further, that references to Section 6(a)(xxiii) shall be to such section as modified by this Joinder Agreement), and (xxv) (as added by this Joinder Agreement), 6(c), 6(e), 6(f), 6(g), 6(h), 8, 9, 13, 14, 15, 16, 17, 18, 19, 21, 22, 24, 26, and 27 of the Agreement (the "**Restructuring Support Sections**"); provided, that the Supporting Term Lenders' rights related to Definitive Documents set forth in Sections 5(a)(iv), 5(a)(ix), 5(b), 6(a)(iii), and 6(a)(iv) of the Agreement shall be limited to only the extent that such Definitive Documents, and in the case of Sections 5(b)(iii) and 6(a)(iii) any motion, pleading, declaration, supporting exhibit, related document, Term Sheet or Definitive Documents, (i) directly relate to (or would otherwise directly affect) (a) the treatment of the First Lien Term Loan Claims of the Supporting Term Lenders under the Agreement or the Plan, (b) the legal or economic rights or waivers proposed to be granted to, or received by the Supporting Term Lenders under the Agreement or the Plan (provided, that, changes in the trading value of the First Lien Term Loan Claims shall not constitute any such legal or economic right or waiver), (c) the obligations of the Supporting Term Lenders under the Agreement, or (d) the implementation of the New First Lien Term Loan Facility or the terms of the First Lien Settlement Term Sheet (except that, counsel to the Supporting Term Lenders shall also be provided copies of all other material pleadings and pleadings related to any other Definitive Documents at least two (2) Business Days or as soon as reasonably practicable prior to filing such pleading, to the extent reasonably practicable) or (ii) otherwise materially and adversely affect the rights or obligations of the Supporting Term Lenders under the Agreement, including the First Lien Settlement Term Sheet; provided, further, that without limiting the generality of the foregoing, (i) the New Term Loan Documentation (including any intercreditor agreements to govern the New First Lien Term Loans (other than the Existing 1L/2L Intercreditor Agreement, which shall continue in place after the Plan Effective Date)) shall be consistent with the Documentation Principles, (ii) any modifications to the Final Cash Collateral Order (including the CCO Modification Order (subject to the NPT Exception)), the 2020 ECF Payment Order (subject to the ECF Exception) and any pleadings filed by the Debtors in connection therewith, in each case, shall be in form and substance reasonably acceptable to the Required Supporting Term Lenders and as otherwise set forth in the First Lien Settlement Term Sheet, and (iii) any new key employee and retentive based compensation programs to be proposed after the Petition Date shall be proposed in consultation with the Supporting Term Lenders; provided, however, that in the event the Plan provides for the Payment in Full of First Lien Term Loan Claims on the Plan Effective Date, the Supporting Term Lenders shall not have consent rights as to any terms of the Definitive Documents. Each of the Supporting Term Lenders hereby acknowledges that such

3

rights and obligations, and the other Supporting Parties' rights and obligations, in their respective capacities as Lenders through the Required Supporting Term Lenders (as defined below) over the matters set forth in the Agreement for which the Supporting Term Lenders have rights or obligations. Except as set forth on the signature pages to the Agreement or this Joinder Agreement, (y) the Specified Claims and Interests applicable to the Supporting Term Lenders shall be the First Lien Credit Agreement Claims and, to the extent any such Supporting Term Lender is a beneficial or legal owner of Guaranteed Unsecured Notes, Guaranteed Unsecured Notes Claims and (z) the Specified Claims and Interests applicable to the Supporting Unsecured Noteholders shall be Guaranteed Unsecured Notes Claims and, to the extent any such Supporting Unsecured Noteholder is a beneficial or legal owner of First Lien Credit Agreement Claims, the First Lien Credit Agreement Claims. For purposes of consent rights, amendment rights, or termination rights in the Agreement or this Joinder Agreement, Supporting Unsecured Noteholders that beneficially or legally own First Lien Credit Agreement Claims shall not be considered Supporting Term Lenders under the Agreement or this Joinder Agreement, and Supporting Term Lenders that beneficially or legally own Guaranteed Unsecured Notes Claims shall not be considered Supporting Unsecured Noteholders under the Agreement or this Joinder Agreement.

2. <u>Consent Rights of the Supporting Term Lenders</u>:

a. The Supporting Term Lenders shall have only the consent and approval rights expressly given to them in the Agreement, the Term Sheet, the First Lien Settlement Term Sheet, and the applicable Definitive Documents; *provided*, that in the event the Plan provides for the Payment in Full of First Lien Term Loan Claims on the Plan Effective Date, the Supporting Term Lenders shall not have consultation or consent rights as to any terms of the Definitive Documents.

b. The foregoing consent and approval rights in subsection (a) shall not limit, modify or otherwise affect the existing consent and approval rights of the other Supporting Parties under the Agreement, including with respect to Definitive Documents.

3. <u>Breaches by the Supporting Term Lenders</u>: The Company shall be entitled to terminate the Agreement as to all of the Supporting Term Lenders upon the breach in any material respect by the Supporting Term Lenders that would result in non-breaching Supporting Term Lenders and any other Supporting Parties holding less than 66.7% in outstanding principal amount of either the (i) First Lien Term Loan Claims maturing in 2024 or (ii) First Lien Term Loan Claims maturing in 2025, in each case with respect to any of the representations, warranties, or covenants of such Supporting Term Lenders set forth in the Agreement and which breach remains uncured for a period of fifteen (15) Business Days after delivery by the Company to the applicable Supporting Term Lenders of written notice of such breach, which written notice will set forth in reasonable detail the alleged breach; *provided* that any such termination by the Company pursuant to the Agreement or this Joinder Agreement shall result in the termination of this Agreement solely as to the Supporting Term Lenders and shall not give rise to a termination right to any other Supporting Party; and *provided*, *further*, that, the Company may, at its option, terminate this Agreement solely as to any Supporting Term Lender that breaches, in any material respect, its representations, warranties or covenants set forth in the Agreement (to the extent such breach remains uncured for a period of fifteen (15) Business Days after delivery by the Company to the applicable Supporting Term Lender of written notice of such breach, which written notice

4

will set forth in reasonable detail such breach, which, for 2159 breach relevant event with respect to all Supporting Term Lenders in accordance with this Section 3; *provided*, *further*, that if the Agreement or this Joinder Agreement is terminated by the Company solely as to the Supporting Term Lenders, then the amendments (a) to the Agreement in Articles II.A.1, II.A.2, II.A.3 (solely as to the definition of "Required Supporting Term Lenders"), II.B (solely as to the Supporting Term Lenders), and II.D, below and (b) to the Term Sheet (other than the addition of the condition precedent related to payment of the Transaction Fees), in each case, shall be null and void.

4. <u>Termination of the Joinder Agreement by the Supporting Term Lenders</u>:

a. The sole remedy of the Supporting Term Lenders for any breach by the Supporting Parties or the Company of the Restructuring Support Sections of the Agreement or this Joinder Agreement, including the DOJ/Opioid Settlement Cash Consent Right (as defined in the First Lien Settlement Term Sheet), shall be termination of this Joinder Agreement by written notice in accordance with the Agreement delivered by Supporting Term Lenders holding two-thirds in outstanding principal amount of the First Lien Term Loans then party to the Joinder Agreement with such notice terminating the Agreement and Joinder Agreement as to all Supporting Term Lenders. If the Supporting Term Lenders terminate this Joinder Agreement, such termination shall not result in a termination of the Agreement or this Joinder Agreement as to the other Supporting Parties (other than the Supporting Term Lenders) and shall not give rise to a termination right under Section 6(a)(xix) for any such Supporting Parties or for the Company under Section 6(b)(iv); <u>provided</u>, that if this Joinder Agreement is terminated by Supporting Term Lenders then the amendments (a) to the Agreement in Articles II.A.1, II.A.2, II.A.3 (solely as to the definition of "Required Supporting Term Lenders"), II.B (solely as to the Supporting Term Lenders), and II.D, below and (b) to the Term Sheet (other than the addition of the condition precedent related to payment of the Transaction Fees), in each case, shall be null and void.

b. Upon ten (10) days' notice, any individual Supporting Term Lender may terminate this Joinder Agreement, as to itself only, by the delivery to counsel to the Company and the other Supporting Parties of a written notice in accordance with Section 7 hereof, in the event that (i) any waiver, modification, amendment or supplement of this Joinder Agreement or the Agreement materially disproportionately and materially adversely affects the economic rights, recoveries, or treatment applicable to the Specified Claims and Interests of such Supporting Term Lender relative to (x), in the case of Specified Claims and Interests comprising First Lien Term Loan Claims, the economic rights, recoveries, or treatment applicable to the First Lien Term Loan Claims of the other Supporting Term Lenders, or (y), in the case of Specified Claims and Interests comprising Guaranteed Unsecured Notes, relative to the economic rights, recoveries, or treatment applicable to the Claims based on the Guaranteed Unsecured Notes of the Supporting Unsecured Noteholders, in each case, without such Supporting Term Lender's consent or (ii) any Definitive Document is filed with the Bankruptcy Court or later amended in such a way that materially disproportionately and materially adversely affects (x), in the case of Specified Claims and Interests comprising First Lien Term Loan Claims, the economic rights, recoveries, or treatment applicable to the First Lien Term Loan Claims of such Supporting Term Lender relative to the economic rights, recoveries, or treatment applicable to the First Lien Term Loan Claims of the other Supporting Term Lenders, or (y), in the case of Specified Claims and Interests comprising Guaranteed Unsecured Notes, the economic rights, recoveries, or treatment applicable to the

5

Claims based on the same such Subordinated Guaranteed Note Claims of such economic impact to the counterparty to such Agreement applicable to the Claims based on the Guaranteed Note Claims of the Supporting Unsecured Noteholders, in each case, without such Supporting Term Lender's consent (each such event, an "***Individual Supporting Term Lender Termination Event***"); <u>provided</u>, that, such Supporting Term Lender shall not object to the Company's efforts to seek an expedited hearing to adjudicate whether an Individual Supporting Term Lender Termination Event has occurred.

     5. <u>Amendments and Waivers</u>:

     a. During the Support Period, this Joinder Agreement and, to the extent that the Supporting Term Lenders have the rights and are subject to the support and other obligations of Supporting Parties and Supporting Unsecured Noteholders of the relevant provision pursuant to <u>Article I.B.1</u> hereof, the Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended, or supplemented except in a writing signed by the Required Supporting Term Lenders; <u>provided</u>, that: (a) any waiver, modification, amendment, or supplement to <u>Section 4(f)(y)</u>, <u>Section 6(e)</u>, <u>Section 6(f)</u>, <u>Section 6(g)</u>, <u>Section 7(a)</u>, <u>Section 8(b)</u>, <u>Section 17</u>, <u>Section 21</u>, or <u>Section 22</u> of the Agreement, or <u>Article I.B.4(b)</u> or <u>Article I.B.8</u> of this Joinder Agreement, or the definition of "Specified Claims and Interests" shall require the prior written consent of each Supporting Term Lender; (b) any waiver, modification, amendment, or supplement to the definitions of "Required Supporting Term Lenders" shall require the prior written consent of each Supporting Term Lender; (c) any waiver, modification, amendment, or supplement of the Opioid Settlement or the CMS/DOJ/States Settlement shall comply with the monetary and payment frequency limitations set forth in the section entitled "***DOJ/Opioid Settlement Cash Consent Right***" in the First Lien Settlement Term Sheet (unless Required Supporting Term Lenders shall otherwise consent); and (d) any Definitive Document or any waiver, modification, amendment or supplement of this Joinder Agreement, the Agreement, or any Definitive Document, in each case, that requires any Supporting Term Lender to make any investment of new capital, including in any Mallinckrodt entity, may not be made without the prior written consent of such Supporting Term Lender; <u>provided</u> that, to the extent that the Company waives, modifies, amends, or supplements the Agreement (other than for the items expressly set forth or contemplated in the First Lien Settlement Term Sheet, including any such items as implemented or governed by any Definitive Document, including, without limitation, the Plan, Disclosure Statement, the Confirmation Order, and the New Term Loan Documentation), including any exhibits or schedules hereto, without the consent of the Required Supporting Term Lenders, the sole remedy afforded to the Supporting Term Lenders shall be termination of this Joinder Agreement as to the Supporting Term Lenders by the Required Supporting Term Lenders.

     b. Following the Plan Effective Date, amendments to any Definitive Document shall be governed as set forth in such Definitive Document. Any consent required to be provided pursuant to this <u>Article I.B.5</u> may be delivered by email from counsel.

     6. <u>Fees and Expenses</u>: The reasonable and documented fees and out-of-pocket expenses of the Supporting Term Lenders, including the reasonable fees and expenses of Gibson, Dunn & Crutcher LLP ("***Gibson Dunn***"), as legal advisor to the Supporting Term Lenders, Evercore Group LLC, as financial advisor, and any other advisor specified in, and any subsequently retained advisor permitted to be reimbursed pursuant to, the Final Cash Collateral Order (the "***Ad Hoc Term Lender Group Advisors***") shall be paid in accordance with the Final Cash Collateral Order.

<div align="center">6</div>

Case 20-12522-JTD Doc 2159-6 Filed 04/30/21 Page 13 of 17

7. Notices. All notices given pursuant to this Agreement shall be given to the addresses set forth on the signature page for the Supporting Term Lenders, with copy (which shall not constitute notice) to:

> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, New York 10166-0193
> Attention: Scott J. Greenberg (sgreenberg@gibsondunn.com)
> Michael J. Cohen (mcohen@gibsondunn.com)

8. <u>Representations and Warranties</u>:

a. Each Supporting Term Lender hereby makes the same representations and warranties of the Supporting Parties set forth in Section 7(a) of the Agreement to each other Party, effective as of the date hereof.

b. Each Supporting Term Lender severally (and not jointly), represents and warrants to the Company that, as of the date hereof (or as of the date such Supporting Term Lender becomes a party hereto), such Supporting Term Lender (i) is or, after taking into account the settlement of any pending assignments of First Lien Term Loans to which such Supporting Term Lender is a party as of the date of this Joinder Agreement, will be the beneficial owner of (or investment manager, advisor, or subadvisor to one or more beneficial owners of) the aggregate principal amount of Specified Claims and Interests set forth besides its name on **Annex 1** hereto (or below its name on the signature page of a Joinder Agreement for any Supporting Term Lender that becomes a Party hereto after the date hereof), (ii) has, with respect to the beneficial owners of such Specified Claims and Interests (as may be set forth on a schedule to such Supporting Term Lender's signature page hereto), (A) sole investment or voting discretion with respect to such Specified Claims and Interests, (B) full power and authority to vote on and consent to matters concerning such Specified Claims and Interests, or to exchange, assign, and transfer such Claims or Interests, and (C) full power and authority to bind or act on the behalf of, such beneficial owners, (iii) such Specified Claims and Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind, that would prevent in any way such Supporting Term Lender's performance of its obligations contained in this Agreement at the time such obligations are required to be performed, and (iv) is not aware of any currently outstanding request to the Administrative Agent under the Existing Credit Agreement to implement a rate of interest for the First Lien Term Loans applicable to ABR Borrowings (as defined in the Existing Credit Agreement).

<p style="text-align:center">7</p>

a. General Reservation of Rights. For the avoidance of doubt, and notwithstanding anything to the contrary in the Agreement or this Joinder Agreement, except as otherwise set forth in any order of the Bankruptcy Court, in the event the Agreement is terminated as to the Supporting Term Lenders, all of the Agreement Parties' rights and remedies under the Existing Credit Agreement, the Bankruptcy Code, and applicable law, including, without limitation, with respect to (a) the Plan, (b) the calculation and treatment of the Specified Claims and Interests held by the Supporting Term Lenders under the Plan, (c) any relief sought by, or relief granted in connection with, the motion seeking authority to pay the 2020 ECF Payment (as defined in the First Lien Settlement Term Sheet), (d) the Existing 1L Intercreditor Agreement, and (e) the Existing 1L/2L Intercreditor Agreement, shall be reserved in all respects.

b. Make-Whole Reservation of Rights. Neither this Agreement nor the Term Sheet provide for the treatment of the Make-Whole Claims, and all Parties' rights related thereto are fully reserved. Notwithstanding anything to the contrary in this Agreement, it is expressly understood and agreed that a Supporting Term Lender (a) may hold First Lien Revolving Loan Claims, First Lien Notes Claims, and/or Second Lien Notes Claims in addition to its Specified Claims and Interests, and (b) that the entry into this Agreement does not limit, waive, impair, or otherwise affect any Supporting Term Lender's right to negotiate for and seek allowance of, or to object to and seek disallowance of, any Make-Whole Claims in the Chapter 11 Cases or the Restructuring, whether in such term lender's capacity as a term lender or otherwise. Nothing contained herein, limits, waives, impairs, or otherwise affects the Company's right to object to, or seek disallowance of, any Make-Whole Claims in the Chapter 11 Cases or Restructuring and any such actions taken in connection with defending or objecting to the Make-Whole Claims is not inconsistent with the Company's obligations under this Agreement.

10. Agreements of the Supporting Term Lenders.

a. During the Support Period, subject to the terms and conditions of this Joinder Agreement and the Agreement, each Supporting Term Lender agrees, severally and not jointly (solely in its capacity as a holder of the Supporting Term Lenders' Specified Claims and Interests, and in no other capacity), solely as long as it remains the legal owner, beneficial owner, and/or investment advisor or manager of or with power and/or authority to bind any of the Supporting Term Lenders' Specified Claims and Interests against and/or in the Company held by it, that it shall not direct the Administrative Agent under the Existing Credit Agreement to implement (or take steps to implement) a rate of interest for the First Lien Term Loans applicable to ABR Borrowings.

**II. Amendments to the Agreement.** In reliance on the representations, warranties, covenants, and agreements contained herein and in the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Agreement and the MSGE Group Joinder Agreement are hereby amended as follows:

A. Definitions.

1. The definitions of "Restructuring," "Term Sheet," and "Plan" in the recitals to the Agreement are hereby amended to incorporate (as applicable) and include reference to the terms of the First Lien Settlement Term Sheet, and the definition of "Parties" in the recitals to the Agreement is hereby amended to incorporate and include reference to the Supporting Term Lenders.

8

**A-0727**

2. The definition of "Related Documents" is hereby amended to add "; and" after clause (xix) and replacing the period at the end of the definition with "; (xx) the New Term Loan Documentation and any other documentation related to any financing used to repay any First Lien Credit Agreement Claims; (xxi) the 2020 ECF Payment Settlement; (xxii) the 2020 ECF Payment Order; and (xxiii) the CCO Modification Order."

3. The following definitions are hereby added to Section 1 of the Agreement in the appropriate alphabetical order:

"***Ad Hoc First Lien Term Lender Group***" means that certain ad hoc group of holders of First Lien Loans represented by, among others, Gibson, Dunn & Crutcher LLP and advised by Evercore Group, LLC.

"***Existing 1L Intercreditor Agreement***" means that certain First Lien Intercreditor Agreement, dated as of April 7, 2020, among Mallinckrodt PLC, as Parent, Mallinckrodt International Finance S.A., as Lux Borrower, Mallinckrodt CB LLC, as Co-Borrower, the other Grantors party thereto, Deutsche Bank AG New York Branch, as Collateral Agent for the Pari Passu Secured Parties and as Authorized Representative for the Credit Agreement Secured Parties, Wilmington Savings Fund Society, FSB, as the Initial Additional Authorized Representative, and each additional Authorized Representative from time to time party thereto.

"***Existing 1L/2L Intercreditor Agreement***" means that certain Second Lien Intercreditor Agreement, dated as of December 6, 2019, among Deutsche Bank AG New York Branch, as First Lien Collateral Agent and as First Lien Credit Representative, Wilmington Savings Fund Society, FSB, as Second Lien Collateral Agent and as Initial Second Lien Document Representative, and the other First Lien Representative Parties and Second Lien Representative Parties thereto.

"***RSA Parties Fee Motion***" means that certain Motion of the Debtors to Assume and/or Enter Into Reimbursement Agreements with RSA Party Professionals filed with the Bankruptcy Court on December 30, 2020 [Docket No. 1092].

"***RSA Parties Fee Order***" means that order granting the RSA Parties Fee Motion, entered on February 1, 2021 [Docket No. 1250].

"***Required Supporting Term Lenders***" means, as of any date of determination, the Specified Supporting Term Lenders then party to this Agreement that, at the time of such approval, together hold at least 60% in outstanding principal amount of First Lien Term Loans held by the Specified Supporting Term Lenders; <u>provided</u>, that, the Ad Hoc First Lien Term Lender Group shall (A) notify the Company promptly of approval of any such Specified Supporting Term Lenders and (B) not revoke approval of any Specified Supporting Term Lenders previously approved by the Ad Hoc First Lien Term Lender Group without notice to the Company.

9

"*Specified Ground Leases*" means those certain leases as determined by the Term Lenders ((i) or (ii)) members of the Ad Hoc First Lien Term Lender Group or (ii) Supporting Term Lenders previously approved by members the Ad Hoc First Lien Term Lender Group.

B. <u>Ad Hoc Group Composition</u>. Section 4(e) of the Agreement is hereby amended and restated in its entirety to read as follows:

e. <u>Ad Hoc Group Composition</u>. No less frequently than every sixty (60) days commencing on the Agreement Effective Date, counsel to each of the Unsecured Notes Ad Hoc Group, the Ad Hoc First Lien Term Lender Group, and the Governmental Plaintiff Ad Hoc Committee shall provide counsel to the Company and to each other, on a professionals' eyes only basis, with a list showing each member of such counsel's respective ad hoc group and, (i) in the case of members of the Unsecured Notes Ad Hoc Group, the aggregate holdings of Guaranteed Unsecured Notes and other claims based on funded indebtedness of the Company (including on account of the Company's secured notes, First Lien Term Loans, and revolving credit facility) or interests of the Company and (ii) in the case of members of the Ad Hoc First Lien Term Lender Group, the aggregate holdings of First Lien Term Loans and other claims based on funded indebtedness of the Company (including on account of the Company's secured notes, Guaranteed Unsecured Notes, and revolving credit facility) or interests of the Company; <u>provided</u>, that counsel to the Governmental Plaintiff Ad Hoc Committee shall only be required to provide such a list if the members of the Governmental Plaintiff Ad Hoc Committee have changed since the last time such a list was provided.

C. <u>Agreements of the Supporting Parties</u>. Section 4 of the Agreement is hereby amended by replacing the period at the end of Section 4(f)(vi) with "; and", and adding the following clause (g):

g. In connection with the negotiation of the Definitive Documents, the Supporting Parties agree to discuss, in good faith, any concerns raised by the Supporting Unsecured Noteholders regarding allocation of fees and expenses incurred by the Official Committee of Opioid Related Claimants during the Chapter 11 Cases.

D. <u>Agreements of the Company</u>.

1. Section 5(a) of the Agreement is hereby amended by deleting the word "and" at the end of Section 5(a)(xvii), replacing the period at the end of Section 5(a)(xviii) with a semicolon, and adding the following clauses (xix), (xx), (xxi), and (xxii):

10

A-0729

Case 20-12522-JTD   Doc 2159-6   Filed 04/30/21   Page 117 of 122

(xix) to support and take all reasonable actions necessary to facilitate the *Motion for Entry of an Order Authorizing the Debtors to Sell Certain De Minimis Assets Outside the Ordinary Course of Business, (II) Granting Limited Relief from the Automatic Stay, and (III) Granting Related Relief* [Docket No. 1441], subject to the ECF Exception, at the hearing currently scheduled for March 16, 2021 (subject to any extensions reasonably agreed by the Debtors and the Required Supporting Term Lenders);

(xx) to seek approval of an amendment to the *Final Order Under Bankruptcy Code Sections 105(a), 361, 362, 363, 503, and 507, and Bankruptcy Rules 4001 and 9014 (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; and (IV) Granting Related Relief* [Docket No. 586] (the "**Final Cash Collateral Order**") to increase the interest rate applied in order to calculate First Lien Adequate Protection Payments (as defined in the Final Cash Collateral Order) and to provide that the Payment in Full of Term Loan Claims must be in compliance with this Agreement (including payment of the applicable Term Loan Exit Payment), so long as the Supporting Term Lenders remain party hereto; *provided that*, to the extent the Company is unable to obtain Bankruptcy Court approval for (A) the application of the Adjusted Interest Rate retroactively to the date on which the Debtors filed a motion seeking entry of the CCO Modification Order or (B) the Pre-Effective Date Term Loan Exit Payment, in each case it shall not constitute a violation of this Section 5(a)(xx) (unless solely in the case of clause (B) such Pre-Effective Date Term Loan Exit Payment is not subsequently approved in connection with confirmation of the Plan), a basis to terminate this Agreement pursuant to Section 6(a)(xxiii), or a basis on which deem the CCO Modification Order unacceptable in connection the exercise of the consent right of the Supporting Term Lenders with respect thereto (the exceptions set forth in this proviso (the "**NPT Exception**");

(xxi) to object to or defend against any motion seeking standing (A) to challenge the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Specified Claims and Interests of the Supporting Term Lenders or the prepetition liens securing the Supporting Term Lenders' Specified Claims and Interests or (B) to assert any other cause of action against the Supporting Term Lenders or with respect or relating to Supporting Term Lenders' Specified Claims and Interests, the First Lien Credit Agreement, or any Loan Document (as defined in the First Lien Credit Agreement) or the prepetition liens securing the Supporting Term Lenders' Specified Claims and Interests; and

(xxii) to support and take all reasonable actions necessary to facilitate the entry of the 2020 ECF Payment Order (as defined in the First Lien Settlement Term Sheet); *provided*, that, to the extent the Company is unable to obtain Bankruptcy Court approval for the entry of the 2020 ECF Payment Order, it shall not constitute a violation of Section 5(a)(xix) or this Section 5(a)(xxii)

11

(or any agreement thereto) (the "Term Loans 2020 ECF Payment Agreement Opioid Claim Exception"); *provided* *further*, that, if 2020 ECF Payment is not paid prior to the Plan Effective Date, the Company shall take all actions necessary to ensure that the 2020 ECF Payment is paid under the Plan; *provided further*, that the Debtors shall not be required to agree to pay more than $114 million (together with any accrued and unpaid interest thereon) in connection with the 2020 ECF Payment or to make any payment in respect thereof other than to the holders of the First Lien Term Loan Claims.

E. <u>Termination of Agreement</u>.

1. Section 6(a)(xxii) of the Agreement is hereby amended and restated in its entirety to read as follows:

(xxii) the Debtors, the Supporting Unsecured Noteholders and the Supporting Governmental Opioid Claimants shall not have agreed upon the Additional Insurance Rights by the time of the objection deadline for the Disclosure Statement Order; or

2. Section 6(a)(xxiii) of the Agreement is hereby amended and restated in its entirety to read as follows:

(xxiii) any of the following events (the "***Milestones***") have not been achieved, extended, or waived by no later than 11:59 pm New York City time on the dates set forth below, <u>provided</u> that any such time and date may be extended with the consent of the Required Supporting Parties (which consent may be provided by email):

A. the Debtors' filing of a motion seeking entry of the CCO Modification Order on or prior to March 17, 2021; *provided* that the Milestone set forth in this Section 6(a)(xxiii)(A) shall only be applicable to the Supporting Term Lenders;

B. the Debtors' filing of the Plan and Disclosure Statement on or prior to March 31, 2021;

C. the Court enters the CCO Modification Order (subject to the NPT Exception) on or prior to April 15, 2021; *provided* that the Milestone set forth in this Section 6(a)(xxiii)(C) shall only be applicable to the Supporting Term Lenders;

D. the Court enters an order approving the Disclosure Statement on or prior to May 15, 2021;

E. the Plan is confirmed on or prior to August 15, 2021;

12

F. a contract or agreement with respect to the DIP Facility is approved by an order of the Bankruptcy Court on or prior to November 17, 2021; and

G. the Plan Effective Date has not occurred on or prior to November 15, 2021.

3. Section 6(a) of the Agreement is hereby amended by deleting the word "or" at the end of Section 6(a)(xxii), replacing the period at the end of Section 6(a)(xxiii) with a semicolon, and adding the following clauses (xxiv) and (xxv):

(xxiv) (A) the Company files any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Specified Claims and Interests or assert any other cause of action against the Supporting Term Lenders or with respect or relating to such Specified Claims and Interests, the First Lien Credit Agreement, or any Loan Document (as defined in the First Lien Credit Agreement) or the prepetition liens securing the Specified Claims and Interests or challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Specified Claims and Interests or asserting any other cause of action against the Supporting Term Lenders or with respect or relating to such Specified Claims and Interests or the prepetition liens securing the Specified Claims and Interests; or (B) the Bankruptcy Court enters an order granting or sustaining any objection or challenge to any of the First Lien Credit Agreement Claims or the prepetition liens securing the First Lien Credit Agreement Claims that is reasonably likely to render the Plan unconfirmable; or

(xxv) the RSA Parties Fee Order is reversed, stayed, or modified, on appeal or otherwise.

F. Fees and Expenses. Section 25 of the Agreement is hereby amended and restated in its entirety to read as follows:

**Fees and Expenses**. The Company shall reimburse all reasonable and documented fees and out-of-pocket expenses, including success fees, of the following professionals and advisors in accordance with the RSA Parties Fee Order: (a) Gilbert LLP, Kramer Levin Naftalis & Frankel LLP, and Brown Rudnick LLP, as legal counsel to the Governmental Plaintiff Ad Hoc Committee; (b) William Fry, as Irish counsel to the Governmental Plaintiff Ad Hoc Committee; (c) Houlihan Lokey, Inc., as investment banker and financial advisor to the Governmental Plaintiff Ad Hoc Committee; (d) such other legal, consulting, financial, and/or other professional advisors to which the Governmental Plaintiff Ad Hoc Committee and the Debtors shall reasonably agree from time to time; (e) Paul, Weiss, Rifkind, Wharton & Garrison LLP as counsel to the Unsecured Notes Ad Hoc Group; (f) Landis Rath & Cobb LLP, as Delaware counsel to the Unsecured Notes Ad Hoc

13

Case 20-12522-JTD Doc 2159-6 Filed 04/30/21 Page 20 of 77

Group, Greenhill & Co., LLC, as agent L.P., as co-counsel to the Unsecured Notes Ad Hoc Group; and Gilbert L.L.P., as regulatory counsel to the Unsecured Notes Ad Hoc Group; (i) Matheson as Irish counsel to the Unsecured Notes Ad Hoc Group; (j) such other legal, consulting, financial, and/or other professional advisors to which the Unsecured Notes Ad Hoc Group and the Debtors shall reasonably agree from time to time; (k) to the extent not identified above, three local counsel (one for the Chapter 11 Cases, one for the Irish Examinership Proceedings, and one for the Recognition Proceedings) for each of the Governmental Plaintiff Ad Hoc Committee and Unsecured Notes Ad Hoc Group; (l) Caplin & Drysdale, Chartered, as legal counsel to the MSGE Group; (m) Seitz, Van Ogtrop & Green, P.A. as Delaware legal counsel to the MSGE Group; (n) FTI Consulting, as financial advisor to the MSGE Group; and (o) such other legal, consulting, financial, and/or other professional advisors to which the MSGE Group and the Debtors shall reasonably agree from time to time; provided, that to the extent that the Company terminates this Agreement under Section 6(b), the Company's reimbursement obligations under this Section 25 shall survive with respect to any and all fees and expenses incurred on or prior to the date of termination. In furtherance of the foregoing (x) simultaneously with the effectiveness of this Agreement, the Company shall pay all such fees and out-of-pocket expenses incurred or accrued at any time prior to the Agreement Effective Date; (y) the Company shall pay any accrued but unpaid amounts owing under such engagement letter and/or fee reimbursement letters to the extent required under the terms thereof upon the termination of this Agreement, but shall not be responsible for any fees and expenses incurred after termination of this Agreement (other than termination of this Agreement as a result of the occurrence of the Plan Effective Date); and (z) notwithstanding anything to the contrary herein, the Company shall also be required to reimburse all reasonable and documented fees and expenses incurred by the Governmental Plaintiff Ad Hoc Committee and the MSGE Group on or after the Effective Date in connection with the implementation of the Plan (excluding, for the avoidance of doubt, the expenses of the administration of the Opioid Trust).

G. <u>Term Sheet</u>. The Term Sheet is hereby amended and restated in its entirety and replaced with **<u>Exhibit A</u>** hereto and all references to the Term Sheet in the Agreement shall be to **<u>Exhibit A</u>** hereto. Attached hereto as **<u>Exhibit B</u>** is a redline of the Term Sheet reflecting the changes.

H. <u>MSGE Group Joinder Agreement</u>. Section 4(b) of the MSGE Group Joinder Agreement is hereby amended and restated in its entirety to read as follows:

Counsel agrees to use best efforts to obtain the executed signature pages of the members of the MSGE Group to be appended hereto within five (5) months from the date of execution of this Joinder Agreement, which may be extended with the consent of the Company, the Governmental Plaintiff Ad Hoc Committee and the Required Supporting Unsecured Noteholders (each of whom are intended third-party beneficiaries hereunder). Failure to satisfy the obligation in this paragraph shall result in a breach of this Joinder Agreement as set forth in Section 2 above.

14

A-0733

A. This Joinder Agreement shall be governed by the governing law set forth in the Agreement.

B. This Joinder Agreement shall become effective and binding upon each Agreement Party upon the execution and delivery by the applicable Joinder Party of an executed signature page hereto and shall become effective and binding on all Agreement Parties upon receipt by the Company of executed signature pages from (a) the Company, (b) the Required Supporting Unsecured Noteholders, (c) the Governmental Plaintiff Ad Hoc Committee, (d) the MSGE Group, and (e) the holders of First Lien Term Loan Claims that hold greater than or equal to 66.7% in outstanding principal amount of each of (i) First Lien Term Loan Claims maturing in 2024 and (ii) First Lien Term Loan Claims maturing in 2025, in each case (the "**Joinder Effective Date**").

C. Except as specifically set forth herein, the terms of the Agreement shall remain in full force and effect and are hereby ratified and confirmed.

D. This Joinder Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Joinder Agreement delivered by facsimile or PDF shall be deemed to be an original for the purposes of this paragraph.

**IN WITNESS WHEREOF**, the Joinder Parties hereto have caused this Joinder Agreement to be executed and delivered by their respective duly authorized officers or other authorized persons, solely in their respective capacity as officers or other authorized persons of the undersigned and not in any other capacity, as of the date first set forth above.

[*Signature pages follow*]

15

**[To Come]**

By: _____

Name: [ ● ]

Title: [ ● ]

[*Signature Page to Joinder Agreement*]

[SUPPORTING ⊗⊗⊗⊗]

By:
Name:
Title:

Notice Address:

Fax:
Attention:
Email:

**Specified Claims and Interests**:
[First Lien Credit Agreement Claims]
[Claims based on the Guaranteed Unsecured Notes]
[Opioid Claims]

[*Signature Page to Joinder Agreement*]

<u>Exhibit A</u>

**Amended & Restated Term Sheet**

<div align="right">Execution Version</div>

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

<u>**Amended & Restated Mallinckrodt Restructuring Term Sheet**</u>

This Term Sheet, which is <u>Exhibit A</u> to the Restructuring Support Agreement dated October 11, 2020, by and among the Company and the Supporting Parties party thereto, describes the proposed terms of the Company's Restructuring. The Debtors will implement the Restructuring through the Plan, which shall be consistent with the terms of this Term Sheet, the RSA and the exhibits and schedules annexed hereto and thereto, including the Opioid Settlement Term Sheet, which is <u>Schedule 1</u> hereto, and the First Lien Settlement Term Sheet, which is <u>Schedule 3</u> hereto (as each may be amended or supplemented from time to time in accordance therewith and/or the terms of the RSA), in the Chapter 11 Cases commenced by the Debtors in the Bankruptcy Court on October 12, 2020, the Scheme of Arrangement based on the Plan to be commenced in the Irish Examinership Proceedings, and the Recognition Proceedings (as defined herein) in which the Canadian Court (as defined herein) shall recognize in Canada the Chapter 11 Cases. This Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the RSA, the Opioid Settlement Term Sheet, or the First Lien Settlement Term Sheet, as applicable.

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Plan and the other Definitive Documents, or the Scheme of Arrangement and the Irish Examinership Proceedings, which remain subject to negotiation in accordance with the RSA. Consummation of the transactions contemplated by this Term Sheet is subject to (a) the negotiation and execution of the Definitive Documents evidencing the transactions comprising the Restructuring, (c) entry of the Confirmation Order and the satisfaction or waiver of any conditions to the effectiveness thereof, (d) approval of the Scheme of Arrangement by the High Court of Ireland and the satisfaction or waiver of any conditions to the effectiveness thereof, and (d) entry of an order recognizing the Confirmation Order in the Recognition Proceedings. The Definitive Documents shall satisfy the requirements of all applicable securities laws, the Bankruptcy Code, this Term Sheet, the Opioid Settlement Term Sheet, the First Lien Settlement Term Sheet, the Scheme of Arrangement, the Companies Act 2014 of Ireland governing the Irish Examinership Proceedings, and the Canadian Companies Arrangement Act governing the Recognition Proceedings. The Definitive Documents will contain terms and conditions that are dependent on each other, including those described in this Term Sheet, the Opioid Settlement Term Sheet, and the First Lien Settlement Term Sheet.

<div align="right">**A-0737**</div>

| Type of Claim | Treatment | Impairment / Voting |
|---|---|---|
| **Administrative, Tax, Other Priority and Other Secured Claims** | All such claims shall be paid in full in cash on the Plan Effective Date, or in the ordinary course of business as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code, in each case, as determined by the Debtors with the reasonable consent of the Required Supporting Unsecured Noteholders, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group and following consultation with the Supporting Term Lenders. Administrative expense claims shall be paid on the Plan Effective Date and shall include Restructuring Expenses (as defined below). | Unimpaired |
| **First Lien Revolving Loan Claims** | All allowed First Lien Revolving Loan Claims shall receive the treatment provided in the First Lien Settlement Term Sheet. | Unimpaired; not entitled to vote |
| **First Lien Term Loan Claims** | All allowed First Lien Term Loan Claims shall receive the treatment provided in the First Lien Settlement Term Sheet. | Unimpaired; not entitled to vote; Impaired; entitled to vote |
| **First Lien Notes Claims** | All allowed First Lien Notes Claims shall be Reinstated at existing rates and maturities. | Unimpaired; not entitled to vote |
| **Second Lien Notes Claims** | All allowed Second Lien Notes Claims shall be Reinstated at existing rates and maturities. | Unimpaired; not entitled to vote |
| **Guaranteed Unsecured Notes Claims** | Holders of allowed Guaranteed Unsecured Notes Claims shall receive their *pro rata* share of: <br><br> i. $375 million of new secured takeback second lien notes due 7 years after emergence (the "***Takeback Second Lien Notes***"), which shall contain economic terms consistent with those set forth in <u>Annex 2</u> hereto; and <br><br> ii. 100% of New Mallinckrodt Common Shares, subject to dilution on account of the New Opioid Warrants and the MIP (each as defined below). | Impaired; entitled to vote |

2

| | | |
|---|---|---|
| **4.75% Unsecured Notes Claims** | No property will be distributed to the Holders of allowed 4.75% Unsecured Notes Claims. | Impaired; deemed to reject; not entitled to vote |
| **Legacy Debentures Claims** | No property will be distributed to the Holders of allowed Legacy Debentures Claims. | Impaired; deemed to reject; not entitled to vote |
| **General Unsecured Claims (Not Otherwise Classified)** | Holders of allowed General Unsecured Claims shall receive their *pro rata* share, at the applicable Debtor, of up to $100 million to be allocated among the Debtors (the "***General Unsecured Recovery Cash Pool***"). | Impaired; entitled to vote |
| **Trade Claims** | As consideration for maintaining trade terms consistent with those practices and programs most favorable to the Debtors in place during the 12 months before the Petition Date or such other favorable terms as the Debtors and the Trade Claimants may mutually agree on, holders of allowed Trade Claims shall receive their *pro rata share* of up to $50 million; *provided that*, any amounts not allocated to allowed Trade Claims up to $50 million shall be allocated to the General Unsecured Recovery Cash Pool. | Impaired; entitled to vote |
| **Opioid Claims** | As of the Plan Effective Date, the Opioid Trust will be formed and shall receive the Opioid Trust Consideration as set forth in the Opioid Settlement Term Sheet. | Impaired; entitled to vote |
| | All Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for Opioid Claims shall be assumed by, the Opioid Trust as more fully set forth in the Opioid Settlement Term Sheet. | |
| | Each Opioid Claim shall be resolved in accordance with the terms, provisions, and procedures of the Opioid Trust Documents. | |

3

| **Intercompany Claims** | No property will be distributed to the Holders of allowed Intercompany Claims. Unless otherwise provided for under the Plan, each Intercompany Claim will either be Reinstated or canceled and released at the option of the Debtors in consultation with the Supporting Unsecured Noteholders, Supporting Term Lenders, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group. | Unimpaired; deemed to accept; or Impaired; deemed to reject; not entitled to vote |
|---|---|---|
| **Intercompany Interests** | Intercompany Interests shall receive no recovery or distribution and be Reinstated solely to the extent necessary to maintain the Debtors' corporate structure. | Unimpaired; deemed to accept; or Impaired; deemed to reject; not entitled to vote |
| **Equity Interests** | All existing Equity Interests shall be discharged, cancelled, released, and extinguished. | Impaired; deemed to reject; not entitled to vote |

<div align="center">

**OTHER TERMS OF THE RESTRUCTURING**

</div>

| **Case Financing** | The Chapter 11 Cases will be financed by existing cash and use of cash collateral on terms and conditions subject to the reasonable consent of the Required Supporting Unsecured Noteholders, the Required Supporting Term Lenders, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group and any cash collateral order will provide that any periods in which creditors are required to challenge any Debtor stipulations or claims against any of the Debtors (including the claims of lenders/bondholders) shall automatically be tolled with respect to the Supporting Governmental Opioid Claimants while the RSA remains in effect with respect to the Supporting Governmental Opioid Claimants. Any such challenge periods applicable to a Supporting Governmental Opioid Claimant would begin to run only after termination of the RSA by or against such Supporting Governmental Opioid Claimant. |
|---|---|
| **Executory Contracts and Unexpired Leases** | Except as otherwise provided in this Term Sheet or the RSA, the Debtors shall assume all executory contracts and unexpired leases other than those executory contracts and unexpired leases to be identified on a schedule of rejected executory contracts and unexpired leases included in the Plan Supplement or otherwise rejected pursuant to an order of the Bankruptcy Court, in each case as determined by the Debtors with the reasonable consent of the Required Supporting Unsecured Noteholders, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group and following consultation with the Supporting Term Lenders. For the avoidance of doubt, assumption of executory contracts and unexpired leases shall be consistent with the RSA and this Term Sheet, including as specified in "Employee Matters" and "Indemnification of Prepetition Directors, Officers, Managers, et al." |

<div align="center">4</div>

**Opioid Trust**
Opioid Claims shall be channeled exclusively to, and all of Mallinckrodt's liability for Opioid Claims shall be assumed by, the Opioid Trust. Each Opioid Claim shall be resolved in accordance with the terms, provisions, and procedures of the Opioid Trust Documents. The Opioid Trust shall be funded in accordance with the provisions of the Plan and the Opioid Settlement Term Sheet.

The sole recourse of any Opioid Claimant on account of such Opioid Claim shall be to the Opioid Trust, and each Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claim against any Released Party.

**CMS/DOJ/States Settlement**
The Plan will provide for the implementation of a settlement between Mallinckrodt, the United States, and the States resolving Acthar-related litigations and government investigations disclosed in the Company's Form 10-K for 2019, including United States of America, et al., ex rel., Charles Strunck, et al. v. Mallinckrodt ARD LLC (E.D. Penn.); United States of America et al. ex rel. Landolt v. Mallinckrodt ARD, LLC (D. Mass.); and Mallinckrodt ARD LLC v. Verma et al. (D.D.C.), and related matters, the terms of which are set forth on Schedule 2 hereto.

**Corporate Governance**
The Reorganized Debtors' board shall consist of at least 7 directors including, the Debtors' Chief Executive Officer. As of the Plan Effective Date, the members of the initial Reorganized Debtors' board shall be designated by the Required Supporting Unsecured Noteholders; *provided that*, the members of the Reorganized Debtors' board, other than the Debtors' Chief Executive Officer, shall be independent under NYSE/NASDAQ listing standards and shall be independent of the Supporting Unsecured Noteholders, unless the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Debtors otherwise consent. No parties shall be afforded special rights under any charter, constitutions or bylaws or similar governing foundational document of any Reorganized Debtor; *provided*, that, the foregoing shall not be deemed to limit certain information, registration or similar rights to be afforded to (i) the Governmental Plaintiff Ad Hoc Committee and the MSGE Group in other agreements with the Reorganized Debtors, including pursuant to the New Opioid Warrants, (ii) the Supporting Term Lenders in connection with other agreements with the Reorganized Debtors, including pursuant to the New Term Loan Documentation, and (iii) any lenders, including the Supporting Term Lenders, pursuant to any Exit Financing Documents.

5

| | |
|---|---|
| **Employee Matters** | Substantially all employees of the Debtors to be retained by the Reorganized Debtors. The Reorganized Debtors shall assume any employment, confidentiality, and non-competition agreements, bonus, gainshare and incentive programs (other than awards of stock options, restricted stock, restricted stock units, and other equity awards), vacation, holiday pay, severance, retirement, supplemental retirement, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs and arrangements, and all other wage, compensation, employee expense reimbursement, and other benefit obligations of the Debtors. |
| **Indemnification of Prepetition Directors, Officers, Managers, et al.** | The Plan shall provide that, consistent with applicable law, all indemnification provisions currently in place (whether in the by-laws, constitutions, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts or otherwise) for the current and former direct and indirect sponsors, directors, officers, managers, employees, attorneys, accountants, investment bankers, financial advisors, restructuring advisors, consultants and other professionals of the Debtors, as applicable, shall be reinstated (to the extent required) and remain intact and irrevocable and shall survive effectiveness of the Restructuring. |
| **MIP** | On the Plan Effective Date, the Reorganized Debtors shall adopt the management incentive plan (the "**MIP**") which shall provide for the issuance to management, key employees and directors of the Reorganized Debtors of 10% of the fully diluted New Mallinckrodt Common Shares (for the avoidance of doubt, after giving effect to the exercise of the New Opioid Warrants) not later than thirty (30) days after the Plan Effective Date at least half of the MIP shares will be granted and shall vest in accordance with the terms set forth in Annex 3 hereto, and the remaining amount of which shall be reserved for future issuance as determined by the Reorganized Debtors' board; provided, that the MIP may be modified or amended by the mutual agreement of the Debtors and the Required Supporting Noteholders prior to the Plan Effective Date, with the consent of the Governmental Plaintiff Ad Hoc Committee and the MSGE Group (such consent not to be unreasonably withheld). The final terms of the MIP (including any amendments or modifications, if any) shall be included in the Plan Supplement. |

6

**Exit Capital Raise**

exact terms, if any, to be agreed upon by the Debtors and Supporting Unsecured Noteholders holding no less than two-thirds in outstanding principal amount of Guaranteed Unsecured Notes held by the Supporting Unsecured Noteholders then party to the Restructuring Support Agreement, with the consent of (i) the Governmental Plaintiff Ad Hoc Committee and the MSGE Group to the extent (x) such exit capital is raised in the form of indebtedness (such consent not to be unreasonably withheld) or (y) that any such terms could reasonably be expected to have an adverse effect, in any material respect, on the treatment, rights, or entitlements of the holders of Opioid Claims under the RSA and (ii) the Required Supporting Term Lenders to the extent (x) such exit capital is raised in the form of indebtedness or (y) that any such terms could reasonably be expected to have an adverse effect on the treatment, rights, or entitlements of the holders of First Lien Term Loan Claims under the RSA and the First Lien Settlement Term Sheet; *provided,* that the Supporting Term Lenders shall not have any consent rights with respect to exit capital raised on or prior to the Plan Effective Date in the form of indebtedness that is (I) junior to the New First Lien Term Loans and matures after the maturity date of the New First Lien Term Loans, (II) any indebtedness incurred to fund payment of the First Lien Revolving Loan Claims and/or the First Lien Notes Claims in an aggregate principal amount not to exceed the principal amount (or accreted value, if applicable) of such First Lien Revolving Loan Claims and/or First Lien Notes Claims (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions, expenses, plus an amount equal to any existing commitment unutilized thereunder and letters of credit undrawn thereunder), (III) the Takeback Second Lien Notes (so long as such Takeback Second Lien Notes are not first-lien indebtedness), (IV) any receivables securitization facility in an aggregate principal amount not to exceed $200 million or (V) other Indebtedness incurred pursuant to provisions of Section 6.01 of Annex 1 attached to the First Lien Settlement Term Sheet ("Annex 1") as if in effect on the date of such incurrence (but, for the avoidance of doubt, this clause (V) shall not apply to any indebtedness permitted to be incurred pursuant to Section 6.01 of Annex 1 based on the calculation of a financial ratio, consolidated total assets or other financial metric) which Indebtedness described in this clause (V), if secured, is secured by any lien permitted by Section 6.02 of Annex 1. For the avoidance of doubt, the re-designation, exchange, replacement, refinancing, or acquisition, on or prior to the Plan Effective Date, of the Takeback Second Lien Notes or the Second Lien Notes, in each case, into, by, or for first lien indebtedness shall be prohibited.

7

| | |
|---|---|
| **Tax Issues** | The Debtors and the Supporting Parties shall cooperate in good faith to structure the Restructuring and related transactions in a tax-efficient manner. |
| **Restructuring Transactions** | Without limiting any rights and remedies of the Debtors or Reorganized Debtors under the Plan or applicable law, but in all cases subject to the terms and conditions of the RSA and any consents or approvals required thereunder, the entry of the Confirmation Order shall constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Plan Effective Date, including such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors, or to reincorporate certain of the Affiliate Debtors under the laws of jurisdictions other than the laws of which the applicable Affiliate Debtors are presently incorporated. All such actions necessary or appropriate to consummate and implement the provisions of the Plan shall be set forth in the Plan Supplement, may include one or more mergers, consolidations, restructures, conversions, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate, but in all cases subject to the terms and conditions of the Plan and the RSA and any consents or approvals required thereunder (collectively, the "**Restructuring Transactions**"); *provided, that* any Restructuring Transactions shall (a) not adversely affect the recoveries under the Plan (i) of the holders of Guaranteed Unsecured Notes Claims without the consent of the Required Supporting Unsecured Noteholders or (ii) the holders of Opioid Claims without the consent of the Governmental Plaintiff Ad Hoc Committee and the MSGE Group, or (b) not materially adversely affect the rights or recoveries under the Plan of the holders of First Lien Term Loan Claims without the consent of the Required Supporting Term Lenders. |
| **Company Status Upon Emergence** | On or as soon as reasonably practicable after the Plan Effective Date, the New Mallinckrodt Common Shares shall be listed for trading on The NASDAQ Capital Market, the NASDAQ Global Market, or the New York Stock Exchange; *provided however that*, in any event, on the Plan Effective Date, the Reorganized Debtors shall have governance standards as though they were listed on any such exchange. |

A-0744

| | |
|---|---|
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Equity Interests, shall be canceled and/or updated to record such cancellation and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Issuance of New Securities; Execution of the Plan Restructuring Documents** | On the Plan Effective Date, the Reorganized Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued or make, or cause to be made, such entries in its books and records pursuant to the Restructuring. The Parties shall use reasonable efforts to make securities issued under the Plan DTC eligible. |
| **Fees and Expenses of the Restructuring Support Agreement Parties** | The Debtors shall pay all reasonable and documented fees and out of pocket expenses of : |

- (a) primary counsel to the Unsecured Notes Ad Hoc Group, Paul, Weiss, Rifkind, Wharton & Garrison LLP, (b) one Delaware counsel to the Unsecured Notes Ad Hoc Group, (c) one Irish counsel to the Unsecured Notes Ad Hoc Group, (d) one regulatory counsel to the Unsecured Notes Ad Hoc Group and (e) one financial advisor to the Unsecured Notes Ad Hoc Group, Perella Weinberg Partners LP, (f) one Canadian counsel to the Unsecured Notes Ad Hoc Group, and (g) such other legal, consulting, financial, and/or other professional advisors to which the Unsecured Notes Ad Hoc Group and the Debtors shall reasonably agree from time to time;

- (a) primary counsel to the Governmental Plaintiff Ad Hoc Group, Gilbert LLP, Kramer Levin Naftalis & Frankel LLP, and Brown Rudnick LLP, (b) one local counsel to the Governmental Plaintiff Ad Hoc Group, (c) one Irish counsel to the Governmental Plaintiff Ad Hoc Committee, (d) one investment banker to the Governmental Plaintiff Ad Hoc Committee, Houlihan Lokey, Inc., and (e) such other legal, consulting, financial, and/or other professional advisors to which the Governmental Plaintiff Ad Hoc Committee and the Debtors shall reasonably agree from time to time;

- (a) primary counsel to the MGSE Group, Caplin & Drysdale, Chartered, (b) one local counsel to the MGSE Group, Seitz, Van Ogtrop & Green, P.A., (c) one financial advisor to the MGSE Group, FTI Consulting, and (d) such other legal, consulting, financial, and/or other professional advisors to which the MGSE Group and the Debtors shall reasonably agree from time to time;

A-0745

Indenture trustee fees; and

- (a) primary counsel to the Ad Hoc First Lien Term Lender Group, Gibson, Dunn & Crutcher LLP, (b) one financial advisor to the Ad Hoc First Lien Term Lender Group, Evercore Group, LLC, and (c) such other legal, consulting, financial, and/or other professional advisors that the Ad Hoc First Lien Term Lender Group is permitted to retain under the Final Cash Collateral Order or as the Debtors shall reasonably agree from time to time (including any additional Delaware counsel retained in connection with the motion seeking approval of the 2020 ECF Payment Settlement),

in each case, that are due and owing after receipt of applicable invoices with non-privileged summaries of services rendered, without any requirement for the filing of fee or retention applications in the Chapter 11 Cases, and in accordance with the terms of the applicable engagement letters, if any, with any balance(s) paid on the Plan Effective Date (collectively, the "***Restructuring Expenses***").

| | |
|---|---|
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| **Releases** | The exculpation provisions, Debtor releases, third-party releases and injunction provisions to be included in the Plan will be consistent with <u>Annex 4</u> hereto in all material respects, to the fullest extent permissible under applicable law. |
| | In addition, the Plan will include separate release and channeling injunction provisions with respect to Opioid Claims. |
| **Consent Rights** | All consent rights not otherwise set forth herein shall be set forth in the RSA. |
| **Conditions Precedent to the Plan Effective Date** | The Plan shall contain customary conditions precedent to occurrence of the Plan Effective Date, including the following: |

- the RSA shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith;

- the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with the RSA and such order shall be a Final Order;

- the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring;

10

**A-0746**

all conditions precedent to the consummation of the Opioid Settlement and related transactions, including the establishment of the Opioid Trust and authorization for the payment of the Opioid Trust Consideration, have been satisfied or waived by the party or parties entitled to waive them in accordance with the terms of the Opioid Trust Documents;

- the final version of the Plan, Plan Supplement, the Opioid Trust Documents, and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan, shall be consistent with the RSA;

- the Canadian Court shall have issued an order recognizing the Confirmation Order in the Recognition Proceedings and giving full force and effect to the Confirmation Order in Canada and such recognition order shall have become a Final Order;

- the High Court of Ireland shall have made an order confirming the Scheme of Arrangement in the Irish Examinership Proceedings and the Scheme of Arrangement shall have become effective in accordance with its terms (or shall become effective concurrently with effectiveness of the Plan);

- the Irish Takeover Panel shall have either: (a) confirmed that an obligation to make a mandatory general offer for the shares of the Parent pursuant to Rule 9 of the Irish Takeover Rules will not be triggered by the implementation of the Scheme of Arrangement and the Plan; or (b) otherwise waived the obligation on the part of any Person to make such an offer;

- any civil or criminal claims asserted by or on behalf of the Department of Justice (other than those resolved pursuant to the CMS/DOJ/States Settlement) have been resolved on terms reasonably acceptable to the Debtors, the Required Supporting Unsecured Noteholders, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group and, to the extent such resolution requires a cash payment that is not paid from the General Unsecured Recovery Cash Pool and such payment (and not any other payments, conditions, or circumstances) causes a materially adverse reduction in projected cash as of the Plan Effective Date as compared to the projections contained in the 8K filed on March 10, 2020, the Required Supporting Term Lenders;

11

the Debtors shall have paid in full all professional fees and expenses of the Debtors' retained professionals that require the Bankruptcy Court's approval or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses;

- the Debtors shall have paid the Restructuring Expenses in full, in cash;

- the Bankruptcy Court shall have entered the CCO Modification Order in form and substance reasonably acceptable to the Required Supporting Term Lenders and such order shall be a Final Order and remain in full force and effect; *provided*, that, this condition precedent shall not be deemed unmet based solely on the Bankruptcy Court declining to apply the Adjusted Interest Rate retroactively to any date prior to the entry of the CCO Modification Order or because of the failure of the CCO Modification Order to require payment of the Term Loan Exit Payment;

- the Debtors shall have paid the Noteholder Consent Fee and Term Loan Exit Payment on the Plan Effective Date;

- the Bankruptcy Court shall have entered a Final Order authorizing and directing the Debtors to pay all Transaction Fees payable under the Reimbursement Agreements (each as defined in the RSA Parties Fee Motion); and

- the Restructuring to be implemented on the Plan Effective Date shall be consistent with the Plan and the RSA.

12

**Certain Definitions**

| | |
|---|---|
| *1992 Legacy Debentures Indenture* | That certain Indenture, dated as of April 30, 1992, by and among Ludlow Corporation, as issuer, U.S. Bank National Association (as successor in interest to Security National Pacific Trust Company (New York)), as trustee, as supplemented by that certain First Supplemental Indenture, dated as of April 30, 1992, with U.S. Bank National Association (as successor in interest to Security Pacific National Trust Company (New York)) (each as modified, amended, or supplemented from time to time). |
| *1993 Legacy Debentures Indenture* | That certain Indenture, dated as of April 30, 1992, by and among Ludlow Corporation, as issuer, U.S. Bank National Association (as successor in interest to Security National Pacific Trust Company (New York)), as trustee, as supplemented by that certain Second Supplemental Indenture, dated as of March 8, 1993, with U.S. Bank National Association (as successor in interest to BankAmerica National Trust Company) (each as modified, amended, or supplemented from time to time). |
| *2013 Notes Indenture* | That certain Indenture, dated as of April 11, 2013, by and among Mallinckrodt International Finance S.A. as issuer, the guarantor party thereto, and Deutsche Bank Trust Company Americas, as trustee (as modified, amended, or supplemented from time to time). |
| *2014 Notes Indenture* | That certain Indenture, dated as of August 13, 2014, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Deutsche Bank Trust Company Americas, as trustee, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| *2020 First Lien Notes Indenture* | That certain Indenture, dated as of April 7, 2020, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Wilmington Savings Fund Society, FSB, as first lien trustee, Deutsche Bank AG New York Branch, as first lien collateral agent, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| *2019 Second Lien Notes Indenture* | That certain Indenture, dated as of December 6, 2019, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Wilmington Savings Fund Society, FSB, as second lien trustee and second lien collateral agent, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |

| | |
|---|---|
| *4.75% Senior Notes due 2023* | The 4.75% senior notes due 2023 pursuant to the 2013 Notes Indenture. |
| *4.75% Unsecured Notes Claims* | Any Claim arising under or based upon the 4.75% Unsecured Notes or the 2013 Notes Indenture. |
| *5.50% Senior Notes 2025* | The 5.50% senior notes due 2025 pursuant to the April 2015 Notes Indenture. |
| *5.625% Senior Notes due 2023* | The 5.625% senior notes due 2023 pursuant to the September 2015 Notes Indenture. |
| *5.75% Senior Notes due 2022* | The 5.75% senior notes due 2022 pursuant to the 2014 Notes Indenture. |
| *8.00% Debentures due March 2023* | The 8.00% debentures due 2023 pursuant to the 1993 Legacy Debentures Indenture. |
| *9.50% Debentures due May 2022* | The 9.50% debentures due 2022 pursuant to the 1992 Legacy Debentures Indenture. |
| *Affiliate* | As defined in section 101(2) of the Bankruptcy Code. |
| *April 2015 Notes Indenture* | That certain Indenture, dated as of April 15, 2015, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Deutsche Bank Trust Company Americas, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| *Avoidance Actions* | Any and all avoidance, recovery, subordination or similar actions or remedies that may be brought by and on behalf of the Debtors or their estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code. |
| *Canadian Court* | The Ontario Superior Court of Justice (Commercial List) |
| *Causes of Action* | Any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counterclaims, defenses, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, under statute, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, federal or state, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise. |

2

**A-0750**

| | |
|---|---|
| *Class* | Each class of Holders of Claims or Equity Interests established under the Plan pursuant to section 1122(a) of the Bankruptcy Code. |
| *Confirmation Date* | The date on which the Confirmation Order is entered by the Bankruptcy Court. |
| *Consummation* | The occurrence of the Plan Effective Date. |
| *Current Opioid PI Claim* | A claim held by an individual against a Debtor for harm arising out of the use of opioid products manufactured or sold prior to the Plan Effective Date, other than a Future Opioid PI Claim. |
| *Entity* | As defined in section 101(15) of the Bankruptcy Code. |
| *Equity Interest* | Any issued, unissued, authorized, or outstanding ordinary shares or shares of common stock, preferred stock, or other instrument evidencing an ownership interest in Mallinckrodt plc, whether or not transferable, together with any warrants, equity-based awards, or contractual rights to purchase or acquire such equity interests at any time and all rights arising with respect thereto that existed immediately before the Plan Effective Date. |
| *Exculpated Party* | In each case, in its capacity as such: (a) the Debtors (and their Representatives); (b) the Reorganized Debtors (and their Representatives); and (c) the Future Claimants Representative. |
| *Existing Credit Agreement* | That certain Credit Agreement, dated as of March 19, 2014, by and among Mallinckrodt plc, as the parent, Mallinckrodt International Finance S.A., as Lux borrower, Mallinckrodt CB LLC, as co-borrower, the First Lien Agent, and the First Lien Lenders (as modified, amended, or supplemented from time to time). |
| *Final Order* | An order entered by the Bankruptcy Court or other court of competent jurisdiction: (a) that has not been reversed, stayed, modified, amended, or revoked, and as to which (i) any right to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has expired and no appeal, motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing is pending or (b) as to which an appeal has been taken, a motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing has been filed and (i) such appeal, motion for leave to appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which leave to appeal, certiorari, review, reargument, stay, or rehearing was sought and (ii) the time to appeal (in the event leave is granted) further or seek leave to appeal, certiorari, further review, reargument, stay, or rehearing has expired and no such appeal, motion for leave to appeal, or petition for certiorari, further review, reargument, stay, or rehearing is pending. |

3

| | |
|---|---|
| *First Lien Agent* | Deutsche Bank AG New York Branch, in its capacity as administrative agent under the Existing Credit Agreement or, as applicable, any successor thereto. |
| *First Lien Notes* | The 10.00% first lien senior secured notes due 2025 pursuant to the 2020 First Lien Notes Indenture. |
| *First Lien Notes Claim* | Any Claim arising under or based upon the First Lien Notes or the 2020 First Lien Notes Indenture. |
| *First Lien Credit Agreement Claims* | Any claim held by the First Lien Agent or the First Lien Lenders derived from or based upon the Existing Credit Agreement or the First Lien Credit Facility, including claims for all principal amounts outstanding (including any right to prepayment thereof), interest, fees, expenses, costs, indemnification and other charges and expenses arising under or related to the First Lien Credit Facility or the Existing Credit Agreement. |
| *First Lien Credit Facility* | The credit facility evidenced by the Existing Credit Agreement. |
| *First Lien Lenders* | The banks, financial institutions, and other lenders party to the Existing Credit Agreement from time to time. |
| *Future Opioid PI Claims* | A claim held by an individual against a Debtor for harm arising out of the use of opioid products manufactured or sold prior to the Plan Effective Date, which could not be discharged by confirmation of a plan of reorganization if the Bankruptcy Court did not appoint a future claimants representative in the Chapter 11 Cases and which claim is to be addressed by the Opioid Trust to assume the liabilities of the Debtors for damages allegedly caused by the use of opioid products. |
| *Future Opioid PI Claimants* | Individuals holding Future Opioid PI Claims. |
| *Future Claimants Representative* | The legal representative for Future Opioid PI Claimants. |

4

A-0752

| | |
|---|---|
| *General Unsecured Claims* | Any Unsecured Claim (other than a Guaranteed Unsecured Notes Claims, Trade Claim, an Opioid Claim, an Administrative, Tax, Other Priority or Other Secured Claim, or (subject to effectiveness of the CMS/DOJ/States Settlement) a Claim resolved by the CMS/DOJ/States Settlement), including without limitation (a) Claims arising from the rejection of unexpired leases or executory contracts, (b) Claims arising from any litigation or other court, administrative or regulatory proceeding, including damages or judgments entered against, or settlement amounts owing by a Debtor in connection therewith, and (c) Claims related to asbestos exposure or products containing asbestos. |
| *Guaranteed Unsecured Notes* | The 5.75% Senior Notes due 2022, the 5.500% Senior Notes Due 2025 and the 5.625% Senior Notes Due 2023. |
| *Guaranteed Unsecured Notes Claims* | Any Claim arising under or based upon the Guaranteed Unsecured Notes or the Guaranteed Unsecured Notes Indentures. |
| *Guaranteed Unsecured Notes Indentures* | Collectively, the 2014 Notes Indenture, the April 2015 Notes Indenture and the September 2015 Notes Indenture. |
| *Holder* | An Entity holding a Claim or Equity Interest, as applicable. |
| *Impaired* | With respect to any Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| *Intercompany Claim* | A prepetition Claim held by a Debtor or non-Debtor against a Debtor. |
| *Intercompany Interest* | An Interest in any Debtor other than Mallinckrodt Plc. |
| *Irish Takeover Panel* | The Irish Takeover Panel constituted under Irish Takeover Panel Act 1997. |
| *Irish Takeover Rules* | The Irish Takeover Panel Act 1997, Takeover Rules 2013. |
| *Legacy Debentures Claims* | Any Claim arising under or based upon the 1992 Legacy Debentures Indenture or 1993 Legacy Debentures Indenture. |
| *Lien* | A lien as defined in section 101(37) of the Bankruptcy Code. |
| *New Mallinckrodt Common Shares* | Common equity interests or ordinary shares in the Reorganized Debtor, Mallinckrodt plc. |
| *New Opioid Warrants* | The warrants contemplated under the Opioid Settlement and Opioid Trust Documents, which shall be consistent with the terms set forth in the Opioid Settlement Term Sheet. |

5

| | |
|---|---|
| *Recognition Proceedings* | The proceedings commenced by the Debtors under Part IV of the Canadian Companies Arrangement Act in the Canadian Court to recognize in Canada the Chapter 11 Cases and to recognize in Canada certain Orders of the Bankruptcy Court. |
| *Reinstated* | With respect to Claims and Equity Interests, that the Claim or Equity Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| *Reorganized Debtors* | The Debtors, as reorganized pursuant to and under the Plan or any successor thereto. |
| *Required Supporting Second Lien Noteholders* | Holders of at least two-thirds in outstanding principal amount of Second Lien Notes. |
| *Released Party* | (a) The Debtors, (b) the Reorganized Debtors, (c) the Non-Debtor Affiliates, (d) with respect to each of the foregoing Persons in clauses (a) through (c), such Persons' (i) predecessors, successors, permitted assigns, subsidiaries, and controlled affiliates, respective heirs, executors, estates, and nominees, in each case solely in their capacity as such and (ii) current and former officers and directors, principals, members, employees, financial advisors, attorneys (including attorneys retained by any director in his or her capacity as such), accountants, investment bankers (including investment bankers retained by any director in his or her capacity as such), consultants, experts and other professionals of the persons described in clauses (a) through (d)(i); (e) each member of the Unsecured Notes Ad Hoc Group in their capacity as such, (f) each Supporting Unsecured Noteholder in their capacity as such, (g) the Opioid Trust, (h) each member of the Governmental Plaintiff Ad Hoc Committee in their capacity as such, (i) each Supporting Governmental Opioid Claimant in their capacity as such; (j) each member of the MSGE Group in their capacity as such; (k) each of the Secured Parties, (l) each Supporting Term Lender in their capacity as such, (m) each member of the Ad Hoc First Lien Term Lender Group in their capacity as such, and (m) with respect to each of the foregoing Persons in clauses (e) through (m), each such Person's Representatives. Notwithstanding anything to the contrary herein, Medtronic plc and its related parties will not be Released Parties. |
| *Second Lien Notes* | The 10.00% second lien senior secured notes due 2025 pursuant to the 2019 Second Lien Notes Indenture. |
| *Second Lien Notes Claim* | Any Claim arising under or based upon the Second Lien Notes Indenture or the 2019 Second Lien Notes Indenture. |

6

A-0754

| | |
|---|---|
| *Secured Parties* | The Prepetition Secured Parties, as defined in the Cash Collateral Order. |
| *September 2015 Notes Indenture* | That certain Indenture, dated as of September 24, 2015, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Deutsche Bank Trust Company Americas, as trustee, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| *Trade Claim* | An Unsecured Claim held by a Trade Claimant. |
| *Trade Claimant* | Trade creditors, service providers and other vendors who provide goods and services necessary for the Debtors continued operations, including those creditors described in (a) *Motion of Debtors for Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors*, (b) *Motion of Debtors for Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Foreign Vendors*, and (c) *Motion of Debtors for Interim and Final Orders (A) Authorizing Payment of Lienholder Claims and (B) Authorizing Payment of Section 503(b)(9) Claims*. |
| *Unimpaired* | With respect to a Claim, Equity Interest, or Class of Claims or Equity Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code. |
| *Unsecured Claim* | A Claim that is not secured by a Lien on property in which one of the Debtors' estates has an interest. |

7

**Takeback Second Lien Notes Summary Terms**

| | |
|---|---|
| **Amount** | • $375 million |
| **Notes** | • Senior Secured Second Lien Notes |
| **Issuers** | • Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC |
| **Obligors** | • Same as the obligors on the Deferred Cash Payments, *provided that* any obligations on account of the Takeback Second Lien Notes shall (i) be guaranteed by the same entities that guarantee the First Lien Notes and (ii) comply with the terms of the Debtors' existing funded indebtedness |
| **Coupon** | • Payable in cash at 10.00% |
| **Maturity** | • Seven (7) years following the Plan Effective Date |
| **Collateral/Priority** | • *Pari passu* with the second lien security interests as with existing Second Lien Notes |
| **Put** | • Puttable to the issuer at 101% of par upon a change of control |
| **Equity Claw** | • Company may redeem up to 40% of Takeback Second Lien Notes at a redemption price of 110% of par with the proceeds of an equity offering |
| **Call Protections** | • Non-callable for 4 years |
| | • 105 call in year 5 |
| | • 102.5 in year 6 |
| | • Par thereafter |
| **Affirmative and Negative Covenants** | • To generally match the 2020 First Lien Notes Indenture, as adjusted to reflect new Takeback Second Lien Notes structure |

**Term Sheet for Mallinckrodt Pharmaceuticals Management Incentive Plan**

The following term sheet summarizes the principal terms of a management incentive plan (the "**MIP**") that certain creditors receiving equity securities (the "**Investors**") of New Mallinckrodt (the "**Company**" and together with its controlled subsidiaries, the "**Company Group**") will adopt effective upon emergence (the "**Closing**").

Capitalized terms used but not defined herein shall have the meanings set forth in the Restructuring Support Agreement and the Restructuring Term Sheet attached thereto as Exhibit A both dated October 11, 2020, to which this term sheet is attached as *Annex 2* (the "**RSA**"). The terms outlined in this Term Sheet assume New Mallinckrodt will be a publicly traded company shortly following Closing consistent with the RSA.

| | |
|---|---|
| **Plan Reserve:** | A number of New Mallinckrodt Common Shares representing 10% of all equity interests in the Company outstanding immediately after the Closing on a fully diluted basis, taking into account the Plan Reserve and any equity securities issued and outstanding at the Closing, and any warrants or securities convertible, exercisable or exchangeable therefor, will be reserved for issuance pursuant to the MIP (such securities issued pursuant to the MIP, the "**Award Shares**").[1] |
| **Eligibility:** | Company employees, non-employee consultants and outside Directors of the Company Group will be eligible to participate in the MIP. Each person who receives an award pursuant to the MIP is hereinafter referred to as a "**Participant**". |
| **Initial Grant:** | Not less than 50% of the Plan Reserve shall be granted in the form of restricted shares, restricted share units or options over New Mallinckrodt Common Shares (the "**Restricted Shares**") within 30 days following Closing with the allocation of such grants to be approved by the Compensation Committee of the Company based upon the recommendations of the Company's CEO (the "**Initial Grants**"). No more than 25% of the Initial Grants shall be in the form of options. |

---

[1]   Plan Reserve subject to adjustment in connection with share split, reverse share split, share dividend or other distribution (whether in the form of cash, shares, other securities or other property), extraordinary cash dividend, recapitalization, merger, consolidation, split-up, spin-off, reorganization, combination, repurchase or exchange of shares or other securities or similar corporate transaction or event.

| | |
|---|---|
| **Vesting of Initial Grants:** | The Initial Grants will vest as determined in good faith by the Compensation Committee in consultation with the Company's CEO over a period not exceeding 3 years. |
| | If a Participant's employment is terminated by the Company without "Cause" or by the Participant for "Good Reason" (to be defined in the MIP), all unvested awards that would otherwise vest during the 12 months following such termination, will vest upon termination, subject to the Participant's execution of a reasonable and customary general release of claims in favor of the Company that becomes effective within 60 days after such termination and continued material compliance with the terms of any non-competition or non-solicitation restrictive covenants to which the Participant is subject. |
| | The MIP will contain other terms consistent with public company equity incentive plans and awards within the Company's peer group. |
| **Change in Control:** | Upon the occurrence of a "Change in Control" (to be defined in the MIP), to the extent awards are not assumed or substituted, all awards under the MIP shall become fully vested and payable. |
| **Restrictive Covenants:** | To the extent a Participant is not already subject to non-compete, non-solicitation or other restrictive covenants, then such Participant will be required to enter into a covenant consistent with Mallinckrodt's current Non-Competition, Non-Solicitation, and Confidentiality Agreement, but with a non-compete/non-solicitation period not to exceed 12 months. |

2

**Plan Release, Exculpation and Injunction Provisions**

**Releases by the Debtors**

Pursuant to section 1123(b) of the Bankruptcy Code (and any other applicable provisions of the Bankruptcy Code), as of the Plan Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the Opioid Settlement and the Restructuring, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Plan Effective Date, by the Debtors and the Estates (the "Debtor Release") from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates, the Debtors' in- or out-of-court restructuring efforts (including the Chapter 11 Cases), the purchase, sale, or rescission of the purchase or sale of any security or indebtedness of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, litigation claims arising from historical intercompany transactions between or among a Debtor and another Debtor, the business or contractual arrangements between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Plan Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Plan Effective Date, the Definitive Documents, the Opioid Trust, Opioid Trust Documents, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement (including any amendments and/or joinders thereto) and related prepetition and postpetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, any Restructuring Transaction, any agreement, instrument, release, and other documents created or entered into prior to the Plan Effective Date in connection with the creation of the Opioid Trust, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation (including the solicitation of votes on the Plan), the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities

pursuant to the Plan, (b) any Released Party under any other contractual arrangements

pursuant to the Plan, (b) any Released Party under any other contractual arrangements between and Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Plan Effective Date relating to any of the foregoing; provided however that the Debtors do not release, and the Opioid Trust shall retain, all Assigned Third-Party Claims; provided, further, that the Debtors do not release, Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct. The foregoing release will be effective as of the Plan Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding anything to the contrary in the foregoing, the releases by the Debtors set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claims which are Reinstated pursuant to the Plan.

The Reorganized Debtors and the Opioid Trust shall be bound, to the same extent the Debtors are bound, by the releases set forth in Article [___] of the Plan. For the avoidance of doubt, Claims or Causes of Action arising out of, or related to, any act or omission prior to the Plan Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct, including findings after the Plan Effective Date, are not released pursuant to Article [___] of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in Article [___] of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith and settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors, their estates and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity or Person asserting any claim or Cause of Action released by Article [___] of the Plan.

**Releases by Holders of Claims and Equity Interests**

Pursuant to section 1123(b) of the Bankruptcy Code (and any other applicable provisions of the Bankruptcy Code), as of the Plan Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the Opioid Settlement and Restructuring, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged, to the maximum extent permitted by law, as such law may be

extended subsequent, as a Plan... Ropt at 20 cv 2159 6 ly prenledited 04/30/21 2P holds gate 48 of why are to accept the

Plan, (b) the holders of all Claims that are Unimpaired under the Plan, (c) the holders of all Claims whose vote to accept or reject the Plan is solicited but who (i) abstain from voting on the Plan and (ii) do not opt out of granting the releases set forth herein, (d) the holders of all Claims or Equity Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, and (e) all other holders of Claims and Equity Interests to the maximum extent permitted by law, in each case, from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such entities existed prior to or after the Petition Date), their Estates, the Debtors' in- or out-of-court restructuring efforts (including the Chapter 11 Cases), the purchase, sale, or rescission of the purchase or sale of any security or indebtedness of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, litigation claims arising from historical intercompany transactions between or among a Debtor and another Debtor, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Plan Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Plan Effective Date, the Definitive Documents, the Opioid Trust, Opioid Trust Documents and the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, and related prepetition and postpetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, any Restructuring Transaction, any agreement, instrument, release, and other documents created or entered into prior to the Plan Effective Date in connection with the creation of the Opioid Trust, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation (including the solicitation of votes on the Plan), the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between and Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Plan Effective Date relating to

3

any of the foregoing, or of any Cause of Action arising out of or related to any such transaction) that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct. For the avoidance of doubt, Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party prior to the Plan Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct, including findings after the Plan Effective Date, are not released pursuant to Article [___] of the Plan. Notwithstanding anything to the contrary in the foregoing, the releases by the Holders of Claims and Equity Interests set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claims which are Reinstated pursuant to the Plan.

Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order shall (x) release, discharge, or preclude the enforcement of any liability of a Released Party to a Governmental Unit arising out of, or relating to, any act or omission of a Released Party prior to the Plan Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act or (y) solely as to any Supporting Governmental Opioid Plaintiff, release or discharge a consultant or expert having been retained to provide strategic advice for sales and marketing of opioid products who has received a civil investigative demand or other subpoena related to sales and marketing of opioid products from any State Attorney General on or after January 1, 2019 through the Petition Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Equity Interests set forth in Article [___] of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors, their estates and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity or Person asserting any claim or Cause of Action released by Article [___] of the Plan.

**Exculpation**

Effective as of the Plan Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person for any claims or Causes of Action arising prior to or on the Plan Effective Date for any act taken or omitted to be taken in connection with, related to, or arising out of, the Chapter 11 Cases, formulating, negotiating, preparing, disseminating, implementing, filing, administering, confirming or effecting the Confirmation or Consummation of the Plan, the Disclosure Statement, the Opioid Settlement, the Opioid Trust Documents, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, or any contract, instrument, release or other agreement or document created or entered into in connection with any of the

4

foregoing, or any other act taken or omitted to be taken in connection with or during the course of the Debtors, the Disclosure Statement or Confirmation or Consummation of the Plan, the Opioid Settlement or the Opioid Trust Documents, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (a) any Causes of Action arising from actual fraud, gross negligence, or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (b) the rights of any Person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

The foregoing exculpation shall be effective as of the Plan Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

**Permanent Injunction**

Except as otherwise expressly provided in the Confirmation Order, Plan or Opioid Trust Documents, from and after the Plan Effective Date all Persons are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from: (a) commencing or continuing, in any manner or in any place, any suit, action or other proceeding of any kind; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any encumbrance of any kind; (d) asserting any right of setoff, or subrogation of any kind; and (d) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any Claim, demand, liability, obligation, debt, right, Cause of Action, Equity Interest or remedy released or to be released, exculpated or to be exculpated, settled or to be settled, or discharged or to be discharged pursuant to the Plan or the Confirmation Order against any Person so released, discharged or exculpated (or the property or estate of any Person so released, discharged or exculpated). All injunctions or stays provided in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force until the Plan Effective Date.

5

<u>Schedule 1</u>

**Opioid Settlement Term Sheet**

Execution Version

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE UNDER THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**Mallinckrodt Opioid Settlement Term Sheet**

This Opioid Settlement Term Sheet, which is <u>Schedule 1</u> to the Term Sheet (the "***Restructuring Term Sheet***") annexed as <u>Exhibit A</u> to the Restructuring Support Agreement, dated October 11, 2020, by and among the Company and the Supporting Parties, describes the proposed treatment of Opioid Claims in connection with the Restructuring contemplated by the Restructuring Support Agreement, as well as certain related implementation and other matters being resolved pursuant to the Opioid Settlement. This Opioid Settlement Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code. Certain capitalized terms used herein are defined in the glossary attached hereto; capitalized terms used but not otherwise defined in this Opioid Settlement Term Sheet have the meanings assigned in the Restructuring Support Agreement or the Restructuring Term Sheet, as applicable.

This Opioid Settlement Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documents implementing the Opioid Settlement and broader Restructuring of claims against and interests in the Debtors, which remain subject to negotiation in accordance with the Restructuring Support Agreement.

**TERMS OF THE PLAN AND THE RESTRUCTURING**

| | |
|---|---|
| **Overview** | The Opioid Settlement and Restructuring will be implemented through the Plan, consistent with the terms of (a) this Opioid Settlement Term Sheet, (b) the Restructuring Term Sheet and (c) the Restructuring Support Agreement, through the Chapter 11 Cases to be commenced in the Bankruptcy Court. |
| | The Plan will provide for the establishment of the Opioid Trust, which will receive the Trust Consideration (as defined below), including certain cash payments, the New Opioid Warrants, and certain other assets. All Opioid Claims will be assumed by the Opioid Trust and be discharged, released, and enjoined as to the Company and the other Released Parties. |
| **Treatment of Opioid Claims** | As of the Plan Effective Date, Mallinckrodt's liability for all Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to and assumed by the Opioid Trust, as described herein. Each Opioid Claim shall be resolved in |

funded in accordance with the provisions of this Term Sheet. The sole recourse of any Opioid Claimant on account of such Opioid Claim shall be to the Opioid Trust, and each such Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claim against any Protected Party.

**Opioid Trust**

On the Plan Effective Date, the Opioid Trust will receive (the "***Trust Consideration***"):

- cash in the amount of $450,000,000;

- the New Opioid Warrants;

- the right to receive cash payments (the "***Deferred Cash Payments***") in the following amounts and on the following dates: (a) $200,000,000 on each of the first and second anniversaries of the Plan Effective Date; and (b) $150,000,000 on each of the third through seventh anniversaries of the Plan Effective Date; *provided*, that at any time prior to the first anniversary of the Plan Effective Date, the Reorganized Debtors shall have the right to prepay, in full or in part, the Deferred Cash Payments, at a price equal to the present value of the amounts to be prepaid, at the date of prepayment, discounted at the discount rate that would be required for (x)(i) the present value of the Deferred Cash Payments at the prepayment date plus (ii) $450,000,000 to equal (y)(i) the present value of the payments under the Original Payments Schedule at the prepayment date (excluding the initial $300,000,000 payment provided for in the Original Payments Schedule), discounted at a discount rate of 12% per annum, *plus* (ii) $300,000,000 (such option, the "***Prepayment Option***");[1] *provided, further*, that to the extent the Reorganized Debtors seek to prepay only a portion of the Deferred Cash Payments in accordance with the Prepayment Option, such prepayment shall (x) be funded solely from the net proceeds of an equity raise by the Reorganized Debtors; and (y) prepay Deferred Cash Payments in accordance with the above in inverse order beginning with the payment due on the seventh anniversary of the Plan Effective Date;

- the Assigned Third-Party Claims; and

---

[1]  **Annex A** sets forth the prepayment cost as of the end of each of the 12 months after the Plan Effective Date. To the extent a prepayment occurs other than at the end of a month, the prepayment cost shall be calculated in accordance with the above formula.

The cash payments described above include amounts to be determined by the Governmental Plaintiff Ad Hoc Committee and the MSGE Group for reimbursement of plaintiffs'/claimants attorneys' fees and costs (not including (i) Restructuring Expenses, which shall be paid directly by the Debtors, and (ii) any reasonable, documented fees and expenses incurred by the Governmental Plaintiff Ad Hoc Committee and the MSGE Group on or after the Plan Effective Date in connection with implementation of the Plan (excluding, for the avoidance of doubt, the expenses of administration of the Opioid Trust (the "**_Trust Expenses_**")), which shall be paid directly by the Reorganized Debtors), and will be joint and several obligations (or be subject to an economically similar arrangement, e.g., one effected by guarantees, subject to tax considerations) of all of the current and future borrowers, issuers, pledgers and guarantors of the Debtors' funded indebtedness from time to time; *provided*, that for so long as the First Lien Notes, Second Lien Notes, the New First Lien Term Loans or Takeback Second Lien Notes remain outstanding, in no event shall the cash payments described above be guaranteed by an entity that does not also guarantee the First Lien Notes, Second Lien Notes, the New First Lien Term Loans or Takeback Second Lien Notes.

| | |
|---|---|
| **Asset Sales; Mandatory Prepayments to Opioid Trust** | The Plan and Confirmation Order will also provide that, after any sale of (i) Mallinckrodt Enterprises Holdings, Inc. and its subsidiaries (including, for the avoidance of doubt, its successors and assigns) or (ii) a material portion of their assets or businesses (including as a result of a merger, equity sale, or asset sale), subject to compliance with the Debtors' covenants under their funded indebtedness (as may be modified from time to time), fifty percent (50%) of the "net proceeds" of such sale (after, for the avoidance of doubt, compliance with then-existing covenants) shall be paid to the Opioid Trust; and the amount of such net proceeds actually conveyed to the Opioid Trust will be deemed a ratable repayment against the remaining structured payments described above that the Opioid Trust is entitled to receive. For the avoidance of doubt, the Debtors will not be under any obligation to undertake any such sale on any particular timeframe. |
| **Tax Matters** | The Opioid Settlement shall be implemented with the objective of maximizing tax efficiency to (i) Mallinckrodt, including with respect to the availability, location and timing of tax deductions and (ii) to the Opioid Claimants, including with respect to the tax classification of the Opioid Trust. |
| | The Opioid Trust will be treated as a qualified settlement fund for tax purposes. |

The Parties intend that payments to the Opioid Trust will constitute "restitution" within the meaning of Section 162(f) of the Internal Revenue Code, and will be so characterized for U.S. federal income tax purposes to the extent such payments are made to or at the direction of government or governmental entities and to the extent allowed by applicable law.

| | |
|---|---|
| **Certain Insurance Matters** | In implementing the assignment of the Assigned Insurance Rights, the Debtors or the Reorganized Debtors, on the one hand, and the Governmental Plaintiff Ad Hoc Committee and the MSGE Group, or the Opioid Trust, on the other hand, shall cooperate and negotiate in good faith concerning (i) treatment of unsatisfied self-insured retentions under the applicable policies with the objective of minimizing adverse consequences to Mallinckrodt, Reorganized Mallinckrodt, and the Opioid Trust (it being understood that the foregoing obligation shall not require the Debtors or Reorganized Debtors to satisfy all or any portion of any such self-insured retentions) and (ii) any actions by the Debtors, Reorganized Debtors, or the Opioid Trust to pursue or preserve the insurance policies relating to the Assigned Insurance Rights. The Debtors and the Reorganized Debtors will use their reasonable best efforts to provide to the Opioid Trust all documents, information, and other cooperation that is reasonably necessary for the Opioid Trust to pursue the Assigned Insurance Rights. |
| **Opioid Trust Documents** | The Opioid Trust Documents will comply with the requirements of the Bankruptcy Code. The material terms of the Opioid Trust Documents will be described in the Disclosure Statement and forms of the Opioid Trust Documents shall be included in the Plan Supplement, with such summaries and forms of documents (i) to be acceptable to the Governmental Plaintiff Ad Hoc Committee and the MSGE Group and reasonably acceptable to the Debtors and the Required Supporting Unsecured Noteholders and (ii), to the extent practicable, delivered to the advisors to the Ad Hoc First Lien Term Lender Group prior to being filed with the Bankruptcy Court. |
| **New Opioid Warrants Agreement** | The agreement governing the New Opioid Warrants shall constitute Definitive Documentation under the Restructuring Support Agreement and will: |

- contain terms and conditions, including, without limitation, cashless exercise option (as far as legally permissible), anti- dilution protection (including, without limitation, against stock splits, stock dividends and similar events) and Black Scholes protections to be agreed, in each case, as customary for transactions of this type and otherwise acceptable to the Debtors, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group;

- provide for a registration rights agreement satisfactory to the Governmental Plaintiff Ad Hoc Committee and the MSGE Group with respect to the New Opioid Warrants and the stock issuable upon

exercise of the New Opioid Warrants providing for, among other things, a resale shelf registration statement and customary demand and piggyback rights; and

- contain enhanced information rights and a covenant requiring Mallinckrodt to, upon request by the Opioid Trust on reasonable notice and subject to reimbursement by the Trust of Mallinckrodt's reasonable and documented out-of-pocket costs and expenses (provided, however, that such notice and reimbursements obligations of the Opioid Trust shall be on terms no less favorable to the Opioid Trust than any such obligations of any other shareholder of the Reorganized Debtors with similar rights), reasonably cooperate in good faith with any private sale by the Opioid Trust of the New Opioid Warrants or any shares received as a result of the exercise of the New Opioid Warrants.

**Channeling Injunction**

The Plan and the Confirmation Order will contain (i) a release by holders of Opioid Claims and (ii) an injunction channeling all Opioid Claims against the Protected Parties to the Opioid Trust, in each case, substantially on the terms set forth on **Exhibit 1** hereto.

In addition, and for the avoidance of doubt, the Plan and Confirmation Order will also provide for customary releases by the Company and by other holders of claims and interests, exculpation provisions, and related injunctive provisions, in each case consistent with Annex 4 to the Restructuring Term Sheet.

**Operating Injunction**   The Company shall seek entry of an injunctive order to be effective on the Petition Date, defining the manner in which the Debtors' opioid business may be lawfully operated by the Debtors or any successors thereto on a going-forward basis during the pendency of the Chapter 11 Cases, on the terms set forth on **Exhibit 2** hereto (the "***Chapter 11 Operating Injunction***").

The Confirmation Order (or a separate order of the Bankruptcy Court or another court of competent jurisdiction, if so agreed by the Company, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group) will extend the Chapter 11 Operating Injunction to govern the Reorganized Debtors' operations after the Plan Effective Date (the "***Post-Plan Effective Date Operating Injunction***" together with the Chapter 11 Operating Injunction, the "***Operating Injunctions***").

The Operating Injunctions shall be acceptable to the Debtors, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group, and reasonably acceptable to the Required Supporting Unsecured Noteholders.

**Assigned Claims Cooperation** During the pendency of the Chapter 11 Cases, the Debtors shall reasonably cooperate with counsel to the Governmental Plaintiff Ad Hoc Committee and the MSGE Group Counsel in connection with the investigation and preservation of the Assigned Third-Party Claims and Assigned Insurance Rights, including by providing non-privileged information (including, without limitation, documents, emails and access to individuals with information), at the reasonable request of counsel to the Governmental Plaintiff Ad Hoc Committee and the MSGE Group Counsel. The Debtors shall, at the reasonable request of the Unsecured Notes Ad Hoc Group, inform counsel to the Unsecured Notes Ad Hoc Group of the status and scope of any such cooperation.

The Debtors shall use reasonable efforts to provide all readily available, non-privileged information relating to the Assigned Third- Party Claims and Assigned Insurance Rights to counsel to the Governmental Plaintiff Ad Hoc Committee and the MSGE Group Counsel during the Debtors' bankruptcy cases; provided, however, that such information shall be provided prior to entry of the Confirmation Order.

On and after the Plan Effective Date, the Reorganized Debtors shall provide reasonable cooperation to the Opioid Trust in connection with the Opioid Trust's investigation, preservation and pursuit of the Assigned Third-Party Claims and Assigned Insurance Rights. The terms and conditions of such cooperation shall be mutually agreed by the Debtors, the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Required Supporting Unsecured Noteholders and set forth in the Plan Supplement and included in the Confirmation Order. The Opioid Trust shall reimburse the Reorganized Debtors for their documented and reasonable out-of-pocket costs and expenses incurred in connection with such reasonable cooperation from and after the Plan Effective Date.

Any request by the Opioid Trust, the Governmental Plaintiff Ad Hoc Committee, or the MSGE Group for cooperation by the Debtors and Reorganized Debtors shall be on reasonable advance notice, and provided during normal business hours and otherwise in a manner that does not disrupt commercial operations.

**Other Terms of Plan and Confirmation Order** The Plan and/or Confirmation Order will provide for, among other things, the following:

- Mallinckrodt will be required to participate in an industry- wide document disclosure program (if any) by disclosing publicly a subset of its litigation documents, subject to scope and protocols to be negotiated in good faith with the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Required Supporting Unsecured Noteholders;

any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) associated with the Assigned Third-Party Claims and Assigned Insurance Rights shall be transferred to the Opioid Trust and shall vest in the Opioid Trust, and the Debtors or the Reorganized Debtors, as the case may be, and the Opioid Trust shall take all necessary actions to effectuate the transfer of such privileges; provided, that (a) such privileges shall be transferred to the Opioid Trust for the sole purpose of enabling, and to the extent necessary to enable, the Opioid Trust to investigate and/or pursue such Assigned Third-Party Claims and Assigned Insurance Rights and (b) no documents or communications subject to a privilege shall be publicly disclosed by the Opioid Trust or communicated to any person not entitled to receive such information or in a manner that would diminish the protected status of such information, unless such disclosure or communication is reasonably necessary to preserve, secure, prosecute, or obtain the benefit of the Assigned Third-Party Claims and Assigned Insurance Rights; provided, further, that the Confirmation Order shall provide that the Opioid Trust's receipt of transferred privileges shall be without waiver in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors' estates;

- the Opioid Trust shall be authorized to conduct Rule 2004 examinations, to the fullest extent permitted thereunder, to investigate the Assigned Third-Party Claims and Assigned Insurance Rights, without the requirement of filing a motion for such authorization; provided, however, that no such Rule 2004 examinations shall be taken of the Debtors, the Reorganized Debtors, or any of their respective then-current employees, officers, directors or representatives, without further order of the Bankruptcy Court after notice and an opportunity to object and be heard;

- the exercise of remedies (including, without limitation, rights of setoff and/or recoupment) by non-Mallinckrodt third parties against Mallinckrodt on account of any Assigned Third-Party Claims shall be enjoined and barred, to the extent permitted by applicable law; and

- the covenants and enforcement rights with respect to Mallinckrodt's deferred payment obligations owed to the Opioid Trust in form and substance reasonably acceptable to the Debtors, the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Required Supporting Unsecured Noteholders in light of the nature, duration and form of the deferred payment obligations.

Case 1:21-cv-01093-LPS   Document 30   Filed 12/13/21   Page 206 of 426 PageID #: 2340

| Term | Meaning |
|---|---|
| Additional Insurance Rights | Additional rights in respect of insurance and/or other consideration, to be agreed to by the Debtors, the Supporting Governmental Opioid Claimants, the MSGE Group, and Supporting Unsecured Noteholders holding no less than two-thirds in outstanding principal amount of Guaranteed Unsecured Notes held by the Supporting Unsecured Noteholders then party to the Restructuring Support Agreement. |
| Assigned Insurance Rights | (a) Any and all claims, demands, entitlements to proceeds, payments, benefits, or Causes of Action of the Debtors under any and all general liability and products liability insurance policies that do or may afford the Debtors with rights, benefits, defense, indemnity, or insurance coverage with respect to any Opioid Claim, and (b) the Additional Insurance Rights. |
| Assigned Medtronic Claims | All Causes of Action against Medtronic plc and/or its subsidiaries, and each of their predecessors, successors, and assigns, including, without limitation, all Avoidance Actions of the Debtors against such parties |
| Assigned Third-Party Claims | (a) All Causes of Action of the Debtors arising out of Opioid Claims, including, without limitation, all Avoidance Actions arising out of Opioid Claims, but excluding any Causes of Action against Parent or any of its subsidiaries, or any Released Party, and (b) the Assigned Medtronic Claims. |
| Avoidance Actions | Any and all avoidance, recovery, subordination or similar actions or remedies that may be brought by and on behalf of the Debtors or their estates under the Bankruptcy Code or applicable non- bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code. |
| Causes of Action | Any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counterclaims, defenses, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, under statute, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, federal or state, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise. |
| New Opioid Warrants | Warrants to acquire the number of New Mallinckrodt Common Shares that would represent 19.99% of all such outstanding shares after giving effect to the exercise of the New Opioid Warrants, subject to dilution from equity reserved under the MIP, at a strike |

| Term | |
|---|---|
| | price reflecting an aggregate equity value for the Reorganized Debtors of $1.551 billion, which warrants shall be exercisable at any time on or prior to the seventh anniversary of the Plan Effective Date; *provided*, that if the Reorganized Debtors exercise the Prepayment Option and prepay the Deferred Cash Payments in full, such warrants shall be exercisable only through and including the fifth anniversary of the Plan Effective Date. |
| Opioid Claim | Claims and causes of action, whether existing now or arising in the future, and whether held by a Governmental Entity or private party, against Mallinckrodt in any way arising out of or relating to opioid products manufactured or sold by Mallinckrodt or any of their predecessors prior to the Plan Effective Date, including, for the avoidance of doubt and without limitation, Claims for indemnification (contractual or otherwise), contribution, or reimbursement against Mallinckrodt on account of payments or losses in any way arising out of or relating to opioid products manufactured or sold by Mallinckrodt or any of their predecessors prior to the Plan Effective Date, including Future Opioid PI Claims; *provided, that* Mallinckrodt shall agree to comply with the terms of the Chapter 11 Operating Injunction as of the Petition Date, and that "Opioid Claims" shall not include any claims in any way arising, in whole or in part, from a violation of the Chapter 11 Operating Injunction |
| Opioid Claimant | A holder of an Opioid Claim |
| Opioid Trust | The trust that is to be established in accordance with the Plan, the Confirmation Order, and the Opioid Trust Documents, which trust will satisfy the requirements of section 468B of the Internal Revenue Code and the Treasury Regulation promulgated thereunder (as such may be modified or supplemented from time to time); <u>provided</u>, <u>however</u>, that nothing contained herein shall be deemed to preclude the establishment of one or more trusts as determined by the Opioid Claimants to be reasonably necessary or appropriate to provide tax efficiency to the Opioid Trust and Opioid Claimants (and all such trusts shall be referred to collectively as the "Opioid Trust"), so long as the establishment of multiple trusts is not reasonably expected to result in any adverse tax consequences for Mallinckrodt. |
| Opioid Trust Documents | The documents governing: (i) the Opioid Trust; (ii) any sub-trusts or vehicles that comprise the Opioid Trust; (iii) the flow of consideration from the Debtors' estates to the Opioid Trust or any sub-trusts or vehicles that comprise the Opioid Trust; (iv) submission, resolution, and distribution procedures in respect of all Opioid Claims; and (v) the flow of distributions, payments or flow of funds made from the Opioid Trust or any such sub-trusts or vehicles after the Plan Effective Date. |

| Term | |
|---|---|
| Original Payment Schedule | The schedule for deferred cash payments under the February 2020 agreement in principle reached between certain state attorneys general and the Debtors, providing for the following payments on the following dates: |

| Date | Payment Amount |
|---|---|
| Plan Effective Date | $300,000,000 |
| Each of 1st and 2nd anniversaries of Plan Effective Date | $200,000,000 |
| Each of 3rd through 8th anniversaries of Plan Effective Date | $150,000,000 |

| | |
|---|---|
| Parent | Mallinckrodt plc |
| Protected Party | (a) The Debtors, (b) the Reorganized Debtors, (c) the Non-Debtor Affiliates, (d) with respect to each of the foregoing Persons in clauses (a) through (c), such Persons' predecessors, successors, permitted assigns, subsidiaries, and controlled affiliates, respective heirs, executors, estates, and nominees, in each case solely in their capacity as such, and (e) with respect to each of the foregoing Persons in clauses (a) through (d), such Persons' officers and directors, principals, members, employees, financial advisors, attorneys, accountants, investment bankers, consultants, experts and other professionals, provided that, solely as to any Supporting Governmental Opioid Plaintiff, consultants and experts in this clause (e) shall not include those retained to provide strategic advice for sales and marketing of opioid products who have received a civil investigative demand or other subpoena related to sales and marketing of opioid products from any State Attorney General on or after January 1, 2019 through the Petition Date. |

**Channeling Injunction/Opioid Claimant Release**

**Releases by Holders of Opioid Claims**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code (and any other applicable provisions of the Bankruptcy Code), as of the Plan Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Opioid Claimant (in its capacity as such) is deemed to have released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Plan Effective Date, each Debtor, Reorganized Debtor, and Protected Party from any and all Claims (including Opioid Claims), counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims asserted, or assertable on behalf of the Debtors, or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their Estates, the Opioid Claims, the Debtors' in- or out-of-court restructuring efforts (including the Chapter 11 Cases), intercompany transactions between or among a Debtor and another Debtor, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, any Avoidance Actions, the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Plan Effective Date, the Opioid Trust, Opioid Trust Documents and the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement, the Disclosure Statement, the Plan, any Restructuring Transaction, or any contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Protected Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into prior to the Plan Effective Date in connection with the creation of the Opioid Trust, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation (including the solicitation of votes on the Plan), the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Plan Effective Date related or relating to any of the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective

**A-0775**

Date obligations of the Debtors under the Plan, and under each document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. The foregoing release will be effective as of the Plan Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to the foregoing release by Opioid Claimants.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of this release by Opioid Claimants, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that this release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the Claims released by the third-party release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable;

(7) given and made after due notice and opportunity for hearing; and (8) a bar to any Opioid Claimant asserting any claim or Cause of Action released pursuant to this release.

*Terms.* Pursuant to section 105(a) of the Bankruptcy Code, from and after the Plan Effective Date, the sole recourse of any Opioid Claimant on account of its Opioid Claims shall be to the Opioid Trust pursuant to this section [__] of the Plan and the Opioid Trust Documents,    and such Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claim against any Protected Party or any property or interest in property of any Protected Party. On and after the Plan Effective Date, all present and future Opioid Claimants shall be permanently and forever stayed, restrained, barred, and enjoined from taking any of the following actions for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Opioid Claim other than from the Opioid Trust pursuant to the Opioid Trust Documents:

- commencing, conducting, or continuing in any manner, directly, indirectly or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

- enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

- creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

- setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; or

- proceeding in any manner in any place with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Opioid Trust, except in conformity and compliance with the Opioid Trust Documents.

*Reservations.* The foregoing injunction shall not stay, restrain, bar, or enjoin (a) the rights of Opioid Claimants to assert Opioid Claims against the Opioid Trust in accordance with the Plan and the Opioid Trust Documents; and (b) the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Trust Expenses against the Opioid Trust.

**Operating Injunction**

See Docket No. 128

**Prepayment Cost of Deferred Cash Payments at Various Months After Plan Effective Date**

**See Docket No. 128**

**DOJ Settlement Terms re: Boston (Medicaid Rebates) and EDPA False Claims Act Matters, and related issues**

- <u>Resolved Matters.</u> Mallinckrodt and the United States (including CMS, DOJ), the applicable states, and *qui tam* relators agree to fully and finally resolve the Acthar-related government litigations disclosed in Mallinckrodt's Form 10-K for 2019, including *United States of America, et al., ex rel., Charles Strunck, et al. v. Mallinckrodt ARD LLC* (E.D. Penn.); *United States of America et al. ex rel. Landolt v. Mallinckrodt ARD, LLC* (D. Mass.); and *Mallinckrodt ARD LLC v. Verma et al. (D.D.C.)*, and related matters (such matters, collectively, the "***Resolved Matters***") on the terms set forth in this Schedule, which will be memorialized in a definitive DOJ Settlement Agreement, and settlement agreements with the States, and incorporated into the Plan.

- <u>Settlement Payments.</u> In full and final satisfaction of all claims at issue in the "Resolved Matters", Mallinckrodt shall make cash payments to the US and State governments totaling $260 million in the aggregate (the "***DOJ Settlement Cash Consideration***") in accordance with the following schedule, with deferred payments bearing interest at a variable rate equal to the nominal interest rate on special issues of government securities to the Social Security trust funds, measured as of each payment date and accruing from September 21, 2020:

| Payment Date | Payment Amount |
|---|---|
| Plan Effective Date | $  15,000,000 |
| First Anniversary of Plan Effective Date | $  15,000,000 |
| Second Anniversary of Plan Effective Date | $  20,000,000 |
| Third Anniversary of Plan Effective Date | $  20,000,000 |
| Fourth Anniversary of Plan Effective Date | $  32,500,000 |
| Fifth Anniversary of Plan Effective Date | $  32,500,000 |
| Sixth Anniversary of Plan Effective Date | $  62,500,000 |
| Seventh Anniversary of Plan Effective Date | $  62,500,000 |

- <u>Releases</u>. Effective as of the date on which the Settlement Agreement is fully executed, Mallinckrodt, on the one hand, and DOJ and the States, on the other hand, will have exchanged mutual releases, as specified in the Settlement Agreements relating to the Resolved Matters.

Supporting Parties under the RSA, the DOJ Settlement Agreement shall contain such additional terms, conditions, representations, warranties, covenants and termination events to which Mallinckrodt, on the one hand, and DOJ on the other hand, may agree. Without limiting or affecting in any way the rights of the Supporting Parties under the RSA, the State Settlement Agreements shall contain such additional terms, conditions, representations, warranties, covenants and termination events to which Mallinckrodt, on the one hand, and the States, on the other hand, may agree.

First Lien Settlement Term Sheet

Execution Version

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE AMENDMENT TO THE RESTRUCTURING SUPPORT AGREEMENT INCORPORATING THIS TERM SHEET AS AN EXHIBIT IS FULLY-EXECUTED, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## First Lien Settlement Term Sheet

This Term Sheet (the "*First Lien Settlement Term Sheet*"), which is **Schedule 3** to the Term Sheet attached as **Exhibit A** (the "*Restructuring Term Sheet*") to the Restructuring Support Agreement dated October 11, 2020, by and among the Company and Supporting Parties thereto (as amended, modified and/or supplemented from time to time, the "*RSA*"), sets forth the proposed treatment of First Lien Credit Agreement Claims under the Plan. The Debtors will implement the terms set forth herein through the New Term Loan Documentation and the Plan (to the extent necessary to implement this First Lien Settlement Term Sheet), which shall be consistent with the terms of this First Lien Settlement Term Sheet, the RSA and the exhibits and schedules annexed thereto; *provided*, that, to the extent that this First Lien Settlement Term Sheet conflicts with any other exhibit to the RSA, including the Restructuring Term Sheet, this First Lien Settlement Term Sheet shall govern. This First Lien Settlement Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the RSA or the other exhibits attached thereto, as applicable.

This First Lien Settlement Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Plan and the New Term Loan Documentation, or the Scheme of Arrangement and the Irish Examinership Proceedings, which remain subject to negotiation in accordance with the RSA. Consummation of the transactions contemplated by this First Lien Settlement Term Sheet is subject to (a) the negotiation and execution of the New Term Loan Documentation and the Plan evidencing and related to the Restructuring, (b) satisfaction or waiver of all of the conditions in the New Term Loan Documentation and the Plan evidencing the transactions comprising the Restructuring, (c) entry of the Confirmation Order and the satisfaction or waiver of any conditions to the effectiveness thereof, (d) approval of the Scheme of Arrangement by the High Court of Ireland and the satisfaction or waiver of any conditions to the effectiveness thereof, and (e) entry of an order recognizing the Confirmation Order in the Recognition Proceedings.

| | |
|---|---|
| **Treatment of First Lien Credit Agreement Claims (Revolver)** | Allowed First Lien Credit Agreement Claims in respect of revolving loans/commitments (the "*First Lien Revolving Loan Claims*") shall be, at the Debtors' option, (a) reinstated or (b) repaid in full in cash, in each case, at par plus accrued and unpaid interest, accounting for adequate protection payments to the revolving lenders or the First Lien Agent for the benefit of the revolving lenders (which, notwithstanding anything to the contrary in the Final Cash Collateral Order, shall be retained by the revolving lenders and not recharacterized as principal payments). |
| | First Lien Revolving Loan Claims shall be separately classified from First Lien Term Loan Claims (defined below) and all other Claims and Interests treated under the Plan, and shall be deemed unimpaired and not entitled to vote on the Plan. |
| **Treatment of First Lien Credit Agreement Claims (Term Loans)** | Holders of allowed First Lien Credit Agreement Claims in respect of term loans (the "*First Lien Term Loan Claims*") shall receive, on the Plan Effective Date, in full and final satisfaction of such claims, at the Debtors' option, either (i) (A) the New First Lien Term Loans *plus* (B) the 2020 ECF Payment to the extent not paid prior to the Plan Effective Date *plus* (C) payment in full in Cash of Accrued and Unpaid Interest to the Plan Effective Date *plus* (D) the Term Loan Exit Payment (collectively, the "*New First Lien Term Loan Treatment*") or (ii) repayment of such Claims in full in cash in an amount equal to (A) the Outstanding Amount *plus* (B) the 2020 ECF Payment to the extent not paid prior to the Plan Effective Date *plus* (C) Accrued and Unpaid Interest *plus* (D) the Term Loan Exit Payment (collectively, such repayments, "*Payment in Full of First Lien Term Loan Claims*"). Any portion of the 2020 ECF Payment that is not made prior to the Plan Effective Date shall, for the avoidance of doubt and without duplication, accrue interest thereon from and after the date set forth in the CCO Modification Order (as defined below) or, in the event no such date is set forth in the CCO Modification Order, from and after the date of the Joinder Agreement, to the date of payment thereof at the Adjusted Interest Rate (which interest is expected to be paid by means of adequate protection payments) and such 2020 ECF Payment and such Accrued and Unpaid Interest thereon (to the extent not paid prior to the Plan Effective Date) shall be paid on the Plan Effective Date. |
| | "*Outstanding Amount*" means an amount equal to $1,899,776,787.81 *less* the 2020 ECF Payment attributable to principal *less* any Principal Payments. |

**A-0783**

the date of the Joinder Agreement through the Plan Effective Date, at the Adjusted Interest Rate (without (i) any default interest in addition thereto or (ii) conversion into an ABR Borrowing (as defined in the Existing Credit Agreement))) after accounting for adequate protection payments to the term lenders or to the First Lien Agent for the benefit of the term lenders (which, notwithstanding anything to the contrary in the Final Cash Collateral Order, shall be retained by the term lenders and, other than the Principal Payments, not recharacterized as principal payments).

"***Principal Payments***" means any quarterly amortization payments, excess cash flow sweep payments and other express payments of principal (including the 2020 ECF Payment).

First Lien Term Loan Claims maturing in 2024 and First Lien Term Loan Claims maturing in 2025 shall be separately classified from one another and from all other Claims and Interests treated under the Plan, and each such class shall be deemed impaired and entitled to vote on the Plan.

### TERMS OF NEW FIRST LIEN TERM LOANS

| | |
|---|---|
| **Facility** | On the Plan Effective Date, unless the Debtors elect to refinance and repay in full in cash the allowed First Lien Term Loan Claims as described in "Treatment of First Lien Credit Agreement Claims (Term Loans)" above, Mallinckrodt International Finance S.A. (the "***Lux Borrower***") Mallinckrodt CB LLC (the "***Co-Borrower***" and, together with the Lux Borrower, the "***Borrowers***") shall enter into a new senior secured first lien term loan facility in an original principal amount equal to the Outstanding Amount (such facility, the "***New First Lien Term Loan Facility***" the loans under such facility, the "***New First Lien Term Loans***," and any all documents related thereto, the "***New Term Loan Documentation***"). The administrative agent and the collateral agent for the New First Lien Term Loan Facility shall be mutually reasonably acceptable to the Company and the Required Supporting Term Lenders in the event the Refinancing Loans (as defined below) are included as a separate tranche in the New First Lien Term Loan Facility. In the event the Refinancing Loans are governed by separate documentation from the New First Lien Term Loan Facility, the collateral agent for the New First Lien Term Loan Facility shall be mutually reasonably acceptable to the Company and the Required Supporting Term Lenders and the administrative agent for the New First Lien Term Loan Facility shall be reasonably acceptable to the Required Supporting Term Lenders and must qualify under Section 8.09 of the Existing Credit Agreement. For the avoidance of doubt, any indebtedness incurred in order to refinance the First Lien Revolver Loan Claims (the "***Refinancing Loans***") may be included as a separate tranche in the New First Lien Term Loan Facility and, if so included, shall be subject to the same terms (other than economic terms) as the New First Lien Term Loans. |

2

A-0784

| | |
|---|---|
| **Interest** | New First Lien Term Loans issued on account of First Lien Term Loan Claims maturing in 2024 shall accrue interest, from and after the Plan Effective Date, at a non-default rate equal to, at the Borrowers' option, either LIBOR plus 525 bps, with a 75 bps LIBOR floor, or ABR plus 425 bps.<br><br>New First Lien Term Loans issued on account of First Lien Term Loan Claims maturing in 2025 shall accrue interest, from and after the Plan Effective Date, at a non-default rate equal to, at the Borrowers' option, either LIBOR plus 550 bps, with a 75 bps LIBOR floor, or ABR plus 450 bps. |
| **Adequate Protection Payments** | As part of the comprehensive and integrated settlements set forth herein, the Final Cash Collateral Order shall be modified, which modification shall be approved by an order of the Bankruptcy Court (the "***CCO Modification Order***") by no later than April 15, 2021, and for so long as the RSA is not terminated with respect to the holders of the First Lien Term Loan Claims, to increase the interest rate applied in order to calculate First Lien Adequate Protection Payments (as defined therein) payable on account of the First Lien Term Loan Claims from the Adjusted LIBO Rate (as defined in the Existing Credit Agreement) plus 200 basis points plus Applicable Margin (as defined in the Existing Credit Agreement) to the Adjusted Interest Rate. The Debtors shall request that such increased rate take effect upon the filing of the motion seeking entry of the CCO Modification Order and shall not, for the avoidance of doubt, apply retroactively to any earlier date or apply to any First Lien Credit Agreement Claims other than First Lien Term Loan Claims; *provided*, that, the Supporting Term Lenders shall not have any right to terminate the Joinder Agreement or the RSA based solely on the Bankruptcy Court declining to apply such increased rate retroactively to the date on which the motion seeking entry of the CCO Modification Order is filed. The Debtors shall file the motion seeking entry of the CCO Modification Order by no later than six (6) Business Days after the execution of the Joinder Agreement and such motion and the CCO Modification Order (subject to the NPT Exception) shall be in form and substance reasonably acceptable to the Required Supporting Term Lenders.[1] |

---

[1]   "***Joinder Agreement***" means that certain Joinder Agreement and Amendment to Restructuring Support Agreement dated as of March 10, 2021 by and among the Debtors, the Required Supporting Unsecured Noteholders, the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Supporting Term Lenders.

3

RSA is consummated with respect to the First Lien Term Loans as of the Plan Effective Date, all First Lien Adequate Protection Payments made to the holders of First Lien Term Loan Claims prior to the Plan Effective Date (other than Principal Payments) shall be retained by the lenders in full satisfaction of their entitlement to interest and fees under section 506(b) of the Bankruptcy Code and shall not be recharacterized as payments of principal.

The holders of First Lien Term Loan Claims party to the RSA, for so long as they are parties to the RSA, shall (i) not seek, or direct the First Lien Agent, to prohibit the continuation of outstanding loans under the Existing Credit Agreement as Eurocurrency Borrowings (as defined in the Existing Credit Agreement) or to require the conversion of such loans into ABR Borrowings (as defined in the Existing Credit Agreement), and, (ii) unless otherwise effected pursuant to an order of the Bankruptcy Court, deliver a communication in writing to the First Lien Agent (which shall comply with the requirements of any such communication set forth in the Existing Credit Agreement and may be delivered by counsel to the Ad Hoc First Lien Term Lender Group, which counsel shall be deemed authorized to deliver such communication by all legal or beneficial owners of First Lien Credit Agreement Claims that execute the RSA or the Joinder Agreement) instructing the First Lien Agent to deem any previous request of any Supporting Term Lenders that the First Lien Agent notify the Borrowers (as defined in the Existing Credit Agreement) of any Event of Default or any prohibition on any such continuation or requirement of any such conversion resulting therefrom withdrawn without prejudice and permit such continuation and not require such conversion, and (iii) not seek, or direct the First Lien Agent to seek, any default interest in respect of outstanding loans under the Existing Credit Agreement, in each case, only for so long as the Supporting Term Lenders remain party to the RSA.

| | |
|---|---|
| **Maturity** | The New First Lien Term Loans shall mature on the date that is the earlier of (a) September 30, 2027 or (b) 5.75 years following the Plan Effective Date. |
| **Amortization** | The New First Lien Term Loans shall amortize at a rate of 2.5% per annum, payable quarterly on March 31, June 30, September 30, and December 31 of each year that the New First Lien Term Loans remain outstanding. |

4

Case 20-12522-JTD   Doc 2159-6   Filed 04/30/21   Page 74 of 122

| | |
|---|---|
| **Call Protection/ Premiums** | open to voluntary prepayment in whole or in part at the Company's option, at a price equal to 100% of the outstanding principal amount of New First Lien Term Loans so prepaid plus all accrued interest, fees and other amounts thereon; *provided* that if any Repricing Event (defined in a manner consistent with the Existing Credit Agreement) occurs prior to the date that is nine months after the Plan Effective Date, a fee in the amount of 1.00% of the outstanding principal amount of New First Lien Term Loans subject to such Repricing Event shall be payable. |
| | Mandatory prepayment events shall be consistent with the Existing Credit Agreement. |
| **Guarantors** | The obligations of Borrower under the New First Lien Term Loan Facility shall be guaranteed by the existing guarantors under the Existing Credit Agreement, *except for* Mallinckrodt Holdings GmbH (provided that the Loan Parties (defined in a manner consistent with the Existing Credit Agreement) covenant not to cause Mallinckrodt Holdings GmbH or the subsidiaries of Mallinckrodt Holdings GmbH to incur any material indebtedness owed to unaffiliated third parties, or guarantee any material indebtedness owed to any unaffiliated third-parties) (such guarantors, the "*Guarantors*"). The Debtors shall reimburse the Ad Hoc First Lien Term Lender Group for the reasonable and documented out-of-pocket fees and expenses of Swiss legal counsel in connection with the exclusion of Mallinckrodt Holdings GmbH as a Guarantor and Swiss law matters in connection with to the New Term Loan Documentation. |
| **Collateral** | The obligations under the New First Lien Term Loan Facility shall be secured by senior, first-priority (subject to certain exceptions consistent with the exceptions set forth in the Existing Credit Agreement) liens on the same assets of the Borrower and Guarantors securing the obligations under the Existing Credit Agreement, plus (or including, as the case may be) (i) 100% of the equity of first-tier foreign subsidiaries and domestic holding companies thereof except if (or until such time as) a Borrower determines in good faith that such pledge of equity issued by such subsidiary (1) could reasonably be expected to result in Mallinckrodt PLC ("Parent") or any of its subsidiaries incurring any material tax or other cost (other than a de minimis cost) or any disruption in the operations or internal financing activities of the Parent and its subsidiaries, (2) is not permitted by, or could reasonably be expected to cause any officers, directors or employees of the Parent or any of its subsidiaries to become subject to related liabilities under any, applicable requirement of law or (3) would constitute "Excluded Securities" pursuant to clause (c) of the definition thereof in the Existing Credit Agreement and (ii) all cash of the Borrower and Guarantors (which, to the extent held by Co-Borrower or any domestic Guarantor in a domestic deposit account and subject to certain customary exceptions, shall be subject to deposit account control agreements in favor of the agent under the New First Lien Term Loan Facility). |

5

agree and the Supporting Term Lenders agree to settle under Rule 9019 of the Federal Rules of Bankruptcy Procedure their dispute with respect to the amount and manner of payment of the excess cash flow payment required to be made to the term lenders under the Existing Credit Agreement for fiscal year 2020 (the "**2020 ECF Payment**"; such settlement, the "**2020 ECF Payment Settlement**"). The 2020 ECF Payment Settlement shall provide the Debtors, and the Supporting Term Lenders agree, that the Debtors shall satisfy their obligation to make the 2020 ECF Payment with a payment in cash in the amount of $114 million to be made solely to the term lenders under the Existing Credit Agreement for application against the term loans under the Existing Credit Agreement. The Debtors shall file a supplement to the existing motion seeking approval to pay the 2020 ECF Payment to set forth the terms and basis for the 2020 ECF Payment Settlement, which supplement shall be in form and substance reasonably acceptable to the Required Supporting Term Lenders. The order approving the 2020 ECF Payment Settlement and the 2020 ECF Payment (the "**2020 ECF Payment Order**") shall be in form and substance reasonably acceptable to the Debtors and the Required Supporting Term Lenders. To the extent the Bankruptcy Court enters the 2020 ECF Payment Order, the Debtors shall make the 2020 ECF Payment to, or for the sole benefit of, the term lenders promptly but in no even later than three (3) Business Days after the Bankruptcy Court enters the 2020 ECF Payment Order. To the extent the Debtors do not receive such authorization, the Debtors shall pay the term lenders the 2020 ECF Payment *plus* accrued interest thereon at the Adjusted LIBO Rate plus 250 basis points plus Applicable Margin (as defined in the Existing Credit Agreement) (the "**Adjusted Interest Rate**") on the Plan Effective Date of the Plan (to the extent unpaid after account for adequate protection payments) in accordance with the proposed treatment of First Lien Term Loan Claims described above. For the avoidance of doubt, no "default interest" or similar amount shall be payable with respect to the 2020 ECF Payment Interest Rate.

Payments relating to settlement and restructuring costs, including the Term Loan Exit Payment and all payments made pursuant to the Plan, made during any fiscal year after fiscal year 2020 shall be deducted from the excess cash flow calculation with respect to the applicable fiscal year.

A-0788

| | |
|---|---|
| Covenants | Agreement (except (1) as set forth under the heading "Ratings" below and (2) as to the Cadence IP Licensee, which covenants shall be deleted), and negative covenants consistent with the Existing Credit Agreement, subject to certain exceptions and modifications as set forth on **Annex 1** hereto. For the avoidance of doubt, such covenants shall not include any financial maintenance covenant. In all circumstances, the covenants shall permit the issuance of the $375 million of Takeback Second Lien Notes as set forth in the RSA. |
| Ratings | The Debtors shall use commercially reasonable efforts to obtain credit ratings for the New First Lien Term Loans from Moody's and Standard & Poor's prior to the Plan Effective Date. |
| Term Loan Exit Payment | The term lenders under the Existing Credit Agreement shall earn an exit payment (the "***Term Loan Exit Payment***") of 0.5% of the Outstanding Amount, which exit payment shall (a) increase to 1.0% of the Outstanding Amount if Payment in Full of First Lien Term Loan Claims does not occur on or prior to the Plan Effective Date and (b) be payable upon the earlier of the Plan Effective Date and the consummation of any transaction that effects Payment in Full of First Lien Term Loan Claims on or prior to the Plan Effective Date. For the avoidance of doubt, the Term Loan Exit Payment will only increase to 1.0% if the treatment of First Lien Term Loan Claims is the New First Lien Term Loan Treatment. |

## OTHER TERMS

| | |
|---|---|
| Consent Rights | The New Term Loan Documentation (including any applicable intercreditor agreements) shall be (i) consistent with the Restructuring Term Sheet and this First Lien Settlement Term Sheet, (ii) based on, and except as otherwise set forth in the Restructuring Term Sheet or this First Lien Settlement Term Sheet, no less favorable to the Debtors than the Existing Credit Agreement and associated Loan Documents (as defined in the Existing Credit Agreement) (provided that the New Term Loan Documentation shall contain a market-standard LIBOR replacement provision to be reasonably agreed to by the Debtors and the Supporting Term Lenders), and (iii) otherwise negotiated in good faith and reasonably agreed between the Debtors and Required Supporting Term Lenders, taking into account (A) the Debtors' financing structure to be implemented in accordance with the terms of the RSA and the Plan and (B) changes in law or accounting standards or to cure mistakes or defects, but in any event to include (w) an event of default in the event the Loan Parties (defined in a manner consistent with the |

or Opioid Settlement, (x) a requirement of a 100% vote of lenders in order to contractually subordinate the liens securing, or the right of payment of, the obligations under the New First Lien Term Loan Facility to any now-existing or hereafter implemented or incurred class of indebtedness, (y) restrictions on the exclusion from collateral of the equity interests of non-wholly owned subsidiaries except to the extent arising from legitimate business transactions with third parties, applicable law or tax efficiency considerations and restrictions on the release of guarantee and collateral obligations of subsidiaries that become less than wholly owned except through legitimate business transactions with third parties, and (z) a prohibition on open market purchases of loans other than the pro rata modified Dutch auctions as permitted in the Existing Credit Agreement and, in any event, any consideration in such modified Dutch auction shall only be in cash (collectively, the "***Documentation Principles***"). For the avoidance of doubt, (1) the representations and warranties set forth in the New Term Loan Documentation shall be established so as to eliminate any representations or warranties that may not be satisfied as of the Plan Effective Date (such as, for example, the absence of a material adverse effect) and (2) the only conditions to the effectiveness of the New First Lien Term Loan Facility shall be (1) completion of New Term Loan Documentation consistent with the Documentation Principles and (2) the conditions to the effectiveness of the relevant plan of reorganization. The Existing 1L/2L Intercreditor Agreement (as defined in the RSA) shall remain in place after the Plan Effective Date and govern the respective rights of the administrative agent under the New Term Loan Documentation, the lenders under the New Term Loan Documentation, the trustee under the Existing Second Lien Indenture,[2] the Second Lien Document Representative (as defined in the Existing 1L/2L Intercreditor Agreement), and the holders of Existing Second Lien Notes[3] and Takeback Second Lien Notes (as defined in the RSA). To the extent any existing first lien debt (other than First Lien Term Loan Claims) is reinstated on the Plan Effective Date, the Existing 1L Intercreditor Agreement (as defined in the RSA) shall remain in place after the Plan Effective Date and govern the respective rights of the administrative agent and the lenders under the New Term Loan Documentation and the agent or trustee and lenders under such reinstated first lien indebtedness.

---

[2]   "***Existing Second Lien Indenture***" means that certain Indenture for 10.000% Second Lien Secured Notes due 2025, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as Issuers, the guarantors party thereto, and Wilmington Savings Fund Society, FSB, as Second Lien Trustee and Second Lien Collateral Agent.

[3]   "***Existing Second Lien Notes***" means those certain 10.000% Second Lien Secured Notes due 2025 under the Existing Second Lien Indenture.

Loan Facility shall permit the consumption of all transactions contemplated by the Plan.

**DOJ/Opioid Settlement Cash Consent Right**

Without the consent of the Required Supporting Term Lenders, the Debtors shall not agree to any changes to the Plan, the Opioid Settlement or CMS/DOJ/States Settlement that (a) result in the aggregate amount of cash to be paid by the reorganized Debtors pursuant to the Opioid Settlement and the CMS/DOJ/States Settlement exceeding $1,860,000,000 (excluding professional fees and expenses payable in connection with the Opioid Settlement and the CMS/DOJ/States Settlement and interest payable in connection with the CMS/DOJ/States Settlement) or (b) accelerate the timing of payments to the Opioid Trust under the Opioid Settlement or payments under the CMS/DOJ/States Settlement in any given year (the "***DOJ/Opioid Settlement Cash Consent Right***"); *provided* that no such consent shall be required for changes related to either (i) the timing of exercise of the Debtors' option to prepay the amounts owing to the Opioid Trust or (ii) the Additional Insurance Rights.

Any partial prepayment of the amounts owing to the Opioid Trust must be funded solely from the net proceeds of an equity raise.

**Intercreditor Agreement Claims**

Except as otherwise agreed by the Debtors in writing, during the Support Period and, if the Restructuring is consummated, from and after the Plan Effective Date, (a) the Supporting Term Lenders shall not pursue any claims under any intercreditor agreement against any holder of any other secured Claims relating to any payments made pursuant to the Final Cash Collateral Order or the Plan and (b) to the extent practicable and in accordance with the terms of the Existing Credit Agreement, the Supporting Term Lenders shall instruct the First Lien Agent not to pursue any such claims; *provided*, however, that to the extent the transactions contemplated by this First Lien Settlement Term Sheet are not consummated and the Company does not propose the Payment in Full of First Lien Term Loan Claims, all of the Supporting Term Lenders' rights and remedies with respect to claims under any intercreditor agreement are expressly reserved.

9

### Negative Covenants and Related Definitions

All capitalized terms used, but not defined, herein shall be defined in a fashion consistent with the Documentation Principles (as defined in the First Lien Settlement Term Sheet to which this excerpt is attached as Annex 1 (the "First Lien Settlement Term Sheet")). The "Closing Date" shall mean the Plan Effective Date (as defined in the First Lien Term Sheet). All schedules described herein shall be completed based upon the actual characteristics of the Parent and its subsidiaries as of the Closing Date. All baskets subject to a cap based on a dollar amount or percentage of Consolidated Total Assets shall be deemed to be unused as of the Closing Date. All baskets set based on a percentage of Consolidated Total Assets shall be set so as match the fixed portion of the basket on the Closing Date after giving effect to any fresh-start accounting required to be implemented in connection the applicable plan of reorganization. Additional baskets shall be agreed as necessary to permit transactions consummated pursuant to the terms of a plan of reorganization consummated in accordance with the terms of the Restructuring Support Agreement and the schedules thereto, to which this Annex 1 is attached (the "RSA").

### Definitions:

"Adjusted Consolidated EBITDA" shall mean, with respect to the Parent and the Subsidiaries on a consolidated basis for any period, the Consolidated Net Income of the Parent and the Subsidiaries for such period plus

(a) the sum of, without duplication, in each case, to the extent deducted in or otherwise reducing Consolidated Net Income for such period:

(i) provision for taxes based on income, profits or capital of the Parent and the Subsidiaries for such period, without duplication, including, without limitation, state franchise and similar taxes, and foreign withholding taxes (including penalties and interest related to taxes or arising from tax examination); plus

(ii) (x) Interest Expense of the Parent and the Subsidiaries for such period and (y) all cash dividend payments (excluding items eliminated in consolidation) on any series of preferred stock of any Subsidiary of Parent or any Disqualified Stock of the Parent and its Subsidiaries; plus

(iii) depreciation, amortization (including amortization of intangibles, deferred financing fees and actuarial gains and losses related to pensions and other post-employment benefits, but excluding amortization of prepaid cash expenses that were paid in a prior period) and other non-cash expenses (excluding any such non-cash charges or expenses to the extent that it represents an accrual of or reserve for cash expenses in any future period or amortization of a prepaid cash expense that was paid in a prior period) of the Parent and the Subsidiaries for such period; plus

employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of the Parent or net cash proceeds of an issuance of Equity Interests of the Parent (other than Disqualified Stock) solely to the extent that such net cash proceeds are excluded from the calculation of the Available Amount; <u>plus</u>

(v) any non-cash losses related to non-operational hedging, including, without limitation, resulting from hedging transactions for interest rate or currency exchange risks associated with this Agreement or the Existing Secured Notes; <u>minus</u>

(b) the sum of, without duplication, in each case, to the extent added back in or otherwise increasing Consolidated Net Income for such period:

(i) non-cash items increasing such Consolidated Net Income for such period (excluding the recognition of deferred revenue or any non-cash items which represent the reversal of any accrual of, or reserve for, anticipated cash charges in any prior period and any items for which cash was received in any prior period); <u>plus</u>

(ii) any non-cash gains related to non-operational hedging, including, without limitation, resulting from hedging transactions for interest rate or currency exchange risks associated with this Agreement or the Existing Secured Notes;

in each case, on a consolidated basis and determined in accordance with Applicable Accounting Principles.

Notwithstanding the preceding, the provision for taxes based on the income or profits of, the Interest Expense of, the depreciation and amortization and other non-cash expenses or non-cash items of and the restructuring charges or expenses of, a Subsidiary (other than any Wholly Owned Subsidiary) of the Parent will be added to (or subtracted from, in the case of non-cash items described in clause (b) above) Consolidated Net Income to compute Adjusted Consolidated EBITDA, (A) in the same proportion that the Net Income of such Subsidiary was added to compute such Consolidated Net Income of the Parent, and (B) only to the extent that a corresponding amount of the Net Income of such Subsidiary would be permitted at the date of determination to be dividended or distributed to the Parent by such Subsidiary without prior governmental approval (that has not been obtained), and without direct or indirect restriction pursuant to the terms of its charter and all agreements, instruments, judgments, decrees, orders, statutes, rules and governmental regulations applicable to that Subsidiary or its stockholders.

"<u>Affiliate</u>" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified.

2

A-0794

"Applicable Period" shall mean an Excess Cash Flow Period or an Excess Cash Flow Interim Period, as the case may be.

"Asset Sale" shall mean (x) any Disposition (including any sale and leaseback of assets and any mortgage or lease of Real Property) to any person (including to a Divided LLC pursuant to a Division) of, any asset or assets of the Parent or any Subsidiary and (y) any sale of any Equity Interests by any Subsidiary to a person other than the Parent or a Subsidiary.

"Attributable Receivables Indebtedness" shall mean the principal amount of Indebtedness (other than any Indebtedness subordinated in right of payment owing by a Receivables Entity to a Receivables Seller or a Receivables Seller to another Receivables Seller in connection with the transfer, sale and/or pledge of Permitted Receivables Facility Assets) which (i) if a Qualified Receivables Facility is structured as a secured lending agreement or other similar agreement, constitutes the principal amount of such Indebtedness or (ii) if a Qualified Receivables Facility is structured as a purchase agreement or other similar agreement, would be outstanding at such time under such Qualified Receivables Facility if the same were structured as a secured lending agreement rather than a purchase agreement or other similar agreement.

"Available Amount" shall mean, as at any time of determination, an amount, not less than zero in the aggregate, determined on a cumulative basis, equal to, without duplication:

(a) $50 million, plus

(b) 50% of the Cumulative Retained Excess Cash Flow Amount on such date of determination, plus

(c) the aggregate amount of proceeds received after the Closing Date and prior to such date of determination that would have constituted Net Proceeds had they exceeded the threshold amounts required to qualify as Net Proceeds (the "Below-Threshold Asset Sale Proceeds"), plus

(d) the cumulative amounts of all prepayments declined by Term Lenders, plus

(e) the Cumulative Parent Qualified Equity Proceeds Amount on such date of determination, minus

(f) the cumulative amount of Investments made with the Available Amount from and after the Closing Date and on or prior to such time, minus

(g) the cumulative amount of Restricted Payments made with the Available Amount from and after the Closing Date and on or prior to such time (without duplication of any such amount subtracted pursuant to the definition of Cumulative Parent Qualified Equity Proceeds Amount);

---

[1]  Section reference to be to general interpretive provision regarding accounting terms. For the avoidance of doubt, interpretive provisions to exclude from Capitalized Lease Obligations any leases that would not have been required to be so included prior to implementation of recent accounting changes.

3

A-0795

Case 20-12522   Doc 21-6   Filed 04/30/21   Page 83 of 172

provided, however, that the aggregate amount of the Available Amount used as a Payment Source of any type of the Available Amount shall not include any Below-Threshold Asset Sale Proceeds or any amounts described in clause (d) above.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"Board of Directors" shall mean, as to any person, the board of directors, the board of managers, the sole manager or other governing body of such person, or if such person is owned or managed by a single entity, the board of directors or other governing body of such entity.

"Borrower" shall mean each of the Lux Borrower and the Co-Borrower, and the term "Borrowers" shall mean all of the Lux Borrower and the Co-Borrower.

"Capital Expenditures" shall mean, for any person in respect of any period, the aggregate of all expenditures incurred by such person during such period that, in accordance with Applicable Accounting Principles, are or should be included in "additions to property, plant or equipment" or similar items reflected in the statement of cash flows of such person; provided, however, that, Capital Expenditures for the Parent and the Subsidiaries shall not include:

(a) expenditures to the extent made with proceeds of the issuance of Qualified Equity Interests (other than Disqualified Stock) of the Parent or capital contributions to the Parent or funds that would have constituted Net Proceeds under clause (a) of the definition of the term "Net Proceeds" (but that will not constitute Net Proceeds as a result of the first or second proviso to such clause (a)); provided that (i) this clause (a) shall exclude expenditures made with the proceeds from sales of Equity Interests financed as contemplated by Section 6.04(e)(iii), proceeds of Equity Interests used to make Investments pursuant to Section 6.04(p), proceeds of Equity Interests used to make a Restricted Payment in reliance on clause (x) of the proviso to Section 6.06(b) and (ii) such proceeds are not included in any determination of the Available Amount;

(b) expenditures of proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other property to the extent such expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets or properties useful in the business of the Parent and the Subsidiaries to the extent such proceeds are not then required to be applied to prepay Term Loans pursuant to Section [___]2;

(c) interest capitalized during such period;

---

2    Section reference to be to the asset sale mandatory prepayment.

(d) extraordinary, unusual or non-recurring items or charges for such period that are approved by the board (excluding the Parent, the Borrowers or any Subsidiary) and for which none of the Parent, the Borrowers or any Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other person (whether before, during or after such period);

(e) the book value of any asset owned by such person prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of such person reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period; provided that (i) any expenditure necessary in order to permit such asset to be reused shall be included as a Capital Expenditure during the period that such expenditure actually is made and (ii) such book value shall have been included in Capital Expenditures when such asset was originally acquired;

(f) the purchase price of equipment purchased during such period to the extent that the consideration therefor consists of any combination of (i) used or surplus equipment traded in at the time of such purchase, (ii) the proceeds of a concurrent sale of used or surplus equipment, in each case, in the ordinary course of business or (iii) assets Disposed of pursuant to Section 6.05(m);

(g) Investments in respect of a Permitted Business Acquisition; or

(h) the purchase price of property, plant or equipment made with proceeds from any Asset Sale to the extent such proceeds are not then required to be applied to prepay Term Loans pursuant to Section 2.11(b).

"Capitalized Lease Obligations" shall mean, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with Applicable Accounting Principles.

"Cash Interest Expense" shall mean, with respect to the Parent and the Subsidiaries on a consolidated basis for any period, Interest Expense for such period to the extent such amounts are paid in cash for such period, excluding, without duplication, in any event (a) pay-in-kind Interest Expense or other non-cash Interest Expense (including as a result of the effects of purchase accounting), (b) to the extent included in Interest Expense, the amortization of any financing fees paid by, or on behalf of, the Parent or any Subsidiary, including such fees paid in connection with the Transactions or upon entering into a Qualified Receivables Facility, and (c) the amortization of debt discounts, if any, or fees in respect of Hedging Agreements; provided, that Cash Interest Expense shall exclude any one time financing fees, including those paid in connection with the Transactions, or upon entering into a Qualified Receivables Facility or any amendment of this Agreement.

"Cash Management Agreement" shall mean any agreement to provide to the Parent, a Borrower or any Subsidiary Loan Party cash management services for collections, treasury management services (including controlled disbursement, overdraft, automated clearing house

5

Case 20-12522-JTD   Doc 2159-6   Filed 04/30/21   Page 85 of 92

fund transfer services, automated deposit services), automated clearinghouse (ACH) relationships, commercial credit cards, merchant card, purchase or debit cards, non-card e-payables services, and other cash management services, including electronic funds transfer services, lockbox services, stop payment services and wire transfer services.

"<u>Cash Management Bank</u>" shall mean any person that, at the time it enters into a Cash Management Agreement (or on the Closing Date), is an Agent, an Arranger, a Lender or an Affiliate of any such person, in each case, in its capacity as a party to such Cash Management Agreement.

"<u>Consolidated Debt</u>" shall mean, as of any date of determination, the sum of (without duplication) all Indebtedness of the type set forth in clauses (a), (b), (e) (to the extent related to any Indebtedness that would otherwise constitute Consolidated Debt), (f), (h) (other than letters of credit, to the extent undrawn), (i) (other than bankers' acceptances to the extent undrawn), (j), (k) (to the extent related to any Indebtedness that would otherwise constitute Consolidated Debt) and (l) of the definition of "Indebtedness" of the Parent and the Subsidiaries determined on a consolidated basis on such date; <u>provided</u>, that the amount of any Indebtedness (including the Indebtedness under this Agreement) with respect to which the applicable obligors have entered into currency hedging arrangements shall be calculated giving effect to such currency hedging arrangements.

"<u>Consolidated Net Income</u>" shall mean, with respect to any person for any period, the aggregate Net Income of such person and its subsidiaries for such period, on a consolidated basis, in accordance with Applicable Accounting Principles; <u>provided</u>, <u>however</u>, that, without duplication:

(a) any net after-tax extraordinary, nonrecurring or unusual gains or losses (less all fees and expenses relating thereto) or expenses or charges, any severance expenses, relocation expenses, curtailments or modifications to pension and post-retirement employee benefit plans, excess pension charges, any expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternate uses and fees, expenses or charges relating to new product lines, Milestone Payments under intellectual property licensing agreements, facilities closing or consolidation costs, acquisition integration costs, facilities opening costs, project start-up costs, business optimization costs, (including inventory optimization programs), systems establishment costs, contract termination costs, future lease commitments, other restructuring charges, reserves or expenses, signing, retention or completion bonuses, expenses or charges related to any issuance of Equity Interests, Investment, acquisition, disposition, recapitalization or issuance, repayment, refinancing, amendment or modification of Indebtedness (in each case, whether or not successful), and any fees, expenses, charges, change in control payments or other payment obligations made in connection with, or related to, the Transaction shall be excluded;

(b) effects of purchase accounting adjustments (including the effects of such adjustments pushed down to such person and such Subsidiaries) in amounts required or permitted by Applicable Accounting Principles, resulting from the application of purchase accounting in relation to any consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded;

Case 20-12522-JTD   Doc 2159-6   Filed 04/30/21   Page 86 of 179

(c) the cumulative effect of a change in accounting principles (which has not been obtained) during such period of any change in accounting on a comprehensive basis of accounting) during such period shall be excluded;

(d) (i) any net after-tax income or loss from disposed, abandoned, transferred, closed or discontinued operations, (ii) any net after-tax gain or loss on disposal of disposed, abandoned, transferred, closed or discontinued operations and (iii) any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by the Parent) shall be excluded;

(e) any net after-tax gains or losses, or any subsequent charges or expenses (less all fees and expenses or charges relating thereto), attributable to the early extinguishment of Indebtedness, hedging obligations or other derivative instruments shall be excluded;

(f) the Net Income for such period of any person that is not a subsidiary of such person, or is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting (other than a guarantor), shall be included only to the extent of the excess (which shall not be less than $0) of the amount of dividends or distributions or other payments actually paid in cash or cash equivalents (or to the extent converted into cash or cash equivalents) to the referent person or a Subsidiary thereof in respect of such period over the amount of all Investments made to such Unrestricted Subsidiaries during such period;

(g) solely for purposes of calculating the Available Amount, the Net Income for such period of any subsidiary of such person shall be excluded to the extent that the declaration or payment of dividends or similar distributions by such subsidiary of its Net Income is not at the date of determination permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such subsidiary or its equityholders, unless such restrictions with respect to the payment of dividends or similar distributions have been legally waived; provided that the Consolidated Net Income of such person shall be increased by the amount of dividends or other distributions or other payments actually paid in cash (or converted into cash) by any such subsidiary to such person or a subsidiary of such person (subject to the provisions of this clause (g)), to the extent not already included therein;

(h) any impairment charge or asset write-off and amortization of intangibles, in each case pursuant to Applicable Accounting Principles, shall be excluded; provided that in no event shall amortization of intangibles so excluded in any period of four consecutive fiscal quarters exceed the greater of $20.0 million and 10% of Consolidated Net Income for such period (before giving effect to such exclusion);

7

(i) any gain or loss relating to a plan, plans or accruals or payments of any plans, or grants or sales of stock, stock appreciation or similar rights, stock options, restricted stock, preferred stock or other rights shall be excluded;

(j) any (i) non-cash compensation charges, (ii) costs and expenses after the Closing Date related to employment of terminated employees, or (iii) costs or expenses realized in connection with or resulting from stock appreciation or similar rights, stock options or other rights existing on the Closing Date of officers, directors and employees, in each case of such person or any of its subsidiaries, shall be excluded;

(k) accruals and reserves that are established or adjusted within 12 months after the Closing Date (excluding any such accruals or reserves to the extent that they represent an accrual of or reserve for cash expenses in any future period or amortization of a prepaid cash expense that was paid in a prior period) and that are so required to be established or adjusted in accordance with Applicable Accounting Principles or as a result of adoption or modification of accounting policies shall be excluded;

(l) the Net Income of any person and its Subsidiaries shall be calculated by deducting the income attributable to, or adding the losses attributable to, the minority equity interests of third parties in any non-Wholly Owned Subsidiary;

(m) any unrealized gains and losses related to currency remeasurements of Indebtedness, and any unrealized net loss or gain resulting from hedging transactions for interest rates, commodities or currency exchange risk, shall be excluded;

(n) to the extent covered by insurance and actually reimbursed, or, so long as such person has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (i) not denied by the applicable carrier in writing within 180 days and (ii) in fact reimbursed within 365 days of the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within 365 days), expenses with respect to liability or casualty events or business interruption shall be excluded; and

(o) non-cash charges for deferred tax asset valuation allowances shall be excluded (except to the extent reversing a previously recognized increase to Consolidated Net Income).

Consolidated Net Income presented in a currency other than Dollars will be converted to Dollars based on the average exchange rate for such currency during, and applied to, each fiscal quarter in the period for which Consolidated Net Income is being calculated.

"Consolidated Secured Net Debt" shall mean, as of any date of determination, (i) Consolidated Debt to the extent secured by Liens on all or any portion of the assets of the Parent or its Subsidiaries on such date (including, for the avoidance of doubt, Qualified Receivables Facility) less (ii) the Unrestricted Cash of the Parent and its Subsidiaries on such date.

8

Case 20-12522-JTD   Doc 2159-6   Filed 04/30/21   Page 88 of 472

Notwithstanding anything to the contrary in the above clause (i), such Indebtedness incurred pursuant to any Incremental Loan) or pursuant to Sections 6.01(b) and (v), and any Permitted Refinancing Indebtedness or Refinancing Notes (or successive Permitted Refinancing Indebtedness or Refinancing Notes) incurred under Sections 6.01(b) or (v) (whether or not secured) shall be included as if secured by Liens as a component of Consolidated Debt pursuant to clause (i) of the immediately preceding sentence; provided that any such Permitted Refinancing Indebtedness (x) if unsecured, shall not constitute a component of Consolidated Debt if, when incurred, such Indebtedness is independently permitted to be incurred under Section 6.01(p) (or is subsequently reclassified as outstanding thereunder) and (y) if secured by the Collateral on a junior lien basis, shall cease to constitute a component of Consolidated Secured Net Debt for purposes of the First Lien Secured Net Leverage Ratio only, if, when incurred, such Indebtedness is independently permitted to be incurred under Section 6.01(p), and permitted to be secured under Section 6.02(ff) (or is subsequently permitted to be outstanding and secured under said Sections).

"Consolidated Total Assets" shall mean, as of any date of determination, the total assets of the Parent and the Subsidiaries, determined on a consolidated basis in accordance with Applicable Accounting Principles, as set forth on the consolidated balance sheet of the Parent as of the last day of the Test Period ending immediately prior to such date for which financial statements of the Parent have been delivered (or were required to be delivered) pursuant to Section [__], [__] or [__],[3] as applicable. Consolidated Total Assets shall be determined on a Pro Forma Basis.

"Consolidated Total Net Debt" shall mean, as of any date of determination, (i) Consolidated Debt on such date less (ii) the Unrestricted Cash of the Parent and its Subsidiaries on such date.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Cumulative Parent Qualified Equity Proceeds Amount" shall mean, at any time of determination, an amount equal to, without duplication:

(a) 100% of the aggregate net proceeds (determined in a manner consistent with the definition of "Net Proceeds"), including cash and the Fair Market Value of tangible assets other than cash, received by the Parent after the Closing Date from the issue or sale of its Qualified Equity Interests, including Qualified Equity Interests of the Parent issued upon conversion of Indebtedness or Disqualified Stock to the extent the Parent or its Wholly Owned Subsidiaries had received the Net Proceeds of such Indebtedness or Disqualified Stock; plus

---

[3]   Section references to be to (i) condition for delivery of pre-closing financial statements, (ii) annual financial statements reporting covenant and (iii) quarterly financial statements reporting covenant.

A-0801

(b) 100% of the aggregate amount of distributions, dividends or other payments paid by the Parent to its shareholders received in cash and the Fair Market Value of tangible assets other than cash after the Closing Date; plus

(c) 100% of the aggregate amount received by the Parent or its Wholly Owned Subsidiaries in cash and the Fair Market Value of assets (other than cash) received by the Parent or its Wholly Owned Subsidiaries after the Closing Date from (without duplication of amounts, and without including the items described below to the extent same are already included in Excess Cash Flow):

(i) the sale or other disposition (other than to the Parent or any Subsidiary) of any Investment made by the Parent and its Subsidiaries and repurchases and redemptions of such Investment from the Parent and its Subsidiaries by any person (other than the Parent and its Subsidiaries) to the extent that (x) such Investment was justified as using a portion of the Available Amount pursuant to clause (Y) of Section 6.04(j) (and such Investment has not subsequently been reclassified as outstanding pursuant to another sub-clause or sub-section of Section 6.04) and (y) the Net Proceeds thereof are not required to be applied pursuant to Section [__][4];

(ii) the sale (other than to the Parent or a Subsidiary) of the Equity Interests of an Unrestricted Subsidiary to the extent that (x) the designation of such Unrestricted Subsidiary was justified as using a portion of the Available Amount pursuant to clause (Y) of Section 6.04(j) (and such Investment has not subsequently been reclassified as outstanding pursuant to another sub-clause or sub-section of Section 6.04) and (y) the Net Proceeds thereof are not required to be applied pursuant to Section [__][5]; or

(iii) to the extent not included in the calculation of Consolidated Net Income for the relevant period, a distribution, dividend or other payment from an Unrestricted Subsidiary to the extent relating to any portion of the Investment therein made pursuant to sub-clause (Y) of Section 6.04(j) (and which has not been subsequently reclassified as outstanding pursuant to another sub-clause or sub-section of said Section 6.04); minus

(d) .the cumulative amount of Restricted Payments made with the Cumulative Parent Qualified Equity Proceeds Amount from and after the Closing Date and on or prior to such time.

"Cumulative Retained Excess Cash Flow Amount" shall mean, at any date, an amount (which shall not be less than zero in the aggregate) determined on a cumulative basis equal to

---

[4]    Section reference to be to asset sale mandatory prepayment.

[5]    Section reference to be to asset sale mandatory prepayment.

10

A-0802

(a) the Retained Percentage of Excess Cash Flow for each Excess Cash Flow Period beginning after the Closing Date and ended prior to such date, <u>plus</u>

(b) for any Excess Cash Flow Interim Period occurring during the Excess Cash Flow Period containing the Closing Date, ending prior to such date and beginning with the first full fiscal quarter after the Closing Date, an amount equal to the Retained Percentage of Excess Cash Flow for such Excess Cash Flow Interim Period, <u>plus</u>

(c) for any Excess Cash Flow Interim Period ended prior to such date but as to which the corresponding Excess Cash Flow Period has not ended, an amount equal to the Retained Percentage of Excess Cash Flow for such Excess Cash Flow Interim Period, <u>minus</u>

(d) the cumulative amount of all Retained Excess Cash Flow Overfundings as of such date.

"<u>Current Assets</u>" shall mean, with respect to the Parent and the Subsidiaries on a consolidated basis at any date of determination, the sum of (a) all assets (other than cash and Permitted Investments or other cash equivalents) that would, in accordance with Applicable Accounting Principles, be classified on a consolidated balance sheet of the Parent and the Subsidiaries as current assets at such date of determination, other than amounts related to current or deferred Taxes based on income or profits, and (b) in the event that a Qualified Receivables Facility is accounted for off balance sheet, (x) gross accounts receivable comprising part of the Permitted Receivables Facility Assets subject to such Qualified Receivables Facility less (y) collections against the amounts sold pursuant to clause (x).

"<u>Current Liabilities</u>" shall mean, with respect to the Parent and the Subsidiaries on a consolidated basis at any date of determination, all liabilities that would, in accordance with Applicable Accounting Principles, be classified on a consolidated balance sheet of the Parent and the Subsidiaries as current liabilities at such date of determination, other than (a) the current portion of any Indebtedness, (b) accruals of Interest Expense (excluding Interest Expense that is due and unpaid), (c) accruals for current or deferred Taxes based on income or profits, (d) accruals, if any, of transaction costs resulting from the Transactions, (e) accruals of any costs or expenses related to (i) severance or termination of employees prior to the Closing Date or (ii) bonuses, pension and other post-retirement benefit obligations, and (f) accruals for exclusions from Consolidated Net Income included in clause (a) of the definition of such term.

"<u>Debt Service</u>" shall mean, with respect to the Parent and the Subsidiaries on a consolidated basis for any period, Cash Interest Expense for such period, plus scheduled principal amortization of Consolidated Debt for such period.

"<u>Designated Non-Cash Consideration</u>" shall mean the Fair Market Value of non-cash consideration received by the Parent, the Lux Borrower or one of the Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer of a Borrower, setting forth such valuation, less the amount of cash or cash equivalents received in connection with a subsequent disposition of such Designated Non-Cash Consideration.

11

Disclosed 20-cv-12522 night D with respect to 4159-6 and excluded 04/30/21 of the Page-91 rrops of 2 ch person who
does not have any material direct or indirect financial interest in or with respect to such transaction.

"Dispose" or "Disposed of" shall mean to convey, sell, lease, sell and leaseback, assign, farm-out, transfer or otherwise dispose of any property, business or asset. The term "Disposition" shall have a correlative meaning to the foregoing.

"Disqualified Stock" shall mean, with respect to any person, any Equity Interests of such person that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled, mandatory payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Stock, in the case of each of the foregoing clauses (a), (b), (c) and (d), prior to the date that is ninety-one (91) days after the Latest Maturity Date in effect at the time of issuance thereof and except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Loan Obligations that are accrued and payable (provided, that only the portion of the Equity Interests that so mature or are mandatorily redeemable, are so convertible or exchangeable or are so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock). Notwithstanding the foregoing: (i) any Equity Interests issued to any employee or to any plan for the benefit of employees of the Parent or the Subsidiaries or by any such plan to such employees shall not constitute Disqualified Stock solely because they may be required to be repurchased by the Parent in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability and (ii) any class of Equity Interests of such person that by its terms authorizes such person to satisfy its obligations thereunder by delivery of Equity Interests that are not Disqualified Stock shall not be deemed to be Disqualified Stock.

"DOJ Settlement" shall mean [_____].[6]

"Divided LLC" means any Delaware LLC which has been formed as a consequence of a Division (excluding any dividing Delaware LLC that survives a Division).

"Division" means the statutory division of any Delaware LLC into two or more Delaware LLCs pursuant to Section 18-217 of the Delaware Limited Liability Company Act.

"Domestic Subsidiary" shall mean any Subsidiary that is not a Foreign Subsidiary.

---

[6]   To be defined to mean the settlement with the DOJ regarding Acthar as implemented by any plan of reorganization, subject to the consent rights of the Supporting Term Lenders under the RSA.

A-0804

Case 1:21-cv-01093-LPS   Document 30   Filed 12/13/21   Page 239 of 426 PageID #: 2373

participations or other equivalents of or interests in (however designated) equity or ownership of such person, including any preferred stock (including any preferred equity certificates (and any other similar instruments)), any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing.

"Excess Cash Flow" shall mean, with respect to the Parent and the Subsidiaries on a consolidated basis for any Applicable Period, Adjusted Consolidated EBITDA of the Parent and the Subsidiaries on a consolidated basis for such Applicable Period, minus, without duplication,

(a) Debt Service for such Applicable Period, reduced by the aggregate principal amount of voluntary prepayments of Consolidated Debt (other than prepayments of the Loans) that would otherwise have constituted scheduled principal amortization during such Applicable Period;

(b) the amount of any voluntary prepayment permitted hereunder of term Indebtedness (other than any Term Loans) during such Applicable Period, in each case to the extent not financed, or intended to be financed, using the proceeds of, without duplication, the incurrence of Indebtedness, the sale or issuance of any Equity Interests, any component of Available Amount (in the case of Cumulative Retained Excess Cash Flow Amount, only to the extent attributable to a time prior to such Applicable Period) or any Net Proceeds not otherwise required to prepay the Loans pursuant to the prepayment provisions of this Agreement or the definition of the term "Net Proceeds", in each case, to the extent that the amount of such prepayment is not already reflected in Debt Service;

(c) (i) Capital Expenditures by the Parent and the Subsidiaries on a consolidated basis during such Applicable Period that are paid in cash and (ii) the aggregate consideration paid in cash during such Applicable Period in respect of Permitted Business Acquisitions and other Investments (excluding intercompany loans and transfers of funds) permitted hereunder, in each case, to the extent not financed with the proceeds of, without duplication, the incurrence of Indebtedness, the sale or issuance of any Equity Interests, any component of Available Amount (in the case of Cumulative Retained Excess Cash Flow Amount, only to the extent attributable to a time prior to such Applicable Period) or any Net Proceeds not otherwise required to prepay the Loans pursuant to the prepayment provisions of this Agreement or the definition of the term "Net Proceeds" (less any amounts received in respect thereof as a return of capital);

(d) Capital Expenditures that the Parent or any Subsidiary shall, during such Applicable Period, become obligated to make but that are not made during such Applicable Period (but are expected to be made in the next Applicable Period); provided that any amount so deducted that will be paid after the close of such Applicable Period shall not be deducted again in a subsequent Applicable Period; provided further that if any such Capital Expenditures so deducted are either (A) not so made in the following Applicable Period or (B) made in the following Applicable Period with the proceeds of, without duplication, the incurrence of Indebtedness, the sale or issuance of any Equity Interests, any component of Available Amount (in the case of Cumulative Retained Excess Cash Flow Amount, only to the extent attributable to a time prior to such Applicable Period) or any Net Proceeds not otherwise required to prepay the Loans pursuant to the prepayment provisions of this Agreement or the definition of the term "Net Proceeds", the amount of such Capital Expenditures not so made or so financed shall be added to the calculation of Excess Cash Flow in such following Applicable Period as set forth in clause (iv) below;

13

A-0805

(e) tax expense included in the determination of Consolidated Net Income for such Applicable Period that will be paid within six months after the close of such Applicable Period and for which reserves have been established, including income tax expense and withholding tax expense incurred in connection with cross-border transactions involving the Foreign Subsidiaries; <u>provided</u> that any amount so deducted that will be paid after the close of such Applicable Period shall not be deducted again in a subsequent Applicable Period;

(f) an amount equal to any increase in Working Capital of the Parent and the Subsidiaries for such Applicable Period;

(g) cash expenditures made in respect of Hedging Agreements during such Applicable Period, to the extent not reflected in the computation of Adjusted Consolidated EBITDA or Cash Interest Expense;

(h) permitted dividends or distributions or repurchases of its Equity Interests paid in cash by the Parent to its shareholders during such Applicable Period and permitted dividends paid by any Subsidiary to any person other than the Parent or any of the Subsidiaries during such Applicable Period, in each case in accordance with Section 6.06(b) (except to the extent such payment is made with amounts described in clauses (x) and (y) of the parenthetical contained in the proviso thereto), (f) and/or (h) (other than Restricted Payments made with Equity Interests (other than Disqualified Stock) of the Parent or with proceeds of Indebtedness or using any component of the Available Amount);

(i) without duplication of any exclusions to the calculation of Consolidated Net Income or Adjusted Consolidated EBITDA, amounts paid in cash during such Applicable Period on account of (A) items that were accounted for as noncash reductions in determining Adjusted Consolidated EBITDA of the Parent and the Subsidiaries in a prior Applicable Period and (B) reserves or accruals established in purchase accounting;

(j) to the extent not deducted in the computation of Net Proceeds in respect of any asset disposition or condemnation giving rise thereto, the amount of any prepayment of Indebtedness (other than Indebtedness created hereunder or under any other Loan Document), together with any interest, premium or penalties required to be paid (and actually paid) in connection therewith to the extent that the income or gain realized from the transaction giving rise to such Net Proceeds exceeds the aggregate amount of all such prepayments and Capital Expenditures made with such Net Proceeds;

(k) the amount related to items of income that were added to or items of expense not deducted from Net Income in calculating Consolidated Net Income or were added to or not deducted from Consolidated Net Income in calculating Adjusted Consolidated EBITDA to the extent either (x) such items of expense represented a cash payment (which

14

had not reduced such items of accrual income or Applicable Period accruals and (x) the Parent and the Subsidiaries or (y) such items of income did not represent cash received by the Parent and the Subsidiaries, in each case on a consolidated basis during such Applicable Period;

(l) all cash payments made in connection with, or relating to, the Transactions; provided that, if the Closing Date occurs after December [__], 2021, a Borrower may elect to cause all or any portion of such cash payments made on the Closing Date to be deemed to have been made in the Excess Cash Flow Period ending December [__], 2021,

plus, without duplication,

(i) an amount equal to any decrease in Working Capital of the Parent and the Subsidiaries for such Applicable Period;

(ii) all proceeds received during such Applicable Period of Capitalized Lease Obligations, purchase money Indebtedness, Sale and Lease-Back Transactions permitted under this Agreement and any other Indebtedness, in each case to the extent used to finance any Capital Expenditure (other than Indebtedness under this Agreement) to the extent there is a corresponding deduction to Excess Cash Flow above in respect of the use of such Borrowings;

(iii) all amounts referred to in clause (c) or (d) above to the extent funded with, without duplication, (x) the proceeds of the sale or issuance of Equity Interests of, or capital contributions to, the Parent after the Closing Date, (y) any amount that would have constituted Net Proceeds under clause (a) of the definition of the term "Net Proceeds" if not so spent or (z) any component of Available Amount (which, in the case of Cumulative Retained Excess Cash Flow Amount, only to the extent attributable to a time prior to such Applicable Period), in each case solely to the extent there is a corresponding deduction from Excess Cash Flow above;

(iv) to the extent any permitted Capital Expenditures referred to in clause (d) above and the delivery of the related equipment do not occur in the following Applicable Period, the amount of such Capital Expenditures that were not so made in such following Applicable Period;

(v) to the extent any Taxes deducted pursuant to in clause (e) above are not paid in such Applicable Period or in the six months after the close of such Applicable Period, the amount of such Taxes that were not so paid in such Applicable Period or in the six months after the close of such Applicable Period;

(vi) cash payments received in respect of Hedging Agreements during such Applicable Period to the extent (x) not included in the computation of Adjusted Consolidated EBITDA or (y) such payments do not reduce Cash Interest Expense;

(vii) any extraordinary or nonrecurring gain realized in cash during such Applicable Period, except to the extent such gain consists of Net Proceeds subject to the prepayment provisions of this Agreement;

15

A-0807

(viii) to the extent included, the computation of Consolidated Net Income to interest expense and

(ix) the amount related to items of expense that were deducted from or items of income not added to Net Income in connection with calculating Consolidated Net Income or were deducted from or not added to Consolidated Net Income in calculating Adjusted Consolidated EBITDA to the extent either (x) such items of income represented cash received by the Parent or any Subsidiary (which had not increased Excess Cash Flow upon the accrual thereof in a prior Applicable Period) or (y) such items of expense do not represent cash paid by the Parent or any Subsidiary, in each case on a consolidated basis during such Applicable Period.

Notwithstanding anything to the contrary set forth in this definition, no effect shall be given, for purposes of calculating Excess Cash Flow, to any non-cash balance sheet impact arising from any refunds pursuant to the CARES Act.

"Excess Cash Flow Interim Period" shall mean, during any Excess Cash Flow Period, any one, two, or three-quarter period (a) commencing at the end of the immediately preceding Excess Cash Flow Period (or, if during the first Excess Cash Flow Period, the fiscal year ended December 25, 2020[7]) and (b) ending on the last day of the most recently ended fiscal quarter (other than the last day of the fiscal year) during such Excess Cash Flow Period for which financial statements are available.

"Excess Cash Flow Period" shall mean each fiscal year of the Parent, commencing with the fiscal year of the Parent ending December [__], 2021.[8]

"Excluded Indebtedness" shall mean all Indebtedness not incurred in violation of Section 6.01.

"Excluded Swap Obligation" shall mean, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation, unless otherwise agreed between the Administrative Agent and a Borrower. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

---

[7]   To be the last day of the 2021 fiscal year if the Closing Date occurs after delivery of annual financials for the 2021 fiscal year.

[8]   To be the 2022 fiscal year if the Closing Date occurs after delivery of annual financials for the 2021 fiscal year.

16

Case 1:20-12522-djh   Doc 2159-6   Filed 04/30/21   Page 96 of 172

"Existing Second Lien Senior Secured Notes" shall mean (i) the $[____] in aggregate principal amount of 10.032% Second Lien Senior Secured Notes, (ii) the $322,868,000 in aggregate principal amount of 10.000% Second Lien Senior Secured Notes due 2025 issued pursuant to the Existing Second Lien Notes Indenture and (iii) the $375,000,000 in aggregate principal amount of 10.000% Second Lien Senior Secured Notes due 202[8][9] issued pursuant to the Existing Takeback Notes Indenture.

"Existing First Lien Notes" shall mean the 10.000% First Lien Senior Secured Notes due 2025 issued pursuant to the Existing First Lien Notes Indenture.

"Existing First Lien Notes Indenture" shall mean the Indenture, dated as of April 7, 2020, among the Lux Borrower and the Co-Borrower, as issuers, the guarantors party thereto from time to time, Deutsche Bank AG New York Branch, as first lien collateral agent, and Wilmington Savings Fund Society, FSB, as first lien trustee, as amended, modified or supplemented from time to time.

"Existing Second Lien Notes Indenture" shall mean the Indenture, dated as of December 6, 2019, among the Lux Borrower and the Co-Borrower, as issuers, the guarantors party thereto from time to time and Wilmington Savings Fund Society, FSB, as second lien collateral agent and second lien trustee, as amended, modified or supplemented from time to time.

"Existing Secured Indentures" shall mean (i) the Existing First Lien Notes Indenture, (ii) the Existing Second Lien Notes Indenture and (iii) the Existing Takeback Notes Indenture.

"Existing Takeback Notes Indenture" shall mean the Indenture, dated as of the Closing Date, among the Lux Borrower and the Co-Borrower, as issuers, the guarantors party thereto from time to time, [_____], as second lien collateral agent, and [_____], as second lien trustee, as amended, modified or supplemented from time to time.

"Fair Market Value" shall mean, with respect to any asset or property, the price that could be negotiated in an arms'-length transaction between a willing seller and a willing buyer, neither of whom is under undue pressure or compulsion to complete the transaction (as determined in good faith by a Borrower).

"Financial Officer" of any person shall mean the Chief Financial Officer, principal accounting officer, Treasurer, Assistant Treasurer, Controller or any Director or other executive responsible for the financial affairs of such person.

"First Lien Secured Net Leverage Ratio" shall mean, as of any date of determination, the ratio of (a) the remainder of (x) Consolidated Secured Net Debt as of such date minus (y) amounts included in clause (i) of the definition of Consolidated Secured Net Debt (and not described in the last sentence of the definition of Consolidated Secured Net Debt, unless excluded by the proviso thereto) which are secured only by Liens on the Collateral securing the Obligations on a junior and subordinated (as to liens and related rights and remedies only) basis

---

9    To be seven years after the Closing Date.

17

A-0809

and which are subject to a prepayment agent's lien and entered into collateral solely in respect of the obligations which is in form and substance reasonably satisfactory to the Administrative Agent, to (b) Adjusted Consolidated EBITDA for the most recently ended Test Period for which financial statements of the Parent have been delivered as required by this Agreement, all determined on a consolidated basis in accordance with Applicable Accounting Principles; <u>provided</u> that Adjusted Consolidated EBITDA shall be determined for the relevant Test Period on a Pro Forma Basis. All Indebtedness described in the last sentence of the definition of Consolidated Secured Net Debt (and not excluded by the proviso thereto) shall also be deemed to constitute Indebtedness included pursuant to preceding clause (a)(x) and which is not deducted pursuant to preceding clause (a)(y).

"<u>Fitch</u>" means Fitch Inc. or any successor to the rating agency business thereof.

"<u>Fixed Charge Coverage Ratio</u>" shall mean, as of any date of determination, the ratio of (a) Adjusted Consolidated EBITDA for the most recently ended Test Period for which financial statements of the Parent have been (or were required to be) delivered as required by Section [__], [__] or [__][10] to (b) the Fixed Charges for such Test Period; <u>provided</u> that the Fixed Charge Coverage Ratio shall be determined for the relevant Test Period on a Pro Forma Basis.

"<u>Fixed Charges</u>" shall mean, with respect to Parent for any period, the sum, without duplication, of:

(a) Interest Expense (excluding amortization or write-off of deferred financing costs) of the Parent and its Subsidiaries for such period, and

(b) all cash dividend payments (excluding items eliminated in consolidation) on any series of preferred stock or Disqualified Stock of the Parent and its Subsidiaries.

"<u>Foreign Subsidiary</u>" shall mean any Subsidiary that is incorporated or organized under the laws of any jurisdiction other than the United States of America, any state thereof or the District of Columbia.

"<u>GAAP</u>" shall mean generally accepted accounting principles in effect from time to time in the United States of America, applied on a consistent basis, subject to the provisions of Section [__].[11]

"<u>Governmental Authority</u>" shall mean any federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory or legislative body.

"<u>Guarantee</u>" of or by any person (the "<u>guarantor</u>") shall mean (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another

---

[10]    Section references to be to (i) condition for delivery of pre-closing financial statements, (ii) annual financial statements reporting covenant and (iii) quarterly financial statements reporting covenant.

[11]    Section reference to be to general interpretive provision regarding accounting terms. For the avoidance of doubt, interpretive provisions to exclude from Capitalized Lease Obligations any leases that would not have been required to be so included prior to implementation of recent accounting changes.

A-0810

Case 20-12522-JTD   Doc 2159-6   Filed 04/30/21   Page 98 of 372

person (the "primary obligor") in any manner, whether directly or indirectly, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of the guarantor securing any Indebtedness or other obligation (or any existing right, contingent or otherwise, of the holder of Indebtedness or other obligation to be secured by such a Lien) of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor (other than Liens on Equity Interests of Unrestricted Subsidiaries securing Indebtedness of such Unrestricted Subsidiaries); provided, however, that the term "Guarantee" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted by this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such person in good faith. The amount of the Indebtedness subject to any Guarantee provided by any person for purposes of clause (b) above shall (unless the applicable Indebtedness has been assumed by such person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the Fair Market Value of the property encumbered thereby.

"Guarantors" shall mean each of the Loan Parties.

"Hedge Bank" shall mean any person that is (or an Affiliate thereof that is) an Agent, an Arranger or a Lender on the Closing Date (or any person that becomes an Agent, Arranger or Lender or Affiliate thereof after the Closing Date) and that enters into a Hedging Agreement, in each case, in its capacity as a party to such Hedging Agreement.

"Hedging Agreement" shall mean any agreement with respect to any swap, forward, future or derivative transaction, or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value, or credit spread transaction, repurchase transaction, reserve repurchase transaction, securities lending transaction, weather index transaction, spot contracts, fixed price physical delivery contracts, or any similar transaction or any combination of these transactions, in each case of the foregoing, whether or not exchange traded; provided, that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Parent, the Lux Borrower or any of the Subsidiaries shall be a Hedging Agreement.

A-0811

Case 21-12522-JKS   Doc 2159-6   Filed 04/30/21   Page 99 of 172

Increases in the value of, unless such increase is a result of any declaration of a dividend on, any accrual of interest, the accretion of accreted value, the amortization of original issue discount, the payment of interest in the form of additional Indebtedness or in the form of common stock of the Parent, the accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies.

"Incremental Amount" shall mean, at any time, the greater of:

(a) the excess (if any) of (i) $[_____][12] over (ii) the sum (without duplication) of the aggregate principal amount of all Term Loans, Existing First Lien Notes, Revolver Replacement Term Loans and all other Indebtedness incurred pursuant to Section 6.01(v), in each case outstanding at such time; and

(b) the amount such that, immediately after giving effect to the establishment of the commitments in respect thereof utilizing this clause (b) and the use of proceeds of the loans thereunder, the First Lien Secured Net Leverage Ratio on a Pro Forma Basis is not greater than (x) so long as Qualified Ratings apply, 2.75 to 1.00 or (y) otherwise, 2.25 to 1.00; provided that, for purposes of this clause (b) net cash proceeds of Incremental Loans incurred at such time shall not be netted against the applicable amount of Consolidated Debt for purposes of such calculation of the First Lien Secured Net Leverage Ratio.[13]

"Indebtedness" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments (except any such obligation issued in the ordinary course of business with a maturity date of no more than six months in a transaction intended to extend payment terms of trade payables or similar obligations to trade creditors incurred in the ordinary course of business), (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person (except any such obligation that constitutes a trade payable or similar obligation to a trade creditor incurred in the ordinary course of business), (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (except any such balance that (i) constitutes a trade payable or similar obligation to a trade creditor incurred in the ordinary course of business, (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such person in accordance with Applicable Accounting Principles and (iii) liabilities accrued in the ordinary course of business) which purchase price is due more than six months after the date of placing the property in service or taking delivery and title thereto, (e) all Guarantees by such person of Indebtedness of others, (f) all Capitalized Lease Obligations of such person, (g) obligations under any Hedging Agreements, to the extent the foregoing would appear on a balance sheet of such person as a liability, (h) the principal component of all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit, (i) the principal component of all obligations of such person in respect of bankers' acceptances, (j) the amount of all obligations of such person with respect to the redemption, repayment or other repurchase of (x) any Disqualified

---

[12]   To be the sum of the following (as of immediately prior to consummation of a plan of reorganization and pro forma for the 2020 Excess Cash Flow paydown): (i) existing TL principal amount, (ii) existing RCF principal amount, (iii) Existing First Lien Notes principal amount and (iv) $150,000,000.

[13]   Consistent with Section 6.01(v), incremental term loan provision shall not contain an MFN provision.

Case 20-12522-JTD   Doc 2159-6   Filed 04/30/21   Page 100 of 172

Stock (excluding Qualified Stock and increase in the carrying value of preferred Stock of any Subsidiary of Parent, (k) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such person (other than Liens on Equity Interests of Unrestricted Subsidiaries securing Indebtedness of such Unrestricted Subsidiaries), whether or not the Indebtedness secured thereby has been assumed and (l) all Attributable Receivables Indebtedness in respect of any Qualified Receivables Facility. The amount of Indebtedness of any person for purposes of clause (k) above shall (unless such Indebtedness has been assumed by such person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the Fair Market Value of the property encumbered thereby. Notwithstanding anything in this Agreement to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of International Accounting Standards No. 39 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness and any such amounts that would have constituted Indebtedness under this Agreement but for the application of this sentence shall not be deemed an incurrence of Indebtedness under this Agreement. For the avoidance of doubt, Indebtedness shall not include any obligations pursuant to (i) the Opioid Settlement or (ii) the DOJ Settlement.

"Intellectual Property" shall mean the following intellectual property rights, both statutory and common law rights, if applicable: (a) copyrights, registrations and applications for registration thereof, (b) trademarks, service marks, trade names, slogans, domain names, logos, trade dress and registrations and applications of registrations thereof, (c) patents, as well as any reissued and reexamined patents and extensions corresponding to the patents and any patent applications, as well as any related continuation, continuation in part and divisional applications and patents issuing therefrom and (d) trade secrets and confidential information, including ideas, designs, concepts, compilations of information, methods, techniques, procedures, processes and other know-how, whether or not patentable.

"Interest Expense" shall mean, with respect to any person for any period, the sum of, without duplication, (a) gross interest expense of such person for such period on a consolidated basis, including (i) the amortization of debt discounts, (ii) the amortization of all fees (including fees with respect to Hedging Agreements) payable in connection with the incurrence of Indebtedness to the extent included in interest expense, (iii) the portion of any payments or accruals with respect to Capitalized Lease Obligations allocable to interest expense and (iv) net payments and receipts (if any) pursuant to interest rate hedging obligations, and excluding unrealized mark-to-market gains and losses attributable to such hedging obligations, amortization of deferred financing fees and expensing of any bridge or other financing fees, (b) capitalized interest of such person, whether paid or accrued, and (c) commissions, discounts, yield and other fees and charges incurred for such period, including any losses on sales of receivables and related assets, in connection with any receivables financing of such person or any of its Subsidiaries that are payable to persons other than the Parent and the Subsidiaries.

"Junior Liens" shall mean Liens on the Collateral that are junior to the Liens thereon securing the Initial Term Loans (and other Loan Obligations, other than Other Incremental Term Loans and Refinancing Term Loans that rank junior in right of security with the Initial Term

21

Case 20-12522-JTD   Doc 2159   Filed 04/30/21   Page 101 of 172

Loans) pursuant to a Security Agreement or Pledge Agreement, as the case may be, to rank equally and ratably with other Junior Liens, and that Indebtedness secured by Junior Liens may be secured by Liens that are senior in priority to, or rank equally and ratably with, or junior in priority to, other Liens constituting Junior Liens), which Permitted Junior Intercreditor Agreement (together with such amendments to the Security Documents and any other Intercreditor Agreements, if any, as are reasonably necessary or advisable (and reasonably acceptable to the Collateral Agent) to give effect to such Liens) shall be entered into in connection with a permitted incurrence of any such Liens (unless a Permitted Junior Intercreditor Agreement and/or Security Documents (as applicable) covering such Liens are already in effect).

"Latest Maturity Date" shall mean, at any date of determination, the latest Term Facility Maturity Date, in each case then in effect on such date of determination.

"Lien" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, charge, security interest or similar monetary encumbrance in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; provided, that in no event shall an operating lease or an agreement to sell be deemed to constitute a Lien.

"Loan Obligations" shall mean (a) the due and punctual payment by the Borrowers of (i) the unpaid principal of and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans made to the Borrowers under this Agreement, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) each payment required to be made by the Borrowers under this Agreement in respect of any Letter of Credit, when and as due, including payments in respect of reimbursement of disbursements, interest thereon (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) and obligations to provide Cash Collateral and (iii) all other monetary obligations of the Parent and the Borrowers owed under or pursuant to this Agreement and each other Loan Document, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), and (b) the due and punctual payment of all obligations of each other Loan Party under or pursuant to each of the Loan Documents.

"Loan Parties" shall mean the Parent, the Borrowers and the Subsidiary Loan Parties.

"Loans" shall mean the Term Loans.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Material Indebtedness" shall mean Indebtedness (other than Loans and Letters of Credit) of any one or more of the Parent or any Subsidiary in an aggregate principal amount exceeding $75,000,000; provided that in no event shall any Qualified Receivables Facility be considered Material Indebtedness.

22

Case 2:20-cv-02522-v   Shall mean   Document 159-6   Property   Filed 04/30/21   Party   Page 102   Of   7 corganization of the

business of Parent and its Subsidiaries, taken as a whole.

"Material Subsidiary" shall mean any Subsidiary, other than any Subsidiary that (a) did not, as of the last day of the fiscal quarter of the Parent most recently ended for which financial statements have been (or were required to be) delivered pursuant to Section [__], [__] or [__],[14] have assets with a value in excess of 5.0% of the Consolidated Total Assets or revenues representing in excess of 5.0% of total revenues of the Parent and the Subsidiaries on a consolidated basis as of such date, and (b) taken together with all such Subsidiaries as of such date, did not have assets with a value in excess of 10% of Consolidated Total Assets or revenues representing in excess of 10% of total revenues of the Parent and the Subsidiaries on a consolidated basis as of such date.

"Milestone Payments" shall mean payments under intellectual property licensing agreements based on the achievement of specified revenue, profit or other performance targets (financial or otherwise).

"Moody's" shall mean Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"Net Income" shall mean, with respect to any person, the net income (loss) of such person, determined in accordance with Applicable Accounting Principles and before any reduction in respect of preferred stock dividends.

"Net Proceeds" shall mean:

(a) 100% of the cash proceeds actually received by the Parent or any Subsidiary (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) from any Asset Sale under Section 6.05(d) (except for any Sale and Lease-Back Transaction described in clause (a) of the proviso to Section 6.03) or Section 6.05(g), net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith, (ii) required payments of Indebtedness (other than Indebtedness incurred under the Loan Documents or Other First Lien Debt) and required payments of other obligations relating to the applicable asset to the extent such Indebtedness or obligations are secured by a Lien permitted hereunder (other than pursuant to the Loan Documents and other than by a Junior Lien), (iii) repayments of Other First Lien Debt (limited to its proportionate share of such

---

14   Section references to be to (i) condition for delivery of pre-closing financial statements, (ii) annual financial statements reporting covenant and (iii) quarterly financial statements reporting covenant.

23

prepayment (at par) rather than outstanding percentage previously scheduled prior to the extent, after the Loan Documents (other than Other Incremental Term Loans and Refinancing Term Loans that rank junior in right of security with the Initial Term Loans) and Other First Lien Debt, (iv) Taxes paid or payable (in the good faith determination of a Borrower) as a direct result thereof, and (v) the amount of any reasonable reserve established in accordance with Applicable Accounting Principles against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) or (iv) above) (x) related to any of the applicable assets and (y) retained by the Parent or any of the Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (<u>provided</u> that (1) the amount of any reduction of such reserve (other than in connection with a payment in respect of any such liability), prior to the date occurring 18 months after the date of the respective Asset Sale, shall be deemed to be cash proceeds of such Asset Sale occurring on the date of such reduction) and (2) the amount of any such reserve that is maintained as at the date occurring 18 months after the date of the applicable Asset Sale shall be deemed to be Net Proceeds from such Asset Sale as of such date; <u>provided</u>, that, if the Parent or the Lux Borrower shall deliver a certificate of a Responsible Officer of the Parent or the Lux Borrower to the Administrative Agent promptly following receipt of any such proceeds setting forth the Parent's or the Lux Borrower's intention to use any portion of such proceeds, within 12 months of such receipt, to acquire, maintain, develop, construct, improve, upgrade or repair assets useful in the business of the Parent and the Subsidiaries or to make Permitted Business Acquisitions and other Investments permitted hereunder (excluding Permitted Investments or, intercompany Investments in Subsidiaries or Unrestricted Subsidiaries) or to reimburse the cost of any of the foregoing incurred on or after the date on which the Asset Sale giving rise to such proceeds was contractually committed (other than inventory), such portion of such proceeds shall not constitute Net Proceeds except to the extent not, within 12 months of such receipt, so used or contractually committed to be so used (it being understood that if any portion of such proceeds are not so used within such 12 month period but within such 12 month period are contractually committed to be used, then such remaining portion if not so used within six months following the end of such 12 month period shall constitute Net Proceeds as of such date without giving effect to this proviso); <u>provided</u>, <u>further</u>, that no net cash proceeds calculated in accordance with the foregoing realized in a single transaction or series of related transactions shall constitute Net Proceeds unless such net cash proceeds shall exceed $15,000,000 (and thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds);

(b) 100% of the cash proceeds actually received by the Parent or any Subsidiary (including casualty insurance settlements and condemnation awards, but only as and when received) from any Recovery Event, net of (i) attorneys' fees, accountants' fees, transfer taxes, deed or mortgage recording taxes on such asset, other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith, (ii) required payments of Indebtedness (other than Indebtedness incurred under the Loan Documents or Other First Lien Debt) and required payments of other obligations relating to the applicable asset to the extent such Indebtedness or other obligations are secured by a Lien permitted hereunder (other than pursuant to the Loan Documents and other than by a Junior Lien), (iii) repayments of Other First Lien Debt (limited to its proportionate share

24

of such prepayment until such obligations shall not at the time be required to be repaid or offered to be repaid under the

Loan Documents (other than Other Incremental Term Loans and Refinancing Term Loans that rank junior in right of security with the Initial Term Loans) and Other First Lien Debt, and (iv) Taxes paid or payable (in the good faith determination of a Borrower) as a direct result thereof; provided, that, if the Parent or the Lux Borrower shall deliver a certificate of a Responsible Officer of the Parent or the Lux Borrower to the Administrative Agent promptly following receipt of any such proceeds setting forth the Parent's or the Lux Borrower's intention to use any portion of such proceeds, within 12 months of such receipt, to acquire, maintain, develop, construct, improve, upgrade or repair assets useful in the business of the Parent and the Subsidiaries or to make Permitted Business Acquisitions and other Investments permitted hereunder (excluding Permitted Investments or intercompany Investments in Subsidiaries or Unrestricted Subsidiaries) or to reimburse the cost of any of the foregoing incurred on or after the date on which the Recovery Event giving rise to such proceeds was contractually committed (other than inventory, except to the extent the proceeds of such Recovery Event are received in respect of inventory), such portion of such proceeds shall not constitute Net Proceeds except to the extent not, within 12 months of such receipt, so used or contractually committed to be so used (it being understood that if any portion of such proceeds are not so used within such 12 month period but within such 12 month period are contractually committed to be used, then such remaining portion if not so used within six months (or, solely in the case of any such Recovery Event relating to manufacturing, processing or assembly plants, 12 months) following the end of such 12 month period shall constitute Net Proceeds as of such date without giving effect to this proviso); provided, further, that no net cash proceeds calculated in accordance with the foregoing realized in a single transaction or series of related transactions shall constitute Net Proceeds unless such net cash proceeds exceed $15,000,000 (and thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds); and

(c) 100% of the cash proceeds from the incurrence, issuance or sale by the Parent or any Subsidiary of any Indebtedness (other than Excluded Indebtedness, except for Refinancing Notes and Refinancing Term Loans), net of all fees (including investment banking fees), commissions, costs and other expenses, in each case incurred in connection with such issuance or sale.

"Obligations" shall mean, collectively, (a) the Loan Obligations, (b) obligations in respect of any Secured Cash Management Agreement and (c) obligations in respect of any Secured Hedge Agreement.

"Opioid Settlement" shall mean [_____].[15]

"Other First Lien Debt" shall mean obligations secured by Other First Liens.

---

[15] To be defined to mean the settlement with the opioid plaintiffs as implemented by any plan of reorganization, subject to the consent rights of the Supporting Term Lenders under the RSA.

A-0817

(and other Loan Obligations that are secured on the Collateral on an equal and ratable basis with the Initial Term Loans) by Liens on the Collateral ranking equally and ratably with the Initial Term Loans) pursuant to a Permitted First Lien Intercreditor Agreement, which Permitted First Lien Intercreditor Agreement (together with such amendments to the Security Documents and any other Intercreditor Agreements, if any, as are reasonably necessary or advisable (and reasonably acceptable to the Collateral Agent) to give effect to such Liens) shall be entered into in connection with a permitted incurrence of any such Liens (unless a Permitted First Lien Intercreditor Agreement and/or Security Documents (as applicable) covering such Liens are already in effect).

"Permitted Business Acquisition" shall mean any acquisition of all or substantially all the assets or business of, or all or substantially all the Equity Interests (other than directors' qualifying shares) not previously held by the Parent and its Subsidiaries in, or merger, consolidation or amalgamation with, a person or business unit or division or line of business of a person (or any subsequent investment made in a person or business unit or division or line of business previously acquired in a Permitted Business Acquisition), if immediately after giving effect thereto: (i) no Event of Default shall have occurred and be continuing or would result therefrom, provided, however, that with respect to a proposed acquisition pursuant to an executed acquisition agreement, at the option of either Borrower, the determination of whether such an Event of Default shall exist shall be made solely at the time of the execution of the acquisition agreement related to such Permitted Business Acquisition; (ii) all transactions related thereto shall be consummated in accordance with applicable laws; (iii) [reserved]; (iv) any acquired or newly formed Subsidiary shall not be liable for any Indebtedness except for Indebtedness permitted by Section 6.01; (v) to the extent required by Section [__],[16] any person acquired in such acquisition shall be merged into a Loan Party or become upon consummation of such acquisition a Subsidiary Loan Party; and (vi) the aggregate cash consideration in respect of such acquisitions and investments in assets that are not owned by the Loan Parties or in Equity Interests in persons that are not Subsidiary Loan Parties or do not become Subsidiary Loan Parties, in each case upon consummation of such acquisition, shall not exceed $150,000,000 plus (A) an amount equal to any returns (in the form of dividends or other distributions or net sale proceeds) received by any Loan Party in respect of any assets not owned by Loan Parties or Equity Interests in persons that are not Subsidiary Loan Parties or do not become Subsidiary Loan Parties that were acquired in such Permitted Business Acquisitions in reliance on the $150,000,000 basket above (excluding any such returns in excess of the amount originally invested) and (B) any amounts in excess thereof that can be, and are, permitted as Investments (and treated as Investments) made under a clause of Section 6.04 other than clause (k) thereof.

"Permitted Debt" shall mean Indebtedness for borrowed money (but not owing to the Parent or any of its Subsidiaries or Unrestricted Subsidiaries) incurred by the Lux Borrower, any other Borrower or any other Loan Party that is a Domestic Subsidiary, provided that (i) any such Permitted Debt shall not be guaranteed by the Parent, any Subsidiary, any Unrestricted Subsidiary or any Affiliate of the foregoing unless such person is a Guarantor and, if secured by any asset of the Parent, any Subsidiary, any Unrestricted Subsidiary or any Affiliate of the foregoing (as permitted by Sections 6.01 and 6.02), such assets consist solely of all or some portion of the Collateral pursuant to security documents no more favorable to the secured party or party, taken as a whole (as determined by a Borrower in good faith), than the Security Documents, (ii) any such Permitted Debt, if secured, shall be subject to an Intercreditor Agreement reasonably

---

16    Section reference to be to further assurances covenant.

A-0818

satisfactory to the Administrative Agent and such Indebtedness is secured by a Lien on the Collateral that is the latest final maturity date of the Loans existing at the time of such incurrence, and the Weighted Average Life to Maturity of any such Permitted Debt shall be no shorter than the remaining Weighted Average Life to Maturity of the Loans with the latest final maturity at the time of such incurrence.

"Permitted First Lien Intercreditor Agreement" shall mean, with respect to any Liens on Collateral that are intended to be equal and ratable with the Liens securing the Initial Term Loans (and other Loan Obligations that are secured by Liens on the Collateral ranking equally and ratably with the Liens securing the Initial Term Loans), one or more intercreditor agreements, each of which shall be in form and substance reasonably satisfactory to the Administrative Agent.

"Permitted Investments" shall mean:

(a) direct obligations of the United States of America or any member of the European Union or any agency thereof or obligations guaranteed by the United States of America or any member of the European Union or any agency thereof, in each case with maturities not exceeding two years from the date of acquisition thereof;

(b) time deposit accounts, certificates of deposit, money market deposits, banker's acceptances and other bank deposits maturing within 180 days of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America having capital, surplus and undivided profits in excess of $250,000,000 and whose long-term debt, or whose parent holding company's long-term debt, is rated A (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(c) repurchase obligations with a term of not more than 180 days for underlying securities of the types described in clause (a) above entered into with a bank meeting the qualifications described in clause (b) above;

(d) commercial paper, maturing not more than one year after the date of acquisition, issued by a corporation (other than an Affiliate of the Parent) organized and in existence under the laws of the United States of America or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of P 1 (or higher) according to Moody's, or A 1 (or higher) according to S&P (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(e) securities with maturities of two years or less from the date of acquisition, issued or fully guaranteed by any State, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A by S&P or A by Moody's (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

27

A-0819

(f) shall be denominated in Dollars and, except as provided pursuant to any other provisions of clauses (a) through (e);

(g) money market funds that (i) comply with the criteria set forth in Rule 2a 7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $1,000,000,000;

(h) time deposit accounts, certificates of deposit, money market deposits, banker's acceptances and other bank deposits in an aggregate face amount not in excess of 0.5% of the total assets of the Parent and the Subsidiaries, on a consolidated basis, as of the end of the Parent's most recently completed fiscal year; and

(i) instruments equivalent to those referred to in clauses (a) through (h) above denominated in any foreign currency comparable in credit quality and tenor to those referred to above and commonly used by corporations for cash management purposes in any jurisdiction outside the United States of America to the extent reasonably required in connection with any business conducted by the Parent, the Lux Borrower or any Subsidiary organized in such jurisdiction.

"Permitted Junior Intercreditor Agreement" shall mean, with respect to any Liens on Collateral that are intended to be junior to any Liens securing the Initial Term Loans (and other Loan Obligations that are secured by Liens on the Collateral ranking equally and ratably with the Liens securing the Initial Term Loans) (including, for the avoidance of doubt, junior Liens pursuant to Section [__][17]), one or more intercreditor agreements, each of which shall be in in form and substance reasonably satisfactory to the Administrative Agent.

"Permitted Receivables Facility Assets" shall mean (i) Receivables Assets (whether now existing or arising in the future) of the Parent and its Subsidiaries which are transferred, sold and/or pledged to a Receivables Entity or a bank, other financial institution or a commercial paper conduit or other conduit facility established and maintained by a bank or other financial institution, pursuant to a Qualified Receivables Facility and any related Permitted Receivables Related Assets which are also so transferred, sold and/or pledged to such Receivables Entity, bank, other financial institution or commercial paper conduit or other conduit facility, and all proceeds thereof and (ii) loans to the Parent and its Subsidiaries secured by Receivables Assets (whether now existing or arising in the future) and any Permitted Receivables Related Assets of the Parent and its Subsidiaries which are made pursuant to a Qualified Receivables Facility.

"Permitted Receivables Facility Documents" shall mean each of the documents and agreements entered into in connection with any Qualified Receivables Facility, including all documents and agreements relating to the issuance, funding and/or purchase of certificates and purchased interests or the incurrence of loans, as applicable, in each case as such documents and agreements may be amended, modified, supplemented, refinanced or replaced from time to time so long as the relevant Qualified Receivables Facility would still meet the requirements of the definition thereof after giving effect to such amendment, modification, supplement, refinancing or replacement.

---

[17]    Section reference to be to incremental loan provision permitting junior incremental loans.

28

which security interests are customarily granted in connection with asset securitization transactions involving receivables similar to Receivables Assets and any collections or proceeds of any of the foregoing (including, without limitation, lock-boxes, deposit accounts, records in respect of Receivables Assets and collections in respect of Receivables Assets).

"Permitted Refinancing Indebtedness" shall mean any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Indebtedness being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Indebtedness); provided, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions, expenses, plus an amount equal to any existing commitment unutilized thereunder and letters of credit undrawn thereunder), (b) except with respect to Section 6.01(i), (i) the final maturity date of such Permitted Refinancing Indebtedness is on or after the earlier of (x) the final maturity date of the Indebtedness being Refinanced and (y) the Latest Maturity Date in effect at the time of incurrence thereof and (ii) the Weighted Average Life to Maturity of such Permitted Refinancing Indebtedness is greater than or equal to the lesser of (x) the Weighted Average Life to Maturity of the Indebtedness being Refinanced and (y) the Weighted Average Life to Maturity of the Class of Term Loans then outstanding with the greatest remaining Weighted Average Life to Maturity, (c) if the Indebtedness being Refinanced is subordinated in right of payment to any Loan Obligations, such Permitted Refinancing Indebtedness shall be subordinated in right of payment to such Loan Obligations on terms in the aggregate not materially less favorable to the Lenders as those contained in the documentation governing the Indebtedness being Refinanced (as determined by a Borrower in good faith), (d) no Permitted Refinancing Indebtedness shall have any borrower which is different than the borrower of the respective Indebtedness being so Refinanced or have guarantors that are not (or would not have been required to become) guarantors with respect to the Indebtedness being so Refinanced (except that a Loan Party may be added as an additional guarantor), (e) if the Indebtedness being Refinanced is secured (and permitted to be secured), such Permitted Refinancing Indebtedness may be secured by Liens on the same (or any subset of the) assets as secured (or would have been required to secure) the Indebtedness being Refinanced, on terms in the aggregate that are no less favorable to the Secured Parties than, the Indebtedness being refinanced or on terms otherwise permitted by Section 6.02 (as determined by a Borrower in good faith), (f) if the Indebtedness being Refinanced was unsecured or if Liens on the Collateral securing the Indebtedness being Refinanced (if any) were Junior Liens, then any Liens on Collateral to secure such Permitted Refinancing Indebtedness shall be Junior Liens; and (g) if the Indebtedness being Refinanced was subject to a Permitted First Lien Intercreditor Agreement or a Permitted Junior Intercreditor Agreement, and if the respective Permitted Refinancing Indebtedness is to be secured by the Collateral, the Permitted Refinancing Indebtedness shall likewise be subject to a Permitted First Lien Intercreditor Agreement or a Permitted Junior Intercreditor Agreement, as applicable.

A-0821

person or other form, company or business trust, partnership, association, corporation, limited liability company or government, individual or family trusts, or any agency or political subdivision thereof.

"Pro Forma Basis" shall mean, as to any person, for any events as described below that occur subsequent to the commencement of a period for which the financial effect of such events is being calculated, and giving effect to the events for which such calculation is being made, such calculation as will give pro forma effect to such events as if such events occurred on the first day of the most recent Test Period ended on or before the occurrence of such event (the "Reference Period"): (i) any Asset Sale and any asset acquisition, Investment (or series of related Investments) in excess of $25 million, merger, amalgamation, consolidation (including the Transaction) (or any similar transaction or transactions), any dividend, distribution or other similar payment, (ii) any operational changes or restructurings of the business of the Parent or any of its Subsidiaries that the Parent or any of its Subsidiaries has determined to make and/or made during or subsequent to the Reference Period (including in connection with an asset Disposition or asset acquisition described in clause (i)) and which are expected to have a continuing impact and are factually supportable, which would include cost savings resulting from head count reduction, closure of facilities and other operational changes and other cost savings in connection therewith, (iii) the designation of any Subsidiary as an Unrestricted Subsidiary or of any Unrestricted Subsidiary as a Subsidiary and (iv) any incurrence, repayment, repurchase or redemption of Indebtedness (or any issuance, repurchase or redemption of Disqualified Stock or preferred stock), other than fluctuations in revolving borrowings in the ordinary course of business (and not resulting from a transaction as described in clause (i) above).

Pro forma calculations made pursuant to the definition of this term "Pro Forma Basis" shall be determined in good faith by a Responsible Officer of the Parent. Any such pro forma calculation may include adjustments appropriate, in the reasonable good faith determination of the Parent and set forth in a certificate of a Responsible Officer, to reflect operating expense reductions, other operating improvements, synergies or such operational changes or restructurings described in clause (ii) of the immediately preceding paragraph reasonably expected to result from the applicable pro forma event in the 12-month period following the consummation of the pro forma event. The Parent shall deliver to the Administrative Agent a certificate of a Responsible Officer of the Parent setting forth such demonstrable or additional operating expense reductions and other operating improvements or synergies and information and calculations supporting them in reasonable detail.

If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date on which the relevant calculation is being made had been the applicable rate for the entire period (taking into account any hedging obligations applicable to such Indebtedness if such hedging obligation has a remaining term in excess of 12 months). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Parent to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with Applicable Accounting Principles. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period, except to the extent the outstandings thereunder are

Case 20-12522-JTD   Doc 159-6   Filed 04/30/21   Page 100 of 172

reasonably expected to be material, determined on a Pro Forma Basis," which occurred during the respective period or thereafter and on or prior to the date of determination. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Parent may designate.

"Qualified Equity Interests" shall mean any Equity Interest other than Disqualified Stock.

"Qualified Jurisdiction" shall mean (x) the United States (and any political subdivision thereof), Ireland, Luxembourg, Switzerland, the United Kingdom or the Netherlands, (y) the jurisdiction of the organization of any entity incorporated or organized outside the United States in a transaction permitted by Section 6.05(n) where the Administrative Agent has made the determination required by clause (iii) thereof, and (z) any other jurisdiction where the Administrative Agent has determined (acting reasonably and following a request by a Borrower and based on advice of local counsel) that Wholly Owned Subsidiaries organized in such jurisdiction may provide guarantees and security which, after giving effect to the Agreed Guarantee and Security Principles, would provide substantially the same benefits as guarantees and security provided with respect to the Collateral owned by such entities as would have been obtained if the respective Subsidiary were instead organized in any of the United States, Ireland, Luxembourg, Switzerland the United Kingdom or the Netherlands (it being understood and agreed that a jurisdiction as has been agreed by the Parent and the Administrative Agent prior to the date hereof shall satisfy the requirements of this clause (z)).

"Qualified Ratings" means public corporate family ratings (or equivalent) that include at least two of the following ratings: a rating equal to or higher than B2 from Moody's, a rating equal to or higher than B from S&P or a rating equal to or higher than B from Fitch.

"Qualified Receivables Facility" shall mean a receivables facility or facilities created under the Permitted Receivables Facility Documents and which is designated as a "Qualified Receivables Facility" (as provided below), providing for the transfer, sale and/or pledge by a Borrower and/or one or more other Receivables Sellers of Permitted Receivables Facility Assets (thereby providing financing to such Borrower and/or the Receivables Sellers) to (i) a Receivables Entity (either directly or through another Receivables Seller), which in turn shall transfer, sell and/or pledge interests in the respective Permitted Receivables Facility Assets to third-party lenders or investors pursuant to the Permitted Receivables Facility Documents in return for the cash used by such Receivables Entity to acquire the Permitted Receivables Facility Assets from such Borrower and/or the respective Receivables Sellers or (ii) a bank or other financial institution, which in turn shall finance the acquisition of the Permitted Receivables Facility Assets through a commercial paper conduit or other conduit facility, or directly to a commercial paper conduit or other conduit facility established and maintained by a bank or other financial institution that will finance the acquisition of the Permitted Receivables Facility Assets through the commercial paper conduit or other conduit facility, in each case, either directly or through another Receivables Seller, so long as, in the case of each of clause (i) and clause (ii), no portion of the Indebtedness or any other obligations (contingent or otherwise) under such receivables facility or facilities (x) is guaranteed by the Parent or any Subsidiary (excluding guarantees of obligations

31

pursuant to Standard Securitization Undertakings) or (y) its obligations in respect of other Indebtedness (other than pursuant to
Standard Securitization Undertakings) or (z) subjects any property or asset (other than Permitted Receivables Facility Assets, Permitted Receivables Related Assets or the Equity Interests of any Receivables Entity) of the Parent or any other Subsidiary (other than a Receivables Entity), directly or indirectly, contingently or otherwise, to the satisfaction thereof (other than pursuant to Standard Securitization Undertakings). Any such designation shall be evidenced to the Administrative Agent by filing with the Administrative Agent a certificate signed by a Financial Officer of the Parent certifying that, to the best of such officer's knowledge and belief after consultation with counsel, such designation complied with the foregoing conditions.

"<u>Real Property</u>" shall mean, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any Loan Party, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, incidental to the ownership, lease or operation thereof.

"<u>Receivables Assets</u>" shall mean any right to payment created by or arising from sales of goods, leases of goods or the rendition of services rendered no matter how evidenced whether or not earned by performance (whether constituting accounts, general intangibles, chattel paper or otherwise).

"<u>Receivables Entity</u>" shall mean any direct or indirect wholly owned Subsidiary of the Parent which engages in no activities other than in connection with the financing of accounts receivable of the Receivables Sellers and which is designated (as provided below) as a "Receivables Entity" (a) with which neither the Parent nor any of its Subsidiaries has any contract, agreement, arrangement or understanding (other than pursuant to the Permitted Receivables Facility Documents (including with respect to fees payable in the ordinary course of business in connection with the servicing of accounts receivable and related assets)) on terms less favorable to the Parent or such Subsidiary than those that might be obtained at the time from persons that are not Affiliates of the Parent (as determined by a Borrower in good faith) and (b) to which neither the Parent nor any other Subsidiary has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results (other than pursuant to Standard Securitization Undertakings). Any such designation shall be evidenced to the Administrative Agent by filing with the Administrative Agent an officer's certificate of the Parent certifying that, to the best of such officer's knowledge and belief after consultation with counsel, such designation complied with the foregoing conditions.

"<u>Receivables Seller</u>" shall mean the Borrowers and those Subsidiaries that are from time to time party to the Permitted Receivables Facility Documents (other than any Receivables Entity).

"<u>Recovery Event</u>" shall mean any event that gives rise to the receipt by the Parent or any of its Subsidiaries of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or Real Property (including any improvements thereon).

32

A-0824

Release 20-1  2022-d an  Decompt159-6tes oFiled 04/30/21x ta Pagun 112 Of b12 y2

Loan Party that is a Domestic Subsidiary (whether under an indenture, a credit agreement or otherwise) and the Indebtedness represented thereby; provided, that (a) 100% of the Net Proceeds of such Refinancing Notes are used to permanently reduce Loans substantially simultaneously with the issuance thereof; (b) the principal amount (or accreted value, if applicable) of such Refinancing Notes does not exceed the principal amount (or accreted value, if applicable) of the aggregate portion of the Loans so reduced (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions and expenses); (c) the final maturity date of such Refinancing Notes is on or after the Term Facility Maturity Date of the Term Loans so reduced; (d) the Weighted Average Life to Maturity of such Refinancing Notes is greater than or equal to the Weighted Average Life to Maturity of the Term Loans so reduced; (e) the terms of such Refinancing Notes do not provide for any scheduled repayment, mandatory redemption or sinking fund obligations prior to the Term Facility Maturity Date of the Term Loans so reduced (other than (x) in the case of notes, customary offers to repurchase or mandatory prepayment provisions upon a change of control, asset sale or event of loss and customary acceleration rights after an event of default and (y) in the case of loans, customary amortization and mandatory and voluntary prepayment provisions which are consistent in all material respects, when taken as a whole, with those applicable to the Initial Term Loans with such Indebtedness (if in the form of term loans) to provide that such mandatory prepayments as a result of asset sales, events of loss, or excess cash flow, shall be shared no more than ratably with the term loans outstanding pursuant to this Agreement); (f) there shall be no borrower or issuer with respect thereto other than the Lux Borrower, any other Borrower or any other Loan Party that is a Domestic Subsidiary, and no guarantor in respect of such Refinancing Notes that is the Parent, any Subsidiary, any Unrestricted Subsidiary or any Affiliate of the foregoing that is not a Loan Party; (g) if such Refinancing Notes are secured by an asset of the Parent, any Subsidiary, any Unrestricted Subsidiary or any Affiliate of the foregoing, the security agreements relating to such assets shall not extend to any assets not constituting Collateral and shall be no more favorable to the secured party or party, taken as a whole (determined by a Borrower in good faith) than the Security Documents (with such differences as are reasonably satisfactory to the Administrative Agent); (h) if such Refinancing Notes are secured, such Refinancing Notes shall be secured by all or a portion of the Collateral, but shall not be secured by any assets of the Parent or its subsidiaries other than the Collateral; (i) Refinancing Notes that are secured by Collateral shall be subject to the provisions of a Permitted First Lien Intercreditor Agreement or a Permitted Junior Intercreditor Agreement, as applicable (and in any event shall be subject to a Permitted Junior Intercreditor Agreement if the Indebtedness being Refinanced is secured on a junior lien basis to any of the Obligations); and (j) if the Indebtedness being refinanced was unsecured or if Liens on the Collateral securing the Indebtedness being Refinanced were Junior Liens, then any Liens on Collateral securing such Refinancing Notes shall also be Junior Liens.

"<u>Regulation U</u>" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"<u>Regulation X</u>" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

A-0825

Required Lenders as determined by time to time pursuant to the Loan Documents, representing more than 50% of the sum of all Loans outstanding; provided, that the Loans of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Required Percentage" shall mean, with respect to an Applicable Period, 50%; provided, that, so long as no Default or Event of Default shall have occurred and is continuing, if the Total Net Leverage Ratio as at the end of the Applicable Period is (x) less than or equal to 4.50 to 1.00, such percentage shall be 25% or (y) 3.50 to 1.00, such percentage shall be 0% and.

"Requirement of Law" shall mean, as to any person, any law, treaty, rule, regulation, statute, order, ordinance, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding upon such person or any of its property or assets or to which such person or any of its property or assets is subject.

"Responsible Officer" of any person shall mean any director (administrateur), manager (gérant), executive officer or Financial Officer of such person, any authorized signatory appointed by the board of directors (conseil d'administration) or board of managers (conseil de gérance) of such person (as applicable) and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement, or any other duly authorized employee or signatory of such person.

"Restricted Margin Stock" shall mean, at any time, all Margin Stock owned by the Parent and its Subsidiaries which is not Unrestricted Margin Stock.

"Restricted Payments" shall have the meaning assigned to such term in Section 6.06. The amount of any Restricted Payment made other than in the form of cash or cash equivalents shall be the Fair Market Value thereof.

"Retained Excess Cash Flow Overfunding" shall mean, at any time, in respect of any Excess Cash Flow Period, the amount, if any, by which the portion of the Available Amount attributable to the Retained Percentage of Excess Cash Flow for all Excess Cash Flow Interim Periods used in such Excess Cash Flow Period exceeds the actual Retained Percentage of Excess Cash Flow for such Excess Cash Flow Period.

"Retained Percentage" shall mean, with respect to any Excess Cash Flow Period (or Excess Cash Flow Interim Period), (a) 100% minus (b) the Required Percentage with respect to such Excess Cash Flow Period (or Excess Cash Flow Interim Period).

"Revolver Replacement Term Loans" shall mean [_____].[18]

---

[18] To mean the term loans incurred to finance the repayment of the existing RCF at closing. For the avoidance of doubt, (i) such term loans may be incurred as Initial Term Loans under the credit agreement; provide that the terms (other than economic terms) of such term loans shall be the same as the terms of the Initial Term Loans and (ii) such term loans may, instead of being secured by pari passu liens on all or any portion of the Collateral, be secured by junior liens on all or any portion of the Collateral or unsecured.

34

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Secured Cash Management Agreement" shall mean any Cash Management Agreement that is entered into by and between any Loan Party and any Cash Management Bank to the extent that such Cash Management Agreement is not otherwise designated in writing by a Borrower and such Cash Management Bank to the Administrative Agent to not be included as a Secured Cash Management Agreement.

"Secured Hedge Agreement" shall mean any Hedging Agreement that is entered into by and between any Loan Party and any Hedge Bank to the extent that such Hedging Agreement is not otherwise designated in writing by a Borrower and such Hedge Bank to the Administrative Agent to not be included as a Secured Hedge Agreement. Notwithstanding the foregoing, for all purposes of the Loan Documents, any Guarantee of, or grant of any Lien to secure, any obligations in respect of a Secured Hedge Agreement by a Guarantor shall not include any Excluded Swap Obligations.

"Secured Net Leverage Ratio" shall mean, as of any date of determination, the ratio of (a) Consolidated Secured Net Debt as of such date to (b) Adjusted Consolidated EBITDA for the most recently ended Test Period for which financial statements of the Parent have been delivered (or were required to be delivered) as required by this Agreement, all determined on a consolidated basis in accordance with Applicable Accounting Principles; provided that Adjusted Consolidated EBITDA shall be determined for the relevant Test Period on a Pro Forma Basis.

"Secured Parties" shall mean, collectively, the Administrative Agent, the Collateral Agent, each Lender, each Hedge Bank that is party to any Secured Hedge Agreement, each Cash Management Bank that is party to any Secured Cash Management Agreement and each sub-agent appointed pursuant to Section [__][19] by the Administrative Agent with respect to matters relating to the Loan Documents or by the Collateral Agent with respect to matters relating to any Security Document.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Similar Business" shall mean any business, the majority of whose revenues are derived from (i) business or activities conducted by the Parent and its Subsidiaries on the Closing Date, (ii) any business that is a natural outgrowth or reasonable extension, development or expansion of any such business or any business similar, reasonably related, incidental, complementary or ancillary to any of the foregoing or (iii) any business that in the Parent's good faith business judgment constitutes a reasonable diversification of businesses conducted by the Parent and its Subsidiaries.

---

[19]    Section reference to be to provision permitting the appointment of sub-agents.

35

A-0827

Case 20-12522   Doc 1059-2   Filed 04/30/21   Page 15 of 172

any Subsidiary thereof in connection with a Qualified Receivables Facility which are reasonably customary (as determined in good faith by a Borrower) in an accounts receivable financing transaction in the commercial paper, term securitization or structured lending market.

"Subordinated Indebtedness" means (a) with respect to any Borrower, any Indebtedness for borrowed money of such Borrower which is by its terms subordinated in right of payment to the Initial Term Loans, and (b) with respect to any Guarantor, any Indebtedness for borrowed money of such Guarantor which is by its terms subordinated in right of payment to its Guarantee of the Initial Term Loans; provided, however, that no Guarantee of Indebtedness which Indebtedness does not itself constitute Subordinated Indebtedness shall constitute Subordinated Indebtedness.

"subsidiary" shall mean, with respect to any person (herein referred to as the "parent"), any corporation, limited liability company, partnership, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, directly or indirectly, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" shall mean, unless the context otherwise requires, a subsidiary of the Parent. Notwithstanding the foregoing (and except for purposes of the definition of "Unrestricted Subsidiary" contained herein) an Unrestricted Subsidiary shall be deemed not to be a Subsidiary of the Parent or any of its Subsidiaries for purposes of this Agreement.

"Subsidiary Guarantee Agreement" shall mean the Subsidiary Guarantee Agreement dated as of the Closing Date as may be amended, restated, supplemented or otherwise modified from time to time, between each Subsidiary Loan Party and the Collateral Agent. The Subsidiary Guarantee Agreement shall also be deemed to include any guaranty agreement prepared under applicable local law (in the case of a Subsidiary Loan Party that is a Foreign Subsidiary) where the Administrative Agent has reasonably determined, based on the advice of counsel and subject to the Agreed Guarantee and Security Principles, that a separate Guarantee (or modified form of Guarantee) is preferable under relevant local law.

"Subsidiary Loan Party" shall mean (a) each Borrower (other than with respect to its own primary Loan Obligations or Secured Cash Management Agreements and any Secured Hedge Agreement to which it is a party), (b) each direct or indirect Wholly Owned Subsidiary of the Parent (other than the Borrowers) (whether owned on the Closing Date or formed or acquired thereafter) that owns directly or indirectly any Equity Interest in any Wholly Owned Domestic Subsidiary of the Parent (which Wholly Owned Domestic Subsidiary of the Parent is not (i) Mallinckrodt Nuclear LLC or (ii) any other Subsidiary if and for so long as such Subsidiary qualifies as an Excluded Subsidiary), (c) each direct or indirect Wholly Owned Domestic Subsidiary of the Parent (other than the Borrowers) (whether owned on the Closing Date or formed or acquired thereafter) (other than (i) Mallinckrodt Nuclear LLC and (ii) any other Subsidiary if

36

Case 1:20-12522-a-lod Doc 2159-6 (d) Filed 04/30/21 Page 116 of 172

and for so long as such entity is not excluded by clause (d) of the definition of Subsidiary) shall be or may be designated bya Borrower (by way of delivering to the Collateral Agent the Subsidiary Guarantee Agreement (or a supplement to the Subsidiary Guarantee Agreement, as reasonably requested by the Administrative Agent) and any applicable Security Documents, in each case, duly executed by such Subsidiary) in its sole discretion (including, without limitation, in connection with transactions permitted by Section 6.05(n)) from time to time to be a guarantor in respect of the Obligations, whereupon such Subsidiary shall be obligated to comply with the other requirements of Section [___][20] as if it were newly acquired. Notwithstanding anything contained in this Agreement to the contrary, a transfer of Collateral from any Loan Party organized in a Qualified Jurisdiction to a Subsidiary Loan Party that is not organized in a Qualified Jurisdiction shall, for purposes of Sections 6.04 and 6.05, be deemed to be an Investment in a Subsidiary that is not a Loan Party and shall be justified as same pursuant to such Sections.

"Swap Obligation" shall mean, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Taxes" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority, whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to tax with respect to the foregoing.

"Termination Date" shall mean the date on which (a) all Commitments shall have been terminated and (b) the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full in cash (other than in respect of contingent indemnification and expense reimbursement claims not then due).

"Test Period" shall mean, on any date of determination, the period of four consecutive fiscal quarters of the Parent then most recently ended (taken as one accounting period) for which financial statements have been (or were required to be) delivered pursuant to Section [___] or [___][21]; provided that prior to the first date financial statements have been delivered pursuant to Section [___] or [___],[22] the Test Period in effect shall be the four fiscal quarter period ending [_____].[23]

"Third Party Funds" shall mean any accounts or funds, or any portion thereof, received by Parent or any of its Subsidiaries as agent on behalf of third parties in accordance with a written agreement that imposes a duty upon Parent or one or more of its Subsidiaries to collect and remit those funds to such third parties.

---

20    Section reference to be to further assurances covenant.
21    Section references to be to (i) annual financial statements reporting covenant and (ii) quarterly financial statements reporting covenant.
22    Section references to be to (i) annual financial statements reporting covenant and (ii) quarterly financial statements reporting covenant.
23    To be the four fiscal quarter period ending most recently before the Closing Date for which financial statements are available.

A-0829

(b) Adjusted Consolidated EBITDA for the most recently ended Test Period for which financial statements of the Parent have been delivered (or were required to be delivered) as required by this Agreement, all determined on a consolidated basis in accordance with Applicable Accounting Principles; <u>provided</u> that Adjusted Consolidated EBITDA shall be determined for the relevant Test Period on a Pro Forma Basis.

"<u>Transaction Documents</u>" shall mean [_____].[24]

"<u>Transaction Expenses</u>" shall mean any fees or expenses incurred or paid by the Parent or any of its Subsidiaries in connection with the Transactions, the Transaction Documents, this Agreement and the other Loan Documents, and the transactions contemplated hereby and thereby.

"<u>Transactions</u>" shall mean, collectively, the transactions to occur pursuant to the Transaction Documents, including (a) [_____][25]; (b) the execution, delivery and performance of the Loan Documents, the creation of the Liens pursuant to the Security Documents, and the initial borrowings hereunder; and (c) the payment of all fees and expenses to be paid and owing in connection with the foregoing.

"<u>Uniform Commercial Code</u>" shall mean the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"<u>Unrestricted Cash</u>" shall mean cash or Permitted Investments of the Parent or any of its Subsidiaries that would not appear as "restricted" on a consolidated balance sheet of the Parent or any of its Subsidiaries.

"<u>Unrestricted Margin Stock</u>" shall mean, at any time, all Margin Stock owned by the Parent and its Subsidiaries to the extent the value thereof exceeds 25% of the aggregate value of all assets owned by the Parent and its Subsidiaries then subject to the covenants contained in Sections 6.02 and 6.05.

"<u>Unrestricted Subsidiary</u>" shall mean (1) any Subsidiary of the Parent, whether now owned or acquired or created after the Closing Date, that is designated after the Closing Date by a Borrower as an Unrestricted Subsidiary hereunder by written notice to the Administrative Agent; <u>provided</u>, that a Borrower shall only be permitted to so designate a new Unrestricted Subsidiary after the Closing Date so long as (a) no Default or Event of Default has occurred and is continuing or would result therefrom, (b) [reserved], (c) all Investments in such Unrestricted Subsidiary at the time of designation (as contemplated by the immediately following sentence) together with all Investments in any other Unrestricted Subsidiary designated as such in reliance on this clause (1) at the time of designation thereof (as contemplated by the immediately following sentence) are permitted by Section 6.01(j), (d) such Subsidiary being designated as an "Unrestricted Subsidiary"

---

24   To mean the [Definitive Documents] relating to any plan of reorganization.
25   To mean all transactions contemplated by any plan of reorganization.

38

A-0830

Case 1:20-cv-12522-LPS Document 59-6 Filed 04/30/21 Page 116 of 172

shall also, concurrently therewith, pledge to the Unrestricted Subsidiary all the Offutt/72 Indebtedness of the Parent or its Subsidiaries issued or incurred after the Closing Date that contains a similar concept, (e) such Subsidiary was not previously designated as an Unrestricted Subsidiary and thereafter re-designated as a Subsidiary, and (f) the Parent shall have delivered to the Administrative Agent an officer's certificate executed by a Responsible Officer of the Parent, certifying to the best of such officer's knowledge, compliance with the requirements of this proviso; and (2) any subsidiary of an Unrestricted Subsidiary (unless transferred to such Unrestricted Subsidiary or any of its subsidiaries by the Parent or one or more of its Restricted Subsidiaries after the date of the designation of the parent entity as a "Unrestricted Subsidiary" hereunder, in which case the subsidiary so transferred would be required to be independently designated in accordance with preceding clause (1)). The designation of any Subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the Parent (or its Subsidiaries) therein at the date of designation in an amount equal to the Fair Market Value of the Parent's (or its Subsidiaries') Investments therein, which shall be required to be justified on such date in accordance with Section 6.04(j) . A Borrower may designate any Unrestricted Subsidiary to be a Subsidiary for purposes of this Agreement (each, a "Subsidiary Redesignation"); provided, that (i) no Default or Event of Default has occurred and is continuing or would result therefrom (after giving effect to the provisions of the immediately succeeding sentence), (ii) [reserved,] and (iii) a Borrower shall have delivered to the Administrative Agent an officer's certificate executed by a Responsible Officer of a Borrower, certifying to the best of such officer's knowledge, compliance with the requirements of preceding clauses (i) and (ii). The designation of any Unrestricted Subsidiary as a Subsidiary after the Closing Date shall constitute (i) the incurrence at the time of designation of any Investment, Indebtedness or Liens of such Subsidiary existing at such time and (ii) a return on any Investment by the applicable Loan Party (or its relevant Subsidiaries) in Unrestricted Subsidiaries pursuant to the preceding sentence in an amount equal to the Fair Market Value at the date of such designation of such Loan Party's (or its relevant Subsidiaries') Investment in such Subsidiary. Notwithstanding anything to the contrary contained above, neither the Lux Borrower nor the Co-Borrower shall be permitted to be an Unrestricted Subsidiary.

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Wholly Owned Domestic Subsidiary" shall mean a Wholly Owned Subsidiary that is also a Domestic Subsidiary.

"Wholly Owned Subsidiary" of any person shall mean a subsidiary of such person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such person or another Wholly Owned Subsidiary of such person. Unless the context otherwise requires, "Wholly Owned Subsidiary" shall mean a Subsidiary of the Parent that is a Wholly Owned Subsidiary of the Parent.

39

Workdesk 420- 2522- 3113 v.11 respect to the Statutory Determination date, on any date of determination, Current

Assets at such date of determination minus Current Liabilities at such date of determination; <u>provided</u>, that, for purposes of calculating Excess Cash Flow, increases or decreases in Working Capital shall be calculated without regard to any changes in Current Assets or Current Liabilities as a result of (a) any reclassification in accordance with Applicable Accounting Principles of assets or liabilities, as applicable, between current and noncurrent or (b) the effects of purchase accounting.

**Negative Covenants:**[26]

ARTICLE VI

*Negative Covenants*

The Parent and each Borrower covenants and agrees with each Lender that, until the Termination Date, unless the Required Lenders shall otherwise consent in writing, the Parent and each Borrower will not, and will not permit any of the Subsidiaries to:

Section 6.01 <u>Indebtedness</u>. Incur, create, assume or permit to exist any Indebtedness, except:

(a) Indebtedness (other than as described in Section 6.01(b) and Section 6.01(bb) below) existing or committed on the Closing Date (<u>provided</u>, that any such Indebtedness (x) that is owed to any person other than Parent and one or more of its Subsidiaries, in an aggregate amount in excess of $5,000,000 shall be set forth in <u>Part A</u> of <u>Schedule 6.01</u> and (y) owing to Parent or one or more of its Subsidiaries in excess of $5,000,000 shall be set forth on <u>Part B</u> of <u>Schedule 6.01</u>) and any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness; <u>provided</u> that (1) any Indebtedness outstanding pursuant to this clause (a) which is owed by a Loan Party to any Subsidiary that is not a Loan Party shall be subordinated in right of payment to the same extent required pursuant to Section 6.01(e) and (2) any Permitted Refinancing Indebtedness at any time incurred with respect to any Indebtedness described in this Section 6.01(a) outstanding on the Closing Date (or an issue of Permitted Refinancing Indebtedness incurred in respect thereof or prior to the incurrence of such Permitted Refinancing Indebtedness) may only be owed to the Parent or its respective Subsidiary to which the Indebtedness described in clause (y) above outstanding on the Closing Date was owed;

(b) Indebtedness created hereunder (including pursuant to Section [__], Section [__] and Section [__][27]) and under the other Loan Documents and any Refinancing Notes incurred to Refinance such Indebtedness;

(c) Indebtedness of the Parent or any Subsidiary pursuant to Hedging Agreements entered into for non-speculative purposes;

---

26    For the avoidance of doubt, all covenants set forth in former Section 5.13 (Cadence IP Licensee) shall be eliminated.

27    Section references to be to (i) incremental loan provision, (ii) extension provision and (iii) refinancing provision.

40

(d) Obligations in respect of any obligations under letters of credit or guarantees (other than for the benefit of)

(d) [text obscured] any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance to the Parent or any Subsidiary, pursuant to reimbursement or indemnification obligations to such person, in each case in the ordinary course of business or consistent with past practice or industry practices;

(e) Indebtedness of the Parent or any Borrower to the Parent or any Subsidiary and of any Subsidiary to the Parent, any Borrower or any other Subsidiary; provided, that (i) Indebtedness of any Subsidiary that is not a Subsidiary Loan Party owing to the Loan Parties incurred pursuant to this Section 6.01(e) shall be subject to Section 6.04 and (ii) Indebtedness owed by any Loan Party to any Subsidiary that is not a Loan Party incurred pursuant to this Section 6.01(e) shall be subordinated in right of payment to the Loan Obligations under this Agreement on subordination terms described in Exhibit F hereto or on other subordination terms reasonably satisfactory to the Administrative Agent and a Borrower;

(f) Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations, in each case provided in the ordinary course of business or consistent with past practice or industry practices, including those incurred to secure health, safety and environmental obligations in the ordinary course of business or consistent with past practice or industry practices;

(g) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services, in each case incurred in the ordinary course of business;

(h) (i) Indebtedness of a Subsidiary acquired after the Closing Date or a person merged or consolidated with the Parent or any Subsidiary after the Closing Date and Indebtedness otherwise assumed by the Parent, any Borrower or any other Loan Party that is a Domestic Subsidiary (and which may be guaranteed by any Loan Party) in connection with the acquisition of assets or Equity Interests (including a Permitted Business Acquisition), where such acquisition, merger or consolidation is not prohibited by this Agreement; provided, that, (x) Indebtedness incurred pursuant to preceding sub clause (h)(i) shall be in existence prior to the respective acquisition of assets or Equity Interests (including a Permitted Business Acquisition) and shall not have been created in contemplation thereof or in connection therewith, and (y) after giving effect to the incurrence of such Indebtedness, (A) in the case of any such Indebtedness that is secured, the Secured Net Leverage Ratio (I) shall not be greater than 3.50 to 1.00 or (II) shall be no more than the Secured Net Leverage Ratio in effect immediately prior thereto and, (B) in the case of any such Indebtedness (whether secured or unsecured), the Fixed Charge Coverage Ratio (I) shall not be less than 2.00 to 1.00 or (II) shall be no more than the Fixed Charge Coverage Ratio in effect immediately prior thereto, each calculated on a Pro Forma Basis for the then most recently ended Test Period; and (ii) any Permitted Refinancing Indebtedness incurred to Refinance any such Indebtedness;

41

A-0833

(i) (Case 20-12522 (JTD)   Doc 1159-6   Filed 04/30/21   Page 22 of 112) y prior to or within 360 days after the acquisition, lease, construction, repair, replacement or improvement of the respective property (real or personal, and whether through the direct purchase of property or the Equity Interest of any person owning such property) permitted under this Agreement in order to finance such acquisition, lease, construction, repair, replacement or improvement, in an aggregate principal amount that immediately after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, together with the aggregate principal amount of any other Indebtedness outstanding pursuant to this Section 6.01(i) and Section 6.01(j), would not exceed the greater of $125,000,000 and [___]% of Consolidated Total Assets when incurred, created or assumed, and (y) any Permitted Refinancing Indebtedness in respect thereof;

(j) (x) Capitalized Lease Obligations and any other Indebtedness incurred by the Parent or any Subsidiary arising from any Sale and Lease-Back Transaction that is permitted under Section 6.03 so long as the principal amount thereof, together with the aggregate principal amount of any other Indebtedness outstanding pursuant to this Section 6.01(j) and Section 6.01(i), would not exceed greater of $125,000,000 and [___]% of Consolidated Total Assets when incurred, created or assumed, and (y) any Permitted Refinancing Indebtedness in respect thereof;

(k) (x) other Indebtedness of the Parent or any Subsidiary, in an aggregate principal amount that, immediately after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, together with the aggregate principal amount of any other Indebtedness outstanding pursuant to this Section 6.01(k), would not exceed the greater of $250,000,000 and [___]% of Consolidated Total Assets when incurred, created or assumed (provided that, if such Indebtedness is of any Subsidiary other than a Loan Party, the aggregate principal amount of such Indebtedness, immediately after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, together with the aggregate principal amount of any other Indebtedness of Subsidiaries other than Loan Parties outstanding pursuant to this Section 6.01(k), does not exceed $100,000,000) and (y) any Permitted Refinancing Indebtedness in respect thereof;

(l) [reserved];

(m) Guarantees (i) by the Parent, any Borrower or any Subsidiary Loan Party of any Indebtedness of the Parent, any Borrower or any Subsidiary Loan Party permitted to be incurred under this Agreement, (ii) by the Parent, any Borrower or any Subsidiary Loan Party of Indebtedness otherwise permitted hereunder of any Subsidiary that is not a Subsidiary Loan Party to the extent Guarantees are permitted by Section 6.04 (other than Section 6.04(r)), (iii) by any Subsidiary that is not a Subsidiary Loan Party of Indebtedness of another Subsidiary that is not a Subsidiary Loan Party, and (iv) by the Parent, any Borrower or any Subsidiary Loan Party of Indebtedness of Subsidiaries that are not Subsidiary Loan Parties incurred for working capital purposes in the ordinary course of business on ordinary business terms so long as such Indebtedness is permitted to be incurred under Section 6.01(q) and to the extent such Guarantees are permitted by Section 6.04 (other than Section 6.04(r)); provided, that Guarantees (x) by the Parent, any Borrower or any Subsidiary Loan Party under this Section 6.01(m) of any other Indebtedness of a person that is subordinated in right of payment to other Indebtedness of such person shall be expressly subordinated in right of payment to the Loan Obligations to at least the same extent as such underlying Indebtedness is subordinated in right of payment and (y) otherwise permitted by this Section 6.01(m) shall not be permitted with respect to any Indebtedness (including, without limitation, Permitted Debt and Permitted Refinancing Indebtedness) where the guarantor providing the Guarantee is not permitted to guarantee such Indebtedness because this Section 6.01 (or defined terms used in this Section 6.01) otherwise limit the persons who may guarantee such Indebtedness (where such Indebtedness is being Refinanced or otherwise);

42

Case 20-12522-JTD   Doc 2159-6   Filed 04/30/21   Page 122 of 172

(n) obligations in respect of Permitted Debt or Subsidiary Debt, in each case, any earn-out, purchase or acquisition price or similar obligations (including earn-outs), in each case, incurred or assumed in connection with the Transactions, any Permitted Business Acquisition, other Investments or the disposition of any business, assets or a Subsidiary not prohibited by this Agreement;

(o) Indebtedness in respect of letters of credit, bank guarantees, warehouse receipts or similar instruments issued in the ordinary course of business or consistent with past practice or industry practices and not supporting obligations in respect of Indebtedness for borrowed money;

(p) (i) Permitted Debt (not secured by Other First Liens on the Collateral) so long as immediately after giving effect to the incurrence of such Permitted Debt and the use of proceeds thereof, (A) the Fixed Charge Coverage Ratio on a Pro Forma Basis is not less than 2.00 to 1.00 and (B) no Default or Event of Default shall have occurred and be continuing or shall result therefrom, and (ii) any Permitted Refinancing Indebtedness in respect thereof;

(q) (x) Indebtedness of Subsidiaries that are not Subsidiary Loan Parties in an aggregate principal amount outstanding that, immediately after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, together with the aggregate principal amount of any other Indebtedness outstanding pursuant to this Section 6.01(q), would not exceed the greater of $100,000,000 and [__]% of Consolidated Total Assets when incurred, created or assumed and (y) any Permitted Refinancing Indebtedness in respect thereof;

(r) Indebtedness incurred in the ordinary course of business in respect of obligations of the Parent or any Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; provided, that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business and not in connection with the borrowing of money or any Hedging Agreements;

(s) Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Parent or any Subsidiary incurred in the ordinary course of business;

(t) (x) Indebtedness in connection with Qualified Receivables Facilities in an aggregate principal amount outstanding that, immediately after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, together with the aggregate principal amount of any other Indebtedness outstanding pursuant to this Section 6.01(t), would not exceed the greater of $200,000,000 and [__]% of Consolidated Total Assets when incurred, created or assumed and (y) any Permitted Refinancing Indebtedness in respect thereof;

(u) obligations in respect of Cash Management Agreements;

43

(v) Indebtedness under Loans and Revolving Loans and Term Loans and Letters of Credit on the Collateral, in an aggregate principal amount outstanding not to exceed at the time of incurrence the Incremental Amount available at such time, and (iv) Permitted Refinancing Indebtedness in respect of any Indebtedness theretofore outstanding pursuant to this clause (v);

(w) Indebtedness of, incurred on behalf of, or representing Guarantees of Indebtedness of, joint ventures subject to compliance with Section 6.04 (other than Section 6.04(r));

(x) Indebtedness issued by the Parent or any Subsidiary to current or former officers, directors and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of the Parent permitted by Section 6.06;

(y) Indebtedness consisting of obligations of the Parent or any Subsidiary under deferred compensation or other similar arrangements incurred by such person in connection with the Transactions and Permitted Business Acquisitions or any other Investment permitted hereunder;

(z) Indebtedness of the Parent or any Subsidiary to or on behalf of any joint venture (regardless of the form of legal entity) that is not a Subsidiary arising in the ordinary course of business in connection with the cash management operations (including with respect to intercompany self-insurance arrangements) of the Parent and the Subsidiaries;

(aa) Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business; and

(bb) (i) Indebtedness in respect of the Existing Secured Notes (other than Existing First Lien Notes) and (ii) Permitted Refinancing Indebtedness incurred in respect thereof.

For purposes of determining compliance with this Section 6.01 or Section 6.02, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on (x) the Dollar Equivalent thereof, in the case of any such Indebtedness denominated in an Alternate Currency or (y) in all other cases, customary currency exchange rates in effect, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) on or prior to the Closing Date, on the Closing Date and, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) after the Closing Date, on the date on which such Indebtedness was incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness); provided, that if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount, as applicable, of such Indebtedness being refinanced plus (ii) the aggregate amount of fees, underwriting discounts, premiums (including tender premiums), defeasance costs and other costs and expenses incurred in connection with such refinancing.

44

Case 1:20-cv-12522   Document 1-59-6   Filed 04/30/21   Page 24 of 172

Furthermore, while complying with any Section (or any subsection thereof), need not comply if any reference to one category of permitted Indebtedness (or any portion thereof) described in Sections 6.01(a) through (bb) but may be permitted in part under any relevant combination thereof (and subject to compliance, where relevant, with Section 6.02) and (B) in the event that an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the categories of permitted Indebtedness (or any portion thereof) described in Sections 6.01(a) through (bb), a Borrower may, in its sole discretion, classify or reclassify, or later divide, classify or reclassify (as if incurred at such later time), such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 6.01 and following Section 6.02 and will be entitled to only include the amount and type of such item of Indebtedness (or any portion thereof) in one of the above clauses (or any portion thereof) and such item of Indebtedness (or any portion thereof) shall be treated as having been incurred or existing pursuant to only such clause or clauses (or any portion thereof) without giving pro forma effect to such item (or portion thereof) when calculating the amount of Indebtedness that may be incurred pursuant to any other clause; provided, that (v) all Indebtedness outstanding under this Agreement shall at all times be deemed to have been incurred pursuant to clause (b) of this Section 6.01, (w) all Indebtedness outstanding on the Closing Date under the Existing Secured Indentures (other than the Existing First Lien Notes) shall at all times be deemed to have been incurred pursuant to clause (bb) of this Section 6.01, (x) all Indebtedness outstanding on the Closing Date under the Existing First Lien Notes shall at all times be deemed to have been incurred pursuant to clause (v) of this Section 6.01, (y) all Indebtedness described in Schedule 6.01 (and any Permitted Refinancing Indebtedness incurred in respect thereof) shall be deemed outstanding under Section 6.01(a) and (z) all Indebtedness owing to the Parent or any of its Subsidiaries must be justified as incurred (and outstanding) pursuant to one or more of Sections 6.01(a), (e), (m) and (w). In addition, with respect to any Indebtedness that was permitted to be incurred hereunder on the date of such incurrence, any Increased Amount of such Indebtedness shall also be permitted hereunder after the date of such incurrence.

This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior in right of payment to secured Indebtedness merely because it is unsecured or (2) senior Indebtedness as subordinated or junior in right of payment to any other senior Indebtedness merely because it has a junior priority with respect to the same collateral.

Section 6.02 Liens. Create, incur, assume or permit to exist any Lien on any property or assets (including stock or other securities of any person) of the Parent or any Subsidiary now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, "Permitted Liens"):

(a) Liens on property or assets of the Parent and the Subsidiaries existing on the Closing Date and, to the extent securing Indebtedness in an aggregate principal amount in excess of $5,000,000, set forth on Schedule 6.02(a) and any modifications, replacements, renewals or extensions thereof; provided, that such Liens shall secure only those obligations that they secure on the Closing Date (and any Permitted Refinancing Indebtedness in respect of such obligations permitted by Section 6.01), shall not be amended, replaced or renewed so as to increase their

45

Case 20-12522-JTD   Doc 159-6   Filed 04/30/21   Page 25 of 172

priority in relation to the Indebtedness that is secured on or in respect of such property, but shall not subsequently apply to any other property or assets of the Parent, any Borrower or any Subsidiary other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien and (B) proceeds and products thereof;

(b) any Lien created under the Loan Documents (including Liens created under the Security Documents securing obligations in respect of Secured Hedge Agreements and Secured Cash Management Agreements);

(c) any Lien on any property or asset of the Parent or any Subsidiary securing Indebtedness or Permitted Refinancing Indebtedness permitted by Section 6.01(h); provided, that (i) such Lien is not created in contemplation of or in connection with such acquisition or such person becoming a Subsidiary, as the case may be, and (ii) such Lien does not apply to any other property or assets of the Parent or any of the Subsidiaries not securing such Indebtedness at the date of the acquisition of such property or asset and accessions and additions thereto and proceeds and products thereof (other than after-acquired property of any entity so acquired (but not the Parent or any other Loan Party, including any Loan Party into which such acquired entity is merged) required to be subjected to such Lien pursuant to the terms of such Indebtedness (and refinancings thereof));

(d) Liens for Taxes, assessments or other governmental charges or levies not yet delinquent by more than 30 days or that are being contested in good faith in compliance with Section [__][28];

(e) Liens imposed by law, such as landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, supplier's, construction or other like Liens, securing obligations that are not overdue by more than 30 days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, the Parent or any Subsidiary shall have set aside on its books reserves in accordance with Applicable Accounting Principles;

(f) (i) pledges and deposits and other Liens made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other social security laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations and (ii) pledges and deposits and other Liens securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Parent or any Subsidiary;

(g) deposits and other Liens to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capitalized Lease Obligations), statutory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, trade contracts, agreements with utilities, and other obligations of a like nature (including letters of credit in lieu of any such bonds or to support the issuance thereof) incurred in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

---

[28]   Section reference to be to tax payment covenant.

46

A-0838

Case 20-12522-JTD  Doc 1059-6  Filed 04/30/21  Page 26 of 67

(h) easements, zoning restrictions, rights-of-way, licenses, special assessments, rights-of-way, covenants, conditions, restrictions and declarations on or with respect to the use of Real Property, servicing agreements, development agreements, site plan agreements and other similar encumbrances incurred in the ordinary course of business and title defects or irregularities that are of a minor nature and that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Parent or any Subsidiary;

(i) Liens securing Indebtedness permitted by Section 6.01(i); provided, that such Liens do not apply to any property or assets of the Parent, any Borrower or any Subsidiary other than the property or assets acquired, leased, constructed, replaced, repaired or improved with such Indebtedness (or the Indebtedness Refinanced thereby), and accessions and additions thereto, proceeds and products thereof, customary security deposits and related property; provided, further, that individual financings provided by one lender may be cross-collateralized to other financings provided by such lender (and its Affiliates) (it being understood that with respect to any Liens on the Collateral being incurred under this clause (i) to secure Permitted Refinancing Indebtedness, if Liens on the Collateral securing the Indebtedness being Refinanced (if any) were Junior Liens, then any Liens on such Collateral being incurred under this clause (i) to secure Permitted Refinancing Indebtedness shall also be Junior Liens);

(j) Liens arising out of Sale and Lease-Back Transactions permitted under Section 6.03, so long as such Liens attach only to the property sold and being leased in such transaction and any accessions and additions thereto or proceeds and products thereof and related property;

(k) non-consensual Liens securing judgments that do not constitute an Event of Default under Section [___][29];

(l) any interest or title of a lessor or sublessor under any leases or subleases entered into by the Parent or any Subsidiary in the ordinary course of business;

(m) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks and other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposits, sweep accounts, reserve accounts or similar accounts of the Parent or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Parent or any Subsidiary, or (iii) relating to purchase orders and other agreements entered into with customers, suppliers or service providers of the Parent, any Borrower or any Subsidiary in the ordinary course of business;

(n) Liens (i) arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business, (iii) encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to brokerage accounts incurred in the ordinary course of business and not for speculative purposes or (iv) in respect of Third Party Funds;

---

[29]  Section reference to be to judgment default.

A-0839

(o) Liens in respect of bank deposits to be set up against receipts in foreign offices permitted under Section 6.01(f) or (o) and incurred in the ordinary course of business or consistent with past practice or industry practices and not supporting obligations in respect of Indebtedness for borrowed money;

(p) leases or subleases, and licenses or sublicenses (including with respect to Intellectual Property), granted to others in the ordinary course of business not interfering in any material respect with the business of the Parent and its Subsidiaries, taken as a whole;

(q) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(r) Liens solely on any cash earnest money deposits made by the Parent or any of the Subsidiaries in connection with any letter of intent or purchase agreement in respect of any Investment permitted hereunder;

(s) Liens with respect to property or assets of any Subsidiary that is not a Loan Party securing obligations of a Subsidiary that is not a Loan Party permitted under Section 6.01;

(t) Liens on any amounts held by a trustee under any indenture or other debt agreement issued in escrow pursuant to customary escrow arrangements pending the release thereof, or under any indenture or other debt agreement pursuant to customary discharge, redemption or defeasance provisions;

(u) the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business;

(v) agreements to subordinate any interest of the Parent or any Subsidiary in any accounts receivable or other proceeds arising from inventory consigned by the Parent, any Borrower or any of the Subsidiaries pursuant to an agreement entered into in the ordinary course of business;

(w) Liens arising from precautionary Uniform Commercial Code financing statements regarding operating leases or other obligations not constituting Indebtedness;

(x) Liens (i) on Equity Interests in joint ventures (A) securing obligations of such joint venture or (B) pursuant to the relevant joint venture agreement or arrangement and (ii) on Equity Interests in Unrestricted Subsidiaries to the extent permitted by the second to last paragraph in Section 6.04;

(y) Liens on securities that are the subject of repurchase agreements constituting Permitted Investments under clause (c) of the definition thereof;

48

A-0840

(z) Liens on any Securitized Receivables and Receivables Related Assets that are subject to Securitization and Liens on the Equity Interests of any Receivables Entity;

Related Assets or the Equity Interests of any Receivables Entity;

(aa) Liens securing insurance premiums financing arrangements; provided, that such Liens are limited to the applicable unearned insurance premiums;

(bb) in the case of Real Property that constitutes a leasehold interest, any Lien to which the fee simple interest (or any superior leasehold interest) is subject;

(cc) Liens securing Indebtedness or other obligation (i) of the Parent or a Subsidiary in favor of the Parent, a Borrower or any Subsidiary Loan Party and (ii) of any Subsidiary that is not Loan Party in favor of any Subsidiary that is not a Loan Party;

(dd) Liens on cash or Permitted Investments securing Hedging Agreements in the ordinary course of business submitted for clearing in accordance with applicable Requirements of Law;

(ee) Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit or bank guarantee issued or created for the account of the Parent, any Borrower or any Subsidiary in the ordinary course of business; provided, that such Lien secures only the obligations of the Parent or such Subsidiaries in respect of such letter of credit, bank guarantee or banker's acceptance to the extent permitted under Section 6.01;

(ff) Liens on Collateral that are Junior Liens securing (x) Permitted Debt and guarantees thereof permitted by Section 6.01(m) and (y) Permitted Refinancing Indebtedness incurred to Refinance Permitted Debt secured pursuant to preceding clause (x) and guarantees thereof permitted by Section 6.01(m);

(gg) Liens on Collateral that are Other First Liens, so long as such Other First Liens secure Indebtedness permitted by Section 6.01(b) or 6.01(v) and guarantees thereof permitted by Section 6.01(m);

(hh) Liens arising out of conditional sale, title retention or similar arrangements for the sale or purchase of goods by the Parent or any of the Subsidiaries in the ordinary course of business;

(ii) Liens on Collateral securing Indebtedness permitted by Section 6.01(bb); and

(jj) other Liens with respect to property or assets of the Parent or any Subsidiary securing (x) obligations in an aggregate outstanding principal amount that, together with the aggregate principal amount of other obligations that are secured pursuant to this clause (jj), immediately after giving effect to the incurrence of such Liens, would not exceed the greater of $75,000,000 and [__]% of Consolidated Total Assets when incurred, created or assumed and (y) Permitted Refinancing Indebtedness incurred to Refinance obligations secured pursuant to preceding clause (x), in each case, to the extent that such Liens (i) are Other First Liens, subject to a Permitted First Lien Intercreditor Agreement or (ii) are Junior Liens, subject to a Permitted Junior Intercreditor Agreement.

49

For CASE 20-12522-JTD's compliance with Docs 2159-62. (Filed 04/30/21 in original at page 291 of 172

permitted solely by reference to one category of permitted Liens (or any portion thereof) described in Sections 6.02(a) through (jj) but may be permitted in part under any combination thereof and (B) in the event that a Lien securing an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the categories of permitted Liens (or any portion thereof) described in Sections 6.02(a) through (jj), a Borrower may, in its sole discretion, classify or reclassify, or later divide, classify or reclassify (as if incurred at such later time), such Lien securing such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 6.02 and will be entitled to only include the amount and type of such Lien or such item of Indebtedness secured by such Lien (or any portion thereof) in one of the above clauses and such Lien securing such item of Indebtedness (or portion thereof) will be treated as being incurred or existing pursuant to only such clause or clauses (or any portion thereof) without giving pro forma effect to such item (or portion thereof) when calculating the amount of Liens or Indebtedness that may be incurred pursuant to any other clause. For purposes of this Section 6.02, Indebtedness will not be considered incurred under a subsection or clause of Section 6.01 if it is later reclassified as outstanding under another subsection or clause of Section 6.01 (in which event, and at which time, same will be deemed incurred under the subsection or clause to which reclassified). In addition, with respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the incurrence of such Indebtedness, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness. Notwithstanding the foregoing, it is acknowledged and agreed that Liens on Collateral that are Junior Liens or Other First Liens shall at all times be justified under clause (b), (i) (in the case of Junior Liens), (ff), (gg), (ii) or (jj) above, as applicable.

Notwithstanding anything to the contrary contained above in this Section 6.02, this Section 6.02 shall not restrict the incurrence or existence of any Liens at any time on Margin Stock that then constitutes Unrestricted Margin Stock.

Section 6.03 <u>Sale and Lease-Back Transactions</u>. Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter, as part of such transaction, rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "<u>Sale and Lease-Back Transaction</u>"); <u>provided</u>, that a Sale and Lease-Back Transaction shall be permitted (a) with respect to property owned by the Parent or any Subsidiary that is acquired after the Closing Date so long as such Sale and Lease-Back Transaction is consummated within 360 days of the acquisition of such property, and (b) with respect to any other property owned by the Parent or any Subsidiary, (x) if the Net Proceeds therefrom are used to prepay the Term Loans to the extent required by Section [__][30] and (y) with respect to all Sale and Lease-Back Transactions pursuant to this clause (b), the requirements of the last two paragraphs of Section 6.05 shall apply to such Sale and Lease-Back Transaction to the extent provided therein.

---

[30]   Section reference to be to asset sale mandatory prepayment.

A-0842

Section 20.4—Loans and Advances) or acquire from a Subsidiary that is not a

Wholly Owned Subsidiary immediately prior to such merger) any Equity Interests, evidences of Indebtedness or other securities of any other person, (ii) make any loans or advances to or Guarantees of the Indebtedness of any other person, or (iii) purchase or otherwise acquire, in one transaction or a series of related transactions, (x) all or substantially all of the property and assets or business of another person or (y) assets constituting a business unit, line of business or division of such person (each of the foregoing, an "Investment"), except:

(a) Investments to effect the Transactions;

(b) (i) Investments (x) by the Parent, any Borrower or any Subsidiary in the Equity Interests of any Subsidiary as of the Closing Date and set forth on Part A of Schedule 6.04 and (y) by the Parent, any Borrower or any Subsidiary consisting of intercompany loans from the Parent, any Borrower or any Subsidiary to the Parent, any Borrower or any Subsidiary as of the Closing Date and set forth on Part B of Schedule 6.04; provided that to the extent any such intercompany loan that is owing by a non-Subsidiary Loan Party to the Parent, any Borrower or any Subsidiary Loan Party (the "Scheduled Loans") (or any additional Investments made by the Parent, any Borrower or any Subsidiary Loan Party pursuant to this proviso) is repaid after the Closing Date or the Parent, any Borrower or any Subsidiary Loan Party receives, after the Closing Date, any dividend, distribution, interest payment, return of capital, repayment or other amount in respect of any scheduled Investment in the Equity Interests of any non-Subsidiary Loan Party (a "Return of Scheduled Equity"), then additional Investments may be made by the Parent, any Borrower or any Subsidiary Loan Party in any non-Subsidiary Loan Party in an aggregate amount up to the amount actually received by the Parent, any Borrower or any Subsidiary Loan Party after the Closing Date as payment in respect of such Investments; provided further that in no event will the aggregate amount of additional Investments made by the Parent, any Borrower or any Subsidiary Loan Party in non-Subsidiary Loan Parties pursuant to this proviso exceed the sum of the original principal amount of the Scheduled Loans on the Closing Date and the aggregate amount of Returns of Scheduled Equity; (ii) Investments in the Parent, any Borrower or any Subsidiary Loan Party; provided that all amounts owing by the Borrowers or any Guarantor to any Subsidiary that is not a Guarantor shall be subordinated in right of payment to the Obligations pursuant to a subordination agreement substantially in the form of Exhibit F hereto or otherwise reasonably satisfactory to the Administrative Agent and a Borrower; (iii) Investments by any Subsidiary that is not a Borrower or Guarantor in any Subsidiary that is not a Borrower or Guarantor; (iv) Investments by the Parent, any Borrower or any Subsidiary Loan Party in any Wholly-Owned Subsidiary that is not a Borrower or Guarantor in an aggregate amount for all such outstanding Investments made after the Closing Date not to exceed the greater of $500,000,000 and [__]% of Consolidated Total Assets when made; provided that any such Investments shall (I) comprise intercompany transactions undertaken in good faith (as certified by a Responsible Officer of a Borrower) for the purpose of improving the consolidated tax efficiency of the Parent and its Subsidiaries and not for the purpose of circumventing any covenant set forth herein and (II) be made solely in the form of cash, notes, receivables, payables or securities; (v) other intercompany liabilities amongst the Borrowers and the Guarantors incurred in the ordinary course of business; (vi) other intercompany liabilities amongst Subsidiaries that are not Guarantors incurred in the ordinary course of business in connection with the cash management operations of such Subsidiaries; and (vii) Investments by the Parent or any Subsidiary Loan Party in any Subsidiary

A-0843

that is not a Loan Party in exchange for the contribution or Disposition of Investments of any other Subsidiary that is not a Loan Party held directly by the Parent or such Subsidiary Loan Party in exchange for Indebtedness, Equity Interests (or additional share premium or paid in capital in respect of Equity Interests) or a combination thereof of the Subsidiary to which such contribution or other Disposition is made or (y) an exchange of Equity Interests of any other Subsidiary that is not a Loan Party for Indebtedness of such Subsidiary; provided that immediately following the consummation of an Investment pursuant to preceding clause (x) or (y), the Subsidiary whose Equity Interests or Indebtedness are the subject of such Investment remains a Subsidiary.

(c) Permitted Investments and Investments that were Permitted Investments when made;

(d) Investments arising out of the receipt by the Parent, any Borrower or any Subsidiary of non-cash consideration for the Disposition of assets permitted under Section 6.05;

(e) loans and advances to officers, directors, employees or consultants of the Parent, any Borrower or any Subsidiary (i) in the ordinary course of business in an aggregate outstanding amount (valued at the time of the making thereof, and without giving effect to any write-downs or write-offs thereof) not to exceed $20,000,000, (ii) in respect of payroll payments and expenses in the ordinary course of business and (iii) in connection with such person's purchase of Equity Interests of the Parent solely to the extent that the amount of such loans and advances shall be contributed to the Parent in cash as common equity;

(f) accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business and any assets or securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers made in the ordinary course of business;

(g) Hedging Agreements entered into for non-speculative purposes;

(h) Investments (not in Subsidiaries, which are provided in clause (b) above) existing on, or contractually committed as of, the Closing Date and set forth on Part C of Schedule 6.04 and any extensions, renewals, replacements or reinvestments thereof, so long as the aggregate amount of all Investments pursuant to this clause (h) is not increased at any time above the amount of such Investment existing or committed on the Closing Date (other than pursuant to an increase as required by the terms of any such Investment as in existence on the Closing Date or as otherwise permitted by this Section 6.04);

(i) Investments resulting from pledges and deposits under Sections 6.02(f), (g), (n), (q), (r), (dd) and (ii);

(j) other Investments by the Parent or any Subsidiary in an aggregate outstanding amount (valued at the time of the making thereof, and without giving effect to any write-downs or write-offs thereof) not to exceed the sum of (X) the greater of $400,000,000 and [___]% of Consolidated Total Assets when made, plus (Y) so long as (1) no Default or Event of Default shall have occurred and be continuing and (2) the Total Net Leverage Ratio on a Pro Forma

52

A-0844

Basis is not greater than (Y) the amount, if any, accounted for by reference to the Available Amount, any portion of the Available Amount on the date of such election that a Borrower elects to apply to this Section 6.04(j)(Y) in a written notice of a Responsible Officer thereof, which notice shall set forth calculations in reasonable detail the amount of Available Amount immediately prior to such election and the amount thereof elected to be so applied, and plus (Z) an amount equal to any returns (including dividends, interest, distributions, returns of principal, profits on sale, repayments, income and similar amounts) actually received in respect of any such Investment (excluding any returns in excess of the amount originally invested) pursuant to clause (X); provided, that if any Investment pursuant to this Section 6.04(j) is made in any person that was not a Subsidiary on the date on which such Investment was made but becomes a Subsidiary thereafter, then such Investment may, at the option of a Borrower, upon such person becoming a Subsidiary and so long as such person remains a Subsidiary, be deemed to have been made pursuant to Section 6.04(b) (to the extent permitted by the provisions thereof) and not in reliance on this Section 6.04(j); provided, further, that no more than $100,000,000 in aggregate outstanding amount (valued at the time of the making thereof, and without giving effect to any write-downs or write-offs thereof) of Investments made in reliance on this clause (j) (other than Investments in the ordinary course of business consistent with past practice in an aggregate outstanding amount not to exceed $15,000,000) shall be made in Unrestricted Subsidiaries (including Investments arising as a result of the designation of a Subsidiary as an Unrestricted Subsidiary equal to the Fair Market Value of the Parent's (or its Subsidiaries') Investments in such Subsidiary at the date of designation);

(k) Investments constituting Permitted Business Acquisitions;

(l) Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business or Investments acquired by the Parent or a Subsidiary as a result of a foreclosure by the Parent or any of the Subsidiaries with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(m) Investments of a Subsidiary acquired after the Closing Date or of a person merged into the Parent or merged into or consolidated with a Subsidiary after the Closing Date, in each case, (i) to the extent such acquisition, merger or consolidation is permitted under this Section 6.04, (ii) in the case of any acquisition, merger or consolidation, in accordance with Section 6.05 and (iii) to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(n) acquisitions by the Parent, any Borrower or any Subsidiary of obligations of one or more officers or other employees of the Parent, any Borrower or any of the Subsidiaries in connection with such officer's or employee's acquisition of Equity Interests of the Parent, so long as no cash is actually advanced by any Borrower or any of the Subsidiaries to such officers or employees in connection with the acquisition of any such obligations;

(o) Guarantees by the Parent, any Borrower or any Subsidiary of operating leases (other than Capitalized Lease Obligations) or of other obligations that do not constitute Indebtedness of the kind described in clauses (a), (b), (e), (f), (g), (h), (i), (j), (k) or (l) of the definition thereof, in each case entered into by the Parent, any Borrower or any Subsidiary in the ordinary course of business;

53

A-0845

Case 20-12522   Document 2159   Filed 04/30/21   Page 133 of 172

(p) Investments consisting of additional Equity Interests (other than Disqualified Stock) of the Parent; provided, that the issuance of such Equity Interests are not included in any determination of the Available Amount;

(q) Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers;

(r) Guarantees permitted under Section 6.01 (except to the extent such Guarantee is expressly subject to this Section 6.04);

(s) advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of the Parent or such Subsidiary;

(t) Investments by the Parent and the Subsidiaries, if the Parent or any Subsidiary would otherwise be permitted to make a Restricted Payment under Section 6.06(g) in such amount (provided that the amount of any such Investment shall also be deemed to be a Restricted Payment under Section 6.06(g) for all purposes of this Agreement);

(u) Investments consisting of Permitted Receivables Facility Assets or arising as a result of Qualified Receivables Facilities;

(v) Investments consisting of the licensing or contribution of Intellectual Property pursuant to joint marketing or other similar arrangements with other persons, in each case in the ordinary course of business;

(w) to the extent constituting Investments, purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of Intellectual Property in each case in the ordinary course of business;

(x) Investments received substantially contemporaneously in exchange for Qualified Equity Interests of the Parent; provided, that the issuance of such Qualified Equity Interests are not included in any determination of the Available Amount;

(y) Investments in joint ventures; provided that the aggregate outstanding amount (valued at the time of the making thereof and without giving effect to any write-downs or write-offs thereof) of Investments made pursuant to this Section 6.04(y) shall not exceed the sum of (A) the greater of $200,000,000 and [___]% of Consolidated Total Assets when made, plus (B) an aggregate amount equal to any returns (including dividends, interest, distributions, returns of principal, profits on sale, repayments, income and similar amounts) actually received in respect of any such Investment (excluding any returns in excess of the amount originally invested); provided, that if any Investment pursuant to this Section 6.04(y) is made in any person that was not a Subsidiary on the date on which such Investment was made but becomes a Subsidiary thereafter, then such Investment may, at the option of a Borrower, upon such person becoming a Subsidiary and so long as such person remains a Subsidiary, be deemed to have been made pursuant to Section 6.04(b) (to the extent permitted by the provisions thereof) and not in reliance on this Section 6.04(y);

A-0846

Case 20-12522-JTD   Doc 2159   Filed 04/30/21   Page 134 of 172

(z) Guarantees of lease obligations of franchisees that are joint ventures and third-party franchisees not in excess of, but without duplication, the aggregate amount of unreimbursed payments made pursuant to any such Guarantee) not to exceed the greater of $100,000,000 and [___]% of Consolidated Total Assets when made;

(aa) additional Investments, so long as, at the time any such Investment is made and immediately after giving effect thereto, (x) no Default or Event of Default shall have occurred and is continuing and (y) the Total Net Leverage Ratio on a Pro Forma Basis is not greater than 3.00 to 1.00.

For purposes of determining compliance with this Section 6.04, (A) an Investment need not be permitted solely by reference to one category of permitted Investments (or any portion thereof) described in Sections 6.04(a) through (aa) but may be permitted in part under any relevant combination thereof and (B) in the event that an Investment (or any portion thereof) meets the criteria of one or more of the categories of permitted Investments (or any portion thereof) described in Sections 6.04(a) through (aa), a Borrower may, in its sole discretion, classify or reclassify, or later divide, classify or reclassify (as if made at such later time), such Investment (or any portion thereof) in any manner that complies with this Section 6.04 and will be entitled to only include the amount and type of such Investment (or any portion thereof) in one or more (as relevant) of the above clauses (or any portion thereof) and such Investment (or any portion thereof) shall be treated as having been made or existing pursuant to only such clause or clauses (or any portion thereof); provided, that (1) all Investments described in Schedule 6.04 shall be deemed outstanding under Section 6.04(b) or Section 6.04(h), as applicable and (2) notwithstanding the foregoing, Investments (other than Investments in the ordinary course of business) in Unrestricted Subsidiaries (including Investments arising as a result of the designation of a Subsidiary as an Unrestricted Subsidiary) may only be made pursuant to Section 6.04(j); provided, further, that upon re-designation of an Unrestricted Subsidiary as a Subsidiary, any Investment therein may be permitted pursuant to any category of permitted Investments (or any portion thereof) described in Sections 6.04(a) through (aa).

Any Investment in any person other than the Parent, a Borrower or a Subsidiary Loan Party that is otherwise permitted by this Section 6.04 may be made through intermediate Investments in Subsidiaries that are not Loan Parties and such intermediate Investments shall be disregarded for purposes of determining the outstanding amount of Investments pursuant to any clause set forth above. The amount of any Investment made other than in the form of cash or cash equivalents shall be the Fair Market Value thereof valued at the time of the making thereof, and without giving effect to any subsequent write-downs or write-offs thereof.

Notwithstanding anything to the contrary set forth in this Section 6.04, no material Investment may be made pursuant to Section 6.04(b) or (j) by a Loan Party to a Subsidiary or an Unrestricted Subsidiary unless (i) all Equity Interests issued by such Subsidiary or Unrestricted Subsidiary and held by Loan Parties constitute Collateral, (ii) a Borrower determines in good faith that such pledge of Equity Interests issued by such Subsidiary or Unrestricted Subsidiary (1) could reasonably be expected to result in the Parent or any of its Subsidiaries incurring any material Tax

A-0847

Case 20-12522-JTD   Doc 159-6   Filed 04/30/21   Page 35 of 172

or other cost (other than immaterial disruptions or costs of a type as to which other Subsidiaries, (2) is not permitted by, or could reasonably be expected to cause any officers, directors or employees of the Parent or any of its Subsidiaries to become subject to related liabilities under any, applicable Requirement of Law or (iii) all Equity Interests issued by such Subsidiary or Unrestricted Subsidiary and held by Loan Parties would constitute "Excluded Securities" pursuant to clause (c) of the definition thereof.

Notwithstanding anything to the contrary set forth in this Section 6.04, no Loan Party shall make any Investment in any Subsidiary (other than another Loan Party) or any Unrestricted Subsidiary if the consideration paid by such Loan Party to such Subsidiary (other than a Loan Party) or such Unrestricted Subsidiary in respect of such Investment constitutes Material Intellectual Property; provided that nothing in this sentence shall prohibit any non-exclusive (other than exclusive distribution or other similar within a specified jurisdiction) license or sublicense of Material Intellectual Property to, or use of Material Intellectual Property by, any Subsidiary or Unrestricted Subsidiary.

Section 6.05 <u>Mergers, Consolidations, Sales of Assets and Acquisitions</u>. Merge into, amalgamate with or consolidate with any other person, or permit any other person to merge into, amalgamate with or consolidate with it, or Dispose of (in one transaction or in a series of related transactions) all or any part of its assets (whether now owned or hereafter acquired), or Dispose of any Equity Interests of any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of related transactions) all or substantially all of the assets of any other person or division or line of business of a person, except that this Section 6.05 shall not prohibit:

(a) (i) the purchase and Disposition of inventory in the ordinary course of business by the Parent or any Subsidiary, (ii) the acquisition or lease (pursuant to an operating lease) of any other asset in the ordinary course of business by the Parent or any Subsidiary or, with respect to operating leases, otherwise for Fair Market Value on market terms (as determined in good faith by a Borrower), (iii) the Disposition of surplus, obsolete, damaged or worn out equipment or other property in the ordinary course of business by the Parent or any Subsidiary or (iv) the Disposition of Permitted Investments in the ordinary course of business;

(b) if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing or would result therefrom, (i) the merger, amalgamation or consolidation of any Subsidiary (other than any Borrower) with or into a Borrower in a transaction in which such Borrower is the survivor, (ii) the merger, amalgamation or consolidation of any Subsidiary (other than any Borrower) with or into any Subsidiary Loan Party in a transaction in which the surviving or resulting entity is or becomes a Subsidiary Loan Party organized in a Qualified Jurisdiction and, in the case of each of clauses (i) and (ii), no person other than a Borrower or a Subsidiary Loan Party receives any consideration (unless otherwise permitted by Section 6.04), (iii) the merger, amalgamation or consolidation of any Subsidiary that is not a Subsidiary Loan Party with or into any other Subsidiary that is not a Subsidiary Loan Party, (iv) the liquidation or dissolution or change in form of entity of any Subsidiary (other than any Borrower) if (x) a Borrower determines in good faith that such liquidation, dissolution or change in form is in the best interests of the Parent and is not materially disadvantageous to the Lenders

56

Case 1:20-cv-12522  Document 1-59-6  Filed 04/30/21  Page 136 of 172

and (y) same meets the requirements set forth in the proviso to clause (iii) under the heading "Permitted Change" above, merge, amalgamate or consolidate with any other person in order to effect an Investment permitted pursuant to Section 6.04 so long as the continuing or surviving person shall be a Subsidiary (unless otherwise permitted by Section 6.04), which shall be a Loan Party if the merging, amalgamating or consolidating Subsidiary was a Loan Party (and organized in a Qualified Jurisdiction if the merging, consolidating or amalgamating subsidiary was a Loan Party organized in a Qualified Jurisdiction) and which together with each of its Subsidiaries shall have complied with any applicable requirements of Section [___][32] or (vi) any Subsidiary (other than any Borrower) may merge, amalgamate or consolidate with any other person in order to effect an Asset Sale otherwise permitted pursuant to this Section 6.05;

(c) Dispositions to the Parent or a Subsidiary; provided, that any Dispositions by a Loan Party to a Subsidiary that is not a Subsidiary Loan Party in reliance on this clause (c) shall be made in compliance with Section 6.04;

(d) Sale and Lease-Back Transactions permitted by Section 6.03;

(e) Investments permitted by Section 6.04, Permitted Liens, and Restricted Payments permitted by Section 6.06;

(f) the discount or sale, in each case without recourse and in the ordinary course of business, of past due receivables arising in the ordinary course of business, but only in connection with the compromise or collection thereof consistent with customary industry practice (and not as part of any bulk sale or financing of receivables);

(g) other Dispositions of assets to persons other than the Parent and its Subsidiaries; provided, that (i) the Net Proceeds thereof, if any, are applied in accordance with Section [___][33] to the extent required thereby and (ii) any such Dispositions shall comply with the final sentence of this Section 6.05;

(h) Permitted Business Acquisitions (including any merger, consolidation or amalgamation in order to effect a Permitted Business Acquisition); provided, that following any such merger, consolidation or amalgamation involving a Borrower, such Borrower is the surviving entity or the requirements of Section 6.05(n) are otherwise complied with;

(i) leases, licenses or subleases or sublicenses of any real or personal property in the ordinary course of business;

(j) Dispositions of inventory in the ordinary course of business or Dispositions or abandonment of Intellectual Property of the Parent and its Subsidiaries determined in good faith by the management of a Borrower to be no longer economically practicable to maintain or useful or necessary in the operation of the business of the Parent or any of the Subsidiaries;

---

[31]  Section reference to be to covenant regarding maintenance of subsidiary existence.
[32]  Section reference to be to further assurances covenant.
[33]  Section reference to be to asset sale mandatory prepayment.

A-0849

(k) any disposition of assets in connection with any Permitted Investment pursuant to the definition of "Net Proceeds";

(l) the purchase and Disposition (including by capital contribution) of Permitted Receivables Facility Assets including pursuant to Qualified Receivables Facilities;

(m) any exchange or swap of assets (other than cash and Permitted Investments) for services and/or other assets (other than cash and Permitted Investments) of comparable or greater value or usefulness to the business of the Parent and the Subsidiaries as a whole, determined in good faith by the management of a Borrower; and

(n) other transactions effected (including mergers, consolidations or acquisitions of "shell" entities) for the sole purpose of reincorporating or reorganizing the Parent or any Subsidiary (other than any Borrower) under the laws of the United States of America or any State thereof or the District of Columbia, Switzerland, the United Kingdom or any jurisdiction that is a member state of the European Union as of the Closing Date; provided that (i) a Borrower shall have provided the Administrative Agent with reasonable advance notice of any transactions as described above in this clause (n), (ii) subject to the Agreed Guarantee and Security Principles, the Lux Borrower shall ensure that, if the respective entity subject to any action described above was a Guarantor, the applicable reincorporated or reorganized entity shall be a Guarantor and shall grant a security interest in substantially all of those of its assets that constituted part of the Collateral immediately prior to such reincorporation or reorganization and (iii) the Administrative Agent shall have concluded (acting reasonably) that, after giving effect to any replacement guarantees and security to be provided pursuant to preceding clause (ii), such transactions are not adverse to the Lenders in any material respect (it being understood and agreed that such a reincorporation or reorganization into a jurisdiction as has been agreed by the Parent and the Administrative Agent prior to Closing Date shall be permitted if the requirements of preceding clauses (i) and (ii) are satisfied).[34]

Notwithstanding anything to the contrary contained above, this Section 6.05 shall not restrict, at any time, the sale of Unrestricted Margin Stock so long as any such sale meets the requirements of the last paragraph of this Section 6.05.

Notwithstanding anything to the contrary contained in Section 6.05 above, no Disposition of assets under Section 6.05(g) or, solely with respect to Sale and Lease-Back Transactions referred to in clause (b) of Section 6.03, under Section 6.05(d), or pursuant to the immediately preceding sentence, shall in each case be permitted unless (i) such Disposition is for Fair Market Value, and (ii) at least 75% of the proceeds of such Disposition (except to Loan Parties) consist of cash or Permitted Investments; provided, that the provisions of this clause (ii) shall not apply to any individual transaction or series of related transactions involving assets with a Fair Market Value of less than $10,000,000 or to other transactions involving assets with a Fair Market Value of not more than $35,000,000 in the aggregate for all such transactions during the term of this Agreement; provided, further, that for purposes of this clause (ii), each of the following shall be deemed to be cash: (a) the amount of any liabilities (as shown on the Parent's or such Subsidiary's most recent balance sheet or in the notes thereto) that are assumed by the transferee

---

[34]    To include at least each Qualified Jurisdiction.

Case 20-12522-JTD   Doc 1360   Filed 04/30/21   Page 36 of 172

of any such assets pursuant to a binding agreement or otherwise for (b) for promissory notes or other obligations or other securities or assets received by the Parent or such Subsidiary from the transferee that are converted by the Parent or such Subsidiary into cash within 180 days after receipt thereof (to the extent of the cash received) and (c) any Designated Non-Cash Consideration received by the Parent or any of its Subsidiaries in such Disposition or any series of related Dispositions, having an aggregate Fair Market Value not to exceed the greater of $120,000,000 and [__]% of Consolidated Total Assets when received (with the Fair Market Value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value).

Notwithstanding anything to the contrary contained in Section 6.05 above, this Section 6.05 or, with respect to Sale and Lease-Back Transactions referred to in clause (b) of Section 6.03, under Section 6.05(d), shall not permit any Loan Party to make any Disposition of Material Intellectual Property to any Subsidiary (other than another Loan Party) or any Unrestricted Subsidiary; provided that nothing in this sentence shall prohibit any non-exclusive (other than exclusive distribution or other similar within a specified jurisdiction) license or sublicense of Material Intellectual Property to, or use of Material Intellectual Property by, any Subsidiary or Unrestricted Subsidiary.

Section 6.06 <u>Dividends and Distributions</u>. (I) Declare or pay any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests (including any repayment by a Subsidiary that is not a Loan Party of any Indebtedness of a direct or indirect parent company that is a Loan Party) other than dividends and distributions on Equity Interests payable solely by the issuance of additional Equity Interests (other than Disqualified Stock) of the person paying such dividends or distributions) or directly or indirectly redeem, purchase, retire or otherwise acquire for value (or permit any Subsidiary to purchase or acquire) any of the Parent's Equity Interests or set aside any amount for any such purpose (other than through the issuance of additional Equity Interests (other than Disqualified Stock) of the person redeeming, purchasing, retiring or acquiring such shares), (II) make any voluntary principal prepayment on, or voluntarily redeem, repurchase, defease or otherwise acquire or retire for value (including through a tender offer, open market purchase or debt-for-debt exchange), in each case prior to any scheduled repayment or scheduled maturity, any Subordinated Indebtedness, Indebtedness for borrowed money (or Indebtedness evidenced by bonds, debentures, notes or similar instruments) secured by Junior Liens or unsecured Indebtedness for borrowed money (or Indebtedness evidenced by bonds, debentures, notes or similar instruments), and any guarantees of any of the foregoing, of the Parent or any Loan Party (other than the prepayment, redemption, repurchase, defeasance, acquisition or retirement (including through a tender offer, open market purchase or debt-for-debt exchange) of (A) Subordinated Indebtedness, Indebtedness secured by Junior Liens or unsecured Indebtedness, in each case in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year after the date of such payment, redemption, repurchase, defeasance, acquisition or retirement and (B) Indebtedness owed to the Parent or any Subsidiary thereof) (such prepayments, redemptions, repurchases, defeasance, acquisitions or retirements described in this clause (II), "Restricted Debt Payments") or (III) make any voluntary prepayment on, or voluntarily repurchase, defease or otherwise acquire or retire for value (including through a purchase for cash or exchange for debt) any payment obligations with respect to the Opioid Settlement or the DOJ Settlement, in each case prior to any scheduled payment (other than any

59

prepayment, repurchase, defeasance, acquisition or retirement) (any such payment, prepayment, repurchase, defeasance, acquisition or retirement) (such prepayments, repurchases, defeasances, acquisitions or retirements described in this clause (III), "Restricted Settlement Payments"; and, collectively, all of the foregoing in clauses (I), (II) and (III), "Restricted Payments"); provided, however, that:

(a) Restricted Payments may be made to the Parent or any Subsidiary (provided that Restricted Payments made by a non-Wholly Owned Subsidiary to the Parent or any Subsidiary that is a direct or indirect parent of such Subsidiary must be made on a pro rata basis (or more favorable basis from the perspective of the Parent or such Subsidiary) based on its ownership interests in such non-Wholly Owned Subsidiary);

(b) Restricted Payments may be made by the Parent to purchase or redeem the Equity Interests of the Parent (including related stock appreciation rights or similar securities) held by then present or former directors, consultants, officers or employees of the Parent or any of the Subsidiaries or by any Plan or any shareholders' agreement then in effect upon such person's death, disability, retirement or termination of employment or under the terms of any such Plan or any other agreement under which such shares of stock or related rights were issued; provided, that the aggregate amount of such purchases or redemptions under this clause (b) shall not exceed in any fiscal year $15,000,000 (plus (x) the amount of net proceeds contributed to the Parent during such calendar year from sales of Equity Interests of the Parent to directors, consultants, officers or employees of the Parent or any Subsidiary in connection with permitted employee compensation and incentive arrangements; provided, that such proceeds are not included in any determination of the Available Amount and (y) the amount of net proceeds of any key-man life insurance policies received during such calendar year, which, if not used in any year, may be carried forward to any subsequent calendar year); and provided, further, that cancellation of Indebtedness owing to the Parent or any Subsidiary from members of management of the Parent or its Subsidiaries in connection with a repurchase of Equity Interests of the Parent will not be deemed to constitute a Restricted Payment for purposes of this Section 6.06;

(c) any person may make non-cash repurchases of Equity Interests deemed to occur upon exercise or settlement of stock options or other Equity Interests if such Equity Interests represent a portion of the exercise price of or withholding obligation with respect to such options or other Equity Interests;

(d) so long as, at the time any such Restricted Payment is made and immediately after giving effect thereto, (x) no Default or Event of Default shall have occurred and is continuing and (y) the Total Net Leverage Ratio on a Pro Forma Basis is not greater than 3.25 to 1.00, and taking into account any outstanding Investments made pursuant to Section 6.04(j)(Y) utilizing the Available Amount, Restricted Payments may be made in an aggregate amount equal to a portion of the Available Amount on the date of such election that the Parent elects to apply to this Section 6.06(d), which such election shall (unless such Restricted Payment is made pursuant to clause (a) of the definition of Available Amount) be set forth in a written notice of a Responsible Officer of a Borrower, which notice shall set forth calculations in reasonable detail the amount of Available Amount immediately prior to such election and the amount thereof elected to be so applied;

60

Case 20-12522-JTD   Doc 1596-6   Filed 04/30/21   Page 40 of 92

(e) Restricted Payments may be made in connection with the consummation of a transaction permitted by Section 7 for the appraised value of any Dissenting Shares (as defined in the Merger Agreement) in accordance with the Merger Agreement;

(f) Restricted Payments may be made to make payments, in cash, in lieu of the issuance of fractional shares, upon the exercise of warrants or upon the conversion or exchange of Equity Interests of any such person;

(g) other Restricted Payments may be made in an aggregate amount from and after the Closing Date not to exceed the greater of $150,000,000 and [___]% of Consolidated Total Assets when made;

(h) additional Restricted Payments may be made, so long as, at the time any such Restricted Payment is made and immediately after giving effect thereto, (x) no Default or Event of Default shall have occurred and is continuing and (y) the Total Net Leverage Ratio on a Pro Forma Basis is not greater than 2.75 to 1.00;

(i) Restricted Payments may be made with any portion of the Cumulative Parent Qualified Equity Proceeds Amount;;

(j) Restricted Debt Payments may be made with the net proceeds of, or with, Indebtedness of Loan Parties permitted to be incurred pursuant to Section 6.01 ("Restricted Debt Payment Indebtedness") that (i) constitutes Subordinated Indebtedness, (ii) is secured by Junior Liens or (iii) is unsecured, in each case so long (1) the final maturity date of such Restricted Debt Payment Indebtedness is on or after the earlier of (x) the final maturity date of the Indebtedness subject to such Restricted Debt Payment ("Repaid Indebtedness") and (y) the Latest Maturity Date in effect at the time of incurrence thereof, and (2) the Weighted Average Life to Maturity of such Restricted Debt Payment Indebtedness is greater than or equal to the lesser of (x) the Weighted Average Life to Maturity of the Repaid Indebtedness and (y) the Weighted Average Life to Maturity of the Class of Term Loans then outstanding with the greatest remaining Weighted Average Life to Maturity; and

(k) Restricted Settlement Payments may be made with the net proceeds of, or with, Indebtedness of Loan Parties permitted to be incurred pursuant to Section 6.01 ("Restricted Settlement Payment Indebtedness") that (i) constitutes Subordinated Indebtedness, (ii) is secured by Junior Liens or (iii) is unsecured, in each case so long as the Weighted Average Life to Maturity of such Restricted Settlement Payment Indebtedness is greater than or equal to the lesser of (x) the Weighted Average Life to Maturity of the Opioid Settlement or the DOJ Settlement, as applicable, and (y) the Weighted Average Life to Maturity of the Class of Term Loans then outstanding with the greatest remaining Weighted Average Life to Maturity.

Notwithstanding anything herein to the contrary, the foregoing provisions of Section 6.06 will not prohibit the payment of any Restricted Payment or the consummation of any redemption, purchase, defeasance or other payment within 60 days after the date of declaration thereof or the giving of notice, as applicable, if at the date of declaration or the giving of such notice such payment would have complied with the provisions of this Agreement.

A-0853

Case 1:21-cv-01093-LPS   Document 30   Filed 12/13/21   Page 288 of 426 PageID #: 2422

Notwithstanding anything to the contrary, no Loan Party shall transfer or otherwise convey any Material Intellectual Property to any Subsidiary (other than another Loan Party) or any Unrestricted Subsidiary in the form of Material Intellectual Property; provided that nothing in this sentence shall prohibit any non-exclusive (other than exclusive distribution or other similar within a specified jurisdiction) license or sublicense of Material Intellectual Property to, or use of Material Intellectual Property by, any Subsidiary or Unrestricted Subsidiary.

Section 6.07 Transactions with Affiliates. i) Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction with, any of its Affiliates (other than the Parent, and the Subsidiaries or any person that becomes a Subsidiary as a result of such transaction) in a transaction (or series of related transactions) involving aggregate consideration in excess of $20,000,000 unless such transaction is (i) otherwise permitted (or required) under this Agreement or (ii) upon terms that are substantially no less favorable to the Parent or such Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate, as determined by the Board of Directors of the Parent or such Subsidiary in good faith.

(a) The foregoing clause (a) shall not prohibit, to the extent otherwise permitted under this Agreement,

(i) any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, equity purchase agreements, stock options and stock ownership plans approved by the Board of Directors of the Parent,

(ii) loans or advances to employees or consultants of the Parent or any of the Subsidiaries in accordance with Section 6.04(e),

(iii) transactions among the Parent or any Subsidiary or any entity that becomes a Subsidiary as a result of such transaction (including via merger, consolidation or amalgamation in which the Parent or a Subsidiary is the surviving entity),

(iv) the payment of fees, reasonable out-of-pocket costs and indemnities to directors, officers, consultants and employees of the Parent and the Subsidiaries in the ordinary course of business,

(v) the Transactions (including the payment of all fees, expenses, bonuses and awards relating thereto) and any transactions pursuant to the Transaction Documents and permitted transactions, agreements and arrangements in existence on the Closing Date and, to the extent involving aggregate consideration in excess of $5,000,000, set forth on Schedule 6.07 or any amendment thereto or replacement thereof or similar arrangement to the extent such amendment, replacement or arrangement is not adverse to the Lenders when taken as a whole in any material respect (as determined by the Parent in good faith),

62

A-0854

subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with employees, officers or directors, and (C) any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees, and any reasonable employment contract and transactions pursuant thereto,

(vii) Restricted Payments permitted under Section 6.06 and Investments permitted under Section 6.04,

(viii) transactions for the purchase or sale of goods, equipment, products, parts and services entered into in the ordinary course of business,

(ix) any transaction in respect of which the Parent delivers to the Administrative Agent a letter addressed to the Board of Directors of the Parent from an accounting, appraisal or investment banking firm, in each case of nationally recognized standing that is in the good faith determination of the Parent qualified to render such letter, which letter states that (i) such transaction is on terms that are substantially no less favorable to the Parent or such Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate or (ii) such transaction is fair to the Parent or such Subsidiary, as applicable, from a financial point of view,

(x) transactions with joint ventures for the purchase or sale of goods, equipment, products, parts and services entered into in the ordinary course of business,

(xi) transactions pursuant to any Qualified Receivables Facility,

(xii) transactions between the Parent or any of the Subsidiaries and any person, a director of which is also a director of the Parent; provided, however, that (A) such director abstains from voting as a director of the Parent on any matter involving such other person and (B) such person is not an Affiliate of the Parent for any reason other than such director's acting in such capacity,

(xiii) transactions permitted by, and complying with, the provisions of Section 6.05 (other than Section 6.05(m)),

(xiv) intercompany transactions undertaken in good faith (as certified by a Responsible Officer of the Parent) for the purpose of improving the consolidated tax efficiency of the Parent and the Subsidiaries and not for the purpose of circumventing any covenant set forth herein,

(xv) payments, loans (or cancellation of loans) or advances to employees or consultants that are (i) approved by a majority of the Disinterested Directors of the Parent in good faith, (ii) made in compliance with applicable law and (iii) otherwise permitted under this Agreement, and

(xvi) transactions with customers, clients or suppliers, or purchasers or sellers of goods or services, in each case in the ordinary course of business or otherwise in compliance with the terms of this Agreement that are fair to the Parent or the Subsidiaries.

63

Case 20-12522-JTD   Doc 3159-6   Filed 04/30/21   Page 143 of 172

respect in any business or business activity substantially different from any business or business activity conducted by any of them on the Closing Date or any Similar Business, and in the case of a Receivables Entity, Qualified Receivables Facilities and related activities.

Section 6.09 <u>Restrictions on Subsidiary Distributions and Negative Pledge Clauses</u>. Permit any Material Subsidiary to enter into any agreement or instrument that by its terms restricts (i) the payment of dividends or other distributions or the making of cash advances to the Parent or any Material Subsidiary that is a direct or indirect parent of such Subsidiary or (ii) the granting of Liens by the Parent or such Material Subsidiary that is a Loan Party pursuant to the Security Documents, in each case other than those arising under any Loan Document, except, in each case, restrictions existing by reason of:

(a) restrictions imposed by applicable law;

(b) contractual encumbrances or restrictions in effect on the Closing Date under Indebtedness existing on the Closing Date and set forth on <u>Schedule 6.01</u> or contained in any Indebtedness outstanding pursuant to Section 6.01(z), or any agreements related to any Permitted Refinancing Indebtedness in respect of any such Indebtedness that does not materially expand the scope of any such encumbrance or restriction (as determined in good faith by a Borrower);

(c) any restriction on a Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Equity Interests or assets of a Subsidiary pending the closing of such sale or disposition;

(d) customary provisions in joint venture agreements and other similar agreements applicable to joint ventures entered into in the ordinary course of business;

(e) any restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

(f) any restrictions imposed by any agreement relating to Indebtedness incurred pursuant to Section 6.01 or Permitted Refinancing Indebtedness in respect thereof, to the extent such restrictions are not materially more restrictive, taken as a whole, than the restrictions contained in this Agreement or are market terms at the time of issuance (in each case as determined in good faith by a Borrower);

(g) customary provisions contained in leases or licenses of Intellectual Property and other similar agreements entered into in the ordinary course of business;

(h) customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(i) customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

64

Case 20-12522-JTD   Doc 2159-5   Filed 04/30/21   Page 44 of 172

(j) customary provisions in joint venture agreements and other similar agreements applicable to joint ventures and applicable solely to such joint venture and the Equity Interests therein and restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business and customary provisions restricting the subletting or assignment of any lease governing a leasehold interest or any assignment of any asset permitted under Section 6.05 pending the consummation of such sale, transfer, lease or other disposition;

(k) customary restrictions and conditions contained in the document relating to any Lien, so long as (1) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien, and (2) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 6.09;

(l) customary net worth provisions contained in Real Property leases entered into by Subsidiaries, so long as a Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Parent and its Subsidiaries to meet their ongoing obligations;

(m) any agreement in effect at the time such subsidiary becomes a Subsidiary, so long as such agreement was not entered into in contemplation of such person becoming a Subsidiary;

(n) restrictions in agreements representing Indebtedness permitted under Section 6.01 of a Subsidiary that is not a Subsidiary Loan Party (so long as such restrictions only relate to non-Loan Parties);

(o) customary restrictions contained in leases, subleases, licenses or Equity Interests or asset sale agreements otherwise permitted hereby as long as such restrictions relate to the Equity Interests and assets subject thereto;

(p) restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(q) restrictions contained in any Permitted Receivables Facility Documents with respect to any Receivables Entity;

(r) restrictions contained in the Opioid Settlement or the DOJ Settlement; and

(s) any encumbrances or restrictions of the type referred to in clause (i) or (ii) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of or similar arrangements to the contracts, instruments or obligations referred to in clauses (a) through (r) above; provided that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements, refinancings or similar arrangements are, in the good faith judgment of the Parent, no more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions as contemplated by such provisions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement, refinancing or similar arrangement.

A-0857

Case 20-12522-JTD   Doc 2159-6   Filed 04/30/21   Page 145 of 152

Section 6.10 or (ii) of the Loan Parties and their Subsidiaries may change their fiscal quarter and/or fiscal year end one or more times, subject to such adjustments to this Agreement as a Borrower and Administrative Agent shall reasonably agree are necessary or appropriate in connection with such change (and the parties hereto hereby authorize either Borrower and the Administrative Agent to make any such amendments to this Agreement as they jointly deem necessary to give effect to the foregoing).

Section 6.11 <u>Amendment to DOJ and Opioid Settlements</u>. (i) Modify, amend or waive any term of either of the DOJ Settlement or the Opioid Settlement that results in (i) total cash payments by the Loan Parties in respect of the DOJ Settlement and the Opioid Settlement to exceed an aggregate amount of $1,860,000,000 (excluding professional fees and expenses payable in connection with the Opioid Settlement and the DOJ Settlement and interest payable in connection with the DOJ Settlement), (ii) the acceleration of the timing of any payment due under either the DOJ Settlement or the Opioid Settlement (except, (A) with respect to the Opioid Settlement, for any changes to the timing of exercise of the option to prepay the amounts owing to the Opioid Trust (as defined in the Opioid Settlement), and (B) the Additional Insurance Rights (as defined in the RSA)), (ii) make any Restricted Settlement Payment in respect of (i) a portion less than all of the remaining payments in respect of the Opioid Settlement or (ii) a portion less than all of the remaining payments in respect of the DOJ Settlement, in each case other than with any portion of the Cumulative Parent Qualified Equity Proceeds Amount or (iii) cause any Subsidiary (other than the Loan Parties) to guarantee the obligations in respect of the Opioid Settlement or the DOJ Settlement.

Section 6.12 <u>Limitation on Transfers to Mallinckrodt Holdings GmbH</u>. (i) Dispose of any material property or assets (including through the making of any material Investment) to Mallinckrodt Holdings GmbH or any of its Subsidiaries, other than pursuant to the intercompany receivable owned by Mallinckrodt Holdings GmbH and existing on March 9, 2021 (the "<u>Swiss Intercompany Receivable</u>"), (ii) permit Mallinckrodt Holdings GmbH and its Subsidiaries, when taken collectively as if constituting a single Subsidiary (but excluding the Swiss Intercompany Receivable), to constitute a Material Subsidiary or (iii) permit Mallinckrodt Holdings GmbH or its Subsidiaries to incur any material Indebtedness owed to unaffiliated third parties, or guarantee any material Indebtedness owed to any unaffiliated third-parties, in each of clauses (i) through (iii), unless Mallinckrodt Holdings GmbH shall become a Loan Party.

66

A-0858

Redline

**Term Lender Holdings**



**Mallinckrodt Gains Support for Its Restructuring Support Agreement**
**from Lenders Holding Approximately $1.3 Billion of Its First Lien Term Loans**

**DUBLIN, Ireland, March 10, 2021 –** Mallinckrodt plc (OTCMKTS: MNKKQ) ("Mallinckrodt" or the "Company") today announced that it has reached agreement with an ad hoc group of first lien term lenders holding approximately $1.3 billion of its outstanding First Lien Term Loans (the "First Lien Term Loan Lenders") to support the Company's previously announced restructuring support agreement ("RSA"). The agreement, which is based on providing new term loans financing to replace the First Lien Term Loans, resolves the open dispute between the Company and the First Lien Term Loan Lenders as to how such Lenders are to be treated under the restructuring plan and serves to extend near-term debt maturities.

Mark Trudeau, President and Chief Executive Officer of Mallinckrodt, said, "We continue to make substantial progress toward implementing a consensual restructuring that addresses the Company's legal uncertainties and positions us to move ahead with our strategic plans. With the support of our First Lien Term Loan Lenders who have become parties to our RSA, we now have support from many of our largest creditor constituents as we continue to build greater consensus towards an outcome that should maximize value and benefit our patients, employees, customers, suppliers and other partners. As we work to complete this process, we remain focused on developing new therapies, improving patient health outcomes and supporting underserved patients."

The key terms of the alternative treatment for the First Lien Term Loan Lenders include:

- If not otherwise refinanced in full in cash prior to the date the Company's Plan of Reorganization becomes effective (the "Plan Effective Date"), First Lien Term Loan Lenders shall receive term loans on the following terms through a plan of reorganization:

  - Increase in LIBOR margin of 2.50% (to a total interest rate of L+525 bps and L+550 bps for the First Lien Term Loans due in 2024 and 2025, respectively), subject to a 75 bps LIBOR floor;

  - Maturity extension to the earlier of September 30, 2027 or 5.75 years following the Plan Effective Date; and

  - No financial maintenance covenants;

- Alternatively, the Company may refinance in full in cash the approximately $1.9 billion of currently outstanding First Lien Term Loans at par prior to or on the Plan Effective Date, subject to reduction for payment upon court approval of the 2020 excess cash flow sweep calculated to be approximately $114 million;

- Exit payment of 50 bps if the First Lien Term Loans are refinanced in full in cash prior to or on the Plan Effective Date, or 100 bps if the First Lien Term Loans are not so refinanced; and

- Cash Collateral Order to be modified to pay an incremental 50 bps of adequate protection interest during the case, with an agreement to treat adequate protection payments as satisfying the Lenders' interest entitlements upon the Plan Effective Date.

As previously announced in October 2020, Mallinckrodt voluntarily initiated Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware to implement the RSA and key legal settlements – including opioid claims – in a fair, orderly, efficient and legally binding manner. The RSA provides for a financial restructuring designed to strengthen the Company's balance sheet and reduce its total debt by approximately $1.3 billion, excluding the 2020 excess cash flow sweep to First Lien Term Loan Lenders noted above, improving the Company's financial position and allowing the Company to

1

continue driving its strategic priorities and investing in the business to develop and commercialize therapies to improve health outcomes. In addition to the First Lien Term Loan Lenders, upon effectiveness of the amendment, the RSA will be supported by:

- Holders of approximately 84% of the Company's guaranteed unsecured notes;

- 50 states and territories and the Plaintiffs' Executive Committee in the opioid multidistrict litigation; and

- The Multi-State Governmental Entities Group (the "MSGE Group"), which represents more than 1,300 counties, municipalities, tribes and other governmental entities, across 38 states and territories, with opioid-related claims against the Company.

To become effective, the agreement must be supported by Lenders holding 66.7% of each of the First Lien Term Loans due in 2024 and the First Lien Term Loans due in 2025, the Governmental Ad Hoc Committee, the MSGE Group and majority of the guaranteed bondholders. The implementation of this settlement is subject to the support of all of these parties and approval of a Chapter 11 plan embodying the RSA by the Bankruptcy Court.

**Advisors**

Latham & Watkins LLP, Ropes & Gray LLP and Wachtell, Lipton, Rosen & Katz are serving as counsel, Guggenheim Securities, LLC is serving as investment banker and AlixPartners LLP is serving as restructuring advisor to Mallinckrodt.

Gibson, Dunn & Crutcher LLP is serving as counsel and Evercore Group LLC is serving as financial advisor to the ad hoc group of First Lien Term Loan Lenders. Paul, Weiss, Rifkind, Wharton & Garrison LLP is serving as counsel and Perella Weinberg Partners LP is serving as financial advisor to the ad hoc group of guaranteed unsecured bondholders. Kramer Levin Naftalis & Frankel LLP, Brown Rudnick LLP and Gilbert LLP are serving as counsel, and Houlihan Lokey is serving as financial advisor to the Governmental Ad Hoc Committee. Caplin & Drysdale is serving as counsel and FTI Consulting is serving as financial advisor to the MSGE Group.

**About Mallinckrodt**

Mallinckrodt is a global business consisting of multiple wholly owned subsidiaries that develop, manufacture, market and distribute specialty pharmaceutical products and therapies. The company's Specialty Brands reportable segment's areas of focus include autoimmune and rare diseases in specialty areas like neurology, rheumatology, nephrology, pulmonology and ophthalmology; immunotherapy and neonatal respiratory critical care therapies; analgesics and gastrointestinal products. Its Specialty Generics reportable segment includes specialty generic drugs and active pharmaceutical ingredients. To learn more about Mallinckrodt, visit www.mallinckrodt.com.

Mallinckrodt uses its website as a channel of distribution of important company information, such as press releases, investor presentations and other financial information. It also uses its website to expedite public access to time-critical information regarding the company in advance of or in lieu of distributing a press release or a filing with the U.S. Securities and Exchange Commission (SEC) disclosing the same information. Therefore, investors should look to the Investor Relations page of the website for important and time-critical information. Visitors to the website can also register to receive automatic e-mail and other notifications alerting them when new information is made available on the Investor Relations page of the website.

2

**CAUTIONARY STATEMENTS RELATED TO FORWARD-LOOKING STATEMENTS**

Statements in this document that are not strictly historical, including statements regarding future financial condition and operating results, legal, economic, business, competitive and/or regulatory factors affecting Mallinckrodt's businesses, and any other statements regarding events or developments the company believes or anticipates will or may occur in the future, may be "forward-looking" statements within the meaning of the Private Securities Litigation Reform Act of 1995, and involve a number of risks and uncertainties.

There are a number of important factors that could cause actual events to differ materially from those suggested or indicated by such forward-looking statements and you should not place undue reliance on any such forward-looking statements. These factors include risks and uncertainties related to, among other things: Mallinckrodt's ongoing Chapter 11 cases; the ability of Mallinckrodt and its subsidiaries to obtain approval from the bankruptcy court with respect to motions or other requests made to the bankruptcy court throughout the course of the Chapter 11 cases and to negotiate, develop, obtain court approval of, confirm and consummate the plan of reorganization contemplated by the restructuring support agreement or any other plan that may be proposed, the effects of the Chapter 11 cases, including increased professional costs, on the liquidity, results of operations and businesses of Mallinckrodt and its subsidiaries; the consummation of the transactions contemplated by the restructuring support agreement, including the ability of the parties to negotiate definitive agreements with respect to the matters covered by the term sheets included in the restructuring support agreement, the occurrence of events that may give rise to a right of any of the parties to terminate the restructuring support agreement and the ability of the parties to receive the required approval by the bankruptcy court and to satisfy the other conditions of the restructuring support agreement, including satisfying the milestones specified in the restructuring support agreement; governmental investigations and inquiries, regulatory actions and lawsuits brought against Mallinckrodt by government agencies and private parties with respect to its historical commercialization of opioids, including the amended non-binding agreement in principle reached by Mallinckrodt in connection with the announcement of its filing of the Chapter 11 petitions regarding the terms and conditions of a global settlement to resolve all current and future opioid-related claims; potential delays in Mallinckrodt's Chapter 11 process; the proposed settlement with governmental parties to resolve certain disputes relating to Acthar Gel; the possibility that such settlement will not be consummated and the risks and uncertainties related thereto, including the time and expense of continuing to litigate this dispute and the impact of this dispute on Mallinckrodt's financial condition and expectations for performance; the ability to maintain relationships with Mallinckrodt's suppliers, customers, employees and other third parties as a result of the Chapter 11 cases; the availability of operating capital during the pendency of the Chapter 11 cases, including events that could terminate Mallinckrodt's right to continue to access the cash collateral of Mallinckrodt's lenders; the possibility that Mallinckrodt may be unable to achieve its business and strategic goals even if the Chapter 11 plan is successfully consummated; the possibility that Mallinckrodt's Chapter 11 cases may be converted into Chapter 7 cases under the bankruptcy code; the potential termination of Mallinckrodt's exclusive right to file a Chapter 11 plan; the possibility that certain claims against Mallinckrodt may not be discharged as part of the bankruptcy process; developing, funding and executing Mallinckrodt's business plan and continuing as a going concern; Mallinckrodt's post-bankruptcy capital structure; scrutiny from governments, legislative bodies and enforcement agencies related to sales, marketing and pricing practices; pricing pressure on certain of Mallinckrodt's products due to legal changes or changes in insurers' reimbursement practices resulting from recent increased public scrutiny of healthcare and pharmaceutical costs; the impact of the outbreak of the COVID-19 coronavirus; the reimbursement practices of governmental health administration authorities, private health coverage insurers and other third-party payers; complex reporting and payment obligations under the Medicare and Medicaid rebate programs and other governmental purchasing and rebate programs; cost containment efforts of customers, purchasing groups, third-party payers and governmental organizations; changes in or failure to comply with

3

relevant laws and regulations; Mallinckrodt's and its partners' ability to successfully develop or commercialize new products or expand commercial opportunities; Mallinckrodt's ability to navigate price fluctuations; competition; Mallinckrodt's and its partners' ability to protect intellectual property rights; limited clinical trial data for Acthar Gel; clinical studies and related regulatory processes; product liability losses and other litigation liability; material health, safety and environmental liabilities; potential indemnification liabilities to Covidien pursuant to the separation and distribution agreement; business development activities; retention of key personnel; the effectiveness of information technology infrastructure including cybersecurity and data leakage risks; customer concentration; Mallinckrodt's reliance on certain individual products that are material to its financial performance; Mallinckrodt's ability to receive procurement and production quotas granted by the U.S. Drug Enforcement Administration; complex manufacturing processes; conducting business internationally; Mallinckrodt's ability to achieve expected benefits from restructuring activities; Mallinckrodt's significant levels of intangible assets and related impairment testing; labor and employment laws and regulations; natural disasters or other catastrophic events; Mallinckrodt's substantial indebtedness and its ability to generate sufficient cash to reduce its indebtedness; Mallinckrodt's ability to generate sufficient cash to service indebtedness even if the existing indebtedness is restructured; future changes to U.S. and foreign tax laws or the impact of disputes with governmental tax authorities; and the impact of Irish laws.

These and other factors are identified and described in more detail in the "Risk Factors" section of Mallinckrodt's Annual Report on Form 10-K for the fiscal year ended December 27, 2019 and Form 10-Q for the fiscal quarters ended September 25, 2020, June 26, 2020 and March 27, 2020. The forward-looking statements made herein speak only as of the date hereof and Mallinckrodt does not assume any obligation to update or revise any forward-looking statement, whether as a result of new information, future events and developments or otherwise, except as required by law.

**CONTACTS**

**Investor Relations**
Daniel J. Speciale
Vice President, Finance and Investor Relations Officer
314-654-3638
daniel.speciale@mnk.com

**Media**
Michael Freitag / Aaron Palash / Aura Reinhard
Joele Frank, Wilkinson Brimmer Katcher
212-355-4449

**Government Affairs**
Mark Tyndall
Senior Vice President, U.S. General Counsel
& Government Affairs
202-459-4141
mark.tyndall@mnk.com

4

A-0864

Mallinckrodt, the "M" brand mark and the Mallinckrodt Pharmaceuticals logo are trademarks of a Mallinckrodt company. Other brands are trademarks of a Mallinckrodt company or their respective owners. ©2021 Mallinckrodt. US-2000496 03/21

5

**A-0865**





**Mallinckrodt Pharmaceuticals:**

Preliminary 2021 Strategic Plan

March 2021



*SUBJECT TO FRE 408, STATE LAW EQUIVALENTS*

# Disclaimers (1 / 2)



**Cautionary Statements Related to Forward-Looking Statements**

Statements in this document that are not strictly historical, including statements regarding future financial condition and operating results, legal, economic, business, competitive and/or regulatory factors affecting Mallinckrodt's businesses, and any other statements regarding events or developments the company believes or anticipates will or may occur in the future, may be "forward-looking" statements within the meaning of the Private Securities Litigation Reform Act of 1995, and involve a number of risks and uncertainties.

There are a number of important factors that could cause actual events to differ materially from those suggested or indicated by such forward-looking statements and you should not place undue reliance on any such forward-looking statements. These factors include risks and uncertainties related to, among other things: Mallinckrodt's ongoing Chapter 11 cases; the ability of Mallinckrodt and its subsidiaries to obtain approval from the bankruptcy court with respect to motions or other requests made to the bankruptcy court throughout the course of the Chapter 11 cases and to negotiate, develop, obtain court approval of, confirm and consummate the plan of reorganization contemplated by the restructuring support agreement or any other plan that may be proposed, the effects of the Chapter 11 cases, including increased professional costs, on the liquidity, results of operations and businesses of Mallinckrodt and its subsidiaries; the consummation of the transactions contemplated by the restructuring support agreement and the amendment and joinder to the restructuring support agreement, including the amendment and joinder becoming effective, ability of the parties to negotiate definitive agreements with respect to the matters covered by the term sheets included in the restructuring support agreement, the occurrence of events that may give rise to a right of any of the parties to terminate the restructuring support agreement and the ability of the parties to receive the required approval by the bankruptcy court and to satisfy the other conditions of the restructuring support agreement, including satisfying the milestones specified in the restructuring support agreement; governmental investigations and inquiries, regulatory actions and lawsuits brought against Mallinckrodt by government agencies and private parties with respect to its historical commercialization of opioids, including the amended non-binding agreement in principle reached by Mallinckrodt in connection with the announcement of its filing of the Chapter 11 petitions regarding the terms and conditions of a global settlement to resolve all current and future opioid-related claims; potential delays in Mallinckrodt's Chapter 11 process; the proposed settlement with governmental parties to resolve certain disputes relating to Acthar Gel; the possibility that such settlement will not be consummated and the risks and uncertainties related thereto, including the time and expense of continuing to litigate this dispute and the impact of this dispute on Mallinckrodt's financial condition and expectations for performance; the ability to maintain relationships with Mallinckrodt's suppliers, customers, employees and other third parties as a result of the Chapter 11 cases; the availability of operating capital during the pendency of the Chapter 11 cases, including events that could terminate Mallinckrodt's right to continue to access the cash collateral of Mallinckrodt's lenders; the possibility that Mallinckrodt may be unable to achieve its business and strategic goals even if the Chapter 11 plan is successfully consummated; the possibility that Mallinckrodt's Chapter 11 cases may be converted into Chapter 7 cases under the bankruptcy code; the potential termination of Mallinckrodt's exclusive right to file a Chapter 11 plan; the possibility that certain claims against Mallinckrodt may not be discharged as part of the bankruptcy process; developing, funding and executing Mallinckrodt's business plan and continuing as a going concern; Mallinckrodt's post-bankruptcy capital structure; scrutiny from governments, legislative bodies and enforcement agencies related to sales, marketing and pricing practices; pricing pressure on certain of Mallinckrodt's products due to legal changes or changes in insurers' reimbursement practices resulting from recent increased public scrutiny of healthcare and pharmaceutical costs; the impact of the outbreak of the COVID-19 coronavirus; the reimbursement practices of governmental health administration authorities, private health coverage insurers and other third-party payers; complex reporting and payment obligations under the Medicare and Medicaid rebate programs and other governmental purchasing and rebate programs; cost containment efforts of customers, purchasing groups, third-party payers and governmental organizations; changes in or failure to comply with relevant laws and regulations; Mallinckrodt's and its partners' ability to successfully develop or commercialize new products or expand commercial opportunities; Mallinckrodt's ability to navigate price fluctuations; competition; Mallinckrodt's and its partners' ability to protect intellectual property rights; limited clinical trial data for Acthar Gel; clinical studies and related regulatory processes; product liability losses and other litigation liability; material health, safety and environmental liabilities; potential indemnification liabilities to Covidien pursuant to the separation and distribution agreement; business development activities; retention of key personnel; the effectiveness of information technology infrastructure including cybersecurity and data leakage risks; customer concentration; Mallinckrodt's reliance on certain individual products that are material to its financial performance;

*SUBJECT TO FRE 408, STATE LAW EQUIVALENTS*

## Disclaimers (1 / 2)



**Cautionary Statements Related to Forward-Looking Statements (cont'd)**

Mallinckrodt's ability to receive procurement and production quotas granted by the U.S. Drug Enforcement Administration; complex manufacturing processes; conducting business internationally; Mallinckrodt's ability to achieve expected benefits from restructuring activities; Mallinckrodt's significant levels of intangible assets and related impairment testing; labor and employment laws and regulations; natural disasters or other catastrophic events; Mallinckrodt's substantial indebtedness and its ability to generate sufficient cash to reduce its indebtedness; Mallinckrodt's ability to generate sufficient cash to service indebtedness even if the existing indebtedness is restructured; future changes to U.S. and foreign tax laws or the impact of disputes with governmental tax authorities; and the impact of Irish laws.

These and other factors are identified and described in more detail in the "Risk Factors" section of Mallinckrodt's Annual Report on Form 10-K for the fiscal year ended December 27, 2019 and Form 10-Q for the fiscal quarters ended September 25, 2020, June 26, 2020 and March 27, 2020. The forward-looking statements made herein speak only as of the date hereof and Mallinckrodt does not assume any obligation to update or revise any forward-looking statement, whether as a result of new information, future events and developments or otherwise, except as required by law.

3

*SUBJECT TO FRE 408, STATE LAW EQUIVALENTS*

# Disclaimers (2 / 2)



## Non-GAAP Financial Measures

When the Company provides its expectation for adjusted net sales, adjusted EBITDA, adjusted operating cash flow and free cash flow on a forward-looking basis, a reconciliation of the differences between the non-GAAP expectations and the corresponding GAAP measures is not available without unreasonable effort.

This document contains financial measures, such as adjusted net sales, adjusted EBITDA, adjusted operating cash flow and free cash flow, which are considered "non-GAAP" financial measures under applicable SEC rules and regulations.

Adjusted net sales represents net sales prepared in accordance with GAAP adjusted to remove the impact of the significant legal and environmental charge related to the Medicaid lawsuit and foreign currency fluctuations.

Adjusted EBITDA represents amounts prepared in accordance with GAAP and adjusts for certain items that management believes are not reflective of the operational performance of the business. Consolidated adjusted EBITDA represents net income (loss), adjusted for interest expense, net, taxes, depreciation and amortization and certain items that management believes are not reflective of the operational performance of the business and additional adjustments. These adjustments include, but are not limited to, restructuring charges, net; non-restructuring impairment charges; inventory step-up expense; discontinued operations; changes in fair value of contingent consideration obligations; significant legal and environmental charges; divestitures; separation costs; gain on debt extinguishment, net; unrealized gain on equity investment; research & development upfront payments; reorganization items, net; share-based compensation and other items identified by the Company.

Adjusted operating cash flow represents operating cash flow prepared in accordance with GAAP adjusted for separation costs, reorganization advisor fees, working capital impacts related to the CARES Act, significant legal and environmental charges and working capital impacts resulting from the company's Chapter 11 bankruptcy filing.

Free cash flow represents net cash provided by operating activities less capital expenditures, each as prepared in accordance with GAAP.

The Company has provided these adjusted financial measures because they are used by the Human Resources and Compensation Committee of the Company's board of directors for compensation purposes and/or management, along with financial measures in accordance with GAAP, to evaluate the company's operating performance. In addition, the Company believes that they will be used by certain investors to measure Mallinckrodt's operating results. Management believes that presenting these adjusted measures provides useful information about the Company's performance across reporting periods on a consistent basis by excluding items that the Company does not believe are indicative of its core operating performance.

When the Company provides its expectation for adjusted net sales, adjusted EBITDA, adjusted operating cash flow and free cash flow on a forward-looking basis, a reconciliation of the differences between the non-GAAP expectations and the corresponding GAAP measures (expected net sales, net income, operating cash flow and capital expenditures) generally is not available without unreasonable effort due to potentially high variability, complexity and low visibility as to the items that would be excluded from the GAAP measure in the relevant future period, such as unusual gains and losses, the ultimate outcome of pending litigation, fluctuations in foreign currency exchange rates, the impact and timing of potential acquisitions and divestitures, and other structural changes or their probable significance. The variability of the excluded items may have a significant, and potentially unpredictable, impact on our future GAAP results.

This non-GAAP information should be considered supplemental to and not a substitute for financial information prepared in accordance with GAAP.

*SUBJECT TO FRE 408, STATE LAW EQUIVALENTS*

## The Company will be better positioned to achieve its vision of being an innovation-driven biopharmaceutical growth company



### Company Vision

| Innovation-driven biopharmaceutical company… | …focused on improving outcomes for underserved patients with severe & critical conditions… | …in two primary brands segments – Critical Care and Immunology – … | …adding value through clinical development and commercialization |

- Our strategic vision incorporates a **refined focus on Critical Care opportunities,** leveraging the Company's existing strengths and capabilities, while **sustaining the immunology portfolio**
- The Specialty Brands business has the medical, regulatory, and commercial **capabilities to effectively compete** in Critical Care, including:
  - Breadth of **reach in the ICU / NICU**, including strong relationships with intensivists, supported by **experienced patient services organization**, which provides patient education, reimbursement support, and service coordination
  - Strong **HEOR[1] and value-based contracting** expertise
  - Unique **drug / device** sales, marketing, and technical expertise
- As a mature generics business, Specialty Generics will continue to deliver **sustainable cash flows**, leveraging vertical integration and commercial & operational excellence, while continuing to evaluate strategic options

**To realize this optimized focus, the Plan incorporates adjustments to align the organizational model with this vision**

(1) HEOR = Health Economics Outcomes Research

5

*SUBJECT TO FRE 408, STATE LAW EQUIVALENTS*

## Executing this strategy involves three phases, optimizing the Company's future operating model towards Critical Care



| | | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| | | ←— Restructuring —→ | ←— Post-Emergence —→ | | ←—— Longer Term —→ | |
| **Strategic Focus** | | • Maximize EBITDA and align organizational operating model | • Ensure compelling growth story by advancing clinical pipeline | | • Position to deliver longer-term growth and value appreciation | |
| **Business Focus** | **Critical Care** | • Grow through near term accretive partnerships [1] | • Leverage commercial infrastructure to maximize product launches [2] | | • Establish leading Critical Care business through on-going investment in assets and capabilities | |
| | **Immunology** | • Generate return on prior Phase IV data investments<br>• Drive commercial performance and partnerships [1] | • Maximize EBITDA; explore opportunities to leverage capacity & patient hub | | • Continue to explore and consider strategic opportunities to maximize EBITDA | |
| | **International** | • Execute near term accretive partnership in China to build portfolio, strengthen platforms | • Drive growth through additional Therakos / INOmax launches and investment in commercial capabilities | | • Become OUS partner of choice for Critical Care assets; strengthen existing footprint | |
| | **SpecGx** | • Initiate strategic investments needed to enhance enterprise value | • Execute on strategic investments<br>• Continue to deliver pipeline launches<br>• Explore strategic opportunities | | • Continue to monetize pipeline<br>• Explore strategic opportunities | |

(1) Seek co-promotion partnerships to leverage existing salesforce capacity
(2) INOmax EVOLVE and new Therakos indications. Plan execubes Terlivaz

A-0871

SUBJECT TO FRE 408, STATE LAW EQUIVALENTS

# Specialty Brands Strategic Outlook



› An optimized resource allocation toward Critical Care, prioritizing buy-ups and lifecycle management, is supported by a compelling strategic rationale that will allow the Company to capitalize on demonstrated and distinctive capabilities and invest in opportunities that require less development investment and time to accretive commercial impact

› The Company's Commercial growth remains rooted in the four pillars:

  – **Fortify Base:** Protect, strengthen & maintain the base business

  – **Expand Portfolio:** Successfully deliver on launches & international expansion opportunities

  – **Maximize Value:** Optimize brands approaching LOE to achieve full residual value

  – **Drive Innovation:** Execute prioritized list of high ROI innovation investments



**High Underserved Patient Needs:**

- Growing patient population with severe and critical conditions; suffer from high morbidity & mortality

- Tangible value proposition and opportunity to leverage value-based contracting experience

- Demonstrate value through reduction in ICU days → lower cost and improved patient outcomes

## Critical Care has strong commercialized and existing pipeline options



### Projected Brands Pipeline at Emergence

| TA | Preclinical | Phase 1 | Phase 2 | Phase 3 | | Commercialized | |
|---|---|---|---|---|---|---|---|
| Critical Care | | | Nitric Oxide *TBI, Cardio*<br><br>StrataGraft *FT*<br><br>MNK-6106 *Hepatic encephalopathy* | Therakos *SOLAS*<br><br>MNK-6105 *Hepatic encephalopathy* | INOmax *Japan*<br><br>Terlivaz *Canada, Japan* | INOmax *HRF[4]*<br><br>Therakos *CTCL[5]*<br><br>Terlivaz[6] *HRS[2] Type 1* | INOmax *EVOLVE device*<br><br>UVADEX *Chronic GVHD[1] (JP)*<br><br>StrataGraft *DPT* |
| Immunology | SLN *Complement-mediated diseases* | SLN500 *Complement-mediated diseases* | | | | Acthar Gel *(Sarcoidosis, Proteinuria, Uveitis, RA, MS, SLE, etc.)* | Acthar Gel *Alternate delivery device* |
| Other[7] | | | | | | Amitiza | Ofirmev |

Product *Indication*     Pending Approval *Indication*

Notes:
1. Graft vs Host Disease; 2.Hepatorenal Syndrome; 3.Traumatic Brain Injury; 4. Hypoxic Respiratory Failure; 5. Cutaneous T-cell Lymphoma; 6. Terlivaz not included in the revenue projections for the forecast period; 7. Passively managed brands

8

A-0873

# Work is ongoing across the organization to align our capabilities with the Critical Care strategic focus



## Targeted Savings

**The Company is enacting approximately $85 million of targeted annualized cost savings across SG&A and R&D, which support the Company's refined strategy and optimize its cost structure**

| ($ in millions) | 2021 | | 2022 | | 2023 | | 2024 | | 2025 |
|---|---|---|---|---|---|---|---|---|---|
| Commercial initiatives | $ | 4 | $ | 17 | $ | 24 | $ | 24 | $ | 25 |
| G&A Initiatives | | 8 | | 33 | | 30 | | 30 | | 30 |
| R&D Initiatives | | - | | 28 | | 28 | | 29 | | 30 |
| **Total** | **$** | **12** | **$** | **78** | **$** | **82** | **$** | **83** | **$** | **85** |

## Commentary

› **Commercial Initiatives**
  › Pursue co-promotion partnerships that leverage breadth of reach in ICU
  › More efficient Acthar commercial model to maximize value
  › Optimize Critical Care resource model

› **G&A Initiatives**
  › Cost savings initiatives across various corporate functions and programs

› **R&D Initiatives**
  › Optimize lean, Critical Care-focused development model and project budget priorities
  › Evaluate flexible, technology-enabled model to reduce fixed costs

*SUBJECT TO FRE 408, STATE LAW EQUIVALENTS*

## These cost savings support the Company's focus on Critical Care opportunities



> The Company's targeted savings initiatives across cost areas and functions is expected to be implemented in the near term, yielding annual run rate savings of $85 million in 2025

> Additionally, the Company will require a relatively lower uncommitted budget, reflective of Critical Care opportunities having lower investment thresholds, which results in a $30 - $40 million improvement

*($ in millions)*

| Cost Area | Description | Target Annual Run Rate Savings (FY2025) |
|---|---|---|
| Commercial | Savings driven by move to multi-specialty approach in Acthar commercial model, which optimizes resource allocation and increased use of digital tools | $19 |
| Commercial | Consolidation of Acthar marketing tactics, leveraging cost efficient digital capabilities | $6 |
| G&A | Project and program spend reductions, including rationalization of technology projects, operations reorganization and discretionary spend areas | $14 |
| G&A | Optimization across corporate functions, including finance, HR, communications and legal | $16 |
| R&D | Development optimizations and alignment toward Critical Care opportunities | $19 |
| R&D | Improvements in post-launch maintenance and alignment toward Critical Care opportunities | $11 |
| | **Total** | **$85** |

10

SUBJECT TO FRE 408, STATE LAW EQUIVALENTS

## Specialty Generics Strategic Outlook



> **Specialty Generics continues to deliver stable cash flows amidst near-term headwinds and make the proper strategic investments required to drive mid-to-longer term growth**

› **2020 SpecGx expected operating profit is in line with the original budget**, even as Company dealt with numerous headwinds and challenges related to COVID-19, bankruptcy, and other key portfolio shifts, as well as taxes, legal expenses, & market declines associated with its opioids business

› Nearly half of 2020 EBITDA is a direct result of the incremental value from 2019/2020 initiatives to **restructure SpecGx** (FTEs, R&D, and SG&A reductions), **optimize distribution/procurement contracts,** and **adjust pricing**

› **COVID-19 response efforts were well-managed**, but COVID-19 is driving declines in the projections for 2020-2022 due to market demand shifting away from higher value ADHD segments and delays to R&D projects

› **Longer-term growth fueled by (i) the maturing of a robust pipeline** of high value products that continue to diversify the portfolio and **(ii) projects to support site utilization** inclusive of line extensions and contract manufacturing

*SUBJECT TO FRE 408, STATE LAW EQUIVALENTS*

## Specialty Generics' strategy focuses on maximizing value of the business to maintain range of strategic options





> Maintain market share in existing segment areas (opioids, ADHD, addiction treatment) while pipeline matures and diversifies
> Mitigate natural portfolio erosion with CapEx projects that increase revenues (API focus)

**Stability** | **Pipeline**

**Execution**

> Increase plant absorption in Hobart and STL with new contract manufacturing arrangements
> Prioritize cost containment
  > COGS
  > R&D
  > SG&A

**Efficiency** | **Capital Allocation**

> Advance current ANDA pipeline of oral solid and complex formulations
> Deliver organic growth that further diversifies business beyond opioids
> Enhance API development and technical capabilities to stimulate growth and utilization of STL Plant

> Strategic investment in CapEx projects delivering mid-term EBITDA and multiple enhancement
> Demonstrate sustainable, long-term value of core assets through reliability and higher ROI investments

12

## Consolidated Revenue and EBITDA Summary



- Projected revenue and EBITDA[1] **grow in the outer years** as the Company emerges from Chapter 11 and optimizes its development strategy on Critical Care opportunities to drive long-term growth

  - Overall assumptions remain similar to those discussed in the prior plan, but reflect **refined outlook based on the current market environment**

  - Revenue and margins impacted by Terlivaz CRL[2] and LOE[3] of managed brands, partially offset by certain improvements in the existing portfolio, and a **series of initiatives** to align with the Company's strategic vision and development focus on Critical Care



Note: 2020 includes actual results through Q3 and projections for Q4
(1)  As used in this document, EBITDA excludes stock compensation expense and certain non-GAAP items. Refer to "Non-GAAP Financial Measures" description on page 4.
(2)  CRL = Complete Response Letter from the FDA
(3)  LOE = Loss of Exclusivity

13

**A-0878**

SUBJECT TO FRE 408, STATE LAW EQUIVALENTS

# Net Sales Forecast by Product Category

**Specialty Brands Net Sales[1] ($ in millions)**

**Specialty Generics Net Sales[1] ($ in millions)**

(1) Refer to "Non-GAAP Financial Measures" description on page 4

*SUBJECT TO FRE 408, STATE LAW EQUIVALENTS*

## Consolidated Projections Overview & Key Assumptions



**Overview**

> Key strategic priorities include:
> - **Optimize resource allocation** efforts towards Critical Care opportunities to strengthen clinical pipeline aligned with differentiated capabilities, while sustaining the immunology portfolio
> - **Realign cost structure**, operating model and culture of organization to a leaner Critical Care-focused strategy, via a series of cost-savings initiatives to align SG&A and R&D resource allocation with company vision
> - **Complete the Company's Chapter 11 reorganization**, increasing future access to capital in order to identify and invest in transformative pipeline projects within Critical Care
> - Support Specialty Generics with **sound investments in R&D, advanced technologies, increased vertical integration, and commercial operating excellence** to deliver sales and growth targets

**Key Assumptions**

> The Company's Unlevered Free Cash Flow excludes debt service and cash taxes
> - Based on current terms of the RSA, proforma annual cash interest is approximately $210 million with no debt repayments
> - Current year cash taxes are estimated at approximately $40 million, with projected cash taxes estimated between 8 - 10% of non-GAAP pre-tax income on a consolidated basis

> Operating cash flow assumptions include impact of initiatives to support strategic realignment
> - Increase in CapEx in 2022 and 2023 for INOmax EVOLVE launch
> - Product-related contingent payments include various milestone obligations relating to pipeline products

> Assumes the RSA is approved in its current form and a Plan of Reorganization is confirmed at the end of Q3 2021; estimated payments upon emergence include
> - Admin and Priority claims of $160 million
> - Trade and GUC claims of $150 million
> - Upfront cash payment for the Opioid and CMS/DOJ settlements of $450 million and $15 million, respectively

> Restructuring Expenses include expenses to facilitate the Company's Chapter 11 reorganization, including professional fees

15

A-0880

*SUBJECT TO FRE 408, STATE LAW EQUIVALENTS*

## Summary Preliminary Consolidated Projections



| ($ in millions) | | 2021E | | 2022E | | 2023E | | 2024E | | 2025E |
|---|---|---|---|---|---|---|---|---|---|---|
| **Net Sales** | | | | | | | | | | |
| Specialty Brands | $ | 1,707 | $ | 1,571 | $ | 1,558 | $ | 1,588 | $ | 1,607 |
| Specialty Generics | | 680 | | 720 | | 800 | | 918 | | 916 |
| **Consolidated Net Sales** | $ | 2,387 | $ | 2,290 | $ | 2,358 | $ | 2,506 | $ | 2,523 |
| *% Growth Y/Y* | | *(12.5%)* | | *(4.1%)* | | *2.9%* | | *6.3%* | | *0.7%* |
| | | | | | | | | | | |
| **EBITDA** | | | | | | | | | | |
| Specialty Brands | $ | 730 | $ | 733 | $ | 708 | $ | 712 | $ | 695 |
| Specialty Generics | | 110 | | 98 | | 131 | | 205 | | 185 |
| **Consolidated EBITDA** [1] | $ | 840 | $ | 832 | $ | 838 | $ | 917 | $ | 879 |
| *EBITDA Margin* | | *35.2%* | | *36.3%* | | *35.6%* | | *36.6%* | | *34.9%* |
| | | | | | | | | | | |
| **EBITDA** [1] | $ | 840 | $ | 832 | $ | 838 | $ | 917 | $ | 879 |
| Change in Net Working Capital | | (50) | | 52 | | (12) | | (34) | | (11) |
| Capital Expenditures | | (76) | | (119) | | (104) | | (76) | | (58) |
| Restructuring & Other Expenses | | (268) | | (15) | | - | | - | | (45) |
| *Post-emergence Expenses* | | | | | | | | | | |
| Opioid Settlement Payments | | (450) | | (200) | | (200) | | (150) | | (150) |
| CMS Settlement Payments | | (15) | | (15) | | (20) | | (20) | | (33) |
| Admin & Priority Claims | | (160) | | - | | - | | - | | - |
| Trade / GUC Claims | | (150) | | - | | - | | - | | - |
| | | | | | | | | | | |
| **Unlevered Free Cash Flow** [2] | $ | (329) | $ | 534 | $ | 502 | $ | 637 | $ | 583 |

Note: Projections are preliminary estimates.
(1) Excludes stock compensation expense. Refer to "Non-GAAP Financial Measures" description on page 4
(2) Unlevered free cash flow before cash taxes
(3) Ending cash for FY2020 was approximately $1.1 billion

16

A-0881

*SUBJECT TO FRE 408, STATE LAW EQUIVALENTS*

## Illustrative Emergence Sources & Uses



- The following illustrative emergence sources and uses are based on an emergence at the end of September 2021
- Note that these estimates exclude potential CARES Act refunds given the uncertainty of timing related review, processing and payment
- Additionally, note that these estimates illustratively exclude the impact of the First Lien Settlement Term Sheet, including the 0.5% to 1.0% Term Loan Exit Payment as well as the incremental 0.5% rate increase on the existing term loans during the case.

*($ in millions)*

| Sources | | | Uses | | |
|---|---|---|---|---|---|
| Cash from Balance Sheet [1][2] | $ | 1,051 | Opioid Settlement - Upfront Cash Payment [3] | $ | 450 |
| | | | CMS/DOJ Settlement - Upfront Cash Payment [4] | | 15 |
| | | | Admin and Priority Claims | | 160 |
| | | | Trade/GUC Claims | | 150 |
| | | | Noteholder Consent Fee | | 19 |
| | | | Cash to Balance Sheet [5] | | 257 |
| **Total Sources** | **$** | **1,051** | **Total Uses** | **$** | **1,051** |

Notes:

(1) Preliminary estimated cash at September 30, 2021, excluding potential CARES Act refunds and subject to further review

(2) Includes an estimated $114 million ECF sweep payment

(3) Upfront cash payment for opioid settlement as part of $1.6 billion of structured cash payments over seven years

(4) Upfront cash payment for Acthar plaintiffs (CMS, DOJ and government entities) as part of $260 million of structured cash payments over seven years

(5) Excludes other potential financing related transactions

47

SUBJECT TO FRE 408, STATE LAW EQUIVALENTS

## Consolidated EBITDA Bridge From Prior Plan



- Cumulative Consolidated EBITDA, when compared to the prior plan, is projected to be above prior plan
- Margin changes driven by exclusion of Terlivaz and revised assumptions across other Brands and Generics products
- Reduced legal expenses driven by completion of whole company restructuring
- Strategic savings initiatives drive ~$85m of annual savings in outer years, including carrying forward into 2025 and beyond

| ($ in millions) | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| **Prior plan EBITDA** | $ 920 | $ 834 | $ 880 | $ 873 | $ 888 |
| **Margins and Other** | | (19) | (241) | (233) | (145) |
| Legal | | 55 | 56 | 57 | 56 |
| ❶ Commercial | | (18) | 33 | 39 | 31 |
| ❷ Shared Services & Other | | (23) | 37 | 34 | 24 |
| **Total SG&A** | | 15 | 126 | 129 | 112 |
| ❸ **Total R&D** | | 10 | 67 | 69 | 63 |
| Reclassifications | | (16) | (9) | (1) | 4 |
| **Plan EBITDA** [(1)] | $ 1,042 | $ 840 | $ 832 | $ 838 | $ 917 |
| Change from Prior Plan | $ 122 | $ 5 | $ (48) | $ (35) | $ 29 |

(1) Excludes restructuring costs. Refer to "Non-GAAP Financial Measures" description on page 4 and "Bridges of GAAP Financial Measures to non-GAAP Performance Measures" on page 20.

### Key Strategic Savings Initiatives

❶ **Commercial savings initiatives** that achieve full run rate of ~$24m/yr, driven largely by optimizations to commercial model (e.g., multi-specialty focus for Acthar team)

❷ **Shared services savings initiatives** with run rate of ~$30m/yr from 2022 onward, driven by cost savings across various corporate functions and programs

❸ **R&D optimization** plan with run rate of ~$30m/yr from 2022 driven by various R&D initiatives

**Reduced uncommitted R&D project spend** of approximately $30-$40m annually from 2022 driven by lower investment requirements for typical Critical Care opportunities

18

A-0883

SUBJECT TO FRE 408, STATE LAW EQUIVALENTS

## 2020 and 2021 KEIP Performance Measures



*$ in millions*

**Performance Measures – 2020[2],[7]**

| Performance Measure | | Actuals | | | | |
|---|---|---|---|---|---|---|
| | H1 Performance | | Q3 Performance | | Q4 Performance[4] | |
| Adj. Operating Cash Flow[3] | $ | 303 | $ | 118 | $ | 178 |
| Adj. Net Sales[4] | $ | 1,354 | $ | 698 | $ | 682 |
| Totals | | | | | | |

**Performance Measures – H1 2021[8]**

| Performance Measure | Threshold 50% | | Target 100% | | Stretch 150% | |
|---|---|---|---|---|---|---|
| Adj. EBITDA | $ | 355 | $ | 418 | $ | 481 |
| Adj. Operating Cash Flow | $ | 342 | $ | 402 | $ | 463 |
| Adj. Net Sales | $ | 1,067 | $ | 1,186 | $ | 1,305 |
| Pipeline Metric | | | | (5) | | |
| Totals | | | | | | |

**Performance Measures – H2 2021[8]**

| Performance Measure | Threshold 50% | | Target 100% | | Stretch 150% | |
|---|---|---|---|---|---|---|
| Adj. EBITDA | $ | 358 | $ | 422 | $ | 485 |
| Adj. Operating Cash Flow | $ | 263 | $ | 310 | $ | 356 |
| Adj. Net Sales | $ | 1,061 | $ | 1,201 | $ | 1,321 |
| Pipeline Metric | | | | (6) | | |
| Totals | | | | | | |

*Refer to "Non-GAAP Financial Measures" section on page 4 and "Bridges of GAAP Financial Measures to non-GAAP Performance Measures" on page 20*

### Notes

(1) Preliminary and unaudited.

(2) Consistent with prior year practices, the performance measures used for compensation purposes include non-GAAP financial measures which exclude the effects of certain items which the HRCC believes do not represent ongoing operating results and/or business trends.

(3) For purposes of Adjusted Operating Cash Flow, the adjustments to the corresponding GAAP financial measure relate to restructuring and restructuring related charges, net; certain tax implications under the CARES Act; cost associated with the ongoing Acthar and Opioid litigations, and other items identified by the company. A bridge from the Company's GAAP financials to the non-GAAP measures is attached hereto.

(4) For purposes of Adj. Net Sales, the adjustments to the corresponding GAAP financial measure relate to the effects of the CMS ruling regarding the AMP reset (refer to Note 11 in the 2020 Q2 Form 10-Q filed on 8/4/2020 for further detail) as well as any foreign exchange rate effects that are captured in the GAAP financial measures. A bridge from the Company's GAAP financials to the non-GAAP measures is attached hereto.

(5) For H1 2021, these milestones include:
*Acthar Auto Injector:* Complete device validation build and verification testing: June 25, 2021.
*Evolve:* Complete bio compatibility, reliability, and human factors testing: May 31, 2021.
*StrataGraft:* Obtain approval of U.S. packaging insert that approximates target product profile: June 25, 2021.

(6) For H2 2021, these milestones include:
*Evolve:* Submit product for approval: October 31, 2021.
*StrataGraft:* First Subject First Dose in P2 development program: December 31, 2021.

(7) For 2020, the weights associated with the Performance Measures were: Adj. Operating Cash Flow (60%), Adj. Net Sales (25%) and Product Launch Execution (15%).

(8) For 2021, the weights associated with the Performance Measures are: Adj. EBITDA (40%), Adj. Operating Cash Flow (40%), Adj. Net Sales (10%), and Pipeline Metric (10%).



**Mallinckrodt**
Pharmaceuticals

19

*SUBJECT TO FRE 408, STATE LAW EQUIVALENTS*

## Bridges of GAAP Financial Measures to non-GAAP Performance Measures



### Adj. Operating Cash Flow

| ($ in millions) | | 2020 | | | Full |
| --- | --- | --- | --- | --- | --- |
| | | H1A | Q3A | Q4A[1] | 2020 |
| Operating Cash Flow (GAAP) | $ | 225 $ | 70 $ | 204 $ | 499 |
| Separation Cost | | 42 | 33 | 18 | 93 |
| Reorganization Advisor Fees | | - | - | 51 | 51 |
| CARES Payroll Deferral | | (6) | (5) | (3) | (13) |
| Opioid Legal | | 40 | 13 | 3 | 56 |
| Acthar Related Legal Matters | | 13 | 6 | 2 | 21 |
| Chapter 11 AP & Accrual Adjustment | | - | - | (80) | (80) |
| Normalized Interest Payment | | - | - | (17) | (17) |
| CMS Base AMP Reset | | (11) | - | - | (11) |
| Adj. Operating Cash Flow (non-GAAP) | $ | 303 $ | 118 $ | 178 $ | 598 |

### Net Sales Revenue

| ($ in millions) | | 2020 | | | Full |
| --- | --- | --- | --- | --- | --- |
| | | H1A | Q3A | Q4A[1] | 2020 |
| Net Sales (GAAP) | $ | 832 $ | 698 $ | 683 $ | 2,213 |
| Adj. for Medicaid lawsuit | | 534 | 1 | 1 | 536 |
| CMS Base AMP Reset | | (12) | - | - | (12) |
| FX Impacts | | (1) | (1) | (1) | (3) |
| Adj. Net Sales (non-GAAP) | $ | 1,354 $ | 698 $ | 682 $ | 2,734 |

**Notes**
(1) Preliminary and unaudited.

*Refer to "Non-GAAP Financial Measures" section on page 4*


20

## <u>CERTIFICATE OF SERVICE</u>

   I, Brett S. Turlington, certify that I am not less than 18 years of age, and that service of the foregoing *Motion of Attestor Limited and Humana Inc. for Entry of an Order Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code* was caused to be made on April 30, 2021, via CM/ECF upon those parties registered to receive such electronic notifications and served, additionally, as indicated upon the parties identified on the attached service list.

Dated: April 30, 2021       */s/ Brett S. Turlington*        
              Brett S. Turlington (Bar No. 6705)

# 2002 SERVICE LIST

**BY EMAIL**

John D. McLaughlin, Jr.
Ferry Joseph, P.A.
824 N. Market Street, Suite 1000
Wilmington, DE  19801
jmclaughlin@ferryjoseph.com

Richard S. Cobb
Landis Rath & Cobb LLP
919 Market Street
Suite 1800
Wilmington, DE  19801
Cobb@lrclaw.com

David C. Weiss
US Attorney For The
District of Delaware
U.S. Attorney's office
1313 N Market Street
Wilmington, DE  19801
Usade.Ecfbankruptcy@Usdoj.Gov

Bankruptcy Department
Delaware Attorney General
Carvel State office Building
820 N. French Street, 6th Floor
Wilmington, DE  19801
Attorney.General@State.De.Us;
Attorney.General@Delaware.Gov

Stanley B. Tarr
Victoria A. Guilfoyle
Blank Rome LLP
1201 N. Market Street, Suite 800
Wilmington, DE  19801
Tarr@BlankRome.com;
Guilfoyle@BlankRome.com

Julia B. Klein
Klein LLC
225 West 14th Street, Suite 100
Wilmington, DE  19801
Klein@kleinllc.com

James L. Patton, Jr.
Robert S. Brady
Edwin J. Harron
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Willmington, DE  19801
bankfilings@ycst.com; jpatton@ycst.com;
rbrady@ycst.com; eharron@ycst.com

Debra I. Grassgreen
James E. O'Neill
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Willmington, DE  19801
Dgrassgreen@pszjlaw.com;
joneill@pszjlaw.com

David M. Klauder
Bielli & Klauder, LLC
1204 N. King Street
Wilmington, DE  19801
Dklauder@bk-legal.com

Michael W. Teichman
Elio Battista, Jr.
Parkowski, Guerke & Swayze, P.A.
1105 N. Market St., 19th Floor
Wilmington, DE  19801
mteichman@pgslegal.com;
ebattista@pgslegal.com

Sommer L. Ross, Esq.
Duane Morris LLP
222 Delaware Avenue, Suite 1600
Wilmington, DE  19801-1659
Slross@duanemorris.com

David M. Fournier
Kenneth A. Listwak
Troutman Pepper Hamilton Sanders LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE  19899-1709
David.fournier@troutman.com;
ken.listwak@troutman.com

Joseph N. Argentina, Jr.
Faegre Drinker Biddle & Reath LLP
222 Delaware Ave., Suite 1410
Wilmington, DE  19801-1621
joseph.argentina@faegredrinker.com

Evan T. Miller
Erin R. Fay
Bayard, P.A
600 N. King Street, Suite 400
Wilmington, DE  19801
emiller@bayardlaw.com;
efay@bayardlaw.com

Domenic E. Pacitti
Klehr Harrison Harvey Branzburg LLP
919 Market Street
Suite 1000
Wilmington, DE  19801-3062
Dpacitti@klehr.com

A-0887

Jeffrey M. Schlerf
Fox Rothschild LLP
919 N. Market Street, Ste 300
Wilmington, DE  19801
jschlerf@foxrothschild.com

Christopher M. Samis
Aaron H. Stulman
D. Ryan Slaugh
Potter Anderson & Corroon LLP
1313 N. Market Street, 6th Flr
Wilmington, DE  19801-3700
Csamis@potteranderson.com;
astulman@potteranderson.com;
rslaugh@potteranderson.com

Ronald S. Gellert
Gellert Scali Busenkell & Brown, LLC
1201 N. Orange St., Suite 300
Wilmington, DE  19801
Rgellert@gsbblaw.com

R. Karl Hill
James S. Green, Jr.
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Ste 1500
Wilmington, DE  19801
khill@svglaw.com;  jsgreen@svglaw.com

William P. Bowden
Michael DeBaecke
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
Wilmington, DE  19801
WBowden@ashbygeddes.com;
MDeBaecke@ashbygeddes.com

Bradley R. Aronstam; Heather Gibbons
Ross Aronstam & Moritz LLP
100 S. West Street
Suite 400
Wilmington, DE  19801
Baronstam@ramllp.com;
hgibbons@ramllp.com

Mark D. Collins, Michael J. Merchant,
Amanda R. Steele, & Brendan J. Schlauch
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE  19801
Collins@Rlf.Com; Merchant@Rlf.Com;
Steele@Rlf.Com; Schlauch@Rlf.Com

Natalie D. Ramsey
Jamie L. Edmonson
Robinson & Cole LLP
1201 N. Market Street, Suite 1406
Wilmington, DE  19801
Nramsey@rc.com;  jedmonson@rc.com

Attn:  Bankruptcy Dept
State of Delaware Attorney General
Carvel State Office Bldg.
820 N. French St.
Wilmington, DE  19801
Attorney.General@State.De.Us

Justin R. Alberto, Seth Van Aalten,
Sarah A. Carnes, Andrew J. Roth-Moore
Cole Schotz P.C.
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
jalberto@coleschotz.com;
svanaalten@coleschotz.com;
scarnes@coleschotz.com; aroth-
moore@coleschotz.com

Joseph H. Huston, Jr.
David W. Giattino
Stevens & Lee, P.C
919 N. Market Street, Ste 1300
Wilmington, DE  19801
Jhh@stevenslee.com; dwg@stevenslee.com

Kate Roggio Buck
Shannon D. Humiston
McCarter & English, LLP
405 N. King Street, 8th Flr
Wilmington, DE  19801
Kbuck@mccarter.com;
shumiston@mccarter.com

William D. Sullivan
William A. Hazeltine
Sullivan Hazeltine Allinson LLC
919 N. Market Street, Suite 420
Wilmington, DE  19801
bsullivan@sha-llc.com;
whazeltine@sha-llc.com

Daniel K. Astin
Ciardi Ciardi & Astin
1204 N. King Street
Wilmington, DE  19801
Dastin@ciardilaw.com

John M. Seaman, Christopher F. Cannataro
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE  19807
seaman@abramsbayliss.com;
cannataro@abramsbayliss.com

A-0888

Christina Rojas Bankruptcy Admin
Delaware Division of Revenue
820 N. French Street, 8th Floor
Wilmington, DE  19801
Fasnotify@State.De.Us

Jeffrey R. Waxman, Brya M. Keilson,
Sarah Ennis
Morris James LLP
500 Delaware Avenue, Ste 1500
Wilmington, DE  19801
Jwaxman@morrisjames.com;
Bkeilson@morrisjames.com;
Sennis@morrisjames.com

Christopher P. Simon
Cross & Simon, LLC
1105 N. Market Street, Suite 901
Wilmington, DE  19801
csimon@crosslaw.com

Gregory W. Hauswirth
Leech Tishman Fuscaldo & Lampl, LLC
1007 N. Orange Street, 4th Flr.
Wilmington, DE  19801
Ghauswirth@leechtishman.com

Curtis A. Hehn
Law Office of Curtis A. Hehn
1007 N. Orange Street, 4th Flr.
Wilmington, DE  19801
Curtishehn@comcast.net

Karen C. Bifferato, Kelly M. Conlan
Connolly Gallagher LLP
1201 N. Market Street, 20th Floor
Wilmington, DE  19801
kbifferato@connollygallagher.com;
kconlan@connollygallagher.com

Michael J. Joyce
The Law Offices of Joyce, LLC
1225 King Street, Suite 800
Wilmington, DE  19801
Mjoyce@mjlawoffices.com

R. Grant Dick IV
Cooch and Taylor, P.A
The Nemours Building
1007 N. Orange St., Suite 1120
Wilmington, DE  19801
Gdick@coochtaylor.com

Jason A. Gibson
The Rosner Law Group LLC
824 N. Market Street, Ste 810
Wilmington, DE  19801
gibson@teamrosner.com

Scott D. Cousins
Cousins Law LLC
Brandywine Plaza West
1521 W. Concord Pike, Suite 301
Wilmington, DE  19803
Scott.cousins@cousins-law.com

Division of Corporations Franchise Taxes
The Delaware Department of State
P.O. Box 898
Dover, DE  19903
Dosdoc_Ftax@State.De.Us

Don Stecker
Linebarger Goggan Blair & Sampson, LLP
112 E. Pecan Street, Suite 2200
San Antonio, TX  78205
Sanantonio.bankruptcy@publicans.com

Reed Heiligman
Hiltz Zanzig & Heiligman
53 West Jackson Blvd., Ste 701
Suite 701
Chicago, IL  60604
reed@hzhlaw.com

Paul M. Lopez, Larry R. Boyd,
Emily M. Hahn
Abernathy, Roeder, Boyd & Hullett, P.C.
1700 Redbud Blvd, Suite 300
McKinney, TX  75069
Plopez@abernathy-law.com;
bankruptcy@abernathy-law.com;
ehahn@abernathy-law.com

Anne Andrews, Sean T. Higgins
Andrews & Thornton
4701 Von Karman Ave, Suite 300
Newport Beach, CA  92660
Aa@andrewsthornton.com;
shiggins@andrewsthornton.com

Matthew J. Piers, Charles D. Wysong,
Emily R. Brown, Margaret Truesdale
Hughes Socol Piers Resnick & Dym, Ltd.
70 W. Madison Street, Ste 4000
Chicago, IL  60602
mpiers@hsplegal.com;
cwysong@hsplegal.com;
ebrown@hsplegal.com;
mtruesdale@hsplegal.com

A-0889

Kenneth H. Eckstein; Daniel M.
Eggermann; Megan M. Wasson
Kramer Levin Naftalis & Frankel LLP
1177 6th Ave
New York, NY  10036
Keckstein@Kramerlevin.Com;
Deggermann@Kramerlevin.Com;
mwasson@kramerlevin.com

Edward E. Neiger, Jennifer A. Christian
ASK LLP
151 W. 46th Street, 4th Floor
New York, NY  10036
Eneiger@askllp.com;
jchristian@askllp.com

James O. Johnston, Bruce Bennett,
Joshua M. Mester
Jones Day
555 S. Flower Street, 50th Flr
Los Angeles, CA  90071
jjohnston@jonesday.com;
bbennett@jonesday.com;
jmester@jonesday.com

Elizabeth Weller
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Freeway, Suite 1000
Dallas, TX  75207
Dallas.bankruptcy@publicans.com

Heather S. Heidelbaugh, John M. Steiner,
Kristin Anders Lawson
Leech Tishman Fuscaldo & Lampl, LLC
525 William Penn Place, 28th Flr
Pittsburgh, PA  15219
Hheidelbaugh@leechtishman.com;
jsteiner@leechtishman.com;
klawson@leechtishman.com

Arik Preis, Mitchell P. Hurley,
Sara L. Brauner
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY  10036-6745
apreis@akingump.com;
mhurley@akingump.com;
sbrauner@akingump.com

Stephen K. Dexter
Lathrop GPM LLP
1515 Wynkoop Street
Suite 600
Denver, CO  80202
Stephen.Dexter@lathropgpm.com

Ashley Keller, Seth Meyer
Keller Lenkner LLC
150 North Riverside Plaza
Suite 4270
Chicago, IL  60606
Ack@kellerlenkner.com;
sam@kellerlenkner.com

Neil Henrichsen, Dawn Stewart
Henrichsen Law Group, PLLC
1440 G. Street, NW
Washington, DC  20005
nhenrichsen@hslawyers.com;
dstewart@hslawyers.com

George A. Davis , George Klidonas,
andrew Sorkin, & Anupama Yerramalli
Latham & Watkins LLP
885 Third Avenue
New York, NY  10022
George.Davis@Lw.Com;
George.Klidonas@Lw.Com;
andrew.Sorkin@Lw.Com;
Anu.Yerramalli@Lw.Com

Jason B. Gott
Latham & Watkins LLP
330 N. Wabash Avenue, Ste 2800
Chicago, IL  60611
Jason.Gott@Lw.Com

Jeffrey E. Bjork
Latham & Watkins LLP
355 S. Grand Avenue, Suite 100
Los Angeles, CA  90071
Jeff.Bjork@Lw.Com

Morton R. Branzburg
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA  19103
Mbranzburg@klehr.com

Daniel M. Eliades, David S. Catuogno,
Travis Powers
K&L Gates LLP
One Newark Center, Tenth Floor
1085 Raymond Boulevard
Newark, NJ  07102
Daniel.eliades@klgates.com;
David.catuogno@klgates.com;
Travis.Powers@klgates.com

Norman Welch
Coggins, Harman & Hewitt
c/o John H. Harman
11 N. Washington St, Suite 520
Rockville, MD  20850
chhlaw587@aol.com

Richard H. Wyron
Frankel Wyron LLP
2101 L Street, NW, Suite 800
Washington, DC  20037
Rwyron@frankelwyron.com

Celeste Brustowicz, Barry J. Cooper,
Stephen H. Wussow
Cooper Law Firm, LLC
1525 Religious Street
New Orleans, LA  70130
Cbrustowicz@sch-llc.com

Cullen D. Speckhart
Cooley LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC  20004
cspeckhart@cooley.com

Cathy Hershcopf, Michael Klein, Lauren
A. Reichardt
Cooley LLP
55 Hudson Yards
New York, NY  10001
Chershcopf@cooley.com; mklein@cooley.com

David J. Molton, Steven D. Pohl,
Gerard T. Cicero
Brown Rudnick LLP
Times Square Tower, # 47 7, 65367
New York, NY  10036
Dmolton@Brownrudnick.Com;
Spohl@Brownrudnick.Com;
gcicero@brownrudnick.com

J. Michael Connolly
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Ste 700
Arlington, VA  22201
mike@consovoymccarthy.com

Darrel Edelman
Darreledelman@aim.com

Gillian Feiner
Commonwealth of Massachusetts
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
Gillian.feiner@mass.gov

David H. Kistenbroker, Joni S. Jacobsen,
Melanie MacKay
Dechert LLP
35 West Wacker Drive, Ste 3400
Chicago, IL  60601
david.kistenbroker@dechert.com;
joni.jacobsen@dechert.com;
melanie.mackay@dechert.com

Megan N. Harper
City of Philadelphia Law Department
Municipal Services Building
1401 JFK Boulevard, 5th Floor
Philadelphia, PA  19102-1595
Megan.Harper@phila.gov

Eric R. Goodman
Brown Rudnick LLP
601 Thirteenth Street NW, Ste 600
Washington, DC  20005
Egoodman@brownrudnick.com

Albert A. Ciardi, III &
Walter W. Gouldsbury III
Ciardi Ciardi & Astin
1905 Spruce Street
Philadelphia, PA  19103
aciardi@ciardilaw.com;
wgouldsbury@ciardilaw.com

Steven D. Pohl
Brown Rudnick LLP
1 Financial Center
Boston, MA  02111
Spohl@brownrudnick.com

Scott A. Zuber, Terri Jane Freedman
Chiesa Shahinian & Giantomasi PC
One Boland Drive
West Orange, NJ  07052
Szuber@csglaw.com; tfreedman@csglaw.com

Kevin C. Maclay, Todd E. Phillips,
Ann W. Langley, George M. O'Connor
Caplin & Drysdale, Chartered
One Thomas Circle, NW, Ste 1100
Washington, DC  20005
kmaclay@capdale.com;
tphillips@capdale.com;
alangley@capdale.com;
goconnor@capdale.com

Shawn M. Christianson
Buchalter, a Professional Corporation
55 Second Street, 17th Floor
San Francisco, CA  94105-3493
Schristianson@buchalter.com

Deb Secrest
Commonwealth of Pennsylvania
Department of Labor and Industry
Collections Support Unit
651 Boas Street, Room 925
Harrisburg, PA  17121
Ra-li-ucts-bankrupt@state.pa.us

Jeffrey W. Golan, Jeffrey B. Gittleman
Barrack, Rodos & Bacine
2001 Market Street, Suite 3300
Philadelphia, PA  19103
jgolan@barrack.com;
jgittleman@barrack.com

David M. Capriotti, Wendy A. Kinsella
Harris Beach PLLC
333 W. Washington St., Ste 200
Syracuse, NY  13202
Dcapriotti@harrisbeach.com;
wkinsella@harrisbeach.com

Ben Harrington
Hagens Berman Sobol Shapiro LLP
715 Hearst Ave., Suite 202
Berkeley, CA  94710
Benh@hbsslaw.com

Frank F. McGinn
Hackett Feinberg P.C.
155 Federal Street, 9th Flr
Boston, MA  02110
ffm@bostonbusinesslaw.com

William P. Weintraub, Michael H.
Goldstein
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
Wweintraub@goodwinlaw.com;
mgoldstein@goodwinlaw.com

Scott D. Gilbert, Kami E. Quinn,
Emily P. Grim
Gilbert LLP
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC  20003
Gilberts@Gilbertlegal.com;
Quinnk@Gilbertlegal.com;
grime@gilbertlegal.com

Scott J. Greenberg, Michael J. Cohen
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166-0193
sgreenberg@gibsondunn.com;
mcohen@gibsondunn.com

Donald K. Ludman
Brown & Connery, LLP
6 North Broad Street, Suite 100
Woodbury, NJ  08096
Dludman@brownconnery.com

Donald E. Haviland, Jr. &
William Platt II
Haviland Hughes
201 S. Maple Ave., Suite 110
Ambler, PA  19002
haviland@havilandhughes.com;
platt@havilandhughes.com

Jeffrey K. Garfinkle
Buchalter, a Professional Corporation
18400 Von Karman Ave., Ste 800
Irvine, CA  92612-0514
Jgarfinkle@buchalter.com

Laurence May
Eiseman Levine Lehrhaupt & Kakoyiannis
805 Third Avenue
New York, NY  10022
lmay@eisemanlevine.com

Christopher R. Belmonte
Pamela A. Bosswick
Duane Morris LLP
230 Park Avenue, Ste 1130
New York, NY  10169
CRBelmonte@duanemorris.com;
PABosswick@duanemorris.com

Raymond L. Fink
Lippes Mathias Wexler Friedman LLP
50 Fountain Plaza, Suite 1700
Buffalo, NY  14202-2216
Rfink@lippes.com

Lauren A. Michaels
PA Office of Attorney General
1251 Waterfront Place
Pittsburgh, PA  15222
Lmichaels@attorneygeneral.gov

Officer Managing Agent Or General Agent
Delaware State Treasury
820 Silver Lake Blvd, Suite 100
Dover, DE  19904
Statetreasurer@State.De.Us

Oscar Garza
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA  93612-4412
Ogarza@gibsondunn.com

Attention Bankruptcy Dept
State of Montana Attorney General
215 N Sanders, Third Floor
Po Box 201401
Helena, MT  59620-1401
Contactdoj@Mt.Gov

Melanie L. Cyganowski, Peter Feldman,
Jennifer S. Feeney
Otterbourg P.C.
230 Park Avenue
New York, NY  10169
Mcyganowski@otterbourg.com;
pfeldman@otterbourg.com;
jfeeney@otterbourg.com

Melissa L. Van Eck, Jason L. Swartley
State of Pennsylvania Attorney General
Strawberry Square, 15th Flr
Harrisburg, PA  17112
Jswartley@attorneygeneral.gov;
mvaneck@attorneygeneral.gov

Attention Bankruptcy Dept
State of Oregon Attorney General
1162 Court Street NE
Salem, OR  97301
Consumer.Hotline@Doj.State.Or.Us

Attention Bankruptcy Dept
State of North Dakota Attorney General
State Capitol
600 E Boulevard Ave Dept 125
Bismarck, ND  58505-0040
Ndag@Nd.Gov

Attention Bankruptcy Dept
State of New Hampshire Attorney General
33 Capitol Street
Concord, NH  03301-0000
Attorneygeneral@Doj.Nh.Gov

Attention Bankruptcy Dept
State of South Dakota Attorney General
1302 East Highway 14, Ste 1
Pierre, SD  57501-8501
Consumerhelp@State.Sd.Us

Attention Bankruptcy Dept
State of Nebraska Attorney General
2115 State Capitol
2nd Flr, Rm 2115
Lincoln, NE  68509-8920
Ago.Info.Help@Nebraska.Gov

Attention Bankruptcy Dept
State of Vermont Attorney General
109 State Street
Montpelier, VT  05609-1001
Ago.Info@Vermont.Gov

Attention Bankruptcy Dept
State of Missouri Attorney General
Supreme Court Building
207 W. High St.
Jefferson City, MO  65102
Attorney.General@Ago.Mo.Gov

Dana Nessel, Katherine C. Kerwin
State of Michigan
Attorney General's Office
Cadillac Place, Ste. 10-200
3030 W. Grand Blvd.
Detroit, MI  48202
Kerwink@michigan.gov

Attention Bankruptcy Dept
State of Maryland Attorney General
200 St. Paul Place
Baltimore, MD  21202-2202
Oag@Oag.State.Md.Us

Attention Bankruptcy Dept
State of Maine Attorney General
6 State House Station
Augusta, ME  04333-0000
Consumer.Mediation@Maine.Gov

Attention Bankruptcy Dept
State of Iowa Attorney General
1305 E. Walnut Street
Des Moines, IA  50319
Webteam@Ag.Iowa.Gov

Attention Bankruptcy Dept
State of Nevada Attorney General
100 North Carson Street
Carson City, NV  89701
Aginfo@Ag.Nv.Gov

Kevin W. Thompson, David R. Barney, Jr.
Thompson Barney Law Firm
2030 Kanawha Boulevard, East
Charleston, WV  25311
Kwthompsonwv@gmail.com

Laurel K. Lackey
WV Office of the Attorney General
Eastern Panhandle Office
269 Aikens Center
Martinsburg, WV  25404
Laurel.k.lackey@wvago.gov

A-0893

Matthew A. Feldman, Joseph G. Minias,
Matthew Freimuth, Richard Choi,
Philip F. DiSanto
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY  10019
Mfeldman@willkie.com;
jminias@willkie.com;
mfreimuth@willkie.com;
rchoil@willkie.com;  pdisanto@willkie.com

Scott Greissman, Andrew T. Zatz,
Michele J. Meises, Sam Lawand
White & Case LLP
1221 Avenue of the Americas
New York, NY  10020-1095
sgreissman@whitecase.com;
azatz@whitecase.com;
sam.lawand@whitecase.com;
michele.meises@whitecase.com

Clay B. Roberts
White & Case LLP
200 South Biscayne Boulevard
Suite 4900
Miami, FL  33131-2352
Clay.roberts@whitecase.com

Attention Bankruptcy Dept
Washington Dc Attorney General
441 4Th Street, NW
Washington, DC  20001
Oag@Dc.Gov

Gordon J. Toering
Warner Norcross + Judd LLP
1500 Warner Building
150 Ottawa Avenue, NW
Grand Rapids, MI  49503
gtoering@wnj.com

Bankruptcy Department
U.S. Environmental Protection Agency
Region III
1650 Arch Street
Philadelphia, PA  19103
Weiss.Cynthia@epa.gov

Attention Bankruptcy Dept
State of Georgia Attorney General
40 Capital Square, SW
Atlanta, GA  30334-1300

Donald Creadore
The Creadore Law Firm, P.C.
450 Seventh Avenue – 1408
New York, NY  10123
Donald@creadorelawfirm.com

Wayne Hogan, Leslie Goller
Terell Hogan, P.A.
233 E. Bay Street, #804
Jacksonville, FL  32202
Hogan@terrellhogan.com;
lgoller@terrellhogan.com

James L. Bromley, Benjamin S. Beller,
Thiago Nascimento dos Reis
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004-2498
bromleyj@sullcrom.com;
bellerb@sullcrom.com;
nascimentot@sullcrom.com

Nicholas F. Kajon
Constantine D. Pourakis
Stevens & Lee, P.C
485 Madison Avenue, 20th Flr.
New York, NY  10022
Nfk@stevenslee.com;  cp@stevenslee.com

Attention Bankruptcy Dept
State of West Virginia Attorney General
State Capitol, Bldg 1,  Rm E 26
Charleston, WV  25305
Consumer@Wvago.Gov

Mary A. Schmergel
U.S. Department of Justice
Civil Division
1100 L Street, NW, Room 7110
Washington, DC  20005
Mary.Schmergel@usdoj.gov

Paul J. Napoli, R. Joseph Hrubiec,
Hunter J. Shkolnik, Shayna E. Sacks,
Salvatore C. Badala, Joseph Ciaccio
Napoli Shkolnik PLLC
360 Lexington Avenue, 11TH Flr.
New York, NY  10017
PNapoli@NSPRLaw.com;
Hunter@NapoliLaw.com;
SSacks@NapoliLaw.com;
SBadala@NapoliLaw.com;
JCiaccio@NapoliLaw.com;
RHrubiec@NapoliLaw.com

Herb Baer & Selwyn Perry
Prime Clerk LLC
60 East 42nd Street, Ste 1440
New York, NY  10165
Mallinckrodtteam@Primeclerk.Com;
Serviceqa@Primeclerk.Com

Ari Y. Basser, Jordan L. Lurie
Pomerantz LLP
1100 Glendon Avenue
Los Angeles, CA  90024
Abasser@pomlaw.com; jllurie@pomlaw.com

Eboney Cobb
Perdue, Brandon, Fielder,
Collins & Mott, L.L.P.
500 E. Border Street, Suite 640
Arlington, TX  76010
ecobb@pbfcm.com

Andrew N. Rosenberg; Alice Belisle
Eaton; Claudia R. Tobler; &
Neal Paul Donnelly
Paul, Weiss, Rifkind, Wharton &
Garrison LLP
1285 Avenue of The Americas
New York, NY  10019-6031
Arosenberg@Paulweiss.Com;
Aeaton@Paulweiss.Com;
Ctobler@Paulweiss.Com;
Ndonnelly@Paulweiss.Com

Carol E. Momjian, Denise A. Kuhn
PA Office of Attorney General
Senior Deputy Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA  19103
Cmomjian@attorneygeneral.gov;
dkuhn@attorneygeneral.gov

Anthony M. Saccullo, Mary E. Augustine
A.M. Saccullo Legal, LLC
27 Crimson King Drive
Bear, DE  19701
ams@saccullolegal.com;
meg@saccullolegal.com

Jane M. Leamy, Esq.
Office of the United States Trustee
844 King Street Suite 2207
Lockbox 35
Wilmington, DE  19801
Jane.M.Leamy@Usdoj.Gov

James F. Chiu, Amanda K. Quick,
Heather M. Crockett
Office of the Attorney General
   of Indiana
302 W. Washington St.
IGCS-5th Floor
Indianapolis, IN  46204
Info@Atg.In.Gov;
Amanda.Quick@atg.in.gov;
Heather.Crockett@atg.in.gov;
James.Chiu@atg.in.gov

Attention Bankruptcy Dept
State of Illinois Attorney General
100 West Randolph Street
Chicago, IL  60601
Webmaster@Atg.State.Il.Us

Karen Cordry
National Assn of Attorneys General
1850 M St., Nw 12Th Floor
Washington, DC  20036
Kcordry@Naag.Org

K. John Shaffer
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA  90017
Johnshaffer@quinnemanuel.com

Deborah M. Perry
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, TX  75201-6659
dperry@munsch.com

Alan E. Gamza, Kent C. Kolbig
Moses & Singer LLP
The Chrysler Building
405 Lexington Avenue
New York, NY  10174
Agamza@mosessinger.com;
kkolbig@mosessinger.com

Juan R. Martinez
Morgan & Morgan, P.A.
Complex Litigation Unit
201 N. Franklin Street, 7th Floor
Tampa, FL  33602
Juanmartinez@forthepeople.com

James D. Young
Morgan & Morgan, P.A.
Complex Litigation Unit
76 South Laura Street, Suite 1100
Jacksonville, FL  32202
jyoung@forthepeople.com

Cyrus Mehri, Steve Skalet,
Joshua Karsh, Aisha Rich
Mehri & Skalet, PLLC
1250 Connecticut Ave., NW
Washington, DC  20036
Cmehri@findjustice.com;
sskalet@findjustice.com;
jkarsh@findjustice.com;
arich@findjustice.com

- 9 -

Matthew J. Rifino, Esquire
McCarter & English, LLP
1600 Market Street, 39th Floor
Philadelphia, PA  19103
Mrifino@mccarter.com

Scott R. Bickford
Martzell, Bickford & Centola
338 Lafayette Street
New Orleans, LA  70130
sbickford@mbfirm.com

Stephanie D. Miller
Mallinckrodt PLC
675 Mcdonnell Blvd.
Hazelwood, MO  63042
Corporate.secretary@mnk.com

Howard S. Beltzer, James A. Copeland
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY  10019-6022
Howard.beltzer@nortonrosefulbright.com;
james.copeland@nortonrosefulbright.com

Legal Department
Securities & Exchange Commission -
NY Office
Brookfield Place
200 Vesey Street Suite 400
New York, NY  10281-1022
Bankruptcynoticeschr@Sec.Gov;
NYrobankruptcy@Sec.Gov

Michael S. Etkin, Andrew Behlmann,
Colleen Maker, Bruce Buechler,
Philip J. Gross
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ  07068
Metkin@lowenstein.com;
abehlmann@lowenstein.com;
cmaker@lowenstein.com;
bbuechler@lowenstein.com;
pgross@lowenstein.com

Attention Bankruptcy Dept
State of Connecticut Attorney General
55 Elm Street
Hartford, CT  06106
Attorney.General@Ct.Gov

Attention Bankruptcy Dept
State of Arizona Attorney General
2005 N Central Ave
Phoenix, AZ  85004-2926
Aginfo@Azag.Gov

Francois M. Blaudeau
Southern Institute for Medical and
Legal Affairs, LLC
2224 1st Ave. North
Birmingham, AL  35203
Francois@southernmedlaw.com

Michelle E. Shriro
Singer & Levick, P.C.
16200 Addison Road, Ste 140
Addison, TX  75001
Mshriro@singerlevick.com

Paul Navid
Province
1230 Rosecrans Ave., Suite 405
Manhattan Beach, CA  90266
PNavid@provincefirm.com

Legal Department
Securities and Exchange Commission -
Regional office
One Penn Center
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
Secbankruptcy@Sec.Gov

Seth H. Lieberman, Patrick Sibley,
Matthew W. Silverman, Sameer M. Alifarag
Pryor Cashman LLP
7 Times Square
New York, NY  10036
Slieberman@pryorcashman.com;
psibley@pryorcashman.com;
msilverman@pryorcashman.com;
SAlifarag@pryorcashman.com

Secretary of The Treasury
Securities & Exchange Commission -
Headquarters
100 F Street NE
Washington, DC  20549
Secbankruptcy@Sec.Gov

Lawrence M. Rolnick, Michael J. Hampson
Rolnick Kramer Sadighi LLP
1251 Avenue of the Americas
New York, NY  10020
Lrolnick@rksllp.com; mhampson@rksllp.com

W. David Arnold
Robison, Curphey & O'Connell, LLC
Four SeaGate, Ninth Floor
Toledo, OH  43604
Darnold@rcolaw.com

A-0896

Lawrence S. Robbins, Michael L. Waldman,
Donald Burke, Jason A. Shaffer
Robbins, Russell, Englert, Orseck,
Untereiner & Sauber LLP
2000 K Street, N.W., 4th Floor
Washington, DC  20006
lrobbins@robbinsrussell.com;
mwaldman@robbinsrussell.com;
dburke@robbinsrussell.com;
jshaffer@robbinsrussell.com

Michael Capeci, David Rosenfeld
Robbins Geller Rudman & Dowd, LLP
58 South Service Rd., Suite 200
Melville, NY  11747
Mcapeci@rgrdlaw.com;
drosenfeld@rgrdlaw.com

Lillian Stenfeldt
Rimon, P.C.
One Embarcadero Center, Ste 400
San Francisco, CA  94111
Lillian.stenfeldt@rimonlaw.com

Jacquelyn H. Choi
Rimon, P.C.
2029 Century Park East
Suite 400-N
Los Angeles, CA  90067
jacquelyn.choi@rimonlaw.com

Michael Lyle, Eric C. Lyttle,
Meghan A. McCaffrey
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, DC  20005
Mikelyle@quinnemanuel.com;
ericlyttle@quinnemanuel.com;
meghanmccaffrey@quinnemanuel.com

Attention Bankruptcy Dept
State of Hawaii Attorney General
425 Queen Street
Honolulu, HI  96813
Hawaiiag@Hawaii.Gov

John R. Ashmead, Esq., Robert J. Gayda,
Esq., & Catherine V. LoTempio, Esq.
Seward & Kissel LLP
One Battery Park Plaza
New York, NY  10004
ashmead@sewkis.com; gayda@sewkis.com;
lotempio@sewkis.com

Attention Bankruptcy Dept
State of California Attorney General
P.O. Box 944255
Sacramento, CA  94244-2550
Bankruptcy@Coag.Gov

Attention Bankruptcy Dept
State of Utah Attorney General
Po Box 142320
Salt Lake City, UT  84114-2320
Uag@Utah.Gov

Attention Bankruptcy Dept
State of New Jersey Attorney General
RJ Hughes Justice Complex
25 Market Street
P.O. Box 080
Trenton, NJ  08625-0080
Askconsumeraffairs@Lps.State.Nj.Us

Steven A. Ginther
State of Missouri
Office of Attorney General
Bankruptcy Unit
PO Box 475
Jefferson City, MO  65105-0475
Deecf@dor.mo.gov

Attention Bankruptcy Dept
State of Michigan Attorney General
G. Mennen Williams Bldg, 7th Flr
525 W. Ottawa St., P.O. Box 30212
Lansing, MI  48909-0212
Miag@Michigan.Gov

Attention Bankruptcy Dept
State of Louisiana Attorney General
P.O. Box 94095
Baton Rouge, LA  70804-4095
Consumerinfo@Ag.State.La.Us

Attention Bankruptcy Dept
State of Alaska Attorney General
P.O. Box 110300
Juneau, AK  99811-0300
Attorney.General@Alaska.Gov

Laura J. Monroe
Perdue, Brandon, Fielder, Collins &
Mott, L.L.P.
P.O. Box 817
Lubbock, TX  79408
Lmbkr@pbfcm.com

- 11 -

A-0897

Jared Q. Libet, Rebecca M. Hartner,
Annemarie B. Mathews
Office of the South Carolina
Attorney General
P.O. Box 11549
Columbia, SC 29211-1549
Jlibet@scag.gov; rhartner@scag.gov;
amathews@scag.gov

Rachel R. Obaldo, Jason B. Binford
Office of the Attorney General of Texas
Bankruptcy & Collections Division
P.O. Box 12548- MC 008
Austin, TX 78711-2548
Public.Information@Oag.State.Tx.Us;
rachel.obaldo@oag.texas.gov;
jason.binford@oag.texas.gov

Diane W. Sanders
Linebarger Goggan Blair & Sampson, LLP
PO Box 17428
Austin, TX 78760-7428
Austin.bankruptcy@publicans.com

Tara LeDay
McCreary, Veselka, Bragg & Allen, P.C.
P.O. Box 1269
Round Rock, TX 78680
Tleday@mvbalaw.com

John P. Dillman
Linebarger Goggan Blair & Sampson, LLP
PO Box 3064
Houston, TX 77253-3064
houston_bankruptcy@publicans.com

Jason S. Greenwood
U.S. Department of Justice
Ben Franklin Station
P.O. Box 875
Washington, DC 20044
Jason.s.greenwood@usdoj.gov

Julie J. Becker & Ian R. Bell
U.S. Bank National Association
Global Corporate Trust Services
60 Livingston Avenue
EP MN WS1D
St. Paul, MN 55107
Julie.becker@usbank.com;
ian.bell@usbank.com

**BY FIRST CLASS MAIL**

GCM
Wilmington Savings Fund Society, FSB
500 Delaware Avenue, 11th Flr.
Wilmington, DE 19801

General Counsel
Food and Drug Administration
1005 Convention Plaza
St. Louis, MO 63101

Michael Shannon
Deutsche Bank AG New York Branch
Leveraged Finance Group-Deutsche Bank
Securities
60 Wall Street
New York, NY 10005

Attention Bankruptcy Dept
State of Oklahoma Attorney General
313 NE 21St Street
Oklahoma City, OK 73105

Attention Bankruptcy Dept
State of Ohio Attorney General
30 E. Broad St., 14th Floor
Columbus, OH 43215

Bankruptcy Unit, Civil Recoveries Bureau
State of New York Attorney General
Office of the Attorney General
The Capitol
Albany, NY 12224-0341

Attention Bankruptcy Dept
State of Minnesota Attorney General
1400 Bremer Tower
445 Minnesota Street
St. Paul, MN 55101-2131

Attention Bankruptcy Dept
State of Kentucky Attorney General
700 Capitol Avenue, Suite 118
Frankfort, KY 40601

Attention Bankruptcy Dept
State of Kansas Attorney General
120 Sw 10th Ave., 2nd Floor
Topeka, KS 66612-1597

Attention Bankruptcy Dept
US of America Attorney General
Us Dept of Justice
950 Pennsylvania Ave NW
Washington, DC 20530-0001

A-0898

Attention Bankruptcy Dept
State of Rhode Island Attorney General
150 South Main Street
Providence, RI  02903-0000

Bankruptcy Department
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC  20530-0001

Gay D. Pelzer
The University of Iowa, Office of
General Counsel
120 Jessup Hall
5 W. Jefferson Street
Iowa City, IA  52242-1316

Attention Bankruptcy Dept
State of Wyoming Attorney General
123 Capitol Building
200 W. 24th Street
Cheyenne, WY  82002

Attention Bankruptcy Dept
State of Virginia Attorney General
900 East Main Street
Richmond, VA  23219

Attention Bankruptcy Dept
State of Florida Attorney General
The Capitol, Pl 01
Tallahassee, FL  32399-1050

Attention Bankruptcy Dept
State of Colorado Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO  80203

Attention Bankruptcy Dept
State of Arkansas Attorney General
323 Center Street, Ste 200
Little Rock, AR  72201-2610

Laura L. McCloud, Bankruptcy
State of Tennessee Attorney General
P.O. Box 20207
Nashville, TN  37202-0207

Attention Bankruptcy Dept
State of North Carolina Attorney General
9001 Mail Service Center
Raleigh, NC  27699-9001

Attention Bankruptcy Dept
State of New Mexico Attorney General
P.O. Drawer 1508
Santa Fe, NM  87504-1508

Attention Bankruptcy Dept
State of Washington Attorney General
1125 Washington St. Se
P.O. Box 40100
Olympia, WA  98504-0100

Attention Bankruptcy Dept
State of Mississippi Attorney General
Walter Sillers Building
550 High Street, Suite 1200
P.O. Box 220
Jackson, MS  39201

Corporates Team -
Mallinckrodt International Finance S.A.
Deutsche Bank National Trust Company
Trust & Agency Services
c/o Deutsche Bank National Trust Company
100 Plaza One
Mailstop Jcy03-0699
Jersey City, NJ  07311-

Attention Bankruptcy Dept
State of Alabama Attorney General
P.O. Box 300152
Montgomery, AL  36130-0152

Centralized Insolvency Operation
Internal Revenue Service
2970 Market Street
Mail Stop 5-Q30.133
Philadelphia, PA  19104-5016

Centralized Insolvency Operation
Internal Revenue Service
P.O. Box 7346
Philadelphia, PA  19101-7346

Attention Bankruptcy Dept
State of Wisconsin Attorney General
Wisconsin Department of Justice
State Capitol, Room 114 East
P. O. Box 7857
Madison, WI  53707-7857

Attention Bankruptcy Dept
State of Idaho Attorney General
700 W. Jefferson Street
P.O. Box 83720
Boise, ID  83720-1000

Registration Section/Odr
Drug Enforcement Administration
PO Box 2639
Springfield, VA  22152-2639

A-0899

Christine R. Etheridge
Wells Fargo Vendor Financial Services
Bankruptcy Administration
P.O. Box 13708
Macon, GA  31208-3708

14763970

A-0900

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| MALLINCKRODT PLC, *et al.*, | : | Case No. 20-12522 (JTD) |
|  | : |  |
| Debtors.[1] | : | (Jointly Administered) |
|  | : |  |
|  | : | **Obj. Deadline:  May 14, 2021 at 4:00 p.m. (ET)** |
|  | : | **Hearing Date:  June 2, 2021 at 3:00 p.m. (ET)** |

----------------------------------------------------------- x

### DEBTORS' FIRST OMNIBUS OBJECTION
### TO UNSUBSTANTIATED CLAIMS (SUBSTANTIVE)

**THIS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN CLAIMS. CLAIMANTS SHOULD CAREFULLY REVIEW THIS OBJECTION AND THE SCHEDULES ATTACHED TO THIS OBJECTION TO DETERMINE WHETHER THIS OBJECTION AFFECTS THEIR CLAIMS.**

***TO THE CLAIMANTS WHOSE CLAIMS ARE SUBJECT TO THIS OBJECTION:***

**\* YOUR SUBSTANTIVE RIGHTS MAY BE AFFECTED BY THIS OBJECTION AND ANY FURTHER OBJECTIONS THAT MAY BE FILED IN THE CHAPTER 11 CASES.**

**\*\* THE RELIEF SOUGHT IN THIS OBJECTION IS WITHOUT PREJUDICE TO THE RIGHTS OF THE DEBTORS AND THEIR ESTATES TO PURSUE FURTHER OBJECTIONS AGAINST THE CLAIMS.**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**")

respectfully represent as follows in support of this objection (this "**Objection**"):

### RELIEF REQUESTED

1.      By this Objection, the Debtors seek entry of an order, substantially in the form

attached hereto as **Exhibit A** (the "**Proposed Order**"), disallowing and expunging certain (i)

unsubstantiated cross-Debtor duplicate claims related to Acthar litigation (the "**Unsubstantiated**

---

[1]      A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

**Acthar Litigation Claims**") identified as "Claims to be Disallowed" on Schedule 1 to the Proposed Order and (ii) unsubstantiated claims identified on Schedule 2 to the Proposed Order (the "**Other Unsubstantiated Acthar Claims**" and, together with the Unsubstantiated Acthar Litigation Claims, the "**Disputed Claims**").[2]

## JURISDICTION AND VENUE

2.      The Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are section 502 of title 11 of the United States Code (the "**Bankruptcy Code**"), rule 3003 and 3007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rule 3007-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

4.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order or judgment by the Court in connection with this Objection if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

---

[2] The Other Unsubstantiated Acthar Claims were filed on a consolidated basis through 46 proofs of claim purporting to represent 820,571 claims by hundreds of thousands of claimants.  The Debtors intend to address the Other Unsubstantiated Acthar Claims on the basis of the 46 proofs of claim filed and listed on Schedule 2 hereto.  The Debtors have not attached detail on the 820,571 individual Other Unsubstantiated Acthar Claims forming the basis for the filed proofs of claim, but will make such detail available upon request.

## **BACKGROUND**

5.     On October 12, 2020 (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On October 27, 2020, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed, pursuant to section 1102 of the Bankruptcy Code:  (a) an official committee of unsecured creditors [Docket No. 306]; and (b) an official committee of opioid-related claimants [Docket No. 308].  No trustee has been appointed in the Chapter 11 Cases.  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

6.     On April 20, 2021, the Debtors filed the *Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [Docket No. 2074] (the "**Plan**") and the *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [Docket No. 2075] (the "**Disclosure Statement**").[3]

7.     Additional factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the *Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 128].  The Debtors also rely upon and incorporate by reference the *Declaration of Randall S. Eisenberg In Support of*

---

[3] Capitalized terms used herein but not defined shall have the meaning ascribed to them in either the Plan or the Disclosure Statement, as applicable.

US-DOCS\121528260.2
RLF1 25216522v.1

A-0903

*Debtors' Motion For Scheduling Order and Objections To Claims*, submitted concurrently herewith.

### BAR DATES

8.    On October 20, 2020, the Debtors filed a motion seeking entry of an order establishing deadlines to file proofs of claim in the Chapter 11 Cases and approval of related procedures.  On November 30, 2020, the Bankruptcy Court entered an order [Docket No. 667] (the "**Bar Date Order**") establishing certain deadlines for the filing of proofs of claim in the Chapter 11 Cases.  By the Bar Date Order, the Bankruptcy Court established February 16, 2021 (the "**General Bar Date**") as the general deadline for all Entities (other than Governmental Units) to file proofs of claim in the Chapter 11 Cases for all claims (other than Opioid Claims and VI Opioid Claims, each as defined in the Bar Date Order[4]) against the Debtors (each such claim, a "**General Claim**") and (ii) April 12, 2021 (the "**Governmental Bar Date**") as the general deadline for all Governmental Units to file proofs of claim in the Chapter 11 Cases for all claims (other than Opioid Claims and VI Opioid Claims) against the Debtors.  No deadline to file Opioid Claims or VI Opioid Claims has been set by the Bankruptcy Court.

### SCHEDULES, PROOFS OF CLAIM, AND CLAIMS RECONCILIATION

9.    On December 23, 2020, the Debtors filed their schedules of assets and liabilities and statements of financial affairs [Docket Nos. 1066-1074].  On February 26, 2021, the Debtors

---

[4] As defined in the Bar Date Order: "**Opioid Claim**" means claims and causes of action, whether existing now or arising in the future, including Future Claims (defined below), against any Debtor in any way arising out of or relating to opioid products manufactured or sold by any Debtor or any of their predecessors prior to the effective date of any plan of reorganization for the Debtors, including, for the avoidance of doubt and without limitation, claims for indemnification (contractual or otherwise), contribution, or reimbursement against any Debtor on account of payments or losses in any way arising out of or relating to opioid products manufactured or sold by any Debtor or any of their predecessors. For the avoidance of doubt, this definition equally applies to foreign creditors. As used in the Bar Date Order, "Future Claim" means a claim represented by the Future Claimants' Representative appointed in these cases. As also defined in the Bar Date Order, "**VI Opioid Claim**" means any claims in any way arising, in whole or in part, from a violation of the Voluntary Injunction attached as Appendix 1 to Exhibit A to the Motion filed at Docket No. 2 in Adv. Pro. No. 20-50850.

4

A-0904

filed amended schedules of assets and liabilities and statements of financial affairs [Docket Nos. 1528-1538] (collectively, and as may be further modified, amended, or supplemented from time to time, the "**Schedules**").

10. The Debtors' register of claims (the "**Claims Register**"), maintained by Prime Clerk, indicates that approximately 49,000 proofs of claim (the "**Claims**") have been filed in the Chapter 11 Cases. This number does not include an additional 820,571 claims, filed through 46 combined proofs of claims, all of which are Other Unsubstantiated Acthar Claims.

11. In the ordinary course of business, the Debtors maintain books and records (the "**Books and Records**") that reflect, among other things, the nature and amount of the liabilities owed to their creditors. The Debtors and their professionals have begun reviewing, comparing, and reconciling the Claims (including any supporting documentation) with the Schedules and Books and Records. This reconciliation process includes identifying particular categories of Claims that may be subject to objection. While this analysis and reconciliation is ongoing, the Debtors have determined that the Disputed Claims should be disallowed and expunged for the reasons described below.

12. Specifically, the claimants asserting the Unsubstantiated Acthar Litigation Claims identified as "Claims to be Disallowed" on <u>Schedule 1</u> to the Proposed Order asserted duplicate claims against multiple Debtors, all related to prepetition Acthar litigation. The relevant underlying lawsuits name only Debtor Mallinckrodt ARD LLC ("**ARD**") and, in some cases, Mallinckrodt plc ("**plc**"). There are no claims asserted against any other Debtor in the underlying litigations, and there are no allegations in respect of any other Debtor in the relevant complaints. Such Debtors' books and records, which are maintained in the ordinary course of business by such Debtors, do not reflect the existence of the asserted Unsubstantiated Acthar Litigation Claims.

US-DOCS\121528260.2
RLF1 25216522v.1

A-0905

Similarly, none of the Unsubstantiated Acthar Litigation Claims contains any substantiation for a claim against any of the non-defendant Debtors.

13.     In an effort to maintain an accurate Claims Register, the Debtors seek to disallow these Unsubstantiated Acthar Litigation Claims filed against the inappropriate Debtor(s), while preserving (for the time being) the Claims filed by the relevant claimants against ARD and/or plc, as applicable.  The Unsubstantiated Acthar Litigation Claims should be disallowed and expunged on the basis of a complete lack of substantiation for the applicable Debtors.

14.     The claimants asserting the Other Unsubstantiated Acthar Claims identified on Schedule 2 to the Proposed Order asserted various claims against the Debtors without any form of substantiation.  The applicable Debtors' books and records, which are maintained in the ordinary course of business by such Debtors, do not reflect the existence of the asserted Other Unsubstantiated Acthar Claims or any litigation filed against the Debtors with respect to the asserted Other Unsubstantiated Acthar Claims.  The Debtors are unaware of any factual basis whatsoever supporting the Other Unsubstantiated Acthar Claims.  In an effort to maintain an accurate Claims Register, the Debtors seek to disallow those Other Unsubstantiated Acthar Claims.

15.     Therefore, the Debtors object to the allowance of each of the Disputed Claims included on Schedules 1 and 2 to the Proposed Order and request that each such Disputed Claim be disallowed and expunged in its entirety.  If the Debtors' objection to the Unsubstantiated Acthar Litigation Claims is sustained, the claims listed on Schedule 1 to the Proposed Order as a "Remaining Claim" will remain on the Claims Register, subject to the rights of the Debtors and their estates to object on any grounds that bankruptcy or nonbankruptcy law permits.

6

## BASIS FOR RELIEF REQUESTED

16.     Section 502(a) of the Bankruptcy Code provides, in pertinent part, that "[a] claim

or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party

in interest . . . objects."  11 U.S.C. § 502(a).  Once an objection to a claim is filed, the Court, after

notice and a hearing, shall determine the allowed amount of the claim.  *See* 11 U.S.C. § 502(b).

17.     Section 502(b)(1) of the Bankruptcy Code provides, in part, that a claim may not

be allowed to the extent that it "is unenforceable against the debtor and property of the debtor,

under any agreement or applicable law."  11 U.S.C. § 502(b)(1).  The Third Circuit has established

a three-pronged standard of review for proofs of claims in *In re Allegheny International, Inc.*, 954

F.2d 167, 173-74 (3d Cir. 1992).  The first Allegheny prong requires that the claimant "allege facts

sufficient to support the claim." *Id*. at 73 ("[A] claim that alleges facts sufficient to support a legal

liability to the claimant satisfies the claimant's initial obligation to go forward."). The facts alleged,

if true, must support a claim.  *See, e.g., In re Nortel Networks, Inc.*, 469 B.R. 478, 497 (Bankr. D.

Del. 2012); *In re Smurfit–Stone Container Corp.*, 444 B.R. 111, 117 (Bankr. D. Del, 2011); *In re

marchFirst, Inc.*, 431 B.R. 436, 443 (Bankr. N. D. Ill. 2010); *In re DJK Residential LLC*, 416 B.R.

100, 106 (Bankr. S.D.N.Y. 2009); *Matter of Rimsat, Ltd.*, 223 B.R. 345, 348 (Bankr. N. D. Ind.

1998).  No such facts were set forth with the Disputed Claims.[5]  As a result, the Disputed Claims

are unenforceable against the Debtors.

18.     In addition, if the Disputed Claims are not disallowed and expunged, the potential

exists for the applicable claimants to receive recoveries to which they are not entitled, to the

detriment of the Debtors' other stakeholders.   Therefore, pursuant to section 502(b)(1) of the

---

[5] Additionally, while a properly filed proof of claim is prima facie evidence of the claim's allowed amount, when an objecting party rebuts a claim's prima facie validity, the claimant bears the burden of proving the claim's validity by a preponderance of evidence.  *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992).  The burden of persuasion with respect to the claim is always on the claimant.  *See id.* at 174.

Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007-1, the Debtors respectfully request that the Court enter the Proposed Order granting the relief requested herein.

**<u>RESPONSES TO OBJECTION</u>**

19.     <u>Filing and Service of Responses</u>:  To contest the Objection, a claimant must file and serve a written response to the Objection (a "**<u>Response</u>**") so that it is actually received by the Clerk of the Court and the parties in the following paragraph no later than May 14, 2021 (the "**<u>Response Deadline</u>**").  Claimants should locate their names and Claims on <u>Schedules 1</u> and <u>2</u> to the Proposed Order, and carefully review the Objection.  A Response must address each ground upon which the Debtors object to a particular Claim.  A hearing to consider the Debtors' Objection will be held on June 2, 2021 at 3:00 p.m. (ET), before the Honorable John T. Dorsey, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801 (the "**<u>Hearing</u>**").

20.     Each Response must be filed and served upon the following entities at the following addresses: (a) the Office of the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801; (b) Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022 (Attn:   Anupama   Yerramalli   (Anu.Yerramalli@lw.com)   and   Hugh   Murtagh (Hugh.Murtagh@lw.com)); (c) Latham & Watkins LLP, 355 South Grand Avenue, Suite 100, Los Angeles, California 90071 (Attn: Jeffrey Bjork (Jeff.Bjork@lw.com)); (d) Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611 (Attn: Jason Gott (Jason.Gott@lw.com)); and (e) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins (collins@rlf.com) and Michael J. Merchant (merchant@rlf.com)).

21.    <u>Content of Responses</u>:  Every Response to the Objection must contain, at a minimum, the following:

    a.    a caption setting forth the name of the Court, the above-referenced case number, and the title of the Objection to which the Response is directed;

    b.    the name of the claimant and description of the basis for the amount of the Disputed Claim;

    c.    a concise statement setting forth the reasons why a particular Disputed Claim should not be disallowed for the reasons set forth in the Objection, including, but not limited to, the specific factual and legal bases upon which the claimant will rely in opposing the Objection at the Hearing;

    d.    all documentation or other evidence of the Claim in question, to the extent not already included with the claimant's proof of claim, upon which the claimant will rely in opposing the Objection at the Hearing;

    e.    the name, address, telephone number, and fax number of the person(s) (who may be the claimant or a legal representative thereof) possessing ultimate authority to reconcile, settle, or otherwise resolve the Claim on behalf of the claimant; and

    f.    the name, address, telephone number, and fax number of the person(s) (who may be the claimant or a legal representative thereof) to whom the Debtors should serve any reply to the Response.

22.    <u>Timely Response Required; Hearing; Replies</u>:  If a Response is properly and timely filed and served in accordance with the above procedures, the Debtors will endeavor to reach a consensual resolution with the claimant.  If no consensual resolution is reached, the Court will conduct the Hearing with respect to the Objection and the Response on June 2, 2021 or such other date and time as parties filing Responses may be notified.  Only those Responses made in writing and timely filed and received will be considered by the Court at any such hearing.

23.    <u>Adjournment of Hearing</u>:  The Debtors reserve the right to adjourn the Hearing on any Claim included in the Objection.  In the event that the Debtors so adjourn the Hearing, they will state that the Hearing on that particular Claim has been adjourned on the agenda for the

Hearing on the Objection, which agenda will be served on the person designated by the claimant in its Response.

24.     If a claimant whose Claim is subject to the Objection, and who is served with the Objection, fails to file and serve a timely Response in compliance with the foregoing procedures, the Debtors will present to the Court an appropriate order disallowing the Disputed Claim without further notice to the claimant.

25.     <u>Separate Contested Matter</u>:  Each of the Disputed Claims and the Debtors' objections thereto as asserted in this Objection constitute a separate contested matter as contemplated by Bankruptcy Rule 9014.  The Debtors request that any order entered by the Court with respect to an objection asserted herein will be deemed a separate order with respect to each such Disputed Claim.

## **<u>RESERVATION OF RIGHTS</u>**

26.     The Debtors expressly reserve the right to amend, modify, or supplement this Objection, and to file additional objections to any other claims (filed or not) that may be asserted against the Debtors and their estates.  Should one or more of the grounds of objection stated in the Objection be dismissed or overruled, the Debtors reserve the right to object to each of the Disputed Claims or any other proofs of claim on any other grounds that the Debtors discover or elect to pursue.

27.     Notwithstanding anything contained in the Objection, or the exhibits and schedules attached hereto, nothing herein will be construed as a waiver of any rights that the Debtors, or any successor to the Debtors, may have to enforce rights of setoff against the claimants.

28.     Nothing in this Objection will be deemed or construed:  (a) as an admission as to the validity of any claim or interest against the Debtors; (b) as a waiver of the Debtors' rights to

US-DOCS\121528260.2
RLF1 25216522v.1

dispute or otherwise object to any claim or proof of interest on any grounds or basis; (c) to waive or release any right, claim, defense, or counterclaim of the Debtors, or to estop the Debtors from asserting any right, claim, defense, or counterclaim; (d) as an approval or assumption of any agreement, contract, or lease, pursuant to section 365 of the Bankruptcy Code; or (e) as an admission that any obligation is entitled to administrative expense priority or any such contract or agreement is executory or unexpired for purposes of section 365 of the Bankruptcy Code or otherwise.

## COMPLIANCE WITH LOCAL BANKRUPTCY RULE 3007-1

29.     Simultaneously herewith, the Debtors filed their *Motion of the Debtors for an Order Granting Leave from Local Rule 3007-1(f) to Permit the Filing of Substantive Omnibus Objections and Granting Related Relief*, seeking relief from this Court from certain of the requirements set forth in Local Rule 3007-1(f)(i), (ii), and (iii) (the "**3007-1(f) Motion**").   The undersigned representative of the Debtors has reviewed the requirements of Local Rule 3007-1 and certifies that, except to the extent implicated by relief sought in the 3007-1(f) Motion, the Objection substantially complies with that Local Rule.  To the extent that the Objection does not otherwise comply with the applicable requirements of Local Rule 3007-1, the Debtors believe such deviations are not material and respectfully request that any such requirement be waived.  To the extent that the Court declines to grant the relief sought in the 3007-1(f) Motion, the Debtors will modify the instant Objection accordingly.

## FURTHER INFORMATION

30.     Questions about or requests for additional information about the proposed disposition of the Disputed Claims hereunder should be directed to the Debtors' counsel in writing at the following addresses:  (a) Latham & Watkins LLP, 885 Third Avenue, New York, New York

10022 (Attn: Anupama Yerramalli (Anu.Yerramalli@lw.com) and Hugh Murtagh (Hugh.Murtagh@lw.com)); (b) Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611 (Attn: Jason Gott (Jason.Gott@lw.com)); and (c) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Michael J. Merchant (merchant@rlf.com)).

31.     Questions regarding the amount of a proof of claim, or the filing of a proof of claim, should be directed in writing to Mallinckrodt plc Ballot Processing, c/o Prime Clerk LLC One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165 or mallinckrodtinfo@primeclerk.com. **Claimants should not contact the Clerk of the Court or the U.S. Trustee to discuss the merits of their Claim or the Objection.**

## NOTICE

32.     Notice of this Objection will be provided to the holders of the Disputed Claims,[6] as well as (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the ad hoc group of the Debtors' prepetition secured lenders; (c) the agent under the Debtors' secured term and revolving financing facilities; (d) counsel to the ad hoc group of holders of the Debtors' unsecured notes; (e) the indenture trustees for the Debtors' outstanding notes; (f) counsel to the ad hoc committee of governmental entities holding opioid claims; (g) counsel to the Unsecured Creditors' Committee; (h) counsel to the Opioid Claimants' Committee; (i) counsel to the multi-state governmental entities group; (j) the United States Attorney's Office for the District of Delaware; (k) the attorneys general for all 50 states and the District of Columbia; (l) the United

---

[6] For the avoidance of doubt, the holder of an Other Unsubstantiated Acthar Claim is the party listed as the creditor in the applicable proof of claim. Such proofs of claim did not provide notice information for each of the 820,571 purported claimants whose claims were listed on a consolidated basis in such proofs of claim, so notice will be provided solely to the party listed in section 3 of the proof of claim on a consolidated basis for each such proof of claim.

States Department of Justice; (m) the Internal Revenue Service; (n) the Securities and Exchange Commission; (o) the United States Drug Enforcement Agency; (p) the United States Food and Drug Administration; and (q) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

[*Remainder of page left intentionally blank*]

US-DOCS\121528260.2
RLF1 25216522v.1

**A-0913**

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the

relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: April 30, 2021

/s/ Michael J. Merchant
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                stearn@rlf.com
                merchant@rlf.com
                steele@rlf.com
                schlauch@rlf.com

- and -

George A. Davis (*pro hac vice*)
George Klidonas (*pro hac vice*)
Andrew Sorkin (*pro hac vice*)
Anupama Yerramalli (*pro hac vice*)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Telephone:      (212) 906-1200
Facsimile:      (212) 751-4864
Email:          george.davis@lw.com
                george.klidonas@lw.com
                andrew.sorkin@lw.com

- and -

Jeffrey E. Bjork (*pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:      (213) 485-1234
Facsimile:      (213) 891-8763
Email:          jeff.bjork@lw.com

- and -

Jason B. Gott (*pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:      (312) 876-7700
Facsimile:      (312) 993-9767
Email:          jason.gott@lw.com

*Counsel for Debtors and Debtors in
Possession*

14

> **PLEASE CAREFULLY REVIEW THIS OBJECTION AND THE ATTACHMENTS HERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS YOUR CLAIM.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MALLINCKRODT PLC, *et al.*, | Case No. 20-12522 (JTD) |
| Debtors.[1] | (Jointly Administered) |
| | **Obj. Deadline: May 14, 2021 at 4:00 p.m. (ET)**<br>**Hearing Date: June 2, 2021 at 3:00 p.m. (ET)** |

### NOTICE OF OMNIBUS OBJECTION AND HEARING

PLEASE TAKE NOTICE that on April 30, 2021, the debtors in possession in the above-captioned cases (collectively, the "**Debtors**") filed the *Debtors' First Omnibus Objection to Unsubstantiated and Duplicative Claims (Substantive)* (the "**Objection**") with the United States Bankruptcy Court for the District of Delaware (the "**Court**"). **Your claim(s) may be disallowed and/or modified as a result of the Objection. Therefore, you should read the attached Objection carefully.**

**PLEASE TAKE FURTHER NOTICE THAT YOUR RIGHTS MAY BE AFFECTED BY THE OBJECTION AND BY ANY FURTHER CLAIM OBJECTION THAT MAY BE FILED BY THE DEBTORS OR OTHERWISE. THE RELIEF SOUGHT HEREIN IS WITHOUT PREJUDICE TO THE DEBTORS' RIGHT TO PURSUE FURTHER OBJECTIONS AGAINST YOUR CLAIM(S) SUBJECT TO THE OBJECTION IN**

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The debtors' mailing address is 675 McDonnell Blvd., St. Louis, Missouri 63042.

**ACCORDANCE WITH APPLICABLE LAW AND APPLICABLE ORDERS OF THE COURT.**

PLEASE TAKE FURTHER NOTICE that objections or responses to the relief requested in the Objection, if any, must be made in writing and filed with the Clerk of the Court, 3rd Floor, 824 North Market Street, Wilmington, Delaware 19801, by **May 14, 2021 at 4:00 p.m. (ET)**.

PLEASE TAKE FURTHER NOTICE that responses to the Objection must contain, at minimum, the following: (a) a caption setting forth the name of the Court, the above-referenced case number, and the title of the Objection to which the Response is directed; (b) the name of the claimant and description of the basis for the amount of the Disputed Claim; (c) a concise statement setting forth the reasons why a particular Disputed Claim should not be disallowed for the reasons set forth in the Objection, including, but not limited to, the specific factual and legal bases upon which the claimant will rely in opposing the Objection at the Hearing; (d) all documentation or other evidence of the Claim in question, to the extent not already included with the claimant's proof of claim, upon which the claimant will rely in opposing the Objection at the Hearing; (e) the name, address, telephone number, and fax number of the person(s) (who may be the claimant or a legal representative thereof) possessing ultimate authority to reconcile, settle, or otherwise resolve the Claim on behalf of the claimant; and (f) the name, address, telephone number, and fax number of the person(s) (who may be the claimant or a legal representative thereof) to whom the Debtors should serve any reply to the Response.

PLEASE TAKE FURTHER NOTICE that if no response to the Objection is timely filed and received in accordance with the above procedures, an order may be entered sustaining the Objection without further notice or a hearing.  If a response is properly filed, served and received in accordance with the above procedures and such response is not resolved, a hearing to consider such response and the Objection will be held before The Honorable John T. Dorsey, United States

2

Bankruptcy Judge for the District of Delaware, at the Court, 824 North Market Street, 5th Floor, Courtroom No. 5, Wilmington, Delaware 19801 on **June 2, 2021 at 3:00 p.m. (ET)** (the "**Hearing**"). Only a response made in writing and timely filed and received will be considered by the Court at the Hearing.

**PLEASE TAKE FURTHER NOTICE THAT, IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY SUSTAIN THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.**

RLF1 25202271v.1

A-0917

Dated: April 30, 2021

/s/ Michael J. Merchant
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:          collins@rlf.com
                stearn@rlf.com
                merchant@rlf.com
                steele@rlf.com
                schlauch@rlf.com

- and -

George A. Davis (*pro hac vice*)
George Klidonas (*pro hac vice*)
Andrew Sorkin (*pro hac vice*)
Anupama Yerramalli (*pro hac vice*)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Telephone:     (212) 906-1200
Facsimile:     (212) 751-4864
Email:          george.davis@lw.com
                george.klidonas@lw.com
                andrew.sorkin@lw.com

- and -

Jeffrey E. Bjork (*pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:     (213) 485-1234
Facsimile:     (213) 891-8763
Email:          jeff.bjork@lw.com

- and -

Jason B. Gott (*pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:     (312) 876-7700
Facsimile:     (312) 993-9767
Email:          jason.gott@lw.com

*Counsel for Debtors and Debtors in Possession*

A-0918

**EXHIBIT A**

**Proposed Order**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x
:
In re:                                                  :    Chapter 11
:
MALLINCKRODT PLC, *et al.*,                             :    Case No. 20-12522 (JTD)
:
Debtors.[1]                                             :    (Jointly Administered)
:
:    **Re: Docket No. __**
:
------------------------------------------------------- x

## ORDER SUSTAINING DEBTORS' FIRST OMNIBUS OBJECTION
## TO UNSUBSTANTIATED CLAIMS (SUBSTANTIVE)

Upon the objection (the "**Objection**")[2] of the above-captioned debtors and debtors in

possession (collectively, the "**Debtors**") to the Disputed Claims set forth on Schedules 1 and 2

hereto, all as more fully set forth in the Objection; and this Court having reviewed the Objection;

and this Court having jurisdiction to consider the Objection and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from

the United States District Court for the District of Delaware dated as of February 29, 2012; and

this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that

this Court may enter a final order consistent with Article III of the United States Constitution; and

this Court having found that venue of this proceeding and the Objection in this district is proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the

Objection has been given and that no other or further notice is necessary; and upon the record

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2]     Capitalized terms used but not otherwise defined herein have the same meanings ascribed to such terms in the Objection.

herein; and after due deliberation thereon; and this Court having determined that there is good and sufficient cause for the relief granted in this Order, therefore, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Objection is GRANTED, as set forth herein.

2.      Any response to the Objection not otherwise withdrawn, resolved, or adjourned is hereby overruled on its merits.

3.      The Disputed Claims listed as "Claims to be Disallowed" on the attached Schedule 1 and all Disputed Claims on the attached Schedule 2 are disallowed and expunged in their entirety. The Claims listed as a "Remaining Claim" on the attached Schedule 1 shall remain on the Claims Register, subject to the Debtors' and their estates' further objections on any substantive or non-substantive grounds and without prejudice or waiver of the Debtors' and their estates' rights to dispute or otherwise object to the Remaining Claims on any grounds or basis.

4.      This Order shall be deemed a separate order with respect to each of the Disputed Claims identified on Schedule 1 and 2 hereto.  Any stay of this Order pending appeal by any of the claimants whose Disputed Claim(s) are subject to this Order shall only apply to the contested matter which involves such claimant and shall not act to stay the applicability or finality of this Order with respect to the other contested matters listed in the Objection or this Order.

5.      The Debtors and Prime Clerk are authorized to take all actions necessary and appropriate to give effect to this Order.

6.      Prime Clerk is authorized to modify the Claims Register to comport with the relief granted by this Order.

7.      Nothing in this Order or the Objection is intended or shall be construed as a waiver of any of the rights the Debtors may have to enforce rights of setoff against the claimants.

A-0921

8.      Nothing in the Objection or this Order shall be deemed or construed:  (a) as an admission as to the validity of any claim against the Debtors; (b) as a waiver of the Debtors' rights to dispute or otherwise object to any claim on any grounds or basis; (c) to waive or release any right, claim, defense, or counterclaim of the Debtors, or to estop the Debtors from asserting any right, claim, defense, or counterclaim; (d) as an approval or assumption of any agreement, contract, or lease, pursuant to section 365 of the Bankruptcy Code; or (e) as an admission that any obligation is entitled to administrative expense priority or any such contract or agreement is executory or unexpired for purposes of section 365 of the Bankruptcy Code or otherwise.

9.      The terms and conditions of this Order shall be immediately enforceable and effective upon its entry.

10.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# SCHEDULE 1

**Unsubstantiated Acthar Litigation Claims**

4

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| 32 BJ North Health Fund | 7902 | $ 2,851,788.18 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| 32BJ North Health Fund | 6123 | $ 2,851,788.18 | N/A | Mallinckrodt plc | Remaining Claim |
| A.L. a minor child (Tina Latham, parent) | 5204 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Accredo Health Group, Inc. and Priority Healthcare Distribution, Inc. d/b/a CuraScript SD Specialty | 4233 | $ 359,391.90 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Acument Global | 5894 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Holdings LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 4249 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Infacare Pharmaceutical Corporation | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5867 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | INO Therapeutics LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5771 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Ludlow LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5759 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MAK LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5796 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Finance LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5194 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Inc. | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5974 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Limited | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5851 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD IP Unlimited Company | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5806 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5969 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Brand Pharmaceuticals LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5983 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Buckingham Unlimited Company | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5977 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Critical Care Finance LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5813 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises Holdings, Inc. | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5819 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 6001 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises UK Limited | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5911 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Equinox Finance LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5984 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products Inc. | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 6005 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products IP Unlimited Company | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5830 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt IP Unlimited Company | Claim To Be Disallowed |

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5888 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Lux IP S.a.r.l. | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5901 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Manufacturing LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5895 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharma IP Trading Unlimited Company | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 6014 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 6345 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 6008 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt UK Ltd | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5865 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Holdings LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 6016 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Holdings LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 6023 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Pool LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 6017 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MCCH LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 6019 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MEH, Inc. | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5375 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MHP Finance LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5923 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MUSHI UK Holdings Limited | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5880 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Petten Holdings Inc. | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 6064 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Shared Services LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5944 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Holdings LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc. as Class Representative of Indirect Purchaser Class in Rockford Cas | 5871 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Pool LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc., as Class Representative of Indirect Purchaser Class in Rockford Ca | 5738 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Acument Global Technologies Inc., as Class Representative of Indirect Purchaser Class in Rockford Ca | 4257 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | IMC Exploration Company | Claim To Be Disallowed |
| Acument Global Technologies Inc., as Class Representative of Indirect Purchaser Class in Rockford Ca | 5982 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Canada ULC | Claim To Be Disallowed |
| Acument Global Technologies Inc., as Class Representative of Indirect Purchaser Class in Rockford Ca | 5370 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MNK 2011 LLC | Claim To Be Disallowed |
| Acument Global Technologies Inc., as Class Representative of Indirect Purchaser Class in Rockford Ca | 6024 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Operations LLC | Claim To Be Disallowed |

A-0925

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| Acument Global Technologies, Inc. | 6075 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 6047 | $ 2,395,450.39 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | IMC Exploration Company | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 6052 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Infacare Pharmaceutical Corporation | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5792 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | INO Therapeutics LLC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 6097 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Ludlow LLC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 6027 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MAK LLC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5847 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Finance LLC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5820 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Inc. | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5824 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Limited | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 6110 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD IP Unlimited Company | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5382 | $ 2,395,450.35 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Acument Global Technologies, Inc. | 5406 | $ 2,395,450.35 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Acument Global Technologies, Inc. | 5352 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Brand Pharmaceuticals LLC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 6116 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Buckingham Unlimited Company | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5868 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Canada ULC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5852 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Critical Care Finance LLC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5854 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises Holdings, Inc. | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5831 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises UK Limited | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5856 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Equinox Finance LLC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5937 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products Inc. | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 6138 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products IP Unlimited Company | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5886 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt IP Unlimited Company | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5415 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Lux IP S.a.r.l. | Claim To Be Disallowed |

A-0926

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| Acument Global Technologies, Inc. | 6427 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Manufacturing LLC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5873 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharma IP Trading Unlimited Company | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5402 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 6483 | $ 2,395,450.35 | N/A | Mallinckrodt plc | Remaining Claim |
| Acument Global Technologies, Inc. | 6141 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt UK Ltd | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5897 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Pool LLC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5374 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MCCH LLC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 6242 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MEH, Inc. | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 6190 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MHP Finance LLC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5428 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MNK 2011 LLC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 6068 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MUSHI UK Holdings Limited | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 6127 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Petten Holdings Inc. | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 6080 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Operations LLC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 6146 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Shared Services LLC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 6039 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Holdings LLC | Claim To Be Disallowed |
| Acument Global Technologies, Inc. | 5451 | $ 2,395,450.35 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Pool LLC | Claim To Be Disallowed |
| Advantage Sales & Marketing LLC | 3395 | $ 821,985.29 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Aetna Inc. on behalf of its subsidiaries and affiliates (see attached Addendum, which is incorporate | 6136 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| AFSCME District Council 47 Health & Welfare Fund | 6011 | $ 329,203.20 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| AFSCME District Council 47 Health & Welfare Fund | 34768 | $ 329,203.20 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| AFSCME District Council 47 Health & Welfare Fund | 4891 | $ 329,203.20 | N/A | Mallinckrodt plc | Remaining Claim |
| AFSCME District Council 47 Health & Welfare Fund | 35413 | $ 329,203.20 | N/A | Mallinckrodt plc | Remaining Claim |
| AFSCME Local 590 | 6325 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| AFSCME Local 590 | 5420 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Alcoa Corporation | 1437 | $ 580,718.52 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Allegheny Health Network | 7889 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Alticor Inc. | 2099 | $ 34,428.79 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| American Insurance | 6153 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| American Insurance | 5289 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| AmeriHealth Caritas Health Plan and Keystone Family Health Plan (see attached addendum, which is inc | 6144 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Anthem, Inc. (see attached Addendum, which is incorporated herein as part of this form) | 6780 | $ - | N/A | Mallinckrodt plc | Remaining Claim |

A-0927

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| AT&T Services Inc | 1707 | $ 11,568,506.93 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Aurora Health Care Central, Inc. | 6282 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products Inc. | Claim To Be Disallowed |
| Aurora Health Care Metro, Inc. | 6279 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products Inc. | Claim To Be Disallowed |
| Aurora Health Care, Inc. | 5778 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products Inc. | Claim To Be Disallowed |
| BCBS Michigan/BCN ASC Self-Funded Plans | 4856 | $ 78,035,798.13 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| BCBS Michigan/BCN ASC Self-Funded Plans | 5419 | $ 78,035,798.13 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| BCBS Michigan/BCN ASC Self-Funded Plans | 4796 | $ 78,035,798.13 | N/A | Mallinckrodt plc | Remaining Claim |
| BCBSM, Inc, d/b/a Blue Cross and Blue Shield of Minnesota (see attached Addendum, incorporated herei | 7888 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Berger, Mary | 4897 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Berger, Mary | 4913 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Big Lots Stores, Inc. | 6295 | $ 34,231.27 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company  (see the attached addendum, whi | 6180 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Blue Cross & Blue Shield of Rhode Island (see the attached addendum, which is incorporated herein as | 6041 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Blue Cross and Blue Shield Association (see attached addendum, which is incorporated herein as part | 6143 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Blue Cross and Blue Shield of Alabama (see attached Addendum, which is incorporated herein as part o | 6147 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Blue Cross and Blue Shield of Florida, Inc. (see the attached addendum, which is incorporated herein | 6046 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Blue Cross and Blue Shield of Kansas City (see attached addendum, which is incorporated herein as pa | 6803 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Blue Cross and Blue Shield of Massachusetts, Inc. and Blue Cross and Blue Shield of Massachusetts HM | 6158 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Blue Cross and Blue Shield of Nebraska, Inc. (see attached addendum, which is incorporated herei | 5853 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Blue Cross and Blue Shield of North Carolina (see the attached addendum, which is incorporated herei | 5874 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Blue Cross and Blue Shield of South Carolina (see attached Addendum, which is incorporated herein as | 6813 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Blue Cross and Blue Shield of Vermont (see attached addendum, which is incorporated herein as part o | 5878 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Blue Cross Blue Shield of Alabama (BCBSAL) | 5863 | $ 39,419,935.30 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Blue Cross Blue Shield of Alabama (BCBSAL) | 5239 | $ 39,419,935.30 | N/A | Mallinckrodt plc | Remaining Claim |
| Blue Cross Blue Shield of Michigan, incl. Blue Care Network of Michigan (wholly-owned subsidiary) | 5291 | $ 97,081,760.37 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Blue Cross Blue Shield of Michigan, incl. Blue Care Network of Michigan (wholly-owned subsidiary) | 4624 | $ 97,081,760.37 | N/A | Mallinckrodt plc | Remaining Claim |
| Blue Cross Blue Shield of North Dakota (see the attached addendum, which is incorporated herein as p | 6264 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Blue Cross Blue Shield of North Dakota (see the attached addendum, which is incorporated herein as p | 6788 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Blue Cross of Idaho Health Service, Inc. (see attached addendum, which is incorporated herein as par | 5836 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Bluecross Blueshield of Tennessee, Inc. (see attached addendum, which is incorporated herein as part | 6828 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Board of Education of Washington County | 6056 | $ 7,556,331.60 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Board of Education of Washington County | 35463 | $ 7,556,331.60 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Board of Education of Washington County | 4716 | $ 7,556,331.60 | N/A | Mallinckrodt plc | Remaining Claim |
| Board of Education of Washington County | 11264 | $ 7,556,331.60 | N/A | Mallinckrodt plc | Remaining Claim |
| Board of Education of Washington County | 35445 | $ 7,556,331.60 | N/A | Mallinckrodt plc | Remaining Claim |
| Building Service 32BJ Health Fund | 5740 | $ 11,424,118.14 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Building Service 32BJ Health Fund | 5815 | $ 11,424,118.14 | N/A | Mallinckrodt plc | Remaining Claim |
| Calbow, Rosalie | 6262 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Calbow, Rosalie | 7901 | $ - | N/A | Mallinckrodt plc | Remaining Claim |

A-0928

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| California Physicians' Service d/b/a Blue Shield of California (see attached addendum, which is inco | 5904 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Capital BlueCross (see attached addendum, which is incorporated herein as part of this form) | 7898 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| CareFirst of Maryland, Inc. (see the attached addendum, which is incorporated herein as part of this | 6269 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| CareSource Management Group Co. (see the attached addendum, which is incorporated herein as part of | 5909 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Caterpillar Inc. | 3410 | $ 379,757.16 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Centene Corporation | 5990 | $ 516,136,168.95 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Centene Corporation | 5941 | $ 115,967,239.30 | N/A | Mallinckrodt plc | Remaining Claim |
| Cigna Holding Company (see attached Addendum, which is incorporated herein as part of this form) | 6201 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| City of Marietta, Georgia | 5953 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| City of Rockford, Il | 4375 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| City of Rockford, IL | 6822 | $ 1,323,604.26 | N/A | Mallinckrodt plc | Remaining Claim |
| City of Rockford, Illinois | 4373 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Infacare Pharmaceutical Corporation | Claim To Be Disallowed |
| City of Rockford, Illinois | 4500 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | INO Therapeutics LLC | Claim To Be Disallowed |
| City of Rockford, Illinois | 4380 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Ludlow LLC | Claim To Be Disallowed |
| City of Rockford, Illinois | 4490 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MAK LLC | Claim To Be Disallowed |
| City of Rockford, Illinois | 4486 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Inc. | Claim To Be Disallowed |
| City of Rockford, Illinois | 4984 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Inc. | Claim To Be Disallowed |
| City of Rockford, Illinois | 4376 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Limited | Claim To Be Disallowed |
| City of Rockford, Illinois | 4471 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD IP Unlimited Company | Claim To Be Disallowed |
| City of Rockford, Illinois | 4382 | $ 1,323,604.26 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| City of Rockford, Illinois | 4476 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Brand Pharmaceuticals LLC | Claim To Be Disallowed |
| City of Rockford, Illinois | 4440 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Buckingham Unlimited Company | Claim To Be Disallowed |
| City of Rockford, Illinois | 4798 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Canada ULC | Claim To Be Disallowed |
| City of Rockford, Illinois | 4383 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Critical Care Finance LLC | Claim To Be Disallowed |
| City of Rockford, Illinois | 4176 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises Holdings, Inc. | Claim To Be Disallowed |
| City of Rockford, Illinois | 4384 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises LLC | Claim To Be Disallowed |
| City of Rockford, Illinois | 4377 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises UK Limited | Claim To Be Disallowed |

A-0929

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| City of Rockford, Illinois | 4479 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Equinox Finance LLC | Claim To Be Disallowed |
| City of Rockford, Illinois | 4981 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products Inc. | Claim To Be Disallowed |
| City of Rockford, Illinois | 4410 | $ 1,323,604.25 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products IP Unlimited Company | Claim To Be Disallowed |
| City of Rockford, Illinois | 4477 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt International Finance SA | Claim To Be Disallowed |
| City of Rockford, Illinois | 4464 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt IP Unlimited Company | Claim To Be Disallowed |
| City of Rockford, Illinois | 4461 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Lux IP S.a.r.l. | Claim To Be Disallowed |
| City of Rockford, Illinois | 4462 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Manufacturing LLC | Claim To Be Disallowed |
| City of Rockford, Illinois | 4236 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharma IP Trading Unlimited Company | Claim To Be Disallowed |
| City of Rockford, Illinois | 4549 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| City of Rockford, Illinois | 6439 | $ 3,863,129,116.14 | N/A | Mallinckrodt plc | Remaining Claim |
| City of Rockford, Illinois | 4521 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt UK Ltd | Claim To Be Disallowed |
| City of Rockford, Illinois | 6357 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Holdings LLC | Claim To Be Disallowed |
| City of Rockford, Illinois | 6395 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Pool LLC | Claim To Be Disallowed |
| City of Rockford, Illinois | 6827 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MCCH LLC | Claim To Be Disallowed |
| City of Rockford, Illinois | 6451 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MEH, Inc. | Claim To Be Disallowed |
| City of Rockford, Illinois | 4420 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MHP Finance LLC | Claim To Be Disallowed |
| City of Rockford, Illinois | 4478 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MNK 2011 LLC | Claim To Be Disallowed |
| City of Rockford, Illinois | 4424 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MUSHI UK Holdings Limited | Claim To Be Disallowed |
| City of Rockford, Illinois | 4460 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Petten Holdings Inc. | Claim To Be Disallowed |
| City of Rockford, Illinois | 4411 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Operations LLC | Claim To Be Disallowed |
| City of Rockford, Illinois | 4406 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Shared Services LLC | Claim To Be Disallowed |
| City of Rockford, Illinois | 4465 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Holdings LLC | Claim To Be Disallowed |

A-0930

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| City of Rockford, Illinois | 4412 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Pool LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as a class representative of the Direct purchaser Class of Acthar purchas | 4386 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | IMC Exploration Company | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4506 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD IP Unlimited Company | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4508 | $ 3,863,129,116.14 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4497 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Brand Pharmaceuticals LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4491 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Canada ULC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4494 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Critical Care Finance LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4488 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4485 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Equinox Finance LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4964 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products Inc. | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4480 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products IP Unlimited Company | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4600 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt International Finance SA | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4472 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt IP Unlimited Company | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4482 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharma IP Trading Unlimited Company | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4483 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4641 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Pool LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4866 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MEH, Inc. | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4470 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MHP Finance LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4387 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MNK 2011 LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 5304 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MUSHI UK Holdings Limited | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4468 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Operations LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4475 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Shared Services LLC | Claim To Be Disallowed |

A-0931

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4469 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Holdings LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4467 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Pool LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar of purcha | 4389 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar purchaser | 6433 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Infacare Pharmaceutical Corporation | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar purchaser | 4220 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | INO Therapeutics LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar purchaser | 4396 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Ludlow LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar purchaser | 4391 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MAK LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar purchaser | 4393 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Finance LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar purchaser | 4174 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Inc. | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar purchaser | 4388 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Limited | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar purchaser | 4390 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Buckingham Unlimited Company | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar purchaser | 4394 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises Holdings, Inc. | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar purchaser | 4243 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises UK Limited | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar purchaser | 4399 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Lux IP S.a.r.l. | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar purchaser | 4395 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Manufacturing LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar purchaser | 5367 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt UK Ltd | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar purchaser | 5368 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Holdings LLC | Claim To Be Disallowed |
| City of Rockford, Illinois as class representative of the Direct Purchaser Class of Acthar purchaser | 4398 | $ 3,863,129,116.14 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MCCH LLC | Claim To Be Disallowed |
| City of Rockford,Illinois | 4379 | $ 1,323,604.26 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | IMC Exploration Company | Claim To Be Disallowed |
| CL minor child Shannon Proctor | 6118 | $ | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Clark, Andrew Scott | 237 | $ 2,500,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Class of purchasers of H.P. Acthar | 6300 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Cleveland Bakers and Teamsters Health and Welfare Fund | 6119 | $ 3,651,262.74 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Cleveland Bakers and Teamsters Health and Welfare Fund | 5892 | $ 3,651,262.74 | N/A | Mallinckrodt plc | Remaining Claim |
| Clients of Faulkner, Hoffman & Phillips, LLC | 4816 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |

A-0932

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| Clients of Faulkner, Hoffman & Phillips, LLC | 5499 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Combs, Jennifer | 5256 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Combs, Jennifer | 5255 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Community Health Options | 1424 | $ 988,133.76 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Confidential Acthar Patient_00031 | 6458 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_00134 | 42101 | $ 2,649.21 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_00483 | 1472 | $ 5,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_00588 | 6461 | $ 8,200.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_01160 | 1987 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_01376 | 8434 | $ 1,000,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_01646 | 2958 | $ 500,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_02146 | 42072 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_02296 | 1757 | $ 1,300,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_02917 | 6228 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_02969 | 2462 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_03747 | 6410 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_03798 | 6021 | $ 10,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Brand Pharmaceuticals LLC | Claim To Be Disallowed |
| Confidential Acthar Patient_04275 | 1852 | $ 5,115.63 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_04348 | 6494 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_04443 | 2045 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_05765 | 3127 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_05775 | 6358 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_06784 | 6890 | $ 150,000,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_07082 | 4793 | $ 2,000,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_07082 | 4666 | $ 2,000,000.00 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Confidential Acthar Patient_07485 | 48074 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_07598 | 47357 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_08815 | 1476 | $ 1,000,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_10024 | 5968 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_12017 | 6444 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_12142 | 5293 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_12596 | 6466 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_12996 | 1509 | $ 2,145,857.56 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_12996 | 1510 | $ 2,145,857.56 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_13029 | 6436 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_13261 | 6383 | $ 30,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_14119 | 4140 | $ 2,000,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |

A-0933

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| Confidential Acthar Patient_14215 | 1989 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_14232 | 3658 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_14278 | 5449 | $ 500.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_15274 | 3350 | $ 3,025.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_15336 | 6366 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_15538 | 2066 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Brand Pharmaceuticals LLC | Claim To Be Disallowed |
| Confidential Acthar Patient_15734 | 6384 | $ 1,526.02 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_16533 | 2047 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_16848 | 6145 | $ 100,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_17151 | 39322 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_17937 | 6408 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_18151 | 2426 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_18864 | 5506 | $ 1,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_19371 | 5992 | $ 75,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_19371 | 6197 | $ 75,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_19492 | 6944 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_19560 | 28577 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_21380 | 37825 | $ 2,989.13 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_21949 | 1984 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_22061 | 2447 | $ 85,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_22358 | 6356 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_22800 | 2992 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_23447 | 39613 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_23699 | 5538 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_24754 | 6368 | $ 1,500.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_25850 | 6476 | $ 1,846.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_26898 | 3262 | $ 30,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_27332 | 1924 | $ 5,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_27569 | 3911 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_27970 | 6364 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_28482 | 5912 | $ 80,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_28720 | 6529 | $ 150,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_28720 | 5924 | $ 150,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Ludlow LLC | Claim To Be Disallowed |
| Confidential Acthar Patient_28720 | 5948 | $ 150,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Ludlow LLC | Claim To Be Disallowed |
| Confidential Acthar Patient_28720 | 5933 | $ 150,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Finance LLC | Claim To Be Disallowed |
| Confidential Acthar Patient_28720 | 6526 | $ 150,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Limited | Claim To Be Disallowed |
| Confidential Acthar Patient_28720 | 6531 | $ 150,000.00 | N/A | Mallinckrodt ARD LLC | Remaining Claim |

A-0934

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| Confidential Acthar Patient_28720 | 6530 | $ 150,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Brand Pharmaceuticals LLC | Claim To Be Disallowed |
| Confidential Acthar Patient_28720 | 6450 | $ 150,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises LLC | Claim To Be Disallowed |
| Confidential Acthar Patient_28720 | 5678 | $ 150,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Equinox Finance LLC | Claim To Be Disallowed |
| Confidential Acthar Patient_28720 | 6478 | $ 150,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| Confidential Acthar Patient_28720 | 6373 | $ 150,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_28720 | 6250 | $ 150,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MCCH LLC | Claim To Be Disallowed |
| Confidential Acthar Patient_28720 | 6482 | $ 150,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Sucampo Holdings Inc. | Claim To Be Disallowed |
| Confidential Acthar Patient_28720 | 6224 | $ 150,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Sucampo Pharma Americas LLC | Claim To Be Disallowed |
| Confidential Acthar Patient_29411 | 5400 | $ 4,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_29983 | 34756 | $ 1,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_30101 | 1948 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_30603 | 2950 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_31113 | 2888 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_31275 | 1462 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_31892 | 6343 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_32417 | 6148 | $ 2,800.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_32665 | 1818 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_33697 | 1886 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_34325 | 5268 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_34336 | 17154 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_35301 | 1515 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_35648 | 6236 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_35862 | 28566 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_36501 | 3506 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_37401 | 2141 | $ 25,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_37540 | 39500 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_38125 | 18108 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_38453 | 8415 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_38602 | 39276 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_38717 | 6259 | $ 3,500.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |

A-0935

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| Confidential Acthar Patient_38847 | 5054 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_39397 | 2048 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_39563 | 6371 | $ 25,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_42285 | 1999 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_42428 | 48073 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_42763 | 6382 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| Confidential Acthar Patient_45617 | 5919 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_47243 | 2316 | $ 10,500.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_47939 | 5445 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_48222 | 2905 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_48233 | 6139 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_48233 | 24629 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_49629 | 42110 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_50063 | 11253 | $ 7,200.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_50063 | 6342 | $ 7,200.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_50196 | 6480 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_50627 | 3368 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_51682 | 5432 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_52089 | 5958 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_54679 | 1944 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_55243 | 48078 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_55689 | 3384 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_55805 | 2002 | $ 1,325.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_56565 | 39257 | $ 155.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_56883 | 1979 | $ 10,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_57182 | 2825 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_57477 | 2043 | $ 1,300,000,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_57633 | 6276 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_59004 | 6362 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_59298 | 1761 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_59650 | 6432 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_59908 | 6385 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_60115 | 8411 | $ 4,800.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_60760 | 1947 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_61355 | 18638 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Confidential Acthar Patient_62007 | 3520 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_64054 | 6492 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Confidential Acthar Patient_65394 | 6418 | $ 800,000.00 | N/A | Mallinckrodt plc | Remaining Claim |
| CoreLogic, Inc. | 1743 | $ 137,156.21 | N/A | Mallinckrodt ARD LLC | Remaining Claim |

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| Council Rock School District | 6128 | $ 1,169,050.32 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Council Rock School District | 6117 | $ 1,169,050.32 | N/A | Mallinckrodt plc | Remaining Claim |
| County of Dakota, Nebraska | 5315 | $ 1,827,231.45 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| County of Dakota, Nebraska | 5898 | $ 1,827,231.45 | N/A | Mallinckrodt plc | Remaining Claim |
| Covenant Health Services Health and Welfare Plan | 6187 | $ 32,258.52 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| CSX Transportation, Inc. | 1428 | $ 296,464.33 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Cyndy Flory, on behalf of a class of other similarly situated purchasers of Acthar | 6140 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Cyndy Flory, on behalf of a class of other similarly situated purchasers of Acthar | 6257 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Division 1181 A.T.U. - New York Welfare Fund | 6120 | $ 171,159.99 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Division 1181 A.T.U. - New York Welfare Fund | 35423 | $ 171,159.99 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Division 1181 A.T.U. - New York Welfare Fund | 6091 | $ 171,159.99 | N/A | Mallinckrodt plc | Remaining Claim |
| Division 1181 A.T.U. - New York Welfare Fund | 25274 | $ 171,159.99 | N/A | Mallinckrodt plc | Remaining Claim |
| Downingtown School District | 6286 | $ 85,109.97 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Downingtown School District | 34587 | $ 255,385.32 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Downingtown School District | 5889 | $ 85,109.97 | N/A | Mallinckrodt plc | Remaining Claim |
| Downingtown School District | 35438 | $ 255,385.32 | N/A | Mallinckrodt plc | Remaining Claim |
| Duncan, Kala | 6329 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Duncan, Kala | 6206 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Dustin's BBQ | 4785 | $ 93,394.08 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Dustin's BBQ | 5274 | $ 93,394.08 | N/A | Mallinckrodt plc | Remaining Claim |
| EmblemHealth, Inc. (see the attached addendum, which is incorporated herein as part of this form) | 6199 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Euromarket Designs, Inc. d/b/a Crate & Barrel and CB2 | 1747 | $ 124,617.64 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Evernorth Health Inc., Express Scripts, Inc., CuraScript, Inc. d/b/a/ CuraScript SP Specialty Pharma | 4197 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Evernorth Health Inc., Express Scripts, Inc., CuraScript, Inc. d/b/a/ CuraScript SP Specialty Pharma | 4510 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Excellus Health Plan, Inc. | 3415 | $ 14,642,827.45 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| FELRA and UFCW Health & Welfare Fund | 4690 | $ 131,252.76 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| FELRA and UFCW Health & Welfare Fund | 35475 | $ 131,252.76 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| FELRA and UFCW Health & Welfare Fund | 6430 | $ 131,252.76 | N/A | Mallinckrodt plc | Remaining Claim |
| FELRA and UFCW Health & Welfare Fund | 35360 | $ 131,252.76 | N/A | Mallinckrodt plc | Remaining Claim |
| Flory, Cyndy | 5000 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Flory, Cyndy | 5991 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Garcia, Nelly | 5305 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Garcia, Nelly | 6247 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| General Dynamics Corporation | 1774 | $ 1,191,942.45 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| General Electric Company | 3453 | $ 6,255,239.40 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| General Mills, Inc. | 1433 | $ 339,512.90 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| General Motors Company | 6044 | $ 3,245,262.04 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Government Employees Health Association, Inc. (see attached addendum, which is incorporated herein a | 5883 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Great Valley School District | 5422 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Great Valley School District | 5809 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| H.D. Smith Holdings LLC | 4627 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Inc. | Claim To Be Disallowed |
| Harlem Consolidated School District 122, Illinois | 4896 | $ 492,795.09 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Harlem Consolidated School District 122, Illinois | 5258 | $ 492,795.09 | N/A | Mallinckrodt plc | Remaining Claim |
| Harvard Pilgrim Health Care, Inc.(see the attached addendum, which is incorporated herein as part of | 5922 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Haverford School District | 6062 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Haverford School District | 5253 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Haviland Hughes | 5265 | $ 14,142,472.30 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Haviland Hughes | 6204 | $ 14,142,472.30 | N/A | Mallinckrodt plc | Remaining Claim |
| Hawaii Medical Service Association (see the attached addendum, which is incorporated herein as part | 6218 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Health Care Service Corp. (see attached Addendum, which is incorporated herein as part of this form) | 6868 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Health Care Service Corp. (see attached Addendum, which is incorporated herein as part of this form) | 7892 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Healthfirst, Inc. | 2083 | $ 120,692,221.45 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| HealthNow New York Inc. (see the attached addendum, which is incorporated herein as part of this fo | 5926 | $ - | N/A | Mallinckrodt plc | Remaining Claim |

A-0937

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| HealthPartners, Inc. (see the attached addendum, which is incorporated herein as part of this form) | 5832 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Heartland Health & Welfare Fund | 4145 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Infacare Pharmaceutical Corporation | Claim To Be Disallowed |
| Heartland Health & Wellness | 4202 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD IP Unlimited Company | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4148 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | IMC Exploration Company | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 6164 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Infacare Pharmaceutical Corporation | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4206 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | INO Therapeutics LLC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4127 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MAK LLC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4134 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Finance LLC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4136 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Inc. | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4147 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Limited | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 6479 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Limited | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 6274 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD IP Unlimited Company | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4152 | $ 1,830,396.36 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Heartland Health & Wellness Fund | 4242 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Brand Pharmaceuticals LLC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4154 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Buckingham Unlimited Company | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4130 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Canada ULC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4158 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Critical Care Finance LLC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4804 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises Holdings, Inc. | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4160 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises LLC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 6469 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises LLC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4338 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises UK Limited | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4161 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Equinox Finance LLC | Claim To Be Disallowed |

A-0938

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| Heartland Health & Wellness Fund | 4155 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products Inc. | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4156 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products IP Unlimited Company | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 6267 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products IP Unlimited Company | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4297 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt International Finance SA | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4553 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt IP Unlimited Company | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4364 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Lux IP S.a.r.l. | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4365 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Manufacturing LLC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4356 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharma IP Trading Unlimited Company | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4397 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 5409 | $ 1,830,396.36 | N/A | Mallinckrodt plc | Remaining Claim |
| Heartland Health & Wellness Fund | 34779 | $ 1,830,396.36 | N/A | Mallinckrodt plc | Remaining Claim |
| Heartland Health & Wellness Fund | 4235 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt UK Ltd | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4527 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Holdings LLC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4493 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Pool LLC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4535 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MCCH LLC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 5027 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MEH, Inc. | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4589 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MHP Finance LLC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4408 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MNK 2011 LLC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4239 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MUSHI UK Holdings Limited | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4167 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Petten Holdings Inc. | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4166 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Operations LLC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4566 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Shared Services LLC | Claim To Be Disallowed |
| Heartland Health & Wellness Fund | 4240 | $ 1,830,396.36 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Holdings LLC | Claim To Be Disallowed |

A-0939

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| Heartland Health & Wellness Fund | 4164 | $ 1,830,396.36 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Pool LLC | Claim To Be Disallowed |
| Heartland Health and Wellness Fund | 4081 | $ 1,830,396.36 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Heartland Health and Wellness Fund | 4121 | $ 1,830,396.36 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Ludlow LLC | Claim To Be Disallowed |
| Highmark Inc., Highmark BCBSD Inc., and Highmark West Virginia Inc. (see attached Addendum, incorpor | 6192 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey (see attached A | 6208 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Howmet Aerospace, Inc. | 1749 | $ 473,572.07 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| HUMANA, INC. | 3344 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| HUMANA, INC. | 3406 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | IMC Exploration Company | Claim To Be Disallowed |
| HUMANA, INC. | 3362 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Infacare Pharmaceutical Corporation | Claim To Be Disallowed |
| HUMANA, INC. | 3411 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | INO Therapeutics LLC | Claim To Be Disallowed |
| HUMANA, INC. | 3403 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Ludlow LLC | Claim To Be Disallowed |
| HUMANA, INC. | 3394 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MAK LLC | Claim To Be Disallowed |
| HUMANA, INC. | 3393 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt APAP LLC | Claim To Be Disallowed |
| HUMANA, INC. | 3438 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Finance LLC | Claim To Be Disallowed |
| HUMANA, INC. | 3417 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Inc. | Claim To Be Disallowed |
| HUMANA, INC. | 3386 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Limited | Claim To Be Disallowed |
| HUMANA, INC. | 3420 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD IP Unlimited Company | Claim To Be Disallowed |
| HUMANA, INC. | 3396 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| HUMANA, INC. | 3221 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Brand Pharmaceuticals LLC | Claim To Be Disallowed |
| HUMANA, INC. | 3379 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Buckingham Unlimited Company | Claim To Be Disallowed |
| HUMANA, INC. | 3219 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Canada ULC | Claim To Be Disallowed |
| HUMANA, INC. | 3423 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt CB LLC | Claim To Be Disallowed |
| HUMANA, INC. | 3225 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Critical Care Finance LLC | Claim To Be Disallowed |

A-0940

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| HUMANA, INC. | 3220 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises Holdings, Inc. | Claim To Be Disallowed |
| HUMANA, INC. | 3226 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises LLC | Claim To Be Disallowed |
| HUMANA, INC. | 3223 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises UK Limited | Claim To Be Disallowed |
| HUMANA, INC. | 3433 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Equinox Finance LLC | Claim To Be Disallowed |
| HUMANA, INC. | 4175 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Group S.a.r.l. | Claim To Be Disallowed |
| HUMANA, INC. | 4208 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Holdings GmbH | Claim To Be Disallowed |
| HUMANA, INC. | 4227 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products Inc. | Claim To Be Disallowed |
| HUMANA, INC. | 4245 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products IP Unlimited Company | Claim To Be Disallowed |
| HUMANA, INC. | 4201 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt International Finance SA | Claim To Be Disallowed |
| HUMANA, INC. | 4772 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt International Holdings S.a.r.l. | Claim To Be Disallowed |
| HUMANA, INC. | 4295 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt IP Unlimited Company | Claim To Be Disallowed |
| HUMANA, INC. | 4299 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt LLC | Claim To Be Disallowed |
| HUMANA, INC. | 4196 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Lux IP S.a.r.l. | Claim To Be Disallowed |
| HUMANA, INC. | 4234 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Manufacturing LLC | Claim To Be Disallowed |
| HUMANA, INC. | 4203 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharma IP Trading Unlimited Company | Claim To Be Disallowed |
| HUMANA, INC. | 4217 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Ireland Limited | Claim To Be Disallowed |
| HUMANA, INC. | 4366 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| Humana, Inc. | 5099 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| HUMANA, INC. | 3133 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| HUMANA, INC. | 4501 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Quincy S.a.r.l. | Claim To Be Disallowed |
| Humana, Inc. | 4381 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt UK Finance LLP | Claim To Be Disallowed |
| HUMANA, INC. | 4512 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt UK Ltd | Claim To Be Disallowed |

A-0941

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| HUMANA, INC. | 4321 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Holdings LLC | Claim To Be Disallowed |
| HUMANA, INC. | 4286 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Pool LLC | Claim To Be Disallowed |
| Humana, Inc. | 4548 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Veterinary, Inc. | Claim To Be Disallowed |
| HUMANA, INC. | 4253 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Windsor Ireland Finance Unlimited Company | Claim To Be Disallowed |
| HUMANA, INC. | 4218 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Windsor S.a.r.l. | Claim To Be Disallowed |
| HUMANA, INC. | 4583 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MCCH LLC | Claim To Be Disallowed |
| HUMANA, INC. | 4516 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MEH, Inc. | Claim To Be Disallowed |
| HUMANA, INC. | 4251 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MHP Finance LLC | Claim To Be Disallowed |
| HUMANA, INC. | 4525 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MKG Medical UK Ltd | Claim To Be Disallowed |
| HUMANA, INC. | 5018 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MNK 2011 LLC | Claim To Be Disallowed |
| HUMANA, INC. | 4559 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MUSHI UK Holdings Limited | Claim To Be Disallowed |
| HUMANA, INC. | 4817 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Ocera Therapeutics, Inc. | Claim To Be Disallowed |
| HUMANA, INC. | 4542 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Petten Holdings Inc. | Claim To Be Disallowed |
| HUMANA, INC. | 4806 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | SpecGx Holdings LLC | Claim To Be Disallowed |
| HUMANA, INC. | 4546 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | SpecGx LLC | Claim To Be Disallowed |
| HUMANA, INC. | 4556 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Operations LLC | Claim To Be Disallowed |
| HUMANA, INC. | 4565 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Shared Services LLC | Claim To Be Disallowed |
| HUMANA, INC. | 5080 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Holdings LLC | Claim To Be Disallowed |
| HUMANA, INC. | 4489 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Pool LLC | Claim To Be Disallowed |
| HUMANA, INC. | 5024 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Stratatech Corporation | Claim To Be Disallowed |
| HUMANA, INC. | 4577 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Sucampo Holdings Inc. | Claim To Be Disallowed |

A-0942

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| HUMANA, INC. | 5115 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Sucampo Pharma Americas LLC | Claim To Be Disallowed |
| HUMANA, INC. | 5002 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Sucampo Pharmaceuticals, Inc. | Claim To Be Disallowed |
| HUMANA, INC. | 4514 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Therakos, Inc. | Claim To Be Disallowed |
| HUMANA, INC. | 5067 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Vtesse LLC | Claim To Be Disallowed |
| HUMANA, INC. | 4598 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | WebsterGx Holdco LLC | Claim To Be Disallowed |
| Huntington Ingalls Industries, Inc. | 1748 | $ 1,114,913.22 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Hyatt Corporation | 1775 | $ 1,379,198.70 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Independence Blue Cross, LLC (see attached Addendum, which is incorporated herein as part of this fo | 6835 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Independent Health Association, Inc. and Independent Health Benefits Corporation (see attached Adden | 6241 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| International Union of Operating Engineers Local 542 | 6452 | $ 479,973.66 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| International Union of Operating Engineers Local 542 | 6532 | $ 479,973.66 | N/A | Mallinckrodt plc | Remaining Claim |
| Iowa Department of Human Services, Iowa Medicaid Enterprise | 48613 | $ 56,471.54 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | SpecGx LLC | Claim To Be Disallowed |
| Johns Hopkins Healthcare, LLC (see the attached addendum, which is incorporated herein as part of t | 5881 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Kaiser Foundation Health Plan, Inc. | 1938 | $ 47,487,169.74 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Kaiser Foundation Health Plan, Inc. | 5272 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| L.A. Care Health Plan | 2061 | $ 32,528,905.65 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Law Enforcement Health Benefits Inc. | 5250 | $ 457,292.31 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Law Enforcement Health Benefits Inc. | 5251 | $ 457,292.31 | N/A | Mallinckrodt plc | Remaining Claim |
| Law Enforcement Health Benefits, Inc. | 18637 | $ 4,041,550.14 | N/A | Mallinckrodt plc | Remaining Claim |
| Law Enforcement Health Benefits,Inc. | 18636 | $ 4,041,550.14 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| LifeStream Behavioral Center, Inc. | 7894 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Linebarger, Michael | 47672 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Louisiana Health Service & Indemnity Company (see the attached addendum, which is incorporated herei | 6160 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| MacLellan Integrated Services | 4517 | $ 3,905,497.38 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| MacLellan Integrated Services | 4773 | $ 3,905,497.38 | N/A | Mallinckrodt plc | Remaining Claim |
| Major League Baseball Players Welfare Plan | 5237 | $ 325,772.76 | N/A | Mallinckrodt plc | Remaining Claim |
| MAO-MSO Recovery II, LLC, Series PMPI, a designated series of MAO-MSO Recovery II, LLC | 6302 | $ 193,950.00 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| MAO-MSO Recovery II, LLC, Series PMPI, a designated series of MAO-MSO Recovery II, LLC | 6455 | $ 193,950.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt LLC | Claim To Be Disallowed |
| MAO-MSO Recovery II, LLC, Series PMPI, a designated series of MAO-MSO Recovery II, LLC | 6273 | $ 8,953.87 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Ireland Limited | Claim To Be Disallowed |
| MAO-MSO Recovery II, LLC, Series PMPI, a designated series of MAO-MSO Recovery II, LLC | 6297 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| MAO-MSO Recovery II, LLC, Series PMPI, a designated series of MAO-MSO Recovery II, LLC | 6084 | $ 193,950.00 | N/A | Mallinckrodt plc | Remaining Claim |
| Marple Newtown School District | 6061 | $ 359,169.12 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Marple Newtown School District | 5248 | $ 359,169.12 | N/A | Mallinckrodt plc | Remaining Claim |
| Marriott International, Inc. | 5269 | $ 1,992,548.98 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| McKesson Corporation on behalf of itself and certain corporate affiliates in the Attachment hereto. | 5471 | $ 119,000,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Operations LLC | Claim To Be Disallowed |
| McKesson Corporation on behalf of itself and certain corporate affiliates in the Attachment hereto. | 5466 | $ 119,000,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Shared Services LLC | Claim To Be Disallowed |

A-0943

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| McKesson Corporation on behalf of itself and certain corporate affiliates in the Attachment hereto. | 5468 | $ 119,000,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Holdings LLC | Claim To Be Disallowed |
| McKesson Corporation on behalf of itself and certain corporate affiliates in the Attachment hereto. | 5480 | $ 119,000,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Pool LLC | Claim To Be Disallowed |
| McKesson Corporation on behalf of itself and certain corporate affiliates in the Attachment hereto. | 5477 | $ 119,000,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Stratatech Corporation | Claim To Be Disallowed |
| Medical Mutual of Ohio (see the attached addendum, which is incorporated herein as part of this form | 6352 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Miller, Carol | 5306 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Miller, Carol | 5910 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| MSP Recovery Claims PROV, Series, LLC | 6405 | $ 298,688.00 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| MSP Recovery Claims PROV, Series, LLC | 6108 | $ 298,688.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt LLC | Claim To Be Disallowed |
| MSP Recovery Claims PROV, Series, LLC | 6417 | $ 298,688.00 | N/A | Mallinckrodt plc | Remaining Claim |
| MSP Recovery Claims Series 44, LLC | 6422 | $ 17,734,223.10 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| MSP Recovery Claims Series 44, LLC | 6538 | $ 51,891,156.80 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| MSP Recovery Claims Series 44, LLC | 4916 | $ 51,891,156.80 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt LLC | Claim To Be Disallowed |
| MSP Recovery Claims Series 44, LLC | 6278 | $ 88,890.70 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt LLC | Claim To Be Disallowed |
| MSP Recovery Claims Series 44, LLC | 6404 | $ 17,734,223.10 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt LLC | Claim To Be Disallowed |
| MSP Recovery Claims Series 44, LLC | 6506 | $ 177,550.73 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt LLC | Claim To Be Disallowed |
| MSP Recovery Claims Series 44, LLC | 5399 | $ 399,536.42 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Ireland Limited | Claim To Be Disallowed |
| MSP Recovery Claims Series 44, LLC | 6327 | $ 189,073.55 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Ireland Limited | Claim To Be Disallowed |
| MSP Recovery Claims Series 44, LLC | 5395 | $ 399,536.42 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| MSP Recovery Claims Series 44, LLC | 6862 | $ 189,073.55 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| MSP Recovery Claims Series 44, LLC | 5267 | $ 88,890.70 | N/A | Mallinckrodt plc | Remaining Claim |
| MSP Recovery Claims Series 44, LLC | 5412 | $ 51,891,156.80 | N/A | Mallinckrodt plc | Remaining Claim |
| MSP Recovery Claims Series 44, LLC | 5429 | $ 177,550.73 | N/A | Mallinckrodt plc | Remaining Claim |
| MSP Recovery Claims Series 44, LLC | 6202 | $ 17,734,223.10 | N/A | Mallinckrodt plc | Remaining Claim |
| MSP Recovery Claims Series 44, LLC | 6131 | $ 178,218.52 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | SpecGx LLC | Claim To Be Disallowed |
| MSP Recovery Claims Series 44, LLC | 7959 | $ 176,156.72 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | SpecGx LLC | Claim To Be Disallowed |
| MSP Recovery Claims, Series LLC | 6401 | $ 103,925,052.80 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| MSP Recovery Claims, Series LLC | 6265 | $ 103,925,052.80 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt LLC | Claim To Be Disallowed |
| MSP Recovery Claims, Series LLC | 6380 | $ 353,793.10 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt LLC | Claim To Be Disallowed |
| MSP Recovery Claims, Series LLC | 6266 | $ 1,923,261.99 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Ireland Limited | Claim To Be Disallowed |

A-0944

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| MSP Recovery Claims, Series LLC | 6388 | $ 1,923,261.99 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| MSP Recovery Claims, Series LLC | 6413 | $ 103,925,052.80 | N/A | Mallinckrodt plc | Remaining Claim |
| MSP Recovery Claims, Series LLC | 6428 | $ 353,793.10 | N/A | Mallinckrodt plc | Remaining Claim |
| MSP Recovery Claims, Series LLC | 6840 | $ 353,793.10 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | SpecGx LLC | Claim To Be Disallowed |
| MSPA Claims 1, LLC | 6351 | $ 3,037,180.50 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| MSPA Claims 1, LLC | 6133 | $ 3,037,180.50 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt LLC | Claim To Be Disallowed |
| MSPA Claims 1, LLC | 6354 | $ 44,052.29 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt LLC | Claim To Be Disallowed |
| MSPA Claims 1, LLC | 5264 | $ 267,466.85 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Ireland Limited | Claim To Be Disallowed |
| MSPA Claims 1, LLC | 6376 | $ 267,466.85 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| MSPA Claims 1, LLC | 6284 | $ 3,037,180.50 | N/A | Mallinckrodt plc | Remaining Claim |
| MSPA Claims 1, LLC | 6334 | $ 44,052.29 | N/A | Mallinckrodt plc | Remaining Claim |
| MSPA Claims 1, LLC | 6429 | $ 221,433.74 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | SpecGx LLC | Claim To Be Disallowed |
| MVP Health Plan, Inc. (see the attached addendum, which is incorporated herein as part of this form) | 5891 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Nestle USA, Inc. | 6321 | $ 1,872,706.40 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| North Dakota Department of Human Services, as the Single State Agency for the purpose of Medicaid, c | 48474 | $ 259,684.80 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| North Dakota Department of Human Services, as the Single State Agency for the purpose of Medicaid, c | 48475 | $ 259,684.80 | N/A | Mallinckrodt plc | Remaining Claim |
| Octorara School District | 6178 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Octorara School District | 6245 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Ohio Conference of Teamsters | 6161 | $ 859,858.32 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Ohio Conference of Teamsters | 5047 | $ 859,858.32 | N/A | Mallinckrodt plc | Remaining Claim |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5309 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5697 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | IMC Exploration Company | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5701 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Infacare Pharmaceutical Corporation | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5692 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | INO Therapeutics LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5689 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Ludlow LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5706 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MAK LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5709 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt APAP LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5712 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Finance LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5704 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Inc. | Claim To Be Disallowed |

A-0945

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5670 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Limited | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5288 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD IP Unlimited Company | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5012 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5724 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Brand Pharmaceuticals LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5716 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Buckingham Unlimited Company | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5313 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Canada ULC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5747 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt CB LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5737 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Critical Care Finance LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5729 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises Holdings, Inc. | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5314 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5750 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises UK Limited | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5682 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Equinox Finance LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5010 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Group S.a.r.l. | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5691 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Holdings GmbH | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5195 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products Inc. | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5734 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products IP Unlimited Company | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5787 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt International Finance SA | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5773 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt International Holdings S.a.r.l. | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5784 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt IP Unlimited Company | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5780 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5805 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Lux IP S.a.r.l. | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5828 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Manufacturing LLC | Claim To Be Disallowed |

A-0946

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5825 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharma IP Trading Unlimited Company | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5812 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Ireland Limited | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5803 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5685 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5433 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Quincy S.a.r.l. | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5840 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt UK Finance LLP | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5826 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt UK Ltd | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5833 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Holdings LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5850 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Pool LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5839 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Veterinary, Inc. | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5842 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Windsor Ireland Finance Unlimited Company | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5846 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Windsor S.a.r.l. | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5837 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MCCH LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5877 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MEH, Inc. | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5742 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MHP Finance LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5869 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MKG Medical UK Ltd | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5766 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MNK 2011 LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5890 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MUSHI UK Holdings Limited | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5931 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Ocera Therapeutics, Inc. | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5790 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Petten Holdings Inc. | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5913 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | SpecGx Holdings LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5917 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | SpecGx LLC | Claim To Be Disallowed |

A-0947

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5908 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Operations LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5938 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Shared Services LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5925 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Holdings LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5940 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Pool LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5962 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Stratatech Corporation | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5960 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Sucampo Holdings Inc. | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5952 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Sucampo Pharma Americas LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5945 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Sucampo Pharmaceuticals, Inc. | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 5956 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Therakos, Inc. | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 6226 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Vtesse LLC | Claim To Be Disallowed |
| OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy s | 6212 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | WebsterGx Holdco LLC | Claim To Be Disallowed |
| Penn Delco School District | 4912 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Penn Delco School District | 5004 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| PepsiCo, Inc | 5484 | $ 335,025.51 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| PepsiCo, Inc. | 6336 | $ 1.00 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Premera Blue Cross (see attached addendum, which is incorporated herein as part of this form) | 6261 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Priority Health (see the attached addendum, which is incorporated herein as part of this form) | 6036 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Providence Health & Services Health and Welfare Plan | 6013 | $ 1,686,169.21 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| PSSU Local Unit Health & Welfare Fund | 6333 | $ 201,311.85 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| PSSU Local Unit Health & Welfare Fund | 24888 | $ 201,311.85 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| PSSU Local Unit Health & Welfare Fund | 4899 | $ 201,311.85 | N/A | Mallinckrodt plc | Remaining Claim |
| PSSU Local Unit Health & Welfare Fund | 35404 | $ 201,311.85 | N/A | Mallinckrodt plc | Remaining Claim |
| Ralph Lauren Corporation | 5882 | $ 260,332.83 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Raytheon Technologies Corporation | 1777 | $ 1,437,039.79 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Rockwell Automation, Inc. | 1431 | $ 71,254.97 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Sanford Health Plan (see the attached addendum, which is incorporated herein as part of this form) | 6268 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| SCAN Health Plan | 2085 | $ 12,423,074.39 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Science Applications International Corporation | 1769 | $ 331,979.09 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Sephora USA, Inc. | 1436 | $ 123,926.24 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Sheet Metal Workers Local No. 40 | 23561 | $ 1,866,069.36 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Sheet Metal Workers Local No. 40 | 33858 | $ 1,866,069.36 | N/A | Mallinckrodt plc | Remaining Claim |
| Sheet Metal Workers' Local No. 40 | 4427 | $ 1,866,069.36 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Sheet Metal Workers' Local No. 40 | 4724 | $ 1,866,069.36 | N/A | Mallinckrodt plc | Remaining Claim |
| Siemens Corporation | 2901 | $ 1,908,807.92 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| St. Joseph Health Service Health and Welfare Plan | 39161 | $ 41,788.21 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt LLC | Claim To Be Disallowed |
| St. Joseph Health Service Health and Welfare Plan | 6183 | $ 41,788.21 | N/A | Mallinckrodt plc | Remaining Claim |
| St. Joseph Health Services Health and Welfare Plan | 5973 | $ 1,232,047.38 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Steamfitters Local Union No 420 | 4513 | $ 411,492.48 | N/A | Mallinckrodt ARD LLC | Remaining Claim |

A-0948

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| Steamfitters Local Union No 420 as representative of Class Acthar purchasers | 4456 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Shared Services LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 | 6527 | $ 411,492.48 | N/A | Mallinckrodt plc | Remaining Claim |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchaser | 4592 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Finance LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4530 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4457 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | IMC Exploration Company | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4504 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | IMC Exploration Company | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4569 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Infacare Pharmaceutical Corporation | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4538 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | INO Therapeutics LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4534 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Ludlow LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4437 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MAK LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4567 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Inc. | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4599 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Limited | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4528 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD IP Unlimited Company | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4596 | $ 1,287,709,705.38 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4590 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Brand Pharmaceuticals LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4601 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Buckingham Unlimited Company | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4502 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Canada ULC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4579 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Critical Care Finance LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4448 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises Holdings, Inc. | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 6085 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 4822 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises UK Limited | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 5875 | $ 1,287,709,705.38 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Equinox Finance LLC | Claim To Be Disallowed |

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 6177 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products IP Unlimited Company | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 4864 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt International Finance SA | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 4871 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Lux IP S.a.r.l. | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 6222 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Manufacturing LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 4840 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharma IP Trading Unlimited Company | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 5997 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 6022 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt UK Ltd | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 4635 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Holdings LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 4838 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Pool LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4450 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MCCH LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4441 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MEH, Inc. | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar purchasers | 4633 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MHP Finance LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 4578 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MNK 2011 LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 4581 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MUSHI UK Holdings Limited | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 4591 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Petten Holdings Inc. | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 4603 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Operations LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 4425 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Holdings LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 as representative of Class of Acthar Purchasers | 4539 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Pool LLC | Claim To Be Disallowed |
| Steamfitters Local Union No. 420 s representative of class of Acthar purchasers | 6387 | $ 1,287,709,705.38 | N/A | Mallinckrodt plc | Remaining Claim |
| Steamfitters Local Union No.420 as representative of Class of Acthar purchasers | 4691 | $ 1,287,709,705.38 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt IP Unlimited Company | Claim To Be Disallowed |
| Target Corporation | 5986 | $ 1,144,180.81 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Target Corporation | 6852 | $ 3,476,593.55 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| The Central Pennsylvania Teamsters Health & Welfare Fund | 4975 | $ 328,075.08 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| The Central Pennsylvania Teamsters Health & Welfare Fund | 35394 | $ 328,075.08 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| The Central Pennsylvania Teamsters Health & Welfare Fund | 4901 | $ 328,075.08 | N/A | Mallinckrodt plc | Remaining Claim |
| The Central Pennsylvania Teamsters Health & Welfare Fund | 34597 | $ 328,075.08 | N/A | Mallinckrodt plc | Remaining Claim |
| The Ohio State Plumbers & Pipefitters Local 162 | 4986 | $ 85,109.97 | N/A | Mallinckrodt ARD LLC | Remaining Claim |

A-0950

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| The Ohio State Plumbers & Pipefitters Local 162 | 28583 | $ 85,109.97 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| The Ohio State Plumbers & Pipefitters Local 162 | 4994 | $ 85,109.97 | N/A | Mallinckrodt plc | Remaining Claim |
| The Ohio State Plumbers & Pipefitters Local 162 | 33857 | $ 85,109.97 | N/A | Mallinckrodt plc | Remaining Claim |
| The Salvation Army | 5786 | $ 1,298,457.69 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| The South East Delco School District | 5011 | $ 857,390.28 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| The South East Delco School District | 24719 | $ 857,390.28 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| The South East Delco School District | 4886 | $ 857,390.28 | N/A | Mallinckrodt plc | Remaining Claim |
| The South East Delco School District | 24787 | $ 857,390.28 | N/A | Mallinckrodt plc | Remaining Claim |
| The Teamsters Local 830 Health & Welfare Fund | 4900 | $ 235,536.78 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| The Teamsters Local 830 Health & Welfare Fund | 24543 | $ 235,536.78 | N/A | Mallinckrodt plc | Remaining Claim |
| The Teamsters Local 830 Health and Welfare Fund | 33824 | $ 235,536.78 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| The Teamsters Local 830 Health and Welfare Fund | 4894 | $ 235,536.78 | N/A | Mallinckrodt plc | Remaining Claim |
| The UFCW Health Insurance Plan for Active Employees & UFCW Health Insurance Plan for Retirees | 5015 | $ 457,599.78 | N/A | Mallinckrodt plc | Remaining Claim |
| The UFCW Health Insurance Plan for Active Employees and the UFCW Health Insurance Plan for Retirees | 5040 | $ 457,599.79 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| The United Fund and Commercial Workers Unions and Employers Health & Welfare fund-Atlanta | 5034 | $ 99,826.05 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| The United Fund and Commercial Workers Unions and Employers Health & Welfare fund-Atlanta | 4790 | $ 99,826.05 | N/A | Mallinckrodt plc | Remaining Claim |
| The United Fund and Commercial Workers Unions and Employers Health & Welfare fund-Atlanta | 5037 | $ 99,826.05 | N/A | Mallinckrodt plc | Remaining Claim |
| Transit Employees Health and Welfare Plan | 6198 | $ 1,234,279.89 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Transit Employees Health and Welfare Plan | 4970 | $ 1,234,279.89 | N/A | Mallinckrodt plc | Remaining Claim |
| Triple-S Salud, Inc. | 5893 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Tufts Associated Health Maintenance Organization, Inc. and its affiliates (see the attached addendum | 5943 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| Unilever United States, Inc. | 5817 | $ 1,689,207.79 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund | 6381 | $ 71,810.28 | N/A | Mallinckrodt plc | Remaining Claim |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4458 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4524 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | IMC Exploration Company | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4507 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Infacare Pharmaceutical Corporation | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4435 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | INO Therapeutics LLC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4454 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Ludlow LLC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4438 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MAK LLC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4532 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Finance LLC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4455 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Inc. | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4451 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Limited | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4453 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD IP Unlimited Company | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4602 | $ 161,411,000.00 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4452 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Brand Pharmaceuticals LLC | Claim To Be Disallowed |

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4587 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Buckingham Unlimited Company | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4585 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Canada ULC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4449 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Critical Care Finance LLC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4614 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises Holdings, Inc. | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4612 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises LLC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4610 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises UK Limited | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4615 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Equinox Finance LLC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 5870 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products Inc. | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 5907 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products IP Unlimited Company | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 5020 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt IP Unlimited Company | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4636 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Lux IP S.a.r.l. | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 5775 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Manufacturing LLC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4609 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharma IP Trading Unlimited Company | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4859 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 6442 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4447 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt UK Ltd | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4842 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Holdings LLC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4843 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Pool LLC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4862 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MCCH LLC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4642 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MEH, Inc. | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4835 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MHP Finance LLC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4860 | $ 161,411,000.00 | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MNK 2011 LLC | Claim To Be Disallowed |

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4831 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MUSHI UK Holdings Limited | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 5864 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Petten Holdings Inc. | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4837 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Operations LLC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 4844 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Shared Services LLC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 5936 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Holdings LLC | Claim To Be Disallowed |
| United Association of Plumber Local Union No. 322 Health & Welfare Fund as Representative of NJ Clas | 6209 | $ 161,411,000.00 | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Pool LLC | Claim To Be Disallowed |
| United Association of Plumbers Local 322 Health & Welfare Fund | 6361 | $ 71,810.28 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| United Construction Workers Health Plan | 6347 | $ 2,023,784.82 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| United Construction Workers Health Plan | 4898 | $ 2,023,784.82 | N/A | Mallinckrodt plc | Remaining Claim |
| United HealthCare Services Inc. on behalf of itself its affiliates its subsidiaries and its parents | 4576 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MHP Finance LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., | 5175 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Holdings LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries and its pare | 5674 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | SpecGx Holdings LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries and its pare | 4853 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST US Pool LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries and its pare | 5423 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Sucampo Holdings Inc. | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries and its pare | 5425 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Therakos, Inc. | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4132 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | IMC Exploration Company | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4221 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Infacare Pharmaceutical Corporation | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4225 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Ludlow LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4159 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt APAP LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4205 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Finance LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4178 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Inc. | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4444 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD Holdings Limited | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4378 | $ - | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4254 | $ - | There is no substantiation of this claim against the Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Brand Pharmaceuticals LLC | Claim To Be Disallowed |

A-0953

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4523 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Buckingham Unlimited Company | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4353 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt CB LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4544 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Critical Care Finance LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4552 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises Holdings, Inc. | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4572 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4564 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Enterprises UK Limited | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4568 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Equinox Finance LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4593 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Group S.a.r.l. | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4580 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Holdings GmbH | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4505 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products Inc. | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4289 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt International Holdings S.a.r.l. | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4180 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt IP Unlimited Company | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4288 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Lux IP S.a.r.l. | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4181 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Manufacturing LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4314 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharma IP Trading Unlimited Company | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4144 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Ireland Limited | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4169 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4213 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt UK Finance LLP | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4324 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Holdings LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4558 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt US Pool LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4536 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Veterinary, Inc. | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4363 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Windsor Ireland Finance Unlimited Company | Claim To Be Disallowed |

A-0954

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4320 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Windsor S.a.r.l. | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4509 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MCCH LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4555 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MEH, Inc. | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4808 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MKG Medical UK Ltd | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4597 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MNK 2011 LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4588 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MUSHI UK Holdings Limited | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 5667 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Ocera Therapeutics, Inc. | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 5638 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Petten Holdings Inc. | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 5624 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | SpecGx LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 5717 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Operations LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 5171 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | ST Shared Services LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4787 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Stratatech Corporation | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 5448 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Sucampo Pharma Americas LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 5431 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Sucampo Pharmaceuticals, Inc. | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4545 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Vtesse LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its par | 4540 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | WebsterGx Holdco LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, etc. | 4131 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Acthar IP Unlimited Company | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, etc. | 4157 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | INO Therapeutics LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, etc. | 4170 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | MAK LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, etc. | 4219 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt ARD IP Unlimited Company | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, etc. | 4337 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Canada ULC | Claim To Be Disallowed |

A-0955

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, etc. | 4141 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Hospital Products IP Unlimited Company | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, etc. | 4211 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt International Finance SA | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, etc. | 4137 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt LLC | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, etc. | 4335 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Pharmaceuticals Limited | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, etc. | 4344 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt Quincy S.a.r.l. | Claim To Be Disallowed |
| United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, etc. | 4342 | $ - | There is no substantiation of this claim against this Debtor in the proof of claim, the Debtor's books and records, or the Acthar litigation history. | Mallinckrodt UK Ltd | Claim To Be Disallowed |
| Upper Darby School District | 4902 | $ 1,709,470.08 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Upper Darby School District | 4903 | $ 1,709,470.08 | N/A | Mallinckrodt plc | Remaining Claim |
| USAble Mutual Insurance Co. (see attached addendum, which is incorporated herein as part of this for | 5876 | $ - | N/A | Mallinckrodt plc | Remaining Claim |
| VIVA Health, Inc. (VIVA) | 6263 | $ 931,302.03 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| VIVA Health, Inc. (VIVA) | 5396 | $ 931,302.03 | N/A | Mallinckrodt plc | Remaining Claim |
| Warner Media, LLC | 1432 | $ 2,359,386.80 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Washington Wholesalers Health and Welfare Fund | 5270 | $ 2,392,725.75 | N/A | Mallinckrodt ARD LLC | Remaining Claim |
| Washington Wholesalers Health and Welfare Fund | 4979 | $ 2,392,725.75 | N/A | Mallinckrodt plc | Remaining Claim |
| Wellmark, Inc., d/b/a Wellmark Blue Cross and Blue Shield of Iowa (see attached Addendum, incorporat | 6340 | $ - | N/A | Mallinckrodt plc | Remaining Claim |

A-0956

## SCHEDULE 2

**Other Unsubstantiated Acthar Claims**

US-DOCS\121528260.2
RLF1 25216522v.1

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| Aetna Inc. on behalf of its subsidiaries and affiliates (see attached Addendum, which is incorporate | 6136 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| AmeriHealth Caritas Health Plan and Keystone Family Health Plan (see attached addendum, which is inc | 6144 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Anthem, Inc. (see attached Addendum, which is incorporated herein as part of this form) | 6780 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| BCBSM, Inc, d/b/a Blue Cross and Blue Shield of Minnesota (see attached Addendum, incorporated herei | 7888 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company (see the attached addendum, whi | 6180 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Blue Cross & Blue Shield of Rhode Island (see the attached addendum, which is incorporated herein as | 6041 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Blue Cross and Blue Shield Association (see attached addendum, which is incorporated herein as part | 6143 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Blue Cross and Blue Shield of Alabama (see attached Addendum, which is incorporated herein as part o | 6147 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Blue Cross and Blue Shield of Florida, Inc. (see the attached addendum, which is incorporated herein as | 6046 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Blue Cross and Blue Shield of Kansas City (see attached Addendum, which is incorporated herein as pa | 6803 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Blue Cross and Blue Shield of Massachusetts, Inc. and Blue Cross and Blue Shield of Massachusetts HM | 6158 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Blue Cross and Blue Shield of Nebraska, Inc. (see attached addendum, which is incorporated herein as | 5853 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Blue Cross and Blue Shield of North Carolina (see the attached addendum, which is incorporated herei | 5874 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Blue Cross and Blue Shield of South Carolina (see attached Addendum, which is incorporated herein as | 6813 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Blue Cross and Blue Shield of Vermont (see attached addendum, which is incorporated herein as part o | 5878 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Blue Cross Blue Shield of North Dakota (see the attached addendum, which is incorporated herein as p | 6264 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Blue Cross Blue Shield of North Dakota (see the attached addendum, which is incorporated herein as p | 6788 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Blue Cross of Idaho Health Service, Inc. (see attached addendum, which is incorporated herein as par | 5836 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Bluecross Blueshield of Tennessee, Inc. (see attached addendum, which is incorporated herein as part | 6828 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| California Physicians' Service d/b/a Blue Shield of California (see attached addendum, which is inco | 5904 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Capital BlueCross (see attached addendum, which is incorporated herein as part of this form) | 7898 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| CareFirst of Maryland, Inc. (see the attached addendum, which is incorporated herein as part of this | 6269 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| CareSource Management Group Co. (see the attached addendum, which is incorporated herein as part of | 5909 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Cigna Holding Company (see attached Addendum, which is incorporated herein as part of this form) | 6201 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| EmblemHealth, Inc. (see the attached addendum, which is incorporated herein as part of this form) | 6199 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Government Employees Health Association, Inc. (see attached addendum, which is incorporated herein a | 5883 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Harvard Pilgrim Health Care, Inc.(see the attached addendum, which is incorporated herein as part of | 5922 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Hawaii Medical Service Association (see attached addendum, which is incorporated herein as part | 6218 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |

| Name of Claimant | Claim Number | Claim Amount | Reason for Disallowance | Debtor | Claim Type |
|---|---|---|---|---|---|
| Health Care Service Corp. (see attached Addendum, which is incorporated herein as part of this form) | 6868 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Health Care Service Corp. (see attached Addendum, which is incorporated herein as part of this form) | 5926 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| HealthNow New York Inc.  (see the attached addendum, which is incorporated herein as part of this fo | 5832 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| HealthPartners, Inc. (see attached addendum, which is incorporated herein as part of this form) | 6192 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Highmark Inc., Highmark BCBSD Inc., and Highmark West Virginia Inc. (see attached Addendum, incorpor | 6208 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey (see attached A | 6835 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Independence Blue Cross, LLC (see attached Addendum, which is incorporated herein as part of this fo | 6241 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Independent Health Association, Inc. and Independent Health Benefits Corporation (see attached Adden | 5881 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Johns Hopkins Healthcare, LLC  (see the attached addendum, which is incorporated herein as part of t | 6160 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Louisiana Health Service & Indemnity Company (see the attached addendum, which is incorporated herei | 6352 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Medical Mutual of Ohio (see the attached addendum, which is incorporated herein as part of this form | 5891 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| MVP Health Plan, Inc. (see the attached addendum, which is incorporated herein as part of this form) | 6261 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Premera Blue Cross (see attached addendum, which is incorporated herein as part of this form) | 6036 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Priority Health (see the attached addendum, which is incorporated herein as part of this form) | 6268 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Sanford Health Plan (see the attached addendum, which is incorporated herein as part of this form) | 5943 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Tufts Associated Health Maintenance Organization, Inc. and its affiliates (see the attached addendum | 5876 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| USAble Mutual Insurance Co. (see attached addendum, which is incorporated herein as part of this for | 6340 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |
| Wellmark, Inc., d/b/a Wellmark Blue Cross and Blue Shield of Iowa (see attached Addendum, incorporat | 3879700 | Not Specified | There is no substantiation of this claim against this Debtor in the proof of claim or in the Debtor's books and records. | Mallinckrodt plc | Claim to be Disallowed |

A-0959

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------

In re:

MALLINCKRODT PLC, *et al.*,[1]

               Debtors.

Chapter 11

Case No. 20-12522 (JTD)

(Jointly Administered)

------------------------------------------------------------

MALLINCKRODT PLC, *et al.*,

               Plaintiffs,

v.

CITY OF ROCKFORD,

               Defendant.

Adv. Pro. No. 21-50428 (JTD)

------------------------------------------------------------

## DECLARATION OF RANDALL S. EISENBERG IN SUPPORT OF DEBTORS' MOTION FOR SCHEDULING ORDER AND OBJECTIONS TO CLAIMS

I, Randall S. Eisenberg, hereby declare as follows:

1.      I am a Managing Director at AlixPartners LLP ("**Alix Partners**"), which maintains its principal office at 909 3rd Avenue, New York, NY 10022, as well as other offices located throughout the world. Since August 2019, Alix Partners has served as restructuring consultant and

---

[1]     A complete list of the Debtors in these chapter 11 cases, and the Plaintiffs in this adversary proceeding, may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

A-0960

financial advisor to Mallinckrodt plc ("**Mallinckrodt**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**").

2.      I submit this declaration (the "**Declaration**") in support of the Debtors' Motion For Scheduling Order ("**Scheduling Motion**"), Debtors' Omnibus Objection To Claims in respect of certain unsubstantiated claim (the "**Unsubstantiated Claims Objection**"), and Debtors Omnibus Objection To Class Proofs of Claim (the **"Class Claim Objection**," and together with the Unsubstantiated Claims Objection, the "**Claims Objections**") (Dkt. Nos. pending), all as filed simultaneously herewith.[2]

3.      Except as otherwise indicated, the statements in this Declaration are based on: (a) my personal knowledge of the Debtors' operations, financing arrangements, business affairs, and books and records that reflect, among other things, the Debtors' liabilities and the amounts owed to their creditors as of the Petition Date; (b) my review of the Claims Objections, which were filed contemporaneously herewith; (c) information provided to me by employees of Alix Partners working under my supervisions; (d) information provided to me by, or discussions with, members of the Debtors' management team, other employees, or the Debtors' other advisors; and/or (e) my general experience and knowledge.

4.      I am authorized to submit this declaration in support of the Scheduling Motion and Claims Objections. If called upon to testify, I can and will testify competently as to the facts set forth herein. My relevant background and qualifications are set forth in the Declaration of Randall S. Eisenberg in Support of Debtors' Motion for Order Authorizing Debtors to Pay the Reasonable and Documented Fees and Expenses of the RSA Party Professionals and Granting Related Relief, *see* D.I. 714 (the "**Prior Declaration**").

---

[2] Capitalized terms used but not otherwise defined herein have the meaning given them in the Scheduling Motion.

RLF1 25216482v.1

A-0961

5.     Over 48,000 proofs of claim have been filed in these chapter 11 proceedings.  Based upon an initial analysis conducted by AlixPartners based upon information provided by Prime Clerk as of April 16, 2021, over 45,000 of these proofs of claim, exceeding $392 billion, fall into Class 6, General Unsecured Claims, in the Debtors' recently filed Plan.

6.     This initial analysis was conducted with the following methodology and assumptions:

a.     Filed claims were categorized based on Prime Clerk's initial review of the claims register and are subject to further review and material change.

b.     No adjustments have been made to any claim amounts for post-petition payments made under any First Day Orders.

c.     No substantive reconciliation has been performed of any filed claims to date.

d.     Over 45,000 General Unsecured Claims have been marked as C/U/D, over 28,000 of which also asserted $0, to be determined, unliquidated or left blank in claim amounts to date. This analysis does not provide any estimates for these proofs of claim.

e.     The value of the filed proofs of claim pool remains subject to material change as Prime Clerk continues to process claims.

7.     The results of this preliminary analysis are set forth in the table below, including detail on the effect of eliminating claims subject to the Claims Objections:

| Proofs of Claim | Number | Amount |
|---|---|---|
| All Claims | 48,743 | $417,171,420,315 |
| Less: Non-Plan Class 6 General Unsecured Claims | 2,942 | 24,558,277,501 |
| Total Plan Class 6 General Unsecured Claims | 45,801 | $392,613,142,814 |
| Less: Non Acthar-Related GUCs | 44,895 | 175,860,153,488 |
| Total Acthar-Related GUCs | 906 | $216,752,989,326 |
| Less: Other Acthar-Related General Unsecured Claims | 296 | 3,405,773,642 |
| Total Acthar-Related GUCs to be Disallowed | 610 | $213,347,215,684 |
| | | |
| Acthar-Related GUCs to be Disallowed Pursuant To Debtors' Unsubstantiated Claims Objection | 556 | $202,884,127,041 |
| Aggregated Individual Claims to be Disallowed Pursuant to Debtors' Unsubstantiated Claims Objection | 46 | Unliquidated |
| Class Acthar-Related GUCs to be Disallowed Pursuant To Debtors' Class Claims Objection | 8 | 10,463,088,643 |
| Total Acthar-Related GUCs to be Disallowed | 610 | $213,347,215,684 |

## THE CLAIMS OBJECTIONS

8.      The Unsubstantiated Claims Objection seeks disallowance of (a) all proofs of claim submitted by Acthar Litigation Claimants against Debtors that are not defendants in the underlying prepetition litigations; and (b) 46 proofs of claim aggregating in excess of 800,000 individual claims and asserting with no basis, that such claimants may hold Acthar-related claims against the relevant Debtors ((a) and (b) collectively, the "**Unsubstantiated Claims**").  To the best of my knowledge, information, and belief, the Debtors have determined, in consultation with their legal counsel, that the Unsubstantiated Claims do not reflect a present liability of the Debtors because they are not supported by any basis stated in, or any documentation supplied with, the proofs of claim.  Sustaining the Unsubstantiated Claims Objection would eliminate approximately $203 billion in claims.

9.      The Class Claim Objection seeks disallowance of all putative class proofs of claim (the "**Class Claims**") submitted by the Acthar Litigation Claimants.  (Only the Haviland Hughes Acthar Litigation Claimants have submitted putative class proofs of claim.)  The Class Claims

include 162 proofs of claim, 154 of which are also part of the Unsubstantiated Claims Objection. To the best of my knowledge, information, and belief, the Debtors have determined, in consultation with their legal counsel, that the Class Claims are improper, procedurally defective, and unwarranted under governing law.  Assuming the Unsubstantiated Claim Objection is sustained, sustaining the Class Claim Objection would eliminate another approximately $10.5 billion in claims.

10.     All told, sustaining the Claim Objections would eliminate approximately $213 billion in Acthar-Related Claims, leaving only approximately $3.4 billion in Acthar-Related Claims.

11.     Failure to sustain the Debtors' Claim Objections could result in the holders of the relevant claims receiving unwarranted recoveries from the Debtors to the detriment of similarly situated creditors, and could also permit such holders to vote on whether to accept or reject the Plan even though such holders do not have valid claims.  Accordingly, the Claims Objections should be sustained as requested, as set forth more fully in each of the Claims Objections.

**THE SCHEDULING MOTION**

12.     The Scheduling Motion seeks an order scheduling litigation of and hearing on the Dischargeability Adversary Proceeding Summary Judgment Motion, on timing consistent with the Claims Objections and certain other Acthar-related proceedings (collectively, the "**Acthar-Related Proceedings**") discussed in the Scheduling Motion.  The Acthar-Related Proceedings have been filed together to obtain resolution of various Acthar-related issues that can impact confirmation of the Debtors' Plan.  These issues include elimination of the approximately $213 billion in claims the Debtors seek to disallow under the Claims Objection, determination that Acthar-related claims of certain governmental units are dischargeable, and establishment of an

5

administrative claims bar date requiring Acthar claimants, among others, promptly to submit, and

explain the basis for, any administrative priority claims.

13.     Without prompt resolution of these issues, the Debtors' progress towards Plan

confirmation may stall, because uncertainty regarding the nature, extent, validity, priority, and

dischargeability of Acthar-related debts may cause stakeholders to question  matters pertaining to

confirmation of the Debtors' Plan, including but not limited to, the class treatment set forth therein,

and feasibility.  In that case, the Debtors' efforts to expeditiously confirm a Plan that is in the best

interest of all holders of allowable claims, and all stakeholders generally, will be at risk.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief.


Dated: April 30, 2021
        Wilmington, Delaware


                                                    /s/ Randall S. Eisenberg_____
                                                    Randall S. Eisenberg
                                                    Managing Director
                                                    AlixPartners LLP

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MALLINCKRODT PLC., *et al.*,[1] | Case No. 20-12522 (JTD) |
| Debtors. | (Jointly Administered) |

**NOTICE OF SERVICE**

PLEASE TAKE NOTICE that, on May 6, 2021, the undersigned counsel caused

*Attestor Limited and Humana Inc.'s First Request for Production of Documents in Connection*

*with Contested Matters* to be served by electronic mail upon the following counsel to the Debtors:

| **RICHARDS, LAYTON & FINGER, P.A.** | **LATHAM & WATKINS LLP** |
|---|---|
| Mark D. Collins | Jeffrey E. Bjork |
| Michael J. Merchant | George A. Davis |
| Amanda R. Steele | George Klidonas |
| Brendan J. Schlauch | Andrew Sorkin |
| collins@rlf.com | Elizabeth Marks |
| merchant@rlf.com | Anupama Yerramalli |
| steele@rlf.com | Jason B. Gott |
| schlauch@rlf.com | jeff.bjork@lw.com |
| | george.davis@lw.com |
| | george.klidonas@lw.com |
| | andrew.sorkin@lw.com |
| | betsy.marks@lw.com |
| | anu.yerramalli@lw.com |
| | jason.gott@lw.com |

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Boulevard, Hazelwood, Missouri 63042.

A-0966

Dated: May 6, 2021
     Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Matthew B. Harvey*
Donna L. Culver (Bar No. 2983)
Robert J. Dehney (Bar No. 3578)
Matthew B. Harvey (Bar No. 5186)
Nader A. Amer (Bar No. 6635)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989
Email:    dculver@morrisnichols.com
         rdehney@morrisnichols.com
         mharvey@morrisnichols.com
         namer@morrisnichols.com

- and -

Matthew A. Feldman (admitted *pro hac vice*)
Matthew Freimuth (admitted *pro hac vice*)
Benjamin P. McCallen (admitted *pro hac vice*)
Richard Choi (admitted *pro hac vice*)
Philip F. DiSanto (admitted *pro hac vice*)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Email:   mfeldman@willkie.com
        mfreimuth@willkie.com
        bmccallen@willkie.com
        rchoi1@willkie.com
        pdisanto@willkie.com

*Counsel to Attestor Limited and Humana Inc.*

A-0967

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>MALLINCKRODT PLC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 20-12522 (JTD)<br><br>(Jointly Administered)<br><br>**Re:  D.I. 2157, 2159, & 2165** |

**ATTESTOR LIMITED AND HUMANA INC.'S**
**FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS**
**IN CONNECTION WITH CONTESTED MATTERS**

Attestor Limited, on behalf of itself and its affiliated entities, including Avon Holdings I, LLC (collectively, "Attestor"),[2] and Humana, Inc. ("Humana"), creditors of the above-captioned debtors (collectively, the "Debtors," as defined further below), by and through their undersigned counsel, serve this First Set of Requests for Production of Documents in Connection With Contested Matters (the "Requests") on Debtors, pursuant to Rule 7034 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 34 of the Federal Rules of Civil Procedure, made applicable by Rule 9014(c) of the Bankruptcy Rules, in connection with (i) *Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases* (D.I. 2157); (ii) *Motion of Attestor Limited and Humana Inc. for Entry of an Order Allowing and Compelling Payment of*

---

[1]       A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.   The Debtors' mailing address is 675 McDonnell Boulevard, Hazelwood, Missouri 63042.

[2]       Attestor, through affiliated entities, has entered into an agreement with Humana to pursue and participate in any proceeds of Humana's claims against the Debtors with respect to the distribution,

*Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code* (D.I. 2159); and (iii)

*Debtors' First Omnibus Objection to Unsubstantiated and Duplicative Claims (Substantive)* (D.I.

2165) (collectively, the "Contested Matters").  Attestor and Humana request that Debtors produce

each of the documents and communications described below no later than May 14, 2021, by

electronic mail or secure file transfer protocol (SFTP), or by such other date and means as may be

agreed upon by the parties.

## <u>INSTRUCTIONS</u>

1.     This set of Requests is for all responsive documents that are in the possession,

custody, or control of Debtors, including, without limitation, information that is in the possession of

their affiliates, attorneys, advisors, agents, representatives, or assigns.

2.     Unless otherwise specified, these Requests call for the production of all documents

generated, prepared, created, or received from January 1, 2010, to the date of these Requests.

3.     For each document produced, identify the custodian of the document.

4.     For any document withheld pursuant to a claim of privilege, provide a log that sets

forth the following information:  the names and positions of the author and sender of the document;

the date of the document; a brief description of the nature and subject matter of the document; and

the basis upon which a claim of privilege is asserted.

5.     If, for reasons other than a claim of privilege, Debtors refuse to produce any

document requested, state the grounds upon which the refusal is based with sufficient specificity to

permit a determination of the propriety of such refusal.

6.     If any document was but is no longer in Debtors' possession or custody or otherwise

subject to Debtors' control, please state and specify in detail for each such document the:  date;

---

marketing, and sale of Acthar.  *See* Verified Statement of Willkie Farr & Gallagher LLP and Morris, Nichols,
Arsht & Tunnell LLP Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure (D.I. 2066).

sender; recipient; persons to whom copies were provided together with their job titles; information contained therein; date upon which it ceased to exist or be in Debtors' possession, custody, or control; disposition that was made of it; and the identity of all persons having knowledge of the contents thereof.

7.      If any objection is made to any of these Requests, the response shall state whether documents are being withheld from inspection and production on the basis of such objection, or whether inspection or production of the responsive items will occur notwithstanding such objection.

8.      The present tense shall be construed to include the past tense and the past tense to include the present tense as necessary to bring within the scope of these Requests any information that might otherwise be construed to be outside their scope.

9.      The singular shall be construed to include the plural and the plural to include the singular as necessary to bring within the scope of these Requests any information that might otherwise by construed to be outside their scope.

10.     Debtors are to supplement their answers to these Requests to the full extent required by all applicable laws, rules, or procedures.

## **DEFINITIONS**

11.     "Acthar" means H.P. Acthar Gel.

12.     "Acthar Claims" means the claims asserted in the Humana Action and other civil litigations seeking damages or other relief related to the marketing, sale, and distribution of Acthar.

13.     "Acthar Entities" means each and every direct or indirect subsidiary or affiliate of Mallinckrodt plc with any ownership, distribution, licensing, marketing, or any other rights, responsibilities, or obligations with respect to Acthar.

14.     "Acthar Intercompany Transfers" means any transaction by or among any Acthar Entities related to the manufacture, marketing, sale, distribution, or licensing of Acthar.

A-0970

15.    "ARD Distribution Agreement" means the Third Amended and Restated Distribution Agreement by and among Mallinckrodt ARD LLC and Mallinckrodt Pharmaceuticals Ireland Ltd., dated December 12, 2014.

16.    "CDF" means Chronic Disease Fund, Inc. (now known as Good Days From CDF or Good Days) and any of its affiliates, attorneys, advisors, agents, representatives, or assigns.

17.    "Chapter 11 Cases" means the Debtors' chapter 11 cases.

18.    "CMS/DOJ/States Settlement" means the Company's settlement with the United States of America and the States resolving certain Acthar-related litigations and government investigations disclosed in the Company's Form 10-K for 2019, the terms of which are set forth on Schedule 2 to the RSA.

19.    "Communication" means the transmittal or transfer (orally, in writing, electronically, or in any other matter) of information of any kind (in the form of words, images, data, facts, ideas, inquiries, or otherwise).

20.    "Company" means Mallinckrodt plc and all of its direct and indirect subsidiaries, together with all of their affiliates, attorneys, advisors, agents, representatives, or assigns.

21.    "Company Entities" means each direct or indirect subsidiary of Mallinckrodt plc.

22.    "Debtors" means the above-captioned debtors, together with all of their direct and indirect subsidiaries, affiliates, attorneys, advisors, agents, representatives, or assigns.

23.    "Document" shall have the meaning prescribed by Rule 34(a)(1) of the Federal Rules of Civil Procedure.

24.    "Exchanging Holders" means Aurelius Capital Master, Ltd., Franklin Advisers, Inc., as investment manager to certain funds and accounts, and Capital Research and Management Company, parties to the exchange and support agreement, dated February 25, 2020.

A-0971

25.     "Humana Action" means the action styled *Humana Inc. v. Mallinckrodt ARD LLC*, Case No. 2:19-cv-06926-DSF-MRW (C.D. Cal.).

26.     "Novartis" means Novartis AG and any of its affiliates, attorneys, advisors, agents, representatives, or assigns.

27.     "Person" means any natural person or any business, legal or governmental entity, or association of whatever kind, nature, or description.

28.     "Questcor" means Questcor Pharmaceuticals, Inc. and any of its affiliates, attorneys, advisors, agents, representatives, or assigns.

29.     "Relating to" or "related to" means concerning, referring to, describing, evidencing, or constituting.

30.     "RSA" means the Restructuring Support Agreement, dated October 11, 2020.

31.     "Specialty Generics Spin-Off" means the Company's decision to spin off its Specialty Generics business, as disclosed in the Company's Form 10-Q dated August 6, 2019.

32.     "Synacthen Entities" means each and every direct or indirect subsidiary or affiliate of Mallinckrodt plc with any ownership, distribution, licensing, marketing, or any other rights, responsibilities, or obligations with respect to Synacthen.

33.     "Synacthen Intercompany Transfers" means any transaction by or among any Synacthen Entities related to the manufacture, marketing, sale, distribution, or licensing of Synacthen.

34.     The term "including" means "including, but not limited to."

35.     "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Requests any information that might otherwise be construed as outside their scope.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

A-0972

1.      A corporate structure chart or documents otherwise sufficient to identify each of the Acthar Entities and any of the rights, responsibilities, and obligations of each of the Acthar Entities with respect to Acthar.

2.      All documents and communications relating to the financial state and the assets of each and every Acthar Entity, including but not limited to:

      i.      all monthly, quarterly, or annual financial statements (including but not limited to income statements, balance sheets, and cash flow statements);

      ii.     volumes, pricing, and unit costs;

      iii.    revenue by key customer (intercompany and third party);

      iv.     spend by key vendor (intercompany and third party);

      v.      financial details of all intercompany cash transactions;

      vi.     any solvency opinions;

      vii.    any fairness opinions for any transaction;

      viii.   any presentations to actual or potential investors, lenders, or rating agencies;

      ix.     any enterprise, going concern valuations, estimate, or appraisals;

      x.      all budgets, forecasts, business plans, and projections;

      xi.     all monthly trial balance results for the Acthar Entities;

      xii.    all documentation and presentations related to transfer pricing;

      xiii.   details of all quarterly management fees; and

      xiv.    any valuations performed in connection with these Chapter 11 Cases.

3.      A corporate structure chart or documents otherwise sufficient to identify each of the Synacthen Entities and any of the rights, responsibilities, and obligations of each of the Synacthen Entities with respect to Synacthen.

A-0973

4.      All documents and communications relating to the financial state and the assets of each and every Synacthen Entity, including but not limited to:

i.       all monthly, quarterly, or annual financial statements (including, but not limited to income statements, balance sheets, and cash flow statements);

ii.      volumes, pricing, and unit costs;

iii.     revenue by key customer (intercompany and third party);

iv.      spend by key vendor (intercompany and third party);

v.       financial details of all intercompany cash transactions;

vi.      any solvency opinions;

vii.     any fairness opinions for any transaction;

viii.    any presentations to actual or potential investors, lenders, or rating agencies;

ix.      any enterprise, going concern valuations, estimate, or appraisals;

x.       all budgets, forecasts, business plans, and projections;

xi.      all monthly trial balance results for the Synacthen Entities;

xii.     all documentation and presentations related to transfer pricing;

xiii.    details of all quarterly management fees; and

xiv.     any valuations performed in connection with these Chapter 11 Cases.

5.      Documents sufficient to identify the Company Entities that constituted, as of October 12, 2020, the Company's (i) "Specialty Brands" business, and (ii) "Specialty Generics" business, as those terms have been used by the Company in its filings and reporting with the United States Securities & Exchange Commission.

6.      All documents and communications relating to any intercompany agreement related to Acthar, Synacthen, the Acthar Entities, or the Synacthen Entities, including but not limited to:

i.       manufacturing agreements;

       ii.      distribution agreements;

       iii.     the ARD Distribution Agreement;

       iv.     royalty agreements;

       v.      licensing agreements;

       vi.     any intercompany transfers;

       vii.    R&D service agreements; and

       viii.   documents sufficient to identify each and every intercompany transaction involving Mallinckrodt ARD LLC or revenues related to Acthar Intercompany Transfers and/or Synacthen Intercompany Transfers.

7.     Documents regarding the processes and procedures governing the Company's centralized banking and cash management system, including but not limited to the Company's cash management agreements.

8.     Documents regarding each and every note, loan, debt instrument, credit facility, or other instrument or facility that is secured or guaranteed by the assets of any Acthar Entity.

9.     Any non-privileged analyses or evaluations of potential intercompany claims, including but not limited to any such potential claims held by the Acthar Entities or the Synacthen Entities.

10.    All documents and communications relating to the negotiation and execution of the RSA, by or among (i) the Debtors, (ii) the Supporting Unsecured Noteholders, (iii) the Plaintiffs' Executive Committee, and (iv) the Supporting Governmental Opioid Claimants, as such terms are defined in the RSA.

11.    All documents and communications relating to (i) the potential, proposed, or actual treatment of the Acthar Claims in the Chapter 11 Cases, and (ii) the value of the Acthar Claims in the Chapter 11 Cases.

A-0975

12.     Documents regarding the Company's intercompany financing and associated legal entity ownership reorganization completed during the three months ending March 29, 2019, as disclosed in the Company's Form 10-Q dated May 7, 2019.

13.     Documents regarding the Company's decision to suspend its previously announced plans for the Specialty Generics Spin-Off, as well as the "range of options intended to lead to the ultimate separation of the Specialty Generics business" that the Company considered between October 12, 2017, and October 12, 2020.

14.     Any non-privileged analyses or evaluations of actual or potential Acthar-related settlements, including but not limited to the CMS/DOJ/States Settlement (including the final agreement or terms or any documents reflecting any changes to the terms in the RSA).

15.     Documents regarding the Company's refinancing efforts between January 1, 2019, and October 12, 2020, that affected or related to Mallinckrodt ARD LLC, including but not limited to:

     i.     the Company's efforts to refinance various Debentures and Notes due in 2020, 2022, 2023, and 2025;

     ii.     the Company's efforts to refinance or amend existing term loans and revolving credit facilities;

     iii.     the Company's negotiation and execution of the exchange and support agreement, dated February 25, 2020, with the Exchanging Holders;

     iv.     the Company's negotiation and execution of the exchange and support agreement, dated April 7, 2020, with the Exchanging Holders and certain private funds managed by Columbus Hill Capital Management, L.P.; and

     v.     the Company's issuance of the 10.00% first lien senior secured notes due 2025 pursuant to the indenture April 7, 2020.

16.    All documents and communications relating to whether any Debtor was balance sheet insolvent, equitably insolvent and/or was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with such Debtor was unreasonably small capital in each case, on or near the date that any Acthar Intercompany Transfer was made.

17.    All non-privileged documents and communications regarding preparations to file the Chapter 11 Cases, including but not limited to any alternatives for restructuring and/or selling parts of the Company's business.

18.    All documents and communications that the Debtors have produced to any other party in connection with the Chapter 11 Cases including, but not limited to, all documents that the Debtors have produced to the Official Committee of Unsecured Creditors (UCC), the Official Committee of Opioid Related Claimants (OCC), the Governmental Plaintiff Ad Hoc Committee, the Ad Hoc First Lien Term Lender Group, the Unsecured Notes Ad Hoc Group, and the Multi-State Governmental Entities Group.

19.    All documents and communications Mallinckrodt ARD LLC previously agreed to produce in the Humana Action, to the extent such documents have not already been produced or productions of such documents have not been completed, including but not limited to:

    i.    all document requests (including those made by or addressed to any party, the government, relators, the Company, or any third party) and all documents produced in response to such requests in connection with (a) *MSP Recovery Claims, Series LLC, et al. v. Mallinckrodt ARD Inc., et al.*, 18-cv-00379 (N.D. Ill.), *City of Rockford, et al. v. Mallinckrodt ARD Inc.*, 17-cv-50107 (N.D. Ill), *Federal Trade Commission, et al. v. Mallinckrodt, et al.*, No. 1:17-cv-00120 (D.D.C.), *United States of America ex rel. Strunck, et al. v. Mallinckrodt ARD,*

*Inc.*, No. 12-cv-0175 (E.D. Pa.), and *United States of America ex rel. Clark v. Questcor Pharmaceuticals, Inc.*, No. 13-cv-1776 (E.D. Pa.), and (b) any investigations by the United States Department of Justice or Federal Trade Commission into the acquisition of the rights to Synacthen, payments to prescribers, and co-payment assistance programs;

ii.  organizational charts or personnel directories sufficient to identify all persons with strategy, sales, marketing, or clinical responsibilities for Acthar or Synacthen;

iii.  all documents relating to doctors who have prescribed Acthar and have accepted money or things of value from the Company, including but not limited to those doctors identified in Exhibit A to Humana's First Set Of Requests For Production To Mallinckrodt ARD LLC in the Humana Action;

iv.  all documents relating to the Company's selection of doctors to receive, or be eligible to receive, money or things of value, including but not limited to the Company's use of data to identify doctors to market Acthar to, the Company's plans for marketing Acthar to doctors, and the Company's process for funding research related to Acthar;

v.  all data relating to the Company's sales, directly or indirectly, of Acthar to Humana or Humana's members, including data relating to Humana or Humana's members from the "Acthar Hub"; and

vi.  all data sufficient to show the amount and source of co-payment assistance provided for any Acthar prescription that Humana covered.

20.  All substantive communications between the Company and the United States Department of Justice, Federal Trade Commission, or state government entities, related to Acthar,

including materials presented during meetings or in substantive exchanges of letters or emails in connection with or relating to any civil litigation, criminal proceeding, or governmental investigations.

21.     All documents or communications relating to the Company's assistance with or subsidization of co-payments for Acthar through donations or payments to any co-payment assistance funds or programs, including all documents relating to the Company's communications with BioSolutia Inc. (now known as Caremetx, LLC), Express Scripts, CuraScript SD, United BioSource (formerly known as HealthBridge), Accredo Health (also doing business as Liberty Pennsylvania, Medco Health Solutions, Liberty Texas, Gentiva, or Gentiva Health Services), National Organization for Rare Disorders, CDF, The Assistance Fund Inc., or Caring Voices Coalition Inc., regarding Acthar co-payments or the marketing of Acthar as less expensive or free because of the availability of co-payment assistance.

22.     All minutes, agendas, memoranda, pre-read documents, and similar documents or communications relating to any matters relating to Acthar that were addressed at any board meeting of any Acthar Entity or Mallinckrodt plc.

23.     All documents relating to the Company's knowledge of, communications about, or compliance with Exhibits A through Q of the Company's Request For Judicial Notice (ECF No. 48) filed by Mallinckrodt ARD LLC in the Humana Action, to the extent that those exhibits address manufacturer assistance or co-payment assistance programs.

24.     All data produced by the Company or any of its co-defendants in (1) *City of Rockford v. Mallinckrodt ARD Inc., et al.*, No. 3:17-cv-50107-IDJ-LAJ (N.D. Ill.), and (2) *MSP Recovery Claims, Series LLC, et al. v. Mallinckrodt ARD Inc., et al.*, 18-cv-00379 (N.D. Ill.).

25.     All documents and communications reflecting financial information relating to Acthar manufacturing and sales, including information regarding prices charged for Acthar, costs

A-0979

expended by the Company in connection with the production, marketing, and sales of Acthar, sales data for Acthar, and revenues, profits, losses, and associated financial data relating to Acthar.

26.     All documents and communications relating to sales forecasts or similar analyses for Acthar, Synacthen, and any other synthetic adrenocorticotropic hormone (ATCH), including but not limited to any forecasts relating to the prospective launch of Synacthen.

27.     All program and donation reports relating to CDF.

28.     All documents and communications relating to the Company's sublicensing of Synacthen to West Therapeutics, including documents and communications reflecting negotiations with the Federal Trade Commission regarding the scope of the Synacthen license and the identity of the licensor.

29.     All documents and communications relating to (i) Questcor's or the Company's acquisition from Novartis of any rights with respect to Synacthen, (ii) Questcor's or the Company's annual payments to Novartis with respect to Synacthen, and (iii) Questcor's or the Company's reporting to Novartis on milestones under all applicable licensing agreements pertaining to Synacthen.

30.     All documents and communications relating to the resolution of any issues pertaining to the manufacturing of Synacthen.

31.     All documents and communications reflecting data pertaining to the Company's international sales of Synacthen from April 4, 2014, to October 12, 2020.

32.     All documents and communications relating to or substantiating any production shortages with respect to Synacthen, including but not limited to attempts to reformulate Synacthen to remove benzyl alcohol, selection and qualification of a replacement finished dose manufacturer, analysis or elimination of any deviations from the Synacthen reference drug generated by the API manufacturing processes used by Bachem, and any reports or related documents

A-0980

regarding qualification or requalification by any country's regulator of Synacthen manufacturing processes, quality, and/or efficacy.

33.     All documents and communications relating to the Company's pricing of Acthar, including all assessments, reports, analyses, or presentations relating to price increases with respect to Acthar.

34.     All documents and communications relating to any defenses the Company has asserted or may assert with respect to the Acthar Claims.

35.     All documents and communications that the Company intends to introduce as evidence or otherwise utilize or rely upon at a hearing or trial in connection with the Contested Matters.

Dated: May 6, 2021
      Wilmington, Delaware        **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

          */s/ Matthew B. Harvey*
          Donna L. Culver (Bar No. 2983)
          Robert J. Dehney (Bar No. 3578)
          Matthew B. Harvey (Bar No. 5186)
          Nader A. Amer (Bar No. 6635)
          1201 North Market Street, 16th Floor
          P.O. Box 1347
          Wilmington, Delaware 19899-1347
          Telephone:  (302) 658-9200
          Facsimile:  (302) 658-3989
          Email:     dculver@morrisnichols.com
                       rdehney@morrisnichols.com
                       mharvey@morrisnichols.com
                       namer@morrisnichols.com

          and

          Matthew A. Feldman (admitted *pro hac vice*)
          Matthew Freimuth (admitted *pro hac vice*)
          Benjamin P. McCallen (admitted *pro hac vice*)
          Richard Choi (admitted *pro hac vice*)
          Philip F. DiSanto (admitted *pro hac vice*)
          **WILLKIE FARR & GALLAGHER LLP**
          787 Seventh Avenue

A-0981

New York, NY 10019
Telephone: (212) 728-8000
Email:      mfeldman@willkie.com
           mfreimuth@willkie.com
           bmccallen@willkie.com
           rchoi1@willkie.com
           pdisanto@willkie.com

*Counsel to Attestor and Humana*

# WILLKIE FARR & GALLAGHER LLP

Matthew Freimuth
787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8183
Fax: 212 728 9183

May 10, 2021

**VIA EMAIL**

Judge John T. Dorsey
United States Bankruptcy Judge
U.S. Bankruptcy Court for the District of Delaware
824 N Market St, 5th Floor, Courtroom 5
Wilmington, DE 19801

Re:     *In re Mallinckrodt plc., et al.*, No. 20-12522 (D. Del.) (JTD) (the "Chapter 11 Cases")

Dear Judge Dorsey:

        We write on behalf of Attestor Limited ("Attestor") and Humana Inc. ("Humana"), and certain of their subsidiaries and affiliates, concerning the schedule for the *Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive)* [D.I. 2165] (the "Acthar Claims Objection").

        At the May 5 hearing, this Court adjourned the Acthar Claims Objection from June 2 to June 7, and instructed the parties to confer about a revised briefing schedule. May 5, 2021 Hr'g Tr. ("I will move the claim objections to the 7th, as well. . . . So the parties should confer and set a scheduling order based on a hearing date for June 7th."). Attestor, Humana, and Debtors have met and conferred concerning a revised schedule on the Acthar Claims Objection. In light of the June 7 hearing, Attestor and Humana proposed a reasonable extension of their response deadline to May 26. Debtors were unwilling to accommodate that request. Because the parties have been unable to reach agreement, we write to request that the Court adjourn Attestor and Humana's deadline to respond to the Acthar Claims Objection from May 14 to at least May 26.

        The Debtors filed the Acthar Claims Objection on Friday, April 30. The Debtors purported to schedule their Acthar Claims Objection for a June 2 hearing—the minimum notice permitted by Bankruptcy Rule 3007(a)(1)—and to set a May 14 response deadline—the earliest deadline permitted by Local Rules 3007-1(h) and 9006-1(c)(ii). Despite this short schedule, the Debtors sought sweeping relief, seeking to disallow billions of dollars in Acthar-related claims, including 63 claims owned by Attestor and Humana. The Acthar Claims Objection offers only one basis for expunging these claims: they argue that claims against Debtor entities other than Mallinckrodt ARD LLC ("ARD") and Mallinckrodt plc ("plc") should be expunged because underlying Acthar litigations name only ARD (and in some instances plc) as defendants. This argument is wrong for several reasons, but most importantly at this stage, it is premised on taking short cuts that would violate the claimants' rights and abilities to

Judge John T. Dorsey
May 10, 2021
Page 2

pursue their claims.  In the prepetition litigation by Humana, plaintiffs would have been permitted to add additional defendants after the completion of fact discovery—none of which has been provided to Humana in these Chapter 11 Cases, despite the fact that Humana has been pursuing discovery from Debtors for over two months.  The reason for the Debtors' hurry is clear—disallowing these claims and removing value from the Acthar claimants is a keystone of their proposed plan, which currently allocates only $100 million in recovery to the entire general unsecured creditor pool, including these claims which total billions of dollars, while funneling all of the value in the reorganized company over to other unsecured creditors.

With this proposed plan by the Debtors now on file, on April 30, 2021, Attestor and Humana filed two motions concerning the same Acthar-related claims that the Debtors seek to summarily disallow and expunge: (1) a motion to estimate Humana's Acthar-related claims against the Debtors, pursuant to a discovery, briefing, and hearing schedule consistent with the Debtors' confirmation schedule;[1] and (2) a motion to allow administrative claims on the basis of the Debtors' ongoing, post-petition violations of antitrust and racketeering laws.[2]  These motions propose a framework through which these claims can be addressed in a sensible and orderly manner over the coming months, while providing our clients with the discovery they are entitled to regarding precisely the same questions that they will raise in response to the Acthar Claims Objection—*i.e.*, whether the Debtors are liable for violations of federal antitrust, RICO, and state tort laws related to the marketing, sale and distribution of Acthar; and if so, which of the entities in the web of the Debtors' corporate structure are liable for such violations.  All these matters require significant discovery concerning, among other things: (i) the Debtors' corporate structure and organization; (ii) the Debtor entities and personnel involved in the conduct alleged by the Humana; (iii) the Debtor entities with rights and obligations related to Acthar; (iv) intercompany transfers and agreements among the Debtor entities and other Mallinckrodt entities; and (v) the merits and value of Attestor and Humana's claims.

Accordingly, Attestor and Humana respectfully request that the Court adjourn responses to the Acthar Claims Objection until at least May 26, 2021.  At that point, the Court will have had the benefit of oral argument on Attestor and Humana's Estimation and Administrative Claims Motion, where the claimants can further explain the interrelatedness of these motions, and Attestor and Humana's position with regards to an expedited schedule for resolution of these claims consistent with their rights to obtain discovery and have an estimation hearing to address Debtors' liability.  In the meantime, Attestor and Humana have again served discovery requests on the Debtors in connection with the Acthar Claims Objections, and will work cooperatively with the Debtors to begin the discovery process on those claims.

Finally, during a meet and confer with the Debtors, despite the Court's instruction to work out an amended schedule in light of the adjournment of the Acthar Claims Objection to June 7, the Debtors

---

[1]     *Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes In These Bankruptcy Cases* [D.I. 2157] (the "Estimation Motion").

[2]     *Motion of Attestor Limited and Humana Inc. for Entry of an Order Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code* [D.I. 2159] (the "Administrative Claims Motion").

A-0984

Judge John T. Dorsey
May 10, 2021
Page 3

made any agreement to extend Attestor and Humana's response deadline contingent upon receiving a "reciprocal" extension of their objection deadline on the Estimation and Administrative Claims Motion. But that request is far from reciprocal.  First, those motions are set for May 26, so the extension sought by the Debtors to respond (to May 21) would leave movants with virtually no time to reply.  Second, unlike the Debtors' motions, which seek affirmative relief in the form of disallowance of billions of dollars in claims, the Estimation and Administrative Claim Motions seek largely to establish a procedure for estimation of those claims.  The Debtors have ample time to respond to the request for estimation, if they truly believe it to be appropriate.

We are available to address these issues with the Court at the previously-scheduled status conference on May 12, or otherwise at the Court's convenience.

Respectfully submitted,

*Matthew Freimuth*

Matthew Freimuth

cc:     Debtors' Counsel

A-0985

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>MALLINCKRODT PLC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 20-12522 (JTD)<br><br>(Jointly Administered)<br><br><br>**Re:  D.I. 2165** |

### ATTESTOR LIMITED AND HUMANA INC.'S
### NOTICE OF DEPOSITION OF DEBTORS
### PURSUANT TO FED. R. CIV. P. 30(b)(6) AND FED. R. BANKR. P. 7030

PLEASE TAKE NOTICE that on May 20, 2021, pursuant to Federal Rule of Civil Procedure 30(b)(6) and Federal Rule of Bankruptcy Procedure 7030, made applicable by Federal Rule of Bankruptcy Procedure 9014, commencing via Veritext's remote deposition platform at 9:00 a.m. ET, before an officer authorized to administer oaths, Attestor Limited, on behalf of itself and its affiliated entities, including Avon Holdings I, LLC (collectively, "Attestor"), and Humana, Inc. ("Humana"), creditors of the above-captioned debtors (collectively, the "Debtors"), by and through their undersigned counsel, shall take the deposition of Debtors by oral examination of witness(es) designated by Debtors to testify on their behalf with respect to the Examination Topics set forth below, and in connection with *Debtors' First Omnibus Objection to Unsubstantiated and Duplicative Claims (Substantive)* [D.I. 2165] (collectively, the "Acthar Claims Objection").

### DEFINITIONS AND INSTRUCTIONS

1.      The Definitions and Instructions found in Attestor and Humana's First Requests for Production of Documents in Connection with Contested Matters, dated May 6, 2021, are

A-0986

incorporated by reference into this document as if set forth in their entirety and applicable to the matters set forth in the Examination Topics set forth below.

## EXAMINATION TOPICS

1.      The Debtors' corporate structure and organization, including (i) the Company entities that constitute the Specialty Brands and Specialty Generics businesses, (ii) the identities of the Acthar Entities and the Synacthen Entities, (iii) the rights, responsibilities, and obligations of each of the Acthar Entities and Synacthen Entities with respect to Acthar and Synacthen, respectively, and (iv) the locations, roles, and titles of personnel with responsibilities related to Acthar or Synacthen.

2.      The financial state, assets, and valuations of the Debtors, including the Acthar Entities and the Synacthen Entities.

3.      The value of Acthar and Synacthen, including but not limited to the value of any rights or intellectual property related to Acthar or Synacthen.

4.      The value of the Acthar Claims individually and collectively, including but not limited to any valuations made or prepared either internally (i.e., within or between the Debtor entities) or externally by consultants or other professionals.

5.      Intercompany agreements related to Acthar, Synacthen, the Acthar Entities, or the Synacthen Entities, including but not limited to:

       i.      manufacturing agreements;

       ii.     distribution agreements;

       iii.    the ARD Distribution Agreement;

       iv.     royalty agreements;

       v.      licensing agreements;

---

[1]      A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.   The

A-0987

vi.    any intercompany transfers;

vii.   R&D service agreements;

viii.  intercompany transactions involving Mallinckrodt ARD LLC or revenues related to Acthar Intercompany Transfers and/or Synacthen Intercompany Transfers; and

ix.    dividends paid to parents, subsidiaries, and affiliates.

6.     Any additional transfers or transactions, including intercompany transfers and transactions, involving (1) Mallinckrodt Lux IP S.a.r.l., Mallinckrodt Pharmaceuticals Ireland Ltd., ST Operations LLC, Mallinckrodt plc, Mallinckrodt US Pool LLC, or Mallinckrodt Group S.a.r.l, or (2) related to Acthar or Synacthen.

7.     The Company's centralized banking and cash management system, including but not limited to the Company's cash management agreements.

8.     The Company's refinancing efforts between January 1, 2019, and October 12, 2020, that affected or related to Mallinckrodt ARD LLC, including but not limited to:

i.     efforts to refinance various Debentures and Notes due in 2020, 2022, 2023, and 2015;

ii.    efforts to refinance or amend existing term loans and revolving credit facilities;

iii.   negotiation and execution of the exchange and support agreement, dated February 25, 2020, with the Exchanging Holders;

iv.    negotiation and execution of the exchange and support agreement, dated April 7, 2020, with the Exchanging Holders and certain private funds managed by Columbus Hill Capital Management, L.P.;

Debtors' mailing address is 675 McDonnell Boulevard, Hazelwood, Missouri 63042.

A-0988

    v.       issuance of the 10.00% first lien senior secured notes due 2025 pursuant to the indenture April 7, 2020;

    vi.     the terms, conditions, and negotiations related to any guarantees granted to holders of unsecured debt; and

    vii.    the terms, conditions, and negotiations related to any security agreements entered into with holders of previously unsecured debt.

9.     The notes, loans, debt instruments, credit facilities, or other instruments or facilities that are secured by the assets of or guaranteed by any Acthar Entity.

10.    The Company's receipt of proceeds from any loans for which an Acthar Entity is a guarantor.

11.    The Company's intercompany financing and associated legal entity ownership reorganization completed during the three months ending March 29, 2019, as disclosed in the Company's Form 10-Q dated May 7, 2019.

12.    Financial information relating to Acthar manufacturing and sales, including information regarding prices charged for Acthar, costs expended by the Company in connection with the production, marketing, and sales of Acthar, sales data for Acthar, and revenues, profits, losses, and associated financial data relating to Acthar.

13.    Financial information relating to the Company's opioid manufacturing and sales, including information regarding:

    i.       prices charged for opioids;

    ii.     costs expended by the Company in connection with the production, marketing, and sales of opioids;

    iii.    sales data for opioids;

    iv.    revenues, profits, losses, and associated financial data relating to opioids;

A-0989

v. the financial state, assets, and valuation of Mallinckrodt's "Specialty Generics" business and/or the entities that are part of the "Specialty Generics" business; and

vi. the entities against whom opioid-related claimants have claims, the value of those claims, and the treatment of those claims under the Plan.

14. The Debtors' bases for disallowing and expunging Acthar-related claims as sought through the Acthar Claims Objection.

15. The Debtors' $260 million CMS/DOJ/States Settlement, including the entities against whom the DOJ and CMS have claims, the value of those claims, and the treatment of those claims under the Plan.

16. The Debtors' proposed treatment of their unsecured noteholders under the Plan.

17. The Company's acquisition of Questcor Pharmaceuticals in 2014, including (i) the individuals responsible for evaluating and deciding to enter into the transaction, (ii) the Company's reasons for entering into the transaction, and (iii) the Company's knowledge of Questcor's pre-merger business practices related to Acthar.

Dated: May 12, 2021
      Wilmington, Delaware       **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

                               */s/Nader A. Amer*_____
                               Donna L. Culver (Bar No. 2983)
                               Robert J. Dehney (Bar No. 3578)
                               Matthew B. Harvey (Bar No. 5186)
                               Nader A. Amer (Bar No. 6635)
                               1201 North Market Street, 16th Floor
                               P.O. Box 1347
                               Wilmington, Delaware 19899-1347
                               Telephone:  (302) 658-9200
                               Facsimile:  (302) 658-3989
                               Email:       dculver@morrisnichols.com
                                               rdehney@morrisnichols.com
                                             mharvey@morrisnichols.com
                                           namer@morrisnichols.com

                               and

                               Matthew A. Feldman (admitted *pro hac vice*)
                               Matthew Freimuth (admitted *pro hac vice*)
                               Benjamin P. McCallen (*pro hac vice* application forthcoming)
                               Richard Choi (admitted *pro hac vice*)
                               Philip F. DiSanto (admitted *pro hac vice*)
                               **WILLKIE FARR & GALLAGHER LLP**
                               787 Seventh Avenue
                               New York, NY 10019
                               Telephone: (212) 728-8000
                               Email:       mfeldman@willkie.com
                                               mfreimuth@willkie.com
                                           bmccallen@willkie.com
                                           rchoi1@willkie.com
                                           pdisanto@willkie.com

                               *Counsel to Attestor and Humana*

A-0991

## CERTIFICATE OF SERVICE

The undersigned certifies that, on May 12, 2021, a true and correct copy of the above **ATTESTOR LIMITED AND HUMANA INC.'S NOTICE OF DEPOSITION OF DEBTORS PURSUANT TO FED. R. CIV. P. 30(b)(6) AND FED. R. BANKR. P. 7030** was served on the following counsel for Debtors and Debtors in Possession:

| | |
|---|---|
| **RICHARDS, LAYTON & FINGER, P.A.**<br>Mark D. Collins (No. 2981)<br>Robert J. Stearn, Jr. (No. 2915)<br>Michael J. Merchant (No. 3854)<br>Amanda R. Steele (No. 5530)<br>Brendan J. Schlauch (No. 6115)<br>One Rodney Square<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 651-7700<br>Facsimile: (302) 651-7701<br>Email: collins@rlf.com<br>stearn@rlf.com<br>merchant@rlf.com<br>steele@rlf.com<br>schlauch@rlf.com | Jason B. Gott (*pro hac vice*)<br>**LATHAM & WATKINS LLP**<br>330 North Wabash Avenue, Suite 2800<br>Chicago, Illinois 60611<br>Telephone: (312) 876-7700<br>Facsimile: (312) 993-9767<br>Email: jason.gott@lw.com |
| George A. Davis (*pro hac vice*)<br>George Klidonas (*pro hac vice*)<br>Andrew Sorkin (*pro hac vice*)<br>Anupama Yerramalli (*pro hac vice*)<br>**LATHAM & WATKINS LLP**<br>885 Third Avenue<br>New York, New York 10022<br>Telephone: (212) 906-1200<br>Facsimile: (212) 751-4864<br>Email: george.davis@lw.com<br>george.klidonas@lw.com<br>andrew.sorkin@lw.com | Jeffrey E. Bjork (*pro hac vice*)<br>**LATHAM & WATKINS LLP**<br>355 South Grand Avenue, Suite 100<br>Los Angeles, California 90071<br>Telephone: (213) 485-1234<br>Facsimile: (213) 891-8763<br>Email: jeff.bjork@lw.com |

*/s/Nader A. Amer*_____

A-0992