Case No. 21-cv-01093-LPS
_____

**UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**
_____

**In re**

**MALLINCKRODT PLC,** *et al.*

**Debtors.**

----------------------------------------------

**ATTESTOR LIMITED AND HUMANA INC.,**

*Appellants*,

**v.**

**MALLINCKRODT PLC,** *et al.*,

*Appellees*.

_____

**APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**
_____

**APPENDIX VOL. 3 (A-2023- A-2239) TO APPELLANT'S OPENING BRIEF**

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Donna L. Culver (No. 2983)
Robert J. Dehney (No. 3578)
Matthew B. Harvey (No. 5186)
Matthew O. Talmo (No. 6333)
Taylor M. Haga (No. 6549)
1201 N. Market St., 16th Floor
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
dculver@morrisnichols.com
rdehney@morrisnichols.com
mharvey@morrisnichols.com
mtalmo@morrisnichols.com
thaga@morrisnichols.com

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (admitted *pro hac vice*)
Matthew Freimuth (admitted *pro hac vice*)
Benjamin P. McCallen (admitted *pro hac vice*)
Richard Choi (admitted *pro hac vice*)
Philip F. DiSanto (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
mfeldman@willkie.com
mfreimuth@willkie.com
bmccallen@willkie.com
rchoi1@willkie.com
pdisanto@willkie.com

**EIMER STAHL LLP**
Benjamin E. Waldin (admitted *pro hac vice*)
Scott C. Solberg (admitted *pro hac vice*)
James W. Joseph (admitted *pro hac vice*)
Sarah H. Catalano (admitted *pro hac vice*)
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
bwaldin@eimerstahl.com
ssolberg@eimerstahl.com
jjoseph@eimerstahl.com
scatalano@eimerstahl.com

# APPENDIX
# TABLE OF CONTENTS

| Document | Page No. |
|---|---|
| Relevant Filings | |
| Proof of Claim No. 4217 of Humana Inc. (February 15, 2021)[1] | A0001 |
| Proof of Claim No. 4144 of Avon Holdings I LLC as Transferee of United Healthcare Services Inc. (February 15, 2021)[2] | A0075 |
| Proof of Claim No. 5812 of Avon Holdings I LLC as Transferee of OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC (February 16, 2021)[3] | A0100 |
| Motion of Debtors for Interim and Final Orders (A) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (B) Authorizing Continuation of Existing Deposit Practices, (C) Waiving Certain U.S. Trustee Guidelines, (D) Authorizing Continuation of Intercompany Transactions, and (E) Granting Superpriority Status to Postpetition Intercompany Claims, Case No. 20-12522, D.I. 23 (October 12, 2020) | A0119 |

---

[1] This is an exemplar of the proofs of claim of Humana Inc. subject to this appeal.  The remaining proofs of claim of Humana Inc. subject to this appeal are substantially identical to this proof of claim and have been assigned the following claim numbers: 3344, 3420, 4175, 4201, 4196, 4203, 4366, 5099, 4542, 4556, and 4565.  These claims have been omitted due to their voluminous nature and can be accessed at: https://restructuring.primeclerk.com/mallinckrodt/Home-ClaimInfo.

[2] This is an exemplar of the proofs of claim of Avon Holdings I LLC as Transferee of United HealthCare Services Inc. subject to this appeal.  The remaining proofs of claim of Avon Holdings I LLC as Transferee of United HealthCare Services Inc. subject to this appeal are substantially identical to this proof of claim and have been assigned the following claim numbers: 5171, 5717, 5638, 4335, 4314, 4288, 4211, 4593, 4219, and 4131.  These claims have been omitted due to their voluminous nature and can be accessed at: https://restructuring.primeclerk.com/mallinckrodt/Home-ClaimInfo.

[3] This is an exemplar of the proofs of claim of Avon Holdings I LLC as Transferee of OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC subject to this appeal.  The remaining proofs of claim of Avon Holdings I LLC as Transferee of OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC subject to this appeal are substantially identical to this proof of claim and have been assigned the following claim numbers: 5309, 5288, 5010, 5787, 5805, 5825, 5803, 5790, 5908, and 5938. These claims have been omitted due to their voluminous nature and can be accessed at: https://restructuring.primeclerk.com/mallinckrodt/Home-ClaimInfo.

| Document | Page No. |
|---|---|
| Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petition and First Day Motions, Case No. 20-12522, D.I. 128 (October 12, 2020) | A0194 |
| Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof, Case No. 20-12522, D.I. 667 (November 30, 2020) | A0450 |
| Excerpt of Affidavit of Service, Case No. 20-12522, D.I. 1131 (January 11, 2021) | A0463 |
| Humana Inc.'s Joinder to the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Actions, Case No. 20-12522, D.I. 1755 (March 16, 2021) | A0465 |
| Notice of Humana Inc.'s Joinder to the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as set forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Action, Case No. 20-12522, D.I. 1768 (March 16, 2021) | A0489 |
| Debtors' Omnibus Objection to the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Actions and to Humana Inc.'s Joinder Thereto, Case No. 20-12522, D.I. 1944 (April 5, 2021) | A0492 |

| Document | Page No. |
|---|---|
| Humana Inc.'s Reply in Support of the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Action and Humana Inc.'s Joinder thereto, Case No. 20-12522, D.I. 1987 (April 8, 2021) | A0531 |
| Excerpt of Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for all Purposes in these Bankruptcy Cases, Case No. 20-12522, D.I. 2157 (April 30, 2021) | A0540 |
| Motion of Attestor Limited and Humana Inc. for Entry of an Order Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code, Case No. 20-12522, D.I. 2159 (April 30, 2021) | A0577 |
| Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 2165 (April 30, 2021) | A0901 |
| Declaration of Randall S. Eisenberg in Support of Debtors' Motion for Scheduling Order and Objections to Claims, Case No. 20-12522, D.I. 2166 (May 1, 2021) | A0960 |
| Notice of Service of Attestor Limited and Humana Inc.'s First Request for Production of Documents in Connection with Contested Matters, Case No. 20-12522, D.I. 2211 (May 6, 2021) | A0966 |
| Attestor Limited and Humana Inc.'s First Request for Production of Documents in Connection with Contested Matters (May 6, 2021) | A0968 |

| Document | Page No. |
|---|---|
| Letter from Matthew Freimuth to the Honorable John T. Dorsey, Regarding Scheduling Issues, Case No. 20-12522, D.I. 2243 (May 10, 2021) | A0983 |
| Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed. R. Civ. P. 30(b)(6) and Fed. R. Bankr. P. 7030, Case No. 20-12522, D.I. 2284 (May 12, 2021) | A0986 |
| Opposition of Attestor Limited and Humana Inc. to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims, Case No. 20-12522, D.I. 2512 (May 21, 2021) [UNDER SEAL] | A0993 |
| Debtors' Omnibus Objection to Motions of Attestor Limited and Humana Inc. for Entry of Orders (A) Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for all Purposes in these Bankruptcy Cases and (B) Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code, Case No. 20-12522, D.I. 2521 (May 21, 2021) | A2023 |
| Debtors' Motion to Quash (A) Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed. R. Civ. P. 30(b)(6) and Fed. R. Bankr. P. 7030; (B) Acthar Plaintiffs' Notice of Deposition *Duces Tecum* of Corporate Designee(s) of Debtors; and (C) Acthar Plaintiffs' Notice of Deposition of Kathleen Breton, Case No. 20-12522, D.I. 2583 (May 26, 2021) | A2077 |
| Attestor Limited and Humana Inc.'s Limited Objection to Debtors' Motion to Quash (A) Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed R. Civ. P. 30(b)(6) and Fed R. Bankr. P. 7030; (B) Acthar Plaintiffs' Notice of Deposition *Duces Tecum* of Corporate Designees of Debtors; and (C) Acthar Plaintiffs' Notice of Deposition of Kathleen Breton, Case No. 20-12522, D.I. 2633 (June 1, 2021) | A2157 |
| Attestor Limited and Humana Inc.'s Reply in Further Support of Motions to Estimate Acthar-Related Claims and Allow | A2203 |

| Document | Page No. |
|---|---|
| Administrative Claims for all Purposes in these Bankruptcy Cases, Case No. 20-12522, D.I. 2657 (June 2, 2021) | |
| Excerpt of Order (I) Approving the Disclosure Statement and Form and Manner of Notice of Hearing Thereon; (II) Establishing Solicitation Procedures, (III) Approving the Form and Manner of Notice to Attorneys and Solicitation Directive, (IV) Approving the Form of Ballots, (V) Approving the Form, Manner, and Scope of Confirmation Notices, (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan and (VII) Granting Related Relief, Case No. 20-12522, D.I. 2911 (June 17, 2021) | A2221 |
| Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Case No. 20-12522, D.I. 2916 (June 18, 2021) | A2240 |
| Disclosure Statement for Joint Plan of Reorganization of Mallinckrodt PLC and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Case No. 20-12522, D.I. 2917 (June 18, 2021) | A2387 |
| Acthar Insurance Claimants' Revised and Supplemental Opposition to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims and Acthar Insurance Claimants' Motion for Substantive Consolidation, Case No. 20-12522, D.I. 2924 (June 18, 2021) [UNDER SEAL] | A3222 |
| Order Establishing Confirmation Schedule and Protocols, Case No. 20-12522, D.I. 2988 (June 24, 2021) | A4718 |
| Notice of Amended Agenda for Video Hearing Scheduled for June 24, 2021 at 1:00 p.m. (ET), Case No. 20-12522, D.I. 2989 (June 24, 2021) | A4730 |
| Debtors' Omnibus Reply in Support of First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 3177 (July 9, 2021) [UNDER SEAL] | A4762 |

| Document | Page No. |
|---|---|
| Statement of the Official Committee of Unsecured Creditors in Connection with the Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 3316 (July 21, 2021) | A6184 |
| Notice of Agenda of Matters Scheduled for Hearing on July 23, 2021 at 10:00 a.m., Case No. 20-12522, D.I. 3309 (July 21, 2021) | A6206 |
| Amended Notice of Agenda of Matters Scheduled for Hearing on July 23, 2021 at 9:00 a.m., Case No. 20-12522, D.I. 3389 (July 22, 2021) | A6213 |
| Transcripts, Order Appealed, and Notice of Appeal | |
| Transcript of Video Hearing [Zoom videoconference] on May 5, 2021 Regarding Motion for Scheduling Order, Adv. Pro. No. 21-50428, D.I. 2204 | A6221 |
| Transcript of Telephonic Hearing [Zoom videoconference] on May 12, 2021 Regarding Scheduling, Case No. 20-12522, D.I. 2303 | A6255 |
| Transcript of Video Hearing [Zoom videoconference] on May 20, 2021 Regarding Administrative Claims Bar Date, Case No. 20-12522, D.I. 2506 | A6293 |
| Transcript of Video Hearing [Zoom videoconference] on May 26, 2021 Regarding Scheduling, Case No. 20-12522, D.I. 2586 | A6331 |
| Transcript of Video Omnibus Hearing [Zoom videoconference] on June 2, 2021, Case No. 20-12522, D.I. 2683 | A6372 |
| Transcript of Telephonic Omnibus Hearing [Zoom videoconference] on June 7, 2021, Case No. 20-12522, D.I. 2752 | A6453 |

| Document | Page No. |
|---|---|
| Transcript of Telephonic Disclosure Statement Hearing [Zoom videoconference] on June 15, 2021, Case No. 20-12522, D.I. 2887 | A6563 |
| Transcript of Telephonic Disclosure Statement Hearing [Zoom videoconference] on June 16, 2021, Case No. 20-12522, D.I. 2930 | A6641 |
| Transcript of Telephonic Hearing [Zoom videoconference] on July 23, 2021 Regarding Unsubstantiated Claims Objection, Case No. 20-12522, D.I. 3414 | A6775 |
| Order Sustaining Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 3406 (July 23, 2021) | A6950 |
| Notice of Appeal, Case No. 20-12522, D.I. 3457 (July 28, 2021) | A6951 |
| Other Items | |
| Creditor's Claims in Bankruptcy Proceedings – The Debtor-Creditor Relationship in Bankruptcy – Allowance and Payment of Claims, Civil Resource Manual, Department of Justice (June 1998), available at https://www.justice.gov/jm/civil-resource-manual-64-creditors-claims-bankruptcy-proceedings | A7146 |
| Press Release, Mallinckrodt Will Pay $100 Million to Settle FTC, State Charges It Illegally Maintained its Monopoly of Specialty Drug Used to Treat Infants, FTC (Jan. 18. 2017), available at https://www.ftc.gov/news-events/press-releases/2017/01/mallinckrodt-will-pay-100-million-settle-ftc-state-charges-it | A7153 |
| Drug Maker Mallinckrodt Agrees to Pay Over $15 Million to Resolve Alleged False Claims Act Liability for "Wining and Dining" Doctors, Department of Justice (Sept. 4, 2019), available at https://www.justice.gov/opa/pr/drug-maker- | A7156 |

| Document | Page No. |
|---|---|
| mallinckrodt-agrees-pay-over-15-million-resolve-alleged-false-claims-act-liability | |
| Second Amended Complaint ¶¶ 7-8, *Humana Inc. v. Mallinckrodt ARD LLC*, No. 2:19-cv-06926 (C.D. Cal. Apr. 24, 2020) [D.I. 60] | A7158 |
| Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, *Humana Inc. v. Mallinckrodt ARD LLC*, No. 2:19-cv-06926 (C.D. Cal. Aug. 14, 2020) [D.I. 80] | A7442 |
| May 24, 2021 Emails Regarding Omnibus Unsubstantiated Claims Objection | A7471 |
| June 23, 2021 Emails Regarding Status Conference; Unsubstantiated Claims Hearing | A7473 |
| July 1, 2021 Emails Regarding Unsubstantiated Claims Objection | A7478 |
| Joint Debtors and Attestor/Humana Exhibit & Witness List for July 23, 2021 Hearing (July 22, 2021) | A7479 |

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket Nos. 2157 and 2159** |

### DEBTORS' OMNIBUS OBJECTION TO MOTIONS OF ATTESTOR LIMITED AND HUMANA INC. FOR ENTRY OF ORDERS (A) PURSUANT TO 11 U.S.C. §§ 105(a) AND 502(c) (I) AUTHORIZING ESTIMATION OF HUMANA'S ACTHAR-RELATED CLAIMS AND (II) ALLOWING HUMANA'S ACTHAR-RELATED CLAIMS FOR ALL PURPOSES IN THESE BANKRUPTCY CASES AND (B) ALLOWING AND COMPELLING PAYMENT OF ADMINISTRATIVE CLAIMS PURSUANT TO SECTION 503(B) OF THE BANKRUPTCY CODE

The debtors and debtors in possession in the above-captioned cases (collectively, the "***Debtors***") hereby submit this omnibus objection (this "***Objection***") to (i) *Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases*, D.I. 2157 (the "***Estimation Motion***");[2] and (ii) *Motion of Attestor Limited and Humana Inc. for Entry of an Order Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code*, D.I. 2159 (the "***Administrative Expenses Motion***" and together with the Estimation Motion, the "***Humana Motions***") filed by Attestor Limited, on behalf of itself and its affiliated entities, including Avon Holdings I, LLC (collectively, "***Attestor***"), and Humana, Inc. (together with

---

[1] A complete list of the Debtors in these chapter 11 cases (the "***Chapter 11 Cases***") may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Estimation Motion or the Administrative Expenses Motion, as applicable.

Attestor, "**Humana**" or "**Movants**").  In support of the Objection, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      At the heart of the Humana Motions is an improper attempt by Humana to estimate its administrative expenses (the Estimation Motion) and then have those estimated expenses allowed and payed immediately (the Administrative Expenses Motion).  These requests are inappropriate because (i) Section 503 of the Bankruptcy Code is explicit that only "actual" administrative expenses can be allowed, not estimated amounts; and (ii) there is no provision in the Bankruptcy Code requiring immediate payment of administrative expenses as opposed to waiting until the effective date of the Debtors' plan of reorganization.

2.      Once these improper requests are set aside, the remaining aspects of the Humana Motions are either premature (such as estimating their administrative expenses for feasibility purposes) or unnecessary (such as estimating their pre-petition claims to determine feasibility or unfair discrimination).  The Court has approved an administrative bar date and objection process that will most efficiently allow the Court to determine whether there are any actual administrative expenses through the bar date.  And, only if there are actual administrative expenses might it then be necessary (with that knowledge in hand) to estimate any remaining administrative expenses through confirmation for feasibility purposes only.  Likewise, it will never be necessary to estimate Humana's pre-petition claims as their amount does not affect feasibility or otherwise interfere with confirmation of the Debtors' reorganization plan.  Any need to estimate is further reduced by the Unsubstantiated Claims Objection (defined below), which if granted in whole or in part will substantially reduce the vast and overlapping Acthar Litigation Claims (defined below).

3.      The Debtors respectfully request that the Court deny the Humana Motions.

**A-2024**

## BACKGROUND

### I.   The Debtors' Business

4.     The Debtors constitute a global specialty pharmaceutical company that produces and sells generic and branded medical and pharmaceutical products critical to patient care, including rare disease treatments, immunotherapy products, acute care products, opioid and non-opioid pain treatment products like acetaminophen, and addiction treatment medications. A complete description of the Debtors' business and operations is set forth in the *Declaration of Stephen Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions*. *See* D.I. 128 ("***Welch Declaration***").

5.     One of the Debtors' branded pharmaceutical products is Acthar® Gel ("***Acthar***"). Acthar is a naturally sourced specialty pharmaceutical consisting of a complex mixture of adrenocorticotropic hormone ("***ACTH***") analogs and other pituitary peptides. It is "an injectable drug approved by the FDA for use in 19 indications, including, among others, monotherapy for the treatment of infantile spasms in infants and children under 2 years of age." *See id.* ¶ 36.

### II.   Humana's Prepetition Lawsuit

6.     Humana commenced its pre-Petition Date[3] lawsuit, *Humana Inc. v. Mallinckrodt ARD LLC*, Case No. 2:19-cv-06926 (C.D. Cal.) ("***Humana Inc.***"), on August 8, 2019. Under its operative complaint, Humana makes (a) antitrust claims under the federal Sherman Act and the antitrust acts of several states; (b) fraud-based claims under the federal RICO act, and various states' unfair competition, deceptive practices acts, and insurance fraud statutes; and (c) an

---

[3]     The "Petition Date" refers to October 12, 2020, the date on which the Debtors filed the above-captioned voluntary petitions in this court (the "***Chapter 11 Cases***") for relief under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***").

US-DOCS\123883875.24

A-2025

equitable claim for unjust enrichment.[4]  *Humana Inc.*, Second Amended Complaint, D.I. 2159-3 ("**Humana Complaint**").  Humana's antitrust claims rest on allegations that Mallinckrodt ARD LLC's predecessor in interest, Questcor Pharmaceuticals Inc., illegally maintained a monopoly for Acthar and engaged in an unreasonable restraint of trade through its 2013 acquisition of certain rights to develop and sell a potential (non-FDA approved) alternative to Acthar called Synacthen Depot.  *Id.* ¶¶ 11, 35, 70-82, 139-52.  Humana's fraud-based claims arise from allegations that Questcor and later Mallinckrodt ARD LLC (a) illegally subsidized patient copay obligations for Acthar by making contributions to "sham charitable funds" that intentionally assisted only Acthar patients, *id.* ¶¶ 12, 93-111, 153-98, and (b) paid kickbacks to doctors in the form of excessive compensation for "for consulting, promotional speaking, and other services related to Acthar," *id.* ¶¶ 13, 112-18, 153-98.  Humana's unjust enrichment claim is based on all the above alleged misconduct.  *Id.* ¶ 208-12.[5]

## III.    **The Debtors' Reorganization**

7.    For over a year preceding the Petition Date, the Debtors had worked to craft the Restructuring Support Agreement ("**RSA**"), which provides a framework to resolve, among other

---

[4]    Humana had also made a claim for tortious interference with contractual relations, which the court dismissed with prejudice. *Humana Inc.*, Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, D.I. 80, attached hereto as Ex. 1.

[5]    *Humana, Inc.* is one of nine pending Acthar Actions, all of which were commenced pre-Petition Date, and all of which rely on a combination of similar (or, in certain instances, identical) factual allegations to support claims similar to those in *Humana, Inc.*  Allegations concerning the Synacthen rights acquisition are in the complaints in all of the pending Acthar Actions, are used (at least before rulings on motions to dismiss) as the basis for antitrust claims or unjust enrichment in five of them, and are used in support of unfair competition or consumer protection claims in seven of them.  Similarly, Humana's fraud-based claims regarding copay assistance and payments to doctors are in six of the other Acthar Actions.

The other **Acthar Actions** are: *Int'l Union of Operating Eng'rs Local 542 v. Mallinckrodt ARD Inc.*, No. 2:21-cv-00114-BMS (E.D. Pa.), *Acument Glob. Techs., Inc. v. Mallinckrodt ARD Inc.*, No. 2:21-cv-02024-JTFTMP (W.D. Tenn.), *City of Rockford v. Mallinckrodt ARD, LLC*, No. 3:17-cv-50107 (N.D. Ill.), *Steamfitters Local 420 v. Mallinckrodt ARD, LLC*, No. 2:19-cv-03047-BMS (E.D. Pa.), *United Ass'n of Plumbers & Pipefitter Local 322 of S. N.J. v. Mallinckrodt ARD, LLC*, No. 1:20-cv-00188-RBK-KMW (D.N.J.), *Health Care Service Corp. v. Mallinckrodt ARD LLC*, Case No. 3:21-cv-165 (N.D. Cal.), *MSP Recovery Claims, Series LLC v. Mallinckrodt ARD LLC*, Case No. 3:20-cv-50056 (N.D. Ill.), and *Marietta v. Mallinckrodt ARD LLC*, Case No. 1:20-cv-00552 (N.D. Ga.).

US-DOCS\123883875.24

A-2026

claims, the more than 3,000 proceedings pending against them in various federal courts, state courts, and other fora. These efforts culminated in the filing of the *Joint Plan of Reorganization of Mallinckrodt plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, D.I. 2074 (including any amendments thereto, the "**Plan**") and the *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Mallinckrodt plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, D.I. 2075 (including any amendments thereto, the "**Disclosure Statement**") on April 20, 2021.

8.      Among other terms, and as relevant here, the RSA and Plan contemplate a $100 million distribution to the general unsecured creditor class, which includes the Acthar Litigation Claimants (defined below) and which would not be diluted by opioid-related claims. In addition, the Debtors have reached an agreement in principle with the federal government and intervenor States related to the Debtors' co-payment assistance and rebate-calculation practices for Acthar. This settlement will also be consummated through the Plan, consistent with the RSA, and will also not draw from the $100 million pool set aside for general unsecured creditors' allowable claims.

9.      The restructuring contemplated by the RSA and to be implemented through the Plan provides fair and equitable treatment of all claims—including any allowed claims of the Acthar Litigation Claimants—and enjoys significant support from nearly every class of affected stakeholders. The RSA is signed by unsecured noteholders holding more than 84 percent of the fulcrum unsecured notes class; first-lien term lenders holding in excess of two-thirds of the first-lien term loans; 50 Attorneys General of states, Washington, D.C., and U.S. territories with respect to their opioid claims; the members of the Plaintiffs' Executive Committee in the pending multi-district opioid litigation, who will recommend that the more than 1,000 plaintiffs they represent support the RSA; and an ad hoc group of approximately 1,300 local governmental entities.

US-DOCS\123883875.24

**A-2027**

**IV.    Acthar-Related Claims And The Debtors' Proposed Resolution Process**

10.    On November 30, 2020, the Court entered its Order, *see* D.I. 667 (the "***Bar Date Order***"), establishing (a) February 16, 2021 as the general deadline for all non-governmental unit entities to file proofs of claim for all prepetition claims other than opioid claims; and (b) April 12, 2021, at 5:00 p.m. prevailing Eastern Time as the deadline for governmental units to file proofs of claim for all prepetition claims other than opioid claims.

11.    As set forth in an *Affidavit of Service* dated January 11, 2021, D.I. 1131, on December 31, 2020 and January 4, 2021, the Debtors' claims and noticing agent served the Bar Date Order broadly on the Debtors' creditor body.  In so doing, the Debtors served the Bar Date Order on all known third-party payors for Acthar (in excess of 1,100 entities) as well as upon all known patients who have filled Acthar prescriptions (in excess of 66,774 persons).  In addition, notice of the bar dates was published in 26 newspapers, including *The Wall Street Journal*, the *Financial Times*, *USA Today*, *The New York Times*, the *Irish Independent*, the *St. Louis Post-Dispatch*, and the *Newark Star Ledger* between January 8 and 13, 2021, in accordance with the Bar Date Order.  *See* D.I. 1131, 1387.

12.    All plaintiffs in the Acthar Actions ("***Acthar Litigation Claimants***") timely filed numerous proofs of claim.  Most relevant here, Humana filed proofs of claim against multiple Debtors, totaling 69 proofs of claim in all.[6]  All of Humana's proofs of claim are identical and based exclusively on the allegations of misconduct described in the Humana Complaint, despite that the only remaining Debtor defendant in *Humana, Inc.* after Humana voluntarily dismissed Mallinckrodt plc is Mallinckrodt ARD LLC.  *See Humana Inc.*, D.I. 34.[7]

---

[6]    In the Estimation Motion, footnote 3, Humana accurately lists its proofs of claim, with one apparent typographical error: it filed proof of claim 4381 (not 4318, as it listed).

[7]    Similarly, the other Acthar Litigation Claimants filed proofs of claim based exclusively on the underlying complaints in their respective Acthar Actions, with many, like Humana, filing identical proofs of claim against nearly

**A-2028**

13.     On April 30, 2021, the Debtors made several filings that, together, aim to reach a global resolution of the Acthar Litigation Claimants' proofs of claim.  The Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Proofs of Administrative Claim, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claim, (IV) Approving Notice of the Initial Administrative Claim, (IV) Approving Notice of the Initial Administrative Claim bar Date, and (V) Granting Related Relief*, D.I. 2162 (the "**Administrative Claims Bar Date Motion**").[8]  Humana and certain other Acthar Litigation Claimants filed objections to the Administrative Claims Bar Date Motion, and the Debtors filed a reply brief.  *See* D.I. 2276, 2283, 2343.  On May 20, 2021, the Court entered an order (the "**Administrative Claims Bar Date Order**") granting the Administrative Claims Bar Date Motion and setting an initial claims bar date of June 28, 2021, for administrative claims that arose after the Petition Date, but prior to April 30, 2021 (the "**Initial Administrative Claims Bar Date**").  *See* D.I. 2480.

14.     Additionally, in furtherance of the global Acthar claims resolution process, the Debtors filed the *Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive)*, D.I. 2165 (the "**Unsubstantiated Claims Objection**"), by which the Debtors object to certain unsubstantiated proofs of claim filed by the Acthar Litigation Claimants (collectively, the "**Acthar**

---

all the Debtors despite that their respective Acthar Actions named one, or at most, two Debtors as defendants.  Some of the Acthar Litigation Claimants also filed purported class proofs of claim across the list of Debtors.  Together, the Acthar Litigation Claimants filed over 350 proofs of claim seeking over $200 billion in payment from the Debtors, though this amount does not include the *unliquidated* amounts Humana asserts.  These proofs of claim are less than 1% of the over 48,000 proofs of claim that have been filed, but seek payments totaling over 50% of the approximately $400 billion claimed across all proofs of claim.

[8]     The Debtors also filed the First Omnibus Objection To Unsubstantiated and Duplicative Claims, D.I. 2165, the Omnibus Objection To Class Proofs of Claim, D.I. 2164, and the adversary proceeding *Mallinckrodt plc, et al. v. City of Rockford*, Case no. 21-ap-50428, to resolve the issue of whether City of Rockford's claims are dischargeable.  Efficiently reaching a global resolution of the Acthar Litigation Claimants' proofs of claim is in the best interest of the Debtors' estates, their creditors, and other stakeholders.  The Debtors are currently intending to proceeding with a confirmation hearing on the Plan in August 2021.  Resolving the Acthar-related issues will clear a path towards timely confirmation, provide greater speed for creditor distributions, and demonstrate confirmability of the Plan.

*Litigation Claims*").  The relevant underlying lawsuits name only Debtor Mallinckrodt ARD LLC

("***ARD***") and, in some cases, Mallinckrodt plc ("***plc***").  There are no claims asserted against any

other Debtor in the underlying litigations, and there are no allegations in respect of any other

Debtor in the relevant complaints.  Therefore, by the Unsubstantiated Claims Objection, the

Debtors seek to have the Acthar Litigation Claims asserted against Debtors other than ARD and,

as applicable, plc disallowed and expunged.

**OBJECTION**

**I.**   **Humana Is Not Entitled to Estimation or Payment of Its Alleged Administrative Expenses**

      **A.**   **Estimation of Administrative Expenses for Allowance Is Contrary to Bankruptcy Law**

15.      Humana remarkably seeks to have its alleged administrative expenses ("***Alleged***

***Administrative Expenses***") allowed under Section 503 of the Bankruptcy Code in an amount

estimated under Section 502(c).  *See* Administrative Expenses Mot. ¶ 18 (citing 11 U.S.C. §

503(b)(1)(A)); Estimation Mot. ¶ 25  (citing 11 U.S.C. §  502(c)(1)-(2)).

16.      But the governing statute for allowance of administrative expenses for creditors

is Section 503 of the Bankruptcy Code, entitled "Allowance of Administrative Expenses."

Humana acknowledges this, as it must, as its Administrative Expenses Motion explicitly seeks

allowance under Section 503.  Administrative Expenses Mot. ¶ 3.  And Section 503 requires that

any allowed expenses be the "actual, necessary expenses."  11 U.S.C. §  503(b).  An "actual"

expense is not an "estimated" expense.  While these terms are not defined in the Bankruptcy Code,

in plain English "actual" means "existing in fact or reality," while "estimated" means "to judge

tentatively or approximately the value, worth or significance of," demonstrating the clear

8

difference in how to determine the amount (if any) owed to Humana.[9]  Section 503 is thus clear on its face that administrative expenses cannot be estimated; instead, they must be "actual".

17.      Humana's attempt to apply Section 502(c) of the Bankruptcy Code to allow administrative expenses violates Third Circuit principles regarding statutory interpretation.  It is a cardinal rule of statutory interpretation that a specific statutory provision (like Section 503) will govern over a generic one (like Section 502(c)).  *See In re Combustion Eng'g*, 391 F.3d 190, 237 n. 49 (3d Cir. 2004) (It is "a well-settled maxim that specific statutory provisions prevail over more general provisions.").[10]  Administrative expenses thus can only be allowed, in general, by following the procedure in Section 503, i.e. in their actual amount, not by estimating under Section 502(c).

18.      In fact, Section 502(c) of the Bankruptcy Code itself is clear that its estimation command does not extend to allowance of administrative expenses under Section 503—it states "there shall be estimated for purpose of allowance **under this section**."  11 U.S.C.  § 502(c)(1).  But that is not what Humana seeks; it seeks (as it must) allowance of administrative expenses under Section 503.  *See* Administrative Expenses Mot. ¶ 3.

19.      Consistent with the language of Sections 503 and 502(c) of the Bankruptcy Code, the Debtors are not aware of any case allowing for payment of estimated administrative

---

[9]      *See*, *Merriam-Webster's Unabridged Dictionary*, (2021) Actual, https://www.merriam-webster.com/dictionary/actual; *Merriam-Webster's Unabridged Dictionary*, (2021) Estimate, https://www.merriam-webster.com/dictionary/estimated.

[10]      The Third Circuit has held that statutes should be read in the ordinary sense of their words when determining whether there are ambiguities, and where there are none, no further judicial inquiry is required.  *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010) ("It is the cardinal canon of statutory interpretation that a court must begin with the statutory language.") (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, (1992) (internal citations and quotations omitted) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then this first canon is also the last: judicial inquiry is complete."); *Price v. Del. State Police Fed. Credit Union*, 370 F.3d 362, 368 (3d Cir. 2004) ("We are to begin with the text of a provision and, if its meaning is clear, end there."); *Harvard Secured Creditors Liquidation Trust v. I.R.S.*, 568 F.3d 444, 451 (3d Cir. 2009) (In determining whether language is unambiguous, we "read the statute in its ordinary and natural sense.")).

expenses.  Instead, cases hold that Section 502(c) only permits allowance by estimation of prepetition claims and interests, not administrative expenses, which are incurred post-petition.  *See In re Macdonald* 128 B.R. 161, 165 (Bankr. W.D. Tex. 1991) (holding that post-petition administrative expenses and their allowance are governed by Section 503 of the Bankruptcy Code, not Section 502(c), which is reserved for prepetition claims).  While courts have approved estimation of administrative expenses for *feasibility* purposes, there is no legal basis for estimation of administrative expenses for allowance of such claims under the Bankruptcy Code.  *See In re Adelphia Business Solutions, Inc.*, 341 B.R. 415, 423 (Bankr. S.D.N.Y. 2003) (rejecting estimation for allowance purposes due to lack of due process to a related debtor and permitting estimation for feasibility only); *In re MacDonald*, 128 B.R. 161 (holding that estimation was only permissible for feasibility purposes and not allowance).

20.     And likewise for this reason, the cases that Humana cites to argue that its purported administrative expenses may be estimated for allowance are inapplicable as they do not concern administrative expenses.  *See Official Comm. of Asbestos Claimants v. Asbestos Prop. Damage Comm. (In re Federal-Mogul Global Inc.)*, 330 B.R. 133, 154 (D. Del. 2005) (concerning personal injury and wrongful death claims not classified as administrative expenses); *In re G-I Holdings, Inc.*, 323 B.R. 583, 599 (Bankr. D.N.J. 2005) (same); *In re Roman Catholic Archbishop of Portland*, 339 B.R. 215, 222 (Bankr. D. Or. 2006) (concerning sex abuse and tort claims not classified as administrative expenses).  Accordingly, this Court should not estimate the Alleged Administrative Expenses for allowance purposes.

**B.     Estimation of the Alleged Administrative Expenses for Feasibility Is Premature and Inappropriate At This Time**

21.     In addition to improperly requesting estimation for allowance, Humana argues that this Court should estimate its Alleged Administrative Expenses to ensure that the Debtors'

US-DOCS\123883875.24

proposed Plan is feasible.  *See* Estimation Mot. ¶ 29.  But estimating Humana's Alleged Administrative Expenses for feasibility is premature and indeed likely will never be necessary.

22.     As specified in the Administrative Claims Bar Date Order, the Court has approved procedures (the "***Administrative Expense Procedures***") for the filing of Acthar-related expenses purportedly entitled to administrative priority, including establishing the Initial Administrative Claims Bar Date for filing administrative expenses arising prior to April 30, 2021.  *See* Administrative Claims Bar Date Order. ¶ 3.  As part of the Administrative Expense Procedures, all claimants must submit a proof of claim form, demonstrating their actual administrative expenses.  The Administrative Expense Procedures then provide a process for filing and resolving the Debtors' objections to such documented administrative expenses.  In their forthcoming objection, the Debtors will demonstrate that Humana has no actual administrative expenses for numerous reasons, including, among other things, that the Debtors terminated their license agreement for Synacthen pre-Petition Date, and that Humana cannot have been injured by supposed fraudulent conduct post-Petition Date because it admittedly knew of the Debtors' alleged conduct but decided to authorize Acthar prescriptions despite this knowledge.  These alleged administrative expenses will fail even without going into the numerous fatal flaws with Humana's underlying pre-Petition Date claims. Thus, before the confirmation hearing, the Court will have determined whether there are any Acthar-related administrative expenses through the date of the Initial Administrative Claims Bar Date.[11]

23.     Once the Administrative Expense Procedures play out, if the Court then determines that there are administrative expenses through the Initial Administrative Claims Bar Date, at that

---

[11]     The Debtors and Humana have agreed that the Humana Motions shall operate as a timely filed proof of administrative expense under the Debtors' proposed Administrative Expense Procedures, and the Debtors reserve all rights to oppose such claim on the merits at the appropriate juncture in the Administrative Expense Procedures.  *See* D.I. 2343, 2480.

US-DOCS\123883875.24

point any administrative expenses between the Initial Administrative Claims Bar Date and the Debtors' emergence from reorganization may be estimated for feasibility purposes. And that estimation will be greatly informed by the decision as to whether there are, in fact, actual administrative expenses, and any future ones can be more easily estimated for feasibility purposes based on the actual ones. Estimation for the purpose of feasibility today is premature as it would be less informed and may never be necessary.[12]

24.      For the foregoing reasons, the Debtors respectfully request that this Court deny Humana's request for estimation of its Alleged Administrative Expenses to determine feasibility of such claims at this time.

**C.      Even If Humana Had Administrative Expenses, They Would Not Need To Be Paid Currently**

25.      Even if Humana's Alleged Administrative Expenses could be allowed by estimation, which they cannot, there is no basis to pay them currently. There is no Bankruptcy Code requirement for payment ahead of a plan confirmation, and advance payment on expenses such as these would be highly unusual. The Bankruptcy Code does not specifically prescribe when administrative expenses need to be paid and generally courts have held that bankruptcy courts retain discretion to determine the timing for payment of administrative expenses. *See In re Midway Airlines Corp.*, 406 F.3d 229 (4th Cir. 2005); *Varsity Carpet Servs., Inc. v. Colortex*

---

[12]      Humana's argument that estimation is necessary to assess the likelihood that the Debtors will continue to be burdened by Acthar-related liability post-emergence also misses the mark. *See* Estimation Mot. ¶¶ 37-38. Granting the relief Humana seeks would do little to address any alleged post-emergence liability issue. Humana asks that the Court adopt a probabilistic method of estimation, which would involve estimating the value of the Alleged Administrative Expenses by "discounting the maximum potential value of Humana's claims by the probability of success." Estimation Mot. ¶ 56. The probabilistic method advocated by Humana would not result in findings of fact or conclusions of law regarding the legality of Debtors' specific Acthar-related practices. *See In re Dow Corning Corp.*, 211 B.R. at 567 ("[N]o matter what answer this Court were to give as its estimate of the value of all tort claims, there is almost no likelihood that the estimate would prove accurate. Therefore, parties in interest will derive no comfort from the results of a lengthy and complex estimation war."). Thus, estimation in accordance with the probabilistic method Humana requests would offer little (if any) guidance to inform the Debtors' post-emergence conduct.

US-DOCS\123883875.24

*Indus., Inc. (In re Colortex Indus., Inc.)*, 19 F.3d 1371, 1384 (11th Cir. 1994); *In re Verco Indus.*, 20 B.R. 664 (B.A.P. 9th Cir. 1982).  In this case, it would be equitable to allow the Debtors' Administrative Expense Procedures to proceed and for it to apply to all prospective administrative expense claimants, including Humana.

26.     Despite Humana's insistence that its Alleged Administrative Expenses must be paid out in full immediately, the Bankruptcy Code does not require that such claims, if allowed, be paid earlier than the effective date of a plan or the winding up of the administration of the case and the distribution of all the property of the estate.  *See* 4 *Collier on Bankruptcy* P 503.3.  In addition, if there are disputed or unliquidated administrative expenses at confirmation, Section 1129(a)(9) of the Bankruptcy Code may be satisfied if the Debtors establish a reserve for such claims.  4 *Collier on Bankruptcy* P 503.3 (citing *In re Pioneer Health Servs., Inc.*, 2018 Bankr. LEXIS 3082 (Bankr. S.D. Miss. Oct. 2, 2018); *In re Camp Arrowhead, Ltd.*, 2010 Bankr. LEXIS 4374, at *11 (Bankr. W.D. Tex. May 21, 2010) (the confirmation order required the debtor to reserve $250,000 for administrative claims not yet allowed).  Thus, immediate payment of Humana's Alleged Administrative Expenses, if allowed, is both an inappropriate remedy and favorably treats Humana to the potential detriment of the Debtors' other creditors.  Until the Court determines that Humana actually has an allowed administrative expense and the amount thereof, it is premature to order when such amounts must be paid—the timing of payment can be determined at the same time as allowance.  While Humana claims to oppose disparate treatment of similarly-situated creditors, it is itself asking for special treatment for its Alleged Administrative Expenses to be allowed separately from the global process the Debtors proposed.

## II.     Estimation of Humana's Prepetition Claims Is Premature and Unnecessary to Advance the Chapter 11 Cases to Confirmation

27.     Removing Humana's baseless request for estimation of the Alleged Administrative

Expenses, all that remains is a premature request to estimate Humana's contingent, unliquidated and disputed Prepetition Claims.  Section 502(c)(1) of the Bankruptcy Code provides for estimation of contingent and unliquidated claims only where "the fixing or liquidation" of the claim "would unduly delay the administration of the case."  While Section 502(c)(1) is couched in mandatory terms, absent a finding of undue delay, "it is within th[e] [c]ourt's sound discretion and not the obligation of [the] [c]ourt to estimate a claim."  *In re RNI Wind Down Corp.*, 369 B.R. 174, 191 (Bankr. D. Del. 2007) (quoting *In re Apex Oil Co.*, 107 B.R. 189, 192 (Bankr. E.D. Mo. 1989) (internal quotations omitted)).  In assessing "undue delay" the critical consideration is "whether the uncertain status of the claim impedes the parties' ability to prepare and file a plan of reorganization within a reasonable time."  *In re Bellucci*, 119 B.R. 763, 778 (Bankr. E.D. Cal. 1990); *see also In re John Q. Hammons Fall 2006, LLC*, 2017 Bankr. LEXIS 3550, *12-13 (Bankr. D. Kan. 2017) (considering "undue delay" to be "excessive or unwarranted slowing of the administration of a debtor's case," including where delay could be "fatal" to moving the chapter 11 case towards reorganization).

28.     No undue delay would result from foregoing estimation of the Prepetition Claims until after consideration of the Debtors' proposed Plan and Disclosure Statement.  Uncertainty regarding the amount of Humana's Prepetition Claims has not prevented the Debtors from filing the Plan, which has garnered broad support among several key creditor constituencies.  Moreover, the quantum of the Prepetition Claims has no bearing on whether the Plan satisfies the Bankruptcy Code's requirements for confirmation.

29.     Humana's assertion that its Prepetition Claims must be estimated to determine whether the Plan is feasible and not unfairly discriminatory are meritless.  As described in further detail herein, because the Plan provides that holders of general unsecured claims, including

Humana, will receive a *pro rata* share of a fixed cash pool, the size of the Prepetition Claims does not affect feasibility. The size of Humana's Prepetition Claims only affects the amount of Humana's *pro rata* distribution relative to other general unsecured creditors. Consideration of unfair discrimination is likewise premature. Humana's argument presupposes that the general unsecured creditor class will vote to reject the Plan—an assumption that is entirely speculative as no creditors have yet been asked to vote on the Plan. If the general unsecured creditor class does vote to reject the Plan, the Debtors will respond at the appropriate time regarding unfair discrimination.

30. By Humana's own admission, estimation would entail significant time and expense. *See* Estimation Mot. ¶¶ 52-54. Humana's proposed procedures contemplate at minimum a four-month estimation process that would involve extensive fact and expert discovery, as well as a lengthy evidentiary hearing. Considering that there is no need to estimate the Prepetition Claims in order to advance these Chapter 11 Cases to confirmation, the delay and cost attendant to estimation should not be unnecessarily imposed on the Debtors and their estates. *See In re Dow Corning Corp.*, 211 B.R. 545, 563 (Bankr. E.D. Mich. 1997) (declining estimation where "there is no guarantee that estimation would in fact move matters along significantly faster" because estimation would "necessarily involve hearings that would be quite lengthy and protracted" and estimation was unnecessary to advance the plan to confirmation). Instead, the Prepetition Claims can be estimated post-confirmation for purposes of fixing distributions to general unsecured creditors in accordance with the streamlined procedures for addressing contingent, unliquidated, and disputed claims established under the Plan. *See* Plan art. VII. Indeed, it is common for courts in this district to estimate contingent, unliquidated, and/or disputed prepetition claims post-confirmation. *See, e.g.*, *In re TerraVia Holdings, Inc.*, Case No. 17-11655 (CSS) (Bankr. D. Del.

15

Dec. 18, 2019) [D.I. 725] (post-confirmation order granting plan administrator's motion seeking to estimate certain unliquidated claims for allowance purposes); *In re CRC Parent Corp.*, Case No. 10-11567 (MFW) (Bankr. D. Del. July 28, 2011) [D.I. 1098] (post-confirmation order granting litigation trustee's motion to estimate certain contingent and unliquidated claims for all purposes); *In re SemCrude, L.P.,* Case No. 08-11525 (BLS) (Bankr. D. Del. Sept. 16, 2010) [D.I. 8477] (post-confirmation order granting reorganized debtors' motion seeking to, among other things, estimate contingent, unliquidated and disputed general unsecured claims); *In re Accredited Home Lenders Holding Co.*, Case No. 09-11516 (MFW) [D.I. 3098] (post-confirmation order granting liquidating trustee's motion seeking to, among other things, estimate certain unliquidated claims for purposes of distribution under confirmed plan).

### A.  Estimation Is Not Necessary to Determine Feasibility

31.  The amount of Humana's Prepetition Claims is irrelevant to the feasibility of the Plan.  Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization."  11 U.S.C. § 1129(a)(11).  To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success; rather, only a reasonable assurance that the provisions of a plan can be performed is required.[13]

32.  The Plan provides for general unsecured creditors to receive their *pro rata* share of a $100 million general unsecured claims cash pool.  *See* Plan art. III.B.6.  The Debtors' obligations

---

[13]  *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *IRS v. Kaplan (In re Kaplan)*, 104 F.3d 589, 597 (3d Cir. 1997); *Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) ("[T]he feasibility test contemplates 'the probability of actual performance of the provisions of the plan. . . . The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.'" (quoting *In re Bergman*, 585 F.2d 1171, 1179 (2d Cir. 1978)).

under the Plan with respect to general unsecured claims are therefore fixed at $100 million, irrespective of the total amount of general unsecured claims that comprise the class. The quantum of Humana's Prepetition Claims affects only the other general unsecured creditors' *pro rata* distributions. Because the amount of the Prepetition Claims does not affect the Debtors' obligations under the Plan, there is no need to determine the total universe of general unsecured claims, let alone the amount of Humana's Prepetition Claims, to assess the Plan's feasibility. *See In re Frascella Enters.*, 360 B.R. 435, 459, n. 52 (Bankr. E.D. Pa. 2007) ("Since the Debtor has proposed a 'pot plan' with a *pro rata* distribution on account of allowed claims, liquidation of the [consumer class action claim] would not be necessary under § 502."); *In re N.Y. Med. Grp. P.C.*, 265 B.R. 408, 413 (Bankr. S.D.N.Y. 2001) ("[I]n spite of the fact that the resolution of the litigation may affect the distributions, the litigation itself will not interfere with the bankruptcy case. . . . [It] will not affect the ability to confirm the proposed 'pot plan'").[14]

33.     Each of the cases cited by Humana to support the proposition that estimation of prepetition claims is necessary to determine feasibility is inapposite.[15] The court in *Adelphia Business Solutions* estimated for feasibility *administrative* expenses, which were required to be

---

[14]     *See also In re Dow Corning Corp.*, 211 B.R. at 568-69, explaining that estimation is unnecessary to determine feasibility where the proposed plan would distribute fixed amount to tort claims:

> The Reorganized Debtor's ability to pay tort claims in full would simply not be an issue under § 1129(a)(11) for no matter how large the actual aggregate tort liability may turn out to be, the Reorganized Debtor would clearly be able to perform the pertinent terms of the plan. If the Court estimated the aggregate claims at something within the $2 billion treasury, the plan would be feasible. If the Court estimated the claims at an amount far in excess of $2 billion, the plan would still be feasible, because the Reorganized Debtor's obligation is capped by the plan at $2 billion, and the Debtor has $2 billion.

[15]     The case law Humana cites in support of the proposition that the estimation is necessary to establish an appropriate reserve is clearly inapplicable to the Prepetition Claims. Whereas the general unsecured claims are receiving distributions from a fixed cash pool, leaving no need to estimate claims to establish a reserve, estimation for feasibility was necessary in Humana's cited cases because the relevant claims either had to be paid in full or would survive the reorganization. *See In re Chemtura Corporation*, 448 B.R. 635 (Bankr. S.D.N.Y. 2011); *In re Hercules Offshore, Inc.*, No. 16-11385 (KJC) (Bankr. D. Del. Nov. 14, 2016) [Dkt. No. 483]; *In re Newpage Corp.*, No. 11-12804 (KG) (Bankr. D. Del. Feb. 19, 2013) [Dkt. No. 3166]; *In re Accredited Home Lenders Holding Co.*, No. 09-11516 (MFW) (Bankr. D. Del. May 31, 2011) [Dkt. No. 2784]

US-DOCS\123883875.24

paid in full under the plan.  *See* 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003).  Likewise, the court in *Pacific Gas & Electric* estimated antitrust claims that the debtors agreed would "pass through" the bankruptcy and therefore, had a direct effect on the feasibility of the debtors' post-emergence operations.  *See* 295 B.R. 635, 642 (Bankr. N.D. Cal. 2003) ("The *sole* reason the court has undertaken this analysis is to ascertain what amount of damages, if any, PG & E should include in its forecasts for meeting obligations that 'pass through,' *i.e.,* are not dealt with, under its proposed Plan of Reorganization." (emphasis in original)).[16]

34.     For the foregoing reasons, estimation of Humana's Prepetition Claims is unnecessary to determine feasibility.

### B.     Estimation to Determine Unfair Discrimination is Premature

35.     Section 1129(b) of the Bankruptcy Code provides that if all applicable requirements of Section 1129(a), other than Section 1129(a)(8) are met, a plan may be confirmed so long as it does not discriminate unfairly with respect to each class of claims and interests that is impaired and has not accepted the plan.  As a result, to confirm a plan that has not been accepted by all impaired classes, the plan proponent must show that the plan "does not discriminate unfairly" with respect to the non-accepting impaired classes.  11 U.S.C. § 1129(b)(1).  The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists,[17] and the Third Circuit has emphasized the "need for flexibility over precision" in applying the unfair discrimination standard in order to "increase the likelihood that a plan can be negotiated and

---

[16]     Additionally, the courts in *Federal-Mogul Global*, 330 B.R. at 154-55, and *In re Interco*, 137 B.R. 993, 998 (Bankr. E.D. Mo. 1992) specifically determined that estimation of the aggregate pending and future asbestos claims and ERISA withdrawal liability, respectively, was necessary for the debtors to formulate a plan.  As described above, that is not the case here.

[17]     *See In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"), *rev'd on other grounds sub nom. Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999).

confirmed." *See In re Tribune*, 972 F.3d 228, 242-44 (3d Cir. 2020).[18]  While any number of factors may be relevant based on the particular circumstances, the touchstone of the unfair discrimination standard is that the plan proponent must have a rational or legitimate basis for discriminatory treatment of similarly situated classes of creditors that results in a materially lower percentage recovery for the dissenting class.  *See id.* at 241.[19]

36.     As a threshold matter, an unfair discrimination inquiry is premature.  Humana's argument presupposes that the general unsecured creditor class will vote to reject the Plan – an assumption that is entirely speculative as no creditors have yet been asked to vote on the Plan.  Section 1129(b)(1) makes plain that it applies "only to classes of creditors (not the individual creditors that comprise them), and then only to classes that dissent."  *See In re Tribune Co.*, 972 F.3d at 242.  Creditors have not yet been asked to vote on the Debtors' Plan and thus, at this stage of the Chapter 11 Cases, it is uncertain whether the general unsecured creditor class will vote to accept or reject the Plan.  If the general unsecured creditors vote to approve the Plan, Humana will have no standing to object that the Plan unfairly discriminates.

37.     Even if the general unsecured creditor class votes to reject the Plan, the Debtors will be prepared to demonstrate that the Plan does not discriminate unfairly against Humana.  The Debtors' case at confirmation is not dependent on the amount of Humana's Prepetition Claim;

---

[18]     *See also In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) (explaining that "whether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis"); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (finding that determination of unfair discrimination requires court to "consider all aspects of the case and the totality of all the circumstances").

[19]     *See also In re Dow Corning Corp.*, 244 B.R. 696, 701 (Bankr. E.D. Mich. 1999); *In re 710 Long Ridge Rd. Operating Co., II, LLC*, 2014 Bankr. LEXIS 863, *64 (Bankr. D. N.J. Mar. 5, 2014) ("The concept of unfair discrimination is not defined under the Bankruptcy Code.  The hallmarks of the various standards have been whether there is a reasonable basis for the discrimination and whether the debtor can confirm and consummate a plan without the proposed discrimination."); *In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. at 585-86 (considering whether there is a "legally acceptable rationale" for the discrimination); *In re Bryson Props. XVII*, 129 B.R. 440, 445 (M.D.N.C. 1991), *rev'd on other grounds*, 961 F.2d 496, 26 C.B.C.2d 1290 (4th Cir.), *cert. denied*, 506 U.S. 866, 113 S. Ct. 191, 121 L. Ed. 2d 134 (1992) ("Where legal claims are sufficiently different as to justify a difference in treatment under a reorganization plan, reasonable differences in treatment are permissible.").

US-DOCS\123883875.24

even assuming that Humana's Prepetition Claim is allowed in the asserted amount for purposes of assessing unfair discrimination, the Debtors will be able to demonstrate that there is a legitimate basis for the disparate treatment of the general unsecured creditors and the Acthar Government Claimants and unsecured noteholders, respectively.[20]

38.     Moreover, by the Unsubstantiated Claims Objection, the Debtors have initiated a comprehensive process to determine the Debtors against which the Acthar Litigation Claimants may have claims.  If the Court sustains the Unsubstantiated Claims Objection and determines that the Prepetition Claims (if any) are predominately limited to ARD, then estimation for the purpose of assessing unfair discrimination is likewise unnecessary.  In that case, the Acthar Litigation Claimants will be entitled to recovery solely from ARD – an entity which the Debtors are prepared to show at confirmation has relatively minor value – and, therefore, discrimination against the Acthar Litigation Claimants will be fair irrespective of the quantum of the Prepetition Claims.

39.     Accordingly, estimation of Humana's Prepetition Claims is unnecessary to assess unfair discrimination in all events.

### III.     The Disclosure Statement Provides Adequate Information Irrespective of Whether Humana's Claims are Estimated

40.     Humana's assertion that the Disclosure Statement cannot provide "adequate information" without first estimating the Humana Claims is likewise baseless.[21]  Section 1125(b) of the Bankruptcy Code requires a plan proponent to provide holders of impaired claims or equity interests with "adequate information" regarding such plan.  As set forth in the Debtors' Solicitation Motion,[22] it is clear that the Disclosure Statement contains "adequate information" for parties to

---

[20]     The Debtors reserve all rights to oppose estimation and/or allowance of Humana's Prepetition Claims on the merits at the appropriate time.

[21]     Humana did not cite any authority in support of its position.

[22]     The "**Solicitation Motion**" means the *Motion of Debtors for Entry of Order (I) Approving the Disclosure Statement and Form and Manner of Notice of Hearing Thereon, (II) Establishing Solicitation Procedures, (III)*

make an informed decision on the Plan regardless of the exact value of the Humana Claims.

41.     It is common for debtors to include descriptions of contingent, unliquidated, and disputed claims subject to ongoing litigation in their disclosure statement and many courts have indicated that such disclosure is adequate notwithstanding that the outcome of the litigation is uncertain and resolution of the claims could have a material effect on general unsecured creditor recoveries. *See In re MetroCraft Public Servs.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (providing a list of 19 types of information to be included in a disclosure statement, including litigation); *see also In re Ashley River Consulting, LLC*, 2015 Bankr. LEXIS 3819, at * 24–25 (Bankr. S.D.N.Y. Nov. 6, 2015) (referencing the list set forth in *MetroCraft*); *Bank of the Ozarks v. Coastal Realty Inv., Inc. (In re Coastal Realty Inv., Inc.)*, 2013 Bankr. LEXIS 197, at *15 (Bankr. S.D. Ga. Jan. 17, 2013) (same).  Indeed, courts have consistently explained that a plan proponent need not speculate as to the possible outcomes or consequences of such litigation to satisfy Section 1125(b).  *See Cadle Co. II, Inc. v. PC Liquidation Corp. (In re PC Liquidation Corp.)*, 383 B.R. 856, 866 (E.D.N.Y. 2008); *see also In re U.S. Brass Corp.*, 194 B.R. 420, 424 (Bankr. E.D. Tex. 1996) (holding that the plan proponent need not speculate about the value of litigation which involves complex legal and factual issues); *In re CDECO Maritime Const. Inc.*, 101 B.R. 499, 501 (Bankr. N.D. Ohio 1989) (holding that a disclosure statement is not the place to argue various theories of recovery of pending litigation or to speculate as to future uncertainties such as consequences of various possible outcomes of pending litigation).

42.     The Disclosure Statement contains a thorough description of both the public and private Acthar-related litigation, including a specific reference to *Humana Inc.*, and an explanation

---

*Approving the Form and Manner of Notice to Attorneys and Solicitation Directive, (IV) Approving the Form of Ballots, (V) Approving Form, Manner, and Scope of Confirmation Notices, (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement, and Confirmation of Plan, and (VII) Granting Related Relief.*  D.I. 2200.

US-DOCS\123883875.24

of the Debtors' potential exposure on account of certain claims.  *See* Disclosure Statement § III. Further, the Disclosure Statement will include a range of estimated distributions for each class of claims and interests such that voting claimants and interest holders can evaluate the Plan based on, in part, their expected recoveries.  Such estimates will take into account the aggregate claims comprising the general unsecured creditors' class, including the Acthar-related claims of Humana and others.  The information provided is adequate to enable a reasonable creditor to make an informed judgment about the Plan.  This Court has approved disclosure statements as containing "adequate information" under similar circumstances where potentially-significant contingent and unliquidated litigation claims could impact creditors' recoveries.  *See, e.g., In Magnum Hunter Res. Corp.*, Case No. 15-12533 (KG) [D.I. 671] (approving disclosure statement that noted that the ultimate recovery for general unsecured creditors is dependent on resolution of various contingent, unliquidated and disputed litigation claims); *In re Atrium Corp.*, Case No. 10-10150 (BLS) [D.I. 419] (same); *see also In re Maxus Energy Corp.*, Case No. 16-11501 (CSS) (Bankr. D. Del. Apr. 19, 2017) [D.I. 1237] (approving disclosure statement with recoveries dependent on litigation outcomes); *In re American Apparel, Inc.*, Case No. 15-12055 (BLS) (Bankr. D. Del. Nov. 20, 2015) [D.I. 365] (approving disclosure statement with general unsecured creditors anticipated recovery funded from a Litigation Trust); *In re Semcrude, L.P.* Case No. 08-11525 (BLS) (Bankr. D. Del. Jul. 21, 2008) [D.I. 4720] (same).

43.     For these reasons, Humana's assertion that the Debtors' Disclosure Statement cannot provide "adequate information" without estimation of the Humana Claims is without merit and should be disregarded.

## <u>CONCLUSION</u>

44.     For the foregoing reasons, the Debtors respectfully request that the Court deny the

relief requested by the Estimation Motion and the Administrative Expenses Motion.

[*Remainder of page intentionally left blank.*]

US-DOCS\123883875.24

**A-2045**

Dated: May 21, 2021

*/s/ Michael J. Merchant*
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:        collins@rlf.com
              merchant@rlf.com
              steele@rlf.com
              schlauch@rlf.com


- and -

George A. Davis (admitted *pro hac vice*)
Christopher Harris (admitted *pro hac vice*)
George Klidonas (admitted *pro hac vice*)
Andrew Sorkin (admitted *pro hac vice*)
Anupama Yerramalli (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:        george.davis@lw.com
              christopher.harris@lw.com
              george.klidonas@lw.com
              andrew.sorkin@lw.com
              anu.yerramalli@lw.com

- and -

Jeffrey E. Bjork (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:    (213) 485-1234
Facsimile:    (213) 891-8763
Email:        jeff.bjork@lw.com

- and -

Jason B. Gott (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:    (312) 876-7700
Facsimile:    (312) 993-9767
Email:        jason.gott@lw.com

*Counsel to the Debtors and Debtors in Possession*

24

**A-2046**

## EXHIBIT 1

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUMANA INC.,<br>Plaintiff,<br><br>v.<br><br>MALLINCKRODT ARD LLC<br>(f/k/a Mallinckrodt ARD Inc., f/k/a<br>Questcor Pharmaceuticals, Inc.),<br>Defendant. | CV 19-6926 DSF (MRWx)<br><br>Order GRANTING in Part and<br>DENYING in Part Defendant's<br>Motion to Dismiss (Dkt. 65) |

Defendant Mallinckrodt ARD LLC moves to dismiss (a) Counts I, II & III (federal and state antitrust laws) in their entirety, or at least to the extent based on any state's antitrust law except Maine, Vermont, or Wisconsin law; (b) Counts IV & V (RICO), Count VI (unfair competition law), Count VII (state consumer fraud and deceptive trade practices acts), and Count VIII (state insurance fraud statutes) to the extent based on allegations regarding co-pay assistance programs; (c) Count IX (tortious interference with contract) in its entirety; and (d) Count VII (state insurance fraud statutes) to the extent asserted under Kentucky or New Jersey law as alleged in Plaintiff Humana Inc.'s Second Amended Complaint (SAC). Dkt. 65-1 (Mot.). Plaintiff opposes. Dkt. 71 (Opp'n). The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15. For the reasons stated below, the motion is GRANTED in part and DENIED in part.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Defendant produces H.P. Acthar Gel (Acthar), a drug that has been available in the United States since it was approved by the FDA in 1952.  Dkt. 60 (SAC) ¶¶ 2, 44.  Plaintiff operates or administers Medicare Part D plans on behalf of federal and state governments and provides coverage for prescription drugs, including Acthar, through other plans.  Id. ¶ 39.  Acthar is an adrenocorticotropic hormone (ACTH) used as an anti-inflammatory.  Id. ¶ 41.  Acthar is approved to treat exacerbations of multiple sclerosis (MS) as well as other diseases and disorders.  Id. ¶ 45.  However, for many of these conditions, Acthar is not the "first-line treatment."  Id. ¶ 46.  Cheaper, non-ACTH drugs are used to treat the same indications.  Id. ¶¶ 49-50, 60.  Infantile spasms is the only condition for which Acthar is the "first-line treatment."  Id. ¶ 51 n.4.  There is only one other FDA-approved drug for infantile spasms.  Id. ¶ 49 n.3.  Acthar is the only long-acting ACTH drug approved for sale in the United States.  Id. ¶ 61.  Another ACTH drug, Synacthen, is approved for sale outside of the United States.  Id. ¶ 70.  Acthar is not marketed outside of the United States.  Id.

Until 2001, when Defendant's predecessor, Questcor, acquired worldwide rights to sell and manufacture Acthar for $100,000, plus royalties, Acthar was priced more competitively with other anti-inflammatory drugs.  Id. ¶ 47.  At that time, because Acthar was expensive to produce and not the first-line treatment for most conditions, the prior manufacturer considered discontinuing production.  Id.  However, as soon as Questcor acquired the rights to sell Acthar, it increased the price from approximately $40 per vial to nearly $750 per vial.  Id. ¶ 54.  On August 27, 2007, Questcor further increased the price from $1,650 to $23,269 per vial.  Id. ¶ 55.  By 2018, the price had increased to $38,892.  Id. ¶ 56.  Between 2011 and 2015, net sales of Acthar increased from $218 million to more than $1 billion, and Medicare spending on Acthar increased from $50 million to $500 million.  Id. ¶¶ 57-58.  Humana itself paid for almost $800 million worth of Acthar since 2001.  See id. ¶ 86.

A-2049

In 2010, Questcor established an MS Acute Exacerbation Fund (MS Fund) with Chronic Disease Fund, Inc. (CDF), a Texas-based charity.  Id. ¶¶ 29, 97-98, 108.  The MS Fund helped patients with government insurance, such as Medicare, with co-pays for Acthar.  Id. ¶ 98.  Although the donation agreement stated that the donated funds were generally for the treatment of patients with acute exacerbations of MS, in reality it did not provide co-pay assistance to purchase any other drugs.  Id.  In 2011, Questcor established a Lupus Exacerbation Fund (Lupus Fund) that was purportedly to provide co-pay assistance for "any medically appropriate therapy," but in fact was used only to provide assistance for Acthar.  Id. ¶ 100.  In 2012, Questcor created a similar fund for rheumatoid arthritis (RA Fund).  Id. ¶ 101.  Between the time Questcor established the MS Fund in 2010 and 2013, Acthar sales for MS treatment nearly quadrupled.  Id. ¶ 108.

In late 2012 and early 2013, Novartis, the company that manufactured Synacthen abroad, sought bids from companies who wanted to acquire the rights to seek FDA approval and sell Synacthen in the United States.  Id. ¶¶ 73-76.  Questcor and three other companies (who were not disclosed) submitted serious bids.  Id.  The three other companies intended to develop Synacthen to compete with Acthar; Questcor had "inchoate plans for Synacthen and conducted limited due diligence when it submitted its initial offer."  Id. ¶ 76.  However, Questcor's bid was the highest, at a minimum of $135 million.  Id. ¶¶ 77-78.  Neither Questcor nor Defendant "made more than superficial efforts to pursue commercialization of Synacthen . . . to protect Acthar monopoly pricing."  Id. ¶ 81.  In July 2017, the FTC approved a sublicense granting another company the rights to develop and market Synacthen to treat infantile spasms and nephrotic syndrome in the United States.  Id. ¶ 82.

On March 9, 2020, the Court granted Defendant's motion to dismiss the antitrust claims and the tortious interference with contractual relations claim in the First Amended Complaint with leave to amend and denied the motion as to the remaining claims.  Dkt. 57 (March Order).  Defendant again seeks dismissal of the antitrust claims and tortious interference claims in their entirety, as well as

3

A-2050

dismissal of the RICO claims, unfair competition claim, state consumer fraud and deceptive practices claims, and insurance fraud claims to the extent they are based on co-pay assistance programs.  Defendant additionally seeks dismissal of the insurance fraud claims to the extent they are based on Kentucky or New Jersey law and 22 of the 25 state-law antitrust claims as barred by the statute of limitations.

## II.  LEGAL STANDARD

Rule 12(b)(6) allows an attack on the pleadings for failure to state a claim on which relief can be granted.  "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam).  However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Id. (quoting Twombly, 550 U.S. at 557) (alteration in original) (citation omitted).  A complaint must "state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.  This means that the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  There must be "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . and factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

Ruling on a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is

entitled to relief.'"  Iqbal, 556 U.S. at 679 (alteration in original)
(citation omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

As a general rule, leave to amend a complaint that has been
dismissed should be freely granted.  Fed. R. Civ. P. 15(a).  However,
leave to amend may be denied when "the court determines that the
allegation of other facts consistent with the challenged pleading could
not possibly cure the deficiency."  Schreiber Distrib. Co. v. Serv-Well
Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986).

## III. DISCUSSION

### A.   Antitrust Claims (Counts I through III)

Plaintiff alleges that Defendant has monopoly power in the
market for "long-acting ACTH drugs in the United States" and that
Questcor's acquisition of the rights to develop and market Synacthen in
the United States "restrained trade" in the relevant market and
"eliminated [a] potential competitive threat" in order to "maintain its
monopoly" so it can "stabilize or raise the price of Acthar to a higher
level" and "suppress[] the output of long-acting ACTH drugs below the
level of output" that would exist in a competitive market.  SAC ¶¶ 140-
42, 146-48.  This conduct purportedly violates Sections 1 and 2 of the
Sherman Antitrust Act and corresponding state antitrust laws.

"In order to state a Section 1 claim . . . plaintiffs must plead facts
which, if true, will prove '(1) a contract, combination or conspiracy
among two or more persons or distinct business entities; (2) by which
the persons or entities intended to harm or restrain trade or commerce
among the several States, or with foreign nations; (3) which actually
injures competition,'" and "(4) that they were harmed by the
defendant's anti-competitive contract, combination, or conspiracy, and
that this harm flowed from an 'anti-competitive aspect of the practice
under scrutiny.'"  Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1197
(9th Cir. 2012) (first quoting Kendall v. Visa U.S.A., Inc., 518 F.3d
1042, 1046 (9th Cir. 2008); then quoting Atl. Richfield Co. v. USA
Petroleum Co., 495 U.S. 328, 334 (1990)).  Section 2 "targets 'the willful
acquisition or maintenance of [monopoly] power as distinguished from

growth or development as a consequence of a superior product, business acumen, or historic accident.'" Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., 555 U.S. 438, 448 (2009) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570 (1966)). "Simply possessing monopoly power and charging monopoly prices does not violate § 2." Id. at 447-48.

### 1. Market Power

Both Section 1 and Section 2 claims depend on whether Plaintiff has sufficiently alleged Defendant has market power in a relevant antitrust market. Newcal Indus., Inc. v. Ikon Office Sol., 513 F.3d 1038, 1044 n.3 (9th Cir. 2008) ("The 'relevant market' and 'market power' requirements apply identically under the two different sections of the Act, meaning that the requirements apply identically to" both Section 1 and Section 2 claims and plaintiff's "market allegations are either sufficient or insufficient for all [antitrust] claims."). "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." Id. at 1045. One such fatal defect is the failure of the alleged market to "encompass . . . all economic substitutes for the product." Id. The Court previously dismissed Plaintiff's antitrust claims, in part, for failing to allege a facially sustainable product market definition. March Order at 13.

Plaintiff now alleges that the relevant market is the market for "the sale of long-acting ACTH drugs in the United States." SAC ¶¶ 140 (Section 2), 147 (Section 1). Plaintiff further alleges that Defendant's product, Acthar, "represents 100% of th[at] sub-market." Id. ¶ 60. Defendant contends that "the SAC . . . proposes yet another *even narrower* ACTH-only market that continues to exclude economic substitutes for Acthar described in Humana's own complaint." Mot. at 2.[1] This is true in some sense if each allegation is considered in a

---

[1] Although Defendant emphasizes that the proposed market definition is "even narrower" with the exclusion of short-acting ACTH, Defendant does not appear to dispute that short-acting ACTH drugs are reasonably excluded from the relevant market. See Mot. at 6 (addressing why Plaintiff must

vacuum.  In addition to the many paragraphs identified in the March
Order that remain materially unchanged, March Order at 6-7 (citing
FAC ¶¶ 6, 13, 43, 46, 49, 57, 84, 147, 151), Plaintiff's amended
complaint adds allegations that appear to contradict its proposed
market, see, e.g., SAC ¶¶ 49-50 ("prednisone is approved by the FDA to
treat all of the same diseases and disorders as Acthar" and "Acthar has
similar pharmacodynamic effects as corticosteroids"); id. ¶ 49 ("Acthar
has been compared to intravenous methylprednisolone for treatment of
MS relapses and to prednisone for treatment of sarcoidosis").  However,
Plaintiff has also added allegations in support of its claim that there is
a "long-acting ACTH drug[] . . . submarket within a broader market for
adrenal hormone drugs."  Id. ¶ 89.  And within these allegations, the
Court concludes that Plaintiff has adequately alleged a long-acting
ACTH submarket.

        "To plead an antitrust claim based on a submarket, 'the plaintiff
must be able to show (but need not necessarily establish in the
complaint) that the alleged submarket is economically distinct from the
general product market.'"  Hicks v. PGA Tour, Inc., 897 F.3d 1109, 1121
(9th Cir. 2018) (quoting Newcal Indus., Inc. v. Ikon Office Sol., 513 F.3d
1038, 1045 (9th Cir. 2008).  A plaintiff can do so by alleging "industry
or public recognition of the submarket as a separate economic entity,
the product's peculiar characteristics and uses, unique production
facilities, distinct customers, distinct prices, sensitivity to price
changes, and specialized vendors."  Id. (quoting Brown Shoe Co. v.
United States, 370 U.S. 294, 325 (1962)).

---

allege indication-based markets and acknowledging Plaintiff's allegation that
"short-acting ACTH drugs are not included in the relevant market 'because
there is no overlap in the medical conditions that the drugs are approved to
treat or diagnose'" (citing SAC ¶ 52 n.6)); id. at 11-12 ("Only for those
indications for which Synacthen proves effective and safe could it even be
considered a possible potential new entrant, as Humana admits when
excluding from its proposed market definition 'short-acting ACTH drugs.'").

a.    <u>Industry or public recognition of the submarket as a separate economic entity</u>

Plaintiff alleges that "[l]ong-acting ACTH drugs are recognized by Mallinckrodt, medical providers, and the public as differentiated from other adrenal hormone drugs."  SAC ¶ 89.a.; <u>see also</u> <u>id.</u> ¶ 50 ("Acthar . . . appears to be viewed by certain providers or patients as distinct from corticosteroids.").  For example, "the widely-used First Data Bank (FDB) drug database" classifies corticosteroids like prednisone in a separate Therapeutic Class from Acthar and other ACTH drugs.  <u>Id.</u> ¶ 52.  Additionally, Defendant has acknowledged in its public filings that Acthar "has limited direct competition due to the unique nature of the product."  <u>Id.</u> ¶ 61.

On the other hand, Plaintiff alleges that Defendant has "aggressively marketed" "studies . . . that claim to show clinical evidence supporting the superiority of Acthar compared with corticosteroid drugs."  SAC ¶ 51.  However, this seems to support, rather than refute, the idea that Acthar and corticosteroids are in the same market.  <u>See</u> <u>Hicks</u>, 897 F.3d at 1122 ("claims of increased effectiveness" of products in the proposed submarket does not "place" those products "in a distinct market").  And Plaintiff also alleges that the FTC "recognized 'ACTH drugs' as a relevant antitrust market when evaluating [Defendant's] acquisition of Synacthen."  SAC ¶ 89.a.ii.  As the Court noted in the March Order, however, the fact that the FTC required Defendant to grant a license only for the treatment of two specific indications "highlights the flaws in a market definition untethered to drugs that are reasonably interchangeable for a given condition."  March Order at 9 n.3.

Plaintiff's allegations as to this factor cut both ways.

b.    <u>Product's peculiar characteristics and uses</u>

Plaintiff contends ACTH drugs have a "biological mechanism of action [that] is distinct from other drugs in that they stimulate the adrenal gland to produce cortisol" while "Glucocorticoid drugs . . . do not work through the adrenal gland."  SAC ¶ 89.b.i.; <u>see also</u> <u>id.</u> ¶ 51

("Acthar's mechanism of action is slightly different from that of corticosteroids").  Similarly, the only other drug approved to treat infantile spasms, Sabril, "is not a steroid, but is instead in a class of anticonvulsant drugs" that "works by inhibiting the breakdown of a particular neural transmitter."  Id. ¶ 49 n.3.  Defendant contends "the new allegations regarding the nature of corticotropin and its mechanism of action do not negate the fact that for some indications, noncorticotropin treatments remain available."  Mot. at 8.  And as the Court previously held, biological differences alone do not render ACTH drugs a distinct market.  March Order at 7 n.2.  However, the product's "peculiar characteristics," is one of many factors the Court is instructed to consider in determining whether the complaint has alleged a plausible submarket.

Importantly, Plaintiff also alleges ACTH drugs have uses different from other drugs used to treat the same conditions.  For example, "Acthar is supposed to be a last-line treatment alternative that may be tried after corticosteroids have failed in the hope that Acthar, through its slightly different mechanism of action, may be effective where similar drugs have not been."  SAC ¶ 51; see also id. ¶ 89.d.i. (Acthar is supposed to be prescribed only where "those drugs have either failed to treat their conditions or those drugs are contraindicated for that patient."); id. ¶ 89.d.iii ("Humana limits approved use of Acthar (other than for infantile spasms) under its policies to patients who have 'contraindications or intolerance to corticosteroids that are not expected to also occur with' Acthar").  And for infantile spasms, "Sabril may be used in combination with long-acting ACTH drugs, or it may be suitable where long-acting ACTH drugs have been ineffective at controlling infantile spasms or were not well tolerated by the patient."  Id. ¶ 49 n.3.[2]  Defendant does not

---

[2] Defendant contends that "the fact that 'Sabril may be used in combination with long-acting ACTH drugs' (SAC ¶ 49 n.3) creates no fact issue as to whether it is not an alternative but a complementary product, like software is to hardware."  Dkt. 78 (Reply) at 2 n.1 (citing Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 565a (4th ed. 2020)).  Defendant does not

A-2056

address these allegations, focusing solely on the fact that long-acting ACTH drugs are FDA approved to treat the same conditions as other drugs.[3]  But, Plaintiff has adequately alleged that, although ACTH drugs and other drugs can be used the treat the same conditions, they are not interchangeable in that doctors or patients are not choosing between long-acting ACTH drugs and other drugs at any given time. Rather, doctors and patients are only turning to long-acting ACTH drugs when other drugs are not an option.  This supports a long-acting ACTH submarket.

### c.  Unique production facilities

Plaintiff alleges that "Acthar is produced at only one facility in Prince Edward Island, Canada . . . using a complex, biologic process that is difficult to replicate" while "Glucocorticoid drugs are synthesized by manufacturers of chemicals for pharmaceuticals in a variety of facilities throughout the world" that "are not equipped to produce Acthar, nor could they be easily modified in order to do so."  Id. ¶ 89.c. This supports a long-acting ACTH submarket.

### d.  Distinct customers

As discussed above, Plaintiff alleges that "[u]sers of Acthar are distinct from users of other adrenal hormone drugs because" Acthar is only supposed to be prescribed where "those drugs have either failed to treat their conditions or those drugs are contraindicated for that patient."  Id. ¶ 89.d.i.; see also id. ¶ 89.d.iii ("Humana limits approved use of Acthar (other than for infantile spasms) under its policies to patients who have 'contraindications or intolerance to corticosteroids that are not expected to also occur with' Acthar").  Plaintiff further

---

explain why this is so.  Further, at this stage, Plaintiff need not create a fact issue.  All factual allegations are accepted as true.

[3] That Defendant glossed over the import of these new allegations is evident by Defendant's incorrect claim that Plaintiff "attempts to justify the[] exclusion [of other drugs] based *solely* on its allegation that 'the drugs exhibit a very low degree of cross-price elasticity.'"  Reply at 1.

A-2057

alleges that "Acthar is inappropriately prescribed as a result of bribes paid to doctors . . . for patients for whom corticosteroids are an appropriate medical and economic substitute" and "[a]bsent the illegal bribe, Acthar would not be prescribed for these patients." Id. ¶ 89.d.ii. Defendant contends this allegation "confuses the issue more" because Plaintiffs describe Acthar and corticosteroids as "appropriate medical and economic substitute[s]." Mot. at 7. However, the Court understands Plaintiff's allegation to acknowledge that Acthar is considered for the same type of consumers (or the same uses) only where doctors are choosing to prescribe Acthar improperly and illegally. Because the parties do not address it, the Court assumes, without deciding, that where a Defendant's alleged illegal conduct causes products to be treated as substitutes when they otherwise would not be, the products are not treated as substitutes for market definition purposes. Therefore, this supports a long-acting ACTH submarket.

e.    Distinct prices and sensitivity to price changes

Plaintiff alleges that "Acthar's price to Humana in 2019 averaged more than $65,000 per prescription, more than 650,000% of the average prescription price for a glucocorticoid drug ($9.79)," id. ¶ 89.e.i., and "[t]he price of Acthar has increased repeatedly and substantially while the price of other Glucocorticoid drugs has decreased," id. ¶ 89.f.i.; see also id. ¶ 62 (from 2011 to 2019 the price of Acthar increased while the price of Glucocorticoid drugs decreased, but the quantity of Acthar reimbursed by Plaintiff substantially increased, while the quantity of reimbursed Glucocorticoid drugs decreased). If the two drugs were economic substitutes, the increasing price disparity between Acthar and Glucocorticoid drugs would have caused consumers to switch from Acthar to Glucocorticoid drugs, but that was not the case. This was confirmed through Plaintiff's economic analysis of the cross-price elasticity of demand provided in the SAC. Id. ¶¶ 63-64.

11

Defendant challenges Plaintiff's analysis on a number of grounds.[4]  However, these criticisms appear better directed to a challenge at the summary judgment stage based on the parties' expert opinions.  For example, Defendant contends the cross-elasticity number is unhelpful because it aggregates indications and excludes non-glucocorticoid alternatives "making it impossible from the allegations to discern whether a positive cross-elasticity of demand exists between ACTH and non-ACTH drugs when used to treat some conditions while a negative cross-elasticity of demand exists when used to treat others."  Mot. at 9.  Defendant contends the SAC itself "suggest[s] Acthar faces different levels of competition between indications – from glucocorticoids for some indications and from non-glucocorticoid alternatives for others."  Id.  However, beyond infantile spasms, for which glucocorticoids are not FDA approved, the SAC gives no reason to assume that cross-elasticity of demand would be positive for some indications and negative for others.  And Plaintiff does not allege that non-glucocorticoid alternatives exist for indications other than infantile spasms.  See Opp'n at 7 ("Humana believes that no such [non-glucocorticoid alternatives] exist, so it cannot be expected to have identified them itself").

As to infantile spasms, Plaintiff did not perform a cross-elasticity analysis with Sabril.  Defendant contends Plaintiff's "argument that Sabril is irrelevant because the [infantile spasm] market is small, and not because of any low cross elasticity of demand (Opp. 8, n.11), is telling."  Reply at 2 n.1.  However, Defendant points to no requirement that at the motion to dismiss stage, a Plaintiff must perform a statistical econometric analysis of the cross-elasticity of every potential substitute.  Plaintiff has alleged that Sabril's characteristics and uses are materially different; that is sufficient at this stage.

---

[4] Defendant contends the March Order rejected the factual premise that Defendant was able to raise its price without losing sales.  Reply at 1 (citing March Order at 11).  But all the Court held was that none of the allegations in the FAC supported that claim.  Plaintiff has now added such allegations.

A-2059

Defendant also contends that because the analysis begins in 2011, it does not exclude any "continuing loss of sales to corticosteroids resulting from the 2007 price adjustment for Acthar and related formulary restrictions" and it also "ignor[es] myriad factors affecting supply and demand for conditions for which Acthar is not commonly used."  Reply at 2.  Plaintiff need not exclude all potentially relevant or confounding factors in the rough cross-elasticity analysis set forth in its complaint.  Plaintiff's proposed submarket need only be plausible; it need not be proven.

Finally, Defendant contends Plaintiff's analysis is flawed because it relies only on its own data.  Mot. at 9 n.3.  However, Plaintiff covers millions of patients and therefore – particularly at the motion to dismiss stage – its own data can serve as a proxy for the "aggregate demand of consumers."  Id.

Therefore, this factor supports a long-acting ACTH submarket.

      f.   <u>Specialized vendors</u>

Plaintiff alleges "Acthar is distributed only through a limited network of specialty pharmacies . . . , while other adrenal hormone drugs are widely available through tens of thousands of retail and other mainstream pharmacies throughout the country (e.g. CVS, Rite Aid, Walgreens)" because "Acthar requires special handling that retail pharmacies are not well equipped to provide."  SAC ¶ 83.g.i.  This supports a long-acting ACTH submarket

Based on the <u>Brown Shoe</u> factors, the Court concludes Plaintiff has adequately pled a submarket for long-acting ACTH drugs.[5]

**2.    Antitrust Injury**

Plaintiff alleges it was harmed by Defendant's unlawful conduct because it otherwise "would have paid for fewer Acthar prescriptions and it would have paid less for those prescriptions" because "increased

---

[5] The Court therefore need not, and does not, address Plaintiff's additional allegations in support of direct proof of market power.

competition [from Synacthen] in the market for long-acting ACTH drugs" would have resulted in "lower prices for Acthar" or more prescriptions for the "lower priced Synacthen."  SAC ¶ 137.  Defendant contends this presumption depends on a speculative chain of events that if Defendant had not purchased the Synacthen rights, another company "would have secured FDA approval . . . , entered the relevant antitrust market, and gained acceptance among doctors, thereby causing a reduction in the prices that [Plaintiff] paid for Acthar."  Mot. at 10.

Plaintiff argues the allegations in the SAC "are beyond sufficient to make it *plausible* that Synacthen would have been sold in the United States but for Mallinckrodt's conduct."  Opp'n at 9-10.  Specifically, Plaintiff has alleged that Synacthen has been used safely and effectively outside the United States and therefore "a buyer would not need to begin the research, development, testing, or manufacturing process from scratch," SAC ¶ 70, 75, that Defendant used Synacthen studies to obtain FDA approval for Acthar, id. ¶ 71, that the FDA has approved a short-acting formulation of Synacthen, id. ¶ 75 n.7, and that there were three other bidders seeking the rights to pursue FDA approval for Synacthen and commercialize it in the United States that had the necessary expertise and financing, as well as sufficient business and regulatory plans, to do so, id. ¶¶ 73-74.  The Court agrees this is more than sufficient.  See Bubar v. Ampco Foods, Inc., 752 F.2d 445, 452 (9th Cir. 1985) (courts consider "[t]he background and experience of [the potential entrant] in his prospective business," "[a]ffirmative action on the part of [a potential entrant] to engage in the proposed business," "ability of [a potential entrant] to finance the business and the purchase of equipment and facilities necessary to engage in the business," and "consummation of contracts" by a potential entrant).

Defendant raises a number of reasons why it believes these allegations are insufficient, none of which the Court finds persuasive.  First, Defendant contends that "[c]ourts addressing this issue have required a plaintiff to plead facts establishing the probability and timing of FDA approval for an unapproved drug to be considered a

potential competitor."  Mot. at 12 (citing Andrx Pharm., Inc. v. Biovail Corp. Int'l, 256 F.3d 799, 807-08, 815 (D.C. Cir. 2001) and Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc., No. CIV.A.03-232, 2004 WL 1427136, at *6 (E.D. Pa. June 21, 2004)).  This presumably stems from the requirement that to establish causation in a competitor exclusion case, the plaintiff must allege that the potential competitor has an "intent to enter the market and a preparedness to do so."  See Bubar, 752 F.2d at 450.[6]  Under Defendant's view, the probability and timing of FDA approval are necessary to make plausible allegations that a competitor is prepared to enter the market.  However, particularly where the plaintiff is a consumer rather than a competitor, and where, as here, the defendant is currently in possession of the "asset package," it would be too exacting a burden to require a plaintiff to allege exactly how long it would take for some other company to get FDA approval.  Plaintiff's allegations make it sufficiently plausible that, but for Defendant's purchase of the Synacthen rights, Synacthen would have been approved by the FDA for use in the United States for at least one of the same indications as Acthar.  That in Brotech the plaintiff had failed to allege when FDA approval "may be anticipated," 2004 WL 1427136, at *6, and in Tawfilis v. Allergan, Inc., 157 F. Supp. 3d 853

---

[6] Plaintiff asserts the cases cited by Defendant address antitrust cases brought by competitors and not consumers, for which there are different burdens.  Opp'n at 10-11.  However, the circuit courts to have considered the issue have concluded that both consumers and competitors must satisfy the intent and preparedness test.  See, e.g., Meijer, Inc. v. Biovail Corp., 533 F.3d 857, 862 (D.C. Cir. 2008) ("Just as a would-be entrant suing an incumbent firm for excluding it from a relevant market in violation of the Sherman Act must demonstrate it intended and was prepared to enter that market, . . . so a would-be purchaser suing an incumbent monopolist for excluding a potential competitor from which it might have bought a product at a lower price must prove the excluded firm was willing and able to supply it but for the incumbent firm's exclusionary conduct" (internal citations omitted)); Sunbeam Television Corp. v. Nielsen Media Research, Inc., 711 F.3d 1264, 1273 (11th Cir. 2013) (following Meijer and rejecting position that "proof of a 'willing and able' competitor 'standing in the wings, ready to swoop in' should only apply to competitor plaintiffs, not customer plaintiffs.").

A-2062

(C.D. Cal. 2015), the plaintiff had alleged that approval "could have" occurred within two years, id. at 857, does not impose a requirement on all plaintiffs to allege the number of years in which approval is likely to occur.  In each of those cases, the court considered the totality of the allegations and concluded that antitrust injury either was or was not plausible.  Most of the other cases cited by Defendant were decided at the summary judgment stage and are therefore inapplicable here.

Next, Defendant contends that although it has been three years since it was required to sublicense the rights to Synacthen for infantile spasms and nephrotic syndrome to another company, id. ¶ 82, the complaint contains no allegations that Synacthen has obtained FDA approval, or even that the sublicensee has made progress in obtaining FDA approval.  Mot. at 13.  According to Defendant, this makes it implausible that Synacthen would have been approved by the FDA if another bidder had purchased it in 2013.  However, a potential entrant that has the rights to develop and sell Synacthen for only two indications is not similarly situated to a potential entrant that can develop and sell Synacthen for any indication.  This is particularly true here where Plaintiff has alleged that the indications for which Defendant retained rights are the cash cows.  See, e.g., SAC ¶ 114 ("[F]ewer than 10% of Acthar's sales come from prescriptions for infantile spasms, and more than 98% of Humana's expenditures for Acthar were made for insureds over the age of 18").  Therefore, this does not make Plaintiff's allegations implausible.

Defendant also contends that because Synacthen is a synthetic drug, it "cannot be presumed to have identical effects on the human body" and therefore would be approved by the FDA for the same 19 indications.  Mot. at 11; see also id. at 13 ("Humana makes no specific allegations regarding Synacthen's use and effectiveness as to any particular Acthar indication, let alone its relative safety and effectiveness versus Acthar as to such indications").  However, that Defendant used Synacthen studies when it applied for FDA approval and that Synacthen is used for the same indications outside of the United States makes it plausible that Synacthen would be approved for those indications in the United States.  Therefore, the Court need not

16

simply "guess as to whether . . . Synacthen is a plausible replacement for Acthar as the standard of care for [infantile spasms] in the United States, and whether, for other indications, it would be one of several alternatives for 'first line' treatment or an alternative to Acthar as a 'last line' treatment."  Reply at 5.  Moreover, the Court agrees with Plaintiff that it "has suffered antitrust injury if it is plausible that a finder of fact could conclude that Synacthen would have been approved for any use, as the introduction of competition would lower the price of all ACTH drugs."  Opp'n at 10 n.12.  There are no allegations that the price of Acthar differs depending on the indication.  Therefore, competition for less than all 19 indications could plausibly lower the price for all indications.

Finally, Defendant argues that Plaintiff has not plausibly alleged that the beginning of the alleged antitrust period should be 2011.  See Mot. at 13.  The bidding process for the rights to sell Synacthen in the United States did not begin until late 2012 and early 2013, and Defendant did not win the rights until June 11, 2013.  SAC ¶¶ 76-77.  Plaintiff fails to explain how any harm caused by Defendant's alleged anticompetitive behavior could have occurred prior to Defendant acquiring the Synacthen license.  However, the date another bidder could have or would have brought Synacthen to market is a factual question not best resolved at the motion to dismiss stage.  Moreover, discovery might reveal that, had it not won the bid, Defendant would have started lowering its prices prior to Synacthen's market entrance in anticipation of future competition.

The Court concludes Plaintiff has adequately alleged an antitrust injury.

### 3.    Statute of Limitations

Defendant contends that 22 of the 25 state laws relevant to Plaintiff's state antitrust claims are barred by the statute of limitations because "[a] cause of action for an allegedly anticompetitive acquisition of assets accrues on the date of the acquisition," which in this case was June 11, 2013, and that statute of limitations for those 22 states is four

17

years or less.  Mot. at 14.[7]  Plaintiff contends its claims were tolled due to fraudulent concealment, the continuing violation doctrine, and American Pipe tolling.  Opp'n at 14-19.

a.    Fraudulent Concealment

Plaintiff alleges it "could not have discovered and remained unaware" of Defendant's illegal conduct until the FTC brought these actions to light in 2017 because Defendant "falsely maintained that it would develop and seek FDA approval of Synacthen."  SAC ¶¶ 131-132. For example, Defendant's chief scientific officer made public statements that Defendant intended to seek FDA approval for Synacthen in conditions different than Acthar and where Synacthen would "potentially provide a clinical benefit over Acthar."  Dkt. 70-2 (RJN Ex. B) (June 2013 Press Release).[8]  However, Plaintiff's Section 2 claim explicitly alleges that Defendant's purchase of the license itself, not its failure to commercialize the drug, is the anticompetitive behavior.  See SAC ¶ 141 (Section 2 claim alleges that "[b]y intervening in the bidding process for Synacthen and purchasing the exclusive license to market Synacthen in the United States, Mallinckrodt eliminated the potential competitive threat posed by an independently owned Synacthen license").  In other words, as alleged, the "potential competitive threat" was an "independently owned Synacthen license."  Plaintiff should have been aware that there would be no independently owned

---

[7] Plaintiff agrees that these 22 states have limitations periods of four or fewer years for antitrust claims, but contends that for two of those states, New York and Oregon, the antitrust claim was statutorily tolled "for one year after the conclusion of any proceeding instituted by the United States under federal antitrust laws."  Opp'n at 19.  Defendant appears to concede that these are not time-barred.  See Reply at 6 n.3.  Therefore, the parties agree that 20 of 25 states relevant to Plaintiff's state antitrust claim are subject to a statute of limitations defense.

[8] The Court grants Plaintiff's unopposed request for judicial notice (Dkt. 70) of a press release issued by Defendant in June 2013.  Fed. R. Evid. 201(b).

18

Synacthen license at the time Defendant publicly announced it would be obtaining the license.

Plaintiff's other allegations provide further support for this conclusion.  For example, Plaintiff alleged that "given the drugs' similarities, any therapeutic indication that [Defendant] might have pursued with Synacthen could have been pursued with Acthar."  Id. ¶ 79.  Plaintiff also alleged that "Novartis was not naïve, and could be expected to understand that Questcor would have little interest in developing the only synthetic competitor to Acthar, its extraordina[r]ily lucrative non-synthetic product."  Id. ¶ 78.  Plaintiff does not explain why it could not have been expected to understand the same thing.  Accepting as true the allegation that Defendant falsely stated that it would obtain FDA approval of Synacthen for certain treatments, there are no allegations in the complaint that would support the necessary assumption that had Defendant developed, obtained FDA approval for, and sold Synacthen in the United States, Plaintiff could have reasonably expected to have either paid lower prices for Acthar or that Synacthen would have been offered by Defendant at a materially lower price.  Given that Defendant would still control 100% of the alleged product market, whether through one drug or two, the Court cannot plausibly draw the inference that Plaintiff was reasonable in assuming Defendant would have acted to its financial detriment and lowered the price of Acthar or introduced Synacthen at a substantially lower price.  See Iqbal, 556 U.S. at 679 (Courts must "draw on their judicial experience and common sense" in determining whether allegations in a complaint are plausible).  Fraudulent concealment, therefore, does not save Plaintiff's otherwise time-barred claims.[9]

---

[9] Plaintiff's footnote implicitly arguing that the Court should find fraudulent concealment here because of the Court's conclusion as to Plaintiff's RICO claim, Opp'n at 15 n.20 (citing March Order at 25), is misplaced.  The facts necessary to put Plaintiff on inquiry notice of the RICO claims differs materially from the types of facts that would put Plaintiff on inquiry notice of the antitrust claims.

b.   <u>Continuing Violation</u>

Plaintiff also contends that Defendant's actions constitute a continuing violation because "its yearly licensing payments to Novartis have forestalled and continue to forestall the transfer of Synacthen rights to a party that would develop it to compete with Acthar."  Mot. at 18.[10]  Specifically, Defendant pays Novartis $25 million each year to maintain its monopoly in the long-acting ACTH market and Plaintiff contends that "[e]ach payment is anticompetitive in that it forestalls Novartis from licensing its drug to others and enables Mallinckrodt to charge monopoly prices."  Id.  Essentially, each payment is a new contract preventing Synacthen from being developed to compete with Acthar.  The Court agrees.

"To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act during the limitations period that meets two criteria: '1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff.'"  <u>Samsung Elecs. Co. v. Panasonic Corp.</u>, 747 F.3d 1199, 1202 (9th Cir. 2014) (quoting <u>Pace Indus., Inc. v. Three Phoenix Co.</u>, 813 F.2d 234, 238 (9th Cir. 1987)).  Cases where "all of the harm occurred at the time of the initial violation . . . is the exception, not the rule.  <u>Id.</u> at 1202-03.  Instead, "[n]on-legal actions taken pursuant to a pre-limitations period contract can lead a new cause of action to accrue." <u>Id.</u> at 1203.

Defendant first contends the continuing violation theory does not apply because "[u]nilateral decisions about whether to develop a new product . . . are *not* subject to antitrust scrutiny."  Reply at 6.  However, Plaintiff is not claiming anticompetitive conduct simply because Defendant chose not to develop an Acthar competitor.  The anticompetitive conduct stems from Defendant's decision to prevent

---

[10] The Court grants Plaintiff's unopposed request for judicial notice (Dkt. 70) of Defendant's SEC filings and the license agreement with Novartis (Dkts. 70-1, 70-3 through 70-8).  Fed. R. Evid. 201(b).

others from developing an Acthar competitor by continuing to pay Novartis for the Synacthen license.  Therefore, the Court finds this argument unconvincing.

Next, Defendant contends the continuing violation theory does not apply because "the license agreement [does not] contain[] a provision requiring [Defendant] to 'shelve' Synacthen."  Reply at 7. However, Defendant cites no case law imposing a requirement for the agreement to explicitly compel the anticompetitive conduct.  Moreover, the license agreement itself explicitly prevents companies other than Defendant from developing Synacthen for sale in the United States, thereby proscribing any independently owned Synacthen license, the anticompetitive conduct at issue here.  And "action taken under a pre-limitations contract [i]s sufficient to restart the statute of limitations so long as the defendant had the ability not to take the challenged action, even if that would have required breaching the allegedly anti-competitive contract."  Samsung, 747 F.3d at 1203.

Finally, Defendant contends recent cases have held that the continuing violation theory does not apply to antitrust allegations based on price increases after an acquisition.  Reply at 7-8 (citing Midwestern Mach., Inc. v. Nw. Airlines, Inc., 167 F.3d 439, 440 (8th Cir. 1999) and Z Techs. Corp. v. Lubrizol Corp., 753 F.3d 594, 603 (6th Cir. 2014)).  These cases are factually distinct from the alleged antitrust violations at issue here, which involve more than an incidental price increase ultimately caused by an acquisition.  Here, the antitrust conduct is the continuing payments to Novartis to prevent another company from developing an Acthar competitor.  A similar arrangement was found to be a continuing violation by the Ninth Circuit in Samsung.  747 F.3d at 1204 (because "the license itself did not permanently and finally control the acts of the SD Defendants[,] [t]heir decision to enforce the contract caused a new anti-competitive harm, and the statute of limitations ran anew from the time that defendants began enforcement.").  To the extent the cases cited by Defendant contradict Ninth Circuit law as set forth in Samsung, the Court disregards them.

21

Therefore, the statute of limitations does not bar Plaintiff from asserting claims based on harms flowing from the alleged anticompetitive license payments made to Novartis during the limitations period.

    c.    <u>American Pipe Tolling</u>

Plaintiff contends it is also "entitled to tolling of its claims under *American Pipe* as of [April and October of 2017 when class actions were filed against Defendant], because in those cases [Plaintiff] is a putative member of the classes and its antitrust claims share a common factual and legal basis with the claims asserted." Opp'n at 15 n.21. Defendant notes that only the April 2017 lawsuit would fall within the statute of limitations, but Plaintiff was not included in the proposed class until an amended complaint was filed in December 2017, after the expiration of the four-year limitations period. <u>See</u> Reply at 8. Therefore, <u>American Pipe</u> does not save Plaintiff's state law claims to the extent based on the 2013 license agreement.[11]

***

Defendant's motion to dismiss the First and Second Counts is DENIED. Defendant's motion to dismiss the Third Count is DENIED as to claims brought under New York, Oregon, Maine, Vermont, and Wisconsin law. As to the remaining state law antitrust claims, Defendant's motion is GRANTED to the extent Plaintiff seeks to challenge the 2013 license agreement (and any other conduct outside of the relevant limitations period), but DENIED as to Defendant's alleged continuing antitrust violations within the limitations period.

---

[11] It does not appear that Defendant disputes that the complaints filed on October 30, 2017 and December 8, 2017 would toll the statute of limitations for claims based on conduct that occurred within four years of those dates.

## B.    RICO (Counts IV and V)

The Court previously held that Plaintiff had adequately alleged RICO claims based on an alleged "Acthar Enterprise," consisting of Defendant, CDF, and the prescribing doctors, that participated in a pattern of racketeering activity including 1) mail and wire fraud based on Defendant's and prescribing doctors' misrepresentations that they were complying with state and federal law, when in fact a) the co-pay assistance programs violated the Anti-Kickback Statute (AKS) and the False Claims Act (FCA), and b) the doctor payments violated state bribery laws and 2) bribery based on the doctor payments.  March Order 13-34.[12]  In so deciding, the Court rejected Defendant's contention that any racketeering acts related to the co-pay assistance funds occurred outside the four-year statute of limitations.  Id. at 23-25.

Defendant now contends that the Court's "reasoning [on the statute of limitations issue] invites consideration of judicially noticeable facts establishing that the claim is time-barred."  Mot. at 3.[13]  Defendant identifies a 2013 New York Times article that purportedly establishes that Humana "would have been on notice of its alleged claim" more than four-years before it filed this action.  Id. at 4; see also id. at 18 ("the alleged conduct has been public knowledge since 2013"), id. at 19 ("major news media reported – as early as 2013 – about Questcor's alleged contributions to the CDF funds at issue and their purported Acthar-only nature").  However, Defendant does not explain

---

[12] The Court also held that Plaintiff had not adequately alleged any racketeering activity based on alleged insured misrepresentations or the theory that co-pay assistance was bribery.  March Order at 26-28.  The Court invited Plaintiff to amend those claims to the extent it wished to continue pursuing them.  Id. at 35 n.21.  Because Plaintiff chose not to amend those claims, it has abandoned them.  For the sake of clarity,  the Fourth and Fifth Counts, to the extent they rely on either of these theories, are DISMISSED.

[13] Defendant concedes it is not entitled to dismissal based on the allegations in the SAC alone.  See Mot. at 19 (Defendant "agrees that [Plaintiff] had not pled admissions on the critical issue of what it knew about the CDF funds at the time").

23

how the Court's reasoning in the March Order warrants reconsideration of the statute of limitations issue.  The Central District of California permits only three grounds on which a motion for reconsideration may be made:

> (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision.

Local Rule 7-18.  The new article is at best a material difference in fact, but Defendant makes no argument that it could not have discovered the article in the exercise of reasonable diligence prior to the March Order.  Therefore, the Court declines to reconsider its prior determination that Plaintiff had adequately alleged it discovered Defendant's wrongdoing within the limitations period.

Further, as Plaintiff points out, even if the Court were to consider the article, it would not change the outcome.  One or two articles are insufficient to show, as a matter of law, that Plaintiff had constructive notice of the facts contained within them.[14]  Additionally, the Court previously concluded that because Plaintiff alleged that the donation agreements fraudulently misrepresented that the funds were not limited to patients using Acthar, had Plaintiff inquired into the funds,

---

[14] Defendant contends that its argument is not that the articles themselves should have put Plaintiff on notice, but that the OIG's 2014 SAB, which purportedly singled out the emergence of single-drug funds, should have caused Plaintiff to run some Google searches to see if there were any articles about drugs covered by Plaintiff.  Reply at 11.  Whether Plaintiff's investigation (or lack thereof) in response to the 2014 SAB was reasonable is a factual issue not best resolved at the motion to dismiss stage.

24

it would not have discovered that the funds were illegal.  March Order
at 24-25.

Defendant's motion to dismiss Counts Four and Five to the
extent based on allegations regarding co-pay assistance programs is
DENIED.

## C.    State Law Claims (Counts VI through X)

### 1.    Statute of Limitations

Defendant contends that 21 of the 25 states' laws under which
Plaintiff brings its unfair competition and consumer fraud and
deceptive trade practices claims, as well as four of the five states' laws
under which Plaintiff brought an insurance fraud claim are also barred
by the relevant statutes of limitations to the extent they are based on
the co-pay assistance funds.  Mot. at 20.  The Court declines to dismiss
those claims for the same reason stated in section III.B. and for the
additional reason that Defendant did not raise this contention in its
prior motion and therefore is prohibited from doing so here under Rule
12(g)(2).  See In re Apple iPhone Antitrust Litig., 846 F.3d 313, 317-318
(9th Cir. 2017), aff'd sub nom. Apple Inc. v. Pepper, 139 S. Ct. 1514
(2019) ("a defendant who fails to assert a failure-to-state-a-claim
defense in a pre-answer Rule 12 motion cannot assert that defense in a
later pre-answer motion under Rule 12(b)(6)").

### 2.    Individual Defenses to State Laws

Defendant next contends Plaintiff's claims under Kentucky and
New Jersey insurance fraud statutes also fail because the Kentucky
statute requires a criminal adjudication of guilt and the New Jersey
statute requires "prelitigation notice . . . with which [Plaintiff] has not
alleged compliance."  Mot. at 15 n.8.  Not only does Rule 12(g)(2)
prevent Defendant from making these arguments in a successive pre-
answer motion to dismiss, but it is also legally incorrect.  As Plaintiff
notes, the Kentucky legislature repealed the requirement of criminal
adjudication.  See 2018 Kentucky Laws Ch. 178 (HB 323) (removing
requirement of a "criminal adjudication of guilt" for a private party to

state a claim for damages).  And as to the New Jersey statute, prelitigation notice is not required.  See N.J. Stat. § 17:33A-7(c) (notice to be provided at the time of filing).  In reply, Defendant appears to concede that Plaintiff can assert its claim under New Jersey law.  Reply at 12 ("Mallinckrodt requests that the Court dismiss with prejudice . . . all other claims (except that under New Jersey's Insurance Fraud Statute)").

Defendant attaches to its brief "Appendix B," a chart of legal defenses to Plaintiff's unfair competition and consumer fraud and deceptive trade practices claims.  See Mot. at 23-25.  That chart includes the following arguments:

- Michigan's statutes do not apply to regulated activities, such as the provision of prescription drugs to Medicare beneficiaries, or alleged misrepresentations not made to customers

- Minnesota's statutes require claims to satisfy the public benefit requirement and therefore do not apply to claims for recovery of private damages

- New Jersey's statutes do not permit claims brought by third-party payors, rather than drug consumers

- North Dakota's statutes do not apply to statements made in connection with coverage, rather than in connection with the sale or advertisement of a drug

Although technically within the 25-page limit, Appendix B skirts the purpose of the page limitation by including additional argument in size 11 font, single-spaced.  Moreover, the arguments were not raised in the prior motion and are therefore improper under Rule 12(g)(2).  The Court will not consider these additional defenses at this time.

### 3.    Tortious Interference

The Court previously dismissed Plaintiff's tortious interference claim because Plaintiff had failed to allege that accepting co-pay

assistance caused its members to breach their contract with Plaintiff. March Order at 34. Plaintiff has added allegations that its contracts with its members "provide[] that an insured is 'responsible for' copayments and 'must pay [their] share of the cost when [they] get [a] service or drug.'" SAC ¶ 202. The contract also states that "when you get a drug through a patient assistance program offered by a drug manufacturer . . . we will not pay for any share of these drug costs." Id. Plaintiff contends that "[i]f the [patient assistance program] uses its funds to pay the member's co-pay, however, then both the letter and the purpose of the [contract] provision are subverted." Id. ¶ 203.

But nothing in the cited provisions can reasonably be read as preventing members from paying their co-pays with money obtained from a co-pay assistance fund. The first provision, as discussed in the March Order, merely requires members to pay their co-pays. It sets no limitations on the source of the funds. The second provision, when read in context, does not prohibit members from doing anything it all. It is only a reminder that if members obtain drugs outside of their plan benefits directly from the drug manufacturer through a patient assistance program, Plaintiff will not reimburse members for any payments made to the patient assistance programs. Here, in contrast, the members do obtain the drugs through their insurance, and simply obtain the funds to pay the co-pays through a co-pay assistance fund. That is not prohibited by the contracts. The contract does not say that if a co-pay assistance fund covers the co-pay, Plaintiff was entitled to deny coverage in the first place, when it otherwise would have provided coverage. Moreover, there is simply nothing in the cited provision that requires members to "identif[y]" whether co-pay assistance "originat[ed] with the manufacturer." Id. Therefore, it does not follow that "it is a breach for the member to use that assistance to procure payment for the manufacturer's drug." Id.; see also id. ("Mallinckrodt is causing Humana members to procure a benefit under the contract to

27

which the members are not entitled under the contract's plain terms.")[15]

Therefore, Plaintiff has still not alleged that its members breached their contracts, and the Court determines that Plaintiff cannot plead any other facts that would cure this deficiency. See Schreiber, 806 F.2d at 1401 (leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency"). Count IX is DISMISSED with prejudice.

## IV. CONCLUSION

Count III, to the extent it relies on laws from states other than New York, Oregon, Maine, Vermont, and Wisconsin and relies on the 2013 license agreement, Counts IV and V, to the extent they rely on purported racketeering activity based on alleged insured

---

[15] In half a sentence Plaintiff contends that members' acceptance of co-pay assistance is alternatively "'disruption' of the contractual relationship." Opp'n at 21 (citing Redfearn v. Trader Joe's Co., 230 Cal. Rptr. 3d 98, 104 (2018)). This is insufficient to preserve this argument. See Birdsong v. Apple, Inc., 590 F.3d 955, 959 (9th Cir. 2009) ("[A] bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review."); see also Indep. Towers of Washington v. Washington, 350 F.3d 925, 929-30 (9th Cir. 2003) ("However much we may importune lawyers to be brief and to get to the point, we have never suggested that they skip the substance of their argument in order to do so. . . . We require contentions to be accompanied by reasons."); Mahaffey v. Ramos, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived").

A-2075

misrepresentations or the theory that co-pay assistance was bribery, and Count IX are DISMISSED with prejudice.  Defendant's motion is otherwise DENIED.

     IT IS SO ORDERED.

Date: August 14, 2020

                                    Dale S. Fischer
                                    United States District Judge

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
|  | ) |
| Debtors.[1] | ) (Jointly Administered) |
|  | ) |
|  | ) **Obj. Deadline: June 1, 2021 at 4:00 p.m. (ET)** |
|  | ) **Hearing Date:  June 2, 2021 at 3:00 p.m. (ET)** |
|  | ) |
|  | ) |

**DEBTORS' MOTION TO QUASH (A) ATTESTOR LIMITED AND HUMANA INC.'S
NOTICE OF DEPOSITION OF DEBTORS PURSUANT TO FED. R. CIV. P. 30(b)(6)
AND FED. R. BANKR. P. 7030; (B) ACTHAR PLAINTIFFS' NOTICE OF
DEPOSITION *DUCES TECUM* OF CORPORATE DESIGNEE(S) OF DEBTORS;
AND (C) ACTHAR PLAINTIFFS' NOTICE OF DEPOSITION
OF KATHLEEN BRETON**

Pursuant to Rules 7026, 7030, and 9014(c) of the Federal Rules of Bankruptcy Procedure

(the "***Bankruptcy Rules***") and Rules 7026-1 and 7030-1 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local***

***Rules***"), Mallinckrodt plc and its affiliated debtors and debtors in possession (collectively, the

"***Debtors***") hereby move (the "***Motion to Quash***") (i) to quash in its entirety *Acthar Plaintiffs'*

*Notice of Deposition of Kathleen Breton* (the "***Breton Notice***"[2]), and (ii) to quash in part (a)

*Attestor Limited and Humana Inc.'s Notice of Deposition Pursuant to Fed. R. Civ. P. 30(b)(6) and*

*Fed. R. Bankr. P. 7030* (the "***Humana Unsubstantiated Claims 30(b)(6) Notice***"[3]) and (b) *Acthar*

*Plaintiffs' Notice of Deposition Duces Tecum of Corporate Designee(s) of Debtors* (the "***Haviland***

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2] The Breton Notice is attached as **Exhibit D** hereto.

[3] The Humana Unsubstantiated Claims 30(b)(6) Notice is attached as **Exhibit E** hereto.

*Hughes Plainttiffs Unsubstantiated Claims 30(b)(6) Notice*,"[4] and together with the Humana Unsubstantiated Claims 30(b)(6) Notice, the "*Unsubstantiated Claims 30(b)(6) Notices*").

In support of this Motion to Quash, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors file this Motion to Quash to prohibit certain discovery served in respect of the Debtors' claims objections, together with a second motion to quash certain discovery requests served in respect of the Debtors' disclosure statement,[5] in order to place reasonable limits on the nearly 200 deposition topics and requests for production served upon the Debtors in recent weeks.

2.      The Debtors have endeavored and will continue to endeavor in good faith to respond timely to all reasonable discovery requests made by all parties in interest in these cases. Nevertheless, in response to this Motion to Quash, the Debtors expect to hear the same refrain the Haviland Hughes Plaintiffs (defined below) make at almost every hearing, whether discovery-related or not:  The Debtors have stonewalled the Haviland Hughes Plaintiffs, who have never received any discovery.  The Debtors do not know whether the Haviland Hughes Plaintiffs actually believe this, or merely hope to convince the Court through repetition, but it is simply untrue.

3.      Before the Debtors filed the current Acthar Issues Pleadings (defined below), the Haviland Hughes Plaintiffs had already received extensive discovery, including numerous depositions and thousands of pages of documents in connection with the two separate hearings

---

[4] The Haviland Hughes Plainttiffs Unsubstantiated Claims 30(b)(6) Notice is attached as **Exhibit F** hereto.

[5] *See Debtors' Motion to Quash and for a Protective Order in Connection with the Acthar Plaintiffs' Notice of Deposition Duces Tecum of Corporate Designee(s) of Debtors Regarding the Acthar Plaintiffs' Preliminary Objections to Debtors' Disclosure Statement,* filed simultaneously herewith.

2

seeking entry of injunctive orders staying aspects of the Haviland Hughes Plaintiffs' prepetition litigations, and their numerous objections to the retention of the Debtors' professionals.

4.      In addition to this extensive prior production, the Haviland Hughes Plaintiffs also received extensive discovery recently. They have received over 200,000 new emails and attachments that the Debtors produced to both Committees in connection with Rule 2004 discovery. The Debtors are reviewing and will be producing hundreds of thousands of more emails to the Committees, which will be provided to the Haviland Hughes Plaintiffs as well. In addition to emails from dozens of custodians, the Committee productions also include all non-privileged board materials from Mallinckrodt plc dating back to the spinoff in 2013, as well as all non-privileged executive committee presentations. The Haviland Hughes Plaintiffs are thus benefitting from the very broad and wide-ranging discovery provided to the Committees.

5.      Moreover, in connection with the Debtors' omnibus unsubstantiated claims objection, last week the Debtors produced to the Haviland Hughes Plaintiffs dozens of corporate entity organizational charts, Acthar management-team charts, intercompany agreements that relate to Acthar, and a document that summarizes the legal entities composing the Debtors. And in connection with the Debtors' objection to the Acthar plaintiffs' class proof of claim, the Debtors produced approximately one hundred emails relating to an agreement with certain third party payors regarding the filing of the proofs of claims, data on the non-Class 6 general unsecured claims (the class in which the Acthar Claimants' claims fall), and the service list for the bar date notice for all known third party payors for Acthar. The Debtors are also agreeing to produce a 30(b)(6) witness for both of these matters. In short, in the bankruptcy the Haviland Hughes Plaintiffs have already received more discovery than any other party in the case. And before the

3

bankruptcy, the Haviland Hughes Plaintiffs had already received over a terabyte of data – well over a million documents – in the underlying Rockford case.[6]

6.      The fact that the Haviland Hughes Plaintiffs have repeatedly made excessively broad discovery demands, untethered to the actual contested matters then before the Court, does not mean they have been deprived of due process – or that their next excessive discovery demands should be allowed.

7.      That is again the situation with the deposition requests that are the subject of this Motion to Quash.  As set forth in detail below, the challenged deposition requests are part of an extremely broad and unfocused series of requests made by the Haviland Hughes Plaintiffs in recent weeks, and they should be quashed to the limited extent requested herein.  Doing so will help place some reasonable limit on the discovery demands made upon the Debtors while not depriving the Haviland Hughes Plaintiffs of the substantial discovery they have received and will continue to receive in these contested matters and otherwise.

8.      This Motion to Quash also requests limits upon certain deposition topics requested by Humana (as defined below) in respect of the omnibus objection to unsubstantiated claims. Those topics are irrelevant to the claims objection for the same reason as the topics noticed by the Haviland Hughes Plaintiffs, and they should likewise be quashed.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the

---

[6] The Rockford production includes the entirety of the document productions and transcripts of investigative hearings from the Federal Trade Commission's investigation concerning the acquisition of rights to Synacthen, and the entirety of the document production in the related *Retrophin v. Questcor Pharmaceuticals, Inc.*, 14 CV 26 (C.D. Cal. 2014) action, as well as documents from the files of 74 custodians using 67 search terms to identify documents responsive to contract-related document requests and 128 search terms to identify documents responsive to other requests.

4

District of Delaware dated as of February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Pursuant to Local Rule 9013-1(f), the Debtors consent to entry of a final order by this Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

10.     Venue of these proceedings and the Motion to Quash in this Court is proper under 28 U.S.C. § 1408 and § 1409.  The statutory and legal predicates for the relief requested herein include Rules 26(b), 26(c), 30(b) and 30(d) of the Federal Rules of Civil Procedure, Bankruptcy Rules 7026 and 7030, and Local Rules 7026-1 and 7030-1.

## BACKGROUND

### A.     General Background

11.     On October 12, 2020 (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court commencing cases for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**").  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

12.     On October 27, 2020, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed, pursuant to section 1102 of the Bankruptcy Code: (a) an official committee of unsecured creditors and (b) an official committee of opioid-related claimants. *See* D.I. 306 & 308.

13.     The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the *Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions* [D.I. 128] filed on the Petition Date and incorporated herein by reference.

5

**B.      Debtors' Acthar-Related Filings**

14.      On April 30, 2021, the Debtors filed several pleadings aimed at raising and resolving several issues related to Acthar that threatened to impact confirmation of the *Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [D.I. 2074] (together with all schedules and exhibits thereto, and as may be further modified, amended, or supplemented from time to time, the "***Plan***").

15.      Relevant to the current Motion is the *Debtors' First Objection to Unsubstantiated Claims (Substantive)* [D.I. 2165] (the "***Unsubstantiated Claims Objection***"). The Unsubstantiated Claims Objection includes objections to proofs of claim filed without any stated basis for a claim against the named Debtor. These include the proofs of claim filed by (a) Humana Inc. (together with any entities, including Attestor Limited, with an interest in such claims, "***Humana***") and (b) alleged third-party payors for Acthar represented by the Haviland Hughes law firm (the "***Haviland Hughes Plaintiffs***" and together with Humana, the "***Acthar Claimants***"). The Acthar Claimants had initiated several prepetition lawsuits against only Mallinckrodt plc and/or Mallinckrodt ARD LLC (the "***Defendant Debtors***") but filed proofs of claim against all or substantially all Debtors. Each challenged objection contains no allegations about the Debtor against whom it is asserted (the "***Non-Defendant Debtors***"). Therefore, the Debtors objected to all proofs of claim filed by the Acthar Claimants against the Non-Defendant Debtors.

16.      Also relevant is the Debtors' *Omnibus Objection to Class Proofs of Claim* [D.I. 2164] (the "***Class Claims Objection***" and together with the Unsubstantiated Claims Objection, the "***Claims Objections***"). The Class Claims Objection objects to putative class proofs of claim filed

6

by the Haviland Hughes Plaintiffs on a variety of procedural bases (but does not, at this time, challenge the underlying alleged conduct or the validity of the individual claim asserted).[7]

17.     The Debtors also initiated an adversary proceeding seeking a declaration of dischargeability of the debts and claims of the City of Rockford, an alleged governmental-unit among the Haviland Hughes Plaintiffs: *Mallinckrodt plc v. City of Rockford*, Adv Pr. No. 20-50428 (JTD) (the "***Discharge Adversary Proceeding***"); and the Debtors sought (the "***Administrative Bar Date Motion***" and together with the Claims Objections and the Discharge Adversary Proceeding, the "***Acthar Issues Pleadings***"), and later obtained, entry of an order establishing an initial bar date for administrative claims.  *See Order (I) Setting an Initial Bar Date for Filing Proofs of Administrative Claim, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claim, (IV) Approving Notice of the Initial Administrative Claim Bar Date, and (V) Granting Related Relief* [D.I. 2480].  The purpose of instituting the initial administrative claims bar date was to, among other things, create a process for understanding the asserted number, size, and legal bases of purported administrative claims related to Acthar.  The Motion to Quash does not relate to any discovery served in connection with the Discharge Adversary Proceeding or the Administrative Bar Date Motion

18.     In all, the Debtors' purpose in filing the Acthar Issues Pleadings was to focus on and resolve discrete Acthar-related issues important to Plan confirmation.

---

[7] The Class Claim Objection focuses on the threshold issue of whether class proofs of claim are permitted in bankruptcy and whether the Court should apply Bankruptcy Rule 7023 to allow such class proof of claims.  To the extent the Court determines that Bankruptcy Rule 7023 is applicable to such proofs of claim, the Debtors reserve their right to, among other things, argue why the requirements of Federal Rule of Civil Procedure 23 have not and cannot be satisfied, to supplement or amend the Class Claim Objection and to file additional objections to the Class Proofs of Claim at any time and on any other basis permitted by applicable law.

US-DOCS\124196690.5RLF1 25376791v.2

### C.    Haviland Hughes Plaintiffs Responses

19.    Apparently in response to the Acthar Issues Pleadings, the Haviland Hughes Plaintiffs unleashed a barrage of their own new pleadings. Those new pleadings include: two motions to lift the automatic stay to allow their underlying litigations to proceed, including re-noticing hearing on a motion initially filed in November 2020 [D.I. 410, 2366, 2386], one motion to lift the existing third-party injunction to allow their underlying litigations to proceed [Adv. Pr. 20-50850 D.I. 2075], a renewed motion for the appointment of a trustee [D.I. 2358] (the "***Renewed Trustee Motion***"), and an objection to the Debtors' disclosure statement [D.I. 2075] (the "***Disclosure Statement Objection***").

20.    And they also unleashed a barrage of discovery requests.  Since the filing of the Debtors' Acthar Issues Pleadings, the Haviland Hughes Plaintiffs have served the following 7 deposition notices.

| # | Deposition Notices | Stated Contested Matter | Topics |
|---|---|---|---|
| 1 | *Acthar Plaintiffs' Notice of Deposition Duces Tecum of Corporate Designee(s) of Debtors*—i.e., the "Haviland Hughes Unsubstantiated Claims 30(b)(6) Notice" relevant to this Motion | Unsubstantiated Claims Objection | 22 |
| 2 | *Acthar Plaintiffs' Notice of Deposition Duces Tecum of Corporate Designee(s) of Debtor* (the "***Haviland Hughes Plaintiffs Class Claims 30(b)(6) Notice***") | Class Claims Objection | 9 |
| 3 | *Acthar Plaintiffs Notice of Deposition Duces Tecum of Corporate Designee(s) of Debtors Regarding the Acthar Plaintiffs' Preliminary Objections to Disclosure Statement* | Haviland Hughes Plaintiffs' DS Objection | 15 |
| 4 | *Acthar Plaintiffs Notice of Deposition Duces Tecum of Corporate Designee(s) of Debtors Regarding the Acthar Plaintiffs' Renewed Motion for Order Directing the Appointment of Trustee* | Haviland Hughes Plaintiffs Renewed Trustee Motion | 17 |
| 5 | *Acthar Plaintiffs' Notice of Deposition of Kathleen Breton*—i.e., the "Breton Notice" relevant to this motion | Unstated | 6 |
| 6 | *Acthar Plaintiffs' Notice of Deposition of Hugh O'Neill* | Unstated | |
| 7 | *Acthar Plaintiffs' Notice of Deposition of Mark Trudeau* | Unstated | |
| Total | | | 69 |

US-DOCS\124196690.5RLF1 25376791v.2

21.     In addition, the Haviland Hughes Plaintiffs have served the following four requests

for production.

| # | Request for Production | Allegedly Relevant Contested Matter | Requests |
|---|---|---|---|
| 1 | *Acthar Plaintiffs' Requests for Production of Documents Submitted to the Mallinckrodt Debtors as to Debtors First Omnibus Objection to Unsubstantiated Claims* | Unsubstantiated Claims Objection | 41 |
| 2 | *Requests for Production of Documents* appended to *Haviland Hughes Plaintiffs' Class Claims 30(b)(6) Notice* | Class Claims Objection | 25 |
| 3 | *Acthar Plaintiffs Requests for Production of Documents Directed to Debtors as to Debtors' Disclosure Statement* | Haviland Hughes Plaintiffs' DS Objection | 18 |
| 4 | *Acthar Plaintiffs Requests for Production of Documents Directed to Debtors as to Acthar Plaintiffs' Motion for Order Directing the Appointment of Trustee* | Haviland Hughes Plaintiffs Renewed Trustee Motion | 18 |
| 5 | *Acthar Plaintiffs' Notice of Deposition of Kathleen Breton*—i.e., the "Breton Notice" relevant to this motion | Unstated | 6 |
| Total | | | 108 |

22.     The Debtors engaged in several meet-and-confer sessions with counsel to the

Haviland Hughes Plaintiffs and were unable to secure agreement that a single one of the foregoing

177 discovery requests and deposition topics can be eliminated, limited, or even deferred to a more

appropriate time and context—such as Plan confirmation.

23.     Nevertheless, the Debtors have made substantial responsive document productions

to the Haviland Hughes Plaintiffs, including producing all Rule 2004 discovery previously offered

(and to be offered) to the Committees, which constitutes over two hundred thousand documents,

as well as substantial productions of approximately 150 new documents responsive to the Haviland

Hughes Plaintiffs' document requests.   In particular, regarding the Unsubstantiated Claims

Objection, the Debtor have agreed to produce requested documents that go to whether the Non-

9

A-2085

Defendant Debtors engaged in Acthar-related activities.  And regarding the Class Claims Objection, the Debtors have agreed to produce non-privileged documents that go to the Debtors' process for identifying and noticing Acthar patients, as well as certain other topics.  And the Debtors have agreed to produce 30(b)(6) representatives on similar related topics, as discussed below.  What they have not agreed to do is prepare witnesses to testify on topics not relevant to the Objections.

###### D.      **Humana Responses**

24.      Humana has responded to the Unsubstantiated Claims Objection with the *Humana Unsubstantiated Claims 30(b)(6) Notice* and a *First Request for Production of Documents In Connection with Contested Matters*.

25.      The Debtors have engaged in several meet-and-confer sessions with counsel to Humana.  The Debtors believe they and Humana are close to agreement on limiting the scope of the *Humana Unsubstantiated Claims 30(b)(6) Notice* but as of yet have not reached agreement. As with the Haviland Hughes Plaintiffs, the Debtors have produced to Humana all Rule 2004 discovery previously produced to the official committees, and have also gathered and produced additional documents responding to many of Humana's requests.

###### E.      **Depositions Subject to this Motion to Quash**

26.      The Debtors seek to quash (a) the *Breton Notice* in its entirety, and (b) the *Unsubstantiated Claims 30(b)(6) Notices* as to the Non-Relevant Topics (as defined below).

###### 1.      Breton Notice

27.      Although the Breton Notice fails to specify what contested matter it purports to relate to, the Debtors believe it is related to the Class Claims Objection.  The Debtors object to the

10

Breton Notice in its entirety as duplicative of the Haviland Hughes Plaintiffs Class Claims 30(b)(6) Notice.

28.     The Haviland Hughes Plaintiffs Class Claims 30(b)(6) Notice, to which the Debtors have raised no objection, requests a corporate representative on the following topics largely focused on the Debtors' process for identifying third-party payors for noticing purposes, including by reliance (if any) on a data compilation previously referred to as the "Payor Intelligence Grid" (properly, the "Payor Nuance Database"):

| # | Topic |
|---|-------|
| 1 | The subject matters included in the Debtors' Omnibus Objection to Proofs of Claim at D.I. 2164 ("Omnibus Objection"). |
| 2 | The May 1, 2021 Declaration of Randall Eisenberg of Alix Partners (D.I. 2166). |
| 3 | The process engaged in by Mallinckrodt to determine the identification and confirmation of Third-Party Payors ("TPP") of Acthar. |
| 4 | Communications with Prime Clerk regarding TPPs and Acthar Claimants. |
| 5 | The process engaged in by Mallinckrodt to notify TPPs and Acthar purchasers of the subject Bankruptcy. |
| 6 | Communications regarding the Payer Intelligence Grid ("P.I.G."). |
| 7 | The P.I.G. itself, its creation, substance and use |
| 8 | The website https://mallinckrodt/acthar.com. |
| 9 | Communications with Acthar purchasers |

29.     The Breton Notice, while not styled as a corporate representative deposition, sets forth the following specific topics for examination, which appear to overlap entirely with the topics set forth above:

11

| # | Topic |
|---|-------|
| 1 | The books and records of Mallinckrodt referring, relating to or reflecting identification of Third-Party Payors ("TPPs") of Acthar. |
| 2 | Identification of Acthar patients, insurers, PBMs, and TPPs. |
| 3 | Communications with Acthar patients, insurers, PBMs, and TPPs. |
| 4 | The Payer Intelligence Grid ("P.I.G."), and its creation, substance and use. |
| 5 | The website https://mallinckrodt/acthar.com. |
| 6 | Communications with and information exchanged with the ASAP HUB about Acthar patients, insurers, PBMs, and TPPs. |

**2.**     Unsubstantiated Claims 30(b)(6) Notices

30.     The Debtors object to several of the topics set forth in the Unsubstantiated Claims 30(b)(6) Notices on the basis that they are entirely irrelevant to issues raised by the Unsubstantiated Claims Objection.

31.     The Haviland Hughes Plaintiffs Unsubstantiated Claims 30(b)(6) Notice topics, and the Debtors responses thereto, as set forth in responses and objections served on the Haviland Hughes Plaintiffs on May 25, 2021, are as follows.

| # | Request | Response |
|---|---------|----------|
| 1 | The subject matters included in the Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive) at D.I. 2165 (the "Omnibus Objection"). | Agreed |
| 2 | The Unsubstantiated Acthar Litigation Claims as listed in Schedule 1 to Omnibus Objection. | Agreed |
| 3 | The Other Unsubstantiated Acthar Claims as listed in Schedule 2 to Omnibus Objection | Agreed |
| 4 | Communications regarding the "Stipulation and Agreement Permitting Third Party Payors to File Consolidated Proofs of Claim" [D.I. 1292], as reflected in the "Addendum to TPP Consolidated Proof of Claim" filed by the various "Other Unsubstantiated Acthar Claims", as listed on Schedule 2, to the Omnibus Objection | Agreed |
| 5 | "Claim Amounts" of the various Unsubstantiated Acthar Litigation Claims, as listed on Schedule 1 to the Omnibus Objection, for which no claim amount is listed but the Debtors (Mallinckrodt plc and Mallinckrodt ARD) list the claim as a "remaining claim". | Agreed |

12

| 6 | "Claim Amounts" of the various Other Unsubstantiated Acthar Claims, as listed on Schedule 1 and 2 to the Omnibus Objection, for which no claim amount is listed but the Debtors (Mallinckrodt plc and Mallinckrodt ARD) list the claim as a "remaining claim". | Agreed |
|---|---|---|
| 7 | Communications regarding Evernorth Proofs of Claim, Claim Nos. 3133 and 3396. | Object |
| 8 | Communications regarding indemnification rights of asserted by Cigna, Evernorth and/or any Express Scripts entity. | Object |
| 9 | The transfer of the sum of $3,333,466,611 from various Debtor entities and Non-Debtor Affiliates to MPIL pre-petition, as reflected in the MPIL Statement of Financial Affairs, D.I. 1010, including the reasons therefor and the source(s) of funds transferred | Object |
| 10 | The transfer of monies out of the $3,333,466,611 held by MPIL after December 23, 2020, and the reason(s) therefor. | Object |
| 11 | The Intercompany – Commercial Supply Chain Reestablishment given as the reason for the above-listed $561,654,617 transfer to MPIL. | Object |
| 12 | The formation, creation and operation of MPIL | Agreed |
| 13 | MPIL's management of the Mallinckrodt specialty brands business, including the sales of Acthar and Synacthen | Agreed |
| 14 | MPIL's specific function of handling the calculation and payment of royalties owed to Aventis Pharmaceuticals under the 2001 Acthar acquisition agreement whereby Aventis was entitled to be paid and was paid 1% of the adjusted net sales of Acthar | Agreed |
| 15 | The formation, creation and operation of Sonorant Therapeutics as the new name of Mallinckrodt once the generic product line (which include the opioid business) was sold off, including the decision to base the new entity in Bedminster, New Jersey, the same location of Mallinckrodt ARD in the United States | Object |
| 16 | The formation, creation and operation of Questcor International, LTD f/k/a Akasia, Limited. | Object |
| 17 | The "Capital Contribution for Novartis Contingent Consideration" payment made on June 17, 2020 by Mallinckrodt ARD to Non-Debtor Questcor International Ltd. | Object |
| 18 | The decision of Mallinckrodt ARD f/k/a Questcor Pharmaceuticals to sell BioVectra in December 2019. | Object |
| 19 | "Project Lobster Tail" and "Project Throughbred". | Object |
| 20 | Mallinckrodt ARD's oversight of Mallinckrodt Ireland including its approval of expenditures by Mallinckrodt ARD's President Kathy Schaefer. | Object |
| 21 | The decision to transfer the Synacthen license from MSPIL to MPIL in 2016. | Object |
| 22 | The current status (between 2019-2021) of the Synacthen license in the United States, as required by the 2017 settlement between Mallinckrodt and the federal government | Object |

32.     The Humana Unsubstantiated Claims 30(b)(6) Notice topics, and the Debtors

13

responses thereto, as set forth in responses and objections served on the Acthar Claimants on May 25, 2021, are as follows.

| # | Request | Response |
|---|---------|----------|
| 1 | The Debtors' corporate structure and organization, including (i) the Company entities that constitute the Specialty Brands and Specialty Generics businesses, (ii) the identities of the Acthar Entities and the Synacthen Entities, (iii) the rights, responsibilities, and obligations of each of the Acthar Entities and Synacthen Entities with respect to Acthar and Synacthen, respectively, and (iv) the locations, roles, and titles of personnel with responsibilities related to Acthar or Synacthen | Agreed |
| 2 | The financial state, assets, and valuations of the Debtors, including the Acthar Entities and the Synacthen Entities | Object |
| 3 | The value of Acthar and Synacthen, including but not limited to the value of any rights or intellectual property related to Acthar or Synacthen. | Object |
| 4 | The value of the Acthar Claims individually and collectively, including but not limited to any valuations made or prepared either internally (i.e., within or between the Debtor entities) or externally by consultants or other professionals | Object |
| 5 | Intercompany agreements related to Acthar, Synacthen, the Acthar Entities, or the Synacthen Entities, including but not limited to: (i) manufacturing agreements;, (ii) distribution agreements; (iii) the ARD Distribution Agreement; (iv) royalty agreements; (v) licensing agreements; (vi) any intercompany transfers; (vii) R&D service agreements; (viii) intercompany transactions involving Mallinckrodt ARD LLC or revenues related to Acthar Intercompany Transfers and/or Synacthen Intercompany Transfers; and (ix) dividends paid to parents, subsidiaries, and affiliates. | Agreed |
| 6 | Any additional transfers or transactions, including intercompany transfers and transactions, involving (1) Mallinckrodt Lux IP S.a.r.l., Mallinckrodt Pharmaceuticals Ireland Ltd., ST Operations LLC, Mallinckrodt plc, Mallinckrodt US Pool LLC, or Mallinckrodt Group S.a.r.l, or (2) related to Acthar or Synacthen | Object |
| 7 | The Company's centralized banking and cash management system, including but not limited to the Company's cash management agreements | Object |
| 8 | The Company's refinancing efforts between January 1, 2019, and October 12, 2020, that affected or related to Mallinckrodt ARD LLC, including but not limited to: (i) efforts to refinance various Debentures and Notes due in 2020, 2022, 2023, and 2015; (ii) efforts to refinance or amend existing term loans and revolving credit facilities; (iii) negotiation and execution of the exchange and support agreement, dated February 25, 2020, with the Exchanging Holders; (iv) negotiation and execution of the exchange and support agreement, dated April 7, 2020, with the Exchanging Holders and certain private funds managed by Columbus Hill Capital Management, L.P.; (v) issuance of the 10.00% first lien senior secured notes due 2025 pursuant to the indenture April 7, 2020; (vi) the terms, conditions, and negotiations related to any guarantees granted to holders of unsecured debt; and (vii) the terms, conditions, and negotiations related to any security agreements entered into with holders of previously unsecured debt | Object |

14

| 9 | The notes, loans, debt instruments, credit facilities, or other instruments or facilities that are secured by the assets of or guaranteed by any Acthar Entity | Object |
|---|---|---|
| 10 | The Company's receipt of proceeds from any loans for which an Acthar Entity is a guarantor. | Object |
| 11 | The Company's intercompany financing and associated legal entity ownership reorganization completed during the three months ending March 29, 2019, as disclosed in the Company's Form 10-Q dated May 7, 2019 | Object |
| 12 | Financial information relating to Acthar manufacturing and sales, including information regarding prices charged for Acthar, costs expended by the Company in connection with the production, marketing, and sales of Acthar, sales data for Acthar, and revenues, profits, losses, and associated financial data relating to Acthar | Object |
| 13 | Financial information relating to the Company's opioid manufacturing and sales, including information regarding: (i) prices charged for opioids; (ii) costs expended by the Company in connection with the production, marketing, and sales of opioids; (iii) sales data for opioids; (iv) revenues, profits, losses, and associated financial data relating to opioids; (v) the financial state, assets, and valuation of Mallinckrodt's "Specialty Generics" business and/or the entities that are part of the "Specialty Generics" business; and (vi) the entities against whom opioid-related claimants have claims, the value of those claims, and the treatment of those claims under the Plan. | Object |
| 14 | The Debtors' bases for disallowing and expunging Acthar-related claims as sought through the Acthar Claims Objection | Agreed |
| 15 | The Debtors' $260 million CMS/DOJ/States Settlement, including the entities against whom the DOJ and CMS have claims, the value of those claims, and the treatment of those claims under the Plan | Object |
| 16 | The Debtors' proposed treatment of their unsecured noteholders under the Plan | Object |
| 17 | The Company's acquisition of Questcor Pharmaceuticals in 2014, including (i) the individuals responsible for evaluating and deciding to enter into the transaction, (ii) the Company's reasons for entering into the transaction, and (iii) the Company's knowledge of Questcor's premerger business practices related to Acthar | Object |

33.    The topics to which the Debtors have objected (notated "Object" above) are referred to herein as the "***Non-Relevant Topics***."  The Debtors are prepared to produce a witness to respond to questions on the "Agreed" topics above.

34.    As already noted, the Debtors have conferred several times with the Acthar Claimants to reduce the scope of the Unsubstantiated Claims 30(b)(6) Notices, and to discuss withdrawing the Breton Notice.  Discussions with Humana have been productive but have not, as

15

of the date of this filing, resulted in agreement.  Discussions with the Haviland Hughes Plaintiffs

have not resulted in any compromises, whether tentative or actual.

## RELIEF REQUESTED

35.     By this Motion, the Debtors respectfully request entry of an order, substantially in

the form attached hereto as **Exhibit A** (the "**Proposed Order**"), (i) quashing the Breton Notice in

its entirety, and (ii) quashing the Unsubstantiated Claims 30(b)(6) Notices as to the Non-Relevant

Topics.

## BASIS FOR RELIEF

### A.       The Breton Notice Should be Quashed as Duplicative

36.     "[W]hen the burden of a discovery request is likely to outweigh the benefits,

Federal Rule of Civil Procedure 26(b)(2)(C) vests the [Court] with the authority to limit a party's

pursuit of otherwise discoverable information." *F.T.C. v. Dutchman Enterprises, LLC*, No. 2:09-

cv-141 (FSH)(MAS), 2010 WL 3034521, at *2 (D.N.J. Aug. 2, 2010).  Under Rule 26(b)(2)(C),

made applicable by Bankruptcy Rule 7026, a court must limit discovery if, among other things

"the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some

other source that is more convenient, less burdensome, or less expensive."  The determination

whether to quash discovery requests is a matter of judicial discretion, based on the facts and

circumstances of the case.  *See, e.g.*, *City of Rockford v. Urmila Paranjpe Baumann (In re*

*Mallinckrodt plc)*, Civ. No. 20-1533-LPS, slip op. at 10 (D. Del. May 21, 2021) (affirming

Bankruptcy Court's order quashing Rockford's subpoena to Express Scripts' in house counsel)

("The Quash Order rests on the Bankruptcy Court's review of the facts and its determination of

matters such as relevance, undue burden, and duplication regarding the information sought in the

US-DOCS\124196690.5RLF1 25376791v.2

amended subpoena – all factual matters that were within the discretion of the Bankruptcy Court to evaluate.").[8]

37.     Here, every one of the topics on which the Haviland Hughes Plaintiffs seek to question Ms. Breton is covered by a matching, or broader, topic set forth in the Haviland Hughes Plaintiffs Class Claims 30(b)(6) Notice.  Without rehashing all of the topics in both notices, the topics in both are focused on documents and communications relating to the Debtors' identification of third-party payors for notice purposes, including through reliance (if any) on the "Payor Intelligence Grid" and the company's Acthar-focused website.  The general areas of inquiry are the same, and the specific topics are nearly identical.  A simple comparison demonstrates that a deposition of Ms. Breton in her personal capacity on these topics will be entirely "cumulative [and] duplicative" and therefore should be quashed.  *See* Fed. R. Civ. P. 26(b)(2)(C).[9]

## B.     The Unsubstantiated Claims 30(b)(6) Notices Should be Quashed as to the Non-Relevant Topics

38.     In addition to requiring limitation on discovery when requests are unreasonably duplicative, Rule 26(b)(2)(C) also requires limitation on discovery when "the proposed discovery is outside the scope permitted by Rule 26(b)(1)."  That rule, in turn, restricts discovery to non-privileged matters "relevant to the needs" of the contested matter, while considering several factors including "whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).

---

[8] A copy of the District Court's Memorandum Order is attached as **Exhibit C** hereto.

[9] The Debtors also reserve the right to object to any modified request by the Haviland Hughes Plaintiffs, should such a request be made, to examine Ms. Breton in her personal capacity on separate, or unstated, topics.  Such a request would serve no purpose related to the Class Claims Objection, would bear instead on the merits of the underlying claims, and presumably would duplicate the Haviland Hughes Plaintiffs' examination of Ms. Breton in prepetition litigation discovery.

39.     Here the Non-Relevant Topics are not relevant to any issue raised by the Unsubstantiated Claims Objection.  The Non-Relevant Topics fall broadly into four categories: (1) topics relating to the claims of other creditors; (2) topics relating to the merits of the Acthar Plaintiffs' underlying litigations; (3) topics related to plan objections; and (4) topics relating to intercompany transactions that could only establish, if anything, causes of action owned by Debtors rather than by creditors.

40.     First, the claims of *other* creditors are irrelevant to the Acthar Claimants' failure to substantiate their own claims—or any attempt by them to substantiate those claims.  There is therefore no relevance to the Haviland Hughes Plaintiffs' demands for communications regarding other creditors' proofs of claim (Haviland Hughes Plaintiffs topics 7 and 8).

41.     Second, the merits of the Acthar Claimants' allegations in the underlying litigations are also irrelevant to the Acthar Claimants failure to substantiate their claims against Non-Defendant Debtors.  The Unsubstantiated Claims Objection is not based on an attack on whether 1) the alleged underlying conduct by the Defendant Debtors occurred, or 2) if it occurred would be wrongful.  Such objections are reserved for another day.  Instead, it is based on the fact that each challenged Proof of Claim fails to assert that the Non-Defendant Debtor against whom the claim is filed (as opposed to the Defendant Debtors) engaged in any Acthar-related conduct whatsoever, much less the challenged conduct. There is therefore no relevance to Humana's request for information regarding the 2014 acquisition of Questcor Pharmaceuticals (and thus Acthar) and any knowledge of Questor's "premerger business practices related to Acthar" (Humana topic 17), none of which is alleged to have involved the Non-Defendant Debtors.  To be clear, the Debtors have agreed to produce every requested document regarding the Acthar-related conduct of the Non-Defendant Debtors.

18

42.     Third, possible plan objections premised on, for example, unfair discrimination, are also irrelevant to the Acthar Claimants' unsubstantiated claims.  There is therefore no relevance to Humana's requests for information regarding treatment of settling DOJ and state entities or "the treatment of . . . unsecured noteholders under the Plan" (Humana topics 15 and 16).

43.     Finally, the possibility of causes of action owned by a debtor against another debtor (or other entity) based on veil-piercing, fraudulent transfer, or similar theories is irrelevant to the Acthar Claimants' failure to substantiate their creditor claims.  The Acthar Claimants are not and could never be the owners of any such derivative claims, and so they cannot form the basis of any Acthar Claimant claim; and as such the Debtors object to such deposition topics (the "***Derivative Claim Topics***").  While the Debtors recognized that such arguments and discovery could be relevant to plan confirmation, they are not relevant to the Unsubstantiated Claim Objection.

44.     In general, derivative claims—i.e., claims "based on rights 'derivative' of, or 'derived from the debtor's"—are property of a debtor's estate in bankruptcy.  *In re Tronox Inc.*, 855 F.3d 84, 99 (2d Cir. 2017); In re W.R. Grace & Co., 607 B.R. 419, 432 (Bankr. D. Del. 2019) ("Generally, a derivative claim is a claim based upon a right that is derivative of, or derived from, a right held by the debtor").  In *Tronox*, the court held that claims asserted by creditors against the debtors' former parent, which were based on "alter ego/veil piercing" theories, were all derivative because the estate had the right to pursue those "generalized" claims in its own right, to augment the estate for the benefit of all creditors.  *Tronox*, 855 F.3d at 105-07.  This court has similarly recognized that claims based upon alter ego or other derivative theories are property of the debtor's estate.  See *In re Maxus Energy Corp.*, 571 B.R. 650 (Bankr. D. Del. 2017) (holding that alter ego claims asserted against a third-party non-debtor are property of the estate because the debtor could have brought such claims under Delaware law prior to the commencement of bankruptcy and such

19

claims are general claims); *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602 (D. Del. 2018) (holding that alter ego claim against non-debtor parent company was property of subsidiary's bankruptcy estate under Delaware state law); see also *In re Emoral, Inc.*, 740 F.3d 875 (3d Cir. 2014) (holding that personal injury claims against non-debtor as "mere continuation" of debtor were generalized claims belonging to estate). A claim against a third party is only "nonderivative" if it is "not based upon the debtor's liability and the third party's liability to the debtor but, rather, *an entirely independent claim held by the plaintiff directly against the third party*." *W.R. Grace*, 607 B.R. at 424 (emphasis added).

45.     The Derivative Claim Topics, however, do not seek information that could establish any *independent* creditor claim; instead they seek information that could only substantiate one Debtor's (or a third party's) liability to another Debtor. These topics are focused entirely on intercompany transactions, cash management, and third-party financing. Responsive information could at best provide a basis for estate claims (and related confirmation objections) based on any alleged improprieties in those transactions, cash flows, or third-party financings, to the extent they harmed a debtor party thereto. No Acthar Claimant was a party to any such transaction, and no Acthar Claimant could have any *independent* claim based on any such transaction. *See W.R. Grace*, 607 B.R. at 424; *Tronox*, 855 F.3d at 105-07; *Maxus*, 517 B.R. 650; *Harrison*, 320 F. Supp. 3d 602; *Emoral*, 740 F.3d 8745. In fact, the Haviland Hughes Plaintiffs appear to recognize the derivative nature of any such claims: These plaintiffs recently served a demand for derivative standing to pursue avoidance claims. *See* Letter from Albert A. Ciardi, III, to George Davis, et al., dated May 19, 2021, attached hereto as **Exhibit B**. However, the possibility of successfully seeking derivative standing to pursue any claim *on behalf of the debtor* still would not transform

20

the estate claim into a creditor claim. As a result, the Derivative Claim Topics are irrelevant to any issue raised by the Unsubstantiated Claims Objection.

46. To be clear, the Debtors have not objected to ever providing discovery on the Derivative Claim Topics; to the contrary, the Debtors have made clear that they understand why such topics may be relevant to confirmation; they will address such topics in the context of confirmation discovery; and they expect to provide a witness on most if not all of these topics, after coordination with other confirmation deposition requests from other interested parties. But the Derivative Claim Topics do not need to be rushed today as they have no relevance to the Unsubstantiated Claims Objection, since the derivative claims cannot constitute the Acthar Claimants' claims.

47. The Debtors have carefully reviewed all of the voluminous discovery recently served by the Acthar Claimants. The Debtors have endeavored in good faith to provide responses and offer witnesses where relevant, non-duplicative, and calibrated not only to the needs of the contested matter to which the requests relate but also to the demands of the Debtors' cases generally. The Debtors will continue to do so in good faith. And the Debtors have agreed to provide testimony on the bulk of these requests in the context of confirmation discovery, reasonably coordinated with the rest of confirmation discovery. However, as to these Objections before the Court today, the Non-Relevant Topics and the Breton Notice fall well over the line into irrelevance, duplication, and burden without benefit.

## COMPLIANCE WITH LOCAL RULE 7026-1(d)

48. To reiterate, the undersigned counsel certifies that the Debtors have made a reasonable effort to reach an agreement with counsel to the Acthar Claimants regarding the relief requested herein, but no agreement has been reached at this time.

US-DOCS\124196690.5RLF1 25376791v.2

## NOTICE

49.     Notice of this Motion to Quash has been provided to: (i) the U.S. Trustee, (ii) counsel for the Acthar Claimants; and (iii) all interested parties requesting notices pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is necessary.

## CONCLUSION

50.     For the reasons above, the Debtors respectfully request that the Court enter the Proposed Order granting this Motion to Quash.

US-DOCS\124196690.5RLF1 25376791v.2

Dated: May 26, 2021

*/s/ Robert J. Stearn, Jr.*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:            collins@rlf.com
                    stearn@rlf.com
                    merchant@rlf.com
                    steele@rlf.com
                    schlauch@rlf.com

- and -

George A. Davis (admitted *pro hac vice*)
George Klidonas (admitted *pro hac vice*)
Andrew Sorkin (admitted *pro hac vice*)
Anupama Yerramalli (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Telephone:      (212) 906-1200
Facsimile:      (212) 751-4864
Email:            george.davis@lw.com
                    george.klidonas@lw.com
                    andrew.sorkin@lw.com
                    anu.yerramalli@lw.com

- and -

Jeffrey E. Bjork (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:      (213) 485-1234
Facsimile:      (213) 891-8763
Email:            jeff.bjork@lw.com

- and -

Jason B. Gott (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:      (312) 876-7700
Facsimile:      (312) 993-9767
Email:            jason.gott@lw.com

*Counsel for Debtors and Debtors in Possession*

US-DOCS\124196690.5RLF1 25376791v.2

**A-2099**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) **Obj. Deadline: June 1, 2021 at 4:00 p.m. (ET)** |
| | ) **Hearing Date: June 2, 2021 at 3:00 p.m. (ET)** |

## NOTICE OF MOTION AND HEARING

PLEASE TAKE NOTICE that the debtors in possession in the above-captioned cases (collectively, the "**Debtors**") have today filed the attached *Debtors' Motion to Quash (A) Attestor Limited and Humana's Notice of Deposition of Debtors Pursuant to Fed. R. Civ. P. 30(b)(6) and Fed. R. Bankr. P. 7030; (B) Acthar Plaintiffs' Notice of Deposition Duces Tecum of Corporation Designee(s) of Debtors; and (C) Acthar Plaintiffs' Notice of Deposition of Kathleen Breton* (the "**Motion to Quash**") with the United States Bankruptcy Court for the District of Delaware (the "**Court**").

PLEASE TAKE FURTHER NOTICE that objections or responses to the relief requested in the Motion to Quash, if any, must be made in writing and filed with the Clerk of the Court, 3rd Floor, 824 North Market Street, Wilmington, Delaware 19801, on or before **June 1, 2021 at 4:00 p.m. (prevailing Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that if any objections to the Motion to Quash are received, the Motion to Quash and such objections shall be considered at a hearing

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The debtors' mailing address is 675 McDonnell Blvd., St. Louis, Missouri 63042.

before The Honorable John T. Dorsey, United States Bankruptcy Judge for the District of Delaware, at the Court, 824 North Market Street, 5th Floor, Courtroom 5, Wilmington, Delaware 19801, on **June 2, 2021 at 3:00 p.m. (prevailing Eastern Time)**.

PLEASE TAKE FURTHER NOTICE THAT IF NO OBJECTIONS TO THE MOTION TO QUASH ARE TIMELY FILED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION TO QUASH WITHOUT FURTHER NOTICE OR HEARING.

*[Remainder of page intentionally left blank]*

RLF1 25376455v.1

**A-2101**

Dated: May 26, 2021

*/s/ Robert J. Stearn, Jr.*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Email:    collins@rlf.com
    stearn@rlf.com
    merchant@rlf.com
    steele@rlf.com
    schlauch@rlf.com

- and -

George A. Davis (*pro hac vice*)
George Klidonas (*pro hac vice*)
Andrew Sorkin (*pro hac vice*)
Anupama Yerramalli (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:    george.davis@lw.com
    george.klidonas@lw.com
    andrew.sorkin@lw.com
    anu.yerramalli@lw.com

- and -

Jeffrey E. Bjork (*pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:    (213) 485-1234
Facsimile:    (213) 891-8763
Email:    jeff.bjork@lw.com

- and -

Jason B. Gott (*pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:    (312) 876-7700
Facsimile:    (312) 993-9767
Email:    jason.gott@lw.com

*Counsel for Debtors and Debtors in Possession*

RLF1 25376455v.1

# EXHIBIT A

## Proposed Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) Re: Docket No. ____ |

**ORDER GRANTING DEBTORS' MOTION TO QUASH (A) ATTESTOR LIMITED AND HUMANA INC.'S NOTICE OF DEPOSITION OF DEBTORS PURSUANT TO FED. R. CIV. P. 30(b)(6) AND FED. R. BANKR. P. 7030; (B) ACTHAR PLAINTIFFS' NOTICE OF DEPOSITION *DUCES TECUM* OF CORPORATE DESIGNEE(S) OF DEBTORS; AND (C) ACTHAR PLAINTIFFS' NOTICE OF DEPOSITION OF KATHLEEN BRETON**

Upon the motion (the "***Motion to Quash***")[2] of the Debtors to quash (a) the Breton Notice in its entirety and (b) the Unsubstantiated Claims 30(b)(6) Notices as to the Non-Relevant Topics; and the Court having considered the Motion to Quash and any objections thereto; and the Court having jurisdiction to consider the Motion to Quash and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion to Quash in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Motion to Quash has been given and that no other or further notice is necessary; and good and

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/Mallinckrodt. The debtors' mailing address is 675 McDonnell Blvd., St. Louis, Missouri 63042.

[2] Capitalized terms used but not otherwise defined herein have the meaning given to them in the Motion to Quash.

sufficient cause appearing therefor, it is hereby,

**ORDERED, ADJUDGED AND DECREED THAT:**

1.     The Motion to Quash is GRANTED as set forth herein.

2.     The Breton Notice is quashed in its entirety.

3.     The Unsubstantiated Claims 30(b)(6) Notices are quashed as to the Non-Relevant Topics.

4.     The Debtors are hereby authorized to take such actions as may be necessary to implement the relief granted by this Order.

5.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

US-DOCS\124196690.5RLF1 25376791v.2

**A-2105**

**Exhibit B**

**Letter from Albert A. Ciardi, III, to George Davis, et al., dated May 19, 2021**

# CIARDI CIARDI & ASTIN

ALBERT A. CIARDI, III. ESQUIRE
ACIARDI@CIARDILAW.COM

1905 Spruce Street
Philadelphia, PA 19103
Phone: 215-557-3550
Fax: 215-557-3551

May 19, 2021

***Via Electronic Mail***
George Davis, Esquire
Latham & Watkins
1271 Avenue of the Americas
New York, NY 10020
George.davis@lw.com

***Via Electronic Mail***
Cathy Hershcopf, Esquire
Cooley LLP
55 Hudson Yards
New York, NY 10001-2157
chershcopf@cooley.com

***Via Electronic Mail***
Michael J. Merchant, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801
merchant@rlf.com

***Via Electronic Mail***
Natalie D. Ramsey, Esquire
Robinson & Cole, LLP
1201 N. Market Street, Suite 1406
Wilmington, DE 19801
nramsey@rc.com

**Re:** **Mallinckrodt PLC, et al.; Case No. 20-12522**

Dear Counsel:

Please consider this letter the demand of the Acthar Plaintiffs: (a) for derivative standing to pursue the avoidance of any of the transfers described in the Debtors' Statements of Financial Affairs and as specifically listed in Exhibit "A" (the "Fraudulent Transfers"); and (b) for the detailed results of the investigation of either the Debtors or Official Committee of Unsecured Creditors of any of the Fraudulent Transfers. The Debtors' Plan and Disclosure Statement values potential avoidance actions related to the Fraudulent Transfers at zero and considers such causes of action as speculative. The Debtors provide no investigative or due diligence support for such statements.

The Acthar Plaintiffs note the following:

1. Each transfer occurred within either one (1) year (Section 547) of the Petition Date.

2. Each Transferor Entity[1] was hopelessly insolvent at the time of each transfer.

_____

[1] Transferor Entity means that Debtor entity which made any of the Fraudulent Transfers. Attached as Exhibit "B" is the Debtors' document identifying the "Brand Entities." The Fraudulent Transfers on Exhibit "A" other than

**PHILADELPHIA**
1905 Spruce Street
Philadelphia, PA 19103
Phone: (215) 557-3550
Fax: (215) 557-3551

**WILMINGTON**
1204 N. King Street
Wilmington, DE 19801
Phone: (302) 658-1100
Fax: (302) 658-1300

**NEW JERSEY**
52 Haddonfield-Berlin Road
Suite 1000
Cherry Hill, NJ 08034
Phone: (856) 368-2001
Fax: (856) 368-2002

A-2107

Ciardi Ciardi & Astin

Page 2

3. The Debtors have provided no evidence of any reasonably equivalent value for the transfer of over 14 billion dollars from insolvent Transferor entities or to any of the non debtor affiliates.

4. The Debtors have provided no reasonable basis for the failure of the recipient Debtor or non-debtor affiliate entities to return the funds to the Transferor entities.

5. The Debtors also transferred substantial funds to Non-Debtor entities, some of which reside outside the United States

6. The Debtor is hopelessly conflicted. The Debtor seeks to use funds secreted by the Fraudulent Transfers to fund the settlement with Opioid Creditors. The Debtors' entities which produced and sold opioids are worthless and have no cash.

7. The Official Committee has a fiduciary duty to all creditors including Opioid Creditors. As such, the Official Committee has a conflict in pursuing a cause of action which benefits the creditors of the Specialty Brands entities to the detriment of any resolution with the Opioid Creditors.

While the only records available to the Acthar Plaintiffs are the Statements of Financial Affairs, the Acthar Plaintiffs intend to seek a broad range of recoveries related to the transfers itemized on Exhibit "A" attached hereto and investigate the officers, directors, and professionals whose advice gave the Debtors comfort in making these Fraudulent Transfers. The Debtors' Disclosure Statement is very clear that a whole business bankruptcy was contemplated in Spring 2020 and the actual insolvency of the Debtors was clear on the dates of these transfers. The Acthar Plaintiffs will seek Court authority to: (a) investigate the one-year transfers; (b) investigate the two year transfers; (c) investigate the employees and advisors who authorized any Fraudulent Transfers, and (d) seek recovery on behalf of the Transferor Debtor Entity of the Fraudulent Transfers as well as damages from any other liable parties.

We acknowledge that the Debtors' SOFA indicate some transfers are non-cash and some have a reference of CMA. We are also cognizant that some of the transfers are duplicative. However, given the complete failure of the Debtors to provide meaningful discovery, all of these transfers are subject to review as are all the communications of the Debtors regarding the nature and purpose of these transfers. We are prepared to meet and confer to the extent you believe our analysis above is incorrect.

Given the foregoing, and the Debtors' utter failure to investigate the Fraudulent Transfers, the Acthar Plaintiffs' request derivative standing and consent to pursue avoidance actions related to the Fraudulent Transfers for the benefit of the estates of the Debtor/Transferor entities. Given the Debtors' desire to move forward with a plan expeditiously, we expect a response within five (5) days of the date of this letter. The Acthar Plaintiffs request an expedited

those from MPIL are all from Brand Entities which according to the Debtors' Disclosure Statement were operated on a separate basis from Generics.

Ciardi Ciardi & Astin

Page  3

response to this letter, as well as the results of the Debtors' comprehensive investigation, because
we are certain that the Debtors would not have made the statement on page 5 of the Liquidation
Analysis at D.I. 2285-2 that recoveries would be "speculative" without having first actually
investigated over 14 billion dollars of transfers.    Absent a reasonable response, we will proceed
with a motion seeking derivative standing from the Court.

Sincerely,

Albert A. Ciardi, III

AACIII/sf

cc:     Donald E. Haviland, Jr., Esquire  *(via email haviland@havilandhughes.com)*
        James Bartimus, Esquire *(via email jb@bflawfirm.com)*
        Daniel K. Astin, Esquire *(via email dastin@ciardilaw.com)*
        Jane M. Leamy, Esquire *(via email jane.m.leamy@usdoj.gov)*

# EXHIBIT A

| Transferor Entity | Date | Amount | Recipient |
|---|---|---|---|
| MEH, Inc. | 7/8/20 | 507,307,399 | ST US Holding |
| ST US Holding | 7/8/20 | 507,307,399 | MNK US Pool |
| Petten Holding, Inc. | 7/8/20<br>9/11/20 | 826,649,296*<br>328,708 | MNK Petten Holdings BV<br>MNK Petten Holdings BV |
| ST US Pool | 9/11/20 | 328,708 | Petten Holdings, Inc. |
| ST US Pool | 8/21/20 – 9/14/20 | 244,450,818 | MPIL |
| ST US Holdings | 7/8/20 | 702,509,002* | Petten Holdings, Inc. |
| ST Operations | 6/15/20 | 261,460,089* | MNK ARD |
| ST Operations | 6/15/20-10/7/20 | 822,996,421 | MPIL |
| MNK Equinox Finance | 7/8/20 | 1,179,252,647* | MNK Enterprises Holdings |
| MNK Equinox Finance | 7/8/20 | 1,200,001,001* | Petten Holdings, Inc. |
| MNK Lux IP Sarl | 10/22/19 – 9/21/20 | 2,757,713,742 | MNK International Finance |
| MNK ARD | 6/17/20 | 25,000,000 | Questcor International Ltd. |
| MNK ARD | 8/27/20 | 41,286,495* | Questcor International Ltd. |
| MNK ARD | 6/15/20 | 261,460,089* | ST Operations |
| MNK ARD | 7/16/20 – 10/7/20 | 261,460,090 | ST Operations |

1

| | | | |
|---|---|---|---|
| MNK ARD | 12/20/19 | 79,995,085 | MNK LLC |
| MNK ARD | 6/10/20 | 561,654,617* | MPIL |
| MNK ARD | 7/16/20 | 10,075,323 | MPIL |
| MNK ARD | 8/26/20 | 7,619,000 | MNK PLC |
| MNK Group Sarl | 4/8/20 | 92,396 | Drite Corsa |
| | 7/20/20 | 11,543,670 | |
| MNK Group Sarl | 6/22/20 | 3,000 | MNK ARD IP |
| | 8/17/20 | 10,000 | |
| MNK Group Sarl | 7/24/20 | 11,180,447 | MNK ARD IP |
| MNK Group Sarl | 9/10/20 | 30,000 | MNK Canada |
| MNK Group Sarl | 5/15/20 | 81,559 | MNK Chemical |
| | 5/18/20 | 81,559 | |
| | 6/17/20 | 161,044 | |
| | 7/15/20 | 117,795 | |
| | 7/15/20 | 133,501 | |
| MNK Group Sarl | 4/23/20 | 4,300,000 | MNK Chemical |
| | 5/21/20 | 1,400,000 | |
| | 6/22/20 | 6,200,000 | |
| | 7/16/20 | 4,000,000 | |
| | 8/21/20 | 2,000,000 | |
| | 8/26/20 | 2,000,000 | |
| MNK Group Sarl | 6/22/20 | 6,000 | MNK Ent. UK LI |
| MNK Group Sarl | 7/14/20 | 43,215 | MNK Finance Mgmt Ireland |
| | 8/14/20 | 42,265 | |
| | 8/28/20 | 3,550,296 | |
| MNK Group Sarl | 5/4/20 | 14,526 | MNK Holdings GMBH |
| | 7/3/20 | 18,594 | |

| | Date | Amount | |
|---|---|---|---|
| | 8/6/20 | 18,166 | MNK Hospital Prod IP |
| | 9/3/20 | 46,205 | |
| | 9/8/20 | 2,220,000 | |
| MNK Group Sarl | 7/24/20 | 62,905,268 | |
| MNK Group Sarl | 3/26/20 | 450,000,000 | MNK Int'l Finance SA |
| | 7/23/20 | 500,000,000 | |
| MNK Group Sarl | 6/15/20 | 163,492 | MNK LLC |
| MNK Group Sarl | 4/8/20 | 30,000,000 | MNK Medical Holdings |
| | 8/7/20 | 10,000,000 | |
| | 8/28/20 | 17,000,000 | |
| MNK Group Sarl | 5/26/20 | 1,000 | MNK Medical Holdings UK |
| MNK Group Sarl | 6/12/20 | 80,522 | MNK Medical Holdings UK ZNDL |
| MNK Group Sarl | 6/22/20 | 1,900,000 | MNK Netherlands |
| | 7/16/20 | 7,000,000 | |
| MNK Group Sarl | 4/23/20 | 1,370,000 | MNK Netherlands |
| | 5/21/20 | 200,000 | |
| | 8/21/20 | 8,000,000 | |
| | 8/26/20 | 1,000,000 | |
| MNK Group Sarl | 7/10/20 | 4,322 | MNK Petten Holdings B.V. |
| | 7/17/20 | 8,643 | |
| | 8/28/20 | 84,531 | |
| MNK Group Sarl | 4/9/20 | 1,000,000 | MPIL |
| | 4/16/20 | 1,500,000 | |
| | 4/21/20 | 1,200,000 | |
| | 4/22/20 | 2,300,000 | |
| | 5/6/20 | 3,000,000 | |
| | 5/7/20 | 9,500,000 | |
| | 5/8/20 | 1,500,000 | |
| | 5/15/20 | 2,000,000 | |

3

| Payer | Date | Amount | Payee |
|---|---|---|---|
| MNK Group Sarl | 5/20/20 | 9,500,000 | MNK SAG Holdings GMBH |
| MNK Group Sarl | 5/21/20 | 1,000,000 | |
| MNK Group Sarl | 5/21/20 | 81,559 | |
| MNK Group Sarl | 5/22/20 | 1,362,893 | |
| MNK Group Sarl | 5/27/20 | 454,298 | |
| MNK Group Sarl | 5/27/20 | 900,000 | |
| MNK Group Sarl | 5/28/20 | 181,719 | |
| MNK Group Sarl | 6/1/20 | 888,810 | |
| MNK Group Sarl | 6/24/20 | 444,405 | |
| MNK Group Sarl | 6/24/20 | 888,810 | |
| MNK Group Sarl | 7/29/20 | 432,152 | |
| MNK Group Sarl | 8/20/20 | 1,267,963 | |
| MNK Group Sarl | 7/16/20 | 6,200 | |
| MNK Group Sarl | 8/26/20 | 20,000 | |
| MNK Group Sarl | 6/17/20 | 4,444 | MNK Windsor Ireland Finance |
| MNK Group Sarl | 6/23/20 | 1,778 | |
| MNK Group Sarl | 8/7/20 | 1,691 | |
| MNK Group Sarl | 9/4/20 | 1,715 | |
| MNK Group Sarl | 9/10/20 | 8,576 | |
| MNK Group Sarl | 8/28/20 | 10,989 | MNK Windsor Sarl |
| MNK Group Sarl | 9/8/20 | 6,861 | |
| MNK Group Sarl | 6/17/20 | 6,442 | MKG Medical UK |
| MNK Group Sarl | 6/16/20 | 3,000 | Mushi UK Holdings Ltd. |
| MNK Group Sarl | 6/22/20 | 15,000 | |
| MNK Group Sarl | 8/28/20 | 169,062 | Profibrix B.V. |
| MNK Group Sarl | 7/23/20 | 428,635 | St Shared Services |
| MNK Group Sarl | 7/16/20 | 7,200 | Sucampo Acquisitions GMBH |
| MNK Group Sarl | 4/23/20 | 5,000 | Sucampo AG |

4

A-2114

| Entity | Date | Amount | Counterparty |
|---|---|---|---|
| | 5/7/20 | 20,000 | |
| | 6/16/20 | 70,000 | |
| | 6/17/20 | 50,000 | |
| | 7/1/20 | 150,000 | |
| | 7/24/20 | 68,100,000 | |
| | 8/27/20 | 4,300,000 | |
| | 8/28/20 | 10,000,000 | |
| MNK Group Sarl | 9/14/20 | 8,576 | Sucampo GMBH |
| MNK Group Sarl | 6/17/20 | 500,000 | Sucampo Pharma LLC |
| MNK Group Sarl | 7/24/20 | 104,653,235 | |
| MNK Group Sarl | 6/26/20 | 230 | Therakos |
| MNK Group Sarl | 6/26/20 | 18,888 | Therakos (Italia) S.R.L. |
| MNK Group Sarl | 6/26/20 | 8,626 | Therakos (UK) Ltd, Dutch Br. |
| MNK Group Sarl | 6/26/20 | 3,678 | Therakos (UK) Ltd, Sucursal |
| MNK Group Sarl | 7/2/20 | 2,506,482 | Therakos UK LTD |
| MNK Group Sarl | 7/7/20 | 2,938,634 | |
| MNK Group Sarl | 7/15/20 | 274,855 | |
| MNK Group Sarl | 5/28/20 | 1,200,000 | Therakos UK LTD |
| MNK Group Sarl | 8/19/20 | 1,300,000 | |
| MPIL | 2/24/20 | 1,162,701 | MNK Group Sarl |
| MPIL | 8/27/20 | 529,902 | |
| MPIL | 7/24/20 | 200,000,000 | MNK Group Sarl |
| MPIL | 6/10/10 | 561,654,617* | MNK ARD LLC |
| MPIL | 9/21/20 | 226,000,000 | MNK Lux IP Sarl |
| MPIL | 12/13/19 | 408,893,420 | MNK Lux IP Sarl |

A-2115

| | Date | Amount | Counterparty |
|---|---|---|---|
| | 12/13/19 | 150,000,000 | MNK Pharma LTD |
| | 12/13/19 | 50,000,000 | |
| | 12/18/19 | 217,602,322 | |
| MPIL | 12/18/19 | 400,000 | |
| | 3/25/20 | 3,000,000 | |
| | 3/27/20 | 11,491 | |
| | 4/21/20 | 1,200,000 | |
| | 6/18/20 | 500,000 | |
| | 6/25/20 | 4,000,000 | |
| | 7/23/20 | 3,524,374 | |
| | 10/7/20 | 14,120,282 | |
| MPIL | 3/9/20 | 35,478,000 | MNK PLC |
| | 5/28/20 | 66,673,403 | |
| | 6/11/20 | 13,757 | |
| | 6/12/20 | 32,402 | |
| | 9/25/20 | 57,301,000 | |
| MPIL | 12/3/19 | 3,092,623 | MNK US Pool LLC |
| | 12/3/19 | 13,105,416 | |
| | 12/3/19 | 1,838,046 | |
| | 12/3/19 | 14,574,009 | |
| | 12/20/19 | 6,963,918 | |
| | 2/24/20 | 7,276,435 | |
| | 3/20/20 | 440,790 | |
| | 5/28/20 | 11,418,880 | |
| | 6/11/20 | 126,057 | |
| | 7/6/20 | 9,515,102 | |
| MPIL | 6/15/20 | 561,536,421* | ST Operations LLC |
| MPIL | 8/7/20 | 3,766,139 | ST US Pool LLC |
| | 9/9/20 | 4,633,711 | |

Total Alleged Non-Cash $6,157,464,274
Total Cash/CMA $8,113,632,587
$14,271,109,000

A-2116

# EXHIBIT B

Document Excluded Due to Confidentiality

BATES labeled

MNK_ACTH_00000018 through MNK_ACTH_00000020

**Exhibit C**

*City of Rockford v. Urmila Paranjpe Baumann (In re Mallinckrodt plc)*, **Civ. No. 20-1533-LPS, slip op (D. Del. May 21, 2021)**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re MALLINCKRODT PLC, *et al.*, | : | Chapter 11 |
| | : | Bankr. Case No. 20-12522-JTD |
| Debtors. | : | (Jointly Administered) |
| | : | |
| CITY OF ROCKFORD, *et al.*, | : | Adv. No. 20-50850 (JTD) |
| | : | |
| Appellants, | : | |
| v. | : | Civ. No. 20-1533-LPS |
| | : | |
| URMILA PARANJPE BAUMANN, *et al.,* | : | |
| | : | |
| Appellees. | : | |

## <u>MEMORANDUM ORDER</u>

Having reviewed the papers submitted in connection with Appellees' motion to dismiss

(D.I. 5) (the "Motion to Dismiss") the instant appeal of the Bankruptcy Court's November 13,

2020 order quashing subpoena (Adv. D.I. 102)[1] (the "Quash Order"), including the opposition to

the Motion to Dismiss (D.I. 14) filed by City of Rockford and Appellees' reply in further support

of the Motion to Dismiss (D.I. 16),

IT IS HEREBY ORDERED that the Motion to Dismiss (D.I. 5) is GRANTED, for the

reasons that follow:

**1.  *Introduction.*** This dispute arises out of an adversary proceeding filed in the chapter

11 cases of Mallinckrodt plc ("Mallinckrodt") and its affiliates (together, "Debtors").

Mallinckrodt sought to temporarily enjoin the prosecution of various actions relating to its drug

Acthar, in which Mallinckrodt and nondebtors Express Scripts Entities are co-defendants,

including one action brought by City of Rockford.  The Quash Order granted Appellees' Motion

to Quash Subpoena or for a Protective Order (Adv. D.I. 72) ("Motion to Quash") filed with

---

[1] The docket of the adversary proceeding, captioned *Mallinckrodt plc v. State of Connecticut, et al.,* Adv. No. 20-50850-JTD (Bankr. D. Del.), is cited herein as "Adv. D.I. __."

A-2120

respect to an amended subpoena issued by City of Rockford and other Acthar Plaintiffs[2] to the

Express Scripts Entities' Associate Chief Counsel of Litigation, Urmila Paranjpe Baumann.  City

of Rockford has not sought leave to appeal but, instead, argues that the Quash Order is

appealable (i) under the collateral order doctrine, (ii) because it should be considered final under

the flexible pragmatic approach to bankruptcy orders, and (iii) because it satisfies the criteria of

28 U.S.C. § 1292(b).

    **2.  *Background.***  On October 12, 2020, Debtors filed a Supplemental Motion for

Injunctive Relief (Adv. D.I. 16) pursuant to § 105(a) of the Bankruptcy Code, which sought, in

part, a preliminary injunction enjoining certain plaintiffs from pursuing claims against certain

third parties, including the Express Scripts Entities, for an initial period of 270 days.  (Adv. D.I.

17 at 7-11)  Debtors' request was based on indemnification rights asserted by the Express Scripts

Entities in connection with that litigation, as well as the cost, burden, and distraction that

continuation of litigation would have on the Debtors' reorganization efforts.  (*See* D.I. 14-2,

11/18/20 Hr'g Tr. at 8)

    City of Rockford, together with other Acthar Plaintiffs, sought discovery to determine the

basis for the indemnity claim.  (*See* D.I. 14 at 1)  Acthar Plaintiffs asserted, among other things,

that the indemnity claim was not timely asserted under the relevant agreements.  (*See id.*)  On

November 2, 2020, Acthar Plaintiffs served a subpoena on Ms. Baumann (Adv. D.I. 73, Ex. 1),

---

[2] The "Acthar Plaintiffs" consist of the following: the City of Rockford ("Rockford"),
Steamfitters Local Union No. 420 ("Steamfitters Local 420"), the International Union of
Operating Engineers Local 542 ("IUOE Local 542"), United Association of Plumbers &
Pipefitters Local 322 of Southern New Jersey ("Plumbers Local 322"), and Acument Global
Technologies ("Acument"), individually and on behalf of the classes of third-party payors
("TPPs") and their beneficiaries that Rockford, Steamfitters Local 420, and Plumbers Local 322
seek to represent in their respective cases currently pending in federal district courts in the
Northern District of Illinois, the Eastern District of Pennsylvania, and the District of New Jersey,
respectively.

who had sent Mallinckrodt a demand for indemnification on behalf of the Express Scripts

Entities.  (Adv. D.I. 18, Ex. Q)  On November 4, 2020, Appellant served an amended subpoena

on Ms. Baumann that included three requests, seeking documents and communications relating

to any common interest agreement between the Debtors and the Express Scripts Entities, as well

as any claims for indemnification and contribution, and noticing Ms. Baumann's deposition for

November 11, 2020.  (Adv. D.I. 73, Ex. 2)  Subject to certain objections, including that the

amended subpoena sought privileged information, Ms. Baumann responded there was no written

joint defense or written common interest agreement between Mallinckrodt and the Express

Scripts Entities in connection with the Acthar litigation, "although the parties do share a common

interest in defending against Plaintiffs' claim in the underlying Acthar litigations." (*Id.* Ex. 3)

Ms. Baumann further responded that "[t]he only non-privileged document responsive to Request

No. 3 is the October 14, 2020 indemnity letter from the Express Scripts Entities to

Mallinckrodt," which City of Rockford already possessed.  Ms. Baumann provided a draft

supplemental draft declaration ("Baumann Declaration") providing the information she had to

offer and confirming that no communications between herself and Mallinckrodt existed relating

to the indemnification request and/or any joint defense prior to the October 14 demand letter.

(*Id.* Ex. 6)

> City of Rockford continued to require that Ms. Baumann sit for a deposition.  (*Id.* Ex. 7)

On November 12, 2020, Ms. Baumann and the Express Scripts Entities filed the Motion to

Quash, asserting that the amended subpoena sought privileged and irrelevant information, which

was duplicative of other discovery taken by City of Rockford, and that it was overly broad and

unduly burdensome.  (Adv. D.I. 72)[3]  They further argued that the City of Rockford had made no

---

[3] Specifically, Ms. Baumann and the Express Scripts Entities argued the only responsive and
relevant information that Ms. Baumann would testify about was available via less burdensome

showing that Ms. Baumann's deposition was needed in order to present any arguments to the

Bankruptcy Court in opposition to Mallinckrodt's Supplemental Motion for Injunctive Relief.

City of Rockford opposed the Motion to Quash.  (Adv. D.I. 100)  On November 13,

2020, the Bankruptcy Court entered the Quash Order.  (Adv. D.I. 102)  On November 16, 2020,

City of Rockford filed its notice of appeal from the Quash Order.  (D.I. 1)  City of Rockford

seeks to argue on appeal that it was denied the opportunity to obtain evidence vital to opposing

the Preliminary Injunction Order, despite its stated intent to pursue only factual, non-privileged

discovery.  (*See* D.I. 14 at 6)  According to City of Rockford, the Baumann Declaration was

vague and conflicted with prior testimony in the case regarding a joint defense agreement.  (*Id.*)

City of Rockford asserts that the Bankruptcy Court improperly denied its right cross-examine

Ms. Baumann, as "a declaration without cross-examination allows one side to dictate what is

relevant as well as what is privileged."  (*Id.*)

On November 16-18, 2020, the Bankruptcy Court received evidence and heard argument

on the Supplemental Motion for Injunctive Relief.  On November 23, 2020, the Bankruptcy

Court issued a bench ruling granting the relief and extending the automatic stay to certain third

parties, including the Express Scripts Entities, for 270 days (Adv. D.I. 180) ("Preliminary

Injunction Order").  With respect to the jurisdictional analysis, the Bankruptcy Court identified

the standard for its "related-to" jurisdiction over a proceeding as whether "the outcome of th[at]

proceeding could conceivably have any effect on the estate being administered in bankruptcy."

---

means, i.e., a sworn declaration; the amended subpoena sought duplicative discovery from Ms.
Baumann, a non-party, that City of Rockford already possessed or could have obtained from
Mallinckrodt witnesses and depositions; the amended subpoena sought irrelevant information
which City of Rockford had twice before sought and been denied by the U.S. District Court for
the Northern District of Illinois in the underlying Acthar litigation; and the amended subpoena on
its face sought to invade the attorney-client and work product privileges by demanding discovery
of privileged information.  (Adv. D.I. 72)

(*See* D.I. 5-3, 11/23/20 Hr'g Tr. at 44 (quoting *Pacor v. Higgins*, 743 F.2d 984, 994 (3d Cir.

1984)) The Bankruptcy Court concluded that continuing the litigation against the Express

Scripts Entities would give rise to several "adverse impacts," including (i) risk to the Debtors of

the successful assertion of indemnity obligations, based on "the three indemnity agreements

referred to by [the Express Scripts Entities]" (*id.* at 46); (ii) risk to the Debtors of record taint and

collateral estoppel (*see id.* at 47); and (iii) discovery demands upon the Debtors (*id.*).  The

Bankruptcy Court concluded that "[a]ny of these factors could have an adverse impact on the

debtors' estates sufficient to establish related to jurisdiction under [§] 1334." (*Id.*)  The Acthar

Plaintiffs appealed the Preliminary Injunction Order.  (*See Mallinckrodt plc v. State of*

*Connecticut*, Misc. No. 20-408-LPS, D.I. 1)  By Memorandum Order dated February 11, 2021,

this Court denied Appellants' motion for leave to appeal the interlocutory Preliminary Injunction

Order.  (*Id.* D.I. 5)  The Preliminary Injunction Order is not the subject of this appeal.

    **3.  *Jurisdiction*.**  This Court has jurisdiction to hear appeals "with leave of the court,

from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings

referred to the bankruptcy judges under section 157 of this title."  28 U.S.C. § 158(a)(3).

    **4.  *Analysis*.**  City of Rockford did not seek leave to appeal the Quash Order.  Instead,

City of Rockford argues that: (i) the Quash Order falls within the collateral order doctrine (*see*

D.I. 14 at 6-10); (ii) the Quash Order should be considered final (*see id.* at 10-14); or (iii) the

Court should grant City of Rockford leave to appeal the Quash Order (*see id.* at 14-18).

    **A.**    ***The Collateral Order Doctrine Does Not Apply***

    City of Rockford asserts that the collateral order doctrine applies to the Quash Order,

which would allow the Court to immediately review it.  (D.I. 14 at 6-10)  The collateral order

doctrine accommodates a small class of rulings that, while not concluding the litigation, do

"finally determine claims of right separable from, and collateral to, rights asserted in the action."

*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).  These are claims that are "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."  *Id.*  To establish collateral order jurisdiction, an appellant must show that the subject order (i) "conclusively determine[d] the disputed question" (ii) "resolve[d] an important issue completely separate from the merits" of the action, and (3) would "be effectively unreviewable on appeal from a final judgment."  *Will v. Hallock*, 546 U.S. 345, 349 (2006) (internal quotations omitted).

Although not clear, City of Rockford appears to argue that the Quash Order conclusively determined an important (discovery) issue, which was whether City of Rockford "can require the author of a publicly filed letter to appear for deposition and answer questions about the timing of the letter and the assertion of the purported [indemnity] claim" where City of Rockford otherwise "had no facts available to it to analyze that claim." (D.I. 14 at 7)  According to City of Rockford, the purported indemnity claim on which it was denied discovery was the sole basis for the Bankruptcy Court's determination that it had jurisdiction to enter the Preliminary Injunction Order, thus "the facts here satisfy the Third Circuit's requirement of a final rather than a provisional disposition of an issue." (*Id.*)  Additionally, City of Rockford asserts, the Quash Order will be effectively unreviewable on appeal after the 270-day relief granted in the Preliminary Injunction Order "runs its course." (*See id.* at 8-9)

The Quash Order does not meet the elements of the collateral order doctrine.  The Third Circuit has held that this doctrine must be "narrowly circumscribe[d]" to a "small class" of orders "involving interests that are 'weightier than the societal interests advanced by the ordinary operation of final judgment principles'" or that are "serious and unsettled." *In re Search of Elec. Commc'ns in the Account of chakafattah@gmail.com*, 802 F.3d 516, 524-26 (3d Cir. 2015) (quoting *United States v. Wecht*, 537 F.3d 222, 230 (3d Cir. 2008)).  This "small class" of orders

6

rarely if ever will include discovery orders. *See generally ADAPT of Phila. v. Phila. Hous. Auth.*, 417 F.3d 390, 395 (3d Cir. 2005) ("The District Court's orders granting ADAPT's motions [to compel] did not resolve an issue 'completely separate from the merits of the dispute.' On the contrary, they resolved a discovery dispute, intertwined with the merits of an underlying action."); *Powell v. Ridge*, 247 F.3d 520, 528-29 (3d Cir. 2011) (Roth, J., concurring) ("Our conclusion that we lacked jurisdiction was not a new limitation on the collateral order doctrine but rather a consistent application of the long-standing rule that simple discovery orders are not final orders subject to immediate review."); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 107-14 (2009) (affirming decision that collateral order doctrine does not apply to order granting motion to compel information implicating attorney-client privilege).

### B.     *The Quash Order Is Not Final*

Generally, an appeals court "lacks jurisdiction to review an order granting a motion to quash a subpoena because the order would be reviewable as error after the final judgment on the merits." *CF & I Steel Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 713 F.2d 494, 496 (9th Cir. 1983); *see also New York v. U.S. Metals Refining Co.*, 771 F.2d 796, 799 (3d Cir. 1985) ("Pretrial discovery orders are not 'final decisions' . . . ."). City of Rockford argues that the Quash Order should be considered final under the flexible pragmatic approach applied in the Third Circuit.

"Because bankruptcy cases involve numerous parties with different claims, the court must consider the practical consequences of delaying resolution of the issue presented." *In re Brown*, 803 F.2d 120, 122 (3d Cir. 1986). "In bankruptcy matters [the Third Circuit has] consistently considered finality in a more pragmatic and less technical sense than in other matters and the concept, for purposes of appellate jurisdiction. should be viewed functionally." *In re Meyertech Corp.*, 831 F.2d 410, 414 (3d Cir. 1987). "The impact on the estate is the '[f]irst and most important' factor in considering finality." *Century Glove, Inc. v. First Am. Bank of New*

*York*, 860 F.2d 94, 98 (3d Cir. 1988) (quoting *Meyertech*, 831 F.2d at 414).  "Th[is] factor recognizes that issues central to the progress of the bankruptcy petition, those 'likely to affect the distribution of the debtor's assets, or the relationship among the creditors,' should be resolved quickly."  *Id.* (quoting *Brown*, 803 F.2d at 122).  "On the other hand, where the order does not affect those central interests, so that the pragmatic concerns have less force, this court has applied the traditional finality requirements."  *Id.* (internal quotation marks omitted).

Consistent with these standards, courts have articulated various factors, including "among other things, (1) whether the order leaves additional work to be done by the Bankruptcy Court, (2) whether the order implicates purely legal issues, (3) the impact of the Bankruptcy Court's order upon the assets of the debtor's estate, (4) the necessity for further fact-finding on remand to the Bankruptcy Court, (5) the preclusive effect of the District Court's decision on the merits of subsequent litigation, and (6) the furtherance of judicial economy."  *In re F-Squared Inv. Mgmt. LLC*, 2019 WL 1417464, at *3 (D. Del. Mar. 29, 2019).

Even applying the flexible pragmatic approach to finality of bankruptcy court orders, courts have held that "pretrial discovery decisions are not considered to be final decisions subject to immediate appeal."  *In re Kaiser Grp. Int'l, Inc.*, 400 B.R. 140, 143 (D. Del. 2009).  "Bankruptcy Court orders granting or denying discovery do not finally dispose of an entire claim on which relief may be granted, and therefore are generally treated as interlocutory and not appealable as of right."  *Hoffenberg v. Cohen (In re Towers Fin. Corp.)*, 164 B.R. 719, 720 (S.D.N.Y. 1994).  The Court reaches the same result here.

The most important factor is the impact of the Quash Order upon the assets of the Debtors' estate.  The Quash Order does not impact the estate at all, as the amended subpoena only seeks discovery from a non-party, Ms. Baumann.  City of Rockford argues that the Quash Order "could have disastrous effects on the debtors' estate" because the sought-after discovery

8

"would have provided information about the factual basis for the indemnity claim" that

purportedly "[d]ebtors have decided not to oppose." (D.I. 14 at 12-13)  City of Rockford

describes the "purported indemnity claim" as "the sole basis for the bankruptcy court holding it

had jurisdiction to issue the preliminary injunction order." (*Id.* at 2 n.2, 7-8)  City of Rockford is

mistaken.  The Bankruptcy Court made clear that it was not deciding the merits of the indemnity

claims or whether they would ultimately be successful.  (D.I. 5-3, 11/23/20 Hr'g Tr. at 46)

(noting "question is only whether potential indemnity claims exist," not whether they will be

allowed as valid claims)  The Bankruptcy Court further stated that it would have entered the

Preliminary Injunction Order regardless of the indemnity claims:

> Even if I were to find that . . . ESI's alleged indemnification claims
> were not valid, the debtors have pointed to several other reasons
> (indiscernible) why continuing – excuse me – why continuation of
> the litigation against the nondebtor entities would have an adverse
> impact on the debtors' estates.

(*Id.* at 46-47)  Indeed, the Bankruptcy Court found multiple other bases – independent of the

existence of the indemnity claims – to justify granting the Preliminary Injunction Order,

including "a risk of collateral estoppel and record taint that would require the debtors to

participate in the litigation in order to protect their interests;" that City of Rockford "would need

to take discovery of debtors' officers and directors in order to establish their claims against the

debtors;" and that the Express Scripts Entities would need to defend themselves against the City

of Rockford's claims "by pointing to the conduct of the debtors, the party that manufactured and

priced the drug, especially in light of the assertions of joint and several liability against the

debtors and ESI." (*Id.* at 47)  Moreover, City of Rockford's assertion that Mallinckrodt has

"decided not to oppose" the indemnity claims, even if true, is beside the point.  As the

Bankruptcy Court correctly determined, the adversary proceeding was not the appropriate forum

to adjudicate the factual basis and merits of the indemnity claims; "whether those claims would be valid[] . . . is an issue for another day." (*Id.* at 50)

    In issuing the Preliminary Injunction Order, the Bankruptcy Court did not rule on whether the Express Scripts Entities' indemnity claims will be successful.  For that reason, the information sought by City of Rockford's subpoena – "information with respect to the basis of the indemnity claim" (D.I. 14 at 4) – would not have affected the ruling on the Preliminary Injunction Order or foreclosed Mallinckrodt's ability to defend itself against the indemnification claims at the appropriate time.  Thus, the Quash Order had no effect on the Debtors' estates.

    Nor do the remaining factors weigh in favor of finality.  City of Rockford argues that the Quash Order "addresses purely legal issues," including "whether the non-party met the heavy burden associated with quashing a subpoena." (D.I. 14 at 11)  City of Rockford cites no legal support for its assertion that a decision to quash a subpoena presents a purely legal question.  The Quash Order did not resolve a purely legal issue but, rather, a factual one.  The Quash Order rests on the Bankruptcy Court's review of the facts and its determination of matters such as relevance, undue burden, and duplication regarding the information sought in the amended subpoena – all factual matters that were within the discretion of the Bankruptcy Court to evaluate.  *See In re Jevic Holding Corp.*, 656 Fed. App'x 617, 619 (3d Cir. 2016) ("We review a decision to quash a subpoena for abuse of discretion.") (citing *N.L.R.B. v. Frazier*, 966 F.2d 812, 815 (3d Cir. 1992)); *Borden Co. v. Sylk*, 410 F.2d 843, 845 (3d Cir. 1969) ("It is a well-established principle that the scope and conduct of discovery are within the sound discretion of the trial court.  It is equally well established that such orders compelling or denying discovery are generally interlocutory.").  City of Rockford does not argue that the Bankruptcy Court applied the wrong standard or committed legal error in applying that standard.  (*See* D.I. 14 at 8-9, 11, 15) (agreeing that Federal Rules of Civil Procedure 26 and 45 govern the scope of

discovery)  Rather, City of Rockford simply takes issue with the Bankruptcy Court's factual
determinations.

City of Rockford further argues that the Quash Order "forecloses any further work" by
the Bankruptcy Court in the adversary proceeding.  The Court disagrees.  Although the
Bankruptcy Court quashed the amended subpoena, the Quash Order did not rule on whether the
City of Rockford would prevail on its opposition to the Preliminary Injunction Order.
Thereafter, the Bankruptcy Court received evidence and argument over the course of three days
with respect to the underlying motion before issuing its ruling.  The Quash Order clearly left
additional work to be done by the Bankruptcy Court.

Finally, the Bankruptcy Court held that the information sought by the amended subpoena
– regarding a factual basis for the indemnity claims – would not have affected its decision to
enter the Preliminary Injunction Order, which was based on other factors as well.  Thus, as to
judicial economy, an appeal or even a reversal of the Quash Order now would not change the
result and would be a waste of the parties' time and resources.

In sum, the relevant factors do not support a finding that the Quash Order should be
considered final.

### C.    *The Quash Order Does Not Warrant Interlocutory Review*

Section 158(a) does not identify the standard district courts should use in deciding
whether to grant leave for interlocutory appeal.  "Typically, however, district courts follow the
standards set forth under 28 U.S.C. § 1292(b), which govern interlocutory appeals from a district
court to a court of appeals." *In re AE Liquidation, Inc.*, 451 B.R. 343, 346 (D. Del. 2011).[4]

---

[4] *See also In re Philadelphia Newspapers, LLC,* 418 B.R. 548, 556 (E.D. Pa. 2009) ("Based upon
the decision of the Third Circuit in *Bertoli v. D'Avella (In re Bertoli)*, 812 F.2d 136, 139 (3d Cir.
1987), courts within this Circuit confronted with the decision whether to grant leave to allow an
interlocutory appeal are informed by the criteria in 28 U.S.C. § 1292(b).").

Under the standards of § 1292(b), an interlocutory appeal is permitted only when the order at issue (1) involves a controlling question of law upon which there is (2) substantial ground for difference of opinion as to its correctness, and (3) if appealed immediately, may materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b); *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974).  Entertaining review of an interlocutory order under § 1292(b) is appropriate only when the party seeking leave to appeal "establishes exceptional circumstances [to] justify a departure from the basic policy of postponing review until after the entry of final judgment." *In re Del. and Hudson Ry. Co.*, 96 B.R. 469, 472-73 (D. Del. 1989), *aff'd*, 884 F.2d 1383 (3d Cir. 1989).  In part, this stems from the fact that "[p]iecemeal litigation is generally disfavored by the Third Circuit." *In re SemCrude, L.P.*, 2010 WL 4537921, at *2 (D. Del. Oct. 26, 2010) (citing *In re White Beauty View, Inc.*, 841 F.2d 524, 526 (3d Cir. 1988)).  Further, leave for interlocutory appeal may be denied for "entirely unrelated reasons such as the state of the appellate docket or the desire to have a full record before considering the disputed legal issue." *Katz*, 496 F.2d at 754.

### i.   *Controlling Question of Law As To Which There Is Substantial Ground for Difference of Opinion*

"A controlling question of law must encompass at the very least every order which, if erroneous, would be reversible error on final appeal." *Katz*, 496 at 755.  "'[C]ontrolling' means serious to the conduct of the litigation, either practically or legally.  And on the practical level, saving of time of the district court and of expense to the litigants [has been] deemed . . . to be a highly relevant factor." *Id.* (internal citation omitted).  The "controlling question of law" also must be one as to which there is "substantial ground for difference of opinion." 28 U.S.C. § 1292(b).

12

City of Rockford repeats its position that the "propriety of quashing a deposition notice issued under Rule 45 is a question of law," but cites no case law to support that position.  (D.I. 14 at 15)  City of Rockford is mistaken.  An order granting a motion to quash necessarily implicates questions of fact, as well as the Bankruptcy Court's wide discretion to weigh factors such as relevance, burden, and privilege.

Because the Quash Order does not "involve a 'controlling question of law,'" there cannot be "'substantial ground for difference of opinion' as to its correctness."  *See Katz*, 496 F.2d at 754 (quoting 28 U.S.C. § 1292(b)).  City of Rockford's speculation that the Bankruptcy Court relied on unarticulated and disputed questions of privilege with which there is "certainly a substantial difference of opinion" (D.I. 14 at 16) is unsupported.  Substantial ground for difference of opinion "calls for more than mere disagreement with the ruling of the Bankruptcy Court."  *Mesabi Metallics Co. LLC v. Cleveland-Cliffs, Inc. (In re Essar Steel Minn. LLC),* 607 B.R. 409, 416 (D. Del. 2019).  While City of Rockford attempts to insert a dispute over legal privilege, it does not challenge the legal standard applied by the Bankruptcy Court or identify any legal error in the Bankruptcy Court's application of that standard.  The Bankruptcy Court's decision is entirely consistent with well-established law.

### ii.   *Whether Immediate Appeal Will Materially Advance Termination Of Litigation*

City of Rockford argues that immediate appeal will materially advance the ultimate termination of the litigation because reversal of the Quash Order will purportedly "highlight[] the basis [of] Express Scripts['] purported indemnity claim" and "requir[e] resolution of the validity of the indemnity claim." (D.I. 14 at 17)  This argument is unavailing.  In granting the Preliminary Injunction Order, the Bankruptcy Court explained that "[i]t is not for this Court to make an ultimate ruling on the question of whether ESI['s] indemnity claims will be successful."

13

(D.I. 5-3, 11/23/20 Hr'g Tr. at 46)  The Bankruptcy Court further made clear that, even if it were to find "that ESI's alleged indemnification claims were not valid, the debtors have pointed to several other reasons . . . why continuation of the litigation against the nondebtor entities would have an adverse impact of the debtors' estates."  (*Id.* at 46-47)  Appellate review of the Quash Order will not advance, materially or otherwise, the ultimate termination of the litigation because the Quash Order and the discovery that City of Rockford sought in the amended subpoena were not necessary to the Bankruptcy Court's decision to grant the Preliminary Injunction Order.

         **iii.**     ***Whether Exceptional Circumstances Justify Immediate Appeal***

"Interlocutory appeal is meant to be used sparingly and only in exceptional cases where the interests cutting in favor of immediate appeal overcome the presumption against piecemeal litigation." *AE Liquidation*, 451 B.R. at 349 (internal quotation marks omitted).  City of Rockford did not identify any exceptional circumstances that might warrant deviation from the final judgment rule.  (*See* D.I. 14)  There is no "urgency that sets this case apart" and establishes the need for immediate review.  *In re Magic Rests., Inc.*, 202 B.R. 24, 26-27 (D. Del. 1996).

     **5.**  ***Conclusion.***  For the reasons explained above, the Court GRANTS the Motion to Dismiss (D.I. 5).  The Clerk is directed to CLOSE Civ. No. 20-1533-LPS.

May 21, 2021
Wilmington, Delaware

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT JUDGE

**Exhibit D**


**Breton Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>MALLINCKRODT PLC, *et al.*,<br><br>                       Debtors. | Chapter 11<br>Case No. 20-12522 (JTD)<br>(Jointly Administered) |

## ACTHAR PLAINTIFFS' NOTICE OF DEPOSITION OF
## KATHLEEN BRETON

**TO:** **Debtors**
    c/o **RICHARDS, LAYTON & FINGER, P.A.**
    Mark D. Collins (No. 2981)
    Robert J. Stearn, Jr. (No. 2915)
    Michael J. Merchant (No. 3854)
    One Rodney Square
    920 N. King Street
    Wilmington, DE 19801

**PLEASE TAKE NOTICE** that, pursuant to Rule 30 of the Federal Rules of Civil

Procedure, **YOU ARE HEREBY COMMANDED** to attend and give testimony before the

above named Court by way of deposition upon oral examination before a notary public or

some other officer authorized by law to administer oaths in the above-captioned matter on

**May 27, 2020, at 9:00 a.m.**, and continuing thereafter from day to day until completed, at the

law offices of Ciradi, Ciardi & Astin, 1204 North King Street, Wilmington, Delaware (or at

such other time, or at such other place, as counsel and the witness agree upon in writing).  The

testimony will be recorded stenographically and by videotape.  The testimony shall cover all

information known or reasonably available to the witness with respect to the subject matters

identified in **Exhibit "A".**

_____

1

**A-2135**

**YOU ARE HEREBY COMMANDED** to attend and give testimony before the above named Court by way of deposition upon oral examination before a notary public or some other officer authorized by law to administer oaths in the above-captioned matter**.**, and continuing thereafter from day to day until completed,

Pursuant to Rule 30(b)(3) and (4), the testimony will be taken by remotely by the identified electronic means (Zoom video conference) and recorded stenographically and by videotape. Failure to appear or comply with this Notice shall subject you to the penalties provided by law.

Date:   May 18, 2021
        Wilmington, Delaware

CIARDI CIARDI & ASTIN

*/s/ Daniel K. Astin*
Daniel K. Astin (No. 4068)
1204 North King Street
Wilmington, DE  19801
Telephone: (302) 658-1100
Facsimile: (302) 658-1300
dastin@ciardilaw.com

2

**A-2136**

-and-

Albert A. Ciardi, III, Esquire
Walter W. Gouldsbury III, Esquire
CIARDI CIARDI & ASTIN
One Commerce Square, Suite 3500
2005 Market Street

Philadelphia, PA 19103
Telephone: (215) 557-3550
Facsimile: (215) 557-3551
aciardi@ciardilaw.com
wgouldsbury@ciardilaw.com

-and-

Donald E. Haviland, Jr., Esquire
HAVILAND HUGHES
201 S. Maple Ave., Suite 110
Ambler, PA 19002
Telephone: (215) 609-4661
Facsimile: (215) 392-4400
haviland@havilandhughes.com

*Attorneys for the Acthar Plaintiffs*

3

**EXHIBIT "A"**

**SUBJECT MATTERS FOR EXAMINATION**

1.  The books and records of Mallinckrodt referring, relating to or reflecting identification of Third-Party Payors ("TPPs") of Acthar.

2.  Identification of Acthar patients, insurers, PBMs, and TPPs.

3.  Communications with Acthar patients, insurers, PBMs, and TPPs.

4.  The Payer Intelligence Grid ("P.I.G."), and its creation, substance and use.

5.  The website https://mallinckrodt/acthar.com.

6.  Communications with and information exchanged with the ASAP HUB about Acthar patients, insurers, PBMs, and TPPs.

**A-2138**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>MALLINCKRODT PLC, *et al.*,<br><br>Debtors. | Chapter 11<br>Case No. 20-12522 (JTD)<br>(Jointly Administered) |

### CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that a true and correct copy of the Notice of Deposition of the Acthar Plaintiffs was served via electronic mail this 18th day of May, 2021, upon all parties.

Date:   May 18, 2021
　　　　Wilmington, Delaware

　　　　　　　　　　　　　　　Donald E. Haviland, Jr., Esquire
　　　　　　　　　　　　　　　HAVILAND HUGHES
　　　　　　　　　　　　　　　201 S. Maple Ave., Suite 110
　　　　　　　　　　　　　　　Ambler, PA 19002
　　　　　　　　　　　　　　　Telephone: (215) 609-4661
　　　　　　　　　　　　　　　Facsimile: (215) 392-4400
　　　　　　　　　　　　　　　haviland@havilandhughes.com

　　　　　　　　　　　　　　　*Attorneys for the Acthar Plaintiffs*

A-2139

**Exhibit E**

**Humana Unsubstantiated Claims 30(b)(6) Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

In re:

MALLINCKRODT PLC., *et al.*,[1]

Debtors.

Chapter 11
Case No. 20-12522 (JTD)

(Jointly Administered)

**Re:  D.I. 2165**

### ATTESTOR LIMITED AND HUMANA INC.'S
### NOTICE OF DEPOSITION OF DEBTORS
### PURSUANT TO FED. R. CIV. P. 30(b)(6) AND FED. R. BANKR. P. 7030

PLEASE TAKE NOTICE that on May 20, 2021, pursuant to Federal Rule of Civil Procedure 30(b)(6) and Federal Rule of Bankruptcy Procedure 7030, made applicable by Federal Rule of Bankruptcy Procedure 9014, commencing via Veritext's remote deposition platform at 9:00 a.m. ET, before an officer authorized to administer oaths, Attestor Limited, on behalf of itself and its affiliated entities, including Avon Holdings I, LLC (collectively, "Attestor"), and Humana, Inc. ("Humana"), creditors of the above-captioned debtors (collectively, the "Debtors"), by and through their undersigned counsel, shall take the deposition of Debtors by oral examination of witness(es) designated by Debtors to testify on their behalf with respect to the Examination Topics set forth below, and in connection with *Debtors' First Omnibus Objection to Unsubstantiated and Duplicative Claims (Substantive)* [D.I. 2165] (collectively, the "Acthar Claims Objection").

### DEFINITIONS AND INSTRUCTIONS

1.      The Definitions and Instructions found in Attestor and Humana's First Requests for Production of Documents in Connection with Contested Matters, dated May 6, 2021, are

incorporated by reference into this document as if set forth in their entirety and applicable to the matters set forth in the Examination Topics set forth below.

## EXAMINATION TOPICS

1.      The Debtors' corporate structure and organization, including (i) the Company entities that constitute the Specialty Brands and Specialty Generics businesses, (ii) the identities of the Acthar Entities and the Synacthen Entities, (iii) the rights, responsibilities, and obligations of each of the Acthar Entities and Synacthen Entities with respect to Acthar and Synacthen, respectively, and (iv) the locations, roles, and titles of personnel with responsibilities related to Acthar or Synacthen.

2.      The financial state, assets, and valuations of the Debtors, including the Acthar Entities and the Synacthen Entities.

3.      The value of Acthar and Synacthen, including but not limited to the value of any rights or intellectual property related to Acthar or Synacthen.

4.      The value of the Acthar Claims individually and collectively, including but not limited to any valuations made or prepared either internally (i.e., within or between the Debtor entities) or externally by consultants or other professionals.

5.      Intercompany agreements related to Acthar, Synacthen, the Acthar Entities, or the Synacthen Entities, including but not limited to:

        i.      manufacturing agreements;

        ii.     distribution agreements;

        iii.    the ARD Distribution Agreement;

        iv.     royalty agreements;

        v.      licensing agreements;

---

[1]      A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The

vi.    any intercompany transfers;

vii.    R&D service agreements;

viii.    intercompany transactions involving Mallinckrodt ARD LLC or revenues related to Acthar Intercompany Transfers and/or Synacthen Intercompany Transfers; and

ix.    dividends paid to parents, subsidiaries, and affiliates.

6.    Any additional transfers or transactions, including intercompany transfers and transactions, involving (1) Mallinckrodt Lux IP S.a.r.l., Mallinckrodt Pharmaceuticals Ireland Ltd., ST Operations LLC, Mallinckrodt plc, Mallinckrodt US Pool LLC, or Mallinckrodt Group S.a.r.l, or (2) related to Acthar or Synacthen.

7.    The Company's centralized banking and cash management system, including but not limited to the Company's cash management agreements.

8.    The Company's refinancing efforts between January 1, 2019, and October 12, 2020, that affected or related to Mallinckrodt ARD LLC, including but not limited to:

i.    efforts to refinance various Debentures and Notes due in 2020, 2022, 2023, and 2015;

ii.    efforts to refinance or amend existing term loans and revolving credit facilities;

iii.    negotiation and execution of the exchange and support agreement, dated February 25, 2020, with the Exchanging Holders;

iv.    negotiation and execution of the exchange and support agreement, dated April 7, 2020, with the Exchanging Holders and certain private funds managed by Columbus Hill Capital Management, L.P.;

Debtors' mailing address is 675 McDonnell Boulevard, Hazelwood, Missouri 63042.

A-2143

  v.  issuance of the 10.00% first lien senior secured notes due 2025 pursuant to the indenture April 7, 2020;

  vi.  the terms, conditions, and negotiations related to any guarantees granted to holders of unsecured debt; and

  vii.  the terms, conditions, and negotiations related to any security agreements entered into with holders of previously unsecured debt.

9.  The notes, loans, debt instruments, credit facilities, or other instruments or facilities that are secured by the assets of or guaranteed by any Acthar Entity.

10.  The Company's receipt of proceeds from any loans for which an Acthar Entity is a guarantor.

11.  The Company's intercompany financing and associated legal entity ownership reorganization completed during the three months ending March 29, 2019, as disclosed in the Company's Form 10-Q dated May 7, 2019.

12.  Financial information relating to Acthar manufacturing and sales, including information regarding prices charged for Acthar, costs expended by the Company in connection with the production, marketing, and sales of Acthar, sales data for Acthar, and revenues, profits, losses, and associated financial data relating to Acthar.

13.  Financial information relating to the Company's opioid manufacturing and sales, including information regarding:

  i.  prices charged for opioids;

  ii.  costs expended by the Company in connection with the production, marketing, and sales of opioids;

  iii.  sales data for opioids;

  iv.  revenues, profits, losses, and associated financial data relating to opioids;

     v.      the financial state, assets, and valuation of Mallinckrodt's "Specialty Generics" business and/or the entities that are part of the "Specialty Generics" business; and

     vi.      the entities against whom opioid-related claimants have claims, the value of those claims, and the treatment of those claims under the Plan.

14.     The Debtors' bases for disallowing and expunging Acthar-related claims as sought through the Acthar Claims Objection.

15.     The Debtors' $260 million CMS/DOJ/States Settlement, including the entities against whom the DOJ and CMS have claims, the value of those claims, and the treatment of those claims under the Plan.

16.     The Debtors' proposed treatment of their unsecured noteholders under the Plan.

17.     The Company's acquisition of Questcor Pharmaceuticals in 2014, including (i) the individuals responsible for evaluating and deciding to enter into the transaction, (ii) the Company's reasons for entering into the transaction, and (iii) the Company's knowledge of Questcor's pre-merger business practices related to Acthar.

Dated: May 12, 2021
      Wilmington, Delaware      **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/Nader A. Amer*_____
Donna L. Culver (Bar No. 2983)
Robert J. Dehney (Bar No. 3578)
Matthew B. Harvey (Bar No. 5186)
Nader A. Amer (Bar No. 6635)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989
Email:     dculver@morrisnichols.com
             rdehney@morrisnichols.com
             mharvey@morrisnichols.com
             namer@morrisnichols.com

and

Matthew A. Feldman (admitted *pro hac vice*)
Matthew Freimuth (admitted *pro hac vice*)
Benjamin P. McCallen (*pro hac vice* application forthcoming)
Richard Choi (admitted *pro hac vice*)
Philip F. DiSanto (admitted *pro hac vice*)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Email:     mfeldman@willkie.com
             mfreimuth@willkie.com
             bmccallen@willkie.com
             rchoi1@willkie.com
             pdisanto@willkie.com

*Counsel to Attestor and Humana*

## CERTIFICATE OF SERVICE

     The undersigned certifies that, on May 12, 2021, a true and correct copy of the above **ATTESTOR LIMITED AND HUMANA INC.'S NOTICE OF DEPOSITION OF DEBTORS PURSUANT TO FED. R. CIV. P. 30(b)(6) AND FED. R. BANKR. P. 7030** was served on the following counsel for Debtors and Debtors in Possession:

| | |
|---|---|
| **RICHARDS, LAYTON & FINGER, P.A.**<br>Mark D. Collins (No. 2981)<br>Robert J. Stearn, Jr. (No. 2915)<br>Michael J. Merchant (No. 3854)<br>Amanda R. Steele (No. 5530)<br>Brendan J. Schlauch (No. 6115)<br>One Rodney Square<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 651-7700<br>Facsimile: (302) 651-7701<br>Email: collins@rlf.com<br>stearn@rlf.com<br>merchant@rlf.com<br>steele@rlf.com<br>schlauch@rlf.com | Jason B. Gott (*pro hac vice*)<br>**LATHAM & WATKINS LLP**<br>330 North Wabash Avenue, Suite 2800<br>Chicago, Illinois 60611<br>Telephone: (312) 876-7700<br>Facsimile: (312) 993-9767<br>Email: jason.gott@lw.com |
| George A. Davis (*pro hac vice*)<br>George Klidonas (*pro hac vice*)<br>Andrew Sorkin (*pro hac vice*)<br>Anupama Yerramalli (*pro hac vice*)<br>**LATHAM & WATKINS LLP**<br>885 Third Avenue<br>New York, New York 10022<br>Telephone: (212) 906-1200<br>Facsimile: (212) 751-4864<br>Email: george.davis@lw.com<br>george.klidonas@lw.com<br>andrew.sorkin@lw.com | Jeffrey E. Bjork (*pro hac vice*)<br>**LATHAM & WATKINS LLP**<br>355 South Grand Avenue, Suite 100<br>Los Angeles, California 90071<br>Telephone: (213) 485-1234<br>Facsimile: (213) 891-8763<br>Email: jeff.bjork@lw.com |

*/s/Nader A. Amer*_____

A-2147

**Exhibit F**

**Haviland Hughes Plaintiffs Unsubstantiated Claims 30(b)(6) Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br>MALLINCKRODT PLC, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 20-12522 (JTD)<br><br>(Jointly Administered) |

### ACTHAR PLAINTIFFS'[1] NOTICE OF DEPOSITION *DUCES TECUM* OF CORPORATE DESIGNEE (S) OF DEBTORS REGARDING DEBTORS' OMNIBUS OBJECTIONS TO UNSUBSTANTIATED CLAIMS [D.I. 2165]

**TO:   Debtors**
c/o **RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Michael J. Merchant (No. 3854)
One Rodney Square
920 N. King Street
Wilmington, DE 19801

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure as incorporated herein through Federal Rule of Bankruptcy Procedure 7030, **the**

**Acthar Plaintiffs** will take the deposition upon oral examination of one or more **Corporate**

**Designee(s) for the Debtors** through one or more officers, directors, agents or other

representatives who shall be designated to testify on Debtors' behalf regarding all information

---

[1] The "**Acthar Plaintiffs**" consist of the following: the City of Rockford ("**Rockford**), Steamfitters Local Union No. 420 ("**Steamfitters Local 420**"), the International Union of Operating Engineers Local 542 ("**IUOE Local 542**"), United Association of Plumbers & Pipefitters Local 322 of Southern New Jersey ("**Plumbers Local 322**") and Acument Global Technologies ("**Acument**"), individually and on behalf of the classes of third party payors ("**TPPs**") and their beneficiaries that Rockford, Steamfitters Local 420 and Plumbers Local 322 seek to represent in their respective cases currently pending in federal district courts in the Northern District of Illinois, the Eastern District of Pennsylvania, and the District of New Jersey, respectively.

1

A-2149

known or reasonably available to Debtors' with respect to the subject matters identified in **Exhibit "A".**

      **YOU ARE HEREBY COMMANDED** to attend and give testimony before the above named Court by way of deposition upon oral examination before a notary public or some other officer authorized by law to administer oaths in the above-captioned matter on **Monday, May 21, 2021, at 9:00 a.m.**, or at such other agreeable time, and continuing thereafter from day to day until completed, at the law offices of Ciardi, Ciardi & Astin, 1204 North King Street, Wilmington, Delaware (or at such other time, or at such other place, as counsel and the witness agree upon in writing).

      Pursuant to Rule 30(b)(3) and (4) as incorporated herein by Federal Rule of Bankruptcy Procedure 7030, the testimony will be taken by remotely by the identified electronic means (Zoom video conference) and recorded stenographically and by videotape.  Failure to appear or comply with this Notice shall subject you to the penalties provided by law.

      **PLEASE TAKE FURTHER NOTICE** that, pursuant to Rule 34 of the Federal Rules of Civil Procedure as incorporated herein by Federal Rule of Bankruptcy Procedure 7034, the Acthar Plaintiffs require the production of documents set forth in **Exhibit "B"** in advance of the deposition, at a mutually agreeable time and place in advance of the deposition.

Date:   May 7, 2021
        Wilmington, Delaware

                              CIARDI CIARDI & ASTIN

                              */s/ Daniel K. Astin*
                              Daniel K. Astin (No. 4068)
                              1204 North King Street
                              Wilmington, DE  19801
                              Telephone: (302) 658-1100
                              Facsimile: (302) 658-1300
                              dastin@ciardilaw.com

A-2150

-and-

Albert A. Ciardi, III, Esquire
Walter W. Gouldsbury III, Esquire
(*Admitted pro hac vice*)
CIARDI CIARDI & ASTIN
1905 Spruce Street
Philadelphia, PA 19103
Telephone: (215) 557-3550
Facsimile: (215) 557-3551
aciardi@ciardilaw.com
wgouldsbury@ciardilaw.com

-and-

Donald E. Haviland, Jr., Esquire
(*Admitted pro hac vice*)
William H. Platt II, Esquire
(*Admitted pro hac vice*)
David M. Catherine, Esquire
HAVILAND HUGHES
201 S. Maple Ave., Suite 110
Ambler, PA 19002
Telephone: (215) 609-4661
Facsimile: (215) 392-4400
haviland@havilandhughes.com
platt@havilandhughes.com
catherine@havilandhughes.com

-and-

Dion G. Rassias, Esquire
Jillian E. Johnston, Esquire
(*Admitted pro hac vice*)
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA  19107
T: 215-592-1000
dgr@beasleyfirm.com
Jill.johnston@beasleyfirm.com
-and-

James R. Bartimus, Esquire
Anthony L. DeWitt, Esquire

*(Admitted pro hac vice)*
BARTIMUS, FRICKLETON,
ROBERTSON, RADAR PC
11150 Overbrook Road
Leawood, KS 66211
(913) 266-2300
(913) 266-2366 (fax)
-and-

Peter J. Flowers, Esquire
Jonathan P. Mincieli, Esquire
*(Admitted pro hac vice)*
MEYERS & FLOWERS, LLC
3 North Second Sreet, Suite 300
St. Charles, IL 60174
T: 630-232-6333
F: 630-845-8982
pjf@meyers-flowers.com
jpm@meyers-flowers.com

*Attorneys for the Acthar Plaintiffs*

**A-2152**

## EXHIBIT "A"

## SUBJECT MATTERS FOR EXAMINATION

1.   The subject matters included in the Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive) at D.I. 2165 (the "Omnibus Objection").

2.   The Unsubstantiated Acthar Litigation Claims as listed in Schedule 1 to Omnibus Objection.

3.   The Other Unsubstantiated Acthar Claims as listed in Schedule 2 to Omnibus Objection.

4.   Communications regarding the "Stipulation and Agreement Permitting Third Party Payors to File Consolidated Proofs of Claim" [D.I. 1292], as reflected in the "Addendum to TPP Consolidated Proof of Claim" filed by the various "Other Unsubstantiated Acthar Claims", as listed on Schedule 2, to the Omnibus Objection.

5.   "Claim Amounts" of the various Unsubstantiated Acthar Litigation Claims, as listed on Schedule 1 to the Omnibus Objection, for which no claim amount is listed but the Debtors (Mallinckrodt plc and Mallinckrodt ARD) list the claim as a "remaining claim".

6.   "Claim Amounts" of the various Other Unsubstantiated Acthar Claims, as listed on Schedule 1 and 2 to the Omnibus Objection, for which no claim amount is listed but the Debtors (Mallinckrodt plc and Mallinckrodt ARD) list the claim as a "remaining claim".

7.   Communications regarding Evernorth Proofs of Claim, Claim Nos. 3133 and 3396.

8.   Communications regarding indemnification rights of asserted by Cigna, Evernorth and/or any Express Scripts entity.

9.   The transfer of the sum of $3,333,466,611 from various Debtor entities and Non-Debtor Affiliates to MPIL pre-petition, as reflected in the MPIL Statement of Financial Affairs, D.I. 1010, including the reasons therefor and the source(s) of funds transferred.

10. The transfer of monies out of the $3,333,466,611 held by MPIL after December 23, 2020, and the reason(s) therefor.

11. The Intercompany – Commercial Supply Chain Reestablishment given as the reason for the above-listed $561,654,617 transfer to MPIL.

12. The formation, creation and operation of MPIL.

13. MPIL's management of the Mallinckrodt specialty brands business, including the sales of Acthar and Synacthen.

14. MPIL's specific function of handling the calculation and payment of royalties owed to Aventis Pharmaceuticals under the 2001 Acthar acquisition agreement whereby Aventis was entitled to be paid and was paid 1% of the adjusted net sales of Acthar.

15. The formation, creation and operation of Sonorant Therapeutics as the new name of Mallinckrodt once the generic product line (which include the opioid business) was sold off, including the decision to base the new entity in Bedminster, New Jersey, the same location of Mallinckrodt ARD in the United States.

16. The formation, creation and operation of Questcor International, LTD f/k/a Akasia, Limited.

17. The "Capital Contribution for Novartis Contingent Consideration" payment made on June 17, 2020 by Mallinckrodt ARD to Non-Debtor Questcor International Ltd.

18. The decision of Mallinckrodt ARD f/k/a Questcor Pharmaceuticals to sell BioVectra in December 2019.

19. "Project Lobster Tail" and "Project Throughbred".

20. Mallinckrodt ARD's oversight of Mallinckrodt Ireland including its approval of expenditures by Mallinckrodt ARD's President Kathy Schaefer.

21. The decision to transfer the Synacthen license from MSPIL to MPIL in 2016.

22. The current status (between 2019-2021) of the Synacthen license in the United States, as required by the 2017 settlement between Mallinckrodt and the federal government.

**EXHIBIT "B"**

**REQUEST FOR PRODUCTION OF DOCUMENTS**

The Acthar Plaintiffs incorporate by reference thereto the following discovery served concurrently herewith:

**THE ACTHAR PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS
SUBMITTED TO THE MALLINCKRODT DEBTORS
AS TO DEBTORS' FIRST OMNIBUS OBJECTION
TO UNSUBSTANTIATED CLAIMS (SUBSTANTIVE) [D.I. 2165]**

A-2155

# CERTIFICATE OF SERVICE

I, Daniel K. Astin, hereby certify that on May 7, 2021, I caused a true and correct copy of the foregoing Notice of Deposition Duces Tecum was served *via* email on the following counsel of record as follows:

Jason B. Gott, Esquire
**Latham & Watkins LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL   60611
E-mail: Jason.gott@lw.com

and

Michael J. Merchant, Esquire
**Richards, Layton & Finger, P.A.**
One Rodney Square
920 N. King Street
Wilmington, DE 19801
merchant@rlf.com

*/s/ Daniel K. Astin*
Daniel K. Astin (No. 4068)

A-2156

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No. 20-12522 (JTD) |
| MALLINCKRODT PLC., *et al.*,[1] |  |
|  | (Jointly Administered) |
|  | **Hearing Date:** |
| Debtors. | **June 2, 2021, 3:00 p.m. (ET)** |
|  |  |
|  | **Re: Docket No. 2583** |

**ATTESTOR LIMITED AND HUMANA INC.'S LIMITED OBJECTION TO DETORS'
MOTION TO QUASH (A) ATTESTOR LIMITED AND HUMANA INC.'S NOTICE OF
DEPOSITION OF DEBTORS PURSUANT TO FED. R. CIV. P. 30(b)(6) AND FED. R.
BANKR. P. 7030; (B) ACTHAR PLAINTIFFS' NOTICE OF DEPOSITION *DUCES TECUM*
OF CORPORATE DESIGNEE(S) OF DEBTORS; AND (C) ACTHAR PLAINTIFFS'
<u>NOTICE OF DEPOSITION OF KATHLEEN BRETON</u>**

---

[1]      A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the
Debtors' proposed claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors'
mailing address is 675 McDonnell Boulevard, Hazelwood, Missouri 63042.

Attestor Limited, on behalf of itself and its affiliated entities, including Avon Holdings I, LLC (collectively, "<u>Attestor</u>"), and Humana, Inc. ("<u>Humana</u>," and, together with Attestor, the "<u>Acthar Insurance Claimants</u>"),[2] creditors of the above-captioned debtors (collectively, the "<u>Debtors</u>" or "<u>Mallinckrodt</u>"), by and through their undersigned counsel, hereby submit this limited objection to the *Debtors' Motion to Quash (A) Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed. R. Civ. P. 30(b)(6) and Fed. R. Bankr. P. 7030; (B) Acthar Plaintiffs' Notice of Deposition* Duces Tecum *of Corporate Designee(s) of Debtors; and (C) Acthar Plaintiffs' Notice of Deposition of Kathleen Breton* [D.I. 2583] (the "<u>Motion to Quash</u>").

## PRELIMINARY STATEMENT

1.      Acthar is by far the Debtors' most profitable drug:  in 2020, that product alone contributed $768 million in net sales to the Debtors' financial results and constituted about 37% of the Specialty Brands sales or 27.9% of the Debtors' overall sales.[3]  A large portion of the revenue from those sales comes directly or indirectly through insurer payments or reimbursements.  Nevertheless, the Debtors have proposed a Plan that allocates $100 million to all general unsecured creditors, including the Acthar Insurance Claimants, while using Acthar revenue to fund billion-dollar payouts to opioid claimants and unsecured noteholders, and protecting the business practices that gave rise to Acthar-related liabilities in the first place.

2.      In order to silence the Acthar Insurance Claimants and confirm their deeply flawed Plan, the Debtors argue through the *First Omnibus Objection to Unsubstantiated Claims (Substantive)* [D.I.

---

[2]      Attestor entered into an agreement with Humana to pursue and participate in any proceeds of Humana's claims against the Debtors with respect to the distribution, marketing, and sale of Acthar.  *See* Verified Statement of Willkie Farr & Gallagher LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure, D.I. 2066.  Attestor is also the transferee and owner of the Acthar-related claims filed by United Healthcare Services Inc. ("<u>United</u>"), and OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC (together, "<u>OptumRx</u>").  *See* Transfer/Assignment of Claim, D.I. 2317.  Attestor is in discussions to acquire additional claims and may seek further relief as to such claims.

[3]      *See* Disclosure Statement at 27-28.

A-2158

2165] (the "'Acthar Claims Objection") that claims asserted by the Acthar Insurance Claimants should be disallowed and expunged except as against two Debtors—Mallinckrodt ARD LLC ("ARD") and Mallinckrodt plc ("plc").  If successful, the Debtors will then argue that ARD and plc have little to no value and, thus, the Acthar Insurance Claimants can be relegated to fight for an even smaller portion of the $100 million pot allocated to all other general unsecured claimants.

3.      The instant Motion to Quash seeks to limit the amount of discovery that Acthar-related claimants can receive in advance of the Debtors' effort to disallow and expunge their claims.  That motion should be denied on the grounds set forth below.

## OBJECTION

4.      The Acthar Insurance Claimants have alleged a decade-long pattern of misconduct by the Debtors related to the pricing, marketing, and sale of Acthar.  Among other things, the Debtors acquired rights to the closest competitor to Acthar without any intention of commercializing it, bribed doctors to prescribe Acthar for indications with no or limited clinical support and reimbursed patient co-payments so that Acthar would be "free" to patients and their physicians, while charging insurers billions at artificially inflated prices.  During this time, the price of Acthar increased from approximately $40 in 2001 to $38,892 in 2018.  On the basis of these facts, in August 2019, Humana commenced litigation against Debtors Mallinckrodt ARD LLC ("ARD"), the entity that distributes Acthar, and Mallinckrodt plc ("plc"), the ultimate corporate parent of ARD.  United and OptumRx, which hold Acthar-related claims similar to those of Humana, had not yet filed litigation at the time of the Debtors' chapter 11 filings.  After these cases were commenced, the Acthar Insurance Claimants filed proofs of claim against all Debtors.

5.      The Acthar Claims Objection seeks to disallow and expunge all claims asserted by each of the Acthar Insurance Claimants—except for those against ARD and plc—on the sole basis that Humana's initial complaint in the pre-petition litigation named only ARD and plc as defendants.  The

A-2159

Debtor's argument is paper-thin and obviously flawed.  First, the full web of Debtor entities was not disclosed to creditors until after these cases were filed, well after the initial Humana complaint. Second, at the very least, the Acthar Insurance Claimants have claims against the Debtor entities that are involved in, assisted in, or controlled anticompetitive and racketeering conduct, such as wildly increasing the price for Acthar, bribing doctors, and purchasing a competitor drug, among other things. If that conduct took place at entities other than ARD and plc, then the Acthar Insurance Claimants at least have claims against the entities where that conduct occurred.  Until relevant discovery is produced in the context of estimation, any disallowance of such claims would be premature.  Third, the Debtors' story simply does not add up.  The Debtors recently filed exhibits to their Disclosure Statement indicating a $5.2-5.7 billion aggregate enterprise value, but appear to attribute only $225 million of distributable value to ARD in a liquidation scenario, despite the fact that this is the entity that distributes and collects payments for the company's most valuable product, which accounts for approximately 30% of the Company's annual sales.  In short, the Debtors' position that the Acthar Insurance Claimants have claims at only two entities—and that those entities have little value—does not hold water.

6.      After the Debtors filed their Acthar Claims Objection, the Acthar Insurance Claimants served document requests and a 30(b)(6) notice on the Debtors, and have met and conferred with the Debtors about that discovery.  The parties have "resolved" certain issues, at least for the purposes of this Motion to Quash.  For instance, the Acthar Insurance Claimants have repeatedly sought information regarding the underlying anticompetitive and racketeering conduct upon which their claims are based, as set forth above.  The Debtors have taken the position that such discovery is irrelevant for purposes of their Acthar Claims Objection.[4]  The Acthar Insurance Claimants disagree—

---

[4]      *See, e.g., Debtors Responses and Objections to Document Requests*, dated May 19, 2021, RFPs 20-34, attached hereto as Exhibit A.

if the question on this motion is whether the Acthar Insurance Claimants can pursue claims against Debtor entities other than ARD and plc, they are entitled to understand whether relevant conduct took place, and if so at what entities. However, discovery on the underlying merits could not be completed by the June 25 hearing, because it involves document discovery, fact depositions and expert testimony, as set forth in the Acthar Insurance Claimants' estimation motion. Moreover, the Acthar Insurance Claimants are mindful of the Court's statement at the May 5 hearing that "[i]f it turns out that discovery is needed [in connection with the Acthar Claims Objection] and the Acthar Plaintiffs can convince me that it's needed and they have been denied the opportunity to take that discovery, then, obviously the claim objections will be denied." (May 5, 2021 Hr'g Tr. 32:14-22.) Thus, while the Acthar Insurance Claimants believe that discovery concerning the underlying merits of their claims is necessary before claims can be summarily disallowed and expunged, that issue is not before the Court on this motion.

7.    Similarly, the Debtors' argument that the Acthar Insurance Claimants are limited to claims at ARD and plc is inextricably intertwined with their argument that those entities have no material value. However, the Acthar Insurance Claimants recognize that many if not all stakeholders in this case have an interest in discovery regarding Debtors' view of value, which should not be done in a duplicative manner. (*See* May 26, 2021 Hr'g Tr. 21:23-22:9 ("THE COURT: Well, the problem with that is those are all confirmation objections . . . they are confirmation issues, and if I open up discovery on this outside the context in just a two-week period, every other constituency in this case is going to want to participate in that [discovery] because there's risk that, if I rule one way or another, it is going to become law of the case[.]"). As such, the Acthar Insurance Claimants do not object to the Motion to Quash insofar as it relates to valuation topics (Topics No. 2, 3, 4 and 12), but reserve their rights to seek information on those topics later in these cases.

8.    Accordingly, this objection to the Motion to Quash is limited to the following 30(b)(6) deposition topics:

4

A-2161

9.      **Topic 7: Cash Management.**  This topic seeks a corporate representative witness on "[t]he Company's centralized banking and cash management system, including but not limited to the Company's cash management agreements."  The Debtors object to providing a witness concerning this topic on the basis that everything the Acthar Insurance Claimants need to know regarding this topic is available in the Debtors' cash management motion, filed with the Court on October 12, 2021, at D.I. 23.[5]  That is not true.  There are many facts about how the Debtors have moved money, including Acthar-related money, both before and after the Petition Date—including how much, why, by whom, and between and on behalf of which entities.  These issues go directly to the purported separateness of the Debtors and their contention that even though most if not all of the Acthar-related revenue goes through ARD and is funneled to other entities, the Acthar Insurance Claimants do not have claims against the entities that receive those funds.

10.      **Topic 15.  DOJ Settlement**.  This topic seeks a witness regarding "[t]he Debtors' CMS/DOJ/States Settlement, including the entities against whom the DOJ and CMS have claims, the value of those claims, and the treatment of those claims under the Plan."  The Debtors object to providing a witness concerning their decision to settle for $260 million the Acthar-related claims asserted by the DOJ, some of which are substantially similar to claims asserted by the Acthar Insurance Claimants.  The DOJ asserted these Acthar-related claims against the entities—ARD and plc—that the Debtors now claim are virtually worthless for the Acthar Insurance Claimants.  Given the similar nature of certain claims by the DOJ, the Acthar Insurance Claimants are entitled to understand the Debtors' view of those liabilities, including whether and what Debtor entities could fund such settlements.  If

---

[5]      *See, e.g., Debtors' Responses and Objections to Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed. R. Civ. P. 30(b)(6) and Fed. R. Bankr. P. 7030*, dated May 26, 2021, Topic No. 7, attached hereto as Exhibit B.

there is a reason for distinguishing the government's claims, that reason may be relevant to the pending motion; if there is no reason, that is even more relevant.

11.    **Topic 17.   Questcor Transaction.**    The Debtors object to providing a witness concerning Mallinckrodt's acquisition of Questcor Pharmaceuticals, the original owner of Acthar.  The full text of Topic 17 reads as follows:  "The Company's acquisition of Questcor Pharmaceuticals in 2014, including (i) the individuals responsible for evaluating and deciding to enter into the transaction, (ii) the Company's reasons for entering into the transaction, and (iii) the Company's knowledge of Questcor' premerger business practices related to Acthar."

12.    The Debtors argue that this request should be quashed because it relates the merits of the underlying claims, which is irrelevant on this motion.  (Motion to Quash ¶ 41.)  That argument misses the point. The Questcor acquisition was effected in 2014 for $5.6 billion pursuant to which a U.S.-based Mallinckrodt entity merged with Questcor.  That transaction is relevant to the Acthar Claims Objection for at least two reasons.  First, the anticompetitive and racketeering conduct underlying the claims of the Acthar Insurance Claimants began at Questcor.  Thus, the Debtors were either aware of that illegal conduct and chose to acquire the company anyway, or learned of it later and chose to continue it.  Either way, the Acthar Insurance Claimants are entitled to explore, among other topics, which individuals and entities were involved in the decision to acquire Questcor, what analysis was done of Questcor's business, and why Mallinckrodt chose to enter into the transaction.  Those facts will be relevant to identifying who at Mallinckrodt was responsible for the decision to acquire the rights to Acthar, which entity they worked for, and whether those same individuals control other entities in the Debtors' corporate structure.  Second, it is the Acthar Insurance Claimants' understanding that when Mallinckrodt acquired Questcor, the entire business apparatus for the production, marketing, sale and distribution of Acthar was absorbed by ARD.  Because the Debtors now claim that ARD engages in little relevant conduct related to Acthar and the value of the drug resides in other "boxes," the Acthar

Insurance Claimants have a right to explore issues related to that acquisition and what happened to those assets since that time.

13.     **Topic 6.   Acthar-Related Transfers or Transactions.**   The Debtors objected to providing a witness on transfers or transactions involving certain entities that the Acthar Insurance Claimants believe to have rights, obligations, or roles in the marketing, sale, or distribution related to Acthar.   The full text of Topic 6 reads as follows:   "Any additional transfers or transactions, including intercompany transfers and transactions, involving (1) Mallinckrodt Lux IP S.a.r.l., Mallinckrodt Pharmaceuticals Ireland Ltd., ST Operations LLC, Mallinckrodt plc, Mallinckrodt US Pool LLC, or Mallinckrodt Group S.a.r.l, or (2) related to Acthar or Synacthen."   In separate correspondence pre-dating their motion to quash, the Debtors agreed to produce a witness on this topic,[6] but nevertheless moved to quash this topic.   To the extent the Debtors are seeking to quash this topic, it should be denied.   The Acthar Insurance Claimants should be permitted in the context of the motion to disallow to understand why various intercompany transactions and transfers took place, and upon whose authority they were made.   The Debtors contend that claims related to these transactions are derivative claims and not relevant to this motion.   (Motion to Quash ¶¶ 43-46.)   Again, this argument misses the point.   The Acthar Insurance Claimants are not interested in discovery of these transactions to show valid derivative claims; rather, they bear directly on questions of overlapping authority among different corporate entities, which employees were in charge of those transfers, and whether they were truly arms-length (as the Debtors contend).

---

[6]     *See* Email from Hugh Murtagh to Benjamin McCallen, dated May 26, 2021, attached hereto as <u>Exhibit B.</u>

## CONCLUSION

14.     The Acthar Insurance Claimants respectfully request that the Court deny the Motion to Quash to the extent it seeks to quash Topics 6, 7, 15, and 17 of the Acthar Insurance Claimants' 30(b)(6) Notice.


Dated: June 1, 2021                    Respectfully submitted,


**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/Nader A. Amer* _____
Donna L. Culver (Bar No. 2983)
Robert J. Dehney (Bar No. 3578)
Matthew B. Harvey (Bar No. 5186)
Nader A. Amer (Bar No. 6635)
1201 North Market Street, 16th Floor
P.O.  Box 1347
Wilmington, DE 19899-1347
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989
Email:      dculver@morrisnichols.com
            rdehney@morrisnichols.com
            mharvey@morrisnichols.com
            namer@morrisnichols.com

and

Matthew A. Feldman (admitted *pro hac vice*)
Matthew Freimuth (admitted *pro hac vice*)
Benjamin P. McCallen (admitted *pro hac vice*)
Richard Choi (admitted *pro hac vice*)
Philip F. DiSanto (admitted *pro hac vice*)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Email:      mfeldman@willkie.com
            mfreimuth@willkie.com
            bmccallen@willkie.com
            rchoi1@willkie.com
            pdisanto@willkie.com

A-2165

**EXHIBIT A**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | )<br>) Chapter 11<br>) |
| MALLINCKRODT., *et al.*, | ) Case No. 20-12522 (JTD)<br>) |
| Debtors. [1] | ) (Jointly Administered)<br>) |
|  | ) Re: D.I. 2157, 2159, & 2165 |

## DEBTORS' RESPONSES AND OBJECTIONS
## TO ATTESTOR LIMITED AND HUMANA INC.'S FIRST REQUESTS FOR
## PRODUCTION OF DOCUMENTS IN CONNECTION WITH CONTESTED MATTERS

Mallinckrodt plc and its affiliates (collectively, the "***Debtors***"), by and through their undersigned counsel, hereby submit the following responses and objections (the "***Responses and Objections***") to the First Requests for Attestor Limited and Humana Inc. ("***Humana***")'s First Request for Production of Documents, dated May 6, 2021 (the "***Requests***").

## PRELIMINARY STATEMENT

The following Responses and Objections are made solely for purposes of these proceedings and are based upon the facts, documents, and information presently known and available to the Debtors. Without obligating themselves to do so, the Debtors reserve the right to alter, supplement, amend, or otherwise modify these Responses and Objections as additional facts or documents are discovered, revealed, recalled, or otherwise ascertained, and as further analysis, research, investigation, and discovery disclose additional facts, documents, contentions, or legal theories which may apply. The Debtors specifically reserve the right to utilize any subsequently discovered documents or evidence in these chapter 11 cases.

The general and specific objections set forth below are intended to apply to all information

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042

requested, produced, or otherwise provided pursuant to the Requests. Further, these responses do not in any way waive any objections by the Debtors, in this or in any subsequent proceeding, on any grounds, including objections as to the competency, relevancy, materiality, privilege, or admissibility of the Responses and Objections, or the subject matter thereof. This Preliminary Statement is incorporated by reference into the general objections and specific objections set forth below.

## **GENERAL OBJECTIONS**

In addition to those grounds for objection that are set forth specifically in response to each Request, the Debtors object to the Requests on the following grounds (the "***General Objections***"). The Debtors' specific responses and objections to the Requests incorporate, and are to be read in light of, these General Objections. Any undertaking to search for, or provide information or documents in response to, any Request remains subject to the General Objections.

1.       The Debtors generally object that the Requests are, on their face, overly broad, unduly burdensome, and not relevant to the claims or defenses at issue in the (i) *Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases (D.I. 2157)*; (ii) *Motion of Attestor Limited and Humana Inc. for Entry of an Order Allowing and Compelling Payment of Administrative Claims Pursuant to section 503(b) of the Bankruptcy Code (D.I. 2159)*; and (iii) *Debtors' First Omnibus Objection to Unsubstantiated and Duplicative Claims (Substantive)* (D.I. 2165) (collectively, the "Contested Matters"). The Requests are unreasonable and impose an undue burden on the estates. Many of these Requests are also not reasonably calculated to lead to the discovery of admissible evidence and are not relevant to the underlying chapter 11 cases and

Contested Matters.

2.　　The Debtors further object to the Requests to the extent they seek or call for information or documents that are protected from discovery and privileged by reason of: (a) attorney-client privilege; (b) work product doctrine; (c) any joint defense, common interest, or other shared privilege; (d) privilege accorded subsequent remedial measures; or (e) any other applicable discovery rule or privilege or other reasons for nonproduction. The Debtors do not intend to waive any applicable privilege or protection and will not disclose any privileged or protected documents. In the event the Debtors inadvertently disclose any such documents, this disclosure is not intended and shall not be deemed to be and shall not be a waiver by the Debtors of any privilege or protection as provided in the *Order Entering Confidentiality and Protective Order* [D.I. 2125] (the "***Protective Order***") entered in the Debtors' cases. The Debtors reserve the right to demand that Humana return any document inadvertently produced. Specific objections on the grounds of privilege are provided for emphasis and clarity only, and the absence of a specific objection should not be interpreted as evidence that the Debtors do not object to a Request on the basis of an applicable privilege or protection.

3.　　The Debtors object to the Requests to the extent they seek information, including financial information, personal information, confidential information, proprietary business information, competitively sensitive business or commercial information, strategic planning information, trade secrets, or other sensitive or private information, that is protected or prohibited from disclosure under applicable law, statutes, regulations, rules, case law, or any other legal authority, including, but not limited to, the right of privacy, as well as any other confidentiality rights possessed by third parties. To the extent the Debtors respond to these Requests by providing confidential, proprietary, or trade secret information, the Debtors will do so only pursuant to the terms of the Protective Order and any Non-Disclosure Agreement in place currently.

A-2169

4. The Debtors object to the Requests as vague and ambiguous to the extent they contain terms or phrases that the Debtors cannot interpret or understand and to the extent the terms and/or phrases used therein are undefined or fail to meaningfully distinguish between similar (but not identical) terms and phrases used in other parts of the Requests. Where possible, the Debtors have made reasonable assumptions as to the intended meaning and have responded accordingly, while preserving the objection as to vagueness and ambiguity.

5. The Debtors object to the Requests to the extent that they purport to require the production of "all" documents under circumstances in which a subset of documents would be sufficient to show the pertinent information, on the grounds that such requests for the production of "all" documents are overly broad and unduly burdensome.

6. The Debtors object to the Requests to the extent that they seek information or documents that are not within the Debtors' possession, custody or control and to the extent they seek information that can be obtained from another source that is more convenient, less burdensome, or less expensive—including, but not limited to, other parties interested in this matter.

7. The Debtors object to the Requests to the extent they seek electronically stored information from sources that are not reasonably accessible because of undue burden or cost, including without limitation, to the extent the Requests purport to require preservation and/or production of electronically stored information or documents that are not stored on active systems, but are stored on systems, backup tapes and other media that are no longer part of normal business operations. Because of the lack of relevance of such electronically stored information and/or the cost or burden associated with searching, preserving, and accessing these data sources, the Debtors will not search for or produce any such electronically stored information absent a court order to do so.

8.     The Debtors object to the Definitions and Instructions to the extent that they are overly broad, unduly burdensome, not proportional to the needs of the case, vague, ambiguous, and inconsistent with the obligations imposed by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, and other governing law, rule, or order.   In particular, the Definitions of various entities are overbroad.

9.     The Debtors object to the Requests, including the Definitions and Instructions, to the extent they are vague, ambiguous, overly broad, or unduly burdensome with respect to the applicable time period.

10.    The Debtors object to the Requests, including the Definitions and Instructions, to the extent that they are unreasonably cumulative and/or duplicative of each other.

11.    The Debtors object to the Requests, including the Definitions and Instructions, to the extent they seek information that is available to Humana in the public domain or available from sources other than the Debtors, or that is available to or already in the possession, custody, or control of Humana or their attorneys, including in the Debtors' prior production to Humana in its underlying litigation, and for which the burden on Humana to obtain the information is no greater than the burden on the Debtors.

## SPECIFIC RESPONSES AND OBJECTIONS

In addition to the General Objections set forth above, which are expressly incorporated by reference in each response below, the Debtors further set forth the following specific Responses and Objections:

## REQUEST NO. 1:

A corporate structure chart or documents otherwise sufficient to identify each of the Acthar Entities and any of the rights, responsibilities, and obligations of each of the Acthar Entities with respect to Acthar.

5

A-2171

**RESPONSE TO REQUEST NO. 1:**

In addition to and without waiving their General Objections, the Debtors object to this Request as overly broad and unduly burdensome to the extent it seeks "documents" that "identify" "any of the rights, responsibilities, and obligations of each of the Acthar Entities with respect to Acthar." The Debtors further object that this Request seeks information which is not relevant to the Contested Matters. The Debtors also object to the definition of "Acthar Entities" as overbroad.

Subject to and without waiving their General and Specific Objections, the Debtors agree to produce corporate entity org charts and a "legal entity summary" document. The Debtors have already produced these documents as of May 17 and 18, 2021.

**REQUEST NO. 2:**

All documents and communications relating to the financial state and the assets of each and every Acthar Entity, including but not limited to:

     i.     all monthly, quarterly, or annual financial statements (including but not limited to income statements, balance sheets, and cash flow statements);

     ii.     volumes, pricing, and unit costs;

     iii.     revenue by key customer (intercompany and third party);

     iv.     spend by key vendor (intercompany and third party);

     v.     financial details of all intercompany cash transactions;

     vi.     any solvency opinions;

     vii.     any fairness opinions for any transaction;

     viii.     any presentations to actual or potential investors, lenders, or rating agencies;

     ix.     any enterprise, going concern valuations, estimate, or appraisals;

     x.     all budgets, forecasts, business plans, and projections;

     xi.     all monthly trial balance results for the Acthar Entities;

     xii.     all documentation and presentations related to transfer pricing;

xiii.    details of all quarterly management fees; and

xiv.    any valuations performed in connection with these Chapter 11 Cases.

**RESPONSE TO REQUEST NO. 2:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters. This Request appears to seek information related to potential estate claims. The Debtors further object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all documents and communications" relating to the "financial state" of "each and every" Acthar Entity. The Debtors also object to the definition of "Acthar Entity" as overbroad.

Subject to and without waiving their General and Specific Objections, the Debtors are willing to meet-and-confer further with Humana over this Request, but in the context of plan confirmation discovery.

**REQUEST NO. 3:**

A corporate structure chart or documents otherwise sufficient to identify each of the Synacthen Entities and any of the rights, responsibilities, and obligations of each of the Synacthen Entities with respect to Synacthen.

**RESPONSE TO REQUEST NO. 3:**

In addition to and without waiving their General Objections, the Debtors object to this Request as overly broad and unduly burdensome to the extent it seeks "documents" that "identify" "any of the rights, responsibilities, and obligations of each of the Synacthen Entities with respect to Synacthen." The Debtors further object that this Request seeks information which is not relevant to the Contested Matters. The Debtors also object to the definition of "Synacthen Entities" as overbroad.

Subject to and without waiving their General and Specific Objections, the Debtors agree to produce corporate entity org charts and a "legal entity summary" document. The Debtors have already produced these documents as of May 17 and 18, 2021.

**REQUEST NO. 4:**

All documents and communications relating to the financial state and the assets of each and every Synacthen Entity, including but not limited to:

  i.     all monthly, quarterly, or annual financial statements (including, but not limited to income statements, balance sheets, and cash flow statements);

  ii.    volumes, pricing, and unit costs;

  iii.   revenue by key customer (intercompany and third party);

  iv.    spend by key vendor (intercompany and third party);

  v.     financial details of all intercompany cash transactions;

  vi.    any solvency opinions;

  vii.   any fairness opinions for any transaction;

  viii.  any presentations to actual or potential investors, lenders, or rating agencies;

  ix.    any enterprise, going concern valuations, estimate, or appraisals;

  x.     all budgets, forecasts, business plans, and projections;

  xi.    all monthly trial balance results for the Synacthen Entities;

  xii.   all documentation and presentations related to transfer pricing;

  xiii.  details of all quarterly management fees; and

  xiv.   any valuations performed in connection with these Chapter 11 Cases.

**RESPONSE TO REQUEST NO. 4:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters. This Request appears to seek information related to potential estate claims. The Debtors further object to this Request on the basis that it is overly

broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all documents and communications" relating to the "financial state" of "each and every" Synacthen Entity. The Debtors also object to the definition of "Synacthen Entity" as overbroad.

Subject to and without waiving their General and Specific Objections, the Debtors are willing to meet-and-confer further with Humana over this Request, but in the context of plan confirmation discovery.

**REQUEST NO. 5:**

Documents sufficient to identify the Company Entities that constituted, as of October 12, 2020, the Company's (i) "Specialty Brands" business, and (ii) "Specialty Generics" business, as those terms have been used by the Company in its filings and reporting with the United States Securities & Exchange Commission.

**RESPONSE TO REQUEST NO. 5:**

Subject to and without waiving their General Objections, the Debtors agree to produce corporate entity org charts and a "legal entity summary" document. The Debtors have already produced these documents as of May 17 and 18, 2021.

**REQUEST NO. 6:**

All documents and communications relating to any intercompany agreement related to Acthar, Synacthen, the Acthar Entities, or the Synacthen Entities, including but not limited to:

     i.    manufacturing agreements;

    ii.    distribution agreements;

   iii.    the ARD Distribution Agreement;

   iv.    royalty agreements;

    v.    licensing agreements;

   vi.    any intercompany transfers;

  vii.    R&D service agreements; and

viii.    documents sufficient to identify each and every intercompany transaction involving Mallinckrodt ARD LLC or revenues related to Acthar Intercompany Transfers and/or Synacthen Intercompany Transfers.

**RESPONSE TO REQUEST NO. 6:**

In addition to and without waiving their General Objections, the Debtors object to this Request on the grounds that it is overly broad and unduly burdensome. The Debtors also object that the terms "each and every intercompany transaction" and "manufacturing agreements," "distribution agreements," "royalty agreements," "licensing agreements," and "any intercompany transfers" in this context are vague and ambiguous, without further specificity as to what Humana is seeking. The Debtors further object that this Request seeks information that is not relevant to the Contested Matters. The Debtors also object to the definitions of "Acthar Entities" and "Synacthen Entities" as overbroad.

Subject to and without waiving their General and Specific Objections, the Debtors agree to produce current intercompany agreements that relate to Acthar and/or Synacthen. The Debtors have produced these agreements as of May 18, 2021.

**REQUEST NO. 7:**

Documents regarding the processes and procedures governing the Company's centralized banking and cash management system, including but not limited to the Company's cash management agreements.

**RESPONSE TO REQUEST NO. 7:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters. The Debtors object to this Request to the extent it seeks information that is publicly available on the chapter 11 docket.

Subject to and without waiving their General and Specific Objections, the Debtors refer Humana to the Debtors' Motion for Interim and Final Orders Authorizing Continued Use of

Existing Cash Management System (D.I. 23), which contains detailed description of the processes and procedures governing the Debtors' centralized banking and cash management system. The Debtors also agree to produce the current Master Cash Management Agreement effective as of August 6, 2020. The Debtors have produced this agreement as of May 18, 2021.

**REQUEST NO. 8:**

Documents regarding each and every note, loan, debt instrument, credit facility, or other instrument or facility that is secured or guaranteed by the assets of any Acthar Entity.

**RESPONSE TO REQUEST NO. 8:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters. This Request appears to seek information related to potential estate claims. The Debtors further object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests documents regarding "each and every note, loan, debt instrument, credit facility, or other instrument or facility" without limitation.

Subject to and without waiving their General and Specific Objections, the Debtors have reproduced to Humana, in connection with plan confirmation discovery, the document productions made to both the Official Committee of Opioid Related Claimants (the "OCC") and the Official Unsecured Creditors Committee documents ("UCC") (together, the "Committee Productions") in Rule 2004 discovery, which contain documents responsive to Request No. 8. The Debtors direct Humana to the Committee Productions. The Debtors' agreement to reproduce the Committee Productions to Humana as a part of Humana's plan discovery is not an admission that this Request is relevant to the Contested Matters or that Humana is entitled to Rule 2004 discovery.

**REQUEST NO. 9:**

Any non-privileged analyses or evaluations of potential intercompany claims, including but not limited to any such potential claims held by the Acthar Entities or the Synacthen Entities.

**RESPONSE TO REQUEST NO. 9:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters. This Request appears to seek information related to potential estate claims. The Debtors further object to this Request on the basis that it seeks privileged information.

Subject to and without waiving their General and Specific Objections, the Debtors are willing to meet-and-confer further with Humana over this Request, but in the context of plan confirmation discovery.

**.REQUEST NO. 10:**

All documents and communications relating to the negotiation and execution of the RSA, by or among (i) the Debtors, (ii) the Supporting Unsecured Noteholders, (iii) the Plaintiffs' Executive Committee, and (iv) the Supporting Governmental Opioid Claimants, as such terms are defined in the RSA.

**RESPONSE TO REQUEST NO. 10:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters. This Request appears to seek information related to potential estate claims. The Debtors further object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it requests "all documents and communications." The Debtors further object to this Request to the extent it seeks documents protected by the attorney client or work product privileges, or any other applicable privilege, immunity, or exemption.

Subject to and without waiving their General and Specific Objections, the Debtors have reproduced to Humana the Committee Productions, which contain documents responsive to this Request. The Debtors direct Humana to the Committee Productions. The Debtors' agreement to reproduce the Committee Productions to Humana as a part of Humana's plan discovery is not an

A-2178

admission that this Request is relevant to the Contested Matters or that Humana is entitled to Rule 2004 discovery.

**REQUEST NO. 11:**

All documents and communications relating to (i) the potential, proposed, or actual treatment of the Acthar Claims in the Chapter 11 Cases, and (ii) the value of the Acthar Claims in the Chapter 11 Cases.

**RESPONSE TO REQUEST NO. 11:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors. If and when the validity of such claims is litigated, the Debtors will meet and confer further over this Request. The Debtors further object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all documents and communications." The Debtors further object to this Request to the extent it seeks documents protected by the attorney client or work product privileges, or any other applicable privilege, immunity, or exemption.

Subject to and without waiving their General and Specific Objections, the Debtors have reproduced to Humana the Committee Productions, which contain documents responsive to this Request. The Debtors direct Humana to the Committee Productions. The Debtors' agreement to reproduce the Committee Productions to Humana as a part of Humana's plan discovery is not an admission that this Request is relevant to the Contested Matters or that Humana is entitled to Rule 2004 discovery. The Debtors also direct Humana to the waterfall presentation, which it has already received from the Debtors' financial advisors in connection with plan discovery as well.

**REQUEST NO. 12:**

Documents regarding the Company's intercompany financing and associated legal entity ownership reorganization completed during the three months ending March 29, 2019, as disclosed

A-2179

in the Company's Form 10-Q dated May 7, 2019.

**RESPONSE TO REQUEST NO. 12:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters. This Request appears to seek information related to potential estate claims. The Debtors further object to this Request on the grounds that it is overly broad and unduly burdensome. The Debtors also object that the terms "intercompany financing and associated legal entity ownership reorganization" in this context are vague and ambiguous. The Debtors further object to this Request to the extent it seeks documents protected by the attorney client or work product privileges, or any other applicable privilege, immunity, or exemption.

Subject to and without waiving their General and Specific Objections, the Debtors have reproduced to Humana the Committee Productions, which contain documents responsive to this Request. The Debtors direct Humana to the Committee Productions. The Debtors' agreement to reproduce the Committee Productions to Humana as a part of Humana's plan discovery is not an admission that this Request is relevant to the Contested Matters or that Humana is entitled to Rule 2004 discovery. The Debtors also direct Humana to the intercompany transaction presentation, which it has already received from the Debtors' financial advisors in connection with plan discovery as well.

**REQUEST NO. 13:**

Documents regarding the Company's decision to suspend its previously announced plans for the Specialty Generics Spin-Off, as well as the "range of options intended to lead to the ultimate separation of the Specialty Generics business" that the Company considered between October 12, 2017, and October 12, 2020.

**RESPONSE TO REQUEST NO. 13:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters.  This Request appears to seek information related to potential estate claims.  The Debtors further object to this Request to the extent it seeks documents protected by the attorney client or work product privileges, or any other applicable privilege, immunity, or exemption.  The Debtors also object to this Request as overly broad and unduly burdensome.

Subject to and without waiving their General and Specific Objections, the Debtors have reproduced to Humana the Committee Productions, which contain documents responsive to this Request.  The Debtors direct Humana to the Committee Productions.  The Debtors' agreement to reproduce the Committee Productions to Humana as a part of Humana's plan discovery is not an admission that this Request is relevant to the Contested Matters or that Humana is entitled to Rule 2004 discovery.

**REQUEST NO. 14:**

Any non-privileged analyses or evaluations of actual or potential Acthar-related settlements, including but not limited to the CMS/DOJ/States Settlement (including the final agreement or terms or any documents reflecting any changes to the terms in the RSA).

**RESPONSE TO REQUEST NO. 14:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors.  If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request.  The Debtors further object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case in that it calls for "any . . . analyses or evaluations."  The Debtors further object to this Request to the extent that the terms "actual or potential Acthar-related settlements" is vague and ambiguous.

Subject to and without waiving their General and Specific Objections, the Debtors have reproduced to Humana the Committee Productions, which may contain documents responsive to this Request. The Debtors direct Humana to the Committee Productions. The Debtors' agreement to reproduce the Committee Productions to Humana as a part of Humana's plan discovery is not an admission that this Request is relevant to the Contested Matters or that Humana is entitled to Rule 2004 discovery.

**REQUEST NO. 15:**

Documents regarding the Company's refinancing efforts between January 1, 2019, and October 12, 2020, that affected or related to Mallinckrodt ARD LLC, including but not limited to:

    i.    the Company's efforts to refinance various Debentures and Notes due in 2020, 2022, 2023, and 2025;

    ii.    the Company's efforts to refinance or amend existing term loans and revolving credit facilities;

    iii.    the Company's negotiation and execution of the exchange and support agreement, dated February 25, 2020, with the Exchanging Holders'

    iv.    the Company's negotiation and execution of the exchange and support agreement, dated April 7, 2020, with the Exchanging Holders and certain private funds managed by Columbus Hill Capital Management, L.P.; and

    v.    the Company's issuance of the 10.00% first lien senior secured notes due 2025 pursuant to the indenture April 7, 2020.

**RESPONSE TO REQUEST NO. 15:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters. This Request appears to seek information related to potential estate claims. The Debtors further object to this Request to the extent it seeks documents protected by the attorney client or work product privileges, or any other applicable

A-2182

privilege, immunity, or exemption. The Debtors also object to this Request as overly broad and unduly burdensome.

Subject to and without waiving their General and Specific Objections, the Debtors have reproduced to Humana the Committee Productions, which contain documents responsive to this Request. The Debtors direct Humana to the Committee Productions. The Debtors' agreement to reproduce the Committee Productions to Humana as a part of Humana's plan discovery is not an admission that this Request is relevant to the Contested Matters or that Humana is entitled to Rule 2004 discovery.

**REQUEST NO. 16:**

All documents and communications relating to whether any Debtor was balance sheet insolvent, equitably insolvent and/or was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with such Debtor was unreasonably small capital in each case, on or near the date that any Acthar Intercompany Transfer was made.

**RESPONSE TO REQUEST NO. 16:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters. This Request appears to seek information related to potential estate claims. The Debtors further object to this Request as overly broad, unduly burdensome, and disproportionate to the needs of the case, to the extent it requests "all documents and communications." The Debtors further object that the terms "about to" and "unreasonably small capital" are vague and ambiguous as used in the context of this Request. The Debtors further object to this Request to the extent it seeks documents protected by the attorney client or work product privileges, or any other applicable privilege, immunity, or exemption.

Subject to and without waiving their General and Specific Objections, the Debtors have reproduced to Humana the Committee Productions, which may contain documents responsive to

this Request.  The Debtors direct Humana to the Committee Productions.  The Debtors' agreement to reproduce the Committee Productions to Humana as a part of Humana's plan discovery is not an admission that this Request is relevant to the Contested Matters or that Humana is entitled to Rule 2004 discovery.

**REQUEST NO. 17:**

All non-privileged documents and communications regarding preparations to file the Chapter 11 Cases, including but not limited to any alternatives for restructuring and/or selling parts of the Company's business.

**RESPONSE TO REQUEST NO. 17:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters.  This Request appears to seek information related to potential estate claims.  The Debtors further object to this Request as overly broad, unduly burdensome, and disproportionate to the needs of the case, to the extent it requests "all non-privileged documents and communications."  The Debtors further object to this Request to the extent it seeks documents protected by the attorney client or work product privileges, or any other applicable privilege, immunity, or exemption.  The Debtors also object that the terms "preparations to file" is vague and ambiguous in this context.

Subject to and without waiving their General and Specific Objections, the Debtors have reproduced to Humana the Committee Productions, which contains documents responsive to this Request.  The Debtors direct Humana to the Committee Productions.  The Debtors' agreement to reproduce the Committee Productions to Humana as a part of Humana's plan discovery is not an admission that this Request is relevant to the Contested Matters or that Humana is entitled to Rule 2004 discovery.

**REQUEST NO. 18:**

All documents and communications that the Debtors have produced to any other party in

18

connection with the Chapter 11 Cases including, but not limited to, all documents that the Debtors have produced to the Official Committee of Unsecured Creditors (UCC), the Official Committee of Opioid Related Claimants (OCC), the Governmental Plaintiff Ad Hoc Committee, the Ad Hoc First Lien Term Lender Group, the Unsecured Notes Ad Hoc Group, and the Multi-State Governmental Entities Group.

**RESPONSE TO REQUEST NO. 18:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters. This Request appears to seek information related to potential estate claims. The Debtors further object that this Request seeks information which is overly broad in scope.

Subject to and without waiving their General and Specific Objections, the Debtors have reproduced to Humana the Committee Productions, which contains documents responsive to this Request. The Debtors direct Humana to the Committee Productions. The Debtors' agreement to reproduce the Committee Productions to Humana as a part of Humana's plan discovery is not an admission that this Request is relevant to the Contested Matters or that Humana is entitled to Rule 2004 discovery.

**REQUEST NO. 19:**

All documents and communications Mallinckrodt ARD LLC previously agreed to produce in the Humana Action, to the extent such documents have not already been produced or productions of such documents have not been completed, including but not limited to:

  i.  all document requests (including those made by or addressed to any party, the government, relators, the Company, or any third party) and all documents produced in response to such requests in connection with (a) MSP Recovery Claims, Series LLC, et al. v. Mallinckrodt ARD Inc., et al., 18-cv-00379 (N.D. Ill.), City of Rockford, et al. v. Mallinckrodt ARD Inc., 17-cv-50107 (N.D. Ill), Federal Trade

A-2185

Commission, et al. v. Mallinckrodt, et al., No. 1:17-cv-00120 (D.D.C.), United States of America ex rel. Strunck, et al. v. Mallinckrodt ARD, Inc., No. 12-cv-0175 (E.D. Pa.), and United States of America ex rel. Clark v. Questcor Pharmaceuticals, Inc., No. 13-cv-1776 (E.D. Pa.), and (b) any investigations by the United States Department of Justice or Federal Trade Commission into the acquisition of the rights to Synacthen, payments to prescribers, and co-payment assistance programs;

ii.  organizational charts or personnel directories sufficient to identify all persons with strategy, sales, marketing, or clinical responsibilities for Acthar or Synacthen;

iii. all documents relating to doctors who have prescribed Acthar and have accepted money or things of value from the Company, including but not limited to those doctors identified in Exhibit A to Humana's First Set Of Requests For Production To Mallinckrodt ARD LLC in the Humana Action;

iv.  all documents relating to the Company's selection of doctors to receive, or be eligible to receive, money or things of value, including but not limited to the Company's use of data to identify doctors to market Acthar to, the Company's plans for marketing Acthar to doctors, and the Company's process for funding research related to Acthar;

v.   all data relating to the Company's sales, directly or indirectly, of Acthar to Humana or Humana's members, including data relating to Humana or Humana's members from the "Acthar Hub";

vi.  and all data sufficient to show the amount and source of co-payment assistance provided for any Acthar prescription that Humana covered.

**RESPONSE TO REQUEST NO. 19**:

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity

of Humana's claims against the Debtors. If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request. The Debtors further object to this Request as overly broad, unduly burdensome, and disproportionate to the needs of the case, to the extent it requests "all documents and communications," "all document requests," and "all data." The Debtors further object to this Request to the extent it requires searching for and providing information that is already in the possession of Humana, or is equally obtainable from third parties or from some source other than the Debtors that is more convenient, less burdensome, or less expensive.

Subject to and without waiving their General and Specific Objections, the Debtors agree to produce management team org charts responsive to sub-request (ii) to the extent that those documents are relevant to Humana's administrative claims or the Debtors' omnibus objections. The Debtors have produced those documents as of May 17 and 18, 2021.

**REQUEST NO. 20:**

All substantive communications between the Company and the United States Department of Justice, Federal Trade Commission, or state government entities, related to Acthar, including materials presented during meetings or in substantive exchanges of letters or emails in connection with or relating to any civil litigation, criminal proceeding, or governmental investigations.

**RESPONSE TO REQUEST NO. 20:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors. If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request. The Debtors further object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all substantive documents." The Debtors object that the terms "in connection with or relating to" are vague and ambiguous. The Debtors also object to this Request to the extent

it seeks documents protected by the attorney client or work product privileges, or any other applicable privilege, immunity, or exemption.

**REQUEST NO. 21:**

All documents or communications relating to the Company's assistance with or subsidization of co-payments for Acthar through donations or payments to any co-payment assistance funds or programs, including all documents relating to the Company's communications with BioSolutia Inc. (now known as Caremetx, LLC), Express Scripts, CuraScript SD, United BioSource (formerly known as HealthBridge), Accredo Health (also doing business as Liberty Pennsylvania, Medco Health Solutions, Liberty Texas, Gentiva, or Gentiva Health Services), National Organization for Rare Disorders, CDF, The Assistance Fund Inc., or Caring Voices Coalition Inc., regarding Acthar co-payments or the marketing of Acthar as less expensive or free because of the availability of co-payment assistance.

**RESPONSE TO REQUEST NO. 21:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors.  If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request.  The Debtors object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all documents and communications."  The Debtors also object to this Request to the extent it documents that are already in the possession of Humana.

**REQUEST NO. 22:**

All minutes, agendas, memoranda, pre-read documents, and similar documents or communications relating to any matters relating to Acthar that were addressed at any board meeting of any Acthar Entity or Mallinckrodt plc.

A-2188

**RESPONSE TO REQUEST NO. 22**:

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors. If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request. The Debtors further object that this Request seeks information which is overly broad in scope. The Debtors also object to this Request on the basis that it seeks privileged information.

Subject to and without waiving their General and Specific Objections, the Debtors have reproduced to Humana the Committee Productions, which contains documents responsive to this Request, specially Mallinckrodt plc board materials. The Debtors direct Humana to the Committee Productions. The Debtors' agreement to reproduce the Committee Productions to Humana as a part of Humana's plan discovery is not an admission that this Request is relevant to the Contested Matters or that Humana is entitled to Rule 2004 discovery.

**REQUEST NO. 23**:

All documents relating to the Company's knowledge of, communications about, or compliance with Exhibits A through Q of the Company's Request For Judicial Notice (ECF No. 48) filed by Mallinckrodt ARD LLC in the Humana Action, to the extent that those exhibits address manufacturer assistance or co-payment assistance programs.

**RESPONSE TO REQUEST NO. 23**:

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors. If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request. The Debtors object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all documents." The Debtors object that the terms "knowledge of,

A-2189

communications about, or compliance with" are vague and ambiguous in this context. The Debtors further object to this Request to the extent it seeks documents protected by the attorney client or work product privileges, or any other applicable privilege, immunity, or exemption.

**REQUEST NO. 24:**

All data produced by the Company or any of its co-defendants in (1) City of Rockford v. Mallinckrodt ARD Inc., et al., No. 3:17-cv-50107-IDJ-LAJ (N.D. Ill.), and (2) MSP Recovery Claims, Series LLC, et al. v. Mallinckrodt ARD Inc., et al., 18-cv-00379 (N.D. Ill.).

**RESPONSE TO REQUEST NO. 24:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors. If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request. The Debtors further object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all data." The Debtors also object to this Request to the extent it documents that are already in the possession of Humana.

**REQUEST NO. 25:**

All documents and communications reflecting financial information relating to Acthar manufacturing and sales, including information regarding prices charged for Acthar, costs expended by the Company in connection with the production, marketing, and sales of Acthar, sales data for Acthar, and revenues, profits, losses, and associated financial data relating to Acthar.

**RESPONSE TO REQUEST NO. 25:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors. If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request. The Debtors object to this Request on the basis

that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all documents and communications." The Debtors also object that the terms "financial information" and "financial data" are vague and ambiguous in this context. The Debtors also object to this Request to the extent it documents that are already in the possession of Humana.

**REQUEST NO. 26:**

All documents and communications relating to sales forecasts or similar analyses for Acthar, Synacthen, and any other synthetic adrenocorticotropic hormone (ATCH), including but not limited to any forecasts relating to the prospective launch of Synacthen.

**RESPONSE TO REQUEST NO. 26:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors. If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request. The Debtors object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all documents and communications." The Debtors further object that the term "similar analyses" is vague and ambiguous in this context. The Debtors also object to this Request to the extent it documents that are already in the possession of Humana.

Subject to and without waiving their General and Specific Objections, the Debtors have reproduced to Humana the Committee Productions, which may contain documents responsive to this Request, specially Mallinckrodt plc board materials. The Debtors direct Humana to the Committee Productions. The Debtors' agreement to reproduce the Committee Productions to Humana as a part of Humana's plan discovery is not an admission that this Request is relevant to the Contested Matters or that Humana is entitled to Rule 2004 discovery.

**REQUEST NO. 27:**

All program and donation reports relating to CDF.

A-2191

**RESPONSE TO REQUEST NO. 27:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors. If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request. The Debtors further object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all program and donation reports." The Debtors further object that the term "program and donation reports" is vague and ambiguous in this context. The Debtors also object to this Request to the extent it documents that are already in the possession of Humana.

**REQUEST NO. 28:**

All documents and communications relating to the Company's sublicensing of Synacthen to West Therapeutics, including documents and communications reflecting negotiations with the Federal Trade Commission regarding the scope of the Synacthen license and the identity of the licensor.

**RESPONSE TO REQUEST NO. 28:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors. If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request. The Debtors object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all documents and communications." The Debtors further object to this Request to the extent it seeks documents protected by the attorney client or work product privileges, or any other applicable privilege, immunity, or exemption. The Debtors also object to this Request to the extent it documents that are already in the possession of Humana.

**REQUEST NO. 29:**

A-2192

All documents and communications relating to (i) Questcor's or the Company's acquisition from Novartis of any rights with respect to Synacthen, (ii) Questcor's or the Company's annual payments to Novartis with respect to Synacthen, and (iii) Questcor's or the Company's reporting to Novartis on milestones under all applicable licensing agreements pertaining to Synacthen.

**RESPONSE TO REQUEST NO. 29:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors.  If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request.  The Debtors object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all documents and communications."  The Debtors also object that the term "any rights" is vague and ambiguous in this context.  The Debtors further object to this Request to the extent it seeks documents protected by the attorney client or work product privileges, or any other applicable privilege, immunity, or exemption.  The Debtors also object to this Request to the extent it documents that are already in the possession of Humana.

**REQUEST NO. 30:**

All documents and communications relating to the resolution of any issues pertaining to the manufacturing of Synacthen.

**RESPONSE TO REQUEST NO. 30:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors.  If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request.  The Debtors object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all documents and communications" on "any issues."  The Debtors object that

A-2193

the phrase "pertaining to" is vague and ambiguous in this context.  The Debtors further object to this Request to the extent it seeks documents protected by the attorney client or work product privileges, or any other applicable privilege, immunity, or exemption.  The Debtors also object to this Request to the extent it documents that are already in the possession of Humana.

**REQUEST NO. 31:**

All documents and communications reflecting data pertaining to the Company's international sales of Synacthen from April 4, 2014, to October 12, 2020.

**RESPONSE TO REQUEST NO. 31:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors.  If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request.  The Debtors further object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all documents and communications."  The Debtors also object to this Request to the extent it documents that are already in the possession of Humana.

**REQUEST NO. 32:**

All documents and communications relating to or substantiating any production shortages with respect to Synacthen, including but not limited to attempts to reformulate Synacthen to remove benzyl alcohol, selection and qualification of a replacement finished dose manufacturer, analysis or elimination of any deviations from the Synacthen reference drug generated by the API manufacturing processes used by Bachem, and any reports or related documents regarding qualification or requalification by any country's regulator of Synacthen manufacturing processes, quality, and/or efficacy.

A-2194

**RESPONSE TO REQUEST NO. 32:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors. If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request. The Debtors object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all documents and communications." The Debtors further object that the terms "relating to or substantiating" are vague and ambiguous in this context. The Debtors also object to this Request to the extent it documents that are already in the possession of Humana.

**REQUEST NO. 33:**

All documents and communications relating to the Company's pricing of Acthar, including all assessments, reports, analyses, or presentations relating to price increases with respect to Acthar.

**RESPONSE TO REQUEST NO. 33:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors. If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request. The Debtors further object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all documents and communications" and "all assessments, reports, analyses, or presentations." The Debtors also object to this Request to the extent it documents that are already in the possession of Humana.

**REQUEST NO. 34:**

All documents and communications relating to any defenses the Company has asserted or may assert with respect to the Acthar Claims.

**RESPONSE TO REQUEST NO. 34:**

In addition to and without waiving their General Objections, the Debtors object to this Request as not relevant to the Contested Matters, as it relates to the determination of the validity of Humana's claims against the Debtors.  If and when the validity of such claims is litigated, the Debtors will meet and confer over this Request.  The Debtors object to this Request on the basis that it is overly broad, unduly burdensome, and not proportional to the needs of the case, to the extent it requests "all documents and communications."  The Debtors further object to this Request to the extent it seeks documents protected by the attorney client or work product privileges, or any other applicable privilege, immunity, or exemption.  The Debtors also object to this Request to the extent it documents that are already in the possession of Humana.

**REQUEST NO. 35:**

All documents and communications that the Company intends to introduce as evidence or otherwise utilize or rely upon at a hearing or trial in connection with the Contested Matters.

**RESPONSE TO REQUEST NO. 35:**

Subject to and without waiving their General Objections, the Debtors agree to provide these documents, if any, at the appropriate time.

30

A-2196

Dated: May 19, 2021

/s/ Elizabeth Marks
Elizabeth Marks (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
200 Clarendon Street
Boston, MA 02116
Telephone:       (617) 948-6000
Facsimile:       (617) 948-6001
Email:       betsy.marks@lw.com

- and -

George A. Davis (admitted *pro hac vice*)
George Klidonas (admitted *pro hac vice*)
Andrew Sorkin (admitted *pro hac vice*)
Anupama Yerramalli (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Telephone:       (212) 906-1200
Facsimile:       (212) 751-4864
Email:       george.davis@lw.com
       george.klidonas@lw.com
       andrew.sorkin@lw.com
       anu.yerramalli@lw.com

- and -

Jeffrey E. Bjork (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:       (213) 485-1234
Facsimile:       (213) 891-8763
Email:       jeff.bjork@lw.com

- and –

Jason B. Gott (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:       (312) 876-7700
Facsimile:       (312) 993-9767
Email:       jason.gott@lw.com

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:       (302) 651-7700
Facsimile:       (302) 651-7701
Email:       collins@rlf.com
       merchant@rlf.com
       steele@rlf.com
       schlauch@rlf.com

A-2197

## EXHIBIT B

| From: | Hugh.Murtagh@lw.com |
|---|---|
| Sent: | Wednesday, May 26, 2021 9:37 AM |
| To: | Bruckner, Ian; CHRISTOPHER.HARRIS@lw.com |
| Cc: | Betsy.Marks@lw.com; Justin.Kirschner@lw.com; Arielle.Nagel@lw.com; Brett.Neve@lw.com; Brett.Newman@lw.com; dculver@morrisnichols.com; rdehney@morrisnichols.com; mharvey@morrisnichols.com; namer@morrisnichols.com; Mallinckrodt |
| Subject: | RE: 2021.05.23 - Letter from B McCallen to Debtors Counsel |

*** EXTERNAL EMAIL ***

Ian, Matt, & Team,

We wanted to see if we can find an agreed resolution on the scope of the 30(b)(6) examination.  While we continue to think that many of the topics you referenced are not strictly relevant to the omnibus claims objection, we would like to avoid engaging in an unnecessary motion-to-quash fight.  We have prepared and will file a motion to quash certain of the topics in the related Haviland Hughes 30(b)(6) notice, but we would be happy to cut you out of that motion if we can reach an agreement on the lines below.

For reference, here is the request from your letter:

"Also, with respect to topics 2, 3, 6, 7, 8 and 17, to the extent those topics relate to the Debtors' corporate structure, changes to corporate structure, the reasons for such changes, and/or any intercompany agreements and cash flows, the Acthar Insurance Claimants reiterate that they are properly within the scope of discovery and we expect you to prepare Debtors' witness to testify accordingly."

And here are proposed resolutions.  Topics 1, 5, and 14, which we are already largely agreed on, are included for reference.

| 1 | The Debtors' corporate structure and organization, including (i) the Company entities that constitute the Specialty Brands and Specialty Generics businesses, (ii) the identities of the Acthar Entities and the Synacthen Entities, (iii) the rights, responsibilities, and obligations of each of the Acthar Entities and Synacthen Entities with respect to Acthar and Synacthen, respectively, and (iv) the locations, roles, and titles of personnel with responsibilities related to Acthar or Synacthen | Okay |
|---|---|---|
| 2 | The financial state, assets, and valuations of the Debtors, including the Acthar Entities and the Synacthen Entities | Not relevant to current dispute.  Relevant topics here appear covered by 1 and 5, which we are agreeing to. |
| 3 | The value of Acthar and Synacthen, including but not limited to the value of any rights or intellectual property related to Acthar or Synacthen. | Not relevant to current dispute.  Relevant topics here appear covered by 1 and 5, which we are agreeing to. |

| 5 | Intercompany agreements related to Acthar, Synacthen, the Acthar Entities, or the Synacthen Entities, including but not limited to: (i) manufacturing agreements;, (ii) distribution agreements; (iii) the ARD Distribution Agreement; (iv) royalty agreements; (v) licensing agreements; (vi) any intercompany transfers; (vii) R&D service agreements; (viii) intercompany transactions involving Mallinckrodt ARD LLC or revenues related to Acthar Intercompany Transfers and/or Synacthen Intercompany Transfers; and (ix) dividends paid to parents, subsidiaries, and affiliates. | Okay—limit to agreements related to Acthar and Synacthen, rather than more generally to any agreement related to the Acthar Entities or Synacthen Entities. The more general formulation is not relevant and is an uncertain universe. |
|---|---|---|
| 6 | Any additional transfers or transactions, including intercompany transfers and transactions, involving (1) Mallinckrodt Lux IP S.a.r.l., Mallinckrodt Pharmaceuticals Ireland Ltd., ST Operations LLC, Mallinckrodt plc, Mallinckrodt US Pool LLC, or Mallinckrodt Group S.a.r.l, or (2) related to Acthar or Synacthen | Okay—provide list of specific disclosed transactions, if any, you have in mind, so witness can be prepared on those. |
| 7 | The Company's centralized banking and cash management system, including but not limited to the Company's cash management agreements | This is set forth in the cash management motion—burdensome to educate without any real benefit or relevance. |
| 8 | The Company's refinancing efforts between January 1, 2019, and October 12, 2020, that affected or related to Mallinckrodt ARD LLC, including but not limited to: (i) efforts to refinance various Debentures and Notes due in 2020, 2022, 2023, and 2015; (ii) efforts to refinance or amend existing term loans and revolving credit facilities; (iii) negotiation and execution of the exchange and support agreement, dated February 25, 2020, with the Exchanging Holders; (iv) negotiation and execution of the exchange and support agreement, dated April 7, 2020, with the Exchanging Holders and certain private funds managed by Columbus Hill Capital Management, L.P.; (v) issuance of the 10.00% first lien senior secured notes due 2025 pursuant to the indenture April 7, 2020; (vi) the terms, conditions, and negotiations related to any guarantees granted to holders of unsecured debt; and (vii) the terms, conditions, and negotiations related to any security agreements entered into with holders of previously unsecured debt | Not relevant to current dispute. |
| 14 | The Debtors' bases for disallowing and expunging Acthar-related claims as sought through the Acthar Claims Objection | Okay |

A-2200

| 17 | The Company's acquisition of Questcor Pharmaceuticals in 2014, including (i) the individuals responsible for evaluating and deciding to enter into the transaction, (ii) the Company's reasons for entering into the transaction, and (iii) the Company's knowledge of Questcor's premerger business practices related to Acthar | Not relevant to current dispute. |
|---|---|---|

If this proposal resolves your concerns, please let us know as soon as you have a chance.  Happy to discuss live.

Best,
Hugh


**Hugh Murtagh**

**LATHAM & WATKINS** LLP
1271 Avenue of the Americas | New York, NY 10020
D: +1.212.906.1648 | C: +1.646.637.8095

---

**From:** Bruckner, Ian <IBruckner@willkie.com>
**Sent:** Sunday, May 23, 2021 8:57 PM
**To:** Harris, Christopher (NY) <CHRISTOPHER.HARRIS@lw.com>; Murtagh, Hugh (NY) <Hugh.Murtagh@lw.com>
**Cc:** Marks, Betsy (BN) <Betsy.Marks@lw.com>; Kirschner, Justin (NY) <Justin.Kirschner@lw.com>; Nagel, Arielle (NY) <Arielle.Nagel@lw.com>; Neve, Brett (NY) <Brett.Neve@lw.com>; Newman, Brett (CH) <Brett.Newman@lw.com>; 'dculver@morrisnichols.com' <dculver@morrisnichols.com>; 'rdehney@morrisnichols.com' <rdehney@morrisnichols.com>; 'mharvey@morrisnichols.com' <mharvey@morrisnichols.com>; 'namer@morrisnichols.com' <namer@morrisnichols.com>; Mallinckrodt <Mallinckrodt@willkie.com>
**Subject:** 2021.05.23 - Letter from B McCallen to Debtors Counsel

Hello all,

Please see attached for a letter from Ben McCallen following up on the meet and confer held on May 21, 2021.

Regards,
Ian

**Ian Bruckner**
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue | New York, NY 10019-6099
Direct: +1 212 728 3409 | Fax: +1 212 728 8111
ibruckner@willkie.com | vCard | www.willkie.com bio

---

**Important Notice:**  This email message is intended to be received only by persons entitled to receive the confidential information it may contain.  Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged.  Please do not read, copy, forward or store this message unless you are an intended recipient of it.  If you have received this message in error, please forward it back.  Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

A-2201

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

**A-2202**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>MALLINCKRODT PLC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 20-12522 (JTD)<br><br>(Jointly Administered)<br>**Hearing Date:**<br>**June 7, 2021, 10:00 a.m. (ET)**<br><br>**Re: Docket Nos. 2157, 2159,**<br>**and 2521** |

**ATTESTOR LIMITED AND HUMANA INC.'S REPLY IN FURTHER SUPPORT OF
MOTIONS TO ESTIMATE ACTHAR-RELATED CLAIMS AND ALLOW
ADMINISTRATIVE CLAIMS FOR ALL PURPOSES IN THESE BANKRUPTCY CASES**[2]

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Boulevard, Hazelwood, Missouri 63042.

[2]     *See Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases*, *In re Mallinckrodt plc., et al.*, No. 20-12522 (JTD) (Bankr. D. Del. Apr. 30, 2021) [D.I. 2157] (the "Estimation Motion"); *Motion of Attestor Limited and Humana Inc. for Entry of an Order Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code*, *In re Mallinckrodt plc., et al.*, No. 20-12522 (JTD) (Bankr. D. Del. Apr. 30, 2021) [D.I. 2159] (the "Administrative Claims Motion"); *Debtors' Omnibus Objection to Motions of Attestor Limited and Humana Inc. for Entry of Orders (A) Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases and (B) Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code*, *In re Mallinckrodt plc., et al.*, No. 20-12522 (JTD) (Bankr. D. Del. May 21, 2021) [D.I. 2521] (the "Debtors' Objection").

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..........................................................**Error! Bookmark not defined.**

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ..............................................................................................................4

    I.     THE ACTHAR INSURANCE CLAIMANTS' ADMINISTRATIVE CLAIMS MUST BE ESTIMATED FOR ALL PURPOSES. ........................................................4

        A.    The Court Has Authority to Estimate Administrative Claims for Allowance Purposes. .........................................................................................................4

        B.    Estimating the Administrative Claims For All Purposes Is Not Premature.......6

        C.    The Court May Order the Payment of Administrative Priority Claims Before Confirmation. ...........................................................................................8

    II.    THE ACTHAR INSURANCE CLAIMANTS' PRE-PETITION CLAIMS MUST BE ESTIMATED FOR ALL PURPOSES. ....................................................8

    III.   THE UNSECURED NOTES AD HOC GROUP'S ARGUMENTS SHOULD ALSO BE REJECTED. ................................................................................................12

CONCLUSION ..........................................................................................................13

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Armstrong World Indus., Inc.,*
    348 B.R. 111 (D. Del. 2006) ................................................................10

*In re G-I Holdings, Inc.,*
    323 B.R. 583 (Bankr. D. N.J. 2005) .........................................................5

*In re John Q. Hammons Fall 2006, LLC,*
    2017 Bankr. LEXIS 3550 (Bankr. D. Kan. Oct. 13, 2017) .........................9

*In re MacDonald,*
    128 B.R. 161 (Bankr. W.D. Tex. 1991) .................................................5, 6

*In re Mud King Prod., Inc.,*
    2015 WL 862319 (S.D. Tex. Feb. 27, 2015) ...........................................10

*Official Comm. of Asbestos Claimants v. Asbestos Prop. Damage Comm. (In re Fed.-*
    *Mogul Glob. Inc.),*
    330 B.R. 133 (D. Del. 2005) ..............................................................5, 10

*In re Roman Catholic Archbishop of Portland,*
    339 B.R. 215 (Bankr. D. Or. 2006) ..........................................................5

*In re Tribune Co.,*
    972 F.3d 228 (3d Cir. 2020) ...................................................................11

Attestor Limited, on behalf of itself and its affiliated entities, including Avon Holdings I, LLC (collectively, "Attestor"), and Humana, Inc. ("Humana," and, together with Attestor, the "Acthar Insurance Claimants"),[3] creditors of the above-captioned debtors (collectively, the "Debtors" or "Mallinckrodt"), by and through their undersigned counsel, hereby submit this reply in further support of the Estimation Motion and Administrative Claims Motion (together, the "Motions").

## PRELIMINARY STATEMENT

1.      The Debtors' successful emergence from bankruptcy depends on their ability to resolve their Acthar-related liabilities.  As Debtors insist in their opposition to the Motions, "[r]esolving the Acthar-related issues will clear a path towards timely confirmation, provide greater speed for creditor distributions, and demonstrate confirmability of the Plan."  (Debtors' Obj. ¶ 13, n.8.)

2.      But since the Debtors filed their own collection of motions and objections—the so-called "Acthar Proceedings" or "global Acthar claims resolution process"—mere hours after the Acthar Insurance Claimants filed these Motions, the parties' vastly different views about the process and timing for resolving Acthar-related claims have been apparent.[4]  The Debtors' "Acthar Proceedings" are designed to shortcut due process and prevent the Court from hearing evidence and making determinations about the Debtors' past and ongoing liability related to the marketing and sale of the

---

[3]      Attestor entered into an agreement with Humana to pursue and participate in any proceeds of Humana's claims against the Debtors with respect to the distribution, marketing, and sale of Acthar.  *See Verified Statement of Willkie Farr & Gallagher LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure*, In re Mallinckrodt plc., et al., No. 20-12522 (JTD) (Bankr. D. Del. Apr. 19, 2021) [Dkt. No. 2066].  Attestor is also the transferee and owner of the Acthar-related claims filed by United Healthcare Services Inc. ("United"), and OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC (together, "OptumRx").  *See Transfer/Assignment of Claim*, In re Mallinckrodt plc., et al., No. 20-12522 (JTD) (Bankr. D. Del. May 14, 2021) [Dkt. No. 2317].  Attestor is in discussions to acquire additional claims and may seek further relief as to such claims.

[4]  *See Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive)*, In re Mallinckrodt plc., et al., No. 20-12522 (JTD) (Bankr. D. Del. Apr. 30, 2021) [Dkt. No. 2165] (the "Acthar Claims Objection"); *Debtors Motion for Entry of an Order (I) Setting an Initial Bar Date for Filing Proofs of Administrative Claim, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claim, (IV) Approving Notice of the Initial Administrative Claim Bar Date, and (V) Granting Related Relief*, In re Mallinckrodt plc., et al., No. 20-12522 (JTD) (Bankr. D. Del. Apr. 30, 2021) [Dkt. No. 2162] (the "Admin. Claims Bar Date Motion").

1

their most profitable drug.  The Debtors' Acthar Claims Objection illustrates the Debtors' approach perfectly: the Debtors seek to expunge billions of dollars of Acthar-related claims against Debtor entities they claim have significant value, while at the same time resisting any discovery on the underlying merits of the claims, which would plainly inform which Debtor entities should be held liable for any wrongdoing.

3.     In contrast, the Estimation Motion and the Administrative Claims Motion propose a coordinated, efficient process that provides for discovery and a fair hearing aimed at resolving the amount of the Debtors' Acthar-related liability, the extent of any administrative claims, and which entities within Debtors' complex corporate structure should be held liable for Acthar-related wrongdoing.

4.     Estimation is necessary before the Court can consider whether to confirm the Debtors' Plan.  The Acthar Insurance Claimants alone have spent nearly $3.6 billion on Acthar that they allege was overprescribed at vastly inflated volume and prices through a fraudulent scheme.  The Acthar Insurance Claimants also continue to incur tens of millions of dollars of Acthar-related expenses each month because there have been no discernible changes in the Debtors' pricing strategy or business practices.  Whether the Debtors face billions of dollars of liability in prepetition claims, and are continuing to incur administrative claims as a result of conduct that has not changed, is critical to assessing whether the Debtors' proposed Plan is feasible, unfairly discriminates against the general unsecured creditor class, is in the best interests of creditors, and is otherwise confirmable.  Resolving Acthar-related issues is urgent because the Debtors are barreling towards a proposed confirmation trial for a Plan that leaves Acthar claimants to wrangle over a $100 million pot, while the Restructuring Support Agreement (the "RSA") parties extract billions of dollars in value from the Debtors—a Plan that is completely untethered from the Debtors' value, the importance of Acthar to their go-forward

2

business plan, or the immense liabilities that they face as a result of their Acthar-related business practices.

5.     The Debtors' opposition provides no basis to deny the Motions.  The Debtors concede that the Court may ultimately need to conduct an estimation proceeding to estimate administrative claims for purposes of determining the feasibility of the Debtors' Plan.  Beyond that, the Debtors' opposition offers a host of procedural arguments about whether such administrative claims can be estimated for allowance purposes, when they should be estimated, and whether and when the Debtors' prepetition liability must be addressed before confirmation.  Each of the Debtors' arguments should be rejected.

6.     The Court has authority to estimate the Acthar Insurance Claimants' administrative claims for allowance purposes, not merely to assess the feasibility of the Plan.  And that process should happen now.  Determining whether the Debtors are incurring tens of millions of dollars in administrative claims each month is necessary to determine whether the Plan is feasible, and making that same determination for allowance purposes is both legally permissible and the most efficient use of the Court's and parties' resources.  The Debtors also admit that the Court has discretion to determine when to pay administrative claims, including on the timeline that the Acthar Insurance Claimants have proposed.

7.     The Debtors' insistence that estimating the Acthar Insurance Claimants' prepetition claims can be delayed until after confirmation is equally unavailing.  Promptly estimating the prepetition claims, which may total many billions of dollars, is essential because whether the Plan can be confirmed depends heavily on the total value of the Acthar Insurance Claimants' claims and the Debtors against whom those claims can be asserted.

8.     An orderly estimation process that enables the Acthar Insurance Claimants to present evidence establishing their claims, along with the amounts of those claims and the Debtors liable for

3

them, must be implemented immediately. The Acthar Insurance Claimants therefore respectfully request that the Court grant the Motions and implement the proposed estimation and allowance procedures.

## ARGUMENT

### I. THE ACTHAR INSURANCE CLAIMANTS' ADMINISTRATIVE CLAIMS MUST BE ESTIMATED FOR ALL PURPOSES.

9. The Debtors do not even attempt to rebut that the Acthar Insurance Claimants' antitrust and racketeering claims, if proven, clearly constitute post-petition administrative claims under the U.S. Supreme Court's *Reading* doctrine, which treats post-petition business torts as administrative priority claims. (Admin. Claims Mot. ¶¶ 21-26.) Nor do the Debtors deny that they are continuing their prepetition Acthar-related business practices post-petition, even though such practices gave rise to Humana's prepetition civil litigation, several other civil cases, and investigations, enforcement actions, and multi-hundred-million-dollar settlements with the FTC, DOJ, and other government agencies.

10. Instead, the Debtors focus entirely on convincing the Court that the Debtors' proposed process for dealing with administrative claims should override the Acthar Insurance Claimants' proposed process. For the reasons set forth below, the Debtors' arguments should be rejected.

#### A. The Court Has Authority to Estimate Administrative Claims for Allowance Purposes.

11. The Debtors' primary argument against estimating the Acthar Insurance Claimants' administrative claims is that estimating such claims for allowance purposes is legally impermissible. While acknowledging that other courts have approved the "estimation of administrative expenses for *feasibility* purposes," (Debtors' Obj. ¶ 19 (emphasis in original)), the Debtors claim that they are unaware of any cases supporting the Acthar Insurance Claimants' position that administrative claims may be estimated for allowance purposes. The Debtors' position is not only incorrect, it is belied by their own authorities.

4

12.     In *In re Macdonald*, which Debtors cite for the proposition that "post-petition administrative expenses and their allowance are governed by Section 503," (Debtors' Obj. ¶ 19), the court observed that Section 502(c)'s estimation procedures can also be adapted to estimate post-petition administrative claims governed by section 503 where the "full-blown allowance process under Section 503(b) would unduly delay the administration of the bankruptcy case . . . ." *See In re MacDonald*, 128 B.R. 161, 165 (Bankr. W.D. Tex. 1991).  While the *Macdonald* court ultimately estimated the post-petition claims solely for feasibility purposes, it did so not because estimation of post-petition administrative claims is forbidden, but because estimating such claims may present due process concerns when used to improperly cap a creditor's recovery without a full adjudication of the claims. *In re MacDonald*, 128 B.R. at 167–68 ("[T]he estimation process may fulfill the allowance requirement for purposes of Section 1129(a)(9), but will not, as in *Baldwin–United,* set the 'outer limits of a claimants' right to recover.'  Rather, the ultimate allowance of the claim will set that right.").[5]  But the due process concerns acknowledged in *Macdonald* are not present here where the creditors themselves, the Acthar Insurance Claimants, have proposed estimating their claims as an efficient alternative to a full adjudication on the merits, which could take many months, if not years, and would delay administration of the Debtors' cases.

13.     In any event, as the Debtors acknowledge, the Acthar Insurance Claimants have simultaneously moved to estimate ***and allow*** their administrative claims.  If the Debtors oppose

---

[5]     Debtors incorrectly claim in their Objection that the Acthar Insurance Claimants cite certain cases in their Estimation Motion for the proposition that "administrative expenses may be estimated for allowance purposes," and attempt to distinguish those cases as "inapplicable as they do not concern administrative expenses."  (Debtors' Obj. ¶ 20.)  The Estimation Motion cited those cases for entirely different propositions. *See* Estimation Mot. ¶ 27 (quoting *In re Roman Catholic Archbishop of Portland*, 339 B.R. 215, 222 (Bankr. D. Or. 2006), for the proposition that the meaning of "undue delay" depends on the circumstances of the case), ¶¶ 26 & 32 (citing *In re G-I Holdings, Inc.*, 323 B.R. 583, 599 (Bankr. D. N.J. 2005), for the proposition that estimation is generally necessary to avoid undue delay, particularly where claims are based on multiple pending litigations), ¶¶ 28 & 32 (citing *Official Comm. of Asbestos Claimants v. Asbestos Prop. Damage Comm. (In re Fed.-Mogul Glob. Inc.),* 330 B.R. 133, 154 (D. Del. 2005), for the proposition that estimation is appropriate to avoid undue delay resulting from pursuing pre-petition litigation claims to final judgment).

A-2210

estimation for allowance purposes, which is the more efficient process for resolving these claims, then

the Acthar Insurance Claimants will—through the "full-blown allowance process"—prove their actual

damages arising from the Debtors' post-petition conduct. *In re MacDonald*, 128 B.R. at 165.

### B. Estimating the Administrative Claims for All Purposes is Not Premature.

14.     The Debtors next argue that estimating the Acthar Insurance Claimants' administrative

claims for feasibility purposes—a process that even the Debtors admit has legal support—is "premature

and indeed likely will never be necessary." (Debtors' Obj. ¶ 21.)  To support that position, the Debtors

claim they will demonstrate in a "forthcoming objection" that "Humana has no actual administrative

expenses for numerous reasons."[6]  But the Debtors make no effort to actually to do so in response to

the Administrative Claims Motion and, in fact, admit that if the Acthar Insurance Claimants' post-

petition claims qualify as administrative claims, they will eventually need to be estimated for feasibility

purposes.  (Debtors' Obj. ¶¶ 22-23.)  In short, the Debtors appear to be arguing not that estimation of

the Acthar Insurance Claims for feasibility purposes is unnecessary, but that the Court should adopt

their truncated and inefficient procedures—presumably in connection with their "forthcoming

objection"[7]—instead of those already proposed by the Acthar Insurance Claimants.

---

[6]     The Debtors, Attestor, and Humana have agreed that the Acthar Insurance Claimants "shall be deemed
to have timely filed Proofs of Administrative Claim against all Debtors by virtue of filing [the Administrative
Claims Motion] with respect to any and all administrative claims relating to the Debtors' sale of H.P. Acthar
Gel asserted by Humana, Inc., United HealthCare Services, Inc., OptumRx Group Holdings Inc. and OptumRx
Holdings, LLC or any other entity in which Attestor Limited, by itself or through its affiliates including Avon
Holdings I, LLC, has acquired or may in the future acquire an interest, provided that all rights and objections of
the Debtors and other parties in interest are reserved with respect thereto." *See Order (I) Setting an Initial Bar
Date for Filing Proofs of Administrative Claim, (II) Establishing Administrative Claims Procedures, (III)
Approving the Form and Manner of Filing Proofs of Administrative Claim, (IV) Approving Notice of the Initial
Administrative Claim Bar Date, and (V) Granting Related Relief, In re Mallinckrodt plc., et al.*, No. 20-12522
(JTD) (Bankr. D. Del. May 20, 2021) [D.I. 2480] ¶ 12.

[7]     The Acthar Insurance Claimants will respond to the Debtors' "forthcoming objection" to their
administrative claims in due course.  Nevertheless, the Debtors' preview of their objection betrays its weakness.
For example, the Debtors argue that Humana cannot possibly have administrative claims because "it admittedly
knew of the Debtors' alleged conduct but decided to authorize Acthar prescriptions despite this knowledge."
(Debtors' Obj. ¶ 22.)  That argument ignores that Humana is, in many cases, required by CMS regulations to
bear its Medicare members' Acthar-related costs.  The Debtors also argue that "the Debtors terminated their

15.     The process for estimating the Debtors' Acthar-related administrative claims should begin now.  The Debtors themselves recently proposed a confirmation schedule that contemplates less than sixty days of fact and expert discovery concerning both Plan confirmation and, essentially, all remaining disputed issues in these cases, culminating in an August 27 hearing.[8]  The Debtors' proposed schedule does not specifically carve out a schedule for claim estimation.  Nor does it provide any deadlines for resolving issues related to administrative claims.  In fact, while the Debtors' proposed confirmation schedule is unreasonably aggressive and deeply flawed, they have proposed that **Plan confirmation discovery** begin next week.  The Debtors' resistance to any discovery concerning the validity and amounts of the Acthar Insurance Claimants' claims to date has only compounded the scheduling issues by wasting precious time and imposing significant burdens on the Acthar Insurance Claimants' ability to obtain necessary discovery relevant to their administrative claims.

16.     As the Debtors have repeatedly acknowledged, the Court must address the Acthar Insurance Claimants' administrative claims.[9]  Given the Debtors' own proposed schedule for confirmation, it is almost laughable to assert that resolving Acthar-related administrative claims is premature in light of some "forthcoming objection."  The time is now.

---

license agreement for Synacthen pre-Petition Date," (*Id.*), while ignoring other aspects of their conduct, including that, on information and belief, they continue to engage in the co-payment reimbursement scheme described in Humana's prepetition complaint.

[8]     *See Debtors' Motion for Order Establishing Confirmation Schedule and Protocols, In re Mallinckrodt plc., et al.*, No. 20-12522 (JTD) (Bankr. D. Del. May 25, 2021) [D.I. 2564].

[9]     *See, e.g.*, Debtors' Obj. ¶ 13, n.8 ("Resolving the Acthar-related issues will clear a path towards timely confirmation, provide greater speed for creditor distributions, and demonstrate confirmability of the Plan."); Admin. Claims Bar Date Mot. ¶ 6 (arguing that "[t]he Debtors' ability to prepare for consummation of the Plan (should it be confirmed) and emerge from these Chapter 11 Cases will be substantially informed by the scope of the Administrative Claims against the Debtors" and noting that "the Debtors are already aware of litigation claimants that have suggested in writing that they may have administrative claims," including litigation claimants with Acthar-related claims).

### C. The Court May Order Payment of Administrative Priority Claims Before Confirmation.

17.     The Debtors also inexplicably argue that, even if the Acthar Insurance Claimants have administrative claims, "there is no basis to pay them currently." (Debtors' Obj. ¶ 25.) But the Acthar Insurance Claimants have not asked for the Debtors to pay their administrative claims immediately. Instead, the Acthar Insurance Claimants request that the Court order the Debtors to pay any then-existing administrative claims in full within 30 days of the Court entering an order estimating and allowing such claims.

18.     The Debtors admit that ordering payment of the Acthar Insurance Claimants' administrative claims before the effective date of a plan is well within the Court's discretion. (Debtors' Obj. ¶ 25 ("The Bankruptcy Code does not specifically prescribe when administrative expenses need to be paid and generally courts have held that bankruptcy courts retain discretion to determine the timing for payment of administrative expenses.")) Though the Debtors may prefer that administrative claims be paid out in full on the effective date of any reorganization plan, there is no barrier to this Court determining that they should be paid earlier. The Acthar Insurance Claimants respectfully submit that paying any existing administrative claims within 30 days of an estimation order is appropriate where, as here, the Acthar Insurance Claimants are continuing to incur many millions of dollars of Acthar-related expenses due to the Debtors' misconduct, which also threatens the feasibility of the Plan.

### II.    THE ACTHAR INSURANCE CLAIMANTS' PREPETITION CLAIMS MUST BE ESTIMATED FOR ALL PURPOSES.

19.     The Debtors argue that estimating prepetition claims does not need to occur now and can instead occur post-confirmation, if ever. But estimation is mandatory because failing to do so will unduly delay the Debtors' cases. Indeed, estimating the Debtors' prepetition liability is necessary to

A-2213

determine whether the Plan is confirmable, and the Debtors' arguments to the contrary are unavailing for at least three reasons.

20.     First, while the Debtors concede that estimating claims is mandatory where fixing or liquidating the claims would result in "undue delay," they nevertheless argue that estimating the Acthar Insurance Claimants' prepetition claims is not mandatory because "[u]ncertainty regarding the amount of Humana's Prepetition Claims has not prevented the Debtors from filing the Plan . . . ."  (Debtors' Obj. ¶ 27.)  But the mere fact that Debtors have filed a placeholder, unconfirmable Plan only serves to highlight why estimating the Acthar Insurance Claimants' claims is necessary to formulating a confirmable plan and thereby avoid undue delay.  Indeed, the Debtors' own authorities make clear that it is.

21.     In *In re John Q. Hammons Fall 2006, LLC*, which Debtors cite in their objection, a creditor filed prepetition breach of contract claims against a trust and certain of its affiliates.  *In re John Q. Hammons Fall 2006, LLC*, 2017 Bankr. LEXIS 3550, at *6 (Bankr. D. Kan. Oct. 13, 2017).  In the chapter 11 case, the creditor filed two proofs of claim against each debtor, each seeking over $550 million.  *Id.* at *6–7.  The Debtors filed an omnibus objection to the claims and simultaneously moved to estimate the claims, arguing that estimation was necessary because the debtors would "not be able to determine the feasibility of any plan without such a decision."  *Id.* at *8.  The court agreed, finding that the debtors "need to know which debtor is liable to [the creditor] and for what amount, so that the plan they propose is meaningful."  *Id.* at *13.  In fact, the court went further, noting that "*any* entity proposing a plan would need the same information."  *Id.* (emphasis in original).  The court ordered estimation so that the debtors could move their chapter 11 cases "from the theoretical to the working reorganization they propose to be."  *Id.*

22.     The Acthar Insurance Claimants' prepetition claims present uncertainties similar to those in *In re John Q Hammons Fall 2006* and the myriad other cases in which courts have estimated

prepetition litigation claims, including uncertainties concerning the Debtors against whom those claims should be asserted and their relative liabilities for that misconduct. *See, e.g., Official Comm. of Asbestos Claimants v. Asbestos Prop. Damage Comm. (In re Fed.-Mogul Glob. Inc.)*, 330 B.R. 133, 154 (D. Del. 2005) (estimating aggregate and future pending asbestos claims to avoid undue delay); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 124 (D. Del. 2006) (estimating aggregate asbestos claims liability); *In re Mud King Prod., Inc.*, 2015 WL 862319, at *4 (S.D. Tex. Feb. 27, 2015) (affirming bankruptcy court order approving estimation of prepetition litigation claims to avoid undue delay of litigating to final judgment).

23.     Second, the Debtors' argument that estimating prepetition claims is unnecessary to determine the feasibility of their proposed Plan is misguided because it ignores that effect that a finding of liability will have on the Debtors' administrative claim liability (and thus cost to exit bankruptcy) as well as the impact on the Debtors' go-forward business plan.  (Debtors' Obj. ¶¶ 19, 22-23.)  As the Estimation Motion makes clear, the estimation process will assess the Debtors' liability for prepetition conduct, whether that conduct is ongoing, and whether the Debtors' current Acthar-related pricing and business practices give rise to post-petition claims.  Resolution of these issues bears squarely on whether the Debtors are likely to face post-emergence claims that undermine their business plan. (Estimation Mot. ¶¶ 34-39.)

24.     The Debtors' argument also improperly presupposes that their proposed Plan meets the Bankruptcy Code's other requirements for confirmation when it does not.  The Acthar Insurance Claimants' prepetition claims against the Debtors may total many billions of dollars.  The Debtors, however, have proposed a $100 million pot and a baseline recovery of 1% for general unsecured creditors, including Acthar claimants, that is completely unmoored from the Debtors' value, the Debtors against whom Acthar-related claims can be asserted, the assets that should be available to satisfy those claims, and the importance of Acthar to the Debtors' go-forward business plan.  At the

same time, value in excess of the enterprise value of the entire opioid side of the Debtors' business will be made available for opioid claimants and unsecured noteholders will recover at least 70% on the dollar, if not more.  In short, the Debtors appear to be using the chapter 11 process to fund massive payouts to the opioid claimants and their unsecured noteholders, extinguish their immense prepetition Acthar-related liabilities, and protect their ability to continue post-emergence with the same practices that gave rise to Acthar-related claims in the first place.  Resolving the questions of how much the Acthar Insurance Claimants' prepetition claims are worth and against which Debtors those claims can be asserted is therefore essential to determining whether the proposed Plan unfairly discriminates against the general unsecured creditor class, is in the best interests of creditors, and is otherwise confirmable.  Estimating the Acthar Insurance Claimants' prepetition claims before confirmation is necessary to enable the Court to resolve those issues at plan confirmation.

25.     That under the Debtors' proposed Plan all general unsecured creditors will draw from a $100 million pot pro rata does not undermine the need to estimate these prepetition claims.  The Debtors again are assuming that their $100 million allocation to general unsecured creditors is adequate, when in reality that allocation ignores the immensity of Acthar-related claims, the importance of Acthar to the Debtors' post-emergence business plan, and the value of the Debtors' Specialty Brands business.  Put simply, estimating the Acthar Insurance Claimants' claims is required in order to determine the differences in recovery between the Acthar Insurance Claimants and claimants in the Debtors' other six unsecured creditor classes, so as to measure whether the plan unfairly discriminates.  *See  In re Tribune Co.*, 972 F.3d 228, 243 (3d Cir. 2020) ("[I]n making an unfair-discrimination determination, start by adding up all proposed plan distributions from the debtor's estate and divide by the number of creditors sharing the same priority. This provides a pro rata baseline. Then look at what actually happens if the plan is implemented . . . [by looking] at the difference between the recovery percentage under the plan of a preferred class and that of a dissenting class.").

26.     Third, the Debtors' argument that estimation of prepetition liabilities is premature to the extent it relates to potential unfair discrimination is also misguided.  The Debtors appear to believe that it is more efficient to wait for general unsecured creditors to **reject** the Plan and then attempt to cram them down at a contested confirmation hearing.  (Debtors' Obj. ¶ 36.)  This approach is not only ill-advised because it is inefficient, wasteful, and expensive, but is completely inconsistent with the Debtors' professed interest in securing confirmation by August 2021.

27.     The UCC, the Acthar Insurance Claimants, and other unsecured creditors have already objected to the Disclosure Statement on the basis that it unfairly discriminates and expect to vigorously oppose Plan confirmation without significant changes.[10]  Without a course correction, the Acthar Insurance Claimants believe it is irresponsible and wasteful to assume that general unsecured creditors will not vote to reject the current Plan.  And when that occurs, confirmation will have to be delayed significantly to allow time for a claims estimation process that the parties could have been pursuing in advance of or simultaneously with the plan confirmation process.  The only way to avoid such waste and delay is to estimate the claims now.

## III.   THE UNSECURED NOTES AD HOC GROUP'S ARGUMENTS SHOULD ALSO BE REJECTED.

28.     The Unsecured Notes Ad Hoc Group's joinder, which parrots the Debtors' process-based arguments, reflects the RSA parties' clear interest in both depriving the Acthar Insurance Claimants of due process and usurping for themselves value that rightfully belongs to other creditors

---

[10]     *See, e.g.*, *Preliminary Objection of Official Committee of Unsecured Creditors to Motion of Debtors for Entry of Order (I) Approving the Disclosure Statement and Form and Manner of Notice of Hearing Thereon, (II) Establishing Solicitation Procedures, (III) Approving the Form and Manner of Notice to Attorneys and Solicitation Directive, (IV) Approving the Form of Ballots, (V) Approving Form, Manner, and Scope of Confirmation Notices, (VI) Establishing Certain Deadlines in Connection With Approval of Disclosure Statement, and Confirmation of Plan, and (VII) Granting Related Relief, In re Mallinckrodt plc., et al.*, No. 20-12522 (JTD) (Bankr. D. Del. May 18, 2021) [D.I. 2392] ¶¶ 2-3  ("UCC Disclosure Statement Objection").

such as the Acthar Insurance Claimants.[11]  In short, the Unsecured Notes Ad Hoc Group argues that the Debtors' proposed process is better because they would avoid a "wasteful" estimation process by summarily disallowing and expunging most of the Acthar Insurance Claimants' claims, thereby confining them to Debtors that the Unsecured Notes Ad Hoc Group understands to "have no material value."  (Unsecured Notes Ad Hoc Group Joinder ¶ 4.)  What the Unsecured Notes Ad Hoc Group really means is that the Debtors' procedures allow virtually no merits discovery or due process and increase the likelihood that the Debtors can deliver nearly all of the estates' assets to unsecured noteholders and opioid claimants at the expense of Acthar Insurance Claimants who have legitimate claim to those assets.  While the Unsecured Notes Ad Hoc Group may prefer that result for obvious reasons, it does not provide a basis for opposing the estimation process that the Bankruptcy Code requires.

## CONCLUSION

29.     The Acthar Insurance Claimants respectfully request that the Court grant the Motions and enter the Proposed Orders attached thereto.


Dated: June 2, 2021                              Respectfully submitted,


                                                 **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

                                                 */s/Nader A. Amer*
                                                 Donna L. Culver (Bar No. 2983)
                                                 Robert J. Dehney (Bar No. 3578)
                                                 Matthew B. Harvey (Bar No. 5186)
                                                 Nader A. Amer (Bar No. 6635)

---

[11] *See the Unsecured Notes Ad Hoc Group's Statement in Support of the Debtors' Omnibus Objection to Motions of Attestor Limited and Humana Inc. for Entry of Orders (A) Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases and (B) Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code, In re Mallinckrodt plc., et al.*, No. 20-12522 (JTD) (Bankr. D. Del. May 21, 2021) [D.I. 2522] (the "Unsecured Notes Ad Hoc Group Joinder").

1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email:    dculver@morrisnichols.com
            rdehney@morrisnichols.com
            mharvey@morrisnichols.com
            namer@morrisnichols.com

and

Matthew A. Feldman (admitted *pro hac vice*)
Matthew Freimuth (admitted *pro hac vice*)
Benjamin P. McCallen (admitted *pro hac vice*)
Richard Choi (admitted *pro hac vice*)
Philip F. DiSanto (admitted *pro hac vice*)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Email:    mfeldman@willkie.com
            mfreimuth@willkie.com
            bmccallen@willkie.com
            rchoi1@willkie.com
            pdisanto@willkie.com

**CERTIFICATE OF SERVICE**

I, Nader A. Amer, hereby certify that I am not less than 18 years of age, and that on June 2, 2021, all parties who have requested CM/ECF notifications in this case received notice of the foregoing, *Attestor Limited and Humana Inc.'s Reply in Further Support of the Motions to Estimate Acthar-Related Claims and Allow Administrative Claims for All Purposes in these Bankruptcy Cases* (the "Reply"), via the Court's CM/ECF notification system.  In addition, I caused a courtesy copy of the Reply to be sent to counsel of record for each of the United States Trustee, the Official Committee of Unsecured Creditors, the Official Committee of Opioid Related Claimants, and the Debtors.


Date:  June 2, 2021                                    */s/  Nader A. Amer*
           Wilmington, Delaware                        Nader A. Amer (No. 6635)

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. 2200** |

## ORDER (I) APPROVING THE DISCLOSURE STATEMENT AND FORM AND MANNER OF NOTICE OF HEARING THEREON, (II) ESTABLISHING SOLICITATION PROCEDURES, (III) APPROVING THE FORM AND MANNER OF NOTICE TO ATTORNEYS AND SOLICITATION DIRECTIVE, (IV) APPROVING THE FORM OF BALLOTS, (V) APPROVING THE FORM, MANNER, AND SCOPE OF CONFIRMATION NOTICES, (VI) ESTABLISHING CERTAIN DEADLINES IN CONNECTION WITH APPROVAL OF DISCLOSURE STATEMENT AND CONFIRMATION OF PLAN, AND (VII) GRANTING RELATED RELIEF

Upon the motion (the "**_Motion_**")[2] of the Debtors for entry of an order (this "**_Order_**"), pursuant to sections 105(a), 1125, 1126, and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3016, 3017, 3018, and 3020, and Local Rule 3017-1: (a) approving the Disclosure Statement for the Plan; (b) approving the form and manner of the Disclosure Statement Hearing Notice in respect of the Disclosure Statement Hearing; (c) establishing the Solicitation Procedures; (d) approving the forms of the Ballots to tabulate votes solicited from Holders of Claims in the Voting Classes; (e) approving the form and manner of the Solicitation Directive Notice and the Solicitation Directive; (f) approving the form, manner, and scope of the Confirmation Notices in respect of the Confirmation Hearing; (g) establishing certain deadlines in connection with the foregoing; and (h) granting related relief, all as more fully set forth in the Motion; and it appearing

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

that this Court has jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the record herein; and after due deliberation thereon; and this Court having determined that there is good and sufficient cause for the relief granted in this Disclosure Statement Order,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED, as set forth herein.

2.      The Disclosure Statement is approved as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, and the Debtors are authorized to distribute the Disclosure Statement and the Solicitation Packages in order to solicit votes on, and pursue confirmation of, the Plan.

3.      The Disclosure Statement Hearing Notice as proposed in the Motion is hereby approved.  Service of the Disclosure Statement Hearing Notice as set forth in the Motion is deemed to have been good and sufficient notice of the Disclosure Statement Hearing, the Disclosure Statement Objection Deadline, and procedures for objecting to the adequacy of the Disclosure Statement.

4.      A Confirmation Hearing to consider confirmation of the Plan is hereby scheduled to be held before this Court on **September 21, 2021 at 10:00 a.m.** (Prevailing Eastern Time).  The Confirmation Hearing may be continued from time to time by the Court without further notice

2

other than adjournments announced in open court or in the filing of a notice or a hearing agenda in the Chapter 11 Cases, subject to any applicable consultation or consent rights in the RSA.

5.      Any objections to the Plan shall: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest held by such Entity; (iv) state with particularity the basis and nature of any objection; and (v) be filed, contemporaneously with a proof of service, with the Court and served by regular mail or email so that it is **actually received** no later than **4:00 p.m. Prevailing Eastern Time on September 3, 2021** (the "**Confirmation Objection Deadline**") by the following parties:

(a)  Counsel to the Debtors, Latham & Watkins LLP, 1271 Avenue of the Americas, New York, New York 10020 (Attn: George Davis (George.Davis@lw.com), George Klidonas (George.Klidonas@lw.com), Anupama Yerramalli (Anu.Yerramalli@lw.com), and Andrew Sorkin (Andrew.Sorkin@lw.com)), Latham & Watkins LLP, 355 South Grand Avenue, Suite 100, Los Angeles, California 90071 (Attn: Jeffrey Bjork (Jeff.Bjork@lw.com)), Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611 (Attn: Jason Gott (Jason.Gott@lw.com)), and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins (collins@rlf.com) and Michael J. Merchant (merchant@rlf.com));

(b)  Counsel to the Guaranteed Unsecured Notes Ad Hoc Group: Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn:  Andrew N. Rosenberg (arosenberg@paulweiss.com), Alice Belisle Eaton (aeaton@paulweiss.com), Claudia R. Tobler (ctobler@paulweiss.com), and Neal Paul Donnelly (ndonnelly@paulweiss.com)), and Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801 (Attn:  Richard S. Cobb (cobb@lrclaw.com));

(c)  Counsel to the Governmental Plaintiff Ad Hoc Committee: Kramer Levin Naftalis & Frankel LLP 1177 Avenue of the Americas, New York, New York 10036 (Attn: Kenneth H. Eckstein (keckstein@kramerlevin.com) and Daniel M. Eggermann (deggermann@kramerlevin.com)), Brown Rudnick LLP Seven Times Square New York, New York 10019 (Attn:  David J. Molton (dmolton@brownrudnick.com) and Steven D. Pohl (spohl@brownrudnick.com)), and Gilbert LLP 700 Pennsylvania Ave., SE, Suite 400, Washington, D.C. 20003 (Attn:  Scott D. Gilbert (gilberts@gilbertlegal.com) and Kami E. Quinn (quinnk@gilbertlegal.com));

US-DOCS\123907696.7

(d)     <u>Counsel to the Multistate Governmental Entities Group</u>: Caplin & Drysdale, Chartered, One Thomas Circle, NW, Suite 1100, Washington D.C. 20005 (Attn: Kevin C. Maclay (kmaclay@capdale.com), Todd E. Phillips (tphillips@capdale.com), and Ann Weber Langley (alangley @capdale.com));

(e)     <u>Counsel to the Ad Hoc First Lien Term Lender Group</u>: Gibson, Dunn & Crutcher LLP, 200 Park Avenue New York, New York 10166 (Attn: Scott J. Greenberg (sgreenberg@gibsondunn.com) and Michael J. Cohen (mcohen@gibsondunn.com)), and Troutman Pepper Hamilton Sanders LLP Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, Delaware 19899-1709 (Attn: David M. Fournier (david.fournier@troutman.com) and Kenneth A. Listwak (ken.listwak@troutman.com));

(f)     <u>The Office of the United States Trustee for the District of Delaware</u>: 844 King Street, Suite 2207, Wilmington, Delaware  19801 19801 (Attn: Jane M. Leamy (Jane.M.Leamy@usdoj.gov));

(g)     <u>Counsel to the Official Committee of Unsecured Creditors</u>: Cooley LLP; 1299 Pennsylvania Avenue, NW, Washington D.C. 20004 (Attn: Cullen D. Speckhart (cspeckhart@cooley.com)), Cooley LLP, 55 Hudson Yards, New York, New York 10001 (Attn: Cathy Hershcopf (chershcopf@cooley.com), Michael Klein (mklein@cooley.com), and Lauren A. Reichardt (lreichardt@cooley.com), and Robinson & Cole LLP, 1201 N. Market Street, Suite 1406, Wilmington, Delaware 19801 (Attn: Natalie D. Ramsey (nramsey@rc.com) and Jamie L. Edmonson (jedmonson@rc.com));

(h)     <u>Counsel to the Future Claims Representative</u>: Young Conaway Stargatt & Taylor, LLP; Rodney Square, 1000 North King Street, Wilmington, DE 19801 (Attn: James L. Patton, Jr. (jpatton@ycst.com)) and Frankel Wyron LLP; 2101 L St., NW, Suite 800, Washington, DC 20037 (Attn: Richard Wyron (rwyron@frankelwyron.com); and

(i)     <u>Counsel to the Official Committee of Opioid Related Claimants</u>: Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Arik Preis (apreis@akingump.com), Mitchell P. Hurley (mhurley@akingump.com), and Sara L. Brauner (sbrauner@akingump.com)) and Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801 (Attn: Justin R. Alberto (jalberto@coleschotz.com)).

6.      Any objections that fail to comply with the requirements set forth in this Order may,

in the Court's discretion, not be considered and may be overruled.

7.      The deadline to file any brief in support of confirmation of the Plan and reply to any objections  shall be **September 17, 2021 at  4:00 p.m.** (Prevailing Eastern Time) (the "***Reply Deadline***").

8.      The Confirmation Hearing Notice, as proposed in the Motion and the form of notice annexed hereto as **Exhibit 4.1,** and as modified by all of the items approved by this Order related to the Additional Opioid Notice Plan annexed hereto as **Exhibit 5,** (including paragraph 40 hereof), shall be deemed good and sufficient notice of the Confirmation Hearing and no further notice need be given; *provided*, *however*, that any provision of Bankruptcy Rule 3017(d) requiring the Debtors to distribute the Disclosure Statement and the Plan to parties not entitled to vote, whether because they are unimpaired or because they are deemed to reject the Plan, or any parties in interest other than as prescribed in this Order, shall be waived; *provided further*, *however*, that the Disclosure Statement and Plan shall remain posted in PDF format at *https://www.restructuring.primeclerk.com/Mallinckrodt* and shall be provided in either electronic or paper form to any parties in interest upon written request to the Debtors.  The Debtors shall also serve a copy of the Confirmation Hearing Notice on all known creditors, interest holders, and interested parties, except the Debtors are not required to serve notice of any kind upon any person or entity to whom the Debtors mailed the Disclosure Statement Notice and had such notice returned by the United States Postal Service marked "undeliverable as addressed," "moved - left no forwarding address," "forwarding order expired," or any similar reason, and as to whom a further reasonable search has failed to disclose an accurate alternate address.

9.      Service of the Confirmation Hearing Notice as set forth in the Motion and herein is sufficient notice of the Confirmation Hearing, the Confirmation Objection Deadline, the Reply Deadline, and procedures for objecting to confirmation of the Plan.

10.     The Debtors shall use the Voting Record Date for determining which Entities are entitled to, as applicable, receive Solicitation Packages, vote to accept or reject the Plan, and receive the Confirmation Hearing Notice and any other notices described in the Motion.  For the avoidance of doubt, the Voting Record Date shall not apply to Opioid Claimants.

11.     The Solicitation Procedures (as defined in **Attachment 1** attached hereto) utilized by the Debtors for distribution of the Solicitation Packages in soliciting acceptances and rejections of the Plan satisfy the requirements of the Bankruptcy Code and the Bankruptcy Rules and are approved.

12.     The following dates and deadlines in connection with the Solicitation Procedures and Confirmation Hearing are approved:

| Event | Date/Deadline |
|---|---|
| Disclosure Statement Objection Deadline | May 19, 2021 at 4:00 p.m., prevailing ET |
| Disclosure Statement Hearing | June 15-16, 2021, at 3:00 p.m., prevailing ET |
| Voting Record Date | June 17, 2021 |
| Solicitation Deadline | Five (5) Business Days after entry of the Disclosure Statement Order |
| Publication Notice Deadline | June 28, 2021 |
| Deadline to object to Claims for voting purposes only | July 12, 2021 at 4:00 p.m., prevailing ET |
| Solicitation Directive Deadline | July 15, 2021 at 4:00 p.m., prevailing ET |
| Deadline to file trust distribution procedures (as may be amended, supplemented or modified from time to time) | The earlier of (a) 30 days from entry of the Disclosure Statement Order and (b) July 21, 2021. |
| Rule 3018(a) Motion Filing Deadline | July 26, 2021 at 4:00 p.m., prevailing ET |
| Plan Supplement Filing Date | August 6, 2021 |
| Deadline to object to Rule 3018(a) Motion | August 9, 2021 |
| Cure Objection Deadline | August 17, 2021 at 4:00 p.m., prevailing ET |
| Confirmation Objection Deadline | September 3, 2021 at 4:00 p.m., prevailing ET |
| Voting Deadline | September 3, 2021 at 4:00 p.m., prevailing ET |
| Deadline to file Voting Report | September 13, 2021 at 4:00 p.m., prevailing ET |
| Deadline to File Confirmation Brief and Omnibus Reply to Plan Objections | September 17, 2021 at 4:00 p.m., prevailing ET |
| Confirmation Hearing Date | September 21, 2021  at 10:00 a.m., prevailing ET |

13.     The forms of Ballots attached hereto as **Exhibits 1.1 through 1.46** are appropriate to the circumstances of these Chapter 11 Cases and are hereby approved.

6

14.     The Debtors are authorized to solicit acceptances of the Plan from Holders of Claims in the Voting Classes, which are Holders of Claims in Classes 2(b)-(c), 3 through 9(a)-(h), and Class 10 (the "***Voting Classes***"). For the avoidance of doubt, Class 9(i) is not a Voting Class.

15.     The proposed distribution and contents of the Solicitation Packages, which shall include the following, are approved:

a.     with respect to Holders of Claims in the Voting Classes (but subject to the Non-Notes Master Ballot Solicitation Procedures (as defined in the Solicitation Procedures)): a cover letter describing the contents of the Solicitation Package and an enclosed USB flash drive, and instructions for obtaining (free of charge) printed copies of the following materials provided in electronic format;

- the Confirmation Hearing Notice;

- the Disclosure Statement with all exhibits, including the Plan with its exhibits (to the extent such exhibits are filed with the Court before the Solicitation Date);

- the Solicitation Procedures;

- the Disclosure Statement Order (without exhibits);

- subject to the Non-Notes Master Ballot Solicitation Procedures, an appropriate Ballot and voting instructions for the same;

- subject to the Non-Notes Master Ballot Solicitation Procedures, a pre-addressed, return envelope for completed Ballots;

- subject to the Non-Notes Master Ballot Solicitation Procedures, solely for Holders of contingent, unliquidated, or disputed Claims that are not subject to an objection filed by the Debtors, the Notice of Limited Voting Status; and

- letters from the Committees expressing their views on the Plan;

b.     with respect to Holders of Claims and Interests in Non-Voting Classes (or Claims in Voting Classes that, as of July 12, 2021, are subject to a pending objection or are otherwise deemed not entitled to vote on the Plan): (a) the Confirmation Hearing Notice and (b) the applicable Notice of Non-Voting Status;

c.     with respect to Holders of Claims in Voting Classes 8(a)-(d) and 9(a)-(h) and any Entity that believes it may have an Opioid Claim that requests a Solicitation

7

Package, the Opioid Claimant Notice, substantially in the form attached hereto as **<u>Exhibit 4.11 and (subject to the Non-Notes Master Ballot Solicitation Procedures (as defined below)) the materials listed in subsection (a) above</u>**;

d. with respect to the U.S. Trustee, a copy of each document contained in each version of the Solicitation Packages, which may include non-customized Ballots and a non-customized Notice of Non-Voting Status; and

e. any other materials ordered by the Court to be included as part of the Solicitation Package.

16. The Solicitation Packages provide the holders of Claims entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code and the Local Rules.

17. As part of the Solicitation Packages, copies of the Disclosure Statement, the Plan, this Order, and exhibits to all of such documents (other than to this Order), shall be provided in PDF format on a USB flash drive, instead of printed hard copies. The cover letter included in the Solicitation Package shall include instructions for obtaining printed copies of the materials free of charge. The Debtors may substitute hard copies of all solicitation materials instead of the USB flash drive as may be necessary to achieve timely distribution of the Solicitation Packages. Any party that receives content in the Solicitation Package in flash drive format but would prefer to receive materials in paper format may contact the Notice and Claims Agent and request paper copies of the corresponding materials previously provided in flash drive format (to be provided at the Debtors' expense) via the communication methods set forth in the Solicitation Procedures.

18. The Debtors are authorized to solicit, receive, and tabulate votes to accept or reject the Plan in accordance with the Solicitation Procedures, which are hereby incorporated by reference. The procedures set forth herein, in the Solicitation Procedures, and in materials for soliciting votes approved hereby, including, without limitation, the proposed Non-Notes Master

8

Ballot Solicitation Procedures and the Notes Master Ballot Solicitation Procedures (each as defined in the Solicitation Procedures), procedures for the temporary allowance of Claims for the purpose of voting to accept or reject the Plan, and the establishment of the Voting Record Date, provide for a fair and equitable process and are consistent with section 1126 of the Bankruptcy Code, Bankruptcy Code Rule 3018 and the Local Rules, and are hereby approved in their entirety.

19.     The Solicitation Directive Notice and the Solicitation Directive, substantially in the form attached hereto as **Exhibits 2.1 and 2.2,** respectively, are approved.  Each Firm is required to complete and return the Solicitation Directive and Client List to the Notice and Claims Agent on or before the Solicitation Directive Deadline (**July 15, 2021 at 4:00 p.m., prevailing ET**), which deadline may be extended by the Debtors in consultation with the Supporting Parties and the Official Committee of Opioid-Related Claimants for Solicitation Directives sent to Firms representing Opioid Claimants.  The Debtors are authorized to serve the relevant Solicitation Packages to Firms via encrypted email or other secured electronic means in lieu of mailing or otherwise serving any paper copies.

20.     The Notice and Claims Agent is authorized to accept the Ballots submitted pursuant to the Non-Notes Master Ballot Solicitation Procedures and accompanying Client Lists via encrypted email or other secured method of electronic communication.  In addition, Master Ballots submitted by Nominees on behalf of the Holders of the First Lien Notes Claims in Class 3, Second Lien Notes Claims in Class 4, Guaranteed Unsecured Notes Claims in Class 5, and Legacy Unsecured Notes Claims in Class 6(d) will also be accepted via email.

21.     The Notice and Claims Agent is authorized to accept Ballots via electronic online transmission solely through a customized online balloting portal on the Debtors' case website or, with respect to Opioid Claimants and any Entity that believes it may have an Opioid Claim,

through the online portal set forth on the dedicated Opioid Claimant webpage; *provided that* the Notice and Claims Agent may otherwise receive all Master Ballots in accordance with this Order. The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted in this manner, and the creditor's electronic signature will be deemed to be immediately legally valid and effective. Ballots submitted via the customized online balloting portal shall be deemed to contain an original signature.

22.     The procedures for establishing Claim amounts for voting purposes and the temporary allowance and disallowance of Claims for vote tabulation purposes, the establishment of the Voting Record Date, and the procedures for soliciting and tabulating certain votes, all as set forth in the Solicitation Procedures, provide for a fair and equitable process and are consistent with section 1126 of the Bankruptcy Code, Bankruptcy Code Rule 3018 and the Local Rules, and are hereby approved in their entirety. For the avoidance of doubt, (a) any Entity that believes it may have an Opioid Claim in Classes 8(a)-(d) and 9(a)-(h) shall not be required to file a Proof of Claim for such Opioid Claim to be temporarily allowed for voting purposes, and (b) such Opioid Claims can only be disputed or subject to disallowance on non-substantive grounds under the Local Rules (i.e., duplicative, wrong case or wrong class, amended or superseded, etc.), and may not be disputed or subject to disallowance on non-substantive grounds pertaining to late filed claims and claims that do not have a basis in the Debtors' books and records.

23.     The Notice and Claims Agent is authorized to assist the Debtors in (a) distributing the Solicitation Packages; (b) receiving, tabulating and reporting on Ballots cast to accept or reject the Plan by holders of Claims against the Debtors; (c) responding to inquiries from holders of Claims and Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages and all other related documents and matters related thereto,

including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan; (d) soliciting votes on the Plan; and (e) if necessary, contacting creditors regarding the Plan.

24.     Nominees are required to forward Solicitation Packages and notices to the Beneficial Holders of First Lien Notes Claims in Class 3, Second Lien Notes Claims in Class 4, Guaranteed Unsecured Notes Claims in Class 5, and Legacy Unsecured Notes Claims in Class 6(d) of the Plan within five (5) business days of receiving the Solicitation Packages and related notices.  To the extent the Nominees incur out-of-pocket expenses in connection with distribution of the Solicitation Packages and related notices, the Debtors are authorized, but not directed, to reimburse such entities for their reasonable and customary expenses incurred in this regard.

25.     The releases, exculpatory provisions, and injunctions, including the Opioid Permanent Channeling Injunction complies with Bankruptcy Rule 3016(c) and conspicuously describes the conduct and parties enjoined by the Plan.  Nothing in this Order shall be deemed a finding or determination or order that the terms and conditions of any of such releases, exculpatory provisions, or injunctions (including the opioid permanent channeling injunction) are approved.

26.     The Debtors, in consultation with the Official Committee of Unsecured Creditors for Classes 6 and 7 and the Official Committee of Opioid-Related Claimants for Classes 8 and 9, and subject to contrary order of this Court, may waive any defect in any Ballot at any time, either before or after the close of voting and without notice.  Except as otherwise provided herein, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline, the Debtors may reject such Ballot as invalid, and therefore, decline to utilize it in connection with confirmation of the Plan by this Court; *provided, however*, that such invalid Ballots shall be documented in the voting results filed with this Court.  Further, the Debtors are authorized to inform the Official

11

Committee of Unsecured Creditors for Classes 6 and 7 and Official Committee of Opioid-Related Claimants for Classes 8 and 9 of any applicable Ballots that the Debtors determine to be defective, and the Official Committee of Unsecured Creditors and Official Committee of Opioid-Related Claimants are each permitted to inform such applicable voter of the defect and the process for correcting such defective Ballot. The Debtors shall use reasonable efforts to identify and inform Official Committee of Opioid-Related Claimant professionals of any defective Ballots and provide claimants with a reasonable opportunity to cure (including a reasonable time after the Voting Deadline which is to be determined on a case by case basis and agreed upon by Debtors).

27.     The Confirmation Notices, including the Notices of Non-Voting Status, substantially in the forms attached hereto as **Exhibits 4.1 through 4.8 and 4.12** are approved.

28.     The Debtors are authorized to send the Notices of Non-Voting Status and the Confirmation Hearing Notice to the applicable Holders of Claims and Equity Interests in the Non-Voting Classes in lieu of a Solicitation Package.

29.     The Debtors are authorized to send the Plan Supplement Notice, substantially in the form attached hereto as **Exhibit 4.3**, on the date that the Debtors file the Plan Supplement (which will be filed and served at least twenty-eight (28) days prior to the Voting Deadline). The Debtors shall file the Plan Supplement with the Court on or before August 6, 2021 (the "***Plan Supplement Filing Date***"), which filing is without prejudice to the Debtors' rights to amend or supplement the Plan Supplement. The Debtors shall file those certain trust distribution procedures (as may be amended, supplemented or modified from time to time) with respect to the Opioid MDT II and Opioid Creditor Trusts with the Court on the earlier of (a) 30 days from entry of the Disclosure Statement Order and (b) July 21, 2021.

30.     The Debtors shall serve copies of the Solicitation Package (other than a Ballot), and the Plan Supplement to: (a) the U.S. Trustee; (b) the United States Attorney for the District of Delaware; (c) the Internal Revenue Service; (d) counsel to the Committees; (e) counsel to the FCR; and (f) the 2002 List.

31.     No later than the Solicitation Deadline or as soon as reasonably practicable thereafter, the Debtors shall publish the Publication Notice, substantially in the form attached hereto as **Exhibit 4.2**, once in each of the publications stated in the Motion, and shall commence its Additional Opioid Notice Plan. The Confirmation Hearing Notice and Publication Notice, the terms of the Additional Opioid Notice Plan attached hereto as **Exhibit 5** (subject to any modifications or recalibration based on results achieved pursuant to Paragraph 40 hereof) each, if properly delivered, published, or executed, as applicable and as provided herein, provide holders of Claims (including Opioid Claims), holders of Interests and all Persons and Entities that have held or asserted, that hold or assert or that may in the future hold or assert any Claim (including an Opioid Claim) with sufficient notice of the releases, exculpatory provisions, and injunctions in satisfaction of the requirements of Bankruptcy Rule 3016(c).

32.     The Debtors are authorized to conduct the Additional Opioid Notice Plan attached hereto as **Exhibit 5** and as further described in the Notice and Claims Agent's *Declaration of Jeanne C. Finegan, APR* [Docket No. 2889]. The Debtors shall consult in good-faith with the Official Committee of Opioid-Related Claimants with respect to the content of television advertisements under the Additional Opioid Notice Plan. Additionally, the Debtors shall provide counsel for the Official Committee of Opioid-Related Claimants with a copy of the final script and any other creative content for any such television advertisement(s) at least 7 days before such advertisement(s) is scheduled to be filmed or otherwise produced. Any dispute regarding the

13

content of the script(s) and/or creative content that cannot be resolved consensually shall be resolved by the Court on at least 3 business days' notice, subject to the Court's availability. The Debtors shall not film or otherwise produce any television advertisement(s) subject to a dispute until such dispute is resolved either by agreement of the parties or a Court order. Notwithstanding anything to the contrary herein, the Official Committee of Opioid-Related Claimants must raise any and all disputes with respect to the final script and any other creative content for any such television advertisement(s) on or before June 25, 2021.

33.     The Contract/Lease Notice and Cure Notice, substantially in the forms attached hereto as **Exhibit 4.9** and **4.10**, respectively, are approved. In connection with the assumption of any executory contract or unexpired lease by the Debtors (any such contract or lease, a "***Contract or Lease***" and, collectively, the "***Contracts and Leases***"), the following procedures (the "***Assumption Procedures***") are authorized and approved:

(a)     <u>Notice</u>.  The Debtors shall mail (or cause to be mailed) the notice attached as **Exhibit 4.10** to this Order (the "***Cure Notice***") to all counterparties to the Debtors' Contracts and Leases (the "***Contract Parties***") by no later than **July 30, 2021**.

(b)     <u>Content of the Cure Notice</u>.  The Cure Notice will include the following information: (i) the title of the Contract or Lease to be assumed; (ii) the name of the counterparty to the Contract or Lease; (iii) any applicable cure amounts, whether arising prepetition or post-petition (the "***Cure Amount***"); and (iv) the deadline by which any such Contract Party must object to the assumption of such Contract or Lease. The Cure Notice also sets forth the contents of <u>Article V.G</u> of the Plan, which provides in pertinent part (and in sum and substance) that (i) as of the Effective Date, any term of any Contract applicable to any Debtor shall be void and of no further force or effect to the extent such Contract creates an obligation of any Debtor, or gives rise to a right under any Insurance Contract of any Debtor, for indemnification or reimbursement of any Person other than the Opioid Trust or any other amounts whatsoever relating to or arising from any actual or potential litigation or dispute in connection with any indemnification obligations under such Contract; and (ii) the Plan shall constitute (i) an amendment to each assumed or assumed and assigned Contract to sever any and all provisions thereof that give rise to any indemnification obligations thereunder and (ii) an agreement by each counterparty to release any and all such obligations and liabilities relating to such severed provisions.

14

(c)     Objections.  Objections to the proposed Cure Amount and adequate assurance of future performance obligations to the Contract Parties must: (i) be in writing; (ii) set forth the nature of the objector's claims against or interests in the Debtors' estates and the basis for the objection and the specific grounds therefor; (iii) comply with the Bankruptcy Rules, Local Rules, and orders of this Court; and (iv) be filed with the Clerk of the Court by the Cure Objection Deadline (**August 17, 2021**).

(d)     Effects of Objecting to a Cure Notice.  A properly filed objection to a Cure Notice will reserve such objecting party's rights against the Debtors with respect to the relevant objection (each such objection a "***Cure Objection***").

(e)     Effects of Not Objecting to a Cure Notice.  If a Contract Party does not object to: (a) the Cure Amount for its Contracts and Leases; (b) the ability of the Debtors to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code; or (c) any other matter pertaining to assumption, then the Cure Amounts owed to such Contract Party shall be paid as soon as reasonably practicable after the effective date of the assumption of such Contract or Lease, and such Contract Party shall forever be barred and estopped from objecting (i) to the proposed Cure Amount as the amount to cure all defaults to satisfy section 365 of the Bankruptcy Code and from asserting that any additional amounts are due or defaults exist; (ii) that any conditions to assumption must be satisfied under such Contract or Lease before it can be assumed; or (iii) that the Debtors have not provided adequate assurance of future performance as contemplated by section 365 of the Bankruptcy Code. Further, a Contract Party will be deemed to consent to certain amendment and release provisions related to the Debtors' indemnification obligations as described in Article V.G of the Plan (such provisions, the "***Co-Defendant Indemnification Obligation Provisions***"), if applicable to such Contract Party's Contract or Lease, unless such Contract Party objects to such provisions before the Confirmation Objection Deadline (**September 3, 2021**).  If a Contract Party does not wish to consent to the Co-Defendant Indemnification Obligation Provisions, such Contract Party must file an objection to the Plan by **September 3, 2021** in accordance with paragraph 5 of this Order.

34.     If a Contract Party objects to the Cure Amount for its Contract or Lease, then such Contract Party's rights are reserved.  If the Plan is approved, then Cure Objections will be resolved in accordance with the provisions of the Plan.  A Cure Objection shall not constitute an objection to the Debtors' Co-Defendant Indemnification Obligation Provisions in Article V.G of the Plan. For a Contract Party to object to the Co-Defendant Indemnification Obligation Provisions, such Contract Party must file an objection to the Plan by the Confirmation Objection Deadline **September 3, 2021**) and in accordance with paragraph 5 above.

15

35.     The mailing of the Cure Notice to the Contract Parties will not (i) obligate the Debtors to assume any Contract or Lease or (ii) constitute any admission or agreement of the Debtors that such Contract or Lease is an "executory" contract or unexpired lease.

36.     The cover letter to be attached to the Disclosure Statement, in substantially the form attached hereto as **Exhibit 3**, is approved.

37.     The Opioid Claimant Notice, in substantially the proposed form of **Exhibit 4.11**, is approved.

38.     Notwithstanding anything to the contrary herein and for the avoidance of doubt, all Entities that believe they may hold an Opioid Claim shall be entitled to obtain a Solicitation Package (with a Ballot) and vote on the Plan.  All materials included in the Solicitation Package for Opioid Claimants shall be made available free of charge online at the dedicated Opioid Claimant webpage.  The dedicated Opioid Claimant webpage shall contain an online portal(s) whereby Opioid Claimants may request (and immediately obtain) and submit a Ballot.

39.     If an Entity that believes it may hold an Opioid Claim contacts the Notice and Claims Agent more than seven (7) business days before the Voting Deadline and requests a Solicitation Package, the Notice and Claims Agent will provide such claimant with a Solicitation Package within two (2) business days of such request, and if such request is made on or after seven (7) business days before the Voting Deadline, the Notice and Claims Agent will provide the Solicitation Package by overnight mail or via email.  Notwithstanding anything to the contrary herein, all such requests must be submitted by no later than three (3) business days before the Voting Deadline.    All such Solicitation Package requests must be made by email to *mallinckrodtballotrequests@primeclerk.com* or through the online portal set forth on the dedicated Opioid Claimant webpage, and the Notice and Claims Agent will not be required to provide

16

Solicitation Packages to parties that do not make a request in this manner.  Additionally, unless hard copy service is requested, the Notice and Claims Agent will provide parties with the Solicitation Package documents or a link where they may be accessed via e-mail, which will include a unique E-Ballot ID# for voting through the E-Ballot platform.

40.     Following the Solicitation Deadline, the Debtors with the assistance of their Notice and Claims Agent, and in consultation with the Supporting Parties, will provide a weekly status update (and shall host a weekly telephonic conference call) to the Official Committee of Opioid-Related Claimants on the status of the solicitation and notification of Opioid Claimants and the status of the Additional Opioid Notice Plan (such as status updates regarding, among other things, (i) the amount of Ballots/Master Ballots distributed to Opioid Claimants and votes cast by Opioid Claimants, (ii) the amount of Ballots/Master Ballots requested by Opioid Claimants, and (iii) inquiries, if any, directed to the Notice and Claims Agent by Opioid Claimants).  In connection therewith, the Debtors shall consult with the Official Committee of Opioid-Related Claimants on a weekly (or more frequent, if the Official Committee of Opioid-Related Claimants contacts the Debtors) basis to consider modifications to the Debtors' solicitation and notification of the Opioid Claimants, with the Debtors' rights and objections reserved with respect to any such proposed modifications.  To the extent that the Official Committee of Opioid-Related Claimants proposes good-faith modifications to the Debtors' solicitation and notification of Opioid Claimants (including, without limitation, the Additional Opioid Notice Plan), and the Debtors refuse to incorporate such modifications, the parties shall in good faith attempt to resolve such dispute.  If the parties fail to resolve such dispute, the Official Committee of Opioid-Related Claimants shall be permitted to seek this Court's assistance in resolving any disputes, which shall be scheduled on three (3) business days' notice subject to the Court's availability, and all parties' rights are reserved

17

with respect to any such Court intervention.  In connection with any dispute, the Debtors shall not be able to utilize the fact that the Court has previously issued an order approving the Solicitation Procedures (or this Order) as adequate, as all parties understand that the Solicitation Procedures may require modification or recalibration based on results achieved.

41.     The Debtors are authorized to make non-substantive changes to the Disclosure Statement, Plan, Confirmation Hearing Notice, Solicitation Packages, the ballots and notices, any voting and tabulation procedures described herein, and related documents without further order of the Court, including changes to correct typographical and grammatical errors, if any, and to make conforming changes to the Disclosure Statement, the Plan, and any other materials in the Solicitation Packages before distribution.

42.     Notwithstanding anything to the contrary herein and for the avoidance of doubt, the Debtors, in consultation with the Supporting Parties, and the Official Committee of Unsecured Creditors solely for extensions for Classes 6 and 7 and the Official Committee of Opioid-Related Claimants solely for extensions for Classes 8 and 9, shall be permitted to extend the Voting Deadline.

43.     The claimants whose claims are included in the Surviving TPP Claims (as that term is defined in the Stipulation and Agreement Disallowing and Expunging Certain Third Party Payor Claims approved by this Court by Order dated May 24, 2021 [ECF. No. 2535] (the "**Stipulation**")) are authorized to vote their Surviving TPP Claims as follows: (a) each claimant with a Surviving TPP Acthar Claim (as defined in the Stipulation) shall have the right to vote a Class 6(a) claim in the amount of $1.00 against each of Mallinckrodt plc and Mallinckrodt ARD LLC, provided that any such claimant whose Surviving TPP Acthar Claim is disallowed (whether by agreement or otherwise) after entry of this Order shall not be entitled to any vote on account of such Surviving

18

TPP Acthar Claim; (b) each claimant with a Surviving TPP Generics Claim (as defined in the Stipulation) shall have the right to vote a Class 6(b) claim in the amount of $1.00 against each of Mallinckrodt plc, Mallinckrodt LLC, SpecGx LLC, Mallinckrodt Inc., and Mallinckrodt APAP LLC; (c) the law firm or other authorized representative that filed each of the Surviving TPP Claims shall have the right, but is not required, to file a Master Ballot with respect to the votes of the underlying claimants; and (d) nothing contained herein shall in any way alter or impair the rights of any Third Party Payor, including but not limited to the claimants whose claims are included in the Surviving TPP Claims, to assert and vote any Opioid Claims and/or any other claims properly asserted by these claimants.

44.     Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a Proof of Claim after the Voting Record Date.

45.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

46.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

47.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: June 17th, 2021
Wilmington, Delaware

JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

19