Case No. 21-cv-01093-LPS
_____

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE
_____

**In re**

**MALLINCKRODT PLC,** *et al.*

**Debtors.**

-----------------------------------------------

**ATTESTOR LIMITED AND HUMANA INC.,**

*Appellants*,

v.

**MALLINCKRODT PLC,** *et al*.,

*Appellees*.

_____

## APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE
_____

## APPENDIX VOL. 5 (A-2871- A-4761) TO APPELLANT'S OPENING BRIEF

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Donna L. Culver (No. 2983)
Robert J. Dehney (No. 3578)
Matthew B. Harvey (No. 5186)
Matthew O. Talmo (No. 6333)
Taylor M. Haga (No. 6549)
1201 N. Market St., 16th Floor
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
dculver@morrisnichols.com
rdehney@morrisnichols.com
mharvey@morrisnichols.com
mtalmo@morrisnichols.com
thaga@morrisnichols.com

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (admitted *pro hac vice*)
Matthew Freimuth (admitted *pro hac vice*)
Benjamin P. McCallen (admitted *pro hac vice*)
Richard Choi (admitted *pro hac vice*)
Philip F. DiSanto (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
mfeldman@willkie.com
mfreimuth@willkie.com
bmccallen@willkie.com
rchoi1@willkie.com
pdisanto@willkie.com

**EIMER STAHL LLP**
Benjamin E. Waldin (admitted *pro hac vice*)
Scott C. Solberg (admitted *pro hac vice*)
James W. Joseph (admitted *pro hac vice*)
Sarah H. Catalano (admitted *pro hac vice*)
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
bwaldin@eimerstahl.com
ssolberg@eimerstahl.com
jjoseph@eimerstahl.com
scatalano@eimerstahl.com

# APPENDIX
# TABLE OF CONTENTS

| Document | Page No. |
|---|---|
| Relevant Filings | |
| Proof of Claim No. 4217 of Humana Inc. (February 15, 2021)[1] | A0001 |
| Proof of Claim No. 4144 of Avon Holdings I LLC as Transferee of United Healthcare Services Inc. (February 15, 2021)[2] | A0075 |
| Proof of Claim No. 5812 of Avon Holdings I LLC as Transferee of OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC (February 16, 2021)[3] | A0100 |
| Motion of Debtors for Interim and Final Orders (A) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (B) Authorizing Continuation of Existing Deposit Practices, (C) Waiving Certain U.S. Trustee Guidelines, (D) Authorizing Continuation of Intercompany Transactions, and (E) Granting Superpriority Status to Postpetition Intercompany Claims, Case No. 20-12522, D.I. 23 (October 12, 2020) | A0119 |

[1] This is an exemplar of the proofs of claim of Humana Inc. subject to this appeal. The remaining proofs of claim of Humana Inc. subject to this appeal are substantially identical to this proof of claim and have been assigned the following claim numbers: 3344, 3420, 4175, 4201, 4196, 4203, 4366, 5099, 4542, 4556, and 4565. These claims have been omitted due to their voluminous nature and can be accessed at: https://restructuring.primeclerk.com/mallinckrodt/Home-ClaimInfo.

[2] This is an exemplar of the proofs of claim of Avon Holdings I LLC as Transferee of United HealthCare Services Inc. subject to this appeal. The remaining proofs of claim of Avon Holdings I LLC as Transferee of United HealthCare Services Inc. subject to this appeal are substantially identical to this proof of claim and have been assigned the following claim numbers: 5171, 5717, 5638, 4335, 4314, 4288, 4211, 4593, 4219, and 4131. These claims have been omitted due to their voluminous nature and can be accessed at: https://restructuring.primeclerk.com/mallinckrodt/Home-ClaimInfo.

[3] This is an exemplar of the proofs of claim of Avon Holdings I LLC as Transferee of OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC subject to this appeal. The remaining proofs of claim of Avon Holdings I LLC as Transferee of OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC subject to this appeal are substantially identical to this proof of claim and have been assigned the following claim numbers: 5309, 5288, 5010, 5787, 5805, 5825, 5803, 5790, 5908, and 5938. These claims have been omitted due to their voluminous nature and can be accessed at: https://restructuring.primeclerk.com/mallinckrodt/Home-ClaimInfo.

| Document | Page No. |
|---|---|
| Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petition and First Day Motions, Case No. 20-12522, D.I. 128 (October 12, 2020) | A0194 |
| Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof, Case No. 20-12522, D.I. 667 (November 30, 2020) | A0450 |
| Excerpt of Affidavit of Service, Case No. 20-12522, D.I. 1131 (January 11, 2021) | A0463 |
| Humana Inc.'s Joinder to the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Actions, Case No. 20-12522, D.I. 1755 (March 16, 2021) | A0465 |
| Notice of Humana Inc.'s Joinder to the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as set forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Action, Case No. 20-12522, D.I. 1768 (March 16, 2021) | A0489 |
| Debtors' Omnibus Objection to the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Actions and to Humana Inc.'s Joinder Thereto, Case No. 20-12522, D.I. 1944 (April 5, 2021) | A0492 |

| Document | Page No. |
|---|---|
| Humana Inc.'s Reply in Support of the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Action and Humana Inc.'s Joinder thereto, Case No. 20-12522, D.I. 1987 (April 8, 2021) | A0531 |
| Excerpt of Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for all Purposes in these Bankruptcy Cases, Case No. 20-12522, D.I. 2157 (April 30, 2021) | A0540 |
| Motion of Attestor Limited and Humana Inc. for Entry of an Order Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code, Case No. 20-12522, D.I. 2159 (April 30, 2021) | A0577 |
| Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 2165 (April 30, 2021) | A0901 |
| Declaration of Randall S. Eisenberg in Support of Debtors' Motion for Scheduling Order and Objections to Claims, Case No. 20-12522, D.I. 2166 (May 1, 2021) | A0960 |
| Notice of Service of Attestor Limited and Humana Inc.'s First Request for Production of Documents in Connection with Contested Matters, Case No. 20-12522, D.I. 2211 (May 6, 2021) | A0966 |
| Attestor Limited and Humana Inc.'s First Request for Production of Documents in Connection with Contested Matters (May 6, 2021) | A0968 |

| Document | Page No. |
|---|---|
| Letter from Matthew Freimuth to the Honorable John T. Dorsey, Regarding Scheduling Issues, Case No. 20-12522, D.I. 2243 (May 10, 2021) | A0983 |
| Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed. R. Civ. P. 30(b)(6) and Fed. R. Bankr. P. 7030, Case No. 20-12522, D.I. 2284 (May 12, 2021) | A0986 |
| Opposition of Attestor Limited and Humana Inc. to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims, Case No. 20-12522, D.I. 2512 (May 21, 2021) [UNDER SEAL] | A0993 |
| Debtors' Omnibus Objection to Motions of Attestor Limited and Humana Inc. for Entry of Orders (A) Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for all Purposes in these Bankruptcy Cases and (B) Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code, Case No. 20-12522, D.I. 2521 (May 21, 2021) | A2023 |
| Debtors' Motion to Quash (A) Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed. R. Civ. P. 30(b)(6) and Fed. R. Bankr. P. 7030; (B) Acthar Plaintiffs' Notice of Deposition *Duces Tecum* of Corporate Designee(s) of Debtors; and (C) Acthar Plaintiffs' Notice of Deposition of Kathleen Breton, Case No. 20-12522, D.I. 2583 (May 26, 2021) | A2077 |
| Attestor Limited and Humana Inc.'s Limited Objection to Debtors' Motion to Quash (A) Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed R. Civ. P. 30(b)(6) and Fed R. Bankr. P. 7030; (B) Acthar Plaintiffs' Notice of Deposition *Duces Tecum* of Corporate Designees of Debtors; and (C) Acthar Plaintiffs' Notice of Deposition of Kathleen Breton, Case No. 20-12522, D.I. 2633 (June 1, 2021) | A2157 |
| Attestor Limited and Humana Inc.'s Reply in Further Support of Motions to Estimate Acthar-Related Claims and Allow | A2203 |

| Document | Page No. |
|---|---|
| Administrative Claims for all Purposes in these Bankruptcy Cases, Case No. 20-12522, D.I. 2657 (June 2, 2021) | |
| Excerpt of Order (I) Approving the Disclosure Statement and Form and Manner of Notice of Hearing Thereon; (II) Establishing Solicitation Procedures, (III) Approving the Form and Manner of Notice to Attorneys and Solicitation Directive, (IV) Approving the Form of Ballots, (V) Approving the Form, Manner, and Scope of Confirmation Notices, (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan and (VII) Granting Related Relief, Case No. 20-12522, D.I. 2911 (June 17, 2021) | A2221 |
| Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Case No. 20-12522, D.I. 2916 (June 18, 2021) | A2240 |
| Disclosure Statement for Joint Plan of Reorganization of Mallinckrodt PLC and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Case No. 20-12522, D.I. 2917 (June 18, 2021) | A2387 |
| Acthar Insurance Claimants' Revised and Supplemental Opposition to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims and Acthar Insurance Claimants' Motion for Substantive Consolidation, Case No. 20-12522, D.I. 2924 (June 18, 2021) [UNDER SEAL] | A3222 |
| Order Establishing Confirmation Schedule and Protocols, Case No. 20-12522, D.I. 2988 (June 24, 2021) | A4718 |
| Notice of Amended Agenda for Video Hearing Scheduled for June 24, 2021 at 1:00 p.m. (ET), Case No. 20-12522, D.I. 2989 (June 24, 2021) | A4730 |
| Debtors' Omnibus Reply in Support of First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 3177 (July 9, 2021) [UNDER SEAL] | A4762 |

| Document | Page No. |
|---|---|
| Statement of the Official Committee of Unsecured Creditors in Connection with the Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 3316 (July 21, 2021) | A6184 |
| Notice of Agenda of Matters Scheduled for Hearing on July 23, 2021 at 10:00 a.m., Case No. 20-12522, D.I. 3309 (July 21, 2021) | A6206 |
| Amended Notice of Agenda of Matters Scheduled for Hearing on July 23, 2021 at 9:00 a.m., Case No. 20-12522, D.I. 3389 (July 22, 2021) | A6213 |
| Transcripts, Order Appealed, and Notice of Appeal | |
| Transcript of Video Hearing [Zoom videoconference] on May 5, 2021 Regarding Motion for Scheduling Order, Adv. Pro. No. 21-50428, D.I. 2204 | A6221 |
| Transcript of Telephonic Hearing [Zoom videoconference] on May 12, 2021 Regarding Scheduling, Case No. 20-12522, D.I. 2303 | A6255 |
| Transcript of Video Hearing [Zoom videoconference] on May 20, 2021 Regarding Administrative Claims Bar Date, Case No. 20-12522, D.I. 2506 | A6293 |
| Transcript of Video Hearing [Zoom videoconference] on May 26, 2021 Regarding Scheduling, Case No. 20-12522, D.I. 2586 | A6331 |
| Transcript of Video Omnibus Hearing [Zoom videoconference] on June 2, 2021, Case No. 20-12522, D.I. 2683 | A6372 |
| Transcript of Telephonic Omnibus Hearing [Zoom videoconference] on June 7, 2021, Case No. 20-12522, D.I. 2752 | A6453 |

| Document | Page No. |
|---|---|
| Transcript of Telephonic Disclosure Statement Hearing [Zoom videoconference] on June 15, 2021, Case No. 20-12522, D.I. 2887 | A6563 |
| Transcript of Telephonic Disclosure Statement Hearing [Zoom videoconference] on June 16, 2021, Case No. 20-12522, D.I. 2930 | A6641 |
| Transcript of Telephonic Hearing [Zoom videoconference] on July 23, 2021 Regarding Unsubstantiated Claims Objection, Case No. 20-12522, D.I. 3414 | A6775 |
| Order Sustaining Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 3406 (July 23, 2021) | A6950 |
| Notice of Appeal, Case No. 20-12522, D.I. 3457 (July 28, 2021) | A6951 |
| Other Items | |
| Creditor's Claims in Bankruptcy Proceedings – The Debtor-Creditor Relationship in Bankruptcy – Allowance and Payment of Claims, Civil Resource Manual, Department of Justice (June 1998), available at https://www.justice.gov/jm/civil-resource-manual-64-creditors-claims-bankruptcy-proceedings | A7146 |
| Press Release, Mallinckrodt Will Pay $100 Million to Settle FTC, State Charges It Illegally Maintained its Monopoly of Specialty Drug Used to Treat Infants, FTC (Jan. 18. 2017), available at https://www.ftc.gov/news-events/press-releases/2017/01/mallinckrodt-will-pay-100-million-settle-ftc-state-charges-it | A7153 |
| Drug Maker Mallinckrodt Agrees to Pay Over $15 Million to Resolve Alleged False Claims Act Liability for "Wining and Dining" Doctors, Department of Justice (Sept. 4, 2019), available at https://www.justice.gov/opa/pr/drug-maker- | A7156 |

| Document | Page No. |
|---|---|
| mallinckrodt-agrees-pay-over-15-million-resolve-alleged-false-claims-act-liability | |
| Second Amended Complaint ¶¶ 7-8, *Humana Inc. v. Mallinckrodt ARD LLC*, No. 2:19-cv-06926 (C.D. Cal. Apr. 24, 2020) [D.I. 60] | A7158 |
| Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, *Humana Inc. v. Mallinckrodt ARD LLC*, No. 2:19-cv-06926 (C.D. Cal. Aug. 14, 2020) [D.I. 80] | A7442 |
| May 24, 2021 Emails Regarding Omnibus Unsubstantiated Claims Objection | A7471 |
| June 23, 2021 Emails Regarding Status Conference; Unsubstantiated Claims Hearing | A7473 |
| July 1, 2021 Emails Regarding Unsubstantiated Claims Objection | A7478 |
| Joint Debtors and Attestor/Humana Exhibit & Witness List for July 23, 2021 Hearing (July 22, 2021) | A7479 |

## Annex A

**Prepayment Cost of Deferred Cash Payments at Various Months After Plan Effective Date[1]**

| Months after Plan Effective Date (end of month) | Prepayment Cost of Deferred Cash Payments |
|---|---|
| 0 | $679,648,516 |
| 1 | $687,520,879 |
| 2 | $695,467,941 |
| 3 | $703,490,411 |
| 4 | $711,589,005 |
| 5 | $719,764,445 |
| 6 | $728,017,460 |
| 7 | $736,348,785 |
| 8 | $744,759,166 |
| 9 | $753,249,350 |
| 10 | $761,820,096 |
| 11 | $770,472,168 |
| 12 | $779,206,338[2] |

---

[1] Amounts shown in annex above show the prepayment cost at the end of each of the 12 months after the Plan Effective Date. To the extent a prepayment occurs other than at the end of the month, the prepayment cost shall be calculated as of such prepayment date pursuant to the formula set forth in the Opioid Settlement Term Sheet.

[2] Prepayment right may be exercised prior to the first anniversary of the Plan Effective Date. Month twelve is illustratively shown and includes $200,000,000 payment due at such time.

## Schedule 2

### DOJ Settlement Terms re: Boston (Medicaid Rebates) and EDPA False Claims Act Matters, and related issues

- <u>Resolved Matters.</u>  Mallinckrodt and the United States (including CMS, DOJ ), the applicable states, and *qui tam* relators agree to fully and finally resolve the Acthar-related government litigations disclosed in Mallinckrodt's Form 10-K for 2019, including *United States of America, et al., ex rel., Charles Strunck, et al. v. Mallinckrodt ARD LLC* (E.D. Penn.); *United States of America et al. ex rel. Landolt v. Mallinckrodt ARD, LLC* (D. Mass.); and *Mallinckrodt ARD LLC v. Verma et al. (D.D.C.)*, and related matters (such matters, collectively, the "***Resolved Matters***") on the terms set forth in this Schedule, which will be memorialized in a definitive DOJ Settlement Agreement, and settlement agreements with the States, and incorporated into the Plan.

- <u>Settlement Payments.</u>  In full and final satisfaction of all claims at issue in the "Resolved Matters", Mallinckrodt shall make cash payments to the US and State governments totaling $260 million in the aggregate in accordance with the following schedule, with deferred payments bearing interest at a variable rate equal to the nominal interest rate on special issues of government securities to the Social Security trust funds, measured as of each payment date and accruing from September 21, 2020:

| Payment Date | Payment Amount |
|---|---|
| Plan Effective Date | $15,000,000 |
| First Anniversary of Plan Effective Date | $15,000,000 |
| Second Anniversary of Plan Effective Date | $20,000,000 |
| Third Anniversary of Plan Effective Date | $20,000,000 |
| Fourth Anniversary of Plan Effective Date | $32,500,000 |
| Fifth Anniversary of Plan Effective Date | $32,500,000 |
| Sixth Anniversary of Plan Effective Date | $62,500,000 |
| Seventh Anniversary of Plan Effective Date | $62,500,000 |

- <u>Releases.</u>  Effective as of the date on which the Settlement Agreement is fully executed, Mallinckrodt, on the one hand, and DOJ and the States, on the other hand, will have exchanged mutual releases, as specified in the Settlement Agreements relating to the Resolved Matters.

- <u>CMS/DOJ/State Settlement Agreement; Additional Terms and Conditions.</u>  Without limiting or affecting in any way the rights of the Supporting Parties under the RSA, the

DOJ Settlement Agreement shall contain such additional terms, conditions, representations, warranties, covenants and termination events to which Mallinckrodt, on the one hand, and DOJ on the other hand, may agree.  Without limiting or affecting in any way the rights of the Supporting Parties under the RSA, the State Settlement Agreements shall contain such additional terms, conditions, representations, warranties, covenants and termination events to which Mallinckrodt, on the one hand, and the States, on the other hand, may agree.

A-2873

## **Exhibit B**

### **Joinder Agreement**

The undersigned hereby acknowledges that it has reviewed and understands the Restructuring Support Agreement (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "***Agreement***")[1] dated as of [ ● ], 2020 by and among (i) Mallinckrodt plc and each of its subsidiaries listed on **Annex 1** to the Agreement, (ii) the Supporting Unsecured Noteholders, and (iii) the Supporting Governmental Opioid Claimants and agrees to be bound as a Supporting Party by the terms and conditions thereof binding on the Supporting Parties with respect to all Claims/Interests held by the undersigned.

The undersigned hereby makes the representations and warranties of the Supporting Parties set forth in the Agreement to each other Party, effective as of the date hereof.

This joinder agreement shall be governed by the governing law set forth in the Agreement.

Date: _____, 2020

**[SUPPORTING PARTY]**

By:_____.
Name:_____
Title:_____
Address:_____

Claims/Interests under the [_____]:[2]          $_____

Other Claims/Interests:          $_____

Opioid related Claims/Interests:[3]          [Description]

---

[1]   Defined terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.
[2]   [To be used by Supporting Unsecured Noteholders for holdings of Guaranteed Unsecured Notes]
[3]   [To be used by Supporting Governmental Opioid Claimants for Opioid Claims]

*Execution Version*

### Joinder Agreement

The undersigned counsel ("**Counsel**") to the Multi-State Governmental Entities Group (the "**MSGE Group**") representing the interests of the entities listed on the *Verified Statement of the Multi-State Governmental Entities Group Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 337] (the "**MSGE Signatories**") hereby (a) acknowledges that it has reviewed and understands the Restructuring Support Agreement (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**")[1] dated as of October 11, 2020 by and among (i) Mallinckrodt plc and each of its subsidiaries listed on **Annex 1** to the Agreement, (ii) the Supporting Unsecured Noteholders, and (iii) the Supporting Governmental Opioid Claimants; and (b) acknowledges that the MSGE Signatories shall have the rights, and undertake the obligations, as the Supporting Governmental Opioid Claimants (except as otherwise expressly set forth herein) and that such rights and obligations shall be exercised by the MSGE Signatories through the MSGE Group over the matters set forth in the Agreement for which the Governmental Plaintiff Ad Hoc Committee has consent rights or obligations.  For the avoidance of doubt, the MSGE Signatories acknowledge that their rights and obligations as Supporting Governmental Opioid Claimants are solely with respect to themselves and no other Supporting Governmental Opioid Claimants and the MSGE Group's rights and obligations are solely with respect to the MSGE Signatories.

In addition to the foregoing, the undersigned counsel to the MSGE Group or the MSGE Signatories agrees as follows as of the date of each of their respective execution of this Joinder Agreement:

1. **Restructuring Support**:  The MSGE Signatories shall be subject to the support and other obligations set forth in Section 4(a) of the Agreement as Supporting Governmental Opioid Claimants.  In addition, Counsel agrees to recommend that the members of the MSGE Group that do not become MSGE Signatories to this Joinder Agreement take the actions contemplated by clauses (A) and (B) of Section 4(a) of the Agreement.

2. **Breaches by the MSGE Group**:  The Company shall be entitled to terminate the Agreement as to all of the MSGE Signatories in the event that any of the MSGE Signatories breach, in any material respect, any of the representations, warranties, or covenants given under the Agreement, and such breach remains uncured for a period of fifteen (15) Business Days after receipt by the MSGE Group from the Company of written notice of such breach, which written notice will set forth in reasonable detail the alleged breach; provided, that any such termination by the Company shall result in the termination of the Agreement solely as to the MSGE Signatories and shall not give rise to a termination right to any other Supporting Party.

3. **Termination of the Agreement by the MSGE Group**:  The sole remedy of the MSGE Signatories for any breach by the Supporting Parties of the Agreement shall be termination of this Joinder Agreement by notice in accordance with the Agreement

---

[1]  Defined terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

delivered by the MSGE Group with such notice terminating the Agreement as to all MSGE Signatories. If the MSGE Group terminates this Joinder Agreement, such termination shall not result in a termination of the Agreement as to the other Supporting Parties (other than the MSGE Signatories) and shall not give rise to a termination right under Section 6(a)(xix) for any such Supporting Parties or for the Company under Section 6(b)(iv). For the avoidance of doubt, and notwithstanding anything to the contrary in the Agreement or this Joinder Agreement, the MSGE Group only has the power to terminate the Agreement as to Supporting Governmental Opioid Claimants that are MSGE Signatories.

4. **Milestones:**

    a. To the extent that the Company takes any action with respect to a Milestone without the consent of the MSGE Group, the sole remedy afforded to the MSGE Signatories shall be termination of this Joinder Agreement by the MSGE Group.

    b. Counsel agrees to use best efforts to obtain the executed signature pages of the members of the MSGE Group to be appended hereto within two (2) months from the date of execution of this Joinder Agreement, which may be extended with the consent of the Company, the Governmental Plaintiff Ad Hoc Committee and the Required Supporting Unsecured Noteholders (each of whom are intended third-party beneficiaries hereunder). Failure to satisfy the obligation in this paragraph shall result in a breach of this Joinder Agreement as set forth in Section 2 above.

5. **Fees and Expenses**: So long as this Joinder Agreement is in effect, the MSGE Group's reasonable and documented fees and out-of-pocket expenses of (a) Caplin & Drysdale, Chartered, as legal counsel to the MSGE Group; (b) Seitz, Van Ogtrop & Green, P.A. as Delaware legal counsel to the MSGE Group; (c) FTI Consulting, as financial advisor to the MSGE Group; and (d) such other legal, consulting, financial, and/or other professional advisors to which the MSGE Group and the Debtors shall reasonably agree from time to time (collectively, the "**MSGE Group Professionals**") shall be paid pursuant to Section 25 of the Agreement and the Mallinckrodt Restructuring Term Sheet at 8.

6. **Notice Parties**: Notices provided pursuant to the Agreement shall be sent to the MSGE Group to the address set forth on the signature page for the MSGE Group, with copy (which shall not constitute notice) to:

    Caplin & Drysdale, Chartered
    One Thomas Circle, NW
    Suite 1100
    Washington, D.C. 20005

2

[*MSGE Group Restructuring Support Agreement Joinder Agreement*]

Attention:     Kevin C. Maclay (kmaclay@capdale.com)
               Todd E. Phillips (tphillips@capdale.com)
               Ann Weber Langley (alangley@capdale.com)

7. **<u>Representations and Warranties</u>**: Counsel and the MSGE Signatories hereby makes the same representations and warranties of the Supporting Parties set forth in the Agreement to each other Party, effective as of the date hereof.

8. **<u>Governing Law:</u>** This joinder agreement shall be governed by the governing law set forth in the Agreement.

Date:  November 13, 2020

### THE     MULTI-STATE     GOVERNMENTAL     ENTITIES GROUP

By: /s/ *Kevin C. Maclay*
Name:  Kevin C. Maclay
Title: Member, Caplin & Drysdale, Chartered
Address:  One Thomas Circle, N.W., Suite 1100
          Washington, D.C. 20005

**<u>Claims Covered by Joinder Agreement</u>**:

Opioid-related Claims as described in the *Verified Statement of the Multi-State Governmental Entities Group Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 337].

3

[*MSGE Group Restructuring Support Agreement Joinder Agreement*]

*Execution Version*

# Schedule A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MALLINCKRODT PLC, *et al.*, | ) | Case No. 20-12522 (JTD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**VERIFIED STATEMENT OF THE MULTI-STATE
GOVERNMENTAL ENTITIES GROUP PURSUANT TO RULE
2019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure, the Multi-State Governmental Entities Group ("**MSGE Group**") in the chapter 11 cases of Mallinckrodt plc, *et al.* (collectively, "**Debtors**"), respectfully submits the following Verified Statement:

1.     The MSGE Group consists of approximately 1,318 entities—1,245 counties, cities and other municipal entities, 9 tribal nations, 13 hospital districts, 16 independent public school districts, 33 medical groups, and 2 funds—across 38 states and territories and collectively represents a constituency of more than 60 million individuals across the United States.  Caplin & Drysdale, Chartered ("**Caplin & Drysdale**") and Seitz, Van Ogtrop & Green, P.A. ("**SVG**") serve as bankruptcy counsel and Delaware counsel, respectively, to the MSGE Group.  A list of the MSGE Group's members as of the current date is attached hereto as **Exhibit A**.

2.     The information set forth in Exhibit A, which is based on information provided by the applicable members of the MSGE Group through their counsel to Caplin & Drysdale and SVG, is intended only to comply with Rule 2019 of the Federal Rules of Bankruptcy Procedure and is not intended for any other purpose.  The MSGE Group makes no representation herein as to the

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

amount, validity, or priority of any particular member's claims and reserves all respective rights thereto.  This Verified Statement and the attached Exhibit A should not be read to waive or limit any of the rights of the MSGE Group or its members to assert, file, or amend any claims in accordance with applicable procedures established by this Court.

3.      The MSGE Group reserves the right to amend or supplement this Verified Statement as necessary in accordance with Rule 2019 of the Federal Rules of Bankruptcy Procedure.

4.      The foregoing is true and accurate to the best of the undersigned's knowledge, information and belief.

*[remainder of page intentionally left blank]*

A-2880

Dated: October 29, 2020                    Respectfully submitted,

                                           /s/ James S. Green, Jr.
                                           R. Karl Hill (DE 2747)
                                           James S. Green, Jr. (DE 4406)
                                           Jared T. Green (DE 5179)
                                           Seitz, Van Ogtrop & Green, P.A.
                                           222 Delaware Avenue, Suite 1500
                                           Wilmington, DE 19801
                                           Tel: (302) 888-0600
                                           Fax: (302) 888-0606
                                           khill@svglaw.com
                                           jsgreen@svglaw.com
                                           jtgreen@svglaw.com

                                           /s/ Kevin C. Maclay
                                           Kevin C. Maclay, Esq. (admitted *pro hac vice*)
                                           Todd E. Phillips, Esq. (admitted *pro hac vice*)
                                           Ann Weber Langley, Esq. (admitted *pro hac vice*)
                                           George M. O'Connor, Esq. (admitted *pro hac vice*)
                                           Caplin & Drysdale, Chartered
                                           One Thomas Circle, NW, Suite 1100
                                           Washington, DC 20005
                                           Tel: (202) 862-5000
                                           Fax: (202) 429-3301
                                           kmaclay@capdale.com
                                           tphillips@capdale.com
                                           alangley@capdale.com
                                           goconnor@capdale.com

                                           *Counsel for the Multi-State Governmental
                                           Entities Group*

A-2881

## CERTIFICATE OF SERVICE

    I hereby certify that on October 29, 2020, a true and correct copy of the foregoing pleading was served via the Court's electronic filing system on all parties requesting notice in this proceeding.

                          */s/ James S. Green, Jr.*
                          James S. Green, Jr.

A-2882

# EXHIBIT A

## PARTIES COMPRISING THE MULTI-STATE GOVERNMENTAL ENTITIES GROUP

For the purposes of this filing made pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure, the mailing address for all parties below is the address of bankruptcy counsel for the Multi-State Governmental Entities Group:

Caplin & Drysdale, Chartered
One Thomas Circle NW, Suite 1100
Washington, DC 20005
Attn: Kevin C. Maclay & Todd E. Phillips

| | Party | State | Economic Interest |
|---|---|---|---|
| 1 | City of Tarrant | Alabama | Unliquidated Claim |
| 2 | Schumacher Medical Corporation of Alabama, Inc. | Alabama | Unliquidated Claim |
| 3 | Apache County | Arizona | Unliquidated Claim |
| 4 | Bullhead City | Arizona | Unliquidated Claim |
| 5 | City of Glendale | Arizona | Unliquidated Claim |
| 6 | City of Prescott | Arizona | Unliquidated Claim |
| 7 | City of Surprise | Arizona | Unliquidated Claim |
| 8 | La Paz County | Arizona | Unliquidated Claim |
| 9 | Pinal County | Arizona | Unliquidated Claim |
| 10 | Alicia | Arkansas | Unliquidated Claim |
| 11 | Almyra | Arkansas | Unliquidated Claim |
| 12 | Alpena | Arkansas | Unliquidated Claim |
| 13 | Amagon | Arkansas | Unliquidated Claim |
| 14 | Anthonyville | Arkansas | Unliquidated Claim |
| 15 | Arkansas County | Arkansas | Unliquidated Claim |
| 16 | Ashley County | Arkansas | Unliquidated Claim |
| 17 | Avoca | Arkansas | Unliquidated Claim |
| 18 | Banks | Arkansas | Unliquidated Claim |
| 19 | Bauxite | Arkansas | Unliquidated Claim |
| 20 | Baxter County | Arkansas | Unliquidated Claim |
| 21 | Beaver | Arkansas | Unliquidated Claim |
| 22 | Beedeville | Arkansas | Unliquidated Claim |
| 23 | Ben Lomond | Arkansas | Unliquidated Claim |
| 24 | Benton County | Arkansas | Unliquidated Claim |
| 25 | Big Flat | Arkansas | Unliquidated Claim |
| 26 | Biggers | Arkansas | Unliquidated Claim |
| 27 | Birdsong | Arkansas | Unliquidated Claim |
| 28 | Black Oak | Arkansas | Unliquidated Claim |
| 29 | Blue Eye | Arkansas | Unliquidated Claim |

| | Party | State | Economic Interest |
|---|---|---|---|
| 30 | Bluff City | Arkansas | Unliquidated Claim |
| 31 | Boone County | Arkansas | Unliquidated Claim |
| 32 | Bradley County | Arkansas | Unliquidated Claim |
| 33 | Burdette | Arkansas | Unliquidated Claim |
| 34 | Cale | Arkansas | Unliquidated Claim |
| 35 | Calhoun County | Arkansas | Unliquidated Claim |
| 36 | Carroll County | Arkansas | Unliquidated Claim |
| 37 | Casa | Arkansas | Unliquidated Claim |
| 38 | Central City | Arkansas | Unliquidated Claim |
| 39 | Chester | Arkansas | Unliquidated Claim |
| 40 | Chicot County | Arkansas | Unliquidated Claim |
| 41 | City of Adona | Arkansas | Unliquidated Claim |
| 42 | City of Altheimer | Arkansas | Unliquidated Claim |
| 43 | City of Arkadelphia | Arkansas | Unliquidated Claim |
| 44 | City of Arkansas City | Arkansas | Unliquidated Claim |
| 45 | City of Ash Flat | Arkansas | Unliquidated Claim |
| 46 | City of Ashdown | Arkansas | Unliquidated Claim |
| 47 | City of Atkins | Arkansas | Unliquidated Claim |
| 48 | City of Augusta | Arkansas | Unliquidated Claim |
| 49 | City of Austin | Arkansas | Unliquidated Claim |
| 50 | City of Bald Knob | Arkansas | Unliquidated Claim |
| 51 | City of Barling | Arkansas | Unliquidated Claim |
| 52 | City of Batesville | Arkansas | Unliquidated Claim |
| 53 | City of Bay | Arkansas | Unliquidated Claim |
| 54 | City of Bearden | Arkansas | Unliquidated Claim |
| 55 | City of Beebe | Arkansas | Unliquidated Claim |
| 56 | City of Bella Vista | Arkansas | Unliquidated Claim |
| 57 | City of Belleville | Arkansas | Unliquidated Claim |
| 58 | City of Benton | Arkansas | Unliquidated Claim |
| 59 | City of Bentonville | Arkansas | Unliquidated Claim |
| 60 | City of Berryville | Arkansas | Unliquidated Claim |
| 61 | City of Bethel Heights | Arkansas | Unliquidated Claim |
| 62 | City of Black Rock | Arkansas | Unliquidated Claim |
| 63 | City of Blytheville | Arkansas | Unliquidated Claim |
| 64 | City of Bonanza | Arkansas | Unliquidated Claim |
| 65 | City of Booneville | Arkansas | Unliquidated Claim |
| 66 | City of Bradford | Arkansas | Unliquidated Claim |
| 67 | City of Bradley | Arkansas | Unliquidated Claim |

A-2885

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 68  | City of Branch | Arkansas | Unliquidated Claim |
| 69  | City of Brinkley | Arkansas | Unliquidated Claim |
| 70  | City of Brookland | Arkansas | Unliquidated Claim |
| 71  | City of Bryant | Arkansas | Unliquidated Claim |
| 72  | City of Buckner | Arkansas | Unliquidated Claim |
| 73  | City of Bull Shoals | Arkansas | Unliquidated Claim |
| 74  | City of Cabot | Arkansas | Unliquidated Claim |
| 75  | City of Caddo Valley | Arkansas | Unliquidated Claim |
| 76  | City of Calico Rock | Arkansas | Unliquidated Claim |
| 77  | City of Calion | Arkansas | Unliquidated Claim |
| 78  | City of Camden | Arkansas | Unliquidated Claim |
| 79  | City of Cammack Village | Arkansas | Unliquidated Claim |
| 80  | City of Caraway | Arkansas | Unliquidated Claim |
| 81  | City of Carlisle | Arkansas | Unliquidated Claim |
| 82  | City of Cave City | Arkansas | Unliquidated Claim |
| 83  | City of Cave Springs | Arkansas | Unliquidated Claim |
| 84  | City of Cedarville | Arkansas | Unliquidated Claim |
| 85  | City of Centerton | Arkansas | Unliquidated Claim |
| 86  | City of Cherokee Village | Arkansas | Unliquidated Claim |
| 87  | City of Cherry Valley | Arkansas | Unliquidated Claim |
| 88  | City of Chidester | Arkansas | Unliquidated Claim |
| 89  | City of Clarendon | Arkansas | Unliquidated Claim |
| 90  | City of Clarksville | Arkansas | Unliquidated Claim |
| 91  | City of Clinton | Arkansas | Unliquidated Claim |
| 92  | City of Coal Hill | Arkansas | Unliquidated Claim |
| 93  | City of Conway | Arkansas | Unliquidated Claim |
| 94  | City of Corning | Arkansas | Unliquidated Claim |
| 95  | City of Cotton Plant | Arkansas | Unliquidated Claim |
| 96  | City of Crossett | Arkansas | Unliquidated Claim |
| 97  | City of Cushman | Arkansas | Unliquidated Claim |
| 98  | City of Danville | Arkansas | Unliquidated Claim |
| 99  | City of Dardanelle | Arkansas | Unliquidated Claim |
| 100 | City of De Queen | Arkansas | Unliquidated Claim |
| 101 | City of Decatur | Arkansas | Unliquidated Claim |
| 102 | City of Delight | Arkansas | Unliquidated Claim |
| 103 | City of Dermott | Arkansas | Unliquidated Claim |
| 104 | City of Des Arc | Arkansas | Unliquidated Claim |
| 105 | City of DeValls Bluff | Arkansas | Unliquidated Claim |

A-2886

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 106 | City of Dewitt | Arkansas | Unliquidated Claim |
| 107 | City of Diamond City | Arkansas | Unliquidated Claim |
| 108 | City of Diaz | Arkansas | Unliquidated Claim |
| 109 | City of Dierks | Arkansas | Unliquidated Claim |
| 110 | City of Dumas | Arkansas | Unliquidated Claim |
| 111 | City of Dyer | Arkansas | Unliquidated Claim |
| 112 | City of East Camden | Arkansas | Unliquidated Claim |
| 113 | City of El Dorado | Arkansas | Unliquidated Claim |
| 114 | City of Elaine | Arkansas | Unliquidated Claim |
| 115 | City of Elkins | Arkansas | Unliquidated Claim |
| 116 | City of Elm Springs | Arkansas | Unliquidated Claim |
| 117 | City of Emmet | Arkansas | Unliquidated Claim |
| 118 | City of England | Arkansas | Unliquidated Claim |
| 119 | City of Eudora | Arkansas | Unliquidated Claim |
| 120 | City of Eureka Springs | Arkansas | Unliquidated Claim |
| 121 | City of Evening Shade | Arkansas | Unliquidated Claim |
| 122 | City of Fairfield Bay | Arkansas | Unliquidated Claim |
| 123 | City of Farmington | Arkansas | Unliquidated Claim |
| 124 | City of Fifty-Six | Arkansas | Unliquidated Claim |
| 125 | City of Fisher | Arkansas | Unliquidated Claim |
| 126 | City of Flippin | Arkansas | Unliquidated Claim |
| 127 | City of Fordyce | Arkansas | Unliquidated Claim |
| 128 | City of Foreman | Arkansas | Unliquidated Claim |
| 129 | City of Forrest City | Arkansas | Unliquidated Claim |
| 130 | City of Fort Smith | Arkansas | Unliquidated Claim |
| 131 | City of Fouke | Arkansas | Unliquidated Claim |
| 132 | City of Gentry | Arkansas | Unliquidated Claim |
| 133 | City of Gillett | Arkansas | Unliquidated Claim |
| 134 | City of Gilmore | Arkansas | Unliquidated Claim |
| 135 | City of Goshen | Arkansas | Unliquidated Claim |
| 136 | City of Gosnell | Arkansas | Unliquidated Claim |
| 137 | City of Gould | Arkansas | Unliquidated Claim |
| 138 | City of Grady | Arkansas | Unliquidated Claim |
| 139 | City of Grannis | Arkansas | Unliquidated Claim |
| 140 | City of Gravette | Arkansas | Unliquidated Claim |
| 141 | City of Green Forest | Arkansas | Unliquidated Claim |
| 142 | City of Greenbrier | Arkansas | Unliquidated Claim |
| 143 | City of Greenland | Arkansas | Unliquidated Claim |

A-2887

|  | Party | State | Economic Interest |
|---|---|---|---|
| 144 | City of Greenwood | Arkansas | Unliquidated Claim |
| 145 | City of Greers Ferry | Arkansas | Unliquidated Claim |
| 146 | City of Grubbs | Arkansas | Unliquidated Claim |
| 147 | City of Gurdon | Arkansas | Unliquidated Claim |
| 148 | City of Guy | Arkansas | Unliquidated Claim |
| 149 | City of Hackett | Arkansas | Unliquidated Claim |
| 150 | City of Hampton | Arkansas | Unliquidated Claim |
| 151 | City of Hardy | Arkansas | Unliquidated Claim |
| 152 | City of Harrisburg | Arkansas | Unliquidated Claim |
| 153 | City of Harrison | Arkansas | Unliquidated Claim |
| 154 | City of Hartman | Arkansas | Unliquidated Claim |
| 155 | City of Haskell | Arkansas | Unliquidated Claim |
| 156 | City of Hazen | Arkansas | Unliquidated Claim |
| 157 | City of Heber Springs | Arkansas | Unliquidated Claim |
| 158 | City of Helena-West Helena | Arkansas | Unliquidated Claim |
| 159 | City of Hermitage | Arkansas | Unliquidated Claim |
| 160 | City of Higginson | Arkansas | Unliquidated Claim |
| 161 | City of Highland | Arkansas | Unliquidated Claim |
| 162 | City of Hope | Arkansas | Unliquidated Claim |
| 163 | City of Horatio | Arkansas | Unliquidated Claim |
| 164 | City of Horseshoe Bend | Arkansas | Unliquidated Claim |
| 165 | City of Hot Springs | Arkansas | Unliquidated Claim |
| 166 | City of Hoxie | Arkansas | Unliquidated Claim |
| 167 | City of Humnoke | Arkansas | Unliquidated Claim |
| 168 | City of Humphrey | Arkansas | Unliquidated Claim |
| 169 | City of Huntington | Arkansas | Unliquidated Claim |
| 170 | City of Huntsville | Arkansas | Unliquidated Claim |
| 171 | City of Huttig | Arkansas | Unliquidated Claim |
| 172 | City of Imboden | Arkansas | Unliquidated Claim |
| 173 | City of Jacksonville | Arkansas | Unliquidated Claim |
| 174 | City of Jasper | Arkansas | Unliquidated Claim |
| 175 | City of Johnson | Arkansas | Unliquidated Claim |
| 176 | City of Joiner | Arkansas | Unliquidated Claim |
| 177 | City of Jonesboro | Arkansas | Unliquidated Claim |
| 178 | City of Judsonia | Arkansas | Unliquidated Claim |
| 179 | City of Keiser | Arkansas | Unliquidated Claim |
| 180 | City of Kensett | Arkansas | Unliquidated Claim |
| 181 | City of Kibler | Arkansas | Unliquidated Claim |

A-2888

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 182 | City of Kingsland | Arkansas | Unliquidated Claim |
| 183 | City of Knoxville | Arkansas | Unliquidated Claim |
| 184 | City of Lake City | Arkansas | Unliquidated Claim |
| 185 | City of Lake View | Arkansas | Unliquidated Claim |
| 186 | City of Lake Village | Arkansas | Unliquidated Claim |
| 187 | City of Lakeview | Arkansas | Unliquidated Claim |
| 188 | City of Lamar | Arkansas | Unliquidated Claim |
| 189 | City of Lavaca | Arkansas | Unliquidated Claim |
| 190 | City of Leachville | Arkansas | Unliquidated Claim |
| 191 | City of Lepanto | Arkansas | Unliquidated Claim |
| 192 | City of Lewisville | Arkansas | Unliquidated Claim |
| 193 | City of Lincoln | Arkansas | Unliquidated Claim |
| 194 | City of Little Flock | Arkansas | Unliquidated Claim |
| 195 | City of Little Rock | Arkansas | Unliquidated Claim |
| 196 | City of Lockesburg | Arkansas | Unliquidated Claim |
| 197 | City of London | Arkansas | Unliquidated Claim |
| 198 | City of Lowell | Arkansas | Unliquidated Claim |
| 199 | City of Luxora | Arkansas | Unliquidated Claim |
| 200 | City of Madison | Arkansas | Unliquidated Claim |
| 201 | City of Magazine | Arkansas | Unliquidated Claim |
| 202 | City of Magnolia | Arkansas | Unliquidated Claim |
| 203 | City of Malvern | Arkansas | Unliquidated Claim |
| 204 | City of Manila | Arkansas | Unliquidated Claim |
| 205 | City of Mansfield | Arkansas | Unliquidated Claim |
| 206 | City of Marion | Arkansas | Unliquidated Claim |
| 207 | City of Marked Tree | Arkansas | Unliquidated Claim |
| 208 | City of Marmaduke | Arkansas | Unliquidated Claim |
| 209 | City of Marshall | Arkansas | Unliquidated Claim |
| 210 | City of Marvell | Arkansas | Unliquidated Claim |
| 211 | City of Maumelle | Arkansas | Unliquidated Claim |
| 212 | City of McCrory | Arkansas | Unliquidated Claim |
| 213 | City of McGehee | Arkansas | Unliquidated Claim |
| 214 | City of McNeil | Arkansas | Unliquidated Claim |
| 215 | City of Melbourne | Arkansas | Unliquidated Claim |
| 216 | City of Mena | Arkansas | Unliquidated Claim |
| 217 | City of Mineral Springs | Arkansas | Unliquidated Claim |
| 218 | City of Mitchellville | Arkansas | Unliquidated Claim |
| 219 | City of Monette | Arkansas | Unliquidated Claim |

A-2889

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 220 | City of Monticello | Arkansas | Unliquidated Claim |
| 221 | City of Montrose | Arkansas | Unliquidated Claim |
| 222 | City of Morrilton | Arkansas | Unliquidated Claim |
| 223 | City of Mount Ida | Arkansas | Unliquidated Claim |
| 224 | City of Mountain Home | Arkansas | Unliquidated Claim |
| 225 | City of Mountain Pine | Arkansas | Unliquidated Claim |
| 226 | City of Mountain View | Arkansas | Unliquidated Claim |
| 227 | City of Mountainburg | Arkansas | Unliquidated Claim |
| 228 | City of Mulberry | Arkansas | Unliquidated Claim |
| 229 | City of Murfreesboro | Arkansas | Unliquidated Claim |
| 230 | City of Nashville | Arkansas | Unliquidated Claim |
| 231 | City of Newport | Arkansas | Unliquidated Claim |
| 232 | City of Norfork | Arkansas | Unliquidated Claim |
| 233 | City of Norphlet | Arkansas | Unliquidated Claim |
| 234 | City of North Little Rock | Arkansas | Unliquidated Claim |
| 235 | City of Oak Grove Heights | Arkansas | Unliquidated Claim |
| 236 | City of Oppelo | Arkansas | Unliquidated Claim |
| 237 | City of Osceola | Arkansas | Unliquidated Claim |
| 238 | City of Oxford | Arkansas | Unliquidated Claim |
| 239 | City of Pangburn | Arkansas | Unliquidated Claim |
| 240 | City of Paragould | Arkansas | Unliquidated Claim |
| 241 | City of Paris | Arkansas | Unliquidated Claim |
| 242 | City of Parkin | Arkansas | Unliquidated Claim |
| 243 | City of Patterson | Arkansas | Unliquidated Claim |
| 244 | City of Pea Ridge | Arkansas | Unliquidated Claim |
| 245 | City of Peach Orchard | Arkansas | Unliquidated Claim |
| 246 | City of Perryville | Arkansas | Unliquidated Claim |
| 247 | City of Piggott | Arkansas | Unliquidated Claim |
| 248 | City of Pine Bluff | Arkansas | Unliquidated Claim |
| 249 | City of Plainview | Arkansas | Unliquidated Claim |
| 250 | City of Plumerville | Arkansas | Unliquidated Claim |
| 251 | City of Pocahontas | Arkansas | Unliquidated Claim |
| 252 | City of Pollard | Arkansas | Unliquidated Claim |
| 253 | City of Portland | Arkansas | Unliquidated Claim |
| 254 | City of Prairie Grove | Arkansas | Unliquidated Claim |
| 255 | City of Prescott | Arkansas | Unliquidated Claim |
| 256 | City of Quitman | Arkansas | Unliquidated Claim |
| 257 | City of Ratcliff | Arkansas | Unliquidated Claim |

A-2890

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 258 | City of Rector | Arkansas | Unliquidated Claim |
| 259 | City of Redfield | Arkansas | Unliquidated Claim |
| 260 | City of Rison | Arkansas | Unliquidated Claim |
| 261 | City of Rockport | Arkansas | Unliquidated Claim |
| 262 | City of Rogers | Arkansas | Unliquidated Claim |
| 263 | City of Russellville | Arkansas | Unliquidated Claim |
| 264 | City of Salem | Arkansas | Unliquidated Claim |
| 265 | City of Salesville | Arkansas | Unliquidated Claim |
| 266 | City of Shannon Hills | Arkansas | Unliquidated Claim |
| 267 | City of Sheridan | Arkansas | Unliquidated Claim |
| 268 | City of Sherwood | Arkansas | Unliquidated Claim |
| 269 | City of Siloam Springs | Arkansas | Unliquidated Claim |
| 270 | City of Smackover | Arkansas | Unliquidated Claim |
| 271 | City of Sparkman | Arkansas | Unliquidated Claim |
| 272 | City of Springdale | Arkansas | Unliquidated Claim |
| 273 | City of Stamps | Arkansas | Unliquidated Claim |
| 274 | City of Star City | Arkansas | Unliquidated Claim |
| 275 | City of Stephens | Arkansas | Unliquidated Claim |
| 276 | City of Strong | Arkansas | Unliquidated Claim |
| 277 | City of Stuttgart | Arkansas | Unliquidated Claim |
| 278 | City of Sulphur Springs | Arkansas | Unliquidated Claim |
| 279 | City of Texarkana | Arkansas | Unliquidated Claim |
| 280 | City of Thornton | Arkansas | Unliquidated Claim |
| 281 | City of Tillar | Arkansas | Unliquidated Claim |
| 282 | City of Tontitown | Arkansas | Unliquidated Claim |
| 283 | City of Traskwood | Arkansas | Unliquidated Claim |
| 284 | City of Trumann | Arkansas | Unliquidated Claim |
| 285 | City of Van Buren | Arkansas | Unliquidated Claim |
| 286 | City of Vilonia | Arkansas | Unliquidated Claim |
| 287 | City of Waldo | Arkansas | Unliquidated Claim |
| 288 | City of Waldron | Arkansas | Unliquidated Claim |
| 289 | City of Walnut Ridge | Arkansas | Unliquidated Claim |
| 290 | City of Ward | Arkansas | Unliquidated Claim |
| 291 | City of Warren | Arkansas | Unliquidated Claim |
| 292 | City of Washington | Arkansas | Unliquidated Claim |
| 293 | City of Watson | Arkansas | Unliquidated Claim |
| 294 | City of Weiner | Arkansas | Unliquidated Claim |
| 295 | City of West Fork | Arkansas | Unliquidated Claim |

8

A-2891

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 296 | City of West Memphis | Arkansas | Unliquidated Claim |
| 297 | City of White Hall | Arkansas | Unliquidated Claim |
| 298 | City of Wilmar | Arkansas | Unliquidated Claim |
| 299 | City of Wilmot | Arkansas | Unliquidated Claim |
| 300 | City of Wilson | Arkansas | Unliquidated Claim |
| 301 | City of Wilton | Arkansas | Unliquidated Claim |
| 302 | City of Winthrop | Arkansas | Unliquidated Claim |
| 303 | City of Wooster | Arkansas | Unliquidated Claim |
| 304 | City of Wrightsville | Arkansas | Unliquidated Claim |
| 305 | City of Wynne | Arkansas | Unliquidated Claim |
| 306 | City of Yellville | Arkansas | Unliquidated Claim |
| 307 | Clark County | Arkansas | Unliquidated Claim |
| 308 | Clay County | Arkansas | Unliquidated Claim |
| 309 | Cleburne County | Arkansas | Unliquidated Claim |
| 310 | Cleveland County | Arkansas | Unliquidated Claim |
| 311 | Columbia County | Arkansas | Unliquidated Claim |
| 312 | Concord | Arkansas | Unliquidated Claim |
| 313 | Conway County | Arkansas | Unliquidated Claim |
| 314 | Cove | Arkansas | Unliquidated Claim |
| 315 | Craighead County | Arkansas | Unliquidated Claim |
| 316 | Crawford County | Arkansas | Unliquidated Claim |
| 317 | Crawfordsville | Arkansas | Unliquidated Claim |
| 318 | Crittenden County | Arkansas | Unliquidated Claim |
| 319 | Cross County | Arkansas | Unliquidated Claim |
| 320 | Dallas County | Arkansas | Unliquidated Claim |
| 321 | Damascus | Arkansas | Unliquidated Claim |
| 322 | Datto | Arkansas | Unliquidated Claim |
| 323 | Delaplaine | Arkansas | Unliquidated Claim |
| 324 | Dell | Arkansas | Unliquidated Claim |
| 325 | Desha County | Arkansas | Unliquidated Claim |
| 326 | Donaldson | Arkansas | Unliquidated Claim |
| 327 | Drew County | Arkansas | Unliquidated Claim |
| 328 | Dyess | Arkansas | Unliquidated Claim |
| 329 | Edmondson | Arkansas | Unliquidated Claim |
| 330 | Egypt | Arkansas | Unliquidated Claim |
| 331 | Emerson | Arkansas | Unliquidated Claim |
| 332 | Etowah | Arkansas | Unliquidated Claim |
| 333 | Everton | Arkansas | Unliquidated Claim |

A-2892

|     | Party | State | Economic Interest |
| --- | --- | --- | --- |
| 334 | Fargo | Arkansas | Unliquidated Claim |
| 335 | Faulkner County | Arkansas | Unliquidated Claim |
| 336 | Felsenthal | Arkansas | Unliquidated Claim |
| 337 | Fountain Hill | Arkansas | Unliquidated Claim |
| 338 | Fourche | Arkansas | Unliquidated Claim |
| 339 | Franklin | Arkansas | Unliquidated Claim |
| 340 | Franklin County | Arkansas | Unliquidated Claim |
| 341 | Fredonia (Biscoe) | Arkansas | Unliquidated Claim |
| 342 | Friendship | Arkansas | Unliquidated Claim |
| 343 | Fulton | Arkansas | Unliquidated Claim |
| 344 | Fulton County | Arkansas | Unliquidated Claim |
| 345 | Garfield | Arkansas | Unliquidated Claim |
| 346 | Garland | Arkansas | Unliquidated Claim |
| 347 | Garland County | Arkansas | Unliquidated Claim |
| 348 | Gilbert | Arkansas | Unliquidated Claim |
| 349 | Grant County | Arkansas | Unliquidated Claim |
| 350 | Greene County | Arkansas | Unliquidated Claim |
| 351 | Harrell | Arkansas | Unliquidated Claim |
| 352 | Hatfield | Arkansas | Unliquidated Claim |
| 353 | Haynes | Arkansas | Unliquidated Claim |
| 354 | Hector | Arkansas | Unliquidated Claim |
| 355 | Hempstead County | Arkansas | Unliquidated Claim |
| 356 | Higden | Arkansas | Unliquidated Claim |
| 357 | Highfill | Arkansas | Unliquidated Claim |
| 358 | Horseshoe Lake | Arkansas | Unliquidated Claim |
| 359 | Hot Spring County | Arkansas | Unliquidated Claim |
| 360 | Howard County | Arkansas | Unliquidated Claim |
| 361 | Hughes | Arkansas | Unliquidated Claim |
| 362 | Independence County | Arkansas | Unliquidated Claim |
| 363 | Izard County | Arkansas | Unliquidated Claim |
| 364 | Jackson County | Arkansas | Unliquidated Claim |
| 365 | Jefferson County | Arkansas | Unliquidated Claim |
| 366 | Jennette | Arkansas | Unliquidated Claim |
| 367 | Jericho | Arkansas | Unliquidated Claim |
| 368 | Johnson County | Arkansas | Unliquidated Claim |
| 369 | La Grange | Arkansas | Unliquidated Claim |
| 370 | Lafayette County | Arkansas | Unliquidated Claim |
| 371 | Lafe | Arkansas | Unliquidated Claim |

A-2893

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 372 | Lawrence County | Arkansas | Unliquidated Claim |
| 373 | Lead Hill | Arkansas | Unliquidated Claim |
| 374 | Lee County | Arkansas | Unliquidated Claim |
| 375 | Leola | Arkansas | Unliquidated Claim |
| 376 | Lexa | Arkansas | Unliquidated Claim |
| 377 | Lincoln County | Arkansas | Unliquidated Claim |
| 378 | Little River County | Arkansas | Unliquidated Claim |
| 379 | Logan County | Arkansas | Unliquidated Claim |
| 380 | Lonoke County | Arkansas | Unliquidated Claim |
| 381 | Louann | Arkansas | Unliquidated Claim |
| 382 | Lynn | Arkansas | Unliquidated Claim |
| 383 | Madison County | Arkansas | Unliquidated Claim |
| 384 | Magness | Arkansas | Unliquidated Claim |
| 385 | Marianna | Arkansas | Unliquidated Claim |
| 386 | Marie | Arkansas | Unliquidated Claim |
| 387 | Marion County | Arkansas | Unliquidated Claim |
| 388 | Maynard | Arkansas | Unliquidated Claim |
| 389 | McDougal | Arkansas | Unliquidated Claim |
| 390 | McNab | Arkansas | Unliquidated Claim |
| 391 | Menifee | Arkansas | Unliquidated Claim |
| 392 | Midway | Arkansas | Unliquidated Claim |
| 393 | Miller County | Arkansas | Unliquidated Claim |
| 394 | Mississippi County | Arkansas | Unliquidated Claim |
| 395 | Monroe County | Arkansas | Unliquidated Claim |
| 396 | Montgomery County | Arkansas | Unliquidated Claim |
| 397 | Moorefield | Arkansas | Unliquidated Claim |
| 398 | Morrison Bluff | Arkansas | Unliquidated Claim |
| 399 | Mount Pleasant | Arkansas | Unliquidated Claim |
| 400 | Mount Vernon | Arkansas | Unliquidated Claim |
| 401 | Nevada County | Arkansas | Unliquidated Claim |
| 402 | Newton County | Arkansas | Unliquidated Claim |
| 403 | Nimmons | Arkansas | Unliquidated Claim |
| 404 | Norman | Arkansas | Unliquidated Claim |
| 405 | Oak Grove | Arkansas | Unliquidated Claim |
| 406 | Oakhaven | Arkansas | Unliquidated Claim |
| 407 | Oden | Arkansas | Unliquidated Claim |
| 408 | O'Kean | Arkansas | Unliquidated Claim |
| 409 | Okolona | Arkansas | Unliquidated Claim |

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 410 | Ouachita County | Arkansas | Unliquidated Claim |
| 411 | Palestine | Arkansas | Unliquidated Claim |
| 412 | Patmos | Arkansas | Unliquidated Claim |
| 413 | Perla | Arkansas | Unliquidated Claim |
| 414 | Perry | Arkansas | Unliquidated Claim |
| 415 | Perry County | Arkansas | Unliquidated Claim |
| 416 | Phillips County | Arkansas | Unliquidated Claim |
| 417 | Pike County | Arkansas | Unliquidated Claim |
| 418 | Pleasant Plains | Arkansas | Unliquidated Claim |
| 419 | Poinsett County | Arkansas | Unliquidated Claim |
| 420 | Polk County | Arkansas | Unliquidated Claim |
| 421 | Pope County | Arkansas | Unliquidated Claim |
| 422 | Powhatan | Arkansas | Unliquidated Claim |
| 423 | Poyen | Arkansas | Unliquidated Claim |
| 424 | Prairie County | Arkansas | Unliquidated Claim |
| 425 | Prattsville | Arkansas | Unliquidated Claim |
| 426 | Pulaski County | Arkansas | Unliquidated Claim |
| 427 | Pyatt | Arkansas | Unliquidated Claim |
| 428 | Randolph County | Arkansas | Unliquidated Claim |
| 429 | Ravenden | Arkansas | Unliquidated Claim |
| 430 | Reed | Arkansas | Unliquidated Claim |
| 431 | Rondo | Arkansas | Unliquidated Claim |
| 432 | Rose Bud | Arkansas | Unliquidated Claim |
| 433 | Rosston | Arkansas | Unliquidated Claim |
| 434 | Rudy | Arkansas | Unliquidated Claim |
| 435 | Saline County | Arkansas | Unliquidated Claim |
| 436 | Scott County | Arkansas | Unliquidated Claim |
| 437 | Searcy County | Arkansas | Unliquidated Claim |
| 438 | Sebastian County | Arkansas | Unliquidated Claim |
| 439 | Second Judicial Circuit Prosecuting Attorney Scott Ellington, *ex rel.* State of Arkansas | Arkansas | Unliquidated Claim |
| 440 | Sedgwick | Arkansas | Unliquidated Claim |
| 441 | Sevier County | Arkansas | Unliquidated Claim |
| 442 | Sharp County | Arkansas | Unliquidated Claim |
| 443 | Sidney | Arkansas | Unliquidated Claim |
| 444 | Smithville | Arkansas | Unliquidated Claim |
| 445 | Springtown | Arkansas | Unliquidated Claim |
| 446 | St. Charles | Arkansas | Unliquidated Claim |

A-2895

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 447 | St. Francis County | Arkansas | Unliquidated Claim |
| 448 | St. Joe | Arkansas | Unliquidated Claim |
| 449 | St. Paul | Arkansas | Unliquidated Claim |
| 450 | Stone County | Arkansas | Unliquidated Claim |
| 451 | Strawberry | Arkansas | Unliquidated Claim |
| 452 | Success | Arkansas | Unliquidated Claim |
| 453 | Sulphur Rock | Arkansas | Unliquidated Claim |
| 454 | The Schumacher Group of Arkansas, Inc. | Arkansas | Unliquidated Claim |
| 455 | Tinsman | Arkansas | Unliquidated Claim |
| 456 | Tollette | Arkansas | Unliquidated Claim |
| 457 | Tull | Arkansas | Unliquidated Claim |
| 458 | Tupelo | Arkansas | Unliquidated Claim |
| 459 | Union County | Arkansas | Unliquidated Claim |
| 460 | Valley Springs | Arkansas | Unliquidated Claim |
| 461 | Van Buren County | Arkansas | Unliquidated Claim |
| 462 | Viola | Arkansas | Unliquidated Claim |
| 463 | Wabbaseka | Arkansas | Unliquidated Claim |
| 464 | Washington County | Arkansas | Unliquidated Claim |
| 465 | Wheatley | Arkansas | Unliquidated Claim |
| 466 | Whelen Springs | Arkansas | Unliquidated Claim |
| 467 | White County | Arkansas | Unliquidated Claim |
| 468 | Wickes | Arkansas | Unliquidated Claim |
| 469 | Widener | Arkansas | Unliquidated Claim |
| 470 | Woodruff County | Arkansas | Unliquidated Claim |
| 471 | Yell County | Arkansas | Unliquidated Claim |
| 472 | Zinc | Arkansas | Unliquidated Claim |
| 473 | Sacramento County | California | Unliquidated Claim |
| 474 | Mesa County | Colorado | Unliquidated Claim |
| 475 | The Schumacher Group of Colorado, Inc. | Colorado | Unliquidated Claim |
| 476 | City of Ansonia | Connecticut | Unliquidated Claim |
| 477 | City of Danbury | Connecticut | Unliquidated Claim |
| 478 | City of Derby | Connecticut | Unliquidated Claim |
| 479 | City of Middletown | Connecticut | Unliquidated Claim |
| 480 | City of New Britain | Connecticut | Unliquidated Claim |
| 481 | City of New Haven | Connecticut | Unliquidated Claim |
| 482 | City of New London | Connecticut | Unliquidated Claim |
| 483 | City of Norwalk | Connecticut | Unliquidated Claim |
| 484 | City of Norwich | Connecticut | Unliquidated Claim |

A-2896

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 485 | City of Trumbull | Connecticut | Unliquidated Claim |
| 486 | Town of Brookfield | Connecticut | Unliquidated Claim |
| 487 | Town of Enfield | Connecticut | Unliquidated Claim |
| 488 | Town of Manchester | Connecticut | Unliquidated Claim |
| 489 | Town of Wallingford | Connecticut | Unliquidated Claim |
| 490 | Town of Wethersfield | Connecticut | Unliquidated Claim |
| 491 | Town of Windham | Connecticut | Unliquidated Claim |
| 492 | City of Dover | Delaware | Unliquidated Claim |
| 493 | City of Seaford | Delaware | Unliquidated Claim |
| 494 | ECI Healthcare Partners, LLC | Delaware | Unliquidated Claim |
| 495 | EDCare Management, Inc. | Delaware | Unliquidated Claim |
| 496 | Kent County | Delaware | Unliquidated Claim |
| 497 | Sterling Group Physician Services, LLC | Delaware | Unliquidated Claim |
| 498 | Sussex County | Delaware | Unliquidated Claim |
| 499 | City of Jacksonville | Florida | Unliquidated Claim |
| 500 | Lee County | Florida | Unliquidated Claim |
| 501 | The Schumacher Group of Florida, Inc. | Florida | Unliquidated Claim |
| 502 | Bibb County | Georgia | Unliquidated Claim |
| 503 | County of Douglas | Georgia | Unliquidated Claim |
| 504 | Fannin County | Georgia | Unliquidated Claim |
| 505 | Schumacher Medical Corporation | Georgia | Unliquidated Claim |
| 506 | City of Anna | Illinois | Unliquidated Claim |
| 507 | City of Benton | Illinois | Unliquidated Claim |
| 508 | City of Burbank | Illinois | Unliquidated Claim |
| 509 | City of Carbondale | Illinois | Unliquidated Claim |
| 510 | City of Countryside | Illinois | Unliquidated Claim |
| 511 | City of Palos Heights | Illinois | Unliquidated Claim |
| 512 | City of Palos Hills | Illinois | Unliquidated Claim |
| 513 | City of Sesser | Illinois | Unliquidated Claim |
| 514 | Madison County | Illinois | Unliquidated Claim |
| 515 | St. Clair County | Illinois | Unliquidated Claim |
| 516 | The Schumacher Group of Illinois, Inc. | Illinois | Unliquidated Claim |
| 517 | Township of Lyons | Illinois | Unliquidated Claim |
| 518 | Village of Bedford Park | Illinois | Unliquidated Claim |
| 519 | Village of Bridgeview | Illinois | Unliquidated Claim |
| 520 | Village of Evergreen Park | Illinois | Unliquidated Claim |
| 521 | Village of Hodgkins | Illinois | Unliquidated Claim |
| 522 | Village of Lyons | Illinois | Unliquidated Claim |

A-2897

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 523 | Village of Summit | Illinois | Unliquidated Claim |
| 524 | St. Joseph County | Indiana | Unliquidated Claim |
| 525 | The Schumacher Group of Indiana, Inc. | Indiana | Unliquidated Claim |
| 526 | Dodge City | Kansas | Unliquidated Claim |
| 527 | Ford County | Kansas | Unliquidated Claim |
| 528 | Shawnee County | Kansas | Unliquidated Claim |
| 529 | City of Benham | Kentucky | Unliquidated Claim |
| 530 | City of Buckhorn | Kentucky | Unliquidated Claim |
| 531 | City of Harlan | Kentucky | Unliquidated Claim |
| 532 | City of Hillview | Kentucky | Unliquidated Claim |
| 533 | City of Hyden | Kentucky | Unliquidated Claim |
| 534 | City of London | Kentucky | Unliquidated Claim |
| 535 | City of Loyall | Kentucky | Unliquidated Claim |
| 536 | City of Lynch | Kentucky | Unliquidated Claim |
| 537 | City of Manchester | Kentucky | Unliquidated Claim |
| 538 | City of Morehead | Kentucky | Unliquidated Claim |
| 539 | City of Mt. Washington | Kentucky | Unliquidated Claim |
| 540 | City of Pippa Passes | Kentucky | Unliquidated Claim |
| 541 | City of Shepherdsville | Kentucky | Unliquidated Claim |
| 542 | City of Whitesburg | Kentucky | Unliquidated Claim |
| 543 | Louisville-Jefferson County Metro Government | Kentucky | Unliquidated Claim |
| 544 | The Schumacher Group of Kentucky, Inc. | Kentucky | Unliquidated Claim |
| 545 | Warren County | Kentucky | Unliquidated Claim |
| 546 | Acadia-St. Landry Hospital Service District d/b/a Acadia-St. Landry Hospital | Louisiana | Unliquidated Claim |
| 547 | Bobby Guidroz - St. Landry Parish Sheriff | Louisiana | Unliquidated Claim |
| 548 | Cameron Parish Hospital and Psychiatric Facility | Louisiana | Unliquidated Claim |
| 549 | City of Alexandria | Louisiana | Unliquidated Claim |
| 550 | City of Bastrop | Louisiana | Unliquidated Claim |
| 551 | City of Eunice | Louisiana | Unliquidated Claim |
| 552 | City of Monroe | Louisiana | Unliquidated Claim |
| 553 | City of Opelousas | Louisiana | Unliquidated Claim |
| 554 | City of Pineville | Louisiana | Unliquidated Claim |
| 555 | City of West Monroe | Louisiana | Unliquidated Claim |
| 556 | Grant Parish | Louisiana | Unliquidated Claim |
| 557 | Hospital Service District No. 1 of the Parish of Avoyelles, State of Louisiana, d/b/a Bunkie General Hospital | Louisiana | Unliquidated Claim |

|  | Party | State | Economic Interest |
|---|---|---|---|
| 558 | Lafayette General Health System, Inc. | Louisiana | Unliquidated Claim |
| 559 | Louis M. Ackal - Iberia Parish Sheriff | Louisiana | Unliquidated Claim |
| 560 | Louisiana Hospital Service District No. 1 of the Parish of LaSalle, State of Louisiana, d/b/a Hardtner Medical Center | Louisiana | Unliquidated Claim |
| 561 | Opelousas General Hospital Authority, A Louisiana Public Trust d/b/a Opelousas General Health System | Louisiana | Unliquidated Claim |
| 562 | R. Chris Nevils - Winn Parish District Attorney | Louisiana | Unliquidated Claim |
| 563 | St. Landry Parish | Louisiana | Unliquidated Claim |
| 564 | Steven McCain - Grant Parish Sheriff | Louisiana | Unliquidated Claim |
| 565 | The Schumacher Group of Louisiana,  Inc. | Louisiana | Unliquidated Claim |
| 566 | Town of Delhi | Louisiana | Unliquidated Claim |
| 567 | Town of Ferriday | Louisiana | Unliquidated Claim |
| 568 | Town of Lake Providence | Louisiana | Unliquidated Claim |
| 569 | Town of Richwood | Louisiana | Unliquidated Claim |
| 570 | Winn Parish | Louisiana | Unliquidated Claim |
| 571 | Calvert County | Maryland | Unliquidated Claim |
| 572 | Carroll County | Maryland | Unliquidated Claim |
| 573 | Charles County | Maryland | Unliquidated Claim |
| 574 | City of Aberdeen | Maryland | Unliquidated Claim |
| 575 | City of Cambridge | Maryland | Unliquidated Claim |
| 576 | City of Charlestown | Maryland | Unliquidated Claim |
| 577 | City of Havre de Grace | Maryland | Unliquidated Claim |
| 578 | City of Laurel | Maryland | Unliquidated Claim |
| 579 | Dorchester County | Maryland | Unliquidated Claim |
| 580 | Howard County | Maryland | Unliquidated Claim |
| 581 | Somerset County | Maryland | Unliquidated Claim |
| 582 | Town of Bel Air | Maryland | Unliquidated Claim |
| 583 | Town of Berlin | Maryland | Unliquidated Claim |
| 584 | Town of Cottage City | Maryland | Unliquidated Claim |
| 585 | Town of Forest Heights | Maryland | Unliquidated Claim |
| 586 | Town of Grantsville | Maryland | Unliquidated Claim |
| 587 | Town of Hurlock | Maryland | Unliquidated Claim |
| 588 | Town of Manchester | Maryland | Unliquidated Claim |
| 589 | Town of Mountain Lake Park | Maryland | Unliquidated Claim |
| 590 | Town of North Brentwood | Maryland | Unliquidated Claim |
| 591 | Town of North East | Maryland | Unliquidated Claim |
| 592 | Town of Oakland | Maryland | Unliquidated Claim |

| | Party | State | Economic Interest |
|---|---|---|---|
| 593 | Town of Perryville | Maryland | Unliquidated Claim |
| 594 | Town of Upper Marlboro | Maryland | Unliquidated Claim |
| 595 | Town of Vienna | Maryland | Unliquidated Claim |
| 596 | Wicomico County | Maryland | Unliquidated Claim |
| 597 | City of Cambridge | Massachusetts | Unliquidated Claim |
| 598 | City of Chicopee | Massachusetts | Unliquidated Claim |
| 599 | City of Framingham | Massachusetts | Unliquidated Claim |
| 600 | City of Gloucester | Massachusetts | Unliquidated Claim |
| 601 | City of Haverhill | Massachusetts | Unliquidated Claim |
| 602 | City of Salem | Massachusetts | Unliquidated Claim |
| 603 | City of Springfield | Massachusetts | Unliquidated Claim |
| 604 | City of Worcester | Massachusetts | Unliquidated Claim |
| 605 | Town of Canton | Massachusetts | Unliquidated Claim |
| 606 | Town of Lynnfield | Massachusetts | Unliquidated Claim |
| 607 | Town of Natick | Massachusetts | Unliquidated Claim |
| 608 | Town of Randolph | Massachusetts | Unliquidated Claim |
| 609 | Town of Wakefield | Massachusetts | Unliquidated Claim |
| 610 | The Schumacher Group of Michigan, Inc. | Michigan | Unliquidated Claim |
| 611 | Big Stone County | Minnesota | Unliquidated Claim |
| 612 | Clay County | Minnesota | Unliquidated Claim |
| 613 | Otter Tail County | Minnesota | Unliquidated Claim |
| 614 | Wilkin County | Minnesota | Unliquidated Claim |
| 615 | City of Clarksdale | Mississippi | Unliquidated Claim |
| 616 | City of Grenada | Mississippi | Unliquidated Claim |
| 617 | City of Holly Springs | Mississippi | Unliquidated Claim |
| 618 | City of Indianola | Mississippi | Unliquidated Claim |
| 619 | Copiah County | Mississippi | Unliquidated Claim |
| 620 | Granada County | Mississippi | Unliquidated Claim |
| 621 | Jonestown | Mississippi | Unliquidated Claim |
| 622 | Patients' Choice Medical Center of Claiborne County, LLC | Mississippi | Unliquidated Claim |
| 623 | Patients' Choice Medical Center of Humphreys County, LLC | Mississippi | Unliquidated Claim |
| 624 | The Schumacher Group of Mississippi, Inc. | Mississippi | Unliquidated Claim |
| 625 | Adair County | Missouri | Unliquidated Claim |
| 626 | Andrew County | Missouri | Unliquidated Claim |
| 627 | Barry County | Missouri | Unliquidated Claim |
| 628 | Barton County | Missouri | Unliquidated Claim |

A-2900

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 629 | Butler County | Missouri | Unliquidated Claim |
| 630 | Camden County | Missouri | Unliquidated Claim |
| 631 | Cape Girardeau County | Missouri | Unliquidated Claim |
| 632 | Christian County | Missouri | Unliquidated Claim |
| 633 | City of Independence | Missouri | Unliquidated Claim |
| 634 | City of Joplin | Missouri | Unliquidated Claim |
| 635 | Clinton County | Missouri | Unliquidated Claim |
| 636 | Crawford County | Missouri | Unliquidated Claim |
| 637 | Dade County | Missouri | Unliquidated Claim |
| 638 | De Kalb County | Missouri | Unliquidated Claim |
| 639 | Dent County | Missouri | Unliquidated Claim |
| 640 | Dunklin County | Missouri | Unliquidated Claim |
| 641 | Franklin County | Missouri | Unliquidated Claim |
| 642 | Greene County | Missouri | Unliquidated Claim |
| 643 | Grundy County | Missouri | Unliquidated Claim |
| 644 | Henry County | Missouri | Unliquidated Claim |
| 645 | Hickory County | Missouri | Unliquidated Claim |
| 646 | Iron County | Missouri | Unliquidated Claim |
| 647 | Jasper County | Missouri | Unliquidated Claim |
| 648 | Jefferson County | Missouri | Unliquidated Claim |
| 649 | Lawrence County | Missouri | Unliquidated Claim |
| 650 | Lincoln County | Missouri | Unliquidated Claim |
| 651 | Madison County | Missouri | Unliquidated Claim |
| 652 | McDonald County | Missouri | Unliquidated Claim |
| 653 | New Madrid County | Missouri | Unliquidated Claim |
| 654 | Perry County | Missouri | Unliquidated Claim |
| 655 | Pike County | Missouri | Unliquidated Claim |
| 656 | Polk County | Missouri | Unliquidated Claim |
| 657 | Ralls County | Missouri | Unliquidated Claim |
| 658 | Ray County | Missouri | Unliquidated Claim |
| 659 | Saline County | Missouri | Unliquidated Claim |
| 660 | St. Clair County | Missouri | Unliquidated Claim |
| 661 | St. Francois County | Missouri | Unliquidated Claim |
| 662 | Ste. Genevieve County | Missouri | Unliquidated Claim |
| 663 | Stone County | Missouri | Unliquidated Claim |
| 664 | Taney County | Missouri | Unliquidated Claim |
| 665 | Texas County | Missouri | Unliquidated Claim |
| 666 | The Schumacher Group of Missouri, Inc. | Missouri | Unliquidated Claim |

A-2901

|   | Party | State | Economic Interest |
|---|---|---|---|
| 667 | Vernon County | Missouri | Unliquidated Claim |
| 668 | Washington County | Missouri | Unliquidated Claim |
| 669 | Anaconda-Deer Lodge County | Montana | Unliquidated Claim |
| 670 | Cascade County | Montana | Unliquidated Claim |
| 671 | City of Great Falls | Montana | Unliquidated Claim |
| 672 | City of Missoula | Montana | Unliquidated Claim |
| 673 | Gallatin County | Montana | Unliquidated Claim |
| 674 | Lake County | Montana | Unliquidated Claim |
| 675 | The Schumacher Group of Montana, Inc. | Montana | Unliquidated Claim |
| 676 | Carson City | Nevada | Unliquidated Claim |
| 677 | Churchill County | Nevada | Unliquidated Claim |
| 678 | City of Ely | Nevada | Unliquidated Claim |
| 679 | City of Fernley | Nevada | Unliquidated Claim |
| 680 | City of Henderson | Nevada | Unliquidated Claim |
| 681 | City of Las Vegas | Nevada | Unliquidated Claim |
| 682 | City of North Las Vegas | Nevada | Unliquidated Claim |
| 683 | City of Reno | Nevada | Unliquidated Claim |
| 684 | City of Sparks | Nevada | Unliquidated Claim |
| 685 | City of West Wendover | Nevada | Unliquidated Claim |
| 686 | Clark County | Nevada | Unliquidated Claim |
| 687 | Douglas County | Nevada | Unliquidated Claim |
| 688 | Esmeralda County | Nevada | Unliquidated Claim |
| 689 | Humboldt County | Nevada | Unliquidated Claim |
| 690 | Lincoln County | Nevada | Unliquidated Claim |
| 691 | Lyon County | Nevada | Unliquidated Claim |
| 692 | Mineral County | Nevada | Unliquidated Claim |
| 693 | The Schumacher Group of Nevada, Inc. | Nevada | Unliquidated Claim |
| 694 | Washoe County | Nevada | Unliquidated Claim |
| 695 | White Pine County | Nevada | Unliquidated Claim |
| 696 | City of Paterson | New Jersey | Unliquidated Claim |
| 697 | City of Trenton | New Jersey | Unliquidated Claim |
| 698 | The Schumacher Group of New Jersey, Inc. | New Jersey | Unliquidated Claim |
| 699 | City of Albuquerque | New Mexico | Unliquidated Claim |
| 700 | City of Santa Fe | New Mexico | Unliquidated Claim |
| 701 | The Schumacher Group of New Mexico, Inc. | New Mexico | Unliquidated Claim |
| 702 | Jefferson County | New York | Unliquidated Claim |
| 703 | Rockland County | New York | Unliquidated Claim |
| 704 | The Schumacher Group of New York, Inc. | New York | Unliquidated Claim |

19

A-2902

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 705 | The Schumacher Group of North Carolina, Inc. | North Carolina | Unliquidated Claim |
| 706 | Barnes County | North Dakota | Unliquidated Claim |
| 707 | Benson County | North Dakota | Unliquidated Claim |
| 708 | Burleigh County | North Dakota | Unliquidated Claim |
| 709 | City of Bismarck | North Dakota | Unliquidated Claim |
| 710 | City of Devils Lake | North Dakota | Unliquidated Claim |
| 711 | City of Lisbon | North Dakota | Unliquidated Claim |
| 712 | Dickey County | North Dakota | Unliquidated Claim |
| 713 | Dunn County | North Dakota | Unliquidated Claim |
| 714 | Eddy County | North Dakota | Unliquidated Claim |
| 715 | Foster County | North Dakota | Unliquidated Claim |
| 716 | Grand Forks County | North Dakota | Unliquidated Claim |
| 717 | LaMoure County | North Dakota | Unliquidated Claim |
| 718 | McKenzie County | North Dakota | Unliquidated Claim |
| 719 | McLean County | North Dakota | Unliquidated Claim |
| 720 | Mercer County | North Dakota | Unliquidated Claim |
| 721 | Mountrail County | North Dakota | Unliquidated Claim |
| 722 | Pembina County | North Dakota | Unliquidated Claim |
| 723 | Pierce County | North Dakota | Unliquidated Claim |
| 724 | Ramsey County | North Dakota | Unliquidated Claim |
| 725 | Ransom County | North Dakota | Unliquidated Claim |
| 726 | Richland County | North Dakota | Unliquidated Claim |
| 727 | Rolette County | North Dakota | Unliquidated Claim |
| 728 | Sargent County | North Dakota | Unliquidated Claim |
| 729 | Stark County | North Dakota | Unliquidated Claim |
| 730 | Towner County | North Dakota | Unliquidated Claim |
| 731 | Walsh County | North Dakota | Unliquidated Claim |
| 732 | Ward County | North Dakota | Unliquidated Claim |
| 733 | Wells County | North Dakota | Unliquidated Claim |
| 734 | Williams County | North Dakota | Unliquidated Claim |
| 735 | City of Lakewood | Ohio | Unliquidated Claim |
| 736 | Marietta City | Ohio | Unliquidated Claim |
| 737 | Meigs County | Ohio | Unliquidated Claim |
| 738 | Noble County | Ohio | Unliquidated Claim |
| 739 | The MetroHealth System | Ohio | Unliquidated Claim |
| 740 | The Schumacher Group of Ohio, Inc. | Ohio | Unliquidated Claim |
| 741 | Washington County | Ohio | Unliquidated Claim |
| 742 | Apache Tribe | Oklahoma | Unliquidated Claim |

A-2903

| | Party | State | Economic Interest |
|---|---|---|---|
| 743 | Atoka County | Oklahoma | Unliquidated Claim |
| 744 | Beckham County | Oklahoma | Unliquidated Claim |
| 745 | Caddo County | Oklahoma | Unliquidated Claim |
| 746 | Choctaw County | Oklahoma | Unliquidated Claim |
| 747 | Cimarron County | Oklahoma | Unliquidated Claim |
| 748 | Citizen Potawatomi Nation | Oklahoma | Unliquidated Claim |
| 749 | City of Ada | Oklahoma | Unliquidated Claim |
| 750 | City of Altus | Oklahoma | Unliquidated Claim |
| 751 | City of Anadarko | Oklahoma | Unliquidated Claim |
| 752 | City of Bethany | Oklahoma | Unliquidated Claim |
| 753 | City of Broken Arrow | Oklahoma | Unliquidated Claim |
| 754 | City of Collinsville | Oklahoma | Unliquidated Claim |
| 755 | City of Edmond | Oklahoma | Unliquidated Claim |
| 756 | City of El Reno | Oklahoma | Unliquidated Claim |
| 757 | City of Elk City | Oklahoma | Unliquidated Claim |
| 758 | City of Enid | Oklahoma | Unliquidated Claim |
| 759 | City of Guthrie | Oklahoma | Unliquidated Claim |
| 760 | City of Jenks | Oklahoma | Unliquidated Claim |
| 761 | City of Lawton | Oklahoma | Unliquidated Claim |
| 762 | City of Midwest City | Oklahoma | Unliquidated Claim |
| 763 | City of Muskogee | Oklahoma | Unliquidated Claim |
| 764 | City of Mustang | Oklahoma | Unliquidated Claim |
| 765 | City of Owasso | Oklahoma | Unliquidated Claim |
| 766 | City of Ponca City | Oklahoma | Unliquidated Claim |
| 767 | City of Seminole | Oklahoma | Unliquidated Claim |
| 768 | City of Shawnee | Oklahoma | Unliquidated Claim |
| 769 | City of Stillwater | Oklahoma | Unliquidated Claim |
| 770 | City of Tulsa | Oklahoma | Unliquidated Claim |
| 771 | City of Yukon | Oklahoma | Unliquidated Claim |
| 772 | Cleveland County | Oklahoma | Unliquidated Claim |
| 773 | Coal County | Oklahoma | Unliquidated Claim |
| 774 | Comanche County | Oklahoma | Unliquidated Claim |
| 775 | Confederated Tribes and Bands of the Yakama Nation | Oklahoma | Unliquidated Claim |
| 776 | Custer County | Oklahoma | Unliquidated Claim |
| 777 | Delaware Nation | Oklahoma | Unliquidated Claim |
| 778 | Dewey County | Oklahoma | Unliquidated Claim |
| 779 | Grady County | Oklahoma | Unliquidated Claim |
| 780 | Greer County | Oklahoma | Unliquidated Claim |

A-2904

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 781 | Harmon County | Oklahoma | Unliquidated Claim |
| 782 | Harper County | Oklahoma | Unliquidated Claim |
| 783 | Haskell County | Oklahoma | Unliquidated Claim |
| 784 | Hughes County | Oklahoma | Unliquidated Claim |
| 785 | Jackson County | Oklahoma | Unliquidated Claim |
| 786 | Jefferson County | Oklahoma | Unliquidated Claim |
| 787 | Johnston County | Oklahoma | Unliquidated Claim |
| 788 | Kay County | Oklahoma | Unliquidated Claim |
| 789 | Kiowa County | Oklahoma | Unliquidated Claim |
| 790 | Latimer County | Oklahoma | Unliquidated Claim |
| 791 | Le Flore County | Oklahoma | Unliquidated Claim |
| 792 | Lincoln County | Oklahoma | Unliquidated Claim |
| 793 | Logan County | Oklahoma | Unliquidated Claim |
| 794 | Love County | Oklahoma | Unliquidated Claim |
| 795 | Major County | Oklahoma | Unliquidated Claim |
| 796 | McCurtain County | Oklahoma | Unliquidated Claim |
| 797 | Muskogee County | Oklahoma | Unliquidated Claim |
| 798 | Noble County | Oklahoma | Unliquidated Claim |
| 799 | Okfuskee County | Oklahoma | Unliquidated Claim |
| 800 | Oklahoma City | Oklahoma | Unliquidated Claim |
| 801 | Oklahoma County | Oklahoma | Unliquidated Claim |
| 802 | Pawnee Nation of Oklahoma | Oklahoma | Unliquidated Claim |
| 803 | Payne County | Oklahoma | Unliquidated Claim |
| 804 | Pittsburg County | Oklahoma | Unliquidated Claim |
| 805 | Ponca Tribe of Indians of Oklahoma | Oklahoma | Unliquidated Claim |
| 806 | Pottawatomie County | Oklahoma | Unliquidated Claim |
| 807 | Roger Mills County | Oklahoma | Unliquidated Claim |
| 808 | Sac and Fox Nation | Oklahoma | Unliquidated Claim |
| 809 | Seminole County | Oklahoma | Unliquidated Claim |
| 810 | Stephens County | Oklahoma | Unliquidated Claim |
| 811 | Texas County | Oklahoma | Unliquidated Claim |
| 812 | The Osage Nation | Oklahoma | Unliquidated Claim |
| 813 | The Schumacher Group of Oklahoma, Inc. | Oklahoma | Unliquidated Claim |
| 814 | The Thlopthlocco Tribal Town | Oklahoma | Unliquidated Claim |
| 815 | Tillman County | Oklahoma | Unliquidated Claim |
| 816 | Woods County | Oklahoma | Unliquidated Claim |
| 817 | Woodward County | Oklahoma | Unliquidated Claim |
| 818 | Adams County | Pennsylvania | Unliquidated Claim |

A-2905

| | Party | State | Economic Interest |
|---|---|---|---|
| 819 | Armstrong County | Pennsylvania | Unliquidated Claim |
| 820 | Beaver County | Pennsylvania | Unliquidated Claim |
| 821 | Bedford County | Pennsylvania | Unliquidated Claim |
| 822 | Bensalem Township | Pennsylvania | Unliquidated Claim |
| 823 | Bradford County | Pennsylvania | Unliquidated Claim |
| 824 | Bucks County | Pennsylvania | Unliquidated Claim |
| 825 | Cambria County | Pennsylvania | Unliquidated Claim |
| 826 | Carbon County | Pennsylvania | Unliquidated Claim |
| 827 | City of Lock Haven | Pennsylvania | Unliquidated Claim |
| 828 | Clarion County | Pennsylvania | Unliquidated Claim |
| 829 | Clinton County | Pennsylvania | Unliquidated Claim |
| 830 | Fayette County | Pennsylvania | Unliquidated Claim |
| 831 | Franklin County | Pennsylvania | Unliquidated Claim |
| 832 | Greene County | Pennsylvania | Unliquidated Claim |
| 833 | Huntingdon County | Pennsylvania | Unliquidated Claim |
| 834 | Lackawanna County | Pennsylvania | Unliquidated Claim |
| 835 | Lawrence County | Pennsylvania | Unliquidated Claim |
| 836 | Lower Makefield Township | Pennsylvania | Unliquidated Claim |
| 837 | Mercer County | Pennsylvania | Unliquidated Claim |
| 838 | Monroe County | Pennsylvania | Unliquidated Claim |
| 839 | Newton Township | Pennsylvania | Unliquidated Claim |
| 840 | Norristown Borough | Pennsylvania | Unliquidated Claim |
| 841 | Sheet Metal Workers Local 19 | Pennsylvania | Unliquidated Claim |
| 842 | The Schumacher Group of Pennsylvania, Inc. | Pennsylvania | Unliquidated Claim |
| 843 | Warminster Township | Pennsylvania | Unliquidated Claim |
| 844 | Warrington Township | Pennsylvania | Unliquidated Claim |
| 845 | Washington County | Pennsylvania | Unliquidated Claim |
| 846 | West Norriton County | Pennsylvania | Unliquidated Claim |
| 847 | Westmoreland County | Pennsylvania | Unliquidated Claim |
| 848 | Municipality of Canóvanas | Puerto Rico | Unliquidated Claim |
| 849 | Municipality of Juncos | Puerto Rico | Unliquidated Claim |
| 850 | Municipality of Rio Grande | Puerto Rico | Unliquidated Claim |
| 851 | Municipality of Vega Alta | Puerto Rico | Unliquidated Claim |
| 852 | Municipality of Yabucoa | Puerto Rico | Unliquidated Claim |
| 853 | Abbeville County | South Carolina | Unliquidated Claim |
| 854 | Aiken County | South Carolina | Unliquidated Claim |
| 855 | Allendale County | South Carolina | Unliquidated Claim |
| 856 | Anderson County | South Carolina | Unliquidated Claim |

A-2906

|     | Party | State | Economic Interest |
| --- | --- | --- | --- |
| 857 | Bamberg County | South Carolina | Unliquidated Claim |
| 858 | Barnwell County | South Carolina | Unliquidated Claim |
| 859 | Beaufort County | South Carolina | Unliquidated Claim |
| 860 | Calhoun County | South Carolina | Unliquidated Claim |
| 861 | Cherokee County | South Carolina | Unliquidated Claim |
| 862 | Chester County | South Carolina | Unliquidated Claim |
| 863 | Chesterfield County | South Carolina | Unliquidated Claim |
| 864 | City of Myrtle Beach | South Carolina | Unliquidated Claim |
| 865 | Clarendon County | South Carolina | Unliquidated Claim |
| 866 | Colleton County | South Carolina | Unliquidated Claim |
| 867 | Dillon County | South Carolina | Unliquidated Claim |
| 868 | Dorchester County | South Carolina | Unliquidated Claim |
| 869 | Edgefield County | South Carolina | Unliquidated Claim |
| 870 | Fairfield County | South Carolina | Unliquidated Claim |
| 871 | Florence County | South Carolina | Unliquidated Claim |
| 872 | Greenville County | South Carolina | Unliquidated Claim |
| 873 | Greenwood County | South Carolina | Unliquidated Claim |
| 874 | Hampton County | South Carolina | Unliquidated Claim |
| 875 | Horry County | South Carolina | Unliquidated Claim |
| 876 | Jasper County | South Carolina | Unliquidated Claim |
| 877 | Kershaw County | South Carolina | Unliquidated Claim |
| 878 | Kershaw County Hospital Board a/k/a Kershaw Health d/b/a Health Service District of Kershaw County | South Carolina | Unliquidated Claim |
| 879 | Lancaster County | South Carolina | Unliquidated Claim |
| 880 | Laurens County | South Carolina | Unliquidated Claim |
| 881 | Lee County | South Carolina | Unliquidated Claim |
| 882 | Lexington County | South Carolina | Unliquidated Claim |
| 883 | Marion County | South Carolina | Unliquidated Claim |
| 884 | Marlboro County | South Carolina | Unliquidated Claim |
| 885 | McCormick County | South Carolina | Unliquidated Claim |
| 886 | Newberry County | South Carolina | Unliquidated Claim |
| 887 | Oconee County | South Carolina | Unliquidated Claim |
| 888 | Orangeburg County | South Carolina | Unliquidated Claim |
| 889 | Pickens County | South Carolina | Unliquidated Claim |
| 890 | Saluda County | South Carolina | Unliquidated Claim |
| 891 | Spartanburg County | South Carolina | Unliquidated Claim |
| 892 | Sumter County | South Carolina | Unliquidated Claim |
| 893 | The Schumacher Group of South Carolina, Inc. | South Carolina | Unliquidated Claim |

A-2907

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 894 | Union County | South Carolina | Unliquidated Claim |
| 895 | Williamsburg County | South Carolina | Unliquidated Claim |
| 896 | York County | South Carolina | Unliquidated Claim |
| 897 | Anderson County[*] | Tennessee | Unliquidated Claim |
| 898 | Bedford County[*] | Tennessee | Unliquidated Claim |
| 899 | Bledsoe County[*] | Tennessee | Unliquidated Claim |
| 900 | Bradley County[*] | Tennessee | Unliquidated Claim |
| 901 | Campbell County[*] | Tennessee | Unliquidated Claim |
| 902 | Cannon County[*] | Tennessee | Unliquidated Claim |
| 903 | Carter County[*] | Tennessee | Unliquidated Claim |
| 904 | City of Algood[*] | Tennessee | Unliquidated Claim |
| 905 | City of Allardt[*] | Tennessee | Unliquidated Claim |
| 906 | City of Ardmore[*] | Tennessee | Unliquidated Claim |
| 907 | City of Athens[*] | Tennessee | Unliquidated Claim |
| 908 | City of Baneberry[*] | Tennessee | Unliquidated Claim |
| 909 | City of Bean Station[*] | Tennessee | Unliquidated Claim |
| 910 | City of Bluff[*] | Tennessee | Unliquidated Claim |
| 911 | City of Bristol[*] | Tennessee | Unliquidated Claim |
| 912 | City of Celine[*] | Tennessee | Unliquidated Claim |
| 913 | City of Charleston[*] | Tennessee | Unliquidated Claim |
| 914 | City of Church Hill[*] | Tennessee | Unliquidated Claim |
| 915 | City of Cleveland[*] | Tennessee | Unliquidated Claim |
| 916 | City of Clifton[*] | Tennessee | Unliquidated Claim |
| 917 | City of Clinton[*] | Tennessee | Unliquidated Claim |
| 918 | City of Coalmont[*] | Tennessee | Unliquidated Claim |
| 919 | City of Collinwood[*] | Tennessee | Unliquidated Claim |
| 920 | City of Columbia[*] | Tennessee | Unliquidated Claim |
| 921 | City of Cookeville[*] | Tennessee | Unliquidated Claim |
| 922 | City of Copperhill[*] | Tennessee | Unliquidated Claim |
| 923 | City of Cowan[*] | Tennessee | Unliquidated Claim |
| 924 | City of Crab Orchard[*] | Tennessee | Unliquidated Claim |
| 925 | City of Crossville[*] | Tennessee | Unliquidated Claim |
| 926 | City of Dayton[*] | Tennessee | Unliquidated Claim |
| 927 | City of Decherd[*] | Tennessee | Unliquidated Claim |

---

[*]    The Tennessee officials and municipalities included in this disclosure participate with the MSGE Group only with respect to their claims against the Debtors arising under the Tennessee Drug Dealer Liability Act, Tenn. Code Ann. Sec. 9-38-101 *et seq.*, and no other causes of action.

A-2908

|     | Party | State | Economic Interest |
|-----|-------|-------|-------------------|
| 928 | City of Ducktown* | Tennessee | Unliquidated Claim |
| 929 | City of Dunlap* | Tennessee | Unliquidated Claim |
| 930 | City of Eagleville* | Tennessee | Unliquidated Claim |
| 931 | City of Elizabethton* | Tennessee | Unliquidated Claim |
| 932 | City of Elkton* | Tennessee | Unliquidated Claim |
| 933 | City of Etowah* | Tennessee | Unliquidated Claim |
| 934 | City of Fayettville* | Tennessee | Unliquidated Claim |
| 935 | City of Gatlinburg* | Tennessee | Unliquidated Claim |
| 936 | City of Greenback* | Tennessee | Unliquidated Claim |
| 937 | City of Gruetli-Laager* | Tennessee | Unliquidated Claim |
| 938 | City of Harriman* | Tennessee | Unliquidated Claim |
| 939 | City of Harrogate* | Tennessee | Unliquidated Claim |
| 940 | City of Iron City* | Tennessee | Unliquidated Claim |
| 941 | City of Jamestown* | Tennessee | Unliquidated Claim |
| 942 | City of Jefferson City* | Tennessee | Unliquidated Claim |
| 943 | City of Jellico* | Tennessee | Unliquidated Claim |
| 944 | City of Johnson City* | Tennessee | Unliquidated Claim |
| 945 | City of Kingsport* | Tennessee | Unliquidated Claim |
| 946 | City of Kingston* | Tennessee | Unliquidated Claim |
| 947 | City of Knoxville* | Tennessee | Unliquidated Claim |
| 948 | City of La Vergne* | Tennessee | Unliquidated Claim |
| 949 | City of LaFollette* | Tennessee | Unliquidated Claim |
| 950 | City of Lawrenceburg* | Tennessee | Unliquidated Claim |
| 951 | City of Lenoir City* | Tennessee | Unliquidated Claim |
| 952 | City of Lewisburg* | Tennessee | Unliquidated Claim |
| 953 | City of Loretto* | Tennessee | Unliquidated Claim |
| 954 | City of Luttrell* | Tennessee | Unliquidated Claim |
| 955 | City of Lynchburg* | Tennessee | Unliquidated Claim |
| 956 | City of Madisonville* | Tennessee | Unliquidated Claim |
| 957 | City of Maynardville* | Tennessee | Unliquidated Claim |
| 958 | City of McMinnville* | Tennessee | Unliquidated Claim |
| 959 | City of Minor Hill* | Tennessee | Unliquidated Claim |
| 960 | City of Morristown* | Tennessee | Unliquidated Claim |
| 961 | City of Mount Pleasant* | Tennessee | Unliquidated Claim |
| 962 | City of Mountain City* | Tennessee | Unliquidated Claim |

---

* The Tennessee officials and municipalities included in this disclosure participate with the MSGE Group only with respect to their claims against the Debtors arising under the Tennessee Drug Dealer Liability Act, Tenn. Code Ann. Sec. 9-38-101 *et seq.*, and no other causes of action.

A-2909

| | Party | State | Economic Interest |
|---|---|---|---|
| 963 | City of Murfreesboro[*] | Tennessee | Unliquidated Claim |
| 964 | City of New Hope[*] | Tennessee | Unliquidated Claim |
| 965 | City of Newport[*] | Tennessee | Unliquidated Claim |
| 966 | City of Niota[*] | Tennessee | Unliquidated Claim |
| 967 | City of Norris[*] | Tennessee | Unliquidated Claim |
| 968 | City of Oak Ridge[*] | Tennessee | Unliquidated Claim |
| 969 | City of Philadelphia[*] | Tennessee | Unliquidated Claim |
| 970 | City of Pigeon Forge[*] | Tennessee | Unliquidated Claim |
| 971 | City of Pikeville[*] | Tennessee | Unliquidated Claim |
| 972 | City of Plainview[*] | Tennessee | Unliquidated Claim |
| 973 | City of Pulaski[*] | Tennessee | Unliquidated Claim |
| 974 | City of Rockwood[*] | Tennessee | Unliquidated Claim |
| 975 | City of Rocky Top[*] | Tennessee | Unliquidated Claim |
| 976 | City of Sevierville[*] | Tennessee | Unliquidated Claim |
| 977 | City of Shelbyville[*] | Tennessee | Unliquidated Claim |
| 978 | City of Smithville[*] | Tennessee | Unliquidated Claim |
| 979 | City of South Pittsburg[*] | Tennessee | Unliquidated Claim |
| 980 | City of Sparta[*] | Tennessee | Unliquidated Claim |
| 981 | City of Spring Hill[*] | Tennessee | Unliquidated Claim |
| 982 | City of St. Joseph[*] | Tennessee | Unliquidated Claim |
| 983 | City of Sunbright[*] | Tennessee | Unliquidated Claim |
| 984 | City of Sweetwater[*] | Tennessee | Unliquidated Claim |
| 985 | City of Tullahoma[*] | Tennessee | Unliquidated Claim |
| 986 | City of Tusculum[*] | Tennessee | Unliquidated Claim |
| 987 | City of Wartburg[*] | Tennessee | Unliquidated Claim |
| 988 | City of Watauga[*] | Tennessee | Unliquidated Claim |
| 989 | City of Waynesboro[*] | Tennessee | Unliquidated Claim |
| 990 | City of Whitwell[*] | Tennessee | Unliquidated Claim |
| 991 | City of Winchester[*] | Tennessee | Unliquidated Claim |
| 992 | Clay County[*] | Tennessee | Unliquidated Claim |
| 993 | Cocke County[*] | Tennessee | Unliquidated Claim |
| 994 | County of Clairborne[*] | Tennessee | Unliquidated Claim |
| 995 | Cumberland County[*] | Tennessee | Unliquidated Claim |
| 996 | Dekalb County[*] | Tennessee | Unliquidated Claim |

---

[*]     The Tennessee officials and municipalities included in this disclosure participate with the MSGE Group only with respect to their claims against the Debtors arising under the Tennessee Drug Dealer Liability Act, Tenn. Code Ann. Sec. 9-38-101 *et seq.*, and no other causes of action.

A-2910

|      | Party | State | Economic Interest |
|------|-------|-------|-------------------|
| 997  | District Attorney General Barry Staubus for the 2d Judicial District[*] | Tennessee | Unliquidated Claim |
| 998  | District Attorney General Brent A. Cooper for the 22d Judicial District[*] | Tennessee | Unliquidated Claim |
| 999  | District Attorney General Bryant C. Dunaway for the 13th Judicial District[*] | Tennessee | Unliquidated Claim |
| 1000 | District Attorney General Charme Allen for the 6th Judicial District[*] | Tennessee | Unliquidated Claim |
| 1001 | District Attorney General Dan Armstrong for the 3d Judicial District[*] | Tennessee | Unliquidated Claim |
| 1002 | District Attorney General Dave Clark for the 7th Judicial District[*] | Tennessee | Unliquidated Claim |
| 1003 | District Attorney General Jared Effler for the 8th Judicial District[*] | Tennessee | Unliquidated Claim |
| 1004 | District Attorney General Jennings H. Jones for the 16th Judicial District[*] | Tennessee | Unliquidated Claim |
| 1005 | District Attorney General Jimmy Dunn for the 4th Judicial District[*] | Tennessee | Unliquidated Claim |
| 1006 | District Attorney General Lisa S. Zavogiannis for the 31st Judicial District[*] | Tennessee | Unliquidated Claim |
| 1007 | District Attorney General Mike Taylor for the 12th Judicial District[*] | Tennessee | Unliquidated Claim |
| 1008 | District Attorney General Robert J. Carter for the 17th Judicial District[*] | Tennessee | Unliquidated Claim |
| 1009 | District Attorney General Russell Johnson for the 9th Judicial District[*] | Tennessee | Unliquidated Claim |
| 1010 | District Attorney General Stephen Crump for the 10th Judicial District[*] | Tennessee | Unliquidated Claim |
| 1011 | District Attorney General Tony Clark for the 1st Judicial District[*] | Tennessee | Unliquidated Claim |
| 1012 | Fentress County[*] | Tennessee | Unliquidated Claim |
| 1013 | Franklin County[*] | Tennessee | Unliquidated Claim |
| 1014 | Giles County[*] | Tennessee | Unliquidated Claim |
| 1015 | Grainger County[*] | Tennessee | Unliquidated Claim |
| 1016 | Greene County[*] | Tennessee | Unliquidated Claim |
| 1017 | Grundy County[*] | Tennessee | Unliquidated Claim |

---

[*] The Tennessee officials and municipalities included in this disclosure participate with the MSGE Group only with respect to their claims against the Debtors arising under the Tennessee Drug Dealer Liability Act, Tenn. Code Ann. Sec. 9-38-101 *et seq.*, and no other causes of action.

A-2911

|      | Party                                         | State     | Economic Interest   |
|------|-----------------------------------------------|-----------|---------------------|
| 1018 | Hamblen County[*]                             | Tennessee | Unliquidated Claim  |
| 1019 | Hancock County[*]                             | Tennessee | Unliquidated Claim  |
| 1020 | Hawking County[*]                             | Tennessee | Unliquidated Claim  |
| 1021 | Hawkins County[*]                             | Tennessee | Unliquidated Claim  |
| 1022 | Jefferson County[*]                           | Tennessee | Unliquidated Claim  |
| 1023 | Johnson County[*]                             | Tennessee | Unliquidated Claim  |
| 1024 | Knox County[*]                                | Tennessee | Unliquidated Claim  |
| 1025 | Laurence County[*]                            | Tennessee | Unliquidated Claim  |
| 1026 | Lincoln County[*]                             | Tennessee | Unliquidated Claim  |
| 1027 | Loudon County[*]                              | Tennessee | Unliquidated Claim  |
| 1028 | Marion County[*]                              | Tennessee | Unliquidated Claim  |
| 1029 | Marshall County[*]                            | Tennessee | Unliquidated Claim  |
| 1030 | Maury County[*]                               | Tennessee | Unliquidated Claim  |
| 1031 | McMinn County[*]                              | Tennessee | Unliquidated Claim  |
| 1032 | Meigs County[*]                               | Tennessee | Unliquidated Claim  |
| 1033 | Monroe County[*]                              | Tennessee | Unliquidated Claim  |
| 1034 | Moore County[*]                               | Tennessee | Unliquidated Claim  |
| 1035 | Morgan County[*]                              | Tennessee | Unliquidated Claim  |
| 1036 | Overton County[*]                             | Tennessee | Unliquidated Claim  |
| 1037 | Patients' Choice Medical Center of Erin, TN   | Tennessee | Unliquidated Claim  |
| 1038 | Picket County[*]                              | Tennessee | Unliquidated Claim  |
| 1039 | Polk County[*]                                | Tennessee | Unliquidated Claim  |
| 1040 | Putnam County[*]                              | Tennessee | Unliquidated Claim  |
| 1041 | Rhea County[*]                                | Tennessee | Unliquidated Claim  |
| 1042 | Roane County[*]                               | Tennessee | Unliquidated Claim  |
| 1043 | Rutherford County[*]                          | Tennessee | Unliquidated Claim  |
| 1044 | Scott County[*]                               | Tennessee | Unliquidated Claim  |
| 1045 | Sequatchie County[*]                          | Tennessee | Unliquidated Claim  |
| 1046 | Sevier County[*]                              | Tennessee | Unliquidated Claim  |
| 1047 | Sullivan County[*]                            | Tennessee | Unliquidated Claim  |
| 1048 | The Schumacher Group of Tennessee, Inc.       | Tennessee | Unliquidated Claim  |
| 1049 | Town of Alexandria[*]                         | Tennessee | Unliquidated Claim  |
| 1050 | Town of Altamont[*]                           | Tennessee | Unliquidated Claim  |
| 1051 | Town of Auburntown[*]                         | Tennessee | Unliquidated Claim  |
| 1052 | Town of Baileyton[*]                          | Tennessee | Unliquidated Claim  |

[*]    The Tennessee officials and municipalities included in this disclosure participate with the MSGE Group only with respect to their claims against the Debtors arising under the Tennessee Drug Dealer Liability Act, Tenn. Code Ann. Sec. 9-38-101 *et seq.*, and no other causes of action.

A-2912

|  | Party | State | Economic Interest |
|---|---|---|---|
| 1053 | Town of Baxter* | Tennessee | Unliquidated Claim |
| 1054 | Town of Beersheba Springs* | Tennessee | Unliquidated Claim |
| 1055 | Town of Bell Buckle* | Tennessee | Unliquidated Claim |
| 1056 | Town of Benton* | Tennessee | Unliquidated Claim |
| 1057 | Town of Blaine* | Tennessee | Unliquidated Claim |
| 1058 | Town of Bulls Gap* | Tennessee | Unliquidated Claim |
| 1059 | Town of Byrdstown* | Tennessee | Unliquidated Claim |
| 1060 | Town of Calhoun* | Tennessee | Unliquidated Claim |
| 1061 | Town of Caryville* | Tennessee | Unliquidated Claim |
| 1062 | Town of Centertown* | Tennessee | Unliquidated Claim |
| 1063 | Town of Chapel Hill* | Tennessee | Unliquidated Claim |
| 1064 | Town of Cornersville* | Tennessee | Unliquidated Claim |
| 1065 | Town of Cumberland Gap* | Tennessee | Unliquidated Claim |
| 1066 | Town of Dandrige* | Tennessee | Unliquidated Claim |
| 1067 | Town of Decatur* | Tennessee | Unliquidated Claim |
| 1068 | Town of Dowelltown* | Tennessee | Unliquidated Claim |
| 1069 | Town of Doyle* | Tennessee | Unliquidated Claim |
| 1070 | Town of Englewood* | Tennessee | Unliquidated Claim |
| 1071 | Town of Erwin* | Tennessee | Unliquidated Claim |
| 1072 | Town of Estill Springs* | Tennessee | Unliquidated Claim |
| 1073 | Town of Ethridge* | Tennessee | Unliquidated Claim |
| 1074 | Town of Farragut* | Tennessee | Unliquidated Claim |
| 1075 | Town of Graysville* | Tennessee | Unliquidated Claim |
| 1076 | Town of Greenville* | Tennessee | Unliquidated Claim |
| 1077 | Town of Huntland* | Tennessee | Unliquidated Claim |
| 1078 | Town of Huntsville* | Tennessee | Unliquidated Claim |
| 1079 | Town of Jacksboro* | Tennessee | Unliquidated Claim |
| 1080 | Town of Jasper* | Tennessee | Unliquidated Claim |
| 1081 | Town of Jonesborough* | Tennessee | Unliquidated Claim |
| 1082 | Town of Kimball* | Tennessee | Unliquidated Claim |
| 1083 | Town of Liberty* | Tennessee | Unliquidated Claim |
| 1084 | Town of Livingston* | Tennessee | Unliquidated Claim |
| 1085 | Town of Loudon* | Tennessee | Unliquidated Claim |
| 1086 | Town of Lynnville* | Tennessee | Unliquidated Claim |
| 1087 | Town of Monteagle* | Tennessee | Unliquidated Claim |

* The Tennessee officials and municipalities included in this disclosure participate with the MSGE Group only with respect to their claims against the Debtors arising under the Tennessee Drug Dealer Liability Act, Tenn. Code Ann. Sec. 9-38-101 *et seq.*, and no other causes of action.

A-2913

|      | Party | State | Economic Interest |
|------|-------|-------|-------------------|
| 1088 | Town of Monterey[*] | Tennessee | Unliquidated Claim |
| 1089 | Town of Morrison[*] | Tennessee | Unliquidated Claim |
| 1090 | Town of Mosheim[*] | Tennessee | Unliquidated Claim |
| 1091 | Town of Mount Carmel[*] | Tennessee | Unliquidated Claim |
| 1092 | Town of New Market[*] | Tennessee | Unliquidated Claim |
| 1093 | Town of New Tazewell[*] | Tennessee | Unliquidated Claim |
| 1094 | Town of Normandy[*] | Tennessee | Unliquidated Claim |
| 1095 | Town of Oakdale[*] | Tennessee | Unliquidated Claim |
| 1096 | Town of Oliver Springs[*] | Tennessee | Unliquidated Claim |
| 1097 | Town of Oneida[*] | Tennessee | Unliquidated Claim |
| 1098 | Town of Orme[*] | Tennessee | Unliquidated Claim |
| 1099 | Town of Palmer[*] | Tennessee | Unliquidated Claim |
| 1100 | Town of Parrottsville[*] | Tennessee | Unliquidated Claim |
| 1101 | Town of Petersburg[*] | Tennessee | Unliquidated Claim |
| 1102 | Town of Pittman Center[*] | Tennessee | Unliquidated Claim |
| 1103 | Town of Pleasant Hill[*] | Tennessee | Unliquidated Claim |
| 1104 | Town of Powells Crossroads[*] | Tennessee | Unliquidated Claim |
| 1105 | Town of Rogersville[*] | Tennessee | Unliquidated Claim |
| 1106 | Town of Rutlege[*] | Tennessee | Unliquidated Claim |
| 1107 | Town of Smyrna[*] | Tennessee | Unliquidated Claim |
| 1108 | Town of Sneedville[*] | Tennessee | Unliquidated Claim |
| 1109 | Town of Spencer[*] | Tennessee | Unliquidated Claim |
| 1110 | Town of Spring City[*] | Tennessee | Unliquidated Claim |
| 1111 | Town of Surgoinsville[*] | Tennessee | Unliquidated Claim |
| 1112 | Town of Tazewell[*] | Tennessee | Unliquidated Claim |
| 1113 | Town of Tellico Plains[*] | Tennessee | Unliquidated Claim |
| 1114 | Town of Tracy City[*] | Tennessee | Unliquidated Claim |
| 1115 | Town of Unicoi[*] | Tennessee | Unliquidated Claim |
| 1116 | Town of Viola[*] | Tennessee | Unliquidated Claim |
| 1117 | Town of Vonroe[*] | Tennessee | Unliquidated Claim |
| 1118 | Town of Wartrace[*] | Tennessee | Unliquidated Claim |
| 1119 | Town of White Pine[*] | Tennessee | Unliquidated Claim |
| 1120 | Town of Winfield[*] | Tennessee | Unliquidated Claim |
| 1121 | Town of Woodbury[*] | Tennessee | Unliquidated Claim |
| 1122 | Unicoi County[*] | Tennessee | Unliquidated Claim |

---

[*]     The Tennessee officials and municipalities included in this disclosure participate with the MSGE Group only with respect to their claims against the Debtors arising under the Tennessee Drug Dealer Liability Act, Tenn. Code Ann. Sec. 9-38-101 *et seq.*, and no other causes of action.

A-2914

|      | Party                                     | State     | Economic Interest   |
|------|-------------------------------------------|-----------|---------------------|
| 1123 | Union County*                             | Tennessee | Unliquidated Claim  |
| 1124 | Van Buren County*                         | Tennessee | Unliquidated Claim  |
| 1125 | Warren County*                            | Tennessee | Unliquidated Claim  |
| 1126 | Washington County*                        | Tennessee | Unliquidated Claim  |
| 1127 | Wayne County*                             | Tennessee | Unliquidated Claim  |
| 1128 | White County*                             | Tennessee | Unliquidated Claim  |
| 1129 | Alief Independent School District         | Texas     | Unliquidated Claim  |
| 1130 | Angelina County                           | Texas     | Unliquidated Claim  |
| 1131 | Bailey County                             | Texas     | Unliquidated Claim  |
| 1132 | Bee County                                | Texas     | Unliquidated Claim  |
| 1133 | Bexar County                              | Texas     | Unliquidated Claim  |
| 1134 | Bexar County Hospital District d/b/a UHS  | Texas     | Unliquidated Claim  |
| 1135 | Bibb County School District               | Texas     | Unliquidated Claim  |
| 1136 | Blanco County                             | Texas     | Unliquidated Claim  |
| 1137 | Bowie County                              | Texas     | Unliquidated Claim  |
| 1138 | Brazos County                             | Texas     | Unliquidated Claim  |
| 1139 | Burleson County                           | Texas     | Unliquidated Claim  |
| 1140 | Burleson County Hospital District         | Texas     | Unliquidated Claim  |
| 1141 | Burnet County                             | Texas     | Unliquidated Claim  |
| 1142 | Cameron County                            | Texas     | Unliquidated Claim  |
| 1143 | Camp County                               | Texas     | Unliquidated Claim  |
| 1144 | Cass County                               | Texas     | Unliquidated Claim  |
| 1145 | Castro County                             | Texas     | Unliquidated Claim  |
| 1146 | Chambers County                           | Texas     | Unliquidated Claim  |
| 1147 | Cherokee County                           | Texas     | Unliquidated Claim  |
| 1148 | City of Houston                           | Texas     | Unliquidated Claim  |
| 1149 | Colorado County                           | Texas     | Unliquidated Claim  |
| 1150 | Cooke County                              | Texas     | Unliquidated Claim  |
| 1151 | Coryell County                            | Texas     | Unliquidated Claim  |
| 1152 | Dallas Community College District         | Texas     | Unliquidated Claim  |
| 1153 | Dallas County                             | Texas     | Unliquidated Claim  |
| 1154 | Dallas Independent School District        | Texas     | Unliquidated Claim  |
| 1155 | Delta County                              | Texas     | Unliquidated Claim  |
| 1156 | Dimmit County                             | Texas     | Unliquidated Claim  |
| 1157 | Downey Unified School District            | Texas     | Unliquidated Claim  |

---

\*      The Tennessee officials and municipalities included in this disclosure participate with the MSGE Group only with respect to their claims against the Debtors arising under the Tennessee Drug Dealer Liability Act, Tenn. Code Ann. Sec. 9-38-101 *et seq.*, and no other causes of action.

A-2915

|      | Party                                  | State | Economic Interest   |
|------|----------------------------------------|-------|---------------------|
| 1158 | Duval County                           | Texas | Unliquidated Claim  |
| 1159 | Ector County                           | Texas | Unliquidated Claim  |
| 1160 | El Paso County                         | Texas | Unliquidated Claim  |
| 1161 | Elk Grove Independent School District  | Texas | Unliquidated Claim  |
| 1162 | Ellis County                           | Texas | Unliquidated Claim  |
| 1163 | Falls County                           | Texas | Unliquidated Claim  |
| 1164 | Fannin County                          | Texas | Unliquidated Claim  |
| 1165 | Fort Bend County                       | Texas | Unliquidated Claim  |
| 1166 | Franklin County                        | Texas | Unliquidated Claim  |
| 1167 | Freestone County                       | Texas | Unliquidated Claim  |
| 1168 | Galveston County                       | Texas | Unliquidated Claim  |
| 1169 | Garland Independent School District     | Texas | Unliquidated Claim  |
| 1170 | Grayson County                         | Texas | Unliquidated Claim  |
| 1171 | Hardin County                          | Texas | Unliquidated Claim  |
| 1172 | Harris County                          | Texas | Unliquidated Claim  |
| 1173 | Harris Health System                   | Texas | Unliquidated Claim  |
| 1174 | Harrison County                        | Texas | Unliquidated Claim  |
| 1175 | Henderson County                       | Texas | Unliquidated Claim  |
| 1176 | Hidalgo County                         | Texas | Unliquidated Claim  |
| 1177 | Hopkins County                         | Texas | Unliquidated Claim  |
| 1178 | Houston County                         | Texas | Unliquidated Claim  |
| 1179 | Houston Independent School District     | Texas | Unliquidated Claim  |
| 1180 | Irving Independent School District      | Texas | Unliquidated Claim  |
| 1181 | Jasper County                          | Texas | Unliquidated Claim  |
| 1182 | Jefferson County                       | Texas | Unliquidated Claim  |
| 1183 | Jim Hogg County                        | Texas | Unliquidated Claim  |
| 1184 | Jim Wells County                       | Texas | Unliquidated Claim  |
| 1185 | Johnson County                         | Texas | Unliquidated Claim  |
| 1186 | Kaufman County                         | Texas | Unliquidated Claim  |
| 1187 | Kendall County                         | Texas | Unliquidated Claim  |
| 1188 | Kern High School District              | Texas | Unliquidated Claim  |
| 1189 | Kerr County                            | Texas | Unliquidated Claim  |
| 1190 | Kleberg County                         | Texas | Unliquidated Claim  |
| 1191 | Lamar County                           | Texas | Unliquidated Claim  |
| 1192 | Leon County                            | Texas | Unliquidated Claim  |
| 1193 | Liberty County                         | Texas | Unliquidated Claim  |
| 1194 | Limestone County                       | Texas | Unliquidated Claim  |
| 1195 | Madison County                         | Texas | Unliquidated Claim  |

A-2916

|      | Party | State | Economic Interest |
|------|-------|-------|-------------------|
| 1196 | Marion County | Texas | Unliquidated Claim |
| 1197 | McMullen County | Texas | Unliquidated Claim |
| 1198 | Mesa County Valley School District 51 | Texas | Unliquidated Claim |
| 1199 | Milam County | Texas | Unliquidated Claim |
| 1200 | Morris County | Texas | Unliquidated Claim |
| 1201 | Nacogdoches County | Texas | Unliquidated Claim |
| 1202 | Newton County | Texas | Unliquidated Claim |
| 1203 | Nueces County | Texas | Unliquidated Claim |
| 1204 | Nueces County Hospital District | Texas | Unliquidated Claim |
| 1205 | Orange County | Texas | Unliquidated Claim |
| 1206 | Panola County | Texas | Unliquidated Claim |
| 1207 | Parker County | Texas | Unliquidated Claim |
| 1208 | Potter County | Texas | Unliquidated Claim |
| 1209 | Red River County | Texas | Unliquidated Claim |
| 1210 | Richardson Independent School District | Texas | Unliquidated Claim |
| 1211 | Roberts County | Texas | Unliquidated Claim |
| 1212 | Robertson County | Texas | Unliquidated Claim |
| 1213 | Rockwall County | Texas | Unliquidated Claim |
| 1214 | Rusk County | Texas | Unliquidated Claim |
| 1215 | San Antonio Police & Fireman's Union | Texas | Unliquidated Claim |
| 1216 | San Saba County | Texas | Unliquidated Claim |
| 1217 | Shackelford County | Texas | Unliquidated Claim |
| 1218 | Shelby County | Texas | Unliquidated Claim |
| 1219 | Smith County | Texas | Unliquidated Claim |
| 1220 | Socorro Independent School District | Texas | Unliquidated Claim |
| 1221 | South Bend Community School Corporation | Texas | Unliquidated Claim |
| 1222 | Stephens County | Texas | Unliquidated Claim |
| 1223 | Tarrant County | Texas | Unliquidated Claim |
| 1224 | Tarrant County Hospital District | Texas | Unliquidated Claim |
| 1225 | Terrell County | Texas | Unliquidated Claim |
| 1226 | Texarkana Independent School District | Texas | Unliquidated Claim |
| 1227 | The Schumacher Group of Texas, Inc. | Texas | Unliquidated Claim |
| 1228 | Titus County | Texas | Unliquidated Claim |
| 1229 | Travis County | Texas | Unliquidated Claim |
| 1230 | Trinity County | Texas | Unliquidated Claim |
| 1231 | Upshur County | Texas | Unliquidated Claim |
| 1232 | Van Zandt County | Texas | Unliquidated Claim |
| 1233 | Waller County | Texas | Unliquidated Claim |

A-2917

|      | Party | State | Economic Interest |
|------|-------|-------|-------------------|
| 1234 | Waukegan Community Unit School District 60 | Texas | Unliquidated Claim |
| 1235 | Webb County | Texas | Unliquidated Claim |
| 1236 | Williamson County | Texas | Unliquidated Claim |
| 1237 | Wood County | Texas | Unliquidated Claim |
| 1238 | Town of Bennington | Vermont | Unliquidated Claim |
| 1239 | Town of Brattleboro | Vermont | Unliquidated Claim |
| 1240 | Town of Sharon | Vermont | Unliquidated Claim |
| 1241 | Accomack County | Virginia | Unliquidated Claim |
| 1242 | Alleghany County | Virginia | Unliquidated Claim |
| 1243 | Amherst County | Virginia | Unliquidated Claim |
| 1244 | Arlington County | Virginia | Unliquidated Claim |
| 1245 | Botetourt County | Virginia | Unliquidated Claim |
| 1246 | Charlotte County | Virginia | Unliquidated Claim |
| 1247 | Chesterfield County | Virginia | Unliquidated Claim |
| 1248 | City of Alexandria | Virginia | Unliquidated Claim |
| 1249 | City of Bristol | Virginia | Unliquidated Claim |
| 1250 | City of Buena Vista | Virginia | Unliquidated Claim |
| 1251 | City of Chesapeake | Virginia | Unliquidated Claim |
| 1252 | City of Covington | Virginia | Unliquidated Claim |
| 1253 | City of Emporia | Virginia | Unliquidated Claim |
| 1254 | City of Fairfax | Virginia | Unliquidated Claim |
| 1255 | City of Fredericksburg | Virginia | Unliquidated Claim |
| 1256 | City of Galax | Virginia | Unliquidated Claim |
| 1257 | City of Lexington | Virginia | Unliquidated Claim |
| 1258 | City of Martinsville | Virginia | Unliquidated Claim |
| 1259 | City of Norton | Virginia | Unliquidated Claim |
| 1260 | City of Poquoson | Virginia | Unliquidated Claim |
| 1261 | City of Portsmouth | Virginia | Unliquidated Claim |
| 1262 | City of Radford | Virginia | Unliquidated Claim |
| 1263 | City of Roanoke | Virginia | Unliquidated Claim |
| 1264 | City of Salem | Virginia | Unliquidated Claim |
| 1265 | City of Waynesboro | Virginia | Unliquidated Claim |
| 1266 | City of Winchester | Virginia | Unliquidated Claim |
| 1267 | Culpeper County | Virginia | Unliquidated Claim |
| 1268 | Cumberland County | Virginia | Unliquidated Claim |
| 1269 | Dickenson County | Virginia | Unliquidated Claim |
| 1270 | Dinwiddie County | Virginia | Unliquidated Claim |
| 1271 | Fairfax County | Virginia | Unliquidated Claim |

A-2918

|      | Party | State | Economic Interest |
|------|-------|-------|-------------------|
| 1272 | Fauquier County | Virginia | Unliquidated Claim |
| 1273 | Floyd County | Virginia | Unliquidated Claim |
| 1274 | Franklin County | Virginia | Unliquidated Claim |
| 1275 | Frederick County | Virginia | Unliquidated Claim |
| 1276 | Giles County | Virginia | Unliquidated Claim |
| 1277 | Goochland County | Virginia | Unliquidated Claim |
| 1278 | Greensville County | Virginia | Unliquidated Claim |
| 1279 | Halifax County | Virginia | Unliquidated Claim |
| 1280 | Henrico County | Virginia | Unliquidated Claim |
| 1281 | Henry County | Virginia | Unliquidated Claim |
| 1282 | Isle of Wight County | Virginia | Unliquidated Claim |
| 1283 | King and Queen County | Virginia | Unliquidated Claim |
| 1284 | Lancaster County | Virginia | Unliquidated Claim |
| 1285 | Lee County | Virginia | Unliquidated Claim |
| 1286 | Loudoun County | Virginia | Unliquidated Claim |
| 1287 | Louisa County | Virginia | Unliquidated Claim |
| 1288 | Madison County | Virginia | Unliquidated Claim |
| 1289 | Mecklenburg County | Virginia | Unliquidated Claim |
| 1290 | Montgomery County | Virginia | Unliquidated Claim |
| 1291 | Northampton County | Virginia | Unliquidated Claim |
| 1292 | Northumberland County | Virginia | Unliquidated Claim |
| 1293 | Page County | Virginia | Unliquidated Claim |
| 1294 | Patrick County | Virginia | Unliquidated Claim |
| 1295 | Pittsylvania County | Virginia | Unliquidated Claim |
| 1296 | Prince George County | Virginia | Unliquidated Claim |
| 1297 | Prince William County | Virginia | Unliquidated Claim |
| 1298 | Roanoke County | Virginia | Unliquidated Claim |
| 1299 | Rockbridge County | Virginia | Unliquidated Claim |
| 1300 | Shenandoah County | Virginia | Unliquidated Claim |
| 1301 | Stafford County | Virginia | Unliquidated Claim |
| 1302 | The Schumacher Group of Virginia, Inc. | Virginia | Unliquidated Claim |
| 1303 | Washington County | Virginia | Unliquidated Claim |
| 1304 | The Schumacher Group of Washington, Inc. | Washington | Unliquidated Claim |
| 1305 | City of Elizabeth | West Virginia | Unliquidated Claim |
| 1306 | City of Harrisville | West Virginia | Unliquidated Claim |
| 1307 | City of Ravenswood | West Virginia | Unliquidated Claim |
| 1308 | City of Ripley | West Virginia | Unliquidated Claim |
| 1309 | City of Spencer | West Virginia | Unliquidated Claim |

A-2919

|  | Party | State | Economic Interest |
|---|---|---|---|
| **1310** | City of St. Mary's | West Virginia | Unliquidated Claim |
| **1311** | Jackson County | West Virginia | Unliquidated Claim |
| **1312** | Pleasants County | West Virginia | Unliquidated Claim |
| **1313** | Ritchie County | West Virginia | Unliquidated Claim |
| **1314** | Roane County | West Virginia | Unliquidated Claim |
| **1315** | The Schumacher Group of West Virginia, Inc. | West Virginia | Unliquidated Claim |
| **1316** | Williamstown County | West Virginia | Unliquidated Claim |
| **1317** | Wirt County | West Virginia | Unliquidated Claim |
| **1318** | Woods County | West Virginia | Unliquidated Claim |

A-2920

Execution Version

**Joinder Agreement and Amendment to Restructuring Support Agreement**

     **THIS JOINDER AGREEMENT AND AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT** dated as of March 10, 2021 (this "***Joinder Agreement***") is entered into by and among the Debtors, the Required Supporting Unsecured Noteholders, the Governmental Plaintiff Ad Hoc Committee (each as defined in the Agreement (as defined below)), the MSGE Group (as defined below), and the undersigned holders of First Lien Term Loan Claims (as defined in the First Lien Settlement Term Sheet (as defined below)) (such undersigned holders, the "***Supporting Term Lenders***" and, together with the Debtors, the Required Supporting Unsecured Noteholders, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group, the "***Joinder Parties***") on behalf of the Debtors, the Supporting Unsecured Noteholders, the Supporting Governmental Opioid Claimants, the MSGE Signatories (as defined in the MSGE Group Joinder Agreement (as defined below)), and the Supporting Term Lenders (together, the "***Agreement Parties***").

     **WHEREAS**, the Debtors, the Supporting Unsecured Noteholders, and the Supporting Governmental Opioid Claimants entered into a certain Restructuring Support Agreement dated as of October 11, 2020 (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, together with the Term Sheet (as defined therein) and First Lien Settlement Term Sheet (as defined below), the "***Agreement***");[1]

     **WHEREAS**, the MSGE Group (as defined in the MSGE Group Joinder Agreement (as defined below)) joined the Agreement pursuant to that certain Joinder Agreement dated November 13, 2020 (the "**MSGE Group Joinder Agreement**");

     **WHEREAS**, as of the date hereof, Counsel to the MSGE Group, Caplin & Drysdale, Chartered ("***MSGE Group Counsel***") has obtained over 1,200 executed signature pages of the members of the MSGE Group to the MSGE Group Joinder Agreement;

     **WHEREAS**, MSGE Group Counsel requests additional time to obtain executed signature pages from the remaining members of the MSGE Group;

     **WHEREAS**, the Debtors, the Supporting Unsecured Noteholders, the Supporting Governmental Opioid Claimants, the MSGE Group, and the Supporting Term Lenders have agreed to a settlement (the "***First Lien Term Loans Settlement***") on the terms set forth in that certain First Lien Settlement Term Sheet attached as **Schedule 3** to the Term Sheet (as amended and restated herein) (the "***First Lien Settlement Term Sheet***");

     **WHEREAS**, in furtherance of the First Lien Term Loans Settlement, the Joinder Parties wish for the Supporting Term Lenders to join the Agreement;

---

[1]   Defined terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement, as amended by this Joinder Agreement (including the Term Sheet, Opioid Settlement Term Sheet, and First Lien Settlement Term Sheet), or the MSGE Group Joinder Agreement, as applicable.

**WHEREAS**, the Joinder Parties wish to amend certain provisions of the Agreement and the MSGE Group Joinder Agreement, and to take such actions necessary to give effect to the foregoing.

**NOW, THEREFORE**, in consideration of the foregoing, the warranties, covenants, and agreements contained herein, in the Agreement, and in the MSGE Group Joinder Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Joinder Parties agree as follows:

**I.     Joinder.**

A.      Each of the Supporting Term Lenders hereby acknowledges that it has reviewed and understands the Agreement.

B.      In addition to the foregoing, each of the Supporting Term Lenders agrees as follows:

1.     <u>Restructuring Support</u>:  The Supporting Term Lenders shall have the rights and be subject to the support and other obligations of Supporting Parties and Supporting Unsecured Noteholders, as applicable, set forth in Sections 2, 4 (other than clause (g), as added by this Joinder Agreement), 5(a) (other than clause (vii) except to the extent of the DOJ/Opioid Settlement Cash Consent Right (as defined in the First Lien Settlement Term Sheet) and clause (viii) unless (A) the applicable Alternative Transaction does not propose the Payment in Full of First Lien Term Loan Claims (as defined in the First Lien Settlement Term Sheet) upon consummation thereof and results in (i) less favorable treatment of the First Lien Term Loan Claims as compared to the treatment for such First Lien Term Loan Claims set forth in the First Lien Settlement Term Sheet or (ii) a Prohibited Ownership Change[2] or (B) would be reasonably expected to have a materially adverse effect on the holders of First Lien Term Loan Claims (acting in such capacity)), 5(b), 6(a) (other than clauses (vi)(C) (unless (A) the applicable Alternative Transaction does not propose the Payment in Full of First Lien Term Loan Claims upon consummation thereof and results in (i) less favorable treatment of the First Lien Term Loan Claims as compared to the treatment for such First Lien Term Loan Claims set forth in the First Lien Settlement Term Sheet or (ii) a Prohibited Ownership Change or (B) would be reasonably expected to have a materially adverse effect on the holders of First Lien Term Loan Claims (acting in such capacity)), (vi)(D) (unless (A) the applicable Alternative Transaction does not propose the Payment in Full of First Lien Term Loan Claims upon consummation thereof and results in (i) less favorable treatment of the First Lien

---

[2]   "***Prohibited Ownership Change***" means, at any time on or prior to the Plan Effective Date, (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC thereunder as in effect on the date hereof) of Equity Interests (as defined in the Term Sheet) representing more than 50% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests, <u>provided</u>, that, solely for the purposes of this Joinder Agreement and the Agreement and subject to <u>Article I.B.9</u> of this Joinder Agreement, (i) the transactions contemplated under this Joinder Agreement, the Agreement, the Term Sheet (including the First Lien Settlement Term Sheet and the Opioid Settlement Term Sheet) shall not constitute a Prohibited Ownership Change and (ii) neither the Unsecured Notes Ad Hoc Group nor the Supporting Unsecured Noteholders shall constitute a group (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC thereunder as in effect on the date hereof).

Term Loan Claims as compared to the treatment for such First Lien Term Loan Claims set forth in the First Lien Settlement Term Sheet or (ii) a Prohibited Ownership Change or (B) would be reasonably expected to have a materially adverse effect on the holders of First Lien Term Loan Claims (acting in such capacity)), (xvi) (provided that, any action by the Company that triggers a Supporting Party Termination Event under Section 6(a)(xvi) shall also apply to the Supporting Term Lenders to the extent such action is in breach of the DOJ/Opioid Settlement Cash Consent Right (as defined in the First Lien Settlement Term Sheet) and the Required Supporting Term Lenders have not previously consented to such action by the Company), (xix) (provided that Section 6(a)(xix) shall also apply to the Supporting Term Lenders to the extent both the Supporting Unsecured Noteholders and the Governmental Plaintiff Ad Hoc Committee terminate their obligations under the Agreement in accordance with Section 6(a)), (xx), (xxi), (xxii), and (xxiii)(B), (D), (E), (F), and (G) (provided that, any extension of the Milestone contained in Section 6(a)(xxiii)(G) beyond March 15, 2022, shall also require the consent of the Required Supporting Term Lenders, and provided, further, that references to Section 6(a)(xxiii) shall be to such section as modified by this Joinder Agreement), and (xxv) (as added by this Joinder Agreement)), 6(c), 6(e), 6(f), 6(g), 6(h), 8, 9,  13, 14, 15, 16, 17, 18, 19, 21, 22, 24, 26, and 27 of the Agreement (the "**_Restructuring Support Sections_**"); provided, that the Supporting Term Lenders' rights related to Definitive Documents set forth in Sections 5(a)(iv), 5(a)(ix), 5(b), 6(a)(iii), and 6(a)(iv) of the Agreement shall be limited to only the extent that such Definitive Documents, and in the case of Sections 5(b)(iii) and 6(a)(iii) any motion, pleading, declaration, supporting exhibit, related document, Term Sheet or Definitive Documents, (i) directly relate to (or would otherwise directly affect) (a) the treatment of the First Lien Term Loan Claims of the Supporting Term Lenders under the Agreement or the Plan, (b) the legal or economic rights or waivers proposed to be granted to, or received by the Supporting Term Lenders under the Agreement or the Plan (provided, that, changes in the trading value of the First Lien Term Loan Claims shall not constitute any such legal or economic right or waiver), (c) the obligations of the Supporting Term Lenders under the Agreement, or (d) the implementation of the New First Lien Term Loan Facility or the terms of the First Lien Settlement Term Sheet (except that, counsel to the Supporting Term Lenders shall also be provided copies of all other material pleadings and pleadings related to any other Definitive Documents at least two (2) Business Days or as soon as reasonably practicable prior to filing such pleading, to the extent reasonably practicable) or (ii) otherwise materially and adversely affect the rights or obligations of the Supporting Term Lenders under the Agreement, including the First Lien Settlement Term Sheet; provided, further, that without limiting the generality of the foregoing, (i) the New Term Loan Documentation (including any intercreditor  agreements to govern the New First Lien Term Loans (other than the Existing 1L/2L Intercreditor Agreement, which shall continue in place after the Plan Effective Date)) shall be consistent with the Documentation Principles, (ii) any modifications to the Final Cash Collateral Order (including the CCO Modification Order (subject to the NPT Exception)), the 2020 ECF Payment Order (subject to the ECF Exception) and any pleadings filed by the Debtors in connection therewith, in each case, shall be in form and substance reasonably acceptable to the Required Supporting Term Lenders and as otherwise set forth in the First Lien Settlement Term Sheet, and (iii) and any new key employee and retentive based compensation programs to be proposed after the Petition Date shall be proposed in consultation with the Supporting Term Lenders; provided, however, that in the event the Plan provides for the Payment in Full of First Lien Term Loan Claims on the Plan Effective Date, the Supporting Term Lenders shall not have consent rights as to any terms of the Definitive Documents.  Each of the Supporting Term Lenders hereby acknowledges that such

3

rights and obligations (other than such rights and obligations set forth in Section 6(g)) shall be exercised by the Supporting Term Lenders through the Required Supporting Term Lenders (as defined below) over the matters set forth in the Agreement for which the Supporting Term Lenders have rights or obligations.  Except as set forth on the signature pages to the Agreement or this Joinder Agreement, (y) the Specified Claims and Interests applicable to the Supporting Term Lenders shall be the First Lien Credit Agreement Claims and, to the extent any such Supporting Term Lender is a beneficial or legal owner of Guaranteed Unsecured Notes, Guaranteed Unsecured Notes Claims and (z) the Specified Claims and Interests applicable to the Supporting Unsecured Noteholders shall be Guaranteed Unsecured Notes Claims and, to the extent any such Supporting Unsecured Noteholder is a beneficial or legal owner of First Lien Credit Agreement Claims, the First Lien Credit Agreement Claims.  For purposes of consent rights, amendment rights, or termination rights in the Agreement or this Joinder Agreement, Supporting Unsecured Noteholders that beneficially or legally own First Lien Credit Agreement Claims shall not be considered Supporting Term Lenders under the Agreement or this Joinder Agreement, and Supporting Term Lenders that beneficially or legally own Guaranteed Unsecured Notes Claims shall not be considered Supporting Unsecured Noteholders under the Agreement or this Joinder Agreement.

2. <u>Consent Rights of the Supporting Term Lenders</u>:

a. The Supporting Term Lenders shall have only the consent and approval rights expressly given to them in the Agreement, the Term Sheet, the First Lien Settlement Term Sheet, and the applicable Definitive Documents; *provided*, that in the event the Plan provides for the Payment in Full of First Lien Term Loan Claims on the Plan Effective Date, the Supporting Term Lenders shall not have consultation or consent rights as to any terms of the Definitive Documents.

b. The foregoing consent and approval rights in subsection (a) shall not limit, modify or otherwise affect the existing consent and approval rights of the other Supporting Parties under the Agreement, including with respect to Definitive Documents.

3. <u>Breaches by the Supporting Term Lenders</u>:  The Company shall be entitled to terminate the Agreement as to all of the Supporting Term Lenders upon the breach in any material respect by the Supporting Term Lenders that would result in non-breaching Supporting Term Lenders and any other Supporting Parties holding less than 66.7% in outstanding principal amount of either the (i) First Lien Term Loan Claims maturing in 2024 or (ii) First Lien Term Loan Claims maturing in 2025, in each case with respect to any of the representations, warranties, or covenants of such Supporting Term Lenders set forth in the Agreement and which breach remains uncured for a period of fifteen (15) Business Days after delivery by the Company to the applicable Supporting Term Lenders of written notice of such breach, which written notice will set forth in reasonable detail the alleged breach; *provided* that any such termination by the Company pursuant to the Agreement or this Joinder Agreement shall result in the termination of this Agreement solely as to the Supporting Term Lenders and shall not give rise to a termination right to any other Supporting Party; and *provided, further*, that, the Company may, at its option, terminate this Agreement solely as to any Supporting Term Lender that breaches, in any material respect, its representations, warranties or covenants set forth in the Agreement (to the extent such breach remains uncured for a period of fifteen (15) Business Days after delivery by the Company to the applicable Supporting Term Lender of written notice of such breach, which written notice

4

will set forth in reasonable detail the alleged breach), whether or not such breach would entitle the Company to terminate the Agreement with respect to all Supporting Term Lenders in accordance with this Section 3; *provided, further*, that if the Agreement or this Joinder Agreement is terminated by the Company solely as to the Supporting Term Lenders, then the amendments (a) to the Agreement in Articles II.A.1, II.A.2, II.A.3 (solely as to the definition of "Required Supporting Term Lenders"), II.B (solely as to the Supporting Term Lenders), and II.D, below and (b) to the Term Sheet (other than the addition of the condition precedent related to payment of the Transaction Fees), in each case, shall be null and void.

4.    <u>Termination of the Joinder Agreement by the Supporting Term Lenders</u>:

a.    The sole remedy of the Supporting Term Lenders for any breach by the Supporting Parties or the Company of the Restructuring Support Sections of the Agreement or this Joinder Agreement, including the DOJ/Opioid Settlement Cash Consent Right (as defined in the First Lien Settlement Term Sheet), shall be termination of this Joinder Agreement by written notice in accordance with the Agreement delivered by Supporting Term Lenders holding two-thirds in outstanding principal amount of the First Lien Term Loans then party to the Joinder Agreement with such notice terminating the Agreement and Joinder Agreement as to all Supporting Term Lenders. If the Supporting Term Lenders terminate this Joinder Agreement, such termination shall not result in a termination of the Agreement or this Joinder Agreement as to the other Supporting Parties (other than the Supporting Term Lenders) and shall not give rise to a termination right under Section 6(a)(xix) for any such Supporting Parties or for the Company under Section 6(b)(iv); <u>provided</u>, that if this Joinder Agreement is terminated by Supporting Term Lenders then the amendments (a) to the Agreement in Articles II.A.1, II.A.2, II.A.3 (solely as to the definition of "Required Supporting Term Lenders"), II.B (solely as to the Supporting Term Lenders), and II.D, below and (b) to the Term Sheet (other than the addition of the condition precedent related to payment of the Transaction Fees), in each case, shall be null and void.

b.    Upon ten (10) days' notice, any individual Supporting Term Lender may terminate this Joinder Agreement, as to itself only, by the delivery to counsel to the Company and the other Supporting Parties of a written notice in accordance with Section 7 hereof, in the event that (i) any waiver, modification, amendment or supplement of this Joinder Agreement or the Agreement materially disproportionately and materially adversely affects the economic rights, recoveries, or treatment applicable to the Specified Claims and Interests of such Supporting Term Lender relative to (x), in the case of Specified Claims and Interests comprising First Lien Term Loan Claims, the economic rights, recoveries, or treatment applicable to the First Lien Term Loan Claims of the other Supporting Term Lenders, or (y), in the case of Specified Claims and Interests comprising Guaranteed Unsecured Notes, relative to the economic rights, recoveries, or treatment applicable to the Claims based on the Guaranteed Unsecured Notes of the Supporting Unsecured Noteholders, in each case, without such Supporting Term Lender's consent or (ii) any Definitive Document is filed with the Bankruptcy Court or later amended in such a way that materially disproportionately and materially adversely affects (x), in the case of Specified Claims and Interests comprising First Lien Term Loan Claims, the economic rights, recoveries, or treatment applicable to the First Lien Term Loan Claims of such Supporting Term Lender relative to the economic rights, recoveries, or treatment applicable to the First Lien Term Loan Claims of the other Supporting Term Lenders, or (y), in the case of Specified Claims and Interests comprising Guaranteed Unsecured Notes, the economic rights, recoveries, or treatment applicable to the

Claims based on the Guaranteed Unsecured Notes of such Supporting Term Lender relative to the economic rights, recoveries, or treatment applicable to the Claims based on the Guaranteed Note Claims of the Supporting Unsecured Noteholders, in each case, without such Supporting Term Lender's consent (each such event, an "***Individual Supporting Term Lender Termination Event***"); provided, that, such Supporting Term Lender shall not object to the Company's efforts to seek an expedited hearing to adjudicate whether an Individual Supporting Term Lender Termination Event has occurred.

5.    Amendments and Waivers:

a.    During the Support Period, this Joinder Agreement and, to the extent that the Supporting Term Lenders have the rights and are subject to the support and other obligations of Supporting Parties and Supporting Unsecured Noteholders of the relevant provision pursuant to Article I.B.1 hereof, the Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended, or supplemented except in a writing signed by the Required Supporting Term Lenders; *provided*, that:   (a) any waiver, modification, amendment, or supplement to Section 4(f)(v), Section 6(e), Section 6(f), Section 6(g), Section 7(a), Section 8(b), Section 17, Section 21, or Section 22 of the Agreement, or Article I.B.4(b) or Article I.B.8 of this Joinder Agreement, or the definition of "Specified Claims and Interests" shall require the prior written consent of each Supporting Term Lender; (b) any waiver, modification, amendment, or supplement to the definitions of "Required Supporting Term Lenders" shall require the prior written consent of each Supporting Term Lender; (c) any waiver, modification, amendment, or supplement of the Opioid Settlement or the CMS/DOJ/States Settlement shall comply with the monetary and payment frequency limitations set forth in the section entitled "***DOJ/Opioid Settlement Cash Consent Right***" in the First Lien Settlement Term Sheet (unless Required Supporting Term Lenders shall otherwise consent); and (d) any Definitive Document or any waiver, modification, amendment or supplement of this Joinder Agreement, the Agreement, or any Definitive Document, in each case, that requires any Supporting Term Lender to make any investment of new capital, including in any Mallinckrodt entity, may not be made without the prior written consent of such Supporting Term Lender; *provided* that, to the extent that the Company waives, modifies, amends, or supplements the Agreement (other than for the items expressly set forth or contemplated in the First Lien Settlement Term Sheet, including any such items as implemented or governed by any Definitive Document, including, without limitation, the Plan, Disclosure Statement, the Confirmation Order, and the New Term Loan Documentation), including any exhibits or schedules hereto, without the consent of the Required Supporting Term Lenders, the sole remedy afforded to the Supporting Term Lenders shall be termination of this Joinder Agreement as to the Supporting Term Lenders by the Required Supporting Term Lenders.

b.    Following the Plan Effective Date, amendments to any Definitive Document shall be governed as set forth in such Definitive Document.  Any consent required to be provided pursuant to this Article I.B.5 may be delivered by email from counsel.

6.    Fees and Expenses: The reasonable and documented fees and out-of-pocket expenses of the Supporting Term Lenders, including the reasonable fees and expenses of Gibson, Dunn & Crutcher LLP ("***Gibson Dunn***"), as legal advisor to the Supporting Term Lenders, Evercore Group LLC, as financial advisor, and any other advisor specified in, and any subsequently retained advisor permitted to be reimbursed pursuant to, the Final Cash Collateral

6

Order (the "**Ad Hoc Term Lender Group Advisors**") shall be paid in accordance with the Final Cash Collateral Order.

7.    Notice Parties:  Notices provided pursuant to the Agreement shall be sent to the Supporting Term Lenders to the address set forth on the signature page for the Supporting Term Lenders, with copy (which shall not constitute notice) to:

> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, New York 10166-0193
> Attention:    Scott J. Greenberg (sgreenberg@gibsondunn.com)
>               Michael J. Cohen (mcohen@gibsondunn.com)

8.    Representations and Warranties:

a.    Each Supporting Term Lender hereby makes the same representations and warranties of the Supporting Parties set forth in Section 7(a) of the Agreement to each other Party, effective as of the date hereof.

b.    Each Supporting Term Lender severally (and not jointly), represents and warrants to the Company that, as of the date hereof (or as of the date such Supporting Term Lender becomes a party hereto), such Supporting Term Lender (i) is or, after taking into account the settlement of any pending assignments of First Lien Term Loans to which such Supporting Term Lender is a party as of the date of this Joinder Agreement, will be the beneficial owner of (or investment manager, advisor, or subadvisor to one or more beneficial owners of) the aggregate principal amount of Specified Claims and Interests set forth besides its name on **Annex 1** hereto (or below its name on the signature page of a Joinder Agreement for any Supporting Term Lender that becomes a Party hereto after the date hereof), (ii) has, with respect to the beneficial owners of such Specified Claims and Interests (as may be set forth on a schedule to such Supporting Term Lender's signature page hereto), (A) sole investment or voting discretion with respect to such Specified Claims and Interests, (B) full power and authority to vote on and consent to matters concerning such Specified Claims and Interests, or to exchange, assign, and transfer such Claims or Interests, and (C) full power and authority to bind or act on the behalf of, such beneficial owners, (iii) such Specified Claims and Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind, that would prevent in any way such Supporting Term Lender's performance of its obligations contained in this Agreement at the time such obligations are required to be performed, and (iv) is not aware of any currently outstanding request to the Administrative Agent under the Existing Credit Agreement to implement a rate of interest for the First Lien Term Loans applicable to ABR Borrowings (as defined in the Existing Credit Agreement).

9.    Supporting Term Lender Reservations of Rights.

a.    General Reservation of Rights.  For the avoidance of doubt, and notwithstanding anything to the contrary in the Agreement or this Joinder Agreement, except as otherwise set forth in any order of the Bankruptcy Court, in the event the Agreement is terminated

as to the Supporting Term Lenders, all of the Agreement Parties' rights and remedies under the Existing Credit Agreement, the Bankruptcy Code, and applicable law, including, without limitation, with respect to (a) the Plan, (b) the calculation and treatment of the Specified Claims and Interests held by the Supporting Term Lenders under the Plan, (c) any relief sought by, or relief granted in connection with, the motion seeking authority to pay the 2020 ECF Payment (as defined in the First Lien Settlement Term Sheet), (d) the Existing 1L Intercreditor Agreement, and (e) the Existing 1L/2L Intercreditor Agreement, shall be reserved in all respects.

b.    <u>Make-Whole Reservation of Rights</u>.  Neither this Agreement nor the Term Sheet provide for the treatment of the Make-Whole Claims, and all Parties' rights related thereto are fully reserved.  Notwithstanding anything to the contrary in this Agreement, it is expressly understood and agreed that a Supporting Term Lender (a) may hold First Lien Revolving Loan Claims, First Lien Notes Claims, and/or Second Lien Notes Claims in addition to its Specified Claims and Interests, and (b) that the entry into this Agreement does not limit, waive, impair, or otherwise affect any Supporting Term Lender's right to negotiate for and seek allowance of, or to object to and seek disallowance of, any Make-Whole Claims in the Chapter 11 Cases or the Restructuring, whether in such term lender's capacity as a term lender or otherwise.  Nothing contained herein, limits, waives, impairs, or otherwise affects the Company's right to object to, or seek disallowance of, any Make-Whole Claims in the Chapter 11 Cases or Restructuring and any such actions taken in connection with defending or objecting to the Make-Whole Claims is not inconsistent with the Company's obligations under this Agreement.

10. <u>Agreements of the Supporting Term Lenders</u>.

a.    During the Support Period, subject to the terms and conditions of this Joinder Agreement and the Agreement, each Supporting Term Lender agrees, severally and not jointly (solely in its capacity as a holder of the Supporting Term Lenders' Specified Claims and Interests, and in no other capacity), solely as long as it remains the legal owner, beneficial owner, and/or investment advisor or manager of or with power and/or authority to bind any of the Supporting Term Lenders' Specified Claims and Interests against and/or in the Company held by it, that it shall not direct the Administrative Agent under the Existing Credit Agreement to implement (or take steps to implement) a rate of interest for the First Lien Term Loans applicable to ABR Borrowings.

**II.    <u>Amendments to the Agreement</u>**.    In reliance on the representations, warranties, covenants, and agreements contained herein and in the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Agreement and the MSGE Group Joinder Agreement are hereby amended as follows:

A.    <u>Definitions</u>.

1.    The definitions of "Restructuring," "Term Sheet," and "Plan" in the recitals to the Agreement are hereby amended to incorporate (as applicable) and include reference to the terms of the First Lien Settlement Term Sheet, and the definition of "Parties" in the recitals to the Agreement is hereby amended to incorporate and include reference to the Supporting Term Lenders.

2.      The definition of "Definitive Documents" in Section 1.m of the Agreement is hereby amended by deleting the word "and" before clause (xix) and replacing the period at the end of the definition with "; (xx) the New Term Loan Documentation and any other documentation related to any financing used to repay any First Lien Credit Agreement Claims; (xxi) the 2020 ECF Payment Settlement; (xxii) the 2020 ECF Payment Order; and (xxiii) the CCO Modification Order."

3.      The following definitions are hereby added to Section 1 of the Agreement in the appropriate alphabetical order:

"*Ad Hoc First Lien Term Lender Group*" means that certain ad hoc group of holders of First Lien Loans represented by, among others, Gibson, Dunn & Crutcher LLP and advised by Evercore Group, LLC.

"*Existing 1L Intercreditor Agreement*" means that certain First Lien Intercreditor Agreement, dated as of April 7, 2020, among Mallinckrodt PLC, as Parent, Mallinckrodt International Finance S.A., as Lux Borrower, Mallinckrodt CB LLC, as Co-Borrower, the other Grantors party thereto, Deutsche Bank AG New York Branch, as Collateral Agent for the Pari Passu Secured Parties and as Authorized Representative for the Credit Agreement Secured Parties, Wilmington Savings Fund Society, FSB, as the Initial Additional Authorized Representative, and each additional Authorized Representative from time to time party thereto.

"*Existing 1L/2L Intercreditor Agreement*" means that certain Second Lien Intercreditor Agreement, dated as of December 6, 2019, among Deutsche Bank AG New York Branch, as First Lien Collateral Agent and as First Lien Credit Representative, Wilmington Savings Fund Society, FSB, as Second Lien Collateral Agent and as Initial Second Lien Document Representative, and the other First Lien Representative Parties and Second Lien Representative Parties thereto.

"*RSA Parties Fee Motion*" means that certain Motion of the Debtors to Assume and/or Enter Into Reimbursement Agreements with RSA Party Professionals filed with the Bankruptcy Court on December 30, 2020 [Docket No. 1092].

"*RSA Parties Fee Order*" means that order granting the RSA Parties Fee Motion, entered on February 1, 2021 [Docket No. 1250].

"*Required Supporting Term Lenders*" means, as of any date of determination, the Specified Supporting Term Lenders then party to this Agreement that, at the time of such approval, together hold at least 60% in outstanding principal amount of First Lien Term Loans held by the Specified Supporting Term Lenders; provided, that, the Ad Hoc First Lien Term Lender Group shall (A) notify the Company promptly of approval of any such Specified Supporting Term Lenders and (B) not revoke approval

9

of any Specified Supporting Term Lenders previously approved by the Ad Hoc First Lien Term Lender Group without notice to the Company.

"***Specified Supporting Term Lender***" means, as of any date of determination, Supporting Term Lenders that are (i) members of the Ad Hoc First Lien Term Lender Group or (ii) Supporting Term Lenders previously approved by members the Ad Hoc First Lien Term Lender Group.

B.    <u>Ad Hoc Group Composition</u>.    Section 4(e) of the Agreement is hereby amended and restated in its entirety to read as follows:

e.    <u>Ad Hoc Group Composition</u>.  No less frequently than every sixty (60) days commencing on the Agreement Effective Date, counsel to each of the Unsecured Notes Ad Hoc Group, the Ad Hoc First Lien Term Lender Group, and the Governmental Plaintiff Ad Hoc Committee shall provide counsel to the Company and to each other, on a professionals' eyes only basis, with a list showing each member of such counsel's respective ad hoc group and, (i) in the case of members of the Unsecured Notes Ad Hoc Group, the aggregate holdings of Guaranteed Unsecured Notes and other claims based on funded indebtedness of the Company (including on account of the Company's secured notes, First Lien Term Loans, and revolving credit facility) or interests of the Company and (ii) in the case of members of the Ad Hoc First Lien Term Lender Group, the aggregate holdings of First Lien Term Loans and other claims based on funded indebtedness of the Company (including on account of the Company's secured notes, Guaranteed Unsecured Notes, and revolving credit facility) or interests of the Company; <u>provided</u>, that counsel to the Governmental Plaintiff Ad Hoc Committee shall only be required to provide such a list if the members of the Governmental Plaintiff Ad Hoc Committee have changed since the last time such a list was provided.

C.    <u>Agreements of the Supporting Parties</u>.    Section 4 of the Agreement is hereby amended by replacing the period at the end of Section 4(f)(vi) with "; and", and adding the following clause (g):

g.    In connection with the negotiation of the Definitive Documents, the Supporting Parties agree to discuss, in good faith, any concerns raised by the Supporting Unsecured Noteholders regarding allocation of fees and expenses incurred by the Official Committee of Opioid Related Claimants during the Chapter 11 Cases.

D.    <u>Agreements of the Company</u>.

1.    Section 5(a) of the Agreement is hereby amended by deleting the word "and" at the end of Section 5(a)(xvii), replacing the period at the end of Section 5(a)(xviii) with a semicolon, and adding the following clauses (xix), (xx), (xxi), and (xxii):

10

A-2930

(xix)  to seek approval of the *Debtors' Motion for Order (I) Authorizing Use of Cash Collateral other than in the Ordinary Course of Business, (II) Granting Limited Relief from the Automatic Stay, and (III) Granting Related Relief* [Docket No. 1441], subject to the ECF Exception, at the hearing currently scheduled for March 16, 2021 (subject to any extensions reasonably agreed by the Debtors and the Required Supporting Term Lenders);

(xx)  to seek approval of an amendment to the *Final Order Under Bankruptcy Code Sections 105(a), 361, 362, 363, 503, and 507, and Bankruptcy Rules 4001 and 9014 (I) Authorizing Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; and (IV) Granting Related Relief* [Docket No. 586] (the "**Final Cash Collateral Order**") to increase the interest rate applied in order to calculate First Lien Adequate Protection Payments (as defined in the Final Cash Collateral Order) and to provide that the Payment in Full of Term Loan Claims must be in compliance with this Agreement (including payment of the applicable Term Loan Exit Payment), so long as the Supporting Term Lenders remain party hereto; *provided that*, to the extent the Company is unable to obtain Bankruptcy Court approval for (A) the application of the Adjusted Interest Rate  retroactively to the date on which the Debtors filed a motion seeking entry of the CCO Modification Order or (B) the Pre-Effective Date Term Loan Exit Payment, in each case it shall not constitute a violation of this Section 5(a)(xx) (unless solely in the case of clause (B) such Pre-Effective Date Term Loan Exit Payment is not subsequently approved in connection with confirmation of the Plan), a basis to terminate this Agreement pursuant to Section 6(a)(xxiii), or a basis on which deem the CCO Modification Order unacceptable in connection the exercise of the consent right of the Supporting Term Lenders with respect thereto (the exceptions set forth in this proviso (the "***NPT Exception***");

(xxi) to object to or defend against any motion seeking standing (A) to challenge the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Specified Claims and Interests of the Supporting Term Lenders or the prepetition liens securing the Supporting Term Lenders' Specified Claims and Interests or (B) to assert any other cause of action against the Supporting Term Lenders or with respect or relating to Supporting Term Lenders' Specified Claims and Interests, the First Lien Credit Agreement, or any Loan Document (as defined in the First Lien Credit Agreement) or the prepetition liens securing the Supporting Term Lenders' Specified Claims and Interests; and

(xxii) to support and take all reasonable actions necessary to facilitate the entry of the 2020 ECF Payment Order (as defined in the First Lien Settlement Term Sheet); *provided*, that, to the extent the Company is unable to obtain Bankruptcy Court approval for the entry of the 2020 ECF Payment Order, it shall not constitute a violation of Section 5(a)(xix) or this Section 5(a)(xxii)

(or any consent right of the Supporting Term Lenders with respect to the 2020 ECF Payment Order) (the "***ECF Exception***"); *provided further*, that, if 2020 ECF Payment is not paid prior to the Plan Effective Date, the Company shall take all actions necessary to ensure that the 2020 ECF Payment is paid under the Plan; *provided further*, that the Debtors shall not be required to agree to pay more than $114 million (together with any accrued and unpaid interest thereon) in connection with the 2020 ECF Payment or to make any payment in respect thereof other than to the holders of the First Lien Term Loan Claims.

E.      Termination of Agreement.

1.      Section 6(a)(xxii) of the Agreement is hereby amended and restated in its entirety to read as follows:

(xxii) the Debtors, the Supporting Unsecured Noteholders and the Supporting Governmental Opioid Claimants shall not have agreed upon the Additional Insurance Rights by the time of the objection deadline for the Disclosure Statement Order; or

2.      Section 6(a)(xxiii) of the Agreement is hereby amended and restated in its entirety to read as follows:

(xxiii) any of the following events (the "***Milestones***") have not been achieved, extended, or waived by no later than 11:59 pm New York City time on the dates set forth below, underlined provided that any such time and date may be extended with the consent of the Required Supporting Parties (which consent may be provided by email):

A.      the Debtors' filing of a motion seeking entry of the CCO Modification Order on or prior to March 17, 2021; *provided* that the Milestone set forth in this Section 6(a)(xxiii)(A) shall only be applicable to the Supporting Term Lenders;

B.      the Debtors' filing of the Plan and Disclosure Statement on or prior to March 31, 2021;

C.      the Court enters the CCO Modification Order (subject to the NPT Exception) on or prior to April 15, 2021; *provided* that the Milestone set forth in this Section 6(a)(xxiii)(C) shall only be applicable to the Supporting Term Lenders;

D.      the Court enters an order approving the Disclosure Statement on or prior to May 15, 2021;

E.      the Plan is confirmed on or prior to August 15, 2021;

F.      a Scheme of Arrangement consistent with this Agreement is approved by the Irish Court on or prior to October 15, 2021; and

G.      the Plan Effective Date has not occurred on or prior to November 15, 2021.

3.      Section 6(a) of the Agreement is hereby amended by deleting the word "or" at the end of Section 6(a)(xxii), replacing the period at the end of Section 6(a)(xxiii) with a semicolon, and adding the following clauses (xxiv) and (xxv):

(xxiv)   (A) the Company files any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Specified Claims and Interests or assert any other cause of action against the Supporting Term Lenders or with respect or relating to such Specified Claims and Interests, the First Lien Credit Agreement, or any Loan Document (as defined in the First Lien Credit Agreement) or the prepetition liens securing the Specified Claims and Interests or challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Specified Claims and Interests or asserting any other cause of action against the Supporting Term Lenders or with respect or relating to such Specified Claims and Interests or the prepetition liens securing the Specified Claims and Interests; or (B) the Bankruptcy Court enters an order granting or sustaining any objection or challenge to any of the First Lien Credit Agreement Claims or the prepetition liens securing the First Lien Credit Agreement Claims that is reasonably likely to render the Plan unconfirmable; or

(xxv)  the RSA Parties Fee Order is reversed, stayed, or modified, on appeal or otherwise.

F.      Fees and Expenses.  Section 25 of the Agreement is hereby amended and restated in its entirety to read as follows:

**Fees and Expenses**.  The Company shall reimburse all reasonable and documented fees and out-of-pocket expenses, including success fees, of the following professionals and advisors in accordance with the RSA Parties Fee Order:  (a) Gilbert LLP, Kramer Levin Naftalis & Frankel LLP, and Brown Rudnick LLP, as legal counsel to the Governmental Plaintiff Ad Hoc Committee; (b) William Fry, as Irish counsel to the Governmental Plaintiff Ad Hoc Committee; (c) Houlihan Lokey, Inc., as investment banker and financial advisor to the Governmental Plaintiff Ad Hoc Committee; (d) such other legal, consulting, financial, and/or other professional advisors to which the Governmental Plaintiff Ad Hoc Committee and the Debtors shall reasonably agree from time to time; (e) Paul, Weiss, Rifkind, Wharton & Garrison LLP as counsel to the Unsecured Notes Ad Hoc Group; (f) Landis Rath & Cobb LLP, as Delaware counsel to the Unsecured Notes Ad Hoc

Group; (g) Perella Weinberg Partners LP, as investment banker to the Unsecured Notes Ad Hoc Group; (h) Reed Smith LLP, as regulatory counsel to the Unsecured Notes Ad Hoc Group; (i) Matheson as Irish counsel to the Unsecured Notes Ad Hoc Group; (j) such other legal, consulting, financial, and/or other professional advisors to which the Unsecured Notes Ad Hoc Group and the Debtors shall reasonably agree from time to time; (k) to the extent not identified above, three local counsel (one for the Chapter 11 Cases, one for the Irish Examinership Proceedings, and one for the Recognition Proceedings) for each of the Governmental Plaintiff Ad Hoc Committee and Unsecured Notes Ad Hoc Group; (l) Caplin & Drysdale, Chartered, as legal counsel to the MSGE Group; (m) Seitz, Van Ogtrop & Green, P.A. as Delaware legal counsel to the MSGE Group; (n) FTI Consulting, as financial advisor to the MSGE Group; and (o) such other legal, consulting, financial, and/or other professional advisors to which the MSGE Group and the Debtors shall reasonably agree from time to time; provided, that to the extent that the Company terminates this Agreement under Section 6(b), the Company's reimbursement obligations under this Section 25 shall survive with respect to any and all fees and expenses incurred on or prior to the date of termination. In furtherance of the foregoing (x) simultaneously with the effectiveness of this Agreement, the Company shall pay all such fees and out-of-pocket expenses incurred or accrued at any time prior to the Agreement Effective Date; (y) the Company shall pay any accrued but unpaid amounts owing under such engagement letter and/or fee reimbursement letters to the extent required under the terms thereof upon the termination of this Agreement, but shall not be responsible for any fees and expenses incurred after termination of this Agreement (other than termination of this Agreement as a result of the occurrence of the Plan Effective Date); and (z) notwithstanding anything to the contrary herein, the Company shall also be required to reimburse all reasonable and documented fees and expenses incurred by the Governmental Plaintiff Ad Hoc Committee and the MSGE Group on or after the Effective Date in connection with the implementation of the Plan (excluding, for the avoidance of doubt, the expenses of the administration of the Opioid Trust).

G.    <u>Term Sheet</u>. The Term Sheet is hereby amended and restated in its entirety and replaced with **<u>Exhibit A</u>** hereto and all references to the Term Sheet in the Agreement shall be to **<u>Exhibit A</u>** hereto. Attached hereto as **<u>Exhibit B</u>** is a redline of the Term Sheet reflecting the changes.

H.    <u>MSGE Group Joinder Agreement</u>. Section 4(b) of the MSGE Group Joinder Agreement is hereby amended and restated in its entirety to read as follows:

Counsel agrees to use best efforts to obtain the executed signature pages of the members of the MSGE Group to be appended hereto within five (5) months from the date of execution of this Joinder Agreement, which may be extended with the consent of the Company, the Governmental Plaintiff Ad Hoc Committee and the Required Supporting Unsecured Noteholders

(each of whom are intended third-party beneficiaries hereunder). Failure to satisfy the obligation in this paragraph shall result in a breach of this Joinder Agreement as set forth in Section 2 above.

**III. Miscellaneous**.

A. This Joinder Agreement shall be governed by the governing law set forth in the Agreement.

B. This Joinder Agreement shall become effective and binding upon each Agreement Party upon the execution and delivery by the applicable Joinder Party of an executed signature page hereto and shall become effective and binding on all Agreement Parties upon receipt by the Company of executed signature pages from (a) the Company, (b) the Required Supporting Unsecured Noteholders, (c) the Governmental Plaintiff Ad Hoc Committee, (d) the MSGE Group, and (e) the holders of First Lien Term Loan Claims that hold greater than or equal to 66.7% in outstanding principal amount of each of (i) First Lien Term Loan Claims maturing in 2024 and (ii) First Lien Term Loan Claims maturing in 2025, in each case (the "***Joinder Effective Date***").

C. Except as specifically set forth herein, the terms of the Agreement shall remain in full force and effect and are hereby ratified and confirmed.

D. This Joinder Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Joinder Agreement delivered by facsimile or PDF shall be deemed to be an original for the purposes of this paragraph.

**IN WITNESS WHEREOF**, the Joinder Parties hereto have caused this Joinder Agreement to be executed and delivered by their respective duly authorized officers or other authorized persons, solely in their respective capacity as officers or other authorized persons of the undersigned and not in any other capacity, as of the date first set forth above.

[*Signature pages follow*]



Case 20-12522-JTD    Doc 2917    Filed 06/18/21    Page 550 of 835

[Signature Pages Redacted]

Case 20-12522-JTD    Doc 2917    Filed 06/18/21    Page 551 of 835

## Exhibit A

**Amended & Restated Term Sheet**

**Execution Version**

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

### Amended & Restated Mallinckrodt Restructuring Term Sheet

This Term Sheet, which is <u>Exhibit A</u> to the Restructuring Support Agreement dated October 11, 2020, by and among the Company and the Supporting Parties party thereto, describes the proposed terms of the Company's Restructuring. The Debtors will implement the Restructuring through the Plan, which shall be consistent with the terms of this Term Sheet, the RSA and the exhibits and schedules annexed hereto and thereto, including the Opioid Settlement Term Sheet, which is <u>Schedule 1</u> hereto, and the First Lien Settlement Term Sheet, which is <u>Schedule 3</u> hereto (as each may be amended or supplemented from time to time in accordance therewith and/or the terms of the RSA), in the Chapter 11 Cases commenced by the Debtors in the Bankruptcy Court on October 12, 2020, the Scheme of Arrangement based on the Plan to be commenced in the Irish Examinership Proceedings, and the Recognition Proceedings (as defined herein) in which the Canadian Court (as defined herein) shall recognize in Canada the Chapter 11 Cases. This Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the RSA, the Opioid Settlement Term Sheet, or the First Lien Settlement Term Sheet, as applicable.

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Plan and the other Definitive Documents, or the Scheme of Arrangement and the Irish Examinership Proceedings, which remain subject to negotiation in accordance with the RSA. Consummation of the transactions contemplated by this Term Sheet is subject to (a) the negotiation and execution of the Definitive Documents evidencing and related to the Restructuring contemplated herein, (b) satisfaction or waiver of all of the conditions in any Definitive Document evidencing the transactions comprising the Restructuring, (c) entry of the Confirmation Order and the satisfaction or waiver of any conditions to the effectiveness thereof, (d) approval of the Scheme of Arrangement by the High Court of Ireland and the satisfaction or waiver of any conditions to the effectiveness thereof, and (d) entry of an order recognizing the Confirmation Order in the Recognition Proceedings. The Definitive Documents shall satisfy the requirements of all applicable securities laws, the Bankruptcy Code, this Term Sheet, the Opioid Settlement Term Sheet, the First Lien Settlement Term Sheet, the Scheme of Arrangement, the Companies Act 2014 of Ireland governing the Irish Examinership Proceedings, and the Canadian Companies Arrangement Act governing the Recognition Proceedings. The Definitive Documents will contain terms and conditions that are dependent on each other, including those described in this Term Sheet, the Opioid Settlement Term Sheet, and the First Lien Settlement Term Sheet.

| **TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN** | | |
|---|---|---|
| **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Administrative, Tax, Other Priority and Other Secured Claims** | All such claims shall be paid in full in cash on the Plan Effective Date, or in the ordinary course of business as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code, in each case, as determined by the Debtors with the reasonable consent of the Required Supporting Unsecured Noteholders, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group and following consultation with the Supporting Term Lenders.

Administrative expense claims shall be paid on the Plan Effective Date and shall include Restructuring Expenses (as defined below). | Unimpaired |
| **First Lien Revolving Loan Claims** | All allowed First Lien Revolving Loan Claims shall receive the treatment provided in the First Lien Settlement Term Sheet. | Unimpaired; not entitled to vote |
| **First Lien Term Loan Claims** | All allowed First Lien Term Loan Claims shall receive the treatment provided in the First Lien Settlement Term Sheet. | Unimpaired; not entitled to vote; Impaired; entitled to vote |
| **First Lien Notes Claims** | All allowed First Lien Notes Claims shall be Reinstated at existing rates and maturities. | Unimpaired; not entitled to vote |
| **Second Lien Notes Claims** | All allowed Second Lien Notes Claims shall be Reinstated at existing rates and maturities. | Unimpaired; not entitled to vote |
| **Guaranteed Unsecured Notes Claims** | Holders of allowed Guaranteed Unsecured Notes Claims shall receive their *pro rata* share of:

i.   $375 million of new secured takeback second lien notes due 7 years after emergence (the "*Takeback Second Lien Notes*"), which shall contain economic terms consistent with those set forth in Annex 2 hereto; and

ii.  100% of New Mallinckrodt Common | Impaired; entitled to vote |

A-2939

| | Shares, subject to dilution on account of the New Opioid Warrants and the MIP (each as defined below). | |
|---|---|---|
| **4.75% Unsecured Notes Claims** | No property will be distributed to the Holders of allowed 4.75% Unsecured Notes Claims. | Impaired; deemed to reject; not entitled to vote |
| **Legacy Debentures Claims** | No property will be distributed to the Holders of allowed Legacy Debentures Claims. | Impaired; deemed to reject; not entitled to vote |
| **General Unsecured Claims (Not Otherwise Classified)** | Holders of allowed General Unsecured Claims shall receive their *pro rata* share, at the applicable Debtor, of up to $100 million to be allocated among the Debtors (the "***General Unsecured Recovery Cash Pool***"). | Impaired; entitled to vote |
| **Trade Claims** | As consideration for maintaining trade terms consistent with those practices and programs most favorable to the Debtors in place during the 12 months before the Petition Date or such other favorable terms as the Debtors and the Trade Claimants may mutually agree on, holders of allowed Trade Claims shall receive their *pro rata share* of up to $50 million; *provided that*, any amounts not allocated to allowed Trade Claims up to $50 million shall be allocated to the General Unsecured Recovery Cash Pool. | Impaired; entitled to vote |
| **Opioid Claims** | As of the Plan Effective Date, the Opioid Trust will be formed and shall receive the Opioid Trust Consideration as set forth in the Opioid Settlement Term Sheet.<br><br>All Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for Opioid Claims shall be assumed by the Opioid Trust as more fully set forth in the Opioid Settlement Term Sheet.<br><br>Each Opioid Claim shall be resolved in accordance with the terms, provisions, and procedures of the Opioid Trust Documents. | Impaired; entitled to vote |

| **Intercompany Claims** | No property will be distributed to the Holders of allowed Intercompany Claims. Unless otherwise provided for under the Plan, each Intercompany Claim will either be Reinstated or canceled and released at the option of the Debtors in consultation with the Supporting Unsecured Noteholders, Supporting Term Lenders, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group. | Unimpaired; deemed to accept; or Impaired; deemed to reject; not entitled to vote |
|---|---|---|
| **Intercompany Interests** | Intercompany Interests shall receive no recovery or distribution and be Reinstated solely to the extent necessary to maintain the Debtors' corporate structure. | Unimpaired; deemed to accept; or Impaired; deemed to reject; not entitled to vote |
| **Equity Interests** | All existing Equity Interests shall be discharged, cancelled, released, and extinguished. | Impaired; deemed to reject; not entitled to vote |
| **OTHER TERMS OF THE RESTRUCTURING** | | |
| **Case Financing** | The Chapter 11 Cases will be financed by existing cash and use of cash collateral on terms and conditions subject to the reasonable consent of the Required Supporting Unsecured Noteholders, the Required Supporting Term Lenders, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group and any cash collateral order will provide that any periods in which creditors are required to challenge any Debtor stipulations or claims against any of the Debtors (including the claims of lenders/bondholders) shall automatically be tolled with respect to the Supporting Governmental Opioid Claimants while the RSA remains in effect with respect to the Supporting Governmental Opioid Claimants. Any such challenge periods applicable to a Supporting Governmental Opioid Claimant would begin to run only after termination of the RSA by or against such Supporting Governmental Opioid Claimant. |
| **Executory Contracts and Unexpired Leases** | Except as otherwise provided in this Term Sheet or the RSA, the Debtors shall assume all executory contracts and unexpired leases other than those executory contracts and unexpired leases to be identified on a schedule of rejected executory contracts and unexpired leases included in the Plan Supplement or otherwise rejected pursuant to an order of the Bankruptcy Court, in each case as determined by the Debtors with the reasonable consent of the Required Supporting Unsecured Noteholders, the Governmental |

4

| | |
|---|---|
| | Plaintiff Ad Hoc Committee, and the MSGE Group and following consultation with the Supporting Term Lenders.  For the avoidance of doubt, assumption of executory contracts and unexpired leases shall be consistent with the RSA and this Term Sheet, including as specified in "Employee Matters" and "Indemnification of Prepetition Directors, Officers, Managers, et al." |
| **Opioid Trust** | Opioid Claims shall be channeled exclusively to, and all of Mallinckrodt's liability for Opioid Claims shall be assumed by, the Opioid Trust.  Each Opioid Claim shall be resolved in accordance with the terms, provisions, and procedures of the Opioid Trust Documents. The Opioid Trust shall be funded in accordance with the provisions of the Plan and the Opioid Settlement Term Sheet.<br><br>The sole recourse of any Opioid Claimant on account of such Opioid Claim shall be to the Opioid Trust, and each Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claim against any Released Party. |
| **CMS/DOJ/States Settlement** | The Plan will provide for the implementation of a settlement between Mallinckrodt, the United States, and the States resolving Acthar-related litigations and government investigations disclosed in the Company's Form 10-K for 2019, including United States of America, et al., ex rel., Charles Strunck, et al. v. Mallinckrodt ARD LLC (E.D. Penn.); United States of America et al. ex rel. Landolt v. Mallinckrodt ARD, LLC (D. Mass.); and Mallinckrodt ARD LLC v. Verma et al. (D.D.C.), and related matters, the terms of which are set forth on <u>Schedule 2</u> hereto. |
| **Corporate Governance** | The Reorganized Debtors' board shall consist of at least 7 directors including, the Debtors' Chief Executive Officer.  As of the Plan Effective Date, the members of the initial Reorganized Debtors' board shall be designated by the Required Supporting Unsecured Noteholders; *provided that*, the members of the Reorganized Debtors' board, other than the Debtors' Chief Executive Officer, shall be independent under NYSE/NASDAQ listing standards and shall be independent of the Supporting Unsecured Noteholders, unless the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Debtors otherwise consent.  No parties shall be afforded special rights under any charter, constitutions or bylaws or similar governing foundational document of any Reorganized Debtor; *provided*, that, the foregoing shall not be deemed to limit certain information, registration or similar rights to be afforded to (i) the Governmental Plaintiff Ad Hoc Committee and the MSGE Group in other agreements with the Reorganized Debtors, including pursuant to the New Opioid Warrants, (ii) the Supporting Term Lenders in connection with other agreements with the Reorganized Debtors, |

|  | including pursuant to the New Term Loan Documentation, and (iii) any lenders, including the Supporting Term Lenders, pursuant to any Exit Financing Documents. |
|---|---|
| **Employee Matters** | Substantially all employees of the Debtors to be retained by the Reorganized Debtors.  The Reorganized Debtors shall assume any employment, confidentiality, and non-competition agreements, bonus, gainshare and incentive programs (other than awards of stock options, restricted stock, restricted stock units, and other equity awards), vacation, holiday pay, severance, retirement, supplemental retirement, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs and arrangements, and all other wage, compensation, employee expense reimbursement, and other benefit obligations of the Debtors. |
| **Indemnification of Prepetition Directors, Officers, Managers, et al.** | The Plan shall provide that, consistent with applicable law, all indemnification provisions currently in place (whether in the by-laws, constitutions, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts or otherwise) for the current and former direct and indirect sponsors, directors, officers, managers, employees, attorneys, accountants, investment bankers, financial advisors, restructuring advisors, consultants and other professionals of the Debtors, as applicable, shall be reinstated (to the extent required) and remain intact and irrevocable and shall survive effectiveness of the Restructuring. |
| **MIP** | On the Plan Effective Date, the Reorganized Debtors shall adopt the management incentive plan (the "***MIP***") which shall provide for the issuance to management, key employees and directors of the Reorganized Debtors of 10% of the fully diluted New Mallinckrodt Common Shares (for the avoidance of doubt, after giving effect to the exercise of the New Opioid Warrants) not later than thirty (30) days after the Plan Effective Date at least half of the MIP shares will be granted and shall vest in accordance with the terms set forth in <u>Annex 3</u> hereto, and the remaining amount of which shall be reserved for future issuance as determined by the Reorganized Debtors' board; <u>provided</u>, that the MIP may be modified or amended by the mutual agreement of the Debtors and the Required Supporting Noteholders prior to the Plan Effective Date, with the consent of the Governmental Plaintiff Ad Hoc Committee and the MSGE Group (such consent not to be unreasonably withheld).  The final terms of the MIP (including any amendments or modifications, if any) shall be included in the Plan Supplement. |

6

| Exit Capital Raise | Exact terms, if any, to be agreed upon by the Debtors and Supporting Unsecured Noteholders holding no less than two-thirds in outstanding principal amount of Guaranteed Unsecured Notes held by the Supporting Unsecured Noteholders then party to the Restructuring Support Agreement, with the consent of (i) the Governmental Plaintiff Ad Hoc Committee and the MSGE Group to the extent (x) such exit capital is raised in the form of indebtedness (such consent not to be unreasonably withheld) or (y) that any such terms could reasonably be expected to have an adverse effect, in any material respect, on the treatment, rights, or entitlements of the holders of Opioid Claims under the RSA and (ii) the Required Supporting Term Lenders to the extent (x) such exit capital is raised in the form of indebtedness or (y) that any such terms could reasonably be expected to have an adverse effect on the treatment, rights, or entitlements of the holders of First Lien Term Loan Claims under the RSA and the First Lien Settlement Term Sheet; *provided*, that the Supporting Term Lenders shall not have any consent rights with respect to exit capital raised on or prior to the Plan Effective Date in the form of indebtedness that is (I) junior to the New First Lien Term Loans and matures after the maturity date of the New First Lien Term Loans, (II) any indebtedness incurred to fund payment of the First Lien Revolving Loan Claims and/or the First Lien Notes Claims in an aggregate principal amount not to exceed the principal amount (or accreted value, if applicable) of such First Lien Revolving Loan Claims and/or First Lien Notes Claims (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions, expenses, plus an amount equal to any existing commitment unutilized thereunder and letters of credit undrawn thereunder), (III) the Takeback Second Lien Notes (so long as such Takeback Second Lien Notes are not first-lien indebtedness), (IV) any receivables securitization facility in an aggregate principal amount not to exceed $200 million or (V) other Indebtedness incurred pursuant to provisions of Section 6.01 of Annex 1 attached to the First Lien Settlement Term Sheet ("Annex 1") as if in effect on the date of such incurrence (but, for the avoidance of doubt, this clause (V) shall not apply to any indebtedness permitted to be incurred pursuant to Section 6.01 of Annex 1 based on the calculation of a financial ratio, consolidated total assets or other financial metric) which Indebtedness described in this clause (V), if secured, is secured by any lien permitted by Section 6.02 of Annex 1. For the avoidance of doubt, the re-designation, exchange, replacement, refinancing, or acquisition, on or prior to the Plan Effective Date, of the Takeback Second Lien Notes or the Second Lien Notes, in each case, into, by, or for first lien indebtedness shall be prohibited. |
|---|---|

| Tax Issues | The Debtors and the Supporting Parties shall cooperate in good faith to structure the Restructuring and related transactions in a tax-efficient manner. |
|---|---|
| **Restructuring Transactions** | Without limiting any rights and remedies of the Debtors or Reorganized Debtors under the Plan or applicable law, but in all cases subject to the terms and conditions of the RSA and any consents or approvals required thereunder, the entry of the Confirmation Order shall constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Plan Effective Date, including such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors, or to reincorporate certain of the Affiliate Debtors under the laws of jurisdictions other than the laws of which the applicable Affiliate Debtors are presently incorporated. All such actions necessary or appropriate to consummate and implement the provisions of the Plan shall be set forth in the Plan Supplement, may include one or more mergers, consolidations, restructures, conversions, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate, but in all cases subject to the terms and conditions of the Plan and the RSA and any consents or approvals required thereunder (collectively, the "**Restructuring Transactions**"); *provided*, *that* any Restructuring Transactions shall (a) not adversely affect the recoveries under the Plan (i) of the holders of Guaranteed Unsecured Notes Claims without the consent of the Required Supporting Unsecured Noteholders or (ii) the holders of Opioid Claims without the consent of the Governmental Plaintiff Ad Hoc Committee and the MSGE Group, or (b) not materially adversely affect the rights or recoveries under the Plan of the holders of First Lien Term Loan Claims without the consent of the Required Supporting Term Lenders. |
| **Company Status Upon Emergence** | On or as soon as reasonably practicable after the Plan Effective Date, the New Mallinckrodt Common Shares shall be listed for trading on The NASDAQ Capital Market, the NASDAQ Global Market, or the New York Stock Exchange; *provided however that*, in any event, on the Plan Effective Date, the Reorganized Debtors shall have governance standards as though they were listed on any such exchange. |

| Cancellation of Notes, Instruments, Certificates, and Other Documents | On the Plan Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Equity Interests, shall be canceled and/or updated to record such cancellation and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
|---|---|
| Issuance of New Securities; Execution of the Plan Restructuring Documents | On the Plan Effective Date, the Reorganized Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued or make, or cause to be made, such entries in its books and records pursuant to the Restructuring. The Parties shall use reasonable efforts to make securities issued under the Plan DTC eligible. |
| Fees and Expenses of the Restructuring Support Agreement Parties | The Debtors shall pay all reasonable and documented fees and out of pocket expenses of :<br><br>• (a) primary counsel to the Unsecured Notes Ad Hoc Group, Paul, Weiss, Rifkind, Wharton & Garrison LLP, (b) one Delaware counsel to the Unsecured Notes Ad Hoc Group, (c) one Irish counsel to the Unsecured Notes Ad Hoc Group, (d) one regulatory counsel to the Unsecured Notes Ad Hoc Group and (e) one financial advisor to the Unsecured Notes Ad Hoc Group, Perella Weinberg Partners LP, (f) one Canadian counsel to the Unsecured Notes Ad Hoc Group, and (g) such other legal, consulting, financial, and/or other professional advisors to which the Unsecured Notes Ad Hoc Group and the Debtors shall reasonably agree from time to time;<br><br>• (a) primary counsel to the Governmental Plaintiff Ad Hoc Group, Gilbert LLP, Kramer Levin Naftalis & Frankel LLP, and Brown Rudnick LLP, (b) one local counsel to the Governmental Plaintiff Ad Hoc Group, (c) one Irish counsel to the Governmental Plaintiff Ad Hoc Committee, (d) one investment banker to the Governmental Plaintiff Ad Hoc Committee, Houlihan Lokey, Inc., and (e) such other legal, consulting, financial, and/or other professional advisors to which the Governmental Plaintiff Ad Hoc Committee and the Debtors shall reasonably agree from time to time;<br><br>• (a) primary counsel to the MGSE Group, Caplin & Drysdale, Chartered, (b) one local counsel to the MSGE Group, Seitz, Van Ogtrop & Green, P.A., (c) one financial advisor to the MSGE Group, FTI Consulting, and (d) such other legal, consulting, financial, and/or other professional advisors to which the MSGE Group and the Debtors shall reasonably |

9

| | |
|---|---|
| | agree from time to time; |
| | • indenture trustee fees; and |
| | • (a) primary counsel to the Ad Hoc First Lien Term Lender Group, Gibson, Dunn & Crutcher LLP, (b) one financial advisor to the Ad Hoc First Lien Term Lender Group, Evercore Group, LLC, and (c) such other legal, consulting, financial, and/or other professional advisors that the Ad Hoc First Lien Term Lender Group is permitted to retain under the Final Cash Collateral Order or as the Debtors shall reasonably agree from time to time (including any additional Delaware counsel retained in connection with the motion seeking approval of the 2020 ECF Payment Settlement), |
| | in each case, that are due and owing after receipt of applicable invoices with non-privileged summaries of services rendered, without any requirement for the filing of fee or retention applications in the Chapter 11 Cases, and in accordance with the terms of the applicable engagement letters, if any, with any balance(s) paid on the Plan Effective Date (collectively, the "**_Restructuring Expenses_**"). |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| **Releases** | The exculpation provisions, Debtor releases, third-party releases and injunction provisions to be included in the Plan will be consistent with _Annex 4_ hereto in all material respects, to the fullest extent permissible under applicable law.<br><br>In addition, the Plan will include separate release and channeling injunction provisions with respect to Opioid Claims. |
| **Consent Rights** | All consent rights not otherwise set forth herein shall be set forth in the RSA. |
| **Conditions Precedent to the Plan Effective Date** | The Plan shall contain customary conditions precedent to occurrence of the Plan Effective Date, including the following:<br><br>• the RSA shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith;<br><br>• the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with the RSA and such order shall be a Final Order;<br><br>• the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of |

A-2947

the other transactions contemplated by the Restructuring;

- all conditions precedent to the consummation of the Opioid Settlement and related transactions, including the establishment of the Opioid Trust and authorization for the payment of the Opioid Trust Consideration, have been satisfied or waived by the party or parties entitled to waive them in accordance with the terms of the Opioid Trust Documents;

- the final version of the Plan, Plan Supplement, the Opioid Trust Documents, and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan, shall be consistent with the RSA;

- the Canadian Court shall have issued an order recognizing the Confirmation Order in the Recognition Proceedings and giving full force and effect to the Confirmation Order in Canada and such recognition order shall have become a Final Order;

- the High Court of Ireland shall have made an order confirming the Scheme of Arrangement in the Irish Examinership Proceedings and the Scheme of Arrangement shall have become effective in accordance with its terms (or shall become effective concurrently with effectiveness of the Plan);

- the Irish Takeover Panel shall have either: (a) confirmed that an obligation to make a mandatory general offer for the shares of the Parent pursuant to Rule 9 of the Irish Takeover Rules will not be triggered by the implementation of the Scheme of Arrangement and the Plan; or (b) otherwise waived the obligation on the part of any Person to make such an offer;

- any civil or criminal claims asserted by or on behalf of the Department of Justice (other than those resolved pursuant to the CMS/DOJ/States Settlement) have been resolved on terms reasonably acceptable to the Debtors, the Required Supporting Unsecured Noteholders, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group and, to the extent such resolution requires a cash payment that is not paid from the General Unsecured Recovery Cash Pool and such payment (and not any other payments, conditions, or circumstances) causes a materially adverse reduction in projected cash as of the Plan Effective Date as compared to the projections contained in the 8K filed on March 10, 2020, the Required Supporting Term Lenders;

|  | <ul><li>the Debtors shall have paid in full all professional fees and expenses of the Debtors' retained professionals that require the Bankruptcy Court's approval or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses;</li><li>the Debtors shall have paid the Restructuring Expenses in full, in cash;</li><li>the Bankruptcy Court shall have entered the CCO Modification Order in form and substance reasonably acceptable to the Required Supporting Term Lenders and such order shall be a Final Order and remain in full force and effect; *provided*, that, this condition precedent shall not be deemed unmet based solely on the Bankruptcy Court declining to apply the Adjusted Interest Rate retroactively to any date prior to the entry of the CCO Modification Order or because of the failure of the CCO Modification Order to require payment of the Term Loan Exit Payment;</li><li>the Debtors shall have paid the Noteholder Consent Fee and Term Loan Exit Payment on the Plan Effective Date;</li><li>the Bankruptcy Court shall have entered a Final Order authorizing and directing the Debtors to pay all Transaction Fees payable under the Reimbursement Agreements (each as defined in the RSA Parties Fee Motion); and</li><li>the Restructuring to be implemented on the Plan Effective Date shall be consistent with the Plan and the RSA.</li></ul> |
|---|---|

A-2949

**Annex 1**

**Certain Definitions**

| | |
|---|---|
| ***1992 Legacy Debentures Indenture*** | That certain Indenture, dated as of April 30, 1992, by and among Ludlow Corporation, as issuer, U.S. Bank National Association (as successor in interest to Security National Pacific Trust Company (New York)), as trustee, as supplemented by that certain First Supplemental Indenture, dated as of April 30, 1992, with U.S. Bank National Association (as successor in interest to Security Pacific National Trust Company (New York)) (each as modified, amended, or supplemented from time to time). |
| ***1993 Legacy Debentures Indenture*** | That certain Indenture, dated as of April 30, 1992, by and among Ludlow Corporation, as issuer, U.S. Bank National Association (as successor in interest to Security National Pacific Trust Company (New York)), as trustee, as supplemented by that certain Second Supplemental Indenture, dated as of March 8, 1993, with U.S. Bank National Association (as successor in interest to BankAmerica National Trust Company) (each as modified, amended, or supplemented from time to time). |
| ***2013 Notes Indenture*** | That certain Indenture, dated as of April 11, 2013, by and among Mallinckrodt International Finance S.A. as issuer, the guarantor party thereto, and Deutsche Bank Trust Company Americas, as trustee (as modified, amended, or supplemented from time to time). |
| ***2014 Notes Indenture*** | That certain Indenture, dated as of August 13, 2014, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Deutsche Bank Trust Company Americas, as trustee, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| ***2020 First Lien Notes Indenture*** | That certain Indenture, dated as of April 7, 2020, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Wilmington Savings Fund Society, FSB, as first lien trustee, Deutsche Bank AG New York Branch, as first lien collateral agent, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| ***2019 Second Lien Notes Indenture*** | That certain Indenture, dated as of December 6, 2019, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Wilmington Savings Fund Society, FSB, as second lien trustee and second lien collateral agent, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |

| | |
|---|---|
| ***4.75% Senior Notes due 2023*** | The 4.75% senior notes due 2023 pursuant to the 2013 Notes Indenture. |
| ***4.75% Unsecured Notes Claims*** | Any Claim arising under or based upon the 4.75% Unsecured Notes or the 2013 Notes Indenture. |
| ***5.50% Senior Notes 2025*** | The 5.50% senior notes due 2025 pursuant to the April 2015 Notes Indenture. |
| ***5.625% Senior Notes due 2023*** | The 5.625% senior notes due 2023 pursuant to the September 2015 Notes Indenture. |
| ***5.75% Senior Notes due 2022*** | The 5.75% senior notes due 2022 pursuant to the 2014 Notes Indenture. |
| ***8.00% Debentures due March 2023*** | The 8.00% debentures due 2023 pursuant to the 1993 Legacy Debentures Indenture. |
| ***9.50% Debentures due May 2022*** | The 9.50% debentures due 2022 pursuant to the 1992 Legacy Debentures Indenture. |
| ***Affiliate*** | As defined in section 101(2) of the Bankruptcy Code. |
| ***April 2015 Notes Indenture*** | That certain Indenture, dated as of April 15, 2015, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Deutsche Bank Trust Company Americas, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| ***Avoidance Actions*** | Any and all avoidance, recovery, subordination or similar actions or remedies that may be brought by and on behalf of the Debtors or their estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code. |
| ***Canadian Court*** | The Ontario Superior Court of Justice (Commercial List) |
| ***Causes of Action*** | Any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counterclaims, defenses, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, under statute, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, federal or state, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, |

| | third party action, action for indemnity or contribution or otherwise. |
|---|---|
| *Class* | Each class of Holders of Claims or Equity Interests established under the Plan pursuant to section 1122(a) of the Bankruptcy Code. |
| *Confirmation Date* | The date on which the Confirmation Order is entered by the Bankruptcy Court. |
| *Consummation* | The occurrence of the Plan Effective Date. |
| *Current Opioid PI Claim* | A claim held by an individual against a Debtor for harm arising out of the use of opioid products manufactured or sold prior to the Plan Effective Date, other than a Future Opioid PI Claim. |
| *Entity* | As defined in section 101(15) of the Bankruptcy Code. |
| *Equity Interest* | Any issued, unissued, authorized, or outstanding ordinary shares or shares of common stock, preferred stock, or other instrument evidencing an ownership interest in Mallinckrodt plc, whether or not transferable, together with any warrants, equity-based awards, or contractual rights to purchase or acquire such equity interests at any time and all rights arising with respect thereto that existed immediately before the Plan Effective Date. |
| *Exculpated Party* | In each case, in its capacity as such: (a) the Debtors (and their Representatives); (b) the Reorganized Debtors (and their Representatives); and (c) the Future Claimants Representative. |
| *Existing Credit Agreement* | That certain Credit Agreement, dated as of March 19, 2014, by and among Mallinckrodt plc, as the parent, Mallinckrodt International Finance S.A., as Lux borrower, Mallinckrodt CB LLC, as co-borrower, the First Lien Agent, and the First Lien Lenders (as modified, amended, or supplemented from time to time). |
| *Final Order* | An order entered by the Bankruptcy Court or other court of competent jurisdiction: (a) that has not been reversed, stayed, modified, amended, or revoked, and as to which (i) any right to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has expired and no appeal, motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing is pending or (b) as to which an appeal has been taken, a motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing has been filed and (i) such appeal, motion for leave to appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was |

3

| | appealed or from which leave to appeal, certiorari, review, reargument, stay, or rehearing was sought and (ii) the time to appeal (in the event leave is granted) further or seek leave to appeal, certiorari, further review, reargument, stay, or rehearing has expired and no such appeal, motion for leave to appeal, or petition for certiorari, further review, reargument, stay, or rehearing is pending. |
|---|---|
| *First Lien Agent* | Deutsche Bank AG New York Branch, in its capacity as administrative agent under the Existing Credit Agreement or, as applicable, any successor thereto. |
| *First Lien Notes* | The 10.00% first lien senior secured notes due 2025 pursuant to the 2020 First Lien Notes Indenture. |
| *First Lien Notes Claim* | Any Claim arising under or based upon the First Lien Notes or the 2020 First Lien Notes Indenture. |
| *First Lien Credit Agreement Claims* | Any claim held by the First Lien Agent or the First Lien Lenders derived from or based upon the Existing Credit Agreement or theFirst Lien Credit Facility, including claims for all principal amounts outstanding (including any right to prepayment thereof), interest, fees, expenses, costs, indemnification and other charges and expenses arising under or related to the First Lien Credit Facility or the Existing Credit Agreement. |
| *First Lien Credit Facility* | The credit facility evidenced by the Existing Credit Agreement. |
| *First Lien Lenders* | The banks, financial institutions, and other lenders party to the Existing Credit Agreement from time to time. |
| *Future Opioid PI Claims* | A claim held by an individual against a Debtor for harm arising out of the use of opioid products manufactured or sold prior to the Plan Effective Date, which could not be discharged by confirmation of a plan of reorganization if the Bankruptcy Court did not appoint a future claimants representative in the Chapter 11 Cases and which claim is to be addressed by the Opioid Trust to assume the liabilities of the Debtors for damages allegedly caused by the use of opioid products. |
| *Future Opioid PI Claimants* | Individuals holding Future Opioid PI Claims. |
| *Future Claimants Representative* | The legal representative for Future Opioid PI Claimants. |
| *General Unsecured* | Any Unsecured Claim (other than a Guaranteed Unsecured Notes |

A-2953

| | |
|---|---|
| **Claims** | Claim, a Trade Claim, an Opioid Claim, an Administrative, Tax, Other Priority or Other Secured Claim, or (subject to effectiveness of the CMS/DOJ/States Settlement) a Claim resolved by the CMS/DOJ/States Settlement), including without limitation (a) Claims arising from the rejection of unexpired leases or executory contracts, (b) Claims arising from any litigation or other court, administrative or regulatory proceeding, including damages or judgments entered against, or settlement amounts owing by a Debtor in connection therewith, and (c) Claims related to asbestos exposure or products containing asbestos. |
| **Guaranteed Unsecured Notes** | The 5.75% Senior Notes due 2022, the 5.500% Senior Notes Due 2025 and the 5.625% Senior Notes Due 2023. |
| **Guaranteed Unsecured Notes Claims** | Any Claim arising under or based upon the Guaranteed Unsecured Notes or the Guaranteed Unsecured Notes Indentures. |
| **Guaranteed Unsecured Notes Indentures** | Collectively, the 2014 Notes Indenture, the April 2015 Notes Indenture and the September 2015 Notes Indenture. |
| **Holder** | An Entity holding a Claim or Equity Interest, as applicable. |
| **Impaired** | With respect to any Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| **Intercompany Claim** | A prepetition Claim held by a Debtor or non-Debtor against a Debtor. |
| **Intercompany Interest** | An Interest in any Debtor other than Mallinckrodt Plc. |
| **Irish Takeover Panel** | The Irish Takeover Panel constituted under Irish Takeover Panel Act 1997. |
| **Irish Takeover Rules** | The Irish Takeover Panel Act 1997, Takeover Rules 2013. |
| **Legacy Debentures Claims** | Any Claim arising under or based upon the 1992 Legacy Debentures Indenture or 1993 Legacy Debentures Indenture. |
| **Lien** | A lien as defined in section 101(37) of the Bankruptcy Code. |
| **New Mallinckrodt Common Shares** | Common equity interests or ordinary shares in the Reorganized Debtor, Mallinckrodt plc. |
| **New Opioid Warrants** | The warrants contemplated under the Opioid Settlement and Opioid Trust Documents, which shall be consistent with the terms set forth in the Opioid Settlement Term Sheet. |

A-2954

| | |
|---|---|
| **Recognition Proceedings** | The proceedings commenced by the Debtors under Part IV of the Canadian Companies Arrangement Act in the Canadian Court to recognize in Canada the Chapter 11 Cases and to recognize in Canada certain Orders of the Bankruptcy Court. |
| **Reinstated** | With respect to Claims and Equity Interests, that the Claim or Equity Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| **Reorganized Debtors** | The Debtors, as reorganized pursuant to and under the Plan or any successor thereto. |
| **Required Supporting Second Lien Noteholders** | Holders of at least two-thirds in outstanding principal amount of Second Lien Notes. |
| **Released Party** | (a) The Debtors, (b) the Reorganized Debtors, (c) the Non-Debtor Affiliates, (d) with respect to each of the foregoing Persons in clauses (a) through (c), such Persons' (i) predecessors, successors, permitted assigns, subsidiaries, and controlled affiliates, respective heirs, executors, estates, and nominees, in each case solely in their capacity as such and (ii) current and former officers and directors, principals, members, employees, financial advisors, attorneys (including attorneys retained by any director in his or her capacity as such), accountants, investment bankers (including investment bankers retained by any director in his or her capacity as such), consultants, experts and other professionals of the persons described in clauses (a) through (d)(i); (e) each member of the Unsecured Notes Ad Hoc Group in their capacity as such, (f) each Supporting Unsecured Noteholder in their capacity as such, (g) the Opioid Trust, (h) each member of the Governmental Plaintiff Ad Hoc Committee in their capacity as such, (i) each Supporting Governmental Opioid Claimant in their capacity as such; (j) each member of the MSGE Group in their capacity as such; (k) each of the Secured Parties, (l) each Supporting Term Lender in their capacity as such, (m) each member of the Ad Hoc First Lien Term Lender Group in their capacity as such, and (m) with respect to each of the foregoing Persons in clauses (e) through (m), each such Person's Representatives.  Notwithstanding anything to the contrary herein, Medtronic plc and its related parties will not be Released Parties. |
| **Second Lien Notes** | The 10.00% second lien senior secured notes due 2025 pursuant to the 2019 Second Lien Notes Indenture. |
| **Second Lien Notes** | Any Claim arising under or based upon the Second Lien Notes |

A-2955

| Claim | Indenture or the 2019 Second Lien Notes Indenture. |
|---|---|
| *Secured Parties* | The Prepetition Secured Parties, as defined in the Cash Collateral Order. |
| *September 2015 Notes Indenture* | That certain Indenture, dated as of September 24, 2015, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Deutsche Bank Trust Company Americas, as trustee, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| *Trade Claim* | An Unsecured Claim held by a Trade Claimant. |
| *Trade Claimant* | Trade creditors, service providers and other vendors who provide goods and services necessary for the Debtors continued operations, including those creditors described in (a) *Motion of Debtors for Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors*, (b) *Motion of Debtors for Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Foreign Vendors*, and (c) *Motion of Debtors for Interim and Final Orders (A) Authorizing Payment of Lienholder Claims and (B) Authorizing Payment of Section 503(b)(9) Claims*. |
| *Unimpaired* | With respect to a Claim, Equity Interest, or Class of Claims or Equity Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code. |
| *Unsecured Claim* | A Claim that is not secured by a Lien on property in which one of the Debtors' estates has an interest. |

A-2956

Case 20-12522-JTD    Doc 2917    Filed 06/18/21    Page 571 of 835

**<u>Annex 2</u>**

**Takeback Second Lien Notes Summary Terms**

| | |
|---|---|
| **Amount** | • $375 million |
| **Notes** | • Senior Secured Second Lien Notes |
| **Issuers** | • Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC |
| **Obligors** | • Same as the obligors on the Deferred Cash Payments, *provided that* any obligations on account of the Takeback Second Lien Notes shall (i) be guaranteed by the same entities that guarantee the First Lien Notes and (ii) comply with the terms of the Debtors' existing funded indebtedness |
| **Coupon** | • Payable in cash at 10.00% |
| **Maturity** | • Seven (7) years following the Plan Effective Date |
| **Collateral/Priority** | • *Pari passu* with the second lien security interests as with existing Second Lien Notes |
| **Put** | • Puttable to the issuer at 101% of par upon a change of control |
| **Equity Claw** | • Company may redeem up to 40% of Takeback Second Lien Notes at a redemption price of 110% of par with the proceeds of an equity offering |
| **Call Protections** | • Non-callable for 4 years<br><br>• 105 call in year 5<br><br>• 102.5 in year 6<br><br>• Par thereafter |
| **Affirmative and Negative Covenants** | • To generally match the 2020 First Lien Notes Indenture, as adjusted to reflect new Takeback Second Lien Notes structure |

A-2957

## Annex 3

### Term Sheet for Mallinckrodt Pharmaceuticals Management Incentive Plan

The following term sheet summarizes the principal terms of a management incentive plan (the "**MIP**") that certain creditors receiving equity securities (the "**Investors**") of New Mallinckrodt (the "**Company**" and together with its controlled subsidiaries, the "**Company Group**") will adopt effective upon emergence (the "**Closing**").

Capitalized terms used but not defined herein shall have the meanings set forth in the Restructuring Support Agreement and the Restructuring Term Sheet attached thereto as Exhibit A both dated October 11, 2020, to which this term sheet is attached as *Annex 2* (the "**RSA**"). The terms outlined in this Term Sheet assume New Mallinckrodt will be a publicly traded company shortly following Closing consistent with the RSA.

| | |
|---|---|
| **Plan Reserve:** | A number of New Mallinckrodt Common Shares representing 10% of all equity interests in the Company outstanding immediately after the Closing on a fully diluted basis, taking into account the Plan Reserve and any equity securities issued and outstanding at the Closing, and any warrants or securities convertible, exercisable or exchangeable therefor, will be reserved for issuance pursuant to the MIP (such securities issued pursuant to the MIP, the "**Award Shares**").[1] |
| **Eligibility:** | Company employees, non-employee consultants and outside Directors of the Company Group will be eligible to participate in the MIP. Each person who receives an award pursuant to the MIP is hereinafter referred to as a "**Participant**". |
| **Initial Grant:** | Not less than 50% of the Plan Reserve shall be granted in the form of restricted shares, restricted share units or options over New Mallinckrodt Common Shares (the "**Restricted Shares**") within 30 days following Closing with the allocation of such grants to be approved by the Compensation Committee of the Company based upon the recommendations of the Company's CEO (the "**Initial Grants**"). No more than 25% of the Initial Grants shall be in the form of options. |

---

[1]    Plan Reserve subject to adjustment in connection with share split, reverse share split, share dividend or other distribution (whether in the form of cash, shares, other securities or other property), extraordinary cash dividend, recapitalization, merger, consolidation, split-up, spin-off, reorganization, combination, repurchase or exchange of shares or other securities or similar corporate transaction or event.

| | |
|---|---|
| **Vesting of Initial Grants:** | The Initial Grants will vest as determined in good faith by the Compensation Committee in consultation with the Company's CEO over a period not exceeding 3 years. |
| | If a Participant's employment is terminated by the Company without "Cause" or by the Participant for "Good Reason" (to be defined in the MIP), all unvested awards that would otherwise vest during the 12 months following such termination, will vest upon termination, subject to the Participant's execution of a reasonable and customary general release of claims in favor of the Company that becomes effective within 60 days after such termination and continued material compliance with the terms of any non-competition or non-solicitation restrictive covenants to which the Participant is subject. |
| | The MIP will contain other terms consistent with public company equity incentive plans and awards within the Company's peer group. |
| **Change in Control:** | Upon the occurrence of a "Change in Control" (to be defined in the MIP), to the extent awards are not assumed or substituted, all awards under the MIP shall become fully vested and payable. |
| **Restrictive Covenants:** | To the extent a Participant is not already subject to non-compete, non-solicitation or other restrictive covenants, then such Participant will be required to enter into a covenant consistent with Mallinckrodt's current Non-Competition, Non-Solicitation, and Confidentiality Agreement, but with a non-compete/non-solicitation period not to exceed 12 months. |

A-2959

**Annex 4**

**Plan Release, Exculpation and Injunction Provisions**

**Releases by the Debtors**

Pursuant to section 1123(b) of the Bankruptcy Code (and any other applicable provisions of the Bankruptcy Code), as of the Plan Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the Opioid Settlement and the Restructuring, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Plan Effective Date, by the Debtors and the Estates (the "Debtor Release") from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates, the Debtors' in- or out-of-court restructuring efforts (including the Chapter 11 Cases), the purchase, sale, or rescission of the purchase or sale of any security or indebtedness of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, litigation claims arising from historical intercompany transactions between or among a Debtor and another Debtor, the business or contractual arrangements between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Plan Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Plan Effective Date, the Definitive Documents, the Opioid Trust, Opioid Trust Documents, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement (including any amendments and/or joinders thereto) and related prepetition and postpetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, any Restructuring Transaction, any agreement, instrument, release, and other documents created or entered into prior to the Plan Effective Date in connection with the creation of the Opioid Trust, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation (including the solicitation of votes on the Plan), the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities

pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between and Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Plan Effective Date relating to any of the foregoing; provided however that the Debtors do not release, and the Opioid Trust shall retain, all Assigned Third-Party Claims; provided, further, that the Debtors do not release, Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.  The foregoing release will be effective as of the Plan Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release.  Notwithstanding anything to the contrary in the foregoing, the releases by the Debtors set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claims which are Reinstated pursuant to the Plan.

The Reorganized Debtors and the Opioid Trust shall be bound, to the same extent the Debtors are bound, by the releases set forth in Article [__] of the Plan.  For the avoidance of doubt, Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party prior to the Plan Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct, including findings after the Plan Effective Date, are not released pursuant to Article [__] of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in Article [__] of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith and settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors, their estates and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity or Person asserting any claim or Cause of Action released by Article [__] of the Plan.

**Releases by Holders of Claims and Equity Interests**

Pursuant to section 1123(b) of the Bankruptcy Code (and any other applicable provisions of the Bankruptcy Code), as of the Plan Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the Opioid Settlement and Restructuring, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged, to the maximum extent permitted by law, as such law may be

extended subsequent to the Plan Effective Date, except as otherwise explicitly provided herein, by (a) the holders of all Claims who vote to accept the Plan, (b) the holders of all Claims that are Unimpaired under the Plan, (c) the holders of all Claims whose vote to accept or reject the Plan is solicited but who (i) abstain from voting on the Plan and (ii) do not opt out of granting the releases set forth herein, (d) the holders of all Claims or Equity Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, and (e) all other holders of Claims and Equity Interests to the maximum extent permitted by law, in each case, from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such entities existed prior to or after the Petition Date), their Estates, the Debtors' in- or out-of-court restructuring efforts (including the Chapter 11 Cases), the purchase, sale, or rescission of the purchase or sale of any security or indebtedness of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, litigation claims arising from historical intercompany transactions between or among a Debtor and another Debtor, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Plan Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Plan Effective Date, the Definitive Documents, the Opioid Trust, Opioid Trust Documents and the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement (including any amendments and/or joinders thereto) and related prepetition and postpetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, any Restructuring Transaction, any agreement, instrument, release, and other documents created or entered into prior to the Plan Effective Date in connection with the creation of the Opioid Trust, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation (including the solicitation of votes on the Plan), the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between and Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Plan Effective Date relating to

3

any of the foregoing, other than Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct.  For the avoidance of doubt, Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party prior to the Plan Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct, including findings after the Plan Effective Date, are not released pursuant to Article   [___] of the Plan.  Notwithstanding anything to the contrary in the foregoing, the releases by the Holders of Claims and Equity Interests set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claims which are Reinstated pursuant to the Plan.

Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order shall (x) release, discharge, or preclude the enforcement of any liability of a Released Party to a Governmental Unit arising out of, or relating to, any act or omission of a Released Party prior to the Plan Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act or (y) solely as to any Supporting Governmental Opioid Plaintiff, release or discharge a consultant or expert having been retained to provide strategic advice for sales and marketing of opioid products who has received a civil investigative demand or other subpoena related to sales and marketing of opioid products from any State Attorney General on or after January 1, 2019 through the Petition Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Equity Interests set forth in Article   [___] of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith and settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors, their estates and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity or Person asserting any claim or Cause of Action released by Article   [___] of the Plan.

**Exculpation**

Effective as of the Plan Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person for any claims or Causes of Action arising prior to or on the Plan Effective Date for any act taken or omitted to be taken in connection with, related to, or arising out of, the Chapter 11 Cases, formulating, negotiating, preparing, disseminating, implementing, filing, administering, confirming or effecting the Confirmation or Consummation of the Plan, the Disclosure Statement, the Opioid Settlement, the Opioid Trust Documents, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, or any contract, instrument, release or other agreement or document created or entered into in connection with any of the

4

foregoing, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the Disclosure Statement or Confirmation or Consummation of the Plan, the Opioid Settlement or the Opioid Trust Documents, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (a) any Causes of Action arising from actual fraud, gross negligence, or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (b) the rights of any Person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

The foregoing exculpation shall be effective as of the Plan Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

**Permanent Injunction**

Except as otherwise expressly provided in the Confirmation Order, Plan or Opioid Trust Documents, from and after the Plan Effective Date all Persons are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from: (a) commencing or continuing, in any manner or in any place, any suit, action or other proceeding of any kind; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any encumbrance of any kind; (d) asserting any right of setoff, or subrogation of any kind; and (d) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any Claim, demand, liability, obligation, debt, right, Cause of Action, Equity Interest or remedy released or to be released, exculpated or to be exculpated, settled or to be settled, or discharged or to be discharged pursuant to the Plan or the Confirmation Order against any Person so released, discharged or exculpated (or the property or estate of any Person so released, discharged or exculpated).  All injunctions or stays provided in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force until the Plan Effective Date.

Case 20-12522-JTD   Doc 2917   Filed 06/18/21   Page 579 of 835

## <u>Schedule 1</u>

**Opioid Settlement Term Sheet**

Execution Version

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE UNDER THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## Mallinckrodt Opioid Settlement Term Sheet

This Opioid Settlement Term Sheet, which is Schedule 1 to the Term Sheet (the "**Restructuring Term Sheet**") annexed as Exhibit A to the Restructuring Support Agreement, dated October 11, 2020, by and among the Company and the Supporting Parties, describes the proposed treatment of Opioid Claims in connection with the Restructuring contemplated by the Restructuring Support Agreement, as well as certain related implementation and other matters being resolved pursuant to the Opioid Settlement. This Opioid Settlement Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code. Certain capitalized terms used herein are defined in the glossary attached hereto; capitalized terms used but not otherwise defined in this Opioid Settlement Term Sheet have the meanings assigned in the Restructuring Support Agreement or the Restructuring Term Sheet, as applicable.

This Opioid Settlement Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documents implementing the Opioid Settlement and broader Restructuring of claims against and interests in the Debtors, which remain subject to negotiation in accordance with the Restructuring Support Agreement.

| TERMS OF THE PLAN AND THE RESTRUCTURING | |
|---|---|
| **Overview** | The Opioid Settlement and Restructuring will be implemented through the Plan, consistent with the terms of (a) this Opioid Settlement Term Sheet, (b) the Restructuring Term Sheet and (c) the Restructuring Support Agreement, through the Chapter 11 Cases to be commenced in the Bankruptcy Court. |
| | The Plan will provide for the establishment of the Opioid Trust, which will receive the Trust Consideration (as defined below), including certain cash payments, the New Opioid Warrants, and certain other assets. All Opioid Claims will be assumed by the Opioid Trust and be discharged, released, and enjoined as to the Company and the other Released Parties. |
| **Treatment of Opioid Claims** | As of the Plan Effective Date, Mallinckrodt's liability for all Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to and assumed by the Opioid Trust, as described herein. Each Opioid Claim shall be resolved in |

| | |
|---|---|
| | accordance with the terms, provisions, and procedures of the Opioid Trust Documents. The Opioid Trust shall be funded in accordance with the provisions of this Term Sheet. The sole recourse of any Opioid Claimant on account of such Opioid Claim shall be to the Opioid Trust, and each such Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claim against any Protected Party. |
| **Opioid Trust** | On the Plan Effective Date, the Opioid Trust will receive (the "***Trust Consideration***"):<br><br>• cash in the amount of $450,000,000;<br><br>• the New Opioid Warrants;<br><br>• the right to receive cash payments (the "***Deferred Cash Payments***") in the following amounts and on the following dates: (a) $200,000,000 on each of the first and second anniversaries of the Plan Effective Date; and (b) $150,000,000 on each of the third through seventh anniversaries of the Plan Effective Date; *provided*, that at any time prior to the first anniversary of the Plan Effective Date, the Reorganized Debtors shall have the right to prepay, in full or in part, the Deferred Cash Payments, at a price equal to the present value of the amounts to be prepaid, at the date of prepayment, discounted at the discount rate that would be required for (x)(i) the present value of the Deferred Cash Payments at the prepayment date plus (ii) $450,000,000 to equal (y)(i) the present value of the payments under the Original Payments Schedule at the prepayment date (excluding the initial $300,000,000 payment provided for in the Original Payments Schedule), discounted at a discount rate of 12% per annum, *plus* (ii) $300,000,000 (such option, the "***Prepayment Option***");[11] *provided, further*, that to the extent the Reorganized Debtors seek to prepay only a portion of the Deferred Cash Payments in accordance with the Prepayment Option, such prepayment shall (x) be funded solely from the net proceeds of an equity raise by the Reorganized Debtors; and (y) prepay Deferred Cash Payments in accordance with the above in inverse order beginning with the payment due on the seventh anniversary of the Plan Effective Date;<br><br>• the Assigned Third-Party Claims; and |

---

[1]   **Annex A** sets forth the prepayment cost as of the end of each of the 12 months after the Plan Effective Date. To the extent a prepayment occurs other than at the end of a month, the prepayment cost shall be calculated in accordance with the above formula.

| | |
|---|---|
| | • the Assigned Insurance Rights. |
| | The cash payments described above include amounts to be determined by the Governmental Plaintiff Ad Hoc Committee and the MSGE Group for reimbursement of plaintiffs'/claimants attorneys' fees and costs (not including (i) Restructuring Expenses, which shall be paid directly by the Debtors, and (ii) any reasonable, documented fees and expenses incurred by the Governmental Plaintiff Ad Hoc Committee and the MSGE Group on or after the Plan Effective Date in connection with implementation of the Plan (excluding, for the avoidance of doubt, the expenses of administration of the Opioid Trust (the "***Trust Expenses***")), which shall be paid directly by the Reorganized Debtors), and will be joint and several obligations (or be subject to an economically similar arrangement, e.g., one effected by guarantees, subject to tax considerations) of all of the current and future borrowers, issuers, pledgers and guarantors of the Debtors' funded indebtedness from time to time; *provided*, that for so long as the First Lien Notes, Second Lien Notes, the New First Lien Term Loans or Takeback Second Lien Notes remain outstanding, in no event shall the cash payments described above be guaranteed by an entity that does not also guarantee the First Lien Notes, Second Lien Notes, the New First Lien Term Loans or Takeback Second Lien Notes. |
| **Asset Sales; Mandatory Prepayments to Opioid Trust** | The Plan and Confirmation Order will also provide that, after any sale of (i) Mallinckrodt Enterprises Holdings, Inc. and its subsidiaries (including, for the avoidance of doubt, its successors and assigns) or (ii) a material portion of their assets or businesses (including as a result of a merger, equity sale, or asset sale), subject to compliance with the Debtors' covenants under their funded indebtedness (as may be modified from time to time), fifty percent (50%) of the "net proceeds" of such sale (after, for the avoidance of doubt, compliance with then-existing covenants) shall be paid to the Opioid Trust; and the amount of such net proceeds actually conveyed to the Opioid Trust will be deemed a ratable repayment against the remaining structured payments described above that the Opioid Trust is entitled to receive. For the avoidance of doubt, the Debtors will not be under any obligation to undertake any such sale on any particular timeframe. |
| **Tax Matters** | The Opioid Settlement shall be implemented with the objective of maximizing tax efficiency to (i) Mallinckrodt, including with respect to the availability, location and timing of tax deductions and (ii) to the Opioid Claimants, including with respect to the tax classification of the Opioid Trust.

The Opioid Trust will be treated as a qualified settlement fund for tax purposes. |

|  | The Parties intend that payments to the Opioid Trust will constitute "restitution" within the meaning of Section 162(f) of the Internal Revenue Code, and will be so characterized for U.S. federal income tax purposes to the extent such payments are made to or at the direction of government or governmental entities and to the extent allowed by applicable law. |
|---|---|
| **Certain Insurance Matters** | In implementing the assignment of the Assigned Insurance Rights, the Debtors or the Reorganized Debtors, on the one hand, and the Governmental Plaintiff Ad Hoc Committee and the MSGE Group, or the Opioid Trust, on the other hand, shall cooperate and negotiate in good faith concerning (i) treatment of unsatisfied self-insured retentions under the applicable policies with the objective of minimizing adverse consequences to Mallinckrodt, Reorganized Mallinckrodt, and the Opioid Trust (it being understood that the foregoing obligation shall not require the Debtors or Reorganized Debtors to satisfy all or any portion of any such self-insured retentions) and (ii) any actions by the Debtors, Reorganized Debtors, or the Opioid Trust to pursue or preserve the insurance policies relating to the Assigned Insurance Rights. The Debtors and the Reorganized Debtors will use their reasonable best efforts to provide to the Opioid Trust all documents, information, and other cooperation that is reasonably necessary for the Opioid Trust to pursue the Assigned Insurance Rights. |
| **Opioid Trust Documents** | The Opioid Trust Documents will comply with the requirements of the Bankruptcy Code. The material terms of the Opioid Trust Documents will be described in the Disclosure Statement and forms of the Opioid Trust Documents shall be included in the Plan Supplement, with such summaries and forms of documents (i) to be acceptable to the Governmental Plaintiff Ad Hoc Committee and the MSGE Group and reasonably acceptable to the Debtors and the Required Supporting Unsecured Noteholders and (ii), to the extent practicable, delivered to the advisors to the Ad Hoc First Lien Term Lender Group prior to being filed with the Bankruptcy Court. |
| **New Opioid Warrants Agreement** | The agreement governing the New Opioid Warrants shall constitute Definitive Documentation under the Restructuring Support Agreement and will: |
|  | • contain terms and conditions, including, without limitation, cashless exercise option (as far as legally permissible), anti-dilution protection (including, without limitation, against stock splits, stock dividends and similar events) and Black Scholes protections to be agreed, in each case, as customary for transactions of this type and otherwise acceptable to the Debtors, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group; |
|  | • provide for a registration rights agreement satisfactory to the Governmental Plaintiff Ad Hoc Committee and the MSGE |

|  | Group with respect to the New Opioid Warrants and the stock issuable upon |
|---|---|
|  | exercise of the New Opioid Warrants providing for, among other things, a resale shelf registration statement and customary demand and piggyback rights; and<br><br>• contain enhanced information rights and a covenant requiring Mallinckrodt to, upon request by the Opioid Trust on reasonable notice and subject to reimbursement by the Trust of Mallinckrodt's reasonable and documented out-of-pocket costs and expenses (provided, however, that such notice and reimbursements obligations of the Opioid Trust shall be on terms no less favorable to the Opioid Trust than any such obligations of any other shareholder of the Reorganized Debtors with similar rights), reasonably cooperate in good faith with any private sale by the Opioid Trust of the New Opioid Warrants or any shares received as a result of the exercise of the New Opioid Warrants. |
| **Channeling Injunction** | The Plan and the Confirmation Order will contain (i) a release by holders of Opioid Claims and (ii) an injunction channeling all Opioid Claims against the Protected Parties to the Opioid Trust, in each case, substantially on the terms set forth on **Exhibit 1** hereto.<br><br>In addition, and for the avoidance of doubt, the Plan and Confirmation Order will also provide for customary releases by the Company and by other holders of claims and interests, exculpation provisions, and related injunctive provisions, in each case consistent with Annex 4 to the Restructuring Term Sheet. |

Case 20-12522-JTD    Doc 2917    Filed 06/18/21    Page 585 of 835

| **Operating Injunction** | The Company shall seek entry of an injunctive order to be effective on the Petition Date, defining the manner in which the Debtors' opioid business may be lawfully operated by the Debtors or any successors thereto on a going-forward basis during the pendency of the Chapter 11 Cases, on the terms set forth on **<u>Exhibit 2</u>** hereto (the "***Chapter 11 Operating Injunction***"). |
|---|---|
| | The Confirmation Order (or a separate order of the Bankruptcy Court or another court of competent jurisdiction, if so agreed by the Company, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group) will extend the Chapter 11 Operating Injunction to govern the Reorganized Debtors' operations after the Plan Effective Date (the "***Post-Plan Effective Date Operating Injunction***" together with the Chapter 11 Operating Injunction, the "***Operating Injunctions***"). |
| | The Operating Injunctions shall be acceptable to the Debtors, the Governmental Plaintiff Ad Hoc Committee, and the MSGE Group, and reasonably acceptable to the Required Supporting Unsecured Noteholders. |

| | |
|---|---|
| **Assigned Claims Cooperation** | During the pendency of the Chapter 11 Cases, the Debtors shall reasonably cooperate with counsel to the Governmental Plaintiff Ad Hoc Committee and the MSGE Group Counsel in connection with the investigation and preservation of the Assigned Third-Party Claims and Assigned Insurance Rights, including by providing non-privileged information (including, without limitation, documents, emails and access to individuals with information), at the reasonable request of counsel to the Governmental Plaintiff Ad Hoc Committee and the MSGE Group Counsel. The Debtors shall, at the reasonable request of the Unsecured Notes Ad Hoc Group, inform counsel to the Unsecured Notes Ad Hoc Group of the status and scope of any such cooperation. |
| | The Debtors shall use reasonable efforts to provide all readily available, non-privileged information relating to the Assigned Third-Party Claims and Assigned Insurance Rights to counsel to the Governmental Plaintiff Ad Hoc Committee and the MSGE Group Counsel during the Debtors' bankruptcy cases; provided, however, that such information shall be provided prior to entry of the Confirmation Order. |
| | On and after the Plan Effective Date, the Reorganized Debtors shall provide reasonable cooperation to the Opioid Trust in connection with the Opioid Trust's investigation, preservation and pursuit of the Assigned Third-Party Claims and Assigned Insurance Rights. The terms and conditions of such cooperation shall be mutually agreed by the Debtors, the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Required Supporting Unsecured Noteholders and set forth in the Plan Supplement and included in the Confirmation Order. The Opioid Trust shall reimburse the Reorganized Debtors for their documented and reasonable out-of-pocket costs and expenses incurred in connection with such reasonable cooperation from and after the Plan Effective Date. |
| | Any request by the Opioid Trust, the Governmental Plaintiff Ad Hoc Committee, or the MSGE Group for cooperation by the Debtors and Reorganized Debtors shall be on reasonable advance notice, and provided during normal business hours and otherwise in a manner that does not disrupt commercial operations. |
| **Other Terms of Plan and Confirmation Order** | The Plan and/or Confirmation Order will provide for, among other things, the following:<br><br>• Mallinckrodt will be required to participate in an industry-wide document disclosure program (if any) by disclosing publicly a subset of its litigation documents, subject to scope and protocols to be negotiated in good faith with the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Required Supporting Unsecured Noteholders; |

A-2972

- any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) associated with the Assigned Third-Party Claims and Assigned Insurance Rights shall be transferred to the Opioid Trust and shall vest in the Opioid Trust, and the Debtors or the Reorganized Debtors, as the case may be, and the Opioid Trust shall take all necessary actions to effectuate the transfer of such privileges; <u>provided, that</u> (a) such privileges shall be transferred to the Opioid Trust for the sole purpose of enabling, and to the extent necessary to enable, the Opioid Trust to investigate and/or pursue such Assigned Third-Party Claims and Assigned Insurance Rights and (b) no documents or communications subject to a privilege shall be publicly disclosed by the Opioid Trust or communicated to any person not entitled to receive such information or in a manner that would diminish the protected status of such information, unless such disclosure or communication is reasonably necessary to preserve, secure, prosecute, or obtain the benefit of the Assigned Third-Party Claims and Assigned Insurance Rights; <u>provided, further,</u> that the Confirmation Order shall provide that the Opioid Trust's receipt of transferred privileges shall be without waiver in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors' estates;

- the Opioid Trust shall be authorized to conduct Rule 2004 examinations, to the fullest extent permitted thereunder, to investigate the Assigned Third-Party Claims and Assigned Insurance Rights, without the requirement of filing a motion for such authorization; *provided*, however, that no such Rule 2004 examinations shall be taken of the Debtors, the Reorganized Debtors, or any of their respective then-current employees, officers, directors or representatives, without further order of the Bankruptcy Court after notice and an opportunity to object and be heard;

- the exercise of remedies (including, without limitation, rights of setoff and/or recoupment) by non-Mallinckrodt third parties against Mallinckrodt on account of any Assigned Third-Party Claims shall be enjoined and barred, to the extent permitted by applicable law; and

- the covenants and enforcement rights with respect to Mallinckrodt's deferred payment obligations owed to the Opioid Trust in form and substance reasonably acceptable to the Debtors, the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Required Supporting Unsecured Noteholders in light



Case 20-12522-JTD    Doc 2917    Filed 06/18/21    Page 588 of 835

| | of the nature, duration and form of the deferred payment obligations. |
|---|---|

## Glossary of Key Defined Terms

| Term | Meaning |
|------|---------|
| Additional Insurance Rights | Additional rights in respect of insurance and/or other consideration, to be agreed to by the Debtors, the Supporting Governmental Opioid Claimants, the MSGE Group, and Supporting Unsecured Noteholders holding no less than two-thirds in outstanding principal amount of Guaranteed Unsecured Notes held by the Supporting Unsecured Noteholders then party to the Restructuring Support Agreement. |
| Assigned Insurance Rights | (a) Any and all claims, demands, entitlements to proceeds, payments, benefits, or Causes of Action of the Debtors under any and all general liability and products liability insurance policies that do or may afford the Debtors with rights, benefits, defense, indemnity, or insurance coverage with respect to any Opioid Claim, and (b) the Additional Insurance Rights. |
| Assigned Medtronic Claims | All Causes of Action of the Debtors against Medtronic plc and/or its subsidiaries, and each of their predecessors, successors, and assigns, including, without limitation, all Avoidance Actions of the Debtors against such parties |
| Assigned Third-Party Claims | (a) All Causes of Action of the Debtors arising out of Opioid Claims, including, without limitation, all Avoidance Actions arising out of Opioid Claims, but excluding any Causes of Action against Parent or any of its subsidiaries, or any Released Party, and (b) the Assigned Medtronic Claims. |
| Avoidance Actions | Any and all avoidance, recovery, subordination or similar actions or remedies that may be brought by and on behalf of the Debtors or their estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code. |
| Causes of Action | Any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counterclaims, defenses, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, under statute, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, federal or state, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise. |
| New Opioid Warrants | Warrants to acquire the number of New Mallinckrodt Common Shares that would represent 19.99% of all such outstanding shares after giving effect to the exercise of the New Opioid Warrants, subject to dilution from equity reserved under the MIP, at a strike |

| Term | Meaning |
|---|---|
| | price reflecting an aggregate equity value for the Reorganized Debtors of $1.551 billion, which warrants shall be exercisable at any time on or prior to the seventh anniversary of the Plan Effective Date; *provided*, that if the Reorganized Debtors exercise the Prepayment Option and prepay the Deferred Cash Payments in full, such warrants shall be exercisable only through and including the fifth anniversary of the Plan Effective Date. |
| Opioid Claim | Claims and causes of action, whether existing now or arising in the future, and whether held by a Governmental Entity or private party, against Mallinckrodt in any way arising out of or relating to opioid products manufactured or sold by Mallinckrodt or any of their predecessors prior to the Plan Effective Date, including, for the avoidance of doubt and without limitation, Claims for indemnification (contractual or otherwise), contribution, or reimbursement against Mallinckrodt on account of payments or losses in any way arising out of or relating to opioid products manufactured or sold by Mallinckrodt or any of their predecessors prior to the Plan Effective Date, including Future Opioid PI Claims; *provided, that* Mallinckrodt shall agree to comply with the terms of the Chapter 11 Operating Injunction as of the Petition Date, and that "Opioid Claims" shall not include any claims in any way arising, in whole or in part, from a violation of the Chapter 11 Operating Injunction |
| Opioid Claimant | A holder of an Opioid Claim |
| Opioid Trust | The trust that is to be established in accordance with the Plan, the Confirmation Order, and the Opioid Trust Documents, which trust will satisfy the requirements of section 468B of the Internal Revenue Code and the Treasury Regulation promulgated thereunder (as such may be modified or supplemented from time to time); provided, however, that nothing contained herein shall be deemed to preclude the establishment of one or more trusts as determined by the Opioid Claimants to be reasonably necessary or appropriate to provide tax efficiency to the Opioid Trust and Opioid Claimants (and all such trusts shall be referred to collectively as the "Opioid Trust"), so long as the establishment of multiple trusts is not reasonably expected to result in any adverse tax consequences for Mallinckrodt. |
| Opioid Trust Documents | The documents governing: (i) the Opioid Trust; (ii) any sub-trusts or vehicles that comprise the Opioid Trust; (iii) the flow of consideration from the Debtors' estates to the Opioid Trust or any sub-trusts or vehicles that comprise the Opioid Trust; (iv) submission, resolution, and distribution procedures in respect of all Opioid Claims; and (v) the flow of distributions, payments or flow of funds made from the Opioid Trust or any such sub-trusts or vehicles after the Plan Effective Date. |

| Term | Meaning |
|---|---|
| Original Payment Schedule | The schedule for deferred cash payments under the February 2020 agreement in principle reached between certain state attorneys general and the Debtors, providing for the following payments on the following dates: |

| Date | Payment Amount |
|---|---|
| Plan Effective Date | $300,000,000 |
| Each of 1st and 2nd anniversaries of Plan Effective Date | $200,000,000 |
| Each of 3rd through 8th anniversaries of Plan Effective Date | $150,000,000 |

| Term | Meaning |
|---|---|
| Parent | Mallinckrodt plc |
| Protected Party | (a) The Debtors, (b) the Reorganized Debtors, (c) the Non-Debtor Affiliates, (d) with respect to each of the foregoing Persons in clauses (a) through (c), such Persons' predecessors, successors, permitted assigns, subsidiaries, and controlled affiliates, respective heirs, executors, estates, and nominees, in each case solely in their capacity as such, and (e) with respect to each of the foregoing Persons in clauses (a) through (d), such Persons' officers and directors, principals, members, employees, financial advisors, attorneys, accountants, investment bankers, consultants, experts and other professionals, provided that, solely as to any Supporting Governmental Opioid Plaintiff, consultants and experts in this clause (e) shall not include those retained to provide strategic advice for sales and marketing of opioid products who have received a civil investigative demand or other subpoena related to sales and marketing of opioid products from any State Attorney General on or after January 1, 2019 through the Petition Date. |

A-2977

**Exhibit 1**

**Channeling Injunction/Opioid Claimant Release**

**Releases by Holders of Opioid Claims**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code (and any other applicable provisions of the Bankruptcy Code), as of the Plan Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Opioid Claimant (in its capacity as such) is deemed to have released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Plan Effective Date, each Debtor, Reorganized Debtor, and Protected Party from any and all Claims (including Opioid Claims), counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims asserted, or assertable on behalf of the Debtors, or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their Estates, the Opioid Claims, the Debtors' in- or out-of-court restructuring efforts (including the Chapter 11 Cases), intercompany transactions between or among a Debtor and another Debtor, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, any Avoidance Actions, the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Plan Effective Date, the Opioid Trust, Opioid Trust Documents and the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement, the Disclosure Statement, the Plan, any Restructuring Transaction, or any contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Protected Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into prior to the Plan Effective Date in connection with the creation of the Opioid Trust, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation (including the solicitation of votes on the Plan), the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Plan Effective Date related or relating to any of the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective

A-2978

Date obligations of any party or Entity under the Plan, any post-Plan Effective Date transaction contemplated by the Restructuring, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. The foregoing release will be effective as of the Plan Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to the foregoing release by Opioid Claimants.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of this release by Opioid Claimants, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that this release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the Claims released by the third-party release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable;

(7) given and made after due notice and opportunity for hearing; and (8) a bar to any Opioid Claimant asserting any claim or Cause of Action released pursuant to this release.

# Channeling Injunction

*Terms.* Pursuant to section 105(a) of the Bankruptcy Code, from and after the Plan Effective Date, the sole recourse of any Opioid Claimant on account of its Opioid Claims shall be to the Opioid Trust pursuant to this section [_] of the Plan and the Opioid Trust Documents, and such Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claim against any Protected Party or any property or interest in property of any Protected Party. On and after the Plan Effective Date, all present and future Opioid Claimants shall be permanently and forever stayed, restrained, barred, and enjoined from taking any of the following actions for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Opioid Claim other than from the Opioid Trust pursuant to the Opioid Trust Documents:

- commencing, conducting, or continuing in any manner, directly, indirectly or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

- enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

- creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

- setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; or

- proceeding in any manner in any place with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Opioid Trust, except in conformity and compliance with the Opioid Trust Documents.

*Reservations.* The foregoing injunction shall not stay, restrain, bar, or enjoin (a) the rights of Opioid Claimants to assert Opioid Claims against the Opioid Trust in accordance with the Plan and the Opioid Trust Documents; and (b) the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Trust Expenses against the Opioid Trust.

Case 20-12522-JTD    Doc 2917    Filed 06/18/21    Page 595 of 835

**Exhibit 2**

**Operating Injunction**

**[No Changes - See Docket No. 128]**

## Annex A

**Prepayment Cost of Deferred Cash Payments at Various Months After Plan Effective Date[1]**

| Months after Plan Effective Date (end of month) | Prepayment Cost of Deferred Cash Payments |
|---|---|
| 0 | $679,648,516 |
| 1 | $687,520,879 |
| 2 | $695,467,941 |
| 3 | $703,490,411 |
| 4 | $711,589,005 |
| 5 | $719,764,445 |
| 6 | $728,017,460 |
| 7 | $736,348,785 |
| 8 | $744,759,166 |
| 9 | $753,249,350 |
| 10 | $761,820,096 |
| 11 | $770,472,168 |
| 12 | $779,206,338[2] |

[1] Amounts shown in annex above show the prepayment cost at the end of each of the 12 months after the Plan Effective Date. To the extent a prepayment occurs other than at the end of the month, the prepayment cost shall be calculated as of such prepayment date pursuant to the formula set forth in the Opioid Settlement Term Sheet.

[2] Prepayment right may be exercised prior to the first anniversary of the Plan Effective Date. Month twelve is illustratively shown and includes $200,000,000 payment due at such time.

A-2982

## Schedule 2

### DOJ Settlement Terms re: Boston (Medicaid Rebates) and EDPA False Claims Act Matters, and related issues

- Resolved Matters.   Mallinckrodt and the United States (including CMS, DOJ), the applicable states, and *qui tam* relators agree to fully and finally resolve the Acthar-related government litigations disclosed in Mallinckrodt's Form 10-K for 2019, including *United States of America, et al., ex rel., Charles Strunck, et al. v. Mallinckrodt ARD LLC* (E.D. Penn.); *United States of America et al. ex rel. Landolt v. Mallinckrodt ARD, LLC* (D. Mass.); and *Mallinckrodt ARD LLC v. Verma et al. (D.D.C.)*, and related matters (such matters, collectively, the "***Resolved Matters***") on the terms set forth in this Schedule, which will be memorialized in a definitive DOJ Settlement Agreement, and settlement agreements with the States, and incorporated into the Plan.

- Settlement Payments.   In full and final satisfaction of all claims at issue in the "Resolved Matters", Mallinckrodt shall make cash payments to the US and State governments totaling $260 million in the aggregate (the "***DOJ Settlement Cash Consideration***") in accordance with the following schedule, with deferred payments bearing interest at a variable rate equal to the nominal interest rate on special issues of government securities to the Social Security trust funds, measured as of each payment date and accruing from September 21, 2020:

| Payment Date | Payment Amount |
|---|---|
| Plan Effective Date | $15,000,000 |
| First Anniversary of Plan Effective Date | $15,000,000 |
| Second Anniversary of Plan Effective Date | $20,000,000 |
| Third Anniversary of Plan Effective Date | $20,000,000 |
| Fourth Anniversary of Plan Effective Date | $32,500,000 |
| Fifth Anniversary of Plan Effective Date | $32,500,000 |
| Sixth Anniversary of Plan Effective Date | $62,500,000 |
| Seventh Anniversary of Plan Effective Date | $62,500,000 |

- Releases.   Effective as of the date on which the Settlement Agreement is fully executed, Mallinckrodt, on the one hand, and DOJ and the States, on the other hand, will have exchanged mutual releases, as specified in the Settlement Agreements relating to the Resolved Matters.

- CMS/DOJ/States Settlement Agreement; Additional Terms and Conditions.   Without

A-2983

limiting or affecting in any way the rights of the Supporting Parties under the RSA, the DOJ Settlement Agreement shall contain such additional terms, conditions, representations, warranties, covenants and termination events to which Mallinckrodt, on the one hand, and DOJ on the other hand, may agree.  Without limiting or affecting in any way the rights of the Supporting Parties under the RSA, the State Settlement Agreements shall contain such additional terms, conditions, representations, warranties, covenants and termination events to which Mallinckrodt, on the one hand, and the States, on the other hand, may agree.

A-2984

Case 20-12522-JTD    Doc 2917    Filed 06/18/21    Page 599 of 835

**<u>Schedule 3</u>**

**First Lien Settlement Term Sheet**

Execution Version

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE AMENDMENT TO THE RESTRUCTURING SUPPORT AGREEMENT INCORPORATING THIS TERM SHEET AS AN EXHIBIT IS FULLY-EXECUTED, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

<u>**First Lien Settlement Term Sheet**</u>

This Term Sheet (the "***First Lien Settlement Term Sheet***"), which is <u>**Schedule 3**</u> to the Term Sheet attached as <u>**Exhibit A**</u> (the "***Restructuring Term Sheet***") to the Restructuring Support Agreement dated October 11, 2020, by and among the Company and Supporting Parties thereto (as amended, modified and/or supplemented from time to time, the "***RSA***"), sets forth the proposed treatment of First Lien Credit Agreement Claims under the Plan.  The Debtors will implement the terms set forth herein through the New Term Loan Documentation and the Plan (to the extent necessary to implement this First Lien Settlement Term Sheet), which shall be consistent with the terms of this First Lien Settlement Term Sheet, the RSA and the exhibits and schedules annexed thereto; *provided*, that, to the extent that this First Lien Settlement Term Sheet conflicts with any other exhibit to the RSA, including the Restructuring Term Sheet, this First Lien Settlement Term Sheet shall govern.  This First Lien Settlement Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code.  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the RSA or the other exhibits attached thereto, as applicable.

This First Lien Settlement Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Plan and the New Term Loan Documentation, or the Scheme of Arrangement and the Irish Examinership Proceedings, which remain subject to negotiation in accordance with the RSA.  Consummation of the transactions contemplated by this First Lien Settlement Term Sheet is subject to (a) the negotiation and execution of the New Term Loan Documentation and the Plan evidencing and related to the Restructuring, (b) satisfaction or waiver of all of the conditions in the New Term Loan Documentation and the Plan evidencing the transactions comprising the Restructuring, (c) entry of the Confirmation Order and the satisfaction or waiver of any conditions to the effectiveness thereof, (d) approval of the Scheme of Arrangement by the High Court of Ireland and the satisfaction or waiver of any conditions to the effectiveness thereof, and (e) entry of an order recognizing the Confirmation Order in the Recognition Proceedings.

| TREATMENT OF ALLOWED FIRST LIEN CREDIT AGREEMENT CLAIMS | |
|---|---|
| **Treatment of First Lien Credit Agreement Claims (Revolver)** | Allowed First Lien Credit Agreement Claims in respect of revolving loans/commitments (the "***First Lien Revolving Loan Claims***") shall be, at the Debtors' option, (a) reinstated or (b) repaid in full in cash, in each case, at par plus accrued and unpaid interest, accounting for adequate protection payments to the revolving lenders or the First Lien Agent for the benefit of the revolving lenders (which, notwithstanding anything to the contrary in the Final Cash Collateral Order, shall be retained by the revolving lenders and not recharacterized as principal payments). |
| | First Lien Revolving Loan Claims shall be separately classified from First Lien Term Loan Claims (defined below) and all other Claims and Interests treated under the Plan, and shall be deemed unimpaired and not entitled to vote on the Plan. |
| **Treatment of First Lien Credit Agreement Claims (Term Loans)** | Holders of allowed First Lien Credit Agreement Claims in respect of term loans (the "***First Lien Term Loan Claims***") shall receive, on the Plan Effective Date, in full and final satisfaction of such claims, at the Debtors' option, either (i) (A) the New First Lien Term Loans *plus* (B) the 2020 ECF Payment to the extent not paid prior to the Plan Effective Date *plus* (C) payment in full in Cash of Accrued and Unpaid Interest to the Plan Effective Date *plus* (D) the Term Loan Exit Payment (collectively, the "***New First Lien Term Loan Treatment***") or (ii) repayment of such Claims in full in cash in an amount equal to (A) the Outstanding Amount *plus* (B) the 2020 ECF Payment to the extent not paid prior to the Plan Effective Date *plus* (C) Accrued and Unpaid Interest *plus* (D) the Term Loan Exit Payment (collectively, such repayments, "***Payment in Full of First Lien Term Loan Claims***"). Any portion of the 2020 ECF Payment that is not made prior to the Plan Effective Date shall, for the avoidance of doubt and without duplication, accrue interest thereon from and after the date set forth in the CCO Modification Order (as defined below) or, in the event no such date is set forth in the CCO Modification Order, from and after the date of the Joinder Agreement, to the date of payment thereof at the Adjusted Interest Rate (which interest is expected to be paid by means of adequate protection payments) and such 2020 ECF Payment and such Accrued and Unpaid Interest thereon (to the extent not paid prior to the Plan Effective Date) shall be paid on the Plan Effective Date. |
| | "***Outstanding Amount***" means an amount equal to $1,899,776,787.81 *less* the 2020 ECF Payment attributable to principal *less* any Principal Payments. |
| | "***Accrued and Unpaid Interest***" means the accrued and unpaid interest (which interest shall accrue, from and after the date of the |

A-2987

Joinder Agreement through the Plan Effective Date, at the Adjusted Interest Rate (without (i) any default interest in addition thereto or (ii) conversion into an ABR Borrowing (as defined in the Existing Credit Agreement))) after accounting for adequate protection payments to the term lenders or to the First Lien Agent for the benefit of the term lenders (which, notwithstanding anything to the contrary in the Final Cash Collateral Order, shall be retained by the term lenders and, other than the Principal Payments, not recharacterized as principal payments).

"***Principal Payments***" means any quarterly amortization payments, excess cash flow sweep payments and other express payments of principal (including the 2020 ECF Payment).

First Lien Term Loan Claims maturing in 2024 and First Lien Term Loan Claims maturing in 2025 shall be separately classified from one another and from all other Claims and Interests treated under the Plan, and each such class shall be deemed impaired and entitled to vote on the Plan.

| **TERMS OF NEW FIRST LIEN TERM LOANS** |
|---|

| Facility | On the Plan Effective Date, unless the Debtors elect to refinance and repay in full in cash the allowed First Lien Term Loan Claims as described in "Treatment of First Lien Credit Agreement Claims (Term Loans)" above, Mallinckrodt International Finance S.A. (the "***Lux Borrower***") Mallinckrodt CB LLC (the "***Co-Borrower***" and, together with the Lux Borrower, the "***Borrowers***") shall enter into a new senior secured first lien term loan facility in an original principal amount equal to the Outstanding Amount (such facility, the "***New First Lien Term Loan Facility***" the loans under such facility, the "***New First Lien Term Loans***," and any all documents related thereto, the "***New Term Loan Documentation***"). The administrative agent and the collateral agent for the New First Lien Term Loan Facility shall be mutually reasonably acceptable to the Company and the Required Supporting Term Lenders in the event the Refinancing Loans (as defined below) are included as a separate tranche in the New First Lien Term Loan Facility. In the event the Refinancing Loans are governed by separate documentation from the New First Lien Term Loan Facility, the collateral agent for the New First Lien Term Loan Facility shall be mutually reasonably acceptable to the Company and the Required Supporting Term Lenders and the administrative agent for the New First Lien Term Loan Facility shall be reasonably acceptable to the Required Supporting Term Lenders and must qualify under Section 8.09 of the Existing Credit Agreement. For the avoidance of doubt, any indebtedness incurred in order to refinance the First Lien Revolver Loan Claims (the "***Refinancing Loans***") may be included as a separate tranche in the |
|---|---|

A-2988

| | |
|---|---|
| | New First Lien Term Loan Facility and, if so included, shall be subject to the same terms (other than economic terms) as the New First Lien Term Loans. |
| **Interest** | New First Lien Term Loans issued on account of First Lien Term Loan Claims maturing in 2024 shall accrue interest, from and after the Plan Effective Date, at a non-default rate equal to, at the Borrowers' option, either LIBOR plus 525 bps, with a 75 bps LIBOR floor, or ABR plus 425 bps.<br><br>New First Lien Term Loans issued on account of First Lien Term Loan Claims maturing in 2025 shall accrue interest, from and after the Plan Effective Date, at a non-default rate equal to, at the Borrowers' option, either LIBOR plus 550 bps, with a 75 bps LIBOR floor, or ABR plus 450 bps. |
| **Adequate Protection Payments** | As part of the comprehensive and integrated settlements set forth herein, the Final Cash Collateral Order shall be modified, which modification shall be approved by an order of the Bankruptcy Court (the "***CCO Modification Order***") by no later than April 15, 2021, and for so long as the RSA is not terminated with respect to the holders of the First Lien Term Loan Claims, to increase the interest rate applied in order to calculate First Lien Adequate Protection Payments (as defined therein) payable on account of the First Lien Term Loan Claims from the Adjusted LIBO Rate (as defined in the Existing Credit Agreement) plus 200 basis points plus Applicable Margin (as defined in the Existing Credit Agreement) to the Adjusted Interest Rate. The Debtors shall request that such increased rate take effect upon the filing of the motion seeking entry of the CCO Modification Order and shall not, for the avoidance of doubt, apply retroactively to any earlier date or apply to any First Lien Credit Agreement Claims other than First Lien Term Loan Claims; *provided*, that, the Supporting Term Lenders shall not have any right to terminate the Joinder Agreement or the RSA based solely on the Bankruptcy Court declining to apply such increased rate retroactively to the date on which the motion seeking entry of the CCO Modification Order is filed. The Debtors shall file the motion seeking entry of the CCO Modification Order by no later than six (6) Business Days after the execution of the Joinder Agreement and such motion and the CCO Modification Order (subject to the NPT Exception) shall be in form and substance reasonably acceptable to the Required Supporting Term Lenders.[1] |

---

[1] "***Joinder Agreement***" means that certain Joinder Agreement and Amendment to Restructuring Support Agreement dated as of March 10, 2021 by and among the Debtors, the Required Supporting Unsecured Noteholders, the Governmental Plaintiff Ad Hoc Committee, the MSGE Group, and the Supporting Term Lenders.

A-2989

|  | So long as the RSA is not terminated with respect to the holders of the First Lien Term Loan Claims as of the Plan Effective Date, all First Lien Adequate Protection Payments made to the holders of First Lien Term Loan Claims prior to the Plan Effective Date (other than Principal Payments) shall be retained by the lenders in full satisfaction of their entitlement to interest and fees under section 506(b) of the Bankruptcy Code and shall not be recharacterized as payments of principal. |
|  | The holders of First Lien Term Loan Claims party to the RSA, for so long as they are parties to the RSA, shall (i) not seek, or direct the First Lien Agent, to prohibit the continuation of outstanding loans under the Existing Credit Agreement as Eurocurrency Borrowings (as defined in the Existing Credit Agreement) or to require the conversion of such loans into ABR Borrowings (as defined in the Existing Credit Agreement), and, (ii) unless otherwise effected pursuant to an order of the Bankruptcy Court, deliver a communication in writing to the First Lien Agent (which shall comply with the requirements of any such communication set forth in the Existing Credit Agreement and may be delivered by counsel to the Ad Hoc First Lien Term Lender Group, which counsel shall be deemed authorized to deliver such communication by all legal or beneficial owners of First Lien Credit Agreement Claims that execute the RSA or the Joinder Agreement) instructing the First Lien Agent to deem any previous request of any Supporting Term Lenders that the First Lien Agent notify the Borrowers (as defined in the Existing Credit Agreement) of any Event of Default or any prohibition on any such continuation or requirement of any such conversion resulting therefrom withdrawn without prejudice and permit such continuation and not require such conversion, and (iii) not seek, or direct the First Lien Agent to seek, any default interest in respect of outstanding loans under the Existing Credit Agreement, in each case, only for so long as the Supporting Term Lenders remain party to the RSA. |
| **Maturity** | The New First Lien Term Loans shall mature on the date that is the earlier of (a) September 30, 2027 or (b) 5.75 years following of the Plan Effective Date. |
| **Amortization** | The New First Lien Term Loans shall amortize at a rate of 2.5% per annum, payable quarterly on March 31, June 30, September 30, and December 31 of each year that the New First Lien Term Loans remain outstanding. |

| | |
|---|---|
| **Call Protection/ Prepayments** | The New First Lien Term Loans may be voluntarily prepaid at any time in whole or in part, at the Company's option, at a price equal to 100% of the outstanding principal amount of New First Lien Term Loans so prepaid plus all accrued interest, fees and other amounts thereon; *provided* that if any Repricing Event (defined in a manner consistent with the Existing Credit Agreement) occurs prior to the date that is nine months after the Plan Effective Date, a fee in the amount of 1.00% of the outstanding principal amount of New First Lien Term Loans subject to such Repricing Event shall be payable.<br><br>Mandatory prepayment events shall be consistent with the Existing Credit Agreement. |
| **Guarantors** | The obligations of Borrower under the New First Lien Term Loan Facility shall be guaranteed by the existing guarantors under the Existing Credit Agreement, *except for* Mallinckrodt Holdings GmbH (provided that the Loan Parties (defined in a manner consistent with the Existing Credit Agreement) covenant not to cause Mallinckrodt Holdings GmbH or the subsidiaries of Mallinckrodt Holdings GmbH to incur any material indebtedness owed to unaffiliated third parties, or guarantee any material indebtedness owed to any unaffiliated third-parties) (such guarantors, the "***Guarantors***"). The Debtors shall reimburse the Ad Hoc First Lien Term Lender Group for the reasonable and documented out-of-pocket fees and expenses of Swiss legal counsel in connection with the exclusion of Mallinckrodt Holdings GmbH as a Guarantor and Swiss law matters in connection with to the New Term Loan Documentation. |
| **Collateral** | The obligations under the New First Lien Term Loan Facility shall be secured by senior, first-priority (subject to certain exceptions consistent with the exceptions set forth in the Existing Credit Agreement) liens on the same assets of the Borrower and Guarantors securing the obligations under the Existing Credit Agreement, plus (or including, as the case may be) (i) 100% of the equity of first-tier foreign subsidiaries and domestic holding companies thereof except if (or until such time as) a Borrower determines in good faith that such pledge of equity issued by such subsidiary (1) could reasonably be expected to result in Mallinckrodt PLC ("Parent") or any of its subsidiaries incurring any material tax or other cost (other than a de minimis cost) or any disruption in the operations or internal financing activities of the Parent and its subsidiaries, (2) is not permitted by, or could reasonably be expected to cause any officers, directors or employees of the Parent or any of its subsidiaries to become subject to related liabilities under any, applicable requirement of law or (3) would constitute "Excluded Securities" pursuant to clause (c) of the definition thereof in the Existing Credit Agreement and (ii) all cash of the Borrower and Guarantors (which, to the extent held by Co- |

5

A-2991

| | |
|---|---|
| | Borrower or any domestic Guarantor in a domestic deposit account and subject to certain customary exceptions, shall be subject to deposit account control agreements in favor of the agent under the New First Lien Term Loan Facility). |
| **ECF Payments** | The Debtors and the Supporting Term Lenders (as defined in the Joinder Agreement and RSA) agree to settle under Rule 9019 of the Federal Rules of Bankruptcy Procedure their dispute with respect to the amount and manner of payment of the excess cash flow payment required to be made to the term lenders under the Existing Credit Agreement for fiscal year 2020 (the "***2020 ECF Payment***"; such settlement, the "***2020 ECF Payment Settlement***").  The 2020 ECF Payment Settlement shall provide the Debtors, and the Supporting Term Lenders agree, that the Debtors shall satisfy their obligation to make the 2020 ECF Payment with a payment in cash in the amount of $114 million to be made solely to the term lenders under the Existing Credit Agreement for application against the term loans under the Existing Credit Agreement.  The Debtors shall file a supplement to the existing motion seeking approval to pay the 2020 ECF Payment to set forth the terms and basis for the 2020 ECF Payment Settlement, which supplement shall be in form and substance reasonably acceptable to the Required Supporting Term Lenders.  The order approving the 2020 ECF Payment Settlement and the 2020 ECF Payment (the "***2020 ECF Payment Order***") shall be in form and substance reasonably acceptable to the Debtors and the Required Supporting Term Lenders.  To the extent the Bankruptcy Court enters the 2020 ECF Payment Order, the Debtors shall make the 2020 ECF Payment to, or for the sole benefit of, the term lenders promptly but in no even later than three (3) Business Days after the Bankruptcy Court enters the 2020 ECF Payment Order.  To the extent the Debtors do not receive such authorization, the Debtors shall pay the term lenders the 2020 ECF Payment *plus* accrued interest thereon at the Adjusted LIBO Rate plus 250 basis points plus Applicable Margin (as defined in the Existing Credit Agreement) (the "***Adjusted Interest Rate***") on the Plan Effective Date of the Plan (to the extent unpaid after account for adequate protection payments) in accordance with the proposed treatment of First Lien Term Loan Claims described above.  For the avoidance of doubt, no "default interest" or similar amount shall be payable with respect to the 2020 ECF Payment Interest Rate.<br><br>Payments relating to settlement and restructuring costs, including the Term Loan Exit Payment and all payments made pursuant to the Plan, made during any fiscal year after fiscal year 2020 shall be deducted from the excess cash flow calculation with respect to the applicable fiscal year. |

A-2992

| Covenants | The New Term Loan Documentation will contain affirmative covenants consistent with the Existing Credit Agreement (except (1) as set forth under the heading "Ratings" below and (2) as to the Cadence IP Licensee, which covenants shall be deleted), and negative covenants consistent with the Existing Credit Agreement, subject to certain exceptions and modifications as set forth on **Annex 1** hereto.  For the avoidance of doubt, such covenants shall not include any financial maintenance covenant.    In all circumstances, the covenants shall permit the issuance of the $375 million of Takeback Second Lien Notes as set forth in the RSA. |
|---|---|
| Ratings | The Debtors shall use commercially reasonable efforts to obtain credit ratings for the New First Lien Term Loans from Moody's and Standard & Poor's prior to the Plan Effective Date. |
| Term Loan Exit Payment | The term lenders under the Existing Credit Agreement shall earn an exit payment (the "***Term Loan Exit Payment***") of 0.5% of the Outstanding Amount, which exit payment shall (a) increase to 1.0% of the Outstanding Amount if Payment in Full of First Lien Term Loan Claims does not occur on or prior to the Plan Effective Date and (b) be payable upon the earlier of the Plan Effective Date and the consummation of any transaction that effects Payment in Full of First Lien Term Loan Claims on or prior to the Plan Effective Date.  For the avoidance of doubt, the Term Loan Exit Payment will only increase to 1.0% if the treatment of First Lien Term Loan Claims is the New First Lien Term Loan Treatment. |
| **OTHER TERMS** | |
| Consent Rights | The New Term Loan Documentation (including any applicable intercreditor agreements) shall be (i) consistent with the Restructuring Term Sheet and this First Lien Settlement Term Sheet, (ii) based on, and except as otherwise set forth in the Restructuring Term Sheet or this First Lien Settlement Term Sheet, no less favorable to the Debtors than the Existing Credit Agreement and associated Loan Documents (as defined in the Existing Credit Agreement) (provided that the New Term Loan Documentation shall contain a market-standard LIBOR replacement provision to be reasonably agreed to by the Debtors and the Supporting Term Lenders), and (iii) otherwise negotiated in good faith and reasonably agreed between the Debtors and Required Supporting Term Lenders, taking into account (A) the Debtors' financing structure to be implemented in accordance with the terms of the RSA and the Plan and (B) changes in law or accounting standards or to cure mistakes or defects, but in any event to include (w) an event of default in the event the Loan Parties (defined in a manner consistent with the |

7

Existing Credit Agreement) fail to make any payments under, or materially breach, the CMS/DOJ/States Settlement or Opioid Settlement, (x) a requirement of a 100% vote of lenders in order to contractually subordinate the liens securing, or the right of payment of, the obligations under the New First Lien Term Loan Facility to any now-existing or hereafter implemented or incurred class of indebtedness, (y) restrictions on the exclusion from collateral of the equity interests of non-wholly owned subsidiaries except to the extent arising from legitimate business transactions with third parties, applicable law or tax efficiency considerations and restrictions on the release of guarantee and collateral obligations of subsidiaries that become less than wholly owned except through legitimate business transactions with third parties, and (z) a prohibition on open market purchases of loans other than the pro rata modified Dutch auctions as permitted in the Existing Credit Agreement and, in any event, any consideration in such modified Dutch auction shall only be in cash (collectively, the "***Documentation Principles***").  For the avoidance of doubt, (1) the representations and warranties set forth in the New Term Loan Documentation shall be established so as to eliminate any representations or warranties that may not be satisfied as of the Plan Effective Date (such as, for example, the absence of a material adverse effect) and (2) the only conditions to the effectiveness of the New First Lien Term Loan Facility shall be (1) completion of New Term Loan Documentation consistent with the Documentation Principles and (2) the conditions to the effectiveness of the relevant plan of reorganization.  The Existing 1L/2L Intercreditor Agreement (as defined in the RSA) shall remain in place after the Plan Effective Date and govern the respective rights of the administrative agent under the New Term Loan Documentation, the lenders under the New Term Loan Documentation, the trustee under the Existing Second Lien Indenture,[2] the Second Lien Document Representative (as defined in the Existing 1L/2L Intercreditor Agreement), and the holders of Existing Second Lien Notes[3] and Takeback Second Lien Notes (as defined in the RSA).  To the extent any existing first lien debt (other than First Lien Term Loan Claims) is reinstated on the Plan Effective Date, the Existing 1L Intercreditor Agreement (as defined in the RSA) shall remain in place after the Plan Effective Date and govern the respective rights of the administrative agent and the lenders under the New Term Loan Documentation and the agent

---

[2]   "***Existing Second Lien Indenture***" means that certain Indenture for 10.000% Second Lien Secured Notes due 2025, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as Issuers, the guarantors party thereto, and Wilmington Savings Fund Society, FSB, as Second Lien Trustee and Second Lien Collateral Agent.

[3]   "***Existing Second Lien Notes***" means those certain 10.000% Second Lien Secured Notes due 2025 under the Existing Second Lien Indenture.

| | or trustee and lenders under such reinstated first lien indebtedness. |
| | For the avoidance of doubt, the Definitive Documentation relating to the implementation of the New First Lien Term Loan Facility shall permit the consummation of all transactions contemplated by the Plan. |
| **DOJ/Opioid Settlement Cash Consent Right** | Without the consent of the Required Supporting Term Lenders, the Debtors shall not agree to any changes to the Plan, the Opioid Settlement or CMS/DOJ/States Settlement that (a) result in the aggregate amount of cash to be paid by the reorganized Debtors pursuant to the Opioid Settlement and the CMS/DOJ/States Settlement exceeding $1,860,000,000 (excluding professional fees and expenses payable in connection with the Opioid Settlement and the CMS/DOJ/States Settlement and interest payable in connection with the CMS/DOJ/States Settlement) or (b) accelerate the timing of payments to the Opioid Trust under the Opioid Settlement or payments under the CMS/DOJ/States Settlement in any given year (the "***DOJ/Opioid Settlement Cash Consent Right***"); *provided* that no such consent shall be required for changes related to either (i) the timing of exercise of the Debtors' option to prepay the amounts owing to the Opioid Trust or (ii) the Additional Insurance Rights. |
| | Any partial prepayment of the amounts owing to the Opioid Trust must be funded solely from the net proceeds of an equity raise. |
| **Intercreditor Agreement Claims** | Except as otherwise agreed by the Debtors in writing, during the Support Period and, if the Restructuring is consummated, from and after the Plan Effective Date, (a) the Supporting Term Lenders shall not pursue any claims under any intercreditor agreement against any holder of any other secured Claims relating to any payments made pursuant to the Final Cash Collateral Order or the Plan and (b) to the extent practicable and in accordance with the terms of the Existing Credit Agreement, the Supporting Term Lenders shall instruct the First Lien Agent not to pursue any such claims; *provided*, however, that to the extent the transactions contemplated by this First Lien Settlement Term Sheet are not consummated and the Company does not propose the Payment in Full of First Lien Term Loan Claims, all of the Supporting Term Lenders' rights and remedies with respect to claims under any intercreditor agreement are expressly reserved. |

**Annex 1**

**Negative Covenants**

## Annex 1

### Negative Covenants and Related Definitions

All capitalized terms used, but not defined, herein shall be defined in a fashion consistent with the Documentation Principles (as defined in the First Lien Settlement Term Sheet to which this excerpt is attached as Annex 1 (the "First Lien Term Sheet")).  The "Closing Date" shall mean the Plan Effective Date (as defined in the First Lien Term Sheet).  All schedules described herein shall be completed based upon the actual characteristics of the Parent and its subsidiaries as of the Closing Date.  All baskets subject to a cap based on a dollar amount or percentage of Consolidated Total Assets shall be deemed to be unused as of the Closing Date.  All baskets set based on a percentage of Consolidated Total Assets shall be set so as match the fixed portion of the basket on the Closing Date after giving effect to any fresh-start accounting required to be implemented in connection the applicable plan of reorganization.  Additional baskets shall be agreed as necessary to permit transactions consummated pursuant to the terms of a plan of reorganization consummated in accordance with the terms of the Restructuring Support Agreement and the schedules thereto, to which this Annex 1 is attached (the "RSA").

### Definitions:

"Adjusted Consolidated EBITDA" shall mean, with respect to the Parent and the Subsidiaries on a consolidated basis for any period, the Consolidated Net Income of the Parent and the Subsidiaries for such period plus

(a)      the sum of, without duplication, in each case, to the extent deducted in or otherwise reducing Consolidated Net Income for such period:

(i)      provision for taxes based on income, profits or capital of the Parent and the Subsidiaries for such period, without duplication, including, without limitation, state franchise and similar taxes, and foreign withholding taxes (including penalties and interest related to taxes or arising from tax examination); plus

(ii)      (x) Interest Expense of the Parent and the Subsidiaries for such period and (y) all cash dividend payments (excluding items eliminated in consolidation) on any series of preferred stock of any Subsidiary of Parent or any Disqualified Stock of the Parent and its Subsidiaries; plus

(iii)      depreciation, amortization (including amortization of intangibles, deferred financing fees and actuarial gains and losses related to pensions and other post-employment benefits, but excluding amortization of prepaid cash expenses that were paid in a prior period) and other non-cash expenses (excluding any such non-cash charges or expenses to the extent that it represents an accrual of or reserve for cash expenses in any future period or amortization of a prepaid cash expense that was paid in a prior period) of the Parent and the Subsidiaries for such period; plus

(iv)     any costs or expenses incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of the Parent or net cash proceeds of an issuance of Equity Interests of the Parent (other than Disqualified Stock) solely to the extent that such net cash proceeds are excluded from the calculation of the Available Amount; plus

(v)     any non-cash losses related to non-operational hedging, including, without limitation, resulting from hedging transactions for interest rate or currency exchange risks associated with this Agreement or the Existing Secured Notes; minus

(b)     the sum of, without duplication, in each case, to the extent added back in or otherwise increasing Consolidated Net Income for such period:

(i)     non-cash items increasing such Consolidated Net Income for such period (excluding the recognition of deferred revenue or any non-cash items which represent the reversal of any accrual of, or reserve for, anticipated cash charges in any prior period and any items for which cash was received in any prior period); plus

(ii)     any non-cash gains related to non-operational hedging, including, without limitation, resulting from hedging transactions for interest rate or currency exchange risks associated with this Agreement or the Existing Secured Notes;

in each case, on a consolidated basis and determined in accordance with Applicable Accounting Principles.

Notwithstanding the preceding, the provision for taxes based on the income or profits of, the Interest Expense of, the depreciation and amortization and other non-cash expenses or non-cash items of and the restructuring charges or expenses of, a Subsidiary (other than any Wholly Owned Subsidiary) of the Parent will be added to (or subtracted from, in the case of non-cash items described in clause (b) above) Consolidated Net Income to compute Adjusted Consolidated EBITDA, (A) in the same proportion that the Net Income of such Subsidiary was added to compute such Consolidated Net Income of the Parent, and (B) only to the extent that a corresponding amount of the Net Income of such Subsidiary would be permitted at the date of determination to be dividended or distributed to the Parent by such Subsidiary without prior governmental approval (that has not been obtained), and without direct or indirect restriction pursuant to the terms of its charter and all agreements, instruments, judgments, decrees, orders, statutes, rules and governmental regulations applicable to that Subsidiary or its stockholders.

"Affiliate" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified.

"<u>Applicable Accounting Principles</u>" shall mean, for any period, the accounting principles applied as provided in Section [___].[1]

"<u>Applicable Period</u>" shall mean an Excess Cash Flow Period or an Excess Cash Flow Interim Period, as the case may be.

"<u>Asset Sale</u>" shall mean (x) any Disposition (including any sale and leaseback of assets and any mortgage or lease of Real Property) to any person (including to a Divided LLC pursuant to a Division) of, any asset or assets of the Parent or any Subsidiary and (y) any sale of any Equity Interests by any Subsidiary to a person other than the Parent or a Subsidiary.

"<u>Attributable Receivables Indebtedness</u>" shall mean the principal amount of Indebtedness (other than any Indebtedness subordinated in right of payment owing by a Receivables Entity to a Receivables Seller or a Receivables Seller to another Receivables Seller in connection with the transfer, sale and/or pledge of Permitted Receivables Facility Assets) which (i) if a Qualified Receivables Facility is structured as a secured lending agreement or other similar agreement, constitutes the principal amount of such Indebtedness or (ii) if a Qualified Receivables Facility is structured as a purchase agreement or other similar agreement, would be outstanding at such time under such Qualified Receivables Facility if the same were structured as a secured lending agreement rather than a purchase agreement or such other similar agreement.

"<u>Available Amount</u>" shall mean, as at any time of determination, an amount, not less than zero in the aggregate, determined on a cumulative basis, equal to, without duplication:

(a)     $50 million, <u>plus</u>

(b)     50% of the Cumulative Retained Excess Cash Flow Amount on such date of determination, <u>plus</u>

(c)     the aggregate amount of proceeds received after the Closing Date and prior to such date of determination that would have constituted Net Proceeds had they exceeded the threshold amounts required to qualify as Net Proceeds (the "<u>Below-Threshold Asset Sale Proceeds</u>"), <u>plus</u>

(d)     the cumulative amounts of all prepayments declined by Term Lenders, <u>plus</u>

(e)     the Cumulative Parent Qualified Equity Proceeds Amount on such date of determination, <u>minus</u>

(f)     the cumulative amount of Investments made with the Available Amount from and after the Closing Date and on or prior to such time, <u>minus</u>

(g)     the cumulative amount of Restricted Payments made with the Available Amount from and after the Closing Date and on or prior to such time (without duplication

---

[1] Section reference to be to general interpretive provision regarding accounting terms.  For the avoidance of doubt, interpretive provisions to exclude from Capitalized Lease Obligations any leases that would not have been required to be so included prior to implementation of recent accounting changes.

of any such amount subtracted pursuant to the definition of Cumulative Parent Qualified Equity Proceeds Amount);

provided, however, for purposes of determining the amount of Available Amount available for Restricted Payments, the calculation of the Available Amount shall not include any Below-Threshold Asset Sale Proceeds or any amounts described in clause (d) above.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"Board of Directors" shall mean, as to any person, the board of directors, the board of managers, the sole manager or other governing body of such person, or if such person is owned or managed by a single entity, the board of directors or other governing body of such entity.

"Borrower" shall mean each of the Lux Borrower and the Co-Borrower, and the term "Borrowers" shall mean all of the Lux Borrower and the Co-Borrower.

"Capital Expenditures" shall mean, for any person in respect of any period, the aggregate of all expenditures incurred by such person during such period that, in accordance with Applicable Accounting Principles, are or should be included in "additions to property, plant or equipment" or similar items reflected in the statement of cash flows of such person; provided, however, that Capital Expenditures for the Parent and the Subsidiaries shall not include:

(a)     expenditures to the extent made with proceeds of the issuance of Qualified Equity Interests (other than Disqualified Stock) of the Parent or capital contributions to the Parent or funds that would have constituted Net Proceeds under clause (a) of the definition of the term "Net Proceeds" (but that will not constitute Net Proceeds as a result of the first or second proviso to such clause (a)); provided that (i) this clause (a) shall exclude expenditures made with the proceeds from sales of Equity Interests financed as contemplated by Section 6.04(e)(iii), proceeds of Equity Interests used to make Investments pursuant to Section 6.04(p), proceeds of Equity Interests used to make a Restricted Payment in reliance on clause (x) of the proviso to Section 6.06(b) and (ii) such proceeds are not included in any determination of the Available Amount;

(b)     expenditures of proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other property to the extent such expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets or properties useful in the business of the Parent and the Subsidiaries to the extent such proceeds are not then required to be applied to prepay Term Loans pursuant to Section [__][2];

(c)     interest capitalized during such period;

_____

[2] Section reference to be to the asset sale mandatory prepayment.

(d)     expenditures that are accounted for as capital expenditures of such person and that actually are paid for by a third party (excluding the Parent, the Borrowers or any Subsidiary) and for which none of the Parent, the Borrowers or any Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other person (whether before, during or after such period);

(e)     the book value of any asset owned by such person prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of such person reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period; provided that (i) any expenditure necessary in order to permit such asset to be reused shall be included as a Capital Expenditure during the period that such expenditure actually is made and (ii) such book value shall have been included in Capital Expenditures when such asset was originally acquired;

(f)     the purchase price of equipment purchased during such period to the extent that the consideration therefor consists of any combination of (i) used or surplus equipment traded in at the time of such purchase, (ii) the proceeds of a concurrent sale of used or surplus equipment, in each case, in the ordinary course of business or (iii) assets Disposed of pursuant to Section 6.05(m);

(g)     Investments in respect of a Permitted Business Acquisition; or

(h)     the purchase of property, plant or equipment made with proceeds from any Asset Sale to the extent such proceeds are not then required to be applied to prepay Term Loans pursuant to Section 2.11(b).

"Capitalized Lease Obligations" shall mean, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with Applicable Accounting Principles.

"Cash Interest Expense" shall mean, with respect to the Parent and the Subsidiaries on a consolidated basis for any period, Interest Expense for such period to the extent such amounts are paid in cash for such period, excluding, without duplication, in any event (a) pay-in-kind Interest Expense or other non-cash Interest Expense (including as a result of the effects of purchase accounting), (b) to the extent included in Interest Expense, the amortization of any financing fees paid by, or on behalf of, the Parent or any Subsidiary, including such fees paid in connection with the Transactions or upon entering into a Qualified Receivables Facility, and (c) the amortization of debt discounts, if any, or fees in respect of Hedging Agreements; provided, that Cash Interest Expense shall exclude any one time financing fees, including those paid in connection with the Transactions, or upon entering into a Qualified Receivables Facility or any amendment of this Agreement.

"Cash Management Agreement" shall mean any agreement to provide to the Parent, a Borrower or any Subsidiary Loan Party cash management services for collections, treasury management services (including controlled disbursement, overdraft, automated clearing house

A-3001

fund transfer services, return items and interstate depository network services), any demand deposit, payroll, trust or operating account relationships, commercial credit cards, merchant card, purchase or debit cards, non-card e-payables services, and other cash management services, including electronic funds transfer services, lockbox services, stop payment services and wire transfer services.

"Cash Management Bank" shall mean any person that, at the time it enters into a Cash Management Agreement (or on the Closing Date), is an Agent, an Arranger, a Lender or an Affiliate of any such person, in each case, in its capacity as a party to such Cash Management Agreement.

"Consolidated Debt" shall mean, as of any date of determination, the sum of (without duplication) all Indebtedness of the type set forth in clauses (a), (b), (e) (to the extent related to any Indebtedness that would otherwise constitute Consolidated Debt), (f), (h) (other than letters of credit, to the extent undrawn), (i) (other than bankers' acceptances to the extent undrawn), (j), (k) (to the extent related to any Indebtedness that would otherwise constitute Consolidated Debt) and (l) of the definition of "Indebtedness" of the Parent and the Subsidiaries determined on a consolidated basis on such date; provided, that the amount of any Indebtedness (including the Indebtedness under this Agreement) with respect to which the applicable obligors have entered into currency hedging arrangements shall be calculated giving effect to such currency hedging arrangements.

"Consolidated Net Income" shall mean, with respect to any person for any period, the aggregate Net Income of such person and its subsidiaries for such period, on a consolidated basis, in accordance with Applicable Accounting Principles; provided, however, that, without duplication:

     (a)     any net after-tax extraordinary, nonrecurring or unusual gains or losses (less all fees and expenses relating thereto) or expenses or charges, any severance expenses, relocation expenses, curtailments or modifications to pension and post-retirement employee benefit plans, excess pension charges, any expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternate uses and fees, expenses or charges relating to new product lines, Milestone Payments under intellectual property licensing agreements, facilities closing or consolidation costs, acquisition integration costs, facilities opening costs, project start-up costs, business optimization costs, (including inventory optimization programs), systems establishment costs, contract termination costs, future lease commitments, other restructuring charges, reserves or expenses, signing, retention or completion bonuses, expenses or charges related to any issuance of Equity Interests, Investment, acquisition, disposition, recapitalization or issuance, repayment, refinancing, amendment or modification of Indebtedness (in each case, whether or not successful), and any fees, expenses, charges, change in control payments or other payment obligations made in connection with, or related to, the Transaction shall be excluded;

     (b)     effects of purchase accounting adjustments (including the effects of such adjustments pushed down to such person and such Subsidiaries) in amounts required or permitted by Applicable Accounting Principles, resulting from the application of purchase

A-3002

accounting in relation to any consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded;

(c)    the cumulative effect of a change in accounting principles (which shall in no case include any change in the comprehensive basis of accounting) during such period shall be excluded;

(d)    (i) any net after-tax income or loss from disposed, abandoned, transferred, closed or discontinued operations, (ii) any net after-tax gain or loss on disposal of disposed, abandoned, transferred, closed or discontinued operations and (iii) any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by the Parent) shall be excluded;

(e)    any net after-tax gains or losses, or any subsequent charges or expenses (less all fees and expenses or charges relating thereto), attributable to the early extinguishment of Indebtedness, hedging obligations or other derivative instruments shall be excluded;

(f)    the Net Income for such period of any person that is not a subsidiary of such person, or is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting (other than a guarantor), shall be included only to the extent of the excess (which shall not be less than $0) of the amount of dividends or distributions or other payments actually paid in cash or cash equivalents (or to the extent converted into cash or cash equivalents) to the referent person or a Subsidiary thereof in respect of such period over the amount of all Investments made to such Unrestricted Subsidiaries during such period;

(g)    solely for purposes of calculating the Available Amount, the Net Income for such period of any subsidiary of such person shall be excluded to the extent that the declaration or payment of dividends or similar distributions by such subsidiary of its Net Income is not at the date of determination permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such subsidiary or its equityholders, unless such restrictions with respect to the payment of dividends or similar distributions have been legally waived; provided that the Consolidated Net Income of such person shall be increased by the amount of dividends or other distributions or other payments actually paid in cash (or converted into cash) by any such subsidiary to such person or a subsidiary of such person (subject to the provisions of this clause (g)), to the extent not already included therein;

(h)    any impairment charge or asset write-off and amortization of intangibles, in each case pursuant to Applicable Accounting Principles, shall be excluded; provided that in no event shall amortization of intangibles so excluded in any period of four consecutive fiscal quarters exceed the greater of $20.0 million and 10% of Consolidated Net Income for such period (before giving effect to such exclusion);

7

(i)     any non-cash expense realized or resulting from stock option plans, employee benefit plans or post-employment benefit plans, or grants or sales of stock, stock appreciation or similar rights, stock options, restricted stock, preferred stock or other rights shall be excluded;

(j)     any (i) non-cash compensation charges, (ii) costs and expenses after the Closing Date related to employment of terminated employees, or (iii) costs or expenses realized in connection with or resulting from stock appreciation or similar rights, stock options or other rights existing on the Closing Date of officers, directors and employees, in each case of such person or any of its subsidiaries, shall be excluded;

(k)     accruals and reserves that are established or adjusted within 12 months after the Closing Date (excluding any such accruals or reserves to the extent that they represent an accrual of or reserve for cash expenses in any future period or amortization of a prepaid cash expense that was paid in a prior period) and that are so required to be established or adjusted in accordance with Applicable Accounting Principles or as a result of adoption or modification of accounting policies shall be excluded;

(l)     the Net Income of any person and its Subsidiaries shall be calculated by deducting the income attributable to, or adding the losses attributable to, the minority equity interests of third parties in any non-Wholly Owned Subsidiary;

(m)     any unrealized gains and losses related to currency remeasurements of Indebtedness, and any unrealized net loss or gain resulting from hedging transactions for interest rates, commodities or currency exchange risk, shall be excluded;

(n)     to the extent covered by insurance and actually reimbursed, or, so long as such person has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (i) not denied by the applicable carrier in writing within 180 days and (ii) in fact reimbursed within 365 days of the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within 365 days), expenses with respect to liability or casualty events or business interruption shall be excluded; and

(o)     non-cash charges for deferred tax asset valuation allowances shall be excluded (except to the extent reversing a previously recognized increase to Consolidated Net Income).

Consolidated Net Income presented in a currency other than Dollars will be converted to Dollars based on the average exchange rate for such currency during, and applied to, each fiscal quarter in the period for which Consolidated Net Income is being calculated.

"Consolidated Secured Net Debt" shall mean, as of any date of determination, (i) Consolidated Debt to the extent secured by Liens on all or any portion of the assets of the Parent or its Subsidiaries on such date (including, for the avoidance of doubt, Qualified Receivables Facility) less (ii) the Unrestricted Cash of the Parent and its Subsidiaries on such date.

Notwithstanding anything to the contrary contained above, all Indebtedness incurred pursuant to this Agreement (including any such Indebtedness incurred pursuant to any Incremental Loan) or pursuant to Sections 6.01(b) and (v), and any Permitted Refinancing Indebtedness or Refinancing Notes (or successive Permitted Refinancing Indebtedness or Refinancing Notes) incurred under Sections 6.01(b) or (v) (whether or not secured) shall be included as if secured by Liens as a component of Consolidated Debt pursuant to clause (i) of the immediately preceding sentence; provided that any such Permitted Refinancing Indebtedness (x) if unsecured, shall not constitute a component of Consolidated Debt if, when incurred, such Indebtedness is independently permitted to be incurred under Section 6.01(p) (or is subsequently reclassified as outstanding thereunder) and (y) if secured by the Collateral on a junior lien basis, shall cease to constitute a component of Consolidated Secured Net Debt for purposes of the First Lien Secured Net Leverage Ratio only, if, when incurred, such Indebtedness is independently permitted to be incurred under Section 6.01(p), and permitted to be secured under Section 6.02(ff) (or is subsequently permitted to be outstanding and secured under said Sections).

"Consolidated Total Assets" shall mean, as of any date of determination, the total assets of the Parent and the Subsidiaries, determined on a consolidated basis in accordance with Applicable Accounting Principles, as set forth on the consolidated balance sheet of the Parent as of the last day of the Test Period ending immediately prior to such date for which financial statements of the Parent have been delivered (or were required to be delivered) pursuant to Section [__], [__] or [__],[3] as applicable.  Consolidated Total Assets shall be determined on a Pro Forma Basis.

"Consolidated Total Net Debt" shall mean, as of any date of determination, (i) Consolidated Debt on such date less (ii) the Unrestricted Cash of the Parent and its Subsidiaries on such date.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Cumulative Parent Qualified Equity Proceeds Amount" shall mean, at any time of determination, an amount equal to, without duplication:

(a)      100% of the aggregate net proceeds (determined in a manner consistent with the definition of "Net Proceeds"), including cash and the Fair Market Value of tangible assets other than cash, received by the Parent after the Closing Date from the issue or sale of its Qualified Equity Interests, including Qualified Equity Interests of the Parent issued upon conversion of Indebtedness or Disqualified Stock to the extent the Parent or its Wholly Owned Subsidiaries had received the Net Proceeds of such Indebtedness or Disqualified Stock; plus

---

[3] Section references to be to (i) condition for delivery of pre-closing financial statements, (ii) annual financial statements reporting covenant and (iii) quarterly financial statements reporting covenant.

A-3005

(b)    100% of the aggregate amount of contributions to the capital of the Parent (but not for Disqualified Stock) by its shareholders received in cash and the Fair Market Value of tangible assets other than cash after the Closing Date; plus

(c)    100% of the aggregate amount received by the Parent or its Wholly Owned Subsidiaries in cash and the Fair Market Value of assets (other than cash) received by the Parent or its Wholly Owned Subsidiaries after the Closing Date from (without duplication of amounts, and without including the items described below to the extent same are already included in Excess Cash Flow):

(i)    the sale or other disposition (other than to the Parent or any Subsidiary) of any Investment made by the Parent and its Subsidiaries and repurchases and redemptions of such Investment from the Parent and its Subsidiaries by any person (other than the Parent and its Subsidiaries) to the extent that (x) such Investment was justified as using a portion of the Available Amount pursuant to clause (Y) of Section 6.04(j) (and such Investment has not subsequently been reclassified as outstanding pursuant to another sub-clause or sub-section of Section 6.04) and (y) the Net Proceeds thereof are not required to be applied pursuant to Section [___][4];

(ii)    the sale (other than to the Parent or a Subsidiary) of the Equity Interests of an Unrestricted Subsidiary to the extent that (x) the designation of such Unrestricted Subsidiary was justified as using a portion of the Available Amount pursuant to clause (Y) of Section 6.04(j) (and such Investment has not subsequently been reclassified as outstanding pursuant to another sub-clause or sub-section of Section 6.04) and (y) the Net Proceeds thereof are not required to be applied pursuant to Section [___][5]; or

(iii)    to the extent not included in the calculation of Consolidated Net Income for the relevant period, a distribution, dividend or other payment from an Unrestricted Subsidiary to the extent relating to any portion of the Investment therein made pursuant to sub-clause (Y) of Section 6.04(j) (and which has not been subsequently reclassified as outstanding pursuant to another sub-clause or sub-section of said Section 6.04); minus

(d)    .the cumulative amount of Restricted Payments made with the Cumulative Parent Qualified Equity Proceeds Amount from and after the Closing Date and on or prior to such time.

"Cumulative Retained Excess Cash Flow Amount" shall mean, at any date, an amount (which shall not be less than zero in the aggregate) determined on a cumulative basis equal to

---

[4] Section reference to be to asset sale mandatory prepayment.

[5] Section reference to be to asset sale mandatory prepayment.

A-3006

(a)      the aggregate cumulative sum of the Retained Percentage of Excess Cash Flow for all Excess Cash Flow Periods beginning after the Closing Date and ended prior to such date, plus

(b)      for any Excess Cash Flow Interim Period occurring during the Excess Cash Flow Period containing the Closing Date, ending prior to such date and beginning with the first full fiscal quarter after the Closing Date, an amount equal to the Retained Percentage of Excess Cash Flow for such Excess Cash Flow Interim Period, plus

(c)      for any Excess Cash Flow Interim Period ended prior to such date but as to which the corresponding Excess Cash Flow Period has not ended, an amount equal to the Retained Percentage of Excess Cash Flow for such Excess Cash Flow Interim Period, minus

(d)      the cumulative amount of all Retained Excess Cash Flow Overfundings as of such date.

"Current Assets" shall mean, with respect to the Parent and the Subsidiaries on a consolidated basis at any date of determination, the sum of (a) all assets (other than cash and Permitted Investments or other cash equivalents) that would, in accordance with Applicable Accounting Principles, be classified on a consolidated balance sheet of the Parent and the Subsidiaries as current assets at such date of determination, other than amounts related to current or deferred Taxes based on income or profits, and (b) in the event that a Qualified Receivables Facility is accounted for off balance sheet, (x) gross accounts receivable comprising part of the Permitted Receivables Facility Assets subject to such Qualified Receivables Facility less (y) collections against the amounts sold pursuant to clause (x).

"Current Liabilities" shall mean, with respect to the Parent and the Subsidiaries on a consolidated basis at any date of determination, all liabilities that would, in accordance with Applicable Accounting Principles, be classified on a consolidated balance sheet of the Parent and the Subsidiaries as current liabilities at such date of determination, other than (a) the current portion of any Indebtedness, (b) accruals of Interest Expense (excluding Interest Expense that is due and unpaid), (c) accruals for current or deferred Taxes based on income or profits, (d) accruals, if any, of transaction costs resulting from the Transactions, (e) accruals of any costs or expenses related to (i) severance or termination of employees prior to the Closing Date or (ii) bonuses, pension and other post-retirement benefit obligations, and (f) accruals for exclusions from Consolidated Net Income included in clause (a) of the definition of such term.

"Debt Service" shall mean, with respect to the Parent and the Subsidiaries on a consolidated basis for any period, Cash Interest Expense for such period, plus scheduled principal amortization of Consolidated Debt for such period.

"Designated Non-Cash Consideration" shall mean the Fair Market Value of non-cash consideration received by the Parent, the Lux Borrower or one of the Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer of a Borrower, setting forth such valuation, less the amount of cash or cash equivalents received in connection with a subsequent disposition of such Designated Non-Cash Consideration.

"<u>Disinterested Director</u>" shall mean, with respect to any person and transaction, a member of the Board of Directors of such person who does not have any material direct or indirect financial interest in or with respect to such transaction.

"<u>Dispose</u>" or "<u>Disposed of</u>" shall mean to convey, sell, lease, sell and leaseback, assign, farm-out, transfer or otherwise dispose of any property, business or asset. The term "<u>Disposition</u>" shall have a correlative meaning to the foregoing.

"<u>Disqualified Stock</u>" shall mean, with respect to any person, any Equity Interests of such person that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled, mandatory payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Stock, in the case of each of the foregoing clauses (a), (b), (c) and (d), prior to the date that is ninety-one (91) days after the Latest Maturity Date in effect at the time of issuance thereof and except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Loan Obligations that are accrued and payable (<u>provided</u>, that only the portion of the Equity Interests that so mature or are mandatorily redeemable, are so convertible or exchangeable or are so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock). Notwithstanding the foregoing: (i) any Equity Interests issued to any employee or to any plan for the benefit of employees of the Parent or the Subsidiaries or by any such plan to such employees shall not constitute Disqualified Stock solely because they may be required to be repurchased by the Parent in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability and (ii) any class of Equity Interests of such person that by its terms authorizes such person to satisfy its obligations thereunder by delivery of Equity Interests that are not Disqualified Stock shall not be deemed to be Disqualified Stock.

"<u>DOJ Settlement</u>" shall mean [_____].[6]

"<u>Divided LLC</u>" means any Delaware LLC which has been formed as a consequence of a Division (excluding any dividing Delaware LLC that survives a Division).

"<u>Division</u>" means the statutory division of any Delaware LLC into two or more Delaware LLCs pursuant to Section 18-217 of the Delaware Limited Liability Company Act.

"<u>Domestic Subsidiary</u>" shall mean any Subsidiary that is not a Foreign Subsidiary.

"<u>Equity Interests</u>" of any person shall mean any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests

---

[6] To be defined to mean the settlement with the DOJ regarding Acthar as implemented by any plan of reorganization, subject to the consent rights of the Supporting Term Lenders under the RSA.

A-3008

in (however designated) equity or ownership of such person, including any preferred stock (including any preferred equity certificates (and any other similar instruments)), any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing.

"Excess Cash Flow" shall mean, with respect to the Parent and the Subsidiaries on a consolidated basis for any Applicable Period, Adjusted Consolidated EBITDA of the Parent and the Subsidiaries on a consolidated basis for such Applicable Period, minus, without duplication,

(a)     Debt Service for such Applicable Period, reduced by the aggregate principal amount of voluntary prepayments of Consolidated Debt (other than prepayments of the Loans) that would otherwise have constituted scheduled principal amortization during such Applicable Period;

(b)     the amount of any voluntary prepayment permitted hereunder of term Indebtedness (other than any Term Loans) during such Applicable Period, in each case to the extent not financed, or intended to be financed, using the proceeds of, without duplication, the incurrence of Indebtedness, the sale or issuance of any Equity Interests, any component of Available Amount (in the case of Cumulative Retained Excess Cash Flow Amount, only to the extent attributable to a time prior to such Applicable Period) or any Net Proceeds not otherwise required to prepay the Loans pursuant to the prepayment provisions of this Agreement or the definition of the term "Net Proceeds", in each case, to the extent that the amount of such prepayment is not already reflected in Debt Service;

(c)     (i) Capital Expenditures by the Parent and the Subsidiaries on a consolidated basis during such Applicable Period that are paid in cash and (ii) the aggregate consideration paid in cash during such Applicable Period in respect of Permitted Business Acquisitions and other Investments (excluding intercompany loans and transfers of funds) permitted hereunder, in each case, to the extent not financed with the proceeds of, without duplication, the incurrence of Indebtedness, the sale or issuance of any Equity Interests, any component of Available Amount (in the case of Cumulative Retained Excess Cash Flow Amount, only to the extent attributable to a time prior to such Applicable Period) or any Net Proceeds not otherwise required to prepay the Loans pursuant to the prepayment provisions of this Agreement or the definition of the term "Net Proceeds" (less any amounts received in respect thereof as a return of capital);

(d)     Capital Expenditures that the Parent or any Subsidiary shall, during such Applicable Period, become obligated to make but that are not made during such Applicable Period (but are expected to be made in the next Applicable Period); provided that any amount so deducted that will be paid after the close of such Applicable Period shall not be deducted again in a subsequent Applicable Period; provided further that if any such Capital Expenditures so deducted are either (A) not so made in the following Applicable Period or (B) made in the following Applicable Period with the proceeds of, without duplication, the incurrence of Indebtedness, the sale or issuance of any Equity Interests, any component of Available Amount (in the case of Cumulative Retained Excess Cash Flow Amount, only to the extent attributable to a time prior to such Applicable Period) or any Net Proceeds not otherwise required to prepay the Loans pursuant the prepayment provisions of this

13

Agreement or the definition of the term "Net Proceeds", the amount of such Capital Expenditures not so made or so financed shall be added to the calculation of Excess Cash Flow in such following Applicable Period as set forth in clause (iv) below;

(e)     Taxes paid in cash by the Parent and the Subsidiaries on a consolidated basis during such Applicable Period or that will be paid within six months after the close of such Applicable Period and for which reserves have been established, including income tax expense and withholding tax expense incurred in connection with cross-border transactions involving the Foreign Subsidiaries; provided that any amount so deducted that will be paid after the close of such Applicable Period shall not be deducted again in a subsequent Applicable Period;

(f)     an amount equal to any increase in Working Capital of the Parent and the Subsidiaries for such Applicable Period;

(g)     cash expenditures made in respect of Hedging Agreements during such Applicable Period, to the extent not reflected in the computation of Adjusted Consolidated EBITDA or Cash Interest Expense;

(h)     permitted dividends or distributions or repurchases of its Equity Interests paid in cash by the Parent to its shareholders during such Applicable Period and permitted dividends paid by any Subsidiary to any person other than the Parent or any of the Subsidiaries during such Applicable Period, in each case in accordance with Section 6.06(b) (except to the extent such payment is made with amounts described in clauses (x) and (y) of the parenthetical contained in the proviso thereto), (f) and/or (h) (other than Restricted Payments made with Equity Interests (other than Disqualified Stock) of the Parent or with proceeds of Indebtedness or using any component of the Available Amount);

(i)     without duplication of any exclusions to the calculation of Consolidated Net Income or Adjusted Consolidated EBITDA, amounts paid in cash during such Applicable Period on account of (A) items that were accounted for as noncash reductions in determining Adjusted Consolidated EBITDA of the Parent and the Subsidiaries in a prior Applicable Period and (B) reserves or accruals established in purchase accounting;

(j)     to the extent not deducted in the computation of Net Proceeds in respect of any asset disposition or condemnation giving rise thereto, the amount of any prepayment of Indebtedness (other than Indebtedness created hereunder or under any other Loan Document), together with any interest, premium or penalties required to be paid (and actually paid) in connection therewith to the extent that the income or gain realized from the transaction giving rise to such Net Proceeds exceeds the aggregate amount of all such prepayments and Capital Expenditures made with such Net Proceeds;

(k)     the amount related to items of income that were added to or items of expense not deducted from Net Income in calculating Consolidated Net Income or were added to or not deducted from Consolidated Net Income in calculating Adjusted Consolidated EBITDA to the extent either (x) such items of expense represented a cash payment (which

14

A-3010

had not reduced Excess Cash Flow upon the accrual thereof in a prior Applicable Period), or an accrual for a cash payment, by the Parent and the Subsidiaries or (y) such items of income did not represent cash received by the Parent and the Subsidiaries, in each case on a consolidated basis during such Applicable Period;

(l)     all cash payments made in connection with, or relating to, the Transactions; provided that, if the Closing Date occurs after December [__], 2021, a Borrower may elect to cause all or any portion of such cash payments made on the Closing Date to be deemed to have been made in the Excess Cash Flow Period ending December [__], 2021,

plus, without duplication,

(i)     an amount equal to any decrease in Working Capital of the Parent and the Subsidiaries for such Applicable Period;

(ii)     all proceeds received during such Applicable Period of Capitalized Lease Obligations, purchase money Indebtedness, Sale and Lease-Back Transactions permitted under this Agreement and any other Indebtedness, in each case to the extent used to finance any Capital Expenditure (other than Indebtedness under this Agreement) to the extent there is a corresponding deduction to Excess Cash Flow above in respect of the use of such Borrowings;

(iii)     all amounts referred to in clause (c) or (d) above to the extent funded with, without duplication, (x) the proceeds of the sale or issuance of Equity Interests of, or capital contributions to, the Parent after the Closing Date, (y) any amount that would have constituted Net Proceeds under clause (a) of the definition of the term "Net Proceeds" if not so spent or (z) any component of Available Amount (which, in the case of Cumulative Retained Excess Cash Flow Amount, only to the extent attributable to a time prior to such Applicable Period), in each case solely to the extent there is a corresponding deduction from Excess Cash Flow above;

(iv)     to the extent any permitted Capital Expenditures referred to in clause (d) above and the delivery of the related equipment do not occur in the following Applicable Period, the amount of such Capital Expenditures that were not so made in such following Applicable Period;

(v)     to the extent any Taxes deducted pursuant to in clause (e) above are not paid in such Applicable Period or in the six months after the close of such Applicable Period, the amount of such Taxes that were not so paid in such Applicable Period or in the six months after the close of such Applicable Period;

(vi)     cash payments received in respect of Hedging Agreements during such Applicable Period to the extent (x) not included in the computation of Adjusted Consolidated EBITDA or (y) such payments do not reduce Cash Interest Expense;

(vii)     any extraordinary or nonrecurring gain realized in cash during such Applicable Period, except to the extent such gain consists of Net Proceeds subject to the prepayment provisions of this Agreement;

(viii)  to the extent deducted in the computation of Adjusted Consolidated EBITDA, cash interest income; and

(ix)  the amount related to items of expense that were deducted from or items of income not added to Net Income in connection with calculating Consolidated Net Income or were deducted from or not added to Consolidated Net Income in calculating Adjusted Consolidated EBITDA to the extent either (x) such items of income represented cash received by the Parent or any Subsidiary (which had not increased Excess Cash Flow upon the accrual thereof in a prior Applicable Period) or (y) such items of expense do not represent cash paid by the Parent or any Subsidiary, in each case on a consolidated basis during such Applicable Period.

Notwithstanding anything to the contrary set forth in this definition, no effect shall be given, for purposes of calculating Excess Cash Flow, to any non-cash balance sheet impact arising from any refunds pursuant to the CARES Act.

"Excess Cash Flow Interim Period" shall mean, during any Excess Cash Flow Period, any one, two, or three-quarter period (a) commencing at the end of the immediately preceding Excess Cash Flow Period (or, if during the first Excess Cash Flow Period, the fiscal year ended December 25, 2020[7]) and (b) ending on the last day of the most recently ended fiscal quarter (other than the last day of the fiscal year) during such Excess Cash Flow Period for which financial statements are available.

"Excess Cash Flow Period" shall mean each fiscal year of the Parent, commencing with the fiscal year of the Parent ending December [___], 2021.[8]

"Excluded Indebtedness" shall mean all Indebtedness not incurred in violation of Section 6.01.

"Excluded Swap Obligation" shall mean, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation, unless otherwise agreed between the Administrative Agent and a Borrower.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

---

[7] To be the last day of the 2021 fiscal year if the Closing Date occurs after delivery of annual financials for the 2021 fiscal year.

[8] To be the 2022 fiscal year if the Closing Date occurs after delivery of annual financials for the 2021 fiscal year.

"Existing Secured Notes" shall mean, collectively, (i) the $495,032,000 in aggregate principal amount of Existing First Lien Notes, (ii) the $322,868,000 in aggregate principal amount of 10.000% Second Lien Senior Secured Notes due 2025 issued pursuant to the Existing Second Lien Notes Indenture and (iii) the $375,000,000 in aggregate principal amount of 10.000% Second Lien Senior Secured Notes due 202[8][9] issued pursuant to the Existing Takeback Notes Indenture.

"Existing First Lien Notes" shall mean the 10.000% First Lien Senior Secured Notes due 2025 issued pursuant to the Existing First Lien Notes Indenture.

"Existing First Lien Notes Indenture" shall mean the Indenture, dated as of April 7, 2020, among the Lux Borrower and the Co-Borrower, as issuers, the guarantors party thereto from time to time, Deutsche Bank AG New York Branch, as first lien collateral agent, and Wilmington Savings Fund Society, FSB, as first lien trustee, as amended, modified or supplemented from time to time.

"Existing Second Lien Notes Indenture" shall mean the Indenture, dated as of December 6, 2019, among the Lux Borrower and the Co-Borrower, as issuers, the guarantors party thereto from time to time and Wilmington Savings Fund Society, FSB, as second lien collateral agent and second lien trustee, as amended, modified or supplemented from time to time.

"Existing Secured Indentures" shall mean (i) the Existing First Lien Notes Indenture, (ii) the Existing Second Lien Notes Indenture and (iii) the Existing Takeback Notes Indenture.

"Existing Takeback Notes Indenture" shall mean the Indenture, dated as of the Closing Date, among the Lux Borrower and the Co-Borrower, as issuers, the guarantors party thereto from time to time, [_____], as second lien collateral agent, and [_____], as second lien trustee, as amended, modified or supplemented from time to time.

"Fair Market Value" shall mean, with respect to any asset or property, the price that could be negotiated in an arms'-length transaction between a willing seller and a willing buyer, neither of whom is under undue pressure or compulsion to complete the transaction (as determined in good faith by a Borrower).

"Financial Officer" of any person shall mean the Chief Financial Officer, principal accounting officer, Treasurer, Assistant Treasurer, Controller or any Director or other executive responsible for the financial affairs of such person.

"First Lien Secured Net Leverage Ratio" shall mean, as of any date of determination, the ratio of (a) the remainder of (x) Consolidated Secured Net Debt as of such date minus (y) amounts included in clause (i) of the definition of Consolidated Secured Net Debt (and not described in the last sentence of the definition of Consolidated Secured Net Debt, unless excluded by the proviso thereto) which are secured only by Liens on the Collateral securing the Obligations on a junior and subordinated (as to liens and related rights and remedies only) basis

---

[9] To be seven years after the Closing Date.

and which are subject to an intercreditor agreement entered into with the Collateral Agent for the benefit of the holders of the Obligations which is in form and substance reasonably satisfactory to the Administrative Agent, to (b) Adjusted Consolidated EBITDA for the most recently ended Test Period for which financial statements of the Parent have been delivered as required by this Agreement, all determined on a consolidated basis in accordance with Applicable Accounting Principles; provided that Adjusted Consolidated EBITDA shall be determined for the relevant Test Period on a Pro Forma Basis. All Indebtedness described in the last sentence of the definition of Consolidated Secured Net Debt (and not excluded by the proviso thereto) shall also be deemed to constitute Indebtedness included pursuant to preceding clause (a)(x) and which is not deducted pursuant to preceding clause (a)(y).

"Fitch" means Fitch Inc. or any successor to the rating agency business thereof.

"Fixed Charge Coverage Ratio" shall mean, as of any date of determination, the ratio of (a) Adjusted Consolidated EBITDA for the most recently ended Test Period for which financial statements of the Parent have been (or were required to be) delivered as required by Section [__], [__] or [__][10] to (b) the Fixed Charges for such Test Period; provided that the Fixed Charge Coverage Ratio shall be determined for the relevant Test Period on a Pro Forma Basis.

"Fixed Charges" shall mean, with respect to Parent for any period, the sum, without duplication, of:

(a) Interest Expense (excluding amortization or write-off of deferred financing costs) of the Parent and its Subsidiaries for such period, and

(b) all cash dividend payments (excluding items eliminated in consolidation) on any series of preferred stock or Disqualified Stock of the Parent and its Subsidiaries.

"Foreign Subsidiary" shall mean any Subsidiary that is incorporated or organized under the laws of any jurisdiction other than the United States of America, any state thereof or the District of Columbia.

"GAAP" shall mean generally accepted accounting principles in effect from time to time in the United States of America, applied on a consistent basis, subject to the provisions of Section [__].[11]

"Governmental Authority" shall mean any federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory or legislative body.

"Guarantee" of or by any person (the "guarantor") shall mean (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another

[10] Section references to be to (i) condition for delivery of pre-closing financial statements, (ii) annual financial statements reporting covenant and (iii) quarterly financial statements reporting covenant.

[11] Section reference to be to general interpretive provision regarding accounting terms. For the avoidance of doubt, interpretive provisions to exclude from Capitalized Lease Obligations any leases that would not have been required to be so included prior to implementation of recent accounting changes.

A-3014

person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of the guarantor securing any Indebtedness or other obligation (or any existing right, contingent or otherwise, of the holder of Indebtedness or other obligation to be secured by such a Lien) of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor (other than Liens on Equity Interests of Unrestricted Subsidiaries securing Indebtedness of such Unrestricted Subsidiaries); provided, however, that the term "Guarantee" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted by this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such person in good faith. The amount of the Indebtedness subject to any Guarantee provided by any person for purposes of clause (b) above shall (unless the applicable Indebtedness has been assumed by such person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the Fair Market Value of the property encumbered thereby.

"Guarantors" shall mean each of the Loan Parties.

"Hedge Bank" shall mean any person that is (or an Affiliate thereof that is) an Agent, an Arranger or a Lender on the Closing Date (or any person that becomes an Agent, Arranger or Lender or Affiliate thereof after the Closing Date) and that enters into a Hedging Agreement, in each case, in its capacity as a party to such Hedging Agreement.

"Hedging Agreement" shall mean any agreement with respect to any swap, forward, future or derivative transaction, or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value, or credit spread transaction, repurchase transaction, reserve repurchase transaction, securities lending transaction, weather index transaction, spot contracts, fixed price physical delivery contracts, or any similar transaction or any combination of these transactions, in each case of the foregoing, whether or not exchange traded; provided, that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Parent, the Lux Borrower or any of the Subsidiaries shall be a Hedging Agreement.

"Increased Amount" of any Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the

19

amortization of original issue discount, the payment of interest in the form of additional Indebtedness or in the form of common stock of the Parent, the accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies.

"Incremental Amount" shall mean, at any time, the greater of:

(a)    the excess (if any) of (i) $[_____][12] over (ii) the sum (without duplication) of the aggregate principal amount of all Term Loans, Existing First Lien Notes, Revolver Replacement Term Loans and all other Indebtedness incurred pursuant to Section 6.01(v), in each case outstanding at such time; and

(b)    the amount such that, immediately after giving effect to the establishment of the commitments in respect thereof utilizing this clause (b) and the use of proceeds of the loans thereunder, the First Lien Secured Net Leverage Ratio on a Pro Forma Basis is not greater than (x) so long as Qualified Ratings apply, 2.75 to 1.00 or (y) otherwise, 2.25 to 1.00; provided that, for purposes of this clause (b) net cash proceeds of Incremental Loans incurred at such time shall not be netted against the applicable amount of Consolidated Debt for purposes of such calculation of the First Lien Secured Net Leverage Ratio.[13]

"Indebtedness" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments (except any such obligation issued in the ordinary course of business with a maturity date of no more than six months in a transaction intended to extend payment terms of trade payables or similar obligations to trade creditors incurred in the ordinary course of business), (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person (except any such obligation that constitutes a trade payable or similar obligation to a trade creditor incurred in the ordinary course of business), (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (except any such balance that (i) constitutes a trade payable or similar obligation to a trade creditor incurred in the ordinary course of business, (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such person in accordance with Applicable Accounting Principles and (iii) liabilities accrued in the ordinary course of business) which purchase price is due more than six months after the date of placing the property in service or taking delivery and title thereto, (e) all Guarantees by such person of Indebtedness of others, (f) all Capitalized Lease Obligations of such person, (g) obligations under any Hedging Agreements, to the extent the foregoing would appear on a balance sheet of such person as a liability, (h) the principal component of all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit, (i) the principal component of all obligations of such person in respect of bankers' acceptances, (j) the amount of all obligations of such person with respect to the redemption, repayment or other repurchase of (x) any Disqualified

---

[12] To be the sum of the following (as of immediately prior to consummation of a plan of reorganization and pro forma for the 2020 Excess Cash Flow paydown): (i) existing TL principal amount, (ii) existing RCF principal amount, (iii) Existing First Lien Notes principal amount and (iv) $150,000,000.

[13] Consistent with Section 6.01(v), incremental term loan provision shall not contain an MFN provision.

A-3016

Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Stock) or (y) any preferred stock of any Subsidiary of Parent, (k) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such person (other than Liens on Equity Interests of Unrestricted Subsidiaries securing Indebtedness of such Unrestricted Subsidiaries), whether or not the Indebtedness secured thereby has been assumed and (l) all Attributable Receivables Indebtedness with respect to Qualified Receivables Facility.  The amount of Indebtedness of any person for purposes of clause (k) above shall (unless such Indebtedness has been assumed by such person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the Fair Market Value of the property encumbered thereby. Notwithstanding anything in this Agreement to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of International Accounting Standards No. 39 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness and any such amounts that would have constituted Indebtedness under this Agreement but for the application of this sentence shall not be deemed an incurrence of Indebtedness under this Agreement.  For the avoidance of doubt, Indebtedness shall not include any obligations pursuant to (i) the Opioid Settlement or (ii) the DOJ Settlement.

"Intellectual Property" shall mean the following intellectual property rights, both statutory and common law rights, if applicable:  (a) copyrights, registrations and applications for registration thereof, (b) trademarks, service marks, trade names, slogans, domain names, logos, trade dress and registrations and applications of registrations thereof, (c) patents, as well as any reissued and reexamined patents and extensions corresponding to the patents and any patent applications, as well as any related continuation, continuation in part and divisional applications and patents issuing therefrom and (d) trade secrets and confidential information, including ideas, designs, concepts, compilations of information, methods, techniques, procedures, processes and other know-how, whether or not patentable.

"Interest Expense" shall mean, with respect to any person for any period, the sum of, without duplication, (a) gross interest expense of such person for such period on a consolidated basis, including (i) the amortization of debt discounts, (ii) the amortization of all fees (including fees with respect to Hedging Agreements) payable in connection with the incurrence of Indebtedness to the extent included in interest expense, (iii) the portion of any payments or accruals with respect to Capitalized Lease Obligations allocable to interest expense and (iv) net payments and receipts (if any) pursuant to interest rate hedging obligations, and excluding unrealized mark-to-market gains and losses attributable to such hedging obligations, amortization of deferred financing fees and expensing of any bridge or other financing fees, (b) capitalized interest of such person, whether paid or accrued, and (c) commissions, discounts, yield and other fees and charges incurred for such period, including any losses on sales of receivables and related assets, in connection with any receivables financing of such person or any of its Subsidiaries that are payable to persons other than the Parent and the Subsidiaries.

"Junior Liens" shall mean Liens on the Collateral that are junior to the Liens thereon securing the Initial Term Loans (and other Loan Obligations, other than Other Incremental Term Loans and Refinancing Term Loans that rank junior in right of security with the Initial Term

A-3017

Loans) pursuant to a Permitted Junior Intercreditor Agreement (it being understood that Junior Liens are not required to rank equally and ratably with other Junior Liens, and that Indebtedness secured by Junior Liens may be secured by Liens that are senior in priority to, or rank equally and ratably with, or junior in priority to, other Liens constituting Junior Liens), which Permitted Junior Intercreditor Agreement (together with such amendments to the Security Documents and any other Intercreditor Agreements, if any, as are reasonably necessary or advisable (and reasonably acceptable to the Collateral Agent) to give effect to such Liens) shall be entered into in connection with a permitted incurrence of any such Liens (unless a Permitted Junior Intercreditor Agreement and/or Security Documents (as applicable) covering such Liens are already in effect).

"<u>Latest Maturity Date</u>" shall mean, at any date of determination, the latest Term Facility Maturity Date, in each case then in effect on such date of determination.

"<u>Lien</u>" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, charge, security interest or similar monetary encumbrance in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; <u>provided</u>, that in no event shall an operating lease or an agreement to sell be deemed to constitute a Lien.

"<u>Loan Obligations</u>" shall mean (a) the due and punctual payment by the Borrowers of (i) the unpaid principal of and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans made to the Borrowers under this Agreement, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) each payment required to be made by the Borrowers under this Agreement in respect of any Letter of Credit, when and as due, including payments in respect of reimbursement of disbursements, interest thereon (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) and obligations to provide Cash Collateral and (iii) all other monetary obligations of the Parent and the Borrowers owed under or pursuant to this Agreement and each other Loan Document, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), and (b) the due and punctual payment of all obligations of each other Loan Party under or pursuant to each of the Loan Documents.

"<u>Loan Parties</u>" shall mean the Parent, the Borrowers and the Subsidiary Loan Parties.

"<u>Loans</u>" shall mean the Term Loans

"<u>Margin Stock</u>" shall have the meaning assigned to such term in Regulation U.

"<u>Material Indebtedness</u>" shall mean Indebtedness (other than Loans and Letters of Credit) of any one or more of the Parent or any Subsidiary in an aggregate principal amount

exceeding $75,000,000; provided that in no event shall any Qualified Receivables Facility be considered Material Indebtedness.

"Material Intellectual Property" shall mean any Intellectual Property owned by any Loan Party that is material to the operation of the business of Parent and its Subsidiaries, taken as a whole.

"Material Subsidiary" shall mean any Subsidiary, other than any Subsidiary that (a) did not, as of the last day of the fiscal quarter of the Parent most recently ended for which financial statements have been (or were required to be) delivered pursuant to Section [__], [__] or [__],[14] have assets with a value in excess of 5.0% of the Consolidated Total Assets or revenues representing in excess of 5.0% of total revenues of the Parent and the Subsidiaries on a consolidated basis as of such date, and (b) taken together with all such Subsidiaries as of such date, did not have assets with a value in excess of 10% of Consolidated Total Assets or revenues representing in excess of 10% of total revenues of the Parent and the Subsidiaries on a consolidated basis as of such date.

"Milestone Payments" shall mean payments under intellectual property licensing agreements based on the achievement of specified revenue, profit or other performance targets (financial or otherwise).

"Moody's" shall mean Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"Net Income" shall mean, with respect to any person, the net income (loss) of such person, determined in accordance with Applicable Accounting Principles and before any reduction in respect of preferred stock dividends.

"Net Proceeds" shall mean:

(a)     100% of the cash proceeds actually received by the Parent or any Subsidiary (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) from any Asset Sale under Section 6.05(d) (except for any Sale and Lease-Back Transaction described in clause (a) of the proviso to Section 6.03) or Section 6.05(g), net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith, (ii) required payments of Indebtedness (other than Indebtedness incurred under the Loan Documents or Other First Lien Debt) and required payments of other obligations relating to the applicable asset to the extent such Indebtedness or other obligations are secured by a Lien permitted hereunder (other than pursuant to the Loan Documents and other than by a Junior Lien), (iii) repayments of Other First Lien Debt (limited to its proportionate share of such

---

[14] Section references to be to (i) condition for delivery of pre-closing financial statements, (ii) annual financial statements reporting covenant and (iii) quarterly financial statements reporting covenant.

A-3019

prepayment, based on the amount of such then outstanding debt as a percentage of all then outstanding Indebtedness incurred under the Loan Documents (other than Other Incremental Term Loans and Refinancing Term Loans that rank junior in right of security with the Initial Term Loans) and Other First Lien Debt, (iv) Taxes paid or payable (in the good faith determination of a Borrower) as a direct result thereof, and (v) the amount of any reasonable reserve established in accordance with Applicable Accounting Principles against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) or (iv) above) (x) related to any of the applicable assets and (y) retained by the Parent or any of the Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (provided that (1) the amount of any reduction of such reserve (other than in connection with a payment in respect of any such liability), prior to the date occurring 18 months after the date of the respective Asset Sale, shall be deemed to be cash proceeds of such Asset Sale occurring on the date of such reduction) and (2) the amount of any such reserve that is maintained as at the date occurring 18 months after the date of the applicable Asset Sale shall be deemed to be Net Proceeds from such Asset Sale as of such date; provided, that, if the Parent or the Lux Borrower shall deliver a certificate of a Responsible Officer of the Parent or the Lux Borrower to the Administrative Agent promptly following receipt of any such proceeds setting forth the Parent's or the Lux Borrower's intention to use any portion of such proceeds, within 12 months of such receipt, to acquire, maintain, develop, construct, improve, upgrade or repair assets useful in the business of the Parent and the Subsidiaries or to make Permitted Business Acquisitions and other Investments permitted hereunder (excluding Permitted Investments or, intercompany Investments in Subsidiaries or Unrestricted Subsidiaries) or to reimburse the cost of any of the foregoing incurred on or after the date on which the Asset Sale giving rise to such proceeds was contractually committed (other than inventory), such portion of such proceeds shall not constitute Net Proceeds except to the extent not, within 12 months of such receipt, so used or contractually committed to be so used (it being understood that if any portion of such proceeds are not so used within such 12 month period but within such 12 month period are contractually committed to be used, then such remaining portion if not so used within six months following the end of such 12 month period shall constitute Net Proceeds as of such date without giving effect to this proviso); provided, further, that no net cash proceeds calculated in accordance with the foregoing realized in a single transaction or series of related transactions shall constitute Net Proceeds unless such net cash proceeds shall exceed $15,000,000 (and thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds);

      (b)      100% of the cash proceeds actually received by the Parent or any Subsidiary (including casualty insurance settlements and condemnation awards, but only as and when received) from any Recovery Event, net of (i) attorneys' fees, accountants' fees, transfer taxes, deed or mortgage recording taxes on such asset, other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith, (ii) required payments of Indebtedness (other than Indebtedness incurred under the Loan Documents or Other First Lien Debt) and required payments of other obligations relating to the applicable asset to the extent such Indebtedness or other obligations are secured by a Lien permitted hereunder (other than pursuant to the Loan Documents and other than by a Junior Lien), (iii) repayments of Other First Lien Debt (limited to its proportionate share

of such prepayment, based on the amount of such then outstanding debt as a percentage of all then outstanding Indebtedness incurred under the Loan Documents (other than Other Incremental Term Loans and Refinancing Term Loans that rank junior in right of security with the Initial Term Loans) and Other First Lien Debt, and (iv) Taxes paid or payable (in the good faith determination of a Borrower) as a direct result thereof; provided, that, if the Parent or the Lux Borrower shall deliver a certificate of a Responsible Officer of the Parent or the Lux Borrower to the Administrative Agent promptly following receipt of any such proceeds setting forth the Parent's or the Lux Borrower's intention to use any portion of such proceeds, within 12 months of such receipt, to acquire, maintain, develop, construct, improve, upgrade or repair assets useful in the business of the Parent and the Subsidiaries or to make Permitted Business Acquisitions and other Investments permitted hereunder (excluding Permitted Investments or intercompany Investments in Subsidiaries or Unrestricted Subsidiaries) or to reimburse the cost of any of the foregoing incurred on or after the date on which the Recovery Event giving rise to such proceeds was contractually committed (other than inventory, except to the extent the proceeds of such Recovery Event are received in respect of inventory), such portion of such proceeds shall not constitute Net Proceeds except to the extent not, within 12 months of such receipt, so used or contractually committed to be so used (it being understood that if any portion of such proceeds are not so used within such 12 month period but within such 12 month period are contractually committed to be used, then such remaining portion if not so used within six months (or, solely in the case of any such Recovery Event relating to manufacturing, processing or assembly plants, 12 months) following the end of such 12 month period shall constitute Net Proceeds as of such date without giving effect to this proviso); provided, further, that no net cash proceeds calculated in accordance with the foregoing realized in a single transaction or series of related transactions shall constitute Net Proceeds unless such net cash proceeds shall exceed $15,000,000 (and thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds); and

(c)     100% of the cash proceeds from the incurrence, issuance or sale by the Parent or any Subsidiary of any Indebtedness (other than Excluded Indebtedness, except for Refinancing Notes and Refinancing Term Loans), net of all fees (including investment banking fees), commissions, costs and other expenses, in each case incurred in connection with such issuance or sale.

"Obligations" shall mean, collectively, (a) the Loan Obligations, (b) obligations in respect of any Secured Cash Management Agreement and (c) obligations in respect of any Secured Hedge Agreement.

"Opioid Settlement" shall mean [_____].[15]

"Other First Lien Debt" shall mean obligations secured by Other First Liens.

"Other First Liens" shall mean Liens on the Collateral that are equal and ratable with the Liens thereon securing the Initial Term Loans (and other Loan Obligations that are secured

---

[15] To be defined to mean the settlement with the opioid plaintiffs as implemented by any plan of reorganization, subject to the consent rights of the Supporting Term Lenders under the RSA.

by Liens on the Collateral ranking equally and ratably with the Initial Term Loans) pursuant to a Permitted First Lien Intercreditor Agreement, which Permitted First Lien Intercreditor Agreement (together with such amendments to the Security Documents and any other Intercreditor Agreements, if any, as are reasonably necessary or advisable (and reasonably acceptable to the Collateral Agent) to give effect to such Liens) shall be entered into in connection with a permitted incurrence of any such Liens (unless a Permitted First Lien Intercreditor Agreement and/or Security Documents (as applicable) covering such Liens are already in effect).

"Permitted Business Acquisition" shall mean any acquisition of all or substantially all the assets or business of, or all or substantially all the Equity Interests (other than directors' qualifying shares) not previously held by the Parent and its Subsidiaries in, or merger, consolidation or amalgamation with, a person or business unit or division or line of business of a person (or any subsequent investment made in a person or business unit or division or line of business previously acquired in a Permitted Business Acquisition), if immediately after giving effect thereto: (i) no Event of Default shall have occurred and be continuing or would result therefrom, provided, however, that with respect to a proposed acquisition pursuant to an executed acquisition agreement, at the option of either Borrower, the determination of whether such an Event of Default shall exist shall be made solely at the time of the execution of the acquisition agreement related to such Permitted Business Acquisition; (ii) all transactions related thereto shall be consummated in accordance with applicable laws; (iii) [reserved]; (iv) any acquired or newly formed Subsidiary shall not be liable for any Indebtedness except for Indebtedness permitted by Section 6.01; (v) to the extent required by Section [__],[16] any person acquired in such acquisition shall be merged into a Loan Party or become upon consummation of such acquisition a Subsidiary Loan Party; and (vi) the aggregate cash consideration in respect of such acquisitions and investments in assets that are not owned by the Loan Parties or in Equity Interests in persons that are not Subsidiary Loan Parties or do not become Subsidiary Loan Parties, in each case upon consummation of such acquisition, shall not exceed $150,000,000 plus (A) an amount equal to any returns (in the form of dividends or other distributions or net sale proceeds) received by any Loan Party in respect of any assets not owned by Loan Parties or Equity Interests in persons that are not Subsidiary Loan Parties or do not become Subsidiary Loan Parties that were acquired in such Permitted Business Acquisitions in reliance on the $150,000,000 basket above (excluding any such returns in excess of the amount originally invested) and (B) any amounts in excess thereof that can be, and are, permitted as Investments (and treated as Investments) made under a clause of Section 6.04 other than clause (k) thereof.

"Permitted Debt" shall mean Indebtedness for borrowed money (but not owing to the Parent or any of its Subsidiaries or Unrestricted Subsidiaries) incurred by the Lux Borrower, any other Borrower or any other Loan Party that is a Domestic Subsidiary, provided that (i) any such Permitted Debt shall not be guaranteed by the Parent, any Subsidiary, any Unrestricted Subsidiary or any Affiliate of the foregoing unless such person is a Guarantor and, if secured by any asset of the Parent, any Subsidiary, any Unrestricted Subsidiary or any Affiliate of the foregoing (as permitted by Sections 6.01 and 6.02), such assets consist solely of all or some portion of the Collateral pursuant to security documents no more favorable to the secured party or party, taken as a whole (as determined by a Borrower in good faith), than the Security Documents, (ii) any such Permitted Debt, if secured, shall be subject to an Intercreditor Agreement reasonably

---

[16] Section reference to be to further assurances covenant.

satisfactory to the Administrative Agent and (iii) if such Permitted Debt is secured, such Permitted Debt shall not mature prior to the date that is the latest final maturity date of the Loans existing at the time of such incurrence, and the Weighted Average Life to Maturity of any such Permitted Debt shall be no shorter than the remaining Weighted Average Life to Maturity of the Loans with the latest final maturity at the time of such incurrence.

"Permitted First Lien Intercreditor Agreement" shall mean, with respect to any Liens on Collateral that are intended to be equal and ratable with the Liens securing the Initial Term Loans (and other Loan Obligations that are secured by Liens on the Collateral ranking equally and ratably with the Liens securing the Initial Term Loans), one or more intercreditor agreements, each of which shall be in in form and substance reasonably satisfactory to the Administrative Agent.

"Permitted Investments" shall mean:

(a)       direct obligations of the United States of America or any member of the European Union or any agency thereof or obligations guaranteed by the United States of America or any member of the European Union or any agency thereof, in each case with maturities not exceeding two years from the date of acquisition thereof;

(b)       time deposit accounts, certificates of deposit, money market deposits, banker's acceptances and other bank deposits maturing within 180 days of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America having capital, surplus and undivided profits in excess of $250,000,000 and whose long-term debt, or whose parent holding company's long-term debt, is rated A (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(c)       repurchase obligations with a term of not more than 180 days for underlying securities of the types described in clause (a) above entered into with a bank meeting the qualifications described in clause (b) above;

(d)       commercial paper, maturing not more than one year after the date of acquisition, issued by a corporation (other than an Affiliate of the Parent) organized and in existence under the laws of the United States of America or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of P 1 (or higher) according to Moody's, or A 1 (or higher) according to S&P (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(e)       securities with maturities of two years or less from the date of acquisition, issued or fully guaranteed by any State, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A by S&P or A by Moody's (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

27

(f)      shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (e);

(g)      money market funds that (i) comply with the criteria set forth in Rule 2a 7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $1,000,000,000;

(h)      time deposit accounts, certificates of deposit, money market deposits, banker's acceptances and other bank deposits in an aggregate face amount not in excess of 0.5% of the total assets of the Parent and the Subsidiaries, on a consolidated basis, as of the end of the Parent's most recently completed fiscal year; and

(i)      instruments equivalent to those referred to in clauses (a) through (h) above denominated in any foreign currency comparable in credit quality and tenor to those referred to above and commonly used by corporations for cash management purposes in any jurisdiction outside the United States of America to the extent reasonably required in connection with any business conducted by the Parent, the Lux Borrower or any Subsidiary organized in such jurisdiction.

"Permitted Junior Intercreditor Agreement" shall mean, with respect to any Liens on Collateral that are intended to be junior to any Liens securing the Initial Term Loans (and other Loan Obligations that are secured by Liens on the Collateral ranking equally and ratably with the Liens securing the Initial Term Loans) (including, for the avoidance of doubt, junior Liens pursuant to Section [__]17), one or more intercreditor agreements, each of which shall be in in form and substance reasonably satisfactory to the Administrative Agent.

"Permitted Receivables Facility Assets" shall mean (i) Receivables Assets (whether now existing or arising in the future) of the Parent and its Subsidiaries which are transferred, sold and/or pledged to a Receivables Entity or a bank, other financial institution or a commercial paper conduit or other conduit facility established and maintained by a bank or other financial institution, pursuant to a Qualified Receivables Facility and any related Permitted Receivables Related Assets which are also so transferred, sold and/or pledged to such Receivables Entity, bank, other financial institution or commercial paper conduit or other conduit facility, and all proceeds thereof and (ii) loans to the Parent and its Subsidiaries secured by Receivables Assets (whether now existing or arising in the future) and any Permitted Receivables Related Assets of the Parent and its Subsidiaries which are made pursuant to a Qualified Receivables Facility.

"Permitted Receivables Facility Documents" shall mean each of the documents and agreements entered into in connection with any Qualified Receivables Facility, including all documents and agreements relating to the issuance, funding and/or purchase of certificates and purchased interests or the incurrence of loans, as applicable, in each case as such documents and agreements may be amended, modified, supplemented, refinanced or replaced from time to time so long as the relevant Qualified Receivables Facility would still meet the requirements of the

---

17 Section reference to be to incremental loan provision permitting junior incremental loans.

definition thereof after giving effect to such amendment, modification, supplement, refinancing or replacement.

"Permitted Receivables Related Assets" shall mean any other assets that are customarily transferred, sold and/or pledged or in respect of which security interests are customarily granted in connection with asset securitization transactions involving receivables similar to Receivables Assets and any collections or proceeds of any of the foregoing (including, without limitation, lock-boxes, deposit accounts, records in respect of Receivables Assets and collections in respect of Receivables Assets).

"Permitted Refinancing Indebtedness" shall mean any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Indebtedness being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Indebtedness); provided, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions, expenses, plus an amount equal to any existing commitment unutilized thereunder and letters of credit undrawn thereunder), (b) except with respect to Section 6.01(i), (i) the final maturity date of such Permitted Refinancing Indebtedness is on or after the earlier of (x) the final maturity date of the Indebtedness being Refinanced and (y) the Latest Maturity Date in effect at the time of incurrence thereof and (ii) the Weighted Average Life to Maturity of such Permitted Refinancing Indebtedness is greater than or equal to the lesser of (x) the Weighted Average Life to Maturity of the Indebtedness being Refinanced and (y) the Weighted Average Life to Maturity of the Class of Term Loans then outstanding with the greatest remaining Weighted Average Life to Maturity, (c) if the Indebtedness being Refinanced is subordinated in right of payment to any Loan Obligations, such Permitted Refinancing Indebtedness shall be subordinated in right of payment to such Loan Obligations on terms in the aggregate not materially less favorable to the Lenders as those contained in the documentation governing the Indebtedness being Refinanced (as determined by a Borrower in good faith), (d) no Permitted Refinancing Indebtedness shall have any borrower which is different than the borrower of the respective Indebtedness being so Refinanced or have guarantors that are not (or would not have been required to become) guarantors with respect to the Indebtedness being so Refinanced (except that a Loan Party may be added as an additional guarantor), (e) if the Indebtedness being Refinanced is secured (and permitted to be secured), such Permitted Refinancing Indebtedness may be secured by Liens on the same (or any subset of the) assets as secured (or would have been required to secure) the Indebtedness being Refinanced, on terms in the aggregate that are no less favorable to the Secured Parties than, the Indebtedness being refinanced or on terms otherwise permitted by Section 6.02 (as determined by a Borrower in good faith), (f) if the Indebtedness being Refinanced was unsecured or if Liens on the Collateral securing the Indebtedness being Refinanced (if any) were Junior Liens, then any Liens on Collateral to secure such Permitted Refinancing Indebtedness shall be Junior Liens; and (g) if the Indebtedness being Refinanced was subject to a Permitted First Lien Intercreditor Agreement or a Permitted Junior Intercreditor Agreement, and if the respective Permitted Refinancing Indebtedness is to be secured by the Collateral, the Permitted Refinancing Indebtedness shall likewise be subject to a Permitted First Lien Intercreditor Agreement or a Permitted Junior Intercreditor Agreement, as applicable.

"person" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company or government, individual or family trusts, or any agency or political subdivision thereof.

"Pro Forma Basis" shall mean, as to any person, for any events as described below that occur subsequent to the commencement of a period for which the financial effect of such events is being calculated, and giving effect to the events for which such calculation is being made, such calculation as will give pro forma effect to such events as if such events occurred on the first day of the most recent Test Period ended on or before the occurrence of such event (the "Reference Period"):  (i) any Asset Sale and any asset acquisition, Investment (or series of related Investments) in excess of $25 million, merger, amalgamation, consolidation (including the Transaction) (or any similar transaction or transactions), any dividend, distribution or other similar payment, (ii) any operational changes or restructurings of the business of the Parent or any of its Subsidiaries that the Parent or any of its Subsidiaries has determined to make and/or made during or subsequent to the Reference Period (including in connection with an asset Disposition or asset acquisition described in clause (i)) and which are expected to have a continuing impact and are factually supportable, which would include cost savings resulting from head count reduction, closure of facilities and other operational changes and other cost savings in connection therewith, (iii) the designation of any Subsidiary as an Unrestricted Subsidiary or of any Unrestricted Subsidiary as a Subsidiary and (iv) any incurrence, repayment, repurchase or redemption of Indebtedness (or any issuance, repurchase or redemption of Disqualified Stock or preferred stock), other than fluctuations in revolving borrowings in the ordinary course of business (and not resulting from a transaction as described in clause (i) above).

Pro forma calculations made pursuant to the definition of this term "Pro Forma Basis" shall be determined in good faith by a Responsible Officer of the Parent.  Any such pro forma calculation may include adjustments appropriate, in the reasonable good faith determination of the Parent and set forth in a certificate of a Responsible Officer, to reflect operating expense reductions, other operating improvements, synergies or such operational changes or restructurings described in clause (ii) of the immediately preceding paragraph reasonably expected to result from the applicable pro forma event in the 12-month period following the consummation of the pro forma event.  The Parent shall deliver to the Administrative Agent a certificate of a Responsible Officer of the Parent setting forth such demonstrable or additional operating expense reductions and other operating improvements or synergies and information and calculations supporting them in reasonable detail.

If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date on which the relevant calculation is being made had been the applicable rate for the entire period (taking into account any hedging obligations applicable to such Indebtedness if such hedging obligation has a remaining term in excess of 12 months). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Parent to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with Applicable Accounting Principles. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period, except to the extent the outstandings thereunder are

30

reasonably expected to increase as a result of any transactions described in clause (i) of the first paragraph of this definition of "Pro Forma Basis" which occurred during the respective period or thereafter and on or prior to the date of determination. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Parent may designate.

"Qualified Equity Interests" shall mean any Equity Interest other than Disqualified Stock.

"Qualified Jurisdiction" shall mean (x) the United States (and any political subdivision thereof), Ireland, Luxembourg, Switzerland, the United Kingdom or the Netherlands, (y) the jurisdiction of the organization of any entity incorporated or organized outside the United States in a transaction permitted by Section 6.05(n) where the Administrative Agent has made the determination required by clause (iii) thereof, and (z) any other jurisdiction where the Administrative Agent has determined (acting reasonably and following a request by a Borrower and based on advice of local counsel) that Wholly Owned Subsidiaries organized in such jurisdiction may provide guarantees and security which, after giving effect to the Agreed Guarantee and Security Principles, would provide substantially the same guarantees and security provided with respect to the Collateral owned by such entities as would have been obtained if the respective Subsidiary were instead organized in any of the United States, Ireland, Luxembourg, Switzerland the United Kingdom or the Netherlands (it being understood and agreed that a jurisdiction as has been agreed by the Parent and the Administrative Agent prior to the date hereof shall satisfy the requirements of this clause (z)).

"Qualified Ratings" means public corporate family ratings (or equivalent) that include at least two of the following ratings: a rating equal to or higher than B2 from Moody's, a rating equal to or higher than B from S&P or a rating equal to or higher than B from Fitch.

"Qualified Receivables Facility" shall mean a receivables facility or facilities created under the Permitted Receivables Facility Documents and which is designated as a "Qualified Receivables Facility" (as provided below), providing for the transfer, sale and/or pledge by a Borrower and/or one or more other Receivables Sellers of Permitted Receivables Facility Assets (thereby providing financing to such Borrower and/or the Receivables Sellers) to (i) a Receivables Entity (either directly or through another Receivables Seller), which in turn shall transfer, sell and/or pledge interests in the respective Permitted Receivables Facility Assets to third-party lenders or investors pursuant to the Permitted Receivables Facility Documents in return for the cash used by such Receivables Entity to acquire the Permitted Receivables Facility Assets from such Borrower and/or the respective Receivables Sellers or (ii) a bank or other financial institution, which in turn shall finance the acquisition of the Permitted Receivables Facility Assets through a commercial paper conduit or other conduit facility, or directly to a commercial paper conduit or other conduit facility established and maintained by a bank or other financial institution that will finance the acquisition of the Permitted Receivables Facility Assets through the commercial paper conduit or other conduit facility, in each case, either directly or through another Receivables Seller, so long as, in the case of each of clause (i) and clause (ii), no portion of the Indebtedness or any other obligations (contingent or otherwise) under such receivables facility or facilities (x) is guaranteed by the Parent or any Subsidiary (excluding guarantees of obligations

pursuant to Standard Securitization Undertakings), (y) is recourse to or obligates the Parent or any other Subsidiary in any way (other than pursuant to Standard Securitization Undertakings) or (z) subjects any property or asset (other than Permitted Receivables Facility Assets, Permitted Receivables Related Assets or the Equity Interests of any Receivables Entity) of the Parent or any other Subsidiary (other than a Receivables Entity), directly or indirectly, contingently or otherwise, to the satisfaction thereof (other than pursuant to Standard Securitization Undertakings).  Any such designation shall be evidenced to the Administrative Agent by filing with the Administrative Agent a certificate signed by a Financial Officer of the Parent certifying that, to the best of such officer's knowledge and belief after consultation with counsel, such designation complied with the foregoing conditions.

"Real Property" shall mean, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any Loan Party, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, incidental to the ownership, lease or operation thereof.

"Receivables Assets" shall mean any right to payment created by or arising from sales of goods, leases of goods or the rendition of services rendered no matter how evidenced whether or not earned by performance (whether constituting accounts, general intangibles, chattel paper or otherwise).

"Receivables Entity" shall mean any direct or indirect wholly owned Subsidiary of the Parent which engages in no activities other than in connection with the financing of accounts receivable of the Receivables Sellers and which is designated (as provided below) as a "Receivables Entity" (a) with which neither the Parent nor any of its Subsidiaries has any contract, agreement, arrangement or understanding (other than pursuant to the Permitted Receivables Facility Documents (including with respect to fees payable in the ordinary course of business in connection with the servicing of accounts receivable and related assets)) on terms less favorable to the Parent or such Subsidiary than those that might be obtained at the time from persons that are not Affiliates of the Parent (as determined by a Borrower in good faith) and (b) to which neither the Parent nor any other Subsidiary has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results (other than pursuant to Standard Securitization Undertakings).  Any such designation shall be evidenced to the Administrative Agent by filing with the Administrative Agent an officer's certificate of the Parent certifying that, to the best of such officer's knowledge and belief after consultation with counsel, such designation complied with the foregoing conditions.

"Receivables Seller" shall mean the Borrowers and those Subsidiaries that are from time to time party to the Permitted Receivables Facility Documents (other than any Receivables Entity).

"Recovery Event" shall mean any event that gives rise to the receipt by the Parent or any of its Subsidiaries of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or Real Property (including any improvements thereon).

"<u>Refinancing Notes</u>" shall mean any secured or unsecured notes or loans issued by the Lux Borrower, any other Borrower or any other Loan Party that is a Domestic Subsidiary (whether under an indenture, a credit agreement or otherwise) and the Indebtedness represented thereby; <u>provided</u>, that (a) 100% of the Net Proceeds of such Refinancing Notes are used to permanently reduce Loans substantially simultaneously with the issuance thereof; (b) the principal amount (or accreted value, if applicable) of such Refinancing Notes does not exceed the principal amount (or accreted value, if applicable) of the aggregate portion of the Loans so reduced (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions and expenses); (c) the final maturity date of such Refinancing Notes is on or after the Term Facility Maturity Date of the Term Loans so reduced; (d) the Weighted Average Life to Maturity of such Refinancing Notes is greater than or equal to the Weighted Average Life to Maturity of the Term Loans so reduced; (e) the terms of such Refinancing Notes do not provide for any scheduled repayment, mandatory redemption or sinking fund obligations prior to the Term Facility Maturity Date of the Term Loans so reduced (other than (x) in the case of notes, customary offers to repurchase or mandatory prepayment provisions upon a change of control, asset sale or event of loss and customary acceleration rights after an event of default and (y) in the case of loans, customary amortization and mandatory and voluntary prepayment provisions which are consistent in all material respects, when taken as a whole, with those applicable to the Initial Term Loans with such Indebtedness (if in the form of term loans) to provide that any such mandatory prepayments as a result of asset sales, events of loss, or excess cash flow, shall be shared no more than ratably with the term loans outstanding pursuant to this Agreement); (f) there shall be no borrower or issuer with respect thereto other than the Lux Borrower, any other Borrower or any other Loan Party that is a Domestic Subsidiary, and no guarantor in respect of such Refinancing Notes that is the Parent, any Subsidiary, any Unrestricted Subsidiary or any Affiliate of the foregoing that is not a Loan Party; (g) if such Refinancing Notes are secured by an asset of the Parent, any Subsidiary, any Unrestricted Subsidiary or any Affiliate of the foregoing, the security agreements relating to such assets shall not extend to any assets not constituting Collateral and shall be no more favorable to the secured party or party, taken as a whole (determined by a Borrower in good faith) than the Security Documents (with such differences as are reasonably satisfactory to the Administrative Agent); (h) if such Refinancing Notes are secured, such Refinancing Notes shall be secured by all or a portion of the Collateral, but shall not be secured by any assets of the Parent or its subsidiaries other than the Collateral; (i) Refinancing Notes that are secured by Collateral shall be subject to the provisions of a Permitted First Lien Intercreditor Agreement or a Permitted Junior Intercreditor Agreement, as applicable (and in any event shall be subject to a Permitted Junior Intercreditor Agreement if the Indebtedness being Refinanced is secured on a junior lien basis to any of the Obligations); and (j) if the Indebtedness being refinanced was unsecured or if Liens on the Collateral securing the Indebtedness being Refinanced were Junior Liens, then any Liens on Collateral securing such Refinancing Notes shall also be Junior Liens.

"<u>Regulation U</u>" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"<u>Regulation X</u>" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Required Lenders" shall mean, at any time, Lenders having Loans outstanding that, taken together, represent more than 50% of the sum of all Loans outstanding; provided, that the Loans of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Required Percentage" shall mean, with respect to an Applicable Period, 50%; provided, that, so long as no Default or Event of Default shall have occurred and is continuing, if the Total Net Leverage Ratio as at the end of the Applicable Period is (x) less than or equal to 4.50 to 1.00, such percentage shall be 25% or (y) 3.50 to 1.00, such percentage shall be 0% and.

"Requirement of Law" shall mean, as to any person, any law, treaty, rule, regulation, statute, order, ordinance, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding upon such person or any of its property or assets or to which such person or any of its property or assets is subject.

"Responsible Officer" of any person shall mean any director (*administrateur*), manager (*gérant*), executive officer or Financial Officer of such person, any authorized signatory appointed by the board of directors (*conseil d'administration*) or board of managers (*conseil de gérance*) of such person (as applicable) and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement, or any other duly authorized employee or signatory of such person.

"Restricted Margin Stock" shall mean, at any time, all Margin Stock owned by the Parent and its Subsidiaries which is not Unrestricted Margin Stock.

"Restricted Payments" shall have the meaning assigned to such term in Section 6.06. The amount of any Restricted Payment made other than in the form of cash or cash equivalents shall be the Fair Market Value thereof.

"Retained Excess Cash Flow Overfunding" shall mean, at any time, in respect of any Excess Cash Flow Period, the amount, if any, by which the portion of the Available Amount attributable to the Retained Percentage of Excess Cash Flow for all Excess Cash Flow Interim Periods used in such Excess Cash Flow Period exceeds the actual Retained Percentage of Excess Cash Flow for such Excess Cash Flow Period.

"Retained Percentage" shall mean, with respect to any Excess Cash Flow Period (or Excess Cash Flow Interim Period), (a) 100% minus (b) the Required Percentage with respect to such Excess Cash Flow Period (or Excess Cash Flow Interim Period).

"Revolver Replacement Term Loans" shall mean [_____].[18]

---

[18] To mean the term loans incurred to finance the repayment of the existing RCF at closing. For the avoidance of doubt, (i) such term loans may be incurred as Initial Term Loans under the credit agreement; provide that the terms (other than economic terms) of such term loans shall be the same as the terms of the Initial Term Loans and (ii) such term loans may, instead of being secured by pari passu liens on all or any portion of the Collateral, be secured by junior liens on all or any portion of the Collateral or unsecured.

A-3030

"S&P" shall mean Standard & Poor's Ratings Services or any successor to the rating agency business thereof.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Secured Cash Management Agreement" shall mean any Cash Management Agreement that is entered into by and between any Loan Party and any Cash Management Bank to the extent that such Cash Management Agreement is not otherwise designated in writing by a Borrower and such Cash Management Bank to the Administrative Agent to not be included as a Secured Cash Management Agreement.

"Secured Hedge Agreement" shall mean any Hedging Agreement that is entered into by and between any Loan Party and any Hedge Bank to the extent that such Hedging Agreement is not otherwise designated in writing by a Borrower and such Hedge Bank to the Administrative Agent to not be included as a Secured Hedge Agreement.  Notwithstanding the foregoing, for all purposes of the Loan Documents, any Guarantee of, or grant of any Lien to secure, any obligations in respect of a Secured Hedge Agreement by a Guarantor shall not include any Excluded Swap Obligations.

"Secured Net Leverage Ratio" shall mean, as of any date of determination, the ratio of (a) Consolidated Secured Net Debt as of such date to (b) Adjusted Consolidated EBITDA for the most recently ended Test Period for which financial statements of the Parent have been delivered (or were required to be delivered) as required by this Agreement, all determined on a consolidated basis in accordance with Applicable Accounting Principles; provided that Adjusted Consolidated EBITDA shall be determined for the relevant Test Period on a Pro Forma Basis.

"Secured Parties" shall mean, collectively, the Administrative Agent, the Collateral Agent, each Lender, each Hedge Bank that is party to any Secured Hedge Agreement, each Cash Management Bank that is party to any Secured Cash Management Agreement and each sub-agent appointed pursuant to Section [___][19] by the Administrative Agent with respect to matters relating to the Loan Documents or by the Collateral Agent with respect to matters relating to any Security Document.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Similar Business" shall mean any business, the majority of whose revenues are derived from (i) business or activities conducted by the Parent and its Subsidiaries on the Closing Date, (ii) any business that is a natural outgrowth or reasonable extension, development or expansion of any such business or any business similar, reasonably related, incidental, complementary or ancillary to any of the foregoing or (iii) any business that in the Parent's good faith business judgment constitutes a reasonable diversification of businesses conducted by the Parent and its Subsidiaries.

---

[19] Section reference to be to provision permitting the appointment of sub-agents.

A-3031

"<u>Standard Securitization Undertakings</u>" shall mean representations, warranties, covenants and indemnities entered into by the Parent or any Subsidiary thereof in connection with a Qualified Receivables Facility which are reasonably customary (as determined in good faith by a Borrower)  in an accounts receivable financing transaction in the commercial paper, term securitization or structured lending market.

"<u>Subordinated Indebtedness</u>" means (a) with respect to any Borrower, any Indebtedness for borrowed money of such Borrower which is by its terms subordinated in right of payment to the Initial Term Loans, and (b) with respect to any Guarantor, any Indebtedness for borrowed money of such Guarantor which is by its terms subordinated in right of payment to its Guarantee of the Initial Term Loans; provided, however, that no Guarantee of Indebtedness which Indebtedness does not itself constitute Subordinated Indebtedness shall constitute Subordinated Indebtedness.

"<u>subsidiary</u>" shall mean, with respect to any person (herein referred to as the "parent"), any corporation, limited liability company, partnership, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, directly or indirectly, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"<u>Subsidiary</u>" shall mean, unless the context otherwise requires, a subsidiary of the Parent.  Notwithstanding the foregoing (and except for purposes of the definition of "Unrestricted Subsidiary" contained herein) an Unrestricted Subsidiary shall be deemed not to be a Subsidiary of the Parent or any of its Subsidiaries for purposes of this Agreement.

"<u>Subsidiary Guarantee Agreement</u>" shall mean the Subsidiary Guarantee Agreement dated as of the Closing Date as may be amended, restated, supplemented or otherwise modified from time to time, between each Subsidiary Loan Party and the Collateral Agent. The Subsidiary Guarantee Agreement shall also be deemed to include any guaranty agreement prepared under applicable local law (in the case of a Subsidiary Loan Party that is a Foreign Subsidiary) where the Administrative Agent has reasonably determined, based on the advice of counsel and subject to the Agreed Guarantee and Security Principles, that a separate Guarantee (or modified form of Guarantee) is preferable under relevant local law.

"<u>Subsidiary Loan Party</u>" shall mean (a) each Borrower (other than with respect to its own primary Loan Obligations or Secured Cash Management Agreements and any Secured Hedge Agreement to which it is a party), (b) each direct or indirect Wholly Owned Subsidiary of the Parent (other than the Borrowers) (whether owned on the Closing Date or formed or acquired thereafter) that owns directly or indirectly any Equity Interest in any Wholly Owned Domestic Subsidiary of the Parent (which Wholly Owned Domestic Subsidiary of the Parent is not (i) Mallinckrodt Nuclear LLC or (ii) any other Subsidiary if and for so long as such Subsidiary qualifies as an Excluded Subsidiary), (c) each direct or indirect Wholly Owned Domestic Subsidiary of the Parent (other than the Borrowers) (whether owned on the Closing Date or formed or acquired thereafter) (other than (i) Mallinckrodt Nuclear LLC and (ii) any other Subsidiary if

A-3032

and for so long as such Subsidiary qualifies as an Excluded Subsidiary) and (d) any other Wholly Owned Subsidiary of the Parent that may be designated by a Borrower (by way of delivering to the Collateral Agent the Subsidiary Guarantee Agreement (or a supplement to the Subsidiary Guarantee Agreement, as reasonably requested by the Administrative Agent) and any applicable Security Documents, in each case, duly executed by such Subsidiary) in its sole discretion (including, without limitation, in connection with transactions permitted by Section 6.05(n)) from time to time to be a guarantor in respect of the Obligations, whereupon such Subsidiary shall be obligated to comply with the other requirements of Section [___][20] as if it were newly acquired. Notwithstanding anything contained in this Agreement to the contrary, a transfer of Collateral from any Loan Party organized in a Qualified Jurisdiction to a Subsidiary Loan Party that is not organized in a Qualified Jurisdiction shall, for purposes of Sections 6.04 and 6.05, be deemed to be an Investment in a Subsidiary that is not a Loan Party and shall be justified as same pursuant to such Sections.

"Swap Obligation" shall mean, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Taxes" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority, whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to tax with respect to the foregoing.

"Termination Date" shall mean the date on which (a) all Commitments shall have been terminated and (b) the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full in cash (other than in respect of contingent indemnification and expense reimbursement claims not then due).

"Test Period" shall mean, on any date of determination, the period of four consecutive fiscal quarters of the Parent then most recently ended (taken as one accounting period) for which financial statements have been (or were required to be) delivered pursuant to Section [___] or [___][21]; provided that prior to the first date financial statements have been delivered pursuant to Section [___] or [___],[22] the Test Period in effect shall be the four fiscal quarter period ending [_____].[23]

"Third Party Funds" shall mean any accounts or funds, or any portion thereof, received by Parent or any of its Subsidiaries as agent on behalf of third parties in accordance with a written agreement that imposes a duty upon Parent or one or more of its Subsidiaries to collect and remit those funds to such third parties.

---

[20] Section reference to be to further assurances covenant.

[21] Section references to be to (i) annual financial statements reporting covenant and (ii) quarterly financial statements reporting covenant.

[22] Section references to be to (i) annual financial statements reporting covenant and (ii) quarterly financial statements reporting covenant.

[23] To be the four fiscal quarter period ending most recently before the Closing Date for which financial statements are available.

"<u>Total Net Leverage Ratio</u>" shall mean, as of any date of determination, the ratio of (a) Consolidated Total Net Debt as of such date to (b) Adjusted Consolidated EBITDA for the most recently ended Test Period for which financial statements of the Parent have been delivered (or were required to be delivered) as required by this Agreement, all determined on a consolidated basis in accordance with Applicable Accounting Principles; <u>provided</u> that Adjusted Consolidated EBITDA shall be determined for the relevant Test Period on a Pro Forma Basis.

"<u>Transaction Documents</u>" shall mean [_____].[24]

"<u>Transaction Expenses</u>" shall mean any fees or expenses incurred or paid by the Parent or any of its Subsidiaries in connection with the Transactions, the Transaction Documents, this Agreement and the other Loan Documents, and the transactions contemplated hereby and thereby.

"<u>Transactions</u>" shall mean, collectively, the transactions to occur pursuant to the Transaction Documents, including (a) [_____][25]; (b) the execution, delivery and performance of the Loan Documents, the creation of the Liens pursuant to the Security Documents, and the initial borrowings hereunder; and (c) the payment of all fees and expenses to be paid and owing in connection with the foregoing.

"<u>Uniform Commercial Code</u>" shall mean the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"<u>Unrestricted Cash</u>" shall mean cash or Permitted Investments of the Parent or any of its Subsidiaries that would not appear as "restricted" on a consolidated balance sheet of the Parent or any of its Subsidiaries.

"<u>Unrestricted Margin Stock</u>" shall mean, at any time, all Margin Stock owned by the Parent and its Subsidiaries to the extent the value thereof exceeds 25% of the aggregate value of all assets owned by the Parent and its Subsidiaries then subject to the covenants contained in Sections 6.02 and 6.05.

"<u>Unrestricted Subsidiary</u>" shall mean (1) any Subsidiary of the Parent, whether now owned or acquired or created after the Closing Date, that is designated after the Closing Date by a Borrower as an Unrestricted Subsidiary hereunder by written notice to the Administrative Agent; <u>provided</u>, that a Borrower shall only be permitted to so designate a new Unrestricted Subsidiary after the Closing Date so long as (a) no Default or Event of Default has occurred and is continuing or would result therefrom, (b) [reserved], (c) all Investments in such Unrestricted Subsidiary at the time of designation (as contemplated by the immediately following sentence) together with all Investments in any other Unrestricted Subsidiary designated as such in reliance on this clause (1) at the time of designation thereof (as contemplated by the immediately following sentence) are permitted by Section 6.01(j), (d) such Subsidiary being designated as an "Unrestricted Subsidiary"

---

[24] To mean the [Definitive Documents] relating to any plan of reorganization.

[25] To mean all transactions contemplated by any plan of reorganization.

A-3034

shall also, concurrently with such designation and thereafter, constitute an "Unrestricted Subsidiary" for purposes for all other Material Indebtedness of the Parent or its Subsidiaries issued or incurred after the Closing Date that contains a similar concept, (e) such Subsidiary was not previously designated as an Unrestricted Subsidiary and thereafter re-designated as a Subsidiary, and (f) the Parent shall have delivered to the Administrative Agent an officer's certificate executed by a Responsible Officer of the Parent, certifying to the best of such officer's knowledge, compliance with the requirements of this proviso; and (2) any subsidiary of an Unrestricted Subsidiary (unless transferred to such Unrestricted Subsidiary or any of its subsidiaries by the Parent or one or more of its Restricted Subsidiaries after the date of the designation of the parent entity as a "Unrestricted Subsidiary" hereunder, in which case the subsidiary so transferred would be required to be independently designated in accordance with preceding clause (1)). The designation of any Subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the Parent (or its Subsidiaries) therein at the date of designation in an amount equal to the Fair Market Value of the Parent's (or its Subsidiaries') Investments therein, which shall be required to be justified on such date in accordance with Section 6.04(j) . A Borrower may designate any Unrestricted Subsidiary to be a Subsidiary for purposes of this Agreement (each, a "Subsidiary Redesignation"); provided, that (i) no Default or Event of Default has occurred and is continuing or would result therefrom (after giving effect to the provisions of the immediately succeeding sentence), (ii) [reserved,] and (iii) a Borrower shall have delivered to the Administrative Agent an officer's certificate executed by a Responsible Officer of a Borrower, certifying to the best of such officer's knowledge, compliance with the requirements of preceding clauses (i) and (ii).  The designation of any Unrestricted Subsidiary as a Subsidiary after the Closing Date shall constitute (i) the incurrence at the time of designation of any Investment, Indebtedness or Liens of such Subsidiary existing at such time and (ii) a return on an Investment by the applicable Loan Party (or its relevant Subsidiaries) in Unrestricted Subsidiaries pursuant to the preceding sentence in an amount equal to the Fair Market Value at the date of such designation of such Loan Party's (or its relevant Subsidiaries') Investment in such Subsidiary. Notwithstanding anything to the contrary contained above, neither the Lux Borrower nor the Co-Borrower shall be permitted to be an Unrestricted Subsidiary.

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing:  (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Wholly Owned Domestic Subsidiary" shall mean a Wholly Owned Subsidiary that is also a Domestic Subsidiary.

"Wholly Owned Subsidiary" of any person shall mean a subsidiary of such person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such person or another Wholly Owned Subsidiary of such person.  Unless the context otherwise requires, "Wholly Owned Subsidiary" shall mean a Subsidiary of the Parent that is a Wholly Owned Subsidiary of the Parent.

"Working Capital" shall mean, with respect to the Parent and the Subsidiaries on a consolidated basis at any date of determination, Current Assets at such date of determination minus Current Liabilities at such date of determination; provided, that, for purposes of calculating Excess Cash Flow, increases or decreases in Working Capital shall be calculated without regard to any changes in Current Assets or Current Liabilities as a result of (a) any reclassification in accordance with Applicable Accounting Principles of assets or liabilities, as applicable, between current and noncurrent or (b) the effects of purchase accounting.

**Negative Covenants:[26]**

ARTICLE VI

*Negative Covenants*

The Parent and each Borrower covenants and agrees with each Lender that, until the Termination Date, unless the Required Lenders shall otherwise consent in writing, the Parent and each Borrower will not, and will not permit any of the Subsidiaries to:

Section 6.01   Indebtedness.   Incur, create, assume or permit to exist any Indebtedness, except:

(a)      Indebtedness (other than as described in Section 6.01(b) and Section 6.01(bb) below) existing or committed on the Closing Date (provided, that any such Indebtedness (x) that is owed to any person other than Parent and one or more of its Subsidiaries, in an aggregate amount in excess of $5,000,000 shall be set forth in Part A of Schedule 6.01 and (y) owing to Parent or one or more of its Subsidiaries in excess of $5,000,000 shall be set forth on Part B of Schedule 6.01) and any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness; provided that (1) any Indebtedness outstanding pursuant to this clause (a) which is owed by a Loan Party to any Subsidiary that is not a Loan Party shall be subordinated in right of payment to the same extent required pursuant to Section 6.01(e) and (2) any Permitted Refinancing Indebtedness at any time incurred with respect to any Indebtedness described in this Section 6.01(a) outstanding on the Closing Date (or an issue of Permitted Refinancing Indebtedness incurred in respect thereof or prior to the incurrence of such Permitted Refinancing Indebtedness) may only be owed to the Parent or its respective Subsidiary to which the Indebtedness described in clause (y) above outstanding on the Closing Date was owed;

(b)      Indebtedness created hereunder (including pursuant to Section [__], Section [__] and Section [__][27]) and under the other Loan Documents and any Refinancing Notes incurred to Refinance such Indebtedness;

(c)      Indebtedness of the Parent or any Subsidiary pursuant to Hedging Agreements entered into for non-speculative purposes;

---

[26] For the avoidance of doubt, all covenants set forth in former Section 5.13 (Cadence IP Licensee) shall be eliminated.

[27] Section references to be to (i) incremental loan provision, (ii) extension provision and (iii) refinancing provision.

(d)        Indebtedness owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance to the Parent or any Subsidiary, pursuant to reimbursement or indemnification obligations to such person, in each case in the ordinary course of business or consistent with past practice or industry practices;

(e)        Indebtedness of the Parent or any Borrower to the Parent or any Subsidiary and of any Subsidiary to the Parent, any Borrower or any other Subsidiary; provided, that (i) Indebtedness of any Subsidiary that is not a Subsidiary Loan Party owing to the Loan Parties incurred pursuant to this Section 6.01(e) shall be subject to Section 6.04 and (ii) Indebtedness owed by any Loan Party to any Subsidiary that is not a Loan Party incurred pursuant to this Section 6.01(e) shall be subordinated in right of payment to the Loan Obligations under this Agreement on subordination terms described in Exhibit F hereto or on other subordination terms reasonably satisfactory to the Administrative Agent and a Borrower;

(f)        Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations, in each case provided in the ordinary course of business or consistent with past practice or industry practices, including those incurred to secure health, safety and environmental obligations in the ordinary course of business or consistent with past practice or industry practices;

(g)        Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services, in each case incurred in the ordinary course of business;

(h)        (i) Indebtedness of a Subsidiary acquired after the Closing Date or a person merged or consolidated with the Parent or any Subsidiary after the Closing Date and Indebtedness otherwise assumed by the Parent, any Borrower or any other Loan Party that is a Domestic Subsidiary (and which may be guaranteed by any Loan Party) in connection with the acquisition of assets or Equity Interests (including a Permitted Business Acquisition), where such acquisition, merger or consolidation is not prohibited by this Agreement; provided, that, (x) Indebtedness incurred pursuant to preceding sub clause (h)(i) shall be in existence prior to the respective acquisition of assets or Equity Interests (including a Permitted Business Acquisition) and shall not have been created in contemplation thereof or in connection therewith, and (y) after giving effect to the incurrence of such Indebtedness, (A) in the case of any such Indebtedness that is secured, the Secured Net Leverage Ratio (I) shall not be greater than 3.50 to 1.00 or (II) shall be no more than the Secured Net Leverage Ratio in effect immediately prior thereto and, (B) in the case of any such Indebtedness (whether secured or unsecured), the Fixed Charge Coverage Ratio (I) shall not be less than 2.00 to 1.00 or (II) shall be no more than the Fixed Charge Coverage Ratio in effect immediately prior thereto, each calculated on a Pro Forma Basis for the then most recently ended Test Period; and (ii) any Permitted Refinancing Indebtedness incurred to Refinance any such Indebtedness;

(i)        (x) Capitalized Lease Obligations, mortgage financings and other Indebtedness incurred by the Parent or any Subsidiary prior to or within 360 days after the

acquisition, lease, construction, repair, replacement or improvement of the respective property (real or personal, and whether through the direct purchase of property or the Equity Interest of any person owning such property) permitted under this Agreement in order to finance such acquisition, lease, construction, repair, replacement or improvement, in an aggregate principal amount that immediately after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, together with the aggregate principal amount of any other Indebtedness outstanding pursuant to this 6.01(i) and Section 6.01(j), would not exceed the greater of $125,000,000 and [___]% of Consolidated Total Assets when incurred, created or assumed, and (y) any Permitted Refinancing Indebtedness in respect thereof;

(j)      (x) Capitalized Lease Obligations and any other Indebtedness incurred by the Parent or any Subsidiary arising from any Sale and Lease-Back Transaction that is permitted under Section 6.03 so long as the principal amount thereof, together with the aggregate principal amount of any other Indebtedness outstanding pursuant to this Section 6.01(j) and Section 6.01(i), would not exceed greater of $125,000,000 and [___]% of Consolidated Total Assets when incurred, created or assumed, and (y) any Permitted Refinancing Indebtedness in respect thereof;

(k)      (x) other Indebtedness of the Parent or any Subsidiary, in an aggregate principal amount that, immediately after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, together with the aggregate principal amount of any other Indebtedness outstanding pursuant to this Section 6.01(k), would not exceed the greater of $250,000,000 and [___]% of Consolidated Total Assets when incurred, created or assumed (provided that, if such Indebtedness is of any Subsidiary other than a Loan Party, the aggregate principal amount of such Indebtedness, immediately after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, together with the aggregate principal amount of any other Indebtedness of Subsidiaries other than Loan Parties outstanding pursuant to this Section 6.01(k), does not exceed $100,000,000) and (y) any Permitted Refinancing Indebtedness in respect thereof;

(l)      [reserved];

(m)      Guarantees (i) by the Parent, any Borrower or any Subsidiary Loan Party of any Indebtedness of the Parent, any Borrower or any Subsidiary Loan Party permitted to be incurred under this Agreement, (ii) by the Parent, any Borrower or any Subsidiary Loan Party of Indebtedness otherwise permitted hereunder of any Subsidiary that is not a Subsidiary Loan Party to the extent such Guarantees are permitted by Section 6.04 (other than Section 6.04(r)), (iii) by any Subsidiary that is not a Subsidiary Loan Party of Indebtedness of another Subsidiary that is not a Subsidiary Loan Party, and (iv) by the Parent, any Borrower or any Subsidiary Loan Party of Indebtedness of Subsidiaries that are not Subsidiary Loan Parties incurred for working capital purposes in the ordinary course of business on ordinary business terms so long as such Indebtedness is permitted to be incurred under Section 6.01(q) and to the extent such Guarantees are permitted by Section 6.04 (other than Section 6.04(r)); provided, that Guarantees (x) by the Parent, any Borrower or any Subsidiary Loan Party under this Section 6.01(m) of any other Indebtedness of a person that is subordinated in right of payment to other Indebtedness of such person shall be expressly subordinated in right of payment to the Loan Obligations to at least the same extent as such underlying Indebtedness is subordinated in right of payment and (y) otherwise permitted by this Section 6.01(m) shall not be permitted with respect to any Indebtedness (including, without limitation, Permitted Debt and Permitted Refinancing Indebtedness) where the

42

A-3038

guarantor providing the Guarantee is not permitted to guarantee such Indebtedness because this Section 6.01 (or defined terms used in this Section 6.01) otherwise limit the persons who may guarantee such Indebtedness (where such Indebtedness is being Refinanced or otherwise);

(n)     Indebtedness arising from agreements of the Parent or any Subsidiary providing for indemnification, adjustment of purchase or acquisition price or similar obligations (including earn-outs), in each case, incurred or assumed in connection with the Transactions, any Permitted Business Acquisition, other Investments or the disposition of any business, assets or a Subsidiary not prohibited by this Agreement;

(o)     Indebtedness in respect of letters of credit, bank guarantees, warehouse receipts or similar instruments issued in the ordinary course of business or consistent with past practice or industry practices and not supporting obligations in respect of Indebtedness for borrowed money;

(p)     (i) Permitted Debt (not secured by Other First Liens on the Collateral) so long as immediately after giving effect to the incurrence of such Permitted Debt and the use of proceeds thereof, (A) the Fixed Charge Coverage Ratio on a Pro Forma Basis is not less than 2.00 to 1.00 and (B) no Default or Event of Default shall have occurred and be continuing or shall result therefrom, and (ii) any Permitted Refinancing Indebtedness in respect thereof;

(q)     (x) Indebtedness of Subsidiaries that are not Subsidiary Loan Parties in an aggregate principal amount outstanding that, immediately after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, together with the aggregate principal amount of any other Indebtedness outstanding pursuant to this Section 6.01(q), would not exceed the greater of $100,000,000 and [__]% of Consolidated Total Assets when incurred, created or assumed and (y) any Permitted Refinancing Indebtedness in respect thereof;

(r)     Indebtedness incurred in the ordinary course of business in respect of obligations of the Parent or any Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; provided, that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business and not in connection with the borrowing of money or any Hedging Agreements;

(s)     Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Parent or any Subsidiary incurred in the ordinary course of business;

(t)     (x) Indebtedness in connection with Qualified Receivables Facilities in an aggregate principal amount outstanding that, immediately after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, together with the aggregate principal amount of any other Indebtedness outstanding pursuant to this Section 6.01(t), would not exceed the greater of $200,000,000 and [__]% of Consolidated Total Assets when incurred, created or assumed and (y) any Permitted Refinancing Indebtedness in respect thereof;

(u)     obligations in respect of Cash Management Agreements;

43

(v)     (i) Existing First Lien Notes, (ii) Revolver Replacement Term Loans, (iii) Permitted Debt secured by Other First Liens on the Collateral, in an aggregate principal amount outstanding not to exceed at the time of incurrence the Incremental Amount available at such time, and (iv) Permitted Refinancing Indebtedness in respect of any Indebtedness theretofore outstanding pursuant to this clause (v);

(w)     Indebtedness of, incurred on behalf of, or representing Guarantees of Indebtedness of, joint ventures subject to compliance with Section 6.04 (other than Section 6.04(r));

(x)     Indebtedness issued by the Parent or any Subsidiary to current or former officers, directors and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of the Parent permitted by Section 6.06;

(y)     Indebtedness consisting of obligations of the Parent or any Subsidiary under deferred compensation or other similar arrangements incurred by such person in connection with the Transactions and Permitted Business Acquisitions or any other Investment permitted hereunder;

(z)     Indebtedness of the Parent or any Subsidiary to or on behalf of any joint venture (regardless of the form of legal entity) that is not a Subsidiary arising in the ordinary course of business in connection with the cash management operations (including with respect to intercompany self-insurance arrangements) of the Parent and the Subsidiaries;

(aa)     Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business; and

(bb)     (i) Indebtedness in respect of the Existing Secured Notes (other than Existing First Lien Notes) and (ii) Permitted Refinancing Indebtedness incurred in respect thereof.

For purposes of determining compliance with this Section 6.01 or Section 6.02, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on (x) the Dollar Equivalent thereof, in the case of any such Indebtedness denominated in an Alternate Currency or (y) in all other cases, customary currency exchange rates in effect, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) on or prior to the Closing Date, on the Closing Date and, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) after the Closing Date, on the date on which such Indebtedness was incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness); provided, that if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount, as applicable, of such Indebtedness being refinanced plus (ii) the aggregate amount of

fees, underwriting discounts, premiums (including tender premiums), defeasance costs and other costs and expenses incurred in connection with such refinancing.

Further, for purposes of determining compliance with this Section 6.01, (A) Indebtedness need not be permitted solely by reference to one category of permitted Indebtedness (or any portion thereof) described in Sections 6.01(a) through (bb) but may be permitted in part under any relevant combination thereof (and subject to compliance, where relevant, with Section 6.02) and (B) in the event that an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the categories of permitted Indebtedness (or any portion thereof) described in Sections 6.01(a) through (bb), a Borrower may, in its sole discretion, classify or reclassify, or later divide, classify or reclassify (as if incurred at such later time), such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 6.01 and following Section 6.02 and will be entitled to only include the amount and type of such item of Indebtedness (or any portion thereof) in one of the above clauses (or any portion thereof) and such item of Indebtedness (or any portion thereof) shall be treated as having been incurred or existing pursuant to only such clause or clauses (or any portion thereof) without giving pro forma effect to such item (or portion thereof) when calculating the amount of Indebtedness that may be incurred pursuant to any other clause; provided, that (v) all Indebtedness outstanding under this Agreement shall at all times be deemed to have been incurred pursuant to clause (b) of this Section 6.01, (w) all Indebtedness outstanding on the Closing Date under the Existing Secured Indentures (other than the Existing First Lien Notes) shall at all times be deemed to have been incurred pursuant to clause (bb) of this Section 6.01, (x) all Indebtedness outstanding on the Closing Date under the Existing First Lien Notes shall at all times be deemed to have been incurred pursuant to clause (v) of this Section 6.01, (y) all Indebtedness described in Schedule 6.01 (and any Permitted Refinancing Indebtedness incurred in respect thereof) shall be deemed outstanding under Section 6.01(a) and (z) all Indebtedness owing to the Parent or any of its Subsidiaries must be justified as incurred (and outstanding) pursuant to one or more of Sections 6.01(a), (e), (m) and (w). In addition, with respect to any Indebtedness that was permitted to be incurred hereunder on the date of such incurrence, any Increased Amount of such Indebtedness shall also be permitted hereunder after the date of such incurrence.

This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior in right of payment to secured Indebtedness merely because it is unsecured or (2) senior Indebtedness as subordinated or junior in right of payment to any other senior Indebtedness merely because it has a junior priority with respect to the same collateral.

Section 6.02   Liens.  Create, incur, assume or permit to exist any Lien on any property or assets (including stock or other securities of any person) of the Parent or any Subsidiary now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, "Permitted Liens"):

(a)     Liens on property or assets of the Parent and the Subsidiaries existing on the Closing Date and, to the extent securing Indebtedness in an aggregate principal amount in excess of $5,000,000, set forth on Schedule 6.02(a) and any modifications, replacements, renewals or extensions thereof; provided, that such Liens shall secure only those obligations that they secure on the Closing Date (and any Permitted Refinancing Indebtedness in respect of such obligations permitted by Section 6.01), shall not be amended, replaced or renewed so as to increase their

A-3041

priority in relation to Liens securing other Indebtedness with respect to such property or assets, if any, as on the Closing Date, and shall not subsequently apply to any other property or assets of the Parent, any Borrower or any Subsidiary other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien and (B) proceeds and products thereof;

(b)     any Lien created under the Loan Documents (including Liens created under the Security Documents securing obligations in respect of Secured Hedge Agreements and Secured Cash Management Agreements);

(c)     any Lien on any property or asset of the Parent or any Subsidiary securing Indebtedness or Permitted Refinancing Indebtedness permitted by Section 6.01(h); provided, that (i) such Lien is not created in contemplation of or in connection with such acquisition or such person becoming a Subsidiary, as the case may be, and (ii) such Lien does not apply to any other property or assets of the Parent or any of the Subsidiaries not securing such Indebtedness at the date of the acquisition of such property or asset and accessions and additions thereto and proceeds and products thereof (other than after-acquired property of any entity so acquired (but not of the Parent or any other Loan Party, including any Loan Party into which such acquired entity is merged) required to be subjected to such Lien pursuant to the terms of such Indebtedness (and refinancings thereof));

(d)     Liens for Taxes, assessments or other governmental charges or levies not yet delinquent by more than 30 days or that are being contested in good faith in compliance with Section [___][28];

(e)     Liens imposed by law, such as landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, supplier's, construction or other like Liens, securing obligations that are not overdue by more than 30 days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, the Parent or any Subsidiary shall have set aside on its books reserves in accordance with Applicable Accounting Principles;

(f)     (i) pledges and deposits and other Liens made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other social security laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations and (ii) pledges and deposits and other Liens securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Parent or any Subsidiary;

(g)     deposits and other Liens to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capitalized Lease Obligations), statutory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, trade contracts, agreements with utilities, and other obligations of a like nature (including letters of credit in lieu of any such bonds or to support the issuance thereof)

---

[28] Section reference to be to tax payment covenant.

A-3042

incurred in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(h)    zoning restrictions, easements, survey exceptions, trackage rights, leases (other than Capitalized Lease Obligations), licenses, special assessments, rights-of-way, covenants, conditions, restrictions and declarations on or with respect to the use of Real Property, servicing agreements, development agreements, site plan agreements and other similar encumbrances incurred in the ordinary course of business and title defects or irregularities that are of a minor nature and that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Parent or any Subsidiary;

(i)    Liens securing Indebtedness permitted by Section 6.01(i); provided, that such Liens do not apply to any property or assets of the Parent, any Borrower or any Subsidiary other than the property or assets acquired, leased, constructed, replaced, repaired or improved with such Indebtedness (or the Indebtedness Refinanced thereby), and accessions and additions thereto, proceeds and products thereof, customary security deposits and related property; provided, further, that individual financings provided by one lender may be cross-collateralized to other financings provided by such lender (and its Affiliates) (it being understood that with respect to any Liens on the Collateral being incurred under this clause (i) to secure Permitted Refinancing Indebtedness, if Liens on the Collateral securing the Indebtedness being Refinanced (if any) were Junior Liens, then any Liens on such Collateral being incurred under this clause (i) to secure Permitted Refinancing Indebtedness shall also be Junior Liens);

(j)    Liens arising out of Sale and Lease-Back Transactions permitted under Section 6.03, so long as such Liens attach only to the property sold and being leased in such transaction and any accessions and additions thereto or proceeds and products thereof and related property;

(k)    non-consensual Liens securing judgments that do not constitute an Event of Default under Section [___][29];

(l)    any interest or title of a lessor or sublessor under any leases or subleases entered into by the Parent or any Subsidiary in the ordinary course of business;

(m)    Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks and other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposits, sweep accounts, reserve accounts or similar accounts of the Parent or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Parent or any Subsidiary, or (iii) relating to purchase orders and other agreements entered into with customers, suppliers or service providers of the Parent, any Borrower or any Subsidiary in the ordinary course of business;

(n)    Liens (i) arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business,

---

[29] Section reference to be to judgment default.

A-3043

(iii) encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to brokerage accounts incurred in the ordinary course of business and not for speculative purposes or (iv) in respect of Third Party Funds;

(o)      Liens securing obligations in respect of letters of credit, bank guarantees, warehouse receipts or similar obligations permitted under Section 6.01(f) or (o) and incurred in the ordinary course of business or consistent with past practice or industry practices and not supporting obligations in respect of Indebtedness for borrowed money;

(p)      leases or subleases, and licenses or sublicenses (including with respect to Intellectual Property), granted to others in the ordinary course of business not interfering in any material respect with the business of the Parent and its Subsidiaries, taken as a whole;

(q)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(r)      Liens solely on any cash earnest money deposits made by the Parent or any of the Subsidiaries in connection with any letter of intent or purchase agreement in respect of any Investment permitted hereunder;

(s)      Liens with respect to property or assets of any Subsidiary that is not a Loan Party securing obligations of a Subsidiary that is not a Loan Party permitted under Section 6.01;

(t)      Liens on any amounts held by a trustee under any indenture or other debt agreement issued in escrow pursuant to customary escrow arrangements pending the release thereof, or under any indenture or other debt agreement pursuant to customary discharge, redemption or defeasance provisions;

(u)      the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business;

(v)      agreements to subordinate any interest of the Parent or any Subsidiary in any accounts receivable or other proceeds arising from inventory consigned by the Parent, any Borrower or any of the Subsidiaries pursuant to an agreement entered into in the ordinary course of business;

(w)      Liens arising from precautionary Uniform Commercial Code financing statements regarding operating leases or other obligations not constituting Indebtedness;

(x)      Liens (i) on Equity Interests in joint ventures (A) securing obligations of such joint venture or (B) pursuant to the relevant joint venture agreement or arrangement and (ii) on Equity Interests in Unrestricted Subsidiaries to the extent permitted by the second to last paragraph in Section 6.04;

(y)      Liens on securities that are the subject of repurchase agreements constituting Permitted Investments under clause (c) of the definition thereof;

48

A-3044

(z)     Liens in respect of Qualified Receivables Facilities that extend only to Permitted Receivables Facility Assets, Permitted Receivables Related Assets or the Equity Interests of any Receivables Entity;

(aa)     Liens securing insurance premiums financing arrangements; provided, that such Liens are limited to the applicable unearned insurance premiums;

(bb)     in the case of Real Property that constitutes a leasehold interest, any Lien to which the fee simple interest (or any superior leasehold interest) is subject;

(cc)     Liens securing Indebtedness or other obligation (i) of the Parent or a Subsidiary in favor of the Parent, a Borrower or any Subsidiary Loan Party and (ii) of any Subsidiary that is not Loan Party in favor of any Subsidiary that is not a Loan Party;

(dd)     Liens on cash or Permitted Investments securing Hedging Agreements in the ordinary course of business submitted for clearing in accordance with applicable Requirements of Law;

(ee)     Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit or bank guarantee issued or created for the account of the Parent, any Borrower or any Subsidiary in the ordinary course of business; provided, that such Lien secures only the obligations of the Parent or such Subsidiaries in respect of such letter of credit, bank guarantee or banker's acceptance to the extent permitted under Section 6.01;

(ff)     Liens on Collateral that are Junior Liens securing (x) Permitted Debt and guarantees thereof permitted by Section 6.01(m) and (y) Permitted Refinancing Indebtedness incurred to Refinance Permitted Debt secured pursuant to preceding clause (x) and guarantees thereof permitted by Section 6.01(m);

(gg)     Liens on Collateral that are Other First Liens, so long as such Other First Liens secure Indebtedness permitted by Section 6.01(b) or 6.01(v) and guarantees thereof permitted by Section 6.01(m);

(hh)     Liens arising out of conditional sale, title retention or similar arrangements for the sale or purchase of goods by the Parent or any of the Subsidiaries in the ordinary course of business;

(ii)     Liens on Collateral securing Indebtedness permitted by Section 6.01(bb); and

(jj)     other Liens with respect to property or assets of the Parent or any Subsidiary securing (x) obligations in an aggregate outstanding principal amount that, together with the aggregate principal amount of other obligations that are secured pursuant to this clause (jj), immediately after giving effect to the incurrence of such Liens, would not exceed the greater of $75,000,000 and [__]% of Consolidated Total Assets when incurred, created or assumed and (y) Permitted Refinancing Indebtedness incurred to Refinance obligations secured pursuant to preceding clause (x), in each case, to the extent that such Liens (i) are Other First Liens, subject to

a Permitted First Lien Intercreditor Agreement or (ii) are Junior Liens, subject to a Permitted Junior Intercreditor Agreement.

For purposes of determining compliance with this Section 6.02, (A) a Lien securing an item of Indebtedness need not be permitted solely by reference to one category of permitted Liens (or any portion thereof) described in Sections 6.02(a) through (jj) but may be permitted in part under any combination thereof and (B) in the event that a Lien securing an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the categories of permitted Liens (or any portion thereof) described in Sections 6.02(a) through (jj), a Borrower may, in its sole discretion, classify or reclassify, or later divide, classify or reclassify (as if incurred at such later time), such Lien securing such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 6.02 and will be entitled to only include the amount and type of such Lien or such item of Indebtedness secured by such Lien (or any portion thereof) in one of the above clauses and such Lien securing such item of Indebtedness (or portion thereof) will be treated as being incurred or existing pursuant to only such clause or clauses (or any portion thereof) without giving pro forma effect to such item (or portion thereof) when calculating the amount of Liens or Indebtedness that may be incurred pursuant to any other clause. For purposes of this Section 6.02, Indebtedness will not be considered incurred under a subsection or clause of Section 6.01 if it is later reclassified as outstanding under another subsection or clause of Section 6.01 (in which event, and at which time, same will be deemed incurred under the subsection or clause to which reclassified). In addition, with respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the incurrence of such Indebtedness, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness. Notwithstanding the foregoing, it is acknowledged and agreed that Liens on Collateral that are Junior Liens or Other First Liens shall at all times be justified under clause (b), (i) (in the case of Junior Liens), (ff), (gg), (ii) or (jj) above, as applicable.

Notwithstanding anything to the contrary contained above in this Section 6.02, this Section 6.02 shall not restrict the incurrence or existence of any Liens at any time on Margin Stock that then constitutes Unrestricted Margin Stock.

Section 6.03    Sale and Lease-Back Transactions.  Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter, as part of such transaction, rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "Sale and Lease-Back Transaction"); provided, that a Sale and Lease-Back Transaction shall be permitted (a) with respect to property owned by the Parent or any Subsidiary that is acquired after the Closing Date so long as such Sale and Lease-Back Transaction is consummated within 360 days of the acquisition of such property, and (b) with respect to any other property owned by the Parent or any Subsidiary, (x) if the Net Proceeds therefrom are used to prepay the Term Loans to the extent required by Section [__]³⁰ and (y) with respect to all Sale and Lease-Back Transactions pursuant to this clause (b), the requirements of the last two paragraphs of Section 6.05 shall apply to such Sale and Lease-Back Transaction to the extent provided therein.

---

³⁰ Section reference to be to asset sale mandatory prepayment.

A-3046

Section 6.04  <u>Investments, Loans and Advances</u>.  (i) Purchase or acquire (including pursuant to any merger with a person that is not a Wholly Owned Subsidiary immediately prior to such merger) any Equity Interests, evidences of Indebtedness or other securities of any other person, (ii) make any loans or advances to or Guarantees the Indebtedness of any other person, or (iii) purchase or otherwise acquire, in one transaction or a series of related transactions, (x) all or substantially all of the property and assets or business of another person or (y) assets constituting a business unit, line of business or division of such person (each of the foregoing, an "<u>Investment</u>"), except:

(a)    Investments to effect the Transactions;

(b)    (i) Investments (x) by the Parent, any Borrower or any Subsidiary in the Equity Interests of any Subsidiary as of the Closing Date and set forth on <u>Part A</u> of <u>Schedule 6.04</u> and (y) by the Parent, any Borrower or any Subsidiary consisting of intercompany loans from the Parent, any Borrower or any Subsidiary to the Parent, any Borrower or any Subsidiary as of the Closing Date and set forth on <u>Part B</u> of <u>Schedule 6.04</u>; <u>provided</u> that to the extent any such intercompany loan that is owing by a non-Subsidiary Loan Party to the Parent, any Borrower or any Subsidiary Loan Party (the "<u>Scheduled Loans</u>") (or any additional Investments made by the Parent, any Borrower or any Subsidiary Loan Party pursuant to this proviso) is repaid after the Closing Date or the Parent, any Borrower or any Subsidiary Loan Party receives, after the Closing Date, any dividend, distribution, interest payment, return of capital, repayment or other amount in respect of any scheduled Investment in the Equity Interests of any non-Subsidiary Loan Party (a "<u>Return of Scheduled Equity</u>"), then additional Investments may be made by the Parent, any Borrower or any Subsidiary Loan Party in any non-Subsidiary Loan Party in an aggregate amount up to the amount actually received by the Parent, any Borrower or any Subsidiary Loan Party after the Closing Date as payment in respect of such Investments; <u>provided</u> <u>further</u> that in no event will the aggregate amount of additional Investments made by the Parent, any Borrower or any Subsidiary Loan Party in non-Subsidiary Loan Parties pursuant to this proviso exceed the sum of the original principal amount of the Scheduled Loans on the Closing Date and the aggregate amount of Returns of Scheduled Equity; (ii) Investments in the Parent, any Borrower or any Subsidiary Loan Party; <u>provided</u> that all amounts owing by the Borrowers or any Guarantor to any Subsidiary that is not a Guarantor shall be subordinated in right of payment to the Obligations pursuant to a subordination agreement substantially in the form of Exhibit F hereto or otherwise reasonably satisfactory to the Administrative Agent and a Borrower; (iii) Investments by any Subsidiary that is not a Borrower or Guarantor in any Subsidiary that is not a Borrower or Guarantor; (iv) Investments by the Parent, any Borrower or any Subsidiary Loan Party in any Wholly-Owned Subsidiary that is not a Borrower or Guarantor in an aggregate amount for all such outstanding Investments made after the Closing Date not to exceed the greater of $500,000,000 and [__]% of Consolidated Total Assets when made; <u>provided</u> that any such Investments shall (I) comprise intercompany transactions undertaken in good faith (as certified by a Responsible Officer of a Borrower) for the purpose of improving the consolidated tax efficiency of the Parent and its Subsidiaries and not for the purpose of circumventing any covenant set forth herein and (II) be made solely in the form of cash, notes, receivables, payables or securities; (v) other intercompany liabilities amongst the Borrowers and the Guarantors incurred in the ordinary course of business; (vi) other intercompany liabilities amongst Subsidiaries that are not Guarantors incurred in the ordinary course of business in connection with the cash management operations of such Subsidiaries; and (vii) Investments by the Parent or any Subsidiary Loan Party in any Subsidiary

51

that is not a Loan Party consisting solely of (x) the contribution or other Disposition of Equity Interests or Indebtedness of any other Subsidiary that is not a Loan Party held directly by the Parent or such Subsidiary Loan Party in exchange for Indebtedness, Equity Interests (or additional share premium or paid in capital in respect of Equity Interests) or a combination thereof of the Subsidiary to which such contribution or other Disposition is made or (y) an exchange of Equity Interests of any other Subsidiary that is not a Loan Party for Indebtedness of such Subsidiary; provided that immediately following the consummation of an Investment pursuant to preceding clause (x) or (y), the Subsidiary whose Equity Interests or Indebtedness are the subject of such Investment remains a Subsidiary.

(c)      Permitted Investments and Investments that were Permitted Investments when made;

(d)      Investments arising out of the receipt by the Parent, any Borrower or any Subsidiary of non-cash consideration for the Disposition of assets permitted under Section 6.05;

(e)      loans and advances to officers, directors, employees or consultants of the Parent, any Borrower or any Subsidiary (i) in the ordinary course of business in an aggregate outstanding amount (valued at the time of the making thereof, and without giving effect to any write-downs or write-offs thereof) not to exceed $20,000,000, (ii) in respect of payroll payments and expenses in the ordinary course of business and (iii) in connection with such person's purchase of Equity Interests of the Parent solely to the extent that the amount of such loans and advances shall be contributed to the Parent in cash as common equity;

(f)      accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business and any assets or securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers made in the ordinary course of business;

(g)      Hedging Agreements entered into for non-speculative purposes;

(h)      Investments (not in Subsidiaries, which are provided in clause (b) above) existing on, or contractually committed as of, the Closing Date and set forth on Part C of Schedule 6.04 and any extensions, renewals, replacements or reinvestments thereof, so long as the aggregate amount of all Investments pursuant to this clause (h) is not increased at any time above the amount of such Investment existing or committed on the Closing Date (other than pursuant to an increase as required by the terms of any such Investment as in existence on the Closing Date or as otherwise permitted by this Section 6.04);

(i)      Investments resulting from pledges and deposits under Sections 6.02(f), (g), (n), (q), (r), (dd) and (ii);

(j)      other Investments by the Parent or any Subsidiary in an aggregate outstanding amount (valued at the time of the making thereof, and without giving effect to any write-downs or write-offs thereof) not to exceed the sum of (X) the greater of $400,000,000 and [___]% of Consolidated Total Assets when made, plus (Y) so long as (1) no Default or Event of Default shall have occurred and be continuing and (2) the Total Net Leverage Ratio on a Pro Forma

Basis is not greater than 3.50 to 1.00, and taking into account any Restricted Payments made pursuant to Section 6.06(d) utilizing the Available Amount, any portion of the Available Amount on the date of such election that a Borrower elects to apply to this Section 6.04(j)(Y) in a written notice of a Responsible Officer thereof, which notice shall set forth calculations in reasonable detail the amount of Available Amount immediately prior to such election and the amount thereof elected to be so applied, and plus (Z) an amount equal to any returns (including dividends, interest, distributions, returns of principal, profits on sale, repayments, income and similar amounts) actually received in respect of any such Investment (excluding any returns in excess of the amount originally invested) pursuant to clause (X); provided, that if any Investment pursuant to this Section 6.04(j) is made in any person that was not a Subsidiary on the date on which such Investment was made but becomes a Subsidiary thereafter, then such Investment may, at the option of a Borrower, upon such person becoming a Subsidiary and so long as such person remains a Subsidiary, be deemed to have been made pursuant to Section 6.04(b) (to the extent permitted by the provisions thereof) and not in reliance on this Section 6.04(j); provided, further, that no more than $100,000,000 in aggregate outstanding amount (valued at the time of the making thereof, and without giving effect to any write-downs or write-offs thereof) of Investments made in reliance on this clause (j) (other than Investments in the ordinary course of business consistent with past practice in an aggregate outstanding amount not to exceed $15,000,000) shall be made in Unrestricted Subsidiaries (including Investments arising as a result of the designation of a Subsidiary as an Unrestricted Subsidiary equal to the Fair Market Value of the Parent's (or its Subsidiaries') Investments in such Subsidiary at the date of designation);

(k)      Investments constituting Permitted Business Acquisitions;

(l)      Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business or Investments acquired by the Parent or a Subsidiary as a result of a foreclosure by the Parent or any of the Subsidiaries with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(m)      Investments of a Subsidiary acquired after the Closing Date or of a person merged into the Parent or merged into or consolidated with a Subsidiary after the Closing Date, in each case, (i) to the extent such acquisition, merger or consolidation is permitted under this Section 6.04, (ii) in the case of any acquisition, merger or consolidation, in accordance with Section 6.05 and (iii) to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(n)      acquisitions by the Parent, any Borrower or any Subsidiary of obligations of one or more officers or other employees of the Parent, any Borrower or any of the Subsidiaries in connection with such officer's or employee's acquisition of Equity Interests of the Parent, so long as no cash is actually advanced by any Borrower or any of the Subsidiaries to such officers or employees in connection with the acquisition of any such obligations;

(o)      Guarantees by the Parent, any Borrower or any Subsidiary of operating leases (other than Capitalized Lease Obligations) or of other obligations that do not constitute Indebtedness of the kind described in clauses (a), (b), (e), (f), (g), (h), (i), (j), (k) or (l) of the

definition thereof, in each case entered into by the Parent, any Borrower or any Subsidiary in the ordinary course of business;

(p)     Investments to the extent that payment for such Investments is made with Equity Interests (other than Disqualified Stock) of the Parent; provided, that the issuance of such Equity Interests are not included in any determination of the Available Amount;

(q)     Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers;

(r)     Guarantees permitted under Section 6.01 (except to the extent such Guarantee is expressly subject to this Section 6.04);

(s)     advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of the Parent or such Subsidiary;

(t)     Investments by the Parent and the Subsidiaries, if the Parent or any Subsidiary would otherwise be permitted to make a Restricted Payment under Section 6.06(g) in such amount (provided that the amount of any such Investment shall also be deemed to be a Restricted Payment under Section 6.06(g) for all purposes of this Agreement);

(u)     Investments consisting of Permitted Receivables Facility Assets or arising as a result of Qualified Receivables Facilities;

(v)     Investments consisting of the licensing or contribution of Intellectual Property pursuant to joint marketing or other similar arrangements with other persons, in each case in the ordinary course of business;

(w)     to the extent constituting Investments, purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of Intellectual Property in each case in the ordinary course of business;

(x)     Investments received substantially contemporaneously in exchange for Qualified Equity Interests of the Parent; provided, that the issuance of such Qualified Equity Interests are not included in any determination of the Available Amount;

(y)     Investments in joint ventures; provided that the aggregate outstanding amount (valued at the time of the making thereof and without giving effect to any write-downs or write-offs thereof) of Investments made pursuant to this Section 6.04(y) shall not exceed the sum of (A) the greater of $200,000,000 and [___]% of Consolidated Total Assets when made, plus (B) an aggregate amount equal to any returns (including dividends, interest, distributions, returns of principal, profits on sale, repayments, income and similar amounts) actually received in respect of any such Investment (excluding any returns in excess of the amount originally invested); provided, that if any Investment pursuant to this Section 6.04(y) is made in any person that was not a Subsidiary on the date on which such Investment was made but becomes a Subsidiary thereafter, then such Investment may, at the option of a Borrower, upon such person becoming a Subsidiary and so long as such person remains a Subsidiary, be deemed to have been made pursuant to

54

A-3050

Section 6.04(b) (to the extent permitted by the provisions thereof) and not in reliance on this Section 6.04(y);

(z)       Investments consisting of Guarantees of Indebtedness of joint ventures, in an aggregate outstanding principal amount (plus, without duplication, the aggregate amount of unreimbursed payments made pursuant to any such Guarantee) not to exceed the greater of $100,000,000 and [   ]% of Consolidated Total Assets when made;

(aa)     additional Investments, so long as, at the time any such Investment is made and immediately after giving effect thereto, (x) no Default or Event of Default shall have occurred and is continuing and (y) the Total Net Leverage Ratio on a Pro Forma Basis is not greater than 3.00 to 1.00.

For purposes of determining compliance with this Section 6.04, (A) an Investment need not be permitted solely by reference to one category of permitted Investments (or any portion thereof) described in Sections 6.04(a) through (aa) but may be permitted in part under any relevant combination thereof and (B) in the event that an Investment (or any portion thereof) meets the criteria of one or more of the categories of permitted Investments (or any portion thereof) described in Sections 6.04(a) through (aa), a Borrower may, in its sole discretion, classify or reclassify, or later divide, classify or reclassify (as if made at such later time), such Investment (or any portion thereof) in any manner that complies with this Section 6.04 and will be entitled to only include the amount and type of such Investment (or any portion thereof) in one or more (as relevant) of the above clauses (or any portion thereof) and such Investment (or any portion thereof) shall be treated as having been made or existing pursuant to only such clause or clauses (or any portion thereof); provided, that (1) all Investments described in Schedule 6.04 shall be deemed outstanding under Section 6.04(b) or Section 6.04(h), as applicable and (2) notwithstanding the foregoing, Investments (other than Investments in the ordinary course of business) in Unrestricted Subsidiaries (including Investments arising as a result of the designation of a Subsidiary as an Unrestricted Subsidiary) may only be made pursuant to Section 6.04(j); provided, further, that upon re-designation of an Unrestricted Subsidiary as a Subsidiary, any Investment therein may be permitted pursuant to any category of permitted Investments (or any portion thereof) described in Sections 6.04(a) through (aa).

Any Investment in any person other than the Parent, a Borrower or a Subsidiary Loan Party that is otherwise permitted by this Section 6.04 may be made through intermediate Investments in Subsidiaries that are not Loan Parties and such intermediate Investments shall be disregarded for purposes of determining the outstanding amount of Investments pursuant to any clause set forth above. The amount of any Investment made other than in the form of cash or cash equivalents shall be the Fair Market Value thereof valued at the time of the making thereof, and without giving effect to any subsequent write-downs or write-offs thereof.

Notwithstanding anything to the contrary set forth in this Section 6.04, no material Investment may be made pursuant to Section 6.04(b) or (j) by a Loan Party to a Subsidiary or an Unrestricted Subsidiary unless (i) all Equity Interests issued by such Subsidiary or Unrestricted Subsidiary and held by Loan Parties constitute Collateral, (ii) a Borrower determines in good faith that such pledge of Equity Interests issued by such Subsidiary or Unrestricted Subsidiary (1) could reasonably be expected to result in the Parent or any of its Subsidiaries incurring any material Tax

A-3051

or other cost (other than a de minimis cost) or any disruption in the operations or internal financing activities of the Parent and its Subsidiaries, (2) is not permitted by, or could reasonably be expected to cause any officers, directors or employees of the Parent or any of its Subsidiaries to become subject to related liabilities under any, applicable Requirement of Law or (iii) all Equity Interests issued by such Subsidiary or Unrestricted Subsidiary and held by Loan Parties would constitute "Excluded Securities" pursuant to clause (c) of the definition thereof.

Notwithstanding anything to the contrary set forth in this Section 6.04, no Loan Party shall make any Investment in any Subsidiary (other than another Loan Party) or any Unrestricted Subsidiary if the consideration paid by such Loan Party to such Subsidiary (other than a Loan Party) or such Unrestricted Subsidiary in respect of such Investment constitutes Material Intellectual Property; provided that nothing in this sentence shall prohibit any non-exclusive (other than exclusive distribution or other similar within a specified jurisdiction) license or sublicense of Material Intellectual Property to, or use of Material Intellectual Property by, any Subsidiary or Unrestricted Subsidiary.

Section 6.05   Mergers, Consolidations, Sales of Assets and Acquisitions.  Merge into, amalgamate with or consolidate with any other person, or permit any other person to merge into, amalgamate with or consolidate with it, or Dispose of (in one transaction or in a series of related transactions) all or any part of its assets (whether now owned or hereafter acquired), or Dispose of any Equity Interests of any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of related transactions) all or substantially all of the assets of any other person or division or line of business of a person, except that this Section 6.05 shall not prohibit:

(a)      (i) the purchase and Disposition of inventory in the ordinary course of business by the Parent or any Subsidiary, (ii) the acquisition or lease (pursuant to an operating lease) of any other asset in the ordinary course of business by the Parent or any Subsidiary or, with respect to operating leases, otherwise for Fair Market Value on market terms (as determined in good faith by a Borrower), (iii) the Disposition of surplus, obsolete, damaged or worn out equipment or other property in the ordinary course of business by the Parent or any Subsidiary or (iv) the Disposition of Permitted Investments in the ordinary course of business;

(b)      if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing or would result therefrom, (i) the merger, amalgamation or consolidation of any Subsidiary (other than any Borrower) with or into a Borrower in a transaction in which such Borrower is the survivor, (ii) the merger, amalgamation or consolidation of any Subsidiary (other than any Borrower) with or into any Subsidiary Loan Party in a transaction in which the surviving or resulting entity is or becomes a Subsidiary Loan Party organized in a Qualified Jurisdiction and, in the case of each of clauses (i) and (ii), no person other than a Borrower or a Subsidiary Loan Party receives any consideration (unless otherwise permitted by Section 6.04), (iii) the merger, amalgamation or consolidation of any Subsidiary that is not a Subsidiary Loan Party with or into any other Subsidiary that is not a Subsidiary Loan Party, (iv) the liquidation or dissolution or change in form of entity of any Subsidiary (other than any Borrower) if (x) a Borrower determines in good faith that such liquidation, dissolution or change in form is in the best interests of the Parent and is not materially disadvantageous to the Lenders

and (y) same meets the requirements contained in the proviso to Section [___],[31] (v) any Subsidiary (other than any Borrower) may merge, amalgamate or consolidate with any other person in order to effect an Investment permitted pursuant to Section 6.04 so long as the continuing or surviving person shall be a Subsidiary (unless otherwise permitted by Section 6.04), which shall be a Loan Party if the merging, amalgamating or consolidating Subsidiary was a Loan Party (and organized in a Qualified Jurisdiction if the merging, consolidating or amalgamating subsidiary was a Loan Party organized in a Qualified Jurisdiction) and which together with each of its Subsidiaries shall have complied with any applicable requirements of Section [___][32] or (vi) any Subsidiary (other than any Borrower) may merge, amalgamate or consolidate with any other person in order to effect an Asset Sale otherwise permitted pursuant to this Section 6.05;

(c)     Dispositions to the Parent or a Subsidiary; provided, that any Dispositions by a Loan Party to a Subsidiary that is not a Subsidiary Loan Party in reliance on this clause (c) shall be made in compliance with Section 6.04;

(d)     Sale and Lease-Back Transactions permitted by Section 6.03;

(e)     Investments permitted by Section 6.04, Permitted Liens, and Restricted Payments permitted by Section 6.06;

(f)     the discount or sale, in each case without recourse and in the ordinary course of business, of past due receivables arising in the ordinary course of business, but only in connection with the compromise or collection thereof consistent with customary industry practice (and not as part of any bulk sale or financing of receivables);

(g)     other Dispositions of assets to persons other than the Parent and its Subsidiaries; provided, that (i) the Net Proceeds thereof, if any, are applied in accordance with Section [___][33] to the extent required thereby and (ii) any such Dispositions shall comply with the final sentence of this Section 6.05;

(h)     Permitted Business Acquisitions (including any merger, consolidation or amalgamation in order to effect a Permitted Business Acquisition); provided, that following any such merger, consolidation or amalgamation involving a Borrower, such Borrower is the surviving entity or the requirements of Section 6.05(n) are otherwise complied with;

(i)     leases, licenses or subleases or sublicenses of any real or personal property in the ordinary course of business;

(j)     Dispositions of inventory in the ordinary course of business or Dispositions or abandonment of Intellectual Property of the Parent and its Subsidiaries determined in good faith by the management of a Borrower to be no longer economically practicable to maintain or useful or necessary in the operation of the business of the Parent or any of the Subsidiaries;

---

[31] Section reference to be to covenant regarding maintenance of subsidiary existence.

[32] Section reference to be to further assurances covenant.

[33] Section reference to be to asset sale mandatory prepayment.

A-3053

(k)     acquisitions and purchases made with the proceeds of any Asset Sale or Recovery Event pursuant to clause (a) or (b) of the definition of "Net Proceeds";

(l)     the purchase and Disposition (including by capital contribution) of Permitted Receivables Facility Assets including pursuant to Qualified Receivables Facilities;

(m)     any exchange or swap of assets (other than cash and Permitted Investments) for services and/or other assets (other than cash and Permitted Investments) of comparable or greater value or usefulness to the business of the Parent and the Subsidiaries as a whole, determined in good faith by the management of a Borrower; and

(n)     other transactions effected (including mergers, consolidations or acquisitions of "shell" entities) for the sole purpose of reincorporating or reorganizing the Parent or any Subsidiary (other than any Borrower) under the laws of the United States of America or any State thereof or the District of Columbia, Switzerland, the United Kingdom or any jurisdiction that is a member state of the European Union as of the Closing Date; provided that (i) a Borrower shall have provided the Administrative Agent with reasonable advance notice of any transactions as described above in this clause (n), (ii) subject to the Agreed Guarantee and Security Principles, the Lux Borrower shall ensure that, if the respective entity subject to any action described above was a Guarantor, the applicable reincorporated or reorganized entity shall be a Guarantor and shall grant a security interest in substantially all of those of its assets that constituted part of the Collateral immediately prior to such reincorporation or reorganization and (iii) the Administrative Agent shall have concluded (acting reasonably) that, after giving effect to any replacement guarantees and security to be provided pursuant to preceding clause (ii), such transactions are not adverse to the Lenders in any material respect (it being understood and agreed that such a reincorporation or reorganization into a jurisdiction as has been agreed by the Parent and the Administrative Agent prior to Closing Date shall be permitted if the requirements of preceding clauses (i) and (ii) are satisfied).[34]

Notwithstanding anything to the contrary contained above, this Section 6.05 shall not restrict, at any time, the sale of Unrestricted Margin Stock so long as any such sale meets the requirements of the last paragraph of this Section 6.05.

Notwithstanding anything to the contrary contained in Section 6.05 above, no Disposition of assets under Section 6.05(g) or, solely with respect to Sale and Lease-Back Transactions referred to in clause (b) of Section 6.03, under Section 6.05(d), or pursuant to the immediately preceding sentence, shall in each case be permitted unless (i) such Disposition is for Fair Market Value, and (ii) at least 75% of the proceeds of such Disposition (except to Loan Parties) consist of cash or Permitted Investments; provided, that the provisions of this clause (ii) shall not apply to any individual transaction or series of related transactions involving assets with a Fair Market Value of less than $10,000,000 or to other transactions involving assets with a Fair Market Value of not more than $35,000,000 in the aggregate for all such transactions during the term of this Agreement; provided, further, that for purposes of this clause (ii), each of the following shall be deemed to be cash: (a) the amount of any liabilities (as shown on the Parent's or such Subsidiary's most recent balance sheet or in the notes thereto) that are assumed by the transferee

---

[34] To include at least each Qualified Jurisdiction.

of any such assets pursuant to a customary novation agreement or are otherwise cancelled in connection with such transaction, (b) any notes or other obligations or other securities or assets received by the Parent or such Subsidiary from the transferee that are converted by the Parent or such Subsidiary into cash within 180 days after receipt thereof (to the extent of the cash received) and (c) any Designated Non-Cash Consideration received by the Parent or any of its Subsidiaries in such Disposition or any series of related Dispositions, having an aggregate Fair Market Value not to exceed the greater of $120,000,000 and [___]% of Consolidated Total Assets when received (with the Fair Market Value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value).

Notwithstanding anything to the contrary contained in Section 6.05 above, this Section 6.05 or, with respect to Sale and Lease-Back Transactions referred to in clause (b) of Section 6.03, under Section 6.05(d), shall not permit any Loan Party to make any Disposition of Material Intellectual Property to any Subsidiary (other than another Loan Party) or any Unrestricted Subsidiary; provided that nothing in this sentence shall prohibit any non-exclusive (other than exclusive distribution or other similar within a specified jurisdiction) license or sublicense of Material Intellectual Property to, or use of Material Intellectual Property by, any Subsidiary or Unrestricted Subsidiary.

Section 6.06    Dividends and Distributions.   (I) Declare or pay any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests (including any repayment by a Subsidiary that is not a Loan Party of any Indebtedness of a direct or indirect parent company that is a Loan Party) other than dividends and distributions on Equity Interests payable solely by the issuance of additional Equity Interests (other than Disqualified Stock) of the person paying such dividends or distributions) or directly or indirectly redeem, purchase, retire or otherwise acquire for value (or permit any Subsidiary to purchase or acquire) any of the Parent's Equity Interests or set aside any amount for any such purpose (other than through the issuance of additional Equity Interests (other than Disqualified Stock) of the person redeeming, purchasing, retiring or acquiring such shares), (II) make any voluntary principal prepayment on, or voluntarily redeem, repurchase, defease or otherwise acquire or retire for value (including through a tender offer, open market purchase or debt-for-debt exchange), in each case prior to any scheduled repayment or scheduled maturity, any Subordinated Indebtedness, Indebtedness for borrowed money (or Indebtedness evidenced by bonds, debentures, notes or similar instruments) secured by Junior Liens or unsecured Indebtedness for borrowed money (or Indebtedness evidenced by bonds, debentures, notes or similar instruments), and any guarantees of any of the foregoing, of the Parent or any Loan Party (other than the prepayment, redemption, repurchase, defeasance, acquisition or retirement (including through a tender offer, open market purchase or debt-for-debt exchange) of (A) Subordinated Indebtedness, Indebtedness secured by Junior Liens or unsecured Indebtedness, in each case in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year after the date of such payment, redemption, repurchase, defeasance, acquisition or retirement and (B) Indebtedness owed to the Parent or any Subsidiary thereof) (such prepayments, redemptions, repurchases, defeasance, acquisitions or retirements described in this clause (II), "Restricted Debt Payments") or (III) make any voluntary prepayment on, or voluntarily repurchase, defease or otherwise acquire or retire for value (including through a purchase for cash or exchange for debt) any payment obligations with respect to the Opioid Settlement or the DOJ Settlement, in each case prior to any scheduled payment (other than any

A-3055

prepayment, repurchase, defeasance, acquisition or retirement for an installment due within six months after the date of such prepayment, repurchase, defeasance, acquisition or retirement) (such prepayments, repurchases, defeasances, acquisitions or retirements described in this clause (III), "Restricted Settlement Payments"); and, collectively, all of the foregoing in clauses (I), (II) and (III), "Restricted Payments"); provided, however, that:

(a)     Restricted Payments may be made to the Parent or any Subsidiary (provided that Restricted Payments made by a non-Wholly Owned Subsidiary to the Parent or any Subsidiary that is a direct or indirect parent of such Subsidiary must be made on a pro rata basis (or more favorable basis from the perspective of the Parent or such Subsidiary) based on its ownership interests in such non-Wholly Owned Subsidiary);

(b)     Restricted Payments may be made by the Parent to purchase or redeem  the Equity Interests of the Parent (including related stock appreciation rights or similar securities) held by then present or former directors, consultants, officers or employees of the Parent or any of the Subsidiaries or by any Plan or any shareholders' agreement then in effect upon such person's death, disability, retirement or termination of employment or under the terms of any such Plan or any other agreement under which such shares of stock or related rights were issued; provided, that the aggregate amount of such purchases or redemptions under this clause (b) shall not exceed in any fiscal year $15,000,000 (plus (x) the amount of net proceeds contributed to the Parent that were received by the Parent during such calendar year from sales of Equity Interests of the Parent to directors, consultants, officers or employees of the Parent or any Subsidiary in connection with permitted employee compensation and incentive arrangements; provided, that such proceeds are not included in any determination of the Available Amount and (y) the amount of net proceeds of any key-man life insurance policies received during such calendar year,  which, if not used in any year, may be carried forward to any subsequent calendar year); and provided, further, that cancellation of Indebtedness owing to the Parent or any Subsidiary from members of management of the Parent or its Subsidiaries in connection with a repurchase of Equity Interests of the Parent will not be deemed to constitute a Restricted Payment for purposes of this Section 6.06;

(c)     any person may make non-cash repurchases of Equity Interests deemed to occur upon exercise or settlement of stock options or other Equity Interests if such Equity Interests represent a portion of the exercise price of or withholding obligation with respect to such options or other Equity Interests;

(d)     so long as, at the time any such Restricted Payment is made and immediately after giving effect thereto, (x) no Default or Event of Default shall have occurred and is continuing and (y) the Total Net Leverage Ratio on a Pro Forma Basis is not greater than 3.25 to 1.00, and taking into account any outstanding Investments made pursuant to Section 6.04(j)(Y) utilizing the Available Amount, Restricted Payments may be made in an aggregate amount equal to a portion of the Available Amount on the date of such election that the Parent elects to apply to this Section 6.06(d), which such election shall (unless such Restricted Payment is made pursuant to clause (a) of the definition of Available Amount) be set forth in a written notice of a Responsible Officer of a Borrower, which notice shall set forth calculations in reasonable detail the amount of Available Amount immediately prior to such election and the amount thereof elected to be so applied;

A-3056

(e)     Restricted Payments may be made in connection with the consummation of the Transactions, including the payment of the appraised value of any Dissenting Shares (as defined in the Merger Agreement) in accordance with the Merger Agreement;

(f)     Restricted Payments may be made to make payments, in cash, in lieu of the issuance of fractional shares, upon the exercise of warrants or upon the conversion or exchange of Equity Interests of any such person;

(g)     other Restricted Payments may be made in an aggregate amount from and after the Closing Date not to exceed the greater of $150,000,000 and [__]% of Consolidated Total Assets when made;

(h)     additional Restricted Payments may be made, so long as, at the time any such Restricted Payment is made and immediately after giving effect thereto, (x) no Default or Event of Default shall have occurred and is continuing and (y) the Total Net Leverage Ratio on a Pro Forma Basis is not greater than 2.75 to 1.00;

(i)     Restricted Payments may be made with any portion of the Cumulative Parent Qualified Equity Proceeds Amount;;

(j)     Restricted Debt Payments may be made with the net proceeds of, or with, Indebtedness of Loan Parties permitted to be incurred pursuant to Section 6.01 ("Restricted Debt Payment Indebtedness") that (i) constitutes Subordinated Indebtedness, (ii) is secured by Junior Liens or (iii) is unsecured, in each case so long (1) the final maturity date of such Restricted Debt Payment Indebtedness is on or after the earlier of (x) the final maturity date of the Indebtedness subject to such Restricted Debt Payment ("Repaid Indebtedness") and (y) the Latest Maturity Date in effect at the time of incurrence thereof, and (2) the Weighted Average Life to Maturity of such Restricted Debt Payment Indebtedness is greater than or equal to the lesser of (x) the Weighted Average Life to Maturity of the Repaid Indebtedness and (y) the Weighted Average Life to Maturity of the Class of Term Loans then outstanding with the greatest remaining Weighted Average Life to Maturity; and

(k)     Restricted Settlement Payments may be made with the net proceeds of, or with, Indebtedness of Loan Parties permitted to be incurred pursuant to Section 6.01 ("Restricted Settlement Payment Indebtedness") that (i) constitutes Subordinated Indebtedness, (ii) is secured by Junior Liens or (iii) is unsecured, in each case so long as the Weighted Average Life to Maturity of such Restricted Settlement Payment Indebtedness is greater than or equal to the lesser of (x) the Weighted Average Life to Maturity of the Opioid Settlement or the DOJ Settlement, as applicable, and (y) the Weighted Average Life to Maturity of the Class of Term Loans then outstanding with the greatest remaining Weighted Average Life to Maturity.

Notwithstanding anything herein to the contrary, the foregoing provisions of Section 6.06 will not prohibit the payment of any Restricted Payment or the consummation of any redemption, purchase, defeasance or other payment within 60 days after the date of declaration thereof or the giving of notice, as applicable, if at the date of declaration or the giving of such notice such payment would have complied with the provisions of this Agreement.

Notwithstanding anything to the contrary set forth in this Section 6.06, no Loan Party shall make any Restricted Payment to any Subsidiary (other than another Loan Party) or any Unrestricted Subsidiary in the form of Material Intellectual Property; provided that nothing in this sentence shall prohibit any non-exclusive (other than exclusive distribution or other similar within a specified jurisdiction) license or sublicense of Material Intellectual Property to, or use of Material Intellectual Property by, any Subsidiary or Unrestricted Subsidiary.

Section 6.07    Transactions with Affiliates.   i) Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction with, any of its Affiliates (other than the Parent, and the Subsidiaries or any person that becomes a Subsidiary as a result of such transaction) in a transaction (or series of related transactions) involving aggregate consideration in excess of $20,000,000 unless such transaction is (i) otherwise permitted (or required) under this Agreement or (ii) upon terms that are substantially no less favorable to the Parent or such Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate, as determined by the Board of Directors of the Parent or such Subsidiary in good faith.

(a)    The foregoing clause (a) shall not prohibit, to the extent otherwise permitted under this Agreement,

(i)    any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, equity purchase agreements, stock options and stock ownership plans approved by the Board of Directors of the Parent,

(ii)    loans or advances to employees or consultants of the Parent or any of the Subsidiaries in accordance with Section 6.04(e),

(iii)    transactions among the Parent or any Subsidiary or any entity that becomes a Subsidiary as a result of such transaction (including via merger, consolidation or amalgamation in which the Parent or a Subsidiary is the surviving entity),

(iv)    the payment of fees, reasonable out-of-pocket costs and indemnities to directors, officers, consultants and employees of the Parent and the Subsidiaries in the ordinary course of business,

(v)    the Transactions (including the payment of all fees, expenses, bonuses and awards relating thereto) and any transactions pursuant to the Transaction Documents and permitted transactions, agreements and arrangements in existence on the Closing Date and, to the extent involving aggregate consideration in excess of $5,000,000, set forth on Schedule 6.07 or any amendment thereto or replacement thereof or similar arrangement to the extent such amendment, replacement or arrangement is not adverse to the Lenders when taken as a whole in any material respect (as determined by the Parent in good faith),

(vi)    (A) any employment agreements entered into by the Parent or any of the Subsidiaries in the ordinary course of business, (B) any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights

or similar rights with employees, officers or directors, and (C) any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees, and any reasonable employment contract and transactions pursuant thereto,

(vii)    Restricted Payments permitted under Section 6.06 and Investments permitted under Section 6.04,

(viii)   transactions for the purchase or sale of goods, equipment, products, parts and services entered into in the ordinary course of business,

(ix)    any transaction in respect of which the Parent delivers to the Administrative Agent a letter addressed to the Board of Directors of the Parent from an accounting, appraisal or investment banking firm, in each case of nationally recognized standing that is in the good faith determination of the Parent qualified to render such letter, which letter states that (i) such transaction is on terms that are substantially no less favorable to the Parent or such Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an Affiliate or (ii) such transaction is fair to the Parent or such Subsidiary, as applicable, from a financial point of view,

(x)    transactions with joint ventures for the purchase or sale of goods, equipment, products, parts and services entered into in the ordinary course of business,

(xi)    transactions pursuant to any Qualified Receivables Facility,

(xii)    transactions between the Parent or any of the Subsidiaries and any person, a director of which is also a director of the Parent; provided, however, that (A) such director abstains from voting as a director of the Parent on any matter involving such other person and (B) such person is not an Affiliate of the Parent for any reason other than such director's acting in such capacity,

(xiii)   transactions permitted by, and complying with, the provisions of Section 6.05 (other than Section 6.05(m)),

(xiv)   intercompany transactions undertaken in good faith (as certified by a Responsible Officer of the Parent) for the purpose of improving the consolidated tax efficiency of the Parent and the Subsidiaries and not for the purpose of circumventing any covenant set forth herein,

(xv)    payments, loans (or cancellation of loans) or advances to employees or consultants that are (i) approved by a majority of the Disinterested Directors of the Parent in good faith, (ii) made in compliance with applicable law and (iii) otherwise permitted under this Agreement, and

(xvi)   transactions with customers, clients or suppliers, or purchasers or sellers of goods or services, in each case in the ordinary course of business or otherwise in compliance with the terms of this Agreement that are fair to the Parent or the Subsidiaries.

Section 6.08   <u>Business of the Parent and the Subsidiaries</u>.  Notwithstanding any other provisions hereof, engage at any time to any material respect in any business or business activity substantially different from any business or business activity conducted by any of them on the Closing Date or any Similar Business, and in the case of a Receivables Entity, Qualified Receivables Facilities and related activities.

Section 6.09   <u>Restrictions on Subsidiary Distributions and Negative Pledge Clauses</u>.  Permit any Material Subsidiary to enter into any agreement or instrument that by its terms restricts (i) the payment of dividends or other distributions or the making of cash advances to the Parent or any Material Subsidiary that is a direct or indirect parent of such Subsidiary or (ii) the granting of Liens by the Parent or such Material Subsidiary that is a Loan Party pursuant to the Security Documents, in each case other than those arising under any Loan Document, except, in each case, restrictions existing by reason of:

(a)   restrictions imposed by applicable law;

(b)   contractual encumbrances or restrictions in effect on the Closing Date under Indebtedness existing on the Closing Date and set forth on <u>Schedule 6.01</u> or contained in any Indebtedness outstanding pursuant to Section 6.01(z), or any agreements related to any Permitted Refinancing Indebtedness in respect of any such Indebtedness that does not materially expand the scope of any such encumbrance or restriction (as determined in good faith by a Borrower);

(c)   any restriction on a Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Equity Interests or assets of a Subsidiary pending the closing of such sale or disposition;

(d)   customary provisions in joint venture agreements and other similar agreements applicable to joint ventures entered into in the ordinary course of business;

(e)   any restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

(f)   any restrictions imposed by any agreement relating to Indebtedness incurred pursuant to Section 6.01 or Permitted Refinancing Indebtedness in respect thereof, to the extent such restrictions are not materially more restrictive, taken as a whole, than the restrictions contained in this Agreement or are market terms at the time of issuance (in each case as determined in good faith by a Borrower);

(g)   customary provisions contained in leases or licenses of Intellectual Property and other similar agreements entered into in the ordinary course of business;

(h)   customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(i)   customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

A-3060

(j)　　customary restrictions and conditions contained in any agreement relating to the sale, transfer, lease or other disposition of any asset permitted under Section 6.05 pending the consummation of such sale, transfer, lease or other disposition;

(k)　　customary restrictions and conditions contained in the document relating to any Lien, so long as (1) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien, and (2) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 6.09;

(l)　　customary net worth provisions contained in Real Property leases entered into by Subsidiaries, so long as a Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Parent and its Subsidiaries to meet their ongoing obligations;

(m)　　any agreement in effect at the time such subsidiary becomes a Subsidiary, so long as such agreement was not entered into in contemplation of such person becoming a Subsidiary;

(n)　　restrictions in agreements representing Indebtedness permitted under Section 6.01 of a Subsidiary that is not a Subsidiary Loan Party (so long as such restrictions only relate to non-Loan Parties);

(o)　　customary restrictions contained in leases, subleases, licenses or Equity Interests or asset sale agreements otherwise permitted hereby as long as such restrictions relate to the Equity Interests and assets subject thereto;

(p)　　restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(q)　　restrictions contained in any Permitted Receivables Facility Documents with respect to any Receivables Entity;

(r)　　restrictions contained in the Opioid Settlement or the DOJ Settlement; and

(s)　　any encumbrances or restrictions of the type referred to in clause (i) or (ii) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of or similar arrangements to the contracts, instruments or obligations referred to in clauses (a) through (r) above; _provided_ that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements, refinancings or similar arrangements are, in the good faith judgment of the Parent, no more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions as contemplated by such provisions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement, refinancing or similar arrangement.

Section 6.10　　Fiscal Year.  In the case of the Parent, permit any change to its fiscal year; _provided_ that the Parent and its Subsidiaries may change their fiscal quarter and/or fiscal year end one or more times, subject to such adjustments to this Agreement as a Borrower and

65

Administrative Agent shall reasonably agree are necessary or appropriate in connection with such change (and the parties hereto hereby authorize either Borrower and the Administrative Agent to make any such amendments to this Agreement as they jointly deem necessary to give effect to the foregoing).

Section 6.11 <u>Amendment to DOJ and Opioid Settlements</u>[(i) Modify, amend or waive any term of either of the DOJ Settlement or the Opioid Settlement that results in (i) total cash payments by the Loan Parties in respect of the DOJ Settlement and the Opioid Settlement to exceed an aggregate amount of $1,860,000,000 (excluding professional fees and expenses payable in connection with the Opioid Settlement and the DOJ Settlement and interest payable in connection with the DOJ Settlement), (ii) the acceleration of the timing of any payment due under either the DOJ Settlement or the Opioid Settlement (except, (A) with respect to the Opioid Settlement, for any changes to the timing of exercise of the option to prepay the amounts owing to the Opioid Trust (as defined in the Opioid Settlement), and (B) the Additional Insurance Rights (as defined in the RSA)), (ii) make any Restricted Settlement Payment in respect of (i) a portion less than all of the remaining payments in respect of the Opioid Settlement or (ii) a portion less than all of the remaining payments in respect of the DOJ Settlement, in each case other than with any portion of the Cumulative Parent Qualified Equity Proceeds Amount or (iii) cause any Subsidiary (other than the Loan Parties) to guarantee the obligations in respect of the Opioid Settlement or the DOJ Settlement.

Section 6.12 <u>Limitation on Transfers to Mallinckrodt Holdings GmbH</u>. (i) Dispose of any material property or assets (including the making of any material Investment) to Mallinckrodt Holdings GmbH or any of its Subsidiaries, other than pursuant to the intercompany receivable owned by Mallinckrodt Holdings GmbH and existing on March 9, 2021 (the "<u>Swiss Intercompany Receivable</u>"), (ii) permit Mallinckrodt Holdings GmbH and its Subsidiaries, when taken collectively as if constituting a single Subsidiary (but excluding the Swiss Intercompany Receivable), to constitute a Material Subsidiary or (iii) permit Mallinckrodt Holdings GmbH or its Subsidiaries to incur any material Indebtedness owed to unaffiliated third parties, or guarantee any material Indebtedness owed to any unaffiliated third-parties, in each of clauses (i) through (iii), unless Mallinckrodt Holdings GmbH shall become a Loan Party.

Case 20-12522-JTD    Doc 2917    Filed 06/18/21    Page 677 of 835

**<u>Exhibit B</u>**

**Redline**

Execution Version

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

<u>**Amended & Restated Mallinckrodt Restructuring Term Sheet**</u>

This Term Sheet, which is <u>Exhibit A</u> to the Restructuring Support Agreement dated October 11, 2020, by and among the Company and the Supporting Parties party thereto, describes the proposed terms of the Company's Restructuring.  The Debtors will implement the Restructuring through the Plan, which shall be consistent with the terms of this Term Sheet, the RSA and the exhibits and schedules annexed hereto and thereto, including the Opioid Settlement Term Sheet, which is <u>Schedule 1</u> hereto**, and the First Lien Settlement Term Sheet, which is Schedule 3 hereto** (as each may be amended or supplemented from time to time in accordance ~~with~~**therewith and/or** the terms of the RSA), in the Chapter 11 Cases ~~to be~~ commenced **by the Debtors** in the Bankruptcy Court **on October 12, 2020**, the Scheme of Arrangement based on the Plan **to be commenced** in the Irish Examinership Proceedings, and the Recognition Proceedings (as defined herein) in which the Canadian Court (as defined herein) shall recognize in Canada the Chapter 11 Cases.  This Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code.  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the RSA ~~or~~**,** the Opioid **Settlement Term Sheet, or the First Lien** Settlement Term Sheet, as applicable.

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Plan and the other Definitive Documents, or the Scheme of Arrangement and the Irish Examinership Proceedings, which remain subject to negotiation in accordance with the RSA.  Consummation of the transactions contemplated by this Term Sheet is subject to (a) the negotiation and execution of the Definitive Documents evidencing and related to the Restructuring contemplated herein, (b) satisfaction or waiver of all of the conditions in any Definitive Document evidencing the transactions comprising the Restructuring, (c) entry of the Confirmation Order and the satisfaction or waiver of any conditions to the effectiveness thereof, (d) approval of the Scheme of Arrangement by the High Court of Ireland and the satisfaction or waiver of any conditions to the effectiveness thereof, and (d) entry of an order recognizing the Confirmation Order in the Recognition Proceedings.  The Definitive Documents shall satisfy the requirements of all applicable securities laws, the Bankruptcy Code, this Term Sheet, the Opioid Settlement Term Sheet, the **First Lien Settlement Term Sheet, the** Scheme of Arrangement, the Companies Act 2014 of Ireland governing the Irish Examinership Proceedings, and the Canadian Companies Arrangement Act governing the Recognition Proceedings.  The Definitive Documents will contain terms and conditions that are dependent on each other, including those described in this Term Sheet ~~and~~**,** the Opioid Settlement Term Sheet**, and the First Lien Settlement Term Sheet**.

2

| TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN | | |
|---|---|---|
| **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Administrative, Tax, Other Priority and Other Secured Claims** | All such claims shall be paid in full in cash on the Plan Effective Date, or in the ordinary course of business as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code, in each case, as determined by the Debtors with the reasonable consent of the Required Supporting Unsecured Noteholders, ~~and~~ the Governmental Plaintiff Ad Hoc Committee**, and the MSGE Group and following consultation with the Supporting Term Lenders**.<br><br>Administrative expense claims shall be paid on the Plan Effective Date and shall include Restructuring Expenses (as defined below). | Unimpaired |
| **First Lien ~~Credit Agreement~~Revolving Loan Claims** | All allowed First Lien ~~Credit Agreement~~**Revolving Loan** Claims shall ~~be Reinstated at existing rates and maturities~~**receive the treatment provided in the First Lien Settlement Term Sheet**. | Unimpaired; not entitled to vote |
| **First Lien Term Loan Claims** | **All allowed First Lien Term Loan Claims shall receive the treatment provided in the First Lien Settlement Term Sheet.** | **Unimpaired; not entitled to vote; Impaired; entitled to vote** |
| **First Lien Notes Claims** | All allowed First Lien Notes Claims shall be Reinstated at existing rates and maturities. | Unimpaired; not entitled to vote |
| **Second Lien Notes Claims** | All allowed Second Lien Notes Claims shall be Reinstated at existing rates and maturities. | Unimpaired; not entitled to vote |
| **Guaranteed Unsecured Notes Claims** | Holders of allowed Guaranteed Unsecured Notes Claims shall receive their *pro rata* share of:<br><br>i.   $375 million of new secured takeback second lien notes due 7 years after emergence (the "***Takeback Second Lien Notes***"), which shall contain economic terms consistent with those set forth in <u>Annex 2</u> hereto; and | Impaired; entitled to vote |

| | ii.   100% of New Mallinckrodt Common Shares, subject to dilution on account of the New Opioid Warrants and the MIP (each as defined below). | |
|---|---|---|
| **4.75% Unsecured Notes Claims** | No property will be distributed to the Holders of allowed 4.75% Unsecured Notes Claims. | Impaired; deemed to reject; not entitled to vote |
| **Legacy Debentures Claims** | No property will be distributed to the Holders of allowed Legacy Debentures Claims. | Impaired; deemed to reject; not entitled to vote |
| **General Unsecured Claims (Not Otherwise Classified)** | Holders of allowed General Unsecured Claims shall receive their *pro rata* share, at the applicable Debtor, of up to $100 million to be allocated among the Debtors (the "***General Unsecured Recovery Cash Pool***"). | Impaired; entitled to vote |
| **Trade Claims** | As consideration for maintaining trade terms consistent with those practices and programs most favorable to the Debtors in place during the 12 months before the Petition Date or such other favorable terms as the Debtors and the Trade Claimants may mutually agree on, holders of allowed Trade Claims shall receive their *pro rata share* of up to $50 million; *provided that*, any amounts not allocated to allowed Trade Claims up to $50 million shall be allocated to the General Unsecured Recovery Cash Pool. | Impaired; entitled to vote |
| **Opioid Claims** | As of the Plan Effective Date, the Opioid Trust will be formed and shall receive the Opioid Trust Consideration as set forth in the Opioid Settlement Term Sheet.<br><br>All Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to, and all of Mallinckrodt's liability for Opioid Claims shall be assumed by, the Opioid Trust as more fully set forth in the Opioid Settlement Term Sheet.<br><br>Each Opioid Claim shall be resolved in accordance with the terms, provisions, and procedures of the Opioid Trust Documents. | Impaired; entitled to vote |

4

| Intercompany Claims | No property will be distributed to the Holders of allowed Intercompany Claims. Unless otherwise provided for under the Plan, each Intercompany Claim will either be Reinstated or canceled and released at the option of the Debtors in consultation with the Supporting Unsecured Noteholders **and, Supporting Term Lenders,** the Governmental Plaintiff Ad Hoc Committee**, and the MSGE Group**. | Unimpaired; deemed to accept; or Impaired; deemed to reject; not entitled to vote |
|---|---|---|
| Intercompany Interests | Intercompany Interests shall receive no recovery or distribution and be Reinstated solely to the extent necessary to maintain the Debtors' corporate structure. | Unimpaired; deemed to accept; or Impaired; deemed to reject; not entitled to vote |
| Equity Interests | All existing Equity Interests shall be discharged, cancelled, released, and extinguished. | Impaired; deemed to reject; not entitled to vote |

| **OTHER TERMS OF THE RESTRUCTURING** | | |
|---|---|---|
| Case Financing | The Chapter 11 Cases will be financed by existing cash and use of cash collateral on terms and conditions subject to the reasonable consent of the Required Supporting Unsecured Noteholders **and, the Required Supporting Term Lenders,** the Governmental Plaintiff Ad Hoc Committee**, and the MSGE Group** and any cash collateral order will provide that any periods in which creditors are required to challenge any Debtor stipulations or claims against any of the Debtors (including the claims of lenders/bondholders) shall automatically be tolled with respect to the Supporting Governmental Opioid Claimants while the RSA remains in effect with respect to the Supporting Governmental Opioid Claimants. Any such challenge periods applicable to a Supporting Governmental Opioid Claimant would begin to run only after termination of the RSA by or against such Supporting Governmental Opioid Claimant. | |
| Executory Contracts and Unexpired Leases | Except as otherwise provided in this Term Sheet or the RSA, the Debtors shall assume all executory contracts and unexpired leases other than those executory contracts and unexpired leases to be identified on a schedule of rejected executory contracts and unexpired leases included in the Plan Supplement or otherwise rejected pursuant to an order of the Bankruptcy Court, in each case as determined by the Debtors with the reasonable consent of the Required Supporting Unsecured Noteholders **and,** the Governmental Plaintiff Ad Hoc Committee**, and the MSGE Group** | |

5

| | and following consultation with the Supporting Term Lenders. For the avoidance of doubt, assumption of executory contracts and unexpired leases shall be consistent with the RSA and this Term Sheet, including as specified in "Employee Matters" and "Indemnification of Prepetition Directors, Officers, Managers, et al." |
|---|---|
| **Opioid Trust** | Opioid Claims shall be channeled exclusively to, and all of Mallinckrodt's liability for Opioid Claims shall be assumed by, the Opioid Trust. Each Opioid Claim shall be resolved in accordance with the terms, provisions, and procedures of the Opioid Trust Documents. The Opioid Trust shall be funded in accordance with the provisions of the Plan and the Opioid Settlement Term Sheet.<br><br>The sole recourse of any Opioid Claimant on account of such Opioid Claim shall be to the Opioid Trust, and each Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claim against any Released Party. |
| **CMS/DOJ/~~State~~States Settlement** | The Plan will provide for the implementation of a settlement between Mallinckrodt, the United States, and the States resolving Acthar-related litigations and government investigations disclosed in the Company's Form 10-K for 2019, including United States of America, et al., ex rel. Charles Strunck, et al. v. Mallinckrodt ARD LLC (E.D. Penn.); United States of America et al. ex rel. Landolt v. Mallinckrodt ARD, LLC (D. Mass.); and Mallinckrodt ARD LLC v. Verma et al. (D.D.C.), and related matters, the terms of which are set forth on Schedule 2 hereto. |
| **Corporate Governance** | The Reorganized Debtors' board shall consist of at least 7 directors including, the Debtors' Chief Executive Officer. As of the Plan Effective Date, the members of the initial Reorganized Debtors' board shall be designated by the Required Supporting Unsecured Noteholders; *provided that*, the members of the Reorganized Debtors' board, other than the Debtors' Chief Executive Officer, shall be independent under NYSE/NASDAQ listing standards and shall be independent of the Supporting Unsecured Noteholders, unless the Governmental Plaintiff Ad Hoc Committee**, the MSGE Group,** and the Debtors otherwise consent. No parties shall be afforded special rights under any charter, constitutions or bylaws or similar governing foundational document of any Reorganized Debtor; *provided*, that, the foregoing shall not be deemed to limit certain information, registration or similar rights to be afforded to **(i)** the Governmental Plaintiff Ad Hoc Committee **and the MSGE Group** in other agreements with the Reorganized ~~Debtor~~**Debtors**, including~~,~~ pursuant to the New Opioid Warrants**, (ii) the Supporting Term Lenders in connection with other agreements with the Reorganized Debtors, including pursuant to the New Term Loan Documentation, and (iii) any lenders, including the** |

6

| | **Supporting Term Lenders, pursuant to any Exit Financing Documents**. |
|---|---|
| **Employee Matters** | Substantially all employees of the Debtors to be retained by the Reorganized Debtors. The Reorganized Debtors shall assume any employment, confidentiality, and non-competition agreements, bonus, gainshare and incentive programs (other than awards of stock options, restricted stock, restricted stock units, and other equity awards), vacation, holiday pay, severance, retirement, supplemental retirement, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs and arrangements, and all other wage, compensation, employee expense reimbursement, and other benefit obligations of the Debtors. |
| **Indemnification of Prepetition Directors, Officers, Managers, et al.** | The Plan shall provide that, consistent with applicable law, all indemnification provisions currently in place (whether in the by-laws, constitutions, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts or otherwise) for the current and former direct and indirect sponsors, directors, officers, managers, employees, attorneys, accountants, investment bankers, financial advisors, restructuring advisors, consultants and other professionals of the Debtors, as applicable, shall be reinstated (to the extent required) and remain intact and irrevocable and shall survive effectiveness of the Restructuring. |
| **MIP** | On the Plan Effective Date, the Reorganized Debtors shall adopt the management incentive plan (the "***MIP***") which shall provide for the issuance to management, key employees and directors of the Reorganized Debtors of 10% of the fully diluted New Mallinckrodt Common Shares (for the avoidance of doubt, after giving effect to the exercise of the New Opioid Warrants) not later than thirty (30) days after the Plan Effective Date at least half of the MIP shares will be granted and shall vest in accordance with the terms set forth in Annex 3 hereto, and the remaining amount of which shall be reserved for future issuance as determined by the Reorganized Debtors' board; provided, that the MIP may be modified or amended by the mutual agreement of the Debtors and the Required Supporting Noteholders prior to the Plan Effective Date, with the consent of the Governmental Plaintiff Ad Hoc Committee **and the MSGE Group** (such consent not to be unreasonably withheld). The final terms of the MIP (including any amendments or modifications, if any) shall be included in the Plan Supplement. |
| **Exit Capital Raise** | Exact terms, if any, to be agreed upon by the Debtors and Supporting Unsecured Noteholders holding no less than two-thirds |

in outstanding principal amount of Guaranteed Unsecured Notes held by the Supporting Unsecured Noteholders then party to the Restructuring Support Agreement, with the consent of **(i)** the Governmental Plaintiff Ad Hoc Committee **and the MSGE Group** to the extent **(x) such exit capital is raised in the form of indebtedness (such consent not to be unreasonably withheld) or (y)** that any such terms could reasonably be expected to have an adverse effect, in any material respect, on the treatment, rights, or entitlements of the holders of Opioid Claims under the RSA **and (ii) the Required Supporting Term Lenders to the extent (x) such exit capital is raised in the form of indebtedness or (y) that any such terms could reasonably be expected to have an adverse effect on the treatment, rights, or entitlements of the holders of First Lien Term Loan Claims under the RSA and the First Lien Settlement Term Sheet; _provided_, that the Supporting Term Lenders shall not have any consent rights with respect to exit capital raised on or prior to the Plan Effective Date in the form of indebtedness that is (I) junior to the New First Lien Term Loans and matures after the maturity date of the New First Lien Term Loans, (II) any indebtedness incurred to fund payment of the First Lien Revolving Loan Claims and/or the First Lien Notes Claims in an aggregate principal amount not to exceed the principal amount (or accreted value, if applicable) of such First Lien Revolving Loan Claims and/or First Lien Notes Claims (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions, expenses, plus an amount equal to any existing commitment unutilized thereunder and letters of credit undrawn thereunder), (III) the Takeback Second Lien Notes (so long as such Takeback Second Lien Notes are not first-lien indebtedness), (IV) any receivables securitization facility in an aggregate principal amount not to exceed $200 million or (V) other Indebtedness incurred pursuant to provisions of Section 6.01 of Annex 1 attached to the First Lien Settlement Term Sheet ("Annex 1") as if in effect on the date of such incurrence (but, for the avoidance of doubt, this clause (V) shall not apply to any indebtedness permitted to be incurred pursuant to Section 6.01 of Annex 1 based on the calculation of a financial ratio, consolidated total assets or other financial metric) which Indebtedness described in this clause (V), if secured, is secured by any lien permitted by Section 6.02 of Annex 1. For the avoidance of doubt, the re-designation, exchange, replacement, refinancing, or acquisition, on or prior to the Plan Effective Date, of the Takeback Second Lien Notes or the Second Lien Notes, in each case, into, by, or for first lien indebtedness shall**

| | |
|---|---|
| | **be prohibited**. |
| **Tax Issues** | The Debtors and the Supporting Parties shall cooperate in good faith to structure the Restructuring and related transactions in a tax-efficient manner. |
| **Restructuring Transactions** | Without limiting any rights and remedies of the Debtors or Reorganized Debtors under the Plan or applicable law, but in all cases subject to the terms and conditions of the RSA and any consents or approvals required thereunder, the entry of the Confirmation Order shall constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Plan Effective Date, including such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors, or to reincorporate certain of the Affiliate Debtors under the laws of jurisdictions other than the laws of which the applicable Affiliate Debtors are presently incorporated. All such actions necessary or appropriate to consummate and implement the provisions of the Plan shall be set forth in the Plan Supplement, may include one or more mergers, consolidations, restructures, conversions, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate, but in all cases subject to the terms and conditions of the Plan and the RSA and any consents or approvals required thereunder (collectively, the "**Restructuring Transactions**"); *provided,* *that* any Restructuring Transactions shall **(a)** not adversely affect the recoveries under the Plan **(i)** of **the** holders of Guaranteed Unsecured Notes Claims without the consent of the Required Supporting Unsecured Noteholders or **(ii)** the holders of Opioid Claims without the consent of the Governmental Plaintiff Ad Hoc Committee **and the MSGE Group, or (b) not materially adversely affect the rights or recoveries under the Plan of the holders of First Lien Term Loan Claims without the consent of the Required Supporting Term Lenders**. |
| **Company Status Upon Emergence** | On or as soon as reasonably practicable after the Plan Effective Date, the New Mallinckrodt Common Shares shall be listed for trading on The NASDAQ Capital Market, the NASDAQ Global Market, or the New York Stock Exchange; *provided however that*, in any event, on the Plan Effective Date, the Reorganized Debtors shall have governance standards as though they were listed on any such exchange. |

9

A-3072

| Cancellation of Notes, Instruments, Certificates, and Other Documents | On the Plan Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Equity Interests, shall be canceled and/or updated to record such cancellation and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
|---|---|
| Issuance of New Securities; Execution of the Plan Restructuring Documents | On the Plan Effective Date, the Reorganized Debtors shall issue all securities, notes, instruments, certificates, and other documents required to be issued or make, or cause to be made, such entries in its books and records pursuant to the Restructuring.  The Parties shall use reasonable efforts to make securities issued under the Plan DTC eligible. |
| Fees and Expenses of the Restructuring Support Agreement Parties | The Debtors shall pay all reasonable and documented fees and out of pocket expenses of :<br><br>• (a) primary counsel to the Unsecured Notes Ad Hoc Group, Paul, Weiss, Rifkind, Wharton & Garrison LLP, (b) one Delaware counsel to the Unsecured Notes Ad Hoc Group, (c) one Irish counsel to the Unsecured Notes Ad Hoc Group, (d) one regulatory counsel to the Unsecured Notes Ad Hoc Group and (e) one financial advisor to the Unsecured Notes Ad Hoc Group, Perella Weinberg Partners LP, (f) one Canadian counsel to the Unsecured Notes Ad Hoc Group, and (g) such other legal, consulting, financial, and/or other professional advisors to which the Unsecured Notes Ad Hoc Group and the Debtors shall reasonably agree from time to time;<br><br>• (a) primary counsel to the Governmental Plaintiff Ad Hoc Group, Gilbert LLP, Kramer Levin Naftalis & Frankel LLP, and Brown Rudnick LLP, (b) one local counsel to the Governmental Plaintiff Ad Hoc Group, (c) one Irish counsel to the Governmental Plaintiff Ad Hoc Committee, (d) one investment banker to the Governmental Plaintiff Ad Hoc Committee, Houlihan Lokey, Inc., and (e) such other legal, consulting, financial, and/or other professional advisors to which the Governmental Plaintiff Ad Hoc Committee  and the Debtors shall reasonably agree from time to time; **and**<br><br>• **(a) primary counsel to the MGSE Group, Caplin & Drysdale, Chartered, (b) one local counsel to the MSGE Group, Seitz, Van Ogtrop & Green, P.A., (c) one financial advisor to the MSGE Group, FTI Consulting, and (d) such other legal, consulting, financial, and/or other professional advisors to which the MSGE Group and the Debtors shall reasonably agree from time to** |

10

| | |
|---|---|
| | **time;** |
| | • indenture trustee fees~~.~~**; and** |
| | • **(a) primary counsel to the Ad Hoc First Lien Term Lender Group, Gibson, Dunn & Crutcher LLP, (b) one financial advisor to the Ad Hoc First Lien Term Lender Group, Evercore Group, LLC, and (c) such other legal, consulting, financial, and/or other professional advisors that the Ad Hoc First Lien Term Lender Group is permitted to retain under the Final Cash Collateral Order or as the Debtors shall reasonably agree from time to time (including any additional Delaware counsel retained in connection with the motion seeking approval of the 2020 ECF Payment Settlement),** |
| | ~~In~~**in** each case, that are due and owing after receipt of applicable invoices with non-privileged summaries of services rendered, without any requirement for the filing of fee or retention applications in the Chapter 11 Cases, and in accordance with the terms of the applicable engagement letters, if any, with any balance(s) paid on the Plan Effective Date (collectively, the "***Restructuring Expenses***"). |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| **Releases** | The exculpation provisions, Debtor releases, third-party releases and injunction provisions to be included in the Plan will be consistent with <u>Annex 4</u> hereto in all material respects, to the fullest extent permissible under applicable law.<br><br>In addition, the Plan will include separate release and channeling injunction provisions with respect to Opioid Claims. |
| **Consent Rights** | All consent rights not otherwise set forth herein shall be set forth in the RSA. |
| **Conditions Precedent to the Plan Effective Date** | The Plan shall contain customary conditions precedent to occurrence of the Plan Effective Date, including the following:<br><br>• the RSA shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith;<br><br>• the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with the RSA and such order shall be a Final Order;<br><br>• the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of |

11

Case 1:21-cv-01093-LPS Document 33 Filed 12/13/21 Page 215 of 405 PageID #: 3643
Case 20-12522-JTD Doc 2917 Filed 06/18/21 Page 689 of 835

the other transactions contemplated by the Restructuring;

- all conditions precedent to the consummation of the Opioid Settlement and related transactions, including the establishment of the Opioid Trust and authorization for the payment of the Opioid Trust Consideration, have been satisfied or waived by the party or parties entitled to waive them in accordance with the terms of the Opioid Trust Documents;

- the final version of the Plan, Plan Supplement, the Opioid Trust Documents, and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan, shall be consistent with the RSA;

- the Canadian Court shall have issued an order recognizing the Confirmation Order in the Recognition Proceedings and giving full force and effect to the Confirmation Order in Canada and such recognition order shall have become a Final Order;

- the High Court of Ireland shall have made an order confirming the Scheme of Arrangement in the Irish Examinership Proceedings and the Scheme of Arrangement shall have become effective in accordance with its terms (or shall become effective concurrently with effectiveness of the Plan);

- the Irish Takeover Panel shall have either: (a) confirmed that an obligation to make a mandatory general offer for the shares of the Parent pursuant to Rule 9 of the Irish Takeover Rules will not be triggered by the implementation of the Scheme of Arrangement and the Plan; or (b) otherwise waived the obligation on the part of any Person to make such an offer;

- any civil or criminal claims asserted by or on behalf of the Department of Justice (other than those resolved pursuant to the CMS/DOJ/~~State~~**States** Settlement) have been resolved on terms reasonably acceptable to the Debtors, the Required Supporting Unsecured Noteholders ~~and,~~ the Governmental Plaintiff Ad Hoc Committee~~,~~**, and the MSGE Group and, to the extent such resolution requires a cash payment that is not paid from the General Unsecured Recovery Cash Pool and such payment (and not any other payments, conditions, or circumstances) causes a materially adverse reduction in projected cash as of the Plan Effective Date as compared to the projections**

12

A-3075

Case 1:21-cv-01093-LPS   Document 33   Filed 12/13/21   Page 216 of 405 PageID #: 3644
Case 20-12522-JTD   Doc 2917   Filed 06/18/21   Page 690 of 835

|  | **contained in the 8K filed on March 10, 2020, the Required Supporting Term Lenders;** |
|  | • the Debtors shall have paid in full all professional fees and expenses of the Debtors' retained professionals that require the Bankruptcy Court's approval or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses; |
|  | • the Debtors shall have paid the Restructuring Expenses in full, in cash; |
|  | • **the Bankruptcy Court shall have entered the CCO Modification Order in form and substance reasonably acceptable to the Required Supporting Term Lenders and such order shall be a Final Order and remain in full force and effect;** _**provided**_**, that, this condition precedent shall not be deemed unmet based solely on the Bankruptcy Court declining to apply the Adjusted Interest Rate retroactively to any date prior to the entry of the CCO Modification Order or because of the failure of the CCO Modification Order to require payment of the Term Loan Exit Payment;** |
|  | • the Debtors shall have paid the Noteholder Consent Fee **and Term Loan Exit Payment** on the Plan Effective Date; ~~and~~ |
|  | • **the Bankruptcy Court shall have entered a Final Order authorizing and directing the Debtors to pay all Transaction Fees payable under the Reimbursement Agreements (each as defined in the RSA Parties Fee Motion); and** |
|  | • the Restructuring to be implemented on the Plan Effective Date shall be consistent with the Plan and the RSA. |

13

A-3076

**Annex 1**

**Certain Definitions**

| | |
|---|---|
| ***1992 Legacy Debentures Indenture*** | That certain Indenture, dated as of April 30, 1992, by and among Ludlow Corporation, **as issuer, U.S. Bank National Association (as successor in interest to Security National Pacific Trust Company (New York)), as trustee, as supplemented by that certain First Supplemental Indenture, dated as of April 30, 1992, with U.S. Bank National Association (as successor in interest to** Security Pacific National Trust Company (New York), ~~as trustee, and the guarantors party thereto from time to time, and that certain a First Supplemental Indenture, dated April 30, 1992, with Security Pacific National Trust Company (New York)~~) (each as modified, amended, or supplemented from time to time). |
| ***1993 Legacy Debentures Indenture*** | That certain **Indenture, dated as of April 30, 1992, by and among Ludlow Corporation, as issuer, U.S. Bank National Association (as successor in interest to Security National Pacific Trust Company (New York)), as trustee, as supplemented by that certain Second Supplemental** Indenture, dated as of March 8, 1993, ~~by and among Ludlow Corporation as issuer,~~**with U.S. Bank National Association (as successor in interest to** BankAmerica National Trust Company ~~(successor by merger to Security Pacific National Trust Company (New York)), as trustee, and the guarantors party thereto from time to time () (each~~ as modified, amended, or supplemented from time to time). |
| ***2013 Notes Indenture*** | That certain Indenture, dated as of April 11, 2013, by and among Mallinckrodt International Finance S.A. as issuer, **the guarantor party thereto,** and Deutsche Bank Trust Company Americas, as trustee (as modified, amended, or supplemented from time to time). |
| ***2014 Notes Indenture*** | That certain Indenture, dated as of August 13, 2014, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Deutsche Bank Trust Company Americas, as trustee, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| ***2020 First Lien Notes Indenture*** | That certain Indenture, dated as of April 7, 2020, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Wilmington Savings Fund Society, FSB, as **first lien** trustee, Deutsche Bank AG New York Branch, as **first lien** collateral agent, and the guarantors party thereto from time to time |

| | |
|---|---|
| | (as modified, amended, or supplemented from time to time). |
| ***2019 Second Lien Notes Indenture*** | That certain Indenture, dated as of December 6, 2019, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Wilmington Savings Fund Society, FSB, as **second lien** trustee and **second lien** collateral agent, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| ***4.75% Senior Notes due 2023*** | The 4.75% senior notes due 2023 pursuant to the 2013 Notes Indenture. |
| ***4.75% Unsecured Notes Claims*** | Any Claim arising under or based upon the 4.75% Unsecured Notes or the 2013 Notes Indenture. |
| ***5.50% Senior Notes 2025*** | The 5.50% senior notes due 2025 pursuant to the April 2015 Notes Indenture. |
| ***5.625% Senior Notes due 2023*** | The 5.625% senior notes due 2023 pursuant to the September 2015 Notes Indenture. |
| ***5.75% Senior Notes due 2022*** | The 5.75% senior notes due 2022 pursuant to the 2014 Notes Indenture. |
| ***8.00% Debentures due March 2023*** | The 8.00% debentures due 2023 pursuant to the 1993 Legacy Debentures Indenture. |
| ***9.50% Debentures due May 2022*** | The 9.50% debentures due 2022 pursuant to the 1992 Legacy Debentures Indenture. |
| ***Affiliate*** | As defined in section 101(2) of the Bankruptcy Code. |
| ***April 2015 Notes Indenture*** | That certain Indenture, dated as of April 15, 2015, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Deutsche Bank Trust Company Americas, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| ***Avoidance Actions*** | Any and all avoidance, recovery, subordination or similar actions or remedies that may be brought by and on behalf of the Debtors or their estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code. |
| ***Canadian Court*** | The Ontario Superior Court of Justice (Commercial List) |
| ***Causes of Action*** | Any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counterclaims, defenses, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or noncontingent, matured or unmatured, suspected or |

2

| | unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, under statute, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, federal or state, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise. |
|---|---|
| *Class* | Each class of Holders of Claims or Equity Interests established under the Plan pursuant to section 1122(a) of the Bankruptcy Code. |
| *Confirmation Date* | The date on which the Confirmation Order is entered by the Bankruptcy Court. |
| *Consummation* | The occurrence of the Plan Effective Date. |
| *Current Opioid PI Claim* | A claim held by an individual against a Debtor for harm arising out of the use of opioid products manufactured or sold prior to the Plan Effective Date, other than a Future Opioid PI Claim. |
| *Entity* | As defined in section 101(15) of the Bankruptcy Code. |
| *Equity Interest* | Any issued, unissued, authorized, or outstanding ordinary shares or shares of common stock, preferred stock, or other instrument evidencing an ownership interest in Mallinckrodt plc, whether or not transferable, together with any warrants, equity-based awards, or contractual rights to purchase or acquire such equity interests at any time and all rights arising with respect thereto that existed immediately before the Plan Effective Date. |
| *Exculpated Party* | In each case, in its capacity as such: (a) the Debtors (and their Representatives); (b) the Reorganized Debtors (and their Representatives); and (c) the Future Claimants Representative. |
| *Existing Credit Agreement* | That certain Credit Agreement, dated as of March 19, 2014, by and among Mallinckrodt plc, as the parent, Mallinckrodt International Finance S.A., as Lux borrower, Mallinckrodt CB LLC, as co-borrower, the First Lien Agent, **and** the First Lien Lenders (as modified, amended, or supplemented from time to time). |
| *Final Order* | An order entered by the Bankruptcy Court or other court of competent jurisdiction: (a) that has not been reversed, stayed, modified, amended, or revoked, and as to which (i) any right to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has expired and no appeal, motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing is pending or |

3

| | (b) as to which an appeal has been taken, a motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing has been filed and (i) such appeal, motion for leave to appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which leave to appeal, certiorari, review, reargument, stay, or rehearing was sought and (ii) the time to appeal (in the event leave is granted) further or seek leave to appeal, certiorari, further review, reargument, stay, or rehearing has expired and no such appeal, motion for leave to appeal, or petition for certiorari, further review, reargument, stay, or rehearing is pending. |
|---|---|
| **First Lien Agent** | Deutsche Bank AG New York Branch, in its capacity as administrative agent under the Existing Credit Agreement or, as applicable, any successor thereto. |
| **First Lien Notes** | The 10.00% first lien senior secured notes due 2025 pursuant to the 2020 First Lien Notes Indenture. |
| **First Lien Notes Claim** | Any Claim arising under or based upon the First Lien Notes or the 2020 First Lien Notes Indenture. |
| **First Lien Credit Agreement Claims** | Any claim held by the First Lien Agent or the First Lien Lenders derived from or based upon the Existing Credit Agreement or theFirst Lien Credit Facility, including claims for all principal amounts outstanding **(including any right to prepayment thereof)**, interest, fees, expenses, costs, indemnification and other charges **and expenses** arising under or related to the First Lien Credit Facility or the Existing Credit Agreement. |
| **First Lien Credit Facility** | The credit facility evidenced by the Existing Credit Agreement. |
| **First Lien Lenders** | The banks, financial institutions, and other lenders party to the Existing Credit Agreement from time to time**.** |
| **Future Opioid PI Claims** | A claim held by an individual against a Debtor for harm arising out of the use of opioid products manufactured or sold prior to the Plan Effective Date, which could not be discharged by confirmation of a plan of reorganization if the Bankruptcy Court did not appoint a future claimants representative in the Chapter 11 Cases and which claim is to be addressed by the Opioid Trust to assume the liabilities of the Debtors for damages allegedly caused by the use of opioid products. |
| **Future Opioid PI Claimants** | Individuals holding Future Opioid PI Claims. |
| **Future Claimants** | The legal representative for Future Opioid PI Claimants. |

4

| Representative | |
|---|---|
| **General Unsecured Claims** | Any Unsecured Claim (other than a Guaranteed Unsecured Notes Claim, a Trade Claim, an Opioid Claim, an Administrative, Tax, Other Priority or Other Secured Claim, or (subject to effectiveness of the CMS/DOJ/~~State~~**States** Settlement) a Claim resolved by the CMS/DOJ/~~State~~**States** Settlement), including without limitation (a) Claims arising from the rejection of unexpired leases or executory contracts, (b) Claims arising from any litigation or other court, administrative or regulatory proceeding, including damages or judgments entered against, or settlement amounts owing by a Debtor in connection therewith, and (c) Claims related to asbestos exposure or products containing asbestos. |
| **Guaranteed Unsecured Notes** | The 5.75% Senior Notes due 2022, the 5.500% Senior Notes Due 2025 and the 5.625% Senior Notes Due 2023. |
| **Guaranteed Unsecured Notes Claims** | Any Claim arising under or based upon the Guaranteed Unsecured Notes or the Guaranteed Unsecured Notes Indentures. |
| **Guaranteed Unsecured Notes Indentures** | Collectively, the 2014 Notes Indenture, the April 2015 Notes Indenture and the September 2015 Notes Indenture. |
| **Holder** | An Entity holding a Claim or Equity Interest, as applicable. |
| **Impaired** | With respect to any Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| **Intercompany Claim** | A prepetition Claim held by a Debtor or non-Debtor against a Debtor. |
| **Intercompany Interest** | An Interest in any Debtor other than Mallinckrodt Plc. |
| **Irish Takeover Panel** | The Irish Takeover Panel constituted under Irish Takeover Panel Act 1997. |
| **Irish Takeover Rules** | The Irish Takeover Panel Act 1997, Takeover Rules 2013. |
| **Legacy Debentures Claims** | Any Claim arising under or based upon the 1992 Legacy Debentures Indenture or 1993 Legacy Debentures Indenture. |
| **Lien** | A lien as defined in section 101(37) of the Bankruptcy Code. |
| **New Mallinckrodt Common Shares** | Common equity interests or ordinary shares in the Reorganized Debtor, Mallinckrodt plc. |
| **New Opioid Warrants** | The warrants contemplated under the Opioid Settlement and Opioid Trust Documents, which shall be consistent with the terms set forth in the Opioid Settlement Term Sheet. |

5

| | |
|---|---|
| *Recognition Proceedings* | The proceedings commenced by the Debtors under Part IV of the Canadian Companies Arrangement Act in the Canadian Court to recognize in Canada the Chapter 11 Cases and to recognize in Canada certain Orders of the Bankruptcy Court. |
| *Reinstated* | With respect to Claims and Equity Interests, that the Claim or Equity Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| *Reorganized Debtors* | The Debtors, as reorganized pursuant to and under the Plan or any successor thereto. |
| *Required Supporting Second Lien Noteholders* | Holders of at least two-thirds in outstanding principal amount of Second Lien Notes. |
| *Released Party* | (a) The Debtors, (b) the Reorganized Debtors, (c) the Non-Debtor Affiliates, (d) with respect to each of the foregoing Persons in clauses (a) through (c), such Persons' (i) predecessors, successors, permitted assigns, subsidiaries, and controlled affiliates, respective heirs, executors, estates, and nominees, in each case solely in their capacity as such and (ii) current and former officers and directors, principals, members, employees, financial advisors, attorneys (including attorneys retained by any director in his or her capacity as such), accountants, investment bankers (including investment bankers retained by any director in his or her capacity as such), consultants, experts and other professionals of the persons described in clauses (a) through (d)(i); (e) each member of the Unsecured Notes Ad Hoc Group in their capacity as such, (f) each Supporting Unsecured Noteholder in their capacity as such, (g) the Opioid Trust, (h) each member of the Governmental Plaintiff Ad Hoc Committee in their capacity as such, (i) each Supporting Governmental Opioid Claimant in their capacity as such; (j) **each member of the MSGE Group in their capacity as such; (k) each of** the Secured Parties**, (l) each Supporting Term Lender in their capacity as such, (m) each member of the Ad Hoc First Lien Term Lender Group in their capacity as such,** and (k~~k~~m) with respect to each of the foregoing Persons in clauses (e) through (j**m**), each such Person's Representatives. Notwithstanding anything to the contrary herein, Medtronic plc and its related parties will not be Released Parties. |
| *Second Lien Notes* | The 10.00% second lien senior secured notes due 2025 pursuant to the 2019 Second Lien Notes Indenture. |
| *Second Lien Notes Claim* | Any Claim arising under or based upon the Second Lien Notes Indenture or the 2019 Second Lien Notes Indenture. |

6

| *Secured Parties* | The Prepetition Secured Parties, as defined in the Cash Collateral Order. |
|---|---|
| *September 2015 Notes Indenture* | That certain Indenture, dated as of September 24, 2015, by and among Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC, as issuers, Deutsche Bank Trust Company Americas, as trustee, and the guarantors party thereto from time to time (as modified, amended, or supplemented from time to time). |
| *Trade Claim* | An Unsecured Claim held by a Trade Claimant. |
| *Trade Claimant* | Trade creditors, service providers and other vendors who provide goods and services necessary for the Debtors continued operations, including those creditors described in (a) *Motion of Debtors for Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors*, (b) *Motion of Debtors for Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of Foreign Vendors*, and (c) *Motion of Debtors for Interim and Final Orders (A) Authorizing Payment of Lienholder Claims and (B) Authorizing Payment of Section 503(b)(9) Claims*. |
| *Unimpaired* | With respect to a Claim, Equity Interest, or Class of Claims or Equity Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code. |
| *Unsecured Claim* | A Claim that is not secured by a Lien on property in which one of the Debtors' estates has an interest. |

7

## Annex 2

### Takeback Second Lien Notes Summary Terms

| | |
|---|---|
| **Amount** | • ~~Approximately~~ $375 million |
| **Notes** | • Senior Secured Second Lien Notes |
| **Issuers** | • Mallinckrodt International Finance S.A. and Mallinckrodt CB LLC |
| **Obligors** | • Same as the obligors on the Deferred Cash Payments, *provided that* any obligations on account of the Takeback Second Lien Notes shall (i) be guaranteed by the same entities that guarantee the First Lien Notes and (ii) comply with the terms of the Debtors' existing funded indebtedness |
| **Coupon** | • Payable in cash at 10.00% |
| **Maturity** | • Seven (7) years following the Plan Effective Date |
| **Collateral/Priority** | • *Pari passu* with the second lien security interests as with existing Second Lien Notes |
| **Put** | • Puttable to the issuer at 101% of par upon a change of control |
| **Equity Claw** | • Company may redeem up to 40% of Takeback Second Lien Notes at a redemption price of 110% of par with the proceeds of an equity offering |
| **Call Protections** | • Non-callable for 4 years<br>• 105 call in year 5<br>• 102.5 in year 6<br>• Par thereafter |
| **Affirmative and Negative Covenants** | • To generally match the 2020 First Lien Notes Indenture, as adjusted to reflect new Takeback Second Lien Notes structure |

## Annex 3

**Term Sheet for Mallinckrodt Pharmaceuticals Management Incentive Plan**

The following term sheet summarizes the principal terms of a management incentive plan (the "**MIP**") that certain creditors receiving equity securities (the "**Investors**") of New Mallinckrodt (the "**Company**" and together with its controlled subsidiaries, the "**Company Group**") will adopt effective upon emergence (the "**Closing**").

Capitalized terms used but not defined herein shall have the meanings set forth in the Restructuring Support Agreement and the Restructuring Term Sheet attached thereto as Exhibit A both dated October 11, 2020, to which this term sheet is attached as *Annex 2* (the "**RSA**"). The terms outlined in this Term Sheet assume New Mallinckrodt will be a publicly traded company shortly following Closing consistent with the RSA.

| | |
|---|---|
| **Plan Reserve:** | A number of New Mallinckrodt Common Shares representing 10% of all equity interests in the Company outstanding immediately after the Closing on a fully diluted basis, taking into account the Plan Reserve and any equity securities issued and outstanding at the Closing, and any warrants or securities convertible, exercisable or exchangeable therefor, will be reserved for issuance pursuant to the MIP (such securities issued pursuant to the MIP, the "**Award Shares**").[1] |
| **Eligibility:** | Company employees, non-employee consultants and outside Directors of the Company Group will be eligible to participate in the MIP. Each person who receives an award pursuant to the MIP is hereinafter referred to as a "**Participant**". |
| **Initial Grant:** | Not less than 50% of the Plan Reserve shall be granted in the form of restricted shares, restricted share units or options over New Mallinckrodt Common Shares (the "**Restricted Shares**") within 30 days following Closing with the allocation of such grants to be approved by the Compensation Committee of the Company based upon the recommendations of the Company's CEO (the "**Initial Grants**"). No more than 25% of the Initial Grants shall be in the form of options. |

---

[1] Plan Reserve subject to adjustment in connection with share split, reverse share split, share dividend or other distribution (whether in the form of cash, shares, other securities or other property), extraordinary cash dividend, recapitalization, merger, consolidation, split-up, spin-off, reorganization, combination, repurchase or exchange of shares or other securities or similar corporate transaction or event.

| | |
|---|---|
| **Vesting of Initial Grants:** | The Initial Grants will vest as determined in good faith by the Compensation Committee in consultation with the Company's CEO over a period not exceeding 3 years. |
| | If a Participant's employment is terminated by the Company without "Cause" or by the Participant for "Good Reason" (to be defined in the MIP), all unvested awards that would otherwise vest during the 12 months following such termination, will vest upon termination, subject to the Participant's execution of a reasonable and customary general release of claims in favor of the Company that becomes effective within 60 days after such termination and continued material compliance with the terms of any non-competition or non-solicitation restrictive covenants to which the Participant is subject. |
| | The MIP will contain other terms consistent with public company equity incentive plans and awards within the Company's peer group. |
| **Change in Control:** | Upon the occurrence of a "Change in Control" (to be defined in the MIP), to the extent awards are not assumed or substituted, all awards under the MIP shall become fully vested and payable. |
| **Restrictive Covenants:** | To the extent a Participant is not already subject to non-compete, non-solicitation or other restrictive covenants, then such Participant will be required to enter into a covenant consistent with Mallinckrodt's current Non-Competition, Non-Solicitation, and Confidentiality Agreement, but with a non-compete/non-solicitation period not to exceed 12 months. |

**A-3086**

**Annex 4**

**Plan Release, Exculpation and Injunction Provisions**

**Releases by the Debtors**

Pursuant to section 1123(b) of the Bankruptcy Code (and any other applicable provisions of the Bankruptcy Code), as of the Plan Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the Opioid Settlement and the Restructuring, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Plan Effective Date, by the Debtors and the Estates (the "Debtor Release") from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates, the Debtors' in- or out-of-court restructuring efforts (including the Chapter 11 Cases), the purchase, sale, or rescission of the purchase or sale of any security **or indebtedness** of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, litigation claims arising from historical intercompany transactions between or among a Debtor and another Debtor, the business or contractual arrangements between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Plan Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Plan Effective Date, the **Definitive Documents, the** Opioid Trust, Opioid Trust Documents, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement **(including any amendments and/or joinders thereto)** and related prepetition **and postpetition** transactions, the Disclosure Statement, the Plan, the Plan Supplement, any Restructuring Transaction, any agreement, instrument, release, and other documents created or entered into prior to the Plan Effective Date in connection with the creation of the Opioid Trust, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation (including the solicitation of votes on the Plan), the pursuit of

Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the business or contractual arrangements between the Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Plan Effective Date relating to any of the foregoing; provided however that the Debtors do not release, and the Opioid Trust shall retain, all Assigned Third-Party Claims; provided, further, that the Debtors do not release, Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct. The foregoing release will be effective as of the Plan Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding anything to the contrary in the foregoing, the releases by the Debtors set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claims which are Reinstated pursuant to the Plan.

The Reorganized Debtors and the Opioid Trust shall be bound, to the same extent the Debtors are bound, by the releases set forth in Article [__] of the Plan. For the avoidance of doubt, Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party prior to the Plan Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct, including findings after the Plan Effective Date, are not released pursuant to Article [__] of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in Article [__] of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith and settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors, their estates and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity or Person asserting any claim or Cause of Action released by Article [__] of the Plan.

**Releases by Holders of Claims and Equity Interests**

Pursuant to section 1123(b) of the Bankruptcy Code (and any other applicable provisions of the Bankruptcy Code), as of the Plan Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties before and during the Chapter 11 Cases to facilitate the Opioid Settlement and Restructuring, and except as otherwise explicitly provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally,

2

irrevocably and forever released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Plan Effective Date, except as otherwise explicitly provided herein, by (a) the holders of all Claims who vote to accept the Plan, (b) the holders of all Claims that are Unimpaired under the Plan, (c) the holders of all Claims whose vote to accept or reject the Plan is solicited but who (i) abstain from voting on the Plan and (ii) do not opt out of granting the releases set forth herein, (d) the holders of all Claims or Equity Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, and (e) all other holders of Claims and Equity Interests to the maximum extent permitted by law, in each case, from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (as such entities existed prior to or after the Petition Date), their Estates, the Debtors' in- or out-of-court restructuring efforts (including the Chapter 11 Cases), the purchase, sale, or rescission of the purchase or sale of any security **or indebtedness** of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, litigation claims arising from historical intercompany transactions between or among a Debtor and another Debtor, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Plan Effective Date), the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Plan Effective Date, the **Definitive Documents, the** Opioid Trust, Opioid Trust Documents and the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement **(including any amendments and/or joinders thereto)** and related prepetition **and postpetition** transactions, the Disclosure Statement, the Plan, the Plan Supplement, any Restructuring Transaction, any agreement, instrument, release, and other documents created or entered into prior to the Plan Effective Date in connection with the creation of the Opioid Trust, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation (including the solicitation of votes on the Plan), the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon the

3

business or contractual arrangements between and Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Plan Effective Date relating to any of the foregoing, other than Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct.  For the avoidance of doubt, Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party prior to the Plan Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct, including findings after the Plan Effective Date, are not released pursuant to Article [___] of the Plan.  Notwithstanding anything to the contrary in the foregoing, the releases by the Holders of Claims and Equity Interests set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claims which are Reinstated pursuant to the Plan.

Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order shall (x) release, discharge, or preclude the enforcement of any liability of a Released Party to a Governmental Unit arising out of, or relating to, any act or omission of a Released Party prior to the Plan Effective Date that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted a criminal act or (y) solely as to any Supporting Governmental Opioid Plaintiff, release or discharge a consultant or expert having been retained to provide strategic advice for sales and marketing of opioid products who has received a civil investigative demand or other subpoena related to sales and marketing of opioid products from any State Attorney General on or after January 1, 2019 through the Petition Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Equity Interests set forth in Article  [__] of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith and settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors, their estates and all Holders of Claims and Equity Interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity or Person asserting any claim or Cause of Action released by Article  [__] of the Plan.

**Exculpation**

Effective as of the Plan Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person for any claims or Causes of Action arising prior to or on the Plan Effective Date for any act taken or omitted to be taken in connection with, related to, or arising out of, the Chapter 11 Cases, formulating, negotiating, preparing, disseminating, implementing, filing, administering, confirming or effecting the Confirmation or Consummation of the Plan, the Disclosure Statement, the Opioid Settlement, the Opioid Trust Documents, the "Agreement in Principle for Global Opioid

4

Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, or any contract, instrument, release or other agreement or document created or entered into in connection with any of the foregoing, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the Disclosure Statement or Confirmation or Consummation of the Plan, the Opioid Settlement or the Opioid Trust Documents, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (a) any Causes of Action arising from actual fraud, gross negligence, or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (b) the rights of any Person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

The foregoing exculpation shall be effective as of the Plan Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

**Permanent Injunction**

Except as otherwise expressly provided in the Confirmation Order, Plan or Opioid Trust Documents, from and after the Plan Effective Date all Persons are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from: (a) commencing or continuing, in any manner or in any place, any suit, action or other proceeding of any kind; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any encumbrance of any kind; (d) asserting any right of setoff, or subrogation of any kind; and (d) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any Claim, demand, liability, obligation, debt, right, Cause of Action, Equity Interest or remedy released or to be released, exculpated or to be exculpated, settled or to be settled, or discharged or to be discharged pursuant to the Plan or the Confirmation Order against any Person so released, discharged or exculpated (or the property or estate of any Person so released, discharged or exculpated). All injunctions or stays provided in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force until the Plan Effective Date.

5

6

A-3092

**Schedule 1**

**Opioid Settlement Term Sheet**

Execution Version

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE UNDER THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## Mallinckrodt Opioid Settlement Term Sheet

This Opioid Settlement Term Sheet, which is <u>Schedule 1</u> to the Term Sheet (the "***Restructuring Term Sheet***") annexed as <u>Exhibit A</u> to the Restructuring Support Agreement, dated October 11, 2020, by and among the Company and the Supporting Parties, describes the proposed treatment of Opioid Claims in connection with the Restructuring contemplated by the Restructuring Support Agreement, as well as certain related implementation and other matters being resolved pursuant to the Opioid Settlement. This Opioid Settlement Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code. Certain capitalized terms used herein are defined in the glossary attached hereto; capitalized terms used but not otherwise defined in this Opioid Settlement Term Sheet have the meanings assigned in the Restructuring Support Agreement or the Restructuring Term Sheet, as applicable.

This Opioid Settlement Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documents implementing the Opioid Settlement and broader Restructuring of claims against and interests in the Debtors, which remain subject to negotiation in accordance with the Restructuring Support Agreement.

| TERMS OF THE PLAN AND THE RESTRUCTURING |
|---|
| **Overview** <br><br> The Opioid Settlement and Restructuring will be implemented through the Plan, consistent with the terms of (a) this Opioid Settlement Term Sheet, (b) the Restructuring Term Sheet and (c) the Restructuring Support Agreement, through the Chapter 11 Cases to be commenced in the Bankruptcy Court. <br><br> The Plan will provide for the establishment of the Opioid Trust, which will receive the Trust Consideration (as defined below), including certain cash payments, the New Opioid Warrants, and certain other assets. All Opioid Claims will be assumed by the Opioid Trust and be discharged, released, and enjoined as to the Company and the other Released Parties. |

| Treatment of Opioid Claims | As of the Plan Effective Date, Mallinckrodt's liability for all Opioid Claims shall automatically, and without further act, deed, or court order, be channeled exclusively to and assumed by the Opioid Trust, as described herein.  Each Opioid Claim shall be resolved in accordance with the terms, provisions, and procedures of the Opioid Trust Documents. The Opioid Trust shall be funded in accordance with the provisions of this Term Sheet. The sole recourse of any Opioid Claimant on account of such Opioid Claim shall be to the Opioid Trust, and each such Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claim against any Protected Party. |
|---|---|
| Opioid Trust | On the Plan Effective Date, the Opioid Trust will receive (the "***Trust Consideration***"): <br><br> • cash in the amount of $450,000,000; <br><br> • the New Opioid Warrants; <br><br> • the right to receive cash payments (the "***Deferred Cash Payments***") in the following amounts and on the following dates: (a) $200,000,000 on each of the first and second anniversaries of the Plan Effective Date; and (b) $150,000,000 on each of the third through seventh anniversaries of the Plan Effective Date; *provided*, that at any time prior to the first anniversary of the Plan Effective Date, the Reorganized Debtors shall have the right to prepay, in full or in part, the Deferred Cash Payments, at a price equal to the present value of the amounts to be prepaid, at the date of prepayment, discounted at the discount rate that would be required for (x)(i) the present value of the Deferred Cash Payments at the prepayment date plus (ii) $450,000,000 to equal (y)(i) the present value of the payments under the Original Payments Schedule at the prepayment date (excluding the initial $300,000,000 payment provided for in the Original Payments Schedule), discounted at a discount rate of 12% per annum, *plus* (ii) $300,000,000 (such option, |

US-DOCS\121513800.4

A-3095

the "***Prepayment Option***");[1] *provided, further*, that to the extent the Reorganized Debtors seek to prepay only a portion of the Deferred Cash Payments in accordance with the Prepayment Option, such prepayment shall (x) be funded solely from the net proceeds of an equity raise by the Reorganized Debtors; and (y) prepay Deferred Cash Payments in accordance with the above in inverse order beginning with the payment due on the seventh anniversary of the Plan Effective Date;

- the Assigned Third-Party Claims; and

---

[1] **Annex A** sets forth the prepayment cost as of the end of each of the 12 months after the Plan Effective Date. To the extent a prepayment occurs other than at the end of a month, the prepayment cost shall be calculated in accordance with the above formula.

3

|   |   |
|---|---|
|   | • the Assigned Insurance Rights. |
|   | The cash payments described above include amounts to be determined by the Governmental Plaintiff Ad Hoc Committee **and the MSGE Group** for reimbursement of plaintiffs'/claimants attorneys' fees and costs (not including (i) Restructuring Expenses, which shall be paid directly by the Debtors, and (ii) any reasonable, documented fees and expenses incurred by the Governmental Plaintiff Ad Hoc Committee **and the MSGE Group** on or after the Plan Effective Date in connection with implementation of the Plan (excluding, for the avoidance of doubt, the expenses of administration of the Opioid Trust (the "*Trust Expenses*")), which shall be paid directly by the Reorganized Debtors), and will be joint and several obligations (or be subject to an economically similar arrangement, e.g., one effected by guarantees, subject to tax considerations) of all of the current and future borrowers, issuers, pledgers and guarantors of the Debtors' funded indebtedness from time to time; *provided*, that for so long as the First Lien Notes, Second Lien Notes**, the New First Lien Term Loans** or Takeback Second Lien Notes remain outstanding, in no event shall the cash payments described above be guaranteed by an entity that does not also guarantee the First Lien Notes, Second Lien Notes**, the New First Lien Term Loans** or Takeback Second Lien Notes. |
| **Asset Sales; Mandatory Prepayments to Opioid Trust** | The Plan and Confirmation Order will also provide that, after any sale of (i) Mallinckrodt Enterprises Holdings, Inc. and its subsidiaries (including, for the avoidance of doubt, its successors and assigns) or (ii) a material portion of their assets or businesses (including as a result of a merger, equity sale, or asset sale), subject to compliance with the Debtors' covenants under their funded indebtedness (as may be modified from time to time), fifty percent (50%) of the "net proceeds" of such sale (after, for the avoidance of doubt, compliance with then-existing covenants) shall be paid to the Opioid Trust; and the amount of such net proceeds actually conveyed to the Opioid Trust will be deemed a ratable repayment against the remaining structured payments described above that the Opioid Trust is entitled to receive. For the avoidance of doubt, the Debtors will not be under any obligation to undertake any such sale on any particular timeframe. |
| **Tax Matters** | The Opioid Settlement shall be implemented with the objective of maximizing tax efficiency to (i) Mallinckrodt, including with respect to the availability, location and timing of tax deductions and (ii) to the Opioid Claimants, including with respect to the tax classification of the Opioid Trust. |
|   | The Opioid Trust will be treated as a qualified settlement fund for tax purposes. |

4

A-3097

| | |
|---|---|
| | The Parties intend that payments to the Opioid Trust will constitute "restitution" within the meaning of Section 162(f) of the Internal Revenue Code, and will be so characterized for U.S. federal income tax purposes to the extent such payments are made to or at the direction of government or governmental entities and to the extent allowed by applicable law. |
| **Certain Insurance Matters** | In implementing the assignment of the Assigned Insurance Rights, the Debtors or the Reorganized Debtors, on the one hand, and the Governmental Plaintiff Ad Hoc Committee **and the MSGE Group,** or the Opioid Trust, on the other hand, shall cooperate and negotiate in good faith concerning (i) treatment of unsatisfied self-insured retentions under the applicable policies with the objective of minimizing adverse consequences to Mallinckrodt, Reorganized Mallinckrodt, and the Opioid Trust (it being understood that the foregoing obligation shall not require the Debtors or Reorganized Debtors to satisfy all or any portion of any such self-insured retentions) and (ii) any actions by the Debtors, Reorganized Debtors, or the Opioid Trust to pursue or preserve the insurance policies relating to the Assigned Insurance Rights. The Debtors and the Reorganized Debtors will use their reasonable best efforts to provide to the Opioid Trust all documents, information, and other cooperation that is reasonably necessary for the Opioid Trust to pursue the Assigned Insurance Rights. |
| **Opioid Trust Documents** | The Opioid Trust Documents will comply with the requirements of the Bankruptcy Code. The material terms of the Opioid Trust Documents will be described in the Disclosure Statement and forms of the Opioid Trust Documents shall be included in the Plan Supplement, with such summaries and forms of documents **(i)** to be acceptable to the Governmental Plaintiff Ad Hoc Committee and **the MSGE Group and** reasonably acceptable to the Debtors and the Required Supporting Unsecured Noteholders **and (ii), to the extent practicable, delivered to the advisors to the Ad Hoc First Lien Term Lender Group prior to being filed with the Bankruptcy Court**. |

| New Opioid Warrants Agreement | The agreement governing the New Opioid Warrants shall constitute Definitive Documentation under the Restructuring Support Agreement and will: |
|---|---|
| | • contain terms and conditions, including, without limitation, cashless exercise option (as far as legally permissible), anti-dilution protection (including, without limitation, against stock splits, stock dividends and similar events) and Black Scholes protections to be agreed, in each case, as customary for transactions of this type and otherwise acceptable to the Debtors ~~and~~ the Governmental Plaintiff Ad Hoc Committee**, and the MSGE Group**; |
| | • provide for a registration rights agreement satisfactory to the Governmental Plaintiff Ad Hoc Committee **and the MSGE Group** with respect to the New Opioid Warrants and the stock issuable upon |
| | ~~●~~ exercise of the New Opioid Warrants providing for, among other things, a resale shelf registration statement and customary demand and piggyback rights; and |
| | • contain enhanced information rights and a covenant requiring Mallinckrodt to, upon request by the Opioid Trust on reasonable notice and subject to reimbursement by the Trust of Mallinckrodt's reasonable and documented out-of-pocket costs and expenses (provided, however, that such notice and reimbursements obligations of the Opioid Trust shall be on terms no less favorable to the Opioid Trust than any such obligations of any other shareholder of the Reorganized Debtors with similar rights), reasonably cooperate in good faith with any private sale by the Opioid Trust of the New Opioid Warrants or any shares received as a result of the exercise of the New Opioid Warrants. |
| **Channeling Injunction** | The Plan and the Confirmation Order will contain (i) a release by holders of Opioid Claims and (ii) an injunction channeling all Opioid Claims against the Protected Parties to the Opioid Trust, in each case, substantially on the terms set forth on **Exhibit 1** hereto. |
| | In addition, and for the avoidance of doubt, the Plan and Confirmation Order will also provide for customary releases by the Company and by other holders of claims and interests, exculpation provisions, and related injunctive provisions, in each case consistent with <u>Annex 4</u> to the Restructuring Term Sheet. |

6

| Operating Injunction | The Company shall seek entry of an injunctive order to be effective on the Petition Date, defining the manner in which the Debtors' opioid business may be lawfully operated by the Debtors or any successors thereto on a going-forward basis during the pendency of the Chapter 11 Cases, on the terms set forth on **Exhibit 2** hereto (the "*Chapter 11 Operating Injunction*"). |
|---|---|
| | The Confirmation Order (or a separate order of the Bankruptcy Court or another court of competent jurisdiction, if so agreed by the Company, the Governmental Plaintiff Ad Hoc Committee**, and the MSGE Group**) will extend the Chapter 11 Operating Injunction to govern the Reorganized Debtors' operations after the Plan Effective Date (the "*Post-Plan Effective Date Operating Injunction*" together with the Chapter 11 Operating Injunction, the "*Operating Injunctions*"). |
| | The Operating Injunctions shall be acceptable to the Debtors ~~and~~, the Governmental Plaintiff Ad Hoc Committee**, and the MSGE Group**, and reasonably acceptable to the Required Supporting Unsecured Noteholders. |

| Assigned Claims Cooperation | During the pendency of the Chapter 11 Cases, the Debtors shall reasonably cooperate with counsel to the Governmental Plaintiff Ad Hoc Committee **and the MSGE Group Counsel** in connection with the investigation and preservation of the Assigned Third-Party Claims and Assigned Insurance Rights, including by providing non-privileged information (including, without limitation, documents, emails and access to individuals with information), at the reasonable request of counsel to the Governmental Plaintiff Ad Hoc Committee **and the MSGE Group Counsel**. The Debtors shall, at the reasonable request of the Unsecured Notes Ad Hoc Group, inform counsel to the Unsecured Notes Ad Hoc Group of the status and scope of any such cooperation. |
|---|---|
| | The Debtors shall use reasonable efforts to provide all readily available, non-privileged information relating to the Assigned Third-Party Claims and Assigned Insurance Rights to counsel to the Governmental Plaintiff Ad Hoc Committee **and the MSGE Group Counsel** during the Debtors' bankruptcy cases; provided, however, that such information shall be provided prior to entry of the Confirmation Order. |
| | On and after the Plan Effective Date, the Reorganized Debtors shall provide reasonable cooperation to the Opioid Trust in connection with the Opioid Trust's investigation, preservation and pursuit of the Assigned Third-Party Claims and Assigned Insurance Rights. The terms and conditions of such cooperation shall be mutually agreed by the Debtors, the Governmental Plaintiff Ad Hoc Committee**, the MSGE Group,** and the Required Supporting Unsecured Noteholders and set forth in the Plan Supplement and included in the Confirmation Order. The Opioid Trust shall reimburse the Reorganized Debtors for their documented and reasonable out-of-pocket costs and expenses incurred in connection with such reasonable cooperation from and after the Plan Effective Date. |
| | Any request by the Opioid Trust ~~or,~~ the Governmental Plaintiff Ad Hoc Committee**, or the MSGE Group** for cooperation by the Debtors and Reorganized Debtors shall be on reasonable advance notice, and provided during normal business hours and otherwise in a manner that does not disrupt commercial operations. |
| Other Terms of Plan and Confirmation Order | The Plan and/or Confirmation Order will provide for, among other things, the following:<br><br>• Mallinckrodt will be required to participate in an industry-wide document disclosure program (if any) by disclosing publicly a subset of its litigation documents, subject to scope and protocols to be negotiated in good faith with the Governmental Plaintiff Ad Hoc Committee**, the MSGE Group,** and the Required Supporting Unsecured Noteholders; |

- any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) associated with the Assigned Third-Party Claims and Assigned Insurance Rights shall be transferred to the Opioid Trust and shall vest in the Opioid Trust, and the Debtors or the Reorganized Debtors, as the case may be, and the Opioid Trust shall take all necessary actions to effectuate the transfer of such privileges; provided, that (a) such privileges shall be transferred to the Opioid Trust for the sole purpose of enabling, and to the extent necessary to enable, the Opioid Trust to investigate and/or pursue such Assigned Third-Party Claims and Assigned Insurance Rights and (b) no documents or communications subject to a privilege shall be publicly disclosed by the Opioid Trust or communicated to any person not entitled to receive such information or in a manner that would diminish the protected status of such information, unless such disclosure or communication is reasonably necessary to preserve, secure, prosecute, or obtain the benefit of the Assigned Third-Party Claims and Assigned Insurance Rights; provided, further, that the Confirmation Order shall provide that the Opioid Trust's receipt of transferred privileges shall be without waiver in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors' estates;

- the Opioid Trust shall be authorized to conduct Rule 2004 examinations, to the fullest extent permitted thereunder, to investigate the Assigned Third-Party Claims and Assigned Insurance Rights, without the requirement of filing a motion for such authorization; provided, however, that no such Rule 2004 examinations shall be taken of the Debtors, the Reorganized Debtors, or any of their respective then-current employees, officers, directors or representatives, without further order of the Bankruptcy Court after notice and an opportunity to object and be heard;

- the exercise of remedies (including, without limitation, rights of setoff and/or recoupment) by non-Mallinckrodt third parties against Mallinckrodt on account of any Assigned Third-Party Claims shall be enjoined and barred, to the extent permitted by applicable law; and

- the covenants and enforcement rights with respect to Mallinckrodt's deferred payment obligations owed to the Opioid Trust in form and substance reasonably acceptable to the Debtors, the Governmental Plaintiff Ad Hoc Committee, **the MSGE Group,** and the Required Supporting Unsecured Noteholders in light of the nature, duration and form of the

| | deferred payment obligations. |
|---|---|
| | |

US-DOCS\121513800.4

A-3103

**Glossary of Key Defined Terms**

| Term | Meaning |
|---|---|
| Additional Insurance Rights | Additional rights in respect of insurance and/or other consideration, to be agreed to by the Debtors, the Supporting Governmental Opioid Claimants**, the MSGE Group,** and Supporting Unsecured Noteholders holding no less than two-thirds in outstanding principal amount of Guaranteed Unsecured Notes held by the Supporting Unsecured Noteholders then party to the Restructuring Support Agreement. |
| Assigned Insurance Rights | (a) Any and all claims, demands, entitlements to proceeds, payments, benefits, or Causes of Action of the Debtors under any and all general liability and products liability insurance policies that do or may afford the Debtors with rights, benefits, defense, indemnity, or insurance coverage with respect to any Opioid Claim, and (b) the Additional Insurance Rights. |
| Assigned Medtronic Claims | All Causes of Action of the Debtors against Medtronic plc and/or its subsidiaries, and each of their predecessors, successors, and assigns, including, without limitation, all Avoidance Actions of the Debtors against such parties |
| Assigned Third-Party Claims | (a) All Causes of Action of the Debtors arising out of Opioid Claims, including, without limitation, all Avoidance Actions arising out of Opioid Claims, but excluding any Causes of Action against Parent or any of its subsidiaries, or any Released Party, and (b) the Assigned Medtronic Claims. |
| Avoidance Actions | Any and all avoidance, recovery, subordination or similar actions or remedies that may be brought by and on behalf of the Debtors or their estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code. |
| Causes of Action | Any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counterclaims, defenses, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, under statute, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, federal or state, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise. |

| Term | Meaning |
|---|---|
| New Opioid Warrants | Warrants to acquire the number of New Mallinckrodt Common Shares that would represent 19.99% of all such outstanding shares after giving effect to the exercise of the New Opioid Warrants, subject to dilution from equity reserved under the MIP, at a strike price reflecting an aggregate equity value for the Reorganized Debtors of $1.551 billion, which warrants shall be exercisable at any time on or prior to the seventh anniversary of the Plan Effective Date; *provided*, that if the Reorganized Debtors exercise the Prepayment Option and prepay the Deferred Cash Payments in full, such warrants shall be exercisable only through and including the fifth anniversary of the Plan Effective Date. |
| Opioid Claim | Claims and causes of action, whether existing now or arising in the future, and whether held by a Governmental Entity or private party, against Mallinckrodt in any way arising out of or relating to opioid products manufactured or sold by Mallinckrodt or any of their predecessors prior to the Plan Effective Date, including, for the avoidance of doubt and without limitation, Claims for indemnification (contractual or otherwise), contribution, or reimbursement against Mallinckrodt on account of payments or losses in any way arising out of or relating to opioid products manufactured or sold by Mallinckrodt or any of their predecessors prior to the Plan Effective Date, including Future Opioid PI Claims; *provided, that* Mallinckrodt shall agree to comply with the terms of the Chapter 11 Operating Injunction as of the Petition Date, and that "Opioid Claims" shall not include any claims in any way arising, in whole or in part, from a violation of the Chapter 11 Operating Injunction |
| Opioid Claimant | A holder of an Opioid Claim |
| Opioid Trust | The trust that is to be established in accordance with the Plan, the Confirmation Order, and the Opioid Trust Documents, which trust will satisfy the requirements of section 468B of the Internal Revenue Code and the Treasury Regulation promulgated thereunder (as such may be modified or supplemented from time to time); provided, however, that nothing contained herein shall be deemed to preclude the establishment of one or more trusts as determined by the Opioid Claimants to be reasonably necessary or appropriate to provide tax efficiency to the Opioid Trust and Opioid Claimants (and all such trusts shall be referred to collectively as the "Opioid Trust"), so long as the establishment of multiple trusts is not reasonably expected to result in any adverse tax consequences for Mallinckrodt. |
| Opioid Trust Documents | The documents governing: (i) the Opioid Trust; (ii) any sub-trusts or vehicles that comprise the Opioid Trust; (iii) the flow of consideration from the Debtors' estates to the Opioid Trust or any sub-trusts or vehicles that comprise the Opioid Trust; (iv) submission, resolution, and distribution procedures in respect of all Opioid Claims; and (v) the flow of distributions, payments or flow of funds made from the Opioid Trust or any such sub-trusts or vehicles after the Plan Effective Date. |

| Term | Meaning |
|---|---|
| Original Payment Schedule | The schedule for deferred cash payments under the February 2020 agreement in principle reached between certain state attorneys general and the Debtors, providing for the following payments on the following dates: |

| Date | Payment Amount |
|---|---|
| Plan Effective Date | $300,000,000 |
| Each of 1st and 2nd anniversaries of Plan Effective Date | $200,000,000 |
| Each of 3rd through 8th anniversaries of Plan Effective Date | $150,000,000 |

| Term | Meaning |
|---|---|
| Parent | Mallinckrodt plc |
| Protected Party | (a) The Debtors, (b) the Reorganized Debtors, (c) the Non-Debtor Affiliates, (d) with respect to each of the foregoing Persons in clauses (a) through (c), such Persons' predecessors, successors, permitted assigns, subsidiaries, and controlled affiliates, respective heirs, executors, estates, and nominees, in each case solely in their capacity as such, and (e) with respect to each of the foregoing Persons in clauses (a) through (d), such Persons' officers and directors, principals, members, employees, financial advisors, attorneys, accountants, investment bankers, consultants, experts and other professionals, provided that, solely as to any Supporting Governmental Opioid Plaintiff, consultants and experts in this clause (e) shall not include those retained to provide strategic advice for sales and marketing of opioid products who have received a civil investigative demand or other subpoena related to sales and marketing of opioid products from any State Attorney General on or after January 1, 2019 through the Petition Date. |

## Exhibit 1

### Channeling Injunction/Opioid Claimant Release

**Releases by Holders of Opioid Claims**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code (and any other applicable provisions of the Bankruptcy Code), as of the Plan Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Opioid Claimant (in its capacity as such) is deemed to have released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Plan Effective Date, each Debtor, Reorganized Debtor, and Protected Party from any and all Claims (including Opioid Claims), counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims asserted, or assertable on behalf of the Debtors, or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their Estates, the Opioid Claims, the Debtors' in- or out-of-court restructuring efforts (including the Chapter 11 Cases), intercompany transactions between or among a Debtor and another Debtor, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, any Avoidance Actions, the negotiation, formulation, preparation, dissemination, filing, or implementation of, prior to the Plan Effective Date, the Opioid Trust, Opioid Trust Documents and the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement, the Disclosure Statement, the Plan, any Restructuring Transaction, or any contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Protected Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into prior to the Plan Effective Date in connection with the creation of the Opioid Trust, the "Agreement in Principle for Global Opioid Settlement and Associated Debt Refinance Activities" announced by the Parent on February 25, 2020, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation (including the solicitation of votes on the Plan), the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence or circumstance taking place on or before the Plan Effective Date related or relating to any of the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective

Date obligations of any party or Entity under the Plan, any post-Plan Effective Date transaction contemplated by the Restructuring, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. The foregoing release will be effective as of the Plan Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to the foregoing release by Opioid Claimants.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of this release by Opioid Claimants, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that this release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the Claims released by the third-party release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any Opioid Claimant asserting any claim or Cause of Action released pursuant to this release.

## Channeling Injunction

*Terms.* Pursuant to section 105(a) of the Bankruptcy Code, from and after the Plan Effective Date, the sole recourse of any Opioid Claimant on account of its Opioid Claims shall be to the Opioid Trust pursuant to this section [__] of the Plan and the Opioid Trust Documents, and such Opioid Claimant shall have no right whatsoever at any time to assert its Opioid Claim against any Protected Party or any property or interest in property of any Protected Party. On and after the Plan Effective Date, all present and future Opioid Claimants shall be permanently and forever stayed, restrained, barred, and enjoined from taking any of the following actions for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Opioid Claim other than from the Opioid Trust pursuant to the Opioid Trust Documents:

- commencing, conducting, or continuing in any manner, directly, indirectly or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

- enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

- creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

- setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; or

- proceeding in any manner in any place with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Opioid Trust, except in conformity and compliance with the Opioid Trust Documents.

*Reservations.* The foregoing injunction shall not stay, restrain, bar, or enjoin (a) the rights of Opioid Claimants to assert Opioid Claims against the Opioid Trust in accordance with the Plan and the Opioid Trust Documents; and (b) the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Trust Expenses against the Opioid Trust.

**Exhibit 2**
**Operating Injunction**

**[No Changes - See Docket No. 128]**

**Annex A**

**Prepayment Cost of Deferred Cash Payments at Various Months After Plan Effective Date[1]**

| Months after Plan Effective Date (end of month) | Prepayment Cost of Deferred Cash Payments |
|:---:|:---:|
| 0 | $679,648,516 |
| 1 | $687,520,879 |
| 2 | $695,467,941 |
| 3 | $703,490,411 |
| 4 | $711,589,005 |
| 5 | $719,764,445 |
| 6 | $728,017,460 |
| 7 | $736,348,785 |
| 8 | $744,759,166 |
| 9 | $753,249,350 |
| 10 | $761,820,096 |
| 11 | $770,472,168 |
| 12 | $779,206,338[2] |

---

[1] Amounts shown in annex above show the prepayment cost at the end of each of the 12 months after the Plan Effective Date. To the extent a prepayment occurs other than at the end of the month, the prepayment cost shall be calculated as of such prepayment date pursuant to the formula set forth in the Opioid Settlement Term Sheet.

[2] Prepayment right may be exercised prior to the first anniversary of the Plan Effective Date. Month twelve is illustratively shown and includes $200,000,000 payment due at such time.

A-3111

**Schedule 3**

**First Lien Settlement Term Sheet**

Case 20-12522-JTD    Doc 2917    Filed 06/18/21    Page 727 of 835

<u>**Annex 1**</u>

**Term Lender Holdings**

**[Redacted]**

Case 20-12522-JTD    Doc 2917    Filed 06/18/21    Page 728 of 835

**<u>Exhibit C</u>**

**Corporate Structure Chart**



A-3115

Case 20-12522-JTD    Doc 2917    Filed 06/18/21    Page 730 of 835

**Exhibit D**

**Financial Projections**

## A. Introduction

The Debtors[1] have prepared the Projections (as defined below) to assist the Bankruptcy Court in determining whether the Plan meets the "feasibility" requirements of section 1129(a)(11) of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors believe that the Plan meets such requirements. In connection with the negotiation and development of the Plan and for the purpose of determining whether the Plan meets the feasibility standard outlined in the Bankruptcy Code, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources during the Projection Period (as defined below). With this consideration in mind, the Debtors' management and their financial advisor prepared these consolidated financial projections (the "Projections") based on the Company's business plan as presented in the Company's Form 8-K filed on March 10, 2021 for the fiscal quarter ending December 31, 2021 through the fiscal year ending December 26, 2025 (the "Projection Period"). The Projections have been prepared on a consolidated basis, consistent with the Company's financial reporting practices, and include all Debtor and non-Debtor entities (hereafter defined as the "Company").

The Debtors do not, as a matter of course, publish their projections, strategies, or forward-looking projections of the financial position, results of operations, and cash flows. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated projections to the holders of Claims or equity interests after the date of this Disclosure Statement, or to include such information in documents required to be filed with the Securities and Exchange Commission ("SEC") or to otherwise make such information public. The assumptions disclosed herein are those that the Debtors believe to be significant to the Projections and are "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.

The Projections present, to the best of the Debtors' knowledge and belief, the Reorganized Debtors' projected balance sheet, results of operations, and cash flows for the Projection Period and reflect the Debtors' assumptions and judgments of the projections based on an assumed and estimated emergence date of September 24, 2021 (the "Emergence Date"). The impact of the restructuring transaction and the recapitalization of the Company's capital structure is shown on the Company's balance sheet, as of September 24, 2021, the Company's fiscal quarter end.

Although the Debtors believe these assumptions are reasonable under current circumstances, such assumptions are subject to inherent uncertainties, including but not limited to, material changes to the economic environment, pricing pressure on certain products due to potential legislative changes, potential legal challenges, changes in health insurers' and governmental health administration authorities' reimbursement practices, changes in the competitive environment, pipeline drug developments, the ongoing and evolving impact of the global COVID-19 pandemic along with the eventual recovery from same, and other factors affecting the Company's businesses. The likelihood, and related financial impact, of a change in any of these factors cannot be predicted with certainty. Consequently, actual financial results could differ materially from the Projections. The Projections assume the Plan will be implemented in accordance with its stated terms. The Projections should be read in conjunction with the assumptions and qualifications contained herein. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in either the Disclosure Statement or the Plan, as applicable.

---

[1] *A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Boulevard, Hazelwood, Missouri 63042*

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP") IN THE UNITED STATES. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY A REGISTERED INDEPENDENT PUBLIC ACCOUNTING FIRM.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH MAY NOT BE REALIZED AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, AS TO THE ACCURACY OR PRECISION OF THE PROJECTIONS OR THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS. HOLDERS OF CLAIMS OR EQUITY INTERESTS MUST MAKE THEIR OWN ASSESSMENT AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN MAKING THEIR DETERMINATION OF WHETHER TO ACCEPT OR REJECT THE PLAN.

**B. Summary of Significant Assumptions**

The Projections were developed by the Company's management using detailed assumptions for net sales and costs, which were developed using a combination of both "bottoms-up" and "top-down" estimation techniques for each of the Company's two major business units, Specialty Brands and Specialty Generics. The Company considered several factors in developing the Projections, including but not limited to:

    (i)    Current and projected market conditions in each of the Company's respective products or product categories, geographic markets, and business segments

    (ii)    Capital expenditure and research and development levels to support growth assumptions

    (iii)    A de-levered capital structure with interest rates consistent with the current market

    (iv)    Working capital levels based on net sales projections, historical trends, and pipeline product launch assumptions

    (v)    No anticipated material acquisitions or divestitures

    (vi)    Inclusion of all Debtor and non-Debtor entities

    (vii)    The Debtors' emergence from chapter 11 on the Emergence Date

The Projections have been presented using accounting policies consistent with those applied in the Company's historical financial statements and includes certain reorganization adjustments and simplified fresh-start accounting adjustments. The Projections do not reflect all the adjustments necessary to implement fresh-start accounting on the Emergence Date pursuant to ASC 852-10, including but not limited to detailed asset valuations and reassessment of the useful lives of depreciable and amortizable assets.

## C. The Debtors' Business Operations

The Company is a global business consisting of multiple wholly-owned subsidiaries that develop, manufacture, market, and distribute specialty pharmaceutical products and therapies, and operates in two reportable segments: Specialty Brands, which includes innovative specialty pharmaceutical brands, and Specialty Generics, which includes niche specialty generic drugs and active pharmaceutical ingredients ("APIs"). For the fiscal year ended December 25, 2020, Specialty Brands accounted for $2,059.6 million in net sales, while Specialty Generics accounted for $689.8 million.

The following charts show the net sales revenue distribution by product for both Specialty Brands and Specialty Generics business units for FY2020.



## Specialty Brands

Specialty Brands markets branded pharmaceutical products for autoimmune and rare diseases in specialty areas like neurology, rheumatology, nephrology, pulmonology, and ophthalmology; immunotherapy and neonatal respiratory critical care therapies; and non-opioid analgesics and gastrointestinal products. Specialty Brands' diversified, in-line portfolio of both marketed and development products is focused on patients with significant unmet medical needs. It promotes its branded products directly to physicians in their offices, hospitals, and ambulatory surgical centers (including neurologists, rheumatologists, nephrologists, pulmonologists, ophthalmologists, neonatologists, respiratory therapists, surgeons, and pharmacy directors) with multiple direct sales teams of approximately 400 sales representatives combined across the different products as of December 25, 2020. These products are purchased by independent wholesale drug distributors, specialty pharmaceutical distributors, retail pharmacy chains and hospital procurement departments, among others, and are eventually dispensed by prescription to patients. Specialty Brands also contracts directly with payer organizations to ensure reimbursement to patients that are prescribed products by their physicians.

A-3119

Specialty Brands currently produces, markets, and sells the following branded products, among others:

(i)   ***Acthar Gel*** is an injectable drug approved by the U.S. Food & Drug Administration ("FDA") for use in 19 indications, including monotherapy for the treatment of infantile spasms in infants and children under two years of age and various other on-label indications for neurology, rheumatology, nephrology, pulmonology and ophthalmology conditions, which collectively generate substantially all of its net sales. The currently approved indications of Acthar Gel are not subject to patent or other exclusivity, but instead are protected by trade secret(s).

(ii)  ***INOmax® (nitric oxide) gas, for inhalation*** is a vasodilator that, in conjunction with ventilatory support and other appropriate agents, is indicated to improve oxygenation and reduce the need for extracorporeal membrane oxygenation in term and near-term (>34 weeks) neonates with hypoxic respiratory failure (HRF) associated with clinical or echocardiographic evidence of pulmonary hypertension. It is also approved in Australia for the treatment of perioperative pulmonary hypertension (PPHN) in adults in conjunction with cardiovascular surgery. It is marketed as part of the INOmax Total Care Package, which includes the drug product, proprietary drug-delivery systems, technical and clinical assistance, 24/7/365 customer service, emergency supply and delivery, and on-site training. The INOmax delivery device has certain IP attached to it, but the INOmax product itself (inhaled nitric oxide gas) is no longer protected by patents in any of the major markets where INOmax is marketed. Where competitors have entered to compete against Mallinckrodt in the inhaled nitric oxide market, they must do so with their own device technology, as Mallinckrodt's nitric oxide cylinders are not compatible with devices outside the INOmax delivery system.

(iii) ***Therakos® photopheresis*** is a global leader in autologous immunotherapy delivered through extracorporeal photopheresis ("ECP"), provided by a proprietary medical device and related consumables. ECP is approved by the FDA for use in the palliative treatment of the skin manifestations of cutaneous T-cell lymphoma ("CTCL") that is unresponsive to other forms of treatment. Outside the U.S., ECP is approved to treat several other serious diseases that arise from immune system imbalances. Therakos' product suite, which is sold to hospitals, clinics, academic centers and blood banks, includes an installed system, a disposable procedural kit used for each treatment and a drug, UVADEX® (methoxsalen) Sterile Solution ("UVADEX"), as well as instrument accessories, instrument maintenance and repair services.

(iv)  ***Amitiza® (lubiprostone)*** is a leading global product in the branded constipation market. It is approved by the FDA in the U.S. for treatment of chronic idiopathic constipation in adults; irritable bowel syndrome with constipation in women 18 years of age and older; and opioid-induced constipation in adult patients with chronic, non-cancer pain, including patients with chronic pain related to prior cancer or its treatment who do not require frequent opioid dosage escalation.

**Specialty Generics**

Specialty Generics is focused on providing its customers with high-quality specialty generic drugs and APIs. It offers a portfolio of product formulations containing hydrocodone-containing tablets, oxycodone-containing tablets, and several other controlled substances, all of which are significant products for the treatment of pain and which are regulated under U.S. Drug Enforcement Administration ("DEA") quota restrictions. Altogether, Specialty Generics operates one of the largest controlled substance pharmaceutical businesses in the U.S., offering generic products for pain management, substance abuse disorders, and Attention Deficit Hyperactivity Disorder ("ADHD"). Notably, Specialty Generics is the only producer of bulk acetaminophen in the North American and European regions.

5

The Specialty Generics business manufacture both (a) finished dosage products, meaning the product (whether in the form of a tablet, capsule, or liquid) that the patient ultimately ingests, and (b) APIs, which are then used to create finished dosage products. Specialty Generics does not promote its finished products directly to physicians, hospitals, or ambulatory surgical centers. Rather, the Company sells these products principally through independent channels, including drug distributors, specialty pharmaceutical distributors, retail pharmacy chains, food store chains with pharmacies, pharmaceutical benefit managers that have mail order pharmacies and hospital buying groups. Both finished dosage products and APIs are largely considered commodity products, and as such, Specialty Generics generally operates on much smaller margins as compared to the Specialty Brands business.

Specialty Generics' revenues are diversified, with roughly half of its revenue coming from APIs, and the other half from finished dosage pharmaceutical products.

**Income Statement Assumptions – Revenue**

## A. Net Sales

The Company forecasts its net sales in two different business segments, Specialty Brands and Specialty Generics. To develop these projections, the Company evaluated market conditions, surveyed the competitive landscape, assessed price and volume dynamics, and applied specific knowledge of key customer actions in each product category. Key factors considered in determining sales projections include, but are not limited to:

  (i)    Overall market trends for similar branded drugs (by category, therapeutic area, and/or disease state) and specialty generic segments, including finished dose and API, where the Company operates (or intends to launch new generic products);
  (ii)   Impact of anticipated competitive entrants in the branded drugs segment, or, in the case of Specialty Generics, changes in the expected number of competitors and/or their collective impact on pricing and market shares;
  (iii)  Analysis of in-line products and existing portfolio performance; and
  (iv)   An assessment of potential, recent developments, and expected progress/evolution of pipeline products.

Products in each of the business segments operate in competitive marketplaces with unique challenges and opportunities.

**Acthar Gel** – The Acthar Gel projections account for the impact of a potential new competitor partially offset by an assumed return to pre-pandemic prescriber and patient behavior, an increase in demand driven by the multi-year effort to complete clinical trials to broaden the published data for the product and to modernize the Acthar Gel brand, and the launch of a self-injector device that is expected to improve patient persistence on therapy and reduce patient and caregiver anxiety over the use of needles to administer the product.

**INOmax** – INOmax is expected to face continued price erosion and volume loss from competition during the early part of the Projection Period, stabilizing as a new competitive equilibrium is reached and with the launch of EVOLVE, the product's next-generation delivery device, which is expected to further the technological (and related reliability and ease-of-use) advantages that INOmax enjoys versus its

A-3121

competitor delivery systems. In addition, increase revenue from growth in international markets is anticipated.

**Therakos** – Therakos is the only provider of extracorporeal photopheresis ("ECP") used to treat Cutaneous T-cell Lymphoma ("CTCL"), and outside the U.S., the Therakos device is broadly approved, including for acute GvHD (Graft vs Host Disease) as well as CTCL. There are a number of competing therapies and treatments for these conditions, some of which have seen increases in utilization during the global pandemic. The Company's focus is on solidifying its position in the ECP market within the U.S., while continuing to establish and grow the Therakos brand globally as it expands into new geographic markets.

**Other Managed Brands** – The Projections contemplates sales from two additional managed brands, Amitiza and Ofirmev. Amitiza sales begin to transition from exclusive branded sales to a generic market through an agreement with an authorized generic manufacturer in the U.S. Amitiza sales begin to show larger declines toward the end of the Projection Period as more generic competitors are expected to enter the market and erode market share and price.

**Branded pipeline launches** – StrataGraft is the only branded pipeline product with an expected launch during the Projection Period. Net sales contribution from StrataGraft are modest in the early years of the Projection Period and increase over time as the product is more broadly utilized.

**Specialty Generics** – The Specialty Generics business is focused on maintaining its base business for finished dose and API products, and advancing its pipeline of expected generics launch products to deliver revenue growth in the later years of the Projection Period. Net sales are expected to return to growth from 2022 onward after a multi-year decline driven by increased competition, payer consolidation, and market-wide reductions in demand for opioid products. As is to be expected in the generic pharmaceutical industry, the segment's growth is driven by an expectation of successfully launching a continuous stream of newer generic products to offset regular declines in price as existing products become increasingly commoditized. In addition to its finished dosage generic products, the Company also expects its API business to remain steady across the Projection Period, with modest growth coming from capacity expansions, entrances into new international markets, and the growth in demand for higher margin stearate APIs for use in the nutraceuticals market.

As is typical in both branded and generic pharmaceutical markets, the Company's net sales are based on its gross product sales, less the combined amounts of various government-mandated and/or privately-negotiated rebates, sales incentives, chargebacks, distribution service agreements fees, fees for services, and administration fees and discounts. These "gross-to-net" adjustments differ across products and product categories.

7

A-3122

**Income Statement Assumptions – Expenses**

### B.  Cost of Goods Sold

The Company's cost of goods sold ("COGS") includes standard costs such as raw materials and manufacturing costs associated with the processing of materials to convert them into finished goods. In addition, it includes other cost of sales such as royalty expenses, handling costs (costs incurred to store, move, and prepare product for shipment), and other plant costs.

Manufacturing costs include wages and benefit costs, processing costs, maintenance costs, utility costs and other costs that are directly attributable to the production of products. Manufacturing costs have both fixed and variable cost components.

COGS, excluding depreciation and amortization, as a percentage of net sales grows from 29.4% to 32.1% over the Projection Period driven by changes in product mix over time and slight margin compression.

### A.  Depreciation & Amortization

Depreciation for property, plant, and equipment, other than land and construction-in-process, is generally based upon the estimated useful life of the asset and is calculated using the straight-line method.

Amortization for intangible assets with finite useful lives is calculated using the straight-line method over the estimated useful lives of the assets. Projected amortization reflects a ratable adjustment to the carrying value of other intangible assets at the Emergence Date in connection with the application of a simplified fresh-start accounting approach as described in the balance sheet assumptions for Goodwill and Other Intangible Assets.

Depreciation and amortization do not reflect the adjustments necessary to implement fresh-start accounting on the Emergence Date pursuant to ASC 852-10, including but not limited to detailed asset valuations and reassessment of the useful lives of amortizable assets.

### B.  Sales, General and Administrative ("SG&A")

SG&A costs include all direct and indirect selling, marketing, and administrative costs of the Debtors. Selling expense includes marketing expense, employee wages and benefits for the various commercial teams, commissions, and office expenses. General and administrative expense includes administrative employee wages and benefits, travel, rents, corporate overhead, insurance, information technology costs, office-related expenses, stock compensation expense, and other expenses.

SG&A expense, excluding reorganization expense and stock compensation expense, as a percentage of net sales improves from 26.5% to 24.0% over the Projection Period.

### C.  Research & Development ("R&D")

R&D expenses comprise of internal research and development costs and are expensed as incurred. These expenses include salary and benefits, allocated overhead and occupancy costs, clinical trial and related clinical manufacturing costs, contract services, medical affairs, and other related costs.

From time to time, the Company enters into licensing or collaborative agreements with third parties to develop a new drug candidate or intellectual property asset. These agreements may include R&D, marketing, promotion and selling activities to be performed by one or all parties involved. These

A-3123

collaborations generally include upfront, milestone and royalty or profit-sharing payments contingent upon future events tied to the developmental and commercial success of the asset. In general, upfront and milestone payments made to third parties under these agreements are expensed as incurred up to the point of regulatory approval of the product.

R&D expense, excluding one-time product-related contingent consideration expense, as a percentage of net sales declines from 10.0% to 9.1% over the Projection Period.

### D. Interest Expense

Reflects interest on funded debt, estimated refinancing fees related to First Lien Notes and Second Lien Notes at maturity and interest on the Federal/State Acthar Settlement obligations. Funded debt interest is based upon projected debt levels and applicable interest rates for funded debt obligations outlined in the Plan and is assumed to be cash paid as incurred. The Projections assume that debt-related financing fees paid at emergence and post-emergence are expensed for accounting purposes and not capitalized.

Interest accretion on settlement obligations accounts for the difference between undiscounted cash flows in connection with the Opioid Trust and Federal/State Acthar Settlement (as provided in the balance sheet assumptions for Opioid Trust and Federal/State Acthar Settlement) and the fair values of these cash flows calculated on a present value basis.[2]

### E. Taxes

Upon emergence from bankruptcy, the reorganized Company is forecasting taxes payable in several taxing jurisdictions, most notably in Ireland and the U.S., based upon the anticipated capital structure and U.S. tax attribute reductions directly resulting from the implementation of the Plan. Taxable income projections include deductions for certain depreciable and amortizable assets subject to limitations and include continued use of pre-emergence Irish and Luxembourg net operating loss carryforwards. Taxable income projections (i) exclude the use of pre-emergence U.S. net operating loss carryforwards due to the uncertain impact the restructuring will have on the Debtors' ability to utilize them and (ii) exclude potential deductions from cash payments in connection with the Opioid Trust and Federal/State Acthar Settlement.

---

[2] *Fair values for the post-emergence Opioid Deferred Cash Payments and Federal/State Acthar Deferred Cash Payments (including the associated nominal interest) are calculated using a discount rate of 10.0%*

A-3124

**Balance Sheet Assumptions**

### A. Cash & Cash Equivalents

The Company classifies cash on hand and deposits in banks, including money market accounts and other investments it may hold from time to time, as cash and cash equivalents.

### B. Accounts Receivable

Trade accounts receivable are presented net of an allowance for doubtful accounts. The allowance for doubtful accounts reflects an estimate of losses inherent in the Company's accounts receivable portfolio and is determined on the basis of historical experience. Accounts receivable are written off when management determines they are uncollectible. Trade accounts receivable are also presented net of reserves related to chargebacks and rebates payable to customers.

### C. Inventory

Inventories are recorded at the lower of cost or net realizable value, primarily using the first-in, first-out convention. The Debtors reduce the carrying value of inventories for those items that are potentially excess, obsolete, or slow-moving based on changes in customer demand, technology developments or other economic factors.

### D. Other Current Assets

Other current assets primarily include prepaid expenses, the current portion of the CARES Act receivable, miscellaneous accounts receivable, royalties receivable, insurance receivable, deposits and restricted cash.

Projections assume the current portion of the CARES Act receivable of $177.8 million is collected in Q4 2021. See note on "Other Long-Term Assets" for details on the non-current portion of the CARES Act receivable.

### E. Property, Plant & Equipment

Property, plant, and equipment is stated at cost less accumulated depreciation. Major renewals and improvements are capitalized, while routine maintenance and repairs are expensed as incurred. Depreciation for property, plant, and equipment, other than land and construction in process, is generally based upon the following estimated useful lives, using the straight-line method:

Buildings: 10 - 45 years

Leasehold improvements: 1 - 20 years

Capitalized software: 1 - 10 years

Machinery and equipment: 1 - 20 years

### F. Other Long-Term Assets

Other long-term assets include income tax receivables, including the non-current portion of the CARES Act receivable, right of use asset lease, long-term investments, non-current insurance receivable, and restricted cash.

A-3125

Projections assume the non-current portion of the CARES Act receivable of $136.6 million is collected in FY 2022. See note on "Other Current Assets" for details on the current portion of the CARES Act receivable.

**G.   Goodwill and Other Intangible Assets**

For purposes of these Projections, the Debtors used a simplified fresh-start accounting approach and adjusted the carrying values of total Goodwill and Other Intangible Assets for the difference between reorganization value and the projected book value of identifiable assets at the Emergence Date. The adjusted carrying values do not reflect the adjustments necessary to implement fresh-start accounting on the Emergence Date pursuant to ASC 852-10, including but not limited to detailed asset valuations and reassessment of the useful lives of amortizable assets.

**H.   Accounts Payable**

The Debtors' days payable[3] is projected to be approximately 35 days at the Emergence Date increasing to approximately 50-60 days throughout the Projection Period, consistent with historical averages.

**I.   Accrued Expenses and Other Liabilities**

Accrued Expenses and Other Liabilities primarily include accrued trade payables, accrued employee payroll and payroll-related costs, accrued utility expense, and accrued taxes.

**J.   Debt Obligations**

Upon consummation of the Plan, the Debtors are assumed to have the following debt obligations:

   (i)    $900 million New Term Loan Facility at an annual interest rate of LIBOR + 530 bps
   (ii)   $200 million in New AR Revolving Facility[4]
   (iii)  $1,777 million New Takeback Term Loan Facility comprising of the following:
          a.   $1,404 million at an annual interest rate of LIBOR + 525 bps
          b.   $373 million at an annual interest rate of LIBOR + 550 bps
   (iv)   $495 million First Lien Notes at an annual interest rate of 10.00%[5]
   (v)    $323 million Second Lien Notes at an annual interest rate of 10.00%[6]
   (vi)   $375 million New Takeback Second Lien Notes at an annual interest rate of 10.00%

**K.   Opioid Trust**

Pursuant to Article IV of the Plan, as of the Plan Effective Date, the Opioid Trust will be formed, and all Opioid Claims will be channeled exclusively to the Opioid Trust, and shall be resolved in accordance with the terms, provisions, and procedures of the Opioid Trust documents. The trust will receive the following cash payment consideration assuming the Reorganized Debtors do not elect to pre-pay any portion in the first year in accordance with the Opioid Trust terms.

---

[3] *Days payable calculated as accounts payable multiplied by numbers of days in the calculation period divided by COGS; COGS includes depreciation but excludes amortization*
[4] *Assumed to be undrawn at emergence*
[5] *Excludes potential Allowed First Lien Notes Makewhole Claims*
[6] *Excludes potential Allowed Second Lien Notes Makewhole Claims*

A-3126

| ($ in millions) | Plan Effective Date | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|
| Opioid Trust Consideration [7] | $450 | $200 | $200 | $150 | $150 | $150 | $150 | $150 |

### L.  Federal/State Acthar Settlement

In parallel with the Restructuring Support Agreement, CMS, the Debtors, the DOJ, and the States (excluding, for this purpose, any territories of the United States) agreed to the material terms of a settlement agreement in connection with the Federal/State Acthar Settlement, to be incorporated into the Plan. Under the settlement in principle, in full and final satisfaction of all claims at issue in connection with the Federal/State Acthar Settlement,  Debtors Mallinckrodt plc and Mallinckrodt ARD, LLC agreed to make cash payments to the United States of America and the States (excluding, for this purpose, any territories of the United States other than the District of Columbia and Puerto Rico) totaling $260 million in the aggregate in accordance with the below schedule, with deferred payments bearing interest at a variable rate equal to the nominal interest rate on special issues of government securities to the Social Security trust funds, measured as of each payment date and accruing from September 21, 2020:

| ($ in millions) | Plan Effective Date | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|
| Federal/State Acthar Settlement payments | $15 | $15 | $20 | $20 | $32.5 | $32.5 | $62.5 | $62.5 |

### M.  Other Liabilities

Other Liabilities include environmental liabilities, deferred tax liabilities and other non-current liabilities.

### N.  Shareholder Equity

Shareholder equity at the Emergence Date includes the effect of the conversion of debt into new equity and application of fresh start accounting.

---

[7] Schedule reflects the Initial Opioid Trust Payment and the Opioid Deferred Cash Payments portions of the Opioid Trust Consideration

A-3127

## Cash Flow Assumptions

### A.  Cash Flow from Operations Activities

The Company is expected to generate stable cash earnings from operations during the Projection Period. Net working capital is projected to be a use of cash over the course of the Projection Period driven by increasing accounts receivable due to increasing revenue and a gradual build-up in inventory, slightly offset by increased days payable outstanding of accounts payable post-emergence.

### B.  Cash Flow from Investing Activities

Cash usage from investing activities in the projection period is primarily driven by an increase in capital spending to support the launch of the INOmax EVOLVE device platform and conversion from the existing U.S. fleet of INOmax DSIR devices for Specialty Brands, as well as capital spending for Specialty Generics projects to increase plant capacity.

### C.  Cash Flow from Financing Activities

Cash usage from financing activities mainly reflect repayment of debt, Opioid Deferred Cash Payments, Federal/State Acthar Deferred Cash Payments, and contingent payments due to other parties under product acquisition or license agreements.

A-3128

The Pro Forma Estimated Non-GAAP Cash Sources and Uses at the Emergence Date set forth below presents the estimated sources and uses of funds for the consummation of the restructuring transactions contemplated in the Plan (the "Restructuring Transactions"). These amounts are subject to adjustment and may differ at the time of the consummation of the Restructuring Transactions depending on several factors, including but not limited to, differences in estimated transaction fees and expenses, differences between actual and projected operating results and any differences in the contemplated debt financing when consummated.

### Mallinckrodt Pharmaceuticals

### Pro Forma Estimated Non-GAAP Cash Sources and Uses at the Emergence Date (UNAUDITED)

### (USD$ in Millions)

| Sources | | | Uses | | | Notes |
|---|---|---|---|---|---|---|
| Cash from Balance Sheet | $ | 1,046 | Existing Revolver Facility Paydown | $ | 900 | |
| New Term Loan Facility | | 900 | Initial Opioid Trust Payment | | 450 | *1* |
| | | | Initial Federal/State Acthar Settlement Payment | | 15 | *2* |
| | | | Administrative and Priority Claims | | 160 | *3* |
| | | | Trade & General Unsecured Claims | | 150 | *4* |
| | | | Noteholder Consent Fee | | 19 | *5* |
| | | | Exit Financing Fees | | 33 | *6* |
| | | | Cash to Balance Sheet | | 219 | |
| **Total Sources** | **$** | **1,946** | **Total Uses** | **$** | **1,946** | |

*Notes:*

*(1) Initial Opioid Trust Payment as defined in the Plan*

*(2) Initial Federal/State Acthar Settlement Payment as defined in the Plan*

*(3) Estimated accrued professional fees and expenses and other estimated Administrative and Priority claims*

*(4) Assumes distribution of the $50 million Trade Claims Cash Pool and the $100 million General Unsecured Claims Cash Pool*

*(5) Payment of the Noteholder Consent Fee as defined in the Plan*

*(6) Includes the Term Loan Exit Payment and estimated fees associated with the New Term Loan Facility and New AR Revolving Facility*

A-3129

The Projected Non-GAAP Pro Forma Consolidated Balance Sheet as of the Emergence Date set forth below presents (a) the projected consolidated financial position of the Company as of September 24, 2021, prior to the consummation of the transactions contemplated in the Plan; (b) the pro forma adjustments to such projected consolidated financial position required to reflect the Restructuring Transactions; and (c) the pro forma projected consolidated financial position of Company as of the assumed Emergence Date, after giving effect to the Restructuring Transactions. The Restructuring Transactions set forth in the columns captioned "Plan Settlement", "New Debt & Other Liabilities", "New Equity", and "Fresh-Start Adjustments" reflect the anticipated effects of the Restructuring Transactions.

### Mallinckrodt Pharmaceuticals

### Projected Non-GAAP Pro Forma Consolidated Balance Sheet
### (UNAUDITED)

### (USD$ in Millions)

| | Notes | Pre-Emergence Sept 24, 2021 [1] | Plan Settlement [2] | New Debt & Other Liabilities | New Equity | Fresh-Start Adjustments [3] | Proforma Sept 24, 2021 |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| Cash | | $ 1,046 | $ (827) | $ – | $ – | $ – | $ 219 |
| Accounts Receivable | | 531 | – | – | – | – | 531 |
| Inventories | | 377 | | | | | 377 |
| Other Current Assets | | 318 | (11) | – | – | – | 307 |
| **Current Assets** | | **$ 2,272** | **$ (838)** | **$ –** | **$ –** | **$ –** | **$ 1,434** |
| PP&E, Net | | $ 819 | $ – | $ – | $ – | $ – | $ 819 |
| Other Long-Term Assets | | 415 | – | – | – | – | 415 |
| Goodwill & Other Intangible Assets, Net | | 5,749 | – | – | – | (1,937) | 3,812 |
| **Total Assets** | | **$ 9,255** | **$ (838)** | **$ –** | **$ –** | **$ (1,937)** | **$ 6,480** |
| **Liabilities and Equity** | | | | | | | |
| Accounts Payable | | $ 72 | $ – | $ – | $ – | $ – | $ 72 |
| Accrued Expenses & Other Current Liabilities | | 427 | (40) | – | – | – | 387 |
| **Current Liabilities** | | **$ 500** | **$ (40)** | **$ –** | **$ –** | **$ –** | **$ 460** |
| Existing Revolver Facility | | $ 900 | $ (900) | $ – | $ – | $ – | $ – |
| New Term Loan Facility | | – | 900 | | | | 900 |
| New Takeback Term Loan Facility | | | | 1,777 | | | 1,777 |
| 10.000% 1L Notes | 4 | 495 | | | | | 495 |
| 10.000% 2L Notes | 4 | 323 | | | | | 323 |
| 10.000% Takeback 2L Notes | | – | | 375 | | | 375 |
| **Total Funded Debt** | | **$ 1,718** | **$ –** | **$ 2,152** | **$ –** | **$ –** | **$ 3,869** |
| Opioid Trust, *at Fair Value* | 5 | $ – | $ – | $ 817 | $ – | $ – | $ 817 |
| Federal/State Acthar Settlement, *at Fair Value* | 5 | – | | 170 | | | 170 |
| Environmental Liabilities | | 61 | | | | | 61 |
| Other Income Tax Liabilities | | 118 | | | | | 118 |
| Other Liabilities | | 157 | (35) | 50 | | | 172 |
| **Liabilities Subject to Compromise:** | *Notes* | | | | | | |
| 2024 Term Loan | | 1,404 | – | (1,404) | – | – | – |
| 2025 Term Loan | | 373 | – | (373) | – | – | – |
| Guaranteed Unsecured Notes | 6 | 1,544 | (356) | (375) | (813) | – | – |
| Accounts Payable & General Unsecured Claims | 7 | 288 | (288) | – | – | – | – |
| Opioid-related litigation settlement liability | | 1,600 | (783) | (817) | – | – | – |
| Acthar Gel-Related Settlement | | 639 | (469) | (170) | – | – | – |
| Other Liabilities | 8 | 50 | – | (50) | – | – | – |
| **Total Liabilities Subject to Compromise** | | **$ 5,897** | **$ (1,896)** | **$ (3,189)** | **$ (813)** | **$ –** | **$ –** |
| **Total Liabilities** | | **$ 8,451** | **$ (1,971)** | **$ –** | **$ (813)** | **$ –** | **$ 5,667** |
| Existing Shareholder's Equity | | $ 804 | $ 1,133 | $ – | $ – | $ (1,937) | $ 0 |
| New Common Equity | 9 | – | – | – | 813 | – | 813 |
| **Total Shareholder's Equity** | | **$ 804** | **$ 1,133** | **$ –** | **$ 813** | **$ (1,937)** | **$ 813** |
| **Total Liabilities & Equity** | | **$ 9,255** | **$ (838)** | **$ –** | **$ –** | **$ (1,937)** | **$ 6,480** |

*Notes:*

*(1) The pre-emergence balance sheet is as of September 24, 2021 and prior to the execution of the transactions contemplated in the Plan*

*(2) Plan settlement includes cash payments pursuant to the Plan – (i) $450 million Initial Opioid Trust Payment, (ii) $15 million Initial Federal/State Acthar Settlement, (iii) estimated $160 million to settle Administrative and Priority claims, (iv) $150 million to settle Trade Claims and General Unsecured Claims, (v) $52.5 million to pay the Noteholder Consent Fee and (vi) estimated exit financing fees*

*(3) Reflects a simplified fresh-start accounting approach to adjust the carrying value of total Goodwill and Other Intangible Assets for the difference between reorganization value and the projected book value of identifiable assets at the Emergence Date*

*(4) Assumes the First Lien Notes and Second Lien Notes are reinstated and excludes potential Allowed First Lien Notes Makewhole Claims and Second Lien Notes Makewhole Claims*

*(5) Fair values for the post-emergence Opioid Deferred Cash Payments and Federal/State Acthar Deferred Cash Payments (including the associated nominal interest) are calculated using a discount rate of 10.0%*

*(6) Equity values are prior to dilution from the New Opioid Warrants and the Management Incentive Plan*

*(7) Includes Trade Claims, certain Administrative Claims, 4.75% Unsecured Notes Claims, Legacy Debenture Claims, asbestos-related claims and other unsecured claims; unliquidated claims have not been estimated for the purposes of this schedule*

*(8) Represents liabilities related to assumed Executory Contracts*

*(9) Based on the midpoint of implied estimated Equity Value as set forth in the Valuation Analysis*

A-3131

The Projected Non-GAAP Pro Forma Consolidated Income Statement set forth below presents the projected consolidated results of operations of the Company for the period commencing September 24, 2021 through December 31, 2021, after giving effect to the Restructuring Transactions to occur on the Emergence Date, and for the fiscal years ending 2022, 2023, 2024 and 2025.

**Mallinckrodt Pharmaceuticals**

**Projected Non-GAAP Pro Forma Consolidated Income Statement**
**(UNAUDITED)**

**(USD$ in Millions)**

| | Notes | Q4 Ending Dec, 2021 | Fiscal Year Ending Dec, 2022 | Dec, 2023 | Dec, 2024 | Dec, 2025 |
|---|---|---|---|---|---|---|
| Net Sales | | $ 605 | $ 2,290 | $ 2,358 | $ 2,506 | $ 2,523 |
| Cost of Goods Sold | | (178) | (691) | (738) | (783) | (809) |
| Depreciation & Amortization | 1 | (120) | (487) | (494) | (498) | (499) |
| Gross Profit | | $ 307 | $ 1,113 | $ 1,126 | $ 1,226 | $ 1,215 |
| SG&A Expense | | $ (197) | $ (564) | $ (584) | $ (614) | $ (645) |
| R&D Expense | | (61) | (224) | (217) | (223) | (275) |
| Operating Profit | | $ 49 | $ 325 | $ 324 | $ 389 | $ 296 |
| Interest Expense | | $ (61) | $ (280) | $ (246) | $ (238) | $ (217) |
| Interest Accreted on Settlement Obligations | 2 | (24) | (95) | (83) | (70) | (58) |
| Earnings Before Taxes | | $ (36) | $ (51) | $ (5) | $ 81 | $ 21 |
| Income Tax Expense | | (13) | (49) | (59) | (69) | (65) |
| Net Income / (Loss) | | $ (49) | $ (100) | $ (64) | $ 12 | $ (44) |
| Operating Profit | | $ 49 | $ 325 | $ 324 | $ 389 | $ 296 |
| Add: Depreciation | | 24 | 101 | 109 | 112 | 113 |
| Add: Amortization | | 96 | 385 | 385 | 385 | 385 |
| Add: Corporate Reorganization Expense | 3 | 35 | – | – | – | – |
| Add: Stock based Compensation Expense | 3 | 2 | 10 | 20 | 30 | 40 |
| Add: Contingent Consideration Expense | 4 | – | 10 | – | – | 45 |
| Adjusted EBITDA | | $ 207 | $ 832 | $ 838 | $ 917 | $ 879 |

*Notes:*

*(1) For purposes of the Projections, aggregate Depreciation and Amortization are included in Gross Profit*

*(2) See note 5 under "Projected Non-GAAP Pro Forma Consolidated Balance Sheet"*

*(3) Corporate reorganization and stock-based compensation expenses are included in SG&A Expense*

*(4) Contingent consideration expense is included in R&D Expense*

17

A-3132

The Projected Non-GAAP Pro Forma Consolidated Balance Sheet set forth below presents the projected consolidated financial position of the Company as of September 24, 2021, after giving effect to the Restructuring Transactions, and as of each fiscal year ending 2021, 2022, 2023, 2024 and 2025.

**Mallinckrodt Pharmaceuticals**

**Projected Non-GAAP Pro Forma Consolidated Balance Sheet**
**(UNAUDITED)**

**(USD$ in Millions)**

| | Notes | Proforma As of Sept 24, 2021 | | Fiscal Year Ending Dec, 2021 | | Dec, 2022 | | Dec, 2023 | | Dec, 2024 | | Dec, 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | | |
| Cash | | $ | 219 | $ | 425 | $ | 200 | $ | 200 | $ | 200 | $ | 200 |
| Accounts Receivable | | | 531 | | 553 | | 499 | | 513 | | 546 | | 549 |
| Inventories | | | 377 | | 391 | | 369 | | 381 | | 403 | | 415 |
| Other Current Assets | | | 307 | | 133 | | 129 | | 129 | | 129 | | 129 |
| **Current Assets** | | **$** | **1,434** | **$** | **1,501** | **$** | **1,197** | **$** | **1,224** | **$** | **1,278** | **$** | **1,293** |
| PP&E, Net | | $ | 819 | $ | 813 | $ | 830 | $ | 826 | $ | 789 | $ | 733 |
| Other Long-Term Assets | | | 415 | | 415 | | 278 | | 278 | | 278 | | 278 |
| Intangible Assets, Net | | | 3,812 | | 3,716 | | 3,330 | | 2,945 | | 2,560 | | 2,174 |
| **Total Assets** | | **$** | **6,480** | **$** | **6,445** | **$** | **5,636** | **$** | **5,273** | **$** | **4,905** | **$** | **4,480** |
| **Liabilities and Equity** | | | | | | | | | | | | |
| Accounts Payable | | $ | 72 | $ | 93 | $ | 108 | $ | 123 | $ | 142 | $ | 147 |
| Accrued Expenses and Other Current Liabilities | | | 454 | | 448 | | 408 | | 408 | | 408 | | 408 |
| **Current Liabilities** | | **$** | **527** | **$** | **541** | **$** | **515** | **$** | **530** | **$** | **550** | **$** | **554** |
| New Term Loan Facility | 1 | $ | 878 | $ | 872 | $ | 680 | $ | 614 | $ | 503 | $ | 402 |
| New Takeback Term Loan Facility | 1 | | 1,732 | | 1,721 | | 1,343 | | 1,213 | | 993 | | 794 |
| 10.000% 1L Notes | | | 495 | | 495 | | 495 | | 495 | | 495 | | 495 |
| 10.000% 2L Notes | | | 323 | | 323 | | 323 | | 323 | | 323 | | 323 |
| 10.000% Takeback 2L Notes | | | 375 | | 375 | | 375 | | 375 | | 375 | | 375 |
| **Total Funded Debt** | | **$** | **3,803** | **$** | **3,786** | **$** | **3,217** | **$** | **3,020** | **$** | **2,690** | **$** | **2,389** |
| Opioid Trust, *at Fair Value* | 2 | $ | 817 | $ | 837 | $ | 716 | $ | 582 | $ | 487 | $ | 382 |
| Federal/State Acthar Settlement, *at Fair Value* | 2 | | 170 | | 174 | | 175 | | 171 | | 167 | | 147 |
| Environmental Liabilities | | | 61 | | 61 | | 61 | | 61 | | 61 | | 61 |
| Other Income Tax Liabilities | | | 118 | | 118 | | 118 | | 118 | | 118 | | 118 |
| Other Liabilities | | | 172 | | 162 | | 157 | | 157 | | 157 | | 157 |
| **Total Liabilities** | | **$** | **5,667** | **$** | **5,679** | **$** | **4,960** | **$** | **4,641** | **$** | **4,230** | **$** | **3,810** |
| **Shareholder's Equity** | | | **813** | | **766** | | **676** | | **632** | | **674** | | **670** |
| **Total Liabilities & Equity** | | **$** | **6,480** | **$** | **6,445** | **$** | **5,636** | **$** | **5,273** | **$** | **4,905** | **$** | **4,480** |

*Notes:*

*(1) Assumes voluntary prepayment of the New Term Facility and the Takeback Term Loan Facility on a pro-rata basis from cash in excess of $200 million commencing in 2022*

*(2) Pro forma balances reflect the present value of Opioid Deferred Cash Payments and Federal/State Acthar Deferred Cash Payments (including the associated nominal interest) at a discount rate of 10.0% and assumes the Prepayment Option is not exercised*

A-3133

The Projected Non-GAAP Pro Forma Consolidated Cash Flow Statement set forth below presents the projected cash flows of the Company commencing September 24, 2021 through December 31, 2021, after the consummation of the Restructuring Transactions, and for the fiscal years ending 2022, 2023, 2024 and 2025.

## Mallinckrodt Pharmaceuticals

### Projected Non-GAAP Pro Forma Consolidated Cash Flow Statement (UNAUDITED)

### (USD$ in Millions)

| | Notes | Q4 Ending Dec, 2021 | | Fiscal Year Ending Dec, 2022 | | Dec, 2023 | | Dec, 2024 | | Dec, 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flows from Operating Activities:** | | | | | | | | | | |
| Net (loss) income | | $ (49) | $ | (100) | $ | (64) | $ | 12 | $ | (44) |
| Add: Depreciation and Amortization | | 120 | | 487 | | 494 | | 498 | | 499 |
| Add: CARES Act Refund | | 178 | | 137 | | – | | – | | – |
| Add: Interest Accreted on Settlement Obligations | | 24 | | 95 | | 83 | | 70 | | 58 |
| Add: Stock Based Compensation | | 2 | | 10 | | 20 | | 30 | | 40 |
| Add: Contingent Consideration Expense | | – | | 10 | | – | | – | | 45 |
| Changes in Working Capital | | (25) | | 54 | | (12) | | (34) | | (11) |
| **Net Cash from Operating Activities** | | $ 250 | $ | 694 | $ | 521 | $ | 576 | $ | 586 |
| | | | | | | | | | | |
| **Cash Flows from Investing Activities:** | | | | | | | | | | |
| Capital Expenditures | | $ (18) | $ | (119) | $ | (104) | $ | (76) | $ | (58) |
| **Net Cash from Investing Activities** | | $ (18) | $ | (119) | $ | (104) | $ | (76) | $ | (58) |
| | | | | | | | | | | |
| **Cash Flows from Financing / Settlement Activities:** | | | | | | | | | | |
| Debt Repayment | 1 | $ (17) | $ | (569) | $ | (197) | $ | (330) | $ | (301) |
| Settlement Obligations | 2 | – | | (215) | | (220) | | (170) | | (183) |
| Contingent Consideration | | (10) | | (15) | | – | | – | | (45) |
| **Net Cash from Financing Activities** | | $ (27) | $ | (799) | $ | (417) | $ | (500) | $ | (528) |
| | | | | | | | | | | |
| **Net Increase / (Decrease) in Cash & Cash Equivalents** | | $ 206 | $ | (225) | $ | – | $ | – | $ | – |
| | | | | | | | | | | |
| **Beginning Cash Balance** | | 219 | | 425 | | 200 | | 200 | | 200 |
| **Ending Cash Balance** | | $ 425 | $ | 200 | $ | 200 | $ | 200 | $ | 200 |

*Notes:*

*(1) Assumes voluntary prepayment of the New Term Loan Facility and the New Takeback Term Loan Facility on a pro-rata basis from cash in excess of $200 million beginning in 2022*

*(2) Reflects Opioid Deferred Cash Payments and Federal/State Acthar Deferred Cash Payments*

A-3134

Case 20-12522-JTD    Doc 2917    Filed 06/18/21    Page 749 of 835

**Exhibit E**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS

### INTRODUCTION

Under the "best interests" of creditors test ("**Best Interests Test**") set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a Claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. See 11 U.S.C. § 1129(a)(7). Accordingly, to demonstrate that the Debtors' Plan satisfies the Best Interest Test, the Debtors have prepared this hypothetical liquidation analysis ("**Liquidation Analysis**") presenting recoveries that may be obtained by Holders of Claims and Interests upon a disposition of assets in a hypothetical chapter 7 liquidation as an alternative to recoveries provided under the Plan.

The Liquidation Analysis presents information based on, among other information, the Debtors' books and records and good-faith estimates regarding asset recoveries and Claims resulting from a hypothetical liquidation under chapter 7 of the Bankruptcy Code. The determination of the proceeds from the hypothetical liquidation of assets involves the use of estimates and assumptions. Although the Debtors consider the estimates and assumptions underlying the Liquidation Analysis to be reasonable under the circumstances, such estimates and assumptions are subject to business, economic, competitive, political, and regulatory uncertainties and contingencies beyond the Debtors' control. Accordingly, the forecasted results set forth by the Liquidation Analysis may not be realized if the Debtors were liquidated. Actual results in such a case could vary from those presented herein, which could result in distributions to members of applicable Classes of Claims that differ from those set forth in this Liquidation Analysis.

The Liquidation Analysis indicates an estimated range of recovery values which may be realized by the Classes of Claims upon disposition of the Debtors' assets pursuant to a chapter 7 liquidation, as an alternative to the Debtors' proposed Plan. As illustrated by the Liquidation Analysis, impaired classes under the Plan would receive less recovery in a chapter 7 liquidation than they would under the Plan. Further, no holder of a Claim or interest would receive or retain property under the Plan of a value that is less than such holder would receive in a chapter 7 liquidation scenario as illustrated by the Liquidation Analysis. Therefore, the Debtors believe that the Plan satisfies the Best Interests Test as set forth in section 1129(a)(7) of the Bankruptcy Code.

The Debtors, with the assistance of their legal, and financial advisor, have prepared this Liquidation Analysis in connection with the Debtors' Plan and Disclosure Statement pursuant to chapter 11 of the Bankruptcy Code. This Liquidation Analysis provides a range of estimated recoveries based upon a hypothetical liquidation of the Debtors' estates and their non-Debtor affiliates ("**Non-Debtors**") if the Debtors' current chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code. The Liquidation Analysis has been prepared assuming that the Debtors' chapter 7 liquidation would commence on or around September 30, 2021 (the "**Conversion Date**") and a chapter 7 trustee (the "**Trustee**") would be appointed to convert all of the Debtors' and Non-Debtors' assets into cash. Unless stated otherwise, the Liquidation

A-3136

Analysis is based on net book values as of December 25, 2020, which is assumed to be representative of the Debtors' and Non-Debtors' assets as of the Conversion Date. In compliance with the Order Authorizing Intercompany Restructuring Transactions [Docket No. 633], the liquidation value of the intellectual property transferred in December 2020 to Debtor Mallinckrodt Pharmaceuticals Ireland Limited is retained by the Debtors that held such intellectual property prior to the transfer. Cash generated from operations related to intellectual property is retained by the Debtors holding such cash in accordance with the Debtors' post-transfer ordinary course cash management procedures.

**The Liquidation Analysis is a hypothetical exercise that has been prepared for the sole purpose of presenting a reasonable good-faith estimate of the proceeds that would be realized if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The Liquidation Analysis does not purport to be a valuation of the Debtors' assets in the context of a holistic reorganization, and there may be a difference between the Liquidation Analysis and the values that may be realized, or Claims generated in an actual liquidation. The Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.**

**Nothing contained in the Liquidation Analysis is intended to be, or constitutes, a concession, admission, or allowance of any claim by the Debtors. The actual amount or priority of Allowed Claims in the chapter 11 cases could differ from the estimated amounts set forth and used in the Liquidation Analysis. The Debtors reserve all rights to supplement, modify, or amend the analysis set forth herein.**

**NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES OR PROJECTED RESULTS SET FORTH HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.**

## METHODOLOGY AND RELATED KEY ASSUMPTIONS

This Liquidation Analysis assumes that proceeds available to creditors would be distributed in accordance with sections 726 and 1129(b) of the Bankruptcy Code. Proceeds available for distribution that would be available for satisfaction of Claims would consist of the proceeds resulting from the disposition of the assets and properties of the Debtors in addition to cash held by the Debtors, as of the Conversion Date. The Debtors operate a highly complex and regulated business that includes various foreign operations. Debtors organized under foreign laws and Non-Debtor foreign affiliates are all assumed to be liquidated in a similar order of priority for distribution of value as described herein, although differing priorities may govern under applicable foreign law. Value from Non-Debtor affiliates is available to the Debtors through the equity ownership of these entities as well as through collection of intercompany receivables to the extent available. The Debtors prepared this Liquidation Analysis and reviewed recoveries on a Debtor-by-Debtor case.

3

A-3137

This Liquidation Analysis assumes: (i) rapid, distressed sales of the Debtors' branded and generics assets within 90 days post-conversion with certain operations being sold as operating business units; (ii) non-Debtor affiliates will wind-down and liquidate in conjunction with the Debtors' liquidation; (iii) during the liquidation sales period, the Trustee will continue to maintain operations related to certain Specialty Brands products and the Specialty Generics' APAP active pharmaceutical ingredient ("**APAP-API**") business in an effort to maximize recoveries; (iv) an additional nine (9) months to wind-down the estates under the supervision of the Trustee to allow for monetization of assets and assessment of Claims which could take longer; (v) the continuation and cooperation of any accounting, treasury, tax, information technology support, and other corporate services necessary to wind-down the estates; and (vi) the Trustee has unrestricted access to cash and proceeds from asset sales held by foreign Debtors and any Non-Debtors, and the Trustee is able to repatriate proceeds. If there are foreign proceedings across the multiple jurisdictions and the Trustee is unable to access cash and sale proceeds generated at foreign entities, recoveries to creditors will be negatively impacted.

The Debtors face various litigations Claims including Opioid-related Claims and Acthar-related Claims. Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars, and such Claims are alleged to be at several or all Debtors in many instances. At the time the Disclosure Statement was filed, the Litigation Claims (as defined below) and Opioid Claims remained unliquidated, contingent, or disputed, and the aggregate amounts of such Claims are unknown. The Debtors dispute these Claims but do not have enough information to estimate the amount of these Claims for purposes of this analysis, and therefore no value has been assigned to such Claims and no recovery is currently projected. Allowed unliquidated or contingent Claims could meaningfully reduce recoveries to other General Unsecured Creditors, including but not limited to, Class 5, Class 6, Class 7 and Class 11 Claims, at the respective Debtors where these Claims are asserted. Under chapter 7, the Litigation Claims and Opioid Claims, or any portion of such Claims, would need to be resolved through litigation and the Trustee would need to engage litigation counsel to defend and liquidate those Claims. This differs significantly from the Plan, which proposes to (i) establish an Opioid Trust to resolve and distribute recovery to the Opioid Claims through the Opioid Trust distribution procedures from certain assets provided by the Debtors, and (ii) resolve Litigation Claims through the distribution of recoveries out of the General Unsecured Claims Cash Pool. As such, litigation in a chapter 7 liquidation is likely to be meaningfully more costly and time-consuming than resolving all Opioid Claims through the Opioid Trust and Litigation Claims through the General Unsecured Claims Cash Pool that are established under the chapter 11 Plan of Reorganization. Litigation with respect to these Claims could extend beyond the contemplated wind-down period and could result in significant costs that would further dilute recoveries in a chapter 7 liquidation. All such litigation expenses would be paid in full ahead of any recovery to general unsecured creditors in a chapter 7 liquidation.

Upon conversion to a chapter 7 liquidation, the agreement in principle with the Centers for Medicaid & Medicare Services ("**CMS**") and the Department of Justice ("**DOJ**") is assumed to be withdrawn, and the Restructuring Support Agreement terminated.

Proceeds from potential preference, fraudulent conveyance, or other Causes of Action may be available for distribution to Holders of Administrative Claims, Priority Claims, and

A-3138

General Unsecured Claims. However, litigation with respect to these Causes of Action would likely be extremely contentious, involve numerous parties and issues, and likely extend for many years beyond the contemplated wind-down period. This would result in significant costs that would be paid in full ahead of any recovery to general unsecured creditors in a chapter 7 liquidation. Further, the Debtors believe that recoveries from such Causes of Action would be speculative in nature. Accordingly, the Liquidation Analysis does not reflect any proceeds from potential Causes of Action that might be asserted by any Debtor's estate.

Upon conversion to chapter 7, a Trustee would be appointed to manage the Debtors' affairs, conduct a sale of the Specialty Brands' and Specialty Generics' assets and wind-down the Debtors' operations. Given the specialized nature of the Debtors' business that operates in a highly regulated environment, the Trustee would continue to rely upon existing management as well as specialized professionals to conduct the sale of the assets. Current employees and professionals will also need to be retained to assist with the wind-down of the estate. The Debtors' conduct their manufacturing and distribution of pharmaceuticals drugs not only in the U.S. but also have significant operations and assets in various foreign jurisdictions. The Liquidation Analysis, herein, assumes the liquidation process is administered under the U.S. Bankruptcy Court; however, foreign jurisdictions may require separate foreign proceedings which could delay the liquidation process and reduce potential recoveries to creditors.

In order to maximize value from the liquidation of assets, the Debtors assume the Trustee will continue ordinary course operations of manufacturing and distributing product for certain of the Debtors' Specialty Brands products, as well as the APAP-API Specialty Generics business. The Trustee would cease the manufacturing and distribution related to all other generic products, including opioid manufacturing and distribution. The Trustee will rely on continuing arrangements with non-Debtor affiliates that manage certain manufacturing capabilities and administer key personnel, such as sales representatives in key foreign markets. Certain developmental products that are extensions of current commercialized products are assumed to be sold with the intangible assets. The values are included in the asset sale proceeds.

The Debtors assume the Trustee will look to sell the underlying operations of INOmax, Amitiza, and the Specialty Generics' APAP active pharmaceutical ingredient operations. The sale of these business operations include the intellectual property or product know-how, inventory, and the owned manufacturing facilities used to manufacture these products (the "**Liquidated Operations**"). For the remaining branded products, a range of liquidation values have been estimated assuming distressed sales of the existing intellectual property ("**IP**"), licenses, and rights associated with certain of the Debtors' developed branded products ("**Liquidated Product IP**"). The intellectual property related to these branded products are assumed to be sold in one or more asset sales under section 363 of the Bankruptcy Code. The Debtors assume the inventory for these branded products will be sold to the same buyer of the intellectual property in order to limit supply interruption as the product rights are transferred. Furthermore, the Debtors reviewed their product pipeline and included recoverable value for certain developmental products. Existing commercial arrangements are maintained as well as all regulatory authorizations, acknowledging the inherent challenges. If the commercial relationships are not maintained or regulatory authorizations are impeded, recoveries to creditors will be negatively impacted. The estimated net sales proceeds realized take into consideration, among other factors, the distressed nature of such a sales process, the likely negative press

A-3139

coverage and market reaction associated with conversion to chapter 7 liquidation, the difficulty of transferring marketing authorization or assigning contract manufacturing arrangements, and the Trustee's limited ability to provide adequate representations, warranties, and indemnities to a buyer.

Furthermore, the Debtors believe there are additional factors that could negatively impact proceeds realized and recoveries to creditors as set forth in the Liquidation Analysis, which include, but are not limited to (a) turnover of key personnel; (b) challenging economic conditions; (c) delays in the liquidation process; (d) withdrawal of marketing authorizations by regulatory bodies due to the chapter 7 proceedings; (e) termination of manufacturing contracts limiting the Debtors ability to maintain continuity of supply; (f) termination of distribution arrangements or loss of customers; (g) negative impact from the termination of agreement in principle with CMS & DOJ as well as a termination of the settlement agreement with certain opioid plaintiffs; (h) complications related to assets and business operations held in foreign jurisdictions; and (i) possible negative impacts from litigation related to Acthar and opioid products. These factors may limit the amount of the liquidation proceeds available to the Trustee to satisfy Allowed Claims under this hypothetical liquidation as well as delay the Trustee's ability to distribute funds to the respective creditors in an orderly and timely manner.

For the avoidance of doubt and as stated above, the Liquidation Analysis does not include: (a) estimates for the tax consequences that may be triggered upon liquidation and sale of assets which could lower potential recoveries to creditors; (b) estimated proceeds from insurance or indemnity recoveries; (c) recoveries from any potential preference, fraudulent transfer, or other litigation or avoidance actions. Any third-party litigation or avoidance Claims would likely inure to the benefit of the Holders of the Debtors' Guaranteed Unsecured Notes or to Holders of Opioid Claims, given the asserted amount and/or structural seniority of these Claims relative to other unsecured Claims.

## PROCEEDS FROM LIQUIDATED OPERATIONS

1.  **Proceeds from Liquidated Operations** include proceeds from the distressed sales of the Liquidated Operations. These sales include the applicable intellectual property, owned manufacturing facilities, machinery & equipment, and inventory. These individual assets are held by different entities and the estimated value realized is allocated to the respective Debtors or Non-Debtors. The sales proceeds are net of commission fees equal to 1.5% of the gross proceed value.

## ASSET RECOVERIES

2.  **Cash & Cash Equivalents** includes cash held in the Debtors' domestic and foreign bank accounts, cash equivalents, and money market accounts. Cash held by non-Debtor affiliates is a source of recovery to the Debtors through satisfaction of any intercompany activity and Investment in Subsidiary after the non-Debtor affiliates wind-down and satisfy their respective obligations. The Debtors' cash is estimated as of the Conversion Date which includes adequate

A-3140

protection cash payments with respect to the Debtors' Secured indebtedness, in accordance with the Debtors' Cash Collateral Order[1]. Estimated recovery of Cash & Cash Equivalents is 100%.

3. **Accounts Receivable, net of reserves** includes all third-party trade accounts receivable, net of chargebacks, rebates, allowances and bad debt reserves. The liquidation of accounts receivable assumes that the Trustee will retain certain personnel from the Debtors and foreign Non-Debtors to oversee collection of outstanding trade accounts receivable. The estimated recoveries used in this Liquidation Analysis take into consideration the inevitable difficulty of collections during a liquidation process, and related concessions that might be required to facilitate the collection of certain receivables. The estimated recovery range for accounts receivable is 70% to 85% of net book value. Collections of trade receivables during a liquidation could be significantly compromised as customers attempt to set off outstanding amounts owed to the Debtors and Non-Debtors against alleged damage and breach of contract Claims, which could reduce recoveries.

4. **Inventory** includes raw materials, work-in-process, and finished goods inventory. The net book value of Finished Goods inventory is adjusted for transfer pricing. The inventory associated with the Liquidated Product IP is sold to the same buyer as the underlying intellectual property; otherwise, the inventory has limited recoverable value without the product intangibles and marketing authorizations. Inventory book values and proceeds realized from the Liquidated Operations, specifically INOmax, Amitiza, and APAP-API, are included in the Proceeds from Liquidated Operations. Recoveries are estimated for certain non-opioid related inventory held by Specialty Generics' entities. However, inventory related to opioid products are assumed to have minimal to no recovery as the Trustee will cease selling opioid products upon a chapter 7 conversion. The estimated recoveries reflect the distressed nature of the respective asset sales and the expedited timeline to complete such a sale. The estimated blended recovery range for all inventory is 51% to 59% of net book value.

5. **Prepaid Expenses** consist of various expenses such as prepaid rent, prepaid maintenance and prepaid insurance. The Debtors estimate that there would be no recoverable value related to prepaid expenses since any prepayment would likely be depleted.

6. **Other Current Assets** includes VAT/sales tax receivables, insurance receivables, deposits, and other receivables. The estimated range of recovery for these assets is 20% to 40%. Restricted cash, also included, are controlled by third-parties for the benefit of surety bonds, letters of credit, and deposits. These funds may be difficult to recoup and recoverable value is estimated to be 0% to 30% of book value. CARES Tax Receivables include receivables from CARES Act related tax refunds based on the Debtors' current estimates. Recoveries are estimated to range from 90% to 100%, net of reserves. These estimates are subject to change, and any refunds received are subject to IRS review both prior to and following receipt. The estimated blended recovery range for all Other Current Assets is 59% to 75%.

7. **Property, Plant, and Equipment, net** includes the Debtors' land, building & building improvements, manufacturing machinery & equipment, furniture & fixtures, leasehold

---

[1] The Debtors reserve all rights as to whether any such adequate protection payments should be recharacterized as payments of principal in a liquidation scenario.

A-3141

improvements, and capitalized software. The owned manufacturing machinery & equipment, land, and buildings related to the Liquidated Operations are included in the Proceeds from Liquidated Operations. Recoveries from the sale of these PP&E assets are net of commission fees of 1.5%. Given the difficulty and cost of liquidating the remaining property, plant and equipment assets in a compressed timeframe, the Debtors assumed the following recoveries:

- Estimated recoveries for certain real property, which includes land & building assets, are based on recent third-party appraisals or real estate tax assessment values. These values are discounted by 15% to 20%. For properties where external values were not readily available, recoveries are estimated to be 40% to 60% of net book value. Recoverable value is reduced for non-dischargeable environmental liabilities that may be asserted at any of the real property.

- Estimated recoveries for machinery & equipment are 10% to 20% of net book value due to the considerable deinstallation costs required to remove these assets as well as the unique use of these assets in the pharmaceutical manufacturing process.

- Estimated recoveries for furniture and office equipment, including vehicles, are 10% to 20% of net book value.

- Capitalized software, communication equipment, and computers are assumed to have a recovery of 5% to 10% of net book value given the specific use of these assets.

- No recoverable value is ascribed to leasehold improvements and construction in progress.

8. **Intangible Assets** include patents, licenses, capitalized development of products, and trademarks. The recovery value for the Intangible Assets is based upon the potential value of the intellectual property assets sold to a third-party buyer under a distressed liquidation sale. An estimated fair market value was determined for the intangible assets to be sold in the chapter 7 liquidation. The value of the Intangible Assets is based on a net present value of the projected cash flows for the individual products. In process research & development related to existing Specialty Brands products are included in the respective intangible value. Proceeds related to intellectual property sold as part of Liquidated Operations are separately included in Proceeds from Liquidated Operations. Any other applicable proceeds for other Intangibles are accounted for in Intangible Asset recoveries. Recoveries from the sale of Intangible Assets are net of commission fees of 1.5%.

This analysis considers many factors, including but not limited to, remaining patent exclusivity, net cash flow generating value, and transition costs and time. The underlying value of these assets in a liquidation are impacted by many factors, such as (a) the short time period of the sale process; (b) possible discounts buyers would require due to the limited due diligence period; (c) the risk of maintaining contractual relationships with contract manufacturers and/or customers; (d) the uncertainty around the ability to transfer marketing authorizations efficiently; and (e) negative publicity and any litigation risk. Recoveries are projected to be 28% to 33% of net book value in aggregate, a portion of which is reflected in Proceeds from Liquidated Operations.

9. **Other Non-Current Assets** includes spare parts, non-current asbestos insurance receivables, long-term deposits, investments, long-term tax receivables, and other non-current assets. Long-term tax receivables relate to the Coronavirus Aid, Relief, and Economic Security ("CARES") Act refund for the tax period ending September 2020. Blended recoveries for Other Non-Current Assets are estimated to be between 31% and 41%.

10. **Intercompany Receivables** include intercompany transactions both between Debtors and with non-Debtor affiliates. Intercompany transactions relate to trade activities from the sale and purchase of goods and services amongst entities, payment for management and corporate services, cash pooling arrangements and intercompany loans. Intercompany transactions are governed by distribution and supply agreements (primarily for cross-border activities), service agreements, cash management agreements, and intercompany loan documents. Transfer pricing used for product transfers and services comply with the Debtors' debt document requirements. Any transfer pricing used is monitored and documented regularly. Recoveries on intercompany transactions are based on the obligor entity's ability to satisfy its obligation, following the absolute priority rule, out of the net proceeds available to creditors. In the course of winding down foreign non-Debtors, to the extent intercompany receivables are subordinated, recoveries to the Debtors and their creditors could be reduced.

11. **Investment in Subsidiary** includes any value available for distribution to parent entities after satisfying all creditors at the respective legal entity. Any distribution to multiple parent entities is based on the equity percentage ownership.

12. **Net Operating Cash Flow - Conversion Through Sale** includes the net operating cash flows generated during the 90-day liquidation sales period. Upon conversion to chapter 7, the Trustee maintains ordinary course operations for 90 days in order to maximize potential recoveries to creditors. During the 90 days after the Conversion Date, the Debtors are estimated to generate positive free cash flow after assuming loss of sales and minimal vendor payment terms given the risks of continuing to do business with a company in a liquidation. Certain aspects of the current organizational structure is largely intact including the sales and marketing, supply chain, operations support, manufacturing & distribution, regulatory, and clinical service organizations. These functions are necessary to maintain continuity of supply and provide the necessary products and treatments to the Debtors' customers and patients in order to preserve and maximize recoverable value.

## CHAPTER 7 LIQUIDATION COSTS

The conversion of these chapter 11 cases to chapter 7 of the Bankruptcy Code will result in additional costs to the Debtors including compensation of the Trustee, as well as retained counsel and other professionals, to oversee the wind-down of the Debtors' and Non-Debtors' estates in both domestic and foreign jurisdictions. The chapter 7 costs include the following:

13. **Chapter 7 Trustee Fees** include fees associated with the appointment of a chapter 7 trustee in accordance with section 326 of the Bankruptcy Code. Although section 326 of the Bankruptcy Code provides for statutory Trustee fees of 3.0% for liquidation proceeds in excess of $1,000,000, for purposes of this analysis, Chapter 7 Trustee Fees are assumed to be 1.5% of total liquidation proceeds, excluding recoveries related to cash on hand. Should the Trustee's fees exceed 1.5%, the proceeds available for distribution to creditors would be reduced. Chapter

9

7 Trustee Fees are allocated to the Debtor entities based on their pro-rata share of Gross Proceeds Available for Distribution.

14. **Chapter 7 Trustee Professional Fees** include the cost of financial advisors, attorneys, and other professionals retained by the Trustee in connection with the wind-down of the Debtors' domestic and foreign operations. The fees represent tax, legal, accounting, claims reconciliation, regulatory and other related services to support the Trustee in this complex, expansive liquidation. The Debtors estimate the chapter 7 Trustee professionals will be retained over a 12-month period to not only manage the liquidation of the Debtors' assets but also wind-down the corporate estates both in the U.S. and in foreign jurisdictions including Ireland, United Kingdom, Luxembourg, and Japan. The fees are estimated to cover the monetization of the various assets as well as an additional nine (9) months to wind-down the U.S. and foreign operations with fees scaling down during the period. The Debtors estimate chapter 7 Trustee Professional Fees are estimated to be approximately $30 million to $34 million, excluding commission and transaction fees incurred as part of liquidating the Debtors' assets.

Absent a settlement with the Centers for Medicaid & Medicare Services, the Department of Justice and with the public and private opioid plaintiffs, litigation amongst the creditor constituents could take many years and lead to a significant cost to the estate. The Liquidation Analysis assumes litigation could take up to three years or longer. The Trustee will need to retain professionals to assist with litigation related to claims allowance, estimation, and allocation of recoveries, and to the extent such litigation implicates any of the Debtors' secured lenders or noteholders, the estate may also be required to bear such parties' legal expenses. Such litigation will likely delay the Trustee's ability to distribute proceeds to creditors. The chapter 7 litigation professional fee costs are estimated to be approximately $125 million to $150 million. Litigation related fees could be materially higher and further reduce recoveries to creditors. Total chapter 7 Trustee Professional Fees are allocated to the Debtor entities based on their pro-rata share of Gross Proceeds Available for Distribution.

15. **Wind-Down Expense** includes retention costs and expenses associated with the wind-down of the Debtors' remaining estates, including the Non-Debtors affiliates, after completing the sale of the Debtors' assets. Costs include additional retention compensation necessary to preserve the sales organization, supply chain, manufacturing, regulatory, clinical services and other functions during the liquidation sales process. The Debtors' assume all sales, marketing, clinical services, manufacturing, supply chain, and other operating costs will essentially cease upon the completion of the asset sales. However, given the complex nature of the Debtors' business operations across various domestic and foreign jurisdictions, additional costs will be incurred to wind-down the corporate affairs including legal, tax, accounting, claims reconciliation, compliance and other necessary functions. The Trustee will retain a number of corporate employees to assist with facilitating the liquidation of the Debtors' assets, providing historical knowledge and insight to the Trustee regarding the Debtors' complex businesses and the chapter 11 cases, and concluding the administrative wind-down of the organization in the various foreign jurisdictions where the Debtors' have domiciled entities.

The estimated wind-down costs are based on a reduction to the current monthly run-rate operating expenses by department with further reductions throughout the wind-down period to complete the necessary wind-down activities. Wind-down costs for the nine (9) month period

10

after the initial asset sale period is estimated to be approximately $26 million to $29 million, excluding employee retention costs. In addition, incremental retention programs are initiated to retain necessary key employees with institutional knowledge to assist the Trustee in facilitating an efficient wind-down process.

## DISTRIBUTION OF PROCEEDS

The Liquidation Analysis assumes that net proceeds from the sale of the assets will be distributed following the absolute priority rule provided in section 1129(b)(2) and in accordance with section 726 of the Bankruptcy Code, and no distributions will be made to holders of equity interests until all creditors are satisfied in full. Certain real property assets are not part of the secured creditors' collateral, and the estimated recoveries from these unencumbered assets have been segregated and made available to Administrative, Priority, and General Unsecured Claims.

## SECURED CLAIMS

The recoveries related to Secured Claims can be found in the table below:

**Summary of Recoveries to Secured Claims**
*($ in 000s)*

| | Estimated Allowed Claims | | Estimated Recovery | | | |
|---|---|---|---|---|---|---|
| | Lower | Higher | Lower | | Higher | |
| **Secured Carve-Out Claims** | | | | | | |
| Carve-Out Claims | $ 37,000 | $ 34,000 | $ 37,000 | *100%* | $ 34,000 | *100%* |
| | | | | | | |
| **Secured Debt Claims** | | | | | | |
| First Lien Revolving Credit Facility Claims | $ 905,600 | $ 905,600 | $ 905,600 | *100%* | $ 905,600 | *100%* |
| First Lien Term Loan Claims | $ 1,792,320 | $ 1,792,320 | $ 1,792,320 | *100%* | $ 1,792,320 | *100%* |
| First Lien Notes Claims | $ 545,790 | $ 545,790 | $ 545,790 | *100%* | $ 545,790 | *100%* |
| Second Lien Notes Claims | $ 355,973 | $ 355,973 | $ 355,973 | *100%* | $ 355,973 | *100%* |
| | $ 3,599,684 | $ 3,599,684 | $ 3,599,684 | | $ 3,599,684 | |

16. **Carve-Out** includes certain unpaid holdback and accrued professional fees and costs entitled to priority above Secured Claims as outlined in the Cash Collateral Order. The Cash Collateral Order provides for a "Carve Out" (as defined therein) that is senior to all liens and Claims (including any super-priority Administrative Claims) held by First Lien Creditors. For purposes of the Liquidation Analysis, the Debtors assumed that the "Carve Out Trigger Notice" (as defined in the Cash Collateral Order) is delivered on the Conversion Date, requiring the Debtors to fund a reserve from the Debtors' cash on hand in the amount of the Carve Out. The Carve-Out costs are estimated to be approximately $34 million to $37 million. This total includes accrued but unpaid fees and expenses incurred by the chapter 11 retained professionals, in addition to fees payable to the U.S. Trustee. Carve Out Claims are assumed to be paid from encumbered asset proceeds; however, such payments can be made out of unencumbered asset proceeds which would reduce recoveries to unsecured creditors.

17. **Class 2 - First Lien Credit Agreement Secured Claims** include estimated Claims of $906 million for the First Lien Revolving Credit Facility Claims and $1.8 billion for the 2024 and 2025 First Lien Term Loan Claims. Claim amounts include accrued interest during the post-conversion period at prepetition interest rates. The First Lien Revolving Credit Facility Claims

11

and First Lien Term Loan Claims are allocated amongst the obligor entities pro-rata based on the respective obligor entities' Net Estimated Proceeds Available for Distribution, excluding estimated value attributable to unencumbered assets[2]. Secured contribution claims are asserted by obligor entities deemed to pay more than their fair allocated share of the First Lien Revolving Credit Facility and First Lien Term Loan Claims, as specified in the Credit Agreement, against obligor entities that under-pay their share of the bank debt claims. First Lien Credit Agreement Secured Claim recoveries are shown net of any secured contribution claim receivables or amounts paid, as applicable.

18. **Class 3 - First Lien Note Claims** include estimated Claims of $546 million which includes accrued interest of $12 million for the post-conversion period and a make-whole premium[3] of $38 million, as of the estimated transaction date in December 2021. The First Lien Note Claims are allocated pro-rata to the obligor entities based on entity count until the Claim is paid in full in accordance with New York law.

19. **Class 4 - Second Lien Note Claims** include estimated Claims of $356 million which includes accrued interest of $8 million for the post-conversion period and a make-whole premium[3] of $25 million, as of the estimated transaction date in December 2021. The Second Lien Note Claims are allocated pro-rata to the obligor entities based on entity count until the Claim is paid in full in accordance with New York law.

20. **Purchase-Money Lien** reflects a secured third-priority purchase-money lien (which is expressly junior in priority to the liens securing the First Lien Credit Agreement Secured Claims, First Lien Note Claims, and Second Lien Note Claims) that is asserted on the inventory held by Mallinckrodt ARD LLC and ST Operations LLC along with the proceeds from the sale of the secured inventory.

## ADMINISTRATIVE AND PRIORITY CLAIMS

21. **Administrative and Priority Claims** include Priority tax, Administrative postpetition, and super-priority intercompany Claims. Priority tax Claims and Administrative postpetition Claims are asserted at certain Debtors based on the Debtors' books and records. The Debtors assume that there will be no employment-related (including "WARN Act" Claims) as of the Conversion Date. To the extent any such Claims arise, recoveries to General Unsecured Claims at certain Debtor entities would be reduced. Postpetition intercompany Claims between Debtor entities are granted super-priority Adminstrative Claim status.

---

[2] Unencumbered assets include real property assets held by the respective legal entity.

[3] It is assumed, solely for purposes of this Liquidation Analysis, that make-whole premiums would be payable on the First Lien Note Claims and the Second Lien Note Claims in connection with a chapter 7 liquidation (as opposed to the treatment set forth in the Debtors' Plan). The Debtors, however, reserve all rights as to whether any such make-whole premiums are payable and, if payable, how any such make-whole premium should be calculated. Furthermore, the Debtors specifically do not believe that any such make-whole premiums would be payable in connection with the treatment of the First Lien Note Claims and the Second Lien Note Claims set forth in the Debtors' Plan.

A-3146

## GENERAL UNSECURED CLAIMS

General Unsecured Claims consist of all unsecured, non-priority Claims arising prior to the Petition Date. Estimates of such Claims are based on the Debtors' books and records and a preliminary review of the proofs of Claim filed against the Debtors in these cases. The Liquidation Analysis includes known estimated contract rejection damage Claims. To the extent additional contract rejection damage Claims exist, the recovery to unsecured creditors at the respective Debtors where these Claims arise could be less.

Below are the various categories of Claims, described according to their Classes under the Plan, that would all be pari passu as General Unsecured Claims in chapter 7. The Liquidation Analysis reflects only liquidated Claims at the respective Debtors, as amounts associated with unliquidated claims, such as litigation Claims, are unknown. As previously described, the Debtors face various litigations Claims including Opioid-related Claims and Acthar-related Claims. Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars, and such Claims are alleged to be at several or all Debtors, in many instances. Allowed unliquidated or contingent Claims could meaningfully reduce recoveries to other General Unsecured Creditors, including but not limited to, Class 5, Class 6, Class 7 and Class 11 Claims, at the respective Debtors where these Claims are asserted.

22. **Class 5 - Guaranteed Unsecured Note Claims** include estimated Claims of $1.5 billion on the Conversion Date, including accrued interest through the Petition Date. The Guaranteed Unsecured Note Claims are obligations of 63 entities including the primary issuer, Mallinckrodt International Finance S.A. The Guaranteed Unsecured Note Claims are allocated and then reallocated pro-rata to the obligor entities based on obligor entity count until the Claim is paid in full or until no value is available for distribution to unsecured creditors at the respective obligor entities, in accordance with New York law. Aggregate recoveries are estimated to be 15% to 58%. Recoveries on these Claims could be diluted if unliquidated, contingent, or disputed claims become Allowed Claims at the respective obligor entities.

23. **Class 6 - General Unsecured Claims** include the following general unsecured claims:

   a) **Other General Unsecured Claims** include non-trade unsecured Claims, pension and retirement plan obligations, unsecured tax Claims, known estimated rejection damage Claims, and other miscelleanous unsecured Claims.

   b) **Environmental & Asbestos Claims** include reserves for estimated environmental liabilities at the Conversion Date. Certain environmental liabilities deemed to be non-dischargeable are assumed to reduce the recoverable value of the related land and building assets, as previously noted. This analysis does not account for potential administrative costs to liquidate these sites. Asbestos Claims include reserves for estimated asbestos liabilities at the Conversion Date.

   c) **4.75% Unsecured Notes** include estimated Claims of $136.8 million on the Conversion Date, including accrued interest through the Petition Date. The 4.75%

Unsecured Notes are issued by Mallinckrodt International Finance S.A. and guaranteed from Mallinckrodt plc.

d) **Legacy Ludlow Debentures** include estimated Claims of $15.3 million on the Conversion Date, including accrued interest through the Petition Date. The Ludlow Debentures only have a Claim against its issuer, Ludlow LLC (f/k/a Ludlow Corporation).

e) "**Litigation Claims**" are Claims derived from pending non-opioid related litigation against the Debtors and all similar Claims, including but not limited to, various Acthar payor lawsuits and the generics price fixing lawsuits. These Claims are unliquidated, contingent, or disputed and the aggregate amount of such Claims are undetermined.

24. **Class 7 - Trade Claims** include estimated prepetition trade Claims as of the Conversion Date.

25. **Class 8 - Governmental Opioid Claims & Class 9 - Other Opioid Claims** include governmental state and non-state Opioid Claims, private plaintiff Opioid Claims, and a Canadian lawsuit. These Claims are unliquidated and the amount of such Claims are undetermined.

26. **Class 10 - Settled Federal/State Acthar Claims** include the CMS and DOJ Claims as well as the EDPA Foundation and Boston Foundation Claims which are settled as part of the Acthar Settlement Agreement. The CMS judgement Claim of $640 million is reflected as a Claim in the Liquidation Analysis. Other Claims in this Class are unliquidated or contingent and amounts are undetermined.

27. **Class 11 - Intercompany Claims** include prepetition intercompany payables between Debtor and non-Debtor affiliates. Prepetition intercompany payables are deemed pari passu to all unsecured Claims, except for non-ordinary course intercompany payables due from an obligor entity to a non-obligor entity, which are deemed subordinate to other unsecured creditors of the obligor entity. Settlement of intercompany payables is based on the obligor entity's ability to satisfy its obligation out of net proceeds available to satisfy unsecured Claims.

## SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS

28. **Class 12 - Intercompany Interests** include any value available for distribution to parent entities after satisfying all creditors at the respective legal entity.

29. **Class 13 - Subordinated Claims** are Claims derived from pending non-opioid related litigation against the Debtors, including but not limited, to subordinated litigation Claims related to penalties from False Claims Act, punitive damages for Acthar trade lawsuits, and securities lawsuit claims. These Subordinated Claims are unliquidated, contingent, or disputed and the aggregate amount of such Claims are unknown. Subordinated Claims also include a subordinated prepetiton intercompany loan due to a non-obligor affiliate. No recoverable value is available for Subordinated Claims.

14

30. **Class 14 - Equity Interest** includes any value available for distribution to the Equity Holders of Mallinckrodt plc. In the Liquidation Analysis, there is no recoverable value available to Equity Interest holders.

## OTHER CONSIDERATIONS

Under chapter 7, the litigation Claims in Class 6 and the Governmental and Other Opioid Claims in Class 8 and Class 9, would be resolved through litigation, and the Trustee would need to engage litigation counsel to defend and litigate these Claims. Claim estimates for unliquidated, contingent, or disputed Claims are unknown at the time the Disclosure Statement was filed. The Debtors do not have sufficient information to properly estimate the amount of these Claims for purposes of this analysis, and therefore, no value has been assigned to Class 6, Class 8, and Class 9 Claims; and thus no recovery value is projected. However, if the unliquidated, contingent or disputed Claims were deemed Allowed Claims at the Debtor entities that are named defendents in the various lawsuits, the aggregate proceeds available to Unsecured Claims range from approximately $3 million to $56 million across the relevant Debtor entities. These proceeds would primarily be available to Specialty Generics' entities, which would substantially benefit the Class 5 Guaranteed Unsecured Note Claims and Class 8 & Class 9 Opioid Claims, given the potential size of these Claims.

A-3149

**Mallinckrodt PLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ 2,530 | | 100% | 100% | $ 2,530 | $ 2,530 |
| Accounts Receivable, net | 3 | – | | – | – | – | – |
| Inventory | 4 | – | | – | – | – | – |
| Prepaid Expenses | 5 | 7,149 | | – | – | – | – |
| Other Current Assets | 6 | 150 | | 17% | 39% | 26 | 58 |
| Plant, Property & Equipment, net | 7 | – | | – | – | – | – |
| Intangible Assets | 8 | – | | – | – | – | – |
| Other Non-Current Assets | 9 | 9,666 | | 10% | 20% | 967 | 1,933 |
| Intercompany Receivables | 10 | 422,820 | | 0% | 1% | 154 | 4,756 |
| Investment in Subsidiary | 11 | 28,408,201 | | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 28,850,515** | | **0%** | **0%** | **$ 3,676** | **$ 9,277** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 3,676** | **$ 9,277** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 43 | $ 114 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 156 | 294 |
| Winddown Expense | 15 | | | | | 1,934 | 1,784 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 2,133** | **$ 2,192** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 1,543** | **$ 7,085** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | $ 1,543 | $ 7,085 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 1 | $ 3 | 100% | 100% | $ 1 | $ 3 |
| Chapter 11 Professionals | | 14 | 49 | 100% | 100% | 14 | 49 |
| **Total Carve Out Fees** | 16 | **$ 14** | **$ 52** | **100%** | **100%** | **$ 14** | **$ 52** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 1,529** | **$ 7,033** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 1,529** | **$ 7,033** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 1,006 | $ 3,727 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 1% | 523 | 3,306 |
| Second Lien Notes | 19 | 355,973 | 355,973 | | | – | – |
| Purchase-Money Lien | 20 | – | – | | | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 1,529** | **$ 7,033** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 71 | $ 71 | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 71** | **$ 71** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[a]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 148,234 [a] | 148,234 [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 12,130 | 12,130 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Acthar Claims | 26 | – | – | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 4,160 | 4,160 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,708,334** | **$ 1,708,334** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

1

**A-3150**

**Mallinckrodt International Finance SA**
**Hypothetical Liquidation Analysis**
($ in 000s)

## I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ 117,057 | 100% | 100% | $ 117,057 | $ 117,057 |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | 65 | – | – | – | – |
| Other Current Assets | 6 | 20,210 | 0% | 30% | 0 | 6,063 |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | – | – | – | – | – |
| Investment in Subsidiary | 11 | 17,894,039 | 0% | 0% | 560 | 646 |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 18,031,371** | **1%** | **1%** | **$ 117,617** | **$ 123,766** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 117,617** | **$ 123,766** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | 1,410 | 1,535 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 5,104 | 3,958 |
| Winddown Expense | 15 | | | | 8,802 | 7,838 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 15,315** | **$ 13,331** |
| **Net Proceeds Available for Distribution** | | | | | **$ 102,301** | **$ 110,435** |

## II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | | | | | **$ 102,301** | **$ 110,435** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 52 | $ 48 | 100% | 100% | $ 52 | $ 48 |
| Chapter 11 Professionals | | 902 | 763 | 100% | 100% | 902 | 763 |
| **Total Carve Out Fees** | 16 | **$ 954** | **$ 810** | **100%** | **100%** | **$ 954** | **$ 810** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 101,347** | **$ 109,624** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 101,347** | **$ 109,624** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 2% | 2% | $ 66,662 | $ 58,097 |
| First Lien Notes | 18 | 545,790 | 545,790 | 6% | 7% | 34,686 | 39,160 |
| Second Lien Notes | 19 | 355,973 | 355,973 | 0% | 3% | – | 12,367 |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **3%** | **3%** | **$ 101,347** | **$ 109,624** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ 47,493 | $ 47,493 | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ 47,493** | **$ 47,493** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 61 | $ 61 | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | 50 | 50 | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 111** | **$ 111** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 144,154 [a] | 144,154 [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 14 | 14 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | [a] | [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | [a] | [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 1,897,856 | 1,897,856 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 3,585,833** | **$ 3,585,833** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Classes** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

2

A-3151

**ST US Pool LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

## I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ 186,669 | 100% | 100% | $ 186,669 | $ 186,669 |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | 218,829 | 0% | 0% | 92 | 132 |
| Investment in Subsidiary | 11 | – | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | | |
| **Total Assets and Gross Recovery** | | **$ 405,498** | **46%** | **46%** | **$ 186,761** | **$ 186,801** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 186,761** | **$ 186,801** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 2,233 | $ 2,310 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 8,085 | 5,955 |
| Winddown Expense | 15 | | | | 23,055 | 20,541 |
| **Total Chapter 7 Liquidation Costs** | | | | | **33,373** | **28,806** |
| **Net Proceeds Available for Distribution** | | | | | **$ 153,387** | **$ 157,994** |

## II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| Net Proceeds Available for Distribution | | | | | | $ 153,387 | $ 157,994 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 77 | $ 68 | 100% | 100% | $ 77 | $ 68 |
| Chapter 11 Professionals | | 1,353 | 1,091 | 100% | 100% | 1,353 | 1,091 |
| **Total Carve Out Fees** | 16 | **$ 1,430** | **$ 1,159** | **100%** | **100%** | **$ 1,430** | **$ 1,159** |
| Net Proceeds After Carve Out Claims | | | | | | $ 151,957 | $ 156,835 |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| Net Proceeds Available for Secured Claims | | | | | | $ 151,957 | $ 156,835 |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 4% | 3% | $ 99,950 | $ 83,117 |
| First Lien Notes | 18 | 545,790 | 545,790 | 9% | 7% | 47,103 | 39,160 |
| Second Lien Notes | 19 | 355,973 | 355,973 | 1% | 10% | 4,903 | 34,558 |
| Purchase-Money Lien | 20 | – | – | | | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **4%** | **4%** | **$ 151,957** | **$ 156,835** |
| Proceeds Available After Satisfying Secured Claims | | | | | | $ – | $ – |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| Net Proceeds Available For Distribution to Superiority Administrative Claims | | | | | | $ – | $ – |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ 192,923 | $ 192,923 | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ 192,923** | **$ 192,923** | **–** | **–** | **$ –** | **$ –** |
| Net Proceeds Available For Distribution to Administrative & Priority Claims | | | | | | $ – | $ – |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | | | **$ –** | **$ –** |
| Net Proceeds Available For Distribution to General Unsecured Claims | | | | | | $ – | $ – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | –[a] | –[a] | | | – | – |
| Class 7 - Trade Claims | 24 | – | – | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | –[a] | –[a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | –[a] | –[a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | 296,696 | 296,696 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,840,506** | **$ 1,840,506** | **–** | **–** | **$ –** | **$ –** |
| Net Proceeds Available For Distribution to Subordinated & Equity Classes | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | –[a] | –[a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

3

A-3152

**Mallinckrodt Group Sarl**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ | – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ | 67,180 | 100% | 100% | $ 67,180 | $ 67,180 |
| Accounts Receivable, net | 3 | | – | – | – | – | – |
| Inventory | 4 | | – | – | – | – | – |
| Prepaid Expenses | 5 | | – | – | – | – | – |
| Other Current Assets | 6 | | 19,101 | 0% | 30% | 16 | 5,738 |
| Plant, Property & Equipment, net | 7 | | – | – | – | – | – |
| Intangible Assets | 8 | | – | – | – | – | – |
| Other Non-Current Assets | 9 | | – | – | – | – | – |
| Intercompany Receivables | 10 | | 37,276 | 55% | 58% | 20,607 | 21,497 |
| Investment in Subsidiary | 11 | | 256,023 | 1% | 2% | 2,042 | 6,251 |
| Net Operating Cash Flow - Conversion Through Sale | 12 | | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | $ | 379,580 | 24% | 27% | $ 89,844 | $ 100,666 |
| **Gross Proceeds Available for Distribution** | | | | | | $ 89,844 | $ 100,666 |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 1,031 | $ 1,174 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 3,734 | 3,028 |
| Winddown Expense | 15 | | | | | 402 | 363 |
| **Total Chapter 7 Liquidation Costs** | | | | | | $ 5,168 | $ 4,565 |
| **Net Proceeds Available for Distribution** | | | | | | $ 84,676 | $ 96,101 |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | $ 84,676 | $ 96,101 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 41 | $ 39 | 100% | 100% | $ 41 | $ 39 |
| Chapter 11 Professionals | | 711 | 620 | 100% | 100% | 711 | 620 |
| **Total Carve Out Fees** | 16 | $ 752 | $ 659 | 100% | 100% | $ 752 | $ 659 |
| **Net Proceeds After Carve Out Claims** | | | | | | $ 83,925 | $ 95,442 |
| Less: Value from Unencumbered Assets | | | | | | | |
| **Net Proceeds Available for Secured Claims** | | | | | | $ 83,925 | $ 95,442 |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ – | $ – | – | – | $ – | $ – |
| First Lien Notes | 18 | | – | – | – | – | – |
| Second Lien Notes | 19 | | – | – | – | – | – |
| Purchase-Money Lien | 20 | | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | $ – | $ – | – | – | $ – | $ – |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $ 83,925 | $ 95,442 |
| Add: Value from Unencumbered Assets | | | | | | | |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | $ 83,925 | $ 95,442 |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ 83,925 | $ 95,442 |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 1 | $ 1 | 100% | 100% | $ 1 | $ 1 |
| Postpetition Intercompany Payables | | | | | | | |
| Priority Tax Claims | | 675 | 675 | 100% | 100% | 675 | 675 |
| **Total Administrative & Priority Claims and Distributions** | 21 | $ 677 | $ 677 | 100% | 100% | $ 677 | $ 677 |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ 83,248 | $ 94,766 |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ – | $ – | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 1,651 [a] | 1,651 [a] | 78% | 89% | 1,286 | 1,464 |
| Class 7 - Trade Claims | 24 | 6 | 6 | 78% | 89% | 5 | 5 |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | | |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | | | | |
| Class 11 - Intercompany Claims | 27 | 105,206 | 105,206 | 78% | 89% | 81,958 | 93,297 |
| **Total Distribution to Unsecured Claims** | | $ 106,863 | $ 106,863 | 78% | 89% | $ 83,248 | $ 94,766 |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | | |
| Class 14 - Equity Interests | 30 | – | – | | | | |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | $ – | $ – | – | – | $ – | $ – |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

4

A-3153

**Mallinckrodt ARD LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I.  CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ 47,745 | | 100% | 100% | $ 47,745 | $ 47,745 |
| Accounts Receivable, net | 3 | 62,582 | | 70% | 85% | 43,807 | 53,195 |
| Inventory | 4 | 148,844 | | 70% | 80% | 104,190 | 119,075 |
| Prepaid Expenses | 5 | 4,227 | | – | – | – | – |
| Other Current Assets | 6 | 94 | | 20% | 40% | 19 | 38 |
| Plant, Property & Equipment, net | 7 | 922 | | 4% | 9% | 40 | 80 |
| Intangible Assets | 8 | – | | – | – | – | – |
| Other Non-Current Assets | 9 | 347 | | 10% | 20% | 35 | 69 |
| Intercompany Receivables | 10 | 159,913 | | 0% | 0% | 50 | 50 |
| Investment in Subsidiary | 11 | 326,766 | | 0% | 0% | 67 | 67 |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | 55,970 | 62,189 |
| **Total Assets and Gross Recovery** | | **$ 751,440** | | **34%** | **38%** | **$ 251,923** | **$ 282,507** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 251,923** | **$ 282,507** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 2,249 | $ 2,570 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 8,144 | 6,627 |
| Winddown Expense | 15 | | | | | 15,765 | 14,136 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 26,159** | **$ 23,333** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 225,764** | **$ 259,174** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$ 225,764** | **$ 259,174** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 108 | $ 104 | 100% | 100% | $ 108 | $ 104 |
| Chapter 11 Professionals | | 1,895 | 1,672 | 100% | 100% | 1,895 | 1,672 |
| **Total Carve Out Fees** | 16 | **$ 2,004** | **$ 1,776** | **100%** | **100%** | **$ 2,004** | **$ 1,776** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 223,761** | **$ 257,398** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 223,761** | **$ 257,398** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 8% | 10% | $ 223,761 | 257,398 |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | 169,691 | 169,691 | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,769,375** | **$ 3,769,375** | **6%** | **7%** | **$ 223,761** | **$ 257,398** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ 40,000 | $ 40,000 | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ 40,000** | **$ 40,000** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 7,925 | $ 7,925 | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | | |
| Priority Tax Claims | | 1,624 | 1,624 | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 9,549** | **$ 9,549** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 51,482 [a] | 51,482 [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 8,705 | 8,705 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | 640,000 [a] | 640,000 [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 46,052 | 46,052 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 2,290,049** | **$ 2,290,049** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Classes** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | | |
| Class 14 - Equity Interests | 30 | – | – | | | | |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

5

A-3154

**ST Operations LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| ***I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION*** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ 1 | 100% | 100% | $ 1 | $ 1 |
| Accounts Receivable, net | 3 | – | | | – | – |
| Inventory | 4 | 230,166 | 70% | 80% | 161,116 | 184,133 |
| Prepaid Expenses | 5 | – | | | – | – |
| Other Current Assets | 6 | – | | | – | – |
| Plant, Property & Equipment, net | 7 | – | | | – | – |
| Intangible Assets | 8 | – | | | – | – |
| Other Non-Current Assets | 9 | – | | | – | – |
| Intercompany Receivables | 10 | 169,691 | | | – | – |
| Investment in Subsidiary | 11 | – | | | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 399,859** | **40%** | **46%** | **$ 161,117** | **$ 184,134** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 161,117** | **$ 184,134** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | 1,937 | 2,292 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 7,013 | 5,910 |
| Winddown Expense | 15 | | | | 1,715 | 1,552 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 10,665** | **$ 9,755** |
| **Net Proceeds Available for Distribution** | | | | | **$ 150,452** | **$ 174,380** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| ***II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS*** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$ 150,452** | **$ 174,380** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 76 | $ 75 | 100% | 100% | $ 76 | $ 75 |
| Chapter 11 Professionals | | 1,327 | 1,204 | 100% | 100% | 1,327 | 1,204 |
| **Total Carve Out Fees** | 16 | **$ 1,403** | **$ 1,280** | **100%** | **100%** | **$ 1,403** | **$ 1,280** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 149,049** | **$ 173,100** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 149,049** | **$ 173,100** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 4% | 3% | $ 98,038 | $ 91,737 |
| First Lien Notes | 18 | 545,790 | 545,790 | 9% | 7% | 47,103 | 39,160 |
| Second Lien Notes | 19 | 355,973 | 355,973 | 1% | 11% | 3,908 | 40,828 |
| Purchase-Money Lien | 20 | 291,347 | 291,347 | – | 0% | 1,715 | 1,375 |
| **Total Secured Claims and Distributions** | | **$ 3,891,031** | **$ 3,891,031** | **4%** | **4%** | **$ 149,049** | **$ 173,100** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | | | – | – |
| Class 7 - Trade Claims | 24 | – | – | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,810** | **$ 1,543,810** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Classes** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

6

A-3155

**Mallinckrodt Pharmaceuticals Ireland Limited**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ | 7,391 | 5% | 5% | $ 353 | $ 397 |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ | 362,354 | 100% | 100% | $ 362,354 | 362,354 |
| Accounts Receivable, net | 3 | | 0 | 70% | 85% | 0 | 0 |
| Inventory | 4 | | 35,183 | 72% | 82% | 25,345 | 28,843 |
| Prepaid Expenses | 5 | | 341 | – | – | – | – |
| Other Current Assets | 6 | | 5,241 | 13% | 36% | 679 | 1,912 |
| Intangible Assets | 8 | | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | | 129,960 | 25% | 33% | 32,762 | 42,544 |
| Other Non-Current Assets | 9 | | 626 | 10% | 20% | 63 | 125 |
| Intercompany Receivables | 10 | | 722,583 | 4% | 5% | 30,615 | 32,938 |
| Investment in Subsidiary | 11 | | 631 | 1796% | 2404% | 11,337 | 15,175 |
| Net Operating Cash Flow - Conversion Through Sale | 12 | | n/a | n/a | n/a | 209 | 232 |
| **Total Assets and Gross Recovery** | | **$ 1,256,919** | | 37% | 39% | **$ 463,363** | **$ 484,123** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 463,716** | **$ 484,520** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 5,538 | $ 5,975 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 20,051 | 15,406 |
| Winddown Expense | 15 | | | | | 12,725 | 11,168 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **38,314** | **32,549** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 425,402** | **$ 451,971** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$ 425,402** | **$ 451,971** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 213 | $ 193 | 100% | 100% | $ 213 | $ 193 |
| Chapter 11 Professionals | | 3,730 | 3,095 | 100% | 100% | 3,730 | 3,095 |
| **Total Carve Out Fees** | 16 | **$ 3,944** | **$ 3,288** | 100% | 100% | **$ 3,944** | **$ 3,288** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 421,459** | **$ 448,683** |
| Less: Value from Unencumbered Assets | | | | | | (24,511) | (26,043) |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 396,948** | **$ 422,640** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 10% | 8% | $ 262,613 | $ 226,349 |
| First Lien Notes | 18 | 545,790 | 545,790 | 9% | 7% | 47,103 | 39,160 |
| Second Lien Notes | 19 | 355,973 | 355,973 | 25% | 11% | 87,231 | 40,828 |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | 11% | 9% | **$ 396,948** | **$ 306,337** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ 116,303** |
| Add: Value from Unencumbered Assets | | | | | | 24,511 | 26,043 |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | **$ 24,511** | **$ 142,346** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ 5,000 | $ 5,000 | 100% | 100% | $ 5,000 | $ 5,000 |
| **Total Superpriority Administrative Claims and Distributions** | | **$ 5,000** | **$ 5,000** | 100% | 100% | **$ 5,000** | **$ 5,000** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ 19,511** | **$ 137,346** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 11,495 | $ 11,495 | 82% | 100% | $ 9,426 | $ 11,495 |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | 12,298 | 12,298 | 82% | 100% | 10,085 | 12,298 |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 23,794** | **$ 23,794** | 82% | 100% | **$ 19,511** | **$ 23,794** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ 113,552** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | 7% | $ – | $ 101,381 |
| Class 6 - General Unsecured Claims | 23 | 64,959 [a] | 64,959 [a] | – | 7% | – | 4,266 |
| Class 7 - Trade Claims | 24 | 7,863 | 7,863 | – | 7% | – | 516 |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 112,523 | 112,523 | – | 7% | – | 7,389 |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,729,154** | **$ 1,729,154** | – | 7% | **$ –** | **$ 113,552** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Classes** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

7

A-3156

**ST Shared Services LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | 1,670 | 70% | 85% | 1,169 | 1,420 |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | 31,385 | – | – | – | – |
| Other Current Assets | 6 | 1,174 | 20% | 40% | 232 | 468 |
| Plant, Property & Equipment, net | 7 | 67,761 | 7% | 13% | 4,590 | 9,113 |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | 750 | 10% | 20% | 75 | 150 |
| Intercompany Receivables | 10 | 207,099 | 0% | 0% | 12 | 157 |
| Investment in Subsidiary | 11 | – | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 309,839** | **2%** | **4%** | **$ 6,078** | **$ 11,308** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 6,078** | **$ 11,308** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 73 | 141 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 264 | 363 |
| Winddown Expense | 15 | | | | 65 | 95 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 402** | **598** |
| **Net Proceeds Available for Distribution** | | | | | **$ 5,676** | **$ 10,710** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | $ 5,676 | $ 10,710 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 3 | $ 5 | 100% | 100% | $ 3 | $ 5 |
| Chapter 11 Professionals | | 50 | 74 | 100% | 100% | 50 | 74 |
| **Total Carve Out Fees** | 16 | **$ 53** | **$ 78** | **100%** | **100%** | **$ 53** | **$ 78** |
| **Net Proceeds After Carve Out Claims** | | | | | | $ 5,623 | $ 10,631 |
| Less: Value from Unencumbered Assets | | | | | | (132) | (198) |
| **Net Proceeds Available for Secured Claims** | | | | | | $ 5,491 | $ 10,433 |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 3,612 | $ 5,530 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 1% | 1,878 | 4,903 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 5,491** | **$ 10,433** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $ – | $ – |
| Add: Value from Unencumbered Assets | | | | | | 132 | 198 |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | $ 132 | $ 198 |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ 132 | $ 198 |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 11,020 | $ 11,020 | 1% | 1% | $ 101 | $ 151 |
| Postpetition Intercompany Payables | | | | | | | |
| Priority Tax Claims | | 3,466 | 3,466 | 1% | 1% | 32 | 47 |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 14,486** | **$ 14,486** | **1%** | **1%** | **$ 132** | **$ 198** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ – | $ – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 1,383 [a] | 1,383 [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 8,560 | 8,560 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – | – | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 103,698 | 103,698 | – | – | – | – |
| **Total Distribution to Unsecured Claims** | | **$ 1,657,451** | **$ 1,657,451** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

8

A-3157

**Mallinckrodt ARD IP Unlimited Company**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ 59 | 100% | 100% | $ 59 | $ 59 |
| Accounts Receivable, net | 3 | – | | | | |
| Inventory | 4 | – | | | | |
| Prepaid Expenses | 5 | – | | | | |
| Other Current Assets | 6 | 0 | 20% | 40% | 0 | 0 |
| Plant, Property & Equipment, net | 7 | – | | | | |
| Intangible Assets | 8 | 3,453,736 | 13% | 15% | 432,649 | 519,488 |
| Other Non-Current Assets | 9 | – | | | | |
| Intercompany Receivables | 10 | – | | | | |
| Investment in Subsidiary | 11 | – | | | | |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | | |
| **Total Assets and Gross Recovery** | | **$ 3,453,795** | **13%** | **15%** | **$ 432,708** | **$ 519,547** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 432,708** | **$ 519,547** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 5,202 | $ 6,468 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 18,835 | 16,676 |
| Winddown Expense | 15 | | | | 4,607 | 4,380 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 28,644** | **$ 27,523** |
| **Net Proceeds Available for Distribution** | | | | | **$ 404,064** | **$ 492,024** |

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$ 404,064** | **$ 492,024** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 204 | $ 212 | 100% | 100% | $ 204 | $ 212 |
| Chapter 11 Professionals | | 3,564 | 3,398 | 100% | 100% | 3,564 | 3,398 |
| **Total Carve Out Fees** | 16 | **$ 3,768** | **$ 3,611** | **100%** | **100%** | **$ 3,768** | **$ 3,611** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 400,296** | **$ 488,413** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 400,296** | **$ 488,413** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 10% | 10% | $ 263,296 | $ 258,842 |
| First Lien Notes | 18 | 545,790 | 545,790 | 9% | 7% | 47,103 | 39,160 |
| Second Lien Notes | 19 | 355,973 | 355,973 | 25% | 11% | 89,896 | 40,828 |
| Purchase-Money Lien | 20 | – | – | | | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **11%** | **9%** | **$ 400,296** | **$ 338,830** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ 149,583** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ 149,583** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ 149,583** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ 149,583** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | 10% | $ – | $ 149,583 |
| Class 6 - General Unsecured Claims | 23 | –[a] | –[a] | | | | |
| Class 7 - Trade Claims | 24 | – | – | | | | |
| Class 8 & Class 9 - Opioid Claims | 25 | –[a] | –[a] | | | | |
| Class 10 - Settled Federal/State Aethar Claims | 26 | –[a] | –[a] | | | | |
| Class 11 - Intercompany Claims | 27 | – | – | | | | |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,810** | **$ 1,543,810** | **–** | **10%** | **$ –** | **$ 149,583** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Classes** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | –[a] | –[a] | | | | |
| Class 14 - Equity Interests | 30 | – | – | | | | |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

9

**Mallinckrodt Hospital Products IP Unlimited Company**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ 1,179,226 | | 49% | 57% | $ 576,532 | $ 668,176 |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ 59 | | 100% | 100% | $ 59 | $ 59 |
| Accounts Receivable, net | 3 | – | | – | – | – | – |
| Inventory | 4 | – | | – | – | – | – |
| Prepaid Expenses | 5 | – | | – | – | – | – |
| Other Current Assets | 6 | 0 | | 20% | 40% | 0 | 0 |
| Plant, Property & Equipment, net | 7 | – | | – | – | – | – |
| Intangible Assets | 8 | 841,500 | | 62% | 72% | 518,515 | 606,515 |
| Other Non-Current Assets | 9 | – | | – | – | – | – |
| Intercompany Receivables | 10 | – | | – | – | – | – |
| Investment in Subsidiary | 11 | – | | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 841,559** | | **62%** | **72%** | **$ 518,574** | **$ 606,574** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 1,095,106** | **$ 1,274,751** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 13,165 | 15,869 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 47,669 | 40,915 |
| Winddown Expense | 15 | | | | | 11,658 | 10,746 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 72,492** | **$ 67,530** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 1,022,614** | **$ 1,207,220** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$ 1,022,614** | **$ 1,207,220** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 515 | $ 521 | 100% | 100% | $ 515 | $ 521 |
| Chapter 11 Professionals | | 9,020 | 8,338 | 100% | 100% | 9,020 | 8,338 |
| **Total Carve Out Fees** | 16 | **$ 9,536** | **$ 8,859** | **100%** | **100%** | **$ 9,536** | **$ 8,859** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 1,013,078** | **$ 1,198,361** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 1,013,078** | **$ 1,198,361** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 25% | 24% | $ 666,356 | $ 635,089 |
| First Lien Notes | 18 | 545,790 | 545,790 | 9% | 7% | 47,103 | 39,160 |
| Second Lien Notes | 19 | 355,973 | 355,973 | 31% | 11% | 108,753 | 40,828 |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **23%** | **20%** | **$ 822,213** | **$ 715,077** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ 190,865** | **$ 483,284** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ 190,865** | **$ 483,284** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ 190,865** | **$ 483,284** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ 190,865** | **$ 483,284** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | 12% | 31% | $ 190,865 | $ 483,283 |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | | | – | – |
| Class 7 - Trade Claims | 24 | 5 | 5 | 12% | 31% | 1 | 1 |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,814** | **$ 1,543,814** | **12%** | **31%** | **$ 190,865** | **$ 483,284** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Classes** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

10

**A-3159**

**SpecGx LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| *I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION* | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ 28,435 | 100% | 100% | $ 28,435 | $ 28,435 |
| Accounts Receivable, net | 3 | 247,896 | 70% | 85% | 173,528 | 210,712 |
| Inventory | 4 | 220,365 | 9% | 12% | 19,722 | 27,329 |
| Prepaid Expenses | 5 | 14,781 | – | – | – | – |
| Other Current Assets | 6 | 11,005 | 0% | 30% | 25 | 3,314 |
| Plant, Property & Equipment, net | 7 | 350,593 | 14% | 20% | 48,427 | 71,342 |
| Intangible Assets | 8 | 79,303 | – | – | – | – |
| Other Non-Current Assets | 9 | 10,989 | 10% | 20% | 1,099 | 2,198 |
| Intercompany Receivables | 10 | 120,714 | 25% | 26% | 29,960 | 31,465 |
| Investment in Subsidiary | 11 | 140,851 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 1,224,934** | 25% | 31% | **$ 301,196** | **$ 374,794** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 301,196** | **$ 374,794** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | 3,480 | 4,435 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 12,599 | 11,434 |
| Winddown Expense | 15 | | | | 15,774 | 14,319 |
| **Total Chapter 7 Liquidation Costs** | | | | | **31,853** | **30,188** |
| **Net Proceeds Available for Distribution** | | | | | **$ 269,343** | **$ 344,607** |

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| *II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS* | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$ 269,343** | **$ 344,607** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 130 | $ 141 | 100% | 100% | $ 130 | $ 141 |
| Chapter 11 Professionals | | 2,278 | 2,257 | 100% | 100% | 2,278 | 2,257 |
| **Total Carve Out Fees** | 16 | **$ 2,408** | **$ 2,398** | 100% | 100% | **$ 2,408** | **$ 2,398** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 266,935** | **$ 342,209** |
| Less: Value from Unencumbered Assets | | | | | | (27,659) | (29,804) |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 239,276** | **$ 312,404** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 6% | 7% | 167,789 | 182,564 |
| First Lien Notes | 18 | 545,790 | 545,790 | 9% | 7% | 47,103 | 39,160 |
| Second Lien Notes | 19 | 355,973 | 355,973 | 7% | 11% | 24,384 | 40,828 |
| Purchase-Money Lien | 20 | | | | | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | 7% | 7% | **$ 239,276** | **$ 262,552** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ 49,852** |
| Add: Value from Unencumbered Assets | | | | | | 27,659 | 29,804 |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ 27,659** | **$ 79,656** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ 6,000 | $ 6,000 | 100% | 100% | $ 6,000 | $ 6,000 |
| **Total Superpriority Administrative Claims and Distributions** | | **$ 6,000** | **$ 6,000** | 100% | 100% | **$ 6,000** | **$ 6,000** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ 21,659** | **$ 73,656** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | 16,637 | 16,637 | 100% | 100% | 16,637 | 16,637 |
| Postpetition Intercompany Payables | | | | | | | |
| Priority Tax Claims | | 2,712 | 2,712 | 100% | 100% | 2,712 | 2,712 |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 19,350** | **$ 19,350** | 100% | 100% | **$ 19,350** | **$ 19,350** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ 2,309** | **$ 54,307** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | 0% | 3% | $ 1,989 | $ 46,784 |
| Class 6 - General Unsecured Claims | 23 | 1,297 [a] | 1,297 [a] | 0% | 3% | 2 | 39 |
| Class 7 - Trade Claims | 24 | 8,606 | 8,606 | 0% | 3% | 11 | 261 |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | | |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | | | | |
| Class 11 - Intercompany Claims | 27 | 238,353 | 238,353 | 0% | 3% | 307 | 7,223 |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,792,065** | **$ 1,792,065** | 0% | 3% | **$ 2,309** | **$ 54,307** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | | | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

11

A-3160

**Mallinckrodt LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

### I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | 8,478 | – | – | – | – |
| Other Current Assets | 6 | 2,283 | 12% | 36% | 265 | 818 |
| Plant, Property & Equipment, net | 7 | 35,875 | 34% | 38% | 12,021 | 13,548 |
| Intangible Assets | 8 | 35,014 | – | – | – | – |
| Other Non-Current Assets | 9 | 78,258 | 80% | 90% | 62,437 | 70,263 |
| Intercompany Receivables | 10 | 334,490 | – | – | – | – |
| Investment in Subsidiary | 11 | 744,351 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 1,238,748** | **6%** | **7%** | **$ 74,723** | **$ 84,629** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 74,723** | **$ 84,629** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 858 | $ 987 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 3,106 | 2,545 |
| Winddown Expense | 15 | | | | 1,860 | 1,539 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 5,823** | **$ 5,071** |
| **Net Proceeds Available for Distribution** | | | | | **$ 68,900** | **$ 79,557** |

### II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | | | | | **$ 68,900** | **$ 79,557** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 33 | $ 32 | 100% | 100% | $ 33 | $ 32 |
| Chapter 11 Professionals | | 578 | 513 | 100% | 100% | 578 | 513 |
| **Total Carve Out Fees** | 16 | **$ 612** | **$ 545** | **100%** | **100%** | **$ 612** | **$ 545** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 68,289** | **$ 79,012** |
| Less: Value from Unencumbered Assets | | | | | | (11,370) | (12,246) |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 56,919** | **$ 66,766** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 2% | 2% | $ 56,919 | $ 66,766 |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **2%** | **2%** | **$ 56,919** | **$ 66,766** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | 11,370 | 12,246 |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ 11,370** | **$ 12,246** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ 14,000 | $ 14,000 | 81% | 87% | $ 11,370 | $ 12,246 |
| **Total Superpriority Administrative Claims and Distributions** | | **$ 14,000** | **$ 14,000** | **81%** | **87%** | **$ 11,370** | **$ 12,246** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 1,366 | $ 1,366 | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | – | – | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 1,366** | **$ 1,366** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 72,248 [a] | 72,248 [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 7,575 | 7,575 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | [a] | [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | [a] | [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 60,686 | 60,686 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,684,319** | **$ 1,684,319** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Classes** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

12

A-3161

**Mallinckrodt APAP LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Higher | Estimated $ Recovery Lower | Higher |
|---|---|---|---|---|---|---|
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ 159,403 | 160% | 194% | $ 255,414 | $ 309,105 |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | 26,039 | 70% | 85% | 18,227 | 22,133 |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | 301 | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | 3,561 | 10% | 20% | 356 | 712 |
| Intercompany Receivables | 10 | 214,733 | 5% | 6% | 10,030 | 12,476 |
| Investment in Subsidiary | 11 | – | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | 7,633 | 8,481 |
| **Total Assets and Gross Recovery** | | $ 244,634 | 15% | 18% | $ 36,247 | $ 43,802 |
| **Gross Proceeds Available for Distribution** | | | | | $ 291,661 | $ 352,907 |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 3,377 | $ 4,228 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 12,227 | 10,901 |
| Winddown Expense | 15 | | | | 17,172 | 15,455 |
| **Total Chapter 7 Liquidation Costs** | | | | | $ 32,776 | $ 30,583 |
| **Net Proceeds Available for Distribution** | | | | | $ 258,885 | $ 322,324 |

| | Note Ref | Estimated Allowed Claims Lower | Higher | Estimated % Recovery Lower | Higher | Estimated $ Recovery Lower | Higher |
|---|---|---|---|---|---|---|---|
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | $ 258,885 | $ 322,324 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 129 | $ 137 | 100% | 100% | $ 129 | $ 137 |
| Chapter 11 Professionals | | 2,259 | 2,195 | 100% | 100% | 2,259 | 2,195 |
| **Total Carve Out Fees** | 16 | $ 2,388 | $ 2,332 | 100% | 100% | $ 2,388 | $ 2,332 |
| **Net Proceeds After Carve Out Claims** | | | | | | $ 256,497 | $ 319,992 |
| Less: Value from Unencumbered Assets | | | | | | (25,318) | (29,561) |
| **Net Proceeds Available for Secured Claims** | | | | | | $ 231,180 | $ 290,431 |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 6% | 6% | $ 153,875 | $ 156,775 |
| First Lien Notes | 18 | 545,790 | 545,790 | 9% | 7% | 47,103 | 39,160 |
| Second Lien Notes | 19 | 355,973 | 355,973 | 8% | 11% | 30,202 | 40,828 |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | $ 3,599,684 | $ 3,599,684 | 6% | 7% | $ 231,180 | $ 236,763 |
| **Proceeds After Satisfying Secured Claims** | | | | | | $ – | $ 53,667 |
| Add: Value from Unencumbered Assets | | | | | | 25,318 | 29,561 |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | $ 25,318 | $ 83,228 |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ 25,318 | $ 83,228 |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | – | – | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ 25,318 | $ 83,228 |
| UNSECURED CLASSES OF CLAIMS(b): | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | 2% | 5% | $ 25,238 | $ 82,967 |
| Class 6 - General Unsecured Claims | 23 | (a) | | – | – | – | – |
| Class 7 - Trade Claims | 24 | 4,867 | 4,867 | 2% | 5% | 80 | 262 |
| Class 8 & Class 9 - Opioid Claims | 25 | (a) | (a) | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | (a) | (a) | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | $ 1,548,677 | $ 1,548,677 | 2% | 5% | $ 25,318 | $ 83,229 |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS(b): | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | (a) | (a) | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | $ – | $ – | – | – | $ – | $ – |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

13

A-3162

**Mallinckrodt Enterprises LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | 250 | 20% | 40% | 50 | 100 |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | 3,396,144 | 0% | 0% | 6,092 | 8,154 |
| Investment in Subsidiary | 11 | 2,237,341 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 5,633,735** | **0%** | **0%** | **$ 6,142** | **$ 8,254** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 6,142** | **$ 8,254** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 70 | $ 96 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 255 | 248 |
| Winddown Expense | 15 | | | | 153 | 150 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 479** | **$ 495** |
| **Net Proceeds Available for Distribution** | | | | | **$ 5,663** | **$ 7,759** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ 5,663 | $ 7,759 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 3 | $ 3 | 100% | 100% | $ 3 | $ 3 |
| Chapter 11 Professionals | | 48 | 50 | 100% | 100% | 48 | 50 |
| **Total Carve Out Fees** | 16 | **$ 50** | **$ 53** | **100%** | **100%** | **$ 50** | **$ 53** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 5,613** | **$ 7,706** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 5,613** | **$ 7,706** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | 5,613 | 7,706 |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 5,613** | **$ 7,706** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 570 [a] | 570 [a] | | | – | – |
| Class 7 - Trade Claims | 24 | 880 | 880 | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | [a] | [a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | [a] | [a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | 2,710 | 2,710 | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,547,970** | **$ 1,547,970** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

14

**A-3163**

**Mallinckrodt Lux IP S.a.r.l.**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ 8 | | 100% | 100% | $ 8 | $ 8 |
| Accounts Receivable, net | 3 | – | | – | – | – | – |
| Inventory | 4 | – | | – | – | – | – |
| Prepaid Expenses | 5 | – | | – | – | – | – |
| Other Current Assets | 6 | 43 | | 20% | 40% | 9 | 17 |
| Plant, Property & Equipment, net | 7 | – | | – | – | – | – |
| Intangible Assets | 8 | – | | – | – | – | – |
| Other Non-Current Assets | 9 | – | | – | – | – | – |
| Intercompany Receivables | 10 | 21,816 | | – | 7% | – | 1,433 |
| Investment in Subsidiary | 11 | 2,600 | | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 24,468** | | **0%** | **6%** | **$ 17** | **$ 1,458** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 17** | **$ 1,458** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 0 | $ 18 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 1 | 47 |
| Winddown Expense | 15 | | | | | 0 | 12 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 1** | **$ 77** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 16** | **$ 1,381** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | $ 16 | $ 1,381 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 1 | 100% | 100% | $ 0 | $ 1 |
| Chapter 11 Professionals | | 0 | 10 | 100% | 100% | 0 | 10 |
| **Total Carve Out Fees** | 16 | **$ 0** | **$ 10** | **100%** | **100%** | **$ 0** | **$ 10** |
| **Net Proceeds After Carve Out Claims** | | | | | | $ 16 | $ 1,371 |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 16** | **$ 1,371** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 10 | $ 727 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 5 | 644 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 16** | **$ 1,371** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $ – | $ – |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | $ – | $ – |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ – | $ – |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 107 | $ 107 | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | 437 | 437 | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 544** | **$ 544** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ – | $ – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | | | – | – |
| Class 7 - Trade Claims | 24 | 1 | 1 | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,811** | **$ 1,543,811** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

15

**A-3164**

**Mallinckrodt Canada ULC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | | Estimated $ Recovery Higher | |
|---|---|---|---|---|---|---|---|---|---|
| *I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION* | | | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ | – | – | – | $ | – | $ | – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | | | |
| Cash and Cash Equivalents | 2 | $ | 2,467 | 100% | 100% | $ | 2,467 | $ | 2,467 |
| Accounts Receivable, net | 3 | | 694 | 70% | 85% | | 486 | | 590 |
| Inventory | 4 | | 3,865 | 24% | 32% | | 928 | | 1,237 |
| Prepaid Expenses | 5 | | – | – | – | | – | | – |
| Other Current Assets | 6 | | 780 | 6% | 33% | | 50 | | 259 |
| Plant, Property & Equipment, net | 7 | | 0 | 10% | 20% | | 0 | | 0 |
| Intangible Assets | 8 | | – | – | – | | – | | – |
| Other Non-Current Assets | 9 | | – | – | – | | – | | – |
| Intercompany Receivables | 10 | | 8 | – | – | | – | | – |
| Investment in Subsidiary | 11 | | – | – | – | | – | | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | | n/a | n/a | n/a | | – | | – |
| **Total Assets and Gross Recovery** | | **$** | **7,814** | **50%** | **58%** | **$** | **3,930** | **$** | **4,552** |
| **Gross Proceeds Available for Distribution** | | | | | | **$** | **3,930** | **$** | **4,552** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ | 45 | $ | 53 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | | 163 | | 137 |
| Winddown Expense | 15 | | | | | | 48 | | 44 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$** | **257** | **$** | **234** |
| **Net Proceeds Available for Distribution** | | | | | | **$** | **3,673** | **$** | **4,318** |

| | Note Ref | Estimated Allowed Claims Lower | | Estimated Allowed Claims Higher | | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | | Estimated $ Recovery Higher | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS* | | | | | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | | | **$** | **3,673** | **$** | **4,318** |
| CARVE OUT: | | | | | | | | | | | |
| US Trustee Fees | | $ | 2 | $ | 2 | 100% | 100% | $ | 2 | $ | 2 |
| Chapter 11 Professionals | | | 31 | | 28 | 100% | 100% | | 31 | | 28 |
| **Total Carve Out Fees** | 16 | **$** | **33** | **$** | **30** | **100%** | **100%** | **$** | **33** | **$** | **30** |
| **Net Proceeds After Carve Out Claims** | | | | | | | | **$** | **3,641** | **$** | **4,289** |
| Less: Value from Unencumbered Assets | | | | | | | | | – | | – |
| **Net Proceeds Available for Secured Claims** | | | | | | | | **$** | **3,641** | **$** | **4,289** |
| SECURED CLAIMS: | | | | | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ | – | $ | – | – | – | $ | – | $ | – |
| First Lien Notes | 18 | | – | | – | – | – | | – | | – |
| Second Lien Notes | 19 | | – | | – | – | – | | – | | – |
| Purchase-Money Lien | 20 | | – | | – | – | – | | – | | – |
| **Total Secured Claims and Distributions** | | **$** | **–** | **$** | **–** | **–** | **–** | **$** | **–** | **$** | **–** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | | | **$** | **3,641** | **$** | **4,289** |
| Add: Value from Unencumbered Assets | | | | | | | | | – | | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | | | **$** | **3,641** | **$** | **4,289** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ | 2,500 | $ | 2,500 | 100% | 100% | $ | 2,500 | $ | 2,500 |
| **Total Superpriority Administrative Claims and Distributions** | | **$** | **2,500** | **$** | **2,500** | **100%** | **100%** | **$** | **2,500** | **$** | **2,500** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | | | **$** | **1,141** | **$** | **1,789** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | | | | | |
| Postpetition Admin Trade Claims | | $ | 2 | $ | 2 | 100% | 100% | $ | 2 | $ | 2 |
| Postpetition Intercompany Payables | | | – | | – | – | – | | – | | – |
| Priority Tax Claims | | | – | | – | – | – | | – | | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$** | **2** | **$** | **2** | **100%** | **100%** | **$** | **2** | **$** | **2** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | | | **$** | **1,138** | **$** | **1,786** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ | – | $ | – | – | – | $ | – | $ | – |
| Class 6 - General Unsecured Claims | 23 | | – [a] | | – [a] | | | | | | |
| Class 7 - Trade Claims | 24 | | 117 | | 117 | 28% | 43% | | 32 | | 51 |
| Class 8 & Class 9 - Opioid Claims | 25 | | – [a] | | – [a] | | | | | | |
| Class 10 - Settled Federal/State Aethar Claims | 26 | | – [a] | | – [a] | | | | | | |
| Class 11 - Intercompany Claims | 27 | | 4,014 | | 4,014 | 28% | 43% | | 1,106 | | 1,736 |
| **Total Distribution to Unsecured Classes of Claims** | | **$** | **4,131** | **$** | **4,131** | **28%** | **43%** | **$** | **1,138** | **$** | **1,786** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | | | **$** | **–** | **$** | **–** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ | – | $ | – | – | – | $ | – | $ | – |
| Class 13 - Subordinated Claims | 29 | | – [a] | | – [a] | | | | | | |
| Class 14 - Equity Interests | 30 | | – | | – | – | – | | – | | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$** | **–** | **$** | **–** | **–** | **–** | **$** | **–** | **$** | **–** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

16

A-3165

**Sucampo Pharma Americas, LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ 431,375 | 22% | 25% | $ 93,392 | $ 106,049 |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ 13,538 | 100% | 100% | $ 13,538 | $ 13,538 |
| Accounts Receivable, net | 3 | 12,612 | 70% | 85% | 8,829 | 10,721 |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | 159 | – | – | – | – |
| Other Current Assets | 6 | 19,009 | 20% | 40% | 3,802 | 7,604 |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | 332 | 10% | 20% | 33 | 66 |
| Intercompany Receivables | 10 | 323,439 | – | – | – | – |
| Investment in Subsidiary | 11 | 61,587 | 105% | 132% | 64,365 | 81,077 |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | 15,803 | 17,559 |
| **Total Assets and Gross Recovery** | | $ 430,676 | 25% | 30% | $ 106,370 | $ 130,565 |
| **Gross Proceeds Available for Distribution** | | | | | $ 199,761 | $ 236,614 |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 2,112 | $ 2,560 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 7,648 | 6,602 |
| Winddown Expense | 15 | | | | 3,911 | 3,571 |
| **Total Chapter 7 Liquidation Costs** | | | | | $ 13,671 | $ 12,733 |
| **Net Proceeds Available for Distribution** | | | | | $ 186,090 | $ 223,881 |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | $ 186,090 | $ 223,881 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 89 | $ 90 | 100% | 100% | $ 89 | $ 90 |
| Chapter 11 Professionals | | 1,563 | 1,447 | 100% | 100% | 1,563 | 1,447 |
| **Total Carve Out Fees** | 16 | $ 1,652 | $ 1,537 | 100% | 100% | $ 1,652 | $ 1,537 |
| **Net Proceeds After Carve Out Claims** | | | | | | $ 184,438 | $ 222,344 |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | $ 184,438 | $ 222,344 |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 5% | 5% | $ 130,639 | $ 133,213 |
| First Lien Notes | 18 | 545,790 | 545,790 | 9% | 7% | 47,103 | 39,160 |
| Second Lien Notes | 19 | 355,973 | 355,973 | 2% | 11% | 6,696 | 40,828 |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | $ 3,599,684 | $ 3,599,684 | 5% | 6% | $ 184,438 | $ 213,201 |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $ – | $ 9,143 |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | $ – | $ 9,143 |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ – | $ 9,143 |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | 15,000 | 15,000 | – | 38% | – | 5,648 |
| Priority Tax Claims | | 9,282 | 9,282 | – | 38% | – | 3,495 |
| **Total Administrative & Priority Claims and Distributions** | 21 | $ 24,282 | $ 24,282 | – | 38% | $ – | $ 9,143 |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ – | $ – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 11 | 11 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – | – | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 134,796 | 134,796 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | $ 1,678,617 | $ 1,678,617 | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | $ – | $ – | – | – | $ – | $ – |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

17

**Sucampo Pharmaceuticals, Inc.**
**Hypothetical Liquidation Analysis**
($ in 000s)

## I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION

| | Note Ref | Net Book Value | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | 1,029 | 90% | 100% | 926 | 1,029 |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | 299,145 | – | – | – | – |
| Investment in Subsidiary | 11 | 294,434 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 594,607** | **0%** | **0%** | **$ 926** | **$ 1,029** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 926** | **$ 1,029** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 11 | $ 13 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 40 | 33 |
| Winddown Expense | 15 | | | | 10 | 9 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 61** | **$ 54** |
| **Net Proceeds Available for Distribution** | | | | | **$ 865** | **$ 974** |

## II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **Net Proceeds Available for Distribution** | | | | | | **$ 865** | **$ 974** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 0 | 100% | 100% | $ 0 | $ 0 |
| Chapter 11 Professionals | | 8 | 7 | 100% | 100% | 8 | 7 |
| **Total Carve Out Fees** | 16 | **$ 8** | **$ 7** | **100%** | **100%** | **$ 8** | **$ 7** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 856** | **$ 967** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 856** | **$ 967** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 563 | $ 513 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 293 | 455 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | | | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 856** | **$ 967** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | | | – | – |
| Class 7 - Trade Claims | 24 | 2 | 2 | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – | – | | | – | – |
| Class 11 - Intercompany Claims | 27 | 141,156 | 141,156 | | | – | – |
| **Total Distribution to Unsecured Claims** | | **$ 1,684,968** | **$ 1,684,968** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | 127,226 | 127,226 [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ 127,226** | **$ 127,226** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

18

**MEH, Inc.**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | 31 | – | – | – | – |
| Other Current Assets | 6 | 48,917 | 89% | 99% | 43,525 | 48,489 |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | 136,689 | 10% | 20% | 13,669 | 27,338 |
| Intercompany Receivables | 10 | 4,561 | 0% | 2% | 3 | 82 |
| Investment in Subsidiary | 11 | 10,490,091 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 10,680,288** | 1% | 1% | **$ 57,198** | **$ 75,908** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 57,198** | **$ 75,908** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 688 | $ 945 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 2,490 | 2,436 |
| Winddown Expense | 15 | | | | 609 | 640 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 3,786** | **$ 4,021** |
| **Net Proceeds Available for Distribution** | | | | | **$ 53,412** | **$ 71,887** |

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$ 53,412** | **$ 71,887** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 27 | $ 31 | 100% | 100% | $ 27 | $ 31 |
| Chapter 11 Professionals | | 471 | 497 | 100% | 100% | 471 | 497 |
| **Total Carve Out Fees** | 16 | **$ 498** | **$ 528** | 100% | 100% | **$ 498** | **$ 528** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 52,913** | **$ 71,360** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 52,913** | **$ 71,360** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 1% | 1% | $ 34,804 | $ 37,818 |
| First Lien Notes | 18 | 545,790 | 545,790 | 3% | 6% | 18,109 | 33,542 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | 1% | 2% | **$ 52,913** | **$ 71,360** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ 40,000 | $ 40,000 | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ 40,000** | **$ 40,000** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 332 | $ 332 | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | 7,031 | 7,031 | – | – | – | – |
| Priority Tax Claims | | 223 | 223 | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 7,586** | **$ 7,586** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 36,620 [a] | 36,620 [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 0 | 0 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 563,020 | 563,020 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 2,143,450** | **$ 2,143,450** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Classes** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

19

**INO Therapeutics LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ | 34,574 | 79% | 89% | $ 27,446 | $ 30,877 |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ | – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | | 104,918 | 70% | 85% | 73,443 | 89,180 |
| Inventory | 4 | | – | – | – | – | – |
| Prepaid Expenses | 5 | | 102 | – | – | – | – |
| Other Current Assets | 6 | | 446 | 14% | 37% | 62 | 165 |
| Plant, Property & Equipment, net | 7 | | 1,368 | – | – | – | – |
| Intangible Assets | 8 | | – | – | – | – | – |
| Other Non-Current Assets | 9 | | – | – | – | – | – |
| Intercompany Receivables | 10 | | 34,784 | 8% | 8% | 2,824 | 2,875 |
| Investment in Subsidiary | 11 | | – | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | | n/a | n/a | n/a | 29,203 | 32,448 |
| **Total Assets and Gross Recovery** | | **$** | **141,617** | **75%** | **88%** | **$ 105,532** | **$ 124,668** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 132,978** | **$ 155,545** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 1,191 | $ 1,436 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 4,313 | 3,703 |
| Winddown Expense | 15 | | | | | 10,103 | 9,116 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 15,607** | **$ 14,254** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 117,371** | **$ 141,291** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ 117,371 | $ 141,291 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 56 | $ 57 | 100% | 100% | $ 56 | $ 57 |
| Chapter 11 Professionals | | 985 | 911 | 100% | 100% | 985 | 911 |
| **Total Carve Out Fees** | 16 | **$ 1,042** | **$ 968** | **100%** | **100%** | **$ 1,042** | **$ 968** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 116,329** | **$ 140,322** |
| Less: Value from Unencumbered Assets | | | | | | (1,003) | (1,128) |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 115,326** | **$ 139,194** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 4% | 5% | $ 115,326 | $ 139,194 |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **3%** | **4%** | **$ 115,326** | **$ 139,194** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | |
| Add: Value from Unencumbered Assets | | | | | | 1,003 | 1,128 |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ 1,003** | **$ 1,128** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ 78,052 | $ 78,052 | 1% | 1% | $ 1,003 | $ 1,128 |
| **Total Superpriority Administrative Claims and Distributions** | | **$ 78,052** | **$ 78,052** | **1%** | **1%** | **$ 1,003** | **$ 1,128** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | | | | | | |
| Priority Tax Claims | | 1,056 | 1,056 | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 1,056** | **$ 1,056** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 1,053 [a] | 1,053 [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 1,413 | 1,413 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | [a] | [a] | | | | |
| Class 10 - Settled Federal/State Aethar Claims | 26 | [a] | [a] | | | | |
| Class 11 - Intercompany Claims | 27 | 177,902 | 177,902 | – | – | – | – |
| **Total Distribution to Unsecured Claims and Distributions** | | **$ 1,724,178** | **$ 1,724,178** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | | |
| Class 14 - Equity Interests | 30 | – | – | | | | |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted various Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

20

A-3169

**Mallinckrodt Manufacturing LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| **I.  CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $  23,127 | 61% | 68% | $  14,003 | $  15,754 |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $  – | – | – | $  – | $  – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | 240 | 19% | 39% | 45 | 95 |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | 82 | 10% | 20% | 8 | 16 |
| Intercompany Receivables | 10 | 50,450 | 10% | 12% | 5,000 | 6,099 |
| Investment in Subsidiary | 11 | – | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | $  50,772 | 10% | 12% | $  5,054 | $  6,211 |
| **Gross Proceeds Available for Distribution** | | | | | $  19,057 | $  21,964 |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $  227 | 270 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 822 | 696 |
| Winddown Expense | 15 | | | | 706 | 637 |
| **Total Chapter 7 Liquidation Costs** | | | | | $  1,754 | $  1,604 |
| **Net Proceeds Available for Distribution** | | | | | $  17,303 | $  20,361 |

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | $  17,303 | $  20,361 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $  9 | $  9 | 100% | 100% | $  9 | $  9 |
| Chapter 11 Professionals | | 151 | 139 | 100% | 100% | 151 | 139 |
| **Total Carve Out Fees** | 16 | $  160 | $  148 | 100% | 100% | $  160 | $  148 |
| **Net Proceeds After Carve Out Claims** | | | | | | $  17,143 | $  20,213 |
| Less: Value from Unencumbered Assets | | | | | | (3,167) | (3,563) |
| **Net Proceeds Available for Secured Claims** | | | | | | $  13,976 | $  16,650 |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $  2,697,920 | $  2,697,920 | 0% | 0% | $  9,211 | $  8,837 |
| First Lien Notes | 18 | 545,790 | 545,790 | 1% | 1% | 4,765 | 7,813 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | $  3,599,684 | $  3,599,684 | 0% | 0% | $  13,976 | $  16,650 |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $  – | $  – |
| Add: Value from Unencumbered Assets | | | | | | 3,167 | 3,563 |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | $  3,167 | $  3,563 |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $  – | $  – | – | – | $  – | $  – |
| **Total Superpriority Administrative Claims and Distributions** | | $  – | $  – | – | – | $  – | $  – |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $  3,167 | $  3,563 |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $  – | $  – | – | – | $  – | $  – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | 7 | 7 | 100% | 100% | 7 | 7 |
| **Total Administrative & Priority Claims and Distributions** | 21 | $  7 | $  7 | 100% | 100% | $  7 | $  7 |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $  3,160 | $  3,556 |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $  1,543,810 | $  1,543,810 | 0% | 0% | $  3,142 | $  3,535 |
| Class 6 - General Unsecured Claims | 23 | 30 [a] | 30 [a] | 0% | 0% | 0 | 0 |
| Class 7 - Trade Claims | 24 | 1,006 | 1,006 | 0% | 0% | 2 | 2 |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 7,900 | 7,900 | 0% | 0% | 16 | 18 |
| **Total Distribution to Unsecured Claims** | | $  1,552,746 | $  1,552,746 | 0% | 0% | $  3,160 | $  3,556 |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $  – | $  – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $  – | $  – | – | – | $  – | $  – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | $  – | $  – | – | – | $  – | $  – |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

21

**A-3170**

**Therakos, Inc.**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| ***I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION*** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ | 91 | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | 2 | $ | – | | | $ – | $ – |
| Cash and Cash Equivalents | 3 | | 21,015 | 70% | 85% | 14,710 | 17,863 |
| Accounts Receivable, net | 4 | | 38,282 | 80% | 90% | 30,626 | 34,454 |
| Inventory | 5 | | 9 | – | – | – | – |
| Prepaid Expenses | 6 | | 64 | 16% | 38% | 10 | 24 |
| Other Current Assets | 7 | | 4,469 | 9% | 17% | 382 | 765 |
| Plant, Property & Equipment, net | 8 | | | – | – | – | – |
| Intangible Assets | 9 | | 57 | 10% | 20% | 6 | 11 |
| Other Non-Current Assets | 10 | | 30,286 | | | – | – |
| Intercompany Receivables | 11 | | 3,098,389 | 0% | 0% | 6,184 | 8,831 |
| Investment in Subsidiary | 12 | | n/a | n/a | n/a | 6,723 | 7,470 |
| Net Operating Cash Flow - Conversion Through Sale | | | | | | | |
| **Total Assets and Gross Recovery** | | **$ 3,192,569** | | 2% | 2% | **$ 58,642** | **$ 69,418** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 58,642** | **$ 69,418** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 596 | $ 723 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 2,158 | 1,863 |
| Wind Down Expense | 15 | | | | | 3,533 | 3,194 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 6,287** | **$ 5,780** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 52,355** | **$ 63,638** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| ***II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS*** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$ 52,355** | **$ 63,638** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 25 | $ 26 | 100% | 100% | $ 25 | $ 26 |
| Chapter 11 Professionals | | 440 | 410 | 100% | 100% | 440 | 410 |
| **Total Carve Out Fees** | 16 | **$ 465** | **$ 436** | 100% | 100% | **$ 465** | **$ 436** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 51,890** | **$ 63,202** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 51,890** | **$ 63,202** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 2% | 2% | $ 51,890 | $ 63,202 |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | 1% | 2% | **$ 51,890** | **$ 63,202** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ 27,871 | $ 27,871 | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ 27,871** | **$ 27,871** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 619 | $ 619 | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | 254 | 254 | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 874** | **$ 874** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 6,540 [a] | 6,540 [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | | | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | [a] | [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | [a] | [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 29,111 | 29,111 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,579,461** | **$ 1,579,461** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Classes** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

22

**A-3171**

**Mallinckrodt US Pool LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | 1,583,406 | 0% | 0% | 132 | 3,102 |
| Investment in Subsidiary | 11 | – | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 1,583,406** | **0%** | **0%** | **$ 132** | **$ 3,102** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 132** | **$ 3,102** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 2 | 36 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 5 | 93 |
| Winddown Expense | 15 | | | | 1 | 25 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 8** | **$ 154** |
| **Net Proceeds Available for Distribution** | | | | | **$ 124** | **$ 2,948** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ 124 | $ 2,948 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 1 | 100% | 100% | $ 0 | $ 1 |
| Chapter 11 Professionals | | 1 | 19 | 100% | 100% | 1 | 19 |
| **Total Carve Out Fees** | 16 | **$ 1** | **$ 20** | **100%** | **100%** | **$ 1** | **$ 20** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 122** | **$ 2,928** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 122** | **$ 2,928** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 122 | $ 2,928 |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 122** | **$ 2,928** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | | | – | – |
| Class 7 - Trade Claims | 24 | – | – | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – | – | | | – | – |
| Class 11 - Intercompany Claims | 27 | 2,296,265 | 2,296,265 | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 3,840,075** | **$ 3,840,075** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | | | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

23

**Mallinckrodt Pharmaceuticals Limited**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ 11,245 | | 100% | 100% | $ 11,245 | $ 11,245 |
| Accounts Receivable, net | 3 | – | | – | – | – | – |
| Inventory | 4 | – | | – | – | – | – |
| Prepaid Expenses | 5 | 586 | | – | – | – | – |
| Other Current Assets | 6 | 124 | | 20% | 40% | 25 | 49 |
| Plant, Property & Equipment, net | 7 | 452 | | 9% | 19% | 42 | 85 |
| Intangible Assets | 8 | – | | – | – | – | – |
| Other Non-Current Assets | 9 | 282 | | 10% | 20% | 28 | 56 |
| Intercompany Receivables | 10 | 1,375 | | 8% | 8% | 117 | 117 |
| Investment in Subsidiary | 11 | 14,001,503 | | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | $ 14,015,567 | | 0% | 0% | $ 11,457 | $ 11,553 |
| **Gross Proceeds Available for Distribution** | | | | | | $ 11,457 | $ 11,553 |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 137 | $ 143 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 497 | 369 |
| Winddown Expense | 15 | | | | | 842 | 751 |
| **Total Chapter 7 Liquidation Costs** | | | | | | $ 1,476 | $ 1,263 |
| **Net Proceeds Available for Distribution** | | | | | | $ 9,981 | $ 10,289 |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | $ 9,981 | $ 10,289 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 5 | $ 4 | 100% | 100% | $ 5 | $ 4 |
| Chapter 11 Professionals | | 88 | 71 | 100% | 100% | 88 | 71 |
| **Total Carve Out Fees** | 16 | $ 93 | $ 76 | 100% | 100% | $ 93 | $ 76 |
| **Net Proceeds After Carve Out Claims** | | | | | | $ 9,888 | $ 10,214 |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | $ 9,888 | $ 10,214 |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 6,504 | $ 5,413 |
| First Lien Notes | 18 | 545,790 | 545,790 | 1% | 1% | 3,384 | 4,801 |
| Second Lien Notes | 19 | 355,973 | 355,973 | | | | |
| Purchase-Money Lien | 20 | – | – | | | | |
| **Total Secured Claims and Distributions** | | $ 3,599,684 | $ 3,599,684 | 0% | 0% | $ 9,888 | $ 10,214 |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $ – | $ – |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | $ – | $ – |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | $ – | $ – | | | $ – | $ – |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ – | $ – |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 796 | $ 796 | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | $ 796 | $ 796 | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ – | $ – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | | | – | – |
| Class 7 - Trade Claims | 24 | 700 | 700 | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | 6,142 | 6,142 | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | $ 1,550,651 | $ 1,550,651 | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | $ – | $ – | – | – | $ – | $ – |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

24

A-3173

**Ocera Therapeutics, Inc.**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | | – | – | – | – |
| Inventory | 4 | – | | – | – | – | – |
| Prepaid Expenses | 5 | 1,944 | | – | – | – | – |
| Other Current Assets | 6 | 45 | | 20% | 40% | 9 | 18 |
| Plant, Property & Equipment, net | 7 | – | | – | – | – | – |
| Intangible Assets | 8 | 64,500 | | – | – | – | – |
| Other Non-Current Assets | 9 | 137 | | 10% | 20% | 14 | 27 |
| Intercompany Receivables | 10 | – | | – | – | – | – |
| Investment in Subsidiary | 11 | – | | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 66,626** | | **0%** | **0%** | **$ 23** | **$ 45** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 23** | **$ 45** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 0 | $ 1 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 1 | 1 |
| Winddown Expense | 15 | | | | | 0 | 0 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 1** | **$ 2** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 21** | **$ 43** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ 21 | $ 43 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 0 | 100% | 100% | $ 0 | $ 0 |
| Chapter 11 Professionals | | 0 | 0 | 100% | 100% | 0 | 0 |
| **Total Carve Out Fees** | 16 | **$ 0** | **$ 0** | **100%** | **100%** | **$ 0** | **$ 0** |
| **Net Proceeds After Carve Out Claims** | | | | | | $ 21 | $ 43 |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 21** | **$ 43** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 21 | $ 43 |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 21** | **$ 43** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $ – | $ – |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ – | $ – |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 665 | $ 665 | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | – | – | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 665** | **$ 665** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ – | $ – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 1,972 | 1,972 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 88,317 | 88,317 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,634,099** | **$ 1,634,099** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

25

**Mallinckrodt Hospital Products Inc.**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| **I.  CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $         – | – | – | $         – | $         – |
| RECOVERIES FROM REMAINING ASSETS: | 2 | $         – | – | – | $         – | $         – |
| Cash and Cash Equivalents | | | | | | |
| Accounts Receivable, net | 3 | 19,426 | 70% | 85% | 13,598 | 16,512 |
| Inventory | 4 | 61,403 | 51% | 71% | 31,316 | 43,596 |
| Prepaid Expenses | 5 | 801 | – | – | – | – |
| Other Current Assets | 6 | 101 | 17% | 38% | 17 | 39 |
| Plant, Property & Equipment, net | 7 | 35 | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | 22,139 | – | – | – | – |
| Investment in Subsidiary | 11 | 3,302,201 | 0% | 0% | 4,304 | 4,687 |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$  3,406,105** | 1% | 2% | **$  49,234** | **$  64,834** |
| **Gross Proceeds Available for Distribution** | | | | | **$  49,234** | **$  64,834** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $       565 | $       756 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 2,046 | 1,950 |
| Winddown Expense | 15 | | | | 500 | 512 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$    3,112** | **$    3,219** |
| **Net Proceeds Available for Distribution** | | | | | **$  46,122** | **$  61,616** |

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$  46,122** | **$  61,616** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $          22 | $          25 | 100% | 100% | $          22 | $          25 |
| Chapter 11 Professionals | | 387 | 397 | 100% | 100% | 387 | 397 |
| **Total Carve Out Fees** | 16 | **$       409** | **$       422** | 100% | 100% | **$       409** | **$       422** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$  45,713** | **$  61,193** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$  45,713** | **$  61,193** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $  2,697,920 | $  2,697,920 | 2% | 2% | 45,713 | 61,193 |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$  3,599,684** | **$  3,599,684** | 1% | 2% | **$  45,713** | **$  61,193** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$         –** | |
| Add: Value from Unencumbered Assets | | | | | | – | |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$         –** | |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $     25,000 | $     25,000 | – | – | $         – | $         – |
| **Total Superpriority Administrative Claims and Distributions** | | **$     25,000** | **$     25,000** | – | – | **$         –** | **$         –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$         –** | |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $       390 | $       390 | – | – | $         – | $         – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | 1,887 | 1,887 | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$    2,277** | **$    2,277** | – | – | **$         –** | **$         –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$         –** | |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $  1,543,810 | $  1,543,810 | – | – | $         – | $         – |
| Class 6 - General Unsecured Claims | 23 | 881 [a] | 881 [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 1,896 | 1,896 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | [a] | [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | [a] | [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 1,432,843 | 1,432,843 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$  2,979,430** | **$  2,979,430** | – | – | **$         –** | **$         –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$         –** | |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $         – | $         – | – | – | $         – | $         – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$         –** | **$         –** | – | – | **$         –** | **$         –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

26

**A-3175**

**Stratatech Corporation**
**Hypothetical Liquidation Analysis**
($ in 000s)

### I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | | | – | – | – | – |
| Inventory | 4 | | | – | – | – | – |
| Prepaid Expenses | 5 | 3,865 | | | | | |
| Other Current Assets | 6 | 1,669 | | 20% | 40% | 334 | 668 |
| Plant, Property & Equipment, net | 7 | 4,631 | | 8% | 14% | 353 | 669 |
| Intangible Assets | 8 | 99,800 | | 120% | 134% | 119,269 | 134,178 |
| Other Non-Current Assets | 9 | 51 | | 10% | 20% | 5 | 10 |
| Intercompany Receivables | 10 | | | | | – | – |
| Investment in Subsidiary | 11 | | | | | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 110,016** | | **109%** | **123%** | **$ 119,961** | **$ 135,524** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 119,961** | **$ 135,524** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 1,432 | $ 1,671 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 5,186 | 4,309 |
| Winddown Expense | 15 | | | | | 2,885 | 2,586 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 9,503** | **$ 8,566** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 110,458** | **$ 126,958** |

### II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| Net Proceeds Available for Distribution | | | | | | $ 110,458 | $ 126,958 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 55 | $ 54 | 100% | 100% | $ 55 | $ 54 |
| Chapter 11 Professionals | | 968 | 869 | 100% | 100% | 968 | 869 |
| **Total Carve Out Fees** | 16 | **$ 1,023** | **$ 923** | **100%** | **100%** | **$ 1,023** | **$ 923** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 109,435** | **$ 126,035** |
| Less: Value from Unencumbered Assets | | | | | | (76) | (114) |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 109,359** | **$ 125,922** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 3% | 3% | $ 72,696 | $ 67,995 |
| First Lien Notes | 18 | 545,790 | 545,790 | 7% | 7% | 36,663 | 39,160 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | 5% | – | 18,767 |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **3%** | **3%** | **$ 109,359** | **$ 125,922** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | 76 | 114 |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ 76** | **$ 114** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ 20,000 | $ 20,000 | 0% | 1% | $ 76 | $ 114 |
| **Total Superpriority Administrative Claims and Distributions** | | **$ 20,000** | **$ 20,000** | **0%** | **1%** | **$ 76** | **$ 114** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 1,252 | $ 1,252 | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | | |
| Priority Tax Claims | | 1 | 1 | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 1,253** | **$ 1,253** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | –[a] | –[a] | | | | |
| Class 7 - Trade Claims | 24 | 520 | 520 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | –[a] | –[a] | | | | |
| Class 10 - Settled Federal/State Aethar Claims | 26 | –[a] | –[a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 81,472 | 81,472 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,625,802** | **$ 1,625,802** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | | |
| Class 13 - Subordinated Claims | 29 | –[a] | –[a] | | | | |
| Class 14 - Equity Interests | 30 | – | – | | | | |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

**Mallinckrodt Holdings GmbH**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| ***I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION*** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ 2,129 | 100% | 100% | $ 2,129 | $ 2,129 |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | 948,201 | 2% | 2% | 20,028 | 22,798 |
| Investment in Subsidiary | 11 | 6,071 | 410% | 461% | 24,892 | 28,003 |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | 501 | 446 |
| **Total Assets and Gross Recovery** | | **$ 956,401** | **5%** | **6%** | **$ 47,049** | **$ 52,931** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 47,049** | **$ 52,931** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 566 | $ 659 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 2,048 | 1,699 |
| Winddown Expense | 15 | | | | 501 | 446 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 3,114** | **$ 2,804** |
| **Net Proceeds Available for Distribution** | | | | | **$ 43,934** | **$ 50,127** |

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| ***II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS*** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$ 43,934** | **$ 50,127** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 22 | $ 22 | 100% | 100% | $ 22 | $ 22 |
| Chapter 11 Professionals | | 388 | 346 | 100% | 100% | 388 | 346 |
| **Total Carve Out Fees** | 16 | **$ 410** | **$ 368** | **100%** | **100%** | **$ 410** | **$ 368** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 43,525** | **$ 49,759** |
| Less: Value from Unencumbered Assets | | | | | | | |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 43,525** | **$ 49,759** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 1% | 1% | $ 28,629 | $ 26,371 |
| First Lien Notes | 18 | – | – | – | – | – | – |
| Second Lien Notes | 19 | – | – | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 2,697,920** | **$ 2,697,920** | **1%** | **1%** | **$ 28,629** | **$ 26,371** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ 14,896** | **$ 23,389** |
| Add: Value from Unencumbered Assets | | | | | | | |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ 14,896** | **$ 23,389** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ 14,896** | **$ 23,389** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | | | | | | |
| Priority Tax Claims | | 950 | 950 | 100% | 100% | 950 | 950 |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 950** | **$ 950** | **100%** | **100%** | **$ 950** | **$ 950** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ 13,947** | **$ 22,439** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | 1% | 1% | $ 13,947 | $ 22,439 |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 2 | 2 | 1% | 1% | 0 | 0 |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,811** | **$ 1,543,811** | **1%** | **1%** | **$ 13,947** | **$ 22,439** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Classes** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

28

**A-3177**

**Mallinckrodt UK Ltd**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I.  CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ | – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ | 28 | 100% | 100% | $ 28 | $ 28 |
| Accounts Receivable, net | 3 | | – | – | – | – | – |
| Inventory | 4 | | – | – | – | – | – |
| Prepaid Expenses | 5 | | – | – | – | – | – |
| Other Current Assets | 6 | | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | | – | – | – | – | – |
| Intangible Assets | 8 | | – | – | – | – | – |
| Other Non-Current Assets | 9 | | – | – | – | – | – |
| Intercompany Receivables | 10 | | – | – | – | – | – |
| Investment in Subsidiary | 11 | | – | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$** | **28** | **100%** | **100%** | **$ 28** | **$ 28** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 28** | **$ 28** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 0 | $ 0 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 1 | 1 |
| Winddown Expense | 15 | | | | | 0 | 0 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 2** | **$ 1** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 26** | **$ 26** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ 26 | $ 26 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 0 | 100% | 100% | $ 0 | $ 0 |
| Chapter 11 Professionals | | 0 | 0 | 100% | 100% | 0 | 0 |
| **Total Carve Out Fees** | 16 | **$ 0** | **$ 0** | **100%** | **100%** | **$ 0** | **$ 0** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 26** | **$ 26** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 26** | **$ 26** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 17 | $ 14 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 9 | 12 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 26** | **$ 26** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | | | – | – |
| Class 7 - Trade Claims | 24 | – | – | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,810** | **$ 1,543,810** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

29

**Mallinckrodt IP Unlimited Company**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ 56 | 100% | 100% | $ 56 | $ 56 |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | – | – | – | – | – |
| Investment in Subsidiary | 11 | 1,026,402 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | | |
| **Total Assets and Gross Recovery** | | **$ 1,026,458** | 0% | 0% | **$ 56** | **$ 56** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 56** | **$ 56** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 1 | $ 1 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 2 | 2 |
| Winddown Expense | 15 | | | | 1 | 0 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 4** | **$ 3** |
| **Net Proceeds Available for Distribution** | | | | | **$ 52** | **$ 53** |

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | $ 52 | $ 53 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 0 | 100% | 100% | $ 0 | $ 0 |
| Chapter 11 Professionals | | 0 | 0 | 100% | 100% | 0 | 0 |
| **Total Carve Out Fees** | 16 | **$ 0** | **$ 0** | 100% | 100% | **$ 0** | **$ 0** |
| **Net Proceeds After Carve Out Claims** | | | | | | $ 52 | $ 53 |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | $ 52 | $ 53 |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 34 | $ 28 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 18 | 25 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | 0% | 0% | **$ 52** | **$ 53** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $ – | $ – |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | $ – | $ – |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ – | $ – |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ – | $ – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 25 [a] | 25 [a] | | | – | – |
| Class 7 - Trade Claims | 24 | – | – | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,835** | **$ 1,543,835** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

30

**A-3179**

**Mallinckrodt Buckingham Unlimited Company**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $  – | – | – | $  – | $  – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $  300 | 100% | 100% | $  300 | $  300 |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | – | – | – | – | – |
| Investment in Subsidiary | 11 | 18,574,244 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 18,574,544** | **0%** | **0%** | **$  300** | **$  300** |
| **Gross Proceeds Available for Distribution** | | | | | **$  300** | **$  300** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $  4 | $  4 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 13 | 10 |
| Winddown Expense | 15 | | | | 3 | 3 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$  20** | **$  16** |
| **Net Proceeds Available for Distribution** | | | | | **$  280** | **$  284** |

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$  280** | **$  284** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $  0 | $  0 | 100% | 100% | $  0 | $  0 |
| Chapter 11 Professionals | | 2 | 2 | 100% | 100% | 2 | 2 |
| **Total Carve Out Fees** | 16 | **$  3** | **$  2** | **100%** | **100%** | **$  3** | **$  2** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$  278** | **$  282** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$  278** | **$  282** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $  183 | $  150 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 95 | 133 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$  278** | **$  282** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$  –** | **$  –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$  –** | **$  –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $  – | $  – | | | $  – | $  – |
| **Total Superpriority Administrative Claims and Distributions** | | **$  –** | **$  –** | | | **$  –** | **$  –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$  –** | **$  –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $  – | $  – | | | $  – | $  – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$  –** | **$  –** | | | **$  –** | **$  –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$  –** | **$  –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $  – | $  – |
| Class 6 - General Unsecured Claims | 23 | –[a] | –[a] | | | – | – |
| Class 7 - Trade Claims | 24 | – | – | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | –[a] | –[a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | –[a] | –[a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | 61 | 61 | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,871** | **$ 1,543,871** | **–** | **–** | **$  –** | **$  –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$  –** | **$  –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $  – | $  – | | | $  – | $  – |
| Class 13 - Subordinated Claims | 29 | –[a] | –[a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$  –** | **$  –** | **–** | **–** | **$  –** | **$  –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

31

**Mallinckrodt Windsor Ireland Finance Unlimited Company**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | | Higher | |
| **I.  CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ | – | – | – | $ | – | $ | – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | | | |
| Cash and Cash Equivalents | 2 | $ | 230 | 100% | 100% | $ | 230 | $ | 230 |
| Accounts Receivable, net | 3 | | – | – | – | | – | | – |
| Inventory | 4 | | – | – | – | | – | | – |
| Prepaid Expenses | 5 | | – | – | – | | – | | – |
| Other Current Assets | 6 | | – | – | – | | – | | – |
| Plant, Property & Equipment, net | 7 | | – | – | – | | – | | – |
| Intangible Assets | 8 | | – | – | – | | – | | – |
| Other Non-Current Assets | 9 | | – | – | – | | – | | – |
| Intercompany Receivables | 10 | | – | – | – | | – | | – |
| Investment in Subsidiary | 11 | | – | – | – | | – | | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | | n/a | n/a | n/a | | – | | – |
| **Total Assets and Gross Recovery** | | **$** | **230** | **100%** | **100%** | **$** | **230** | **$** | **230** |
| **Gross Proceeds Available for Distribution** | | | | | | **$** | **230** | **$** | **230** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ | 3 | $ | 3 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | | 10 | | 7 |
| Winddown Expense | 15 | | | | | | 2 | | 2 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$** | **15** | **$** | **12** |
| **Net Proceeds Available for Distribution** | | | | | | **$** | **215** | **$** | **218** |

| | Note Ref | Estimated Allowed Claims | | | | Estimated % Recovery | | Estimated $ Recovery | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Lower | | Higher | | Lower | Higher | Lower | | Higher | |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | | | $ | 215 | $ | 218 |
| CARVE OUT: | | | | | | | | | | | |
| US Trustee Fees | | $ | 0 | $ | 0 | 100% | 100% | $ | 0 | $ | 0 |
| Chapter 11 Professionals | | | 2 | | 2 | 100% | 100% | | 2 | | 2 |
| **Total Carve Out Fees** | 16 | **$** | **2** | **$** | **2** | **100%** | **100%** | **$** | **2** | **$** | **2** |
| **Net Proceeds After Carve Out Claims** | | | | | | | | **$** | **213** | **$** | **216** |
| Less: Value from Unencumbered Assets | | | | | | | | | – | | – |
| **Net Proceeds Available for Secured Claims** | | | | | | | | **$** | **213** | **$** | **216** |
| SECURED CLAIMS: | | | | | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ | 2,697,920 | $ | 2,697,920 | 0% | 0% | $ | 140 | $ | 115 |
| First Lien Notes | 18 | | 545,790 | | 545,790 | 0% | 0% | | 73 | | 102 |
| Second Lien Notes | 19 | | 355,973 | | 355,973 | – | – | | – | | – |
| Purchase-Money Lien | 20 | | – | | – | – | – | | – | | – |
| **Total Secured Claims and Distributions** | | **$** | **3,599,684** | **$** | **3,599,684** | **0%** | **0%** | **$** | **213** | **$** | **216** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | | | **$** | **–** | **$** | **–** |
| Add: Value from Unencumbered Assets | | | | | | | | | – | | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | | | **$** | **–** | **$** | **–** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ | – | $ | – | | | $ | – | $ | – |
| **Total Superpriority Administrative Claims and Distributions** | | **$** | **–** | **$** | **–** | | | **$** | **–** | **$** | **–** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | | | **$** | **–** | **$** | **–** |
| ADMININSTRATIVE & PRIORITY CLAIMS: | | | | | | | | | | | |
| Postpetition Admin Trade Claims | | $ | – | $ | – | | | $ | – | $ | – |
| Postpetition Intercompany Payables | | | – | | – | | | | – | | – |
| Priority Tax Claims | | | – | | – | | | | – | | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$** | **–** | **$** | **–** | | | **$** | **–** | **$** | **–** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | | | **$** | **–** | **$** | **–** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ | 1,543,810 | $ | 1,543,810 | | | $ | – | $ | – |
| Class 6 - General Unsecured Claims | 23 | | – [a] | | – [a] | | | | – | | – |
| Class 7 - Trade Claims | 24 | | 1 | | 1 | | | | – | | – |
| Class 8 & Class 9 - Opioid Claims | 25 | | – [a] | | – [a] | | | | – | | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | | – [a] | | – [a] | | | | – | | – |
| Class 11 - Intercompany Claims | 27 | | 22 | | 22 | | | | – | | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$** | **1,543,833** | **$** | **1,543,833** | **–** | **–** | **$** | **–** | **$** | **–** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | | | **$** | **–** | **$** | **–** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ | – | $ | – | | | $ | – | $ | – |
| Class 13 - Subordinated Claims | 29 | | – [a] | | – [a] | | | | – | | – |
| Class 14 - Equity Interests | 30 | | – | | – | | | | – | | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$** | **–** | **$** | **–** | **–** | **–** | **$** | **–** | **$** | **–** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

32

**A-3181**

**Mallinckrodt Pharma IP Trading Unlimited Company**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ 17,298 | | 100% | 100% | $ 17,298 | $ 17,298 |
| Accounts Receivable, net | 3 | – | | – | – | – | – |
| Inventory | 4 | – | | – | – | – | – |
| Prepaid Expenses | 5 | – | | – | – | – | – |
| Other Current Assets | 6 | – | | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | | – | – | – | – |
| Intangible Assets | 8 | – | | – | – | – | – |
| Other Non-Current Assets | 9 | – | | – | – | – | – |
| Intercompany Receivables | 10 | – | | – | – | – | – |
| Investment in Subsidiary | 11 | 4,228,310 | | 0% | 0% | 2,859 | 3,275 |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 4,245,608** | | **0%** | **0%** | **$ 20,157** | **$ 20,573** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 20,157** | **$ 20,573** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 242 | $ 256 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 877 | 660 |
| Winddown Expense | 15 | | | | | 355 | 301 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 1,474** | **$ 1,217** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 18,682** | **$ 19,356** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$ 18,682** | **$ 19,356** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 9 | $ 8 | 100% | 100% | $ 9 | $ 8 |
| Chapter 11 Professionals | | 165 | 134 | 100% | 100% | 165 | 134 |
| **Total Carve Out Fees** | 16 | **$ 174** | **$ 142** | 100% | 100% | **$ 174** | **$ 142** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 18,508** | **$ 19,214** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 18,508** | **$ 19,214** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 12,174 | $ 10,183 |
| First Lien Notes | 18 | 545,790 | 545,790 | 1% | 2% | 6,334 | 9,031 |
| Second Lien Notes | 19 | – | – | – | – | – | – |
| Purchase-Money Lien | 20 | 355,973 | 355,973 | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **1%** | **1%** | **$ 18,508** | **$ 19,214** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 0 | $ 0 | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 0** | **$ 0** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | | | – | – |
| Class 7 - Trade Claims | 24 | 4 | 4 | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,814** | **$ 1,543,814** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

33

**Acthar IP Unlimited Company**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $          – | – | – | $          – | $          – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $        39 | 100% | 100% | $        39 | $        39 |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | – | – | – | – | – |
| Investment in Subsidiary | 11 | 2,729,807 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$   2,729,846** | **0%** | **0%** | **$        39** | **$        39** |
| **Gross Proceeds Available for Distribution** | | | | | **$        39** | **$        39** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $          0 | $          0 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 2 | 1 |
| Winddown Expense | 15 | | | | 0 | 0 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$          3** | **$          2** |
| **Net Proceeds Available for Distribution** | | | | | **$        36** | **$        37** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | $        36 | $        37 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $          0 | $          0 | 100% | 100% | $          0 | $          0 |
| Chapter 11 Professionals | | 0 | 0 | 100% | 100% | 0 | 0 |
| **Total Carve Out Fees** | 16 | **$          0** | **$          0** | **100%** | **100%** | **$          0** | **$          0** |
| **Net Proceeds After Carve Out Claims** | | | | | | $        36 | $        37 |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$        36** | **$        37** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $   2,697,920 | $   2,697,920 | 0% | 0% | $        24 | $        19 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 12 | 17 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$   3,599,684** | **$   3,599,684** | **0%** | **0%** | **$        36** | **$        37** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $          – | $          – |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$          –** | **$          –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $          – | $          – | | | $          – | $          – |
| **Total Superpriority Administrative Claims and Distributions** | | **$          –** | **$          –** | | | **$          –** | **$          –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$          –** | **$          –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $          – | $          – | | | $          – | $          – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$          –** | **$          –** | | | **$          –** | **$          –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$          –** | **$          –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $   1,543,810 | $   1,543,810 | – | – | $          – | $          – |
| Class 6 - General Unsecured Claims | 23 | –[a] | –[a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | – | – | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | –[a] | –[a] | – | – | – | – |
| Class 10 - Settled Federal/State Acthar Claims | 26 | –[a] | –[a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$   1,543,810** | **$   1,543,810** | **–** | **–** | **$          –** | **$          –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$          –** | **$          –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $          – | $          – | | | $          – | $          – |
| Class 13 - Subordinated Claims | 29 | –[a] | –[a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$          –** | **$          –** | **–** | **–** | **$          –** | **$          –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

34

**Mallinckrodt UK Finance LLP**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ 336 | 100% | 100% | $ 336 | $ 336 |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | 18 | – | – | – | – |
| Investment in Subsidiary | 11 | – | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | | |
| **Total Assets and Gross Recovery** | | $ 355 | 95% | 95% | $ 336 | $ 336 |
| **Gross Proceeds Available for Distribution** | | | | | $ 336 | $ 336 |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 4 | $ 4 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 14 | 10 |
| Winddown Expense | 15 | | | | 3 | 3 |
| **Total Chapter 7 Liquidation Costs** | | | | | $ 21 | $ 17 |
| **Net Proceeds Available for Distribution** | | | | | $ 315 | $ 320 |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | $ 315 | $ 320 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 0 | 100% | 100% | $ 0 | $ 0 |
| Chapter 11 Professionals | | 3 | 2 | 100% | 100% | 3 | 2 |
| **Total Carve Out Fees** | 16 | $ 3 | $ 2 | 100% | 100% | $ 3 | $ 2 |
| **Net Proceeds After Carve Out Claims** | | | | | | $ 312 | $ 317 |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | $ 312 | $ 317 |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 312 | $ 317 |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | $ 3,599,684 | $ 3,599,684 | 0% | 0% | $ 312 | $ 317 |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $ – | $ – |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | $ – | $ – |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ – | $ – |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | | | | | – | – |
| Priority Tax Claims | | | | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ – | $ – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | –[a] | –[a] | | | | |
| Class 7 - Trade Claims | 24 | – | – | | | | |
| Class 8 & Class 9 - Opioid Claims | 25 | –[a] | –[a] | | | | |
| Class 10 - Settled Federal/State Aethar Claims | 26 | –[a] | –[a] | | | | |
| Class 11 - Intercompany Claims | 27 | – | – | | | | |
| **Total Distribution to Unsecured Classes of Claims** | | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Subordinated & Equity Classes** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | –[a] | –[a] | | | | |
| Class 14 - Equity Interests | 30 | – | – | | | | |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | $ – | $ – | – | – | $ – | $ – |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

35

A-3184

**Mallinckrodt ARD Holdings Limited**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ 85 | 100% | 100% | $ 85 | $ 85 |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | 679,619 | – | – | – | – |
| Investment in Subsidiary | 11 | 7,482,727 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 8,162,431** | **0%** | **0%** | **$ 85** | **$ 85** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 85** | **$ 85** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 1 | $ 1 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 4 | 3 |
| Winddown Expense | 15 | | | | 1 | 1 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 6** | **$ 4** |
| **Net Proceeds Available for Distribution** | | | | | **$ 79** | **$ 80** |

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$ 79** | **$ 80** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 0 | 100% | 100% | $ 0 | $ 0 |
| Chapter 11 Professionals | | 1 | 1 | 100% | 100% | 1 | 1 |
| **Total Carve Out Fees** | 16 | **$ 1** | **$ 1** | **100%** | **100%** | **$ 1** | **$ 1** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 78** | **$ 80** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 78** | **$ 80** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 52 | $ 42 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 27 | 37 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 78** | **$ 80** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | | | – | – |
| Class 7 - Trade Claims | 24 | – | – | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | 193 | 193 | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,544,002** | **$ 1,544,002** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

36

**MUSHI UK Holdings Limited**
**Hypothetical Liquidation Analysis**
($ in 000s)

## I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ 305 | 100% | 100% | $ 305 | $ 305 |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | – | – | – | – | – |
| Investment in Subsidiary | 11 | 7,482,426 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 7,482,731** | **0%** | **0%** | **$ 305** | **$ 305** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 305** | **$ 305** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 4 | $ 4 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 13 | 10 |
| Winddown Expense | 15 | | | | 3 | 3 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 20** | **$ 16** |
| **Net Proceeds Available for Distribution** | | | | | **$ 284** | **$ 289** |

## II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | | | | | $ 284 | $ 289 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 0 | 100% | 100% | $ 0 | $ 0 |
| Chapter 11 Professionals | | 3 | 2 | 100% | 100% | 3 | 2 |
| **Total Carve Out Fees** | 16 | **$ 3** | **$ 2** | **100%** | **100%** | **$ 3** | **$ 2** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 282** | **$ 286** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 282** | **$ 286** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 185 | $ 152 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 96 | 135 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 282** | **$ 286** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | –[a] | –[a] | | | – | – |
| Class 7 - Trade Claims | 24 | – | – | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | –[a] | –[a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | –[a] | –[a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | 145 | 145 | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,955** | **$ 1,543,955** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | –[a] | –[a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

37

A-3186

**Mallinckrodt Enterprises UK Limited**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ | – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | | |
| Cash and Cash Equivalents | 2 | $ 301 | | 100% | 100% | $ 301 | $ | 301 |
| Accounts Receivable, net | 3 | – | | – | – | – | | – |
| Inventory | 4 | – | | – | – | – | | – |
| Prepaid Expenses | 5 | – | | – | – | – | | – |
| Other Current Assets | 6 | – | | – | – | – | | – |
| Plant, Property & Equipment, net | 7 | – | | – | – | – | | – |
| Intangible Assets | 8 | – | | – | – | – | | – |
| Other Non-Current Assets | 9 | – | | – | – | – | | – |
| Intercompany Receivables | 10 | – | | – | – | – | | – |
| Investment in Subsidiary | 11 | – | | – | – | – | | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | | – |
| **Total Assets and Gross Recovery** | | **$ 301** | | 100% | 100% | **$ 301** | **$** | **301** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 301** | **$** | **301** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 4 | $ | 4 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 13 | | 10 |
| Winddown Expense | 15 | | | | | 3 | | 3 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 20** | **$** | **16** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 281** | **$** | **285** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | | |
|---|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ 281 | $ | 285 |
| CARVE OUT: | | | | | | | | |
| US Trustee Fees | | $ 0 | $ 0 | 100% | 100% | $ 0 | $ | 0 |
| Chapter 11 Professionals | | 2 | 2 | 100% | 100% | 2 | | 2 |
| **Total Carve Out Fees** | 16 | **$ 3** | **$ 2** | 100% | 100% | **$ 3** | **$** | **2** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 278** | **$** | **283** |
| Less: Value from Unencumbered Assets | | | | | | – | | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 278** | **$** | **283** |
| SECURED CLAIMS: | | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 183 | $ | 150 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 95 | | 133 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | 0% | 0% | **$ 278** | **$** | **283** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$** | **–** |
| Add: Value from Unencumbered Assets | | | | | | – | | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$** | **–** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ | – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$** | **–** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$** | **–** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ | – |
| Postpetition Intercompany Payables | | – | – | | | – | | – |
| Priority Tax Claims | | – | – | | | – | | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | | | **$ –** | **$** | **–** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$** | **–** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ | – |
| Class 6 - General Unsecured Claims | 23 | –[a] | –[a] | | | – | | – |
| Class 7 - Trade Claims | 24 | – | – | | | – | | – |
| Class 8 & Class 9 - Opioid Claims | 25 | –[a] | –[a] | | | – | | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | –[a] | –[a] | | | – | | – |
| Class 11 - Intercompany Claims | 27 | 136 | 136 | | | – | | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,945** | **$ 1,543,945** | – | – | **$ –** | **$** | **–** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$** | **–** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ | – |
| Class 13 - Subordinated Claims | 29 | –[a] | –[a] | | | – | | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$** | **–** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

38

A-3187

**MKG Medical UK LTD**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ 206 | | 100% | 100% | $ 206 | $ 206 |
| Accounts Receivable, net | 3 | – | | – | – | – | – |
| Inventory | 4 | – | | – | – | – | – |
| Prepaid Expenses | 5 | – | | – | – | – | – |
| Other Current Assets | 6 | – | | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | | – | – | – | – |
| Intangible Assets | 8 | – | | – | – | – | – |
| Other Non-Current Assets | 9 | – | | – | – | – | – |
| Intercompany Receivables | 10 | – | | – | – | – | – |
| Investment in Subsidiary | 11 | – | | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | $ 206 | | 100% | 100% | $ 206 | $ 206 |
| **Gross Proceeds Available for Distribution** | | | | | | $ 206 | $ 206 |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 2 | $ 3 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 9 | 7 |
| Winddown Expense | 15 | | | | | 2 | 2 |
| **Total Chapter 7 Liquidation Costs** | | | | | | $ 14 | $ 11 |
| **Net Proceeds Available for Distribution** | | | | | | $ 193 | $ 195 |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ 193 | $ 195 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 0 | 100% | 100% | $ 0 | $ 0 |
| Chapter 11 Professionals | | 2 | 1 | 100% | 100% | 2 | 1 |
| **Total Carve Out Fees** | 16 | $ 2 | $ 1 | 100% | 100% | $ 2 | $ 1 |
| **Net Proceeds After Carve Out Claims** | | | | | | $ 191 | $ 194 |
| Less: Value from Unencumbered Assets | | | | | | – | |
| **Net Proceeds Available for Secured Claims** | | | | | | $ 191 | $ 194 |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 126 | $ 103 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 65 | 91 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | | | | |
| **Total Secured Claims and Distributions** | | $ 3,599,684 | $ 3,599,684 | 0% | 0% | $ 191 | $ 194 |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $ – | $ – |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | $ – | $ – |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | $ – | $ – | | | $ – | $ – |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ – | $ – |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | $ – | $ – | | | $ – | $ – |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ – | $ – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | |
| Class 6 - General Unsecured Claims | 23 | –[a] | –[a] | | | | |
| Class 7 - Trade Claims | 24 | – | – | | | | |
| Class 8 & Class 9 - Opioid Claims | 25 | –[a] | –[a] | | | | |
| Class 10 - Settled Federal/State Aethar Claims | 26 | –[a] | –[a] | | | | |
| Class 11 - Intercompany Claims | 27 | 89 | 89 | | | | |
| **Total Distribution to Unsecured Classes of Claims** | | $ 1,543,899 | $ 1,543,899 | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | |
| Class 13 - Subordinated Claims | 29 | –[a] | –[a] | | | | |
| Class 14 - Equity Interests | 30 | – | – | | | | |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | $ – | $ – | – | – | $ – | $ – |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

39

A-3188

**Mallinckrodt Quincy S.a.r.l.**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| *I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION* | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ 291 | 100% | 100% | $ 291 | $ 291 |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | 5 | – | – | – | – |
| Investment in Subsidiary | 11 | 14,455,252 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 14,455,549** | **0%** | **0%** | **$ 291** | **$ 291** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 291** | **$ 291** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 4 | $ 4 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 13 | 9 |
| Winddown Expense | 15 | | | | 3 | 2 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 19** | **$ 15** |
| **Net Proceeds Available for Distribution** | | | | | **$ 272** | **$ 276** |

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| *II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS* | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ 272 | $ 276 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 0 | 100% | 100% | $ 0 | $ 0 |
| Chapter 11 Professionals | | 2 | 2 | 100% | 100% | 2 | 2 |
| **Total Carve Out Fees** | 16 | **$ 3** | **$ 2** | **100%** | **100%** | **$ 2** | **$ 2** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 269** | **$ 274** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 269** | **$ 274** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 177 | $ 145 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 92 | 129 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | | | | | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 269** | **$ 274** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 1,230 [a] | 1,230 [a] | | | – | – |
| Class 7 - Trade Claims | 24 | 2 | 2 | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,545,041** | **$ 1,545,041** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

40

A-3189

**Mallinckrodt Windsor S.a.r.l.**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ 364 | | 100% | 100% | $ 364 | $ 364 |
| Accounts Receivable, net | 3 | – | | – | – | – | – |
| Inventory | 4 | – | | – | – | – | – |
| Prepaid Expenses | 5 | – | | – | – | – | – |
| Other Current Assets | 6 | – | | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | | – | – | – | – |
| Intangible Assets | 8 | – | | – | – | – | – |
| Other Non-Current Assets | 9 | – | | – | – | – | – |
| Intercompany Receivables | 10 | – | | – | – | – | – |
| Investment in Subsidiary | 11 | 9,017,420 | | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 9,017,784** | | **0%** | **0%** | **$ 364** | **$ 364** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 364** | **$ 364** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 4 | $ 5 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 16 | 12 |
| Winddown Expense | 15 | | | | | 4 | 3 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 24** | **$ 19** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 340** | **$ 344** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ 340 | $ 344 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 0 | 100% | 100% | $ 0 | $ 0 |
| Chapter 11 Professionals | | 3 | 2 | 100% | 100% | 3 | 2 |
| **Total Carve Out Fees** | 16 | **$ 3** | **$ 3** | **100%** | **100%** | **$ 3** | **$ 3** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 336** | **$ 342** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 336** | **$ 342** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 221 | $ 181 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 115 | 161 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 336** | **$ 342** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | | | | |
| Class 7 - Trade Claims | 24 | – | – | | | | |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | | |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | | | | |
| Class 11 - Intercompany Claims | 27 | 80 | 80 | | | | |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,890** | **$ 1,543,890** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | | |
| Class 14 - Equity Interests | 30 | – | – | | | | |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

41

**Mallinckrodt International Holdings S.a.r.l.**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ 228 | 100% | 100% | $ 228 | $ 228 |
| Accounts Receivable, net | 3 | – | | | – | – |
| Inventory | 4 | – | | | – | – |
| Prepaid Expenses | 5 | – | | | – | – |
| Other Current Assets | 6 | – | | | – | – |
| Plant, Property & Equipment, net | 7 | – | | | – | – |
| Intangible Assets | 8 | – | | | – | – |
| Other Non-Current Assets | 9 | – | | | – | – |
| Intercompany Receivables | 10 | – | | | – | – |
| Investment in Subsidiary | 11 | 308,159 | | | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 308,388** | 0% | 0% | **$ 228** | **$ 228** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 228** | **$ 228** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 3 | $ 3 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 10 | 7 |
| Winddown Expense | 15 | | | | 2 | 2 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 15** | **$ 12** |
| **Net Proceeds Available for Distribution** | | | | | **$ 213** | **$ 216** |

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | $ 213 | $ 216 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 0 | 100% | 100% | $ 0 | $ 0 |
| Chapter 11 Professionals | | 2 | 1 | 100% | 100% | 2 | 1 |
| **Total Carve Out Fees** | 16 | **$ 2** | **$ 2** | 100% | 100% | **$ 2** | **$ 2** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 211** | **$ 215** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 211** | **$ 215** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 139 | $ 114 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 72 | 101 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | | | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | 0% | 0% | **$ 211** | **$ 215** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | –[a] | –[a] | | | – | – |
| Class 7 - Trade Claims | 24 | – | – | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | –[a] | –[a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | –[a] | –[a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,810** | **$ 1,543,810** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | –[a] | –[a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

**MNK 2011 LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | 0 | – | – | – | – |
| Investment in Subsidiary | 11 | 5,557,721 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 5,557,721** | | – | **$ –** | **$ –** |
| **Gross Proceeds Available for Distribution** | | | | | **$ –** | **$ –** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ – | $ – |
| Chapter 7 Trustee Professional Fees | 14 | | | | – | – |
| Winddown Expense | 15 | | | | – | – |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ –** | **$ –** |
| **Net Proceeds Available for Distribution** | | | | | **$ –** | **$ –** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ – | $ – |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ – | $ – | – | – | $ – | $ – |
| Chapter 11 Professionals | | – | – | – | – | – | – |
| **Total Carve Out Fees** | 16 | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ –** | **$ –** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ –** | **$ –** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | – | – | $ – | $ – |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | – | – | **$ –** | **$ –** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | – | – | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 112 | 112 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,921** | **$ 1,543,921** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

43

A-3192

**Mallinckrodt Brand Pharmaceuticals LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | | |
| Inventory | 4 | – | – | – | | |
| Prepaid Expenses | 5 | – | – | – | | |
| Other Current Assets | 6 | – | – | – | | |
| Plant, Property & Equipment, net | 7 | – | – | – | | |
| Intangible Assets | 8 | – | – | – | | |
| Other Non-Current Assets | 9 | – | – | – | | |
| Intercompany Receivables | 10 | 4,679 | – | – | | |
| Investment in Subsidiary | 11 | 5,557,721 | – | – | | |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | | – |
| **Total Assets and Gross Recovery** | | **$ 5,562,400** | | – | **$ –** | **$ –** |
| **Gross Proceeds Available for Distribution** | | | | | **$ –** | **$ –** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ – | $ – |
| Chapter 7 Trustee Professional Fees | 14 | | | | – | – |
| Winddown Expense | 15 | | | | – | – |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ –** | **$ –** |
| **Net Proceeds Available for Distribution** | | | | | **$ –** | **$ –** |

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ – | $ – |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ – | $ – | – | – | $ – | $ – |
| Chapter 11 Professionals | | – | – | – | – | – | – |
| **Total Carve Out Fees** | 16 | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ –** | **$ –** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ –** | **$ –** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | – | – | $ – | $ – |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | – | – | **$ –** | **$ –** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | – | – | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 114 | 114 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,924** | **$ 1,543,924** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

44

A-3193

**Ludlow LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | | |
| Inventory | 4 | – | – | – | | |
| Prepaid Expenses | 5 | – | – | – | | |
| Other Current Assets | 6 | – | – | – | | |
| Plant, Property & Equipment, net | 7 | – | – | – | | |
| Intangible Assets | 8 | – | – | – | | |
| Other Non-Current Assets | 9 | – | – | – | | |
| Intercompany Receivables | 10 | – | – | – | | |
| Investment in Subsidiary | 11 | 7,113,077 | – | – | | |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | | |
| **Total Assets and Gross Recovery** | | **$ 7,113,077** | | – | **$ –** | **$ –** |
| **Gross Proceeds Available for Distribution** | | | | | **$ –** | **$ –** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ – | $ – |
| Chapter 7 Trustee Professional Fees | 14 | | | | – | – |
| Winddown Expense | 15 | | | | – | – |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ –** | **$ –** |
| **Net Proceeds Available for Distribution** | | | | | **$ –** | **$ –** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ – | $ – |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ – | $ – | – | – | $ – | $ – |
| Chapter 11 Professionals | | – | – | – | – | – | – |
| **Total Carve Out Fees** | 16 | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ –** | **$ –** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ –** | **$ –** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | – | – | $ – | $ – |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | – | – | **$ –** | **$ –** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | 12,355 | 12,355 | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 12,355** | **$ 12,355** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 16,158 [a] | 16,158 [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | – | – | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | [a] | [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – | – | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 328,665 | 328,665 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,888,633** | **$ 1,888,633** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

45

A-3194

**IMC Exploration Company**
**Hypothetical Liquidation Analysis**
($ in 000s)

## I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Higher | Estimated $ Recovery Lower | Higher |
|---|---|---|---|---|---|---|
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | 261 | – | – | – | – |
| Investment in Subsidiary | 11 | – | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 261** | | – | **$ –** | **$ –** |
| **Gross Proceeds Available for Distribution** | | | | | **$ –** | **$ –** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ – | $ – |
| Chapter 7 Trustee Professional Fees | 14 | | | | – | – |
| Winddown Expense | 15 | | | | – | – |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ –** | **$ –** |
| **Net Proceeds Available for Distribution** | | | | | **$ –** | **$ –** |

## II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS

| | Note Ref | Estimated Allowed Claims Lower | Higher | Estimated % Recovery Lower | Higher | Estimated $ Recovery Lower | Higher |
|---|---|---|---|---|---|---|---|
| Net Proceeds Available for Distribution | | | | | | $ – | $ – |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ – | $ – | – | – | $ – | $ – |
| Chapter 11 Professionals | | – | – | – | – | – | – |
| **Total Carve Out Fees** | 16 | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ –** | **$ –** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ –** | **$ –** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | – | – | $ – | $ – |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | – | – | **$ –** | **$ –** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | – | – | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | –[a] | –[a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | – | – | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | –[a] | –[a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | –[a] | –[a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,810** | **$ 1,543,810** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | –[a] | –[a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

46

**Mallinckrodt ARD Holdings Inc.**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Higher | Estimated $ Recovery Lower | Higher |
|---|---|---|---|---|---|---|
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | 98,782 | 90% | 100% | 88,904 | 98,782 |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | – | – | – | – | – |
| Investment in Subsidiary | 11 | 2,938,533 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 3,037,315** | **3%** | **3%** | **$ 88,904** | **$ 98,782** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 88,904** | **$ 98,782** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 1,069 | $ 1,230 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 3,870 | 3,171 |
| Winddown Expense | 15 | | | | 946 | 833 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 5,885** | **$ 5,233** |
| **Net Proceeds Available for Distribution** | | | | | **$ 83,019** | **$ 93,549** |

| | Note Ref | Estimated Allowed Claims Lower | Higher | Estimated % Recovery Lower | Higher | Estimated $ Recovery Lower | Higher |
|---|---|---|---|---|---|---|---|
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ 83,019 | $ 93,549 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 42 | $ 40 | 100% | 100% | $ 42 | $ 40 |
| Chapter 11 Professionals | | 732 | 646 | 100% | 100% | 732 | 646 |
| **Total Carve Out Fees** | 16 | **$ 774** | **$ 686** | **100%** | **100%** | **$ 774** | **$ 686** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 82,245** | **$ 92,863** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 82,245** | **$ 92,863** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 2% | 2% | $ 54,097 | $ 49,214 |
| First Lien Notes | 18 | 545,790 | 545,790 | 5% | 7% | 28,148 | 39,160 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | 1% | – | 4,489 |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **2%** | **3%** | **$ 82,245** | **$ 92,863** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | – | – | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 1,155 | 1,155 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 8,797 | 8,797 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,553,762** | **$ 1,553,762** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

47

A-3196

**Mallinckrodt CB LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

### I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION

| | Note Ref | Net Book Value | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | – | – | – | – | – |
| Investment in Subsidiary | 11 | – | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | $ – | – | – | $ – | $ – |
| **Gross Proceeds Available for Distribution** | | | | | $ – | $ – |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ – | $ – |
| Chapter 7 Trustee Professional Fees | 14 | | | | – | – |
| Winddown Expense | 15 | | | | – | – |
| **Total Chapter 7 Liquidation Costs** | | | | | $ – | $ – |
| **Net Proceeds Available for Distribution** | | | | | $ – | $ – |

### II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **Net Proceeds Available for Distribution** | | | | | | $ – | $ – |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ – | $ – | – | – | $ – | $ – |
| Chapter 11 Professionals | | – | – | – | – | – | – |
| **Total Carve Out Fees** | 16 | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds After Carve Out Claims** | | | | | | $ – | $ – |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | $ – | $ – |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | – | – | $ – | $ – |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | $ 3,599,684 | $ 3,599,684 | – | – | $ – | $ – |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $ – | $ – |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | $ – | $ – |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ – | $ – |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | – | – | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ – | $ – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | – | – | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Subordinated & Equity Classes** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | $ – | $ – | – | – | $ – | $ – |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

48

**A-3197**

**MHP Finance LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | 246,385 | – | – | – | – |
| Investment in Subsidiary | 11 | – | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 246,385** | | | **$ –** | **$ –** |
| **Gross Proceeds Available for Distribution** | | | | | $ – | $ – |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ – | $ – |
| Chapter 7 Trustee Professional Fees | 14 | | | | – | – |
| Winddown Expense | 15 | | | | – | – |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ –** | **$ –** |
| **Net Proceeds Available for Distribution** | | | | | **$ –** | **$ –** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ – | $ – |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ – | $ – | – | – | $ – | $ – |
| Chapter 11 Professionals | | – | – | – | – | – | – |
| **Total Carve Out Fees** | 16 | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ –** | **$ –** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ –** | **$ –** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | – | – | $ – | $ – |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | – | – | **$ –** | **$ –** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | 1,858 | 1,858 | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 1,858** | **$ 1,858** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | – | – | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,810** | **$ 1,543,810** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

49

**A-3198**

**Mallinckrodt Critical Care Finance LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | | – | – | | |
| Inventory | 4 | – | | – | – | | |
| Prepaid Expenses | 5 | – | | – | – | | |
| Other Current Assets | 6 | – | | – | – | | |
| Plant, Property & Equipment, net | 7 | – | | – | – | | |
| Intangible Assets | 8 | – | | – | – | | |
| Other Non-Current Assets | 9 | – | | – | – | | |
| Intercompany Receivables | 10 | 1,325,022 | | – | – | | |
| Investment in Subsidiary | 11 | – | | – | – | | |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | | – |
| **Total Assets and Gross Recovery** | | $ 1,325,022 | | | – | $ – | $ – |
| **Gross Proceeds Available for Distribution** | | | | | | $ – | $ – |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ – | $ – |
| Chapter 7 Trustee Professional Fees | 14 | | | | | – | |
| Winddown Expense | 15 | | | | | – | |
| **Total Chapter 7 Liquidation Costs** | | | | | | $ – | $ – |
| **Net Proceeds Available for Distribution** | | | | | | $ – | $ – |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | $ – | $ – |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ – | $ – | – | – | $ – | $ – |
| Chapter 11 Professionals | | – | – | – | – | – | – |
| **Total Carve Out Fees** | 16 | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds After Carve Out Claims** | | | | | | $ – | $ – |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | $ – | $ – |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | – | – | $ – | $ – |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | $ 3,599,684 | $ 3,599,684 | – | – | $ – | $ – |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $ – | $ – |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | $ – | $ – |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ – | $ – |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | 18,047 | 18,047 | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | $ 18,047 | $ 18,047 | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ – | $ – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | – | – | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | $ – | $ – | – | – | $ – | $ – |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

50

A-3199

**Mallinckrodt Equinox Finance LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | | – | – | – | – |
| Inventory | 4 | – | | – | – | – | – |
| Prepaid Expenses | 5 | – | | – | – | – | – |
| Other Current Assets | 6 | – | | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | | – | – | – | – |
| Intangible Assets | 8 | – | | – | – | – | – |
| Other Non-Current Assets | 9 | – | | – | – | – | – |
| Intercompany Receivables | 10 | 32,654 | | 0% | 0% | 1 | 31 |
| Investment in Subsidiary | 11 | – | | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 32,654** | | **0%** | **0%** | **$ 1** | **$ 31** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 1** | **$ 31** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 0 | $ 0 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 0 | 1 |
| Winddown Expense | 15 | | | | | 0 | 0 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 0** | **$ 2** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 1** | **$ 29** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$ 1** | **$ 29** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 0 | 100% | 100% | $ 0 | $ 0 |
| Chapter 11 Professionals | | 0 | 0 | 100% | 100% | 0 | 0 |
| **Total Carve Out Fees** | 16 | **$ 0** | **$ 0** | **100%** | **100%** | **$ 0** | **$ 0** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 1** | **$ 29** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 1** | **$ 29** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 1 | 15 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 0 | 14 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 1** | **$ 29** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | 755 | 755 | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 755** | **$ 755** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | –[a] | –[a] | | | – | – |
| Class 7 - Trade Claims | 24 | – | – | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | –[a] | –[a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | –[a] | –[a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,810** | **$ 1,543,810** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | –[a] | –[a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

51

**ST US Holdings LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Higher | Estimated $ Recovery Lower | Higher |
|---|---|---|---|---|---|---|
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | 97 | 14% | 21% | 14 | 20 |
| Investment in Subsidiary | 11 | 6,849,341 | 1% | 1% | 73,285 | 76,506 |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 6,849,438** | 1% | 1% | **$ 73,298** | **$ 76,527** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 73,298** | **$ 76,527** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 881 | $ 953 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 3,191 | 2,456 |
| Winddown Expense | 15 | | | | 780 | 645 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 4,852** | **$ 4,054** |
| **Net Proceeds Available for Distribution** | | | | | **$ 68,446** | **$ 72,473** |

| | Note Ref | Estimated Allowed Claims Lower | Higher | Estimated % Recovery Lower | Higher | Estimated $ Recovery Lower | Higher |
|---|---|---|---|---|---|---|---|
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$ 68,446** | **$ 72,473** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 35 | $ 31 | 100% | 100% | $ 35 | $ 31 |
| Chapter 11 Professionals | | 604 | 501 | 100% | 100% | 604 | 501 |
| **Total Carve Out Fees** | 16 | **$ 638** | **$ 532** | 100% | 100% | **$ 638** | **$ 532** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 67,808** | **$ 71,941** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 67,808** | **$ 71,941** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 2% | 1% | 44,601 | 38,126 |
| First Lien Notes | 18 | 545,790 | 545,790 | 4% | 6% | 23,207 | 33,815 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | 2% | 2% | **$ 67,808** | **$ 71,941** |
| **Proceeds Available After Satisfying Secured Claims** | | | | 2% | 2% | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | 622 | 622 | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 622** | **$ 622** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 4,899 [a] | 4,899 [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | – | – | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | [a] | [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | [a] | [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 251,201 | 251,201 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,799,910** | **$ 1,799,910** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | [a] | [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

52

**MCCH LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | – | – | – | – | – |
| Investment in Subsidiary | 11 | 7,344,105 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 7,344,105** | | – | **$ –** | **$ –** |
| **Gross Proceeds Available for Distribution** | | | | | **$ –** | **$ –** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ – | $ – |
| Chapter 7 Trustee Professional Fees | 14 | | | | – | – |
| Winddown Expense | 15 | | | | – | – |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ –** | **$ –** |
| **Net Proceeds Available for Distribution** | | | | | **$ –** | **$ –** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ – | $ – |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ – | $ – | – | – | $ – | $ – |
| Chapter 11 Professionals | | – | – | – | – | – | – |
| **Total Carve Out Fees** | 16 | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ –** | **$ –** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ –** | **$ –** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | – | – | $ – | $ – |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | – | – | **$ –** | **$ –** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | – | – | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | – | – | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 158,019 | 158,019 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,701,829** | **$ 1,701,829** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

A-3202

**MAK LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $     – | – | – | $     – | $     – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $     – | – | – | $     – | $     – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | – | – | – | – | – |
| Investment in Subsidiary | 11 | 64,377 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | $     64,377 | – | – | $     – | $     – |
| **Gross Proceeds Available for Distribution** | | | | | $     – | $     – |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $     – | $     – |
| Chapter 7 Trustee Professional Fees | 14 | | | | – | – |
| Winddown Expense | 15 | | | | – | – |
| **Total Chapter 7 Liquidation Costs** | | | | | $     – | $     – |
| **Net Proceeds Available for Distribution** | | | | | $     – | $     – |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $     – | $     – |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $     – | $     – | – | – | $     – | $     – |
| Chapter 11 Professionals | | – | – | – | – | – | – |
| **Total Carve Out Fees** | 16 | $     – | $     – | – | – | $     – | $     – |
| **Net Proceeds After Carve Out Claims** | | | | | | $     – | $     – |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | $     – | $     – |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $     2,697,920 | $     2,697,920 | – | – | $     – | $     – |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | $     3,599,684 | $     3,599,684 | – | – | $     – | $     – |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $     – | $     – |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | $     – | $     – |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $     – | $     – | – | – | $     – | $     – |
| **Total Superpriority Administrative Claims and Distributions** | | $     – | $     – | – | – | $     – | $     – |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $     – | $     – |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $     – | $     – | – | – | $     – | $     – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | – | – | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | $     – | $     – | – | – | $     – | $     – |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $     – | $     – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $     1,543,810 | $     1,543,810 | – | – | $     – | $     – |
| Class 6 - General Unsecured Claims | 23 | –[a] | –[a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | – | – | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | –[a] | –[a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | –[a] | –[a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 44,439 | 44,439 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | $     1,588,249 | $     1,588,249 | – | – | $     – | $     – |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $     – | $     – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $     – | $     – | – | – | $     – | $     – |
| Class 13 - Subordinated Claims | 29 | –[a] | –[a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | $     – | $     – | – | – | $     – | $     – |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

54

**Petten Holdings Inc.**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | | – | – | – | – |
| Inventory | 4 | – | | – | – | – | – |
| Prepaid Expenses | 5 | – | | – | – | – | – |
| Other Current Assets | 6 | – | | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | | – | – | – | – |
| Intangible Assets | 8 | – | | – | – | – | – |
| Other Non-Current Assets | 9 | – | | – | – | – | – |
| Intercompany Receivables | 10 | 0 | | – | – | – | – |
| Investment in Subsidiary | 11 | 2,047,752 | | 1% | 1% | 29,482 | 29,482 |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 2,047,752** | | 1% | 1% | **$ 29,482** | **$ 29,482** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 29,482** | **$ 29,482** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 354 | $ 367 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 1,283 | 946 |
| Winddown Expense | 15 | | | | | 314 | 249 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 1,952** | **$ 1,562** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 27,530** | **$ 27,920** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$ 27,530** | **$ 27,920** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 14 | $ 12 | 100% | 100% | $ 14 | $ 12 |
| Chapter 11 Professionals | | 243 | 193 | 100% | 100% | 243 | 193 |
| **Total Carve Out Fees** | 16 | **$ 257** | **$ 205** | 100% | 100% | **$ 257** | **$ 205** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 27,273** | **$ 27,715** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 27,273** | **$ 27,715** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 1% | 1% | $ 17,939 | $ 14,688 |
| First Lien Notes | 18 | 545,790 | 545,790 | 2% | 2% | 9,334 | 13,027 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | 1% | 1% | **$ 27,273** | **$ 27,715** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | | | | |
| Class 7 - Trade Claims | 24 | – | – | | | | |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | | |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – | – | | | | |
| Class 11 - Intercompany Claims | 27 | 329 | 329 | | | | |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,544,138** | **$ 1,544,138** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | | |
| Class 14 - Equity Interests | 30 | – | – | | | | |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

55

**A-3204**

**Sucampo Holdings, Inc.**
**Hypothetical Liquidation Analysis**
($ in 000s)

### I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | | – | – | – | – |
| Inventory | 4 | – | | – | – | – | – |
| Prepaid Expenses | 5 | – | | – | – | – | – |
| Other Current Assets | 6 | – | | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | | – | – | – | – |
| Intangible Assets | 8 | – | | – | – | – | – |
| Other Non-Current Assets | 9 | – | | – | – | – | – |
| Intercompany Receivables | 10 | – | | – | – | – | – |
| Investment in Subsidiary | 11 | 94,433 | | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 94,433** | | | | **$ –** | **$ –** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ –** | **$ –** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ – | $ – |
| Chapter 7 Trustee Professional Fees | 14 | | | | | – | – |
| Winddown Expense | 15 | | | | | – | – |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ –** | **$ –** |
| **Net Proceeds Available for Distribution** | | | | | | **$ –** | **$ –** |

### II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| Net Proceeds Available for Distribution | | | | | | $ – | $ – |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ – | $ – | – | – | $ – | $ – |
| Chapter 11 Professionals | | – | – | – | – | – | – |
| **Total Carve Out Fees** | 16 | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ –** | **$ –** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ –** | **$ –** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | – | – | $ – | $ – |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | – | – | **$ –** | **$ –** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | – | – | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | – | – | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,810** | **$ 1,543,810** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

**InfaCare Pharmaceutical Corporation**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | | – | – | – | – |
| Inventory | 4 | – | | – | – | – | – |
| Prepaid Expenses | 5 | 16 | | – | – | – | – |
| Other Current Assets | 6 | – | | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | | – | – | – | – |
| Intangible Assets | 8 | – | | – | – | – | – |
| Other Non-Current Assets | 9 | – | | – | – | – | – |
| Intercompany Receivables | 10 | 35,383 | | – | 0% | – | 1 |
| Investment in Subsidiary | 11 | – | | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 35,399** | | – | 0% | **$ –** | **$ 1** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ –** | **$ 1** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ – | $ 0 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | – | 0 |
| Winddown Expense | 15 | | | | | – | 0 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ –** | **$ 0** |
| **Net Proceeds Available for Distribution** | | | | | | **$ –** | **$ 1** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ – | $ 1 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ – | $ 0 | – | 100% | $ – | $ 0 |
| Chapter 11 Professionals | | – | 0 | – | 100% | – | 0 |
| **Total Carve Out Fees** | 16 | **$ –** | **$ 0** | – | 100% | **$ –** | **$ 0** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ –** | **$ 1** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ –** | **$ 1** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | – | 0% | $ – | $ 1 |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | – | 0% | **$ –** | **$ 1** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 4 | $ 4 | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 4** | **$ 4** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 100 [a] | 100 [a] | | | – | – |
| Class 7 - Trade Claims | 24 | 65 | 65 | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,543,975** | **$ 1,543,975** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | | | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

57

**A-3206**

**Vtesse LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

### I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION

| | Note Ref | Net Book Value | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|
| | | | Lower | Higher | Lower | Higher |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | 1,021 | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | – | – | – | – | – |
| Investment in Subsidiary | 11 | – | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | $ 1,021 | | | $ – | $ – |
| **Gross Proceeds Available for Distribution** | | | | | $ – | $ – |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ – | $ – |
| Chapter 7 Trustee Professional Fees | 14 | | | | – | – |
| Winddown Expense | 15 | | | | – | – |
| **Total Chapter 7 Liquidation Costs** | | | | | $ – | $ – |
| **Net Proceeds Available for Distribution** | | | | | $ – | $ – |

### II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **Net Proceeds Available for Distribution** | | | | | | $ – | $ – |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ – | $ – | – | – | $ – | $ – |
| Chapter 11 Professionals | | – | – | – | – | – | – |
| **Total Carve Out Fees** | 16 | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds After Carve Out Claims** | | | | | | $ – | $ – |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | $ – | $ – |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | – | – | $ – | $ – |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | $ 3,599,684 | $ 3,599,684 | – | – | $ – | $ – |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $ – | $ – |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | $ – | $ – |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ – | $ – |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 701 | $ 701 | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | – | – | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | $ 701 | $ 701 | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ – | $ – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 877 | 877 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 152,739 | 152,739 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | $ 1,697,426 | $ 1,697,426 | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | $ – | $ – | – | – | $ – | $ – |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

A-3207

**Mallinckrodt Veterinary, Inc.**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| *I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION* | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | | – | – | | |
| Inventory | 4 | – | | – | – | | |
| Prepaid Expenses | 5 | – | | – | – | | |
| Other Current Assets | 6 | 1,490 | | – | 30% | | 447 |
| Plant, Property & Equipment, net | 7 | – | | – | – | | |
| Intangible Assets | 8 | – | | – | – | | |
| Other Non-Current Assets | 9 | – | | – | – | | |
| Intercompany Receivables | 10 | – | | – | – | | |
| Investment in Subsidiary | 11 | – | | – | – | | |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | | |
| **Total Assets and Gross Recovery** | | **$ 1,490** | | – | 30% | **$ –** | **$ 447** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ –** | **$ 447** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ – | $ 6 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | – | 14 |
| Winddown Expense | 15 | | | | | – | 4 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ –** | **$ 24** |
| **Net Proceeds Available for Distribution** | | | | | | **$ –** | **$ 423** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| *II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS* | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | $ – | $ 423 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ – | $ 0 | – | 100% | $ – | $ 0 |
| Chapter 11 Professionals | | – | 3 | – | 100% | – | 3 |
| **Total Carve Out Fees** | 16 | **$ –** | **$ 3** | – | 100% | **$ –** | **$ 3** |
| **Net Proceeds After Carve Out Claims** | | | | | | $ – | $ 420 |
| Less: Value from Unencumbered Assets | | | | | | | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ –** | **$ 420** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | – | 0% | $ – | $ 223 |
| First Lien Notes | 18 | 545,790 | 545,790 | – | 0% | | 197 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | | |
| Purchase-Money Lien | 20 | – | – | | | | |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | – | 0% | **$ –** | **$ 420** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $ – | $ – |
| Add: Value from Unencumbered Assets | | | | | | | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ – | $ – |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 11 | $ 11 | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | – | | |
| Priority Tax Claims | | – | – | | – | | |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 11** | **$ 11** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ – | $ – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 2,409 [a] | 2,409 [a] | – | – | | |
| Class 7 - Trade Claims | 24 | 101 | 101 | – | – | | |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | | |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | | |
| Class 11 - Intercompany Claims | 27 | 4,258 | 4,258 | – | – | | |
| **Total Distribution to Unsecured Claims** | | **$ 1,550,578** | **$ 1,550,578** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | – | | |
| Class 14 - Equity Interests | 30 | – | – | | – | | |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

59

A-3208

**Mallinckrodt US Holdings LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| ***I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION*** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | | – | – | – | – |
| Inventory | 4 | – | | – | – | – | – |
| Prepaid Expenses | 5 | – | | – | – | – | – |
| Other Current Assets | 6 | 5,680 | | 18% | 39% | 1,002 | 2,205 |
| Plant, Property & Equipment, net | 7 | – | | – | – | – | – |
| Intangible Assets | 8 | – | | – | – | – | – |
| Other Non-Current Assets | 9 | 15,177 | | 10% | 20% | 1,518 | 3,035 |
| Intercompany Receivables | 10 | – | | – | – | – | – |
| Investment in Subsidiary | 11 | – | | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 20,858** | | **12%** | **25%** | **$ 2,520** | **$ 5,241** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 2,520** | **$ 5,241** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 30 | $ 65 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 110 | 168 |
| Winddown Expense | 15 | | | | | 27 | 44 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 167** | **$ 278** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 2,353** | **$ 4,963** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| ***II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS*** | | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | | **$ 2,353** | **$ 4,963** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 1 | $ 2 | 100% | 100% | $ 1 | $ 2 |
| Chapter 11 Professionals | | 21 | 34 | 100% | 100% | 21 | 34 |
| **Total Carve Out Fees** | 16 | **$ 22** | **$ 36** | **100%** | **100%** | **$ 22** | **$ 36** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 2,331** | **$ 4,927** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 2,331** | **$ 4,927** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 1,533 | $ 2,611 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 798 | 2,316 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 2,331** | **$ 4,927** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ 184 | $ 184 | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | – | – | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 184** | **$ 184** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 44,923 [a] | 44,923 [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | 339 | 339 | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | 6,950 | 6,950 | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 1,596,022** | **$ 1,596,022** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

**Mallinckrodt ARD Finance LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | | – | – | | |
| Inventory | 4 | – | | – | – | | |
| Prepaid Expenses | 5 | – | | – | – | | |
| Other Current Assets | 6 | – | | – | – | | |
| Plant, Property & Equipment, net | 7 | – | | – | – | | |
| Intangible Assets | 8 | – | | – | – | | |
| Other Non-Current Assets | 9 | – | | – | – | | |
| Intercompany Receivables | 10 | – | | – | – | | |
| Investment in Subsidiary | 11 | 5,391,816 | | – | – | | |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | | – |
| **Total Assets and Gross Recovery** | | $ 5,391,816 | | | – | $ – | $ – |
| **Gross Proceeds Available for Distribution** | | | | | | $ – | $ – |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ – | $ – |
| Chapter 7 Trustee Professional Fees | 14 | | | | | – | |
| Winddown Expense | 15 | | | | | – | |
| **Total Chapter 7 Liquidation Costs** | | | | | | $ – | $ – |
| **Net Proceeds Available for Distribution** | | | | | | $ – | $ – |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ – | $ – |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ – | $ – | – | – | $ – | $ – |
| Chapter 11 Professionals | | – | – | – | – | – | |
| **Total Carve Out Fees** | 16 | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds After Carve Out Claims** | | | | | | $ – | $ – |
| Less: Value from Unencumbered Assets | | | | | | – | |
| **Net Proceeds Available for Secured Claims** | | | | | | $ – | $ – |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | – | – | $ – | $ – |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | | |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | | |
| Purchase-Money Lien | 20 | – | – | – | – | | |
| **Total Secured Claims and Distributions** | | $ 3,599,684 | $ 3,599,684 | – | – | $ – | $ – |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $ – | $ – |
| Add: Value from Unencumbered Assets | | | | | | – | |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | $ – | $ – |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ – | $ – |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | | |
| Priority Tax Claims | | 16,380 | 16,380 | – | – | | |
| **Total Administrative & Priority Claims and Distributions** | 21 | $ 16,380 | $ 16,380 | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ – | $ – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | – | – | | |
| Class 7 - Trade Claims | 24 | – | – | – | – | | |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | | |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – | – | – | – | | |
| Class 11 - Intercompany Claims | 27 | 149,002 | 149,002 | – | – | | |
| **Total Distribution to Unsecured Classes of Claims** | | $ 1,692,812 | $ 1,692,812 | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | | |
| Class 14 - Equity Interests | 30 | – | – | – | – | | |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | $ – | $ – | – | – | $ – | $ – |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

61

**A-3210**

**Mallinckrodt Enterprises Holdings Inc.**
**Hypothetical Liquidation Analysis**
($ in 000s)

| | Note Ref | Net Book Value | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | | | Lower | Higher | Lower | Higher |
| **I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | | | | | | | |
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | | – | – | – | – |
| Inventory | 4 | – | | – | – | – | – |
| Prepaid Expenses | 5 | – | | – | – | – | – |
| Other Current Assets | 6 | – | | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | | – | – | – | – |
| Intangible Assets | 8 | – | | – | – | – | – |
| Other Non-Current Assets | 9 | 471 | | 10% | 20% | 47 | 94 |
| Intercompany Receivables | 10 | 126,493 | | – | – | – | – |
| Investment in Subsidiary | 11 | 5,114,595 | | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | **$ 5,241,560** | | **0%** | **0%** | **$ 47** | **$ 94** |
| **Gross Proceeds Available for Distribution** | | | | | | **$ 47** | **$ 94** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | | $ 1 | $ 1 |
| Chapter 7 Trustee Professional Fees | 14 | | | | | 2 | 3 |
| Winddown Expense | 15 | | | | | 1 | 2 |
| **Total Chapter 7 Liquidation Costs** | | | | | | **$ 4** | **$ 6** |
| **Net Proceeds Available for Distribution** | | | | | | **$ 43** | **$ 89** |

| | Note Ref | Estimated Allowed Claims | | Estimated % Recovery | | Estimated $ Recovery | |
|---|---|---|---|---|---|---|---|
| | | Lower | Higher | Lower | Higher | Lower | Higher |
| **II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | | | | | | | |
| Net Proceeds Available for Distribution | | | | | | $ 43 | $ 89 |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 0 | 100% | 100% | $ 0 | $ 0 |
| Chapter 11 Professionals | | 0 | 1 | 100% | 100% | 0 | 1 |
| **Total Carve Out Fees** | 16 | **$ 0** | **$ 1** | **100%** | **100%** | **$ 0** | **$ 1** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 43** | **$ 88** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 43** | **$ 88** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 43 | $ 88 |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | | | – | – |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 43** | **$ 88** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superiority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | 2,168 | 2,168 | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ 2,168** | **$ 2,168** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | 1,203 [a] | 1,203 [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | – | – | | | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | [a] | [a] | | | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | [a] | [a] | | | – | – |
| Class 11 - Intercompany Claims | 27 | 1,880,711 | 1,880,711 | | | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | **$ 3,425,724** | **$ 3,425,724** | – | – | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | – | – |
| Class 14 - Equity Interests | 30 | – | – | | | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | – | – | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

62

A-3211

**SpecGx Holdings LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

## I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ 200 | 100% | 100% | $ 200 | $ 200 |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | – | – | – | – | – |
| Investment in Subsidiary | 11 | 744,351 | | | | |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | | |
| **Total Assets and Gross Recovery** | | **$ 744,551** | **0%** | **0%** | **$ 200** | **$ 200** |
| **Gross Proceeds Available for Distribution** | | | | | **$ 200** | **$ 200** |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ 2 | $ 2 |
| Chapter 7 Trustee Professional Fees | 14 | | | | 9 | 6 |
| Winddown Expense | 15 | | | | 2 | 2 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 13** | **$ 11** |
| **Net Proceeds Available for Distribution** | | | | | **$ 187** | **$ 189** |

## II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS

| | Note Ref | Estimated Allowed Claims Lower | Estimated Allowed Claims Higher | Estimated % Recovery Lower | Estimated % Recovery Higher | Estimated $ Recovery Lower | Estimated $ Recovery Higher |
|---|---|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | | | | | **$ 187** | **$ 189** |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ 0 | $ 0 | 100% | 100% | $ 0 | $ 0 |
| Chapter 11 Professionals | | 2 | 1 | 100% | 100% | 2 | 1 |
| **Total Carve Out Fees** | 16 | **$ 2** | **$ 1** | **100%** | **100%** | **$ 2** | **$ 1** |
| **Net Proceeds After Carve Out Claims** | | | | | | **$ 185** | **$ 188** |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | **$ 185** | **$ 188** |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | 0% | 0% | $ 122 | $ 100 |
| First Lien Notes | 18 | 545,790 | 545,790 | 0% | 0% | 63 | 88 |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | | | | |
| **Total Secured Claims and Distributions** | | **$ 3,599,684** | **$ 3,599,684** | **0%** | **0%** | **$ 185** | **$ 188** |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | **$ –** | **$ –** |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | **$ –** | **$ –** |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | | | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | **$ –** | **$ –** |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | | | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | | | – | – |
| Priority Tax Claims | | – | – | | | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | **$ –** | **$ –** | | | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | **$ –** | **$ –** |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | | | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | | | | |
| Class 7 - Trade Claims | 24 | 750 | 750 | | | | |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | | | | |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | | | | |
| Class 11 - Intercompany Claims | 27 | 200 | 200 | | | | |
| **Total Distribution to Unsecured Claims** | | **$ 1,544,759** | **$ 1,544,759** | **–** | **–** | **$ –** | **$ –** |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | **$ –** | **$ –** |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | | | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | | | | |
| Class 14 - Equity Interests | 30 | – | – | | | | |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | **$ –** | **$ –** | **–** | **–** | **$ –** | **$ –** |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

63

**A-3212**

**WebsterGx Holdco LLC**
**Hypothetical Liquidation Analysis**
($ in 000s)

### I. CALCULATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION

| | Note Ref | Net Book Value | Estimated % Recovery Lower | Higher | Estimated $ Recovery Lower | Higher |
|---|---|---|---|---|---|---|
| PROCEEDS FROM LIQUIDATED OPERATIONS | 1 | $ – | – | – | $ – | $ – |
| RECOVERIES FROM REMAINING ASSETS: | | | | | | |
| Cash and Cash Equivalents | 2 | $ – | – | – | $ – | $ – |
| Accounts Receivable, net | 3 | – | – | – | – | – |
| Inventory | 4 | – | – | – | – | – |
| Prepaid Expenses | 5 | – | – | – | – | – |
| Other Current Assets | 6 | – | – | – | – | – |
| Plant, Property & Equipment, net | 7 | – | – | – | – | – |
| Intangible Assets | 8 | – | – | – | – | – |
| Other Non-Current Assets | 9 | – | – | – | – | – |
| Intercompany Receivables | 10 | 1 | – | – | – | – |
| Investment in Subsidiary | 11 | 0 | – | – | – | – |
| Net Operating Cash Flow - Conversion Through Sale | 12 | n/a | n/a | n/a | – | – |
| **Total Assets and Gross Recovery** | | $ 1 | | | $ – | $ – |
| **Gross Proceeds Available for Distribution** | | | | | $ – | $ – |
| CHAPTER 7 LIQUIDATION COSTS: | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | $ – | $ – |
| Chapter 7 Trustee Professional Fees | 14 | | | | – | – |
| Winddown Expense | 15 | | | | – | – |
| **Total Chapter 7 Liquidation Costs** | | | | | $ – | $ – |
| **Net Proceeds Available for Distribution** | | | | | $ – | $ – |

### II. ALLOCATION OF NET PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS

| | Note Ref | Estimated Allowed Claims Lower | Higher | Estimated % Recovery Lower | Higher | Estimated $ Recovery Lower | Higher |
|---|---|---|---|---|---|---|---|
| **Net Proceeds Available for Distribution** | | | | | | $ – | $ – |
| CARVE OUT: | | | | | | | |
| US Trustee Fees | | $ – | $ – | – | – | $ – | $ – |
| Chapter 11 Professionals | | – | – | – | – | – | – |
| **Total Carve Out Fees** | 16 | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds After Carve Out Claims** | | | | | | $ – | $ – |
| Less: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available for Secured Claims** | | | | | | $ – | $ – |
| SECURED CLAIMS: | | | | | | | |
| Revolver & Term Loan Credit Facility | 17 | $ 2,697,920 | $ 2,697,920 | – | – | $ – | $ – |
| First Lien Notes | 18 | 545,790 | 545,790 | – | – | – | – |
| Second Lien Notes | 19 | 355,973 | 355,973 | – | – | – | – |
| Purchase-Money Lien | 20 | – | – | – | – | – | – |
| **Total Secured Claims and Distributions** | | $ 3,599,684 | $ 3,599,684 | – | – | $ – | $ – |
| **Proceeds Available After Satisfying Secured Claims** | | | | | | $ – | $ – |
| Add: Value from Unencumbered Assets | | | | | | – | – |
| **Net Proceeds Available For Distribution to Superpriority Administrative Claims** | | | | | | $ – | $ – |
| SUPERPRIORITY ADMINISTRATIVE CLAIMS: | | | | | | | |
| Superpriority Postpetition Intercompany Payables | 21 | $ – | $ – | – | – | $ – | $ – |
| **Total Superpriority Administrative Claims and Distributions** | | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Administrative & Priority Claims** | | | | | | $ – | $ – |
| ADMINISTRATIVE & PRIORITY CLAIMS: | | | | | | | |
| Postpetition Admin Trade Claims | | $ – | $ – | – | – | $ – | $ – |
| Postpetition Intercompany Payables | | – | – | – | – | – | – |
| Priority Tax Claims | | – | – | – | – | – | – |
| **Total Administrative & Priority Claims and Distributions** | 21 | $ – | $ – | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to General Unsecured Claims** | | | | | | $ – | $ – |
| UNSECURED CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 5 - Guaranteed Unsecured Notes Claims | 22 | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| Class 6 - General Unsecured Claims | 23 | – [a] | – [a] | – | – | – | – |
| Class 7 - Trade Claims | 24 | – | – | – | – | – | – |
| Class 8 & Class 9 - Opioid Claims | 25 | – [a] | – [a] | – | – | – | – |
| Class 10 - Settled Federal/State Aethar Claims | 26 | – [a] | – [a] | – | – | – | – |
| Class 11 - Intercompany Claims | 27 | – | – | – | – | – | – |
| **Total Distribution to Unsecured Classes of Claims** | | $ 1,543,810 | $ 1,543,810 | – | – | $ – | $ – |
| **Net Proceeds Available For Distribution to Subordinated & Equity Claims** | | | | | | $ – | $ – |
| SUBORDINATED UNSECURED & EQUITY CLASSES OF CLAIMS[b]: | | | | | | | |
| Class 12 - Intercompany Interests | 28 | $ – | $ – | – | – | $ – | $ – |
| Class 13 - Subordinated Claims | 29 | – [a] | – [a] | – | – | – | – |
| Class 14 - Equity Interests | 30 | – | – | – | – | – | – |
| **Total Distribution to Subordinated & Equity Classes of Claims** | | $ – | $ – | – | – | $ – | $ – |

(a) Various litigation creditors have asserted Claims against the Debtors in amounts totaling billions of dollars, and in some instances trillions of dollars. Some such Claims are asserted at certain Debtors and others are asserted at all Debtors.
(b) Classes of Claims reflect Liquidated Claims. Contingent or Unliquidated claims, which are undetermined at the time of presentation, have been excluded.

64

A-3213

Case 20-12522-JTD    Doc 2917    Filed 06/18/21    Page 828 of 835

**<u>Exhibit F</u>**

**Valuation Analysis**

**Valuation Analysis**

THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE REGARDING, AND GUGGENHEIM SECURITIES, LLC ("GUGGENHEIM SECURITIES") DOES NOT EXPRESS ANY VIEW OR OPINION AS TO, THE PRICE OR RANGE OF PRICES AT WHICH ANY OF THE SHARES OR OTHER SECURITIES OF THE DEBTORS OR THE REORGANIZED DEBTORS MAY TRADE, BE SALEABLE OR OTHERWISE BE TRANSFERABLE AT ANY TIME, INCLUDING, WITHOUT LIMITATION, SUBSEQUENT TO CONSUMMATIFEAON OF THE PLAN.[1]

SUCH VALUATION INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, AND OTHER STAKEHOLDERS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING, WITHOUT LIMITATION, IN CONNECTION WITH THE PURCHASE OR SALE OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS OR ANY OF THEIR AFFILIATES.

THE ESTIMATED VALUE SET FORTH IN THE VALUATION ANALYSIS DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE DEBTORS OR THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATES SET FORTH IN THE VALUATION ANALYSIS. ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH ANY SECURITIES OF THE REORGANIZED DEBTORS MAY TRADE AFTER GIVING EFFECT TO THE TRANSACTIONS CONTEMPLATED TO BE EFFECTED BY THE PLAN AS OF OR FOLLOWING CONSUMMATION THEREOF. ANY SUCH PRICES MAY BE MATERIALLY DIFFERENT THAN INDICATED BY THE VALUATION ANALYSIS.

IN THE EVENT THAT THE PLAN IS NOT CONSUMMATED AS OF THE EXPECTED EFFECTIVE DATE AS ASSUMED IN THE FINANCIAL PROJECTIONS, IT IS HIGHLY LIKELY THAT THE VALUATION ANALYSIS CONTAINED HEREIN WILL CHANGE, POSSIBLY MATERIALLY.

With authorization from the Bankruptcy Court, the Debtors retained Guggenheim Securities as their investment banker in connection with the Chapter 11 Cases. Solely for purposes of the Plan and the Disclosure Statement, Guggenheim Securities estimated the total enterprise value (the "Total Enterprise Value")[2] and the implied estimated equity value (the "Equity Value") of the Reorganized Debtors on a consolidated going-concern basis and *pro forma* for the transactions contemplated by the Plan (the

---

[1]   Capitalized terms used but not otherwise defined herein shall, to the extent defined in (x) the *Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code*, dated April 20, 2021 (the "Plan"), or (y) the *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code*, dated April 20, 2021 (the "Disclosure Statement") have the meanings ascribed to such terms in the Plan or Disclosure Statement, as the context requires.

[2]   Total Enterprise Value is a financial term that generally means (a) the subject company's equity value (i.e., the value of the subject company's equity and equity-linked securities (i) inclusive of the value of (y) any minority investments held by the subject company and (z) any non-operating assets of the subject company and (ii) exclusive of the value of any non-controlling interests in the subject company's businesses that are held by third parties) plus (b) the subject company's funded debt less (c) the subject company's excess cash, cash equivalents and short- and long-term marketable securities. But see, also, discussion below pertaining to the method used herein to derive the implied estimated equity value for the Reorganized Debtors.

"Valuation Analysis"), all as set forth below. The Valuation Analysis was based on financial information provided by the Debtors' senior management, including the Financial Projections (defined below) attached to the Disclosure Statement as **Exhibit D**, and information provided by other sources.

In assessing and utilizing the Financial Projections for purposes of performing the Valuation Analysis, Guggenheim Securities took into account its discussions with the Debtors' senior management regarding the risks and uncertainties of realizing the Financial Projections in light of (i) the current and prospective industry conditions and competitive dynamics facing the Debtors (and, as of the Effective Date, the Reorganized Debtors), (ii) the Debtors' recent financial performance, (iii) the key commercial, operational and financial drivers underlying the Financial Projections, (iv) the impact and economic effects of the COVID-19 pandemic on any of the foregoing and (v) various other facts and circumstances relevant to the Financial Projections.

The Valuation Analysis was conducted as of April 16, 2021 and assumes the effective date of the Plan occurs on September 24, 2021 (the "Effective Date").

### Estimated Total Enterprise Value and Equity Value

Based on the Financial Projections and other information and the financial analyses described herein, Guggenheim Securities estimated the Total Enterprise Value of the Reorganized Debtors to be approximately $5,200 to $5,700 million, with a midpoint of $5,450 million. After deducting (i) *pro forma* net funded debt of $3,650 million[3] as contemplated by the Plan as of the Effective Date, and (ii) the *fair value* of certain deferred settlement payments of $987 million,[4] Guggenheim Securities' estimated Total Enterprise Value implies an estimated Equity Value for the Reorganized Debtors of approximately $563 to $1,063 million, with a midpoint of $813 million.

THE FINANCIAL PROJECTIONS FOR, AND THE ESTIMATED TOTAL ENTERPRISE VALUE AND THE IMPLIED ESTIMATED EQUITY VALUE OF, THE REORGANIZED DEBTORS ARE SUBJECT TO VARIOUS UNCERTAINTIES AND CONTINGENCIES THAT ARE INHERENTLY DIFFICULT TO PREDICT. AMONG OTHER THINGS, SUCH ESTIMATED VALUES WILL FLUCTUATE BASED ON (I) GENERAL ECONOMIC AND BUSINESS CONDITIONS, CAPITAL MARKETS CONDITIONS AND INDUSTRY-SPECIFIC AND COMPANY-SPECIFIC FACTORS AND (II) THE FINANCIAL CONDITION, FINANCIAL PERFORMANCE AND FINANCIAL PROSPECTS OF THE REORGANIZED DEBTORS. MANY OF THE FOREGOING FACTORS AND/OR DRIVERS ARE BEYOND THE CONTROL OF THE DEBTORS, THE REORGANIZED DEBTORS AND GUGGENHEIM SECURITIES. ACCORDINGLY, THE ESTIMATED VALUES SET FORTH HEREIN ARE NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE THE ESTIMATED TOTAL ENTERPRISE VALUE AND THE IMPLIED ESTIMATED EQUITY VALUE OF THE REORGANIZED DEBTORS AS SET FORTH HEREIN ARE INHERENTLY SUBJECT TO SUCH UNCERTAINTIES AND CONTINGENCIES, NONE OF THE DEBTORS, THE REORGANIZED DEBTORS, GUGGENHEIM SECURITIES OR ANY OTHER PERSON ASSUMES ANY RESPONSIBILITY FOR THEIR ACCURACY, ACHIEVABILITY OR REALIZATION. ANY VARIANCE IN ACTUAL RESULTS FROM THE ESTIMATES SET FORTH IN THE FINANCIAL PROJECTIONS COULD HAVE A MATERIAL IMPACT ON GUGGENHEIM SECURITIES' VALUATION ANALYSIS.

---

[3]   Reflects Total Funded Debt of $3,869 million (*pro forma* for the Effective Date), less *pro forma* Cash to Balance Sheet of $219 million, net of payments to be made upon emergence on the Effective Date, all as set forth in the Financial Projections.

[4]   Reflects the fair values for the post-emergence Opioid Deferred Cash Payments and Federal/State Acthar Deferred Cash Payments set forth in the Financial Projections.

2

UNLESS OTHERWISE INDICATED HEREIN, GUGGENHEIM SECURITIES' VALUATION ANALYSIS WAS BASED ON THE FINANCIAL PROJECTIONS FOR THE REORGANIZED DEBTORS AND ON CAPITAL MARKETS DATA AS OF APRIL 16, 2021, REFLECTS INFORMATION MADE AVAILABLE TO GUGGENHEIM SECURITIES AS OF OR PRIOR TO SUCH DATE AND IS BASED ON ECONOMIC, CAPITAL MARKETS AND OTHER CONDITIONS AS OF SUCH DATE. GUGGENHEIM SECURITIES IS NOT MAKING ANY ASSESSMENT REGARDING THE IMPACT OR THE ECONOMIC EFFECTS OF THE COVID-19 PANDEMIC, INCLUDING WITH RESPECT TO THE POTENTIAL IMPACT OR EFFECTS ON THE FUTURE FINANCIAL PERFORMANCE OF THE REORGANIZED DEBTORS. ALTHOUGH THE VALUATION ANALYSIS MAY BE AFFECTED BY SUBSEQUENT DEVELOPMENTS INCLUDING, WITHOUT LIMITATION, DEVELOPMENTS RELATING TO THE COVID-19 PANDEMIC, GUGGENHEIM SECURITIES ASSUMES NO RESPONSIBILITY FOR UPDATING OR REVISING THE ESTIMATED TOTAL ENTERPRISE VALUE OR THE IMPLIED ESTIMATED EQUITY VALUE OF THE REORGANIZED DEBTORS FOR ANY REASON, WHETHER DUE TO FACTS, CIRCUMSTANCES OR EVENTS OCCURRING AFTER SUCH DATE OR OTHERWISE.

***Summary of Reviews, Financial Analyses and Valuation Methodologies***

In the course of estimating the Total Enterprise Value of the Reorganized Debtors, Guggenheim Securities:

- reviewed the Plan and the Disclosure Statement, each dated as of April 20, 2021;

- reviewed the Restructuring Support Agreement entered into on October 11, 2020 (as modified by the MSGE Group Joinder Agreement and the Supporting Term Lenders Joinder Agreement);

- reviewed the *pro forma* capitalization of the Reorganized Debtors as contemplated by the Plan as of the Effective Date;

- reviewed certain historical and forward-looking business and financial information regarding the business and prospects of the Debtors and the Reorganized Debtors (including certain consolidated financial projections for the Reorganized Debtors for the fiscal quarter ending December 31, 2021 through the fiscal year ending December 26, 2025 (the "Financial Projections") and certain estimates as to potential realizable existing tax attributes expected to be utilized by the Reorganized Debtors), all as prepared and approved for Guggenheim Securities' use by the Debtors' senior management;

- discussed with the Debtors' senior management and the Debtors' other advisors (as applicable) their respective views regarding the (i) business, operations, historical and projected financial results and future prospects of the Debtors and the Reorganized Debtors, (ii) key assumptions related to the Financial Projections and (iii) commercial, competitive and regulatory dynamics in the specialty pharmaceutical and generic pharmaceutical sectors;

- performed discounted cash flow analyses based on the Financial Projections;

- compared the financial performance of the Debtors with corresponding data for certain publicly traded companies that Guggenheim Securities deemed relevant in evaluating the Reorganized Debtors and reviewed the trading multiples for such publicly traded companies; and

- conducted such other studies, analyses, inquiries and investigations as Guggenheim Securities deemed appropriate.

In connection with performing its Valuation Analysis, Guggenheim Securities:

A-3217

- based its Valuation Analysis on various assumptions, including assumptions concerning general economic, business and capital markets conditions and industry-specific and company-specific factors, all of which are beyond the control of the Debtors, the Reorganized Debtors and Guggenheim Securities;

- performed a variety of financial analyses and considered a variety of factors in assessing the estimated Total Enterprise Value of the Reorganized Debtors;

- did not form a view or opinion as to whether any individual analysis or factor, whether positive or negative, considered in isolation, supported or failed to support its estimate of the Total Enterprise Value of the Reorganized Debtors;

- considered the results of all of its financial analyses (including the principal valuation analyses described below) and did not attribute any particular weight to any one analysis or factor; and

- ultimately arrived at its estimate of the Total Enterprise Value of the Reorganized Debtors based on the results of the financial analyses assessed as a whole and believes that the totality of the factors considered and the various financial analyses performed by Guggenheim Securities operated collectively to support its estimate of the Total Enterprise Value of the Reorganized Debtors.

The following is a summary of the principal valuation analyses (commonly used by investment bankers and other financial advisor practitioners) that Guggenheim Securities performed and considered in estimating the Total Enterprise Value of the Reorganized Debtors: (i) Discounted Cash Flow Analysis and (ii) Selected Publicly Traded Companies Analysis.


*Discounted Cash Flow Analysis*

Discounted Cash Flow Analysis involves estimating a subject company's "intrinsic value" based on the sum of the present values of its (i) projected/forecasted annual unlevered after-tax free cash flows during an explicit projection/forecast period and (ii) estimated terminal/continuing value beyond the explicit projection/forecast horizon. Guggenheim Securities typically estimates the subject company's terminal/continuing value by applying a range of assumed perpetual growth rates to the subject company's projected/forecasted normalized unlevered after-tax free cash flow in the terminal year. The present values of such projected/forecasted annual unlevered after-tax free cash flows and estimated terminal/continuing value are then calculated by discounting them back to the present (i.e., in the case of the Reorganized Debtors, to the assumed Effective Date) based on the subject company's estimated weighted average cost of capital. In connection with its Valuation Analysis, Guggenheim Securities based its Discounted Cash Flow Analysis on the Financial Projections for the Reorganized Debtors.


*Selected Publicly Traded Companies Analysis*

Selected Publicly Traded Companies Analysis involves estimating a subject company's stand-alone fully distributed public market trading value based on both qualitative and quantitative reviews and analyses of the subject company versus certain publicly traded companies which are deemed to be reasonably comparable to the subject company. Among other things, such quantitative analyses typically include calculating various prevailing public market trading valuation multiples (based on various financial metrics considered appropriate given the subject company's and its peer group's industry or sector) and then applying such public market trading valuation multiples in the context of the subject company's historical and projected/forecasted financial performance.

4

With respect to its Selected Publicly Traded Companies Analysis related to the Reorganized Debtors, Guggenheim Securities notes that none of the selected publicly traded companies used in the Selected Publicly Traded Companies Analysis is identical or directly comparable to the Reorganized Debtors; however, such companies were selected by Guggenheim Securities, among other reasons, because they represented publicly traded companies which may be considered broadly similar, for purposes of Guggenheim Securities' financial analyses, to the Reorganized Debtors based on Guggenheim Securities' familiarity with the specialty pharmaceutical and specialty generics sectors primarily based in the United States. In any event, the Selected Publicly Traded Companies Analysis is not mathematical; rather, such analysis involves complex considerations and judgments concerning the differences in business, operating, financial and capital markets-related characteristics and other factors regarding the selected publicly traded companies to which the Reorganized Debtors were compared.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE FINANCIAL ANALYSES PERFORMED BY GUGGENHEIM SECURITIES. GUGGENHEIM SECURITIES' PREPARATION OF ITS VALUATION ANALYSIS INVOLVED VARIOUS COMPLEX DETERMINATIONS AND JUDGMENTS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF VALUATION ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH ANALYSES ARE NOT READILY SUSCEPTIBLE TO SUMMARY DESCRIPTION.

### Certain Caveats, Limitations and Considerations

With respect to the information used in performing its Valuation Analysis described herein, it should be noted that:

- Guggenheim Securities relied upon and assumed the accuracy, completeness and reasonableness of all industry, business, financial, legal, regulatory, tax, accounting, actuarial and other information (including, without limitation, the Financial Projections, any other estimates and any other forward-looking information) provided by or discussed with the Debtors and their other advisors or obtained from public sources, data suppliers and other third parties;

- Guggenheim Securities did not assume any responsibility, obligation or liability for the accuracy, completeness, reasonableness, achievability or independent verification of, and Guggenheim Securities did not independently verify, any of the above-referenced information (including, without limitation, the Financial Projections, any other estimates and any other forward-looking information);

- Guggenheim Securities expressed no view, opinion, representation, guaranty or warranty (in each case, express or implied) regarding the reasonableness or achievability of the Financial Projections, any other estimates and any other forward-looking information or the assumptions upon which they are based; and

- Specifically, with respect to (i) the Financial Projections, any other estimates and any other forward-looking information provided by or discussed with the Debtors, (a) Guggenheim Securities was advised by the Debtors' senior management, and Guggenheim Securities assumed, that the Financial Projections, such other estimates and such other forward-looking information utilized in its analyses had been reasonably prepared on bases reflecting the best then-currently available estimates and judgments of the Debtors' senior management as to the expected future performance of the Reorganized Debtors, (b) Guggenheim Securities assumed that the Financial Projections would be realized substantially as projected/forecasted and (c) Guggenheim Securities assumed that the Financial Projections, such other estimates and such other forward-looking information had been reviewed by the Debtors' Board of Directors with the understanding that such

5

A-3219

information would be used and relied upon by Guggenheim Securities in connection with its Valuation Analysis and (ii) any financial projections, other estimates and/or other forward-looking information obtained by Guggenheim Securities from public sources, data suppliers and other third parties, Guggenheim Securities assumed that such information was reasonable and reliable.

Guggenheim Securities further assumed that (i) in all respects meaningful to its analyses, (a) the final version of the Plan, as confirmed, and the related Disclosure Statement will not differ from earlier versions thereof that Guggenheim Securities reviewed in order to prepare its Valuation Analysis and (b) the Debtors will comply with all terms and conditions of the Plan, the Disclosure Statement and the Restructuring Support Agreement; (ii) the Plan will be consummated in a timely manner in accordance with its terms and the terms of the Restructuring Support Agreement and in compliance with all applicable laws, documents and other requirements, without any delays, limitations, restrictions, conditions, waivers, amendments or modifications (regulatory, tax-related or otherwise) that would have an effect on the Reorganized Debtors in any way meaningful to Guggenheim Securities' analyses; and (iii) no material changes that would affect the estimated Total Enterprise Value of the Reorganized Debtors will occur between the date of the filing of the Disclosure Statement to which this Valuation Analysis is attached and the Effective Date.

Guggenheim Securities' financial advice to the Debtors and its Valuation Analysis (and any materials provided in connection therewith):

- were provided to the Debtors' Board of Directors (in its capacity as such) solely for its information and assistance in connection with its evaluation of the Plan;

- do not constitute a recommendation to the Debtors' Board of Directors with respect to the Plan;

- do not constitute advice or a recommendation to any holder of any Claim against or Interest in any of the Debtors, any creditors of any of the Debtors or any other stakeholders in any of the Debtors (all of the foregoing, "Interested Parties") as to how to vote or act in connection with the Plan;

- do not address the (i) Debtors' or such Interested Parties' underlying business or financial decision to, respectively, propose or accept or reject the Plan (and any transactions contemplated thereby), (ii) relative merits of the Plan (and any transactions contemplated thereby) as compared to any alternative business or financial strategies that might exist for the Debtors or such Interested Parties or (iii) effects of any other transaction in which the Debtors or such Interested Parties might engage;

- do not constitute a view or opinion as to (i) any term, aspect or implication of the Plan (including, without limitation, the form or structure of any transactions contemplated thereby) or the Disclosure Statement or (ii) the Restructuring Support Agreement or any other agreement, transaction document or instrument contemplated by the Plan or to be entered into or amended in connection with the Plan;

- do not constitute a view or opinion as to fairness, financial or otherwise, of the Plan to, or of any consideration to be paid to or received by, any of the Interested Parties;

- do not constitute a view or opinion as to the fairness, financial or otherwise, of the amount or nature of any compensation payable to or to be received by any of the Debtors' or the Reorganized Debtors' directors, officers or employees, or any class of such persons, in connection with the Plan relative to the consideration to be distributed to or received by the Interested Parties;

- do not constitute a view or opinion regarding the solvency/liquidity of the Reorganized Debtors or any other entity under any relevant laws relating to bankruptcy, insolvency or similar matters; and

6

A-3220

- do not constitute a solvency/liquidity opinion or a liquidation analysis.

Guggenheim Securities' professionals are not legal, regulatory, tax, consulting, turn-around, accounting, appraisal or actuarial experts and Guggenheim Securities' financial analyses described herein should not be construed as constituting advice with respect to such matters; accordingly, Guggenheim Securities relied on the assessments of the Debtors' senior management and the Debtor's other advisors with respect to such matters.

Guggenheim Securities did not perform or obtain any independent appraisal of the assets or liabilities (including any contingent, derivative or off-balance sheet assets and liabilities) of the Debtors, the Reorganized Debtors or any other entity or of the solvency/liquidity of the Debtors, the Reorganized Debtors or any other entity, nor was Guggenheim Securities furnished with any such appraisals (other than the Liquidation Analysis, prepared by the Debtors, with the assistance of their financial advisor, attached to the Disclosure Statement as **Exhibit E**).

A-3221

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
|  | ) |
| Debtors.[1] | ) (Jointly Administered) |
|  | ) |
|  | ) |

## ORDER ESTABLISHING CONFIRMATION SCHEDULE AND PROTOCOLS

Upon consideration of the motion (the "***Motion***")[2] filed by the Debtors for entry of an order

establishing a confirmation schedule and related protocols, all as more fully set forth in the Motion;

and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended*

*Standing Order of Reference* from the United States District Court for the District of Delaware,

dated February 29, 2012; and consideration of the Motion and the requested relief being a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Debtors consent to entry of a final order by

this Court under Article III of the United States Constitution; and venue being proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409; and appropriate notice of and the opportunity for

a hearing on the Motion having been given; and the relief requested in the Motion being in the best

interests of the Debtors' estates, their creditors and other parties in interest; and the Court having

determined that the legal and factual bases set forth in the Motion establish just cause for the relief

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims
and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675
McDonnell Blvd., Hazelwood, Missouri 63042.

[2]   All capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the
Motion.

A-4718

granted herein; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY**

**ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      The schedule and protocols set forth below will govern the Confirmation

Proceedings and the Confirmation Hearing:[3]

<div align="center">

**The Schedule**

</div>

a.      *Disclosure Statement Schedule:

    i.      *Disclosure Statement Objection Deadline. **May 19, 2021 at 4:00 p.m. (prevailing Eastern Time)** shall be the deadline by which any objections to the Disclosure Statement must be filed.

    ii.      *Deadline to File Reply to Disclosure Statement Objections. **June 14, 2021 at 11:59 p.m. (prevailing Eastern Time)** shall be the deadline by which replies to any objections to the Disclosure Statement must be filed.

    iii.      *Disclosure Statement Hearing. **June 15, 2021 at 3:00 p.m. (prevailing Eastern Time)** shall be the Disclosure Statement Hearing.

    iv.      *Voting Record Date. **June 16, 2021** shall be the voting record date.

b.      *Voting Schedule:

    i.      *Solicitation Deadline. **Five (5) business days after entry of the Disclosure Statement Order** shall be the deadline by which the Debtors distribute the Solicitation Packages to those holders of Claims in the Voting Classes that are entitled to vote on the Plan as of the Voting Record Date.

    ii.      *Publication Notice Deadline. **June 28, 2021 (or as soon as reasonably practicable thereafter)** shall be the deadline to publish the Publication Notice (as defined in the Disclosure Statement Order).

    iii.      *Deadline to Object to Claims for Voting Purposes Only. **July 12, 2021 at 4:00 p.m. (prevailing Eastern Time)** shall be the deadline to object to Claims for voting purposes only.

---

[3]      Any dates and deadlines marked with an asterisk herein are provided by the Disclosure Statement Order and provided herein for ease of reference. For the avoidance of doubt, dates and deadlines that are not marked with an asterisk are established by this Order.

iv.   \*Solicitation Directive Deadline.  **July 15, 2021 at 4:00 p.m. (prevailing Eastern Time)** shall be the Solicitation Directive Deadline.

v.   Solicitation Directive Deadline.  **The earlier of (a) 30 days from entry of the Disclosure Statement Order and (b) July 21, 2021** shall be the deadline by which the Debtors will file trust distribution procedures (as may be amended, supplemented or modified from time to time) for any trusts that are to be established in accordance with the Plan and the Confirmation Order.

vi.   \*Rule 3018(a) Motion Filing Deadline.  **July 26, 2021 at 4:00 p.m. (prevailing Eastern Time)** shall be the deadline to file a Rule 3018(a) motion.

vii.   Deadline for Claim Objection Referenced in Article VII.J of the Plan.  **July 30, 2021** shall be the deadline for the Debtors to file the Claim Objection referenced in Article VII.J of the Plan ("***July 30 Claim Objection***").

viii.   \*Plan Supplement Filing Deadline.  **August 6, 2021** shall be the deadline to file the Plan Supplement.

ix.   \*Deadline to Object to Rule 3018(a) Motion.  **August 9, 2021** shall be the deadline to object to a Rule 3018(a) motion.

x.   \*Voting Deadline.  **September 3, 2021 at 4:00 p.m. (prevailing Eastern Time)** shall be the deadline to vote on the Plan.

xi.   \*Deadline to File Voting Report.  **September 13, 2021 at 4:00 p.m. (prevailing Eastern Time)** shall be the deadline for the filing of the voting report.

c.   Assumption and Cure Schedule:

i.   \*Deadline to Serve Cure Notices.  **July 30, 2021** shall be the deadline to serve a cure notice.

ii.   \*Contract/Cure Objection Deadline.  **August 17, 2021 at 4:00 p.m. (prevailing Eastern Time)** shall be the deadline to object to the Debtors' proposed assumption and cure of contracts or leases.

d.   Confirmation Fact Discovery:

i.   Deadline for Committees to Serve Final Rule 2004 Document Requests and for Parties to Agree on Final Rule 2004 ESI Search Criteria ("***June 18 Requests and Criteria***").  **June 18, 2021** shall be the deadline by which (a)

US-DOCS\123795071.22

**A-4720**

the Committees[4] must serve any requests for the production of documents or information related to Rule 2004 on a final basis and (b) for the parties to agree on final Rule 2004 search criteria for electronically stored information ("***ESI***") for production.[5]

ii. <u>Deadline to Serve Plan-Related Document Requests</u>. **June 23, 2021** shall be the deadline by which any party in interest that intends to seek document discovery in connection with confirmation ("***Requesting Party" or "Requesting Parties***") must serve requests for the production of documents or information (the "***Plan Requests***").[6]

iii. <u>Deadline to Respond and Object to Plan Requests</u>. **July 2, 2021** shall be the deadline by which any party subject to a Plan Request ("***Producing Parties***") must respond and/or object to such Plan Requests.

iv. <u>Deadline to Substantially Complete Review and Production of Documents and Information Responsive to June 18 Requests and Criteria</u>. **July 28, 2021** shall be the deadline by which parties must substantially complete production of documents and information in response to June 18 Requests and Criteria.

v. <u>Deadline to Substantially Complete Document Discovery Responsive to Additional Requests</u>. **July [30], 2021**[7] shall be the deadline by which parties must substantially complete production of documents in response to additional requests (i.e., Plan Requests served on or before June 23, 2021). Producing Parties will produce responsive documents on a rolling basis.

vi. <u>Deadline to Complete Fact Depositions</u>. **August 13, 2021** shall be the deadline by all fact depositions must be completed.

e. <u>Confirmation Expert Discovery</u>:[8]

i. <u>Deadline to Submit Initial Expert Reports and Produce Information Considered in Connection with Forming Expert Opinion(s)</u>. **August 13,**

---

[4] "***Committees***" means, collectively, the official committee of unsecured creditors and the official committee of opioid claimants that were each appointed in these chapter 11 cases.

[5] "***Rule 2004***" means Bankruptcy Rule 2004 and Local Rule 2004-1.

[6] The pending informal document requests, which are agreed to be unrelated to confirmation, and other discovery related to the Royalty Agreement that the parties agree is unrelated to confirmation served by the Objecting Creditors (as such term is defined in *the Limited Objection of Greathouse, Rose, and Glenn to the Debtors' Motion for Order Establishing Confirmation Schedule And Protocols* [Docket No. 2627]), shall not be subject to this Order, and the rights of the Debtors and the Objecting Creditors are reserved with respect to such discovery.

[7] The Debtors cannot commit to a deadline to complete Plan discovery document production without knowing the scope of Plan-related discovery sought. The Debtors reserve the right to seek modification of this date once all discovery is served.

[8] For avoidance of doubt, this schedule applies to the July 30 Claim Objection as well.

**2021** shall be the deadline by which (a) all written expert reports must be served and (b) all information that such experts considered in connection with forming their respective expert opinions must be produced. These reports must satisfy the requirements of Federal Rule of Civil Procedure 7026(a)(2)(B) (made applicable by Bankruptcy Rule 7026).

ii.   <u>Deadline to Submit Rebuttal Expert Reports and Produce Information Considered in Connection with Forming Expert Opinions</u>. **August 25, 2021** shall be the deadline by (a) which all rebuttal expert reports must be served and (b) all information that such experts considered in connection with forming their respective expert opinions must be produced. These reports must satisfy the requirements of Federal Rule of Civil Procedure 26(a)(2)(B) (made applicable by Bankruptcy Rule 7026). To the extent expert opinions are offered for the first time in rebuttal expert reports, nothing herein will preclude any party from offering responsive expert testimony on those new opinions at the Confirmation Hearing.

iii.  <u>Deadline to Complete Expert Depositions</u>. **September 1, 2021** shall be the deadline by which all expert depositions must be completed.

f.   <u>Confirmation Hearing</u>:

i.   *<u>Deadline to Serve Confirmation Hearing Notice</u>. **Five (5) business days after entry of the Disclosure Statement Order** shall be the date by which the Confirmation Hearing Notice will be served upon the Debtors' creditor matrix and all Holders of Equity Interests of record.

ii.  <u>Deadline for Debtors to Circulate Proposed Virtual Procedures Order to Confirmation Parties</u>. **August 27, 2021** shall be the deadline by which the Debtors shall circulate a proposed form of virtual procedures order (the "***Virtual Procedures Order***") to the Confirmation Parties, which shall contain protocols for conducting the Confirmation Hearing remotely (either in whole or in part).

iii. *<u>Plan Objection and Response to Claim Objection Deadline</u>. **September 3, 2021 at 4:00 p.m. (prevailing Eastern Time)** shall be the deadline by which any objections to the Plan and any responses to the July 30 Claim Objection must be filed. A Plan objection may be combined with a response to the July 30 Claim Objection.

iv.  <u>Deadline to Exchange Initial Witness and Exhibit Lists and Deposition Designations</u>. **September 3, 2021** shall be the deadline by which Confirmation Parties must serve on the other Confirmation Parties a complete list of witnesses and exhibits they intend to offer at the Confirmation Hearing and any deposition designations related thereto. The list of witnesses shall identify all witnesses that each party who objects to the Plan (an "***Objecting Party***") and each party who supports the Plan (a

"**Supporting Party**," and together with each Objecting Party, the "**Confirmation Parties**") will or may call at the Confirmation Hearing.

v.  Deadline to Exchange Objections to Initial Witness and Exhibit Lists and Deposition Designations. **September 9, 2021** shall be the date by which the Confirmation Parties must serve on the other Confirmation Parties any objections to the initial witness and exhibit lists and deposition designations.

vi.  Deadline to Exchange Case-in-Chief Witness Declarations. **September 10, 2021** shall be the date by which the Confirmation Parties must exchange their respective case-in-chief witness declarations, if any.

vii.  Deadline to Meet and Confer Regarding Objections to Case-in-Chief Declarations. **September 13, 2021** shall be the date by which the Confirmation Parties must meet and confer regarding any objections to case-in-chief declarations.

viii.  Deadline to Conduct Evidentiary Dispute Resolution. **September 14, 2021** shall be the date by which the Confirmation Parties must meet and confer with a view toward narrowing and resolving any evidentiary disputes.

ix.  Deadline to Submit Proposed Virtual Procedures Order. **September 15, 2021** shall be the deadline by which the Confirmation Parties must have conferred and submitted to chambers a proposed Virtual Procedures Order.

x.  Deadline to Submit Joint Exhibit Book and Joint Witness List, and Case-in-Chief Witness Declarations. **September 17, 2021** shall be the date by which the Confirmation Parties shall (a) deliver to the Court's chambers a joint exhibit book (the "**Joint Exhibit Book**") of all exhibits agreed to be admissible, (b) deliver to the Court's chambers a joint witness list ("**Joint Witness List**") of all witnesses that each Confirmation Party will or may call at the Confirmation Hearing in their case in chief or on rebuttal, and (c) deliver to the Court's chambers, file, and serve on the other Confirmation Parties written declarations under penalty of perjury of all witnesses under their respective control that they intend to call in their case in chief at the Confirmation Hearing, (d) separate from the Joint Exhibit Book, deliver any exhibits intended to be used only for impeachment purposes in electronic copy to the Court and the other Confirmation Parties and clearly label such exhibits "For Impeachment Purposes Only."

xi.  *Deadline to File the Confirmation Brief, Joinders/Replies to Plan Objections, and July 30 Claim Objection. **September 17, 2021 at 4:00 p.m. (prevailing Eastern Time)** shall be the deadline for the Debtors and any Supporting Party to file and serve a brief and omnibus reply in support of confirmation of the Plan and any joinders/replies to Plan objections.  The same deadline shall also apply to the Debtors' reply in support of the July

30 Claim Objection, which may be combined with the reply in support of confirmation.

xii.   <u>Status Conferences</u>.   The Court shall hold status conferences with the Confirmation Parties leading to confirmation on the following dates: **August 10, 2021 at 1:00 p.m. (prevailing Eastern Time); August 25, 2021 at 1:00 p.m. (prevailing Eastern Time); September 14, 2021 at 1:00 p.m. (prevailing Eastern Time);** and any other such dates as the Court deems necessary.

xiii.   <u>Final Pretrial Conference</u>.   **September 20, 2021** shall be the date of the final pretrial conference and/or rehearsal for the virtual Confirmation Hearing.

xiv.   <u>*Confirmation Hearing</u>.   **September 21, 2021 at 10:00 a.m. (prevailing Eastern Time)** shall be the start of the Confirmation Hearing, which will continue, as necessary, from day to day in each case starting at [ ]:[ ] [ ].m. (prevailing Eastern Time), except as otherwise set by the Court and as may be extended by the Court as the Court's schedule permits.   The Confirmation Hearing shall also serve as the hearing on the July 30 Claim Objection.

xv.   <u>Deadline to Submit Rebuttal Witness Testimony</u>.   The Confirmation Parties shall deliver to the Court's chambers, file, and serve on the other Confirmation Parties written declarations under penalty of perjury of all rebuttal witnesses under their respective control by no later than 48 hours before such Confirmation Party intends to submit such declaration for entry into evidence.

### **The Confirmation Protocols**

a.   <u>Discovery of Debtors, Parties, and Third Parties</u>.   The Confirmation Parties are hereby authorized to serve confirmation-related discovery pursuant to Bankruptcy Rule 9014, including by seeking documents from the Debtors, other parties in interest, and any third parties. For the avoidance of doubt, no further motion practice is required prior to serving discovery under these Confirmation Protocols.

b.   <u>Overlap with Prior Discovery</u>.   To the extent that the Confirmation Parties serve discovery seeking documents that were already produced, whether formally or informally, in response to other requests in these chapter 11 cases, the Debtors may refer to those prior productions to satisfy the Confirmation Parties' requests.

c.   <u>Protective Order</u>.   The *Confidentiality and Protective Order* as entered by the Court Docket No. 2125 (as may be amended from time to time, the "***Protective Order***") shall govern all discovery in connection with the Confirmation Proceedings and Confirmation Hearing.

d.   <u>Discovery Dispute Resolution</u>.   In the event of a dispute with respect to one or more discovery requests, counsel for the Producing Party and for the Requesting Party

shall promptly meet and confer in good faith to attempt to resolve the dispute.  If, notwithstanding their good faith efforts to do so, such parties are unable to resolve such discovery dispute at any time after they have met and conferred, either Party may promptly seek a telephonic discovery conference from the Court.  If requested by the Court following the telephonic conference, the parties may email a letter, no longer than two single spaced pages in length (excluding exhibits), of the nature of the dispute.  Any response, may be submitted by emailed letter, no longer than two single spaced pages in length (excluding exhibits), within two business days.  Parties shall simultaneously send a copy of any such letters to Debtors' counsel (if Debtors are not the Producing Party or Requesting Party).

e.  <u>Limitations on Interrogatories and Requests for Admission</u>.  Unless otherwise ordered by the Court, no Requesting Party shall serve requests for admission, the Committees may each serve up to 15 interrogatories, and all other parties may serve up to 3 interrogatories in connection with the Confirmation Proceedings.  The Debtors may serve the same amount of interrogatories on any Requesting Party that are served on them by that Requesting Party subject, for the avoidance of doubt, to the parties' respective rights under Federal Rule of Civil Procedure 26(c) and the dispute resolution provisions of these Protocols.

f.  <u>Limitations on Depositions</u>.  Absent obtaining leave from this Court under Rule 30(a)(2) or 30(d)(1) of the Federal Rules of Civil Procedure, as made applicable by the Federal Rules of Bankruptcy Procedure 7030 and 9014, or upon mutual written agreement with the party sought to be deposed, a party may not take a deposition that would result in: (a) more than 20 days of fact witness depositions taken in total by the Committees or other Objecting Parties; (b) a witness being deposed more than once in his or her individual capacity; and/or (c) a witness being deposed for more than seven hours in his or her individual capacity.  For clarity, the total of 20 days of fact witness depositions includes 30(b)(6) depositions, and each deposition day is limited to seven hours pursuant to Federal Rule of Civil Procedure 30(d)(1) (if a deposition is less than seven hours, that shall still count as one deposition day unless otherwise agreed).

g.  <u>Deposition Noticing, Duration, Allocation, and Timing</u>.  Any party seeking to take a deposition of a Debtor witness should attempt in good faith to coordinate the date for the deposition with the Debtors and other parties that may wish to depose the same witness, as well as how to divide up the deposition time.  To that end, within two business days of receipt of a notice or subpoena (or by a different date if agreed by the requesting party) to take the deposition of a witness affiliated with or controlled by the Debtors, the Debtors shall identify to the Requesting Party all other parties (if any) that have advised the Debtors they intend to depose the same witness and with which the Debtors believe the Requesting Party should meet and confer concerning timing for the noticed deposition ("***Participating Party*" or "*Participating Parties***").  The Requesting Party shall seek in good faith to meet and confer with any such Participating Parties within five days of the Debtors' receipt of the corresponding deposition notice or subpoena to discuss the date for

the deposition and how to divide up the deposition time amongst the parties who seek to examine the witness.

If a Requesting Party or any Participating Party reports in writing (which may take the form of an email) to the Debtors that the Requesting Party and the Participating Parties have agreed on a date for the deposition, the Debtors must produce the deponent(s) on that date, or on another date that the Debtors may propose and that any Requesting Party or Participating Party advises the Debtors in writing is acceptable to all Participating Parties and the Requesting Party (the "***Agreed Date***"), for a period of one day of 7 hours, subject to the deposing parties' rights pursuant to Federal Rule of Civil Procedure 30(d)(1); *provided*, *however*, that the Debtors are not obligated to produce the deponent(s) on the date for the deposition identified by the Requesting Party or Participating Party if the Debtors first obtain relief from their obligation through a telephonic discovery conference with the Court. For the avoidance of doubt, unless the Debtors' first obtain relief from the Court or the consent of the Requesting Party and Participating Parties as described above, they must make the noticed witness available on the Agreed Date.

If the Requesting Party or any Participating Party reports in writing (which may take the form of an email) to the Debtors that the Requesting Party and the Participating Parties have not, despite good faith efforts, agreed among themselves on a date for the deposition or on how to divide up the deposition time, then the Requesting Party or any Participating Party may seek a teleconference with the Court to establish a date for the deposition or to seek guidance on how the deposition time shall be divided amongst the parties seeking to examine the witness.

The Debtors strongly encourage the Requesting Party and Participating Parties to resolve any disputes over how to allocate deposition time in advance of the deposition, so that everyone has clarity about the length and sequence of the deposition, and it may proceed in an orderly and efficient manner. A Requesting Party may elect to proceed forward with a deposition without an agreement with the Participating Parties on how the deposition time shall be allocated, however. In that event, if not all of the deposing parties have concluded their examinations within the 7 hour time limit, then the Debtors may choose either (i) to end the deposition after 7 hours, and no party may seek to depose the witness further without seeking Court relief; or (ii) to allow the witness to continue to be examined longer than 7 hours, but to count the deposition (in the Debtors' discretion) as more than one deposition day under Section f. For clarity, pursuant to Section f, any deposition lasting between 1 and 7 hours shall count as one deposition day, any deposition lasting between 7 and 14 hours may count as two deposition days (in the Debtors' discretion), and any deposition lasting between 14 and 21 hours may count as three deposition days (in the Debtors' discretion), *provided, however*, that any party reserves its right to seek Court relief that a deposition that lasts longer than 7 hours should count as a single deposition under Section f. The Debtors will be reasonable in exercising their discretion under this provision—if, for example, the

examining parties need only slightly longer than 7 hours to finish the deposition, the Debtors do not intend to count that as two deposition days.[9]

Deposition notices shall not include Plan Requests. The rights of any person or party noticed for a deposition are reserved with respect to objecting to any such depositions, including the number of depositions, and any such person or party may seek relief from the Court pursuant to the Discovery Dispute Resolution procedures provided herein with respect to any deposition notice or subpoena, including, for the avoidance of doubt, by seeking to quash, limit, terminate, or adjourn any deposition notice or subpoena.

As to any deposition notice or subpoena, the Requesting Party and the Debtors may alter the procedures and deadlines provided in this subsection (g) by mutual consent.

h.   Third-Party Documents Received Pursuant to Subpoena.  Each Requesting Party shall (i) produce or make available to the other Confirmation Parties any materials obtained by such Requesting Party obtained from third parties or (ii) identify any basis for withholding such documents from other Confirmation Parties, in each case within two (2) business days of receiving such materials from a third party.

i.   Debtors' Receipt of Discovery-Related Materials.  Each Requesting Party or Producing Party (if not the Debtors) shall produce or make available to Debtors' counsel any materials produced by or requested by the applicable Requesting Party or Producing Party (if not the Debtors) from a reasonable period of time from the date on which such production or request is made.

j.   Assertions of Privilege.  If any Producing Party intends on withholding or redacting any materials on the grounds of privilege, work product, or any other type of protection or immunity from disclosure, in response to confirmation-related discovery, the Producing Party and Requesting Party shall meet and confer on the scope and format of corresponding privilege logs, consistent with the Protective Order in these chapter 11 cases. To the extent such materials were previously withheld or redacted on the grounds of privilege, work product, or any other type of protection or immunity from disclosure, in connection with production in the MDL, in other pre-petition civil litigations, or in these chapter 11 cases, such prior determinations (as reflected in designations on the materials themselves or in the

---

[9] The OCC does not believe that this provision is consistent with applicable rules, their understanding of the 20 deposition cap that that the Committees previously negotiated with the Debtors, or practical in the circumstances of these cases.  However, because the OCC has been unable to convince the Debtors to proceed in a manner the OCC believes is more suitable, and because the OCC was attentive to the Court's clear preference expressed at the June 16, 2021 hearing that the parties resolve this issue without Court intervention, the OCC has agreed to the Debtors' preferred procedure.  The OCC's agreement is subject to its right to seek intervention from this Court in the future, including to the extent the Debtors' preferred procedure renders the 20 deposition cap insufficient.

US-DOCS\123795071.22

A-4727

relevant privilege log(s)) the document need not be re-logged, so long as the document shall be subject to the challenge provisions in the Protective Order in these chapter 11 cases. A Producing Party shall provide its initial privilege log(s) within two weeks after it substantially completes production of documents in response to Document Requests.

k. <u>Expert Discovery</u>. Any expert retained or specially employed to provide expert testimony in connection with the Confirmation Proceedings shall submit an expert report that satisfies the requirements of Federal Rule of Civil Procedure 26(a)(2)(B) (made applicable by Bankruptcy Rule 7026), and, on or before the deadline provided by this Order, shall produce the expert materials required to be disclosed by Federal Rule of Civil Procedure 26 (made applicable by Bankruptcy Rule 7026). Parties shall have the right to amend or supplement such report to respond to information disclosed or opinions expressed after the date of such expert's report(s), by written supplement exchanged and submitted by the deadlines provided by this Order. No drafts of any part of any report or declaration of any expert will be subject to production or other disclosure. This protection is in addition to, and does not limit or replace, the protections of Federal Rule of Civil Procedure 26(b)(4)(B) (applicable here under Bankruptcy Rule 7026).

3. Any deadline set forth above may be extended by order of the Court, and except for the Confirmation Hearing, may be extended without order of the Court upon the written consent of the Debtors or, if the Debtors are the party subject to the deadline, the party to which the subject of the deadline is owed, which consent may be granted via email.

4. The Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules for the District of Delaware apply to these Confirmation Proceedings. To the extent there is a conflict between any of the foregoing and this Order, this Order shall govern.

5. The terms and conditions of this Order are immediately effective and enforceable upon its entry.

6. The Debtors are authorized to take all actions necessary or appropriate to effectuate the relief granted in this Order in accordance with the Motion.

US-DOCS\123795071.22

A-4728

7.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

**Dated: June 24th, 2021**
**Wilmington, Delaware**

**JOHN T. DORSEY**
**UNITED STATES BANKRUPTCY JUDGE**

A-4729

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) |

## NOTICE OF *AMENDED*[2] AGENDA FOR VIDEO HEARING SCHEDULED FOR JUNE 24, 2021 AT 1:00 P.M. (PREVAILING EASTERN TIME), BEFORE THE HONORABLE JOHN T. DORSEY, AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE[3]

---

**THE REMOTE HEARING WILL BE CONDUCTED ENTIRELY BY ZOOM AND REQUIRES ALL PARTICIPANTS TO REGISTER IN ADVANCE. COURTCALL WILL NOT BE USED TO DIAL IN.**

**PLEASE USE THE FOLLOWING LINK TO REGISTER FOR THE HEARING:**
https://debuscourts.zoomgov.com/meeting/register/vJIsd-yhpzsjHatKYoCvJvdgWsLlvHfMCaA

**ONCE REGISTERED, PARTIES WILL RECEIVE A CONFIRMATION EMAIL CONTAINING PERSONAL LOG-IN INFORMATION FOR THE HEARING.**

---

## I. RESOLVED MATTER:

1. Attestor Limited and Humana Inc.'s Motion for a Protective Order Quashing Notice of Deposition and Precluding Deposition of the Acthar Insurance Claimants [Docket No. 2879 – filed June 15, 2021]

   <u>Status</u>: The parties have reached an agreement regarding certain discovery issues, thereby eliminating the need for a hearing on the Motion at this time.

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The debtors' mailing address is 675 McDonnell Blvd., St. Louis, Missouri 63042.

[2] **Amended items appear in bold.**

[3] All motions and other pleadings referenced herein are available online at the following address: http://restructuring.primeclerk.com/Mallinckrodt.

## II.    **CONTINUED MATTER:**

2.    Limited Objection of the Tribal Leadership Committee to Debtors' Motion for Entry of an Order (A) Appointing a Mediator and (B) Establishing Mediation Procedures as Set Forth in the Proposed Order and Cross-Motion to Add the Tribal Leadership Committee as a "Mediation Party" [Docket No. 1340 – filed February 9, 2021]

   Status: The hearing on the Cross-Motion has been adjourned to the omnibus hearing scheduled for July 13, 2021 at 1:00 p.m. (ET).

3.    Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Actions [Docket No. 1632 – filed March 10, 2021]

   Status: The Debtors and the UCC have negotiated a stipulation that resolves the balance of the relief requested in the Motion, which they intend to submit under certification of counsel.

4.    Motion of the Official Committee of Unsecured Creditors to Seal Certain Exhibits of the Declaration of David H. Kupfer in Support of Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Action [Docket No. 1706 – filed March 15, 2021]

   Status: This Motion will be addressed in connection with Agenda Item 3.

5.    End-Payer Plaintiffs' Motion for Declaratory Relief, or in the Alternative, Relief from the Automatic Stay and Waiver of the Stay Imposed by Fed. R. Bankr. P. 4001 [Docket No. 2081 – filed April 20, 2021]

   Status: The hearing on the Motion has been adjourned to the omnibus hearing scheduled for July 22, 2021 at 11:00 a.m. (ET)

6.    Debtors' Motion for Entry of Order (I) Approving Sale of VTS Assets to MANDOS LLC and (II) Granting Related Relief [Docket No. 2433 – filed May 19, 2021]

   Status: The hearing on the Motion has been adjourned to the hearing scheduled for June 29, 2021 at 3:00 p.m. (ET).

7.    Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases [Docket No. 2436 – filed May 19, 2021]

   Status: The hearing on the Notice has been adjourned to the hearing scheduled for June 29, 2021 at 3:00 p.m. (ET).

8.   Motion of Debtors for Entry of an Order Approving Debtors' Entry Into and Performance Under a Settlement Agreement Between the Shenk Plaintiffs and the Shenk Defendants and Granting Related Relief [Docket No. 2393 – filed May 18, 2021]

      Status: The hearing on the Motion is not going forward.  The parties are in discussions regarding a continued hearing date on the Motion.

9.   Motion of the Official Committee of Unsecured Creditors to Seal Certain Portions of the Lathrop Declaration in Support of the Official Committee of Unsecured Creditors' Objection to the Debtors' Sale Motion [Docket No. 2808 – filed June 11, 2021]

      Status: The hearing on the Motion has been adjourned to the hearing scheduled for June 29, 2021 at 3:00 p.m. (ET).

## III.   MATTERS GOING FORWARD:

10.  Application of the Official Committee of Unsecured Creditors of Mallinckrodt plc, *et al.*, for Entry of an Order (I) Authorizing the Employment and Retention of Cushman & Wakefield, Inc. as Real Property Appraisers for the Committee, Effective as of April 29, 2021, (II) Waiving Certain Information Requirements, and (III) Granting Related Relief [Docket No. 2542 – filed May 24, 2021]

      Objection/Response Deadline:        June 10, 2021 at 4:00 p.m. (ET); extended by agreement to June 17, 2021 at 4:00 p.m. (ET) for the Debtors

      Objections/Responses Received:

      A.   Debtors' Objection to Application of the Official Committee of Unsecured Creditors of Mallinckrodt plc, *et al.*, for Entry of an Order (I) Authorizing the Employment and Retention of Cushman & Wakefield, Inc. as Real Property Appraisers for the Committee, Effective as of April 29, 2021, (II) Waiving Certain Information Requirements, and (III) Granting Related Relief [Docket No. 2912 – filed June 17, 2021]

      B.   Declaration of Stephen A. Welch in Support of Debtors' Objection to Application of the Official Committee of Unsecured Creditors of Mallinckrodt plc, *et al.*, for Entry of an Order (I) Authorizing the Employment and Retention of Cushman & Wakefield, Inc. as Real Property Appraisers for the Committee, Effective as of April 29, 2021, (II) Waiving Certain Information Requirements, and (III) Granting Related Relief [Docket No. 2913 – filed June 17, 2021]

      Related Documents:

      i.   Reply in Support of Application of the Official Committee of Unsecured Creditors of Mallinckrodt plc, *et al.*, for Entry of an Order (I) Authorizing the Employment and Retention of Cushman & Wakefield, Inc. as Real Property Appraisers for the Committee, Effective as of April 29, 2021, (II) Waiving Certain Information

3

Requirements, and (III) Granting Related Relief [Docket No. 2940 – filed June 21, 2021]

    a.    Supplemental Declaration of Richard Marchitelli in Support of the Application of the Official Committee of Unsecured Creditors of Mallinckrodt plc, *et al.*, for Entry of an Order (I) Authorizing the Employment and Retention of Cushman & Wakefield, Inc. as Real Property Appraisers for the Committee, Effective as of April 29, 2021, (II) Waiving Certain Information Requirements, and (III) Granting Related Relief [Docket No. 2942 – filed June 21, 2021]

Status: **The hearing on the Application will not be going forward on a contested basis. The parties have reached agreement on a consensual form of order that they intend to present at the hearing.**

## IV.    <u>INTERIM FEE APPLICATIONS</u>:

11.    Uncontested Interim Fee Applications.  See <u>Exhibit A</u> hereto.

    <u>Related Documents</u>:  None at this time.

    <u>Related Documents</u>:

    i.    **Certification of Counsel Regarding Second Omnibus Order Awarding Interim Allowance of Compensation for Services Rendered and for Reimbursement of Expenses [Docket No. 2977; filed June 23, 2021]**

    Status: **On June 23, 2021, the Debtors filed a proposed form of order approving the interim fee applications listed on <u>Exhibit A</u> under certification of counsel. Accordingly, a hearing is only necessary to the extent the Court has any questions or concerns.**

12.    First Interim Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of First Interim Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for Services Rendered and for Reimbursement of Expenses as Special Counsel to the Debtors for the Period from November 1, 2020 through March 31, 2021 [Docket No. 2347 – filed May 17, 2021]

    <u>Objection Deadline</u>:  June 7, 2021 at 4:00 p.m. (ET)

    <u>Objections/Responses Received</u>:

    A.    Acthar Plaintiffs' Objection to Interim Fee Applications of Arnold & Porter [Docket No. 2558 – filed May 25, 2021]

Related Documents:

i.    First Combined Monthly Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for the Period from November 1, 2020 through December 31, 2020 [Docket No. 1714 – filed March 15, 2021]

ii.    Certificate of No Objection Regarding the First Combined Monthly Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for the Period from November 1, 2020 through December 31, 2020 (No Order Required) [Docket No. 1974 – filed April 7, 2021]

iii.    Second Monthly Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for the Period from January 1, 2021 through January 31, 2021 [Docket No. 1963 – filed April 6, 2021]

iv.    Certificate of No Objection Regarding the Second Monthly Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for the Period from January 1, 2021 through January 31, 2021 (No Order Required) [Docket No. 2129 – filed April 28, 2021]

v.    Third Monthly Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for the Period from February 1, 2021 through February 28, 2021 [Docket No. 2153 – filed April 30, 2021]

vi.    Certificate of No Objection Regarding the Third Monthly Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for the Period from February 1, 2021 through February 28, 2021 (No Order Required) [Docket No. 2516 – filed May 21, 2021]

vii.    Fourth Monthly Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2290 – filed May 13, 2021]

viii.    Fee Examiner's Final Report Regarding First Combined Monthly Fee Application Request of Arnold & Porter Kaye Scholer LLP [Docket No. 2753 – filed June 8, 2021]

ix.    Special Counsel Arnold & Porter Kaye Scholer LLP's Response to the Ad Hoc Acthar Group's Objection to the Firm's Interim Fee Application of May 17, 2021 [Dkt. No. 2347] [Docket No. 2941 – filed June 21, 2021]

x.    **Certification of Counsel Regarding Second Omnibus Order Awarding Interim Allowance of Compensation for Services Rendered and for Reimbursement of Expenses [Docket No. 2977 – filed June 23, 2021]**

5

Status: **The parties discussed and the Acthar Plaintiffs no longer have any objection to an order being entered approving the Interim Application for Compensation of Arnold & Porter. Accordingly, the parties have agreed that Arnold & Porter may submit an order approving their Interim Application under certification of counsel without objection. On June 23, 2021, the Debtors filed an omnibus order approving all interim fee applications, including the Interim Application of Arnold & Porter, under certification of counsel. Accordingly, a hearing is only necessary to the extent the Court has any questions or concerns.**

Dated: June 24, 2021

/s/ Michael J. Merchant
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:         collins@rlf.com
               merchant@rlf.com
               steele@rlf.com
               schlauch@rlf.com

- and -

George A. Davis (*pro hac vice*)
George Klidonas (*pro hac vice*)
Andrew Sorkin (*pro hac vice*)
Anupama Yerramalli (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 906-1200
Facsimile:     (212) 751-4864
Email:         george.davis@lw.com
               george.klidonas@lw.com
               andrew.sorkin@lw.com
               anu.yerramalli@lw.com

- and –

Jeffrey E. Bjork (*pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:     (213) 485-1234
Facsimile:     (213) 891-8763
Email:         jeff.bjork@lw.com

- and –

Jason B. Gott (*pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:     (312) 876-7700
Facsimile:     (312) 993-9767
Email:         jason.gott@lw.com

*Counsel for Debtors and Debtors in Possession*
6

RLF1 25532774v.1

**A-4735**

**Exhibit A**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
|  | ) |
| Debtors.[1] | ) (Jointly Administered) |
|  | ) |

**INDEX OF INTERIM FEE APPLICATIONS SCHEDULED FOR**
**HEARING ON JUNE 24, 2021 AT 1:00 P.M. (ET)**

1.  First Interim Fee Application of Houlihan Lokey Capital, Inc., Investment Banker and Financial Advisor to the Governmental Plaintiff Ad Hoc Committee, for Allowance of Compensation and Reimbursement of Expenses for the Period from October 12, 2020 through December 31, 2020 [Docket No. 2318 – filed May 14, 2021]

    Objection Deadline:   June 3, 2021 at 4:00 p.m. (ET)

    Objections/Responses Received:      None.

    Related Documents:

    i.   First Monthly Fee Application of Houlihan Lokey Capital, Inc., Investment Banker and Financial Advisor to the Governmental Plaintiff Ad Hoc Committee, for Allowance of Compensation and Reimbursement of Expenses for the Period from October 12, 2020 through November 30, 2020 [Docket No. 1818 – filed March 22, 2021]

    ii.  Certificate of No Objection [Docket No. 2023 – filed April 13, 2021]

    iii. Second Monthly Fee Application of Houlihan Lokey Capital, Inc., Investment Banker and Financial Advisor to the Governmental Plaintiff Ad Hoc Committee, for Allowance of Compensation and Reimbursement of Expenses for the Period from December 1, 2020 through December 31, 2020 [Docket No. 1819 – filed March 22, 2021]

    iv.  Certificate of No Objection [Docket No. 2025 – filed April 13, 2021]

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The debtors' mailing address is 675 McDonnell Blvd., St. Louis, Missouri 63042.

v.     Fee Examiner's Final Report Regarding First Interim Fee Application Request of Houlihan Lokey Capital, Inc. [Docket No. 2556 – filed May 25, 2021]

2.     Second Interim Application of Robinson & Cole LLP as Co-Counsel to the Official Committee of Unsecured Creditors for the Period from January 1, 2021 through March 31, 2021 [Docket No. 2319 – filed May 14, 2021]

Objection Deadline:    June 3, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:        None.

Related Documents:

i.     Third Monthly Fee Application of Robinson & Cole LLP as Co-Counsel to the Official Committee of Unsecured Creditors for Allowance of Compensation and Reimbursement of Expenses for the Period from January 1, 2021 through January 31, 2021 [Docket No. 1561 – filed March 1, 2021]

ii.    Certificate of No Objection Regarding the Third Monthly Fee Application of Robinson & Cole LLP as Co-Counsel to the Official Committee of Unsecured Creditors for Allowance of Compensation and Reimbursement of Expenses for the Period from January 1, 2021 through January 31, 2021 [Docket No. 1835 – filed March 23, 2021]

iii.   Fourth Monthly Fee Application of Robinson & Cole LLP as Co-Counsel to the Official Committee of Unsecured Creditors for Allowance of Compensation and Reimbursement of Expenses Incurred for the Period from February 1, 2021 through February 28, 2021 [Docket No. 1923 – filed March 31, 2021]

iv.    Certificate of No Objection Regarding the Fourth Monthly Fee Application of Robinson & Cole LLP to the Official Committee of Unsecured Creditors for Allowance of Compensation and Reimbursement of Expenses from February 1, 2021 through February 28, 2021 [Docket No. 2092 – filed April 21, 2021]

v.     Fifth Monthly Fee Application of Robinson & Cole LLP as Co-Counsel to the Official Committee of Unsecured Creditors for Allowance of Compensation and Reimbursement of Expenses Incurred for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2208 – filed May 6, 2021]

vi.    Certificate of No Objection Regarding the Fifth Monthly Fee Application of Robinson & Cole LLP as Co-Counsel to the Official Committee of Unsecured Creditors for Allowance of Compensation and Reimbursement of Expenses Incurred for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2592 – filed May 27, 2021]

vii.   Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Robinson & Cole LLP [Docket No. 2625 – filed June 1, 2021]

RLF1 25517536v.1

A-4738

3.    Second Interim Application of Cooley LLP, Co-Counsel to the Official Committee of Unsecured Creditors of Mallinckrodt plc, et al., for Compensation and Reimbursement of Expenses for the Period of January 1, 2021 through March 31, 2021 [Docket No. 2320 – filed May 14, 2021]

   Objection Deadline:    June 3, 2021 at 4:00 p.m. (ET)

   Objections/Responses Received:        None.

   Related Documents:

   i.      Third Monthly Application of Cooley LLP, Counsel to the Official Committee of Unsecured Creditors of Mallinckrodt plc, et al., for Compensation and Reimbursement of Expenses for the Period of January 1, 2021 through January 31, 2021 [Docket No. 1562 – filed March 1, 2021]

   ii.     Certificate of No Objection Regarding the Third Monthly Application of Cooley LLP, Counsel to the Official Committee of Unsecured Creditors of Mallinckrodt plc, et al., for Compensation and Reimbursement of Expenses for the Period of January 1, 2021 through January 31, 2021 [Docket No. 1836 – filed March 23, 2021]

   iii.    Fourth Monthly Application of Cooley LLP, Counsel to the Official Committee of Unsecured Creditors of Mallinckrodt plc, et al. for Compensation and Reimbursement of Expenses for the Period of February 1, 2021 through February 28, 2021 [Docket No. 1930 – filed April 1, 2021]

   iv.     Certificate of No Objection Regarding the Fourth Monthly Application of Cooley LLP, Counsel to the Official Committee of Unsecured Creditors of Mallinckrodt plc, et al. for Compensation and Reimbursement of Expenses for the Period of February 1, 2021 through February 28, 2021 [Docket No. 2101 – filed April 22, 2021]

   v.      Fifth Monthly Application of Cooley LLP, Counsel to the Official Committee of Unsecured Creditors of Mallinckrodt plc, et al. for Compensation and Reimbursement of Expenses for the Period of March 1, 2021 through March 31, 2021 [Docket No. 2175 – filed May 3, 2021]

   vi.     Certificate of No Objection Regarding the Fifth Monthly Application of Cooley LLP, Counsel to the Official Committee of Unsecured Creditors of Mallinckrodt plc, et al. for Compensation and Reimbursement of Expenses for the Period of March 1, 2021 through March 31, 2021 [Docket No. 2674 – filed June 3, 2021]

   vii.    Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Cooley LLP [Docket No. 2754 – filed June 8, 2021]

4.    Second Interim Fee Application of Alvarez & Marsal North America, LLC for Payment of Compensation and Reimbursement of Expenses as Financial Advisor to the Official

Committee of Unsecured Creditors for the Period from January 1, 2021 through March 31, 2021 [Docket No. 2322 – filed May 14, 2021]

<u>Objection Deadline</u>:   June 3, 2021 at 4:00 p.m. (ET)

<u>Objections/Responses Received</u>:      None.

<u>Related Documents</u>:

i.      Third Monthly Fee Application of Alvarez & Marsal North America, LLC for Payment of Compensation and Reimbursement of Expenses as Financial Advisor to the Official Committee of Unsecured Creditors for the Period from January 1, 2021 through January 31, 2021 [Docket No. 1792 – filed March 18, 2021]

ii.     Certificate of No Objection Regarding the Third Monthly Fee Application of Alvarez & Marsal North America, LLC for Payment of Compensation and Reimbursement of Expenses as Financial Advisor to the Official Committee of Unsecured Creditors for the Period from January 1, 2021 through January 31, 2021 [Docket No. 1989 – filed April 8, 2021]

iii.    Fourth Monthly Application of Alvarez & Marsal North America, LLC for Payment of Compensation and Reimbursement of Expenses as Financial Advisor to the Official Committee of Unsecured Creditors for the Period from February 1, 2021 through February 28, 2021 [Docket No. 1996 – filed April 9, 2021]

iv.     Certificate of No Objection Regarding the Fourth Monthly Application of Alvarez & Marsal North America, LLC for Payment of Compensation and Reimbursement of Expenses as Financial Advisor to the Official Committee of Unsecured Creditors for the Period from February 1, 2021 through February 28, 2021 [Docket No. 2212 – filed May 7, 2021]

v.      Fifth Monthly Application of Alvarez & Marsal North America, LLC for Payment of Compensation and Reimbursement of Expenses as Financial Advisor to the Official Committee of Unsecured Creditors for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2277 – filed May 12, 2021]

vi.     Certificate of No Objection Regarding the Fifth Monthly Application of Alvarez & Marsal North America, LLC for Payment of Compensation and Reimbursement of Expenses as Financial Advisor to the Official Committee of Unsecured Creditors for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2665 – filed June 2, 2021]

vii.    Notice of Filing of an Exhibit to the Second Interim Fee Application of Alvarez & Marsal North America, LLC for Payment of Compensation and Reimbursement of Expenses as Financial Advisor to the Official Committee of Unsecured Creditors for the Period from January 1, 2021 through March 31, 2021 [Docket No. 2526 – filed May 21, 2021]

4

       viii.    Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Alvarez & Marsal North America, LLC [Docket No. 2555 – filed May 25, 2021]

5.    Second Interim Fee Application of Dundon Advisers LLC as Co-Financial Adviser to the Official Committee of Unsecured Creditors for Allowance of Compensation for Services Rendered and Reimbursement of Expenses for the Period January 1, 2021 through and including March 31, 2021 [Docket No. 2324 – filed May 14, 2021]

    Objection Deadline:   June 3, 2021 at 4:00 p.m. (ET)

    Objections/Responses Received:    None.

    Related Documents:

    i.    Third Monthly Application of Dundon Advisers LLC as Co-Financial Adviser to the Official Committee of Unsecured Creditors for Allowance of Compensation for Services Rendered and Reimbursement of Expenses for the Period January 1, 2021 through and including January 31, 2021 [Docket No. 1563 – filed March 1, 2021]

    ii.    Certificate of No Objection Regarding the Third Monthly Application of Dundon Advisers LLC as Co-Financial Adviser to the Official Committee of Unsecured Creditors for Allowance of Compensation for Services Rendered and Reimbursement of Expenses for the Period January 1, 2021 through and including January 31, 2021 [Docket No. 1837 – filed March 23, 2021]

    iii.    Fourth Monthly Application of Dundon Advisers LLC as Co-Financial Adviser to the Official Committee of Unsecured Creditors for Allowance of Compensation and Reimbursement of Expenses for the Period February 1, 2021 through February 28, 2021 [Docket No. 1831 – filed March 23, 2021]

    iv.    Certificate of No Objection Regarding the Fourth Monthly Application of Dundon Advisers LLC as Co-Financial Adviser to the Official Committee of Unsecured Creditors for Allowance of Compensation and Reimbursement of Expenses for the Period February 1, 2021 through February 28, 2021 [Docket No. 2034 – filed April 13, 2021]

    v.    Fifth Monthly Application of Dundon Advisers LLC as Co-Financial Adviser to the Official Committee of Unsecured Creditors for Allowance of Compensation and Reimbursement of Expenses for the Period March 1, 2021 through March 31, 2021 [Docket No. 2155 – filed April 30, 2021]

    vi.    Certificate of No Objection Regarding the Fifth Monthly Application of Dundon Advisers LLC as Co-Financial Adviser to the Official Committee of Unsecured Creditors for Allowance of Compensation and Reimbursement of Expenses for the Period March 1, 2021 through March 31, 2021 [Docket No. 2515 – filed May 21, 2021]

vii.    Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Dundon Advisers LLC [Docket No. 2438 – filed May 19, 2021]

6.    Second Interim Application of Moelis & Company LLC for Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred as Investment Banker to the Official Committee of Unsecured Creditors from January 1, 2021 through and including March 31, 2021 [Docket No. 2326 – filed May 14, 2021]

Objection Deadline:   June 3, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:      None.

Related Documents:

i.    Second Monthly Application of Moelis & Company LLC for Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred as Investment Banker to the Official Committee of Unsecured Creditors from January 1, 2021 through and including January 31, 2021 [Docket No. 1564 – filed March 1, 2021]

ii.    Certificate of No Objection Regarding Second Monthly Application of Moelis & Company LLC for Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred as Investment Banker to the Official Committee of Unsecured Creditors from January 1, 2021 through and including January 31, 2021 [Docket No. 1838 – filed March 23, 2021]

iii.    Third Monthly Application of Moelis & Company LLC for Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred as Investment Banker to the Official Committee of Unsecured Creditors from February 1, 2021 through and including February 28, 2021 [Docket No. 1849 – filed March 23, 2021]

iv.    Certificate of No Objection Regarding Third Monthly Application of Moelis & Company LLC for Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred as Investment Banker to the Official Committee of Unsecured Creditors from February 1, 2021 through and including February 28, 2021 [Docket No. 2035 – filed April 13, 2021]

v.    Fourth Monthly Application of Moelis & Company LLC for Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred as Investment Banker to the Official Committee of Unsecured Creditors from March 1, 2021 through and including March 31, 2021 [Docket No. 2154 – filed April 30, 2021]

vi.    Certificate of No Objection Regarding Fourth Monthly Application of Moelis & Company LLC for Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred as Investment Banker

to the Official Committee of Unsecured Creditors from March 1, 2021 through and including March 31, 2021 [Docket No. 2513 – filed May 21, 2021]

vii.  Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Moelis & Company LLC [Docket No. 2561 – filed May 25, 2021]

7.  Second Interim Fee Application of Ropes & Gray LLP as Special Litigation Counsel to the Debtors for the Period from January 1, 2021 through and including March 31, 2021 [Docket No. 2339 – filed May 17, 2021]

Objection Deadline:  June 7, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:  None.

Related Documents:

i.  Third Monthly Application of Ropes & Gray LLP, Special Litigation Counsel to the Debtors, for Allowance of Compensation for Services Rendered and Expenses Incurred for the Period from January 1, 2021 through January 31, 2021 [Docket No. 1928 – filed April 1, 2021]

ii.  Certificate of No Objection Regarding the Third Monthly Application of Ropes & Gray LLP, Special Litigation Counsel to the Debtors, for Allowance of Compensation for Services Rendered and Expenses Incurred for the Period from January 1, 2021 through January 31, 2021 (No Order Required) [Docket No. 2105 – filed April 22, 2021]

iii.  Fourth Monthly Application of Ropes & Gray LLP, Special Litigation Counsel to the Debtors, for Allowance of Compensation for Services Rendered and Expenses Incurred for the Period from February 1, 2021 through February 28, 2021 [Docket No. 2184 – filed May 4, 2021]

iv.  Certificate of No Objection Regarding the Fourth Monthly Application of Ropes & Gray LLP, Special Litigation Counsel to the Debtors, for Allowance of Compensation for Services Rendered and Expenses Incurred for the Period from February 1, 2021 through February 28, 2021 (No Order Required) [Docket No. 2594 – filed May 27, 2021]

v.  Fifth Monthly Application of Ropes & Gray LLP, Special Litigation Counsel to the Debtors, for Allowance of Compensation for Services Rendered and Expenses Incurred for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2262 – filed May 11, 2021]

vi.  Certificate of No Objection Regarding the Fifth Monthly Application of Ropes & Gray LLP, Special Litigation Counsel to the Debtors, for Allowance of Compensation for Services Rendered and Expenses Incurred for the Period from March 1, 2021 through March 31, 2021 (No Order Required) [Docket No. 2690 – filed June 3, 2021]

RLF1 25517536v.1

A-4743

vii.    Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Ropes & Gray LLP [Docket No. 2738 – filed June 7, 2021]

8.    Combined First and Second Interim Application for Compensation for Services Rendered and Reimbursement of Expenses of Maples & Calder (Ireland) LLP as Special Foreign Counsel for the Official Committee of Unsecured Creditors for the Period from November 12, 2020 through March 31, 2021 [Docket No. 2346 – filed May 17, 2021]

Objection Deadline:    June 7, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:    None.

Related Documents:

i.    First Monthly Fee Application of Maples and Calder (Ireland) LLP as Special Foreign Counsel to the Official Committee of Unsecured Creditors for Allowance of Compensation for the Period from November 12, 2020 through December 31, 2020 [Docket No. 1565 – filed March 1, 2021]

ii.    Certificate of No Objection Regarding the First Monthly Fee Application of Maples and Calder (Ireland) LLP as Special Foreign Counsel to the Official Committee of Unsecured Creditors for Allowance of Compensation for the Period from November 12, 2020 through December 31, 2020 [Docket No. 1839 – filed March 23, 2021]

iii.    Combined Second Monthly Fee Application of Maples and Calder (Ireland) LLP as Special Foreign Counsel to the Official Committee of Unsecured Creditors for Allowance of Compensation for the Period from January 1, 2021 through February 28, 2021 [Docket No. 1998 – filed April 9, 2021]

iv.    Certificate of No Objection Regarding the Combined Second Monthly Fee Application of Maples and Calder (Ireland) LLP as Special Foreign Counsel to the Official Committee of Unsecured Creditors for Allowance of Compensation for the Period from January 1, 2021 through February 28, 2021 [Docket No. 2213 – filed May 7, 2021]

v.    Third Monthly Fee Application of Maples and Calder (Ireland) LLP as Special Foreign Counsel to the Official Committee of Unsecured Creditors for Allowance of Compensation for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2214 – filed May 7, 2021]

vi.    Certificate of No Objection Regarding Third Monthly Fee Application of Maples and Calder (Ireland) LLP as Special Foreign Counsel to the Official Committee of Unsecured Creditors for Allowance of Compensation for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2664 – filed June 2, 2021]

vii.    Fee Examiner's Final Report Regarding Combined First and Second Interim Fee Application Request of Maples and Calder (Ireland) LLP [Docket No. 2800 – filed June 10, 2021]

9.    First Interim Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for Services Rendered and for Reimbursement of Expenses as Special Counsel to the Debtors for the Period from November 1, 2020 through March 31, 2021 [Docket No. 2347 – filed May 17, 2021]

Objection Deadline:    June 7, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:

A.    Acthar Plaintiffs' Objection to Interim Fee Applications of Arnold & Porter [Docket No. 2558 – filed May 25, 2021]

Related Documents:

i.    First Combined Monthly Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for the Period from November 1, 2020 through December 31, 2020 [Docket No. 1714 – filed March 15, 2021]

ii.    Certificate of No Objection Regarding the First Combined Monthly Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for the Period from November 1, 2020 through December 31, 2020 (No Order Required) [Docket No. 1974 – filed April 7, 2021]

iii.    Second Monthly Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for the Period from January 1, 2021 through January 31, 2021 [Docket No. 1963 – filed April 6, 2021]

iv.    Certificate of No Objection Regarding the Second Monthly Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for the Period from January 1, 2021 through January 31, 2021 (No Order Required) [Docket No. 2129 – filed April 28, 2021]

v.    Third Monthly Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for the Period from February 1, 2021 through February 28, 2021 [Docket No. 2153 – filed April 30, 2021]

vi.    Certificate of No Objection Regarding the Third Monthly Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for the Period from February 1, 2021 through February 28, 2021 (No Order Required) [Docket No. 2516 – filed May 21, 2021]

vii.    Fourth Monthly Fee Application of Arnold & Porter Kaye Scholer LLP for Allowance of Interim Compensation for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2290 – filed May 13, 2021]

**A-4745**

viii.   Fee Examiner's Final Report Regarding First Combined Monthly Fee Application Request of Arnold & Porter Kaye Scholer LLP [Docket No. 2753 – filed June 8, 2021]

10.   Second Interim Fee Application of Brown Rudnick LLP for Compensation for Services Rendered and Reimbursement of Expenses as Co-Counsel to the Ad Hoc Committee of Governmental Claimants for the Period January 1, 2021 through March 31, 2021 [Docket No. 2348 – filed May 17, 2021]

Objection Deadline:   June 7, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:      None.

Related Documents:

i.   Third Monthly Application of Brown Rudnick LLP for Compensation for Services Rendered and Reimbursement of Expenses as Co-Counsel to the Ad Hoc Committee of Governmental Claimants for the Period January 1, 2021 through January 31, 2021 [Docket No. 1479 – filed February 22, 2021]

ii.   Certificate of No Objection [Docket No. 1762 – filed March 16, 2021]

iii.   Fourth Monthly Application of Brown Rudnick LLP for Compensation for Services Rendered and Reimbursement of Expenses as Co-Counsel to the Ad Hoc Committee of Governmental Claimants for the Period February 1, 2021 through February 28, 2021 [Docket No. 1868 – filed March 25, 2021]

iv.   Certificate of No Objection [Docket No. 2056 – filed April 16, 2021]

v.   Fifth Monthly Application of Brown Rudnick LLP for Compensation for Services Rendered and Reimbursement of Expenses as Co-Counsel to the Ad Hoc Committee of Governmental Claimants for the Period March 1, 2021 through March 31, 2021 [Docket No. 2106 – filed April 22, 2021]

vi.   Certificate of No Objection [Docket No. 2300 – filed May 13, 2021]

vii.   Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Brown Rudnick LLP [Docket No. 2890 – filed June 16, 2021]

11.   Second Interim Fee Application Request of Richards, Layton & Finger, P.A. [Docket No. 2355 – filed May 17, 2021]

Objection Deadline:   March 8, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:      None.

A-4746

Related Documents:

i.  Fourth Monthly Application of Richards, Layton & Finger, P.A. for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from January 1, 2021 through January 31, 2021 [Docket No. 1592 – filed March 4, 2021]

ii.  Certificate of No Objection Regarding the Fourth Monthly Application of Richards, Layton & Finger, P.A. for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from January 1, 2021 through January 31, 2021 (No Order Required) [Docket No. 1866 – filed March 25, 2021]

iii.  Fifth Monthly Application of Richards, Layton & Finger, P.A. for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from February 1, 2021 through February 28, 2021 [Docket No. 1965 – filed April 6, 2021]

iv.  Certificate of No Objection Regarding the Fifth Monthly Application of Richards, Layton & Finger, P.A. for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from February 1, 2021 through February 28, 2021 (No Order Required) [Docket No. 2131 – filed April 28, 2021]

v.  Sixth Monthly Application of Richards, Layton & Finger, P.A. for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2307 – filed May 14, 2021]

vi.  Certificate of No Objection Regarding the Sixth Monthly Application of Richards, Layton & Finger, P.A. for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from March 1, 2021 through March 31, 2021 (No Order Required) [Docket No. 2716 – filed June 4, 2021]

vii.  Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Richards, Layton & Finger, P.A. [Docket No. 2694 – filed June 3, 2021]

12.  Second Interim Fee Application of Guggenheim Securities, LLC as Investment Banker for the Debtors and Debtors in Possession for Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred for the Period from January 1, 2021 to and including March 31, 2021 [Docket No. 2357 – filed May 17, 2021]

Objection Deadline:  June 7, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:  None.

RLF1 25517536v.1

A-4747

Related Documents:

i.  Third Consolidated Monthly Application of Guggenheim Securities, LLC for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Investment Banker for the Debtors and Debtors in Possession for the Period from January 1, 2021 to and including March 31, 2021 [Docket No. 2356 – filed May 17, 2021]

ii.  Certificate of No Objection Regarding the Third Consolidated Monthly Application of Guggenheim Securities, LLC for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Investment Banker for the Debtors and Debtors in Possession for the Period from January 1, 2021 to and including March 31, 2021 (No Order Required) [Docket No. 2766 – filed June 8, 2021]

iii.  Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Guggenheim Securities, LLC [Docket No. 2793 – filed June 10, 2021]

13.  Second Interim Fee Application of Akin Gump Strauss Hauer & Feld LLP, as Lead Counsel to the Official Committee of Opioid Related Claimants of Mallinckrodt plc, *et al.*, for the Period from January 1, 2021 through and including March 31, 2021 [Docket No. 2359 – filed May 17, 2021]

Objection Deadline:   June 7, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:       None.

Related Documents:

i.  Third Monthly Fee Application of Akin Gump Strauss Hauer & Feld LLP, as Lead Counsel to the Official Committee of Opioid Related Claimants of Mallinckrodt plc, *et al.*, for the Period from January 1, 2021 through and including January 31, 2021 [Docket No. 1785 – filed March 17, 2021]

ii.  Certification of No Objection Regarding Third Monthly Fee Application of Akin Gump Strauss Hauer & Feld LLP, as Lead Counsel to the Official Committee of Opioid Related Claimants of Mallinckrodt plc, *et al.*, for the Period from January 1, 2021 through and including January 31, 2021 (No Order Required) [Docket No. 1980 – filed April 7, 2021]

iii.  Fourth Monthly Fee Application of Akin Gump Strauss Hauer & Feld LLP, as Lead Counsel to the Official Committee of Opioid Related Claimants of Mallinckrodt plc, *et al.*, for the Period from February 1, 2021 through and including February 28, 2021 [Docket No. 2059 – filed April 16, 2021]

iv.    Certification of No Objection Regarding Fourth Monthly Fee Application of Akin Gump Strauss Hauer & Feld LLP, as Lead Counsel to the Official Committee of Opioid Related Claimants of Mallinckrodt plc, *et al.*, for the Period from February 1, 2021 through and including February 28, 2021 (No Order Required) [Docket No. 2223 – filed May 7, 2021]

v.    Fifth Monthly Fee Application of Akin Gump Strauss Hauer & Feld LLP, as Lead Counsel to the Official Committee of Opioid Related Claimants of Mallinckrodt plc, *et al.*, for the Period from March 1, 2021 through and including March 31, 2021 [Docket No. 2354 – filed May 17, 2021]

vi.    Certification of No Objection Regarding Fifth Monthly Fee Application of Akin Gump Strauss Hauer & Feld LLP, as Lead Counsel to the Official Committee of Opioid Related Claimants of Mallinckrodt plc, *et al.*, for the Period from March 1, 2021 through and including March 31, 2021 (No Order Required) [Docket No. 2757 – filed June 8, 2021]

vii.    Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Akin Gump Strauss Hauer & Feld LLC [Docket No. 2636 – filed June 1, 2021]

14.    Second Interim Fee Application of Cole Schotz P.C., Delaware and Efficiency Co-Counsel to the Official Committee of Opioid Related Claimants, for Allowance of Compensation and Reimbursement of Expenses for the Period from January 1, 2021 through March 31, 2021 [Docket No. 2360 – filed May 17, 2021]

Objection Deadline:    June 7, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:    None.

Related Documents:

i.    Second Monthly Fee Application of Cole Schotz P.C., Delaware and Efficiency Co-Counsel to the Official Committee of Opioid Related Claimants, for Allowance of Compensation and Reimbursement of Expenses for the Period from January 1, 2021 through January 31, 2021 [Docket No. 1786 – filed March 17, 2021]

ii.    Certification of No Objection Regarding Second Monthly Fee Application of Cole Schotz P.C., Delaware and Efficiency Co-Counsel to the Official Committee of Opioid Related Claimants, for Allowance of Compensation and Reimbursement of Expenses for the Period from January 1, 2021 through January 31, 2021 (No Order Required) [Docket No. 1981 – filed April 7, 2021]

iii.    Third Monthly Fee Application of Cole Schotz P.C., Delaware and Efficiency Co-Counsel to the Official Committee of Opioid Related Claimants, for Allowance of Compensation and Reimbursement of Expenses for the Period from February 1, 2021 through February 28, 2021 [Docket No. 2060 – filed April 16, 2021]

iv.     Certification of No Objection Regarding Third Monthly Fee Application of Cole Schotz P.C., Delaware and Efficiency Co-Counsel to the Official Committee of Opioid Related Claimants, for Allowance of Compensation and Reimbursement of Expenses for the Period from February 1, 2021 through February 28, 2021 (No Order Required) [Docket No. 2224 – filed May 7, 2021]

v.      Fourth Monthly Fee Application of Cole Schotz P.C., Delaware and Efficiency Co-Counsel to the Official Committee of Opioid Related Claimants, for Allowance of Compensation and Reimbursement of Expenses for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2349 – filed May 17, 2021]

vi.     Certification of No Objection Regarding Fourth Monthly Fee Application of Cole Schotz P.C., Delaware and Efficiency Co-Counsel to the Official Committee of Opioid Related Claimants, for Allowance of Compensation and Reimbursement of Expenses for the Period from March 1, 2021 through March 31, 2021 (No Order Required) [Docket No. 2755 – filed June 8, 2021]

vii.    Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Cole Schotz P.C. [Docket No. 2638 – filed June 1, 2021]

15.  Second Interim Fee Application of Wachtell, Lipton, Rosen & Katz for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors and Debtors in Possession for the Period from January 1, 2021 through March 31, 2021 [Docket No. 2361 – filed May 17, 2021]

Objection Deadline:   June 7, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:     None.

Related Documents:

i.      Third Monthly Application of Wachtell, Lipton, Rosen & Katz for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from January 1, 2021 through January 31, 2021 [Docket No. 2340 – filed May 17, 2021]

ii.     Certificate of No Objection Regarding the Third Monthly Application of Wachtell, Lipton, Rosen & Katz for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from January 1, 2021 through January 31, 2021 (No Order Required) [Docket No. 2779 – filed June 9, 2021]

iii.    Fourth Monthly Application of Wachtell, Lipton, Rosen & Katz for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from February 1, 2021 through February 28, 2021 [Docket No. 2341 – filed May 17, 2021]

iv. Certificate of No Objection Regarding the Fourth Monthly Application of Wachtell, Lipton, Rosen & Katz for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from February 1, 2021 through February 28, 2021 (No Order Required) [Docket No. 2781 – filed June 9, 2021]

v. Fifth Monthly Application of Wachtell, Lipton, Rosen & Katz for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2344 – filed May 17, 2021]

vi. Certificate of No Objection Regarding the Fifth Monthly Application of Wachtell, Lipton, Rosen & Katz for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from March 1, 2021 through March 31, 2021 (No Order Required) [Docket No. 2782 – filed June 9, 2021]

vii. Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Wachtell, Lipton, Rosen & Katz [Docket No. 2891 – filed June 16, 2021]

16. Second Interim Fee Application of Cassels Brock & Blackwell LLP, as Canadian Counsel to the Official Committee of Opioid Related Claimants of Mallinckrodt plc, *et al.*, for the Period from January 1, 2021 through and including March 31, 2021 [Docket No. 2362 – filed May 17, 2021]

Objection Deadline:   June 7, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:      None.

Related Documents:

i. Second Monthly Fee Application of Cassels Brock & Blackwell LLP, as Canadian Counsel to the Official Committee of Opioid Related Claimants of Mallinckrodt plc, *et al.*, for the Period from January 1, 2021 through and including January 31, 2021 [Docket No. 1787 – filed March 17, 2021]

ii. Certification of No Objection Regarding Second Monthly Fee Application of Cassels Brock & Blackwell LLP, as Canadian Counsel to the Official Committee of Opioid Related Claimants of Mallinckrodt plc, *et al.*, for the Period from January 1, 2021 through and including January 31, 2021 [Docket No. 1982 – filed April 7, 2021]

iii. Third Monthly Fee Application of Cassels Brock & Blackwell LLP, as Canadian Counsel to the Official Committee of Opioid Related Claimants of Mallinckrodt plc, *et al.*, for the Period from February 1, 2021 through and including February 28, 2021 [Docket No. 2061 – filed April 16, 2021]

RLF1 25517536v.1

iv.      Certification of No Objection Regarding Third Monthly Fee Application of Cassels Brock & Blackwell LLP, as Canadian Counsel to the Official Committee of Opioid Related Claimants of Mallinckrodt plc, *et al.*, for the Period from February 1, 2021 through and including February 28, 2021 [Docket No. 2225 – filed May 7, 2021]

v.      Fourth Monthly Fee Application of Cassels Brock & Blackwell LLP, as Canadian Counsel to the Official Committee of Opioid Related Claimants of Mallinckrodt plc, *et al.*, for the Period from March 1, 2021 through and including March 31, 2021 [Docket No. 2351 – filed May 27, 2021]

vi.      Certification of No Objection Regarding Fourth Monthly Fee Application of Cassels Brock & Blackwell LLP, as Canadian Counsel to the Official Committee of Opioid Related Claimants of Mallinckrodt plc, *et al.*, for the Period from March 1, 2021 through and including March 31, 2021 [Docket No. 2758 – filed June 8, 2021]

vii.      Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Cassels Brock & Blackwell LLP [Docket No. 2737 – filed June 7, 2021]

17.      Second Interim Fee Application of Jefferies LLC for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Investment Banker for the Official Committee of Opioid-Related Claimants for the Period from January 1, 2021 through March 31, 2021 [Docket No. 2363 – filed May 17, 2021]

     Objection Deadline:    June 7, 2021 at 4:00 p.m. (ET)

     Objections/Responses Received:      None.

     Related Documents:

i.      Third Monthly Application of Jefferies LLC for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Investment Banker for the Official Committee of Opioid-Related Claimants for the Period from January 1, 2021 through January 31, 2021 [Docket No. 1789 – filed March 17, 2021]

ii.      Certification of No Objection Regarding Third Monthly Application of Jefferies LLC for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Investment Banker for the Official Committee of Opioid-Related Claimants for the Period from October 28, 2020 through November 30, 2020 (No Order Required) [Docket No. 1984 – filed April 7, 2021]

iii.      Fourth Monthly Application of Jefferies LLC for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Investment Banker for the Official Committee of Opioid-Related Claimants for the Period from February 1, 2021 through February 28, 2021 [Docket No. 2062 – filed April 16, 2021]

iv.    Certification of No Objection Regarding Fourth Monthly Application of Jefferies LLC for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Investment Banker for the Official Committee of Opioid-Related Claimants for the Period from February 1, 2021 through February 28, 2021 (No Order Required) [Docket No. 2226 – filed May 7, 2021]

v.    Fifth Monthly Application of Jefferies LLC for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Investment Banker for the Official Committee of Opioid-Related Claimants for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2352 – filed May 17, 2021

vi.    Certification of No Objection Regarding Fifth Monthly Application of Jefferies LLC for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Investment Banker for the Official Committee of Opioid-Related Claimants for the Period from March 1, 2021 through March 31, 2021 (No Order Required) [Docket No. 2759 – filed June 8, 2021]

vii.    Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Jefferies, LLC [Docket No. 2560– filed May 25, 2021]

18.   Second Interim Application for Compensation and Reimbursement of Expenses of Province, LLC, as Financial Advisor to the Official Committee of Opioid Related Claimants, for the Period from January 1, 2021 through March 31, 2021 [Docket No. 2364 – filed May 17, 2021]

Objection Deadline:   June 7, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:    None.

Related Documents:

i.    Second Monthly Application for Compensation and Reimbursement of Expenses of Province, LLC as Financial Advisor to the Official Committee of Opioid Related Claimants, for the Period from January 1, 2021 through January 31, 2021 [Docket No. 1788 – filed March 17, 2021]

ii.    Certification of No Objection Regarding Second Monthly Application for Compensation and Reimbursement of Expenses of Province, LLC as Financial Advisor to the Official Committee of Opioid Related Claimants, for the Period from January 1, 2021 through January 31, 2021 (No Order Required) [Docket No. 1983 – filed April 7, 2021]

iii.    Third Monthly Application for Compensation and Reimbursement of Expenses of Province, LLC as Financial Advisor to the Official Committee of Opioid Related Claimants, for the Period from February 1, 2021 through February 28, 2021 [Docket No. 2063 – filed April 16, 2021]

17

iv.   Certification of No Objection Regarding Third Monthly Application for Compensation and Reimbursement of Expenses of Province, LLC as Financial Advisor to the Official Committee of Opioid Related Claimants, for the Period from February 1, 2021 through February 28, 2021 (No Order Required) [Docket No. 2227 – filed May 7, 2021]

v.   Fourth Monthly Application for Compensation and Reimbursement of Expenses of Province, LLC as Financial Advisor to the Official Committee of Opioid Related Claimants, for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2353 – filed May 17, 2021]

vi.   Certification of No Objection Regarding Fourth Monthly Application for Compensation and Reimbursement of Expenses of Province, LLC as Financial Advisor to the Official Committee of Opioid Related Claimants, for the Period from March 1, 2021 through March 31, 2021 (No Order Required) [Docket No. 2760 – filed June 8, 2021]

vii.   Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Province, LLC [Docket No. 2632 – filed June 1, 2021]

19.   Combined Fourth and Fifth Monthly and Second Interim Fee Application of Morris James LLP, Co-Counsel for the Governmental Plaintiff Ad Hoc Committee, for Allowance of Compensation and Reimbursement of Expenses for the Period from January 1, 2021 through February 28, 2021 [Docket No. 2383 – filed May 18, 2021]

Objection Deadline:   June 7, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:   None.

Related Documents:

i.   Certificate of No Objection [Docket No. 2762 – filed June 8, 2021]

ii.   Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Morris James LLP [Docket No. 2786 – filed June 9, 2021]

20.   Second Interim Fee Application of Katten Muchin Rosenman LLP as Counsel to the Specialty Generics Debtors, at the Sole Direction of the Disinterested Managers, for Compensation for Services Rendered and Reimbursement of Expenses for the Period of January 1, 2021 through March 31, 2021 [Docket No. 2391 – filed May 18, 2021]

Objection Deadline:   June 7, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:   None.

Related Documents:

i.     Fourth Monthly Fee Statement of Katten Muchin Rosenman LLP as Counsel to the Specialty Generics Debtors, at the Sole Direction of the Disinterested Managers, for Compensation for Services Rendered and Reimbursement of Expenses for the Period of January 1, 2021 through January 31, 2021 [Docket No. 1509 – filed February 24, 2021]

ii.     Certificate of No Objection Regarding the Fourth Monthly Fee Statement of Katten Muchin Rosenman LLP as Counsel to the Specialty Generics Debtors, at the Sole Direction of the Disinterested Managers, for Compensation for Services Rendered and Reimbursement of Expenses for the Period of January 1, 2021 through January 31, 2021 (No Order Required) [Docket No. 1795 – filed March 18, 2021]

iii.     Fifth Monthly Fee Statement of Katten Muchin Rosenman LLP as Counsel to the Specialty Generics Debtors, at the Sole Direction of the Disinterested Managers, for Compensation for Services Rendered and Reimbursement of Expenses for the Period of February 1, 2021 through February 28, 2021 [Docket No. 1939 – filed April 5, 2021]

iv.     Certificate of No Objection Regarding the Fifth Monthly Fee Statement of Katten Muchin Rosenman LLP as Counsel to the Specialty Generics Debtors, at the Sole Direction of the Disinterested Managers, for Compensation for Services Rendered and Reimbursement of Expenses for the Period of February 1, 2021 through February 28, 2021 (No Order Required) [Docket No. 2130 – filed April 28, 2021]

v.     Sixth Monthly Fee Statement of Katten Muchin Rosenman LLP as Counsel to the Specialty Generics Debtors, at the Sole Direction of the Disinterested Managers, for Compensation for Services Rendered and Reimbursement of Expenses for the Period of March 1, 2021 through March 31, 2021 [Docket No. 2239 – filed May 10, 2021]

vi.     Certificate of No Objection Regarding the Sixth Monthly Fee Statement of Katten Muchin Rosenman LLP as Counsel to the Specialty Generics Debtors, at the Sole Direction of the Disinterested Managers, for Compensation for Services Rendered and Reimbursement of Expenses for the Period of March 1, 2021 through March 31, 2021 (No Order Required) [Docket No. 2668 – filed June 2, 2021]

vii.     Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Katten Muchin Rosenman LLP [Docket No. 2799 – filed June 10, 2021]

21.     Second Interim Fee Application of AlixPartners, LLP, Financial Advisor to the Chapter 11 Debtors for Allowance of Compensation for Services Rendered and the period January 1, 2021 through March 31, 2021 [Docket No. 2494 – filed May 20, 2021]

Objection Deadline:   June 9, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:       None.

A-4755

Related Documents:

i.    Monthly Application of AlixPartners, LLP, Financial Advisor to the Chapter 11 Debtors for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses for the Period January 1, 2021 through and Including January 31, 2021 [Docket No. 1574 – filed March 2, 2021]

ii.   Certificate of No Objection Regarding the First Monthly Application of AlixPartners, LLP, Financial Advisor to the Chapter 11 Debtors for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses for the Period January 1, 2021 through and Including January 31, 2021 [Docket No. 1833 – filed March 23, 2021]

iii.  Monthly Application of AlixPartners, LLP, Financial Advisor to the Chapter 11 Debtors for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred for the Period February 1, 2021 through and Including February 28, 2021 [Docket No. 1929 – filed April 1, 2021]

iv.   Certificate of No Objection Regarding the Monthly Application of AlixPartners, LLP, Financial Advisor to the Chapter 11 Debtors for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred for the Period February 1, 2021 through and Including February 28, 2021 (No Order Required) [Docket No. 2103 – filed April 22, 2021]

v.    Monthly Application of AlixPartners, LLP, Financial Advisor to the Chapter 11 Debtors for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred for the Period March 1, 2021 through and Including March 31, 2021 [Docket No. 2230 – filed May 7, 2021]

vi.   Certificate of No Objection Regarding the Monthly Application of AlixPartners, LLP, Financial Advisor to the Chapter 11 Debtors for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred for the Period March 1, 2021 through and Including March 31, 2021 (No Order Required) [Docket No. 2623 – filed June 1, 2021]

vii.  Fee Examiner's Final Report Regarding Second Interim Fee Application Request of AlixPartners, LLP [Docket No. 2792 – filed June 10, 2021]

22.   Second Interim Fee Application of Houlihan Lokey Capital, Inc., Investment Banker and Financial Advisor to the Governmental Plaintiff Ad Hoc Committee, for Allowance of Compensation and Reimbursement of Expenses for the Period from January 1, 2021 through March 31, 2021 [Docket No. 2510 – filed May 21, 2021]

Objection Deadline:   June 10, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:    None.

Related Documents:

RLF1 25517536v.1

A-4756

     i.      Third Monthly Fee Application of Houlihan Lokey Capital, Inc., Investment Banker and Financial Advisor to the Governmental Plaintiff Ad Hoc Committee, for Allowance of Compensation and Reimbursement of Expenses for the Period from January 1, 2021 through January 31, 2021 [Docket No. 1820 – filed March 22, 2021]

     ii.     Certificate of No Objection [Docket No. 2027 – filed April 13, 2021]

     iii.    Fourth Monthly Fee Application of Houlihan Lokey Capital, Inc., Investment Banker and Financial Advisor to the Governmental Plaintiff Ad Hoc Committee, for Allowance of Compensation and Reimbursement of Expenses for the Period from February 1, 2021 through February 28, 2021 [Docket No. 2312 – filed May 14, 2021]

     iv.    Certificate of No Objection [Docket No. 2713 – filed June 4, 2021]

     v.     Fifth Monthly Fee Application of Houlihan Lokey Capital, Inc., Investment Banker and Financial Advisor to the Governmental Plaintiff Ad Hoc Committee, for Allowance of Compensation and Reimbursement of Expenses for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2313 – filed May 14, 2021

     vi.    Certificate of No Objection [Docket No. 2714 – filed June 4, 2021]

     vii.   Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Houlihan Lokey Capital, Inc. [Docket No. 2652 – filed June 2, 2021]

23.    Second Interim Application of Landis Rath & Cobb LLP, Delaware Counsel to the Unsecured Notes Ad Hoc Group, for Compensation and Reimbursement of Expenses for the Period from January 1, 2021 through March 31, 2021 [Docket No. 2562 – filed May 25, 2021]

    Objection Deadline:   June 14, 2021 at 4:00 p.m. (ET)

    Objections/Responses Received:    None.

    Related Documents:

     i.      Second Monthly Application of Landis Rath & Cobb LLP, Delaware Counsel to the Unsecured Notes Ad Hoc Group, for Compensation and Reimbursement of Expenses for the Period from January 1, 2021 through January 31, 2021 [Docket No. 1581 – filed March 3, 2021]

     ii.     Certificate of No Objection [Docket No. 1859 – filed March 24, 2021]

     iii.    Third Monthly Application of Landis Rath & Cobb LLP, Delaware Counsel to the Unsecured Notes Ad Hoc Group, for Compensation and Reimbursement of Expenses for the Period from February 1, 2021 through February 28, 2021 [Docket No. 1860 – filed March 24, 2021]

iv.     Certificate of No Objection [Docket No. 2040 – filed April 14, 2021]

v.     Fourth Monthly Application of Landis Rath & Cobb LLP, Delaware Counsel to the Unsecured Notes Ad Hoc Group, for Compensation and Reimbursement of Expenses for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2109 – filed April 23, 2021]

vi.     Certificate of No Objection [Docket No. 2314 – filed May 14, 2021]

vii.     Fee Examiner's Final Report Regarding Second Interim Fee Application Request of Landis Rath & Cobb LLP [Docket No. 2869 – filed June 15, 2021]

24.     Second Interim Fee Application of Kramer Levin Naftalis & Frankel LLP for Allowance of Compensation for Professional Services Rendered and for Reimbursement of Actual and Necessary Expenses Incurred as Co-Counsel to the Governmental Plaintiff Ad Hoc Committee of Mallinckrodt plc, for the Period from January 1, 2021 through March 31, 2021 [Docket No. 2601 – filed May 28, 2021]

Objection Deadline:    June 16, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:    None.

Related Documents:

i.     Fourth Monthly Fee Application of Kramer Levin Naftalis & Frankel LLP, Co-Counsel to the Governmental Plaintiff Ad Hoc Committee, for Allowance of Compensation and Reimbursement of Expenses for the Period January 1, 2021 through January 31, 2021 [Docket No. 1922 – filed March 31, 2021]

ii.     Certificate of No Objection [Docket No. 2093 – filed April 21, 2021]

iii.     Fifth Monthly Fee Application of Kramer Levin Naftalis & Frankel LLP, Co-Counsel to the Governmental Plaintiff Ad Hoc Committee, for Allowance of Compensation and Reimbursement of Expenses for the Period November 1, 2020 through November 30, 2020 [Docket No. 2044 – filed April 14, 2021]

iv.     Certificate of No Objection [Docket No. 2194 – filed May 5, 2021]

v.     Sixth Monthly Fee Application of Kramer Levin Naftalis & Frankel LLP, Co-Counsel to the Governmental Plaintiff Ad Hoc Committee, for Allowance of Compensation and Reimbursement of Expenses for the Period March 1, 2021 through March 31, 2021 [Docket No. 2308 – filed May 14, 2021]

vi.     Certificate of No Objection [Docket No. 2711 – filed June 4, 2021]

vii.     Fee Examiner's Final Report Regarding First Interim Fee Application Request of Kramer Levin Naftalis & Frankel LLP [Docket No. 2756 – filed June 8, 2021]

25. Second Interim Fee Application of Latham & Watkins LLP for Allowance of Compensation for Services Rendered and for Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from January 1, 2021 through March 31, 2021 [Docket No. 2647 – filed June 1, 2021]

Objection Deadline:   June 21, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:       None.

Related Documents:

i.       Fourth Monthly Application of Latham & Watkins LLP for Compensation for Services Rendered and Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from January 1, 2021 through January 31, 2021 [Docket No. 2372 – filed May 18, 2021]

ii.      Certificate of No Objection Regarding the Fourth Monthly Application of Latham & Watkins LLP for Compensation for Services Rendered and Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from January 1, 2021 through January 31, 2021 (No Order Required) [Docket No. 2763 – filed June 8, 2021]

iii.     Fifth Monthly Application of Latham & Watkins LLP for Compensation for Services Rendered and Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from February 1, 2021 through February 28, 2021 [Docket No. 2388 – filed May 18, 2021]

iv.      Certificate of No Objection Regarding the Fifth Monthly Application of Latham & Watkins LLP for Compensation for Services Rendered and Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from February 1, 2021 through February 28, 2021 (No Order Required) [Docket No. 2764 – filed June 8, 2021]

v.       Sixth Monthly Application of Latham & Watkins LLP for Compensation for Services Rendered and Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2570 – filed May 26, 2021]

vi.      Certificate of No Objection Regarding the Sixth Monthly Application of Latham & Watkins LLP for Compensation for Services Rendered and Reimbursement of Expenses as Co-Counsel to the Debtors for the Period from March 1, 2021 through March 31, 2021 (No Order Required) [Docket No. 2893 – filed June 16, 2021]

vii.     Fee Examiner's Final Report Regarding First Interim Fee Application Request of Latham & Watkins LLP [Docket No. 2809 – filed June 11, 2021]

A-4759

26.     Second Interim Fee Application of Perella Weinberg Partners LP, Investment Banker to the Unsecured Notes Ad Hoc Group, for Compensation and Reimbursement of Expenses for the Period from January 1, 2021 through March 31, 2021 [Docket No. 2655 – filed June 2, 2021]

Objection Deadline:   June 22, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:       None.

Related Documents:

i.      Second Monthly Application of Perella Weinberg Partners LP, Investment Banker to the Unsecured Notes Ad Hoc Group, for Compensation and Reimbursement of Expenses for the Period from January 1, 2021 through January 31, 2021 [Docket No. 1870 – filed March 25, 2021]

ii.     Certificate of No Objection [Docket No. 2049 – filed April 16, 2021]

iii.    Third Monthly Application of Perella Weinberg Partners LP, Investment Banker to the Unsecured Notes Ad Hoc Group, for Compensation and Reimbursement of Expenses for the Period from February 1, 2021 through February 28, 2021 [Docket No. 1986 – filed April 8, 2021]

iv.     Certificate of No Objection [Docket No. 2148 – filed April 30, 2021]

v.      Fourth Monthly Application of Perella Weinberg Partners LP, Investment Banker to the Unsecured Notes Ad Hoc Group, for Compensation and Reimbursement of Expenses for the Period from March 1, 2021 through March 31, 2021 [Docket No. 2207 – filed May 6, 2021]

vi.     Certificate of No Objection [Docket No. 2598 – filed May 28, 2021]

vii.    Fee Examiner's Final Report Regarding Second Monthly and Interim Fee Application Request of Perella Weinberg Partners LP [Docket No. 2870 – filed June 15, 2021]

27.     Combined First Monthly and Interim Application of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Counsel to the Unsecured Notes Ad Hoc Group, for Compensation and Reimbursement of Expenses for the period from October 12, 2020 through December 31, 2020 [Docket No. 2036 – filed April 13, 2021]

Objection Deadline:   May 4, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:       None.

Related Documents:

i.      Certificate of No Objection [Docket No. 2390 – filed May 18, 2021]

ii.    Fee Examiner's Final Report Regarding First Interim Fee Application Request of Paul, Weiss, Rifkind, Wharton & Garrison LLP [Docket No. 2253 – filed May 11, 2021]

RLF1 25517536v.1