Case No. 21-cv-01093-LPS
_____

**UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**
_____

**In re**

**MALLINCKRODT PLC,** *et al.*

**Debtors.**

-----------------------------------------------

**ATTESTOR LIMITED AND HUMANA INC.,**

*Appellants,*

v.

**MALLINCKRODT PLC,** *et al.,*

*Appellees.*

_____

**APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**
_____

**APPENDIX VOL. 6 (A-6184- A-6949) TO APPELLANT'S OPENING BRIEF**

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Donna L. Culver (No. 2983)
Robert J. Dehney (No. 3578)
Matthew B. Harvey (No. 5186)
Matthew O. Talmo (No. 6333)
Taylor M. Haga (No. 6549)
1201 N. Market St., 16th Floor
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
dculver@morrisnichols.com
rdehney@morrisnichols.com
mharvey@morrisnichols.com
mtalmo@morrisnichols.com
thaga@morrisnichols.com

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (admitted *pro hac vice*)
Matthew Freimuth (admitted *pro hac vice*)
Benjamin P. McCallen (admitted *pro hac vice*)
Richard Choi (admitted *pro hac vice*)
Philip F. DiSanto (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
mfeldman@willkie.com
mfreimuth@willkie.com
bmccallen@willkie.com
rchoi1@willkie.com
pdisanto@willkie.com

**EIMER STAHL LLP**
Benjamin E. Waldin (admitted *pro hac vice*)
Scott C. Solberg (admitted *pro hac vice*)
James W. Joseph (admitted *pro hac vice*)
Sarah H. Catalano (admitted *pro hac vice*)
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
bwaldin@eimerstahl.com
ssolberg@eimerstahl.com
jjoseph@eimerstahl.com
scatalano@eimerstahl.com

# APPENDIX
# TABLE OF CONTENTS

| Document | Page No. |
|---|---|
| Relevant Filings | |
| Proof of Claim No. 4217 of Humana Inc. (February 15, 2021)[1] | A0001 |
| Proof of Claim No. 4144 of Avon Holdings I LLC as Transferee of United Healthcare Services Inc. (February 15, 2021)[2] | A0075 |
| Proof of Claim No. 5812 of Avon Holdings I LLC as Transferee of OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC (February 16, 2021)[3] | A0100 |
| Motion of Debtors for Interim and Final Orders (A) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (B) Authorizing Continuation of Existing Deposit Practices, (C) Waiving Certain U.S. Trustee Guidelines, (D) Authorizing Continuation of Intercompany Transactions, and (E) Granting Superpriority Status to Postpetition Intercompany Claims, Case No. 20-12522, D.I. 23 (October 12, 2020) | A0119 |

[1] This is an exemplar of the proofs of claim of Humana Inc. subject to this appeal.  The remaining proofs of claim of Humana Inc. subject to this appeal are substantially identical to this proof of claim and have been assigned the following claim numbers: 3344, 3420, 4175, 4201, 4196, 4203, 4366, 5099, 4542, 4556, and 4565.  These claims have been omitted due to their voluminous nature and can be accessed at: https://restructuring.primeclerk.com/mallinckrodt/Home-ClaimInfo.

[2] This is an exemplar of the proofs of claim of Avon Holdings I LLC as Transferee of United HealthCare Services Inc. subject to this appeal.  The remaining proofs of claim of Avon Holdings I LLC as Transferee of United HealthCare Services Inc. subject to this appeal are substantially identical to this proof of claim and have been assigned the following claim numbers: 5171, 5717, 5638, 4335, 4314, 4288, 4211, 4593, 4219, and 4131.  These claims have been omitted due to their voluminous nature and can be accessed at: https://restructuring.primeclerk.com/mallinckrodt/Home-ClaimInfo.

[3] This is an exemplar of the proofs of claim of Avon Holdings I LLC as Transferee of OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC subject to this appeal.  The remaining proofs of claim of Avon Holdings I LLC as Transferee of OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC subject to this appeal are substantially identical to this proof of claim and have been assigned the following claim numbers: 5309, 5288, 5010, 5787, 5805, 5825, 5803, 5790, 5908, and 5938. These claims have been omitted due to their voluminous nature and can be accessed at: https://restructuring.primeclerk.com/mallinckrodt/Home-ClaimInfo.

| Document | Page No. |
|---|---|
| Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petition and First Day Motions, Case No. 20-12522, D.I. 128 (October 12, 2020) | A0194 |
| Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof, Case No. 20-12522, D.I. 667 (November 30, 2020) | A0450 |
| Excerpt of Affidavit of Service, Case No. 20-12522, D.I. 1131 (January 11, 2021) | A0463 |
| Humana Inc.'s Joinder to the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Actions, Case No. 20-12522, D.I. 1755 (March 16, 2021) | A0465 |
| Notice of Humana Inc.'s Joinder to the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as set forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Action, Case No. 20-12522, D.I. 1768 (March 16, 2021) | A0489 |
| Debtors' Omnibus Objection to the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Actions and to Humana Inc.'s Joinder Thereto, Case No. 20-12522, D.I. 1944 (April 5, 2021) | A0492 |

| Document | Page No. |
|---|---|
| Humana Inc.'s Reply in Support of the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Action and Humana Inc.'s Joinder thereto, Case No. 20-12522, D.I. 1987 (April 8, 2021) | A0531 |
| Excerpt of Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for all Purposes in these Bankruptcy Cases, Case No. 20-12522, D.I. 2157 (April 30, 2021) | A0540 |
| Motion of Attestor Limited and Humana Inc. for Entry of an Order Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code, Case No. 20-12522, D.I. 2159 (April 30, 2021) | A0577 |
| Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 2165 (April 30, 2021) | A0901 |
| Declaration of Randall S. Eisenberg in Support of Debtors' Motion for Scheduling Order and Objections to Claims, Case No. 20-12522, D.I. 2166 (May 1, 2021) | A0960 |
| Notice of Service of Attestor Limited and Humana Inc.'s First Request for Production of Documents in Connection with Contested Matters, Case No. 20-12522, D.I. 2211 (May 6, 2021) | A0966 |
| Attestor Limited and Humana Inc.'s First Request for Production of Documents in Connection with Contested Matters (May 6, 2021) | A0968 |

| Document | Page No. |
|---|---|
| Letter from Matthew Freimuth to the Honorable John T. Dorsey, Regarding Scheduling Issues, Case No. 20-12522, D.I. 2243 (May 10, 2021) | A0983 |
| Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed. R. Civ. P. 30(b)(6) and Fed. R. Bankr. P. 7030, Case No. 20-12522, D.I. 2284 (May 12, 2021) | A0986 |
| Opposition of Attestor Limited and Humana Inc. to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims, Case No. 20-12522, D.I. 2512 (May 21, 2021) [UNDER SEAL] | A0993 |
| Debtors' Omnibus Objection to Motions of Attestor Limited and Humana Inc. for Entry of Orders (A) Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for all Purposes in these Bankruptcy Cases and (B) Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code, Case No. 20-12522, D.I. 2521 (May 21, 2021) | A2023 |
| Debtors' Motion to Quash (A) Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed. R. Civ. P. 30(b)(6) and Fed. R. Bankr. P. 7030; (B) Acthar Plaintiffs' Notice of Deposition *Duces Tecum* of Corporate Designee(s) of Debtors; and (C) Acthar Plaintiffs' Notice of Deposition of Kathleen Breton, Case No. 20-12522, D.I. 2583 (May 26, 2021) | A2077 |
| Attestor Limited and Humana Inc.'s Limited Objection to Debtors' Motion to Quash (A) Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed R. Civ. P. 30(b)(6) and Fed R. Bankr. P. 7030; (B) Acthar Plaintiffs' Notice of Deposition *Duces Tecum* of Corporate Designees of Debtors; and (C) Acthar Plaintiffs' Notice of Deposition of Kathleen Breton, Case No. 20-12522, D.I. 2633 (June 1, 2021) | A2157 |
| Attestor Limited and Humana Inc.'s Reply in Further Support of Motions to Estimate Acthar-Related Claims and Allow | A2203 |

| Document | Page No. |
|---|---|
| Administrative Claims for all Purposes in these Bankruptcy Cases, Case No. 20-12522, D.I. 2657 (June 2, 2021) | |
| Excerpt of Order (I) Approving the Disclosure Statement and Form and Manner of Notice of Hearing Thereon; (II) Establishing Solicitation Procedures, (III) Approving the Form and Manner of Notice to Attorneys and Solicitation Directive, (IV) Approving the Form of Ballots, (V) Approving the Form, Manner, and Scope of Confirmation Notices, (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan and (VII) Granting Related Relief, Case No. 20-12522, D.I. 2911 (June 17, 2021) | A2221 |
| Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Case No. 20-12522, D.I. 2916 (June 18, 2021) | A2240 |
| Disclosure Statement for Joint Plan of Reorganization of Mallinckrodt PLC and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Case No. 20-12522, D.I. 2917 (June 18, 2021) | A2387 |
| Acthar Insurance Claimants' Revised and Supplemental Opposition to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims and Acthar Insurance Claimants' Motion for Substantive Consolidation, Case No. 20-12522, D.I. 2924 (June 18, 2021) [UNDER SEAL] | A3222 |
| Order Establishing Confirmation Schedule and Protocols, Case No. 20-12522, D.I. 2988 (June 24, 2021) | A4718 |
| Notice of Amended Agenda for Video Hearing Scheduled for June 24, 2021 at 1:00 p.m. (ET), Case No. 20-12522, D.I. 2989 (June 24, 2021) | A4730 |
| Debtors' Omnibus Reply in Support of First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 3177 (July 9, 2021) [UNDER SEAL] | A4762 |

| Document | Page No. |
|---|---|
| Statement of the Official Committee of Unsecured Creditors in Connection with the Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 3316 (July 21, 2021) | A6184 |
| Notice of Agenda of Matters Scheduled for Hearing on July 23, 2021 at 10:00 a.m., Case No. 20-12522, D.I. 3309 (July 21, 2021) | A6206 |
| Amended Notice of Agenda of Matters Scheduled for Hearing on July 23, 2021 at 9:00 a.m., Case No. 20-12522, D.I. 3389 (July 22, 2021) | A6213 |
| Transcripts, Order Appealed, and Notice of Appeal | |
| Transcript of Video Hearing [Zoom videoconference] on May 5, 2021 Regarding Motion for Scheduling Order, Adv. Pro. No. 21-50428, D.I. 2204 | A6221 |
| Transcript of Telephonic Hearing [Zoom videoconference] on May 12, 2021 Regarding Scheduling, Case No. 20-12522, D.I. 2303 | A6255 |
| Transcript of Video Hearing [Zoom videoconference] on May 20, 2021 Regarding Administrative Claims Bar Date, Case No. 20-12522, D.I. 2506 | A6293 |
| Transcript of Video Hearing [Zoom videoconference] on May 26, 2021 Regarding Scheduling, Case No. 20-12522, D.I. 2586 | A6331 |
| Transcript of Video Omnibus Hearing [Zoom videoconference] on June 2, 2021, Case No. 20-12522, D.I. 2683 | A6372 |
| Transcript of Telephonic Omnibus Hearing [Zoom videoconference] on June 7, 2021, Case No. 20-12522, D.I. 2752 | A6453 |

| Document | Page No. |
|---|---|
| Transcript of Telephonic Disclosure Statement Hearing [Zoom videoconference] on June 15, 2021, Case No. 20-12522, D.I. 2887 | A6563 |
| Transcript of Telephonic Disclosure Statement Hearing [Zoom videoconference] on June 16, 2021, Case No. 20-12522, D.I. 2930 | A6641 |
| Transcript of Telephonic Hearing [Zoom videoconference] on July 23, 2021 Regarding Unsubstantiated Claims Objection, Case No. 20-12522, D.I. 3414 | A6775 |
| Order Sustaining Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 3406 (July 23, 2021) | A6950 |
| Notice of Appeal, Case No. 20-12522, D.I. 3457 (July 28, 2021) | A6951 |
| Other Items | |
| Creditor's Claims in Bankruptcy Proceedings – The Debtor-Creditor Relationship in Bankruptcy – Allowance and Payment of Claims, Civil Resource Manual, Department of Justice (June 1998), available at https://www.justice.gov/jm/civil-resource-manual-64-creditors-claims-bankruptcy-proceedings | A7146 |
| Press Release, Mallinckrodt Will Pay $100 Million to Settle FTC, State Charges It Illegally Maintained its Monopoly of Specialty Drug Used to Treat Infants, FTC (Jan. 18. 2017), available at https://www.ftc.gov/news-events/press-releases/2017/01/mallinckrodt-will-pay-100-million-settle-ftc-state-charges-it | A7153 |
| Drug Maker Mallinckrodt Agrees to Pay Over $15 Million to Resolve Alleged False Claims Act Liability for "Wining and Dining" Doctors, Department of Justice (Sept. 4, 2019), available at https://www.justice.gov/opa/pr/drug-maker- | A7156 |

| Document | Page No. |
|---|---|
| mallinckrodt-agrees-pay-over-15-million-resolve-alleged-false-claims-act-liability | |
| Second Amended Complaint ¶¶ 7-8, *Humana Inc. v. Mallinckrodt ARD LLC*, No. 2:19-cv-06926 (C.D. Cal. Apr. 24, 2020) [D.I. 60] | A7158 |
| Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, *Humana Inc. v. Mallinckrodt ARD LLC*, No. 2:19-cv-06926 (C.D. Cal. Aug. 14, 2020) [D.I. 80] | A7442 |
| May 24, 2021 Emails Regarding Omnibus Unsubstantiated Claims Objection | A7471 |
| June 23, 2021 Emails Regarding Status Conference; Unsubstantiated Claims Hearing | A7473 |
| July 1, 2021 Emails Regarding Unsubstantiated Claims Objection | A7478 |
| Joint Debtors and Attestor/Humana Exhibit & Witness List for July 23, 2021 Hearing (July 22, 2021) | A7479 |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MALLINCKRODT PLC, *et al.*, | Case No. 20-12522 (JTD) |
| Debtors.[1] | Jointly Administered |
| | **RE: 2165, 2512, 2529, 2924 & 3177** |

**STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**IN CONNECTION WITH THE DEBTORS' FIRST OMNIBUS**
**OBJECTION TO UNSUBSTANTIATED CLAIMS (SUBSTANTIVE)**

The Official Committee of Unsecured Creditors (the "UCC")[2] of Mallinckrodt plc and its affiliated Debtors,[3] by and through its undersigned counsel, submits the following statement and reservation of rights (the "Statement") regarding the *Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive)* [D.I. 2165] (the "Acthar Unsubstantiated Claims Objection")[4] scheduled to be heard July 23, 2021. In support of the Statement, the UCC respectfully states as follows.

**STATEMENT**

1.      Since the commencement of these cases, the UCC has worked diligently to understand the "enterprise threatening litigation" that led to this filing, as described in the Welch

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2] The following four members comprise the UCC: (i) Acument Global Technologies, Inc.; (ii) Commodore Bowens, Jr., as Administrator for Estate of Commodore Bowens; (iii) U.S. Bank Trust National Association; and (iv) AFSCME District Council 47 Health and Welfare Fund [Docket No. 306, 1082].

[3] All terms not otherwise defined herein shall have the meaning ascribed to them in the Acthar Unsubstantiated Claims Objection.

[4] The objection deadline on the Acthar Unsubstantiated Claims Objection passed on June 2, 2021. The UCC submits this Statement to reflect its position on the issue and does not intend to introduce any new arguments.

A-6184

Declaration.[5]  One key question that has emerged, which should be answered prior to *whether* the Debtors should be held liable for these Acthar-related claims, is *where*, among the Debtors' entities, the Acthar liabilities sit.

2.        Under the Acthar Unsubstantiated Claims Objection,[6] the only entities the Debtors purport to be liable for the allegations made against the Debtors regarding Acthar price-fixing and monopolization are Mallinckrodt ARD LLC ("ARD") and Mallinckrodt plc ("plc"), on the basis that those are the entities named in the underlying complaints.  The Debtors' Reply makes clear that "[a]t issue in the Objection is only the Private Acthar Claimants' failure to substantiate in their proofs of claim their purported claims against the Non-Defendant Debtors, not the merits of these underlying claims against ARD and plc."  Debtors' Reply, ¶ 42.  Accordingly, the issue before the Court is not whether the underlying claims are viable, but *where* such claims should sit if viable.

3.        Upon review of the Acthar Unsubstantiated Claims Objection and responsive pleadings filed by the Ad Hoc Acthar Group[7] and the Acthar Insurance Claimants (collectively, the "Private Acthar Claimants") and in conjunction with the UCC's own independent analysis, the UCC cannot make sense of the Debtors' assertion that the Private Acthar Claimants' claims for Acthar liability exclusively sit at ARD and plc because other of the Debtors' entities were involved

---

[5] *Declaration of Stephen A. Welch, Chief Transformational Officer in Support of Chapter 11 Petitions and First Day Motions* [D.I. 128].

[6] The Debtors purport to file the Acthar Unsubstantiated Claims Objection in order to separate the "wheat from the chaff," citing the biblical proverb in which separates out the good wheat and burns the worthless, discarded husk that remains.  This is a misplaced metaphor.  In short, the ruling that the Debtors seek would leave the Acthar claims, if viable, as part of the "chaff"—because even if the Acthar claims have merit, only two Debtor entities that hold little value would be left liable on such claims.

[7] Pleadings include (i) the *Opposition of Attestor Limited and Humana Inc. to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims* [D.I. 2512] (the "Initial Attestor/Humana Opposition"), (ii) the *Acthar Insurance Claimants' Revised and Supplemental Opposition to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims and Acthar Insurance Claimants' Motion for Substantive Consolidation* [D.I. 2924] (the "Revised Attestor/Humana Opposition" and together with the Initial Attestor/Humana Opposition, the "Attestor/Humana Oppositions", and the claimants identified therein, "Acthar Insurance Claimants"), (iii) *The Acthar Plaintiffs' Motion to Dismiss* [D.I. 2529] (the "Ad Hoc Acthar Motion to Dismiss") and (iv) the *Response of the Ad Hoc Acthar Group to Debtors' First Omnibus Objection to "Unsubstantiated" Claims (Substantive)* [D.I. 2947] (the "Ad Hoc Acthar Response" and the claimants identified therein, "Ad Hoc Acthar Group."

in the Debtors' Acthar operations.  Limiting such claims to these entities will prevent the Acthar claims, if viable, from recovering value from the entity that holds the valuable Acthar intellectual property, entities involved in the sale of Acthar, and/or entities that control or direct the anticompetitive behavior placed at issue by the Private Acthar Claimants.

4.      Although the Debtors state that "[t]he Private Acthar Claimants must live with the consequences of their ongoing choice not to allege any facts in their proofs of claim as against the Non-Defendant Debtors," Debtors' Reply, ¶ 2, the underlying complaints referenced in the relative responsive pleadings and proofs of claim discuss operations that *do* implicate these additional entities through the actions alleged.  Debtors also fail to engage with the liberal standard for amendments under Rule 15 of the Federal Rules of Civil Procedure that, but for the automatic stay, would allow for amendments of the pleadings in these cases to conform to the proofs of claim.

5.      Proofs of claim filed by members of the Ad Hoc Acthar Group, regardless of the merits of the underlying claims, implicate entities besides ARD and plc, including those that hold the Acthar intellectual property and that directed the alleged anticompetitive behaviors.  The decision that upheld certain portions of the operative Rockford complaint indicate this.  *Ad Hoc Acthar Response*; *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 751 (N.D. Ill. 2019), *reconsideration denied*, No. 17 C 50107, 2019 WL 2763181 (N.D. Ill. May 3, 2019). Humana, Inc., an Acthar Insurance Claimant, similarly alleges the Debtors increased the price of Acthar to an artificially inflated, supra-competitive level through its monopoly of the Acthar intellectual property.  Second Amended Complaint ¶¶ 7-8, 47, 53-69, *Humana Inc. v. Mallinckrodt ARD LLC,* No. 2:19-cv-06926 (C.D. Cal. Apr. 24, 2020) (attached as Ex. A to the *Notice of Filing*

*of Proposed Redacted Version of the Opposition of Attestor Limited and Humana Inc. to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims* [D.I. 2577]).

6.      In their pleadings, the Debtors have not rebutted the evidence put forward by the Private Acthar Claimants that liabilities sit at entities besides plc and ARD, if such liabilities exist. Multiple entities on the Specialty Brands side of the Debtors' business are involved with the production and sale of Acthar, including in holding relevant intellectual property. *See Deposition of Stephen A. Welch*, June 11, 2021 (transcript attached as Ex. Z to the Debtors' Reply) (describing Acthar operations).

7.      At this time, the UCC takes no position as to whether the Acthar claims sit at each entity identified within the responsive pleadings filed by the Private Acthar Claimants or the issue of substantive consolidation, and reserves its final decision until all evidence is put before the Court.

**RESERVATION OF RIGHTS**

8.      The UCC reserves all rights to articulate a final position upon hearing all evidence and argument at the July 23, 2021 hearing, including a position on which entities the Acthar liabilities sit.  On the issue of substantive consolidation, the UCC reserves all rights for consideration of the issue in connection with confirmation of the Debtors' plan.

**A-6187**

Dated:  July 21, 2021
      Wilmington, Delaware

                      */s/ Jamie L. Edmonson*
                      Natalie D. Ramsey (No. 5378)
                      Jamie L. Edmonson (No. 4247)
                      James F. Lathrop (No. 6492)
                      **ROBINSON & COLE LLP**
                      1201 N. Market Street, Suite 1406
                      Wilmington, DE 19801
                      Tel: (302) 295-4800
                      Fax: (302) 351-8618
                      Email:  jedmonson@rc.com

                      -and-

                      Patrick M. Birney (admitted *pro hac vice*)
                      John L. Cordani (admitted *pro hac vice*)
                      **ROBINSON & COLE LLP**
                      280 Trumbull Street
                      Hartford, CT  06103
                      Tel:  (800) 826-3579
                      Fax:  (860) 275-8299

                      -and-

                      Cullen D. Speckhart (admitted *pro hac vice*)
                      **COOLEY LLP**
                      1299 Pennsylvania Avenue, NW
                      Washington, DC 20004
                      Tel: (202) 842-7800
                      Fax: (202) 842-7899
                      Email: cspeckhart@cooley.com
                      -and-

                      Cathy Hershcopf (admitted *pro hac vice*)
                      Michael Klein (admitted *pro hac vice*)
                      **COOLEY LLP**
                      55 Hudson Yards
                      New York, NY 10001
                      Tel: (212) 479-6000
                      Fax: (212) 479-6275

                      *Counsel for the Official Committee of Unsecured*
                      *Creditors of Mallinckrodt plc, et al.*

## CERTIFICATE OF SERVICE

I, Jamie L. Edmonson, hereby certify that a true and correct copy of the ***Statement of the***

***Official Committee of Unsecured Creditors in Connection with the Debtors' First Omnibus***

***Objection to Unsubstantiated Claims (Substantive)*** was filed electronically on July 21, 2021, with

the United States Bankruptcy Court and served on the attached 2002 Service List via Email

Notification and First Class mail.

*/s/ Jamie L. Edmonson*
Jamie L. Edmonson (No. 4247)

**A-6189**

Mallinckrodt plc Service List
(All Parties Served Via Email Notification unless listed otherwise)

Stephanie D. Miller
Mallinckrodt PLC
675 McDonnell Blvd.
Hazelwood, Missouri 63042
coroporate.secretary@mnk.com

George A. Da**vis**
George Klidonas
Andrew Sorkin
Anupama Yerramalli
Latham & Walkins LLP
1271 Avenue of the Americas
New York, NY  10020
george.davis@lw.com
george.klidonas@lw.com

Jeffery Bjork
Latham & Walkins LLP
355 South Grand Avenue
Suite 100
Los Angeles, CA  90071
Jeff.bjork@lw.com

Mark D. Collins
Michael J. Merchant
Richards, Layton & Finger, P.A.
Once Rodney Square
920 North King Street
Wilmington, DE 19801
collins@rlf.com
merchant@rlf.com


James L. Bromley
Benjamin S. Beller
Thiago Nascimento dos Reis
Sullivan & Cromwell LLP
125 Broad Street
New York, NY10004-2498
bromleyj@sullcrom.com
bellerb@sullcrom.com
nascimentot@sullcrom.com
Christopher M. Samis

Aaron H. Stulman
D. Ryan Slaugh
Potter Anderson & Corroon LLP
1313 N. Market Street, 6th Floor
Wilmington, DE 19801
csamis@potteranderson.com
astulman@potteranderson.com
rslaugh@potteranderson.com

Rachel R. Obaldo
Jason B. Binford
Assistant Attorneys General
Office of the Attorney General of Texas
Bankruptcy & Collections Division
P. O. Box 12548- MC 008
Austin, TX 78711-2548
rachel.obaldo@oag.texas.gov
jason.binford@oag.texas.gov

Scott J. Greenberg
Michael J. Cohen
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
sgreenberg@gibsondunn.com
mcohen@gibsondunn.com

Oscar Garza
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 93612-4412
ogarza@gibsondunn.com
David M. Fournier
Kenneth A. Listwak
Troutman Pepper Hamilton Sanders LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19801
david.fournier@troutman.com
ken.listwak@troutman.com

A-6190

James O. Johnston
Bruce Bennett
Joshua M. Mester
Jones Day
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
jjohnston@jonesday.com
bbennett@jonesday.com
jmester@jonesday.com
Scott D. Cousins
Cousins Law LLC
Brandywine Plaza West
1521 West Concord Pike, Suite 301
Wilmington, DE 19803
scott.cousins@cousins-law.com

Ashley Keller
Seth Meyer
Keller Lenkner LLC
150 North Riverside Plaza, Suite 4270
Chicago, IL 60606
ack@kellerlenkner.com
sam@kellerlenkner.com

J. Michael Connolly
Consovoy Mccarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22201
mike@consovoymccarthy.com

James D. Young
Morgan & Morgan, P.A.
Complex Litigation Unit
76 South Laura Street, Suite 1100
Jacksonville, FL 32202
jyoung@forthepeople.com

Juan R. Martinez
Morgan & Morgan, P.A.
Complex Litigation Unit
201 North Franklin Street, 7th Floor
Tampa, FL 33602
juanmartinez@forthepeople.com

Nicholas F. Kajon
Constantine D. Pourakis
Stevens & Lee, P.C.
485 Madison Avenue, 20th Floor
New York, NY 10022
nfk@stevenslee.com
cp@stevenslee.com

Joseph H. Huston, Jr.
David W. Giattino
Stevens & Lee, P.C.
919 North Market Street, Suite 1300
Wilmington, DE 19801
jhh@stevenslee.com
dwg@stevenslee.com

Jeffrey K. Garfinkle
Buchalter, a Professional Corporation
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
jgarfinkle@buchalter.com

Jeffrey R. Waxman
Brya M. Keilson
Sarah Ennis
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
jwaxman@morrisjames.com
bkeilson@morrisjames.com
sennis@morrisjames.com

Kenneth H. Eckstein
Daniel M. Eggermann
Megan M. Wasson
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
keckstein@kramerlevin.com
deggermann@kramerlevin.com
mwasson@kramerlevin.com

Scott D. Gilbert
Kami E. Quinn
Emily P. Grim
Gilbert LLP
700 Pennsylvania Avenue, SE, Suite 400
Washington, DC 20003
gilberts@gilbertlegal.com
quinnk@gilbertlegal.com
grime@gilbertlegal.com

David J. Molton
Gerard T. Cicero
Brown Rudnick LLP
7 Times Square
New York, NY 10036
dmolton@brownrudnick.com
gcicero@brownrudnick.com

Steven D. Pohl
Brown Rudnick LLP
One Financial Center
Boston, MA 02111
spohl@brownrudnick.com

Eric R. Goodman
Brown Rudnick LLP
601 Thirteenth Street NW, Suite 600
Washington, DC 20005
egoodman@brownrudnick.com

William P. Bowden
Michael DeBaecke
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
wbowden@ashbygeddes.com
mdebaecke@ashbygeddes.com

Seth H. Lieberman
Patrick Sibley
Matthew W. Silverman
Sameer M. Alifarag
Pryor Cashman LLP
7 Times Square
New York, NY 10036
slieberman@pryorcashman.com
psibley@pryorcashman.com
msilverman@pryorcashman.com
salifarag@pryorcashman.com

Andrew N. Rosenberg
Alice Belisle Eaton
Claudia R. Tobler
Neal Paul Donnelly
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
arosenberg@paulweiss.com
aeaton@paulweiss.com
ctobler@paulweiss.com
ndonnelly@paulweiss.com

Richard S. Cobb
Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, DE 19801
cobb@lrclaw.com

David M. Klauder
Bielli & Klauder, LLC
1204 N. King Street
Wilmington, DE 19801
dklauder@bk-legal.com

Scott R. Bickford
Martell, Bickford & Centola
338 Lafayette Street
New Orleans, LA 70130
sbickford@mbfirm.com

A-6192

Donald Creadore
The Creadore Law Firm, P.C.
450 Seventh Avenue - 1408
New York, NY 10123
donald@creadorelawfirm.com

Celeste Brustowicz
Barry J. Cooper
Stephen H. Wussow
10, LLC
1525 Religious Street
New Orleans, LA 70130
cbrustowicz@sch-llc.com

Kevin W. Thompson
David R. Barney, Jr.
Thompson Barney Law Firm
2030 Kanawha Boulevard, East
Charleston, WV 25311
kwthompsonwv@gmail.com

Mary A. Schmergel
Senior Trial Counsel
U.S. Department of Justice
Civil Division
1100 L Street, NW, Room 7110
Washington DC, 20005
mary.schmergel@usdoj.gov

R. Karl Hill
James S. Green, Jr.
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19801
khill@svglaw.com
jsgreen@svglaw.com

Kevin C. Maclay
Todd E. Phillips
Ann W. Langley
George M. O'Connor
Caplin & Drysdale, Chartered
One Thoms Circle, NW, Suite 1100
Washington, D.C. 20005
kmaclay@capdale.com
tphillips@capdale.com
alangley@capdale.com
goconnor@capdale.com

Scott Greissman
Andrew T. Zatz
Michele J. Meises
Sam Lawand
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
sgreissman@whitecase.com
azatz@whitecase.com
michele.meises@whitecase.com
sam.lawand@whitecase.com

Clay B. Roberts
White & Case LLP
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131-2352
clay.roberts@whitecase.com

Jeffrey M. Schlerf
Fox Rothschild LLP
919 North Market Street, Suite 300
Wilmington, DE 19801
jschlerf@foxrothschild.com

Melissa L. Van Eck
Senior Deputy Attorney General
Office of the Attorney General of
Pennsylvania
Financial Enforcement Section
Strawberry Square, 15th Floor
Harrisburg, PA 17112
mvaneck@attorneygeneral.gov

Paul J. Napoli
Hunter J. Shkolnik
Shayna E. Sacks
Salvatore C. Badala
Joseph Ciaccio
Napoli Shkolnik PLLC
360 Lexington Avenue, Eleventh Floor
New York, NY 10017
pnapoli@nsprlaw.com
hunter@napolilaw.com
ssacks@napolilaw.com
sbadala@napolilaw.com
jciaccio@napolilaw.com

A-6193

Amanda K. Quick
Deputy Attorney General
Office of the Attorney General of Indiana
302 W. Washington St., IGCS-5th Floor
Indianapolis, IN 46204
amanda.quick@atg.in.gov

Heather M. Crockett
Deputy Attorney General
Office of the Attorney General of Indiana
302 W. Washington St., IGCS-5th Floor
Indianapolis, IN 46204
heather.crockett@atg.in.gov

Karen C. Bifferato
Kelly M. Conlan
Connolly Gallagher LLP
1201 N. Market Street, 20th Floor
Wilmington, DE 19801
kbifferato@connollygallagher.com
kconlan@connollygallagher.com

Raymond L. Fink
Lippes Mathias Wexler Friedman LLP
50 Fountain Plaza, Suite 1700
Buffalo, NY 14202-2216
rfink@lippes.com

Domenic E. Pacitti
Klehr Harrison Harvey Branzburg LLP
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
dpacitti@klehr.com

Morton R. Branzburg
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103
mbranzburg@klehr.com

Anne Andrews
Sean T. Higgins
Andrews & Thornton
4701 Von Karman Avenue, Suite 300
Newport Beach, CA 92660
aa@andrewsthornton.com
shiggins@andrewsthornton.com

John R. Ashmead
Robert J. Gayda
Catherine V. LoTempio
Seward & Kissel LLP
One Battery Park Plaza
New York, NY 10004
ashmead@sewkis.com
gayda@sewkis.com
lotempio@sewkis.com

Julie J. Becker
Ian R. Bell
U.S. Bank National Association
Global Corporate Trust Services
60 Livingston Avenue
EP-MN-WS1D
St. Paul, MN 55107
julie.becker@usbank.com
ian.bell@usbank.com

Stanley B. Tarr
Victoria A. Guilfoyle
Blank Rome LLP
1201 N. Market Street, Suite 800
Wilmington, DE  19801
tarr@blankrome.com
guilfoyle@blankrome.com

Sommer L. Ross
Duane Morris LLP
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801
slross@duanemorris.com

Daniel K. Astin
Ciardi Ciardi & Astin
1204 N. King Street
Wilmington, DE 19801
dastin@ciardilaw.com

Albert A. Ciardi, III
Walter W. Gouldsbury III
Ciardi Ciardi & Astin
1905 Spruce Street
Philadelphia, PA 19103
aciardi@ciardilaw.com
wgouldsbury@ciardilaw.com

A-6194

Donald E. Haviland, Jr.
William Platt II
Haviland Hughes
201 S. Maple Avenue, Suite 110
Ambler, PA 19002
haviland@havilandhughes.com
platt@havilandhughes.com

Tennessee Attorney General's Office
Attn.: Laura L. McCloud, Bankruptcy
Division
P.O. Box 20207
Nashville, TN 37202-0207
agbankdelaware@ag.tn.gov

Don Stecker
Linebarger Goggan Blair & Sampson, LLP
112 E. Pecan Street, Suite 2200
San Antonio, TX 78205
sanantonio.bankruptcy@publicans.com

Elizabeth Weller
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Freeway, Suite 1000
Dallas, TX 75207
dallas.bankruptcy@publicans.com

Megan N. Harper
Deputy City Solicitor
City of Philadelphia Law Department
Municipal Services Building
1401 JFK Boulevard, 5th Floor
Philadelphia, PA 19102-1595
megan.harper@phila.gov

Deb Secrest
Commonwealth of Pennsylvania
Department of Labor and Industry
Collections Support Unit
651 Boas Street, Room 925
Harrisburg, PA 17121
ra-il-ucts-bankrupt@state.pa.us

Michael Lyle
Eric C. Lyttle
Meghan A. McCaffrey
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900

Washington, D.C. 20005
mikelyle@quinnemanuel.com
ericlyttle@quinnemanuel.com
meghanmccaffrey@quinnemanuel.com

K. John Shaffer
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
johnshaffer@quinnemanuel.com

John M. Seaman
Christopher F. Cannataro
Kevin G. Abrams
Eric A. Veres
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807
seaman@abramsbayliss.com
cannataro@abramsbayliss.com
abrams2abramsbayliss.com
veres@abramsbayliss.com

John P. Dillman
Linebarger Goggan Blair & Sampson, LLP
P.O. Box 3064
Houston, TX 77253-3064
houston_bankruptcy@publicans.com

Paul M. Lopez
Larry R. Boyd
Emily M. Hahn
Abernathy, Roeder, Boyd & Hullett, P.C.
1700 Redbud Blvd, Suite 300
McKinney, TX 75069
plopez@abernathy-law.com
bankruptcy@abernathy-law.com
ehahn@abernathy-law.com

Tara LeDay
McCreary, Veselka, Bragg & Allen, P.C.
P.O. Box 1269
Round Rock, TX 78680
tleday@mvbalaw.com

Joseph N. Argentina, Jr.
Faegre Drinker Biddle & Reath LLP
222 Delaware Avenue, Suite 1410

A-6195

Case 20-12522-JTD    Doc 3316-1    Filed 07/21/21    Page 8 of 17

Wilmington, DE 19801
joseph.argentina@faegredrinker.com

Lauren A. Michaels
Deputy Attorney General
Office of the Attorney General of
Pennsylvania
Financial Enforcement Section
1251 Waterfront Place
Pittsburgh, PA 15222
lmichaels@attorneygeneral.gov

Debra I. Grassgreen
James E. O'Neill
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801
dgrassgreen@pszjlaw.com
joneill@pszjlaw.com

Lawrence M. Rolnick
Michael J. Hampson
Rolnick Kramer Sadighi LLP
1251 Avenue of the Americas
New York, NY 10020
lrolnick@rksllp.com
mhampson@rksllp.com

Jason A. Gibson
The Rosner Law Group LLC
824 N. Market Street, Suite 810
Wilmington, DE 19801
gibson@teamrosner.com

Reed Heiligman
Hiltz Zanzig & Heiligman LLC
53 West Jackson Blvd., Suite 701
Chicago, IL 60604
reed@hzhlaw.com

Diane W. Sanders
Linebarger Goggan Blair & Sampson, LLP
P.O. Box 17428
Austin, TX 78760-7428
austin.bankruptcy@publicans.com

Jason L. Swartley
Chief Deputy Attorney General
Office of the Attorney General of
Pennsylvania
Financial Enforcement Section
Strawberry Square, 15th Floor
Harrisburg, PA 17112
jswartley@attorneygeneral.gov

Justin R. Alberto
Seth Van Aalten
Sarah A. Carnes
Andrew J. Roth-Moore
Cole Schotz P.C.
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
jalberto@coleschotz.com
svanaalten@coleschotz.com
scarnes@coleschotz.com
aroth-moore@coleschotz.com

Arik Preis
Mitchell P. Hurley
Sara L. Brauner
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036-6745
apreis@akingump.com
mhurley@akingump.com
sbrauner@akingump.com
Edward E. Neiger
Jennifer A. Christian
ASK LLP
151 W. 46th Street, 4th Floor
New York, NY 10036
eneiger@askllp.com
jchristian@askllp.com

Anthony M. Saccullo
Mary E. Augustine
A.M. Saccullo Legal, LLC
27 Crimson King Drive
Bear, DE 19701
ams@saccullolegal.com
meg@saccullolegal.com

A-6197

William P. Weintraub
Michael H. Goldstein
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
wweintraub@goodwinlaw.com
mgoldstein@goodwinlaw.com

Cathy Hershcopf
Michael Klein
Lauren A. Reichardt
Cooley LLP
55 Hudson Yards
New York, NY 10001
chershcopf@cooley.com
mklein@cooley.com
lreichardt@cooley.com

Cullen D. Speckhart
Cooley LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
cspeckhart@cooley.com

Eboney Cobb
Perdue, Brandon, Fielder,
Collins & Mott, L.L.P.
500 E. Border Street, Suite 640
Arlington, TX 76010
ecobb@pbfcm.com

Michael S. Etkin
Andrew Behlmann
Colleen Maker
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
metkin@lowenstein.com
abehlmann@lowenstein.com
cmaker@lowenstein.com

Jeffrey W. Golan
Jeffrey B. Gittleman
Barrack, Rodos & Bacine
2001 Market Street, Suite 3300
Philadelphia, PA 19103
jgolan@barrack.com
jgittleman@barrack.com

Gillian Feiner
Senior Enforcement Counsel
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
gillian.feiner@mass.gov

Laura J. Monroe
Perdue, Brandon, Fielder,
Collins & Mott, L.L.P.
P.O. Box 817
Lubbock, TX 79408
lmbkr@pbfcm.com

Christine R. Etheridge
Bankruptcy Administration
Wells Fargo Vendor Financial Services,
LLC
f/k/a GE Capital Information Technology
Solutions c/o A Ricoh USA Program f/d/b/a
IKON Financial Services
P.O. Box 13708
Macon, GA 31208-3708
christine.etheridge@leasingconnection.com

Shawn M. Christianson
Buchalter, a Professional Corporation
55 Second Street, 17th Floor
San Francisco, CA 94105-3493
schristianson@buchalter.com

Wichita County
c/o Mollie Lerew
Perdue, Brandon, Fielder,
Collins & Mott, L.L.P.
P.O. Box 8188
Wichita Falls, TX 76307
mlerew@pbfcm.com

A-6198

Deborah M. Perry
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, TX 75201-6659
dperry@munsch.com

Daniel M. Eliades
David S. Catuogno
Travis Powers
K&L Gates LLP
One Newark Center, Tenth Floor
1085 Raymond Boulevard
Newark, NJ 07102
daniel.eliades@klgates.com
david.catuogno@klgates.com
travis.powers@klgates.com

Howard S. Beltzer
James A. Copeland
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019-6022
howard.beltzer@nortonrosefulbright.com
james.copeland@nortonrosefulbright.com

Christopher P. Simon
Cross & Simon, LLC
1105 North Market Street, Suite 901
Wilmington, DE 19801
csimon@crosslaw.com
City of Seattle
c/o Ben Harrington
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
benh@hbsslaw.com

David M. Capriotti
Wendy A. Kinsella
Harris Beach PLLC
333 West Washington Street, Suite 200
Syracuse, NY 13202
dcapriotti@harrisbeach.com
wkinsella@harrisbeach.com

John D. McLaughlin, Jr.
Ferry Joseph, P.A,
824 North Market Street, Suite 1000
Wilmington, DE 19801
jmclaughlin@ferryjoseph.com

Bruce Buechler
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
bbuechler@lowenstein.com

Brendan Sullivan
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
500 Delaware Avenue, Suite 200
Wilmington, DE 19801
bsullivan@paulweiss.com

Daniel J. Kramer
David W. Brown
William A. Clareman
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
1285 Avenue of the Americas
New York, NY 10019
dkramer@paulweiss.com
dbrown@paulweiss.com
wclareman@paulweiss.com

Francois M. Blaudeau,
Southern Institute for Medical
and Legal Affairs, LLC
2224 1st Avenue North
Birmingham, AL 35203
francois@southernmedlaw.com

Ronald S. Gellert
Gellert Scali Busenkell & Brown,LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
rgellert@gsbblaw.com

Ari Y. Basser
Jordan L. Lurie
Pomerantz LLP
1100 Glendon Avenue
Los Angeles, CA 90024
abasser@pomlaw.com
jllurie@pomlaw.com

Thomas E. Panowicz
Assistant City Attorney
City of South Bend
Department of Law
227 W. Jefferson Blvd., Suite 1200S
South Bend, IN 46601
tpanowic@southbendin.gov
bankruptcy@southbendin.gov

Michael J. Joyce
The Law Offices of Joyce, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
mjoyce@mjlawoffices.com

Laurence May
Eiseman Levine Lehrhaupt & Kakoyiannis
P.C.
805 Third Avenue
New York, New York 10022
lmay@eisemanlevine.com

Michael Capeci
David Rosenfeld
Robbins Geller Rudman & Dowd, LLP
58 South Service Rd., Suite 200
Melville, NY 11747
mcapeci@rgrdlaw.com
drosenfeld@rgrdlaw.com

Lawrence S. Robbins
Michael L. Waldman
Donald Burke
Jason A. Shaffer
Robbins, Russell, Englert, Orseck,
Untereiner & Sauber LLP
2000 K Street, N.W., 4th Floor
Washington, D.C. 20006
lrobbins@robbinsrussell.com
mwaldman@robbinsrussell.com

dburke@robbinsrussell.com
jshaffer@robbinsrussell.com

William D. Sullivan
William A. Hazeltine
Sullivan Hazeltine Allinson LLC
919 North Market Street, Suite 420
Wilmington, DE 19801
bsullivan@sha-llc.com
whazeltine@sha-llc.com

Jared Q. Libet
Rebecca M. Hartner
Assistant Deputy Attorney General
Office of the South Carolina Attorney
General
P. O. Box 11549
Columbia, SC 29211-1549
jlibet@scag.gov
rhartner@scag.gov

Missouri Department of Revenue
Bankruptcy Unit
Attn: Steven A. Ginther
P.O. Box 475
Jefferson City, MO 65105-0475
deecf@dor.mo.gov
Robert Padjen
Office of the Colorado Attorney General
1300 Broadway, 8th Floor
Denver, CO 80203
robert.padjen@coag.gov

Lawrence P. Eagel
Bragar Eagel & Squire, P.C.
810 Seventh Avenue, Suite 620
New York, NY 10019
eagel@bespc.com

Brent B. Barriere
Tristan Manthey
Fishman Haygood, L.L.P.
201 St. Charles Avenue, Suite 4600
New Orleans, LA 70170-4600
tmanthey@fishmanhaygood.com
bbarriere@fishmanhaygood.com

Alan E. Gamza
Kent C. Kolbig
Moses & Singer LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
agamza@mosessinger.com
kkolbig@mosessinger.com

Evan T. Miller
Erin R. Fay
Bayard, P.A.
600 N. King Street, Suite 400
Wilmington, DE 19801
emiller@bayardlaw.com
efay@bayardlaw.com

Bradley R. Aronstam
Anne M. Steadman
Ross Aronstam & Moritz LLP
100 S. West Street, Suite 400
Wilmington, DE 19801
baronstam@ramllp.com
asteadman@ramllp.com

David H. Kistenbroker
Joni S. Jacobsen
Melanie MacKay
Dechert LLP
35 West Wacker Drive, Suite 3400
Chicago, IL 60601
david.kistenbroker@dechert.com
joni.jacobsen@dechert.com
melanie.mackay@dechert.com

Cyrus Mehri
Steve Skalet
Joshua Karsh
Aisha Rich
Mehri & Skalet, PLLC
1250 Connecticut Ave., NW
Washington, D.C. 20036
cmehri@findjustice.com
sskalet@findjustice.com
jkarash@findjustice.com
arich@findjustice.com

Matthew J. Piers
Charles D. Wysong
Emily R. Brown
Margaret truesdale
Hughes Socol Piers Resnick & Dym, Ltd.
70 W. Madison Street
Suite 4000
Chicago, IL 60602
mpiers@hsplegal.com
cwysong@hsplegal.com
ebrown@hsplegal.com
mtruesdale@hsplegal.com

Kate Roggio Buck
Shannon D. Humiston
McCarter & English, LLP
405 N. King Street, 8th Fl.
Wilmington, DE 19801
kbuck@mccarter.com
shumiston@mccarter.com

Frank F. McGinn
Hackett Feinberg P.C.
155 Federal Street, 9th Floor
Boston, MA 02110
ffm@bostonbusinesslaw.com

Gordon J. Toering
Warner Norccross + Judd LLP
1500 Warner Building
150 Ottawa Avenue, NW
Grand Rapids, MI 49503
gtoering@wnj.com

Donald K. Ludman
Brown & Connery, LLP
6 North Broad Street, Suite 100
Woodbury, NJ 08096
dludman@brownconnery.com

Michelle E. Shriro
Singer & Levick, PC
16200 Addison Road, Suite 140
Addison, TX 75001
mshiriro@singerlevick.com

R. Grant Dick IV
Cooch and Taylor, P.A.
The Nemours Building
1007 N. Orange St., Suite 1120
Wilmington, DE  19801
gdick@coochtaylor.com

Lillian Stenfeldt
Rimon, P.C.
One Embarcadero Center
Suite 400
San Francisco, CA  94111
lillian.stenfeldt@rimonlaw.com

Jacquelyn H. Choi
Rimon, P.C.
2029 Century Park East
Suite 400N
Los Angeles, CA  90067
Jacquelyn.choi@rimonlaw.com

Jason S. Greenwood
US Dept. of Justice
PO Box 875, Ben Franklin Station
Washington, D.C. 20044
Jason.s.greenwood@usdoj.gov

Scott A. Zuber
Terri Jane Freedman
Chiesa Shahinian & Giantomasi PC
One Boland Drive
West Orange, NJ  17052
szuber@csglaw.com
tfreedman@csglaw.com

Michael W. Teichman
Elio Battista, Jr.
Parkowski, Guerke & Swayze, P.A.
1105 N. Market St., 19th Fl.
Wilmington, DE  19801
mteichman@pgslegal.com
ebattista@pgslegal.com

Gregory W. Hauswirth
Leech Tishman Fuscaldo & Lampl, LLC
1007 N. Orange Street, 4th Fl.
Wilmington, DE  19801
ghausirth@leechtishman.com

Heather S. Heidelaugh
John M. Steiner
Leech Tishman Fuscaldo & Lampl, LLC
525 William Penn Place, 28th Fl.
Pittsburgh, PA  15219
hheidelbaugh@leechtishman.com
jsteiner@leechtishman.com

Christopher R. Belmonte
Pamela A. Bosswick
Duane Morris LLP
230 Park Avenue, Suite 1130
New York, NY  10169
crbelmonte@duanemorris.com
pabosswick@duanemorris.com

Carol E. Momjian
Denise A. Kuhn
Commonwealth of Pennsylvania
Department of Human Services
Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA  19103
cmomjian@attorneygeneral.gov
dkuhn@attorneygeneral.gov

Matthew A. Feldman
Joseph G. Minias
Matthew Freimuth
Richard Choi
Philip F. DiSanto
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY  10019
mfeldman@willkie.com
jminias@willkie.com
rchoi1@willkie.com
pdisanto@willkie.com

Donna L. Culver
Robert J. Dehney
Matthew B. Harvey
Nader A. Amer
Morris Nichols Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE  19899-1347
dculver@morrisnichols.com
rdehney@morrisnichols.com
mharvey@morrisnichols.com
namer@morrisnichols.com

Philip J. Gross
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ  07068
pgross@lowenstein.com

Jason B. Gottfox
Latham & Watkins SSP
330 North Wabash Avenue
Suite 2800
Chicago, IL  60611
Jason.gott@lw.com

James L. Patton, Jr.
Robert S. Brady
Edwin J. Harron
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE  19801
jpatton@ycst.com
eharron@ycst.com
Office of the United States Trustee
Attn: Jane M. Leamy
844 King Street Suite 2207
Lockbox 35
Wilmington, DE 19801

Julia B. Klein
KLEIN LLC
225 West 14th Street, Suite 100
Wilmington, DE  19801
klein@kleinllc.com

Maria Aprile Sawczuk, Esq.
Goldstein & McClintock, LLP
501 Silverside Road, Suite 65
Wilmington, DE 19809
marias@goldmclaw.com

David Christian, Esq.
David Christian Attorneys LLC
105 W. Madison Street, Suite 1400
Chicago, IL 60602
dchristian@dca.law

Keith Moskowitz, Esq.
Dentons US LLP
233 S. Wacker Dr., Suite 5900
Chicago, IL 60606-6361
keith.moskowitz@dentons.com

Jennifer R. Hoover
John C. Gentile
Benesch, Friedlander, Coplan & Aronoff
LLP
1313 N. Market Street, Suite 1201
Wilmington, DE  19801
jhoover@beneschlaw.com
jgentile@beneschlaw.com

Sean E. O'Donnell
Christopher W. Carty
Kristina M. Wesch
Rachel H. Ginzburg
Herrick, Feinstein LLP
2 Park Avenue
New York, NY  10016
sodonnell@herrick.com
ccarty@herrick.com
kwesch@herrick.com
rginzburg@herrick.com

Benjamin E. Waldin
Scott C. Solberg
James w. Joseph
Sarah H. Catalano
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL  60604
bwaldin@eimerstahl.com

A-6203

ssolberg@eimerstahl.com
jjoseph@eimerstahl.com
scatalano@eimerstahl.com

John Mark Stern
Bankruptcy & Collections Division MC008
P.O. Box 12548
Austin, TX 78711-2548
Bk-jstern@oag.texas.gov

Dianne F. Coffino
R. Alexander Clark
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018-1405
dcoffino@cov.com
aclark@cov.com

Frederick B. Rosner
Zhao (Ruby) Liu
The Rosner Law Group LLC
824 N. Market Street, Suite 810
Wilmington, DE  19801
rosner@teamrosner.com
liu@teamrosner.com

Andrew I. Silfen
Beth M. Bownstein
Arent Fox LLP
1301 Avenue of the Americas, Fl. 42
New York, NY  10019
andrew.silfen@arentfox.com
beth.brownstein@arentfox.com

Jackson D. Toof
Arent Fox LLP
1717 K Street, NW
Washington, DC  20006
jackson.toof@arentfox.com

Karen M. Grivner
Clark Hill Plc
824 N. Market St., Suite 710
Wilmington, DE  19801
kgrivner@clarkhill.com

Jacob R. Kirkham
Kobre & Kim LLP
600 North King Street, Suite 501
Wilmington, DE  19801
Jacob.kirkham@kobrekim.com

Daniel J. Saval
Kobre & Kim LLP
800 Third Avenue
New York, NY  10022
Daniel.saval@kobrekim.com

**(VIA FIRST CLASS MAIL)**

Attorneys for Darin Zabor
Andrews & Thorton
Anne Andrew,
Sean T. Higgins
4701 Von Karman Avenue
Suite 300
Newport, Beach, CA  92660

Norman Welch
c/o John H. Harman
11 North Washington St, Suite 520
Rockville, MD 20850

Delaware Division of Revenue
Attn: Christina Rojas Bankruptcy
Administrator
820 N. French Street, 8th Floor
Wilmington, DE  19801

Delaware State Dept. of the Treasury
Attn: Officer Managing Agent or General
Agent
820 Silver Lake Boulevard
Suite 100
Dover, DE  19904

Hiller Law, LLC
Attn: Adam Hiller
1500 North French Street
Wilmington, E 1

Mallinckrodt PLC
Attn: General Counsel

**A-6204**

675 Mcdonnell Blvd.
Hazelwood, MO 63042

State Attorney General
National Association of Attorneys
General
Karen Dordry
1850 M St., NW 12th Floor
Washington, DC 20036

Office of the United States Trustee
Attn: Jane M. Leamy
844 King Street Suite 2207
Lockbox 35
Wilmington, DE 19801

Prime Clerk LLC
Herb Baer
Selwyn Perry
60 E. 42nd Street
Suite 1440
New York, NY  10165

Paul Navied
1230 Rosecrans Avenue
Suite 405
Manhattan Beach, CA 90266
Securities and Exchange Commission
NY Office
Legal Department
Brookfield Place
200 Vesey Street, Suite 400
New York, NY  10281-1022

Gay D. Pelzer, Deputy General Counsel
The University of Iowa
Office of General Counsel
120 Jessup Hall
5 W. Jefferson Street
Iowa City, IA  52242-1316

Stephen K. Dexter
Lathrop GPM LLP
1515 Wynkoop Street
Suite 600
Denver, CO  80202

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MALLINCKRODT PLC, *et al.*, | ) | Case No. 20-12522 (JTD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**NOTICE OF AGENDA FOR VIDEO HEARING**
**SCHEDULED FOR JULY 23, 2021 AT 10:00 A.M. (PREVAILING**
**EASTERN TIME), BEFORE THE HONORABLE JOHN T. DORSEY, AT THE**
**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**[2]

> **THE REMOTE HEARING WILL BE CONDUCTED ENTIRELY BY ZOOM**
> **AND REQUIRES ALL PARTICIPANTS TO REGISTER IN ADVANCE.**
> **COURTCALL WILL NOT BE USED TO DIAL IN.**
>
> **PLEASE USE THE FOLLOWING LINK TO REGISTER FOR THE HEARING:**
> https://debuscourts.zoomgov.com/meeting/register/vJIscO6hqjguGdSJYEnm-VrIuor4ZzZ5wM0
>
> **ONCE REGISTERED, PARTIES WILL RECEIVE A CONFIRMATION EMAIL**
> **CONTAINING PERSONAL LOG-IN INFORMATION FOR THE HEARING.**

## I. UNSUBSTANTIATED CLAIMS OBJECTION:

1.  Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive) [Docket No. 2165 – filed April 30, 2021]

    Objection/Response Deadline:    May 14, 2021 at 4:00 p.m. (ET)

    Objections/Responses Received:

    A.    Informal response received from St. Joseph Health Service Health and Welfare Plan (Claim No. 39161)

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The debtors' mailing address is 675 McDonnell Blvd., St. Louis, Missouri 63042.

[2]    All motions and other pleadings referenced herein are available online at the following address: http://restructuring.primeclerk.com/Mallinckrodt.

B.   Iowa Department of Human Services' Response to Debtors' First Omnibus Objection to Unsubstantiated Claims [Docket No. 2305 – filed May 14, 2021]

C.   Response to Debtors' First Omnibus Objection to Unsubstantiated and Duplicative Claims (Substantive) [Docket No. 2330 – filed May 17, 2021]

D.   Omnibus Objection to Claims Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive) [Docket No. 2426 – filed May 19, 2021]

E.   [SEALED] Opposition of Attestor Limited and Humana Inc. to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims [Docket No. 2512 – filed May 21, 2021]

F.   The Acthar Plaintiffs' Motion to Dismiss [Docket No. 2529 – filed May 21, 2021]

G.   [SEALED] Acthar Insurance Claimants' Revised and Supplemental Opposition to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims and Acthar Insurance Claimants' Motion for Substantive Consolidation [Docket No. 2924 – filed June 18, 2021]

H.   [SEALED] Response of the Ad Hoc Acthar Group to Debtors' First Omnibus Objection to "Unsubstantiated" Claims (Substantive) [Docket No. 2947 – filed June 21, 2021]

   i.   [SEALED] Declaration of Donald E. Haviland, Jr. in Support of the Ad Hoc Acthar Group's Response to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims (Substantive) [Docket No. 2948 – filed June 21, 2021]

   ii.   [SEALED] Notice of Filing of Exhibit B to Declaration of Donald E. Haviland, Jr. in Support of the Ad Hoc Acthar Group's Response to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims (Substantive) [Docket No. 2961 – filed June 22, 2021]

<u>Related Documents</u>:

i.   Declaration of Randall S. Eisenberg in Support of Debtors' Motion for Scheduling Order and Objections to Claims [Docket No. 2166 – filed May 1, 2021]

ii.   Submission of Copies of Proofs of Claim Regarding Debtors' First Omnibus Objection to Unsubstantiated and Duplicative Claims (Substantive) [Docket No. 2548 – filed May 24, 2021]

iii.   Notice of Continued Hearing to Consider Approval of Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive) [Docket No. 3176 – filed July 9, 2021]

iv.   [SEALED] Debtors' Omnibus Reply in Support of First Omnibus Objection to Unsubstantiated Claims (Substantive) [Docket No. 3177 – filed July 9, 2021]

    a.   Order Granting Motion for Leave to Exceed the Page Limitation with Respect to the Debtors' Omnibus Reply in Support of First Omnibus Objection to Unsubstantiated Claims (Substantive) [Docket No. 3183 – entered July 12, 2021]

    b.   Notice of Filing of Proposed Redacted Version of Debtors' Omnibus Reply in Support of First Omnibus Objection to Unsubstantiated Claims (Substantive) [Docket No. 3229 – filed July 14, 2021]

v.   Ad Hoc Acthar Group Witness List for July 23, 2021 Hearing on Debtors' First Omnibus Objection to Unsubstantiated Proofs of Claim (Substantive) [Docket No. 3278 – filed July 19, 2021]

vi.   [SEALED] Debtors' Motion to Quash (A) Ad Hoc Acthar Group's Notice of Deposition of Melissa Falcone and (B) Ad Hoc Acthar Group's Notice of Deposition of Hugh M O'Neill [Docket No. 3289 – filed July 20, 2021]

vii.   Notice of Filing of Proposed Redacted Version of Debtors' Motion to Quash (A) Ad Hoc Acthar Group's Notice of Deposition of Melissa Falcone and (B) Ad Hoc Acthar Group's Notice of Deposition of Hugh M O'Neill [Docket No. 3297 – filed July 20, 2021]

Witness Information:

i.   The Debtors may offer the testimony by declaration, proffer and/or live video testimony of Stephen Welch, the Debtors' Chief Transformation Officer..

ii.   The Ad Hoc Acthar Group may offer the testimony by declaration, proffer and/or live video testimony of the following parties: Randall Eisenberg, Managing Partner, Alix Partners, L.P.; Stephen Welch, the Debtors' Chief Transformation Officer,; Hugh O'Neill, the Debtors' Executive VP and Chief Commercial and Operations Officer; and Melissa Falcone, the Debtors' former VP of Patient Services and Reimbursement.

iii.   The Acthar Insurance Claimants may offer the testimony by declaration, proffer and/or live video testimony of the following parties: Stephen Welch, the Debtors' Chief Transformation Officer; and any witness called by any other party.

Status: The hearing on the Claims Objection will go forward.

2.   Motion to File Under Seal the Opposition of Attestor Limited and Humana Inc. to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims [Docket No. 2578 – filed May 26, 2021]

Objection/Response Deadline:    June 7, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:        None at this time.

Related Documents:    None at this time.

Status: The hearing on the Motion will go forward.

3.    Debtors' Motion to File Under Seal Certain Confidential Information in Debtors' Omnibus Reply in Support of First Omnibus Objection to Unsubstantiated Claims (Substantive) [Docket No. 3228 – filed July 14, 2021]

Objection/Response Deadline:        At the hearing.

Objections/Responses Received:        None at this time.

Related Documents:    None at this time.

Status: The hearing on the Motion will go forward.

4.    Debtors' Motion in Limine to Preclude the Ad Hoc Acthar Group from Introducing Arguments and Evidence Not Set Forth in its Written Briefing [Docket No. 3266 – filed July 16, 2021]

Objection/Response Deadline:        July 22, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:

A.    Letter from Ad Hoc Acthar Group's Counsel to Debtors' Counsel [Docket No. 3280 – filed July 19, 2021]

B.    Ad Hoc Acthar Group's Response to Debtors' Motion in Limine to Preclude Evidence [Docket No. 3284 – filed July 19, 2021]

Related Documents:    None at this time.

Status: The Debtors have reached out to counsel to the Ad Hoc Acthar Group in an attempt to resolve the motion, but as of now the hearing on the motion is going forward.

## II.    SUBSTANTIVE CONSOLIDATION MOTION:

5.    [SEALED] Acthar Insurance Claimants' Revised and Supplemental Opposition to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims and Acthar Insurance Claimants' Motion for Substantive Consolidation [Docket No. 2924 – filed June 18, 2021]

Objection/Response Deadline:        August 6, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:

A.    Debtors' Preliminary Objection to Acthar Insurance Claimants' Motion Seeking Substantive Consolidation [Docket No. 3093 – filed July 2, 2021] (the "Preliminary Objection")

4

B.    The Unsecured Notes Ad Hoc Group's (A) Joinder to the Debtors' Preliminary Objection to Acthar Insurance Claimants' Motion Seeking Substantive Consolidation and (B) Statement in Support of the Debtors' Emergency Motion to Expedite its Consideration [Docket No. 3106 – filed July 2, 2021]

C.    The Official Committee of Opioid Related Claimants' Statement and Request for Clarification with Respect to the Debtors' Preliminary Objection to Acthar Insurance Claimants' Motion Seeking Substantive Consolidation [Docket No. 3260 – filed July 16, 2021]

D.    Governmental Plaintiff Ad Hoc Committee's Statement in Support of Debtors' Preliminary Objection to Acthar Insurance Claimants' Motion Seeking Substantive Consolidation [Docket No. 3262 – filed July 16, 2021]

Related Documents:

i.    Notice of Filing of Proposed Redacted Version of the Acthar Insurance Claimants' Revised and Supplemental Opposition to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims and Acthar Insurance Claimants' Motion for Substantive Consolidation [Docket No. 2982 – filed June 23, 2021]

ii.   Order Expediting Consideration of the Debtors' Preliminary Objection to Acthar Insurance Claimants' Motion Seeking Substantive Consolidation [Docket No. 3118 – entered July 3, 2021]

iii.  Acthar Insurance Claimants' Reply to the Debtors' "Preliminary Objection" to the Acthar Insurance Claimants' Motion for Substantive Consolidation [Docket No. 3261 – filed July 16, 2021]

Status: The hearing on the Acthar Insurance Claimants' Motion for Substantive Consolidation will go forward solely with respect to the Debtors' Preliminary Objection thereto.

III.   **STATUS CONFERENCE:**

6.    Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases [Docket No. 2157 – filed April 30, 2021]

Objection/Response Deadline:        May 21, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:

A.    Statement of Attestor Limited Regarding the Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases [Docket No. 2497 – filed May 20, 2021]

B.      Debtors' Omnibus Objection to Motions of Attestor Limited and Humana Inc. for Entry of Orders (A) Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases and (B) Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code [Docket No. 2521 – filed May 21, 2021]

C.      The Unsecured Notes Ad Hoc Group's Statement in Support of the Debtors' Omnibus Objection to Motions of Attestor Limited and Humana Inc. for Entry of Orders (A) Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases and (B) Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code [Docket No. 2522 – filed May 21, 2021]

D.      C&M Claimants' Joinder in Attestor/Humana Motion to Estimate Humana's Claims [Docket No. 2525 – filed May 21, 2021]

Related Documents:

i.      Amended Notice of Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases [Docket No. 2315 – filed May 14, 2021]

ii.     Attestor Limited and Humana Inc.'s Reply in Further Support of Motions to Estimate Acthar-Related Claims and Allow Administrative Claims for All Purposes in These Bankruptcy Cases [Docket No. 2657 – filed June 2, 2021]

Status: A status conference regarding the Estimation Motion will go forward.

Dated: July 21, 2021

*/s/ Michael J. Merchant*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:         collins@rlf.com
               merchant@rlf.com
               steele@rlf.com
               schlauch@rlf.com

- and -

George A. Davis (*pro hac vice*)
George Klidonas (*pro hac vice*)
Andrew Sorkin (*pro hac vice*)
Anupama Yerramalli (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 906-1200
Facsimile:     (212) 751-4864
Email:         george.davis@lw.com
               george.klidonas@lw.com
               andrew.sorkin@lw.com
               anu.yerramalli@lw.com

- and –

Jeffrey E. Bjork (*pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:     (213) 485-1234
Facsimile:     (213) 891-8763
Email:         jeff.bjork@lw.com

- and –

Jason B. Gott (*pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:     (312) 876-7700
Facsimile:     (312) 993-9767
Email:         jason.gott@lw.com

*Counsel for Debtors and Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
|  | ) |
| Debtors.[1] | ) (Jointly Administered) |
|  | ) |
|  | ) |

## NOTICE OF *AMENDED*[2] AGENDA FOR VIDEO HEARING SCHEDULED FOR JULY 23, 2021 AT *9:00 A.M.* (PREVAILING EASTERN TIME), BEFORE THE HONORABLE JOHN T. DORSEY, AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE[3]

*AT THE DIRECTION OF THE COURT, THE HEARING TIME HAS BEEN RESCHEDULED FROM 10:00 A.M. TO 9:00 A.M.*

**THE REMOTE HEARING WILL BE CONDUCTED ENTIRELY BY ZOOM AND REQUIRES ALL PARTICIPANTS TO REGISTER IN ADVANCE. COURTCALL WILL NOT BE USED TO DIAL IN.**

**PLEASE USE THE FOLLOWING LINK TO REGISTER FOR THE HEARING:**
https://debuscourts.zoomgov.com/meeting/register/vJIscO6hqjguGdSJYEnm-VrIuor4ZzZ5wM0

**ONCE REGISTERED, PARTIES WILL RECEIVE A CONFIRMATION EMAIL CONTAINING PERSONAL LOG-IN INFORMATION FOR THE HEARING.**

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The debtors' mailing address is 675 McDonnell Blvd., St. Louis, Missouri 63042.

**[2]   Amended items appear in bold.**

[3]   All motions and other pleadings referenced herein are available online at the following address: http://restructuring.primeclerk.com/Mallinckrodt.

# I.   UNSUBSTANTIATED CLAIMS OBJECTION:

1.   Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive) [Docket No. 2165 – filed April 30, 2021]

     Objection/Response Deadline:        May 14, 2021 at 4:00 p.m. (ET)

     Objections/Responses Received:

     A.   Informal response received from St. Joseph Health Service Health and Welfare Plan (Claim No. 39161)

     B.   Iowa Department of Human Services' Response to Debtors' First Omnibus Objection to Unsubstantiated Claims [Docket No. 2305 – filed May 14, 2021]

     C.   Response to Debtors' First Omnibus Objection to Unsubstantiated and Duplicative Claims (Substantive) [Docket No. 2330 – filed May 17, 2021]

     D.   Omnibus Objection to Claims Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive) [Docket No. 2426 – filed May 19, 2021]

     E.   [SEALED] Opposition of Attestor Limited and Humana Inc. to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims [Docket No. 2512 – filed May 21, 2021]

     F.   The Acthar Plaintiffs' Motion to Dismiss [Docket No. 2529 – filed May 21, 2021]

     G.   [SEALED] Acthar Insurance Claimants' Revised and Supplemental Opposition to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims and Acthar Insurance Claimants' Motion for Substantive Consolidation [Docket No. 2924 – filed June 18, 2021

     H.   [SEALED] Response of the Ad Hoc Acthar Group to Debtors' First Omnibus Objection to "Unsubstantiated" Claims (Substantive) [Docket No. 2947 – filed June 21, 2021]

          i.   [SEALED] Declaration of Donald E. Haviland, Jr. in Support of the Ad Hoc Acthar Group's Response to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims (Substantive) [Docket No. 2948 – filed June 21, 2021]

          ii.   [SEALED] Notice of Filing of Exhibit B to Declaration of Donald E. Haviland, Jr. in Support of the Ad Hoc Acthar Group's Response to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims (Substantive) [Docket No. 2961 – filed June 22, 2021]

A-6214

Related Documents:

i.       Declaration of Randall S. Eisenberg in Support of Debtors' Motion for Scheduling Order and Objections to Claims [Docket No. 2166 – filed May 1, 2021]

ii.      Submission of Copies of Proofs of Claim Regarding Debtors' First Omnibus Objection to Unsubstantiated and Duplicative Claims (Substantive) [Docket No. 2548 – filed May 24, 2021]

iii.     Notice of Continued Hearing to Consider Approval of Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive) [Docket No. 3176 – filed July 9, 2021]

iv.      [SEALED] Debtors' Omnibus Reply in Support of First Omnibus Objection to Unsubstantiated Claims (Substantive) [Docket No. 3177 – filed July 9, 2021]

         a.       Order Granting Motion for Leave to Exceed the Page Limitation with Respect to the Debtors' Omnibus Reply in Support of First Omnibus Objection to Unsubstantiated Claims (Substantive) [Docket No. 3183 – entered July 12, 2021]

         b.       Notice of Filing of Proposed Redacted Version of Debtors' Omnibus Reply in Support of First Omnibus Objection to Unsubstantiated Claims (Substantive) [Docket No. 3229 – filed July 14, 2021]

v.       Ad Hoc Acthar Group Witness List for July 23, 2021 Hearing on Debtors' First Omnibus Objection to Unsubstantiated Proofs of Claim (Substantive) [Docket No. 3278 – filed July 19, 2021]

vi.      [SEALED] Debtors' Motion to Quash (A) Ad Hoc Acthar Group's Notice of Deposition of Melissa Falcone and (B) Ad Hoc Acthar Group's Notice of Deposition of Hugh M O'Neill [Docket No. 3289 – filed July 20, 2021]

vii.     Notice of Filing of Proposed Redacted Version of Debtors' Motion to Quash (A) Ad Hoc Acthar Group's Notice of Deposition of Melissa Falcone and (B) Ad Hoc Acthar Group's Notice of Deposition of Hugh M O'Neill [Docket No. 3297 – filed July 20, 2021]

viii.    **Statement of the Official Committee of Unsecured Creditors in Connection With the Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive) [Docket No. 3316 – filed July 21, 2021]**

Witness Information:

i.       The Debtors may offer the testimony by declaration, proffer and/or live video testimony of Stephen Welch, the Debtors' Chief Transformation Officer..

3

ii.     The Ad Hoc Acthar Group may offer the testimony by declaration, proffer and/or live video testimony of the following parties: Randall Eisenberg, Managing Partner, Alix Partners, L.P.; Stephen Welch, the Debtors' Chief Transformation Officer,; Hugh O'Neill, the Debtors' Executive VP and Chief Commercial and Operations Officer; and Melissa Falcone, the Debtors' former VP of Patient Services and Reimbursement.

iii.    The Acthar Insurance Claimants may offer the testimony by declaration, proffer and/or live video testimony of the following parties: Stephen Welch, the Debtors' Chief Transformation Officer; and any witness called by any other party.

Status: The hearing on the Claims Objection will go forward.

2.      Motion to File Under Seal the Opposition of Attestor Limited and Humana Inc. to the Debtors' First Omnibus Objection to "Unsubstantiated' Claims [Docket No. 2578 – filed May 26, 2021]

Objection/Response Deadline:        June 7, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:      None at this time.

Related Documents:   None at this time.

Status: The hearing on the Motion will go forward.

3.      Debtors' Motion to File Under Seal Certain Confidential Information in Debtors' Omnibus Reply in Support of First Omnibus Objection to Unsubstantiated Claims (Substantive) [Docket No. 3228 – filed July 14, 2021]

Objection/Response Deadline:        At the hearing.

Objections/Responses Received:      None at this time.

Related Documents:   None at this time.

Status: The hearing on the Motion will go forward.

4.      Debtors' Motion in Limine to Preclude the Ad Hoc Acthar Group from Introducing Arguments and Evidence Not Set Forth in its Written Briefing [Docket No. 3266 – filed July 16, 2021]

Objection/Response Deadline:        July 22, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:

A.      Letter from Ad Hoc Acthar Group's Counsel to Debtors' Counsel [Docket No. 3280 – filed July 19, 2021]

B.      Ad Hoc Acthar Group's Response to Debtors' Motion in Limine to Preclude Evidence [Docket No. 3284 – filed July 19, 2021]

4

Related Documents:

i.        **Notice of Withdrawal [Docket No. 3382 – filed July 22, 2021]**

Status: **On July 22, 2021, the Debtors withdrew this Motion.  Accordingly, a hearing with respect to this Motion is no longer necessary.**

## II.      **SUBSTANTIVE CONSOLIDATION MOTION:**

5.        [SEALED] Acthar Insurance Claimants' Revised and Supplemental Opposition to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims and Acthar Insurance Claimants' Motion for Substantive Consolidation [Docket No. 2924 – filed June 18, 2021]

Objection/Response Deadline:          August 6, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:

A.        Debtors' Preliminary Objection to Acthar Insurance Claimants' Motion Seeking Substantive Consolidation [Docket No. 3093 – filed July 2, 2021] (the "Preliminary Objection")

B.        The Unsecured Notes Ad Hoc Group's (A) Joinder to the Debtors' Preliminary Objection to Acthar Insurance Claimants' Motion Seeking Substantive Consolidation and (B) Statement in Support of the Debtors' Emergency Motion to Expedite its Consideration [Docket No. 3106 – filed July 2, 2021]

C.        The Official Committee of Opioid Related Claimants' Statement and Request for Clarification with Respect to the Debtors' Preliminary Objection to Acthar Insurance Claimants' Motion Seeking Substantive Consolidation [Docket No. 3260 – filed July 16, 2021]

D.        Governmental Plaintiff Ad Hoc Committee's Statement in Support of Debtors' Preliminary Objection to Acthar Insurance Claimants' Motion Seeking Substantive Consolidation [Docket No. 3262 – filed July 16, 2021]

Related Documents:

i.        Notice of Filing of Proposed Redacted Version of the Acthar Insurance Claimants' Revised and Supplemental Opposition to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims and Acthar Insurance Claimants' Motion for Substantive Consolidation [Docket No. 2982 – filed June 23, 2021]

ii.       Order Expediting Consideration of the Debtors' Preliminary Objection to Acthar Insurance Claimants' Motion Seeking Substantive Consolidation [Docket No. 3118 – entered July 3, 2021]

iii.    Acthar Insurance Claimants' Reply to the Debtors' "Preliminary Objection" to the Acthar Insurance Claimants' Motion for Substantive Consolidation [Docket No. 3261 – filed July 16, 2021]

Status: The hearing on the Acthar Insurance Claimants' Motion for Substantive Consolidation will go forward solely with respect to the Debtors' Preliminary Objection thereto.

## III.    **STATUS CONFERENCE:**

6.    Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases [Docket No. 2157 – filed April 30, 2021]

Objection/Response Deadline:        May 21, 2021 at 4:00 p.m. (ET)

Objections/Responses Received:

A.    Statement of Attestor Limited Regarding the Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases [Docket No. 2497 – filed May 20, 2021]

B.    Debtors' Omnibus Objection to Motions of Attestor Limited and Humana Inc. for Entry of Orders (A) Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases and (B) Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code [Docket No. 2521 – filed May 21, 2021]

C.    The Unsecured Notes Ad Hoc Group's Statement in Support of the Debtors' Omnibus Objection to Motions of Attestor Limited and Humana Inc. for Entry of Orders (A) Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases and (B) Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code [Docket No. 2522 – filed May 21, 2021]

D.    C&M Claimants' Joinder in Attestor/Humana Motion to Estimate Humana's Claims [Docket No. 2525 – filed May 21, 2021]

Related Documents:

i.    Amended Notice of Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases [Docket No. 2315 – filed May 14, 2021]

6

    ii.      Attestor Limited and Humana Inc.'s Reply in Further Support of Motions to Estimate Acthar-Related Claims and Allow Administrative Claims for All Purposes in These Bankruptcy Cases [Docket No. 2657 – filed June 2, 2021]

<u>Status</u>: A status conference regarding the Estimation Motion will go forward.

## IV.    <u>ADDITIONAL MATTERS SCHEDULED FOR HEARING</u>:

7.    **[SEALED] Debtors' Motion to Quash (A) Ad Hoc Acthar Group's Notice of Deposition of Melissa Falcone and (B) Ad Hoc Acthar Group's Notice of Deposition of Hugh M O'Neill [Docket No. 3289 – filed July 20, 2021]**

    <u>Objection/Response Deadline</u>:    At the hearing.

    <u>Objections/Responses Received</u>:

    A.    **Ad Hoc Acthar Group's Motion to Compel Discovery and Response to Debtors' Motion to Quash [Docket No. 3385 – filed July 22, 2021]**

    <u>Related Documents</u>:

    i.    **Notice of Filing of Proposed Redacted Version of Debtors' Motion to Quash (A) Ad Hoc Acthar Group's Notice of Deposition of Melissa Falcone and (B) Ad Hoc Acthar Group's Notice of Deposition of Hugh M. O'Neill [Docket No. 3297 – filed May 14, 2021]**

    <u>Status</u>:  **At the direction of the Court, a hearing regarding this matter will go forward.**

8.    **Ad Hoc Acthar Group's Motion to Compel Discovery and Response to Debtors' Motion to Quash [Docket No. 3385 – filed July 22, 2021]**

    <u>Objection/Response Deadline</u>:    At the hearing.

    <u>Objections/Responses Received</u>:    None at this time.

    <u>Related Documents</u>:

    i.    **Certification of Daniel K. Astin Pursuant to Del. Bankr. L.R. 7026-1 in Support of the Ad Hoc Acthar Group's Motion to Compel [Docket No. 3386 – filed July 22, 2021]**

    <u>Status</u>:  **At the direction of the Court, a hearing regarding this matter will go forward.**

Dated: July 22, 2021

*/s/ Michael J. Merchant*
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:          collins@rlf.com
                merchant@rlf.com
                steele@rlf.com
                schlauch@rlf.com

- and -

George A. Davis (*pro hac vice*)
George Klidonas (*pro hac vice*)
Andrew Sorkin (*pro hac vice*)
Anupama Yerramalli (*pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Telephone:      (212) 906-1200
Facsimile:      (212) 751-4864
Email:          george.davis@lw.com
                george.klidonas@lw.com
                andrew.sorkin@lw.com
                anu.yerramalli@lw.com

- and –

Jeffrey E. Bjork (*pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:      (213) 485-1234
Facsimile:      (213) 891-8763
Email:          jeff.bjork@lw.com

- and –

Jason B. Gott (*pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:      (312) 876-7700
Facsimile:      (312) 993-9767
Email:          jason.gott@lw.com

*Counsel for Debtors and Debtors in Possession*

**A-6220**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
|  | . | Chapter 11 |
| IN RE: | . |  |
|  | . | Case No. 20-12522(JTD) |
| MALLINCKRODT PLC, et al, | . |  |
|  | . |  |
|  | . | 824 Market Street |
|  | . | Wilmington, Delaware 19801 |
| Debtors. | . |  |
| . . . . . . . . . . . . . . . | . | Wednesday, May 5, 2021 |
| MALLINCKRODT PLC, et al, | . |  |
|  | . | Adv. Proc. No. 21-50428(JTD) |
| vs. | . |  |
|  | . |  |
| CITY OF ROCKFORD. | . |  |
| . . . . . . . . . . . . . . | . |  |

TRANSCRIPT OF VIDEO HEARING RE:
MOTION FOR SCHEDULING ORDER
BEFORE THE HONORABLE JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA ZOOM:

For the Debtors:          Michael J. Merchant, Esq.
                          Amanda J. Steele, Esq.
                          Robert J. Stearn, Esq.
                          RICHARDS, LAYTON & FINGER, PA

                          George A. Davis, Esq.
                          Anu Yerramalli, Esq.
                          Christopher R. Harris, Esq.
                          Jason Moehlmann, Esq.
                          Justin Kirschner, Esq.
                          LATHAM & WATKINS, LLP

(Appearances Continued)

Audio Operator:           Electronically Recorded
                          by Jason Spencer, ECRO

Transcription Company:    Reliable
                          1007 N. Orange Street
                          Wilmington, Delaware 19801
                          (302)654-8080
                          Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA ZOOM:   (Continued)

```
For the U.S. Trustee:          Jane Leamy, Esq.
                               OFFICE OF THE U.S. TRUSTEE

For the Official Committee
of Unsecured Creditors:        James Lathrop, Esq.
                               Jamie Edmonson, Esq.
                               ROBINSON & COLE, LLP

For the Ad Hoc Group of
First Lien Term Lenders:       David Fournier, Esq.
                               TROUTMAN PEPPER HAMILTON
                                SANDERS, LLP

                               Scott Greenberg, Esq.
                               Jeremy Evans, Esq.
                               Michael J. Cohen, Esq.
                               Jennifer Conn, Esq.
                               Chaim Fortgang, Esq.
                               Michelle Choi, Esq.
                               Joshua Brody, Esq.
                               Leesa Haspel, Esq.
                               Matthew Biben, Esq.
                               GIBSON, DUNN & CRUTCHER, LLP

For Deutsche Bank, as
Administrative Agent:          Evan Miller, Esq.
                               BAYARD, PA

                               Stephanie Slater, Esq.
                               FOX ROTHSCHILD, LLP

                               Michele Meises, Esq.
                               WHITE & CASE, LLP

                               Alan Gamza, Esq.
                               MOSES & SINGER, LLP

For the Ad Hoc Committee
of Government Entities
Holding Medicaid Rebate
Claims:                        Melanie Cyganowski, Esq.
                               Michael Maizel, Esq.
                               Peter Feldman, Esq.
                               Jennifer Feeney, Esq.
                               OTTERBOURG, PC

(Appearances Continued)
```

APPEARANCES VIA ZOOM:  (Continued)

```
For the Legal Representative
for Future Claimants:        Robert Brady, Esq.
                             Jaime Chapman, Esq.
                             James Patton, Esq.
                             Edwin Harron, Esq.
                             Melanie Sharp, Esq.
                             Heather Smillie, Esq.
                             YOUNG, CONAWAY, STARGATT
                              & Taylor, LLP

                             Richard Wyron, Esq.
                             Roger Frankel, Esq.
                             FRANKEL WYRON, LLP

                             Karen Bray, Esq.
                             GREENBERG TRAURIG, LLP

For Humana, Inc., et al:     Matthew Harvey, Esq.
                             Robert Dehney, Esq.
                             Nader Amer, Esq.
                             MORRIS, NICHOLS, ARSHT
                              & TUNNELL, LLP

                             Philip DiSanto, Esq.
                             Matthew Freimuth, Esq.
                             Benjamin McCallen, Esq.
                             WILLKIE, FARR & GALLAGHER, LLP

For the Official Committee
of Opioid Claimants:         Justin Alberto, Esq.
                             Anthony De Leo, Esq.
                             COLE SCHOTZ, PC

                             Arik Preis, Esq.
                             Mitchell Hurley, Esq.
                             Sara Brauner, Esq.
                             Brooks Barker, Esq.
                             AKIN, GUMP, STRAUSS, HAUER
                              & FELD, LLP

For the Multi-State
Governmental Entities
Group:                       James S. Green, Jr., Esq.
                             SEITZ, VAN OGTROP & GREEN, PA

                             George O'Connor, Esq.
                             Ann Langley, Esq.
                             CAPLIN & DRYSDALE, CHARTERED

(Appearances Continued)
```

```
      APPEARANCES VIA ZOOM:   (Continued)

  For the Unsecured Note
  Ad Hoc Group:               Richard S. Cobb, Esq.
                              Matthew Pierce, Esq.
                              LANDIS, RATH & COBB, LLP

                              Andrew Rosenberg, Esq.
                              Claudia Tobler, Esq.
                              Alice Eaton, Esq.
                              PAUL, WEISS, RIFKIND, WHARTON
                               & GARRISON, LLP

  For OCM Luxembourg:         Scott Cousins, Esq.
                              Scott Jones, Esq.
                              COUSINS LAW, LLC

  For Deerfield Partners,
  LP, et al:                  Aaron Stulman, Esq.
                              Christopher M. Samis, Esq.
                              POTTER, ANDERSON & CORROON, LLP

                              Benjamin Beller, Esq.
                              James Bromley, Esq.
                              Thiago Nascimento Dos Reis, Esq.
                              SULLIVAN & CROMWELL

  For the Commonwealth of
  Pennsylvania:               Melissa Van Eck, Esq.
                              OFFICE OF THE ATTORNEY GENERAL

  For Wilmington Savings Fund
  Society, FSB:               Michael D. DeBaecke, Esq.
                              ASHBY & GEDDES

                              Sameer Alifarag, Esq.
                              PRYOR CASHMAN, LLP

  For the Ad Hoc Group of
  Revolving Loan
  Participants:               James Johnston, Esq.
                              JONES DAY

  For Express Scripts:        Kenneth John Shaffer, Esq.
                              Meghan McCaffrey, Esq.
                              QUINN, EMANUEL, URQUHART
                               & SULLIVAN

  (Appearances Continued)
```

A-6224

```
      APPEARANCES VIA ZOOM:   (Continued)


For the Governmental
Plaintiff Ad Hoc
Committee:                    Kenneth Eckstein, Esq.
                              KRAMER, LEVIN, NAFTALIS
                               & FRANKEL, LLP


For Independent Managers
of the Speciality Generics
Debtors:                      Julia Winters, Esq.
                              Ethan Trotz, Esq.
                              KATTEN MUCHIN ROSENMAN, LLP


For McKesson Corporation:     Les Carter, Esq.
                              THE POWELL FIRM


For the Ad Hoc First Lien
Notes Group:                  William Hazeltine, Esq.
                              SULLIVAN HAZELTINE ALLINSON, LLC


For the Acthar Plaintiffs:    Daniel Astin, Esq.
                              CIARDI, CIARDI & ASTIN


Also Appearing:               Gerard Pettit, Esq.
                              JOSEPH P. HALL & ASSOCIATES

                              David Ambrosia, Esq.
                              COLUMBUS HILL CAPITAL MANAGEMENT

                              Spencer Payne
                              Andrew Miller
                              AURELIUS CAPITAL MANAGEMENT, LP

                              Dawn Chung
                              GUGGENHEIM

                              Heather Barlow
                              DUNDON ADVISORS, LLC

                              David Skatoff
                              Agnes Tang
                              Teddy Kindelan
                              Olivia Parsons
                              Nikan Ansari
                              DUCERA PARTNERS, LLC

                              Randall Eisenberg
                              ALIX PARTNERS


(Appearances Continued)
```

APPEARANCES VIA ZOOM:  (Continued)

Also Appearing                    Michael Renoff
                                  SCOGGIN CAPITAL

                                  Matthew Russell
                                  HUDSON BAY

                                  Megan Wasson
                                  Philip Bentley
                                  GOVERNMENTAL PLAINTIFF AD HOC
                                   COMMITTEE

                                  Alexander Kharkov
                                  PARKER

                                  Gautam Dhingra
                                  JPMORGAN

                                  John Vaccaro
                                  CATALUR CAPITAL MANAGEMENT, LP

                                  Kevin Pleines
                                  RPA ADVISORS

                                  James MacInnis
                                  "DB"

                                  Uday Gorrepati
                                  "ABI PROJECT"

                                  Vasu Kalpat, *Pro Se*

                                  Sergei Star, *Pro Se*

                                  Olga Smolyakova, *Pro Se*

                                  Vasilii Dunin, *Pro Se*

                                  Pomah Aohuob, *Pro Se*

                                  Serg Mnk, *Pro Se*

                                  Lakhtionov Dimitry, *Pro Se*

                                  Darrel Edelman, *Pro Se*

                                  Iowell Finson, *Pro Se*

                                  Ross Rosenfelt, *Pro Se*

    (Appearances Continued)

A-6226

APPEARANCES VIA ZOOM:  (Continued)

Also Appearing:              Elena Tcygankova, *Pro Se*

                             Rocnoanh Malder, *Pro Se*

                             Jeremy Hill
                             Negsa Balluku
                             BLOOMBERG

                             Karen Leung
                             REORG RESEARCH, INC.

8

<u>INDEX</u>

|                                  | <u>Page</u> |
|----------------------------------|-------------|
| <u>ARGUMENT BY MR. HARRIS</u>    | 9           |
| <u>ARGUMENT BY MR. ASTIN</u>     | 17          |
| <u>ARGUMENT BY MR. FREIMUTH</u>  | 27          |
| <u>FURTHER ARGUMENT</u>          | 28          |
| <u>COURT DECISION</u>            | 31          |

A-6228

1          (Proceedings commence at 10:02 a.m.)

2               THE COURT:  Good morning, everyone.  This is Judge

3     Dorsey.  We're on the record in Mallinckrodt PLC, Case Number

4     21-50428.

5               I'll go ahead and turn it over to debtors' counsel.

6               MR. STEARN:  Good morning, Your Honor.  May it

7     please the Court, Bob Stearn from Richards, Layton & Finger

8     on behalf of the debtors.  Can Your Honor hear me okay?

9               THE COURT:  I can.  Thank you.

10              MR. STEARN:  Thank you, Your Honor.

11              Your Honor, there's a single item on today's

12     agenda, that's the debtors' motion for a scheduling order in

13     Adversary Proceeding Number 21-5428, which is the debtors'

14     adversary proceeding brought against the City of Rockford.

15     That motion will be handled by Chris Harris of Latham &

16     Watkins.  And with the Court's permission, I'll turn the

17     virtual podium over to Mr. Harris.

18              THE COURT:  All right.  Mr. Harris, go ahead.

19              MR. STEARN:  Thank you, Your Honor.

20              MR. HARRIS:  Thank you, Your Honor.  And thank you

21     for hearing us today, and your chambers, as well, and

22     accommodating our timing.

23              So, as Mr. Stearn said, this is a scheduling motion

24     in an adversary proceeding that the debtors filed Friday

25     against one of the Acthar claimants, the City of Rockford.

1    And the adversary proceeding seeks a declaratory judgment

2    that Rockford's claims are dischargeable.  And so we filed

3    our summary judgment motion that essentially said that, even

4    assuming all of the allegations in Rockford's complaints and

5    in its proof of claim are true, even if they're true, that

6    Rockford's claim is still dischargeable.  And we filed it now

7    because we believe no discovery is needed because we frame

8    this as a purely legal issue.

9         So today's motion, the motion before you today, is

10   to set a hearing date for that summary judgment motion.  We

11   are not seeking relief from the Court for the briefing

12   schedule for the summary judgment motion.  The briefing

13   schedule complies with all the bankruptcy rules and the local

14   rules.  And in particular, the schedule is:

15        We file our opening brief on April 30th.

16        The opposition -- any opposition briefs would be

17   due 14 days thereafter, on May 14th.

18        Reply brief would be due seven days thereafter.

19        And then what we're seeking today is to have a

20   hearing set on June 2nd.

21        So the opposition of May 4th [sic] and the reply

22   date of May 21st complies with the fourteen- and seven-day

23   requirements of Local Rule 7007.  And the reason we're

24   seeking the hearing date is we understand we would need

25   permission from your court to do so before the briefing is

1     complete under Local Rule 7007-3.

2              So let me explain briefly why we are seeking that

3     June 2nd hearing date.  Basically it's to keep us on track

4     for an August confirmation schedule.  So -- and I -- as

5     you're probably aware, we are seeking confirmation of our

6     plan or about August 15th.  That's a milestone date under the

7     RSA, and so it's obviously very important to us to keep the

8     RSA on track and impact.

9              That schedule is also important economically.  In

10    addition to the monthly cost of running the case, which the

11    City of Rockford has pointed repeatedly, including in their

12    objection to this motion, there's also the realities of

13    today's financing market, which is that we're in an extremely

14    opportune window now to arrange exit financing, and we want

15    to move quickly to confirmation so we can lock in financing

16    at today's favorable terms.

17             So, in order to be able to continue to proceed on

18    that timing, we are hoping to resolve a host of issues,

19    including several that are implicated by the Acthar-related

20    claims.  And the one that this summary judgment deals with is

21    dischargeability.  That is obviously an important issue for a

22    plan confirmation because it addresses that, as reorganized

23    debtors, we're going to still be subject to substantial

24    claims.

25             And Rockford, in particular here, filed a proof of

1    claim for $3.8 billion.  So the dischargeability of that

2    claim is obviously important to confirmation.  And Rockford

3    has already argued that the lack of dischargeability raises

4    confirmation concerns.

5         So, for instance, if you go way back to the -- to

6    their TRO opposition brief back in October 2020, they argued

7    that the fact that their claims weren't dischargeable will

8    make reorganization impossible.  That was in the adversary

9    proceeding on staying the Acthar litigations, Docket Number

10   33, at Page 4.

11        In addition to the adversary proceeding that we're

12   talking about today, on Friday, we also filed several other

13   Acthar-related motions in the main case to help resolve other

14   issues that will help keep us on track for our confirmation

15   schedule.  We filed two omnibus claims objections, one that's

16   seeking to disallow Acthar-related class claims and another

17   seeking to disallow Acthar claims that are unsubstantiated

18   against certain of the debtors, and those two motions are

19   being heard on June 2nd.

20        So I mention those motions because, in the motion

21   before Your Honor today, we're seeking the same date for our

22   hearing on our dischargeability summary judgment motion.  And

23   we're doing that because we think it's efficient to have all

24   the Acthar issues heard at the same time.  It will focus the

25   parties and it will hopefully clear away as many issues as

13

1    fast as possible to allow us to continue on our path.  So

2    that's why we're going -- asking for this relief for a June

3    2nd date.

4            We have received one objection, it is from the City

5    of Rockford.  And in the objection, Rockford makes a few

6    points:

7            One is that the schedule that we are seeking

8    doesn't comply with the rules.  The objection does not,

9    however, identify any rules or explain why the schedule is

10   inconsistent in any way.  You know, the timing of our summary

11   judgment motion, the fact that we filed everything we did,

12   totally complies with Federal Rule of Civil Procedure 56(b),

13   which says that:

14           "Unless a different time is set by local rule or

15           the Court orders otherwise, a party may file a

16           motion for summary judgment at any time until 30

17           days after the close of all discovery."

18           So, on its face, there's nothing that requires that

19   summary judgment motion can only be filed after an answer or

20   after discovery has begun.  It can be filed at any time up

21   until the deadline.  And there's nothing in the local rules

22   that modifies Rule 56(b).

23           There's also nothing unprecedented about filing a

24   summary judgment motion at the same time as an adversary

25   proceeding is brought and before an answer or discovery has

A-6233

1    occurred.

2             For instance, in the Nine Point Energy bankruptcy

3    proceeding before Judge Walrath, the debtors filed a

4    declaratory judgment adversary proceeding and filed summary

5    judgment motions on legal issues immediately thereafter,

6    within a day or two thereafter.  That's -- the bankruptcy

7    case there is 21-10570; the adversary case there is 21-50243.

8    The adversary complaint was filed on March 15th.  The debtors

9    filed one partial summary judgment motion the next day, March

10   16th, and a second one ten days later on March 26th.  The

11   parties went into summary judgment briefing over the next few

12   weeks, and a hearing was just held yesterday on the summary

13   judgment motions and rulings were issued.

14            So there is nothing unprecedented or inconsistent

15   with the rules with moving immediately for summary judgment,

16   and that's what we've done here, particularly since this is,

17   as we framed it, a purely legal issue.  And given that, we

18   think that there is -- that the normal time in the rules is

19   sufficient time for people to brief this purely legal issue

20   of whether Rockford's claim, assuming all the facts are true,

21   is dischargeable.

22            And we think that's particularly true because

23   Rockford has been aware of and raising and working on this

24   issue for months.  As I noted, they raised dischargeability

25   as early as October 2020, just two weeks after the case was

1    started.  And again, in February of 2021, as Your Honor is

2    aware, Rockford filed a motion to extend its deadline to file

3    its own dischargeability complaint, that's Docket Number

4    1380.  So they've had ample time to analyze this issue of

5    whether their claims are dischargeable, and presumably have

6    already analyzed it before asserting to the Court that they

7    were not dischargeable.

8            The other point in the objection that they make is

9    about mediation, and they emphasize that we are hopefully

10   starting a mediation soon on the Acthar-related claims, and

11   in result, they argue that it's inappropriate to go forward

12   with summary judgment briefing while that mediation is

13   proceeding.

14           You know, we greatly hope that the mediation will

15   proceed and be successful, but we don't know when it will

16   begin, when it will end, or whether it will be successful.

17   So we don't have the ability to just wait for an uncertain

18   event with an uncertain time frame and an uncertain outcome.

19   You know, we are -- it is now May, and we need to go forward

20   on a dual-track process.

21           We can -- you know, to put it bluntly, we can walk

22   and chew gum at the same time, we can litigate and negotiate.

23   And frankly, negotiations are often sharpened by the parties

24   making their legal positions known and getting input from the

25   Court on those positions.  So we don't think there's any

16

1    inconsistency between our fervent desire that we can mediate

2    and simultaneously proceeding against one of the Acthar

3    claimants.

4         They also point to the opioid mediation and say

5    that, somehow, the Acthar plaintiffs are being treated

6    differently because we are going forward with litigation

7    against certain of them while the opioid litigants don't have

8    to litigate.  That's actually not accurate.  We are dual-

9    tracking on the opioid side, as well.

10        Now because of, you know, good progress that has

11   been made in that mediation, the parties have agreed to

12   continue the opioid mediation until Friday, but we are dual-

13   tracking the litigation there.  You know, throughout that

14   mediation, we've been engaged in extensive discovery with the

15   OCC, it is not on pause, we are pushing that forward, as

16   well.  And regardless, you know, this is a different time in

17   the case.  This isn't February; it's now May.  Time is

18   getting short and we no longer have time to wait to see how a

19   mediation will proceed.

20        Just one last point that it's not clear whether

21   Rockford is raising.  But they did in their opposition brief

22   mention that they have not yet taken discovery.  It's not

23   clear whether they're arguing that that is a reason that our

24   summary judgment motion can't be heard.  If so, that would

25   not be an appropriate argument.  If they think they need

A-6236

 1    discovery, they can raise that as an argument in opposition

 2    to the grant of summary judgment, but that doesn't prevent

 3    the summary judgment motion itself from being heard.  It was

 4    just a possible basis for denying the motion, particularly

 5    since the motion complied with the federal rules and the

 6    local rules.

 7            In any event, there's -- if they do raise this

 8    point, Rockford is not going to have a need for additional

 9    discovery.  They have had years of discovery in their

10    underlying lawsuits, they've had a chance to amend their

11    complaint.  They had a chance to put whatever facts they

12    wanted in their proof of claim.  And our summary judgment

13    motion then accepts the truth of all of that.  So what we

14    have here is a legal dispute that we framed on an issue that

15    Rockford has been raising for months on a schedule that we

16    have proposed that complies with the local rules.

17            Let me pause and see if the Court has any

18    questions.  If not, I'm sure Mr. Astin would like to be

19    heard.

20            THE COURT:  Okay.  I have no questions.

21            Mr. Astin, are you speaking on behalf of the City

22    of Rockford?

23            MR. ASTIN:  Yes, Your Honor.  Good morning.  May it

24    please the Court, Daniel Astin for the Acthar Plaintiffs.

25            Judge, we had -- as you can see, we had less than

1    one business day notice on this motion and less than one

2    business day to prepare for this hearing and for any

3    response.  The order granting the shortened notice to have

4    this scheduling hearing today was entered more than 24 hours

5    before the deadline for us to respond, which was yesterday at

6    4 p.m.  Be that as it may, we're here.

7            But we -- what we continue to see, in borrowing

8    from my opposing colleague's hyperbole, they have said all

9    along they have not been able and shouldn't be forced to walk

10   and chew gum at the same time.  We have been consistent since

11   the first day of this hearing, as your -- as the Court is

12   well aware, that we need to take discovery.

13           You know, I, anecdotally -- and maybe I've just

14   been in the wrong cases -- have never been in a case where,

15   seven months in, somebody comes -- a debtor comes out of the

16   gate and says don't let them take discovery, don't let them

17   distract us, don't let them have this sideline litigation,

18   we've got the stay, we've got the PI, we're going to be in an

19   out of here in a number of months.  Now here we are, seven

20   months later, and they say, well, we're out of time, it's

21   getting late, and we should -- and we should be able to roll

22   on our time schedule.

23           This is a very, very short runway, but we've been

24   consistent all along on two things:  We need to take

25   discovery on these myriad of issues and we need to

1    coordinate.

2             Now, today, it seems, at the end of my comments and

3    argument, I'm going to ask Your Honor to consider receiving a

4    motion from me under 9013 to appoint a discovery master and

5    direct the parties to do what they should do and should be

6    having done all along, which is to have meaningful meet-and-

7    confers.

8             THE COURT:  Let me --

9             MR. ASTIN:  In my view --

10            THE COURT:  Let me stop you there for a moment, Mr.

11   Astin, because, under the Bankruptcy Code, I am not allowed

12   to appoint a discovery master; it's prohibited.

13            MR. ASTIN:  I -- okay.  I have read some of the

14   literature on that, and I believe that there -- I mean, with

15   your equitable powers, you could appoint someone, whether you

16   call it a "discovery master" or something else to help us

17   guide.  And that was my -- that was the impetus for my

18   request.

19            But we need help here, Judge, whether it's an

20   admonishment by the Court to talk and coordinate.  There --

21   as you can see from the docket, you can take judicial notice,

22   not just harkening back to Mr. Harris' comments, he's right.

23   There are many, many issues.  And there was another midnight

24   massacre on Friday night, a bunch of new filings.  We held

25   off and told them we were holding off on the certain forms of

1   relief because we wanted to foster good will and good faith

2   and focus negotiations in what we hope will soon be a

3   mediation.

4          I'm optimistic.  And I am one who has said publicly

5   and privately to all concerned that I think the only hope we

6   have in resolving these myriad of issues is to get before a

7   mediator.  And I was -- our side was elated that a sitting

8   judge would agree to take the time to help us with this, and

9   I'm sure, with your acquiescence, and we certainly appreciate

10  that.  That's a big step in the right direction.

11         But we have more coming.  And we always look --

12  we're always looking at this in a box and on a rail.  Less

13  than twenty -- less than one business day's notice.  And it

14  presumes that we're potted plants and that that procedure --

15  and that our rights, substantively and procedurally and to

16  due process would not be exercised.

17         We filed yesterday -- and again, we're always --

18  we're all small firms in this case, as you know.  But we put

19  together a Rule 12 motion and we filed that yesterday, as

20  quickly as we possibly could.  But we have more comments.

21         Now, general speaking (indiscernible) when Mr.

22  Harris and his colleagues knew, as they did on Friday night.

23  And to their credit, they told us on Friday afternoon that

24  that was coming.  So, generally speaking, under Rule 7007-3.

25  You have to request within seven days after the reply a

1    scheduling conference.  There's a reason why it's not brought

2    on a rail, as in this case, when something is filed Friday,

3    and here we are on Wednesday morning, and that is because

4    other things can happen.  And I'll represent to the Court

5    that, unless something drastically changes in our approach,

6    by Friday we will timely file or request, under Rule 56, to

7    extend these deadlines because we don't believe that we can

8    adequately respond and we need discovery.

9         We also have the relief from the PI coming, which

10   we were holding off on because of the mediation.  Mr. Harris

11   has now convinced my team that he's absolutely right.  Let's

12   build it to a crescendo.  Let's bring everything that each

13   side has to bring.  I'll take it on faith that he's correctly

14   and that it's much more efficient to bring all these things

15   at once and -- but we're going to need discovery.

16        And I think Your Honor alluded to a couple of

17   things -- I'm not putting words in your mouth, and you can

18   correct me if I'm wrong -- at the beginning of the case.

19   Eventually, we're going to have to go after who we're going

20   to go after.  And eventually, we're going to have to get some

21   discovery.  We've been crystal clear since day one because it

22   is practical, it is ethical, and it is collegial to say we

23   don't want to take AlixPartners three times, we don't want to

24   take the number one and number two three times.  We don't

25   want to take any 30(b)(6) designees that they may put up

1    three times.  We want to do this once.

2           And to our credit, in the limited circumstances

3    where my co-counsel Mr. Haviland, who is not available today

4    because he's in another hearing in the Wawa case, to our

5    credit, we don't take seven hours, as we're allowed to take

6    under the Delaware rules.  We're very, very efficient.

7           And so we're going to need coordination on relief

8    from the PI.  We're going to need coordination of what I

9    believe will be a soon-coming motion on cert of class.  And

10   we're looking very strongly at the timing of filing our new

11   trustee motion, especially since we've had another Friday

12   night massacre, and we're -- our rights are now being jammed

13   up.

14          Now I'm not going to say anything pejorative about

15   my learned colleagues on the other side.  But we fought hard

16   to convince them that, on the extension of time to file

17   complaint to discharge, that the rules gave it to us, were in

18   our favor, that there was not required notice, not adequate

19   notice, there was no notice.  And we got an extension.  And

20   then everybody else -- others got an extension.  And then

21   everybody else got a second extension, and we got on that

22   extension, and that's until June.

23          So it's a little disingenuous to say, well, we've

24   taken all this time, and now it's time and we're running out

25   of time.  I guess, in the future, what I'll have to do, as a

1    custom and practice, is I'll have to say, well, I might get

2    snookered, so on my extension, until whenever it is, I have

3    to have a clause that says that you won't -- you, the debtor,

4    won't bring it beforehand because it's not months and months

5    and months.

6              We are -- we have been -- as the docket shows and

7    all the transcripts show, we've been jammed up, fighting

8    fires from this debtor from the beginning of the case.  When

9    you get an extension, that doesn't mean you're out preparing

10   -- and again, it begs the issue of whether we have adequate

11   discovery, which goes right to the heart of the due process.

12             In the Celotex case, which I don't have to tell

13   Your Honor about, and that trilogy at the supreme level --

14   and I think -- I can think of at least two cases by Judges

15   here in the Delaware Bankruptcy Court and look at the

16   (indiscernible) when you file the appropriate affidavit,

17   fulsome, personal knowledge, all the facts, and we ask for

18   additional time, it's pretty much supposed that you're going

19   to get that additional time.

20             But why should we have to come back to this Court

21   on -- after Friday and do this whole thing all over again?

22   We have to get discovery, unless Your Honor is just going to

23   say, once and for all, Mr. Astin, Mr. Haviland, Acthar

24   Plaintiffs, you are never going to get discovery in this

25   case.  That would be really more efficient.  But I can't

24

1    imagine that's what Your Honor has in store for us.

2          At some point, we need to have our time in

3    discovery.  All of these issues are connected.  It's sort of

4    like the old adage in the medical field, the knee bone is

5    connected to the thigh bone.  There's so much interlocking

6    issues -- so many interlocking issues here that it's only

7    appropriate that we coordinate.  We're willing to coordinate,

8    I want to coordinate at any time.

9          But a meet-and-confer is not a call where you get

10   on the line with sundry attorneys, and the attorneys that are

11   in the power seat -- and the debtors are in the power seat,

12   right?  Getting a fresh start, moving forward.  There's a lot

13   of leeway the debtors are given for obvious reasons.  And

14   they say this is what we're doing and we're getting a

15   hearing.  And I only say -- I said to -- I don't even

16   remember the name of the lawyer.  Mr. Stearn was on, but he

17   wasn't -- and I wasn't talking with him.  Another lawyer from

18   Latham, and I said, well, hey, you're a great predictor, a

19   phenomenal predictor in all the cases I've ever been in here

20   -- I oversaw, of course, hundreds in the U.S. Trustee's

21   Office.  I've never seen such great predictors of outcome

22   than these folks on their jammed-up procedure, putting

23   everything on a short rail.

24         When they say, we're going to file this at midnight

25   and we're going to do that and we're going to have a hearing,

A-6244

1   you know, within this period of time or whatever, they're

2   batting -- they're almost batting a thousand.  We, I think,

3   have struck out on just about every time we have asked for

4   shortened notice on something.  And I take that -- I take

5   that to heart.  I say to myself why is that.

6         Well, maybe the Court is saying it's really, really

7   busy and that you should bring this shortened notice only

8   when absolutely necessary.  And on this one, Judge, I'm going

9   to just suggest to you that this was not absolutely

10  necessary.  There's other things coming.  We shouldn't be

11  doing this today, but we are.  But we should put this off.

12  There should be a scheduling conference after our filings and

13  when the briefing is done and all the replies are in and we

14  should get our discovery.

15        But that discovery should be coordinated with

16  everything else that's dormant and gets teed up and anything

17  else that they just filed on Friday night and anything that

18  we're going to file within short order, including possibly --

19  and I emphasize "possibly," it may be a timing issue where we

20  may decide that our best bet is to try mediation -- a motion

21  that may -- we may seek to dispossess the debtor.  We're also

22  contemplating an examiner motion on a couple of issues, and

23  these are real issues.

24        So I would add -- I've taken too much of the

25  Court's time.  I would request -- respectfully request the

1   Court to not enter the scheduling order today, let things

2   play out procedurally as they will, so that everyone has

3   time, and that to admonish -- if you're not going to appoint

4   someone to help us with discovery, coordinate discovery --

5   there's (indiscernible) say to Your Honor that would

6   (indiscernible) suggested strongly, urged me, reminded me of

7   your chambers procedure at the beginning of the case.  It

8   hasn't worked.

9          When we've had discovery disputes and we've sought

10  to get the Court's assistance on this, we either haven't been

11  able to get it, for whatever reason -- it's not nefarious,

12  it's not anybody singling anybody out, I know that.  I know

13  that's just the pace of play in the Court's business.  But

14  it's just, in this particular case, for reasons beyond

15  everyone's control, it just hasn't worked.  And we need to

16  have our discovery, but it needs to be coordinated.

17         The fees for one of the professionals I saw for a

18  month were $3 million.  And the fees are just going to go up

19  and up and up unless we stop this constant on a rail, leading

20  to a debate, leading to a quick order, forestalling any

21  discovery.  We need to coordinate.  And I know -- I can't see

22  the case ever getting resolved unless we have our discovery.

23  We've been very, very patient.  It's been months and months

24  and months.  We have not delayed that outcome.

25         We still need a fulsome disclosure statement to be

1    filed.  There's nothing on file that tells anybody anything.

2    These delays are not of our making.  And with that, I'd ask,

3    unless Your Honor has any questions for me, I'll rest.

4              THE COURT:  I see Mr. Freimuth has raised his hand.

5    Mr. Freimuth, do you have something to say?

6              MR. FREIMUTH:  Yes.  Good morning, Your Honor.

7    This is Matthew Freimuth from Willkie Farr.  We represent

8    Humana in connection with its Acthar-related claims.

9              And I just wanted to address briefly some comments

10   that Mr. Harris made because they relate to the scheduling of

11   other Acthar-related proceedings in connection with the

12   motions that were filed on Friday night.  On Friday, before

13   the plaintiffs -- before the debtors filed their motions, we

14   filed a motion to estimate our claim and proposed a schedule

15   that would address the debtors -- a schedule for estimation

16   that would address the debtors' liabilities for Acthar-

17   related conduct.  The debtors identified which debtor

18   entities were involved in that illegal conduct to establish a

19   claim amount and address the extent of any administrative

20   claim.

21             In connection with that motion, we proposed a time

22   table that would endeavor to get that estimation proceeding

23   resolved expeditiously.  After we filed our motion, which --

24   the debtors filed their papers, which we think affect our

25   substantive rights with respect to the Humana Acthar-related

 1      claim, without the benefit of fact and expert discovery in

 2      connection with an estimation proceeding like the one we've

 3      proposed.

 4              We've just begun discussing with debtors late

 5      yesterday afternoon a process that would potentially align

 6      these issues raised in our estimation motion and in the

 7      debtors' papers.  And we just wanted to alert Your Honor that

 8      those discussions were ongoing.  They do relate to the

 9      overall resolution of the issues raised in these Acthar-

10      related proceedings.  And to the extent we're unable to reach

11      sort of consensus on those issues with the debtors, we would

12      expect to be in front of Your Honor in short order, given

13      that some of the other deadlines that Mr. Harris alluded to

14      are fast approaching.  So we just wanted to alert Your Honor

15      to that issue this morning.

16              THE COURT:  Okay.  Thank you.

17              Mr. Harris?

18              MR. HARRIS:  Thank you, Your Honor.  I'll be very

19      brief.

20              Yeah, I believe the argument that we've heard about

21      the scheduling of the summary judgment motion essentially

22      boils down to discovery.  I am not aware of any pending

23      discovery that Mr. Astin's clients have served that we have

24      not responded to, so I am not exactly sure what discovery he

25      will seek or will want, but there is none out there pending

1    that we haven't addressed.

2         If he files a Rule 56 motion, we will, of course,

3    address it.  If appropriate and filed on a timely basis, it

4    could be heard along with a summary judgment motion, and

5    probably be the most efficient way for Your Honor to see

6    whether discovery is needed or not, to have both of those

7    issues framed for the Court.  And you can see whether you can

8    decide the summary judgment motion with or without whatever

9    discovery they identify in the future that they think they

10   need.  But it's really impossible to address the impact of a

11   hypothetical discovery motion that hasn't been served.

12        What you do have is a summary judgment motion that

13   we have before you, that we framed as a legal issue.  It can

14   be heard timely.  I didn't hear any argument why the City of

15   Rockford can't analyze today whether their claims, if true,

16   are dischargeable.

17        The other point I heard was that, while we

18   stipulated to allow the City of Rockford an extension of its

19   deadline to file the dischargeability complaint, somehow that

20   means we're not allowed to file one.  That's clearly not

21   correct.  We -- the debtors, under Bankruptcy Rule 4007(a),

22   have our own right to file a dischargeability complaint.  And

23   the fact that Mr. Astin's clients preserved their rights does

24   not mean we waived ours in any way.  We specifically need to

25   have this resolved quickly, and that's why we have filed it,

A-6249

30

1    rather than waiting endlessly.  We don't know when anyone

2    else will file such a complaint.

3            As to the comments by counsel for Humana, you know,

4    I -- we did reach out yesterday to see if we could coordinate

5    our respective motions.  We, hopefully, will be able to reach

6    a resolution and come to Your Honor with that. Just to be

7    clear, Humana's claims do not raise dischargeability issues

8    and so aren't an issue in the adversary proceeding or the

9    summary judgment motion that's before Your Honor today.

10           MR. ASTIN:  And Judge, Mr. Astin.  If I may, just

11   very quickly.  Mr. Harris forgets that we've tried to take

12   depositions many times throughout the case.  They have either

13   been thwarted by the relief that was granted or by a motion

14   to quash that was granted.  We've never been able to get

15   those depos, any (indiscernible) depositions.

16           I mean, if you look at the -- this case is an odd

17   case.  The committee has been out there with their 2004s and,

18   to my knowledge, those 2004s have not taken place.  It just

19   seems like the lady doth protest too much.  Give us our

20   discovery, give us our day -- give us our opportunity to

21   explore live witnesses that are running this case and that

22   will help resolve all of these issues.  And again, there are

23   many issues and none of them are in a vacuum.  They're all

24   related, they're all overlapping, for the most part.  Thank

25   you, Judge.

1          THE COURT:  All right.  Well, the only issue before

2     me today is setting a hearing date on a motion for summary

3     judgment filed in connection with an adversary proceeding.

4          There's nothing in the rules that says a plaintiff

5     cannot file their complaints and file a summary judgment

6     motion simultaneously, so that is not something that is

7     improper in any way.  The question is just a matter of the

8     timing of this.

9          And if there are discovery issues -- and the

10    discovery issues relate solely to this motion, which is the

11    dischargeability of the Acthar Plaintiffs' claims.  The

12    debtors say they're going to assume all of the facts alleged

13    in the various complaints are accurate and, based on that,

14    their claims are dischargeable.  So the question about

15    discovery can come up in the context of a reply or a

16    response.  If, in fact, there is -- if the Acthar Plaintiffs

17    can establish that there is a need for discovery in

18    connection with this motion and this motion only, they can

19    use that as a basis to oppose the motion and the motion can

20    be denied based on that, the failure to provide discovery.

21          The other discovery issues that were discussed all

22    relate to other motions, various motions that were pending.

23    Of course, there's no -- the Acthar Plaintiffs have not filed

24    2004 motion requests or requests for discovery.  And you can

25    take discovery in connection with adversary proceedings or

1    contested matters, and I have ruled on those as we've gone

2    along, based on the facts and circumstances of those

3    individual disputes.

4           So, at this point, I'm going to set the hearing,

5    but I'm going to set it for a little bit later than what the

6    debtors are asking for because, one, my calendar.  We have

7    the next omnibus, there's a claim objection set for -- it was

8    set at three o'clock on the 2nd.  And if you have two claims

9    objections and this summary judgment motion, we're not going

10   to be able to finish on time.  So I am going to set this for

11   a hearing on Monday, June 7th, at 10 a.m. and we'll have the

12   whole day, I'll block the whole day out.

13          So, depending on what kind of responses I receive

14   from the City of Rockford -- and I will move the claim

15   objections to the 7th, as well.  I have not reviewed those, I

16   have no idea what they are.  I don't know whether discovery

17   will be needed in connection with those, and that's an issue

18   that will have to be dealt with at a later time, but the same

19   applies.  If it turns out that discovery is needed and the

20   Acthar Plaintiffs can convince me that it's needed and they

21   have been denied the opportunity to take that discovery,

22   then, obviously, the claim objections will be denied.  So

23   that's what we're going to do.

24          So the parties should confer and set a scheduling

25   order based on a hearing date for June 7th.  Any questions?

33

1            UNIDENTIFIED:  Thank you, Judge.

2            THE COURT:  Okay.

3            UNIDENTIFIED:  Thank you.

4            THE COURT:  All right.  We are dismissed.  Thank

5     you.

6         (Proceedings concluded at 10:39 a.m.)

7                         *****

34

<pre>
 1                        CERTIFICATION

 2              I certify that the foregoing is a correct

 3     transcript from the electronic sound recording of the

 4     proceedings in the above-entitled matter to the best of my

 5     knowledge and ability.

 6

 7

 8

 9

10

11     _____     May 5, 2021

12     Coleen Rand, AAERT Cert. No. 341

13     Certified Court Transcriptionist

14     For Reliable
</pre>

1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2
                                       .   Chapter 11
3    IN RE:                            .
                                       .   Case No. 20-12522 (JTD)
4    MALLINCKRODT PLC, *et al.*,       .
                                       .
5                                      .   Courtroom No. 5
                                       .   824 North Market Street
6                                      .   Wilmington, Delaware 19801
                                       .
7                       Debtors.       .   May 12, 2021
8    . . . . . . . . . . . . . . . . .     3:00 P.M.

9              TRANSCRIPT OF TELEPHONIC OMNIBUS MOTOIN
                  BEFORE THE HONORABLE JOHN T. DORSEY
10                  UNITED STATES BANKRUPTCY JUDGE

11   TELEPHONIC APPEARANCES:

12   For the Debtor:          Mark D. Collins, Esquire
                              Michael J. Merchant, Esquire
13                            Amanda R. Steele, Esquire
                              Brendan J. Schlauch, Esquire
14                            RICHARDS, LAYTON & FINGER, P.A.
                              Rodney Square
15                            920 N. King Street
                              Wilmington, Delaware 19801
16

17

18   Audio Operator:         Jason Spencer

19   Transcription Company:   Reliable
20                            1007 N. Orange Street
                              Wilmington, Delaware 19801
21                            (302)654-8080
                              Email:  gmatthews@reliable-co.com
22

23   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.

24

25

A-6255

```
1   TELEPHONIC APPEARANCES (Continued):

2   For the Debtors:          George A. Davis, Esquire
                              George Klidonas, Esquire
3                             Andrew Sorkin, Esquire
                              Anupama Yerramalli, Esquire
4                             Hugh Murtagh, Esquire
                              LATHAM & WATKINS LLP
5                             885 Third Avenue
                              New York, New York 10022
6
7                             - and -

8                             Jeffrey E. Bjork, Esquire
                              Amy Quartarolo, Esquire
9                             LATHAM & WATKINS LLP
                              355 South Grand Avenue, Suite 100
10                            Los Angeles, California 90071

11                            - and -

12                            Jason B. Gott, Esquire
                              LATHAM & WATKINS LLP
13                            330 North Wabash Avenue, Suite 2800
                              Chicago, Illinois 60611
14

15  For Acthar Plaintiffs:    Donald Haviland, Esquire
                              HAVILAND HUGHES LLC
16                            111 S. Independence Mall E Unit 1000
                              Philadelphia, Pennsylvania 19106
17
18  For the Committee:        Cullen Speckhart, Esquire
                              COOLEY LLP
19                            1299 Pennsylvania Avenue, NW
                              Suite 700
20                            Washington, DC 20004

21  For Committee of          Arik Preis, Esquire
    Opioid-Related            AKIN GUMP STRAUSS HAUER & FELD LLP
22  Claimants:                One Bryant Park
                              Bank of America Tower
23                            New York, New York 10036

24  For Attestor Limited,     Matthew Freimuth, Esquire
    Humana Inc.:              WILLKIE FARR & GALLAGHER LLP
25                            787 Seventh Avenue
                              New York, New York 10019
```

1  <u>MATTERS GOING FORWARD</u>:

2  Letter to the Honorable John T. Dorsey from Attestor Limited
   and Humana Inc., with respect to Scheduling Issues [Docket No.
3  2243; Filed May 10, 2021]

4  **Ruling:   Matter Moved to June 7th**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
1        (Proceedings commenced at 3:00 p.m.)

2              THE COURT:  Good afternoon.  This is Judge Dorsey.

3    We're on the record in Mallinckrodt PLC; Case No. 20-12522.

4              I will go ahead and turn it over to debtors'

5    counsel to run the agenda.

6              MR. MERCHANT:  Good afternoon, Your Honor.

7    Michael Merchant of Richards, Layton & Finger on behalf of

8    the debtors.

9              Your Honor, I apologize.  We're working on the

10   length of the agenda, but we still got 20 pages for just one

11   item going forward.  That is Agenda Item No. 17 which is the

12   Attestor Limited and Humana letter.

13             Before getting to that matter, if acceptable to

14   the court Mr. Davis is on and would like to provide the court

15   with some status updates.

16             THE COURT:  Okay.  Mr. Merchant, for the agendas

17   maybe I can give you a little relief here from the Local

18   Rule.  If it's a matter that's not going forward you don't

19   need to list out every single related docket entry or

20   information.  If it's a matter that's been continued to

21   another hearing date no need to list out everything.  Just

22   put in whatever the motion is and that it's been continued to

23   another date.  That should help.

24             MR. MERCHANT:  Thank you, Your Honor.  We will do

25   that going forward.
```

1          THE COURT:  Alright, thank you.

2          Mr. Davis, go ahead.

3          MR. DAVIS:  Good afternoon, Your Honor.

4          Can you hear me alright?

5          THE COURT:  I can.  Thank you.

6          MR. DAVIS:  Your Honor, for the record George

7   Davis of Latham & Watkins for the debtors.

8          Before turning to the scheduling matters in the

9   agenda, which my colleagues will handle, we wanted to provide

10  the court with a brief case status update as has been a lot

11  of activity in the run-up to this hearing.

12          The opioid claimant mediation has been continued

13  for another week, to this Friday, which reflects the

14  constructive dialog that is continuing among the

15  participants.  With respect to mediation confidentiality all

16  we can say is that the parties are working hard to reach

17  resolutions and we intend to incorporate all such resolution

18  in a revised plan and disclosure statement to be filed in the

19  coming days in advance of the disclosure statement objection

20  deadline of May 19th.

21          The provisional appointment of Roger Frankel as

22  the future claims representative was also extended to this

23  Friday.  The hearing on the permanent appointment is

24  scheduled for May 26th and the debtors intend on proceeding

25  on that date with the hearing.

1              Consistent with the resolution the parties reached

2    in December the OCC has informed us that it will evaluate the

3    results of the opioid mediation in determining whether to

4    object to the FCR motion and prosecuted bar date motion.  We

5    expect the debtors' financial projections, valuation and

6    liquidation analysis to be filed later today or tomorrow; all

7    of which support the debtors' plan.

8              The debtors have received informal comments from

9    various constituents on the plan and disclosure statement and

10   are actively engaged and hope to resolve as many issues as we

11   can in advance of the objection deadline and the disclosure

12   statement hearing on May 26th.

13             With respect to the non-opioid general unsecured

14   creditors and allocation of their plan recoveries we heard

15   this morning that Judge Sontchi is unavailable to mediate and

16   has encouraged the parties to consider alternatives, which

17   we're doing.  Your Honor, these cases were commenced seven

18   months ago, actually to this date.

19             Since that time we've worked day and night with

20   all of our creditor constituents to provide diligence,

21   discovery and information to put parties in a position to

22   evaluate the restructuring.  The debtors recognize that

23   transparency is a prerequisite to the sort of candid

24   discussions that we need to have with constituents and have

25   acted accordingly throughout these cases.

1            This process began with the committees back in
2   November when they were appointed with presentations about
3   the business operations, the recovery, waterfall model that
4   underpins the plan, intercompany analysis, the history of
5   negotiations to reach the restructuring support agreement and
6   the event that transpired over the course of 2019 and 2020
7   that led to the ultimate filing of these cases on October
8   12th.

9            Your Honor, just one second.

10           The debtors created a virtual data room for the
11  UCC through which they have had access to thousands of
12  documents responding to over 850 requests from the committee.
13  The debtors' advisors and management have had over 50 formal
14  and informal calls with the UCC and its advisors.  Since that
15  time we shared a presentation on the updated waterfall to the
16  unsecured creditors committee's professionals on February 1st
17  with an ongoing dialog and the running of requested scenarios
18  for them.

19           Two weeks later the debtor made a proposal on the
20  allocation of the cash pool made available to general
21  unsecured creditors under the plan.  We did not receive any
22  feedback or response on that allocation and still have not to
23  this day.

24           Since January we have produced, on a rolling
25  basis, two and a half million documents inclusive of

1  underlying litigation productions, and new documents

2  collected, and reviewed by the debtors.  We have honored our

3  commitment to produce and exchange related discovery by April

4  30th which was comprised of over 55,000 emails, held weekly

5  meet and confers, negotiated consensual resolutions to 2004

6  requests, created a timeline for discovery to be completed by

7  the end of June; all to stay on track for an August

8  confirmation.

9       We have afforded the UCC significant time to

10  engage with us (indiscernible) on these issues to no avail.

11  They now say in three to four weeks they will be ready to

12  engage. Your Honor, from the debtors' perspective that is

13  simply too late.

14       The debtors are at the point where we need to

15  steer these cases to a conclusion.  The RSA and the deals

16  reached prepetition and during the case are premised on a

17  timeline that has the debtors confirming a plan in August and

18  emerging in November with an Irish examinership proceeding.

19  That timeline was hard-fought and our RSA parties would

20  prefer if we could expedite it further, which is

21  understandable considering that the debtors are spending $20

22  to $25 million a month on professional fees.

23       We are restructuring an over $5 billion capital

24  structure and can't allow allocation of $150 million to

25  threaten to derail the cases particularly when such

9

1  allocation is not necessary to confirm a plan.  The size of

2  the pot, which seems to be the main focus of the UCC and

3  certain of its constituents, is a legal issue at

4  confirmation; not one that should hold-up a disclosure

5  statement.

6          We want consensus, but we cannot risk losing all

7  that we have accomplished.  So we are considering

8  alternatives for general unsecured creditors which could

9  include a non-allocated pot plan for all general unsecured

10  creditors with a post-emergence claims resolution process.

11  We find ourselves in one of the most robust and favorable

12  capital markets of our lifetime.

13          The recent leverage commentary and data comps

14  report from May 6th said, for example, the discounted spread

15  to maturity, which takes into account the bid price and

16  nominal spread on outstanding loans to B-minus borrowers, has

17  fallen to the lowest level since the great depression --

18  sorry, since the great recession.

19          The debtors, as fiduciaries, for all stakeholders

20  have an opportunity to secure exit debt and equity capital in

21  this incredibly favorable market, but only if they have a

22  reasonably certain timeline towards confirmation and

23  emergence.  That is why it remains critical for the debtors

24  to adhere to the timeline for emergence announced on the

25  first day of these cases.

1          So we do intend to proceed with the disclosure

2    statement hearing on May 26th and with approval to begin the

3    solicitation process.  We can proceed down a dual track of

4    solicitation of the plan with mediation during the

5    solicitation period in an effort to reach a consensual

6    confirmation.  Debtors, committees, and large creditors do

7    that all the time and this case should be no different.

8          We're not asking for any relief today from Your

9    Honor, but we felt it was important to provide an update to

10   the court and are available to answer any questions Your

11   Honor may have.

12         THE COURT:  Thank you.  I don't have any

13   questions.  I'm sure others are going to want to speak.

14         I see Ms. Speckhart has already raised her hand.

15   Go ahead, Ms. Speckhart.

16      (No verbal response)

17         THE COURT:  Your muted, Ms. Speckhart.

18         MS. SPECKHART:  Your Honor, can you hear me now?

19         THE COURT:  I can.  Thank you.

20         MS. SPECKHART:  Great.  Thanks.  Your Honor,

21   Cullen Speckhart appearing on behalf of the UCC.

22         To provide the committee's perspective on next

23   steps here and maybe by way of a preview of things to come.

24   I would just have to point out the irregularities of

25   sequencing and what Mr. Davis reported, and what the debtors

A-6264

11

1  are proposing.

2         In rushing to a hearing on a disclosure statement

3  and soliciting votes on a plan it is really nothing more than

4  a placeholder.  It is subject to a process of mediation and

5  perhaps significant revision that hasn't even started with

6  respect to (indiscernible).

7         Setting to one side the fact that we're one week

8  out from the objection deadline and critical components of

9  the plan have yet to be filed including the debtors'

10  liquidation and valuation related information that are

11  central to an unsecured creditors understanding of its

12  prospects for recovery which would be a basis on its own for

13  adjourning the hearing on the 26th.

14         What we have, as of this morning, is a statement

15  from Judge Sontchi including, among other things, that in his

16  view this case calls out for --

17         THE COURT:  Hold on, Ms. Speckhart.  I don't want

18  to get into anything that happened during the mediation.  I

19  don't think that's appropriate.  I don't think anything that

20  Judge Sontchi said should be relayed to me in any way.

21         MS. SPECKHART:  As Mr. Davis indicated, Judge

22  Sontchi has asked the parties to consider alternatives

23  including (indiscernible) private mediator as soon as

24  possible.  And to aid in that objective we have already

25  approached the debtors about exchanging some names and

12

1  getting on with it.

2          So the plan that appears on the docket before Your

3  Honor is just a placeholder and it needs a lot of development

4  on its merits and its principal terms.  We all agree that

5  mediation is the best way to address those issues because

6  they're the kinds of issues that (indiscernible) upon weeks

7  of litigation.  We are all interested in avoiding that if we

8  can, but we want to give mediation a chance to work before we

9  take the next step.

10          We want to make sure that the gating issues are

11  handled before we go through disclosure statements and start

12  soliciting the plan.  Those issues include the question of

13  whether 100 million is the right number for the plan to

14  contribute to general unsecured creditors, which is as much

15  of a legal issue as it is a financial issue related to

16  valuation which we do not have the debtors' view of at this

17  point in time.

18          How that consideration would be at 100 million or

19  some other number should be allocated among various unsecured

20  creditors groups, and how to estimate and treat various types

21  of unsecured claims.  These are not insignificant elements of

22  the plan.  In fact, they are the most significant elements of

23  the plan from the perspective of our constituency and we have

24  repeatedly indicated to the debtors that we will be prepared

25  to mediate at the end of this month, two weeks from now,

13

1  following a full and fair analysis of the information we have

2  been siting to obtain from the debtors since we became

3  involved.

4          So one week out from the objection deadline there

5  is still a lack of transparency about the plan, and how it

6  works, and everyone, including Judge Sontchi, recognizes that

7  we need to mediate.  What we don't need to be doing is

8  (indiscernible) towards a hearing on a disclosure statement

9  on a plan that lacks material terms and is just a

10  placeholder, and it makes even less sense to proceed to

11  solicit votes on a plan that is under, at least, one active

12  mediation involving the UCC and potentially others.

13          So our perspective is very simple, Your Honor.  We

14  want to mediate.  We want to do it soon.  We don't want to

15  come to a disclosure statement hearing about a plan that is

16  not fully or even substantially formed on the treatment of

17  general unsecured claims.

18          Thank you, Your Honor.  I will be happy to answer

19  any questions.

20          THE COURT:  Thank you, Ms. Speckhart.

21          Mr. Preis?

22          MR. PREIS:  Good afternoon, Your Honor.  Arik

23  Preis from Akin Gump Strauss Hauer & Feld.

24          Can you hear me?

25          THE COURT:  I can.  Thank you.

```
1            MR. PREIS:  I actually had not prepared anything
2    to say this afternoon.  I just wanted to say after listening
3    to Mr. Davis I just wanted to clarify a few things.  It seems
4    to me he touched on three subjects.  One was the opioid
5    mediation; two was discovery that both we and the official
6    committee have been engaged in; three, the bulk of the
7    comments seems to be about the non-opioid side of this case.
8            With regard to the opioid mediation I have nothing
9    to say.
10            With regard to discovery I didn't want our silence
11   to be taken as acquiescence that we agree or disagree with
12   everything Mr. Davis said; just wanted to make that clear.
13            I have nothing to say about the non-opioid side of
14   the case.
15            Thank you, Your Honor.
16            THE COURT:  Thank you, Mr. Preis.
17            Anyone else wish to be heard?
18       (No verbal response)
19            THE COURT:  Well, I certainly encourage mediation
20   and I understand that this is a very complex large case.
21   Mediation is not something that can be done quickly, but I
22   would ask, Ms. Speckhart, is it possible to begin the
23   mediation process even though you haven't completed the
24   discovery with the understanding that it might have to extend
25   beyond the time that you feel comfortable that you have had
```

A-6268

15

1  the opportunity to review all the discovery that you've
2  received to date.

3       (No verbal response)

4           THE COURT:  You're muted, Ms. Speckhart.

5           MS. SPECKHART:  Your Honor, I believe that we have
6  the information that we need to begin the mediation process.
7  We want to make sure that our professionals and our committee
8  have the ability to consider the analysis that our financial
9  professionals and our legal professionals have been doing for
10 several months now.  We have targeted the end of May for that
11 process.

12          Now if the question of can we move the next two
13 weeks constructively and productively to talk to the debtors
14 on a preliminary basis about our thoughts, about resolutions
15 on discreet issues I believe the answer is yes.  We are happy
16 to do that.  We do believe that we need the supervision of a
17 mediator and a formal mediation process.  We're looking
18 forward to doing that.

19          I can say on behalf of our entire group that we
20 will be as expeditious about that as we possibly can be.  The
21 goal here is not to derail the debtors' confirmation process.
22 It is simply to allow us the opportunity to have a fulsome
23 mediation so that we have the best chance of avoiding a
24 highly contentious and fiercely litigated confirmation
25 proceeding in court.

1        THE COURT:  Mr. Davis, you mentioned that you're

2   exploring other opportunities.  What are the other

3   opportunities for a mediator; looking for a private mediator

4   to mediate these particular issues?

5        MR. DAVIS:  Yes, Your Honor.  So we, you know,

6   need to discuss that internally.  We just got word that Judge

7   Sontchi would not be available earlier today.  So we need to,

8   you know, certainly discuss with the other mediation parties

9   the prospect for a private mediator and that process.

10        I think the point that I wanted to get across is

11   I do think, just given how long it took to set-up mediation

12   on the opioid side and attempting to do it on the general

13   unsecured creditors side it is going to take a bit to agree

14   on a mediator time, for that mediator to get up to speed, and

15   we think it is imperative that our, you know, process of

16   moving forward with a disclosure statement and solicitation

17   continue in parallel because, you know, I particularly -- so

18   much of everything we have achieved to date, including the

19   RSA milestones, and the financing market, and the

20   availability of credit today which may not be there or may be

21   available on different and worse terms two months from now we

22   just can't afford to wait.

23        So we have -- we are prepared to mediate.  We

24   think mediation makes sense.  We do think, to some extent,

25   allocation of recoveries -- you know, we can propose and may

1  wind up proposing a pot-plan for unsecured creditors. That

2  would obviate the need to deal with allocation entirely as

3  long as everyone was getting better than their Chapter 7

4  liquidation recovery.  The plan would be confirmable and

5  certainly wouldn't be any disparate treatment as among

6  creditors.

7         So that is a path to the debtor and probably in

8  the debtors' best interest.  We have made ourselves available

9  and willing to participate in allocation so that we can try

10 to get money in creditors hands quicker because all of the

11 extensive, contingent, and disputed claims on the general

12 unsecured creditors side between the Acthar claims, the

13 general -- the generics price fixing claims, the asbestos

14 claims, the environmental claims; I mean they are complicated

15 multi-faceted and complex.

16        The idea of reaching agreement, just given the

17 level of complexity and the disputes over value at which

18 debtor has what amount of value, make mediation a very

19 difficult task.  I think Judge Sontchi recognized that.

20        We are prepared to do it.  We don't think it's

21 necessary to confirm a plan in this case, but we're prepared

22 to do it to try to get to an agreement with unsecured

23 creditors to get money in their hands faster, but we don't

24 think the entirety of the debtors' reorganization should be

25 brought to a halt in order to allow that priority.  We have

1  given it time and it sounds like we may be able to begin, in

2  earnest, you know, hopefully soon.  We look forward to that.

3       We do think it will take time.  They are very

4  complex issues.  You know, probably take a month, or two, or

5  possibly more to successfully mediate.  We just don't have

6  that time and availability to let, you know, the entirety of

7  the estate and all of the other major stakeholders, you know,

8  to hold that at bay and incur the cost attendant to that.  So

9  we look forward to mediating, but hopefully in parallel to

10 soliciting votes on the plan.

11      THE COURT:  Alright, it sounds like you can start

12 the process now to select the mediator and negotiate over how

13 the mediation is going to proceed.  That is probably going to

14 take more than a couple of weeks or at least a couple of

15 weeks so that then Ms. Speckhart would be in a position to be

16 able to participate in the mediation with a full review of

17 all the discovery and the advice of her consultants.  So I

18 would highly encourage the parties to start that today, start

19 that process today of looking for a mediator.

20      MR. DAVIS:  Thank you, Your Honor.

21      THE COURT:  Mr. Haviland?  It says here Mr. Platt,

22 but I know it's you, Mr. Haviland.  Go ahead.

23      MR. HAVILAND:  Thank you, Your Honor.  I was

24 scrambling to find the Zoom link and I had to take my

25 partners.  So I am going to clarify I am Don Haviland, not

1  Bill Platt.

2          Thanks for the opportunity to speak.  I wasn't

3  going to.  I only appeared today because we have an agreed

4  upon schedule with the debtors and I know debtors' counsel

5  will present at the appropriate time.

6          Since the subject of mediation came up I thought

7  I'd just lend my two cents in the absence of Mr. Aspen who

8  had another commitment.  We were very, very appreciative of

9  the court and in particular Judge Sontchi for agreeing to

10  take on the task, at least, as far as he was able to get.

11  It's unfortunate he is unable to go any further.

12          I want the court to know, from the Acthar

13  Plaintiffs standpoint, we are ready, willing and able to go

14  forward.  The parties had done all they needed to do to get

15  to the table.  We just can't do it this week.  We have also

16  reached out to the debtors to try to fast-track the

17  recommendation of private mediators so that we can move

18  ahead.

19          The deadlines are unfortunate because as the court

20  well knows a number of pleadings have been filed in the last

21  couple of weeks, and the debtor is moving quickly.  We don't

22  mind the pace in terms of getting issues resolved.  We want

23  to get the mediation underway and see where that goes.  Like

24  I said, we worked out an agreeable schedule on some of the

25  response dates.

1            It's ambitious.  I want you to know, Judge, there
2   is a lot of paper that's already been filed and more that
3   will come in short order, but I know Your Honor had a
4   conference with the parties about scheduling and has given
5   the parties a little bit of leash in terms of how that works.
6   You know, this case has been going on for a while now.  We
7   all know what it's about and we look forward to getting to
8   the table to try to resolve it if we can.
9            We have a slightly different view then the debtors
10  in terms of the pace at play and the order at play, but I
11  wanted to echo what Mr. Davis said that there is no reason to
12  halt the mediation or in any way impede that.  I don't think
13  it's going to take months.  I think it's going to take a lot
14  less time because the parties know what they're looking to
15  accomplish.  We just have to get to the table.
16           Thank you, Your Honor.
17           THE COURT:  Thank you, Mr. Haviland.
18           Alright, anyone else before we move onto the
19  scheduling issue?
20       (No verbal response)
21           THE COURT:  Okay.  This was Humana had sent the
22  initial letter.  So let me hear from Humana and then I will
23  come back to the debtors.
24           MR. FREIMUTH:  Good afternoon, Your Honor.  This
25  is Matthew Freimuth from Willkie Farr on behalf of Attestor

1    and Humana.

2              Can you hear me okay?

3              THE COURT:  I can.  Thank you.

4              MR. FREIMUTH:  Okay.  Attestor holds rights to

5    participate and pursue Humana's Acthar related claims.  We're

6    here today on a request to adjourn the May 14th response date

7    on debtors' claims objections which seeks to expunge

8    potentially billions of dollars of Acthar related claims on a

9    short schedule and so far without the benefit of any of the

10   discovery that Humana has requested in these cases so far.

11             The debtors approach raises significant due

12   process concerns in our view, which I will address in a

13   moment.  I can appreciate that the court might be wondering

14   why a group of lawyers can't agree on something as straight-

15   forward as a briefing schedule.  And the reason is that this

16   dispute occurs in the context of a broader debate about the

17   best way to resolve outstanding issues related to the

18   debtors' Acthar related liabilities and issues around the

19   confirmation of the debtors' plan.

20             So with the court's indulgence I'd like to just

21   take a minute to set the stage by explaining who my clients

22   are and providing a bit of context for the current scheduling

23   dispute.

24             In 2001 a vile of Acthar cost around $40.  A vile

25   today costs around $40,000.  Humana's prepetition lawsuit

1   asserts that the debtors violated federal anti-trust laws,
2   RICO, and various state tort laws by engaging in its scheme
3   to prop-up the price of the drug.  That scheme had, at least,
4   three components:
5              The debtors purchase of a competitive product and
6   shelving it to maintain and illegal monopoly; the debtors
7   engaging in a scheme to bribe doctors to prescribe Acthar
8   even to treat diseases for which there is no clinical
9   evidence establishing the utility of the drug; three,
10  subsidizing co-pays through bogus charities to conceal the
11  cost of the drug from consumers.
12             Humana's lawsuit followed on the heels of
13  litigation by the FTC and the DOJ directed at some of the
14  same conduct.  For insurers like Humana this was meant
15  footing the bill for massive overly priced and overpriced and
16  over prescribed Acthar.
17             In Humana's case from 2010 to the present this
18  resulted in over a billion dollars -- in potentially over a
19  billion dollars in prepetition liability.  In addition,
20  Humana has also incurred and is continuing to incur
21  substantial post-petition administrative expenses relating to
22  Mallinckrodt's ongoing illegal pricing of Acthar.
23             Since the petition date Humana has continued to
24  purchase Acthar (indiscernible) spending approximately $45
25  million on the drug since the petition date and continuing to

1   spend, on average, approximately $7.5 million per month.

2   Since even before these cases began the debtors have,

3   essentially, refused to seriously engage with private Acthar

4   claimants like Humana.  They excluded Humana from the RSA

5   negotiating table and have consistently either ignored or

6   refused to provide Humana with any discovery in these cases.

7   Disclosure in these cases from Humana's perspective has been

8   a major problem and it continues to be in the context of the

9   debtors' claim objection.

10         The consequences of excluding Acthar claimants,

11  private Acthar claimants from the negotiating table are

12  clear.  The debtors plan is predicated on paying some

13  unsecured creditors who are parties to the RSA like the

14  opioid claimants, the DOJ and unsecured bondholders while

15  excluding other unsecured creditors such as my client.  So

16  despite the fact that Acthar sales account for 30 percent of

17  the debtors overall business, despite the fact that the

18  debtors acknowledge having potential Acthar liabilities of

19  $15 billion, the company has relegated private Acthar

20  claimants to wrangle over $100 million pot with hopes of

21  other unsecured creditors.

22         That brings us to where we are today.  All the

23  parties seem to agree that issues related to the debtors'

24  Acthar liabilities need to be resolved prior to confirmation.

25  We have competing sets of motions and objections that seek to

1  accomplish that.  Attestor and Humana believe that the most

2  logical and reasonable path forward requires a threshold

3  determination of the value of Humana's claims and the

4  debtors' liabilities.  As such we filed motions to estimate

5  those liabilities and to allow post-petition administrative

6  claims.  Those motions are set to be heard by the court on

7  May 26th.

8          In the context of the estimation motion Humana has

9  proposed an expedited but orderly process for addressing

10  debtors' Acthar related claims including the question raised

11  by the debtors' objection which debtor entities should be

12  held liable for the alleged misconduct.  On the same day we

13  filed our motion, after giving us no discovery over several

14  months and, basically, keeping us on the back burner since

15  the petition date the debtors filed their objection which

16  seeks to disallow and expunge billions of dollars of Acthar

17  related claims against debtor entities other than

18  Mallinckrodt ARD and PLC.

19          The objection is one step in the debtors' plan to

20  clear up its Acthar issues in a hurried way.  The entire

21  basis for the debtors' objection is that Humana's underlying

22  litigation names only Mallinckrodt ARD as the defendant and

23  other Acthar litigations name PLC.  The debtors' objection

24  ignores the obvious fact that had Human proceeded in its

25  litigation Humana would have had the ability to exercise its

1  due process rights, take discovery, and amend its complaint

2  to add additional defendants including other Mallinckrodt

3  entities if necessary.

4         To date, in the context of these Chapter 11

5  proceedings, Humana has not been afforded that due process.

6  The debtors have either resisted or been non-responsive to

7  our efforts to obtain discovery including its issues relevant

8  to which debtor entities should be subject to liabilities.

9         The failure to obtain discovery in these matters

10  is not from a lack of trying on Humana's part.  On February

11  25th we served an informal letter request on the debtors

12  requesting production of certain documents.  After a brief

13  meet and confer the debtors advised that they were not

14  authorized to provide us with any documents.  The debtors

15  even refused to produce documents that they had previously

16  produced and made available to the UCC.

17         As Your Honor knows, we joined the UCC's 2004

18  motion and, again, in that context the debtors resisted

19  providing us access to documents it produced to the UCC which

20  we thought would be a reasonable and efficient starting place

21  for discovery.  Last week we propounded document discovery in

22  the context of the claim objections.  We received no

23  indication that the debtors are going to produce any

24  documents and we are two days away from the existing May 14th

25  objection deadline.

1          In light of the court's decision last week to move

2    the hearing from June 2nd to June 7th and given the

3    importance of the issues raised by the debtors' objection

4    Attestor and Humana conferred with the debtors and proposed a

5    reasonable extension of its objection response deadline to

6    May 26th.

7          The May 26th date is significant.  That is the

8    date our estimation and administrative claims motions are to

9    be heard.  At that point the court will have had the benefit

10   of oral argument on the estimation and admin motions will be

11   further explained the inter-relatedness of those motions to

12   the objection as well as our position with regard to an

13   appropriate schedule for resolving these claims consistent

14   with our rights to obtain discovery and have an estimation to

15   address the debtors' liability.

16         In response to that request to adjourn to May 26th

17   the debtors have floated a number of proposals, all of which

18   are unacceptable to Humana for different reasons.  In their

19   letter yesterday the debtors described the proposal to extend

20   Humana's response to May 21st in exchange for an extension of

21   their time to respond to the estimation motion.  That demand

22   for a reciprocal extension doesn't make sense.

23         Number one, it would jam the debtor -- jam Humana

24   in its reply and unlike the debtors' claims objection neither

25   of Humana's motions require discovery before the hearing on

1  May 26th.  So the debtors have no obvious need for more time.

2          Just today, the debtors quoted a proposal that

3  would accommodated for a lengthier briefing schedule but was

4  premised on adjourning the estimation motion and the admin

5  motion from May 26th to June 7th.  Respectfully, Your Honor,

6  those motions need to be heard promptly.  A process like the

7  one contemplated in our estimation motion requiring discovery

8  needs to put in place -- needs to be put in place at the

9  earliest possible convenience.  That issue should not be

10  deferred for another nearly two weeks.

11          So where does that leave us.  Attestor proposed a

12  modest extension that would adjourn its response to the

13  Acthar claims objection until, at least, May 26th when the

14  court has had the opportunity to hear the estimation and

15  admin motion.  There is no prejudice to the debtors in

16  extending that response date as they would still have a full

17  week to reply in advance of the June 7th hearing.

18          On that basis, Your Honor, we request the

19  adjournment from May 14th to May 26th of our response to the

20  debtors' claim objection.

21          Thank you.

22          THE COURT:  I want to see if I understand what the

23  real issue is here, what the big picture issue is here I

24  should say.  It sounds like, you know, ordinarily you would

25  have, as Mr. Davis indicated, their thinking about putting

1   together a pot-plan.  So there is really two different groups

2   of debtors here.  There's those that the debtors say are

3   responsible for the opioid claims and those who are -- and

4   other debtors who have general unsecured claims against them.

5          I think what the problem here is, is that the

6   debtors disagree with your position that your clients have

7   claims against the debtors with the opioid responsibilities.

8   Am I getting that right?  Is that the real issue here?

9          MR. FREIMUTH:  I think that is only part of it,

10  Your Honor.  There are a number of debtor entities against

11  which we have asserted claims on the generic side of the

12  house so to speak.  And as I understand the debtors'

13  objection they would seek to expunge all claims against all

14  debtor entities other than just ARD and PLC.

15         There are other entities involved, we believe, in

16  activity related to Acthar, other potential theories of veil

17  piercing or fraudulent transfers that we need to be able to

18  explore to identify which debtor entities our claims are

19  properly asserted against.  And we have been afforded, to

20  date, no discovery on those issues despite, again, having

21  propounded the Rule 2004 request and having served discovery

22  in the context of this disputed motion last week.

23         THE COURT:  Alright, let me hear from the debtors.

24  Mr. Harris, are you doing the argument for the debtors?

25         MR. MURTAGH:  Your Honor, its Mr. Murtagh.

```
1                THE COURT:  Go ahead, Mr. Murtagh.

2                MR. MURTAGH:  Can you hear me okay, Your Honor?

3                THE COURT:  I can.  Go ahead.

4                MR. MURTAGH:  Thank you.  It's Hugh Murtagh from

5    Latham & Watkins on behalf of the debtors.

6                Your Honor, needless to say we disagree with the

7    allegations --

8                THE COURT:  You froze, Mr. Murtagh.  We can't hear

9    you.  I think everybody froze.

10               MR. MURTAGH:  -- that --

11               THE COURT:  Hold on, Mr. Murtagh.  I had some

12   glitch on my computer.

13               MR. MURTAGH:  I can hear you, Your Honor.

14               THE COURT:  Okay.  I had some glitch. I couldn't

15   hear anybody and everybody froze.  So why don't you start

16   over again because I think I missed something.

17               MR. MURTAGH:  Can you hear me now, Your Honor?

18               THE COURT:  I can.  Go ahead.

19               Can you hear me?

20               MR. MURTAGH:  Yes, I can.  I was saying that

21   needless to say we disagree with the substance of what Mr.

22   Freimuth just said, but most of it is irrelevant.  The only

23   thing that we're before Your Honor on today, and we apologize

24   for not having been able to resolve this consensually, is

25   there's a scheduling objection on briefing for responses to
```

1  the debtors' omnibus claims objection.

2          To be clear, the basis for that objection is that

3  Humana and other claimants have prepetition lawsuits against

4  one or, at most, two debtors, but file proofs of claim

5  against every debtor with absolutely no basis stated.  There

6  is not substantiation behind any of those claims at all. So

7  that is what that objection is about.  The only thing before

8  the court is whether Humana should be required to respond on

9  the default schedule set forth in the local rules.

10          So to focus on that scheduling conflict let me

11  just set the table a little bit.

12          As I think should have been clear from Mr.

13  Freimuth's statements the debtors worked very hard to avoid

14  burning the court with this dispute.  The debtors always

15  worked very hard to keep scheduling disputes away from the

16  court and to that end I'm happy to report, as Mr. Haviland

17  noted, that we have reached an agreement with Mr. Haviland

18  for the Haviland Hughes responses to the several motions and

19  objections pending against them.

20          The substance of that agreement is that the

21  schedule for the Haviland Hughes (indiscernible) time to

22  respond to the omnibus claims objection, (indiscernible)

23  objection and the discharge summary judgment motion will be

24  May 21st and the debtors will reply no later than June 2nd.

25  So we have a total agreement with the Haviland Hughes

A-6284

1  plaintiffs on scheduling.

2        We have also had productive discussions with a

3  number of the other parties targeted by the recent Acthar

4  filings and we expect that there will be some more consensual

5  resolutions.  We worked very hard with Humana to find

6  something that addressed their concerns.  Mr. Freimuth

7  described some of them, but there were more and Humana

8  rejected, literally, every single one of them.

9        Instead, what Humana is insisting upon is the

10 unilateral extension of almost two weeks while also refusing

11 to grant an extension of our own objection deadline and it's

12 just not reasonable.

13       So to give a little more background, Your Honor,

14 on April 30th the debtors filed an omnibus objection to

15 unsubstantiated claims to the Acthar plaintiffs who had filed

16 claims against every debtor regardless of any alleged

17 connection between those debtors and Acthar.  Humana is one

18 of those plaintiffs, like I said.  They have had a feud

19 pending since early 2020 asserting claims against

20 Mallinckrodt ARD and (indiscernible).  In fact, they

21 originally sued ARD and PLC in the Smithfield case.  So they

22 have been dropping defendants rather than adding them.

23       The debtors' objection does not address the merits

24 of any claim against ARD, it just seeks to allow totally

25 unsubstantiated claims (indiscernible).  Also, on April 30th,

1  Humana filed two motions; one seeking to allow administrative

2  claims in estimated amounts, and the other seeking to

3  establish an estimation process for both administrative and

4  prepetition claims.

5        Both parties, not just the debtors, set the

6  response date in accordance with the local rules for fourteen

7  days after the filing of the pleadings.  Humana objected.

8  The debtors posted two meet and confer sessions with Humana

9  at which the debtors offered various alternatives all of

10 which Humana rejected.

11       We tried to have a frank conversation with Humana.

12 At the outset we told them that we felt there were

13 substantial problems with their pleadings, not the least of

14 which they said it is not possible to estimate for allowance

15 for administrative claims.  So we should find another way to

16 achieve what the substance of what Humana wanted and they

17 said no.  We said, okay, then let's discuss a mutual

18 extension of time and them, again, said no.  We said why not

19 and they said that this court has ordered us to give Humana

20 an extension when it advised the parties to discharge

21 adversary proceedings that they should agree on a schedule.

22 Obviously, we disagree with theat.

23       We tried again.  Yesterday we attempted to resolve

24 the dispute by offering Humana seven additional days to

25 respond to the objection paired with only three days of an

1  extension for the debtor to respond to their motion.  Humana,

2  again, rejected the compromise this time asserting that the

3  debtors proposal --

4         THE COURT:  You froze again, Mr. Murtagh.

5         MR. MURTAGH:  -- little time to reply before --

6  can you hear me, Your Honor?

7         THE COURT:  You froze there for a second.

8         MR. MURTAGH:  Yeah, I saw it freeze.  Can you hear

9  me now?

10         THE COURT:  I can, but I'm going to cut you off

11  because, you know, I don't need all the whole back and forth

12  about we said, they said.  I just need to know what the

13  bottom line is here.

14         MR. MURTAGH:  Fair enough, Your Honor.

15         THE COURT:  Let me ask you a question to try to

16  get to what the bottom line is here.  Are these motions by

17  Humana related to the motions filed by the debtors?

18         MR. MURTAGH:  They are barely related, Your Honor.

19  Our claims objection, like I said, seeks to disallow claims

20  that are completely unsubstantiated.  That is the basis of

21  the objection.  There is no attempt to get into the merits of

22  any allegations that are actually plead.

23         By contrast, Humana's motion seeks to get into the

24  underlying merits by estimating them to allowance for

25  prepetition and purported administrative expenses.  So they

1  are trying to get us the merits to estimation.  We are simply

2  trying to disallow unsubstantiated claims.

3          THE COURT:  Well that sounds related to me in that

4  how can I even begin the process of determining an estimation

5  procedure unless I know what the claims are and what the

6  universe of claims are is what I am trying to get at.  My

7  inclination here is to move the Humana motions to the 7th

8  with the other motions that are already on for the 7th and

9  hear them altogether because they seem to be interrelated to

10 me.

11         MR. MURTAGH:  Well, Your Honor, absolutely we

12 understood that was the concern raised by Humana and even if

13 we disagree with it we were amenable to that solution.  So if

14 the court thinks that is the way to go we are happy with that

15 resolution.

16         THE COURT:  Alright, Mr. Freimuth, why doesn't

17 that work?  We're talking about, a what, extra ten days,

18 twelve days.

19         MR. FREIMUTH:  The concern with that, Your Honor,

20 is that as part of the estimation motion, okay, we proposed a

21 process for fact discovery, expert discovery, briefing and a

22 hearing.  And that fact discovery, as part of estimation,

23 would necessarily explore issues like which of the debtor

24 entities should be held liable for the alleged misconduct on

25 the part of Mallinckrodt, if you will the type of discovery

1  that we would obtain had we been involved in or permitted to

2  proceed in our underlying litigation.

3          That is, obviously, a time consuming process, one

4  that we think can be done efficiently and expeditiously, but

5  we think it's important to get those issues like the

6  estimation motion and the admin motion in front of Your Honor

7  as quickly as possible.  Even a delay of ten days or more is

8  delay in ability of our time, Your Honor, to obtain discovery

9  that up to this point has been denied to us and which bears

10 squarely on the question of which of the debtor entities are

11 liable.  That is the concern with shifting the estimation and

12 admin motions even further in time.  We need to get that

13 process underway.

14         THE COURT:  Well isn't that the risk that the

15 debtors take?  I mean if I conclude that, yes, you need to

16 have discovery and that we need to have an estimation hearing

17 it's going to push the debtors' timeline and that's on them.

18 Obviously, we can't -- if I determine that I have to estimate

19 these claims in order to approve a plan the debtors are the

20 ones who have to deal with theat.

21         MR. FREIMUTH:  It certainly is a risk to the

22 debtors, Your Honor.  I don't disagree with that.

23         THE COURT:  So if they're willing to take that

24 risk and have the hearing on the 7th I don't see any reason

25 not to move it to that date.

1          MR. FREIMUTH:  Your Honor, again, I think on that

2    I will just say, again, we do see some urgency here in

3    getting the estimation and the admin motions resolved

4    quickly.  We don't think the debtors suffer any prejudice by

5    adjourning our response to their objection to May 26th to

6    allow the court to have the benefit of appearing that

7    objection -- hearing our estimation motion before filing that

8    objection.

9          So that would be our position, Your Honor.

10   Obviously, if you are inclined to move it I hear you.

11         THE COURT:  Yeah, I don't think there's anything

12   that -- the fact that there is going to be an oral argument

13   and then you're going to file your objection right after the

14   argument I don't think is going to help me at all because I'm

15   still going to see the same argument.  You're not going to

16   change the argument based on the oral argument I don't think.

17   You probably won't have time to do that.

18         In any event, I think moving it to the 7th is more

19   efficient since I do see all these motions as interrelated.

20   So I am going to move the Humana motions for establishing

21   procedures for estimation and the administrative claim to

22   June 7th.  I will put you on the same schedule that the

23   debtors have agreed to with Mr. Haviland's clients for

24   briefing that way everything is done at the same time.

25         MR. FREIMUTH:  Understood, Your Honor.

```
 1          THE COURT:  Okay.  Anything else for today?
 2          MR. MURTAGH:  Your Honor, just one point of
 3  clarification with respect to the debtors.  One thing that we
 4  had proposed is that (indiscernible) to Humana was that we be
 5  given until May 17th to respond on their pleading and we
 6  would submit that request again.
 7          THE COURT:  Well I was of the view that if we're
 8  going to move it to the 7th that the debtors' response would
 9  be due the 21st and the 2nd would be the reply deadline for
10  the Humana motion.
11      (No verbal response)
12          THE COURT:  I think you froze again, Mr. Murtagh.
13  Can you hear me?
14          MR. MURTAGH:  Yes, I can hear you now, Your Honor.
15          THE COURT:  Okay.  So did you get that?
16          MR. MURTAGH:  I didn't, I'm sorry.
17          THE COURT:  Okay.  I'm going to put you on the
18  same schedule as the other motions that are currently
19  scheduled for the 7th.  So your response to Humana's motions
20  will be due on the 21st and then Humana will have until June
21  2nd to file their replies.
22          MR. MURTAGH:  Understood.  Thank you, Your Honor.
23          THE COURT:  Okay.  Alright, anything else for
24  today?
25      (No verbal response)
```

1        THE COURT:  Thank you all.  We are adjourned.

2        (A Chorus of "Thank you, Your Honor")

3        (Proceedings concluded at 3:50 p.m.)

4

5                        CERTIFICATE

6

7        I certify that the foregoing is a correct transcript

8    from the electronic sound recording of the proceedings in the

9    above-entitled matter.

10

11

12   /s/Mary Zajaczkowski_____     May 13, 2021
     Mary Zajaczkowski, CET**D-531

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
|  | . | Case No. 20-12522(JTD) |
| MALLINCKRODT PLC, et al, | . |  |
|  | . |  |
|  | . |  |
|  | . | 824 Market Street |
|  | . | Wilmington, Delaware 19801 |
|  | . |  |
| Debtors. | . | Thursday, May 20, 2021 |
| . . . . . . . . . . . . . . . . | . | 10:00 A.M. |


TRANSCRIPT OF VIDEO MOTION
BEFORE THE HONORABLE JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA ZOOM:

For the Debtors:          Michael Merchant, Esquire
                          Robert Stearn, Esquire
                          RICHARDS, LAYTON & FINGER, P.A.
                          Rodney Square
                          920 N. King Street
                          Wilmington, Delaware 19801

                          - and -

                          Jeffrey E. Bjork, Esquire
                          Amy Quartarolo, Esquire
                          LATHAM & WATKINS LLP
                          355 South Grand Avenue, Suite 100
                          Los Angeles, California 90071


(APPEARANCES CONTINUED)


Audio Operator:           Jason Spencer

Transcription Service:    Reliable
                          1007 N. Orange Street
                          Wilmington, Delaware 19801
                          Telephone: (302) 654-8080
                          E-Mail: gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording:
transcript produced by transcription service.

APPEARANCES VIA ZOOM (continued):

For the Debtors:                Christopher Harris, Esquire
                                George A. Davis, Esquire
                                George Klidonas, Esquire
                                Andrew Sorkin, Esquire
                                Anupama Yerramalli, Esquire
                                Hugh Murtagh, Esquire
                                LATHAM & WATKINS LLP
                                885 Third Avenue
                                New York, New York 10022

                                - and -

                                Jason B. Gott, Esquire
                                Jason Moehlmann, Esquire
                                LATHAM & WATKINS LLP
                                330 North Wabash Avenue, Suite 2800
                                Chicago, Illinois 60611

For the U.S. Trustee:           Jane Leamy, Esquire
                                Andrew R. Vara, Esquire
                                OFFICE OF THE U.S. TRUSTEE

For the Official
Committee of Unsecured
Creditors:                      James Lathrop, Esquire
                                Jamie Edmonson, Esquire
                                ROBINSON & COLE, LLP

                                - and -

                                Cullen Speckhart, Esquire
                                Johnathan Kim, Esquire
                                Cathy Hershcopf, Esquire
                                Michael Klein, Esquire
                                COOLEY LLP
                                1299 Pennsylvania Avenue, NW
                                Suite 700
                                Washington, DC 20004

For Committee of
Opioid-Related
Claimants:                      Arik Preis, Esquire
                                AKIN GUMP STRAUSS HAUER & FELD LLP
                                One Bryant Park
                                Bank of America Tower
                                New York, New York 10036

(APPEARANCES CONTINUED)

APPEARANCES VIA ZOOM (continued):

For Acthar Plaintiffs:          Donald Haviland, Esquire
                                HAVILAND HUGHES LLC
                                111 S. Independence Mall E Unit 1000
                                Philadelphia, Pennsylvania 19106

                                - and -

                                Daniel K. Astin, Esquire
                                CIARDI, CIARDI, ASTIN
                                1905 Spruce Street
                                Philadelphia, PA 19103


For Attestor Limited,
Humana Inc.:                    Matthew Freimuth, Esquire
                                Benjamin McCallen, Esquire
                                Skyler Silvertrust, Esquire
                                WILLKIE FARR & GALLAGHER LLP
                                787 Seventh Avenue
                                New York, New York 10019

For the Ad Hoc Group of
First Lien Term Lenders: David Fournier, Esquire
                                TROUTMAN PEPPER HAMILTON
                                 SANDERS, LLP

                                - and -

                                Scott Greenberg, Esquire
                                Jeremy Evans, Esquire
                                Michael J. Cohen, Esquire
                                Jennifer Conn, Esquire
                                Chaim Fortgang, Esquire
                                Michelle Choi, Esquire
                                Joshua Brody, Esquire
                                Leesa Haspel, Esquire
                                Matthew Biben, Esquire
                                GIBSON, DUNN & CRUTCHER, LLP


For the Ad Hoc Committee
of Government Entities
Holding Medicaid Rebate
Claims:                         Melanie Cyganowski, Esquire
                                Michael Maizel, Esquire
                                Peter Feldman, Esquire
                                Jennifer Feeney, Esquire
                                OTTERBOURG, PC
(APPEARANCES CONTINUED)

```
           APPEARANCES VIA ZOOM (continued):


           For Deutsche Bank, as
           Administrative Agent:      Evan Miller, Esquire
                                      BAYARD, PA

                                      Stephanie Slater, Esquire
                                      FOX ROTHSCHILD, LLP

                                      Michele Meises, Esquire
                                      WHITE & CASE, LLP

                                      Alan Gamza, Esquire
                                      MOSES & SINGER, LLP


           For the Legal Representative
           for Future Claimants:      Robert Brady, Esquire
                                      Jaime Chapman, Esquire
                                      James Patton, Esquire
                                      Edwin Harron, Esquire
                                      Melanie Sharp, Esquire
                                      Heather Smillie, Esquire
                                      YOUNG, CONAWAY, STARGATT
                                       & TAYLOR, LLP

                                      - and -

                                      Richard Wyron, Esquire
                                      Roger Frankel, Esquire
                                      Karen Bray, Esquire
                                      GREENBERG TRAURIG, LLP

                                      - and -

                                      David Skatoff, Esquire
                                      Agnes Tang, Esquire
                                      Olivia Parsons, Esquire
                                      Nikan Ansari, Esquire
                                      DUCERA PARTNERS, LLC
                                      11 Times Square
                                      New York, NY 10036

           For Humana, Inc., et al: Matthew Harvey, Esquire
                                      Robert Dehney, Esquire
                                      Nader Amer, Esquire
                                      MORRIS, NICHOLS, ARSHT
                                       & TUNNELL, LLP



           (APPEARANCES CONTINUED)
```

```
          APPEARANCES VIA ZOOM (continued):


For Humana, Inc., et al: Philip DiSanto, Esquire
                         Matthew Freimuth, Esquire
                         Benjamin McCallen, Esquire
                         WILLKIE, FARR & GALLAGHER, LLP

For the Official Committee
of Opioid Claimants:     Justin Alberto, Esquire
                         Anthony De Leo, Esquire
                         Sophie Macon, Esquire
                         COLE SCHOTZ, PC

                         - and -

                         Brooks Barker, Esquire
                         AKIN, GUMP, STRAUSS, HAUER
                          & FELD, LLP

For the Multi-State
Governmental Entities
Group:                   Jared Green, Esquire
                         SEITZ, VAN OGTROP & GREEN, PA

                         - and -

                         George O'Connor, Esquire
                         Jeffrey Leisemer, Esquire
                         CAPLIN & DRYSDALE, CHARTERED

For the Unsecured Note
Ad Hoc Group:            Richard S. Cobb, Esquire
                         LANDIS, RATH & COBB, LLP

                         Andrew Rosenberg, Esquire
                         Claudia Tobler, Esquire
                         Alice Eaton, Esquire
                         PAUL, WEISS, RIFKIND, WHARTON
                          & GARRISON, LLP
```

A-6297

<u>INDEX</u>

| <u>PROCEEDING</u> | <u>PAGE</u> |
|---|---|
| Motion | 7 |

<br>

| <u>ORAL ARGUMENT</u> | <u>PAGE</u> |
|---|---|
| by Mr. Murtagh | 8, 27 |
| by Mr. Haviland | 14 |
| by Mr. Freimuth | 33 |

<br>

| <u>BY THE COURT</u> | <u>PAGE</u> |
|---|---|
| Decision | 31 |

7

1                          MORNING SESSION

2          (Proceedings resume at 10:01 a.m.)

3              THE COURT:  Good morning.  This is Judge Dorsey.

4      We're on the record in Mallinckrodt PLC, case 20-12522, and

5      we'll go ahead and turn it over to Debtor's Counsel to run

6      the agenda, which I see is much shorter and only one item on

7      the agenda for today.  Go ahead, Mr. Merchant.

8              MR. MERCHANT:  Good morning, Your Honor.  Michael

9      Merchant of Richards, Layton and Finger on behalf of the

10     Debtor.  So, we were successful today, but I can't make

11     promises going forward.  There's one matter on the agenda

12     today, it's the Debtor's motion to establish an

13     administrative claims bar date.  Mr. Murtagh will be handling

14     that motion on behalf of the Debtors.  And then at the

15     conclusion of the hearing, Your Honor, Mr. Snyder would like

16     to provide the Court with certain updates regarding some

17     agreements that have been reached with regards to the

18     challenge period.

19             THE COURT:  All right.  Mr. Murtagh, go ahead.

20             MR. MURTAGH:  Good morning, Your Honor.  Can you

21     hear me okay?

22             THE COURT:  I can.  Thank you.

23             MR. MURTAGH:  Thank you, Your Honor.  Hugh Murtagh

24     from Latham and Watkins on behalf of the Debtors.  As Mr.

25     Merchant said, the only item on the agenda for today is the

A-6299

1    Debtor's request for establishment of a an initial

2    administrative claims bar date.

3        Your Honor, the -- the purpose of the motion is to

4    establish an initial bar date for administrative claims that

5    give the Debtor's a sense of the number asserted amounts and

6    bases for alleged administrative claims.  The Debtor's

7    believe that with that information they can determine how to

8    address the claims sufficiently to ensure confirmation,

9    whether that be through allowance, objection, or perhaps

10   estimation for feasability purposes.

11       The Debtors received two objections to the bar date

12   motion, one from Humana and Attestor, and another one from

13   Acthar Plaintiffs represented by Haviland Hughes.  I'm happy

14   to report, Your Honor, that the Debtors resolved the

15   objection of Humana and Attestor through the addition of

16   language in the amended proposed form of order that was

17   submitted at DI 24 37.  And we -- we have one minor

18   additional refinement to that language that I will walk

19   through with Your Honor.  But, just to summarize first with

20   regard to how we resolved the Humana and Attestor objection,

21   and then to go through the continuing objection from --

22   excuse me, from the Haviland Hughes Plaintiff.

23       Beginning with Humana, Your Honor, Humana and

24   Attestor objected to entry of the bar date order to the

25   extent that it could be retro -- prejudice their ability to

1   proceed on their recently filed motion for an estimation and

2   allowance of administrative claims.  While the Debtors don't

3   agree with the substance of the motion, the Debtors are not

4   through the bar gate order attempting to foreclose Humana and

5   Attestor from pursing that motion.  And so the agreed

6   language provides in effect that Humana and Attestor are --

7   to have timely filed these claims, and the order does not

8   prevent continued prosecution of the estimation and allowance

9   motions, and all parties' rights and objections are reserved

10  in that regard.

11       And, Your Honor, there's some revised language,

12  which you may have had a chance to look is at paragraph

13  twelve of the order.  And we do have one additional minor

14  change that -- that we would like to preview to Your Honor,

15  that we would propose to submit through a further slightly

16  amended form of order after this hearing.  And -- that

17  change, Your Honor, is in paragraph twelve in the added

18  language.  And I -- I don't know if you have it in front of

19  you, and I can very quickly explain it.

20       THE COURT:  I do.  I have it in front of me.

21       MR. MURTAGH:  -- Your Honor, in the -- in the --

22  the new language that appears beginning with any motion

23  applications or other requests, the full sentence reads:  Any

24  motion application or other requests filed with this Court

25  for allowance and payments of administrative expenses prior

1  to the entry of this order shall be deemed timely filed --

2  administrative claims.  The only refinement we would propose

3  to make, Your Honor, is to strike the portion of that lang --

4  that sentence that says -- that refers to or other requests.

5  Upon reflection, we -- we believe that that catchall is

6  potentially so broad that parties may believe that if they

7  had for instance just submitted a reservation of rights in an

8  unrelated pleading, that they were excused from the bar date.

9  And if it were read that broadly, it would be begin to defeat

10  the purpose of establishing the bar date.  So -- propose to

11  revise the language to say instead, any motions for

12  applications filed with this Court for allowance, and then to

13  continue with what is already written.

14          THE COURT:  All right.  Is that something -- Humana

15  has agreed to?

16          MR. MURTAGH:  And Humana is agreeable to that

17  change, Your Honor.

18          THE COURT:  Okay.  All right.  Thank you.

19          MR. MURTAGH:   With -- with that change, Your

20  Honor, the language in paragraph twelve resolves the

21  objection of Humana and Attestor.  Though, I understand Mr.

22  Freimuth or somebody else from the Willkie Firm may have a

23  few points to -- that they may want to make in any event.

24          THE COURT:  All right.

25          MR. MURTAGH:  So, let's move on to the Haviland

1   Hughes, which remains a live objection.  The Haviland Hughes

2   Plaintiff, who -- what are the -- the Acthar litigants

3   represented by the Haviland Hughes Firm, they objected on two

4   grounds.  First, that no claimant should be exempted from the

5   bar date, and second the -- the notice provided for the order

6   may be inadequate.

7        So, starting with the -- the claims exclusions,

8   Your Honor, the -- the Haviland Hughes Plaintiffs appear to

9   assert first that no exclusions are warranted.  But, it

10  appears they're focused on the exclusion of opioids claims.

11  -- more general point first, there is no requirement that an

12  initial claims bar date embrace all claims rather than

13  specific categories of claims.

14        And as in other cases that are cited in our reply,

15  Your Honor, the request here is tailored to require filing of

16  only those claims that the Debtors believe -- examine in the

17  context of -- confirmation.  That is not the case with opioid

18  claims for the following reasons:  The Debtors are in the

19  process of revising their plan to provide for the following

20  treatment.  First with regard to opioid claims generally,

21  which is just claims related to any opioids product, under

22  the revised plans any alleged administrative opioid claims

23  will be channeled to the trust.  Second, with regard to

24  opioids voluntary injunction, or VI claims, which has claims

25  relating to violation of a voluntary injunction on opioid

1    activities that has been entered in -- and is overseen by the

2    monitor.  First the Debtors are confident that there will be

3    no such administrative claims.  But, to the extent they are

4    asserted, the revised plan will provide that they ride

5    through and are not discharged, and so the effect those

6    changes can be reflected in a revised plan that will be filed

7    with this Court.  If -- if any of that were to fail to come

8    to pass, the Debtors could then pivot and return to

9    considering creating some sort of -- for opioid claims.  But,

10   given the proposed treatment for opioids -- asserted opioids

11   administrative claims, there's simply no need to go through

12   the time, expense, and burden of establishing an

13   administrative bar date for those claims at this time.

14        The Debtors explain these plan mechanics to the

15   Haviland Hughes Plaintiffs, and they responded that they

16   maintained their objection.  So, that's the claims exclusion.

17        The -- the second objection, Your Honor, was on

18   notice.  And as regard to notice, the purported procedures

19   under the proposed order require the Debtors first to quote

20   notify -- to notify quote all creditors and other known

21   holders of claims against the debtors, based -- their post-

22   petition -- records, and to expressly provide the

23   supplemental mailing in the event additional potential

24   claimants become known.  Now, in addition the -- the order

25   will require the Debtors to publish notice in the Wall Street

13

1    Journal, the New York Times, the U.S.A. Today, the Financial

2    Times, the Irish Independent, the St. Louis Post-Dispatch,

3    and the Star Ledger.

4         The Haviland Hughes Plaintiffs appear not to object

5    to this broad notice, but they assert and said that the

6    Debtors have not previously and will not now actually mail

7    notice to all known Acthar purchasers.  The -- the Plaintiffs

8    have repeated this assertion recently in a variety of

9    pleadings, and -- and I do expect that Mr. Haviland will

10   shortly stand up and repeat this assertion in sweeping terms

11   while offering no evidence for it.  The Debtors will respond

12   to those assertions when they're relevant, but for now in the

13   context of the request for entry of the bar date order, they

14   simply are not.

15        What is relevant is whether the noticing procedures

16   themselves are appropriate, and on that there is no

17   objection.  Furthermore, to the extent the Debtors discover

18   additional claimants, the Debtors have already provided for

19   supplemental mailings.  And to the extent that any claimant

20   asserts nevertheless that it did not receive appropriate

21   notice, the Debtors have added comfort language to the order,

22   clarifying that the order does not preclude any claimant from

23   later asserting that it not -- did not receive appropriate

24   notice.  And that language is at paragraph fourteen.

25        So, Your Honor, while the Haviland Hughes Plaintiff

1    may speculate as to possible failure -- notice, they don't

2    object to the procedures in the order, and those procedures

3    already address the possibility of any actual notice -- that

4    could arise in the future.  So, for -- for the foregoing

5    reasons, Your Honor, the Debtors respectfully request that

6    the Court overrule the remaining objection and enter the

7    further amended form of order that the Debtors will submit

8    upon conclusion of the hearing.  Thank you, Your Honor.

9              THE COURT:  Thank you, Mr. Murtagh.  Mr. Haviland?

10             MR. HAVILAND:  Good morning, Your Honor.  Can you

11   hear me all right?

12             THE COURT:  I can.  Thank you.

13             MR. HAVILAND:  I'm here also with my co-counsel

14   Daniel Astin, who is appearing by phone.  He's traveling this

15   morning.  And just as a point of order, Judge, we would

16   notice the change in the attribution of the Acthar Plaintiffs

17   seven months into this case, now all of a sudden their

18   Haviland Hughes Plaintiffs, which I pointed out in an email

19   late last night to Mr. Murtagh, to be personalizing the

20   Acthar Plaintiffs at this point is only going to confuse the

21   record, not only in this Court, but on appeal.  I know the

22   Court well knows that the Acthar Plaintiffs are the only

23   punitive class action plaintiffs in this case for purchases

24   of Acthar, represented by Ciardi, Ciardi, and Astin; Meyers

25   and Flowers in Illinois; the Beasley Firm in Philadelphia;

     the Bartimus Frickleton Firm in Kansas; and so to be

1   personifying the group of plaintiffs who are claimants as the

2   Haviland Hughes Firm I just think at this point in time,

3   Judge, it smacks of some type of personal commentary that I

4   think is inappropriate.  But, Counsel, despite my request

5   that we continue to keep the record clean decided to make

6   that attribution this morning.  I'm only going to continue to

7   represent the Acthar Plaintiffs, Judge, along with my co-

8   counsel.

9         With that said, we did speak to the Debtors'

10  Counsel about our concerns and were unable to reach

11  agreement.  Your Honor will remember back in November when

12  the original claims bar date was raised, we raised three

13  objections, and one of them went to the notice issue and due

14  process.  And unfortunately, those issues were not timely

15  resolved, because the debtor represented at the time that

16  they were going to provide first class mail notice, as

17  required under the Supreme Court decision in Mullane, which

18  the Debtors cite and rely upon.  They said they were going to

19  send first class mail notice to all known creditors.  And

20  both in that -- the context of that discussion, of that

21  objection and now, we've repeatedly pointed out to the

22  Debtors' Counsel that the Acthar Plaintiffs, who are part of

23  the Acthar Plaintiffs class, are all known to these debtors.

24  And so our objection goes to due process, both procedural and

25  substantive due process.  And it's threatening whether or not

1    any discharge will be allowed once the plan, if one is

2    confirmed.  But, the Debtors seem to feel like if they can

3    continue down this pathway, they're going to be able to get

4    everything approved, and then it'll all just go away.

5          Despite our best efforts to talk to the current

6    counsel, we've been -- we've been litigating these issues for

7    more than four years.  There are databases, Judge, with the

8    names and addresses of the third party -- in the class.  The

9    Acthar Plaintiffs filed over seventy proofs of claim with

10   respect to the original bar date.  More than half of those,

11   Your Honor, did not get notice.  Now, you might wonder how

12   the heck did they file a proof of claim?  And the answer to

13   that is simple, many of those claimants are part of a large

14   coalition of self-funded payers called the Delaware Valley

15   Healthcare Coalition, headed by the plan administrator for --

16   O.E. Local 542, Mr. Heenan.  Now, Mr. Heenan is one of the

17   five Acthar Plaintiffs who sued back in 2017, 2018, so they

18   know the Local 542 Plaintiffs.

19         Well, when it became clear that the Debtors weren't

20   going to notify third-party payers who purchased Acthar, Mr.

21   Heenan wrote a letter to the coalition.  And it's as a result

22   of that letter, not any notice by the Debtors, that a number,

23   and I mean dozens of schools, unions, and municipalities

24   stepped forward to file proofs of claim.  Now, when I pointed

25   that fact out, and it's a fact, Judge, and you'll hear about

1    it in the -- in the June hearings on the motion to bar the --

2    proof of claim, that it took the extraordinary efforts of

3    others, not the Debtors, to notify folks that they had

4    claims.  They said, well we've looked at the books and

5    records, and we find only eleven hundred third party payers.

6    Now, just to put that in context, Judge, if you look at the

7    10K, the public report of Mallinckrodt and just go back to

8    2013, I had somebody look at it this morning, there were

9    twenty-eight thousand one hundred and twelve prescriptions of

10   Acthar that year.  Twenty-eight thousand prescriptions paid

11   for by third-party payers, but only eleven hundred notices

12   were sent.

13        Now, it's the Debtors' burden to demonstrate that

14   they're fulfilling due process.  But, instead of doing that,

15   what we hear is the Acthar Plaintiffs just keep complaining.

16   When we point out that -- that this drug is very different

17   from opioids, it is not a pharmacy dispensed drug.  You can't

18   go into a Walgreens or a CVS and buy Acthar.  In 2007, as

19   we've alleged in our complaint, and I don't think it's

20   contested, Mallinckrodt's predecessor company Questcor

21   changed the distribution of this product.  They got rid of

22   all wholesale distribution, the Cardinals, the McKessons of

23   the world don't distribute the product anymore.  All the

24   distribution of Acthar goes through Express Scripts

25   subsidiary CuraScript.  All prescriptions of Acthar go

1    through the hub that was once owned by Express Scripts called

2    United Biosource.  That is an agent of Mallinckrodt by

3    contract.  All the folks that work at United Biosource are

4    paid for Mallinckrodt.

5          Why do these facts matter?  The debtor has all that

6    information of those prescriptions in their fingertips, in

7    their books and records, yet they refuse to look at those

8    book and -- books and records for purposes of notice.  Now,

9    you might wonder why?  Well, I think I know the answer.  It's

10   not contested that the claims of the Acthar Plaintiffs are

11   $15 billion.  If every claimant stepped forward and made a

12   claim for the purchase of Acthar, and you'll see in a class

13   group -- objection, Judge, the Debtors argue that and agreed

14   that the class definition is every purchaser of Acthar from

15   2007 overpaid, because on August 27 they raised the price

16   from $1,600.00 to $29,000.00 in what we allege is an

17   antitrust conspiracy with Express Scripts.  So, all those

18   purchases are in the punitive class.

19         Now, I'm not going to argue the class issue,

20   that'll come up on the 7th.  But, we had to point out to the

21   Court this morning the problem of due process and the problem

22   of notice.  I -- I read with great interest the motion for

23   entry, because it really does target our group of plaintiffs.

24   You read paragraph six, the Debtors say that their ability to

25   prepare for consummation of the plan will be informed by the

1    scope of -- administrative claims.  And then they go on to

2    point out one, two, three, four pleadings filed by the Acthar

3    Plaintiffs.  Nowhere do they talk about any other credits --

4    no other creditors, just the Acthar Plaintiffs.  Because they

5    know what we know, the claims are vastly under reported.  If

6    our litigation group and the Acthar Plaintiffs filed over

7    seventy proofs of claim, there are thousands that have not

8    been filed.  And this is the reason for the two-fold

9    objection this morning.  Number one, all claimants should be

10   forced to come to the table and file administrative claims.

11   Now, the issue of the opioid claims bar date has been raised

12   several times back in the original bar date -- the O.C.C.

13   representative argued in an objection there should be a bar

14   date for the opioid claims, and those objections went by the

15   wayside.  And now we're arguing for that, because if there

16   are administrative claims, we agree with the Debtors that

17   it's going to impact the scope of the -- of the plan and the

18   amount of money that would be available given the

19   administrative priority of the administrative claims.  But,

20   you can't leave a big group of claimants out there with an

21   amorphous number.

22        Now, we all know -- raised that issue.  We don't --

23   we don't represent opioid claimants -- opioid claimants.

24   But, we do represent third-party payers, Your Honor.  And

25   here's the importance that -- that we just couldn't have the

1    Debtors understand.  When they send a notice out that says

2    you have a bar date -- and the notice here reads just like

3    there isn't a bar date.  You have a bar date and you must act

4    by this date, however you don't have to act if you have an

5    opioid claim.  And then if you look at footnote three in

6    exhibit two to the submission, it defines an opioid claim as

7    anyone who has a claim for opioids.

8          Judge, every one of our third-party Plaintiff

9    clients has an opioid claim, but they've been told do

10   nothing.  Here's a notice that was sent to you, but you don't

11   have to do anything.  And it's right up front.  It's the first

12   thing, who must file a claim?  Any person with an

13   administrative claim other than opioids.  What does that tell

14   a third-party payer that paid for Acthar?  Well, it doesn't

15   tell them that they have to act on the Acthar claim.  It tell

16   them, because you have an opioid claim, do nothing.  We're

17   going to point out to the Court by live testimony at the

18   hearing in June, our third-party payer clients who have

19   opioid claims, who have actually filed suit, who didn't know

20   they needed to file an Acthar claim.  Now, we filed some of

21   those claims, but not all of those claims.  But, all those

22   claims will be extinguished due to the confusion in the

23   notice and the lack of direct mail notice to those third-

24   party payers telling them that your substantial claims for

25   Acthar, which on average, Judge, are a half a million

1    dollars, they are substantial economic loss claims.

2          As I said, if you just take any snapshot from the

3    10K, you've got ten thou -- tens of thousands of

4    prescriptions of Acthar each year.  And when the Debtors said

5    that they've only notices eleven hundred third-party payers,

6    you can look at that number alone and realize there's

7    something wrong with that.  Because think about the -- I.S. -

8    - indication for Acthar, infantile spasm.  It's a baby born

9    with infantile spasms.  It's an acute condition, there's

10   about two thousand that are born each year that are born with

11   it.  It doesn't repeat itself.  But, if you take that

12   population each year, that's a third-party payer covering

13   that patient and paying for Acthar.  You blow so far passed

14   eleven hundred third-party payers, it's ridiculous.  If you

15   had a class action, Your Honor, and you were trying to

16   certify a class of third party payers, that notice would go

17   out to over fifty thousand third party payers.  Anyone who

18   does notice in this case knows that.  This isn't the first

19   case that involves a prescription drug.

20         But, despite our best efforts talking to the

21   Debtor, pointing them to their own documents, explaining to

22   them basic facts that this drug is not a pharmacy dispensed

23   drug, it is one that's sent to the home of every Acthar

24   patient.  Mallinckrodt pays for a nurse to go to the home of

25   the patient and teach them to self-inject.  Now, I ask you,

1    how can they do that if they don't have the address of the

2    person?  How can they send a nurse to that place?

3    Mallinckrodt is very sophisticated in tracking this product.

4    It is their most important drug.  That was the first day

5    hearing's affidavit, that it's the most expensive, most --

6    most important, the driver of the plan.

7            So, I -- I didn't want this to be the only issue of

8    the day, but it's an important issue and it's a watershed

9    moment, Judge, because they want to set a bar date of June

10   28th, which is just over a month from now.  We know from the

11   objection that I raised back in November about the mail, I

12   don't know about anybody on this call, but I got a Christmas

13   card in April, in the mail.  The mails are slow.  They are

14   not working quickly.  But, they're proposing to send some

15   mail notice out inside of a month and set a bar date on

16   administrative claims of June 28th.  So, I'm trying to give

17   the Court some focus and -- perhaps a way out.  We would ask

18   that the proposed date be pushed back at least by a month,

19   until we can have the hearing on the notice issues, because

20   that's not today.

21           We just filed out opposition to the objection.  And

22   the Debtors ironically just asked for discovery of the Acthar

23   Plaintiffs for their own documents, so we could point them

24   yet again to their own documents that show in their books and

25   records the names and addresses of third-party payers who pay

23

1     for Acthar.  But, that's not the issue, Judge.  It's an

2     important issue in terms of the fact that there are known

3     creditors, and the Debtors don't object to the fact that

4     known creditors must be given notice.  Publication notice

5     does not supplant that.  Especially this notice, which says

6     what I just read before.  Mallinckrodt has an administrative

7     bar date, but if you have an opioid claim do nothing.  That

8     sends the wrong message to third-party payers with Acthar

9     clams, because it says nothing about Acthar.  It doesn't say,

10    as it should say up front, if you have an opioid claim you

11    don't need to do anything now.  But, if you have an Acthar

12    claim you better move now, because you have a bar date.  By

13    the way, you probably already lost certain rights, because of

14    the original bar date.

15          And we've gotten claim calls, Judge, from clients -

16    - now this is how this works.  You've got a union plan

17    administrator that goes to a meeting and he says to a couple

18    of folks at the meeting, hey I filed this claim on Acthar.

19    And they say, oh what's that?  And the next thing you know,

20    we get a call from the Carpenters Union.  And they say, do I

21    have an Acthar claim?  They run the numbers, and don't you

22    know it, they do.  But, they didn't file, Judge.  And that

23    just came in next week.  But, Mr. Murtagh said to us, well

24    Mr. Haviland, no harm, no foul, because you can file that

25    claim, and -- and maybe we won't object to it as late.  But,

24

1    that's not the issue.  The issue is, that plan administrator

2    had to hear from another plan administrator, who heard from

3    the coalition or some other place other than the Debtors.

4    And what we'll show you at the hearing in June is the claims

5    that have been filed that don't appear on their list.  And

6    the question for the Court and the Debtors is, why not?  If

7    you know that these third-party payers paid for Acthar, and

8    we'll show you where that is, why didn't you sent them

9    notice?  And I suggest again, Your Honor, $15 billion in --

10   in absent class member claims would so eclipse the pool of

11   the unsecured creditors of a hundred million, it would make

12   this plan confirmation that -- relegates that money an

13   absolute abomination to think that you could give that group

14   a $100 million and say go fish.

15         They're issue for another day.  Today is simply the

16   issue of a notice that went out to tell third-party payers

17   who have -- opioid claims, which they all do, do nothing, but

18   if you have an Acthar claim, it says nothing.  It doesn't

19   tell you there's an urgent bar date.  It doesn't tell you,

20   you have to act.  And it's my job as class counsel to stand

21   up for their rights, because this isn't class notice where we

22   would have used a plan -- a notice plan manager that would

23   have used that list of third-party payers and matched it

24   against the list of the debtors to update addresses to the

25   extent they're not current -- you go back to 2007.  But the

1    record will show you, Your Honor, they know the names and

2    addresses of every payer of Acthar.  It's their business to

3    know that.  It's their most important constituent, that's why

4    they know that.

5         We just want them to tell people about the bar

6    date.  Because if we go to plan confirmation and discharge,

7    there'll be some lawsuits some other place, and it won't be

8    discharged when an Article Three Judge looks at it and says

9    they didn't give notice.  Now, we tried to raise that back in

10   November.  We were told they were going to send notice to all

11   known creditors, and they didn't do it.

12        And if you look at that list of eleven hundred,

13   Judge -- and I'll finish in a moment, they include in the

14   definition of third-party payers, Express Scripts.  Well,

15   Express Scripts is the Defendant.  We sued them.  They're the

16   co-conspirators, so they don't count.  The other P.V.M. don't

17   count.  They don't pay for the drugs.  They administer claims

18   of the drug.  We represent the payers, the people who have

19   skin in the game that actually paid the overcharge.  They're

20   the folks that have the claim.  They're the folks that --

21   that should be -- filing proofs of claim in this bankruptcy.

22        And I'll just end with this.  The -- the comfort

23   language -- I was interested to hear that being added, but

24   that doesn't give our clients comfort, because it doesn't say

25   that we will agree that late filed claims will be accepted,

1    as this notice percolates around different circles and we see

2    people starting to find out about this case and these bar

3    dates.  The Debtors should agree that any claim that comes in

4    by plan confirmation should be acceptable given what we've

5    pointed out when -- when it comes to notice.

6           Your Honor, that's all I have to say on those

7    objections.  These are important objections, because it's a

8    watershed moment.  I'll finish with the -- the point that I

9    started, that this -- this plan seemed to be directed at the

10   Acthar Plaintiffs.  We have indicated that we have post-

11   petition claims.  We are going to file those post-petition

12   claims, and we're going to do it on the class wide basis.

13   And we're going to do that to protect the rights of absent

14   class members, as we've done from the start.  Because they

15   don't know that they have a bar date.  And they have relied

16   upon the class.  And they've done that since 2018 when the

17   Mayor of the City of Rockford went on National Television

18   with Leslie Stahl and told everybody you know what's going on

19   with Mallinckrodt?  This fixes it.  And he riveted the

20   population of America, and the phones rang off the hook at

21   Mallinckrodt and Express Scripts the next day.  Folks are

22   relying upon the class device.  We'll get to that on another

23   day.

24           But, Judge, I only ask that you defer this until we

25   can get through these issues.  You'll have a full record from

1    which to decide whether or not the notice is sufficient.  And

2    you'll rule on that as you will, but today to set a bar date

3    of June 28th, respectfully, Judge, I just think is going to

4    compound due process, substantive and procedural errors that

5    we can't undo.  Thank you for your time this morning.

6           THE COURT:  All right.  Mr. Freimuth, I see you

7    raised your hand -- before I go back to Mr. Murtagh.

8           MR. FREIMUTH:  It -- it's find, Your Honor, if --

9    if you want to let Mr. Murtagh address Mr. Haviland's

10   comments.  I did just want to make a few remarks about --

11   about resolution of the issue with the Debtors.

12          THE COURT:  All right.  Mr. Murtagh, why don't you

13   respond to Mr. Haviland?

14          MR. MURTAGH:  Thank you, Your Honor.  Just -- just

15   to make a -- a few preliminary points, and then I'll turn to

16   the -- the substantive -- the objections that were filed to -

17   - to rebut the assertions.  First, as -- as Your Honor well

18   knows, but I think needs to be said, Mr. Haviland's

19   statements are not evidence.  There's no evidence in this

20   proceeding at all regarding any of his assertions,

21   substantially all of which the Debtors, needless to say,

22   disagree with.  There is no evidence stated that there has

23   been any failure of any notice at any time.  There is no

24   evidence that the U.S. Mail does not work.  Mr. Haviland is

25   not class counsel.  There is no certified class, no motions

1   for certification have been filed in the under -- underlying

2   litigations before they were filed.

3           And last, as to the nomenclature.  As we explained

4   to the Mr. Haviland this morning after we received his email,

5   there's absolutely nothing -- about this.  We were referring

6   to Haviland's clients as the Haviland Hughes Plaintiffs,

7   because we found it very confusing to refer to them as the

8   Acthar Plaintiffs in the context of disputes in which there

9   are other Acthar Plaintiffs that he doesn't represent.  So,

10  we just needed a -- a different term to make it clear that he

11  represents a certain group of Acthar Plaintiffs, not all of

12  the Acthar Plaintiffs, and not a class of Acthar Plaintiffs.

13  That's the only reason, and we do not mean any offense by it

14  at all.

15          So, to -- to turn to -- the last -- Your Honor.  I

16  think Mr. Haviland made a number of proposals at the podium

17  here about the way the order should be changed.  We -- we

18  received none of them prior to hearing that just now.  We had

19  not been asked to consider any other language at all, and we

20  do not think that the proposals he just made are worth

21  considering for the reasons I'll explain.

22          First with regard to the exclusion of opioid

23  claims.  Mr. Haviland cites no authority for the proposition

24  and we are not aware of any authority for the proposition

25  that an initial administrative claims bar date needs to

1    include all claims rather than the claims that are necessary

2    to address at that time.  Again, there are cases cited in our

3    pleadings that do exactly that, and <u>Takata</u> is a good example,

4    because it has a very broad exclusion for all claims related

5    to Takata products.

6                Second, Your Honor, Mr. Haviland made the assertion

7    the -- the noticing is very confusing, because it excludes a

8    need to file claims in respect to opioids and tells everybody

9    else to do nothing.  Well, Your Honor, that's not what the

10   language says.  The language of the notice that three asks,

11   which is in exhibit two to the order, says any person or

12   entity holding an opioid claim or -- V. I. opioid claim, each

13   holder of such claim -- opioid claimant needs to file a

14   claim, provided however that an opioid claimant that wishes

15   to assert an administrative claim against the Debtors, but is

16   not an opioid claim or a V.I. opioid claim, must file proof

17   of administrative claim with respect to such claim or claims,

18   which are not opioid claims or V.I. opioid claims on or

19   before the initial administrative claims bar date.  This

20   language is not confusing, Your Honor.  It's crystal clear.

21   The only thing you don't have to file is your opioid related

22   claim.  To -- as regards to the -- the objection that opioid

23   claims are excluded or that exclusion of claims is confusing,

24   neither holds water.

25                Second, with regards to notice, Your Honor,

1    generally -- again, Mr. Haviland's assertions regarding

2    evidence are -- are -- regarding notice are -- are not

3    evidence, as I said.  But, I -- I think the more important

4    point, Your Honor, is that it -- the -- the assertions just

5    aren't relevant to the propriety of entering of the initial

6    administrative claims bar date order.  That order requires

7    the Debtors to undertake the notice that is set forth in the

8    order.  And that includes noticing all known creditors and

9    holders of claims, and a very publication -- publication

10    notice, so that we sweep up and capture all know and unknown

11    plaintiffs.  That's what the order requires the Debtors to

12    do.

13          What Mr. Haviland is asserting is that will in fact

14    fail to do it, but that's not an issue for today.  The

15    Debtors won't fail to do this.  But if they did, the issue

16    would be that we have failed to live up to the notice that

17    this order correctly asks the Debtors to perform.  And if

18    that happens, we would address it when it occurs.  It's not

19    an objection to the language of the order or the propriety of

20    the notice that the order requires.  So, that is the reason

21    why the noticing is appropriate.

22          And -- and given that we are not aware of any

23    problem with the U.S. Mail, we do not see the need to extend

24    the bar date for another thirty days for the unsubstantiated

25    assertion that the mail had stopped working.

1          And for these reasons, Your Honor, we again

2     respectfully request that the Court overrule these objections

3     and enter the order.

4          THE COURT:  All right.  Let me address the -- this

5     objection first, and then I'll go to you, Mr. Freimuth.

6          First of all, Mr. Haviland, I was not confused by

7     the concept and I did not see the -- the Debtors as making

8     this a person thing by referring to your clients as the

9     Haviland Hughes Acthar Plaintiffs, because there are other

10    Acthar Plaintiffs, including Mr. Freimuth's clients, who's

11    about to speak.  So, he was distinguishing you from others

12    who are represented separately, and I did not see that as a -

13    - personal attack on you.  And I -- I -- I took it as just

14    trying to be clear as to who they were talking about.

15         As far as the notice, I agree with the Debtors that

16    the notice that is provided for in -- in this order is

17    appropriate.  And the Debtors have an obligation to live up

18    to that.  If they don't, then there will be consequences down

19    the road.  But, that's for another day.  And as Mr. Murtagh

20    mentioned, there is a comfort provision in the order that

21    says if someone did not receive notice they can file a late

22    claim, but I will note that also -- section -- excuse me,

23    Rule 503 -- Section 503 specifically provides that the Court

24    can approve a late filed claim upon a showing of -- of cause.

25    So, if someone didn't get notice and they come in later,

A-6323

```
1    they're certainly going to be able to file a claim if they

2    can show that they didn't receive the notice as required by

3    this order.

4         As for the opioid claimants, I agree with the

5    Debtors that the language -- let me get back to that

6    language.

7         (brief pause)

8         The opioid claimants -- in subsection F of

9    paragraph five.  It does say that it relates only to opioid

10   claims, and that if you are a claimant who has something

11   other than an opioid claim, you do need to file a proof of

12   claim.  So, I am going to, though, as the Debtors to include

13   language in here just as an accommodation, Mr. Haviland, that

14   says must file a proof of administrative claim with respect

15   to such claim or claims, which are not opioid claims or V.I.

16   opioid claims, and put in a parentheses, including but not

17   limited to any Acthar claim.  That way is makes it clear --

18   it makes it specifically that it applies to -- Acthar

19   claimants.  And I think that addresses that issue.

20        So, with those findings and conclusions I will

21   overrule the objection, subject to that one change to that

22   one paragraph.  And we'll go from there.  So, let me hear

23   from Mr. Freimuth before I actually say I'm going to enter

24   the order, though, because I'm not sure -- I'm -- I'm

25   assuming he's just going to say he agrees with everything.
```

1    But, if not, I'm going to have to make further rulings, so

2    I'll wait on entering the order.

3            MR. FREIMUTH:  Good -- good morning, Your Honor.

4    This is Matthew Freimuth from Willkie Farr on behalf of

5    Attestor and Humana.  Can you hear me okay?

6            THE COURT:  I can.  Thank you.

7            MR. FREIMUTH:  Attestor and Humana are one of the

8    largest holders, we believe, of administrative expense claims

9    in these cases.  And these claims arise from the fact that

10   Humana and other insurers have continued to pay prices for

11   Acthar post-petition that are -- the direct result of the

12   Debtors' illegal and ongoing anti-competitive conduct.

13           As the Court is probably aware by now, we and the

14   Debtors have very differing views about the process for

15   resolving outstanding issues about the Debtors' Acthar

16   related liability.  The Debtors have put forward their so-

17   called Acthar proceedings, of which this motion was one, and

18   as Mr. Murtagh noted, we filed shortly before the Debtors

19   filed their Acthar proceedings, our administrative claims

20   motion, and our estimation motion.  The estimation motion and

21   the -- and the admin motion are scheduled to be heard now on

22   June 7th, and they propose procedures for resolving a number

23   of issues, including the amount of our administrative claims.

24           Our concern with setting the June 28th bar date was

25   that the amount of our claim and the Debtor entities against

1    whom those claims would be asserted would be unresolved by

2    that June 28th date.  And so we were concerned that the

3    implementation of this bar date was an attempt to shortcut

4    some of the administrative claims as used without appropriate

5    due process.  As Your Honor will hear from us -- in -- in

6    coming days and more as we approach the June 7th hearing,

7    that's a concern that we have with respect to a number of the

8    Debtors' Acthar related proceedings.  But for purposes of

9    this motion we and the Debtors agree to modify the proposed

10   order such that Attestor and Humana are deemed to have timely

11   filed administrative claims by virtue of the filing of their

12   motion.  This does resolve our concern with the bar date, but

13   we thought it was important to just give some context to the

14   Court for our prospective on how this issue fits into the

15   other issues that Your Honor will be hearing more about in

16   the coming weeks.

17           THE COURT:  Okay.  Thank you, Mr. Freimuth.  Is

18   there anyone else who wants to be heard before I rule?  All

19   right.  So, having overruled the one objection subject to the

20   change that I indicated on paragraph five F, I am satisfied

21   the order is appropriate.  I will enter that order.  Do we

22   have anything else for today, Mr. Merchant?

23           MR. MERCHANT:  Yes, Your Honor.  The status update

24   with regard to the challenge period that I referenced at the

25   beginning of the period.  I think Mr. Snyder is going to

1    provide the Court with that update.

2              THE COURT:  All right.  Mr. Snyder?

3              MR. SNYDER:  Your Honor, can you hear me?

4              THE COURT:  I can.  Thank you.

5              MR. SNYDER:  Thank you, Your Honor.  Over -- as --

6    as you may remember, the challenge -- there was a limited

7    challenge period that was preserved for the U.C.C., the

8    O.C.C. and the F.C.R. that was scheduled to expire on

9    Wednesday evening.  Over the last couple days in discussions

10   among the Debtors, our various secured lenders and those

11   three parties, the various extensions were agreed to and

12   documented by email.  The O.C.C.'s remaining challenge period

13   was extended until Sunday evening -- end of day on Sunday.

14   The U.C.C.'s remaining challenge period was extended and in a

15   somewhat more complicated fashion only with respect to

16   certain technical lien attachments and/or perfection issues

17   to various deadlines, which we can explain in more detail if

18   you would like.  And the Future Claim Representatives -- the

19   Future Claim Representatives challenge period was extended

20   until end of day on Sunday, solely for purposes of

21   intervening in any challenge brought by the O.C.C. and/or the

22   U.C.C.

23             THE COURT:  Okay.  Do we -- are we going to upload

24   a form of order for this?

25             MR. SNYDER:  Your Honor, it's not strictly required

1    by the -- collateral order, however for purposes of good

2    record keeping, if you would like us to do so, we are happy

3    to work something out with secured lenders and the three

4    parties I mentioned, and put it on the record.

5              THE COURT:  Probably a good idea to do that, just

6    so -- when I -- I don't have time to go into detail about all

7    the different various deadlines set with the U.C.C., because

8    I have another hearing in -- in a few minutes.  So, yeah if

9    you could upload an order under -- that would be helpful.

10             MR. SNYDER:  Totally understood, Your Honor.  We'll

11   reach out to the various parties in interest and get

12   something in and get something on the docket with --

13             THE COURT:  Okay.  Thank you, Mr. Snyder.  Anything

14   else?  All right.

15             MR. MERCHANT:  Nothing further from -- Your Honor.

16             THE COURT:  Okay.  Thank you all very much.  Have a

17   good day.  And I'll see everybody -- when's our next hearing

18   in this case, coming up?

19             MR. MERCHANT:  I believe the 26th, Your Honor.

20             THE COURT:  Yes, that's an omnibus -- okay.  I'll

21   see everybody on the 26th, just a -- less than a week from --

22   away.

23             MR. MERCHANT:  Thank you, Your Honor.

24             THE COURT:  Thank you all.

25             MR. MURTAGH:  Thank you, Your Honor.

1          MR. FREIMUTH:  Thank you, Your Honor.

2     (Proceeding concluded at 10:46 a.m.)

3     * * * * * * *

1              CERTIFICATION

2          I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    Transcriptionist:  Andrea Semanovich

8

9

10    /s/ Andrea Semanovich      May 20, 2021

11    Andrea Semanovich, Transcriber

12

13

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                     .   Chapter 11
                                .   Case No. 20-12522(JTD)
 4   MALLINCKRODT PLC, et al.,  .
                                .   (Jointly Administered)
 5                              .
                                .
 6                              .   824 Market Street
                 Debtors.       .   Wilmington, Delaware 19801
 7                              .
                                .   Wednesday, May 26, 2021
 8   . . . . . . . . . . . . . .   1:00 p.m.

 9                    TRANSCRIPT OF ZOOM HEARING
                 BEFORE THE HONORABLE JOHN T. DORSEY
10                   UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Michael J. Merchant, Esquire
                               RICHARDS, LAYTON & FINGER, P.A.
13                             One Rodney Square
                               920 North King Street
14                             Wilmington, Delaware 19801

15                             -and-

16                             Christopher R. Harris, Esquire
                               LATHAM & WATKINS, LLP
17                             885 Third Avenue
                               New York, New York 10022
18
     (APPEARANCES CONTINUED)
19
     Electronically
20   Recorded By:              Jason Spencer, ECRO

21   Transcription Service:    Reliable
                               1007 N. Orange Street
22                             Wilmington, Delaware 19801
                               Telephone: (302) 654-8080
23                             E-Mail:  gmatthews@reliable-co.com

24

25   Proceedings recorded by electronic sound recording:
     transcript produced by transcription service.
```

A-6331

2

```
 1  APPEARANCES (CONTINUED):

 2  For the Acthar
    Plaintiffs:                  Donald Haviland, Esquire
 3                               HAVILAND HUGHES LAW FIRM LLC
                                 111 S. Independence Mall E
 4                               Unit 1000
                                 Philadelphia, Pennsylvania 19106
 5
                                 - and -
 6
                                 Albert A. Ciardi, Esquire
 7                               Daniel J. Astin, Esquire
                                 CIARDI CIARDI & ASTIN
 8                               1905 Spruce Street
                                 Philadelphia, Pennsylvania 19103
 9
10  For the Official
    Committee of
11  Unsecured Creditors:         Cullen D. Speckhart, Esquire
                                 COOLEY, LLP
12                               1299 Pennsylvania Avenue, NW
                                 Suite 700
13                               Washington, DC 20004

14
    For the U.S. Trustee:        Jane M. Leamy, Esquire
15                               OFFICE OF THE UNITED STATES TRUSTEE
                                 J. Caleb Boggs Federal Building
16                               844 King Street
                                 Suite 2207, Lockbox 35
17                               Wilmington, Delaware 19801

18

19

20

21

22

23

24

25
```

A-6332

3

1                              <u>INDEX</u>

2  <u>MATTERS GOING FORWARD</u>:                              <u>PAGE</u>

3  Agenda
   Item 16:    Letter from the Debtors to the Honorable        4
4              Judge John T. Dorsey with respect to Request
               For an Adjournment of the Acthar Plaintiffs'
5              Renewed Motion for Order Directing the
               Appointment of a Trustee [<u>Docket 2519</u> - filed
6              May 21, 2021]

7

8  Court's ruling                                              33

9

10 Transcriptionist's Certificate

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          (Proceedings commenced at 1:00 p.m.)

2               THE COURT:  Good afternoon.  This is Judge Dorsey.

3    We are on the record in Mallinckrodt PLC, Case Number 20-

4    12522.

5               I'll go ahead and turn it over to debtors' counsel

6    to run the agenda.

7               MR. MERCHANT:  Good afternoon, Your Honor, Michael

8    Merchant of Richards, Layton & Finger on behalf of the

9    debtors.

10              Your Honor, before getting to the one matter that

11   is on for the agenda today, I just wanted to update the

12   Court.  We referenced an extension of the challenge period at

13   the last hearing.  I just wanted to alert the Court that we

14   are in the process of filing a proposed stipulation and order

15   under certification of counsel today in that regard, it will

16   actually extend the challenge period through June 6th, and

17   the details of that extension are set forth in that

18   stipulation.

19              THE COURT:  All right, thank you.

20              MR. MERCHANT:  With that, we filed an amended

21   agenda this morning.  The only matter remaining on the agenda

22   is the debtors' letter request with respect to the scheduling

23   of the hearing on the trustee motion, that's Agenda Item

24   Number 16, and Chris Harris from Latham & Watkins is on and

25   will be handling that on behalf of the debtors.

5

```
1              THE COURT:  All right.  Mr. Harris, go ahead.
2              MR. HARRIS:  Thank you, Your Honor.  And just for
3    the record, Chris Harris of Latham for the debtors.
4              We're here on our request to put off the hearing
5    on the Haviland Hughes plaintiffs' motion for appointment of
6    a trustee until confirmation.  They set the trustee motion
7    for a hearing on June 9th, which is three weeks after they
8    filed their motion, and that's the date on which we already
9    have contested lift-stay motions scheduled and the Haviland
10   Hughes plaintiffs' separate motion to lift the preliminary
11   injunction, and two other matters that may be contested.
12   It's also just one day after our disclosure statement hearing
13   and it's just two days after another hearing where we expect
14   to have several contested matters, including several related
15   to Acthar.  So Humana's estimation and administrative claims
16   motion; our summary judgment motion in our adversary
17   proceeding against the City of Rockford; our objection to the
18   Acthar-related class proofs of claim; and our omnibus
19   objection to unsubstantiated claims.
20             And, needless to say, these all involve a lot of
21   briefing leading up to them and most of them involve
22   substantial discovery as well.
23             So, given all that's going on and trying to make
24   the issues in the trustee motion be handled in a coordinated
25   and efficient matter, we've proposed to have the hearing on
```

A-6335

6

1  the trustee motion occur along with plan confirmation.  We're

2  happy to have the motion decided, but there's no emergency

3  justifying that it be rushed and decided now.

4          The first point I'd like to make on this, and it's

5  briefly touched in our letter, is that the motion primarily

6  raises confirmation issues such as the allocation of value

7  across the Mallinckrodt entities; whether the plan was filed

8  in good faith; whether the plan unfairly discriminates

9  against the Acthar plaintiffs or claimants; whether our

10 current Acthar pricing gives rise to administrative claims or

11 is illegal conduct in violation of the bankruptcy code; and

12 other matters that are on their face confirmation objections.

13         The trustee admits that they're confirmation

14 issues and in fact they say that -- I'm sorry, I said the

15 trustee -- the Haviland Hughes plaintiffs admit that these

16 are confirmation issues and that's one of their reasons for

17 appointing a trustee, they say, because we're proposing an

18 un-confirmable plan.  So I just wanted to talk about what

19 practically that means, however it makes sense to try and

20 decide these issues in two weeks.

21         So, for example, they say in the trustee motion

22 that the Acthar creditors are being treated unfairly,

23 differently than other creditors that makes the plan un-

24 confirmable.  But if Your Honor were to decide that issue in

25 June in the context of the trustee motion, how would that

1    work?  If you reject their argument, are the Haviland Hughes

2    plaintiffs now barred from raising that argument again at

3    confirmation?  Or how about the other Acthar creditors, are

4    they barred?  Is the committee barred?  Is everyone barred

5    from making that argument later?

6            If that's the case, then everyone needs to step up

7    now and litigate these confirmation issues in the next two

8    weeks.  Or, if that June decision doesn't bar anyone, then

9    does the estate have to bear the cost of litigating the same

10   issues twice, once in June and once at confirmation?  And,

11   even if that is the case, is everyone going to feel the need

12   to litigate things in full now just to avoid poisoning the

13   well by a bad preliminary ruling?

14           That's just one example, but there's lots of other

15   examples of issues that they raise that other creditors will

16   be interested in, and will have arguments for and against,

17   and will be raised at confirmation.  So disjointed litigation

18   over what are fundamentally confirmation issues or different

19   parties at different points in time, it's not fair to the

20   litigants and it's certainly not in the interests of the

21   estate, which is going to have to bear those costs.

22           So, consistent with that, it's not surprising that

23   courts have found that when there's arguments for a trustee

24   that are actually confirmation objections, they should be

25   decided at confirmation.  That was in -- one example is In re

1  WorldCom, Inc., which is 2003 WL 23966765, a Southern

2  District of New York bankruptcy case.

3          So that's the first point, it's not practical to

4  try and decide these confirmation issues now.  The second

5  point is also a practical one, which is discovery just

6  leading up to a hearing is going to be a heavy lift, more

7  than two weeks are needed, and it needs to be coordinated

8  with the other parties, with the other creditors and with the

9  committee.

10          So the Haviland Hughes plaintiffs have demanded

11  extensive discovery, a lot of which duplicates discovery that

12  they and others are going to seek in confirmation.  So, just

13  focusing on the documents, they asked for all documents and

14  communications regarding valuation of the entities, how those

15  values were determined, how value is allocated; all documents

16  regarding the financial statement and the assets of each and

17  every Acthar entity; all communications between the debtors

18  and everyone about the RSA.  They've requested all documents

19  about intercompany transfers and value allocation, and all

20  documents about classification and treatment under the plan.

21  And they demanded all this stuff be produced immediately so

22  they can then take equally broad 30(b)(6) depositions.

23          So other parties are going to want documents on

24  these same issues or related issues and we need to coordinate

25  those requests.  Even if there was a way to do it in two

1  weeks, which there is not, it would be inefficient to do it

2  now and then have different overlapping requests later for

3  confirmation purposes.  That's just documents.

4         They also want depositions.  They've asked for the

5  personal depositions of our CEO Mr. Trudeau and our COO Mr.

6  O'Neill, but other parties want to depose them too on

7  unrelated issues.  The committees have both said they want to

8  depose them and they would tell you they are not ready to do

9  so.  They have not even requested their emails yet.  So is

10 everyone going to be forced to rush the one and only personal

11 deposition of our executives next week?  Are these witnesses

12 going to be forced to sit twice for a personal deposition?

13        And then the Haviland Hughes plaintiffs have also

14 asked for a variety of 30(b)(6) topics on things that are

15 clearly related to confirmation such as the subject matters

16 included in the plan of reorganization; the financial

17 projections, liquidation analysis and valuation analysis; the

18 valuation methodology for each of the debtors' business

19 units; the determination by the debtors of separately

20 classified unsecured creditors.  People are going to want to

21 take these depositions on these topics again.

22        So, June 9th is in two weeks, not enough time to

23 permit the parties to develop the comprehensive factual

24 record that's needed to resolve the issues that they're

25 raising and there's no way to coordinate this with these

1  similar, but not identical, discovery that people will want

2  in the confirmation process.

3          So I do want to be clear that the debtors do

4  intend to provide discovery to the Haviland Hughes plaintiffs

5  on these issues as soon as practical regardless of the

6  hearing date.  We've already produced over 100,000 documents

7  to the Haviland Hughes plaintiffs, we're producing hundreds

8  of thousands of more emails to the committees that we will

9  provide to the Haviland Hughes plaintiffs, and we have told

10 the Haviland Hughes plaintiffs we will treat their trustee

11 document requests and their disclosure statement document

12 requests as confirmation discovery and that we will, you

13 know, handle them and expect to produce many more documents

14 to them through that process.  But it's important that the

15 discovery and the issues be coordinated with the issues that

16 other people want discovery on as well.  It's not possible to

17 conduct proper discovery on all these issues now and it's not

18 efficient to do that either.

19         The last point I'd just make on this is, there is

20 no emergency that justifies rushing this motion.  You know,

21 the Haviland Hughes plaintiffs say that this is urgent, but

22 their actions make it clear that it's not.  They filed their

23 original trustee motion on February 1st, but they didn't even

24 want it heard right away.  This goes to a hearing almost 60

25 days later and then they withdrew their motion.  Then they

1   waited another 90 days to re-file that.  None of that

2   reflects a sense of urgency.

3          And, to be clear, the central allegations in the

4   first motion are quite similar to those in the renewed

5   motion.  They both argue that the Acthar claimants are being

6   unfairly discriminated against, that the debtors engaged in

7   mismanagement before and after the bankruptcy filing, that

8   we're committing consumer fraud every day because we haven't

9   re-priced Acthar, there's excessive professional fees and

10  conflicts of interest.  Those are all arguments that were

11  made before.

12         The main new argument is that pursuit of the plan

13  would be a waste of resources because it's patently un-

14  confirmable, but that point is going to be decided by the

15  Court at the disclosure statement hearing, which is scheduled

16  for June 8th.  And it's not even clear what urgency the

17  Haviland Hughes plaintiffs feel at this point.  Their letter

18  no longer asks that the motion be heard on June 9th, they

19  just ask that it be heard before confirmation.

20         So, if the Court decides that the trustee motion

21  should be heard before confirmation, you know, we will

22  obviously find a way to do that, but discovery needs to be

23  completed first, it needs to be coordinated with the rest of

24  confirmation discovery, and we need to resolve the issues of

25  how these same issues can be decided twice without subjecting

12

1    the estate and the parties and the Court to the burden of two

2    duplicative trials.

3              So our position is that the easiest answer and

4    much more logical answer is to have these issues decided in

5    the context of the confirmation hearing.

6              THE COURT:  Well, let me ask you a question, Mr.

7    Harris.  One of the things that is raised by Mr. Hughes'

8    clients is that the debtors are continuing to engage in

9    illegal activity through the price fixing and anti-

10   competitive aspects of the claims involving Acthar.  Is that

11   a confirmation issue and how do I deal with that?

12             MR. HARRIS:  They have raised it as a confirmation

13   issue because they have indicated that one of the elements of

14   a confirmable plan is that the debtors not engage in illegal

15   conduct.  So they have raised that.

16             I would say there is no evidence at all -- you

17   know, they know extensively about the conduct that's been --

18   that they allege to have participated in, you know, they have

19   gotten years of discovery to date.  No regulator has said

20   that we're engaging in illegal conduct, that is a, you know,

21   fiction that they have created.  So there's no basis for

22   that.  They can raise it at confirmation, I'm sure they will

23   raise it at confirmation, as they've raised it in sort of

24   every context to date.

25             THE COURT:  Okay.  Thank you, Mr. Harris.

A-6342

1          Let me hear from the Acthar plaintiffs.

2          MR. ASTIN:  Your Honor, may it please the Court.

3   Good afternoon, Daniel Astin for Ciardi Ciardi & Astin.  My

4   partner Albert Ciardi is going to handle the argument for the

5   Acthar plaintiffs.

6          THE COURT:  All right.  Mr. Ciardi?

7          MR. CIARDI:  Good afternoon, Your Honor.  Thank

8   you.

9          As I think I had made clear in my letter

10  responding to the debtors' letter, we are open and have

11  always been open and would have been open if there was a pre-

12  letter discussion on a new hearing date somewhat further out

13  to allow a more fulsome discovery.  We would love that.  We

14  would love to have had that discussion not in open court and

15  before today and in an appropriate meet-and-confer, but we

16  didn't have that.

17         But what I think is misunderstood by the debtors,

18  it is not that our trustee motion reiterates or simply

19  restates a confirmation objection.  What our trustee motion

20  goes through and does, it outlines severe infirmities in the

21  plan which point to self-dealing, it points to inappropriate

22  investigation of insider transfers to the tune of $14

23  billion, more than we raised in our motion, Your Honor.

24  We've done a further analysis.  Those issues point to the

25  fact that this case, this plan, which hasn't changed at all

14

1   since the RSA was drafted many, many, many months ago, hasn't

2   changed at all since what was in their minds when they put

3   the RSA together, when we were before Your Honor on

4   exclusivity, when they promised a plan the end of March and

5   when we got it in April.

6          So we re-filed our motion when we saw the plan

7   because now we knew in fact that they weren't changing their

8   position that was in the RSA and that they were going to be

9   giving all of the value of this entity to either the

10  guaranteed unsecured notes, who are in no different a

11  position than my clients, and to management.

12         And one of the issues that we're raising in the

13  motion is on valuation and allocation, and with regard to the

14  investigation of the transfers, is the debtors have raised --

15  and they have raised it in their response to the committee's

16  2004 motion -- that, oh, there's nothing to see over here

17  with the guaranteed unsecured notes, they're structurally

18  senior to you.  Well, that word doesn't exist anywhere in the

19  bankruptcy code or the Uniform Commercial Code, and the

20  reason they get to say that is because there have been $14

21  billion of transfers upstreamed from operating entities,

22  which the debtors refuse to investigate or pursue.  And then,

23  when they move that money upstream and put their patents and

24  other things offshore in Dutch companies where we can't get

25  to them, they then can turn around and say, oh, we gave the

1   funded debt that money, you don't get it, and we're not going

2   to pursue the transfers to bring all this back down.

3          Structural seniority is no different than asset

4   stripping with a fancy name, and that's what the trustee

5   motion is going to investigate and clarify, Your Honor.  And

6   in fact what we are able to do just on the debtors' own

7   documents right now that we have possession of, we know that

8   they have prepared a detailed presentation on intercompany

9   transfers because they say that at paragraph 57 of Document

10  Number 1944, and they gave that to the committee.  So this

11  argument that somehow they're going to be creating all this

12  new discovery to give to us, it already exists.  They

13  prepared, as detailed in their -- again, in their response to

14  the 2004 examination of the committee, a waterfall of all

15  their valuations and allocations.  They did that in February

16  with the committee, we didn't get it until April.  We have

17  requested the backup for 30 days; it still has been refused

18  to be provided.  That backup exists and it's available, and

19  they can push a button and send it to us.

20          So all of this, I guess, concern that we're going

21  to be overburdening the debtors with all these new document

22  requests, they exist, they're ready now, they've been shared

23  with third parties, they are not privileged, and they should

24  be provided.  And they form the basis of the trustee motion,

25  which details a debtor that sat around the table with the

1   guaranteed unsecured notes, whacked up the company, left ten

2   percent for management and that ten percent, based upon the

3   debtors' numbers in their plan supplement, is worth between

4   80 and $100 million.

5           So they want to be able to go forward with a plan

6   that gives the Acthar plaintiffs basically nothing, a piece

7   of $100 million, maybe, and give the management more than

8   that, give creditors that are unsecured creditors just like

9   that a 70-percent distribution, and all of that falls into

10  our trustee motion, which shows that this debtor is operating

11  in bad faith.  And the fact that they are giving this

12  distribution to management, more than they're giving to the

13  unsecured creditors, right out of the gate -- and that's not

14  magical numbers that I came up with on my own, Your Honor,

15  the plan says they're going to get ten percent.  I went to

16  the plan supplement and it shows on the day of confirmation

17  there's value in shareholders' equity at what we consider to

18  be a low value of over $813 million.  I can do that math.  At

19  the low value, it's $81 million.  When you read the rest of

20  the Guggenheim report, that number could be close to a

21  billion, which would mean they're getting more.

22          So we've got not only management getting more and

23  self-dealing with no independent investigation, we've got

24  asset stripping in order to promote the guaranteed unsecured

25  notes, and we have all of this being done.  Now they want to

1  have us on an expedited track to get to confirmation where

2  we're going to get to confirmation and at that point in time

3  the trustee motion is justice denied or delayed, however you

4  want to look at it, if we don't get these issues addressed

5  now, now that we have the facts, which is what's supporting

6  the new motion, the facts in the debtors' plan supplement,

7  the facts in the debtors' plan, the response to the 2004

8  motion.

9          My targeted discovery, Your Honor, that we have

10  asked for isn't overwhelming.  I mean, Mr. Trudeau and Mr.

11  O'Neill, for the grand total of a day and a half or two days,

12  and I'll make my case at a hearing before June 30th that this

13  debtor has been engaged in asset stripping.

14          So we think it would be appropriate -- I would

15  agree with the debtors, maybe not June 9th, but sometime

16  before June 30th to have the hearing, to have a short

17  targeted period of discovery beforehand, and have -- and

18  address all these issues.  And these aren't -- it's not a

19  confirmation objection, Your Honor, it is using the plan to

20  show the bad faith and self-dealing of the debtors and

21  management, and that is what creates the need for a trustee

22  here, because the Acthar plaintiffs and every creditor on the

23  specialty brand side of the business is being forced to bear

24  the punishment of the specialty generics and management's

25  decision to engage in an opioid scheme, and, as a result,

1   we're paying the price for their past sins.  And they're not
2   -- they're not acknowledging that responsibility and they
3   want us to bear that cost.  That's not fair, that's not
4   appropriate, that's why a trustee needs to be appointed, even
5   if just for specialty brands, so that a fair and reasonable
6   plan that reflects the will of all the creditors can be
7   addressed.
8              And that's why, Your Honor, we do not want to --
9   we do not agree and would not want this hearing to take place
10  in August or whenever the debtors get around to putting
11  together a plan that might go to confirmation.  These issues
12  need to be addressed now because they go to the good faith or
13  lack of good faith of the debtors in presenting this, and
14  they go right to the heart of trustee issues such as self-
15  dealing, non-investigation of transfers, and just an unfair
16  and unreasonable burden shifting from the ills of specialty
17  generic and what management did there to what's going on with
18  the Acthar entities.
19             And I want to focus now on what Your Honor's
20  question was to Mr. Harris.  Every day that goes by in this
21  case -- since the filing of the petition date, there have
22  been deliveries of Acthar gel to customers, to patients, they
23  have all been done; there's been no change in conduct since
24  the prepetition conduct that survived five motions to dismiss
25  at the district court level.  So to extent that there's a

19

1  concern that whether our cases have merit, they do; they

2  survived five motions to dismiss and motions for

3  reconsideration.

4          THE COURT:  Well, Mr. Ciardi, a motion to dismiss

5  --

6          MR. CIARDI:  Every day --

7          THE COURT:  -- in a motion to dismiss, the court

8  is only -- is assuming that the facts alleged in the

9  complaint are true.  So that doesn't really show me that

10 there's ultimately merit to the claims.  And I have no ruling

11 from any --

12         MR. CIARDI:  I understand.

13         THE COURT:  -- I have no judgment from any court

14 that says that the debtors have engaged in illegal activity,

15 I have no investigation by the government that says they're

16 continuing to engage in illegal activity, which the

17 government could do, if they choose.

18         So, you know --

19         MR. CIARDI:  This --

20         THE COURT:  -- I spent a number of years --

21         MR. CIARDI:  I'm sorry, Your Honor, I didn't mean

22 to interrupt.

23         THE COURT:  -- I spent a number of years in the

24 military and I can recognize a flanking maneuver when I see

25 one, and it seems to me that this portion of the motion to

1    appoint a trustee is really trying to outflank the automatic

2    stay that's in place against the debtors to pursue claims

3    that it's just not time to do that.  This is not the time to

4    pursue those claims; that will come at some point, but this

5    is not the time.

6             MR. CIARDI:  Your Honor, what -- I guess what I

7    was going to is that this debtor is continuing to do things

8    that we believe are violating the antitrust laws of the

9    United States.  And that conduct is illegal, in our mind, and

10   we think it's appropriate to be raised as a trustee motion

11   because it should not be allowed to continue under the banner

12   of being a Chapter 11 bankruptcy, and it's something that

13   needs to be examined now to prevent further harm to my

14   clients.  Further financial and physical harm is being

15   incurred on a daily basis to the patients that can't get

16   access to this gel.  That's not appropriate, that's not a

17   proper use of Chapter 11.  And while we --

18             THE COURT:  Well, Mr. Ciardi --

19             MR. CIARDI:  -- we are --

20             THE COURT:  -- I have no evidence before me that

21   anybody is being denied access to this drug.  And I

22   understand you want to litigate your claims, but, as I said,

23   this is not the time or place to do that.  And if you want to

24   -- if there's going to be a hearing on this issue as it

25   relates to the appointment of a trustee, that's going to

1  require discovery and probably, I don't know how many week

2  long trial, because I'd have to make an underlying

3  determination on the validity of your claims that you've made

4  against the debtors and I can't do that.  It's not going to

5  happen between now and August or September, I can tell you

6  that.  I don't have time.

7          MR. CIARDI:  Your Honor, but Your Honor could

8  address on a very short basis the fact that the debtors have

9  made improper insider transfers to the tune of $14 billion,

10  moved money away from where the general unsecured creditors

11  can get them, refuse to investigate or pursue those transfers

12  because it benefits the guaranteed unsecured notes, which

13  locks in a class that can vote in favor of a plan that gives

14  management ten percent of the company, more than what's given

15  to unsecured creditors.

16          If you put the antitrust conspiracy aside, right

17  down the center of the bankruptcy trustee rubric is that, and

18  that could be addressed in two or three weeks or less with

19  targeted discovery.  And that issue should be addressed well

20  before confirmation because it goes to whether this debtor is

21  capable of exercising its fiduciary duties to put forth a

22  plan.

23          THE COURT:  Well, the problem with that is those

24  are all confirmation objections, which you have recognized,

25  they're confirmation issues, and if I open discovery on this

1  outside the context in just a two-week period, every other

2  constituency in this case is going to want to participate in

3  that deductible because there's a risk that, if I rule one

4  way or the other, it's going to become law of the case, and

5  now how are they going to then come to confirmation and make

6  arguments when based on a very limited, short discovery

7  period I'm making findings of fact about what the debtors did

8  or didn't do.  That seems unfair to every other constituency

9  in this case.

10         MR. CIARDI:  Your Honor, I have to disagree for

11  the following reason and on two points.  Number one, if the

12  debtors are engaged in self-dealing, whether we have to do it

13  twice or three times, it still has to get done.  The code

14  requires us to have that investigation.  But the second part

15  of it is, is this debtor is burning tens of millions of

16  dollars a month, if their plan is dead on arrival -- and I'm

17  not the only creditor that -- I'm not representing the only

18  group of creditors this time that believes that it's dead on

19  arrival -- we should know that now before we burn a whole lot

20  of legal fees and daylight in going to try to get something

21  approved to send out to creditors that has no hope of ever

22  getting approved.

23         THE COURT:  Well, what do you --

24         MR. CIARDI:  This will save the estate time.

25         THE COURT:  -- what do you -- Mr. Ciardi, what do

A-6352

1   you think it's going to cost if I rule that the trustee

2   should be appointed, how would that affect this case?  A

3   trustee comes in, they have to start --

4           MR. CIARDI:  If the trustee --

5           THE COURT:  -- if a trustee comes in, it has to

6   start over from scratch, and this whole case starts over

7   again.  Is that --

8           MR. CIARDI:  Your Honor --

9           THE COURT:  -- is that an efficient --

10          MR. CIARDI:  -- if the case --

11          THE COURT:  -- is that efficient, rather than

12  dealing with these issues at the time of confirmation, along

13  with confirmation, and anyone who objects to confirmation can

14  do that.  There will be discovery on the confirmation issues,

15  the debtors have recognized that and they're willing to go

16  forward with that discovery, just not doing it on a two-week,

17  or even a three-or-four-week basis.  The amount of discovery

18  that needs to be done and the effect that it has on every

19  other constituency in this case is what is most concerning to

20  me.

21          MR. CIARDI:  But, Your Honor, if that -- and we

22  believe that it is true, if this debtor has engaged in self-

23  dealing, and that the documents that we believe discovery

24  will bear out will show that this plan that they implemented

25  under the RSA was meant to protect the guaranteed unsecured

1   notes and management at the expense of the general unsecured

2   creditors, of which we are a part, then that has to be

3   addressed now.  Whether that has a billion dollar effect on

4   value or a million dollar effect on value, we believe it will

5   have a tremendous increase in value because instead of the

6   specialty brands having to bear the price of the opioid

7   mistakes of management, the specialty brands' creditors will

8   be able to recover more under a trustee than they are now.

9          Right now, we're getting nothing; we're getting

10  less than management.  If we're getting the value of the

11  Acthar brand entities, which is all that's really left in

12  this company, we can create a plan or a trustee could put a

13  plan together that generates a much larger distribution for

14  unsecured creditors than what's currently being offered now,

15  which is two and a half percent -- that's what they're

16  offering guaranteed -- or general unsecured creditors now,

17  what they're offering the guaranteed unsecured notes is close

18  to 70 percent, and they're only doing it by this structural

19  seniority, which is only happening because they were going to

20  move assets out of those entities.  And that has to be

21  changed, that has to be reversed, Judge, because, if it

22  doesn't and we get to confirmation and we've wasted another

23  four months of time to get there and then the trustee has to

24  start, that is a waste of judicial resources and it's another

25  four months that my clients have been punished, physically

1  and financially, by the debtors' conduct, and that's just not

2  fair.

3              And if Your Honor is considering moving it to

4  that, I am going to go with the phrase that has been -- that

5  we all learned in law school, justice delayed is justice

6  denied, and that's where we are if this trustee motion gets

7  moved to confirmation.

8              Thank you, Your Honor.

9              THE COURT:  All right.  Does anyone -- before I go

10 back to Mr. Harris, does anyone else wish to speak?  And, if

11 you would -- I'm not sure what happened to my screen here,

12 but usually everybody who is on video appears on page 1, but

13 right now everybody is scattered all over the place.  So, if

14 there's anyone who wants to speak in support of the trustee

15 motion, please raise your hand.

16             MR. HAVILAND:  Your Honor, this is Don Haviland.

17 I wanted to speak to the discovery issue that was raised by

18 Mr. Harris and the fact that our discovery propounded cuts

19 across not just the trustee issues, but also the issues

20 raised by the debtors by their April 30th filings.  Your

21 Honor said that it goes -- the issues go to the validity of

22 the claims.  The debtors filed two objections and have asked

23 to have those decided in the first week of June.

24             Now, we met and conferred at length yesterday over

25 the various corporate designee depositions, Trudeau, O'Neill,

1    and one other individual deposition, and we were told none of

2    that was going to happen.  We were told that the debtors were

3    unwilling to move off their objection to what they call the

4    Acthar plaintiffs', quote, "unsubstantiated claims," close

5    quote.  They are challenging the validity of the Acthar

6    plaintiffs' claims.

7              And I want to point out, Judge, we are the only

8    group of unsecured creditors that are getting this

9    favoritism.  We have these substantive objections, who are

10   400 proofs of claim, who are being told you get no discovery.

11   And why it intersects with the trustee issues is we have made

12   claims against these specialty brands, Mallinckrodt entities

13   to whom they transferred billions of dollars to leave a shell

14   at the Mallinckrodt ARD company, which is the company in

15   charge of the Acthar business, a billion-dollar-a-year

16   business.

17             So it does go to the heart of the matter, Judge.

18   On June the 7th, because the debtors are unwilling to move

19   that hearing date, you're going to hear me speak again about

20   all the discovery we didn't get.  You're going to hear the

21   debtors argue that you should rule in a vacuum, that we

22   shouldn't get to understand how billions of dollars can be

23   moved out of a company we sued into a company we didn't sue,

24   and why we should not be able to make a claim in bankruptcy

25   against that entity.

1          Now, Mr. Harris just glossed over a whole bunch of

2    discovery.  He said they produced hundreds of thousands of

3    documents to us.  Well, that may be true in the purest sense

4    of the word, Judge, but what they did was they reproduced to

5    the Acthar plaintiffs a subset of the documents that were

6    produced to the plaintiffs, over five million pages, in the

7    underlying litigation.  That's not discovery.  That was

8    discovery given to the committees, which is a subset of the

9    discovery we asked for.  The sum total of what they've given

10   us is one chart, one chart that talks to these subsidiary

11   entities, who they are, and it helpfully demarcates them as

12   brand entities and generic entities.  So that we now know

13   that in the 64 entities that Mr. Welch spoke about on the

14   first day hearings which are brands and which are generics,

15   but that's just the first inquiry.  One document, that's what

16   we got, one document, no witness.

17          We do know from the schedules and statements about

18   these money moves, but we don't know how, why, or where they

19   were sent and whether or not that money was appropriately

20   moved.  And that's the heart of the issue in terms of claims

21   and the debtors want to have you rule on claims, the validity

22   of claims, on June the 7th.

23          Separately, they have filed an adversary

24   proceeding saying that there should be a discharge of the

25   Rockford plaintiffs' claims, a complaint for discharge, an

1   adversary.  We have opposed that with a Rule 56(d) affidavit,

2   which goes into great detail about the discovery that we will

3   need in order to defend the complaint.  The defendants have

4   yet to commit to any discovery; in fact, had the audacity to

5   notice the deposition of the lawyer who did the 56(d)

6   affidavit.  And they're aggressively seeking discovery in

7   seven days or less of the Acthar plaintiff.  We get no

8   discovery, they get discovery in seven days.  And you're

9   going to see motions practice, Judge, because I don't know

10  anyone that's going to be prepared for a corporate designee

11  deposition on Tuesday after the long holiday.

12          But that adversary proceeding has a summary

13  judgment motion component to it.  They filed the complaint

14  and summary judgment on the same day.  And I know Your Honor

15  had a conference with Mr. Astin and counsel about this, and

16  we told the Court that we were going to put forward an

17  affidavit to point out the discovery that needed to be taken.

18          What we tried to do is give the debtor various

19  corporate designee notices with topics.  The debtor is still

20  coming back with proposals, but has yet to commit to one

21  witness on one day to answer those topics.  We have not

22  gotten any discovery.

23          And so the suggestion Your Honor made about being

24  concerned about discovery, coordinating discovery, we

25  proposed that to the debtors, but we're being told, no, that

```
 1   their agenda will dictate.  They will get their hearings on
 2   June the 7th, the 8th and the 9th, but all of our issues are
 3   going to get put off to another day.
 4            And, Judge, it's going to come to a head.  You're
 5   going to see this come to a head on the 7th when I have no
 6   discovery and they say just dismiss these claims that were
 7   validly filed and are validly constituted, because, unlike
 8   any other claimants, we attached complaints, documentation of
 9   damages, and actual documents, so much so that there was a
10   motion to seal every one of our claims and now they're not
11   even publicly available to anybody.
12            But to Your Honor's point about the continuing
13   conduct, I have to point out that the Federal Trade
14   Commission filed a complaint against this company and got a
15   declaratory injunctive component to a stipulated settlement
16   with this company to not continue to do things.  We believe
17   they're violating that.  So the government did prosecute in
18   2017 and that's why Rockford sued.
19            Secondly, the Department of Justice, a different
20   arm of the Federal Government, has prosecuted this company
21   for marketing fraud in Philadelphia.  That case remains
22   pending.  Local 420 filed a companion suit.  The United
23   States Congress issued a report on October 1 of 2020 where
24   these executives testified and detailed fraudulent conduct.
25            And nowhere did any one of those congressional
```

1   committees, FTC or the DOJ say that this company had stopped,

2   had stopped.

3            The debtor likes to say, well, no one compelled

4   them to stop.  That's what the civil plaintiffs' lawsuits are

5   doing.  We have a declaratory injunctive component in

6   Rockford, Local 420, and every one of our complaints.  They

7   have not stopped.  And you don't have to take my word for it,

8   Judge, Mr. Welch and Mr. Reasons, as corporate designees,

9   testified under oath in direct questioning, have you changed

10  the underlying conduct?  They said no; in this record, no.

11  That's the evidence.  We're arguing about scheduling, but

12  that's the evidence, and we're going to go forward to prove

13  that at the appropriate time.

14           But, Judge, to finish what Mr. Ciardi pointed out,

15  we're perfectly willing to coordinate scheduling.  We had an

16  original deposition notice of Mr. O'Neill and Mr. Trudeau, as

17  Your Honor remembers at the first hearing I had with you, it

18  was an emergency motion to put that off and we agreed to

19  that.  But the issue then was whether or not there would be a

20  breathing spell, whether or not these executives would get

21  time to focus.  Well, it's been almost eight months.  So

22  we've noticed those depositions.

23           This is the first we're hearing, by the way, that

24  others want to take those executives.  Fine, let's coordinate

25  a date.  I'm not suggesting it has to be next week, but it

1   has to be next week if we're going to have a hearing on June

2   7th, because those depositions go to our defense of their

3   motion.  So perhaps we should have a coordinated discussion

4   with everybody about scheduling and put off the June 7th, the

5   June 8th, and the June 9th schedule that the debtors are

6   rushing.  They started on April 30th with these motions, we

7   called them the Friday night filings because they literally

8   came in at 11:00 to midnight on Friday night, and we had to

9   scramble the next week to respond.

10           We, the Acthar plaintiffs, are getting all this

11  attention, Judge, but we're getting no discovery, and at some

12  point in time due process is going to have to come into this

13  case.  We're going to have to get some discovery so we can

14  defend what this company is saying about claims, or we'll

15  just go to a hearing and you'll dismiss them.  I suppose

16  that's what they want, in which case they should just ask you

17  to rule today.  Why go through the process?

18           THE COURT:  All right.  Mr. Harris, I can't find

19  you on my screen.  Can you raise your hand, please?

20           MR. HARRIS:  Yes.  Sorry, Your Honor.

21           THE COURT:  There we are.  Okay.

22           MR. HARRIS:  Can you see me now?

23           THE COURT:  I can see you.  Go ahead.

24           MR. HARRIS:  Thank you, Your Honor.  I'll be

25  brief.

1                On the points Mr. Ciardi made, I would just say,

2     the reason you heard is what I said you would hear, which is

3     those are admittedly plan confirmation issues, all of those

4     issues he raised are plan confirmation issues.  To the extent

5     that there is an argument about patent un-confirmability, we

6     have a disclosure statement hearing on June 8th that will

7     address that.

8                In terms of its suggestion that we just heard

9     today that we carve off just one of the many issues he raised

10    and just look at litigating intercompany transfers, it's not

11    that simple.  He may think that these transfers that he's

12    talking about out of ARD were inappropriate, but there's

13    creditors on the other side of Mallinckrodt who will think

14    that they were appropriate and don't want value to be

15    transferred that way, and they are challenging their own

16    transfers to ARD.  The other creditors have made their own

17    arguments about intercompany transfers.  There is no way to

18    isolate just one intercompany transfer and address whether

19    that makes our plan patently un-confirmable in two weeks

20    without every creditor wanting to step in, have their

21    transfers addressed as well, and have a full issue -- a full

22    resolution on this.

23               So the point is the same for every one of these

24    issues, they cannot be hived off and done easily.

25               In terms of cost, there is no way that having a

1    separate, duplicative trustee discovery process and motion is

2    going to reduce costs, it is just going to duplicate them.

3           In terms of what you heard from Mr. Haviland about

4    discovery, he is talking about a different contested matter.

5    He's talking about discovery on the debtors' unsubstantiated

6    omnibus claims objection.  I don't know why we're discussing

7    that today, but just to correct the record, we have provided

8    over a hundred emails, we've provided dozens of organization

9    charts, we've provided dozens of intercompany agreements; we

10   have provided every document that was produced under Rule

11   2004 to the committees.

12          And to be clear, as I said, their other requests

13   which we think go beyond the scope of that objection we have

14   said we will consider and produce in the context of

15   confirmation discovery to the extent relevant.

16          So we've never said no, we have provided

17   discovery, we will continue to provide discovery, but what

18   they're asking for for the trustee motion is enormous,

19   entirely duplicative with confirmation discovery and needs to

20   be coordinated with it.

21          THE COURT:  All right.

22          MR. HARRIS:  Unless the Court has more questions,

23   that's all I have.

24          THE COURT:  No, I don't have any questions.

25          So the only issue before me today is a scheduling

1    issue.  Do I move the trustee -- the hearing on the trustee

2    motion to confirmation or do I leave it where it is, or pick

3    some other date in between?

4            Given the issues that are involved in the trustee

5    motion, which predominantly appear to be issues involving

6    confirmation, which every single constituency and creditor in

7    this case is going to be interested in, and trying to conduct

8    that discovery and have a hearing on June 9th is simply

9    something that can't be done, there's just not enough time to

10   do that.  And it would be prejudicial to all of the parties

11   in this case, not just the debtors, but all the other

12   constituencies in this case are going to be prejudiced if we

13   have to do this two-step process of a trustee motion and then

14   a confirmation objection.

15           A lot of this is going to get fleshed at the

16   disclosure statement hearing.  The parties have already filed

17   objections to the disclosure statement and those are going to

18   have to be dealt with at that hearing.

19           So given that I think, preserving the resources of

20   both the estate and this court, it makes more sense to have

21   the trustee motion heard at the time of the confirmation

22   hearing; it's more efficient, it reduces the discovery burden

23   on everybody, and it just makes more sense from a practical

24   standpoint to do it that way.  If it turns out that the

25   debtors' confirmation hearing is denied -- or confirmation is

1  denied at that hearing, then there's issues about whether the

2  trustee should be appointed at that point, and I think that

3  makes it more efficient as well.

4          So, based on what I've heard and the issues that

5  are involved, I am going to grant the -- I'm going to assume

6  this was a motion to continue the trustee hearing and I'm

7  going to continue it to the date of the confirmation hearing.

8  And the parties, obviously, are going to have to continue to

9  discuss, coordinate with issues involving discovery, and the

10  debtors should do that with everybody involved in the case,

11  anybody who wants discovery on these issues, and provide the

12  discovery in as timely a fashion as is possible under the

13  circumstances.

14          Are there any questions?

15      (No verbal response)

16          THE COURT:  Mr. Ciardi?

17          MR. ASTIN:  No, Your Honor.

18          MR. CIARDI:  Yes, Your Honor.  So the question is,

19  so Your Honor will be entering an order today that adjourns

20  this hearing on an unscheduled basis to whenever the debtors

21  may or may not have confirmation?

22          THE COURT:  That's right.

23          MR. CIARDI:  What if the disclosure statement is

24  not approved next week?  Then there's nothing pending.

25          THE COURT:  Well, then we will have a status

1    conference at that point.

2              MR. CIARDI:  And could this hearing be adjourned

3    to that date and then address scheduling at that date?

4              THE COURT:  Mr. Harris?

5              MR. HARRIS:  Your Honor, there's no need to

6    adjourn the hearing.  If you just -- in fact the disclosure

7    statement is not approved, we can have another discussion on

8    this in terms of scheduling when we -- when that issue

9    arises, but I think the appropriate thing is right now to

10   schedule it to become -- in the same time as the confirmation

11   hearing.

12             THE COURT:  Yeah, I --

13             MR. CIARDI:  Your Honor, there is no confirmation

14   hearing.

15             THE COURT:  Well, I understand that, so -- but I

16   am going to enter an order today, and I'm going to ask the

17   debtors to prepare a form of order, that moves the trustee

18   motion to a date to be determined at the time of

19   confirmation.  I will also set a status conference -- when is

20   our disclosure statement hearing?

21             MR. CIARDI:  June 8th, Your Honor.

22             MR. HARRIS:  June 8th.

23             THE COURT:  I will set a status conference on the

24   trustee motion for -- my calendar is jammed -- we'll set it

25   for June 14th at 11:00 a.m.

```
 1              Mr. Harris?
 2              MR. CIARDI:  Your Honor, how will this affect
 3  their response date?
 4              THE COURT:  Mr. Harris?
 5              MR. HARRIS:  Your Honor, I would propose -- I
 6  propose it be coordinated with whatever response date is set
 7  for confirmation.  Since it's the same issues, it should be
 8  -- the response date could be at the same time as on the
 9  confirmation schedule.
10              THE COURT:  I think that --
11              MR. CIARDI:  Your Honor, that would be unfair to
12  the --
13              THE COURT:  Well, I think it makes --
14              MR. CIARDI:  -- that would be unfair to the Acthar
15  plaintiffs.
16              THE COURT:  Well --
17              MR. CIARDI:  How will we know what discovery we
18  need to take in the interim without their answer?
19              THE COURT:  Well, that's a valid point.  Mr.
20  Harris, how do they know what discovery to take until they
21  see what your response is?
22              MR. HARRIS:  Well, they already served discovery
23  without seeing our response, so I don't fully understand that
24  complaint.  They've indicated at different -- they have
25  indicated they already know the issues that they're
```

1  interested in, they served discovery on them, they're very

2  detailed, they can serve additional discovery.  They don't

3  need our objection to serve discovery, that's not how

4  confirmation normally proceeds and these issues don't

5  normally proceed -- which are confirmation issues by the

6  debtors objecting and then discovery taking place, it's sort

7  of the opposite process normally.

8         MR. CIARDI:  Your Honor, the Acthar plaintiffs

9  have raised serious issues of self-dealing, mismanagement,

10  fraudulent transfer, the debtor needs to step up and put an

11  answer on the record that affirmatively denies or admits that

12  conduct, so that we then know how to move forward with regard

13  to our discovery in preparing for a hearing.  It's unfair to

14  adjourn us to some date in the future and give them an open-

15  ended answer date; they should have to answer as within the

16  next ten to fifteen days.  They clearly think it's frivolous,

17  so an answer should be very easy to do, and then we'll know

18  what we need to take in discovery and what may be admitted or

19  denied.  But then they will have answered these allegations,

20  which they should be doing on June 9th or June 25th or

21  whatever.

22         I understand Your Honor has ruled to move them on

23  to a date that's an uncertain future, but they should answer

24  in a document that's filed with the Court, so that people can

25  examine how they choose to respond.  That's an important

1  thing for the bankruptcy system.

2          THE COURT:  All right.  Well, for now, I'm going

3  to leave that open.  We'll put that on the agenda for the

4  status conference that we hold on June 14th as to when the

5  response date will be, because it will be informed by what

6  happens during the disclosure statement hearing.

7          So, for now, Mr. Harris, the order should be that

8  the hearing on the trustee motion is continued to a date to

9  be determined in conjunction with plan confirmation, that

10 there will be a status conference on June 14th at 11:00, and

11 that as a part of that status conference will be the issue of

12 when the debtors need to file a response to the trustee

13 motion.

14         MR. HARRIS:  Understood, Your Honor.

15         THE COURT:  Anything else for today?

16     (No verbal response)

17         THE COURT:  Okay.

18         MR. CIARDI:  Nothing additional, Your Honor.

19         THE COURT:  All right.  Thank you everybody.  We

20 have a holiday weekend coming up, I'm not sure -- hopefully,

21 everybody can enjoy it.  I know there's a lot coming up in

22 the next couple of weeks, so I'm sure everybody is going to

23 be busy, but I hope you can at least take some time off to

24 spend with your family.

25         So enjoy the holiday weekend and I will see

40

1   everybody soon.  We are adjourned.

2                COUNSEL:  Thank you, Your Honor.

3          (Proceedings concluded at 1:53 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>CERTIFICATION</u>

2               I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9    <u>/s/ Tracey J. Williams</u>                    <u>May 26, 2021</u>

10   Tracey J. Williams, CET-914

11   Certified Court Transcriptionist

12   For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25

A-6371

```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE


                               .  Chapter 11
           IN RE:              .
                               .  Case No. 20-12522(JTD)
           MALLINCKRODT PLC, et al,  .
                               .
                               .  824 Market Street
                               .  Wilmington, Delaware 19801
                   Debtors.    .
           . . . . . . . . . . . . . . . .  Wednesday, June 2, 2021

                      TRANSCRIPT OF VIDEO HEARING
                 BEFORE THE HONORABLE JOHN T. DORSEY
                    UNITED STATES BANKRUPTCY JUDGE

           APPEARANCES VIA ZOOM:

           For the Debtors:        Michael J. Merchant, Esq.
                                    Robert J. Stearn, Esq.
                                    RICHARDS, LAYTON & FINGER, PA

                                    George A. Davis, Esq.
                                    Jeffrey E. Bjork, Esq.
                                    Jason B. Gott, Esq.
                                    Anu Yerramalli, Esq.
                                    Hugh Murtagh, Esq.
                                    Jason Moehlmann, Esq.
                                    Keith Simon, Esq.
                                    Justin Kirschner, Esq.
                                    LATHAM & WATKINS, LLP




           (Appearances Continued)

           Audio Operator:         Electronically Recorded
                                    by Jason Spencer, ECRO

           Transcription Company:  Reliable
                                    1007 N. Orange Street
                                    Wilmington, Delaware 19801
                                    (302)654-8080
                                    Email:  gmatthews@reliable-co.com


           Proceedings recorded by electronic sound recording,
           transcript produced by transcription service.
```

A-6372

APPEARANCES VIA ZOOM:  (Continued)

For the U.S. Trustee:          Jane Leamy, Esq.
                               OFFICE OF THE U.S. TRUSTEE

For the Official Committee
of Unsecured Creditors:        Jamie Edmonson, Esq.
                               Ryan Messina, Esq.
                               ROBINSON & COLE, LLP

                               Cathy Hershcopf, Esq.
                               Michael Klein, Esq.
                               Jeremiah Ledwidge, Esq.
                               Cullen Speckhart, Esq.
                               Jonathan Kim, Esq.
                               Evan Lazerowitz, Esq.
                               COOLEY, LLP

For the Ad Hoc Group of
First Lien Term Lenders:       David Fournier, Esq.
                               TROUTMAN PEPPER HAMILTON
                                SANDERS, LLP

                               Scott Greenberg, Esq.
                               Jeremy Evans, Esq.
                               Michael J. Cohen, Esq.
                               Jennifer Conn, Esq.
                               Chaim Fortgang, Esq.
                               Michelle Choi, Esq.
                               Joshua Brody, Esq.
                               Leesa Haspel, Esq.
                               Matthew Biben, Esq.
                               GIBSON, DUNN & CRUTCHER, LLP

For the City of Rockford:      James Bartimus, Esq.
                               BARTIMUS FRICKLETON ROBERTSON
                                RADER

For Deutsche Bank:             Evan Miller, Esq.
                               BAYARD, PA

                               Jeffrey Schlerf, Esq.
                               FOX ROTHSCHILD, LLP

                               Michele Meises, Esq.
                               Clay Roberts, Esq.
                               WHITE & CASE, LLP

                               Kent Kolbig, Esq.
                               MOSES & SINGER, LLP

(Appearances Continued)

A-6373

```
        APPEARANCES VIA ZOOM:   (Continued)

  For the Legal Representative
  for Future Claimants:         Robert Brady, Esq.
                                Travis Buchanan, Esq.
                                Jaime Chapman, Esq.
                                James Patton, Esq.
                                Edwin Harron, Esq.
                                Melanie Sharp, Esq.
                                Heather Smillie, Esq.
                                YOUNG, CONAWAY, STARGATT
                                 & TAYLOR, LLP

                                Richard Wyron, Esq.
                                Roger Frankel, Esq.
                                FRANKEL WYRON, LLP

                                Karen Bray, Esq.
                                GREENBERG TRAURIG, LLP

  For Humana, Inc., et al:      Donna Culver, Esq.
                                Matthew Harvey, Esq.
                                Robert Dehney, Esq.
                                Taylor Haga, Esq.
                                Nader Amer, Esq.
                                MORRIS, NICHOLS, ARSHT
                                 & TUNNELL, LLP

                                Philip DiSanto, Esq.
                                Paul Shalhoub, Esq.
                                Matthew Feldman, Esq.
                                Matthew Freimuth, Esq.
                                Richard Choi, Esq.
                                Benjamin McCallen, Esq.
                                WILLKIE, FARR & GALLAGHER, LLP

  For Deerfield Partners,
  LP, et al:                    Aaron Stulman, Esq.
                                Christopher M. Samis, Esq.
                                POTTER, ANDERSON & CORROON, LLP

                                Elizabeth Lombard, Esq.
                                Benjamin Beller, Esq.
                                James Bromley, Esq.
                                SULLIVAN & CROMWELL
  (Appearances Continued)
```

```
          APPEARANCES VIA ZOOM:   (Continued)


For the Official Committee
of Opioid Claimants:          Justin Alberto, Esq.
                              Anthony De Leo, Esq.
                              Sophie Macon
                              COLE SCHOTZ, PC

                              Arik Preis, Esq.
                              Mitchell Hurley, Esq.
                              Sara Brauner, Esq.
                              Brooks Barker, Esq.
                              AKIN, GUMP, STRAUSS, HAUER
                               & FELD, LLP

For the Multi-State
Governmental Entities
Group:                        James S. Green, Jr., Esq.
                              SEITZ, VAN OGTROP & GREEN, PA

                              George O'Connor, Esq.
                              Ann Langley, Esq.
                              CAPLIN & DRYSDALE, CHARTERED

For the Unsecured Note
Ad Hoc Group:                 Richard S. Cobb, Esq.
                              LANDIS, RATH & COBB, LLP

                              Andrew Rosenberg, Esq.
                              Claudia Tobler, Esq.
                              Alice Eaton, Esq.
                              Neal Donnelly, Esq.
                              Julia Heasley, Esq.
                              PAUL, WEISS, RIFKIND, WHARTON
                               & GARRISON, LLP

For the Ad Hoc First Lien
Notes Group:                  William Hazeltine, Esq.
                              SULLIVAN HAZELTINE ALLINSON, LLC

                              Donald Burke, Esq.
                              ROBBINS, RUSSELL, ENGLERT, ORSECK
                               & UNTEREINER, LLP

(Appearances Continued)
```

```
APPEARANCES VIA ZOOM:  (Continued)

For the Ad Hoc Consortium
of Equity Holders:           Jennifer Hoover, Esq.
                             John Gentile, Esq.
                             BENESCH, FRIEDLANDER, COPLAN,
                              & ARONOFF, LLP

                             Kristina Wesch, Esq.
                             HERRICK FEINSTEIN, LLP

For OCM Luxembourg:          Scott Cousins, Esq.
                             Scott Jones, Esq.
                             COUSINS LAW, LLC

For the Acthar Plaintiffs:   Albert Ciardi, Esq.
                             Daniel Astin, Esq.
                             Walter Gouldsbury, Esq.
                             CIARDI, CIARDI & ASTIN

                             William Platt, Esq.
                             Donald Haviland, Esq.
                             HAVILAND HUGHES

For the City of Marietta:    Michael Etkin, Esq.
                             LOWENSTEIN SANDLER, LLP

For the United States:       Jason Greenwood, Esq.
                             U.S. DEPARTMENT OF JUSTICE

For the Ad Hoc Committee
of Government Entities
Holding Medicaid Rebate
Claims:                      Michael Maizel, Esq.
                             OTTERBOURG, PC

For Baldwin County, AL,
et al:                       Aaron Harrah, Esq.
                             HILL, PETERSON, CARPER, BEE,
                              AND DEITZLER

For Unsecured Creditors:     Iowell Finson, Esq.
                             FINSON LAW FIRM

(Appearances Continued)
```

A-6376

```
        APPEARANCES VIA ZOOM:   (Continued)


     For the Governmental
     Plaintiff Ad Hoc
     Committee:                  Brya Keilson, Esq.
                                 Jeffrey Waxman, Esq.
                                 MORRIS JAMES, LLP

                                 Daniel Eggerman, Esq.
                                 KRAMER, LEVIN, NAFTALIS
                                  & FRANKEL, LLP

     For the Ad Hoc Group of
     Revolving Loan
     Participants:               James Johnston, Esq.
                                 JONES DAY

     For Express Scripts:        Kenneth John Shaffer, Esq.
                                 Meghan McCaffrey, Esq.
                                 QUINN, EMANUEL, URQUHART
                                   & SULLIVAN

     For McKesson Corporation:   Jeffrey Garfinkle, Esq.
                                 BUCHALTER

     For Cotter Corporation
     (N.S.L.):                   Adam Swingle, Esq.
                                 JENNER & BLOCK, LLP

     For Buxton:                 Julia Klein, Esq.
                                 KLEIN, LLC

     For Independent Managers
     of the Speciality Generics
     Debtors:                    David Crichlow, Esq.
                                 Ethan Trotz, Esq.
                                 KATTEN MUCHIN ROSENMAN, LLP

     For Wilmington Savings Fund
     Society, FSB:               Michael D. DeBaecke, Esq.
                                 ASHBY & GEDDES

                                 Sameer Alifarag, Esq.
                                 PRYOR CASHMAN, LLP


     (Appearances Continued)
```

A-6377

APPEARANCES VIA ZOOM:   (Continued)

Also Appearing:                    Nick Hagen, Esq.
                                   SKADDEN, ARPS, SLATE, MEAGHER
                                    & FLOM, LLP

                                   Jonathan Mitnick, Esq.
                                   SIMPSON, THACHER & BARTLETT

                                   Brian Guiney, Esq.
                                   PATTERSON, BELKNAP, WEBB
                                    & TYLER, LLP

                                   Stephen Welch
                                   MALLINCKRODT

                                   Erik Wright
                                   Jordan Wolfe
                                   CERBERUS

                                   David Ambrosia
                                   COLUMBUS HILL CAPITAL MANAGEMENT

                                   Spencer Payne
                                   Andrew Miller
                                   AURELIUS CAPITAL MANAGEMENT, LP

                                   Daun Chung
                                   GUGGENHEIM

                                   Ted Nguyen
                                   MARINER INVESTMENT GROUP

                                   Heather Barlow
                                   DUNDON ADVISORS, LLC

                                   David Skatoff
                                   Agnes Tang
                                   Teddy Kindelan
                                   Olivia Parsons
                                   Nikan Ansari
                                   DUCERA PARTNERS, LLC

                                   Matthew Russell
                                   HUDSON BAY

                                   Megan Wasson
                                   GOVERNMENTAL PLAINTIFF AD HOC
                                    COMMITTEE

        (Appearances Continued)

A-6378

APPEARANCES VIA ZOOM:  (Continued)

Also Appearing:                James Lathrop
                               OFFICIAL COMMITTEE OF UNSECURED
                                CREDITORS

                               Christopher Guth
                               Torben Geisler
                               HUMANA

                               Kaitlyn Sundt
                               ALIX PARTNERS

                `              Austin Viny
                               PRIME SHARES WORLD MARKETS, LLC

                               Jon Pruchansky
                               PALOMA PARTNERS

                               Chris Warren
                               ODEON CAPITAL

                               Bill Schatz
                               CHICAGO TRADING COMPANY

                               Serena Lightstone
                               FTI CONSULTING

                               Megan Harper
                               CITY OF PHILADELPHIA

                               Gautam Dhingra
                               JP MORGAN

                               Kevin Pleines
                               RPA ADVISORS

                               David Chasen
                               TWO SEAS CAPITAL

                               Jeffrey Kaplan
                               "BCAS"

                               Valerie Petrov
                               "TES"

                               Anthony Pacelli
                               "DB"

        (Appearances Continued)

APPEARANCES VIA ZOOM:  (Continued)

Also Appearing:                Matthew Manning
                               "M3"

                               Uday Gorrepati
                               "ABI PROJECT"

                               Ian Silverbrand, *Pro Se*

                               Vasu Kalpat, *Pro Se*

                               Brian Kessler, *Pro Se*

                               Vasilii Dunin, *Pro Se*

                               Darrel Edelman, *Pro Se*

                               Huahai Ma, *Pro Se*

                               Pomah Aohuob, *Pro Se*

                               "POCO M3"

                               Maria Chutchian
                               REUTERS

                               Jason DiBattista
                               LEV FIN INSIGHTS

                               Taylor Harrison
                               DEBTWIRE

                               Karen Leung
                               REORG RESEARCH, INC.

                               Steven Church
                               BLOOMBERG

                               Laura Haney
                               Katherine Dute
                               U.S. BANKRUPTCY COURT

INDEX

Page

DISCUSSION RE:  ATTESTOR/HUMANA MOTIONS TO ESTIMATE        11

MOTION TO QUASH RE:  ATTESTOR/HUMANA                       13

MOTION TO QUASH/COMPEL RE:  DEPOSITION K. BRETON           45

MOTION TO QUASH/COMPEL RE:  DISCLOSURE STATEMENT ISSUES    54

MOTION TO QUASH/COMPEL RE:  UNSUBSTANTIATED CLAIMS         66

MOTION TO QUASH/COMPEL RE:  DATABASE AND WEBSITE           68

1        (Proceedings commence at 3:01 p.m.)

2              THE COURT:  Good afternoon.  This is Judge Dorsey.

3    We're on the record in Mallinckrodt PLC, Case Number 20-

4    12522.

5              Mr. Merchant, I'll go ahead and turn it over to

6    you.

7              Can everybody hear me okay?  Mr. Merchant, can you

8    hear me?

9              MR. MERCHANT:  Again, Your Honor, it was a little

10   bit choppy there, but --

11             THE COURT:  It was choppy there.

12             MR. MERCHANT:  Michael Merchant of Richards, Layton

13   & Finger on behalf of the debtors.

14             On today's agenda, we have three discovery-related

15   matters.  And I'm going to turn the podium over to Mr.

16   Murtagh, who will be handling those on behalf of the debtors.

17             THE COURT:  All right.  Before we go to that, I've

18   been looking at the schedule of upcoming hearings, which is

19   daunting, particularly in light of all the other ones I have.

20   I had a question about the Attestor and Humana motions to

21   estimate.  Why are we estimating claims at this point in the

22   case?  Let me ask Humana's counsel that.  I know it's not on

23   the agenda, but I'm trying to --

24             MR. MCCALLEN:  Your Honor --

25             THE COURT:  -- I'm trying to --

1          MR. MCCALLEN:  Sure.

2          THE COURT:  -- manage my calendar here.

3          MR. MCCALLEN:  Your Honor, can you hear me okay?

4          THE COURT:  I can.  Go ahead.

5          MR. MCCALLEN:  Good afternoon, Your Honor.

6     Benjamin McCallen from Willkie, Farr & Gallagher on behalf of

7     Attestor, Humana, and additional parties, which we've been

8     referring to as the "Acthar insurer claimants."

9          Your Honor, I -- so our motion to estimate and the

10    motion for administrative claims made clear what we're trying

11    to do at this point -- and we're not actually, on Monday,

12    asking Your Honor to actually estimate any claims, or to

13    actually make a finding that there are administrative claims

14    or that the administrative claims can be set for a certain

15    amount on Monday.

16         The purpose of that motion actually is -- and I

17    think we're going to talk about this a little bit today in

18    the context of some of the other motions on the calendar,

19    which is setting an overall, coherent schedule for

20    adjudication of these issues, but are necessary to happen in

21    the context of plan confirmation.

22         And we proposed a schedule, Your Honor, in our

23    initial motion, which was filed, you know, about a month ago

24    now.  And that schedule has -- you know, we can discuss this

25    on Monday about what the appropriate schedule is.  It's been

1    a little bit overtaken by events.  But the idea would be to

2    put a schedule into place, Your Honor, that would give us an

3    opportunity to take fact discovery, which includes getting

4    the documents we need; taking depositions of relevant

5    witnesses; and then also dealing with, you know, various

6    expert issues that are going to be on the calendar and are

7    necessary to adjudicate those claims, as well.

8            So it's really a motion about process more than

9    actually, at this point in time, making a finding that there

10   are claims and the value of those claims.

11           THE COURT:  All right.  Thank you.  I appreciate

12   the explanation.  All right.  That's fine.  Thank you.

13           All right.  Mr. Murtagh, I'd like to do these in --

14   I'd like to do the -- as long as we're talking about Humana

15   and Attestor, let's do the motion to quash

16           MR. MURTAGH:  Yes, Your Honor.  So that is Item 3

17   on the agenda and it was a motion to quash certain

18   deposition-related topics and a deposition.  It addresses

19   both Humana and Mr. Haviland and Mr. Astin's clients.

20           Before I jump into responding, Your Honor, I just

21   needed to make a point on nomenclature.  Mr. Astin had let us

22   know that his group still believes that the use of the

23   defined term "Haviland Hughes Plaintiffs" was unfairly

24   personalizing him.  And so we're going to make every effort

25   to refer to them as the "Ad Hoc Acthar Group," to

14

1    differentiate them from the Humana/Attestor Group.  And I may

2    slip up on that just by force of habit, but that's the

3    nomenclature we're going to use.

4              THE COURT:  All right.  Go ahead.

5         MR. MURTAGH:  And with respect to the motion to

6    quash that Your Honor referenced, this was addressing both

7    requests from Humana/Attestor and from the Ad Hoc Acthar

8    Group.  But the Ad Hoc Acthar Group did not object to the

9    motion, so we view it as a live issue only between us and

10   Humana, in respect of this limited objection, and that's what

11   I'll respond to, Your Honor.

12             THE COURT:  All right.  Go ahead.

13        MR. MURTAGH:  Your Honor, the Humana/Attestor

14   motion -- sorry.  Our motion was a motion to quash what we

15   viewed as irrelevant deposition topics propounded in respect

16   of the debtors' unsubstantiated claims objection.  And Your

17   Honor, we've had a number of discussions with Humana or the

18   Acthar (indiscernible) group that we thought were quite near

19   to resolving the issues, and we got very close, but we were

20   unable to.  And they've left a limited number of four topics

21   that are still live issues.

22             As to those issues, Your Honor, I'd start by saying

23   our objection is on the basis that those issues are

24   irrelevant, those topics are irrelevant to anything related

25   to substantiating the other unsubstantiated claims.  And as a

A-6385

1    predicate to that, two points:

2        The first is that what it appears that Humana

3    actually wants is discovery to help them amend their proofs

4    of claim because the proofs of claim they've targeted have no

5    substantiation at all regarding any debtor, other than the

6    debtors who are defending in the underlying complaints.  And

7    so there's no substantiation there at all and it fails the

8    first (indiscernible)

9        So this looks like a request for information that

10   would let them amend, and the debtors are amenable to that

11   and have said that they will produce documents that would

12   allow Humana to see if there is -- if there are any facts

13   that would allow them to bring claims that they have actually

14   pled against new Mallinckrodt (indiscernible

15       However, there is no relevance to, first, discovery

16   into claims that were never pled against any debtor because

17   the federal rules, on their face do not permit discovery into

18   un-pled claims.

19       And second, because the only un-pled claims, the

20   only additional claims that Humana has identified are clearly

21   derivative claims owned by the debtors' estates.  They are

22   targeting fraudulent transfer and veil-piercing claims in

23   request for intercompany transactions.  And the law is

24   abundantly clear that those sorts of claims are derivative

25   claims in bankruptcy, they are owned by the debtors.  That's

1   Tronox from the Second Circuit, In Re (indiscernible) Emoral

2   from the Third Circuit, In Re W.R. Grace from the Bankruptcy

3   Court here in Delaware, and a number of other cases cited in

4   our brief.

5       Given that those sorts of derivative claims are

6   owned by the debtors in bankruptcy, they cannot be used to

7   substantiate a creditor claim because they will never be a

8   creditor claim.  And that's the basis on which we objected to

9   what we viewed as the irrelevant requests.

10      Now Humana has come back and suggested that they

11  maintain their position that they need (indiscernible) four

12  of the topics that were listed, and so I'll turn to those

13  individually.

14      The first topic that Humana identified as

15  potentially relevant was cash management.  But here, Humana

16  asserts relevance only as to questions regarding the,

17  quote/unquote, "purported separateness of the debtors."

18  Again, purported separateness is an issue that can only go to

19  a veil-piercing claim, which is not a creditor claim.

20      Second, they request the topic related to the

21  Department of Justice Acthar settlement.  And there, Humana

22  references no relevant claim at all, but expresses interest

23  in potentially dissimilar treatment among creditors.  That

24  is, if anything, a plan issue.

25      The third, Your Honor, is the Questcor acquisition.

1   And here, Humana requests information of the 2014 acquisition

2   of Questcor.  But again, the focus appears to be on potential

3   asset transfers, which would, again, only go to derivative

4   claims.

5          And to the extent that the thrust of the question

6   is understanding which debtors may have responsibility for

7   Acthar, the debtors have already agreed to another topic

8   that's very broadly worded that I can just read out for Your

9   Honor, that covers that issue which we agree may be relevant

10  in the current setting.  And that topic is:

11         The debtors' corporate structure and organization,

12  including the company entities that constitute the specialty

13  brands and specialty generic businesses; the identities of

14  the Acthar Entities and the Synacthen Entities; the rights,

15  responsibilities and obligations of each of the Acthar

16  Entities and the Synacthen Entities with respect to Acthar

17  and Synacthen, respectively; and for the locations, roles,

18  and titles of personnel with responsibilities related to

19  Acthar and Synacthen.

20         And the debtors have agreed to that broad topic.

21  There is nothing new that can be gained and there is nothing

22  relevant that can be gained by seeking information now about

23  the 2013 Questcor acquisition.

24         And finally, Your Honor, fourth, Humana describes a

25  request for Acthar-related transfers or transactions, but

A-6388

1   that is not what the identified topic requests.  This is

2   their (indiscernible) and it requests, first, information on

3   a variety of transfers with no stated relationship to Acthar,

4   which, again, could only be relevant, as we conceded, to

5   derivative claims; and second, separately, asks for any

6   transfers related -- information on any transfers related to

7   Acthar and Synacthen.  That second topic, to the degree

8   relevant to substantiating claims against other debtors, is

9   covered by other topics the debtors have already agreed on,

10  which go to the intercompany agreements and intercompany

11  relationships in respect of the Acthar business line.

12          So, in sum, Your Honor, these are four requests

13  that remain entirely irrelevant because they are almost

14  entirely focused on claims that these creditors cannot use to

15  establish their otherwise unsubstantiated claims.  And so, as

16  elsewhere and as we'll discuss further today, the debtors are

17  prepared to produce witnesses and documents, to the extent

18  they're actually relevant to the contested matter at issue.

19  But given the number of contested matters and the sheer

20  volume of discovery that has been propounded, it's really

21  important at this point to make sure that the requests are

22  properly tailored and relevant to the contested matter in

23  which they are asserted.

24          THE COURT:  Well, have you already provided the

25  2004 discovery requested by the UCC to Attestor and Humana?

1           MR. MURTAGH:  Yes, Your Honor.

2           THE COURT:  Doesn't that include discovery on

3     intercompany transfers?

4           MR. MURTAGH:  I do not know the full content of

5     that very voluminous production, but I believe it does, to

6     some extent, Your Honor.

7           THE COURT:  I think it was part of their request,

8     so I hope it's in there.

9           Is there anyone from the UCC who could tell me

10    what's in that discovery on the line?

11          MR. MURTAGH:  I think I can take a moment and

12    confirm with members of my team, Your Honor.

13          THE COURT:  Okay.  Go ahead.

14       (Pause in proceedings)

15          MR. MURTAGH:  Just a moment, Your Honor.  I

16    apologize.

17          THE COURT:  Well, while you're waiting for that,

18    let me ask you another question.  Why is the DOJ settlement

19    issue not relevant to these claims?  What if the DOJ settled

20    with a debtor other than the ones that the Acthar Plaintiffs

21    have sued; that would be relevant, wouldn't it?

22          MR. MURTAGH:  No, Your Honor.  The stated basis --

23    Humana's stated basis for interest in the DOJ's settlement is

24    understanding whether the Department of Justice is receiving

25    different treatment for its claims than Humana is receiving

1    for its claims, not whether anything in the DOJ settlement

2    would help Humana understand whether it can assert claims

3    against debtor if it has not previously sued.

4              THE COURT:  Let me --

5              MR. MURTAGH:  It's truly a dissimilar treatment.

6              THE COURT:  Let me handle these things then --

7    these things one at a time.

8              Mr. McCallen, are you speaking on behalf of your

9    clients?

10             MR. MCCALLEN:  I am, Your Honor.

11             THE COURT:  Okay.  So --

12             MR. MCCALLEN:  Can you hear me okay?

13             THE COURT:  I can.  What are you asking for --

14   what's the purpose of asking for information regarding the

15   DOJ settlement?

16             MR. MCCALLEN:  Well, I think Your Honor hit it

17   right on the head whenever you asked your first question,

18   which is to say, you know, it is our understanding that the

19   Department of Justice has entered into a settlement with the

20   debtors, and they're receiving $260 million as part of that

21   settlement.  Their claims are asserted against ARD and PLC,

22   that's my understanding.  Maybe there's more to it that I

23   don't know from the public record, but would like to

24   understand.

25             And if they're getting $260 million, but at the

1    same time the debtors are looking at us and saying, well, you

2    only have claims against ARD and PLC, so those claims really

3    aren't worth a whole lot -- which is why, in the context of

4    the plan -- and that's why it's really important to

5    understand really all of these issues.

6            But I can use this as a springboard, Your Honor, to

7    understand the broader context of what's going on here, is

8    that, as we said in our papers and I'm sure Your Honor has

9    probably heard a thousand times and is sick of hearing it

10   from us.  But there's a proposed plan on the table right now

11   from the debtors, and what that proposed plan does is it pays

12   certain unsecured creditors hundreds of millions, if not

13   billions of dollars.  And it provides for other unsecured

14   creditors like my clients only the right to recover from a

15   general unsecured creditor pool of $100 million.

16           And they really give a -- there's really two

17   arguments that, at different points in time, they have come

18   up with to say why this makes sense and why this is not fair

19   -- why this is fair for us:

20           The first is they're going to eventually argue, I

21   imagine, that our claims really aren't worth that much

22   because no antitrust or anti-competitive conduct occurred.

23   And that's --

24           THE COURT:  Let me --

25           MR. MCCALLEN:  -- what our --

1          MR. MCCALLEN:  -- estimation motion --

2          THE COURT:  Let --

3          MR. MCCALLEN:  -- is about.

4          THE COURT:  Let me stop you, Mr. McCallen, because

5     what you're telling me sounds like it goes to the issue of

6     confirmation, not whether or not your clients have claims

7     against other debtor entities than the two that you sued pre-

8     petition.

9          MR. MCCALLEN:  Well, that's what the -- that's what

10    the debtors would like Your Honor to think, and that's

11    because this goes to the second argument they have made,

12    which is the unsubstantiated claims objection.  And it's

13    really an exercise, Your Honor, in artificial line fraud

14    because what they've done is they've come to the Court and

15    they've said, look, we're able to -- we're -- we have a copy

16    of the Humana pre-petition complaint in front of us and it

17    only asserts claims against ARD and PLC.  So, on the basis of

18    that fact, all of the other insurer claimants, whether or not

19    they've actually brought pre-petition litigation -- and some

20    of them didn't -- are limited to bringing claims against ARD

21    and PLC.

22          So, whenever they made that argument, we

23    immediately said, all right.  Well, then you've opened this

24    door and you said you can't bring claims against ARD, anybody

25    other than ARD and PLC, so then we're entitled to discovery

23

1   on a couple of different issues.  One of them is:  Did

2   anything wrong happen; and, if so, who did it?  Who engaged

3   in anti-competitive pricing, marketing, or sales of the drug?

4   Which entities did they work for, if not ARD or PLC?  Who

5   ultimately benefitted from it within the debtors' corporate

6   structure.

7         And the debtors have come back to us and said

8   that's not a subject for discovery now, that's plan

9   confirmation.  And what they've come back and they've said

10  what we're going to do is we're going to give you -- and

11  they've done this.  They've given us a handful of org chars

12  and they've given us a three-page document that has a list of

13  all the debtor entities.  I think there are something like 92

14  entities on this -- on the brand side of the business and 20

15  odd entities on the generic side of the business, and it has

16  a list of their legal roles and entities.

17        And they say you are free to explore, at a 30(b)(6)

18  deposition, what all of those different entities do and don't

19  do.  We're not going to get discovery about any of the

20  alleged antitrust conduct.  According to Mr. Murtagh, I can't

21  ask questions about how they move assets around because

22  that's an issue that goes to derivative claims.  But you can

23  understand, they say, who does what at each debtor entity,

24  maybe ask some questions about who the employees are.  And

25  then they're going to come back in front of Your Honor -- the

24

1    current proposal is to come back on June 25th -- with a

2    motion to disallow billions of dollars of claims, not just

3    ours, but billions of dollars of claims on the basis that we

4    haven't shown that there's a factual basis for those claims,

5    when we haven't gotten the underlying discovery.

6         So, to your question, Your Honor, that isn't this a

7    plan confirmation information, the debtors, the issues they

8    are raising on this motion are all plan confirmation issues.

9    But they're trying to cherry-pick certain pieces of it out

10   and say, through a just general claims objection, let's do

11   two weeks of discovery on these partial issues, come back in

12   front of the Court, and we're going to try to disallow your

13   claims on this basis.

14        And so what the parties are going to end up doing -

15   - it's clear, the writing is already on the wall -- we're

16   going to run around for the next couple of weeks, we're going

17   to take depositions, give the documents they give us [sic],

18   and then we're going to put in, you know, supplemental

19   briefing in front of Your Honor with a big stack of exhibits

20   from what we're able to find in the UCC production, and have

21   a witness.

22        And we're going to come back and, you know, we'll

23   be arguing, making the exact same argument that I'm making

24   today, which is:  How can you disallow claims against all of

25   the debtor entities, other than ARD and PLC, when we haven't

A-6395

1    gotten discovery on the allegations of our claims to figure

2    out, number one, do they have merit; and, if they do, who did

3    that conduct and which entities are they at.  That's exactly

4    what we would have gotten in a pre-petition litigation.

5           So, Your Honor, the answer to your question:  Are -

6    - some of these issues, do they have a little bit of a plan

7    confirmation flavor to them?  They do.  But I think that the

8    answer to that isn't don't give us discovery into it; it's

9    don't conduct this sort of piecemeal hearing in two weeks on

10   an issue about -- that's full of cherry-picked issues.

11          And this is what the debtor said to you last week,

12   Your Honor.  They came in front of you on the trustee motion

13   and they said they're raising a bunch of issues -- or not us,

14   but Mr. Haviland and his group were raising a bunch of

15   issues, they said they were plan confirmation issues, let's

16   get an orderly schedule, let's do all of this one time and do

17   it in the context of plan confirmation, and Your Honor agreed

18   with that.  And here they are today in front of you, saying,

19   no, we can disallow billions of dollars of claims by just

20   isolating certain pieces and certain arguments whenever it's

21   all tied together.

22          And really, all of this, what we should be doing is

23   setting an overall discovery schedule on all of these issues,

24   including our estimation proceeding, which is tied into this,

25   and ultimately figure out how that works in the context of

1    plan confirmation, which is coming back to what Your Honor

2    first asked me, what we were on for Monday to discuss.

3              THE COURT:  All right.  Mr. Murtagh, do you want to

4    respond to that?

5              MR. MURTAGH:  Yes, Your Honor.  Yes, Your Honor.

6              What I hear Mr. McCallen saying is they believe

7    they're entitled to understand who did that conduct; i.e.,

8    Acthar-related conduct, to know whether they may have -- be

9    able to assert their claims against -- validly, against

10   additional entities for whom they have not previously

11   substantiated the claim.  And we said we understand that and

12   we produced -- as Mr. McCallen said, we produced to the

13   Humana group all of the documents that helped demonstrate and

14   illustrate which debtor entities have contact with Acthar:

15   Organizational charts, all of the currently affected

16   intercompany agreements related to Acthar.  And we've agreed

17   to produce a witness who will speak to those very topics.

18             That's what he's asking for and we're agreeing to

19   give it to him because we agree that it may be relevant to

20   substantiating claims against other debtors where the claims

21   are previously unsubstantiated, and that's where the line is

22   properly drawn.

23             Beyond that, there are issues that cannot have any

24   relevance to substantiating their claims.  And of course it's

25   appropriate, particularly given the volume of discovery we're

1    dealing with, to have things produced and dealt with at the

2    time they become relevant.  And as Mr. McCallen admitted,

3    much of this is plan-related.  And that of it which is plan-

4    related is not appropriate for now.  It needs to be

5    coordinated with all of the other parties who will want plan-

6    related discovery, and we will discuss it at that time.  But

7    there is no relevance and Mr. McCallen did not explain

8    relevance to these four topics to substantiating his

9    unsubstantiated claim.

10             THE COURT:  Well, right now, I'm only dealing with

11   the DOJ settlement.  And if the issue -- and the issue is, at

12   this point, in connection with your motion, whether or not

13   any other debtors, other than ARD and PLC, engaged in conduct

14   that involved Acthar, whether it was manufacturing it,

15   selling it, marketing it, whatever it might be.  And it would

16   seem to me that the DOJ settlement topic is something that

17   could directly to that issue.  So I'm going to allow

18   discovery on that topic.

19             MR. MURTAGH:  Understood, Your Honor.

20             THE COURT:  Let's go to -- did you get a response

21   on the question of what's in the UCC discovery?

22             MR. MURTAGH:  Yes, Your Honor.  My best

23   understanding is that the Rule 2004 documents include details

24   on the key intercompany transactions.  If I am wrong on that,

25   I will know about that momentarily, but -- so my answer is

1    yes, Your Honor, there is -- the key intercompany transaction

2    doc -- information is in the 2004 discovery.

3         THE COURT:  So, since you've already given it to

4    them, that seems to address the issues about transfers.  So,

5    Mr. McCallen, what else are you looking for?

6         MR. MCCALLEN:  I think you hit the nail right on

7    the head, Your Honor.  They've given it to us.  If we have

8    information on it, we should be able to ask questions of

9    their witness about it.

10        THE COURT:  So it's just a topic for the deposition

11   you're talking about.

12        MR. MCCALLEN:  Correct.  I mean, the motion to

13   quash is limited to the 30 -- the topic of the 30(b)(6)

14   deposition, Your Honor.  And in the context of the

15   intercompany transactions, you know, this is really the same

16   issue -- and we can (indiscernible) if it's easier; if not,

17   we can continue to go through them.

18        But we have a separate request on the operations of

19   the cash management.  And really, it goes to these questions

20   of, you know, who does what among these 90 plus entities on

21   this specialty brand side of the business.  Mr. Murtagh

22   points to the fact that we've given us some org charts and

23   intercompany agreements.  That helps us understand those

24   issues.

25        But we're entitled to know, for instance, how --

29

1   why is that ARD, which is the entity that we asserted claims

2   against initially in the pre-petition litigation, which

3   distributes this drug, if the money it pulls in, based upon

4   the information we have seen, tens of millions of dollars

5   even during the course of these cases, go out of ARD and into

6   other entities and distributed throughout this ninety-plus

7   entity structure that the debtors have.

8          And we have claims against ARD, which they're --

9   you know, again, the debtors want to say you only have claims

10  against ARD because they filed their exhibits to the

11  disclosure statement, they've said there's very little

12  distributable value in ARD.  So tens of millions of dollars

13  are going in every month even while these cases are going on

14  and they're going out the back door.  Where are they going?

15  Who's making decisions about where they're going?  Why are

16  they going there?  These questions all go to issues about

17  who's running -- who's making decisions there and what

18  entities may we have claims against as part of these cases.

19         THE COURT:  Well, what claim would you have against

20  -- if ARD is the one that markets, distributes, and sells the

21  product, and they get the receipts in from those sales and

22  then transfer it to other entities, isn't that a -- you know,

23  at best, you have a fraudulent conveyance claim.  How is that

24  relevant to your claims against those other entities?  And

25  that's not a claim you can bring.

1          MR. MCCALLEN:  Because --

2          THE COURT:  You can't bring a fraudulent conveyance

3    claim against any of those entities.  It's a debtor cause of

4    action.

5          MR. MCCALLEN:  Absolutely, Your Honor, and we told

6    this to the debtors.  We're not doing this because we're --

7    because, at this point, we're looking to bring fraudulent

8    conveyance claims.  The reason that we want this discovery

9    because it speaks directly to issues about control.  Who does

10   what within this, you know, very complicated web of debtor

11   entities, like I said 90 plus entities, that there is

12   somebody who is making decisions about how -- not only how

13   the drug is marketed, how it is sold, how it is priced.

14          We've obviously put the issue in front of Your

15   Honor, too, on several occasions, about the incredible price

16   increases that have happened to Acthar over the years.  But

17   these are questions that go to exactly who was liable for

18   relevant conduct among the debtors.

19          THE COURT:  How so?

20          MR. MCCALLEN:  It's related to (indiscernible)

21          THE COURT:  You're losing me on that, Mr. McCallen.

22   How so?  Let's assume for a moment that ARD transfers funds

23   to one of the other debtor entities and they -- that other

24   debtor entity happens to have the same person who is the CEO

25   of that entity.  How does that give you a claim against that

1    other entity?

2         If it speaks to the fact that -- and again, when

3    Your Honor -- if we go back a second, Your Honor said, you

4    know, a couple of minutes ago that ARD distributes the drugs.

5    They distribute it.  But you also said they market and sell

6    it.  We don't know that.  We think a lot of that might go on

7    at different entities.  So, understanding how these -- the

8    company's structure works and exactly who's pulling the

9    strings we think is directly relevant to figuring out where

10   did actionable conduct occur.

11        Now, again, I want to say I would much rather be

12   having this conversation in the context of documents that

13   show that pricing was set by, you know, Bob Smith.  And then

14   we also see that Bob Smith doesn't work at ARD, he works at

15   MPIL, and that Bob Smith is also involved in, you know,

16   moving cash out of ARD into other entities.  That would, I

17   think, collectively support a claim against that other

18   entity, MPIL, in the context of our antitrust claims.  But

19   right now, we're just getting the piece about -- you know,

20   we're not getting the antitrust stuff because they've said to

21   us we're not giving you that discovery, that's a plan

22   confirmation issue.

23        THE COURT:  Mr. Murtagh.

24        MR. MURTAGH:  Your Honor, and Mr. McCallen is not

25   expressing any reason why transfers themselves would help

1    establish what he believes is relevant, which is, as we hear

2    it, who has responsibility for Acthar operations.  And we've

3    agreed to produce documents and a witness on that topic.

4    They have the agreements, they can ask those questions.  What

5    we've objected to is an open-ended inquiry into intercompany

6    transactions that are untethered in any way to Acthar and

7    have no relevance to the claims that need to be substantiated

8    or to anything that Mr. McCallen just mentioned.

9         THE COURT:  Well, I guess his point is how do I

10   know it's untethered to Acthar unless I see what those

11   transfers are and who authorized the transfers and who

12   benefitted from it.

13        MR. MURTAGH:  Because, Your Honor, the transfers

14   that are made are made pursuant to the intercompany

15   agreements that have been produced.  And the substance of

16   what Mr. McCallen is interested in is understanding the --

17   where the lines are connected in the enterprise, who has

18   responsibility for what aspects of Acthar, and that's within

19   the agreements and the other documents that have been

20   produced.

21        But regardless of whether a transaction -- a cash

22   transfer goes from ARD to somebody else, whether it can be

23   flagged as having (indiscernible) related to an Acthar

24   payment, it will never substantiate any further the business

25   line and the people responsible.  And the transfer itself

A-6403

33

1    will never give rise to a claim that these creditors own.

2    What we are giving them, what they can use to substantiate

3    their claims, if they can be substantiated -- and they're

4    asking for substantially more and related discovery for

5    transactions that can't help them.

6            THE COURT:  Well, are we talking about just

7    transfers from ARD to other entities, Mr. McCallen?

8            MR. MCCALLEN:  Your Honor, I think that would be

9    the -- that would be the focus of the questions, yes.

10           THE COURT:  All right.  To that extent, I think

11   it's appropriate.  And Mr. Murtagh, you told me you've

12   already produced all of the intercompany agreements and

13   you're going to produce information about transfers, so --

14   you should produce information about transfers from ARD to

15   other debtor entities, so that they can explore that and

16   understand the structure of the company and why those

17   transfers were being made in the context of these

18   intercompany agreements.

19           MR. MURTAGH:  Understood, Your Honor.  So, just to

20   be totally clear, we should understand the request for the

21   topic not to be quashed on Number 6, to the extent that it is

22   a request to ask questions about transfers from ARD to other

23   Mallinckrodt entities.

24           THE COURT:  That's what I would authorize you to --

25   that's what I would -- that's the discovery that I will

1    allow, let me put it that way.

2             MR. MCCALLEN:  And Your Honor --

3             MR. MURTAGH:  Thank you, Your Honor.

4             MR. MCCALLEN:  -- just to clarify -- just to

5    clarify.  Presumably, if there's follow-on transfers, that

6    would be within the scope, as well?

7             THE COURT:  Well, yeah.  I mean, if money is

8    transferring from ARD to Company B, and then Company B is

9    transferring it to Company Z, yeah, that's going to be

10   relevant.  You can follow the money trail from ARD.

11            MR. MCCALLEN:  Okay., Thank you, Your Honor.

12            THE COURT:  I don't see -- going back to the cash

13   management one -- how that -- what additional information you

14   would need beyond those transfers, unless it's -- maybe you

15   can explain that to me, Mr. McCallen.

16            MR. MCCALLEN:  I actually think they're very, very

17   much overlapped, Your Honor.  I agree with you.  You know,

18   there might be some questions about, you know, the flow of

19   funds post-petition that are more directly relevant to the

20   cash management procedures put in place as part of the

21   bankruptcy, as opposed to pre-petition transfers.  There

22   might be a temporal element.  But I think, from a subject

23   matter perspective, they're largely covering the same

24   territory.

25            THE COURT:  All right.  So I think you've got it

1      covered then with what I've already authorized for that

2      topic.

3              So that leaves one other one, right?  The Questcor

4      transaction you mentioned, Mr. Murtagh, is that the --

5              MR. MURTAGH:  Yes, Your Honor, that's the last one.

6              THE COURT:  All right.  Mr. McCallen, what's the

7      relevance of the Questcor transaction?

8              MR. MCCALLEN:  Sure, Your Honor.  As a little bit

9      of context here, the debtors purchased Questcor in 2014 for,

10     I believe, $5 billion.  The anti-competitive conduct that we

11     have put at issue in our claim is alleged to have begun

12     before Mallinckrodt and actually took place at Questcor.

13             But you know, even more relevant here for the

14     purposes of this deposition, the acquisition is important

15     because it's our understanding that Questcor, whenever it was

16     acquired, came under the Mallinckrodt umbrella and became

17     ARD.  What A-R -- what is current -- what is today ARD used

18     to be Questcor.  And in 2014, that was a standalone entity

19     that had a value that the debtors thought of $5 billion, and

20     it had the rights to Acthar.  That was the mechanism through

21     which they purchased the Acthar drug.

22             Between 2014 and 2021, where we are today, the

23     value of that is much lower, according to them.  But more

24     importantly -- and this goes back to the discussion about the

25     alleged mall-distributable [sic] value of ARD, the

36

1    operations, the IP, the assets, employees somehow got

2    diffused through the entire debtor structure, so that now

3    we're left -- even though we sued the entity that used to be

4    Questcor that used to sell Acthar, according to the debtors,

5    there's not really much there.  And so we are -- we would

6    like to understand that.

7            Again, it's not a fraudulent conveyance issue.

8    It's a question about who did relevant conduct; and, if so,

9    where.  Did it get moved out of ARD, at some point; if so,

10   why and by whom?  It all goes to the issues about whether or

11   not, you know, it's reasonable for us to only have claims at

12   ARD.

13           Again, I think we need to understand -- and I'll

14   just say it one more time, Your Honor, because it's really

15   important and we'll be back in front of you again with me

16   saying this on the 25th.  Without discovery about whether

17   antitrust and anti-competitive conduct occurred; and, if so,

18   who did and where, this idea that we can disallow claims

19   against entities under -- other than ARD is completely

20   inconsistent with what could happen in a -- outside of

21   bankruptcy, which is we would be allowed to pursue our

22   claims.  We would get discovery about relevant conduct and we

23   could amend our complaint, if we need to.

24           And so, you know, this Questcor is a piece of this,

25   overall.  But I'm just using it to reiterate the point, Your

1    Honor, that, you know, exactly who did what where and how

2    they got out of ARD and into other entities is certainly

3    something we want to explore in the context of this request.

4    But it also just really highlights the prejudice to us at

5    this point of the motion moving forward in its current form,

6    and we haven't had discovery of the underlying merits and

7    don't know who did what and where.

8          THE COURT:  Well, I'm not following how the

9    Questcor transaction plays into that.  I mean, they -- you

10   said ARD purchased Questcor or the debtors purchased Questcor

11   and Questcor became ARD.  And then you're saying that you

12   need to follow what happened after that acquisition as to

13   then who was responsible among the debtor entities for the

14   marketing, sale, manufacturing of Acthar.  So how does the

15   Questcor transaction itself inform you in -- to that extent?

16   I'm not following that.

17         MR. MCCALLEN:  Sure, Your Honor.  And I think the -

18   - in a couple of ways:

19         Number one, the debtors chose to acquire this

20   business at Questcor.  They were engaged in the sale of

21   Acthar.  The conduct, again, that forms the basis for the

22   DOJ's complaint that forms the basis for our complaint, in

23   large part, took place there.  So it's, I think, relevant for

24   us to understand what did they understand about that and then

25   who was involved in that decision.  It was a big acquisition

38

1    for Mallinckrodt.  We expect it went up to the very senior-

2    most levels of the company, in terms of making the decision

3    to engage into that -- engage in the transaction.

4           I think, if it's -- if it does go up to those

5    levels and people at other entities, then, if we're able to

6    later show that there was antitrust conduct at those entities

7    and then, as they came into the -- under the Mallinckrodt

8    umbrella, I think that speaks to claims that we could bring

9    at a later date against those entities.  So that's sort of

10   the first part.

11          And then the second part is, to the extent that it

12   was -- Questcor, once it became ARD, was disassembled, again,

13   it's not fraudulent transfer; it's who did that, who made

14   that decision to move operations out of ARD somewhere else

15   and what's the legal consequences of that.  And do we have --

16   does that gives us claims then against those other entities

17   because, suddenly, a -- something that was once done in ARD,

18   which we understood was done at ARD when we filed our

19   complaint, now gets done at, you know, some entity in

20   Luxemburg.  And if so, how did that happen and what happens

21   at that entity now in Luxemburg.

22          It's really hard -- you know, Mr. Murtagh will say

23   you can ask questions about what that entity in Luxemburg

24   does.  I think he would admit that, he would say that's fair

25   game.  But when we talk about why it was moved there, for

1    instance, from ARD as part of -- after the Questcor

2    acquisition, you know, suddenly that's off base.

3          But it just really speaks to our -- from my

4    perspective, to the artificial line-drawing that's going on

5    here with this motion to try to get in front of Your Honor

6    with this question of does the fact that we didn't assert

7    claims against other entities pre-petition provide a basis

8    right now to disallow our claims, assuming we get, you know,

9    an opportunity to ask a little bit about the corporate

10   structure of the debtors.

11         THE COURT:  Well, how does the -- the only issue

12   that's going to be before me on these motions is whether or

13   not you have claims against other entities.  So the question

14   is:  If you take the deposition and you ask the question what

15   does the Luxemburg entity do, and then you want to follow up

16   with why, why did it get transferred out of ARD to this

17   entity in -- this is all hypothetical, obviously; I have no

18   idea -- why did it get transferred to this entity in

19   Luxemburg, how does that change the fact that this entity in

20   Luxemburg is doing it, so they now have responsibility for it

21   and you have a claim against them?  How does the why make a

22   difference?  That's what I'm trying to get at.

23         MR. MCCALLEN:  In that particular scenario, Your

24   Honor, maybe the why doesn't.  I would agree with you, in

25   that situation, we would have claims against that Luxemburg

1    entity.  But I know that these -- having taken a lot of these

2    30(b)(6) depositions before, that you never know quite which

3    direction it's going to go because you don't know what the

4    people are going to say.  And when you start sort of saying,

5    all right, there's a topic that's generally on limits, but

6    you know, some piece of it is -- might be off limits, you're

7    inevitably going to bump up into areas.

8         We have a witness, I think we know who the witness

9    is going to be, I think he's a pretty senior employee of the

10   company who's likely to know a lot about these topics.  I

11   think the question I would pose is:  What is the harm, at

12   this point, in us asking these questions?  If it's irrelevant

13   -- and that's basically what you're getting on this motion to

14   quash is a relevance objection -- if it's irrelevant, then

15   we'll do what we do at trial with irrelevant testimony all

16   the time; they'll make an objection on relevance and Your

17   Honor will exclude it.  But to not give us discovery on it on

18   the basis of relevance, when we have a very knowledgeable

19   witness there and we're already asking questions about the

20   transaction, seems to me to be inefficient at the very least.

21        THE COURT:  Well, I guess the debtors' position is

22   that there's so much discovery that has to be done, trying to

23   get it done, and they're trying to limit it as much as they

24   can into what is actually necessary for what's before me at

25   that particular time, which I understand.  But I also

1    understand your point, Mr. McCallen, that you've got a

2    witness there who you're asking why does the Luxemburg entity

3    have it, that person should know, I would think, if the -- if

4    the Luxemburg entity has it, why do they have it or how did

5    it get transferred to them.  So those questions, I think, are

6    fair game.  It's -- that's not that great of an additional

7    burden on the debtors to prepare the witness for those type

8    of questions.

9           But I guess, going back to the original issue, is

10   this idea of the Questcor transaction because you're talking

11   -- you're giving me all these examples of what happened after

12   that transaction, after they bought Questcor.  So the

13   question is:  Prior to the time they purchased Questcor --

14   and I assume that's what you're looking for -- what does it

15   matter what Questcor did with the product?

16          MR. MCCALLEN:  I don't think that -- well,

17   actually, to clarify, Your Honor, that was not going to be

18   the expected line of testimony.  It's about what happened on

19   the debtors' side of things because what happened on the

20   Questcor side of things speaks to the underlying anti-

21   competitive conduct, which Mr. Murtagh and his colleagues

22   have told us, time and time again, we're not going to get

23   now, we're going to get later.  And so, you know, again,

24   we'll be coming back to argue on the 25th that you can't

25   really deal with the issue of which claim, which buckets, or

1    which boxes we have claims against until we see whether we

2    have claims and, you know, who did the conduct.

3            So to answer to Your Honor's question about

4    Questcor, I did not expect to inquire about what happened to

5    Questcor.  Frankly, I would expect their witness -- and they

6    probably did diligence on the deal, so presumably they would

7    have an understanding as to what was going on at Questcor.

8    But it was more to understand how was it that Questcor -- the

9    decision from the debtors' perspective to do the acquisition;

10    and then, once the acquisition took place, you know, how then

11    is it that what used to just be Questcor as ARD became the

12    plate of spaghetti that we see in the debtors' current

13    corporate structure.

14            THE COURT:  Well, it's -- you know, the way you're

15    describing it to me when you get into the issues about the

16    transaction itself sounds like you're getting into the merits

17    of the underlying claim:  What did the debtors know at the

18    time they purchased Questcor?  Did they know that there was

19    anti-competitive activities happening?  Did they know that

20    other, you know, in appropriate things were -- sales.  I've

21    seen allegations that there were bribes paid to doctors and

22    things like that.

23            So, if all of that happened at Questcor and the

24    debtors knew about it at the time they purchased Questcor,

25    how does that inform you about what entities you have claims

A-6413

1    against?  It might go to the merits of your claim, but we're

2    not there yet, we're not to the merits of the claims yet.

3            MR. MCCALLEN:  You know what, Your Honor?  If we're

4    going to divide it up that way, I actually think I would be

5    comfortable leaving that question aside.  But I think,

6    consistent with the theory that I put forward on the

7    transfers and cash management and understanding who's pulling

8    the strings and exactly how it's tied into the current debtor

9    corporate structure, I think the second half of what I

10   articulated is understanding how -- what the historical ARD

11   became modern day ARD, which is, you know, very little left,

12   and then the rest of the debtors' structure is where I would

13   focus the examination.

14           THE COURT:  And I think that's fair game.

15           MR. MCCALLEN:  Okay.  That --

16           MR. MURTAGH:  Your Honor --

17           MR. MCCALLEN:  -- (indiscernible) thank you.

18           MR. MURTAGH:  So, Judge, just for clarity, their

19   Request Number 17 is only about the Questcor transaction,

20   essentially on the date the Questcor transaction occurred?  I

21   believe what Mr. McCallen is talking about is embraced within

22   their first sort of broader, catchall request (indiscernible)

23   17 quashed.  And we have Your Honor's understanding about

24   what the permissible scope is within their first request.

25           THE COURT:  I think -- you broke up there a little

44

1   bit, Mr. Murtagh.  I don't think I completely understood what

2   you were saying.

3            MR. MURTAGH:  I'm sorry, Your Honor.  Can you hear

4   me now?

5            THE COURT:  Yes.  You just -- there was like a skip

6   in it --

7            MR. MURTAGH:  I --

8            THE COURT:  -- and I think it was right when you

9   were saying something I needed to hear, so ...

10           MR. MURTAGH:  That's right, it would be the only

11  time and it skipped.

12           So my suggestion, Your Honor, based on the

13  discussion, is that we deem Request Number 17 quashed because

14  that request relates only to the Questcor transaction,

15  essentially historically, on the day it occurred.  And I

16  understand Your Honor to be saying that transformations over

17  time and why does the current debtor do what it does may be

18  fair game, but those would be embraced within their first,

19  broader request, and we all understand that as being part of

20  the first request.

21           THE COURT:  Right.  I think that's right.  I think

22  it's what happened after the acquisition at Mallinckrodt that

23  is the issued for this particular motion.  And you're going

24  to get in -- you're going to get the discovery later, Mr.

25  McCallen, as to what the debtors knew at the time they

1   acquired Questcor for sure, there's no question about that.

2   But just right now is not the time to do that.  We're trying

3   to streamline things as much as we can as possible.

4          MR. MCCALLEN:  Understood, Your Honor.  Thank you.

5          THE COURT:  Okay.  So is that it for the insurance

6   claimants?

7      (No verbal response)

8          THE COURT:  Is that all, Mr. McCallen?

9          MR. MURTAGH:  I believe it is, Your Honor.

10         THE COURT:  Okay.

11         MR. MCCALLEN:  (Indiscernible)

12         MR. MURTAGH:  (Indiscernible) Mr. McCallen.

13         THE COURT:  Okay.  So, obviously --

14         MR. MCCALLEN:  Yes, Your Honor.  Thank you.

15         THE COURT:  All right.  So, obviously, we then get

16  to the -- what we now call the "Ad Hoc Acthar Plaintiffs

17  Group."  And obviously, everything that we've talked about to

18  this point, whatever Mr. McCallen's clients get, they get,

19  too, no question about it.

20         So, with that, what else -- what other issues are

21  there with regard to the Ad Hoc Acthar Plaintiffs Group?

22         MR. MURTAGH:  Well, Your Honor, I -- as I said at

23  the top, they did not object to our motion to quash the

24  30(b)(6) topics.  But we understand that whatever Mr.

25  McCallen has prevailed upon here will be made available, the

A-6416

46

1    topics, to them, as well.

2            There was also a -- as a component of that motion,

3    there were some additional topics and there was a motion to

4    quash a deposition of Kathleen Breton.  Again, just while

5    we're dealing with this motion, there was no objection filed

6    by the Ad Hoc Acthar Group, so we would request that those

7    elements of the motion are granted.

8            THE COURT:  Mr. Haviland.

9            MR. HAVILAND:  Thank you, Your Honor.  So I

10   appreciate that the Humana argument went first because it

11   helps to clarify a number of the issues that we had with the

12   debtors.

13           I did want to point out that the reason we did not

14   object to the motion to quash is because we had filed a

15   motion to compel and a lot of these things start crossing one

16   another, and there's no need to object to something you've

17   already asked for and the issues join.  At least that was our

18   view.

19           And I only want to point out that the unresolved

20   issues -- because I believe a number of the issues had been

21   already addressed -- will be addressed by Mr. Ciardi in the

22   first argument.  We're working from the bottom to the top.

23           The only thing I want to point out on the Breton

24   issue, Your Honor -- and the background is we did a corporate

25   designee notice on a number of topics.  The debtors were not

1    understanding some of the topics.  We had a meet-and-confer

2    and we suggested that Kathleen Breton, who is a senior

3    officer in the Mallinckrodt ARD entity, who has been there

4    for a long time -- and I use the phrase that she "knows where

5    the bodies are buried" -- that she might be a good candidate

6    for that role, and we separately noticed her deposition

7    because we wanted to make sure that all the documents where

8    her name appears, we're at least able to ask her because we

9    think they go to the merits.  After that, the debtors

10   designated her.

11       So I think what Your Honor suggested -- and if I

12   can get that at least acknowledgment from the Court, that we

13   don't want to have to go around this again if, for some

14   reason, the topic doesn't squarely hit the witness'

15   knowledge.  Obviously, she wouldn't be binding the company.

16   But this witness has been with the company for quite a while,

17   her name appears on a number of documents.  We'd like to take

18   a short deposition where we can cover the topics and get the

19   answers to the questions.  But we didn't want to unduly fight

20   over it since it's the same person sitting in two capacities.

21       If it -- and this has happened a number of times

22   with us, Judge.  I -- we have clients who sit in two

23   capacities, corporate designees and individually.  We just

24   say to the opposing counsel let's just be clear on the record

25   that we'll cover the topics and, if you believe that the

1  witness has individual knowledge that can supplement, but not

2  binding on the corporation, we'll give you the opportunity to

3  do that.

4         And that's the only reason I'm speaking now, Judge,

5  is I don't want to see us have to come back on a new notice

6  for Mr. Breton, and the topics that we laid out are the

7  topics for the corporate designee.  But nobody wants to waste

8  time.  So we would agree to not have the deposition

9  individually, with the caveat that as long as we're having

10  the witness appear in her full capacity.

11         THE COURT:  Mr. Murtagh.

12         MR. MURTAGH:  Your Honor, there's actually not any

13  overlap between the motion to compel and the motion to quash

14  that we're talking about.  The Ad Hoc Acthar Group's motion

15  to compel targets requests for production of documents.  The

16  motion to quash we're talking about is a request to quash

17  irrelevant deposition topics and to quash Ms. Breton's

18  deposition.  They're not covered by the motion to compel and

19  the Ad Hoc Acthar Group did not pose an objection to our

20  motion to quash.

21         THE COURT:  Well, Mr. Haviland, I'm not entirely --

22         MR. HAVILAND:  Judge (indiscernible)

23         THE COURT:  I'm not entirely sure what you're

24  asking.  Are you asking for Ms. Breton in her individual

25  capacity, or are you satisfied with going forward with a

1    30(b)(6) deposition?

2              MR. HAVILAND:  No, we want her in her individual

3    capacity, so that we're not losing the opportunity to ask her

4    about her knowledge.

5              THE COURT:  I'm sorry.  I didn't hear your last --

6              MR. HAVILAND:  Whether or not that's

7    (indiscernible) I'm sorry.  We want her in her individual

8    capacity because we know that she knows the answer to many of

9    the topics we want to ask about.  Whether she will be

10   prepared to testify for the corporation, that's the reason

11   for 30(b)(6), but we want her in her individual capacity.

12             THE COURT:  Well, she's a senior officer of the

13   company.  Her testimony is binding regardless of whether it's

14   a 30(b)(6) or not.

15             But I guess the question is:  Why do we need to do

16   two depositions?  If the debtors are going to put up a

17   30(b)(6) witness that covers the topics, and if they produce

18   a witness who can't answer the questions on those topics,

19   then certainly you would entitled to a further deposition,

20   Mr. Haviland.

21             MR. HAVILAND:  It's the same witness, Judge.

22   That's the only reason I point it out.  That -- I don't think

23   we have an objection, provided that she's testifying in the

24   full capacity, the same witness.

25             THE COURT:  I don't -- I'm confused.  Mr. Murtagh,

A-6420

1      is this person gong to be your 30(b)(6) witness?

2                MR. MURTAGH:  Your Honor, it is our expectation

3      that Ms. Breton will be the 30(b)(6) witness in respect of

4      class claims issues.  The deposition that was noticed was an

5      individual notice of Ms. Breton.  The topics duplicated --

6      excuse me -- duplicated entirely topics that were noticed in

7      the 30(b)(6) deposition.

8                THE COURT:  So you're producing her as a 30(b)(6)

9      witness for the topics that Mr. Haviland has requested, so

10     I'm missing the issue here.  I mean, she can -- you can

11     subpoena a witness, both as a 30(b)(6) witness and in their

12     individual capacity, and I see no reason not to allow Mr.

13     Haviland to do that at this point.  So I'll allow the

14     deposition to go forward as both a 30(b)(6) and in her

15     individual capacity.

16               MR. MURTAGH:  As limited to the topics that are

17     appended to Ms. Breton's 30(b)(6) -- sorry -- individual

18     capacity deposition, Your Honor, or just more generally on

19     any topic?

20               THE COURT:  Well, it's going to be -- obviously,

21     it's limited to the issues that are relevant to what she's

22     being deposed for.  You know, we're not going beyond -- if

23     there's limitations on the discovery -- which there are,

24     obviously, I've already ruled on some of those limitations

25     and there may be more -- obviously, you can't delve into

A-6421

51

1    things that I've said that are not appropriate at this time.

2          But if it's something that is related to the motion

3    for which she is being called as a witness to testify as a

4    30(b)(6) witness, then Mr. Haviland has the right to also

5    notice her in her individual capacity.

6          MR. MURTAGH:  Okay.  Thank you, Your Honor.  I just

7    want to make sure that I'm understanding properly that --

8    what we're expecting is that we will produce Ms. Breton and

9    that she will be educated on the topics that have been

10    noticed, and that the deposition will be limited to those

11    topics.

12          MR. HAVILAND:  So, Judge, that's the reason why I

13    spoke, is the topics are the ones that we want the companies

14    to speak to because they go to the companies' positions about

15    the objections to the class proof of claim.  Again, we

16    pointed out to the debtors that this individual witness has

17    material knowledge about the third-party payers in the class,

18    who they are, what their addresses are, what their spends

19    are.  We believe that's covered by the topics.

20          But as Your Honor knows, 30(b)(6) has a different

21    convention to it, in terms of the witness' preparation and

22    ability and willingness to bind the corporation.  We just

23    don't want to get caught up in a deposition that she was only

24    prepared in this limited capacity.  But if she were to take

25    that hat off, she could answer a question about a document

1    within the realm of discoverable information on the issue at

2    hand, but not constrained by the fact that she's not binding

3    the corporation with that testimony because that has its own

4    component to it.  The witness has to be willing to be

5    prepared to testify to bind the company.

6         We keep talking past each other, Judge, but I just

7    don't want to have a conflict at the dep.  I think it's going

8    to be very straightforward.  As I said, we will be very clear

9    with the witness that, if, for some reason, she doesn't feel

10   comfortable speaking to the -- for the company on a topic,

11   she'll tell us that.  I'd like to have the ability of our

12   attorneys to say, ma'am, could you answer the question if you

13   were just talking as Kathleen Breton; sure, Mr. Haviland, and

14   let's talk about that.  And then, if she can't bind the

15   company, well, that's -- you're not bringing her back simply

16   to have her put a different hat on.  We're trying to be very

17   practical here, but we're missing each other, in terms of how

18   that convention is going to be.

19        THE COURT:  Well, is Ms. Breton --

20        MR. MURTAGH:  Your Honor --

21        THE COURT:  Is Ms. Breton --

22        MR. MURTAGH:  -- (indiscernible)

23        THE COURT:  -- an officer of the company?

24        MR. MURTAGH:  Let me get her title, Your Honor.

25        What I was going to say -- and we may be talking

53

1   past each other.  All I was asking was, if we were agreeing

2   to limit the deposition, regardless of capacity to the topics

3   that are noticed in the deposition notice that was sent to

4   Breton, which is -- I understand what Mr. Haviland is

5   suggesting and I -- the debtors are prepared to move forward

6   on that basis.

7           THE COURT:  All right.

8           MR. HAVILAND:  And Judge, while they're checking

9   that, the overarching topic is the objection to the class

10   proof of claim, which is everything that's in their motion

11   and all the issues to that.  You know, that's why -- that's a

12   pretty all-encompassing topic.

13           Like I don't expect this deposition is going to

14   last more than a couple of hours.  We've been very efficient,

15   as I'm sure Ms. Marks and Mr. Harris would testify.  We try

16   to get in and get out.  And that's the only reason for

17   speaking on this particular issue, so that the witness isn't

18   unnecessarily cabined in her personal knowledge.

19           THE COURT:  All right.  Well, just notice the

20   deposition as a 30(b)(6) and a 30(b)(1), and we'll deal with

21   whatever comes up in the deposition later on, once the

22   questions come up.  If there's a dispute, you can bring it to

23   my attention and we'll resolve it later.

24           MR. HAVILAND:  Thank you, Your Honor.

25           THE COURT:  All right.  What's the next issue?

1      MR. MURTAGH:  Your Honor, I believe that resolves

2    the agenda item, which was the motion to quash the -- certain

3    class claims and unsubstantiated claims, deposition topics.

4      I think that -- so there are two items left.

5    They're broadly overlapping at this point.  The first is the

6    Ad Hoc Acthar Group's motion to compel discovery into

7    disclosure statement topics, certain class claims topics, and

8    certain unsubstantiated claims topics.  And the other item is

9    our motion to quash the disclosure statement related

10   discovery.

11      So I think it may make sense to focus first on

12   disclosure statement related discovery, which would knock out

13   at least a portion of the motion to compel, as well as the

14   motion to quash.

15      THE COURT:  All right.  Well, let me hear from --

16   Mr. Haviland, this is your motion.  Are you handling the

17   argument?

18      MR. HAVILAND:  Mr. Ciardi is, Your Honor.

19      THE COURT:  Mr. Ciardi?

20      MR. CIARDI:  Good afternoon, Your Honor.  Thank

21   you, Your Honor.  And I don't want to overlap on any

22   discovery issues that Your Honor already addressed.  If I'm -

23   - the first -- we raised about four topics in the motion to

24   compel that we thought were discovery appropriate for the

25   disclosure statement.

A-6425

1          And I'm going to address the transfers, and I know

2     Your Honor addressed them to some degree with regard to the

3     unsubstantiated claim issue.  And the identification of where

4     or when the intercompany transfer documentation was provided,

5     that's in Paragraph 57 of the debtors' response to the

6     committee's 2004 request, and that's where they say they gave

7     a detailed presentation on the debtors' intercompany

8     transactions.  Whether that is going to be sufficient for

9     what we need for the disclosure statement, Your Honor, really

10    rises and falls on what we have been provided to date and the

11    fact that it raises so many more questions.

12         Following up on what Mr. McCallen said, and again,

13    not to plow ground that he's already plowed very well, on

14    July 8th of 2020 -- so 92 days before the bankruptcy -- while

15    in contemplation of the bankruptcy, the ARD debtor enters

16    into an agreement with another debtor to give up 80 percent

17    of its profits; a three-page agreement.  And that same day,

18    $4 billion moves.  On June 15th, another group of

19    interrelated debtors sign three more agreements and another

20    $2 billion transfers.  So, within about 100 days of the

21    bankruptcy, there's $6 billion of transfers with two

22    agreements -- or two sets of agreements, whereby the ARD

23    debtor is giving up 80 percent of its profits to some other

24    entity that my clients haven't asserted claims against,

25    possibly Mr. McCallen's clients haven't asserted claims

56

1    against.

2         Now, while I understand the argument, so I'm not

3    addressing that on unsubstantiated claim issues.  For the

4    disclosure statement, discovery is needed regarding all of

5    those issues because what we then find out is that none of

6    those contracts appear on any of the debtors' statements of

7    financial affairs.  So they're not disclosed, they're not

8    disclosed in the filing.  They're not disclosed anywhere to

9    the (indiscernible) had we not taken -- or been given the

10   limited amount of discovery that we were given -- which

11   basically was a couple of org charts and these three or four

12   intercompany agreements -- we would not have been able to tie

13   that together.

14        But the fact that those agreements exist, were made

15   while the debtor was contemplating a bankruptcy, moved money

16   from ARD -- 80 percent, not an insignificant amount of money

17   for a company that generates hundreds of millions of dollars

18   of revenue and profits a year -- away from those entities to

19   an entity which, in one organizational chart, is described as

20   simply a tax vehicle, and another organizational chart

21   describes as an operating company, and that entity then turns

22   around and shifts its obligations back to some other entity,

23   Your Honor, this all is fertile ground for discovery in the

24   disclosure statement because those transfers -- which the

25   debtor labels in the disclosure statement with one word,

57

1    "speculative" -- that is the only information given to a

2    creditor in the disclosure statement regarding $14 billion of

3    transfers.

4         None of these contracts are listed.  They're not

5    listed on the debtors schedules and statement of financial

6    affairs.  They're not indicated they're being rejected or not

7    rejected under the plan.  And they happen to occur at the

8    same time as $6 billion of transfers.  None of that appears i

9    the disclosure statement.

10        Just focusing on the transfers, the entire

11   fourteen-billion-dollar universe of them, discovery is

12   needed.  And it can be targeted and it won't take that long.

13   Why were those series of documents executed?  Why were they

14   executed right before the bankruptcy?  Why was $6 billion

15   transferred?  All of that, we need in discovery so we can

16   give it to the Court, so that it can be in the disclosure

17   statement.

18        THE COURT:  Well, the disclosure statement only has

19   to provide general descriptions; it doesn't have to provide

20   detailed information.  It sounds like you have the

21   information.  If it's not in the disclosure statement, it

22   should be.  And it should be described in detail that these

23   transfers occurred, when they occurred, what entity they went

24   from, what entity they went to.  That's all -- you don't need

25   discovery on that.

58

1             MR. CIARDI:  Well, we actually -- Your Honor, if

2   the debtor is going to agree to amend to include the

3   discussion of why these agreements were entered on June 8th -

4   - or sorry, July 8th and June 15th, and who authorized them,

5   who counseled them to enter into those agreements --

6             THE COURT:  That -- they don't --

7             MR. CIARDI:  -- and disclose --

8             THE COURT:  -- need that --

9             MR. CIARDI:  -- the (indiscernible)

10           THE COURT:  -- kind of -- they don't need that kind

11  of detail in there.  All they need to show is that there were

12  transfers that occurred, when they occurred, how much they

13  were.  Those kind of -- that kind of information, yes, has to

14  be disclosed.  Who made the decision to transfer?  Who cares

15  at this point?  It's a disclosure statement.  You're giving

16  them basic information.

17           And the two -- both parties should be talking about

18  this.  This should be -- if you have information that you

19  think should be included in the disclosure statement, you

20  should be talking to the debtors and saying you need to

21  include this in the disclosure statement.  And then, if we

22  get to the hearing and they haven't included it, you can make

23  your argument, hey, they didn't include this in there and it

24  should be in there.

25           MR. CIARDI:  Your Honor, the position back on all

A-6429

1    of these issues is that it is irrelevant.  Now the

2    description of $14 billion of transfers is speculative,

3    obviously now that Your Honor has made that statement, I am

4    assuming the debtor will change that.  However, it doesn't --

5    it should not preclude us from getting actual discovery on

6    these issues because what it goes to, Your Honor -- and Your

7    Honor was questioning Mr. McCallen on some of these points.

8         What it goes to is fraud and whether our clients

9    have claims for actual fraud against not only the debtors

10   that they dealt with on a direct basis, but everybody up the

11   food chain.  And those aren't derivative claims; those are

12   direct claims.  Those are direct claims with all of those

13   entities participating in that fraud to move $14 billion away

14   from us and into the hands of the guaranteed unsecured notes.

15   And that's been a general theme of ours all along, is that

16   this entire plan has been put together for the benefit of the

17   guaranteed unsecured noteholders and management.

18        I understand Your Honor's ruling, I'm going to move

19   on.  And maybe the debtor will amend the disclosure statement

20   on the transfers and we'll address this on the 8th.

21        The other thing that we have asked for discovery on

22   and was going to be part of the notice of deposition, which

23   is the counter in the motion to quash, is management is

24   getting a gift of close to $100 million.  Nobody would know

25   that in this disclosure statement.  Nobody would know who

1   negotiated on behalf of the debtors.  Nobody would know who

2   negotiated on behalf of management.  Nobody would know how

3   that was valued.  Nobody would know anything about that gift

4   and why they get more than general unsecured creditors.

5           That doesn't appear anywhere in the disclosure

6   statement.  That appears only in our argument, Your Honor,

7   because we took a definition that is hidden in the plan and

8   applied it to the value that's remaining in the plan

9   supplement to get to $100 million.

10          Now maybe the debtor is now going to amend the

11  disclosure statement to say we're giving management a gift of

12  $100 million on the day we file, and yes, it's more than what

13  unsecured creditors get, and that's fair because of whatever

14  reason they're going to come up with.  But we are entitled to

15  discovery to determine whether there was self-dealing

16  involved and what other issues were involved in the

17  determination of fairness, value, amount.

18          And this goes right into the third object -- third

19  issue that we cover in the disclosure statement --

20          THE COURT:  Well, let me stop --

21          MR. CIARDI:  -- which is we --

22          THE COURT:  Let me stop you there first.

23          MR. CIARDI:  -- (indiscernible)

24          THE COURT:  What you just described are

25  confirmation issues.  You know, those are confirmation

1    issues.  That discovery will be taken in connection with

2    confirmation.

3         For purposes of the disclosure, again, you should

4    be talking to each other about information that you have that

5    you think should be included in the disclosure statement.

6    You should be talking to the debtors.  If they think you're

7    correct, they should include it in there; if they don't, you

8    can come in on the 8th and object and say, Your Honor, this

9    stuff, we asked them to put this in there, they didn't put it

10   in there, they should be in there, and I'll make a ruling at

11   that time.

12        MR. CIARDI:  And Your Honor, we don't know how --

13   we don't know what to ask them to put in because we don't

14   know how it was negotiated, who negotiated it, who valued it,

15   and why they consider it fair.  So how do I know what to ask

16   them to put in without knowing those facts?

17        THE COURT:  Well, those facts I don't know --

18        MR. CIARDI:  And that would have --

19        THE COURT:  Those facts --

20        MR. CIARDI:  -- been discussed --

21        THE COURT:  -- I don't --

22        MR. CIARDI:  -- in the deposition.

23        THE COURT:  Hold on.  Those facts I don't believe

24   are relevant to an issue of the disclosure statement.  Again,

25   same kind of thing.  You don't need all of the detail; you

62

1    just need to know that there is a -- and I have no idea

2    whether this is correct or not.  You're telling me that

3    there's a gift to management.  I don't know, they probably

4    describe it in a different way, I'm sure.

5              But you know, the fact that there's going to be a

6    possibility that management will receive some value in this

7    company after confirmation of the plan should be in the

8    disclosure statement.  And it has to be disclosed in a manner

9    that gives a reasonable person, an investor or a creditor,

10   the information they need to decide whether or not they're

11   going to approve or disapprove the plan.  If there are issues

12   later on that this plan -- that this part of the plan is

13   proposed in bad faith, that it's all a part of a scheme, that

14   there's some conspiracy, that will all be dealt with at

15   confirmation.

16             MR. CIARDI:  But Your Honor, if we get targeted

17   discovery on this issue, we can ferret that bad faith out

18   now, in the next week --

19             THE COURT:  It's not the time --

20             MR. CIARDI:  -- before we --

21             THE COURT:  -- to do it.

22             MR. CIARDI:  -- spend a lot of time and --

23             THE COURT:  It's not the time to do it.  That's --

24   we need to get the disclosure statement out to people, so

25   that others might want to come in and challenge this and say,

63

1    hey, what's going on here, why is management getting $100

2    million out of this deal.  But that's -- you know, you need

3    to get the -- you need to get the disclosure statement out so

4    people -- other creditors can see it, read it, understand it,

5    and know whether they going to have -- whether they're going

6    to have a claim or an objection to confirmation.

7            So those are all confirmation issues that we'll --

8    you'll -- and you're going to get discovery on those issues

9    in relation to confirmation.  I'm not saying you're not

10   getting any discovery.  It's just -- again, it's a timing

11   issue more than anything else.

12           MR. CIARDI:  Your Honor, then let me move to the

13   next issue, valuation.  We have asked for all of the existing

14   valuations, not just the one that Guggenheim put in the plan

15   supplement, but any other ones that this debtor has with

16   regard to the values of the debtors' assets.

17           THE COURT:  Confirmation issue.

18           MR. CIARDI:  And given the --

19           THE COURT:  Confirmation issue.  Valuation is a

20   confirmation issue.

21           MR. CIARDI:  Your Honor, I'm not asking for Your

22   Honor to make a valuation (indiscernible) at the disclosure

23   statement, I'm asking for it to be disclosed in the

24   disclosure statement and be provided to us in advance what

25   other valuations are out there.  Does the debtor have any

1    other valuations today where they have -- or in the last year

2    of the same assets that they're valuing for one amount by

3    Guggenheim in the plan supplement.  We should be entitled to

4    know, to the extent any other valuations exist.

5            THE COURT:  Confirmation issue.

6            MR. CIARDI:  Your Honor, and the last topic on the

7    disclosure statement that we asked about is that we have

8    asked -- and I think it's important to understand the --

9    whether there have been any discussions with Express Scripts

10    and how Express Scripts will react to the rejection of their

11    indemnification agreement and to the -- their -- at this

12    point in time, them not getting -- or Express Scripts not

13    getting the relief, not being indemnified, and whether that

14    will impact the debtors' future revenue because any impact on

15    the debtors' future revenue will impact the plan going

16    forward.  That's a disclosure statement issue, but we don't

17    know that because we can't ask those questions.

18            THE COURT:  The debtor can't put in its disclosure

19    statement what somebody else's reaction might or might not be

20    in connection with the plan --

21            MR. CIARDI:  Unless they --

22            THE COURT:  -- that's being --

23            MR. CIARDI:  -- know it.

24            THE COURT:  -- proposed.  No, it's -- that's --

25    it's -- no, I'm -- that's not required.  I'm not going to

65

1    allow discovery on that issue.

2              MR. CIARDI:  Your Honor, that goes to whether the

3    plan is feasible.

4              THE COURT:  No, it doesn't.

5              MR. CIARDI:  And it goes to whether any creditor

6    can make a determination because if the plan -- if the -- if

7    Express Scripts is going to walk away from this debtor or the

8    agreements are going to change or there's some other

9    arrangement that we don't know about going forward, that has

10   a dramatic impact on both value and revenue, and creditors

11   should be entitled to see that.

12             THE COURT:  No, that's not a disclosure statement

13   issue.  We'll deal with that at confirmation.

14             MR. CIARDI:  Your Honor, this disclosure statement

15   is not going to have anything of value for creditors in it to

16   read.

17             THE COURT:  I've seen it.

18             MR. CIARDI:  There's nothing --

19             THE COURT:  I've seen it.

20             MR. CIARDI:  -- on the transfers --

21             THE COURT:  I've seen it, I -- it's got a lot of

22   information in it, Mr. Ciardi, a lot of information.

23             MR. CIARDI:  And Your Honor, we've made our points.

24   I understand your ruling.

25             THE COURT:  All right.  What's next?

1          MR. MURTAGH:  Your Honor, on the basis of that

2     discussion, I'd propose that we view the debtors' motion to

3     quash the discovery -- the disclosure statement related

4     deposition and for a proposed order on the request for

5     production as granted.

6          THE COURT:  Yes.  I'm not going to allow the

7     discovery that's been requested.  It's -- that discovery is

8     quashed.

9          MR. MURTAGH:  Thank you, Your Honor.

10          And that also removes one prong of the motion to

11     compel.

12          THE COURT:  Also, just --

13          MR. MURTAGH:  In theory --

14          THE COURT:  Just to be clear --

15          MR. MURTAGH:  -- there are (indiscernible)

16          THE COURT:  Just to be clear, I'm quashing it as it

17     relates to the disclosure statement.  That does not mean

18     they're not going to get this discovery in connection with

19     plan confirmation.

20          MR. MURTAGH:  Understood, Your Honor.

21          That also takes away one prong of the motion to

22     compel.  Your Honor, a second prong of the motion to compel

23     overlaps with the discussion we had with Mr. McCallen

24     regarding what are the proper topics of this and of

25     investigation for substantiating unsubstantiated claims.  I

1    think the ground that's been covered -- I would propose that

2    we view that portion of the motion to compel as denied,

3    except to the extent we will provide additional -- we

4    understand that there are additional items that are relevant

5    based on the discussion with Mr. McCallen that will also be

6    made available to mister -- to the Ad Hoc Acthar Group.

7              THE COURT:  Well, let me ask the Acthar Group if

8    they have anything else to add to that.  Who's going to speak

9    on those issues?

10             MR. CIARDI:  I think that would be Mr. Haviland,

11   Your Honor.  He has his hand up on that.

12             THE COURT:  Okay.  Mr. Haviland?

13             MR. HAVILAND:  I'm sorry, Judge.  I didn't

14   understand the point.  I was distracted.

15             THE COURT:  The --

16             MR. HAVILAND:  My hand is still up, but I --

17             THE COURT:  I get distracted, too, sometimes when

18   these ...

19        (Laughter)

20             THE COURT:  The question is:  Do we -- is there

21   anything left to talk about with regard to your motion to

22   compel that we haven't already resolved in connection with

23   Mr. McCallen's clients' discussions that we had earlier.

24             MR. HAVILAND:  I think, Judge, the reason why I put

25   my hand up before was to clarify that I thought there was

68

1    some overlap with the Humana discussion.  The areas where the

2    debtor did not object apply to our motion to compel because

3    the protective order came in at the same time and agreed to

4    certain discovery areas and then Your Honor ruled.  So I

5    don't believe there's anything outstanding.  I think all

6    three prongs have at least resolved the issue based on the

7    Court's ruling.

8                THE COURT:  Okay.

9            (Pause in proceedings)

10               THE COURT:  There was one additional item, the

11   Payor Nuance Database [sic] and the Acthar website.  Is that

12   -- have we resolved that issued?

13               MR. MURTAGH:  No, Your Honor, that was the last

14   prong I was referring to that I don't think has been

15   discussed.  That's separate (indiscernible) the Ad Hoc Acthar

16   Group and relates to their request for production of

17   documents on -- essentially in relation to the debtors'

18   noticing practices.  And there were a series of requests made

19   for communications and documents relating to the payer nuance

20   -- the Payor Nuance Database, and separately to the Acthar

21   website and the 2018 60 Minutes presentation.

22               And the debtors' response on those was that they

23   could not be relevant to establishing the debtors' noticing

24   practices for notifying Acthar payors because those data sets

25   were not used and could not be used for noticing purposes.

1    And with regard to the Payor Nuance database, that is because

2    that database is just a data set that is a subset of a much -

3    - of a larger compilation sometimes referred to as the "hub,"

4    which was used for noticing purposes and which has been

5    produced.

6            And with regard to the Acthar website and the 60

7    Minutes episode, the debtors do not have a system for

8    maintaining information on the identities of anybody who made

9    inquiries to those -- to the Acthar website or in response to

10   the 60 Minutes episode, so there's nothing there to be used

11   for identifying information -- people who may be entitled to

12   noticing as an Acthar payor.

13           However, we are prepared to present a 30(b)(6) --

14   which I believe will be Ms. Breton now -- who can speak to --

15   confirm those averments and speak to those topics.  But the

16   request to go out and search for and review and collect a

17   swath of documents related to those two topics when they're

18   not actually relevant to the topic -- to the noticing issue,

19   it's irrelevant and it's unduly burdensome.

20           THE COURT:  Mr. Haviland?

21           MR. HAVILAND:  Well, so, Judge, you know, part of

22   the problem we've had in discussing this with the debtors'

23   counsel is they take the position that the plan for noticing

24   third-party payers was attorney/client privilege, it was done

25   by lawyers for lawyers.  And in probing that and pointing out

1    to the debtor its own documents, its own databases, we

2    evolved to the point where now we pointed out to them that,

3    after the 60 Minutes episode, hundreds of folks called the

4    company directly, complained, called Express Scripts, Express

5    Scripts and Mallinckrodt created a joint website.

6          This issue will be decided on the -- at the end of

7    the month.  And if the debtor has taken the position that

8    those documents don't exist or they're too burdensome, well,

9    then that's the record that they'll stand on.  And it's our

10   position that they had, in their books and records, other

11   information available to them to properly notify people.

12         We pointed out to the debtor that more than half of

13   our claimants did not get notice.  That's a troubling

14   statistic, Judge, when you figure that this is a drug that's

15   directly dispensed.  So this isn't opioids.  This isn't

16   something you can walk into CVS or Walgreen's and buy.  This

17   medication is sent to a patient's home, a nurse is sent to

18   the home.

19         The debtors know who pays for the medication.  It's

20   $100,000, it's not an insignificant amount of money for a

21   business to track that.  And we filed a motion to compel to

22   give the debtor the opportunity to look at those issues,

23   identify that there are folks they could identify and notice

24   better.  But if they don't want to do that, it's their

25   disclosure, it's their notice that they have to stand by.

A-6441

1      And if it's not -- if it's not substantial enough to reach

2      the group of third-party payers, that's the reason why we

3      contend there should be a class proof of claim.  And that's

4      why Rockford has been doing that for the last four years.

5            So I don't believe -- I think counsel represented

6      that they've turned over the database.  They have not done

7      that.  They haven't turned over documents relating to the

8      website.  They haven't turned over the underlying documents

9      regarding the PIG -- which is the parent intelligence grid --

10     a document created by Ms. Breton for the purpose of tracking

11     third-party payers, knowing who they are, knowing their

12     policies.

13           But we'll get that deposition and we'll see how it

14     goes.  If the debtors don't want to produce documents, they

15     don't want to produce documents.  We're not getting hundreds

16     of thousands of pages, Judge.  Where we got that through the

17     UCC was in the documents we already got in the underlying

18     litigation, nothing more.

19           THE COURT:  Mr. Murtagh, have -- has the debtor

20     turned over the actual database that you referred to that is

21     comprehensive?

22           MR. MURTAGH:  Yes, Your Honor.  That database is in

23     -- the data from that database is in the Ad Hoc Acthar

24     Group's possession.

25           THE COURT:  Well, Mr. Haviland, they say you have

72

1    it.

2           MR. HAVILAND:  I don't know where it is, Judge.  I

3    had my office review, before this hearing, the hundred emails

4    or so between the debtors' counsel and the third-party

5    payers.  We looked at the organization charts.  I've got them

6    all here from 2016, they're all organized.  I've got the

7    contracts that they produced.  So that's a database --

8           MR. MURTAGH:  Right.  Your Honor --

9           MR. HAVILAND:  -- (indiscernible) that --

10          MR. MURTAGH:  No, sorry.  Let me clarify that -- I

11   wasn't clear -- that that database was already produced in

12   the underlying Rockford litigation; and is, therefore,

13   already in mister -- in Mr. Haviland's possession and in the

14   possession of the Ad Hoc Acthar Group.  It is not among the

15   new production that has already -- that was just made because

16   it was already turned over.

17          MR. HAVILAND:  Perhaps counsel will give us the

18   Bates Number or the sequence of where that is, so that we

19   don't have to waste the Court's time.  If it was produced

20   four years ago, then obviously counsel can tell us how and

21   when that was done, and it's not an issue for present

22   discovery; it's an issue of fact discovery.

23          THE COURT:  All right.  Well, let's check to make -

24   -

25          MR. MURTAGH:  (Indiscernible)

```
 1              THE COURT:  Let's check and make sure it was
 2     produced.  And if it was four years ago, were there any
 3     updates in the last four years that need to be provided?
 4              MR. MURTAGH:  Your Honor, it was not four years
 5     ago.
 6              THE COURT:  Well --
 7              MR. HAVILAND:  The discovery was 2018, Judge, so --
 8     I am losing track of time.  It's about three years ago.
 9              MR. MURTAGH:  No, Your Honor.  It was produced in
10     December 2019.
11              THE COURT:  All right.  Well, we're still a year --
12     almost a year and a half out from that.  So, if there's any
13     updates in that last year and a half, that's -- that needs to
14     be provided, as well.
15              MR. MURTAGH:  Understood, Your Honor.  We can look
16     into that and we have been looking to that as a potential
17     issue and (indiscernible)
18              THE COURT:  And what you're telling me is the
19     debtors set up a website.  What was this website that was set
20     up.
21              MR. MURTAGH:  (Indiscernible)
22              MR. HAVILAND:  Judge --
23              THE COURT:  Let me hear from --
24              MR. HAVILAND:  Oh, I'm sorry --
25              THE COURT:  -- Mr. Murtagh.
```

74

1          MR. HAVILAND:  -- sorry, mister --

2          MR. MURTAGH:  It's just an informational site

3     related to the Acthar products, through which somebody who

4     goes to the website can make an inquiry of the company.

5          THE COURT:  So how would they do that, by

6     submitting something through the website?

7          MR. MURTAGH:  Yes, Your Honor.

8          THE COURT:  And --

9          MR. MURTAGH:  But those inquires are not -- they're

10    not tracked and stored and there's no repository of

11    personally identifying information for who made any such

12    inquiry.

13         THE COURT:  All right.  It seems odd, but okay.

14         How about the -- what was the other thing?

15         MR. MURTAGH:  The 60 Minutes episode, Your Honor.

16         THE COURT:  Yes.  What was that all about?

17         MR. MURTAGH:  I -- Your Honor, I'm not aware of

18    hundreds of people that Mr. Haviland has in mind, who made

19    inquiries to the company specifically in response to that 60

20    Minutes episode.  And my understanding is that, similarly,

21    there's not a system to collect the information of anybody

22    who did so to confirm that anybody who did so is an Acthar

23    payor and know their address for separate noticing purposes.

24         In addition, Your Honor, the, quote/unquote, "hub

25    data" that we're referring to, if we're talking about

1    individual patients, that hub data is extremely comprehensive

2    for individual patient data.

3          THE COURT:  Well, I think Mr. Haviland is more

4    interested in third-party payers, not individual payers.

5          MR. MURTAGH:  Well, I believe that's right, Your

6    Honor.  I'm not aware of -- I do not know, one way or the

7    other, whether any single third-party payor contacted the

8    company in response to the 60 Minutes episode; or, if so,

9    whether any such payor was not already recorded in the other

10   databases of payors that the company maintains.

11         THE COURT:  So is the database that has been

12   provided to him -- that you're going to check to see if it's

13   been updated in the last 15 months -- does that database

14   include all third-party payors who paid for Acthar?

15         MR. MURTAGH:  Your Honor, it likely does not

16   contain all of the third-party payors.  That is not the only

17   information the company used to assemble its data set for

18   noticing purposes.  But that -- what that -- and there will

19   be time to get further into this, of course, Your Honor.  But

20   what that database does is it's a central system for

21   information that is initially input by the patient.  And I --

22   my understanding is the vast, vast majority of patients have

23   information in that system, but that information does not

24   always get completely filled out.  And so there will be gaps

25   in places where that information has not been filled out all

1    the way down to the level of the third-party payor.

2            But again, that's not the -- that's not the only

3    thing the debtors did.  There were other noticing practices

4    that were used.  It was just the debtors using -- what the

5    debtor did was use what they had available to them that gave

6    them knowledge of actual Acthar payors and they noticed the

7    known payors and had a comprehensive system for providing

8    publication and constructive notice to unknown third-party

9    payors.

10           THE COURT:  So -- but this database was the only

11   thing that the debtors had in their possession that informed

12   them about who the third-party payors were.

13           MR. MURTAGH:  No, Your Honor.  It was an important

14   part.  But we also had, for instance, information on third-

15   party payors who had -- or had been part of rebate programs.

16   And that was used also to understand who may be third-party

17   payors.  So the debtors did everything they could to meet

18   their burden of finding the payers who are known to them

19   through a search of their books and records, and that's as

20   thorough as it could be, based on what the debtors had.  And

21   beyond that, there was a very broad publication notice.

22           THE COURT:  So -- well, my question is -- I want to

23   make sure that everything the debtors used that they have in

24   their possession to identify third-party payers has been

25   produced to Mr. Haviland.

1          MR. MURTAGH:  Yes, Your Honor.  I -- it --

2   everything that -- that is my understanding.  And the primary

3   -- they were produced (indiscernible) but some of it was

4   previously produced.  And I understand Your Honor saying,

5   well, make sure that, if there are updates, that -- if you

6   know there's a diff -- if there is a difference between what

7   was produced in December '19 -- 2019 and today, and we are on

8   that.  But the answer, otherwise, is yes, whatever was used

9   for noticing purposes has been turned over to the Ad Hoc

10  Acthar Group.

11          THE COURT:  All right.  And I assume that, if it's

12  something that you produced to Mr. Haviland back in 2019,

13  that you've told him he already has that in his possession

14  and where he can find it?

15          MR. MURTAGH:  Yes, Your Honor.  But if that is not

16  at Mr. Haviland's fingertips, we will work with him to make

17  sure he can find it.

18          THE COURT:  All right.  Let's do that, so that we

19  make sure he has all the information available.

20          MR. MURTAGH:  Of course, Your Honor.

21          THE COURT:  Okay.  All right.  Anything else?

22          MR. MURTAGH:  Not from the debtors, Your Honor.

23  Just for process-wise, I would propose that -- the following

24  resolutions:

25              I think that the -- that mister -- that the Ad Hoc

1    Acthar Group motion to compel should be viewed as denied, but

2    on the understanding that Mr. Haviland's group -- I'm sorry -

3    - the Ad Hoc Acthar Group will have the same access to

4    documents and deposition topics that the Humana/Attestor

5    Group has.

6              The motion to quash the DS discovery is granted.

7              And the motion to quash the 30(b)(6) topics and the

8    Breton notice will take some modification because we went

9    through four particular topics with Humana and Your Honor

10   directed us to accept the deposition of Ms. Breton in her

11   corporate and individual capacity.

12             THE COURT:  All right.  Well, that sounds right to

13   me, but I'm going to -- you know, you're going to have to

14   draft up whatever order you want me to sign and make sure you

15   -- everybody else is on board with it before you submit it to

16   me, obviously.

17             MR. MURTAGH:  Yes, Your Honor.

18             THE COURT:  Mr. Astin, you had your --

19             MR. MCCALLEN:  Your Honor --

20             THE COURT:  Oh, hold on.  Let me -- Mr. Astin had

21   his hand up.

22             MR. ASTIN:  Your Honor, thank you.  You anticipated

23   my question on circulation of the order.  That's all I had,

24   Thank you, Your Honor.  Thank you --

25             THE COURT:  All righyt.  Okay.

1          MR. ASTIN:  -- for your time today.

2          THE COURT:  Yep.  Mr. McCallen.

3          MR. MCCALLEN:  Yes, Your Honor.  I was just going

4     to suggest, with respect to the motion to quash, you know, if

5     Mr. Murtagh and his team wants to take a crack at putting

6     this into writing, you know, we don't have an objection to

7     that.  But I feel like Your Honor gave us very good guidance

8     today at the hearing, we obviously have the transcript from

9     it.  I don't know that we would necessarily need to spend the

10    time trying to boil it down into a written order.  I would

11    feel comfortable proceeding with the transcript we have and

12    the guidance Your Honor gave us on the topics.

13         THE COURT:  Well, I can so order the transcript.

14    Is that acceptable to everyone else?  Mr. Haviland

15    (indiscernible)

16         MR. MURTAGH:  I'm just thinking.  I'm just trying

17    to --

18         MR. MCCALLEN:  Thank you, Your Honor.

19         MR. MURTAGH:  -- think through everything that was

20    said in the last hour and a half, Your Honor.  But if that's

21    only with respect to the motion to quash that addressed

22    Humana and also addressed, to some extent, the Ad Hoc Acthar

23    Group, I believe that makes sense.

24         THE COURT:  All right.  I'll go ahead and so order

25    the transcript, and then you can rely on the transcript for

1    what the actual rulings are.  And if there's any confusion or

2    disagreement about what I said -- which I know I'm not always

3    a hundred percent clear -- just contact me and we can get

4    back on the record, if necessary.

5              MR. MURTAGH:  Understood, Your Honor.  Thank you.

6              THE COURT:  All right.  Is that it for today?

7    Okay.  Thank you.

8              MR. MURTAGH:  Nothing more from the debtor.

9              THE COURT:  All right.

10             UNIDENTIFIED:  Nothing more.

11             THE COURT:  Thank you.  We are adjourned.

12             MR. MCCALLEN:  Thank you, Your Honor.

13         (Proceedings concluded at 4:36 p.m.)

14                         *****

81

<u>CERTIFICATION</u>

1

2          I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10

11    _____          June 3, 2021

12    Coleen Rand, AAERT Cert. No. 341

13    Certified Court Transcriptionist

14    For Reliable

**A-6452**

1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2
                                    .    Chapter 11
3   IN RE:                          .
                                    .    Case No. 20-12522 (JTD)
4   MALLINCKRODT PLC, *et al.*,     .
                                    .    (Jointly Administered)
5                    Debtors.       .
    _____ .
6   MALLINCKRODT PLC, *et al.*,     .
                                    .
7                    Plaintiffs,    .    Adv. Pro. No. 21-50428
                                    .
8        v.                         .
                                    .    Courtroom No. 5
9   CITY OF ROCKFORD,               .    824 N. Market Street
                                    .    Wilmington, Delaware 19801
10                                  .
                     Defendants.    .    June 7, 2021
11  . . . . . . . . . . . . . . . . .    10:00 A.M.
12                 TRANSCRIPT OF TELEPHONIC HEARING
13            BEFORE THE HONORABLE JOHN T. DORSEY
                 UNITED STATES BANKRUPTCY JUDGE
14
    TELEPHONIC APPEARANCES:
15
    For the Debtor:          Mark D. Collins, Esquire
16                           Michael J. Merchant, Esquire
                             Amanda R. Steele, Esquire
17                           Brendan J. Schlauch, Esquire
                             RICHARDS, LAYTON & FINGER, P.A.
18                           Rodney Square
                             920 N. King Street
19                           Wilmington, Delaware 19801
20
21  Audio Operator:          Jason Spencer
22  Transcription Company:   Reliable
                             1007 N. Orange Street
23                           Wilmington, Delaware 19801
                             (302)654-8080
24                           Email:  gmatthews@reliable-co.com
25
    Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.

```
 1  TELEPHONIC APPEARANCES (Cont'd):

 2  For the Debtors:          George A. Davis, Esquire
                              George Klidonas, Esquire
 3                            Andrew Sorkin, Esquire
                              Anupama Yerramalli, Esquire
 4                            Hugh Murtagh, Esquire
                              Christopher Harris, Esquire
 5                            LATHAM & WATKINS LLP
                              885 Third Avenue
 6                            New York, New York 10022

 7                            - and -

 8
                              Jeffrey E. Bjork, Esquire
 9                            Amy Quartarolo, Esquire
                              LATHAM & WATKINS LLP
10                            355 South Grand Avenue, Suite 100
                              Los Angeles, California 90071
11
                              - and -
12
                              Jason B. Gott, Esquire
13                            LATHAM & WATKINS LLP
                              330 North Wabash Avenue, Suite 2800
14                            Chicago, Illinois 60611

15
16  For Acthar Group:         Donald Haviland, Esquire
                              HAVILAND HUGHES LLC
17                            111 S. Independence Mall E Unit 1000
                              Philadelphia, Pennsylvania 19106
18
                              - and -
19
                              Daniel Astin, Esquire
20                            CIARDI CIARDI & ASTIN
                              1204 North King Street
21                            Wilmington, Delaware 19801

22
    For Humana:               Matthew Feldman, Esquire
23                            WILLKIE FARR & GALLAGHER LLP
                              787 Seventh Avenue
24                            New York, New York 10019

25
```

1 | TELEPHONIC APPEARANCES (Cont'd):

2 | For Attestor Limited,     Matthew Freimuth, Esquire
Humana Inc.:              WILLKIE FARR & GALLAGHER LLP

3 |                           787 Seventh Avenue
                            New York, New York 10019

4 |

5 |

6 |

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1  MATTERS GOING FORWARD:

2  Motion of Attestor Limited and Humana Inc. for Entry of an
   Order Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I)
3  Authorizing Estimation of Humana's Acthar-Related Claims and
   (II) Allowing Humana's Acthar-Related Claims for All Purposes
4  in These Bankruptcy Cases [Docket No. 2157 – filed April 30,
   2021]
5
   Motion of Attestor Limited and Humana Inc. for Entry of an
6  Order Allowing and Compelling Payment of Administrative Claims
   Pursuant to Section 503(b) of the Bankruptcy Code [Docket No.
7  2159 – filed April 30, 2021]

8       **Ruling:  50**

9  ADVERSARY MOTIONS GOING FORWARD:

10 Debtors' Motion for Summary Judgment [Adv. Case No. 21-50428
   (JTD) – Adv. Docket No. 2 – filed April 30, 2021]
11
12      **Ruling:  Matter Taken Under Advisement**

13 Motion to Dismiss Debtors' Complaint for Determination and
   Declaration of Dischargeability of Alleged Claims and Debts of
14 City of Rockford [Adv. Case No. 21-50428 (JTD) – Adv. Docket
   No. 12 – filed May 4, 2021]
15
   Anthony L. DeWitt's and the City of Rockford's Motion to Quash
16 and for a Protective Order in Connection with the Debtors'
   Notice of 30(b)(6) Deposition [Adv. Case No. 21-50428 (JTD) –
17 Adv. Docket No. 25 – filed May 28, 2021]

18      **Ruling:  Motions Denied**

19
20
21
22
23
24
25

A-6456

1          (Proceedings commenced at 10:01 a.m.)

2               THE COURT:  Good morning, this is Judge Dorsey.

3    We're on the record in Mallinckrodt PLC, Case No. 20-12522.

4               I will go ahead and turn it over to the debtors to

5    run the agenda.

6               MR. MERCHANT:  Good morning, Your Honor.  Michael

7    Merchant of Richards, Layton & Finger on behalf of the

8    debtors.

9               Your Honor, before turning to the agenda we just

10   wanted to update the court that the parties have entered into

11   a stipulation to extend the challenge period for the OCC and

12   the FCR through June 11th.  The parties are working on a

13   stipulation that will be submitted to the court for approval.

14               THE COURT:  Alright.

15               MR. MERCHANT:  Turning back to the agenda there's

16   two sets of matters on today's agenda.  The first set is the

17   Attestor/Humana related motions and then there is the

18   adversary related motions.  I believe that we think we'd

19   address these, if acceptable to the court, in agenda order

20   starting with the Attestor and Humana motions.  I will turn

21   the podium over to movant's counsel to present their motion.

22   Chris Harris from Latham & Watkins will be addressing them on

23   behalf of the debtors.

24               THE COURT:  Alright, who is speaking on behalf of

25   the movants?

6

1           MR. FELDMAN:  Good morning, Your Honor.  Matthew

2    Feldman from Willkie Farr & Gallagher.

3           Can you hear me alright?

4           THE COURT:  I can.  Thank you.

5           MR. FELDMAN:  Thank you, Your Honor.  I'm going to

6    start and my partner, Matthew Freimuth, is going to join me

7    as well.

8           Your Honor, we're here today on, really, a

9    preliminary basis with respect to the motions that we filed

10   with the court.  And just to give it a little bit of context,

11   Your Honor, when these cases filed there was an RSA in place,

12   as the court is aware, really, with just half of the company;

13   the generic side of the house, if you will, and even calling

14   that half the company is being generous because of the amount

15   of revenue and profits generated from the brand side.

16          So as the company has moved down the road towards

17   confirmation, really, without pause, without an opportunity

18   to have the brand side catch-up, which was not expected to be

19   in Chapter 11, we are really left, Your Honor, with very few

20   options other than to continue to press these claims before

21   Your Honor so that if the court were to move these cases

22   briskly towards confirmation, as requested by the debtors and

23   as set forth by the debtors, then there is an opportunity for

24   the court to make findings and a real decision as to whether

25   or not there is a plan here that is susceptible to being

7

1  confirmed.

2          So, Your Honor, we are asking the court to

3  estimate our prepetition claim which goes towards whether or

4  not the plan unfairly discriminates against various classes

5  of unsecured creditors.  Obviously, discrimination is

6  permitted, but unfair discrimination is not permitted.

7          Perhaps even more importantly, Your Honor, to the

8  extent that the debtor's behavior continues and it does

9  continue the question that is going to be before Your Honor

10 not today, but in the near term, is whether or not that

11 constitutes an administrative claim such that the debtor's

12 ability to demonstrate feasibility is impacted; and perhaps

13 even more importantly to the extent this behavior continues

14 post-emergence is this a capital structure that can sustain

15 itself without the risk of a second round of Chapter 11.

16          (Indiscernible), Your Honor, again, not so much

17 with today, but as you would expect we don't think this

18 creates a confirmable opportunity.  We do think that the

19 company, either through the mediation process, or through its

20 own abilities, so certainly professionals on the company

21 side, ought to be engaged in a negotiation over the branded

22 side of the business.  Frankly, it ought to be released from

23 its obligations under the RSA not to have those discussions

24 and not to have that negotiation.

25          So that is really, Your Honor, the context of why

1   we're here today.  What we're looking for specifically from

2   the court today I'm going to turn it over to my partner, Matt

3   Freimuth, unless the court has any questions for me, Your

4   Honor.

5           THE COURT:  Alright, Mr. Freimuth?  Is that his

6   name?

7           MR. FELDMAN:  Yes.

8           MR. FREIMUTH:  Yes.

9           THE COURT:  Alright, there you are, Mr. Freimuth.

10          MR. FREIMUTH:  Good morning, Your Honor.  This is

11  Matthew Freimuth from Willkie Farr.

12          Can you hear me okay?

13          THE COURT:  I can.  Thank you.

14          MR. FREIMUTH:  Okay.  As my partner, Mr. Feldman,

15  eluded to today we're here on two motions; the motion to

16  estimate and the motion to allow the administrative claim.

17  And I want to be clear, first, about what we are asking for

18  today, Your Honor.  We want the court to put in place a

19  process that allows us to take discovery of the underlying

20  merits of our prepetition and our post-petition claims

21  culminating in an estimation hearing where the court can hear

22  evidence and estimate the amount of prepetition liability and

23  Humana's administrative -- Humana and United's administrative

24  claims.

25          The procedures that we proposed in our motion

1  balance the claimants' right to due process with the debtors'

2  desire to promptly resolve these cases and exit from

3  bankruptcy.  The motions are joined today by other insurers

4  and corporations who have overpaid for Acthar as a result of

5  the debtors' illegal conduct including Centene, Community

6  Health Options, Excellus BlueCross BlueShield, Health First,

7  and 32 corporations with self-funded health plans.

8         My plan this morning, Your Honor, is to address

9  the motions in three parts.  I'd like to just provide Your

10 Honor with some brief background as to the claims being

11 asserted by Attestor and Humana.  Second, I'd like to address

12 why estimation in these cases is mandatory and why it needs

13 to happen now.  Finally, I'd like to provide Your Honor with

14 some specifics about our views on what the estimation process

15 should look like.  Throughout I will be addressing some of

16 the arguments that the debtors have made in opposition to our

17 motions.

18         Your Honor, first, by way of background, Humana

19 and United are two of the largest health insurers in the

20 United States and two of the largest providers of Medicare

21 Part D drug coverage.  As a result, they pay tens of millions

22 of dollars every month for HP Acthar Gel prescribed to their

23 members including post-petition.

24         I want to just talk a little bit about the drug

25 because I think it's relevant for context.  The FDA first

1  approved Acthar for use in the 1950's, but since then cheaper
2  lower cost anti-inflammatory drugs like Prednisone have
3  replaced it as a treatment for common ailments.  By the early
4  2000's Acthar was a specialty pharmaceutical product used for
5  first line treatment only for a few rare disorders.
6          In 2001 Acthar sold for $40 a vile.  That same
7  year Questcor acquired Acthar and began an extraordinary run
8  of price increases that the debtors continued.  Those price
9  increases continued for nearly two decades such that today
10 the price of Acthar is more than $42,000 a vile which is an
11 increase of over 100,000 percent.
12         If that success, Your Honor, sounds too good to be
13 true it's because it is.  Government agencies and private
14 plaintiffs have pursued Mallinckrodt for a host of illegal
15 conducts related to Acthar.  The FTC sued Mallinckrodt's
16 predecessor for violation of the antitrust laws when it
17 acquired and shelved Synacthen, a low-cost alternative to
18 Acthar.
19         The DOJ has alleged a laundry list of bad behavior
20 related to Acthar over the past few years including that
21 Mallinckrodt illegally wined and dined doctors to introduce
22 them to induce them to make Medicare referrals, that
23 Mallinckrodt made donations through sham charitable
24 foundations as illegal kickbacks to Acthar patients, and that
25 Mallinckrodt attempted to avoid paying Medicaid rebates.

1          Private litigants followed on the heels of these

2    government cases and pursued their own damages claims. And,

3    of course, this is often the case because a federal

4    government's decision to pursue claims is seen as an

5    important barometer of the merits of those claims and the

6    severity of the misconduct.

7          Humana filed its case in the Central District of

8    California and that case, Your Honor, has survived two

9    motions to dismiss.  Now I have heard Your Honor in the past

10   several weeks' remark on that issue noting that a judge in

11   the Rule 12 context must assume, in response to a Rule 12

12   motion, that all allegations are true.  That is 100 percent

13   correct, of course.

14          The point is this; any antitrust defendant will

15   tell you that a case that follows on the heels of government

16   actions, one that survives multiple rounds of Rule 12

17   briefing and leaves the defendant staring down the barrel of

18   a potential jury trial in which damages are troubled is a

19   case that presents enormous risk for the defendant because it

20   has enormous value to the plaintiff.  Any way you cut it,

21   Your Honor, these claims have substantial value.

22          This brings me to my second point, it's time for

23   this court to estimate the value of the Humana and United

24   claims.  Our estimation and allowance motions make clear that

25   the court must hear evidence concerning these allegations and

1   must estimate the value of the claims before determining, as

2   Mr. Feldman said, whether the debtors' plan meets the

3   bankruptcy codes requirements for confirmation.  The

4   bankruptcy code requires estimation where adjudicating a

5   contingent liability is necessary -- would result in undue

6   delay.  That is clearly the case here.

7           Humana would not have proceeded to trial on its

8   claims until September 2022, a full year beyond the current

9   confirmation milestones.  We're talking about a complex

10  multi-billion dollar case where the District Court put in

11  place a schedule that provided for over 700 days of fact

12  discovery, 150 days of expert discovery, motion practice and

13  a jury trial.

14          You're likely going to hear from the debtors that

15  the case wouldn't be unduly delayed if Your Honor rejects an

16  estimation process because you don't need to know the value

17  of the Acthar claims to confirm the plan.  And the debtors

18  are wrong on that point, Your Honor.  The court must resolve

19  the size of the prepetition and the administrative claims

20  before it can consider whether the debtors' plan meets the

21  requirements of the code.

22          To explain or address the question of whether or

23  not these claims need to be estimated or dealt with I think

24  its easiest, at least for me, Your Honor, to think about them

25  separately in the context of the administrative claims and

13

1  the prepetition claims separately.

2          So let's start with the administrative claims.

3  The Acthar claimants have paid, on average, $15 to $20

4  million a month for Acthar.  The allegation, Your Honor, is

5  that the debtors are only able to maintain that price for the

6  drug because of their illegal conduct.  We have to have a

7  process in place for the court to hear evidence and make a

8  determination as to whether or not those allegations are

9  true.  If they are there's no way that the court can conclude

10 that the debtors' plan is feasible.

11         The Acthar related administrative liabilities

12 would dwarf the $160 million of administrative claims the

13 debtors have said they need to pay -- that they need to pay

14 to exit bankruptcy.  Two, a finding of administrative expense

15 liability would mean that the debtors' current ongoing

16 practices related to Acthar are illegal and would need to

17 cease or else expose the debtors' continued post-bankruptcy

18 liability.

19         So after the administrative claims this is an

20 issue that must be resolved prior to confirmation.

21 Estimation is the right process to do it.  The debtors even

22 recognize that the administrative claims must be estimated

23 for feasibility purposes, but they argue at length, in their

24 objection, that the court cannot estimate administrative

25 claims for allowance purposes.

1          To some extent I think that argument misses the
2   mark. If the court puts in place the process we're asking for
3   we will be able to present evidence of liability and damages
4   in an amount certain.  Either way the code permits the court
5   to be flexible and use estimation under Section 502(c) for
6   allowance purposes.  And I would direct Your Honor to the
7   case that we cite in our opening and reply brief In Re
8   McDonald.  There the court plainly states that estimation may
9   be adapted to the handling of contingent and unliquidated
10  administrative claims when the full blown allowance process
11  under 503(b) would unduly delay the proceedings.
12          As explained in that case the reason some courts
13  don't estimate administrative claims for allowance purposes
14  is because there can be due process concerns when the debtor
15  seeks to use a truncated process to set the outer limit on
16  administrative claims recovery. Those concerns aren't present
17  here, Your Honor, where the creditors, themselves, Humana,
18  United and Attestor are the ones seeking estimation and
19  believe putting a dollar amount on their accruing claims is
20  essential to moving these cases forward.
21          With respect to the prepetition claims, Your
22  Honor, I want to start with a very practical point.  Even if
23  the debtors deem to concede that we're going to have to have
24  some process to grapple with the administrative claims,
25  whether that's estimation or some full-blown process, but

1  whatever that is its going to involve the same legal

2  theories, the same experts, many if not all of the same fact

3  witnesses and documents related to the prepetition claims --

4  excuse me, related to the administrative claims.

5         So as a matter of efficiency it makes no sense to

6  tackle the administrative claims issues now and then defer

7  estimation of prepetition claims to some later post-

8  confirmation time period.  The court is going to have to do

9  it all twice in that world.  We think, Your Honor, it make

10  sense to proceed with respect to both the prepetition and the

11  administrative claims now.

12         And as Mr. Feldman indicated, there are -- aside

13  from the practical concerns there are legal reasons why the

14  court needs to grapple with the size of the prepetition

15  claims to including that it relates to unfair discrimination,

16  feasibility, best interest and whether or not the debtors are

17  unfairly discriminating between different classes of

18  unsecured creditors.

19         Your Honor, as a matter of process we recognize

20  that we can't have over 700 days of fact discovery followed

21  by 150 days of expert discovery and motion practice.  We

22  proposed a streamlined 120 day schedule that contemplates 60

23  days for fact discovery, 45 days for expert discovery,

24  pretrial briefing and a prompt evidentiary hearing before the

25  court.  It certainly isn't ideal from our perspective, Your

1   Honor, but we recognize the needs of these Chapter 11 cases.

2          We think that the evidentiary issues here are not

3   insignificant and will require a hearing in the ballpark of

4   five to ten days of Your Honor's time.  At that hearing we

5   would expect to present a series of live fact witnesses who

6   would testify about the debtors' antitrust and racketeering

7   violations, an expert economist who would testify about

8   antitrust damages, likely an MD who would testify about the

9   uses of Acthar and an expert testify about FDA regulations.

10         The end result would be, Your Honor, that after an

11  estimation process the court will have heard core evidence

12  related to the debtors' Acthar related liability, will have

13  enough information to estimate the value of the Acthar

14  insurance claimants' claims, and will be able to move these

15  cases towards confirmation with some degree of certainty

16  around the extent of the debtors' Acthar related liability.

17         We think the best way for the court to move

18  forward is to grant our motions, put a procedure in place to

19  estimate and allow the administrative claims and get this

20  process going promptly, Your Honor.

21         THE COURT:  Well, Mr. Freimuth, you're proposing

22  120 days, but that is just to get to trial.  Then you are

23  telling me it's going to be a one to two week trial after

24  which there is going to have to be post-trial submissions if

25  not briefing, at least findings of fact and conclusions of

1  law, and then I got to decide it.  That is going to take some
2  time.  So we're -- you're actually asking me to push this
3  case to 2022 basically.
4          MR. FREIMUTH:  So what I'd say to that, Your
5  Honor, is that the schedule that we have in place
6  contemplates, yes, 120 days to get to a hearing.  That is not
7  all together dissimilar from the schedules that have been put
8  before Your Honor by the OCC and the UCC to get us to
9  confirmation.
10         Now I concede we would have to have the estimation
11 hearing before that, but Your Honor could hear that evidence
12 perhaps at the start of confirmation and, basically, you
13 know, have briefing on that process in the context of that
14 kind of proceeding.  So we don't think that the schedule
15 pushes it that far out.
16         In any event, Your Honor, these issues with
17 respect to particularly the administrative claim and the
18 post-confirmation -- and the prepetition claims they have to
19 be dealt with.  And the process we proposed, even though it
20 is 120 days, is a reasonable one to do that.
21         THE COURT:  So you are proposing that I have a
22 combined estimation hearing and confirmation hearing on these
23 issues?
24         MR. FREIMUTH:  I'm suggesting, Your Honor, that
25 that is one way that you could do it.  Obviously, there are

1   issues with respect to a plan that is forthcoming that isn't

2   even on file yet.  The disclosure statement hearing that you

3   are going to have next week and also a scheduling that you

4   are going to have at the same time.  Those issues are

5   unresolved, Your Honor, and so we could potentially get this

6   estimation process started, okay.

7          We've asked for document requests to be served in

8   seven days, for document discovery to be completed in 45

9   days, and then we can revisit the overall schedule after Your

10  Honor has had an opportunity to hear the issues with respect

11  to the disclosure statement, hear the parties, including

12  others in this case, discuss the overall schedule.

13         The point is we need to get started on this

14  estimation process promptly.

15         THE COURT:  Alright.

16         MR. FREIMUTH:  And so what I am suggesting, Your

17  Honor, is if Your Honor is reluctant to put in place the

18  entire schedule because you have concerns about how this is

19  going to impact confirmation let's just get started, Your

20  Honor, with document discovery on these issues and revisit

21  the overall schedule after Your Honor has had a full chance

22  to hear the issues with the disclosure statement, consider

23  the schedules that are going to be heard next week on the

24  15th.

25         THE COURT:  Alright, did your clients have any

1  prepetition discovery in connection with their State Court

2  action?

3          MR. FREIMUTH:  My clients have a federal action,

4  Your Honor, and they received some discovery in that case.

5  Document discovery had just begun.  My understanding is they

6  had received productions from the debtors of materials that

7  they had already produced in other cases and were beginning

8  the process of talking about what else they needed to obtain

9  as that case proceeded.

10          THE COURT:  Okay.  Thank you, Mr. Freimuth.

11          Mr. Harris?

12          MR. HARRIS:  Thank you, Your Honor.  Can you hear

13  me okay?

14          THE COURT:  I can.  Thank you.

15          MR. HARRIS:  So for the record Chris Harris of

16  Latham & Watkins for the debtors.

17          Your Honor, at every hearing no matter what

18  procedure or discovery motion we're talking about Humana

19  makes this speech about how bad the debtors are.  It is never

20  truly relevant to the issue before the court and we have held

21  our tongue, but at some point it's unfair to our management,

22  and our employees, and the doctors who prescribe Acthar to

23  let them be maligned this way and it's also (indiscernible)

24  with the misimpressions.  So I just want to briefly correct

25  some of the things you heard today.

1               Starting with what Acthar is, it's a complex

2    injectable biopharmaceutical product which the FDA approved

3    for 19 serious conditions including infantile spasms, that's

4    a term you've heard mentioned in court, multiple sclerosis

5    and rheumatoid arthritis.  There is no dispute, and the

6    creditors admit this, that Acthar is a life changing therapy

7    for a small group of patients for whom other therapies have

8    failed.

9               So efficacy, and utility for the healthcare system

10   is not the issue.  Instead, Humana's main complaint seems to

11   be that the current price for Acthar is too high, but they

12   repeatedly gloss over several things.

13              First, Acthar is difficult to manufacture.  The

14   debtors don't have a patent and, in fact, we've given away

15   samples for generic manufacturers to try and make it.  Now on

16   top of that it's used by a very small patient population.  So

17   Questcor, which was the predecessor company that sold Acthar,

18   nearly went out of business before raising its price to

19   ensure that Acthar could stay on the market and be available.

20   Questcor had a legal right to make that decision.

21              Second, since Mallinckrodt acquired Questcor in

22   late 2014 we have invested more than $660 million into

23   (indiscernible) Acthar.  So that has included over $470

24   million research and development including starting nine

25   clinical trials and close to $190 million in manufacturing

1  advancements.  So needless to say if Acthar were priced where

2  the plaintiff suggests it should be none of those investments

3  would have occurred.

4          Third, since 2014 when Mallinckrodt acquired

5  Acthar the list price for Acthar has increased only 5 percent

6  annually on average and that is without adjusting for

7  inflation or the significant discount in programs that the

8  debtors started.  In two of the last six years the debtors

9  did not make any price increasing.  In the last two years the

10  net price of Acthar went down as it will this year again.

11          It's very notable that despite the government

12  investigations and settlements that you have heard Humana

13  talk about the government hasn't required that the price of

14  Acthar be changed.  That really tells you all you need to

15  know about this claim that somehow the pricing is illegal.

16  The government hasn't said that.

17          Of course, as we have also improved the ability of

18  patients to obtain Acthar through our robust free and

19  commercial copay assistance programs, which means that many

20  patients pay nothing out of pocket.  So contrary to what you

21  hear from Humana these assistance programs are legally and

22  extremely beneficial for the patients who need them.

23          So let me just address some of the other theories

24  you have heard about why Acthar's price is somehow wrongful.

25  Unlike what you have heard, Mallinckrodt was not prosecuted

1  by the Federal Trade Commission and it's not in violation of

2  a 2017 settlement with that agency.  The FDC investigated

3  Questcor, a predecessor, their acquisition of a license for a

4  product called Synacthen which was a supposed potential

5  competitor to Acthar.  Synacthen wasn't approved for use in

6  the United States and it still isn't approved.

7         So after Mallinckrodt acquired Questcor it

8  resolved that FDC investigation by agreeing, among other

9  things, to sublicense its Synacthen rights to a third-party.

10  That sub-licensee has now had those rights for almost four

11  years.  It hasn't been able to secure FDA approval and it

12  recently announced that it had abandoned its development

13  efforts.

14         Separately, Mallinckrodt invested its own

15  considerable sums in trying to develop Synacthen, but because

16  of the substantial clinical obstacles we surrendered our

17  remaining Synacthen rights back to the original licensor in

18  2020 prepetition.

19         So, in sum, we've done the things the FDC wanted

20  to do to cure the antitrust concerns.  We've tried to develop

21  Synacthen.  We have also licensed it to someone else to

22  develop it.  We both failed over many years of combined

23  efforts and now we have given up the Synacthen license.  So

24  the suggestion that Mallinckrodt is engaged in any

25  anticompetitive conduct with respect to Synacthen and even

1  more so that any new claims could be accruing now as a result

2  is completely baseless.

3          The Department of Justice, likewise, has not

4  prosecuted Mallinckrodt for any marketing fraud ongoing or

5  otherwise.  Questcor cooperated with the DOJ to investigate

6  the (indiscernible) allegations that were made in complaints

7  filed in 2012 and 2013.  That is a marketing fraud that has

8  occurred almost a decade ago.  The DOJ declined to pursue

9  criminal charges and instead it refers to civil division

10  claims between 2009 and 2013 twelve Questcor sales reps

11  provided excessive meals and entertainment to prescribers and

12  that Questcor made contributions to charitable copious funds

13  that were illegal subsidies for Medicare beneficiaries.

14          So after Mallinckrodt acquired Questcor the

15  companies worked to resolve these inherited litigations and

16  investigations, and we significantly increased our compliance

17  controls to gold standard levels.  For instance, the company

18  complies with the industry standard code around interactions

19  with physicians; that's the code that's been recognized by

20  the health and human services officer of inspector general as

21  the appropriate standard.  We have among the strongest

22  controls in the industry around interactions with charitable

23  foundations.

24          So the reality of how the debtors operate with

25  Acthar is in stark contrast to the fiction you've heard very

1  briefly in these speeches.  And so at the right time you will

2  see evidence on this.

3        The other thing I want to briefly state is

4  specific to administrative claims.  As I just explained,

5  Humana cannot have a post-petition antitrust claim because

6  the antitrust claim is based exclusively on the Synacthen

7  license and we relinquished it before the petition date.

8  It's also going to be very tricky for Humana to show it was

9  somehow tricked by marketing fraud in the paying for Acthar

10 post-petition given that it now clearly knows about whatever

11 the marketing schemes are its unhappy about and it's still

12 paying for those prescriptions.

13        Humana, as a sponsor of Part D prescription drug

14 benefits, has the right to make reasoned determinations as to

15 what drugs they will cover to treat particular diseases and

16 under what conditions including by imposing prior

17 authorization and other management requirements.  They do

18 that.

19        So in their reply brief they submitted they tried

20 to explain how they could still have a fraud claim when post-

21 petition they know whatever the facts are and they are still

22 deciding to pay for Acthar.  They say very vaguely that in

23 many cases CMS regulations require it to provide coverage for

24 Acthar, but its telling that Humana doesn't tell you what

25 those cases or situations are because those are actually

```
1   situations where Acthar has determined to be medically
2   necessary.
3           So every post-petition payment Humana has made for
4   Acthar is one (indiscernible) wide open.  And the federal
5   government would be pretty surprised to hear that Human is
6   paying for Medicare subscriptions that Humana thinks are
7   fraudulent and unnecessary.  It would be surprised because
8   it's not true.  Humana reviews every one of those
9   prescriptions post-petition with full information in making
10  its decisions.  That's probably part of the reason why Humana
11  and the other insurers sold their claims to a litigation
12  funder.  That tells you also what they really think about the
13  merits of these claims.
14          So I want to -- with that, resetting the table of
15  Acthar, I want to turn to what is actually before the court
16  which are the two motions that Humana and its affiliated
17  insurance companies are filing.
18          So the first motion, that's Docket 2157, asked the
19  court to set a procedure and schedule for estimating all of
20  Humana's purported claims.  So that is prepetition and
21  administrative for purposes of claims allowance, feasibility,
22  to have a separate process distinct from any other creditor's
23  claims.
24          The second motion, Docket No. 2159, follows on
25  from their first motion.  It asked the court to order today
```

1  that whatever those administrative claims are estimated to be

2  in the future those estimated administrative claims are

3  actually allowed and paid out within 30 days.  So these

4  motions should be denied because they will create an

5  unprecedented procedure that benefits a single creditor,

6  Humana, by giving them an impermissible objective of getting

7  paid now for purported administrative claims they had not

8  proved, that weren't estimated on a (indiscernible) basis.

9         The debtors are not aware of any court having ever

10  done that and Humana doesn't cite a single example of any

11  court doing that other than this request to have their

12  estimated administrative claims allowed and paid all they're

13  doing is raising confirmation objections and asking that they

14  get their own unique and contradictory confirmation,

15  discovery and hearing which is premature, inefficient, and

16  unnecessary.  We may never need much of a discovery.  We may

17  never need a ten day hearing and whatever they do need should

18  be coordinated with everyone else in the confirmation

19  schedule.

20         So I want to level set on what is the current

21  process the debtors already have in place to address Humana

22  and everyone else's objections.  I want to then address why

23  their proposed process for administrative claims to be

24  allowed as an estimated level is inappropriate.  Then I want

25  to address why there is no need to estimate feasibility, or

1   administrative claims, or their prepetition claims.

2            First, just what our process is.  We have a series

3   of concrete solutions already in place to address Acthar

4   specific issues.  We have the unsubstantiated claims

5   objection pending now which might eliminate hundreds of

6   Acthar claims against various debtors including dozens filed

7   by Humana.  We also have the class claims objection pending

8   now which may substantially further reduce the asserted

9   Acthar claims both prepetition and administrative.

10            We have a June 28th administrative claims bar date

11  by an objection process that this court approved which will

12  give the debtors visibility into the full universe of

13  asserted administrative claims, not just Humana's, and it

14  will allow us to consider the most efficient response. As

15  part of that process the debtors will file an objection to

16  Humana's administrative claims shortly raising any of the

17  points that I talked about earlier.

18            Then, more generally, not specific to Acthar, we

19  started a process for confirmation discovery and hearing.

20  The entire reason they say they need estimation is to make

21  confirmation objections, feasibility, undue discrimination,

22  best interest, but we have proposed a confirmation discovery

23  schedule.  We have gotten comments from parties on it.  We

24  have gotten comments from Humana which filed their own brief

25  with comments on the schedule and will soon end up wiht a

1  disclosure statement and a confirmation schedule, and that

2  schedule will include a discovery schedule that will

3  efficiently provide for all creditors, not just Humana, to

4  get discovery in a coordinated process.

5          All Humana is seeking to do is to have their own

6  unique process to add delay or inconsistent deadlines,

7  inconsistent discovery and then, as you have heard, to seek

8  to push back the entire confirmation process to accommodate

9  their own unique schedule.  Everything they desire to do can

10 be addressed in a coordinated basis with all the other

11 creditors who also want discovery.  So that is our process.

12         I just want to briefly talk about the request to

13 estimate for allowance purposes which I think we can put

14 aside quickly.  I am not even sure if they are still pursuing

15 that.  I think, in their brief, they have essentially

16 abandoned that request, but this is what they say in their

17 reply brief:

18         If the debtors oppose estimation for allowance

19 purposes, which we do, then the Acthar insurance claimants

20 will, through the full blown allowance process, prove there

21 are actual damages arising from the debtors' post-petition

22 conduct.  That is their brief at Paragraph 13.  So that is

23 where we are.

24         I don't think anyone at this point is arguing that

25 instead you should allow and allege the administrative claims

1  in an estimated amount.  Just to avoid any ambiguity here it

2  is clear that the bankruptcy code does not allow that.  As we

3  explained in our brief, Section 503 governs administrative

4  expenses and it requires that any allowed administrative

5  expenses be the "actual" necessary expenses.  Actual means

6  just that, not estimated, actual.

7          What did you hear in response to that?  Statutory

8  analysis, nothing.  In fact, Humana recognizes that 503

9  governs.  That is why their administrative claims motion

10  asked the court to allow their claims under 503, not 502.

11  (Indiscernible) that's exactly what it called.  And

12  consistent with 503 the actual estimation provision, 502(c),

13  expressly limits itself to allowance under this section,

14  Section 502.  It doesn't apply to allowance of administrative

15  claims under 503.

16          No case that we are aware of and no case that

17  Humana has found of actually estimated administrative claims

18  for allowance.  All they do is point to dicta in one case

19  McDonald, but that case actually only estimated for

20  feasibility.  It also held that administrative expenses and

21  their allowance are governed by 503, not 502.  And as Judge

22  Gerber said in Adelphia the McDonald court (indiscernible)

23  estimation for feasibility purposes, but not for allowance

24  purposes.  That is from Judge Gerber in Adelphia.

25          There is no authority for what Humana requests to

1  get an allowed claim -- an allowed administrative claim on an

2  estimated level.  It would also be distorting and unfair to

3  the debtors and every other creditor.  Specifically, what

4  they are asking is that the court allow administrative

5  expenses based on a probabilistic determination, whether

6  their claims might succeed and then to pay them in full

7  within 30 days.

8          So that is why they want to estimate

9  administrative claims.  They are going to lose any litigation

10 over allowance of those actual administrative claims, but if

11 you do a probabilistic estimation and they have only a 10

12 percent chance of winning then they'll still get an estimated

13 10 percent and in their view get it paid out immediately.

14 That would not be fair to other creditors who (indiscernible)

15 before Humana and getting paid out an estimated amount in

16 full before anyone else.  It is also squarely prohibited by

17 the code.

18         So putting that request aside everything that's

19 left is really a confirmation objection.  So let's talk about

20 estimation of administrative claims for feasibility.  The key

21 point is that we already have a step by step plan that I went

22 through that will address administrative claims.  And if

23 that, at the end of that process, still requires estimation

24 we can do it then.

25         We have, as I mentioned, our claims objection, our

A-6482

1   unsubstantiated claims objection, the class claims objection.

2   We have administrative bar dates and we will surely file an

3   objection to Humana's own administrative claims.  We also

4   have plan confirmation proceedings and I think what's

5   important to remember is that if you create a Humana only

6   discovery process with its own schedule, and own deadlines,

7   and own document reductions, and own depositions that is

8   going to be hugely inefficient.

9          It ignores the fact that these cases are about a

10  lot more than just Acthar and that there's many parties

11  interested in the same discovery that Humana wants for

12  various reasons.  So many parties are interested in the value

13  of the different debtor entities.  Many parties are

14  interested in intercompany transfers in and out of ARD and

15  other debtors.  Many parties are interested in Questcor

16  transaction.  Many parties are interested in the debtors'

17  current Acthar business practices and many parties are

18  interested in the same witnesses who have many roles such as

19  senior management which is oversight of more than just Acthar

20  and other things.

21         So it makes no sense for discovery to have these

22  two different tracks.  It makes no sense for us to go to the

23  same data sources twice multiple times for individual

24  requests.  It makes no sense to serially depose the same

25  witnesses on different or varied topics. If the complaint

1  that Humana has is a lot more time in our proposed

2  confirmation schedule we're going to have a hearing next week

3  on that schedule.  If we're going to argue for how much time

4  they want including Humana and it already has, and the court

5  will set an appropriate schedule.  There is no need to have a

6  Humana only, Acthar only confirmation discovery schedule.

7         The other point I'd make is that there is nothing

8  novel about the feasibility issues that Humana is raising

9  that would require a special standalone process.  Courts deal

10 all the time with determining whether the debtors will be

11 able to pay their administrative claims.  The confirmation

12 only requires that a reasonable assurance that we can pay if

13 there are administrative claims.  Likewise, courts deal all

14 the time with arguments that regulations make a debtor's

15 post-emergence business plan and its activities not feasible.

16 Debtors will be easily able to meet that standard.

17        Humana focuses on a worst case scenario where the

18 debtors have to abandon their current Acthar pricing model.

19 Feasibility only means that it's not reasonably likely that

20 the debtors will have to file for bankruptcy again.  To quote

21 the Fifth Circuit in T-H New Orleans, that's 116 F.3d 790,

22        "The debtors are not required to do business in

23 economic prospects in the worst possible way."

24        So you don't assume the worst case scenario, you

25 consider the full range of outcomes and the debtors dispute

1   with Humana on the relative likelihood of each outcome.  In

2   Humana's worst case scenario that our pricing has to be

3   abandoned it's extremely unlikely, particularly since no

4   governmental entity has acquired that Acthar change its

5   pricing; the Acthar pricing changed.  Regardless, Humana's

6   probabilistic estimation procedures will do nothing to fix

7   that concern.

8            If you do a probabilistic estimation that is not

9   going to result in a finding or conclusion of law regarding

10  the legality of our pricing model and so it's not going to

11  offer guidance regarding the debtors' post-emergence conduct.

12           So if after going through the normal confirmation

13  discovery process to whatever is ordered next week the court

14  determines that more time is needed for Acthar specific

15  discovery or more hearing days are needed we can deal with it

16  then, but its horribly inefficient and premature to right now

17  carve-out Humana from the discovery process that everyone

18  else was going to follow and instead create its own

19  contradictory process for its administrative claims.

20           THE COURT:  Let me ask you, Mr. Harris, when is

21  the debtor proposing to provide Humana the information that

22  it is seeking with regard to viability of its claims?

23           MR. HARRIS:  So let me address that in two

24  aspects.  There is the viability of its administrative claims

25  and then its prepetition claims.

```
 1              THE COURT:  Right.
 2              MR. HARRIS:  So on the administrative claims we
 3  have asked them to serve us with discovery requests specific
 4  to the administrative claims.  We asked for that two weeks
 5  ago and they have not done so.  And the reason I say that is
 6  because we believe very strongly that you will be able to
 7  resolve whether there are administrative claims or not based
 8  on the usual standard which is what post-petition conduct was
 9  engaged in or not.
10              On the prepetition claims we have a discovery
11  dispute with them about whether that is relevant to the
12  administrative claims or not.  What I was going to talk about
13  next is whether putting aside administrative claims is there
14  a need to estimate prepetition claims for feasibility
15  purposes.  So we believe there is no need to estimate the
16  prepetition claims for feasibility purposes and we had not
17  yet provided discovery on prepetition conduct.
18              I imagine the parties will be before your court
19  with a dispute on that; although, we have a meet and confer
20  with Humana on that, I think -- I think we're doing it
21  perhaps Wednesday after the Wednesday hearing.  So there may
22  be ways to provide some discovery quickly such as, you know,
23  Humana has already gotten over, you know, several hundred
24  thousand documents in their prepetition litigation.  There
25  was also document productions from other Acthar cases that we
```

1  are seeing if there is a way to produce those to give them

2  that prepetition discovery as well.

3         So we don't think it is relevant all for

4  confirmation.  It is not relevant to the admin claims.  We

5  don't think you need to estimate prepetition claims for

6  confirmation, but, you know, there may be a way to give them

7  some discovery on that also as well.

8         If I can just briefly turn to that last point

9  which is whether you need to estimate the prepetition claims

10  for confirmation discovery.  Our proposal on that is the

11  normal proposal, the normal process which is to estimate

12  prepetition claims post-confirmation to the extent necessary

13  for distributions.  They are telling you that that doesn't

14  work because you need to estimate to confirm a plan for

15  feasibility, unfair discrimination, and best interest.  Let

16  me just talk about each of those briefly.

17         For feasibility the amount of Humana's prepetition

18  claims doesn't effect feasibility because our plan proposes

19  to pay holders of general unsecured claims, including Humana,

20  a pro rata share of $100 million fixed cash pool. So our

21  obligations under that plan are fixed and Humana's claims are

22  dischargeable.  So the size of the prepetition claims only

23  effects the recoveries of other creditors.  It doesn't affect

24  our ability to merge.

25         So in trying to find a feasibility hook Humana

1  argues that you need to estimate the prepetition claims

2  because somehow that will affect the amount of administrative

3  claims.  That is confusing discovery of prepetition conduct

4  which for reasons I don't know they're saying is relevant to

5  administrative claims with estimating the prepetition claims.

6  Those are two different things.

7           We think you will be able to decide the

8  administrative claims without ever looking at prepetition

9  conduct.  We're going to file an objection to that effect,

10 but if we're wrong then you can get discovery in the

11 prepetition conduct, but that doesn't mean you have to

12 estimate the amount of those claims; that is a completely

13 different issue.

14          They also talk about unfair discrimination and

15 they argue that the plan can't be confirmed without knowing

16 which debtors are liable for prepetition claims.  That is

17 true.  If Humana has filed claims for billions of dollars of

18 payments against every debtor, so if, in fact, those claims

19 are valid there could be discrimination issues.  That is why

20 we filed the omnibus claims objection to help determine at

21 which boxes the claims actually lie.

22          So until that is resolved there is no reason to

23 create a special estimation process for prepetition claims.

24 If, as we think, Humana's claims are landing into certain

25 boxes we're prepared to demonstrate that there is a

1  legitimate basis for the disparate treatment of Acthar

2  claimants and unsecured noteholders and the government based

3  on their different rights and positions in claims.  We're

4  prepared to defend that even assuming Humana claims are in

5  the dollar amount they assert.

6       If our omnibus objection is unsuccessful in

7  limiting the boxes then we may need to estimate the amount of

8  the claims (indiscernible) discrimination, but we can do that

9  through the normal plan confirmation process just like every

10 other plan confirmation objection.  So that is being heard on

11 June 25th allowing for a limited amount of time to that

12 objection to play out is not going to delay confirmation.  In

13 the meantime I'm sure we will be before your court trying to

14 get your assistance on whether or not we need to provide

15 discovery on pre-confirmation conduct.

16      And if that -- if it turns out we do after the

17 omnibus objection and if it turns out that then proceeding

18 with further processes delays the confirmation schedule that

19 is a risk that we understand and accept, but the answer is

20 not to start a costly and distracting prepetition estimation

21 process now which might never be required, the better path is

22 to proceed with their claims objections and plan confirmation

23 discovery instead of scheduling motion for everyone as we

24 will next week.

25      The last thing they say is best interest.  Again,

1  if the debtors prepare on their omnibus claims objection to
2  limit the boxes we believe we will be able to show at
3  confirmation that the private Acthar claimants, including
4  Humana, receive a greater recovery under the plan then in the
5  liquidation and that is regardless of whether the Humana
6  claims are allowed in their full asserted amounts or
7  disallowed entirely.
8          If we don't prevail in limiting the boxes then, as
9  I said, we can at that point determine whether we need to
10 estimate the amount of the claims. We are willing to live
11 with the risk to the schedule this entails.
12         So the bottom line is the bankruptcy code doesn't
13 allow estimation of administrative claims for allowance
14 purposes and everything else that it raised is really just an
15 argument that they want discovery for confirmation
16 objections.  So we can deal with it like we did with everyone
17 else's request for discovery for confirmation through a
18 single coordinated confirmation schedule and process.
19         THE COURT:  Okay.  Thank you, Mr. Harris.
20         Mr. Freimuth --
21         MR. FELDMAN:  Your Honor, briefly in response.
22         THE COURT:  Okay.  Mr. Feldman, are you going to
23 respond or Mr. Freimuth?
24         MR. FELDMAN:  Yeah, I'm going to start, Your
25 Honor, and address a number of points.

1          This is confirmation, confirmation, confirmation

2   which I (indiscernible) and that's all I hear about, Your

3   Honor. Humana and United, which are both reprinted by my

4   firm, actually are the largest holders of Acthar claims.

5   They're not a small holder who just, sort of, ride the wave

6   as the debtors would like you to believe, but it was also

7   said, very clearly, they will take the risk on finding Your

8   Honor.

9          So if getting out of bankruptcy is truly important

10  to the debtors on a particular timeline they have already

11  told you that they're prepared to blow-up that timeline.

12  Your Honor, we would like to start discovery now on what will

13  undoubtedly be the largest claims in the case and, frankly,

14  Your Honor, they do go directly to best interest and to

15  feasibility.  Sure, we're going to have a fight over what

16  boxes the claims are at, but it's going to be impossible for

17  these companies to demonstrate best interest at any box if

18  the court were to find that the prepetition claims are

19  anything close to what we think they are.

20          So that litigation has to happen, Your Honor.  And

21  if people want to push this off and not give us discovery

22  and, frankly, even when we asked for discovery they don't

23  give us discovery; they tell us it's not really relevant,

24  we'll have to take it to Your Honor which, obviously, we're

25  prepared to do.  If that is how they want to play it and if

40

1 | Your Honor wants to allow them to do that then we will be
2 | here in 2022.
3 | We actually are trying to create a process that
4 | would get these companies out in 2021 which seems to be what
5 | everybody is focused on happening.  They simply cannot emerge
6 | until these issues are resolved.  We're entitled to an
7 | estimation on our prepetition claim.  On the post-petition
8 | claim it's a red herring, Your Honor.
9 | If there is an administrative claim it's not a
10 | probability analysis.  The problem with the administrative
11 | claim, Your Honor, is that the amount changes every day as
12 | Humana, and United and others reimburse.  It's not a question
13 | of being able to fix an allowed administrative claim.  You
14 | can fix an allowed administrative claim, Your Honor.  We're
15 | going to ask you to do that, but it's as of a certain date.
16 | The discovery that relates to post-petition and
17 | prepetition is the same behavior because the conduct hasn't
18 | changed, Your Honor.  So either they are liable, in which
19 | case there is going to be both a prepetition claim and a
20 | post-petition claim, or Your Honor will find that they
21 | haven't violated antitrust law.
22 | I am not going to get into the merits argument as
23 | Mr. Harris did.  I really think that is for another day.
24 | This is something the court is going to have to grapple with
25 | and they would love it to be at confirmation, Your Honor,

```
 1 │ because at that point the company is going to have spent
 2 │ millions upon millions of dollars preparing for confirmation,
 3 │ soliciting acceptances and then throw up their hands and say,
 4 │ Judge, you have to confirm the plan.  You let us get to this
 5 │ point.
 6 │         Your Honor, you ought to know in advance of
 7 │ confirmation whether they are putting forward a plan that is
 8 │ susceptible to being confirmed.  We don't think it is.  We
 9 │ think (indiscernible) feasibility problems.  They definitely
10 │ have best interest and unfair discrimination problems. And we
11 │ can either all do it at confirmation, Your Honor, or we can
12 │ do it in a way that every other company does it which is if
13 │ you have a very large claim that needs to be estimated you
14 │ get that estimation done in advance of confirmation.
15 │         I'm happy to address specific questions, but I
16 │ don't know if Mr. Freimuth wants to.  I will jump-in with
17 │ anything specific, but I think the path is clear, Your Honor.
18 │         THE COURT:  Well Mr. Freimuth told me that they
19 │ were willing -- that your clients are willing to wait until
20 │ the confirmation hearing and hear these issues in connection
21 │ with confirmation, and Mr. Harris said --
22 │         MR. FELDMAN:  We are, Your Honor, but I'm not --
23 │         THE COURT:  Hold on.  Mr. Harris is telling me
24 │ that he's given you discovery on the administrative claims
25 │ issue.  So what else do you want me to do?  If you're going
```

1  to hear these at the confirmation hearing and you're getting

2  the discovery I am not clear what you are actually asking me

3  for other than the prepetition -- I'm just talking about the

4  administrative claim.  We will get to the prepetition in a

5  minute.

6          MR. FELDMAN:  Matt do you want to jump-in?

7          MR. FREIMUTH:  Yeah, sure.  Your Honor, we have

8  had discovery outstanding for several weeks on issues that we

9  believe are relevant to the administrative claim.  And the

10 debtors have not produced anything, Your Honor.

11         What you heard, I think, from Mr. Harris today is

12 that discovery on those issues ought to get going once Your

13 Honor approves a confirmation schedule.  And our point, Your

14 Honor, is that the hearing on the administrative claims, the

15 discovery required is not insignificant and it needs to get

16 underway now.  There is no reason to delay that process any

17 further.

18         THE COURT:  Well, Mr. Harris's point is we need to

19 do this discovery in conjunction with everyone else who might

20 want the same information.  And if it's going to be done in

21 conjunction with confirmation everybody is going to be

22 interested in this.  So why should I order something separate

23 at this point?  I don't understand.  If you have discovery

24 outstanding and they haven't responded, file a motion to

25 compel and I will hear that.

1          MR. FREIMUTH:  Well, we're talking about discovery

2    in the context of the administrative claim which is Humana's

3    claim, Your Honor.  It's a specific contested matter that we

4    should be proceeding in.  There is no reason to delay, you

5    know, discovery of the underlying merits of that claim.

6          THE COURT:  You're telling me, though, that you're

7    going to hear it at confirmation.  So what difference does it

8    make if we do it now or if we do it a month from now.  I just

9    don't get it.  I don't know what you want me to do.

10         MR. FREIMUTH:  The issue, Your Honor, is that if

11   we do a month from now it further jams the schedule.  What

12   you are going to hear the debtors say a month from now is

13   that, you know, they will have not given us any discovery.

14   We will be, you know, a month from now down the road and the

15   debtors will be telling you we've got to go, go, go to get to

16   our, you know, confirmation hearing.

17         So it's the same consistent jam-up that we've had

18   throughout these cases.  And there is no reason to delay

19   getting going on these issues today when we know that they're

20   going to have to be dealt with prior to confirmation.  But

21   whether there is a viable administrative claim here by Humana

22   or United is an issue that this court must grapple with.  And

23   if the court must grapple with it there is no reason why the

24   process can't be put in place today to get it done.

25         THE COURT:  Well it sounds like there is a

1    process.  You have issued discovery.

2              Mr. Harris, are you going to respond to the

3    discovery that they have issued?

4              MR. HARRIS:  Yes, Your Honor.  In fact, to be

5    clear we have responded to discovery issues.  We have given

6    them all sorts of documents responsive to it in addition to

7    objections and responses.  We have given them over $200,000

8    documents that were produced to the committee.  We have given

9    them org charts, we've given them intercompany agreements.

10   We have given them summaries of the debtors' entities and

11   activities, we have given them intercompany balances.  We're

12   producing further details on intercompany transfers.

13             We have produced documents.  If they want -- if

14   they disagree with the scope of our production we're having a

15   meet and confer and we will talk with them further, but we

16   are absolutely producing documents, have and will produce

17   more.

18             THE COURT:  And these are documents that are

19   relevant to -- that are responsive to their request for

20   information about the alleged administrative claim that they?

21             MR. HARRIS:  Well, I believe so.  Most of the

22   documents requested they served were specific -- they seemed

23   to be targeted to the omnibus claims objection which is about

24   which entities.  We have asked them to serve us specific

25   requests targeted to the administrative claims objection who

1  were asking about what activities we do post-petition.  We

2  asked for that several weeks ago.  They had declined.  So I

3  would like to start producing.  I am waiting for that

4  request.  I will produce it as soon as they serve any

5  discovery request about post-petition conduct.

6          None of their requests seek that, to be clear.  So

7  I have asked for them to serve those.  I asked several weeks

8  ago for them to serve it.  They haven't done it

9          THE COURT:  Mr. Freimuth, why haven't you issued

10  the discovery he is asking for?

11          MR. FREIMUTH:  Your Honor, we have issued

12  discovery going to the underlying merits of the claims both

13  pre and post-petition and the debtors have resisted all

14  discovery on the underlying merits saying that it has to

15  wait.  Our view, Your Honor, is that it doesn't have to wait.

16  We should put a process in place to get the Humana and the

17  United claims estimated -- the prepetition claims estimated

18  and the administrative claims resolved.

19          That process is set out very clearly in our

20  estimation motion.  We should be serving all discovery

21  necessary for the underlying estimation of the prepetition

22  claims, the resolution of the admin claims.  We should get

23  those documents produced and there's not a reason to delay

24  production until the confirmation timeline that the debtors

25  are going to presumably attempt to put in place next week.

1          THE COURT:  Well let's talk then about the

2     prepetition claims.  Why -- I am not getting your argument as

3     to why that is relevant to confirmation.  I mean your claims

4     are what they are.  This is a bucket plan that they're

5     proposing.  There is going to be a certain amount of money

6     available to pay creditors, and they're going to be paid on a

7     pro rata basis based on their determination of whether you

8     fall into bucket A, or bucket B, or bucket C.

9          If your issue is that you have concerns that your

10    clients are being treated differently than other similarly

11    situated creditors within that bucket that's a different

12    issue.  That has nothing to do wiht the amount of your claim.

13    That has to do wiht the way you are being treated under the

14    proposed plan.

15         So why would prepetition claims have anything to

16    do with that?

17         MR. FELDMAN:  Your Honor, why don't I take this

18    one.  This is because they are -- the plan that's on file

19    now, what they filed this week or whenever they filed the

20    amended plan this is what that says.  The plan that is on

21    file now attempts to subsequently consolidate the unsecured

22    classes, but not subsequently consolidate any other class.

23    So why is it relevant with the size of our classes?

24         In the context of a non-substantively consolidated

25    claim, Your Honor, they have to demonstrate best interest on

1    an entity by entity basis. The size of the claim is going to

2    be directly relevant to whether or not we are receiving more

3    then we could receive in a liquidation of that entity.  So

4    it's clearly relevant.

5            Secondly, Your Honor, unfair discrimination comes

6    into play.  If we're getting one cent on the dollar in our

7    box and a similarly situated creditor is getting sixty cents

8    on the dollar or eighty cents on the dollar this court is

9    going to have to make an unfair discrimination determination.

10   So what box you're in and how much you're getting is

11   absolutely going to be relevant -- I'm sorry, I said another

12   box.  If another unsecured creditor is getting sixty cents in

13   my box you are going to have to make an unfair discrimination

14   determination.

15           It is not true that all unsecured creditors are

16   being treated equally.  There are unsecured creditors who are

17   part of the RSA who are getting specified treatment under the

18   RSA.  So this court is going to have to grapple with those

19   issues and the size of the claims is going to be directly

20   relevant.  You are absolutely right, Your Honor, if they go

21   forward with a subsequently consolidated plan for those

22   unsecured creditors they deemed to be part of that pot plan

23   then that is just going to be a creditor on creditor crime,

24   not a creditor on company crime.

25           THE COURT:  Well can't I just estimate your claims

1  based on your proofs of claim for purposes of confirmation

2  only so I can determine -- I will assume your claims are

3  worth $5 billion or whatever you have alleged for purposes of

4  determining the feasibility of a plan or the fairness of a

5  plan.

6         MR. FELDMAN:  You can do it, Your Honor, but you

7  stop the train right now because these companies can't get

8  out of bankruptcy given the size of the unsecured claims box

9  by box and meet the best interest test.  It is just not going

10 to be possible, Your Honor.

11        So, you know, either we're going to do it the way

12 it should be done and we're going to know whether we have

13 claims or not have claims, and if we have claims it's going

14 to create an issue for the plan, and if we don't have claims

15 then as the company thinks then the plan is going to go

16 forward.

17        If the company didn't think they had to resolve

18 these claims, Your Honor, they wouldn't do the omnibus

19 objection to claims that's pending before the court today

20 that the debtors have brought.  And there wouldn't be

21 additional objections to claims that Mr. Harris identified

22 coming.  They know they have to estimate and resolve these

23 claims.

24        THE COURT:  Mr. Harris?

25        MR. HARRIS:  Yes, Your Honor.  Just to make this

1  very clear, what box the claims asserted against is relevant

2  (indiscernible) discrimination.  That is why we filed the

3  omnibus objection.  The amount of the claims will likely not

4  be depending on what boxes remain.

5          So we said we can defend these confirmation issues

6  including unfair discrimination even if you assume

7  (indiscernible).  So it's very likely there is never going to

8  be (indiscernible).  Under the objection of the

9  (indiscernible) file that is an objection to the

10  administrative claims, not an objection to the prepetition

11  confirmation (indiscernible).

12          So the entire idea that you need a special process

13  is entirely premature.  It's very likely we will find a way

14  to accommodate it within the disclosure statement.  We are

15  willing to take that risk as I have said, and to produce

16  discovery as I have said.  What discovery is relevant was

17  (indiscernible).  That is not a reason to create a special

18  process now that (indiscernible) everyone else is going to

19  have to go through.

20          THE COURT:  When is the -- Mr. Harris, you

21  mentioned we have a hearing later this week to address some

22  of these issues.

23          MR. HARRIS:  Yes.  So there is a pending -- the

24  disclosure statement motion and then there is also a motion

25  to set a schedule for confirmation hearing.  I believe they

1  are both set for the 15th or will be set for the 15th, but

2  let me check with my colleagues to make sure I have that

3  right.

4        (Pause in record)

5             MR. HARRIS:  Yes.  We are set for the 15th.

6             THE COURT:  Alright, let's take a short recess

7  here.  I want to think about this and then I'll come back and

8  let you know what we're going to do.  Let's take a recess

9  until 11:20.

10        (Recess taken at 11:07 a.m.)

11        (Proceedings resumed at 11:21 a.m.)

12             THE COURT:  This is Judge Dorsey.  We're back on

13  the record.

14             Here is what we're going to do with regard to

15  this; what I'm hearing is that on the administrative claim

16  Humana and the other insurance companies are seeking

17  discovery on issues relating to the debtors' post-petition

18  conduct, and whether it has happened and continues to happen,

19  and does that create an administrative claim.

20             The debtors have told me that they have produced

21  and will continue to produce information relating to those

22  claims.  And keeping in mind that this issue will be heard in

23  conjunction with confirmation as Mr. Freimuth told me Humana

24  was willing to do, the discovery should be produced in a

25  manner that would allow Humana to be able to present those

1   issues at confirmation.

2          If a dispute arises as to whether discovery is

3   being provided on a timely basis or whether discovery is

4   being produced as it relates to the administrative claim then

5   I will hear that as a discovery dispute in connection with an

6   appropriate motion.

7          On the prepetition estimation of the claims I am

8   not clear -- it's not clear to me at this time that it's

9   necessary to estimate those claims.  I think I will be better

10  informed after we have the claim objection hearing on June

11  25th.  So I am going to defer on that issue, but I will not

12  allow discovery on that issue at that point because we need

13  to get to other more important discovery including whether

14  there is an administrative claim that could have an impact on

15  feasibility of the claim.

16         So I am going to defer that until after the claim

17  objection hearing on the 25th and then I will reconsider how

18  to deal with the prepetition claim estimation.

19         Any questions?

20         MR. FELDMAN:  Your Honor, just one question.

21         THE COURT:  Yes.

22         MR. FELDMAN:  Deferring it to the 25th should we

23  put it on the calendar at the backend of the hearing on the

24  25th so depending on how Your Honor rules we can discuss it?

25         THE COURT:  You can put it on for that day, yeah,

A-6503

1    if I rule on the 25th, we'll see.  Once I hear the evidence I

2    might need to take some time, but, yes, you can add it to the

3    agenda for the 25th.

4                MR. FELDMAN:  Fair enough.  Thank you.

5                THE COURT:  Alright, what's next on the agenda?

6                MR. MERCHANT:  Your Honor, I think that brings us

7    to the adversary items. I think on behalf of the debtors Mr.

8    Harris will be handling those as well.

9                THE COURT:  Alright, Mr. Harris?

10               MR. HARRIS:  Thank you, Your Honor.

11               So there are three motions in connection with

12   adversary proceeding.  In addition to myself you may be

13   hearing from Ms. Betsy Marks from Latham who you have heard

14   from before.  The three motions are Rockford's motion to --

15   the City of Rockford's motion to dismiss the adversary

16   proceeding, it was an adversary proceeding we brought against

17   the City of Rockford and the declaration of the

18   dischargeability of its claims.  Second motion is our motion

19   for summary judgments.  The third is Rockford filed a motion

20   to quash a 30(b)(6) subpoena that we served on them.

21               On those three motions it is not clear if Rockford

22   is still pursuing its motion to dismiss.  It did not file a

23   reply to our opposition brief, but if it is still pursuing it

24   we would suggest we start there and let Rockford argue it.

25   Then we could turn to the other two motions.  Our summary

53

1  motion judgment motion and Rockford's motion to quash our
2  30(b)(6).  We suggest it would make sense to hear both of
3  those motions before ruling on those two motions because they
4  effect each other.
5            THE COURT:  Alright, is Rockford still pursuing
6  the motion to dismiss?
7            MR. HAVILAND:  Your Honor, Don Haviland for the ad
8  hoc Acthar group, once known as Acthar Plaintiffs.  Yes, we
9  are.
10           THE COURT:  Alright, then here is what I'm going
11 to do; I want to hear from Mr. Astin, as local counsel, as to
12 why I should not issue an order to show cause to sanction you
13 under Rule 11 for this motion.  Rule 4004 -- excuse me, 4007
14 clearly states that a debtor may file a complaint to obtain a
15 determination of dischargeability of debt.  Did you read the
16 rule before you filed this motion to dismiss, Mr. Astin?
17           MR. ASTIN:  We read all the applicable rules, Your
18 Honor, before we filed the motion to dismiss.
19           THE COURT:  Well, obviously, you didn't take care
20 to read them carefully because it's absolutely obvious that
21 the debtor can file a complaint to determine dischargeability
22 of a debt.  This motion was absolutely ridiculous and a
23 complete waste of time, waste of my time, waste of the
24 debtors' time and money.
25           MR. ASTIN:  Your Honor --

 1          THE COURT:  Tell me why I shouldn't issue an order
 2  to show cause to sanction you?
 3          MR. ASTIN:  First off, I'll say in due respect,
 4  Your Honor --
 5          THE COURT:  Don't say in all due respect because I
 6  know that's now what you mean.  Just tell me what you mean,
 7  Mr. Astin.
 8          MR. ASTIN:  Your Honor, that is exactly what I
 9  mean.  That is exactly what I mean because I know Your Honor
10  is exercised, but the time to reach a conclusion from the
11  bench on this issue -- you can think what you will, but the
12  time to reach a conclusion is not now at this moment.
13          THE COURT:  I'm not saying I'm going to sanction
14  you now, Mr. Astin.  I am saying I am going to issue an order
15  --
16          MR. ASTIN:  Your Honor, I'd like to --
17          THE COURT:  Don't interrupt me, Mr. Astin, or
18  you're going to be in contempt.  I have had it with these
19  ridiculous motions that are being filed by you and your co-
20  counsel.  They are without merit, many of them are without
21  merit and it is taking up a lot of my time.  It is taking up
22  a lot of the debtors' time and money.  I am done with this.
23          There was absolutely no basis to file this motion
24  to dismiss, none.  So my question is --
25          MR. ASTIN:  Obviously --

1          THE COURT:  Go ahead, Mr. Astin.

2          MR. ASTIN:  Your Honor, obviously, whether you

3  agree or not, I believe that the motions that we filed were

4  in good faith and appropriate under the circumstances.  I

5  take umbrage with the statement that many of these motions

6  are frivolous.  In this case, if you want to hear from me, we

7  have tried at every turn to cooperate on behalf of our many

8  clients and constituency with the debtors.  We have struck

9  out on relevancy the lowest standard that you could possibly

10 have.  Many times the debtor saying this is irrelevant.

11         This has been -- if you listen to the Humana

12 arguments we're not, to your prior statement, the only ones

13 complaining anymore.  The conduct in this case -- and I will

14 stand, and if you want to issue a rule to show cause I will

15 appear and I will present my case, Your Honor, after I've had

16 an opportunity to meet and confer internally not only with my

17 partners in my firm, but also with my co-counsel and anybody

18 else that I deem appropriate to give Your Honor a cogent

19 answer and presentation at that hearing.

20         At every turn this case, in my 31 years of

21 experience, 20 plus years of bankruptcy, not laying it at

22 Your Honor's feet because Your Honor isn't the one that

23 brings it.  Every motion that is brought we have unilateral

24 rescheduling of hearings where there are contested matters by

25 the debtors.  We have a 100 percent refusal to provide

1  relevant and material discovery to actionable colorable

2  claims that are brought before the court.  This debtor is

3  running rough-shot.  That is my view.

4          And, again, not laying it at Your Honor's feet,

5  and I'm not reaching any negative or pejorative conclusions

6  about what Your Honor has done here because it is the

7  obligation of the officers of the court, whether they are pro

8  hac or whether they are Delaware counsel, to bring the issues

9  before the court, to act in an equitable and fair and

10 reasonable manner, and that has not happened.

11         I am a -- I regret that Your Honor feels that many

12 of the motions have been frivolous because I whole-heartedly

13 disagree.  You and I will never agree on that point that I

14 think it was an inappropriate thing to bring up on this call

15 without me being able to defend that position and to reach a

16 conclusion, Your Honor, as you have and you, obviously,

17 exercised.  There is no basis to reach that conclusion to

18 make such a broad statement about frivolous pleadings.

19         Now I am, obviously, at a disadvantage here, but I

20 can tell you that I will stand by my reputation and I will

21 stand by my history before all of the courts where I have

22 ever practiced.  And I will stand by my co-counsel's actions

23 in this case of which there are five Venerable firms.  And my

24 firm is no slouch either.

25         THE COURT:  All right, well --

```
 1            MR. ASTIN:  But every meet-and-confer --
 2            THE COURT:  Okay, Mr. Astin, okay.
 3            MR. ASTIN:  -- every --
 4            THE COURT:  Mr. Astin, I've heard enough.  The
 5   motion to dismiss is denied as frivolous and I will decide
 6   later whether or not I'm going to issue an order to show
 7   cause.
 8            MR. ASTIN:  Very well, Your Honor, and I thank you
 9   for hearing me.
10            THE COURT:  Mr. Harris?
11            MR. HARRIS:  Thank you, Your Honor.  So that
12   brings us to the debtors' motion, which is our motion for
13   summary judgment.
14            We are seeking very narrow relief in our adversary
15   proceeding; it is just about the City of Rockford's claims,
16   it's not about hypothetical claims of absent putative class
17   members.  And we're seeking a declaration that Rockford's
18   claims don't fall within the discharge exception in
19   1141(b)(6) for debts of a kind specified in 523(a)(2)(A).  So
20   that's arising from fraud and fraudulent misrepresentation.
21   The only fraud-type claim that Rockford asserted in its proof
22   of claims was the theory that the price of Acthar itself was
23   a misrepresentation, priced at misrepresentation.
24            And so, for purposes of our summary judgment
25   motion, we've accepted as true all of the allegations in
```

1    Rockford's proof of claim and our motion says that those

2    allegations, even if proven, would be insufficient to cause

3    Rockford's claims to fit within the discharge exception, and

4    we believe you can decide that as a matter of law.

5            So when you read Rockford's opposition brief,

6    there doesn't actually seem to be any dispute about that.

7    There's no dispute that it's existing fraud allegations are

8    insufficient.  So, at a minimum, we're entitled to summary

9    judgment with respect to the proofs of claims that it

10   actually asserted in its -- with respect to claims it's

11   asserted in its proof of claims.

12           Instead of arguing that there are genuine issues

13   of material fact with respect to the dischargeability of

14   those existing claims, Rockford argues that instead, after

15   the bar date has passed, it should be allowed to do two

16   things:  amend its proof of claims to raise new fraud claims

17   based on an entirely different theory and facts about

18   marketing misconduct; and, second, to take discovery under

19   Rule 56(d) to support those new allegations.  So those are

20   theories of marketing fraud that Rockford has never raised

21   before, not in the underlying district court litigation,

22   despite having years to do so, and, most importantly, not in

23   its February 2021 proof of claim.

24           So those requests, those requests to submit a late

25   new claim after the bar date is passed and to conduct

59

1   discovery on those yet un-pled claims under Rule 56(d), those

2   fail for two reasons, first is that they're procedurally

3   improper.  Late amendments to a claim after the bar date and

4   discovery under 56(d) are both limited to existing claims.

5   You don't get to amend after the bar date to add new claims

6   and you don't get to conduct discovery under 56(d) about new

7   un-pled claims.

8            And they try to excuse this flaw by saying they

9   only became aware of this alleged marketing fraud after the

10  complaints (indiscernible) *qui tam* actions were unsealed,

11  which was after the fraud claims were dismissed in the

12  district court in January 2019, but that is irrelevant.  The

13  *qui tam* complaints were unsealed nearly two years before the

14  February of 2021 bar date in these cases and nearly two years

15  before the City of Rockford submitted its proof of claim.

16           THE COURT:  Mr. Harris, you're starting break up a

17  little -- Mr. Harris, you're breaking up a little bit when

18  you're speaking.

19           MR. HARRIS:  I'm sorry, Your Honor.  Is that

20  better if I move closer?

21           THE COURT:  Yes, yes.

22           MR. HARRIS:  I was saying, the fact that the *qui*

23  *tam* actions that contained the alleged marketing fraud, that

24  those were unsealed in early 2019 after the City of Rockford

25  fraud claim was dismissed is irrelevant because they were

1   unsealed years before the City of Rockford submitted its

2   proof of claim in February 2021.  So despite having

3   everything in those *qui tam* actions about the marketing

4   claims for two years, City of Rockford chose not to assert

5   them in its proofs of claim.  And we know that City of

6   Rockford's counsel was aware of those *qui tam* allegations and

7   the potential marketing claims because in 2019 it asserted

8   those claims on behalf of other plaintiffs, in particular

9   Steamfitters, and it included those marketing claims in those

10  other clients' February 2021 proofs of claim (indiscernible)

11  Rockford.

12          So these are procedurally improper requests

13  because they seek to add new claims after the bar date

14  (indiscernible) conduct discovery under 56(d) on new, un-pled

15  claims and that's not allowed under the rules unless they

16  (indiscernible) --

17          THE COURT:  You're breaking up again, Mr. Harris.

18          MR. HARRIS:  I'm sorry, Your Honor.  Let me try --

19  I may have to dial in on a different phone.  Could I ask if

20  anyone else could go on mute, if perhaps Mr. Astin is not on

21  mute?

22      (Pause)

23          THE COURT:  There you go.  Try again, Mr. --

24          MR. HARRIS:  All right.  The second reason why

25  these new requests are improper is because they're futile.

1  Granting leave to amend or to conduct discovery would be
2  futile because the City of Rockford can't assert these
3  marketing fraud claims.
4         The City of Rockford only paid for two Acthar
5  prescriptions, but back in 2015, and according to their
6  interrogatory responses, the prescriptions were both for
7  infantile spasms, which is an on-label use.  But the *qui tam*
8  allegations that they now say they want to add in a new
9  marketing claim were focused entirely on marketing practices
10 with respect to off-label uses for multiple sclerosis.  And
11 the City of Rockford admits in its opposition brief and in
12 its 5060 declaration that the claimant wants to add it for
13 those *qui tam* allegations, which would be an off-label
14 marketing claim based on a few particular conditions,
15 principally multiple sclerosis, and not the conditions that
16 the City of Rockford paid for.
17        So that's why the City of Rockford never asserted
18 these claims before because they can't it doesn't have those.
19 It didn't pay for prescriptions for the conditions for which
20 allegedly there was improper marketing conduct.  So even if
21 it wasn't too late to bring these claims, it would be futile
22 to bring them now.
23        So let me just briefly talk about the existing
24 claims that are in the bar date.  As we explained in our
25 briefs, they filed 82 proofs of claim, all of them are

A-6513

1    substantiated only by the allegations in the second amended

2    complaint that was filed in the district court.  The only

3    fraud-based claim asserted in them is this theory that price

4    is a misrepresentation.  Those claims were dismissed by the

5    district court, which gave the City of Rockford 45 days to

6    re-plead them; it didn't.  In fact, Rockford concedes in its

7    opposition brief that it didn't do so because it concluded it

8    couldn't meet the Rule 11 standard to amend.

9          Even if those price-as-fraud claims could still be

10   pursued, they're dischargeable because they don't satisfy

11   1141(b)(6).  We explained all the reason for that in our

12   summary judgment brief and the City of Rockford doesn't

13   respond in any way.  They don't even attempt to explain why

14   that price-as-misrepresentation claim would not be

15   dischargeable.  And they're 50, 60 declarations they

16   submitted doesn't change any of that.  It has nothing to do

17   with Rockford's current claims, it doesn't say that discovery

18   would prevent summary judgment on Rockford's current claims;

19   it's just about discovery on future, possible, un-pled

20   marketing fraud claims.  And so it's not a reason not to

21   grant summary judgment on the current-pled claims.

22          So (indiscernible) is undisputed, it's sufficient

23   to grant our motion for summary judgment that Rockford's

24   claims in its proof of claims are dischargeable, and the only

25   dispute is over a different question:  should Rockford be

1   granted leave to amend to add these new claims or should it

2   receive discovery under Rule 56(d) to find facts to support

3   these new claims?  So just to go over those two issues

4   quickly.

5           Leave to amend should not be granted because

6   adding new claims is prohibited after the bar date.  You

7   know, we've cited a number of cases to that effect, including

8   Judge Carey's 2019 decision in Exide and In re Blue Coal

9   Corporation in the Bankruptcy Court in the Middle District of

10  Pennsylvania.  Both of those and other cases we cited are

11  very clear, past the bar date, you can't add new claims

12  unless there's excusable neglect.  Rockford hasn't asserted

13  that, nor could they.

14          And that makes sense.  The purpose of the bar date

15  is to make sure that at some point the debtor has visibility

16  of the full universe of claims against it.  If instead you

17  could freely allow amendments to proofs of claim to assert

18  new and unrelated claims; that would undermine that finality.

19  That's particularly true here where the debtors have

20  commenced this adversary proceeding to obtain clarity on

21  whether Rockford's claims are dischargeable.  If Rockford

22  instead is permitted to continuously amend its existing proof

23  of claims to try out new theories, we're never going to get

24  that clarity.

25          Now, even if the Court is inclined to apply the

1  Rule 15 standards, as Rockford suggests in terms of whether

2  it should be allowed to amend, Rockford's request to amend

3  should still be denied.

4          The first thing I'd say is that Rockford admits

5  that Rule 15(d) governs its request to file a supplemental

6  pleading.  They say that at the opposition brief at 26 and

7  27.  And they also admit that 15(d) limits supplemental

8  pleadings to (indiscernible) event that happens after the

9  date of a pleading to be supplemented.  But here everything

10  that Rockford wants to add occurred before the pleading to be

11  supplemented, its February 2021 proofs of claim.

12          So the unsealing of these *qui tam* complaints or

13  certainly the events discussed in them occurred years before

14  February 2021 when Rockford decided and filed its proof of

15  claim.

16          The other possible grounds for leave to amend

17  would be 15(a)(2).  Rockford's opposition doesn't claim it

18  can amend under 15(a)(2), but it wouldn't satisfy that

19  standard anyway.  The case law applying 15(a)(2) looks at

20  whether there would be undue prejudice to the non-movant

21  (indiscernible) debtors and whether the request was the

22  product of undue delay by the movants.

23          The request to undue delay -- or with undue

24  prejudice, sorry, the debtors need to know whether those

25  claims are dischargeable now.  We're filing a plan that's

1  premised on claims being dischargeable and the parties who
2  are receiving equity (indiscernible) need clarity on that.
3  Rockford hasn't amended, it's now almost three months after
4  the bar date and less than three months until we may have a
5  confirmation hearing, and now allowing Rockford to amend
6  would delay the answer to these questions, that is undue
7  prejudice.
8          As to whether the City of Rockford unduly delayed,
9  you know, the City of Rockford makes a number of, you know,
10 explanations about why it failed to amend its district court
11 complaint, including that the key facts were in the sealed
12 *qui tam* complaints, but that's the wrong question.  Why
13 didn't it include these new marketing fraud claims in its
14 February 2021 proofs of claim?  So the *qui tam* complaints
15 were unsealed in April 2019, two years earlier.  During that
16 whole time, Rockford never amended its allegations, whether
17 in the underlying action or its proof of claims, based on
18 those *qui tam* allegations.
19         And even if it were procedurally proper to amend
20 to add new claims after the bar date, that should still be
21 denied because it would be futile.  That's why the City of
22 Rockford didn't include a marketing fraud claim, it doesn't
23 have a marketing fraud claim it can assert.
24         So the *qui tam* allegations, which is what the City
25 of Rockford says it wants to add to its proof of claim,

A-6517

1  focused on the debtors' off-label marketing to treat multiple

2  sclerosis.  The Rockford opposition briefs and DeWitt 5060

3  declaration are very clear about that, they repeatedly

4  describe the *qui tam* allegations as about off-label marketing

5  for multiple sclerosis, if you look at the opposition brief

6  at page 18, page 21, page 22.  In fact, that's how they

7  conclude their whole opposition brief by talking about how

8  they want to add a claim for marketing of the drug Acthar for

9  off-label purposes.

10        In their DeWitt declaration, their 56(d)

11  declaration also repeatedly emphasizes that what they want to

12  add are claims about off-label multiple sclerosis

13  prescriptions.  You can look at paragraphs 36, 56,

14  throughout.  The problem with that and the reason why it

15  would be futile to give them leave to amend is that Rockford

16  acknowledges that the two -- there are only two prescriptions

17  it paid for -- were for a different condition, specifically

18  something called infantile spasms.  That's what the City of

19  Rockford swore in its interrogatory responses.

20        So that's their interrogatory response and

21  objections at paragraph 6, which is Exhibit A to our summary

22  judgment brief.  But the prescriptions that they paid for for

23  infantile spasms have nothing to do with the off-label

24  multiple sclerosis marketing fraud (indiscernible) of the *qui*

25  *tam* complaints and the DeWitt declaration and what the City

1  of Rockford says it wants to add.

2          The last point I'd make on why it's futile is

3  that, even if the City of Rockford had paid for a different

4  kind of Acthar prescription, something that was now part of

5  the alleged marketing scheme, it still would be a

6  dischargeable claim, and that's because Rockford can't

7  demonstrate the debtors made material misrepresentations to

8  Rockford that were intended to deceive the City of Rockford.

9  Both of those are essential elements to a dischargeable -- to

10 a non-dischargeable claim.  The alleged marketing misconduct

11 was targeted at doctors, not the City of Rockford.

12          So that's the reasons why it's procedurally

13 improper and it would be futile to grant them leave to amend

14 their February 2021 proof of claim.

15          Turning briefly to their 56(d) requests for

16 additional discovery, it should be denied for the same

17 reasons.  You can't use 56(d) discovery -- 56(d) declarations

18 to seek discovery on new claims that aren't pled and, for

19 that reason, the DeWitt declaration fails the Third Circuit's

20 Dowling test for what is a sufficient 56(d) declaration.

21          You know, we cited a number of cases that are very

22 clear that 56(d) can't be used to seek discovery on new, un-

23 pled claims.  You can't avoid summary judgment by seeking

24 discovery on claims you never pled.

25          And, second, even if a 56(d) declaration could

1   seek discovery on claims that aren't pled, their 56(d)

2   declaration would still be inadequate under the factors

3   articulated by the Third Circuit in Dowling.  So Dowling

4   says, to be a sufficient 56(d) declaration, you have to

5   describe with specificity what particular information is

6   sought, that's the first factor; how if disclosed it would

7   preclude summary judgment, that's the second factor; and why

8   it has not been previously obtained, that's the third factor.

9          So the declaration they submitted fails the second

10  Dowling factor because it doesn't explain how the discovery

11  it seeks would give Rockford a dischargeable fraud claim.

12  There's a long list of general categories of information it

13  proposes that the City of Rockford needs, but it never

14  indicates how any of that discovery or the debtors' alleged

15  marketing misconduct is at all relevant to Rockford's claims,

16  because it's not.  And, as I explained, Rockford only paid

17  for two specific prescriptions for Acthar.  The declaration

18  just says generic statements, that doesn't attempt to explain

19  at all how the discovery would show that those two

20  prescriptions were written as a result of marketing fraud.

21          And in fact many of the categories of discovery

22  listed in the declaration aren't specific to prescriptions at

23  all, they're about general categories of corporate structure,

24  documents related to Acthar sales.  Essentially, the

25  declaration fails to identify what prescriptions Rockford

1  paid for, what marketing-specific discovery they need related

2  to those two prescriptions, and how the identified categories

3  are at all relevant to potential fraud-based claims that

4  Rockford could bring based on those two prescriptions.

5          It also fails to satisfy the third Dowling factor,

6  which requires the City of Rockford to show that the

7  information it needs to oppose summary judgment is in the

8  sole possession of the moving party.  So Rockford itself has

9  the relevant information about whether it was misled by fraud

10  and it's had it for years.  Rockford -- the City of Rockford

11  knows what prescriptions it fulfilled, it knows what the

12  prescribed uses were for those, it knows whether it filled

13  them, it knows which doctors prescribed them, it knows what

14  payments those doctors received, because that's all reported

15  on a governmental website, it knows whether Rockford made any

16  -- whether Mallinckrodt made any statements directly to

17  Rockford, and it knows whether Rockford relied on them.  All

18  that's information in the City of Rockford's possession and

19  it's very telling that the DeWitt declaration says nothing

20  about any of that; it just has vague, generic statements

21  about generic marketing, having nothing at all to do with the

22  City of Rockford, nothing at all with the two prescriptions

23  that Rockford filled in 2015.

24          And, even beyond that, the City of Rockford and

25  counsel have already had the benefit of millions of

1  documents, numerous fact witnesses, the (indiscernible) *qui*

2  *tam* actions, years of discovery to develop whatever it chose

3  to articulate in the proofs of claim it filed in February.

4  So if evidence of actionable marketing misconduct existed

5  about the particular prescriptions that Rockford filled,

6  Rockford would be in possession of those facts and it could

7  have already submitted a proof of claim based on them.

8          So, for all those reasons, we propose summary

9  judgment is appropriate.  There's no dispute that what's

10  actually in their proof of claims is dischargeable and it's

11  inappropriate to allow amendment for further discovery at

12  this point on un-pled claims.

13          THE COURT:  Thank you, Mr. Harris.

14          Let me hear from Rockford.

15          MR. HAVILAND:  Thank you, Your Honor.  Don

16  Haviland for the City of Rockford.

17          This is a motion for summary judgment filed the

18  same day as a complaint, an adversary complaint filed only

19  against the City of Rockford.  That is an uncommon

20  occurrence, especially in a case like this that has had a

21  long history in the Article III courts.  And I say courts

22  deliberately, Judge, and I say Acthar deliberately, Judge --

23  not Acthsar (ph) because when you use the word Achtsar, the

24  media doesn't pick it up, when you say Acthar, the media

25  does.

1            It's interesting that the debtors have singled out

2    Rockford in this adversary proceeding.  They've offered no

3    evidence, they've offered no witnesses, they've only offered

4    argument of counsel, and this Court has repeatedly said

5    that's not evidence.  And because Mr. Harris spent quite some

6    time at the beginning of this hearing unrelated to this

7    hearing talking about facts, I'm going to want to go through

8    some of those things because arguments of counsel are not

9    factual; in fact, they can be proven to be not true because

10   the facts alleged by Mr. Harris are not true.

11           Now, there are five pending cases brought by the

12   Acthar plaintiffs, the ad hoc group of Acthar plaintiffs.

13   The City of Rockford filed a case in April of 2017 on the

14   heels of the Federal Trade Commission prosecution of this

15   company.  And I'm going to try and cover as much of what Mr.

16   Harris said early on, so that I can try to clarify a number

17   of things.

18           I believe he represented that the FTC did not

19   prosecute Mallinckrodt, but instead prosecuted a predecessor

20   entity by the name of Questcor.  Well, it's an interesting

21   sleight of hand, Judge, because Questcor, the company that

22   sold Acthar, that Mallinckrodt PLC paid 5.9 billion for in

23   August of 2014, is Mallinckrodt ARD.  Let me say that again.

24   Questcor is Mallinckrodt ARD, they're not separate entities.

25   In fact, the evidence would show for a time Mallinckrodt

1  continued to call the business Questcor.  It was located in

2  California, but they moved the headquarters to Bedminster,

3  New Jersey, not far from my office.  Questcor is Mallinckrodt

4  ARD.

5           When the government prosecuted this company in

6  2017, almost three years after the acquisition, it was

7  Mallinckrodt who settled and agreed to terms of an injunction

8  involving Synacthen, S-y-n-a-c-t-h-e-n, not Syancsen with an

9  S.  Again, it seems deliberate that we're adding Ses to the

10 words here and after all this time we shouldn't be doing

11 that.

12          And I found it very interesting for the first that

13 the debtor has revealed -- and I couldn't find this anywhere,

14 Judge, and we tried to scramble -- that this debtor has given

15 Synacthen to the company that sold it to them for $130

16 million.  The government, the FTC -- and, Judge, you need

17 look no further than the Rockford proof of claim, which

18 attaches the complaint filed in 2017, which attaches the

19 government's complaint and a Retrophin complaint -- if you

20 wonder who Retrophin is, well, Retrophin is a competitor to

21 Mallinckrodt -- Retrophin offered Novartis $16 million to

22 Synacthen.  This is in the complaint, Judge, and hopefully I

23 can just summarize.  I'm happy to go through the pleading.

24 This company came in at the eleventh hour and paid $130

25 million.  Now, why would a company do that?  Why would a

1   company overpay by that amount?

2           The government alleged and Martin Shkreli, the

3   infamous "Pharma Bro," the CEO of Retrophin alleged as a

4   whistleblower that this company did that to commit an

5   antitrust violation.  And the government and the company

6   settled and paid $100 million on top of the $130 million they

7   paid to Synacthen to resolve those claims and agreed to

8   license the medication to a new company, did that, but we

9   have evidence that goes to that conduct as well.  But we just

10  learned -- and I don't want to bury the lead -- we learned

11  for the first time this debtor, prepetition, gave it back.

12  So I hope the committees are listening because this is an

13  important $130 million sitting out there for a company that

14  paid for a drug that it never cared to use.  One hundred and

15  thirty million dollars.

16          But, Judge, we agreed with the debtors that this

17  dischargeability issue could be and should be deferred to

18  last week, to -- I think the deadline was June the 4th.  Now,

19  the debtors entered that agreement with not just the Acthar

20  plaintiff group, but also the federal government and a number

21  of other creditors, but only as to Rockford did the debtors

22  file a dischargeability complaint on April the 30th.

23          Now, why would they do that when they stipulated

24  to allow the creditor, who has the right to bring that non-

25  dischargeability complaint, why would they do that?  Why

1    would they jump the gun?  Well, they jumped the gun because

2    they filed summary judgment, because they didn't want to

3    follow the Rules of Civil Procedure, Rule 12, which questions

4    the standing, the ripeness, the claim or controversy, and now

5    we know by the summary judgment that they're only seeking a

6    legal opinion of this Court.  And I'll get to that in a

7    moment.

8              Mr. Harris represents and the pleadings say

9    they're accepting as true all facts.  Now, that's important

10   because they want to bypass the factual material facts in

11   dispute to get to the advisory opinion they're seeking today,

12   and that's what it is and that's, Your Honor, why we sought a

13   motion to dismiss.  Court's don't issue advisory opinions,

14   but that's what they're seeking from Your Honor and, I do say

15   with respect, that's why the motion was filed so the Court

16   could address its jurisdiction first and foremost.  Litigants

17   don't get to invoke federal court jurisdiction unless they

18   have an actual case or controversy, standing, and a ripe

19   claim, and aren't seeking an advisory opinion.

20             So we single out Rockford --

21             THE COURT:  Mr. Haviland, how is this --

22             MR. HAVILAND:  -- from the four other --

23             THE COURT:  -- how is this an advisory opinion?

24   They filed a complaint seeking to determine the

25   dischargeability of a proof of claim filed by the City of

1  Rockford, which they are allowed to do under the rules and

2  the code of this Court, so how am I providing an advisory

3  opinion?  I'm ruling on whether or not the claim that has

4  been filed by the City of Rockford is subject to

5  dischargeability.

6          MR. HAVILAND:  Your Honor, they're not asking you

7  to rule on the merits and the dischargeability under Section

8  523 because they don't want you to look at the facts.

9  They're telling you we agree to all the facts as pled, that's

10 just a legal question.  They say it's only a legal issue,

11 that's an advisory opinion.

12         Now, we don't accept that because we know from Mr.

13 Harris' opening they're arguing facts.

14         THE COURT:  No, they're --

15         MR. HAVILAND:  They're not accepting the facts --

16         THE COURT:  -- they're accepting your facts that

17 you alleged in your complaint.  You allege in your -- or your

18 proof of claim, which you attached to the complaint, the

19 complaint alleges facts.  They're saying all those facts

20 alleged in the complaint that haven't been dismissed by the

21 district court in Illinois are true and, based on that, the

22 City of Rockford does not have a claim that would fall under

23 the exception for dischargeability under 1141(d).

24         And, by the way, 523(a) is dischargeability for an

25 individual debtor, not a corporate debtor.  So that's why

 1  Rockford --

 2              MR. HAVILAND:  I understand that.

 3              THE COURT:  -- is being brought under 1141(d).

 4              MR. HAVILAND:  Judge, I want to just point out to

 5  the Court, we object to the submission by Mr. Merchant of the

 6  first exhibit, which is Claim Number 6439, which is the

 7  Rockford class proof of claim, the class issue is not before

 8  this Court.

 9              THE COURT:  Well, they didn't even ask --

10              MR. HAVILAND:  But they haven't given you --

11              THE COURT:  -- I haven't even looked at it and I

12  haven't been asked to look at it, so --

13              MR. HAVILAND:  Well, and I agree with that, and

14  that they haven't properly framed that there's no dispute of

15  fact.  We would ask you, Judge, to look at Claim Number 6822,

16  which is in the court file -- unfortunately, it's under seal

17  -- but that is the City of Rockford's individual claim --

18              THE COURT:  I did look at that --

19              MR. HAVILAND:  -- against Mallinckrodt --

20              THE COURT:  -- I did look at that and I actually

21  have a question about that because in the proof of claim,

22  there's an allegation made in that proof of claim that the

23  motion to dismiss in the district court in Illinois was

24  denied when clearly that is not true.  Why is that in there?

25              MR. HAVILAND:  It was -- because the motion to

1  dismiss argued facts about fraud and pointed out that facts

2  were not pled with particularity as to the fraud-based

3  claims.  On that, Judge Kapala dismissed without prejudice,

4  didn't make a finding that he rejected the claim, he said

5  that the claim was not sufficiently particularized under Rule

6  9(b) and granted leave to amend.

7          Judge, I'm glad you looked at the claim because

8  you'll notice in the addendum, which is Exhibit -- it's

9  called the Addendum to the Proof of Claim of the City of

10 Rockford, we talk about the existing case, the antitrust case

11 that's been proceeding since April of 2017, and the debtors

12 say they accept as true all the allegations of the

13 complaints, I want to read to you what the proof of claim

14 actually says.  That the proposed class, of which Rockford is

15 a part, is all third party payers and beneficiaries who pay

16 for Acthar.  It's not limited by antitrust.

17         There's a footnote that the debtors have ignored

18 and the footnote reads as follows:  "Because the discovery

19 was not completed in Rockford," the Rockford case, "the City

20 reserves the right to re-plead, replace, amend, or supplement

21 this proof of claim to include any claim at law or in equity,

22 including such claims brought on a class basis by the

23 represented by the plaintiff Steamfitters Local Union No. 420

24 v. Mallinckrodt ARD, *et al.*, as the City is a member of the

25 putative class in that case, as well as the Rockford case."

1          Our proof of claim clearly told the debtors we are

2    members of two classes which has survived Rule 12, the

3    Rockford case and the 420 case.  Again, they haven't brought

4    before you the Local 420 complaint, which is the complaint

5    that was filed on the heels of the unsealing of the DOJ case,

6    the *qui tam* case brought by three whistleblowers of this

7    company who said that this company was engaged in marketing

8    fraud involving doctors and kickbacks and free samples of

9    drugs.  And the Local 420 case goes in specific detail

10   talking about doctors, talking about the conduct, talking

11   about the kickbacks, mirroring, but also expanding upon the

12   government's claim.

13          And, Judge, I don't want to lose sight of the fact

14   they're settling the DOJ claims.  Your Honor last week

15   allowed discovery into that settlement to understand the

16   nature and scope of what the debtors have done with the

17   government, but it's in our proof of claim --

18          THE COURT:  Well --

19          MR. HAVILAND:  -- you don't have to amend

20   anything.

21          THE COURT:  -- hold on, hold on.  The fact that

22   the City of Rockford is part of a putative class -- which is

23   a putative class, it has not been approved, so that's still

24   an issue -- they can still only recover for the claims that

25   they actually have.  And I have before me evidence submitted

 1   by the debtors that in connection with interrogatories

 2   submitted in the Illinois action the City of Rockford

 3   identified two claims that they assert against the debtors,

 4   both of those are for on-label prescriptions for Acthar, for

 5   infantile spasms.  The fraud claims that you are referring to

 6   all relate to allegations that the debtors were engaged in

 7   marketing for off-label use of Acthar.

 8            So the question is, does the City of Rockford have

 9   off -- have they paid for off-label uses of Acthar?  And, if

10   they haven't, how do they have a fraud claim?

11            MR. HAVILAND:  They have, Your Honor.

12            THE COURT:  Then why --

13            MR. HAVILAND:  Let me just --

14            THE COURT:  -- well, then why in response to the

15   summary judgment motion did I not get a declaration from the

16   City of Rockford saying that they have?

17            MR. HAVILAND:  Because you have Exhibit C to the

18   proof of claim, Judge.

19            THE COURT:  There's nothing in there that says

20   that.  There's nothing in there that says the City --

21            MR. HAVILAND:  Sure there is.

22            THE COURT:  Show me where in the declaration it

23   says the City of Rockford paid for off-label uses of Acthar.

24            MR. HAVILAND:  Exhibit C, Judge, is an ASAP form

25   signed by Dr. Tracey Gertler of Lurie Children's Hospital in

1  Chicago, she has a diagnosis of a condition called opsoclonus

2  myoclonus syndrome, or OMS, which the debtors concede only

3  affects a hundred babies a year and is off-label, has been

4  off-label, is off-label, and this doctor prescribed that

5  drug, Acthar, for an off-label condition.

6           Now you're going to cite me back to the

7  interrogatory --

8           THE COURT:  What is the evidence that I have that

9  Rockford paid anything for that?

10          MR. HAVILAND:  It's in our complaint, Judge, that

11  we paid for two patients, two police officers' children, over

12  $500,000, and these are the two exhibits attached to the

13  proof of claim.  Exhibit B actually gives you detail of those

14  claimed payments.  If you look at that schedule, you'll see

15  the two patients' payments in there that Rockford paid for.

16  In fact, Dr. Gertler prescribed the medication for 52 weeks.

17  So OMS is the larger of the two claims as between the two

18  patients.

19          Your Honor asked about the interrogatory answers.

20  We object -- would have objected to the motion of the debtors

21  to extend the page limit on replies, Your Honor granted it,

22  that gave them the opportunity to for the first time in reply

23  on summary judgment put interrogatory answers from the City

24  of Rockford.  It's Exhibit A to the reply.  The objection

25  makes clear, Judge, Rockford objected to the use of this

1  interrogatory in any other proceeding.  Rockford pointed out

2  that the answer given at the time was based on this

3  information at the time available to it, and yet it also said

4  that there's information not within its control about this

5  payment for Acthar, and it reserved the right to amend those

6  interrogatory answers.

7          Judge, if you look at the Exhibit C to the proof

8  of claim, it's Express Script's document, 0332098 going

9  through to -99, to prove -- the ASAP form signed by Dr.

10  Gertler for OMS, an off-label condition, has a patient

11  authorization.  And if you see the complaint filed by

12  Rockford, Exhibit A to that complaint has this blank ASAP

13  form as the starting point of the fraud, whether it's

14  antitrust, consumer fraud, or just plain old garden-variety

15  fraud.  This was the ignition switch; this is why they

16  engaged doctors.  Dr. Gertler never sought a patient's

17  consent.  If you look on the form, she wrote, "N/A," not

18  applicable.

19          Now, I'm going to get to that in a moment why we

20  believe that's the case.  If you look at the prior form, Dr.

21  Millichap in the same hospital actually got the patient's

22  consent for infantile spasms, as Your Honor points out, an

23  approved condition as of 2010, but not the only choice of

24  therapy for babies with IS, but the mother signed.  As to the

25  OMS patient, I'll call them patient B, the doctor wrote,

1  "N/A."

2          Let me talk to you about the interrogatory in a

3  moment, because when we answered that, the City of Rockford

4  answered, it said that Rockford administered -- that it had

5  two patients, which Your Honor understands there's HIPAA

6  protection for patients, the City of Rockford honors that, it

7  doesn't have direct optics into an individual patient's

8  disease state -- it believed at the time that the two

9  patients, given that they were babies, were treating for IS,

10 it didn't know at that time what the defendants knew and have

11 known since 2017 that the second patient treated for OMS, an

12 off-label condition.

13         Now, perhaps it's the appropriate time to point

14 out to the Court that we issued subpoenas for appearance

15 today -- and I have the affidavits of service I'd like to

16 offer into the record, I'll send them to Mr. Cavello and Mr.

17 Harris -- the doctors were served last week for this hearing

18 to appear and testify to explain that situation.  We have not

19 heard back.  They are not here, I don't believe, I haven't

20 seen them on the Zoom when I was watching the 156-some-odd

21 people, and if they are I'd like to examine them on the

22 record because it is a contested factual issue if the debtors

23 are going to argue that these babies were treated for IS,

24 they clearly were not, the evidence shows otherwise.  And I

25 haven't gone outside of the proof of claim, Judge, I'm still

1  within the four corners of the proof of claim.

2         Now, the reason why we did the 56(d) affidavit was

3  to point out to the debtors that you're not going to be able

4  to put the blinders on to the situation of Rockford where

5  they've got two babies, $500,000 or more, one clearly off-

6  label.  It begs the question, why and how did that baby get

7  that medication and why did Rockford have to pay almost

8  $45,000 for a medication that used to cost $40.  Whether you

9  call that antitrust, RICO, consumer fraud, common law fraud

10 -- you just heard from Humana, who filed a RICO and antitrust

11 case, RICO for the same conduct that the DOJ is litigating

12 that the debtors are settling, and yet the debtors haven't

13 filed a claim for dischargeability as to Humana.

14         I come back to my initial point, but I want to go

15 through the fact that the 56(d) goes well beyond what's

16 needed here because the debtors haven't satisfied their

17 initial burden.  They haven't put anything before the Court.

18 They haven't offered into evidence the interrogatories; it's

19 attached to a reply that we would have objected to extending

20 because it says no less than six or seven times we object to

21 its use in a court proceeding outside of Rockford.

22         And I want to pause for a moment, Judge.  May

23 27th, the Judicial Panel on Multi-District Litigation had a

24 hearing, and Ms. Marks attended for the debtors and she

25 represented the seven federal district judges that Rockford

1   was getting all the discovery it needed to prove its claim

2   and, therefore, you didn't need to consolidate all these

3   cases.  Well, Judge Kennelly of the Northern District of

4   Illinois said to Ms. Marks, we don't send MDLs to bankruptcy

5   judges, we send MDLs to Article III judges.  So your argument

6   about dual tracking and economies of scale doesn't fly with

7   the panel because whatever happens -- and it's going to

8   happen, we're going to get a ruling -- the panel is going to

9   consolidate all the Acthar cases, and that includes Humana

10   and the Blues and Marietta and our five cases -- in one

11   Article III court.

12         So, Your Honor, I should have led with this, but

13   we jumped right into a lot of issues.  The debtors don't want

14   discovery, they don't want it; they don't want to have to

15   answer these questions, they don't want to have to

16   demonstrate what I said is untrue, that OMS is off-label, and

17   they know it.  When I'm done, Mr. Harris will not deny that.

18   I've got PowerPoints to show otherwise.  They did debtor

19   investor presentations that show otherwise.  And I'm happy to

20   spend the balance of my time showing the Court the evidence,

21   but that's not my burden when they haven't raised the lack of

22   a material fact in dispute.  They simply went on a diatribe

23   this morning, and I do want to spend a little bit of time on

24   that.

25         Mr. Harris said to you that -- he admitted that

1  Acthar is a late-line therapy, but what they don't tell you
2  and the 420 complaint says -- and it's not limited to MS and
3  I want to underscore that, Judge, I want to underscore that
4  the government's case -- and it's attached to Mr. DeWitt's
5  affidavit as Exhibit B, it's a hefty document -- does not
6  limit off-label promotion and free sample fraud.  And that's
7  the government unsealing and intervening in a case brought by
8  three whistleblowers.  They're not my clients, Judge, they're
9  their employees.  In this very hefty complaint the government
10 says through Relator Prada (ph), who's a sales rep, paragraph
11 12, that the company promoted Acthar for off-label uses to
12 neurologists.  Well, neurologists also treat babies with IS
13 and OMS.

14         And if you read through, Judge, the allegations
15 are not limited to MS.  Paragraph 20, "At all times relevant
16 hereto, the defendant and its neurology sales specialist
17 promoted Acthar to health care professionals for off-label
18 uses."

19         If you continue on -- and this is a good paragraph
20 which differentiates MS -- the purpose of the fraudulent
21 marketing scheme in paragraph 33, "It was the intentional
22 plan and purpose of Questcor's scheme to illegally market HB
23 Acthar beginning at least as early as 2007 and continuing to
24 the present."

25         The present is the date of the pleading, June

1    2017.  Why is that important?  The company knew when

2    Rockford's patients were treating at a Chicago hospital that

3    they were getting an off-label medication in 2015.  The

4    company knew in June of 2017 that the government had alleged

5    it was off-label promotion.  Rockford sued in April, two

6    months before, but did the debtors tell Judge Johnston or

7    Judge Kapala, well, wait a minute, Judge, we think you should

8    know that we have these *qui tam* whistleblowers, some of our

9    own, who have turned state's evidence against us -- and by

10   the way, Mr. Harris pointed out, the investigation actually

11   started in 2012 by Skadden Arps talking to the board of

12   directors -- and I put that in the record already -- advising

13   the company about the allegations of these three

14   whistleblowers, which continued in 2012, 2013, 2014, 2015 --

15   that's Rockford -- 2016, and 2017, when this complaint was

16   filed, which says, paragraph 33, "continuing to the present

17   as a subsidiary of Mallinckrodt" -- not Questcor -- "in order

18   to increase the sales of Acthar provided valuable

19   remunerations to induce and encourage physicians to promote

20   and prescribe the drug for on and off-label uses" -- on and

21   off-label uses -- "IS and OMS, illegally promoted the drug to

22   health care providers and patients using false, deceptive,

23   and misleading methods and means that are beyond the limits

24   of FDA approval."

25              And if you go forward in the complaint, Judge,

1    there's an entire section that goes on for pages about how it

2    is unlawful for a drug company to promote its medication for

3    off-label uses.  OMS is, has been, and is today off-label.

4            Now, I have evidence that Dr. Millichap has been

5    paid to do studies and I'm happy to share this with you,

6    Judge -- I'm just going to make a proffer because he's not

7    here, and I'd suggest at an appropriate time we should get

8    his deposition before you rule in a vacuum about facts and

9    evidence -- he has no less than three studies on Acthar

10   beginning in 2012, for which he was paid, for which he got

11   free samples, which the government alleges was wrong.  And he

12   published three studies, only one of which, by the way, he

13   discloses he's been paid by Mallinckrodt, only one and it's

14   not even him, it's another doctor on the study, but there's a

15   clinical agreement -- I'll give counsel the benefit of the

16   Bates number, MNK-00731979 -- which was produced to the

17   Federal Trade Commission as QCOR-00995192.  I can't share it

18   with the world, Judge, because they're not part of Rockford

19   and it's under a confidentiality order, but that is the

20   clinical study agreement for an IIS, investigator-initiated

21   study, between Dr. Millichap and Questcor, paying him to

22   study the uses of Acthar outside of the appropriate uses, and

23   that's what the government sued over.  It doesn't want drug

24   companies paying doctors to experiment on their patients.

25           Now --

1          THE COURT:  Let me ask you a question --

2          MR. HAVILAND:  -- we put in the record --

3          THE COURT:  -- Mr. Haviland, let me ask you a

4    question -- do you agree that if the only claims the City of

5    Rockford has are for on-label use of Acthar that they would

6    not have a claim for fraud?

7          MR. HAVILAND:  No.

8          THE COURT:  And what's the basis for that?

9          MR. HAVILAND:  I'm going to send you a public

10   document, Your Honor, it is -- there's an advisory opinion

11   that was --

12         THE COURT:  Don't send me anything, it's not --

13   you know, just tell me what you have.

14         MR. HAVILAND:  Okay.  In November of 2018, Law360

15   published an article that Mallinckrodt could face kickback

16   sanctions due to a plan to provide free vials of Acthar to

17   hospitals as part of a program that they told the government

18   they wanted to start to use Acthar at the hospital as the

19   ignition switch, to start babies who present in the hospital

20   on Acthar, because the government knew how important that is.

21   If you start a baby on therapy, if it ain't broken, you're

22   not going to fix.

23         It's that Law360 article that unsealed the fact

24   that the OIG had an anonymous letter, it's Advisory Opinion

25   18-14, the requestor was Mallinckrodt.  Mallinckrodt asked

1  for advice from the government about whether it would be

2  illegal for them to provide free samples of Acthar to

3  hospitals.  They had already been doing it, Judge, since

4  2007, they just waited 11 years to ask for the government's

5  opinion.  In 2015, they were doing it.

6           We don't know whether these patients were given a

7  freebie, so that when the mom left with the baby with OMS she

8  had to pay for 51 weeks and Rockford had to pay the big bill

9  because she got a free one that the government says was

10 illegal then, was illegal at the time of the request -- and

11 the company has this advisory opinion, they know about it,

12 that's why they don't want to talk about the facts.

13           THE COURT:  Well, the OMS --

14           MR. HAVILAND:  So, yes, it's fraud --

15           THE COURT:  -- let me just make sure I'm clear on

16 this -- the OMS is an off-label use, correct?

17           MR. HAVILAND:  Correct.

18           THE COURT:  All right.  So I'm asking you about

19 on-label uses.  What's your evidence --

20           MR. HAVILAND:  Yes.

21           THE COURT:  -- what is the evidence that there's

22 fraud even if the only thing Rockford paid for was on-label

23 uses of Acthar?

24           MR. HAVILAND:  Because, Judge, if the company

25 promoted a freebie to get a patient hooked on IS treatment,

1   what they're doing is they're trying to take away the

2   doctor's decision-making about Vigabatrin and other

3   treatments.

4          Acthar is not the only thing to treat a baby with

5   infantile spasms.  Only half of the prescriptions actually go

6   to Acthar.  Where do the other half go?  They go to other

7   cheaper medications.  So when the company wants to go in a

8   hospital and give a bunch of free samples that the government

9   says is a kickback, that's fraud.  You're starting the baby

10  on a fraudulent condition because you're taking away the

11  decision-making and that's why the N/A on the form is so

12  important.  Was this discussed with the mother?  Did she

13  understand that, yeah, you're going to get the first one

14  free, but you're going to leave the hospital and you're going

15  to have to pay for that, your city is going to have to pay

16  for that, your insurer is going to have to pay for that.

17         The government told the company in 2018 it was

18  wrong to do it, they had been doing it since 2007.

19         Now, the other evidence we have, Judge, is the

20  marketing of Acthar for IS conditions.  Again, I won't send

21  it to you, but I'll make a proffer.  In 2011, Bates number

22  MNK-02713029 through -045, it's a managers meeting for IS

23  marketing -- IS marketing.  The author is a woman by the name

24  of Julie Wilson, who was deposed by the FTC as part of this

25  investigation.  In that document, they talk about promoting

1  for IS.  Now, why would you promote for IS?  Because you have

2  to capture that marketplace.

3         The big problem here with this company, Judge, is

4  they took a medication that used to cost 50 bucks and they

5  jacked the price and doctors said we're not going to

6  prescribe it.  So they had to go market it.  They had to go

7  into the hospitals and convince doctors that it was valuable.

8  And that's where the fraud comes in, because it worked at

9  $40, it doesn't work any better at $46,000, the current

10 price, so they had to market it.  And why this document is so

11 important is because -- why IS?  It says, "It's a cash cow

12 because reimbursement for IS is solid."  That's the platform

13 by which they went out and sold to other (indiscernible)

14 states.

15        But then on slide 37, it's the Bates number, the

16 marketing managers looked at six reps, six sales reps that

17 were selling in IS and pointed out the hospital sample vial

18 program that I just pointed out to the Court.  And on the

19 slide 37, "IS selling situations.  Price, story, and counter-

20 selling, how it works."

21        And it looked at six sales reps, one of them was

22 Kelly Nauman, N-a-u-m-a-n, Children's Hospital of Chicago,

23 where Drs. Millichap and Gertler were at the time and are up

24 until the time it became the Lurie Hospital.

25        The note says, "Parents decide."  Now, think about

1  that, parents decide.  So they have to counter-detail the

2  parents' decision.  That's the OMS, N/A, no parents'

3  decision, you just bypassed that entirely.

4          But the next name is really important, Nick

5  Brunetti, B-r-u-n-e-t-t-i, in Denver.  Now, Mr. Harris said

6  to you that the government's case only involved MS.  Judge,

7  attached to Mr. DeWitt's declaration we put the settlement

8  agreement between these debtors and the DOJ from September of

9  2019.  Now Alex Partners is engaged, this is the debtor

10  preparing for bankruptcy, this is a settlement of a portion

11  of the government's case.

12          And if you go to the exhibit to that, it's Exhibit

13  A, there's a letter agreement with John Bentivoglio of

14  Skadden Arps and the U.S. Government and it says, "Dear Mr.

15  Bentivoglio, the United States contends it has civil claims

16  as specified in paragraph 3 against Questcor for engaging in

17  the conduct described in this paragraph," and alleges that

18  "12 Questcor sales representatives marketing Acthar provided

19  illegal remuneration to health care providers in the form of

20  lavish meals and entertainment with the intent to induce

21  Medicare referrals in violation of the AKS," which is the

22  fraudulent statute that they sued under.

23          Attachment A has the 12 names, Nick Brunetti is

24  listed.  Nick Brunetti promoted IS, he's in the managers

25  meeting from 2011.  So when I point out to you, Judge, that

1    the government didn't limit its complaint to MS, it talked

2    about promoting for off-label, there is the evidence.

3            By the way, you don't have to leave the complaint,

4    which we put in Mr. DeWitt's affidavit, it says repeatedly

5    that this company was promoting for off-label uses, it says

6    in the complaint that's illegal.  The company settled that

7    and agreed that Mr. Brunetti was one such person, he promoted

8    for IS.  There's your connection.  Kelly Nauman promoted at

9    the Chicago Memorial Hospital where the doctors are.

10           Now, Judge, we asked a witness to appear today,

11   Dr. Steve Romano, who's the head medical director of

12   Mallinckrodt.  We were told by Mr. Harris over the weekend

13   that he's unavailable.  He had a personal commitment, I

14   understand that, but we wanted a witness to be able to

15   examine before the Court on these issues so that I'm not

16   doing what Mr. Harris is doing, just talking about facts via

17   documents.  We can have an evidentiary record.

18           And going back to the point, Your Honor asked

19   about IS.  If they're promoting for IS to cheat the system,

20   so that a doctor is not going to give Sabril, Vigabatrin, a

21   cheaper medication, because they're putting their finger on

22   the scale by giving freebies away, giving doctors these

23   lucrative contracts to do studies on their patients, that's

24   fraud.  That's the government's case that they're settling.

25   And we incorporated those allegations into the Rockford proof

A-6545

1  of claim in a footnote.  We didn't repeat them because the

2  complaint has it.  The 420 complaint attaches the

3  government's *qui tam* complaints, both Ms. Scott-Clarks, Lisa

4  Prada, and Charles Strung (ph).  If you take all those

5  complaints together, you see a pattern of the company using

6  sales reps to go out there and engage doctors as key opinion

7  leaders or KOLs.

8          And this is where there's a nice connection to the

9  opioid case, Judge, and it's taken me a while to make that

10  connection.  One of the primary issues that opioid plaintiffs

11  allege is drug companies paid key opinion leaders, KOLs, to

12  go out and teach doctors about the fifth vital sign, pain.

13  Now, we know there is no fifth vital sign, but the drug

14  companies created that by paying doctors.  That's the case.

15  There's other factors to it too, but that's one of the

16  primary cases before the judge in Ohio.  Well, Mallinckrodt

17  did the same thing with Acthar, it paid KOLs.  It actually

18  had a group, 12 people -- by the way, one of them, Michael

19  Dittenbrenner (ph), is on the settlement agreement, he was a

20  KOLL, a key opinion leader liaison.  His job was to go out

21  there and liaison to the doctors.  Again, one of the 12

22  people that this company in September of 2019 admitted was

23  doing wrongful conduct.

24          Not my evidence, Judge, the evidence of record in

25  the DOJ case.  We ask you to take judicial notice of it, of

1  course, but it doesn't answer the ultimate questions about

2  the fraud.  That's fraud, the government says it's fraud, and

3  Rockford has two cases, IS promotion at the hospital setting

4  and OMS for off-label.

5          Judge, I'm mindful of the fact that, you know, I'm

6  arguing against an empty chair.  You know, Mr. Harris spent

7  quite a while -- and I just pointed out about the samples --

8  he said, we give away free samples.  Yeah, but he forgot to

9  tell you that the government went after them for that, that

10 the entire patient assistance program is still a live issue

11 in the Scott-Clark case.  That's right, that's fraud.

12 They're giving away samples to take away that hook.  Payers

13 want patients to have some skin in the game, so when they

14 have these programs to try to take the patient's skin in the

15 game out, that's fraud.  The government calls it a kickback;

16 we call it fraud, because we want to know that the patients

17 are getting the best medication for the best value to treat

18 their condition.  When a drug company like this has a doctor

19 write a script for 52 weeks for a condition that's never been

20 tested, never proven, that's a problem.

21          And I notice in a portion of the complaint brought

22 by the relators, there was a line in there that I want to get

23 my fingers on, but it pointed out that Acthar is not

24 indicated for folks who are getting vaccinations.  Now, think

25 about that.  That's why time matters.  I hope everybody on

1  this call has been vaccinated, but think about all the people

2  that have been vaccinated that are now getting Acthar.  You

3  want to talk about harm?  That's harm.  This company is not

4  going to the FDA saying, hey, we're going to do a study of

5  Acthar treatment of people who got vaccinated for COVID-19.

6  But the *qui tam* relators said as a fact, a fact that's the

7  case.

8        So assume all facts to be true.  I agree with Mr.

9  Harris.  And in his reply brief he says the complaints, the

10  complaints, because the Rockford complaint isn't the end of

11  the story.  Rockford in 2017 attached the FTC complaint and

12  the Shkreli complaint, Retrophin; 420 attached the two *qui*

13  *tam* relator complaints; and Rockford attached all of that to

14  its proof of claim.

15        The debtors want you to put your blinders on,

16  Judge, and just focus on Rockford and say, nothing to see

17  here, it's just a purely legal question, we're going to tell

18  you why we're not doing these things because, oh, today we

19  learned for the first time they gave Synacthen back, isn't

20  that interesting.  We'd like to know why that is because

21  perhaps they'll make the argument that that undermines the

22  antitrust claim going forward.  We just heard that for the

23  first time, but the bottom line is we haven't gotten

24  discovery.  And I would suggest, Your Honor, the best way,

25  the most practical way to deal with this issue is to defer

1  this to the scheduling conference so that Mr. Romano, who we

2  believe is the person most knowledgeable at the debtors about

3  these issues, these factual issues in dispute, can testify.

4  We're happy to convert that appearances today into a

5  deposition notice, and the same with the doctors.  I expect

6  we're going to probably get a call from corporate counsel

7  sometime today asking about it and I'd like to report that

8  we'd just like to set up a Zoom dep to ask those questions.

9           But to suggest that there's no material fact in

10  dispute on this record and you've got a proof of claim that

11  made very clear that Rockford was part of 420 -- and let me

12  just address the issue of the why didn't Rockford amend,

13  right?  So the judge granted leave and, yes, he set a 45

14  deadline because he wanted discovery to begin.  But what the

15  debtors haven't told you, and Arnold & Porter is not here to

16  answer for themselves, they didn't want all the discovery of

17  the 420 claims going forward in Rockford.  They bifurcated

18  the two.  They said, no, no, we just want to focus on

19  antitrust.

20           So when they say we've got a lot of discovery,

21  that's right, but as Mr. Welch testified in support of the

22  preliminary injunction, we didn't get everything, and that's

23  why they got the injunction.  Completing discovery was going

24  to cost so much.  We got some depositions, not all.  We

25  didn't get Mark Trudeau, we didn't get Mr. O'Neil (ph),

1  number one, number two, even though they filed a motion under

2  the Apex rule to prevent those depositions; they lost that.

3  I understand now that other creditors want to examine those

4  witnesses, so do we on these issues.  I have Mr. O'Neil's

5  presentations on these issues.  And we'll do a corporate

6  designee as well and maybe they'll put Mr. O'Neal up or not.

7              But to suggest that we don't get to take that

8  discovery because we're just going to look at Rockford as it

9  was pled in April of 2017, when the judge said, I don't see

10  particular allegations, but I'm going to give you leave to

11  re-plead down the road, Judge, the MDL judge is going to

12  decide those issues.  The first order of business when

13  there's coordination and consolidation, should there be one

14  complaint.  That judge is going to decide should all this be

15  in one place -- which, by the way, to Ms. Marks' point to the

16  panel -- you're dual-tracking, but at least it's all

17  streamlined.  In the Article III court, prepetition, post-

18  petition, ongoing post-discharge is all in one place.  And I

19  suggest to Your Honor that makes your job easier.  You get to

20  focus on the bankruptcy issues and let the Article III judge

21  focus on the other issues that don't directly relate to the

22  plan, the approval, and the issues that you have to deal

23  with.

24              But to suggest that we got all the discovery we

25  needed, we got no discovery in Local 420, none, not a

99

1  document, not a deposition.  And to underscore that, Local
2  542 has an individual complaint that named the three doctors
3  who treated the three patients of Local 542, pointed out that
4  they were getting promotions --
5          THE COURT:  Mr. Haviland --
6          MR. HAVILAND:  -- from --
7          THE COURT:  -- Mr. Haviland, we're getting off of
8  the Rockford proof of claim.  So I'm going to ask you to wrap
9  it up because I have other things I need to attend to.  So,
10 if you have something else you want to address to the
11 question of whether or not the Rockford proof of claim is
12 subject to dischargeability, go ahead.
13         MR. HAVILAND:  So, Judge, I wasn't off topic
14 because in fact Local 542 is incorporated in Local 420, which
15 is incorporated in Rockford.
16         But the point is the debtors just want you to
17 focus on one issue.  In fact, they want to put before you a
18 class proof of claim that can't be dismissed, there's no
19 class certified.  That's an issue that's coming down the
20 road.
21         My suggestion, Judge -- and, look, if you're going
22 to grant summary judgment, that's a final judgment, we'll go
23 to the appellate court.  I'm going to submit to you on this
24 record -- and if you're going to do that, I would ask leave
25 to submit everything I cited and then some, because there's a

1  factual record that the Court should look at and it relates

2  to Rockford, directly to Rockford, what these doctors did,

3  what this company did in the Chicago Memorial Hospital where

4  these babies treated, Rockford had to pay a lot of money.

5         I'll leave you with this.  We are the largest

6  plaintiff.  We put a $3.8 billion claim in.  They want to

7  tell you how important Humana is, they're not.  They're part

8  of the class, Judge.  If the debtors really wanted to wrap

9  this up, they start working with class counsel, keeping all

10 the Acthar claims in one place.  See, they don't point

11 something out to you, Humana is one of the largest companies

12 that sells Acthar through its specialty pharmacy.  So it's an

13 interesting problem for Humana.  There's just like Accreto

14 (ph) at Express Scripts.

15        But I say that only to point out because Mr.

16 Harris thought it was relevant that they have this funder.  I

17 don't know how that was relevant.  But if you're going to

18 look at the size of the claims, look at it in the context

19 that taking out Rockford, which is what they're trying to do,

20 it has nothing to do with the plan confirmation, because I

21 heard last week everything goes to the plan confirmation,

22 this should too.  That's what was just argued with the folks

23 at Humana.  But somehow this issue, this one client who has a

24 $1.3 million claim, this is so mission-critical to this

25 company, it can't get its plan confirmed unless you grant

1  summary judgment today.  I don't think there's a record for

2  it, Judge, I don't think they've met their burden.  If they

3  had, then the burden shifts to us, but ultimately shifts back

4  to them because you assume as true the facts in our favor,

5  not the movants.  They tried to switch that by making their

6  complaint an adversary complaint where somehow you don't look

7  at the underlying complaint that alleges the facts.  And I

8  didn't see a case in any of their filings that said you could

9  shift the burden like that and somehow just ignore the facts.

10  I think why they say it's just a legal question, which

11  perhaps is just an advisory opinion.

12         But, Judge, we ask that you put this off to allow

13  the record to be developed.  If not, then when?  Because we

14  filed on Friday four adversary complaints, one for Local 420,

15  one for Local 542, one for Local 322, and for Accumen (ph),

16  two of them are class complaints, Your Honor.  Local 420 is a

17  class action, which is before Judge Schiller in Philadelphia,

18  it will be part of the MDL when it gets consolidated in a

19  week or so.

20         Thank you, Your Honor.

21         THE COURT:  Thank you.

22         Mr. Harris?

23         MR. HARRIS:  Thank you, Your Honor.  I will try to

24  be brief and focus this on the Rockford's proof of claim.

25         Just to clarify, we only brought the adversary

1    proceeding against Rockford because Rockford is the only

2    governmental entity among the ad hoc Acthar group.  And Mr.

3    Haviland mentioned, despite that, they just filed four

4    dischargeability complaints brought by non-governmental

5    entities, which is startling, and we will be asking them to

6    withdraw them as they are frivolous.  But that aside, that is

7    why we only brought this against the City of Rockford, it's

8    the only governmental entity.

9          Next point.  The claims that are actually in the

10   proof of claim -- proof of claims by the City of Rockford are

11   dischargeable.  You didn't hear anything about that.  We're

12   entitled to summary judgment that those claims are

13   dischargeable, there's no dispute about that.

14         Next point.  Everything you just heard about and

15   everything that we're talking about now is about a different

16   issue, whether they should be granted leave to amend and,

17   likewise, to conduct 56(d) discovery to include new claims

18   and discovery on those new claims that they didn't include in

19   their February of 2021 proofs of claim.

20         The first problem with that is it is procedurally

21   wrong and improper.  Everything you just heard, every piece

22   of evidence or whatever you want to call that that you just

23   heard, was available to the City of Rockford before February

24   2021.  So if they wanted to include a marketing fraud claim

25   on whatever basis, they could have done it.  Why is that

1  important?  Because it means there is no excusable neglect

2  for their failure to include it.  And that means, the cases

3  are very clear, you cannot add a new claim to a proof of

4  claim after the bar date unless there's excusable neglect,

5  and they gave no attempt to explain why they couldn't have

6  included this in February 2021 --

7              THE COURT:  Well, Mr. Haviland would say --

8              MR. HARRIS:  -- that means they don't get --

9              THE COURT:  -- Mr. Haviland would say we did

10  include it because we attached other complaints for these

11  unions that include claims for marketing fraud and as a part

12  of the City of Rockford's claim.  How do you respond to that?

13             MR. HARRIS:  Your Honor, what they did was they

14  included a footnote, the City of Rockford included a footnote

15  reserving its right in the future to amend to include those

16  claims.  You can't modify the rules by your own statement.

17  They don't get to change the rules for amendment just by

18  saying they do.  They could have included it then and they

19  chose not to.  I think I know why they didn't, because they

20  don't have a claim, but just the fact that they included a

21  footnote reserving their right to do it doesn't mean they in

22  fact can do it unless they justify the standard, which is

23  excusable neglect.  Nothing, there was nothing to explain why

24  they couldn't have included this in February 2021 if they had

25  a claim because there is no reason, everything you just heard

1  they had.  But they don't get to avoid the rules just by

2  including a footnote reserving their rights, I guess, to

3  violate the rules.  And that's the problem here:

4  procedurally, they can't do what they want to do.

5          The other point here is that, even if there wasn't

6  a procedural bar to their claim, which they don't make any

7  attempt to get over that bar, it would be futile.  So we're

8  having a back-and-forth now about whether the two

9  prescriptions they paid for were only about infantile spasms,

10  which is what they admitted in the interrogatory response in

11  January 2020, or does it also include a second condition

12  called OMS.

13          By the time they submitted that January 2020

14  interrogatory response, they had all the evidence that

15  they're talking about now.  That Exhibit C that they've

16  referred to, those forms from 2015, they had those.  You can

17  look at the Bates stamp, they were produced by ESI (ph) in

18  the City of Rockford litigation in 2019, before the City of

19  Rockford made its interrogatory response.  I don't know why

20  they answered the way they did.  Maybe they have other

21  evidence to indicate that in fact it is all infantile spasms,

22  I don't know, but that's what they said.  It is admissible

23  evidence in a motion for summary judgment under Rule

24  56(c)(1)(A)(i), which specifically allows the underlying

25  admissions and interrogatory answers.  So that's what they

1  admitted.

2          But, more importantly, it doesn't even matter.  If

3  one of their prescriptions was for OMS, they still don't

4  explain how they have a claim because nothing in anything

5  that you just heard about has anything to do with marketing

6  for OMS.  There's nothing about that in the *qui tam* actions.

7  If you read their opposition brief, they say we'll give you a

8  preview of what our amended claim will look like.  Go look at

9  Steamfitters.  I looked at Steamfitters, it has nothing to do

10 with OMS or infantile spasms.  Nothing else they tell you to

11 go look at, the *qui tam* actions, the other complaints, none

12 of them have anything saying that there was anything wrong

13 about the marketing of OMS.

14          So even if they -- one of their two prescriptions

15 was for OMS, they're missing the other half of the equation,

16 which is did -- does anyone say Mallinckrodt did any improper

17 marketing of OMS?  They don't say that.  None of the

18 complaints that they allege say that.

19          The more general point is, if they wanted -- that

20 everything you just heard could have been in the proofs of

21 claim or it could have been in a sworn 5060 declaration.

22 This is a summary judgment motion.  If they want to resist

23 summary judgment and put in evidence, what you do is you

24 submit a declaration attaching the evidence.  They didn't

25 attach any of this, today is the day to do it.  If you need

1  new discovery, then what you do is you submit a 56(d)

2  declaration.  They did do that, but that said nothing about

3  OMS.  So their 56(d) declaration doesn't say anything about

4  wanting to do discovery for OMS marketing or wanting to do

5  discovery for an on-label claim, it says the exact opposite.

6         So there's -- we're here on a motion where there's

7  rules on how you're supposed to respond to it.  You put

8  things into evidence by declaration that you're going to rely

9  on or you ask for new discovery by a 56(d) declaration.  What

10 they have done is clearly improper under both of those to

11 resist discovery -- or to resist a summary judgment ruling.

12 So that's why you are now left with this, I guess, plea to

13 put this all off so they can go and get more evidence.  Let

14 me just address that briefly.

15         On the testimony from these two doctors in Chicago

16 that Mr. Haviland indicates they want to testify, he waited

17 until the business day before this hearing to attempt to

18 subpoena them.  He's known about this hearing for six weeks.

19 In addition, those trial subpoenas, which I've never seen,

20 would clearly be improper because those doctors are over 100

21 miles away from the Court.  If he wanted to depose them to

22 get evidence for summary judgment, he had six weeks to do

23 that and he didn't.  So you can't delay and use your own

24 delay as an excuse to adjourn a hearing that he's known about

25 for six weeks.

1          The same is true for his desire to depose a person

2    at Mallinckrodt, Dr. Steve Romano.  Again, the business day

3    before the hearing, Friday, he first attempted to notice him

4    through a completely improper procedure, something called a

5    notice to testify that he emailed to counsel.  There is no

6    such thing.  If he wanted Mr. Romano to testify, then he

7    needed to serve a subpoena under Rule 45 and to do it on a

8    timely basis.

9          So they've known about this hearing for six weeks,

10   they had an obligation to come to this hearing with their

11   evidence by submitting declarations with the evidence they

12   wanted or submitting a declaration specifying what additional

13   discovery they needed.  They didn't do anything that

14   satisfies that burden to resist summary judgment now.

15   There's nothing in that 56(d) declaration that explains what

16   are the prescriptions they issued, that they want marketing

17   about those particular prescriptions, all it talks about is

18   an off-label MS-focused discovery that has nothing to do with

19   the actual claims that they now seek to bring.

20         So we're entitled to summary judgment on what's in

21   the proof of claims; procedurally, they're not allowed to

22   amend them or to get 56(d) discovery on new proof of claims

23   unless they show excusable neglect, which they don't even

24   attempt to do, and it would be futile anyway.

25         THE COURT:  All right.  Thank you, Mr. Harris.

```
 1              Mr. Haviland, I'll give you one minute.

 2              MR. HAVILAND:  Thank you, Your Honor.  Three quick

 3    points.  Number one, Rockford is not the only government

 4    claim.  The County of Dakota, Nebraska filed a proof of claim

 5    at 58985313, so that disavows that argument.

 6              As far as delay, we didn't get a reply brief which

 7    raised factual issues of an interrogatory until June 2.  We

 8    acted within 48 hours by Friday.  The debtor set the schedule

 9    over our objections.

10              Number three, as far as modifying the rules, Your

11    Honor should take judicial notice of the number of times that

12    the debtors have come to you with stipulations with the

13    Blues.  They allowed them to file aggregate proofs of claim

14    in advance of the bar date, they've allowed them to

15    supplement those proofs of claim this week with backup.

16    We've asked for the information behind those deals, we got a

17    hundred emails.  So when I tell you that Rockford is being

18    targeted, I'm not just saying it, it's happening.  They want

19    to argue we're modifying the rules, we're following the

20    rules, we did follow the rules.  And our proof of claim, if

21    you compare it to any other Acthar plaintiff, it's as robust

22    as any in this case.

23              Thank you.

24              THE COURT:  All right.  I'm going to take the

25    matter under advisement, I'll issue a ruling in due course,
```

1 which will also include my ruling on the motion to dismiss,

2 and hopefully we'll get that out this week.

3          Anything else for today?  I know you have the

4 motion -- there was a motion to -- a motion to quash?

5          MR. HAVILAND:  We do, Judge.  And I didn't -- I'm

6 sorry, I didn't hear that the debtors were looking to take

7 Mr. DeWitt's deposition.  I think they proceeded today

8 without that.  So I don't know if that moots it or -- because

9 Mr. Mincieli from Meyers & Flowers is prepared to argue that.

10          THE COURT:  Well, I think they were actually

11 looking to --

12          MR. HAVILAND:  Your Honor, I --

13          THE COURT:  -- they were looking to take a

14 30(b)(6) of Rockford, not Mr. DeWitt's, but I guess the

15 Rockford folks could identify Mr. DeWitt as a 30(b)(6)

16 witness.

17          But I think at this point, until I rule on the

18 summary judgment motion, I'm going to just hold that in

19 abeyance until I make that ruling.

20          Anything else?

21          MR. MERCHANT:  Thank you, Your Honor.  I don't

22 believe there's anything else on today's agenda.

23          THE COURT:  Okay.  All right, we are adjourned

24 then.  Thank you all.

25          COUNSEL:  Thank you, Your Honor.

110

1   (Proceedings concluded at 12:53 p.m.)

2

3         <u>CERTIFICATE</u>

4

5   We certify that the foregoing is a correct transcript

6 from the electronic sound recording of the proceedings in the

7 above-entitled matter.

8

 <u>/s/Mary Zajaczkowski</u>    June 7, 2021
9 Mary Zajaczkowski, CET**D-531

10 <u>/s/ Tracey J. Williams</u>   June 7, 2021
 Tracey J. Williams, CET-914
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2
                                      .   Chapter 11
3    IN RE:                           .
                                      .   Case No. 20-12522 (JTD)
4    MALLINCKRODT PLC, et al.,        .
                                      .
5                                     .   Courtroom No. 5
                                      .   824 North Market Street
6                                     .   Wilmington, Delaware 19801
                                      .
7                      Debtors.       .   June 15, 2021
8    . . . . . . . . . . . . . . . .      3:00 P.M.

9           TRANSCRIPT OF TELEPHONIC OMNIBUS HEARING
                BEFORE THE HONORABLE JOHN T. DORSEY
10                UNITED STATES BANKRUPTCY JUDGE

11   TELEPHONIC APPEARANCES:

12   For the Debtor:          Michael J. Merchant, Esquire
                              Robert Stearn, Jr., Esquire
13                            RICHARDS, LAYTON & FINGER, P.A.
                              Rodney Square
14                            920 N. King Street
                              Wilmington, Delaware 19801
15

16

17

18   Audio Operator:         Jason Spencer, ECRO

19   Transcription Company:  Reliable
                             1007 N. Orange Street
20                           Wilmington, Delaware 19801
                             (302)654-8080
21                           Email:  gmatthews@reliable-co.com

22   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
23

24

25
```

A-6563

```
 1  TELEPHONIC APPEARANCES (Cont'd):

 2  For the Debtors:          George A. Davis, Esquire
                              George Klidonas, Esquire
 3                            Andrew Sorkin, Esquire
                              Anupama Yerramalli, Esquire
 4                            Hugh Murtagh, Esquire
                              LATHAM & WATKINS LLP
 5                            885 Third Avenue
                              New York, New York 10022
 6
 7                            - and -

 8                            Jeffrey E. Bjork, Esquire
                              Amy Quartarolo, Esquire
 9                            LATHAM & WATKINS LLP
                              355 South Grand Avenue, Suite 100
10                            Los Angeles, California 90071

11                            - and -

12                            Jason B. Gott, Esquire
                              Jason Moehlmann, Esquire
13                            LATHAM & WATKINS LLP
                              330 North Wabash Avenue, Suite 2800
14                            Chicago, Illinois 60611

15                            - and -

16                            Michael Cassel, Esquire
17                            WACHTELL LIPTON ROSEN & KATZ
                              51 West 52nd Street
18                            New York, New York 10019

19  For Opioid Claimants:     Arik Preis, Esquire
20                            AKIN GUMP STRAUSS HAUER & FELD LLP
                              One Bryant Park
21                            Bank of America Tower
                              New York, New York 10036
22
23  For Multi-State           Kevin Maclay, Esquire
    Governmental Entities:    CAPLIN & DRYSDALE
24                            One Thomas Circle NW, Suite 1100
                              Washington, DC 20005
25
```

```
 1   TELEPHONIC APPEARANCES (Cont'd):

 2   For Acthar Group:          Albert Ciardi, Esquire
                                Daniel Astin, Esquire
 3                              CIARDI CIARDI & ASTIN
                                1204 North King Street
 4                              Wilmington, Delaware 19801

 5
     For Humana:                Matthew Feldman, Esquire
 6                              WILLKIE FARR & GALLAGHER LLP
                                787 Seventh Avenue
 7                              New York, New York 10019

 8   For the Committee:         Cullen Speckhart, Esquire
                                COOLEY LLP
 9                              1299 Pennsylvania Avenue, NW
                                Suite 700
10                              Washington, DC 20004

11
     For Governmental           Kenneth Eckstein, Esquire
12   Plaintiff:                 KRAMER LEVIN NAFTALIS & FRANKEL LLP
                                1177 Avenue of the Americas
13                              New York, New York 10036

14   For Columbus Hill          Paul Silverstein, Esquire
     Capital Management:        HUNTON ANDREWS KURTH LLP
15                              200 Park Avenue
                                New York, New York 10166
16
     For Columbia Casualty      David Christian, Esquire
17   Group:                     DAVID CHRISTIAN ATTORNEYS LLC
                                P.O. Box 9120
18                              Mission, Kansas 66201

19   For Covidien Limited:      Philip Anker, Esquire
                                WILMERHALE
20                              7 World Trade Center
                                250 Greenwich Street
21                              New York, New York 10007

22   For Johnson & Johnson:     Evan Jones, Esquire
                                O'MELVENY & MYERS LLP
23                              400 South Hope Street, 18th Floor
                                Los Angeles, California 90071
24

25
```

A-6565

```
 1 | TELEPHONIC APPEARANCES (Cont'd):

 2 | For State of West      Gregory Hauswirth, Esquire
     Virginia:             LEECH TISHMAN FUSCALDO & LAMPL LLC
 3 |                        1007 N. Orange Street, 4th Floor
                            Wilmington, Delaware 19801
 4 |
                            - and -
 5 |
                            Kristin Anders Lawson, Esquire
 6 |                        525 William Penn Place, 28th Floor
                            Pittsburgh, Pennsylvania 15219
 7 |

 8 |

 9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |
```

A-6566

1  <u>MATTER GOING FORWARD</u>:

2  Motion of Debtors for Entry of Order (I) Approving the
   Disclosure Statement and Form and Manner of Notice of Hearing
3  Thereon, (II) Establishing Solicitation Procedures, (III)
   Approving the Form and Manner of Notice to Attorneys and
4  Solicitation Directive, (IV) Approving the Form of Ballots,
   (V) Approving Form, Manner, and Scope of Confirmation Notices,
5  (VI) Establishing Certain Deadlines In Connection with
   Approval of Disclosure Statement, and Confirmation of Plan,
6  and (VII) Granting Related Relief [Docket No. 2200; Filed
   5/5/21]
7
            **Ruling:  Adjourned to 6/16/21 at 12:30 p.m.**
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (Proceedings commenced at 3:06 p.m.)

 2              THE COURT:  Good afternoon.  This is Judge Dorsey.

 3  We're on the record in Mallinckrodt PLC; Case No. 20-12522.

 4              I apologize for being a little late.  I was trying

 5  -- I was having some difficulty dialing into the Zoom.  I

 6  understand some other folks might be as well.  We're up to

 7  291 participants now.  So I think based on the registration

 8  most if not everybody is in.  If you are having trouble you

 9  can dial-in on the telephone instead of on the video. It

10  might be easier for you.

11              In any event, let's go ahead and get started.

12              Mr. Merchant?

13              MS. SAWCZUK:  Your Honor?

14              THE COURT:  I see someone.

15              MS. SAWCZUK:  Your Honor, I apologize.  Maria

16  Sawczuk speaking.

17              I cannot -- I don't know if it's just me, but I

18  cannot understand you (indiscernible), Your Honor.

19              THE COURT:  I can't understand what you're saying.

20              Can everyone hear me okay?  Can people hear me?

21        (No verbal response)

22              THE COURT:  We have some bad sound quality

23  apparently.  Everybody sounds garbled.  I assume I do too.  I

24  hear people talking, but I can't understand what you are

25  saying.  We're going to try and get our IT people to get on

7

1    board here.

2         (Pause in record)

3              THE COURT:  Can everyone hear me now okay?

4    Nodding heads, okay.

5              My apologies.  We had a glitch in our system.  We

6    had to update my license so that I could accommodate so many

7    people on this call and that kind of messed up the sound

8    system, but it sounds like we're back and I think everybody

9    is in now.  So we will go ahead and begin.

10             This is Judge Dorsey.  We're on the record in

11   Mallinckrodt PLC; Case No. 20-12522.

12             I will go ahead and turn it over to debtor's

13   counsel to run the agenda.

14             MR. MERCHANT:  Good afternoon, Your Honor.

15   Michael Merchant of Richards, Layton & Finger on behalf of

16   the debtors.

17             Your Honor, this is, obviously, the hearing to

18   consider approval of the debtors' disclosure statement and

19   certain related motion.  I know Your Honor has limited time

20   today, so I will cede the screen immediately to Jason Gott

21   who will be presenting on behalf of the debtors.

22             THE COURT:  Alright, Mr. Gott?

23             MR. GOTT:  Good afternoon, Your Honor.  Jason Gott

24   from Latham & Watkins on behalf of the debtors.

25             Can you hear me okay?

8

1          THE COURT:  I can. Thank you.

2          MR. GOTT:  Great.  So before getting to the heart

3    of the hearing which, as Mr. Merchant said, is approval of

4    our disclosure statement and our proposed solicitation

5    process I want to take stock of where we are and how far

6    these cases have come.  Most importantly, the opioid

7    mediation has been successful in producing consensual

8    allocations among nearly all of the public and private opioid

9    claimant groups.

10          Of the groups of claimants that went into

11   mediation ten of them have agreed on their respective

12   allocations from the opioid settlement and we also understand

13   that discussions are continuing today, during this hearing,

14   in fact, among the remaining opioid constituencies and we

15   are, actually, just before the start of this hearing that

16   there may be one additional agreement in principal that we

17   hopefully will be able to back into our documents before

18   solicitation begins.

19          Your Honor will recall that we identified that

20   allocation process as one of the central issues of this case

21   back at the first day hearing in October.  So to have that

22   resolved consensually and so broadly is a great outcome.  And

23   it's not just beneficial for these cases and for getting to

24   emergence on an efficient timeline, although, of course, it

25   is, one of the many facets to the agreements coming out of

9

1  the opioid mediation is that about 90  percent of the total

2  settlement dollars after (indiscernible) which basically

3  represents all of the groups allocations except for personal

4  injury and NAS claimants, including future claimants, that

5  that 90 percent number reflects a portion of the settlement

6  that ultimately will end up going toward abatement

7  initiatives in responding to the opioid abuse epidemic.

8          So with that on the horizon it's now our job, on

9  the debtor's side, to drive these cases forward, to get to a

10 conclusion and to get to confirmation, then to execute on the

11 plan so that those dollars from the opioid settlement can get

12 to work.  That includes $450 million right away on the

13 effective date.

14         Your Honor, in parallel path and as Your Honor

15 knows on the funded debt side we have grown our support for

16 the plan considerably since the petition date.  We have 70

17 percent of our term lenders and 84 percent of our guaranteed

18 unsecured noteholders signed onto our restructuring support

19 agreement.  Together they reflect almost $3 and a half

20 billion of the debtors' capital structure with locked in

21 votes supporting the plan when the time comes to vote.

22         And that brings us to today in this process for

23 approval of our disclosure statement.  The latest versions of

24 the relevant documents that have been filed on the docket,

25 anyways, can be found at Docket No. 2863 for the plan, 2864

1  for the disclosure statement and 2867 for the form of order

2  approving the disclosure statement in the forms and notices

3  attached to it.

4           We originally filed our plan and disclosure

5  statement on April 20th and since then we received a number

6  of objections, including some supplemental objections,

7  received over just the last three days based on our June 8th

8  plan and disclosure statement filing.  The debtors, and the

9  RSA parties, and the objectors have been working very hard

10  over many weeks now to narrow the issues raised in those

11  objections.

12           While we still have a number of open issues coming

13  into the hearing, as Your Honor may see from the summary

14  status report we filed, we are pleased to report that we have

15  resolved objections, at least for today's purposes, of the

16  following parties:

17           The ad hoc committee, NAS Children, subject to

18  some agreed plan updates that will be included; the future

19  claims representative for opioid claimants, likewise subject

20  to plan updates; United Healthcare; the hospitals opioid

21  claimants group; the third-party payor opioid claimants

22  group, also subject to plan updates; the West Virginia NAS

23  and adult opioid claimants group; several other opioid

24  claimants that filed joinders to other objections that

25  includes Carpenter Health Network, Four Winds Louisiana

11

1   Cherokee, the Northwestern Band of Shoshone Nation, and the

2   City of Covington, Louisiana.

3          Then steering away from the opioid side we also

4   have resolved objections as to the ad hoc group of first lien

5   noteholders, Deerfield Capital which holds some of the

6   debtors' second lien notes, the Chubb companies, royalty

7   claimants, Greathouse, Rose, Glenn, and Cotter Corporation.

8          Now among those parties and also others I know

9   there are some that would like to make statements in this

10  hearing with their views on the plan and the path forward.

11  And I propose to save those for the end, Your Honor, whether

12  that happens to be today or another day in the hope that we

13  can get through as many of the objections as possible in the

14  time we  have this afternoon.

15         So setting those aside for the moment, we do have

16  outstanding objections from, we believe, about twenty

17  parties.  We have proposed disclosure based resolutions to

18  all of them where disclosure could address the objections

19  that we were seeking.  We have also made a number of changes

20  to the plan to address some of the concerns that were raised.

21         The court will see, as we move through the

22  hearing, that considerable levels of detail on a number of

23  different subjects had been added to the documents, but

24  unfortunately we just weren't able to reach consensus or

25  weren't able to get fully engaged with the objectors over the

1  last few weeks.

2          So jumping right in and as a point of structure

3  for the hearing today we wanted to raise initially that we

4  have a significant number of patents on confirmability

5  objections that parties are continuing to press today.  We

6  tried to capture those in Exhibit C attached to our reply.

7  Certainly some of the objections noted in that Exhibit C have

8  been resolved over the last few days, but there are patent

9  unconfirmability objections that remain.

10          Your Honor, our view is that all of these

11  objections go to confirmation issues which respectively

12  conceded by calling them patent unconfirmability objections,

13  but more importantly none of the issues raised by the

14  objectors on confirmability actually show that the plan is

15  patently unconfirmable.

16          Many of the issues raised in the eliminated by

17  voting results and others simply reflect legal or factual

18  disagreements between the debtors and the objectors which, of

19  course, have to be resolved either at or before the

20  confirmation trial.  The debtors recognize that their legal

21  burden to confirmation (indiscernible), but in the meantime

22  we wanted to start by requesting guidance from Your Honor on

23  whether based on the parties briefings in the papers that

24  have been filed the court wants to hear all of these

25  confirmability objections alongside the disclosure related

13

1  objections or whether we might narrow the scope of the

2  hearing a bit at the top by limiting the scope of

3  confirmability objections.

4  THE COURT:  Well I want to go ahead and hear if

5  someone wants to speak.  I have read the papers, so I am

6  informed about what the issues are.  But if somebody wants to

7  address them, who's made an objection, I am going to listen

8  to it.

9  MR. GOTT:  Understood, Your Honor.  So with that I

10 think we can get -- we intend to use the summary chart that

11 was filed, our most recent one filed this afternoon at Docket

12 2873.  We propose to march through that top to bottom to

13 structure the remainder of the hearing.  We tried to make

14 that chart useful and we recognize we may not have gotten

15 everyone's arguments exactly right.  So we certainly weren't

16 intending to, you know, misconstrue or mislead as to any

17 parties arguments.  We can figure out any issues that may

18 arise along the way.  We did try to consult with all of the

19 objectors about the chart and so hopefully it ends up being

20 helpful.

21 Just a brief affirmative case, Your Honor, before

22 we dive into the objections.  To lay the legal groundwork

23 it's important to remember the standard we're operating under

24 for today which is does the disclosure statement contain

25 adequate information about the plan.  That is adequate

1  information for a typical creditor in making an informed vote

2  on the plan.  That includes things like background of the

3  case, an explanation of the debtor's businesses, risk factors

4  relevant to the plan, tax consequences and, of course, the

5  proposed classifications and distributions under the plan.

6          Importantly, there are a few things that the code

7  and case law make clear are not required for the disclosure

8  statement to be approved.  One of those things is coverage of

9  specialized parochial issues that are relevant to one or only

10  a few creditors; the case there is Waterville Timeshare

11  Group, 67 B.R. 412.

12          Similarly the disclosure statement is not required

13  to compare the actual plan to other hypothetical ways a

14  Chapter 11 plan could be formulated in these cases; that's

15  Section 1125(a)(1) of the Bankruptcy Code.  The DS is not

16  required to have valuations or appraisals of asset values,

17  Section 1125(b).  Likewise, we arent' required to pack every

18  piece of information into the DS that is available from other

19  sources like our schedules and SOFAs or SEC filings, for

20  example; Section 1125(a)(2)(c).

21          Also not needed are chronicles of legal arguments

22  and factual issues that are better suited for discovery and

23  for the confirmation trial itself.  In the case there is

24  Stanley Hotel, 13 B.R. 926 in the Bankruptcy Court for the

25  District of Colorado 1981.

1          Finally, Your Honor, we don't -- the disclosure
2    statement doesn't have to justify the plan, it just has to
3    explain the plan.  The merits of the plan are for
4    confirmation.  Many of the purported disclosure based
5    objections that the court will hear actually go to the
6    justification analysis underlying the plan which are classic
7    confirmation issues.
8          So these principals all comport with the over-
9    arching notion of making the disclosure statement actually
10   usable for the typical creditor voting on the plan and not
11   completely burdened with the whims of every creditor who
12   simply wants to make a point.
13         Suffice to say, Your Honor, we have covered the
14   landscape of relevant information regarding disclosure
15   statement and then some.  It's a very long document that
16   delves into many different topics and we think it really
17   speaks for itself.
18         So unless Your Honor has any questions about that
19   short affirmative case I'd suggest we turn to the objections.
20         THE COURT:  Alright, let's go.
21         MR. GOTT:  So starting at the top of our chart is
22   the objections filed by the ad hoc Acthar plaintiffs group.
23   I will let counsel to the ad hoc Acthar group explain the
24   objections.  I will note that we have exchanged a number of
25   proposed disclosures and actual disclosures that are now

1  contained in the disclosure statement with counsel in the

2  hope of addressing as many of these objections as we can.

3          I think we have gone a long way to providing

4  sufficient information on the topics raised, notwithstanding

5  that I think many of them, if not all of them, fall into the

6  categories I just walked through of topics that just aren't

7  necessarily required to be covered in the disclosure

8  statement.

9          So with that introduction I will allow counsel to

10  the ad hoc Acthar group to walk through their objections.

11          THE COURT:  Alright.

12          MR. CIARDI:  I think that will be me, Your Honor.

13  Mr. Astin is also on the line as well.  We have exchanged

14  charts on where our remaining objections are and I think I

15  will focus the court on some of the ones that I think aren't

16  covered in other people's objections, Your Honor, so that you

17  don't have to hear the same argument more than once.

18          We have raised an objection and the language of

19  which we have a concern appears on what is now Page 3 of the

20  new blackline version of the disclosure statement at Docket

21  2865-2 at Page 17 of 242.  There was a discussion in that

22  section regarding why the general unsecured creditors with a

23  strict application to the absolute priority rule are entitled

24  to no more than $34 million.

25          We have asked that language be added that explains

A-6578

1    why that strict application of the absolute priority rule

2    will not apply to the opioid creditors as they are in no

3    different situation then us.  They have no different -- they

4    have no better position or claim as we may have against the

5    entities that hold the Acthar IP; although, we do believe we

6    have claims against those entities.  And as a result we

7    should be -- they should be -- it should be disclosed that

8    they are being treated differently then what was being

9    proposed for the general unsecured creditors.

10          So that is one, Your Honor, that I believe we have

11   been pushing and we believe there needs to be disclosure as

12   to why opioid creditors are getting $1.6 billion.  Unsecured

13   creditors are getting $100 million and the absolute priority

14   rule is not being applied equally as to both groups of

15   creditors or, at least, as the debtors seem to apply the

16   absolute priority rule.  So that is one of our objections

17   that we still believe needs further disclosure in the

18   disclosure statement to explain the difference in how the

19   treatment occurs.

20          Do you want me to stop or do you want me to do all

21   of them, Your Honor?

22          THE COURT:  Why don't we do these one at a time

23   that way it will be a little more efficient I think.

24          MR. CIARDI:  Understood.

25          THE COURT:  Mr. Gott?

A-6579

1            MR. GOTT:  Yes, Your Honor. For starters, this
2    clearly goes to a confirmation issue which is whether there
3    is discrimination among the groups and whether that
4    discrimination is unfair.  You would think the disclosures
5    that we have added go above and beyond in explaining the
6    debtors' analysis that underpins the plan.  It's also just
7    simply not the case that general unsecured creditors recovery
8    is strictly based on an application of the absolute priority
9    rule as that disclosure suggests the $100 million that
10   general unsecured creditors are proposed to receive under the
11   plan is significantly greater then what our analysis suggests
12   they are entitled to.
13           So all to say, Your Honor, you know, we think that
14   disclosure is accurate.  We think it explains the reason we -
15   - it explains where the proposed recovery for general
16   unsecured creditors is coming from, what underpins that
17   proposed recovery.  Moreover, Your Honor, in a separate part
18   of the disclosure statement, it's in Article 3(b), we do
19   explain the justification for the recoveries for a whole list
20   of opioid claims; in particular, we state the recoveries to
21   holders of opioid claims and other terms set forth in the
22   opioid settlement term sheet are the results of months of
23   hard-fought negotiations.
24           The debtors believe these terms are well within
25   the range of reasonableness, applicable to settlements.

1  Furthermore, the terms are justified by the potential amounts

2  and nature of the opioid claims, their corresponding

3  entitlements, potential avoidance actions related to

4  specialty generic debtors, and the terms of the plan itself

5  which, importantly, release and channel opioid claims away

6  from all of the debtors and their non-debtor affiliates.

7        So, Your Honor, we think the issue has been more

8  than adequately addressed in the disclosure statement.

9        MR. CIARDI:  Your Honor, if I could respond.

10        THE COURT:  Go ahead.

11        MR. CIARDI:  While they provide that analysis with

12  regard to the general unsecured creditors of which my clients

13  are a part they do not provide the analysis that they have

14  done allegedly or should have done with regard to the

15  opioids; therefore, there is no way for a creditor to compare

16  whether the same analysis was done as to both.  Simply saying

17  that a settlement was reached, whether it was hard-fought or

18  not, does not mean you get to override the priority in the

19  distribution scheme set-up in the bankruptcy code.  9019 does

20  not override the regular distribution scheme.

21        So if those creditors are the same as ours and

22  there was an analysis that showed that they were different or

23  had some better or more rights that should be included in the

24  disclosure statement, and if it's not it does not provide the

25  -- the disclosure statement doesn't provide sufficient

1   information on that point.

2          THE COURT:  Well I'm satisfied that the language

3   the debtors proposed meets the requirements of 1125.  It

4   certainly provides any reasonable creditor with an

5   opportunity to understand what is happening in the proposed

6   plan and whether or not they would want to vote for the plan.

7   And it is a confirmation issue on whether or not similarly

8   situated creditors are being treated unfairly.  So I will

9   overrule that objection.

10         MR. CIARDI:  The second one, Your Honor, that I

11  would like to point out that I don't think is duplicated in

12  anybody else's is our objection to the disclosures regarding

13  the gift that is going to management of 10 percent of the

14  company upon confirmation.  We have asked for specific

15  language -- and I should say, Your Honor, this is now --

16  there is now finally some language in what is Page 57 of the

17  amended disclosure statement at Page 71 of 242 in the same

18  blackline document.

19         There is a section now regarding that wasn't in

20  the first one.  It indicates that there was hard-fought

21  negotiations regarding this.  We have asked for information

22  regarding hard-fought for who because it certainly wasn't

23  general unsecured creditors.  We have asked for information

24  on who was representing the debtor as it is the -- as this is

25  a transaction where the board sits on both sides and the

1  Delaware duty of loyalty which cannot be indemnified and

2  which they have now breached we have asked for information on

3  how this was a fair transaction.  None of that is in here.

4       All that is in here is that it was hard-fought for

5  somebody and the other creditors are okay with it because it

6  doesn't affect the -- for whatever reason they're okay with

7  it.  So we would ask, Your Honor, for additional information

8  because this is a duty of loyalty issue that should be

9  disclosed to all the creditors and people should know why

10 management is getting $100 million for nothing.  So we would

11 ask for more disclosure on that point.

12       THE COURT:  Mr. Gott?

13       MR. GOTT:  Your Honor, again, this is plainly an

14 issue for confirmation.  We don't -- the disclosure statement

15 does not have to provide every legal and factual piece of

16 support for all of the provisions of the plan. It just has to

17 explain what the plan does.  In the disclosures we've added

18 more than adequately address the topic of the process for

19 agreement on the management incentive plan for the purpose of

20 the agreement.

21       You know, what the objectors are overlooking here

22 is that the reorganized company will need a strong managment

23 team to succeed, to meet its obligations under the plan.  And

24 in the pharmaceutical space incentive plans are key to

25 keeping top management, to attracting new management when

1  folks leave.  And, you know, the characterization as being a

2  gift completely misunderstands the way it works.  If anything

3  it's a deduct against the equity going to the guaranteed

4  unsecured noteholders.  It's not coming out of general

5  unsecured creditors' recovery which is fixed at $100 million.

6          So this is all confirmation issues.  And the

7  disclosures we have added are more than sufficient.

8          MR. CIARDI:  Your Honor, again, I think it's

9  appropriate for everybody who is voting on the plan to know

10 how this was valued, who was representing -- there should

11 have been someone on both sides of this transaction, at least

12 somebody representing the company's  interest because the

13 board was on both sides of it negotiating $100 million for

14 themselves.

15         I think it's a little weak simply to say that the

16 management that got us into this problem is the strong

17 management that is going to get us out of this problem

18 because they are the ones who are the reason we are here

19 today.  We should not be getting $100 million gift without

20 there being some explanation of the why.  We're just asking

21 for the why.  We intend to raise it in confirmation as well

22 and it's also part of our trustee motion.  We think there

23 should be further disclosure going out to creditors on this

24 point.

25         MR. GOTT:  Your Honor, just to correct one point

1  so that the record isn't unclear.  First of all, the

2  management incentive plan does not go to the board.  It's

3  approved by the board and it's in favor of the management

4  team, not the board.

5          In the terms of the MIP were negotiated amongst

6  the debtors, and the RSA parties, and the debtors' board.  So

7  to suggest that the board, or the officers, or any other

8  party for that matter is on both sides of the transaction

9  with unfettered discretion to approve and implement the MIP

10  is just false which is another reason that we wouldn't want

11  to include that disclosure in our document.

12          MR. CIARDI:  Your Honor, that is --

13          THE COURT:  Hold on, Mr. Ciardi.  I think the

14  disclosure is sufficient at this point.  It clearly is a

15  confirmation issue.  And I receive letters from people all

16  the time and one of the things they complain about most is

17  the amount that is going to management under the plan. So

18  it's certainly something that people are aware of and

19  something that they will take into consideration when

20  deciding whether or not to vote for the plan.  The why we can

21  deal with at the time we get to confirmation.

22          MR. CIARDI:  And, Your Honor, the final issue that

23  I'll raise, although, do want to say that there are other

24  objections that we have.  They are covered by other people's

25  objections, so I'm not going to repeat them; I'll just try to

1  focus on the ones that we have.  I just don't want the Court

2  to think I'm waiving them at this point.

3          If we had asked in -- for a complete or for a more

4  clear description of the parties being released or not

5  released, including whether, in particular, Express Scripts

6  or any of their entities or parties are receiving any release

7  of any kind under the plan.  But this is as particular to us,

8  because, obviously, we maintain a complaint against Express

9  Scripts, as well, but it should be not very difficult for the

10  debtors to simply say, identify by name who is getting an

11  actual release under the plan, and we think that's not an

12  unfair request for a specific identification of the released

13  party (indiscernible).

14          THE COURT:  Mr. Gott?

15          MR. GOTT:  Your Honor, so, I think we could work

16  through, and to be clear, I think this is one point where,

17  you know, this topic, the request was just made in the last

18  couple of days.  So, this is one point where we could

19  continue to work through.

20          I think we would be okay with making a disclosure

21  in the negative here, identifying which parties that the ad

22  hoc Acthar member might be concerned about that are not

23  released parties.  That would include the Express Scripts and

24  interests.  But naming each and every individual and company

25  in a list that is captured in the defined term of released

1  parties, would certainly defeat the notion of keeping the

2  disclosure statement readable and user-friendly, and,

3  frankly, I don't know if that really addresses the concern

4  that the ad hoc Acthar group actually has.  If we can,

5  instead, frame our disclosure in the negative, like I said,

6  we can engage on and figure out exactly what that disclosure

7  might look like.

8          THE COURT:  All right.  I think that's a

9  reasonable resolution of the issue.  If the debtors are

10  willing to put in --

11          MR. CIARDI:  We would be okay with that

12  resolution, Your Honor, we just --

13          THE COURT:  Hold on.  Hold on.

14          Mr. Ciardi, you're talking over me.

15          MR. CIARDI:  I'm sorry, Your Honor.

16          THE COURT:  It's a reasonable resolution.  I think

17  the debtors have proposed a reasonable resolution that would

18  provide comfort to the ad hoc committee of Acthar Plaintiffs,

19  that Express Scripts is not being released pursuant to the

20  plan and putting that disclosure in that satisfies that

21  issue.

22          I don't think it's necessary to list out every

23  single person that might be covered by the releases.  That,

24  as Mr. Gott points out, that would make it release provision

25  unreadable and most people are going to get lost in it, so I

1  am satisfied with that proposed resolution, Mr. Gott.

2         MR. CIARDI:  Your Honor, so would we.  And the

3  corollary to that is we have asked this similar comment with

4  regard to co-Defendant indemnity agreement; again, it's

5  particular as to us, but we want to know if those indemnity

6  agreements that are effect that Express Scripts may have are

7  going to be assumed or not.  And that should be clearly laid

8  out in the plan or disclosure statement, or, again, if it's

9  in the negative that these people are not going to be

10  assumed, that's fine, too.  We would be okay with that

11  result, as long as their clarification either in an

12  affirmative or negative manner on the co-Defendant indemnity

13  agreements.

14         MR. GOTT:  Your Honor, that will be disclosed in

15  due course when we file our plan supplement that will contain

16  lists of assumed and rejected contracts, and at that point,

17  that information will be disclosed.

18         At this point, sitting here today, I don't think

19  we have a determination on that front and it's completely

20  ordinary for that to be disclosed as part of the plan

21  supplement.

22         THE COURT:  I agree, it can be disclosed in the

23  plan supplement.

24         MR. CIARDI:  Your Honor, could I ask for one

25  clarification on your ruling on that, is it that we would,

1 obviously, need to object on the assumption that it may be

2 assumed or may not be assumed.

3          We have to take discovery either way on that

4 during the pre-confirmation period and not wait for this plan

5 supplement to be filed.  So, will that be -- I don't want to

6 run into a relevance issue, because they haven't yet made a

7 determination.  We're going to need to take discovery and

8 know where parties are on that point, where express scripts

9 is.

10          I just want to be clear that we're not going to be

11 waiting until the plan supplement to be able to take

12 discovery on that point.

13          THE COURT:  Well, it's not really an issue for the

14 disclosure statement, but if they haven't made the

15 determination yet, you have to assume that they're not going

16 to assume it, so you are entitled to take your discovery.

17          MR. CIARDI:  Thank you, Your Honor.

18          Your Honor, with that, I will cede the podium.

19 Our other issues are primarily covered by other parties, as

20 well.

21          THE COURT:  All right.  Thank you, Mr. Ciardi.

22          MR. GOTT:  Your Honor, the next objection on the

23 list was filed by Columbus Hill Capital Management.  The

24 original objection is at Docket 2350, supplemental objection

25 at Number 2850.  You know, primarily, the objection goes to

1  questions of confirmability, in particular, around

2  reinstatement of the first lien notes, as well as the amount

3  of adequate protection payments and how all of those

4  variables factor into the allowed amount of the first lien

5  notes claims under the plan.

6          So, for those reasons, we believe that these

7  objections should be overruled as going to confirmation, and

8  we have otherwise addressed the disclosure-related objections

9  raised by Columbus Hill, by disclosing the termsheet for the

10  cram-down first lien notes that's attached to our plan as

11  Exhibit A, and also indicating that we will file with the

12  plan supplement, you know, the more detailed documents

13  underpinning those first lien cram-down notes.

14          And lastly, an objection -- Columbus Hill raised

15  an objection regarding the schedule in our discovery

16  protocols.  And my understanding, although I could be getting

17  this wrong, my understanding is that it seems that that

18  objection has been worked out, but I will cede the podium to

19  counsel to Columbus Hill to address the objection.

20          THE COURT:  All right.

21          MR. SILVERSTEIN:  Your Honor, it's Paul

22  Silverstein.

23          THE COURT:  Yes, can you turn down your radio,

24  please.

25          MR. SILVERSTEIN:  Well, the video -- my screen

1   says the host has stopped by video, so I don't know what to

2   do about that.  I promise that I'm wearing a suit.  I was on

3   video before, but I'll be very, very, very brief, 60 seconds,

4   maximum.

5            THE COURT:  All right.  Go ahead.

6            MR. SILVERSTEIN:  As I think Mr. Gott mentioned,

7   we filed an objection and then we filed a supplemental

8   objection mid-day yesterday.  I'm pleased to report that we

9   do not believe there exists material disclosure issues with

10  respect to the 1L notes at this point.  We have had numerous

11  discuss with debtors' over the last week or so toward that

12  end.

13           Our focus now is on the full and proper

14  adjudication of the two substantive issues:  the debtors'

15  forthcoming objection to the applicable premium and Columbus

16  Hill's objection to the title treatment of the plan, which

17  provides for, what's referred to as "cram-down notes."

18           The debtors have proposed a schedule for

19  addressing its claim objection and Columbus Hill's objection

20  to the terms of the title notes.  You know, if this comes up

21  with respect to schedule, we can address them, if and when

22  they come up, and that's all I really have to say.

23           And I appreciate your time.

24           THE COURT:  All right.  Great.

25           Thank you, Mr. Silverstein.

1          MR. SILVERSTEIN:  The simplest response I think
2     you've heard all day, Your Honor.
3          THE COURT:  I'm sorry?
4          MR. SILVERSTEIN:  The simplest response I think
5     you've heard eh all day, Your Honor.
6          THE COURT:  I appreciate it.  Thank you very much.
7     And I'm going to lower your hand there, okay.
8          All right.  So, it sounds like those are resolved,
9     Mr. Gott.
10          What's next?
11          MR. GOTT:  The next objection was filed by Vasu
12     Kalpat and Subha Vasudevan at Docket Number 2370.  These are
13     two holders of the debtors' four and three-quarters notes.
14          The objection -- it's not that the objection under
15     the plan treats the four and three-quarters notes unfairly;
16     we think that is squarely an objection to the confirmation
17     and we think it should be overruled.
18          THE COURT:  Okay.  Anyone speaking for the
19     objectors?
20          (No verbal response)
21          THE COURT:  Okay.  No takers.
22          So, I will overrule that objection.  It is a
23     confirmation objection.  We'll deal with that if, and when
24     necessary at confirmation.
25          MR. GOTT:  The next live objection, Your Honor, so

1  skipping over to the next row, which we were able to resolve,

2  the next live objection was filed by the State of West

3  Virginia, that's Docket Number 2373, with a supplemental

4  objection filed at Docket Number 2378.

5          Your Honor, really two objections here.  The first

6  concerns disclosures around recoveries to holders of opioid

7  claims and we think the process that we have set up for

8  disclosing the specifics around recoveries and the treatments

9  of opioid claims is appropriate here and I think to get into

10  that after counsel address the objection.

11          The second objection we understand to be raised,

12  is a timing objection that approval of the disclosure

13  statement at this stage, is premature.

14          THE COURT:  Okay.  Let me hear from the State of

15  West Virginia.

16          MR. HAUSWIRTH:  Good afternoon, Your Honor.

17  Gregory Hauswirth on behalf of the State of West Virginia, of

18  Leech Tishman Fuscaldo & Lampl.

19          I have with me here on the line, our colleagues,

20  Kristin Lawson and John Steiner, that I would like to cede

21  the podium to for the objection.

22          THE COURT:  Okay.  Who's going to do the speaking?

23          MS. LAWSON:  Good afternoon, Your Honor, Kristin

24  Lawson, from Leech Tishman Fuscaldo & Lampl, on behalf of the

25  State of West Virginia.

1           First, I just wanted to make clear that West

2    Virginia is one of the small handful of states that are not a

3    party to the RSA.  We are not included in the governmental ad

4    hoc committee.  We're not part of the multi-stake group that

5    is working with municipalities, and as such, we have not been

6    involved in mediation or the negotiations and discussions

7    that have taken place regarding the allocations, both to the

8    various opioid trusts, as well as between the states and

9    municipalities that are going to be ultimately sharing the

10   assets that are distributed to what is now called, I believe,

11   the NoAct II Trust (phonetic).

12          And I point that out only because we have, to

13   date, been kind of force to do speculate as to how much the

14   State is going to receive and how that amount is being

15   determined.  In the recent, just the past week with the

16   amendments to the plan and the disclosure statement, we

17   certainly have seen some additional disclosures, some

18   indications that this is actually going to be very similar to

19   the allocation that took place in the Purdue Pharma case,

20   which has been our assumption, but has not been formally

21   confirmed by the debtors.

22          And accordingly, our two issues, which really do

23   overlap, relate to what is that allocation methodology,

24   because that goes to the heart of what a State opioid

25   claimant is ultimately going to receive and how that has been

1  calculated, and then also when that information is going to

2  be provided, because as of now, there have been some

3  improvements in the confirmation timeline, but we are still

4  looking at probably mid-July, early August before the trust

5  distribution procedures are filed.

6        We assume those procedures will contain the

7  allocation methodology, but we're not confident of that,

8  because I don't believe those procedures are a defined term

9  in the plan.  And, you know, this really goes to the heart of

10 adequate information, because, again, the question is, as a

11 reasonable investor with a holder of estate opioid claims,

12 what are they going to receive, when are they going to

13 receive it, and what are the risks that they are not going to

14 receive it.

15       And there are still as of today, some gaps in the

16 plan and disclosure statement.  We do not know what the U.S.

17 Government is going to receive.  We don't know what is going

18 to the other opioid claim reserve.  So, as a result, we don't

19 even know how much money is going into the No Act Trust

20 (phonetic).  We have some understanding of how it's going to

21 be split with the Tribes, between the Tribes and the States,

22 and we've been given a percentage.

23       We've been given -- there's now a chart that was

24 disclosed as of last week that says that West Virginia is

25 estimated to receive approximately 1.06 percent of the State

34

1  portion, but what's missing is that is a percentage of what

2  number, and how was that number calculated?

3          Again, we believe we have some understanding.  We

4  were actually -- we learned yesterday in a filing by the

5  Government plaintiff ad hoc committee, they have advised us

6  that it is a Purdue Pharma allocation that's being followed

7  and they've referenced some very specific percentages that

8  we've not seen from the debtor in this case.

9          We believe that we're entitled to an opportunity

10  to review that formula, that calculation to make sure that it

11  is accurate so that as we proceed to confirmation, we can

12  prepare our discovery, prepare any necessary expert, and if

13  there is a confirmation issue as to whether that's an

14  appropriate allocation, then we have information necessary to

15  address that.

16          And then as to the timing, specifically, we do

17  acknowledge that the debtors have given additional time

18  between the filing with the plan supplement and, ultimately,

19  the voting deadline and the plan objection deadline.  They

20  have increased it from what was originally 7 days to now 28

21  days.

22          But our argument from the outset has been that we

23  were entitled to that information within 28 days prior to the

24  disclosure statement hearing, because for the holder of

25  opioid claims, the trust is in effect, the plan.  We are

1  being directed to that trust as our sole and exclusive

2  remedy.  Those are the documents that are going to determine

3  how much we have received, when we receive it, what

4  procedures we have to follow, and to date, we are just

5  missing a lot of information about that.  We can't make a

6  reasonable estimate of what we're going to receive.

7            THE COURT:  Mr. Gott?

8            MR. GOTT:  Your Honor, think you heard really the

9  three key things there.  One is the total allocation for the

10  State of West Virginia has been disclosed.  Two is that the

11  procedures governing the allocation in the, you know, trust

12  distribution procedures that are to come, will look very

13  similar to those with which the State of West Virginia would

14  be familiar or any other State opioid claimant would be

15  familiar from the Purdue Pharma bankruptcy.

16            And then third, Ms. Lawson is correct that we have

17  extended the timeline considerably between when this

18  information will be filed publicly and the voting deadline;

19  in fact, I think our summary chart may have referred to a 28-

20  day period when we filed it before.  It's now longer, you

21  know, in fact, at the latest, physicality procedures will be

22  filed based on our latest discussions with the OCC, among

23  others, will be July 21st, and if sooner, we'll file it

24  within 30 days after approval of the disclosure statement,

25  and that could be as soon as July 15th.  You're talking

1  about, you know, five to six weeks with the information

2  publicly disclosed and available for any opioid creditor to

3  digest that information and determine exactly what the

4  outcome would be for them.  We think that's appropriate and

5  adequate here.

6          THE COURT:  Are there any other State or

7  Government entities of any kind that have -- that are not

8  part of the group, that are individual creditors in the case,

9  other than West Virginia?

10          MR. GOTT:  Your Honor, I believe West Virginia was

11  the only objecting party and we haven't been engaged by any

12  other particular State to this date, unless my memory is

13  failing me.

14          THE COURT:  Mr. Preis raised his hand.  Maybe he

15  has some understanding of that.

16          MR. PRIES:  No, I was just going to answer your

17  question.  You asked if there are other States that are not

18  part of the governmental entity group that signed the RSA,

19  correct?

20          THE COURT:  Correct.

21          MR. PRIES:  That was your question?

22          THE COURT:  Yes.

23          MR. PRIES:  Yeah, so there are five States that

24  are not party to the RSA.  West Virginia is one of them.

25  West Virginia is the only one that filed an objection for the

1 case, but there are five States that are not party to the

2 RSA.

3          THE COURT:  Okay.  Mr. Eckstein, you raised your

4 hand.  Did you have something you wanted to say?

5          MR. ECKSTEIN:  Yes, Your Honor.  Good afternoon.

6 It's Kenneth Eckstein of Kramer Levin, on behalf of the

7 governmental ad hoc committee.

8          I was first going to confirm what Mr. Preis just

9 disclosed, that there are a total of five -- there are

10 various territories that have (indiscernible), but the total

11 is five.  And, Your Honor, we obviously did welcome

12 participation by West Virginia and any of the other States

13 that want to participate in the RSA, so it's certainly not a

14 function of the group to exclude West Virginia.

15          And I know that West Virginia and the other

16 States, and various other parties, in general, do communicate

17 quite extensively, so notwithstanding the objection, there is

18 a great deal of dialogue.  From a standpoint of the

19 objection, Your Honor, we did confirm in our pleading that

20 was filed earlier this week that the allocation that is being

21 utilized here, in fact, will narrow the allocation procedures

22 that have been adopted in the Purdue case.  And there's been

23 a fair amount of activity, including the extent of an

24 interaction with West Virginia during the case and more

25 importantly, before the case, the development of a statewide

38

1  allocation (indiscernible) with expansive amounts of

2  discussions, negotiation, and all of those details will be

3  appropriately presented to the Court in connection with

4  confirmation so that the Court is fully apprised of just how

5  the allocation came about, but that is information that is

6  more restraining order appropriately left for the

7  confirmation hearing when the Court is being asked to

8  consider the treatment of the opioid claimants.

9         As Ms. Lawson indicated, there is now disclosure

10  of the percentage, which really is the key to information,

11  and as Your Honor just heard, the details of the trust

12  procedures are going to be reflected in the plan supplement

13  that get filed within the next 30 days, well in advance of

14  the deadline for voting.

15         But as a practical matter, because this has all

16  been laid out, you know, in connection with Purdue, the

17  details are, at this point, known to West Virginia and I

18  think that from a standpoint of disclosure, there was

19  certainly affluent information for the Court to be

20  comfortable, but all parties who are participating in the

21  opioid trust have a fair amount of clarity as to what the

22  size of the recovery is and how it can be split amongst the

23  case.

24         And there are additional details that are

25  important, but those will be reflected in the plan supplement

1 that is scheduled to be filed.

2          So, from a disclosure standpoint, we think that

3 the requirements of 1125 have been met and we do recognize

4 that if there remains a dispute on this issue, at the time of

5 confirmation, that the background and how the allocation will

6 have been arrived at will be presented to the Court and

7 considered at that time.

8          THE COURT:  Thank you, Mr. Eckstein.

9          Let me hear from Mr. Maclay and then Ms. Lawson,

10 I'll come back to you.

11          MR. MACLAY:  Thank you, Your Honor.

12          Just to follow-up on a couple of the points made

13 by Mr. Eckstein, first, as Mr. Eckstein noted, and as the

14 brief we filed also noted, there's a table attached to the

15 disclosure statement which lays out the relative percentages

16 among the States, and when Ms. Lawson talked about, we don't

17 know what numbers those percentages come out of, well, she

18 knows as much as we do, Your Honor.

19          Obviously, there are still some variables in play,

20 but I think it's been public, in terms of what the thoughts

21 currently are.  Obviously, negotiations continue, but there's

22 nothing that's being withheld.

23          In terms of disclosure obligations, we have,

24 collectively, as the plan proponents, have disclosed

25 everything that there is to disclose, with respect to the

1    size of the pot, as well as the percentages among the States.

2    And as Mr. Eckstein noted, the trust distribution procedures

3    are still being worked on, but when they are finalized, they

4    will, of course, be put into the plan supplement, as has been

5    done in other cases, like (indiscernible) and we think

6    that's, you know, given the circumstances here, fully

7    appropriate.

8                There's nothing that's being withheld; it's just

9    we can only disclose what's available to be disclosed and

10   that should be sufficient under the standards that govern

11   approval of the disclosure statement, Your Honor.

12               So, those are my comments, Your Honor, unless you

13   have any questions.

14               THE COURT:  Thank you, Mr. Maclay.

15               Ms. Lawson?

16               MS. LAWSON:  Thank you, Your Honor.

17               First, I certainly did not mean to suggest, if

18   anyone took it that way, that we have been frozen out of any

19   discussions.  There is, at the bottom of this, I think a

20   fundamental disagreement between West Virginia and some of

21   the other States as to how the allocation should be made.

22               There are many large States that will benefit from

23   a population-based allocation and West Virginia is a

24   relatively small, but very hard-hit State that believes that

25   intensity of crisis within the state needs to be taken into

1  account to a larger degree to fairly allocate these funds and

2  to direct them where they are most needed.

3         A state was just made that nothing had been

4  withheld from us, but I think one of the critical issuing

5  here is that if we are, in fact, using the same allocation

6  formula as Purdue Pharma, then the debtors should be able to

7  state that in the disclosure statement.  The allocation

8  formula was disclosed in Purdue Pharma, after several

9  iterations of the disclosure statement.  And that -- I don't

10 think we should be hearing that from third parties,

11 informally, I think that is a critical piece of information

12 to explain that this percentage was not just pulled out of

13 thin air, to understand the purpose behind it, how it was

14 calculated, and to allow us to check the accuracy of that in

15 terms of the input that they used and whether we agree with

16 those, because this is, as they said, ultimately, a

17 confirmation issue as to whether the allocation method is

18 proper and fair, and we just want an adequate opportunity to

19 understand and test that as the approach to confirmation

20 hearing and go through the confirmation with any discovery.

21         THE COURT:  Mr. Gott?

22         MR. GOTT:  Your Honor, I think you just really

23 heard the key point, which is that the rationale behind the

24 proposed allocation is a confirmation issue and it's

25 something that will be tested in the discovery process that

42

1  we have teed up for confirmation and that be -- and to add

2  that confirmation is the appropriate time to tackle the

3  propriety of the allocation.

4          You know, like I mentioned, and to echo the

5  comments of Mr. Maclay and Mr. Eckstein, it is certainly not

6  unprecedented and, indeed, is, you know, more and more

7  comment in other mass-tort context for specifics around

8  procedures and, you know, the precise outcome for individual

9  claimants to be disclosed as part of a plan supplement.

10          And here, when we -- to use the phrase "plan

11  supplement" is somewhat misleading, because often I think

12  when we think of a plan supplement, we think of something

13  that's disclosed maybe seven days before the voting deadline.

14  That's just (indiscernible) to some of the, you know, extra

15  documents that go along with the transaction that's

16  contemplated by the plan.

17          Here, we're talking about, like I said, five or

18  six weeks with the documents at issue that we'll disclose

19  what the plan will provide to these claimants and how those

20  funds will be allocated and distributed and for what uses

21  they can be deployed.  So, we think the time with that

22  information is more than adequate and so we think that this

23  objection should be overruled.

24          THE COURT:  I agree.  I think it is not unusual in

25  mass-tort cases to have the TDPs filed later with the plan

A-6604

1  supplement and I am satisfied that the debtors are providing

2  a sufficient amount of time between those disclosures and the

3  voting deadline to allow the opioid claimants to review those

4  and make a determination of whether or not they think it is

5  appropriate to vote for or against the plan.

6          So, I think the disclosures are adequate.  I will

7  overrule the objection.

8          MR. GOTT:  Okay.  Your Honor, the next objection

9  on the chart that has not been resolved was filed by Attestor

10 Limited and Humana, Inc., at Docket Number 2384.

11          There are a number of issues that, at least to our

12 understanding, are still outstanding, and so I would cede the

13 podium to Attestor's defense counsel to take us through their

14 objection and hopefully flag those topics for us that we

15 think are still outstanding.

16          THE COURT:  All right.

17          MR. FELDMAN:  Your Honor, I assume you can hear

18 me.  Matt Feldman for Attestor, Humana.  I'm from Willkie

19 Farr & Gallagher.

20          THE COURT:  Go ahead, Mr. Feldman.

21          MR. FELDMAN:  Thank you, Your Honor.

22          Your Honor, I think everything I'm going to say

23 Mr. Gott is going to respond that those are confirmation

24 issues, but if the Court will indulge me for just a couple of

25 minutes, I think I'm going to explain why I don't think

1  they're confirmation issues and why I do think they are

2  disclosure issues.

3          Your Honor, we have to really back up a little bit

4  and understand how we got here today.  We got here today

5  through a negotiation pre-petition with the RSA parties,

6  where essentially all of value from the combined business was

7  allocated to the opioid side of the house.  And why would

8  they do that, Your Honor?  They would do that because, in

9  fact, they didn't expect to file the branded business, and

10  that made all the sense in the world.  As long as they could,

11  in the ordinary course of business, pay for the Acthar

12  business and the other branded business, then there was no

13  reason not to take that value and move it across to the

14  opioid settlement.

15          But what happened in the interim is that the DOJ

16  and CMS showed up.  They brought legitimate claims for

17  antitrust violations and other types of violations, lawsuit

18  filed.  And so the company, again, I think appropriately,

19  made the decision that they needed to file the entire

20  company.  But there was no value left available for Acthar

21  and its creditors and those claimants.

22          And so, as a result, here we are.  They've put

23  together a plan that, in essence, says you'll take $30

24  million because that's all the value there is.  The legal

25  fees in this case and professional fees are going to exceed

1   $30 million, so that number couldn't have been right.  But

2   they bumped it up to a hundred, and they said, you know, go

3   sit in the corner and be happy because the guaranteed bonds

4   have claims at all of the boxes and you don't.

5          Well, we're going to find out, Your Honor, at

6   least start to find out on June 25th if that's right.  But of

7   course, they want the disclosure statement approved today, so

8   they want to go out with a plan that won't work, if it's, in

9   fact, the boxes don't work the way they say they do.  And Mr.

10  Harris, I think said to you at the last hearing, Your Honor,

11  that he'll take that timing risk.

12         I don't understand why he has to take that timing

13  risk; in fact, I'm not sure why we're going forward with the

14  disclosure statement today.  We're in the middle of a

15  mediation with Judge Sontchi, which is -- well, "middle" is a

16  bit of an overstatement -- the beginning of a mediation with

17  Judge Sontchi that has not had a chance to perform or work.

18         But at the end of the day, if we're right -- and

19  we will demonstrate that at confirmation, that, in fact,

20  value has moved -- then their -- this plan won't be

21  confirmed.  And by the way, if we're wrong, then there should

22  be disclosure about it because we can't decide whether to

23  vote in favor of a plan that allocates $100 million to all

24  general unsecured creditors, other than the Government, other

25  than the bonds, other than the opioid side, or whether we

1   should vote to oppose it because there's no disclosure around

2   that, Your Honor.

3          In fact, all of that disclosure is going to have

4   to come through a discovery process which Your Honor knows

5   and everybody else on the Zoom calls knows has been and will

6   continue to be a very difficult process because the debtors

7   are not forthcoming with disclosure and are not forthcoming

8   with discovery.

9          So we think, Your Honor, there are really two

10  paths here:  One is that we ought to simply delay approval of

11  the disclosure statement for 30 days, let some of these other

12  issues ripen, including, frankly, on the opioid side -- which

13  I was not all that familiar with, which I'm hearing about

14  this morning -- or, I'm sorry, this afternoon.  But also let

15  the Court hear whether or not we are entitled to claims at

16  additional boxes, which would change the disclosure.  If

17  we're not entitled to those claims, then maybe this

18  disclosure statement can stand or maybe it could be

19  supplemented by that, and to let Judge Sontchi begin his

20  process of mediation.

21         If we go forward today, Judge, we are heading

22  towards a confirmation war, not a confirmation process.  And

23  in my mind, it may be for no reason.  But certainly, we could

24  understand and limit the number of issues that have to be

25  dealt with at confirmation if the case had just progressed a

1  little bit further.

2          And so we would ask, Your Honor, that they either

3  update the disclosure that relates to what value was taken

4  from the Acthar side of the house, the branded side of the

5  house, and moved over to the opioid settlements.  But more

6  importantly, Your Honor, we would ask the Court not to

7  approve the disclosure statement today -- you don't have to

8  deny it today, either, Your Honor -- and give these cases

9  time to ripen.

10          So I'll pause there.  And I'm sure Mr. Gott is

11  going to say these are all confirmation issues, Judge,

12  overrule the objection, and we'll talk about it.

13          THE COURT:  Mr. Gott.

14          MR. GOTT:  Your Honor, you know, to the contrary,

15  you know, certainly while the issues that Humana and Attestor

16  have raised that Mr. Feldman discussed will be disputed and

17  will be litigated at confirmation, to the extent they aren't

18  litigated before then and resolved in the many turning wheels

19  that are already in motion.

20          You know, I think we -- I think that the

21  disclosure issue that's raised around the potential risks

22  associated with the Attestor/Humana litigation, their

23  theories of their claims and of potential bankruptcy-related

24  issues like avoidance actions, like administrative claims,

25  those have all been addressed with pages -- frankly, pages

1  and pages of additional disclosures that have been included

2  in the disclosure statement.

3          Just starting on page -- looking at the -- this is

4  the redline of the disclosure statement that was filed at

5  Docket 2865, this was earlier this morning, overnight,

6  starting on Page 98, we have more than two entire pages, two

7  and a half pages that were largely drafted by Humana and

8  Attestor, to explain their view of the cases and explain the

9  risks associated with receiving court confirmation of this

10 plan.  So we think the -- we think the disclosures around all

11 of these issues are adequate and appropriate.

12         And like I said, we do have -- we have a number of

13 processes that are already in motion and are already moving.

14 We have the claims objection hearing coming up on the 25th,

15 we had a discharge proceeding last week, and we have the

16 administrative claims bar date coming up and litigation

17 around Acthar administrative claims.  And all of those things

18 will build and will occur -- are intended to occur before the

19 confirmation hearing or, at latest, in connection with the

20 confirmation hearing, when the pieces will come together and

21 the debtors will carry their burden and prove that the plan

22 is structured appropriately.

23         So we think the -- we think the objection as to

24 the adequacy of the disclosures is unfounded, and we think it

25 should be overruled.

1          THE COURT:  What about the -- what are the

2  disclosures regarding the transfer of funds between the

3  specialty brand side and the generics brand side?  I think

4  that's what Mr. Feldman is talking about.

5          MR. FELDMAN:  I note -- I'm sorry, Your Honor.

6  I'm not interrupting.  I -- we don't dispute that the risks

7  associated with us being successful on the litigation have

8  been properly disclosed.  We think it's a shame to go

9  forward, but that's a different issue.  But there is no

10  disclosure that I'm aware of, Your Honor -- and it is a

11  voluminous document and they keep updating it and filing, to

12  their credit.  I am certainly not aware of anything that

13  talks about the fact that value has been siphoned off from

14  the specialty brand side to the generic side.

15          THE COURT:  Well, my guess is they're not going to

16  describe it as that it was "siphoned off."  But let me hear

17  from Mr. Gott as to what he thinks the disclosures are in the

18  disclosure statement.

19          MR. GOTT:  Your Honor, the piece that we've added,

20  and we thought it was -- we thought it was targeted at what

21  was being raised by this objection, not just by Humana and

22  Attestor, but also by the Ad Hoc Acthar Group -- and that --

23  the disclosure was added -- excuse me -- I believe it's

24  Article 4, Section D of the disclosure statement, and I can

25  get the page reference.  That's Page 98 of that redline I

1  mentioned before, filed at 2865.

2          And the disclosure is that -- and again, this was

3  targeted to what we thought the issue was -- was that the Ad

4  Hoc Acthar Group has identified 14 billion of intercompany

5  transfers that it believes may be subject to challenge and/or

6  avoidance.  The debtors' position is that the transfers

7  identified largely reflect ordinary course intercompany

8  business activity and/or satisfaction of non-avoidable

9  obligation, the general structures of which are described in

10  more detail in the debtors' cash management motion filed at

11  Docket Number 23 in the Chapter 11 cases.

12          So that would be -- that's our summary of the

13  issue and of our position on things.  You know, we -- as Your

14  Honor noted, we don't believe that there are actionable

15  claims relating to any of the historical transfers at issue

16  involving Mallinckrodt ARD.  But if -- you know, if there are

17  -- if there are topics that aren't addressed by that

18  disclosure that we may have had a disconnect on, you know,

19  happy to consider further disclosures around the subject.

20  But we think that that level of disclosure, explaining that

21  transfers have been identified, they've -- the creditor and

22  the objector believes that they may be avoidable, the debtors

23  disagree, I think that's the level of disclosure that's

24  really necessary here.

25          MR. FELDMAN:  Your Honor, I think there are two

1   things missing in that disclosure:  One is the impact of us

2   being right, that is missing; and, secondly, Your Honor,

3   whether or not they're continuing to take value or money from

4   the Acthar brand -- specialty branded side of the house and

5   move it over to the generic side of the house, whether that's

6   part of their business plan going forward.  People should

7   understand that because there now is a stock option under the

8   plan.  So would you want to own -- you know, would you want

9   to own this company if money is going to be, you know, moved

10  around as it has been historically?  And that's not disclosed

11  -- again, I'll turn to Mr. Gott, he knows the document better

12  than I do -- but certainly not disclosed anywhere that I see.

13              THE COURT:  Mr. Gott.

14              MR. GOTT:  Your Honor, as the disclosure

15  indicates, the flow of funds around the company is disclosed

16  in some detail in our cash management motion.  And the

17  disclosure statement now specifically refers anyone reading

18  that section to that motion to gain a better understanding.

19  And then, fundamentally, you know, the validity -- excuse me,

20  the validity of those transfers or whether any of them give

21  rise to actionable claims are issues that will need to be

22  sorted out in the confirmation discovery process.

23              THE COURT:  All right.  I do think the

24  disclosures, at this point, are sufficient to give a

25  reasonable investor the opportunity to determine -- or to

1   understand that there's a dispute over these transfers.  I

2   don't think the debtors have to disclose what the results

3   would be if they lose the dispute because that would be

4   giving disclosures about other potential plans, which is not

5   required by 1125.

6             So I think the disclosures, at this point, are

7   satisfactory enough to allow a reasonable investor to make a

8   determination on whether or not to vote for the plan, based

9   on the fact that there -- these transfers occurred, there's a

10  dispute as to whether the transfers are legitimate and that

11  will be decided at confirmation.

12            MR. FELDMAN:  Thank you, Your Honor.

13            And I'm not going to renew it at this moment, but

14  we would urge Your Honor, as part of the overall hearing

15  today, to consider whether this is an appropriate time to

16  approve a disclosure statement.  Thank you.

17            THE COURT:  Thank you.

18            MR. GOTT:  Okay.  Your Honor, next, the next

19  objection we have in the chart was filed by the Buxton

20  Helmsley Group and Alexander Parker at Docket Number 2385.

21  We believe we've -- we believe we've addressed, really, the

22  primary issue raised by the objection, at least for

23  disclosure purposes, by disclosing that there are -- there is

24  a dispute, particularly arising under Irish law, around the

25  propriety actually taken by the debtors and their board.

```
1              But beyond that, Your Honor, we don't think there
2   are additional issues that require further disclosure and any
3   other aspects of this objection would be related to
4   confirmation and should be overruled.
5              THE COURT:  All right.  Let me hear from Buxton
6   Helmsley Group.
7         (No verbal response)
8              THE COURT:  No response.  All right.  That
9   objection is overruled.
10             MR. GOTT:  Your Honor, the next objection on the
11  list was filed by Covidien -- excuse me -- at Docket Number
12  2389.
13             We think these -- we think these objections have
14  been cured with the additional disclosures relating to the
15  treatment of opioid claims and how the opioid trusts are
16  going to be structured and then the further disclosures that
17  are yet to come in the plan supplement filing process.
18             And then, you know, beyond that, Your Honor, we
19  think these objections were really just hard to get
20  (indiscernible) around those topics, so we think that it
21  would be appropriate to overrule this one, as well.
22             THE COURT:  All right.  Mr. Anker, are you
23  speaking on behalf of Covidien?
24             MR. ANKER:  I am, Your Honor.  Can you hear me
25  okay?
```

54

1          THE COURT:  Yes.  Thank you.

2          MR. ANKER:  Okay.  Your Honor, I'll try to be

3    brief, as well, maybe not quite as brief as Mr. Silverstein,

4    but hopefully brief.

5          I think, as Mr. Gott just noted, our objections

6    are entirely disclosure objections.  I appreciate -- and we

7    certainly reserve all rights as to confirmation, but I

8    appreciate that courts don't like to hear confirmation

9    objections at the disclosure statement hearing, and I'm not

10   going to pretend that the plan is, quote, "patently

11   unconfirmable" within the limited context of that law.

12         With respect to disclosure, I guess my reaction

13   is, if this were the original plan that called for the filing

14   of the plan supplement literally five days before the

15   objection deadline and the voting deadline, I don't think the

16   disclosure statement provides adequate disclosure and I'm

17   happy to say why.  But I think that, if these -- I think

18   these are issues that can be cured, and I expect the debtor

19   will cure through the plan supplement, which I gather now is

20   going to be filed 35 to 6 weeks [sic] before.

21         By way of example, there is a new class that was

22   created yesterday under the plan -- I say "yesterday," in the

23   plan that got filed overnight -- Class 9-I, as in Irving, for

24   no recovery opioid claims, which is defined as claims that

25   are -- and let me see if I can get the definition here right,

1   Your Honor, yeah -- all opioid claims that are either a

2   subject of disallowance under Section 502(e)(1)(B) of the

3   Bankruptcy Code as of the effective date, subject, however,

4   to Section 502(j) of the Code, and the definition goes on.

5           Well, who is making that subject to disallowance?

6   Is it Your Honor?  I have no qualms.  But who makes that

7   decision and what does it mean, subject to reconsideration

8   under 502(j), for purposes of classification?

9           On treatment, with respect to other opioid claims,

10  which is the other class the claim might fall in, assuming

11  it's not part of an assumed contract, there, if you look at

12  the definition of what other opioid claims -- again, and this

13  does go to disclosure -- it says, quote, "Shall receive its

14  pro rata share" -- each other opioid claim, quote:

15          "-- shall receive its pro rata share of the other

16  opioid claim share up to" blank "percentage of the allowed

17  amount of such claim."

18          Well, clearly, to know what to do, that percentage

19  has to be filled in.  And even if you look at the definition

20  of "other opioid claim share," it is defined in a blank, as

21  well, as a share to be determined in connection with

22  confirmation, potentially, and also must be acceptable to

23  other holders, the Governmental Plaintiff Ad Hoc Committee

24  and the MSGE Group, who are not, in fact, parties to that --

25  are not evidently in that class.  All of that creates issues.

56

1               Another issue by way of disclosure is that what is

2       apparently allocated to the other opioid claims are, quote,

3       "a share," the unspecified share of, quote, "the opioid MDT 2

4       initial distributable value."  But there's another provision

5       of the plan that talks about for the opioid second -- or

6       subsequent distribution, that that may go in part to a

7       reserve for other opioid claims.

8               I'm not going to argue today that there needs to

9       be ratable, fair treatment.  What I do think is there needs

10      to be disclosure on all of these issues to allow people to

11      make reasonable decisions.  I do think, in candor, that

12      disclosure can occur in the plan supplement.  I hope and I

13      expect it will be made and it will be made with clarity and

14      not, you know, a lot of provisions that are hard to

15      reconcile.

16              And I am certainly am prepared -- and Mr. Gott

17      reached out to me, and I appreciate that.  I'm certainly

18      prepared, if we have questions, to get on the phone and see

19      if we can at least understand the treatment, so we can then

20      make a judgment what, if anything, we need to do when it

21      comes to plan confirmation.  So, with that, Your Honor, we're

22      not pressing the objection today, on the understanding that

23      there will be clarity on all of these issues in the plan

24      supplement.

25              Thank you, Your Honor.  Happy to answer questions

57

1    if you have any.

2              THE COURT:  Thank you, Mr. Anker.  No questions.

3              Mr. Gott, I assume the plan supplement will

4    address all these issues, through the TDPs, I assume?

5              MR. GOTT:  Yes.  Your Honor, I think, between the

6    plan supplement, but then, also, I think, fundamentally,

7    we're -- what we're grappling with are the difficulties

8    associated with what are highly contingent and disputed

9    claims of parties who, you know, may be asserting -- in

10   Covidien's case, you know, may be asserting indemnification

11   rights, you know, potentially contribution rights in the

12   future.

13             But the notion is or the trouble is in the next --

14   and this is -- this goes to why we amended the plan along the

15   lines Mr. Anker described.  The fundamental problem is that

16   we have provisions of the Bankruptcy Code to grapple with in

17   figuring out how to deal with those claims.  Section 509(c)

18   provides for subordination of claims for contribution by co-

19   debtors with the debtor to payment in full of the primary

20   creditor on those claims; Section 502(e)(1)(B), which

21   provides that claims (indiscernible) for indemnification or

22   contribution or reimbursement can be -- should be disallowed,

23   so long as they are contingent.  And so there are, you know,

24   some necessary uncertainties built into any process dealing

25   with potentially large and any large number of claims that

A-6619

1 are like those that we are dealing with here.

2         And so what the plan proposes to do and what we

3 will -- what we propose to do moving forward is to make sure

4 that those issues are resolved in connection with

5 confirmation.  And I think the plan supplement, you know,

6 will address -- will certainly address, you know, the -- how

7 those claims may be asserted and any of those buckets will be

8 adjudicated or resolved or settled, however it make be

9 treated.

10         We do have -- you know, the -- we did amend the

11 plan or we revised the plan to, you know, state more clearly

12 that the other opioid claims are going to be adjudicated,

13 resolved, liquidated, settled by the opioid MDT 2 trustee, so

14 that's the main trustee for the master distribution trust.

15 And you know, we -- that's the -- that -- we think the

16 disclosures around that process are appropriate.

17         So I understand Mr. Anker's concerns.  I just

18 wanted to make sure that the intention behind the plan and

19 the provisions of the plan is clear, so that there weren't

20 any -- there weren't any misconceptions.

21         THE COURT:  All right.  Well --

22         MR. ANKER:  So, Your Honor, if I might?  This is

23 Mr. Anker.  If I can just be heard briefly.

24         The last thing I'm going to ask is for the debtor

25 to change the provisions of the Bankruptcy Code, and I don't

59

1   want to get into -- I don't want to get into ultimate plan

2   objections.  These are -- while I hope these claims never

3   arise, frankly, at least in a liquidating way, there are

4   provisions of the code, 502(j), that provide, you know, for

5   reconsideration of a previously contingent claim and lots of

6   case law that provides for it, and so then for catchup

7   distributions, if necessary.

8            And there are lots of provisions that say -- and I

9   think, as I read the disclosure statement, it now says that

10  Your Honor -- the issues can be brought to Your Honor post-

11  confirmation and Your Honor gets to decide about the

12  allowability or non-allowability of those claims in

13  accordance with the Bankruptcy Code and applicable law.  And

14  if it says that, that may be sufficient.

15           I am not going to get into plan confirmation

16  issues now.  I am committed to working with Mr. Gott, if it's

17  not clear already, to make sure we have clarity, so my client

18  can make a judgment on what, if anything, it wants to do at

19  this point.  Hopefully, that will be nothing.

20           THE COURT:  All right.  Thank you, Mr. Anker.

21           So it sounds like these objections are not being

22  pursued, so we will set those aside for now.  And if they are

23  not resolved at the time of confirmation, I'm assuming I'll

24  hear from Mr. Anker again, but hopefully, those get resolved.

25           MR. ANKER:  Thank you, Your Honor.

1          THE COURT:  All right.  Mr. Gott, next.

2          MR. GOTT:  All right.  Yeah, next, Your Honor, so

3   we have the UCC's objections, which we have resolved.  The

4   UCC is one of the parties who we know would like to make a

5   statement.  As I mentioned at the outset, we'd like to save

6   those for the end to try to get through as many objections

7   this afternoon as we can to avoid the need for so many people

8   to come back onto the hearing whenever it may (indiscernible)

9   I know we're already down under 30 minutes left, so I imagine

10  we'll be needing to rethink the -- so I just wanted to put a

11  pin in it and make it clear we understand the UCC will want

12  to make a statement (indiscernible)

13         THE COURT:  Ms. Speckhart, is that okay with you,

14  to wait until the end?

15         MS. SPECKHART:  Yes, Your Honor.  If that's your

16  preference, we would like to just explain some of the

17  reasoning (indiscernible) settlement that we made, and we'll

18  save that for the end, if it's appropriate.

19         THE COURT:  Okay.  Thank you.

20         All right.  Next up, Mr. Gott?

21         MR. GOTT:  Yes.  So the next -- actually, the next

22  objection that we have not resolved -- so I'll note that, on

23  the chart, the next objection that shows a substantive

24  response is the Ad Hoc Committee of NAS Children.  We did

25  hear from counsel to the ad hoc committee before the hearing

1  started that their issues had been resolved and that they

2  would not be pressing any objections.

3         So I think we can move on to the next one down the

4  list.

5         THE COURT:  Let me just ask if --

6         MR. GOTT:  And that is --

7         THE COURT:  Let me just confirm that, if someone

8  from the Ad Hoc Committee of NAS Children wants to speak.

9     (No verbal response)

10        THE COURT:  Okay.  Go ahead, Mr. Gott.

11        MR. GOTT:  Sure.  Next on the list is the

12 objection filed by Columbia Casualty Company, Docket Number

13 2400.  And I will -- I'll turn the podium over to Mr.

14 Christian to take us through that objection.

15        THE COURT:  All right.  Mr. Christian.

16        MR. CHRISTIAN:  Thank you, Mr. Gott.  Thank you,

17 Your Honor.  David Christian on behalf of Columbia Casualty

18 Company.

19        Our -- using the debtors' chart as a tool, the

20 first item is that we complained that the disclosure

21 statement didn't identify or adequately describe what was

22 happening with insurance policies that might be assigned to

23 the trust.  Let me say that I appreciate Latham & Watkins and

24 Mr. Gott, in particular, extending the amount of time that

25 would be available between filing of the plan supplement and

1  the objection deadline.  That solves my problem of having

2  time to review it and object, if necessary, before the

3  confirmation hearing.

4          I would just mention -- and I know this has been

5  touched on a little bit during the discussions with counsel

6  for the State of West Virginia and just a minute ago with Mr.

7  Anker -- that, you know, we sort of assumed that a disclosure

8  statement would give the clear details about what assets --

9  which is a significant (indiscernible) potentially

10 significant assets are being assigned to a trust before

11 disclosure statements are approved and just being adequate.

12 That's the kind of information that, if I were a voter, I

13 might be very interested in.  But that, of course, isn't my

14 main concern.

15         So I'll just -- I won't belabor the point, I'll

16 just mention that this seems like the kind of information

17 that, rather than being in a plan supplement, should be part

18 of an approved disclosure statement.  But having the

19 additional time that's been provided certainly deals with the

20 main concern of my client.

21         THE COURT:  All right.  So is your objection

22 resolved, Mr. Christian, at this point?  Are you going to --

23         MR. CHRISTIAN:  I -- well, I think that particular

24 point on the chart is mostly resolved from my standpoint.

25 And I heard what you said about the plan supplement earlier,

1  and I'm not going to belabor the point about having that

2  before the Court approves the disclosure statement.

3          THE COURT:  Okay.  Is there another issue that is

4  still outstanding?

5          MR. CHRISTIAN:  Yeah, there are a couple of more

6  issues I'd like to talk about.  The second item on the

7  debtors' chart relates to the plan provision about the debtor

8  negotiating with the trust to minimize adverse consequences

9  of self-insured retentions.  And we pointed out that we

10 didn't know what that meant and we posited in our objection a

11 couple of things it might mean, some of which are on the

12 (indiscernible) under the spectrum and some of which are

13 pretty innocuous.

14         And the debtor has proposed to amend the

15 disclosure statement to require that self-insured retentions

16 be paid to the extent required by applicable law.  What that

17 doesn't say is that the self-insured retentions are not

18 impaired by the plan.  And one of the things we had suggested

19 to the debtor that, if it's the case that the plan provides

20 that self-insured retentions that are below Columbia's

21 policies may be impaired by the plan, we would take the

22 position that that limits the ability to access the insurance

23 coverage that sits above those self-insured retentions.

24         Now that's our litigation position, the debtor

25 doesn't have to agree with it, but it seems like an important

```
 1  disclosure to claimants that there may be valuable insurance
 2  assets that may or may not be part of the assets assigned to
 3  the trust for resolving claims, and that the debtors' lack of
 4  provision or potential impairment of the self-insured
 5  retentions could limit or eliminate their ability to access
 6  those insurance proceeds.
 7          We suggested language along that line.  I don't
 8  know that the debtors had a chance to fully consider it, I
 9  don't know the debtors' position on that language or that
10  additional disclosure, but that's our view.
11          THE COURT:  Okay.  Mr. Gott.
12          MR. GOTT:  Your Honor, on that specific point,
13  that's right.  I do know I have a proposal from Mr.
14  Christian, and we will consider it.  Of course, we did
15  discuss it with our RSA parties, as well.  But I think, from
16  our -- my understanding on reading that disclosure and then
17  hearing Mr. Christian, I'm sure we can work out the
18  disclosure around that particular item.
19          THE COURT:  It does sound like something that is
20  easily fixed with a sentence or two.
21          MR. GOTT:  Yes, Your Honor.
22          MR. CHRISTIAN:  One other thing -- well, let me
23  mention two other things just for the sake of good
24  housekeeping.  The debtor, I think correctly, indicates that
25  we've resolved our disclosure objection related to the use of
```

A-6626

1  the trust (indiscernible) Rule 2004, after confirmation.

2  There's, I think it's about four sentences that they've added

3  to the disclosure statement that extends our view of that.

4            There is also a plan modification that was

5  included in the proposal from the debtor for resolving its

6  objection.  I just -- I may have missed it.  But in the

7  version of the plan that was filed just before this hearing,

8  I did not see that additional plan provision.  And I think

9  that's an important piece of the puzzle to make the

10 additional disclosure make sense or to make it true.  That

11 modification in the plan needs to be incorporated, as well.

12 And so, just for the sake of housekeeping, I'll mention to

13 you that we think that's important.  Our understanding is the

14 debtor intends to include it and it just wasn't on the

15 version I had seen on the -- as this hearing was beginning.

16            THE COURT:  Mr. Gott?

17            MR. GOTT:  That's correct, Your Honor.  I think we

18 intend to address that -- we intend to address that issue in

19 the forthcoming revised version of the plan.

20            THE COURT:  All right.  So it sounds like that's

21 resolved.

22            MR. CHRISTIAN:  Thank you, Mr. Gott.

23            Yes, Your Honor.  One last point, it's Number 4 on

24 the debtors' chart of Columbia's objections.  I think it's

25 half-resolved.  It's listed as resolved in the latest version

1  of the chart, but I'll say I think it's half-resolved.  And

2  what I mean by that is this:

3          Certainly, the additional language in the

4  disclosure statement explains that the way they're getting

5  opioid policies into the trust, if they're executory, is

6  through Section 365.  If they're non-executory, I understand

7  from this additional disclosure that (indiscernible) rely on

8  (indiscernible) under Section 1123(a) of the Bankruptcy Code.

9  So we appreciate having that disclosure, so we know sort of

10 what we're dealing with.

11         What it doesn't do is explain whether or not

12 they're treating the opioid insurance policies as executory,

13 and so we don't really know what (indiscernible) operating

14 and creditors don't know whether they're looking an

15 assumption and an assignment or they're looking at some

16 preemption battle, in the context of getting the policies

17 into the trust.

18         And I'll just mention for context that Columbia

19 has issued a policy in 2016 that had a term from June of 2016

20 to June 2017, which renewed for another year from June of

21 2017 to June of 2018.  And I wouldn't -- it would surprise me

22 to learn the debtor -- it would be unusual for the debtor to

23 take the position that a liability policy with an expired

24 term prior to the petition date, under which all the premiums

25 had been paid, was an executory contract that would be --

1 given the state of the law, at least in the Third Circuit,

2 would be a novel approach.

3          But I think the disclosure statement should

4 disclose, you know, which of those avenues they're using to

5 treat policies like Columbia's, and to make disclosure,

6 depending on which it is, about any objection we might have

7 to that.

8          THE COURT:  Mr. Gott?

9          MR. GOTT:  Your Honor, that -- so this topic is, I

10 think, very clearly a (indiscernible) is quite specific to

11 Columbia or to insurers, which, of course are very -- a small

12 subset of our creditor base.  It's also not something that

13 affects distributions to any other creditors.  It's not

14 something that affects the value of the reorganized company.

15 You know, these just aren't -- these aren't the types of

16 issues that need to be covered by a disclosure statement.

17          And indeed, they will be covered, though, when it

18 comes time to file the plan supplement and to disclose the

19 executory contracts that we intend to assume and, as

20 applicable, assume and assign to the opioid trust.  And we

21 can have, you know, the disputes around whether a contract is

22 executory or not, whether they are operating under Section

23 365 or not, can play out from there and are appropriately

24 addressed at confirmation.

25          You know, sitting here today, I don't think -- I

1  don't think there's any requirement contemplated under

2  Section 1125 that we articulate -- excuse me -- that we

3  articulate the legal basis for every single contract

4  assignment or assignment of rights that we may ultimately

5  undertake, particularly when the schedules for, again, the

6  assigned contracts and the assigned term policies will all be

7  disclosed in the plan supplement, and so that any disputes

8  can take off from there.

9        THE COURT:  All right.  I agree.

10        MR. CHRISTIAN:  Your Honor --

11        THE COURT:  I think --

12        MR. CHRISTIAN:  -- one --

13        THE COURT:  I agree.  I think the issue is really

14  one that is of interest only to Columbia and maybe some other

15  insurance companies.  And I think the issue is adequately

16  disclosed at this point.  To get into details about how and

17  when and why they are -- whether contracts are assumable or

18  not assumable and how they're going to be transferred to the

19  trust, I think, is something that is a confirmation issue and

20  I don't think is required under 1125 for the debtors to

21  disclose that.

22        MR. CHRISTIAN:  Your Honor, may I just say one

23  remark about Mr. Gott's rejoinder there?

24        THE COURT:  Go ahead.

25        MR. CHRISTIAN:  And I -- again, I don't -- thank

1  you, Your Honor.  I don't want to belabor the point or the

2  Court's time.

3         I do think it's more than our sort of parochial

4  legal issue at confirmation.  Just by way of example -- and

5  we mentioned this in our objection to the disclosure

6  statement -- the plan has a provision and it's rather

7  lengthy, about how, if it's an executory contract under which

8  somebody else might have a claim, that that claim would be

9  cut off and that the executory contract would be modified.

10  And certainly, it's worth a battle about whether that's

11  permissible under Section 365, whether there would be an

12  improperly characterized policy as executory and also whether

13  it's assignable anyway are things that could directly affect

14  the rights or abilities of creditors to gain access to the

15  proceeds of that policy.

16         So I think it -- it's not my fight to fight.  You

17  know, my client isn't (indiscernible) on this plan.  But I

18  don't think it's true to say that it doesn't relate to the

19  distributions that creditors might obtain from the proceeds

20  of those policies.

21         THE COURT:  Well, I don't think that changes my

22  position.  I think the plan -- or excuse me -- the disclosure

23  statement does provide adequate information for a reasonable

24  creditor to make a determination on -- as to whether or not

25  the insurance proceeds will or will not be available.  And if

1  they want to vote for or against the plan based on issue --

2  on that issue, I think they have sufficient information.

3          MR. CHRISTIAN:  Very good, Your Honor.  Thank you.

4          THE COURT:  All right.  We only have ten minutes

5  left, Mr. Gott.  We still have a ways to go here, it looks

6  like.

7          MR. GOTT:  Yeah.

8          THE COURT:  I did --

9          MR. GOTT:  We do.

10          THE COURT:  I did reserve -- I have time tomorrow.

11  I had several hearings that have come off for tomorrow, so we

12  can pick this up tomorrow morning at 10 a.m.  And how much

13  time --

14          MR. GOTT:  That would be -- that would be -- that

15  would be fine for the debtors, Your Honor.

16          THE COURT:  All right.  Is it --

17          MR. PREIS:  Your Honor?

18          THE COURT:  Go ahead.

19          MR. PREIS:  I'm sorry.  Arik Preis from Akin,

20  Gump, Strauss, Hauer & Feld.

21          We have alerted the debtors to this problem and

22  (indiscernible) chambers that there are a number of us who

23  need to be in another hearing tomorrow at 10 a.m. for a

24  companion opioid case that should be done by, I would say,

25  hopefully, 12:30 or so, twelve o'clock.  So, if at all

1 possible, if we could start at 12 or 12:30, that would be

2 (indiscernible)

3            THE COURT:  How much time do you think we have

4 left, Mr. Gott?  How many objections are remaining here.

5            MR. GOTT:  So I would say we probably have -- we

6 probably have a little less time than we just spent now on

7 disclosure and confirmability issues, specifically.  So

8 something more -- you know, something like an hour or an hour

9 and a half, if I had to -- if I had to wager.

10            We also have the scheduling motion and some issues

11 around discovery protocols that will also take up some time.

12 So I think this will be -- you know, we probably still are

13 looking like -- looking at something to the tune of a few

14 more hours.

15            THE COURT:  Well --

16            MR. JONES:  Your Honor, this is Evan Jones from

17 O'Melveny & Myers.

18            THE COURT:  Go ahead, Mr. Jones.

19            MR. JONES:  Your Honor, just a point of personal

20 privilege.  There are other conflicts.  I have a bankruptcy

21 trustee who has just flown into LA tonight for an all-day

22 meeting tomorrow that I am hosting.  We do have objections

23 that we'd like to be heard.  I understand that scheduling

24 anything for a group this large becomes difficult.  But we

25 only heard from the debtors yesterday that they thought we

1    might roll over into tomorrow.  I can clear my day on

2    Thursday.  I don't know if that's convenient for the Court or

3    not.

4              THE COURT:  I can't clear my day on Thursday.

5              MR. JONES:  Very well, Your Honor.  I'll have a

6    colleague present and I apologize to the Court for not being

7    here tomorrow.

8              THE COURT:  Okay.  Well, I appreciate your ability

9    to have a colleague deal with the issue.

10             Is there anyone else who has --

11             MR. JONES:  Thank you, Your Honor.

12             THE COURT:  -- any issue with tomorrow?  All

13   right.

14             MR. CIARDI:  Your Honor, Albert Ciardi.  We have

15   the status conference on the trustee motion is also on at the

16   end of the disclosure statement hearing for today.  I don't

17   know if that's one of the matters Mr. Gott had been

18   mentioning that still needs to be addressed.  We, obviously,

19   can do that at another time, but it is on the list.

20             So I don't have -- I, like the others, are not

21   available in the morning tomorrow.  But I think our matter

22   can be somewhat discrete and put on a different day.

23             THE COURT:  All right.  Well, I appreciate moving

24   that off then, it will free up some time.  My day tomorrow, I

25   have -- actually, I'm having a live hearing for the first

1  time in 15, 16 months tomorrow, at three o'clock.  So let's

2  start at -- Mr. Preis, is 12 okay, or do you need 12:30?

3         MR. PREIS:  I hesitate because Mr. Eckstein and

4  Mr. McClay are also speaking at the same hearing.  So I don't

5  know how long (indiscernible) for some other people.  But I

6  (indiscernible) 12 or 12:30.

7         MR. ECKSTEIN:  Your Honor, based upon the -- this

8  is Mr. Eckstein.  Based upon my experience in the other case,

9  I would think 12:30 probably is the safer time.  But I am

10  also mindful that you want to be able to conclude tomorrow.

11  So we'll figure out how to handle it either way.  But I would

12  appreciate starting at 12 or 12:30 --

13         THE COURT:  All right.  We'll --

14         MR. ECKSTEIN:  -- and we'll join as quickly as

15  possible.

16         THE COURT:  We'll start at 12:30.  I guess the one

17  good thing about having a live hearing is I can always make

18  them wait in the hallway, if we run over a little bit.  So we

19  will -- we'll start at 12:30.  Hopefully, we will get through

20  at least the disclosure statement issues tomorrow.  If we

21  need to, I appreciate Mr. Ciardi's willingness to push off

22  the other issue until later.

23         We also have a discovery issue between -- that the

24  debtors brought to me today that I told them I would hear at

25  eleven o'clock tomorrow, but I guess that doesn't work,

1   either.  Is that still a live issue, the discovery dispute?

2   I think Mr. Stern --

3              MR. ASTIN:  Your Honor, this is -- yes, Your

4   Honor.  Daniel Astin.  On the (indiscernible) I believe Mr.

5   Flowers, Pete Flowers (indiscernible) this morning and he

6   reached out to Mr. Murtaugh.  I believe that we have a rubric

7   for resolving the issue that will not require the Court's

8   intervention.  I don't know whether that loop has been

9   closed, but that's what (indiscernible) Murtaugh can speak to

10  that issue.

11             THE COURT:  Mr. Murtaugh, are you --

12             MR. HARRIS:  Your Honor, this is --

13             THE COURT:  Or Mr. Harris or somebody, whoever is

14  speaking.

15             MR. HARRIS:  Yes, Your Honor.  This is Chris

16  Harris of Latham, if you can hear me.

17             We had made a proposal to the ad hoc group, we

18  have not yet heard back.  Hopefully, we can resolve this, but

19  we would like to reserve the time tomorrow, whenever is least

20  inconvenient to the Court, in case we're not able to -- it's

21  still live now, but hopefully we can resolve it.

22             MR. ASTIN:  Your Honor, Mr. Astin.  I -- my sense

23  is that it will be resolved.  I am on -- I am on an airplane

24  in the middle afternoon (indiscernible) but I'm -- from what

25  I saw from the proposal, I am fairly optimistic that it will

1  be resolved (indiscernible)

2          THE COURT:  All right.  Well, let's try to -- I

3  did tell the parties they could file something today by -- or

4  now, by tomorrow at ten o'clock in the morning, so I'll see

5  if those come in at ten o'clock tomorrow.  If they don't, I

6  assume the issue is resolved.  If they do come in, we'll

7  either hear it at the end of the disclosure statement

8  hearing, if we're able to get to it.  If not, we'll have to

9  push it to another day.  I can do it late in the day on

10 Thursday, if necessary, but hopefully it gets resolved.  So

11 just let me know if it's resolved or not by tomorrow morning.

12         MR. ASTIN:  We will do that.  Thank you.

13         THE COURT:  All right.

14         MR. STEARN:  Your Honor, it's Bob Stearn -- if I

15 made be heard for just a second -- from Richards, Layton &

16 Finger.

17         We will endeavor to resolve this consensually.  If

18 we can't, we will let you know by email to Mr. Cavello in the

19 morning, and we'll file our letter.

20         THE COURT:  All right.  Thank you, Mr. Stearn, I

21 appreciate that.

22         All right.  The other thing I wanted to mention

23 just for people to think about is I see we have -- based on

24 the schedule you have for confirmation, you have this set for

25 a one-day confirmation hearing.  I don't know if we're going

1   to have this done in one day if all of these objections that

2   I have to -- that are confirmation issues, that I've said are

3   confirmation issues go forward.

4           So do we need to set this for a multiple-day

5   hearing?  Which, if we need to, I'd rather do that now

6   because, once my schedule fills up, then we might end up

7   with, you know, a day here, a day there.  So, if you want

8   more than one day, you know, if you want two or three days in

9   a row, it's best to let me know now, so we can get it on the

10  schedule.

11          Ms. Yerramalli, you raised your hand.

12          MS. YERRAMALLI:  Your Honor, Anu Yerramalli of

13  Latham & Watkins on behalf of the debtors.

14          You read my mind.  That was one of the things that

15  I was going to raise when we addressed the scheduling motion,

16  is that we do believe this will be a multiple-day hearing and

17  that we would like to work with Your Honor and chambers now

18  to set those dates, ideally consecutively.  But we did not

19  want to presuppose or presume that the 21st worked for Your

20  Honor, so we agreed to that date with all the parties.  And

21  when we address the scheduling motion, we're going to request

22  a date that works.  But if we could coordinate that with

23  chambers tonight and have a time line that we can present

24  tomorrow, we're happy to do that.

25          THE COURT:  All right.  Why don't we -- why don't

1  we do that?  And we'll talk about it tomorrow.  But I'm

2  assuming you're going to need at least three days, maybe

3  more, for confirmation.  So let's see if we can find a time

4  when we can get it consecutively.  I do see I have something

5  on my calendar for the 23rd and 24th already, so -- but

6  that's something I might be able to change.  All right.

7  We'll talk about that tomorrow then.

8              MS. YERRAMALLI:  Thank you, Your Honor.

9              THE COURT:  And the other thing, too, I'd ask the

10  parties to consider is do you want to do this hearing live

11  for confirmation, rather than -- avoiding some of these

12  issues we have with the technology like we had this

13  afternoon.  But think about it.  I'm not wedded to it, one

14  way or the other.  If the parties want it and think it would

15  be helpful, I'm happy to do it live; otherwise, we'll do it

16  virtually.  Okay?

17              All right.  Well, thank you all.  I'm a couple of

18  minutes late for my next appointment, so I need to jump off,

19  but -- so we are adjourned until tomorrow at 12:30, and I

20  will see everybody then.

21              COUNSEL:  Thank you, Your Honor.  Thank you, Your

22  Honor.

23          (Proceedings adjourned to 6/16/21 at 12:30 p.m.)

24          (Concluded at 5:01 p.m.)

25

78

1                           <u>CERTIFICATE</u>

2

3        We certify that the foregoing is a correct transcript

4    from the electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7

8    <u>/s/Mary Zajaczkowski</u>          June 15, 2021
     Mary Zajaczkowski, CET**D-531

9

10   <u>/s/William J. Garling</u>         June 15, 2021
     William J. Garling, CE/T 543

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          UNITED STATES BANKRUPTCY COURT
              DISTRICT OF DELAWARE
2
                              .  Chapter 11
3   IN RE:                    .
                              .  Case No. 20-12522 (JTD)
4   MALLINCKRODT PLC, *et al.*, .
                              .
5                             .  Courtroom No. 5
                              .  824 North Market Street
6                             .  Wilmington, Delaware 19801
7                             .
              Debtors.        .  June 16, 2021
8   . . . . . . . . . . . . . . .  12:30 P.M.

9      TRANSCRIPT OF TELEPHONIC DISCLOSURE STATEMENT HEARING
          BEFORE THE HONORABLE JOHN T. DORSEY
10              UNITED STATES BANKRUPTCY JUDGE

11
    TELEPHONIC APPEARANCES:
12
    For the Debtor:          Michael J. Merchant, Esquire
13                           RICHARDS, LAYTON & FINGER, P.A.
                             Rodney Square
14                           920 N. King Street
                             Wilmington, Delaware 19801
15
                             - and -
16
                             Anupama Yerramalli, Esquire
17                           Elizabeth Marks, Esquire
                             LATHAM & WATKINS LLP
18                           885 Third Avenue
                             New York, New York 10022
19

20  Audio Operator:          Jason Spencer, ECRO

21  Transcription Company:   Reliable
                             1007 N. Orange Street
22                           Wilmington, Delaware 19801
                             (302)654-8080
23                           Email:  gmatthews@reliable-co.com

24
    Proceedings recorded by electronic sound recording, transcript
25  produced by transcription service.

A-6641

```
1   TELEPHONIC APPEARANCES (Cont'd):

2   For the Debtors:           Jason B. Gott, Esquire
                               330 North Wabash Avenue, Suite 2800
3                              Chicago, Illinois 60611

4
    For Opioid Claimants:      Arik Preis, Esquire
5                              Mitchell Hurley, Esquire
                               AKIN GUMP STRAUSS HAUER & FELD LLP
6                              One Bryant Park
                               Bank of America Tower
7                              New York, New York 10036

8   For the SEC:               Alan Maza, Esquire
                               U.S. SECURITIES & EXCHANGE COMMISSION
9                              100 F Street, NE
                               Washington, D.C.
10                             District of Columbia 20549

11
    For the Canadian           Michael Joyce, Esquire
12  Elevator Industry          LAW OFFICES OF JOYCE LLC
    Pension Fund:              1225 N. King Street, Suite 800
13                             Wilmington, Delaware 19801

14  For the City of            Michael Etkin, Esquire
    Marietta:                  LOWENSTEIN SANDLER LLP
15                             One Lowenstein Drive
                               Roseland, New Jersey 07068
16
    For U.S. Bank National     John Ashmead, Esquire
17  Association:               SEWARD & KISSEL LLP
                               One Battery Park Plaza
18                             New York, New York 10004

19
    For the U.S. Trustee:      Jane Leamy, Esquire
20                             UNITED STATES DEPARTMENT OF JUSTICE
                               OFFICE OF THE UNITED STATES TRUSTEE
21                             844 King Street, Suite 2207
                               Lockbox 35
22                             Wilmington, Delaware 19801

23  For Teva                   Michael Goldstein, Esquire
    Pharmaceuticals:           GOODWIN PROCTER LLP
24                             The New York Times Building
                               620 Eighth Avenue
25                             New York, New York 10018
```

A-6642

```
 1   TELEPHONIC APPEARANCES (Cont'd):

 2   For Acthar Group:          Albert Ciardi, Esquire
                                Daniel Astin, Esquire
 3                              CIARDI CIARDI & ASTIN
                                1204 North King Street
 4                              Wilmington, Delaware 19801

 5
     For Humana:                Benjamin McCallen, Esquire
 6                              WILLKIE FARR & GALLAGHER LLP
                                787 Seventh Avenue
 7                              New York, New York 10019

 8   For the Committee:         Cullen Speckhart, Esquire
                                COOLEY LLP
 9                              1299 Pennsylvania Avenue, NW
                                Suite 700
10                              Washington, DC 20004

11
     For Governmental           Kenneth Eckstein, Esquire
12   Plaintiff:                 KRAMER LEVIN NAFTALIS & FRANKEL LLP
                                1177 Avenue of the Americas
13                              New York, New York 10036

14   For Columbus Hill          Paul Silverstein, Esquire
     Capital Management:        HUNTON ANDREWS KURTH LLP
15                              200 Park Avenue
                                New York, New York 10166
16
     For Columbia Casualty      David Christian, Esquire
17   Group:                     DAVID CHRISTIAN ATTORNEYS LLC
                                P.O. Box 9120
18                              Mission, Kansas 66201

19   For Covidien Limited:      Philip Anker, Esquire
                                WILMERHALE
20                              7 World Trade Center
                                250 Greenwich Street
21                              New York, New York 10007

22   For Multi-State            Kevin Maclay, Esquire
     Governmental Entities:     CAPLIN & DRYSDALE
23                              One Thomas Circle NW, Suite 1100
                                Washington, DC 20005
24

25
```

A-6643

```
 1  TELEPHONIC APPEARANCES (Cont'd):

 2  For State of West         Gregory Hauswirth, Esquire
    Virginia:                 LEECH TISHMAN FUSCALDO & LAMPL LLC
 3                            1007 N. Orange Street, 4th Floor
                              Wilmington, Delaware 19801
 4
                              - and -
 5
                              Kristin Anders Lawson, Esquire
 6                            525 William Penn Place, 28th Floor
                              Pittsburgh, Pennsylvania 15219
 7
    For McKesson              Jeffrey Garfinkle, Esquire
 8  Corporation:             BUCHALTER LAW FIRM
                              18400 Von Karman Avenue, Suite 800
 9                            Irvine, California 92612

10
    For Johnson & Johnson:    Jordan Weber, Esquire
11                            O'MELVENY & MYERS LLP
                              400 South Hope Street, 18th Floor
12                            Los Angeles, California 90071

13  For Multi-State           Kevin Maclay, Esquire
    Governmental Entities:    CAPLIN & DRYSDALE
14                            One Thomas Circle NW, Suite 1100
                              Washington, DC 20005
15
    For the Ad Hoc            Steven Smith, Esquire
16  Consortium of Equity      Christopher Carty, Esquire
    Holders:                  HERRICK FEINSTEIN LLP
17                            Two Park Avenue
                              New York, New York 10016
18
19  For the United States:    Mary Schmergel, Esquire
                              UNITED STATES DEPARTMENT OF JUSTICE
20                            CIVIL DIVISION
                              1100 L Street, NW
21                            Washington DC, 20005

22  For the Board of          David Giattino, Esquire
    Education of Chicago      STEVENS & LEE, P.C.
23  of Public Schools:        919 North Market Street, Suite 1300
                              Wilmington, Delaware 19801
24

25
```

A-6644

```
1   TELEPHONIC APPEARANCES (Cont'd):

2   For the Ad Hoc          Harold Israel, Esquire
    Committee of NAS        LEVENFELD PEARLSSTEIN, LLC
3   Children:               2 North LaSalle Street, Suite 1300
                            Chicago, Illinois 60602
4
    In Propia Persona:      Darrel Edelman, Pro Se
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   <u>MATTER GOING FORWARD</u>:

2   Motion of Debtors for Entry of Order (I) Approving the
Disclosure Statement and Form and Manner of Notice of Hearing

3   Thereon, (II) Establishing Solicitation Procedures, (III)
Approving the Form and Manner of Notice to Attorneys and

4   Solicitation Directive, (IV) Approving the Form of Ballots,
(V) Approving Form, Manner, and Scope of Confirmation Notices,

5   (VI) Establishing Certain Deadlines In Connection with
Approval of Disclosure Statement, and Confirmation of Plan,

6   and (VII) Granting Related Relief [Docket No. 2200; Filed
5/5/21]

7

       **Ruling:   Approved/Order Entered**

8

9   <u>EXHIBITS</u>:                        <u>ID</u>     <u>Rec'd</u>

10  Declaration of Jeanne Finegan                132

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-6646

```
 1        (Proceedings commenced at 12:32 p.m.)

 2             THE COURT:  Good afternoon.  This is Judge Dorsey.

 3   We're on the record in Mallinckrodt PLC; Case No. 20-12522.

 4   This is a continuation of the disclosure statement hearing

 5   from yesterday.

 6             Mr. Gott, you want to proceed?

 7             MR. GOTT:  Yes, Your Honor.  Good afternoon.

 8   Jason Gott from Latham & Watkins on behalf of the debtors.

 9             Can you hear me okay?

10             THE COURT:  I can.  Thank you.

11             MR. GOTT:  Great.  Just before diving in, one

12   process point.  It was mentioned yesterday that there was a

13   Purdue Pharma hearing this morning.  We delayed the start

14   until this time to allow as much time as possible for that

15   hearing to conclude.  We understand that it is still going,

16   but we are -- we, you know, discussed with those who are

17   involved there and they are okay with our proceeding, but

18   just wanted to let Your Honor know that, you know, Mr. Preis

19   for the OCC is still in that Purdue hearing as well as a few

20   others.

21             So they won't' be here right now; hopefully we

22   will be joined by the end of the hearing, but we will try to

23   push off any statements and the like until we know that Mr.

24   Preis is present and can present his statement.

25             THE COURT:  Alright, with that I will dive right
```

8

1  into the objections where we left off yesterday.  The first

2  one in the chart is the Securities & Exchange Commission.

3  The objection was filed at Docket 2401.  I will yield the

4  podium to the objector.

5           THE COURT:  Alright.

6           MR. MAZA:  Thank you, Your Honor.  This is Alan

7  Maza from the SEC.

8           Can you hear me?

9           THE COURT:  I can.  I'm trying to -- there you

10  are, okay.  Go ahead, Mr. Maza.

11           MR. MAZA:  Thank you.

12           Your Honor, the issue that were raising has been

13  raised before Your Honor and many other courts by the SEC,

14  probably as well as the U.S. Trustees Office regarding the

15  opt-out mechanism that's being utilized.  We have a

16  particular concern here with regard to shareholders and

17  510(b) claimants who are deemed to reject the plan.

18           I have argued this issue before numerous courts

19  and the consensus, I would say, with regard to, at least, the

20  deemed to reject class, which is not receiving any

21  consideration under a plan, is that the opt-out is just not

22  an appropriate mechanism.  I know one of my colleagues argued

23  this matter before Your Honor in AAC Holdings and I cited

24  that in our objection where Your Honor asked the obvious

25  question: what reasonable investor was receiving absolutely

1  zero under this plan is going to opt -- is going to say, you

2  know what, take away my revisions as well.

3       It doesn't make sense under a published decision

4  such as Emerge and Washington Mutual, and from a logical

5  perspective it makes absolutely no sense.  This is -- even in

6  front of other courts, Judge Gross.  We had this issue, he

7  has agreed.  Even judges in other districts I've had this

8  matter like in (indiscernible) in front of Judge Drain who is

9  always in favor of an opt-out, but he too draws the line at a

10  circumstance where the stakeholders are getting nothing under

11  the plan.  He says there is absolutely no basis to put the

12  burden on the stakeholder who is receiving no consideration

13  especially for a third-party release which, obviously, is

14  supposed to be under Continental, the where situation.

15       This is just, basically, the debtors taking an

16  opportunity to take advantage of those inattentive

17  shareholders who may not read the plan.  It's going to a

18  third-party intermediary.  So they may not even get it.  And

19  it's just -- it really is not justified.

20       We tried to resolve this issue.  We are not making

21  an issue with the opt-out even though we typically would

22  object to an opt-out by even creditors, but we understand

23  that there is stakeholders in the creditor class who are very

24  active in the plan process, they're entitled to vote.  So

25  we're not raising that issue here; however, for the

1  shareholders and subordinate claimants I don't think there is

2  any basis and the debtors will not be able to find a

3  published decision to support their -- to advance this

4  process.

5       So we are seeking -- we are raising it at the

6  disclosure statement hearing because they have sought to

7  approve this as part of the solicitation process.  We think

8  it's, as Your Honor recommended in AAC Holdings, or we

9  suggested it can be addressed at this point and this issue

10  should be taken off the table today, and not be, you know,

11  reserved for a confirmation battle on this obvious issue.

12       THE COURT:  Mr. Gott?

13       MR. GOTT:  Your Honor, I think we are all in

14  agreement that the issue fundamentally goes to confirmation

15  of the plan, recognizing that, yes, today, we have an

16  opportunity to address it, but at bottom I think the point

17  here is that the debtors recognize that the structure, as it

18  currently exists, is being challenged.  We have added

19  disclosures to that effect in the disclosure statement.  And

20  we think that is the proper resolution for today.  We

21  understand the risk heading into confirmation.

22       I think despite Mr. Maza's statements, we would

23  all recognize that the decisions reported or not are a mixed

24  bag and there are plenty of cases in this court in the

25  district that support the notion that even for deemed to

1  reject classes an opt-out structure is appropriate and can be

2  utilized.  Frankly, it's consistent with a class action

3  practice in Article III courts.

4          So all this to say, Your Honor, we don't think

5  there is such a fundamental issue that would preclude

6  issuance of the disclosure statement. We don't think this

7  rises to the level of the standard for today which is patent

8  unconfirmability.  We have legal support for the positon that

9  we are taking it for the structure of the plan.  So we think

10  the objection should be overruled.

11          THE COURT:  Well are the -- are classes that are

12  deemed to reject because they did nothing under the plan, are

13  they going to be solicited?

14          MR. GOTT:  There will be notices.  So equity

15  holders will be sent notices.  As Mr. Maza suggested, that

16  may be through intermediaries.  There will also be

17  publication notice which is, again, sufficient due process

18  for those unknown stakeholders from a constitutional

19  perspective.  And those notices we will put them on alert to

20  the existence of the releases.

21          So, yes.  I think the answer is, yes.  They will

22  receive notices.  They will be on notice that is adequate

23  from a constitutional perspective of the plan and proposed

24  releases.

25          THE COURT:  Are they going to be given the

1    opportunity to opt-out or is they have to object to the plan?

2         MR. GOTT:  No, they -- so there will be -- so for

3    subordinated claims, I guess -- well to clarify one thing.

4    In the first instance, we don't intend to (indiscernible) the

5    claims register at this point to move claimants from -- to

6    take proofs of claim and put them in the subordinated claims

7    class and, therefore, not send them a solicitation package.

8         Anyone with a filed proof of claim, I think, will

9    fundamentally -- will be receiving a solicitation package.

10   So that will have the opt-out option in the ballot there.

11   Then the notices that will go out to the deemed to reject

12   class will indicate that they are able to obtain an opt-out

13   form and to submit that in lieu of having to file an

14   objection.

15        So, you know, if there is any lack of clarity on

16   that front we will look at the documents again just to make

17   sure that that is crystal clear, but the intention is for the

18   opt-outs to be able to be done through a simpler election and

19   not filing a -- not having to file an objection to opt-out.

20        THE COURT:  Well that is a concern of mine that I

21   want to make sure that people who are deemed to reject are

22   going to have an opportunity and make it crystal clear that

23   they have an opportunity to submit a form to opt-out of the

24   third-party releases.

25        MR. GOTT:  Understood, Your Honor.  You know, we

1  may even be able to develop a streamlined process for doing

2  so; although, it may take a little while in discussion with

3  our noticing agent.  We will make it clear that opt-out forms

4  are available, simple forms, and can be obtained by

5  contacting the noticing agent or visiting the case website,

6  for example; all of which should really streamline that

7  process.

8          THE COURT:  Alright, well I do think that -- I

9  don't want to prejudge the issue at this point.  I do think

10 it is a confirmation issue, but it is one that I am

11 interested in and I think it does depend on the facts and

12 circumstances and how the noticing is done, and whether or

13 not I believe at the end of the day parties had a full and

14 fair opportunity to receive and understand this opt-out and

15 be able to obtain the proper form to be able to submit that

16 opt-out, but we will deal with that at confirmation.

17         MR. GOTT:  Thank you, Your Honor.

18         MR. MAZA:  Your Honor, may I just address one more

19 point?

20         THE COURT:  Yes.

21         MR. MAZA:  I realize we are reserving this for

22 confirmation.  I just -- in terms of, at least in Emerge it

23 was an unconfirmable matter.  So I am wondering if Your Honor

24 would reconsider with respect to it because the court was --

25 Judge Owens was reluctant to confirm the plan at confirmation

1  based on that.  She denied confirmation based on this issue.

2  I am wondering if that changes Your Honor's perspective, at

3  least deeming it patently unconfirmable at this point.

4              THE COURT:  No.  I am aware of Judge Owens

5  decision in <u>Emerge</u>.  At this point my view is, as I said,

6  this all depends on the facts and circumstances and how this

7  is played out in the solicitation process.  So I am not going

8  to rule at this point that the plan is patently unconfirmable

9  because it contains releases of third-parties through this

10 opt-out system.

11             MR. MAZA:  One last question, Your Honor.  Are we

12 able to rely on the submission as our objection to

13 confirmation?

14             THE COURT:  Mr. Gott, do you have any objection to

15 that?

16             MR. GOTT:  No objection.  That's fine.

17             THE COURT:  That's fine, Mr. Maza.

18             MR. MAZA:  Okay.  Thank you.

19             So just to be clear, this will be our confirmation

20 objection.  Unless we file a supplement we will stand on

21 these submissions.  Thank you.

22             THE COURT:  Thank you, Mr. Maza.

23             MR. MAZA:  Thank you, sir.

24             MR. JOYCE:  Your Honor?  Sorry to interrupt.

25             THE COURT:  Who is speaking?

1            MR. JOYCE:  Michael Joyce for the Canadian

2    Elevator Industry Pension Fund.

3            Your Honor, we have a similar objection to the

4    third-party releases and the solicitation aspect of those

5    releases.  I don't want to go out of order, Your Honor, but I

6    thought it might be an appropriate time to be heard.

7            THE COURT:  Well, Mr. Joyce, first of all, you're

8    sitting sideways on my screen.

9            MR. JOYCE:  I have a bit of a Zoom set-up here,

10   Your Honor, that is not my typical one.

11           THE COURT:  So is your objection the same to these

12   third-party releases?

13           MR. JOYCE:  We have objected to the substance of

14   the third-party releases.  Your Honor, we would reserve those

15   objections for confirmation, but we also have joined in the

16   U.S. Trustees objection, Your Honor.  We have an objection to

17   the solicitation aspect of the notices and the third-party

18   releases.

19           THE COURT:  Well I think I've already ruled on

20   that. So I don't think there is any need for further argument

21   at this point.

22           MR. JOYCE:  Very well, Your Honor, thank you.

23           THE COURT:  Thank you.

24           MR. GOTT:  Next, Your Honor, we have the next

25   unresolved objection is filed by the City of Marietta.  We

1  were able to resolve some points here and not others and so I

2  will turn the podium over to counsel to Marietta.

3            THE COURT:  Alright.

4            MR. ETKIN:  Good afternoon, Your Honor; Michael

5  Etkin.

6            Can you hear me?

7            THE COURT:  I can.  Thank you.

8            MR. ETKIN:  Thank you.

9        Your Honor, we filed a joinder to the disclosure

10  statement objections of the ad hoc group of Acthar

11  plaintiffs, the Attestor and Humana claimants, as well as the

12  unsecured creditors committee.  We have worked with debtors'

13  counsel, as Mr. Gott has indicated, and we resolved most of

14  the issues that we have raised.  We paid attention to the

15  hearing yesterday where several other issues were raised by

16  those objectors.

17            So there really is only one remaining concern that

18  we have and wanted to raise today when we had the

19  opportunity.  We don't know what the resolution of the

20  creditors committee is, and what changes are going to be made

21  as a result of that resolution.  Again, that was an objection

22  that we joined in.  So that will, obviously, be relevant or

23  we believe it will be relevant to us as well.

24            The one remaining concern is the fact that the

25  disclosure statement and the plan itself expressly states

1  that the debtors are not being substantively consolidated

2  pursuant to the plan, yet it's equally clear that at least

3  for purposes of distribution to unsecured creditors the

4  debtors are being consolidated for distribution purposes

5  irrespective of where a particular unsecured creditors claim

6  sits.

7          Creditors, therefore, in our view, and we have

8  raised this with the debtor and have had discussions with the

9  debtor on this point, they need to compare the results

10 stemming from the consolidation for distribution purposes in

11 terms of their treatment with what recoveries they might

12 obtain if the treatment and distribution is on a debtor by

13 debtor basis.

14         So we have asked for that information to be

15 included in the disclosure statement because we believe that

16 creditors cannot really make an informed decision in

17 connection with their treatment and that being distribution

18 on a consolidated basis without getting a sense of what

19 distributions will be like if distribution was on a debtor by

20 debtor basis.

21         So everyone, essentially, conceded yesterday that

22 the ability of a particular creditor to make an informed

23 choice in connection with voting for or against the plan we

24 think and we have urged the debtor in our discussions that it

25 would be critical as to what needs to be included in the

1  disclosure statement relating to the issue of the distinction

2  between distributions on a debtor by debtor basis and

3  distributions, effectively, on a substantively consolidated

4  basis for distribution purposes.

5        In other words, what will distributions to

6  unsecured creditors look like without this de facto

7  substantive consolidation for distribution purposes.  So we

8  have urged the debtor that creditors should and are entitled

9  to that information and it should be included in the

10 disclosure statement.  I think that there may have been

11 variations to that theme that were raised by other objectors

12 yesterday, but that is really the one issue we wanted to

13 bring to the court's attention.

14        We think that for disclosure purposes everything

15 else has pretty much been resolved.

16        THE COURT:  Thank you, Mr. Etkin.

17        Mr. Gott?

18        MR. GOTT:  Your Honor, I think three points in

19 response.

20        One is, I think, what is being requested goes

21 directly to the Section 1125 non-requirement for a disclosure

22 statement in that the disclosure statement did not have to

23 describe results or describe what alternative plans might

24 have looked like beyond the plan that is actually being

25 proposed.  Fundamentally, that is what counsel is proposing

1  here is for us to calculate what distributions might have

2  looked like under some alternative plan.

3          That brings us to the second point which I think

4  helps understand the rational for that statutory rule which

5  is we don't know what an alternative plan might look like.

6  We don't know -- for us to postulate what distributions might

7  look like under some alternative plan would require us to

8  consider an infinite world of possibilities and other things

9  that may have to take shape if we were to make distributions

10 in a different way.  That may change other aspects of the

11 plan and then all of a sudden you're in a world where terms

12 start moving around, economics start moving around, and

13 you're really just disclosing information that ends up being

14 useful at the end of the day.

15          Then the third point, Your Honor, is that we have,

16 in fact, disclosed, as we discussed yesterday, what the

17 debtors believe are the waterfall entitlements of general

18 unsecured creditors and put that into the disclosure

19 statement which, essentially, answers the concern that

20 Marietta is raising here in that it informs creditors that,

21 you know, if we were to revisit the distributions that would

22 be the baseline and you would work up from there, you'd have

23 to work up from there to get to the $100 million.

24          So, you know, that is the debtor's view on what

25 the baseline would be and any step further to try to take

1    what is proposed in the plan, which is substantially more

2    than $34 million, it just addresses hypothetical points that

3    aren't at issue today.  So those disclosures aren't required

4    under Section 1125.

5              THE COURT:  Well is there any disclosure in the

6    disclosure statement that if distributions were made and

7    other then a consolidated basis that there could be material

8    differences in the distributions to the classes as what is

9    being proposed in this plan?

10             MR. GOTT:  Well I don't know that we specifically

11   say that.  Again, it would be -- I suppose that is a truth

12   that we could put into the disclosure statement.  We would

13   agree with that statement that if we made distributions in

14   different ways and some other way that those distributions

15   could look very different.

16             You know, we do have -- we have included with the

17   disclosure statement our liquidation analysis which is done

18   on an entity by entity basis and not a consolidated basis.

19   So, frankly, creditors could go to that document to get a

20   waiver of what their entitlements might be.  Obviously, that

21   scenario would look a little different from a plan of

22   reorganization from a total value perspective, but that is a

23   way for a creditor to get a little more information about

24   what an entity by entity distribution might look like.

25             Your Honor, I think beyond simply stating the

 1  reality that if distributions were done differently than the
 2  results could be different.  It would require us to make
 3  alternative assumptions about alternative realities
 4  (indiscernible) with this plan.
 5          THE COURT:  Well I agree with you. I don't think
 6  we need to include in the disclosure statement what the
 7  distributions would be under alternative plans assuming there
 8  was no substantive consolidation for distribution purposes.
 9  But I think there needs to be something in there that says
10  that there could be a material difference for distributions
11  if it was not done on a consolidated basis, and maybe refer
12  to the liquidation analysis and say, you know, as an example
13  look at the liquidation analysis and you can see what you
14  would receive on an entity by entity basis in a liquidation
15  scenario.
16          I think that is what Mr. Etkin's concern is that a
17  reasonable investor or creditor might look at the plan and
18  not understand there could be a difference if they received a
19  distribution on an entity by entity basis.  I think that is
20  all that needs to be included.  We don't need to do a full
21  analysis of what that distribution would look like.  We just
22  need to let them know there is a potential for a difference
23  if you vote for this plan.
24          MR. GOTT:  Sure.  Your Honor, we would --
25          MR. ETKIN:  Your Honor, may I be heard for a

22

1    moment?

2              THE COURT:  Who is speaking?

3              MR. ETKIN:  Its Michael Etkin, Your Honor.

4              THE COURT:  Go ahead, Mr. Etkin.

5              MR. ETKIN:  May I be heard for a moment?

6              THE COURT:  Go ahead.

7              MR. ETKIN:  Thank you.

8              I think, Your Honor, you hit the nail on the head

9    in terms of the overarching concern.  This is not a matter of

10   laying out a grab bag of plan options.  The debtor has said

11   they are not substantively consolidating these cases, but

12   they are substantively consolidating the debtors for

13   distribution purposes.  So that is what really raises the

14   issue.  And it's not a question of just saying, in a general

15   sense, well if we put a different plan out there the

16   treatment would be different.  That is obvious and a bit

17   simplistic.

18             My -- I have a concern about focusing directly on

19   the liquidation analysis because, you know, that may be done

20   on a debtor by debtor basis, but it's also in the context of

21   a liquidation of these estates as opposed to a restructuring.

22   I think that I am certainly prepared to try to work on the

23   language that the court has suggested with Mr. Gott and I

24   understand, you know, the court's reaction and decision with

25   respect to taking a deeper dive with respect to that.

23

```
 1              I do think that something needs to be said if the

 2    debtors are contemplating treatment that if it doesn't work

 3    or if there was an alternative on a debtor by debtor basis

 4    that it would result in a different set of results.

 5              THE COURT:  Well as I said --

 6              MR. GOTT:  Your Honor, if I may --

 7              THE COURT:  -- this doesn't need to be overly

 8    complicated.  I think -- and it's going to depend -- I mean

 9    it could be, depending on which entity the creditor has a

10    claim against, if it was done on a non-consolidated basis

11    they might get more, they might get less, they might get the

12    same; we don't know.  I don't think the debtors need to go

13    into detail on which entity would receive more, which would

14    receive less, which would receive the same.

15              I think there just needs to be -- so that

16    creditors understand when voting on this plan that it's being

17    done on a consolidated basis.  Distributions are on a

18    consolidated basis and if it was done on a non-consolidated

19    basis their recovery could be different, either greater or

20    lesser.

21              MR. GOTT:  Your Honor, just to address one point

22    about the plan which I think may explain some of the

23    disconnect here.  So while the distributions for general

24    unsecured creditors will be generally done on a consolidated

25    basis under the plan we have expressly provided and reserved
```

A-6663

1  that, you know, to the extent necessary to satisfy

2  confirmation requirements, whether those are best interest

3  requirements or unfair discrimination requirements, whatever

4  they may be, that would dictate a different result then what

5  would result from a true pure consolidation that we will --

6  that we are reserving the right to make non-ratable

7  distributions to account for those requirements.

8          I think that is why I had a little bit of trouble

9  understanding what would be accomplished by showing or saying

10 that there may be different entitlements because we

11 fundamentally are going to honor any entitlement that we are

12 required to honor under the bankruptcy code.  But if Your

13 Honor's directive is to include a disclosure that in a non-

14 consolidated scenario distributions may look -- distributions

15 could look quite different from those that would be done in

16 our distribution consolidation that we can certainly tackle

17 that.

18         THE COURT:  That is all I am looking for.  I

19 think, you know, if this is a sentence or two that's it.

20 It's not overly complicated.

21         MR. GOTT:  Okay.  We will do that, Your Honor.

22 Thank you.

23         MR. ETKIN:  Thank you, Your Honor.

24         THE COURT:  Thank you, Mr. Etkin.

25         Once you're done speaking -- for some reason

1 today, on my Zoom, I cannot lower people's hands.  So once

2 you are done speaking if you could lower your hand that would

3 be helpful then others, when they raise their hands, I can

4 see them more clearly.

5          Go ahead, Mr. Gott.  What is next?

6          MR. GOTT:  Next, Your Honor, is the objection of

7 U.S. Bank National Association; original objection at Docket

8 2407, supplemental objection at Docket 2856.  So I will turn

9 the podium over to counsel for U.S. Bank.

10          MR. ASHMEAD:  Good afternoon, Your Honor.  John

11 Ashmead for U.S. Bank, who is indenture trustee for the MIF's

12 and (indiscernible).

13          We joined in the UCC response, and UCC counsel

14 will be speaking after Zoom shortly.  So we will sort of

15 leave that to keep it short.

16          Your Honor, in terms of the disclosure we are

17 looking for largely mirrored what Mr. Etkin's just discussed.

18 So I am not going to go over that.  I will also add that Mr.

19 Gott and some of his colleagues reached out to me yesterday

20 and today to work on some additional language and I'm sure we

21 will work that part of it.  If they had the stuff that Mr.

22 Etkin's talked about that will help as well.

23          I think the only thing I'd mention, that was in

24 our response, is, Your Honor, that won't or maybe won't be

25 covered by the UCC and counsel was we do still think it is

1  premature in light of the mediation and we should just sort

2  of see where that turns out so we don't have to do a redo.  I

3  am not going to belabor it, Your Honor.  You've heard that

4  from a number of parties.

5          Lastly, and, again, you heard a little bit of

6  this, I think, from Mr. Feldman yesterday and I assume you

7  might hear it from UCC counsel is just the notion about, you

8  know, this case is a bit of a square peg in a round hole in

9  the sense that, you know, there was a deal negotiated on the

10  specialty generic side that contemplated just that side being

11  restructured, then the CMS judgment came out and a couple

12  other things.  They decided to do everything, but they never

13  changed that.

14          It sort of makes it difficult and I only raise

15  that point, as others did, I think, is, you know, not wanting

16  to be wasteful and going down a path that may result in a

17  redo particularly in light of the mediation which is already

18  commenced.

19          With that, Your Honor, I have no further comments.

20          THE COURT:  Thank you, Mr. Ashmead.

21          Well we might as well address this issue of

22  postponing this pending the mediation.  I am not going to do

23  that.  I think that the parties here are all highly

24  sophisticated, well represented, and can certainly tackle

25  both the mediation and the plan confirmation process going

1   forward.

2          You know, there is the risk that it could result

3   in additional time having to be incurred if the mediation

4   turns out differently than the parties are anticipating at

5   this point, but it also saves time if the mediation turns out

6   appropriately and the plan can move forward.  So either way

7   there is a potential for a delay that would increase the cost

8   to the estate and I am mindful of the fact that, you know, at

9   this point we're at $20 million a month on attorney's fees in

10  this case at this point.

11         So we need to move it forward as expeditiously as

12  possible and I think whether I delay it now or delay it later

13  if things don't work out its six one half dozen another.  So

14  at this point I'm going to allow the process to proceed.

15         Mr. Gott?

16         MR. GOTT:  Thank you.

17         Next objection we have that is unresolved is filed

18  -- was filed by the United States Trustee at Docket 2414.

19         THE COURT:  Okay.  I had third-party payors next

20  on my list.  Did that get resolved?

21         MR. GOTT:  It was, Your Honor.  I mentioned in my

22  opening remarks yesterday that we resolved it between the

23  time that the chart was filed and the start of the hearing.

24  We will have actually a couple more of those as we go through

25  here.  I will make sure -- next time I will pause and let you

1  know.  Yes, we did resolve the third-party payors objection.

2          THE COURT:  Okay.  Thank you.

3          Ms. Leamy?

4          MS. LEAMY:  Good afternoon, Your Honor.  Jane

5  Leamy for the U.S. Trustee.

6          Our remaining objection concerns the third-party

7  release and opt-out and it was covered by the SEC.  We also

8  expanded our objection to include (indiscernible) creditors,

9  non-opioid creditors to abstain from voting and rejecting

10  creditors, but I heard you loud and clear that that is a

11  confirmation issue.  So I will defer argument on that until

12  confirmation.

13          I would like to request though at this time that

14  the debtors consider a carve-out from the definition of non-

15  debtor releasing parties.  For any party in a voting class

16  whose solicitation package is returned as undeliverable and

17  that that be listed in the balloting or voting report.  If

18  parties don't have knowledge they can't really be deemed to

19  consent to a release.

20          So we would request that the debtors clarify what

21  the voting tabulation report will list those parties who (I)

22  opt-out of the releases; (II) whose solicitation package is

23  returned; (III) are in voting classes that did not receive a

24  package.  I believe their order right now provides that they

25  are not required to serve anyone who was previously returned

1   as undeliverable which would make sense.  That way, Your

2   Honor, there will be a court record as to parties that that

3   can be reviewed at the time of the confirmation hearing.

4           Thank you.

5           THE COURT:  Mr. Gott?

6           MR. GOTT:  Your Honor, if I am understanding the

7   request correctly I think that makes sense and it's my

8   understanding of Ms. Leamy's point that we keep record and

9   keep the information for those parties whose mail has

10  previously returned as undeliverable or whose solicitation

11  packages are returned as undeliverable, and make sure that

12  information is disclosed.

13          I think we will, of course, as to individual

14  creditors that information may need to be sealed, may need to

15  be protected in some ways, but we can certainly keep that

16  information, keep it handy and then tackle the issue, the

17  confirmation issue of whether those parties should be bound

18  by the release at the confirmation hearing.

19          THE COURT:  Ms. Leamy, is that what you were

20  looking for?

21          MS. LEAMY:  Yes.  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          Mr. Gott, what is next?

24          MR. GOTT:  So moving down the list the next place

25  we have in the chart that is unresolved is the West Virginia

1  NAS Claimants and Adult Claimants.  This objection has been

2  resolved and was withdrawn yesterday with a filing on the

3  docket.

4          Next objection was filed by Darrel Edelman, a

5  shareholder.  Your Honor, so I received an email this morning

6  from Mr. Edelman and I will just read the email and get to

7  the point.  His email said,

8          "I was available yesterday to speak to my

9  objection to the disclosure statement, but will not be

10  available today.  As a result of this I ask that you enter

11  this document into the record during this hearing when you

12  get to my objections.  Thanks.  Darrel Edelman."

13          He sent me a three or four page statement

14  regarding his objections that, frankly, Your Honor, I am a

15  little bit disinclined to read a statement against my

16  client's interests into the record on behalf of a party who

17  is unable to attend to press their objection.  So we think it

18  would be appropriate to overrule the objection and move

19  forward, but if Your Honor would prefer I read the statement

20  I can do so.

21          THE COURT:  Well I am looking at what his original

22  objections were here.  Let me take a look at these real

23  quick.

24          MR. GOTT:  Sure.  And I'm happy to lay a little

25  argument and lay some groundwork for that if you would like,

1   Your Honor.

2           THE COURT:  Mr. Edelman is here.  Let me hear from

3   Mr. Edelman.  Go ahead, Mr. Edelman.

4           MR. EDELMAN:  Thanks, Your Honor, for allowing me

5   the opportunity to speak on my objection.  As outlined in my

6   submission documents 2421 I understand it's not a popular

7   position to argue (indiscernible) claimants.  The immediate

8   response to this is to classify objections as a way to blame

9   the victims.

10          THE COURT:  Mr. Edelman, you're fading out.  Can

11  you get closer to your microphone and speak-up?

12          MR. EDELMAN:  Is that any better?

13          THE COURT:  Slightly.

14          MR. EDELMAN:  I am not a computer literate that

15  much.  So I will try the best I can.

16          My primary objection that I have to the disclosure

17  statement is that it was premature.  The reason that I said

18  that was I have been trying to follow the manner in which the

19  opioid claimants or the claims that have been made and

20  whether they have filed claims and proofs of claims.  I

21  cannot find that and I cannot find any information that has

22  been provided that say when they will file those claims.

23          From a shareholder perspective we have very few

24  rights in these bankruptcy cases other than that they would

25  have the right to be heard.  So it doesn't mean that we -- we

1  do have our rights to challenge claims when the proofs of

2  claims are submitted.  Unfortunately, that hasn't' been done.

3  I personally don't really know what to do.

4         So, you know, I do understand that there has been,

5  I think, 370 pages of things that were listed; 2,860 in the

6  original assets and liabilities document.  There was -- I

7  don't know where these claims fall in terms of how one

8  evaluates where they are.  I do know that the court has the

9  ability to transfer all the opioid claims litigation to the

10  District Court for resolution.  And that is one thing that I

11  would like to (indiscernible), you know, especially when it's

12  important to those who will see no recovery.

13         I think, from my perspective, I just want to make

14  sure that I am heard, that, you know, the opioid claims are

15  deemed to be legally enforceable against the debtor and that

16  is what provides that they have a right to the claims.

17         So with that that is basically my objection in a

18  nutshell.

19         THE COURT:  Mr. Gott?

20         MR. GOTT:  Your Honor, certainly we heard the

21  concerns and understand -- I think understand the argument

22  which is that from a shareholder's perspective -- and we have

23  heard it before in these cases.  From a shareholder's

24  perspective that there's -- if one were to conclude that the

25  opioid claimants are not entitled to anything then there may

1  be something more there for shareholders.

2          As we have discussed previously we just don't

3  think that that proposition reflects the reality of the

4  situation.  And, Your Honor, has previously ruled that, you

5  know, shareholders are, indeed, out of the money in this

6  situation for that very reason.  You know, so at bottom, I

7  think, the concerns being raised are confirmation issues and

8  are challenges to the plan and the propriety of the plan.  I

9  think they should be overruled for today's purposes.

10         THE COURT:  You want to address Mr. Edelman's

11 concern about the lack of proofs of claim filed by opioid

12 claimants and why that is so, just so he understands it?

13         MR. GOTT:  Sure.  Happy to do that.

14         First, I think there have been a couple hundred

15 opioid claims that have been filed, but earlier in the case

16 we have made the determination not to have a claims bar date

17 for opioid claims and that is part and parcel of the overall

18 resolution for opioid claims embodied in the plan in that

19 those claims will become assertable only against the opioid

20 trust after the plan is implemented.  At that point the trust

21 will go through the exercise or various trusts will go

22 through the exercise of bringing in claims, sending out

23 notices, asking anyone who wants to file a claim to submit it

24 then those trusts will be responsible for administering and

25 resolving those claims.

1          That process is one that can take place entirely

2   after confirmation and not slow down our Chapter 11 process

3   to keep us in the case any longer.  We made the determination

4   that bringing those claims in during the cases was not

5   necessary and instead they all transferred to the opioid

6   trusts.

7          THE COURT:  Thank you.

8          Mr. Edelman, does that address your question about

9   why there is no opioid proof of claim filed?

10         MR. EDELMAN:  Well to some degree.  It seems to me

11  that its more convenient for the debtors then for anybody

12  else because once the plan is confirmed and it goes to the

13  opioid trust there is no way to (indiscernible) to challenge

14  any of those claims.

15         THE COURT:  Well, Mr. Edelman, I think at this

16  point what -- the issues that you are raising go to

17  confirmation of the plan rather than to the disclosure

18  statement.  At this point the only thing before me is whether

19  or not to approve the disclosure statement that the debtors

20  are proposing to submit to the creditors of the company so

21  that they can vote on whether or not to approve the plan or

22  disapprove the plan.

23         The issues that you are raising are whether or not

24  the plan, itself, should be confirmed once we get to a

25  confirmation hearing.  That is not going to happen until

1  September. So those are issues that are preserved for you at

2  this point and we will have to deal with them in September

3  when we get to confirmation.

4          MR. EDELMAN:  Thank you.

5          THE COURT:  Thank you, Mr. Edelman.

6          Mr. Gott, go ahead.

7          MR. GOTT:  Your Honor, the next objection we would

8  come to on the list is Teva Pharmaceuticals.  So we had a

9  reservation of rights filed by the State Teachers Retirement

10 System of Ohio which (indiscernible).  I'm not sure if we

11 need to stop or pause on that.

12          The next place we would go is Teva Pharmaceuticals

13 and actually I was informed by counsel yesterday that Teva

14 and then the objections filed by Johnson & Johnson, and then

15 the Distributors, Manufacturers and Pharmacies Group which

16 are the three out of the next four objections on our chart

17 will all be taken up -- will largely be taken up together by

18 counsel for one of the distributors.  So I think we will turn

19 to those issues now and I will cede the podium.

20          THE COURT:  Mr. Goldstein?

21      (No verbal response)

22          THE COURT:  Your muted, Mr. Goldstein.

23          MR. GOLDSTEIN:  Apologies.  Michael Goldstein,

24 Goodwin Procter, for Teva.

25          Just for the record, Your Honor, to confirm Mr.

1   Garfinkle on behalf of McKesson who is going to seek for the

2   Distributors, Manufacturers and Pharmacies for efficiency

3   purposes and avoid duplication.  I might take the privilege

4   of just reserving the opportunity to comment if I think Mr.

5   Garfinkle missed something or collaborate, but I anticipate

6   that that won't be necessary, but just wanted to state my

7   appearance and state that for the record.

8            Thank you, Your Honor.

9            THE COURT:  Thank you, Mr. Goldstein.

10           Mr. Garfield?

11           MR. GARFINKLE:  Mr. Garfinkle, Your Honor.

12           THE COURT:  Garfinkle, I'm sorry.

13           MR. GARFINKLE:  Jeff Garfinkle, Buchalter, on

14   behalf of McKesson Corporation and certain of its corporate

15   affiliates.  We are part of the collective group of

16   Distributors, Manufacturers and Pharmacies for purposes of

17   the argument.  I'm just going to call them the debtor's

18   customers.

19           So, this is our first opportunity to come before

20   Your Honor.  I appreciate that. I speak for McKesson, but

21   there are similarly situated companies all who have separate

22   counsel who are centered into a collective objection as we

23   did in Purdue and we were complimented for self-organizing to

24   make it easier for the debtor and the court to address these

25   objections rather than do them individually.

1        The primary -- and the debtor acknowledges in the

2   customer motion there is a critical nature of the customers

3   for the success of the business, for the distributors and all

4   of us who have contracts in which there are indemnities and

5   insurance obligations for which we distribute at the

6   distributor level all 25 of the debtor's generic products and

7   certain of their brand of pharmaceutical for which they have

8   five primary.

9        All of the defendants -- sorry, all of the parties

10  in my group, there were eight that filed the objection, nine

11  that filed the supplements, all of us are co-defendants with

12  the debtor in massive amounts of State Court and Federal

13  Court lawsuits in all 50 states; the District of Columbia,

14  the Commonwealth of Puerto Rico, certain providences in

15  Canada, and in travel courts.  All would be co-defendants

16  with Mallinckrodt in those lawsuits, but for the debtor's

17  filing the bankruptcy and the automatic stay.

18        As we point out in our initial objection, and we

19  have decided to (indiscernible) our supplemental objection,

20  is a serious issue on the, what we have termed, "defensive

21  rights"; that is the rights of co-defendants to lift the

22  debtor as a co-responsible party or single responsible party

23  for any liability that may be imposed.

24        The problem with the plan in that it purports,

25  initially, to deprive the co-defendants of their right to not

1    seek liability against the estates, but rather simply name

2    the debtor as a responsible party on jury verdict forms and,

3    otherwise, liability of portion.  Again, that would have no

4    impact whatsoever on the estates.

5              This issue arose in the Purdue Pharma case, a case

6    which the debtor is relying heavily that the plan has seven

7    references to the Purdue Pharma bankruptcy case and we have

8    heard a number of cross-references over the last few days

9    regarding that process.  We were able to reach agreement on a

10   carve-out of the defensive rights from the recent discharge

11   injunction exculpation provision in the Purdue plan and we

12   provided that language, customized to this case, to the

13   Latham team and as of last night they are willing to include

14   that language with one exception into the plan.  That

15   exception raises a facially unconfirmable plan issue and a

16   very serious issue for us.

17             Specifically, the co-defendant rights as they are

18   -- let me go to the exact language here from the version not

19   yet filed with the court, but which was provided last night

20   to my group, was the plan now has a new defining term co-

21   defendant rights that we, and prohibits -- I'm going to quote

22   the clause that is of real concern,

23             "Shall in no case result in the debtors or

24   reorganized debtors as opposed from the opioid MDT II being

25   named by the jury verdict form or other finding of

1   liabilities."

2            So the plan, as the debtor proposes, would

3   prohibit Mallinckrodt or reorganized Mallinckrodt from being

4   named on a jury verdict form.  Now why does that happen?  And

5   I will put this in concrete terms, today and next week there

6   are three ongoing trials in the United States on opioids:

7            One is in California, in Orange County, California

8   in which certain of the manufacturers of opioids are

9   defendants, but for the debtor's bankruptcy case Mallinckrodt

10  would have been a defendant in that;

11           Today, in a Federal Court in West Virginia there

12  is an opioid trial going on involving the distributors;

13           Next week in Sussex County, New York in State

14  Court there is going to trial another opioid lawsuit in which

15  both manufacturers, pharmacies and distributors are co-

16  defendants.  But for Mallinckrodt being in bankruptcy it

17  would be a party to that lawsuit.

18           As we sit here today if this were going to jury

19  verdict the defendants that remain in that could name Purdue,

20  Insys, another opioid manufacturer which is in bankruptcy in

21  this court, and Mallinckrodt as responsible parties in terms

22  of any liability allocation yet on plan confirmation the co-

23  defendants are prohibited from naming Mallinckrodt as a

24  responsible party.  This makes absolutely no sense in our

25  view and a restriction that doesn't exist as to Purdue and

1  Insys.

2          We think this is a facially unconfirmable plan

3  issue.  If the court wants to reserve it for plan

4  confirmation so be it, but we can't be put in a position

5  where today, tomorrow and next week we can lift mention

6  Mallinckrodt being a responsible party during the course of

7  the trial, but them on a jury verdict form and come September

8  maybe while the jury is out in New York and the Sussex County

9  trial.  They need to be removed from the jury verdict form

10  because of the provision in the plan.

11          We tried to explain this to the other side.  It is

12  a serious issue for us.  I just don't want the court to

13  (indiscernible).  If the court wants to defer this to plan

14  confirmation so be it.  We think this is a gate keeping legal

15  issue which prohibits confirmation or approval of the

16  disclosure statement at this time.

17          We have a couple of other minor issues that we can

18  raise, but this is the most serious disclosure statement plan

19  issue for the group for which I am seeking.  There are

20  jurisdictional issues that certain of the parties have

21  raised, that Teva and Johnson & Johnson have raised, the

22  jurisdictional issue on this point.  I am going to set that

23  aside.

24          It just doesn't make any sense that today we can

25  name Purdue, Mallinckrodt and Insys as co-responsible parties

1   yet on confirmation we can't do that.

2          THE COURT:  Mr. Gott?

3          MR. GOTT:  Sure.  Your Honor, I think the argument

4   we just heard glosses over a couple of things that are

5   important to understand.  First is that the structure of the

6   plan and what the plan says is that as of the effective date

7   all of the debtor's obligations as to opioid claims and all

8   opioid claimants' rights as against the debtors, including

9   opioid co-defendants, will all transfer over to the opioid

10  trust.  They are all being assumed by the opioid trust.

11          What we have proposed and what our position is, is

12  that the opioid trust would be the appropriate party to gain

13  money (indiscernible) because that is the entity that carries

14  the liabilities going forward.  We don't think that any of

15  the plan provisions, and we would agree, that as of today

16  there is no gag order or anything that would prevent the

17  making of arguments in their defense as to Mallinckrodt's

18  conduct and that wouldn't be the case after the effective

19  date either.

20          We do think -- I would take issue with one point.

21  We do think that the automatic stay in place today would

22  prevent the co-defendants from naming Mallinckrodt on a jury

23  apportionment form and advancing on behalf of a plaintiff,

24  you know, the notion that Mallinckrodt carries a liability in

25  the opioid trials.  There was litigation over this matter in

1  _Purdue_ and there has been no request to lift the stay for us

2  in our case here.  So I think that is a separate issue, set

3  that to the side.

4        I think the distinction between today versus post-

5  effective date is a bit misleading in that respect.  But the

6  overarching issue here is that the rubber really meets the

7  road from the debtor's perspective and future perspective of

8  the reorganized debtors when it comes time for the actual

9  portion (indiscernible) at the end of a trial.  Leaving the

10 reorganized debtors exposed to being tagged publicly, having

11 that liability assessed to them and not just assessed to

12 them, but assessed to them without the ability to -- without

13 appearing in any of those trials.

14       What we are looking to avoid is exactly that drag

15 under the reorganized company.  That is exactly what the

16 opioid settlement as a whole is meant to tackle.  Frankly,

17 the level that -- the potential risks and consequences of

18 those results really could jeopardize the company's ability

19 to meet its settlement obligations going into the future if

20 that were to become a real drag on performance.

21       So all to say, Your Honor, we think those facts do

22 merit the prohibition through our challenging injunction of

23 naming the debtors, the reorganized debtors and, again, to

24 drill down on what was glossed over as distinct from the

25 opioid trust, Mallinckrodt's opioid trust could still be

1 named on a jury apportionment form, but, you know, we think

2 that that is -- we think that is a defensible route.  We

3 think that is confirmable, but also to say that we -- to go

4 into the substance further if Your Honor would prefer, but we

5 think we have backup for that and we think it's appropriate

6 in the circumstances here.

7          So fundamentally this is an issue for

8 confirmation.  So we would propose to let the objection be

9 overruled for today.  We have, as Mr. Garfinkle noted,

10 incorporated every word of what the co-defendants proposed to

11 us with our carve-out added.  You know, frankly, the language

12 that was proposed to us went far beyond the simple issue of

13 jury apportionment or putting the name on a verdict, and

14 putting a name on a verdicts form.

15          We, you know, in the interest of trying to get to

16 a resolution adopted that language and included our carve-

17 out.  We think the plan should go out on that basis.  If that

18 is -- if the issue is brought at confirmation we think it can

19 be dealt with appropriately there and run a full briefing at

20 trial.

21          THE COURT:  Well is the debtor's position that the

22 co-defendants cannot list Mallinckrodt on the jury verdict

23 form today for these trials that are going forward in the

24 next few days?

25          MR. GOTT:  Yes, Your Honor.  We think the

1   automatic stay would prevent that or at minimum we think it

2   would be appropriate for a request to modify the automatic

3   stay to allow that to happen.  You know, from our perspective

4   it would be no different than a plaintiff looking to pursue

5   recoveries against the debtor's insurers and needing to name

6   the debtors in a suit in order to do that.

7          We understand that they aren't looking to actually

8   pursue a recovery from the debtors of the estates at this

9   time, but the fact is that, and as I think we all understand,

10  the protections of the automatic stay are even broader than

11  those afforded by Section 524 of the discharge and the

12  channeling, and what our channeling injunction might provide.

13         So, yes, I think that would be our expectation.

14         THE COURT:  Well how do the co-defendants --

15         MR. GARFINKLE:  Your Honor, may I be heard?

16         THE COURT:  Hold on a second.  How do the co-

17  defendants, if they're going -- if the issue in these trials

18  is how to allocate responsibility amongst all the opioid

19  manufacturers, distributors and pharmacies how do you

20  allocate the responsibility if you don't include the empty

21  chairs.  How do they -- you know, they have to be able to

22  refer to the empty chairs.  You know, they have to be able to

23  refer to the empty chair and say, okay, there's these ten --

24  this is tort's 101; you got 10 defendants, one of them is

25  missing, but the 10 defendants who are in the case what to

1 say, well, yeah, but it was those guys fault or at least part

2 of it was their fault.  You have to allocate responsibility

3 among us all.  How do they do that?

4          MR. GOTT:  Your Honor, as I noted, I don't think

5 we would be looking for -- we're not looking for a gag order

6 on any arguments they might make in their defense.  We are

7 contesting that they can't, you know, make arguments in trial

8 as to any level of fault or liability on Mallinckrodt's part.

9          I think the issue, though, is that understanding

10 that this is an impingement on what, otherwise, may be their

11 background state law rights.  By filing a bankruptcy petition

12 the automatic stay says that, you know, certain actions can't

13 be taken including a lot of actions that, otherwise, would be

14 permitted under state law.  So we are argue that the

15 automatic stay would prevent that.

16          THE COURT:  What happened in Purdue?  What did

17 Judge Drain do in Purdue?  Did he lift the automatic stay to

18 allow the naming of Purdue in those actions?

19          MR. WEBER:  Your Honor my understanding -- and for

20 the record, this is Jordan Weber of O'Melveny & Myers for

21 Johnson & Johnson.  We're appearing today to address the

22 jurisdiction issue, and I think this addresses your point.

23          Our view and my understanding of the view of the

24 litigators involved here is that the automatic stay does not

25 apply to the naming of these -- from the debtors as co -- as

1 liable, potentially liable.  And you know, we would dispute

2 the idea that that exercise could -- that exercise would

3 control or have any effect on the property of the estate.

4         I think that the jurisdiction issue that we're

5 here to discuss, you know, cuts through this issue like a

6 razor because it -- the example set by the debtors of, you

7 know, for example debtors' insurer.  That is the

8 quintessential case under controlling Third Circuit law, that

9 shows that, you know, when you have a derivative claim by an

10 insurer, that can then have an indemnification claim against

11 the debtors' estate.  And that is something that is within

12 the Court's jurisdiction to enjoin.  But where there's no

13 indemnification or there's no potential liability on the part

14 of the debtor -- which is exactly what we're talking about

15 here -- it's outside of the Court's jurisdiction.

16         And so that's why we decided to both join in the

17 joint objection of our similarly situated parties, but also

18 to join in the Teva objection because it focuses on the

19 jurisdiction issue, which we think is an additional critical

20 issue that has never received the attention it demands.  And

21 in fact, I don't believe it was mentioned in any of the

22 objection charts filed by the debtor or, more importantly,

23 did not even receive a passing mention in the debtors' or any

24 other parties' reply pleadings that we're aware of.

25         And we think this is appropriate to address this

1   now.  Controlling Third Circuit law states that the plan is

2   patently unconfirmable where defects cannot be overcome by

3   creditor voting and material facts are not in dispute.  And

4   in the absence of jurisdiction, to approve a highly

5   negotiated relief provision among other provisions in the

6   plan is a prime example of that kind of issue that needs to

7   be addressed.

8           So we understand that there's, you know, a general

9   desire to put off confirmation objections to later, but this

10  is precisely the sort of issue that leads a Bankruptcy Court

11  to decline to approve a disclosure statement, and they can

12  and do that in the rare cases in which that occurs.

13          As Mr. Garfinkle has pointed out, we cannot

14  necessarily -- and I think as we pointed out in our

15  pleadings, it's not necessarily clear as a disclosure matter

16  what the debtors' intent is with regard to the defensive

17  rights of co-defendants.  But I think, you know, the comments

18  from debtors' counsel here today regarding, you know, the

19  automatic stay, as applicable to the debtors today, is

20  indicative of -- you know, is indicative of the fact that

21  there may be sort of a misunderstanding here of whether or

22  not naming the debtors would have any impact on the debtors'

23  estates.

24          And it cannot be the case that the Court has

25  jurisdiction to enjoin or prevent any action that might,

 1  theoretically, have some sort of drag on the performance of

 2  the company.  The Court doesn't have jurisdiction to prevent

 3  a journalist from -- or a private research report to come out

 4  and discuss the potential liability of the debtor, and that's

 5  -- that is the same here.

 6          If this provision is intended to prevent us from

 7  asserting allocation or a claim reduction or setoff in

 8  litigation with a plaintiff, which we think it may, that's

 9  plainly beyond the Court's jurisdiction, in our view.  And

10  the jurisdiction is limited, at its extreme, to things that

11  relate to the debtor, the estate, or this case.  The seminal

12  Pacor case in the Third Circuit defines the Court's

13  jurisdiction is a matter that may affect the debtor, the

14  estate, or the case.  And that test has been, of course

15  (indiscernible) standard in the Supreme Court.  And we feel

16  strongly that taking away our right to defend ourselves

17  against plaintiff (indiscernible) it simply takes value away

18  from the co-defendants and gives it to the plaintiffs, and

19  who certainly should not be relying on this language in

20  connection with solicitation of the plan.

21          That transfer does not affect the debtor.  And no

22  one is questioning the Court's ability to discharge the

23  debtor or even, at this point, although it's reserved for

24  confirmation, the third-party release.  We think that the

25  transfer of value does not meet the very expansive rule set

1  forth in Pacor because the conceivable effect on the estate

2  or the debtor is an expansive rule.

3        We would also direct the Court to the decision --

4  the Third Circuit's decision in Combustion Engineering, which

5  is directly on point.  That, for the record, is Combustion

6  Engineering, 391 F.3d 190, at 230.

7        And just to conclude, Your Honor, we don't believe

8  it's appropriate for the Court (indiscernible) approval a

9  plan for solicitation that indisputably goes beyond its

10  jurisdiction, and waste judicial, estate, and creditor

11  resources on such a plan.

12        THE COURT:  Well --

13        MR. WEBER:  The effect of the plan's release --

14        THE COURT:  Hold on.

15        MR. WEBER:  -- remains unclear and --

16        THE COURT:  All right.  Hold on.

17        MR. WEBER:  -- the debtors have --

18        THE COURT:  Hold on.

19        MR. WEBER:  -- (indiscernible)

20        THE COURT:  Hold on.  The debtors aren't asking me

21  for an injunction now.  What -- their argument is -- and the

22  reason I asked the question is I wanted to understand what

23  their position was here.  Their position is the automatic

24  stay applies to your being able to name them on a jury form.

25  You disagree and say the automatic stay doesn't apply.  So,

50

1   at this point, you're free to name them on the jury form and

2   run the risk that I find against you later on, if it turns

3   out later on that that is a violation of the automatic stay.

4   But that's the risk you take.  And I'm not making any

5   judgment on that this way -- at this time, one way or the

6   other.  It's not before me, it's not the issue.

7           The issue now is, as Mr. Gott laid it out for me,

8   the plan is going to say all opioid claims are transferred --

9   are channeled to the trust.  And once the plan is confirmed,

10  if it is confirmed, then you can name the trust as -- in your

11  defensive positions in your cases.  But at this point,

12  there's -- you know, the risk is on you.  If you want to name

13  them, you can name them going forward.

14          MR. WEBER:  (Indiscernible)

15          THE COURT:  But you run the risk that it turns out

16  the automatic stay does apply.  But you seem pretty confident

17  it doesn't, so it's up to you.  I'm not going to give you a

18  comfort order on that, one way or the other, because it's not

19  before me.  I --

20          MR. WEBER:  We agree, Your Honor.  We agree, Your

21  Honor.  We're not here to seek any order or we're not here to

22  discuss the automatic stay issue.  We think that was, you

23  know, raised in connection with, you know, your discussion

24  with Mr. Gott.

25          The reason why I latched onto that point is

1  because it's indicative in the jurisdiction -- in the

2  jurisdiction cases in the Third Circuit, it's the same issue

3  as to whether or not there is any impact on the estate.  It's

4  similar -- it's similar as to whether or not the automatic

5  stay applies.  We think that there is an injunction in the

6  plan as to -- that's unclear as to whether or not we can

7  assert the defensive rights.  And we think that the Court

8  does not have jurisdiction to approve that for a similar

9  reason as we think the automatic stay does not apply, which

10 is that it has no impact, conceivable impact on the property

11 of the estate.

12          And you know, I'm not a personal injury or the

13 kind of litigator that deals in those cases.  But my

14 understanding is that this is the normal way to apportion --

15 to exercise, you know, your rights of apportionment, which is

16 to name the party that engaged in the conduct on the verdict

17 form, and the rules may vary from state to state.  But we

18 cannot have a plan that would eliminate that.  And our view

19 is that, you know, it's plainly outside the Court's decision

20 and patently unconfirmable and it should be fixed now, not

21 later, Your Honor.

22          THE COURT:  Well, it sounds like --

23          MR. WEBER:  And (indiscernible)

24          THE COURT:  -- the only thing that needs to be

25 fixed is whether or not the disclosure statement -- what does

1   the -- Mr. Gott, what does the disclosure statement say now,

2   that they -- that, if the plan is confirmed, they won't be

3   able to name the debtor as a co-defendant, but they will be

4   able to name the trust as a co-defendant?  Is that my -- am

5   my under -- is my understanding correct?

6          MR. GOTT:  Yes.  Well, so -- yes.  As modified in

7   -- as Mr. Garfinkle noted, this was done over the course of

8   the last 48 hours or so, we haven't filed a plan with this

9   language in it yet.  But the plan, as modified, would say

10  precisely that.  And we've added disclosures to the

11  disclosure statement to explain that.  Those are found at

12  Article 4(z) of the disclosure statement.  It says:

13          "The opioid permanent channeling injunction under

14  the plan will enjoin any party from naming the debtors, the

15  reorganized debtors in any apportionment or allocation of

16  liability in any litigation or proceeding, insofar as the

17  claim or cause of action asserted in such litigation or

18  proceeding is an opioid claim."

19          THE COURT:  And does it go to the next sentence,

20  to say that they are permitted to name the trust, the opioid

21  litigation trust?

22          MR. GOTT:  Yes.  So the -- so let me say that a

23  little more clearly.  So the revised documents, as filed,

24  will say that, but the excerpt I just read was from our

25  previously filed disclosure statement.  So, yes, the updated

1  disclosure statement will include that, the next sentence to
2  capture the (indiscernible)
3        THE COURT:  All right.  So, Mr. Garfinkle and Mr.
4  Weber, it sounds like they're not saying you can't name the
5  debtors now or you can't name -- or -- and if the plan is
6  approved, you're going to have to use the trust because all
7  of the liabilities are going to be channeled to the trust.
8  So you're not losing any defensive rights.  So what am I
9  missing here?
10        MR. GARFINKLE:  Your Honor, may I address it?
11  First, you asked the question as to how whether -- how did
12  they deal with this in Purdue.  I'm not the lead counsel for
13  McKesson in Purdue; I'm co-counsel with the Jenner & Block
14  firm.  I don't think, as I recall -- and I've been fairly
15  monitoring the filings in Purdue -- that there was ever a
16  relief from stay motion that was necessitated in this regard.
17        I think (indiscernible) exception to an argument
18  that naming a co-defendant, bankruptcy co-defendant on a jury
19  form for which no liability will come to the estate at all
20  violates the automatic stay.  There's no provision of 362
21  that could plausibly be read that way.  The Court, in the
22  history of -- as far as I know, there's not even a published
23  decision that would so hold it.
24        THE COURT:  I already --
25        MR. GARFINKLE:  So I will look --

A-6693

1          THE COURT:  I already --

2          MR. GARFINKLE:  -- (indiscernible)

3          THE COURT:  -- addressed that.  I already

4   addressed that, Mr. Garfinkle.  I said I'm not making any

5   ruling one way or the other on that.  You're not getting a

6   comfort order out of me, I'm not going to make any comment on

7   it one way or the other.  You run the risk you do what you

8   think you have the right to do, and we'll see how it plays

9   out.

10          MR. GARFINKLE:  Understood.

11          Now let me go to the language of kind of the

12   absurdity of this.  What they're saying is we can name the

13   trust.  But can we name the trust as to as successor-in-

14   interest to Mallinckrodt?  Can we say that -- in the jury

15   form, "Opioid MDT Trust, MDT 2, as successor-in-interest to

16   Mallinckrodt?"  Is that prohibited?

17          Because what we're talking about here is pre-

18   bankruptcy conduct by the debtor, in terms of a presentation

19   to a jury.  And we have over 3,500 lawsuits all being handled

20   by state court or federal court litigators, who are being

21   asked to present cases through trials and tribunals all over

22   the country and in Canada.  And to suggest that we can't name

23   Mallinckrodt on a jury verdict form, as opposed to a

24   different name, Opioid MV2 -- MDT 2 is something that's been

25   unprecedented in that regard.

1          We can name Purdue, we can name Insys, but we

2   can't name Mallinckrodt.  That makes no sense.  And I

3   understand the automatic stay issue and the Court doesn't

4   want to give an advisory ruling on it.  But the reality is,

5   today, we could do that as against the two other bankrupt

6   opiate cases and debtors, but we can't do it as to

7   Mallinckrodt.

8          This is a serious issue for us.  I understand it -

9   - you know, it's -- we can defer this to plan confirmation,

10  which is fine.  But I need to emphasize how serious this is,

11  in light of the sheer numerosity of lawsuits pending in every

12  forum in the country.  So I'll leave it at that.  I don't

13  know if anybody wants to (indiscernible)

14          THE COURT:  Well, Mr. Gott.

15          MR. WEBER:  Your Honor --

16          THE COURT:  Hold on.

17          MR. WEBER:  -- let's --

18          THE COURT:  Hold on, hold on one second.

19          Mr. Gott, are you -- is it the debtors' position

20  that, if this plan is confirmed, they cannot name as a co-

21  defendant on the jury verdict form the trust as successor-in-

22  interest to Mallinckrodt?

23          MR. GOTT:  So, if I'm understanding the question

24  being posed, then the answer is no.  I think the -- if the --

25  if it is the trust being identified on the jury form, that's

1  what we are proposing be, you know, expressly protected

2  within the language that is -- will be in the revised plan.

3  It says that -- it says that the debtors or the reorganized

4  debtors cannot be named in that form, as distinct from the

5  Opioid MDT 2, which, therefore, could be named in that form.

6          And we take your point, Your Honor's point that,

7  you know, a supplemental sentence in the disclosure statement

8  making that point clear would be useful, and we will

9  certainly add that.

10          THE COURT:  Well, I think the issue --

11          MR. GARFINKLE:  Your Honor, if I --

12          THE COURT:  -- hold on -- the issue for the co-

13  defendants is, if we put MDT 2 on the jury verdict form, the

14  jury is not going to know who that is.  Who is MDT 2?  They

15  got to be able to say MDT 2 used to be Mallinckrodt, that's

16  Mallinckrodt's liabilities, but they've been channeled

17  through this injunction, so, if you find that there's

18  liability, it's the trust that's on the line, not the

19  Mallinckrodt defendant.  How would they -- how -- I mean,

20  they can't put something on this form that just says MDT 2

21  without some explanation.

22          MR. GOTT:  Yeah.  Your Honor, I -- no, that's what

23  I thought I was addressing in responding to your question.

24  Correct, the notion of naming Opioid MDT 2 as successor to

25  Mallinckrodt, that, of course, is accurate, and we wouldn't

57

1   oppose that.  You know, that was raised in our discussions

2   with the co-defendants and that's right.  There would be -- I

3   think the notion would not be that would be prohibited; that

4   would be permitted.

5           And as we -- as I said, you know, as far as during

6   trial, during arguments, it is not our expectation that the -

7   - you know, that Mallinckrodt's conduct can't be referenced,

8   that that, of course, is part of -- is part of their right in

9   presenting their defense.  We're just suggesting that the

10  channeling injunction under the plan can stop them from

11  naming Reorganized Mallinckrodt as a liable party, and

12  instead would permit them to name Opioid MDT 2.  And if they

13  want to say as successor to Mallinckrodt, that's fine.  I'm

14  sure it will be -- I'm sure it will be very clear to any jury

15  or any judge, by the end of a month-long trial, that Opioid

16  MDT 2 is the successor to Mallinckrodt.  But that, of course,

17  could be written on the form, as well.

18          THE COURT:  So, again --

19          MR. WEBER:  Your Honor --

20          THE COURT:  -- I'm lost as to why this is an issue

21  if that's the case.

22          MR. WEBER:  Your Honor, speaking for Johnson &

23  Johnson, this is an issue because I think there's just a

24  continued kind of disconnect here.  It -- we think it's

25  irrelevant that the liability -- successor in liability would

```
 1  be the trust because the purpose of the apportionment has
 2  nothing to do with the liability of the trust or the debtor
 3  or the pre-petition -- it's related to the pre-petition
 4  conduct.  It's simply discussing what the liability of the
 5  actual defendants are.
 6          So it's plainly beyond the Court's jurisdiction to
 7  approve a channeling injunction that states that we can't
 8  name whomever we want on a jury form because that proceeding
 9  and that action have no effect on -- no conceivable effect on
10  the debtor's estate.  And we can't be in a position where
11  we're constrained by language in a plan, in a channeling
12  injunction in a plan that will prevent us from exercising
13  properly -- and as I said, the rules as to how the verdict
14  form would work may vary from state to state -- it would have
15  no effect on the debtors' estate, no conceivable effect.  So
16  there's no reason why it would need to be cabined to the
17  trust because there's no chance of any liability flowing from
18  these proceedings to the trust.  Thank you, Your Honor.
19          THE COURT:  Well, I --
20          MR. GOLDSTEIN:  Your Honor --
21          THE COURT:  You're --
22          MR. GOLDSTEIN:  -- if I --
23          THE COURT:  You're --
24          MR. GOLDSTEIN:  -- may be heard?
25          THE COURT:  I just don't get what you're coming
```

1    at.  I mean, you can put on the jury verdict for MDT 2 as
2    successor-in-interest to pre-petition Mallinckrodt.  And
3    during the course of the trial, you're going to refer to the
4    conduct of Mallinckrodt pre-petition, as Mr. Gott said.  It's
5    going to be very clear to everybody what the issue is.  So
6    I'm satisfied that the --
7              MR. GOLDSTEIN:  Your --
8              THE COURT:  I don't think there's any patently
9    unconfirmable issue at this point in time.  If you want to
10   argue this at confirmation, you can, but I'm overruling the
11   objection at this time.
12             MR. GOLDSTEIN:  Your Honor, I tried not to
13   interject.  Michael Goldstein from Goodwin Procter.  If I
14   could just have the floor for a minute, I think I can perhaps
15   help.
16             THE COURT:  Go ahead.
17             MR. GOLDSTEIN:  Thank you, Your Honor.
18             Your Honor, I think the problem is none of us know
19   (indiscernible) disclosure issue and legal issue, what it
20   means to say MDT 2 as successor-in-interest to Mallinckrodt,
21   unless we say for all purposes, including all Mallinckrodt
22   pre-petition conduct which is deemed to be attributable to
23   the MDT 2 Trust.  And that's the gap here, that we don't know
24   if simply saying successor-in-interest for liability purposes
25   under a plan of reorganization is enough for 50 states charge

1 | and the Federal Court to apportion liability for conduct.

2 | And here's the legal issue.  It's not an automatic

3 | stay issue.  It's there's a right to do this today.  Forget

4 | about the automatic stay.  The right exists.  And I think Mr.

5 | Gott even acknowledged they are impinging on a state law

6 | right.  They want to take that right away.  And whether it's

7 | a jurisdictional issue or whether it's actually a best

8 | interest issue, right?  Because we're not getting anything

9 | and they're taking that right away.  And in a liquidation,

10 | every co-defendant would have this right.  So the issue --

11 | and we can argue that at confirmation.

12 | But the point about why the proposal doesn't work

13 | is because it isn't a hundred percent congruent with saying

14 | we're naming Mallinckrodt, debtor -- not even talking about

15 | the reorganized debtor, we're talking about the debtor's pre-

16 | petition conduct.  And if there's any uncertainty that, in

17 | the jury form, by referencing some trust, even if it's a

18 | successor, without saying for all purposes, for all effects

19 | with respect to Mallinckrodt's pre-petition conduct, we are

20 | opening up an uncertainty, taking away rights, and that's the

21 | problem, in a nutshell.  Thank you, Your Honor, for giving me

22 | the opportunity to make that point on the record.

23 | THE COURT:  Well, that sounds like this is an

24 | issue between the co-defendants and Mallinckrodt at this

25 | point.  It's not a disclosure issue.  That's an issue for

1  confirmation as to what you will or will not be able to

2  include a jury verdict form.  It's something that can be

3  overcome by either a vote or if there are material facts at

4  issue.  What is the language going to be, what is the

5  specific language going to be?  I don't know at this point.

6  So, at this point, I'm not going to say that the plan is

7  patently unconfirmable because of this issue.  But the

8  parties should discuss this and work it out.

9           I mean, what would you do in a case where -- what

10  if Mallinckrodt sold itself before it filed for bankruptcy

11  and now is owned by Opioid Distributor XYZ, and you wanted to

12  sue Opioid Distributor XYZ, you'd name Opioid Distributor XYZ

13  on the jury verdict form, and you would -- but you'd refer to

14  all the conduct that Mallinckrodt did before it became Opioid

15  Distributor XYZ.  I don't see the difference.

16           All right.  I've ruled on that one.  Anything else

17  --

18           MR. EDELMAN:  Your Honor --

19           MR. GARFINKLE:  The next item, Your Honor, goes to

20  the new definition of "no opioid claims" --

21           THE COURT:  To what?

22           MR. GARFINKLE:  -- that was added in the last --

23           THE COURT:  Mr. Garfinkle, I lost you there for a

24  second.  It goes to what?

25           MR. GARFINKLE:  The "no recovery opioid claims,"

62

1  which was a new definition added in the last, I want to say

2  48 hours.  The -- we had discussions in which -- and I just

3  want to confirm this on the record -- with the -- with Mr.

4  Gott on this new definition, which they're amending.  To be

5  clear, within the group that I am speaking on behalf of, some

6  have filed opiate claims, some have not filed opiate claims.

7  McKesson has; others have not.

8         And the way the language was -- previously read,

9  you fall into that class if your claim was subject to

10 disallowance under Section 502(e)(1)(B), as of the effective

11 date.  They are modifying that as of the relevant time your

12 claim would be disallowed under 502(e)(1)(B), which is the

13 section of the Bankruptcy Code that disallows contingent

14 indemnity claims.

15        Certain of our clients, including McKesson, have

16 both fixed and contingent indemnification claims that they

17 have asserted.  And what I was told by Mr. Gott -- and if I

18 can confirm this -- is the debtor does not intend to seek

19 other -- seek either disallowance of claims or subordination

20 of claims pre-confirmation.  And so that, for the time being,

21 the new class, which is Class 9-I of the plan, the no

22 recovery opiate claim class, is an empty class, which may

23 then get filled up, should there be objection post-

24 confirmation and post-effective-date.  I think, if that's --

25        MR. GOTT:  Your Honor --

 1          MR. GARFINKLE:  If that's the case, then our

 2   concern over that section is resolved.

 3          THE COURT:  It is resolved.

 4          MR. GOTT:  Yeah, Your Honor, if I can -- okay.

 5   Your Honor, I can confirm that the -- excuse me -- the

 6   administration of the other opioid claims, which would

 7   include this basket, is a matter that's intended to be

 8   deferred until post-confirmation (indiscernible) post-

 9   effective-date.  And so, for the time being, in the absence

10   of a ruling expressly disallowing or subordinating those

11   claims, that that is the -- that is the outcome that would

12   hold as of the confirmation date.

13          THE COURT:  Okay.  Let's try to -- let's try to

14   stick to the --

15          MR. GARFINKLE:  And finally --

16          THE COURT:  -- things that --

17          MR. GARFINKLE:  -- Your Honor, I want to --

18          THE COURT:  Let's stick to the things that aren't

19   resolved because I'm running short -- I only have an hour

20   left, and then I have another hearing, so ...

21          MR. GARFINKLE:  Okay.  Your Honor, I'm just --

22   I'll finish up by saying this:  My group will, over the next

23   two months, work with the debtors, hopefully, to resolve the

24   executory contract issue, which remains unresolved, that we

25   dealt with -- we mentioned in our plan -- in our disclosure

64

1    statement objection.  The debtors can't operate without the

2    distributors and -- they just can't.  They will -- the plan

3    will not be feasible.  And so we'll see what we can get.

4              THE COURT:  All right.  Thank you, Mr. Garfinkle.

5              MR. GARFINKLE:  Thank you.

6              MR. GOTT:  Your Honor, the next objection we would

7    get -- so that would cover the next three unresolved

8    objections.  And the next one would be the Department of

9    Justice, filed at 2507.

10             THE COURT:  All right.  Who's speaking for the

11   DOJ?

12             MS. SCHMERGEL:  Good afternoon, Your Honor.  It's

13   Mary Schmergel on behalf of the United States.

14             THE COURT:  Go ahead, Ms. Schmergel.

15             MS. SCHMERGEL:  Thank you, Your Honor.

16             So we did file our objection to the disclosure

17   statement.  I would say, at this point, our objection, as far

18   as the adequate information, has been resolved, in that the

19   amended disclosure statement and plan that had been filed --

20   and we understand that there will be another amended plan

21   filed shortly after the disclosure statement hearing or

22   sometime within the next day or two does now disclose the

23   treatment of the Federal Healthcare Agency's claim.

24             Unfortunately, the United States disputes and

25   objects to the proposed treatment.  It basically states that

A-6704

1  the United States will either have to reach a settlement or

2  receive an unfair or discriminatory treatment under the plan,

3  while it's giving releases to the protected parties.

4         As we detailed in our disclosure statement

5  objection, we are not bound under federal law by any

6  allocation that would be reached by the debtors and the other

7  mediation parties.  As the Court is aware, we were a

8  mediation party.  And unfortunately, we would have to

9  disagree with Mr. Gott's statement yesterday that the -- you

10 know, we'll have to agree to disagree, respectfully disagree

11 that the mediation was successful because, obviously, the

12 United States -- since there has been no settlement reached

13 with the United States; and that, you know, by failing to

14 reach a settlement with the United States, we may need to

15 pursue our rights against the protected parties, which would

16 include the debtors, possibly the reorganized debtors, as

17 well as the various trusts and any entities receiving

18 settlement monies from the trust that are being proposed

19 under the plan.

20        In other words, you know, what needs to be

21 disclosed and what needs to be made clear -- and we have

22 asked the debtors to insert a footnote into the disclosure

23 statement, which we understand that they have agreed to do.

24 But the creditor groups need to understand that, without a

25 settlement, you know, they may be receiving -- you know, it

1   may be -- their share under the (indiscernible) trust may be

2   misleading in that it does not account for the fact that we

3   may seek recovery from these trusts post-confirmation under

4   federal law.

5           So that's why we thought this footnote was

6   important, so that all the parties and creditors are aware

7   that, if there is no resolution with the United States, their

8   shares may ultimately -- or whatever they receive under the

9   trust may ultimately need to be reduced by the Government's

10  medical recovery claim.

11          We also, Your Honor, would like to note many of

12  the parties and creditors in this case have mentioned or

13  acknowledged that the proposed trusts that are being -- under

14  the new amended plan mimic or are similar to or follow the

15  same allocation scheme as the trust in Purdue Pharma case.

16  We would like it to be noted, in case those who don't -- who

17  are not aware the United States was not a mediation party in

18  the Purdue Pharma case.  There is no proposed trust in the

19  Purdue Pharma case for the United States.  It is widely known

20  that the Department of Justice and the United States entered

21  into several different types of settlement with Purdue

22  Pharma.

23          We consider Purdue Pharma to be a vastly different

24  case than the Mallinckrodt case.  For full disclosure, there

25  is a settlement -- a current settlement pending before Judge

1   Drain and the DOJ that would resolve the Federal Healthcare

2   Agency's claims, which are the claims that were the subject

3   of the mediation in this particular case.  However, that

4   settlement has yet to be approved by the DOJ or Judge Drain,

5   and it is based on the very specific facts and circumstances

6   of the Purdue case.  It is not binding or has no precedential

7   effect in this case.

8           So we would caution any creditor or creditor group

9   looking to the settlement in Purdue Pharma for any kind of

10  guidance of what might be an appropriate amount of the

11  federal agency -- of the federal agency's claims in this

12  particular case, particularly since Mallinckrodt did produce

13  and distribute significantly more opioids than Purdue Pharma.

14          So, again, you we recognize that our objections to

15  the proposed treatment is more of a plan confirmation issue.

16  But we thought it was important to raise this issue before

17  the Judge and the Court and the other creditors because we do

18  believe our plan objection could ultimately lead to a

19  significant reallocation of the proposed settlement trusts.

20  And again, you know, we want that to be noted.  And I'm sure

21  Mr. Gott will confirm that the footnote that we requested

22  will be included in the disclosure statement.

23          THE COURT:  Mr. Gott?

24          MR. GOTT:  Yes.  Your Honor, we are -- my

25  understanding is that there is agreed upon language at this

1  point that we will be including in the documents.  And

2  suffice it to say, you know, of course the debtors' position

3  on some of the legal and factual assertions that Ms.

4  Schmergel just made, that we disagree with them.  But we --

5  the -- my understanding is that the language is close -- is

6  at a resolution.

7           THE COURT:  Okay.  Ms. Schmergel, does that

8  address your concern?

9           MS. SCHMERGEL:  Yes, Your Honor.

10          THE COURT:  Okay.  Thank you.  Anything else, Ms.

11  Schmergel?  No?  Okay.

12          Mr. Gott.

13          MR. GOTT:  Your Honor, the next objection on the

14  list was filed by Blake Kim, Docket Number 2509 and Docket

15  Number 2531.

16          MR. KIM: Good afternoon, Your Honor.  My name is

17  Blake Kim, I'm the CEO of Burlingame Investment Group, an

18  investment advisor for our clients.  They are investing in

19  (indiscernible) notes held by Mallinckrodt PLC, the parent

20  and holding company of the debtors.

21          Basically, Your Honor, we have three objections,

22  the first of which is that the disclosure statement is opaque

23  and very complex.  The updated disclosure statement has made

24  some improvements, but that's mostly for other classes.  For

25  our Class 6, improvement is small to none.

1          (Indiscernible) the recovery value of our class is

2    somewhere between 0.8 percent to 34 percent, Your Honor.

3    That is basically a huge range.  It's all or nothing

4    (indiscernible) and as a fiduciary for our investors, we

5    cannot make any intelligent vote on the facts.  So we're

6    asking that they narrow down what the recovery value for us

7    would be.

8          And also, our (indiscernible) any one of such a

9    wide range of outcomes.  Again, we are a financial debt

10   creditors.

11         THE COURT:  Well, on that issue, Mr. Kim, it's

12   difficult for the debtors to be able to give you a precise

13   amount of recovery here because there are huge, huge

14   unliquidated claims against the company that remain

15   outstanding --

16         MR. KIM:  Yes, sir.

17         THE COURT:  -- that haven't been resolved yet.  So

18   it's -- a lot of it is going to depend -- your client's

19   recovery, a lot of is going to depend on what happens to

20   those other contingent unliquidated claims that are out

21   there, so that's why there's a wide swing.

22         MR. KIM:  Well, our biggest issue with that is

23   that most of the claims are born at the subsidiary level

24   (indiscernible) holding company creditors.

25         That leads to our objection number two, which is

1  kind of tied.  Basically, our Class 6 is designated as like a

2  black hole.  The debtors have basically stuck (indiscernible)

3  noteholders with the rest of unsecured claimants, the holders

4  of claims that are not resolved.  And most of those claims,

5  again, were perpetrated at the subsidiary level, such as

6  Acthar Gel claims that are non-governmental and asbestos.

7          You know, the absolutely priority rule dictates

8  that similar class creditors be treated equally.  But the

9  debtors (indiscernible) recovery range that is

10 (indiscernible) analyzed and very well brings zero recovery

11 for us, a financial creditor.  This is a complete violation

12 of one unsecured creditor class for another, sir.

13         And our objection number three, sir, is we feel

14 that there should be a substantive consolidation.  The

15 debtors have been reporting their financial numbers for many

16 years on a consolidated basis.  As a result, as a noteholder,

17 we have no intelligent way of deciphering what our security

18 value should be.

19         Furthermore, the senior management and the board

20 of directors have been shared by the subsidiaries and the

21 holding companies.  For all these reasons, we feel that, in

22 addition to Class 6 being the -- you know, most of the claims

23 in Class 6 being perpetrated at the subsidiary level, we

24 believe that the disclosure statement should be revised and

25 produced at substantial consolidation levels.

```
 1              And I mean, I refer the objection (indiscernible)
 2    for confirmation.  But it's basically valuation.  We feel
 3    that it completely lacks credibility.
 4              THE COURT:  All right.  Mr. Gott?
 5              MR. GOTT:  Your Honor, I think the arguments Mr.
 6    Kim is raising are all -- fundamentally go to the question of
 7    whether the proposed treatment for Class 6 creditors is fair
 8    and appropriate and meets the confirmation standards.  We
 9    think those questions are appropriately deferred until the
10    confirmation hearing.
11              We of course believe -- as we stated in our
12    disclosure statement and have added supplemental disclosures
13    to address similar objections.  We of course believe that the
14    plan and the rationale and analysis underlying that plan are
15    all fully compliant with the Bankruptcy Code and that we will
16    carry our burden at the confirmation hearing, but we think
17    the issues are for another day.
18              THE COURT:  All right.  I agree.  I think, Mr.
19    Kim, the language that they proposed for your objection
20    number one, I think that resolves the issue with regard to
21    the disclosure statement itself.  Your other objections all
22    go to plan confirmation, which your objections will be
23    preserved until we get to the confirmation hearing, which
24    will be in September, and you will have the right at that
25    time to raise these objections against the confirmation of
```

1   the debtors' plan.

2            MR. KIM:  Thank you, Your Honor.

3            THE COURT:  All right.  Thank you.

4            MR. GOTT:  Next, Your Honor, so we do have on the

5   list -- so we resolved the objections of the future claims

6   representative.  We do have on the list the opioid claimants

7   committee, who will be among those looking to make statements

8   by the end of the hearing.  As we noted in the chart, I think

9   there are also -- there may also be scheduling and/or

10  discovery protocol issues that are still outstanding, if they

11  haven't been resolved during the course of the last couple of

12  hours, so those are not for right this moment, we'll come to

13  those soon.

14           We have -- next on the list is the Canadian

15  Elevator Industry Pension Trust Fun.  I think it was Mr.

16  Joyce who addressed this point earlier, and I'm not sure if

17  there was anything -- I think there's nothing else to address

18  from his objection, but I will pause to allow -- for anyone

19  to correct me on that front.

20           THE COURT:  Mr. Joyce?

21           MR. JOYCE:  Your Honor, Michael Joyce.  Your

22  Honor, we just reserve our objections for confirmation.

23           THE COURT:  All right.  Thank you.

24           MR. GOTT:  So the next unresolved objection would

25  be the -- that filed by the Ad Hoc Consortium of Equity

A-6712

1   Holders of Mallinckrodt PLC, at Docket Number 2616.

2             Your Honor, this objection was filed substantially

3   after the deadline to file objections.  But we are -- we're

4   happy to address them, nonetheless.  We were able to resolve

5   the objection regarding disclosures around the releases, but

6   we believe the remainder of the objections also go to --

7   squarely to confirmation and should be reserved for that

8   time.

9             THE COURT:  All right.  Does anyone wish to speak

10  for the ad hoc committee -- Ad Hoc Consortium of Equity

11  Holders?

12            MR. SMITH:  Yes, Your Honor.  Good afternoon.

13  Steven Smith from Herrick Feinstein on behalf of the Ad Hoc

14  Consortium of Equity Holders.

15            THE COURT:  Go ahead, Mr. Smith.

16            MR. SMITH:  Thank you, Your Honor.

17            I'm going to be even briefer than I planned to be,

18  given the arguments already raised and Your Honor's rulings,

19  but I do have several points I'd like to make.

20            The consortium organized recently in reaction to a

21  plan which, if confirmed, will wipe out equity completely and

22  do so through (indiscernible) improper, *de facto* substantive

23  consolidation of legally separate and distinct debtor

24  entities.

25            Many of the objections we raise in our papers,

1   Your Honor, regarding the adequacy of disclosure have already

2   been resolved and discussed by Mr. Feldman on behalf of

3   Humana and Attestor, Mr. Maza on behalf of the SEC, Mr. Etkin

4   on behalf of Marietta, and others, and we heard Your Honor's

5   rulings on those issues, and so we'll simply preserve our

6   objection on these issues for the confirmation hearing.  But

7   we raised two arguments in our papers, Your Honor, that the

8   plan is patently unconfirmable, sufficient we think to

9   prevent the approval of the DS, the disclosure statement.

10          The first one, Your Honor did discuss earlier, and

11   that relates to the non-consensual releases and the opt-out

12   mechanics.  And so we'll simply preserve our objection on

13   those issues, as well, for confirmation.

14          But we think and submit respectfully that the

15   plan, as proposed, improperly substantively consolidates the

16   debtors for purposes of its funding plan obligations.  And if

17   the corporate formalities are respected, Your Honor, it's

18   possible that there are debtors on the specialty brands side

19   of the business that may be solvent, and that the value would

20   travel up the chain to the public parent, leaving a potential

21   recovery for equity.  And as we said in our papers, Your

22   Honor, the debtors have consistently taken the position that

23   they have obeyed all corporate formalities.

24          In response to that argument, the debtors are now

25   saying and arguing that the pooling of the assets under the

1  plan as part of the Rule 9019 settlement, in order to achieve

2  global peace, but that's essentially an end run around a

3  normal, stringent, substantive consolidation analysis that is

4  required by the Third Circuit in In Re Owens Corning, 419

5  F.3d 195, and by this Court, Your Honor, in In Re HH

6  Liquidation, 590 B.R. 211.

7         And I can tell Your Honor that this issue of

8  trying to squeeze substantive consolidation under the 9019

9  umbrella came before Judge Drain in the Chapter 11 case

10  (indiscernible) Communications in the Southern District of

11  New York, Case Number 03-41710, at the hearing to approve the

12  disclosure statement.  And there, in that case, Judge Drain

13  was not inclined to approve the disclosure statement and sent

14  the parties back to the drawing board.

15         So, for this reason, Your Honor, we respectfully

16  submit that the plan is patently unconfirmable, and as a

17  result, the disclosure statement should be denied at this

18  point.  With that, I'll rest on my papers and yield the

19  podium.  Thank you.

20         THE COURT:  Thank you.

21         Mr. Gott.

22         MR. GOTT:  Your Honor, we think the ad hoc

23  consortium is fundamentally misunderstanding the plan.  The

24  plan is not (indiscernible) substantive consolidation, other

25  than its (indiscernible) narrow respect, which is that

1  distributions to Class 6 creditors will be done on a

2  consolidated basis.

3        And for all other purposes, everyone's

4  entitlements and everyone's -- in satisfaction of all the

5  requirements under the Bankruptcy Code will be undertaken and

6  will be satisfied at the confirmation hearing on a debtor-by-

7  debtor basis.  And you know pertinent to the substantive --

8  to the substantive points articulated by counsel, you know,

9  we will show at confirmation that the -- that distributions

10 that are provided for under the plan are consistent with

11 those entitlements, when you look at it on a debtor-by-debtor

12 basis.  And as Your Honor has already ruled in these cases

13 that equity holders are, in fact, out of the money.  So we

14 believe that this objection should be overruled.

15        THE COURT:  I agree.  I think the objection, if

16 there is an objection here, given that I've already ruled

17 that the debtors are hopelessly insolvent, that the equity

18 claimants' objections can be heard at confirmation.  And I'll

19 overrule the objection now.  And Mr. Smith, you can raise

20 those objections at confirmation if you choose.

21        MR. SMITH:  Thank you, Judge.

22        MR. GOTT:  And Your Honor, the last objection on

23 our chart, filed by the public schools, we've been able to

24 resolve that.

25        So that would bring us to the end of the

1  disclosure statement and solicitation procedures related

2  objections.  And at this point, we would -- I think we would

3  be pivoting toward the scheduling and discovery protocols

4  motion, unless Your Honor has any questions.  And I think, at

5  the end of the hearing, we'll wrap up with, you know, a

6  discussion of our exact steps forward from here.

7           THE COURT:  All right.  Did we -- are we going to

8  discuss the -- are we going to allow the UCC to make a

9  statement on the record?  I think the OCC wanted to make one,

10 as well.

11          MR. GOTT:  Yeah.  If Mr. Preis has been able to

12 join, we can do that now, or if we could save that for the

13 end of the hearing, if he has not been able to join us yet.

14          THE COURT:  Mr. Preis, are you with us or are you

15 still with Judge Drain up in New York?

16     (No verbal response)

17          THE COURT:  It looks like he must still be with

18 Judge Drain, so we'll skip that for now and move on to the

19 next.

20          MR. ISRAEL:  (Indiscernible) on behalf of the NAS

21 ad hoc group.  Judge Drain is issuing his ruling right now,

22 so I anticipate (indiscernible) over shortly.

23          THE COURT:  Okay.  Thank you.

24          MR. ISRAEL:  Thank you.

25          MR. GIATTINO:  Your Honor, this is David Giattino,

1  Stevens & Lee.  I'm here appearing for the public school

2  district creditors.  Our clients wanted us to read something

3  into the record, basically along the lines of that we're

4  reserving our right to re-raise the objections in response to

5  confirmation of the plan, and that our withdrawal of current

6  objection isn't a waiver of a right to raise those

7  objections.

8          THE COURT:  All right.  Understood.  Thank you.

9          MR. GIATTINO:  Thank you, Your Honor.

10         MR. GOTT:  All right.  And with that, Your Honor,

11  I will turn the podium over to Ms. Yerramalli.

12         THE COURT:  Okay.  Ms. Yerramalli?

13         MS. YERRAMALLI:  Good afternoon, Your Honor.  Ana

14  Yerramalli of Latham & Watkins on behalf of the debtors.

15         Your Honor, now that we have a path to approval of

16  the disclosure statement and for the debtors to commence

17  soliciting the plan, we need to set the course of how we get

18  from today to the confirmation hearing.

19         As the panoply of confirmation-related objections

20  has shown over the last two days, this will likely be a

21  highly litigious confirmation process.  Not every case has a

22  confirmation discovery and litigation schedule, but a case

23  like this calls out for one to create, from the outset, a

24  manageable process to approach the confirmation issues in an

25  organized manner and with the least number of fire drills

1   before the Court.

2           Ultimately, the protocols are intended to provide

3   reasonable default ground rules for an orderly process.  They

4   do not prevent any parties from coming back to Court to

5   address specific discovery or scheduling issues as they

6   arise.  This alone should be the basis to overrule any

7   objections.  No one believes the schedule is perfect, but it

8   is the debtors' view that we need to set this timetable and

9   begin moving forward with discovery and hopefully, in

10  parallel, continue negotiations to address plan issues.

11          Your Honor noted earlier in the hearing that

12  parties can proceed with mediation, negotiations, and other

13  litigation while the confirmation process proceeds,

14  particularly given the mounting costs of this case.  We

15  appreciate that the Court and chambers have been extremely

16  flexible with the pace and schedule of these cases.

17          This timetable and set of protocols seeks to

18  establish a framework for the benefit of everyone.  The dates

19  and deadlines may be viewed as tight, but that tends to push

20  parties to make compromises or to narrow issues.

21          As Mr. Gott has tirelessly poured through over the

22  last two days, we have tried to work on disclosure, schedule,

23  and discovery protocols with each objecting party.  The

24  objections to the schedule and the protocols generally fall

25  into a few categories; namely, that the schedule is too

80

1  tight, that there is insufficient information to begin the

2  confirmation process, and that there are a few disputes over

3  the details of document and written discovery and deposition

4  protocols.

5          We've engaged in extensive negotiations with both

6  committees to reach compromises that we believe address all

7  of the objecting parties' concerns.  The committee's input,

8  particularly on this schedule, was informative and led to

9  consensus on the timetable amongst the debtors, the RSA

10 parties, and the committee.

11         Some of the key changes that we made were

12 extending the solicitation directed deadline to July 15th at

13 4 p.m.  We also agreed to file the trust distribution

14 procedures on the earlier of July 21st, 2021 or within 30

15 days from entry of the disclosure statement order.  Many

16 objectors felt that this information is needed for voting

17 purposes, and we've provided a mechanism for that to occur.

18 These will now be filed 44 days before the September 3rd

19 voting deadline, which we also extended from its original

20 date.

21         We increased the time by when we will file the

22 plan supplements from 7 days to 28 days before the voting

23 deadline.

24         We also agreed with the 1L and 2L noteholders,

25 which may have certain claims that will be subject to

A-6720

1  litigation at confirmation on a schedule for when claims
2  objections would be filed.
3          We finally agreed to commence the confirmation
4  hearing on September 21st, 2021, which I believe works with
5  the Court's calendar.
6          The -- I think the way to proceed with this
7  particular motion is to deal with the schedule first.  There
8  are a few open points on the discovery protocols that the
9  litigation experts are trygin to work through as we speak.
10 And if they, you know, are not resolved within the next -- by
11 the time I get through the scheduling issues, then we can
12 take those up after the schedule.
13         But as you can see from this hearing, there are
14 numerous confirmation issues on which new parties will be
15 seekign discovery.  We believe that the schedule for
16 discovery, including deadlines for the parties to serve
17 document requests, and the discovery protocols and limits we
18 are seeking are absolutely necessary to bring order to what
19 could become significant chaos.  It's beneficial to all
20 parties, including those objecting, to know what the process
21 will be, how written discovery will work, how depositions
22 will be scheduled and conducted.
23         So, with respect to the schedule itself, Your
24 Honor, we have resolved the time line and the schedule with
25 the following parties:  The OCC, the UCC, the Department of

1   Justice, the Ad Hoc 1L Noteholder Group, and Deerfield.  West

2   Virginia withdrew its objection last night, and I understand

3   that the City of Marietta is not pressing its objection.

4           I believe that leaves four potential parties that

5   have objections to the schedule, which we should take in

6   turn.  The first is Mr. Darrel Edelman, who has spoken

7   previously.

8           THE COURT:  Mr. Edelman?

9      (No verbal response)

10          THE COURT:  Mr. Edelman, do you wish to be heard

11  on the schedule?

12          MR. EDELMAN:  (Indiscernible) not very computer

13  literate.  No, that's fine on the schedule, thanks.

14          THE COURT:  All right.  Thank you.

15          MS. YERRAMALLI:  The next is the Ad Hoc Consortium

16  of Equity Holders.

17          THE COURT:  Okay.

18          MR. CARTY:  Good afternoon, Your Honor.

19  Christopher Carty of Herrick Feinstein for the Ad Hoc

20  Consortium of Equity Holders.  I'm just going to speak

21  briefly to the schedule.

22          The debtors' revised schedule did address many of

23  the issues we raised in our objection.  The objection

24  (indiscernible) about the compressed time (indiscernible) in

25  the schedule, which, while the debtors did push back the

1  confirmation hearing about three and a half weeks from their

2  original proposal, it seems that most of that time is

3  allocated to extending the substantial completion deadline

4  for the debtors to July 30th.  And that is going to leave the

5  parties virtually no time to review the documents the debtors

6  produced, prepare for depositions, and take depositions, I

7  think with just a two-week period from the end of the

8  substantial completion deadline to the end of fact discovery.

9          And I think it's worth noting that, in the revised

10  schedule, the debtors submitted, I believe yesterday, that

11  they have not yet committed to the substantial completion

12  deadline of July 30th.  They note that, because -- that they

13  are -- they seek the right to modify that deadline because

14  they do not know the scope of plan discovery that will be

15  served on them.

16          And I think it's fair to say that, at the last two

17  days of hearing, the number of issues that will be raised at

18  confirmation -- and as debtors' counsel noted, this is likely

19  to be a highly litigious process.  It's just -- it's our

20  position that, by setting a schedule now, we're really

21  putting the cart before the horse, that it may be more

22  efficient to -- for the debtors to take in plan discovery,

23  determine what that will entail on their end, when they will

24  be able to produce documents, and for the parties to decide

25  on the rest of the (indiscernible) you know, based on an

84

1   understanding of the debtors' schedule for producing

2   documents.

3            But at the very least, I think (indiscernible)

4   clear we're reserving rights to come back and seek

5   modifications to the schedule, depending on what documents

6   are produced in the case.

7            THE COURT:  Well --

8            MR. CARTY:  (Indiscernible)

9            THE COURT:  -- there is always a right to come

10  back if the scheduling is not working, so that's not an

11  issue.  So, at this point, I -- and you know, in litigation,

12  as a former litigator, usually, you have a trial date and you

13  work back from there.  Here, we have a confirmation date and

14  we're going to work back from there.  So we're working within

15  the time frame that we have.  So it can be done, it's been

16  done many times before.  So I think, in terms of timing, at

17  least at this point, sitting here, it looks like that's

18  something that could be accomplished.  But as I said,

19  everyone certainly has a right to come back later and say

20  it's not working, and we can revisit it.  So this isn't

21  written in stone; it's just written on paper at this point,

22  so ...

23            MR. CARTY:  Okay.  Thank you, Your Honor.

24            MS. YERRAMALLI:  Thank you, Your Honor.

25            The next objection is that of the distributors

A-6724

 1  with respect to the schedule.

 2           THE COURT:  Okay.

 3           MR. GARFINKLE:  Your Honor, Jeff Garfinkle on

 4  behalf of McKesson and certain of its corporate affiliates.

 5  The only concern that we have is -- and we put this in our

 6  objection -- is the June 23rd deadline to do written

 7  discovery.  That is awfully quick to this process.  We think

 8  it should be one week later, such that it would be June 30,

 9  and all the discovery response dates on document production

10  would then flow back by one week.  But to require this

11  document production request to go out a week from today, when

12  we're still evaluating a number of these in flux provision

13  is, we think, too short.  That's the only criticism that we

14  have with the procedures, Your Honor.

15           THE COURT:  Ms. Yerramalli?

16           MR. GOTT:  Your Honor, to echo what Your Honor

17  just said, you know, we took a start time for the

18  confirmation hearing and a starting date and worked

19  backwards.  I believe that, you know, discovery requests can

20  be served by the 23rd.  If there is a, you know, need to

21  supplement that because something changes, we'll -- we can

22  pivot realtime.  But the goal for today is to set a process

23  and to have it start moving.

24           I think we are otherwise trying to extend dates

25  and negotiate dates in a bit of a vacuum, and I think we need

1    to do what works for the schedule that we've set forth, which

2    were starting to agree to.  And if we need to make a change,

3    parties rights are reversed -- are reserved to come back to

4    court.

5              THE COURT:  Yeah, I agree.  I think you have a

6    week.  I'm assuming you've already started working on this

7    discovery request, since this plan has been on file for quite

8    some time.  So I'd be surprised if you haven't already begun

9    drafting your discovery requests.  I'm sure there's a number

10   of parties who have already issued their discovery requests.

11   So I think the 23rd, at this point, is workable.  If it --

12   again, if it turns out not to be, the parties are free to

13   come back and ask for additional time.

14             MS. YERRAMALLI:  Thank you, Your Honor.

15             The remaining objections to the schedule is that

16   of Attestor and Humana, which I think is going to bleed into

17   some of the nitty-gritty on the discovery protocols, which

18   the litigation experts are best suited to handle

19   (indiscernible) as we speak in this hearing.

20             But just very quickly, I wanted to address Your

21   Honor's question about how to handle the confirmation hearing

22   and whether it should be in person or virtual.  When we spoke

23   to Your Honor's chambers -- and we understand that September

24   20th to 22nd are available, and then there may be some

25   additional time the following week, if we require additional

1   days.

2           What we've proposed in the schedule is that

3   September 20th would be a pretrial conference, and that the

4   confirmation hearing would begin on September 21st.  We would

5   use September 22nd.  And then, if Your Honor has availability

6   the remainder of the week, we can do that, or we would

7   reconvene that following Monday.

8           With respect to whether we should decide today

9   whether it should be in person or virtual, the debtors

10  believe that we should have it be a virtual hearing today but

11  revisit in August, when we have a better sense of what the

12  protocols are, what the building capacity will be, and more

13  importantly what remains contested, versus whether there have

14  been resolutions, so that we can better assess how many

15  people will need to travel to Delaware to attend the hearing

16  in person and what the -- you know, what the numbers are

17  going to look like as to who has to be in the courtroom.  I

18  think trying to make that decision today is a bit premature.

19          THE COURT:  I agree.  I think -- I just threw it

20  out there as a possibility.  But yes, we still have time to

21  wait to consider whether it's going to be practical, given

22  the number of people involved in this case.  Even without

23  COVID protocols, given the number of people on this Zoom

24  call, if everybody wanted to attend in person, we would have

25  to use an overflow room because not everybody would fit in my

88

```
 1   courtroom.  So we'll play that by ear and we'll revisit it
 2   sometime in August.
 3              THE COURT:  Do we have --
 4              MS. YERRAMALLI:  I will now --
 5              THE COURT:  Let me ask you a question, Ms.
 6   Yerramalli.  Do we have built into this discovery protocol
 7   periodic status conferences, just so I can have those on my
 8   calendars do arise, so we can use those, or do we have
 9   omnibus dates still on the calendar that we can use?
10              MS. YERRAMALLI:  Your Honor, we do have two
11   omnibus hearing dates per month that are separate and apart
12   from this schedule.  We can, if useful, build into this
13   calendar those particular omnibus dates to have status
14   updates provided at the time --
15              THE COURT:  Why don't we --
16              MS. YERRAMALLI:  -- or we can set different dates,
17   whichever your preference is.
18              THE COURT:  Let's use those and include a status
19   update.  And if parties have issues about discovery or any
20   other things of that kind, we can deal with those at those
21   omnibus hearings.
22              MS. YERRAMALLI:  That makes sense to the debtors,
23   Your Honor.
24              THE COURT:  All right.  Thank you.  All right.
25              MS. YERRAMALLI:  The final objections are of
```

1  Attestor and Humana with respect to discovery and the

2  schedule.

3         THE COURT:  Are we prepared to go forward with

4  that or are we still discussing issues?

5         MR. MCCALLEN:  Your Honor, can you hear me?

6  Benjamin McCallen from Willkie, Farr & Gallagher, on behalf

7  of the Acthar insurance claimants.

8         THE COURT:  Go ahead, Mr. McCallen.

9         MR. MCCALLEN:  The short answer is, Your Honor, I

10 don't know.  We've actually been having email correspondence

11 while this hearing has been going on, so I'm, frankly, not

12 sure about the scope of the disagreement, if any.  I'm happy

13 to address what I believe to be the open issue, and debtors'

14 counsel can correct me if that is, in fact, the only open

15 issue.

16        THE COURT:  Well, let's go ahead and why don't we

17 -- I do need to take a little bit of time before my next

18 hearing because it is a live hearing -- it's actually a

19 hybrid, some live and some people will be online, and we're

20 using a different system for conducting those hearings when

21 they are live, so I need to make sure the IT folks have got

22 this all set up and ready to go for three o'clock.  I expect

23 that hearing will not take more than an hour.

24        So why don't we recess now?  We'll reconvene at 4

25 and we'll wrap up the rest of the issues at that time.  That

1   will also give those who are attending the Purdue hearing an

2   opportunity to breathe for a few minutes before coming --

3   jumping on this call.

4           MS. YERRAMALLI:  We appreciate that, Your Honor.

5   Thank you.

6           THE COURT:  All right.  So we will stand in recess

7   until four o'clock.  Thank you

8       (Recess taken at 2:38 p.m.)

9       (Proceedings resume at 4:08 p.m.)

10          THE COURT:  All right.  Good afternoon.  Can

11  everyone hear me okay?  Apparently, trying to do a live

12  hearing broke my courtroom, so I'm now coming to you from my

13  chambers, instead, so -- well, we'll go ahead.  I don't think

14  -- hopefully, the sound quality is good enough; it won't be

15  as good as when I'm in the courtroom, but we'll go ahead and

16  give it a try.

17          So I think, Ms. Yerramalli, we were talking about

18  the schedule.

19          MS. YERRAMALLI:  Yes, Your Honor.  Anu Yerramalli

20  of Latham & Watkins on behalf of the debtors.

21          I think where we left off was the Humana/Attestor

22  objection to the schedule.  But I do think the hour that we

23  got from Your Honor while you had your other hearing, I

24  believe we've been able to resolve those issues.  But I will

25  let counsel to Humana and Attestor first raise their

1  position.

2          THE COURT:  Okay.  Mr. McCallen?

3          MR. MCCALLEN:  Good afternoon again, Your Honor.

4  Can you hear me okay?

5          THE COURT:  I can, thank you.

6          MR. MCCALLEN:  Okay.  Just for the record, again,

7  Benjamin McCallen, Willkie, Farr & Gallagher, for the Acthar

8  insurance claimants.

9          Your Honor, we have resolved our issues with the

10  debtors, and I just wanted, with the Court's indulgence, to

11  make one note and one point on the record.  And that is, as

12  Your Honor knows, we've moved for estimation of our claims in

13  these cases, and the Court heard that as an initial matter

14  last week.  And we've sought in that motion to set an

15  estimation hearing in advance of confirmation.

16          We understand the Court is going to take up the

17  issue of whether our claims need to be estimated after the

18  hearing on the 25th on the debtors' claim objection.  So we

19  understand that and appreciate that, so this comment is a bit

20  premature.

21          But I just did want to reiterate that, you know,

22  assuming for a second the Court ultimately agrees with us

23  that the estimation of our claims is appropriate, we think

24  our claims need to be estimated at the outset of any process,

25  whether that's in advance of confirmation, as we argued

1  previously, or whether it's at the beginning of a larger

2  confirmation hearing.  And that's one of the issues, the

3  primary issue we were discussing with the debtors.

4          You know, the debtors told us that they don't want

5  to reach that level of detail at this point, in terms of a

6  scheduling order and addressing what issues will be heard

7  when at -- you know, either at confirmation or before, and

8  that makes total sense to us, both from their perspective and

9  the Court's, so I won't take up any more of the Court's time

10 on this.  But I did just want to state again on the record

11 our position on this issue.  And with that, I think our

12 issues with the debtors are resolved, Your Honor.

13         THE COURT:  All right.  Thank you, Mr. McCallen.

14         MS. YERRAMALLI:  Thank you, Your Honor.

15         Your Honor, I misspoke when I referenced that the

16 West Virginia objection to the scheduling order was

17 withdrawn, that was the West Virginia NAS claimants.  The

18 State of West Virginia, I believe, still wants to make a

19 reservation of rights, so I will turn the podium over to Ms.

20 Lawson.

21         THE COURT:  All right.  Ms. Lawson?

22         MS. LAWSON:  Thank you, Your Honor.  Kristin

23 Lawson from Leech, Tishman, Fuscaldo & Lampl on behalf of the

24 State of West Virginia.

25         I just wanted to briefly mention we did file a

1   limited objection to the scheduling motion.  That was

2   primarily filed to preserve our issues that we had raised in

3   our objection to the disclosure statement, where we had

4   argued, if you recall, that the solicitation and confirmation

5   process were premature until we had seen the trust documents.

6   But you'll also recall that that objection was overruled.

7          We did not withdraw our objection, however,

8   because we did still have some concerns that the specific

9   time line, as you heard from other creditors just before the

10  recess, was particularly tight with respect to when the TDPs

11  and plan supplement documents would be filed, relative to

12  ongoing document discovery and the preparation of expert

13  reports.

14         That said, we did hear multiple statements prior

15  to the break, both from the debtors and also from Your Honor,

16  to the effect that we would be able to seek recourse if any

17  issues arose during the process.  And so we just wanted to

18  make clear that we were, in fact, reserving our rights to

19  seek redress if any issues arise and if modification of the

20  time line later becomes warranted.

21         THE COURT:  Thank you, Ms. Lawson.

22         MS. LAWSON:  Thank you.

23         MS. YERRAMALLI:  Your Honor, I do believe that now

24  addressed all of the scheduling-related objections that had

25  been filed.

1              During the break, we continued to work with the
2   various parties on updates and revisions with respect to the
3   interrogatories and the deposition protocols.  I will cede
4   the podium to Ms. Marks, in order to address those, because I
5   believe we have a path forward on those, as well.
6              THE COURT:  All right.  Ms. Marks.
7              MS. MARKS:  Good afternoon, Your Honor.  My camera
8   suddenly seems to not be working, so I apologize for that.  I
9   am trying to log in on my phone.  I seem to be in the waiting
10  room, and I'm not sure if anyone is available to --
11             THE COURT:  I can hear --
12             MS. MARKS:  -- to let me in.
13             THE COURT:  -- I can hear you fine, so that's
14  okay.
15             MS. MARKS:  Okay.  Okay.  Thank you, Your Honor.
16             So we have worked over the past few days very much
17  so, worked very hard with both of the committees to try to
18  reach agreement on these protocols.  We do believe, as Ms.
19  Yerramalli said earlier, that an orderly process is necessary
20  to prevent depositions and discovery from potentially
21  spiraling out of control, given the contentious nature of
22  this case and the number of parties who may want to be a part
23  of depositions and take discovery.
24             On the written discovery, there was some dispute
25  over whether or not parties should be able to serve

1  interrogatories and RFAs.  We have agreed that each of the

2  committees may serve up to 15 interrogatories.  They are

3  willing to forego any RFAs.  We would ask that other parties-

4  in-interest who may want to serve interrogatories be limited

5  to 3.  We believe that's a reasonable compromise to avoid

6  overburdening the debtors on written discovery.

7          On depositions, there's been quite a lot of back-

8  and-forth on depositions.  I believe we've reached agreement

9  on 20 days of fact witness deposition.  If anyone still

10 disagrees with that, you know, they're more than welcome to

11 speak up.  But with the committees, at least, we've agreed on

12 20 days of fact witness depositions.

13         We've also gone back and forth quite a bit on the

14 protocols for how to decide on the dates for depositions and

15 also have to divide up the time.  We are concerned that, even

16 if the debtors agree to put forward a witness, there may be -

17 -

18         THE COURT:  There you are, Ms. Marks.

19         MS. MARKS:  Okay.

20         THE COURT:  Oh, now you got to unmute yourself,

21 though.

22         MS. MARKS:  All right.  Can you hear me now?

23         THE COURT:  Yes, go ahead.

24         MS. MARKS:  Okay.  We are concerned about making

25 sure that the scheduling of the depositions is orderly and

1  coordinated, that all of the parties work together to try to

2  best figure out how to split up the time.  You know, we

3  envision that there might be disputes about that, and we want

4  to make sure that there's a process in place to resolve those

5  ahead of time.  Ideally, we would like to go into the

6  depositions knowing that there's agreement on how to split up

7  the time among the parties who want to depose the witness.

8          I believe that we've reached agreement with the

9  committees on that.  There is some final language that we

10  need to tweak in the protocols to make sure that everyone is

11  on board with the language.  But I believe, on that protocol

12  all together for depositions, that we've reached agreement,

13  as well.

14          THE COURT:  All right.  Does anyone else wish to

15  be heard on the discovery issues?

16          MR. HURLEY:  Your Honor, it's Mitch Hurley on

17  behalf of the OCC.  Could I be heard very briefly?

18          THE COURT:  Go ahead, Mr. Hurley.

19          MR. HURLEY:  Okay.  So Ms. Marks, I think covered

20  that for the most part very accurately.  It certainly is true

21  that we've been working for a couple of weeks pretty

22  intensely with the debtors and with counsel for the UCC to

23  try to arrive at agreement on the schedule on the protocols,

24  and including in the 24 hours, I guess, or a little bit more

25  than that, since the last version of the proposed order was

97

1  filed by the debtors.  And in that period of time, we've

2  exchanged several drafts of language with the debtors.

3          And my understanding is that the debtors, after

4  this hearing, are going to file a revised order that reflects

5  much of the drafting that was exchanged over the course of

6  the past 24 hours, so it will be different than the order

7  that was filed yesterday, of course.

8          And when the hearing began this afternoon at

9  12:30, there really was just one issue that remained, at

10 least from the OCC's perspective, and it, in fact, related to

11 how depositions under that twenty-deposition cap would be

12 counted.  During the course of the hearing, during the last

13 session, we had a telephone call with counsel for the

14 debtors.  And we think that we've agreed in principle on a

15 way to resolve even that last issue.  After this hearing,

16 we've agreed that we're going to have a further conversation

17 to make sure that we are in full agreement on exactly how

18 that language should be included in the order, so that we're

19 all on the same page, but I'm confident we're going to be

20 able to do that.

21         There were two points that were made, and I think

22 maybe counsel just misstated it a little bit.  So, with

23 respect to interrogatories, there is a provision now that the

24 committees can serve each up to 15 interrogatories.  That's

25 without leave.  Of course, the parties have the right to come

1  back and seek leave to serve interrogatories or RFAs, if they

2  get leave from the Court.  So it's not an absolute limit,

3  it's a without leave limit.

4          And then, with respect to the depositions, I think

5  Ms. Marks said we agreed on 20 days, and our agreement and

6  our understanding of that agreement is it's 20 depositions.

7  As I said, the kind of last remaining issue between the

8  parties is on exactly how that's going to be counted and

9  measured against the 20.  Again, I think we're going to reach

10  agreement and we're not going to have to argue about it.  But

11  at least from the OCC's perspective, we have always been

12  talking about depositions, as opposed to days.

13          THE COURT:  Ms. Marks, are we talking about days

14  or depositions --

15          MS. MARKS:  Well --

16          THE COURT:  -- or are they --

17          MS. MARKS:  -- I think --

18          THE COURT:  -- synonymous?

19          MS. MARKS:  I think maybe you're getting a -- you

20  know, a flavor of the negotiations.  There's a lot of nitty-

21  gritty that goes into this.  We have built in -- language

22  into the protocols that each depositions should be limited to

23  seven hours, pursuant to the Federal Rules.  We believe that

24  is true.  Some depositions may take longer than that; given

25  the number of parties who seek to question the witnesses, we

1    may need to run long.  We may agree ahead of time; we may

2    not.  And so I think there is some question about how we're

3    going to deal with that, when depositions run long, whether

4    or not they count as one day or two days, one deposition or

5    two days.  I do think this is the language that we need to

6    work out.

7             I am hopeful that we will be able to, as well.

8    Although, you know, I guess there's the chance we may need to

9    come back before you if we can't agree on that language, but

10   I'm hopeful that we'll be able to.

11            THE COURT:  All rght.  Thank you.  I'm hopeful you

12   will able to agree, as well.

13            All right.  Anyone else wish to be heard?  Mr.

14   Christian, you raised your hand.

15            MR. CHRISTIAN:  Yes.  Thank you, Your Honor.

16   David Christian again for Columbia Casualty Company.

17            We objected to the proposed protocols because of

18   the limitations on the normal discovery tools that would be

19   available to a more minor participant like Columbia in a

20   proceeding such as this and that are presumptively

21   appropriate under the rules.

22            In particular, we focused on the fact that the

23   protocols would prohibit us from using the tools of

24   interrogatories and requests for admission with respect to

25   our issues in any contested matter related to our policies.

1   And we pointed out in our objection that those are just the
2   kind of tools that help a more minor party narrow issues and
3   focus objections.
4           And I'll just give an example related to the
5   discussion of the disclosure statement that we had yesterday.
6   And that is we don't know, at this point, whether the debtor
7   proposes to treat our policies as executory or not.  And so,
8   rather than engaging in lots of document discovery and
9   deposing a witness, we might want to just ask an
10  interrogatory:  Do you contend that our policy is executory?
11  On what basis do you contend that our policy is executory?
12  On what basis do you propose to override the anti-assignment
13  clause, things like that, that are not hard to answer, but
14  are not answered on the face of the plan and the disclosure
15  statement.
16          And so we view those relatively modest and routine
17  tools as a way of narrowing issues, so that we're not, for
18  example, filing a confirmation objection that has to address
19  both the executory scenario and a non-executory scenario.  We
20  think it saves the parties and the Court time and is not at
21  all a burden to the debtors.
22          I recognize that we are minor, compared to the
23  vast scope of these proceedings, and there's many hundreds,
24  if not thousands of parties who will have something to say
25  before the confirmation process is over.  But we don't think

1    that we ought to be precluded from the outset without leave

2    of Court to use these routine tools in this fashion.

3             Now I heard the presentation from Ms. Marks about

4    apparently some agreement on parties who are not sort of part

5    of the core group and permitted three interrogatories.  I

6    didn't hear her say anything about requests for admission, so

7    I assume that means that they still propose to preclude

8    requests for admission.  It's really the first I've heard of

9    the three-interrogatory option.

10            The last version I saw, which I believe was

11   circulated yesterday in redline form, did not include that

12   element.  And I haven't sat down to think about, okay, what

13   are the specific interrogatories I would ask, especially as

14   the plan and the disclosure statement are evolving documents

15   at this point.  But we objection to the limitation on our

16   ability to use those regular tools under the rules.

17            And I guess I'm happy to consider, you know,

18   something that gives a limitation on my client's ability to

19   use those tools as a way of trying to meet the debtors'

20   desire for a streamlined process.  But honestly, I'm reacting

21   to that three-interrogatory limitation on the fly here.

22            THE COURT:  Well, I would certainly hope that the

23   debtors will just tell you, without having to even issue an

24   interrogatory, as to whether or not they're going to claim

25   that your contracts are executory or not.

1          Ms. Marks, when can we let Mr. Christian know the

2     answer to that question?

3          MS. MARKS:  I will confer with my team.  I'm not

4     the right person to give that answer now, but we will confer

5     and try to get back to him.

6          And I would clarify, I have not had the chance to

7     negotiate with Mr. Christian personally.  But you know, the

8     debtors are reasonable, I believe we've always been

9     reasonable in discovery.  If there's a creditor who is able

10    to use written discovery as a way to narrow issues, you know,

11    we would always be supportive of that and are happy to

12    negotiate, you know, perhaps more written discovery, if

13    someone needs it and if that's an efficient way to proceed.

14         These are really just meant to be sort of baseline

15    default ground rules, so that we don't get, you know, swamped

16    with 25 interrogatories from 20 different objecting parties.

17         THE COURT:  No, I understand that.  And Mr.

18    Christian, I certainly understand your position, and I'm

19    hopeful that you can work with the debtors to, one, get an

20    answer to this question without having to undertake

21    discovery; and, two, if you do have other issues that you

22    need to do discovery on, you can limit them as much as

23    possible and work with the debtors within what they're

24    proposing here.

25         Obviously, as I said before, this isn't written in

 1  stone.  So, if an issue arises and you believe you need

 2  additional information and there's a dispute with the debtor

 3  about that, you're always free to come back to me and ask for

 4  relief on that issue.

 5          MR. CHRISTIAN:  I appreciate that, Your Honor.

 6  Thank you.

 7          THE COURT:  Okay.  Anyone else?

 8      (No verbal response)

 9          THE COURT:  Well, I thought there would be a lot

10  more complaints about this one, but -- so I'm very glad there

11  isn't.

12          All right.  So where does that leave us, Ms.

13  Yerramalli?  Are we then moving on to something else?

14          MS. YERRAMALLI:  Yes, Your Honor.  So I think,

15  with that, we have concluded the presentations on both the

16  disclosure statement and the scheduling order, from the

17  perspective of the debtors.

18          I do understand that both of the committees would

19  like to make some short remarks.  And then I think we need to

20  move a declaration into evidence that is in the process of

21  being docketed, that is of Ms. Jeanne Finegan from Prime

22  Clerk that supports the noticing program that's embodied in

23  our solicitation process.  So we may want to turn to the

24  committees, and then I can do the housekeeping at the end,

25  just because I would -- I want to make sure the declaration

1  has actually been docketed.

2          THE COURT:  Is this -- I thought I saw a

3  declaration before.  Is this a new one?

4          MS. YERRAMALLI:  There was a revision and an

5  update to it, so we need to present that one.

6          THE COURT:  All right.  Okay.  Well, let's go

7  ahead with the committees' presentations.  Who wants to go

8  first, the OCC or the UCC?

9          MS. SPECKHART:  I'll go first, Your Honor, if you

10  don't mind.

11          THE COURT:  All right.  Go ahead, Ms. Speckhart.

12          MS. SPECKHART:  Thank you.  Good afternoon, Your

13  Honor.  Cullen Speckhart, for the record, of Cooley,

14  appearing on behalf of the UCC, just to explain the

15  resolution that we made on the disclosure statement items,

16  and also to offer Your Honor some insight on our committee's

17  work at this point in the case.

18          Your Honor, on May 18th, we filed a preliminary

19  objection to the original disclosure statement.  And in that

20  pleading, we indicated a number of solicitation concerns and

21  we identified some areas where we felt the disclosure

22  statement fell short in providing creditors in Class 6 with

23  the information that they need to make an informed voting

24  decision.  And we pointed out then, as Your Honor recognized

25  today, that this is the plan that is the subject of an

1  ongoing process of judicial mediation.  And for that reason,

2  we view it as a placeholder that isn't ready for

3  solicitation.

4          And that sounds like a negative statement, but it

5  comes from an optimistic place because we believe that a

6  successful mediation may really result in material changes to

7  the plan.  And in candor, Your Honor, the debtors are truly

8  mediating with us in good faith and this isn't just a

9  colossal waste of Judge Sontchi's time.  And they also

10  understand the plan may materially change and that soliciting

11  in this posture may not be the optimal way to proceed.  And

12  this is something we've certainly expressed in our many

13  discussions with the parties.  And in response, the debtors

14  have insisted that solicitation must happen now, regardless

15  of the ongoing mediation and regardless of our position on

16  the hastiness of the process.

17          And so, leading into this hearing, the UCC had a

18  choice:  We could either put the Court in a very difficult

19  position by asking Your Honor to confront the plan's obvious

20  and serious flaws today and hold off solicitation, or we

21  could try to find a path that indulged the debtors' desire to

22  plow ahead and seek acceptances of a plan that, in our view,

23  stands very little chance of being confirmed absent some

24  significant adjustments.

25          And after a lot of consideration of the

1 practicalities involved, the approach we've taken here is to

2 avoid a sideshow fight over solicitation and, instead, to

3 focus on the real work that's happening in plan negotiations.

4          But in order to get to a place where the UCC is

5 comfortable with solicitation at this time, we needed to

6 reach agreement on a number of conditions.  And those

7 conditions take the form of a set of safeguarding

8 modifications to the solicitation process that come through

9 in our supplemental statement that we filed ahead of

10 yesterday's hearing, indicating that we have reached a

11 resolution on our disclosure and solicitation-based

12 objections.

13          And the resolution itself includes a number of

14 features, all of which are designed to put what I'll call

15 "protective counterbalances" on solicitation in favor of

16 Class 6 creditors.  And by that I mean that our agreement

17 with the debtors' mandates, among other things, that the

18 disclosures made to creditors about this plan carry the UCC's

19 own message about the problems with the plan an the UCC's

20 recommendation about how creditors in Class 6 should vote; or

21 when creditors receive the debtors' materials urging them to

22 vote to accept the plan, they also receive our materials in

23 the form of a letter asking them to vote against the plan by

24 checking the box to reject.  And the letter explains in clear

25 language the reasons why we're making that recommendation.

1          The disclosure statement itself will also state in

2    bold, black-box format, that the UCC does not support this

3    plan.  And as Ms. Yerramalli indicated, the confirmation

4    schedule has been adjusted as part of this global agreement

5    to advance the goal of giving mediation a chance to work.

6          And we've also verified directly with Prime Clerk

7    that the balloting mechanics will provide for debtor-by-

8    debtor voting, notwithstanding the proposed distribution

9    mechanism in Class 6, which has been described as

10   consolidated.

11          And just to clarify the record on the point of

12   consolidation, as was raised by Mr. Etkin on behalf of

13   Marietta, our reading of the plan suggests that the plan

14   doesn't consolidate all the debtors.  It cherry-picks debtors

15   to be consolidated, to make sure that the general unsecured

16   claims don't dilute guaranteed noteholder recoveries.

17          So that being said, and regardless of the ruling

18   today on adequate information, no one other than the debtors

19   seems to be able to interpret how this plan is supposed to

20   function in Class 6 and we're working in mediation to change

21   it for the debtor.  And we believe that creditors in our

22   constituency need to know our views on whether this plan, as

23   currently proposed, should be acceptable to them.

24          And again, we view the settlement features as

25   critical safeguards to protect holders of claims in Class 6

1    from voting solicitation that's happening much too soon on a

2    plan that shouldn't be confirmed, for a whole host of good

3    reasons, some of which you heard yesterday and earlier today.

4            As Mr. Feldman, on behalf of Attestor and Humana,

5    and also Mr. Ashmead on behalf of the indenture trustee made

6    reference to one of the fundamental problems from which a lot

7    of these confirmation objections are percolating, and that is

8    the debtors made their key settlements pre-petition, during a

9    time when they didn't anticipating having to put more than

10   one piece of this company into bankruptcy.  And so the

11   settlements that are impacting the whole enterprise now were

12   not made with bankruptcy rules in mind.  They weren't built

13   with the architecture of 1129 as their blueprint.

14           And so now, after confronting the fact that a

15   HoldCo filing could not be avoided and marching towards

16   confirmation, the debtors are trying to retrofit their

17   settlement structure onto the Bankruptcy Code.  And there are

18   places where those shapes don't line up and it's causing a

19   lot of friction.

20           One of those points of friction is the application

21   of the absolute priority rule.  Mr. Ciardi, on behalf of

22   several Acthar plaintiffs, is trying to figure out how the

23   absolute priority rule yields $100 million for general

24   unsecured creditors, while also yielding 1.6 billion for the

25   opioids and 100 percent of the company for the guaranteed

1  unsecured notes.

2          If the settlements in the RSA were made according

3  to a uniform application of the absolute priority rule and

4  without unfairly discriminating, what would this plan look

5  like is his question.  And we also want to know the answer.

6  And we want to know about the intercompany transfers and why

7  specialty brands seems to be disproportionately funding the

8  opioid settlement and specialty generics.

9          You heard Mr. Feldman talk about moving money

10  around.  I think that he used the word "siphoning" yesterday.

11  And of course, if specialty brands had remained in a non-

12  bankruptcy environment, the debtors might have been free to

13  move value around the org chart without triggering

14  confirmation objections.  But we are in a HoldCo filing now,

15  where bankruptcy principles have to govern.  And there are

16  serious questions about debtor-by-debtor valuation and

17  whether the best interests test can be satisfied with respect

18  to creditors in our class.

19          So we settled our disclosure and solicitation

20  objections in part by asking creditors to consider this and

21  vote no on the plan for these reasons, all of which we've

22  raised with the debtors.  And their consistent response --

23  and you've heard references to this over the last two days --

24  is that these pre-petition settlements are sacrosanct because

25  they're the result of months and months of hard-fought

1  negotiations involving so many parties and so many

2  complexities and no one should consider challenging their

3  propriety.

4          And that is -- Your Honor, that is a brute force

5  answer to some pretty thoughtful and considered questions

6  about confirmation in this case.  That answer says we don't

7  care if our settlement structure and the Code are misaligned,

8  we will use the weight of the debtor-in-possession to jam

9  these on you.

10         And in all fairness to the debtors, these

11 settlements might represent major feats of negotiation, and

12 no one is questioning how hard fought they were.  But it

13 should go without saying that 1129 includes no major feat of

14 negotiation exception that would absolve the debtors of their

15 burden to show why this plan passes the legal testing of the

16 Bankruptcy Code at Class 6.

17         So we will not -- as Mr. Feldman alluded, we will

18 not sit in a corner consoling ourselves for being frozen out

19 of value that the debtors gave away to others pre-petition.

20 We will be objecting and litigating, for lots of weeks if we

21 have to, regardless of what ultimately happens in Purdue.

22 Mr. Preis referenced Purdue yesterday as a companion case,

23 but this case is not Purdue.  And in Purdue, there is no

24 analog for our committee of non-opioid creditors, who have

25 not only billions of dollars of economic interest at stake,

1  but also an enumeration of compelling objections to be lodged

2  at confirmation.

3        And I will save our confirmation objections for

4  the appropriate hearing, but I would be remiss if I did not

5  point out that the revised plan -- which now purports to be a

6  pot plan for Class 6 -- contains a new feature that we view

7  as particularly insidious.  It creates this pot of $100

8  million of value, allegedly to be shared on a pro rata basis

9  among allowed Class 6 claims.  But it also says that the

10 debtors reserve their right to use that cash to reach

11 separate settlements with individual holders of claims

12 between now an confirmation.

13        So this concept, if it is respected, would allow

14 the debtors to create a race to the bank or a cascade of

15 inequities because, conceivably, the could take the entire

16 $100 million that's in the pot -- which we already believe is

17 far too little -- and give it to one creditor or one creditor

18 group in an effort to buy their support for the plan.  And

19 that is just fundamentally wrong.  It's objectionable under

20 1129 and it allows the debtors to injure the interests of

21 creditors behind the scenes, without those creditors even

22 being aware that it's happening.  And that's not

23 transparency, nor is it helpful to the goal of getting to a

24 consensual resolution on the plan.

25        And although we're not asking Your Honor to rule

112

1  on this today, we do believe this is a plan objection that
2  shouldn't wait for the confirmation hearing to come to Your
3  Honor's attention, especially if it's going to put the UCC in
4  a position of having to object to separate settlements made
5  between the debtors and individual creditors in our
6  constituency because those settlements encroach upon plan
7  consideration that really should remain committed to the pot
8  without the risk of being dissipated inequitably along the
9  way.

10           So, in closing, Your Honor, we're not asking the
11  Court to deny the disclosure statement motion today and we're
12  not asking Your Honor to make any premature decisions on
13  confirmation.  We are making a clear expression of our intent
14  to protect the interests of general unsecured creditors by
15  safeguarding them in the process of solicitation and in the
16  process of mediation, where we will continue to work in good
17  faith to resolve our plan objections with the debtors and the
18  other parties.

19           If Your Honor has any questions, I'll be happy to
20  respond; if not, I'll turn the podium back to the debtors or
21  Mr. Preis.

22           THE COURT:  Thank you, Ms. Speckhart.  I don't
23  have any questions.  I appreciate your comments, though.

24           MS. SPECKHART:  Thank you.

25           THE COURT:  Mr. Preis, go ahead.

113

1          MR. PREIS:  Good afternoon, Your Honor.

2          Can you hear me?

3          THE COURT:  Yes.  Go ahead.

4          MR. PREIS:  Okay.  Arik Preis from Akin Gump

5    Strauss Hauer & Feld on behalf of the official committee of

6    opioid claimants.

7          Your Honor, up until Monday morning it had been a

8    while since we actually addressed the court.  There had been

9    a number of hearings about the UCC's issues, the Acthar

10   related issues; we observed, but we remained silent.  Please

11   don't take our silence as indicative of the fact that we

12   happen to be doing it a lot or that everything is okay.  We

13   have been quite active and we have throughout the case.  We

14   try to do most of our work behind the scenes and not bring

15   anything directly to you.  And even today we worked to

16   resolve our issues; thus especially with the TPP's and the

17   schedule which I will get to.

18         As the debtors noted, we're not objecting to the

19   entry of the proposed form of order today approving the

20   disclosure statement.  The debtors did agree we could address

21   Your Honor on a number of resolutions we reached to get to

22   today both in the mediation and the TPP's.  Also, I'm briefly

23   going to address for Your Honor some of our issues with the

24   plan and what we have been doing as far as our investigation.

25         The first thing that I am going to -- I'm going to

1   divide my presentation into four parts:

2           The first is going to be about the allocation

3   mediation, what happened there and what you should expect to

4   happen between now and confirmation.

5           Second is I'm going to address the lack of an

6   opioid bar date and how we address that, and the debtor's new

7   noticing program which I want to go into a little bit of

8   detail so Your Honor has some comfort in how that was

9   resolved.

10          Third, I want to generally address our views about

11  the plan.

12          Fourth, I'm going to address the releases and the

13  channeling injunction.

14          There are some points during my remarks where I am

15  going to address the OCC's letter which was docketed prior to

16  today's hearing this morning. And as you will see and,

17  frankly, its consistent with Your Honor's comments yesterday,

18  we're urging opioid claimants not to vote on the plan until

19  two things happen.  One, the TPP's are publicly available.

20  Two, until they have our final views on the plan because

21  right now the letter just says we're still doing our work.

22          On the allocation mediation, first item, I will

23  address three things: first, what it was and wasn't; second,

24  what the outcome was; third, what you can expect in the

25  coming months.

1          So first what it was and wasn't.  The mediation

2  order was pretty clear that this was an allocation mediation

3  solely about allocation of opioid trust assets as between the

4  11 or 12 mediating parties. It was not about and it was never

5  about requiring that any of the parties agree to the RSA or

6  the allocation of value going to opioid claimants was at

7  large.  For whatever reason, and despite the fact that the

8  order was pretty clear, some parties got confused; not

9  necessarily the opioid claimants.  I believe this confusion

10  has now been rectified, but it became a troubling and

11  annoying side show during mediation.

12          The importance of this, of clarifying this is a

13  big group who reached resolution and allocation in mediation,

14  other then the RSA parties, continue to be concerned about

15  the amount of value going to opioid claimants especially

16  those who are getting a percentage of the pot.  Obviously,

17  their dollars grow if the pot grows.  And, of course, they

18  are interested in making sure the OCC presses its work and

19  does its job to make sure that either of the amount of value

20  that is in the opioid trust is sufficient or that we press

21  any objection.

22          Second, what was the outcome of the mediation.

23  The plan sets forth the outcome of the mediation, but I think

24  it may be helpful for you to understand.  There were a number

25  of agreements reached between two groups of public claimants

1    on the one hand, which are the governmental claimants group

2    and the MSGE group, and on the other side between various

3    private claimants regarding allocation to each group.

4            Opioid trust assets will be allocated on a

5    percentage basis to four of the groups; the PI's, the NAS

6    PI's in each case including any futures, if any, the

7    hospitals and the TPP's - third-party payers; whereas three

8    groups will receive a very small fixed dollar amount on the

9    effective date.  That is the (indiscernible) payer group, the

10   AS medical monitoring group, and the emergency room

11   physicians.

12           Each group, other than the PI's, will use their

13   funds for abatement.  The remaining value of the opioid trust

14   will be distributed to the public side claims; the states and

15   the political sub-divisions and tribes, and hopefully the DOJ

16   at some point.  You heard Ms. Schmergel this morning talk

17   about their issues.  Again, it will be used for abatement.

18   This is, of course, one of the better off principals of the

19   plan and the OCC is pleased the public side is continuing to

20   agree to use their funds for these purposes to combat the

21   opioid epidemic.

22           The overall split between the publics and the

23   privates as a whole is approximately 80/20 depending upon if

24   you use nominal or net present value which is roughly, give

25   or take a few percentage points, the same outcome as in

1  Purdue, again, depending upon whether someone uses nominal or

2  net present value.  Again, the numbers kind of move between

3  parties, but the overall split is roughly the same.

4         Importantly, two groups did not reach -- sorry,

5  one group did not reach resolution which is the DOJ and

6  agency claims. I'm sure each -- as you know, they addressed

7  Your Honor this morning.  We're disappointed that a

8  resolution hasn't been reached with them, but we hope that

9  their relatively small gap can be bridged.

10         Finally, as part of the allocation mediation there

11  is an agreement among the private side claimants to pay over

12  to the public side contingency counsel a common benefit

13  assessment of 5 percent of the amounts that go to the private

14  side claimants.  In return, the private side claimants will

15  not have any other assessments.  The private side continues

16  (indiscernible).  There are some specifics in the plan about

17  how that gets split between costs and expenses, but all of

18  that is set forth in the plan.

19         This is roughly the same resolution that was

20  reached in Purdue which leads me to my last point about

21  mediation, what should you expect in the coming months.  If

22  the plan gets confirmed all the opioid trust assets get

23  distributed to the MDT II, all opioid claimant claims get

24  channeled to the MDT II.  From there the MDT II makes

25  distributions to various trusts like the possible trust, the

1  TPP trust, the (indiscernible), the tribal trust, et cetera.
2  In addition, the opioid claimants' claims move from the MDT
3  II and they get channeled from there to the various trusts
4  based on their type and nature.  In turn each trust makes a
5  distribution to their claimants in the trust.
6         For the opioid claimants that reached agreement
7  each is now working on their TDP.  As you know the TDP's will
8  govern the manner in which assets will be distributed to
9  those whose claims were channeled to the trust.  These TDP's
10 will include, as you know, how claimants make the claims,
11 what evidence is needed, the scoring grids, et cetera.
12        It's impossible for a claimant to know right now
13 the likelihood that they will receive a distribution or the
14 potential size without these TDP's.  That is why normally
15 they get included in a disclosure statement.  Here, as you
16 know, because mediation took so long and because the debtors
17 didn't want to further delay the disclosure statement hearing
18 we agreed that the parties would work on their TDP's after
19 the disclosure statement hearing, but they needed to be done
20 no later than July 21st and docketed from the last date that
21 the TDP's can be docketed until the voting deadline and the
22 confirmation deadline -- confirmation objection deadline will
23 be 42 days roughly.  That gives people, effectively, six
24 weeks.  Of course, if they're not docketed by July 21st we
25 may be back in front of you asking for more time on the

1  backend for the voting deadline or confirmation.

2          So the bigger picture, said in another way, in the

3  coming days the noticing program, which we're going to talk

4  about shortly, through that each opioid claimant is going to

5  find out, some for the first time, that Mallinckrodt is in

6  Chapter 11 and that is plan is up for a vote.  Each claimant

7  will also be told in the disclosure statement and in our

8  letter that the TDP's will be coming out later.

9          Going one step further we're going to encourage

10 creditors not to vote until they have a chance to review,

11 among other things, the TDP's and ask any questions.  We felt

12 this compromise which, effectively, gives people 30 days to

13 look at the plan, the disclosure statement, the releases, the

14 allocation, et cetera, and understand that before they get

15 their TDP's and before they find out our view on the plan

16 made sense.  It gives people adequate time to make their

17 decision before they vote.  The debtors also agreed with us

18 that they will work out a plain English explanation of the

19 TDP's at the time they are filed.  This will be very helpful

20 especially for the pro se claimants.

21         As it relates to the groups that have not reached

22 a resolution, which, effectively, is the DOJ, its likely that

23 between now and confirmation they may object or we may reach

24 a resolution.  We hope, just like we have up until now, that

25 there will be a resolution reached with them, but there is no

1  gaurantee.  Indeed, if there is no settlement with them, the

2  DOJ in particular, the plan is going to need to make an

3  accommodation for future litigation with them about their

4  alleged entitlements to trust assets.

5          Okay, let me now move to the second item I want to

6  talk about which is the noticing plan.  As you know, about

7  seven months ago, we objected to the appointment of an FCR

8  and we cross-moved for the established of a bar date, of an

9  opioid claimant bar date.  Fast forward seven months we now

10  have agreements on allocation and mediation.  We now have an

11  agreement to appoint an FCR which Your Honor approved last

12  week, and we have an agreement to withdraw our motion to

13  establish an opioid claimant bar date.

14          In return we have the foreign compromises on

15  allocations going to each -- to various groups.  Two, TDP's

16  that are going to be docketed in sufficient time prior to

17  people voting.  Three, with regard to voting we have worked

18  out with the debtors on a noticing program that while

19  definitely far from perfect is designed to provide

20  constructive notice to a significant number of people across

21  the country.

22          I want to note a few items in particular and

23  before I do that I do want to mention that Ms. Finegan, who I

24  saw her declaration was filed and the debtors are making a

25  change to it, I just want to mention that we have had the

1   pleasure of working with her and her team now in Purdie and

2   in Mallinckrodt.  We really do appreciate not just how

3   diligent and good she is at her job, but how cooperative she

4   is and how she listens to things and is constructive.  We

5   really do appreciate that.

6           First, the debtors have agreed to produce

7   television commercials notifying the American public, first,

8   the fact that Mallinckrodt is in Chapter 11 and, second, of

9   claimants' rights to vote.  The debtors consulted with us no

10  the creative content, the script, the voice-over, et cetera,

11  or the commercial and we continue to have rights regarding

12  the commercial as per Paragraph 32 of the revised disclosure

13  statement order.

14          Second, the debtors have worked with us on putting

15  together the noticing program for social media, internet,

16  content and banners, where the banners will go, what they

17  will say, et cetera.  The same with magazines, newspapers,

18  community outreach, and other modes of publication notes.

19          Third, the debtors worked with us on the form of

20  potential outreach including utilizing the solicitation

21  directive which, effectively, allows counsel to vote on

22  behalf of the claimants; thus (indiscernible) certification.

23  The debtors are also trying to work with Purdue to get access

24  to the address information for 140,000 PI victims in Purdue

25  so that direct notice can be sent to them as well.

1    Obviously, the Purdue claimants may not be direct overlap

2    with the Mallinckrodt claimants, but we believe that is a

3    decent start.

4            Fourth, the debtors have worked with us in an

5    attempt to make voting as easy as possible, specifically this

6    includes making the ballots and other information easily

7    accessible to the websites that are referred to in the

8    various forms of publication notice.

9            Fifth, and given that this is the first time a

10   voting noticing program is being used in an opioid situation

11   the debtors have agreed to have weekly calls with us to

12   update us on how the voting is going, what the outreach is,

13   what seems to be working and what isn't.  They have agreed to

14   consider any suggestions we have during those sessions and if

15   they don't take our suggestions we're permitted to come back

16   to court and seek this court's modifications to the program.

17   This is legislated in Paragraph 40 of the proposed disclosure

18   statement order.

19           We feel that the stop, look, listen and if

20   necessary recalibrate is one of the most important parts of

21   the program.  We are comforted in how the debtors and Prime

22   Clerk have been receptive to our suggestions to date.  We

23   feel this looking process is especially important because in

24   this case, which is different then most mass torts, all of

25   the PI's did not file pre-bankruptcy litigation.  So as a

1 result the noticing program is the first time many of them

2 are getting notice of Mallinckrodt's bankruptcy.

3         Six, as I eluded to earlier, is the voting

4 timeline.  After a lot of discussion and negotiation, as Ms.

5 Yerramalli mentioned, and I will say it again June 22nd

6 solicitation deadline, September 3rd voting deadline, TDP

7 deadline July 22nd.  So 73 days to vote, 42 days between TDP

8 deadline and voting deadline.

9         Finally, the debtors agree to include our position

10 letter in the solicitation materials and to make sure opioid

11 claimants have access to it and access to the OCC advisors.

12 In our letter we make clear to opioid claimants our position

13 on the plan which I mentioned earlier.  Our letter also

14 explains what the OCC is, what Mallinckrodt's place in the

15 opioid crisis has been and is, the outcome of the allocation

16 mediation, the work that the OCC has been doing to

17 investigate the sufficiency of value being placed to the

18 opioid trust, and we talk about the TDP's and the fact that

19 people should be on the look-out for those, you know, around

20 July 21st.

21         All of this working together is not necessarily

22 perfect, but it's a fair program given the facts and

23 circumstances of the case.  That is why we draw-up our

24 objection to the needing an opioid bar date and our objection

25 to the FCR.

1          Third topic, I want to address some general views

2     about the plan.  As you know, we have been taking discovery

3     in order to assess whether the assets that are contemplated

4     being put in the MDT are sufficient.  We heard a lot today

5     and yesterday from the OCC, and from Attestor, and Humana,

6     and the Acthar plaintiffs, and U.S. Bank about the fact that

7     they think there is too much value going to opioid claimants.

8     It's funny, we listen to this because we think it's the

9     opposite, although we are still doing our investigation.

10         So what are we looking at?  First, we're looking

11    at the general things that we're getting which are the estate

12    causes of action, including the claims against Medtronic.

13    Second is the insurance that was placed in the trust.  Third

14    is the value of the warrants.

15         Second, we're looking at overall enterprise value

16    to determine if certain claimants are getting greater then

17    par, and if certain claimants are getting too much.

18         Third, as it relates to our intercompany analysis

19    we're investing the following: which entities do opioid

20    claimants have direct claims, how large are those claims,

21    what is the value available at such entities, what is the

22    value of intercompany claims including estate type claims, in

23    other words the state against the state, and is it possible

24    to avoid claims and guarantees and liens as the secured

25    lenders at certain entities.  We know about that from our

125

1  hearing on Monday.

2          Fourth, and somewhat conversely because we want to

3  look at everything, we're looking at should the entire of

4  enterprise be substantively consolidated because of the

5  intercompany transactions that occurred during the

6  prepetition period over the last seven years which make it,

7  some people say, impossible to disentangle the entities from

8  each other.  If subcon is merited, we don't know yet, what

9  would recoveries look like for opioid claimants versus the

10 recoveries set forth in the plan.

11         Fifth, we're looking at what work SpecGx, so

12 called independent directors did and what they didn't do in

13 determining if there are causes of action against them.

14         Six, what consideration is being provided by the

15 hundreds of people who are receiving releases under the plan

16 as compared to the potential causes of action against them.

17 You have heard about this way back when during the KEIP

18 hearing when, obviously, we didn't press our objection, but

19 we agreed that we would look at what those people who are

20 part of the KEIP did and are doing to get their releases.

21         We're continuing our discovery and we have not

22 initiated anything.  To be certain if at the end of our

23 investigation we determine that the value going to opioid

24 claimants under the plan is insufficient we're going to be

25 objecting to the plan unless we reach a negotiated resolution

 1  with the noteholders and the debtors.  We talked a little
 2  about that on Monday.  As we note in our letter to all opioid
 3  claimants, when we do make a decision we will let all
 4  claimants know what by filing another statement on the docket
 5  of our intentions whether that be to object to the plan or
 6  not.  They will know, obviously, if we file an objection.
 7          Our last issue is the channeling injunction in the
 8  releases.  As you know, we filed an objection to the
 9  disclosure statement in which we stated that the plan
10  shouldn't be approved for solicitation because of the
11  releases in the channeling injunction.  Obviously, we did not
12  press that today.  To be clear, our objection was and is,
13  based on the channeling of opioid claims to the MDT II and
14  then to various sub trusts.
15          The only type of channeling that has ever been
16  done is in asbestos cases or where there is overwhelming
17  creditor approval.  At this time we don't know if there is
18  going to be overwhelming creditor support, but we do know
19  private creditors have concerns about the value going to
20  opioid claimants.  As a result it's very possible that opioid
21  claimants may not support the channeling injunction in the
22  release which may cause problems at confirmation.  This is
23  specifically why we spend so much time making sure the voting
24  and noticing program works and that people actually vote on
25  the plan.

1          Aside from this major issues we have two other

2    issues of the release.  The first is that the plan provides

3    not just for releases for the debtors, but for third-parties

4    and specifically it relates to things like officers,

5    directors, advisors, consultants, etc., of the debtors.

6    Unlike most plans that say all of those people solely in

7    their capacities as such this plan doesn't say that.

8          This plan says that you get released as it relates

9    to the debtors, etc., but not solely in your capacity as an

10   officer, or director, or advisor, or consultant to the

11   debtors.  I don't quite understand why that is.  We think

12   that is not consistent with pretty much every plan we have

13   ever seen, but we do intend on pressing an objection to that

14   unless we reach a resolution.

15         The second issue relates to the debtor releases.

16   The debtors, as you know, are giving grand releases to a

17   number of parties and we asked them, just like in Purdue, to

18   give releases to all the opioid claimants in their capacities

19   as such; meaning a broad release to personal injury claimants

20   and more narrow release to, what I will call, commercial

21   opioid claimants like hospitals, TPP's, governmental

22   entities, entities that Mallinckrodt may actually have causes

23   of action that have nothing to do with their opioid claims.

24         The reason for this is simple, under the plan all

25   of these types of claimants are going to be channeling their

1   claims to a trust.  They are going to lose all their claims.

2   They are going to give up third-party releases, and under the

3   TDP's they may end up getting nothing and yet they are going

4   to walk away from this case not only losing everything they

5   have, but still being subject to litigation from the debtors.

6   You can imagine that for a PI that is just totally

7   incomprehensible that they walk away from the case with no

8   money releasing all sorts of people and still being subject

9   to claims against them by the debtors.

10          In closing, Your Honor, I just wanted to note the

11  following.  We have tried very hard in this case not to bring

12  issues to your attention, but rather to resolve them.  In

13  addition, we actually worked to help other parties in the

14  case resolve their issues including supporting the RSA

15  parties from getting their professional fees and expenses

16  paid despite the fact that the noteholders actually objected

17  to our retention of an investment banker supposedly because

18  they didn't -- I guess because they didn't want us to bring

19  valuation arguments.

20          As you know, from yesterday or from Monday, we've

21  tried to save money in these cases for people by not filing

22  our challenge objection, but trying to work out our issues

23  between the debtors and the noteholders.  I say all this not

24  because we deserve a pat on the back or because we want

25  better treatment, but because we want you to know we do a lot

1   of things behind the scenes in an effort to avoid bringing

2   things in front of Your Honor.

3           At some point if the plan doesn't change we're

4   actually going to have no choice but to bring back our issues

5   to you for adjudication.  That is why you heard Mr. Hurley

6   spend a little bit of time this morning or this afternoon

7   discussing the confirmation protocol because if we actually

8   have to litigate confirmation we're going to need to do that.

9           With that, Your Honor, I have no more comments.

10  Do you have any questions?

11          THE COURT:  No questions.  Thank you, Mr. Preis.

12  I appreciate the comments.

13          Mr. Israel, you have raised your hand.  Go ahead.

14          MR. ISRAEL:  Yes, Your Honor.  Good afternoon.

15  Harold Israel on behalf of the ad hoc committee of NAS

16  Children.

17          We just wanted to make a very brief statement.

18  First is that Mr. Gott correctly informed the court that the

19  NAS committee's objection to the disclosure statement have

20  been resolved.  Our agreement was also -- was predicated on

21  the debtor's agreement, as referenced by Mr. Preis, to file a

22  plain English document describing the TDP's (indiscernible)

23  with the actual filing of the TDP's on July 21st.

24          The NAS committee would also like to inform the

25  court that in connection with the TDP's the Purdue case that

130

1  they are negotiating a protocol to handle settlements with

2  minor children that we hope will, once agreed, be replicated

3  in this case and brought before this court.

4        Lastly, like other parties, the NAS committee

5  reserves its rights on all matters related to the plan and

6  confirmation.

7        Thank you, Your Honor.

8        THE COURT:  Thank you, Mr. Israel.

9        Anyone else?

10     (No verbal response)

11        THE COURT:  Ms. Yerramalli?

12        MS. YERRAMALLI:  Thank you, Your Honor.

13        There were certain statements made by the UCC that

14  I cannot leave unanswered.  Your Honor, we disagree with the

15  notion that the debtors have done anything untoward or that

16  the plan does not comply with the law.  GUC mediation is

17  ongoing which the debtors are participating in, in good faith

18  and we believe parties can also continue to negotiate while

19  continuing to litigate.

20        I would also note that the UCC has said that the

21  opioid settlement is too rich and the OCC has said that

22  opioid claimants are entitled to more.  That is typically a

23  hallmark of a settlement when no one is completely satisfied,

24  but those are all issues for confirmation, not for today.

25        In the end today's goal is to send a plan out for

1  vote and to have a finding that it has adequate information

2  to seek such a vote.  The time will come when the debtors

3  will demonstrate, at confirmation, that this plan is

4  confirmable and in the meantime we remain committed to try to

5  build further consensus.

6           With that, Your HOor, I will turn to just a couple

7  of housekeeping matters.

8           During this discourse the declaration that I

9  referenced at the outset, the declaration of Ms. Jeanne

10 Finegan has been docketed at Docket No. 2889.  Your Honor, I

11 would seek to enter that into evidence.

12          THE COURT:  I do have that here.  It was forwarded

13 to me.  I did read the initial one.  Can you tell me what the

14 changes are?

15          MS. YERRAMALLI:  Certainly.  Your Honor, there is

16 a revision to better capture the current status vis-à-vis the

17 Purdue non-public claimant information that Mr. Preis had

18 also mentioned.  We are working through what the best

19 approach is to access that information, but it remains a

20 complicated point and we did not want the declaration to have

21 a statement that was currently inaccurate.

22          THE COURT:  Which -- is there a particular

23 paragraph that has been revised?

24          MS. YERRAMALLI:  Yes.  It is Paragraph 20 on Page

25 -- on the top of Page 9.  I believe a redline was filed as

1  well, Your Honor, which would potentially be easier to

2  follow.

3        THE COURT:  I've got it.  The only change was to

4  Paragraph 20.  I've got that.

5        Is there any objection to the introduction of the

6  declaration?

7     (No verbal response)

8        THE COURT:  Its admitted without objection.

9     (Declaration of Jeanne Finegan received into evidence)

10       MS. YERRAMALLI:  Thank you, Your Honor.

11       With that, Your Honor, we will be filing a revised

12 disclosure statement order just reflecting the voting record

13 date of today, hoping that the order gets entered today, a

14 revised plan and disclosure statement reflecting the results

15 of the hearing, and a scheduling order as well reflecting the

16 results of the hearing.

17       If the court has any concerns with any of these

18 revisions we're available to reconvene to address.

19       THE COURT:  Alright, just so the record is clear I

20 will approve -- conditional approval to the disclosure

21 statement and the protocol subject to receipt of the revised

22 versions under COC from counsel which I will review, and if I

23 have any concerns I certainly will let everybody know.

24 Hopefully those will all get resolved.

25       MS. YERRAMALLI:  Thank you, Your Honor.

1       THE COURT:  Anything else for today?

2       MR. MERCHANT:  I don't believe so, Your Honor.

3       THE COURT:  Thank you all very much.  I appreciate

4  it.  Again, I apologize for having to jump on and off of the

5  hearing, but I did -- did we talk -- did we set a hearing

6  date yet for confirmation, Ms. Yerramalli, or are you still

7  working with the parties and my Chamber staff?

8       MS. YERRAMALLI:  We will have a pretrial

9  conference on September 20th and the confirmation hearing

10  will begin on September 21st and continue on the 22nd.

11       THE COURT:  That's right.

12       MS. YERRAMALLI:  Then working with your Chambers

13  for additional dates after that.

14       THE COURT:  Alright, let's -- just to be safe I

15  will block out the 27th and 28th of September as well so if

16  we have to carry over we will have some continuity.

17       MS. YERRAMALLI:  Thank you, Your Honor.

18       THE COURT:  Thank you all very much.  I appreciate

19  it.  We are adjourned.  I appreciate everybody's working

20  together on this.  I know this is a hugely complex case with

21  a lot of moving parts.  I think it's come a long way to this

22  point.  There is still a long way to go.  Still a lot of

23  issues that need to be resolved.  Hopefully the parties can

24  do that before we get to confirmation and we won't need four

25  days of confirmation.  I am guessing there is going to be

134

1  probably some objections left to resolve. So I will be

2  prepared for that.  Continue to work.

3          I appreciate it.  Thank you all very much for your

4  hard work.

5      (A Chorus of "Thank you, Your Honor")

6          THE COURT:  We're adjourned.

7      (Proceedings concluded at 5:05 p.m.)

8

9

10                        CERTIFICATE

11

12      I certify that the foregoing is a correct transcript

13  from the electronic sound recording of the proceedings in the

14  above-entitled matter.

15

16

17  /s/Mary Zajaczkowski_____        June 17, 2021
    Mary Zajaczkowski, CET**D-531

18

19

20

21

22

23

24

25

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2
                                       .   Chapter 11
 3    IN RE:                           .
                                       .   Case No. 20-12522 (JTD)
 4    MALLINCKRODT PLC, et al.,        .
                                       .
 5                                     .   Courtroom No. 5
                                       .   824 North Market Street
 6                                     .   Wilmington, Delaware 19801
                                       .
 7                         Debtors.    .   July 23, 2021
 8    . . . . . . . . . . . . . . . .  .   9:03 A.M.

 9                    TRANSCRIPT OF TELEPHONIC HEARING
                   BEFORE THE HONORABLE JOHN T. DORSEY
10                   UNITED STATES BANKRUPTCY JUDGE

11    TELEPHONIC APPEARANCES:

12    For the Debtor:          Michael J. Merchant, Esquire
                               RICHARDS, LAYTON & FINGER, P.A.
13                             Rodney Square
                               920 N. King Street
14                             Wilmington, Delaware 19801

15                             - and -

16                             George Klidonas, Esquire
                               Hugh Murtagh, Esquire
17                             Christopher Harris, Esquire
                               Keith Simon, Esquire
18                             LATHAM & WATKINS LLP
                               885 Third Avenue
19                             New York, New York 10022

20
21    Audio Operator:          Sherry J. Stiles, ECRO

22    Transcription Company:   Reliable
                               1007 N. Orange Street
23                             Wilmington, Delaware 19801
                               (302)654-8080
24                             Email:  gmatthews@reliable-co.com

25
      Proceedings recorded by electronic sound recording, transcript
      produced by transcription service.
```

```
 1   TELEPHONIC APPEARANCES (Cont'd):

 2   For Opioid Claimants:      Arik Preis, Esquire
                                Mitchell Hurley, Esquire
 3                              AKIN GUMP STRAUSS HAUER & FELD LLP
                                One Bryant Park
 4                              Bank of America Tower
                                New York, New York 10036
 5
     For Acthar Group:         Daniel Astin, Esquire
 6                             CIARDI CIARDI & ASTIN
                               1204 North King Street
 7                             Wilmington, Delaware 19801

 8                              - and -

 9
                               Donald Haviland, Esquire
10                             HAVILAND HUGHES LLC
                               111 S. Independence Mall E Unit 1000
11                             Philadelphia, Pennsylvania 19106

12   For Humana:               Benjamin McCallen, Esquire
                               Matthew Freimuth, Esquire
13                             WILLKIE FARR & GALLAGHER LLP
                               787 Seventh Avenue
14                             New York, New York 10019

15

16

17

18

19

20

21

22

23

24

25
```

1    MATTERS GOING FORWARD:

2    7. [SEALED] Debtors' Motion to Quash (A) Ad Hoc Acthar Group's
     Notice of Deposition of Melissa Falconi and (B) Ad Hoc Acthar
3    Group's Notice of Deposition of Hugh M O'Neill [Docket No.
     3289 – filed July 20, 2021]
4
     8. Ad Hoc Acthar Group's Motion to Compel Discovery and
5    Response to Debtors' Motion to Quash [Docket No. 3385 – filed
     July 22, 2021]
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1         (Proceedings commence at 9:03 a.m.)
 2              THE COURT:  Good morning, everyone.  This is Judge
 3    Dorsey.  We're on the record in Mallinckrodt PLC, Case Number
 4    20-12522.
 5              For those who haven't seen this before, this is
 6    the new look for our Zoom calls.  This is in anticipation of
 7    getting ready to go back to live hearings, but because we
 8    will continue to use Zoom instead of CourtCall even when we
 9    have live hearings, this is how things will look going
10    forward.
11              So, with that, I'll turn it over to debtors'
12    counsel to run the agenda.
13              MR. MERCHANT:  Thank you, Your Honor.  Michael
14    Merchant of Richards, Layton & Finger on behalf of the
15    debtors.
16              Your Honor, before turning to the agenda, I
17    believe Mr. Alberto sent chambers an email on July 15th,
18    relating to an agreement with respect to payments pursuant to
19    the KEIP order, and the OCC wanted to make certain statements
20    on the record regarding that agreement.  So, if acceptable to
21    the Court, I'd like to turn the podium over to Mr. Preis to
22    make those statements now, and then Mr. Klidonas will then be
23    making a brief statement on behalf of the debtors.
24              THE COURT:  All right.  Mr. Preis, go ahead.
25              MR. PREIS:  Good morning, Your Honor.  This is
```

1  Arik Preis from Akin Gump.  Can you hear me?

2              THE COURT:  I can, thank you.

3              MR. PREIS:  Okay.  I like the new look.

4              Good morning, Your Honor.  Arik Preis, Akin, Gump,

5  Straus, Hauer & Feld, LLP on behalf of the Official Committee

6  of Opioid Related Claimants.

7              Your Honor, as agreed with the debtors, the OCC

8  wanted to take a few minutes at the outset of the hearing to

9  update the Court with regard to the KEIP.  My remarks will be

10 (indiscernible) into four parts:

11             First, a reminder of what the KEIP order stated

12 with regard to our investigation (indiscernible)

13             Second, a brief summary of what we have done to

14 date.

15             Third, a very brief overview of what we've

16 preliminarily found.

17             And fourth (indiscernible)

18             THE COURT:  Mr. Preis.

19             MR. PREIS:  (Indiscernible)

20             THE COURT:  Mr. Preis --

21             MR. PREIS:  Yes.

22             THE COURT:  -- you're breaking up a little bit on

23 your presentation.  You're skipping out a little bit.  I

24 think your voice is dropping and it's not picking up on the

25 microphone, maybe.

6

```
 1          MR. PREIS:  Oh, okay.  Oh (indiscernible) is that
 2  any better?
 3          THE COURT:  That's better.
 4          MR. PREIS:  Okay.  Okay.  I promise this
 5  presentation will not take more than five minutes.
 6          First, a reminder of what is in the KEIP order.
 7  In accordance with Paragraph 4 of the KEIP order, the OCC and
 8  the debtors agreed that the OCC would conduct (indiscernible)
 9  investigation to the 12 individuals who are part of the KEIP.
10  In connection with the investigation, the debtors would
11  review and, as appropriate, produce up to an additional
12  50,000 (indiscernible) in other words, in addition to the
13  documents that we're already producing under our Rule 2004
14  investigation, that were specifically targeted to the
15  individuals in the KEIP.
16          The debtors also agreed to produce privilege logs
17  and witnesses for deposition (indiscernible) our
18  investigation, subject to the debtors' right to object to any
19  such deposition.  In return, we agreed to inform the debtors
20  of any facts we found that would lead us to believe that the
21  KEIP participants engaged in wrongdoing that might
22  (indiscernible) by us to withhold (indiscernible) KEIP
23  payment.
24          We were also permitted, by agreement and in the
25  order, that, by no later than July 15th, which was obviously
```

1  last week, in our discretion, to file a motion to enjoin any

2  future payment and/or claw back any Q4 2020 payments

3  previously made to KEIP participants under the 2020 KEIP,

4  based on any findings that we uncovered in our investigation.

5         Those rights, which are under Paragraph 4 of the

6  KEIP order, are in addition to those in Paragraph 3 of the

7  KEIP order, which states that, under certain circumstances,

8  KEIP participants are not eligible to receive any

9  (indiscernible) payments and that all parties' rights are

10  reserved to seek disgorgement of previous payments under

11  certain circumstances.

12         As everyone knows, as Your Honor knows, we didn't

13  file anything on July 15th, but instead, we decided to

14  continue our investigation in light of the items I'm going to

15  mention in a moment.

16         We also, of course, reserve our rights under

17  Paragraph 3 of the KEIP order, as well as our right to object

18  to the debtor (indiscernible) releases being sought pursuant

19  to the proposed plan, some of the KEIP (indiscernible)

20         Okay.  Second, our investigation.  Although we

21  have vigorously pursued our investigation of potential

22  misconduct by the KEIP participants over the past few months,

23  that investigation was not complete by July 15th, nor could

24  it be.  Although the debtors, to their credit, have produced

25  a significant amount of documents, the reason that the

1  investigation could not have been complete by July 15th was

2  that discovery was not complete by (indiscernible) for

3  instance, just yesterday, we received -- the debtors produced

4  more than 12,000 documents in response to our 2004 request.

5  And we understand that further productions are still

6  contemplated.

7           In addition, just one week before the July 15th

8  deadline, the debtors produced approximately 37,000

9  documents.  It was obviously impossible to review and

10  consider that information before July 15th.  That production

11  included (indiscernible) specific communications that the

12  debtors had previously withheld as privileged, but had

13  downgraded.

14          Moreover, we have found that many documents that

15  the debtors produced in response to our 2004 investigation

16  have been important in our analysis of the debtors' practices

17  concerning opioids and (indiscernible) analysis of the KEIP.

18          As of July 15th, the debtors had also not

19  completed production of privilege logs the OCC needs to

20  analyze in connection with our investigation.  While the

21  debtors, to their credit, again, provided certain interim

22  privilege logs, metadata logs in response to our requests for

23  information on a rolling basis, the metadata logs lacked

24  standard information, the basis of which (indiscernible)

25  withheld.

1          Furthermore, the majority of the log documents --

2    or the log information, including several thousand entries

3    involving KEIP participants, was provided just days before

4    July 15th.

5          In addition -- and this, again, we -- is by

6    agreement -- no depositions have taken place yet, which makes

7    sense, given that the debtors' document production is not

8    complete.  The debtors have been adamant that the

9    (indiscernible) witnesses be the (indiscernible) to

10   understand (indiscernible) all parties and all subject

11   matter.  And the Court recently entered a confirmation

12   schedule and protocol calling for fact witnesses to continue

13   through August 13th.

14         We agreed to the July 15th deadline back in April,

15   when the OCC anticipated that all the debtors' document

16   production would be substantially completed in June, with

17   depositions to be completed (indiscernible) in July, in

18   anticipation of a confirmation hearing in August.  That was

19   the schedule back then.  Obviously, that's not

20   (indiscernible) anymore.

21         In light of the shifting time line, in early July,

22   the OCC, we reached out to the debtors, described what we had

23   found to date, and to seek an extension of the time to

24   complete our investigation and potentially file a motion.

25   The debtors refused, which was fine.  Notwithstanding this

1  refusal and given that our investigation is still ongoing, we

2  made the determination not to file a motion on July 15th, but

3  to reserve our rights (indiscernible)

4           Third, a very, very brief update as to what we

5  have found to date.  And we've conveyed this update, both

6  orally and in writing and in much greater detail to the

7  debtors outside professionals, the outside professionals to

8  the governmental ad hoc group and their Attorneys General,

9  subject in each case to the terms of the protective order.

10          We've reviewed the documents and we believe some

11 of the documents raise concerns regarding some, but not

12 nearly all of the KEIP participants in connection with the

13 sale, marketing, and distribution of prescription opioids

14 (indiscernible) such conduct comes in the form of certain

15 (indiscernible) the marketing and sale of the debtors'

16 branded prescription opioid medication, as well as in the

17 monitoring of specific orders of the debtors' (indiscernible)

18 opioid products.

19          We believe the debtors' practices included the

20 targeting of doctors known to prescribe (indiscernible)

21 quantities of opioid pills and focus on achieving

22 prescription metrics and incentivizing sales reps

23 (indiscernible) we believe that the debtors and these

24 individuals engaged in these practices at a time when the

25 addictive properties of opioids were completely understood

1   and widely known.

2         While we believe that the documents discovered to

3   date raise significant concerns, we also recognize that our

4   investigation is not complete.  As I noted, documents still

5   must be produced and reviewed and we still must depose

6   certain key participants to learn more.  Filing a motion at

7   this time would be premature (indiscernible)

8         Finally, our next steps.  In addition to

9   establishing whether grounds exist to claw back or enjoin

10   KEIP payments, the investigation will establish whether we

11   have a basis to object to the proposed releases that the

12   debtors are proposing to offer (indiscernible) at the

13   appropriate time, and if we determine that doing so is in the

14   best interests of the opioid defendants, we will raise these

15   issues.

16         That's the extent of our statement.  I understand

17   that the debtors would like to make some statements, as well.

18   But before we do that, do you have any questions for me?

19         THE COURT:  No questions.  Thank you, Mr. Preis.

20         MR. PREIS:  Thank you.

21         THE COURT:  Who is speaking on behalf of the

22   debtors?  I'm sorry, I forgot.  Mr. Klidonas, go ahead.

23         MR. KLIDONAS:  Good morning, Your Honor.  George

24   Klidonas of Latham & Watkins on behalf of Mallinckrodt PLC

25   and its affiliated debtors.

1          The debtors' professionals, as Mr. Preis

2    mentioned, have discussed with the OCC their preliminary

3    findings and the relevance of such preliminary findings on

4    the key employee incentive plan or the "KEIP," as we call it,

5    and the releases proposed under the Chapter 11 plan.  But the

6    debtors do feel compelled to respond to the OCC's statement.

7          First, the debtors have fully participated and

8    continue to fully participate in the discovery process with

9    the OCC.  We've worked as quickly as possible to produce

10   documents to the OCC.  That said, the debtors, as mentioned

11   earlier, did not agree to the OCC's request to extend their

12   deadline to file a motion under the KEIP order because the

13   requested extension would not -- would have been after the

14   payment of the first half of the 2021 keep.  And our position

15   is those payments should be made when the company is

16   obligated to make those payments.

17         Regarding the substance of the OCC statement, the

18   debtors disagree with the OCC's interpretation of the small

19   set of documents that they provided, about 60 that they

20   showed us.  Many of these documents have already been

21   produced to the states and other multi-district litigation

22   plaintiffs; and, therefore, these same allegations were

23   raised pre-petition in a variety of different complaints.

24         The company has defended those pre-petition

25   allegations vigorously in the past and the proposed opioid

1  settlement resolves all of those claims and allegations in

2  their totality.  The debtors believe that conflating the

3  entitlement to KEIP payments is really sort of a veiled

4  attempt at calling into question the entire settlement

5  reached and the releases set forth in the plan.

6          If what the OCC wants to do is re-litigate these

7  allegations that have been settled, then debtors believe that

8  the proposed opioid settlement could have the potential of

9  unraveling.  But we decided, on balance, having a fight on

10  this issue right now would just be a complete waste of estate

11  resources and addressing confirmation of related issues in a

12  vacuum this early would just be unproductive.

13          To put this into context, the debtors believe that

14  the OCC's preliminary findings regarding the actions of a

15  small subset of KEIP participants -- as of today, our

16  understanding, it's about three of them -- and certain

17  aspects of the monitoring and marketing practices are

18  generally misguided.

19          The documents raised by the OCC are about from

20  2011 to 2015, when the companies produced and sold the

21  branded pain products.  We believe that Mallinckrodt branded

22  pain medication never made up more than about .5 percent of

23  the opioid pain market.  In addition, the debtors contend

24  that every Mallinckrodt pain product was FDA approved, every

25  milligram of such product and distributed was and is

1  authorized in advance by the DEA and then reported back to

2  the DEA in accordance with compliance protocols.

3          The debtors also believe and contend that the

4  purpose of the branded opioid marketing strategy was to

5  inform prescribers of the benefits of its longer lasting,

6  extending relief pain products, that serve generally as an

7  alternative, to allow patients to take these medications less

8  frequently.

9          And finally, with respect to the SOM -- the

10 suspicious order monitoring -- Mallinckrodt's historical

11 controls have been lauded by the DEA as exemplary and

12 consistent with what the DEA expects for Mallinckrodt as an

13 industry leader.  But as Mr. Preis mentioned, you know, just

14 as the OCC is continuing its review, we, the debtors -- you

15 know, the investigations being conducted by the independent

16 directors, more specifically, in connection with the plan

17 releases are still ongoing and are assessing the conduct that

18 the OCC is alleging.

19          So the last point I just want to raise on

20 discovery, Your Honor, is we just want to sort of clarify the

21 record a little bit.  The OCC has been the beneficiary of

22 extensive discovery in these Chapter 11 cases.  As of July

23 14th, the OCC has received 95 percent of the documents

24 responsive to their requests.  The vast majority of these

25 were produced by the end of June.

1          The negotiated discovery with respect to the OCC's
2   KEIP review was produced by the end of April, as contemplated
3   by the KEIP order.
4          And then I think it was mentioned earlier, interim
5   privilege logs have been provided and metadata for all
6   privileged documents was sent while the final privilege logs
7   are being completed.
8          And no depositions have been sought or noticed in
9   connection with the KEIP to date, nor was there any discovery
10  about any documents found by the OCC until almost two months
11  after the KEIP (indiscernible) was provided.
12         So, just to circle back and close the loop, you
13  know, neither the OCC, nor the debtors, as we both mentioned,
14  are looking to have this argument today on these issues.  We
15  both felt the need to at least provide the Court with some
16  context and with their perspectives of where things stand.
17         With that, Your Honor, I think we can turn to the
18  agenda today.
19              THE COURT:  All right.  Thank you, Mr. Klidonas.
20              MR. KLIDONAS:  You're welcome.
21              THE COURT:  Mr. Merchant, back to the agenda.
22              MR. MERCHANT:  Yes, Your Honor.  Turning to the
23  agenda, I think, based on the dialogue with chambers this
24  week, it probably makes sense to turn to Agenda Items 7 and 8
25  first, which are the discovery-related motions related to the

16

1   unsubstantiated claims objection going forward today.  So,

2   with that, I'll cede the podium to Mr. Murtagh to address the

3   debtors' motion to quash.

4           THE COURT:  Mr. Murtagh.

5           MR. MURTAGH:  Good morning, Your Honor.  It's Hugh

6   Murtagh from Latham & Watkins on behalf of the debtors.  Can

7   you hear me okay?

8           THE COURT:  Yes, thank you.

9           MR. MURTAGH:  Your Honor, I'll lay out where I

10  think we are on discovery disputes and then tell you how I

11  plan to go through it, subject to the Court's approval.  My

12  understanding based on the filings by the Ad Hoc Acthar Group

13  yesterday are as follows:

14          We have a live motion to quash as to depositions

15  noticed for Mr. O'Neill and Ms. Falcone.  I don't believe the

16  Ad Hoc Acthar Group is continuing to press requests for a

17  deposition of Ms. Falcone.  So, as to the motion to quash, I

18  will focus on the request to depose Mr. O'Neill.

19          The Ad Hoc Acthar Group also filed its motion to

20  compel production of certain documents, and that remains

21  open.  And I understand that's a portion of the motion to

22  compel.  But if it's more expedient for Your Honor, I'll

23  address that also while I'm addressing the motion to quash

24  Mr. O'Neill's deposition.

25          THE COURT:  Yeah, let's do them all at once.

A-6790

1          MR. MURTAGH:  Okay, Your Honor.

2          Your Honor, the headline on all of this is that

3    these discovery requests are months late, irrelevant, and

4    unnecessary.  The background, as Your Honor knows, is that

5    the debtors filed their objection to the Ad Hoc Acthar

6    Group's claims nearly three months ago, on April 30th.  And

7    as Your Honor also knows, we had a discovery dispute at that

8    time about the scope of discovery in this matter and Your

9    Honor made a ruling on the proper scope of discovery in this

10   matter.

11         The debtors, thereafter, provided extremely broad

12   discovery to the ad hoc group and also provided additional

13   new discovery with targeted responses to questions asked,

14   relating specifically to the subject matter here, which is

15   substantiation for what we view as the unsubstantiated

16   claims.

17         Thereafter, Your Honor, the ad hoc group had the

18   opportunity to file two responses, and the second came over

19   two months after the filing of the objection.  The ad hoc

20   group never, until last Friday, weeks after the filing of

21   their second response and a week after the debtors' reply,

22   even suggested that it had insufficient discovery.

23         Now the ad hoc group asserts that the debtors'

24   reply somehow revealed to them an urgent need to depose Mr.

25   O'Neill and to receive more documents.  And they appear to

1  give two reasons, neither of which is persuasive, and I'll go

2  through each of them, first dealing with Mr. O'Neill.

3        The first reason they give is that our reply

4  somehow alerted them to the existence of a publicly reported

5  opinion issued two years ago in the opioid MDL litigation.

6  And in respect of that opinion, the ad hoc group argues that

7  this belated discovered opinion is important because, first,

8  it allegedly validates an alter ego theory of liability

9  against PLC, and second, that Mr. O'Neill's testimony is

10  critical to that supposed validation.  Well, neither of those

11  assertions is true, Your Honor.

12        First, to be clear, the opinion states only that

13  the parties dispute and offer conflicting evidence on alter

14  ego and the matter should be litigated at a later date.  And

15  that later litigation never occurred.

16        The second is that Mr. O'Neill's name is not even

17  mentioned anywhere in the opinion.

18        So, apparently, on this, what the ad hoc group has

19  in mind is a statement in the plaintiffs' brief that Mr.

20  O'Neill did not recall details about certain Mallinckrodt

21  entities' board composition.  But Your Honor, on this

22  supposed reason for deposing Mr. O'Neill, if the ad hoc group

23  had wanted to explore alter ego theories and board

24  composition, they could have done so over the last three

25  months.  They could have sought additional discovery.  They

1   could have asked questions of Mr. Welch in deposition, and

2   they can attempt to do so with Mr. Welch on the stand today.

3   They do not need Mr. O'Neill for that.  So the belated

4   discovery of the MDL opinion and Mr. O'Neill's supposed

5   importance to it is not a grounds for deposing Mr. O'Neill.

6           The second reason that the ad hoc group has given

7   for deposing Mr. O'Neill is that he has allegedly become

8   relevant because his name appears on a single document cited

9   in the debtors' reply.  That document is a board deck

10  discussing Mallinckrodt Pharmaceutical International -- sorry

11  -- Mallinckrodt Pharmaceutical Ireland Limited's decision-

12  making responsibilities with regard to Acthar.  And it was

13  produced to Rockford pre-petition and it was offered in the

14  brief to demonstrate that the ad hoc group had notice pre-

15  petition of the involvement of Mallinckrodt Pharmaceuticals

16  Ireland Limited with Acthar.

17          It does not make relevant anything Mr. O'Neill did

18  or said.  The only connection between that document and Mr.

19  O'Neill is that his name appears I believe on an email cover

20  sheet to the transmission of the document, that's it.  So,

21  having not made Mr. O'Neill irrelevant in any way, in any new

22  way in the reply, this supposed second reason, his name is

23  mentioned as a name attached to a document, also is not a

24  reason to depose Mr. O'Neill.

25          And with regard to the deposition of Mr. O'Neill

1  in general, before turning to the RFPs, Your Honor, the

2  bottom line is that the ad hoc group has repeatedly noticed

3  Mr. O'Neill for deposition in these cases on what appears to

4  be tactical grounds, and this is no different.  I believe

5  this is the third time they've done so.  And now it appears

6  to be an attempt to disrupt a hearing that's been three

7  months in the making.  And the delay in the timing on this is

8  inexcusable and the deposition is wholly unnecessary.

9          With regard to the RFPs, Your Honor, the story is

10  much the same.  They are also inexcusably late, irrelevant,

11  and unnecessary.  Nevertheless, to be clear, in an attempt to

12  avoid having a dispute before the Court, Your Honor, the

13  debtors agreed to produce documents responsive to several of

14  the requests and responsive to the requests on which we

15  thought the ad hoc group was focused.

16          So, specifically, the debtors agreed to production

17  of the O'Neill deposition in the 2019 opioid MDL proceedings

18  and all exhibits, and also the entire record of the

19  jurisdictional motion to dismiss dispute in that litigation,

20  on which the ad hoc group is focused, and they now have those

21  documents.

22          We also responded and made clear that all of the

23  support -- all of the documents supporting our reply are

24  attached to our reply.  So that took care of three of the

25  requests, Your Honor.  And we maintained objection to four of

1    the requests.

2            Now one of those requests is for all of the

3    documents used to prepare Mr. O'Neill for his deposition in

4    2019.  And we object on the basis that that is work product

5    and attorney/client privilege and not subject to production.

6    The remaining three requests, Your Honor, are hopelessly

7    over-broad and burdensome, in addition to being irrelevant

8    and inappropriate.  And what they comprise, Your Honor, is a

9    request for all communications, documents, agreements and any

10   other material relating to Acthar by, with, or about 32

11   different Mallinckrodt entities from the beginning of time to

12   today.

13           Now, plainly, that request is hopelessly over-

14   broad.  But even if it were more limited, the request would

15   still be hopelessly late and made without any attempt to

16   discern whether there's a specific need or any documents that

17   are sought are already in the voluminous productions that

18   have been made to the Ad Hoc Acthar Group.

19           So, much like the request to depose Mr. O'Neill,

20   Your Honor, the -- these requests have no basis to be made

21   now.  They're made without considering whether the

22   information the ad hoc group requests is actually relevant or

23   needed or even in their possession already.  And it appears

24   to be another attempt to insert a tactical delay into these

25   proceedings.  And in short, Your Honor, the time for this is

1   up, and the time to litigate these issues is now, on the full

2   and complete opportunity and record that have been made over

3   the last three months.

4           THE COURT:  Okay.  Thank you, Mr. Murtagh.

5           Let me hear from the ad hoc group.

6           MR. ASTIN:  Good morning, Your Honor.  Daniel

7   Astin for Ciardi, Ciardi & Astin.  My co-counsel Mr. Haviland

8   will be presenting this morning.  And we thank the Court for

9   accommodating us this early, before the regularly scheduled

10  hearing.

11          THE COURT:  Mr. Haviland, go ahead.

12          MR. HAVILAND:  Good morning, Your Honor.  It seems

13  to me that the debtors' objections and motion bases for both

14  the depositions and the documents are three:  The discovery

15  is late, it's irrelevant and unnecessary.  I don't know where

16  the third prong comes in the rules, other than Rule 26 up to

17  Rule 37, so I'll focus on the timing and the relevancy

18  arguments.

19          I have to give a little context, Your Honor, so

20  you can understand how this dispute came about.  The debtors

21  have known about the Acthar Plaintiffs' desire to take Steve

22  O'Neill's -- or Hugh O'Neill's deposition since prior to the

23  bankruptcy.  You'll recall the first time we met, Your Honor,

24  was on an emergent basis to quash the court-ordered

25  deposition of Mr. O'Neill out of the Rockford Court.

1          The debtors prevail upon the Court, saying that

2     they needed a breathing spell, and that Mr. O'Neill and Mr.

3     Trudeau were critical to the reorganization function.  I

4     remember Mr. Stearn arguing for an hour at the end of that

5     hearing, only to have it resolved with the Court directing

6     the parties to meet and confer to schedule that deposition.

7     And we've attempted to do that -- and Mr. Astin can attest --

8     multiple times over the last ten-plus months, and never once

9     have the debtors offered to provide a deposition date for Mr.

10    Trudeau or Mr. O'Neill.

11         So the context is important.  We had court-ordered

12    deposition dates coming into this bankruptcy.  The debtors,

13    in the personages of Mallinckrodt PLC and ARD had filed

14    motions to quash for Apex Protection, and they were denied on

15    a full record by a Federal Judge.

16         And the reason why this issue has come to the fore

17    today, Judge, is we got a reply brief after hours on July

18    9th, a Friday night.  It was almost 50 pages, well beyond the

19    page limit provided under the rule.  The Court granted leave

20    to the debtors to put that volume before the Court.  And in

21    that volume -- on a reply, mind you, this is a reply to the

22    response to their objections -- they proceeded down a number

23    of paths that weren't raised in the initial objection, and

24    that's why this is important.  There's nothing late about

25    inquiring about a position of the debtors that's newly framed

1   in a fifty-page filing on reply.

2           Now we noticed Mr. O'Neill's deposition last

3   Thursday.  We asked -- and we also noticed his one-time

4   executive assistant, Melissa Falcone, who then become a Vice

5   President of Patient Services, and we now know through Arnold

6   & Porter is no longer with the company.  And I point that

7   out, Judge, because, last Friday, Arnold & Porter

8   represented, on behalf of the debtors, they don't represent

9   Ms. Falcone.  She's a former executive employee.  I have an

10  email at four o'clock last Friday to that effect:

11          "Don, Ms. Falcone left the company shortly after

12  you deposed her in February 2020, we do not currently

13  represent her."

14          The debtors have not demonstrated to this Court

15  how they have a right to move for a protective order on a

16  former employee.  And when we got that notice, Judge, we

17  expedited a subpoena.  And you'll see in our filings, we

18  provided not one, but two affidavits of service of Ms.

19  Falcone in Illinois, where she currently resides, at her

20  place of business, at AbbVie, and her home address.

21          So, since the time of service, last Friday, we

22  haven't heard from Ms. Falcone or counsel.  All we heard from

23  the debtors was they don't represent her.  So they have a

24  procedural problem in saying that they can quash a subpoena

25  of a former employee more than a hundred miles from this

1   Court.

2          And realizing that it was more than a hundred

3   miles, we issued the subpoena under the Northern District of

4   Illinois caption, the Rockford case, so that that court would

5   have jurisdiction over any discovery disputes.  I'm not

6   suggesting Your Honor doesn't, but we hadn't heard from the

7   debtors at all until late in the day, when they filed the

8   motion for a protective order on Wednesday, taking this

9   position.  There's a fundamental problem with their approach

10  in trying to prevent Ms. Falcone's deposition, and I'll get

11  to the relevancy in a moment.

12         But as further background, the Court should also

13  understand that the Ad Hoc Acthar Group has produced four,

14  four clients for depositions:  The City of Rockford; this

15  Acument Global Technologies, whose designee sits as the chair

16  of the committee; Teamsters Local 830; and Dakota County,

17  Nebraska.  Four.  We also produced an expert for deposition.

18  That's five depositions.

19         The debtors have yet to produce one executive for

20  deposition.  Mr. Welch, who I see -- good morning, Mr. Welch

21  -- we've had the opportunity to depose him too many times.

22  I'm sure he's tired of it; we are, as well.  He seems to be

23  their go-to witness.  And I credit him for his ability to try

24  to answer questions.  But Judge, he worked in the specialty

25  generics division of the company.

1          Mr. O'Neill is the Executive Vice President of

2     Commercial Operations of the brand business.  And what you're

3     going to hear about today in the hearing is whether or not

4     we're entitled to claim against entities in the brand

5     business.

6          Now the reason why we looked to see whether there

7     had been any issue involving alter-ego was because in those

8     notices I just referenced the debtors asked my clients, at

9     request number nine, all the basis for a theory of alter-ego.

10    And it caused plaintiff's counsel to scratch heads saying why

11    are they asking this question.  It seems like they know

12    something we don't.

13         Sure enough we look and we see Judge Dorsey -- I'm

14    sorry, you're Judge Dorsey -- Judge Polster -- I'm a little

15    tired, Your Honor, it's a Friday -- in the City of Summit

16    case, the In Re National Opioid Litigation, 2019 ruled on a

17    similar motion by Mallinckrodt PLC seeking to prevent its

18    jurisdiction in conjunction with two subsidiaries, the SpecGx

19    generic company and then an entity by the name of

20    Mallinckrodt LLC which the debtors say is a generic company;

21    we have evidence to say that it's a brand company.  It signed

22    contracts on behalf of the Acthar business.  So that is a

23    factual dispute.

24         We're only getting to the issue of whether or not

25    we can avail ourselves of the same theory that the generic

1   opioid plaintiffs have viewed.  And in the ruling by Judge

2   Polster he found, and I'm at star of the Lexus case 92, the

3   court finds that the issue of whether SpecGx LLC and/or

4   Mallinckrodt LLC are the alter-egos of Mallinckrodt PLC

5   should be litigated in the track one trial.  Mr. Murtagh says

6   it was kicked down the road.  No, the judge found enough

7   evidence of alter-ego and it was evidenced.

8              Here is the problem, Judge, everything was filed

9   under seal.  We asked the debtors will you give us that

10  material so we can understand the basis of the ruling.  They

11  said -- well, they didn't respond initially.  They eventually

12  had us go back to plaintiff's counsel (indiscernible), we

13  did.  We needed their consent to have those under seal

14  pleadings and documents produced.  We finally just got them

15  the other day.  In fact, late yesterday.  We added them to

16  our exhibit list.

17             Counsel is right that Judge Polster doesn't detail

18  the evidence because it was under seal and counsel is correct

19  that plaintiff's counsel, in their brief, repeatedly cited to

20  the deposition transcript of the head of commercial

21  operations, Mr. O'Neil.  And why it's evidentiary here,

22  Judge, and why his deposition here is so critical the senior

23  most person in charge of the entire brand side business said

24  I don't differentiate companies.  To me it's Mallinckrodt,

25  its Mallinckrodt Pharmaceuticals.  I don't know who pays my

1  check, I don't think PLC, LLC, any subsidiary company, I am

2  in charge of all of it; operations are mine.  I make those

3  decisions.

4          We put that transcript before the court for later,

5  but, Judge, that is just a snapshot of the issue that the

6  debtors are presenting to the court.  Now remember it's the

7  debtor's objecting to our claims against entities like

8  Mallinckrodt LLC who signed contracts.  That is why the

9  ruling by Judge Polster is so important because LLC is also

10 on the generic side business in opioids and the judge there

11 said that goes to trial.

12         Now I'm not going to pre-argue today's issues, but

13 that is the backdrop of what began in October with Mr. O'Neil

14 has continued since came to a head this past week and last

15 week because of the importance of his deposition.

16 Unbeknownst to us, but fully known by the debtors who were

17 litigating over the opioid litigation.

18         Now we also know that Arnold & Porter has

19 represented Mr. O'Neill because at Exhibit 48 of our exhibits

20 today that we shared with Your Honor Arnold & Porter abruptly

21 adjourned Mr. O'Neil's deposition.  It had been scheduled for

22 November citing that he had a problem and that he couldn't

23 appear.  At some point the debtor has to put up a witness

24 other than Mr. Welsh.  I'm sure Mr. Welsh will appreciate

25 that.  I noticed, Judge, that others have noticed Mr. O'Neil,

1  the committees have noticed Mr. O'Neil.

2        The debtors are unwilling to negotiate a date,

3  they have been unwilling to talk about an omnibus schedule

4  for discovery.  Mr. Astin has tried repeatedly to get there

5  to be an omnibus approach to discovery and not just plan

6  discovery, discoveries relating to our issues.  When I say

7  our issues their objections, the objection today, but they

8  say you don't get them here because he's irrelevant and I

9  suppose we will hear weeks from now whether or not they're

10  going to produce him later.

11        Relevancy is not a grounds to quash a deposition

12  notice.  Counsel has only argued relevancy and timing.  I

13  have given you the timing.  He's relevant.  There is no one

14  more relevant then Mr. O'Neill when it comes to the

15  commercial operations of the brand side business.  I think

16  Mr. Welsh would freely admit that if asked.  So he should be

17  deposed, he should be asked -- forced to answer questions

18  about these distinct entities that the debtors are now

19  claiming for the first time have independence of the PLC.

20        Why that is important, Judge, and you probably

21  read this in the papers, they're now arguing this dual

22  position that in some senses they're a single entity, that

23  Mallinckrodt is Mallinckrodt.  In response to the Humana

24  brief they raised the Copperweld antitrust decision which

25  says that a parent cannot conspire and agree with a

1  subsidiary.  Well that is right, but they don't show the

2  court, and we will show the court later, that Copperweld was

3  further to say because it's a single enterprise because

4  there's a purpose between a parent and a sub, and that's why

5  you can't have a conspiracy between those entities.

6          The debtors are trying to do that now by saying

7  that somehow we had to sue every single disparate subsidiary,

8  but they never made that argument in Rockford.  They never

9  made that argument 420.  They never made that argument in

10 322.  In fact, they never objected to our suing the PLC.  I

11 note that they did object in the Human case, but not in our

12 case.

13         So we're being pushed to a point where now all of

14 a sudden the debtor is taking a completely different approach

15 and they're saying you don't get to depose the one witness

16 who can speak to that issue whether or not there's

17 independence of form, function, decision making of all these

18 disparate entities and the head of commercial operations

19 knows that better than anybody else.

20         The reason why it's important, Judge, is they put

21 it in their reply.  They are arguing we should have known.

22 The Ad hoc Acthar group should have known better, should have

23 done more and all I'm going to cite to, Your Honor, is what

24 we put in the record (indiscernible) 147 through 162 is the

25 discovery in Rockford.  We issued four sets of discovery.  We

1 | asked for all contracts, and this is important the defendants

2 | and any third-party relating to distribution, pricing,

3 | marketing, sales of Acthar.  Repeatedly Mallinckrodt said

4 | they complied.

5 |         The court ordered no less than three times

6 | compliance.  In ECF 171, 224 and 354 which are Exhibits 152,

7 | 153, and 154 of the evidence we put in.  Court orders and

8 | repeatedly they say we produced the documents.  We propounded

9 | the request last week to say, okay, to Mr. Murtagh's point.

10 | If the record is what the record is and they did respond to

11 | the one request give us all the evidence that supports your

12 | reply.  Mr. Murtagh responded you have it.  Well then we said

13 | we want to make sure we have all the evidence of the

14 | discussions, the contracts, presentations, communications,

15 | discussions of Acthar between the non-debtor entities.

16 |         The response is interesting, burden.  Burdon

17 | denotes we investigated, we've seen that it's too much, it's

18 | too difficult.  They haven't put an affidavit of burden

19 | forward, that's why I couldn't discuss with Mr. Murtagh how

20 | do we get past that objection.  He didn't articulate to us.

21 | He didn't say, Mr. Haviland, you have 100,000 pages of

22 | documents is there some way we can give you (indiscernible)

23 | to say, okay, this one speaks to all the other documents.  We

24 | never had that discussion.  They simply say no.  They say no

25 | that it's irrelevant and burdensome.  It's relevant because,

1  Your Honor, we did have that hearing on the motion to compel

2  and Your Honor said that we can follow the money and follow

3  the function.  That is what we are trying to do.

4          When we got the reply and we see them putting

5  documents in from the Rockford litigation which are, frankly,

6  cherry-picked out of the record Ms. Falconi's emails, Mr.

7  O'Neil's emails, and then trying to ascribe some meaning to

8  that that we should have known that this ARD entity that we

9  sued under the parent, PLC, the entire form and function was

10 blown up and all the functions went to a UK company and an

11 Irish company.

12         Your Honor, no witness ever said that.  We deposed

13 William Hillmer as a corporate -- well the FDC deposed him as

14 a corporate designee in 2016, that's 159. The corporate

15 designee of Mallinckrodt.  He never said that.  And by the

16 way, he was designated one month after this company adopted

17 the (indiscernible) process where they're having these two

18 foreign parents make decision making.  Did he perjure himself

19 he certainly did tell the truth.

20         Then we deposed him later on July 21st, 2020.  I

21 asked him, did you testify truthfully, that's Exhibit 162, he

22 said yes.  Has anything changed; no.  We deposed Ms. Falconi

23 February 28th, 2020, Exhibit 160, who do you work for;

24 Mallinckrodt Pharmaceuticals.  That entity doesn't exist.

25 She was the right-hand to Mr. O'Neil.  Never once did she

1   say, when asked about pricing distribution, Acthar, Mr.

2   Haviland, we go to Ireland.  We have to get the Irish

3   company's approval.

4            Then we deposed Mike Close [phonetic], the

5   "closer" they call him, the contract guy, the guy actually

6   involved in all the contracts, not once did he ever say

7   here's what happens, by the way, that's Exhibit 161, we have

8   to go to Ireland and the UK to get approval for all pricing,

9   distributions, decision-making on Acthar.  They are telling

10  us, through this court, that we failed in our job.

11           Your Honor, we have four sets of written

12  discovery, three court orders, fifteen depositions only four

13  of which are current employees of Mallinckrodt.  We have got

14  the debtor moving repeatedly to prevent depositions starting

15  with Mr. O'Neil and continuing through today.  The question

16  is when are we going to get due process, when are we going to

17  get the discovery.

18           These debtors want to have an objection where they

19  get to put Mr. Welsh up and say what they want him to say.

20  And I'm not suggesting that he's not testifying as an

21  informed witness for the company, but he doesn't have direct

22  personal knowledge of those issues.  He's not on the emails.

23  He wasn't at the presentations.  He's not part of those

24  organizations.

25           When are we going to get the discovery.  Now I'm

1  not suggesting that we adjourn today. I think we use today.

2  But I am suggesting we can't close, not with the record the

3  way it is as created by these debtors.

4          Thank you.

5          THE COURT:  Mr. Murtagh?

6          MR. MURTAGH:  Yes, Your Honor.  Just to try to

7  bring some clarity I don't understand Mr. Haviland to still

8  be requesting a deposition of Ms. Falconi and it was not made

9  part of the motion to compel.  I didn't hear any reason why

10 he needs Ms. Falconi.  So I am going to assume that that's

11 not part of the motion.  I am going to leave Ms. Falconi out

12 of this for now.  That would take care of one of the

13 disputes.

14         The second with regard to Mr. O'Neil's deposition.

15 I understand from Mr. Havilland, as he's told the court

16 repeatedly, that he would like an opportunity to examine Mr.

17 O'Neil.  Mr. O'Neil will be put up for examination at the

18 beginning of August as part of plan confirmation.  There are

19 many people who have an interest in deposing Mr. O'Neil and

20 there will be an opportunity to depose Mr. O'Neil.

21         There have been repeated occasions in this case in

22 which Mr. Haviland has done what he's done today which is to

23 say in the context of a separate specific matter it's unfair

24 that he has not been allowed to depose Mr. O'Neil.  He, in

25 fact, had raised this question back in May and asserted, in

1   court, that he needed to depose Mr. O'Neil as part of his

2   response to the unsubstantiated claims objection.  He later

3   left off of that and did not pursue it.  That was over two

4   months ago.

5            This briefing commenced three months ago.  When

6   Mr. Haviland did not say that I could follow him in his

7   argument was any reason why Mr. O'Neil has now become

8   relevant for the first time three months after these

9   objections were put in place.  Again, Your Honor, the fact

10  that Mr. O'Neil was deposed in an MDL proceeding two years

11  ago and the proceeding, itself, are not new.  They did not

12  become new in our reply and they were not referenced in our

13  reply.

14            We did not raise alter-ego for the first time in

15  our reply.  As Your Honor knows, we have been arguing alter-

16  ego issues before this court for months in the context of

17  estimation, in the context of discovery disputes.  It is not

18  a surprise to hear that the debtors want to know whether

19  there is any assertion of alter-ego because that could be a

20  ground on which claimants are attempting to create claims and

21  the as the debtors have said repeatedly believe those to be

22  estate causes of action.  That is patent in the record for

23  months.  So that is not new.

24            The single document about Mallinckrodt

25  Pharmaceuticals Ireland Ltd., having decision making

1  authority also is not new.  The point of putting in the reply

2  was to demonstrate that Rockford had it prepetition.  There

3  is just nothing new today, Your Honor.  There is no reason

4  that has become apparent in the past week for a need to

5  depose Mr. O'Neil in the context of these proceedings.

6          If Mr. Haviland felt that he needed Mr. O'Neil to

7  defend his claims he had that need three months ago and the

8  time to argue about it was three months ago.  He didn't and

9  he never asked for it.  Today is the day of the hearing on

10 the objection.  It's just inexcusable to be raising it at

11 this stage.

12         As I said at the beginning, Your Honor, that is

13 exactly the same for the RFP's.  We gave the discovery after

14 discovery discussions before Your Honor that was ordered and

15 we have not heard for months that there is anything

16 insufficient about it.  The new request is for, literally,

17 every document that exists relating to Acthar for all time

18 among thirty-three separate entities.  It is not targeted at

19 all.  It is just an attempt to disrupt.

20         These are both just attempts to disrupt and they

21 should be denied.  The argument can proceed today and at the

22 close of today's hearing, if we can finish today, the record

23 and the argument on this proceeding should be closed.  It's

24 been going on for three months.

25         THE COURT:  Alright, well the only issue before me

1 today is the issue of whether or not the proofs of claim

2 filed by the ad hoc group and the insurance group of Acthar

3 claimants complies with the code, the rules, and the Third

4 Circuit's ruling in _Allegheny_.  As Mr. Murtagh pointed out, I

5 did give leeway on taking discovery with regard to these

6 claims, as Mr. Haviland pointed out, to follow the money and

7 see where that took them.

8          The issues about whether or not -- well, let me

9 back up.  I allowed that discovery because I was under the

10 impression that the Acthar claimants were going to seek to

11 amend their proofs of claim.  For whatever reason they

12 decided not to do theat.  So the only thing I have before me

13 today are the proofs of claim and the only thing I'm going to

14 rule on today are whether or not those proofs of claim, as

15 written, state facts sufficient to allege a claim against the

16 debtors against whom those proofs of claim were filed.

17          I am not going to get into whether or not there is

18 other evidence that might have been used to -- that could

19 have been included in those proofs of claim because, again,

20 there is no motion to amend, so there is nothing for me to

21 decide on that issue.  The only issue -- again, I am going to

22 make this very clear, the only issue before me today is are

23 the proofs of claim, as written, sufficient to state a claim

24 against the debtors against whom those proofs of claim were

25 filed.

1           This discovery may go to the question of whether

2    or not there could be an amendment to those proofs of claim,

3    but that issue is not before me.  So we're going to get to --

4    I'm going to set this motion aside for now.  We're going to

5    go to the underlying merits of the only substantive issue

6    before me which is the proofs of claim and we will go forward

7    from there, then I will make my ruling and we'll see whether

8    or not the additional discovery might be allowed somewhere

9    down the road.  For now that issue is moot as far as I am

10   concerned.

11           MR. MURTAGH:  Understood, Your Honor.  Based on

12   your instructions just now do you mind if we take a moment or

13   two just to confer among our team on how to proceed?

14           THE COURT:  Yes.  We will take a ten minute

15   recess.  We will reconvene at 10:05.

16           MR. MURTAGH:  Thank you, Your Honor.

17       (Recess taken at 9:53 a.m.)

18       (Proceedings resumed at 10:05 a.m.)

19           THE COURT:  We're back on the record.  Mr.

20   Murtagh, are you ready to proceed?

21           MR. MURTAGH:  Yes, Your Honor.  I will go ahead

22   and turn the podium over to Mr. Harris.

23           THE COURT:  Mr. Harris?

24       (No verbal response)

25           THE COURT:  Mr. Harris, can you hear me?

1          MR. MURTAGH:  Can you hear us?

2     (No verbal response)

3          MR. MURTAGH:  He may have lost audio.  Let me send

4  him a text.

5          MR. HAVILAND:  Your Honor, before we begin, may I

6  be heard?

7          THE COURT:  On what?

8          MR. HAVILAND:  On the issue that came up toward

9  the end of the last session, the issue about leave to amend.

10  I am only offering a potential solution to a protracted

11  hearing today.  In our brief, at Docket 2529, we requested

12  leave to amend at Pages 15 through 18.  We would be willing

13  to forego any examination of Mr. Welsh today if the debtors

14  would agree to the admissibility of the documents that were

15  produced and that are part of our file.

16          That would, at least, make the issue more acute

17  for the court.  Of course, those documents are not attached

18  to our proof of claim; only the complaints were.  We do point

19  out in our opposition to the objections we're seeking leave

20  to amend through this process to put the factual detail

21  before the court.  I'm suggesting that that is a way to short

22  change today not to take away anyone's ability to present

23  evidence, but I am going to suspect that Mr. Welsh hasn't

24  seen a number of the documents and the examination is going

25  to be lengthy.

1          If the debtor is amenable to the admission of

2    those exhibits they're in the court file and we can move onto

3    the next issue of whether or not (indiscernible).

4          THE COURT:  I'm not sure if Mr. Harris heard all

5    of that.

6          MR. HARRIS:  I'm sorry, Your Honor, I was having

7    audio problems. I apologize, I did not.

8          THE COURT:  Mr. Haviland, do you want to repeat

9    that?

10          MR. HAVILAND:  Sure.  I'm sorry, Chris, I didn't

11    realize you were out.  Mr.  Harris, I just said to the court

12    that as a point of order, based on the court's observations

13    of the issues before the court today in terms of the existing

14    proofs of claim, the existing proofs of claim, as everyone

15    knows, at least for the ad hoc Acthar group, consist of an

16    addendum which describes the claims, a complaint which talks

17    about the conduct of the named defendants, the PLC and ARD,

18    and unnamed co-conspirators and others, then it provides, as

19    Exhibits B and C, the damages claim and the actual proof that

20    the claimant is included in the claim within the complaint.

21          None of the exhibits that we're about to examine

22    Mr. Welsh on, as a corporate designee, are included in the

23    proofs of claim.  It seems to me the court has framed the

24    issue, and I'm not suggesting that Judge Dorsey has done

25    anything other than set the pace of play for today, we have a

1  number of exhibits, as you can see from our exhibit list,

2  that are not in our proofs of claim.  The issue is whether

3  they should be and if so when.

4        In our opposition brief I just pointed out that

5  its filed May 21st at Docket 2529 beginning on Page 15 of 19

6  we say leave to amend the proofs of claim should be granted.

7  We cite Federal Rule of Civil Procedure 15(d), we cite cases

8  in the Third Circuit and the District of Delaware that leave

9  to amend should freely be given.  That was two months ago.

10 We haven't gotten leave to amend and we would like leave to

11 amend.  And we are willing to forego any examination of Mr.

12 Welsh today provided that the debtors agree to the

13 admissibility in this record today of the documents that we

14 put in that are Mallinckrodt documents that were produced

15 either in the context of the bankruptcy, which most of them

16 are, or some which come from the underlying Rockford file and

17 that is why they haven't made publicly available.

18        This is going to be a long hearing today.  It

19 seems to me that that is the issue before the court whether

20 or not leave to amend should be granted.

21        MR. MCCALLEN:  Your Honor, may I be heard on that

22 briefly?

23        THE COURT:  Your cross talking here.  Who -- let

24 me -- was it Mr. McCallen?  Go ahead.

25        MR. MCCALLEN:  Thank you, Your Honor.  I think it

1  might make sense for me to go first as the other Acthar

2  private -- private Acthar plaintiff here and then maybe Mr.

3  Harris can respond to both of us if that works for you, Your

4  Honor.

5          THE COURT:  That's fine.

6          MR. MCCALLEN:  So I guess with regard to the

7  statements that Mr. Haviland just made, you know, from my

8  perspective, Your Honor, we might get some day to the

9  question of whether or not leave to amend should be granted.

10  That is leave to amend the pleadings, but I don't think we're

11  there yet.

12          You know, I think, Your Honor, a little bit of a

13  history here might put some context and be helpful at least

14  with respect to my clients.  You know, when we filed our

15  claims in this bankruptcy proceeding we did so without the

16  benefit of any discovery in this case or in the prepetition

17  litigation.

18          Humana, which is one of my clients, filed its

19  lawsuit in 2019 and it had no significant discovery in that

20  case at the time that the bankruptcy cases were filed.  I

21  think that, in fact, Humana's motion to dismiss was decided

22  in Mallinckrodt.  It just answered, literally, a couple weeks

23  before the bankruptcy petition in this case.

24          It was really part of these cases that information

25  that Mr. Welsh testified to at his deposition, in which I

1  think you will hear about today, started to come to light.

2  You know, as Your Honor recalls, on the same day, April 30th,

3  we filed a motion to estimate.  The debtors filed this claims

4  objection; what they style the unsubstantiated claims

5  objection.  Your Honor, I am going to have a lot to say about

6  what that means in the context of Allegheny.  I think Your

7  Honor is spot on whenever you said Allegheny governs here.  I

8  think they're way out side of it in terms of the second and

9  third prongs of Allegheny.

10          With regard to the first prong of Allegheny, Your

11  Honor, the -- when we filed those cross motions, you know,

12  the debtor said your claims are unsubstantiated.  There is --

13  you have cited no evidence against these specific boxes and

14  we basically said at that point everything we know we have

15  either learned about from public filings which was very

16  little, frankly, or we had got pursuant to a very restrictive

17  NDA at the outset of the case.

18          So we said to them, okay, fine, you're putting an

19  issue -- the claims, you know, we served them with discovery.

20  I'm not going to belabor the history there.  Your Honor

21  remembers.  We were in front of you on a 30(b)(6).  My

22  colleague, Mr. Freimuth, was in front of you asking for

23  discovery on our estimation motion.  You know, the debtors

24  pushed back and they said, no, we can hear this issue, this

25  unsubstantiated claims objection on just this limited factual

44

1   record.

2           I believe then and I continue to believe now it

3   was an exercise and artificial line drawn, Your Honor,

4   because you just can't disentangle the issues about corporate

5   structure that they offered Mr. Welsh for and that we deposed

6   him on from questions about did something wrongful happen and

7   if so where it happened.

8           So from our perspective, Your Honor, you know, all

9   of those issues are tied together.  We now find ourselves

10  three months into this process and, candidly, exactly where I

11  was afraid we would be when we started this which is we have

12  this factual record which we are prepared to move forward on

13  today and, you know, cross-examine Mr. Welsh.  I'm sure the

14  debtors are prepared to move forward and give the direct

15  examination of Mr. Welsh.

16          Candidly, I think, Your Honor, whenever you look

17  at the governing law not only Allegheny, but when we get to

18  the evidence, Your Honor, about the second and third prong of

19  Allegheny as well as the Copperweld and other cases you're

20  clearly going to see today, just even on the limited record

21  that we have put together for Mr. Welsh, that our claims

22  would withstand a motion to dismiss and they withstand, from

23  an evidentiary perspective, whatever it is that the debtors

24  are putting forward with this unsubstantiated claims

25  objection.  That is what I won't get into right now.  I do

1  want to talk about it later because it's not clear to me
2  exactly what it is.

3        I guess what I am trying to say, Your Honor, is I
4  didn't get a chance to confer with Mr. Haviland on the break,
5  We will, obviously, seek guidance from Your Honor and proceed
6  in a way that Your Honor thinks is effective in light of the
7  way Your Honor is seeing the pleadings thus far, but we are
8  prepared to move forward with the evidence today.

9        I think we are going to do enough today that's
10 going to get Your Honor comfortable that our pleading
11 survives whatever this unsubstantiated claims objection
12 really is.

13       THE COURT:  Well here is the problem I have with
14 your client's proofs of claim, Mr. McCallen; they filed them
15 and they include a footnote that says we're filing these out
16 of an abundance of caution because we don't actually know
17 whether we have claims against these debtors and we think
18 discovery in the future will show that we do.  That is not
19 how the claims process is supposed to work.

20       What should have happened here is as soon as this
21 case was filed and certainly as soon as the bar date was set
22 back in March -- no, when was it set?

23       MR. HARRIS:  The bar date was in February, Your
24 Honor.

25       THE COURT:  The bar date was in February.  I

1   entered the order in, what, October?  November 30th I set the

2   bar date order.  The bar date was set for February, so you

3   had 78 days.  The way the process is supposed to work in

4   bankruptcy is if you're not sure you have a claim against a

5   debtor then you seek 2004 discovery to find out if you do,

6   but neither one of the groups of Acthar claimants here

7   decided to do that, for whatever reason.  Instead, they just

8   filed blanket proofs of claim against every single creditor -

9   - excuse me, every single debtor in the corporate structure

10  not knowing whether they had claims or not.

11            I got a problem with that.  I got a huge problem

12  with that.  I think its bad faith.  I also have a problem

13  with the fact that folks actually filed these proofs of claim

14  under penalty of perjury not knowing whether they had a

15  claim.  So those are the issues that I have with this whole

16  process.  The proper procedure was not filed.  It could have

17  been and you didn't do it.

18            So having read these papers, having looked at the

19  proofs of claim I will tell you exactly where I am on this.

20  My view is all of these claims should be dismissed.  If you

21  want to say, well, we want a leave to file a late claim then

22  you can file a late claim and I will decide it then under the

23  Pioneer factors the Supreme Court set forth for excusable

24  neglect because you had the time to do your investigation,

25  you had the time to request 2004 discovery to find out

1   whether you actually had claims against these particular
2   debtors and you chose not to do it.
3           I see that as gamesmanship.  I see that as let's
4   put pressure on the debtors by bringing claims against every
5   single debtor in the corporate structure, including the
6   generic side and the specialty side, because that is going to
7   screw up the debtor's plan of reorganization.
8           So that is where I am on all of this.  So you are
9   going to have to convince me otherwise today.  And I don't
10  need to hear the evidence as to whether or not there is
11  claims against these debtors.  I want to know why you didn't
12  seek 2004 discovery, why you didn't seek to amend.
13          Mr. Haviland, I don't think saying you want leave
14  to amend in your response to the motion is sufficient because
15  there are specific requirements for a motion to amend that I
16  have to make rulings on and it's not in the papers.
17          Mr. Harris, what is your position?  Go ahead.
18          MR. HARRIS:  Thank you, Your Honor.  That is
19  exactly our view of things.  With your helpful guidance that
20  the issue before the court is what we said it was which is
21  whether the proofs of claim, as written, substantiate claims
22  against the non-debtor defendants and there is not a need for
23  an evidentiary hearing for that.  I don't know if the
24  claimants are implicitly conceding as they seem to be that as
25  written they do not substantiate a claim.  If so we could

1  probably just go forward to a ruling on dismissing them.

2         If they do still dispute that then I would suggest

3  we have oral argument on whether the claims, as written,

4  substantiate a claim.  I think it will be abundantly clear,

5  maybe not, that that's the issue of the parties.  No one has

6  moved to amend and so that is not before the court.

7         If and when they file we will respond, but our

8  view is we will be able to defeat that.  It is extremely

9  prejudicial for them to have laid in wait and to raise a new

10 amended proof of claim later so close to confirmation, but

11 that is not an issue Your Honor has to decide today.  As you

12 said today all that is before you is those proofs of claim as

13 written and we are happy to argue that if they are still

14 disputing that they are sufficient on their face.  If not,

15 you know, the court understands the issues.

16        THE COURT:  Mr. Haviland, you raised your hand.

17        MR. HAVILAND:  Your Honor, I'd just like some

18 guidance in terms of whether we should file a formal motion

19 on the heels of the May 21st request.  I have been practicing

20 in the Federal District Courts for 31 years and when there is

21 a motion filed, motion to dismiss under Rule 12, which is

22 what I deem the objections to (b), they cite Twombly and

23 Iqbal even though I agree the Allegheny standard applies and

24 is not the same level of pleading (indiscernible).  That is

25 how I read the cases.

1            I didn't think that we needed a formal motion when
2   we moved to dismiss with the alternative request leave to
3   amend.  The debtors responded in their reply, a week ago, to
4   say leave should not be granted.  I would just like to know,
5   if the court is inclined to tell us today, should we file a
6   formal motion.

7            I don't agree with Mr. Harris that we have
8   conceded that the proofs of claim that we filed in some
9   thirty branded debtor cases, Judge, and we tried to be very
10  careful and judicious about the claims we filed and we did
11  not file on all sixty-four cases.  I think the court will see
12  that.  We did not file, at least to my knowledge, any claim
13  against any generic company that is clearly a generic; SpecGx
14  being the obvious one.

15           We did file as to entities that were at a time
16  part of the brand business, Mallinckrodt LLC for instance,
17  Mr. Hillmer signed contracts.  So we tried to be very careful
18  and deliberate about claiming on the brand side business
19  because our view, Your Honor, is when Questcor and
20  Mallinckrodt merged in August of 2014, and it was not an
21  acquisition, it was a merger 50.5 percent of the shares went
22  to Mallinckrodt shareholders, 49.5 went to Questcor; two
23  companies became one.  Later this ARD subsidiary was stripped
24  of its assets and found to be insolvent internally back in
25  2018.  The rest is just the maneuvers of the corporation with

1  respect to its subsidiary.  We think they are just divisions.

2          To me, Your Honor, that is just a question of

3  facts that can be decided on the papers.  Mr. Welsh certainly

4  has a lot of knowledge about the reasons why those things

5  were done for tax purposes, but doesn't have a lot of

6  knowledge about the functional aspects of it which is why we

7  asked for the witnesses we did.

8          So I am speaking at length here to find guidance

9  as to whether or not a formal motion at this point should be

10  filed today in which case we will do it so that the issue can

11  be brought to the floor and the court can rule on timing,

12  substance, any issue that goes into what was done back on

13  February 16th, what was done in the context of the April 30th

14  objection and the May 21st response.

15          It seems to me that the parties are coalescing

16  around an approach that the documents are the documents.

17  That is why I made the suggestion, and I'm glad we're

18  discussing it, because we can probably short change the

19  hearing at length by not having to ask Mr. Welsh a number of

20  things he doesn't know about documents he hasn't seen.  Then

21  the court can rule on the papers in terms of the proffer.

22          Given where we are I can't leave the fact that

23  we've made a request for leave to amend two months ago and if

24  it's a formal motion that's required, even though there's

25  been a response, then we will file that so that the court can

1  clearly see that that is set for a hearing date and we can

2  decide that because we will certainly put more information in

3  the motion to give the court context based on discussion

4  about the timing and all the material we received in the wake

5  of the court's ruling on a motion to compel.

6           THE COURT:  Mr. McCallen, do you have a response?

7       (No verbal response)

8           THE COURT:  You're muted, Mr. McCallen.

9           MR. MCCALLEN:  Sorry about that, Your Honor.  I do

10  have a couple points.  Your Honor, thank you for the guidance

11  at the outset of the hearing.  I do always think it's

12  instructive and helpful to understand where the court is

13  viewing issues at an early stage of the case.

14           I do want to make a couple points because having

15  heard what Your Honor said I want to let you know why we are

16  where we are from our perspective so you understand.  I hope

17  that we are here in good faith.

18           The -- this goes to the point that we, sort of,

19  laid in wait to see what would happen.  Your Honor, we tried

20  extensively during these cases and on many occasions to get

21  information from the debtors informally.  That did not -- we

22  do not always get what we wanted when we wanted it.  In fact,

23  we did not get the level of information we thought we needed.

24  We also -- as you know, the UCC was pursuing a Rule 2004

25  request.  We joined in that request and, you know, in

1  retrospect, Your Honor, in light of what Your Honor has said
2  today perhaps we should have been more aggressive in bringing
3  to the court what we felt was informational stonewalling by
4  the debtors.

5          Having heard what Your Honor said today I think
6  that that is something we would have done if we would have
7  known then the way Your Honor was going to view this issue
8  now.  You know, the reality is that we largely learned about
9  these entities upon the filing of bankruptcy cases.  Your
10 Honor, we really learned, for the first time, that, from my
11 perspective at least, on April 30th whenever the debtors
12 filed this objection that, really, this kind of box by box
13 level scrutiny was going to be a basis to attack our claims.

14         Your Honor has to recall, and this is in Mr.
15 Welsh's first day declaration he talks about this, the reason
16 that the company filed for bankruptcy they had an opioid
17 settlement on the generic side of the business and then they
18 had certain liabilities, Acthar related liabilities coming on
19 the brand side.  It was that that led them to file the
20 specialty brand side of the business; not just PLC and ARD,
21 they filed the entire specialty brand side of the business.

22         So from our perspective, you know, Your Honor, we
23 -- in pursuing these claims we thought, you know, I think at
24 the filing of the bankruptcy the expectation among people on
25 our side of the case was ARD and PLC, you know, these are the

1  main entities and maybe some of these other ones are, sort

2  of, related, but that is sort of where the conduct took

3  place, but, in fact, it turned out, Your Honor, that ARD and

4  PLC are a very small part of the story and other entities are

5  a larger part of the story.

6          So, you know, that is just background, Your Honor,

7  that I wanted to try to put that on the record to address

8  Your Honor's comments about how we got here and, you know,

9  the procedure around what we did and whether we brought our

10 plans in good faith.

11         In terms of next steps, Your Honor, I actually

12 think it might -- I know the last thing we want to do is

13 start with another break, but if we're going to do anything

14 other than proceed the way that I think we all envision,

15 which is opening statements, short opening statements

16 followed by Mr. Welsh and cross, followed by closings, I

17 would like the opportunity to confer with my colleagues.  I

18 think there has been a lot of information here that has been

19 conveyed from the court to the parties.  I think I would like

20 an opportunity to absorb that and discuss it with my clients

21 if that is possible.

22         THE COURT:  Alright, let me hear from Mr. Harris

23 first.

24         MR. HARRIS:  Thank you, Your Honor.  Again, our

25 view is there is not a need for an evidentiary hearing at

1    this point.  The issue is what do the proofs of claim say and

2    assuming the facts are true did they substantiate a claim

3    against each debtor against whom it was filed.  That can be

4    determined on the basis of pleadings, the proofs of claim,

5    and the law which is in the briefs.  We're happy to go to

6    oral argument on that.

7              In terms of a few points that were made the ad hoc

8    group did not move (indiscernible).  What they said in a

9    motion to dismiss is that in the future they would seek leave

10   to amend at some unspecified point when unspecified discovery

11   is completed and I don't even know what that amendment would

12   be because they didn't file an amended proof of claim.  So

13   the thought that they had actually moved to amend in some

14   unspecified way at some unspecified time is just not

15   accurate.

16             In terms of Humana they have not sought leave to

17   amend and Attestor.  I actually received hundreds of

18   thousands of documents prepetition.  They received millions

19   of documents in the bankruptcy.  They saw pleadings in the

20   bankruptcy filing case in the early stages that indicated the

21   ownership of IP, the licensing structure, many things, all of

22   which would put them on notice as to what entities are

23   involved.  It had gotten the entire Acthar production, the

24   prepetition lawsuit, which is millions of pages and they have

25   all the facts currently about Acthar entities do what.  In

1   fact, they stipulated with us that they would rely on the

2   facts in their reply brief in exchange for us not pursuing

3   further discovery from them.  And despite that they chose not

4   to amend.

5           The idea that you just heard that somehow

6   respecting corporate formalities and limiting each corporate

7   entities liabilities to its own liabilities was a surprise to

8   them.  They view that that was somehow surprising to them is

9   incredible.  That is the foundation of corporate law.  It is

10  the foundation of how Chapter 11's are run.  The thought that

11  this did not occur to them until they saw our omnibus

12  objection that they would have to substantiate a claim

13  against each entity is just not credible.

14          So at this point we would propose that we go to

15  oral arguments on whether the proofs of claim as written

16  substantiate unless the court views that it does not need the

17  argument because the paper are sufficient.

18          THE COURT:  Thank you, Mr. Harris.

19          Mr. Haviland?

20          MR. HAVILAND:  Judge, one final point and it's

21  what I started with.  We do have a substantial record that we

22  supplied to the court and the parties and that is now before

23  the court.  I can't let Mr. Harris's comment about some

24  stipulation to rely upon what was in the papers go

25  unanswered.  We did not -- we, the ad hoc Acthar group, did

1   not make that agreement.  I know counsel is aware of that.

2           They had asked in exchange for agreeing not to

3   take our client's depositions, which I pointed out to the

4   court, (indiscernible) was deposed just the other day.  We

5   put our clients up.  And so we did not make any agreement

6   that we would rely upon simply the response papers because

7   there is more to it than that.  And whether the court is

8   going to go forward with an evidentiary hearing or some other

9   vehicle to get these issues properly framed and before the

10  court we're not resting on our opposition to the objections

11  without making that substantial proffer of those exhibits.

12          THE COURT:  Mr. McCallen, in your papers you

13  actually state flat out that you were going to -- after

14  discovery was completed you were going to make a

15  determination and work with the debtors to see whether you

16  could dismiss the claims against the generic brand debtors.

17  Have you made that determination?

18          MR. MCCALLEN:  I think what our -- we have not

19  yet, Your Honor.  The short answer is we have not.  To the

20  point that Mr. Murtagh was making earlier there has been no

21  further discovery on this motion after the deposition of Mr.

22  Welsh.

23          We have documents from the debtors that represent

24  which those entities are and we would, you know, like the

25  opportunity, as we anticipated doing during discovery, is

 1  taking further discovery, confirming the fact that the

 2  generic side is the generic side, the debtors -- the

 3  specialty brand side is the specialty brand side.  Then we're

 4  going to dismiss those generic claims.

 5          We have no -- we have been very clear about that.

 6  The debtors have also, you know, not reached out to us to

 7  say, well, let's talk about how we can do this.  So, Your

 8  Honor, we haven't had that conversation with them.  I do

 9  think we would want some more confirmatory discovery, but it

10  is our intention to do that, Your Honor.

11          THE COURT:  You see that's another problem because

12  you have had months do that and I don't understand why you

13  haven't.  The only reason I could think of as to why you

14  wouldn't is for hold up factor because you're holding up the

15  debtor's proposed plan of reorganization by maintaining

16  claims against the generic side without any basis for knowing

17  whether you -- you've had months to take discovery on that

18  issue.  I am just really frustrated with where this process

19  stands.

20          Mr. McCallen, I am going to give you the

21  opportunity to take a break.  I am not going to hear any

22  evidence today.  I don't think I need to.  I will hear brief

23  arguments as to why, as written, these proofs of claims

24  should not be dismissed or whether or not I should grant

25  leave or grant leave to seek leave to amend because I'm not

1  going to grant leave to amend based on the record I have

2  before me.  We will take it from there.  That is what I want

3  to hear about when we come back.

4          So let's take -- let's recess until -- how much

5  time do you think you will need, Mr. McCallen?

6          MR. MCCALLEN:  Ten minutes should be fine, Your

7  Honor.

8          THE COURT:  Alright, well let's take a little bit

9  longer.  Let's recess until eleven o'clock.

10         MR. MCCALLEN:  Thank you, Your Honor.

11     (Recess taken at 10:35 a.m.)

12     (Proceedings resumed at 11:05 a.m.)

13         THE COURT:  Alright, we are back in the record.

14  Mr. McCallen, did you have an opportunity to discuss the

15  issues and do you have anything to add?

16         MR. MCCALLEN:  No, Your Honor.  I think in light

17  of the court's guidance we would proceed directly to

18  argument.  I don't think there's anything further that we

19  need to discuss at this point.

20         THE COURT:  Alright, so the argument that I want

21  to hear is do these proofs of claim, as drafted, allege facts

22  sufficient to establish a claim against the debtors against

23  whom those proofs of claim were filed.  If they do not is the

24  proper way to proceed to dismiss those claims or is it to

25  grant leave to amend those claims?

1        So with that, Mr. Harris, you raised your hand.

2        MR. HARRIS:  Thank you, Your Honor.  I will

3   address those two points in order.  I will first talk about

4   why each challenged claim should be disallowed under the

5   first step of _Allegheny_ and then I will talk about why that

6   disallowance should be with prejudice given where we are in

7   the case today.

8        So I don't believe this first question is

9   difficult.  Under _Allegheny_ which governs here, no one

10  disputes that, before there is a _prima facie_ valid proof of

11  claim, so in order to assert a _prima facie_ valid proof of

12  claim the claimants have to satisfy the first step of

13  _Allegheny_ which is,

14        "The claimant must allege facts sufficient to

15  support the claim."

16        That is the standard and that also means that the

17  factual allegations in the proof of claim there must be

18  allegations of specific wrongful conduct attributable to the

19  debtor in question and we cited several cases applying that

20  standard to disallow claims.  It was the _In Re Tribune_ case,

21  the _Hilton v. Hongisto_ case as examples.

22        So just attaching a prepetition complaint to a

23  proof of claim, if the complaint doesn't allege any facts

24  about that debtor does not satisfy the standard.  There is no

25  magic to the words of calling something a complaint.  The

1    complaint actually has to say something about the debtor

2    against whom the claim is filed.

3            The main case that the claimants rely on, F-

4    Squared just confirms that.  I am going to quote it,

5            "Multiple courts and commentators also require

6    that a proof of claim allege facts sufficient to support the

7    claim.  A reviewing court will assume the allegations are

8    true and ask whether the facts established are the necessary

9    elements of a claim."

10           That's F-Squared, that is what Allegheny says.  So

11   you look at what are the facts alleged in the proof of claim.

12           Here, the challenge proofs of claim, including all

13   the facts in the complaints appended thereto, fail that

14   threshold.  So the issue isn't assertion of facts.  It's not

15   about whether they documented or proved those facts.  For

16   today we're assuming they have.

17           So here is where we are, there are zero facts

18   asserted against each of the non-defendant debtors, no facts

19   at all.  I heard -- I saw in the briefs two responses to

20   that.  One is that there is a small set of proof of claims,

21   in particular those that were filed by United Healthcare and

22   Optum RX, claims that Attestor has now bought, that define

23   Mallinckrodt to include every debtor, but that is just

24   impermissible group pleading.  It doesn't satisfy the

25   obligation to allege facts about the specific against whom

1  the claim was filed.

2          We cited several cases to that effect in our brief

3  including In Re Frohoff [phonetic], In Re Conex Holdings, and

4  In Re PennySaver.  Notably, the claimants don't cite any case

5  saying that it's sufficient to make a group pleading against

6  60 defendants together because there are no such cases.  It

7  also violates the requirement that a proof of claim must

8  clearly identify the debtor and make a demand specifically

9  against that debtor.  That is the (indiscernible) case we

10  cite.

11          So clearly those couple of proofs of claim that

12  just lump 60 debtors together and make statements about

13  Mallinckrodt's generics they are not sufficient.  The only

14  other defense to the wording of these proof of claims that

15  any claimant makes is that their proof of claims refer

16  "unnamed" co-conspirators. That is insufficient for at least

17  three reasons.

18          First, the reference to an unnamed co-conspirator

19  is not a reference to the non-defendant debtors and that is

20  because a corporation can't conspire with its own affiliates.

21  Copperweld, the case that Humana and Attestor rely on and

22  that you heard the ad hoc group mention as well, confirms

23  that.  You cannot conspire with your affiliates.

24          Second problem with this argument is that even

25  this -- even if this was supposed to be a reference, the

1  unnamed co-conspirators were supposed to be a reference to

2  the non-defendant debtors the failure to actually name them

3  is a failure to properly identify them and, thus, violates

4  the requirements that a specific debtor be individually

5  identified.  We cited the Springer case to that effect and we

6  cited others as well; Smith v. Department of Corrections New

7  Jersey, and In Re PennySaver.

8          The third problem with this argument about the

9  reference to unnamed co-conspirators is that even if the

10 proofs of claim had actually said that the particular debtor

11 was a co-conspirator that would still not be nearly enough

12 because all that is, is a legal conclusion.  That is not a

13 factual allegation.

14         We cited several cases holding that, for example,

15 Bell Atlantic v. Twombly, "A bare assertion of conspiracy

16 will not suffice."  (Indiscernible), Third Circuit case.  It

17 is, "Not enough for a complaint to simply make conclusory

18 allegations of concerted action, but be devoid of facts

19 actually reflected in a joint action."

20         The In Re (indiscernible) Group antitrust

21 litigation which hold that an antitrust complaint "Fails to

22 adequately plead the existence of a conspiracy where

23 plaintiffs never state that any or all of the defendants have

24 joined the actual conspiracy.  That case also noted that in

25 the City of Rockford case against ARD, so the actual case the

1  ad hoc group brought pre-conspiracy,

2          "Plaintiffs conspiracy claim was dismissed for

3  conclusory pleading against an unidentified co-conspirator

4  where the complaint contained scant mentions of the co-

5  conspirator in its role as a part of the dealing

6  arrangement."

7          So it is Black Letter Law that just saying someone

8  is a co-conspirator is insufficient.  So that is not a

9  defense to these proofs of claim either.  So because the

10  private Acthar plaintiffs did not meet their initial burden

11  under the first step of Allegheny their proofs of claim never

12  achieved validity, you never get to the second or third steps

13  of Allegheny and the claims should be disallowed.

14          I do want to, just to confirm that, make some

15  general points of law that support this.  These are all in

16  our brief.

17          First, the fact that the non-debtor defendants are

18  affiliates of ARD and PLC does not create liability in any

19  way.  That is Black Letter corporate and bankruptcy law.  We

20  cited several cases for that.  In Re HH Liquidation, that's a

21  Bankruptcy District of Delaware, it is axiomatic that parents

22  and subsidiary corporations are separate entities having

23  separate assets and liabilities; hence, the parent's

24  creditors have no claim for the subsidiaries assets and vice

25  versa.  We also cited In Re Regency Holdings, Southern

64

1  District of New York bankruptcy case,

2          "A part seeking to overcome the presumption of

3  separateness must pierce the corporate veil or prove the two

4  entities should be substantively consolidated."

5          So a corporate entity is liable only for its own

6  debts and its own (indiscernible).  To the extent that the

7  claimants here are trying to articulate theories of alter-ego

8  or veil piercing those are estate claims, they cannot be a

9  part of the proof of claim of an individual creditor against

10  an estate.  We cited several cases to that effect; Emerald,

11  In Re Buildings by Jami [phonetic], In Re Tronics.  So the

12  fact that they are affiliates is not enough.

13          Specific to the actual claims that they have

14  raised that is true as well.  If you look at antitrust law,

15  and we cited several cases to this effect, you know, Attestor

16  and Humana seem to be relying on a theory that asserting

17  claims against one member of the corporate enterprise is

18  sufficient to establish antitrust claims against the rest of

19  the corporate enterprise.  That is completely wrong. It is a

20  deep mischaracterization of the cases that Attestor actually

21  cites which instead votes the plaintiffs are required to show

22  that each defendant independently participated in an

23  enterprise scheme.

24          So if you look at the main case they rely on,

25  Copperweld, it actually rejects intercorporate liability

1 under Section 1 of the Sherman Act,

2     "If a parent and a wholly-owned subsidiary do

3 agree on a course of action there is no sudden joining of

4 economic resources that it previously served different

5 interests."

6     Courts can uniformly reject it, Attestor's

7 argument, that under Copperweld the plaintiff does not need

8 to allege the anti-competitive actions of each separate

9 corporate defendant.  We cited several cases to that effect;

10 there's the In Re Insurance Brokerage Antitrust Litigation

11 Third Circuit case,

12     "Contrary to plaintiff's suggestion it does not

13 follow through Copperweld that subsidiary entities are

14 automatically liable under Section 1 for any agreements which

15 the parent is the party."

16     We also cited (indiscernible), Tenth Circuit case

17 where the plaintiff sought to extend Copperweld to hold

18 parent and sibling entities as one reliability even when

19 there is no evidence that each were involved in the challenge

20 conduct.  The court rejected this.  So it is the law in the

21 antitrust liability.  It is that the plaintiff must allege

22 facts that each defendant independently participated in any

23 alleged antitrust scheme.

24     We cited the Lennox case for that.  All these are

25 cases that Humana cite.  The Lennox case said that Lennox was

1  still required to come forward with evidence that each

2  defendant independently participated in the enterprise scheme

3  to justify holding that defendant liable as part of the

4  enterprise.  Arandell, the Ninth Circuit case,

5          "Copperweld does not support holding a subsidiary

6  liable for the parent's independent conduct."

7          That is with any antitrust defendant plaintiffs

8  must report evidence that CES, a particular defendant,

9  engaged in competitive conduct.  Or the Insurance Brokerage

10 Antitrust case Third Circuit again where,

11         "Defendants are not plausibly alleged to have,

12 themselves, entered into unlawful agreements.  The antitrust

13 claims against these entities must fail."

14         So that is the law.  They have to allege facts

15 that each defendant engaged in anti-competitive conduct.

16 These proofs of claim allege nothing about the anti-

17 competitive conduct of each of the debtors that they are

18 filed against.  And it's not surprising because of that

19 because there are only two types of anti-competitive conduct

20 alleged; the 2013 acquisition of Synacthen and the exclusive

21 distributorship arrangement with (indiscernible).  There is

22 no allegation in the proofs of claim that any of the non-

23 defendant debtors engaged in either of those activities.  In

24 fact, both of those activities started before Mallinckrodt

25 even acquired Acthar, acquired Questcor.  So it's not

1  surprising that there are no allegations that other

2  Mallinckrodt entities were involved in these.

3           Antitrust liability, the same thing is true for

4  RICO liability.  The cases are clear you have to allege that

5  each defendant, each debtor independently engaged in a

6  racketeering activity either by conducting it or directing

7  it.  That is the reason the (indiscernible) case, the Supreme

8  Court case 1993,

9           "It is clear that Congress did not intend to

10 extent RICO liability under 1962(c) beyond those who

11 participate in the operation or management of an enterprise

12 for pattern of racketeering activity."

13          So the cases are very clear that just associating

14 or doing business with a related entity is insufficient to

15 create RICO liability.  That is the In Re Insurance Broker

16 Antitrust case again,

17          "Mere association with an enterprise does not

18 violate 1962(c)."

19          Likewise, we cited cases saying merely providing

20 goods and services that benefit the alleged RICO enterprise

21 is not liability.  That is University of Maryland v. Peat

22 Marwick case, Third Circuit, and the James Streibich

23 Revocable Trust case.  Likewise, we cited cases saying merely

24 receiving revenues that are derived from a RICO scheme is

25 also not enough for RICO liability.  That is the James

1  Streibich Revocable Trust case again where it granted a

2  motion to dismiss where the plaintiff provided "nothing to

3  suggest that wholly-owned corporate defendants were anything

4  more than pass-through vehicles for funding."

5          Likewise, we cited the Lerner v. Colman case which

6  found that an alleged rule consisting of "passive reception

7  of fraudulently acquired stock and promissory notes did not

8  constitute RICO liability."  We also cited cases that just

9  providing a license that someone else uses in racketeering

10 activity is not enough.  That is the Goran case.  Then we

11 cited cases that provided financing is not enough, that is

12 the (indiscernible) case, "Passive financing arrangements are

13 insufficient to give rise to liability."

14         And the same thing is true for unjust enrichment.

15 I make just two points about that.  First off is the extent

16 that there is any unjust enrichment claim that is cognizable

17 in the proofs of claim, it is a disguised alter-ego veil

18 piercing claim that somehow value has flowed up to, I guess,

19 all debtors somehow and, therefore, the claimant should be

20 able to access that value wherever it went.  That is just a

21 disguised veil piercing claim attempting to disregard

22 corporate formalities.

23         We cited several cases saying that unjust

24 enrichment cannot be used to nullify corporate separateness

25 without satisfying the elements of alter-ego and veil

1   piercing.  That includes the <u>QVC</u> case which is a Third

2   Circuit 2016 case.  We also cited <u>In Re Citizens</u> and <u>Bank of</u>

3   <u>New York Mellon</u>.  And because they are really just alter-ego

4   and veil piercing claims claimants cannot put them in their

5   proof of claim.  They are not a valid claim against these

6   entities.

7          The second problem with these is that even if they

8   had standing to bring them an unjust enrichment claim also

9   requires conduct by the actual debtor.  Even if it doesn't

10  require wrongful conduct it does require that the defendant,

11  itself, engaged in conduct and that that conduct had a direct

12  relationship with the plaintiff's loss.  We cited the Shubert

13  (indiscernible) case, New York Superior Court 2020,

14          "There must be a causal connection between the

15  plaintiff's claimed loss and defendant's actions."

16          We also cited <u>Betty v. BMW</u>, (indiscernible), and

17  the Kagan [phonetic] case.  So unjust enrichment as well

18  requires an allegation of conduct by the defendant and that

19  that conduct directly caused the plaintiff's loss.  Here

20  there are no facts alleged as to any conduct by the non-

21  defendant debtors.

22          So where does that leave us?  Clearly on their

23  face these claims do not substantiate a claim against the

24  non-defendant debtors.  They should be disallowed.  So the

25  real issue is whether that disallowance should be with

70

1  prejudice.  We argue it should because there is no excusable

2  neglect here for the failure to properly file proofs of claim

3  or, at least, amend them by now.  It would be highly

4  prejudicial to allow an amendment now so close to

5  confirmation, so disruptive to do that now.

6          So the courts apply an equitable test focusing on

7  prejudice, delay and bad faith to determine whether to permit

8  a proposed amendment after the bar date.  So we cited In Re

9  Exide and In Re Brown.  Prejudice is the most heavily

10 weighted factor of this.  Here there is no excusable neglect

11 for failure to have filed a proof of claim or, at least,

12 amended them by now.  They certainly would be highly

13 prejudicial.

14         Let me just review the facts for the court.  Prior

15 to the bar date both sets of claimants were aware of, at

16 least the material facts in the case that other -- that other

17 entities had some role if they wanted to substantiate those

18 claims.

19         In terms of the Acthar claimants they were given

20 over one million documents in prepetition discovery, fifteen

21 depositions including many documents that described the role

22 of other Mallinckrodt entities.  They had documents and we

23 attached those documents to our brief including slides that

24 showed that MPIL was the contracting entity for Acthar

25 management, that other entities owed the IP and engaged

71

1   licensing agreements.  We showed there were attached
2   documents indicating that MPIL approved the strategic plan,
3   documents indicating that MPIL was involved in setting the
4   price for Acthar.  Humana received several of those documents
5   as well prepetition.
6           In addition, there were bankruptcy filings in this
7   case before the bar date.  The IP restructuring motion, which
8   is Docket No. 385, was filed in November 2020 showed the
9   Acthar ownership and licensing structure as of the bar date;
10  in particular that Mallinckrodt ARD owed the Acthar related
11  IP, that it licensed it to Lux IP S.a.r.l., sub-licensed it
12  to MPIL which then owed Lux IP S.a.r.l. licensing fees.
13  Those are the facts that I imagine they would try and amend.
14  Those are the key facts they were aware of the bar date
15  whether they paid attention to it or not.
16          Then after the bar date, but well before this
17  hearing, we provided extensive discovery to both sets of
18  claimants.  Millions of pages of documents, all the data that
19  is needed to establish the Acthar related conduct of each of
20  the non-defendant debtors and they chose not to amend.  So
21  there is not excusable neglect for failing to file a proper
22  proof of claim or, at least, amending it before this hearing.
23          It would also be highly prejudicial to allow that
24  amendment now.  It would be a hugely wasteful and inefficient
25  use of the party's resources and the court's resources.  We

1  have a hearing today.  This motion was filed three months

2  ago.  We have already extended the hearing date twice to

3  allow them to conduct discovery and incorporate those facts

4  wherever they chose to be.  It would be hugely wasteful to

5  the estate and the court to repeat this whole process later.

6          It would also be extremely prejudicial to allow

7  the claimants to amend later, to string out the claims filing

8  process after the bar date and after this hearing.  I'm sure

9  Your Honor remembers we brought this objection in April and

10  we're very clear about why we did this.  We did this in order

11  to provide clarity to the estate and the court in advance of

12  confirmations so we would know whether there were surviving

13  claims against other boxes and if so whether we had to

14  conduct an estimation hearing on those surviving claims

15  against other boxes.

16          If you recall, Humana told you that if we do have

17  to go that route it would be extremely lengthy and timely.

18  They estimate it will take four months for discovery and at

19  the end of trial.  We tried to avoid all this by fronting

20  these issues and filing this estimation motion.  It would be

21  highly prejudicial for them now, months later, to file a

22  motion to amend which, itself, will take a month to deal

23  with.  And if they're permitted to amend then we have a

24  hearing on the legal sufficiency of those amended claims

25  under Allegheny step one.  And if any are legally sufficient

1 then we have to go through an estimation process at that

2 point possibly.

3          They told repeatedly that they knew that we are

4 somehow the bottleneck, that we have not been providing

5 discovery.  They have the discovery.  They are the ones who

6 are now slowing down this process and keeping these claims

7 open apparently for leverage purposes.  They should have

8 started whenever they needed back at the beginning of the

9 bankruptcy process.

10          They should have come to court if they were

11 unhappy with the discovery that they had gotten.  We

12 repeatedly invited them to do so.  They had gotten the

13 discovery that they need.  They did not amend the claims.  It

14 is way too late and would be highly prejudicial to not just

15 the debtors, but to this entire bankruptcy process for them

16 to amend in the future.  So we believe that disallowance of

17 these claims should be with prejudice.

18          With that I will pause, unless the court

19 questions, to allow my colleagues to speak.

20          THE COURT:  Well, Mr. Harris, if I dismiss the

21 claims, does that give, is it because of the fact that they

22 failed to allege facts sufficient to show that there's a

23 claim against these debtors, is there anything that stops

24 them from then filing a motion to file a late-filed claim?

25          MR. HARRIS:  Obviously, anyone can file a motion.

1  If it disallowances with prejudice, they would have to

2  satisfy the standard for that.  I don't think even if they

3  file a motion for a late-filed claim, they would be able to

4  satisfy it for the reasons I just described.  I think the

5  same standards would apply, which is was there excusable

6  neglect, and is there prejudice to the debtors for the late

7  filing.  So, I think that issue can be decided now in the

8  context of determining to disallow these claims with

9  prejudice.

10         But, of course, they could file a motion if they

11  choose to.

12         THE COURT:  Okay.  Thank you, Mr. Harris.

13         Mr. McCallen, I'll let you go first and then I'll

14  go for Mr. Haviland.

15         MR. MCCALLEN:  Okay.  Thank you, Your Honor.

16         Mr. Harris made a lot of points and I'm going to

17  try to hit them, or most of them, as many as I could make

18  note of, and I'll try to do efficiently, Your Honor.

19         Your Honor, I think Mr. Harris acknowledges in his

20  presentation that really the standard on this motion is that

21  of notice of pleading.  The case law is clear that it's not

22  even a 12(b)(6) type standard, but under for a bankruptcy

23  proof of claim, there's actually even a lower threshold.

24         I don't think they can -- and I don't think they

25  do argue that they're not on notice of the relevant conduct,

1  because we have a 50-page pre-petition complaint, at least on

2  behalf of Humana, we do, and that's survived two motions to

3  dismiss in terms of, does it allege valid claims under the

4  antitrust RICO and unjust enrichment and other state laws.

5          It's really a group-leading argument and Mr.

6  Harris alluded to this.  So, it's not so much is there

7  sufficient allegations of conduct, but do you have

8  allegations against the boxes for conduct in each of those

9  boxes.

10         And when it comes to that issue, Your Honor, I

11 think, obviously, the complaint that we've attached to our

12 proofs of claim, it was filed pre-petition, it was before we

13 knew what we know now, so there was just literally impossible

14 for those documents to contain the allegations of the facts

15 that are put in our objection.

16         But, again, when you come back to the idea of

17 notice, there's really no argument the debtors can make from

18 a pleading perspective, hey, we don't have notice of what you

19 guys think happened.  All of the facts that we have were

20 obtained from them via discovery.

21         They know the corporate structure.  They know the

22 divisions, and that gives them argument.  Then they made them

23 in their pleading, you know, they made evidentiary arguments

24 and they made other arguments about what that means, and we

25 didn't get to those today, but from a first step of Allegheny

1  or even, frankly, a 12(b)(6) standard, and I think the debtor

2  unfairly mix them up at times, but under either circumstance,

3  the purpose of that is to give the defendant, or here the

4  debtors, fair notice of the allegations.

5          And I think when it comes to that, they might have

6  arguments down the road that we can't prove-up those claims,

7  and, again, then maybe there's certain boxes those claims

8  shouldn't be against, but in terms of a notice standard, I

9  don't think they can really make that claim.

10          And they cited, Mr. Harris cited the F-Squared

11  case, that's  F-Squared Investment Management; that's a case

12  from this Court.  And what the Court said there, I think is

13  important.  The Court said that it's a relatively low

14  threshold that is less burdensome in the federal, civil

15  pleading standard, when talking about standard under proofs

16  of claim, and, again, re-emphasized the fact that as long as

17  a proof of claim provides fair notice and the Court can glean

18  an actionable claim from the complaint, then it should

19  entertain the parties' case.

20          THE COURT:  Well, if the actionable claim in the

21  complaint is against debtors A and B, how does that give

22  notice to debtors C, D, E, F, G, H, I, J, K that there's a

23  claim against them?  How does it give the Court the

24  opportunity to know that there are claims against those other

25  debtors?

1          MR. MCCALLEN:  So, Your Honor, I think, and this

2     comes back -- this goes to the other point that I think Mr.

3     Harris was speaking to, which is that the case law

4     construing, particularly on the antitrust side, claims

5     against multiple entities within a single enterprise, and

6     this was the Copperweld case which he alluded to, and then

7     the progeny, I think various circuit courts have now

8     interpreted Copperweld.

9          THE COURT:  Well, then, why didn't Humana, pre-

10    petition, sue all of them?  If it's that easy, if it's easy

11    to say if you're in the corporate structure, we can sue you

12    for antitrust liability, why didn't you sue them pre-

13    petition?

14         MR. MCCALLEN:  Well, two things, Your Honor.

15    First, we didn't know about them.

16         THE COURT:  Well, it's a publicly traded company.

17    You could certainly look at their SEC filings and know who

18    was in the corporate structure.

19         MR. MCCALLEN:  In this situation, Your Honor, the

20    level of detail we have here and the additional entities, we

21    did not know that.  And, actually, Your Honor, I respectfully

22    disagree, the information we presented to the Court, via our

23    objection, that we obtained through discovery in this case

24    about, you know, the division between holding the IP in a

25    box, that being licensed to different boxes, which are the

1   ones who make the decisions about marketing, sales,

2   distribution, and, then, you know, funneling that down to ARD

3   and various other facts that we talked about in our

4   objection, that was not public information.

5          THE COURT:  Well, here's the --

6          MR. MCCALLEN:  And I don't think the debtors ever

7   claimed that it was.

8          THE COURT:  Well, here's the problem.  It's not

9   included in the proof of claim that's before me.  You

10  included it in your objection, but it's not in your proof of

11  claim and you didn't move to amend the proof of claim.

12         MR. MCCALLEN:  Understood, Your Honor.

13         And I can address the amendment point now or I can

14  finish out on the pleading argument and then move on to that

15  point.

16         THE COURT:  Go ahead.  I don't want to interrupt

17  your flow.

18         MR. MCCALLEN:  Sure.  Thank you, Your Honor.

19         So, coming back, I was talking about Copperweld.

20  So, let's talk about what Copperweld says.  In that case, the

21  Court held that a parent and its subsidiary cannot be co-

22  conspirators for purposes of establishing conspiracy under

23  Section 1 of the Sherman Act.

24         I think me and Mr. Harris agree about that.  I

25  don't think we disagree about the holding of it.  And the

1 Court explained that the reason for this is that the parent

2 and its related subsidiaries share the same corporate

3 consciousness and have a unit of interest, and as a result,

4 the Court said -- and I'll just use one quote -- the Court

5 said:

6          "The coordinated activity of a parent and fully

7 owned subsidiary must be viewed as that of a single

8 enterprise."

9          And what courts that have interpreted Copperweld

10 have said is that the reasoning of Copperweld permit pursuit

11 of antitrust claims, based on the coordinated conduct of

12 multiple entities, functioning as a single enterprise and

13 that in some circumstances, proof about each entity's

14 separate (indiscernible) is not necessarily relevant.

15          And what I want to say, Your Honor, is that Mr.

16 Harris, I believe, mischaracterizes our argument.  They say

17 that we miscite these cases, but I think they miscite us,

18 because we're not saying, and we've never said that an entity

19 can be held liable solely by virtue of their corporate

20 affiliation with other debtor entities.  That's not our

21 argument.  It's never been our argument.

22          And all of the cases, and the pieces of Copperweld

23 and Lennox (phonetic), and Arandell (phonetic) and the other

24 cases that Mr. Harris and his attempted pointed you to in

25 their brief and (indiscernible) argument, that's what they're

1  all saying.  They're all making that point, that, hey, just

2  by (indiscernible) of being a sister corporation, that's not

3  enough.

4        And our point is, we're not saying that's all

5  there is.  We think at the end of the day there is a set of

6  core entities, and, Your Honor, I think, you know, this is

7  maybe a good time to tell you how I sort of think that the

8  discovery that we've obtained from the debtors and how the

9  corporate structure works, I almost think of it as a set of

10  three concentric circles.  You have the inner-most core of

11  entities that we now know about who are integrally involved

12  in the manufacture or the creation of intellectual property

13  through research and development, manufacture, based upon

14  that research and development, then distribution and sale of

15  that product.  And that's about 10 or so entities that fit

16  within that core group of entities that are involved in that

17  concept.

18        And then, thereafter, you have another set of

19  entities, what I like to think of as sort of a second

20  concentric circle, which are entities that benefited from

21  that or we believe may have benefited from that, because the

22  discovery from that is still ongoing.  The debtors are

23  producing documents to us, no doubt, and we're reviewing them

24  as quickly as we can -- there's been a lot of production --

25  and we are setting depositions to comply with.  We haven't

1  had any additional depositions yet.  We've set them to comply

2  with the Court's scheduling order for plan confirmation, but

3  we've been planning to take those depositions in early

4  August.

5          But we know that a lot of entities benefited from

6  the proceeds of Acthar, which is, by far, the debtors' most

7  profitable and the largest revenue generator for the debtors.

8  You know, when you actually look at the first day

9  declaration, I think in 2019, the year before the bankruptcy

10 petition, Acthar earned for the debtors something just shy of

11 a billion dollars.  And when you look at the entire

12 enterprise, Specialty Brands and Generics, their revenue was

13 about $3.1 billion.  So, Acthar is a third of this business

14 and it's the reason that they've said that they ultimately

15 put this entire Specialty Brands business into bankruptcy.

16         And so, this Acthar revenue, once it got taken in

17 through ARD and distributed up the corporate chain, it was

18 used, we believe, for a variety of corporate purposes.  It

19 was used to pay down debt.  It was used for purposes

20 unrelated to Acthar, and purposes related to Acthar,

21 distributed throughout that very complicated corporate

22 structure.

23         And, you know, beyond that, Your Honor, I think

24 the third circle of entities are the rest of the Specialty

25 Brands, because like I said, we don't have any intention of

1   going after the Generics entities.  It would be the remainder

2   of the Specialty Brands entities.

3            And it may turn out, Your Honor, that the some or

4   all of those Specialty Brands entities, at least with respect

5   to our direct claims, putting aside substantive consolidation

6   for a minute, that some of those should be dismissed.  But

7   when I come back to that, Your Honor, that is a level of

8   detail and level of interconnectedness among entities that no

9   SEC filings pre-petition anywhere near to describing.  And

10  that's what we've been untangling as part of the discovery

11  process.

12           THE COURT:  Well, what you just described to me,

13  Mr. McCallen, the transfer of funds amongst the various

14  debtor entities, that sounds like a fraudulent conveyance

15  claim, which does not belong to you; it belongings to the

16  estate.

17           MR. MCCALLEN:  So, let me address, that Your

18  Honor, because that's one of the points that the debtors made

19  and Mr. Harris made in his presentation just now.  And I want

20  to say a couple of things.

21           First, we are not pursuing alter-ego claims.  They

22  keep trying to say that.  And every time we look at any

23  entity, they say that's alter-ego.  That's veil-piercing.

24  That's not what we're saying.

25           The same conduct can give rise to multiple

1    different claims at the same time.  There could be conduct

2    about moving (indiscernible) that's between the debtor

3    entities that gives rise to veil-piercing or fraudulent

4    transfer claims, true.  But that same conduct can also give

5    rise to other causes of action; for instance, an unjust

6    enrichment claim.  That's a direct claim we would have

7    against that entity and that's an equitable claim under state

8    law designed to allow parties to get proceeds that were

9    improperly, or without a valid basis, distributed to other

10   entities.

11          Now, what Mr. Harris says in response to that is,

12   but there's got to be some level of culpable conduct at that

13   entity, and I have a couple of responses to that.  One, and

14   it's kind of difficult, Your Honor, because we're talking, I

15   think, literally, about dozens of entities, but number one, a

16   lot of those entities, I believe are run by the same

17   individuals that are making decisions about the transfers

18   themselves and are involved in the entity that we would view

19   as concentric circle number one.  There's incredible overlap

20   here among decision-making among the debtors.

21          Number two, a lot of the entities that Mr. Harris

22   is going to point out is he's going to say, that's a passive

23   entity.  It doesn't do anything.  It's just a boxed asset.

24   There's no employees.  There's no business operations there.

25          And for that, Your Honor, I would say that is a

84

1  really problematic position for the debtors to take and if

2  the Court were to ultimately adopt it, because what the

3  debtors have done, and, Your Honor, at some point, we

4  ultimately hear the evidence on, this we'll get into this in

5  much more detail, but I think it's important that Your Honor

6  understand.

7           The two entities that they are saying we can have

8  claims against, ARD and PLC, have very little value relative

9  to the overall value that Acthar provided to the debtors'

10 business.  According to their liquidation analysis, they say

11 that most of the value related to Acthar resides in an entity

12 or at least pre-petition it resided in an entity called

13 Mallinckrodt ARD IP, and that's the entity that holds their

14 intellectual property.

15          And intellectual property consists -- it's not a

16 patent-protected drug at this point, so the supposedly

17 valuable intellectual property consists of research and

18 development about potential use for Acthar, how to make

19 Acthar, things like that.  That is a passive entity that has

20 no business praising.  It has no employees.  It does nothing,

21 other than hold the Acthar IP.

22          And the position that the debtors are taking that,

23 hey, you need to have actionable conduct at every entity, if

24 that were true in this situation, not only this debtor, but

25 every debtor.  This would be a roadmap for every corporation

1   in America, put your assets in a passive entity that cannot

2   engage in any conduct, because it doesn't have any employees.

3   It doesn't have business operations, other than holding the

4   things that you care most about, and you can't touch it in a

5   litigation.

6          You can't touch it in a bankruptcy, certainly, but

7   you couldn't touch it in a litigation, according to them,

8   either, because if there had been no bankruptcy and we took

9   discovery and did all this in California Federal Court, they

10  would say, we can't (indiscernible) claims against the entity

11  that holds the IP, for instance, because it's just a passive

12  entity and it didn't do anything.

13         THE COURT:  Well, two observations, Mr. McCallen.

14  One, you quoted to me the Copperweld case, and the quote you

15  gave me was that you have to show coordinated activity

16  between the entities.  So, there has to be some activity,

17  even under Copperweld.

18         Your proofs of claim don't allege any activity by

19  any of these debtors that you've asserted these proofs of

20  claim against, beyond the entity that you sued pre-petition,

21  and, again, you're describing to me fraudulent transfer.

22         If the debtor set this up so they could funnel the

23  money into a passive entity for purposes of protecting it,

24  perhaps there are claims against them for fraudulent

25  transfer, but, again, that is not your claim; that belongs to

1  the estate.

2          MR. MCCALLEN:  So, thank you, Your Honor.  I have

3  a couple of responses.  I think it may be fraudulent

4  transfer.  I also believe for the reasons I've stated, it

5  would also be a claim for unjust enrichment.  And also, under

6  Copperweld, I think they would be included within a

7  coordinated enterprise.

8          Because, remember, Your Honor, the structure that

9  was put together was put together solely for tax reasons for

10 the debtors, and the debtors make a lot of that.  They say

11 that we're suggesting that the structure, itself, was done

12 some nefarious reasons.  That hasn't been our argument now.

13 I mean, obviously, it is later on.  We found out through

14 discovery that it was done to protect assets in a certain

15 way, then maybe our view on that would be change.

16          So, we're not criticizing them for setting up

17 their business in a tax-efficient way, but what we're saying

18 is that when those decisions come down from the top, or at

19 least from the same place, wherever it's coming from in the

20 debtors' organization, because it's the same individuals who

21 are making these decisions -- it's employees of, you know, ST

22 Shared Services that do the work on the tax side for the

23 debtors -- you can't use this structure, which was done for

24 these tax-efficiency purposes, as a basis to when you get

25 into bankruptcy, to shield recovery from creditors.

1          And, Your Honor, it's not all creditor; it's just
2    certain creditors, and this is a really important point,
3    which when I talk about the leave to amend point, I'll hit on
4    it again, but I want to make it now.  It's really important
5    that Your Honor understand, this effectively, the dispute
6    that's between -- Your Honor, this is between -- this is an
7    intercreditor dispute.
8          When these cases were filed, when the bankruptcy
9    cases were filed, they came in with a deal with the opioid
10   plaintiffs and certain other RSA parties, including the
11   bondholders, and then eventually there's going to be a
12   settlement with the government.
13         We've been very clear, and I want to be clear
14   about it, again, Your Honor, we are not challenging the
15   opioid settlement, and certainly by having our proofs of
16   claim filed against the Generics entity, we were not in any
17   way, Your Honor, and this is really true, we were not in any
18   way attempting to gum up the works on the Generics side of
19   the business for their bankruptcy.
20         But, Your Honor, what we are fighting about at
21   this point is the value that's left over and who's going to
22   get it, because under the debtors' proposed plan, you pay the
23   opioid settlement, you pay the Government, and you have a
24   very limited amount left over on the Specialty Brands side,
25   and so you've got to split it up amongst the unsecured

1   creditors.  And the debtors have proposed a plan that gives

2   us claims only at two boxes, whereas the bondholders have

3   claims everywhere.

4        So, really, this is, effectively, an intercreditor

5   dispute between us and the other Acthar Plaintiffs and the

6   bondholders, about who, on the unsecured side on the

7   Specialty Brands, gets what's left over after you pay the

8   opioid settlement and after you pay the Government.  That's

9   what this is really about.

10        But let me come back, Your Honor, because I just

11   want to make sure I hit any other points that I had.  I think

12   I hit everything I had on the pleading standard.

13        Oh, there's one other thing I wanted to say.

14   Look, Your Honor pointed out the fact that the fact that are

15   in our objection are not in our complaint.  I'm not going to

16   fight that.  I can't.  That was filed in 2019 before we knew

17   those facts but let me talk in the context of if Your Honor

18   feels that the pleading is insufficient, whether or not we

19   should, at this point, be given, granted permission to file a

20   motion for leave to amend.

21        And I think, Your Honor, it's clear that we should

22   for a couple of reasons.  First, when looking at the

23   standards and the factors the courts will consider whenever

24   deciding to ultimate grant a motion for leave to amend -- I

25   understand Your Honor is just asking us now to argue whether

1  we should be permitted to do so, but I think looking at what

2  the ultimate standard will be is formative for the decision

3  in front of the Court now -- one factor is whether there was

4  a timely assertion of similar claims or demand evidencing

5  intention to hold the estate liable.

6          And I don't think they can reasonably contest that

7  there was a similar claim filed, such as the one we have

8  here.  Obviously, if the Court determines that it's

9  insufficient or inadequate as a pleading matter, that's

10  another thing, but I think what this factor speaks to is,

11  again, this idea of notice, and they clearly had notice of

12  our claim.

13          Another factor the courts will look at is whether

14  other creditors would receive a windfall if the Court refused

15  to allow the amendment.  And I think this goes to the point

16  that I was speaking to a few minutes ago, Your Honor, about

17  whether or not there would be a windfall.

18          In this situation, whenever you look at the

19  dynamics of the case, like I said, at this point, this isn't

20  about dipping into the pockets of any of those opioid

21  plaintiffs or the Government; this is a fight amongst

22  creditors on the unsecured side about who gets what left

23  over.  And so, in terms of prejudice to the debtors, there is

24  no prejudice, Your Honor.  This is a pot plan and so, you

25  know, we should be allowed to continue to litigate those

1  claims.

2          The reality is, and the equities of this are, and

3  I think the courts also will look at the equities when

4  deciding whether to grant leave to amend, the equities of

5  this are that Humana and the other insurers who have claims

6  in these cases are some of the largest payors into the debtor

7  structure for years.  I've talked about the fact that Acthar

8  is its biggest drug, is its most profitable drug.

9          You know, these entities have paid billions of

10  dollars of claims and if we do have valid antitrust, RICO, or

11  other state law claims, if we do, and that'll be decided

12  later -- I'm not assuming it right now -- but if Your Honor

13  assumes that we do have valid claims, then it is only fair

14  and equitable that we have an opportunity to recover against

15  the entity that holds all of the different assets that those

16  -- that our proceeds supported for all of those years as part

17  of the debtors' Specialty Brands business.

18          In terms of the question about the reason for the

19  failure to amend and whether it would be equitable at this

20  point to allow us to amend, again, I just want to remind Your

21  Honor of the timing.  I mentioned earlier -- I won't go back

22  to it -- but our pre-petition complaint.  We got the

23  discovery in this case.  We -- Mr. Harris said that we've

24  adjourned this hearing two times, he said, to allow us to

25  take more discovery.  That's right in part.  We did adjourn

1  it the first time because the debtors were producing
2  documents, a relatively limited universe of documents that
3  they said was are relevant to this motion, and so we pushed
4  it back a week to allow us an opportunity to review those
5  corporate organizational documents and to prepare to depose
6  Mr. Welch.
7          We took that deposition in mid-June, and we filed
8  our objection a week later.  That was a pretty significant
9  undertaking to pull that information together within the week
10 and put the brief together that we did, but we did that and
11 we put that before the Court.
12         Thereafter, the debtor were set to file their
13 reply brief the following week and we were going to have a
14 hearing the following week, but it was set for the same day
15 as the proof of claim hearing that was going to be -- I'm
16 sorry -- the class claim hearing for Mr. Haviland's client
17 and we weren't going to get to it all in one day.  So, we
18 agreed to extend the deadline for the debtors to file their
19 reply brief and, ultimately, we pushed even further because
20 Mr. Welch had, I believe he was out of the office last week.
21 We originally talked about doing it the 13th and we pushed it
22 to the 23rd.
23         So, this last month was extended, you know, for
24 reasons -- there was never any expectation or understanding
25 from the debtors' perspective that we were going to continue

1  to take discovery on this issue.  We have always said, and I

2  recall saying this to Your Honor here in front of you on our

3  30(b)(6) motion for quash, we've always believed you cannot

4  disentangle the issues that the debtors put forward in this

5  motion, this objection, from the broader merits of our

6  claims.  That's why we, right away, when we filed the

7  estimation motion, we sought that discovery.

8          And the debtors took the position on this motion,

9  on this objection, rather, they said, it's not relevant here.

10  The question is who actually did what, the merits of the

11  claim.  That goes, if ever, to confirmation.

12          And then whenever we got in front of Your Honor to

13  argue for discovery on estimation, again, the debtor said,

14  that's for another day.  You'll get that discovery later.

15          So, we were limited when we came in on this

16  objection to the universe of information that they said this

17  was about.  And I told Your Honor back when we were in front

18  of you on the 30(b)(6) argument, I said, they're drawing

19  artificial lines and distinctions here, because you can't

20  disentangle, you know, documents about what the different

21  corporate entities are supposed to do or don't do, and who's

22  involved on that level from questions about who is involved

23  on a more substantive level, and do our claims have merit and

24  if so, in what boxes.

25          So, Your Honor, I just want to put that on the

 1  record, because I believe that goes to the issue of the

 2  reasons for the failure to amend.  I appreciate Your Honor

 3  understood that we were always going to move for leave to

 4  amend.  We thought the purpose of the objection, Your Honor,

 5  was to tee up this dispute to the Court via a contested

 6  matter, which we were obviously prepared to do today.

 7          You know, if Your Honor believes that the

 8  complaint does not withstand the standards of the first wrung

 9  of Allegheny, then we think under the circumstances, Your

10  Honor, it would be fair and would not prejudice the debtors

11  to allow us to leave to amend.  They know the facts.  They

12  know what we're going to say.  It's not like they have to do

13  anything new to prepare themselves for that case.

14          It's just a matter of them making us jump through

15  these hoops to try to prove-up the claims that, you know, we

16  have had and that they have known about for years.  And it's

17  really just a question at this point about, do we get to --

18  if we have valid claims, because one way or another, we're

19  entitled to ultimately try to prove-up our claims.  If those

20  claims are valid, do we get to go after the entities who are,

21  at the very least, involved in the Acthar-related conduct,

22  and maybe, ultimately, the entire Specialty Brands, or are we

23  stuck with ARD and PLC.

24          PLC is the parent company -- virtually no assets

25  in comparison to the overall enterprise value of the debtors,

1 and ARD, as well.  ARD is an entity that has brought in

2 billions of dollars over the years from the sale of Acthar

3 and about 95 percent of it has been removed.  And I'm not

4 saying it's a fraudulent transfer or anything like that, but

5 the reality is that what it reflects is that these entities

6 are treated as a single enterprise.  And I use that word

7 because that's what the Copperweld Court talks about, it's

8 coordinated conduct amongst those entities by the same people

9 who largely sit in either officer or director positions in

10 most of the boxes.

11           And if it turns out that this Court decides, via

12 estimation or at confirmation or whenever it occurs, that we

13 have valid claims, both the equity and the law require that

14 we should be able to go at the boxes that have that value,

15 and that's what this is really about.  Are we going to be

16 allowed to do that or is that value going to be allowed to go

17 to the other unsecured creditors of the Specialty Brands

18 business.

19           I don't have anything further, Your Honor.  If you

20 have any questions, I'm obviously happy to answer them.

21           THE COURT:  No questions.  Thank you, Mr.

22 McCallen.

23           Mr. Haviland, before I go to you, we're going to

24 take a lunch break.  So, let's recess until 12:45.

25           (Recess taken at 11:59 a.m.)

1          (Proceedings resumed at 12:45 p.m.)

2                THE COURT:  Good afternoon.  We're back on the

3     record.

4                Mr. Haviland, you may proceed.

5                MR. HAVILAND:  Thank you, Your Honor.

6                It's a little difficult to close in a hearing when

7     the record hasn't been fully discovered and presented, so I'm

8     going to try to do so succinctly, based on all that you've

9     heard.

10               At the outset, I agree with Mr. McCallen on the

11    law.  I think he adequately and appropriately explained the

12    Allegheny standard and we agree that it's not as robust as

13    Rule 12, which we faced no less than five times in the

14    underlying litigations.  But at the outset, I want to address

15    a couple of open issues.

16               Number one, the Court had asked about the issue of

17    claiming against Brands and Generics and I just want to

18    reiterate that we, the ad hoc Acthar group, and, it is

19    important, Judge, to differentiate claimants.  Too many

20    times, I think there's a one-size-fits-all with the debtors'

21    objections and they do toggle between our positions and our

22    claims in their papers, but I want to be crystal clear with

23    the Court that we make no claims against the Generics side of

24    the business.  We haven't attempted to do so.

25               To the extent the debtors may point to a claim

96

1    against Mallinckrodt, LLC, which is in the Brands -- the

2    Generics side hierarchy, and I'll show in a moment, that the

3    substantial evidence that we have shows that Bill Hilmer

4    (phonetic), Hugh O'Neill (phonetic), and other executives in

5    the Brands business signed documents in the name of that

6    entity for Acthar.  So, they can call it a generic today.

7    But it wasn't before, and when that changed is what discovery

8    is all about.  So, I just want to be crystal clear, we are

9    seeking to claim only against the Brands entities that are

10   involved in and responsible for Acthar.

11           Number two, we did not file prophylactic proofs of

12   claim.  We specifically demarcated those debtors whom we

13   believed were involved in Acthar.  There's no footnote in our

14   proofs of claim that say we're unsure; we were very sure

15   about who we claimed against.

16           And we, unlike most claimants -- and we haven't

17   heard from Mr. Eisenberg, who has a declaration talking about

18   45,000 unsecured claimants who have zero value -- well,

19   that's not us.  We had claims that had very clear addenda to

20   explain our position and had three attachments.  Number one,

21   the complaint, and I want to pause on that for a moment just

22   to point out to the Court that the debtor has put into

23   evidence before you, Exhibit Numbers 9, 10, 11, 12, 14, 19,

24   20, 23, 25, 26, and 27, which are the complaints of the ad

25   hoc Acthar group litigants, and almost all of the orders

1  denying Mallinckrodt's motions to dismiss, both under Federal

2  Rule 12 in three instances and the State Court Rules in

3  Pennsylvania and Tennessee.

4          And that's important.  I know Your Honor has

5  several times observed that Rule 12 isn't the end, but it is

6  at this point in terms of pleading.  We have pled claims and

7  the debtors address antitrust, RICO, and unjust enrichment,

8  but they haven't addressed consumer fraud, which is in the

9  Pennsylvania cases, both before Judge Schuller in the federal

10 court, and in the state court case now before Your Honor, the

11 542 cases before you under the Pennsylvania UTPCPL.  They

12 haven't addressed that at all, nor have they addressed fraud

13 or conspiracy, causes of action which have survived their

14 motions.  So, they haven't attempted to demarcate their

15 position among the various claimants.

16         And then, finally, Your Honor made a comment about

17 bad faith and lack of support.  If that was directed at us, I

18 respect the Court's observation, but we can't agree that what

19 we've attempted to do by providing that support was done in

20 bad faith.  We, unlike, anyone, gave a damage model and a

21 quantification, based on actual purchases of Acthar.  That's

22 our Exhibit B.  Actual purchases.  In fact, that so incensed

23 Express Scripts that they moved to suppress and put under

24 seal all of our claims, and they currently are all sealed.

25 No one can see them, except the Court and the debtors.

A-6871

```
 1              And then the third thing we did to substantiate,
 2    and this is about substance, substantiate, we gave the
 3    complaint that five judges have said it passes muster under
 4    Rule 12.  Then we said this claimant, and there are over 70,
 5    this claimant fits this claim because there is an ASAP form,
 6    Acthar support and access program form.  Now, if you read any
 7    of our complaints, we allege that beginning in 2007, that's
 8    how this company changed the world.  That's how they created
 9    a distribution model, a marketing and sales paradigm that
10    allowed them to take the price from $40 to nearly $50,000,
11    the ASAP form.
12              And by showing the Court through our claims that
13    every single claimant had a beneficiary with one of those
14    forms, we took that claimant and put them within the
15    complaint.  Now, that's the overarching approach.
16              I want to get to the issues that the Court raised
17    about these other entities and I want to walk through it a
18    little differently.  I won't repeat the Allegheny standards.
19              I will point out that those Rule 12, the PO
20    rulings and the Tennessee ruling demonstrate that we
21    satisfied Twombly and Iqbal and that we did not group-plead.
22    And why that's important is because Mallinckrodt never made
23    that argument, even though we sued the PLC and ARD.  They
24    never made that argument; Express Scripts did, and it was
25    rejected because, and counsel pointed out we've amended our
```

1    complaints because at times when the Court said, we want you

2    to differentiate your cause of action as between these

3    various entities, we didn't and as to the five Express

4    Scripts entities, we survived that.

5         We argued the single-entity doctrine of the

6    antitrust.  Mallinckrodt did not.  And we submit, Judge, the

7    law of the case which comes up to the claim is that they

8    don't get a do-over.  They don't get to now say, we're not a

9    single entity, but that's what they're doing, but they're

10   doing it very carefully and very cautiously because they

11   don't want to create this situation where they have these

12   disparate corporate entities that can be sued.  They want it

13   to be an enterprise, one PLC.

14        So, we take the entity as an enterprise, as one,

15   and I'll get to that in a moment.  The evidence strongly

16   supports that, overwhelmingly supports that.

17        But even if you look at it the way they want you

18   to and break up this single enterprise into these buckets

19   that, yes, they existed in a federal filing to the SEC, but

20   nowhere do they say what the record in this case has shown,

21   is they took the Acthar function and business and broke it

22   up.  Sent it to the U.K.  Sent it to Ireland.  Sent it to

23   Luxembourg.

24        Nowhere, and I'll show you why that's true, all

25   the documents are stamped highly confidential.  No one gets

1   to see them.  They don't put that business model out there.

2   They haven't cited you any evidence where it's publicly

3   available that MPL and MPIL had a collaboration agreement

4   over the Acthar business where all the decision-making was

5   done overseas.  Nowhere has that been publicly divulged.

6          It only came in the last two months.  It only came

7   through Mr. Welch who's on the camera right now, telling us

8   that's how it operated when he instituted DEMPE, D-e-m-p-e,

9   decision-making for the company, as a tax convenience, so

10  they get the benefit of Irish tax laws, the U.K. tax laws.

11  They toggle back and forth, moved functions when it

12  advantaged the corporation.

13         And I agree with Mr. McCallen, we're not saying

14  that was evil.  They can do what's in their best tax

15  interests, but don't argue to us that because you've moved

16  function over there, we can't follow the money, as Your Honor

17  pointed out, and the function -- and I'll get to that in a

18  moment.

19         But even if they are independent entities, and we

20  don't accept that, we look at the independent entities as

21  potential co-conspirators.  And there's a reason why single

22  enterprises don't argue this, because now, all of a sudden,

23  you've got a horizontal conspiracy.  You've got an entity on

24  one plane that has functions, conspiring with one another to

25  set prices to have a monopolization on a product.  Boy,

1   that's an interesting proposition the debtors want us to

2   have, that the PLC in conspiracy with the MPL and MPIL to

3   maintain the monopoly for Acthar by suppressing Synacthen, by

4   maintaining the distribution scheme.  But if that's where

5   they want to go, that's where I'm going to go.

6           We say in paragraph 212 of the Rockford complaint

7   that beginning as early as 2007, the exact date being unknown

8   not plaintiffs, and continuing thereafter until the present,

9   the defendants and other unnamed co-conspirators between and

10  among themselves, entered into an agreement and, otherwise,

11  continuing conspiracy to cause my clients to overpay for

12  Acthar.  The rest is laid out in the complaint, which five

13  courts, five, have found plead specific -- by the way, they

14  argued 9(b), not specific enough in time, place, and manner -

15  - rejected.

16          I don't think this Court can rule on what they're

17  suggesting without going into those court's opinions and

18  saying, I've looked at the pleading.  We have tested it under

19  9(b).  We tested it under group pleading.  We tested it under

20  Twombly and Iqbal and it survived.  It goes to the next level

21  of discovery, and that's important.

22          THE COURT:  Well, Mr. Haviland, the complaints

23  that you're talking about were only against PLC and ARD, so,

24  to the extent the courts in those cases found that you

25  survived the Rule 12 motion, it's only as to those two

1  entities.

2          And in Delaware, the corporate structure is

3  sacrosanct and it is observed, unless proven otherwise.  So,

4  you had an obligation to come forward in your proofs of claim

5  and allege facts that would show me and show the debtors that

6  there were claims against these other entities, other than

7  PLC and ARD.  So, let's focus on that issue.

8          MR. HAVILAND:  Certainly, Judge.

9          So, let's talk about the antitrust and let's talk

10  about the facts.  I want to start with the fact that in a

11  price-fixing case, and we have that, the United States

12  Supreme Court said in 1898 in the Joint Traffic case, as

13  reiterated in the New Jersey case, 211 U.S. 1, there's a rule

14  of reason that requires the fact-finder to decide whether

15  under all the circumstances of the case, the practice imposes

16  a restraint.

17          And I point that out, Judge, because Judge

18  Capello, who ruled on this issue, said clearly that I am not

19  going to decide whether a rule of reason applies.

20          They're asking you to essentially accept

21  everything Mr. Harris said is true.  Well, that's not the way

22  it works.

23          Everything we say is true in terms of conduct.

24  The judge did not decide whether it's per se -- by the way,

25  per se, if they fix the pricing, we get right to damages --

 1  he said at <u>Rockford</u>, 360 F.Supp. 3rd 754, the Court need not

 2  make this determination at this time.  They're asking you to

 3  make that determination right now, what standard applies.

 4       Do you take this conduct, which was described?  We

 5  didn't know all the players and actors at that time.

 6       And, Judge, I've got to point out an obvious

 7  thing.  Mr. Welch hasn't testified, but a company like Petten

 8  Holdings, and I'll show you in a moment, a contract signed

 9  June 2020, didn't exist until February of 2020.  I would have

10  asked Mr. Welch this question:  Mr. Welch, how is it possible

11  that the City of Rockford can sue an entity that didn't exist

12  until three years later?

13       Well, it's not possible.  They created that

14  entity.  They moved the distribution function out of ARD to

15  Petten Holdings.  Now, how do we know about that?

16       We got the contract two months ago, not in the

17  underlying litigation where the Court ordered all contracts

18  to be produced, where Arnold & Porter reported to the Judge

19  that they had done it, repeatedly said they'd done it, and

20  they hadn't done it.  That's a contract involving Acthar

21  distribution with Petten Holdings never produced.  That's

22  Section 1.

23       Section 2, monopolization, and the judge in the

24  <u>Rockford</u> case, at 360 F.Supp. 3rd 755-56, points out that a

25  conspiracy to monopolize consists of a combination or a

1  conspiracy.  We allege there was a conspiracy and there were

2  many actors, many of which we didn't know.  We talked about

3  all the different entities with Express Scripts, but this

4  debtor never once said there are other actors.

5        They hid behind the enterprise of PLC and

6  represented repeatedly through discovery sponsor that

7  Mallinckrodt took the position.  Now, the judge, at page 747,

8  described our claims as follows:

9        "The gravamen of the Plaintiffs' antitrust claims

10 is that the defendants acted and conspired to raise prices

11 exorbitantly high as part of a vertical price-fixing scheme."

12       Let me pause there.  The price-fixing function has

13 moved.  We did not know that.  I deposed Mr. Hilmer.  He was

14 asked by the FTC one month after DEMPE decision-making was

15 put in place, who and how is the decision-making on pricing

16 done?

17       He said, Mallinckrodt.  He never said that MPL and

18 MPIL-n a collaboration agreement, decide that.  They go up to

19 the executive committee of the PLC.  That Mr. O'Neill has to

20 fly over there.  He never said that.

21       Now, the Court is being asked to fault the

22 Plaintiffs for not doing our job, but what do you do when a

23 witness doesn't tell the truth?  That was the FTC.

24       Two years later, in 2020 -- three years later -- I

25 asked him the same question.  He said he testified truthfully

1  and never once under oath did he say, Mr. Haviland, I need

2  you to know something.  It's July of 2020.  We've had DEMPE

3  for a long time at this company.  MPL and MPIL are deciding

4  all these things.  ARD is insolvent.

5          We learned through the document in this case,

6  Project Easter, Project Gemini, Project Apollo, and a Project

7  Creed (phonetic), we don't even know what it's about because

8  it's all under privilege --  I'll show you the documents --

9  that they moved those functions out.  Now, they did it for

10  tax reasons, but Your Honor said we get the following

11  conduct.

12          In the last two months, we've learned more than

13  we've learned in the last four years about how this

14  enterprise operates.  They never told us that the entity that

15  we sued was insolvent.  Insolvent.  Couldn't write debt.  Had

16  its debt-writing function taken away because it all got moved

17  overseas.  And the Court is going to fault us for not asking

18  the right questions.

19          We never got to ask the senior (indiscernible),

20  Mr. Trudeau, Mr. O'Neill, Mr. Phillips, who was never

21  disclosed as a custodian, Dr. Romano, who I tried to depose

22  months ago.  They constantly, constantly run interference and

23  argue with the blinders on that it doesn't relate to this

24  issue.  They don't want to put these witnesses up because

25  it's their documents.

1          This company is only run by five to seven

2    executives, Judge.  I can name them for you right now -- I

3    just did.  They could have a hundred entities.  It's a same

4    people.

5          If you read the SOFAs, it's Brian Reasons, Ian

6    Watkins, occasionally Mr. Welch comes in as executive

7    secretary.  It's the same people, and why that matters is

8    because a part that they don't talk to you about when you

9    have Copperweld.

10          By the way, they never said Copperweld to us,

11   because that would have begged the question for the judge in

12   Rockford, all right, let's examine the PLC and the ARD and

13   whether they're conspiring with one another, parent and sub.

14   They didn't want to make that argument.

15          But here's what Copperweld actually says, and it's

16   out of Rockford in the context of ex Express Scripts arguing

17   that it should not be held liable for the acts of its

18   subsidiaries.  Copperweld holds that the single entity cannot

19   conspire with itself, either with its employees or its

20   wholly-owned subsidiaries, 467 U.S. 769-770.  I'm going to

21   read to you what the Court says, so you don't have to take my

22   word for what it says:

23          "The officers of a single firm are not separate

24   actors.  There can be little doubt that the operations of a

25   corporate enterprise organized into divisions must be judged

1   as the conduct of a single actor."

2              Now, why is that important?

3              Because Mr. O'Neill, when he was deposed over in

4   the opioid case, said I don't treat these entities as

5   distinct entities.  They're all just divisions.  They're all

6   part of the same enterprise.  And I'm going to read to you

7   what he says, and by the way, this is in the record, because

8   I finally got the deposition and we put it before the Court.

9   We didn't get his deposition, but we got the documents that

10  were produced in the opioid litigation.  It's Exhibit 157 is

11  his CV and he was asked about and he says -- I'm trying to

12  streamline, Judge, and it's taking me out of order.  I

13  apologize.  I'll paraphrase.  He says in his CV, and this is

14  -- he had just updated a month before he was deposed, that

15  there's one enterprise, there's one organization, and that

16  these other entities he was asked about, and he was asked

17  about SpecGX, the Generics company, but he was asked about

18  Mallinckrodt, LLC, the entity that wrote contracts involving

19  Acthar.  I don't see those corporate forms.  They're all

20  divisions.

21             And there's something that Mr. McCallen said that

22  I agree with, but I want to give a different flavor for.

23  This enterprise decided to create, instead of divisions and

24  departments like some entities do, Judge, they created

25  separate corporations:  holding companies, operating

1  companies, cash pools.  That's a different way to do it, but

2  the result is the same.

3          If they're operating as a single enterprise, you

4  don't get to break up your liabilities and move functions and

5  assets around, and if that's the position, then that's a

6  legal question for this Court and any reviewing Court going

7  down the road.

8          I want to go through, Your Honor, the proof, and

9  the proof being what we had and what we didn't have, because

10 that's really what is at the heart of the matter.  It goes to

11 the underlying claims as they were stated and as to our

12 request for leave to amend.  We put in the record, and,

13 Judge, I am just going to make an overall proffer that

14 defense counsel can respond to, the debtors' counsel, AHG1

15 all the way through AHG174, which consists of the debtors'

16 documents with the exception of a handful of Express Scripts

17 documents that the debtors didn't have and were pointing out

18 they didn't produce, because they're in the files.  They're

19 documents that were shared between the companies but were

20 never produced.

21         Now, Express Scripts yesterday agreed we could

22 introduce those documents under the protective order in this

23 case, as long as they remained under seal.  So, I wanted to

24 make sure that that is the proffer, that we're not asking

25 that they be put in the public record.  But I want to walk

1   through that evidence, Judge, because when you review the

2   discovery that was conducted in the underlying litigation and

3   what's attempted to be conducted here, you get to the same

4   result.

5          We only knew what we knew and couldn't know what

6   we didn't know.  And let's not lose sight of the fact, our

7   cases were stayed and we were enjoined.  We were prevented,

8   because of the freezing spell, from taking any discovery of

9   either the debtors, third parties, or importantly, Express

10  Scripts to find out how the relationship had changed.

11         THE COURT:  Well, that's not true, Mr. Haviland.

12  You had the opportunity to take 2004 discovery in connection

13  with this bankruptcy case.

14         MR. HAVILAND:  Well, Judge, it's interesting that

15  you say that, because -- and my co-counsel, local counsel,

16  Dan Astin is on -- we sought 2004 discovery and Mr. Stearn

17  said we weren't entitled to it.  He said that we had to work

18  through the UCC.  We then contacted the UCC to find out about

19  producing discovery that they had.  We just got that within

20  the last month or so.  We have attempted to take 2004

21  discovery.  We've been denied it.

22         THE COURT:  Well, you should have brought that to

23  the Court's attention.  It wasn't brought to my attention

24  that you were denied 2004 discovery.

25         And I'll point out that you did, in fact, join,

1 filed a motion to join the UCC's 2004 discovery and then

2 later withdrew it -- I don't know why -- but you withdrew

3 your 2004 discovery request to join the UCC.

4          And why you didn't get it up until now, again,

5 that's -- you know, you have an obligation to come forward

6 and notify the Court if you're not getting what you think

7 you're entitled to.

8          MR. HAVILAND:  Well, Judge, we have repeatedly

9 tried to follow your Court's admonition to write and ask for

10 an audience.  I don't think we've had an audience with you

11 till since months ago when I was called at five o'clock to

12 get on the call.  Just this week we sought to have this issue

13 of the depositions decided and then the debtors filed a five

14 o'clock motion for a protective order that got moved to

15 today.  So, we've attempted to do that, but we've been

16 unsuccessful.

17          I note that when the debtors write and ask to put

18 the Shenk motion off, it gets granted.  We don't get to

19 comment on it.  We don't get to talk about the implications

20 to the plan or our claims, but --

21          THE COURT:  Hold on right there, Mr. Haviland,

22 because I left open that motion to give you the opportunity

23 to respond.  You filed nothing in response to that, so that's

24 why I granted that motion.

25          Number two, you have never, ever, ever come to me

1  and said, we want 2004 discovery and the debtors are denying

2  it to us -- ever -- and if you had, I would have heard it.

3  So, don't put this on me, Mr. Haviland.

4        MR. HAVILAND:  I'm not putting it on you, Judge.

5  I'm pointing out that if there are tactics, it's the debtors.

6        THE COURT:  No, the tactics are yours, because

7  you're waiting until the last minute to then seek discovery

8  and then file motions to compel and that's what's screwing up

9  this process, not the debtors.  You have an obligation to

10 move the case forward, as well as the debtors do.  You have

11 an obligation to come forward if you're not getting discovery

12 and you didn't do it.

13       MR. HAVILAND:  Judge, that is just not the case,

14 okay.  We have, prior to this bankruptcy, aggressively sought

15 discovery --

16       THE COURT:  I don't care what happened before the

17 bankruptcy, Mr. Haviland.  I'm talking about what's happening

18 in this case.

19       MR. HAVILAND:  Well, context is important, Judge,

20 because we're being faulted for what we knew about and didn't

21 do before October 12th.  Let's not lose sight of the debtors'

22 position, that we should be faulted for all the little things

23 they have taken out of the record from the Rockford case,

24 which none of them say what I just said.  They didn't produce

25 any of the 2020 contracts, the collaboration agreements, any

1  of those documents were produced, even they were squarely

2  asked for:  all contracts, all communications.

3          We then asked again in this context and we're told

4  it's overbroad.  When they represented to judges -- and not

5  just one judge -- that they had done it.  Now, it's not these

6  lawyers.  I noticed that Ms. Shores was on in her hoodie a

7  little while ago.  It was Arnold & Porter.  Repeatedly

8  reported to judges that they had done what they were supposed

9  to do.

10          You know, Judge, at some point in time, that is

11  going to have to be dealt with.  And whether -- you know, the

12  bankruptcy can't stop a federal judge from dealing with

13  misrepresentations in their courts and those representations

14  were made to judge up in Rockford --

15          THE COURT:  Mr. Haviland, I don't want to hear any

16  of this.  I want to hear what happened in this court.

17  Because you have the opportunity to take 2004 discovery.  You

18  did not do so.  You joined the UCC's, but then withdrew your

19  joinder.  You waited until just days before this hearing to

20  seek additional discovery and you haven't shown me any reason

21  why that discovery would have given you -- you've told me now

22  you have all this evidence, you have all this information

23  that would have allowed you to amend your proofs of claim,

24  but you didn't do it.

25          MR. HAVILAND:  So, Your Honor, I want to tell you

1 about --

2          THE COURT:  You lost your -- I can't hear you, Mr.

3 Haviland.

4          MR. HAVILAND:  I, inadvertently, hit my mouse,

5 Your Honor.

6          So, Your Honor made a comment to Mr. McCallen that

7 you can look at the public filings and you can see all these

8 entities.  Well, one of the first things that Judge Johnston,

9 as a magistrate, now a district judge in Rockford, ordered

10 even before the Rule 12 motions, he said, and he asked me,

11 Mr. Haviland, you know, if you had your wish list, what would

12 you like?

13          I said, Judge, I'd like the organization charts.

14 I'd like to see how this company is organized.  And we put in

15 the record, Judge, at ECF 171, that order.  That order was

16 2018.  Produce all those organization charts so we can see

17 what they're talking about today.  It was never done.

18          What was not produced, and I'm going to reel these

19 things off just so you can have the record for it, it was

20 never produced in response to that order.

21          THE COURT:  If this is pre-petition stuff, Mr.

22 Haviland, I don't want to hear it.

23          MR. HAVILAND:  No, Judge, it's Mallinckrodt

24 ACTH00000047, produced in this case.  We have marked these as

25 AHAG61, a 2016 organization chart which shows how the Acthar

1   ARD business was moved from a top-line position directly

2   reporting into the PLC, all the way down to where it exists

3   right now as a defunct entity.  That's AHAG Exhibit 61, page

4   47.  If you go to page 44, it's the 2017 chart.  If you go to

5   page 45, it's the 2018 chart.  If you go to the next page,

6   69, it's the 2019 chart.

7            We never got the chart that Mr. Welch did at the

8   first day hearing which lays out all the debtor

9   organizations, because you have to go through the

10  machinations of all these moves to see how the Acthar

11  business was moved down, subordinated, and stripped of all of

12  its assets.

13           This company merged with QuestCor.  It didn't

14  acquire QuestCor.  They created the Mallinckrodt PLC as a

15  49/50 shareholder.  We only had to sue the PLC, Judge.

16  That's all we had to do in 2017.

17           THE COURT:  Again, it doesn't matter what you did

18  before the bankruptcy, Mr. Haviland.

19           What is at issue today is whether the proofs of

20  claim that you have filed against the debtors, other than PLC

21  and ARD, state sufficient facts to establish that there is a

22  claim against those debtors, and that's what I want to focus

23  on.

24           MR. HAVILAND:  And I'm going to focus on that with

25  you, Your Honor.

1          Mallinckrodt has proffered as an exhibit, two

2    exhibits, that were marked in Mr. Welch's deposition, first

3    produced in this case --

4          THE COURT:  None of those exhibits have been

5    admitted into evidence.  I told you I wasn't having an

6    evidentiary hearing today.

7          MR. HAVILAND:  Well, Judge, I'm making a proffer

8    now and I would like to offer them to be admitted.  And

9    Exhibit 60 and 61 are the collaboration agreements signed by

10   Mallinckrodt Pharmaceuticals Ltd. and Mallinckrodt

11   Pharmaceuticals Ireland Ltd., and in that document just

12   produced in this case in the last couple of months, it

13   details how the function of Acthar, the decision-making on

14   manufacturing, distribution, pricing, marketing, and sales,

15   was moved between Ireland and the U.K.; those two entities.

16         That document was created October 1, 2016.  It was

17   never produced in the underlying litigation.  It was only

18   produced two months ago.

19         THE COURT:  So, you had it two months ago.  Why

20   didn't you amend your proofs of claim to add that to your

21   proofs of claim against these other entities?

22         MR. HAVILAND:  Because two months ago, Judge, I

23   sought leave.  May 21, I asked this Court for leave.

24         THE COURT:  No, you didn't ask for leave.  I went

25   back and looked at your -- you filed a motion to dismiss the

1  claim objection and in that, the only thing you asked for was

2  for leave to file a motion to amend later in the future and

3  you didn't do that.

4        MR. HAVILAND:  Your Honor, that's why I ask you,

5  are we going to exalt form over substance?

6        Do you want a motion on that very issue when we

7  haven't had the issue of whether or not their objections have

8  been carried?

9        You know, it's a chicken-and-egg problem in my

10 mind, and I don't really practice in the bankruptcy arena,

11 but it seems to me that when we put forward a complaint that

12 has passed muster by five courts and talks about conduct, now

13 the debtor says, well, we broke up the band, Mr. Haviland, we

14 moved all of these functions around, Mr. Haviland, catch us

15 if you can, Mr. Haviland, figure out that we created entities

16 in 2020 that you maybe should've known about even though they

17 weren't described anywhere that they were doing Acthar, but

18 you should have done something about that, even though we got

19 documents two months ago.

20       So, I say in our response, and it's a group that

21 filed it, if that's true, then we seek leave to amend to

22 bring those facts to the Court.

23       Judge, if you're inclined to say under Rule 15

24 that the door is shut today, then just shut the door.  I

25 don't think the Supreme Court or the Third Circuit says that

 1   when it comes to Rule 15.  We're supposed to be getting to

 2   the facts and the truth.  It seems to me we're just

 3   getting -- it's a game of time and running out the clock.

 4          These debtors have stonewalled us repeatedly and

 5   if granted leave to file that motion, which I sought, and

 6   we'll file it next week.  I'm not looking to put this off.

 7   We want that hearing on September 1, 2021, Judge.  Let me say

 8   that again:  we want that hearing.  But we want to get there

 9   -- I know it's funny, Mr. Welch, but I don't think it's funny

10   -- we want to get there, because we want to be able to prove

11   our claims, okay.  And we don't want to get caught in these

12   traps that you've got the discovery.

13          We did not get those collaboration agreements;

14   they were withheld.  And if Your Honor doesn't want to look

15   at what the other judges ordered, that's fine; that's your

16   prerogative, I suppose, but in context of faulting us for not

17   asking the right questions at the right time, coming in, we

18   had.

19          What we also didn't know is all these projects,

20   which repeatedly talk about Acthar-function moving, and Mr.

21   Welch's deposition 13, MNK's Exhibit 62, Bates number 1558,

22   produced two months ago, Project Easter, how they moved

23   functions.  And Mr. Welch repeatedly said it was for tax

24   purposes, but the fact is it's more than that.

25          In this context, they're saying, you don't get to

1  claim against them because we did this machination.  And,

2  Judge, you should go through, and I'm proffering these

3  documents because I have them now, and today is the day,

4  Exhibit 62, Exhibit 55, Exhibit 56, Exhibit 57, Exhibit 58,

5  Exhibit 59, Exhibit 63 are all the projects produced by the

6  debtor two months ago, which it would take a team of people

7  to figure out what all of those corporate maneuvers mean.

8          We've barely scratched the surface with Mr. Welch,

9  in terms of all the different functions and move.  What's

10  clear to me as I sit back, I see the PLC, I see MIFSA

11  (phonetic), I see CV.  The two entities that financed Acthar,

12  not with anybody within Mallinckrodt, no, no, the documents

13  are clear, and they're in my proffer, the documents are

14  clear.  They gave equity and they're out of the money, and

15  they took the borrowing capacity of QuestCor and financed

16  against it.

17          QuestCor came in as a billion-dollar enterprise.

18  By the way, they paid $5.8 billion.  At the time, this

19  company was only worth two.  A two-billion-dollar company

20  buys a six-billion-dollar company.  Who had the stronger

21  position?

22          So, MIFSA and CV created that debt instrument.

23  And, by the way, that's how all the general unsecured

24  noteholders are claiming now against everybody beneath them.

25  But if you look at those document, Judge, and they're in the

1   record, I'm proffering them, the PLC did not give any
2   guaranty to those noteholders, none.  We sued the PLC.
3          So if you're going to look at these claims and we
4   can't discriminate among unsecured claimants, because we're
5   in the same position other than under the RSA they're getting
6   $375 million and 80 percent ownership of the company.  So
7   they are getting that.  We are getting some share of $100
8   million broken up among 64 different entities, most of which
9   have no revenue, no assets, no money, no function, but
10  somehow they're getting a share of that money and we're being
11  told you get a little share of ARD, an insolvent entity that
12  nobody knew about, and the PLC.  Thank you very much, let's
13  all go home because if that's the way that is going to play
14  out then I think it's time for someone else to review it
15  because that to me just shows you what is going on here,
16  Judge.  They took a company that was making a billion dollars
17  a year and they stripped it dry.
18          Now I want to point out our discovery so you can
19  have a clear record in terms of deciding whether to give us
20  leave to file a motion for leave.  We have put in the record
21  the court's orders in Rockford's at A8-AG 152, 153 and 154.
22  We have put in the record our multiple discovery requests 1,
23  2, 3 and 4, AH 149, 148, 150 and 151.  We have put into the
24  record correspondence between counsel for the City of
25  Rockford and Arnold & Porter about their discovery

1    deficiencies AH 157 and 155.  We have also put into the

2    record, Judge, Mallinckrodt's custodian list in Rockford AH

3    156.  You will find it interesting that people who were

4    talking about it are not on it.  Mr. Phillips is not on

5    there.

6          Now Rule 26, I'm pretty sure, was amended a long,

7    long time ago where the defendant has to tell us the people

8    with knowledge.  They didn't do it.  In fact, we got a letter

9    on August 12th, 2019 right before Bryan Cave left AH 158

10   giving a very short list of people that did not include the

11   following important people that drive the decision making in

12   this company.

13         Kathy Schaefer, the president of virtually every

14   brand company sometimes Brian Reasons, Brian Reasons isn't on

15   there.  Gary Phillips, the head of MPIL, who with Dr. Romano

16   makes all of the decision makings under the collaboration

17   agreement.  Mark Tradeau, the CEO, is not on there.  You know

18   who else isn't on there, Mr. Welsh the person most

19   knowledgeable in this bankruptcy; he's not on the list.  It's

20   not our job to catch them, that is their 26 obligation.  They

21   should have told us these people were relevant.

22         Now we got from the debtors a document that I'm

23   going to proffer, (indiscernible) 5, Welsh Exhibit 5, a

24   summary of legal entities and it purports to explain what is

25   a brand and what's a generic.  The problem with that, Judge,

1    is the debtor decided what is brand and what is generic

2    without any regard to the history that I just told you about

3    that's in those documents. Mallinckrodt LLC, and I'm going to

4    go through them, clearly signed documents on behalf of this

5    entity that is the brand entity time and time, and time and

6    time again.

7            I want to point out another fact that is relevant

8    to the issues of whether or not we get to go after these

9    entities.  There's two documents you put in, the Irish

10   statutory account filings, AHG 9 and 11, and a cover at 10.

11   In those filings, Judge, the brand entities exist in one

12   location.  675 James S. McDonnell Boulevard, Hazelwood,

13   Missouri.

14           One of the factors the courts look to is do they

15   have different offices.  They have one.  That is their

16   office.  We didn't know that.  We didn't know we shouldn't be

17   looking at all these other entities.  All these now brand

18   entities that are working the Acthar business.  The point is,

19   Judge, the person that knew this the most was never deposed.

20   He was ordered in Rockford to appear.  The first time you and

21   I spoke was to quash that subpoena of Mr. O'Neill.  He has

22   yet to testify.  We deposed the people they put-up, Mr.

23   Hillmer, the executive assistant, Ms. Falconi, and Mr. Close

24   [sic], but that's it.  That is all we got.

25           Why that matters, Judge, in the record we put in

1    the opioid litigation which these debtors are involved in,

2    AHD 63 and the pleadings that follow 62 which frame the issue

3    for Judge Polster about whether or not this PLC, whom we sued

4    -- by the way, I don't want to cast aspersions on anyone, but

5    none of the blues, the insurance claimants, sued anybody.

6    Let me repeat that, they didn't sue anybody.  There is no

7    complaint.

8              So if you're going to judge claims in terms of

9    whose where in the pecking order we sued, we litigated

10   (indiscernible) 12, we framed the conduct that courts have

11   agreed with.  Those blues entities they haven't explained why

12   they have a claim.  Most of them, from what I can tell,

13   Judge, are third-party administrators.  They don't even pay

14   for Acthar.  They administer for my clients.  It seems to me

15   that is a double DIP.  Humana, and I'm not going to pick on

16   Humana, but they sued the PLC then dismissed the PLC.  We

17   didn't.  So we have claims against the PLC and ARD.

18             The reason why the judge, and I won't repeat the

19   citation to the unreported case of Judge Polster, he looked

20   at the plaintiffs' proffer and Mr. O'Neill's transcript which

21   was under seal, but it's at 171, he testified:

22             Question,

23             "What's your job?"

24             Answer,

25             "I am in charge of the brands.  I am the executive

A-6896

1  vice president."

2          Question,

3          "For what organization?"

4          Answer,

5          "Mallinckrodt Pharmaceuticals."

6          Let me pause there.  There is no Mallinckrodt

7  Pharmaceuticals.  You can look at that list there is no

8  entity called Mallinckrodt Pharmaceuticals.  Every single

9  witness we deposed curiously said they work for Mallinckrodt

10 Pharmaceuticals.

11         He is then asked,

12         "What is the PLC?"

13         Answer,

14         "I believe that is the holding company."

15         Question,

16         "Who pays your salary?"

17         Answer,

18         "I don't know."

19         Then he goes onto say, when they were asked about

20 the PLC again, the entity we sued, "You think of it as all

21 one company, counsel," and I'm on Page 18 at Line 5, "Well, I

22 think about it as Mallinckrodt Pharmaceutical and then the

23 way I think about it there's subsidiaries attached to it."

24 That is the highest ranking officer in this company

25 testifying under oath that he thinks about it as one company.

1          What you are getting today, though is lawyers.

2   Latham & Watkins, Wachtell who were part of the original

3   merger agreement, they both represented those entities,

4   they're arguing to you now that it's different.  They're not

5   letting the executives come forward, Judge, and testifying

6   under oath what I just read to you.  Then he is asked,

7          "What do you do?"

8          Answer,

9          "The operational piece is run by myself and an

10  operating committee."

11         That is on Page 19.  That is the record.  In his

12  CV, and I pointed this out, its Exhibit 172 he says its "One

13  commercial organization."  There is a franchise.  The ARD

14  franchise.  Then he talks about in communication with

15  outsiders including investors and key stakeholders the ARD

16  "division."  He doesn't say Inc., LLC, he doesn't say it has

17  to go all the way up this hierarchy to get to MEH, to get to

18  the PLC.  He says I am the highest ranking officer, it's a

19  division.

20         By the way, separate witnesses would depose Mr.

21  Kilper who is in finance.  Mr. Welsh may know him.  His

22  deposition is now in the record at 173.  He says, again,

23         "Who do you work for?"

24         Answer,

25         "I work for Mallinckrodt."

```
 1              Question,

 2              "Which Mallinckrodt entity is your employer?"

 3              Answer,

 4              "I don't know.  I work for Mallinckrodt."

 5              Question,

 6              "Who pays your check?"

 7              Answer,

 8              "I don't know."

 9              Question,

10              "Where does the money come from?"

11              Answer,

12              "I don't know."

13              Then he talks about,

14              "What position do other executives, Mr. Harbaugh,

15   have?"

16              Answer,

17              "You're talking about legal entities.  I don't

18   know."

19              Question,

20              "From an operational standpoint do you make

21   distinctions between the legal entities in Mallinckrodt?"

22              Answer,

23              "From an operational perspective I do not."

24              That is Page 12 of Exhibit 173.  His CV says the

25   same thing at 174.  Mallinckrodt Pharmaceuticals.  This is
```

1  the evidence, Judge.  You're now being shown this chart --

2  and I understand corporate law, we all get that in law

3  school, but these debtors are trying to hide assets and

4  liabilities, and shield an insolvent corporation.  Judge, if

5  you read those projects that I read Easter [phonetic] and

6  Gemini we only found out that ARD was insolvent as of the

7  fall of 2018 from Mr. Welsh, insolvent.  It had no ability to

8  write anything.  Every single function got moved out; HR,

9  legal, finance, manufacturing, IP, research and development,

10  distribution, pricing, marketing, sales.

11        I want to turn to that right now and then I will

12  conclude.  All those functions no longer reside in ARD, none

13  of them.  We litigated the issue of the contract, the

14  exclusive distribution contract which is in the record.  Your

15  Honor has seen it a couple times, Exhibit 170; it's the 2007

16  agreement signed by then Questcor.  It was only amended 12

17  times and the last time was 2017, Exhibit 169.

18        I asked Mr. Welsh I that agreement is still

19  operative and he said yes.  Here is the problem, we didn't

20  get these documents.  There's a warehousing agreement signed

21  June 10th, 2020. It's produced in this case two months ago at

22  MK ACTH 1762.  It's in your record, Your Honor, as Exhibit

23  53.  We didn't get the transmittal from Wachtell, Exhibit 51

24  which was signed off by the MPIL organization.  There it's

25  signed by Mr. Pio [phonetic], that's Exhibit 51.

1          We didn't get the bill of sale which transferred

2  $561 million from ARD -- by the way, don't take my word from

3  it, the ARD SOFA in the record at 969, Docket 969, at 4.2

4  MPIL received $561,654,617 as an intercompany commercial

5  chain transfer.  That is why it matters.  June that happened.

6  The bill of sale produced, which is Exhibit 52, references a

7  third amended and restated distribution agreement from

8  September 2019 between MPIL and ARD.  It's a distribution

9  agreement.

10          I can't tell you how many times we asked for

11  distribution agreements because the lead document from '07 is

12  a distribution agreement, never produced.  ARD document

13  signed with MPIL never produced.  No excuse.  There is an

14  assumption agreement MPIL where the operations were turned

15  over to SD Operations, a new entity.  Judge, you don't have

16  any record in front of you, but if you look at our LEHB

17  complaint, and I put that in the record, that is the one we

18  filed for post-petition conduct, we detailed all these

19  entities and when they were formed.  And most of the ones

20  we're going after were formed after Rockford sued.

21          So Exhibit 55 is the assumption agreement, never

22  produced.  Exhibit 56 is the transmittal, never produced.

23  Exhibit 54 a distribution agreement, never produced.  As to

24  the (indiscernible) operation manager is 59, never produced.

25  Exhibit 58 SD Operations transmittal, never produced.  A

128

1  services agreement at Exhibit 82 -- by the way, these are all

2  in June of 2020, all signed in June of 2020.

3        Now we're to July, July 8th now all of a sudden we

4  see Petna Holdings [phonetic] signs an agreement with ARD,

5  this is Exhibit 2, and it seems to me, Judge, all the

6  functions get transferred out.  ARD says it doesn't possess

7  the knowhow to do the things it's been doing since Questcor

8  did them in '07 and now all of a sudden they're getting

9  transferred by an entity that was formed in February called

10 Petna Holdings, Exhibit 2.

11       Exhibit 94, those functions are now transferred to

12 a company called SDE Services, never existed before 2020.

13 September 8th, 2020 that happened.  September 8th, but we're

14 supposed to know that and sue SP Shared Services because of a

15 contract that was signed on September 8th.

16       I am going to just point out, Judge, that there

17 are a litany of documents that go to the issue of

18 Mallinckrodt LLC and the reason why I keep to this is if you

19 look down to what the debtors described as the brand side

20 business which goes from NIFSA, you've got CV, and then you

21 come down and you see NEH, a Nevada Corporation, which

22 historically was the entity that controlled all the US brand

23 business.  It goes to the left, to the Mallinckrodt ARD

24 Holding Company and then it goes to the right, to the

25 generics.  I'm sure Your Honor has seen the chart a number of

1    times.

2            THE COURT:  Hold on one second, Mr. Haviland.

3    I've got a technical issue here.

4            MR. HAVILAND:  No worries.

5        (Pause)

6            THE COURT:  All right.  I've lost my courtroom

7    camera, so I'm going to switch -- oh, now it's back.  Never

8    mind.  Go ahead, Mr. Hughes -- or, excuse me, Mr. Haviland.

9            MR. HAVILAND:  I see Your Honor.  I'm going to

10   finish up here.  I'm trying to point out to the Court as

11   quickly as possible how the functions are moved.  We walked

12   through distribution; we talked about the collaboration

13   agreement which deals with pricing.

14           I do want to touch upon R&D because, Your Honor,

15   when you rule denying our motion to compel, but granting

16   limited leave, you said follow the money -- and I'm going to

17   paraphrase -- but follow the function as well.  Research and

18   development, an important part of this, had been transferred

19   in 2014, shortly after the merger.  That document is revealed

20   by AHG No. 100, a document signed by MPIL and Mallinckrodt

21   ARD, Inc., the defendant in our case.

22           And I can't say it enough, Judge, if Arnold &

23   Porter were litigating with us right here, they'd say, yes,

24   we asked for it five different ways.  It's not over-broad to

25   ask for the research and development services agreement, it

1  was only produced two months ago.  That's how we know that
2  R&D got transferred.
3          Now, I did say I wanted to touch upon Mallinckrodt
4  LLC because there are a few entities when you look at those
5  projects that moved over from the brand side to the generic
6  side -- and they may be generic-oriented today, but they
7  weren't -- Mallinckrodt LLC is the one that stands out,
8  Judge, because repeatedly they signed contracts, beginning
9  with a document in 2015.  That exclusive wholesale product
10 purchase agreement that we've described was modified by Todd
11 Killian, the vice president of market access for Mallinckrodt
12 LLC, using the same address on McConnell Boulevard up in St.
13 Louis.  That's at Bates number 109.
14          Exhibit 34 is a rebate agreement signed by LLC;
15 Exhibit 35 is a distribution agreement with Caremark signed
16 by LLC; an inflation agreement signed with Express Scripts at
17 Exhibit 8, signed with LLC; Caremark again, Exhibit 36.
18          The rebate agreements, I think they say in their
19 papers that these are just isolated PBM agreements, they're
20 not.  The distribution, the sales, and the financing in terms
21 of inflation and rebates are signed by Mallinckrodt LLC.
22          And by the way, Judge, the one I'm pausing on,
23 number 49, here's what the read says at the beginning, the
24 third amendment to the rebate agreement with Caremark,
25 "Mallinckrodt LLC, the manufacturer."

1          Now, these are legal documents.  You've got -- you

2     want to respect the entity, I do.  So if the LLC says,

3     Mallinckrodt LLC on the generic side says we are the

4     manufacturer of Acthar -- and, by the way, this is signed by

5     Hugh O'Neill, SVP President, U.S. Specialty Services -- I

6     take him at his word that they're the manufacturer.

7          Price increases, that's another important

8     function.  That function got moved and the discussion begins

9     at Exhibit 20.  And then there are a series of price

10    announcements, which we point to under the exclusive

11    agreement, where they announce the prices in concert with

12    Express Scripts.  And these documents were all signed by

13    Mallinckrodt LLC, not ARD; 44, the December 2014 price

14    announcement; 73, the June 2015 price announcement.

15         And by the way, I'm glossing over, but each time

16    Acthar is going up thousands of dollars.  In 2015, it went

17    from 32,000 to 34,000.  On Exhibit 68, 2016 price increase,

18    it goes from 34 to 36,000.  Exhibit 39, it goes from 34 to

19    37,000.  All signed by Bill Hilmer, Senior Director,

20    Strategic Pricing and Contracts, Mallinckrodt LLC, not ARD.

21    And he was deposed and asked these questions.

22         I'm going to finish with a couple of other points.

23    The legal, which is a function.  We've shown you, Judge, in

24    the prior issues with Arnold & Porter, there was one

25    engagement.  And there was an issue about whether or not

1    Arnold & Porter represented all the different entities and I

2    think the ruling was, well, they can represent the

3    affiliates, but where a single entity engages one lawyer in

4    one engagement, well, that denotes the fact that it's one

5    single enterprise because they're going to do a conflicts

6    check.  If they're different enterprises and Arnold & Porter

7    represents one and some other company represents another,

8    there may be adversity there.  But those exhibits, 164, 165,

9    and 166 we'll maintain under seal, but that points out to us

10   that the company is acting as a single entity.

11          Finance, Mr. McCallen touched upon that, but the

12   cash management system was done through one function through

13   these holdcos.  We put in the record Exhibit 7 and then,

14   importantly, the agreements, the master cash agreements at

15   Exhibit 5 from August of 2020, and Exhibit 6, it's September

16   2021.  The signatories of all the different entities we're

17   talking about and their right to get cash, one person, Brian

18   Riesen signs for all those entities to give them the right.

19          My point being there's only a couple of people

20   that are running this entire company.  The Mallinckrodt

21   Pharmaceuticals brand, undifferentiated, shows up in their

22   balance sheet, Exhibit 21 and 22.  Their actual balance

23   sheets, if you look at all the money coming into the

24   organization and denotes it as Mallinckrodt Pharmaceuticals,

25   it doesn't put it in these different buckets, these cash

1  pools, it looks at it as an enterprise, money coming into one

2  organization, and then the organization reallocates those

3  monies.

4           Finally, Your Honor, we put into the record to

5  give you direction in terms of where we would go with an

6  amended pleading.  Well, we've already done it.  We filed a

7  complaint on behalf of the Law Enforcement Health Benefits

8  Fund, it's at Exhibit 168, that lays out these entities and

9  who they are and what they do.  So the debtor has known about

10 that since May 26th, 2021.  We sought leave to amend May 21,

11 but that pleading was filed, it's now in the record before

12 you.

13          And I'm going to finish with that, Judge.  And I

14 want to loop in the committee because they filed a pleading

15 last night, it's at Docket 3316.  And we have worked by and

16 through the committee, who is the committee for the general

17 unsecured creditors, including our group, especially our

18 group, our client sits as the chair.  And as counsel now

19 knows -- we haven't had contact with her until this last week

20 -- because she has a fiduciary obligation to all creditors,

21 but the committee came out and took a position and I think

22 it's important, they said, "Since the commencement of the

23 cases" -- I'm at paragraph 1 -- "the UCC has worked

24 diligently to understand the enterprise threatening

25 litigation and how this enterprise works."

1          And the UCC's own independent analysis, quote,

2    "They cannot make sense of the debtors' assertion that the

3    private claimant, Acthar claimants' claim for liability

4    exclusively sits in ARD because the debtor entities were

5    involved in the debtors' Acthar operations."

6          This is their discovery.  They got this discovery

7    with their professionals.  That's their conclusion at

8    paragraph 3.  And they're coming out and saying they can't

9    take a position at this point because they're not done their

10   work, but you're being asked to say shut the door on any

11   amendment.  And I respectfully submit, Judge, there's only so

12   many different ways you can ask, but if it's going to require

13   a motion, we'll file it, we'll file it tonight.  But to have

14   the debtors argue that you should not allow an amendment in

15   the face of all this evidence -- and I mean all this evidence

16   -- what was not produced in the underlying litigation, what

17   was dumped upon us in the last 60 days, and we said, if

18   you're going to look to that, Judge, and rely upon that,

19   then, please, give us leave to amend.

20          And maybe it was inartful to say we'll file a

21   motion -- or we want leave to file a motion, I'm amending

22   that now to say, Judge, we want to file a motion, because

23   Your Honor should not have to rule in a vacuum simply upon

24   proofs of claim that were filed February 16 which have this

25   bona fides to them.  This company is committing antitrust

1  violations, RICO violations, consumer fraud, and it doesn't
2  seem like we're ever going to get that point.  I'm not asking
3  you to litigate the underlying question, but you can't ignore
4  the fact that we have viable claims against the PLC and ARD,
5  and they want to shut the door as to everybody else by their
6  creation through some tax vehicle.

7          So we ask for leave to amend, Judge.  Thank you.

8          But I want to admit these exhibits, Exhibits 1
9  through 174, and the Debtors' Exhibits that I've referenced,
10 because this is the hearing.  I believe Mr. Murtagh said at
11 the beginning, now is the time.  That's my proffer and I ask
12 the Court to admit them.

13         THE COURT:  All right.  You've made your proffer,
14 but I'm not going to admit them into evidence at this time.

15         Mr. Harris?

16         MR. HARRIS:  Thank you, Your Honor.

17         We are not here to discuss whether there are valid
18 claims against ARD or PLC.  We do not object to them for
19 today's purposes.  We're here to determine whether these
20 proofs of claims against the non-defendant debtors are
21 sufficiently alleged.  All these claimants chose not to
22 amend, that was their call.  Collectively, what you heard is
23 one single attempt to defend the existing proofs of claim,
24 that is attestor saying that this is just a notice pleading
25 standard.  That's not an answer.

136

1        The standard under <u>Allegheny</u> is, quote, "The
2   claimants must allege facts sufficient to support the claim."
3   There's no dispute they allege no facts as to any non-
4   defendant debtor.
5        And as to notice pleading, the proofs of claim do
6   put the debtors on notice of alleged conduct of ARD and PLC,
7   but there's no notice of alleged conduct by any non-defendant
8   debtor, there's no notice of what facts supposedly make these
9   debtors liable.  So there is -- you've heard no real defense
10  of these proofs of claim.  All this discussion is really
11  about is the plea about whether the disallowance of these
12  proofs of claim should be with prejudice or not.
13       So what did you hear to support essentially the
14  request to allow them to amend that is extremely late?  Well,
15  attestor said a bunch of things about what they believe some
16  of the non-defendant debtors did.  And I guess they did that
17  to preview what their amended proofs of claim would say in
18  order to encourage allowance of this late amendment.  But if
19  you listen to what they said, everything they said is clearly
20  insufficient.  None of the activities they mention that they
21  say these other entities did are the alleged wrongful acts
22  here.  None of them are what they claim to be the tortious
23  wrongful acts.
24       They said some debtors were involved in
25  manufacturing Acthar.  Well, there's nothing wrong with

1    manufacturing Acthar.  The second category, some defendants

2    are engaged in R&D of Acthar.  There's nothing alleged to be

3    wrongful about R&D of Acthar.  They said some are engaged in

4    distribution, but what you didn't hear is that any of these

5    entities are engaged in the only supposedly wrongful part of

6    the distribution, which is the exclusive CuraScript

7    distribution contract.  If you look at the proof of claims

8    and you look at what you heard today, that contract is only

9    with ARD.

10             So what did you really hear is that other entities

11   benefited from the proceeds of Acthar.  That is insufficient

12   as a matter of law for all of these claims.  I noted the

13   cases holding that as black letter law under antitrust law,

14   RICO, unjust enrichment.  You heard nothing in response, not

15   one case other than a discussion of Copperweld.  But what

16   Copperweld just says is that affiliates share a state of

17   mind, but you still have to allege that each affiliate

18   engaged in antitrust conduct, and that's what all the cases I

19   went through in my opening support.  There are no cases that

20   support this theory that just because revenue goes to an

21   affiliate that affiliate is directly liable for antitrust,

22   RICO, or unjust enrichment, you heard no case in response.

23             When are they going to come forward with a case

24   that supports these theories?  Well, today was the day.  They

25   filed -- they each filed two different briefs in response to

138

1   this -- to our objection.  There is not one case they cite to

2   support that the mere receipt of revenue by an affiliate is

3   enough for direct liability under any of their theories.

4          We have had enough delay, it is time to let these

5   issues be decided.

6          In terms of what you also heard is that there's

7   overlapping employees or that some employees view

8   Mallinckrodt as operating as one entity or as one business.

9   That's not an argument for direct liability.  I'm sure you

10  will hear that in the context of substantive consolidation or

11  veil piercing, but there's not one case that you heard that

12  supports that those facts would create direct liability under

13  any of these theories.

14         You heard Mr. Haviland mention that there have

15  been prepetition motions to dismiss, some granted, some

16  denied, but of course none of those were claims against the

17  non-defendant debtors.  No court has ever said that the

18  allegations in those complaints are sufficient to support a

19  claim against the non-defendant debtors.

20         You heard him mention consumer fraud claims.  That

21  wasn't mentioned in any of the briefs he filed and in fact he

22  admitted in response to his interrogatories -- or the City of

23  Rockford did that the City of Rockford had no contact with

24  any non-defendant debtors.  It's hard to see how that would

25  substantiate a fraud claim against those entities if they

A-6912

1  never even communicated.

2          You also heard the ad hoc group a mid-level

3  employee, Mr. Bill Hilmer, as supposedly perjuring himself.

4  That is outrageous and there's no basis and it's

5  inappropriate to do live in a courtroom like that.

6          The other thing you heard was talk about shifting

7  of corporate assets.  Well, that is a fraudulent conveyance

8  claim and, if it's supported and they want to argue it, or if

9  they want to argue for veil piercing in response to

10 confirmation, you will hear it then, but it is not a direct

11 claim they can bring.

12         What is really going on?  Well, you heard the

13 truth.  They want to go against entities other than the ones

14 that they actually substantiated a claim against because the

15 entities that they did put details about those things against

16 they believe are now valuable and they're worried about value

17 having shifted out of those entities.  That is fraudulent

18 conveyance.

19         So they've had materials before the bar date that

20 would have allowed them to state facts about these entities.

21 They have the 10-Ks that list every subsidiary in Schedule

22 21, just like every 10-K does.  Our organization chart was

23 part of the first day filing.  The IP restructuring memo we

24 filed in November 2020 said who owns the Acthar IP, what

25 entities it was licensed to, and who paid and received

1  royalties.  Why was not in that in the proofs of claim they

2  filed months later?

3          You heard both sets of claimants run through all

4  the evidence that they now have, but they've had that for

5  months.  Why didn't they amend their proofs of claim?  There

6  is no excuse provided by either of them why they did not

7  amend before this hearing.  No one has explained why they

8  didn't pursue Rule 2004 discovery before the bar date, no one

9  has explained why they didn't incorporate what they knew

10  about these other entities before the bar date, and no one

11  has explained why they didn't amend the proofs of claim after

12  the bar date and before this hearing.  They have known from

13  day one that they have to substantiate their claims against

14  each debtor.  They could have amended and it is extremely

15  prejudicial to the debtors and to this restructuring for this

16  late amendment to happen now.  They would have to file a

17  motion to amend, we would have to hear it; we would then have

18  to redo this hearing with their newly amended proofs of

19  claim.  If those in fact were to survive, we would then need

20  to have an estimation process perhaps and a hearing on that.

21  All of that pushing back and prejudicing the estate, the

22  other creditors, and this Court.

23          It is too late, it is too prejudicial.  They

24  should have acted in the way in which the rules require, they

25  should have supported their proofs of claim when filed or

1  they should have amended them when they had the information

2  to do so.

3          With that, I'll pause.

4          THE COURT:  Thank you, Mr. Harris.

5          All right, I'm going to take a recess so I can

6  consider the issues.  We'll recess until 3 o'clock.  I'll

7  come back on and I'll give you my ruling at that time.

8      (Recess taken at 1:55 p.m.)

9      (Proceedings resumed at 3:03 p.m.)

10         THE COURT:  All right, this is Judge Dorsey.  We

11  are back on the record.  I'm going to give you my ruling on

12  the motion to dismiss the unsubstantiated claims.

13         Retired Judge Gross once wrote that "the bar date

14  is important to the administration of a bankruptcy case as it

15  brings certainty to the debtor's case by enabling the debtor

16  and its creditors to know the amount of claims that exist.

17  It is akin to a statute of limitations and must be followed."

18  That's In re Nortel Networks, Inc., 573 B.R. 522 (Bankr. D.

19  Del. 2017).

20         It's plain to me based upon a review of the proofs

21  of claim at issue and the objections, as well as the parties'

22  pleadings and the arguments presented today, that those

23  claims were filed with a complete disregard for whether or

24  not any claims actually existed against those debtor entities

25  and in some instances with actual knowledge that either no

1  claim existed or likely existed at all.  The strategy was

2  obviously:  file proofs of claim against as many debtors as

3  possible in a corporate structure, assert that the proofs of

4  claim constitute prima facie evidence of the validity of the

5  claims, force the debtors to object due to the destruction

6  caused to the debtors' plan of reorganization process,

7  thereby gaining leverage against the debtors, then seek

8  discovery on the claims in the hope of finding facts to

9  support them.  Those actions constitute bad faith and an

10 abuse of the claims process established by the bankruptcy

11 code and the bankruptcy rules.  Therefore, I will sustain the

12 objections to the claims and they will all be dismissed.

13        The proper procedure here, as I stated at the

14 beginning of this hearing, would have been to seek Rule 2004

15 discovery, seeking information on whether or not potential

16 claims existed against any of the debtors other than

17 Mallinckrodt PLC or Mallinckrodt ARD, claims against which

18 the debtors are not objecting, prior to the filing of the

19 proofs of claim.  For whatever reason, neither of the Acthar

20 groups chose that path.

21        The bar date order was entered on November 30,

22 2020, setting a bar date of February 16th, 2021, giving the

23 Acthar claimants 78 days to investigate whether or not they

24 had claims against any other debtor entities.  The only

25 parties that sought 2004 discovery were the UCC and the OCC.

1  The insurance claimants didn't join the UCC discovery until

2  March 16th, 2021, a month after the bar date.  The Acthar

3  group didn't join until March 3rd of 2021, again, after the

4  bar date, but later withdrew that joinder for reasons that

5  are perplexing to me.

6           The proofs of claim as filed failed to assert

7  facts sufficient to support claims against the debtors.

8  Therefore, those proofs of claim do not meet the sufficiency

9  requirements under the Third Circuit's decision in Allegheny

10  International 954 F.2d 167, 173, a 1992 decision.

11           The proofs of claim only assert claims against PLC

12  and ARD, with in some cases vague references to alleged

13  unknown co-conspirators and in other instances where they

14  outright admit that the proof of claim is being filed, quote,

15  "out of an abundance of caution," close quote, just in case

16  they do have claims that can be substantiated through

17  discovery.  Those types of allegations are not sufficient to

18  put the debtor, the Court, or the parties in interest on

19  notice of a claim.

20           I will note that, despite the failure to seek 2004

21  discovery prior to filing the claims, the debtors did engage

22  with discovery with the claimants after the objection had

23  been filed, and I made rulings on that discovery indicating

24  what was permissible and what was not permissible.

25  Interestingly enough, that was in connection with a motion

1  brought by the debtors for a protective order, not a motion

2  to compel brought by the parties -- the claimants.  Neither

3  group sought a motion to compel discovery, believing that

4  they had -- that the information that they were seeking was

5  being withheld.  They waited until the Acthar -- the ad hoc

6  group waited until just days before this hearing to seek a

7  motion to compel, which was too late.  Instead, the Acthar

8  plaintiffs simply rested on their proofs of claim as filed

9  and attempted to argue new facts in their responses to the

10  objection.

11       Those responses do not qualify as motions to amend

12  and I do not find that any of the facts alleged in the

13  responses somehow modify the proofs of claim as filed.  If

14  the claimants believed that they had uncovered facts that

15  would allow them to amend, they should have filed the

16  appropriate motion and I could have evaluated those motions

17  under the appropriate standards for amending a proof of

18  claim.

19       Now, the ad hoc group claims that they requested

20  leave to amend in their motion to dismiss, but, as I noted

21  previously, all they asked for was leave to file a motion for

22  leave to amend, not asking to amend the actual complaints --

23  or, excuse me, proofs of claim, and that would require me to

24  engage in a factual finding that simply was not before the

25  Court at this time.

1          So even if I granted a motion to leave at this

2    time, because I find that the proofs of claim as filed fail

3    to state any claim whatsoever against the debtor entities,

4    motion to leave would actually be akin to a motion to file a

5    late claim.  And as noted in the Enron decision of the

6    Southern District of New York, "the decision to grant or deny

7    an amendment to a timely-filed proof of claim rests with the

8    sound discretion of the bankruptcy judge."  That is In re

9    Enron Corp., 328 B.R. 75 at 86, a 2005 decision.

10          The court went on to say it's important to make

11   sure that the amendment is not in actuality a new claim and,

12   given that no claims were asserted against the debtors in the

13   proofs of claim that I am dismissing, any amendment at this

14   point would in fact be a new claim against those debtors.

15   Because it is a new claim, it would require use of the

16   excusable neglect standard in Pioneer.  And, as Judge Gross

17   noted in the Nortel decision, "Courts take a hard line when

18   applying Pioneer," and particularly in emphasizing the reason

19   for the delay.

20          I'll also make a note here on the Rule 15 relation

21   back because that was raised by the ad hoc group.  Relation

22   back only applies under Rule 15 not -- does not apply, I

23   should say, to adding a party, but only to amendments to the

24   party against whom the claim is asserted.  Well, again,

25   there's no claims asserted here, so Rule 15 would be

1    inapplicable.

2              So what's the standard under Pioneer for allowing

3    a late-filed claim?  You have to show excusable neglect.  And

4    the factors are you have to show danger or prejudice to the

5    estate; length of delay and impact upon judicial proceedings;

6    the reasons for the delay, including whether it was within

7    the reasonable control of the movant who acted in good faith;

8    and all of those factors have to be balanced.  And it's Hefta

9    v. Official Committee of Unsecured Creditors, In re American

10   Classic Voyages Company, 405 F.3d 127 at 133 (3d. Cir. 2005).

11             In this case, I find that allowing the filing of

12   the late-filed claims would not comply with the Pioneer

13   standard.  It would require an estimation hearing to

14   determine the validity of those claims, extensive discovery

15   on the merits of those claims that would take months and

16   would be followed by a days-long, if not months-long,

17   evidentiary hearing before the debtors could move forward

18   with their confirmation.  That clearly has an adverse impact

19   on these cases, particularly in light of the fact that I

20   believe the debtors have indicated to me in the past the cost

21   of this bankruptcy is about $20 million a month.

22             It's been nine months since these cases were

23   filed, eight months since the bar date notice went out,

24   almost six months since the bar date passed, with no attempt

25   to seek to amend the proofs of claim.  Allowing late-filed

1    claims now would have a significant impact on these cases.

2                The reasons for delay also do not favor allowing

3    the late-filed claims.  The movants never asked for 2004

4    discovery before the bar date, they never moved to compel

5    discovery they claimed was not forthcoming.  And, curiously,

6    Mr. Haviland went through a litany of documents that he

7    wanted to introduce into evidence that he indicated were

8    produced two months ago.  And yet, again, no motion to amend

9    was filed.

10               So it's clear to me that these proofs of claim do

11   not meet the standard for allowing an amendment, so I will

12   dismiss them with prejudice at this point.

13               All right?  With that, Mr. Merchant, do we have

14   anything else on the agenda for today?

15               MR. MERCHANT:  Thank you, Your Honor.  I believe

16   two other things.  First of all, I think the debtors and some

17   of the other parties had filed motions to leave in -- I mean

18   motions to seal in connection with the various pleadings

19   related to the unsubstantiated claim objection.  I don't

20   believe there's been any objection to any of those motions,

21   though, consistent with the local rules, the objection

22   deadlines were set for this hearing.

23               So, unless Your Honor has any concerns, you know,

24   I would propose having the parties just upload orders with

25   respect to each of those procedural motions.

1          THE COURT:  I don't have any questions or

2    concerns.  Does anyone else wish to be heard on that issue?

3        (No verbal response)

4          THE COURT:  Okay.

5          MR. MCCALLEN:  Your Honor, and --

6          THE COURT:  Oh, go ahead, Mr. McCallen.

7          MR. MCCALLEN:  I'm sorry, Your Honor.  I think

8    it's actually the issue we just covered a minute ago.  I

9    understand Your Honor's order, but just for purposes of the

10   record, can we consider that Your Honor has read the decision

11   on the record and that's so order and there won't be a final

12   written order of any sort, and we can proceed from there from

13   today's record?

14         THE COURT:  Is there any objection to just having

15   it so ordered on the record or do you want to have a written

16   order submitted under seal?  I'll open it up, if anybody has

17   a preference.

18       (No verbal response)

19         THE COURT:  All right, nobody has a preference.

20   All right, so I will just so order the record.

21         MR. MCCALLEN:  Thank you, Your Honor.

22         MR. MERCHANT:  Thank you, Your Honor.  So, getting

23   back to the motions to seal, may we proceed in the manner in

24   which I proposed?

25         THE COURT:  Yes, nobody has an objection.  I don't

1  have any problem with them, so I will -- if you want to

2  upload those orders, we'll get them entered.

3          MR. MERCHANT:  Thank you, Your Honor.

4          The one remaining matter that was on the agenda

5  for today was the debtors' preliminary objection to Humana's

6  motion for substantive consolidation of these cases.  I know

7  that there was an agreement that that would go forward today

8  and Keith Simon from Latham & Watkins will be addressing that

9  on behalf of the debtors.

10         THE COURT:  All right.  Mr. Simon?

11         MR. SIMON:  Good afternoon, Your Honor.  It's

12  Keith Simon of Latham & Watkins for the company.  Can you

13  hear me okay?

14         THE COURT:  I can.  Thank you.

15         MR. SIMON:  Great.  So, Your Honor, before we get

16  into the details of Humana's request for an August 24th

17  stand-alone sub-con hearing, I'd like to explain at a high

18  level how I see this playing out.

19         First, I'm pleased to report that we've resolved

20  our issues with the OCC.  They agree with us that there's no

21  need for a separate stand-alone sub-con hearing, and I

22  believe someone from Akin Gump will be reading some

23  statements on the record to confirm our understanding.  They

24  previewed that with us and we're on board with the concepts

25  that they're going to lay out.

1           So, Your Honor, as everyone knows, our Chapter 11

2    plan does not contemplate substantive consolidation; rather,

3    it respects the prepetition boxes and allocates value based

4    on the assets and liabilities of those separate boxes.  So we

5    have teed up the issue.  As part of our case in chief during

6    the confirmation, we will show why respecting those boxes is

7    appropriate under Section 1129 of the code.  And if we can

8    show that the boxes can and should be respected, then by

9    definition we defeat and moot on the merits that the boxes

10   should not be respected for whatever reason.  Consolidated,

11   merged, ignored, overlooked, pierced, it doesn't matter what

12   the basis is, they're either respected or not, because those

13   are mutually-exclusive positions.

14           And so our resolution with the committee, which

15   they'll read on the record, is that for a confirmation

16   objection, for them or anyone really to be able to argue the

17   boxes shouldn't be respected, for whatever reason, A, B, and

18   C, you don't need standing for a confirmation objection, you

19   don't need standing -- or to file an adversary proceeding to

20   make those arguments.  But, again, they're just confirmation

21   objections, they're not stand-alone causes of action, they're

22   not stand-alone proceedings.

23           The committee was concerned that they would have

24   to jump through a bunch of hoops just to say the magic words

25   "alter ego," they don't.  They can raise that as confirmation

1   objections, but that's all they are.

2            So, to be clear, people can file whatever

3   confirmation objections they believe are appropriate and we

4   will respond to those on the merits when it comes to

5   respecting the boxes.

6            So, Your Honor, I did just want to raise a couple

7   of issues that Humana asserted about the need for an August

8   25th sub-con-only hearing.  First, in paragraph 11 of their

9   reply, they say sub-con will have a substantial impact on

10  plan negotiation and confirmation issues, so those should be

11  heard first.  Well, Your Honor, you could say that about any

12  number of confirmation issues.  Best interest tests,

13  feasibility, unfair discrimination, a channeling injunction,

14  releases, all of those have a substantial impact on the

15  process, that's why they're heard together.  And since we're

16  the plan proponents, to be honest, we would like to present

17  our arguments in the way that gives us the greatest chance of

18  success.  We think that is our right, unless Your Honor has

19  different views, that we should present the arguments in the

20  way that we think is most appropriate and it's not up for a

21  creditor to say this should be decided first, unless Your

22  Honor has preferences on the order we present arguments.

23           We of course believe an August hearing is a waste

24  of time because sub-con is inappropriate and we will deal

25  with the merits at the confirmation hearing.

1              The second point they make -- and this is the last

2     point I wanted to respond to -- is they say, you know, what's

3     the harm?  We're all doing all of this discovery, there's no

4     prejudice, so let's just have the hearing in August.  Well,

5     as my litigators will tell you, we're doing all of this

6     discovery, all of the documents, all of the emails, all of

7     the depositions, all of the expert reports for a confirmation

8     hearing scheduled September 21st, not August 25th, and you

9     can't separate sub-con from these other issues because it --

10    sub-con goes to where do assets and liabilities sit.  That is

11    fundamentally going to impact best interests and unfair

12    discrimination at a minimum.  So you can't just say this

13    disclosure statement is only for sub-con, it's relevant to

14    all of these confirmation issues, which is why you can't

15    slice and dice all of the discovery.  We're doing all of this

16    now for a September 21st hearing, not August 25th.

17             So, with that, Your Honor, I believe that covered

18    my points that we will address the boxes as part of our case

19    in chief and people can object on whatever basis they want as

20    confirmation objections.  So, unless Your Honor has anything

21    for me, I'll turn the podium over I think to Akin Gump and go

22    from there.

23             THE COURT:  All right.  Who's speaking for Akin?

24             MR. HURLEY:  Your Honor, Mitch Hurley with Akin

25    Gump on behalf of the OCC.

1          THE COURT:  Okay.  Go ahead, Mr. Hurley.

2          MR. HURLEY:  Thank you.  So, Your Honor, Mr. Simon

3   I think has accurately described the nature of our agreement

4   in broad strokes.  I do want to provide just a bit of context

5   that I hope will eliminate why the OCC filed its statement in

6   the first place and the significance of the agreement that it

7   believes it's reached with the debtors.

8          So, as the Court is aware, the deadline for

9   parties to file objections to the plan is September 3rd.  As

10  Mr. Price outlined for the Court on June 16th, while the

11  OCC's investigation is ongoing, at present the OCC believes

12  that the plan may substantially under-compensate opioid

13  creditors on a number of grounds, and the OCC is considering

14  a number of potential arguments it may raise in connection

15  with objecting to confirmation of the debtors' plan.  That

16  process is not complete and we don't know yet exactly what

17  form the OCC's objection, if any, will take, but certainly

18  the OCC's intention always has been to raise all arguments

19  and objections it may have to the plan at confirmation rather

20  than by some separate motion or in some separate proceeding.

21         Among the potential grounds we're considering is

22  investigating whether doctrines like substantive

23  consolidation, or alter ego or agency or veil piercing, might

24  be applicable in these cases in a way that would render the

25  plan un-confirmable.  We've sought discovery on these points

1  and intend to continue to take discovery on these points.

2  But certainly to the extent that we determine to raise

3  arguments like that, it has always been the OCC's intention,

4  as I said, to raise those kind of points at confirmation and

5  in a manner and at a time that's consistent with the schedule

6  and protocols that have been entered by the Court already.

7  So that would include in the OCC's written plan objection,

8  which currently is due on September 3rd, and that I think

9  brings us to where we are now.

10        As you know, the Acthar insurance claimants moved

11 the Court for an order substantively consolidating the assets

12 and liabilities of certain debtor entities and set a hearing

13 on the motion of August 25th.  The debtors filed their

14 preliminary objection, arguing the motion to consolidate

15 shouldn't be heard on the 25th and, among other things, they

16 argued that a creditor can't seek an order to substantively

17 consolidate debtor estates without first obtaining derivative

18 standing to do so and filing an adversary complaint.

19        The debtors' procedural arguments drew the

20 attention of the OCC because, as I just got through

21 explaining, we're considering raising arguments of that kind

22 in objection to the debtors' plan.  If we do invoke sub-con

23 or other doctrines of the kind mentioned in the debtors'

24 papers -- and that's still an if -- the OCC may do it in a

25 way that's very different than proposed by the Acthar

1 ┃ plaintiffs who seek to substantively consolidate only a

2 ┃ subset of the debtor entities.

3 ┃        But for now what the OCC is concerned about is

4 ┃ really only that we're going to be relying on theories of

5 ┃ that kind as bases for objecting to the plan at confirmation

6 ┃ if we determine it's appropriate to so object, even if we

7 ┃ don't first file a motion either in connection with a

8 ┃ contested matter or obtain derivative standing.

9 ┃        We were first reassured by some statements in the

10 ┃ debtors' papers that suggested they agreed.  You know, they

11 ┃ argued that it would be wasteful to go forward on the 25th in

12 ┃ part because it's inevitable that issues like sub-con will be

13 ┃ litigated at objection to confirmation, whether named

14 ┃ substantive consolidation, alter ego, or veil piercing, that

15 ┃ was reassuring.  During a subsequent discovery meet-and-

16 ┃ confer, the debtors took a different position and that's why

17 ┃ we filed our statement is really we just wanted to make sure

18 ┃ that we got clarity, if possible.

19 ┃        Now, the debtors had taken the position in meet-

20 ┃ and-confer conversations that in fact we wouldn't be allowed

21 ┃ to argue sub-con or any of those other doctrines at

22 ┃ confirmation without making a motion first.  As we explained

23 ┃ in our papers, that's not the OCC's view of the law.  We

24 ┃ believe that those kinds of arguments absolutely can be

25 ┃ raised validly as plan objections and that, for example, just

1   to be really clear about what we mean by that, the OCC's view

2   is, if it were to persuade the Court in connection with

3   confirmation that debtor entities are subject to substantive

4   consolidation and that, as a result, the plan does not

5   satisfy aspects of Section 1129 because, for example, in a

6   sub-con scenario, opioid creditors arguably would be entitled

7   to more consideration than contemplated under the plan, the

8   OCC would contend that would be an absolutely appropriate

9   basis for the Court to reject the plan, even though the OCC

10  did not first make a separate motion for substantive

11  consolidation in advance of confirmation.

12         Now, of course, we want to do what the Court

13  thinks we need to do and if the Court were to conclude that a

14  motion or some other kind of procedural step is required for

15  the OCC to raise arguments of that kind, we want to make sure

16  those steps get taken and they get taken on a timely basis.

17  So, again, that's really why we filed our statement.

18         Now, since filing the statement, the debtors

19  reached out to us and, based on conversations that we have

20  had with them, one on July 21st and again yesterday, we

21  understand that the OCC and the debtors are now in agreement

22  on those procedural issues.  And this is our specific

23  understanding of the agreement.  We understand the debtors

24  agree that substantive consolidation and theories like alter

25  ego, veil piercing, and agency can appropriately be raised as

157

1  objections to the plan at confirmation without the need for

2  any separate motion practice or other procedural steps by the

3  OCC as a predicate to asserting those arguments.

4        For its part, provided that they can be raised and

5  adjudicated on the merits as appropriate plan objections at

6  confirmation, the OCC will not seek to have claims or

7  arguments of that kind determined prior to the confirmation

8  hearing in these cases.

9        Now, to be crystal clear and to perhaps state the

10  obvious, the debtors are not conceding that substantive

11  consolidation or alter ego or agency or doctrines that, if

12  asserted by the OCC, should be applied in these cases.

13  Presumably, if we raise those kinds of arguments, they're

14  going to say just the opposite that those doctrines do not

15  apply.  But what we do understand the debtors to be agreeing

16  to is that the OCC can appropriately raise those kinds of

17  arguments as appropriate objections to the debtors' proposed

18  plan and, if those kinds of arguments are raised by the OCC

19  in connection with objecting to the plan, they must be

20  resolved on the merits before the plan can be confirmed one

21  way or the other, and that the Court may rely on those kinds

22  of doctrines, if raised and proven, as bases potentially for

23  denying plan confirmation, again, even though the OCC didn't

24  first raise the doctrines by motion.

25        So that's the understanding, our understanding of

1  the agreement.  We are still hoping, Your Honor, to get the

2  Court's guidance because, of course, ultimately, it's going

3  to be up to Your Honor regardless of what the parties agree.

4  I will say, to be clear, if the Court prefers the OCC to

5  proceed in some other way, if the Court would like the OCC to

6  work with the debtors to come up with a written stipulation

7  for presentation to Your Honor to be so ordered, we would be

8  happy to do that.

9         The one thing that the OCC wants to avoid is to

10 find itself in some kind of procedural "gotcha" situation.

11 And so we would be very grateful for any guidance that the

12 Court might be willing to provide, so we can hopefully avoid

13 such a situation.

14        Thank you, Your Honor.

15        THE COURT:  Thank you, Mr. Hurley.

16        Well, I can't say off the top of my head whether

17 or not it's required to file a motion for substantive

18 consolidation rather than just including -- I assume you

19 would include it within your objection to confirmation, which

20 in effect is the motion -- is a motion, you -- or response to

21 a motion, I guess.  So you're objecting to plan confirmation

22 because the debtor should be substantively consolidated and I

23 think that is sufficient.  I don't think you need to file a

24 separate motion at this time, I don't think there's anything

25 in the rules or the law that requires you to file a separate

1  motion for substantive consolidation.  You might need to file

2  one for standing to bring a substantive consolidation motion,

3  but if you are bringing that motion in connection with

4  objection to confirmation, I think that is fine.  But if the

5  parties want to make certain there's no -- nobody tries to

6  raise later on the gotcha, you didn't file a motion, I'm

7  happy to enter whatever stipulation the parties wish to enter

8  into.

9          MR. HURLEY:  Thank you, Your Honor.

10         THE COURT:  Mr. Freimuth?

11         MR. FREIMUTH:  Good afternoon, Your Honor.  This

12  is Matthew Freimuth from Willkie Farr on behalf of attestor

13  and Humana.  Can you hear me okay?

14         THE COURT:  I can.  Thank you.

15         MR. FREIMUTH:  Fundamentally, what we have now

16  after the filing of the preliminary objection by the debtors

17  is I believe a dispute about timing, whether our motion for

18  substantive consolidation should be heard in advance of

19  confirmation, as it's been noticed, or at or in connection

20  with confirmation.

21         Our view, Your Honor, is that we filed the motion

22  seeking substantive consolidation of the debtors' specialty

23  brands business and the Acthar entities on June 18th and

24  noticed it for a hearing more than two months later.  There

25  was nothing improper about the filing of the motion, the

1   cases are clear that creditors have standing to pursue

2   substantive consolidation.  The debtors cite no case finding

3   that a creditor needs to seek derivative standing to bring a

4   sub-con motion.  And the cases are clear that substantive

5   consolidation can be sought by motion and that no adversary

6   proceeding is required.

7           The filing of the motion and the timing for the

8   hearing that we've set provide all parties in interest an

9   opportunity to be heard on our request and, consistent with

10  the dates in the confirmation discovery protocol, we've been

11  pressing for discovery relevant to the sub-con motion, and I

12  want to circle back to that.  There have been some disputes

13  that will likely require the Court's attention, but documents

14  have been produced, depositions have been requested, they're

15  in the process of being scheduled and noticed.  And so the

16  discovery needed and being sought coincides with and complies

17  with the discovery provisions of the confirmation protocol

18  and that fact discovery should be done in advance of August

19  25th when the motion is currently noticed.

20          It's not true, from our perspective, that hearing

21  the motion before confirmation is going to create some sort

22  of significant additional burden, the work is already

23  underway.  We think there's great benefit in getting to the

24  merits of the sub-con issue promptly.

25          Mr. Harris in his remarks earlier today suggested

1  that we were engaging in an effort to slow these proceedings

2  now, we're not.  We want this issue heard and resolved

3  promptly, Your Honor.  He also alluded to the need to bring

4  clarity to the debtors and the various constituencies about

5  certain issues before confirmation, we think this is one.

6          So with that said, Your Honor, we think that it

7  would be perfectly appropriate and efficient for this Court

8  to hear the sub-con motion that we filed in advance of

9  confirmation on the date we noticed of August 25th.

10          I did allude, Your Honor, to one issue with

11  respect to certain discovery disputes.  Whether you'd like me

12  to sort of address that now or later, the mere point I want

13  to make is we do have some disputes with respect to documents

14  that we're seeking in connection with sub-con and, frankly,

15  they cut across other confirmation and estimation issues as

16  well.  I understand the process is to request a conference

17  with Your Honor.  We would with respect to those issues, Your

18  Honor, like to file a short letter early next week, perhaps

19  by close of business Monday, teeing up the issues that exist

20  today.  We've heard the Court loud and clear that, to the

21  extent that there are discovery disputes and issues that need

22  the Court's attention, it's on us to file the motion to

23  compel.  So we would like to proceed on that basis.

24          THE COURT:  All right.  Well, let me hear -- Mr.

25  Simon, what's the debtors' view?

1          MR. SIMON:  Well, Your Honor, I don't have -- I

2    defer to Mr. Harris or my litigators on the discovery

3    disputes, but I kind of do go back to the idea of you can't

4    just say discovery is underway and so we can have a hearing

5    on the 25th because, again, all of the confirmation protocol

6    dates and deadlines were with a September 21st hearing in

7    mind.  And it's no surprise that our plan doesn't have

8    substantive consolidation, it never has.  So the original

9    plan, I believe, was filed in April, and there was various

10   updates to the documents and the order was approving the DS

11   and the plan for solicitation I believe was June 25th,

12   roughly at that time frame.

13          So this issue about not seeking substantive

14   consolidation has always been our position.  I mean, we teed

15   up that issue.  So the idea that we could have a plan on file

16   that's always been no sub-con and then a creditor can say,

17   well, let's decide sub-con early, that's literally what we

18   have scheduled for hearing on the 21st.  So, again, like it's

19   not just enough to say, well, discovery is underway; that's

20   true, but it won't be done.  That's the point is we need this

21   time frame to have these issues decided together because, if

22   anything is relevant to sub-con or not relevant to sub-con,

23   it's going to impact other issues.  Best interests and unfair

24   discrimination come right to mind.

25          So if someone wants to depose a witness about an

1  intercompany agreement, assets moved from A to be, that's

2  going to be relevant for sub-con.  It's also going to be

3  relevant for best interests and unfair discrimination

4  because, if those intercompany agreements are properly

5  documented and formalities are fulfilled, that negates sub-

6  con by definition and now people have the facts about best

7  interests and unfair discrimination, because if they sit at

8  certain boxes where the notes are and not other claims, that

9  is unbelievably relevant to best interests and unfair

10 discrimination.  So everyone is going to have to show up and

11 argue every issue about where assets sit.

12         So it's not just this isolated issue that can be

13 decided on its own on the 25th.

14         THE COURT:  Mr. Freimuth, I was taken by one thing

15 that you said that the discovery you're seeking does overlap

16 other issues that relate to confirmation.  So I guess I'm

17 struggling with what's -- why not wait until we get to

18 confirmation?  We could have -- we could start off the

19 confirmation hearing with the question of whether or not

20 substantive consolidation is appropriate and then I can

21 perhaps make a ruling on that before we go further into the

22 confirmation hearing, which would resolve the issue one way

23 or the other.  Either the plan is not going to get confirmed

24 or I'll overrule it and we go on with the other issues.

25         MR. FREIMUTH:  All I meant to suggest by that

1  comment, Your Honor, is some of the specific categories of

2  documents and data that we're seeking where we have disputes

3  could very well be relevant to issues related to substantive

4  consolidation.  They may come up in the context of estimation

5  of our prepetition claim or they -- you know, they may be

6  relevant to various confirmation issues.  So I was speaking

7  specifically with respect to -- one of the categories, for

8  example, is subsidiary minutes of the various boards of

9  directors.

10       So, to your point, we think that getting clarity

11  on these issues prior to confirmation makes good sense, it's

12  an efficient way to resolve the question up front, so that

13  we're not headed to a confirmation hearing months later with

14  questions about whether or not the Acthar entities or the

15  specialty brands entities should be consolidated or not.

16       And in response to the point about whether

17  discovery is ongoing, the fact of the matter is the fact

18  depositions and the witnesses that are going to be testifying

19  about these issues, we understand from the debtor they're

20  going to be made available for deposition in the first two

21  weeks of August.  So the record ought to be developed and

22  ready to present to Your Honor in advance of confirmation.

23       MR. SIMON:  Your Honor, it's Keith Simon.  Could I

24  say one thing, though, just to put this in context, which is

25  if you scheduled a hearing for the 25th, I'm not sure if that

1  means that the OCC has to say we agree with sub-con right

2  now, like are we going to do this hearing twice?

3          So, again, like I just don't -- I feel like it's

4  going to be an inefficient use of this Court's time because

5  that means that everyone will have to argue it.  Otherwise,

6  if Humana argues it and you agree with us, then does the OCC

7  get bound by that as law of the case because you found that

8  formalities were fulfilled and properly followed, but because

9  Akin Gump didn't raise it they are now bound by that?  It

10 just -- I don't see how it practically works to have a

11 hearing on this issue in advance of confirmation when you

12 could say those exact same arguments about every confirmation

13 requirement.  This plan can't go forward if you think it

14 violates the best interests test --

15          THE COURT:  Well, I --

16          MR. SIMON:  -- that's just one example.

17          THE COURT:  Well, I think that's a good point.  I

18 mean, I can't -- if we go forward on a separate motion on

19 sub-con, anybody who has a sub-con objection is going to have

20 to participate in that.  And because the discovery issues

21 overlap one another, it just doesn't -- it doesn't seem to be

22 efficient -- the efficiencies actually go the other way, I

23 think.  I think it's less efficient to go forward on August

24 25th with a sub-con, a separate sub-con hearing that's going

25 to require everybody's participation just weeks before we get

1   to the confirmation hearing.  It is a confirmation-type

2   issue.

3           So I just think the efficiencies here would be

4   let's do this on the first day of the confirmation hearing.

5   We'll hear the motion for sub-con on day one of the

6   confirmation hearing, and I can rule on that and then we can

7   move into other issues.  And maybe there's other issues that

8   will come up along the way that we need to -- we could do

9   this, you know, rule on them as we go rather than doing a

10  week-long hearing and then have me try to write an 80-page

11  opinion about all these different issues.

12          I'll open it -- I mean, what do people think about

13  that?  Mr. Freimuth, because it's your motion, so --

14          MR. FREIMUTH:  Yeah, Your Honor, that would be

15  acceptable to us to have that motion heard at the first day

16  of confirmation, as you've just described.

17          THE COURT:  All right.  That allows us to get

18  through all the discovery.  There may be overlapping

19  discovery issues, everybody is going to want to participate

20  in those depositions, so I think that makes sense to do it

21  that way.

22          Mr. Simon, does that cause any concerns on your

23  part?

24          MR. SIMON:  Your Honor, obviously, ultimately, if

25  that's what Your Honor prefers, we will of course go with

1    that.  But, again, you know, our initial idea was that our

2    case in chief would moot this issue, but if it's Humana's

3    independent motion, then obviously it's their burden to prove

4    sub-con.  It's their motion and, if they're the proponent,

5    they're going to have to satisfy it by Owens Corning and it's

6    their burden.  So, if they want to have it heard first

7    outside of plan confirmation the day of, it's their burden.

8    I just want to make sure that that's crystal clear.

9              THE COURT:  It is.  It is your burden, Mr.

10   Freimuth, you're going to have to meet the requirements of

11   Corning to show sub-con.

12             MR. FREIMUTH:  We understand, Your Honor.

13             THE COURT:  All right.  Okay.

14             MR. FREIMUTH:  Apologies, Your Honor.  There was

15   the issue that I did raise with respect to some discovery

16   disputes --

17             THE COURT:  Yes.

18             MR. FREIMUTH:  -- that have arisen that, frankly,

19   have ripened up just, I would say, within the last 12 hours

20   or so.  So it's a few categories of documents, one relates to

21   a request that we have outstanding for minutes of subsidiary

22   boards, another relates to some outstanding data requests we

23   have.  My proposal, Your Honor, is that we just set a

24   schedule today where we could file a short letter with the

25   Court indicating what the disputes are and indicating the

168

1  relief we're requesting.  We could be prepared to do that

2  very early in the week next week.

3          THE COURT:  Well, the one problem with very early

4  in the week next is I'm going to be on vacation next week.

5  I'm not going to disappoint my granddaughter.  So I'm not

6  going to do any work while I'm vacation.  So I wouldn't be

7  able to address it until the week after next.

8          Have the parties met and conferred on these issues

9  and you're at an impasse, is that where you are at this

10 point?

11         MR. FREIMUTH:  We have met and conferred, Your

12 Honor, I do believe we're at an impasse with respect to at

13 least the request for subsidiary board minutes.

14         THE COURT:  Well, that sounds like a pretty

15 discrete issue.  Why don't we -- go ahead and file it next

16 week.  I'll try to get to it as soon as possible.  It may not

17 be until I get back on August 2nd, but if the parties -- if

18 you want to file a -- if it's just that one discrete issue,

19 that sounds like it could be done in just a few pages, a few-

20 page letter.

21         MR. FREIMUTH:  Yeah.  And to be clear, Your Honor,

22 the other issue relates to data that we're requesting that we

23 believe supports the liquidation analysis and valuation that

24 underlies the debtor's disclosure statement.  It is also a

25 very discrete issue, so I think we could present both to you

1  within two pages.

2          THE COURT:  Okay.  Then why don't you go ahead and

3  file yours Monday or Tuesday, whenever you are ready.  I'll

4  give the debtors an opportunity to reply by -- you know, I'll

5  give you two days to reply, Mr. Simon or Mr. Harris, whoever

6  is going to reply, and then we'll take it from there.

7          MR. FREIMUTH:  Okay.

8          THE COURT:  And I may just look at them and pass

9  on to my courtroom deputy what my ruling is and he can let

10 you know -- or let you know at least what I'm thinking.

11 Maybe that will help move things along.

12         MR. FREIMUTH:  Okay.  We appreciate that, Your

13 Honor.

14         THE COURT:  All right.  Okay.

15         Mr. Hurley, you raised your hand.

16         MR. HURLEY:  Thank you, Your Honor.  I just wanted

17 to hopefully make something clear in terms of our timing.  So

18 it sounds like what we're contemplating is that the OCC will

19 be able to make whatever arguments it has on sub-con or

20 similar, if any, in its objection, and then also will have an

21 opportunity to be heard on those issues at the outset of the

22 hearing, and I guess alongside attestor or other parties that

23 are making similar arguments.  Do I have that right?

24         THE COURT:  Yes, absolutely.  Yes.

25         MR. HURLEY:  Okay.  And it may make sense, as you

A-6943

1  suggested, Your Honor, for us to try and get that

2  memorialized in a stipulation, and I'll reach out separately

3  to Mr. Simon on that.

4          THE COURT:  Okay.

5          MR. HURLEY:  Thank you.

6          THE COURT:  All right.

7          MR. SIMON:  And, Your Honor, just procedurally,

8  Mr. Hurley reminded me of a very good point.  I mean, the

9  hearing was originally scheduled for August 25th with an

10  objection deadline of August 6th.  So because it's going to

11  be heard at confirmation, when I assumed our response would

12  be part of our confirmation brief, but I wanted to make sure

13  that was what Your Honor was thinking as well.  I just want

14  to know when our objection deadline is -- I know when the

15  hearing is, but I want to know when we have to respond.

16          THE COURT:  Well, if you make it a part of your

17  confirmation brief, then Mr. Freimuth isn't going to get a

18  reply.

19          MR. SIMON:  Okay.

20          THE COURT:  So I think we're going to have to set

21  that as a separate schedule.

22          MR. SIMON:  Okay.

23          THE COURT:  So -- just so that he has the

24  opportunity to file his reply.  But I'll let the parties work

25  that out in terms of timing.

1          MR. SIMON:  We'll talk.  Maybe the idea will be

2     they have their plan objections due on September 3rd, maybe

3     ours is due September 3rd for this, and then they reply at

4     the same time as our confirmation brief, maybe something like

5     that.  But we'll talk and that's fine.

6          THE COURT:  Yeah.  Hopefully, you can get that

7     worked out.  I think that should be able to be resolved.

8          MR. SIMON:  Okay.

9          THE COURT:  All right.  Anything else for today?

10         MR. MERCHANT:  Your Honor, the only other thing I

11    failed -- I neglected to mention that is on the agenda is the

12    attestor and Humana asked that there be a status conference

13    on their estimation motion, and that is the one remaining

14    item on today's hearing agenda.

15         THE COURT:  All right.  Let me hear from attestor.

16         MR. FREIMUTH:  Sure, Your Honor.  You'll recall

17    that when we had our estimation motion heard on the 7th we

18    asked for a status conference to be set for the day on which

19    Your Honor was going to hear argument on the unsubstantiated

20    claims objection.  Just by way of update, since June 7th, on

21    June 21st, the debtors advised us that they would engage with

22    us on discovery on the underlying merits of the claims in

23    anticipation that estimation may be necessary, and so that

24    process has been underway.  Arnold & Porter, who represents

25    the debtors in the underlying Humana case, has appeared,

1    we've engaged in meet-and-confers.

2              Practically, what that has meant is that since

3    June 21st, when the debtors agreed to begin providing us

4    merits discovery, they provided us with 1.8 million

5    documents, some of which has taken weeks to load onto our

6    review platform, but we are moving through that material as

7    quickly as we possibly can.

8              On Tuesday of this week, the debtors advised us

9    that they would anticipate that, to the extent that we have

10   questions of their witnesses related to the merits of either

11   the prepetition claims or the admin claims, that we would be

12   prepared to ask those witnesses questions during the first

13   two weeks of August.  Obviously, with respect to the document

14   flow, we have some serious concerns about that schedule.

15   Obviously, whatever the debtors propose with respect to a

16   schedule we'll consider, but there may well be issues to the

17   extent that depositions get scheduled and documents related

18   to the merits of either the prepetition claim or the admin

19   claim remain outstanding.

20             So we're working through those issues.  There's

21   nothing, I think, ripe to present to Your Honor today, but I

22   just wanted to alert you that that process is ongoing and we

23   are getting quite a volume of documents.  We've gotten

24   commitments from the debtors to produce additional documents

25   with no clear indication yet as to exactly when those are

173

1  coming.  So we just wanted to alert Your Honor that that

2  process is underway.

3          THE COURT:  All right.  Thank you.  That's the

4  problem with discovery is sometimes you get what you ask for.

5  You've got too many documents to review.

6          Mr. Harris?

7          MR. HARRIS:  And, Your Honor, just to follow up

8  and clarify.  Mr. Freimuth is right, we have been going

9  forward with full discovery on the merits of the underlying

10  claims against PLC and ARD to be prepared if we decided that

11  estimation is needed, all that was awaiting a decision on our

12  omnibus objection.  So we will take this time and think about

13  over the weekend whether we believe estimation is needed.

14  You know, likely, I think we may decide it is not, and we can

15  talk again and we're happy to talk again with attestor about

16  our views on that, you know, next week.

17          I just didn't want to leave hanging out there that

18  there was any decision made that in fact now estimation is

19  needed, it may well be the debtors' view that it is not.

20  But, as he said, we have been producing discovery regardless

21  so the parties would be prepared in the event that we do need

22  to estimate.

23          THE COURT:  Thank you, Mr. Harris.

24          All right, anything else for today, Mr. Merchant?

25          MR. MERCHANT:  I believe that's all for today.  I

174

1    thank the Court for its time and have a great vacation, Your

2    Honor.

3              THE COURT:  All right.  Thank you all very much.

4    Have a good weekend, and I know my week will be better than

5    yours.

6         (Laughter)

7              THE COURT:  All right.  We're adjourned.

8              COUNSEL:  Thank you, Your Honor.

9              THE COURT:  Thank you.

10        (Proceedings concluded at 3:52 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        CERTIFICATE


3        We certify that the foregoing is a correct transcript

4   from the electronic sound recording of the proceedings in the

5   above-entitled matter.

6
    /s/Mary Zajaczkowski              June 24, 2021
7   Mary Zajaczkowski, CET**D-531

8
    /s/William J. Garling             June 24, 2021
9   William J. Garling, CE/T 543

10
11  /s/ Tracey J. Williams            June 24, 2021
    Tracey J. Williams, CET-914
12
```