Case No. 21-cv-01093-LPS
_____

**UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**
_____


**In re**

**MALLINCKRODT PLC,** *et al.*

**Debtors.**

---------------------------------------------


**ATTESTOR LIMITED AND HUMANA INC.,**

*Appellants*,

**v.**

**MALLINCKRODT PLC,** *et al.*,

*Appellees*.

_____

**APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**
_____

**APPENDIX VOL. 7 (A-6950- A-7486) TO APPELLANT'S OPENING BRIEF**

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Donna L. Culver (No. 2983)
Robert J. Dehney (No. 3578)
Matthew B. Harvey (No. 5186)
Matthew O. Talmo (No. 6333)
Taylor M. Haga (No. 6549)
1201 N. Market St., 16th Floor
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
dculver@morrisnichols.com
rdehney@morrisnichols.com
mharvey@morrisnichols.com
mtalmo@morrisnichols.com
thaga@morrisnichols.com

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (admitted *pro hac vice*)
Matthew Freimuth (admitted *pro hac vice*)
Benjamin P. McCallen (admitted *pro hac vice*)
Richard Choi (admitted *pro hac vice*)
Philip F. DiSanto (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
mfeldman@willkie.com
mfreimuth@willkie.com
bmccallen@willkie.com
rchoi1@willkie.com
pdisanto@willkie.com

**EIMER STAHL LLP**
Benjamin E. Waldin (admitted *pro hac vice*)
Scott C. Solberg (admitted *pro hac vice*)
James W. Joseph (admitted *pro hac vice*)
Sarah H. Catalano (admitted *pro hac vice*)
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
bwaldin@eimerstahl.com
ssolberg@eimerstahl.com
jjoseph@eimerstahl.com
scatalano@eimerstahl.com

# APPENDIX
# TABLE OF CONTENTS

| Document | Page No. |
|---|---|
| Relevant Filings | |
| Proof of Claim No. 4217 of Humana Inc. (February 15, 2021)[1] | A0001 |
| Proof of Claim No. 4144 of Avon Holdings I LLC as Transferee of United Healthcare Services Inc. (February 15, 2021)[2] | A0075 |
| Proof of Claim No. 5812 of Avon Holdings I LLC as Transferee of OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC (February 16, 2021)[3] | A0100 |
| Motion of Debtors for Interim and Final Orders (A) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (B) Authorizing Continuation of Existing Deposit Practices, (C) Waiving Certain U.S. Trustee Guidelines, (D) Authorizing Continuation of Intercompany Transactions, and (E) Granting Superpriority Status to Postpetition Intercompany Claims, Case No. 20-12522, D.I. 23 (October 12, 2020) | A0119 |

[1] This is an exemplar of the proofs of claim of Humana Inc. subject to this appeal.  The remaining proofs of claim of Humana Inc. subject to this appeal are substantially identical to this proof of claim and have been assigned the following claim numbers: 3344, 3420, 4175, 4201, 4196, 4203, 4366, 5099, 4542, 4556, and 4565.  These claims have been omitted due to their voluminous nature and can be accessed at: https://restructuring.primeclerk.com/mallinckrodt/Home-ClaimInfo.

[2] This is an exemplar of the proofs of claim of Avon Holdings I LLC as Transferee of United HealthCare Services Inc. subject to this appeal.  The remaining proofs of claim of Avon Holdings I LLC as Transferee of United HealthCare Services Inc. subject to this appeal are substantially identical to this proof of claim and have been assigned the following claim numbers: 5171, 5717, 5638, 4335, 4314, 4288, 4211, 4593, 4219, and 4131.  These claims have been omitted due to their voluminous nature and can be accessed at: https://restructuring.primeclerk.com/mallinckrodt/Home-ClaimInfo.

[3] This is an exemplar of the proofs of claim of Avon Holdings I LLC as Transferee of OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC subject to this appeal.  The remaining proofs of claim of Avon Holdings I LLC as Transferee of OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC subject to this appeal are substantially identical to this proof of claim and have been assigned the following claim numbers: 5309, 5288, 5010, 5787, 5805, 5825, 5803, 5790, 5908, and 5938. These claims have been omitted due to their voluminous nature and can be accessed at: https://restructuring.primeclerk.com/mallinckrodt/Home-ClaimInfo.

| Document | Page No. |
|---|---|
| Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petition and First Day Motions, Case No. 20-12522, D.I. 128 (October 12, 2020) | A0194 |
| Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof, Case No. 20-12522, D.I. 667 (November 30, 2020) | A0450 |
| Excerpt of Affidavit of Service, Case No. 20-12522, D.I. 1131 (January 11, 2021) | A0463 |
| Humana Inc.'s Joinder to the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Actions, Case No. 20-12522, D.I. 1755 (March 16, 2021) | A0465 |
| Notice of Humana Inc.'s Joinder to the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as set forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Action, Case No. 20-12522, D.I. 1768 (March 16, 2021) | A0489 |
| Debtors' Omnibus Objection to the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Actions and to Humana Inc.'s Joinder Thereto, Case No. 20-12522, D.I. 1944 (April 5, 2021) | A0492 |

| Document | Page No. |
|---|---|
| Humana Inc.'s Reply in Support of the Motion of the Official Committee of Unsecured Creditors (1) for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Discovery of the Debtors and Third Parties, and (2) for an Order Extending Period to (A) Challenge the Debtors' Stipulations as Set Forth in the Final Cash Collateral Order and (B) Assert Related Claims or Causes of Action and Humana Inc.'s Joinder thereto, Case No. 20-12522, D.I. 1987 (April 8, 2021) | A0531 |
| Excerpt of Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for all Purposes in these Bankruptcy Cases, Case No. 20-12522, D.I. 2157 (April 30, 2021) | A0540 |
| Motion of Attestor Limited and Humana Inc. for Entry of an Order Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code, Case No. 20-12522, D.I. 2159 (April 30, 2021) | A0577 |
| Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 2165 (April 30, 2021) | A0901 |
| Declaration of Randall S. Eisenberg in Support of Debtors' Motion for Scheduling Order and Objections to Claims, Case No. 20-12522, D.I. 2166 (May 1, 2021) | A0960 |
| Notice of Service of Attestor Limited and Humana Inc.'s First Request for Production of Documents in Connection with Contested Matters, Case No. 20-12522, D.I. 2211 (May 6, 2021) | A0966 |
| Attestor Limited and Humana Inc.'s First Request for Production of Documents in Connection with Contested Matters (May 6, 2021) | A0968 |

| Document | Page No. |
|---|---|
| Letter from Matthew Freimuth to the Honorable John T. Dorsey, Regarding Scheduling Issues, Case No. 20-12522, D.I. 2243 (May 10, 2021) | A0983 |
| Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed. R. Civ. P. 30(b)(6) and Fed. R. Bankr. P. 7030, Case No. 20-12522, D.I. 2284 (May 12, 2021) | A0986 |
| Opposition of Attestor Limited and Humana Inc. to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims, Case No. 20-12522, D.I. 2512 (May 21, 2021) [UNDER SEAL] | A0993 |
| Debtors' Omnibus Objection to Motions of Attestor Limited and Humana Inc. for Entry of Orders (A) Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for all Purposes in these Bankruptcy Cases and (B) Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code, Case No. 20-12522, D.I. 2521 (May 21, 2021) | A2023 |
| Debtors' Motion to Quash (A) Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed. R. Civ. P. 30(b)(6) and Fed. R. Bankr. P. 7030; (B) Acthar Plaintiffs' Notice of Deposition *Duces Tecum* of Corporate Designee(s) of Debtors; and (C) Acthar Plaintiffs' Notice of Deposition of Kathleen Breton, Case No. 20-12522, D.I. 2583 (May 26, 2021) | A2077 |
| Attestor Limited and Humana Inc.'s Limited Objection to Debtors' Motion to Quash (A) Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed R. Civ. P. 30(b)(6) and Fed R. Bankr. P. 7030; (B) Acthar Plaintiffs' Notice of Deposition *Duces Tecum* of Corporate Designees of Debtors; and (C) Acthar Plaintiffs' Notice of Deposition of Kathleen Breton, Case No. 20-12522, D.I. 2633 (June 1, 2021) | A2157 |
| Attestor Limited and Humana Inc.'s Reply in Further Support of Motions to Estimate Acthar-Related Claims and Allow | A2203 |

| Document | Page No. |
|---|---|
| Administrative Claims for all Purposes in these Bankruptcy Cases, Case No. 20-12522, D.I. 2657 (June 2, 2021) | |
| Excerpt of Order (I) Approving the Disclosure Statement and Form and Manner of Notice of Hearing Thereon; (II) Establishing Solicitation Procedures, (III) Approving the Form and Manner of Notice to Attorneys and Solicitation Directive, (IV) Approving the Form of Ballots, (V) Approving the Form, Manner, and Scope of Confirmation Notices, (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan and (VII) Granting Related Relief, Case No. 20-12522, D.I. 2911 (June 17, 2021) | A2221 |
| Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Case No. 20-12522, D.I. 2916 (June 18, 2021) | A2240 |
| Disclosure Statement for Joint Plan of Reorganization of Mallinckrodt PLC and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Case No. 20-12522, D.I. 2917 (June 18, 2021) | A2387 |
| Acthar Insurance Claimants' Revised and Supplemental Opposition to the Debtors' First Omnibus Objection to "Unsubstantiated" Claims and Acthar Insurance Claimants' Motion for Substantive Consolidation, Case No. 20-12522, D.I. 2924 (June 18, 2021) [UNDER SEAL] | A3222 |
| Order Establishing Confirmation Schedule and Protocols, Case No. 20-12522, D.I. 2988 (June 24, 2021) | A4718 |
| Notice of Amended Agenda for Video Hearing Scheduled for June 24, 2021 at 1:00 p.m. (ET), Case No. 20-12522, D.I. 2989 (June 24, 2021) | A4730 |
| Debtors' Omnibus Reply in Support of First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 3177 (July 9, 2021) [UNDER SEAL] | A4762 |

| Document | Page No. |
|---|---|
| Statement of the Official Committee of Unsecured Creditors in Connection with the Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 3316 (July 21, 2021) | A6184 |
| Notice of Agenda of Matters Scheduled for Hearing on July 23, 2021 at 10:00 a.m., Case No. 20-12522, D.I. 3309 (July 21, 2021) | A6206 |
| Amended Notice of Agenda of Matters Scheduled for Hearing on July 23, 2021 at 9:00 a.m., Case No. 20-12522, D.I. 3389 (July 22, 2021) | A6213 |
| Transcripts, Order Appealed, and Notice of Appeal | |
| Transcript of Video Hearing [Zoom videoconference] on May 5, 2021 Regarding Motion for Scheduling Order, Adv. Pro. No. 21-50428, D.I. 2204 | A6221 |
| Transcript of Telephonic Hearing [Zoom videoconference] on May 12, 2021 Regarding Scheduling, Case No. 20-12522, D.I. 2303 | A6255 |
| Transcript of Video Hearing [Zoom videoconference] on May 20, 2021 Regarding Administrative Claims Bar Date, Case No. 20-12522, D.I. 2506 | A6293 |
| Transcript of Video Hearing [Zoom videoconference] on May 26, 2021 Regarding Scheduling, Case No. 20-12522, D.I. 2586 | A6331 |
| Transcript of Video Omnibus Hearing [Zoom videoconference] on June 2, 2021, Case No. 20-12522, D.I. 2683 | A6372 |
| Transcript of Telephonic Omnibus Hearing [Zoom videoconference] on June 7, 2021, Case No. 20-12522, D.I. 2752 | A6453 |

| Document | Page No. |
|---|---|
| Transcript of Telephonic Disclosure Statement Hearing [Zoom videoconference] on June 15, 2021, Case No. 20-12522, D.I. 2887 | A6563 |
| Transcript of Telephonic Disclosure Statement Hearing [Zoom videoconference] on June 16, 2021, Case No. 20-12522, D.I. 2930 | A6641 |
| Transcript of Telephonic Hearing [Zoom videoconference] on July 23, 2021 Regarding Unsubstantiated Claims Objection, Case No. 20-12522, D.I. 3414 | A6775 |
| Order Sustaining Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive), Case No. 20-12522, D.I. 3406 (July 23, 2021) | A6950 |
| Notice of Appeal, Case No. 20-12522, D.I. 3457 (July 28, 2021) | A6951 |
| Other Items | |
| Creditor's Claims in Bankruptcy Proceedings – The Debtor-Creditor Relationship in Bankruptcy – Allowance and Payment of Claims, Civil Resource Manual, Department of Justice (June 1998), available at https://www.justice.gov/jm/civil-resource-manual-64-creditors-claims-bankruptcy-proceedings | A7146 |
| Press Release, Mallinckrodt Will Pay $100 Million to Settle FTC, State Charges It Illegally Maintained its Monopoly of Specialty Drug Used to Treat Infants, FTC (Jan. 18. 2017), available at https://www.ftc.gov/news-events/press-releases/2017/01/mallinckrodt-will-pay-100-million-settle-ftc-state-charges-it | A7153 |
| Drug Maker Mallinckrodt Agrees to Pay Over $15 Million to Resolve Alleged False Claims Act Liability for "Wining and Dining" Doctors, Department of Justice (Sept. 4, 2019), available at https://www.justice.gov/opa/pr/drug-maker- | A7156 |

| Document | Page No. |
|---|---|
| mallinckrodt-agrees-pay-over-15-million-resolve-alleged-false-claims-act-liability | |
| Second Amended Complaint ¶¶ 7-8, *Humana Inc. v. Mallinckrodt ARD LLC*, No. 2:19-cv-06926 (C.D. Cal. Apr. 24, 2020) [D.I. 60] | A7158 |
| Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, *Humana Inc. v. Mallinckrodt ARD LLC*, No. 2:19-cv-06926 (C.D. Cal. Aug. 14, 2020) [D.I. 80] | A7442 |
| May 24, 2021 Emails Regarding Omnibus Unsubstantiated Claims Objection | A7471 |
| June 23, 2021 Emails Regarding Status Conference; Unsubstantiated Claims Hearing | A7473 |
| July 1, 2021 Emails Regarding Unsubstantiated Claims Objection | A7478 |
| Joint Debtors and Attestor/Humana Exhibit & Witness List for July 23, 2021 Hearing (July 22, 2021) | A7479 |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MALLINCKRODT PLC, *et al.*, | ) | Case No. 20-12522 (JTD) |
| | ) | |
| Debtor. | ) | |
| | ) | **Re: Docket No. 2165** |

### <u>ORDER</u>

For the reasons stated on the record at the hearing held on this day, the Debtors' First

Omnibus Objection to Unsubstantiated Claims (Substantive) (D.I. 2165) is sustained.

SO ORDERED.

Dated: July 23rd, 2021
Wilmington, Delaware

**JOHN T. DORSEY**
**UNITED STATES BANKRUPTCY JUDGE**

A-6950

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| MALLINCKRODT PLC, *et al.*,[1] | Case No. 20-12522 (JTD) |
| Debtor. | (Jointly Administered) |
| | **Re: D.I. 3405, 3406** |

## NOTICE OF APPEAL

**PLEASE TAKE NOTICE** that Attestor Limited, on behalf of itself and its affiliated entities, including Avon Holdings I, LLC ("Attestor"), and Humana, Inc. ("Humana", and together with Attestor, the "Acthar Insurance Claimants"), creditors in the above-captioned chapter 11 cases, hereby appeal to the United States District Court for the District of Delaware, pursuant to 28 U.S.C. § 158(a) and Rules 8002(a)(1) and 8003 of the Federal Rules of Bankruptcy Procedure, from the order (D.I. 3406) (the "Order") sustaining the *Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive)* (D.I. 2165), entered on July 23, 2021, by the United States Bankruptcy Court for the District of Delaware, and the oral bench ruling issued in connection with the Order (the "Bench Ruling"), as so ordered at D.I. 3405.[2]

---

[1]  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinkrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2]  Attestor entered into an agreement with Humana to pursue and participate in any proceeds of Humana's claims against the Debtors with respect to the distribution, marketing, and sale of Acthar.  *See* Verified Statement of Willkie Farr & Gallagher LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure, D.I. 2066.  Attestor is also the transferee and owner of additional Acthar-related claims subject to the Order and Bench Ruling, which were filed by United Healthcare Services, Inc. ("United") and OptumRx Group Holdings and OptumRx Holdings, LLC (together, "OptumRx").  *See* Transfer/Assignment of Claim, D.I. 2317.  For the avoidance of doubt, this notice of appeal includes all of the aforementioned claims.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Order is attached hereto as

**Exhibit A** and copies of the Bench Ruling and the so ordered docket entry are attached hereto as

**Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that the names of all parties to the Order and

Bench Ruling appealed from and the names, addresses, and telephone numbers of their respective

attorneys are as follows:

| Counsel to the Acthar Insurance Claimants | Counsel to Mallinckrodt PLC and its affiliated debtors |
|---|---|
| MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>Donna L. Culver (Bar No. 2983)<br>Robert J. Dehney (Bar No. 3578)<br>Matthew B. Harvey (Bar No. 5186)<br>1201 North Market Street, 16th Floor<br>P.O. Box 1347<br>Wilmington, DE 19899-1347<br>Telephone: (302) 658-9200<br>Facsimile: (302) 658-3989<br>Email: dculver@morrisnichols.com<br>     rdehney@morrisnichols.com<br>     mharvey@morrisnichols.com<br><br>WILLKIE FARR & GALLAGHER LLP<br>Matthew A. Feldman<br>Matthew Freimuth<br>Benjamin P. McCallen<br>Richard Choi<br>Philip F. DiSanto<br>787 Seventh Avenue<br>New York, NY 10019<br>Telephone: (212) 728-8000<br>Email: mfeldman@willkie.com<br>     mfreimuth@willkie.com<br>     bmccallen@willkie.com<br>     rchoi@willkie.com<br>     pdisanto@willkie.com | RICHARDS, LAYTON & FINGER, P.A.<br>Mark D. Collins (No. 2981)<br>Robert J. Stearn, Jr. (No. 2915)<br>Michael J. Merchant (No. 3854)<br>Amanda R. Steele (No. 5530)<br>Brendan J. Schlauch (No. 6115)<br>One Rodney Square<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 651-7700<br>Facsimile: (302) 651-7701<br>Email: collins@rlf.com<br>     stearn@rlf.com<br>     merchant@rlf.com<br>     steele@rlf.com<br>     schlauch@rlf.com<br><br>LATHAM & WATKINS LLP<br>George A. Davis<br>George Klidonas<br>Andrew Sorkin<br>Anupama Yerramalli<br>885 Third Avenue<br>New York, New York 10022<br>Telephone: (212) 906-1200<br>Facsimile: (212) 751-4864<br>Email: george.davis@lw.com<br>     george.klidonas@lw.com<br>     andrew.sorkin@lw.com |

A-6952

| | |
|---|---|
| EIMER STAHL LLP<br>Benjamin E. Waldin<br>Scott C. Solberg<br>James W. Joseph<br>Sarah H. Catalano<br>224 South Michigan Avenue<br>Suite 1100<br>Chicago, IL 60604<br>Telephone: (312) 660-7600<br>Email: bwaldin@eimerstahl.com<br>    ssolberg@eimerstahl.com<br>    jjoseph@eimerstahl.com<br>    scatalano@eimerstahl.com | Jeffrey E. Bjork<br>355 South Grand Avenue, Suite 100<br>Los Angeles, California 90071<br>Telephone: (213) 485-1234<br>Facsimile: (213) 891-8763<br>Email: jeff.bjork@lw.com<br><br>Jason B. Gott<br>330 North Wabash Avenue, Suite 2800<br>Chicago, Illinois 60611<br>Telephone: (312) 876-7700<br>Facsimile: (312) 993-9767<br>Email: jason.gott@lw.com |

Dated: July 28, 2021
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Matthew B. Harvey*
Donna L. Culver (Bar No. 2983)
Robert J. Dehney (Bar No. 3578)
Matthew B. Harvey (Bar No. 5186)
1201 North Market Street, 16th Floor
P.O.  Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Email:  dculver@morrisnichols.com
      rdehney@morrisnichols.com
      mharvey@morrisnichols.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (admitted *pro hac vice*)
Matthew Freimuth (admitted *pro hac vice*)
Benjamin P. McCallen (admitted *pro hac vice*)
Richard Choi (admitted *pro hac vice*)
Philip F. DiSanto (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Email: mfeldman@willkie.com
      mfreimuth@willkie.com
      bmccallen@willkie.com
      rchoi@willkie.com
      pdisanto@willkie.com

A-6953

-and-

**EIMER STAHL LLP**
Benjamin E. Waldin (admitted *pro hac vice*)
Scott C. Solberg (admitted *pro hac vice*)
James W. Joseph (admitted *pro hac vice*)
Sarah H. Catalano (admitted *pro hac vice*)
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Email: bwaldin@eimerstahl.com
        ssolberg@eimerstahl.com
        jjoseph@eimerstahl.com
        scatalano@eimerstahl.com

*Counsel to the Acthar Insurance Claimants*

A-6954

**<u>Exhibit A</u>**

**Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                              )         Chapter 11
                                    )
MALLINCKRODT PLC, *et al.*,         )         Case No. 20-12522 (JTD)
                                    )
          Debtor.                   )
                                    )         **Re: Docket No. 2165**
_____     )

### <u>ORDER</u>

For the reasons stated on the record at the hearing held on this day, the Debtors' First

Omnibus Objection to Unsubstantiated Claims (Substantive) (D.I. 2165) is sustained.

SO ORDERED.

**Dated: July 23rd, 2021**
**Wilmington, Delaware**

                                    **JOHN T. DORSEY**
                                    **UNITED STATES BANKRUPTCY JUDGE**

A-6956

**Exhibit B**

**Bench Ruling and Docket Entry**

```
 1                        UNITED STATES BANKRUPTCY COURT
                              DISTRICT OF DELAWARE
 2
                                       .   Chapter 11
 3     IN RE:                          .
                                       .   Case No. 20-12522 (JTD)
 4     MALLINCKRODT PLC, et al.,       .
                                       .
 5                                     .   Courtroom No. 5
                                       .   824 North Market Street
 6                                     .   Wilmington, Delaware 19801
                                       .
 7                          Debtors.   .   July 23, 2021
 8     . . . . . . . . . . . . . . . . .   9:03 A.M.

 9                      TRANSCRIPT OF TELEPHONIC HEARING
                    BEFORE THE HONORABLE JOHN T. DORSEY
10                     UNITED STATES BANKRUPTCY JUDGE

11     TELEPHONIC APPEARANCES:

12
       For the Debtor:         Michael J. Merchant, Esquire
13                             RICHARDS, LAYTON & FINGER, P.A.
                               Rodney Square
14                             920 N. King Street
                               Wilmington, Delaware 19801
15
                               - and -
16
                               George Klidonas, Esquire
17                             Hugh Murtagh, Esquire
                               Christopher Harris, Esquire
18                             Keith Simon, Esquire
                               LATHAM & WATKINS LLP
19                             885 Third Avenue
                               New York, New York 10022
20

21     Audio Operator:         Sherry J. Stiles, ECRO

22     Transcription Company:   Reliable
                               1007 N. Orange Street
23                             Wilmington, Delaware 19801
                               (302)654-8080
24                             Email:  gmatthews@reliable-co.com

25
       Proceedings recorded by electronic sound recording, transcript
       produced by transcription service.
```

```
 1   TELEPHONIC APPEARANCES (Cont'd):

 2   For Opioid Claimants:      Arik Preis, Esquire
                                Mitchell Hurley, Esquire
 3                              AKIN GUMP STRAUSS HAUER & FELD LLP
                                One Bryant Park
 4                              Bank of America Tower
                                New York, New York 10036
 5
     For Acthar Group:         Daniel Astin, Esquire
 6                              CIARDI CIARDI & ASTIN
                                1204 North King Street
 7                              Wilmington, Delaware 19801

 8                              - and -

 9
                                Donald Haviland, Esquire
10                              HAVILAND HUGHES LLC
                                111 S. Independence Mall E Unit 1000
11                              Philadelphia, Pennsylvania 19106

12   For Humana:               Benjamin McCallen, Esquire
13                              Matthew Freimuth, Esquire
                                WILLKIE FARR & GALLAGHER LLP
14                              787 Seventh Avenue
                                New York, New York 10019
15

16

17

18

19

20

21

22

23

24

25
```

A-6959

1    MATTERS GOING FORWARD:

2    7. [SEALED] Debtors' Motion to Quash (A) Ad Hoc Acthar Group's
     Notice of Deposition of Melissa Falconi and (B) Ad Hoc Acthar
3    Group's Notice of Deposition of Hugh M O'Neill [Docket No.
     3289 – filed July 20, 2021]
4
     8. Ad Hoc Acthar Group's Motion to Compel Discovery and
5    Response to Debtors' Motion to Quash [Docket No. 3385 – filed
     July 22, 2021]
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 9:03 a.m.)

2               THE COURT:  Good morning, everyone.  This is Judge

3      Dorsey.  We're on the record in Mallinckrodt PLC, Case Number

4      20-12522.

5               For those who haven't seen this before, this is

6      the new look for our Zoom calls.  This is in anticipation of

7      getting ready to go back to live hearings, but because we

8      will continue to use Zoom instead of CourtCall even when we

9      have live hearings, this is how things will look going

10     forward.

11              So, with that, I'll turn it over to debtors'

12     counsel to run the agenda.

13              MR. MERCHANT:  Thank you, Your Honor.  Michael

14     Merchant of Richards, Layton & Finger on behalf of the

15     debtors.

16              Your Honor, before turning to the agenda, I

17     believe Mr. Alberto sent chambers an email on July 15th,

18     relating to an agreement with respect to payments pursuant to

19     the KEIP order, and the OCC wanted to make certain statements

20     on the record regarding that agreement.  So, if acceptable to

21     the Court, I'd like to turn the podium over to Mr. Preis to

22     make those statements now, and then Mr. Klidonas will then be

23     making a brief statement on behalf of the debtors.

24              THE COURT:  All right.  Mr. Preis, go ahead.

25              MR. PREIS:  Good morning, Your Honor.  This is

A-6961

Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 23 of 547 PageID #: 4632
Case 20-12522-JTD Doc 3457-2 Filed 07/28/21 Page 6 of 188

5

1   Arik Preis from Akin Gump.  Can you hear me?

2                  THE COURT:  I can, thank you.

3                  MR. PREIS:  Okay.  I like the new look.

4                  Good morning, Your Honor.  Arik Preis, Akin, Gump,

5   Straus, Hauer & Feld, LLP on behalf of the Official Committee

6   of Opioid Related Claimants.

7                  Your Honor, as agreed with the debtors, the OCC

8   wanted to take a few minutes at the outset of the hearing to

9   update the Court with regard to the KEIP.  My remarks will be

10  (indiscernible) into four parts:

11                 First, a reminder of what the KEIP order stated

12  with regard to our investigation (indiscernible)

13                 Second, a brief summary of what we have done to

14  date.

15                 Third, a very brief overview of what we've

16  preliminarily found.

17                 And fourth (indiscernible)

18                 THE COURT:  Mr. Preis.

19                 MR. PREIS:  (Indiscernible)

20                 THE COURT:  Mr. Preis --

21                 MR. PREIS:  Yes.

22                 THE COURT:  -- you're breaking up a little bit on

23  your presentation.  You're skipping out a little bit.  I

24  think your voice is dropping and it's not picking up on the

25  microphone, maybe.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 24 of 547 PageID #: 4633
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 7 of 188

6

1          MR. PREIS:  Oh, okay.  Oh (indiscernible) is that

2    any better?

3          THE COURT:  That's better.

4          MR. PREIS:  Okay.  Okay.  I promise this

5    presentation will not take more than five minutes.

6          First, a reminder of what is in the KEIP order.

7    In accordance with Paragraph 4 of the KEIP order, the OCC and

8    the debtors agreed that the OCC would conduct (indiscernible)

9    investigation to the 12 individuals who are part of the KEIP.

10   In connection with the investigation, the debtors would

11   review and, as appropriate, produce up to an additional

12   50,000 (indiscernible) in other words, in addition to the

13   documents that we're already producing under our Rule 2004

14   investigation, that were specifically targeted to the

15   individuals in the KEIP.

16         The debtors also agreed to produce privilege logs

17   and witnesses for deposition (indiscernible) our

18   investigation, subject to the debtors' right to object to any

19   such deposition.  In return, we agreed to inform the debtors

20   of any facts we found that would lead us to believe that the

21   KEIP participants engaged in wrongdoing that might

22   (indiscernible) by us to withhold (indiscernible) KEIP

23   payment.

24         We were also permitted, by agreement and in the

25   order, that, by no later than July 15th, which was obviously

1   last week, in our discretion, to file a motion to enjoin any

2   future payment and/or claw back any Q4 2020 payments

3   previously made to KEIP participants under the 2020 KEIP,

4   based on any findings that we uncovered in our investigation.

5           Those rights, which are under Paragraph 4 of the

6   KEIP order, are in addition to those in Paragraph 3 of the

7   KEIP order, which states that, under certain circumstances,

8   KEIP participants are not eligible to receive any

9   (indiscernible) payments and that all parties' rights are

10  reserved to seek disgorgement of previous payments under

11  certain circumstances.

12          As everyone knows, as Your Honor knows, we didn't

13  file anything on July 15th, but instead, we decided to

14  continue our investigation in light of the items I'm going to

15  mention in a moment.

16          We also, of course, reserve our rights under

17  Paragraph 3 of the KEIP order, as well as our right to object

18  to the debtor (indiscernible) releases being sought pursuant

19  to the proposed plan, some of the KEIP (indiscernible)

20          Okay.  Second, our investigation.  Although we

21  have vigorously pursued our investigation of potential

22  misconduct by the KEIP participants over the past few months,

23  that investigation was not complete by July 15th, nor could

24  it be.  Although the debtors, to their credit, have produced

25  a significant amount of documents, the reason that the

1  investigation could not have been complete by July 15th was

2  that discovery was not complete by (indiscernible) for

3  instance, just yesterday, we received -- the debtors produced

4  more than 12,000 documents in response to our 2004 request.

5  And we understand that further productions are still

6  contemplated.

7           In addition, just one week before the July 15th

8  deadline, the debtors produced approximately 37,000

9  documents.  It was obviously impossible to review and

10 consider that information before July 15th.  That production

11 included (indiscernible) specific communications that the

12 debtors had previously withheld as privileged, but had

13 downgraded.

14          Moreover, we have found that many documents that

15 the debtors produced in response to our 2004 investigation

16 have been important in our analysis of the debtors' practices

17 concerning opioids and (indiscernible) analysis of the KEIP.

18          As of July 15th, the debtors had also not

19 completed production of privilege logs the OCC needs to

20 analyze in connection with our investigation.  While the

21 debtors, to their credit, again, provided certain interim

22 privilege logs, metadata logs in response to our requests for

23 information on a rolling basis, the metadata logs lacked

24 standard information, the basis of which (indiscernible)

25 withheld.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 27 of 547 PageID #: 4636
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 10 of 188

9

1          Furthermore, the majority of the log documents --

2    or the log information, including several thousand entries

3    involving KEIP participants, was provided just days before

4    July 15th.

5          In addition -- and this, again, we -- is by

6    agreement -- no depositions have taken place yet, which makes

7    sense, given that the debtors' document production is not

8    complete.  The debtors have been adamant that the

9    (indiscernible) witnesses be the (indiscernible) to

10   understand (indiscernible) all parties and all subject

11   matter.  And the Court recently entered a confirmation

12   schedule and protocol calling for fact witnesses to continue

13   through August 13th.

14         We agreed to the July 15th deadline back in April,

15   when the OCC anticipated that all the debtors' document

16   production would be substantially completed in June, with

17   depositions to be completed (indiscernible) in July, in

18   anticipation of a confirmation hearing in August.  That was

19   the schedule back then.  Obviously, that's not

20   (indiscernible) anymore.

21         In light of the shifting time line, in early July,

22   the OCC, we reached out to the debtors, described what we had

23   found to date, and to seek an extension of the time to

24   complete our investigation and potentially file a motion.

25   The debtors refused, which was fine.  Notwithstanding this

1    refusal and given that our investigation is still ongoing, we

2    made the determination not to file a motion on July 15th, but

3    to reserve our rights (indiscernible)

4              Third, a very, very brief update as to what we

5    have found to date.  And we've conveyed this update, both

6    orally and in writing and in much greater detail to the

7    debtors outside professionals, the outside professionals to

8    the governmental ad hoc group and their Attorneys General,

9    subject in each case to the terms of the protective order.

10             We've reviewed the documents and we believe some

11   of the documents raise concerns regarding some, but not

12   nearly all of the KEIP participants in connection with the

13   sale, marketing, and distribution of prescription opioids

14   (indiscernible) such conduct comes in the form of certain

15   (indiscernible) the marketing and sale of the debtors'

16   branded prescription opioid medication, as well as in the

17   monitoring of specific orders of the debtors' (indiscernible)

18   opioid products.

19             We believe the debtors' practices included the

20   targeting of doctors known to prescribe (indiscernible)

21   quantities of opioid pills and focus on achieving

22   prescription metrics and incentivizing sales reps

23   (indiscernible) we believe that the debtors and these

24   individuals engaged in these practices at a time when the

25   addictive properties of opioids were completely understood

1  and widely known.

2          While we believe that the documents discovered to

3  date raise significant concerns, we also recognize that our

4  investigation is not complete.  As I noted, documents still

5  must be produced and reviewed and we still must depose

6  certain key participants to learn more.  Filing a motion at

7  this time would be premature (indiscernible)

8          Finally, our next steps.  In addition to

9  establishing whether grounds exist to claw back or enjoin

10  KEIP payments, the investigation will establish whether we

11  have a basis to object to the proposed releases that the

12  debtors are proposing to offer (indiscernible) at the

13  appropriate time, and if we determine that doing so is in the

14  best interests of the opioid defendants, we will raise these

15  issues.

16          That's the extent of our statement.  I understand

17  that the debtors would like to make some statements, as well.

18  But before we do that, do you have any questions for me?

19          THE COURT:  No questions.  Thank you, Mr. Preis.

20          MR. PREIS:  Thank you.

21          THE COURT:  Who is speaking on behalf of the

22  debtors?  I'm sorry, I forgot.  Mr. Klidonas, go ahead.

23          MR. KLIDONAS:  Good morning, Your Honor.  George

24  Klidonas of Latham & Watkins on behalf of Mallinckrodt PLC

25  and its affiliated debtors.

1           The debtors' professionals, as Mr. Preis

2    mentioned, have discussed with the OCC their preliminary

3    findings and the relevance of such preliminary findings on

4    the key employee incentive plan or the "KEIP," as we call it,

5    and the releases proposed under the Chapter 11 plan.  But the

6    debtors do feel compelled to respond to the OCC's statement.

7           First, the debtors have fully participated and

8    continue to fully participate in the discovery process with

9    the OCC.  We've worked as quickly as possible to produce

10   documents to the OCC.  That said, the debtors, as mentioned

11   earlier, did not agree to the OCC's request to extend their

12   deadline to file a motion under the KEIP order because the

13   requested extension would not -- would have been after the

14   payment of the first half of the 2021 keep.  And our position

15   is those payments should be made when the company is

16   obligated to make those payments.

17          Regarding the substance of the OCC statement, the

18   debtors disagree with the OCC's interpretation of the small

19   set of documents that they provided, about 60 that they

20   showed us.  Many of these documents have already been

21   produced to the states and other multi-district litigation

22   plaintiffs; and, therefore, these same allegations were

23   raised pre-petition in a variety of different complaints.

24          The company has defended those pre-petition

25   allegations vigorously in the past and the proposed opioid

1  settlement resolves all of those claims and allegations in

2  their totality.  The debtors believe that conflating the

3  entitlement to KEIP payments is really sort of a veiled

4  attempt at calling into question the entire settlement

5  reached and the releases set forth in the plan.

6          If what the OCC wants to do is re-litigate these

7  allegations that have been settled, then debtors believe that

8  the proposed opioid settlement could have the potential of

9  unraveling.  But we decided, on balance, having a fight on

10 this issue right now would just be a complete waste of estate

11 resources and addressing confirmation of related issues in a

12 vacuum this early would just be unproductive.

13         To put this into context, the debtors believe that

14 the OCC's preliminary findings regarding the actions of a

15 small subset of KEIP participants -- as of today, our

16 understanding, it's about three of them -- and certain

17 aspects of the monitoring and marketing practices are

18 generally misguided.

19         The documents raised by the OCC are about from

20 2011 to 2015, when the companies produced and sold the

21 branded pain products.  We believe that Mallinckrodt branded

22 pain medication never made up more than about .5 percent of

23 the opioid pain market.  In addition, the debtors contend

24 that every Mallinckrodt pain product was FDA approved, every

25 milligram of such product and distributed was and is

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 32 of 547 PageID #: 4641
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 15 of 188

14

1   authorized in advance by the DEA and then reported back to

2   the DEA in accordance with compliance protocols.

3            The debtors also believe and contend that the

4   purpose of the branded opioid marketing strategy was to

5   inform prescribers of the benefits of its longer lasting,

6   extending relief pain products, that serve generally as an

7   alternative, to allow patients to take these medications less

8   frequently.

9            And finally, with respect to the SOM -- the

10  suspicious order monitoring -- Mallinckrodt's historical

11  controls have been lauded by the DEA as exemplary and

12  consistent with what the DEA expects for Mallinckrodt as an

13  industry leader.  But as Mr. Preis mentioned, you know, just

14  as the OCC is continuing its review, we, the debtors -- you

15  know, the investigations being conducted by the independent

16  directors, more specifically, in connection with the plan

17  releases are still ongoing and are assessing the conduct that

18  the OCC is alleging.

19           So the last point I just want to raise on

20  discovery, Your Honor, is we just want to sort of clarify the

21  record a little bit.  The OCC has been the beneficiary of

22  extensive discovery in these Chapter 11 cases.  As of July

23  14th, the OCC has received 95 percent of the documents

24  responsive to their requests.  The vast majority of these

25  were produced by the end of June.

1          The negotiated discovery with respect to the OCC's

2   KEIP review was produced by the end of April, as contemplated

3   by the KEIP order.

4          And then I think it was mentioned earlier, interim

5   privilege logs have been provided and metadata for all

6   privileged documents was sent while the final privilege logs

7   are being completed.

8          And no depositions have been sought or noticed in

9   connection with the KEIP to date, nor was there any discovery

10  about any documents found by the OCC until almost two months

11  after the KEIP (indiscernible) was provided.

12         So, just to circle back and close the loop, you

13  know, neither the OCC, nor the debtors, as we both mentioned,

14  are looking to have this argument today on these issues.  We

15  both felt the need to at least provide the Court with some

16  context and with their perspectives of where things stand.

17         With that, Your Honor, I think we can turn to the

18  agenda today.

19         THE COURT:  All right.  Thank you, Mr. Klidonas.

20         MR. KLIDONAS:  You're welcome.

21         THE COURT:  Mr. Merchant, back to the agenda.

22         MR. MERCHANT:  Yes, Your Honor.  Turning to the

23  agenda, I think, based on the dialogue with chambers this

24  week, it probably makes sense to turn to Agenda Items 7 and 8

25  first, which are the discovery-related motions related to the

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 34 of 547 PageID #: 4643
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 17 of 188

16

 1  unsubstantiated claims objection going forward today.  So,

 2  with that, I'll cede the podium to Mr. Murtagh to address the

 3  debtors' motion to quash.

 4              THE COURT:  Mr. Murtagh.

 5              MR. MURTAGH:  Good morning, Your Honor.  It's Hugh

 6  Murtagh from Latham & Watkins on behalf of the debtors.  Can

 7  you hear me okay?

 8              THE COURT:  Yes, thank you.

 9              MR. MURTAGH:  Your Honor, I'll lay out where I

10  think we are on discovery disputes and then tell you how I

11  plan to go through it, subject to the Court's approval.  My

12  understanding based on the filings by the Ad Hoc Acthar Group

13  yesterday are as follows:

14              We have a live motion to quash as to depositions

15  noticed for Mr. O'Neill and Ms. Falcone.  I don't believe the

16  Ad Hoc Acthar Group is continuing to press requests for a

17  deposition of Ms. Falcone.  So, as to the motion to quash, I

18  will focus on the request to depose Mr. O'Neill.

19              The Ad Hoc Acthar Group also filed its motion to

20  compel production of certain documents, and that remains

21  open.  And I understand that's a portion of the motion to

22  compel.  But if it's more expedient for Your Honor, I'll

23  address that also while I'm addressing the motion to quash

24  Mr. O'Neill's deposition.

25              THE COURT:  Yeah, let's do them all at once.

1          MR. MURTAGH:  Okay, Your Honor.

2          Your Honor, the headline on all of this is that

3   these discovery requests are months late, irrelevant, and

4   unnecessary.  The background, as Your Honor knows, is that

5   the debtors filed their objection to the Ad Hoc Acthar

6   Group's claims nearly three months ago, on April 30th.  And

7   as Your Honor also knows, we had a discovery dispute at that

8   time about the scope of discovery in this matter and Your

9   Honor made a ruling on the proper scope of discovery in this

10  matter.

11          The debtors, thereafter, provided extremely broad

12  discovery to the ad hoc group and also provided additional

13  new discovery with targeted responses to questions asked,

14  relating specifically to the subject matter here, which is

15  substantiation for what we view as the unsubstantiated

16  claims.

17          Thereafter, Your Honor, the ad hoc group had the

18  opportunity to file two responses, and the second came over

19  two months after the filing of the objection.  The ad hoc

20  group never, until last Friday, weeks after the filing of

21  their second response and a week after the debtors' reply,

22  even suggested that it had insufficient discovery.

23          Now the ad hoc group asserts that the debtors'

24  reply somehow revealed to them an urgent need to depose Mr.

25  O'Neill and to receive more documents.  And they appear to

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 36 of 547 PageID #: 4645
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 19 of 188

18

1  give two reasons, neither of which is persuasive, and I'll go

2  through each of them, first dealing with Mr. O'Neill.

3         The first reason they give is that our reply

4  somehow alerted them to the existence of a publicly reported

5  opinion issued two years ago in the opioid MDL litigation.

6  And in respect of that opinion, the ad hoc group argues that

7  this belated discovered opinion is important because, first,

8  it allegedly validates an alter ego theory of liability

9  against PLC, and second, that Mr. O'Neill's testimony is

10  critical to that supposed validation.  Well, neither of those

11  assertions is true, Your Honor.

12         First, to be clear, the opinion states only that

13  the parties dispute and offer conflicting evidence on alter

14  ego and the matter should be litigated at a later date.  And

15  that later litigation never occurred.

16         The second is that Mr. O'Neill's name is not even

17  mentioned anywhere in the opinion.

18         So, apparently, on this, what the ad hoc group has

19  in mind is a statement in the plaintiffs' brief that Mr.

20  O'Neill did not recall details about certain Mallinckrodt

21  entities' board composition.  But Your Honor, on this

22  supposed reason for deposing Mr. O'Neill, if the ad hoc group

23  had wanted to explore alter ego theories and board

24  composition, they could have done so over the last three

25  months.  They could have sought additional discovery.  They

1   could have asked questions of Mr. Welch in deposition, and

2   they can attempt to do so with Mr. Welch on the stand today.

3   They do not need Mr. O'Neill for that.  So the belated

4   discovery of the MDL opinion and Mr. O'Neill's supposed

5   importance to it is not a grounds for deposing Mr. O'Neill.

6          The second reason that the ad hoc group has given

7   for deposing Mr. O'Neill is that he has allegedly become

8   relevant because his name appears on a single document cited

9   in the debtors' reply.  That document is a board deck

10  discussing Mallinckrodt Pharmaceutical International -- sorry

11  -- Mallinckrodt Pharmaceutical Ireland Limited's decision-

12  making responsibilities with regard to Acthar.  And it was

13  produced to Rockford pre-petition and it was offered in the

14  brief to demonstrate that the ad hoc group had notice pre-

15  petition of the involvement of Mallinckrodt Pharmaceuticals

16  Ireland Limited with Acthar.

17         It does not make relevant anything Mr. O'Neill did

18  or said.  The only connection between that document and Mr.

19  O'Neill is that his name appears I believe on an email cover

20  sheet to the transmission of the document, that's it.  So,

21  having not made Mr. O'Neill irrelevant in any way, in any new

22  way in the reply, this supposed second reason, his name is

23  mentioned as a name attached to a document, also is not a

24  reason to depose Mr. O'Neill.

25         And with regard to the deposition of Mr. O'Neill

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 38 of 547 PageID #: 4647
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 21 of 188

20

1   in general, before turning to the RFPs, Your Honor, the

2   bottom line is that the ad hoc group has repeatedly noticed

3   Mr. O'Neill for deposition in these cases on what appears to

4   be tactical grounds, and this is no different.  I believe

5   this is the third time they've done so.  And now it appears

6   to be an attempt to disrupt a hearing that's been three

7   months in the making.  And the delay in the timing on this is

8   inexcusable and the deposition is wholly unnecessary.

9           With regard to the RFPs, Your Honor, the story is

10  much the same.  They are also inexcusably late, irrelevant,

11  and unnecessary.  Nevertheless, to be clear, in an attempt to

12  avoid having a dispute before the Court, Your Honor, the

13  debtors agreed to produce documents responsive to several of

14  the requests and responsive to the requests on which we

15  thought the ad hoc group was focused.

16          So, specifically, the debtors agreed to production

17  of the O'Neill deposition in the 2019 opioid MDL proceedings

18  and all exhibits, and also the entire record of the

19  jurisdictional motion to dismiss dispute in that litigation,

20  on which the ad hoc group is focused, and they now have those

21  documents.

22          We also responded and made clear that all of the

23  support -- all of the documents supporting our reply are

24  attached to our reply.  So that took care of three of the

25  requests, Your Honor.  And we maintained objection to four of

1  the requests.

2          Now one of those requests is for all of the

3  documents used to prepare Mr. O'Neill for his deposition in

4  2019.  And we object on the basis that that is work product

5  and attorney/client privilege and not subject to production.

6  The remaining three requests, Your Honor, are hopelessly

7  over-broad and burdensome, in addition to being irrelevant

8  and inappropriate.  And what they comprise, Your Honor, is a

9  request for all communications, documents, agreements and any

10 other material relating to Acthar by, with, or about 32

11 different Mallinckrodt entities from the beginning of time to

12 today.

13          Now, plainly, that request is hopelessly over-

14 broad.  But even if it were more limited, the request would

15 still be hopelessly late and made without any attempt to

16 discern whether there's a specific need or any documents that

17 are sought are already in the voluminous productions that

18 have been made to the Ad Hoc Acthar Group.

19          So, much like the request to depose Mr. O'Neill,

20 Your Honor, the -- these requests have no basis to be made

21 now.  They're made without considering whether the

22 information the ad hoc group requests is actually relevant or

23 needed or even in their possession already.  And it appears

24 to be another attempt to insert a tactical delay into these

25 proceedings.  And in short, Your Honor, the time for this is

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 40 of 547 PageID #: 4649
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 23 of 188

22

1  up, and the time to litigate these issues is now, on the full

2  and complete opportunity and record that have been made over

3  the last three months.

4          THE COURT:  Okay.  Thank you, Mr. Murtagh.

5          Let me hear from the ad hoc group.

6          MR. ASTIN:  Good morning, Your Honor.  Daniel

7  Astin for Ciardi, Ciardi & Astin.  My co-counsel Mr. Haviland

8  will be presenting this morning.  And we thank the Court for

9  accommodating us this early, before the regularly scheduled

10  hearing.

11          THE COURT:  Mr. Haviland, go ahead.

12          MR. HAVILAND:  Good morning, Your Honor.  It seems

13  to me that the debtors' objections and motion bases for both

14  the depositions and the documents are three:  The discovery

15  is late, it's irrelevant and unnecessary.  I don't know where

16  the third prong comes in the rules, other than Rule 26 up to

17  Rule 37, so I'll focus on the timing and the relevancy

18  arguments.

19          I have to give a little context, Your Honor, so

20  you can understand how this dispute came about.  The debtors

21  have known about the Acthar Plaintiffs' desire to take Steve

22  O'Neill's -- or Hugh O'Neill's deposition since prior to the

23  bankruptcy.  You'll recall the first time we met, Your Honor,

24  was on an emergent basis to quash the court-ordered

25  deposition of Mr. O'Neill out of the Rockford Court.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 41 of 547 PageID #: 4650
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 24 of 188

23

1          The debtors prevail upon the Court, saying that

2     they needed a breathing spell, and that Mr. O'Neill and Mr.

3     Trudeau were critical to the reorganization function.  I

4     remember Mr. Stearn arguing for an hour at the end of that

5     hearing, only to have it resolved with the Court directing

6     the parties to meet and confer to schedule that deposition.

7     And we've attempted to do that -- and Mr. Astin can attest --

8     multiple times over the last ten-plus months, and never once

9     have the debtors offered to provide a deposition date for Mr.

10    Trudeau or Mr. O'Neill.

11         So the context is important.  We had court-ordered

12    deposition dates coming into this bankruptcy.  The debtors,

13    in the personages of Mallinckrodt PLC and ARD had filed

14    motions to quash for Apex Protection, and they were denied on

15    a full record by a Federal Judge.

16         And the reason why this issue has come to the fore

17    today, Judge, is we got a reply brief after hours on July

18    9th, a Friday night.  It was almost 50 pages, well beyond the

19    page limit provided under the rule.  The Court granted leave

20    to the debtors to put that volume before the Court.  And in

21    that volume -- on a reply, mind you, this is a reply to the

22    response to their objections -- they proceeded down a number

23    of paths that weren't raised in the initial objection, and

24    that's why this is important.  There's nothing late about

25    inquiring about a position of the debtors that's newly framed

1   in a fifty-page filing on reply.

2          Now we noticed Mr. O'Neill's deposition last

3   Thursday.  We asked -- and we also noticed his one-time

4   executive assistant, Melissa Falcone, who then become a Vice

5   President of Patient Services, and we now know through Arnold

6   & Porter is no longer with the company.  And I point that

7   out, Judge, because, last Friday, Arnold & Porter

8   represented, on behalf of the debtors, they don't represent

9   Ms. Falcone.  She's a former executive employee.  I have an

10  email at four o'clock last Friday to that effect:

11          "Don, Ms. Falcone left the company shortly after

12  you deposed her in February 2020, we do not currently

13  represent her."

14          The debtors have not demonstrated to this Court

15  how they have a right to move for a protective order on a

16  former employee.  And when we got that notice, Judge, we

17  expedited a subpoena.  And you'll see in our filings, we

18  provided not one, but two affidavits of service of Ms.

19  Falcone in Illinois, where she currently resides, at her

20  place of business, at AbbVie, and her home address.

21          So, since the time of service, last Friday, we

22  haven't heard from Ms. Falcone or counsel.  All we heard from

23  the debtors was they don't represent her.  So they have a

24  procedural problem in saying that they can quash a subpoena

25  of a former employee more than a hundred miles from this

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 43 of 547 PageID #: 4652
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 26 of 188

25

1  Court.

2           And realizing that it was more than a hundred

3  miles, we issued the subpoena under the Northern District of

4  Illinois caption, the Rockford case, so that that court would

5  have jurisdiction over any discovery disputes.  I'm not

6  suggesting Your Honor doesn't, but we hadn't heard from the

7  debtors at all until late in the day, when they filed the

8  motion for a protective order on Wednesday, taking this

9  position.  There's a fundamental problem with their approach

10 in trying to prevent Ms. Falcone's deposition, and I'll get

11 to the relevancy in a moment.

12          But as further background, the Court should also

13 understand that the Ad Hoc Acthar Group has produced four,

14 four clients for depositions:  The City of Rockford; this

15 Acument Global Technologies, whose designee sits as the chair

16 of the committee; Teamsters Local 830; and Dakota County,

17 Nebraska.  Four.  We also produced an expert for deposition.

18 That's five depositions.

19          The debtors have yet to produce one executive for

20 deposition.  Mr. Welch, who I see -- good morning, Mr. Welch

21 -- we've had the opportunity to depose him too many times.

22 I'm sure he's tired of it; we are, as well.  He seems to be

23 their go-to witness.  And I credit him for his ability to try

24 to answer questions.  But Judge, he worked in the specialty

25 generics division of the company.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 44 of 547 PageID #: 4653
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 27 of 188

26

1          Mr. O'Neill is the Executive Vice President of

2    Commercial Operations of the brand business.  And what you're

3    going to hear about today in the hearing is whether or not

4    we're entitled to claim against entities in the brand

5    business.

6          Now the reason why we looked to see whether there

7    had been any issue involving alter-ego was because in those

8    notices I just referenced the debtors asked my clients, at

9    request number nine, all the basis for a theory of alter-ego.

10   And it caused plaintiff's counsel to scratch heads saying why

11   are they asking this question.  It seems like they know

12   something we don't.

13         Sure enough we look and we see Judge Dorsey -- I'm

14   sorry, you're Judge Dorsey -- Judge Polster -- I'm a little

15   tired, Your Honor, it's a Friday -- in the City of Summit

16   case, the In Re National Opioid Litigation, 2019 ruled on a

17   similar motion by Mallinckrodt PLC seeking to prevent its

18   jurisdiction in conjunction with two subsidiaries, the SpecGx

19   generic company and then an entity by the name of

20   Mallinckrodt LLC which the debtors say is a generic company;

21   we have evidence to say that it's a brand company.  It signed

22   contracts on behalf of the Acthar business.  So that is a

23   factual dispute.

24         We're only getting to the issue of whether or not

25   we can avail ourselves of the same theory that the generic

1   opioid plaintiffs have viewed.  And in the ruling by Judge

2   Polster he found, and I'm at star of the Lexus case 92, the

3   court finds that the issue of whether SpecGx LLC and/or

4   Mallinckrodt LLC are the alter-egos of Mallinckrodt PLC

5   should be litigated in the track one trial.  Mr. Murtagh says

6   it was kicked down the road.  No, the judge found enough

7   evidence of alter-ego and it was evidenced.

8            Here is the problem, Judge, everything was filed

9   under seal.  We asked the debtors will you give us that

10  material so we can understand the basis of the ruling.  They

11  said -- well, they didn't respond initially.  They eventually

12  had us go back to plaintiff's counsel (indiscernible), we

13  did.  We needed their consent to have those under seal

14  pleadings and documents produced.  We finally just got them

15  the other day.  In fact, late yesterday.  We added them to

16  our exhibit list.

17           Counsel is right that Judge Polster doesn't detail

18  the evidence because it was under seal and counsel is correct

19  that plaintiff's counsel, in their brief, repeatedly cited to

20  the deposition transcript of the head of commercial

21  operations, Mr. O'Neil.  And why it's evidentiary here,

22  Judge, and why his deposition here is so critical the senior

23  most person in charge of the entire brand side business said

24  I don't differentiate companies.  To me it's Mallinckrodt,

25  its Mallinckrodt Pharmaceuticals.  I don't know who pays my

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 46 of 547 PageID #: 4655
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 29 of 188

28

1  check, I don't think PLC, LLC, any subsidiary company, I am

2  in charge of all of it; operations are mine.  I make those

3  decisions.

4           We put that transcript before the court for later,

5  but, Judge, that is just a snapshot of the issue that the

6  debtors are presenting to the court.  Now remember it's the

7  debtor's objecting to our claims against entities like

8  Mallinckrodt LLC who signed contracts.  That is why the

9  ruling by Judge Polster is so important because LLC is also

10 on the generic side business in opioids and the judge there

11 said that goes to trial.

12          Now I'm not going to pre-argue today's issues, but

13 that is the backdrop of what began in October with Mr. O'Neil

14 has continued since came to a head this past week and last

15 week because of the importance of his deposition.

16 Unbeknownst to us, but fully known by the debtors who were

17 litigating over the opioid litigation.

18          Now we also know that Arnold & Porter has

19 represented Mr. O'Neill because at Exhibit 48 of our exhibits

20 today that we shared with Your Honor Arnold & Porter abruptly

21 adjourned Mr. O'Neil's deposition.  It had been scheduled for

22 November citing that he had a problem and that he couldn't

23 appear.  At some point the debtor has to put up a witness

24 other than Mr. Welsh.  I'm sure Mr. Welsh will appreciate

25 that.  I noticed, Judge, that others have noticed Mr. O'Neil,

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 47 of 547 PageID #: 4656
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 30 of 188

29

1   the committees have noticed Mr. O'Neil.

2           The debtors are unwilling to negotiate a date,

3   they have been unwilling to talk about an omnibus schedule

4   for discovery.  Mr. Astin has tried repeatedly to get there

5   to be an omnibus approach to discovery and not just plan

6   discovery, discoveries relating to our issues.  When I say

7   our issues their objections, the objection today, but they

8   say you don't get them here because he's irrelevant and I

9   suppose we will hear weeks from now whether or not they're

10  going to produce him later.

11          Relevancy is not a grounds to quash a deposition

12  notice.  Counsel has only argued relevancy and timing.  I

13  have given you the timing.  He's relevant.  There is no one

14  more relevant then Mr. O'Neill when it comes to the

15  commercial operations of the brand side business.  I think

16  Mr. Welsh would freely admit that if asked.  So he should be

17  deposed, he should be asked -- forced to answer questions

18  about these distinct entities that the debtors are now

19  claiming for the first time have independence of the PLC.

20          Why that is important, Judge, and you probably

21  read this in the papers, they're now arguing this dual

22  position that in some senses they're a single entity, that

23  Mallinckrodt is Mallinckrodt.  In response to the Humana

24  brief they raised the Copperweld antitrust decision which

25  says that a parent cannot conspire and agree with a

1  subsidiary.  Well that is right, but they don't show the

2  court, and we will show the court later, that Copperweld was

3  further to say because it's a single enterprise because

4  there's a purpose between a parent and a sub, and that's why

5  you can't have a conspiracy between those entities.

6        The debtors are trying to do that now by saying

7  that somehow we had to sue every single disparate subsidiary,

8  but they never made that argument in Rockford.  They never

9  made that argument 420.  They never made that argument in

10  322.  In fact, they never objected to our suing the PLC.  I

11  note that they did object in the Human case, but not in our

12  case.

13        So we're being pushed to a point where now all of

14  a sudden the debtor is taking a completely different approach

15  and they're saying you don't get to depose the one witness

16  who can speak to that issue whether or not there's

17  independence of form, function, decision making of all these

18  disparate entities and the head of commercial operations

19  knows that better than anybody else.

20        The reason why it's important, Judge, is they put

21  it in their reply.  They are arguing we should have known.

22  The Ad hoc Acthar group should have known better, should have

23  done more and all I'm going to cite to, Your Honor, is what

24  we put in the record (indiscernible) 147 through 162 is the

25  discovery in Rockford.  We issued four sets of discovery.  We

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 49 of 547 PageID #: 4658
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 32 of 188

31

1  asked for all contracts, and this is important the defendants

2  and any third-party relating to distribution, pricing,

3  marketing, sales of Acthar.  Repeatedly Mallinckrodt said

4  they complied.

5       The court ordered no less than three times

6  compliance.  In ECF 171, 224 and 354 which are Exhibits 152,

7  153, and 154 of the evidence we put in.  Court orders and

8  repeatedly they say we produced the documents.  We propounded

9  the request last week to say, okay, to Mr. Murtagh's point.

10  If the record is what the record is and they did respond to

11  the one request give us all the evidence that supports your

12  reply.  Mr. Murtagh responded you have it.  Well then we said

13  we want to make sure we have all the evidence of the

14  discussions, the contracts, presentations, communications,

15  discussions of Acthar between the non-debtor entities.

16       The response is interesting, burden.  Burdon

17  denotes we investigated, we've seen that it's too much, it's

18  too difficult.  They haven't put an affidavit of burden

19  forward, that's why I couldn't discuss with Mr. Murtagh how

20  do we get past that objection.  He didn't articulate to us.

21  He didn't say, Mr. Haviland, you have 100,000 pages of

22  documents is there some way we can give you (indiscernible)

23  to say, okay, this one speaks to all the other documents.  We

24  never had that discussion.  They simply say no.  They say no

25  that it's irrelevant and burdensome.  It's relevant because,

1  Your Honor, we did have that hearing on the motion to compel

2  and Your Honor said that we can follow the money and follow

3  the function.  That is what we are trying to do.

4       When we got the reply and we see them putting

5  documents in from the Rockford litigation which are, frankly,

6  cherry-picked out of the record Ms. Falconi's emails, Mr.

7  O'Neil's emails, and then trying to ascribe some meaning to

8  that that we should have known that this ARD entity that we

9  sued under the parent, PLC, the entire form and function was

10  blown up and all the functions went to a UK company and an

11  Irish company.

12       Your Honor, no witness ever said that.  We deposed

13  William Hillmer as a corporate -- well the FDC deposed him as

14  a corporate designee in 2016, that's 159. The corporate

15  designee of Mallinckrodt.  He never said that.  And by the

16  way, he was designated one month after this company adopted

17  the (indiscernible) process where they're having these two

18  foreign parents make decision making.  Did he perjure himself

19  he certainly did tell the truth.

20       Then we deposed him later on July 21st, 2020.  I

21  asked him, did you testify truthfully, that's Exhibit 162, he

22  said yes.  Has anything changed; no.  We deposed Ms. Falconi

23  February 28th, 2020, Exhibit 160, who do you work for;

24  Mallinckrodt Pharmaceuticals.  That entity doesn't exist.

25  She was the right-hand to Mr. O'Neil.  Never once did she

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 51 of 547 PageID #: 4660
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 34 of 188

33

1  say, when asked about pricing distribution, Acthar, Mr.

2  Haviland, we go to Ireland.  We have to get the Irish

3  company's approval.

4        Then we deposed Mike Close [phonetic], the

5  "closer" they call him, the contract guy, the guy actually

6  involved in all the contracts, not once did he ever say

7  here's what happens, by the way, that's Exhibit 161, we have

8  to go to Ireland and the UK to get approval for all pricing,

9  distributions, decision-making on Acthar.  They are telling

10 us, through this court, that we failed in our job.

11       Your Honor, we have four sets of written

12 discovery, three court orders, fifteen depositions only four

13 of which are current employees of Mallinckrodt.  We have got

14 the debtor moving repeatedly to prevent depositions starting

15 with Mr. O'Neil and continuing through today.  The question

16 is when are we going to get due process, when are we going to

17 get the discovery.

18       These debtors want to have an objection where they

19 get to put Mr. Welsh up and say what they want him to say.

20 And I'm not suggesting that he's not testifying as an

21 informed witness for the company, but he doesn't have direct

22 personal knowledge of those issues.  He's not on the emails.

23 He wasn't at the presentations.  He's not part of those

24 organizations.

25       When are we going to get the discovery.  Now I'm

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 52 of 547 PageID #: 4661
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 35 of 188

34

1  not suggesting that we adjourn today. I think we use today.

2  But I am suggesting we can't close, not with the record the

3  way it is as created by these debtors.

4           Thank you.

5           THE COURT:  Mr. Murtagh?

6           MR. MURTAGH:  Yes, Your Honor.  Just to try to

7  bring some clarity I don't understand Mr. Haviland to still

8  be requesting a deposition of Ms. Falconi and it was not made

9  part of the motion to compel.  I didn't hear any reason why

10  he needs Ms. Falconi.  So I am going to assume that that's

11  not part of the motion.  I am going to leave Ms. Falconi out

12  of this for now.  That would take care of one of the

13  disputes.

14           The second with regard to Mr. O'Neil's deposition.

15  I understand from Mr. Havilland, as he's told the court

16  repeatedly, that he would like an opportunity to examine Mr.

17  O'Neil.  Mr. O'Neil will be put up for examination at the

18  beginning of August as part of plan confirmation.  There are

19  many people who have an interest in deposing Mr. O'Neil and

20  there will be an opportunity to depose Mr. O'Neil.

21           There have been repeated occasions in this case in

22  which Mr. Haviland has done what he's done today which is to

23  say in the context of a separate specific matter it's unfair

24  that he has not been allowed to depose Mr. O'Neil.  He, in

25  fact, had raised this question back in May and asserted, in

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 53 of 547 PageID #: 4662
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 36 of 188

35

1  court, that he needed to depose Mr. O'Neil as part of his

2  response to the unsubstantiated claims objection.  He later

3  left off of that and did not pursue it.  That was over two

4  months ago.

5          This briefing commenced three months ago.  When

6  Mr. Haviland did not say that I could follow him in his

7  argument was any reason why Mr. O'Neil has now become

8  relevant for the first time three months after these

9  objections were put in place.  Again, Your Honor, the fact

10 that Mr. O'Neil was deposed in an MDL proceeding two years

11 ago and the proceeding, itself, are not new.  They did not

12 become new in our reply and they were not referenced in our

13 reply.

14         We did not raise alter-ego for the first time in

15 our reply.  As Your Honor knows, we have been arguing alter-

16 ego issues before this court for months in the context of

17 estimation, in the context of discovery disputes.  It is not

18 a surprise to hear that the debtors want to know whether

19 there is any assertion of alter-ego because that could be a

20 ground on which claimants are attempting to create claims and

21 the as the debtors have said repeatedly believe those to be

22 estate causes of action.  That is patent in the record for

23 months.  So that is not new.

24         The single document about Mallinckrodt

25 Pharmaceuticals Ireland Ltd., having decision making

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 54 of 547 PageID #: 4663
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 37 of 188

36

1  authority also is not new.  The point of putting in the reply

2  was to demonstrate that Rockford had it prepetition.  There

3  is just nothing new today, Your Honor.  There is no reason

4  that has become apparent in the past week for a need to

5  depose Mr. O'Neil in the context of these proceedings.

6          If Mr. Haviland felt that he needed Mr. O'Neil to

7  defend his claims he had that need three months ago and the

8  time to argue about it was three months ago.  He didn't and

9  he never asked for it.  Today is the day of the hearing on

10 the objection.  It's just inexcusable to be raising it at

11 this stage.

12          As I said at the beginning, Your Honor, that is

13 exactly the same for the RFP's.  We gave the discovery after

14 discovery discussions before Your Honor that was ordered and

15 we have not heard for months that there is anything

16 insufficient about it.  The new request is for, literally,

17 every document that exists relating to Acthar for all time

18 among thirty-three separate entities.  It is not targeted at

19 all.  It is just an attempt to disrupt.

20          These are both just attempts to disrupt and they

21 should be denied.  The argument can proceed today and at the

22 close of today's hearing, if we can finish today, the record

23 and the argument on this proceeding should be closed.  It's

24 been going on for three months.

25          THE COURT:  Alright, well the only issue before me

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 55 of 547 PageID #: 4664
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 38 of 188

37

1  today is the issue of whether or not the proofs of claim

2  filed by the ad hoc group and the insurance group of Acthar

3  claimants complies with the code, the rules, and the Third

4  Circuit's ruling in _Allegheny_.  As Mr. Murtagh pointed out, I

5  did give leeway on taking discovery with regard to these

6  claims, as Mr. Haviland pointed out, to follow the money and

7  see where that took them.

8          The issues about whether or not -- well, let me

9  back up.  I allowed that discovery because I was under the

10  impression that the Acthar claimants were going to seek to

11  amend their proofs of claim.  For whatever reason they

12  decided not to do theat.  So the only thing I have before me

13  today are the proofs of claim and the only thing I'm going to

14  rule on today are whether or not those proofs of claim, as

15  written, state facts sufficient to allege a claim against the

16  debtors against whom those proofs of claim were filed.

17          I am not going to get into whether or not there is

18  other evidence that might have been used to -- that could

19  have been included in those proofs of claim because, again,

20  there is no motion to amend, so there is nothing for me to

21  decide on that issue.  The only issue -- again, I am going to

22  make this very clear, the only issue before me today is are

23  the proofs of claim, as written, sufficient to state a claim

24  against the debtors against whom those proofs of claim were

25  filed.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 56 of 547 PageID #: 4665
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 39 of 188

38

1        This discovery may go to the question of whether

2   or not there could be an amendment to those proofs of claim,

3   but that issue is not before me.  So we're going to get to --

4   I'm going to set this motion aside for now.  We're going to

5   go to the underlying merits of the only substantive issue

6   before me which is the proofs of claim and we will go forward

7   from there, then I will make my ruling and we'll see whether

8   or not the additional discovery might be allowed somewhere

9   down the road.  For now that issue is moot as far as I am

10  concerned.

11        MR. MURTAGH:  Understood, Your Honor.  Based on

12  your instructions just now do you mind if we take a moment or

13  two just to confer among our team on how to proceed?

14        THE COURT:  Yes.  We will take a ten minute

15  recess.  We will reconvene at 10:05.

16        MR. MURTAGH:  Thank you, Your Honor.

17     (Recess taken at 9:53 a.m.)

18     (Proceedings resumed at 10:05 a.m.)

19        THE COURT:  We're back on the record.  Mr.

20  Murtagh, are you ready to proceed?

21        MR. MURTAGH:  Yes, Your Honor.  I will go ahead

22  and turn the podium over to Mr. Harris.

23        THE COURT:  Mr. Harris?

24     (No verbal response)

25        THE COURT:  Mr. Harris, can you hear me?

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 57 of 547 PageID #: 4666
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 40 of 188

39

```
 1              MR. MURTAGH:  Can you hear us?

 2        (No verbal response)

 3              MR. MURTAGH:  He may have lost audio.  Let me send

 4   him a text.

 5              MR. HAVILAND:  Your Honor, before we begin, may I

 6   be heard?

 7              THE COURT:  On what?

 8              MR. HAVILAND:  On the issue that came up toward

 9   the end of the last session, the issue about leave to amend.

10   I am only offering a potential solution to a protracted

11   hearing today.  In our brief, at Docket 2529, we requested

12   leave to amend at Pages 15 through 18.  We would be willing

13   to forego any examination of Mr. Welsh today if the debtors

14   would agree to the admissibility of the documents that were

15   produced and that are part of our file.

16              That would, at least, make the issue more acute

17   for the court.  Of course, those documents are not attached

18   to our proof of claim; only the complaints were.  We do point

19   out in our opposition to the objections we're seeking leave

20   to amend through this process to put the factual detail

21   before the court.  I'm suggesting that that is a way to short

22   change today not to take away anyone's ability to present

23   evidence, but I am going to suspect that Mr. Welsh hasn't

24   seen a number of the documents and the examination is going

25   to be lengthy.
```

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 58 of 547 PageID #: 4667
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 41 of 188

40

1          If the debtor is amenable to the admission of

2    those exhibits they're in the court file and we can move onto

3    the next issue of whether or not (indiscernible).

4          THE COURT:  I'm not sure if Mr. Harris heard all

5    of that.

6          MR. HARRIS:  I'm sorry, Your Honor, I was having

7    audio problems. I apologize, I did not.

8          THE COURT:  Mr. Haviland, do you want to repeat

9    that?

10         MR. HAVILAND:  Sure.  I'm sorry, Chris, I didn't

11   realize you were out.  Mr.  Harris, I just said to the court

12   that as a point of order, based on the court's observations

13   of the issues before the court today in terms of the existing

14   proofs of claim, the existing proofs of claim, as everyone

15   knows, at least for the ad hoc Acthar group, consist of an

16   addendum which describes the claims, a complaint which talks

17   about the conduct of the named defendants, the PLC and ARD,

18   and unnamed co-conspirators and others, then it provides, as

19   Exhibits B and C, the damages claim and the actual proof that

20   the claimant is included in the claim within the complaint.

21         None of the exhibits that we're about to examine

22   Mr. Welsh on, as a corporate designee, are included in the

23   proofs of claim.  It seems to me the court has framed the

24   issue, and I'm not suggesting that Judge Dorsey has done

25   anything other than set the pace of play for today, we have a

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 59 of 547 PageID #: 4668
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 42 of 188

41

1  number of exhibits, as you can see from our exhibit list,

2  that are not in our proofs of claim.  The issue is whether

3  they should be and if so when.

4           In our opposition brief I just pointed out that

5  its filed May 21st at Docket 2529 beginning on Page 15 of 19

6  we say leave to amend the proofs of claim should be granted.

7  We cite Federal Rule of Civil Procedure 15(d), we cite cases

8  in the Third Circuit and the District of Delaware that leave

9  to amend should freely be given.  That was two months ago.

10 We haven't gotten leave to amend and we would like leave to

11 amend.  And we are willing to forego any examination of Mr.

12 Welsh today provided that the debtors agree to the

13 admissibility in this record today of the documents that we

14 put in that are Mallinckrodt documents that were produced

15 either in the context of the bankruptcy, which most of them

16 are, or some which come from the underlying Rockford file and

17 that is why they haven't made publicly available.

18          This is going to be a long hearing today.  It

19 seems to me that that is the issue before the court whether

20 or not leave to amend should be granted.

21          MR. MCCALLEN:  Your Honor, may I be heard on that

22 briefly?

23          THE COURT:  Your cross talking here.  Who -- let

24 me -- was it Mr. McCallen?  Go ahead.

25          MR. MCCALLEN:  Thank you, Your Honor.  I think it

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 60 of 547 PageID #: 4669
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 43 of 188

42

1 │ might make sense for me to go first as the other Acthar

2 │ private -- private Acthar plaintiff here and then maybe Mr.

3 │ Harris can respond to both of us if that works for you, Your

4 │ Honor.

5 │          THE COURT:  That's fine.

6 │          MR. MCCALLEN:  So I guess with regard to the

7 │ statements that Mr. Haviland just made, you know, from my

8 │ perspective, Your Honor, we might get some day to the

9 │ question of whether or not leave to amend should be granted.

10 │ That is leave to amend the pleadings, but I don't think we're

11 │ there yet.

12 │          You know, I think, Your Honor, a little bit of a

13 │ history here might put some context and be helpful at least

14 │ with respect to my clients.  You know, when we filed our

15 │ claims in this bankruptcy proceeding we did so without the

16 │ benefit of any discovery in this case or in the prepetition

17 │ litigation.

18 │          Humana, which is one of my clients, filed its

19 │ lawsuit in 2019 and it had no significant discovery in that

20 │ case at the time that the bankruptcy cases were filed. I

21 │ think that, in fact, Humana's motion to dismiss was decided

22 │ in Mallinckrodt.  It just answered, literally, a couple weeks

23 │ before the bankruptcy petition in this case.

24 │          It was really part of these cases that information

25 │ that Mr. Welsh testified to at his deposition, in which I

1  think you will hear about today, started to come to light.

2  You know, as Your Honor recalls, on the same day, April 30th,

3  we filed a motion to estimate.  The debtors filed this claims

4  objection; what they style the unsubstantiated claims

5  objection.  Your Honor, I am going to have a lot to say about

6  what that means in the context of Allegheny.  I think Your

7  Honor is spot on whenever you said Allegheny governs here.  I

8  think they're way out side of it in terms of the second and

9  third prongs of Allegheny.

10         With regard to the first prong of Allegheny, Your

11  Honor, the -- when we filed those cross motions, you know,

12  the debtor said your claims are unsubstantiated.  There is --

13  you have cited no evidence against these specific boxes and

14  we basically said at that point everything we know we have

15  either learned about from public filings which was very

16  little, frankly, or we had got pursuant to a very restrictive

17  NDA at the outset of the case.

18         So we said to them, okay, fine, you're putting an

19  issue -- the claims, you know, we served them with discovery.

20  I'm not going to belabor the history there.  Your Honor

21  remembers.  We were in front of you on a 30(b)(6).  My

22  colleague, Mr. Freimuth, was in front of you asking for

23  discovery on our estimation motion.  You know, the debtors

24  pushed back and they said, no, we can hear this issue, this

25  unsubstantiated claims objection on just this limited factual

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 62 of 547 PageID #: 4671
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 45 of 188

44

1   record.

2            I believe then and I continue to believe now it

3   was an exercise and artificial line drawn, Your Honor,

4   because you just can't disentangle the issues about corporate

5   structure that they offered Mr. Welsh for and that we deposed

6   him on from questions about did something wrongful happen and

7   if so where it happened.

8            So from our perspective, Your Honor, you know, all

9   of those issues are tied together.  We now find ourselves

10  three months into this process and, candidly, exactly where I

11  was afraid we would be when we started this which is we have

12  this factual record which we are prepared to move forward on

13  today and, you know, cross-examine Mr. Welsh.  I'm sure the

14  debtors are prepared to move forward and give the direct

15  examination of Mr. Welsh.

16           Candidly, I think, Your Honor, whenever you look

17  at the governing law not only Allegheny, but when we get to

18  the evidence, Your Honor, about the second and third prong of

19  Allegheny as well as the Copperweld and other cases you're

20  clearly going to see today, just even on the limited record

21  that we have put together for Mr. Welsh, that our claims

22  would withstand a motion to dismiss and they withstand, from

23  an evidentiary perspective, whatever it is that the debtors

24  are putting forward with this unsubstantiated claims

25  objection.  That is what I won't get into right now.  I do

1  want to talk about it later because it's not clear to me

2  exactly what it is.

3          I guess what I am trying to say, Your Honor, is I

4  didn't get a chance to confer with Mr. Haviland on the break,

5  We will, obviously, seek guidance from Your Honor and proceed

6  in a way that Your Honor thinks is effective in light of the

7  way Your Honor is seeing the pleadings thus far, but we are

8  prepared to move forward with the evidence today.

9          I think we are going to do enough today that's

10 going to get Your Honor comfortable that our pleading

11 survives whatever this unsubstantiated claims objection

12 really is.

13         THE COURT:  Well here is the problem I have with

14 your client's proofs of claim, Mr. McCallen; they filed them

15 and they include a footnote that says we're filing these out

16 of an abundance of caution because we don't actually know

17 whether we have claims against these debtors and we think

18 discovery in the future will show that we do.  That is not

19 how the claims process is supposed to work.

20         What should have happened here is as soon as this

21 case was filed and certainly as soon as the bar date was set

22 back in March -- no, when was it set?

23         MR. HARRIS:  The bar date was in February, Your

24 Honor.

25         THE COURT:  The bar date was in February.  I

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 64 of 547 PageID #: 4673
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 47 of 188

46

1  entered the order in, what, October?  November 30th I set the

2  bar date order.  The bar date was set for February, so you

3  had 78 days.  The way the process is supposed to work in

4  bankruptcy is if you're not sure you have a claim against a

5  debtor then you seek 2004 discovery to find out if you do,

6  but neither one of the groups of Acthar claimants here

7  decided to do that, for whatever reason.  Instead, they just

8  filed blanket proofs of claim against every single creditor -

9  - excuse me, every single debtor in the corporate structure

10 not knowing whether they had claims or not.

11             I got a problem with that.  I got a huge problem

12 with that.  I think its bad faith.  I also have a problem

13 with the fact that folks actually filed these proofs of claim

14 under penalty of perjury not knowing whether they had a

15 claim.  So those are the issues that I have with this whole

16 process.  The proper procedure was not filed.  It could have

17 been and you didn't do it.

18             So having read these papers, having looked at the

19 proofs of claim I will tell you exactly where I am on this.

20 My view is all of these claims should be dismissed.  If you

21 want to say, well, we want a leave to file a late claim then

22 you can file a late claim and I will decide it then under the

23 Pioneer factors the Supreme Court set forth for excusable

24 neglect because you had the time to do your investigation,

25 you had the time to request 2004 discovery to find out

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 65 of 547 PageID #: 4674
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 48 of 188

47

1  whether you actually had claims against these particular

2  debtors and you chose not to do it.

3          I see that as gamesmanship.  I see that as let's

4  put pressure on the debtors by bringing claims against every

5  single debtor in the corporate structure, including the

6  generic side and the specialty side, because that is going to

7  screw up the debtor's plan of reorganization.

8          So that is where I am on all of this.  So you are

9  going to have to convince me otherwise today.  And I don't

10  need to hear the evidence as to whether or not there is

11  claims against these debtors.  I want to know why you didn't

12  seek 2004 discovery, why you didn't seek to amend.

13          Mr. Haviland, I don't think saying you want leave

14  to amend in your response to the motion is sufficient because

15  there are specific requirements for a motion to amend that I

16  have to make rulings on and it's not in the papers.

17          Mr. Harris, what is your position?  Go ahead.

18          MR. HARRIS:  Thank you, Your Honor.  That is

19  exactly our view of things.  With your helpful guidance that

20  the issue before the court is what we said it was which is

21  whether the proofs of claim, as written, substantiate claims

22  against the non-debtor defendants and there is not a need for

23  an evidentiary hearing for that.  I don't know if the

24  claimants are implicitly conceding as they seem to be that as

25  written they do not substantiate a claim.  If so we could

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 66 of 547 PageID #: 4675
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 49 of 188

48

1   probably just go forward to a ruling on dismissing them.

2           If they do still dispute that then I would suggest

3   we have oral argument on whether the claims, as written,

4   substantiate a claim.  I think it will be abundantly clear,

5   maybe not, that that's the issue of the parties.  No one has

6   moved to amend and so that is not before the court.

7           If and when they file we will respond, but our

8   view is we will be able to defeat that.  It is extremely

9   prejudicial for them to have laid in wait and to raise a new

10  amended proof of claim later so close to confirmation, but

11  that is not an issue Your Honor has to decide today.  As you

12  said today all that is before you is those proofs of claim as

13  written and we are happy to argue that if they are still

14  disputing that they are sufficient on their face.  If not,

15  you know, the court understands the issues.

16          THE COURT:  Mr. Haviland, you raised your hand.

17          MR. HAVILAND:  Your Honor, I'd just like some

18  guidance in terms of whether we should file a formal motion

19  on the heels of the May 21st request.  I have been practicing

20  in the Federal District Courts for 31 years and when there is

21  a motion filed, motion to dismiss under Rule 12, which is

22  what I deem the objections to (b), they cite Twombly and

23  Iqbal even though I agree the Allegheny standard applies and

24  is not the same level of pleading (indiscernible).  That is

25  how I read the cases.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 67 of 547 PageID #: 4676
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 50 of 188

49

1      I didn't think that we needed a formal motion when

2   we moved to dismiss with the alternative request leave to

3   amend.  The debtors responded in their reply, a week ago, to

4   say leave should not be granted.  I would just like to know,

5   if the court is inclined to tell us today, should we file a

6   formal motion.

7      I don't agree with Mr. Harris that we have

8   conceded that the proofs of claim that we filed in some

9   thirty branded debtor cases, Judge, and we tried to be very

10  careful and judicious about the claims we filed and we did

11  not file on all sixty-four cases.  I think the court will see

12  that.  We did not file, at least to my knowledge, any claim

13  against any generic company that is clearly a generic; SpecGx

14  being the obvious one.

15     We did file as to entities that were at a time

16  part of the brand business, Mallinckrodt LLC for instance,

17  Mr. Hillmer signed contracts.  So we tried to be very careful

18  and deliberate about claiming on the brand side business

19  because our view, Your Honor, is when Questcor and

20  Mallinckrodt merged in August of 2014, and it was not an

21  acquisition, it was a merger 50.5 percent of the shares went

22  to Mallinckrodt shareholders, 49.5 went to Questcor; two

23  companies became one.  Later this ARD subsidiary was stripped

24  of its assets and found to be insolvent internally back in

25  2018.  The rest is just the maneuvers of the corporation with

1   respect to its subsidiary.  We think they are just divisions.

2          To me, Your Honor, that is just a question of

3   facts that can be decided on the papers.  Mr. Welsh certainly

4   has a lot of knowledge about the reasons why those things

5   were done for tax purposes, but doesn't have a lot of

6   knowledge about the functional aspects of it which is why we

7   asked for the witnesses we did.

8          So I am speaking at length here to find guidance

9   as to whether or not a formal motion at this point should be

10  filed today in which case we will do it so that the issue can

11  be brought to the floor and the court can rule on timing,

12  substance, any issue that goes into what was done back on

13  February 16th, what was done in the context of the April 30th

14  objection and the May 21st response.

15         It seems to me that the parties are coalescing

16  around an approach that the documents are the documents.

17  That is why I made the suggestion, and I'm glad we're

18  discussing it, because we can probably short change the

19  hearing at length by not having to ask Mr. Welsh a number of

20  things he doesn't know about documents he hasn't seen.  Then

21  the court can rule on the papers in terms of the proffer.

22         Given where we are I can't leave the fact that

23  we've made a request for leave to amend two months ago and if

24  it's a formal motion that's required, even though there's

25  been a response, then we will file that so that the court can

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 69 of 547 PageID #: 4678
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 52 of 188

51

1  clearly see that that is set for a hearing date and we can

2  decide that because we will certainly put more information in

3  the motion to give the court context based on discussion

4  about the timing and all the material we received in the wake

5  of the court's ruling on a motion to compel.

6          THE COURT:  Mr. McCallen, do you have a response?

7      (No verbal response)

8          THE COURT:  You're muted, Mr. McCallen.

9          MR. MCCALLEN:  Sorry about that, Your Honor.  I do

10  have a couple points.  Your Honor, thank you for the guidance

11  at the outset of the hearing.  I do always think it's

12  instructive and helpful to understand where the court is

13  viewing issues at an early stage of the case.

14          I do want to make a couple points because having

15  heard what Your Honor said I want to let you know why we are

16  where we are from our perspective so you understand.  I hope

17  that we are here in good faith.

18          The -- this goes to the point that we, sort of,

19  laid in wait to see what would happen.  Your Honor, we tried

20  extensively during these cases and on many occasions to get

21  information from the debtors informally.  That did not -- we

22  do not always get what we wanted when we wanted it.  In fact,

23  we did not get the level of information we thought we needed.

24  We also -- as you know, the UCC was pursuing a Rule 2004

25  request.  We joined in that request and, you know, in

1  retrospect, Your Honor, in light of what Your Honor has said

2  today perhaps we should have been more aggressive in bringing

3  to the court what we felt was informational stonewalling by

4  the debtors.

5        Having heard what Your Honor said today I think

6  that that is something we would have done if we would have

7  known then the way Your Honor was going to view this issue

8  now.  You know, the reality is that we largely learned about

9  these entities upon the filing of bankruptcy cases.  Your

10  Honor, we really learned, for the first time, that, from my

11  perspective at least, on April 30th whenever the debtors

12  filed this objection that, really, this kind of box by box

13  level scrutiny was going to be a basis to attack our claims.

14        Your Honor has to recall, and this is in Mr.

15  Welsh's first day declaration he talks about this, the reason

16  that the company filed for bankruptcy they had an opioid

17  settlement on the generic side of the business and then they

18  had certain liabilities, Acthar related liabilities coming on

19  the brand side.  It was that that led them to file the

20  specialty brand side of the business; not just PLC and ARD,

21  they filed the entire specialty brand side of the business.

22        So from our perspective, you know, Your Honor, we

23  -- in pursuing these claims we thought, you know, I think at

24  the filing of the bankruptcy the expectation among people on

25  our side of the case was ARD and PLC, you know, these are the

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 71 of 547 PageID #: 4680
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 54 of 188

53

1 main entities and maybe some of these other ones are, sort

2 of, related, but that is sort of where the conduct took

3 place, but, in fact, it turned out, Your Honor, that ARD and

4 PLC are a very small part of the story and other entities are

5 a larger part of the story.

6        So, you know, that is just background, Your Honor,

7 that I wanted to try to put that on the record to address

8 Your Honor's comments about how we got here and, you know,

9 the procedure around what we did and whether we brought our

10 plans in good faith.

11        In terms of next steps, Your Honor, I actually

12 think it might -- I know the last thing we want to do is

13 start with another break, but if we're going to do anything

14 other than proceed the way that I think we all envision,

15 which is opening statements, short opening statements

16 followed by Mr. Welsh and cross, followed by closings, I

17 would like the opportunity to confer with my colleagues.  I

18 think there has been a lot of information here that has been

19 conveyed from the court to the parties.  I think I would like

20 an opportunity to absorb that and discuss it with my clients

21 if that is possible.

22        THE COURT:  Alright, let me hear from Mr. Harris

23 first.

24        MR. HARRIS:  Thank you, Your Honor.  Again, our

25 view is there is not a need for an evidentiary hearing at

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 72 of 547 PageID #: 4681
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 55 of 188

54

1  this point.  The issue is what do the proofs of claim say and

2  assuming the facts are true did they substantiate a claim

3  against each debtor against whom it was filed.  That can be

4  determined on the basis of pleadings, the proofs of claim,

5  and the law which is in the briefs.  We're happy to go to

6  oral argument on that.

7          In terms of a few points that were made the ad hoc

8  group did not move (indiscernible).  What they said in a

9  motion to dismiss is that in the future they would seek leave

10  to amend at some unspecified point when unspecified discovery

11  is completed and I don't even know what that amendment would

12  be because they didn't file an amended proof of claim.  So

13  the thought that they had actually moved to amend in some

14  unspecified way at some unspecified time is just not

15  accurate.

16          In terms of Humana they have not sought leave to

17  amend and Attestor.  I actually received hundreds of

18  thousands of documents prepetition.  They received millions

19  of documents in the bankruptcy.  They saw pleadings in the

20  bankruptcy filing case in the early stages that indicated the

21  ownership of IP, the licensing structure, many things, all of

22  which would put them on notice as to what entities are

23  involved.  It had gotten the entire Acthar production, the

24  prepetition lawsuit, which is millions of pages and they have

25  all the facts currently about Acthar entities do what.  In

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 73 of 547 PageID #: 4682
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 56 of 188

55

1   fact, they stipulated with us that they would rely on the

2   facts in their reply brief in exchange for us not pursuing

3   further discovery from them.  And despite that they chose not

4   to amend.

5           The idea that you just heard that somehow

6   respecting corporate formalities and limiting each corporate

7   entities liabilities to its own liabilities was a surprise to

8   them.  They view that that was somehow surprising to them is

9   incredible.  That is the foundation of corporate law.  It is

10  the foundation of how Chapter 11's are run.  The thought that

11  this did not occur to them until they saw our omnibus

12  objection that they would have to substantiate a claim

13  against each entity is just not credible.

14          So at this point we would propose that we go to

15  oral arguments on whether the proofs of claim as written

16  substantiate unless the court views that it does not need the

17  argument because the paper are sufficient.

18          THE COURT:  Thank you, Mr. Harris.

19          Mr. Haviland?

20          MR. HAVILAND:  Judge, one final point and it's

21  what I started with.  We do have a substantial record that we

22  supplied to the court and the parties and that is now before

23  the court.  I can't let Mr. Harris's comment about some

24  stipulation to rely upon what was in the papers go

25  unanswered.  We did not -- we, the ad hoc Acthar group, did

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 74 of 547 PageID #: 4683
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 57 of 188

56

1    not make that agreement.  I know counsel is aware of that.

2            They had asked in exchange for agreeing not to

3    take our client's depositions, which I pointed out to the

4    court, (indiscernible) was deposed just the other day.  We

5    put our clients up.  And so we did not make any agreement

6    that we would rely upon simply the response papers because

7    there is more to it than that.  And whether the court is

8    going to go forward with an evidentiary hearing or some other

9    vehicle to get these issues properly framed and before the

10   court we're not resting on our opposition to the objections

11   without making that substantial proffer of those exhibits.

12           THE COURT:  Mr. McCallen, in your papers you

13   actually state flat out that you were going to -- after

14   discovery was completed you were going to make a

15   determination and work with the debtors to see whether you

16   could dismiss the claims against the generic brand debtors.

17   Have you made that determination?

18           MR. MCCALLEN:  I think what our -- we have not

19   yet, Your Honor.  The short answer is we have not.  To the

20   point that Mr. Murtagh was making earlier there has been no

21   further discovery on this motion after the deposition of Mr.

22   Welsh.

23           We have documents from the debtors that represent

24   which those entities are and we would, you know, like the

25   opportunity, as we anticipated doing during discovery, is

1  taking further discovery, confirming the fact that the

2  generic side is the generic side, the debtors -- the

3  specialty brand side is the specialty brand side.  Then we're

4  going to dismiss those generic claims.

5          We have no -- we have been very clear about that.

6  The debtors have also, you know, not reached out to us to

7  say, well, let's talk about how we can do this.  So, Your

8  Honor, we haven't had that conversation with them.  I do

9  think we would want some more confirmatory discovery, but it

10  is our intention to do that, Your Honor.

11          THE COURT:  You see that's another problem because

12  you have had months do that and I don't understand why you

13  haven't.  The only reason I could think of as to why you

14  wouldn't is for hold up factor because you're holding up the

15  debtor's proposed plan of reorganization by maintaining

16  claims against the generic side without any basis for knowing

17  whether you -- you've had months to take discovery on that

18  issue.  I am just really frustrated with where this process

19  stands.

20          Mr. McCallen, I am going to give you the

21  opportunity to take a break.  I am not going to hear any

22  evidence today.  I don't think I need to.  I will hear brief

23  arguments as to why, as written, these proofs of claims

24  should not be dismissed or whether or not I should grant

25  leave or grant leave to seek leave to amend because I'm not

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 76 of 547 PageID #: 4685
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 59 of 188

58

1   going to grant leave to amend based on the record I have

2   before me.  We will take it from there.  That is what I want

3   to hear about when we come back.

4            So let's take -- let's recess until -- how much

5   time do you think you will need, Mr. McCallen?

6            MR. MCCALLEN:  Ten minutes should be fine, Your

7   Honor.

8            THE COURT:  Alright, well let's take a little bit

9   longer.  Let's recess until eleven o'clock.

10           MR. MCCALLEN:  Thank you, Your Honor.

11      (Recess taken at 10:35 a.m.)

12      (Proceedings resumed at 11:05 a.m.)

13           THE COURT:  Alright, we are back in the record.

14  Mr. McCallen, did you have an opportunity to discuss the

15  issues and do you have anything to add?

16           MR. MCCALLEN:  No, Your Honor.  I think in light

17  of the court's guidance we would proceed directly to

18  argument.  I don't think there's anything further that we

19  need to discuss at this point.

20           THE COURT:  Alright, so the argument that I want

21  to hear is do these proofs of claim, as drafted, allege facts

22  sufficient to establish a claim against the debtors against

23  whom those proofs of claim were filed.  If they do not is the

24  proper way to proceed to dismiss those claims or is it to

25  grant leave to amend those claims?

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 77 of 547 PageID #: 4686
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 60 of 188

59

1           So with that, Mr. Harris, you raised your hand.

2           MR. HARRIS:  Thank you, Your Honor.  I will

3  address those two points in order.  I will first talk about

4  why each challenged claim should be disallowed under the

5  first step of Allegheny and then I will talk about why that

6  disallowance should be with prejudice given where we are in

7  the case today.

8           So I don't believe this first question is

9  difficult.  Under Allegheny which governs here, no one

10 disputes that, before there is a *prima facie* valid proof of

11 claim, so in order to assert a *prima facie* valid proof of

12 claim the claimants have to satisfy the first step of

13 Allegheny which is,

14          "The claimant must allege facts sufficient to

15 support the claim."

16          That is the standard and that also means that the

17 factual allegations in the proof of claim there must be

18 allegations of specific wrongful conduct attributable to the

19 debtor in question and we cited several cases applying that

20 standard to disallow claims.  It was the In Re Tribune case,

21 the Hilton v. Hongisto case as examples.

22          So just attaching a prepetition complaint to a

23 proof of claim, if the complaint doesn't allege any facts

24 about that debtor does not satisfy the standard.  There is no

25 magic to the words of calling something a complaint.  The

1    complaint actually has to say something about the debtor

2    against whom the claim is filed.

3         The main case that the claimants rely on, F-

4    Squared just confirms that.  I am going to quote it,

5         "Multiple courts and commentators also require

6    that a proof of claim allege facts sufficient to support the

7    claim.  A reviewing court will assume the allegations are

8    true and ask whether the facts established are the necessary

9    elements of a claim."

10        That's F-Squared, that is what Allegheny says.  So

11   you look at what are the facts alleged in the proof of claim.

12        Here, the challenge proofs of claim, including all

13   the facts in the complaints appended thereto, fail that

14   threshold.  So the issue isn't assertion of facts.  It's not

15   about whether they documented or proved those facts.  For

16   today we're assuming they have.

17        So here is where we are, there are zero facts

18   asserted against each of the non-defendant debtors, no facts

19   at all.  I heard -- I saw in the briefs two responses to

20   that.  One is that there is a small set of proof of claims,

21   in particular those that were filed by United Healthcare and

22   Optum RX, claims that Attestor has now bought, that define

23   Mallinckrodt to include every debtor, but that is just

24   impermissible group pleading.  It doesn't satisfy the

25   obligation to allege facts about the specific against whom

1  the claim was filed.

2          We cited several cases to that effect in our brief

3  including In Re Frohoff [phonetic], In Re Conex Holdings, and

4  In Re PennySaver.  Notably, the claimants don't cite any case

5  saying that it's sufficient to make a group pleading against

6  60 defendants together because there are no such cases.  It

7  also violates the requirement that a proof of claim must

8  clearly identify the debtor and make a demand specifically

9  against that debtor.  That is the (indiscernible) case we

10  cite.

11          So clearly those couple of proofs of claim that

12  just lump 60 debtors together and make statements about

13  Mallinckrodt's generics they are not sufficient.  The only

14  other defense to the wording of these proof of claims that

15  any claimant makes is that their proof of claims refer

16  "unnamed" co-conspirators. That is insufficient for at least

17  three reasons.

18          First, the reference to an unnamed co-conspirator

19  is not a reference to the non-defendant debtors and that is

20  because a corporation can't conspire with its own affiliates.

21  Copperweld, the case that Humana and Attestor rely on and

22  that you heard the ad hoc group mention as well, confirms

23  that.  You cannot conspire with your affiliates.

24          Second problem with this argument is that even

25  this -- even if this was supposed to be a reference, the

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 80 of 547 PageID #: 4689
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 63 of 188

62

1  unnamed co-conspirators were supposed to be a reference to

2  the non-defendant debtors the failure to actually name them

3  is a failure to properly identify them and, thus, violates

4  the requirements that a specific debtor be individually

5  identified.  We cited the Springer case to that effect and we

6  cited others as well; Smith v. Department of Corrections New

7  Jersey, and In Re PennySaver.

8          The third problem with this argument about the

9  reference to unnamed co-conspirators is that even if the

10 proofs of claim had actually said that the particular debtor

11 was a co-conspirator that would still not be nearly enough

12 because all that is, is a legal conclusion.  That is not a

13 factual allegation.

14         We cited several cases holding that, for example,

15 Bell Atlantic v. Twombly, "A bare assertion of conspiracy

16 will not suffice."  (Indiscernible), Third Circuit case.  It

17 is, "Not enough for a complaint to simply make conclusory

18 allegations of concerted action, but be devoid of facts

19 actually reflected in a joint action."

20         The In Re (indiscernible) Group antitrust

21 litigation which hold that an antitrust complaint "Fails to

22 adequately plead the existence of a conspiracy where

23 plaintiffs never state that any or all of the defendants have

24 joined the actual conspiracy.  That case also noted that in

25 the City of Rockford case against ARD, so the actual case the

1  ad hoc group brought pre-conspiracy,

2           "Plaintiffs conspiracy claim was dismissed for

3  conclusory pleading against an unidentified co-conspirator

4  where the complaint contained scant mentions of the co-

5  conspirator in its role as a part of the dealing

6  arrangement."

7           So it is Black Letter Law that just saying someone

8  is a co-conspirator is insufficient.  So that is not a

9  defense to these proofs of claim either.  So because the

10  private Acthar plaintiffs did not meet their initial burden

11  under the first step of Allegheny their proofs of claim never

12  achieved validity, you never get to the second or third steps

13  of Allegheny and the claims should be disallowed.

14           I do want to, just to confirm that, make some

15  general points of law that support this.  These are all in

16  our brief.

17           First, the fact that the non-debtor defendants are

18  affiliates of ARD and PLC does not create liability in any

19  way.  That is Black Letter corporate and bankruptcy law.  We

20  cited several cases for that.  In Re HH Liquidation, that's a

21  Bankruptcy District of Delaware, it is axiomatic that parents

22  and subsidiary corporations are separate entities having

23  separate assets and liabilities; hence, the parent's

24  creditors have no claim for the subsidiaries assets and vice

25  versa.  We also cited In Re Regency Holdings, Southern

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 82 of 547 PageID #: 4691
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 65 of 188

64

1  District of New York bankruptcy case,

2          "A part seeking to overcome the presumption of

3  separateness must pierce the corporate veil or prove the two

4  entities should be substantively consolidated."

5          So a corporate entity is liable only for its own

6  debts and its own (indiscernible).  To the extent that the

7  claimants here are trying to articulate theories of alter-ego

8  or veil piercing those are estate claims, they cannot be a

9  part of the proof of claim of an individual creditor against

10  an estate.  We cited several cases to that effect; Emerald,

11  In Re Buildings by Jami [phonetic], In Re Tronics.  So the

12  fact that they are affiliates is not enough.

13          Specific to the actual claims that they have

14  raised that is true as well.  If you look at antitrust law,

15  and we cited several cases to this effect, you know, Attestor

16  and Humana seem to be relying on a theory that asserting

17  claims against one member of the corporate enterprise is

18  sufficient to establish antitrust claims against the rest of

19  the corporate enterprise.  That is completely wrong. It is a

20  deep mischaracterization of the cases that Attestor actually

21  cites which instead votes the plaintiffs are required to show

22  that each defendant independently participated in an

23  enterprise scheme.

24          So if you look at the main case they rely on,

25  Copperweld, it actually rejects intercorporate liability

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 83 of 547 PageID #: 4692
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 66 of 188

65

1  under Section 1 of the Sherman Act,

2          "If a parent and a wholly-owned subsidiary do

3  agree on a course of action there is no sudden joining of

4  economic resources that it previously served different

5  interests."

6          Courts can uniformly reject it, Attestor's

7  argument, that under Copperweld the plaintiff does not need

8  to allege the anti-competitive actions of each separate

9  corporate defendant.  We cited several cases to that effect;

10 there's the In Re Insurance Brokerage Antitrust Litigation

11 Third Circuit case,

12         "Contrary to plaintiff's suggestion it does not

13 follow through Copperweld that subsidiary entities are

14 automatically liable under Section 1 for any agreements which

15 the parent is the party."

16         We also cited (indiscernible), Tenth Circuit case

17 where the plaintiff sought to extend Copperweld to hold

18 parent and sibling entities as one reliability even when

19 there is no evidence that each were involved in the challenge

20 conduct.  The court rejected this.  So it is the law in the

21 antitrust liability.  It is that the plaintiff must allege

22 facts that each defendant independently participated in any

23 alleged antitrust scheme.

24         We cited the Lennox case for that.  All these are

25 cases that Humana cite.  The Lennox case said that Lennox was

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 84 of 547 PageID #: 4693
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 67 of 188

66

1   still required to come forward with evidence that each

2   defendant independently participated in the enterprise scheme

3   to justify holding that defendant liable as part of the

4   enterprise.  Arandell, the Ninth Circuit case,

5            "Copperweld does not support holding a subsidiary

6   liable for the parent's independent conduct."

7            That is with any antitrust defendant plaintiffs

8   must report evidence that CES, a particular defendant,

9   engaged in competitive conduct.  Or the Insurance Brokerage

10  Antitrust case Third Circuit again where,

11           "Defendants are not plausibly alleged to have,

12  themselves, entered into unlawful agreements.  The antitrust

13  claims against these entities must fail."

14           So that is the law.  They have to allege facts

15  that each defendant engaged in anti-competitive conduct.

16  These proofs of claim allege nothing about the anti-

17  competitive conduct of each of the debtors that they are

18  filed against.  And it's not surprising because of that

19  because there are only two types of anti-competitive conduct

20  alleged; the 2013 acquisition of Synacthen and the exclusive

21  distributorship arrangement with (indiscernible).  There is

22  no allegation in the proofs of claim that any of the non-

23  defendant debtors engaged in either of those activities.  In

24  fact, both of those activities started before Mallinckrodt

25  even acquired Acthar, acquired Questcor.  So it's not

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 85 of 547 PageID #: 4694
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 68 of 188

67

1  surprising that there are no allegations that other

2  Mallinckrodt entities were involved in these.

3          Antitrust liability, the same thing is true for

4  RICO liability.  The cases are clear you have to allege that

5  each defendant, each debtor independently engaged in a

6  racketeering activity either by conducting it or directing

7  it.  That is the reason the (indiscernible) case, the Supreme

8  Court case 1993,

9          "It is clear that Congress did not intend to

10  extent RICO liability under 1962(c) beyond those who

11  participate in the operation or management of an enterprise

12  for pattern of racketeering activity."

13          So the cases are very clear that just associating

14  or doing business with a related entity is insufficient to

15  create RICO liability.  That is the In Re Insurance Broker

16  Antitrust case again,

17          "Mere association with an enterprise does not

18  violate 1962(c)."

19          Likewise, we cited cases saying merely providing

20  goods and services that benefit the alleged RICO enterprise

21  is not liability.  That is University of Maryland v. Peat

22  Marwick case, Third Circuit, and the James Streibich

23  Revocable Trust case.  Likewise, we cited cases saying merely

24  receiving revenues that are derived from a RICO scheme is

25  also not enough for RICO liability.  That is the James

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 86 of 547 PageID #: 4695
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 69 of 188

68

1  Streibich Revocable Trust case again where it granted a

2  motion to dismiss where the plaintiff provided "nothing to

3  suggest that wholly-owned corporate defendants were anything

4  more than pass-through vehicles for funding."

5          Likewise, we cited the Lerner v. Colman case which

6  found that an alleged rule consisting of "passive reception

7  of fraudulently acquired stock and promissory notes did not

8  constitute RICO liability."  We also cited cases that just

9  providing a license that someone else uses in racketeering

10  activity is not enough.  That is the Goran case.  Then we

11  cited cases that provided financing is not enough, that is

12  the (indiscernible) case, "Passive financing arrangements are

13  insufficient to give rise to liability."

14          And the same thing is true for unjust enrichment.

15  I make just two points about that.  First off is the extent

16  that there is any unjust enrichment claim that is cognizable

17  in the proofs of claim, it is a disguised alter-ego veil

18  piercing claim that somehow value has flowed up to, I guess,

19  all debtors somehow and, therefore, the claimant should be

20  able to access that value wherever it went.  That is just a

21  disguised veil piercing claim attempting to disregard

22  corporate formalities.

23          We cited several cases saying that unjust

24  enrichment cannot be used to nullify corporate separateness

25  without satisfying the elements of alter-ego and veil

1  piercing.  That includes the <u>QVC</u> case which is a Third

2  Circuit 2016 case.  We also cited <u>In Re Citizens</u> and <u>Bank of</u>

3  <u>New York Mellon</u>.  And because they are really just alter-ego

4  and veil piercing claims claimants cannot put them in their

5  proof of claim.  They are not a valid claim against these

6  entities.

7          The second problem with these is that even if they

8  had standing to bring them an unjust enrichment claim also

9  requires conduct by the actual debtor.  Even if it doesn't

10  require wrongful conduct it does require that the defendant,

11  itself, engaged in conduct and that that conduct had a direct

12  relationship with the plaintiff's loss.  We cited the Shubert

13  (indiscernible) case, New York Superior Court 2020,

14          "There must be a causal connection between the

15  plaintiff's claimed loss and defendant's actions."

16          We also cited <u>Betty v. BMW</u>, (indiscernible), and

17  the Kagan [phonetic] case.  So unjust enrichment as well

18  requires an allegation of conduct by the defendant and that

19  that conduct directly caused the plaintiff's loss.  Here

20  there are no facts alleged as to any conduct by the non-

21  defendant debtors.

22          So where does that leave us?  Clearly on their

23  face these claims do not substantiate a claim against the

24  non-defendant debtors.  They should be disallowed.  So the

25  real issue is whether that disallowance should be with

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 88 of 547 PageID #: 4697
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 71 of 188

70

1  prejudice.  We argue it should because there is no excusable

2  neglect here for the failure to properly file proofs of claim

3  or, at least, amend them by now.  It would be highly

4  prejudicial to allow an amendment now so close to

5  confirmation, so disruptive to do that now.

6          So the courts apply an equitable test focusing on

7  prejudice, delay and bad faith to determine whether to permit

8  a proposed amendment after the bar date.  So we cited In Re

9  Exide and In Re Brown.  Prejudice is the most heavily

10  weighted factor of this.  Here there is no excusable neglect

11  for failure to have filed a proof of claim or, at least,

12  amended them by now.  They certainly would be highly

13  prejudicial.

14          Let me just review the facts for the court.  Prior

15  to the bar date both sets of claimants were aware of, at

16  least the material facts in the case that other -- that other

17  entities had some role if they wanted to substantiate those

18  claims.

19          In terms of the Acthar claimants they were given

20  over one million documents in prepetition discovery, fifteen

21  depositions including many documents that described the role

22  of other Mallinckrodt entities.  They had documents and we

23  attached those documents to our brief including slides that

24  showed that MPIL was the contracting entity for Acthar

25  management, that other entities owed the IP and engaged

1   licensing agreements.  We showed there were attached

2   documents indicating that MPIL approved the strategic plan,

3   documents indicating that MPIL was involved in setting the

4   price for Acthar.  Humana received several of those documents

5   as well prepetition.

6          In addition, there were bankruptcy filings in this

7   case before the bar date.  The IP restructuring motion, which

8   is Docket No. 385, was filed in November 2020 showed the

9   Acthar ownership and licensing structure as of the bar date;

10  in particular that Mallinckrodt ARD owed the Acthar related

11  IP, that it licensed it to Lux IP S.a.r.l., sub-licensed it

12  to MPIL which then owed Lux IP S.a.r.l. licensing fees.

13  Those are the facts that I imagine they would try and amend.

14  Those are the key facts they were aware of the bar date

15  whether they paid attention to it or not.

16          Then after the bar date, but well before this

17  hearing, we provided extensive discovery to both sets of

18  claimants.  Millions of pages of documents, all the data that

19  is needed to establish the Acthar related conduct of each of

20  the non-defendant debtors and they chose not to amend.  So

21  there is not excusable neglect for failing to file a proper

22  proof of claim or, at least, amending it before this hearing.

23          It would also be highly prejudicial to allow that

24  amendment now.  It would be a hugely wasteful and inefficient

25  use of the party's resources and the court's resources.  We

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 90 of 547 PageID #: 4699
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 73 of 188

72

1  have a hearing today.  This motion was filed three months

2  ago.  We have already extended the hearing date twice to

3  allow them to conduct discovery and incorporate those facts

4  wherever they chose to be.  It would be hugely wasteful to

5  the estate and the court to repeat this whole process later.

6          It would also be extremely prejudicial to allow

7  the claimants to amend later, to string out the claims filing

8  process after the bar date and after this hearing.  I'm sure

9  Your Honor remembers we brought this objection in April and

10 we're very clear about why we did this.  We did this in order

11 to provide clarity to the estate and the court in advance of

12 confirmations so we would know whether there were surviving

13 claims against other boxes and if so whether we had to

14 conduct an estimation hearing on those surviving claims

15 against other boxes.

16         If you recall, Humana told you that if we do have

17 to go that route it would be extremely lengthy and timely.

18 They estimate it will take four months for discovery and at

19 the end of trial.  We tried to avoid all this by fronting

20 these issues and filing this estimation motion.  It would be

21 highly prejudicial for them now, months later, to file a

22 motion to amend which, itself, will take a month to deal

23 with.  And if they're permitted to amend then we have a

24 hearing on the legal sufficiency of those amended claims

25 under Allegheny step one.  And if any are legally sufficient

1    then we have to go through an estimation process at that

2    point possibly.

3         They told repeatedly that they knew that we are

4    somehow the bottleneck, that we have not been providing

5    discovery.  They have the discovery.  They are the ones who

6    are now slowing down this process and keeping these claims

7    open apparently for leverage purposes.  They should have

8    started whenever they needed back at the beginning of the

9    bankruptcy process.

10        They should have come to court if they were

11   unhappy with the discovery that they had gotten.  We

12   repeatedly invited them to do so.  They had gotten the

13   discovery that they need.  They did not amend the claims.  It

14   is way too late and would be highly prejudicial to not just

15   the debtors, but to this entire bankruptcy process for them

16   to amend in the future.  So we believe that disallowance of

17   these claims should be with prejudice.

18        With that I will pause, unless the court

19   questions, to allow my colleagues to speak.

20        THE COURT:  Well, Mr. Harris, if I dismiss the

21   claims, does that give, is it because of the fact that they

22   failed to allege facts sufficient to show that there's a

23   claim against these debtors, is there anything that stops

24   them from then filing a motion to file a late-filed claim?

25        MR. HARRIS:  Obviously, anyone can file a motion.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 92 of 547 PageID #: 4701
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 75 of 188

74

1  If it disallowances with prejudice, they would have to

2  satisfy the standard for that.  I don't think even if they

3  file a motion for a late-filed claim, they would be able to

4  satisfy it for the reasons I just described.  I think the

5  same standards would apply, which is was there excusable

6  neglect, and is there prejudice to the debtors for the late

7  filing.  So, I think that issue can be decided now in the

8  context of determining to disallow these claims with

9  prejudice.

10          But, of course, they could file a motion if they

11  choose to.

12          THE COURT:  Okay.  Thank you, Mr. Harris.

13          Mr. McCallen, I'll let you go first and then I'll

14  go for Mr. Haviland.

15          MR. MCCALLEN:  Okay.  Thank you, Your Honor.

16          Mr. Harris made a lot of points and I'm going to

17  try to hit them, or most of them, as many as I could make

18  note of, and I'll try to do efficiently, Your Honor.

19          Your Honor, I think Mr. Harris acknowledges in his

20  presentation that really the standard on this motion is that

21  of notice of pleading.  The case law is clear that it's not

22  even a 12(b)(6) type standard, but under for a bankruptcy

23  proof of claim, there's actually even a lower threshold.

24          I don't think they can -- and I don't think they

25  do argue that they're not on notice of the relevant conduct,

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 93 of 547 PageID #: 4702
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 76 of 188

75

1  because we have a 50-page pre-petition complaint, at least on

2  behalf of Humana, we do, and that's survived two motions to

3  dismiss in terms of, does it allege valid claims under the

4  antitrust RICO and unjust enrichment and other state laws.

5          It's really a group-leading argument and Mr.

6  Harris alluded to this.  So, it's not so much is there

7  sufficient allegations of conduct, but do you have

8  allegations against the boxes for conduct in each of those

9  boxes.

10          And when it comes to that issue, Your Honor, I

11  think, obviously, the complaint that we've attached to our

12  proofs of claim, it was filed pre-petition, it was before we

13  knew what we know now, so there was just literally impossible

14  for those documents to contain the allegations of the facts

15  that are put in our objection.

16          But, again, when you come back to the idea of

17  notice, there's really no argument the debtors can make from

18  a pleading perspective, hey, we don't have notice of what you

19  guys think happened.  All of the facts that we have were

20  obtained from them via discovery.

21          They know the corporate structure.  They know the

22  divisions, and that gives them argument.  Then they made them

23  in their pleading, you know, they made evidentiary arguments

24  and they made other arguments about what that means, and we

25  didn't get to those today, but from a first step of Allegheny

1  or even, frankly, a 12(b)(6) standard, and I think the debtor

2  unfairly mix them up at times, but under either circumstance,

3  the purpose of that is to give the defendant, or here the

4  debtors, fair notice of the allegations.

5          And I think when it comes to that, they might have

6  arguments down the road that we can't prove-up those claims,

7  and, again, then maybe there's certain boxes those claims

8  shouldn't be against, but in terms of a notice standard, I

9  don't think they can really make that claim.

10          And they cited, Mr. Harris cited the F-Squared

11  case, that's  F-Squared Investment Management; that's a case

12  from this Court.  And what the Court said there, I think is

13  important.  The Court said that it's a relatively low

14  threshold that is less burdensome in the federal, civil

15  pleading standard, when talking about standard under proofs

16  of claim, and, again, re-emphasized the fact that as long as

17  a proof of claim provides fair notice and the Court can glean

18  an actionable claim from the complaint, then it should

19  entertain the parties' case.

20          THE COURT:  Well, if the actionable claim in the

21  complaint is against debtors A and B, how does that give

22  notice to debtors C, D, E, F, G, H, I, J, K that there's a

23  claim against them?  How does it give the Court the

24  opportunity to know that there are claims against those other

25  debtors?

1              MR. MCCALLEN:  So, Your Honor, I think, and this

2     comes back -- this goes to the other point that I think Mr.

3     Harris was speaking to, which is that the case law

4     construing, particularly on the antitrust side, claims

5     against multiple entities within a single enterprise, and

6     this was the Copperweld case which he alluded to, and then

7     the progeny, I think various circuit courts have now

8     interpreted Copperweld.

9              THE COURT:  Well, then, why didn't Humana, pre-

10    petition, sue all of them?  If it's that easy, if it's easy

11    to say if you're in the corporate structure, we can sue you

12    for antitrust liability, why didn't you sue them pre-

13    petition?

14             MR. MCCALLEN:  Well, two things, Your Honor.

15    First, we didn't know about them.

16             THE COURT:  Well, it's a publicly traded company.

17    You could certainly look at their SEC filings and know who

18    was in the corporate structure.

19             MR. MCCALLEN:  In this situation, Your Honor, the

20    level of detail we have here and the additional entities, we

21    did not know that.  And, actually, Your Honor, I respectfully

22    disagree, the information we presented to the Court, via our

23    objection, that we obtained through discovery in this case

24    about, you know, the division between holding the IP in a

25    box, that being licensed to different boxes, which are the

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 96 of 547 PageID #: 4705
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 79 of 188

78

1  ones who make the decisions about marketing, sales,

2  distribution, and, then, you know, funneling that down to ARD

3  and various other facts that we talked about in our

4  objection, that was not public information.

5           THE COURT:  Well, here's the --

6           MR. MCCALLEN:  And I don't think the debtors ever

7  claimed that it was.

8           THE COURT:  Well, here's the problem.  It's not

9  included in the proof of claim that's before me.  You

10 included it in your objection, but it's not in your proof of

11 claim and you didn't move to amend the proof of claim.

12          MR. MCCALLEN:  Understood, Your Honor.

13          And I can address the amendment point now or I can

14 finish out on the pleading argument and then move on to that

15 point.

16          THE COURT:  Go ahead.  I don't want to interrupt

17 your flow.

18          MR. MCCALLEN:  Sure.  Thank you, Your Honor.

19          So, coming back, I was talking about Copperweld.

20 So, let's talk about what Copperweld says.  In that case, the

21 Court held that a parent and its subsidiary cannot be co-

22 conspirators for purposes of establishing conspiracy under

23 Section 1 of the Sherman Act.

24          I think me and Mr. Harris agree about that.  I

25 don't think we disagree about the holding of it.  And the

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 97 of 547 PageID #: 4706
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 80 of 188

79

1  Court explained that the reason for this is that the parent

2  and its related subsidiaries share the same corporate

3  consciousness and have a unit of interest, and as a result,

4  the Court said -- and I'll just use one quote -- the Court

5  said:

6          "The coordinated activity of a parent and fully

7  owned subsidiary must be viewed as that of a single

8  enterprise."

9          And what courts that have interpreted Copperweld

10  have said is that the reasoning of Copperweld permit pursuit

11  of antitrust claims, based on the coordinated conduct of

12  multiple entities, functioning as a single enterprise and

13  that in some circumstances, proof about each entity's

14  separate (indiscernible) is not necessarily relevant.

15          And what I want to say, Your Honor, is that Mr.

16  Harris, I believe, mischaracterizes our argument.  They say

17  that we miscite these cases, but I think they miscite us,

18  because we're not saying, and we've never said that an entity

19  can be held liable solely by virtue of their corporate

20  affiliation with other debtor entities.  That's not our

21  argument.  It's never been our argument.

22          And all of the cases, and the pieces of Copperweld

23  and Lennox (phonetic), and Arandell (phonetic) and the other

24  cases that Mr. Harris and his attempted pointed you to in

25  their brief and (indiscernible) argument, that's what they're

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 98 of 547 PageID #: 4707
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 81 of 188

80

1  all saying.  They're all making that point, that, hey, just

2  by (indiscernible) of being a sister corporation, that's not

3  enough.

4        And our point is, we're not saying that's all

5  there is.  We think at the end of the day there is a set of

6  core entities, and, Your Honor, I think, you know, this is

7  maybe a good time to tell you how I sort of think that the

8  discovery that we've obtained from the debtors and how the

9  corporate structure works, I almost think of it as a set of

10 three concentric circles.  You have the inner-most core of

11 entities that we now know about who are integrally involved

12 in the manufacture or the creation of intellectual property

13 through research and development, manufacture, based upon

14 that research and development, then distribution and sale of

15 that product.  And that's about 10 or so entities that fit

16 within that core group of entities that are involved in that

17 concept.

18        And then, thereafter, you have another set of

19 entities, what I like to think of as sort of a second

20 concentric circle, which are entities that benefited from

21 that or we believe may have benefited from that, because the

22 discovery from that is still ongoing.  The debtors are

23 producing documents to us, no doubt, and we're reviewing them

24 as quickly as we can -- there's been a lot of production --

25 and we are setting depositions to comply with.  We haven't

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 99 of 547 PageID #: 4708
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 82 of 188

81

1    had any additional depositions yet.  We've set them to comply

2    with the Court's scheduling order for plan confirmation, but

3    we've been planning to take those depositions in early

4    August.

5            But we know that a lot of entities benefited from

6    the proceeds of Acthar, which is, by far, the debtors' most

7    profitable and the largest revenue generator for the debtors.

8    You know, when you actually look at the first day

9    declaration, I think in 2019, the year before the bankruptcy

10   petition, Acthar earned for the debtors something just shy of

11   a billion dollars.  And when you look at the entire

12   enterprise, Specialty Brands and Generics, their revenue was

13   about $3.1 billion.  So, Acthar is a third of this business

14   and it's the reason that they've said that they ultimately

15   put this entire Specialty Brands business into bankruptcy.

16           And so, this Acthar revenue, once it got taken in

17   through ARD and distributed up the corporate chain, it was

18   used, we believe, for a variety of corporate purposes.  It

19   was used to pay down debt.  It was used for purposes

20   unrelated to Acthar, and purposes related to Acthar,

21   distributed throughout that very complicated corporate

22   structure.

23           And, you know, beyond that, Your Honor, I think

24   the third circle of entities are the rest of the Specialty

25   Brands, because like I said, we don't have any intention of

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 100 of 547 PageID #: 4709
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 83 of 188

82

1  going after the Generics entities.  It would be the remainder

2  of the Specialty Brands entities.

3        And it may turn out, Your Honor, that the some or

4  all of those Specialty Brands entities, at least with respect

5  to our direct claims, putting aside substantive consolidation

6  for a minute, that some of those should be dismissed.  But

7  when I come back to that, Your Honor, that is a level of

8  detail and level of interconnectedness among entities that no

9  SEC filings pre-petition anywhere near to describing.  And

10 that's what we've been untangling as part of the discovery

11 process.

12        THE COURT:  Well, what you just described to me,

13 Mr. McCallen, the transfer of funds amongst the various

14 debtor entities, that sounds like a fraudulent conveyance

15 claim, which does not belong to you; it belongings to the

16 estate.

17        MR. MCCALLEN:  So, let me address, that Your

18 Honor, because that's one of the points that the debtors made

19 and Mr. Harris made in his presentation just now.  And I want

20 to say a couple of things.

21        First, we are not pursuing alter-ego claims.  They

22 keep trying to say that.  And every time we look at any

23 entity, they say that's alter-ego.  That's veil-piercing.

24 That's not what we're saying.

25        The same conduct can give rise to multiple

1  different claims at the same time.  There could be conduct

2  about moving (indiscernible) that's between the debtor

3  entities that gives rise to veil-piercing or fraudulent

4  transfer claims, true.  But that same conduct can also give

5  rise to other causes of action; for instance, an unjust

6  enrichment claim.  That's a direct claim we would have

7  against that entity and that's an equitable claim under state

8  law designed to allow parties to get proceeds that were

9  improperly, or without a valid basis, distributed to other

10 entities.

11         Now, what Mr. Harris says in response to that is,

12 but there's got to be some level of culpable conduct at that

13 entity, and I have a couple of responses to that.  One, and

14 it's kind of difficult, Your Honor, because we're talking, I

15 think, literally, about dozens of entities, but number one, a

16 lot of those entities, I believe are run by the same

17 individuals that are making decisions about the transfers

18 themselves and are involved in the entity that we would view

19 as concentric circle number one.  There's incredible overlap

20 here among decision-making among the debtors.

21         Number two, a lot of the entities that Mr. Harris

22 is going to point out is he's going to say, that's a passive

23 entity.  It doesn't do anything.  It's just a boxed asset.

24 There's no employees.  There's no business operations there.

25         And for that, Your Honor, I would say that is a

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 102 of 547 PageID #: 4711
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 85 of 188

84

1  really problematic position for the debtors to take and if

2  the Court were to ultimately adopt it, because what the

3  debtors have done, and, Your Honor, at some point, we

4  ultimately hear the evidence on, this we'll get into this in

5  much more detail, but I think it's important that Your Honor

6  understand.

7         The two entities that they are saying we can have

8  claims against, ARD and PLC, have very little value relative

9  to the overall value that Acthar provided to the debtors'

10 business.  According to their liquidation analysis, they say

11 that most of the value related to Acthar resides in an entity

12 or at least pre-petition it resided in an entity called

13 Mallinckrodt ARD IP, and that's the entity that holds their

14 intellectual property.

15        And intellectual property consists -- it's not a

16 patent-protected drug at this point, so the supposedly

17 valuable intellectual property consists of research and

18 development about potential use for Acthar, how to make

19 Acthar, things like that.  That is a passive entity that has

20 no business praising.  It has no employees.  It does nothing,

21 other than hold the Acthar IP.

22        And the position that the debtors are taking that,

23 hey, you need to have actionable conduct at every entity, if

24 that were true in this situation, not only this debtor, but

25 every debtor.  This would be a roadmap for every corporation

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 103 of 547 PageID #: 4712
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 86 of 188

85

1  in America, put your assets in a passive entity that cannot

2  engage in any conduct, because it doesn't have any employees.

3  It doesn't have business operations, other than holding the

4  things that you care most about, and you can't touch it in a

5  litigation.

6         You can't touch it in a bankruptcy, certainly, but

7  you couldn't touch it in a litigation, according to them,

8  either, because if there had been no bankruptcy and we took

9  discovery and did all this in California Federal Court, they

10  would say, we can't (indiscernible) claims against the entity

11  that holds the IP, for instance, because it's just a passive

12  entity and it didn't do anything.

13         THE COURT:  Well, two observations, Mr. McCallen.

14  One, you quoted to me the Copperweld case, and the quote you

15  gave me was that you have to show coordinated activity

16  between the entities.  So, there has to be some activity,

17  even under Copperweld.

18         Your proofs of claim don't allege any activity by

19  any of these debtors that you've asserted these proofs of

20  claim against, beyond the entity that you sued pre-petition,

21  and, again, you're describing to me fraudulent transfer.

22         If the debtor set this up so they could funnel the

23  money into a passive entity for purposes of protecting it,

24  perhaps there are claims against them for fraudulent

25  transfer, but, again, that is not your claim; that belongs to

1  the estate.

2            MR. MCCALLEN:  So, thank you, Your Honor.  I have

3  a couple of responses.  I think it may be fraudulent

4  transfer.  I also believe for the reasons I've stated, it

5  would also be a claim for unjust enrichment.  And also, under

6  Copperweld, I think they would be included within a

7  coordinated enterprise.

8            Because, remember, Your Honor, the structure that

9  was put together was put together solely for tax reasons for

10  the debtors, and the debtors make a lot of that.  They say

11  that we're suggesting that the structure, itself, was done

12  some nefarious reasons.  That hasn't been our argument now.

13  I mean, obviously, it is later on.  We found out through

14  discovery that it was done to protect assets in a certain

15  way, then maybe our view on that would be change.

16            So, we're not criticizing them for setting up

17  their business in a tax-efficient way, but what we're saying

18  is that when those decisions come down from the top, or at

19  least from the same place, wherever it's coming from in the

20  debtors' organization, because it's the same individuals who

21  are making these decisions -- it's employees of, you know, ST

22  Shared Services that do the work on the tax side for the

23  debtors -- you can't use this structure, which was done for

24  these tax-efficiency purposes, as a basis to when you get

25  into bankruptcy, to shield recovery from creditors.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 105 of 547 PageID #: 4714
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 88 of 188

87

1          And, Your Honor, it's not all creditor; it's just

2     certain creditors, and this is a really important point,

3     which when I talk about the leave to amend point, I'll hit on

4     it again, but I want to make it now.  It's really important

5     that Your Honor understand, this effectively, the dispute

6     that's between -- Your Honor, this is between -- this is an

7     intercreditor dispute.

8          When these cases were filed, when the bankruptcy

9     cases were filed, they came in with a deal with the opioid

10    plaintiffs and certain other RSA parties, including the

11    bondholders, and then eventually there's going to be a

12    settlement with the government.

13         We've been very clear, and I want to be clear

14    about it, again, Your Honor, we are not challenging the

15    opioid settlement, and certainly by having our proofs of

16    claim filed against the Generics entity, we were not in any

17    way, Your Honor, and this is really true, we were not in any

18    way attempting to gum up the works on the Generics side of

19    the business for their bankruptcy.

20         But, Your Honor, what we are fighting about at

21    this point is the value that's left over and who's going to

22    get it, because under the debtors' proposed plan, you pay the

23    opioid settlement, you pay the Government, and you have a

24    very limited amount left over on the Specialty Brands side,

25    and so you've got to split it up amongst the unsecured

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 106 of 547 PageID #: 4715
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 89 of 188

88

1  creditors.  And the debtors have proposed a plan that gives

2  us claims only at two boxes, whereas the bondholders have

3  claims everywhere.

4         So, really, this is, effectively, an intercreditor

5  dispute between us and the other Acthar Plaintiffs and the

6  bondholders, about who, on the unsecured side on the

7  Specialty Brands, gets what's left over after you pay the

8  opioid settlement and after you pay the Government.  That's

9  what this is really about.

10        But let me come back, Your Honor, because I just

11  want to make sure I hit any other points that I had.  I think

12  I hit everything I had on the pleading standard.

13        Oh, there's one other thing I wanted to say.

14  Look, Your Honor pointed out the fact that the fact that are

15  in our objection are not in our complaint.  I'm not going to

16  fight that.  I can't.  That was filed in 2019 before we knew

17  those facts but let me talk in the context of if Your Honor

18  feels that the pleading is insufficient, whether or not we

19  should, at this point, be given, granted permission to file a

20  motion for leave to amend.

21        And I think, Your Honor, it's clear that we should

22  for a couple of reasons.  First, when looking at the

23  standards and the factors the courts will consider whenever

24  deciding to ultimate grant a motion for leave to amend -- I

25  understand Your Honor is just asking us now to argue whether

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 107 of 547 PageID #: 4716
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 90 of 188

89

1    we should be permitted to do so, but I think looking at what

2    the ultimate standard will be is formative for the decision

3    in front of the Court now -- one factor is whether there was

4    a timely assertion of similar claims or demand evidencing

5    intention to hold the estate liable.

6         And I don't think they can reasonably contest that

7    there was a similar claim filed, such as the one we have

8    here.  Obviously, if the Court determines that it's

9    insufficient or inadequate as a pleading matter, that's

10   another thing, but I think what this factor speaks to is,

11   again, this idea of notice, and they clearly had notice of

12   our claim.

13        Another factor the courts will look at is whether

14   other creditors would receive a windfall if the Court refused

15   to allow the amendment.  And I think this goes to the point

16   that I was speaking to a few minutes ago, Your Honor, about

17   whether or not there would be a windfall.

18        In this situation, whenever you look at the

19   dynamics of the case, like I said, at this point, this isn't

20   about dipping into the pockets of any of those opioid

21   plaintiffs or the Government; this is a fight amongst

22   creditors on the unsecured side about who gets what left

23   over.  And so, in terms of prejudice to the debtors, there is

24   no prejudice, Your Honor.  This is a pot plan and so, you

25   know, we should be allowed to continue to litigate those

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 108 of 547 PageID #: 4717
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 91 of 188

90

1  claims.

2          The reality is, and the equities of this are, and

3  I think the courts also will look at the equities when

4  deciding whether to grant leave to amend, the equities of

5  this are that Humana and the other insurers who have claims

6  in these cases are some of the largest payors into the debtor

7  structure for years.  I've talked about the fact that Acthar

8  is its biggest drug, is its most profitable drug.

9          You know, these entities have paid billions of

10  dollars of claims and if we do have valid antitrust, RICO, or

11  other state law claims, if we do, and that'll be decided

12  later -- I'm not assuming it right now -- but if Your Honor

13  assumes that we do have valid claims, then it is only fair

14  and equitable that we have an opportunity to recover against

15  the entity that holds all of the different assets that those

16  -- that our proceeds supported for all of those years as part

17  of the debtors' Specialty Brands business.

18          In terms of the question about the reason for the

19  failure to amend and whether it would be equitable at this

20  point to allow us to amend, again, I just want to remind Your

21  Honor of the timing.  I mentioned earlier -- I won't go back

22  to it -- but our pre-petition complaint.  We got the

23  discovery in this case.  We -- Mr. Harris said that we've

24  adjourned this hearing two times, he said, to allow us to

25  take more discovery.  That's right in part.  We did adjourn

1  it the first time because the debtors were producing

2  documents, a relatively limited universe of documents that

3  they said was are relevant to this motion, and so we pushed

4  it back a week to allow us an opportunity to review those

5  corporate organizational documents and to prepare to depose

6  Mr. Welch.

7          We took that deposition in mid-June, and we filed

8  our objection a week later.  That was a pretty significant

9  undertaking to pull that information together within the week

10  and put the brief together that we did, but we did that and

11  we put that before the Court.

12          Thereafter, the debtor were set to file their

13  reply brief the following week and we were going to have a

14  hearing the following week, but it was set for the same day

15  as the proof of claim hearing that was going to be -- I'm

16  sorry -- the class claim hearing for Mr. Haviland's client

17  and we weren't going to get to it all in one day.  So, we

18  agreed to extend the deadline for the debtors to file their

19  reply brief and, ultimately, we pushed even further because

20  Mr. Welch had, I believe he was out of the office last week.

21  We originally talked about doing it the 13th and we pushed it

22  to the 23rd.

23          So, this last month was extended, you know, for

24  reasons -- there was never any expectation or understanding

25  from the debtors' perspective that we were going to continue

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 110 of 547 PageID #: 4719
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 93 of 188

92

1  to take discovery on this issue.  We have always said, and I

2  recall saying this to Your Honor here in front of you on our

3  30(b)(6) motion for quash, we've always believed you cannot

4  disentangle the issues that the debtors put forward in this

5  motion, this objection, from the broader merits of our

6  claims.  That's why we, right away, when we filed the

7  estimation motion, we sought that discovery.

8            And the debtors took the position on this motion,

9  on this objection, rather, they said, it's not relevant here.

10 The question is who actually did what, the merits of the

11 claim.  That goes, if ever, to confirmation.

12           And then whenever we got in front of Your Honor to

13 argue for discovery on estimation, again, the debtor said,

14 that's for another day.  You'll get that discovery later.

15           So, we were limited when we came in on this

16 objection to the universe of information that they said this

17 was about.  And I told Your Honor back when we were in front

18 of you on the 30(b)(6) argument, I said, they're drawing

19 artificial lines and distinctions here, because you can't

20 disentangle, you know, documents about what the different

21 corporate entities are supposed to do or don't do, and who's

22 involved on that level from questions about who is involved

23 on a more substantive level, and do our claims have merit and

24 if so, in what boxes.

25           So, Your Honor, I just want to put that on the

1  record, because I believe that goes to the issue of the

2  reasons for the failure to amend.  I appreciate Your Honor

3  understood that we were always going to move for leave to

4  amend.  We thought the purpose of the objection, Your Honor,

5  was to tee up this dispute to the Court via a contested

6  matter, which we were obviously prepared to do today.

7            You know, if Your Honor believes that the

8  complaint does not withstand the standards of the first wrung

9  of Allegheny, then we think under the circumstances, Your

10 Honor, it would be fair and would not prejudice the debtors

11 to allow us to leave to amend.  They know the facts.  They

12 know what we're going to say.  It's not like they have to do

13 anything new to prepare themselves for that case.

14           It's just a matter of them making us jump through

15 these hoops to try to prove-up the claims that, you know, we

16 have had and that they have known about for years.  And it's

17 really just a question at this point about, do we get to --

18 if we have valid claims, because one way or another, we're

19 entitled to ultimately try to prove-up our claims.  If those

20 claims are valid, do we get to go after the entities who are,

21 at the very least, involved in the Acthar-related conduct,

22 and maybe, ultimately, the entire Specialty Brands, or are we

23 stuck with ARD and PLC.

24           PLC is the parent company -- virtually no assets

25 in comparison to the overall enterprise value of the debtors,

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 112 of 547 PageID #: 4721
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 95 of 188

94

1  and ARD, as well.  ARD is an entity that has brought in

2  billions of dollars over the years from the sale of Acthar

3  and about 95 percent of it has been removed.  And I'm not

4  saying it's a fraudulent transfer or anything like that, but

5  the reality is that what it reflects is that these entities

6  are treated as a single enterprise.  And I use that word

7  because that's what the Copperweld Court talks about, it's

8  coordinated conduct amongst those entities by the same people

9  who largely sit in either officer or director positions in

10 most of the boxes.

11        And if it turns out that this Court decides, via

12 estimation or at confirmation or whenever it occurs, that we

13 have valid claims, both the equity and the law require that

14 we should be able to go at the boxes that have that value,

15 and that's what this is really about.  Are we going to be

16 allowed to do that or is that value going to be allowed to go

17 to the other unsecured creditors of the Specialty Brands

18 business.

19        I don't have anything further, Your Honor.  If you

20 have any questions, I'm obviously happy to answer them.

21        THE COURT:  No questions.  Thank you, Mr.

22 McCallen.

23        Mr. Haviland, before I go to you, we're going to

24 take a lunch break.  So, let's recess until 12:45.

25        (Recess taken at 11:59 a.m.)

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 113 of 547 PageID #: 4722
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 96 of 188

95

1      (Proceedings resumed at 12:45 p.m.)

2           THE COURT:  Good afternoon.  We're back on the

3 record.

4           Mr. Haviland, you may proceed.

5           MR. HAVILAND:  Thank you, Your Honor.

6           It's a little difficult to close in a hearing when

7 the record hasn't been fully discovered and presented, so I'm

8 going to try to do so succinctly, based on all that you've

9 heard.

10           At the outset, I agree with Mr. McCallen on the

11 law.  I think he adequately and appropriately explained the

12 Allegheny standard and we agree that it's not as robust as

13 Rule 12, which we faced no less than five times in the

14 underlying litigations.  But at the outset, I want to address

15 a couple of open issues.

16           Number one, the Court had asked about the issue of

17 claiming against Brands and Generics and I just want to

18 reiterate that we, the ad hoc Acthar group, and, it is

19 important, Judge, to differentiate claimants.  Too many

20 times, I think there's a one-size-fits-all with the debtors'

21 objections and they do toggle between our positions and our

22 claims in their papers, but I want to be crystal clear with

23 the Court that we make no claims against the Generics side of

24 the business.  We haven't attempted to do so.

25           To the extent the debtors may point to a claim

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 114 of 547 PageID #: 4723
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 97 of 188

96

1   against Mallinckrodt, LLC, which is in the Brands -- the

2   Generics side hierarchy, and I'll show in a moment, that the

3   substantial evidence that we have shows that Bill Hilmer

4   (phonetic), Hugh O'Neill (phonetic), and other executives in

5   the Brands business signed documents in the name of that

6   entity for Acthar.  So, they can call it a generic today.

7   But it wasn't before, and when that changed is what discovery

8   is all about.  So, I just want to be crystal clear, we are

9   seeking to claim only against the Brands entities that are

10  involved in and responsible for Acthar.

11          Number two, we did not file prophylactic proofs of

12  claim.  We specifically demarcated those debtors whom we

13  believed were involved in Acthar.  There's no footnote in our

14  proofs of claim that say we're unsure; we were very sure

15  about who we claimed against.

16          And we, unlike most claimants -- and we haven't

17  heard from Mr. Eisenberg, who has a declaration talking about

18  45,000 unsecured claimants who have zero value -- well,

19  that's not us.  We had claims that had very clear addenda to

20  explain our position and had three attachments.  Number one,

21  the complaint, and I want to pause on that for a moment just

22  to point out to the Court that the debtor has put into

23  evidence before you, Exhibit Numbers 9, 10, 11, 12, 14, 19,

24  20, 23, 25, 26, and 27, which are the complaints of the ad

25  hoc Acthar group litigants, and almost all of the orders

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 115 of 547 PageID #: 4724
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 98 of 188

97

1  denying Mallinckrodt's motions to dismiss, both under Federal

2  Rule 12 in three instances and the State Court Rules in

3  Pennsylvania and Tennessee.

4          And that's important.  I know Your Honor has

5  several times observed that Rule 12 isn't the end, but it is

6  at this point in terms of pleading.  We have pled claims and

7  the debtors address antitrust, RICO, and unjust enrichment,

8  but they haven't addressed consumer fraud, which is in the

9  Pennsylvania cases, both before Judge Schuller in the federal

10  court, and in the state court case now before Your Honor, the

11  542 cases before you under the Pennsylvania UTPCPL.  They

12  haven't addressed that at all, nor have they addressed fraud

13  or conspiracy, causes of action which have survived their

14  motions.  So, they haven't attempted to demarcate their

15  position among the various claimants.

16          And then, finally, Your Honor made a comment about

17  bad faith and lack of support.  If that was directed at us, I

18  respect the Court's observation, but we can't agree that what

19  we've attempted to do by providing that support was done in

20  bad faith.  We, unlike, anyone, gave a damage model and a

21  quantification, based on actual purchases of Acthar.  That's

22  our Exhibit B.  Actual purchases.  In fact, that so incensed

23  Express Scripts that they moved to suppress and put under

24  seal all of our claims, and they currently are all sealed.

25  No one can see them, except the Court and the debtors.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 116 of 547 PageID #: 4725
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 99 of 188

98

1           And then the third thing we did to substantiate,

2    and this is about substance, substantiate, we gave the

3    complaint that five judges have said it passes muster under

4    Rule 12.  Then we said this claimant, and there are over 70,

5    this claimant fits this claim because there is an ASAP form,

6    Acthar support and access program form.  Now, if you read any

7    of our complaints, we allege that beginning in 2007, that's

8    how this company changed the world.  That's how they created

9    a distribution model, a marketing and sales paradigm that

10   allowed them to take the price from $40 to nearly $50,000,

11   the ASAP form.

12          And by showing the Court through our claims that

13   every single claimant had a beneficiary with one of those

14   forms, we took that claimant and put them within the

15   complaint.  Now, that's the overarching approach.

16          I want to get to the issues that the Court raised

17   about these other entities and I want to walk through it a

18   little differently.  I won't repeat the Allegheny standards.

19          I will point out that those Rule 12, the PO

20   rulings and the Tennessee ruling demonstrate that we

21   satisfied Twombly and Iqbal and that we did not group-plead.

22   And why that's important is because Mallinckrodt never made

23   that argument, even though we sued the PLC and ARD.  They

24   never made that argument; Express Scripts did, and it was

25   rejected because, and counsel pointed out we've amended our

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 117 of 547 PageID #: 4726
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 100 of 188

99

1    complaints because at times when the Court said, we want you

2    to differentiate your cause of action as between these

3    various entities, we didn't and as to the five Express

4    Scripts entities, we survived that.

5         We argued the single-entity doctrine of the

6    antitrust.  Mallinckrodt did not.  And we submit, Judge, the

7    law of the case which comes up to the claim is that they

8    don't get a do-over.  They don't get to now say, we're not a

9    single entity, but that's what they're doing, but they're

10   doing it very carefully and very cautiously because they

11   don't want to create this situation where they have these

12   disparate corporate entities that can be sued.  They want it

13   to be an enterprise, one PLC.

14        So, we take the entity as an enterprise, as one,

15   and I'll get to that in a moment.  The evidence strongly

16   supports that, overwhelmingly supports that.

17        But even if you look at it the way they want you

18   to and break up this single enterprise into these buckets

19   that, yes, they existed in a federal filing to the SEC, but

20   nowhere do they say what the record in this case has shown,

21   is they took the Acthar function and business and broke it

22   up.  Sent it to the U.K.  Sent it to Ireland.  Sent it to

23   Luxembourg.

24        Nowhere, and I'll show you why that's true, all

25   the documents are stamped highly confidential.  No one gets

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 118 of 547 PageID #: 4727
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 101 of 188

100

1  to see them.  They don't put that business model out there.

2  They haven't cited you any evidence where it's publicly

3  available that MPL and MPIL had a collaboration agreement

4  over the Acthar business where all the decision-making was

5  done overseas.  Nowhere has that been publicly divulged.

6          It only came in the last two months.  It only came

7  through Mr. Welch who's on the camera right now, telling us

8  that's how it operated when he instituted DEMPE, D-e-m-p-e,

9  decision-making for the company, as a tax convenience, so

10 they get the benefit of Irish tax laws, the U.K. tax laws.

11 They toggle back and forth, moved functions when it

12 advantaged the corporation.

13         And I agree with Mr. McCallen, we're not saying

14 that was evil.  They can do what's in their best tax

15 interests, but don't argue to us that because you've moved

16 function over there, we can't follow the money, as Your Honor

17 pointed out, and the function -- and I'll get to that in a

18 moment.

19         But even if they are independent entities, and we

20 don't accept that, we look at the independent entities as

21 potential co-conspirators.  And there's a reason why single

22 enterprises don't argue this, because now, all of a sudden,

23 you've got a horizontal conspiracy.  You've got an entity on

24 one plane that has functions, conspiring with one another to

25 set prices to have a monopolization on a product.  Boy,

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 119 of 547 PageID #: 4728
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 102 of 188

101

1   that's an interesting proposition the debtors want us to

2   have, that the PLC in conspiracy with the MPL and MPIL to

3   maintain the monopoly for Acthar by suppressing Synacthen, by

4   maintaining the distribution scheme.  But if that's where

5   they want to go, that's where I'm going to go.

6          We say in paragraph 212 of the Rockford complaint

7   that beginning as early as 2007, the exact date being unknown

8   not plaintiffs, and continuing thereafter until the present,

9   the defendants and other unnamed co-conspirators between and

10  among themselves, entered into an agreement and, otherwise,

11  continuing conspiracy to cause my clients to overpay for

12  Acthar.  The rest is laid out in the complaint, which five

13  courts, five, have found plead specific -- by the way, they

14  argued 9(b), not specific enough in time, place, and manner -

15  - rejected.

16         I don't think this Court can rule on what they're

17  suggesting without going into those court's opinions and

18  saying, I've looked at the pleading.  We have tested it under

19  9(b).  We tested it under group pleading.  We tested it under

20  Twombly and Iqbal and it survived.  It goes to the next level

21  of discovery, and that's important.

22         THE COURT:  Well, Mr. Haviland, the complaints

23  that you're talking about were only against PLC and ARD, so,

24  to the extent the courts in those cases found that you

25  survived the Rule 12 motion, it's only as to those two

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 120 of 547 PageID #: 4729
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 103 of 188

102

1  entities.

2          And in Delaware, the corporate structure is

3  sacrosanct and it is observed, unless proven otherwise.  So,

4  you had an obligation to come forward in your proofs of claim

5  and allege facts that would show me and show the debtors that

6  there were claims against these other entities, other than

7  PLC and ARD.  So, let's focus on that issue.

8          MR. HAVILAND:  Certainly, Judge.

9          So, let's talk about the antitrust and let's talk

10  about the facts.  I want to start with the fact that in a

11  price-fixing case, and we have that, the United States

12  Supreme Court said in 1898 in the Joint Traffic case, as

13  reiterated in the New Jersey case, 211 U.S. 1, there's a rule

14  of reason that requires the fact-finder to decide whether

15  under all the circumstances of the case, the practice imposes

16  a restraint.

17          And I point that out, Judge, because Judge

18  Capello, who ruled on this issue, said clearly that I am not

19  going to decide whether a rule of reason applies.

20          They're asking you to essentially accept

21  everything Mr. Harris said is true.  Well, that's not the way

22  it works.

23          Everything we say is true in terms of conduct.

24  The judge did not decide whether it's per se -- by the way,

25  per se, if they fix the pricing, we get right to damages --

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 121 of 547 PageID #: 4730
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 104 of 188

103

1   he said at Rockford, 360 F.Supp. 3rd 754, the Court need not

2   make this determination at this time.  They're asking you to

3   make that determination right now, what standard applies.

4           Do you take this conduct, which was described?  We

5   didn't know all the players and actors at that time.

6           And, Judge, I've got to point out an obvious

7   thing.  Mr. Welch hasn't testified, but a company like Petten

8   Holdings, and I'll show you in a moment, a contract signed

9   June 2020, didn't exist until February of 2020.  I would have

10  asked Mr. Welch this question:  Mr. Welch, how is it possible

11  that the City of Rockford can sue an entity that didn't exist

12  until three years later?

13          Well, it's not possible.  They created that

14  entity.  They moved the distribution function out of ARD to

15  Petten Holdings.  Now, how do we know about that?

16          We got the contract two months ago, not in the

17  underlying litigation where the Court ordered all contracts

18  to be produced, where Arnold & Porter reported to the Judge

19  that they had done it, repeatedly said they'd done it, and

20  they hadn't done it.  That's a contract involving Acthar

21  distribution with Petten Holdings never produced.  That's

22  Section 1.

23          Section 2, monopolization, and the judge in the

24  Rockford case, at 360 F.Supp. 3rd 755-56, points out that a

25  conspiracy to monopolize consists of a combination or a

1   conspiracy.  We allege there was a conspiracy and there were

2   many actors, many of which we didn't know.  We talked about

3   all the different entities with Express Scripts, but this

4   debtor never once said there are other actors.

5           They hid behind the enterprise of PLC and

6   represented repeatedly through discovery sponsor that

7   Mallinckrodt took the position.  Now, the judge, at page 747,

8   described our claims as follows:

9           "The gravamen of the Plaintiffs' antitrust claims

10  is that the defendants acted and conspired to raise prices

11  exorbitantly high as part of a vertical price-fixing scheme."

12          Let me pause there.  The price-fixing function has

13  moved.  We did not know that.  I deposed Mr. Hilmer.  He was

14  asked by the FTC one month after DEMPE decision-making was

15  put in place, who and how is the decision-making on pricing

16  done?

17          He said, Mallinckrodt.  He never said that MPL and

18  MPIL-n a collaboration agreement, decide that.  They go up to

19  the executive committee of the PLC.  That Mr. O'Neill has to

20  fly over there.  He never said that.

21          Now, the Court is being asked to fault the

22  Plaintiffs for not doing our job, but what do you do when a

23  witness doesn't tell the truth?  That was the FTC.

24          Two years later, in 2020 -- three years later -- I

25  asked him the same question.  He said he testified truthfully

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 123 of 547 PageID #: 4732
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 106 of 188

105

1  and never once under oath did he say, Mr. Haviland, I need

2  you to know something.  It's July of 2020.  We've had DEMPE

3  for a long time at this company.  MPL and MPIL are deciding

4  all these things.  ARD is insolvent.

5          We learned through the document in this case,

6  Project Easter, Project Gemini, Project Apollo, and a Project

7  Creed (phonetic), we don't even know what it's about because

8  it's all under privilege --  I'll show you the documents --

9  that they moved those functions out.  Now, they did it for

10 tax reasons, but Your Honor said we get the following

11 conduct.

12          In the last two months, we've learned more than

13 we've learned in the last four years about how this

14 enterprise operates.  They never told us that the entity that

15 we sued was insolvent.  Insolvent.  Couldn't write debt.  Had

16 its debt-writing function taken away because it all got moved

17 overseas.  And the Court is going to fault us for not asking

18 the right questions.

19          We never got to ask the senior (indiscernible),

20 Mr. Trudeau, Mr. O'Neill, Mr. Phillips, who was never

21 disclosed as a custodian, Dr. Romano, who I tried to depose

22 months ago.  They constantly, constantly run interference and

23 argue with the blinders on that it doesn't relate to this

24 issue.  They don't want to put these witnesses up because

25 it's their documents.

1          This company is only run by five to seven

2     executives, Judge.  I can name them for you right now -- I

3     just did.  They could have a hundred entities.  It's a same

4     people.

5          If you read the SOFAs, it's Brian Reasons, Ian

6     Watkins, occasionally Mr. Welch comes in as executive

7     secretary.  It's the same people, and why that matters is

8     because a part that they don't talk to you about when you

9     have Copperweld.

10          By the way, they never said Copperweld to us,

11     because that would have begged the question for the judge in

12     Rockford, all right, let's examine the PLC and the ARD and

13     whether they're conspiring with one another, parent and sub.

14     They didn't want to make that argument.

15          But here's what Copperweld actually says, and it's

16     out of Rockford in the context of ex Express Scripts arguing

17     that it should not be held liable for the acts of its

18     subsidiaries.  Copperweld holds that the single entity cannot

19     conspire with itself, either with its employees or its

20     wholly-owned subsidiaries, 467 U.S. 769-770.  I'm going to

21     read to you what the Court says, so you don't have to take my

22     word for what it says:

23          "The officers of a single firm are not separate

24     actors.  There can be little doubt that the operations of a

25     corporate enterprise organized into divisions must be judged

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 125 of 547 PageID #: 4734
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 108 of 188

107

1   as the conduct of a single actor."

2              Now, why is that important?

3              Because Mr. O'Neill, when he was deposed over in

4   the opioid case, said I don't treat these entities as

5   distinct entities.  They're all just divisions.  They're all

6   part of the same enterprise.  And I'm going to read to you

7   what he says, and by the way, this is in the record, because

8   I finally got the deposition and we put it before the Court.

9   We didn't get his deposition, but we got the documents that

10  were produced in the opioid litigation.  It's Exhibit 157 is

11  his CV and he was asked about and he says -- I'm trying to

12  streamline, Judge, and it's taking me out of order.  I

13  apologize.  I'll paraphrase.  He says in his CV, and this is

14  -- he had just updated a month before he was deposed, that

15  there's one enterprise, there's one organization, and that

16  these other entities he was asked about, and he was asked

17  about SpecGX, the Generics company, but he was asked about

18  Mallinckrodt, LLC, the entity that wrote contracts involving

19  Acthar.  I don't see those corporate forms.  They're all

20  divisions.

21             And there's something that Mr. McCallen said that

22  I agree with, but I want to give a different flavor for.

23  This enterprise decided to create, instead of divisions and

24  departments like some entities do, Judge, they created

25  separate corporations:  holding companies, operating

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 126 of 547 PageID #: 4735
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 109 of 188

108

1   companies, cash pools.  That's a different way to do it, but

2   the result is the same.

3            If they're operating as a single enterprise, you

4   don't get to break up your liabilities and move functions and

5   assets around, and if that's the position, then that's a

6   legal question for this Court and any reviewing Court going

7   down the road.

8            I want to go through, Your Honor, the proof, and

9   the proof being what we had and what we didn't have, because

10  that's really what is at the heart of the matter.  It goes to

11  the underlying claims as they were stated and as to our

12  request for leave to amend.  We put in the record, and,

13  Judge, I am just going to make an overall proffer that

14  defense counsel can respond to, the debtors' counsel, AHG1

15  all the way through AHG174, which consists of the debtors'

16  documents with the exception of a handful of Express Scripts

17  documents that the debtors didn't have and were pointing out

18  they didn't produce, because they're in the files.  They're

19  documents that were shared between the companies but were

20  never produced.

21           Now, Express Scripts yesterday agreed we could

22  introduce those documents under the protective order in this

23  case, as long as they remained under seal.  So, I wanted to

24  make sure that that is the proffer, that we're not asking

25  that they be put in the public record.  But I want to walk

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 127 of 547 PageID #: 4736
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 110 of 188

109

1  through that evidence, Judge, because when you review the

2  discovery that was conducted in the underlying litigation and

3  what's attempted to be conducted here, you get to the same

4  result.

5          We only knew what we knew and couldn't know what

6  we didn't know.  And let's not lose sight of the fact, our

7  cases were stayed and we were enjoined.  We were prevented,

8  because of the freezing spell, from taking any discovery of

9  either the debtors, third parties, or importantly, Express

10 Scripts to find out how the relationship had changed.

11         THE COURT:  Well, that's not true, Mr. Haviland.

12 You had the opportunity to take 2004 discovery in connection

13 with this bankruptcy case.

14         MR. HAVILAND:  Well, Judge, it's interesting that

15 you say that, because -- and my co-counsel, local counsel,

16 Dan Astin is on -- we sought 2004 discovery and Mr. Stearn

17 said we weren't entitled to it.  He said that we had to work

18 through the UCC.  We then contacted the UCC to find out about

19 producing discovery that they had.  We just got that within

20 the last month or so.  We have attempted to take 2004

21 discovery.  We've been denied it.

22         THE COURT:  Well, you should have brought that to

23 the Court's attention.  It wasn't brought to my attention

24 that you were denied 2004 discovery.

25         And I'll point out that you did, in fact, join,

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 128 of 547 PageID #: 4737
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 111 of 188

110

1  filed a motion to join the UCC's 2004 discovery and then

2  later withdrew it -- I don't know why -- but you withdrew

3  your 2004 discovery request to join the UCC.

4         And why you didn't get it up until now, again,

5  that's -- you know, you have an obligation to come forward

6  and notify the Court if you're not getting what you think

7  you're entitled to.

8         MR. HAVILAND:  Well, Judge, we have repeatedly

9  tried to follow your Court's admonition to write and ask for

10  an audience.  I don't think we've had an audience with you

11  till since months ago when I was called at five o'clock to

12  get on the call.  Just this week we sought to have this issue

13  of the depositions decided and then the debtors filed a five

14  o'clock motion for a protective order that got moved to

15  today.  So, we've attempted to do that, but we've been

16  unsuccessful.

17         I note that when the debtors write and ask to put

18  the Shenk motion off, it gets granted.  We don't get to

19  comment on it.  We don't get to talk about the implications

20  to the plan or our claims, but --

21         THE COURT:  Hold on right there, Mr. Haviland,

22  because I left open that motion to give you the opportunity

23  to respond.  You filed nothing in response to that, so that's

24  why I granted that motion.

25         Number two, you have never, ever, ever come to me

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 129 of 547 PageID #: 4738
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 112 of 188

111

1   and said, we want 2004 discovery and the debtors are denying

2   it to us -- ever -- and if you had, I would have heard it.

3   So, don't put this on me, Mr. Haviland.

4            MR. HAVILAND:  I'm not putting it on you, Judge.

5   I'm pointing out that if there are tactics, it's the debtors.

6            THE COURT:  No, the tactics are yours, because

7   you're waiting until the last minute to then seek discovery

8   and then file motions to compel and that's what's screwing up

9   this process, not the debtors.  You have an obligation to

10  move the case forward, as well as the debtors do.  You have

11  an obligation to come forward if you're not getting discovery

12  and you didn't do it.

13           MR. HAVILAND:  Judge, that is just not the case,

14  okay.  We have, prior to this bankruptcy, aggressively sought

15  discovery --

16           THE COURT:  I don't care what happened before the

17  bankruptcy, Mr. Haviland.  I'm talking about what's happening

18  in this case.

19           MR. HAVILAND:  Well, context is important, Judge,

20  because we're being faulted for what we knew about and didn't

21  do before October 12th.  Let's not lose sight of the debtors'

22  position, that we should be faulted for all the little things

23  they have taken out of the record from the Rockford case,

24  which none of them say what I just said.  They didn't produce

25  any of the 2020 contracts, the collaboration agreements, any

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 130 of 547 PageID #: 4739
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 113 of 188

112

1  of those documents were produced, even they were squarely

2  asked for:  all contracts, all communications.

3           We then asked again in this context and we're told

4  it's overbroad.  When they represented to judges -- and not

5  just one judge -- that they had done it.  Now, it's not these

6  lawyers.  I noticed that Ms. Shores was on in her hoodie a

7  little while ago.  It was Arnold & Porter.  Repeatedly

8  reported to judges that they had done what they were supposed

9  to do.

10          You know, Judge, at some point in time, that is

11 going to have to be dealt with.  And whether -- you know, the

12 bankruptcy can't stop a federal judge from dealing with

13 misrepresentations in their courts and those representations

14 were made to judge up in Rockford --

15          THE COURT:  Mr. Haviland, I don't want to hear any

16 of this.  I want to hear what happened in this court.

17 Because you have the opportunity to take 2004 discovery.  You

18 did not do so.  You joined the UCC's, but then withdrew your

19 joinder.  You waited until just days before this hearing to

20 seek additional discovery and you haven't shown me any reason

21 why that discovery would have given you -- you've told me now

22 you have all this evidence, you have all this information

23 that would have allowed you to amend your proofs of claim,

24 but you didn't do it.

25          MR. HAVILAND:  So, Your Honor, I want to tell you

1   about --

2           THE COURT:  You lost your -- I can't hear you, Mr.

3   Haviland.

4           MR. HAVILAND:  I, inadvertently, hit my mouse,

5   Your Honor.

6           So, Your Honor made a comment to Mr. McCallen that

7   you can look at the public filings and you can see all these

8   entities.  Well, one of the first things that Judge Johnston,

9   as a magistrate, now a district judge in Rockford, ordered

10  even before the Rule 12 motions, he said, and he asked me,

11  Mr. Haviland, you know, if you had your wish list, what would

12  you like?

13          I said, Judge, I'd like the organization charts.

14  I'd like to see how this company is organized.  And we put in

15  the record, Judge, at ECF 171, that order.  That order was

16  2018.  Produce all those organization charts so we can see

17  what they're talking about today.  It was never done.

18          What was not produced, and I'm going to reel these

19  things off just so you can have the record for it, it was

20  never produced in response to that order.

21          THE COURT:  If this is pre-petition stuff, Mr.

22  Haviland, I don't want to hear it.

23          MR. HAVILAND:  No, Judge, it's Mallinckrodt

24  ACTH00000047, produced in this case.  We have marked these as

25  AHAG61, a 2016 organization chart which shows how the Acthar

1   ARD business was moved from a top-line position directly

2   reporting into the PLC, all the way down to where it exists

3   right now as a defunct entity.  That's AHAG Exhibit 61, page

4   47.  If you go to page 44, it's the 2017 chart.  If you go to

5   page 45, it's the 2018 chart.  If you go to the next page,

6   69, it's the 2019 chart.

7           We never got the chart that Mr. Welch did at the

8   first day hearing which lays out all the debtor

9   organizations, because you have to go through the

10  machinations of all these moves to see how the Acthar

11  business was moved down, subordinated, and stripped of all of

12  its assets.

13          This company merged with QuestCor.  It didn't

14  acquire QuestCor.  They created the Mallinckrodt PLC as a

15  49/50 shareholder.  We only had to sue the PLC, Judge.

16  That's all we had to do in 2017.

17          THE COURT:  Again, it doesn't matter what you did

18  before the bankruptcy, Mr. Haviland.

19          What is at issue today is whether the proofs of

20  claim that you have filed against the debtors, other than PLC

21  and ARD, state sufficient facts to establish that there is a

22  claim against those debtors, and that's what I want to focus

23  on.

24          MR. HAVILAND:  And I'm going to focus on that with

25  you, Your Honor.

1          Mallinckrodt has proffered as an exhibit, two

2   exhibits, that were marked in Mr. Welch's deposition, first

3   produced in this case --

4          THE COURT:  None of those exhibits have been

5   admitted into evidence.  I told you I wasn't having an

6   evidentiary hearing today.

7          MR. HAVILAND:  Well, Judge, I'm making a proffer

8   now and I would like to offer them to be admitted.  And

9   Exhibit 60 and 61 are the collaboration agreements signed by

10  Mallinckrodt Pharmaceuticals Ltd. and Mallinckrodt

11  Pharmaceuticals Ireland Ltd., and in that document just

12  produced in this case in the last couple of months, it

13  details how the function of Acthar, the decision-making on

14  manufacturing, distribution, pricing, marketing, and sales,

15  was moved between Ireland and the U.K.; those two entities.

16         That document was created October 1, 2016.  It was

17  never produced in the underlying litigation.  It was only

18  produced two months ago.

19         THE COURT:  So, you had it two months ago.  Why

20  didn't you amend your proofs of claim to add that to your

21  proofs of claim against these other entities?

22         MR. HAVILAND:  Because two months ago, Judge, I

23  sought leave.  May 21, I asked this Court for leave.

24         THE COURT:  No, you didn't ask for leave.  I went

25  back and looked at your -- you filed a motion to dismiss the

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 134 of 547 PageID #: 4743
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 117 of 188

116

1   claim objection and in that, the only thing you asked for was

2   for leave to file a motion to amend later in the future and

3   you didn't do that.

4            MR. HAVILAND:  Your Honor, that's why I ask you,

5   are we going to exalt form over substance?

6            Do you want a motion on that very issue when we

7   haven't had the issue of whether or not their objections have

8   been carried?

9            You know, it's a chicken-and-egg problem in my

10  mind, and I don't really practice in the bankruptcy arena,

11  but it seems to me that when we put forward a complaint that

12  has passed muster by five courts and talks about conduct, now

13  the debtor says, well, we broke up the band, Mr. Haviland, we

14  moved all of these functions around, Mr. Haviland, catch us

15  if you can, Mr. Haviland, figure out that we created entities

16  in 2020 that you maybe should've known about even though they

17  weren't described anywhere that they were doing Acthar, but

18  you should have done something about that, even though we got

19  documents two months ago.

20           So, I say in our response, and it's a group that

21  filed it, if that's true, then we seek leave to amend to

22  bring those facts to the Court.

23           Judge, if you're inclined to say under Rule 15

24  that the door is shut today, then just shut the door.  I

25  don't think the Supreme Court or the Third Circuit says that

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 135 of 547 PageID #: 4744
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 118 of 188

117

1   when it comes to Rule 15.  We're supposed to be getting to

2   the facts and the truth.  It seems to me we're just

3   getting -- it's a game of time and running out the clock.

4           These debtors have stonewalled us repeatedly and

5   if granted leave to file that motion, which I sought, and

6   we'll file it next week.  I'm not looking to put this off.

7   We want that hearing on September 1, 2021, Judge.  Let me say

8   that again:  we want that hearing.  But we want to get there

9   -- I know it's funny, Mr. Welch, but I don't think it's funny

10  -- we want to get there, because we want to be able to prove

11  our claims, okay.  And we don't want to get caught in these

12  traps that you've got the discovery.

13          We did not get those collaboration agreements;

14  they were withheld.  And if Your Honor doesn't want to look

15  at what the other judges ordered, that's fine; that's your

16  prerogative, I suppose, but in context of faulting us for not

17  asking the right questions at the right time, coming in, we

18  had.

19          What we also didn't know is all these projects,

20  which repeatedly talk about Acthar-function moving, and Mr.

21  Welch's deposition 13, MNK's Exhibit 62, Bates number 1558,

22  produced two months ago, Project Easter, how they moved

23  functions.  And Mr. Welch repeatedly said it was for tax

24  purposes, but the fact is it's more than that.

25          In this context, they're saying, you don't get to

1  claim against them because we did this machination.  And,

2  Judge, you should go through, and I'm proffering these

3  documents because I have them now, and today is the day,

4  Exhibit 62, Exhibit 55, Exhibit 56, Exhibit 57, Exhibit 58,

5  Exhibit 59, Exhibit 63 are all the projects produced by the

6  debtor two months ago, which it would take a team of people

7  to figure out what all of those corporate maneuvers mean.

8          We've barely scratched the surface with Mr. Welch,

9  in terms of all the different functions and move.  What's

10 clear to me as I sit back, I see the PLC, I see MIFSA

11 (phonetic), I see CV.  The two entities that financed Acthar,

12 not with anybody within Mallinckrodt, no, no, the documents

13 are clear, and they're in my proffer, the documents are

14 clear.  They gave equity and they're out of the money, and

15 they took the borrowing capacity of QuestCor and financed

16 against it.

17         QuestCor came in as a billion-dollar enterprise.

18 By the way, they paid $5.8 billion.  At the time, this

19 company was only worth two.  A two-billion-dollar company

20 buys a six-billion-dollar company.  Who had the stronger

21 position?

22         So, MIFSA and CV created that debt instrument.

23 And, by the way, that's how all the general unsecured

24 noteholders are claiming now against everybody beneath them.

25 But if you look at those document, Judge, and they're in the

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 137 of 547 PageID #: 4746
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 120 of 188

119

1  record, I'm proffering them, the PLC did not give any

2  guaranty to those noteholders, none.  We sued the PLC.

3          So if you're going to look at these claims and we

4  can't discriminate among unsecured claimants, because we're

5  in the same position other than under the RSA they're getting

6  $375 million and 80 percent ownership of the company.  So

7  they are getting that.  We are getting some share of $100

8  million broken up among 64 different entities, most of which

9  have no revenue, no assets, no money, no function, but

10  somehow they're getting a share of that money and we're being

11  told you get a little share of ARD, an insolvent entity that

12  nobody knew about, and the PLC.  Thank you very much, let's

13  all go home because if that's the way that is going to play

14  out then I think it's time for someone else to review it

15  because that to me just shows you what is going on here,

16  Judge.  They took a company that was making a billion dollars

17  a year and they stripped it dry.

18          Now I want to point out our discovery so you can

19  have a clear record in terms of deciding whether to give us

20  leave to file a motion for leave.  We have put in the record

21  the court's orders in Rockford's at A8-AG 152, 153 and 154.

22  We have put in the record our multiple discovery requests 1,

23  2, 3 and 4, AH 149, 148, 150 and 151.  We have put into the

24  record correspondence between counsel for the City of

25  Rockford and Arnold & Porter about their discovery

1  deficiencies AH 157 and 155.  We have also put into the

2  record, Judge, Mallinckrodt's custodian list in Rockford AH

3  156.  You will find it interesting that people who were

4  talking about it are not on it.  Mr. Phillips is not on

5  there.

6          Now Rule 26, I'm pretty sure, was amended a long,

7  long time ago where the defendant has to tell us the people

8  with knowledge.  They didn't do it.  In fact, we got a letter

9  on August 12th, 2019 right before Bryan Cave left AH 158

10 giving a very short list of people that did not include the

11 following important people that drive the decision making in

12 this company.

13          Kathy Schaefer, the president of virtually every

14 brand company sometimes Brian Reasons, Brian Reasons isn't on

15 there.  Gary Phillips, the head of MPIL, who with Dr. Romano

16 makes all of the decision makings under the collaboration

17 agreement.  Mark Tradeau, the CEO, is not on there.  You know

18 who else isn't on there, Mr. Welsh the person most

19 knowledgeable in this bankruptcy; he's not on the list.  It's

20 not our job to catch them, that is their 26 obligation.  They

21 should have told us these people were relevant.

22          Now we got from the debtors a document that I'm

23 going to proffer, (indiscernible) 5, Welsh Exhibit 5, a

24 summary of legal entities and it purports to explain what is

25 a brand and what's a generic.  The problem with that, Judge,

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 139 of 547 PageID #: 4748
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 122 of 188

121

1   is the debtor decided what is brand and what is generic

2   without any regard to the history that I just told you about

3   that's in those documents. Mallinckrodt LLC, and I'm going to

4   go through them, clearly signed documents on behalf of this

5   entity that is the brand entity time and time, and time and

6   time again.

7           I want to point out another fact that is relevant

8   to the issues of whether or not we get to go after these

9   entities.  There's two documents you put in, the Irish

10  statutory account filings, AHG 9 and 11, and a cover at 10.

11  In those filings, Judge, the brand entities exist in one

12  location.  675 James S. McDonnell Boulevard, Hazelwood,

13  Missouri.

14          One of the factors the courts look to is do they

15  have different offices.  They have one.  That is their

16  office.  We didn't know that.  We didn't know we shouldn't be

17  looking at all these other entities.  All these now brand

18  entities that are working the Acthar business.  The point is,

19  Judge, the person that knew this the most was never deposed.

20  He was ordered in Rockford to appear.  The first time you and

21  I spoke was to quash that subpoena of Mr. O'Neill.  He has

22  yet to testify.  We deposed the people they put-up, Mr.

23  Hillmer, the executive assistant, Ms. Falconi, and Mr. Close

24  [sic], but that's it.  That is all we got.

25          Why that matters, Judge, in the record we put in

1   the opioid litigation which these debtors are involved in,

2   AHD 63 and the pleadings that follow 62 which frame the issue

3   for Judge Polster about whether or not this PLC, whom we sued

4   -- by the way, I don't want to cast aspersions on anyone, but

5   none of the blues, the insurance claimants, sued anybody.

6   Let me repeat that, they didn't sue anybody.  There is no

7   complaint.

8          So if you're going to judge claims in terms of

9   whose where in the pecking order we sued, we litigated

10  (indiscernible) 12, we framed the conduct that courts have

11  agreed with.  Those blues entities they haven't explained why

12  they have a claim.  Most of them, from what I can tell,

13  Judge, are third-party administrators.  They don't even pay

14  for Acthar.  They administer for my clients.  It seems to me

15  that is a double DIP.  Humana, and I'm not going to pick on

16  Humana, but they sued the PLC then dismissed the PLC.  We

17  didn't.  So we have claims against the PLC and ARD.

18          The reason why the judge, and I won't repeat the

19  citation to the unreported case of Judge Polster, he looked

20  at the plaintiffs' proffer and Mr. O'Neill's transcript which

21  was under seal, but it's at 171, he testified:

22          Question,

23          "What's your job?"

24          Answer,

25          "I am in charge of the brands.  I am the executive

A-7079

123

1  vice president."

2          Question,

3          "For what organization?"

4          Answer,

5          "Mallinckrodt Pharmaceuticals."

6          Let me pause there.  There is no Mallinckrodt

7  Pharmaceuticals.  You can look at that list there is no

8  entity called Mallinckrodt Pharmaceuticals.  Every single

9  witness we deposed curiously said they work for Mallinckrodt

10 Pharmaceuticals.

11         He is then asked,

12         "What is the PLC?"

13         Answer,

14         "I believe that is the holding company."

15         Question,

16         "Who pays your salary?"

17         Answer,

18         "I don't know."

19         Then he goes onto say, when they were asked about

20 the PLC again, the entity we sued, "You think of it as all

21 one company, counsel," and I'm on Page 18 at Line 5, "Well, I

22 think about it as Mallinckrodt Pharmaceutical and then the

23 way I think about it there's subsidiaries attached to it."

24 That is the highest ranking officer in this company

25 testifying under oath that he thinks about it as one company.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 142 of 547 PageID #: 4751
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 125 of 188

124

1          What you are getting today, though is lawyers.

2   Latham & Watkins, Wachtell who were part of the original

3   merger agreement, they both represented those entities,

4   they're arguing to you now that it's different.  They're not

5   letting the executives come forward, Judge, and testifying

6   under oath what I just read to you.  Then he is asked,

7          "What do you do?"

8          Answer,

9          "The operational piece is run by myself and an

10  operating committee."

11         That is on Page 19.  That is the record.  In his

12  CV, and I pointed this out, its Exhibit 172 he says its "One

13  commercial organization."  There is a franchise.  The ARD

14  franchise.  Then he talks about in communication with

15  outsiders including investors and key stakeholders the ARD

16  "division."  He doesn't say Inc., LLC, he doesn't say it has

17  to go all the way up this hierarchy to get to MEH, to get to

18  the PLC.  He says I am the highest ranking officer, it's a

19  division.

20         By the way, separate witnesses would depose Mr.

21  Kilper who is in finance.  Mr. Welsh may know him.  His

22  deposition is now in the record at 173.  He says, again,

23         "Who do you work for?"

24         Answer,

25         "I work for Mallinckrodt."

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 143 of 547 PageID #: 4752
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 126 of 188

125

1          Question,

2          "Which Mallinckrodt entity is your employer?"

3          Answer,

4          "I don't know.  I work for Mallinckrodt."

5          Question,

6          "Who pays your check?"

7          Answer,

8          "I don't know."

9          Question,

10         "Where does the money come from?"

11         Answer,

12         "I don't know."

13         Then he talks about,

14         "What position do other executives, Mr. Harbaugh,

15 have?"

16         Answer,

17         "You're talking about legal entities.  I don't

18 know."

19         Question,

20         "From an operational standpoint do you make

21 distinctions between the legal entities in Mallinckrodt?"

22         Answer,

23         "From an operational perspective I do not."

24         That is Page 12 of Exhibit 173.  His CV says the

25 same thing at 174.  Mallinckrodt Pharmaceuticals.  This is

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 144 of 547 PageID #: 4753
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 127 of 188

126

1  the evidence, Judge.  You're now being shown this chart --

2  and I understand corporate law, we all get that in law

3  school, but these debtors are trying to hide assets and

4  liabilities, and shield an insolvent corporation.  Judge, if

5  you read those projects that I read Easter [phonetic] and

6  Gemini we only found out that ARD was insolvent as of the

7  fall of 2018 from Mr. Welsh, insolvent.  It had no ability to

8  write anything.  Every single function got moved out; HR,

9  legal, finance, manufacturing, IP, research and development,

10  distribution, pricing, marketing, sales.

11          I want to turn to that right now and then I will

12  conclude.  All those functions no longer reside in ARD, none

13  of them.  We litigated the issue of the contract, the

14  exclusive distribution contract which is in the record.  Your

15  Honor has seen it a couple times, Exhibit 170; it's the 2007

16  agreement signed by then Questcor.  It was only amended 12

17  times and the last time was 2017, Exhibit 169.

18          I asked Mr. Welsh I that agreement is still

19  operative and he said yes.  Here is the problem, we didn't

20  get these documents.  There's a warehousing agreement signed

21  June 10th, 2020. It's produced in this case two months ago at

22  MK ACTH 1762.  It's in your record, Your Honor, as Exhibit

23  53.  We didn't get the transmittal from Wachtell, Exhibit 51

24  which was signed off by the MPIL organization.  There it's

25  signed by Mr. Pio [phonetic], that's Exhibit 51.

A-7083

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 145 of 547 PageID #: 4754
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 128 of 188

127

1          We didn't get the bill of sale which transferred

2    $561 million from ARD -- by the way, don't take my word from

3    it, the ARD SOFA in the record at 969, Docket 969, at 4.2

4    MPIL received $561,654,617 as an intercompany commercial

5    chain transfer.  That is why it matters.  June that happened.

6    The bill of sale produced, which is Exhibit 52, references a

7    third amended and restated distribution agreement from

8    September 2019 between MPIL and ARD.  It's a distribution

9    agreement.

10          I can't tell you how many times we asked for

11   distribution agreements because the lead document from '07 is

12   a distribution agreement, never produced.  ARD document

13   signed with MPIL never produced.  No excuse.  There is an

14   assumption agreement MPIL where the operations were turned

15   over to SD Operations, a new entity.  Judge, you don't have

16   any record in front of you, but if you look at our LEHB

17   complaint, and I put that in the record, that is the one we

18   filed for post-petition conduct, we detailed all these

19   entities and when they were formed.  And most of the ones

20   we're going after were formed after Rockford sued.

21          So Exhibit 55 is the assumption agreement, never

22   produced.  Exhibit 56 is the transmittal, never produced.

23   Exhibit 54 a distribution agreement, never produced.  As to

24   the (indiscernible) operation manager is 59, never produced.

25   Exhibit 58 SD Operations transmittal, never produced.  A

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 146 of 547 PageID #: 4755
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 129 of 188

128

1  services agreement at Exhibit 82 -- by the way, these are all

2  in June of 2020, all signed in June of 2020.

3         Now we're to July, July 8th now all of a sudden we

4  see Petna Holdings [phonetic] signs an agreement with ARD,

5  this is Exhibit 2, and it seems to me, Judge, all the

6  functions get transferred out.  ARD says it doesn't possess

7  the knowhow to do the things it's been doing since Questcor

8  did them in '07 and now all of a sudden they're getting

9  transferred by an entity that was formed in February called

10 Petna Holdings, Exhibit 2.

11        Exhibit 94, those functions are now transferred to

12 a company called SDE Services, never existed before 2020.

13 September 8th, 2020 that happened.  September 8th, but we're

14 supposed to know that and sue SP Shared Services because of a

15 contract that was signed on September 8th.

16        I am going to just point out, Judge, that there

17 are a litany of documents that go to the issue of

18 Mallinckrodt LLC and the reason why I keep to this is if you

19 look down to what the debtors described as the brand side

20 business which goes from NIFSA, you've got CV, and then you

21 come down and you see NEH, a Nevada Corporation, which

22 historically was the entity that controlled all the US brand

23 business.  It goes to the left, to the Mallinckrodt ARD

24 Holding Company and then it goes to the right, to the

25 generics.  I'm sure Your Honor has seen the chart a number of

1    times.

2              THE COURT:  Hold on one second, Mr. Haviland.

3    I've got a technical issue here.

4              MR. HAVILAND:  No worries.

5         (Pause)

6              THE COURT:  All right.  I've lost my courtroom

7    camera, so I'm going to switch -- oh, now it's back.  Never

8    mind.  Go ahead, Mr. Hughes -- or, excuse me, Mr. Haviland.

9              MR. HAVILAND:  I see Your Honor.  I'm going to

10   finish up here.  I'm trying to point out to the Court as

11   quickly as possible how the functions are moved.  We walked

12   through distribution; we talked about the collaboration

13   agreement which deals with pricing.

14             I do want to touch upon R&D because, Your Honor,

15   when you rule denying our motion to compel, but granting

16   limited leave, you said follow the money -- and I'm going to

17   paraphrase -- but follow the function as well.  Research and

18   development, an important part of this, had been transferred

19   in 2014, shortly after the merger.  That document is revealed

20   by AHG No. 100, a document signed by MPIL and Mallinckrodt

21   ARD, Inc., the defendant in our case.

22             And I can't say it enough, Judge, if Arnold &

23   Porter were litigating with us right here, they'd say, yes,

24   we asked for it five different ways.  It's not over-broad to

25   ask for the research and development services agreement, it

1   was only produced two months ago.  That's how we know that

2   R&D got transferred.

3         Now, I did say I wanted to touch upon Mallinckrodt

4   LLC because there are a few entities when you look at those

5   projects that moved over from the brand side to the generic

6   side -- and they may be generic-oriented today, but they

7   weren't -- Mallinckrodt LLC is the one that stands out,

8   Judge, because repeatedly they signed contracts, beginning

9   with a document in 2015.  That exclusive wholesale product

10  purchase agreement that we've described was modified by Todd

11  Killian, the vice president of market access for Mallinckrodt

12  LLC, using the same address on McConnell Boulevard up in St.

13  Louis.  That's at Bates number 109.

14        Exhibit 34 is a rebate agreement signed by LLC;

15  Exhibit 35 is a distribution agreement with Caremark signed

16  by LLC; an inflation agreement signed with Express Scripts at

17  Exhibit 8, signed with LLC; Caremark again, Exhibit 36.

18        The rebate agreements, I think they say in their

19  papers that these are just isolated PBM agreements, they're

20  not.  The distribution, the sales, and the financing in terms

21  of inflation and rebates are signed by Mallinckrodt LLC.

22        And by the way, Judge, the one I'm pausing on,

23  number 49, here's what the read says at the beginning, the

24  third amendment to the rebate agreement with Caremark,

25  "Mallinckrodt LLC, the manufacturer."

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 149 of 547 PageID #: 4758
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 132 of 188

131

1          Now, these are legal documents.  You've got -- you

2     want to respect the entity, I do.  So if the LLC says,

3     Mallinckrodt LLC on the generic side says we are the

4     manufacturer of Acthar -- and, by the way, this is signed by

5     Hugh O'Neill, SVP President, U.S. Specialty Services -- I

6     take him at his word that they're the manufacturer.

7          Price increases, that's another important

8     function.  That function got moved and the discussion begins

9     at Exhibit 20.  And then there are a series of price

10    announcements, which we point to under the exclusive

11    agreement, where they announce the prices in concert with

12    Express Scripts.  And these documents were all signed by

13    Mallinckrodt LLC, not ARD; 44, the December 2014 price

14    announcement; 73, the June 2015 price announcement.

15         And by the way, I'm glossing over, but each time

16    Acthar is going up thousands of dollars.  In 2015, it went

17    from 32,000 to 34,000.  On Exhibit 68, 2016 price increase,

18    it goes from 34 to 36,000.  Exhibit 39, it goes from 34 to

19    37,000.  All signed by Bill Hilmer, Senior Director,

20    Strategic Pricing and Contracts, Mallinckrodt LLC, not ARD.

21    And he was deposed and asked these questions.

22         I'm going to finish with a couple of other points.

23    The legal, which is a function.  We've shown you, Judge, in

24    the prior issues with Arnold & Porter, there was one

25    engagement.  And there was an issue about whether or not

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 150 of 547 PageID #: 4759
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 133 of 188

132

1   Arnold & Porter represented all the different entities and I

2   think the ruling was, well, they can represent the

3   affiliates, but where a single entity engages one lawyer in

4   one engagement, well, that denotes the fact that it's one

5   single enterprise because they're going to do a conflicts

6   check.  If they're different enterprises and Arnold & Porter

7   represents one and some other company represents another,

8   there may be adversity there.  But those exhibits, 164, 165,

9   and 166 we'll maintain under seal, but that points out to us

10  that the company is acting as a single entity.

11          Finance, Mr. McCallen touched upon that, but the

12  cash management system was done through one function through

13  these holdcos.  We put in the record Exhibit 7 and then,

14  importantly, the agreements, the master cash agreements at

15  Exhibit 5 from August of 2020, and Exhibit 6, it's September

16  2021.  The signatories of all the different entities we're

17  talking about and their right to get cash, one person, Brian

18  Riesen signs for all those entities to give them the right.

19          My point being there's only a couple of people

20  that are running this entire company.  The Mallinckrodt

21  Pharmaceuticals brand, undifferentiated, shows up in their

22  balance sheet, Exhibit 21 and 22.  Their actual balance

23  sheets, if you look at all the money coming into the

24  organization and denotes it as Mallinckrodt Pharmaceuticals,

25  it doesn't put it in these different buckets, these cash

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 151 of 547 PageID #: 4760
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 134 of 188

133

1  pools, it looks at it as an enterprise, money coming into one

2  organization, and then the organization reallocates those

3  monies.

4           Finally, Your Honor, we put into the record to

5  give you direction in terms of where we would go with an

6  amended pleading.  Well, we've already done it.  We filed a

7  complaint on behalf of the Law Enforcement Health Benefits

8  Fund, it's at Exhibit 168, that lays out these entities and

9  who they are and what they do.  So the debtor has known about

10  that since May 26th, 2021.  We sought leave to amend May 21,

11  but that pleading was filed, it's now in the record before

12  you.

13           And I'm going to finish with that, Judge.  And I

14  want to loop in the committee because they filed a pleading

15  last night, it's at Docket 3316.  And we have worked by and

16  through the committee, who is the committee for the general

17  unsecured creditors, including our group, especially our

18  group, our client sits as the chair.  And as counsel now

19  knows -- we haven't had contact with her until this last week

20  -- because she has a fiduciary obligation to all creditors,

21  but the committee came out and took a position and I think

22  it's important, they said, "Since the commencement of the

23  cases" -- I'm at paragraph 1 -- "the UCC has worked

24  diligently to understand the enterprise threatening

25  litigation and how this enterprise works."

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 152 of 547 PageID #: 4761
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 135 of 188

134

1          And the UCC's own independent analysis, quote,

2     "They cannot make sense of the debtors' assertion that the

3     private claimant, Acthar claimants' claim for liability

4     exclusively sits in ARD because the debtor entities were

5     involved in the debtors' Acthar operations."

6          This is their discovery.  They got this discovery

7     with their professionals.  That's their conclusion at

8     paragraph 3.  And they're coming out and saying they can't

9     take a position at this point because they're not done their

10    work, but you're being asked to say shut the door on any

11    amendment.  And I respectfully submit, Judge, there's only so

12    many different ways you can ask, but if it's going to require

13    a motion, we'll file it, we'll file it tonight.  But to have

14    the debtors argue that you should not allow an amendment in

15    the face of all this evidence -- and I mean all this evidence

16    -- what was not produced in the underlying litigation, what

17    was dumped upon us in the last 60 days, and we said, if

18    you're going to look to that, Judge, and rely upon that,

19    then, please, give us leave to amend.

20          And maybe it was inartful to say we'll file a

21    motion -- or we want leave to file a motion, I'm amending

22    that now to say, Judge, we want to file a motion, because

23    Your Honor should not have to rule in a vacuum simply upon

24    proofs of claim that were filed February 16 which have this

25    bona fides to them.  This company is committing antitrust

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 153 of 547 PageID #: 4762
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 136 of 188

135

1   violations, RICO violations, consumer fraud, and it doesn't

2   seem like we're ever going to get that point.  I'm not asking

3   you to litigate the underlying question, but you can't ignore

4   the fact that we have viable claims against the PLC and ARD,

5   and they want to shut the door as to everybody else by their

6   creation through some tax vehicle.

7             So we ask for leave to amend, Judge.  Thank you.

8             But I want to admit these exhibits, Exhibits 1

9   through 174, and the Debtors' Exhibits that I've referenced,

10  because this is the hearing.  I believe Mr. Murtagh said at

11  the beginning, now is the time.  That's my proffer and I ask

12  the Court to admit them.

13            THE COURT:  All right.  You've made your proffer,

14  but I'm not going to admit them into evidence at this time.

15            Mr. Harris?

16            MR. HARRIS:  Thank you, Your Honor.

17            We are not here to discuss whether there are valid

18  claims against ARD or PLC.  We do not object to them for

19  today's purposes.  We're here to determine whether these

20  proofs of claims against the non-defendant debtors are

21  sufficiently alleged.  All these claimants chose not to

22  amend, that was their call.  Collectively, what you heard is

23  one single attempt to defend the existing proofs of claim,

24  that is attestor saying that this is just a notice pleading

25  standard.  That's not an answer.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 154 of 547 PageID #: 4763
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 137 of 188

136

1          The standard under Allegheny is, quote, "The

2   claimants must allege facts sufficient to support the claim."

3   There's no dispute they allege no facts as to any non-

4   defendant debtor.

5          And as to notice pleading, the proofs of claim do

6   put the debtors on notice of alleged conduct of ARD and PLC,

7   but there's no notice of alleged conduct by any non-defendant

8   debtor, there's no notice of what facts supposedly make these

9   debtors liable.  So there is -- you've heard no real defense

10  of these proofs of claim.  All this discussion is really

11  about is the plea about whether the disallowance of these

12  proofs of claim should be with prejudice or not.

13         So what did you hear to support essentially the

14  request to allow them to amend that is extremely late?  Well,

15  attestor said a bunch of things about what they believe some

16  of the non-defendant debtors did.  And I guess they did that

17  to preview what their amended proofs of claim would say in

18  order to encourage allowance of this late amendment.  But if

19  you listen to what they said, everything they said is clearly

20  insufficient.  None of the activities they mention that they

21  say these other entities did are the alleged wrongful acts

22  here.  None of them are what they claim to be the tortious

23  wrongful acts.

24         They said some debtors were involved in

25  manufacturing Acthar.  Well, there's nothing wrong with

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 155 of 547 PageID #: 4764
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 138 of 188

137

1  manufacturing Acthar.  The second category, some defendants

2  are engaged in R&D of Acthar.  There's nothing alleged to be

3  wrongful about R&D of Acthar.  They said some are engaged in

4  distribution, but what you didn't hear is that any of these

5  entities are engaged in the only supposedly wrongful part of

6  the distribution, which is the exclusive CuraScript

7  distribution contract.  If you look at the proof of claims

8  and you look at what you heard today, that contract is only

9  with ARD.

10        So what did you really hear is that other entities

11  benefited from the proceeds of Acthar.  That is insufficient

12  as a matter of law for all of these claims.  I noted the

13  cases holding that as black letter law under antitrust law,

14  RICO, unjust enrichment.  You heard nothing in response, not

15  one case other than a discussion of Copperweld.  But what

16  Copperweld just says is that affiliates share a state of

17  mind, but you still have to allege that each affiliate

18  engaged in antitrust conduct, and that's what all the cases I

19  went through in my opening support.  There are no cases that

20  support this theory that just because revenue goes to an

21  affiliate that affiliate is directly liable for antitrust,

22  RICO, or unjust enrichment, you heard no case in response.

23        When are they going to come forward with a case

24  that supports these theories?  Well, today was the day.  They

25  filed -- they each filed two different briefs in response to

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 156 of 547 PageID #: 4765
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 139 of 188

138

1  this -- to our objection.  There is not one case they cite to

2  support that the mere receipt of revenue by an affiliate is

3  enough for direct liability under any of their theories.

4          We have had enough delay, it is time to let these

5  issues be decided.

6          In terms of what you also heard is that there's

7  overlapping employees or that some employees view

8  Mallinckrodt as operating as one entity or as one business.

9  That's not an argument for direct liability.  I'm sure you

10  will hear that in the context of substantive consolidation or

11  veil piercing, but there's not one case that you heard that

12  supports that those facts would create direct liability under

13  any of these theories.

14          You heard Mr. Haviland mention that there have

15  been prepetition motions to dismiss, some granted, some

16  denied, but of course none of those were claims against the

17  non-defendant debtors.  No court has ever said that the

18  allegations in those complaints are sufficient to support a

19  claim against the non-defendant debtors.

20          You heard him mention consumer fraud claims.  That

21  wasn't mentioned in any of the briefs he filed and in fact he

22  admitted in response to his interrogatories -- or the City of

23  Rockford did that the City of Rockford had no contact with

24  any non-defendant debtors.  It's hard to see how that would

25  substantiate a fraud claim against those entities if they

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 157 of 547 PageID #: 4766
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 140 of 188

139

1  never even communicated.

2           You also heard the ad hoc group a mid-level

3  employee, Mr. Bill Hilmer, as supposedly perjuring himself.

4  That is outrageous and there's no basis and it's

5  inappropriate to do live in a courtroom like that.

6           The other thing you heard was talk about shifting

7  of corporate assets.  Well, that is a fraudulent conveyance

8  claim and, if it's supported and they want to argue it, or if

9  they want to argue for veil piercing in response to

10  confirmation, you will hear it then, but it is not a direct

11  claim they can bring.

12           What is really going on?  Well, you heard the

13  truth.  They want to go against entities other than the ones

14  that they actually substantiated a claim against because the

15  entities that they did put details about those things against

16  they believe are now valuable and they're worried about value

17  having shifted out of those entities.  That is fraudulent

18  conveyance.

19           So they've had materials before the bar date that

20  would have allowed them to state facts about these entities.

21  They have the 10-Ks that list every subsidiary in Schedule

22  21, just like every 10-K does.  Our organization chart was

23  part of the first day filing.  The IP restructuring memo we

24  filed in November 2020 said who owns the Acthar IP, what

25  entities it was licensed to, and who paid and received

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 158 of 547 PageID #: 4767
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 141 of 188

140

1    royalties.  Why was not in that in the proofs of claim they

2    filed months later?

3            You heard both sets of claimants run through all

4    the evidence that they now have, but they've had that for

5    months.  Why didn't they amend their proofs of claim?  There

6    is no excuse provided by either of them why they did not

7    amend before this hearing.  No one has explained why they

8    didn't pursue Rule 2004 discovery before the bar date, no one

9    has explained why they didn't incorporate what they knew

10   about these other entities before the bar date, and no one

11   has explained why they didn't amend the proofs of claim after

12   the bar date and before this hearing.  They have known from

13   day one that they have to substantiate their claims against

14   each debtor.  They could have amended and it is extremely

15   prejudicial to the debtors and to this restructuring for this

16   late amendment to happen now.  They would have to file a

17   motion to amend, we would have to hear it; we would then have

18   to redo this hearing with their newly amended proofs of

19   claim.  If those in fact were to survive, we would then need

20   to have an estimation process perhaps and a hearing on that.

21   All of that pushing back and prejudicing the estate, the

22   other creditors, and this Court.

23           It is too late, it is too prejudicial.  They

24   should have acted in the way in which the rules require, they

25   should have supported their proofs of claim when filed or

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 159 of 547 PageID #: 4768
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 142 of 188

141

1 they should have amended them when they had the information

2 to do so.

3          With that, I'll pause.

4          THE COURT:  Thank you, Mr. Harris.

5          All right, I'm going to take a recess so I can

6 consider the issues.  We'll recess until 3 o'clock.  I'll

7 come back on and I'll give you my ruling at that time.

8      (Recess taken at 1:55 p.m.)

9      (Proceedings resumed at 3:03 p.m.)

10          THE COURT:  All right, this is Judge Dorsey.  We

11 are back on the record.  I'm going to give you my ruling on

12 the motion to dismiss the unsubstantiated claims.

13          Retired Judge Gross once wrote that "the bar date

14 is important to the administration of a bankruptcy case as it

15 brings certainty to the debtor's case by enabling the debtor

16 and its creditors to know the amount of claims that exist.

17 It is akin to a statute of limitations and must be followed."

18 That's In re Nortel Networks, Inc., 573 B.R. 522 (Bankr. D.

19 Del. 2017).

20          It's plain to me based upon a review of the proofs

21 of claim at issue and the objections, as well as the parties'

22 pleadings and the arguments presented today, that those

23 claims were filed with a complete disregard for whether or

24 not any claims actually existed against those debtor entities

25 and in some instances with actual knowledge that either no

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 160 of 547 PageID #: 4769
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 143 of 188

142

1   claim existed or likely existed at all.  The strategy was

2   obviously:  file proofs of claim against as many debtors as

3   possible in a corporate structure, assert that the proofs of

4   claim constitute prima facie evidence of the validity of the

5   claims, force the debtors to object due to the destruction

6   caused to the debtors' plan of reorganization process,

7   thereby gaining leverage against the debtors, then seek

8   discovery on the claims in the hope of finding facts to

9   support them.  Those actions constitute bad faith and an

10  abuse of the claims process established by the bankruptcy

11  code and the bankruptcy rules.  Therefore, I will sustain the

12  objections to the claims and they will all be dismissed.

13          The proper procedure here, as I stated at the

14  beginning of this hearing, would have been to seek Rule 2004

15  discovery, seeking information on whether or not potential

16  claims existed against any of the debtors other than

17  Mallinckrodt PLC or Mallinckrodt ARD, claims against which

18  the debtors are not objecting, prior to the filing of the

19  proofs of claim.  For whatever reason, neither of the Acthar

20  groups chose that path.

21          The bar date order was entered on November 30,

22  2020, setting a bar date of February 16th, 2021, giving the

23  Acthar claimants 78 days to investigate whether or not they

24  had claims against any other debtor entities.  The only

25  parties that sought 2004 discovery were the UCC and the OCC.

1  The insurance claimants didn't join the UCC discovery until

2  March 16th, 2021, a month after the bar date.  The Acthar

3  group didn't join until March 3rd of 2021, again, after the

4  bar date, but later withdrew that joinder for reasons that

5  are perplexing to me.

6          The proofs of claim as filed failed to assert

7  facts sufficient to support claims against the debtors.

8  Therefore, those proofs of claim do not meet the sufficiency

9  requirements under the Third Circuit's decision in Allegheny

10 International 954 F.2d 167, 173, a 1992 decision.

11         The proofs of claim only assert claims against PLC

12 and ARD, with in some cases vague references to alleged

13 unknown co-conspirators and in other instances where they

14 outright admit that the proof of claim is being filed, quote,

15 "out of an abundance of caution," close quote, just in case

16 they do have claims that can be substantiated through

17 discovery.  Those types of allegations are not sufficient to

18 put the debtor, the Court, or the parties in interest on

19 notice of a claim.

20         I will note that, despite the failure to seek 2004

21 discovery prior to filing the claims, the debtors did engage

22 with discovery with the claimants after the objection had

23 been filed, and I made rulings on that discovery indicating

24 what was permissible and what was not permissible.

25 Interestingly enough, that was in connection with a motion

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 162 of 547 PageID #: 4771
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 145 of 188

144

1   brought by the debtors for a protective order, not a motion

2   to compel brought by the parties -- the claimants.  Neither

3   group sought a motion to compel discovery, believing that

4   they had -- that the information that they were seeking was

5   being withheld.  They waited until the Acthar -- the ad hoc

6   group waited until just days before this hearing to seek a

7   motion to compel, which was too late.  Instead, the Acthar

8   plaintiffs simply rested on their proofs of claim as filed

9   and attempted to argue new facts in their responses to the

10  objection.

11           Those responses do not qualify as motions to amend

12  and I do not find that any of the facts alleged in the

13  responses somehow modify the proofs of claim as filed.  If

14  the claimants believed that they had uncovered facts that

15  would allow them to amend, they should have filed the

16  appropriate motion and I could have evaluated those motions

17  under the appropriate standards for amending a proof of

18  claim.

19           Now, the ad hoc group claims that they requested

20  leave to amend in their motion to dismiss, but, as I noted

21  previously, all they asked for was leave to file a motion for

22  leave to amend, not asking to amend the actual complaints --

23  or, excuse me, proofs of claim, and that would require me to

24  engage in a factual finding that simply was not before the

25  Court at this time.

A-7101

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 163 of 547 PageID #: 4772
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 146 of 188

145

1          So even if I granted a motion to leave at this

2    time, because I find that the proofs of claim as filed fail

3    to state any claim whatsoever against the debtor entities,

4    motion to leave would actually be akin to a motion to file a

5    late claim.  And as noted in the Enron decision of the

6    Southern District of New York, "the decision to grant or deny

7    an amendment to a timely-filed proof of claim rests with the

8    sound discretion of the bankruptcy judge."  That is In re

9    Enron Corp., 328 B.R. 75 at 86, a 2005 decision.

10          The court went on to say it's important to make

11   sure that the amendment is not in actuality a new claim and,

12   given that no claims were asserted against the debtors in the

13   proofs of claim that I am dismissing, any amendment at this

14   point would in fact be a new claim against those debtors.

15   Because it is a new claim, it would require use of the

16   excusable neglect standard in Pioneer.  And, as Judge Gross

17   noted in the Nortel decision, "Courts take a hard line when

18   applying Pioneer," and particularly in emphasizing the reason

19   for the delay.

20          I'll also make a note here on the Rule 15 relation

21   back because that was raised by the ad hoc group.  Relation

22   back only applies under Rule 15 not -- does not apply, I

23   should say, to adding a party, but only to amendments to the

24   party against whom the claim is asserted.  Well, again,

25   there's no claims asserted here, so Rule 15 would be

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 164 of 547 PageID #: 4773
  Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 147 of 188

146

1  inapplicable.

2          So what's the standard under Pioneer for allowing

3  a late-filed claim?  You have to show excusable neglect.  And

4  the factors are you have to show danger or prejudice to the

5  estate; length of delay and impact upon judicial proceedings;

6  the reasons for the delay, including whether it was within

7  the reasonable control of the movant who acted in good faith;

8  and all of those factors have to be balanced.  And it's Hefta

9  v. Official Committee of Unsecured Creditors, In re American

10  Classic Voyages Company, 405 F.3d 127 at 133 (3d. Cir. 2005).

11          In this case, I find that allowing the filing of

12  the late-filed claims would not comply with the Pioneer

13  standard.  It would require an estimation hearing to

14  determine the validity of those claims, extensive discovery

15  on the merits of those claims that would take months and

16  would be followed by a days-long, if not months-long,

17  evidentiary hearing before the debtors could move forward

18  with their confirmation.  That clearly has an adverse impact

19  on these cases, particularly in light of the fact that I

20  believe the debtors have indicated to me in the past the cost

21  of this bankruptcy is about $20 million a month.

22          It's been nine months since these cases were

23  filed, eight months since the bar date notice went out,

24  almost six months since the bar date passed, with no attempt

25  to seek to amend the proofs of claim.  Allowing late-filed

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 165 of 547 PageID #: 4774
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 148 of 188

147

1    claims now would have a significant impact on these cases.

2            The reasons for delay also do not favor allowing

3    the late-filed claims.  The movants never asked for 2004

4    discovery before the bar date, they never moved to compel

5    discovery they claimed was not forthcoming.  And, curiously,

6    Mr. Haviland went through a litany of documents that he

7    wanted to introduce into evidence that he indicated were

8    produced two months ago.  And yet, again, no motion to amend

9    was filed.

10            So it's clear to me that these proofs of claim do

11   not meet the standard for allowing an amendment, so I will

12   dismiss them with prejudice at this point.

13            All right?  With that, Mr. Merchant, do we have

14   anything else on the agenda for today?

15            MR. MERCHANT:  Thank you, Your Honor.  I believe

16   two other things.  First of all, I think the debtors and some

17   of the other parties had filed motions to leave in -- I mean

18   motions to seal in connection with the various pleadings

19   related to the unsubstantiated claim objection.  I don't

20   believe there's been any objection to any of those motions,

21   though, consistent with the local rules, the objection

22   deadlines were set for this hearing.

23            So, unless Your Honor has any concerns, you know,

24   I would propose having the parties just upload orders with

25   respect to each of those procedural motions.

1              THE COURT:  I don't have any questions or

2     concerns.  Does anyone else wish to be heard on that issue?

3          (No verbal response)

4              THE COURT:  Okay.

5              MR. MCCALLEN:  Your Honor, and --

6              THE COURT:  Oh, go ahead, Mr. McCallen.

7              MR. MCCALLEN:  I'm sorry, Your Honor.  I think

8     it's actually the issue we just covered a minute ago.  I

9     understand Your Honor's order, but just for purposes of the

10    record, can we consider that Your Honor has read the decision

11    on the record and that's so order and there won't be a final

12    written order of any sort, and we can proceed from there from

13    today's record?

14             THE COURT:  Is there any objection to just having

15    it so ordered on the record or do you want to have a written

16    order submitted under seal?  I'll open it up, if anybody has

17    a preference.

18         (No verbal response)

19             THE COURT:  All right, nobody has a preference.

20    All right, so I will just so order the record.

21             MR. MCCALLEN:  Thank you, Your Honor.

22             MR. MERCHANT:  Thank you, Your Honor.  So, getting

23    back to the motions to seal, may we proceed in the manner in

24    which I proposed?

25             THE COURT:  Yes, nobody has an objection.  I don't

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 167 of 547 PageID #: 4776
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 150 of 188

149

 1  have any problem with them, so I will -- if you want to

 2  upload those orders, we'll get them entered.

 3          MR. MERCHANT:  Thank you, Your Honor.

 4          The one remaining matter that was on the agenda

 5  for today was the debtors' preliminary objection to Humana's

 6  motion for substantive consolidation of these cases.  I know

 7  that there was an agreement that that would go forward today

 8  and Keith Simon from Latham & Watkins will be addressing that

 9  on behalf of the debtors.

10          THE COURT:  All right.  Mr. Simon?

11          MR. SIMON:  Good afternoon, Your Honor.  It's

12  Keith Simon of Latham & Watkins for the company.  Can you

13  hear me okay?

14          THE COURT:  I can.  Thank you.

15          MR. SIMON:  Great.  So, Your Honor, before we get

16  into the details of Humana's request for an August 24th

17  stand-alone sub-con hearing, I'd like to explain at a high

18  level how I see this playing out.

19          First, I'm pleased to report that we've resolved

20  our issues with the OCC.  They agree with us that there's no

21  need for a separate stand-alone sub-con hearing, and I

22  believe someone from Akin Gump will be reading some

23  statements on the record to confirm our understanding.  They

24  previewed that with us and we're on board with the concepts

25  that they're going to lay out.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 168 of 547 PageID #: 4777
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 151 of 188

150

1          So, Your Honor, as everyone knows, our Chapter 11

2    plan does not contemplate substantive consolidation; rather,

3    it respects the prepetition boxes and allocates value based

4    on the assets and liabilities of those separate boxes.  So we

5    have teed up the issue.  As part of our case in chief during

6    the confirmation, we will show why respecting those boxes is

7    appropriate under Section 1129 of the code.  And if we can

8    show that the boxes can and should be respected, then by

9    definition we defeat and moot on the merits that the boxes

10   should not be respected for whatever reason.  Consolidated,

11   merged, ignored, overlooked, pierced, it doesn't matter what

12   the basis is, they're either respected or not, because those

13   are mutually-exclusive positions.

14          And so our resolution with the committee, which

15   they'll read on the record, is that for a confirmation

16   objection, for them or anyone really to be able to argue the

17   boxes shouldn't be respected, for whatever reason, A, B, and

18   C, you don't need standing for a confirmation objection, you

19   don't need standing -- or to file an adversary proceeding to

20   make those arguments.  But, again, they're just confirmation

21   objections, they're not stand-alone causes of action, they're

22   not stand-alone proceedings.

23          The committee was concerned that they would have

24   to jump through a bunch of hoops just to say the magic words

25   "alter ego," they don't.  They can raise that as confirmation

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 169 of 547 PageID #: 4778
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 152 of 188

151

1  objections, but that's all they are.

2          So, to be clear, people can file whatever

3  confirmation objections they believe are appropriate and we

4  will respond to those on the merits when it comes to

5  respecting the boxes.

6          So, Your Honor, I did just want to raise a couple

7  of issues that Humana asserted about the need for an August

8  25th sub-con-only hearing.  First, in paragraph 11 of their

9  reply, they say sub-con will have a substantial impact on

10 plan negotiation and confirmation issues, so those should be

11 heard first.  Well, Your Honor, you could say that about any

12 number of confirmation issues.  Best interest tests,

13 feasibility, unfair discrimination, a channeling injunction,

14 releases, all of those have a substantial impact on the

15 process, that's why they're heard together.  And since we're

16 the plan proponents, to be honest, we would like to present

17 our arguments in the way that gives us the greatest chance of

18 success.  We think that is our right, unless Your Honor has

19 different views, that we should present the arguments in the

20 way that we think is most appropriate and it's not up for a

21 creditor to say this should be decided first, unless Your

22 Honor has preferences on the order we present arguments.

23         We of course believe an August hearing is a waste

24 of time because sub-con is inappropriate and we will deal

25 with the merits at the confirmation hearing.

1          The second point they make -- and this is the last

2     point I wanted to respond to -- is they say, you know, what's

3     the harm?  We're all doing all of this discovery, there's no

4     prejudice, so let's just have the hearing in August.  Well,

5     as my litigators will tell you, we're doing all of this

6     discovery, all of the documents, all of the emails, all of

7     the depositions, all of the expert reports for a confirmation

8     hearing scheduled September 21st, not August 25th, and you

9     can't separate sub-con from these other issues because it --

10    sub-con goes to where do assets and liabilities sit.  That is

11    fundamentally going to impact best interests and unfair

12    discrimination at a minimum.  So you can't just say this

13    disclosure statement is only for sub-con, it's relevant to

14    all of these confirmation issues, which is why you can't

15    slice and dice all of the discovery.  We're doing all of this

16    now for a September 21st hearing, not August 25th.

17          So, with that, Your Honor, I believe that covered

18    my points that we will address the boxes as part of our case

19    in chief and people can object on whatever basis they want as

20    confirmation objections.  So, unless Your Honor has anything

21    for me, I'll turn the podium over I think to Akin Gump and go

22    from there.

23          THE COURT:  All right.  Who's speaking for Akin?

24          MR. HURLEY:  Your Honor, Mitch Hurley with Akin

25    Gump on behalf of the OCC.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 171 of 547 PageID #: 4780
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 154 of 188

153

1          THE COURT:  Okay.  Go ahead, Mr. Hurley.

2          MR. HURLEY:  Thank you.  So, Your Honor, Mr. Simon

3   I think has accurately described the nature of our agreement

4   in broad strokes.  I do want to provide just a bit of context

5   that I hope will eliminate why the OCC filed its statement in

6   the first place and the significance of the agreement that it

7   believes it's reached with the debtors.

8          So, as the Court is aware, the deadline for

9   parties to file objections to the plan is September 3rd.  As

10  Mr. Price outlined for the Court on June 16th, while the

11  OCC's investigation is ongoing, at present the OCC believes

12  that the plan may substantially under-compensate opioid

13  creditors on a number of grounds, and the OCC is considering

14  a number of potential arguments it may raise in connection

15  with objecting to confirmation of the debtors' plan.  That

16  process is not complete and we don't know yet exactly what

17  form the OCC's objection, if any, will take, but certainly

18  the OCC's intention always has been to raise all arguments

19  and objections it may have to the plan at confirmation rather

20  than by some separate motion or in some separate proceeding.

21         Among the potential grounds we're considering is

22  investigating whether doctrines like substantive

23  consolidation, or alter ego or agency or veil piercing, might

24  be applicable in these cases in a way that would render the

25  plan un-confirmable.  We've sought discovery on these points

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 172 of 547 PageID #: 4781
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 155 of 188

154

1  and intend to continue to take discovery on these points.

2  But certainly to the extent that we determine to raise

3  arguments like that, it has always been the OCC's intention,

4  as I said, to raise those kind of points at confirmation and

5  in a manner and at a time that's consistent with the schedule

6  and protocols that have been entered by the Court already.

7  So that would include in the OCC's written plan objection,

8  which currently is due on September 3rd, and that I think

9  brings us to where we are now.

10         As you know, the Acthar insurance claimants moved

11  the Court for an order substantively consolidating the assets

12  and liabilities of certain debtor entities and set a hearing

13  on the motion of August 25th.  The debtors filed their

14  preliminary objection, arguing the motion to consolidate

15  shouldn't be heard on the 25th and, among other things, they

16  argued that a creditor can't seek an order to substantively

17  consolidate debtor estates without first obtaining derivative

18  standing to do so and filing an adversary complaint.

19         The debtors' procedural arguments drew the

20  attention of the OCC because, as I just got through

21  explaining, we're considering raising arguments of that kind

22  in objection to the debtors' plan.  If we do invoke sub-con

23  or other doctrines of the kind mentioned in the debtors'

24  papers -- and that's still an if -- the OCC may do it in a

25  way that's very different than proposed by the Acthar

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 173 of 547 PageID #: 4782
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 156 of 188

155

1  plaintiffs who seek to substantively consolidate only a

2  subset of the debtor entities.

3          But for now what the OCC is concerned about is

4  really only that we're going to be relying on theories of

5  that kind as bases for objecting to the plan at confirmation

6  if we determine it's appropriate to so object, even if we

7  don't first file a motion either in connection with a

8  contested matter or obtain derivative standing.

9          We were first reassured by some statements in the

10  debtors' papers that suggested they agreed.  You know, they

11  argued that it would be wasteful to go forward on the 25th in

12  part because it's inevitable that issues like sub-con will be

13  litigated at objection to confirmation, whether named

14  substantive consolidation, alter ego, or veil piercing, that

15  was reassuring.  During a subsequent discovery meet-and-

16  confer, the debtors took a different position and that's why

17  we filed our statement is really we just wanted to make sure

18  that we got clarity, if possible.

19          Now, the debtors had taken the position in meet-

20  and-confer conversations that in fact we wouldn't be allowed

21  to argue sub-con or any of those other doctrines at

22  confirmation without making a motion first.  As we explained

23  in our papers, that's not the OCC's view of the law.  We

24  believe that those kinds of arguments absolutely can be

25  raised validly as plan objections and that, for example, just

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 174 of 547 PageID #: 4783
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 157 of 188

156

1  to be really clear about what we mean by that, the OCC's view

2  is, if it were to persuade the Court in connection with

3  confirmation that debtor entities are subject to substantive

4  consolidation and that, as a result, the plan does not

5  satisfy aspects of Section 1129 because, for example, in a

6  sub-con scenario, opioid creditors arguably would be entitled

7  to more consideration than contemplated under the plan, the

8  OCC would contend that would be an absolutely appropriate

9  basis for the Court to reject the plan, even though the OCC

10 did not first make a separate motion for substantive

11 consolidation in advance of confirmation.

12         Now, of course, we want to do what the Court

13 thinks we need to do and if the Court were to conclude that a

14 motion or some other kind of procedural step is required for

15 the OCC to raise arguments of that kind, we want to make sure

16 those steps get taken and they get taken on a timely basis.

17 So, again, that's really why we filed our statement.

18         Now, since filing the statement, the debtors

19 reached out to us and, based on conversations that we have

20 had with them, one on July 21st and again yesterday, we

21 understand that the OCC and the debtors are now in agreement

22 on those procedural issues.  And this is our specific

23 understanding of the agreement.  We understand the debtors

24 agree that substantive consolidation and theories like alter

25 ego, veil piercing, and agency can appropriately be raised as

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 175 of 547 PageID #: 4784
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 158 of 188

157

1  objections to the plan at confirmation without the need for

2  any separate motion practice or other procedural steps by the

3  OCC as a predicate to asserting those arguments.

4           For its part, provided that they can be raised and

5  adjudicated on the merits as appropriate plan objections at

6  confirmation, the OCC will not seek to have claims or

7  arguments of that kind determined prior to the confirmation

8  hearing in these cases.

9           Now, to be crystal clear and to perhaps state the

10 obvious, the debtors are not conceding that substantive

11 consolidation or alter ego or agency or doctrines that, if

12 asserted by the OCC, should be applied in these cases.

13 Presumably, if we raise those kinds of arguments, they're

14 going to say just the opposite that those doctrines do not

15 apply.  But what we do understand the debtors to be agreeing

16 to is that the OCC can appropriately raise those kinds of

17 arguments as appropriate objections to the debtors' proposed

18 plan and, if those kinds of arguments are raised by the OCC

19 in connection with objecting to the plan, they must be

20 resolved on the merits before the plan can be confirmed one

21 way or the other, and that the Court may rely on those kinds

22 of doctrines, if raised and proven, as bases potentially for

23 denying plan confirmation, again, even though the OCC didn't

24 first raise the doctrines by motion.

25           So that's the understanding, our understanding of

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 176 of 547 PageID #: 4785
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 159 of 188

158

1  the agreement.  We are still hoping, Your Honor, to get the

2  Court's guidance because, of course, ultimately, it's going

3  to be up to Your Honor regardless of what the parties agree.

4  I will say, to be clear, if the Court prefers the OCC to

5  proceed in some other way, if the Court would like the OCC to

6  work with the debtors to come up with a written stipulation

7  for presentation to Your Honor to be so ordered, we would be

8  happy to do that.

9         The one thing that the OCC wants to avoid is to

10  find itself in some kind of procedural "gotcha" situation.

11  And so we would be very grateful for any guidance that the

12  Court might be willing to provide, so we can hopefully avoid

13  such a situation.

14         Thank you, Your Honor.

15         THE COURT:  Thank you, Mr. Hurley.

16         Well, I can't say off the top of my head whether

17  or not it's required to file a motion for substantive

18  consolidation rather than just including -- I assume you

19  would include it within your objection to confirmation, which

20  in effect is the motion -- is a motion, you -- or response to

21  a motion, I guess.  So you're objecting to plan confirmation

22  because the debtor should be substantively consolidated and I

23  think that is sufficient.  I don't think you need to file a

24  separate motion at this time, I don't think there's anything

25  in the rules or the law that requires you to file a separate

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 177 of 547 PageID #: 4786
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 160 of 188

159

1  motion for substantive consolidation.  You might need to file

2  one for standing to bring a substantive consolidation motion,

3  but if you are bringing that motion in connection with

4  objection to confirmation, I think that is fine.  But if the

5  parties want to make certain there's no -- nobody tries to

6  raise later on the gotcha, you didn't file a motion, I'm

7  happy to enter whatever stipulation the parties wish to enter

8  into.

9          MR. HURLEY:  Thank you, Your Honor.

10          THE COURT:  Mr. Freimuth?

11          MR. FREIMUTH:  Good afternoon, Your Honor.  This

12  is Matthew Freimuth from Willkie Farr on behalf of attestor

13  and Humana.  Can you hear me okay?

14          THE COURT:  I can.  Thank you.

15          MR. FREIMUTH:  Fundamentally, what we have now

16  after the filing of the preliminary objection by the debtors

17  is I believe a dispute about timing, whether our motion for

18  substantive consolidation should be heard in advance of

19  confirmation, as it's been noticed, or at or in connection

20  with confirmation.

21          Our view, Your Honor, is that we filed the motion

22  seeking substantive consolidation of the debtors' specialty

23  brands business and the Acthar entities on June 18th and

24  noticed it for a hearing more than two months later.  There

25  was nothing improper about the filing of the motion, the

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 178 of 547 PageID #: 4787
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 161 of 188

160

1  cases are clear that creditors have standing to pursue

2  substantive consolidation.  The debtors cite no case finding

3  that a creditor needs to seek derivative standing to bring a

4  sub-con motion.  And the cases are clear that substantive

5  consolidation can be sought by motion and that no adversary

6  proceeding is required.

7       The filing of the motion and the timing for the

8  hearing that we've set provide all parties in interest an

9  opportunity to be heard on our request and, consistent with

10  the dates in the confirmation discovery protocol, we've been

11  pressing for discovery relevant to the sub-con motion, and I

12  want to circle back to that.  There have been some disputes

13  that will likely require the Court's attention, but documents

14  have been produced, depositions have been requested, they're

15  in the process of being scheduled and noticed.  And so the

16  discovery needed and being sought coincides with and complies

17  with the discovery provisions of the confirmation protocol

18  and that fact discovery should be done in advance of August

19  25th when the motion is currently noticed.

20       It's not true, from our perspective, that hearing

21  the motion before confirmation is going to create some sort

22  of significant additional burden, the work is already

23  underway.  We think there's great benefit in getting to the

24  merits of the sub-con issue promptly.

25       Mr. Harris in his remarks earlier today suggested

1   that we were engaging in an effort to slow these proceedings

2   now, we're not.  We want this issue heard and resolved

3   promptly, Your Honor.  He also alluded to the need to bring

4   clarity to the debtors and the various constituencies about

5   certain issues before confirmation, we think this is one.

6           So with that said, Your Honor, we think that it

7   would be perfectly appropriate and efficient for this Court

8   to hear the sub-con motion that we filed in advance of

9   confirmation on the date we noticed of August 25th.

10          I did allude, Your Honor, to one issue with

11  respect to certain discovery disputes.  Whether you'd like me

12  to sort of address that now or later, the mere point I want

13  to make is we do have some disputes with respect to documents

14  that we're seeking in connection with sub-con and, frankly,

15  they cut across other confirmation and estimation issues as

16  well.  I understand the process is to request a conference

17  with Your Honor.  We would with respect to those issues, Your

18  Honor, like to file a short letter early next week, perhaps

19  by close of business Monday, teeing up the issues that exist

20  today.  We've heard the Court loud and clear that, to the

21  extent that there are discovery disputes and issues that need

22  the Court's attention, it's on us to file the motion to

23  compel.  So we would like to proceed on that basis.

24          THE COURT:  All right.  Well, let me hear -- Mr.

25  Simon, what's the debtors' view?

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 180 of 547 PageID #: 4789
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 163 of 188

162

1          MR. SIMON:  Well, Your Honor, I don't have -- I

2    defer to Mr. Harris or my litigators on the discovery

3    disputes, but I kind of do go back to the idea of you can't

4    just say discovery is underway and so we can have a hearing

5    on the 25th because, again, all of the confirmation protocol

6    dates and deadlines were with a September 21st hearing in

7    mind.  And it's no surprise that our plan doesn't have

8    substantive consolidation, it never has.  So the original

9    plan, I believe, was filed in April, and there was various

10   updates to the documents and the order was approving the DS

11   and the plan for solicitation I believe was June 25th,

12   roughly at that time frame.

13          So this issue about not seeking substantive

14   consolidation has always been our position.  I mean, we teed

15   up that issue.  So the idea that we could have a plan on file

16   that's always been no sub-con and then a creditor can say,

17   well, let's decide sub-con early, that's literally what we

18   have scheduled for hearing on the 21st.  So, again, like it's

19   not just enough to say, well, discovery is underway; that's

20   true, but it won't be done.  That's the point is we need this

21   time frame to have these issues decided together because, if

22   anything is relevant to sub-con or not relevant to sub-con,

23   it's going to impact other issues.  Best interests and unfair

24   discrimination come right to mind.

25          So if someone wants to depose a witness about an

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 181 of 547 PageID #: 4790
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 164 of 188

163

1  intercompany agreement, assets moved from A to be, that's

2  going to be relevant for sub-con.  It's also going to be

3  relevant for best interests and unfair discrimination

4  because, if those intercompany agreements are properly

5  documented and formalities are fulfilled, that negates sub-

6  con by definition and now people have the facts about best

7  interests and unfair discrimination, because if they sit at

8  certain boxes where the notes are and not other claims, that

9  is unbelievably relevant to best interests and unfair

10  discrimination.  So everyone is going to have to show up and

11  argue every issue about where assets sit.

12          So it's not just this isolated issue that can be

13  decided on its own on the 25th.

14          THE COURT:  Mr. Freimuth, I was taken by one thing

15  that you said that the discovery you're seeking does overlap

16  other issues that relate to confirmation.  So I guess I'm

17  struggling with what's -- why not wait until we get to

18  confirmation?  We could have -- we could start off the

19  confirmation hearing with the question of whether or not

20  substantive consolidation is appropriate and then I can

21  perhaps make a ruling on that before we go further into the

22  confirmation hearing, which would resolve the issue one way

23  or the other.  Either the plan is not going to get confirmed

24  or I'll overrule it and we go on with the other issues.

25          MR. FREIMUTH:  All I meant to suggest by that

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 182 of 547 PageID #: 4791
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 165 of 188

164

1   comment, Your Honor, is some of the specific categories of

2   documents and data that we're seeking where we have disputes

3   could very well be relevant to issues related to substantive

4   consolidation.  They may come up in the context of estimation

5   of our prepetition claim or they -- you know, they may be

6   relevant to various confirmation issues.  So I was speaking

7   specifically with respect to -- one of the categories, for

8   example, is subsidiary minutes of the various boards of

9   directors.

10          So, to your point, we think that getting clarity

11   on these issues prior to confirmation makes good sense, it's

12   an efficient way to resolve the question up front, so that

13   we're not headed to a confirmation hearing months later with

14   questions about whether or not the Acthar entities or the

15   specialty brands entities should be consolidated or not.

16          And in response to the point about whether

17   discovery is ongoing, the fact of the matter is the fact

18   depositions and the witnesses that are going to be testifying

19   about these issues, we understand from the debtor they're

20   going to be made available for deposition in the first two

21   weeks of August.  So the record ought to be developed and

22   ready to present to Your Honor in advance of confirmation.

23          MR. SIMON:  Your Honor, it's Keith Simon.  Could I

24   say one thing, though, just to put this in context, which is

25   if you scheduled a hearing for the 25th, I'm not sure if that

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 183 of 547 PageID #: 4792
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 166 of 188

165

1  means that the OCC has to say we agree with sub-con right

2  now, like are we going to do this hearing twice?

3         So, again, like I just don't -- I feel like it's

4  going to be an inefficient use of this Court's time because

5  that means that everyone will have to argue it.  Otherwise,

6  if Humana argues it and you agree with us, then does the OCC

7  get bound by that as law of the case because you found that

8  formalities were fulfilled and properly followed, but because

9  Akin Gump didn't raise it they are now bound by that?  It

10 just -- I don't see how it practically works to have a

11 hearing on this issue in advance of confirmation when you

12 could say those exact same arguments about every confirmation

13 requirement.  This plan can't go forward if you think it

14 violates the best interests test --

15         THE COURT:  Well, I --

16         MR. SIMON:  -- that's just one example.

17         THE COURT:  Well, I think that's a good point.  I

18 mean, I can't -- if we go forward on a separate motion on

19 sub-con, anybody who has a sub-con objection is going to have

20 to participate in that.  And because the discovery issues

21 overlap one another, it just doesn't -- it doesn't seem to be

22 efficient -- the efficiencies actually go the other way, I

23 think.  I think it's less efficient to go forward on August

24 25th with a sub-con, a separate sub-con hearing that's going

25 to require everybody's participation just weeks before we get

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 184 of 547 PageID #: 4793
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 167 of 188

166

1  to the confirmation hearing.  It is a confirmation-type

2  issue.

3          So I just think the efficiencies here would be

4  let's do this on the first day of the confirmation hearing.

5  We'll hear the motion for sub-con on day one of the

6  confirmation hearing, and I can rule on that and then we can

7  move into other issues.  And maybe there's other issues that

8  will come up along the way that we need to -- we could do

9  this, you know, rule on them as we go rather than doing a

10 week-long hearing and then have me try to write an 80-page

11 opinion about all these different issues.

12          I'll open it -- I mean, what do people think about

13 that?  Mr. Freimuth, because it's your motion, so --

14          MR. FREIMUTH:  Yeah, Your Honor, that would be

15 acceptable to us to have that motion heard at the first day

16 of confirmation, as you've just described.

17          THE COURT:  All right.  That allows us to get

18 through all the discovery.  There may be overlapping

19 discovery issues, everybody is going to want to participate

20 in those depositions, so I think that makes sense to do it

21 that way.

22          Mr. Simon, does that cause any concerns on your

23 part?

24          MR. SIMON:  Your Honor, obviously, ultimately, if

25 that's what Your Honor prefers, we will of course go with

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 185 of 547 PageID #: 4794
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 168 of 188

167

1   that.  But, again, you know, our initial idea was that our

2   case in chief would moot this issue, but if it's Humana's

3   independent motion, then obviously it's their burden to prove

4   sub-con.  It's their motion and, if they're the proponent,

5   they're going to have to satisfy it by Owens Corning and it's

6   their burden.  So, if they want to have it heard first

7   outside of plan confirmation the day of, it's their burden.

8   I just want to make sure that that's crystal clear.

9          THE COURT:  It is.  It is your burden, Mr.

10  Freimuth, you're going to have to meet the requirements of

11  Corning to show sub-con.

12          MR. FREIMUTH:  We understand, Your Honor.

13          THE COURT:  All right.  Okay.

14          MR. FREIMUTH:  Apologies, Your Honor.  There was

15  the issue that I did raise with respect to some discovery

16  disputes --

17          THE COURT:  Yes.

18          MR. FREIMUTH:  -- that have arisen that, frankly,

19  have ripened up just, I would say, within the last 12 hours

20  or so.  So it's a few categories of documents, one relates to

21  a request that we have outstanding for minutes of subsidiary

22  boards, another relates to some outstanding data requests we

23  have.  My proposal, Your Honor, is that we just set a

24  schedule today where we could file a short letter with the

25  Court indicating what the disputes are and indicating the

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 186 of 547 PageID #: 4795
Case 20-12522-JTD    Doc 3457-2    Filed 07/28/21    Page 169 of 188

168

1  relief we're requesting.  We could be prepared to do that

2  very early in the week next week.

3          THE COURT:  Well, the one problem with very early

4  in the week next is I'm going to be on vacation next week.

5  I'm not going to disappoint my granddaughter.  So I'm not

6  going to do any work while I'm vacation.  So I wouldn't be

7  able to address it until the week after next.

8          Have the parties met and conferred on these issues

9  and you're at an impasse, is that where you are at this

10 point?

11         MR. FREIMUTH:  We have met and conferred, Your

12 Honor, I do believe we're at an impasse with respect to at

13 least the request for subsidiary board minutes.

14         THE COURT:  Well, that sounds like a pretty

15 discrete issue.  Why don't we -- go ahead and file it next

16 week.  I'll try to get to it as soon as possible.  It may not

17 be until I get back on August 2nd, but if the parties -- if

18 you want to file a -- if it's just that one discrete issue,

19 that sounds like it could be done in just a few pages, a few-

20 page letter.

21         MR. FREIMUTH:  Yeah.  And to be clear, Your Honor,

22 the other issue relates to data that we're requesting that we

23 believe supports the liquidation analysis and valuation that

24 underlies the debtor's disclosure statement.  It is also a

25 very discrete issue, so I think we could present both to you

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 187 of 547 PageID #: 4796
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 170 of 188

169

1  within two pages.

2              THE COURT:  Okay.  Then why don't you go ahead and

3  file yours Monday or Tuesday, whenever you are ready.  I'll

4  give the debtors an opportunity to reply by -- you know, I'll

5  give you two days to reply, Mr. Simon or Mr. Harris, whoever

6  is going to reply, and then we'll take it from there.

7              MR. FREIMUTH:  Okay.

8              THE COURT:  And I may just look at them and pass

9  on to my courtroom deputy what my ruling is and he can let

10 you know -- or let you know at least what I'm thinking.

11 Maybe that will help move things along.

12             MR. FREIMUTH:  Okay.  We appreciate that, Your

13 Honor.

14             THE COURT:  All right.  Okay.

15             Mr. Hurley, you raised your hand.

16             MR. HURLEY:  Thank you, Your Honor.  I just wanted

17 to hopefully make something clear in terms of our timing.  So

18 it sounds like what we're contemplating is that the OCC will

19 be able to make whatever arguments it has on sub-con or

20 similar, if any, in its objection, and then also will have an

21 opportunity to be heard on those issues at the outset of the

22 hearing, and I guess alongside attestor or other parties that

23 are making similar arguments.  Do I have that right?

24             THE COURT:  Yes, absolutely.  Yes.

25             MR. HURLEY:  Okay.  And it may make sense, as you

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 188 of 547 PageID #: 4797
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 171 of 188

170

1   suggested, Your Honor, for us to try and get that

2   memorialized in a stipulation, and I'll reach out separately

3   to Mr. Simon on that.

4          THE COURT:  Okay.

5          MR. HURLEY:  Thank you.

6          THE COURT:  All right.

7          MR. SIMON:  And, Your Honor, just procedurally,

8   Mr. Hurley reminded me of a very good point.  I mean, the

9   hearing was originally scheduled for August 25th with an

10  objection deadline of August 6th.  So because it's going to

11  be heard at confirmation, when I assumed our response would

12  be part of our confirmation brief, but I wanted to make sure

13  that was what Your Honor was thinking as well.  I just want

14  to know when our objection deadline is -- I know when the

15  hearing is, but I want to know when we have to respond.

16         THE COURT:  Well, if you make it a part of your

17  confirmation brief, then Mr. Freimuth isn't going to get a

18  reply.

19         MR. SIMON:  Okay.

20         THE COURT:  So I think we're going to have to set

21  that as a separate schedule.

22         MR. SIMON:  Okay.

23         THE COURT:  So -- just so that he has the

24  opportunity to file his reply.  But I'll let the parties work

25  that out in terms of timing.

1          MR. SIMON:  We'll talk.  Maybe the idea will be

2     they have their plan objections due on September 3rd, maybe

3     ours is due September 3rd for this, and then they reply at

4     the same time as our confirmation brief, maybe something like

5     that.  But we'll talk and that's fine.

6          THE COURT:  Yeah.  Hopefully, you can get that

7     worked out.  I think that should be able to be resolved.

8          MR. SIMON:  Okay.

9          THE COURT:  All right.  Anything else for today?

10          MR. MERCHANT:  Your Honor, the only other thing I

11     failed -- I neglected to mention that is on the agenda is the

12     attestor and Humana asked that there be a status conference

13     on their estimation motion, and that is the one remaining

14     item on today's hearing agenda.

15          THE COURT:  All right.  Let me hear from attestor.

16          MR. FREIMUTH:  Sure, Your Honor.  You'll recall

17     that when we had our estimation motion heard on the 7th we

18     asked for a status conference to be set for the day on which

19     Your Honor was going to hear argument on the unsubstantiated

20     claims objection.  Just by way of update, since June 7th, on

21     June 21st, the debtors advised us that they would engage with

22     us on discovery on the underlying merits of the claims in

23     anticipation that estimation may be necessary, and so that

24     process has been underway.  Arnold & Porter, who represents

25     the debtors in the underlying Humana case, has appeared,

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 190 of 547 PageID #: 4799
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 173 of 188

172

1   we've engaged in meet-and-confers.

2          Practically, what that has meant is that since

3   June 21st, when the debtors agreed to begin providing us

4   merits discovery, they provided us with 1.8 million

5   documents, some of which has taken weeks to load onto our

6   review platform, but we are moving through that material as

7   quickly as we possibly can.

8          On Tuesday of this week, the debtors advised us

9   that they would anticipate that, to the extent that we have

10  questions of their witnesses related to the merits of either

11  the prepetition claims or the admin claims, that we would be

12  prepared to ask those witnesses questions during the first

13  two weeks of August.  Obviously, with respect to the document

14  flow, we have some serious concerns about that schedule.

15  Obviously, whatever the debtors propose with respect to a

16  schedule we'll consider, but there may well be issues to the

17  extent that depositions get scheduled and documents related

18  to the merits of either the prepetition claim or the admin

19  claim remain outstanding.

20          So we're working through those issues.  There's

21  nothing, I think, ripe to present to Your Honor today, but I

22  just wanted to alert you that that process is ongoing and we

23  are getting quite a volume of documents.  We've gotten

24  commitments from the debtors to produce additional documents

25  with no clear indication yet as to exactly when those are

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 191 of 547 PageID #: 4800
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 174 of 188

173

1  coming.  So we just wanted to alert Your Honor that that

2  process is underway.

3         THE COURT:  All right.  Thank you.  That's the

4  problem with discovery is sometimes you get what you ask for.

5  You've got too many documents to review.

6         Mr. Harris?

7         MR. HARRIS:  And, Your Honor, just to follow up

8  and clarify.  Mr. Freimuth is right, we have been going

9  forward with full discovery on the merits of the underlying

10 claims against PLC and ARD to be prepared if we decided that

11 estimation is needed, all that was awaiting a decision on our

12 omnibus objection.  So we will take this time and think about

13 over the weekend whether we believe estimation is needed.

14 You know, likely, I think we may decide it is not, and we can

15 talk again and we're happy to talk again with attestor about

16 our views on that, you know, next week.

17         I just didn't want to leave hanging out there that

18 there was any decision made that in fact now estimation is

19 needed, it may well be the debtors' view that it is not.

20 But, as he said, we have been producing discovery regardless

21 so the parties would be prepared in the event that we do need

22 to estimate.

23         THE COURT:  Thank you, Mr. Harris.

24         All right, anything else for today, Mr. Merchant?

25         MR. MERCHANT:  I believe that's all for today.  I

174

```
1   thank the Court for its time and have a great vacation, Your

2   Honor.

3           THE COURT:  All right.  Thank you all very much.

4   Have a good weekend, and I know my week will be better than

5   yours.

6       (Laughter)

7           THE COURT:  All right.  We're adjourned.

8           COUNSEL:  Thank you, Your Honor.

9           THE COURT:  Thank you.

10      (Proceedings concluded at 3:52 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 193 of 547 PageID #: 4802
Case 20-12522-JTD   Doc 3457-2   Filed 07/28/21   Page 176 of 188

175

1                          CERTIFICATE

2

3        We certify that the foregoing is a correct transcript

4    from the electronic sound recording of the proceedings in the

5    above-entitled matter.

6
     /s/Mary Zajaczkowski              June 24, 2021
7    Mary Zajaczkowski, CET**D-531

8
     /s/William J. Garling             June 24, 2021
9    William J. Garling, CE/T 543

10

11   /s/ Tracey J. Williams            June 24, 2021
     Tracey J. Williams, CET-914
12

13

14

15

16

17

18

19

20

21

22

23

24

25

LEAD, SealedDoc(s), MEGA, STANDOrder, CLMSAGNT, APPEAL

**U.S. Bankruptcy Court**
**District of Delaware (Delaware)**
**Bankruptcy Petition #: 20-12522-JTD**

| | |
|---|---|
| *Date filed:* | 10/12/2020 |
| *341 meeting:* | 02/12/2021 |
| *Deadline for filing claims:* | 02/16/2021 |

*Assigned to:* John T. Dorsey
Chapter 11
Voluntary
Asset

*Debtor*                                    represented by **Justin A. Allen**
**Mallinckrodt plc**                                        Ogletree, Deakins, Nash, Smoak & Stewart
675 McDonnell Blvd.                                        111 Monument Circle, Suite 4600
Hazelwood, MO 63042                                        Indianapolis, IN 46204
ST. LOUIS-MO                                               (317) 916-2533
Tax ID / EIN: 98-1088325                                   Email: justin.allen@ogletree.com

                                                          **Michael B. Bernstein**
                                                          Arnold & Porter Kaye Scholer LLP
                                                          601 Massachusetts Ave, NW
                                                          Washington, DC 20001-3743
                                                          202-942-5000
                                                          Email: michael.b.bernstein@arnoldporter.com

                                                          **Jeffrey E. Bjork**
                                                          Latham & Watkins
                                                          335 South Grand Avenue
                                                          Suite 100
                                                          Los Angeles, CA 90071-1560
                                                          213-485-1234
                                                          Fax : 213-891-8763
                                                          Email: jeff.bjork@lw.com

                                                          **Sara A. Brown**
                                                          Latham & Watkins LLP
                                                          1271 Avenue of the Americas
                                                          New York, NY 10020
                                                          212-906-1200
                                                          Fax : 212-751-4854
                                                          Email: sara.brown@lw.com

                                                          **Liza L. Burton**
                                                          Latham & Watkins LLP
                                                          1271 Avenue of the Americas
                                                          New York, NY 10020

                                                          **Michael H. Cassel**
                                                          Wachtell, Lipton, Rosen & Katz
                                                          51 West 52nd Street

A-7133

New York, NY 10019
212-403-1000
Fax : 212-403-2000
Email: mhcassel@wlrk.com

**Andrew J.H. Cheung**
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
212-403-1000
Fax : 212-403-2000
Email: ajhcheung@wlrk.com

**Mark D. Collins**
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302 651-7700
Fax : 302-651-7701
Email: collins@RLF.com

**George A Davis**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
212-906-1200
Fax : 212-751-4864
Email: george.davis@lw.com

**Garrett Spencer Eggen**
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
Fax : 302-651-7701
Email: Eggen@rlf.com

**Rosa Jean Evergreen**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001
202-942-5000
Fax : 202-942-5999
Email: rosa.evergreen@arnoldporter.com

**Victor Goldfield**
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
(212) 403-1000
Fax : 212-403-2000
Email: VGoldfeld@wlrk.com

A-7134

**Jason B. Gott**
Latham & Watkins LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
312-876-7700
Fax : 312-993-9767
Email: jason.gott@lw.com

**Christopher R. Harris**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
212-906-1200
Fax : 212-751-4864
Email: christopher.harris@lw.com

**Matthew B. Harvey**
Morris Nichols Arsht & Tunnell, LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
302-351-9393
Fax : 302-225-2571
Email: mharvey@mnat.com

**Justin S. Kirschner**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
Email: justin.kirschner@lw.com

**Emil A. Kleinhaus**
Wachtell Lipton Rosen & Katz
51 West 52nd Street
New York, NY 10019
212-403-1000
Fax : 212-403-2000
Email: eakleinhaus@wlrk.com

**George Klidonas**
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200
Email: george.klidonas@lw.com

**Kiet Lam**
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
(212) 403-1000

**A-7135**

Email: KTLam@wlrk.com

**Garrett S. Long**
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
Email: garrett.long@lw.com

**Arthur Luk**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
202-942-5000
Fax : 202-942-5999
Email: arthur.luk@arnoldporter.com

**John F. Lynch**
Wachtell Lipton Rosen & Katz
51 West 52nd Street
New York, NY 10019
212-403-1000
Fax : 212-403-2000
Email: jlynch@wlrk.com

**Robert Charles Maddox**
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
302-651-7551
Fax : 302-498-7551
Email: maddox@rlf.com

**Michael Joseph Merchant**
Richards Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
usa
302-651-7700
Fax : 302-651-7701
Email: merchant@rlf.com

**Phillip Mindlin**
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
212-403-1000
Fax : 212-403-2000
Email: pmindlin@wlrk.com

**Jason Moehlmann**
Latham & Watkins LLP

**A-7136**

330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
312-876-7700
Fax : 312-993-9767
Email: jason.moehlmann@lw.com

**Hugh K. Murtagh**
Latham & Watkins
1271 Avenue of the Americas
New York, NY 10020
212-906-1200
Fax : 212-751-4864
Email: hugh.murtagh@lw.com

**Arielle Nagel**
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200
Email: arielle.nagel@lw.com

**Dan O'Meara**
Ogletree, Deakins, Nash, Smoak & Stewart
1735 Market Street
Suite 3000
Philadelphia, PA 19103
215-995-2833
Fax : 215-995-2801
Email: dan.omeara@ogletreeedeakins.com

**Sonia Kuester Pfaffenroth**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001
202-942-5000
Fax : 202-942-5999
Email: sonia.pfaffenroth@arnoldporter.com

**Amy Christine Quartarolo**
Latham & Watkins LLP
355 South Grand Avenue
Suite 100
Los Angeles, CA 90071
213-485-1234
Fax : 213-891-8763
Email: amy.quartarolo@lw.com

**Brendan Joseph Schlauch**
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700 x7749

A-7137

Fax : 302-651-7701
Email: schlauch@rlf.com

**Eric Shapland**
Arnold & Porter Kaye Scholer LLP
44th Floor
777 South Figueroa Street
Los Angeles, CA 90017
(213) 243-4000
Email: eric.shapland@arnoldporter.com

**Laura Shores**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001-3743
202-942-5000
Fax : 202-942-5999
Email: laura.shores@arnoldporter.com

**Sarah Silveira**
Richards Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
Fax : 302-651-7701
Email: silveira@rlf.com

**Keith A. Simon**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
212-906-1372
Fax : 212-751-4864
Email: keith.simon@lw.com

**Neil M. Snyder**
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
212-403-1000
Fax : 212-403-2000
Email: skcharles@wlrk.com

**Andrew Sorkin**
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
202-637-2200
Fax : 202-637-2201
Email: andrew.sorkin@lw.com

**Robert J. Stearn, Jr.**

A-7138

Richards, Layton & Finger, P. A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
Fax : 302-651-7701
Email: stearn@rlf.com

**Amanda R. Steele**
Richards, Layton and Finger
920 N. King Street
Wilmington, DE 19801
302-651-7838
Fax : 302-428-7838
Email: steele@rlf.com

**Randall Carl Weber-Levine**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
Email: randall.weber-levine@lw.com

**Matthew Wolf**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
202-942-5000
Fax : 202-942-5999
Email: matthew.wolf@arnoldporter.com

**Anupama Yerramalli**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
Fax : (212) 751-4864
Email: anu.yerramalli@lw.com

**Kelsey Zottnick**
Latham & Watkins LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
(312) 876-7700
Email: kelsey.zottnick@lw.com

*U.S. Trustee*                      represented by **Jane M. Leamy**
**U.S. Trustee**                    Office of the U.S. Trustee
Office of the United States Trustee  844 King St.
J. Caleb Boggs Federal Building      Suite 2207
844 King Street, Suite 2207          Wilmington, DE 19801
Lockbox 35                           302-573-6491
Wilmington, DE 19801                 Fax : 302-573-6497

A-7139

(302)-573-6491

Email: jane.m.leamy@usdoj.gov

**Richard L. Schepacarter**
Office of the United States Trustee
U. S. Department of Justice
844 King Street, Suite 2207
Lockbox #35
Wilmington, DE 19801
usa
302-573-6491
Fax : 302-573-6497
Email: richard.schepacarter@usdoj.gov

*Mediator*
**Kenneth R. Feinberg**

*Claims Agent*                                      represented by **Benjamin Joseph Steele**
**Prime Clerk LLC**                                                Prime Clerk LLC
www.primeclerk.com                                                One Grand Central Place
One Grand Central Place                                            60 East 42nd Street
60 East 42nd St, Suite 1440                                        Suite 1440
New York, NY 10165                                                 New York, NY 10165
212-257-5450                                                       212-257-5490
                                                                   Fax : 212-257-5452
                                                                   Email: bsteele@primeclerk.com

*Transcriber*
**Reliable Companies**
Attn: Gene Matthews
1007 North Orange Street
Suite 110
Wilmington, DE 19801
302-654-8080

*Creditor Committee*                               represented by **Patrick M. Birney**
**Official Committee of Unsecured Creditors**                     Robinson & Cole
**Mallinckrodt plc**                                              280 Trumbull Street
                                                                  Hartford, CT 06103
                                                                  860-275-8275
                                                                  Email: pbirney@rc.com

                                                                   **Joseph W Brown**
                                                                   Cooley, LLP
                                                                   1299 Pennsylvania Ave., NW
                                                                   Suite 700
                                                                   Washington, DC 20004
                                                                   202-776-2060
                                                                   Fax : 202-842-7899
                                                                   Email: jbrown@cooley.com

                                                                   **John D. Cordani, Jr.**
                                                                   Robinson & Cole LLP
                                                                   280 Trumbull Street

**A-7140**

Hartford, CT 06103
(860) 275-8287
Email: jcordani@rc.com

**Jamie Lynne Edmonson**
Robinson+Cole LLP
1201 North Market Street
Suite 1406
Wilmington, DE 19801
302-516-1705
Fax : 302-516-1699
Email: jedmonson@rc.com

**Weiru Fang**
Cooley LLP
1299 Pennyslvania Avenue, NW
Suite 700
Washington, DC 20004
202-776-2110
Fax : 202-842-7899
Email: wfang@cooley.com

**Allegra Flamm**
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
(202) 776-2985
Email: aflamm@cooley.com

**Cathy Hershcopf**
Cooley LLP
55 Hudson Yards
New York, NY 10001
212-479-6000
Fax : 212-479-6275
Email: chershcopf@cooley.com

**Jonathan J. Kim**
55 Hudson Yards
New York, NY 10001
(212) 479-6000
Fax : 212-479-6275
Email: jkim@cooley.com

**Michael Klein**
Cooley LLP
55 Hudson Yards
New York, NY 10001
212-479-6461
Fax : 212-479-6275
Email: mklein@cooley.com

**David H. Kupfer**
Cooley LLP

**A-7141**

55 Hudson Yards
New York, NY 10001
212.479.6530
Fax : 212.479.6275
Email: dkupfer@cooley.com

**James F. Lathrop**
Robinson & Cole LLP
1201 North Market Street, Suite 1406
Wilmington, DE 19801
302-516-1700
Fax : 302-516-1699
Email: jlathrop@rc.com

**Evan M. Lazerowitz**
Cooley LLP
55 Hudson Yards
New York, NY 10001
212-479-6000
Fax : 212-479-6275
Email: elazerowitz@cooley.com

**Summer M McKee**
Cooley LLP
55 Hudson Yards
New York, NY 10001
212-479-6000
Email: smckee@cooley.com

**Dana Moss**
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
(202) 842-7135vvv
Email: dmoss@cooley.com

**Natalie D. Ramsey**
Robinson & Cole LLP
1201 North Market Street
Suite 1406
Wilmington, DE 19801
302-516-1702
Fax : 302-516-1699
Email: NRamsey@rc.com

**Lauren Reichardt**
Cooley LLP
55 Hudson Yards
New York, NY 10001
212-479-6515
Email: lreichardt@cooley.com

**Erica Richards**
Cooley LLP

55 Hudson Yards
New York, NY 10001
212-479-6000
Fax : 212-479-6275
Email: erichards@cooley.com

**Joshua Siegel**
Cooley, LLP
1299 Pennsylvania Ave., NW
Suite 700
Washington, DC 20004
202-842-7891
Fax : 202-842-7899
Email: jsiegel@cooley.com

**Cullen Drescher Speckhart**
Cooley LLP
1299 Pennsylvania Ave NW
Suite 700
Washington, DC 20004
(202) 776-2052
Email: cspeckhart@cooley.com

**Aric H. Wu**
Cooley LLP
55 Hudson Yards
New York, NY 10001
212-479-6000
Fax : 212-479-6275
Email: ahwu@cooley.com

| Filing Date | # | Docket Text |
|---|---|---|
| 07/23/2021 | 3405<br>(6 pgs) | Minute Entry Re: 3389 ; Telephonic Hearing Held Re: 2165 , 2578 , 3228 ; debtors' first omnibus objection to unsubstantiated claims ( 2165 ) is SUSTAINED (***The record for this hearing is SO ORDERED***); order to follow; motions to seal ( 2578 and 3228 ) are GRANTED; orders to be uploaded for signing; Appearances: (See Attached Registration Sheets) (RC) (Entered: 07/23/2021) |

**PACER Service Center**

**Transaction Receipt**

07/28/2021 15:45:48

| PACER Login: | mnat0009 | Client Code: | 49895-0003 |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 20-12522-JTD Fil or Ent: filed From: 5/28/2021 To: 7/28/2021 Doc From: 3405 Doc To: 3405 Term: included |

A-7143

| | | | Headers: included Format: html Page counts for documents: included |
|---|---|---|---|
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

**A-7144**

Case 20-12522-JTD    Doc 3457-3    Filed 07/28/21    Page 1 of 1

### CERTIFICATE OF SERVICE

    I, Matthew O. Talmo, hereby certify that I am not less than 18 years of age and that service of the foregoing was caused to be made on July 28, 2021 via CM/ECF upon those parties registered to receive such electronic notifications and via email upon counsel to Mallinckrodt PLC and its affiliated debtors.

Dated: July 28, 2021                     */s/ Matthew O. Talmo*
                                          Matthew O. Talmo (Bar No. 6333)

An official website of the United States government
Here's how you know

THE UNITED STATES
DEPARTMENT *of* JUSTICE

# CREDITOR'S CLAIMS IN BANKRUPTCY PROCEEDINGS -- THE DEBTOR-CREDITOR RELATIONSHIP IN BANKRUPTCY -- ALLOWANCE AND PAYMENT OF CLAIMS

B. Asserting Claims To The Bankruptcy Estate

1. Whether to File a Claim

a. Necessity of filing

(1) General rule: filing is required. The only claims allowed to share in the bankruptcy estate are those for which proofs have been filed. *Wilson v. Allegheny Int'l, Inc.*, 134 B.R. 282 (N.D. Ill. 1991). When in doubt, file proof of claim.

(2) Exceptions to filing requirement

(a) Lack of knowledge

(i) Of bankruptcy case

*See In re Global Precious Metals, Inc.*, 143 B.R. 204 (Bankr. N.D. Ill. 1992). Held, lack of notice does not authorize court to extend bar date; however, Code protects creditors, namely, § 523(a)(3) (lack of creditor notice renders nondischargeable claim against individual debtor); § 726(a)(2)(C) (claim not subordinated if filed late due to lack of notice); § 501(c) (debtor or trustee may file proof of claim if creditor does not file timely).

Due process should protect creditor where these provisions fail to do so. *See Broomall Indus. v. Data Design Logic Sys.*, 786 F.2d 401 (Fed. Cir. 1986); *Reliable Elec. Co. v. Olson Constr. Co.*, 726 F.2d 620 (10th Cir. 1984); *United States v. Cole (In re Cole)*, 146 B.R. 837 (D. Colo. 1992). **Unknown** creditors' claims will be discharged if there is sufficient notification publication notice, usually through national newspapers. However, due process requires that **known** creditors receive formal actual notice of a bankruptcy case before the discharge affects their claims. A known creditor is one whose identity is either known or reasonably ascertainable by the debtor; a creditor's identity is reasonably ascertainable if that creditor can be identified through reasonably diligent efforts. Ed. Note: This protection from discharge applies equally to the United States. In the case of governmental entities, "adequate notice" must satisfy requirement of "fundamental fairness" rather than due process. However, this standard still requires that if the federal agency was a known creditor it must have received actual formal notice of a bankruptcy case before its claims are discharged. That the federal agency knew through informal means, i.e., word of mouth, that the debtor was in bankruptcy is not sufficient. If the agency was not sent the formal notices required by the Code we should be arguing that its claim is not discharged.

Priority tax claim, filed late because IRS was not notified of bankruptcy case or bar date, should be treated same as if filed timely. *United States v. Cardinal Mine Supply, Inc.*, 916 F.2d 1087 (6th Cir. 1990); *see also United States v. Ulrich (In re Mantz)*, 151 B.R. 928 (Bankr. 9th Cir. 1993) (same fact pattern, denied IRS priority but allowed general unsecured claim), *rev'd*, No. 93-15985, 1994 WL 447271 (9th Cir. Aug. 19, 1994); *IRS v. Century Boat Co. (In re Century Boat Co.)*, 986 F.2d 154, 156-57 (6th Cir. 1993) (*Cardinal Mine* does not save every priority claim); *United States v. Vecchio*, 147 B.R. 303 (E.D.N.Y. 1992) (held *Cardinal Mine* inapplicable where IRS given notice in time to file claim), *rev'd*, 20 F.3d 555 (2d Cir. 1994).

[Note: Section 213(b) of the Bankruptcy Reform Act of 1994 amends Code § 726(a)(1) to preserve the order of distribution for priority claims "tardily filed before the date on which the trustee commences distribution under this title."]

(ii) Of existence of claim

A-7146

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 208 of 547 PageID #: 4817

8/7/2021          64. Creditor's Claims in Bankruptcy Proceedings -- The Debtor-Creditor Relationship In Bankruptcy -- Allowance and Payment of Claims | …

"In most cases, we anticipate that the government will not possess sufficient knowledge to assert a potential claim until completion of a post-award audit." *In re Remington Rand Corp.*, 836 F.2d at 833 n.7.

    (b) Debtor's schedules -- chapters 9, 11 [§§ 925, 1111(a)] -- list claim as undisputed, fixed, liquidated. Rule 3003(b)(1) (filing not required); *see also* Rule 1019 (effect of conversion of case to chapter 7).

    (c) "No asset" chapter 7. Rule 2002(e), 3002(c)(5). In some jurisdictions, clerk will not accept proof of claim in "no asset" case.

    b. Reasons for asserting a claim

A claim exists whether or not a proof of claim is filed. Filing is required only to permit creditor's participation in the case. *Grynberg v. United States (In re Grynberg)*, 986 F.2d 367, 371 (10th Cir. 1993).

    (1) Involuntary petitions [§ 303]

    (2) Administration of estate -- creditors' committees. §§ 1102, 1103. However, under current law, government eligibility for committee membership is limited.

    (3) Objection to discharge [§ 727(e)]

    (4) Voting on [§ 1126] or objecting to plan [§§ 1225, 1325]

    (5) Participation in distribution of estate property through liquidation dividends or plan payments [§§ 726, 1123, 1222, 1322]

    c. Considerations in deciding whether to file claim

    (1) Sovereign immunity

Filing proof of claim waives sovereign immunity permitting bankruptcy court to decide counterclaims by estate against government. *See* § 106(b).

    (2) Jury trial

Filing proof of claim waives right to jury trial on counterclaims. *See Langenkamp v. Culp*, 498 U.S. 42 (1990) (*per curiam*).

    (3) Nondischargeable claims

Some categories require creditor to take affirmative step of requesting that debt be excepted from discharge. *See* § 523(c)(1).

    (4) Secured claims (including setoff)

Unavoided liens survive bankruptcy, *see* § 506(d)(2); *In re Tarnow*, 749 F.2d 464 (7th Cir. 1984), but circumstances may demand action by secured creditor to protect lien. *See In re Newport Offshore, Ltd.*, 78 B.R. 383 (Bankr. D.R.I. 1987) (denying setoff right).

    2. When to File a Claim in a Bankruptcy Case

    a. "Bar date." The bar date establishes the date by which claims must be filed against the estate.

A bar order serves the important purpose of enabling the parties to a bankruptcy case to identify with reasonable promptness the identity of those making claims against the bankruptcy estate and the general amount of the claims, a necessary step in achieving the goal of successful reorganization. ... Thus, a bar order does not "function merely as a procedural gauntlet," ... but as an integral part of the reorganization process.

*First Fidelity Bank, N.A. v. Hooker Inves., Inc. (In re Hooker Inves.)*, 937 F.2d 833, 840 (2d Cir. 1991). The bar date is akin to a statute of limitations and must be strictly observed. *In re Keene Corp.*, 188 B.R. 903, 907 (Bankr. S.D.N.Y.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 209 of 547 PageID #: 4818

8/7/2021          64. Creditor's Claims in Bankruptcy Proceedings -- The Debtor-Creditor Relationship In Bankruptcy -- Allowance and Payment of Claims | …

1995).

(1) Fixed by rule in chapters 7, 12 and 13 with some exceptions, *e.g.*, upon timely request, court may extend deadline for U.S. to file. *See* Rule 3002(c). **Note: as a rule, bankruptcy deadlines are relatively short. Time is of the essence.**

(2) Set by court in chapters 9 and 11 [Rule 3003(c)(3)]

(3) **"A claim of a governmental unit shall be timely filed if it is filed before 180 days after the date of the order for relief or such later time as the Federal Rules of Bankruptcy Procedure may provide."**

(4) Rejected executory contracts and unexpired leases -- court sets date [Rule 3002(c)(4)]

(5) Postpetition claims. § 503. Note: a motion for an administrative expense shall be made upon application and notice pursuant to § 503 and not by proof of claim. *Security Ins. Corp. of Hartford v. First Century Corp. (In re First Century Corp.)*, 166 B.R. 47 (Bankr. M.D. Pa. 1944). Section 213(c) of the Bankruptcy Reform Act of 1994 amends Code § 503 to provide that the court may permit tardy filing of an administrative expense claim for cause.

(6) Effect of conversion of case. Rule 1019; *see United States v. Ginley (In re Johnson)*, 901 F.2d 513 (6th Cir. 1990) (upon conversion of case from ch. 11 to ch. 7, IRS was required to comply with the bar date set for claims arising in the superseded ch. 11 case with respect to taxes incurred postpetition but preconversion).

(7) Amendment of claims. Should be freely permitted, and amendment **not creating new or additional claim** may be filed after expiration of normal time limits. *See Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*, 954 F.2d 1 (1st Cir. 1992); *In re Unroe*, 937 F.2d 346 (7th Cir. 1991); *In re Donovan Wire & Iron Co.)*, 822 F.2d 38 (8th Cir. 1987); *In re International Horizons, Inc.*, 751 F.2d 1213 (11th Cir. 1985); *In re Dietz*, 136 B.R. 459 (Bankr. E.D. Mich. 1992); *In re Walls & All, Inc.*, 127 B.R. 115 (W.D. Pa. 1991). "The crucial inquiry is whether the opposing party would be unduly prejudiced by the amendment." *Roberts Farms Inc. v. Bultman (In re Roberts Farms Inc.)*, 980 F.2d 1248, 1251 (9th Cir. 1992); *see also Matter of Alliance Operating Corp.*, 60 F.3d 1174 (5th Cir. 1995) (Changing the type of claim from unsecured to priority sets forth a new claim and is not permitted through amendment of an existing proof of claim.); *In re Brown*, 159 B.R. 710 (Bankr. D.N.J. 1993).

b. Missed deadlines

(1) Avoiding default

(a) First, look for an exception to the filing requirement, e.g., failure to provide adequate notice. *See City of New York v. New York, New Haven & Hartford R.R. Co.*, 344 U.S. 293 (1953) (where creditor was not given reasonable notice of bar date for filing proof of claim, creditor was not barred from asserting claim post-confirmation); *In re Spring Valley Farms, Inc.*, 863 F.2d 832 (11th Cir. 1989); *Broomall Indus. v. Data Design Logic Sys.*, 786 F.2d 401, 405 (Fed. Cir. 1986) (even if creditor had actual notice of bankruptcy proceeding, "that fact would not have obviated the necessity for the service of formal notice" on creditor); *Reliable Elec. Co., Inc. v. Olson Constr. Co.*, 726 F.2d 620, 622-23 (10th Cir. 1984); *In re Intaco Puerto Rico, Inc.*, 494 F.2d 94, 99 (1st Cir. 1974); *In re Harbor Tank Storage Co., Inc.*, 385 F.2d 111, 115 (3d Cir. 1967); *In re Arlington Heights Congregate Housing Partnership*, 189 BR 187 (Bankr. S.D. Ind. 1995) (without formal notice, actual knowledge of the bankruptcy case will not suffice and a known creditor's claim must be allowed even if late filed); *In re Interstate Cigar Co.*, 150 B.R. 305, 309 (Bankr. E.D.N.Y. 1993).

(b) Informal proof of claim

"A failure to comply with the [Bankruptcy Codes's] claim filing requirements ... is not necessarily the death knell for a misguided or inattentive creditor. The bankruptcy court may allow a Chapter 11 claim ... when a disallowance of the

claim will produce an unfair result through no fault of the creditor. Allowance of such a claim, upon the manifestation of an intent to hold the estate liable on the debt, has come to be known as an informal proof of claim. ... The [informal proof of] claim must be in writing; there must be a demand by the creditor on the estate; it must evidence an intent to hold the debtor liable; the claim must be filed with the bankruptcy court; and allowance of the claim must be equitable under the facts of the case." *Matter of Plunkett*, 191 B.R. 768, 774 (Bankr. E.D. Wis. 1995); *accord Clark v. Valley Fed. Savs. and Loan Ass'n (In re Reliance Equities, Inc.)*, 966 F.2d 1338, 1345 (10th Cir. 1992). Whether the writing must be filed with the court is subject to controversy. *Compare In re County of Orange*, 191 B.R. 1005, 1022 (Bankr. C.D. Cal. 1996) (Informal letter to the debtor/trustee was sufficient for informal proof of claim) *and In re Dauer*, 165 B.R. 146, 147 (Bankr. D.N.J. 1994) ("To constitute an informal proof of claim there must be a writing which makes a demand on the estate and/or expresses an intent to hold the estate liable for the debt.") *with In re Cole*, 189 B.R. 40, 51 (Bankr. S.D.N.Y. 1995) (An informal proof of claim requires a "timely written assertion or pleading," which "apprise[s] **the court** of the existence, nature, and amount of the claims ....") (emphasis added).

(c) Excusable neglect

Courts are permitted to accept late filings caused by inadvertence, mistake, or carelessness, not just by intervening circumstances beyond the party's control. FRBP 9006(b)(1); *Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P.*, 113 S. Ct. 1489 (1993). In making this equitable determination, courts should consider (1) the danger of prejudice to the debtor, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith. *Id.* at 1498; *Agribank v. Green*, 188 B.R. 982, 989 (C.D. Ill. 1995) (Intentional failure to file proof of claim timely so that its claim would be definitively stated and would not have to be amended is not excusable neglect.).

(2) Consequences of missing filing deadline

(a) Secured claims: "Ordinarily, liens and other secured interests survive bankruptcy." *Farrey v. Sanderfoot*, 500 U.S. 291, 297 (1991). "Because an unchallenged lien survives the discharge of the debtor in bankruptcy, a lienholder need not file a proof of claim under section 501." *Folendore v. SBA (In re Folendore)*, 862 F.2d 1537, 1539 (11th Cir. 1989). However, creditor loses right to proceed *in personam* against the debtor. *See Johnson v. Home State Bank*, 501 U.S. at 84.

(b) Setoff: Nothing in § 553 requires that a right of setoff be asserted in a proof of claim to be preserved. To the contrary, § 553 expressly provides that nothing in the Code affects a creditor's right to setoff unless explicitly stated in § 553, which makes no mention of proofs of claim. Despite this, whether failing to file a proof of claim or failure to assert a right of setoff in a proof of claim may waive that right is subject to controversy. *Compare In re Davidovich*, 901 F.2d 1533, 1539 (10th Cir. 1990) (proof of claim not prerequisite to retention of setoff right); *Willcox v. Goess*, 92 F.2d 8, 16 (2d Cir. 1937), *cert. denied*, 303 U.S. 647 (1938) (setoff under Bankruptcy Act allowable on provable claim even if no proof made and bar date passed); *Bloor v. Shapiro*, 32 B.R. 993, 1002 (S.D.N.Y. 1983) (setoff permissible even in absence of timely filed proof of claim); *In re Aquasport, Inc.*, 155 B.R. 245, 247 (S.D. Fla. 1992), *aff'd*, 985 F.2d 579 (11th Cir. 1993); *In re Concept Clubs, Inc.*, 154 B.R. 581, 589 (D. Utah 1993); *Stratton v. Equitable Bank*, 104 B.R. 713, 735 (D. Md. 1989); *In re Calderone*, 166 B.R. 825, 830 (Bankr. W.D. Pa. 1994); *In re Selma Apparel Corp.*, 155 B.R. 241, 244 (Bankr. S.D. Ala. 1992); *In re Suncrete Corp.*, 100 B.R. 102, 104 (Bankr. M.D. Fla. 1989); *In re Denby Stores*, 86 B.R. 768, 777 (Bankr. S.D.N.Y. 1988); Lawrence P. King, 4 *Collier on Bankruptcy* ¶ 553.01[4], at 553-6 (15th ed. 1993) (all allowing setoff without filing proof of claim) *and In re Custom Ctr., Inc.*, 163 B.R. 309, 315-17 (Bankr. E.D. Tenn. 1994) (failure to assert setoff in original proof of claim does not waive right to setoff) *with In re Britton*, 83 B.R. 914, 919-921 (Bankr. E.D.N.C. 1988); *In re Butler*, 61 B.R. 790 (Bankr. S.D. Fla. 1986); *and* 4 *Collier on Bankruptcy* ¶ 553.07, at 553-43 (all asserting that failure to preserve setoff in proof of claim is waiver of that right). *See also In re Village Craftsman, Inc.*, 160 B.R. 740, 748 (Bankr. D.N.J. 1993) (setoff waived when creditor files unsecured proof of claim and does not object to unsecured treatment in plan of reorganization); *In re Apex Int'l Mgmt. Servs., Inc.*, 155 B.R. 591 (Bankr. M.D. Fla. 1993); *In re Sound Emporium*, 48 B.R. 1 (Bankr. W.D. Tex. 1984) (both holding that setoff permitted if failure to assert that right in proof was good faith mistake and led to no detrimental reliance by other parties).

(c) Unsecured claims:

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 211 of 547 PageID #: 4820

8/7/2021          64. Creditor's Claims in Bankruptcy Proceedings -- The Debtor-Creditor Relationship In Bankruptcy -- Allowance and Payment of Claims | …

Chapter 7: Section 726(a)(3) permits payment of claims filed late but only after payment in full of timely filed general unsecured claims. Decisions allowing late claims in chapter 7 cases include *In re Sea Air Shuttle Corp.*, 168 B.R. 501 (Bankr. D.P.R. 1994); *In re Brennan*, 167 B.R. 316 (Bankr. D. Mass. 1993); *In re Osman*, 164 B.R.709 (Bankr. S.D. Ga. 1993); *In re Brenner*, 160 B.R. 302 (Bankr. E.D. Mich. 1993); *In re McLaughlin*, 157 B.R. 873 (Bankr. N.D. Iowa 1993); *In re Rago*, 149 B.R. 882 (Bankr. N.D. Ill. 1992); *In re Corporacion de Servicios Medico-Hospitalarios de Fajardo, Inc.*, 149 B.R. 746 (Bankr. D.P.R. 1993).

Chapter 13: Courts are split. *Compare In re Hausladen*, 146 B.R. 557 (Bankr. D. Minn. 1992) (Rule 3002 is inconsistent with the Code in that it requires disallowance of late-filed claims in chapter 13) *with In re Duarte*, 146 B.R. 958 (Bankr. W.D. Tex. 1992) (Rule 3002 bars late-filed claims unless one of the 6 exceptions is met or denial of due process can be demonstrated).

[Note: Section 213(a) of the Bankruptcy Reform Act of 1994 amends Code § 502(b) to disallow tardily filed claims except as provided in § 726(a)(1), (2), or (3) or the Bankruptcy Rules. The legislative history states that the amendment is designed to overrule *Hausladen* and its progeny. 103 Cong. Rec. H10768 (daily ed. Oct. 4, 1994).]

   3. Filing the Claim

   a. Proof of claim "shall be *executed* by the creditor or the creditor's authorized agent . . . ." Rule 3001(b) (emphasis added).

   b. Filing on behalf of the government

   (1) Filing proof of claim is analogous to filing a complaint in a civil action for purposes of litigation authority. Thus, DOJ or U.S. Attorney files the claim with the court. (Note: this is particularly important where multiple agencies are involved in the case and where preserving sovereign immunity is a primary consideration.)

   (2) Creditor agency may file if agency has litigation authority or by arrangement with DOJ, *e.g.*, IRS Special Procedures function for filing tax claims, or in emergency. *In re Schibilsky*, 185 B.R. 81 (Bankr. N.D. Ga. 1995) (IRS has properly delegated authority to file proofs of claim on behalf of United States.).

   (3) Third parties may file. § 501(b), (c). However, third party does not waive sovereign immunity by filing claim on behalf of government. *See* legislative history of § 106. H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 317 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 29-30 (1978).

   c. What to file

   (1) Proof of claim. A "written statement" which "shall conform substantially to the appropriate Official Form." Rule 3001(a); *see* Official Form 10 (Rev. 6/91).

To preclude possible inadvertent waiver of rights, DOJ recommends that any government proof of claim contain a statement to the following effect:

   This claim reflects the known liability of the debtor to this agency of the United States. The United States reserves the right to amend this claim to assert subsequently discovered liabilities. This agency holds subject to setoff against this claim a debt owed to the debtor of _____ (amount). The identification of any sums held subject to setoff is without prejudice to any other right under 11 U.S.C. § 553 to set off, against this claim, debts owed by this or any other Federal agency.

   (2) Supporting documents. Rule 3001(c), (d). Copies of the documents evidencing the government's claim, including its lien position if applicable, should be attached with a certified statement of account showing the amount owing on the petition date.

   (3) Internal documents: Claims Collection Litigation Report. *See* 4 C.F.R. § 105.2. Applicable to claims under Civil Division cognizance. See attachments to this outline regarding current Nationwide Central Intake Facility procedures applicable in bankruptcy cases. (Note: NCIF procedures and CCLR do not

**A-7150**

**Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 212 of 547 PageID #: 4821**

8/7/2021          64. Creditor's Claims in Bankruptcy Proceedings -- The Debtor-Creditor Relationship In Bankruptcy -- Allowance and Payment of Claims | …

apply to tax claims, which are filed by IRS, or to environmental claims, which as a general rule are forwarded by the agency directly to the Environment and Natural Resources Division for filing.)

C. Allowance and Payment of Claims

1. Allowability

a. Proof of claim is *prima facie* evidence of validity and amount of claim. Rule 3001(f). *See* § 502(a) (claim deemed allowed absent objection); *In re White*, 168 B.R. 825, 828-29 (Bankr. D. Conn. 1994).

b. Claims scheduled as undisputed, fixed, liquidated in chapters 9, 11 [Rule 3003]

c. Estimation of claims [§ 502(c)]

d. Temporary allowance to permit voting on plan where objection is pending [Rule 3018(a)]

2. Resolving Objections

a. A "party in interest" may object. § 502. This becomes a "contested matter." *See* Rule 9014. If the objection is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding. Rule 3007. Once the objector produces some evidence (the mere filing of an objection is insufficient) disputing the validity of a claim, the burden shifts to the claimant. The claimant bears the ultimate burden of establishing a valid claim by a preponderance of the evidence. *In re South Motor Co.*, 161 B.R. 532, 547 (Bankr. S.D. Fla. 1993).

b. Objections to government claims. Differing views regarding extent of notice that must be given to United States. *Compare In re Morrell*, 69 B.R. 147 (N.D. Cal. 1986) (objection to IRS claim must be served upon Attorney General and U.S. Attorney in addition to the IRS because the U.S. is the actual claimant) *with In re Hejl*, 85 B.R. 399 (Bankr. W.D. Tex. 1988) (Rule 3007 does not require service upon U.S. Attorney where IRS claim is involved), *rev'd*, No. MO-88-CA-165 (W.D. Tex. Oct. 11, 1988). *See generally In re M & L Business Machine Co., Inc.*, 190 B.R. 111, 115-16 (D. Colo. 1995) ("In light of the comparatively lenient procedure in bankruptcy, persons effecting service must provide correct notice in accordance with the rules. Thus, strict compliance with Rule 7004 serves to protect due process rights as well as assure bankruptcy matters proceed expeditiously." (citations omitted)). Unless the plan expressly reserves the debtor's right to object to claims postconfirmation, there is "no place in the postconfirmation world" for objections to claims. The only means to challenge a claim postpetition is through a motion to reconsider under § 502(j). *Matter of Bernard*, 189 B.R. 1017, 1020 (Bankr. N.D. Ga. 1996) (Filing an objection 26 months after confirmation -- when the chapter 13 plan expressly required objections to be filed within 6 months of confirmation -- was "unreasonable and unjustifiable.").

c. Determining tax claims [§ 505]

d. Subordination [§ 510]

e. Reconsideration [§ 502(j); Rule 3008]

f. Appeal [Rules 8001-8019]

3. Payment of Claims

a. In liquidation cases

(1) Distribution to secured creditors. Trustee satisfies secured claims through proceeds from sale of property [§ 363], or abandonment [§ 554] or other disposition [§ 725] of collateral. Also, secured claims may be satisfied through foreclosure or exercise of setoff after obtaining relief from the automatic stay under § 362.

(2) Distribution to unsecured creditors. Dividends [*see* Rule 3009] paid according to § 726(a) ranking:

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 213 of 547 PageID #: 4822

8/7/2021          64. Creditor's Claims in Bankruptcy Proceedings -- The Debtor-Creditor Relationship In Bankruptcy -- Allowance and Payment of Claims | …

(a) First, priority claims [§ 507]

(b) Second, general unsecured claims

(c) Third, tardily filed claims

(d) Fourth, fines, penalties or forfeitures, or multiple, exemplary or punitive damages not compensating for actual, pecuniary loss

(e) Fifth, interest

b. Under chapter 11, 12, or 13 plans

(1) As provided for by the plan

(2) Protections afforded secured claims under the Code. §§ 1111(b), 1129(a)(7), 1129(b)(2)(A), 1225(a)(5), 1325(a)(5).

(3) As to unsecured claims, § 726 order of distribution does not apply [*see* § 103(b)], but, absent consent, priority claims must be paid [*see* §§ 1129(a)(9), 1222(a)(2), 1322(a)(2)], and other unsecured claims must receive at least as much as they would have received if § 726 applied [§§ 1129(a)(7), 1225(a)(4), 1325(a)(4)]

(4) Plan payments [Rule 3021]

c. Sale or transfer of claims [Rule 1003]

d. Reaffirmation agreements [§ 524(c)(d)]

e. Other sources of payment -- insurance, guarantees, co-debtors


[updated June 1998]

‹ 63. Creditor's Claims In Bankruptcy Proceedings          up          65. Setoff and Recoupment in Bankruptcy -- Setoffs (cont'd), Recoupment ›

A-7152



# Mallinckrodt Will Pay $100 Million to Settle FTC, State Charges It Illegally Maintained its Monopoly of Specialty Drug Used to Treat Infants

January 18, 2017

## Settlement requires the company to license rights to develop a synthetic alternative to Acthar

## Share This Page

FOR RELEASE

**TAGS:** Health Care | Prescription Drugs | Bureau of Competition | Competition | Nonmerger | Single Firm Conduct

Mallinckrodt ARD Inc., formerly known as Questcor Pharmaceuticals, Inc., and its parent company, Mallinckrodt plc, have agreed to pay $100 million to settle Federal Trade Commission charges that they violated the antitrust laws when Questcor acquired the rights to a drug that threatened its monopoly in the U.S. market for adrenocorticotropic hormone (ACTH) drugs. Acthar is a specialty drug used as a treatment for infantile spasms, a rare seizure disorder afflicting infants, as well a drug of last resort used to treat other serious medical conditions.

The FTC's complaint alleges that, while benefitting from an existing monopoly over the only U.S. ACTH drug, Acthar, Questcor illegally acquired the U.S. rights to develop a competing drug, Synacthen Depot. The acquisition stifled competition by preventing any other company from using the Synacthen assets to develop a synthetic ACTH drug, preserving Questcor's monopoly and allowing it to maintain extremely high prices for Acthar.

"Questcor took advantage of its monopoly to repeatedly raise the price of Acthar, from $40 per vial in 2001 to more than $34,000 per vial today – an 85,000 percent increase," said FTC Chairwoman Edith Ramirez. "We charge that, to maintain its monopoly pricing, it acquired the rights to its greatest competitive threat, a synthetic version of Acthar, to forestall future competition. This is precisely the kind of conduct the antitrust laws prohibit."

Acthar is a specialty drug used as a treatment for infantile spasms, a rare seizure disorder afflicting infants, and a drug of last resort to treat several other serious medical conditions – including nephrotic syndrome, flare-ups of multiple sclerosis, and rheumatoid disorders. According to the complaint, Acthar treatment for an infant with infantile spasms can cost more than $100,000.

In Europe, Canada, and other parts of the world, the complaint notes that doctors treat patients suffering from these conditions with Synacthen Depot, which is available at a fraction of Acthar's price in the United States. The complaint alleges that Questcor has consistently viewed Synacthen Depot as a significant competitive threat to its Acthar monopoly in the United States.

The FTC alleges that in June 2013, Questcor acquired the U.S. rights to Synacthen from Novartis AG, outbidding several other companies that were seeking to acquire the rights to Synacthen. Those alternative bidders were interested in developing the drug and had plans to sell it at a significant discount to Acthar's price, capturing a substantial amount of Questcor's business. The FTC charges that Questcor's acquisition of Synacthen stifled competition and eliminated the possibility that an alternative bidder would make the drug available in the U.S. market and compete with Acthar.

In addition to the $100 million monetary payment, the proposed stipulated court order requires that Questcor grant a license to develop Synacthen Depot to treat infantile spasms and nephrotic syndrome to a licensee approved by the Commission.

A monitor will ensure that Questcor complies with its obligation to grant the license within 120 days of the entry of the order; after that time, a trustee will be appointed to effectuate the license. The order also requires Questcor to provide periodic reports on its efforts, and provide the Commission with advance notice of any future acquisitions of U.S. rights to ACTH drugs.

The states of Alaska, Maryland, New York, Texas and Washington joined in the FTC's complaint. Under the settlement, the states will receive $10 million from the $100 million judgment and an additional $2 million as payment for attorney's fees and costs.

The Commission vote authorizing staff to file the complaint and the proposed stipulated order in federal court was 3-0. Commissioner Maureen K. Ohlhausen issued a concurring statement. FTC staff filed the complaint and proposed order in the U.S. District Court for the District of Columbia.

**NOTE:** The Commission files a complaint when it has "reason to believe" that the law has been or is being violated and it appears to the Commission that a proceeding is in the public interest. Stipulated orders have the force of law when approved and signed by the District Court judge.

The Federal Trade Commission works to promote competition, and protect and educate consumers. You can learn more about how competition benefits consumers or file an antitrust complaint. Like the FTC on Facebook, follow us on Twitter, read our blogs and subscribe to press releases for the latest FTC news and resources.

PRESS RELEASE REFERENCE:
FTC Approves Sublicense for Synacthen Depot Submitted by Mallinckrodt ARD Inc.

# Contact Information

**MEDIA CONTACT:**
Betsy Lordan
*Office of Public Affairs*
202-326-3707

**STAFF CONTACT:**
Mike Moiseyev
*Bureau of Competition*
202-326-3106



ftc.gov

A-7155

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 217 of 547 PageID #: 4826

8/7/2021          Drug Maker Mallinckrodt Agrees to Pay Over $15 Million to Resolve Alleged False Claims Act Liability for "Wining and Dining" Doctors | O…



🇺🇸 An official website of the United States government
Here's how you know

STICE NEWS

Department of Justice

Office of Public Affairs

FOR IMMEDIATE RELEASE                                    Wednesday, September 4, 2019

## Drug Maker Mallinckrodt Agrees to Pay Over $15 Million to Resolve Alleged False Claims Act Liability for "Wining and Dining" Doctors

Pharmaceutical company Mallinckrodt ARD LLC (formerly known as Mallinckrodt ARD Inc. and previously Questcor Pharmaceuticals Inc. "Questcor"), has agreed to pay $15.4 million to resolve claims that Questcor paid illegal kickbacks to doctors, in the form of lavish dinners and entertainment, to induce prescriptions of the company's drug, H.P. Acthar Gel (Acthar) from 2009 through 2013.

The Federal Anti-Kickback Statute prohibits a pharmaceutical company from offering or paying, directly or indirectly, any remuneration — which includes money or any other thing of value — with the intent to induce a health care provider to prescribe a drug reimbursed by a federal health care program, including Medicare. This prohibition extends to such practices as "wining and dining" doctors to induce them to write Medicare prescriptions of a company's products.

The government alleged that, from 2009 to 2013, twelve Questcor sales representatives marketing Acthar provided illegal remuneration to health care providers in the form of lavish meals and entertainment expenses.  The company paid this remuneration, the government alleges, with the intent to induce Acthar Medicare referrals from those health care providers, resulting in a violation of the Anti-Kickback Statute and the submission of false claims to Medicare.

"The Department of Justice will hold companies accountable for the payment of illegal kickbacks in any form," said Assistant Attorney General Jody Hunt of the Department of Justice's Civil Division. "Improper inducements have no place in our federal healthcare system, which depends on physicians making decisions based on the healthcare needs of their patients and not on or influenced by personal financial considerations."

"When companies buy off doctors, patients suffer.  My Office is committed to rooting out this type of behavior and the Anti-Kickback Statute is a critical tool in that fight," said U.S. Attorney McSwain.  "We will continue to protect the integrity of our healthcare system by holding drug companies accountable for their conduct."

"Paying kickbacks to win business, as contended in this case, cheats taxpayers and the patients who rely on government health care programs for essential care," said Maureen R. Dixon, Special Agent in Charge for the Office of Inspector General of the U.S. Department of Health and Human Services.  "We will continue working with our law enforcement partners to hold accountable entities paying such kickbacks."

The allegations that are the subject of yesterday's settlement were originally alleged in two cases filed under the whistleblower, or qui tam, provision of the False Claims Act.  The act permits private parties to sue for fraud on behalf of the United States and to share in any recovery.  The act also permits the government to intervene in such actions, as the government previously did in the two whistleblower cases.  The whistleblowers will receive approximately $2.926 million of the settlement.  The government is continuing to pursue claims in these two matters alleging that Mallinckrodt violated the False Claims Act by using a foundation as a conduit to pay illegal kickbacks in the form of copay subsidies for Acthar.  These claims are not being resolved by the settlement.

The government's pursuit of these matters illustrates the government's emphasis on combating healthcare fraud.  One of the most powerful tools in this effort is the False Claims Act.  Tips and complaints from all sources about potential

A-7156

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 218 of 547 PageID #: 4827

8/7/2021          Drug Maker Mallinckrodt Agrees to Pay Over $15 Million to Resolve Alleged False Claims Act Liability for "Wining and Dining" Doctors | O…

fraud, waste, abuse, and mismanagement can be reported to the Department of Health and Human Services, at 800-HHS-TIPS (800-447-8477).

This matter is being handled by the Civil Division's Commercial Litigation Branch and the U.S. Attorney's Office for the Eastern District of Pennsylvania, with assistance from the U.S. Department of Health and Human Services Office of Inspector General.  The two lawsuits are captioned *United States of America ex rel. Strunck et al. v. Mallinckrodt ARD, Inc.*, No. 12-CV-0175 (E.D. Pa.) and *United States of America ex rel. Clark v. Questcor Pharmaceuticals, Inc.*, No. 13-CV-1776 (E.D. Pa.).

The claims resolved by this settlement are allegations only and there has been no determination of liability.

**Topic(s):**
False Claims Act

**Component(s):**
Civil Division
USAO - Pennsylvania, Eastern

**Press Release Number:**
19-928

*Updated September 4, 2019*

A-7157

Gary S. Lincenberg
Jeremy D. Matz
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW P.C.
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067
Telephone: 310−201−2100
Fax: 310−201−2110
Email: glincenberg@birdmarella.com
        jmatz@birdmarella.com

Scott C. Solberg (admitted *pro hac vice*)
James W Joseph (admitted *pro hac vice*)
Benjamin E. Waldin (admitted *pro hac vice*)
EIMER STAHL LLP
224 South Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
Email: ssolberg@eimerstahl.com
        jjoseph@eimerstahl.com
        bwaldin@eimerstahl.com

*Attorneys for Plaintiff Humana Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| HUMANA INC.,<br><br>              Plaintiff,<br><br>     v.<br><br><br>MALLINCKRODT ARD LLC (f/k/a<br>Mallinckrodt ARD Inc., f/k/a Questcor<br>Pharmaceuticals, Inc.),<br><br>              Defendant. | Case No. 2:19-cv-06926-DSF-MRW<br><br>**DEMAND FOR JURY TRIAL**<br><br>Honorable Dale S. Fischer<br>United States District Judge |

SECOND AMENDED COMPLAINT

A-7158

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................1

II.     PARTIES ..............................................................................................5

III.    JURISDICTION AND VENUE................................................................9

IV.     FACTUAL ALLEGATIONS .................................................................10

   A.   Humana ..........................................................................................10

   B.   Acthar .............................................................................................11

   C.   Medical Use of Acthar and Other Adrenal Hormone Drugs ....................13

   D.   Mallinckrodt's Monopoly Power with Acthar ...........................................16

      1.   Direct Evidence of Monopoly Power...........................................16

      2.   Further Evidence of Monopoly Power ........................................17

      3.   Anticompetitive Conduct in the Acquisition of Synacthen ........................19

      4.   Mallinckrodt's Sales of Acthar to Humana and its Members....................22

      5.   Scope of the Antitrust Allegations .............................................24

   E.   Mallinckrodt's Kickback and Racketeering Schemes ...............................29

      1.   Patient Co-Pay Subsidies Through Sham Charitable Funds.......................29

      2.   Physician Kickbacks......................................................................33

      3.   False Representations and Certifications ...................................36

      4.   Use of the Mails and Wires .........................................................38

   F.   Mallinckrodt's Fraudulent Concealment of the Illegal Scheme ................38

   G.   Damages ........................................................................................39

Count I  Violation of the Sherman Antitrust Act, 15 U.S.C. § 2............................40

Count II  Violation of the Sherman Antitrust Act, 15 U.S.C. § 1 ..........................41

Count III Violation of State Antitrust Laws .........................................................42

Count IV Violation of the RICO Act, 18 U.S.C. § 1962(c) ...................................43

Count V Conspiracy to Violate the RICO Act, 18 U.S.C. § 1962(d).....................45

Count VI State Unfair Competition Law Claims ..................................................47

Count VII State Consumer Fraud and Deceptive Trade Practice Law Claims .......49

A-7159

Count VIII  State Insurance Fraud Claims...................................................................51

Count IX Tortious Interference with Contractual Relations.....................................52

Count X Unjust Enrichment.......................................................................................54

V.      PRAYER FOR RELIEF.................................................................................54

VI.     JURY DEMAND...........................................................................................55

A-7160

## SECOND AMENDED COMPLAINT

Plaintiff Humana Inc. ("Plaintiff" or "Humana"), complains against Defendant, Mallinckrodt ARD LLC, formerly known as Questcor Pharmaceuticals, Inc. ("Questcor")("Defendant," "Mallinckrodt," or the "Company"), as follows:

## I.   INTRODUCTION

1.     This action arises from one of the most outrageous price-gouging schemes in the history of American medicine.

2.     H.P. Acthar Gel ("Acthar") is a drug that has been available since 1952, and for nearly half a century, its price was modest. In 2001, a vial of the drug cost $40.

3.     But by 2018, the same vial cost over $39,000. This is a 97,500% price increase. It is as if the price of milk increased from $3 to over $2,900 per gallon, or a mortgage payment rose from $2,000 to over $2 million per month.

4.     These eye-popping price increases are not an accident, a market anomaly, or a necessary byproduct of legislation. They are the intended result of purposeful and illegal conduct by Acthar's producers, Mallinckrodt and its predecessor Questcor. This conduct consists of a complex, multipart scheme involving monopoly, bribery, racketeering, fraud, and other deceptive and unfair practices that have imposed exorbitant and pointless costs on those financially responsible for the costs of the drug, including not just patients but also health and Medicare insurers like Humana, the plaintiff here.

5.     Though Acthar may be a billion-dollar golden goose for Mallinckrodt today, its origins were humble. The drug is an adrenocorticotropic hormone ("ACTH") analogue produced from the pituitary gland of pigs. It was invented in the late 1940s by the meat company Armour, as a byproduct of pork-processing operations. At the time, Acthar was considered a miracle drug because it stimulated the body's production of cortisol, provoking a natural anti-inflammatory response that was beneficial for the treatment of various conditions. Acthar was given broad approval by the FDA in 1952

A-7161

to treat a wide range of ailments at a time when such broad approvals were commonplace and did not require support from clinical trials.

6.      This also occurred before the commercial development of synthetic steroid drugs (corticosteroids) and many popular non-steroidal anti-inflammatory drugs (NSAIDs), such as ibuprofen. The advent of these safe, cheap alternative treatments in pill form reduced the need for an injectable drug derived from the pituitary gland of pigs. These developments completely redefined the economic market for Acthar and rendered it a niche, specialty drug.  By the 1990s, Acthar remained medically and economically viable for only a few key uses. For example, Acthar remains the standard of care for infantile spasms, a rare but catastrophic epileptic syndrome affecting babies and toddlers two years old or younger. But other than this and a handful of similarly rare conditions, Acthar is—especially for older patients who are Medicare beneficiaries, such as Humana members—either a drug of last resort or not known to be clinically effective.

7.      Consequently, the drug became unprofitable for its manufacturer, Aventis Pharmaceuticals, Inc., which had considered stopping production. But the drug was saved in 2001, when Mallinckrodt's predecessor Questcor purchased the right to produce this unprofitable and largely outdated drug for $100,000 plus modest royalties, seeing it as a potential gold mine for exploitation.

8.      Thereafter began a run of outrageous price increases. The cost of Acthar ballooned from $40 in 2001, to $750 immediately after it was acquired, to $1,650 by 2007. In that year the price was jacked up to $23,269 per vial. But the increases did not stop or reverse course: instead the price of Acthar was increased eight more times so that by 2018, the drug cost $38,892 per vial. And since treatment with Acthar usually requires at least three vials, a single course of treatment can cost nearly $120,000. The following charts the course of Acthar pricing:



9.      In just over a decade, Acthar went from a nearly extinct, financial sinkhole to a billion-dollar cash machine. In August 2014—in the midst of this meteoric price rise—Questcor merged into Mallinckrodt in a deal worth approximately $5.6 billion. At the time, Acthar was the only drug product sold by Questcor.

10.      Mallinckrodt has been able to inflate and maintain the shocking price increases of Acthar mainly through three types of improper conduct.

11.      *First*, Mallinckrodt eliminated the competition. It did so by acquiring and then shelving the rights to Acthar's much cheaper synthetic equivalent ACTH, a drug called Synacthen Depot ("Synacthen"). Drug giant Novartis AG ("Novartis") was already selling Synacthen in Europe, Asia, and Latin America, but the drug was not approved for use in the United States. After Novartis launched an auction for Synacthen, Mallinckrodt substantially outbid the competition for the rights to Synacthen in the U.S. But rather than undertake the process of obtaining FDA approval for the only drug that was a direct competitor of its best-selling product, Mallinckrodt never seriously attempted to bring Synacthen to market for any clinical use for which Acthar was approved. This kept the price of Acthar artificially high. In addition, Mallinckrodt vertically integrated its sales by distributing Acthar exclusively through

A-7163

the specialty pharmacy CuraScript. CuraScript had no role in decisions on Acthar's pricing. Because of Mallinckrodt's anticompetitive behavior, the FTC and several states sued it for antitrust violations and later reached a $100 million settlement, as well as an agreement that Mallinckrodt would sublicense its Synacthen rights to a third party.

12.    *Second*, Mallinckrodt increased and then maintained artificially high demand for Acthar by using a charitable foundation for the illegal purpose of paying patient co-pays. This fund—initially called the Chronic Disease Fund, now doing business as Good Days—provided "patient assistance" funds for Acthar only, and not for other drugs. Mallinckrodt financed the foundation, directed patients to the fund, paid their co-pays as "donations," and then marketed the drug as "free." In other words, it was a bribe to patients and a vehicle through which Mallinckrodt could persuade physicians that the astronomical price of the drug should not be a barrier to prescribing it. It also constituted a fraud on Medicare, which is why the Department of Justice recently brought claims against Mallinckrodt under two federal statutes, the False Claims Act, 31 U.S.C. §§ 3729-3733, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). In addition, this conduct constituted a fraud on Humana (one of the nation's largest sponsors of Medicare Advantage plans) and an intentional interference in Humana's relationship with its insureds, because it removed the incentive for patients to exercise the responsibility ordinarily imposed by co-pays, deductible limits, and other out-of-pocket costs set forth in Humana's agreements with its insureds.

13.    *Third*, Defendant simultaneously maintained this artificially high demand through a pervasive bribery scheme to doctors. It should go without saying that doctors would not otherwise be inclined to prescribe, what for most purposes is an antiquated and expensive drug that requires refrigeration and injection, when cheaper, more effective pills and remedies were available. Furthermore, though Acthar is a first-line treatment for infantile spasms, that market is small and Mallinckrodt sought to redirect its marketing efforts away from the poor public-relations consequences of earning billions of dollars off the backs of sick children. Consequently, Mallinckrodt

aggressively marketed the drug for the treatment of conditions more common among adult patients, including those eligible for Medicare. So under the guise of "education" and "marketing," Mallinckrodt paid millions of dollars to thousands of doctors to encourage the use of Acthar even for conditions where it is not the first-line treatment. Though payment of modest expenses to doctors by pharmaceutical companies may frequently be lawful and harmless, here Mallinckrodt crossed well over the line by paying thinly disguised bribes to at least 20 doctors—mainly rheumatologists, neurologists, and nephrologists—responsible for a significant number of prescriptions. Mallinckrodt paid this group of physicians at least $250,000 each over a three-year period. Not surprisingly, physicians who received more than $10,000 from Mallinckrodt prescribed more than double the amount of Acthar as those who received $25 or less. Also not surprising: fewer than 10% of Acthar prescriptions are now for treatment of infantile spasms.

14.     Humana, a Medicare Part D provider, has paid more than $700 million over more than eight years for Acthar. It paid an inflated price due to Mallinckrodt's monopolization and racketeering, and reimbursed unnecessary Acthar treatments due to the prescribing doctors' misrepresentations that they had not received any illegal kickbacks. By this action, Humana seeks to recoup from Mallinckrodt its ill-gotten gains.

## II.   PARTIES

15.     **Humana.** Plaintiff Humana Inc. ("Humana") is a Delaware corporation with its principal place of business at 500 West Main Street, Louisville, Kentucky. Humana and its subsidiaries are providers of healthcare related services, including insuring risk for prescription drug costs for more than eight million members in all 50 states, the District of Columbia, and Puerto Rico. More than 75% of Humana's total premium revenues in the year 2012 were derived from contracts with the federal government, including Medicare Part D prescription drug coverage and Medicare Advantage plans. Humana operates its insurance businesses through a variety of wholly

A-7165

owned subsidiaries, all of which have assigned their relevant claims in this action to Humana.[1]

16. **Mallinckrodt.** Defendant Mallinckrodt ARD LLC has its principal place of business at 1425 Route 206, Bedminster, NJ, 07921. Mallinckrodt ARD LLC was previously named Mallinckrodt ARD, Inc., and before that was named Questcor Pharmaceuticals, Inc.

17. Mallinckrodt ARD LLC is a subsidiary of Mallinckrodt plc, an Irish public limited company. On April 4, 2014, Mallinckrodt plc entered into an Agreement and Plan of Merger with Questcor and absorbed Questcor as a wholly owned subsidiary on August 14, 2014 for approximately $5.6 billion.

18. Questcor survived the merger as a wholly owned indirect subsidiary of Mallinckrodt plc and continued to market Acthar thereafter, until changing its name to Mallinckrodt ARD, Inc. on July 27, 2015.

19. On January 26, 2019, Mallinckrodt ARD, Inc. converted to Mallinckrodt ARD LLC and it continues to market Acthar to this day.

20. **Mallinckrodt's Unnamed Agents and Co-Conspirators.** Mallinckrodt was joined in its scheme by several persons or groups of persons who served as agents,

---

[1]     Some of the subsidiaries through which Humana conducts insurance business include: Arcadian Health Plan, Inc., CarePlus Health Plans, Inc., Cariten Health Plan, Inc., Cariten Insurance Company, CHA HMO, Inc., CompBenefits Insurance Company, Emphesys Insurance Company, Health Value Management, Inc. d/b/a ChoiceCare Network, Humana Behavioral Health, Inc., HumanaDental, Inc., Humana Benefit Plan of Illinois, Inc., Humana Employers Health Plan of Georgia, Inc., Humana Health Benefit Plan of Louisiana, Inc., Humana Health Company of New York, Inc., Humana Health Insurance Company of Florida, Inc., Humana Health Plan of California, Inc., Humana Health Plan of Ohio, Inc., Humana Health Plan of Texas, Inc., Humana Health Plan, Inc., Humana Health Plans of Puerto Rico, Inc., Humana Insurance Company, Humana Insurance Company of Kentucky, Humana Insurance Company of New York, Humana Medical Plan of Michigan, Inc., Humana Insurance of Puerto Rico, Inc., Humana Medical Plan of Pennsylvania, Inc., Humana Medical Plan of Utah, Inc., Humana Medical Plan, Inc., Humana Pharmacy Solutions, Inc., Humana Regional Health Plan, Inc., and Humana Wisconsin Health Organization Insurance Corporation.

A-7166

co-conspirators, aiders and abettors, or otherwise acted in concert in connection with Mallinckrodt's Acthar price schemes that have not been named as defendants in this matter but are nonetheless important to the claims herein.

21.     <u>The Competitor</u>. Novartis marketed and sold Synacthen outside of the United States, and owned exclusive rights to sell Synacthen in the U.S. On information and belief, Novartis agreed to sell the Synacthen U.S. rights to Questcor with knowledge that Questcor did not intend to bring Synacthen to market to compete with Acthar.

22.     <u>The Consultant</u>. BioSolutia Inc., now known as CareMetx, LLC ("BioSolutia") is a Maryland-based firm that provided health-care consulting services to Mallinckrodt, including through an individual consultant (the "BioSolutia Consultant") who was retained full time to work on Acthar, and who helped design and implement Mallinckrodt's schemes.

23.     <u>The Agents</u>. Acthar is a "specialty pharmaceutical" and generally unavailable at most retail pharmacies. It is instead available primarily through specialty pharmacies, which focus on high-cost, high-complexity, and/or high-touch medication therapy for patients with complex disease states.

24.     Because of this, in June 2007, Mallinckrodt agreed with Express Scripts Holding Company ("Express Scripts"), a Missouri-based pharmacy benefit management company, to provide integrated services critical to the scheme and to do so through certain of Express Scripts' subsidiaries. Each of these subsidiaries had separate functions, but their coordinated purpose was to support and maintain Mallinckrodt's inflated Acthar prices, including by acting as Mallinckrodt's agent for purposes of pricing.

25.     Priority Healthcare Distribution Inc., doing business as CuraScript SD ("CuraScript"), a Florida-based specialty pharmacy distributor, served as Mallinckrodt's exclusive distributor for Acthar. CuraScript was engaged by Mallinckrodt to deliver Acthar to the network of specialty pharmacies (including

A-7167

Humana Pharmacy), who then deliver the medicine to patients' homes. CuraScript may have been aided in this function by CuraScript, Inc., doing business as CuraScript SP Specialty Pharmacy, which itself operates specialty pharmacies in the United States. Both CuraScript and CuraScript SP Specialty Pharmacy were subsidiaries of Express Scripts.

26.     United BioSource Corporation, formerly known as HealthBridge and now known as United BioSource LLC ("UBC"), a Pennsylvania-based company, provided pharmaceutical support services. During most of the relevant time period, UBC was also an Express Scripts subsidiary, though Express Scripts completed its sale of UBC to a private equity firm in 2018. UBC designed and operationalized patient access centers that assist patients and prescribers with navigating prescription drug coverage and pharmacy options through patient access programs, including patient assistance programs, reimbursement, alternate funding, and compliance services. UBC was engaged by Mallinckrodt to act as the administrator for the reimbursement of Acthar, interacting directly with patients and third-party payors by coordinating various patient-assistance programs, including the ASAP and PAP programs described further below.

27.     Accredo Health Group, Inc., doing business as Liberty Pennsylvania, Medco Health Solutions, Liberty Texas, Gentiva, or Gentiva Health Services ("Accredo"), is also an Express Scripts subsidiary. Accredo is a specialty pharmacy services company that assists patients in obtaining medications, including by advocating for insurance coverage of the drug.

28.     As applied to Acthar, UBC acted as the hub between these entities, designing and coordinating Acthar's sale, distribution, and reimbursement through its patient access programs. So, for example, when a doctor prescribes an initial or renewal course of Acthar to a patient, the prescription is sent to the "Acthar Hub" and a case manager is assigned to the patient through UBC or Accredo, which performs administrative services associated with obtaining insurance coverage of the drug from insurers such as Humana. Payment by the insurer or other payor is then made to

1  CuraScript, which ships the medication to specialty pharmacies or directly to the

2  patient. As set forth further below, CuraScript has no role in setting the price, which is

3  functionally set by Mallinckrodt alone. CuraScript merely acts as Mallinckrodt's agent,

4  collecting payment and shipping the medication.

5       29.   The Charity. Chronic Disease Fund, Inc. ("CDF") is a Texas-based

6  501(c)(3) organization that now goes by the name Good Days From CDF or simply

7  Good Days. Its putative mission is to provide co-pay assistance and other financial

8  support to patients who meet the charity's application criteria.

9       30.   The Prescribing Doctors. Mallinckrodt paid certain physicians (the

10 "Prescribing Doctors") substantial sums to promote Acthar over other treatments. The

11 Prescribing Doctors agreed with Mallinckrodt to promote and prescribe Acthar without

12 disclosing to Humana or other payors their remuneration from Mallinckrodt. Not all of

13 the Prescribing Doctors are known to Humana, and discovery is needed to identify them

14 fully.

15            **III.   JURISDICTION AND VENUE**

16      31.   This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331,

17 because this action arises under the laws of the United States, including the Sherman

18 Act, 15 U.S.C. § 1, *et seq.*, and 28 U.S.C. §1964(c), because this action alleges

19 violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

20 U.S.C. § 1962.

21      32.   This Court has personal jurisdiction over the Defendant pursuant to 15

22 U.S.C. § 22 because it transacts business in this district and may be found here.

23      33.   This court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over

24 violations of state law, including state common law claims.

25      34.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and

26 (c), and 18 U.S.C. § 1965.

27      35.   A substantial part of the events giving rise to this action occurred in this

28 judicial district. Questcor Pharmaceuticals Inc.—later renamed Mallinckrodt ARD

A-7169

Inc.—was until January 26, 2019 a California corporation. The successor to Mallinckrodt ARD Inc., Mallinckrodt ARD LLC is a limited liability corporation organized under the laws of California.  Prior to its 2014 acquisition by Mallinckrodt, Questcor was headquartered in Anaheim, California, in this judicial district. Several of the co-conspirator Prescribing Doctors are also located in the state of California, including one Prescribing Doctor whose offices are located in Los Angeles, California in this judicial district. Furthermore, Humana has more than 575,000 insureds in the state of California. Humana's operating subsidiary in California, Humana Health Plan of California, is located in Irvine, California in this judicial district.

## IV.  FACTUAL ALLEGATIONS

### A.  Humana

36.     Congress established Medicare in 1965 to provide health insurance coverage for people aged sixty-five or older and for people with certain disabilities or afflictions. In 2003, Congress established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D. Under Medicare Part D, Medicare contracts with private entities, known as Part D Plan Sponsors, to administer prescription drug plans.

37.     Under the Medicare statute, a Part D beneficiary may be required to make a partial payment for the cost of prescription drugs in the form of a co-payment, coinsurance, or deductible (collectively "co-pays"). The co-pays can be substantial for expensive medications and vary throughout the year, depending on a beneficiary's total Part D covered expenses incurred that year up to that point.

38.     Medicare co-pays exist to encourage physicians and beneficiaries to be efficient consumers of federally reimbursed health care products, while also encouraging those manufacturing such products to price them based on market forces such as consumer sensitivity and competition. Manufacturers paying the Medicare co-pays of those seeking to buy their drug circumvent this congressionally designed check on health care costs. As the United States Department of Health and Human Services,

A-7170

Office of the Inspector General has observed, drug manufacturers paying the Medicare Part D co-pays of patients taking their products "eliminat[e] a market safeguard against inflated prices." HHS-OIG, Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623, 70625 (Nov. 22, 2005).

39.    Humana operates or administers Medicare Part D plans on behalf of the federal and state governments for millions of members. Humana also provides coverage for pharmaceuticals, including Acthar, through other plans, including medical insurance (Medicare Part B), Medicare Advantage (Medicare Part C), Medicaid, and commercial healthcare plans. Through its administration of these plans, Humana bears significant risk that the costs and utilization of healthcare services will rise. When Humana assumes these risks it relies in large part on the protections afforded by law against submissions of false or fraudulent claims to government healthcare providers.

40.    Humana's agreements with its providers include a provision that requires the provider to certify its compliance with state and federal law, as well as rules promulgated by government entities such as the Centers for Medicare & Medicaid Services ("CMS"), a division of the Department of Health and Human Services that administers Medicare and Medicaid. These contractual provisions are essential for Humana to ensure that it receives prompt payments and reimbursements from CMS for valid claims, and to ensure that it does not pay invalid claims that might increase costs to both itself and Medicare.

**B.    Acthar**

41.    Acthar is an ACTH analogue used as an anti-inflammatory. Though its exact mechanism of operation is unclear, it is believed to stimulate the body's own steroidal hormones (such as cortisol and corticosterone), as well as to affect the body's steroid-independent immunomodulatory and anti-inflammatory pathways.

42.    Acthar's active ingredient is extracted from pig pituitary glands. It was invented in 1948 by the pharmaceutical division of the Armour meatpacking and processing company. The original form of ACTH has a half-life of only 10 minutes, so

A-7171

Acthar was developed for clinical use by creating a repository gel tailored to a patient's individual needs. The gel must be refrigerated and is applied through either an intramuscular or a subcutaneous depot injection (i.e., an injection that deposits the drug in a localized mass, which is gradually absorbed by the body over an extended period).

43.     Acthar's invention either was roughly contemporaneous with, or preceded, the development of certain corticosteroids, a class of steroids that can also be used to fight inflammation. Well-known examples of corticosteroids include hydrocortisone and prednisone. Acthar's invention also predated the discovery of ibuprofen and certain over-the-counter NSAIDs in pill form that are also used to combat inflammation.

44.     The U.S. Food and Drug Administration ("FDA") first approved Acthar for marketing in the United States in 1952. This was before drugs were required to demonstrate "substantial evidence" of the efficacy for a marketed indication. Its original label lacked evidence from controlled clinical trials.

45.     Acthar was approved to treat multiple sclerosis ("MS") in 1979. Today, it is approved for treatment of exacerbations of MS and also for indications of diseases and disorders that include rheumatic, collagen, dermatologic, and allergic states, as well as ophthalmic, respiratory, and edematous states. Specifically, these include idiopathic membranous nephropathy, the largest single cause of nephrotic syndrome, a kidney disorder; rheumatoid arthritis; dermatomyositis and polymyositis (inflammatory diseases of the skin and muscles); symptoms of sarcoidosis (a disease that mainly affects the lungs and lymph glands); and inflammatory conditions of the eye.

46.     However, there remains a lack of evidence to support the use of Acthar for most indications. The clinical evidence supporting the effectiveness of Acthar in treating some of these conditions consists of small (fewer than 25 participants) uncontrolled trials and case reports. For many of these conditions, Acthar is not considered the first-line treatment.

47.     Acthar was owned first by Armour Pharmaceutical Company, then by Rhone-Poulenc Rorer, and until 2001 by Aventis (now Sanofi). To that point, the drug

A-7172

was priced relatively more competitively with other anti-inflammatories.[2] But since it was expensive to produce, difficult to apply, and (except for certain indications such as infantile spasms) not known to be more effective than simpler, cheaper, and more widely available drugs, Aventis considered discontinuing production. Questcor acquired worldwide rights to sell and manufacture Acthar from Aventis in July 2001. In view of what would come, the price was a pittance: $100,000, plus modest royalties.

**C.     Medical Use of Acthar and Other Adrenal Hormone Drugs**

48.     Corticotropin, the active ingredient in Acthar, is classified by United States Pharmacopeia (USP) in its Drug Classification system under "Hormonal Agents, Stimulant/ Replacement/ Modifying (Adrenal)."  Among the other drugs in this category are prednisone, hydrocortisone, dexamethasone, and other corticosteroids. Each of these drugs affects the levels of the hormone cortisol in the body.  This broad class of drugs is the one from which medical providers may choose a drug with the same basic biological mechanism of action.

49.     For example, with the sole exception of infantile spasms,[3] prednisone is approved by the FDA to treat all of the same diseases and disorders as Acthar. Therefore it is not surprising that when Acthar is compared with other drugs by the medical research community, those comparisons are almost universally made to

---

[2] Even then, Acthar was still more than quadruple the cost of corticosteroids, making it far less than a perfect economic substitute. When purchased from Aventis, a two-to-three vial course of Acthar treatment cost approximately $80 to $120, whereas a course of treatment with corticosteroids typically costs $20 or less.

[3] Only one other drug, Sabril (vigabatrin), has FDA approval for treatment of infantile spasms. Sabril is not a steroid, but is instead in a class of anticonvulsant drugs that are used to treat epilepsy. Sabril works by inhibiting the breakdown of a particular neural transmitter. Sabril may be used in combination with long-acting ACTH drugs, or it may be suitable where long-acting ACTH drugs have been ineffective at controlling infantile spasms or were not well tolerated by the patient. Although long-acting ACTH drugs and Sabril may both be used to treat infantile spasms, they are not medical substitutes for one another because of their different biological mechanisms of action.

A-7173

corticosteroids.  Indeed, Mallinckrodt itself prominently references a comparative study between Acthar and prednisone for the treatment of infantile spasms on its website. Additionally, Acthar has been compared to intravenous methylprednisolone for treatment of MS relapses and to prednisone for treatment of sarcoidosis.

50.     For most of Acthar's indications, there is a lack of medical evidence to support its use over prednisone or any other corticosteroid medication.  Acthar has similar pharmacodynamic effects as corticosteroids, but it must be administered through an injection, as opposed to a pill, and it must be refrigerated.  Although this difference alone would be enough to make Acthar an undesirable substitute for corticosteroids, its astronomical cost is also a major factor in the medical community's preference for corticosteroids over Acthar. Prednisone, which is available as a generic medication made by many manufacturers, can cost as little as $0.20 per pill (less than $20 for a typical course of treatment) as compared to the $39,000 per-vial cost of Acthar (or $117,000 for a three-vial treatment).  Due to the lack of medical data supporting the use of Acthar over more convenient and cheaper corticosteroids, a question remains why Acthar or other long-acting ACTH drugs are prescribed at all.  Part of the answer to that question is certainly the illegal co-payment and bribery schemes described below, but that does not appear to be the full story.  Acthar also appears to be viewed by certain providers or patients as distinct from corticosteroids.

51.     Despite its classification within a broad group of "Hormonal Agents" acting on the adrenal system by USP, Acthar is considered to be distinct from the corticosteroid drugs within the classification for several reasons.  First, Acthar's mechanism of action is slightly different from that of corticosteroids.  As Mallinckrodt describes in its marketing literature for Acthar: "Acthar is not a steroid. But one of the ways it is thought to work is by helping your body produce its own natural steroid hormones." Second, studies funded by Mallinckrodt have been published that claim to show clinical evidence supporting the superiority of Acthar compared with corticosteroid drugs. Mallinckrodt has aggressively marketed these studies and their

14

conclusions to physicians.  Third, Acthar is supposed to be a last-line treatment alternative that may be tried after corticosteroids have failed in the hope that Acthar, through its slightly different mechanism of action, may be effective where similar drugs have not been. In language on Acthar's label required by the FDA, it was noted that "corticosteroid therapy is considered to be the treatment of choice" relative to Acthar, unless the condition is unresponsive to corticosteroid therapy.  Mallinckrodt further explains to its investors that Acthar "may not be prescribed unless a clear benefit in efficacy or safety is demonstrated or until alternatives have failed to provide positive patient outcomes or are not well tolerated by the patient."[4]  Humana, similar to many other insurers, likewise limits approved use of Acthar (other than for infantile spasms) under its policies to patients who have "contraindications or intolerance to corticosteroids that are not expected to also occur with" Acthar.

52.    These distinctions are further evidenced by Acthar's assignment to a different Standard Therapeutic Class than corticosteroids in the widely-used First Data Bank (FDB) drug database.[5]  Corticosteroids like prednisone are in FDB's "Glucocorticoids" Standard Therapeutic Class.   In contrast, FDB classifies Acthar in the "Adrenocorticotrophic Hormones" Standard Therapeutic Class.  The only other drugs in the "Adrenocorticotrophic Hormones" Standard Therapeutic Class are Synacthen and several short-acting (non-depot) formulations of natural and synthetic ACTH which are approved by the FDA only for use in the testing of adrenal function.[6]

---

[4] The only exception is that Acthar may be considered the most effective, "first-line" treatment for infantile spasms.

[5] Humana utilizes information from both FDB and USP to classify drugs according to their therapeutic class in the normal course of its business.

[6] These short-acting ACTH drugs (Acthrel and Cortrosyn) are not appropriate medical substitutes for Acthar because there is no overlap in the medical conditions that the drugs are approved to treat or diagnose. Acthar is not indicated to diagnose adrenal insufficiency and the short-acting ACTH drugs are indicated only for use in that diagnosis. Moreover, the short-acting nature of these drugs makes them impractical for

A-7175

### D.    Mallinckrodt's Monopoly Power with Acthar

#### 1.    Direct Evidence of Monopoly Power

53.    Mallinckrodt has exercised monopoly power in the United States with Acthar. Ever since its acquisition of marketing rights in 2001, Mallinckrodt has charged supracompetitive prices for the drug.

54.    Immediately after acquiring the rights to sell Acthar, Mallinckrodt's predecessor company Questcor increased the price from approximately $40 per vial to nearly $750 per vial.

55.    By the end of 2006, Acthar accounted for 94 percent of Questcor's net sales. On August 27, 2007, Questcor increased the price of Acthar by more than 1,300% overnight, from $1,650 to $23,269 per vial. The decision to charge tens of thousands for a vial of Acthar was spearheaded by Questcor's chief executive, Don Bailey, who spent most of his career as an executive with a defense contractor, not in the pharmaceutical industry.

56.    Questor has since raised the price of Acthar on multiple occasions since 2011 to $38,892 in 2018.

57.    Acthar net sales increased from $218 million in 2011 to more than $1 billion in 2015.

58.    Medicare spending on Acthar increased geometrically from 2011 to 2015, with total spending of nearly $2 billion and more than $600 million in 2016 alone. The following chart reveals how the number of Medicare Part D claims for Acthar has grown by more than 700% from 2011 to 2016:

---

treatment of the chronic or persistent conditions that long-acting ACTH drugs are designed to treat. Short-acting ACTH drugs would need to be given intravenously or at frequent intervals in order to have the same effect. Therefore only long-acting ACTH drug formulations can be considered medically appropriate substitutes for Acthar.

A-7176

| Year | Claim Count | Total Spending |
|---|---|---|
| 2011 | 1,471 | $49,456,911 |
| 2012 | 3,387 | $141,451,608 |
| 2013 | 6,752 | $262,581,602 |
| 2014 | 9,611 | $391,189,653 |
| 2015 | 11,209 | $503,999,371 |
| 2016 | 12,867 | $636,174,840 |
| Total: | 45,297 | $1,984,853,985 |

### 2.  Further Evidence of Monopoly Power

59.     Several factors constitute further evidence of Mallinckrodt's monopoly power.

60.     Lack of Competition. Mallinckrodt does not set the price of Acthar by reference to other adrenal hormone drugs prescribed to treat the same indications that Acthar treats. Acthar is priced substantially higher than corticosteroid drugs used to treat the same indications. This suggests that there is no competitive constraint on Mallinckrodt's ability to set prices. Indeed, Acthar represents 100% of the sub-market for long-acting ACTH drugs available in the United States.

61.     Although Acthar may face limited competition at the margin from other drugs in the broader adrenal hormone class, in practice it competes almost entirely in a separate market (or submarket) for long-acting ACTH drugs.  In the United States, Acthar is the only long-acting ACTH drug approved by the FDA. Mallinckrodt acknowledges this in its own financial filings, stating that "Acthar Gel has limited direct competition due to the unique nature of the product." Acthar may have some medical similarity to other drugs in the adrenal hormone class, but economically it is in a distinct market.

62.     This lack of competition is further evidenced by Acthar's low rates of substitution for other adrenal hormone drugs.  Humana's data on prescriptions of Acthar show that from 2011 to 2019, the price of Acthar increased 59% while the price of Glucocorticoid drugs *decreased* by 5%. During the same period, the quantity of

A-7177

Acthar reimbursed by Humana increased 273%, while the quantity of Glucocorticoid drugs reimbursed *decreased* by 22%. This shows that while Glucocorticoid drugs got cheaper relative to Acthar, the amount of Acthar prescribed increased. If Acthar were viewed as an economic substitute for Glucocorticoid drugs, users of Acthar would have switched as Glucocorticoids became relatively cheaper. In practice, it appears that there was little or no substitution from Acthar to Glucocorticoid drugs as a result of Acthar's rising prices. Glucocorticoid drugs are Acthar's closest medical substitute but Acthar's use grew completely independently of their pricing, indicating that Glucocorticoids operate as part of a separate economic market.

63. This measure of substitution is expressed in economic terms as the cross-price elasticity of demand. In order for products to be considered close economic substitutes, they should have a cross-price elasticity above the value 2.0 (positive). Values close to zero or negative indicate little or no economic substitution. The cross-price elasticity demand for Acthar versus the Standard Therapeutic Class of Glucocorticoids is *negative* 0.1, showing a very low degree of substitution between Acthar and Glucocorticoid drugs.

64. Acthar also has a low cross-price elasticity of demand with the short-acting ACTH diagnostic agents included in its Standard Therapeutic Class. Humana's data show that the cross-price elasticity between Acthar and these drugs is *negative* 1.0. These short-acting drugs are also rarely used. Acthar represented more than 99% of all drugs purchased for Humana members within the Standard Therapeutic Class of Adrenocorticotrophic Hormones from 2011 to 2019.

65. One of the main reasons for the absence of competition with Acthar is the unavailability of Synacthen, a close medical and economic substitute. Mallinckrodt's conduct with respect to Synacthen is addressed further below.

66. <u>Enhanced Profitability</u>. Acthar's post-2011 price increases were effective, however, at increasing Mallinckrodt's profits because they did not result in much, if any, loss of volume to drugs that are potential medical substitutes such as

A-7178

Glucocorticoids.  Mallinckrodt's revenues on Acthar grew from $218 million in 2011 to $953 million in 2019.  Mallinckrodt's profits on Acthar likewise increased by hundreds of millions of dollars per year during the period from 2011 to 2019.  Mallinckrodt therefore exercised its monopoly power by profitably pushing through significant and durable price increases on Acthar after 2011.

67.     Mallinckrodt restricted output of Acthar in order to achieve this pricing. Had Acthar been offered at a lower price, similar to the price Synacthen is sold at in other countries or similar to the price Acthar used to be sold at by Aventis, demand for the product would increase because more people who want long-acting ACTH drugs would be able (or willing) to afford them.  Instead, Mallinckrodt has upped the price of Acthar each year such that its price increased by nearly 60% since 2011, suppressing demand and output of Acthar relative to what it would have been if Synacthen or Acthar were widely available at competitive prices.

68.     High Barriers to Entry. Despite the lack of patent protection for Acthar, the U.S. ACTH market is still characterized by high barriers to entry. This includes FDA approval, which is required to market drugs to U.S. consumers. Drugs sold outside of the U.S. are therefore not viable substitutes.

69.     Furthermore, developing a safe, effective, and reliable substitute would require substantial investments of resources and time, with no guarantee of success. One would have to source the active ingredient, develop a sustained-release depot-injection formulation, scale production, and conduct clinical trials, particularly because Acthar is derived from a biological and not a chemical process. Mallinckrodt's CEO has assured investors that Acthar "has significant durability in the marketplace" because "it will be very difficult for this product to be replicated in any way [by] a generic."

### 3.     Anticompetitive Conduct in the Acquisition of Synacthen

70.     Synacthen is a synthetic ACTH drug with similar biological activities and pharmacological effects as Acthar. In Europe, Canada, and other parts of the world, doctors treat patients with Synacthen for the same conditions that are treated with

A-7179

Acthar in the U.S. Acthar is not marketed outside of the United States. On information and belief, the reason Acthar is not marketed internationally is because it is not cost competitive with Synacthen.

71.     Questcor itself considered the drugs so similar that it submitted Synacthen information to support its application to the FDA to expand the label indications for Acthar. It also cited Synacthen studies in its Acthar marketing materials.

72.     Before June 2013, Novartis marketed and sold Synacthen abroad. For years, Questcor viewed Synacthen as a significant potential competitive threat to its monopoly. Questcor therefore sought to acquire the rights to Synacthen as a defensive move to prevent competitors from acquiring it and developing it as a competitor to Acthar.

73.     In late 2011, Novartis decided to divest exclusive rights to seek FDA approval for Synacthen and commercialize it in the United States. Dozens of companies contacted Novartis and expressed interest in acquiring Synacthen. Three firms proceeded through several rounds of negotiations with Novartis, submitted formal offers, and drafted near-final agreements.

74.     Each of the three firms planned to develop and use Synacthen to compete directly with Acthar, and to price Synacthen well below Acthar. The three firms had the necessary expertise and financing, as well as sufficient business and regulatory plans, to develop Synacthen for the U.S. market. The identity of the firms that were denied the development rights to Synacthen on account of Mallinckrodt's anticompetitive conduct were not publicly disclosed by Novartis.

75.     The Synacthen asset package sold by Novartis included valuable trade secrets, including technical documentation detailing both the precise formulation for the Synacthen drug product and the manufacturing process. Because Synacthen had a long history of safe and effective use abroad, a buyer would not need to begin the research,

A-7180

development, testing, or manufacturing process from scratch. The asset package would therefore substantially lower the barriers to entry in the U.S. ACTH market.[7]

76.     The bidding process occurred in late 2012 and early 2013. Questcor signed a confidentiality agreement with Novartis and submitted an offer for Synacthen. Novartis negotiated with the three alternative bidders in parallel with Questcor, and each company had exchanged deal terms with Novartis and had submitted a formal offer. The offers by the three alternative bidders were comparable to each other in value and structured similarly, and included an upfront payment, milestone payments upon FDA approval, and significant royalties on U.S. Synacthen sales. Unlike the three alternative bidders, however, Questcor had only inchoate plans for Synacthen and conducted limited due diligence when it submitted its initial offer to Novartis. It nevertheless submitted a bid several multiples higher than the other bidders.

77.     On June 11, 2013, Questcor and Novartis entered into a Licensing Agreement, Asset Purchase Agreement, and Supply Agreement (collectively, "the Agreements"), that gave Questcor exclusive rights to develop, market, and sell Synacthen in the United States. Under the Agreements, Questcor is obligated to pay a minimum of $135 million to Novartis for Synacthen.

78.     On information and belief, Novartis knew and understood that Questcor did not intend to develop Synacthen. This may be inferred from the fact that Questcor's bid for Synacthen was substantially higher than that of its competitors, even though Questcor had done far less, and was in a worse position, to bring Synacthen to market. In addition, Novartis was not naïve, and could be expected to understand that Questcor would have little interest in developing the only synthetic competitor to Acthar, its extraordinarily lucrative non-synthetic product.

---

[7] It is also important to note that a short-acting version of Synacthen, sold under the brand name Cortrosyn, has been approved by the FDA for sale in the United States since 2009. This fact makes it far more likely that the FDA would approve a long-acting version of the same drug.

A-7181

79.     Questcor claimed that it acquired Synacthen to develop it for new, non-Acthar indications, but given the drugs' similarities, any therapeutic indication that Questcor might have pursued with Synacthen could have been pursued with Acthar.

80.     Fourteen months after acquiring Synacthen, Mallinckrodt acquired Questcor for $5.6 billion, an amount almost entirely attributable to the value of Acthar.

81.     Neither Questcor nor Mallinckrodt made more than superficial efforts to pursue commercialization of Synacthen, however. Instead Mallinckrodt chose to shelve the asset and thereby to protect Acthar monopoly pricing.

82.     This conduct led the U.S. Federal Trade Commission ("FTC"), joined by the states of Alaska, Maryland, New York, Texas, and Washington, to bring an action against Mallinckrodt under the FTC Act, Section 2 of the Sherman Act, and state antitrust laws. On January 18, 2017, the FTC announced that Mallinckrodt had agreed to pay $100 million to settle the suit. The parties also filed and the court approved a stipulated court order requiring Questcor to grant a license to develop Synacthen to treat infantile spasms and nephrotic syndrome to a licensee approved by the FTC. On July 14, 2017, the FTC announced that it had approved a sublicense granting West Therapeutic Development, LLC certain rights to develop and market Synacthen in the United States.

### 4.     Mallinckrodt's Sales of Acthar to Humana and its Members

83.     Mallinckrodt has complete control over the price of Acthar and has on many occasions increased its price without negotiating with any of the purchasers or consumers of Acthar. Mallinckrodt is the sole entity with control over the wholesale acquisition cost (WAC) of Acthar that determines the price at which Acthar is sold throughout the pharmaceutical distribution chain. No other company has any influence over the price of Acthar in the marketplace.

84.     Humana is obligated to and does pay the price of Acthar that Mallinckrodt sets. Mallinckrodt has purposefully sought to insulate itself from liability for the pricing of Acthar by engaging its co-conspirator Express Scripts as an intermediary in the sale

SECOND AMENDED COMPLAINT

A-7182

of Acthar to all other purchasers. Express Scripts' CuraScript SD unit serves as the exclusive distributor of Acthar. But CuraScript SD has no independent authority to set the price of Acthar and bears no risk from Acthar sales. CuraScript bears no pricing risk for Acthar because it is guaranteed an adjustment in its acquisition costs if Mallinckrodt changes the price of Acthar. Furthermore, CuraScript is paid a fixed fee for each vial of Acthar that is sold by Mallinckrodt (CuraScript SD does no marketing or selling of Acthar) so it does not incur any benefit or cost based on the price of Acthar. In 2009 that fixed fee was set at $230 per vial. CuraScript bears no risk of holding Acthar in inventory because Mallinckrodt has agreed to accept returns of any Acthar which goes unsold before its expiration date. With respect to sales of Acthar, CuraScript is completely controlled by Mallinckrodt and acts merely as its agent.

85.    In addition to dictating its actions through contractual terms, Mallinckrodt confirmed that CuraScript SD was subject to its control by telling the SEC that if CuraScript SD were to fail to perform in the way that it wished, it could quickly and easily switch to a distributor who would provide "equivalent services." CuraScript SD had no choice but to comply with Mallinckrodt's directives because it was at risk of being terminated and replaced with a distributor that would. Furthermore, CuraScript SD's parent, Express Scripts, had many other lucrative consulting, administrative services, and specialty pharmacy sales arrangements with Mallinckrodt that would also be at risk if CuraScript SD did not perform at Mallinckrodt's command. CuraScript SD and its parent Express Scripts were not only complicit in, but actively took part in Mallinckrodt's scheme to further its monopoly in the ACTH drug market. As a co-conspirator and beneficiary of Mallinckrodt's scheme, there was no realistic possibility that CuraScript SD or its parent Express Scripts would ever bring suit against Mallinckrodt based on its anticompetitive actions.

86.    Humana paid for almost $800 million worth of Acthar during the relevant period. Humana's Acthar purchases were made according to the wholesale cost that Mallinckrodt set and controlled. Humana purchased Acthar from Mallinckrodt's agent

A-7183

1  CuraScript SD and also from other specialty pharmacies that fulfilled prescriptions for

2  its members.

3      87.    In 2015, Humana's commercial insurance division directly contracted with

4  Mallinckrodt for rebates based on its Acthar purchases made for members of Humana's

5  commercial insurance plans. In January 2017, Humana's Medicare business entered

6  into a second rebate agreement with Mallinckrodt covering purchases made for

7  members on Humana's Medicare plans. The claims and causes of action asserted in this

8  complaint do not arise out of or relate to those agreements, and Humana is not asserting

9  any claims or seeking any damages for breach of either of these agreements.

10          **5.**    **Scope of the Antitrust Allegations**

11      88.  <u>Product Market</u>. The relevant product market is long-acting ACTH drugs,

12  consisting of Acthar and Synacthen.  During the relevant time period, Acthar was the

13  only long-acting ACTH drug approved by the FDA for sale in the United States.

14      89.    Alternatively, long-acting ACTH drugs are a valid submarket within a

15  broader market for adrenal hormone drugs.

16      a.  Public Recognition – Long-acting ACTH drugs are recognized by

17          Mallinckrodt, medical providers, and the public as differentiated from

18          other adrenal hormone drugs.

19          i.  Acthar is publicly touted by Mallinckrodt as being "unique" and

20            facing limited competition from other drugs, including

21            corticosteroids.  Additionally, medical providers and the public

22            generally view Acthar as distinct from other adrenal hormone drugs

23            such as corticosteroids. One basis for such a view may be that

24            certain medical researchers, mostly funded by Mallinckrodt, have

25            published studies that recognize long-acting ACTH drugs as

26            medically distinct from corticosteroids.

27          ii.  The FTC recognized "ACTH drugs" as a relevant antitrust market

28            when evaluating Mallinckrodt's acquisition of Synacthen.  The FTC

alleged in its complaint against Mallinckrodt related to that acquisition that Acthar had "a 100% share of the market for ACTH drugs in the United States" because "[n]o other ACTH drug is FDA-approved for therapeutic use."

iii. Mallinckrodt's predecessor identified Synacthen as a potential competitive threat in its SEC filings before it licensed the rights to sell that drug in the United States. Mallinckrodt has relied upon studies using Synacthen to support its requests for certain label indications to the FDA.

iv. The size of the long-acting ACTH drug market is significant relative to total spending on adrenal hormone drugs.  From 2011 through the end of 2019, Humana and its members spent more than $800 million on Acthar.  During that same period, Humana and its members spent less than $500 million on Glucocorticoid drugs and less than $35,000 on short-acting adrenocorticotrophic hormones.

b. Product characteristics and uses – Long-acting ACTH drugs' composition and method of action are distinct from other adrenal hormone drugs.

i. Long-acting ACTH drugs' biological mechanism of action is distinct from other drugs in that they stimulate the adrenal gland to produce cortisol.  Glucocorticoid drugs are synthetic forms of cortisol that do not work through the adrenal gland.

ii. Long-acting ACTH drugs are believed by some medical providers to be differentiated from other adrenal hormone drugs because of this distinction in its biological method of action. Certain medical research, sponsored by Mallinckrodt, also claim that Acthar achieves superior results to corticosteroids and/or support differing effects of Acthar on the body relative to corticosteroids.

A-7185

c. Unique production facilities – Long-acting ACTH drugs are made in different facilities and using different processes than other adrenal hormone drugs.

i. Acthar is produced at only one facility in Prince Edward Island, Canada.  Acthar is produced using a complex, biologic process that is difficult to replicate.

ii. Glucocorticoid drugs are synthesized by manufacturers of chemicals for pharmaceuticals in a variety of facilities throughout the world. These facilities are not equipped to produce Acthar, nor could they be easily modified in order to do so.

d. Distinct Customers – Long-acting ACTH drug customers are distinct from customers for other adrenal hormones.

i. Users of Acthar are distinct from users of other adrenal hormone drugs because those drugs have either failed to treat their conditions, or those drugs are contraindicated for that patient.  Therefore corticosteroid drugs are not a viable option for that patient.

ii. In some instances, Acthar is inappropriately prescribed as a result of bribes paid to doctors (as described further below) for patients for whom corticosteroids are an appropriate medical and economic substitute.  Absent the illegal bribe, Acthar would not be prescribed for these patients, therefore any substitution between corticosteroids and Acthar for this subset of patients was induced and would not have occurred in a market absent this conduct.

iii. The FDA has instructed that Acthar be labeled as "having limited therapeutic value in those conditions responsive to corticosteroid therapy." Humana limits approved use of Acthar (other than for infantile spasms) under its policies to patients who have "contraindications or intolerance to corticosteroids that are not

A-7186

1    expected to also occur with" Acthar. Other insurers impose very

2    similar restrictions on Acthar's use.  Mallinckrodt acknowledges

3    that Acthar "may not be prescribed unless a clear benefit in efficacy

4    or safety is demonstrated or until alternatives have failed to provide

5    positive patient outcomes or are not well tolerated by the patient."

6        iv.  Synacthen is not offered for sale in the United States because of

7    Mallinckrodt's anticompetitive conduct

8    e.  Distinct Prices – Prices for long-acting ACTH drugs are distinct from

9    prices for other adrenal hormone drugs.

10       i.  Acthar's price is distinct from that of other adrenal hormone drugs.

11   Prices of drugs to payors, such as Humana, are the full cost of the

12   drug, less any portion of the cost for which the member is

13   responsible.  Acthar's price to Humana in 2019 averaged more than

14   $65,000 per prescription, more than 650,000% of the average

15   prescription price for a glucocorticoid drug ($9.79).

16       ii.  Acthar's price to patients in the form of co-insurance or co-

17   payments is substantially higher than the price for other adrenal

18   hormone drugs.  For Medicare members, Humana's co-insurance

19   amounts averaged approximately $1,500 per Acthar prescription in

20   2019.  Comparatively, the average Humana Medicare member co-

21   payment or co-insurance for a glucocorticoid prescription averaged

22   approximately $3.93. Thus, Acthar's "price" in the form of co-

23   insurance to Humana's Medicare members in 2019 averaged

24   35,000% higher than the price for glucocorticoid drugs.

25       iii.  Even if a Humana member's co-payment were subsidized by a co-

26   payment charity (as described further below), the amount that

27   member was responsible for (their price) remained unchanged.

28

Assumption of payment by co-payment charities did not alter the price of the drug in the market.

    iv.  Synacthen is not offered for sale in the United States because of Mallinckrodt's anticompetitive conduct.

f.  Sensitivity to price changes - Prices and quantities of long-acting ACTH drugs are not sensitive to changes in prices of other adrenal hormone drugs.

    i.  The price of Acthar has increased repeatedly and substantially while the price of other Glucocorticoid drugs has decreased.

    ii.  The cross-price elasticity between Acthar and Glucocorticoid drugs is extremely small. The cross-price elasticity between Acthar and short-acting adrenocorticotrophic hormones is extremely small.

    iii.  The cross-price elasticity between Synacthen and Acthar is believed to be highly significant (above 2.0).

    iv.  Synacthen is not offered for sale in the United States because of Mallinckrodt's anticompetitive conduct

g.  Distinct vendors - Long-acting ACTH drugs are sold by vendors that are distinct from those that sell other adrenal hormone drugs.

    i.  Acthar is distributed only through a limited network of specialty pharmacies (e.g. Accredo, BriovaRx, Senderra), while other adrenal hormone drugs are widely available through tens of thousands of retail and other mainstream pharmacies throughout the country (e.g. CVS, Rite Aid, Walgreens).  Acthar requires special handling that retail pharmacies are not well equipped to provide.

    ii.  Synacthen is not offered for sale in the United States because of Mallinckrodt's anticompetitive conduct.

90.   <u>Geographic Market</u>. The relevant market is the entire United States.

A-7188

91.  <u>Time</u>. The relevant period is from 2011 through the present. Humana specifically alleges that the conduct and patterns of conduct alleged here occurred and continued to occur throughout this period.

**E.    Mallinckrodt's Kickback and Racketeering Schemes**

92.  Mallinckrodt designed and coordinated a multifaceted scheme (the "Acthar Enterprise") intended to charge and maintain inflated prices for Acthar, including through a conspiracy to defraud payors such as Humana. Built on Mallinckrodt's monopolistic practices, the scheme consisted of two subsidiary schemes: (1) illicit patient co-pay subsidies through sham charitable funds; and (2) kickbacks to the Prescribing Doctors.

**1.  Patient Co-Pay Subsidies Through Sham Charitable Funds**

93.  Not long after raising Acthar's price to over $23,000 per vial in 2007, Questcor knew that it might have priced itself out of the MS market. Questcor also understood that, for some insurance plans, the over-$23,000 price could lead to very high patient costs. Medicare Part D beneficiaries, in particular, could owe thousands of dollars in co-pays for one vial of Acthar.

94.  Questcor realized that it could overcome doctor and patient cost concerns by subsidizing patient co-pay obligations, and thereby defrauding Medicare Part D payors like Humana. Questcor knew that it was illegal to subsidize Medicare co-pays directly, so it sought to accomplish the same result through a "co-pay assistance fund" that it designed, created, and used as a money conduit to pay patient co-pay subsidies for Acthar (but no other drug).

95.  The operation was spearheaded by the executives of Questcor and aided by the BioSolutia Consultant, who was retained full-time specifically for the purpose of assisting with Acthar reimbursement.

96.  By the spring of 2010, Questcor had tried one foundation ("NORD") but was dissatisfied with what it considered to be the small scale of the operation, and looked instead for a foundation where it could fund co-pays on a much larger scale.

A-7189

This effort resulted in Questcor connecting with CDF to discuss starting a new fund for Questcor.

97.     Though CDF already had a fund for MS patients, Questcor sought to establish an "MS Exacerbation Co-pay Fund" distinct from CDF's existing fund because Questcor did not want to make payments to a fund that might pay the co-pays of MS drugs other than Acthar.

98.     After a presentation by CDF, Questcor moved its co-pay programs from NORD to CDF. Questcor and CDF established a new "MS Acute Exacerbation Fund" just for patients with government insurance, such as Medicare Part D, and just for the co-pays of Acthar but no other drugs. For patients with private insurance, Questcor had CDF open a separate Acthar "Private Fund" for Mallinckrodt to send private insurance patients to CDF to have Acthar co-pays paid. That fund also exclusively covered Acthar and Questcor financed that fund. Questcor's donation agreement falsely represented that the funds were generally for treatment of patients with acute exacerbations of MS, when in fact Questcor knew it was just for patients using Acthar. Questcor thereafter made co-pay assistance an important part of its sales and marketing program.

99.     Questcor sent patients to CDF through Questcor's "reimbursement hub" for Acthar, called the Acthar Support and Access Program ("ASAP"), which was administered by UBC under Mallinckrodt's direction and control. Questcor and UBC controlled ASAP, which included a call center that received referrals for Acthar from physician offices and patients. Questcor's sales force took steps to ensure that any Acthar prescriptions were routed through ASAP so that Questcor could track them. Patients sometimes had their co-pays paid for months or years through the fund.

100.   In 2011, Questcor repeated this scheme in connection with a "Lupus Exacerbation" fund. Questcor financed the fund. It falsely stated that the fund was for "any medically appropriate therapy," when in fact Questcor intended to fund only Acthar and exclude other therapies. Questcor and UBC referred patients to the fund through ASAP and tracked the patients thereafter. And through 2014, the Lupus

A-7190

1    Exacerbation fund paid the co-pays of Acthar but no other drug, again often for months

2    or years.

3         101.   In 2012, Questcor repeated the scheme yet again for rheumatoid arthritis

4    patients. It created an "RA Exacerbation Fund" at CDF, financed the fund, sent patients

5    to the fund through ASAP with UBC's assistance, tracked the patients, and paid

6    subsidies for sometimes months' or years' worth of refills of Acthar but no other drug.

7         102.   That same year, Questcor became concerned that it would lose referrals to

8    the fund for lack of co-pay assistance. Questcor therefore implemented an "automatic

9    offering" of co-pay assistance to all patients with co-pays greater than $150,

10   administered by UBC through the reimbursement hub. The ASAP program referred

11   over 98 percent of the patients who received co-pay subsidies from the MS, Lupus, or

12   RA Exacerbation funds at CDF.

13        103.   During the same period that Questcor sent Acthar patients to CDF to

14   receive Medicare co-pay subsidies, Questcor also retained NORD to operate a "Patient

15   Assistance Program" ("PAP") that offered free Acthar to patients who met certain

16   financial criteria and could not afford the drug's high price. ASAP also sent certain

17   patients to NORD for that purpose. As with ASAP, the PAP program was administered

18   by UBC under Mallinckrodt's direction and control. But Questcor intentionally did not

19   send Acthar patients with Medicare or other insurance coverage for the drug to the

20   NORD PAP. Instead, Questcor sent those patients to CDF, where they received co-pay

21   subsidies to cover their costs and triggered insurance reimbursement for Acthar.

22   Questcor also required patients to appeal insurance coverage denials of Acthar before

23   referring them to the PAP. In other words, whenever possible, Mallinckrodt sought to

24   cause Medicare claims to be submitted for Acthar so that Mallinckrodt could get paid

25   from a sale of the drug as opposed to giving it away for free through the NORD PAP.

26        104.   Questcor marketed guaranteed co-pay assistance to physicians and patients

27   as a way to neutralize concerns about the price and to induce sales and Medicare

28   reimbursement. This began immediately after establishing the MS Acute Exacerbation

A-7191

1    Fund at CDF and continued throughout the relevant time period. For example, company

2    training materials instructed the sales force: "DO NOT APOLOGIZE FOR THE

3    PRICE." The training instead directed sales representatives to "[r]eview [the] co-pay

4    coverage program" with prescribers who expressed concern about the drug's price.

5         105.   Furthermore, after Questcor conducted research and discovered that price

6    was an obstacle to more prescriptions, Questcor's internal remediation plan noted the

7    importance of co-pay support.

8         106.   Questcor's sales force continued to promote guaranteed Acthar co-pay

9    subsidies through CDF in this manner, with the intent to induce Medicare Part D

10   claims.

11        107.   Questcor monitored its co-pay support programs by receiving detailed

12   financial reports from CDF containing information about how many patients were

13   enrolled in the fund, how much the fund had already paid out, and how much had been

14   allocated to enrolled patients. The reports also stated the percentage of patients

15   approved to receive co-pay subsidies, the average co-pay amount paid by the fund, the

16   total number of resulting drug "dispenses" (broken out by new dispenses vs. refills),

17   and the remaining fund balance. Because these funds paid Acthar co-pays only, all of

18   these reported metrics were specific to Acthar. This gave Questcor the ability to

19   monitor its fund balances and confirm the amount of future payments to CDF necessary

20   to keep paying Acthar co-pay subsidies smoothly.

21        108.   The funds worked as planned. After Questcor established the co-pay

22   conduit at CDF, Questcor achieved significant growth in Acthar MS sales and corporate

23   revenue. For example, Acthar MS sales nearly quadrupled between the third quarter of

24   2010 (when Questcor established the MS "acute exacerbation" fund) and the third

25   quarter of 2013.

26        109.   Questcor also intensified its dramatic price increases. On January 3, 2011

27   Questcor raised Acthar's price to over $24,430 per vial. Under six months later, it

28   raised the price again to over $25,600 per vial. In December 2011, it raised the price to

A-7192

over $27,300 per vial. In May 2012, it raised the price to over $28,680 per vial. In June 2013, it raised the price to over $30,100 per vial. In January 2014, it raised the price to over $31,600 per vial. In December 2014 it raised the price to over $32,200 per vial.

110.   The Company knowingly and willfully violated the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), by paying illegal Acthar co-pay subsidies as described above to induce prescriptions and sales of Acthar reimbursed by Medicare, and knowingly and willfully violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, and its prohibition on submitting, or causing to be submitted, false claims to federal health care programs, including Medicare. The Company's knowledge and willfulness is evidenced by internal training materials that instructed its employees on these laws and their relevant prohibitions; corporate policies reflecting the Company's knowledge of its illegality; trade publications and articles circulated among the key executives and consultants warning against the practice; and longstanding and repeated warnings about the practice from the Office of the Inspector General of the United States Department of Health and Human Services.

111.   On information and belief, Mallinckrodt continued to pay or substantially subsidize required patient co-payments for Acthar after 2014 and continues to do so until today.[8]

### 2.   Physician Kickbacks

112.   The second part of the Acthar Enterprise consisted of kickbacks to the Prescribing Doctors in exchange for increased prescriptions of Acthar.

113.   Mallinckrodt's co-pay subsidies were one way to prop up demand and receive payment from third-party payors such as Humana. Another was Mallinckrodt's aggressive push to move away from prescriptions for infantile spasms and towards conditions affecting elderly patients, and therefore to increase reimbursement by

---

[8] Mallinckrodt, "Acthar Reimbursement and Copayment Support," https://www.actharishcp.com/reimbursement-and-copay (last visited August 4, 2019).

A-7193

Medicare and third-party payors like Humana. Mallinckrodt has heavily marketed Acthar to neurologists (for MS), to nephrologists (for idiopathic membranous nephropathy and nephrotic syndrome), to rheumatologists (for a variety of conditions including rheumatoid arthritis), to pulmonologists (for sarcoidosis), and to ophthalmologists (for severe allergic or inflammatory eye conditions).

114.   In 2014 the president of the autoimmune and rare-disease business selling Acthar made a presentation to investors detailing a strategy to expand Acthar's sales to patients in rheumatology, pulmonology, ophthalmology, dermatology, and kidney disease. In the several decades prior, Acthar had not been prescribed in large quantities for these conditions despite having been FDA approved for such treatments. Although there were no new medical studies suggesting Acthar was needed to treat any of these conditions, the president pledged to "expand significantly" Acthar's sales force in the fields of rheumatology and pulmonology in the upcoming year. That sales effort was wildly successful at expanding the market for Acthar beyond infantile spasms. Now fewer than 10% of Acthar's sales come from prescriptions for infantile spasms, and more than 98% of Humana's expenditures for Acthar were made for insureds over the age of 18.

115.   A 2018 study published in JAMA Network Open concluded that "[a]ggressive sales tactics and payments from [Mallinckrodt] may influence prescribing behavior for [Acthar]." Indeed their "findings suggest that financial conflicts of interest may be driving use of corticotropin in the Medicare program." The study examined Medicare data about the providers who submitted more than ten claims for Acthar. It noted that "[a]mong the 50 prescribers (21.3%) who received more than $10 000 in payments during the year [2015], corticotropin expenditures per prescriber (mean [SD], $1 304 884 [$1 022 937]) were more than double that of the 45 prescribers (19.2%) who received $25 or less (mean [SD], $594 976 [$256 357])." The study's invariable regression analysis further showed that "Medicare spending on [Acthar] increased by 7.9% (approximately $53 000) for every $10 000 increase in payments to prescribers,"

or a return of investment of approximately 5:1. The study further noted that 207 of 235 frequent corticotropin prescribers (88%) who submitted more than 10 claims received a corticotropin-related payment from Mallinckrodt. By contrast, a recent study found that among all specialists, only 35% receive payments from the pharmaceutical industry.

116.   From 2013 to 2016, Mallinckrodt paid doctors nearly $27.5 million in Acthar-related payments. A handful of doctors received unusually large sums of money: during the same period, Mallinckrodt paid more than $6.5 million to only 288 prescribers for consulting, promotional speaking, and other services related to Acthar.

117.   Many of the top prescribers to Humana's members have been paid substantial fees by Mallinckrodt. These include the following:

| Prescribing Doctor | Specialty | Amount Paid By Mallinckrodt to the Prescribing Doctor (Payment Dates) | Amount Humana Paid for Acthar Prescriptions by These Doctors |
|---|---|---|---|
| 1 | Int. Med./Sarcoidosis | $116,000 (2013-2015) | $10,672,325 |
| 2 | Rheumatology | $22,762 (2013-2015) | $4,841,709 |
| 3 | Rheumatology | $273,937 (2013-2016) | $3,459,480 |
| 4 | Neurology | $142,978 (2013) | $2,723,683 |
| 5 | Rheumatology | $267,701 (2013-2016) | $1,928,838 |
| 6 | Rheumatology | $370,970 (2013-2016) | $778,060 |
| 7 | Psychiatry/Neurology | $345,913 (2013-2016) | $739,894 |
| 8 | Rheumatology | $224,713 (2013-2016) | $612,561 |
| 9 | Neurology | $332,393 (2013-2016) | $379,250 |

The goal of Mallinckrodt's scheme was to increase its sales of Acthar at the expense of those who paid for it—primarily health insurers such as Humana. Mallinckrodt required the assistance and complicity of the Prescribing Doctors to achieve its ends. It knew that in order to increase the prescription rates of Acthar, the Prescribing Doctors would need to prescribe Acthar in situations in which it was not called for and in lieu of considerably more cost-effective medications.

118.   On September 3, 2019, Mallinckrodt paid more than $15 million to the United States Department of Justice to settle claims that it paid illegal kickbacks to doctors to prescribe Acthar.

A-7195

### 3.     False Representations and Certifications

119.   In order to effectuate its scheme, Mallinckrodt either made or caused to be made three kinds of false representations and certifications directly to Humana.

120.   *First*, Mallinckrodt directly misrepresented to Humana that it was complying with state and federal law, including laws related bribery, kickbacks, and false claims.

121.   When a pharmacy dispenses drugs to a Humana Part D member, the pharmacy submits a claim to Humana, which in turn submits an electronic record of the claim, called a Prescription Drug Event ("PDE"), to CMS. After dispensing the drug, the pharmacy receives reimbursement from Humana for the portion of the drug cost not paid by the Part D member at the point of sale.

122.   PDE claims data are necessary for CMS to administer the Part D program and to reimburse Part D Plan Sponsors such as Humana. Generating and submitting PDE data is a condition of payment for CMS' provision of Medicare funds to Part D Plan sponsors. *See* 42 C.F.R. § 423.322.

123.   Part D Plan Sponsors must comply with "[f]ederal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. § 3729, *et seq*.), and the anti-kickback statute (§ 1127B(b)) of the Act)." 42 C.F.R. § 423.505(h)(l). Any "downstream" or "related" entities that Part D Plans subcontract with (including pharmacies dispensing medication and manufacturers selling medication) must also comply with these, and any other, contractual obligations of the Part D Plan and with all applicable federal laws, regulations, and CMS instructions. *See* 42 C.F.R. § 423.505(i)(3).

124.   CMS regulations require Part D Plan Sponsors and related "downstream" entities that generate and submit PDE claims data to certify that such data is true, accurate, and complete and that the PDE data is the basis for obtaining federal reimbursement for the health care products or services reflected therein. *Id*.

A-7196

§ 423.505(k). Congress has determined that any Medicare claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).

125.   Mallinckrodt and its captive agent CuraScript made such certifications and therefore directly misrepresented to Humana that they were complying with federal law.

126.   *Second*, when providers, including the Prescribing Doctors, prescribe pharmaceutical treatment, they must generally obtain prior authorization from insurers such as Humana. By going through the prior authorization process, the Prescribing Doctors represent to Humana that the prescription medication is medically necessary, up-to-date, and non-duplicative. They are further representing that they are not violating state or federal law applicable to the provision of their services.

127.   Mallinckrodt, CDF, and the Prescribing Doctors knew that offering or accepting money or other consideration in exchange for prescriptions was a violation of the law and CMS policies and procedures. Mallinckrodt, CDF, and the Prescribing Doctors knew that their enterprise was a violation of these rules because it involved a payment in exchange for an increased rate of prescriptions.

128.   Through its unlawful payments to the Prescribing Doctors and its payments to patients through the CDF funds, Mallinckrodt caused false certifications and representations to be made to Humana during the prior authorization process.

129.   *Third*, Humana members are required to pay what they owe for drug coverage under Medicare Part D and other kinds of plans, and they are advised in their evidence of coverage documents that they must pay their share of the cost when they obtain prescription drugs. Through its illegal scheme to pay patient co-pays through phony charitable funds at CDF, Mallinckrodt caused Humana members to unintentionally misrepresent that they had paid their contractual share of prescription drug coverage.

A-7197

### 4.     Use of the Mails and Wires

130.     Throughout the relevant period, Mallinckrodt, CDF, and the Prescribing Doctors used thousands of mail and interstate wire communications to create and manage their scheme, which involved nationwide distribution of Acthar through the Prescribing Doctors and CuraScript at the direction of Mallinckrodt. Mallinckrodt communicated with the Prescribing Doctors through the mails and wires, caused thousands of reimbursement requests to be submitted by the Prescribing Doctors over the wires or by mail, and made illegal kickback payments to the Prescribing Doctors over the wires or by mail.

### F.     Mallinckrodt's Fraudulent Concealment of the Illegal Scheme

131.     Mallinckrodt actively concealed the existence of its illegal scheme and the acts underlying it through false or misleading statements to Humana and to the public. Mallinckrodt falsely maintained that it would develop and seek FDA approval of Synacthen when in reality it purposefully failed to put the effort and resources into obtaining a broad FDA approval of Synacthen as an alternative to Acthar. Mallinckrodt also failed to disclose to Humana its arrangements with CDF that created specialized funds that were used to illegally reimburse co-payments for Acthar, despite its certifications to Humana that it was following federal law and CMS rules that prohibited such co-payment subsidies for Medicare patients. Finally, Mallinckrodt also failed to disclose its kickback payments to doctors that violated federal law and CMS rules despite its certifications to Humana that it was abiding by such laws and CMS rules.

132.     Due to Mallinckrodt's fraudulent concealment, Humana could not have discovered and remained unaware of the foregoing conduct until the Federal Trade Commission and the United States Department of Justice brought these acts and practices to light through investigations, legal actions, and/or settlements.

A-7198

**G.     Damages**

133.   As a result of Mallinckrodt's multipronged scheme to inflate Acthar's price and utilization, Humana incurred significant losses. A substantial portion of Humana's business is evaluating, underwriting, and managing risks involved in insuring healthcare costs. As a commercial insurer, Humana bears significant risk of utilization of unnecessary, ineffective, or uneconomical medical care. The same is true for Humana's Medicare plans.

134.   For Humana's Medicare business, Humana bears the risk of rising prescription drug prices and utilization in part through Part D "risk corridors" and Medicare Advantage capitation payments. Both of these Medicare provisions shift risk from the federal government to Humana to pay for some or all of the increased costs of prescription drugs for the Medicare members it covers. As such, Humana benefits financially when costs and utilization of prescription drugs are lower than expected and conversely it is harmed when costs and utilization of prescription drugs are higher than expected. In addition, for the portion of costs covered by the government under these programs, Humana bears a risk of non-payment if claims are found to be false or fraudulent by the government.

135.   The risk of fraudulent claims is one that is shared by Humana and the government sponsors of healthcare plans that Humana administers. Therefore the claims of the government and the claims of Humana against Mallinckrodt are substantially the same.

136.   Mallinckrodt's scheme was designed to cause and did cause Humana and others to pay for Acthar prescriptions that they would otherwise not have reimbursed and to pay more for those prescriptions than they otherwise would have paid. Humana was among the group of health insurers who were the targets of Mallinckrodt's scheme. Mallinckrodt knew that nearly all of its sales of Acthar in the United States would be sold to patients who carried prescription drug insurance that would bear the majority of

Acthar's cost. Humana's insurance plans bore the majority of Acthar's costs for its members and was directly injured as a result of Mallinckrodt's illegal conduct.

137.   But for Mallinckrodt's scheme to perpetuate its monopoly over long-acting ACTH drugs, illegally subsidize Humana's members' co-pays, and pay kickbacks to Prescribing Doctors, Humana would have paid for fewer Acthar prescriptions and it would have paid less for those prescriptions that it otherwise would have covered. Specifically, but for Mallinckrodt's monopolistic conduct, including its acquisition of Synacthen, Humana would have benefitted from increased competition in the market for long-acting ACTH drugs and would have either paid lower prices for Acthar or it would have steered its members to lower priced Synacthen. Similarly, but for Mallinckrodt's kickbacks, Mallinckrodt and the Prescribing Doctors would not have defrauded Humana by falsely certifying their compliance with federal and state law through submissions for reimbursements for Acthar prescriptions. Finally, but for Mallinckrodt's kickback scheme and illegal co-pay assistance through CDF, prescription rates for Acthar would have been lower, and Humana members would have received different care from their physicians that was more effective, less harmful, or more cost effective than doses of Acthar.

138.   As a consequence of Mallinckrodt's conduct, Humana paid almost $800 million for Acthar prescriptions. In the absence of such conduct, Humana would have paid a small fraction of that amount. Humana has also incurred administrative, investigative, legal, and other costs as a result of Mallinckrodt's conduct.

## Count I

## Violation of the Sherman Antitrust Act, 15 U.S.C. § 2

139.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

140.   Mallinckrodt has, and at all relevant times, had monopoly power in the market for the sale of long-acting ACTH drugs in the United States.

A-7200

141.   By intervening in the bidding process for Synacthen and purchasing the exclusive license to market Synacthen in the United States, Mallinckrodt eliminated the potential competitive threat posed by an independently owned Synacthen license. Mallinckrodt's conduct was reasonably capable of contributing significantly to the preservation of Mallinckrodt's monopoly power and monopoly pricing of Acthar in the United States.

142.   The effect of Mallinckrodt's actions to maintain its monopoly was to stabilize or raise the price of Acthar to a higher level than it would have commanded in the absence of the monopolistic conduct. Mallinckrodt's actions also had the effect of suppressing the output of long-acting ACTH drugs below the level of output which would have been produced absent its monopolistic conduct.

143.   Humana suffered injuries when it paid those higher prices.

144.   Defendant's acts and practices constitute monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## Count II

## Violation of the Sherman Antitrust Act, 15 U.S.C. § 1

145.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

146.   Mallinckrodt entered into an exclusive agreement with Novartis to license the right to market Synacthen in the United States.

147.   That agreement restrained trade in the market for the sale of long-acting ACTH drugs in the United States.

148.   The effect of that agreement was to maintain or raise the price of Acthar to a higher level than it would have commanded in the absence of the agreement and to suppress the output of long-acting ACTH drugs below that which would have prevailed in the absence of the agreement.

149.   Humana suffered injuries when it paid those higher prices.

41

150.   The agreement between Mallinckrodt and Novartis constitutes an anticompetitive agreement in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## Count III

### Violation of State Antitrust Laws

151.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

152.   The aforementioned practices by the Defendant that violate Sections 1 and 2 of the Sherman Act were and are also violations of the following states' antitrust laws:

a.   Ala. Code § 6-5-60, *et seq.* (Alabama);

b.   Ariz. Rev. Stat. Ann. § 44-1401, *et seq.* (Arizona);

c.   Cal. Bus. & Prof. Code § 16750, *et seq.* (California);

d.   Conn. Gen. Stat. Ann. § 35-24, *et seq.* (Connecticut);

e.   D.C. Code Ann. § 28-4501, *et seq.* (D.C.);

f.   Fla. Stat. Ann. § 501.201, *et seq.* (Florida);

g.   Haw. Rev. Stat. Ann. § 480-1, *et seq.* (Hawaii);

h.   740 Ill. Comp. Stat. Ann. 10/1, *et seq.* (Illinois);

i.   Iowa Code Ann. § 553.1, *et seq.* (Iowa);

j.   Kan. Stat. Ann. § 50-101, *et seq.* (Kansas);

k.   Me. Rev. Stat. tit. 10, § 1101, *et seq.* (Maine);

l.   Mich. Comp. Laws Ann. § 445.771, *et seq.* (Michigan);

m.   Minn. Stat. Ann. § 325D.49, *et seq.* (Minnesota);

n.   Miss. Code. Ann. § 75-21-1, *et seq.* (Mississippi);

o.   Neb. Rev. Stat. Ann. § 59-801, *et seq.* (Nebraska);

p.   Nev. Rev. Stat. Ann. § 598A.010, *et seq.* (Nevada);

q.   N.M. Stat. Ann. § 57-1-1, *et seq.* (New Mexico);

r.   N.Y. Gen. Bus. Law § 340, *et seq.* (New York);

A-7202

s.    N.C. Gen. Stat. § 75-1, *et seq.* (North Carolina);

t.    Or. Rev. Stat. Ann. § 646.705, *et seq.* (Oregon);

u.    S.D. Codified Laws § 37-1-3.1, *et seq.* (South Dakota);

v.    Tenn. Code Ann. § 47-25-101, *et seq.* (Tennessee);

w.    Utah Code Ann. § 76-10-3101, *et seq.* (Utah);

x.    Vt. Stat. Ann. tit. 9, § 2451, *et seq.* (Vermont);

y.    Wis. Stat. Ann. § 133.01, *et seq.* (Wisconsin).

## Count IV

### Violation of the RICO Act, 18 U.S.C. § 1962(c)

153.    Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

154.    Mallinckrodt is a "person" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

155.    The Acthar Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Mallinckrodt, Express Scripts and its relevant subsidiaries (including CuraScript), CDF, and the Prescribing Doctors—including their corporate parents, siblings, subsidiaries, employees, and agents. The Acthar Enterprise was an ongoing organization that functioned as a continuing unit. The Acthar Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity. Mallinckrodt, Express Scripts, CuraScript, CDF, and the Prescribing Doctors are each "persons" distinct from the Acthar Enterprise.

156.    Mallinckrodt established the Acthar Enterprise to fraudulently increase its sales of Acthar. Mallinckrodt subsidized co-pays through CDF, and paid the Prescribing Doctors, in exchange for an increased rate of prescriptions of Acthar in lieu of less expensive alternative treatment. Mallinckrodt, CDF, and the Prescribing Doctors knew that their scheme violated federal and state laws.

A-7203

157.   Such payments also violated state commercial bribery statutes which prohibit offering anything of value to a fiduciary for the purpose of altering the fiduciary's conduct towards those to whom he owes fiduciary duties. Doctors, like the Prescribing Doctors, owe fiduciary duties to their patients to offer medical advice and counseling based on the best interest of the patient, not what is in their own pecuniary interest.

158.   False representations of compliance with federal and state laws were made to Humana for payment over the wires or by mail. These false representations were made directly to Humana and were a condition of reimbursement by Humana for all Acthar claims submitted by the Prescribing Doctors. The illegal payments were sent over the wires or by mail to the Prescribing Doctors and to CDF.

159.   The Acthar Enterprise engaged in and affected interstate commerce because, among other things, it marketed, sold, purchased, or provided Acthar to thousands of individuals throughout the United States.

160.   Mallinckrodt has asserted control over the Acthar Enterprise by issuing payments to doctors who prescribed Acthar as treatment for conditions for which more affordable alternative treatments were readily available. Mallinckrodt asserted control over the enterprise by utilizing one exclusive distributor, CuraScript, and setting the price of Acthar paid by Humana.

161.   Mallinckrodt has asserted control over the Acthar Enterprise by designing, organizing, and funding the phony charitable funds at CDF used for Acthar co-pays.

162.   Mallinckrodt has conducted and participated in the affairs of the Acthar Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1952 (use of interstate facilities to conduct unlawful activity), and state bribery statutes.

163.   The effect of Mallinckrodt's racketeering activity was to induce sales of Acthar that otherwise would not have been made in the absence of the illegal conduct

A-7204

and to maintain or raise the price of Acthar to a higher level than it would have commanded in the absence of the illegal conduct.

164.    Humana suffered injuries when it reimbursed those prescriptions for Acthar that otherwise would not have been made and/or paid the higher prices that resulted from the illegal conduct.

165.    Humana's injuries were directly and proximately caused by Mallinckrodt's racketeering activities as described above.

166.    By virtue of these violations of 18 U.S.C. § 1962(c), Mallinckrodt is jointly and severally liable to Humana for three times the damages Humana has sustained, plus the cost of this suit, including reasonable attorneys' fees.

<u>**Count V**</u>

**Conspiracy to Violate the RICO Act, 18 U.S.C. § 1962(d)**

167.    Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

168.    Title 18 U.S.C. § 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

169.    Mallinckrodt has violated 18 U.S.C. § 1962(d) by conspiring with the Prescribing Doctors, CuraScript, and CDF to violate 18 U.S.C. §1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Acthar Enterprise described previously through a pattern of racketeering activity.

170.    Mallinckrodt and its co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Humana of money.

171.    The nature of the above-described Mallinckrodt's co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware

that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

172.   As a direct and proximate result of Mallinckrodt's overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Humana has been injured in its business and property as set forth more fully above.

173.   Mallinckrodt and its co-conspirators have sought to and have engaged in the commission of overt acts, including the following unlawful racketeering predicate acts:

a.   Multiple instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1342;

b.   Multiple instances of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346;

c.   Multiple instances of wire fraud in violation of 18 U.S.C. §§ 1343 and 1346;

d.   Multiple instances of unlawful activity in violation of 18 U.S.C. §1952;

e.   Multiple instances of bribery in violation of state statutes, including but not limited to Cal. Penal Code § 641.3, 720 Ill. Comp. Stat. 5/29A-1, Tex. Penal Code § 32.43, N.J. Stat. § 2C:21-10, and N.Y. Penal Law § 180.00.

174.   The purpose and effect of the conspiracy was to induce sales of Acthar that otherwise would not have been made in the absence of the illegal conduct and to maintain or raise the price of Acthar to a higher level than it would have commanded in the absence of the illegal conduct.

175.   Humana suffered injuries when it reimbursed those prescriptions for Acthar that otherwise would not have been made and/or paid the higher prices that resulted from the illegal, conspiratorial conduct.

A-7206

176.   Humana's injuries were directly and proximately caused by Mallinckrodt's racketeering activities as described above.

177.   By virtue of these violations of 18 U.S.C. § 1962(d), Mallinckrodt is jointly and severally liable to Humana for three times the damages Humana has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## Count VI

### State Unfair Competition Law Claims

178.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

179.   Mallinckrodt and its co-conspirators have engaged in fraudulent and deceptive business practices that violate the state unfair competition laws of Alaska, Arizona, Arkansas, California, Connecticut, Florida, Idaho, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Nebraska, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Oregon, South Carolina, Tennessee, Washington, Wisconsin, and Wyoming.

180.   Mallinckrodt and its co-conspirators have engaged in unfair competition under the states' laws by unlawfully making and accepting remuneration in exchange for the sale of Acthar to Humana and its members in consumer transactions. This conduct violated the federal AKS and equivalent state statutes and caused the certifications of compliance with law provided by the Prescribing Doctors to Humana to be fraudulent.

181.   Plaintiff Humana was directly and proximately injured by Mallinckrodt and its co-conspirators' conduct and would not have paid what it did for Acthar had Mallinckrodt fully disclosed its schemes.

182.   Mallinckrodt engaged in wrongful conduct while at the same time obtaining under false pretenses a significant sum of money from plaintiff Humana. Humana suffered injury in fact and actual damages including lost money and property as a result of Mallinckrodt's violations of:

A-7207

a.   A.S. § 45.50.471(a), *et seq.* (Alaska);

b.   Ariz. Rev. Stat. Ann. § 44-1521, *et seq.* (Arizona);

c.   Ark. Code Ann. § 4-88-101, *et seq.* (Arkansas);

d.   Cal. Bus. & Prof. Code § 17200, *et seq.* (California);

e.   Conn. Gen. Stat. § 42-110a, *et seq.* (Connecticut);

f.   Fla. Stat. § 501.201, *et seq.* (Florida);

g.   Idaho Code Ann. § 48-601, *et seq.* (Idaho);

h.   815 Ill. Comp. Stat. 505/1, *et seq.* (Illinois);

i.   Ind. Code § 24-5-0.5-1, *et seq.* (Indiana);

j.   La. Rev. Stat. Ann. § 51:1401, *et seq.* (Louisiana);

k.   Md. Code Ann., Com. Law § 13-101, *et seq.* (Maryland);

l.   Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.* (Massachusetts);

m.   Mich. Comp. Laws § 445.901, *et seq.* (Michigan);

n.   Neb. Rev. Stat. § 59-1601, *et seq.* (Nebraska);

o.   N.H. Rev. Stat. Ann. § 358-A:1, *et seq.* (New Hampshire);

p.   N.J. Stat. Ann. § 56:8-1, *et seq.* (New Jersey);

q.   N.M. Stat. § 57-12-1, *et seq.* (New Mexico);

r.   N.C. Gen. Stat. § 75-1.1, *et seq.* (North Carolina);

s.   N.D. Cent. Code § 51-15-01, *et seq.* (North Dakota);

t.   O.R.S. 646.607, *et seq.* (Oregon);

u.   S.C. Code Ann. § 39-5-10, *et seq.* (South Carolina);

v.   Tenn. Code Ann. § 47-18-101, *et seq.* (Tennessee);

w.   Wash. Rev. Code § 19.86.010, *et seq.* (Washington);

x.   Wis. Stat. § 100.18, *et seq.* (Wisconsin);

y.   Wyo. Stat. Ann. § 40-12-101, *et seq.* (Wyoming).

183.   Pursuant to these states' laws, Humana seeks judgment in its favor and against Mallinckrodt requiring Mallinckrodt to pay restitution of wrongful profits, revenues, and benefits received as a result of the Acthar schemes.

A-7208

## <u>Count VII</u>

### **State Consumer Fraud and Deceptive Trade Practice Law Claims**

184.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

185.   Mallinckrodt and its co-conspirators have engaged in fraudulent and deceptive business practices that violate the state consumer fraud, consumer protection, and/or deceptive trade practices laws of Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, North Carolina, South Carolina, Tennessee, and Wisconsin, and in particular the following laws:

    a.    Ariz. Rev. Stat. Ann. § 44-1521, *et seq.* (Arizona);

    b.    Ark. Code Ann. § 4-88-101, *et seq.* (Arkansas);

    c.    Cal. Bus. & Prof. Code § 17200, *et seq.* (California);

    d.    Colo. Rev. Stat. § 6-1-101, *et seq.* (Colorado);

    e.    Conn. Gen. Stat. § 42-110a, *et seq.* (Connecticut);

    f.    Fla. Stat. § 501.201, *et seq.* (Florida);

    g.    Ga. Code Ann. § 10-1-390, *et seq.* (Georgia);

    h.    815 Ill. Comp. Stat. 505/1, *et seq.* (Illinois);

    i.    Ind. Code § 24-5-0.5-1, *et seq.* (Indiana);

    j.    La. Rev. Stat. Ann. § 51:1401, *et seq.* (Louisiana);

    k.    Md. Code Ann., Com. Law § 13-101, *et seq.* (Maryland);

    l.    Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.* (Massachusetts);

    m.    Mich. Comp. Laws § 445.901, *et seq.* (Michigan);

    n.    Minn. Stat. § 325F.68, *et seq.* (Minnesota);

    o.    Neb. Rev. Stat. § 59-1601, *et seq.* (Nebraska);

    p.    Nev. Rev. Stat. § 41.600, *et seq.* (Nevada);

    q.    N.H. Rev. Stat. Ann. § 358-A:1, *et seq.* (New Hampshire);

    r.    N.C. Gen. Stat. § 75-1.1, *et seq.* (North Carolina);

A-7209

    s.     S.C. Code Ann. § 39-5-10, *et seq.* (South Carolina);

    t.     Tenn. Code Ann. § 47-18-101, *et seq.* (Tennessee);

    u.     Wis. Stat. § 100.18, *et seq.* (Wisconsin).

186.    Humana is a person or consumer entitled to protection under the foregoing state laws.

187.    Mallinckrodt directly misrepresented to Humana that it was complying with federal and state laws, including laws against bribery, kickbacks, and false claims to the government. In addition, through its payments to doctors, Mallinckrodt induced the Prescribing Doctors to falsely certify to Humana through the prior authorization process that they had not received any illegal kickbacks from manufacturers.

188.    Mallinckrodt intended payors such as Humana to rely on these certifications. The intention may be inferred by the very nature of the representation, whose sole purpose is to procure payment for Acthar.

189.    These representations and certifications were made in an effort by Mallinckrodt to sell Acthar to the consuming public, and were addressed to the market generally by having Acthar paid for at inflated prices by Medicare, Medicaid, and third-party payors such as Humana. The ultimate consequence of this conduct is a significant injury to the consuming public by, among other things, imposing additional costs on the taxpaying public for Medicare, raising the cost of insurance, and obstructing the availability of Acthar and its synthetic substitute to consumers.

190.    Humana relied on these misrepresentations to its detriment, which were material to its decision to pay for Acthar treatments.

191.    Humana was directly and proximately injured by Mallinckrodt and its co-conspirators' conduct, suffered an injury in fact, and suffered actual, ascertainable damages. Humana would not have paid for Acthar, or would have paid only a small fraction of the amount it actually did pay, had Mallinckrodt refrained from engineering the false representations or otherwise disclosed its schemes.

A-7210

192.   Mallinckrodt's conduct offends established public policy and the public interest, and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

## Count VIII

## State Insurance Fraud Claims

193.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

194.   Mallinckrodt and its co-conspirators have committed insurance fraud in violation of the laws of Illinois, Kentucky, Pennsylvania, New Jersey, and Tennessee, and in particular the following laws:

   a.   720 ILCS 5/17-10.5(Illinois);

   b.    Ky. Rev. Stat. § 304.47-010, *et seq.* (Kentucky);

   c.   18 Pa. Cons. Stat. Ann. § 4117 (Pennsylvania);

   d.   N.J. Stat. § 17:33A, *et seq.* (New Jersey);

   e.   Tenn. Code Ann. §§ 56-53-101 (Tennessee).

195.   Mallinckrodt knowingly presented or caused to be presented to Humana statements in support of claims for insurance benefits for Acthar that it knew contained false and/or misleading information. Mallinckrodt knew and intended that by engaging in its schemes to pay kickbacks to doctors and illegally subsidize co-payments through phony charitable funds that misleading and/or false information would be submitted to Humana and other Medicare payors in connection with insurance claims.

196.   The statements of the co-conspirator doctors who prescribed Acthar and the pharmacies who filled Acthar prescriptions to Humana were false because they certified compliance with federal and state laws and regulations that were not, in fact, complied with. Among the laws which the doctors and pharmacies were not in compliance with were the anti-kickback statutes.

197.   The compliance certifications were material to Humana's decision to reimburse claims for Acthar that Mallinckrodt caused to be submitted. Had the

A-7211

1  certification of compliance with federal and state laws and regulations been withheld or

2  corrected by the doctors or pharmacies, Humana would not to have paid these claims.

3      198.   Humana's injuries were directly and proximately caused by the false or

4  misleading statements that Mallinckrodt made to it, or caused to be submitted to it, as

5  described above.

**Count IX**

**Tortious Interference with Contractual Relations**

8      199.   Humana incorporates by reference each of the above paragraphs of this

9  Complaint as though fully stated herein.

10     200.   Humana had valid and enforceable written contracts with each of its

11  members who were prescribed Acthar during the relevant period. These agreements

12  specify that members will pay their share of the costs for prescription drugs. The

13  purpose of this co-payment obligation is to provide an incentive to members to exercise

14  patient responsibility for health care costs, and so to help control health care and health

15  insurance costs on a larger scale.

16     201.   This co-payment obligation was known to Mallinckrodt, not only because

17  this is how most medical insurance generally works but also because Medicare policy

18  documents are largely prescribed by federal law.  CMS mandates that insurers use

19  approved language in their Medicare policy documents, including the pertinent

20  Evidence of Coverage ("EOC") document.  Those materials are publicly available and

21  well known in the pharmaceutical industry.[9]  Humana adopts these materials as issued

22  by CMS for its own EOC documents.

23

24

_____

25  [9] *See*, *e.g.*, https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Mark

26  etngModelsStandardDocumentsandEducationalMaterial (CMS website collecting
model EOC documents) and https://www.cms.gov/Medicare/Prescription-Drug-

27  Coverage/PrescriptionDrugCovContra/Part-D-Model-Materials (model Part D

28  materials).

A-7212

202.   For example, attached as **Exhibit A** is an Evidence of Coverage from Humana written for a 2014 California plan incorporating Medicare's model language. That document provides that an insured is "responsible for" copayments and "must pay [their] share of the cost when [they] get [a] service or drug." *Id*. at 153.  With respect to PAPs in particular, the coverage document states:

---

**2. When you get a drug through a patient assistance program offered by a drug manufacturer**

Some members are enrolled in a patient assistance program offered by a drug manufacturer that is outside the plan benefits. If you get any drugs through a program offered by a drug manufacturer, you may pay a copayment to the patient assistance program.

- Save your receipt and send a copy to us so that we can have your out-of-pocket expenses count toward qualifying you for the Catastrophic Coverage Stage.
- **Please note:** Because you are getting your drug through the patient assistance program and not through the plan's benefits, we will not pay for any share of these drug costs. But sending a copy of the receipt allows us to calculate your out-of-pocket costs correctly and may help you qualify for the Catastrophic Coverage Stage more quickly.

---

*Id*. at 141 (highlighting added); *see also id*. at 122 (advising members to provide receipts for their co-pays to PAPs to "[m]ake sure that we have that information we need" when the member "made a copayment for drugs that are provided under a drug manufacturer patient assistance program").

203.   As the highlighted language makes plain to members, Humana does not pay for drugs provided through a PAP, but the member's expenses may affect the computation of that member's out-of-pocket costs.  If the PAP uses its funds to pay the member's co-pay, however, then both the letter and the purpose of the EOC provision are subverted.  Mallinckrodt's scheme to pay those patient co-pays through the sham charitable funds at CDF did precisely that, causing members to unintentionally

A-7213

represent that were paying their share of a covered drug when in fact they were not paying and the drug was not covered.

204.   Mallinckrodt intended to and did induce Humana members to breach their obligations by subsidizing their co-pays.

205.   Humana was harmed by these breaches because it reimbursed claims for Acthar that otherwise would not have been made.

206.   Mallinckrodt has intentionally interfered with the contracts between Humana and its members.

207.   Humana seeks judgment in its favor and against Mallinckrodt, requiring Mallinckrodt to pay monetary and punitive damages for the conduct described herein.

## Count X

### Unjust Enrichment

208.   Humana incorporates by reference each of the above paragraphs of this Complaint as though fully stated herein.

209.   As the intended and expected result of their conscious wrongdoing as set forth in this Complaint, Mallinckrodt has profited and benefited from payments Humana made for Acthar as a result of its schemes.

210.   The circumstances of Mallinckrodt's receipt of monies based on the conduct set forth in this Complaint are such that, in equity and good conscience, Mallinckrodt should not retain such monies, the amount of which is to be determined at trial.

211.   Humana is entitled in equity to seek restitution of Mallinckrodt's wrongful profits, revenues, and benefits received as a result of its schemes.

212.   Humana states this claim to the extent that it is deemed not to have an adequate legal remedy.

### V.   PRAYER FOR RELIEF

213.   Based on the foregoing, Humana requests that the Court enter an order that:

A-7214

1       a.    Enters judgment in favor of Humana and against the Defendant;

2       b.    Awards Humana its actual damages in an amount to be determined

3             at trial;

4       c.    Awards Humana punitive damages;

5       d.    Awards Humana treble damages under 15 U.S.C. § 15(a), 18 U.S.C.

6             § 1964(c), or any other provision of law, including state law, that

7             permits doubling or trebling of damages;

8       e.    Awards Humana its attorneys' fees and litigation costs under 15

9             U.S.C. § 15(a), 18 U.S.C. § 1964(c), or any other provision of law,

10           including state law, that permits recovery of such costs and fees;

11      f.    Awards Humana pre-and post-judgment interest; and

12      g.    Provides any other relief that the Court deems proper.

13             **VI.    JURY DEMAND**

14    214.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial

15 by jury on all issues so triable.

16

17 Dated:    April 24, 2020      By:   */s/ Scott C. Solberg*

18                    Gary S. Lincenberg
19                    Jeremy D. Matz
                      BIRD, MARELLA, BOXER,
20                    WOLPERT, NESSIM, DROOKS,
                      LINCENBERG & RHOW P.C.
21                    1875 Century Park East, 23rd Floor
                      Los Angeles, CA 90067
22                    Telephone: 310−201−2100
                      Fax: 310−201−2110
23                    Email: glincenberg@birdmarella.com
                          jmatz@birdmarella.com
24

25                    Scott C. Solberg
                    (admitted *pro hac vice*)
26                    James W Joseph
                    (admitted *pro hac vice*)
27                    Benjamin E. Waldin
                    (admitted *pro hac vice*)
28                    EIMER STAHL LLP
                    224 South Michigan Ave., Suite 1100

A-7215

1

Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
Email: ssolberg@eimerstahl.com
jjoseph@eimerstahl.com
bwaldin@eimerstahl.com

*Attorneys for Plaintiff Humana Inc.*

# EXHIBIT A

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 279 of 547 PageID #: 4888
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 2 of 225   Page ID
#:1243

2014
# Evidence of Coverage



# Your 2014
# Evidence of Coverage

We're sending you this 2014 plan benefit information as required by the Centers for Medicare & Medicaid Services (CMS).

This document provides complete details of coverage and plan benefits for 2014.

Did you know you can get plan-related information online?
Visit **Humana.com** and log in to *My*Humana to:
• View your plan details
• Check if a provider is in-network
• Choose how you want to receive information

**A-7219**

# 2014
# Evidence of Coverage

Humana Gold Plus®

H0108-004 (HMO)

Fresno
Fresno, Kings and Madera counties







**January 1 – December 31, 2014**

**Evidence of Coverage:**

**Your Medicare Health Benefits and Services and Prescription Drug Coverage as a Member of Humana Gold Plus H0108-004 (HMO)**

This booklet gives you the details about your Medicare health care and prescription drug coverage from January 1 - December 31, 2014. It explains how to get coverage for the health care services and prescription drugs you need. **This is an important legal document. Please keep it in a safe place.**

This plan, Humana Gold Plus H0108-004 (HMO), is offered by HUMANA HEALTH PLAN OF CALIFORNIA, INC. (When this Evidence of Coverage says "we," "us," or "our," it means HUMANA HEALTH PLAN OF CALIFORNIA, INC. When it says "plan" or "our plan," it means Humana Gold Plus H0108-004 (HMO).)

Humana Gold Plus H0108-004 (HMO) is a Medicare Advantage HMO plan with a Medicare contract. Enrollment in this Humana plan depends on contract renewal.

This information is available for free in other languages. Please contact our Customer Care number at 1-800-457-4708 for additional information. (TTY users should call: 711). Hours are from 8 a.m. to 8 p.m. seven days a week from Oct. 1 – Feb. 14 and 8 a.m. to 8 p.m. Monday-Friday from Feb. 15 - Sept. 30. Customer Care also has free language interpreter services available for non-English speakers.

No se cobra por recibir esta información en otros idiomas. Para obtener más información, comuníquese con nuestro departamento de Atención al Cliente llamando al 1-800-457-4708. (Los usuarios de TTY deben llamar al: 711). El horario de atención es de 8 a.m. a 8 p.m., los siete días de la semana entre el 1 de octubre y el 14 de febrero, y de 8 a.m. a 8 p.m., de lunes a viernes entre el 15 de febrero y el 30 de septiembre. Además, el departamento de Atención al Cliente les proporciona servicios gratuitos de intérpretes de otros idiomas a los afiliados que no hablen inglés.

This information is available in a different format, including Braille, large print, and audio tapes. Please call Customer Care at the number listed above if you need plan information in another format.

Benefits, formulary, pharmacy network, premium, deductible, and/or copayments/coinsurance may change on January 1, 2015.

H0108_AEOC_MAPD_HMO_004_2014 Accepted

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Table of Contents

# 2014 Evidence of Coverage

# Table of Contents

This list of chapters and page numbers is your starting point. For more help in finding information you need, go to the first page of a chapter. **You will find a detailed list of topics at the beginning of each chapter.**

**Chapter 1.**    **Getting started as a member**...................................................................**8**

Explains what it means to be in a Medicare health plan and how to use this booklet. Tells about materials we will send you, your plan premium, your plan membership card, and keeping your membership record up to date.

**Chapter 2.**    **Important phone numbers and resources** ...............................................**20**

Tells you how to get in touch with our plan (Humana Gold Plus H0108-004 (HMO)) and with other organizations including Medicare, the State Health Insurance Assistance Program (SHIP), the Quality Improvement Organization, Social Security, Medicaid (the state health insurance program for people with low incomes), programs that help people pay for their prescription drugs, and the Railroad Retirement Board.

**Chapter 3.**    **Using the plan's coverage for your medical services** ...................................**35**

Explains important things you need to know about getting your medical care as a member of our plan. Topics include using the providers in the plan's network and how to get care when you have an emergency.

**Chapter 4.**    **Medical Benefits Chart (what is covered and what you pay)**........................**47**

Gives the details about which types of medical care are covered and <u>not</u> covered for you as a member of our plan. Explains how much you will pay as your share of the cost for your covered medical care.

**Chapter 5.**    **Using the plan's coverage for your Part D prescription drugs**....................**100**

Explains rules you need to follow when you get your Part D drugs. Tells how to use the plan's Prescription Drug Guide (Formulary) to find out which drugs are covered. Tells which kinds of drugs are <u>not</u> covered. Explains several kinds of restrictions that apply to coverage for certain drugs. Explains where to get your prescriptions filled. Tells about the plan's programs for drug safety and managing medications.

Case 1:21-cv-01993-LRS  Document 35  Filed 12/13/21  Page 285 of 547  PageID #: 4894
Case 2:19-cv-06926-DSF-MRW  Document 60-1  Filed 04/24/20  Page 8 of 228  Page ID #:1249

2014 Evidence of Coverage for Humana Gold Plus H0163-004 (HMO)
Table of Contents

**Chapter 6.** **What you pay for your Part D prescription drugs** .....................................**118**

Tells about the three stages of drug coverage (Initial Coverage Stage, Coverage Gap Stage, Catastrophic Coverage Stage) and how these stages affect what you pay for your drugs. Explains the five cost-sharing tiers for your Part D drugs and tells what you must pay for a drug in each cost-sharing tier. Tells about the late enrollment penalty.

**Chapter 7.** **Asking us to pay our share of a bill you have received for covered medical services or drugs** .....................................**137**

Explains when and how to send a bill to us when you want to ask us to pay you back for our share of the cost for your covered services or drugs.

**Chapter 8.** **Your rights and responsibilities** .....................................**142**

Explains the rights and responsibilities you have as a member of our plan. Tells what you can do if you think your rights are not being respected.

**Chapter 9.** **What to do if you have a problem or complaint (coverage decisions, appeals, complaints)** .....................................**155**

Tells you step-by-step what to do if you are having problems or concerns as a member of our plan.
- Explains how to ask for coverage decisions and make appeals if you are having trouble getting the medical care or prescription drugs you think are covered by our plan. This includes asking us to make exceptions to the rules or extra restrictions on your coverage for prescription drugs, and asking us to keep covering hospital care and certain types of medical services if you think your coverage is ending too soon.
- Explains how to make complaints about quality of care, waiting times, customer service, and other concerns.

**Chapter 10.** **Ending your membership in the plan** .....................................**197**

Explains when and how you can end your membership in the plan. Explains situations in which our plan is required to end your membership.

**Chapter 11.** **Legal notices** .....................................**204**

Includes notices about governing law and about nondiscrimination.

**Chapter 12.** **Definitions of important words** .....................................**209**

Explains key terms used in this booklet.

**Exhibit A.** **State Agency Contact Information**

Lists the names, addresses, phone numbers, and other contact information for a variety of helpful resources in your state.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 286 of 547 PageID #: 4885
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 9 of 225   Page ID #:1250

# Chapter 1. Getting started as a member

**SECTION 1**    **Introduction**

Section 1.1    You are enrolled in Humana Gold Plus H0108-004 (HMO),
which is a Medicare HMO...........................................................10

Section 1.2    What is the Evidence of Coverage booklet about? ...........................................10

Section 1.3    What does this chapter tell you?...................................................................10

Section 1.4    What if you are new to Humana Gold Plus H0108-004 (HMO)?............................10

Section 1.5    Legal information about the Evidence of Coverage..........................................11

**SECTION 2**    **What makes you eligible to be a plan member?**

Section 2.1    Your eligibility requirements .......................................................................11

Section 2.2    What are Medicare Part A and Medicare Part B?................................................11

Section 2.3    Here is the plan service area for Humana Gold Plus H0108-004 (HMO) .................12

**SECTION 3**    **What other materials will you get from us?**

Section 3.1    Your plan membership card - Use it to get all covered care and prescription
drugs......................................................................................................12

Section 3.2    The Provider Directory: Your guide to all providers and pharmacies in the plan's
network .................................................................................................13

Section 3.3    The plan's Prescription Drug Guide (Formulary) .............................................13

Section 3.4    SmartSummary: Reports with a summary of payments made for your Part D
prescription drugs ...................................................................................14

**SECTION 4**    **Your monthly premium for Humana Gold Plus H0108-004 (HMO)**

Section 4.1    How much is your plan premium? ...............................................................14

Section 4.2    If you pay a Part D late enrollment penalty, there are several ways you can pay
your penalty ..........................................................................................15

Section 4.3    Can we change your monthly plan premium during the year?..............................17

**SECTION 5**    **Please keep your plan membership record up to date**

Section 5.1    How to help make sure that we have accurate information about you ..................17

**SECTION 6**    **We protect the privacy of your personal health information**

Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 287 of 547 PageID #: 4896
Case 2:19-cv-06926-DSF-MRW Document 60-1 Filed 04/24/20 Page 10 of 225 Page ID #:1251
2014 Evidence of Coverage for Humana Gold Plus H0103-004 (HMO)
Chapter 1: Getting started as a member

Section 6.1    We make sure that your health information is protected ...................................18

**SECTION 7**    **How other insurance works with our plan**

Section 7.1    Which plan pays first when you have other insurance?......................................18

Case 1:21-cv-01093-LPS  Document 35  Filed 12/13/21  Page 288 of 547 PageID #: 4897
Case 2:19-cv-06926-DSF-MRW  Document 60-1  Filed 04/24/20  Page 11 of 225  Page ID #:1252

# SECTION 1          Introduction

| Section 1.1 | You are enrolled in Humana Gold Plus H0108-004 (HMO), which is a Medicare HMO |
|---|---|

You are covered by Medicare, and you have chosen to get your Medicare health care and your prescription drug coverage through our plan, Humana Gold Plus H0108-004 (HMO).

There are different types of Medicare health plans. Humana Gold Plus H0108-004 (HMO) is a Medicare Advantage HMO Plan (HMO stands for Health Maintenance Organization). Like all Medicare health plans, this Medicare HMO is approved by Medicare and run by a private company.

| Section 1.2 | What is the Evidence of Coverage booklet about? |
|---|---|

This Evidence of Coverage booklet tells you how to get your Medicare medical care and prescription drugs covered through our plan. This booklet explains your rights and responsibilities, what is covered, and what you pay as a member of the plan.

This plan, Humana Gold Plus H0108-004 (HMO), is offered by HUMANA HEALTH PLAN OF CALIFORNIA, INC. (When this Evidence of Coverage says "we," "us," or "our," it means HUMANA HEALTH PLAN OF CALIFORNIA, INC. When it says "plan" or "our plan," it means Humana Gold Plus H0108-004 (HMO).)

The word "coverage" and "covered services" refers to the medical care and services and the prescription drugs available to you as a member of Humana Gold Plus H0108-004 (HMO).

| Section 1.3 | What does this chapter tell you? |
|---|---|

Look through Chapter 1 of this Evidence of Coverage to learn:
- What makes you eligible to be a plan member?
- What is your plan's service area?
- What materials will you get from us?
- What is your plan premium and how can you pay it?
- How do you keep the information in your membership record up to date?

| Section 1.4 | What if you are new to Humana Gold Plus H0108-004 (HMO)? |
|---|---|

If you are a new member, then it's important for you to learn what the plan's rules are and what services are available to you. We encourage you to set aside some time to look through this Evidence of Coverage booklet.

If you are confused or concerned or just have a question, please contact Customer Care (phone numbers are printed on the back cover of this booklet).

A-7227

Case 1:21-cv-01083-LPS Document 35 Filed 12/13/21 Page 289 of 547 PageID #: 4898
Case 2:19-cv-06926-DSF-MRW Document 60-1 Filed 04/24/20 Page 12 of 225 Page ID #:1253

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 1: Getting started as a member

| Section 1.5 | Legal information about the Evidence of Coverage |

**It's part of our contract with you**

This Evidence of Coverage is part of our contract with you about how Humana Gold Plus H0108-004 (HMO) covers your care. Other parts of this contract include your enrollment form, the Prescription Drug Guide (Formulary), and any notices you receive from us about changes to your coverage or conditions that affect your coverage. These notices are sometimes called "riders" or "amendments."

The contract is in effect for months in which you are enrolled in Humana Gold Plus H0108-004 (HMO) between January 1, 2014 and December 31, 2014.

Each calendar year, Medicare allows us to make changes to the plans that we offer. This means we can change the costs and benefits of Humana Gold Plus H0108-004 (HMO) after December 31, 2014. We can also choose to stop offering the plan, or to offer it in a different service area, after December 31, 2014.

**Medicare must approve our plan each year**

Medicare (the Centers for Medicare & Medicaid Services) must approve Humana Gold Plus H0108-004 (HMO) each year. You can continue to get Medicare coverage as a member of our plan as long as we choose to continue to offer the plan and Medicare renews its approval of the plan.

# SECTION 2     What makes you eligible to be a plan member?

| Section 2.1 | Your eligibility requirements |

<u>You are eligible for membership in our plan as long as:</u>
- You live in our geographic service area (Section 2.3 below describes our service area)
- -- and -- you have both Medicare Part A and Medicare Part B
- -- and -- you do <u>not</u> have End-Stage Renal Disease (ESRD), with limited exceptions, such as if you develop ESRD when you are already a member of a plan that we offer, or you were a member of a different plan that was terminated.

| Section 2.2 | What are Medicare Part A and Medicare Part B? |

When you first signed up for Medicare, you received information about what services are covered under Medicare Part A and Medicare Part B. Remember:
- Medicare Part A generally helps cover services furnished by institutional providers such as hospitals (for inpatient services), skilled nursing facilities, or home health agencies.
- Medicare Part B is for most other medical services (such as physician's services and other outpatient services) and certain items (such as durable medical equipment and supplies).

Case 1:21-cv-01993-LPS   Document 35   Filed 12/13/21   Page 290 of 547 PageID #: 4899
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 13 of 228   Page ID #:1254

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 1: Getting started as a member

| Section 2.3 | Here is the plan service area for Humana Gold Plus H0108-004 (HMO) |
|---|---|

Although Medicare is a federal program, Humana Gold Plus H0108-004 (HMO) is available only to individuals who live in our plan service area. To remain a member of our plan, you must keep living in this service area. The service area is described below.

Our service area includes the following county/counties in California: Fresno, Kings, Madera Counties, CA.

If you plan to move out of the service area, please contact Customer Care (phone numbers are printed on the back cover of this booklet). When you move, you will have a Special Enrollment Period that will allow you to switch to Original Medicare or enroll in a Medicare health or drug plan that is available in your new location.

It is also important that you call Social Security if you move or change your mailing address. You can find phone numbers and contact information for Social Security in Chapter 2, Section 5.

# SECTION 3   What other materials will you get from us?

| Section 3.1 | Your plan membership card – Use it to get all covered care and prescription drugs |
|---|---|

While you are a member of our plan, you must use your membership card for our plan whenever you get any services covered by this plan and for prescription drugs you get at network pharmacies. Here's a sample membership card to show you what yours will look like:




As long as you are a member of our plan **you must <u>not</u> use your red, white, and blue Medicare card** to get covered medical services (with the exception of routine clinical research studies and hospice services). Keep your red, white, and blue Medicare card in a safe place in case you need it later.

**Here's why this is so important:** If you get covered services using your red, white, and blue Medicare card instead of using your Humana Gold Plus H0108-004 (HMO) membership card while you are a plan member, you may have to pay the full cost yourself.

If your plan membership card is damaged, lost, or stolen, call Customer Care right away and we will send you a new card. (Phone numbers for Customer Care are printed on the back cover of this booklet.)

Case 1:21-cv-01083-LPS Document 35 Filed 12/13/21 Page 291 of 547 PageID #: 4900
Case 2:19-cv-06926-DSF-MRW Document 60-1 Filed 04/24/20 Page 14 of 225 Page ID
#:1255

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 1: Getting started as a member

---

| Section 3.2 | The Provider Directory: Your guide to all providers and pharmacies in the plan's network |
|---|---|

The Provider Directory lists our network providers.

**What are "network providers"?**

**Network providers** are the doctors and other health care professionals, medical groups, hospitals, and other health care facilities that have an agreement with us to accept our payment and any plan cost sharing as payment in full. We have arranged for these providers to deliver covered services to members in our plan.

**Why do you need to know which providers are part of our network?**

It is important to know which providers are part of our network because, with limited exceptions, while you are a member of our plan you must use network providers to get your medical care and services. The only exceptions are emergencies, urgently needed care when the network is not available (generally, when you are out of the area), out-of-area dialysis services, and cases in which Humana Gold Plus H0108-004 (HMO) authorizes use of out-of-network providers. See Chapter 3 (Using the plan's coverage for your medical services) for more specific information about emergency, out-of-network, and out-of-area coverage.

**What are "network pharmacies"?**

Our Provider Directory gives you a complete list of our network pharmacies– that means all of the pharmacies that have agreed to fill covered prescriptions for our plan members.

**Why do you need to know about network pharmacies?**

You can use the Provider Directory to find the network pharmacy you want to use. This is important because, with few exceptions, you must get your prescriptions filled at one of our network pharmacies if you want our plan to cover (help you pay for) them.

If you don't have the Provider Directory, you can get a copy from Customer Care (phone numbers are printed on the back cover of this booklet). You may ask Customer Care for more information about our network providers, including their qualifications. You can also see the Provider Directory at **Humana.com** or download it from this website. Both Customer Care and the website can give you the most up-to-date information about changes in our network pharmacies.

---

| Section 3.3 | The plan's Prescription Drug Guide (Formulary) |
|---|---|

The plan has a Prescription Drug Guide (Formulary). We call it the "Drug Guide" for short. It tells which Part D prescription drugs are covered by Humana Gold Plus H0108-004 (HMO). The drugs on this list are selected by the plan with the help of a team of doctors and pharmacists. The list must meet requirements set by Medicare. Medicare has approved the Humana Gold Plus H0108-004 (HMO) Drug Guide.

The Drug Guide also tells you if there are any rules that restrict coverage for your drugs.

We will send you a copy of the Drug Guide. The Drug Guide we send to you includes information for the covered drugs that are most commonly used by our members. However, we cover additional drugs that are not included in the printed Drug Guide. If one of your drugs is not listed in the Drug Guide, you should visit our website or contact

---

Case 1:21-cv-01083-LPS Document 35 Filed 12/13/21 Page 292 of 547 PageID #: 4901
Case 2:19-cv-08926-DSF-MRW Document 60-1 Filed 04/24/20 Page 15 of 225 Page ID #1256
2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 1: Getting started as a member

Customer Care to find out if we cover it. To get the most complete and current information about which drugs are covered, you can visit the plan's website **(Humana.com)** or call Customer Care (phone numbers are printed on the back cover of this booklet).

| Section 3.4 | SmartSummary: Reports with a summary of payments made for your Part D prescription drugs |
|---|---|

When you use your Part D prescription drug benefits, we will send you a summary report to help you understand and keep track of payments for your Part D prescription drugs. This summary report is called SmartSummary®.

SmartSummary tells you the total amount you have spent on your Part D prescription drugs and the total amount we have paid for each of your Part D prescription drugs during the month. Chapter 6 (What you pay for your Part D prescription drugs) gives more information about SmartSummary and how it can help you keep track of your drug coverage.

SmartSummary is also available upon request. To get a copy, please contact Customer Care (phone numbers are printed on the back cover of this booklet).

## SECTION 4       Your monthly premium for Humana Gold Plus H0108-004 (HMO)

| Section 4.1 | How much is your plan premium? |
|---|---|

You do not pay a separate monthly plan premium for Humana Gold Plus H0108-004 (HMO). You must continue to pay your Medicare Part B premium (unless your Part B premium is paid for you by Medicaid or another third party).

**In some situations, your plan premium could be <u>more</u>**

In some situations, your plan premium could be more than the amount listed above in Section 4.1. These situations are described below.

- If you signed up for extra benefits, also called "optional supplemental benefits", then you pay an additional premium each month for these extra benefits. If you have any questions about your plan premiums, please call Customer Care (phone numbers are printed on the back cover of this booklet).

  MyOption℠ Dental – High PPO: **$25.30** additional monthly premium
  MyOption℠ Vision: **$15.30** additional monthly premium
  MyOption℠ Plus: **$24.30** additional monthly premium

- Some members are required to pay a **late enrollment penalty** because they did not join a Medicare drug plan when they first became eligible or because they had a continuous period of 63 days or more when they didn't have "creditable" prescription drug coverage. ("Creditable" means the drug coverage is expected to pay, on average, at least as much as Medicare's standard prescription drug coverage.) For these members, the late enrollment penalty is added to the plan's monthly premium. Their premium amount will be the monthly plan premium plus the amount of their late enrollment penalty.

Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 293 of 547 PageID #: 4902
Case 2:19-cv-08926-DSF-MRW Document 66-1 Filed 04/24/20 Page 16 of 225 Page ID #:1257

2014 Evidence of Coverage for Humana Gold Plus H0103-004 (HMO)
Chapter 1: Getting started as a member

– If you are required to pay the late enrollment penalty, the amount of your penalty depends on how long you waited before you enrolled in drug coverage or how many months you were without drug coverage after you became eligible. Chapter 6, Section 10 explains the late enrollment penalty.

If you have a late enrollment penalty and do not pay it, you could be disenrolled from the plan.

**Many members are required to pay other Medicare premiums**

Many members are required to pay other Medicare premiums. As explained in Section 2 above, in order to be eligible for our plan, you must be entitled to Medicare Part A and enrolled in Medicare Part B. For that reason, some plan members (those who aren't eligible for premium-free Part A) pay a premium for Medicare Part A. And most plan members pay a premium for Medicare Part B. **You must continue paying your Medicare premiums to remain a member of the plan.**

Some people pay an extra amount for Part D because of their yearly income. If your income is **$85,000** or above for an individual (or married individuals filing separately) or **$170,000** or above for married couples, you must pay an extra amount directly to the government (not the Medicare plan) for your Medicare Part D coverage.

• If you are required to pay the extra amount and you do not pay it, you will be disenrolled from the plan and lose prescription drug coverage.
• If you have to pay an extra amount, Social Security, not your Medicare plan, will send you a letter telling you what that extra amount will be.
• For more information about Part D premiums based on income, go to Chapter 6, Section 11 of this booklet. You can also visit http://www.medicare.gov on the web or call 1-800-MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week. TTY users should call 1-877-486-2048. Or you may call Social Security at 1-800-772-1213. TTY users should call 1-800-325-0778.

Your copy of Medicare & You 2014 gives information about the Medicare premiums in the section called "2014 Medicare Costs." This explains how the Medicare Part B and Part D premiums differ for people with different incomes. Everyone with Medicare receives a copy of Medicare & You each year in the fall. Those new to Medicare receive it within a month after first signing up. You can also download a copy of Medicare & You 2014 from the Medicare website (http://www.medicare.gov). Or, you can order a printed copy by phone at 1-800-MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week. TTY users call 1-877-486-2048.

| Section 4.2 | If you pay a Part D late enrollment penalty, there are several ways you can pay your penalty |
|---|---|

If you pay a Part D late enrollment penalty, there are four ways you can pay the penalty. Members select a payment option choice at the time of enrollment. If you wish to change your payment option, you can easily do so by contacting Customer Care, or you can visit our eBilling site at **Humana.com** to set up a payment option for your account.

1. Login to **Humana.com** with your user id and password. If you don't have a user name or password, click on "Register for MyHumana."
2. Click on the eBilling link under "My Claims & Spending" tab.
3. Once you click on the eBilling link, you'll be able to make a payment. You can also check your account balance and review an invoice summary.

Case 1:21-cv-01083-LPS   Document 35   Filed 12/13/21   Page 294 of 547 PageID #: 4903
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 17 of 225   Page ID #:1258

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 1: Getting started as a member

If you decide to change the way you pay your late enrollment penalty, it can take up to three months for your new payment method to take effect. While we are processing your request for a new payment method, you are responsible for making sure that your late enrollment penalty is paid on time.

**Option 1: You can pay by check**

Checks should be made out to the plan and sent to the plan. Checks should <u>not</u> be made out to the Centers for Medicare & Medicaid Services or the U.S. Department of Health and Human Services (HHS) and should <u>not</u> be sent to these agencies.

You may decide to pay your late enrollment penalty directly to our plan with a check or money order using the coupon book Humana will provide to you. Your late enrollment penalty payment will always be due on the first day of the month.

**Option 2: Automatically withdrawn from your checking or savings account, or charged directly to your credit card or debit card**

Instead of paying by check, you can have your late enrollment penalty automatically withdrawn from your checking or savings account, or charged directly to your credit card or debit card. Your late enrollment penalty will be automatically withdrawn from your checking or savings account on the third working day of each month or charged directly to your credit card or debit card monthly. Please call our Customer Care department to set up your automatic withdrawal or credit or debit card payments.

**Options 3 and 4: You can have the late enrollment penalty taken out of your monthly Social Security check or Railroad Retiree Board (RRB) benefit**

You can have the late enrollment penalty taken out of your monthly Social Security or Railroad Retiree Board benefit check. You can contact Customer Care for more information on how to pay your late enrollment penalty this way or you can visit our eBilling site at Humana.com to set up your SSA or RRB payment option. We will be happy to help you set this up. (Phone numbers for Customer Care are printed on the back cover of this booklet.)

**What to do if you are having trouble paying your late enrollment penalty**

Your late enrollment penalty is due in our office by the first day of the month. If we have not received your penalty payment by the 15th of the month, we will send you a notice telling you that your plan membership will end if we do not receive your late enrollment penalty within six months.

If you are having trouble paying your late enrollment penalty on time, please contact Customer Care to see if we can direct you to programs that will help with your penalty. (Phone numbers for Customer Care are printed on the back cover of this booklet.)

If we end your membership with the plan because you did not pay your late enrollment penalty, then you may not be able to receive Part D coverage until the following year if you enroll in a new plan during the annual enrollment period. During the annual enrollment period, you may either join a stand-alone prescription drug plan or a health plan that also provides drug coverage. (If you go without "creditable" drug coverage for more than 63 days, you may have to pay a late enrollment penalty for as long as you have Part D coverage.)

If we end your membership because you did not pay your late enrollment penalty, you will have health coverage under Original Medicare.

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 1: Getting started as a member

At the time we end your membership, you may still owe us for the penalty you have not paid. We have the right to pursue collection of the penalty amount you owe. In the future, if you want to enroll again in our plan (or another plan that we offer), you will need to pay the amount you owe before you can enroll.

If you think we have wrongfully ended your membership, you have a right to ask us to reconsider this decision by making a complaint. Chapter 9, Section 10 of this booklet tells how to make a complaint. If you had an emergency circumstance that was out of your control and it caused you to not be able to pay your premiums within our grace period, you can ask Medicare to reconsider this decision by calling 1-800-MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week. TTY users should call 1-877-486-2048.

| Section 4.3 | Can we change your monthly plan premium during the year? |
|---|---|

**No.** We are not allowed to begin charging a monthly plan premium during the year. If the monthly plan premium changes for next year we will tell you in September and the change will take effect on January 1.

However, in some cases, you may need to start paying or may be able to stop paying a late enrollment penalty. (The late enrollment penalty may apply if you had a continuous period of 63 days or more when you didn't have "creditable" prescription drug coverage.) This could happen if you become eligible for the "Extra Help" program or if you lose your eligibility for the "Extra Help" program during the year:

- If you currently pay the late enrollment penalty and become eligible for "Extra Help" during the year, you would be able to stop paying your penalty.
- If the "Extra Help" program is currently paying your late enrollment penalty and you lose your eligibility during the year, you would need to start paying your penalty.

You can find out more about the "Extra Help" program in Chapter 2, Section 7.

# SECTION 5    Please keep your plan membership record up to date

| Section 5.1 | How to help make sure that we have accurate information about you |
|---|---|

Your membership record has information from your enrollment form, including your address and telephone number. It shows your specific plan coverage including your Primary Care Physician.

The doctors, hospitals, pharmacists, and other providers in the plan's network need to have correct information about you. **These network providers use your membership record to know what services and drugs are covered and the cost-sharing amounts for you.** Because of this, it is very important that you help us keep your information up to date.

**Let us know about these changes:**

- Changes to your name, your address, or your phone number
- Changes in any other health insurance coverage you have (such as from your employer, your spouse's employer, workers' compensation, or Medicaid)
- If you have any liability claims, such as claims from an automobile accident
- If you have been admitted to a nursing home
- If you receive care in an out-of-area or out-of-network hospital or emergency room
- If your designated responsible party (such as a caregiver) changes

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 296 of 547 PageID #: 4905
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 19 of 225   Page ID #:1260

• If you are participating in a clinical research study

If any of this information changes, please let us know by calling Customer Care (phone numbers are printed on the back cover of this booklet).

It is also important to contact Social Security if you move or change your mailing address. You can find phone numbers and contact information for Social Security in Chapter 2, Section 5.

**Read over the information we send you about any other insurance coverage you have**

Medicare requires that we collect information from you about any other medical or drug insurance coverage that you have. That's because we must coordinate any other coverage you have with your benefits under our plan. (For more information about how our coverage works when you have other insurance, see Section 7 in this chapter.)

Once each year, we will send you a letter that lists any other medical or drug insurance coverage that we know about. Please read over this information carefully. If it is correct, you don't need to do anything. If the information is incorrect, or if you have other coverage that is not listed, please call Customer Care (phone numbers are printed on the back cover of this booklet).

## SECTION 6    We protect the privacy of your personal health information

### Section 6.1    We make sure that your health information is protected

Federal and state laws protect the privacy of your medical records and personal health information. We protect your personal health information as required by these laws.

For more information about how we protect your personal health information, please go to Chapter 8, Section 1.4 of this booklet.

## SECTION 7    How other insurance works with our plan

### Section 7.1    Which plan pays first when you have other insurance?

When you have other insurance (like employer group health coverage), there are rules set by Medicare that decide whether our plan or your other insurance pays first. The insurance that pays first is called the "primary payer" and pays up to the limits of its coverage. The one that pays second, called the "secondary payer," only pays if there are costs left uncovered by the primary coverage. The secondary payer may not pay all of the uncovered costs.

These rules apply for employer or union group health plan coverage:
• If you have retiree coverage, Medicare pays first.
• If your group health plan coverage is based on your or a family member's current employment, who pays first depends on your age, the size of the employer, and whether you have Medicare based on age, disability, or End-stage Renal Disease (ESRD):
  – If you're under 65 and disabled and you or your family member is still working, your plan pays first if the employer has 100 or more employees or at least one employer in a multiple employer plan has more than 100 employees.

2014 Evidence of Coverage for Humana Gold Plus H0163-004 (HMO)
Chapter 1: Getting started as a member

- If you're over 65 and you or your spouse is still working, the plan pays first if the employer has 20 or more employees or at least one employer in a multiple employer plan has more than 20 employees.
- If you have Medicare because of ESRD, your group health plan will pay first for the first 30 months after you become eligible for Medicare.

These types of coverage usually pay first for services related to each type:
- No-fault insurance (including automobile insurance)
- Liability (including automobile insurance)
- Black lung benefits
- Workers' compensation

Medicaid and TRICARE never pay first for Medicare-covered services. They only pay after Medicare, employer group health plans, and/or Medigap have paid.

If you have other insurance, tell your doctor, hospital, and pharmacy. If you have questions about who pays first, or you need to update your other insurance information, call Customer Care (phone numbers are printed on the back cover of this booklet.) You may need to give your plan member ID number to your other insurers (once you have confirmed their identity) so your bills are paid correctly and on time.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 298 of 547 PageID #: 4907
Case 2:15-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 21 of 225   Page ID
#:1262

# CHAPTER 2. Important phone numbers and resources

**SECTION 1**    **Humana Gold Plus H0108-004 (HMO) contacts** (how to contact us, including how to reach Customer Care at the plan) ................................................................21

**SECTION 2**    **Medicare** (how to get help and information directly from the federal Medicare program) ................................................................28

**SECTION 3**    **State Health Insurance Assistance Program** (free help, information, and answers to your questions about Medicare) ..............30

**SECTION 4**    **Quality Improvement Organization** (paid by Medicare to check on the quality of care for people with Medicare) ..........30

**SECTION 5**    **Social Security** ................................................................30

**SECTION 6**    **Medicaid** (a joint federal and state program that helps with medical costs for some people with limited income and resources) ........................................31

**SECTION 7**    **Information about programs to help people pay for their prescription drugs** ................................................................32

**SECTION 8**    **How to contact the Railroad Retirement Board** ...........................................34

**SECTION 9**    **Do you have "group insurance" or other health insurance from an employer?** ................................................................34

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 2: Important phone numbers and resources

---

# SECTION 1        Humana Gold Plus H0108-004 (HMO) contacts

(how to contact us, including how to reach Customer Care at the plan)

**How to contact our plan's Customer Care**

For assistance with claims, billing, or member card questions, please call or write to Humana Gold Plus H0108-004 (HMO) Customer Care. We will be happy to help you.

| Customer Care | |
|---|---|
| **CALL** | 1-800-457-4708 |
| | Calls to this number are free. (A Customer Care representative will be available to answer your call directly during the annual enrollment period and 60 days after from 8 a.m. until 8 p.m.) |
| | However, beginning February 15, 2014, your call may be handled by our automated phone system on Saturdays, Sundays, and some Public Holidays. When leaving a message, simply select the reason for your call from the automated list and a knowledgeable representative will return your call by the end of the next working day. |
| | Customer Care also has free language interpreter services available for non-English speakers. |
| **TTY** | 711 |
| | Hours of operation are the same as above. |
| | This number requires special telephone equipment and is only for people who have difficulties with hearing or speaking. |
| | Calls to this number are free. |
| **FAX** | 1-877-837-7741 |
| **WRITE** | Humana, P.O. Box 14168, Lexington, KY 40512-4168 |
| **WEBSITE** | **Humana.com** |

**How to contact us when you are asking for a coverage decision about your medical care**

A coverage decision is a decision we make about your benefits and coverage or about the amount we will pay for your medical services. For more information on asking for coverage decisions about your medical care, see Chapter 9 (What to do if you have a problem or complaint (coverage decisions, appeals, complaints)).

You may call us if you have questions about our coverage decision process.

---

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 300 of 547 PageID #: 4909
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 23 of 225   Page ID
#:1264

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 2: Important phone numbers and resources

| Coverage Decisions for Medical Care | |
|---|---|
| **CALL** | 1-800-457-4708, For fast (expedited) coverage decisions, call 1-866-737-5113 |
| | 8 a.m. to 8 p.m. seven days a week from Oct. 1 – Feb. 14. 8 a.m. to 8 p.m. Monday-Friday from Feb. 15 - Sept. 30. You can leave us a voicemail message after hours, Saturdays, Sundays and some public holidays. Just leave a message and select the reason for your call from the automated list. We'll call back by the end of the next business day. Please have your Humana ID card with you when you call. |
| | Calls to this number are free. |
| **TTY** | 711 |
| | Hours of operation are the same as above. |
| | This number requires special telephone equipment and is only for people who have difficulties with hearing or speaking. |
| | Calls to this number are free. |
| **FAX** | 1-888-200-7440 for expedited coverage decisions only |
| **WRITE** | Humana, P.O. Box 14168, Lexington, KY 40512-4168 |

**How to contact us when you are making an appeal about your medical care**

An appeal is a formal way of asking us to review and change a coverage decision we have made. For more information on making an appeal about your medical care, see Chapter 9 (What to do if you have a problem or complaint (coverage decisions, appeals, complaints)).

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 2: Important phone numbers and resources

| **Appeals for Medical Care** | |
|---|---|
| **CALL** | 1-800-457-4708 |
| | 8 a.m. to 8 p.m. seven days a week from Oct. 1 – Feb. 14. 8 a.m. to 8 p.m. Monday-Friday from Feb. 15 - Sept. 30. You can leave us a voicemail message after hours, Saturdays, Sundays and some public holidays. Just leave a message and select the reason for your call from the automated list. We'll call back by the end of the next business day. Please have your Humana ID card with you when you call. |
| | Calls to this number are free. |
| **TTY** | 711 |
| | Hours of operation are the same as above. |
| | This number requires special telephone equipment and is only for people who have difficulties with hearing or speaking. |
| | Calls to this number are free. |
| **FAX** | 1-800-949-2961 for expedited appeals only. |
| **WRITE** | Humana Grievances and Appeals Dept., P.O. Box 14165, Lexington, KY 40512-4165 |

**How to contact us when you are making a complaint about your medical care**

You can make a complaint about us or one of our network providers, including a complaint about the quality of your care. This type of complaint does not involve coverage or payment disputes. (If your problem is about the plan's coverage or payment, you should look at the section above about making an appeal.) For more information on making a complaint about your medical care, see Chapter 9 (What to do if you have a problem or complaint (coverage decisions, appeals, complaints)).

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 2: Important phone numbers and resources

| Complaints about Medical Care | |
|---|---|
| **CALL** | 1-800-457-4708 |
| | 8 a.m. to 8 p.m. seven days a week from Oct. 1 – Feb. 14. 8 a.m. to 8 p.m. Monday-Friday from Feb. 15 - Sept. 30. You can leave us a voicemail message after hours, Saturdays, Sundays and some public holidays. Just leave a message and select the reason for your call from the automated list. We'll call back by the end of the next business day. Please have your Humana ID card with you when you call. |
| | Calls to this number are free. |
| **TTY** | 711 |
| | Hours of operation are the same as above. |
| | This number requires special telephone equipment and is only for people who have difficulties with hearing or speaking. |
| | Calls to this number are free. |
| **FAX** | 1-800-949-2961, for expedited grievances only. |
| **WRITE** | Humana Grievances and Appeals Dept., P.O. Box 14165, Lexington, KY 40512-4165 |
| **MEDICARE WEBSITE** | You can submit a complaint about Humana Gold Plus H0108-004 (HMO) directly to Medicare. To submit an online complaint to Medicare, go to www.medicare.gov/MedicareComplaintForm/home.aspx. |

**How to contact us when you are asking for a coverage decision about your Part D prescription drugs**

A coverage decision is a decision we make about your benefits and coverage or about the amount we will pay for your Part D prescription drugs. For more information on asking for coverage decisions about your Part D prescription drugs, see Chapter 9 (What to do if you have a problem or complaint (coverage decisions, appeals, complaints)).

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 2: Important phone numbers and resources

| Coverage Decisions for Part D Prescription Drugs | |
|---|---|
| **CALL** | 1-800-555-2546, 24 hours a day, seven days a week. |
| | Calls to this number are free. |
| **TTY** | 711 |
| | Hours of operation are the same as above. |
| | This number requires special telephone equipment and is only for people who have difficulties with hearing or speaking. |
| | Calls to this number are free. |
| **FAX** | 1-877-486-2621 for coverage determinations only. |
| **WRITE** | Humana Clinical Pharmacy Review, Attn: Medicare Part D Coverage Determinations, P.O. Box 33008, Louisville, KY 40232 |
| **WEBSITE** | **Humana.com** |

**How to contact us when you are making an appeal about your Part D prescription drugs**

An appeal is a formal way of asking us to review and change a coverage decision we have made. For more information on making an appeal about your Part D prescription drugs, see Chapter 9 (What to do if you have a problem or complaint (coverage decisions, appeals, complaints)).

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 304 of 547 PageID #: 4913
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 27 of 225   Page ID #:1268

| **Appeals for Part D Prescription Drugs** | |
|---|---|
| **CALL** | 1-800-457-4708 |
| | 8 a.m. to 8 p.m. seven days a week from Oct. 1 – Feb. 14. 8 a.m. to 8 p.m. Monday-Friday from Feb. 15 - Sept. 30. You can leave us a voicemail message after hours, Saturdays, Sundays and some public holidays. Just leave a message and select the reason for your call from the automated list. We'll call back by the end of the next business day. Please have your Humana ID card with you when you call. |
| | Calls to this number are free. |
| **TTY** | 711 |
| | Hours of operation are the same as above. |
| | This number requires special telephone equipment and is only for people who have difficulties with hearing or speaking. |
| | Calls to this number are free. |
| **FAX** | 1-800-949-2961 for expedited appeals only. |
| **WRITE** | Humana Grievances and Appeals Dept., P.O. Box 14165, Lexington, KY 40512-4165 |
| **WEBSITE** | **Humana.com** |

**How to contact us when you are making a complaint about your Part D prescription drugs**

You can make a complaint about us or one of our network pharmacies, including a complaint about the quality of your care. This type of complaint does not involve coverage or payment disputes. (If your problem is about the plan's coverage or payment, you should look at the section above about making an appeal.) For more information on making a complaint about your Part D prescription drugs, see Chapter 9 (What to do if you have a problem or complaint (coverage decisions, appeals, complaints)).

A-7243

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 2: Important phone numbers and resources

| Complaints about Part D Prescription Drugs | |
|---|---|
| **CALL** | 1-800-457-4708 |
| | 8 a.m. to 8 p.m. seven days a week from Oct. 1 – Feb. 14. 8 a.m. to 8 p.m. Monday-Friday from Feb. 15 - Sept. 30. You can leave us a voicemail message after hours, Saturdays, Sundays and some public holidays. Just leave a message and select the reason for your call from the automated list. We'll call back by the end of the next business day. Please have your Humana ID card with you when you call. |
| | Calls to this number are free. |
| **TTY** | 711 |
| | Hours of operation are the same as above. |
| | This number requires special telephone equipment and is only for people who have difficulties with hearing or speaking. |
| | Calls to this number are free. |
| **FAX** | 1-800-949-2961, for expedited grievances only. |
| **WRITE** | Humana Grievances and Appeals Dept., P.O. Box 14165, Lexington, KY 40512-4165 |
| **MEDICARE WEBSITE** | You can submit a complaint about Humana Gold Plus H0108-004 (HMO) directly to Medicare. To submit an online complaint to Medicare, go to www.medicare.gov/MedicareComplaintForm/home.aspx. |

**Where to send a request asking us to pay for our share of the cost for medical care or a drug you have received**

For more information on situations in which you may need to ask us for reimbursement or to pay a bill you have received from a provider, see Chapter 7 (Asking us to pay our share of a bill you have received for covered medical services or drugs).

**Please note**: If you send us a payment request and we deny any part of your request, you can appeal our decision. See Chapter 9 (What to do if you have a problem or complaint (coverage decisions, appeals, complaints)) for more information.

Case 1:21-cv-01093-LPS  Document 35  Filed 12/13/21  Page 306 of 547 PageID #: 4915
Case 2:19-cv-06926-DSF-MRW  Document 60-1  Filed 04/24/20  Page 29 of 225  Page ID #:1270

| Payment Requests | |
|---|---|
| **CALL** | 1-800-457-4708 |
| | 8 a.m. to 8 p.m. seven days a week from Oct. 1 – Feb. 14. 8 a.m. to 8 p.m. Monday-Friday from Feb. 15 - Sept. 30. You can leave us a voicemail message after hours, Saturdays, Sundays and some public holidays. Just leave a message and select the reason for your call from the automated list. We'll call back by the end of the next business day. Please have your Humana ID card with you when you call. |
| | Calls to this number are free. |
| **TTY** | 711 |
| | Hours of operation are the same as above. |
| | This number requires special telephone equipment and is only for people who have difficulties with hearing or speaking. |
| | Calls to this number are free. |
| **WRITE** | Humana, P.O. Box 14168, Lexington, KY 40512-4168 |
| **WEBSITE** | **Humana.com** |

# SECTION 2   Medicare
### (how to get help and information directly from the federal Medicare program)

Medicare is the federal health insurance program for people 65 years of age or older, some people under age 65 with disabilities, and people with End-Stage Renal Disease (permanent kidney failure requiring dialysis or a kidney transplant).

The federal agency in charge of Medicare is the Centers for Medicare & Medicaid Services (sometimes called "CMS"). This agency contracts with Medicare Advantage organizations, including us.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 2: Important phone numbers and resources

| Medicare | |
|---|---|
| **CALL** | 1-800-MEDICARE, or 1-800-633-4227<br><br>Calls to this number are free.<br><br>24 hours a day, 7 days a week. |
| **TTY** | 1-877-486-2048<br><br>This number requires special telephone equipment and is only for people who have difficulties with hearing or speaking.<br><br>Calls to this number are free. |
| **WEBSITE** | http://www.medicare.gov<br><br>This is the official government website for Medicare. It gives you up-to-date information about Medicare and current Medicare issues. It also has information about hospitals, nursing homes, physicians, home health agencies, and dialysis facilities. It includes booklets you can print directly from your computer. You can also find Medicare contacts in your state.<br><br>The Medicare website also has detailed information about your Medicare eligibility and enrollment options with the following tools:<br>• **Medicare Eligibility Tool:** Provides Medicare eligibility status information.<br>• **Medicare Plan Finder:** Provides personalized information about available Medicare prescription drug plans, Medicare health plans, and Medigap (Medicare Supplement Insurance) policies in your area. These tools provide an <u>estimate</u> of what your out-of-pocket costs might be in different Medicare plans.<br>You can also use the website to tell Medicare about any complaints you have about Humana Gold Plus H0108-004 (HMO):<br><br>• **Tell Medicare about your complaint:** You can submit a complaint about Humana Gold Plus H0108-004 (HMO) directly to Medicare. To submit a complaint to Medicare, go to www.medicare.gov/MedicareComplaintForm/home.aspx. Medicare takes your complaints seriously and will use this information to help improve the quality of the Medicare program.<br><br>If you don't have a computer, your local library or senior center may be able to help you visit this website using its computer. Or, you can call Medicare and tell them what information you are looking for. They will find the information on the website, print it out, and send it to you. (You can call Medicare at 1-800-MEDICARE (1-800-633- 4227), 24 hours a day, 7 days a week. TTY users should call 1-877- 486-2048.) |

Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 308 of 547 PageID #: 4917
Case 2:19-cv-06926-DSF-MRW Document 60-1 Filed 04/24/20 Page 31 of 225 Page ID #:1272

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 2: Important phone numbers and resources

| SECTION 3 | **State Health Insurance Assistance Program**<br>(free help, information, and answers to your questions about Medicare) |
|---|---|

The State Health Insurance Assistance Program (SHIP) is a government program with trained counselors in every state.

The State Health Insurance Assistance Program (SHIP) is independent (not connected with any insurance company or health plan). It is a state program that gets money from the federal government to give free local health insurance counseling to people with Medicare.

State Health Insurance Assistance Program (SHIP) counselors can help you with your Medicare questions or problems. They can help you understand your Medicare rights, help you make complaints about your medical care or treatment, and help you straighten out problems with your Medicare bills. State Health Insurance Assistance Program (SHIP) counselors can also help you understand your Medicare plan choices and answer questions about switching plans.

Contact information for your State Health Insurance Assistance Program (SHIP) can be found in "Exhibit A" in the back of this document.

| SECTION 4 | **Quality Improvement Organization**<br>(paid by Medicare to check on the quality of care for people with Medicare) |
|---|---|

There is a Quality Improvement Organization (QIO) for each state.

The Quality Improvement Organization (QIO) has a group of doctors and other health care professionals who are paid by the federal government. This organization is paid by Medicare to check on and help improve the quality of care for people with Medicare. The Quality Improvement Organization (QIO) is an independent organization. It is not connected with our plan.

You should contact your Quality Improvement Organization (QIO) in any of these situations:

- You have a complaint about the quality of care you have received.
- You think coverage for your hospital stay is ending too soon.
- You think coverage for your home health care, skilled nursing facility care, or Comprehensive Outpatient Rehabilitation Facility (CORF) services are ending too soon.

Contact information for your state Quality Improvement Organization (QIO) can be found in "Exhibit A" in the back of this document.

| SECTION 5 | **Social Security** |
|---|---|

Social Security is responsible for determining eligibility and handling enrollment for Medicare. U.S. citizens who are 65 or older, or who have a disability or End-Stage Renal Disease and meet certain conditions, are eligible for Medicare. If you are already getting Social Security checks, enrollment into Medicare is automatic. If you are not getting Social Security checks, you have to enroll in Medicare. Social Security handles the enrollment process for Medicare. To apply for Medicare, you can call Social Security or visit your local Social Security office.

Case 1:21-cv-01083-LPS Document 35 Filed 12/13/21 Page 309 of 547 PageID #: 4918
Case 2:19-cv-08926-DSF-MRW Document 60-1 Filed 04/24/20 Page 32 of 225 Page ID
#:1272

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 2: Important phone numbers and resources

---

Social Security is also responsible for determining who has to pay an extra amount for their Part D drug coverage because they have a higher income. If you got a letter from Social Security telling you that you have to pay the extra amount and have questions about the amount or if your income went down because of a life-changing event, you can call Social Security to ask for a reconsideration.

If you move or change your mailing address, it is important that you contact Social Security to let them know.

| Social Security | |
|---|---|
| **CALL** | 1-800-772-1213 |
| | Calls to this number are free. |
| | Available 7 a.m. to 7 p.m., Monday through Friday. |
| | You can use Social Security's automated telephone services to get recorded information and conduct some business 24 hours a day. |
| **TTY** | 1-800-325-0778 |
| | This number requires special telephone equipment and is only for people who have difficulties with hearing or speaking. |
| | Calls to this number are free. |
| | Available 7 a.m. to 7 p.m., Monday through Friday. |
| **WEBSITE** | http://www.ssa.gov |

---

## SECTION 6    Medicaid
(a joint federal and state program that helps with medical costs for some people with limited income and resources)

---

Medicaid is a joint federal and state government program that helps with medical costs for certain people with limited incomes and resources. Some people with Medicare are also eligible for Medicaid.

In addition, there are programs offered through Medicaid that help people with Medicare pay their Medicare costs, such as their Medicare premiums. These "Medicare Savings Programs" help people with limited income and resources save money each year:

- **Qualified Medicare Beneficiary (QMB):** Helps pay Medicare Part A and Part B premiums, and other cost sharing (like deductibles, coinsurance, and copayments). (Some people with QMB are also eligible for full Medicaid benefits (QMB+).)
- **Specified Low-Income Medicare Beneficiary (SLMB):** Helps pay Part B premiums. (Some people with SLMB are also eligible for full Medicaid benefits (SLMB+).)
- **Qualified Individual (QI):** Helps pay Part B premiums.
- **Qualified Disabled & Working Individuals (QDWI):** Helps pay Part A premiums.

To find out more about Medicaid and its programs, contact your state Medicaid office. Contact information for your state Medicaid Office can be found in "Exhibit A" in the back of this document.

---

Case 1:21-cv-01083-LPS Document 35 Filed 12/13/21 Page 310 of 547 PageID #: 4919
Case 2:19-cv-06926-DSF-MRW Document 60-1 Filed 04/24/20 Page 33 of 225 Page ID #:1274

2014 Evidence of Coverage for Humana Gold Plus H0163-004 (HMO)
Chapter 2: Important phone numbers and resources

# SECTION 7     Information about programs to help people pay for their prescription drugs

**Medicare's "Extra Help" Program**

Medicare provides "Extra Help" to pay prescription drug costs for people who have limited income and resources. Resources include your savings and stocks, but not your home or car. If you qualify, you get help paying for any Medicare drug plan's monthly premium, and prescription copayments or coinsurance. This "Extra Help" also counts toward your out-of-pocket costs.

People with limited income and resources may qualify for "Extra Help". Some people automatically qualify for "Extra Help" and don't need to apply. Medicare mails a letter to people who automatically qualify for "Extra Help".

You may be able to get "Extra Help" to pay for your prescription drug premiums and costs. To see if you qualify for getting "Extra Help", call:

- 1-800-MEDICARE (1-800-633-4227). TTY users should call 1-877-486-2048, 24 hours a day, 7 days a week;
- The Social Security Office at 1-800-772-1213, between 7 am to 7 pm, Monday through Friday. TTY users should call 1-800-325-0778; or
- Your State Medicaid Office. (See "Exhibit A" for contact information.)

If you believe you have qualified for "Extra Help" and you believe that you are paying an incorrect cost-sharing amount when you get your prescription at a pharmacy, our plan has established a process that allows you to either request assistance in obtaining evidence of your proper copayment level, or, if you already have the evidence, to provide this evidence to us.

- At the pharmacy you can show proof of Extra Help by providing any of the following:
  - A copy of your Medicaid card with your name and eligibility date during a month after June of the previous calendar year;
  - One of the following letters from the Social Security Administration (SSA), showing Extra Help status (Important Information, Award Letter, Notice of Change or Notice of Action);
  - A copy of a state document that confirms active Medicaid status during a month after June of the previous calendar year;
  - A screen print from the state Medicaid system showing your Medicaid status during a month after June of the previous calendar year;
  - A print out from the state electronic enrollment file showing Medicaid status during a month after June of the previous calendar year;
  - Any other documentation provided by the state showing Medicaid status during a month after June of the previous calendar year;
  - A letter from SSA showing that the individual receives SSI;
  - A remittance from the facility showing Medicaid payment for a full calendar month for that individual during a month after June of the previous calendar year;
  - A copy of a state document that confirms Medicaid payment on behalf of the individual to the facility for a full calendar month after June of the previous calendar year;
  - A screen print from the State Medicaid systems showing that the individual's institutional status based on at least a full calendar month stay for Medicaid payment purposes during a month after June of the previous calendar year.

Please note that this Extra Help proof must be confirmed by a Pharmacist, CMS representative, State Medicaid official, or a Humana Sales Agent. The Extra Help proof must also reflect the date for the time period in question.

Case 1:21-cv-01083-LPS Document 35 Filed 12/13/21 Page 311 of 547 PageID #: 4920
Case 2:19-cv-06926-DSF-MRW Document 60-1 Filed 04/24/20 Page 34 of 228 Page ID #:1275
2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 2: Important phone numbers and resources

Once we have updated your information at the pharmacy, you can mail proof to the following address to maintain this copayment level: Humana, P.O. Box 14168, Lexington, KY 40512-4168.

We will also follow-up with you by letter requesting that the proof be mailed back within 30 days of the date of the letter.

If you have any questions, please feel free to call Customer Care (phone numbers are on the back cover of this booklet).

- When we receive the evidence showing your copayment or coinsurance level, we will update our system so that you can pay the correct copayment or coinsurance when you get your next prescription at the pharmacy. If you overpay your copayment or coinsurance, we will reimburse you. Either we will forward a check to you in the amount of your overpayment or we will offset future copayments or coinsurance. If the pharmacy hasn't collected a copayment or coinsurance from you and is carrying your copayment or coinsurance as a debt owed by you, we may make the payment directly to the pharmacy. If a state paid on your behalf, we may make payment directly to the state. Please contact Customer Care if you have questions (phone numbers are printed on the back cover of this booklet).

**Medicare Coverage Gap Discount Program**

The Medicare Coverage Gap Discount Program is available nationwide. Because Humana Gold Plus H0108-004 (HMO) offers additional gap coverage during the Coverage Gap Stage, your out-of-pocket costs will sometimes be lower than the costs described here. Please go to Chapter 6, Section 6 for more information about your coverage during the Coverage Gap Stage.

The Medicare Coverage Gap Discount Program provides manufacturer discounts on brand name drugs to Part D enrollees who have reached the coverage gap and are not already receiving "Extra Help." A **50 percent** discount on the negotiated price (excluding the dispensing fee and vaccine administration fee, if any) is available for those brand name drugs from manufacturers that have agreed to pay the discount. The plan pays an additional **2.5 percent** and you pay the remaining **47.5 percent** for your brand drugs.

If you reach the coverage gap, we will automatically apply the discount when your pharmacy bills you for your prescription and your SmartSummary will show any discount provided. Both the amount you pay and the amount discounted by the manufacturer count toward your out-of-pocket costs as if you had paid them and moves you through the coverage gap.

You also receive some coverage for generic drugs. If you reach the coverage gap, the plan pays **28 percent** of the price for generic drugs and you pay the remaining **72 percent** of the price. The coverage for generic drugs works differently than the coverage for brand name drugs. For generic drugs, the amount paid by the plan (**28 percent**) does not count toward your out-of-pocket costs. Only the amount you pay counts and moves you through the coverage gap. Also, the dispensing fee is included as part of the cost of the drug.

If you have any questions about the availability of discounts for the drugs you are taking or about the Medicare Coverage Gap Discount Program in general, please contact Customer Care (phone numbers are printed on the back cover of this booklet).

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 2: Important phone numbers and resources

---

# SECTION 8        How to contact the Railroad Retirement Board

The Railroad Retirement Board is an independent federal agency that administers comprehensive benefit programs for the nation's railroad workers and their families. If you have questions regarding your benefits from the Railroad Retirement Board, contact the agency.

If you receive your Medicare through the Railroad Retirement Board, it is important that you let them know if you move or change your mailing address.

| Railroad Retirement Board | |
|---|---|
| **CALL** | 1-877-772-5772<br><br>Calls to this number are free.<br><br>Available 9:00 a.m. to 3:30 p.m., Monday through Friday<br><br>If you have a touch-tone telephone, recorded information and automated services are available 24 hours a day, including weekends and holidays. |
| **TTY** | 1-312-751-4701<br><br>This number requires special telephone equipment and is only for people who have difficulties with hearing or speaking.<br><br>Calls to this number are <u>not</u> free. |
| **WEBSITE** | http://www.rrb.gov |

---

# SECTION 9        Do you have "group insurance" or other health insurance from an employer?

If you (or your spouse) get benefits from your (or your spouse's) employer or retiree group, call the employer/union benefits administrator or Customer Care if you have any questions. You can ask about your (or your spouse's) employer or retiree health benefits, premiums, or the enrollment period. (Phone numbers for Customer Care are printed on the back cover of this booklet.)

If you have other prescription drug coverage through your (or your spouse's) employer or retiree group, please contact **that group's benefits administrator**. The benefits administrator can help you determine how your current prescription drug coverage will work with our plan.

---

# Chapter 3. Using the plan's coverage for your medical services

**SECTION 1**  **Things to know about getting your medical care covered as a member of our plan**

Section 1.1  What are "network providers" and "covered services"? .................................. 37

Section 1.2  Basic rules for getting your medical care covered by the plan ............................. 37

**SECTION 2**  **Use providers in the plan's network to get your medical care**

Section 2.1  You must choose a Primary Care Physician (PCP) to provide and oversee your medical care .................................................. 38

Section 2.2  What kinds of medical care can you get without getting approval in advance from your PCP? .................................................. 39

Section 2.3  How to get care from specialists and other network providers ............................ 40

Section 2.4  How to get care from out-of-network providers ................................................ 41

**SECTION 3**  **How to get covered services when you have an emergency or an urgent need for care**

Section 3.1  Getting care if you have a medical emergency ................................................ 41

Section 3.2  Getting care when you have an urgent need for care ........................................ 42

**SECTION 4**  **What if you are billed directly for the full cost of your covered services?**

Section 4.1  You can ask us to pay our share of the cost of covered services ........................... 43

Section 4.2  If services are not covered by our plan, you must pay the full cost ....................... 43

**SECTION 5**  **How are your medical services covered when you are in a "clinical research study"?**

Section 5.1  What is a "clinical research study"? ............................................................. 43

Section 5.2  When you participate in a clinical research study, who pays for what? .................. 44

**SECTION 6**  **Rules for getting care covered in a "religious non-medical health care institution"**

Section 6.1  What is a religious non-medical health care institution? ................................... 45

Section 6.2  What care from a religious non-medical health care institution is covered by our plan? .................................................. 45

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 314 of 547 PageID #: 4923
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 37 of 225   Page ID #:1278

**SECTION 7      Rules for ownership of durable medical equipment**

Section 7.1      Will you own the durable medical equipment after making a certain number of payments under our plan? ...................................................................46

A-7253

# SECTION 1     Things to know about getting your medical care covered as a member of our plan

This chapter explains what you need to know about using the plan to get your medical care covered. It gives definitions of terms and explains the rules you will need to follow to get the medical treatments, services, and other medical care that are covered by the plan.

For the details on what medical care is covered by our plan and how much you pay when you get this care, use the benefits chart in the next chapter, Chapter 4 (Medical Benefits Chart, what is covered and what you pay).

## Section 1.1     What are "network providers" and "covered services"?

Here are some definitions that can help you understand how you get the care and services that are covered for you as a member of our plan:

- **"Providers"** are doctors and other health care professionals licensed by the state to provide medical services and care. The term "providers" also includes hospitals and other health care facilities.
- **"Network providers"** are the doctors and other health care professionals, medical groups, hospitals, and other health care facilities that have an agreement with us to accept our payment and your cost-sharing amount as payment in full. We have arranged for these providers to deliver covered services to members in our plan. The providers in our network generally bill us directly for care they give you. When you see a network provider, you usually pay only your share of the cost for their services.
- **"Covered services"** include all the medical care, health care services, supplies, and equipment that are covered by our plan. Your covered services for medical care are listed in the benefits chart in Chapter 4.

## Section 1.2     Basic rules for getting your medical care covered by the plan

As a Medicare health plan, Humana Gold Plus H0108-004 (HMO) must cover all services covered by Original Medicare and must follow Original Medicare's coverage rules.

Humana Gold Plus H0108-004 (HMO) will generally cover your medical care as long as:
- **The care you receive is included in the plan's Medical Benefits Chart** (this chart is in Chapter 4 of this booklet).
- **The care you receive is considered medically necessary.** "Medically necessary" means that the services, supplies, or drugs are needed for the prevention, diagnosis, or treatment of your medical condition and meet accepted standards of medical practice.
- **You have a network primary care physician (a PCP) who is providing and overseeing your care.** As a member of our plan, you must choose a network PCP (for more information about this, see Section 2.1 in this chapter).
  - In most situations, your network PCP must give you approval in advance before you can use other providers in the plan's network, such as specialists, hospitals, skilled nursing facilities, or home health care agencies. This is called giving you a "referral." For more information about this, see Section 2.3 of this chapter.
  - Referrals from your PCP are not required for emergency care or urgently needed care. There are also some other kinds of care you can get without having approval in advance from your PCP (for more information about this, see Section 2.2 of this chapter).

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 3: Using the plan's coverage for your medical services

- **You must receive your care from a network provider** (for more information about this, see Section 2 in this chapter). In most cases, care you receive from an out-of-network provider (a provider who is not part of our plan's network) will not be covered. <u>Here are three exceptions</u>:
  - The plan covers emergency care or urgently needed care that you get from an out-of-network provider. For more information about this, and to see what emergency or urgently needed care means, see Section 3 in this chapter.
  - If you need medical care that Medicare requires our plan to cover and the providers in our network cannot provide this care, you can get this care from an out-of-network provider. You must obtain authorization from the plan prior to seeking care from an out-of-network provider. In this situation, you will pay the same as you would pay if you got the care from a network provider. For information about getting approval to see an out-of-network doctor, see Section 2.4 in this chapter.
  - Kidney dialysis services that you get at a Medicare-certified dialysis facility when you are temporarily outside the plan's service area.

## SECTION 2    Use providers in the plan's network to get your medical care

### Section 2.1    You must choose a Primary Care Physician (PCP) to provide and oversee your medical care

**What is a "PCP" and what does the PCP do for you?**

When you become a member of our plan, you must choose a plan physician to be your PCP. Your PCP is a physician who meets state requirements and is trained to give you basic medical care. Your Provider Directory will indicate which physicians may act as your PCP. As we explain below, you can get your routine or basic care from your PCP. Your PCP can also coordinate the rest of the covered services you get as a plan member. For example, in order to see a network specialist, you usually need to get your PCP's approval first (this is called getting a "referral" to a specialist).

This includes:

- Your x-rays
- Laboratory tests
- Therapies
- Care from doctors who are specialists
- Hospital admissions
- Follow-up care

"Coordinating" your services includes checking or consulting with other plan providers about your care and how it is going. If you need certain types of covered services or supplies, you must get approval in advance from your PCP (such as giving you a referral). In some cases, your PCP will need to get prior authorization (prior approval). Chapter 4 has more information on which services require prior authorization.

Since your PCP can provide and coordinate your medical care, you should have all of your past medical records sent to your PCP's office. Chapter 8 tells you how we will protect the privacy of your medical records and personal health information.

Case 1:21-cv-01083-LPS Document 35 Filed 12/13/21 Page 317 of 547 PageID #: 4926
Case 2:19-cv-06926-DSF-MRW Document 66-1 Filed 04/24/20 Page 40 of 225 Page ID #:1281

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 3: Using the plan's coverage for your medical services

## How do you get care from your PCP?

You will usually see your PCP first for most of your routine health care needs.

There are only a few types of covered services you may get on your own, without contacting your PCP first. For more information about which services do not require referrals, see Section 2.2 below.

If it is after normal business hours and you have a need for routine care, please call your PCP back during normal business hours. If you have an emergency or have an urgent need for care after normal business hours, see sections 3.1 Emergency Care or 3.2 Urgently Needed Care in this document. You may also call HumanaFirst, our 24 hour nurse advice line, at 1-800-622-9529 (TTY 711).

## How do you choose your PCP?

You will receive a plan Provider Directory at the time of enrollment to help you select the PCP of your choice. The PCP you choose will be listed on your enrollment form. If you enroll at **Humana.com**, you will be directed to the plan's online Provider Directory to select the PCP of your choice. You can change your PCP at any time (as explained later in this section). If there is a particular plan specialist or hospital that you want to use, check first to be sure your PCP gives referrals to that specialist or uses that hospital. The name and office telephone number of your PCP is printed on your member ID card.

## Changing your PCP

You may change your PCP for any reason, at any time. Also, it's possible that your PCP might leave our plan's network of providers and you would have to find a new PCP. Change requests received by the last working day of the month will usually be effective on the first day of the following month. To change your PCP, call Customer Care.

When you call, be sure to tell Customer Care if you are seeing specialists or getting other covered services that needed your PCP's approval (such as home health services and durable medical equipment). Customer Care will help make sure that you can continue with the specialty care and other services you have been getting when you change your PCP. They will also check to be sure the PCP you want to switch to is accepting new patients. Customer Care will change your membership record to show the name of your new PCP, and tell you when the change to your new PCP will take effect.

They will also send you a new membership card that shows the name and phone number of your new PCP.

---

| Section 2.2 | What kinds of medical care can you get without getting approval in advance from your PCP? |
|---|---|

---

You can get services such as those listed below without getting approval in advance from your PCP.
- Routine women's health care, which includes breast exams, screening mammograms (x-rays of the breast), Pap tests, and pelvic exams from network providers.
- Flu shots, Hepatitis B vaccinations, and pneumonia vaccinations from network providers.
- Emergency services from in-network providers or from out-of-network providers.
- Urgently needed care from in-network providers or from out-of-network providers when network providers are temporarily unavailable or inaccessible, e.g., when you are temporarily outside of the plan's service area.
- Kidney dialysis services that you get at a Medicare-certified dialysis facility when you are temporarily outside the plan's service area. (If possible, please call Customer Care before you leave the service area so we can help arrange for you to have maintenance dialysis while you are away. Phone numbers for Customer Care are printed on the back cover of this booklet.)

2014 Evidence of Coverage for Humana Gold Plus H0108 004 (HMO)
Chapter 3: Using the plan's coverage for your medical services

- All covered preventive services from network providers. These services are indicated in the Chapter 4 benefits chart with an 🍎.
- Supplemental Benefits covered by the plan:
  - Health and wellness education programs – Fitness
  - Health and wellness education programs – Humana Active Outlook®
  - Nurse Advice 24 Hour Hotline (HumanaFirst®)
  - Over-the-Counter Drugs
  - Smoking Cessation (QuitNet)

| Section 2.3 | How to get care from specialists and other network providers |
|---|---|

A specialist is a doctor who provides health care services for a specific disease or part of the body. There are many kinds of specialists. Here are a few examples:
- Oncologists care for patients with cancer.
- Cardiologists care for patients with heart conditions.
- Orthopedists care for patients with certain bone, joint, or muscle conditions.

When your PCP thinks that you need specialized treatment, he/she can give you a referral to see a specialist or certain other providers. If you are seeing a specialist for your care, you may need to return to your PCP for a referral for additional services.

For some types of services, your PCP may need to get approval in advance from our plan (this is called getting "prior authorization"). See Chapter 4, Section 2.1 for information about which services require prior authorization.

It is very important to get a referral (approval in advance) from your PCP before you see a specialist or certain other providers (there are a few exceptions, including women's health care that we explained earlier in this section). **If you don't have a referral (approval in advance) before you get services from a specialist, you may have to pay for these services yourself. If the specialist wants you to come back for more care, check first to be sure that the referral (approval in advance) you got from your PCP for the first visit covers more visits.**

If there are specific specialists you want to use, find out whether your PCP sends patients to these specialists. Each plan PCP has certain plan specialists they use for referrals. This means that the PCP you select may determine the specialists you may see. You may generally change your PCP at any time if you want to see a plan specialist that your current PCP can't refer you to. Earlier in this section, under "Changing your PCP," we explained how to change your PCP. If there are specific hospitals you want to use, you must first find out whether your PCP, or the doctors you will be seeing, uses these hospitals.

If you need hospital care, we will cover these services for you. Covered services are listed in the Medical Benefits Chart in Chapter 4 under the heading "Inpatient Hospital Care". We use "hospital" to mean a facility that is certified by the Medicare program and licensed by the state to provide inpatient, outpatient, diagnostic, and therapeutic services. The term "hospital" does not include facilities that mainly provide custodial care (such as convalescent nursing homes or rest homes). By "custodial care," we mean help with bathing, dressing, using the bathroom, eating, and other activities of daily living. Except in an emergency, your PCP or specialist will arrange your admission to the hospital.

For a list of network hospitals, please refer to the Provider Directory. Your doctor may not admit to all network hospitals. Please ask your doctor to find out the hospitals with which he/she has privileges.

Case 1:21-cv-01083-LPS Document 35 Filed 12/13/21 Page 319 of 547 PageID #: 4928
Case 2:19-cv-08926-DSF-MRW Document 60-1 Filed 04/24/20 Page 42 of 225 Page ID
#:1282

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 3: Using the plan's coverage for your medical services

**What if a specialist or another network provider leaves our plan?**

Sometimes a specialist, clinic, hospital, or other network provider you are using might leave the plan. If there is a change in your provider network, we will send you a letter notifying you of the change 30 days prior to the provider's date of termination. The notification describes the changes in your provider network and the effective date of the change. The written notification will contain specific information, depending on the type of provider that is leaving the network.

| Section 2.4 | How to get care from out-of-network providers |
|---|---|

Your network PCP or plan must give you approval in advance before you can use providers not in the plan's network. This is called giving you a "referral." For more information about this and situations when you can see an out-of-network provider without a referral (such as an emergency), see Sections 2.2 and 2.3 of this chapter. If you don't have a referral (approval in advance) before you get services from an out-of-network provider, you may have to pay for these services yourself.

For some types of services, your doctor may need to get approval in advance from our plan (this is called getting "prior authorization"). See Chapter 4, Section 2.1 for more information about which services require prior authorization.

It is best to ask an out-of-network provider to bill the plan first. But, if you have already paid for the covered services, we will reimburse you for our share of the cost for covered services. Or if an out-of-network provider sends you a bill that you think we should pay, you can send it to us for payment. See Chapter 7 (Asking the plan to pay its share of a bill you have received for covered services or drugs) for information about what to do if you receive a bill or if you need to ask for reimbursement.

# SECTION 3 How to get covered services when you have an emergency or an urgent need for care

| Section 3.1 | Getting care if you have a medical emergency |
|---|---|

**What is a "medical emergency" and what should you do if you have one?**

A **"medical emergency"** is when you, or any other prudent layperson with an average knowledge of health and medicine, believe that you have medical symptoms that require immediate medical attention to prevent loss of life, loss of a limb, or loss of function of a limb. The medical symptoms may be an illness, injury, severe pain, or a medical condition that is quickly getting worse.

If you have a medical emergency:
- **Get help as quickly as possible.** Call 911 for help or go to the nearest emergency room or hospital. Call for an ambulance if you need it. You do <u>not</u> need to get approval or a referral first from your PCP.
- **As soon as possible, make sure that our plan has been told about your emergency.** We need to follow up on your emergency care. You or someone else should call to tell us about your emergency care, usually within 48 hours. Call your primary care physician's telephone number on the back of your ID card.

Case 1:21-cv-01083-LPS   Document 35   Filed 12/13/21   Page 320 of 547 PageID #: 4929
Case 2:19-cv-06926-DSF-MRW   Document 66-1   Filed 04/24/20   Page 43 of 225   Page ID #:1384

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 3: Using the plan's coverage for your medical services

## What is covered if you have a medical emergency?

You may get covered emergency medical care whenever you need it, anywhere in the United States or its territories. Our plan covers ambulance services in situations where getting to the emergency room in any other way could endanger your health. For more information, see the Medical Benefits Chart in Chapter 4 of this booklet.

You are covered for emergency care worldwide. See Chapter 4, Medical Benefits Chart (what is covered and what you pay) for more information.

If you have an emergency, we will talk with the doctors who are giving you emergency care to help manage and follow up on your care. The doctors who are giving you emergency care will decide when your condition is stable and the medical emergency is over.

After the emergency is over you are entitled to follow-up care to be sure your condition continues to be stable. Your follow-up care will be covered by our plan. If your emergency care is provided by out-of-network providers, we will try to arrange for network providers to take over your care as soon as your medical condition and the circumstances allow.

## What if it wasn't a medical emergency?

Sometimes it can be hard to know if you have a medical emergency. For example, you might go in for emergency care – thinking that your health is in serious danger – and the doctor may say that it wasn't a medical emergency after all. If it turns out that it was not an emergency, as long as you reasonably thought your health was in serious danger, we will cover your care.

However, after the doctor has said that it was <u>not</u> an emergency, we will generally cover additional care <u>only</u> if you get the additional care in one of these two ways:
- You go to a network provider to get the additional care.
- – or – the additional care you get is considered "urgently needed care" and you follow the rules for getting this urgent care (for more information about this, see Section 3.2 below).

---

| Section 3.2 | Getting care when you have an urgent need for care |
| --- | --- |

## What is "urgently needed care"?

"Urgently needed care" is a non-emergency, unforeseen medical illness, injury, or condition that requires immediate medical care. Urgently needed care may be furnished by in-network providers or by out-of-network providers when network providers are temporarily unavailable or inaccessible. The unforeseen condition could, for example, be an unforeseen flare-up of a known condition that you have.

## What if you are in the plan's service area when you have an urgent need for care?

In most situations, if you are in the plan's service area, we will cover urgently needed care <u>only</u> if you get this care from a network provider and follow the other rules described earlier in this chapter. However, if the circumstances are unusual or extraordinary, and network providers are temporarily unavailable or inaccessible, we will cover urgently needed care that you get from an out-of-network provider.

The plan's Provider Directory will tell you which facilities in your area are in-network. This information can also be found online at Humana.com. For any other questions regarding urgently needed care, please contact Customer Care (phone numbers are printed on the back cover of this booklet).

Case 1:21-cv-01083-LPS  Document 35  Filed 12/13/21  Page 321 of 547 PageID #: 4930

Case 2:19-cv-08926-DSF-MRW  Document 66-1  Filed 04/24/20  Page 44 of 225  Page ID
#:1285

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 3: Using the plan's coverage for your medical services

**What if you are <u>outside</u> the plan's service area when you have an urgent need for care?**

When you are outside the service area and cannot get care from a network provider, our plan will cover urgently needed care that you get from any provider.

Our plan does not cover urgently needed care or any other non-emergency care if you receive the care outside of the United States.

# SECTION 4     What if you are billed directly for the full cost of your covered services?

## Section 4.1     You can ask us to pay our share of the cost of your covered services

If you have paid more than your share for covered services, or if you have received a bill for the full cost of covered medical services, go to Chapter 7 (Asking us to pay our share of a bill you have received for covered medical services or drugs) for information about what to do.

## Section 4.2     If services are not covered by our plan, you must pay the full cost

Humana Gold Plus H0108-004 (HMO) covers all medical services that are medically necessary, are listed in the plan's Medical Benefits Chart (this chart is in Chapter 4 of this booklet), and are obtained consistent with plan rules. You are responsible for paying the full cost of services that aren't covered by our plan, either because they are not plan covered services, or they were obtained out-of-network and were not authorized.

If you have any questions about whether we will pay for any medical service or care that you are considering, you have the right to ask us whether we will cover it before you get it. If we say we will not cover your services, you have the right to appeal our decision not to cover your care.

Chapter 9 (What to do if you have a problem or complaint (coverage decisions, appeals, complaints)) has more information about what to do if you want a coverage decision from us or want to appeal a decision we have already made. You may also call Customer Care to get more information about how to do this (phone numbers are printed on the back cover of this booklet).

For covered services that have a benefit limitation, you pay the full cost of any services you get after you have used up your benefit for that type of covered service. Paying for costs once a benefit limit has been reached will **not** count toward your out-of-pocket maximum. You can call Customer Care when you want to know how much of your benefit limit you have already used.

# SECTION 5     How are your medical services covered when you are in a "clinical research study"?

## Section 5.1     What is a "clinical research study"?

A clinical research study (also called a "clinical trial") is a way that doctors and scientists test new types of medical care, like how well a new cancer drug works. They test new medical care procedures or drugs by asking for

Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 322 of 547 PageID #: 4931
Case 2:19-cv-00926-DSF-MRW Document 60-1 Filed 04/24/20 Page 45 of 225 Page ID #:1286

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 3: Using the plan's coverage for your medical services

volunteers to help with the study. This kind of study is one of the final stages of a research process that helps doctors and scientists see if a new approach works and if it is safe.

Not all clinical research studies are open to members of our plan. Medicare first needs to approve the research study. If you participate in a study that Medicare has <u>not</u> approved, <u>you will be responsible for paying all costs for your participation in the study</u>.

Once Medicare approves the study, someone who works on the study will contact you to explain more about the study and see if you meet the requirements set by the scientists who are running the study. You can participate in the study as long as you meet the requirements for the study <u>and</u> you have a full understanding and acceptance of what is involved if you participate in the study.

If you participate in a Medicare-approved study, Original Medicare pays most of the costs for the covered services you receive as part of the study. When you are in a clinical research study, you may stay enrolled in our plan and continue to get the rest of your care (the care that is not related to the study) through our plan.

If you want to participate in a Medicare-approved clinical research study, you do <u>not</u> need to get approval from us or your PCP. The providers that deliver your care as part of the clinical research study do <u>not</u> need to be part of our plan's network of providers.

Although you do not need to get our plan's permission to be in a clinical research study, **you do need to tell us before you start participating in a clinical research study**. Here is why you need to tell us:
1.   We can let you know whether the clinical research study is Medicare-approved.
2.   We can tell you what services you will get from clinical research study providers instead of from our plan.

If you plan on participating in a clinical research study, contact Customer Care (phone numbers are printed on the back cover of this booklet).

| Section 5.2 | When you participate in a clinical research study, who pays for what? |
|---|---|

Once you join a Medicare-approved clinical research study, you are covered for routine items and services you receive as part of the study, including:
•   Room and board for a hospital stay that Medicare would pay for even if you weren't in a study.
•   An operation or other medical procedure if it is part of the research study.
•   Treatment of side effects and complications of the new care.

Original Medicare pays most of the cost of the covered services you receive as part of the study. After Medicare has paid its share of the cost for these services, our plan will also pay for part of the costs. We will pay the difference between the cost sharing in Original Medicare and your cost sharing as a member of our plan. This means you will pay the same amount for the services you receive as part of the study as you would if you received these services from our plan.

<u>Here's an example of how the cost sharing works</u>: Let's say that you have a lab test that costs **$100** as part of the research study. Let's also say that your share of the costs for this test is **$20** under Original Medicare, but the test would be **$10** under our plan's benefits. In this case, Original Medicare would pay **$80** for the test and we would pay another **$10**. This means that you would pay **$10**, which is the same amount you would pay under our plan's benefits.

In order for us to pay for our share of the costs, you will need to submit a request for payment. With your request, you will need to send us a copy of your Medicare Summary Notices or other documentation that shows what

Case 2:19-cv-08926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 46 of 225   Page ID #:1287
Case 1:21-cv-01083-LPS   Document 35   Filed 12/13/21   Page 323 of 547 PageID #: 4932

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 3: Using the plan's coverage for your medical services

services you received as part of the study and how much you owe. Please see Chapter 7 for more information about submitting requests for payment.

When you are part of a clinical research study, **neither Medicare nor our plan will pay for any of the following**:
- Generally, Medicare will <u>not</u> pay for the new item or service that the study is testing unless Medicare would cover the item or service even if you were <u>not</u> in a study.
- Items and services the study gives you or any participant for free.
- Items or services provided only to collect data, and not used in your direct health care. For example, Medicare would not pay for monthly CT scans done as part of the study if your medical condition would normally require only one CT scan.

**Do you want to know more?**

You can get more information about joining a clinical research study by reading the publication "Medicare and Clinical Research Studies" on the Medicare website (http://www.medicare.gov). You can also call 1-800-MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week. TTY users should call 1-877-486-2048.

# SECTION 6      Rules for getting care covered in a "religious non-medical health care institution"

## Section 6.1      What is a religious non-medical health care institution?

A religious non-medical health care institution is a facility that provides care for a condition that would ordinarily be treated in a hospital or skilled nursing facility. If getting care in a hospital or a skilled nursing facility is against a member's religious beliefs, we will instead provide coverage for care in a religious non-medical health care institution. You may choose to pursue medical care at any time for any reason. This benefit is provided only for Part A inpatient services (non-medical health care services). Medicare will only pay for non-medical health care services provided by religious non-medical health care institutions.

## Section 6.2      What care from a religious non-medical health care institution is covered by our plan?

To get care from a religious non-medical health care institution, you must sign a legal document that says you are conscientiously opposed to getting medical treatment that is "non-excepted."

- "Non-excepted" medical care or treatment is any medical care or treatment that is <u>voluntary</u> and <u>not required</u> by any federal, state, or local law.
- "Excepted" medical treatment is medical care or treatment that you get that is <u>not</u> voluntary or <u>is required</u> under federal, state, or local law.

To be covered by our plan, the care you get from a religious non-medical health care institution must meet the following conditions:
- The facility providing the care must be certified by Medicare.
- Our plan's coverage of services you receive is limited to <u>non-religious</u> aspects of care.
- If you get services from this institution that are provided to you in your home, our plan will cover these services only if your condition would ordinarily meet the conditions for coverage of services given by home health agencies that are not religious non-medical health care institutions.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 324 of 547 PageID #: 4933
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 47 of 225   Page ID #:1288

- If you get services from this institution that are provided to you in a facility, the following conditions apply:
  - You must have a medical condition that would allow you to receive covered services for inpatient hospital care or skilled nursing facility care.
  - – and – you must get approval in advance from our plan before you are admitted to the facility or your stay will not be covered.

You are covered for an unlimited number of medically necessary inpatient hospital days. See Chapter 4 (Medical Benefits Chart).

# SECTION 7    Rules for ownership of durable medical equipment

### Section 7.1    Will you own the durable medical equipment after making a certain number of payments under our plan?

Durable medical equipment includes items such as oxygen equipment and supplies, wheelchairs, walkers, and hospital beds ordered by a provider for use in the home. Certain items, such as prosthetics, are always owned by the member. In this section, we discuss other types of durable medical equipment that must be rented.

In Original Medicare, people who rent certain types of durable medical equipment own the equipment after paying co-payments for the item for 13 months. As a member of Humana Gold Plus H0108-004 (HMO), however, you will not acquire ownership of rented durable medical equipment items no matter how many copayments you make for the item while a member of our plan. Under certain limited circumstances we will transfer ownership of the durable medical equipment item. Call Customer Care (phone numbers are printed on the back cover of this booklet) to find out about the requirements you must meet and the documentation you need to provide.

**What happens to payments you have made for durable medical equipment if you switch to Original Medicare?**

If you switch to Original Medicare after being a member of our plan: If you did not acquire ownership of the durable medical equipment item while in our plan, you will have to make 13 new consecutive payments for the item while in Original Medicare in order to acquire ownership of the item. Your previous payments while in our plan do not count toward these 13 consecutive payments.

If you made payments for the durable medical equipment item under Original Medicare before you joined our plan, these previous Original Medicare payments also do not count toward the 13 consecutive payments. You will have to make 13 consecutive payments for the item under Original Medicare in order to acquire ownership. There are no exceptions to this case when you return to Original Medicare.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 325 of 547 PageID #: 4934
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 48 of 225   Page ID #:1289
2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

# Chapter 4. Medical Benefits Chart
# (what is covered and what you pay)

**SECTION 1**     **Understanding your out-of-pocket costs for covered services**

Section 1.1    Types of out-of-pocket costs you may pay for your covered services ...................48

Section 1.2    What is the most you will pay for Medicare Part A and Part B covered medical services? .................................................................................................48

Section 1.3    Our plan does not allow providers to "balance bill" you .....................................49

**SECTION 2**     **Use the Medical Benefits Chart to find out what is covered for you and how much you will pay**

Section 2.1    Your medical benefits and costs as a member of the plan..................................49

Section 2.2    Extra "optional supplemental" benefits you can buy ........................................74

**SECTION 3**     **What benefits are not covered by the plan?**

Section 3.1    Benefits we do <u>not</u> cover (exclusions)..........................................................98

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 326 of 547 PageID #: 4935
Case 2:15-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 49 of 225   Page ID #:1290

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

# SECTION 1        Understanding your out-of-pocket costs for covered services

This chapter focuses on your covered services and what you pay for your medical benefits. It includes a Medical Benefits Chart that lists your covered services and shows how much you will pay for each covered service as a member of Humana Gold Plus H0108-004 (HMO). Later in this chapter, you can find information about medical services that are not covered. Also, see exclusions and limitations pertaining to certain supplemental benefits in the chart in this chapter.

## Section 1.1        Types of out-of-pocket costs you may pay for your covered services

To understand the payment information we give you in this chapter, you need to know about the types of out-of-pocket costs you may pay for your covered services.

- A **"copayment"** is the fixed amount you pay each time you receive certain medical services. You pay a copayment at the time you get the medical service. (The Medical Benefits Chart in Section 2 tells you more about your copayments.)
- **"Coinsurance"** is the percentage you pay of the total cost of certain medical services. You pay a coinsurance at the time you get the medical service. (The Medical Benefits Chart in Section 2 tells you more about your coinsurance.)

Some people qualify for state Medicaid programs to help them pay their out-of-pocket costs for Medicare. (These "Medicare Savings Programs" include the Qualified Medicare Beneficiary (QMB), Specified Low-Income Medicare Beneficiary (SLMB), Qualifying Individual (QI), and Qualified Disabled & Working Individuals (QDWI) programs.) If you are enrolled in one of these programs, you may still have to pay a copayment for the service, depending on the rules in your state.

## Section 1.2        What is the most you will pay for Medicare Part A and Part B covered medical services?

Because you are enrolled in a Medicare Advantage Plan, there is a limit to how much you have to pay out-of-pocket each year for in-network medical services that are covered under Medicare Part A and Part B (see the Medical Benefits Chart in Section 2, below). This limit is called the maximum out-of-pocket amount for medical services.

As a member of Humana Gold Plus H0108-004 (HMO), the most you will have to pay out-of-pocket for in-network covered Part A and Part B services in 2014 is **$6,700**. The amounts you pay for copayments and coinsurance for in-network covered services count toward this maximum out-of-pocket amount. (The amounts you pay for your prescription drugs, and any Supplemental Benefits (listed below) do not count toward your out-of-pocket maximum.) If you reach the maximum out-of-pocket amount of **$6,700**, you will not have to pay any out-of-pocket costs for the rest of the year for in-network covered Part A and Part B services. However, you must continue to pay the Medicare Part B premium (unless your Part B premium is paid for you by Medicaid or another third party).

- Supplemental Benefits covered by the plan:
  - Health and wellness education programs – Fitness
  - Health and wellness education programs – Humana Active Outlook®
  - Nurse Advice 24 Hour Hotline (HumanaFirst®)

Case 1:21-cv-01083-LPS   Document 35   Filed 12/13/21   Page 327 of 547 PageID #: 4936
Case 2:19-cv-08926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 50 of 225   Page ID #:1291

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

– Over-the-Counter Drugs
– Smoking Cessation (QuitNet)

| Section 1.3 | Our plan does not allow providers to "balance bill" you |
|---|---|

As a member of Humana Gold Plus H0108-004 (HMO), an important protection for you is that you only have to pay the plan's cost-sharing amount when you get services covered by our plan. We do not allow providers to add additional separate charges, called "balance billing." This protection (that you never pay more than your cost-sharing amount) applies even if we pay the provider less than the provider charges for a service and even if there is a dispute and we don't pay certain provider charges.

Here is how this protection works.
• If your cost sharing is a copayment (a set amount of dollars, for example, **$15.00**), then you pay only that amount for any covered services from a network provider.
• If your cost sharing is a coinsurance (a percentage of the total charges), then you never pay more than that percentage. However, your cost depends on which type of provider you see:
    > If you receive the  covered services from a network provider, you pay the coinsurance percentage multiplied by the plan's reimbursement rate (as determined in the contract between the provider and the plan).
    > If you receive the covered services from an out-of-network provider who participates with Medicare, you pay the coinsurance percentage multiplied by the Medicare payment rate for participating providers. (Remember, the plan covers services from out-of-network providers only in certain situations, such as when you get a referral.)
    > If you receive the covered services from an out-of-network provider who does not participate with Medicare, you pay the coinsurance percentage multiplied by the Medicare payment rate for non-participating providers. (Remember, the plan covers services from out-of-network providers only in certain situations, such as when you get a referral.)

# SECTION 2         Use the Medical Benefits Chart to find out what is covered for you and how much you will pay

| Section 2.1 | Your medical benefits and costs as a member of the plan |
|---|---|

The Medical Benefits Chart on the following pages lists the services Humana Gold Plus H0108-004 (HMO) covers and what you pay out-of-pocket for each service. The services listed in the Medical Benefits Chart are covered only when the following coverage requirements are met:
• Your Medicare-covered services must be provided according to the coverage guidelines established by Medicare.
• Your services (including medical care, services, supplies, and equipment) must be medically necessary. "Medically necessary" means that the services, supplies, or drugs are needed for the prevention, diagnosis, or treatment of your medical condition and meet accepted standards of medical practice.
• You receive your care from a network provider. In most cases, care you receive from an out-of-network provider will not be covered. Chapter 3 provides more information about requirements for using network providers and the situations when we will cover services from an out-of-network provider.
• You have a primary care physician (a PCP) who is providing and overseeing your care. In most situations, your PCP must give you approval in advance before you can see other providers in the plan's network. This is called

Case 1:21-cv-01093-LPS  Document 35  Filed 12/13/21  Page 328 of 547 PageID #: 4937
Case 2:19-cv-06926-DSF-MRW  Document 60-1  Filed 04/24/20  Page 31 of 225  Page ID
#:1292

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

giving you a "referral." Chapter 3 provides more information about getting a referral and the situations when you do not need a referral.

- Some of the services listed in the Medical Benefits Chart are covered <u>only</u> if your doctor or other network provider gets approval in advance (sometimes called "prior authorization") from us. Covered services that need approval in advance are marked in the Medical Benefits Chart by a footnote. In addition, the following services not listed in the Benefits Chart require prior authorization:
  - Automatic Implantable Cardioverter Defibrillators (AICD)
  - Pain Management Procedures
  - Hyperbaric Therapy
  - Infertility Testing and Treatment
  - Varicose Vein: Surgical Treatment and Sclerotherapy
  - Ventricular Assist Devices
  - Routine Maternity Care
  - Cardiac Implants
  - Sleep Studies
  - Transthoracic Echocardiogram (TTE)
  - Coronary Angioplasty/Stent Procedures
  - Bone Growth Stimulators
  - Spinal Fusion

Other important things to know about our coverage:

- Like all Medicare health plans, we cover everything that Original Medicare covers. For some of these benefits, you pay <u>more</u> in our plan than you would in Original Medicare. For others, you pay <u>less</u>. (If you want to know more about the coverage and costs of Original Medicare, look in your Medicare & You 2014 Handbook. View it online at http://www.medicare.gov or ask for a copy by calling 1-800-MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week. TTY users should call 1-877-486-2048.)
- For all preventive services that are covered at no cost under Original Medicare, we also cover the service at no cost to you. However, if you also are treated or monitored for an existing medical condition during the visit when you receive the preventive service, a copayment will apply for the care received for the existing medical condition.
- Sometimes, Medicare adds coverage under Original Medicare for new services during the year. If Medicare adds coverage for any services during 2014, either Medicare or our plan will cover those services.

You will see this apple next to the preventive services in the benefits chart.

| Medical Benefits Chart | |
|---|---|
| **Services that are covered for you** | **What you must pay** when you get these services |
| **Abdominal aortic aneurysm screening**<br><br>A one-time screening ultrasound for people at risk. The plan only covers this screening if you get a referral for it as a result of your "Welcome to Medicare" preventive visit. | - If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for |

Case 1:21-cv-01093-LPS  Document 35  Filed 12/13/21  Page 329 of 547 PageID #: 4938
Case 2:19-cv-06926-DSF-MRW  Document 66-1  Filed 04/24/20  Page 52 of 225  Page ID #:3293

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| | the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for an abdominal aortic aneurysm screening in a specialist's office.<br>• **$0** copayment for an abdominal aortic aneurysm screening in a freestanding radiological facility.<br>• **$0** copayment for an abdominal aortic aneurysm screening in an outpatient hospital. |
| **Ambulance services**<br><br>• Covered ambulance services include fixed wing, rotary wing, and ground ambulance services, to the nearest appropriate facility that can provide care only if they are furnished to a member whose medical condition is such that other means of transportation are contraindicated (could endanger the person's health) or if authorized by the plan.<br><br>• Non-emergency transportation by ambulance is appropriate if it is documented that the member's condition is such that other means of transportation are contraindicated (could endanger the person's health) and that transportation by ambulance is medically required. | **In Network:**<br>• **$200** copayment per date of service for ambulance services regardless of the number of trips. |
| ☘ **Annual wellness visit**<br><br>If you've had Part B for longer than 12 months, you can get an annual wellness visit to develop or update a personalized prevention plan based on your current health and risk factors. This is covered once every 12 months.<br><br>• **Note**: Your first annual wellness visit can't take place within 12 months of your "Welcome to Medicare" preventive visit. However, you don't need to have had a "Welcome to Medicare" visit to be covered for annual wellness visits after you've had Part B for 12 months.<br><br>• **Note**: Any lab or diagnostic procedures that are ordered are not covered under this benefit and you pay your plan cost sharing amount for those services separately. | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• There is no coinsurance, copayment, or deductible for the annual wellness visit. |
| ☘ **Bone mass measurement** | • If you also are treated or monitored for an existing medical condition during the |

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| For qualified individuals (generally, this means people at risk of losing bone mass or at risk of osteoporosis), the following services are covered every 24 months or more frequently if medically necessary: procedures to identify bone mass, detect bone loss, or determine bone quality, including a physician's interpretation of the results. | visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for bone mass measurement in a specialist's office.<br>• **$0** copayment for bone mass measurement in a freestanding radiological facility.<br>• **$0** copayment for bone mass measurement in an outpatient hospital. |
| 🍎 **Breast cancer screening (mammograms)**<br><br>Covered services include:<br><br>• One baseline mammogram between the ages of 35 and 39<br>• One screening mammogram every 12 months for women age 40 and older<br>• Clinical breast exams once every 24 months | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for a screening mammogram in a specialist's office.<br>• **$0** copayment for a screening mammogram in a freestanding radiological facility.<br>• **$0** copayment for a screening mammogram in an outpatient hospital. |
| **Cardiac rehabilitation services**<br><br>Comprehensive programs of cardiac rehabilitation services that include exercise, education, and counseling are covered for members who meet certain conditions with a doctor's referral. The plan also covers intensive | **In Network:**<br>• **$5** copayment for cardiac rehabilitation in a specialist's office. |

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| cardiac rehabilitation programs that are typically more rigorous or more intense than cardiac rehabilitation programs. | • **$30** copayment for cardiac rehabilitation in an outpatient hospital. |
| ☕ **Cardiovascular disease risk reduction visit (therapy for cardiovascular disease)**<br><br>We cover 1 visit per year with your primary care doctor to help lower your risk for cardiovascular disease. During this visit, your doctor may discuss aspirin use (if appropriate), check your blood pressure, and give you tips to make sure you're eating well. | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for the cardiovascular disease reduction visit. |
| ☕ **Cardiovascular disease testing**<br><br>Blood tests for the detection of cardiovascular disease (or abnormalities associated with an elevated risk of cardiovascular disease) once every 5 years (60 months). | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for services in a primary care physician's office.<br>• **$0** copayment for services in a specialist's office.<br>• **$0** copayment for services in a freestanding laboratory facility.<br>• **$0** copayment for services in an outpatient hospital. |
| ☕ **Cervical and vaginal cancer screening**<br><br>Covered services include:<br><br>• For all women: Pap tests and pelvic exams are covered once every 24 months | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to |

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| • If you are at high risk of cervical cancer or have had an abnormal Pap test and are of childbearing age: one Pap test every 12 months | the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for services in a primary care physician's office.<br>• **$0** copayment for services in a specialist's office. |
| **Chiropractic services**<br><br>Covered services include:<br><br>• We cover only manual manipulation of the spine to correct subluxation<br>• Other services performed by a chiropractor are not covered | **In Network:**<br>• **$5** copayment for Medicare covered chiropractic services in a specialist's office. |
| ☝ **Colorectal cancer screening**<br><br>For people 50 and older, the following are covered:<br><br>• Flexible sigmoidoscopy (or screening barium enema as an alternative) every 48 months<br>• Fecal occult blood test, every 12 months<br><br>For people at high risk of colorectal cancer, we cover:<br><br>• Screening colonoscopy (or screening barium enema as an alternative) every 24 months<br><br>For people not at high risk of colorectal cancer, we cover:<br><br>• Screening colonoscopy every 10 years (120 months), but not within 48 months of a screening sigmoidoscopy | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for colorectal screening exams in a specialist's office.<br>• **$0** copayment for colorectal screening exams in an ambulatory surgical center.<br>• **$0** copayment for colorectal screening exams in an outpatient hospital. |
| ☝ **Depression screening**<br><br>We cover 1 screening for depression per year. The screening must be done in a primary care setting that can provide follow-up treatment and referrals. | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for |

A-7271

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| | the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for the depression screening. |
| ⚕ **Diabetes screening**<br><br>We cover this screening (includes fasting glucose tests) if you have any of the following risk factors: high blood pressure (hypertension), history of abnormal cholesterol and triglyceride levels (dyslipidemia), obesity, or a history of high blood sugar (glucose). Tests may also be covered if you meet other requirements, like being overweight and having a family history of diabetes.<br><br>Based on the results of these tests, you may be eligible for up to two diabetes screenings every 12 months. | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for diabetes screening in a primary care physician's office.<br>• **$0** copayment for diabetes screening in a specialist's office.<br>• **$0** copayment for diabetes screening in a freestanding laboratory facility.<br>• **$0** copayment for diabetes screening in an outpatient hospital. |
| ⚕ **Diabetes self-management training, diabetic services and supplies**<br><br>For all people who have diabetes (insulin and non-insulin users). Covered services include:<br><br>• Supplies to monitor your blood glucose: Blood glucose monitor, blood glucose test strips, lancet devices and lancets, and glucose-control solutions for checking the accuracy of test strips and monitors<br><br>• For people with diabetes who have severe diabetic foot disease: One pair per calendar year of therapeutic custom-molded shoes (including inserts provided with such shoes) and two additional pairs of inserts, or one pair of depth shoes and three pairs of inserts (not including the non-customized removable inserts provided with such shoes). Coverage includes fitting.<br><br>• Diabetes self-management training is covered under certain conditions | **In Network:**<br>• **$0** copayment for diabetes self-management training in a primary care physician's office.<br>• **$0** copayment for diabetes self-management training in a specialist's office.<br>• **$0** copayment for diabetes self-management training in an outpatient hospital.<br>• **0%** coinsurance for diabetic monitoring supplies from a preferred durable medical equipment provider.<br>• **20%** coinsurance for diabetic monitoring supplies from a |

Case 1:21-cv-01083-LPS   Document 35   Filed 12/13/21   Page 334 of 547 PageID #: 4943
Case 2:19-cv-08926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 57 of 225   Page ID #:1298

2014 Evidence of Coverage for Humana Gold Plus H0103-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| | non-preferred durable medical equipment provider. <br>• **0%** coinsurance for diabetic shoes and inserts. <br>• **10%** coinsurance for a 30-day supply of Accu-Check and Onetouch diabetic monitoring supplies from a network retail pharmacy. <br>• **20%** coinsurance for a 30-day supply of all other diabetic monitoring supplies from a network retail pharmacy. |
| **Durable medical equipment and related supplies** <br><br>(For a definition of "durable medical equipment," see Chapter 12 of this booklet.) <br><br>Covered items include, but are not limited to: wheelchairs, crutches, hospital bed, IV infusion pump, oxygen equipment, nebulizer, and walker. <br><br>We cover all medically necessary durable medical equipment covered by Original Medicare. If our supplier in your area does not carry a particular brand or manufacturer, you may ask them if they can special order it for you. <br><br>• Prior authorization may be required for home health services. Contact the plan for details. | **In Network:** <br>• **20%** coinsurance for durable medical equipment. |
| **Emergency care** <br><br>Emergency care refers to services that are: <br><br>• Furnished by a provider qualified to furnish emergency services, and <br>• Needed to evaluate or stabilize an emergency medical condition. <br><br>A medical emergency is when you, or any other prudent layperson with an average knowledge of health and medicine, believe that you have medical symptoms that require immediate medical attention to prevent loss of life, loss of a limb, or loss of function of a limb. The medical symptoms may be an illness, injury, severe pain, or a medical condition that is quickly getting worse. <br><br>You are covered for emergency care world-wide. If you have an emergency outside of the U.S. and its territories, you will be responsible to pay for the services rendered upfront. You must submit to Humana for reimbursement, for more information please see Chapter 7. We may not reimburse you for all out of pocket expenses. This is because our | • You do not pay the emergency room visit costshare if you are admitted to the hospital within 24 hours for the same condition. <br><br>**In Network:** <br>• **$65** copayment for emergency services in an emergency room. <br>• If you receive emergency care at an out-of-network hospital and need inpatient care after your emergency condition is stabilized, you must return to a network hospital in order for your care to continue to be covered OR you must have your inpatient care at the out-of-network hospital |

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| contracted rates may be lower than providers outside of the U.S. and its territories. | authorized by the plan and your cost is the cost-sharing you would pay at a network hospital. |
| **Health and wellness education programs**<br><br>**Fitness**<br><br>Get fit with Humana Fitness from the SilverSneakers® Fitness Program.<br><br>With this benefit, you are covered for everything included with a membership* at participating fitness centers across the country.<br><br>Your benefit also includes:<br><br>• SilverSneakers classes designed exclusively for older adults to improve your body's strength and flexibility<br>• On-site advisors to act as your contact for information and personalized service<br>• Social activities and health education events<br>• Access to www.silversneakers.com, where you can create exercise and nutrition plans, track fitness progress, find health articles and recipes, and more.<br>• SilverSneakers® Steps personalized home fitness program<br><br>* Any nonstandard fitness center services that usually have an extra fee are not included in your membership. | **In Network:**<br><br>• **$0** copayment |
| **Health and wellness education programs**<br><br>**Humana Active Outlook®**<br><br>Learn to live a healthier, more fulfilled life with the award-winning **Humana Active Outlook** Program. No matter what your personal health goals are, this health and wellness education program can help. There's no extra cost to you.<br><br>• Discover new things in **HAO** Magazine, health tracking materials, and **HAO Digest**, with practical tips for those living with chronic conditions<br>• Learn from custom health and wellness information and interactive tools at **HumanaActiveOutlook.com**<br>• Find support for healthy changes with programs from Humana:<br>  – Work toward wellness with Humana personal health coaching<br>  – Learn to live better with personalized health support for chronic health conditions | **In Network:**<br><br>• **$0** copayment |
| **Hearing services** | |

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| Diagnostic hearing and balance evaluations performed by your PCP to determine if you need medical treatment are covered as outpatient care when furnished by a physician, audiologist, or other qualified provider. | **In Network:**<br>• **$0** copayment for services in a primary care physician's office.<br>• **$5** copayment for services in a specialist's office. |
| 🍎 **HIV screening**<br><br>For people who ask for an HIV screening test or who are at increased risk for HIV infection, we cover:<br><br>• One screening exam every 12 months<br><br>For women who are pregnant, we cover:<br><br>• Up to three screening exams during a pregnancy | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for an HIV screening in a primary care physician's office.<br>• **$0** copayment for an HIV screening in a specialist's office.<br>• **$0** copayment for an HIV screening in an outpatient hospital.<br>• **$0** copayment for an HIV screening in a freestanding laboratory facility. |
| **Home health agency care**<br><br>Prior to receiving home health services, a doctor must certify that you need home health services and will order home health services to be provided by a home health agency. You must be homebound, which means leaving home is a major effort.<br><br>Covered services include, but are not limited to:<br><br>• Part-time or intermittent skilled nursing and home health aide services (To be covered under the home health care benefit, your skilled nursing and home health aide services combined must total fewer than 8 hours per day and 35 hours per week)<br>• Physical therapy, occupational therapy, and speech therapy<br>• Medical and social services | **In Network:**<br>• **$0** copayment for each home health visit. |

A-7275

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| • Medical equipment and supplies<br>• Prior authorization may be required for home health services. Contact the plan for details. | |
| **Hospice care**<br><br>You may receive care from any Medicare-certified hospice program. Your hospice doctor can be a network provider or an out-of-network provider. Covered services include:<br>• Drugs for symptom control and pain relief<br>• Short-term respite care<br>• Home care<br><br>For hospice services and for services that are covered by Medicare Part A or B and are related to your terminal condition: Original Medicare (rather than our plan) will pay for your hospice services and any Part A and Part B services related to your terminal condition. While you are in the hospice program, your hospice provider will bill Original Medicare for the services that Original Medicare pays for.<br><br>For services that are covered by Medicare Part A or B and are not related to your terminal condition: If you need non-emergency, non-urgently needed services that are covered under Medicare Part A or B and that are not related to your terminal condition, your cost for these services depends on whether you use a provider in our plan's network:<br><br>• If you obtain the covered services from a network provider, you only pay the plan cost-sharing amount for in-network services<br>• If you obtain the covered services from an out-of-network provider, you pay the cost sharing under Fee-For-Service Medicare (Original Medicare)<br><br>For services that are covered by Humana Gold Plus H0108-004 (HMO) but are not covered by Medicare Part A or B: Humana Gold Plus H0108-004 (HMO) will continue to cover plan-covered services that are not covered under Part A or B whether or not they are related to your terminal condition. You pay your plan cost sharing amount for these services.<br><br>**Note:** If you need non-hospice care (care that is not related to your terminal condition), you should contact us to arrange the services. Getting your non-hospice care through our network providers will lower your share of the costs for the services.<br><br>Our plan covers hospice consultation services (one time only) for a terminally ill person who hasn't elected the hospice benefit. | When you enroll in a Medicare-certified hospice program, your hospice services and your Part A and Part B services related to your terminal condition are paid for by Original Medicare, not Humana Gold Plus H0108-004 (HMO). |
| 🍏 **Immunizations** | • If you also are treated or monitored for an existing |

Case 1:21-cv-01093-LPS  Document 35  Filed 12/13/21  Page 338 of 547 PageID #: 4947
Case 2:19-cv-06926-DSF-MRW  Document 66-1  Filed 04/24/20  Page 61 of 225  Page ID
#:1302

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| Covered Medicare Part B services include:<br><br>• Pneumonia vaccine<br>• Flu shots, once a year in the fall or winter<br>• Hepatitis B vaccine if you are at high or intermediate risk of getting Hepatitis B<br>• Other vaccines if you are at risk and they meet Medicare Part B coverage rules<br>• We also cover some vaccines under our outpatient prescription drug benefit | medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for immunizations in a primary care physician's office.<br>• **$0** copayment for immunizations in a specialist's office. |
| **Inpatient hospital care**<br><br>You are covered for an unlimited number of medically necessary days. Covered services include but are not limited to:<br><br>• Semi-private room (or a private room if medically necessary)<br>• Meals including special diets<br>• Regular nursing services<br>• Costs of special care units (such as intensive care or coronary care units)<br>• Drugs and medications<br>• Lab tests<br>• X-rays and other radiology services<br>• Necessary surgical and medical supplies<br>• Use of appliances, such as wheelchairs<br>• Operating and recovery room costs<br>• Physical, occupational, and speech language therapy<br>• Inpatient substance abuse services<br>• Under certain conditions, the following types of transplants are covered: corneal, kidney, kidney-pancreatic, heart, liver, lung, heart/lung, bone marrow, stem cell, and intestinal/multivisceral. If you need a transplant, we will arrange to have your case reviewed by a Medicare-approved transplant center that will decide whether you are a candidate for a transplant. Transplant providers may be local or outside of the service area. If local transplant providers are willing to accept the Original Medicare rate, then you can choose to obtain your transplant services locally or at a distant location offered by the plan. If Humana Gold Plus H0108-004 (HMO) provides transplant services at a distant location (outside of the service area) and you chose to obtain transplants at this distant location, we will arrange or pay for appropriate lodging and transportation costs for you and a companion. Travel reimbursement | **In Network:**<br>• Your inpatient benefits will begin on day one each time you are admitted or transferred to a specific facility type, including Inpatient Rehabilitation facilities, Long Term Acute Care (LTAC) facilities, Inpatient Acute Care facilities, and Inpatient Psychiatric facilities.<br>• **$335** copayment per day, days 1 to 5 for inpatient care in an inpatient hospital<br>• **$0** copayment for physician services in an inpatient hospital. |

A-7277

Case 1:21-cv-01083-LPS Document 35 Filed 12/13/21 Page 339 of 547 PageID #: 4948
Case 2:19-cv-06926-DSF-MRW Document 60-1 Filed 04/24/20 Page 62 of 225 Page ID
#:1303
2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| requires a minimum of 100 miles one way to transplant center and is limited to **$10,000** per transplant.<br>– If you are in need of a solid organ or bone marrow/stem cell transplant, please contact our Transplant Department at 1-866-421-5663 for important information about your transplant care.<br>• Blood - including storage and administration. Coverage of whole blood and packed red cells begins with the first pint of blood that you need.<br>• Physician services<br><br>**Note:** To be an inpatient, your provider must write an order to admit you formally as an inpatient of the hospital. Even if you stay in the hospital overnight, you might still be considered an "outpatient." If you are not sure if you are an inpatient or an outpatient, you should ask the hospital staff.<br><br>You can also find more information in a Medicare fact sheet called "Are You a Hospital Inpatient or Outpatient? If You Have Medicare – Ask!" This fact sheet is available on the Web at http://www.medicare.gov/Publications/Pubs/pdf/11435.pdf or by calling 1-800-MEDICARE (1-800-633-4227). TTY users call 1-877-486-2048. You can call these numbers for free, 24 hours a day, 7 days a week.<br><br>• Prior authorization is required for inpatient hospital care<br>• Prior authorization is required for transplant services. | |
| **Inpatient mental health care**<br><br>• Covered services include mental health care services that require a hospital stay.<br>• 190-day lifetime limit for inpatient services in a psychiatric hospital.<br>– The 190-day limit does not apply to Mental Health services provided in a psychiatric unit of a general hospital.<br>• The benefit days used under the Original Medicare program will count toward the 190-day lifetime reserve days when enrolling in a Medicare Advantage plan.<br>• Prior authorization is required for inpatient mental health care. | **In Network:**<br>• Your inpatient benefits will begin on day one each time you are admitted or transferred to a specific facility type, including Inpatient Rehabilitation facilities, Long Term Acute Care (LTAC) facilities, Inpatient Acute Care facilities, and Inpatient Psychiatric facilities.<br>• **$335** copayment per day, days 1 to 5 for inpatient mental health care in an inpatient hospital<br>• **$296** copayment per day, days 1 to 5 for inpatient mental health care in an inpatient psychiatric facility<br>• **$0** copayment for physician services in an inpatient hospital.<br>• **$0** copayment for physician services in an inpatient psychiatric facility. |

Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 340 of 547 PageID #: 4949
Case 2:19-cv-06926-DSF-MRW Document 66-1 Filed 04/24/20 Page 63 of 225 Page ID #:304

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| **Inpatient services covered during a non-covered inpatient stay**<br><br>If you have exhausted your inpatient benefits or if the inpatient stay is not reasonable and necessary, we will not cover your inpatient stay. However, in some cases, we will cover certain services you receive while you are in the hospital or the skilled nursing facility (SNF). Covered services include, but are not limited to:<br><br>• Physician services<br>• Diagnostic tests (like lab tests)<br>• X-ray, radium, and isotope therapy including technician materials and services<br>• Surgical dressings<br>• Splints, casts and other devices used to reduce fractures and dislocations<br>• Prosthetics and orthotics devices (other than dental) that replace all or part of an internal body organ (including contiguous tissue), or all or part of the function of a permanently inoperative or malfunctioning internal body organ, including replacement or repairs of such devices<br>• Leg, arm, back, and neck braces; trusses, and artificial legs, arms, and eyes including adjustments, repairs, and replacements required because of breakage, wear, loss, or a change in the patient's physical condition<br>• Physical therapy, speech therapy, and occupational therapy | **In Network:**<br>• **$0** copayment for physician services in an inpatient hospital.<br>• **$0** copayment for physician services in a Skilled Nursing Facility. |
| 👑 **Medical nutrition therapy**<br><br>This benefit is for people with diabetes, renal (kidney) disease (but not on dialysis), or after a kidney transplant when referred by your doctor.<br><br>We cover 3 hours of one-on-one counseling services during your first year that you receive medical nutrition therapy services under Medicare (this includes our plan, any other Medicare Advantage plan, or Original Medicare), and 2 hours each year after that. If your condition, treatment, or diagnosis changes, you may be able to receive more hours of treatment with a physician's referral. A physician must prescribe these services and renew their referral yearly if your treatment is needed into the next calendar year. | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for nutrition therapy in a primary care physician's office.<br>• **$0** copayment for nutrition therapy in a specialist's office.<br>• **$0** copayment for nutrition therapy in an outpatient hospital. |
| **Medicare Part B prescription drugs** | **In Network:** |

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| These drugs are covered under Part B of Original Medicare. Members of our plan receive coverage for these drugs through our plan. Covered drugs include:<br><br>• Drugs that usually aren't self-administered by the patient and are injected or infused while you are getting physician, hospital outpatient, or ambulatory surgical center services<br>• Drugs you take using durable medical equipment (such as nebulizers) that were authorized by the plan<br>• Clotting factors you give yourself by injection if you have hemophilia<br>• Immunosuppressive Drugs, if you were enrolled in Medicare Part A at the time of the organ transplant<br>• Injectable osteoporosis drugs, if you are homebound, have a bone fracture that a doctor certifies was related to post-menopausal osteoporosis, and cannot self-administer the drug<br>• Antigens<br>• Certain oral anti-cancer drugs and anti-nausea drugs<br>• Certain drugs for home dialysis, including heparin, the antidote for heparin when medically necessary, topical anesthetics, and erythropoisis-stimulating agents (such as Epogen®, Procrit®, Epoetin Alfa, Aranesp®, or Darbepoetin Alfa)<br>• Intravenous Immune Globulin for the home treatment of primary immune deficiency diseases<br>• Prior authorization may be required for Part B drugs. Contact plan for details.<br><br>Chapter 5 explains the Part D prescription drug benefit, including the rules you must follow to have prescriptions covered. What you pay for your Part D prescription drugs through our plan is listed in Chapter 6. | • **20%** coinsurance for Medicare Part B covered drugs in a physician's office.<br>• **$200** copayment for Medicare Part B covered drugs administered in an outpatient hospital<br>• **20%** coinsurance for chemotherapy drugs in a physician's office.<br>• **20%** coinsurance for chemotherapy drugs in an outpatient hospital.<br>• **20%** coinsurance for Medicare Part B covered drugs from a network retail pharmacy. |
| **Nurse Advice 24 Hour Hotline (HumanaFirst®)**<br><br>If you have questions about symptoms you're experiencing but aren't sure if you need to see your doctor, Humana can help. Call HumanaFirst, our advice line for members, 24 hours a day, seven days a week at-1-800-622-9529 (TTY 711). It's staffed by nurses who can help address your immediate health concerns and answer questions about particular medical conditions. | **In Network:**<br><br>• **$0** copayment |
| 👐 **Obesity screening and therapy to promote sustained weight loss**<br><br>If you have a body mass index of 30 or more, we cover intensive counseling to help you lose weight. This counseling is covered if you get it in a primary care setting, where it can be coordinated with your comprehensive prevention plan. Talk to your primary care doctor or practitioner to find out more. | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for |

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| | the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for obesity screening and therapy in a primary care physician's office. |
| **Outpatient diagnostic tests and therapeutic services and supplies**<br><br>Covered services include, but are not limited to:<br><br>• X-rays<br>• Radiation (radium and isotope) therapy including technician materials and supplies<br>• Surgical supplies, such as dressings<br>• Splints, casts and other devices used to reduce fractures and dislocations<br>• Laboratory tests<br>• Blood. Coverage begins with the first pint of blood that you need. Coverage of storage and administration begins with the first pint of blood that you need.<br>• Other outpatient diagnostic tests<br>• Prior authorization is required for CT scans, MRA, MRI, nuclear stress test, PET scans, PET registry (NOPR), SPECT, Molecular Diagnostic/Genetic Testing, radiation therapy, and outpatient observation. | **In Network:**<br>• **$0** copayment for services in a primary care physician's office.<br>• **$5** copayment for services in a specialist's office.<br>  – **20%** coinsurance for radiation therapy in a specialist's office.<br>  – **$200** copayment for a facility based sleep study in a specialist's office.<br>• **$200** copayment for services in an outpatient hospital.<br>  – **$335** copayment for advanced imaging services in an outpatient hospital.<br>  – **$335** copayment for nuclear medicine services in an outpatient hospital.<br>  – **20%** coinsurance for radiation therapy in an outpatient hospital.<br>  – **$0** copayment for laboratory services in an outpatient hospital.<br>• **$0** copayment for a home based sleep study.<br>• **$200** copayment for services in a freestanding radiological facility.<br>  – **$285** copayment for advanced imaging services in a freestanding radiological facility.<br>  – **$285** copayment for nuclear medicine services in a freestanding radiological facility. |

2014 Evidence of Coverage for Humana Gold Plus H0103-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| | – **20%** coinsurance for radiation therapy in a freestanding radiological facility.<br>• **$0** copayment for laboratory services in a freestanding laboratory facility.<br>• **20%** coinsurance for medical supplies.<br>• There may be additional Part B drugs or injectables received in conjunction with these services, please see "Medicare Covered Part B Drugs" within this chart for a description of those benefits. |
| **Outpatient hospital services**<br><br>We cover medically-necessary services you get in the outpatient department of a hospital for diagnosis or treatment of an illness or injury.<br><br>Covered services include, but are not limited to:<br><br>• Services in an emergency department or outpatient clinic, such as observation services or outpatient surgery<br>• Laboratory and diagnostic tests billed by the hospital<br>• Mental health care, including care in a partial-hospitalization program, if a doctor certifies that inpatient treatment would be required without it<br>• X-rays and other radiology services billed by the hospital<br>• Medical supplies such as splints and casts<br>• Certain screenings and preventive services<br>• Certain drugs and biologicals that you can't give yourself<br><br>**Note:** Unless the provider has written an order to admit you as an inpatient to the hospital, you are an outpatient and pay the cost-sharing amounts for outpatient hospital services. Even if you stay in the hospital overnight, you might still be considered an "outpatient." If you are not sure if you are an outpatient, you should ask the hospital staff.<br><br>You can also find more information in a Medicare fact sheet called "Are You a Hospital Inpatient or Outpatient? If You Have Medicare – Ask!" This fact sheet is available on the Web at http://www.medicare.gov/Publications/Pubs/pdf/11435.pdf or by calling 1-800-MEDICARE (1-800-633-4227). TTY users call 1-877-486-2048. You can call these numbers for free, 24 hours a day, 7 days a week. | **In Network:**<br>• **$200** copayment for services in an outpatient hospital.<br>  – **$335** copayment for advanced imaging services in an outpatient hospital.<br>  – **$335** copayment for nuclear medicine services in an outpatient hospital.<br>  – **20%** coinsurance for radiation therapy in an outpatient hospital.<br>  – **$0** copayment for laboratory services in an outpatient hospital.<br>  – **$335** copayment for surgery services in an outpatient hospital.<br>  – **$55** copayment for each partial hospitalization visit<br>• **$65** copayment for emergency services in an emergency room.<br>• **$5** copayment for clinic services. |

2014 Evidence of Coverage for Humana Gold Plus H0163-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| • Prior authorization is required for CT scans, MRA, MRI, nuclear stress test, PET scans, PET registry (NOPR), SPECT, Molecular Diagnostic/Genetic Testing, and outpatient observation. | |
| **Outpatient mental health care**<br><br>Covered services include:<br><br>Mental health services provided by a state-licensed psychiatrist or doctor, clinical psychologist, clinical social worker, clinical nurse specialist, nurse practitioner, physician assistant, or other Medicare-qualified mental health care professional as allowed under applicable state laws. | **In Network:**<br>• **$5** copayment for mental health services in a specialist's office.<br>• **$200** copayment for mental health services in an outpatient hospital. |
| **Outpatient rehabilitation services**<br><br>Covered services include: physical therapy, occupational therapy, and speech language therapy.<br><br>Outpatient rehabilitation services are provided in various outpatient settings, such as hospital outpatient departments, independent therapist offices, and Comprehensive Outpatient Rehabilitation Facilities (CORFs).<br><br>• Prior authorization is required for physical, occupational, and speech therapies. | **In Network:**<br>• **$30** copayment for services in a specialist's office.<br>• **$30** copayment for services in an outpatient hospital.<br>• **$30** copayment for physical therapy in a Comprehensive Outpatient Rehabilitation Facility.<br>• **$30** copayment for occupational therapy in a Comprehensive Outpatient Rehabilitation Facility.<br>• **$30** copayment for speech therapy in a Comprehensive Outpatient Rehabilitation Facility. |
| **Outpatient substance abuse services** | **In Network:**<br>• **$5** copayment for substance abuse services in a specialist's office.<br>• **$200** copayment for substance abuse services in an outpatient hospital.<br>• **$55** copayment for each partial hospitalization visit. |
| **Outpatient surgery, including services provided at hospital outpatient facilities and ambulatory surgical centers**<br><br>**Note:** If you are having surgery in a hospital facility, you should check with your provider about whether you will be an inpatient or outpatient. Unless the provider writes an order to admit you as an inpatient to the hospital, | **In Network:**<br>• **$335** copayment for surgery services in an outpatient hospital. |

A-7283

Case 1:21-cv-01083-LPS  Document 35  Filed 12/13/21  Page 345 of 547 PageID #: 4954
Case 2:19-cv-06926-DSF-MRW  Document 60-1  Filed 04/24/20  Page 68 of 225  Page ID
#:1309

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| you are an outpatient and pay the cost-sharing amounts for outpatient surgery. Even if you stay in the hospital overnight, you might still be considered an "outpatient."<br><br>• Prior authorization is required for abdominoplasty, balloon sinuplasty, blepharoplasty, breast procedures, otoplasty, elective outpatient cardiac catheterizations, penile implant, rhinoplasty, septoplasty, obesity, oral surgeries, and surgery for obstructive sleep apnea. | • **$285** copayment for surgery services in an ambulatory surgical center.<br>• **$0** copayment for surgeon services in an outpatient hospital.<br>• **$0** copayment for surgeon services in an ambulatory surgical center. |
| **Over-the-Counter Drugs**<br><br>You are eligible for a **$10** monthly benefit to be used toward the purchase of over-the-counter (OTC) health and wellness products available through our mail order service. The order form can be obtained by calling Customer Care. | **In Network:**<br><br>• **$0** copayment |
| **Partial hospitalization services**<br><br>"Partial hospitalization" is a structured program of active psychiatric treatment provided in a hospital outpatient setting or by a community mental health center, that is more intense than the care received in your doctor's or therapist's office and is an alternative to inpatient hospitalization.<br><br>• Prior authorization is required for partial hospitalization services. | **In Network:**<br>• **$55** copayment for each partial hospitalization visit. |
| **Physical Exam (Routine)**<br><br>In addition to the Annual Wellness Visit or the "Welcome to Medicare" physical exam, you are covered for the following exam once per year:<br><br>• Comprehensive preventive medicine evaluation and management, including an age and gender appropriate history, examination, and counseling/anticipatory guidance/risk factor reduction interventions<br>• **Note**: Any lab or diagnostic procedures that are ordered are not covered under this benefit and you pay your plan cost sharing amount for those services separately. | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for a comprehensive routine physical exam in a primary care physician's office. |
| **Physician/Practitioner services, including doctor's office visits**<br><br>Covered services include: | **In Network:**<br>• **$0** copayment for each visit in a primary care physician's office. |

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| • Medically-necessary medical care or surgery services furnished in a physician's office, certified ambulatory surgical center, hospital outpatient department, or any other location<br>• Consultation, diagnosis, and treatment by a specialist<br>• Basic hearing and balance exams performed by your PCP or specialist, if your doctor orders it to see if you need medical treatment.<br>• Certain telehealth services including consultation, diagnosis, and treatment by a physician or practitioner for patients in certain rural areas or other locations approved by Medicare<br>• Second opinion by another network provider prior to surgery<br>• Non-routine dental care (covered services are limited to surgery of the jaw or related structures, setting fractures of the jaw or facial bones, extraction of teeth to prepare the jaw for radiation treatments of neoplastic cancer disease, or services that would be covered when provided by a physician) | • **$5** copayment for each visit in a specialist's office.<br>  – **20%** coinsurance for radiation therapy in a specialist's office. |
| **Podiatry services**<br><br>Covered services include:<br><br>• Diagnosis and the medical or surgical treatment of injuries and diseases of the feet (such as hammer toe or heel spurs).<br>• Routine foot care for members with certain medical conditions affecting the lower limbs | **In Network:**<br>• **$5** copayment for Medicare covered podiatry services in a specialist's office. |
| 🖐 **Prostate cancer screening exams**<br><br>For men age 50 and older, covered services include the following - once every 12 months:<br><br>• Digital rectal exam<br>• Prostate Specific Antigen (PSA) test | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for prostate cancer screening exam in a primary care physician's office.<br>• **$0** copayment for prostate cancer screening exam in a specialist's office. |
| **Prosthetic devices and related supplies** | **In Network:**<br>• **20%** coinsurance for prosthetics. |

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| Devices (other than dental) that replace all or part of a body part or function. These include, but are not limited to: colostomy bags and supplies directly related to colostomy care, pacemakers, braces, prosthetic shoes, artificial limbs, and breast prostheses (including a surgical brassiere after a mastectomy). Includes certain supplies related to prosthetic devices, and repair and/or replacement of prosthetic devices. Also includes some coverage following cataract removal or cataract surgery – see "Vision Care" later in this section for more detail.<br><br>• Prior authorization is required for prosthetic devices. | |
| **Pulmonary rehabilitation services**<br><br>Comprehensive programs of pulmonary rehabilitation are covered for members who have moderate to very severe chronic obstructive pulmonary disease (COPD) and a referral for pulmonary rehabilitation from the doctor treating the chronic respiratory disease. | **In Network:**<br>• **$5** copayment for pulmonary rehabilitation in a specialist's office.<br>• **$30** copayment for pulmonary rehabilitation in an outpatient hospital. |
| ☺ **Screening and counseling to reduce alcohol misuse**<br><br>We cover one alcohol misuse screening for adults with Medicare (including pregnant women) who misuse alcohol, but aren't alcohol dependent.<br><br>If you screen positive for alcohol misuse, you can get up to 4 brief face-to-face counseling sessions per year (if you're competent and alert during counseling) provided by a qualified primary care doctor or practitioner in a primary care setting. | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply.<br><br>**In Network:**<br>• **$0** copayment for an alcohol misuse screening or counseling session. |
| ☺ **Screening for sexually transmitted infections (STIs) and counseling to prevent STIs**<br><br>We cover sexually transmitted infection (STI) screenings for chlamydia, gonorrhea, syphilis, and Hepatitis B. These screenings are covered for pregnant women and for certain people who are at increased risk for an STI when the tests are ordered by a primary care provider. We cover these tests once every 12 months or at certain times during pregnancy.<br><br>We also cover up to 2 individual 20 to 30 minute, face-to-face high-intensity behavioral counseling sessions each year for sexually active | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply. |

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| adults at increased risk for STIs. We will only cover these counseling sessions as a preventive service if they are provided by a primary care provider and take place in a primary care setting, such as a doctor's office. | **In Network:**<br>• **$0** copayment for an STI screening or counseling session. |
| **Services to treat kidney disease and conditions**<br><br>Covered services include:<br><br>• Kidney disease education services to teach kidney care and help members make informed decisions about their care. For members with stage IV chronic kidney disease when referred by their doctor, we cover up to six sessions of kidney disease education services per lifetime.<br>• Outpatient dialysis treatments (including dialysis treatments when temporarily out of the service area, as explained in Chapter 3)<br>• Inpatient dialysis treatments (if you are admitted as an inpatient to a hospital for special care)<br>• Self-dialysis training (includes training for you and anyone helping you with your home dialysis treatments)<br>• Home dialysis equipment and supplies<br>• Certain home dialysis support services (such as, when necessary, visits by trained dialysis workers to check on your home dialysis, to help in emergencies, and check your dialysis equipment and water supply)<br><br>Certain drugs for dialysis are covered under your Medicare Part B drug benefit. For information about coverage for Part B Drugs, please go to the section, "Medicare Part B prescription drugs." | **In Network:**<br>• **$0** copayment for kidney disease education services in a primary care physician's office.<br>• **$0** copayment for kidney disease education services in a specialist's office.<br>• **0%** coinsurance for renal dialysis services in a dialysis center.<br>• **20%** coinsurance for renal dialysis services in an outpatient hospital.<br>• **20%** coinsurance for dialysis equipment.<br>• **$0** copayment for each home health visit in a member's home.<br>• For inpatient renal dialysis services, please see "Inpatient hospital care" earlier in this section. |
| **Skilled nursing facility (SNF) care**<br><br>(For a definition of "skilled nursing facility care," see Chapter 12 of this booklet. Skilled nursing facilities are sometimes called "SNFs.")<br><br>You are covered for up to 100 medically necessary days per benefit period. Prior hospital stay is not required. Covered services include but are not limited to:<br><br>• Semiprivate room (or a private room if medically necessary)<br>• Meals, including special diets<br>• Skilled nursing services<br>• Physical therapy, occupational therapy, and speech therapy<br>• Drugs administered to you as part of your plan of care (This includes substances that are naturally present in the body, such as blood clotting factors.)<br>• Blood - including storage and administration. Coverage of whole blood and packed red cells begins with the first pint of blood you need.<br>• Medical and surgical supplies ordinarily provided by SNFs<br>• Laboratory tests ordinarily provided by SNFs<br>• X-rays and other radiology services ordinarily provided by SNFs | • A new skilled nursing benefit period will begin on day one when you first enroll in a Humana Medicare Advantage plan, or you have been discharged from a skilled nursing facility (or not received inpatient skilled level of care) for **60** consecutive days.<br><br>**In Network:**<br><br>Per benefit period, you pay:<br>• **$25** copayment per day, days 1 to 20 for skilled nursing care in a Skilled Nursing Facility<br>• **$150** copayment per day, days 21 to 100 for skilled nursing care in a Skilled Nursing Facility |

Case 1:21-cv-01083-LPS Document 35 Filed 12/13/21 Page 349 of 547 PageID #: 4958
Case 2:19-cv-06926-DSF-MRW Document 60-1 Filed 04/24/20 Page 72 of 225 Page ID #:1313

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| • Use of appliances such as wheelchairs ordinarily provided by SNFs<br>• Physician/Practitioner services<br><br>Generally, you will get your SNF care from network facilities. However, under certain conditions listed below, you may be able to pay in-network cost sharing for a facility that isn't a network provider, if the facility accepts our plan's amounts for payment.<br>• A nursing home or continuing care retirement community where you were living right before you went to the hospital (as long as it provides skilled nursing facility care).<br>• A SNF where your spouse is living at the time you leave the hospital.<br>• Prior authorization is required for inpatient skilled nursing care. | |
| 🖐 **Smoking and tobacco use cessation (counseling to stop smoking or tobacco use)**<br><br>If you use tobacco, but do not have signs or symptoms of tobacco-related disease: We cover two counseling quit attempts within a 12-month period as a preventive service with no cost to you from an in-network provider. Each counseling attempt includes up to four face-to-face visits.<br><br>If you use tobacco and have been diagnosed with a tobacco-related disease or are taking medicine that may be affected by tobacco: We cover cessation counseling services. We cover two counseling quit attempts within a 12-month period, however, you will pay the applicable inpatient or outpatient cost sharing. Each counseling attempt includes up to four face-to-face visits. | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply.<br>If you use tobacco, but do not have signs or symptoms of tobacco-related disease:<br><br>**In Network:**<br>• **$0** copayment for smoking cessation services in a primary care physician's office.<br>• **$0** copayment for smoking cessation services in a specialist's office.<br>If you use tobacco and have been diagnosed with a tobacco-related disease or are taking medicine that may be affected by tobacco:<br><br>**In Network:**<br>• **$0** copayment for smoking cessation services in a primary care physician's office.<br>• **$5** copayment for smoking cessation services in a specialist's office. |

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| **Smoking Cessation (QuitNet)**<br><br>Stop smoking with QuitNet Comprehensive. Services include:<br><br>• Web-based or telephonic coaching<br>• The QuitNet, QuitGuide, and QuitTips e-mail support<br>• Over-the-counter nicotine replacement therapy, including patches, gums, and lozenges<br><br>You can enroll by phone at 1-888-572-4074 or online at www.quitnet.com/humana. | **In Network:**<br><br>• **$0** copayment |
| **Urgently needed care**<br><br>Urgently needed care is care provided to treat a non-emergency, unforeseen medical illness, injury, or condition that requires immediate medical care. Urgently needed care may be furnished by in-network providers or by out-of-network providers when network providers are temporarily unavailable or inaccessible.<br><br>You are covered for urgently needed care in the United States and its territories. | **In Network:**<br>• **$0** copayment for urgently needed care in a primary care physician's office.<br>• **$5** copayment for urgently needed care in a specialist's office.<br>• **$5** copayment for urgently needed care in an immediate care facility. |
| ☝ **Vision care**<br><br>Covered services include:<br><br>• Outpatient physician services for the diagnosis and treatment of diseases and injuries of the eye, including treatment for age-related macular degeneration. Original Medicare doesn't cover routine eye exams (eye refractions) for eyeglasses/contacts.<br>• One pair of eyeglasses or contact lenses after each cataract surgery that includes insertion of an intraocular lens. (If you have two separate cataract operations, you cannot reserve the benefit after the first surgery and purchase two eyeglasses after the second surgery.) Corrective lenses/frames (and replacements) needed after a cataract removal without a lens implant. | **In Network:**<br><br>• **$5** copayment for Medicare covered vision services in a specialist's office.<br>• **$0** copayment for Medicare covered eyewear following cataract surgery. |
| ☝ **"Welcome to Medicare" Preventive Visit**<br><br>The plan covers the one-time "Welcome to Medicare" preventive visit. The visit includes a review of your health, as well as education and counseling about the preventive services you need (including certain screenings and shots), and referrals for other care if needed.<br><br>**Important:** We cover the "Welcome to Medicare" preventive visit only within the first 12 months you have Medicare Part B. When you make your | • If you also are treated or monitored for an existing medical condition during the visit when you receive a preventive service, or if other services are billed in addition to the preventive service, the cost sharing for the care received for the existing medical condition or other services will also apply. |

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 351 of 547 PageID #: 4960
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 74 of 225   Page ID
#:1315

2014 Evidence of Coverage for Humana Gold Plus H0103-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay when you get these services |
|---|---|
| appointment, let your doctor's office know you would like to schedule your "Welcome to Medicare" preventive visit.<br><br>• **Note**: Any lab or diagnostic procedures that are ordered are not covered under this benefit and you pay your plan cost sharing amount for those services separately. | **In Network:**<br>• There is no coinsurance, copayment, or deductible for the Welcome to Medicare preventive visit. |

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

---

| Section 2.2 | Extra "optional supplemental" benefits you can buy |
|---|---|

Your plan offers some extra benefits that are not covered by Original Medicare and are not included in your benefits package as a plan member. These extra benefits are called "**Optional Supplemental Benefits**." If you want these optional supplemental benefits, you must sign up for them and you may have to pay an extra premium for them. The optional supplemental benefits included in this section are subject to the same appeals process as any other plan benefits.

If you purchase these optional supplemental benefits, this Evidence of Coverage contract will apply to the extra benefits you purchase. There are multiple ways to pay the premium for the optional supplemental benefits, including payments by check, credit or debit card, or automatic withdrawal from your checking or savings account. For more information about your payment options, please call Customer Care at the phone number on the back of your Humana member ID card.

| Services that are covered for you | What you must pay |
|---|---|
| **Optional Supplemental Benefits** | |

## Extra benefits you can add to customize your Medicare Advantage plan

**Optional supplemental benefits enrollment**

To get optional supplemental benefits, you must choose the benefits in one of two ways:

1. Enroll in optional supplemental benefits (OSBs) when you enroll in your Medicare Advantage plan. In most cases, your optional supplemental benefits will begin the same day that your Medicare Advantage plan begins.
2. Fill out a separate optional supplemental benefits enrollment application at any time. You can also call 1-800-645-7322 (TTY: 711), Monday - Friday, 8 a.m. to 8 p.m. local time. If you enroll this way, your optional supplemental benefits will begin on the first day of the month after Humana receives your application.

Medicare Advantage plans and optional supplemental benefits must be reapproved by the Centers for Medicare & Medicaid Services (CMS) each year. Any changes to your plan will be reported to you in the Annual Notification of Changes letter sent in the fall. Once your plan is approved, if you do not change your Medicare Advantage plan during the annual election period and you are enrolled in an OSB, then your OSB will be renewed automatically at the beginning of the next year, if the OSB is still available.

Please note the following benefits are purchased separately and are not included in your Medicare Advantage plan premium. These benefits are offered on an annual basis. Any unused benefits will not "roll over" to the next coverage year.

---

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|

For more information about enrollment in optional supplemental benefits, call Customer Care at the phone number on the back of your Humana member ID card. That number also appears at the end of this section.

### Optional supplemental benefits provider directory

To find a provider for your optional supplemental benefits (OSB), see your OSB Provider Directory. It will be sent to you within 10 days of enrolling in an OSB.

If you need an OSB Provider Directory or want the name of a provider, please call Customer Care. Humana is not responsible for the availability or ongoing participation of any provider and the provider availability may change. Always make sure your provider is in the network before receiving care.

### Optional supplemental benefits voluntary disenrollment

If you want to end your optional supplemental benefits coverage, you need to let us know by writing us a letter. We **cannot** accept disenrollment requests by phone.

Your letter should:
• Tell us clearly that you want to disenroll from the optional supplemental benefits only – not the Medicare Advantage plan
• Include your name, member ID number, and signature
• Be sent to the Humana disenrollment office. You can get the address by calling Customer Care at the phone number on the back of your Humana member ID card. The number is also at the end of this section.

2014 Evidence of Coverage for Humana Gold Plus H0163-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|
| **Optional supplemental benefits involuntary disenrollment** | |

If you do not pay the premiums for your optional supplemental benefits, you will lose your OSB coverage. We will tell you in writing that you have 60 days to pay the optional supplemental benefit premium before your coverage ends. At the end of your grace period, we will end the benefits if you have not paid everything you owe.

If you end these benefits, or if you lose them because you did not pay what you owe, you can start these benefits again later in the year. Any claims that were previously processed in the original coverage will count towards your benefit maximum. Your benefits will not start over.

**Refund of premium**

If you pay more premiums than you owe, we may return these funds if you ask to end the benefits. If we issue a refund for overpayment, it will be mailed within 45 business days of notification. However, if you have an outstanding balance for your Medicare Advantage (MA) plan premium, we will apply your overpayment of optional supplemental benefit premiums to your outstanding balance for your Medicare Advantage plan.

**MyOption**[SM] **Dental – High PPO**

This optional supplemental benefit (OSB) provides you with extra benefits. You will need to pay extra monthly premiums for these benefits. These benefits include coverage for many preventive, basic, and major dental services.

**Premium information**

| | |
|---|---|
| Monthly premium | **$25.30** monthly benefit premium. |

**Coverage information**

General information
• Individual annual deductible – annual deductible does not apply to preventive and diagnostic services
• Maximum plan benefit – combined for both in-network and out-of-network services – of **$1,500** per person per calendar year

**$50** annual deductible.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|
| **Dental benefit** | |
| With this optional supplemental benefit, you are covered for certain diagnostic and preventive services – including bitewing X-rays, routine cleanings, and checkups – when you see a network dentist. You can choose to see a non-network dentist for covered dental services. Humana negotiates rates for dental services. When you see a non-network dentist, you will pay your part of the negotiated rate (your coinsurance). If your dentist charges more than that rate, you may have to pay more. | |

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 356 of 547 PageID #: 4965
Case 2:15-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 79 of 225   Page ID
#:1320

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay | |
|---|---|---|
| Covered dental services – total annual benefit (Medicare Advantage Plan plus OSB) | Network Dentist* | Non-Network Dentist** |
| **Preventive and diagnostic dental services**<br>• Oral examinations – two per calendar year<br>• Bitewing X-rays – one series of films per calendar year<br>• Dental prophylaxis (cleanings) – two per calendar year | **0%** | **30%** |
| **Basic dental services (minor restorative)**<br>• Amalgam restorations (fillings) and composite resin restorations (fillings) – two from this group per calendar year<br>  – Anterior (front) teeth – amalgam restorations and composite resin restorations<br>  – Posterior (back) teeth – amalgam restorations and comparable amalgam benefit applied for composite resin restorations.  Member is responsible for remaining cost difference between composite restoration and amalgam restoration.<br>• Extractions – two per calendar year<br>• Crown or bridge re-cement – one per calendar year<br>• Emergency treatment for pain – two per calendar year<br>• Periodontal scaling and root planing – one procedure per quadrant every three years | **50%** | **55%** |
| **Major dental services (endodontics, periodontics, and oral surgery)**<br>• Root canal treatment – one per calendar year<br>• Crowns – one per calendar year<br>• Complete dentures – one complete upper and/or lower complete denture every five years<br>• Partial dentures – one per calendar year<br>• Denture adjustments (not covered within six months of initial placement) – one per calendar year<br>• Denture reline (Not allowed on spare dentures) – one per calendar year | **70%** | **75%** |

*Network dentists have agreed to provide services at an in-network rate. If you see a network dentist, you cannot be billed more than the in-network rate.

**Non-network dentists have not agreed to provide services at an in-network rate. Humana negotiates rates for dental services. When you see a non-network dentist, you will pay your part of the negotiated rate (your coinsurance). If your dentist charges more than that rate, you may have to pay more.

2014 Evidence of Coverage for Humana Gold Plus H0163-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|

**General benefit payments**

The optional supplemental benefit helps you pay for covered dental services, as shown in the Coverage Information section. Covered dental services are subject to the conditions, limitations, exclusions, and maximums of this optional supplemental benefit.

After you receive a dental service, we will check to see if it is a covered dental service. If we determine it is a covered dental service, we will pay benefits as follows:
1. We will determine the total covered expense.
2. We will review the covered expense against any maximum benefits that may apply.
3. We will check to see if you have met your deductible. If you have not, we will subtract any amount needed to meet the deductible.
4. We will pay the remaining eligible covered expense to you or your dentist, based on your coinsurance for that covered service.

**Alternate services**

If there are two or more services that can fix a dental condition, Humana will decide how to pay your benefits using the covered expenses for the least expensive covered service that produces a professionally satisfactory result, as determined by us. We will pay up to the reimbursement limit for the least expensive covered service and subject to any deductible, coinsurance, and maximum benefit. You must pay the excess amount.

If you or your dentist choose a treatment that costs more than the one we recommend, Humana's payment will be based on the cost of the less expensive treatment. You will be responsible for the rest of the bill.

**Pretreatment plan**

We suggest that if dental care you need is expected to exceed **$300**, you or your dentist send a dental treatment plan for us to review before your treatment. The dental treatment plan should include:
1. A list of services you will receive. Your dentist should use the American Dental Association nomenclature and codes;
2. Your dentist's written description of the proposed treatment;
3. Supporting pretreatment X-rays showing your dental needs;
4. Itemized cost of the proposed treatment; and
5. Any other appropriate diagnostic materials that we may request.

An estimate for services is not a guarantee of what we will pay. It tells you and your dentist in advance about the benefits payable for the covered expenses in the treatment plan. We will notify you and your dentist of the benefits payable based on the submitted treatment plan.

An estimate for services is not necessary for emergency care.

2014 Evidence of Coverage for Humana Gold Plus H0103-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|

**Process and timing**

An estimate for services is valid for 90 days after the date we notify you and your dentist of the benefits payable for the proposed treatment plan. This is subject to your eligibility of coverage. If treatment will not begin for more than 90 days after the date we notify you and your dentist, we recommend that you submit a new treatment plan.

**General provisions**

**Dentists are independent providers.** Humana's obligations are limited to payment for services described in this document.

**Dental records.** We have access to dental and treatment records of members. We use this information for determination of benefits, processing claims, utilization review, quality assurance, financial audit, or for any other purposes reasonably related to covered dental services. Each member should fill out and send us such additional consents, releases, and other documents we may ask for in order to determine or provide benefits. If we do not get all of the information we need from you and your dentist, we can decide not to pay benefits for your treatment.

**Limitations and exclusions**

This MyOption Dental – High PPO optional supplemental benefit does not include coverage for the following:
1. Any expenses incurred while you qualify for any workers' compensation or occupational disease act or law, whether or not you applied for coverage.
2. Services that are:
   a. Free or that you would not be required to pay for if you did not have this insurance, unless charges are received from and reimbursable to the U.S. government or any of its agencies as required by law;
   b. Furnished by, or payable under, any plan or law through any government or any political subdivision – this does not include Medicare or Medicaid; or
   c. Furnished by any U.S. government-owned or operated hospital/institution/agency for any service connected with sickness or bodily injury.
3. Any loss caused or contributed by: war or any act of war, whether declared or not; any act of international armed conflict; or any conflict involving armed forces of any international authority.
4. Any expense arising from the completion of forms.
5. Your failure to keep an appointment with the dentist.
6. Any service we consider cosmetic dentistry unless it is necessary as a result of an accidental injury sustained while you are covered under this policy. We consider the following cosmetic dentistry procedures:
   a. Facings on crowns or pontics – the portion of a fixed bridge between the abutments – posterior to the second bicuspid

A-7297

2014 Evidence of Coverage for Humana Gold Plus H0103-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|
| **Limitations and exclusions** | |

    b.  Any service to correct congenital malformation

    c.  Any service performed primarily to improve appearance; or characterization and personalization of prosthetic devices

7.  Charges for: any type of implant and all related services, including crowns or the prosthetic device attached to it; precision or semi-precision attachments; overdentures and any endodontic treatment associated with overdentures; other customized attachments.

8.  Any service related to:

    a.  Altering vertical dimension of teeth

    b.  Restoration or maintenance of occlusion

    c.  Splinting teeth, including multiple abutments, or any service to stabilize periodontally weakened teeth

    d.  Replacing tooth structures lost as a result of abrasion, attrition, erosion, or abfraction

    e.  Bite registration or bite analysis

9.  Infection control, including but not limited to sterilization techniques.

10.  Fees for treatment performed by someone other than a dentist except for scaling and teeth cleaning, and the topical application of fluoride that can be performed by a licensed dental hygienist. The treatment must be rendered under the supervision and guidance of the dentist in accordance with generally accepted dental standards.

11.  Any hospital, surgical, or treatment facility, or for services of an anesthesiologist or anesthetist.

12.  Prescription drugs or pre-medications, whether dispensed or prescribed.

13.  Any service not specifically listed in the coverage information.

14.  Any service that we determine: Is not a dental necessity; does not offer a favorable prognosis; does not have uniform professional endorsement; or is deemed to be experimental or investigational in nature.

15.  Orthodontic services.

16.  Any expense incurred before your effective date or after the date your coverage under this optional supplemental benefit terminates.

17.  Services provided by someone who ordinarily lives in your home or who is a family member.

18.  Charges exceeding the reimbursement limit for the service.

19.  Treatment resulting from any intentionally self-inflicted injury or bodily illness.

20.  Local anesthetics, irrigation, nitrous oxide, bases, pulp caps, temporary dental services, study models, treatment plans, occlusal adjustments, or tissue preparation associated with the impression or placement of a restoration when charged as a separate service. These services are considered an integral part of the entire dental service.

21.  Repair and replacement of orthodontic appliances.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|

**Limitations and exclusions**

22. Any surgical or nonsurgical treatment for any jaw joint problems, including any temporomandibular joint disorder, craniomaxillary, craniomandibular disorder, or other conditions of the joint linking the jaw bone and skull; or treatment of the facial muscles used in expression and chewing functions, for symptoms including, but not limited to, headaches.

23. Extractions, except for extractions of erupted tooth or exposed root (includes routine removal of tooth structure, minor smoothing of socket bone, and closure, as necessary), or surgical removal of erupted tooth requiring elevation of mucoperiosteal flap and removal of bone of section of tooth.

**Excess coverage**

We will not pay benefits for any accidental injury if other insurance will provide payments or expense coverage, regardless of whether the other coverage is described as primary, excess, or contingent. If your claim against another insurer is denied or partially paid, we will process your claim according to the terms and conditions of this certificate. If we make a payment, you agree to assign to us any right you have against the other insurer for dental expenses we pay. Payments made by the other insurer will be credited toward any applicable coinsurance or calendar year deductibles.

It's your responsibility to understand your dental coverage, including its limitations and exclusions. To be covered, all dental services must be received from a licensed dentist who deems the service necessary and must be approved by the plan. Remember, the greatest savings on covered services are through OSB network dentists. The dentist you choose may ask you to sign an informed consent document detailing the risks, covered dental services, and options to all recommended treatments. You should always ask the dentist for a treatment plan detailing the services to be performed and the associated costs prior to having work performed.

**Questions?**

For more information about MyOption Dental – High PPO or to request an optional supplemental benefit application,
call HumanaDental Customer Care at
1-800-669-6614
For TTY, call 711
Monday – Friday, 8 a.m. – 6 p.m. local time

Visit **Humana.com**

2014 Evidence of Coverage for Humana Gold Plus H0103-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|
| **MyOption℠ Vision** | |
| This optional supplemental benefit (OSB) provides you with extra benefits. You will need to pay extra monthly premiums for these benefits. These benefits include coverage for a routine eye exam for members who wear eyeglasses, as well as one set of eyeglass frames and one pair of lenses, **and/or** contact lenses. | |
| **Premium information** | |
| Monthly premium | **$15.30** monthly benefit premium. |
| **Coverage information** | |

Vision benefit through EyeMed Vision Care
- The MyOption Vision optional supplemental benefit includes coverage for a routine eye exam for members who wear eyeglasses and standard lenses as follows:

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay | |
|---|---|---|
| **Covered vision benefits** | **EyeMed Network Vision Provider** | **Non–EyeMed Network Vision Provider** |
| • Routine exam for members who wear eyeglasses with refraction/dilation as necessary | **$40** allowance* | **$40** allowance |
| ***Visit any in-network EyeMed Select vision provider and your routine exam charge will not exceed the $40 allowance.** | | |
| • One set of eyeglass frames and one pair of lenses **and/or** contact lenses (conventional or disposable lenses). Eyeglass lens treatments to include polycarbonate, UV, scratch resistance and transitional tinting.<br>• The benefit can only be used one time. Any remaining benefit dollars do not "roll over" to a future purchase. | **$350** benefit | **$350** (combined in and out-of-network) |

**Frequency**
• Routine examination – Once every 12 months
• One set of eyeglass frames and one pair of lenses **and/or** contact lenses (conventional or disposable) – Once every 12 months

Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 363 of 547 PageID #: 4972
Case 2:19-cv-06926-DSF-MRW Document 60-1 Filed 04/24/20 Page 86 of 225 Page ID #:1327

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|

**Choosing a vision provider**

You may choose to get vision care from either an EyeMed vision provider or a non-EyeMed vision provider. Choosing an EyeMed vision provider from the OSB Provider Directory will decrease your costs for vision OSB services.
- To find a provider for your optional supplemental benefits, see your OSB Provider Directory. It will be sent to you within 10 days of enrolling in an OSB.
- If you do not receive an OSB Provider Directory or need help finding an EyeMed provider, please call EyeMed at the phone number at the end of this document. To get the in-network rate, make sure your provider is in the EyeMed Select network before you get care. We are not responsible for the availability or ongoing participation of any provider.

If you choose an EyeMed vision provider, just call the provider's office and make an appointment. Be sure to tell the provider's office that you are a Humana Medicare Advantage member **with EyeMed benefits**. If you have questions about EyeMed vision providers in your area or any other questions about your vision coverage under MyOption Vision, please call EyeMed at the phone number at the end of this document.

If you choose to get vision care from a non-EyeMed vision provider, you will have to pay the full bill at the time of your appointment. Then you will submit an EyeMed out-of-network claim form. The out-of-network claim form can be found on MyHumana by clicking on Vision Information. You must also send an itemized statement of charges to EyeMed Vision Care.

Whether you choose an EyeMed vision provider or a non-EyeMed vision provider, you must pay for any copayment and any costs and fees that exceed your covered vision benefit allowance, and any services or materials that are not covered under MyOption Vision.

**How to submit a paper claim**

If you receive emergency services or other services from a non-network provider, you will have to pay the full cost of those services and then submit claims documentation. Within 90 days, call EyeMed at the phone number at the end of this document to request a claim form and instructions on submitting your claim. The out-of-network claim form can also be found on MyHumana by clicking on Vision Information.

**General provisions**

**EyeMed Vision Care is a third party administrator and an independent provider offering retail and private practitioners.**
Humana's obligations are limited to payment for services described in this document.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|

**Limitations and exclusions**

The MyOption Vision optional supplemental benefit does not include coverage for the following:

1. Standard contact lens fit and follow-up.
2. Refitting or change in lens design after initial fitting.
3. No more than one set of eyeglass frames and one pair of lenses per calendar year.
4. The benefit dollars can only be used one time. Any remaining benefit dollars do not "roll over" to a future purchase.
5. Any expense arising from the completion of forms.
6. Any service not specifically listed in your optional supplemental benefit.
7. Orthoptic or vision training.
8. Subnormal vision aids and associated testing.
9. Aniseikonic lenses.
10. Any service we consider cosmetic.
11. Any expense incurred before your effective date or after the date your coverage under this optional supplemental benefit terminates.
12. Services provided by someone who ordinarily lives in your home or who is a family member.
13. Charges exceeding the allowance for the service.
14. Treatment resulting from any intentionally self-inflicted injury or bodily illness.
15. Plano lenses.
16. Medical or surgical treatment of eye, eyes, or supporting structures.
17. Non-prescription sunglasses.
18. Two pair of glasses in lieu of bifocals.
19. Services or materials provided by any other group benefit plans providing vision care.
20. Certain name brands when manufacturer imposes no discount.
21. Corrective vision treatment of an experimental nature.
22. Solutions and/or cleaning products for glasses or contact lenses.
23. Non-prescription items.
24. Costs associated with securing materials.
25. Pre- and post-operative services.
26. Orthokeratology.
27. Routine maintenance of materials.
28. Artistically painted lenses.
29. Any expenses incurred while you qualify for any workers' compensation or occupational disease act or law, whether or not you applied for coverage.
30. Services that are:
    a. Free or that you would not be required to pay for if you did not have this insurance, unless charges are received from and reimbursable to the U.S. government or any of its agencies as required by law;

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|

**Limitations and exclusions**

    b.  Furnished by, or payable under, any plan or law through any government or any political subdivision (this does not include Medicare or Medicaid); or

    c.  Furnished by any U.S. government-owned or operated hospital/institution/agency for any service connected with sickness or bodily injury.

31. Any loss caused or contributed by: war or any act of war, whether declared or not; any act of international armed conflict; or any conflict involving armed forces of any international authority.

32. Your failure to keep an appointment.

33. Any hospital, surgical or treatment facility, or for services of an anesthesiologist or anesthetist.

34. Prescription drugs or pre-medications, whether dispensed or prescribed.

35. Any service that we determine is not a visual necessity; does not offer a favorable prognosis; does not have uniform professional endorsement; or is deemed to be experimental or investigational in nature.

36. Replacement of lenses or eyeglass frames furnished under this optional supplemental benefit which are lost or broken, unless otherwise available under the optional supplemental benefit.

37. Any examination or material required by an employer as a condition of employment or safety eyewear.

38. Pathological treatment.

**Questions?**

To request an optional supplemental benefit application,
call Humana Customer Care at
1-800-457-4708
For TTY, call 711
Seven days a week, 8 a.m. – 8 p.m. local time
Please note that our automated phone system may answer during weekends and holidays from February 15 – September 30. Please leave your name and telephone number, and we will call you back by the end of the next business day.

For information on vision benefits,
call EyeMed Customer Service at
1-888-289-0595
For TTY, call 711
Monday – Saturday, 7:30 a.m. – 11 p.m. Eastern time
Sunday, 11 a.m. – 8 p.m. Eastern time

Visit **Humana.com**

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|
| **MyOption℠ Plus** | |
| This optional supplemental benefit provides you with extra benefits. You will need to pay extra monthly premiums for these benefits. These benefits include both dental and vision. This document will explain all the details of your dental benefits, and then it will cover your vision benefits. | |
| **Premium information** | |
| Monthly premium | **$24.30** monthly benefit premium. |
| **Coverage information** | |
| General information<br>• Individual annual deductible – annual deductible does not apply to preventive and diagnostic services<br>• Maximum plan benefit – combined for both in-network and out-of-network services – of **$1,000** per person per calendar year on dental coverage. | **$50** annual deductible on dental coverage. |
| **Dental benefit** | |
| With this optional supplemental benefit, you are covered for certain diagnostic and preventive services – including bitewing X-rays, routine cleanings, and checkups – when you see a network dentist. You can choose to see a non-network dentist for covered dental services. Humana negotiates rates for dental services. When you see a non-network dentist, you will pay your part of the negotiated rate (your coinsurance). If your dentist charges more than that rate, you may have to pay more. | |

Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 367 of 547 PageID #: 4976
Case 2:19-cv-06926-DSF-MRW Document 66-1 Filed 04/24/20 Page 90 of 225 Page ID
#:1331

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay | |
|---|---|---|
| **Covered dental services – total annual benefit (Medicare Advantage Plan plus OSB)** | **Network Dentist*** | **Non-Network Dentist**** |
| **Preventive and diagnostic dental services** <br>• Oral examinations – two per calendar year <br>• Bitewing X-rays – one series of films per calendar year <br>• Dental prophylaxis (cleanings) – two per calendar year | **0%** | **30%** |
| **Basic dental services (minor restorative)** <br>• Amalgam restorations (fillings) and composite resin restorations (fillings) – two from this group per calendar year <br> – Anterior (front) teeth – amalgam restorations and composite resin restorations <br> – Posterior (back) teeth – amalgam restorations and comparable amalgam benefit applied for composite resin restorations. Member is responsible for remaining cost difference between composite restoration and amalgam restoration. <br>• Extractions – two per calendar year <br>• Crown or bridge re-cement – one per calendar year <br>• Emergency treatment for pain – two per calendar year | **50%** | **55%** |

*Network dentists have agreed to provide services at an in-network rate. If you see a network dentist, you cannot be billed more than the in-network rate.

**Non-network dentists have not agreed to provide services at an in-network rate. Humana negotiates rates for dental services. When you see a non-network dentist, you will pay your part of the negotiated rate (your coinsurance). If your dentist charges more than that rate, you may have to pay more.

**General benefit payments**

The optional supplemental benefit helps you pay for covered dental services, as shown in the Coverage Information section. Covered dental services are subject to the conditions, limitations, exclusions, and maximums of this optional supplemental benefit.

After you receive a dental service, we will check to see if it is a covered dental service. If we determine it is a covered dental service, we will pay benefits as follows:
1. We will determine the total covered expense.
2. We will review the covered expense against any maximum benefits that may apply.
3. We will check to see if you have met your deductible. If you have not, we will subtract any amount needed to meet the deductible.
4. We will pay the remaining eligible covered expense to you or your dentist, based on your coinsurance for that covered service.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 368 of 547 PageID #: 4977
Case 2:15-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 91 of 225   Page ID #:1382

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|

**Alternate services**

If there are two or more services that can fix a dental condition, Humana will decide how to pay your benefits using the covered expenses for the least expensive covered service that produces a professionally satisfactory result, as determined by us. We will pay up to the reimbursement limit for the least expensive covered service and subject to any deductible, coinsurance, and maximum benefit. You must pay the excess amount.

If you or your dentist choose a treatment that costs more than the one we recommend, Humana's payment will be based on the cost of the less expensive treatment. You will be responsible for the rest of the bill.

**Pretreatment plan**

We suggest that if dental care you need is expected to exceed **$300**, you or your dentist send a dental treatment plan for us to review before your treatment. The dental treatment plan should include:
1.  A list of services you will receive. Your dentist should use the American Dental Association nomenclature and codes;
2.  Your dentist's written description of the proposed treatment;
3.  Supporting pretreatment X-rays showing your dental needs;
4.  Itemized cost of the proposed treatment; and
5.  Any other appropriate diagnostic materials that we may request.

An estimate for services is not a guarantee of what we will pay. It tells you and your dentist in advance about the benefits payable for the covered expenses in the treatment plan. We will notify you and your dentist of the benefits payable based on the submitted treatment plan.

An estimate for services is not necessary for emergency care.

**Process and timing**

An estimate for services is valid for 90 days after the date we notify you and your dentist of the benefits payable for the proposed treatment plan. This is subject to your eligibility of coverage. If treatment will not begin for more than 90 days after the date we notify you and your dentist, we recommend that you submit a new treatment plan.

Case 1:21-cv-01083-LPS Document 35 Filed 12/13/21 Page 369 of 547 PageID #: 4978
Case 2:19-cv-06926-DSF-MRW Document 60-1 Filed 04/24/20 Page 92 of 225 Page ID #:1332

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|

**General provisions**

**Dentists are independent providers.** Humana's obligations are limited to payment for services described in this document.

**Dental records.** We have access to dental and treatment records of members. We use this information for determination of benefits, processing claims, utilization review, quality assurance, financial audit, or for any other purpose reasonably related to covered dental services. Each member should fill out and send us such additional consents, releases, and other documents we may ask for in order to determine or provide benefits. If we do not get all of the information we need from you and your dentist, we can decide not to pay benefits for your treatment.

**Dental limitations and exclusions**

This MyOption Plus optional supplemental benefit does not include coverage for the following:
1. Any expenses incurred while you qualify for any workers' compensation or occupational disease act or law, whether or not you applied for coverage.
2. Services that are:
   a. Free or that you would not be required to pay for if you did not have this insurance, unless charges are received from and reimbursable to the U.S. government or any of its agencies as required by law
   b. Furnished by, or payable under, any plan or law through any government or any political subdivision – this does not include Medicare or Medicaid; or
   c. Furnished by any U.S. government-owned or operated hospital/institution/agency for any service connected with sickness or bodily injury.
3. Any loss caused or contributed by: war or any act of war, whether declared or not; any act of international armed conflict; or any conflict involving armed forces of any international authority.
4. Any expense arising from the completion of forms.
5. Your failure to keep an appointment with the dentist.
6. Any service we consider cosmetic dentistry unless it is necessary as a result of an accidental injury sustained while you are covered under this policy. We consider the following cosmetic dentistry procedures:
   a. Facings on crowns or pontics – the portion of a fixed bridge between the abutments – posterior to the second bicuspid
   b. Any service to correct congenital malformation
   c. Any service performed primarily to improve appearance; or characterization and personalization of prosthetic devices
7. Charges for: any type of implant and all related services, including crowns or the prosthetic device attached to it; precision or semi-precision attachments; overdentures and any endodontic

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|

**Dental limitations and exclusions**

treatment associated with overdentures; other customized attachments.

8. Any service related to:
   a. Altering vertical dimension of teeth
   b. Restoration or maintenance of occlusion
   c. Splinting teeth, including multiple abutments, or any service to stabilize periodontally weakened teeth
   d. Replacing tooth structures lost as a result of abrasion, attrition, erosion, or abfraction
   e. Bite registration or bite analysis
9. Infection control, including but not limited to sterilization techniques.
10. Fees for treatment performed by someone other than a dentist except for scaling and teeth cleaning, and the topical application of fluoride that can be performed by a licensed dental hygienist. The treatment must be rendered under the supervision and guidance of the dentist in accordance with generally accepted dental standards.
11. Any hospital, surgical, or treatment facility, or for services of an anesthesiologist or anesthetist.
12. Prescription drugs or pre-medications, whether dispensed or prescribed.
13. Any service not specifically listed in the Coverage Information.
14. Any service that we determine: Is not a dental necessity; does not offer a favorable prognosis; does not have uniform professional endorsement; or is deemed to be experimental or investigational in nature.
15. Orthodontic services.
16. Any expense incurred before your effective date or after the date your coverage under this optional supplemental benefit terminates.
17. Services provided by someone who ordinarily lives in your home or who is a family member.
18. Charges exceeding the reimbursement limit for the service.
19. Treatment resulting from any intentionally self-inflicted injury or bodily illness.
20. Local anesthetics, irrigation, nitrous oxide, bases, pulp caps, temporary dental services, study models, treatment plans, occlusal adjustments, or tissue preparation associated with the impression or placement of a restoration when charged as a separate service. These services are considered an integral part of the entire dental service.
21. Repair and replacement of orthodontic appliances.
22. Any surgical or nonsurgical treatment for any jaw joint problems, including any temporomandibular joint disorder, craniomaxillary, craniomandibular disorder, or other conditions of the joint linking the jaw bone and skull; or treatment of the facial muscles used in expression and chewing functions, for symptoms including, but not limited to, headaches.

A-7309

Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 371 of 547 PageID #: 4980
Case 2:19-cv-06926-DSF-MRW Document 60-1 Filed 04/24/20 Page 94 of 225 Page ID #:1335
2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|

**Dental limitations and exclusions**

23. Extractions, except for extractions of erupted tooth or exposed root (includes routine removal of tooth structure, minor smoothing of socket bone, and closure, as necessary), or surgical removal of erupted tooth requiring elevation of mucoperiosteal flap and removal of bone of section of tooth.

**Excess coverage**

We will not pay benefits for any accidental injury if other insurance will provide payments or expense coverage, regardless of whether the other coverage is described as primary, excess, or contingent. If your claim against another insurer is denied or partially paid, we will process your claim according to the terms and conditions of this certificate. If we make a payment, you agree to assign to us any right you have against the other insurer for dental expenses we pay. Payments made by the other insurer will be credited toward any applicable coinsurance or calendar year deductibles.

It's your responsibility to understand your dental coverage, including its limitations and exclusions. To be covered, all dental services must be received from a licensed dentist who deems the service necessary and must be approved by the plan. Remember, the greatest savings on covered services are through OSB network dentists. The dentist you choose may ask you to sign an informed consent document detailing the risks, covered dental services, and options to all recommended treatments. You should always ask the dentist for a treatment plan detailing the services to be performed and the associated costs prior to having work performed.

**Coverage information**

Vision benefit through EyeMed
- The MyOption Plus optional supplemental benefit includes coverage for a routine eye exam for members who wear eyeglasses, standard lenses, and eyeglass frames as follows:

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay | |
|---|---|---|
| **Covered vision benefits** | **EyeMed Network Vision Provider** | **Non-EyeMed Network Vision Provider** |
| • Routine exam for members who wear eyeglasses with refraction/dilation as necessary | **$40** allowance* | **$40** allowance |
| ***Visit any in-network EyeMed Select vision provider and your routine exam charge will not exceed the $40 allowance.** | | |
| • One set of eyeglass frames and one pair of lenses (eyeglass lens treatments to include polycarbonate, UV, scratch resistance and transitional tinting)<br>• Contact lenses (instead of frames; includes conventional or disposable) | **$290** benefit | **$290** (combined in and out-of-network) |

**Frequency**
• Routine examination – Once every 12 months
• One set of eyeglass frames and one pair of lenses or contact lenses – Once every 12 months

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|

### Choosing a vision provider

You may choose to get vision care from either an EyeMed vision provider or a non-EyeMed vision provider. Choosing an EyeMed vision provider from the OSB Provider Directory will decrease your costs for vision OSB services.

- To find a provider for your optional supplemental benefits, see your OSB Provider Directory. It will be sent to you within 10 days of enrolling in an OSB.
- If you do not receive an OSB Provider Directory or need help finding an EyeMed provider, please call EyeMed at the phone number at the end of this document. To get the in-network rate, make sure your provider is in the EyeMed Select network before you get care. We are not responsible for the availability or ongoing participation of any provider.

After you have chosen an EyeMed vision provider, just call the provider's office and make an appointment. Be sure to tell the provider's office that you are a Humana Medicare Advantage member with EyeMed benefits. If you have questions about EyeMed vision providers in your area or any other questions about your vision coverage under MyOption Plus, please call EyeMed at the phone number at the end of this document.

If you choose to get vision care from a non-EyeMed vision provider, you will have to pay the full bill at the time of your appointment. Then you will submit an EyeMed out-of-network claim. You must include an itemized statement of charges to EyeMed Vision Care. The out-of-network claim form can be found on MyHumana by clicking on Vision Information.

Whether you choose an EyeMed vision provider or a non-EyeMed vision provider, you must pay for any copayment and any costs and fees that exceed your covered vision benefit allowance, and any services or materials that are not covered under MyOption Plus.

### How to submit a paper claim

If you receive emergency services or other services from a non-network provider, you will have to pay the full cost of those services and then submit claims documentation for payment consideration. Within 90 days, call EyeMed Customer Service at the phone number at the end of this document to request a claims form and instructions on submitting your claim. The out-of-network claim form can also be found on MyHumana by clicking on Vision Information.

### General provisions

**EyeMed is an independent provider.** Humana's obligations are limited to payment for services described in this document.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|

**Vision limitations and exclusions**

The MyOption Plus optional supplemental benefit does not include coverage for the following:

1. Standard contact lens fit and follow-up.
2. Refitting or change in lens design after initial fitting.
3. No more than one set of eyeglass frames and one pair of lenses per calendar year.
4. The benefit dollars can only be used one time. Any remaining benefit dollars do not "roll over" to a future purchase.
5. Any expense arising from the completion of forms.
6. Any service not specifically listed in your optional supplemental benefit.
7. Orthoptic or vision training.
8. Subnormal vision aids and associated testing.
9. Aniseikonic lenses.
10. Any service we consider cosmetic.
11. Any expense incurred before your effective date or after the date your coverage under this optional supplemental benefit terminates.
12. Services provided by someone who ordinarily lives in your home or who is a family member.
13. Charges exceeding the allowance for the service.
14. Treatment resulting from any intentionally self-inflicted injury or bodily illness.
15. Plano lenses.
16. Medical or surgical treatment of eye, eyes, or supporting structures.
17. Non-prescription sunglasses.
18. Two pair of glasses in lieu of bifocals.
19. Services or materials provided by any other group benefit plans providing vision care.
20. Certain name brands when manufacturer imposes no discount.
21. Corrective vision treatment of an experimental nature.
22. Solutions and/or cleaning products for glasses or contact lenses.
23. Non-prescription items.
24. Costs associated with securing materials.
25. Pre- and post-operative services.
26. Orthokeratology.
27. Routine maintenance of materials.
28. Artistically painted lenses.
29. Any expenses incurred while you qualify for any workers' compensation or occupational disease act or law, whether or not you applied for coverage.
30. Services that are:
    a. Free or that you would not be required to pay for if you did not have this insurance, unless charges are received from and reimbursable to the U.S. government or any of its agencies as required by law;

A-7313

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 375 of 547 PageID #: 4984
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 98 of 225   Page ID #:1339

| Services that are covered for you | What you must pay |
|---|---|
| **Vision limitations and exclusions** | |

    b. Furnished by, or payable under, any plan or law through any government or any political subdivision (this does not include Medicare or Medicaid); or

    c. Furnished by any U.S. government-owned or operated hospital/institution/agency for any service connected with sickness or bodily injury.

31. Any loss caused or contributed by: war or any act of war, whether declared or not; any act of international armed conflict; or any conflict involving armed forces of any international authority.

32. Your failure to keep an appointment.

33. Any hospital, surgical or treatment facility, or for services of an anesthesiologist or anesthetist.

34. Prescription drugs or pre-medications, whether dispensed or prescribed.

35. Any service that we determine is not a visual necessity; does not offer a favorable prognosis; does not have uniform professional endorsement; or is deemed to be experimental or investigational in nature.

36. Replacement of lenses or eyeglass frames furnished under this optional supplemental benefit which are lost or broken, unless otherwise available under the optional supplemental benefit.

37. Any examination or material required by an employer as a condition of employment or safety eyewear.

38. Pathological treatment.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

| Services that are covered for you | What you must pay |
|---|---|
| **Questions?** | |

To request an optional supplemental benefit application,
call Humana Customer Care at
1-800-457-4708
For TTY, call 711
Seven days a week, 8 a.m. – 8 p.m. local time
Please note that our automated phone system may answer during
weekends and holidays from February 15 – September 30. Please leave
your name and telephone number, and we will call you back by the end
of the next business day.

For information on **DENTAL** benefits,
call HumanaDental Customer Care at
1-800-669-6614
For TTY, call 711
Monday – Friday, 8 a.m. – 6 p.m. local time

For information on **VISION** benefits,
call EyeMed Customer Service at
1-888-289-0595
For TTY, call 711
Monday – Saturday, 7:30 a.m. – 11 p.m. Eastern time
Sunday, 11 a.m. – 8 p.m. Eastern time

Visit **Humana.com**

# SECTION 3    What benefits are not covered by the plan?

## Section 3.1    Benefits we do <u>not</u> cover (exclusions)

This section tells you what kinds of benefits are "excluded." Excluded means that the plan doesn't cover these benefits.

The list below describes some services and items that aren't covered under any conditions and some that are excluded only under specific conditions.

If you get benefits that are excluded, you must pay for them yourself. We won't pay for the excluded medical benefits listed in this section (or elsewhere in this booklet), and neither will Original Medicare. The only exception: If a benefit on the exclusion list is found upon appeal to be a medical benefit that we should have paid for or covered because of your specific situation. (For information about appealing a decision we have made to not cover a medical service, go to Chapter 9, Section 5.3 in this booklet.)

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 377 of 547 PageID #: 4986
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 100 of 225   Page ID
#:1341
2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 4: Medical Benefits Chart (what is covered and what you pay)

In addition to any exclusions or limitations described in the Benefits Chart, or anywhere else in this Evidence of Coverage, **the following items and services aren't covered under Original Medicare or by our plan:**

- Services considered not reasonable and necessary, according to the standards of Original Medicare, unless these services are listed by our plan as covered services.
- Experimental medical and surgical procedures, equipment and medications, unless covered by Original Medicare or under a Medicare-approved clinical research study or by our plan. (See Chapter 3, Section 5 for more information on clinical research studies.) Experimental procedures and items are those items and procedures determined by our plan and Original Medicare to not be generally accepted by the medical community.
- Surgical treatment for morbid obesity, except when it is considered medically necessary and covered under Original Medicare.
- Private room in a hospital, except when it is considered medically necessary.
- Private duty nurses.
- Personal items in your room at a hospital or a skilled nursing facility, such as a telephone or a television.
- Full-time nursing care in your home.
- Custodial care is care provided in a nursing home, hospice, or other facility setting when you do not require skilled medical care or skilled nursing care. Custodial care is personal care that does not require the continuing attention of trained medical or paramedical personnel, such as care that helps you with activities of daily living, such as bathing or dressing.
- Homemaker services include basic household assistance, including light housekeeping or light meal preparation.
- Fees charged by your immediate relatives or members of your household.
- Meals delivered to your home.
- Elective or voluntary enhancement procedures or services (including weight loss, hair growth, sexual performance, athletic performance, cosmetic purposes, anti-aging and mental performance), except when medically necessary.
- Cosmetic surgery or procedures, unless because of an accidental injury or to improve a malformed part of the body. However, all stages of reconstruction are covered for a breast after a mastectomy, as well as for the unaffected breast to produce a symmetrical appearance.
- Routine dental care such as cleanings, fillings, or dentures. However, non-routine dental care required to treat illness or injury may be covered as inpatient or outpatient care.
- Chiropractic care, other than manual manipulation of the spine consistent with Medicare coverage guidelines.
- Routine foot care, except for the limited coverage provided according to Medicare guidelines.
- Orthopedic shoes, unless the shoes are part of a leg brace and are included in the cost of the brace or the shoes are for a person with diabetic foot disease.
- Supportive devices for the feet, except for orthopedic or therapeutic shoes for people with diabetic foot disease.
- Hearing aids and routine hearing examinations.
- Eyeglasses, routine eye examinations, radial keratotomy, LASIK surgery, vision therapy, and other low vision aids. However, eyeglasses are covered for people after cataract surgery.
- Reversal of sterilization procedures, sex change operations, and non-prescription contraceptive supplies.
- Acupuncture.
- Naturopath services (uses natural or alternative treatments).
- Services provided to veterans in Veterans Affairs (VA) facilities. However, when emergency services are received at VA hospital and the VA cost sharing is more than the cost sharing under our plan, we will reimburse veterans for the difference. Members are still responsible for our cost-sharing amounts.

The plan will not cover the excluded services listed above. Even if you receive the services at an emergency facility, the excluded services are still not covered.

# Chapter 5. Using the plan's coverage for your Part D prescription drugs

**SECTION 1    Introduction**

Section 1.1   This chapter describes your coverage for Part D drugs ....................................102

Section 1.2   Basic rules for the plan's Part D drug coverage.................................................102

**SECTION 2    Fill your prescription at a network pharmacy or through the plan's mail-order service**

Section 2.1   To have your prescription covered, use a network pharmacy ...........................103

Section 2.2   Finding network pharmacies ...................................................................103

Section 2.3   Using the plan's mail-order services...........................................................104

Section 2.4   How can you get a long-term supply of drugs? ...............................................104

Section 2.5   When can you use a pharmacy that is not in the plan's network?.......................104

**SECTION 3    Your drugs need to be in the plan's "Drug Guide"**

Section 3.1   The "Drug Guide" tells which Part D drugs are covered....................................106

Section 3.2   There are five "cost-sharing tiers" for drugs in the Drug Guide ..........................106

Section 3.3   How can you find out if a specific drug is in the Drug Guide?.............................107

**SECTION 4    There are restrictions on coverage for some drugs**

Section 4.1   Why do some drugs have restrictions?.......................................................107

Section 4.2   What kinds of restrictions?........................................................................107

Section 4.3   Do any of these restrictions apply to your drugs?...........................................108

**SECTION 5    What if one of your drugs is not covered in the way you'd like it to be covered?**

Section 5.1   There are things you can do if your drug is not covered in the way you'd like it to be covered ................................................................................108

Section 5.2   What can you do if your drug is not in the Drug Guide or if the drug is restricted in some way? ........................................................................109

Section 5.3   What can you do if your drug is in a cost-sharing tier you think is too high? ..........112

Case 1:21-cv-01983-JRS Document 35 Filed 12/13/21 Page 379 of 547 PageID #: 4988
Case 2:19-cv-08928-DSF-MRW Document 60-1 Filed 04/24/20 Page 102 of 225 Page ID
#:1343
2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

**SECTION 6**     **What if your coverage changes for one of your drugs?**

Section 6.1    The Drug Guide can change during the year.................................................112

Section 6.2    What happens if coverage changes for a drug you are taking? ..........................113

**SECTION 7**     **What types of drugs are <u>not</u> covered by the plan?**

Section 7.1    Types of drugs we do not cover.................................................................114

**SECTION 8**     **Show your plan membership card when you fill a prescription**

Section 8.1    Show your membership card.....................................................................114

Section 8.2    What if you don't have your membership card with you?.................................115

**SECTION 9**     **Part D drug coverage in special situations**

Section 9.1    What if you're in a hospital or a skilled nursing facility for a stay that is covered by the plan? ..............................................................................115

Section 9.2    What if you're a resident in a long-term care facility?....................................115

Section 9.3    What if you're also getting drug coverage from an employer or retiree group plan?........................................................................................116

**SECTION 10**   **Programs on drug safety and managing medications**

Section 10.1 Programs to help members use drugs safely.................................................116

Section 10.2 Programs to help members manage their medications ..................................117

Case 1:21-cv-01983-LPS Document 35 Filed 12/13/21 Page 380 of 547 PageID #: 4989
Case 2:19-cv-08928-DSF-MRW Document 60-1 Filed 04/24/20 Page 103 of 225 Page ID
#:1344

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

---



**Did you know there are programs to help people pay for their drugs?**

There are programs to help people with limited resources pay for their drugs. The "Extra Help" program helps people with limited resources pay for their drugs. For more information, see Chapter 2, Section 7.

**Are you currently getting help to pay for your drugs?**

If you are in a program that helps pay for your drugs, **some information in this Evidence of Coverage about the costs for Part D prescription drugs may not apply to you**. We send you a separate mailing containing the "Evidence of Coverage Rider for People Who Get Extra Help Paying for Prescription Drugs" (also known as the "Low Income Subsidy Rider" or the "LIS Rider"), which tells you about your drug coverage. If you do not have this mailing, please call Customer Care and ask for the "LIS Rider." (Phone numbers for Customer Care are printed on the back cover of this booklet.)

# SECTION 1    Introduction

## Section 1.1    This chapter describes your coverage for Part D drugs

This chapter explains rules for using your coverage for Part D drugs. The next chapter tells what you pay for Part D drugs (Chapter 6, What you pay for your Part D prescription drugs).

In addition to your coverage for Part D drugs, Humana Gold Plus H0108-004 (HMO) also covers some drugs under the plan's medical benefits:
- The plan covers drugs you are given during covered stays in the hospital or in a skilled nursing facility. Chapter 4 (Medical Benefits Chart, what is covered and what you pay) tells about the benefits and costs for drugs during a covered hospital or skilled nursing facility stay.
- Medicare Part B also provides benefits for some drugs. Part B drugs include certain chemotherapy drugs, certain drug injections you are given during an office visit, and drugs you are given at a dialysis facility. Chapter 4 (Medical Benefits Chart, what is covered and what you pay) tells about your benefits and costs for Part B drugs.

The two examples of drugs described above are covered by the plan's medical benefits. The rest of your prescription drugs are covered under the plan's Part D benefits.

## Section 1.2    Basic rules for the plan's Part D drug coverage

The plan will generally cover your drugs as long as you follow these basic rules:
- You must have a provider (a doctor or other prescriber) write your prescription.
- You must use a network pharmacy to fill your prescription. (See Section 2, Fill your prescriptions at a network pharmacy or through the plan's mail-order service.)
- Your drug must be in the plan's Prescription Drug Guide (Formulary) (we call it the "Drug Guide" for short). (See Section 3, Your drugs need to be in the plan's Drug Guide.)
- Your drug must be used for a medically accepted indication. A "medically accepted indication" is a use of the drug that is either approved by the Food and Drug Administration or supported by certain reference books. (See Section 3 for more information about a medically accepted indication.)

---

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 381 of 547 PageID #: 4990
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 104 of 225   Page ID #:1345

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

---

# SECTION 2     Fill your prescription at a network pharmacy or through the plan's mail-order service

## Section 2.1     To have your prescription covered, use a network pharmacy

In most cases, your prescriptions are covered <u>only</u> if they are filled at the plan's network pharmacies. (See Section 2.5 for information about when we would cover prescriptions filled at out-of-network pharmacies.)

A network pharmacy is a pharmacy that has a contract with the plan to provide your covered prescription drugs. The term "covered drugs" means all of the Part D prescription drugs that are covered by the plan's Drug Guide.

## Section 2.2     Finding network pharmacies

**How do you find a network pharmacy in your area?**
To find a network pharmacy, you can look in your Provider Directory, visit our website (**Humana.com**), or call Customer Care (phone numbers are printed on the back cover of this booklet). Choose whatever is easiest for you.

You may go to any of our network pharmacies.

If you switch from one network pharmacy to another, and you need a refill of a drug you have been taking, you can ask either to have a new prescription written by a provider or have your prescription transferred to your new network pharmacy.

**What if the pharmacy you have been using leaves the network?**
If the pharmacy you have been using leaves the plan's network, you will have to find a new pharmacy that is in the network. To find another network pharmacy in your area, you can get help from Customer Care (phone numbers are printed on the back cover of this booklet) or use the Provider Directory. You can also find information on our website at **Humana.com**.

**What if you need a specialized pharmacy?**
Sometimes prescriptions must be filled at a specialized pharmacy. Specialized pharmacies include:
- Pharmacies that supply drugs for home infusion therapy.
- Pharmacies that supply drugs for residents of a long-term care facility. Usually, a long-term care facility (such as a nursing home) has its own pharmacy. Residents may get prescription drugs through the facility's pharmacy as long as it is part of our network. If your long-term care pharmacy is not in our network, please contact Customer Care.
- Pharmacies that serve the Indian Health Service / Tribal / Urban Indian Health Program (not available in Puerto Rico). Except in emergencies, only Native Americans or Alaska Natives have access to these pharmacies in our network.
- Pharmacies that dispense drugs that are restricted by the FDA to certain locations or that require special handling, provider coordination, or education on their use. (Note: This scenario should happen rarely.)

To locate a specialized pharmacy, look in your Provider Directory or call Customer Care (phone numbers are printed on the back cover of this booklet).

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 382 of 547 PageID #: 4991
Case 2:19-cv-06928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 105 of 225   Page ID
#:1346

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

---

| Section 2.3 | Using the plan's mail-order services |
|---|---|

For certain kinds of drugs, you can use the plan's network mail-order services. Generally, the drugs available through mail order are drugs that you take on a regular basis, for a chronic or long-term medical condition. The drugs available through our plan's mail-order service are marked as "**mail-order" drugs** in our Drug Guide.

Our plan's mail-order service allows you to order **up to a 90-day supply**.

Preferred mail-order pharmacies are mail-order pharmacies in our network where the plan has negotiated lower cost sharing for members for covered drugs than at non-preferred mail-order pharmacies. However, you will usually have access to lower drug prices at non-preferred mail-order pharmacies than at out-of-network pharmacies. You may go to either of these types of network mail-order pharmacies to receive your covered prescription drugs.

To get order forms and information about filling your prescriptions by mail, please contact Customer Care.

Usually a mail-order pharmacy order will get to you in no more than 14 days. **We recommend that you discuss with your physician the option of writing a prescription for a 30-day supply to fill at a network retail pharmacy along with your prescription for mail-order, in case your order is delayed.**

| Section 2.4 | How can you get a long-term supply of drugs? |
|---|---|

When you get a long-term supply of drugs, your cost sharing may be lower. The plan offers two ways to get a long-term supply of "maintenance" drugs in our plan's Drug Guide. (Maintenance drugs are drugs that you take on a regular basis, for a chronic or long-term medical condition.)
1. **Some retail pharmacies** in our network allow you to get a long-term supply of maintenance drugs. Some of these retail pharmacies may agree to accept the mail-order cost-sharing amount for a long-term supply of maintenance drugs. Other retail pharmacies may not agree to accept the mail-order cost-sharing amounts for a long-term supply of maintenance drugs. In this case you will be responsible for the difference in price. Your Provider Directory tells you which pharmacies in our network can give you a long-term supply of maintenance drugs. You can also call Customer Care for more information (phone numbers are printed on the back cover of this booklet).
2. For certain kinds of drugs, you can use the plan's network **mail-order services**. The drugs available through our plan's mail-order service are marked as **"mail-order" drugs** in our Drug Guide. Our plan's mail-order service requires you to order at least a 30-day supply of the drug and no more than a 90-day supply. See Section 2.3 for more information about using our mail-order services.

| Section 2.5 | When can you use a pharmacy that is not in the plan's network? |
|---|---|

**Your prescription may be covered in certain situations**
We have network pharmacies outside of our service area where you can get your prescriptions filled as a member of our plan. Generally, we cover drugs filled at an out-of-network pharmacy only when you are not able to use a network pharmacy. Here are the circumstances when we would cover prescriptions filled at an out-of-network pharmacy:
- **If you need a prescription because of a medical emergency**
  - We will cover prescriptions that are filled at an out-of-network pharmacy if the prescriptions are related to care for a medical emergency or urgently needed care. In this situation, you will have to pay the full cost

Case 1:21-cv-01083-JRS  Document 35  Filed 12/13/21  Page 383 of 547 PageID #: 4992
Case 2:19-cv-08928-DSF-MRW  Document 60-1  Filed 04/24/20  Page 106 of 225  Page ID #:1347

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

(rather than paying just your copayment or coinsurance) when you fill your prescription. You can ask us to reimburse you for our share of the cost by submitting a paper claim form. If you go to an out-of-network pharmacy, you may be responsible for paying the difference between what we would pay for a prescription filled at an in-network pharmacy and what the out-of-network pharmacy charged for your prescription. (Chapter 7, Section 2.1 explains how to ask the plan to pay you back.)

- **If you need coverage while you are traveling away from the plan's service area**
  - If you take a prescription drug on a regular basis and you are going on a trip, be sure to check your supply of the drug before you leave. When possible, take along all the medication you will need. You may be able to order your prescription drugs ahead of time through our preferred prescription home delivery service (mail-order) or through a retail network pharmacy that offers an extended supply. If you are traveling outside of your plan's service area but within the United States and territories and become ill, or run out of your prescription drugs, call Customer Care to find a network pharmacy in your area where you can fill your prescription. If a network pharmacy is not available, we will cover prescriptions that are filled at an out-of-network pharmacy if you follow all other coverage rules identified within this document. In this situation, you will have to pay the full cost (rather than paying just your copayment or coinsurance) when you fill your prescription.
  - You may be responsible for paying the difference between what we would pay for a prescription filled at an in-network pharmacy and what the out-of-network pharmacy charged for your prescription. You can ask us to reimburse you for our share of the cost by submitting a paper claim form. (Chapter 7, Section 2.1 explains how to ask the plan to pay you back.)
  - **Please recognize, however, that multiple non-emergency occurrences of out-of-network pharmacy claims will result in claim denials. In addition, we cannot pay for any stolen medications or prescriptions that are filled by pharmacies outside the United States and territories, even for a medical emergency.**

<u>Other times you can get your prescription covered if you go to an out-of-network pharmacy.</u>

We will cover your prescription at an out-of-network pharmacy if at least one of the following applies:

- If you are unable to get a covered drug in a timely manner because there is no network pharmacy within a reasonable driving distance providing 24-hour service.
- If you are trying to fill a covered prescription drug that is not regularly stocked at a network retail or mail-order pharmacy (these drugs include orphan drugs or other specialty pharmaceuticals).
- If you get a covered prescription drug from an institutional based pharmacy while a patient in an emergency room, provider based clinic, outpatient surgery clinic, or other outpatient setting.
- If you are automatically enrolled in our plan because you are Medicaid eligible and have a seven-month retroactive enrollment period.
- If you become evacuated due to a state or federal emergency disaster declaration or other public health emergency declaration and cannot readily find an in-network pharmacy.

In these situations, **please check first with Customer Care** to see if there is a network pharmacy nearby. (Phone numbers for Customer Care are printed on the back cover of this booklet.)

**How do you ask for reimbursement from the plan?**
If you must use an out-of-network pharmacy, you will generally have to pay the full cost (rather than your normal share of the cost) when you fill your prescription. You can ask us to reimburse you for our share of the cost. (Chapter 7, Section 2.1 explains how to ask the plan to pay you back.)

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 384 of 547 PageID #: 4993
Case 2:19-cv-06926-DSF-MRW   Document 66-1   Filed 04/24/20   Page 107 of 225   Page ID #:1348

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

# SECTION 3        Your drugs need to be in the plan's "Drug Guide"

| Section 3.1 | The "Drug Guide" tells which Part D drugs are covered |
|---|---|

The plan has a "Prescription Drug Guide (Formulary)." In this Evidence of Coverage, **we call it the "Drug Guide" for short**.

The drugs on this list are selected by the plan with the help of a team of doctors and pharmacists. The list must meet requirements set by Medicare. Medicare has approved the plan's Drug Guide.

The drugs in the Drug Guide are only those covered under Medicare Part D (earlier in this chapter, Section 1.1 explains about Part D drugs).

We will generally cover a drug in the plan's Drug Guide as long as you follow the other coverage rules explained in this chapter and the use of the drug is a medically accepted indication. A "medically accepted indication" is a use of the drug that is <u>either</u>:
- approved by the Food and Drug Administration. (That is, the Food and Drug Administration has approved the drug for the diagnosis or condition for which it is being prescribed.)
- -- <u>or</u> -- supported by certain reference books. (These reference books are the American Hospital Formulary Service Drug Information, the DRUGDEX Information System, and the USPDI or its successor.)

**The Drug Guide includes both brand-name and generic drugs**
A generic drug is a prescription drug that has the same active ingredients as the brand-name drug. Generally, it works just as well as the brand-name drug and usually costs less. There are generic drug substitutes available for many brand-name drugs.

Our plan also covers certain over-the-counter drugs. Some over-the-counter drugs are less expensive than prescription drugs and work just as well. For more information, call Customer Care (phone numbers are printed on the back cover of this booklet).

**What is <u>not</u> in the Drug Guide?**
The plan does not cover all prescription drugs.
- In some cases, the law does not allow any Medicare plan to cover certain types of drugs (for more information about this, see Section 7.1 in this chapter).
- In other cases, we have decided not to include a particular drug in the Drug Guide.

| Section 3.2 | There are five "cost-sharing tiers" for drugs in the Drug Guide |
|---|---|

Every drug in the plan's Drug Guide is in one of five cost-sharing tiers. In general, the higher the cost-sharing tier, the higher your cost for the drug:
- **Cost-Sharing Tier 1 – Preferred Generic**: Generic or brand drugs that are available at the lowest cost share for this plan.
- **Cost-Sharing Tier 2 – Non-Preferred Generic**: Generic or brand drugs that Humana offers at a higher cost to you than Tier 1 Preferred Generic drugs.
- **Cost-Sharing Tier 3 – Preferred Brand**: Generic or brand drugs that Humana offers at a lower cost to you than Tier 4 Non-Preferred Brand drugs.

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 385 of 547 PageID #: 4994
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 108 of 228   Page ID
#:1349
2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

- **Cost-Sharing Tier 4 – Non-Preferred Brand**: Generic or brand drugs that Humana offers at a higher cost to you than Tier 3 Preferred Brand drugs.
- **Cost-Sharing Tier 5 – Specialty**: Some injectables and other high-cost drugs.

To find out which cost-sharing tier your drug is in, look it up in the plan's Drug Guide.
The amount you pay for drugs in each cost-sharing tier is shown in Chapter 6 (What you pay for your Part D prescription drugs).

| Section 3.3 | How can you find out if a specific drug is in the Drug Guide? |
|---|---|

You have three ways to find out:
1. Check the most recent Drug Guide we sent you in the mail. Please note: The Drug Guide we send includes information for the covered drugs that are most commonly used by our members. However, we cover additional drugs that are not included in the printed Drug Guide. If one of your drugs is not listed in the Drug Guide, you should visit our website or contact Customer Care to find out if we cover it.
2. Visit the plan's website (**Humana.com**). The Drug Guide on the website is always the most current.
3. Call Customer Care to find out if a particular drug is in the plan's Drug Guide or to ask for a copy of the list. (Phone numbers for Customer Care are printed on the back cover of this booklet.)

# SECTION 4     There are restrictions on coverage for some drugs

| Section 4.1 | Why do some drugs have restrictions? |
|---|---|

For certain prescription drugs, special rules restrict how and when the plan covers them. A team of doctors and pharmacists developed these rules to help our members use drugs in the most effective ways. These special rules also help control overall drug costs, which keeps your drug coverage more affordable.

In general, our rules encourage you to get a drug that works for your medical condition and is safe and effective. Whenever a safe, lower-cost drug will work just as well medically as a higher-cost drug, the plan's rules are designed to encourage you and your provider to use that lower-cost option. We also need to comply with Medicare's rules and regulations for drug coverage and cost sharing.

**If there is a restriction for your drug, it usually means that you or your provider will have to take extra steps in order for us to cover the drug.** If you want us to waive the restriction for you, you will need to use the coverage decision process and ask us to make an exception. We may or may not agree to waive the restriction for you. (See Chapter 9, Section 6.2 for information about asking for exceptions.)

| Section 4.2 | What kinds of restrictions? |
|---|---|

Our plan uses different types of restrictions to help our members use drugs in the most effective ways. The sections below tell you more about the types of restrictions we use for certain drugs.

**Restricting brand-name drugs when a generic version is available**
Generally, a "generic" drug works the same as a brand-name drug and usually costs less. **When a generic version of a brand-name drug is available, our network pharmacies will provide you the generic version.** We usually will not cover the brand-name drug when a generic version is available. However, if your provider has told us the

Case 1:21-cv-01083-LRS   Document 35   Filed 12/13/21   Page 386 of 547   PageID #: 4995
Case 2:19-cv-06928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 109 of 225   Page ID
#:1350

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

medical reason that neither the generic drug nor other covered drugs that treat the same condition will work for you, then we will cover the brand-name drug. (Your share of the cost may be greater for the brand-name drug than for the generic drug.)

**Getting plan approval in advance**
For certain drugs, you or your provider need to get approval from the plan before we will agree to cover the drug for you. This is called "**prior authorization.**" Sometimes the requirement for getting approval in advance helps guide appropriate use of certain drugs. If you do not get this approval, your drug might not be covered by the plan.

**Trying a different drug first**
This requirement encourages you to try less costly but just as effective drugs before the plan covers another drug. For example, if Drug A and Drug B treat the same medical condition, the plan may require you to try Drug A first. If Drug A does not work for you, the plan will then cover Drug B. This requirement to try a different drug first is called "**step therapy.**"

**Quantity limits**
For certain drugs, we limit the amount of the drug that you can have. For example, the plan might limit how many refills you can get, or how much of a drug you can get each time you fill your prescription. For example, if it is normally considered safe to take only one pill per day for a certain drug, we may limit coverage for your prescription to no more than one pill per day.

| Section 4.3 | Do any of these restrictions apply to your drugs? |
|---|---|

The plan's Drug Guide includes information about the restrictions described above. To find out if any of these restrictions apply to a drug you take or want to take, check the Drug Guide. For the most up-to-date information, call Customer Care (phone numbers are printed on the back cover of this booklet) or check our website **Humana.com**.

**If there is a restriction for your drug, it usually means that you or your provider will have to take extra steps in order for us to cover the drug.** If there is a restriction on the drug you want to take, you should contact Customer Care to learn what you or your provider would need to do to get coverage for the drug. If you want us to waive the restriction for you, you will need to use the coverage decision process and ask us to make an exception. We may or may not agree to waive the restriction for you. (See Chapter 9, Section 6.2 for information about asking for exceptions.)

| SECTION 5 | What if one of your drugs is not covered in the way you'd like it to be covered? |
|---|---|

| Section 5.1 | There are things you can do if your drug is not covered in the way you'd like it to be covered |
|---|---|

Suppose there is a prescription drug you are currently taking, or one that you and your provider think you should be taking. We hope that your drug coverage will work well for you, but it's possible that you might have a problem. For example:

- **What if the drug you want to take is not covered by the plan?** For example, the drug might not be covered at all. Or maybe a generic version of the drug is covered but the brand-name version you want to take is not covered.

Case 1:31-cv-01983-JRS   Document 35   Filed 12/13/21   Page 387 of 547 PageID #: 4996
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 110 of 225   Page ID
#:1351

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

- **What if the drug is covered, but there are extra rules or restrictions on coverage for that drug?** As explained in Section 4, some of the drugs covered by the plan have extra rules to restrict their use. For example, you might be required to try a different drug first, to see if it will work, before the drug you want to take will be covered for you. Or there might be limits on what amount of the drug (number of pills, etc.) is covered during a particular time period. In some cases, you may want us to waive the restriction for you. For example, you might want us to cover a certain drug for you without having to try other drugs first. Or you may want us to cover more of a drug (number of pills, etc.) than we normally will cover.
- **What if the drug is covered, but it is in a cost-sharing tier that makes your cost sharing more expensive than you think it should be?** The plan puts each covered drug into one of five different cost-sharing tiers. How much you pay for your prescription depends in part on which cost-sharing tier your drug is in.

There are things you can do if your drug is not covered in the way that you'd like it to be covered. Your options depend on what type of problem you have:
- If your drug is not in the Drug Guide or if your drug is restricted, go to Section 5.2 to learn what you can do.
- If your drug is in a cost-sharing tier that makes your cost more expensive than you think it should be, go to Section 5.3 to learn what you can do.

| | |
|---|---|
| **Section 5.2** | **What can you do if your drug is not in the Drug Guide or if the drug is restricted in some way?** |

If your drug is not in the Drug Guide or is restricted, here are things you can do:
- You may be able to get a temporary supply of the drug (only members in certain situations can get a temporary supply). This will give you and your provider time to change to another drug or to file a request to have the drug covered.
- You can change to another drug.
- You can request an exception and ask the plan to cover the drug or remove restrictions from the drug.

**You may be able to get a temporary supply**
Under certain circumstances, the plan can offer a temporary supply of a drug to you when your drug is not in the Drug Guide or when it is restricted in some way. Doing this gives you time to talk with your provider about the change in coverage and figure out what to do.

To be eligible for a temporary supply, you must meet the two requirements below:
1. **The change to your drug coverage must be one of the following types of changes:**
   - The drug you have been taking is **no longer in the plan's Drug Guide.**
   - -- or -- the drug you have been taking is **now restricted in some way** (Section 4 in this chapter tells about restrictions).
2. **You must be in one of the situations described below:**
   - **For those members who were in the plan last year and aren't in a long-term care facility:**
     We will cover a temporary supply of your drug **one time only during the first 90 days of the calendar year**. This temporary supply will be for a maximum of 30 days, or less if your prescription is written for fewer days. The prescription must be filled at a network pharmacy.
   - **For those members who are new to the plan and aren't in a long-term care facility:**
     We will cover a temporary supply of your drug **one time only during the first 90 days of your membership** in the plan. This temporary supply will be for a maximum of 30 days, or less if your prescription is written for fewer days. The prescription must be filled at a network pharmacy.
   - **For those members who are new to the plan and reside in a long-term care facility:**

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 388 of 547 PageID #: 4987
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 111 of 225   Page ID
#:1352

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

We will cover a temporary supply of your drug **during the first 90 days of your membership** in the plan. The first supply will be for a maximum of 93 days, or less if your prescription is written for fewer days. (Please note that the long-term care pharmacy may provide the drug in smaller amounts at a time to prevent waste.) If needed, we will cover additional refills during your first 90 days in the plan.

- **For those members who have been in the plan for more than 90 days and reside in a long-term care facility and need a supply right away:**
  We will cover one 31-day supply, or less if your prescription is written for fewer days. This is in addition to the above long-term care transition supply.
- **Transition Supply for Current Members with changes in treatment setting:**
  Throughout the plan year, you may have a change in your treatment setting due to the level of care you require. Such transitions include:
  – Members who are discharged from a hospital or skilled nursing facility to a home setting
  – Members who are admitted to a hospital or skilled nursing facility from a home setting
  – Members who transfer from one skilled nursing facility to another and are served by a different pharmacy
  – Members who end their skilled nursing facility Medicare Part A stay (where payments include all pharmacy charges) and who need to now use their Part D plan benefit
  – Members who give up hospice status and revert back to standard Medicare Part A and B coverage
  – Members discharged from chronic psychiatric hospitals with highly individualized drug regimens

For these changes in treatment settings, we will cover up to a 31-day supply of a Part D covered drug when your prescription is filled at a pharmacy. If you change treatment settings multiple times within the same month, you may have to request an exception or prior authorization and receive approval for continued coverage of your drug. We will review these requests for continuation of therapy on a case-by-case basis when you are stabilized on a drug regimen which, if altered, is known to have risks.

### Transition policy
We want to be sure that you, as a new or existing member, safely transition into the 2014 plan year. In 2014, you may not be able to receive your current drug therapy if the drug:
- Is not in our Drug Guide
  or
- Requires prior authorization because of quantity limits, step therapy requirements, or confirmation of your clinical history

### Cost sharing for Drugs Provided through the Transition Policy
If you're eligible for the low-income subsidy (LIS) in 2014, your copayment or coinsurance for a temporary supply of drugs provided during your transition period won't exceed your LIS limit. If you don't receive LIS, your copayment or coinsurance will be based on your plan's approved drug cost-sharing tiers.

### One-Time Transition Supply at a Retail or Mail-Order Pharmacy
Beginning Jan. 1, 2014, when you have limited ability to receive your current prescription therapy:
- We will cover a one-time, 30-day supply of a Part D-covered drug <u>unless</u> the prescription is written for less than 30 days during the first 90 days of your eligibility.
- After you have your 30-day supply, you'll receive a letter that explains the temporary nature of the transition medication supply. After you receive the letter, talk to your provider and decide if you should switch to an alternative drug or request an exception or prior authorization. We may not pay for refills of temporary supply drugs until an exception or prior authorization has been requested and approved.

### Transition Supply for Residents of Long-Term Care Facilities
We assist members in long-term care facilities who transition between plans, have both Medicare and full Medicaid benefits, or submit an exception or an appeal request. For long-term care residents, we will cover up to a

Case 1:21-cv-01083-LPS   Document 35   Filed 12/13/21   Page 389 of 547 PageID #: 4998
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 112 of 225   Page ID
#:1353

2014 Evidence of Coverage for Humana Gold Plus H0163 004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

31-day supply and two additional refills of a Part D-covered drug. This coverage is offered anytime during the first 90 days of your eligibility when your current prescription therapy is filled at a long-term care pharmacy.

If your ability to receive your drug therapy is limited – but you're past the first 90 days of membership in your plan – we will cover up to a 31-day emergency supply of a Part D-covered drug so you can continue therapy while you pursue an exception or prior authorization.

### Transition Extension

We make arrangements to continue to provide necessary drugs to you via an extension of the transition period, on a case-by case basis, when your exception request or appeal has not been processed by the end of your transition period.

### Pharmacy and Therapeutics Committee

The Pharmacy and Therapeutics (P&T) committee has oversight of our Part D Drug Guide and associated policies. The P&T committee designed these polices for certain Part D drugs. The policies are designed to make sure the drug is used based on medically accepted clinical guidelines for indications where the drug has been proven safe and effective and is prescribed according to manufacturer recommendations.

After you receive your temporary supply of a Part D drug, your medication may require medical review if:

- It's not in the Drug Guide
  or
- It requires prior authorization due to quantity limits, step therapy requirements, or confirmation of your clinical history

If you're stabilized on a drug not in the Drug Guide or a drug requiring prior authorization or have tried other drug alternatives, your provider can provide us with a statement of your clinical history to help with the prior authorization or exception request process.

### Public Notice of Transition Policy

This Transition Policy is available on our website, **Humana.com**, in the same area where the Part D Formulary is displayed.

To ask for a temporary supply, call Customer Care (phone numbers are printed on the back cover of this booklet).

During the time when you are getting a temporary supply of a drug, you should talk with your provider to decide what to do when your temporary supply runs out. You can either switch to a different drug covered by the plan or ask the plan to make an exception for you and cover your current drug. The sections below tell you more about these options.

### You can change to another drug

Start by talking with your provider. Perhaps there is a different drug covered by the plan that might work just as well for you. You can call Customer Care to ask for a list of covered drugs that treat the same medical condition. This list can help your provider find a covered drug that might work for you. (Phone numbers for Customer Care are printed on the back cover of this booklet.)

### You can ask for an exception

You and your provider can ask the plan to make an exception for you and cover the drug in the way you would like it to be covered. If your provider says that you have medical reasons that justify asking us for an exception, your provider can help you request an exception to the rule. For example, you can ask the plan to cover a drug even though it is not in the plan's Drug Guide. Or you can ask the plan to make an exception and cover the drug without restrictions.

Case 1:31-cv-01983-LPS   Document 35   Filed 12/13/21   Page 390 of 547 PageID #: 4999
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 113 of 225   Page ID
#:3354

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

---

If you are a current member and a drug you are taking will be removed from the formulary or restricted in some way for next year, we will allow you to request a formulary exception in advance for next year. We will tell you about any change in the coverage for your drug for next year. You can ask for an exception before next year and we will give you an answer within 72 hours after we receive your request (or your prescriber's supporting statement). If we approve your request, we will authorize the coverage before the change takes effect.

If you and your provider want to ask for an exception, Chapter 9, Section 6.4 tells what to do. It explains the procedures and deadlines that have been set by Medicare to make sure your request is handled promptly and fairly.

| Section 5.3 | What can you do if your drug is in a cost-sharing tier you think is too high? |
|---|---|

If your drug is in a cost-sharing tier you think is too high, here are things you can do:

**You can change to another drug**
If your drug is in a cost-sharing tier you think is too high, start by talking with your provider. Perhaps there is a different drug in a lower cost-sharing tier that might work just as well for you. You can call Customer Care to ask for a list of covered drugs that treat the same medical condition. This list can help your provider find a covered drug that might work for you. (Phone numbers for Customer Care are printed on the back cover of this booklet.)

**You can ask for an exception**
For drugs in Cost-Sharing Tier 2 – Non-Preferred Generic Drugs or Cost-Sharing Tier 4 - Non-Preferred Brand Drugs, you and your provider can ask the plan to make an exception in the cost-sharing tier for the drug so that you pay less for it. If your provider says that you have medical reasons that justify asking us for an exception, your provider can help you request an exception to the rule.

If you and your provider want to ask for an exception, Chapter 9, Section 6.4 tells what to do. It explains the procedures and deadlines that have been set by Medicare to make sure your request is handled promptly and fairly.

Drugs in some of our cost-sharing tiers are not eligible for this type of exception. We do not lower the cost-sharing amount for drugs in Cost-Sharing Tier 1 – Preferred Generic drugs, Cost-Sharing Tier 3 – Preferred Brand drugs or Cost-Sharing Tier 5 – Specialty drugs.

# SECTION 6      What if your coverage changes for one of your drugs?

| Section 6.1 | The Drug Guide can change during the year |
|---|---|

Most of the changes in drug coverage happen at the beginning of each year (January 1). However, during the year, the plan might make many kinds of changes to the Drug Guide. For example, the plan might:
- **Add or remove drugs from the Drug Guide.** New drugs become available, including new generic drugs. Perhaps the government has given approval for a new use for an existing drug. Sometimes, a drug gets recalled and we decide not to cover it. Or we might remove a drug from the list because it has been found to be ineffective.

---

A-7329

Case 1:21-cv-01083-LPS   Document 35   Filed 12/13/21   Page 391 of 547 PageID #: 5000
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 114 of 228   Page ID
#:1355

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

- **Move a drug to a higher or lower cost-sharing tier.**
- **Add or remove a restriction on coverage for a drug** (for more information about restrictions to coverage, see Section 4 in this chapter).
- **Replace a brand-name drug with a generic drug.**

In almost all cases, we must get approval from Medicare for any changes we make to the plan's Drug Guide.

| Section 6.2 | What happens if coverage changes for a drug you are taking? |
|---|---|

**How will you find out if your drug's coverage has been changed?**
If there is a change to coverage for a drug you are taking, the plan will send you a notice to tell you. Normally, **we will let you know at least 60 days ahead of time.**

Once in a while, a drug is **suddenly recalled** because it's been found to be unsafe or for other reasons. If this happens, the plan will immediately remove the drug from the Drug Guide. We will let you know of this change right away. Your provider will also know about this change, and can work with you to find another drug for your condition.

**Do changes to your drug coverage affect you right away?**
If any of the following types of changes affect a drug you are taking, the change will not affect you until January 1 of the next year if you stay in the plan:
- If we move your drug into a higher cost-sharing tier.
- If we put a new restriction on your use of the drug.
- If we remove your drug from the Drug Guide, but not because of a sudden recall or because a new generic drug has replaced it.

If any of these changes happen for a drug you are taking, then the change won't affect your use or what you pay as your share of the cost until January 1 of the next year. Until that date, you probably won't see any increase in your payments or any added restriction to your use of the drug. However, on January 1 of the next year, the changes will affect you.

In some cases, you will be affected by the coverage change before January 1:
- If a **brand-name drug you are taking is replaced by a new generic drug**, the plan must give you at least 60 days' notice or give you a 60-day refill of your brand-name drug at a network pharmacy.
  - During this 60-day period, you should be working with your provider to switch to the generic or to a different drug that we cover.
  - Or you and your provider can ask the plan to make an exception and continue to cover the brand-name drug for you. For information on how to ask for an exception, see Chapter 9 (What to do if you have a problem or complaint (coverage decisions, appeals, complaints)).
- Again, if a drug is **suddenly recalled** because it's been found to be unsafe or for other reasons, the plan will immediately remove the drug from the Drug Guide. We will let you know of this change right away.
  - Your provider will also know about this change, and can work with you to find another drug for your condition.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 392 of 547 PageID #: 5001

Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 115 of 225   Page ID #:1356

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

# SECTION 7 What types of drugs are <u>not</u> covered by the plan?

## Section 7.1 Types of drugs we do not cover

This section tells you what kinds of prescription drugs are "excluded." This means Medicare does not pay for these drugs.

If you get drugs that are excluded, you must pay for them yourself. We won't pay for the drugs that are listed in this section. The only exception: If the requested drug is found upon appeal to be a drug that is not excluded under Part D and we should have paid for or covered it because of your specific situation. (For information about appealing a decision we have made to not cover a drug, go to Chapter 9, Section 6.5 in this booklet.)

Here are three general rules about drugs that Medicare drug plans will not cover under Part D:
- Our plan's Part D drug coverage cannot cover a drug that would be covered under Medicare Part A or Part B.
- Our plan cannot cover a drug purchased outside the United States and its territories.
- Our plan usually cannot cover off-label use. "Off-label use" is any use of the drug other than those indicated on a drug's label as approved by the Food and Drug Administration.
  - Generally, coverage for "off-label use" is allowed only when the use is supported by certain reference books. These reference books are the American Hospital Formulary Service Drug Information, the DRUGDEX Information System, and the USPDI or its successor. If the use is not supported by any of these reference books, then our plan cannot cover its "off-label use."

Also, by law, these categories of drugs are not covered by Medicare drug plans:
- Non-prescription drugs (also called over-the-counter drugs)
- Drugs when used to promote fertility
- Drugs when used for the relief of cough or cold symptoms
- Drugs when used for cosmetic purposes or to promote hair growth
- Prescription vitamins and mineral products, except prenatal vitamins and fluoride preparations
- Drugs when used for the treatment of sexual or erectile dysfunction, such as Viagra, Cialis, Levitra, and Caverject
- Drugs when used for treatment of anorexia, weight loss, or weight gain
- Outpatient drugs for which the manufacturer seeks to require that associated tests or monitoring services be purchased exclusively from the manufacturer as a condition of sale

**If you receive "Extra Help" paying for your drugs,** your state Medicaid program may cover some prescription drugs not normally covered in a Medicare drug plan. Please contact your state Medicaid program to determine what drug coverage may be available to you. (You can find phone numbers and contact information for Medicaid in Chapter 2, Section 6.)

# SECTION 8 Show your plan membership card when you fill a prescription

## Section 8.1 Show your membership card

To fill your prescription, show your plan membership card at the network pharmacy you choose. When you show your plan membership card, the network pharmacy will automatically bill the plan for <u>our</u> share of your covered

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 393 of 547 PageID #: 5002
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 116 of 225   Page ID
#:1357

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

prescription drug cost. You will need to pay the pharmacy <u>your</u> share of the cost when you pick up your prescription.

| Section 8.2 | What if you don't have your membership card with you? |
| --- | --- |

If you don't have your plan membership card with you when you fill your prescription, ask the pharmacy to call the plan to get the necessary information.

If the pharmacy is not able to get the necessary information, **you may have to pay the full cost of the prescription when you pick it up.** (You can then **ask us to reimburse you** for our share. See Chapter 7, Section 2.1 for information about how to ask the plan for reimbursement.)

# SECTION 9          Part D drug coverage in special situations

| Section 9.1 | What if you're in a hospital or a skilled nursing facility for a stay that is covered by the plan? |
| --- | --- |

If you are admitted to a hospital or to a skilled nursing facility for a stay covered by the plan, we will generally cover the cost of your prescription drugs during your stay. Once you leave the hospital or skilled nursing facility, the plan will cover your drugs as long as the drugs meet all of our rules for coverage. See the previous parts of this section that tell about the rules for getting drug coverage. Chapter 6 (What you pay for your Part D prescription drugs) gives more information about drug coverage and what you pay.

**Please Note:** When you enter, live in, or leave a skilled nursing facility, you are entitled to a special enrollment period. During this time period, you can switch plans or change your coverage. (Chapter 10, Ending your membership in the plan, tells when you can leave our plan and join a different Medicare plan.)

| Section 9.2 | What if you're a resident in a long-term care facility? |
| --- | --- |

Usually, a long-term care facility (such as a nursing home) has its own pharmacy, or a pharmacy that supplies drugs for all of its residents. If you are a resident of a long-term care facility, you may get your prescription drugs through the facility's pharmacy as long as it is part of our network.

Check your Provider Directory to find out if your long-term care facility's pharmacy is part of our network. If it isn't, or if you need more information, please contact Customer Care (phone numbers are printed on the back cover of this booklet).

**What if you're a resident in a long-term care facility and become a new member of the plan?**
If you need a drug that is not in our Drug Guide or is restricted in some way, the plan will cover a **temporary supply** of your drug during the first 90 days of your membership. The first supply will be for a maximum of 93 days, or less if your prescription is written for fewer days. (Please note that the long-term care pharmacy may provide the drug in smaller amounts at a time to prevent waste.) If needed, we will cover additional refills during your first 90 days in the plan.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 394 of 547 PageID #: 5003
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 117 of 225   Page ID #:1358

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

If you have been a member of the plan for more than 90 days and need a drug that is not in our Drug Guide, or if the plan has any restriction on the drug's coverage, we will cover one 31-day supply, or less if your prescription is written for fewer days.

During the time when you are getting a temporary supply of a drug, you should talk with your provider to decide what to do when your temporary supply runs out. Perhaps there is a different drug covered by the plan that might work just as well for you. Or you and your provider can ask the plan to make an exception for you and cover the drug in the way you would like it to be covered. If you and your provider want to ask for an exception, Chapter 9, Section 6.4 tells what to do.

| Section 9.3 | What if you're also getting drug coverage from an employer or retiree group plan? |
|---|---|

Do you currently have other prescription drug coverage through your (or your spouse's) employer or retiree group? If so, please contact **that group's benefits administrator**. He or she can help you determine how your current prescription drug coverage will work with our plan.

In general, if you are currently employed, the prescription drug coverage you get from us will be <u>secondary</u> to your employer or retiree group coverage. That means your group coverage would pay first.

**Special note about 'creditable coverage':**
Each year your employer or retiree group should send you a notice that tells if your prescription drug coverage for the next calendar year is "creditable" and the choices you have for drug coverage.

If the coverage from the group plan is **"creditable,"** it means that the plan has drug coverage that is expected to pay, on average, at least as much as Medicare's standard prescription drug coverage.

**Keep these notices about creditable coverage,** because you may need them later. If you enroll in a Medicare plan that includes Part D drug coverage, you may need these notices to show that you have maintained creditable coverage. If you didn't get a notice about creditable coverage from your employer or retiree group plan, you can get a copy from the employer or retiree plan's benefits administrator or the employer or union.

# SECTION 10     Programs on drug safety and managing medications

| Section 10.1 | Programs to help members use drugs safely |
|---|---|

We conduct drug use reviews for our members to help make sure that they are getting safe and appropriate care. These reviews are especially important for members who have more than one provider who prescribes their drugs.

We do a review each time you fill a prescription. We also review our records on a regular basis. During these reviews, we look for potential problems such as:
- Possible medication errors.
- Drugs that may not be necessary because you are taking another drug to treat the same medical condition.
- Drugs that may not be safe or appropriate because of your age or gender.
- Certain combinations of drugs that could harm you if taken at the same time.
- Prescriptions written for drugs that have ingredients you are allergic to.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 5: Using the plan's coverage for your Part D prescription drugs

- Possible errors in the amount (dosage) of a drug you are taking.

If we see a possible problem in your use of medications, we will work with your provider to correct the problem.

| Section 10.2 | Programs to help members manage their medications |
|---|---|

We have programs that can help our members with special situations. For example, some members have several complex medical conditions or they may need to take many drugs at the same time, or they could have very high drug costs.

These programs are voluntary and free to members. A team of pharmacists and doctors developed the programs for us. The programs can help make sure that our members are using the drugs that work best to treat their medical conditions and help us identify possible medication errors.

One program is called a Medication Therapy Management (MTM) program. Some members who take several medications for different medical conditions may qualify. A pharmacist or other health professional will give you a comprehensive review of all your medications. You can talk about how best to take your medications, your costs, or any problems you're having. You'll get a written summary of this discussion. The summary has a medication action plan that recommends what you can do to make the best use of your medications, with space for you to take notes or write down any follow-up questions. You'll also get a personal medication list that will include all the medications you're taking and why you take them.

If we have a program that fits your needs, we will automatically enroll you in the program and send you information. If you decide not to participate, please notify us and we will withdraw you from the program. If you have any questions about these programs, please contact Customer Care (phone numbers are printed on the back cover of this booklet).

Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 396 of 547 PageID #: 5005
Case 2:15-cv-06926-DSF-MRW Document 60-1 Filed 04/24/20 Page 119 of 225 Page ID #:1360

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

# Chapter 6. What you pay for your Part D prescription drugs

**SECTION 1**   **Introduction**

Section 1.1   Use this chapter together with other materials that explain your drug coverage …120

Section 1.2   Types of out-of-pocket costs you may pay for covered drugs ………………………120

**SECTION 2**   **What you pay for a drug depends on which "drug payment stage" you are in when you get the drug**

Section 2.1   What are the drug payment stages for
Humana Gold Plus H0108-004 (HMO) members?……………………………………………121

**SECTION 3**   **We send you reports that explain payments for your drugs and which payment stage you are in**

Section 3.1   We send you a monthly report called the "SmartSummary"…………………………122

Section 3.2   Help us keep our information about your drug payments up to date………………122

**SECTION 4**   **There is no deductible for Humana Gold Plus H0108-004 (HMO)**

Section 4.1   You do not pay a deductible for your Part D drugs…………………………………………123

**SECTION 5**   **During the Initial Coverage Stage, the plan pays its share of your drug costs and you pay your share**

Section 5.1   What you pay for a drug depends on the drug and where you fill your
prescription…………………………………………………………………………………………123

Section 5.2   A table that shows your costs for a one-month supply of a drug ……………………124

Section 5.3   If your doctor prescribes less than a full month's supply, you may not have to pay the
cost of the entire month's supply …………………………………………………………125

Section 5.4   A table that shows your costs for a long-term (90-day) supply of a drug…………126

Section 5.5   You stay in the Initial Coverage Stage until your total drug costs for the year
reach **$2,850**………………………………………………………………………………………126

**SECTION 6**   **During the Coverage Gap Stage, the plan provides some drug coverage**

Section 6.1   You stay in the Coverage Gap Stage until your out-of-pocket costs
reach **$4,550**………………………………………………………………………………………127

Section 6.2   How Medicare calculates your out-of-pocket costs for prescription drugs …………129

Case 1:31-cv-01983-LPS   Document 35   Filed 12/13/21   Page 397 of 547 PageID #: 5006
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 120 of 225   Page ID
#:1361

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

**SECTION 7**    **During the Catastrophic Coverage Stage, the plan pays most of the cost for your drugs**

Section 7.1    Once you are in the Catastrophic Coverage Stage, you will stay in this stage for the rest of the year .................................................................................131

**SECTION 8**    **Additional benefits information**

Section 8.1    Our plan does not offer additional benefits ...................................................131

**SECTION 9**    **What you pay for vaccinations covered by Part D depends on how and where you get them**

Section 9.1    Our plan has separate coverage for the Part D vaccine medication itself and for the cost of giving you the vaccination shot ...................................................131

Section 9.2    You may want to call us at Customer Care before you get a vaccination .............133

**SECTION 10**    **Do you have to pay the Part D "late enrollment penalty"?**

Section 10.1 What is the Part D "late enrollment penalty"?.................................................133

Section 10.2 How much is the Part D late enrollment penalty? ...........................................134

Section 10.3 In some situations, you can enroll late and not have to pay the penalty .............134

Section 10.4 What can you do if you disagree about your late enrollment penalty?................135

**SECTION 11**    **Do you have to pay an extra Part D amount because of your income?**

Section 11.1 Who pays an extra Part D amount because of income? ...................................135

Section 11.2 How much is the extra Part D amount? ......................................................135

Section 11.3 What can you do if you disagree about paying an extra Part D amount?.............136

Section 11.4 What happens if you do not pay the extra Part D amount? ..............................136

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

 **Did you know there are programs to help people pay for their drugs?**
The "Extra Help" program helps people with limited resources pay for their drugs. For more information, see Chapter 2, Section 7.

**Are you currently getting help to pay for your drugs?**

If you are in a program that helps pay for your drugs, **some information in this Evidence of Coverage about the costs for Part D prescription drugs may not apply to you**. We send you a separate mailing containing the "Evidence of Coverage Rider for People Who Get Extra Help Paying for Prescription Drugs" (also known as the "Low Income Subsidy Rider" or the "LIS Rider"), which tells you about your drug coverage. If you don't have this mailing, please call Customer Care and ask for the "LIS Rider." (Phone numbers for Customer Care are printed on the back cover of this booklet.)

# SECTION 1      Introduction

| Section 1.1 | Use this chapter together with other materials that explain your drug coverage |
|---|---|

This chapter focuses on what you pay for your Part D prescription drugs. To keep things simple, we use "drug" in this chapter to mean a Part D prescription drug. As explained in Chapter 5, not all drugs are Part D drugs – some drugs are covered under Medicare Part A or Part B and other drugs are excluded from Medicare coverage by law.

To understand the payment information we give you in this chapter, you need to know the basics of what drugs are covered, where to fill your prescriptions, and what rules to follow when you get your covered drugs. Here are materials that explain these basics:

- **The plan's Prescription Drug Guide (Formulary).** To keep things simple, we call this the "Drug Guide."
  - This Drug Guide tells which drugs are covered for you.
  - It also tells which of the five "cost-sharing tiers" the drug is in and whether there are any restrictions on your coverage for the drug.
  - If you need a copy of the Drug Guide, call Customer Care (phone numbers are printed on the back cover of this booklet). You can also find the Drug Guide on our website at **Humana.com**. The Drug Guide on the website is always the most current.
- **Chapter 5 of this booklet.** Chapter 5 gives the details about your prescription drug coverage, including rules you need to follow when you get your covered drugs. Chapter 5 also tells which types of prescription drugs are not covered by our plan.
- **The plan's Provider Directory.** In most situations you must use a network pharmacy to get your covered drugs (see Chapter 5 for the details). The Provider Directory has a list of pharmacies in the plan's network. It also tells you which pharmacies in our network can give you a long-term supply of a drug (such as filling a prescription for a three-month's supply).

| Section 1.2 | Types of out-of-pocket costs you may pay for covered drugs |
|---|---|

To understand the payment information we give you in this chapter, you need to know about the types of out-of-pocket costs you may pay for your covered services. The amount that you pay for a drug is called "cost-sharing," and there are three ways you may be asked to pay.

- The **"deductible"** is the amount you must pay for drugs before our plan begins to pay its share.

**120 - 2014 EVIDENCE OF COVERAGE**

Case 1:21-cv-01983-JRS   Document 35   Filed 12/13/21   Page 399 of 547 PageID #: 5008
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 122 of 225   Page ID #:1362

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

- **"Copayment"** means that you pay a fixed amount each time you fill a prescription.
- **"Coinsurance"** means that you pay a percent of the total cost of the drug each time you fill a prescription.

## SECTION 2   What you pay for a drug depends on which "drug payment stage" you are in when you get the drug

| Section 2.1 | What are the drug payment stages for Humana Gold Plus H0108-004 (HMO) members? |
|---|---|

As shown in the table below, there are "drug payment stages" for your prescription drug coverage under Humana Gold Plus H0108-004 (HMO). How much you pay for a drug depends on which of these stages you are in at the time you get a prescription filled or refilled.

| Stage 1 **Yearly Deductible Stage** | Stage 2 **Initial Coverage Stage** | Stage 3 **Coverage Gap Stage** | Stage 4 **Catastrophic Coverage Stage** |
|---|---|---|---|
| Because there is no deductible for the plan, this payment stage does not apply to you. | You begin in this stage when you fill your first prescription of the year.<br><br>During this stage, the plan pays its share of the cost of your drugs and **you pay your share of the cost.**<br><br>You stay in this stage until your year-to-date **"total drug costs"** (your payments plus any Part D plan's payments) total **$2,850**<br><br>(Details are in Section 5 of this chapter.) | During this stage, the plan provides coverage for the following:<br>• Select Home Infusion Drugs<br><br>For all other drugs, you pay **47.5%** of the price for brand-name drugs (plus a portion of the dispensing fee) and will generally pay no more than **72%** of the price for generic drugs.<br><br>You stay in this stage until your year-to-date **"out-of-pocket costs"** (your payments) reach a total of **$4,550**. This amount and rules for counting costs toward this amount have been set by Medicare.<br><br>(Details are in Section 6 of this chapter.) | During this stage, **the plan will pay most of the cost** of your drugs for the rest of the calendar year (through December 31, 2014).<br><br>(Details are in Section 7 of this chapter.) |

Case 1:21-cv-01983-JRS  Document 35  Filed 12/13/21  Page 400 of 547 PageID #: 5009
Case 2:19-cv-08928-DSF-MRW  Document 60-1  Filed 04/24/20  Page 123 of 225  Page ID
#:1364

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

---

# SECTION 3   We send you reports that explain payments for your drugs and which payment stage you are in

| Section 3.1 | We send you a monthly report called the "SmartSummary" |
|---|---|

Our plan keeps track of the costs of your prescription drugs and the payments you have made when you get your prescriptions filled or refilled at the pharmacy. This way, we can tell you when you have moved from one drug payment stage to the next. In particular, there are two types of costs we keep track of:

- We keep track of how much you have paid. This is called your **out-of-pocket** cost.
- We keep track of your **"total drug costs."** This is the amount you pay out-of-pocket or others pay on your behalf plus the amount paid by the plan.

Our plan will prepare a written report called the SmartSummary when you have had one or more prescriptions filled through the plan during the previous month. It includes:

- **Information for that month.** This report gives the payment details about the prescriptions you have filled during the previous month. It shows the total drug costs, what the plan paid, and what you and others on your behalf paid.
- **Totals for the year since January 1.** This is called "year-to-date" information. It shows you the total drug costs and total payments for your drugs since the year began.

| Section 3.2 | Help us keep our information about your drug payments up to date |
|---|---|

To keep track of your drug costs and the payments you make for drugs, we use records we get from pharmacies. Here is how you can help us keep your information correct and up to date:

- **Show your membership card when you get a prescription filled.** To make sure we know about the prescriptions you are filling and what you are paying, show your plan membership card every time you get a prescription filled.
- **Make sure we have the information we need.** There are times you may pay for prescription drugs when we will not automatically get the information we need to keep track of your out-of-pocket costs. To help us keep track of your out-of-pocket costs, you may give us copies of receipts for drugs that you have purchased. (If you are billed for a covered drug, you can ask our plan to pay our share of the cost. For instructions on how to do this, go to Chapter 7, Section 2 of this booklet.) Here are some types of situations when you may want to give us copies of your drug receipts to be sure we have a complete record of what you have spent for your drugs:
  - When you purchase a covered drug at a network pharmacy at a special price or using a discount card that is not part of our plan's benefit.
  - When you made a copayment for drugs that are provided under a drug manufacturer patient assistance program.
  - Any time you have purchased covered drugs at out-of-network pharmacies or other times you have paid the full price for a covered drug under special circumstances.
- **Send us information about the payments others have made for you.** Payments made by certain other individuals and organizations also count toward your out-of-pocket costs and help qualify you for catastrophic coverage. For example, payments made by an AIDS drug assistance program, the Indian Health Service, and most charities count toward your out-of-pocket costs. You should keep a record of these payments and send them to us so we can track your costs.

---

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 401 of 547 PageID #: 5010
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 124 of 225   Page ID
#:1365

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

- **Check the written report we send you.** When you receive a SmartSummary in the mail, please look it over to be sure the information is complete and correct. If you think something is missing from the report, or if you have any questions, please call Customer Care (phone numbers are printed on the back cover of this booklet). Be sure to keep these reports. They are an important record of your drug expenses.

# SECTION 4       There is no deductible for Humana Gold Plus H0108-004 (HMO)

| Section 4.1 | You do not pay a deductible for your Part D drugs |
|---|---|

There is no deductible for Humana Gold Plus H0108-004 (HMO). You begin in the Initial Coverage Stage when you fill your first prescription of the year. See Section 5 for information about your coverage in the Initial Coverage Stage.

# SECTION 5       During the Initial Coverage Stage, the plan pays its share of your drug costs and you pay your share

| Section 5.1 | What you pay for a drug depends on the drug and where you fill your prescription |
|---|---|

During the Initial Coverage Stage, the plan pays its share of the cost of your covered prescription drugs, and you pay your share (your copayment or coinsurance amount). Your share of the cost will vary depending on the drug and where you fill your prescription.

**The plan has five cost-sharing tiers**
Every drug in the plan's Drug Guide is in one of five cost-sharing tiers. In general, the higher the cost-sharing tier number, the higher your cost for the drug:

- **Cost-Sharing Tier 1 – Preferred Generic:** Generic or brand drugs that are available at the lowest cost share for this plan.
- **Cost-Sharing Tier 2 – Non-Preferred Generic:** Generic or brand drugs that Humana offers at a higher cost to you than Tier 1 Preferred Generic drugs.
- **Cost-Sharing Tier 3 – Preferred Brand:** Generic or brand drugs that Humana offers at a lower cost to you than Tier 4 Non-Preferred Brand drugs.
- **Cost-Sharing Tier 4 – Non-Preferred Brand:** Generic or brand drugs that Humana offers at a higher cost to you than Tier 3 Preferred Brand drugs.
- **Cost-Sharing Tier 5 – Specialty:** Some injectables and other high-cost drugs.

To find out which cost-sharing tier your drug is in, look it up in the plan's Drug Guide.

**Your pharmacy choices**

How much you pay for a drug depends on whether you get the drug from:

- A retail pharmacy that is in our plan's network
- A pharmacy that is not in the plan's network
- A preferred mail-order pharmacy that is in our plan's network

Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 402 of 547 PageID #: 5011
Case 2:19-cv-06926-DSF-MRW Document 60-1 Filed 04/24/20 Page 125 of 225 Page ID
#:1366

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

- A non-preferred mail-order pharmacy that is in our plan's network

For more information about these pharmacy choices and filling your prescriptions, see Chapter 5 in this booklet and the plan's Provider Directory.

Generally, we will cover your prescriptions <u>only</u> if they are filled at one of our network pharmacies. Some of our network pharmacies are also preferred. You may go to either preferred network pharmacies or other network pharmacies to receive your covered prescription drugs. Your costs may be less at preferred pharmacies.

| Section 5.2 | A table that shows your costs for a one-month supply of a drug |
|---|---|

During the Initial Coverage Stage, your share of the cost of a covered drug will be either a copayment or coinsurance.

- **"Copayment"** means that you pay a fixed amount each time you fill a prescription.
- **"Coinsurance"** means that you pay a percent of the total cost of the drug each time you fill a prescription.

As shown in the table below, the amount of the copayment or coinsurance depends on which cost-sharing tier your drug is in. Please note:
- If your covered drug costs less than the copayment amount listed in the chart, you will pay that lower price for the drug. You pay <u>either</u> the full price of the drug <u>or</u> the copayment amount, <u>whichever is lower</u>.
- We cover prescriptions filled at out-of-network pharmacies in only limited situations. Please see Chapter 5, Section 2.5 for information about when we will cover a prescription filled at an out-of-network pharmacy.

**Your share of the cost when you get a one-month supply of a covered Part D prescription drug from:**

|  | Retail Pharmacy | Preferred Mail Order Pharmacy | Non-Preferred Mail Order Pharmacy | LTC Pharmacy | OON Pharmacy (Coverage is limited to certain situations; see Chapter 3 for details.)* |
|---|---|---|---|---|---|
| Cost-Sharing Tier 1 Preferred Generic | **$5** | **$5** | **$5** | **$5** | **$5** |
| Cost-Sharing Tier 2 Non-Preferred Generic | **$10** | **$10** | **$10** | **$10** | **$10** |
| Cost-Sharing Tier 3 Preferred Brand | **$45** | **$45** | **$45** | **$45** | **$45** |
| Cost-Sharing Tier 4 Non-Preferred Brand | **$95** | **$95** | **$95** | **$95** | **$95** |

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

| | Retail Pharmacy | Preferred Mail Order Pharmacy | Non-Preferred Mail Order Pharmacy | LTC Pharmacy | OON Pharmacy (Coverage is limited to certain situations; see Chapter 3 for details.)* |
|---|---|---|---|---|---|
| Cost-Sharing Tier 5 Specialty | 33% | 33% | 33% | 33% | 33% |

\* You pay the in network cost share plus the difference between the in network cost and the out of network cost for covered prescription drugs received from a non network pharmacy.

| Section 5.3 | If your doctor prescribes less than a full month's supply, you may not have to pay the cost of the entire month's supply |
|---|---|

Typically, you pay a copay to cover a full month's supply of a covered drug. However your doctor can prescribe less than a month's supply of drugs. There may be times when you want to ask your doctor about prescribing less than a month's supply of a drug (for example, when you are trying a medication for the first time that is known to have serious side effects). If your doctor agrees, you will not have to pay for the full month's supply for certain drugs.

The amount you pay when you get less than a full month's supply will depend on whether you are responsible for paying coinsurance (a percentage of the total cost) or a copayment (a flat dollar amount).

• If you are responsible for coinsurance, you pay a <u>percentage</u> of the total cost of the drug. You pay the same percentage regardless of whether the prescription is for a full month's supply or for fewer days. However, because the entire drug cost will be lower if you get less than a full month's supply, the <u>amount</u> you pay will be less.
• If you are responsible for a copayment for the drug, your copayment will be based on the number of days of the drug that you receive. We will calculate the amount you pay per day for your drug (the "daily cost-sharing rate") and multiply it by the number of days of the drug you receive.
  – Here's an example: Let's say the copayment for your drug for a full month's supply (a 30-day supply) is $30. This means that the amount you pay per day for your drug is $1. If you receive a 7 days' supply of the drug, your payment will be $1 per day multiplied by 7 days, for a total payment of $7.
  – You should not have to pay more per day just because you begin with less than a month's supply. Let's go back to the example above. Let's say you and your doctor agree that the drug is working well and that you should continue taking the drug after your 7 days' supply runs out. If you receive a second prescription for the rest of the month, or 23 days more of the drug, you will still pay $1 per day, or $23. Your total cost for the month will be $7 for your first prescription and $23 for your second prescription, for a total of $30 – the same as your copayment would be for a full month's supply.

Daily cost-sharing allows you to make sure a drug works for you before you have to pay for an entire month's supply.

Case 1:31-cv-01083-LPS   Document 35   Filed 12/13/21   Page 404 of 547 PageID #: 5013
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 127 of 225   Page ID
#:1368

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

---

| Section 5.4 | A table that shows your costs for a long-term (up to a 90-day) supply of a drug |
|---|---|

For some drugs, you can get a long-term supply (also called an "extended supply") when you fill your prescription. A long-term supply is up to a 90-day supply. (For details on where and how to get a long-term supply of a drug, see Chapter 5, Section 2.4.)

The table below shows what you pay when you get a long-term (up to a 90-day) supply of a drug.

Please note: If your covered drug costs less than the copayment amount listed in the chart, you will pay that lower price for the drug. You pay either the full price of the drug <u>or</u> the copayment amount, <u>whichever is lower</u>.

**Your share of the cost when you get a long-term (90-day) supply of a covered Part D prescription drug from:**

|  | Retail Pharmacy | Preferred Mail Order Pharmacy | Non-Preferred Mail Order Pharmacy |
|---|---|---|---|
| Cost-Sharing Tier 1 Preferred Generic | **$15** | **$0** | **$15** |
| Cost-Sharing Tier 2 Non-Preferred Generic | **$30** | **$0** | **$30** |
| Cost-Sharing Tier 3 Preferred Brand | **$135** | **$125** | **$135** |
| Cost-Sharing Tier 4 Non-Preferred Brand | **$285** | **$275** | **$285** |

Cost-Sharing Tier 5 drugs are limited to a 30 day supply

---

| Section 5.5 | You stay in the Initial Coverage Stage until your total drug costs for the year reach $2,850 |
|---|---|

You stay in the Initial Coverage Stage until the total amount for the prescription drugs you have filled and refilled reaches the **$2,850 limit for the Initial Coverage Stage**.

Your total drug cost is based on adding together what you have paid and what any Part D plan has paid:

- **What <u>you</u> have paid** for all the covered drugs you have received since you started with your first drug purchase of the year. (See Section 6.2 for more information about how Medicare calculates your out-of-pocket costs.) This includes:
  - The total you paid as your share of the cost for your drugs during the Initial Coverage Stage.
- **What the <u>plan</u> has paid** as its share of the cost for your drugs during the Initial Coverage Stage. (If you were enrolled in a different Part D plan at any time during 2014, the amount that plan paid during the Initial Coverage Stage also counts toward your total drug costs.)

We also provide some over-the-counter medications exclusively for your use. These over-the-counter drugs are provided at no cost to you. To find out which drugs our plan covers, refer to your Drug Guide.

---

A-7343

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 405 of 547 PageID #: 5014
Case 2:19-cv-06928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 128 of 225   Page ID
#:1369

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

The SmartSummary that we send to you will help you keep track of how much you and the plan have spent for your drugs during the year. Many people do not reach the **$2,850** limit in a year.

We will let you know if you reach this **$2,850** amount. If you do reach this amount, you will leave the Initial Coverage Stage and move on to the Coverage Gap Stage.

## SECTION 6     During the Coverage Gap Stage, the plan provides some drug coverage

| Section 6.1 | You stay in the Coverage Gap Stage until your out-of-pocket costs reach $4,550 |
|---|---|

After you leave the Initial Coverage Stage, we will continue to provide some prescription drug coverage in the Coverage Gap. For details about which types of drugs are covered and their cost shares, see the charts below.

For drugs we do not provide coverage for in the Coverage Gap, the Medicare Coverage Gap Discount Program provides manufacturer discounts on brand-name drugs. You pay **47.5 percent** of the negotiated price (excluding the dispensing fee and vaccine administration fee, if any) for brand-name drugs. Both the amount you pay and the amount discounted by the manufacturer count toward your out-of-pocket costs as if you had paid them and moves you through the coverage gap.

You also receive some coverage for generic drugs that we do not cover in the Coverage Gap. You pay no more than **72 percent** of the cost for generic drugs and the plan pays the rest. For generic drugs, the amount paid by the plan **(28 percent)** does not count toward your out-of-pocket costs. Only the amount you pay counts and moves you through the coverage gap.

For drugs we do not cover in the Coverage Gap, you continue paying the discounted price for brand-name drugs and no more than **72 percent** of the costs of generic drugs until your yearly out-of-pocket payments reach a maximum amount that Medicare has set. In 2014, that amount is **$4,550**.

The table below shows what you pay when you get a one-month 30-day supply (or less) of a drug.

|  | Retail Pharmacy | Preferred Mail Order Pharmacy | Non-Preferred Mail Order Pharmacy | LTC Pharmacy | OON Pharmacy (Coverage is limited to certain situations; see Chapter 3 for details.)* |
|---|---|---|---|---|---|
| **Cost- Sharing Tier 1** |  |  |  |  |  |
| Home Infusion Drugs | **$5** | **$5** | **$5** | **$5** | **$5** |
| All Other Drugs | **100%** | **100%** | **100%** | **100%** | **100%** |

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

| | Retail Pharmacy | Preferred Mail Order Pharmacy | Non-Preferred Mail Order Pharmacy | LTC Pharmacy | OON Pharmacy (Coverage is limited to certain situations; see Chapter 3 for details.)* |
|---|---|---|---|---|---|
| **Cost- Sharing Tier 2** | | | | | |
| Home Infusion Drugs | **$10** | **$10** | **$10** | **$10** | **$10** |
| All Other Drugs | **100%** | **100%** | **100%** | **100%** | **100%** |
| **Cost- Sharing Tier 3** | | | | | |
| Home Infusion Drugs | **$45** | **$45** | **$45** | **$45** | **$45** |
| All Other Drugs | **100%** | **100%** | **100%** | **100%** | **100%** |
| **Cost- Sharing Tier 4** | | | | | |
| Home Infusion Drugs | **$95** | **$95** | **$95** | **$95** | **$95** |
| All Other Drugs | **100%** | **100%** | **100%** | **100%** | **100%** |
| **Cost- Sharing Tier 5** | | | | | |
| Home Infusion Drugs | **33%** | **33%** | **33%** | **33%** | **33%** |
| All Other Drugs | **100%** | **100%** | **100%** | **100%** | **100%** |

* You pay the in network cost share plus the difference between the in network cost and the out of network cost for covered prescription drugs received from a non network pharmacy.

The table below shows what you pay when you get a long-term 90-day supply of a drug.

| | Retail Pharmacy | Preferred Mail Order Pharmacy | Non-Preferred Mail Order Pharmacy |
|---|---|---|---|
| **Cost-Sharing Tier 1** | | | |
| Home Infusion Drugs | **$15** | **$0** | **$15** |
| All Other Drugs | **100%** | **100%** | **100%** |

Case 1:31-cv-01983-LRS   Document 35   Filed 12/13/21   Page 407 of 547 PageID #: 5016
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 130 of 225   Page ID
#:1371

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

| | Retail Pharmacy | Preferred Mail Order Pharmacy | Non-Preferred Mail Order Pharmacy |
|---|---|---|---|
| **Cost-Sharing Tier 2** | | | |
| Home Infusion Drugs | **$30** | **$0** | **$30** |
| All Other Drugs | **100%** | **100%** | **100%** |
| **Cost-Sharing Tier 3** | | | |
| Home Infusion Drugs | **$135** | **$125** | **$135** |
| All Other Drugs | **100%** | **100%** | **100%** |
| **Cost-Sharing Tier 4** | | | |
| Home Infusion Drugs | **$285** | **$275** | **$285** |
| All Other Drugs | **100%** | **100%** | **100%** |

Cost-Sharing Tier 5 drugs are limited to a 30 day supply

Medicare has rules about what counts and what does not count as your out-of-pocket costs. When you reach an out-of-pocket limit of **$4,550**, you leave the Coverage Gap Stage and move on to the Catastrophic Coverage Stage.

| Section 6.2 | How Medicare calculates your out-of-pocket costs for prescription drugs |
|---|---|

Here are Medicare's rules that we must follow when we keep track of your out-of-pocket costs for your drugs.

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

---

**These payments are included in your out-of-pocket costs**

When you add up your out-of-pocket costs, **you can include** the payments listed below (as long as they are for Part D covered drugs and you followed the rules for drug coverage that are explained in Chapter 5 of this booklet):

- The amount you pay for drugs when you are in any of the following drug payment stages:
  – The Initial Coverage Stage.
  – The Coverage Gap Stage.
- Any payments you made during this calendar year as a member of a different Medicare prescription drug plan before you joined our plan.

**It matters who pays:**

- If you make these payments **yourself**, they are included in your out-of-pocket costs.
- These payments are also included if they are made on your behalf by **certain other individuals or organizations**. This includes payments for your drugs made by a friend or relative, by most charities, by AIDS drug assistance programs, or by the Indian Health Service. Payments made by Medicare's "Extra Help" program are also included.
- Some of the payments made by the Medicare Coverage Gap Discount Program are included. The amount the manufacturer pays for your brand-name drugs is included. But the amount the plan pays for your generic drugs is not included.

**Moving on to the Catastrophic Coverage Stage:**

When you (or those paying on your behalf) have spent a total of **$4,550** in out-of-pocket costs within the calendar year, you will move from the Coverage Gap Stage to the Catastrophic Coverage Stage.

---

**These payments are not included in your out-of-pocket costs**

When you add up your out-of-pocket costs, you are **not allowed to include** any of these types of payments for prescription drugs:
- Drugs you buy outside the United States and its territories.
- Drugs that are not covered by our plan.
- Drugs you get at an out-of-network pharmacy that do not meet the plan's requirements for out-of-network coverage.
- Non-Part D drugs, including prescription drugs covered by Part A or Part B and other drugs excluded from coverage by Medicare.
- Payments you make toward prescription drugs not normally covered in a Medicare Prescription Drug Plan.
- Payments made by the plan for your generic drugs while in the Coverage Gap.
- Payments for your drugs that are made by group health plans including employer health plans.
- Payments for your drugs that are made by certain insurance plans and government-funded health programs such as TRICARE and the Veterans Administration.
- Payments for your drugs made by a third-party with a legal obligation to pay for prescription costs (for example, Workers' Compensation).

Reminder: If any other organization such as the ones listed above pays part or all of your out-of-pocket costs for drugs, you are required to tell our plan. Call Customer Care to let us know (phone numbers are printed on the back cover of this booklet).

---

2014 Evidence of Coverage for Humana Gold Plus H0163-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

**How can you keep track of your out-of-pocket total?**

- **We will help you.** The SmartSummary report we send to you includes the current amount of your out-of-pocket costs (Section 3 in this chapter tells about this report). When you reach a total of **$4,550** in out-of-pocket costs for the year, this report will tell you that you have left the Coverage Gap Stage and have moved on to the Catastrophic Coverage Stage.
- **Make sure we have the information we need.** Section 3.2 tells what you can do to help make sure that our records of what you have spent are complete and up to date.

# SECTION 7   During the Catastrophic Coverage Stage, the plan pays most of the cost for your drugs

| Section 7.1 | Once you are in the Catastrophic Coverage Stage, you will stay in this stage for the rest of the year |
|---|---|

You qualify for the Catastrophic Coverage Stage when your out-of-pocket costs have reached the **$4,550** limit for the calendar year. Once you are in the Catastrophic Coverage Stage, you will stay in this payment stage until the end of the calendar year.

During this stage, the plan will pay most of the cost for your drugs.
- **Your share** of the cost for a covered drug will be either coinsurance or a copayment, whichever is the <u>larger</u> amount:
  - –<u>either</u> – coinsurance of **5 percent** of the cost of the drug
  - –<u>or</u> – **$2.55** copayment for a generic drug or a drug that is treated like a generic. Or a **$6.35** copayment for all other drugs.
- **Our plan pays the rest** of the cost.

# SECTION 8   Additional benefits information

| Section 8.1 | Our plan does not offer additional benefits |
|---|---|

There are no additional prescription drug benefits available with this plan.

# SECTION 9   What you pay for vaccinations covered by Part D depends on how and where you get them

| Section 9.1 | Our plan has separate coverage for the Part D vaccine medication itself and for the cost of giving you the vaccination shot |
|---|---|

Our plan provides coverage of a number of Part D vaccines. We also cover vaccines that are considered medical benefits. You can find out about coverage of these vaccines by going to the Medical Benefits Chart in Chapter 4, Section 2.1.

Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 410 of 547 PageID #: 5019
Case 2:19-cv-06926-DSF-MRW Document 60-1 Filed 04/24/20 Page 133 of 225 Page ID #1304

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

There are two parts to our coverage of Part D vaccinations:
- The first part of coverage is the cost of **the vaccine medication itself**. The vaccine is a prescription medication.
- The second part of coverage is for the cost of **giving you the vaccination shot**. (This is sometimes called the "administration" of the vaccine.)

**What do you pay for a Part D vaccination?**

What you pay for a Part D vaccination depends on three things:

1. **The type of vaccine** (what you are being vaccinated for).
   - Some vaccines are considered medical benefits. You can find out about your coverage of these vaccines by going to Chapter 4, Medical Benefits Chart (what is covered and what you pay).
   - Other vaccines are considered Part D drugs. You can find these vaccines listed in the plan's Drug Guide (Formulary).
2. **Where you get the vaccine medication.**
3. **Who gives you the vaccination shot.**

What you pay at the time you get the Part D vaccination can vary depending on the circumstances. For example:
- Sometimes when you get your vaccination shot, you will have to pay the entire cost for both the vaccine medication and for getting the vaccination shot. You can ask our plan to pay you back for our share of the cost.
- Other times, when you get the vaccine medication or the vaccination shot, you will pay only your share of the cost.

To show how this works, here are three common ways you might get a Part D vaccination shot. Remember you are responsible for all of the costs associated with vaccines (including their administration) during the Coverage Gap Stage of your benefit.

    Situation 1:    You buy the Part D vaccine at the pharmacy and you get your vaccination shot at the network pharmacy. (Whether you have this choice depends on where you live. Some states do not allow pharmacies to administer a vaccination.)
- You will have to pay the pharmacy the amount of your copayment or coinsurance for the vaccine and administration of the vaccine.

    Situation 2:    You get the Part D vaccination at your doctor's office.
- When you get the vaccination, you will pay for the entire cost of the vaccine and its administration.
- You can then ask our plan to pay our share of the cost by using the procedures that are described in Chapter 7 of this booklet (Asking us to pay our share of a bill you have received for covered medical services or drugs).
- You will be reimbursed the amount you paid less your normal coinsurance or copayment for the vaccine (including administration) less any difference between the amount the doctor charges and what we normally pay. (If you get "Extra Help," we will reimburse you for this difference.)

Case 1:21-cv-01083-JRS Document 35 Filed 12/13/21 Page 411 of 547 PageID #: 5020
Case 2:19-cv-06928-DSF-MRW Document 60-1 Filed 04/24/20 Page 134 of 225 Page ID #:1375

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

<u>Situation 3:</u>   You buy the Part D vaccine at your pharmacy, and then take it to your doctor's office where they give you the vaccination shot.
- You will have to pay the pharmacy the amount of your coinsurance or copayment for the vaccine itself.
- When your doctor gives you the vaccination shot, you will pay the entire cost for this service. You can then ask our plan to pay our share of the cost by using the procedures described in Chapter 7 of this booklet.
- You will be reimbursed the amount charged by the doctor for administering the vaccine less any difference between the amount the doctor charges and what we normally pay. (If you get "Extra Help", we will reimburse you for this difference.)

| Section 9.2 | You may want to call us at Customer Care before you get a vaccination |
|---|---|

The rules for coverage of vaccinations are complicated. We are here to help. We recommend that you call us first at Customer Care whenever you are planning to get a vaccination (phone numbers for Customer Care are printed on the back cover of this booklet).

- We can tell you about how your vaccination is covered by our plan and explain your share of the cost.
- We can tell you how to keep your own cost down by using providers and pharmacies in our network.
- If you are not able to use a network provider and pharmacy, we can tell you what you need to do to get payment from us for our share of the cost.

# SECTION 10        Do you have to pay the Part D "late enrollment penalty"?

| Section 10.1 | What is the Part D "late enrollment penalty"? |
|---|---|

**Note:** If you receive "Extra Help" from Medicare to pay for your prescription drugs, the late enrollment penalty rules do not apply to you. You will not pay a late enrollment penalty, even if you go without "creditable" prescription drug coverage.

You may pay a financial penalty if you did not enroll in a plan offering Medicare Part D drug coverage when you first became eligible for this drug coverage or you experienced a continuous period of 63 days or more when you didn't have creditable prescription drug coverage. ("Creditable prescription drug coverage" is coverage that meets Medicare's minimum standards since it is expected to pay, on average, at least as much as Medicare's standard prescription drug coverage.) The amount of the penalty depends on how long you waited to enroll in a creditable prescription drug coverage plan any time after the end of your initial enrollment period or how many full calendar months you went without creditable prescription drug coverage. You will have to pay this penalty for as long as you have Part D coverage.

When you first enroll in Humana Gold Plus H0108-004 (HMO), we let you know the amount of the penalty. Your late enrollment penalty is considered your plan premium. If you do not pay your late enrollment penalty, you could be disenrolled from the plan.

Case 1:21-cv-01083-LRS   Document 35   Filed 12/13/21   Page 412 of 547 PageID #: 5021
Case 2:19-cv-06928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 135 of 225   Page ID
#:1376

| Section 10.2 | How much is the Part D late enrollment penalty? |
| --- | --- |

Medicare determines the amount of the penalty. Here is how it works:
- First count the number of full months that you delayed enrolling in a Medicare drug plan, after you were eligible to enroll. Or count the number of full months in which you did not have creditable prescription drug coverage, if the break in coverage was 63 days or more. The penalty is **1 percent** for every month that you didn't have creditable coverage. For example, if you go 14 months without coverage, the penalty will be **14 percent**.
- Then Medicare determines the amount of the average monthly premium for Medicare drug plans in the nation from the previous year. For 2013, this average premium amount was **$31.17**. This amount may change for 2014.
- To calculate your monthly penalty, you multiply the penalty percentage and the average monthly premium and then round it to the nearest 10 cents. In the example here it would be **14 percent** times **$31.17**, which equals **$4.36**. This rounds to **$4.40**. This amount would be added **to the monthly premium for someone with a late enrollment penalty**.

There are three important things to note about this monthly late enrollment penalty:
- First, **the penalty may change each year**, because the average monthly premium can change each year. If the national average premium (as determined by Medicare) increases, your penalty will increase.
- Second, **you will continue to pay a penalty** every month for as long as you are enrolled in a plan that has Medicare Part D drug benefits.
- Third, if you are under 65 and currently receiving Medicare benefits, the late enrollment penalty will reset when you turn 65. After age 65, your late enrollment penalty will be based only on the months that you don't have coverage after your initial enrollment period for aging into Medicare.

| Section 10.3 | In some situations, you can enroll late and not have to pay the penalty |
| --- | --- |

Even if you have delayed enrolling in a plan offering Medicare Part D coverage when you were first eligible, sometimes you do not have to pay the late enrollment penalty.

**You will not have to pay a penalty for late enrollment if you are in any of these situations:**
- If you already have prescription drug coverage that is expected to pay, on average, at least as much as Medicare's standard prescription drug coverage. Medicare calls this **"creditable drug coverage."** Please note:
  - Creditable coverage could include drug coverage from a former employer or union, TRICARE, or the Department of Veterans Affairs. Your insurer or your human resources department will tell you each year if your drug coverage is creditable coverage. This information may be sent to you in a letter or included in a newsletter from the plan. Keep this information, because you may need it if you join a Medicare drug plan later.
    > Please note: If you receive a "certificate of creditable coverage" when your health coverage ends, it may not mean your prescription drug coverage was creditable. The notice must state that you had "creditable" prescription drug coverage that expected to pay as much as Medicare's standard prescription drug plan pays.
  - The following are not creditable prescription drug coverage: prescription drug discount cards, free clinics, and drug discount websites.
  - For additional information about creditable coverage, please look in your Medicare & You 2014 Handbook or call Medicare at 1-800-MEDICARE (1-800-633-4227). TTY users call 1-877-486-2048. You can call these numbers for free, 24 hours a day, 7 days a week.
- If you were without creditable coverage, but you were without it for less than 63 days in a row.
- If you are receiving "Extra Help" from Medicare.

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 413 of 547 PageID #: 5022
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 136 of 225   Page ID
#:1377

2014 Evidence of Coverage for Humana Gold Plus H0103-004 (HMO)
Chapter 6: What you pay for your Part D prescription drugs

---

| **Section 10.4** | **What can you do if you disagree about your late enrollment penalty?** |
|---|---|

If you disagree about your late enrollment penalty, you or your representative can ask for a review of the decision about your late enrollment penalty. Generally, you must request this review **within 60 days** from the date on the letter you receive stating you have to pay a late enrollment penalty. Call Customer Care to find out more about how to do this (phone numbers are printed on the back cover of this booklet).

**Important:** Do not stop paying your late enrollment penalty while you're waiting for a review of the decision about your late enrollment penalty. If you do, you could be disenrolled for failure to pay your plan premiums.

# SECTION 11   Do you have to pay an extra Part D amount because of your income?

| **Section 11.1** | **Who pays an extra Part D amount because of income?** |
|---|---|

Most people pay a standard monthly Part D premium. However, some people pay an extra amount because of their yearly income. If your income is **$85,000** or above for an individual (or married individuals filing separately) or **$170,000** or above for married couples, you must pay an extra amount directly to the government for your Medicare Part D coverage.

If you have to pay an extra amount, Social Security, not your Medicare plan, will send you a letter telling you what that extra amount will be and how to pay it. The extra amount will be withheld from your Social Security, Railroad Retirement Board, or Office of Personnel Management benefit check, no matter how you usually pay your plan premium, unless your monthly benefit isn't enough to cover the extra amount owed. If your benefit check isn't enough to cover the extra amount, you will get a bill from Medicare. **You must pay the extra amount to the government. It cannot be paid with your monthly plan premium.**

| **Section 11.2** | **How much is the extra Part D amount?** |
|---|---|

If your modified adjusted gross income (MAGI) as reported on your IRS tax return is above a certain amount, you will pay an extra amount in addition to your monthly plan premium.

The chart below shows the extra amount based on your income.

---

Case 1:31-cv-01983-LPS  Document 35  Filed 12/13/21  Page 414 of 547 PageID #: 5023
Case 2:19-cv-08928-DSF-MRW  Document 60-1  Filed 04/24/20  Page 137 of 225  Page ID
#:1378

| If you filed an individual tax return and your income in 2012 was: | If you were married but filed a separate tax return and your income in 2012 was: | If you filed a joint tax return and your income in 2012 was: | This is the monthly cost of your extra Part D amount (to be paid in addition to your plan premium) |
|---|---|---|---|
| Equal to or less than **$85,000** | Equal to or less than **$85,000** | Equal to or less than **$170,000** | **$0** |
| Greater than **$85,000** and less than or equal to **$107,000** | | Greater than **$170,000** and less than or equal to **$214,000** | **$12.10** |
| Greater than **$107,000** and less than or equal to **$160,000** | | Greater than **$214,000** and less than or equal to **$320,000** | **$31.10** |
| Greater than **$160,000** and less than or equal to **$214,000** | Greater than **$85,000** and less than or equal to **$129,000** | Greater than **$320,000** and less than or equal to **$428,000** | **$50.20** |
| Greater than **$214,000** | Greater than **$129,000** | Greater than **$428,000** | **$69.30** |

## Section 11.3  What can you do if you disagree about paying an extra Part D amount?

If you disagree about paying an extra amount because of your income, you can ask Social Security to review the decision. To find out more about how to do this, contact Social Security at 1-800-772-1213 (TTY 1-800-325-0778).

## Section 11.4  What happens if you do not pay the extra Part D amount?

The extra amount is paid directly to the government (not your Medicare plan) for your Medicare Part D coverage. If you are required to pay the extra amount and you do not pay it, you will be disenrolled from the plan and lose prescription drug coverage.

Case 1:31-cv-01083-LPS Document 35 Filed 12/13/21 Page 415 of 547 PageID #: 5024
Case 2:19-cv-08928-DSF-MRW Document 60-1 Filed 04/24/20 Page 138 of 225 Page ID
#:3379
2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 7: Asking us to pay our share of a bill you have received for covered medical services or drugs

# Chapter 7. Asking us to pay our share of a bill you have received for covered medical services or drugs

**SECTION 1**    **Situations in which you should ask us to pay our share of the cost of your covered services or drugs**

Section 1.1    If you pay our plan's share of the cost of your covered services or drugs, or if you receive a bill, you can ask us for payment ................................................138

**SECTION 2**    **How to ask us to pay you back or to pay a bill you have received**

Section 2.1    How and where to send us your request for payment......................................139

**SECTION 3**    **We will consider your request for payment and say yes or no**

Section 3.1    We check to see whether we should cover the service or drug and how much we owe................................................................................140

Section 3.2    If we tell you that we will not pay for all or part of the medical care or drug, you can make an appeal ........................................................140

**SECTION 4**    **Other situations in which you should save your receipts and send copies to us**

Section 4.1    In some cases, you should send copies of your receipts to us to help us track your out-of-pocket drug costs.........................................................................140

Case 1:31-cv-01083-LPS   Document 35   Filed 12/13/21   Page 416 of 547 PageID #: 5025
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 139 of 225   Page ID #:3380

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 7: Asking us to pay our share of a bill you have received for covered medical services or drugs

# SECTION 1     Situations in which you should ask us to pay our share of the cost of your covered services or drugs

## Section 1.1     If you pay our plan's share of the cost of your covered services or drugs, or if you receive a bill, you can ask us for payment

Sometimes when you get medical care or a prescription drug, you may need to pay the full cost right away. Other times, you may find that you have paid more than you expected under the coverage rules of the plan. In either case, you can ask our plan to pay you back (paying you back is often called "reimbursing" you). It is your right to be paid back by our plan whenever you've paid more than your share of the cost for medical services or drugs that are covered by our plan.

There may also be times when you get a bill from a provider for the full cost of medical care you have received. In many cases, you should send this bill to us instead of paying it. We will look at the bill and decide whether the services should be covered. If we decide they should be covered, we will pay the provider directly.

Here are examples of situations in which you may need to ask our plan to pay you back or to pay a bill you have received:

1. **When you've received emergency or urgently needed medical care from a provider who is not in our plan's network**
   You can receive emergency services from any provider, whether or not the provider is a part of our network. When you receive emergency or urgently needed care from a provider who is not part of our network, you are only responsible for paying your share of the cost, not for the entire cost. You should ask the provider to bill the plan for our share of the cost.
   • If you pay the entire amount yourself at the time you receive the care, you need to ask us to pay you back for our share of the cost. Send us the bill, along with documentation of any payments you have made.
   • At times you may get a bill from the provider asking for payment that you think you do not owe. Send us this bill, along with documentation of any payments you have already made.
      – If the provider is owed anything, we will pay the provider directly.
      – If you have already paid more than your share of the cost for the service, we will determine how much you owed and pay you back for our share of the cost.

2. **When a network provider sends you a bill you think you should not pay**
   Network providers should always bill the plan directly, and ask you only for your share of the cost. But sometimes they make mistakes, and ask you to pay more than your share.
   • You only have to pay your cost-sharing amount when you get services covered by our plan. We do not allow providers to add additional separate charges, called "balance billing." This protection (that you never pay more than your cost-sharing amount) applies even if we pay the provider less than the provider charges for a service and even if there is a dispute and we don't pay certain provider charges. For more information about "balance billing," go to Chapter 4, Section 1.3.
   • Whenever you get a bill from a network provider that you think is more than you should pay, send us the bill. We will contact the provider directly and resolve the billing problem.
   • If you have already paid a bill to a network provider, but you feel that you paid too much, send us the bill along with documentation of any payment you have made and ask us to pay you back the difference between the amount you paid and the amount you owed under the plan.

3. **If you are retroactively enrolled in our plan**

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 417 of 547 PageID #: 5026
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 140 of 225   Page ID #:1391

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 7: Asking us to pay our share of a bill you have received for covered medical services or drugs

Sometimes a person's enrollment in the plan is retroactive. (Retroactive means that the first day of their enrollment has already passed. The enrollment date may even have occurred last year.)

If you were retroactively enrolled in our plan and you paid out-of-pocket for any of your covered services or drugs after your enrollment date, you can ask us to pay you back for our share of the costs. You will need to submit paperwork for us to handle the reimbursement.

- Please call Customer Care for additional information about how to ask us to pay you back and deadlines for making your request. (Phone numbers for Customer Care are printed on the back cover of this booklet.)

**4. When you use an out-of-network pharmacy to get a prescription filled**

If you go to an out-of-network pharmacy and try to use your membership card to fill a prescription, the pharmacy may not be able to submit the claim directly to us. When that happens, you will have to pay the full cost of your prescription. (We cover prescriptions filled at out-of-network pharmacies only in a few special situations. Please go to Chapter 5, Sec. 2.5 to learn more.)

- Save your receipt and send a copy to us when you ask us to pay you back for our share of the cost.

**5. When you pay the full cost for a prescription because you don't have your plan membership card with you**

If you do not have your plan membership card with you, you can ask the pharmacy to call the plan or to look up your plan enrollment information. However, if the pharmacy cannot get the enrollment information they need right away, you may need to pay the full cost of the prescription yourself.

- Save your receipt and send a copy to us when you ask us to pay you back for our share of the cost.

**6. When you pay the full cost for a prescription in other situations**

You may pay the full cost of the prescription because you find that the drug is not covered for some reason.

- For example, the drug may not be on the plan's Prescription Drug Guide (Formulary); or it could have a requirement or restriction that you didn't know about or don't think should apply to you. If you decide to get the drug immediately, you may need to pay the full cost for it.

- Save your receipt and send a copy to us when you ask us to pay you back. In some situations, we may need to get more information from your doctor in order to pay you back for our share of the cost.

All of the examples above are types of coverage decisions. This means that if we deny your request for payment, you can appeal our decision. Chapter 9 of this booklet (What to do if you have a problem or complaint (coverage decisions, appeals, complaints)) has information about how to make an appeal.

## SECTION 2     How to ask us to pay you back or to pay a bill you have received

### Section 2.1     How and where to send us your request for payment

Send us your request for payment, along with your bill and documentation of any payment you have made. It's a good idea to make a copy of your bill and receipts for your records.

Mail your request for payment together with any bills or receipts to us at this address:

Humana, P.O. Box 14168, Lexington, KY 40512-4168

Contact Customer Care if you have any questions (phone numbers are printed on the back cover of this booklet). If you don't know what you should have paid, or you receive bills and you don't know what to do about those bills, we can help. You can also call if you want to give us more information about a request for payment you have already sent to us.

Case 1:31-cv-01983-JRS Document 35 Filed 12/13/21 Page 418 of 547 PageID #: 5027
Case 2:19-cv-08928-DSF-MRW Document 60-1 Filed 04/24/20 Page 141 of 225 Page ID
#:1382

2014 Evidence of Coverage for Humana Gold Plus H0163-004 (HMO)
Chapter 7: Asking us to pay our share of a bill you have received for covered medical services or drugs

---

# SECTION 3    We will consider your request for payment and say yes or no

| Section 3.1 | We check to see whether we should cover the service or drug and how much we owe |
|---|---|

When we receive your request for payment, we will let you know if we need any additional information from you. Otherwise, we will consider your request and make a coverage decision.

- If we decide that the medical care or drug is covered and you followed all the rules for getting the care or drug, we will pay for our share of the cost. If you have already paid for the service or drug, we will mail your reimbursement of our share of the cost to you. If you have not paid for the service or drug yet, we will mail the payment directly to the provider. (Chapter 3 explains the rules you need to follow for getting your medical services covered. Chapter 5 explains the rules you need to follow for getting your Part D prescription drugs covered.)
- If we decide that the medical care or drug is <u>not</u> covered, or you did <u>not</u> follow all the rules, we will not pay for our share of the cost. Instead, we will send you a letter that explains the reasons why we are not sending the payment you have requested and your rights to appeal that decision.

| Section 3.2 | If we tell you that we will not pay for all or part of the medical care or drug, you can make an appeal |
|---|---|

If you think we have made a mistake in turning down your request for payment or you don't agree with the amount we are paying, you can make an appeal. If you make an appeal, it means you are asking us to change the decision we made when we turned down your request for payment.

For the details on how to make this appeal, go to Chapter 9 of this booklet (What to do if you have a problem or complaint (coverage decisions, appeals, complaints)). The appeals process is a formal process with detailed procedures and important deadlines. If making an appeal is new to you, you will find it helpful to start by reading Section 4 of Chapter 9. Section 4 is an introductory section that explains the process for coverage decisions and appeals and gives definitions of terms such as "appeal." Then after you have read Section 4, you can go to the section in Chapter 9 that tells what to do for your situation:
- If you want to make an appeal about getting paid back for a medical service, go to Section 5.3 in Chapter 9.
- If you want to make an appeal about getting paid back for a drug, go to Section 6.5 of Chapter 9.

---

# SECTION 4    Other situations in which you should save your receipts and send copies to us

| Section 4.1 | In some cases, you should send copies of your receipts to us to help us track your out-of-pocket drug costs |
|---|---|

There are some situations when you should let us know about payments you have made for your drugs. In these cases, you are not asking us for payment. Instead, you are telling us about your payments so that we can calculate your out-of-pocket costs correctly. This may help you to qualify for the Catastrophic Coverage Stage more quickly.

---

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 7: Asking us to pay our share of a bill you have received for covered medical services or drugs

Here are two situations when you should send us copies of receipts to let us know about payments you have made for your drugs:

1. **When you buy the drug for a price that is lower than our price**
   Sometimes when you are in the Coverage Gap Stage you can buy your drug **at a network pharmacy** for a price that is lower than our price.
   - For example, a pharmacy might offer a special price on the drug. Or you may have a discount card that is outside our benefit that offers a lower price.
   - Unless special conditions apply, you must use a network pharmacy in these situations and your drug must be in our Drug Guide.
   - Save your receipt and send a copy to us so that we can have your out-of-pocket expenses count toward qualifying you for the Catastrophic Coverage Stage.
   - **Please note:** If you are in the Coverage Gap Stage, we will not pay for any share of these drug costs. But sending a copy of the receipt allows us to calculate your out-of-pocket costs correctly and may help you qualify for the Catastrophic Coverage Stage more quickly.

2. **When you get a drug through a patient assistance program offered by a drug manufacturer**
   Some members are enrolled in a patient assistance program offered by a drug manufacturer that is outside the plan benefits. If you get any drugs through a program offered by a drug manufacturer, you may pay a copayment to the patient assistance program.
   - Save your receipt and send a copy to us so that we can have your out-of-pocket expenses count toward qualifying you for the Catastrophic Coverage Stage.
   - **Please note:** Because you are getting your drug through the patient assistance program and not through the plan's benefits, we will not pay for any share of these drug costs. But sending a copy of the receipt allows us to calculate your out-of-pocket costs correctly and may help you qualify for the Catastrophic Coverage Stage more quickly.

Since you are not asking for payment in the two cases described above, these situations are not considered coverage decisions. Therefore, you cannot make an appeal if you disagree with our decision.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 420 of 547 PageID #: 5028
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 143 of 225   Page ID
#:1384

# Chapter 8. Your rights and responsibilities

**SECTION 1     Our plan must honor your rights as a member of the plan**

Section 1.1   We must provide information in a way that works for you (in languages other than English, in Braille, in large print, or other alternative formats, etc.) ..............143

Section 1.2   We must treat you with fairness and respect at all times ................................143

Section 1.3   We must ensure that you get timely access to your covered services and drugs....144

Section 1.4   We must protect the privacy of your personal health information ......................144

Section 1.5   We must give you information about the plan, its network of providers, and your covered services...................................................................................................149

Section 1.6   We must support your right to make decisions about your care.........................150

Section 1.7   You have the right to make complaints and to ask us to reconsider decisions we have made ...................................................................................................151

Section 1.8   What can you do if you believe you are being treated unfairly or your rights are not being respected? ........................................................................................152

Section 1.9   How to get more information about your rights ...............................................152

**SECTION 2     You have some responsibilities as a member of the plan**

Section 2.1   What are your responsibilities? ................................................................152

Case 1:21-cv-01983-JRS   Document 35   Filed 12/13/21   Page 421 of 547 PageID #: 5030
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 144 of 225   Page ID
#:1385
2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 8: Your rights and responsibilities

# SECTION 1        Our plan must honor your rights as a member of the plan

| Section 1.1 | We must provide information in a way that works for you (in languages other than English, in Braille, in large print, or other alternative formats, etc.) |
|---|---|

To get information from us in a way that works for you, please call Customer Care (phone numbers are printed on the back cover of this booklet).

Our plan has people and free language interpreter services available to answer questions from non-English speaking members. We can also give you information in Braille, in large print, or other alternative formats if you need it. If you are eligible for Medicare because of a disability, we are required to give you information about the plan's benefits that is accessible and appropriate for you.

If you have any trouble getting information from our plan because of problems related to language or a disability, please call Medicare at 1-800-MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week, and tell them that you want to file a complaint. TTY users call 1-877-486-2048.

Para obtener información de una forma que se ajuste a sus necesidades, llame al departamento de Atención al Cliente (los números de teléfono están en la contraportada de este manual).

Nuestro plan cuenta con personal y servicios gratuitos de intérpretes de otros idiomas disponibles para responder preguntas de afiliados que no hablan inglés. También podemos darle información en Braille, en letra grande o en otros formatos alternativos en caso de ser necesario. Si usted es elegible para Medicare por una discapacidad, se nos exige darle información sobre los beneficios del plan que sea accesible y apropiada para usted.

Si se le dificulta obtener información de nuestro plan debido a problemas relacionados con el idioma o una discapacidad, llame a Medicare al 1-800-MEDICARE (1-800-633-4227), 24 horas del día, 7 días de la semana, y dígales que quiere presentar una queja. Los usuarios de TTY deben llamar al 1-877-486-2048.

| Section 1.2 | We must treat you with fairness and respect at all times |
|---|---|

Our plan must obey laws that protect you from discrimination or unfair treatment. **We do not discriminate** based on a person's race, ethnicity, national origin, religion, gender, age, mental or physical disability, health status, claims experience, medical history, genetic information, evidence of insurability, or geographic location within the service area.

If you want more information or have concerns about discrimination or unfair treatment, please call the Department of Health and Human Services' **Office for Civil Rights** 1-800-368-1019 (TTY 1-800-537-7697) or your local Office for Civil Rights.

If you have a disability and need help with access to care, please call Customer Care (phone numbers are printed on the back cover of this booklet). If you have a complaint, such as a problem with wheelchair access, Customer Care can help.

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 422 of 547 PageID #: 5031
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 145 of 228   Page ID
#1386

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 8: Your rights and responsibilities

---

| Section 1.3 | We must ensure that you get timely access to your covered services and drugs |
| --- | --- |

As a member of our plan, you have the right to choose a primary care physician (PCP) in the plan's network to provide and arrange for your covered services (Chapter 3 explains more about this). Call Customer Care to learn which doctors are accepting new patients (phone numbers are printed on the back cover of this booklet). You also have the right to go to a women's health specialist (such as a gynecologist) without a referral. As a plan member, you have the right to get appointments and covered services from the plan's network of providers <u>within a reasonable amount of time</u>. This includes the right to get timely services from specialists when you need that care. You also have the right to get your prescriptions filled or refilled at any of our network pharmacies without long delays.

If you think that you are not getting your medical care or Part D drugs within a reasonable amount of time, Chapter 9, Section 10 of this booklet tells what you can do. (If we have denied coverage for your medical care or drugs and you don't agree with our decision, Chapter 9, Section 4 tells what you can do.)

---

| Section 1.4 | We must protect the privacy of your personal health information |
| --- | --- |

Federal and state laws protect the privacy of your medical records and personal health information. We protect your personal health information as required by these laws.
- Your "personal health information" includes the personal information you gave us when you enrolled in this plan, as well as your medical records and other medical and health information.
- The laws that protect your privacy give you rights related to getting information and controlling how your health information is used. We give you a written notice, called a "Notice of Privacy Practice," that tells about these rights and explains how we protect the privacy of your health information.

**How do we protect the privacy of your health information?**
- We make sure that unauthorized people don't see or change your records.
- In most situations, if we give your health information to anyone who isn't providing your care or paying for your care, <u>we are required to get written permission from you first</u>. Written permission can be given by you or by someone you have given legal power to make decisions for you.
- There are certain exceptions that do not require us to get your written permission first. These exceptions are allowed or required by law.
  - For example, we are required to release health information to government agencies that are checking on quality of care.
  - Because you are a member of our plan through Medicare, we are required to give Medicare your health information, including information about your Part D prescription drugs. If Medicare releases your information for research or other uses, this will be done according to federal statutes and regulations.

**You can see the information in your records and know how it has been shared with others**

You have the right to look at your medical records held at the plan, and to get a copy of your records. We are allowed to charge you a fee for making copies. You also have the right to ask us to make additions or corrections to your medical records. If you ask us to do this, we will work with your healthcare provider to decide whether the changes should be made.

You have the right to know how your health information has been shared with others for any purposes that are not routine.

---

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 8: Your rights and responsibilities

If you have questions or concerns about the privacy of your personal health information, please call Customer Care (phone numbers are printed on the back cover of this booklet).

**Notice of Privacy Practices for your personal health information**

**THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY.**

The privacy of your personal and health information is important. You don't need to do anything unless you have a request or complaint.

We reserve the right to change our privacy practices and the terms of this notice at any time, as allowed by law. This includes the right to make changes in our privacy practices and the revised terms of our notice effective for all personal and health information we maintain. This includes information we created or received before we made the changes. When we make a significant change in our privacy practices, we will change this notice and send the notice to our health plan subscribers.

**What is personal and health information?**
Personal and health information - from now on referred to as "information" - includes both medical information and individually identifiable information, like your name, address, telephone number, or Social Security number. The term "information" in this notice includes any personal and health information created or received by a healthcare provider or health plan that relates to your physical or mental health or condition, providing healthcare to you, or the payment for such healthcare. We protect this information in all formats including electronic, written, and oral information.

**How do we protect your information?**
In keeping with federal and state laws and our own policy, we have a responsibility to protect the privacy of your information. We have safeguards in place to protect your information in various ways including:
- Limiting who may see your information
- Limiting how we use or disclose your information
- Informing you of our legal duties about your information
- Training our associates about company privacy policies and procedures

**How do we use and disclose your information?**
We must use and disclose your information:
- To you or someone who has the legal right to act on your behalf
- To the Secretary of the Department of Health and Human Services
- Where required by law

We have the right to use and disclose your information:
- To a doctor, a hospital, or other healthcare provider so you can receive medical care
- For payment activities, including claims payment for covered services provided to you by healthcare providers and for health plan premium payments
- For healthcare operation activities including processing your enrollment, responding to your inquiries and requests for services, coordinating your care, resolving disputes, conducting medical management, improving quality, reviewing the competence of healthcare professionals, and determining premiums
- For performing underwriting activities. However, we will not use any results of genetic testing or ask questions regarding family history.
- To your plan sponsor to permit them to perform plan administration functions such as eligibility, enrollment and disenrollment activities. We may share summary level health information about you with your plan sponsor in certain situations such as to allow your plan sponsor to obtain bids from other health plans. We will not share

Case 1:21-cv-01983-JRS   Document 35   Filed 12/13/21   Page 424 of 547 PageID #: 5033
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 147 of 225   Page ID
#:1388

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 8: Your rights and responsibilities

detailed health information to your plan sponsor unless you provide us your permission or your plan sponsor has certified they agree to maintain the privacy of your information.
- To contact you with information about health-related benefits and services, appointment reminders, or about treatment alternatives that may be of interest to you if you have not opted out as described below
- To your family and friends if you are unavailable to communicate, such as in an emergency
- To your family and friends or any other person you identify, provided the information is directly relevant to their involvement with your health care or payment for that care. For example, if a family member or a caregiver calls us with prior knowledge of a claim, we may confirm whether or not the claim has been received and paid.
- To provide payment information to the subscriber for Internal Revenue Service substantiation
- To public health agencies if we believe there is a serious health or safety threat
- To appropriate authorities when there are issues about abuse, neglect, or domestic violence
- In response to a court or administrative order, subpoena, discovery request, or other lawful process
- For law enforcement purposes, to military authorities, and as otherwise required by law
- To assist in disaster relief efforts
- For compliance programs and health oversight activities
- To fulfill our obligations under any workers' compensation law or contract
- To avert a serious and imminent threat to your health or safety or the health or safety of others
- For research purposes in limited circumstances
- For procurement, banking, or transplantation of organs, eyes, or tissue
- To a coroner, medical examiner, or funeral director

**Will we use your information for purposes not described in this notice?**
In all situations other than described in this notice, we will request your written permission before using or disclosing your information. You may revoke your permission at any time by notifying us in writing. We will not use or disclose your information for any reason not described in this notice without your permission. The following uses and disclosures will require an authorization:
- Most uses and disclosures of psychotherapy notes
- Marketing purposes
- Sale of protected health information

**What do we do with your information when you are no longer a member or you do not obtain coverage through us?**
Your information may continue to be used for purposes described in this notice when your membership is terminated or you do not obtain coverage through us. After the required legal retention period, we destroy the information following strict procedures to maintain the confidentiality.

**What are my rights concerning my information?**
The following are your rights with respect to your information: We are committed to responding to your rights request in a timely manner:
- Access – You have the right to review and obtain a copy of your information that may be used to make decisions about you, such as claims and case or medical management records. You also may receive a summary of this health information. If you request copies, we may charge you a fee for each page, a per hour charge for staff time to locate and copy your information, and postage.
- Adverse Underwriting Decision – You have the right to be provided a reason for denial or adverse underwriting decision if we decline your application for insurance. *
- Alternate Communications – You have the right to receive confidential communications of information in a different manner or at a different place to avoid a life threatening situation. We will accommodate your request if it is reasonable.
- Amendment – You have the right to request an amendment of information we maintain about you if you believe the information is wrong or incomplete. We may deny your request if we did not create the information,

A-7363

Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 148 of 225   Page ID
#:1389
Case 1:21-cv-01983-LJRS   Document 35   Filed 12/13/21   Page 425 of 547 PageID #: 5034
2014 Evidence of Coverage for Humana Gold Plus H0103-004 (HMO)
Chapter 8: Your rights and responsibilities

we do not maintain the information, or the information is correct and complete. If we deny your request, we will give you a written explanation of the denial.

- Disclosure – You have the right to receive a listing of instances in which we or our business associates have disclosed your information for purposes other than treatment, payment, health plan operations, and certain other activities. We maintain this information and make it available to you for a period of six years at your request. If you request this list more than once in a 12-month period, we may charge you a reasonable, cost-based fee for responding to these additional requests.
- Notice – You have the right to receive a written copy of this notice any time you request.
- Restriction – You have the right to ask to restrict uses or disclosures of your information. We are not required to agree to these restrictions, but if we do, we will abide by our agreement. You also have the right to agree to or terminate a previously submitted restriction.

**What types of communications can I opt out of that are made to me?**
- **Appointment reminders**
- **Treatment alternatives or other health–related benefits**
- **or services**
- **Fundraising activities**

**How do I exercise my rights or obtain a copy of this notice?**
All of your privacy rights can be exercised by obtaining the applicable privacy rights request forms. You may obtain any of the forms by:
- Contacting us at 1-866-861-2762 at any time
- Accessing our website at **Humana.com** and going to the Privacy Practices link
- E-mailing us at privacyoffice@humana.com

\* This right applies only to our Massachusetts residents in accordance with state regulations.

Send completed request form to:
Humana Inc.
Privacy Office 003/10911
101 E. Main Street
Louisville, KY 40202

**What should I do if I believe my privacy has been violated?**
If you believe your privacy has been violated in any way, you may file a complaint with us by calling us at: 1-866-861-2762 any time.

You may also submit a written complaint to the U.S. Department of Health and Human Services, Office of Civil Rights (OCR). We will give you the appropriate OCR regional address on request. You also have the option to e-mail your complaint to OCRComplaint@hhs.gov. We support your right to protect the privacy of your personal and health information. We will not retaliate in any way if you elect to file a complaint with us or with the U.S. Department of Health and Human Services.

We follow all federal and state laws, rules, and regulations addressing the protection of personal and health information. In situations when federal and state laws, rules, and regulations conflict, we follow the law, rule, or regulation which provides greater member protection.

**What will happen if my private information is used or disclosed inappropriately?**
You have a right to receive a notice that a breach has resulted in your unsecured private information being inappropriately used or disclosed. We will notify you in a timely manner if such a breach occurs.

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 8: Your rights and responsibilities

The following affiliates and subsidiaries also adhere to our privacy policies and procedures:

American Dental Plan of North Carolina, Inc.
American Dental Providers of Arkansas, Inc.
Arcadian Health Plan, Inc.
CarePlus Health Plans, Inc.
Cariten Health Plan, Inc.
Cariten Insurance Company
CHA HMO, Inc.
CompBenefits Company
CompBenefits Dental, Inc.
CompBenefits Insurance Company
CompBenefits of Alabama, Inc.
CompBenefits of Georgia, Inc.
CorpHealth, Inc. dba LifeSynch
Corphealth Provider Link, Inc.
DentiCare, Inc.
Emphesys, Inc.
Emphesys Insurance Company
HumanaDental Insurance Company
Humana AdvantageCare Plan, Inc. fna Metcare Health Plans, Inc.
Humana Benefit Plan of Illinois, Inc. fna OSF Health Plans, Inc.
Humana Employers Health Plan of Georgia, Inc.
Humana Health Benefit Plan of Louisiana, Inc.
Humana Health Company of New York, Inc.
Humana Health Insurance Company of Florida, Inc.
Humana Health Plan of California, Inc.
Humana Health Plan of Ohio, Inc.
Humana Health Plan of Texas, Inc.
Humana Health Plan, Inc.
Humana Health Plans of Puerto Rico, Inc.
Humana Insurance Company
Humana Insurance Company of Kentucky
Humana Insurance Company of New York
Humana Insurance of Puerto Rico, Inc.
Humana MarketPOINT, Inc.
Humana MarketPOINT of Puerto Rico, Inc.
Humana Medical Plan, Inc.
Humana Medical Plan of Michigan, Inc.
Humana Medical Plan of Pennsylvania, Inc.
Humana Medical Plan of Utah, Inc.
Humana Pharmacy, Inc.
Humana Regional Health Plan, Inc.
Humana Wisconsin Health Organization Insurance Corporation
Managed Care Indemnity, Inc.
Preferred Health Partnership of Tennessee, Inc.
The Dental Concern, Inc.
The Dental Concern, Ltd.

Case 1:21-cv-01983-LPS   Document 35   Filed 12/13/21   Page 427 of 547 PageID #: 5036
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 150 of 225   Page ID
#:3391
2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 8: Your rights and responsibilities

| Section 1.5 | We must give you information about the plan, its network of providers, and your covered services |
|---|---|

As a member of Humana Gold Plus H0108-004 (HMO), you have the right to get several kinds of information from us. (As explained above in Section 1.1, you have the right to get information from us in a way that works for you. This includes getting the information in languages other than English and in large print or other alternative formats.)

If you want any of the following kinds of information, please call Customer Care (phone numbers are printed on the back cover of this booklet):

- **Information about our plan.** This includes, for example, information about the plan's financial condition. It also includes information about the number of appeals made by members and the plan's performance ratings, including how it has been rated by plan members and how it compares to other Medicare health plans.
- **Information about our network providers including our network pharmacies.**
  - For example, you have the right to get information from us about the qualifications of the providers and pharmacies in our network and how we pay the providers in our network.
  - For a list of the providers in the plan's network, see the Provider Directory.
  - For a list of pharmacies in the plan's network, see the Provider Directory.
  - For more detailed information about our providers or pharmacies, you can call Customer Care (phone numbers are printed on the back cover of this booklet) or visit our website at **Humana.com**.
- **Information about your coverage and the rules you must follow when using your coverage.**
  - In Chapters 3 and 4 of this booklet, we explain what medical services are covered for you, any restrictions to your coverage, and what rules you must follow to get your covered medical services.
  - To get the details on your Part D prescription drug coverage, see Chapters 5 and 6 of this booklet plus the plan's Prescription Drug Guide (Formulary). These chapters, together with the Prescription Drug Guide (Formulary), tell you what drugs are covered and explain the rules you must follow and the restrictions to your coverage for certain drugs.
  - We have special programs to help you if you have complicated medical conditions or certain chronic conditions. Our case management program offers supportive services to members with complicated medical conditions, or those who have been hospitalized. A Humana nurse helps you navigate the health care system and assists in coordinating services. Other programs help people manage health conditions like diabetes, heart failure, COPD and other illnesses. If you would like more information about these special health programs you may call the Health Planning and Support team at 1-800-491-4164.
  - If you have questions about the rules or restrictions, please call Customer Care (phone numbers are printed on the back cover of this booklet).
- **Information about why something is not covered and what you can do about it.**
  - If a medical service or Part D drug is not covered for you, or if your coverage is restricted in some way, you can ask us for a written explanation. You have the right to this explanation even if you received the medical service or drug from an out-of-network provider or pharmacy.
  - If you are not happy or if you disagree with a decision we make about what medical care or Part D drug is covered for you, you have the right to ask us to change the decision. You can ask us to change the decision by making an appeal. For details on what to do if something is not covered for you in the way you think it should be covered, see Chapter 9 of this booklet. It gives you the details about how to make an appeal if you want us to change our decision. (Chapter 9 also tells about how to make a complaint about quality of care, waiting times, and other concerns.)
  - If you want to ask our plan to pay our share of a bill you have received for medical care or a Part D prescription drug, see Chapter 7 of this booklet.

Case 1:21-cv-01983-JRS  Document 35  Filed 12/13/21  Page 428 of 547 PageID #: 5037
Case 2:19-cv-08928-DSF-MRW  Document 60-1  Filed 04/24/20  Page 151 of 225  Page ID
#:1392

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 8: Your rights and responsibilities

We have a Quality Improvement (QI) program that focuses on clinical and preventive care and member service functions of the health plan. You may obtain a written Quality Improvement Progress Report that contains information on our Quality Improvement (QI) Program and how we are meeting our QI Program goals. It is available on Humana's website under Humana Medicare Plans. To request a printed copy or to provide input into the QI Program, mail a request to the following address: Humana Quality Operations and Compliance Department, Progress Report, 321 West Main, WFP 20, Louisville, KY 40202.

| Section 1.6 | We must support your right to make decisions about your care |
|---|---|

**You have the right to know your treatment options and participate in decisions about your health care**
You have the right to get full information from your doctors and other health care providers when you go for medical care. Your providers must explain your medical condition and your treatment choices in a way that you can understand.

You also have the right to participate fully in decisions about your health care. To help you make decisions with your doctors about what treatment is best for you, your rights include the following:
- **To know about all of your choices.** This means that you have the right to be told about all of the treatment options that are recommended for your condition, no matter what they cost or whether they are covered by our plan. It also includes being told about programs our plan offers to help members manage their medications and use drugs safely.
- **To know about the risks.** You have the right to be told about any risks involved in your care. You must be told in advance if any proposed medical care or treatment is part of a research experiment. You always have the choice to refuse any experimental treatments.
- **The right to say "no."** You have the right to refuse any recommended treatment. This includes the right to leave a hospital or other medical facility, even if your doctor advises you not to leave. You also have the right to stop taking your medication. Of course, if you refuse treatment or stop taking medication, you accept full responsibility for what happens to your body as a result.
- **To receive an explanation if you are denied coverage for care.** You have the right to receive an explanation from us if a provider has denied care that you believe you should receive. To receive this explanation, you will need to ask us for a coverage decision. Chapter 9 of this booklet tells how to ask the plan for a coverage decision.

**You have the right to give instructions about what is to be done if you are not able to make medical decisions for yourself**
Sometimes people become unable to make health care decisions for themselves due to accidents or serious illness. You have the right to say what you want to happen if you are in one of these situations. This means that, if you want to, you can:
- Fill out a written form to give **someone the legal authority to make medical decisions for you** if you ever become unable to make decisions for yourself.
- **Give your doctors written instructions** about how you want them to handle your medical care if you become unable to make decisions for yourself.

The legal documents that you can use to give your directions in advance in these situations are called **"advance directives."** There are different types of advance directives and different names for them. Documents called **"living will"** and **"power of attorney for health care"** are examples of advance directives.

If you want to use an "advance directive" to give your instructions, here is what to do:
- **Get the form.** If you want to have an advance directive, you can get a form from your lawyer, from a social worker, or from some office supply stores. You can sometimes get advance directive forms from organizations that give people information about Medicare.

Case 1:21-cv-01983-JRS   Document 35   Filed 12/13/21   Page 429 of 547 PageID #: 5038
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 152 of 225   Page ID #:1393

2014 Evidence of Coverage for Humana Gold Plus H0103-004 (HMO)
Chapter 8: Your rights and responsibilities

- **Fill it out and sign it.** Regardless of where you get this form, keep in mind that it is a legal document. You should consider having a lawyer help you prepare it.
- **Give copies to appropriate people.** You should give a copy of the form to your doctor and to the person you name on the form as the one to make decisions for you if you can't. You may want to give copies to close friends or family members as well. Be sure to keep a copy at home.

If you know ahead of time that you are going to be hospitalized, and you have signed an advance directive, **take a copy with you to the hospital**.
- If you are admitted to the hospital, they will ask you whether you have signed an advance directive form and whether you have it with you.
- If you have not signed an advance directive form, the hospital has forms available and will ask if you want to sign one.

**Remember, it is your choice whether you want to fill out an advance directive** (including whether you want to sign one if you are in the hospital). According to law, no one can deny you care or discriminate against you based on whether or not you have signed an advance directive.

**What if your instructions are not followed?**
If you have signed an advance directive, and you believe that a doctor or hospital did not follow the instructions in it, you may file a complaint with the state agency that handles advance directives.

Contact information for the state agency that handles advance directives can be found in "Exhibit A" in the back of this document.

| Section 1.7 | You have the right to make complaints and to ask us to reconsider decisions we have made |
|---|---|

At Humana, a process called Utilization Management (UM) is used to determine whether a service or treatment is covered and appropriate for payment under your benefit plan. Humana does not reward or provide financial incentives to doctors, other individuals or Humana employees for denying coverage or encouraging under use of services. In fact, Humana works with your doctors and other providers to help you get the most appropriate care for your medical condition. If you have questions or concerns related to Utilization Management, staff are available at least eight hours a day during normal business hours. Humana has free language interpreter services available to answer questions related to Utilization Management from non-English speaking members. TTY users should call 1-800-833-3301 or 711.

Humana decides about coverage of new medical procedures and devices on an ongoing basis. This is done by checking peer-reviewed medical literature and consulting with medical experts to see if the new technology is effective and safe. Humana also relies on guidance from the Centers for Medicare & Medicaid Services (CMS), which often makes national coverage decisions for new medical procedures or devices.

If you have any problems or concerns about your covered services or care, Chapter 9 of this booklet tells what you can do. It gives the details about how to deal with all types of problems and complaints.

As explained in Chapter 9, what you need to do to follow up on a problem or concern depends on the situation. You might need to ask our plan to make a coverage decision for you, make an appeal to us to change a coverage decision, or make a complaint. Whatever you do – ask for a coverage decision, make an appeal, or make a complaint – **we are required to treat you fairly**.

Case 1:21-cv-01983-JRS   Document 35   Filed 12/13/21   Page 430 of 547 PageID #: 5039
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 153 of 225   Page ID
#:1394

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 8: Your rights and responsibilities

You have the right to get a summary of information about the appeals and complaints that other members have filed against our plan in the past. To get this information, please call Customer Care (phone numbers are printed on the back cover of this booklet).

| Section 1.8 | What can you do if you believe you are being treated unfairly or your rights are not being respected? |
|---|---|

**If it is about discrimination, call the Office for Civil Rights**
If you believe you have been treated unfairly or your rights have not been respected due to your race, disability, religion, sex, health, ethnicity, creed (beliefs), age, or national origin, you should call the Department of Health and Human Services' **Office for Civil Rights** at 1-800-368-1019 or TTY 1-800-537-7697, or call your local Office for Civil Rights.

**Is it about something else?**
If you believe you have been treated unfairly or your rights have not been respected, and it's not about discrimination, you can get help dealing with the problem you are having:
· You can **call Customer Care** (phone numbers are printed on the back cover of this booklet).
· You can **call the State Health Insurance Assistance Program**. For details about this organization and how to contact it, go to Chapter 2, Section 3.
· Or, **you can call Medicare** at 1-800-MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week. TTY users should call 1-877-486-2048.

| Section 1.9 | How to get more information about your rights |
|---|---|

There are several places where you can get more information about your rights:
· You can **call Customer Care** (phone numbers are printed on the back cover of this booklet).
· You can **call the State Health Insurance Assistance Program**. For details about this organization and how to contact it, go to Chapter 2, Section 3.
· You can contact **Medicare**.
  – You can visit the Medicare website to read or download the publication "Your Medicare Rights & Protections." (The publication is available at: http://www.medicare.gov/Publications/Pubs/pdf/10112.pdf.)
  – Or, you can call 1-800-MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week. TTY users should call 1-877-486-2048.

# SECTION 2       You have some responsibilities as a member of the plan

| Section 2.1 | What are your responsibilities? |
|---|---|

Things you need to do as a member of the plan are listed below. If you have any questions, please call Customer Care (phone numbers are printed on the back cover of this booklet). We're here to help.
· **Get familiar with your covered services and the rules you must follow to get these covered services**. Use this Evidence of Coverage booklet to learn what is covered for you and the rules you need to follow to get your covered services.
  – Chapters 3 and 4 give the details about your medical services, including what is covered, what is not covered, rules to follow, and what you pay.

Case 1:31-cv-01983-LPS   Document 35   Filed 12/13/21   Page 431 of 547 PageID #: 5040
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 154 of 225   Page ID #:1395

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 8: Your rights and responsibilities

– Chapters 5 and 6 give the details about your coverage for Part D prescription drugs.
- **If you have any other health insurance coverage or prescription drug coverage in addition to our plan, you are required to tell us.** Please call Customer Care to let us know (phone numbers are printed on the back cover of this booklet).
  – We are required to follow rules set by Medicare to make sure that you are using all of your coverage in combination when you get your covered services from our plan. This is called **"coordination of benefits"** because it involves coordinating the health and drug benefits you get from our plan with any other health and drug benefits available to you. We'll help you coordinate your benefits . (For more information about coordination of benefits, go to Chapter 1, Section 7.)
- **Tell your doctor and other health care providers that you are enrolled in our plan.** Show your plan membership card whenever you get your medical care or Part D prescription drugs.
- **Help your doctors and other providers help you by giving them information, asking questions, and following through on your care.**
  – To help your doctors and other health providers give you the best care, learn as much as you are able to about your health problems and give them the information they need about you and your health. Follow the treatment plans and instructions that you and your doctors agree upon.
  – Make sure your doctors know all of the drugs you are taking, including over-the-counter drugs, vitamins, and supplements.
  – If you have any questions, be sure to ask. Your doctors and other health care providers are supposed to explain things in a way you can understand. If you ask a question and you don't understand the answer you are given, ask again.
- **Be considerate.** We expect all our members to respect the rights of other patients. We also expect you to act in a way that helps the smooth running of your doctor's office, hospitals, and other offices.
- **Pay what you owe.** As a plan member, you are responsible for these payments:
  – In order to be eligible for our plan, you must have Medicare Part A and Medicare Part B. For that reason, some plan members must pay a premium for Medicare Part A and most plan members must pay a premium for Medicare Part B to remain a member of the plan.
  – For most  of your medical services or drugs covered by the plan, you must pay your share of the cost when you get the service or drug. This will be a copayment (a fixed amount) or coinsurance (a percentage of the total cost). Chapter 4 tells what you must pay for your medical services. Chapter 6 tells what you must pay for your Part D prescription drugs.
  – If you get any medical services or drugs that are not covered by our plan or by other insurance you may have, you must pay the full cost.
    > If you disagree with our decision to deny coverage for a service or drug, you can make an appeal. Please see Chapter 9 of this booklet for information about how to make an appeal.
  – If you are required to pay a late enrollment penalty, you must pay the penalty to remain a member of the plan.
  – If you are required to pay the extra amount for Part D because of your yearly income, you must pay the extra amount directly to the government to remain a member of the plan.
- **Tell us if you move.** If you are going to move, it's important to tell us right away. Call Customer Care (phone numbers are printed on the back cover of this booklet).
  – **If you move outside of our plan service area, you cannot remain a member of our plan.** (Chapter 1 tells about our service area.) We can help you figure out whether you are moving outside our service area. If you are leaving our service area, you will have a Special Enrollment Period when you can join any Medicare plan available in your new area. We can let you know if we have a plan in your new area.
  – **If you move within our service area, we still need to know** so we can keep your membership record up to date and know how to contact you.
  – If you move, it is also important to tell Social Security (or the Railroad Retirement Board). You can find phone numbers and contact information for these organizations in Chapter 2.

2014 Evidence of Coverage for Humana Gold Plus H0163-004 (HMO)
Chapter 8: Your rights and responsibilities

- **Call Customer Care for help if you have questions or concerns.** <u>We also welcome any suggestions you may have for improving our plan.</u>
    – Phone numbers and calling hours for Customer Care are printed on the back cover of this booklet.
    – For more information on how to reach us, including our mailing address, please see Chapter 2.

Case 1:21-cv-01983-LPS   Document 35   Filed 12/13/21   Page 433 of 547 PageID #: 5042
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 156 of 225   Page ID #:1397

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

# Chapter 9. What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

## BACKGROUND

**SECTION 1**     **Introduction**

Section 1.1   What to do if you have a problem or concern ................................................158

Section 1.2   What about the legal terms? ...................................................................158

**SECTION 2**     **You can get help from government organizations that are not connected with us**

Section 2.1   Where to get more information and personalized assistance ...........................158

**SECTION 3**     **To deal with your problem, which process should you use?**

Section 3.1   Should you use the process for coverage decisions and appeals? Or should you use the process for making complaints? ......................................................159

## COVERAGE DECISIONS AND APPEALS

**SECTION 4**     **A guide to the basics of coverage decisions and appeals**

Section 4.1   Asking for coverage decisions and making appeals: the big picture ....................160

Section 4.2   How to get help when you are asking for a coverage decision or making an appeal ..............................................................................................160

Section 4.3   Which section of this chapter gives the details for your situation? .....................161

**SECTION 5**     **Your medical care: How to ask for a coverage decision or make an appeal**

Section 5.1   This section tells what to do if you have problems getting coverage for medical care or if you want us to pay you back for our share of the cost of your care .........162

Section 5.2   Step-by-step: How to ask for a coverage decision (how to ask our plan to authorize or provide the medical care coverage you want) ...............................163

Section 5.3   Step-by-step: How to make a Level 1 Appeal (how to ask for a review of a medical care coverage decision made by our plan) .........................................165

Section 5.4   Step-by-step: How a Level 2 Appeal is done ...................................................167

Section 5.5   What if you are asking us to pay you for our share of a bill you have received for medical care? ................................................................................168

Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 434 of 547 PageID #: 5043
Case 2:13-cv-08926-DSF-MRW Document 60-1 Filed 04/24/20 Page 157 of 225 Page ID #:398

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

**SECTION 6**   **Your Part D prescription drugs: How to ask for a coverage decision or make an appeal**

Section 6.1   This section tells you what to do if you have problems getting a Part D drug or you want us to pay you back for a Part D drug ................................................170

Section 6.2   What is an exception? ........................................................................171

Section 6.3   Important things to know about asking for exceptions ....................................172

Section 6.4   Step-by-step: How to ask for a coverage decision, including an exception............173

Section 6.5   Step-by-step: How to make a Level 1 Appeal (how to ask for a review of a coverage decision made by our plan) .........................................................175

Section 6.6   Step-by-step: How to make a Level 2 Appeal..................................................177

**SECTION 7**   **How to ask us to cover a longer inpatient hospital stay if you think the doctor is discharging you too soon**

Section 7.1   During your inpatient hospital stay, you will get a written notice from Medicare that tells about your rights........................................................................179

Section 7.2   Step-by-step: How to make a Level 1 Appeal to change your hospital discharge date ................................................................................................180

Section 7.3   Step-by-step: How to make a Level 2 Appeal to change your hospital discharge date ................................................................................................182

Section 7.4   What if you miss the deadline for making your Level 1 Appeal? ........................183

**SECTION 8**   **How to ask us to keep covering certain medical services if you think your coverage is ending too soon**

Section 8.1   This section is about three services only: Home health care, skilled nursing facility care, and Comprehensive Outpatient Rehabilitation Facility (CORF) services .........185

Section 8.2   We will tell you in advance when your coverage will be ending ........................185

Section 8.3   Step-by-step: How to make a Level 1 Appeal to have our plan cover your care for a longer time.................................................................................186

Section 8.4   Step-by-step: How to make a Level 2 Appeal to have our plan cover your care for a longer time.................................................................................188

Section 8.5   What if you miss the deadline for making your Level 1 Appeal? ........................188

**SECTION 9**   **Taking your appeal to Level 3 and beyond**

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

Section 9.1   Levels of Appeal 3, 4, and 5 for Medical Service Appeals....................................191

Section 9.2   Levels of Appeal 3, 4, and 5 for Part D Drug Appeals.........................................192

## MAKING COMPLAINTS

**SECTION 10**   **How to make a complaint about quality of care, waiting times, customer service, or other concerns**

Section 10.1 What kinds of problems are handled by the complaint process?........................193

Section 10.2 The formal name for "making a complaint" is "filing a grievance".....................194

Section 10.3 Step-by-step: Making a complaint...............................................................195

Section 10.4 You can also make complaints about quality of care to the Quality Improvement Organization.........................................................................................196

Section 10.5 You can also tell Medicare about your complaint.............................................196

Case 2:19-cv-08926-DSF-MRW Document 60-1 Filed 04/24/20 Page 133 of 225 Page ID
#:1,400
Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 436 of 547 PageID #: 5045

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

## BACKGROUND

# SECTION 1    Introduction

### Section 1.1    What to do if you have a problem or concern

This chapter explains two types of processes for handling problems and concerns:

- For some types of problems, you need to use the **process for coverage decisions and appeals.**
- For other types of problems, you need to use the **process for making complaints.**

Both of these processes have been approved by Medicare. To ensure fairness and prompt handling of your problems, each process has a set of rules, procedures, and deadlines that must be followed by us and by you.

Which one do you use? That depends on the type of problem you are having. The guide in Section 3 will help you identify the right process to use.

### Section 1.2    What about the legal terms?

There are technical legal terms for some of the rules, procedures, and types of deadlines explained in this chapter. Many of these terms are unfamiliar to most people and can be hard to understand.

To keep things simple, this chapter explains the legal rules and procedures using simpler words in place of certain legal terms. For example, this chapter generally says "making a complaint" rather than "filing a grievance," "coverage decision" rather than "organization determination" or "coverage determination," and "Independent Review Organization" instead of "Independent Review Entity." It also uses abbreviations as little as possible.

However, it can be helpful – and sometimes quite important – for you to know the correct legal terms for the situation you are in. Knowing which terms to use will help you communicate more clearly and accurately when you are dealing with your problem and get the right help or information for your situation. To help you know which terms to use, we include legal terms when we give the details for handling specific types of situations.

# SECTION 2    You can get help from government organizations that are not connected with us

### Section 2.1    Where to get more information and personalized assistance

Sometimes it can be confusing to start or follow through the process for dealing with a problem. This can be especially true if you do not feel well or have limited energy. Other times, you may not have the knowledge you need to take the next step.

**Get help from an independent government organization**

We are always available to help you. But in some situations you may also want help or guidance from someone who is not connected with us. You can always contact your **State Health Insurance Assistance Program (SHIP)**.

Case 1:21-cv-01983-JRS   Document 35   Filed 12/13/21   Page 437 of 547 PageID #: 5046
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 160 of 225   Page ID
#:3401

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

This government program has trained counselors in every state. The program is not connected with us or with any insurance company or health plan. The counselors at this program can help you understand which process you should use to handle a problem you are having. They can also answer your questions, give you more information, and offer guidance on what to do.

The services of SHIP counselors are free. You will find phone numbers in "Exhibit A" at the end of this booklet.

**You can also get help and information from Medicare**

For more information and help in handling a problem, you can also contact Medicare. Here are two ways to get information directly from Medicare:

- You can call 1-800-MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week. TTY users should call 1-877-486-2048.
- You can visit the Medicare website (http://www.medicare.gov).

## SECTION 3          To deal with your problem, which process should you use?

| Section 3.1 | Should you use the process for coverage decisions and appeals? Or should you use the process for making complaints? |
|---|---|

If you have a problem or concern, you only need to read the parts of this chapter that apply to your situation. The guide that follows will help.

| To figure out which part of this chapter will help with your specific problem or concern, **START HERE** |
|---|
| **Is your problem or concern about your benefits or coverage?**<br>(This includes problems about whether particular medical care or prescription drugs are covered or not, the way in which they are covered, and problems related to payment for medical care or prescription drugs.) |

| **Yes.**<br>My problem is about<br>benefits or coverage.<br><br>Go on to the next section of this chapter, **Section 4, "A guide to the basics of coverage decisions and appeals."** | **No.**<br>My problem is <u>not</u> about<br>benefits or coverage.<br><br>Skip ahead to **Section 10** at the end of this chapter:<br>**"How to make a complaint about quality of care, waiting times, customer service or other concerns."** |
|---|---|

Case 1:21-cv-01983-JRS   Document 35   Filed 12/13/21   Page 438 of 547 PageID #: 5047
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 161 of 225   Page ID #3 402

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

## COVERAGE DECISIONS AND APPEALS

## SECTION 4        A guide to the basics of coverage decisions and appeals

### Section 4.1        Asking for coverage decisions and making appeals: the big picture

The process for coverage decisions and appeals deals with problems related to your benefits and coverage for medical services and prescription drugs, including problems related to payment. This is the process you use for issues such as whether something is covered or not and the way in which something is covered.

**Asking for coverage decisions**

A coverage decision is a decision we make about your benefits and coverage or about the amount we will pay for your medical services or drugs. For example, your plan network doctor makes a (favorable) coverage decision for you whenever you receive medical care from him or her or if your network doctor refers you to a medical specialist. You or your doctor can also contact us and ask for a coverage decision if your doctor is unsure whether we will cover a particular medical service or refuses to provide medical care you think that you need. In other words, if you want to know if we will cover a medical service before you receive it, you can ask us to make a coverage decision for you.

We are making a coverage decision for you whenever we decide what is covered for you and how much we pay. In some cases we might decide a service or drug is not covered or is no longer covered by Medicare for you. If you disagree with this coverage decision, you can make an appeal.

**Making an appeal**

If we make a coverage decision and you are not satisfied with this decision, you can "appeal" the decision. An appeal is a formal way of asking us to review and change a coverage decision we have made.

When you make an appeal, we review the coverage decision we have made to check to see if we were following all of the rules properly. Your appeal is handled by different reviewers than those who made the original unfavorable decision. When we have completed the review, we give you our decision.

If we say no to all or part of your Level 1 Appeal, you can go on to a Level 2 Appeal. The Level 2 Appeal is conducted by an independent organization that is not connected to us. (In some situations, your case will be automatically sent to the independent organization for a Level 2 Appeal. If this happens, we will let you know. In other situations, you will need to ask for a Level 2 Appeal.) If you are not satisfied with the decision at the Level 2 Appeal, you may be able to continue through additional levels of appeal.

### Section 4.2        How to get help when you are asking for a coverage decision or making an appeal

Would you like some help? Here are resources you may wish to use if you decide to ask for any kind of coverage decision or appeal a decision:

- You **can call us at Customer Care** (phone numbers are printed on the back cover of this booklet).

Case 1:31-cv-01083-LRS   Document 35   Filed 12/13/21   Page 439 of 547 PageID #: 5048
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 162 of 225   Page ID
#:3402

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

- To **get free help from an independent organization** that is not connected with our plan, contact your State Health Insurance Assistance Program (see Section 2 of this chapter).
- **Your doctor can make a request for you.**
  - For medical care, your doctor can request a coverage decision or a Level 1 Appeal on your behalf. If your appeal is denied at Level 1, it will be automatically forwarded to Level 2. To request any appeal after Level 2, your doctor must be appointed as your representative.
  - For Part D prescription drugs, your doctor or other prescriber can request a coverage decision or a Level 1 or 2 Appeal on your behalf. To request any appeal after Level 2, your doctor or other prescriber must be appointed as your representative.
- **You can ask someone to act on your behalf.** If you want to, you can name another person to act for you as your "representative" to ask for a coverage decision or make an appeal.
  - There may be someone who is already legally authorized to act as your representative under state law.
  - If you want a friend, relative, your doctor or other provider, or other person to be your representative, call Customer Care (phone numbers are printed on the back cover of this booklet) and ask for the "Appointment of Representative" form. (The form is also available on Medicare's website at http://www.cms.hhs.gov/cmsforms/downloads/cms1696.pdf.) The form gives that person permission to act on your behalf. It must be signed by you and by the person who you would like to act on your behalf. You must give us a copy of the signed form.
- **You also have the right to hire a lawyer to act for you.** You may contact your own lawyer, or get the name of a lawyer from your local bar association or other referral service. There are also groups that will give you free legal services if you qualify. However, **you are not required to hire a lawyer** to ask for any kind of coverage decision or appeal a decision.

| Section 4.3 | Which section of this chapter gives the details for your situation? |
|---|---|

There are four different types of situations that involve coverage decisions and appeals. Since each situation has different rules and deadlines, we give the details for each one in a separate section:

- **Section 5** of this chapter: "Your medical care: How to ask for a coverage decision or make an appeal"
- **Section 6** of this chapter: "Your Part D prescription drugs: How to ask for a coverage decision or make an appeal"
- **Section 7** of this chapter: "How to ask us to cover a longer inpatient hospital stay if you think the doctor is discharging you too soon"
- **Section 8** of this chapter: "How to ask us to keep covering certain medical services if you think your coverage is ending too soon" (Applies to these services only: Home health care, skilled nursing facility care, and Comprehensive Outpatient Rehabilitation Facility (CORF) services)

If you're not sure which section you should be using, please call Customer Care (phone numbers are printed on the back cover of this booklet). You can also get help or information from government organizations such as your State Health Insurance Assistance Program ("Exhibit A" at the end of this booklet has the phone numbers for this program).

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 440 of 547 PageID #: 5049
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 163 of 225   Page ID #:1404

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

## SECTION 5     Your medical care: How to ask for a coverage decision or make an appeal

 Have you read Section 4 of this chapter (A guide to "the basics" of coverage decisions and appeals)? If not, you may want to read it before you start this section.

| Section 5.1 | This section tells what to do if you have problems getting coverage for medical care or if you want us to pay you back for our share of the cost of your care |
|---|---|

This section is about your benefits for medical care and services. These benefits are described in Chapter 4 of this booklet: Medical Benefits Chart (what is covered and what you pay). To keep things simple, we generally refer to "medical care coverage" or "medical care" in the rest of this section, instead of repeating "medical care or treatment or services" every time.

This section tells what you can do if you are in any of the five following situations:

1. You are not getting certain medical care you want, and you believe that this care is covered by our plan.

2. Our plan will not approve the medical care your doctor or other medical provider wants to give you, and you believe that this care is covered by the plan.

3. You have received medical care or services that you believe should be covered by the plan, but we have said we will not pay for this care.

4. You have received and paid for medical care or services that you believe should be covered by the plan, and you want to ask our plan to reimburse you for this care.

5. You are being told that coverage for certain medical care you have been getting that we previously approved will be reduced or stopped, and you believe that reducing or stopping this care could harm your health.

   - NOTE: **If the coverage that will be stopped is for hospital care, home health care, skilled nursing facility care, or Comprehensive Outpatient Rehabilitation Facility (CORF) services**, you need to read a separate section of this chapter because special rules apply to these types of care. Here's what to read in those situations:
     – Chapter 9, Section 7: How to ask us to cover a longer inpatient hospital stay if you think the doctor is discharging you too soon.
     – Chapter 9, Section 8: How to ask us to keep covering certain medical services if you think your coverage is ending too soon. This section is about three services only: home health care, skilled nursing facility care, and Comprehensive Outpatient Rehabilitation Facility (CORF) services.

   - For all other situations that involve being told that medical care you have been getting will be stopped, use this section (Section 5) as your guide for what to do.

Case 2:21-cv-01983-JLS-RS   Document 35   Filed 12/13/21   Page 441 of 547 PageID #: 5050
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 164 of 225   Page ID #:1405

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

| Which of these situations are you in? | |
|---|---|
| **If you are in this situation:** | **This is what you can do:** |
| Do you want to find out whether we will cover the medical care or services you want? | You can ask us to make a coverage decision for you. Go to the next section of this chapter, **Section 5.2.** |
| Have we already told you that we will not cover or pay for a medical service in the way that you want it to be covered or paid for? | You can make an **appeal.** (This means you are asking us to reconsider.) Skip ahead to **Section 5.3** of this chapter. |
| Do you want to ask us to pay you back for medical care or services you have already received and paid for? | You can send us the bill. Skip ahead to **Section 5.5** of this chapter. |

| Section 5.2 | Step-by-step: How to ask for a coverage decision (how to ask our plan to authorize or provide the medical care coverage you want) |
|---|---|

| **Legal Terms** | When a coverage decision involves your medical care, it is called an "**organization determination.**" |
|---|---|

**Step 1: You ask our plan to make a coverage decision on the medical care you are requesting.** If your health requires a quick response, you should ask us to make a **"fast coverage decision."**

| **Legal Terms** | A "fast coverage decision" is called an "**expedited determination.**" |
|---|---|

How to request coverage for the medical care you want

- Start by calling, writing, or faxing our plan to make your request for us to authorize or provide coverage for the medical care you want. You, your doctor, or your representative can do this.
- For the details on how to contact us, go to Chapter 2, Section 1 and look for the section called, How to contact us when you are asking for a coverage decision about your medical care.

Generally we use the standard deadlines for giving you our decision

When we give you our decision, we will use the "standard" deadlines unless we have agreed to use the "fast" deadlines. **A standard coverage decision means we will give you an answer within 14 days** after we receive your request.

- **However, we can take up to 14 more calendar days** if you ask for more time, or if we need information (such as medical records from out-of-network providers) that may benefit you. If we decide to take extra days to make the decision, we will tell you in writing.

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 442 of 547 PageID #: 5051
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 165 of 225   Page ID
#:1406

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

- If you believe we should <u>not</u> take extra days, you can file a "fast complaint" about our decision to take extra days. When you file a fast complaint, we will give you an answer to your complaint within 24 hours. (The process for making a complaint is different from the process for coverage decisions and appeals. For more information about the process for making complaints, including fast complaints, see Section 10 of this chapter.)

If your health requires it, ask us to give you a "fast coverage decision"

- **A fast coverage decision means we will answer within 72 hours.**
  - **However, we can take up to 14 more calendar days** if we find that some information that may benefit you is missing (such as medical records from out-of-network providers), or if you need time to get information to us for the review. If we decide to take extra days, we will tell you in writing.
  - If you believe we should <u>not</u> take extra days, you can file a "fast complaint" about our decision to take extra days. (For more information about the process for making complaints, including fast complaints, see Section 10 of this chapter.) We will call you as soon as we make the decision.
- **To get a fast coverage decision, you must meet two requirements:**
  - You can get a fast coverage decision <u>only</u> if you are asking for coverage for medical care <u>you have not yet received.</u> (You cannot get a fast coverage decision if your request is about payment for medical care you have already received.)
  - You can get a fast coverage decision <u>only</u> if using the standard deadlines could <u>cause serious harm to your health or hurt your ability to function.</u>
- **If your doctor tells us that your health requires a "fast coverage decision," we will automatically agree to give you a fast coverage decision.**
- If you ask for a fast coverage decision on your own, without your doctor's support, we will decide whether your health requires that we give you a fast coverage decision.
  - If we decide that your medical condition does not meet the requirements for a fast coverage decision, we will send you a letter that says so (and we will use the standard deadlines instead).
  - This letter will tell you that if your doctor asks for the fast coverage decision, we will automatically give you a fast coverage decision.
  - The letter will also tell how you can file a "fast complaint" about our decision to give you a standard coverage decision instead of the fast coverage decision you requested. (For more information about the process for making complaints, including fast complaints, see Section 10 of this chapter.)

**Step 2:** **We consider your request for medical care coverage and give you our answer.**

<u>Deadlines for a **"fast"** coverage decision</u>
- Generally, for a fast coverage decision, we will give you our answer **within 72 hours.**
  - As explained above, we can take up to 14 more calendar days under certain circumstances. If we decide to take extra days to make the coverage decision, we will tell you in writing.
  - If you believe we should <u>not</u> take extra days, you can file a "fast complaint" about our decision to take extra days. When you file a fast complaint, we will give you an answer to your complaint within 24 hours. (For more information about the process for making complaints, including fast complaints, see Section 10 of this chapter.)
  - If we do not give you our answer within 72 hours (or if there is an extended time period, by the end of that period), you have the right to appeal. Section 5.3 below tells how to make an appeal.
- **If our answer is yes to part or all of what you requested,** we must authorize or provide the medical care coverage we have agreed to provide within 72 hours after we received your request. If we extended the time needed to make our coverage decision, we will provide the coverage by the end of that extended period.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

- **If our answer is no to part or all of what you requested,** we will send you a detailed written explanation as to why we said no.

Deadlines for a **"standard"** coverage decision
- Generally, for a standard coverage decision, we will give you our answer **within 14 days of receiving your request.**
  - We can take up to 14 more calendar days ("an extended time period") under certain circumstances. If we decide to take extra days to make the coverage decision, we will tell you in writing.
  - If you believe we should <u>not</u> take extra days, you can file a "fast complaint" about our decision to take extra days. When you file a fast complaint, we will give you an answer to your complaint within 24 hours. (For more information about the process for making complaints, including fast complaints, see Section 10 of this chapter.)
  - If we do not give you our answer within 14 days (or if there is an extended time period, by the end of that period), you have the right to appeal. Section 5.3 below tells how to make an appeal.
- **If our answer is yes to part or all of what you requested,** we must authorize or provide the coverage we have agreed to provide within 14 days after we received your request. If we extended the time needed to make our coverage decision, we will provide the coverage by the end of that extended period.
- **If our answer is no to part or all of what you requested,** we will send you a written statement that explains why we said no.

**Step 3:** **If we say no to your request for coverage for medical care, you decide if you want to make an appeal.**
- If we say no, you have the right to ask us to reconsider – and perhaps change – this decision by making an appeal. Making an appeal means making another try to get the medical care coverage you want.
- If you decide to make an appeal, it means you are going on to Level 1 of the appeals process (see Section 5.3 below).

| Section 5.3 | Step-by-step: How to make a Level 1 Appeal |
| --- | --- |
| | **(how to ask for a review of a medical care coverage decision made by our plan)** |

| Legal Terms | An appeal to the plan about a medical care coverage decision is called a plan "**reconsideration.**" |
| --- | --- |

**Step 1:** **You contact us and make your appeal.** If your health requires a quick response, you must ask for a **"fast appeal."**

What to do

- **To start an appeal you, your doctor, or your representative, must contact us.** For details on how to reach us for any purpose related to your appeal, go to Chapter 2, Section 1 and look for the section called, How to contact us when you are making an appeal about your medical care.
- **If you are asking for a standard appeal, make your standard appeal in writing by submitting a request.**
  - If you have someone appealing our decision for you other than your doctor, your appeal must include an Appointment of Representative form authorizing this person to represent you. (To get the form, call Customer Care (phone numbers are printed on the back cover of this booklet) and ask for the

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 444 of 547 PageID #: 5053
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 167 of 225   Page ID #:1408

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

"Appointment of Representative" form. It is also available on Medicare's website at http://www.cms.hhs.gov/cmsforms/downloads/cms1696.pdf or on our website at http://apps.humana.com/marketing/documents.asp?file=639132.) While we can accept an appeal request without the form, we cannot complete our review until we receive it. If we do not receive the form within 44 days after receiving your appeal request (our deadline for making a decision on your appeal), your appeal request will be sent to the Independent Review Organization for dismissal.

- **If you are asking for a fast appeal, make your appeal in writing or call us** at the phone number shown in Chapter 2, Section 1 (How to contact us when you are making an appeal about your medical care).
- **You must make your appeal request within 60 calendar days** from the date on the written notice we sent to tell you our answer to your request for a coverage decision. If you miss this deadline and have a good reason for missing it, we may give you more time to make your appeal. Examples of good cause for missing the deadline may include if you had a serious illness that prevented you from contacting us or if we provided you with incorrect or incomplete information about the deadline for requesting an appeal.
- **You can ask for a copy of the information regarding your medical decision and add more information to support your appeal.**
  - You have the right to ask us for a copy of the information regarding your appeal. We are allowed to charge a fee for copying and sending this information to you.
  - If you wish, you and your doctor may give us additional information to support your appeal.

If your health requires it, ask for a "fast appeal" (you can make a request by calling us)

| Legal Terms | A "fast appeal" is also called an "**expedited reconsideration.**" |
|---|---|

- If you are appealing a decision we made about coverage for care you have not yet received, you and/or your doctor will need to decide if you need a "fast appeal."
- The requirements and procedures for getting a "fast appeal" are the same as those for getting a "fast coverage decision." To ask for a fast appeal, follow the instructions for asking for a fast coverage decision. (These instructions are given earlier in this section.)
- If your doctor tells us that your health requires a "fast appeal," we will give you a fast appeal.

**Step 2:** **We consider your appeal and we give you our answer.**

- When our plan is reviewing your appeal, we take another careful look at all of the information about your request for coverage of medical care. We check to see if we were following all the rules when we said no to your request.
- We will gather more information if we need it. We may contact you or your doctor to get more information.

Deadlines for a **"fast" appeal**

- When we are using the fast deadlines, we must give you our answer **within 72 hours after we receive your appeal.** We will give you our answer sooner if your health requires us to do so.
  - However, if you ask for more time, or if we need to gather more information that may benefit you, we **can take up to 14 more calendar days.** If we decide to take extra days to make the decision, we will tell you in writing.
  - If we do not give you an answer within 72 hours (or by the end of the extended time period if we took extra days), we are required to automatically send your request on to Level 2 of the appeals process, where it will be reviewed by an independent organization. Later in this section, we tell you about this organization and explain what happens at Level 2 of the appeals process.
- **If our answer is yes to part or all of what you requested,** we must authorize or provide the coverage we have agreed to provide within 72 hours after we receive your appeal.

Case 1:31-cv-01983-LRS Document 35 Filed 12/13/21 Page 445 of 547 PageID #: 5054
Case 2:19-cv-08928-DSF-MRW Document 60-1 Filed 04/24/20 Page 168 of 228 Page ID #:1409

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

- **If our answer is no to part or all of what you requested,** we will send you a written denial notice informing you that we have automatically sent your appeal to the Independent Review Organization for a Level 2 Appeal.

Deadlines for a **"standard" appeal**

- If we are using the standard deadlines, we must give you our answer **within 30 calendar days** after we receive your appeal if your appeal is about coverage for services you have not yet received. We will give you our decision sooner if your health condition requires us to.
    - However, if you ask for more time, or if we need to gather more information that may benefit you, **we can take up to 14 more calendar days.**
    - If you believe we should <u>not</u> take extra days, you can file a "fast complaint" about our decision to take extra days. When you file a fast complaint, we will give you an answer to your complaint within 24 hours. (For more information about the process for making complaints, including fast complaints, see Section 10 of this chapter.)
    - If we do not give you an answer by the deadline above (or by the end of the extended time period if we took extra days), we are required to send your request on to Level 2 of the appeals process, where it will be reviewed by an independent outside organization. Later in this section, we talk about this review organization and explain what happens at Level 2 of the appeals process.
- **If our answer is yes to part or all of what you requested,** we must authorize or provide the coverage we have agreed to provide within 30 days after we receive your appeal.
- **If our answer is no to part or all of what you requested,** we will send you a written denial notice informing you that we have automatically sent your appeal to the Independent Review Organization for a Level 2 Appeal.

**Step 3: If our plan says no to part or all of your appeal, your case will <u>automatically</u> be sent on to the next level of the appeals process.**

- To make sure we were following all the rules when we said no to your appeal, **we are required to send your appeal to the "Independent Review Organization."** When we do this, it means that your appeal is going on to the next level of the appeals process, which is Level 2.

---

| Section 5.4 | Step-by-step: How a Level 2 Appeal is done |
|---|---|

If we say no to your Level 1 Appeal, your case will <u>automatically</u> be sent on to the next level of the appeals process. During the Level 2 Appeal, the **Independent Review Organization** reviews our decision for your first appeal. This organization decides whether the decision we made should be changed.

| Legal Terms | The formal name for the "Independent Review Organization" is the "**Independent Review Entity.**" It is sometimes called the "**IRE.**" |
|---|---|

**Step 1: The Independent Review Organization reviews your appeal.**

- **The Independent Review Organization is an independent organization that is hired by Medicare.** This organization is not connected with us and it is not a government agency. This organization is a company chosen by Medicare to handle the job of being the Independent Review Organization. Medicare oversees its work.
- We will send the information about your appeal to this organization. This information is called your "case file." **You have the right to ask us for a copy of your case file.** We are allowed to charge you a fee for copying and sending this information to you.

Case 1:21-cv-01983-LPS   Document 35   Filed 12/13/21   Page 446 of 547 PageID #: 5055
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 169 of 228   Page ID #:1410
2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

- You have a right to give the Independent Review Organization additional information to support your appeal.
- Reviewers at the Independent Review Organization will take a careful look at all of the information related to your appeal.

If you had a "fast" appeal at Level 1, you will also have a **"fast" appeal** at Level 2

- If you had a fast appeal to our plan at Level 1, you will automatically receive a fast appeal at Level 2. The review organization must give you an answer to your Level 2 Appeal **within 72 hours** of when it receives your appeal.
- However, if the Independent Review Organization needs to gather more information that may benefit you, **it can take up to 14 more calendar days.**

If you had a "standard" appeal at Level 1, you will also have a **"standard" appeal** at Level 2

- If you had a standard appeal to our plan at Level 1, you will automatically receive a standard appeal at Level 2. The review organization must give you an answer to your Level 2 Appeal **within 30 calendar days** of when it receives your appeal.
- However, if the Independent Review Organization needs to gather more information that may benefit you, **it can take up to 14 more calendar days.**

**Step 2:** **The Independent Review Organization gives you their answer.**

The Independent Review Organization will tell you its decision in writing and explain the reasons for it.

- **If the review organization says yes to part or all of what you requested,** we must authorize the medical care coverage within 72 hours or provide the service within 14 calendar days after we receive the decision from the review organization.
- **If this organization says no to part or all of your appeal,** it means they agree with us that your request (or part of your request) for coverage for medical care should not be approved. (This is called "upholding the decision." It is also called "turning down your appeal.")
  - There is certain dollar value that must be in dispute to continue with the appeals process. For example, to continue and make another appeal at Level 3, the dollar value of the medical care coverage you are requesting must meet a certain minimum. If the dollar value of the coverage you are requesting is too low, you cannot make another appeal, which means that the decision at Level 2 is final. The written notice you get from the Independent Review Organization will tell you how to find out the dollar amount to continue the appeals process.

**Step 3:** **If your case meets the requirements, you choose whether you want to take your appeal further.**

- There are three additional levels in the appeals process after Level 2 (for a total of five levels of appeal).
- If your Level 2 Appeal is turned down and you meet the requirements to continue with the appeals process, you must decide whether you want to go on to Level 3 and make a third appeal. The details on how to do this are in the written notice you got after your Level 2 Appeal.
- The Level 3 Appeal is handled by an administrative law judge. Section 9 in this chapter tells more about Levels 3, 4, and 5 of the appeals process.

| Section 5.5 | What if you are asking us to pay you for our share of a bill you have received for medical care? |
|---|---|

If you want to ask us for payment for medical care, start by reading Chapter 7 of this booklet: Asking us to pay our share of a bill you have received for covered medical services or drugs. Chapter 7 describes the situations in which

Case 1:21-cv-01983-LPS   Document 35   Filed 12/13/21   Page 447 of 547 PageID #: 5056
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 170 of 225   Page ID
#:1411

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

you may need to ask for reimbursement or to pay a bill you have received from a provider. It also tells how to send us the paperwork that asks for payment.

**Asking for reimbursement is asking for a coverage decision from us**

If you send us the paperwork that asks for reimbursement, you are asking us to make a coverage decision (for more information about coverage decisions, see Section 4.1 of this chapter). To make this coverage decision, we will check to see if the medical care you paid for is a covered service (see Chapter 4: Medical Benefits Chart (what is covered and what you pay)). We will also check to see if you followed all the rules for using your coverage for medical care (these rules are given in Chapter 3 of this booklet: Using the plan's coverage for your medical services).

**We will say yes or no to your request**

- If the medical care you paid for is covered and you followed all the rules, we will send you the payment for our share of the cost of your medical care within 60 calendar days after we receive your request. Or, if you haven't paid for the services, we will send the payment directly to the provider. (When we send the payment, it's the same as saying yes to your request for a coverage decision.)
- If the medical care is <u>not</u> covered, or you did <u>not</u> follow all the rules, we will not send payment. Instead, we will send you a letter that says we will not pay for the services and the reasons why in detail. (When we turn down your request for payment, it's the same as saying no to your request for a coverage decision.)

**What if you ask for payment and we say that we will not pay?**

If you do not agree with our decision to turn you down, **you can make an appeal.** If you make an appeal, it means you are asking us to change the coverage decision we made when we turned down your request for payment.

**To make this appeal, follow the process for appeals that we describe in part 5.3 of this section.** Go to this part for step-by-step instructions. When you are following these instructions, please note:

- If you make an appeal for reimbursement, we must give you our answer within 60 calendar days after we receive your appeal. (If you are asking us to pay you back for medical care you have already received and paid for yourself, you are not allowed to ask for a fast appeal.)
- If the Independent Review Organization reverses our decision to deny payment, we must send the payment you have requested to you or to the provider within 30 calendar days. If the answer to your appeal is yes at any stage of the appeals process after Level 2, we must send the payment you requested to you or to the provider within 60 calendar days.

# SECTION 6          Your Part D prescription drugs: How to ask for a coverage decision or make an appeal



Have you read Section 4 of this chapter (A guide to "the basics" of coverage decisions and appeals)? If not, you may want to read it before you start this section.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

| Section 6.1 | This section tells you what to do if you have problems getting a Part D drug or you want us to pay you back for a Part D drug |
|---|---|

Your benefits as a member of our plan include coverage for many prescription drugs. Please refer to our plan's Prescription Drug Guide (Formulary). To be covered, the drug must be used for a medically accepted indication. (A "medically accepted indication" is a use of the drug that is either approved by the Food and Drug Administration or supported by certain reference books. See Chapter 5, Section 3 for more information about a medically accepted indication.)

- **This section is about your Part D drugs only.** To keep things simple, we generally say "drug" in the rest of this section, instead of repeating "covered outpatient prescription drug" or "Part D drug" every time.
- For details about what we mean by Part D drugs, the Prescription Drug Guide (Formulary), rules and restrictions on coverage, and cost information, see Chapter 5 (Using our plan's coverage for your Part D prescription drugs) and Chapter 6 (What you pay for your Part D prescription drugs).

**Part D coverage decisions and appeals**

As discussed in Section 4 of this chapter, a coverage decision is a decision we make about your benefits and coverage or about the amount we will pay for your drugs.

| Legal Terms | An initial coverage decision about your Part D drugs is called a **"coverage determination."** |
|---|---|

Here are examples of coverage decisions you ask us to make about your Part D drugs:
- You ask us to make an exception, including:
  - Asking us to cover a Part D drug that is not in the plan's Prescription Drug Guide (Formulary)
  - Asking us to waive a restriction on the plan's coverage for a drug (such as limits on the amount of the drug you can get)
  - Asking to pay a lower cost-sharing amount for a covered non-preferred drug
- You ask us whether a drug is covered for you and whether you satisfy any applicable coverage rules. (For example, when your drug is in the plan's Prescription Drug Guide (Formulary) but we require you to get approval from us before we will cover it for you.)
  - <u>Please note</u>: If your pharmacy tells you that your prescription cannot be filled as written, you will get a written notice explaining how to contact us to ask for a coverage decision.
- You ask us to pay for a prescription drug you already bought. This is a request for a coverage decision about payment.

If you disagree with a coverage decision we have made, you can appeal our decision.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

This section tells you both how to ask for coverage decisions and how to request an appeal. Use the chart below to help you determine which part has information for your situation:

| Which of these situations are you in? | | | |
|---|---|---|---|
| Do you need a drug that isn't in our Drug Guide or need us to waive a rule or restriction on a drug we cover? | Do you want us to cover a drug in our Drug Guide and you believe you meet any plan rules or restrictions (such as getting approval in advance) for the drug you need? | Do you want to ask us to pay you back for a drug you have already received and paid for? | Have we already told you that we will not cover or pay for a drug in the way that you want it to be covered or paid for? |
| You can ask us to make an exception. (This is a type of coverage decision.) Start with **Section 6.2** of this chapter. | You can ask us for a coverage decision. Skip ahead to **Section 6.4** of this chapter. | You can ask us to pay you back. (This is a type of coverage decision.) Skip ahead to **Section 6.4** of this chapter. | You can make an appeal. (This means you are asking us to reconsider.) Skip ahead to **Section 6.5** of this chapter |

| Section 6.2 | What is an exception? |
|---|---|

If a drug is not covered in the way you would like it to be covered, you can ask us to make an "exception." An exception is a type of coverage decision. Similar to other types of coverage decisions, if we turn down your request for an exception, you can appeal our decision.

When you ask for an exception, your doctor or other prescriber will need to explain the medical reasons why you need the exception approved. We will then consider your request. Here are three examples of exceptions that you or your doctor or other prescriber can ask us to make:

**1. Covering a Part D drug for you that is not in our plan's Prescription Drug Guide (Formulary).** (We call it the "Drug Guide" for short.)

| Legal Terms | Asking for coverage of a drug that is not in the Drug Guide is sometimes called asking for a **"formulary exception."** |
|---|---|

- If we agree to make an exception and cover a drug that is not in the Drug Guide, you will need to pay the cost-sharing amount that applies to Cost-Sharing Tier 4 – Non-Preferred Brand Drugs. You cannot ask for an exception to the copayment or coinsurance amount we require you to pay for the drug.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

**2. Removing a restriction on our coverage for a covered drug.** There are extra rules or restrictions that apply to certain drugs in our Prescription Drug Guide (Formulary) (for more information, go to Chapter 5 and look for Section 4).

| Legal Terms | Asking for removal of a restriction on coverage for a drug is sometimes called asking for a **"formulary exception."** |
|---|---|

- The extra rules and restrictions on coverage for certain drugs include:
    - **Being required to use the generic version** of a drug instead of the brand-name drug.
    - **Getting plan approval in advance** before we will agree to cover the drug for you. (This is sometimes called "prior authorization.")
    - **Being required to try a different drug first** before we will agree to cover the drug you are asking for. (This is sometimes called "step therapy.")
    - **Quantity limits.** For some drugs, there are restrictions on the amount of the drug you can have.
- If we agree to make an exception and waive a restriction for you, you can ask for an exception to the copayment or coinsurance amount we require you to pay for the drug.

**3. Changing coverage of a drug to a lower cost-sharing tier.** Every drug in our Drug Guide is in one of five cost-sharing tiers. In general, the lower the cost-sharing tier number, the less you will pay as your share of the cost of the drug.

| Legal Terms | Asking to pay a lower preferred price for a covered non-preferred drug is sometimes called asking for a **"tiering exception."** |
|---|---|

- If your drug is in Cost-Sharing Tier 4 – Non-Preferred Brand Drugs you can ask us to cover it at the cost-sharing amount that applies to Tier 3 - Preferred Brand Drugs. This would lower your share of the cost for the drug.
- If your generic drug is in the Cost-Sharing Tier 2 - Non-Preferred Generics you can ask us to cover it at the cost-sharing amount that applies to Tier 1 – Preferred Generic Drugs. This would lower your share of the cost for the drug.
- You cannot ask us to change the cost-sharing tier for any drug in Tier 5 – Specialty Drugs.

| Section 6.3 | Important things to know about asking for exceptions |
|---|---|

**Your doctor must tell us the medical reasons**

Your doctor or other prescriber must give us a statement that explains the medical reasons for requesting an exception. For a faster decision, include this medical information from your doctor or other prescriber when you ask for the exception.

Typically, our Drug Guide includes more than one drug for treating a particular condition. These different possibilities are called "alternative" drugs. If an alternative drug would be just as effective as the drug you are requesting and would not cause more side effects or other health problems, we will generally <u>not</u> approve your request for an exception.

A-7389

Case 1:21-cv-01983-JRS Document 35 Filed 12/13/21 Page 451 of 547 PageID #: 5060
Case 2:19-cv-08928-DSF-MRW Document 60-1 Filed 04/24/20 Page 174 of 225 Page ID #:3,415

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

**We can say yes or no to your request**

- If we approve your request for an exception, our approval usually is valid until the end of the plan year. This is true as long as your doctor continues to prescribe the drug for you and that drug continues to be safe and effective for treating your condition.
- If we say no to your request for an exception, you can ask for a review of our decision by making an appeal. Section 6.5 tells how to make an appeal if we say no.

The next section tells you how to ask for a coverage decision, including an exception.

| Section 6.4 | Step-by-step: How to ask for a coverage decision, including an exception |
|---|---|

**Step 1:** **You ask us to make a coverage decision about the drug(s) or payment you need. If your health requires a quick response, you must ask us to make a "fast coverage decision." You cannot ask for a fast coverage decision if you are asking us to pay you back for a drug you already bought.**

What to do
- **Request the type of coverage decision you want.** Start by calling, writing, or faxing us to make your request. You, your representative, or your doctor (or other prescriber) can do this. You can also access the coverage decision process through our website. For the details, go to Chapter 2, Section 1 and look for the section called, How to contact us when you are asking for a coverage decision about your Part D prescription drugs. Or if you are asking us to pay you back for a drug, go to the section called, Where to send a request asking us to pay for our share of the cost for medical care or a drug you have received.
- **You or your doctor or someone else who is acting on your behalf** can ask for a coverage decision. Section 4 of this chapter tells how you can give written permission to someone else to act as your representative. You can also have a lawyer act on your behalf.
- **If you want to ask us to pay you back for a drug,** start by reading Chapter 7 of this booklet: Asking us to pay our share of a bill you have received for covered medical services or drugs. Chapter 7 describes the situations in which you may need to ask for reimbursement. It also tells how to send us the paperwork that asks us to pay you back for our share of the cost of a drug you have paid for.
- **If you are requesting an exception, provide the "supporting statement."** Your doctor or other prescriber must give us the medical reasons for the drug exception you are requesting. (We call this the "supporting statement.") Your doctor or other prescriber can fax or mail the statement to us. Or your doctor or other prescriber can tell us on the phone and follow up by faxing or mailing a written statement if necessary. See Sections 6.2 and 6.3 for more information about exception requests.
- **We must accept any written request,** including a request submitted on the CMS Model Coverage Determination Request Form, which is available on our website.
- **To submit a coverage determination request online,** please got to: http://www.humana.com/medicare/medicare_prescription_drugs/medicare_drug_tools/determination.aspx. Fill out the Coverage Determination Request Form. You'll need to send us supporting documentation from the prescribing doctor to show medical need. Your information will be sent to us securely.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 452 of 547 PageID #: 5061
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 173 of 225   Page ID
#:1416

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

If your health requires it, ask us to give you a "fast coverage decision"

| | |
|---|---|
| **Legal Terms** | A "fast coverage decision" is called an **"expedited coverage determination."** |

- When we give you our decision, we will use the "standard" deadlines unless we have agreed to use the "fast" deadlines. A standard coverage decision means we will give you an answer within 72 hours after we receive your doctor's statement. A fast coverage decision means we will answer within 24 hours.
- **To get a fast coverage decision, you must meet two requirements:**
    - You can get a fast coverage decision <u>only</u> if you are asking for a <u>drug you have not yet received.</u> (You cannot get a fast coverage decision if you are asking us to pay you back for a drug you have already bought.)
    - You can get a fast coverage decision <u>only</u> if using the standard deadlines could <u>cause serious harm to your health or hurt your ability to function.</u>
- **If your doctor or other prescriber tells us that your health requires a "fast coverage decision," we will automatically agree to give you a fast coverage decision.**
- If you ask for a fast coverage decision on your own (without your doctor's or other prescriber's support), we will decide whether your health requires that we give you a fast coverage decision.
    - If we decide that your medical condition does not meet the requirements for a fast coverage decision, we will send you a letter that says so (and we will use the standard deadlines instead).
    - This letter will tell you that if your doctor or other prescriber asks for the fast coverage decision, we will automatically give you a fast coverage decision.
    - The letter will also tell how you can file a complaint about our decision to give you a standard coverage decision instead of the fast coverage decision you requested. It tells how to file a "fast" complaint, which means you would get our answer to your complaint within 24 hours. (The process for making a complaint is different from the process for coverage decisions and appeals. For more information about the process for making complaints, see Section 10 of this chapter.)

**Step 2:** We consider your request and we give you our answer.

<u>Deadlines for a "**fast**" coverage decision</u>
- If we are using the fast deadlines, we must give you our answer **within 24 hours.**
    - Generally, this means within 24 hours after we receive your request. If you are requesting an exception, we will give you our answer within 24 hours after we receive your doctor's statement supporting your request. We will give you our answer sooner if your health requires us to.
    - If we do not meet this deadline, we are required to send your request on to Level 2 of the appeals process, where it will be reviewed by an independent outside organization. Later in this section, we talk about this review organization and explain what happens at Appeal Level 2.
- **If our answer is yes to part or all of what you requested,** we must provide the coverage we have agreed to provide within 24 hours after we receive your request or doctor's statement supporting your request.
- **If our answer is no to part or all of what you requested,** we will send you a written statement that explains why we said no. We will also tell you how to appeal.

<u>Deadlines for a "**standard**" coverage decision about a drug you have not yet received</u>
- If we are using the standard deadlines, we must give you our answer **within 72 hours.**
    - Generally, this means within 72 hours after we receive your request. If you are requesting an exception, we will give you our answer within 72 hours after we receive your doctor's statement supporting your request. We will give you our answer sooner if your health requires us to.

Case 1:31-cv-01983-LRS   Document 35   Filed 12/13/21   Page 453 of 547 PageID #: 5062
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 176 of 225   Page ID #:3417

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

- – If we do not meet this deadline, we are required to send your request on to Level 2 of the appeals process, where it will be reviewed by an independent organization. Later in this section, we talk about this review organization and explain what happens at Appeal Level 2.
- **If our answer is yes to part or all of what you requested –**
  - – If we approve your request for coverage, we must **provide the coverage** we have agreed to provide **within 72 hours** after we receive your request or doctor's statement supporting your request.
- **If our answer is no to part or all of what you requested,** we will send you a written statement that explains why we said no. We will also tell you how to appeal.

Deadlines for a "**standard**" coverage decision about payment for a drug you have already bought
- We must give you our answer **within 14 calendar days** after we receive your request.
  - – If we do not meet this deadline, we are required to send your request on to Level 2 of the appeals process, where it will be reviewed by an independent organization. Later in this section, we talk about this review organization and explain what happens at Appeal Level 2.
- **If our answer is yes to part or all of what you requested,** we are also required to make payment to you within 14 calendar days after we receive your request.
- **If our answer is no to part or all of what you requested**, we will send you a written statement that explains why we said no. We will also tell you how to appeal.

**Step 3: If we say no to your coverage request, you decide if you want to make an appeal.**

- If we say no, you have the right to request an appeal. Requesting an appeal means asking us to reconsider – and possibly change – the decision we made.

| Section 6.5 | Step-by-step: How to make a Level 1 Appeal |
| --- | --- |
| | (how to ask for a review of a coverage decision made by our plan) |

| Legal Terms | An appeal to the plan about a Part D drug coverage decision is called a plan **"redetermination."** |
| --- | --- |

**Step 1: You contact us and make your Level 1 Appeal.** If your health requires a quick response, you must ask for a "**fast appeal.**"

What to do
- **To start your appeal, you (or your representative or your doctor or other prescriber) must contact us.**
  - – For details on how to reach us by phone, fax, or mail, or on our website for any purpose related to your appeal, go to Chapter 2, Section 1, and look for the section called, How to contact us when you are making an appeal about your Part D prescription drugs.
- **If you are asking for a standard appeal, make your appeal by submitting a written request.**
- **If you are asking for a fast appeal, you may make your appeal in writing or you may call us at the phone number shown in Chapter 2, Section 1** (How to contact us when you are making an appeal about your part D prescription drugs).
- **We must accept any written request,** including a request submitted on the CMS Model Coverage Determination Request Form, which is available on our web site.
- **You must make your appeal request within 60 calendar days** from the date on the written notice we sent to tell you our answer to your request for a coverage decision. If you miss this deadline and have a good reason for missing it, we may give you more time to make your appeal. Examples of good cause for

Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 454 of 547 PageID #: 5063
Case 2:19-cv-08926-DSF-MRW Document 80-11 Filed 04/24/20 Page 177 of 225 Page ID #:1488

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

missing the deadline may include if you had a serious illness that prevented you from contacting us or if we provided you with incorrect or incomplete information about the deadline for requesting an appeal.

- **You can ask for a copy of the information in your appeal and add more information.**
    - You have the right to ask us for a copy of the information regarding your appeal. We are allowed to charge a fee for copying and sending this information to you.
    - If you wish, you and your doctor or other prescriber may give us additional information to support your appeal.

If your health requires it, ask for a "fast appeal"

| Legal Terms | A "fast appeal" is also called an **"expedited redetermination."** |
|---|---|

- If you are appealing a decision we made about a drug you have not yet received, you and your doctor or other prescriber will need to decide if you need a "fast appeal."
- The requirements for getting a "fast appeal" are the same as those for getting a "fast coverage decision" in Section 6.4 of this chapter.

**Step 2: We consider your appeal and we give you our answer.**

- When we are reviewing your appeal, we take another careful look at all of the information about your coverage request. We check to see if we were following all the rules when we said no to your request. We may contact you or your doctor or other prescriber to get more information.

Deadlines for a "**fast**" appeal
- If we are using the fast deadlines, we must give you our answer **within 72 hours after we receive your appeal.** We will give you our answer sooner if your health requires it.
    - If we do not give you an answer within 72 hours, we are required to send your request on to Level 2 of the appeals process, where it will be reviewed by an Independent Review Organization. Later in this section, we talk about this review organization and explain what happens at Level 2 of the appeals process.
- **If our answer is yes to part or all of what you requested,** we must provide the coverage we have agreed to provide within 72 hours after we receive your appeal.
- **If our answer is no to part or all of what you requested,** we will send you a written statement that explains why we said no and how to appeal our decision.

Deadlines for a "**standard**" appeal
- If we are using the standard deadlines, we must give you our answer **within 7 calendar days** after we receive your appeal. We will give you our decision sooner if you have not received the drug yet and your health condition requires us to do so. If you believe your health requires it, you should ask for "fast" appeal.
    - If we do not give you a decision within 7 calendar days, we are required to send your request on to Level 2 of the appeals process, where it will be reviewed by an Independent Review Organization. Later in this section, we tell about this review organization and explain what happens at Level 2 of the appeals process.
- **If our answer is yes to part or all of what you requested –**
    - If we approve a request for coverage, we must **provide the coverage** we have agreed to provide as quickly as your health requires, but **no later than 7 calendar days** after we receive your appeal.
    - If we approve a request to pay you back for a drug you already bought, we are required to **send payment to you within 30 calendar days** after we receive your appeal request.

2014 Evidence of Coverage for Humana Gold Plus H0103-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

- **If our answer is no to part or all of what you requested,** we will send you a written statement that explains why we said no and how to appeal our decision.

**Step 3: If we say no to your appeal, you decide if you want to continue with the appeals process and make another appeal**.

- If we say no to your appeal, you then choose whether to accept this decision or continue by making another appeal.
- If you decide to make another appeal, it means your appeal is going on to Level 2 of the appeals process (see below).

| Section 6.6 | Step-by-step: How to make a Level 2 Appeal |
|---|---|

If we say no to your appeal, you then choose whether to accept this decision or continue by making another appeal. If you decide to go on to a Level 2 Appeal, the **Independent Review Organization** reviews the decision we made when we said no to your first appeal. This organization decides whether the decision we made should be changed.

| Legal Terms | The formal name for the "Independent Review Organization" is the **"Independent Review Entity."** It is sometimes called the **"IRE."** |
|---|---|

**Step 1: To make a Level 2 Appeal, you (or your representative or your doctor or other prescriber) must contact the Independent Review Organization and ask for a review of your case.**

- If we say no to your Level 1 Appeal, the written notice we send you will include **instructions on how to make a Level 2 Appeal** with the Independent Review Organization. These instructions will tell who can make this Level 2 Appeal, what deadlines you must follow, and how to reach the review organization.
- When you make an appeal to the Independent Review Organization, we will send the information we have about your appeal to this organization. This information is called your "case file." **You have the right to ask us for a copy of your case file.** We are allowed to charge you a fee for copying and sending this information to you.
- You have a right to give the Independent Review Organization additional information to support your appeal.

**Step 2: The Independent Review Organization does a review of your appeal and gives you an answer.**

- **The Independent Review Organization is an independent organization that is hired by Medicare.** This organization is not connected with us and it is not a government agency. This organization is a company chosen by Medicare to review our decisions about your Part D benefits with us.
- Reviewers at the Independent Review Organization will take a careful look at all of the information related to your appeal. The organization will tell you its decision in writing and explain the reasons for it.

Deadlines for "**fast" appeal** at Level 2

- If your health requires it, ask the Independent Review Organization for a "fast appeal."
- If the review organization agrees to give you a "fast appeal," the review organization must give you an answer to your Level 2 Appeal **within 72 hours** after it receives your appeal request.
- **If the Independent Review Organization says yes to part or all of what you requested,** we must provide the drug coverage that was approved by the review organization **within 24 hours** after we receive the decision from the review organization.

Case 1:21-cv-01083-LPS   Document 35   Filed 12/13/21   Page 456 of 547 PageID #: 5065
Case 2:19-cv-08926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 179 of 225   Page ID #:420

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

Deadlines for "**standard" appeal** at Level 2

- If you have a standard appeal at Level 2, the review organization must give you an answer to your Level 2 Appeal **within 7 calendar days** after it receives your appeal.
- **If the Independent Review Organization says yes to part or all of what you requested –**
  - If the Independent Review Organization approves a request for coverage, we must **provide the drug coverage** that was approved by the review organization **within 72 hours** after we receive the decision from the review organization.
  - If the Independent Review Organization approves a request to pay you back for a drug you already bought, we are required to **send payment to you within 30 calendar days** after we receive the decision from the review organization.

**What if the review organization says no to your appeal?**

If this organization says no to your appeal, it means the organization agrees with our decision not to approve your request. (This is called "upholding the decision." It is also called "turning down your appeal.")

To continue and make another appeal at Level 3, the dollar value of the drug coverage you are requesting must meet a minimum amount. If the dollar value of the coverage you are requesting is too low, you cannot make another appeal and the decision at Level 2 is final. The notice you get from the Independent Review Organization will tell you the dollar value that must be in dispute to continue with the appeals process.

**Step 3:** **If the dollar value of the coverage you are requesting meets the requirement, you choose whether you want to take your appeal further.**

- There are three additional levels in the appeals process after Level 2 (for a total of five levels of appeal).
- If your Level 2 Appeal is turned down and you meet the requirements to continue with the appeals process, you must decide whether you want to go on to Level 3 and make a third appeal. If you decide to make a third appeal, the details on how to do this are in the written notice you got after your second appeal.
- The Level 3 Appeal is handled by an administrative law judge. Section 9 in this chapter tells more about Levels 3, 4, and 5 of the appeals process.

---

# SECTION 7 How to ask us to cover a longer inpatient hospital stay if you think the doctor is discharging you too soon

When you are admitted to a hospital, you have the right to get all of your covered hospital services that are necessary to diagnose and treat your illness or injury. For more information about our coverage for your hospital care, including any limitations on this coverage, see Chapter 4 of this booklet: Medical Benefits Chart (what is covered and what you pay).

During your hospital stay, your doctor and the hospital staff will be working with you to prepare for the day when you will leave the hospital. They will also help arrange for care you may need after you leave.

- The day you leave the hospital is called your **"discharge date."** Our plan's coverage of your hospital stay ends on this date.
- When your discharge date has been decided, your doctor or the hospital staff will let you know.
- If you think you are being asked to leave the hospital too soon, you can ask for a longer hospital stay and your request will be considered. This section tells you how to ask.

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

---

| Section 7.1 | During your inpatient hospital stay, you will get a written notice from Medicare that tells about your rights |
|---|---|

During your hospital stay, you will be given a written notice called An Important Message from Medicare about Your Rights. Everyone with Medicare gets a copy of this notice whenever they are admitted to a hospital. Someone at the hospital (for example, a caseworker or nurse) must give it to you within two days after you are admitted. If you do not get the notice, ask any hospital employee for it. If you need help, please call Customer Care (phone numbers are printed on the back cover of this booklet). You can also call 1-800-MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week. TTY users should call 1-877-486-2048.

1. **Read this notice carefully and ask questions if you don't understand it.** It tells you about your rights as a hospital patient, including:
   - Your right to receive Medicare-covered services during and after your hospital stay, as ordered by your doctor. This includes the right to know what these services are, who will pay for them, and where you can get them.
   - Your right to be involved in any decisions about your hospital stay, and know who will pay for it.
   - Where to report any concerns you have about quality of your hospital care.
   - Your right to appeal your discharge decision if you think you are being discharged from the hospital too soon.

| Legal Terms | The written notice from Medicare tells you how you can **"request an immediate review."** Requesting an immediate review is a formal, legal way to ask for a delay in your discharge date so that we will cover your hospital care for a longer time. (Section 7.2 below tells you how you can request an immediate review.) |
|---|---|

2. **You must sign the written notice to show that you received it and understand your rights.**
   - You or someone who is acting on your behalf must sign the notice. (Section 4 of this chapter tells how you can give written permission to someone else to act as your representative.)
   - Signing the notice shows <u>only</u> that you have received the information about your rights. The notice does not give your discharge date (your doctor or hospital staff will tell you your discharge date). Signing the notice **does <u>not</u> mean** you are agreeing on a discharge date.

3. **Keep your copy** of the signed notice so you will have the information about making an appeal (or reporting a concern about quality of care) handy if you need it.
   - If you sign the notice more than two days before the day you leave the hospital, you will get another copy before you are scheduled to be discharged.
   - To look at a copy of this notice in advance, you can call Customer Care (phone numbers are printed on the back cover of this booklet) or 1-800 MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week. TTY users should call 1-877-486-2048. You can also see it online at http://www.cms.gov/BNI/12_HospitalDischargeAppealNotices.asp.

---

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 458 of 547 PageID #: 5067
Case 2:19-cv-06928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 181 of 225   Page ID
#:4422

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

| Section 7.2 | Step-by-step: How to make a Level 1 Appeal to change your hospital discharge date |
|---|---|

If you want to ask for your inpatient hospital services to be covered by us for a longer time, you will need to use the appeals process to make this request. Before you start, understand what you need to do and what the deadlines are.

- **Follow the process.** Each step in the first two levels of the appeals process is explained below.
- **Meet the deadlines.** The deadlines are important. Be sure that you understand and follow the deadlines that apply to things you must do.
- **Ask for help if you need it.** If you have questions or need help at any time, please call Customer Care (phone numbers are printed on the back cover of this booklet). Or call your State Health Insurance Assistance Program, a government organization that provides personalized assistance (see Section 2 of this chapter).

**During a Level 1 Appeal, the Quality Improvement Organization reviews your appeal.** It checks to see if your planned discharge date is medically appropriate for you.

<u>**Step 1:**</u> **Contact the Quality Improvement Organization in your state and ask for a "fast review" of your hospital discharge. You must act quickly.**

| Legal Terms | A "fast review" is also called an **"immediate review."** |
|---|---|

What is the Quality Improvement Organization?
- This organization is a group of doctors and other health care professionals who are paid by the federal government. These experts are not part of our plan. This organization is paid by Medicare to check on and help improve the quality of care for people with Medicare. This includes reviewing hospital discharge dates for people with Medicare.

How can you contact this organization?
- The written notice you received (An Important Message from Medicare About Your Rights) tells you how to reach this organization. (Or find the name, address, and phone number of the Quality Improvement Organization for your state in Chapter 2, Section 4, of this booklet.)

Act quickly:
- To make your appeal, you must contact the Quality Improvement Organization <u>before</u> you leave the hospital and **no later than your planned discharge date.** (Your "planned discharge date" is the date that has been set for you to leave the hospital.)
  - If you meet this deadline, you are allowed to stay in the hospital <u>after</u> your discharge date <u>without paying for it</u> while you wait to get the decision on your appeal from the Quality Improvement Organization.
  - If you do <u>not</u> meet this deadline, and you decide to stay in the hospital after your planned discharge date, <u>you may have to pay all of the costs</u> for hospital care you receive after your planned discharge date.

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 459 of 547 PageID #: 5068
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 182 of 225   Page ID
#:4422

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

- If you miss the deadline for contacting the Quality Improvement Organization about your appeal, you can make your appeal directly to our plan instead. For details about this other way to make your appeal, see Section 7.4.

<u>Ask for a "fast review":</u>
- You must ask the Quality Improvement Organization for a **"fast review"** of your discharge. Asking for a "fast review" means you are asking for the organization to use the "fast" deadlines for an appeal instead of using the standard deadlines.

| Legal Terms | A **"fast review"** is also called an **"immediate review"** or an **"expedited review."** |
| --- | --- |

**Step 2:** **The Quality Improvement Organization conducts an independent review of your case.**

<u>What happens during this review?</u>
- Health professionals at the Quality Improvement Organization (we will call them "the reviewers" for short) will ask you (or your representative) why you believe coverage for the services should continue. You don't have to prepare anything in writing, but you may do so if you wish.
- The reviewers will also look at your medical information, talk with your doctor, and review information that the hospital and we have given to them.
- By noon of the day after the reviewers informed our plan of your appeal, you will also get a written notice that gives your planned discharge date and explains in detail the reasons why your doctor, the hospital, and we think it is right (medically appropriate) for you to be discharged on that date.

| Legal Terms | This written explanation is called the **"Detailed Notice of Discharge."** You can get a sample of this notice by calling Customer Care (phone numbers are printed on the back cover of this booklet) or 1-800-MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week. (TTY users should call 1-877-486-2048.) Or you can see a sample notice online at http://www.cms.hhs.gov/BNI/ |
| --- | --- |

**Step 3:** **Within one full day after it has all the needed information, the Quality Improvement Organization will give you its answer to your appeal.**

<u>What happens if the answer is yes?</u>
- If the review organization says <u>yes</u> to your appeal, **we must keep providing your covered inpatient hospital services for as long as these services are medically necessary.**
- You will have to keep paying your share of the costs (such as deductibles or copayments, if these apply). In addition, there may be limitations on your covered hospital services. (See Chapter 4 of this booklet).

<u>What happens if the answer is no?</u>
- If the review organization says <u>no</u> to your appeal, they are saying that your planned discharge date is medically appropriate. If this happens, **our coverage for your inpatient hospital services will end** at noon on the day <u>after</u> the Quality Improvement Organization gives you its answer to your appeal.
- If the review organization says <u>no</u> to your appeal and you decide to stay in the hospital, then **you may have to pay the full cost** of hospital care you receive after noon on the day after the Quality Improvement Organization gives you its answer to your appeal.

Case 1:31-cv-01983-LPS   Document 35   Filed 12/13/21   Page 460 of 547 PageID #: 5069
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 183 of 225   Page ID
#:1424

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

**Step 4:** **If the answer to your Level 1 Appeal is no, you decide if you want to make another appeal.**
- If the Quality Improvement Organization has turned down your appeal, <u>and</u> you stay in the hospital after your planned discharge date, then you can make another appeal. Making another appeal means you are going on to "Level 2" of the appeals process.

| Section 7.3 | Step-by-step: How to make a Level 2 Appeal to change your hospital discharge date |
|---|---|

If the Quality Improvement Organization has turned down your appeal, <u>and</u> you stay in the hospital after your planned discharge date, then you can make a Level 2 Appeal. During a Level 2 Appeal, you ask the Quality Improvement Organization to take another look at the decision they made on your first appeal. If the Quality Improvement Organization turns down your Level 2 Appeal, you may have to pay the full cost for your stay after your planned discharge date.

Here are the steps for Level 2 of the appeal process:

**Step 1:** **You contact the Quality Improvement Organization again and ask for another review.**
- You must ask for this review **within 60 calendar days** after the day when the Quality Improvement Organization said <u>no</u> to your Level 1 Appeal. You can ask for this review only if you stayed in the hospital after the date that your coverage for the care ended.

**Step 2:** **The Quality Improvement Organization does a second review of your situation.**
- Reviewers at the Quality Improvement Organization will take another careful look at all of the information related to your appeal.

**Step 3:** **Within 14 calendar days, the Quality Improvement Organization reviewers will decide on your appeal and tell you their decision.**

If the review organization says yes:
- **We must reimburse you** for our share of the costs of hospital care you have received since noon on the day after the date your first appeal was turned down by the Quality Improvement Organization. **We must continue providing coverage for your inpatient hospital care for as long as it is medically necessary.**
- You must continue to pay your share of the costs and coverage limitations may apply.

If the review organization says no:
- It means they agree with the decision they made on your Level 1 Appeal and will not change it. This is called "upholding the decision."
- The notice you get will tell you in writing what you can do if you wish to continue with the review process. It will give you the details about how to go on to the next level of appeal, which is handled by a judge.

**Step 4:** **If the answer is no, you will need to decide whether you want to take your appeal further by going on to Level 3.**
- There are three additional levels in the appeals process after Level 2 (for a total of five levels of appeal). If the review organization turns down your Level 2 Appeal, you can choose whether to accept that decision or whether to go on to Level 3 and make another appeal. At Level 3, your appeal is reviewed by a judge.
- Section 9 in this chapter tells more about Levels 3, 4, and 5 of the appeals process.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

---

| Section 7.4 | What if you miss the deadline for making your Level 1 Appeal? |
|---|---|

**You can appeal to us instead**

As explained above in Section 7.2, you must act quickly to contact the Quality Improvement Organization to start your first appeal of your hospital discharge. ("Quickly" means before you leave the hospital and no later than your planned discharge date.) If you miss the deadline for contacting this organization, there is another way to make your appeal.

If you use this other way of making your appeal, the first two levels of appeal are different.

**Step-by-Step: How to make a Level 1 Alternate Appeal**

If you miss the deadline for contacting the Quality Improvement Organization, you can make an appeal to us, asking for a "fast review." A fast review is an appeal that uses the fast deadlines instead of the standard deadlines.

| Legal Terms | A "fast" review (or "fast appeal") is also called an **"expedited appeal"**. |
|---|---|

<u>**Step 1:**</u> **Contact us and ask for a "fast review."**
- For details on how to contact us, go to Chapter 2, Section 1 and look for the section called, How to contact us when you are making an appeal about your medical care.
- **Be sure to ask for a "fast review."** This means you are asking us to give you an answer using the "fast" deadlines rather than the "standard" deadlines.

<u>**Step 2:**</u> **We do a "fast" review of your planned discharge date, checking to see if it was medically appropriate.**
- During this review, we take a look at all of the information about your hospital stay. We check to see if your planned discharge date was medically appropriate. We will check to see if the decision about when you should leave the hospital was fair and followed all the rules.
- In this situation, we will use the "fast" deadlines rather than the standard deadlines for giving you the answer to this review.

<u>**Step 3:**</u> **We give you our decision within 72 hours after you ask for a "fast review" ("fast appeal").**
- **If we say yes to your fast appeal,** it means we have agreed with you that you still need to be in the hospital after the discharge date, and will keep providing your covered inpatient hospital services for as long as it is medically necessary. It also means that we have agreed to reimburse you for our share of the costs of care you have received since the date when we said your coverage would end. (You must pay your share of the costs and there may be coverage limitations that apply.)
- **If we say no to your fast appeal,** we are saying that your planned discharge date was medically appropriate. Our coverage for your inpatient hospital services ends as of the day we said coverage would end.
  - If you stayed in the hospital <u>after</u> your planned discharge date, then **you may have to pay the full cost** of hospital care you received after the planned discharge date.

---

Case 1:31-cv-01983-LPS Document 35 Filed 12/13/21 Page 462 of 547 PageID #: 5071
Case 2:13-cv-08928-DSF-MRW Document 60-1 Filed 04/24/20 Page 185 of 225 Page ID #3426

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

**Step 4: If we say no to your fast appeal, your case will automatically be sent on to the next level of the appeals process.**

- To make sure we were following all the rules when we said no to your fast appeal, **we are required to send your appeal to the "Independent Review Organization."** When we do this, it means that you are automatically going on to Level 2 of the appeals process.

**Step-by-Step: How to make a Level 2 Alternate Appeal**

If we say no to your Level 1 Appeal, your case will automatically be sent on to the next level of the appeals process. During the Level 2 Appeal, the **Independent Review Organization** reviews the decision we made when we said no to your "fast appeal." This organization decides whether the decision we made should be changed.

| Legal Terms | The formal name for the **"Independent Review Organization"** is the "Independent Review Entity." It is sometimes called the **"IRE."** |
|---|---|

**Step 1: We will automatically forward your case to the Independent Review Organization.**

- We are required to send the information for your Level 2 Appeal to the Independent Review Organization within 24 hours of when we tell you that we are saying no to your first appeal. (If you think we are not meeting this deadline or other deadlines, you can make a complaint. The complaint process is different from the appeal process. Section 10 of this chapter tells how to make a complaint.)

**Step 2: The Independent Review Organization does a "fast review" of your appeal. The reviewers give you an answer within 72 hours.**

- **The Independent Review Organization is an independent organization that is hired by Medicare.** This organization is not connected with our plan and it is not a government agency. This organization is a company chosen by Medicare to handle the job of being the Independent Review Organization. Medicare oversees its work.
- Reviewers at the Independent Review Organization will take a careful look at all of the information related to your appeal of your hospital discharge.
- **If this organization says yes to your appeal,** then we must reimburse you (pay you back) for our share of the costs of hospital care you have received since the date of your planned discharge. We must also continue the plan's coverage of your inpatient hospital services for as long as it is medically necessary. You must continue to pay your share of the costs. If there are coverage limitations, these could limit how much we would reimburse or how long we would continue to cover your services.
- **If this organization says no to your appeal,** it means they agree with us that your planned hospital discharge date was medically appropriate.
  - The notice you get from the Independent Review Organization will tell you in writing what you can do if you wish to continue with the review process. It will give you the details about how to go on to a Level 3 Appeal, which is handled by a judge.

**Step 3: If the Independent Review Organization turns down your appeal, you choose whether you want to take your appeal further.**

- There are three additional levels in the appeals process after Level 2 (for a total of five levels of appeal). If reviewers say no to your Level 2 Appeal, you decide whether to accept their decision or go on to Level 3 and make a third appeal.
- Section 9 in this chapter tells more about Levels 3, 4, and 5 of the appeals process.

Case 1:21-cv-01983-JRS   Document 35   Filed 12/13/21   Page 463 of 547 PageID #: 5072
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 186 of 225   Page ID
#:4427
2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

| SECTION 8 | How to ask us to keep covering certain medical services if you think your coverage is ending too soon |
|---|---|

| Section 8.1 | This section is about three services <u>only</u>: Home health care, skilled nursing facility care, and Comprehensive Outpatient Rehabilitation Facility (CORF) services |
|---|---|

This section is about the following types of care <u>only</u>:

- **Home health care services** you are getting.
- **Skilled nursing care** you are getting as a patient in a skilled nursing facility. (To learn about requirements for being considered a "skilled nursing facility," see Chapter 12, Definitions of important words.)
- **Rehabilitation care** you are getting as an outpatient at a Medicare-approved Comprehensive Outpatient Rehabilitation Facility (CORF). Usually, this means you are getting treatment for an illness or accident, or you are recovering from a major operation. (For more information about this type of facility, see Chapter 12, Definitions of important words.)

When you are getting any of these types of care, you have the right to keep getting your covered services for that type of care for as long as the care is needed to diagnose and treat your illness or injury. For more information on your covered services, including your share of the cost and any limitations to coverage that may apply, see Chapter 4 of this booklet: Medical Benefits Chart (what is covered and what you pay).

When we decide it is time to stop covering any of the three types of care for you, we are required to tell you in advance. When your coverage for that care ends, <u>we will stop paying our share of the cost for your care</u>.

If you think we are ending the coverage of your care too soon, **you can appeal our decision.** This section tells you how to ask for an appeal.

| Section 8.2 | We will tell you in advance when your coverage will be ending |
|---|---|

1. **You receive a notice in writing.** At least two days before our plan is going to stop covering your care, the agency or facility that is providing your care will give you a notice.
   - The written notice tells you the date when we will stop covering the care for you.

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 464 of 547 PageID #: 5073
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 187 of 225   Page ID #:1428

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

- The written notice also tells what you can do if you want to ask our plan to change this decision about when to end your care, and keep covering it for a longer period of time.

| Legal Terms | In telling you what you can do, the written notice is telling how you can request a **"fast-track appeal."** Requesting a fast-track appeal is a formal, legal way to request a change to our coverage decision about when to stop your care. (Section 8.3 below tells how you can request a fast-track appeal.) |
|---|---|

| Legal Terms | The written notice is called the **"Notice of Medicare Non-Coverage."** To get a sample copy, call Customer Care (phone numbers are printed on the back cover of this booklet) or 1-800-MEDICARE (1-800-633-4227, 24 hours a day, 7 days a week. TTY users should call 1-877-486-2048.). Or see a copy online at http://www.cms.hhs.gov/BNI/ |
|---|---|

2. **You must sign the written notice to show that you received it.**
   - You or someone who is acting on your behalf must sign the notice. (Section 4 tells how you can give written permission to someone else to act as your representative.)
   - Signing the notice shows only that you have received the information about when your coverage will stop. **Signing it does not mean you agree** with the plan that it's time to stop getting the care.

## Section 8.3    Step-by-step: How to make a Level 1 Appeal to have our plan cover your care for a longer time

If you want to ask us to cover your care for a longer period of time, you will need to use the appeals process to make this request. Before you start, understand what you need to do and what the deadlines are.

- **Follow the process.** Each step in the first two levels of the appeals process is explained below.
- **Meet the deadlines.** The deadlines are important. Be sure that you understand and follow the deadlines that apply to things you must do. There are also deadlines our plan must follow. (If you think we are not meeting our deadlines, you can file a complaint. Section 10 of this chapter tells you how to file a complaint.)
- **Ask for help if you need it.** If you have questions or need help at any time, please call Customer Care (phone numbers are printed on the back cover of this booklet). Or call your State Health Insurance Assistance Program, a government organization that provides personalized assistance (see Section 2 of this chapter).

**During a Level 1 Appeal, the Quality Improvement Organization reviews your appeal and decides whether to change the decision made by our plan.**

**Step 1: Make your Level 1 Appeal: contact the Quality Improvement Organization in your state and ask for a review. You must act quickly.**

What is the Quality Improvement Organization?
- This organization is a group of doctors and other health care experts who are paid by the federal government. These experts are not part of our plan. They check on the quality of care received by people with Medicare and review plan decisions about when it's time to stop covering certain kinds of medical care.

How can you contact this organization?

Case 1:21-cv-01983-LPS   Document 35   Filed 12/13/21   Page 465 of 547 PageID #: 5074
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 188 of 225   Page ID
#:1429

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

---

- The written notice you received tells you how to reach this organization. (Or find the name, address, and phone number of the Quality Improvement Organization for your state in "Exhibit A" in the back of this booklet.)

What should you ask for?
- Ask this organization to do an independent review of whether it is medically appropriate for us to end coverage for your medical services.

Your deadline for contacting this organization.
- You must contact the Quality Improvement Organization to start your appeal <u>no later than noon of the day after you receive the written notice telling you when we will stop covering your care.</u>
- If you miss the deadline for contacting the Quality Improvement Organization about your appeal, you can make your appeal directly to us instead. For details about this other way to make your appeal, see Section 8.5.

**Step 2: The Quality Improvement Organization conducts an independent review of your case.**
What happens during this review?
- Health professionals at the Quality Improvement Organization (we will call them "the reviewers" for short) will ask you (or your representative) why you believe coverage for the services should continue. You don't have to prepare anything in writing, but you may do so if you wish.
- The review organization will also look at your medical information, talk with your doctor, and review information that our plan has given to them.
- By the end of the day the reviewers informed us of your appeal, and you will also get a written notice from us that explains in detail our reasons for ending our coverage for your services.

| **Legal Terms** | This notice is called the **"Detailed Explanation of Non-Coverage."** |
|---|---|

**Step 3: Within one full day after they have all the information they need, the reviewers will tell you their decision.**
<u>What happens if the reviewers say yes to your appeal?</u>
- If the reviewers say <u>yes</u> to your appeal, then **we must keep providing your covered services for as long as it is medically necessary.**
- You will have to keep paying your share of the costs (such as deductibles or copayments, if these apply). In addition, there may be limitations on your covered services (see Chapter 4 of this booklet).

<u>What happens if the reviewers say no to your appeal?</u>
- If the reviewers say <u>no</u> to your appeal, then **your coverage will end on the date we have told you.** We will stop paying its share of the costs of this care.
- If you decide to keep getting the home health care, or skilled nursing facility care, or Comprehensive Outpatient Rehabilitation Facility (CORF) services <u>after</u> this date when your coverage ends, then **you will have to pay the full cost** of this care yourself.

**Step 4: If the answer to your Level 1 Appeal is no, you decide if you want to make another appeal.**
- This first appeal you make is "Level 1" of the appeals process. If reviewers say <u>no</u> to your Level 1 Appeal – <u>and</u> you choose to continue getting care after your coverage for the care has ended – then you can make another appeal.
- Making another appeal means you are going on to "Level 2" of the appeals process.

---

Case 1:21-cv-01983-JRS   Document 35   Filed 12/13/21   Page 466 of 547 PageID #: 5075
Case 2:13-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 189 of 225   Page ID
#:3430

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

| Section 8.4 | Step-by-step: How to make a Level 2 Appeal to have our plan cover your care for a longer time |
|---|---|

If the Quality Improvement Organization has turned down your appeal <u>and</u> you choose to continue getting care after your coverage for the care has ended, then you can make a Level 2 Appeal. During a Level 2 Appeal, you ask the Quality Improvement Organization to take another look at the decision they made on your first appeal. If the Quality Improvement Organization turns down your Level 2 Appeal, you may have to pay the full cost for your home health care, or skilled nursing facility care, or Comprehensive Outpatient Rehabilitation Facility (CORF) services <u>after</u> the date when we said your coverage would end.

Here are the steps for Level 2 of the appeal process:

<u>**Step 1:**</u> **You contact the Quality Improvement Organization again and ask for another review.**
- You must ask for this review **within 60 days** after the day when the Quality Improvement Organization said <u>no</u> to your Level 1 Appeal. You can ask for this review only if you continued getting care after the date that your coverage for the care ended.

<u>**Step 2:**</u> **The Quality Improvement Organization does a second review of your situation.**
- Reviewers at the Quality Improvement Organization will take another careful look at all of the information related to your appeal.

<u>**Step 3:**</u> **Within 14 days, the Quality Improvement Organization reviewers will decide on your appeal and tell you their decision.**

What happens if the review organization says yes to your appeal?
- **We must reimburse you** for our share of the costs of care you have received since the date when we said your coverage would end. **We must continue providing coverage** for the care for as long as it is medically necessary.
- You must continue to pay your share of the costs and there may be coverage limitations that apply.

What happens if the review organization says no?
- It means they agree with the decision we made to your Level 1 Appeal and will not change it.
- The notice you get will tell you in writing what you can do if you wish to continue with the review process. It will give you the details about how to go on to the next level of appeal, which is handled by a judge.

<u>**Step 4:**</u> **If the answer is no, you will need to decide whether you want to take your appeal further.**
- There are three additional levels of appeal after Level 2, for a total of five levels of appeal. If reviewers turn down your Level 2 Appeal, you can choose whether to accept that decision or to go on to Level 3 and make another appeal. At Level 3, your appeal is reviewed by a judge.
- Section 9 in this chapter tells more about Levels 3, 4, and 5 of the appeals process.

| Section 8.5 | What if you miss the deadline for making your Level 1 Appeal? |
|---|---|

**You can appeal to us instead**
As explained above in Section 8.3, you must act quickly to contact the Quality Improvement Organization to start your first appeal (within a day or two, at the most). If you miss the deadline for contacting this organization, there is another way to make your appeal. If you use this other way of making your appeal, the first two levels of appeal are different.

Case 1:21-cv-01983-LRS   Document 35   Filed 12/13/21   Page 467 of 547 PageID #: 5076
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 190 of 228   Page ID #:3431

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

**Step-by-Step: How to make a Level 1 <u>Alternate</u> Appeal**

If you miss the deadline for contacting the Quality Improvement Organization, you can make an appeal to us, asking for a "fast review." A fast review is an appeal that uses the fast deadlines instead of the standard deadlines. Here are the steps for a Level 1 Alternate Appeal:

| Legal Terms | A "fast" review (or "fast appeal") is also called an **"expedited appeal".** |
|---|---|

**Step 1: Contact us and ask for a "fast review."**
- For details on how to contact us, go to Chapter 2, Section 1 and look for the section called, How to contact us when you are making an appeal about your medical care.
- **Be sure to ask for a "fast review."** This means you are asking us to give you an answer using the "fast" deadlines rather than the "standard" deadlines.

**Step 2: We do a "fast" review of the decision we made about when to end coverage for your services.**
- During this review, we take another look at all of the information about your case. We check to see if we were following all the rules when we set the date for ending the plan's coverage for services you were receiving.
- We will use the "fast" deadlines rather than the standard deadlines for giving you the answer to this review. (Usually, if you make an appeal to our plan and ask for a "fast review," we are allowed to decide whether to agree to your request and give you a "fast review." But in this situation, the rules require us to give you a fast response if you ask for it.)

**Step 3: We give you our decision within 72 hours after you ask for a "fast review" ("fast appeal").**
- **If we say yes to your fast appeal,** it means we have agreed with you that you need services longer, and will keep providing your covered services for as long as it is medically necessary. It also means that we have agreed to reimburse you for our share of the costs of care you have received since the date when we said your coverage would end. (You must pay your share of the costs and there may be coverage limitations that apply.)
- **If we say no to your fast appeal,** then your coverage will end on the date we told you and we will not pay any share of the costs after this date. We will stop paying its share of the costs of this care.
- If you continued to get home health care, or skilled nursing facility care, or Comprehensive Outpatient Rehabilitation Facility (CORF) services <u>after</u> the date when we said your coverage would end, then **you will have to pay the full cost** of this care yourself.

**Step 4: If we say <u>no</u> to your fast appeal, your case will <u>automatically</u> go on to the next level of the appeals process.**
- To make sure we were following all the rules when we said no to your fast appeal, **we are required to send your appeal to the "Independent Review Organization."** When we do this, it means that you are <u>automatically</u> going on to Level 2 of the appeals process.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

### Step-by-Step: How to make a Level 2 Alternate Appeal

If we say no to your Level 1 Appeal, your case will automatically be sent on to the next level of the appeals process. During the Level 2 Appeal, the **Independent Review Organization** reviews the decision we made when we said no to your "fast appeal." This organization decides whether the decision we made should be changed.

| Legal Terms | The formal name for the "Independent Review Organization" is the **"Independent Review Entity."** It is sometimes called the **"IRE."** |

### Step 1: We will automatically forward your case to the Independent Review Organization.
- We are required to send the information for your Level 2 Appeal to the Independent Review Organization within 24 hours of when we tell you that we are saying no to your first appeal. (If you think we are not meeting this deadline or other deadlines, you can make a complaint. The complaint process is different from the appeal process. Section 10 of this chapter tells how to make a complaint.)

### Step 2: The Independent Review Organization does a "fast review" of your appeal. The reviewers give you an answer within 72 hours.
- **The Independent Review Organization is an independent organization that is hired by Medicare.** This organization is not connected with our plan and it is not a government agency. This organization is a company chosen by Medicare to handle the job of being the Independent Review Organization. Medicare oversees its work.
- Reviewers at the Independent Review Organization will take a careful look at all of the information related to your appeal.
- **If this organization says yes to your appeal,** then we must reimburse you (pay you back) for our share of the costs of care you have received since the date when we said your coverage would end. We must also continue to cover the care for as long as it is medically necessary. You must continue to pay your share of the costs. If there are coverage limitations, these could limit how much we would reimburse or how long we would continue to cover your services.
- **If this organization says no to your appeal,** it means they agree with the decision our plan made to your first appeal and will not change it.
    - The notice you get from the Independent Review Organization will tell you in writing what you can do if you wish to continue with the review process. It will give you the details about how to go on to a Level 3 Appeal.

### Step 3: If the Independent Review Organization turns down your appeal, you choose whether you want to take your appeal further.
- There are three additional levels of appeal after Level 2, for a total of five levels of appeal. If reviewers say no to your Level 2 Appeal, you can choose whether to accept that decision or whether to go on to Level 3 and make another appeal. At Level 3, your appeal is reviewed by a judge.
- Section 9 in this chapter tells more about Levels 3, 4, and 5 of the appeals process.

Case 1:21-cv-01983-JRS   Document 35   Filed 12/13/21   Page 469 of 547 PageID #: 5078
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 192 of 225   Page ID #:1432

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

# SECTION 9     Taking your appeal to Level 3 and beyond

## Section 9.1     Levels of Appeal 3, 4, and 5 for Medical Service Appeals

This section may be appropriate for you if you have made a Level 1 Appeal and a Level 2 Appeal, and both of your appeals have been turned down.

If the dollar value of the item or medical service you have appealed meets certain minimum levels, you may be able to go on to additional levels of appeal. If the dollar value is less than the minimum level, you cannot appeal any further. If the dollar value is high enough, the written response you receive to your Level 2 Appeal will explain who to contact and what to do to ask for a Level 3 Appeal.

For most situations that involve appeals, the last three levels of appeal work in much the same way. Here is who handles the review of your appeal at each of these levels.

| Level 3 Appeal | **A judge who works for the federal government** will review your appeal and give you an answer. This judge is called an "Administrative Law Judge." |
| --- | --- |

- **If the Administrative Law Judge says yes to your appeal, the appeals process <u>may</u> or <u>may not</u> be over –** We will decide whether to appeal this decision to Level 4. Unlike a decision at Level 2 (Independent Review Organization), we have the right to appeal a Level 3 decision that is favorable to you.
  - If we decide <u>not</u> to appeal the decision, we must authorize or provide you with the service within 60 calendar days after receiving the judge's decision.
  - If we decide to appeal the decision, we will send you a copy of the Level 4 Appeal request with any accompanying documents. We may wait for the Level 4 Appeal decision before authorizing or providing the service in dispute.
- **If the Administrative Law Judge says no to your appeal, the appeals process <u>may</u> or <u>may not</u> be over.**
  - If you decide to accept this decision that turns down your appeal, the appeals process is over.
  - If you do not want to accept the decision, you can continue to the next level of the review process. If the administrative law judge says no to your appeal, the notice you get will tell you what to do next if you choose to continue with your appeal.

| Level 4 Appeal | The **Appeals Council** will review your appeal and give you an answer. The Appeals Council works for the federal government. |
| --- | --- |

- **If the answer is yes, or if the Appeals Council denies our request to review a favorable Level 3 Appeal decision, the appeals process <u>may</u> or <u>may not</u> be over –** We will decide whether to appeal this decision to Level 5. Unlike a decision at Level 2 (Independent Review Organization), we have the right to appeal a Level 4 decision that is favorable to you.
  - If we decide <u>not</u> to appeal the decision, we must authorize or provide you with the service within 60 calendar days after receiving the Appeals Council's decision.
  - If we decide to appeal the decision, we will let you know in writing.
- **If the answer is no or if the Appeals Council denies the review request, the appeals process <u>may</u> or <u>may not</u> be over.**
  - If you decide to accept this decision that turns down your appeal, the appeals process is over.
  - If you do not want to accept the decision, you might be able to continue to the next level of the review process. If the Appeals Council says no to your appeal, the notice you get will tell you whether the rules

Case 1:21-cv-01083-LPS Document 35 Filed 12/13/21 Page 470 of 547 PageID #: 5079
Case 2:19-cv-06928-DSF-MRW Document 60-1 Filed 04/24/20 Page 193 of 225 Page ID #:1404

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

allow you to go on to a Level 5 Appeal. If the rules allow you to go on, the written notice will also tell you who to contact and what to do next if you choose to continue with your appeal.

| Level 5 Appeal | A judge at the **Federal District Court** will review your appeal. |

- This is the last step of the administrative appeals process.

## Section 9.2    Levels of Appeal 3, 4, and 5 for Part D Drug Appeals

This section may be appropriate for you if you have made a Level 1 Appeal and a Level 2 Appeal, and both of your appeals have been turned down.

If the value of the drug you have appealed meets a certain dollar amount, you may be able to go on to additional levels of appeal. If the dollar amount is less than the minimum level, you cannot appeal any further. The written response you receive to your Level 2 Appeal will explain who to contact and what to do to ask for a Level 3 Appeal.

For most situations that involve appeals, the last three levels of appeal work in much the same way. Here is who handles the review of your appeal at each of these levels.

| Level 3 Appeal | **A judge who works for the federal government** will review your appeal and give you an answer. This judge is called an "Administrative Law Judge." |

- **If the answer is yes, the appeals process is over.** What you asked for in the appeal has been approved. We must **authorize or provide the drug coverage** that was approved by the Administrative Law Judge **within 72 hours (24 hours for expedited appeals) or make payment no later than 30 calendar days** after we receive the decision.
- **If the answer is no, the appeals process <u>may</u> or <u>may not</u> be over.**
    - If you decide to accept this decision that turns down your appeal, the appeals process is over.
    - If you do not want to accept the decision, you can continue to the next level of the review process. If the administrative law judge says no to your appeal, the notice you get will tell you what to do next if you choose to continue with your appeal.

| Level 4 Appeal | The **Appeals Council** will review your appeal and give you an answer. The Appeals Council works for the federal government. |

- **If the answer is yes, the appeals process is over.** What you asked for in the appeal has been approved. We must **authorize or provide the drug coverage** that was approved by the Appeals Council **within 72 hours (24 hours for expedited appeals) or make payment no later than 30 calendar days** after we receive the decision.
- **If the answer is no, the appeals process <u>may</u> or <u>may not</u> be over.**
    - If you decide to accept this decision that turns down your appeal, the appeals process is over.
    - If you do not want to accept the decision, you might be able to continue to the next level of the review process. If the Appeals Council says no to your appeal or denies your request to review the appeal, the notice you get will tell you whether the rules allow you to go on to a Level 5 Appeal. If the rules allow

Case 1:21-cv-01983-JRS   Document 35   Filed 12/13/21   Page 471 of 547 PageID #: 5080
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 194 of 228   Page ID #:1435

you to go on, the written notice will also tell you who to contact and what to do next if you choose to continue with your appeal.

| **Level 5 Appeal** | A judge at the **Federal District Court** will review your appeal. |
|---|---|

• This is the last step of the appeals process.

## MAKING COMPLAINTS

# SECTION 10    How to make a complaint about quality of care, waiting times, customer service, or other concerns



If your problem is about decisions related to benefits, coverage, or payment, then this section is not for you. Instead, you need to use the process for coverage decisions and appeals. Go to Section 4 of this chapter.

| **Section 10.1** | **What kinds of problems are handled by the complaint process?** |
|---|---|

This section explains how to use the process for making complaints. The complaint process is used for certain types of problems only. This includes problems related to quality of care, waiting times, and the customer service you receive. Here are examples of the kinds of problems handled by the complaint process.

---

**If you have any of these kinds of problems, you can "make a complaint"**

**Quality of your medical care**

• Are you unhappy with the quality of the care you have received (including care in the hospital)?

**Respecting your privacy**

• Do you believe that someone did not respect your right to privacy or shared information about you that you feel should be confidential?

**Disrespect, poor customer service, or other negative behaviors**

• Has someone been rude or disrespectful to you?
• Are you unhappy with how our Customer Care has treated you?
• Do you feel you are being encouraged to leave the plan?

The next page has more examples of possible reasons for making a complaint

---

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

| **Possible complaints** (continued) |
| --- |

**Waiting times**

- Are you having trouble getting an appointment, or waiting too long to get it?
- Have you been kept waiting too long by doctors, pharmacists, or other health professionals? Or by our Customer Care or other staff at the plan?
  - Examples include waiting too long on the phone, in the waiting room, when getting a prescription, or in the exam room.

**Cleanliness**

- Are you unhappy with the cleanliness or condition of a clinic, hospital, or doctor's office?

**Information you get from us**

- Do you believe we have not given you a notice that we are required to give?
- Do you think written information we have given you is hard to understand?

**These types of complaints are all related to the <u>timeliness</u> of our actions related to coverage decisions and appeals**

The process of asking for a coverage decision and making appeals is explained in Sections 4-9 of this chapter. If you are asking for a decision or making an appeal, you use that process, not the complaint process.

However, if you have already asked us for a coverage decision or made an appeal, and you think that we are not responding quickly enough, you can also make a complaint about our slowness. Here are examples:

- If you have asked us to give you a "fast coverage decision" or a "fast appeal", and we have said we will not, you can make a complaint.
- If you believe we are not meeting the deadlines for giving you a coverage decision or an answer to an appeal you have made, you can make a complaint.
- When a coverage decision we made is reviewed and we are told that we must cover or reimburse you for certain medical services or drugs, there are deadlines that apply. If you think we are not meeting these deadlines, you can make a complaint.
- When we do not give you a decision on time, we are required to forward your case to the Independent Review Organization. If we do not do that within the required deadline, you can make a complaint.

| **Section 10.2** | **The formal for "making a complaint" is "filing a grievance"** |
| --- | --- |

| **Legal Terms** | • What this section calls a "**complaint**" is also called a "**grievance.**"<br>• Another term for "**making a complaint**" is "**filing a grievance.**"<br>• Another way to say "**using the process for complaints**" is "**using the process for filing a grievance.**" |
| --- | --- |

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 9: What to do if you have a problem or complaint (coverage decisions, appeals, complaints)

---

| Section 10.3 | Step-by-step: Making a complaint |
|---|---|

**Step 1:** **Contact us promptly – either by phone or in writing.**

- **Usually, calling Customer Care is the first step.** If there is anything else you need to do, Customer Care will let you know. 1-800-457-4708 TTY 711 from 8 a.m. to 8 p.m. seven days a week from Oct. 1 – Feb. 14 and 8 a.m. to 8 p.m. Monday-Friday from Feb. 15 – Sept. 30.
- **If you do not wish to call (or you called and were not satisfied), you can put your complaint in writing and send it to us.** If you put your complaint in writing, we will respond to your complaint in writing.

**Grievance process**
You or your representative may file your concerns in writing or verbally.

**Please follow the grievance process described below:**
When filing a grievance, please provide the following information:

Your name, address, telephone number, and member identification number; you or your authorized representative's signature and the date signed; a summary of the grievance and any previous contact with us; and a description of the action you are requesting. If you or your authorized representative require assistance in preparing and submitting your written grievance, contact Customer Care at the number shown in Chapter 2 of this booklet.

You may request an expedited (fast) grievance if:

- You disagree with our decision to extend the timeframe to make an initial (standard) organization/coverage determination or reconsideration.
- We deny your request for a 72-hour/fast (expedited) organization/coverage determination or reconsiderations/redeterminations.
- We deny your request for a 72-hour/fast (expedited) appeal.

If you mail the request for an expedited grievance, we will provide oral acknowledgement upon receipt. We will make a determination within 24 hours of receipt of your request.

- **Whether you call or write, you should contact Customer Care right away.** The complaint must be made within 60 calendar days after you had the problem you want to complain about.
- **If you are making a complaint because we denied your request for a "fast coverage decision" or a "fast appeal", we will automatically give you a "fast" complaint.** If you have a "fast" complaint, it means we will give you **an answer within 24 hours.**

| **Legal Terms** | What this section calls a "**fast complaint**" is also called an "**expedited grievance.**" |
|---|---|

**Step 2:** **We look into your complaint and give you our answer.**

- **If possible, we will answer you right away.** If you call us with a complaint, we may be able to give you an answer on the same phone call. If your health condition requires us to answer quickly, we will do that.
- **Most complaints are answered in 30 calendar days.** If we need more information and the delay is in your best interest or if you ask for more time, we can take up to 14 more calendar days (44 calendar days total) to answer your complaint.

---

Case 1:21-cv-01083-LPS   Document 35   Filed 12/13/21   Page 474 of 547 PageID #: 5083
Case 2:19-cv-06928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 197 of 225   Page ID
#:1432

- **If we do not agree** with some or all of your complaint or don't take responsibility for the problem you are complaining about, we will let you know. Our response will include our reasons for this answer. We must respond whether we agree with the complaint or not.

| Section 10.4 | You can also make complaints about quality of care to the Quality Improvement Organization |
|---|---|

You can make your complaint about the quality of care you received to us by using the step-by-step process outlined above.

When your complaint is about <u>quality of care,</u> you also have two extra options:

- **You can make your complaint to the Quality Improvement Organization.** If you prefer, you can make your complaint about the quality of care you received directly to this organization (<u>without</u> making the complaint to us).
  - The Quality Improvement Organization is a group of practicing doctors and other health care experts paid by the federal government to check and improve the care given to Medicare patients.
  - To find the name, address, and phone number of the Quality Improvement Organization for your state, look in Chapter 2, Section 4, of this booklet. If you make a complaint to this organization, we will work with them to resolve your complaint.
- **Or you can make your complaint to both at the same time.** If you wish, you can make your complaint about quality of care to us and also to the Quality Improvement Organization.

| Section 10.5 | You can also tell Medicare about your complaint |
|---|---|

You can submit a complaint about Humana Gold Plus H0108-004 (HMO) directly to Medicare. To submit a complaint to Medicare, go to www.medicare.gov/MedicareComplaintForm/home.aspx. Medicare takes your complaints seriously and will use this information to help improve the quality of the Medicare program.

If you have any other feedback or concerns, or if you feel the plan is not addressing your issue, please call 1-800-MEDICARE (1-800-633-4227). TTY/TDD users can call 1-877-486-2048.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 10: Ending your membership in the plan

# Chapter 10. Ending your membership in the plan

**SECTION 1**   **Introduction**

Section 1.1   This chapter focuses on ending your membership in our plan ...........................198

**SECTION 2**   **When can you end your membership in our plan?**

Section 2.1   You can end your membership during the Annual Enrollment Period. .................198

Section 2.2   You can end your membership during the annual Medicare Advantage
Disenrollment Period, but your choices are more limited..................................199

Section 2.3   In certain situations, you can end your membership during a Special
Enrollment Period..............................................................................199

Section 2.4   Where can you get more information about when you can end your
membership?.....................................................................................200

**SECTION 3**   **How do you end your membership in our plan?**

Section 3.1   Usually, you end your membership by enrolling in another plan .......................200

**SECTION 4**   **Until your membership ends, you must keep getting your medical services and
drugs through our plan**

Section 4.1   Until your membership ends, you are still a member of our plan.......................201

**SECTION 5**   **Humana Gold Plus H0108-004 (HMO) must end your membership in the plan in
certain situations**

Section 5.1   When must we end your membership in the plan?........................................202

Section 5.2   We cannot ask you to leave our plan for any reason related to your health ..........202

Section 5.3   You have the right to make a complaint if we end your membership in
our plan ........................................................................................203

Case 1:21-cv-01083-JRS  Document 35  Filed 12/13/21  Page 476 of 547 PageID #: 5085
Case 2:19-cv-06928-DSF-MRW  Document 60-1  Filed 04/24/20  Page 199 of 225  Page ID #:1440

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 10: Ending your membership in the plan

# SECTION 1 Introduction

## Section 1.1 This chapter focuses on ending your membership in our plan

Ending your membership in Humana Gold Plus H0108-004 (HMO) may be **voluntary** (your own choice) or **involuntary** (not your own choice):
- You might leave our plan because you have decided that you <u>want</u> to leave.
  - There are only certain times during the year, or certain situations, when you may voluntarily end your membership in the plan. Section 2 tells you <u>when</u> you can end your membership in the plan.
  - The process for voluntarily ending your membership varies depending on what type of new coverage you are choosing. Section 3 tells you <u>how</u> to end your membership in each situation.
- There are also limited situations where you do not choose to leave, but we are required to end your membership. Section 5 tells you about situations when we must end your membership.

If you are leaving our plan, you must continue to get your medical care and prescription drugs through our plan until your membership ends.

# SECTION 2 When can you end your membership in our plan?

You may end your membership in our plan only during certain times of the year, known as enrollment periods. All members have the opportunity to leave the plan during the Annual Enrollment Period and during the annual Medicare Advantage Disenrollment Period. In certain situations, you may also be eligible to leave the plan at other times of the year.

## Section 2.1 You can end your membership during the Annual Enrollment Period

You can end your membership during the **Annual Enrollment Period** (also known as the "Annual Coordinated Election Period"). This is the time when you should review your health and drug coverage and make a decision about your coverage for the upcoming year.
- **When is the Annual Enrollment Period?** This happens from October 15 to December 7.
- **What type of plan can you switch to during the Annual Enrollment Period?** During this time, you can review your health coverage and your prescription drug coverage. You can choose to keep your current coverage or make changes to your coverage for the upcoming year. If you decide to change to a new plan, you can choose any of the following types of plans:
  - Another Medicare health plan. (You can choose a plan that covers prescription drugs or one that does not cover prescription drugs.)
  - Original Medicare <u>with</u> a separate Medicare prescription drug plan.
  - - or - Original Medicare <u>without</u> a separate Medicare prescription drug plan.
    - > **If you receive "Extra Help" from Medicare to pay for your prescription drugs:** If you switch to Original Medicare and do not enroll in a separate Medicare prescription drug plan, Medicare may enroll you in a drug plan, unless you have opted out of automatic enrollment.

    **Note:** If you disenroll from Medicare prescription drug coverage and go without creditable prescription drug coverage, you may need to pay a late enrollment penalty if you join a Medicare drug plan later. ("Creditable" coverage means the coverage is expected to pay, on average, at least as much as Medicare's

Case 1:31-cv-01983-LPS  Document 35  Filed 12/13/21  Page 477 of 547 PageID #: 5086
Case 2:19-cv-08928-DSF-MRW  Document 60-1  Filed 04/24/20  Page 200 of 225  Page ID
#:1441
2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 10: Ending your membership in the plan

standard prescription drug coverage.) See Chapter 6, Section 10 for more information about the late enrollment penalty.

- **When will your membership end?** Your membership will end when your new plan's coverage begins on January 1.

| Section 2.2 | You can end your membership during the annual Medicare Advantage Disenrollment Period, but your choices are more limited |
|---|---|

You have the opportunity to make one change to your health coverage during the annual **Medicare Advantage Disenrollment Period**.
- **When is the annual Medicare Advantage Disenrollment Period?** This happens every year from January 1 to February 14.
- **What type of plan can you switch to during the annual Medicare Advantage Disenrollment Period?** During this time, you can cancel your Medicare Advantage plan enrollment and switch to Original Medicare. If you choose to switch to Original Medicare during this period, you have until February 14 to join a separate Medicare prescription drug plan to add drug coverage.
- **When will your membership end?** Your membership will end on the first day of the month after we get your request to switch to Original Medicare. If you also choose to enroll in a Medicare prescription drug plan, your membership in the drug plan will begin the first day of the month after the drug plan gets your enrollment request.

| Section 2.3 | In certain situations, you can end your membership during a Special Enrollment Period |
|---|---|

In certain situations, members of Humana Gold Plus H0108-004 (HMO) may be eligible to end their membership at other times of the year. This is known as a **Special Enrollment Period**.
- **Who is eligible for a Special Enrollment Period?** If any of the following situations apply to you, you are eligible to end your membership during a Special Enrollment Period. These are just examples, for the full list you can contact the plan, call Medicare, or visit the Medicare website (http://www.medicare.gov):
  - Usually, when you have moved.
  - If you have Medicaid.
  - If you are eligible for "Extra Help" with paying for your Medicare prescriptions.
  - If we violate our contract with you.
  - If you are getting care in an institution, such as a nursing home or long-term care hospital.
  - If you enroll in the Program of All-inclusive Care for the Elderly (PACE).
- **When are Special Enrollment Periods?** The enrollment periods vary depending on your situation.
- **What can you do?** To find out if you are eligible for a Special Enrollment Period, please call Medicare at 1-800-MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week. TTY users call 1-877-486-2048. If you are eligible to end your membership because of a special situation, you can choose to change both your Medicare health coverage and prescription drug coverage. This means you can choose any of the following types of plans:
  - Another Medicare health plan. (You can choose a plan that covers prescription drugs or one that does not cover prescription drugs.)
  - Original Medicare with a separate Medicare prescription drug plan.
  - - or - Original Medicare without a separate Medicare prescription drug plan.

Case 1:21-cv-01093-LPS Document 35 Filed 12/13/21 Page 478 of 547 PageID #: 5087
Case 2:19-cv-06926-DSF-MRW Document 60-1 Filed 04/24/20 Page 201 of 225 Page ID #:1462

2014 Evidence of Coverage for Humana Gold Plus H0168-004 (HMO)
Chapter 10: Ending your membership in the plan

> **If you receive "Extra Help" from Medicare to pay for your prescription drugs:** If you switch to Original Medicare and do not enroll in a separate Medicare prescription drug plan, Medicare may enroll you in a drug plan, unless you have opted out of automatic enrollment.
> **Note:** If you disenroll from Medicare prescription drug coverage and go without creditable prescription drug coverage, you may need to pay a late enrollment penalty if you join a Medicare drug plan later. ("Creditable" coverage means the coverage is expected to pay, on average, at least as much as Medicare's standard prescription drug coverage.) See Chapter 6, Section 10 for more information about the late enrollment penalty.

- **When will your membership end?** Your membership will usually end on the first day of the month after we receive your request to change your plan.

| Section 2.4 | Where can you get more information about when you can end your membership? |
|---|---|

If you have any questions or would like more information on when you can end your membership:
- You can **call Customer Care** (phone numbers are printed on the back cover of this booklet).
- You can find the information in the **Medicare & You 2014** Handbook.
  - Everyone with Medicare receives a copy of Medicare & You each fall. Those new to Medicare receive it within a month after first signing up.
  - You can also download a copy from the Medicare website (http://www.medicare.gov). Or, you can order a printed copy by calling Medicare at the number below.
- You can contact **Medicare** at 1-800-MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week. TTY users should call 1-877-486-2048.

# SECTION 3     How do you end your membership in our plan?

| Section 3.1 | Usually, you end your membership by enrolling in another plan |
|---|---|

Usually, to end your membership in our plan, you simply enroll in another Medicare plan during one of the enrollment periods (see Section 2 in this chapter for information about the enrollment periods). However, if you want to switch from our plan to Original Medicare <u>without</u> a Medicare prescription drug plan , you must ask to be disenrolled from our plan. There are two ways you can ask to be disenrolled:
- You can make a request in writing to us. Contact Customer Care if you need more information on how to do this (phone numbers are printed on the back cover of this booklet).
- --or-- You can contact Medicare at 1-800-MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week. TTY users should call 1-877-486-2048.
  **Note:** If you disenroll from Medicare prescription drug coverage and go without creditable prescription drug coverage, you may need to pay a late enrollment penalty if you join a Medicare drug plan later. ("Creditable" coverage means the coverage is expected to pay, on average, at least as much as Medicare's standard prescription drug coverage.) See Chapter 6, Section 10 for more information about the late enrollment penalty.

Case 1:21-cv-01983-JRS   Document 35   Filed 12/13/21   Page 479 of 547 PageID #: 5088
Case 2:19-cv-06928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 202 of 225   Page ID
#:1442

The table below explains how you should end your membership in our plan.

| If you would like to switch from our plan to: | This is what you should do: |
|---|---|
| • Another Medicare health plan. | • Enroll in the new Medicare health plan. You will automatically be disenrolled from Humana Gold Plus H0108-004 (HMO) when your new plan's coverage begins. |
| • Original Medicare <u>with</u> a separate Medicare prescription drug plan. | • Enroll in the new Medicare prescription drug plan. You will automatically be disenrolled from Humana Gold Plus H0108-004 (HMO) when your new plan's coverage begins. |
| • Original Medicare <u>without</u> a separate Medicare prescription drug plan.<br>  – **Note:** If you disenroll from a Medicare prescription drug plan and go without creditable prescription drug coverage, you may need to pay a late enrollment penalty if you join a Medicare drug plan later. See Chapter 6, Section 10 for more information about the late enrollment penalty. | • **Send us a written request to disenroll.** Contact Customer Care if you need more information on how to do this (phone numbers are printed on the back cover of this booklet).<br>• You can also contact **Medicare** at 1-800-MEDICARE (1-800-633-4227), 24 hours a day, 7 days a week, and ask to be disenrolled. TTY users should call 1-877-486-2048.<br>• You will be disenrolled from Humana Gold Plus H0108-004 (HMO) when your coverage in Original Medicare begins. |

# SECTION 4    Until your membership ends, you must keep getting your medical services and drugs through our plan

## Section 4.1    Until your membership ends, you are still a member of our plan

If you leave Humana Gold Plus H0108-004 (HMO), it may take time before your membership ends and your new Medicare coverage goes into effect. (See Section 2 for information on when your new coverage begins.) During this time, you must continue to get your medical care and prescription drugs through our plan.
- **You should continue to use our network pharmacies to get your prescriptions filled until your membership in our plan ends.** Usually, your prescription drugs are only covered if they are filled at a network pharmacy, including through our mail-order pharmacy services.
- **If you are hospitalized on the day that your membership ends, your hospital stay will usually be covered by our plan until you are discharged** (even if you are discharged after your new health coverage begins).

Case 1:31-cv-01983-LPS   Document 35   Filed 12/13/21   Page 480 of 547 PageID #: 5089
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 203 of 225   Page ID
#:1444

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 10: Ending your membership in the plan

# SECTION 5 Humana Gold Plus H0108-004 (HMO) must end your membership in the plan in certain situations

## Section 5.1 When must we end your membership in the plan?

**Humana Gold Plus H0108-004 (HMO) must end your membership in the plan if any of the following happen:**
- If you do not stay continuously enrolled in Medicare Part A and Part B.
- If you move out of our service area.
- If you are away from our service area for more than six months.
  - If you move or take a long trip, you need to call Customer Care to find out if the place you are moving or traveling to is in our plan's area. (Phone numbers for Customer Care are printed on the back cover of this booklet.)
- If you become incarcerated (go to prison).
- If you lie about or withhold information about other insurance you have that provides prescription drug coverage.
- If you intentionally give us incorrect information when you are enrolling in our plan and that information affects your eligibility for our plan. (We cannot make you leave our plan for this reason unless we get permission from Medicare first.)
- If you continuously behave in a way that is disruptive and makes it difficult for us to provide medical care for you and other members of our plan. (We cannot make you leave our plan for this reason unless we get permission from Medicare first.)
- If you let someone else use your membership card to get medical care. (We cannot make you leave our plan for this reason unless we get permission from Medicare first.)
  - If we end your membership because of this reason, Medicare may have your case investigated by the Inspector General.
- If you are required to pay the extra Part D amount because of your income and you do not pay it, Medicare <u>will</u> disenroll you from our plan and you will lose prescription drug coverage.

### Where can you get more information?

If you have questions or would like more information on when we can end your membership:
- You can call **Customer Care** for more information (phone numbers are printed on the back cover of this booklet).

## Section 5.2 We <u>cannot</u> ask you to leave our plan for any reason related to your health

Humana Gold Plus H0108-004 (HMO) is not allowed to ask you to leave our plan for any reason related to your health.

### What should you do if this happens?
If you feel that you are being asked to leave our plan because of a health-related reason, you should call Medicare at 1-800-MEDICARE (1-800-633-4227). TTY users should call 1-877-486-2048. You may call 24 hours a day, 7 days a week.

Case 1:21-cv-01083-LPS   Document 35   Filed 12/13/21   Page 481 of 547 PageID #: 5090
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 204 of 225   Page ID #:1445

| Section 5.3 | You have the right to make a complaint if we end your membership in our plan |
|---|---|

If we end your membership in our plan, we must tell you our reasons in writing for ending your membership. We must also explain how you can make a complaint about our decision to end your membership. You can also look in Chapter 9, Section 11 for information about how to make a complaint.

Case 1:21-cv-01093-LPS  Document 35  Filed 12/13/21  Page 482 of 547 PageID #: 5091
Case 2:13-cv-00926-DSF-MRW  Document 60-1  Filed 04/24/20  Page 205 of 225  Page ID
#:1466

# Chapter 11. Legal notices

**SECTION 1**  **Notice about governing law**........................................................................**205**

**SECTION 2**  **Notice about nondiscrimination** ............................................................**205**

**SECTION 3**  **Notice about Medicare Secondary Payer subrogation rights** ........................**205**

**SECTION 4**  **Additional Notice about Subrogation and Third Party Recovery**....................**205**

**SECTION 5**  **Notice of coordination of benefits** ..........................................................**206**

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 483 of 547 PageID #: 5092
Case 2:19-cv-06928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 206 of 225   Page ID #:1447

---

# SECTION 1 Notice about governing law

Many laws apply to this Evidence of Coverage and some additional provisions may apply because they are required by law. This may affect your rights and responsibilities even if the laws are not included or explained in this document. The principal law that applies to this document is Title XVIII of the Social Security Act and the regulations created under the Social Security Act by the Centers for Medicare & Medicaid Services, or CMS. In addition, other federal laws may apply and, under certain circumstances, the laws of the state you live in.

# SECTION 2 Notice about nondiscrimination

We don't discriminate based on a person's race, disability, religion, sex, health, ethnicity, creed, age, or national origin. All organizations that provide Medicare Advantage Plans, like our plan, must obey federal laws against discrimination, including Title VI of the Civil Rights Act of 1964, the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, the Americans with Disabilities Act, all other laws that apply to organizations that get federal funding, and any other laws and rules that apply for any other reason.

# SECTION 3 Notice about Medicare Secondary Payer subrogation rights

We have the right and responsibility to collect for covered Medicare services for which Medicare is not the primary payer. According to CMS regulations at 42 CFR sections 422.108 and 423.462, Humana Gold Plus H0108-004 (HMO), as a Medicare Advantage Organization, will exercise the same rights of recovery that the Secretary exercises under CMS regulations in subparts B through D of part 411 of 42 CFR and the rules established in this section supersede any State laws.

# SECTION 4 Additional Notice about Subrogation and Third Party Recovery

**Subrogation**

If we make any payment to you or on your behalf for covered services, we are entitled to be fully subrogated to any and all rights you have against any person, entity, or insurer that may be responsible for payment of medical expenses and/or benefits related to your injury, illness, or condition.

Once we have made a payment for covered services, we shall have a lien on the proceeds of any judgment, settlement, or other award or recovery you receive, including but not limited to the following:

1. Any award, settlement, benefits, or other amounts paid under any workers' compensation law or award;
2. Any and all payments made directly by or on behalf of a third-party tortfeasor or person, entity, or insurer responsible for indemnifying the third-party tortfeasor;
3. Any arbitration awards, payments, settlements, structured settlements, or other benefits or amounts paid under an uninsured or underinsured motorist coverage policy; or
4. Any other payments designated, earmarked, or otherwise intended to be paid to you as compensation, restitution, or remuneration for your injury, illness, or condition suffered as a result of the negligence or liability of a third party.

Case 1:21-cv-01093-LRS Document 35 Filed 12/13/21 Page 484 of 547 PageID #: 5093
Case 2:19-cv-06928-DSF-MRW Document 60-1 Filed 04/24/20 Page 207 of 225 Page ID #:1448

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 11: Legal notices

You agree to cooperate with us and any of our representatives and to take any actions or steps necessary to secure our lien, including but not limited to:

1. Responding to requests for information about any accidents or injuries;
2. Responding to our requests for information and providing any relevant information that we have requested; and
3. Participating in all phases of any legal action we commence in order to protect our rights, including, but not limited to, participating in discovery, attending depositions, and appearing and testifying at trial.

In addition, you agree not to do anything to prejudice our rights, including, but not limited to, assigning any rights or causes of action that you may have against any person or entity relating to your injury, illness, or condition without our prior express written consent. Your failure to cooperate shall be deemed a breach of your obligations, and we may institute a legal action against you to protect our rights.

**Reimbursement**

We are also entitled to be fully reimbursed for any and all benefit payments we make to you or on your behalf that are the responsibility of any person, organization, or insurer. Our right of reimbursement is separate and apart from our subrogation right, and is limited only by the amount of actual benefits paid under our plan. You must immediately pay to us any amounts you recover by judgment, settlement, award, recovery, or otherwise from any liable third party, his or her insurer, to the extent that we paid out or provided benefits for your injury, illness, or condition during your enrollment in our plan.

**Antisubrogation rules do not apply**

Our subrogation and reimbursement rights shall have first priority, to be paid before any of your other claims are paid. Our subrogation and reimbursement rights will not be affected, reduced, or eliminated by the "made whole" doctrine or any other equitable doctrine.

We are not obligated to pursue subrogation or reimbursement either for our own benefit or on your behalf. Our rights under Medicare law and this Evidence of Coverage shall not be affected, reduced, or eliminated by our failure to intervene in any legal action you commence relating to your injury, illness, or condition.

# SECTION 5     Notice of coordination of benefits

**Why do we need to know if you have other coverage?**

We coordinate benefits in accordance with the Medicare Secondary Payer rules, which allow us to bill, or authorize a provider of services to bill, other insurance carriers, plans, policies, employers, or other entities when the other payer is responsible for payment of services provided to you. We are also authorized to charge or bill you for amounts the other payer has already paid to you for such services. We shall have all the rights accorded to the Medicare Program under the Medicare Secondary Payer rules.

**Who pays first when you have other coverage?**

When you have additional coverage, how we coordinate your coverage depends on your situation. With coordination of benefits, you will often get your care as usual through our plan providers, and the other plan or plans you have will simply help pay for the care you receive. If you have group health coverage, you may be able to maximize the benefits available to you if you use providers who participate in your group plan **and** our plan. In other situations, such as for benefits that are not covered by our plan, you may get your care outside of our plan.

**Employer and employee organization group health plans**

Sometimes, a group health plan must provide health benefits to you before we will provide health benefits to you. This happens if:

- You have coverage under a group health plan (including both employer and employee organization plans), either directly or through your spouse, and
- The employer has twenty (20) or more employees (as determined by Medicare rules), and
- You are not covered by Medicare due to disability or End Stage Renal Disease (ESRD).

If the employer has fewer than twenty (20) employees, generally we will provide your primary health benefits. If you have retiree coverage under a group health plan, either directly or through your spouse, generally we will provide primary health benefits. Special rules apply if you have or develop ESRD.

**Employer and employee organization group health plans for people who are disabled**

If you have coverage under a group health plan, and you have Medicare because you are disabled, generally we will provide your primary health benefits. This happens if:

- You are under age 65, and
- You do not have ESRD, and
- You do not have coverage directly or through your spouse under a large group health plan.

A large group health plan is a health plan offered by an employer with 100 or more employees, or by an employer who is part of a multiple-employer plan where any employer participating in the plan has 100 or more employees. If you have coverage under a large group health plan, either directly or through your spouse, your large group health plan must provide health benefits to you before we will provide health benefits to you. This happens if:

- You do not have ESRD, and
- Are under age 65 and have Medicare based on a disability.

In such cases, we will provide only those benefits not covered by your large employer group plan. Special rules apply if you have or develop ESRD.

**Employer and employee organization group health plans for people with End Stage Renal Disease ("ESRD")**

If you are or become eligible for Medicare because of ESRD and have coverage under an employer or employee organization group health plan, either directly or through your spouse, your group health plan is responsible for providing primary health benefits to you for the first thirty (30) months after you become eligible for Medicare due to your ESRD. We will provide secondary coverage to you during this time, and we will provide primary coverage to you thereafter. If you are already on Medicare because of age or disability when you develop ESRD, we will provide primary coverage.

**Workers' Compensation and similar programs**

If you have suffered a job-related illness or injury and workers' compensation benefits are available to you, workers' compensation must provide its benefits first for any healthcare costs related to your job-related illness or injury before we will provide any benefits under this Evidence of Coverage for services rendered in connection with your job-related illness or injury.

**Accidents and injuries**

Case 1:21-cv-01083-LPS Document 35 Filed 12/13/21 Page 486 of 547 PageID #: 5095
Case 2:19-cv-08928-DSF-MRW Document 60-1 Filed 04/24/20 Page 209 of 225 Page ID
#:1450

The Medicare Secondary Payer rules apply if you have been in an accident or suffered an injury. If benefits under "Med Pay," no-fault, automobile, accident, or liability coverage are available to you, the "Med Pay," no-fault, automobile, accident, or liability coverage carrier must provide its benefits first for any healthcare costs related to the accident or injury before we will provide any benefits for services related to your accident or injury.

Liability insurance claims are often not settled promptly. We may make conditional payments while the liability claim is pending. We may also receive a claim and not know that a liability or other claim is pending. In these situations, our payments are conditional. Conditional payments must be refunded to us upon receipt of the insurance or liability payment.

If you recover from a third party for medical expenses, we are entitled to recovery of payments we have made without regard to any settlement agreement stipulations. Stipulations that the settlement does not include damages for medical expenses will be disregarded. We will recognize allocations of liability payments to non-medical losses only when payment is based on a court order on the merits of the case. We will not seek recovery from any portion of an award that is appropriately designated by the court as payment for losses other than medical services (e.g., property losses).

Where we provide benefits in the form of services, we shall be entitled to reimbursement on the basis of the reasonable value of the benefits provided.

**Non-duplication of benefits**

We will not duplicate any benefits or payments you receive under any automobile, accident, liability, or other coverage. You agree to notify us when such coverage is available to you, and it is your responsibility to take any actions necessary to receive benefits or payments under such automobile, accident, liability, or other coverage. We may seek reimbursement of the reasonable value of any benefits we have provided in the event that we have duplicated benefits to which you are entitled under such coverage. You are obligated to cooperate with us in obtaining payment from any automobile, accident, or liability coverage or other carrier.

If we do provide benefits to you before any other type of health coverage you may have, we may seek recovery of those benefits in accordance with the Medicare Secondary Payer rules. Please also refer to the **Subrogation and third-party recovery** section for more information on our recovery rights.

**More information**

This is just a brief summary. Whether we pay first or second - or at all - depends on what types of additional insurance you have and the Medicare rules that apply to your situation. For more information, consult the brochure published by the government called "Medicare and Other Health Benefits: Your Guide to WHO PAYS FIRST." It is CMS Pub. No. 02179. Be sure to consult the most current version. Other details are explained in the Medicare Secondary Payer rules, such as the way the number of persons employed by an employer for purposes of the coordination of benefits rules is to be determined. The rules are published in the Code of Federal Regulations.

**Appeal rights**

If you disagree with any decision or action by our plan in connection with the coordination of benefits and payment rules outlined above, you must follow the procedures explained in Chapter 9 What to do if you have a problem or complaint (coverage decisions, appeals, complaints) in this Evidence of Coverage.

Case 1:21-cv-01083-LPS   Document 35   Filed 12/13/21   Page 487 of 547 PageID #: 5096
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 210 of 228   Page ID
#:3451

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 12: Definitions of important words

# Chapter 12. Definitions of important words

**Advanced Imaging Services** - Computed Tomography Imaging (CT/CAT) Scan, Magnetic Resonance Angiography (MRA), Magnetic Resonance Imaging (MRI), and Positron Emission Tomography (PET) Scan.

**Allowed Amount** - Individual charge determined by a carrier for a covered medical service or supply.

**Ambulatory Surgical Center** - An Ambulatory Surgical Center is an entity that operates exclusively for the purpose of furnishing outpatient surgical services to patients not requiring hospitalization and whose expected stay in the center does not exceed 24 hours.

**Annual Enrollment Period** - A set time each fall when members can change their health or drugs plans or switch to Original Medicare. The Annual Enrollment Period is from October 15 until December 7.

**Appeal** - An appeal is something you do if you disagree with our decision to deny a request for coverage of health care services or prescription drugs or payment for services or drugs you already received. You may also make an appeal if you disagree with our decision to stop services that you are receiving. For example, you may ask for an appeal if we don't pay for a drug, item, or service you think you should be able to receive. Chapter 9 explains appeals, including the process involved in making an appeal.

**Balance Billing** - When a provider (such as a doctor or hospital) bills a patient more than the plan's allowed cost-sharing amount. As a member of Humana Gold Plus H0108-004 (HMO), you only have to pay our plan's cost-sharing amounts when you get services covered by our plan. We do not allow providers to "balance bill" or otherwise charge you more than the amount of cost sharing your plan says you must pay.

**Benefit Period** - The way that Original Medicare measures your use of hospital and skilled nursing facility (SNF) services. For our plan, you will have a benefit period for your skilled nursing facility benefits. A benefit period begins the day you go into a skilled nursing facility. The benefit period will accumulate one day for each day you are inpatient at a SNF. The benefit period ends when you haven't received any inpatient skilled care in a SNF for 60 days in a row. If you go into a skilled nursing facility after one benefit period has ended, a new benefit period begins. There is no limit to the number of benefit periods.

**Brand-Name Drug** - A prescription drug that is manufactured and sold by the pharmaceutical company that originally researched and developed the drug. Brand-name drugs have the same active-ingredient formula as the generic version of the drug. However, generic drugs are manufactured and sold by other drug manufacturers and are generally not available until after the patent on the brand-name drug has expired.

**Catastrophic Coverage Stage** - The stage in the Part D Drug Benefit where you pay a low copayment or coinsurance for your drugs after you or other qualified parties on your behalf have spent **$4,550** in covered drugs during the covered year.

**Centers for Medicare & Medicaid Services (CMS)** - The federal agency that administers Medicare. Chapter 2 explains how to contact CMS.

**Coinsurance** - An amount you may be required to pay as your share of the cost for services or prescription drugs after you pay any deductibles. Coinsurance is usually a percentage (for example, **20 percent**).

**Comprehensive Outpatient Rehabilitation Facility (CORF)** - A facility that mainly provides rehabilitation services after an illness or injury, and provides a variety of services including physical therapy, social or psychological services, respiratory therapy, occupational therapy and speech-language pathology services, and home environment evaluation services.

**Computed Tomography Imaging (CT/CAT) Scan** - Combines the use of a digital computer together with a rotating X-ray device to create detailed cross-sectional images of different organs and body parts.

**Contracted Rate** - The rate the network provider or pharmacy has agreed to accept for covered services or prescription drugs.

**Copayment** - An amount you may be required to pay as your share of the cost for a medical service or supply, like a doctor's visit, hospital outpatient visit, or a prescription drug. A copayment is usually a set amount, rather than a percentage. For example, you might pay **$10** or **$20** for a doctor's visit or prescription drug.

**Cost Sharing** - Cost sharing refers to amounts that a member has to pay when services or drugs are received. Cost sharing includes any combination of the following three types of payments: (1) any "deductible" amount a plan may impose before services or drugs are covered; (2) any fixed "copayment" amount that a plan requires when a specific service or drug is received; or (3) any "coinsurance" amount, a percentage of the total amount paid for a service or drug, that a plan requires when a specific service or drug is received. A "daily cost-sharing rate" may apply when your doctor prescribes less than a full month's supply of certain drugs for you and you are required to pay a copayment.

**Cost-Sharing Tier** - Every drug on the list of covered drugs is in one of five cost-sharing tiers. In general, the higher the cost-sharing tier, the higher your cost for the drug.

**Coverage Determination** - A decision about whether a drug prescribed for you is covered by the plan and the amount, if any, you are required to pay for the prescription. In general, if you bring your prescription to a pharmacy and the pharmacy tells you the prescription isn't covered under your plan, that isn't a coverage determination. You need to call or write to your plan to ask for a formal decision about the coverage. Coverage determinations are called "coverage decisions" in this booklet. Chapter 9 explains how to ask us for a coverage decision.

**Covered Drugs** - The term we use to mean all of the prescription drugs covered by our plan.

**Covered Services** - The general term we use to mean all of the health care services and supplies that are covered by our plan.

**Creditable Prescription Drug Coverage** - Prescription drug coverage (for example, from an employer or union) that is expected to pay, on average, at least as much as Medicare's standard prescription drug coverage. People who have this kind of coverage when they become eligible for Medicare can generally keep that coverage without paying a penalty, if they decide to enroll in Medicare prescription drug coverage later.

**Custodial Care** - Custodial care is personal care provided in a nursing home, hospice, or other facility setting when you do not need skilled medical care or skilled nursing care. Custodial care is personal care that can be provided by people who don't have professional skills or training, such as help with activities of daily living like bathing, dressing, eating, getting in or out of a bed or chair, moving around, and using the bathroom. It may also include the kind of health-related care that most people do themselves, like using eye drops. Medicare doesn't pay for custodial care.

Case 1:21-cv-01983-LPS   Document 35   Filed 12/13/21   Page 489 of 547 PageID #: 5098
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 212 of 225   Page ID
#:3453

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 12: Definitions of important words

**Customer Care** - A department within our plan responsible for answering your questions about your membership, benefits, grievances, and appeals. See Chapter 2 for information about how to contact Customer Care.

**Daily cost-sharing rate** - A "daily cost-sharing rate" may apply when your doctor prescribes less than a full month's supply of certain drugs for you and you are required to pay a copayment. A daily cost sharing rate is the copay divided by the number of days in a month's supply. Here is an example: If your copay for a one-month supply of a drug is $30, and a one-month's supply in your plan is 30 days, then your "daily cost-sharing rate" is $1 per day. This means you pay $1 for each day's supply when you fill your prescription.

**Deductible** - The amount you must pay for health care or prescriptions before our plan begins to pay.

**Diagnostic Mammogram** - A radiological procedure furnished to a man or woman with signs or symptoms of breast disease.

**Disenroll or Disenrollment** - The process of ending your membership in our plan. Disenrollment may be voluntary (your own choice) or involuntary (not your own choice).

**Dispensing Fee** - A fee charged each time a covered drug is dispensed to pay for the cost of filling a prescription. The dispensing fee covers costs such as the pharmacist's time to prepare and package the prescription.

**Durable Medical Equipment** - Certain medical equipment that is ordered by your doctor for medical reasons. Examples are walkers, wheelchairs, or hospital beds.

**Emergency** - A medical emergency is when you, or any other prudent layperson with an average knowledge of health and medicine, believe that you have medical symptoms that require immediate medical attention to prevent loss of life, loss of a limb, or loss of function of a limb. The medical symptoms may be an illness, injury, severe pain, or a medical condition that is quickly getting worse.

**Emergency Care** - Covered services that are: (1) rendered by a provider qualified to furnish emergency services; and (2) needed to treat, evaluate, or stabilize an emergency medical condition.

**Evidence of Coverage (EOC) and Disclosure Information** - This document, along with your enrollment form and any other attachments, riders, or other optional coverage selected, which explains your coverage, what we must do, your rights, and what you have to do as a member of our plan.

**Exception** - A type of coverage determination that, if approved, allows you to get a drug that is not on your plan sponsor's formulary (a formulary exception), or get a non-preferred drug at the preferred cost-sharing level (a tiering exception). You may also request an exception if your plan sponsor requires you to try another drug before receiving the drug you are requesting, or the plan limits the quantity or dosage of the drug you are requesting (a formulary exception).

**Extra Help** - A Medicare program to help people with limited income and resources pay Medicare prescription drug program costs, such as premiums, deductibles, and coinsurance.

**Formulary** - A list of covered drugs provided by the plan.

**Freestanding Dialysis Center** - A freestanding facility that provides dialysis on an outpatient basis. This type of facility does not provide inpatient room and board and is Medicare-certified and licensed by the proper authority.

Case 1:21-cv-01083-LPS   Document 35   Filed 12/13/21   Page 490 of 547 PageID #: 5099
Case 2:19-cv-06928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 213 of 225   Page ID #:1454

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 12: Definitions of important words

**Freestanding Lab** - A freestanding facility that provides laboratory tests on an outpatient basis for the prevention, diagnosis, and treatment of an injury or illness. This type of facility does not provide inpatient room and board and is Medicare-certified and licensed by the proper authority.

**Freestanding Radiology (Imaging) Center** - A freestanding facility that provides one or more of the following services on an outpatient basis for the prevention, diagnosis, and treatment of an injury or illness: X-rays; nuclear medicine; radiation oncology. This type of facility does not provide inpatient room and board and is Medicare-certified and licensed by the proper authority.

**Generic Drug** - A prescription drug that is approved by the Food and Drug Administration (FDA) as having the same active ingredient(s) as the brand-name drug. Generally, a "generic" drug works the same as a brand-name drug and usually costs less.

**Grievance** - A type of complaint you make about us or one of our network providers or pharmacies, including a complaint concerning the quality of your care. This type of complaint does not involve coverage or payment disputes.

**Health Maintenance Organization (HMO)** - A type of Medicare managed care plan where a group of doctors, hospitals, and other health care providers agree to give health care to Medicare beneficiaries for a set amount of money from Medicare every month. You usually must get your care from the providers in the plan.

**Home Health Aide** - A home health aide provides services that don't need the skills of a licensed nurse or therapist, such as help with personal care (e.g., bathing, using the toilet, dressing, or carrying out the prescribed exercises). Home health aides do not have a nursing license or provide therapy.

**Home Health Care** - Skilled nursing care and certain other health care services that you get in your home for the treatment of an illness or injury. Covered services are listed in Chapter 4 under the heading, "Home health care." If you need home health care services, our plan will cover these services for you, provided the Medicare coverage requirements are met. Home health care can include services from a home health aide if the services are part of the home health plan of care for your illness or injury. They aren't covered unless you are also getting a covered skilled service. Home health services don't include the services of housekeepers, food service arrangements, or full-time nursing care at home.

**Hospice Care** - A special way of caring for people who are terminally ill and providing counseling for their families. Hospice care is physical care and counseling that is given by a team of people who are part of a Medicare-certified public agency or private company. Depending on the situation, this care may be given in the home, a hospice facility, a hospital, or a nursing home. Care from a hospice is meant to help patients in the last months of life by giving comfort and relief from pain. The focus is on care, not cure. For more information on hospice care, visit www.medicare.gov and under "Search Tools" choose "Find a Medicare Publication" to view or download the publication "Medicare Hospice Benefits." Or, call 1-800-MEDICARE (1-800-633-4227). TTY users should call 1-877-486-2048.

**Hospital Inpatient Stay** - A hospital stay when you have been formally admitted to the hospital for skilled medical services. Even if you stay in the hospital overnight, you might still be considered an "outpatient."

**Humana's National Transplant Network (NTN)** - A network of Humana-approved facilities all of which are also Medicare-approved facilities.

Case 1:21-cv-01983-LPS Document 35 Filed 12/13/21 Page 491 of 547 PageID #: 5100
Case 2:19-cv-08928-DSF-MRW Document 60-1 Filed 04/24/20 Page 214 of 228 Page ID #:3455

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 12: Definitions of important words

**Immediate Care Facility** - A facility established to diagnose and treat an unforeseen injury or illness on an outpatient basis. This facility is staffed by physicians and provides treatment by, or under, the supervision of physicians as well as nursing care. This type of facility does not provide inpatient room and board.

**Initial Coverage Limit** - The maximum limit of coverage under the Initial Coverage Stage.

**Initial Coverage Stage** - This is the stage before your total drug expenses have reached **$2,850**, including amounts you've paid and what our plan has paid on your behalf.

**Initial Enrollment Period** - When you are first eligible for Medicare, the period of time when you can sign up for Medicare Part A and Part B. For example, if you're eligible for Medicare when you turn 65, your Initial Enrollment Period is the 7-month period that begins 3 months before the month you turn 65, includes the month you turn 65, and ends 3 months after the month you turn 65.

**Inpatient Care** - Health care that you get when you are admitted to a hospital.

**Institutional Equivalent Special Needs Plan (SNP)** - An institutional Special Needs Plan that enrolls eligible individuals living in the community but requiring an institutional level of care based on the State assessment. The assessment must be performed using the same respective State level of care assessment tool and administered by an entity other than the organization offering the plan. This type of Special Needs Plan may restrict enrollment to individuals that reside in a contracted assisted living facility (ALF) if necessary to ensure uniform delivery of specialized care.

**Institutional Special Needs Plan (SNP)** - A Special Needs Plan that enrolls eligible individuals who continuously reside or are expected to continuously reside for 90 days or longer in a long-term care (LTC) facility. These LTC facilities may include a skilled nursing facility (SNF); nursing facility (NF); (SNF/NF); an intermediate care facility for the mentally retarded (ICF/MR); and/or an inpatient psychiatric facility. An institutional Special Needs Plan to serve Medicare residents of LTC facilities must have a contractual arrangement with (or own and operate) the specific LTC facility (ies).

**Late Enrollment Penalty** - An amount added to your monthly premium for Medicare drug coverage if you go without creditable coverage (coverage that is expected to pay, on average, at least as much as standard Medicare prescription drug coverage) for a continuous period of 63 days or more. You pay this higher amount as long as you have a Medicare drug plan. There are some exceptions. For example, if you receive "Extra Help" from Medicare to pay your prescription drug plan costs, the late enrollment penalty rules do not apply to you. If you receive "Extra Help", you do not pay a penalty, even if you go without "creditable" prescription drug coverage.

**List of Covered Drugs (Formulary or "Drug Guide")** - A list of prescription drugs covered by the plan. The drugs on this list are selected by the plan with the help of doctors and pharmacists. The list includes both brand-name and generic drugs.

**Low Income Subsidy (LIS)** - See "Extra Help."

**Magnetic Resonance Angiography (MRA)** - A noninvasive method and a form of magnetic resonance imaging (MRI) that can measure blood flow through blood vessels.

**Magnetic Resonance Imaging (MRI)** - A diagnostic imaging modality method that uses a magnetic field and computerized analysis of induced radio frequency signals to noninvasively image body tissue.

Case 1:21-cv-01093-LPS   Document 35   Filed 12/13/21   Page 492 of 547 PageID #: 5101
Case 2:19-cv-06926-DSF-MRW   Document 60-1   Filed 04/24/20   Page 215 of 225   Page ID
#:1456

**Medicaid (or Medical Assistance)** - A joint federal and state program that helps with medical costs for some people with low incomes and limited resources. Medicaid programs vary from state to state, but most health care costs are covered if you qualify for both Medicare and Medicaid. See Chapter 2, Section 6 for information about how to contact Medicaid in your state.

**Medically Accepted Indication** - A use of a drug that is either approved by the Food and Drug Administration or supported by certain reference books. See Chapter 5, Section 3 for more information about a medically accepted indication.

**Medically Necessary** - Services, supplies, or drugs that are needed for the prevention, diagnosis, or treatment of your medical condition and meet accepted standards of medical practice.

**Medicare** - The federal health insurance program for people 65 years of age or older, some people under age 65 with certain disabilities, and people with End-Stage Renal Disease (generally those with permanent kidney failure who need dialysis or a kidney transplant). People with Medicare can get their Medicare health coverage through Original Medicare, a PACE plan, or a Medicare Advantage Plan.

**Medicare Advantage Disenrollment Period** - A set time each year when members in a Medicare Advantage Plan can cancel their plan enrollment and switch to Original Medicare. The Medicare Advantage Disenrollment Period is from January 1 until February 14, 2014.

**Medicare Advantage Organization** - Medicare Advantage Plans are run by private companies. They give you more options, and sometimes, extra benefits. These plans are still part of the Medicare program and are also called "Part C." They provide all your Part A (Hospital) and Part B (Medical) coverage. Some may also provide Part D (Prescription Drug) coverage.

**Medicare Advantage (MA) Plan** - Sometimes called Medicare Part C. A plan offered by a private company that contracts with Medicare to provide you with all your Medicare Part A and Part B benefits. A Medicare Advantage Plan can be an HMO, PPO, a Private Fee-for-Service (PFFS) plan, or a Medicare Medical Savings Account (MSA) plan. When you are enrolled in a Medicare Advantage Plan, Medicare services are covered through the plan, and are not paid for under Original Medicare. In most cases, Medicare Advantage Plans also offer Medicare Part D (prescription drug coverage). These plans are called **Medicare Advantage Plans with Prescription Drug Coverage**. Everyone who has Medicare Part A and Part B is eligible to join any Medicare health plan that is offered in their area, except people with End-Stage Renal Disease (unless certain exceptions apply).

**Medicare Allowable Charge** - The amount allowed by Medicare for a particular benefit or service.

**Medicare Coverage Gap Discount Program** - A program that provides discounts on most covered Part D brand-name drugs to Part D enrollees who have reached the Coverage Gap Stage and who are not already receiving "Extra Help." Discounts are based on agreements between the federal government and certain drug manufacturers. For this reason, most, but not all, brand-name drugs are discounted.

**Medicare-Covered Services** - Services covered by Medicare Part A and Part B. All Medicare health plans, including our plan, must cover all of the services that are covered by Medicare Part A and B.

**Medicare Health Plan** - A Medicare health plan is offered by a private company that contracts with Medicare to provide Part A and Part B benefits to people with Medicare who enroll in the plan. This term includes all Medicare Advantage Plans, Medicare Cost Plans, Demonstration/Pilot Programs, and Programs of All-inclusive Care for the Elderly (PACE).

Case 1:21-cv-01983-LPS   Document 35   Filed 12/13/21   Page 493 of 547 PageID #: 5102
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 216 of 225   Page ID #:3457

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 12: Definitions of important words

**Medicare Limiting Charge** - In the Original Medicare plan, the highest amount of money you can be charged for a covered service by doctors and other health care suppliers who do not accept assignment. The limiting charge is 15 percent over Medicare's approved amount. The limiting charge only applies to certain services and does not apply to supplies or equipment.

**Medicare Prescription Drug Coverage (Medicare Part D)** - Insurance to help pay for outpatient prescription drugs, vaccines, biologicals, and some supplies not covered by Medicare Part A or Part B.

**"Medigap" (Medicare Supplement Insurance) Policy** - Medicare supplement insurance sold by private insurance companies to fill "gaps" in Original Medicare. Medigap policies only work with Original Medicare. (A Medicare Advantage Plan is not a Medigap policy.)

**Member (Member of our Plan, or "Plan Member")** - A person with Medicare who is eligible to get covered services, who has enrolled in our plan and whose enrollment has been confirmed by the Centers for Medicare & Medicaid Services (CMS).

**Network Pharmacy** - A network pharmacy is a pharmacy where members of our plan can get their prescription drug benefits. We call them "network pharmacies" because they contract with our plan. In most cases, your prescriptions are covered only if they are filled at one of our network pharmacies.

**Network Provider –** "Provider" is the general term we use for doctors, other health care professionals, hospitals, and other health care facilities that are licensed or certified by Medicare and by the state to provide health care services. We call them **"network providers"** when they have an agreement with our plan to accept our payment as payment in full, and in some cases to coordinate as well as provide covered services to members of our plan. Our plan pays network providers based on the agreements it has with the providers or if the providers agree to provide you with plan-covered services. Network providers may also be referred to as "plan providers."

**Non-Plan Provider or Non-Plan Facility** - A provider or facility with which we have not arranged to coordinate or provide covered services to members of our plan. Non-plan providers are providers that are not employed, owned, or operated by our plan or are not under contract to deliver covered services to you. As explained in this booklet, most services you get from non-plan providers are not covered by our plan or Original Medicare.

**Non-Preferred Network Pharmacy** - A network pharmacy that offers covered drugs to members of our plan at higher cost-sharing levels than apply at a preferred network pharmacy.

**Nuclear Medicine** - Radiology in which radioisotopes (compounds containing radioactive forms of atoms) are introduced into the body for the purpose of imaging, evaluating organ function, or localizing disease or tumors.

**Observation** - A stay in a hospital for less than 24 hours if: (1) You have not been admitted as a registered bed patient; (2) you are physically detained in an emergency room, treatment room, observation room, or other such area; or (3) you are being observed to determine whether an inpatient confinement will be required.

**Optional Supplemental Benefits** - Non-Medicare-covered benefits that can be purchased for an additional premium and are not included in your package of benefits. If you choose to have optional supplemental benefits, you may have to pay an additional premium. You must voluntarily elect Optional Supplemental Benefits in order to get them.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 12: Definitions of important words

**Organization Determination** - The Medicare Advantage plan has made an organization determination when it makes a decision about whether items or services are covered or how much you have to pay for covered items or services. The Medicare Advantage plan's network provider or facility has also made an organization determination when it provides you with an item or service, or refers you to an out-of-network provider for an item or service. Organization determinations are called "coverage decisions" in this booklet. Chapter 9 explains how to ask us for a coverage decision.

**Original Medicare** ("Traditional Medicare" or "Fee-for-service" Medicare) - Original Medicare is offered by the government, and not a private health plan such as Medicare Advantage Plans and prescription drug plans. Under Original Medicare, Medicare services are covered by paying doctors, hospitals, and other health care providers payment amounts established by Congress. You can see any doctor, hospital, or other health care provider that accepts Medicare. You must pay the deductible. Medicare pays its share of the Medicare-approved amount, and you pay your share. Original Medicare has two parts: Part A (Hospital Insurance) and Part B (Medical Insurance) and is available everywhere in the United States.

**Our plan** - The plan you are enrolled in, Humana Gold Plus H0108-004 (HMO)

**Out-of-Network Pharmacy** - A pharmacy that doesn't have a contract with our plan to coordinate or provide covered drugs to members of our plan. As explained in this Evidence of Coverage, most drugs you get from out-of-network pharmacies are not covered by our plan unless certain conditions apply.

**Out-of-Network Provider or Out-of-Network Facility** - A provider or facility with which we have not arranged to coordinate or provide covered services to members of our plan. Out-of-network providers are providers that are not employed, owned, or operated by our plan or are not under contract to deliver covered services to you. Using out-of-network providers or facilities is explained in this booklet in Chapter 3.

**Out-of-Pocket Costs** - See the definition for "cost sharing" above. A member's cost-sharing requirement to pay for a portion of services or drugs received is also referred to as the member's "out-of-pocket" cost requirement.

**PACE plan** - A PACE (Program of All-inclusive Care for the Elderly) plan combines medical, social, and long-term care services for frail people to help people stay independent and living in their community (instead of moving to a nursing home) as long as possible, while getting the high-quality care they need. People enrolled in PACE plans receive both their Medicare and Medicaid benefits through the plan.

**Part C – see "Medicare Advantage (MA) Plan."**

**Part D** - The voluntary Medicare Prescription Drug Benefit Program. (For ease of reference, we will refer to the prescription drug benefit program as Part D.)

**Part D Drugs** - Drugs that can be covered under Part D. We may or may not offer all Part D drugs. (See your formulary for a specific list of covered drugs.) Certain categories of drugs were specifically excluded by Congress from being covered as Part D drugs.

**Plan Provider – see "Network Provider".**

**Point-of-Service (POS) Plan** - A Medicare managed care plan option that lets you use doctors and hospitals outside the plan for an additional cost.

**Positron Emission Tomography (PET) Scan** - A medical imaging technique that involves injecting the patient with an isotope and using a PET scanner to detect the radiation emitted.

Case 1:21-cv-01083-JRS   Document 35   Filed 12/13/21   Page 495 of 547 PageID #: 5104
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 218 of 225   Page ID
#:1459

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 12: Definitions of important words

**Preferred Network Pharmacy** - A network pharmacy that offers covered drugs to members of our plan that may have lower cost-sharing levels than at other network pharmacies.

**Preferred Provider Organization (PPO) Plan** - A Preferred Provider Organization plan is a Medicare Advantage Plan that has a network of contracted providers that have agreed to treat plan members for a specified payment amount. A PPO plan must cover all plan benefits whether they are received from network or out-of-network providers. Member cost sharing will generally be higher when plan benefits are received from out-of-network providers. PPO plans have an annual limit on your out-of-pocket costs for services received from network (preferred) providers and a higher limit on your total combined out-of-pocket costs for services from both in-network (preferred) and out-of-network (non-preferred) providers.

**Premium** - The periodic payment to Medicare, an insurance company, or a health care plan for health or prescription drug coverage.

**Prescription Drug Guide (Formulary)** - A list of covered drugs provided by the plan. The drugs on this list are selected by the plan with the help of doctors and pharmacists. The list includes both brand-name and generic drugs.

**Primary Care Physician (PCP)** - Your primary care physician is the doctor or other provider you see first for most health problems. He or she makes sure you get the care you need to keep you healthy. He or she also may talk with other doctors and health care providers about your care and refer you to them. In many Medicare health plans, you must see your primary care physician before you see any other health care provider. See Chapter 3, Section 2.1 for information about Primary Care Physicians.

**Prior Authorization** - Approval in advance to get services or certain drugs that may or may not be on our formulary. Some medical services are covered only if your doctor or other provider gets "prior authorization" from our plan. Covered services that need prior authorization are marked in the Benefits Chart in Chapter 4. Some drugs are covered only if your doctor or other network provider gets "prior authorization" from us. Covered drugs that need prior authorization are marked in the formulary.

**Quality Improvement Organization (QIO)** - A group of practicing doctors and other health care experts paid by the federal government to check and improve the care given to Medicare patients. See Chapter 2, Section 4 for information about how to contact the QIO in your state.

**Quantity Limits** - A management tool that is designed to limit the use of selected drugs for quality, safety, or utilization reasons. Limits may be on the amount of the drug that we cover per prescription or for a defined period of time.

**Rehabilitation Services** - These services include physical therapy, speech and language therapy, and occupational therapy.

**Screening Mammogram** - A radiological procedure for early detection of breast cancer, and; includes a physician's interpretation of the results.

**Service Area** - A geographic area where a health plan accepts members if it limits membership based on where people live. For plans that limit which doctors and hospitals you may use, it's also generally the area where you can get routine (non-emergency) services. The plan may disenroll you if you permanently move out of the plan's service area.

Case 1:31-cv-01983-LRS   Document 35   Filed 12/13/21   Page 496 of 547 PageID #: 5105
Case 2:19-cv-08928-DSF-MRW   Document 60-1   Filed 04/24/20   Page 219 of 228   Page ID
#:1460

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Chapter 12: Definitions of important words

**Skilled Nursing Facility (SNF) Care** - Skilled nursing care and rehabilitation services provided on a continuous, daily basis, in a skilled nursing facility. Examples of skilled nursing facility care include physical therapy or intravenous injections that can only be given by a registered nurse or doctor.

**Special Enrollment Period** - A set time when members can change their health or drugs plans or return to Original Medicare. Situations in which you may be eligible for a Special Enrollment Period include: if you move outside the service area, if you are getting "Extra Help" with your prescription drug costs, if you move into a nursing home, or if we violate our contract with you.

**Special Needs Plan** - A special type of Medicare Advantage Plan that provides more focused health care for specific groups of people, such as those who have both Medicare and Medicaid, who reside in a nursing home, or who have certain chronic medical conditions.

**Step Therapy** - A utilization tool that requires you to first try another drug to treat your medical condition before we will cover the drug your physician may have initially prescribed.

**Supplemental Security Income (SSI)** - A monthly benefit paid by Social Security to people with limited income and resources who are disabled, blind, or age 65 and older. SSI benefits are not the same as Social Security benefits.

**Urgently Needed Care** - Urgently needed care is care provided to treat a non-emergency, unforeseen medical illness, injury, or condition that requires immediate medical care. Urgently needed care may be furnished by network providers or by  out-of-network providers when network providers are temporarily unavailable or inaccessible.

2014 Evidence of Coverage for Humana Gold Plus H0108-004 (HMO)
Exhibit A - State Agency Contact Information

# State Agency Contact Information

This section provides the contact information for the state agencies referenced in Chapter 2 and in other locations within this Evidence of Coverage. If you have trouble locating the information you seek, please contact Customer Care at the phone number on the back cover of this booklet.

| State | California |
|---|---|
| **SHIP Name and Contact Information** | California Health Insurance Counseling & Advocacy Program (HICAP)<br>1300 National Drive<br>Suite 200<br>Sacramento,CA 95834-1992<br>1-800-434-0222 (toll free)<br>1-916-419-7500<br>1-916-928-2267 (fax)<br>1-800-735-2929<br>http://www.aging.ca.gov/HICAP/ |
| **Quality Improvement Organization** | Health Services Advisory Group<br>700 N. Brand Blvd<br>Suite 370<br>Glendale,CA 91203<br>1-866-800-8749 (medicare helpline)<br>818-409-9229 (local)<br>1-818-409-0835 (fax)<br>1-800-881-5980 (TTY)<br>http://www.hsag.com/ |
| **State Medicaid Office** | Department of Health Care Services - Medi-Cal (Medicaid)<br>PO Box 13029<br>Sacramento,CA 95813-4029<br>1-800-541-5555 (toll free)<br>1-916-636-1980 (local)<br>http://www.medi-cal.ca.gov/ |

# Multi-language Interpreter Services

**English:** We have free interpreter services to answer any questions you may have about our health or drug plan. To get an interpreter, just call us at 1-800-457-4708. Someone who speaks English/Language can help you. This is a free service.

**Spanish:** Tenemos servicios de intérprete sin costo alguno para responder cualquier pregunta que pueda tener sobre nuestro plan de salud o medicamentos. Para hablar con un intérprete, por favor llame al 1-800-457-4708. Alguien que hable español le podrá ayudar. Este es un servicio gratuito.

**Chinese Mandarin:** 我们提供免费的翻译服务，帮助您解答关于健康或药物保险的任何疑问。如果您需要此翻译服务，请致电 1-800-457-4708。我们的中文工作人员很乐意帮助您。这是一项免费服务。

**Chinese Cantonese:** 您對我們的健康或藥物保險可能存有疑問，為此我們提供免費的翻譯服務。如需翻譯服務，請致電 1-800-457-4708。我們講中文的人員將樂意為您提供幫助。這是一項免費服務。

**Tagalog:** Mayroon kaming libreng serbisyo sa pagsasaling-wika upang masagot ang anumang mga katanungan ninyo hinggil sa aming planong pangkalusugan o panggamot. Upang makakuha ng tagasaling-wika, tawagan lamang kami sa 1-800-457-4708. Maaari kayong tulungan ng isang nakakapagsalita ng Tagalog. Ito ay libreng serbisyo.

**French:** Nous proposons des services gratuits d'interprétation pour répondre à toutes vos questions relatives à no tre régime de santé ou d'assurance-médicaments. Pour accéder au service d'interprétation, il vous suffit de nous appeler au 1-800-457-4708. Un interlocuteur parlant Français pourra vous aider. Ce service est gratuit.

**Vietnamese:** Chúng tôi có dịch v ụ thông dịch miễn phí để trả l ời các câu hỏi về chương sức khỏe và chương trình thuốc men. Nếu quí vị cần thông dịch viên xin gọi 1-800-281-6918 s ẽ có nhân viên nói tiếng Việt giúp đỡ quí vị. Đây là dịch vụ miễn phí .

**German:** Unser kostenloser Dolmetscherservice beantwortet Ihren Fragen zu unserem Gesundheits- und Arzneimittelplan. Unsere Dolmetscher erreichen Sie unter 1-800-457-4708. Man wird Ihnen dort auf Deutsch weiterhelfen. Dieser Service ist kostenlos.

**Korean:** 당사는 의료 보험 또는 약품 보험에 관한 질문에 답해 드리고자 무료 통역 서비스를 제공하고 있습니다. 통역 서비스를 이용하려면 전화 1-800-457-4708 번으로 문의해 주십시오. 한국어를 하는 담당자가 도와 드릴 것입니다. 이 서비스는 무료로 운영됩니다.

**Russian:** Если у вас возникнут вопросы относительно страхового или медикаментного плана, вы можете воспользоваться нашими бесплатными услугами переводчиков. Чтобы воспользоваться услугами переводчика, позвоните нам по телефону 1-800-457-4708. Вам окажет помощь сотрудник, который говорит по-русски. Данная услуга бесплатная.

**Arabic:**

إننا نقدم خدمات الترجمة الفورية المجانية للإجابة عن أي أسئلة تتعلق بالصحة أو جدول الأدوية لدينا. للحصول على مترجم فوري، ليس عليك سوى الإتصال بنا على 1-800-457-4708. سيقوم شخص ما يتحدث اللغة العربية بمساعدتك. هذه الخدمة مجانية.

**Hindi:** हमारे स्वास्थ्य या दवा की योजना के बारे में आपके किसी भी प्रश्न के जवाब देने के लिए हमारे पास मुफ्त दुभाषिया सेवाएँ उपलब्ध हैं. एक दुभाषिया प्राप्त करने के लिए, बस हमें 1-800-457-4708 पर फोन करें. कोई व्यक्ति जो हिन्दी बोलता है आपकी मदद कर सकता है. यह एक मुफ्त सेवा है.

**Italian:** È disponibile un servizio di interpretariato gratuito per rispondere a eventuali domande sul nostro piano sanitario e farmaceutico. Per un interprete, contattare il numero 1-800-457-4708. Un nostro incaricato che parla Italianovi fornirà l'assistenza necessaria. È un servizio gratuito.

**Portugués:** Dispomos de serviços de interpretação gratuitos para responder a qualquer questão que tenha acerca do nosso plano de saúde ou de medicação. Para obter um intérprete, contacte-nos através do número 1-800-457-4708. Irá encontrar alguém que fale o idioma Português para o ajudar. Este serviço é gratuito.

**French Creole:** Nou genyen sèvis entèprèt gratis pou reponn tout kesyon ou ta genyen konsènan plan medikal oswa dwòg nou an. Pou jwenn yon entèprèt, jis rele nou nan 1-800-457-4708. Yon moun ki pale Kreyòl kapab ede w. Sa a se yon sèvis ki gratis.

**Polish:** Umożliwiamy bezpłatne skorzystanie z usług tłumacza ustnego, który pomoże w uzyskaniu odpowiedzi na temat planu zdrowotnego lub dawkowania leków. Aby skorzystać z pomocy tłumacza znającego język polski, należy zadzwonić pod numer 1-800-457-4708. Ta usługa jest bezpłatna.

**Japanese:** 当社の健康 健康保険と薬品 処方薬プランに関するご質問にお答えするために 無料の通訳サービスがありますございます。通訳をご用命になるには、1-800-457-4708 にお電話ください。日本語を話す人 者 が支援いたします。これは無料のサー ビス です。

**Humana Gold Plus H0108-004 (HMO) Customer Care**

| | |
|---|---|
| **CALL** | 1-800-457-4708 |
| | Calls to this number are free. Customer Care is available seven days a week, from 8 a.m. to 8 p.m. (A customer care representative will be available to answer your call directly during the annual enrollment period and 60 days after from 8 a.m. until 8 p.m.) |
| | However, beginning February 15, 2014, your call may be handled by our automated phone system on Saturdays, Sundays, and some Public Holidays. When leaving a message, simply select the reason for your call from the automated list and a knowledgeable representative will return your call by the end of the next working day. |
| | Customer Care also has free language interpreter services available for non-English speakers. |
| **TTY** | 711 |
| | Calls to this number are free. Hours of operation are the same as above. |
| | This number requires special telephone equipment and is only for people who have difficulties with hearing or speaking. |
| **FAX** | 1-877-837-7741 |
| **WRITE** | Humana, P.O. Box 14168, Lexington, KY 40512-4168 |
| **WEBSITE** | **Humana.com** |

**State Health Insurance Assistance Program**

The State Health Insurance Assistance Program (SHIP) is a state program that gets money from the federal government to give free local health insurance counseling to people with Medicare.

Contact information for your State Health Insurance Assistance Program (SHIP) can be found in "Exhibit A" in this document.

**A-7440**

Humana Inc.
PO Box 14168
Lexington, KY 40512-4168

## Important Plan Information

H0108004EOC14



Humana.com

A-7441

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| HUMANA INC.,<br>Plaintiff,<br><br>v.<br><br>MALLINCKRODT ARD LLC<br>(f/k/a Mallinckrodt ARD Inc., f/k/a<br>Questcor Pharmaceuticals, Inc.),<br>Defendant. | CV 19-6926 DSF (MRWx)<br><br>Order GRANTING in Part and<br>DENYING in Part Defendant's<br>Motion to Dismiss (Dkt. 65) |

Defendant Mallinckrodt ARD LLC moves to dismiss (a) Counts I, II & III (federal and state antitrust laws) in their entirety, or at least to the extent based on any state's antitrust law except Maine, Vermont, or Wisconsin law; (b) Counts IV & V (RICO), Count VI (unfair competition law), Count VII (state consumer fraud and deceptive trade practices acts), and Count VIII (state insurance fraud statutes) to the extent based on allegations regarding co-pay assistance programs; (c) Count IX (tortious interference with contract) in its entirety; and (d) Count VII (state insurance fraud statutes) to the extent asserted under Kentucky or New Jersey law as alleged in Plaintiff Humana Inc.'s Second Amended Complaint (SAC). Dkt. 65-1 (Mot.). Plaintiff opposes. Dkt. 71 (Opp'n). The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15. For the reasons stated below, the motion is GRANTED in part and DENIED in part.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant produces H.P. Acthar Gel (Acthar), a drug that has been available in the United States since it was approved by the FDA in 1952. Dkt. 60 (SAC) ¶¶ 2, 44. Plaintiff operates or administers Medicare Part D plans on behalf of federal and state governments and provides coverage for prescription drugs, including Acthar, through other plans. Id. ¶ 39. Acthar is an adrenocorticotropic hormone (ACTH) used as an anti-inflammatory. Id. ¶ 41. Acthar is approved to treat exacerbations of multiple sclerosis (MS) as well as other diseases and disorders. Id. ¶ 45. However, for many of these conditions, Acthar is not the "first-line treatment." Id. ¶ 46. Cheaper, non-ACTH drugs are used to treat the same indications. Id. ¶¶ 49-50, 60. Infantile spasms is the only condition for which Acthar is the "first-line treatment." Id. ¶ 51 n.4. There is only one other FDA-approved drug for infantile spasms. Id. ¶ 49 n.3. Acthar is the only long-acting ACTH drug approved for sale in the United States. Id. ¶ 61. Another ACTH drug, Synacthen, is approved for sale outside of the United States. Id. ¶ 70. Acthar is not marketed outside of the United States. Id.

Until 2001, when Defendant's predecessor, Questcor, acquired worldwide rights to sell and manufacture Acthar for $100,000, plus royalties, Acthar was priced more competitively with other anti-inflammatory drugs. Id. ¶ 47. At that time, because Acthar was expensive to produce and not the first-line treatment for most conditions, the prior manufacturer considered discontinuing production. Id. However, as soon as Questcor acquired the rights to sell Acthar, it increased the price from approximately $40 per vial to nearly $750 per vial. Id. ¶ 54. On August 27, 2007, Questcor further increased the price from $1,650 to $23,269 per vial. Id. ¶ 55. By 2018, the price had increased to $38,892. Id. ¶ 56. Between 2011 and 2015, net sales of Acthar increased from $218 million to more than $1 billion, and Medicare spending on Acthar increased from $50 million to $500 million. Id. ¶¶ 57-58. Humana itself paid for almost $800 million worth of Acthar since 2001. See id. ¶ 86.

A-7443

In 2010, Questcor established an MS Acute Exacerbation Fund (MS Fund) with Chronic Disease Fund, Inc. (CDF), a Texas-based charity. Id. ¶¶ 29, 97-98, 108. The MS Fund helped patients with government insurance, such as Medicare, with co-pays for Acthar. Id. ¶ 98. Although the donation agreement stated that the donated funds were generally for the treatment of patients with acute exacerbations of MS, in reality it did not provide co-pay assistance to purchase any other drugs. Id. In 2011, Questcor established a Lupus Exacerbation Fund (Lupus Fund) that was purportedly to provide co-pay assistance for "any medically appropriate therapy," but in fact was used only to provide assistance for Acthar. Id. ¶ 100. In 2012, Questcor created a similar fund for rheumatoid arthritis (RA Fund). Id. ¶ 101. Between the time Questcor established the MS Fund in 2010 and 2013, Acthar sales for MS treatment nearly quadrupled. Id. ¶ 108.

In late 2012 and early 2013, Novartis, the company that manufactured Synacthen abroad, sought bids from companies who wanted to acquire the rights to seek FDA approval and sell Synacthen in the United States. Id. ¶¶ 73-76. Questcor and three other companies (who were not disclosed) submitted serious bids. Id. The three other companies intended to develop Synacthen to compete with Acthar; Questcor had "inchoate plans for Synacthen and conducted limited due diligence when it submitted its initial offer." Id. ¶ 76. However, Questcor's bid was the highest, at a minimum of $135 million. Id. ¶¶ 77-78. Neither Questcor nor Defendant "made more than superficial efforts to pursue commercialization of Synacthen . . . to protect Acthar monopoly pricing." Id. ¶ 81. In July 2017, the FTC approved a sublicense granting another company the rights to develop and market Synacthen to treat infantile spasms and nephrotic syndrome in the United States. Id. ¶ 82.

On March 9, 2020, the Court granted Defendant's motion to dismiss the antitrust claims and the tortious interference with contractual relations claim in the First Amended Complaint with leave to amend and denied the motion as to the remaining claims. Dkt. 57 (March Order). Defendant again seeks dismissal of the antitrust claims and tortious interference claims in their entirety, as well as

3

dismissal of the RICO claims, unfair competition claim, state consumer fraud and deceptive practices claims, and insurance fraud claims to the extent they are based on co-pay assistance programs.  Defendant additionally seeks dismissal of the insurance fraud claims to the extent they are based on Kentucky or New Jersey law and 22 of the 25 state-law antitrust claims as barred by the statute of limitations.

## II.  LEGAL STANDARD

Rule 12(b)(6) allows an attack on the pleadings for failure to state a claim on which relief can be granted.  "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam).  However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Id. (quoting Twombly, 550 U.S. at 557) (alteration in original) (citation omitted).  A complaint must "state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.  This means that the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  There must be "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . and factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

Ruling on a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is

A-7445

entitled to relief.'" Iqbal, 556 U.S. at 679 (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

As a general rule, leave to amend a complaint that has been dismissed should be freely granted. Fed. R. Civ. P. 15(a). However, leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986).

## III. DISCUSSION

### A.    Antitrust Claims (Counts I through III)

Plaintiff alleges that Defendant has monopoly power in the market for "long-acting ACTH drugs in the United States" and that Questcor's acquisition of the rights to develop and market Synacthen in the United States "restrained trade" in the relevant market and "eliminated [a] potential competitive threat" in order to "maintain its monopoly" so it can "stabilize or raise the price of Acthar to a higher level" and "suppress[] the output of long-acting ACTH drugs below the level of output" that would exist in a competitive market. SAC ¶¶ 140-42, 146-48. This conduct purportedly violates Sections 1 and 2 of the Sherman Antitrust Act and corresponding state antitrust laws.

"In order to state a Section 1 claim . . . plaintiffs must plead facts which, if true, will prove '(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition,'" and "'(4) that they were harmed by the defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from an 'anti-competitive aspect of the practice under scrutiny.'" Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1197 (9th Cir. 2012) (first quoting Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1046 (9th Cir. 2008); then quoting Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990)). Section 2 "targets 'the willful acquisition or maintenance of [monopoly] power as distinguished from

A-7446

growth or development as a consequence of a superior product, business acumen, or historic accident.'" <u>Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.</u>, 555 U.S. 438, 448 (2009) (quoting <u>United States v. Grinnell Corp.</u>, 384 U.S. 563, 570 (1966)). "Simply possessing monopoly power and charging monopoly prices does not violate § 2." <u>Id.</u> at 447-48.

### 1.    Market Power

Both Section 1 and Section 2 claims depend on whether Plaintiff has sufficiently alleged Defendant has market power in a relevant antitrust market. <u>Newcal Indus., Inc. v. Ikon Office Sol.</u>, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008) ("The 'relevant market' and 'market power' requirements apply identically under the two different sections of the Act, meaning that the requirements apply identically to" both Section 1 and Section 2 claims and plaintiff's "market allegations are either sufficient or insufficient for all [antitrust] claims."). "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." <u>Id.</u> at 1045. One such fatal defect is the failure of the alleged market to "encompass . . . all economic substitutes for the product." <u>Id.</u> The Court previously dismissed Plaintiff's antitrust claims, in part, for failing to allege a facially sustainable product market definition. March Order at 13.

Plaintiff now alleges that the relevant market is the market for "the sale of long-acting ACTH drugs in the United States." SAC ¶¶ 140 (Section 2), 147 (Section 1). Plaintiff further alleges that Defendant's product, Acthar, "represents 100% of th[at] sub-market." <u>Id.</u> ¶ 60. Defendant contends that "the SAC . . . proposes yet another *even narrower* ACTH-only market that continues to exclude economic substitutes for Acthar described in Humana's own complaint." Mot. at 2.[1] This is true in some sense if each allegation is considered in a

---

[1] Although Defendant emphasizes that the proposed market definition is "even narrower" with the exclusion of short-acting ACTH, Defendant does not appear to dispute that short-acting ACTH drugs are reasonably excluded from the relevant market. <u>See</u> Mot. at 6 (addressing why Plaintiff must

A-7447

vacuum.  In addition to the many paragraphs identified in the March Order that remain materially unchanged, March Order at 6-7 (citing FAC ¶¶ 6, 13, 43, 46, 49, 57, 84, 147, 151), Plaintiff's amended complaint adds allegations that appear to contradict its proposed market, see, e.g., SAC ¶¶ 49-50 ("prednisone is approved by the FDA to treat all of the same diseases and disorders as Acthar" and "Acthar has similar pharmacodynamic effects as corticosteroids"); id. ¶ 49 ("Acthar has been compared to intravenous methylprednisolone for treatment of MS relapses and to prednisone for treatment of sarcoidosis").  However, Plaintiff has also added allegations in support of its claim that there is a "long-acting ACTH drug[] . . . submarket within a broader market for adrenal hormone drugs."  Id. ¶ 89.  And within these allegations, the Court concludes that Plaintiff has adequately alleged a long-acting ACTH submarket.

     "To plead an antitrust claim based on a submarket, 'the plaintiff must be able to show (but need not necessarily establish in the complaint) that the alleged submarket is economically distinct from the general product market.'"  Hicks v. PGA Tour, Inc., 897 F.3d 1109, 1121 (9th Cir. 2018) (quoting Newcal Indus., Inc. v. Ikon Office Sol., 513 F.3d 1038, 1045 (9th Cir. 2008).  A plaintiff can do so by alleging "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  Id. (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)).

---

allege indication-based markets and acknowledging Plaintiff's allegation that "short-acting ACTH drugs are not included in the relevant market 'because there is no overlap in the medical conditions that the drugs are approved to treat or diagnose'" (citing SAC ¶ 52 n.6)); id. at 11-12 ("Only for those indications for which Synacthen proves effective and safe could it even be considered a possible potential new entrant, as Humana admits when excluding from its proposed market definition 'short-acting ACTH drugs.'").

A-7448

a.   Industry or public recognition of the submarket as a
separate economic entity

Plaintiff alleges that "[l]ong-acting ACTH drugs are recognized
by Mallinckrodt, medical providers, and the public as differentiated
from other adrenal hormone drugs."  SAC ¶ 89.a.; see also id. ¶ 50
("Acthar . . . appears to be viewed by certain providers or patients as
distinct from corticosteroids.").  For example, "the widely-used First
Data Bank (FDB) drug database" classifies corticosteroids like
prednisone in a separate Therapeutic Class from Acthar and other
ACTH drugs.  Id. ¶ 52.  Additionally, Defendant has acknowledged in
its public filings that Acthar "has limited direct competition due to the
unique nature of the product."  Id. ¶ 61.

On the other hand, Plaintiff alleges that Defendant has
"aggressively marketed" "studies . . . that claim to show clinical
evidence supporting the superiority of Acthar compared with
corticosteroid drugs."  SAC ¶ 51.  However, this seems to support,
rather than refute, the idea that Acthar and corticosteroids are in the
same market.  See Hicks, 897 F.3d at 1122 ("claims of increased
effectiveness" of products in the proposed submarket does not "place"
those products "in a distinct market").  And Plaintiff also alleges that
the FTC "recognized 'ACTH drugs' as a relevant antitrust market when
evaluating [Defendant's] acquisition of Synacthen."  SAC ¶ 89.a.ii.  As
the Court noted in the March Order, however, the fact that the FTC
required Defendant to grant a license only for the treatment of two
specific indications "highlights the flaws in a market definition
untethered to drugs that are reasonably interchangeable for a given
condition."  March Order at 9 n.3.

Plaintiff's allegations as to this factor cut both ways.

b.   Product's peculiar characteristics and uses

Plaintiff contends ACTH drugs have a "biological mechanism of
action [that] is distinct from other drugs in that they stimulate the
adrenal gland to produce cortisol" while "Glucocorticoid drugs . . . do
not work through the adrenal gland."  SAC ¶ 89.b.i.; see also id. ¶ 51

8

("Acthar's mechanism of action is slightly different from that of
corticosteroids").  Similarly, the only other drug approved to treat
infantile spasms, Sabril, "is not a steroid, but is instead in a class of
anticonvulsant drugs" that "works by inhibiting the breakdown of a
particular neural transmitter."  Id. ¶ 49 n.3.  Defendant contends "the
new allegations regarding the nature of corticotropin and its
mechanism of action do not negate the fact that for some indications,
noncorticotropin treatments remain available."  Mot. at 8.  And as the
Court previously held, biological differences alone do not render ACTH
drugs a distinct market.  March Order at 7 n.2.  However, the product's
"peculiar characteristics," is one of many factors the Court is instructed
to consider in determining whether the complaint has alleged a
plausible submarket.

Importantly, Plaintiff also alleges ACTH drugs have uses
different from other drugs used to treat the same conditions.  For
example, "Acthar is supposed to be a last-line treatment alternative
that may be tried after corticosteroids have failed in the hope that
Acthar, through its slightly different mechanism of action, may be
effective where similar drugs have not been."  SAC ¶ 51; see also id.
¶ 89.d.i. (Acthar is supposed to be prescribed only where "those drugs
have either failed to treat their conditions or those drugs are
contraindicated for that patient."); id. ¶ 89.d.iii ("Humana limits
approved use of Acthar (other than for infantile spasms) under its
policies to patients who have 'contraindications or intolerance to
corticosteroids that are not expected to also occur with' Acthar").  And
for infantile spasms, "Sabril may be used in combination with long-
acting ACTH drugs, or it may be suitable where long-acting ACTH
drugs have been ineffective at controlling infantile spasms or were not
well tolerated by the patient."  Id. ¶ 49 n.3.[2]  Defendant does not

_____

[2] Defendant contends that "the fact that 'Sabril may be used in combination
with long-acting ACTH drugs' (SAC ¶ 49 n.3) creates no fact issue as to
whether it is not an alternative but a complementary product, like software is
to hardware."  Dkt. 78 (Reply) at 2 n.1 (citing Phillip E. Areeda & Herbert
Hovenkamp, Antitrust Law § 565a (4th ed. 2020)).  Defendant does not

address these allegations, focusing solely on the fact that long-acting ACTH drugs are FDA approved to treat the same conditions as other drugs.[3]  But, Plaintiff has adequately alleged that, although ACTH drugs and other drugs can be used the treat the same conditions, they are not interchangeable in that doctors or patients are not choosing between long-acting ACTH drugs and other drugs at any given time.  Rather, doctors and patients are only turning to long-acting ACTH drugs when other drugs are not an option.  This supports a long-acting ACTH submarket.

### c.  Unique production facilities

Plaintiff alleges that "Acthar is produced at only one facility in Prince Edward Island, Canada . . . using a complex, biologic process that is difficult to replicate" while "Glucocorticoid drugs are synthesized by manufacturers of chemicals for pharmaceuticals in a variety of facilities throughout the world" that "are not equipped to produce Acthar, nor could they be easily modified in order to do so."  Id. ¶ 89.c.  This supports a long-acting ACTH submarket.

### d.  Distinct customers

As discussed above, Plaintiff alleges that "[u]sers of Acthar are distinct from users of other adrenal hormone drugs because" Acthar is only supposed to be prescribed where "those drugs have either failed to treat their conditions or those drugs are contraindicated for that patient."  Id. ¶ 89.d.i.; see also id. ¶ 89.d.iii ("Humana limits approved use of Acthar (other than for infantile spasms) under its policies to patients who have 'contraindications or intolerance to corticosteroids that are not expected to also occur with' Acthar").  Plaintiff further

_____

explain why this is so.  Further, at this stage, Plaintiff need not create a fact issue.  All factual allegations are accepted as true.

[3] That Defendant glossed over the import of these new allegations is evident by Defendant's incorrect claim that Plaintiff "attempts to justify the[] exclusion [of other drugs] based *solely* on its allegation that 'the drugs exhibit a very low degree of cross-price elasticity.'"  Reply at 1.

A-7451

alleges that "Acthar is inappropriately prescribed as a result of bribes paid to doctors . . . for patients for whom corticosteroids are an appropriate medical and economic substitute" and "[a]bsent the illegal bribe, Acthar would not be prescribed for these patients." Id. ¶ 89.d.ii. Defendant contends this allegation "confuses the issue more" because Plaintiffs describe Acthar and corticosteroids as "appropriate medical and economic substitute[s]." Mot. at 7. However, the Court understands Plaintiff's allegation to acknowledge that Acthar is considered for the same type of consumers (or the same uses) only where doctors are choosing to prescribe Acthar improperly and illegally. Because the parties do not address it, the Court assumes, without deciding, that where a Defendant's alleged illegal conduct causes products to be treated as substitutes when they otherwise would not be, the products are not treated as substitutes for market definition purposes. Therefore, this supports a long-acting ACTH submarket.

e.     <u>Distinct prices and sensitivity to price changes</u>

Plaintiff alleges that "Acthar's price to Humana in 2019 averaged more than $65,000 per prescription, more than 650,000% of the average prescription price for a glucocorticoid drug ($9.79)," id. ¶ 89.e.i., and "[t]he price of Acthar has increased repeatedly and substantially while the price of other Glucocorticoid drugs has decreased," id. ¶ 89.f.i.; <u>see also</u> id. ¶ 62 (from 2011 to 2019 the price of Acthar increased while the price of Glucocorticoid drugs decreased, but the quantity of Acthar reimbursed by Plaintiff substantially increased, while the quantity of reimbursed Glucocorticoid drugs decreased). If the two drugs were economic substitutes, the increasing price disparity between Acthar and Glucocorticoid drugs would have caused consumers to switch from Acthar to Glucocorticoid drugs, but that was not the case. This was confirmed through Plaintiff's economic analysis of the cross-price elasticity of demand provided in the SAC. Id. ¶¶ 63-64.

Defendant challenges Plaintiff's analysis on a number of grounds.[4]  However, these criticisms appear better directed to a challenge at the summary judgment stage based on the parties' expert opinions.  For example, Defendant contends the cross-elasticity number is unhelpful because it aggregates indications and excludes non-glucocorticoid alternatives "making it impossible from the allegations to discern whether a positive cross-elasticity of demand exists between ACTH and non-ACTH drugs when used to treat some conditions while a negative cross-elasticity of demand exists when used to treat others." Mot. at 9.  Defendant contends the SAC itself "suggest[s] Acthar faces different levels of competition between indications – from glucocorticoids for some indications and from non-glucocorticoid alternatives for others."  Id.  However, beyond infantile spasms, for which glucocorticoids are not FDA approved, the SAC gives no reason to assume that cross-elasticity of demand would be positive for some indications and negative for others.  And Plaintiff does not allege that non-glucocorticoid alternatives exist for indications other than infantile spasms.  See Opp'n at 7 ("Humana believes that no such [non-glucocorticoid alternatives] exist, so it cannot be expected to have identified them itself").

As to infantile spasms, Plaintiff did not perform a cross-elasticity analysis with Sabril.  Defendant contends Plaintiff's "argument that Sabril is irrelevant because the [infantile spasm] market is small, and not because of any low cross elasticity of demand (Opp. 8, n.11), is telling."  Reply at 2 n.1.  However, Defendant points to no requirement that at the motion to dismiss stage, a Plaintiff must perform a statistical econometric analysis of the cross-elasticity of every potential substitute.  Plaintiff has alleged that Sabril's characteristics and uses are materially different; that is sufficient at this stage.

---

[4] Defendant contends the March Order rejected the factual premise that Defendant was able to raise its price without losing sales.  Reply at 1 (citing March Order at 11).  But all the Court held was that none of the allegations in the FAC supported that claim.  Plaintiff has now added such allegations.

Defendant also contends that because the analysis begins in 2011, it does not exclude any "continuing loss of sales to corticosteroids resulting from the 2007 price adjustment for Acthar and related formulary restrictions" and it also "ignor[es] myriad factors affecting supply and demand for conditions for which Acthar is not commonly used." Reply at 2. Plaintiff need not exclude all potentially relevant or confounding factors in the rough cross-elasticity analysis set forth in its complaint. Plaintiff's proposed submarket need only be plausible; it need not be proven.

Finally, Defendant contends Plaintiff's analysis is flawed because it relies only on its own data. Mot. at 9 n.3. However, Plaintiff covers millions of patients and therefore – particularly at the motion to dismiss stage – its own data can serve as a proxy for the "aggregate demand of consumers." Id.

Therefore, this factor supports a long-acting ACTH submarket.

> f.   Specialized vendors

Plaintiff alleges "Acthar is distributed only through a limited network of specialty pharmacies . . . , while other adrenal hormone drugs are widely available through tens of thousands of retail and other mainstream pharmacies throughout the country (e.g. CVS, Rite Aid, Walgreens)" because "Acthar requires special handling that retail pharmacies are not well equipped to provide." SAC ¶ 83.g.i. This supports a long-acting ACTH submarket

Based on the Brown Shoe factors, the Court concludes Plaintiff has adequately pled a submarket for long-acting ACTH drugs.[5]

## 2.   Antitrust Injury

Plaintiff alleges it was harmed by Defendant's unlawful conduct because it otherwise "would have paid for fewer Acthar prescriptions and it would have paid less for those prescriptions" because "increased

---

[5] The Court therefore need not, and does not, address Plaintiff's additional allegations in support of direct proof of market power.

A-7454

competition [from Synacthen] in the market for long-acting ACTH drugs" would have resulted in "lower prices for Acthar" or more prescriptions for the "lower priced Synacthen." SAC ¶ 137. Defendant contends this presumption depends on a speculative chain of events that if Defendant had not purchased the Synacthen rights, another company "would have secured FDA approval . . . , entered the relevant antitrust market, and gained acceptance among doctors, thereby causing a reduction in the prices that [Plaintiff] paid for Acthar." Mot. at 10.

Plaintiff argues the allegations in the SAC "are beyond sufficient to make it *plausible* that Synacthen would have been sold in the United States but for Mallinckrodt's conduct." Opp'n at 9-10. Specifically, Plaintiff has alleged that Synacthen has been used safely and effectively outside the United States and therefore "a buyer would not need to begin the research, development, testing, or manufacturing process from scratch," SAC ¶ 70, 75, that Defendant used Synacthen studies to obtain FDA approval for Acthar, id. ¶ 71, that the FDA has approved a short-acting formulation of Synacthen, id. ¶ 75 n.7, and that there were three other bidders seeking the rights to pursue FDA approval for Synacthen and commercialize it in the United States that had the necessary expertise and financing, as well as sufficient business and regulatory plans, to do so, id. ¶¶ 73-74. The Court agrees this is more than sufficient. See Bubar v. Ampco Foods, Inc., 752 F.2d 445, 452 (9th Cir. 1985) (courts consider "[t]he background and experience of [the potential entrant] in his prospective business," "[a]ffirmative action on the part of [a potential entrant] to engage in the proposed business," "ability of [a potential entrant] to finance the business and the purchase of equipment and facilities necessary to engage in the business," and "consummation of contracts" by a potential entrant).

Defendant raises a number of reasons why it believes these allegations are insufficient, none of which the Court finds persuasive. First, Defendant contends that "[c]ourts addressing this issue have required a plaintiff to plead facts establishing the probability and timing of FDA approval for an unapproved drug to be considered a

potential competitor." Mot. at 12 (citing <u>Andrx Pharm., Inc. v. Biovail Corp. Int'l</u>, 256 F.3d 799, 807-08, 815 (D.C. Cir. 2001) and <u>Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.</u>, No. CIV.A.03-232, 2004 WL 1427136, at *6 (E.D. Pa. June 21, 2004)). This presumably stems from the requirement that to establish causation in a competitor exclusion case, the plaintiff must allege that the potential competitor has an "intent to enter the market and a preparedness to do so." <u>See</u> <u>Bubar</u>, 752 F.2d at 450.[6] Under Defendant's view, the probability and timing of FDA approval are necessary to make plausible allegations that a competitor is prepared to enter the market. However, particularly where the plaintiff is a consumer rather than a competitor, and where, as here, the defendant is currently in possession of the "asset package," it would be too exacting a burden to require a plaintiff to allege exactly how long it would take for some other company to get FDA approval. Plaintiff's allegations make it sufficiently plausible that, but for Defendant's purchase of the Synacthen rights, Synacthen would have been approved by the FDA for use in the United States for at least one of the same indications as Acthar. That in <u>Brotech</u> the plaintiff had failed to allege when FDA approval "may be anticipated," 2004 WL 1427136, at *6, and in <u>Tawfilis v. Allergan, Inc.</u>, 157 F. Supp. 3d 853

---

[6] Plaintiff asserts the cases cited by Defendant address antitrust cases brought by competitors and not consumers, for which there are different burdens. Opp'n at 10-11. However, the circuit courts to have considered the issue have concluded that both consumers and competitors must satisfy the intent and preparedness test. <u>See, e.g.</u>, <u>Meijer, Inc. v. Biovail Corp.</u>, 533 F.3d 857, 862 (D.C. Cir. 2008) ("Just as a would-be entrant suing an incumbent firm for excluding it from a relevant market in violation of the Sherman Act must demonstrate it intended and was prepared to enter that market, . . . so a would-be purchaser suing an incumbent monopolist for excluding a potential competitor from which it might have bought a product at a lower price must prove the excluded firm was willing and able to supply it but for the incumbent firm's exclusionary conduct" (internal citations omitted)); <u>Sunbeam Television Corp. v. Nielsen Media Research, Inc.</u>, 711 F.3d 1264, 1273 (11th Cir. 2013) (following <u>Meijer</u> and rejecting position that "proof of a 'willing and able' competitor 'standing in the wings, ready to swoop in' should only apply to *competitor* plaintiffs, not *customer* plaintiffs.").

(C.D. Cal. 2015), the plaintiff had alleged that approval "could have" occurred within two years, id. at 857, does not impose a requirement on all plaintiffs to allege the number of years in which approval is likely to occur.  In each of those cases, the court considered the totality of the allegations and concluded that antitrust injury either was or was not plausible.  Most of the other cases cited by Defendant were decided at the summary judgment stage and are therefore inapplicable here.

Next, Defendant contends that although it has been three years since it was required to sublicense the rights to Synacthen for infantile spasms and nephrotic syndrome to another company, id. ¶ 82, the complaint contains no allegations that Synacthen has obtained FDA approval, or even that the sublicensee has made progress in obtaining FDA approval.  Mot. at 13.  According to Defendant, this makes it implausible that Synacthen would have been approved by the FDA if another bidder had purchased it in 2013.  However, a potential entrant that has the rights to develop and sell Synacthen for only two indications is not similarly situated to a potential entrant that can develop and sell Synacthen for any indication.  This is particularly true here where Plaintiff has alleged that the indications for which Defendant retained rights are the cash cows.  See, e.g., SAC ¶ 114 ("[F]ewer than 10% of Acthar's sales come from prescriptions for infantile spasms, and more than 98% of Humana's expenditures for Acthar were made for insureds over the age of 18").  Therefore, this does not make Plaintiff's allegations implausible.

Defendant also contends that because Synacthen is a synthetic drug, it "cannot be presumed to have identical effects on the human body" and therefore would be approved by the FDA for the same 19 indications.  Mot. at 11; see also id. at 13 ("Humana makes no specific allegations regarding Synacthen's use and effectiveness as to any particular Acthar indication, let alone its relative safety and effectiveness versus Acthar as to such indications").  However, that Defendant used Synacthen studies when it applied for FDA approval and that Synacthen is used for the same indications outside of the United States makes it plausible that Synacthen would be approved for those indications in the United States.  Therefore, the Court need not

simply "guess as to whether . . . Synacthen is a plausible replacement for Acthar as the standard of care for [infantile spasms] in the United States, and whether, for other indications, it would be one of several alternatives for 'first line' treatment or an alternative to Acthar as a 'last line' treatment."  Reply at 5.  Moreover, the Court agrees with Plaintiff that it "has suffered antitrust injury if it is plausible that a finder of fact could conclude that Synacthen would have been approved for any use, as the introduction of competition would lower the price of all ACTH drugs."  Opp'n at 10 n.12.  There are no allegations that the price of Acthar differs depending on the indication.  Therefore, competition for less than all 19 indications could plausibly lower the price for all indications.

Finally, Defendant argues that Plaintiff has not plausibly alleged that the beginning of the alleged antitrust period should be 2011.  See Mot. at 13.  The bidding process for the rights to sell Synacthen in the United States did not begin until late 2012 and early 2013, and Defendant did not win the rights until June 11, 2013.  SAC ¶¶ 76-77.  Plaintiff fails to explain how any harm caused by Defendant's alleged anticompetitive behavior could have occurred prior to Defendant acquiring the Synacthen license.  However, the date another bidder could have or would have brought Synacthen to market is a factual question not best resolved at the motion to dismiss stage.  Moreover, discovery might reveal that, had it not won the bid, Defendant would have started lowering its prices prior to Synacthen's market entrance in anticipation of future competition.

The Court concludes Plaintiff has adequately alleged an antitrust injury.

### 3.    Statute of Limitations

Defendant contends that 22 of the 25 state laws relevant to Plaintiff's state antitrust claims are barred by the statute of limitations because "[a] cause of action for an allegedly anticompetitive acquisition of assets accrues on the date of the acquisition," which in this case was June 11, 2013, and that statute of limitations for those 22 states is four

years or less.  Mot. at 14.[7]  Plaintiff contends its claims were tolled due
to fraudulent concealment, the continuing violation doctrine, and
American Pipe tolling.  Opp'n at 14-19.

   a. Fraudulent Concealment

   Plaintiff alleges it "could not have discovered and remained
unaware" of Defendant's illegal conduct until the FTC brought these
actions to light in 2017 because Defendant "falsely maintained that it
would develop and seek FDA approval of Synacthen."  SAC ¶¶ 131-132.
For example, Defendant's chief scientific officer made public statements
that Defendant intended to seek FDA approval for Synacthen in
conditions different than Acthar and where Synacthen would
"potentially provide a clinical benefit over Acthar."  Dkt. 70-2 (RJN Ex.
B) (June 2013 Press Release).[8]  However, Plaintiff's Section 2 claim
explicitly alleges that Defendant's purchase of the license itself, not its
failure to commercialize the drug, is the anticompetitive behavior.  See
SAC ¶ 141 (Section 2 claim alleges that "[b]y intervening in the bidding
process for Synacthen and purchasing the exclusive license to market
Synacthen in the United States, Mallinckrodt eliminated the potential
competitive threat posed by an independently owned Synacthen
license").  In other words, as alleged, the "potential competitive threat"
was an "independently owned Synacthen license."  Plaintiff should
have been aware that there would be no independently owned

---

[7] Plaintiff agrees that these 22 states have limitations periods of four or fewer
years for antitrust claims, but contends that for two of those states, New
York and Oregon, the antitrust claim was statutorily tolled "for one year after
the conclusion of any proceeding instituted by the United States under
federal antitrust laws."  Opp'n at 19.  Defendant appears to concede that
these are not time-barred.  See Reply at 6 n.3.  Therefore, the parties agree
that 20 of 25 states relevant to Plaintiff's state antitrust claim are subject to
a statute of limitations defense.

[8] The Court grants Plaintiff's unopposed request for judicial notice (Dkt. 70)
of a press release issued by Defendant in June 2013.  Fed. R. Evid. 201(b).

Synacthen license at the time Defendant publicly announced it would be obtaining the license.

Plaintiff's other allegations provide further support for this conclusion.  For example, Plaintiff alleged that "given the drugs' similarities, any therapeutic indication that [Defendant] might have pursued with Synacthen could have been pursued with Acthar."  Id. ¶ 79.  Plaintiff also alleged that "Novartis was not naïve, and could be expected to understand that Questcor would have little interest in developing the only synthetic competitor to Acthar, its extraordina[r]ily lucrative non-synthetic product."  Id. ¶ 78.  Plaintiff does not explain why it could not have been expected to understand the same thing. Accepting as true the allegation that Defendant falsely stated that it would obtain FDA approval of Synacthen for certain treatments, there are no allegations in the complaint that would support the necessary assumption that had Defendant developed, obtained FDA approval for, and sold Synacthen in the United States, Plaintiff could have reasonably expected to have either paid lower prices for Acthar or that Synacthen would have been offered by Defendant at a materially lower price.  Given that Defendant would still control 100% of the alleged product market, whether through one drug or two, the Court cannot plausibly draw the inference that Plaintiff was reasonable in assuming Defendant would have acted to its financial detriment and lowered the price of Acthar or introduced Synacthen at a substantially lower price. See Iqbal, 556 U.S. at 679 (Courts must "draw on their judicial experience and common sense" in determining whether allegations in a complaint are plausible).  Fraudulent concealment, therefore, does not save Plaintiff's otherwise time-barred claims.[9]

---

[9] Plaintiff's footnote implicitly arguing that the Court should find fraudulent concealment here because of the Court's conclusion as to Plaintiff's RICO claim, Opp'n at 15 n.20 (citing March Order at 25), is misplaced.  The facts necessary to put Plaintiff on inquiry notice of the RICO claims differs materially from the types of facts that would put Plaintiff on inquiry notice of the antitrust claims.

A-7460

b.    <u>Continuing Violation</u>

Plaintiff also contends that Defendant's actions constitute a continuing violation because "its yearly licensing payments to Novartis have forestalled and continue to forestall the transfer of Synacthen rights to a party that would develop it to compete with Acthar." Mot. at 18.[10] Specifically, Defendant pays Novartis $25 million each year to maintain its monopoly in the long-acting ACTH market and Plaintiff contends that "[e]ach payment is anticompetitive in that it forestalls Novartis from licensing its drug to others and enables Mallinckrodt to charge monopoly prices." <u>Id.</u> Essentially, each payment is a new contract preventing Synacthen from being developed to compete with Acthar. The Court agrees.

"To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act during the limitations period that meets two criteria: '1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff.'" <u>Samsung Elecs. Co. v. Panasonic Corp.</u>, 747 F.3d 1199, 1202 (9th Cir. 2014) (quoting <u>Pace Indus., Inc. v. Three Phoenix Co.</u>, 813 F.2d 234, 238 (9th Cir. 1987)). Cases where "all of the harm occurred at the time of the initial violation . . . is the exception, not the rule. <u>Id.</u> at 1202-03. Instead, "[n]on-legal actions taken pursuant to a pre-limitations period contract can lead a new cause of action to accrue." <u>Id.</u> at 1203.

Defendant first contends the continuing violation theory does not apply because "[u]nilateral decisions about whether to develop a new product . . . are *not* subject to antitrust scrutiny." Reply at 6. However, Plaintiff is not claiming anticompetitive conduct simply because Defendant chose not to develop an Acthar competitor. The anticompetitive conduct stems from Defendant's decision to prevent

---

[10] The Court grants Plaintiff's unopposed request for judicial notice (Dkt. 70) of Defendant's SEC filings and the license agreement with Novartis (Dkts. 70-1, 70-3 through 70-8). Fed. R. Evid. 201(b).

A-7461

others from developing an Acthar competitor by continuing to pay Novartis for the Synacthen license.  Therefore, the Court finds this argument unconvincing.

Next, Defendant contends the continuing violation theory does not apply because "the license agreement [does not] contain[] a provision requiring [Defendant] to 'shelve' Synacthen."  Reply at 7.  However, Defendant cites no case law imposing a requirement for the agreement to explicitly compel the anticompetitive conduct.  Moreover, the license agreement itself explicitly prevents companies other than Defendant from developing Synacthen for sale in the United States, thereby proscribing any independently owned Synacthen license, the anticompetitive conduct at issue here.  And "action taken under a pre-limitations contract [i]s sufficient to restart the statute of limitations so long as the defendant had the ability not to take the challenged action, even if that would have required breaching the allegedly anti-competitive contract."  Samsung, 747 F.3d at 1203.

Finally, Defendant contends recent cases have held that the continuing violation theory does not apply to antitrust allegations based on price increases after an acquisition.  Reply at 7-8 (citing Midwestern Mach., Inc. v. Nw. Airlines, Inc., 167 F.3d 439, 440 (8th Cir. 1999) and Z Techs. Corp. v. Lubrizol Corp., 753 F.3d 594, 603 (6th Cir. 2014)).  These cases are factually distinct from the alleged antitrust violations at issue here, which involve more than an incidental price increase ultimately caused by an acquisition.  Here, the antitrust conduct is the continuing payments to Novartis to prevent another company from developing an Acthar competitor.  A similar arrangement was found to be a continuing violation by the Ninth Circuit in Samsung.  747 F.3d at 1204 (because "the license itself did not permanently and finally control the acts of the SD Defendants[,] [t]heir decision to enforce the contract caused a new anti-competitive harm, and the statute of limitations ran anew from the time that defendants began enforcement.").  To the extent the cases cited by Defendant contradict Ninth Circuit law as set forth in Samsung, the Court disregards them.

Therefore, the statute of limitations does not bar Plaintiff from asserting claims based on harms flowing from the alleged anticompetitive license payments made to Novartis during the limitations period.

     c.    <u>American Pipe Tolling</u>

Plaintiff contends it is also "entitled to tolling of its claims under *American Pipe* as of [April and October of 2017 when class actions were filed against Defendant], because in those cases [Plaintiff] is a putative member of the classes and its antitrust claims share a common factual and legal basis with the claims asserted." Opp'n at 15 n.21. Defendant notes that only the April 2017 lawsuit would fall within the statute of limitations, but Plaintiff was not included in the proposed class until an amended complaint was filed in December 2017, after the expiration of the four-year limitations period. <u>See</u> Reply at 8. Therefore, <u>American Pipe</u> does not save Plaintiff's state law claims to the extent based on the 2013 license agreement.[11]

***

Defendant's motion to dismiss the First and Second Counts is DENIED. Defendant's motion to dismiss the Third Count is DENIED as to claims brought under New York, Oregon, Maine, Vermont, and Wisconsin law. As to the remaining state law antitrust claims, Defendant's motion is GRANTED to the extent Plaintiff seeks to challenge the 2013 license agreement (and any other conduct outside of the relevant limitations period), but DENIED as to Defendant's alleged continuing antitrust violations within the limitations period.

---

[11] It does not appear that Defendant disputes that the complaints filed on October 30, 2017 and December 8, 2017 would toll the statute of limitations for claims based on conduct that occurred within four years of those dates.

A-7463

## B.    RICO (Counts IV and V)

The Court previously held that Plaintiff had adequately alleged RICO claims based on an alleged "Acthar Enterprise," consisting of Defendant, CDF, and the prescribing doctors, that participated in a pattern of racketeering activity including 1) mail and wire fraud based on Defendant's and prescribing doctors' misrepresentations that they were complying with state and federal law, when in fact a) the co-pay assistance programs violated the Anti-Kickback Statute (AKS) and the False Claims Act (FCA), and b) the doctor payments violated state bribery laws and 2) bribery based on the doctor payments.  March Order 13-34.[12]  In so deciding, the Court rejected Defendant's contention that any racketeering acts related to the co-pay assistance funds occurred outside the four-year statute of limitations.  Id. at 23-25.

Defendant now contends that the Court's "reasoning [on the statute of limitations issue] invites consideration of judicially noticeable facts establishing that the claim is time-barred."  Mot. at 3.[13]  Defendant identifies a 2013 New York Times article that purportedly establishes that Humana "would have been on notice of its alleged claim" more than four-years before it filed this action.  Id. at 4; see also id. at 18 ("the alleged conduct has been public knowledge since 2013"), id. at 19 ("major news media reported – as early as 2013 – about Questcor's alleged contributions to the CDF funds at issue and their purported Acthar-only nature").  However, Defendant does not explain

---

[12] The Court also held that Plaintiff had not adequately alleged any racketeering activity based on alleged insured misrepresentations or the theory that co-pay assistance was bribery.  March Order at 26-28.  The Court invited Plaintiff to amend those claims to the extent it wished to continue pursuing them.  Id. at 35 n.21.  Because Plaintiff chose not to amend those claims, it has abandoned them.  For the sake of clarity, the Fourth and Fifth Counts, to the extent they rely on either of these theories, are DISMISSED.

[13] Defendant concedes it is not entitled to dismissal based on the allegations in the SAC alone.  See Mot. at 19 (Defendant "agrees that [Plaintiff] had not pled admissions on the critical issue of what it knew about the CDF funds at the time").

how the Court's reasoning in the March Order warrants reconsideration of the statute of limitations issue. The Central District of California permits only three grounds on which a motion for reconsideration may be made:

> (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision.

Local Rule 7-18. The new article is at best a material difference in fact, but Defendant makes no argument that it could not have discovered the article in the exercise of reasonable diligence prior to the March Order. Therefore, the Court declines to reconsider its prior determination that Plaintiff had adequately alleged it discovered Defendant's wrongdoing within the limitations period.

Further, as Plaintiff points out, even if the Court were to consider the article, it would not change the outcome. One or two articles are insufficient to show, as a matter of law, that Plaintiff had constructive notice of the facts contained within them.[14] Additionally, the Court previously concluded that because Plaintiff alleged that the donation agreements fraudulently misrepresented that the funds were not limited to patients using Acthar, had Plaintiff inquired into the funds,

_____

[14] Defendant contends that its argument is not that the articles themselves should have put Plaintiff on notice, but that the OIG's 2014 SAB, which purportedly singled out the emergence of single-drug funds, should have caused Plaintiff to run some Google searches to see if there were any articles about drugs covered by Plaintiff. Reply at 11. Whether Plaintiff's investigation (or lack thereof) in response to the 2014 SAB was reasonable is a factual issue not best resolved at the motion to dismiss stage.

it would not have discovered that the funds were illegal.  March Order at 24-25.

Defendant's motion to dismiss Counts Four and Five to the extent based on allegations regarding co-pay assistance programs is DENIED.

## C.    State Law Claims (Counts VI through X)

### 1.    Statute of Limitations

Defendant contends that 21 of the 25 states' laws under which Plaintiff brings its unfair competition and consumer fraud and deceptive trade practices claims, as well as four of the five states' laws under which Plaintiff brought an insurance fraud claim are also barred by the relevant statutes of limitations to the extent they are based on the co-pay assistance funds.  Mot. at 20.  The Court declines to dismiss those claims for the same reason stated in section III.B. and for the additional reason that Defendant did not raise this contention in its prior motion and therefore is prohibited from doing so here under Rule 12(g)(2).  See In re Apple iPhone Antitrust Litig., 846 F.3d 313, 317-318 (9th Cir. 2017), aff'd sub nom. Apple Inc. v. Pepper, 139 S. Ct. 1514 (2019) ("a defendant who fails to assert a failure-to-state-a-claim defense in a pre-answer Rule 12 motion cannot assert that defense in a later pre-answer motion under Rule 12(b)(6)").

### 2.    Individual Defenses to State Laws

Defendant next contends Plaintiff's claims under Kentucky and New Jersey insurance fraud statutes also fail because the Kentucky statute requires a criminal adjudication of guilt and the New Jersey statute requires "prelitigation notice . . . with which [Plaintiff] has not alleged compliance."  Mot. at 15 n.8.  Not only does Rule 12(g)(2) prevent Defendant from making these arguments in a successive pre-answer motion to dismiss, but it is also legally incorrect.  As Plaintiff notes, the Kentucky legislature repealed the requirement of criminal adjudication.  See 2018 Kentucky Laws Ch. 178 (HB 323) (removing requirement of a "criminal adjudication of guilt" for a private party to

A-7466

state a claim for damages). And as to the New Jersey statute, prelitigation notice is not required. See N.J. Stat. § 17:33A-7(c) (notice to be provided at the time of filing). In reply, Defendant appears to concede that Plaintiff can assert its claim under New Jersey law. Reply at 12 ("Mallinckrodt requests that the Court dismiss with prejudice . . . all other claims (except that under New Jersey's Insurance Fraud Statute)").

Defendant attaches to its brief "Appendix B," a chart of legal defenses to Plaintiff's unfair competition and consumer fraud and deceptive trade practices claims. See Mot. at 23-25. That chart includes the following arguments:

- Michigan's statutes do not apply to regulated activities, such as the provision of prescription drugs to Medicare beneficiaries, or alleged misrepresentations not made to customers

- Minnesota's statutes require claims to satisfy the public benefit requirement and therefore do not apply to claims for recovery of private damages

- New Jersey's statutes do not permit claims brought by third-party payors, rather than drug consumers

- North Dakota's statutes do not apply to statements made in connection with coverage, rather than in connection with the sale or advertisement of a drug

Although technically within the 25-page limit, Appendix B skirts the purpose of the page limitation by including additional argument in size 11 font, single-spaced. Moreover, the arguments were not raised in the prior motion and are therefore improper under Rule 12(g)(2). The Court will not consider these additional defenses at this time.

### 3. Tortious Interference

The Court previously dismissed Plaintiff's tortious interference claim because Plaintiff had failed to allege that accepting co-pay

assistance caused its members to breach their contract with Plaintiff. March Order at 34.  Plaintiff has added allegations that its contracts with its members "provide[] that an insured is 'responsible for' copayments and 'must pay [their] share of the cost when [they] get [a] service or drug.'"  SAC ¶ 202.  The contract also states that "when you get a drug through a patient assistance program offered by a drug manufacturer . . . we will not pay for any share of these drug costs."  Id. Plaintiff contends that "[i]f the [patient assistance program] uses its funds to pay the member's co-pay, however, then both the letter and the purpose of the [contract] provision are subverted."  Id. ¶ 203.

But nothing in the cited provisions can reasonably be read as preventing members from paying their co-pays with money obtained from a co-pay assistance fund.  The first provision, as discussed in the March Order, merely requires members to pay their co-pays.  It sets no limitations on the source of the funds.  The second provision, when read in context, does not prohibit members from doing anything it all.  It is only a reminder that if members obtain drugs outside of their plan benefits directly from the drug manufacturer through a patient assistance program, Plaintiff will not reimburse members for any payments made to the patient assistance programs.  Here, in contrast, the members do obtain the drugs through their insurance, and simply obtain the funds to pay the co-pays through a co-pay assistance fund. That is not prohibited by the contracts.  The contract does not say that if a co-pay assistance fund covers the co-pay, Plaintiff was entitled to deny coverage in the first place, when it otherwise would have provided coverage.  Moreover, there is simply nothing in the cited provision that requires members to "identif[y]" whether co-pay assistance "originat[ed] with the manufacturer."  Id.  Therefore, it does not follow that "it is a breach for the member to use that assistance to procure payment for the manufacturer's drug."  Id.; see also id. ("Mallinckrodt is causing Humana members to procure a benefit under the contract to

A-7468

which the members are not entitled under the contract's plain terms.")[15]

Therefore, Plaintiff has still not alleged that its members breached their contracts, and the Court determines that Plaintiff cannot plead any other facts that would cure this deficiency. See Schreiber, 806 F.2d at 1401 (leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency"). Count IX is DISMISSED with prejudice.

## IV. CONCLUSION

Count III, to the extent it relies on laws from states other than New York, Oregon, Maine, Vermont, and Wisconsin and relies on the 2013 license agreement, Counts IV and V, to the extent they rely on purported racketeering activity based on alleged insured

---

[15] In half a sentence Plaintiff contends that members' acceptance of co-pay assistance is alternatively "'disruption' of the contractual relationship." Opp'n at 21 (citing Redfearn v. Trader Joe's Co., 230 Cal. Rptr. 3d 98, 104 (2018)). This is insufficient to preserve this argument. See Birdsong v. Apple, Inc., 590 F.3d 955, 959 (9th Cir. 2009) ("[A] bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review."); see also Indep. Towers of Washington v. Washington, 350 F.3d 925, 929-30 (9th Cir. 2003) ("However much we may importune lawyers to be brief and to get to the point, we have never suggested that they skip the substance of their argument in order to do so. . . . We require contentions to be accompanied by reasons."); Mahaffey v. Ramos, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived").

A-7469

misrepresentations or the theory that co-pay assistance was bribery, and Count IX are DISMISSED with prejudice.  Defendant's motion is otherwise DENIED.

IT IS SO ORDERED.

Date: August 14, 2020

Dale S. Fischer
United States District Judge

| | |
|---|---|
| **From:** | CHRISTOPHER.HARRIS@lw.com |
| **Sent:** | Monday, May 24, 2021 6:23 PM |
| **To:** | BMcCallen@willkie.com; haviland@havilandhughes.com; wgouldsbury@ciardilaw.com; jb@bflawfirm.com; Aciardi@ciardilaw.com; platt@havilandhughes.com; dastin@ciardilaw.com; catherine@havilandhughes.com; mfreimuth@willkie.com; IBruckner@willkie.com; SSilvertrust@willkie.com; PDiSanto@willkie.com; Culver, Donna; Dehney, Robert; Harvey, Matthew; Amer, Nader |
| **Cc:** | Hugh.Murtagh@lw.com; Betsy.Marks@lw.com; Merchant@RLF.com; Stearn@RLF.com; mfeldman@willkie.com |
| **Subject:** | [EXT] RE: Omnibus unsubstantiated claims objection |

That is fine thanks.

---

**From:** McCallen, Benjamin <BMcCallen@willkie.com>
**Date:** Monday, May 24, 2021, 6:12 PM
**To:** Harris, Christopher (NY) <CHRISTOPHER.HARRIS@lw.com>, haviland@havilandhughes.com <haviland@havilandhughes.com>, wgouldsbury@ciardilaw.com <wgouldsbury@ciardilaw.com>, jb@bflawfirm.com <jb@bflawfirm.com>, Aciardi@ciardilaw.com <Aciardi@ciardilaw.com>, platt@havilandhughes.com <platt@havilandhughes.com>, dastin@ciardilaw.com <dastin@ciardilaw.com>, catherine@havilandhughes.com <catherine@havilandhughes.com>, Freimuth, Matthew <mfreimuth@willkie.com>, Bruckner, Ian <IBruckner@willkie.com>, Silvertrust, Skyler J. <SSilvertrust@willkie.com>, DiSanto, Philip <PDiSanto@willkie.com>, dculver@morrisnichols.com <dculver@morrisnichols.com>, rdehney@morrisnichols.com <rdehney@morrisnichols.com>, mharvey@morrisnichols.com <mharvey@morrisnichols.com>, namer@morrisnichols.com <namer@morrisnichols.com>
**Cc:** Murtagh, Hugh (NY) <Hugh.Murtagh@lw.com>, Marks, Betsy (BN) <Betsy.Marks@lw.com>, Merchant@RLF.com <Merchant@RLF.com>, Stearn@RLF.com <Stearn@RLF.com>, Feldman, Matthew <mfeldman@willkie.com>
**Subject:** RE: Omnibus unsubstantiated claims objection

Chris,
We have no objection to your proposal, provided that our admin and estimation motions stay on calendar for June 7.


**Benjamin P. McCallen**
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue | New York, NY 10019-6099
Direct: +1 212 728 8182 | Fax: +1 212 728 9182
bmccallen@willkie.com | vCard | www.willkie.com bio

---

**From:** CHRISTOPHER.HARRIS@lw.com <CHRISTOPHER.HARRIS@lw.com>
**Sent:** Monday, May 24, 2021 6:04 PM
**To:** haviland@havilandhughes.com; wgouldsbury@ciardilaw.com; jb@bflawfirm.com; Aciardi@ciardilaw.com; platt@havilandhughes.com; dastin@ciardilaw.com; catherine@havilandhughes.com; Freimuth, Matthew <mfreimuth@willkie.com>; McCallen, Benjamin <BMcCallen@willkie.com>; Bruckner, Ian <IBruckner@willkie.com>; Silvertrust, Skyler J. <SSilvertrust@willkie.com>; DiSanto, Philip <PDiSanto@willkie.com>; dculver@morrisnichols.com; rdehney@morrisnichols.com; mharvey@morrisnichols.com; namer@morrisnichols.com

1

**Cc:** Hugh.Murtagh@lw.com; Betsy.Marks@lw.com; Merchant@RLF.com; Stearn@RLF.com
**Subject:** Omnibus unsubstantiated claims objection

**\*\*\* EXTERNAL EMAIL \*\*\***

Counsel, we believe that the parties would benefit from clarity from the Court as to the scope of relevant discovery (both documents and deposition topics). The Haviland Hughes Plaintiffs have filed a motion to compel on document discovery to be heard on June 2, and we think it would make sense to get the Court's guidance then on the related scope of depositions as well. We think therefore it makes sense to move the 30b6 deposition until the week of June 1 after we get the Court's guidance. We have also heard from the Insurance Claimants that they need more time to review the Committee document production. To allow time for any additional production and review, we will adjourn the hearing on the unsubstantiated claims objection for two weeks to the week of June 21.

In addition, we also understand you wish to file a supplemental objection or other briefing after the 30b6 deposition, in which case we will file our reply brief five business after your supplemental briefing.

If you object to this adjournment please let us know tomorrow; otherwise we will reach out to the Court to find available dates for the week of June 21.

My apologies if I missed anyone who should be on this email.

Thank you.

---

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

---

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

A-7472

| | |
|---|---|
| **From:** | McCallen, Benjamin <BMcCallen@willkie.com> |
| **Sent:** | Wednesday, June 23, 2021 5:02 PM |
| **To:** | 'Hugh.Murtagh@lw.com'; DiSanto, Philip; Amer, Nader; Harvey, Matthew; Dehney, Robert; Choi, Richard; Polizzano, Michelle; Powell, Wesley; bwaldin@EimerStahl.com; DiSanto, Philip; Freimuth, Matthew; Feldman, Matthew |
| **Cc:** | Keith.Simon@lw.com; CHRISTOPHER.HARRIS@lw.com; Betsy.Marks@lw.com; Jeffrey.Mispagel@lw.com; Keith.Simon@lw.com; Justin.Kirschner@lw.com; Kelsey.Zottnick@lw.com; Larry.Hong@lw.com; Alexandra.Zablocki@lw.com; Nacif.Taousse@lw.com; Stearn@RLF.com; Merchant@RLF.com |
| **Subject:** | [EXT] RE: status conference; unsubstantiated claims hearing date |

Hugh:

Agreed on both points below.  However, I think we need to address your reply date.  Would July 9 work?  That would give you three weeks from the date we filed our brief, and also give us ample time with your papers to prepare for the hearing.

**Benjamin P. McCallen**
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue | New York, NY 10019-6099
Direct: +1 212 728 8182 | Fax: +1 212 728 9182
bmccallen@willkie.com | vCard | www.willkie.com bio

---

**From:** Hugh.Murtagh@lw.com <Hugh.Murtagh@lw.com>
**Sent:** Tuesday, June 22, 2021 10:49 PM
**To:** McCallen, Benjamin <BMcCallen@willkie.com>; DiSanto, Philip <PDiSanto@willkie.com>; namer@morrisnichols.com; MHarvey@morrisnichols.com; RDehney@morrisnichols.com; Choi, Richard <rchoi1@willkie.com>; Polizzano, Michelle <MPolizzano@willkie.com>; Powell, Wesley <wpowell@willkie.com>; bwaldin@EimerStahl.com; DiSanto, Philip <PDiSanto@willkie.com>; Freimuth, Matthew <mfreimuth@willkie.com>; Feldman, Matthew <mfeldman@willkie.com>
**Cc:** Keith.Simon@lw.com; CHRISTOPHER.HARRIS@lw.com; Betsy.Marks@lw.com; Jeffrey.Mispagel@lw.com; Keith.Simon@lw.com; Justin.Kirschner@lw.com; Kelsey.Zottnick@lw.com; Larry.Hong@lw.com; Alexandra.Zablocki@lw.com; Nacif.Taousse@lw.com; Stearn@RLF.com; Merchant@RLF.com
**Subject:** status conference; unsubstantiated claims hearing date

**\*\*\* EXTERNAL EMAIL \*\*\***

Ben, All,

Two things:

First:  We had agreed to have a status conference on your estimation motion at the conclusion of the 6/25 hearing.  Assume we should just adjourn that to come at the conclusion of the unsubstantiated claims hearing.  Let me know if you have any concerns.

Second:  We learned belatedly that Stephen Welch cannot be available on July 13.  The court's availability through mid-July is extremely limited.  It looks like we can get July 23 instead.  Does this work for your side?  Sorry for this after all the back and forth to find a date—had a miscommunication on our end.

Best,
Hugh

**Hugh Murtagh**

**LATHAM & WATKINS LLP**
1271 Avenue of the Americas | New York, NY 10020
D: +1.212.906.1648 | C: +1.646.637.8095

---

**From:** McCallen, Benjamin <BMcCallen@willkie.com>
**Sent:** Monday, June 21, 2021 6:25 PM
**To:** Murtagh, Hugh (NY) <Hugh.Murtagh@lw.com>; DiSanto, Philip <PDiSanto@willkie.com>; namer@morrisnichols.com; MHarvey@morrisnichols.com; RDehney@morrisnichols.com; Choi, Richard <rchoi1@willkie.com>; Polizzano, Michelle <MPolizzano@willkie.com>; Powell, Wesley <wpowell@willkie.com>; bwaldin@EimerStahl.com; DiSanto, Philip <PDiSanto@willkie.com>; Freimuth, Matthew <mfreimuth@willkie.com>; Feldman, Matthew <mfeldman@willkie.com>
**Cc:** Simon, Keith (NY) <Keith.Simon@lw.com>; Harris, Christopher (NY) <CHRISTOPHER.HARRIS@lw.com>; Marks, Betsy (BN) <Betsy.Marks@lw.com>; Mispagel, Jeffrey (NY) <Jeffrey.Mispagel@lw.com>; Simon, Keith (NY) <Keith.Simon@lw.com>; Kirschner, Justin (NY) <Justin.Kirschner@lw.com>; Zottnick, Kelsey (CH) <Kelsey.Zottnick@lw.com>; Hong, Larry (NY) <Larry.Hong@lw.com>; Zablocki, Alexandra (NY) <Alexandra.Zablocki@lw.com>; Taousse, Nacif (NY) <Nacif.Taousse@lw.com>; Stearn@RLF.com; Merchant@RLF.com
**Subject:** RE: Friday's hearing

That works.

**Benjamin P. McCallen**
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue | New York, NY 10019-6099
Direct: +1 212 728 8182 | Fax: +1 212 728 9182
bmccallen@willkie.com | vCard | www.willkie.com bio

---

**From:** Hugh.Murtagh@lw.com <Hugh.Murtagh@lw.com>
**Sent:** Monday, June 21, 2021 6:24 PM
**To:** McCallen, Benjamin <BMcCallen@willkie.com>; DiSanto, Philip <PDiSanto@willkie.com>; namer@morrisnichols.com; MHarvey@morrisnichols.com; RDehney@morrisnichols.com; Choi, Richard <rchoi1@willkie.com>; Polizzano, Michelle <MPolizzano@willkie.com>; Powell, Wesley <wpowell@willkie.com>; bwaldin@EimerStahl.com; DiSanto, Philip <PDiSanto@willkie.com>; Freimuth, Matthew <mfreimuth@willkie.com>; Feldman, Matthew <mfeldman@willkie.com>
**Cc:** Keith.Simon@lw.com; CHRISTOPHER.HARRIS@lw.com; Betsy.Marks@lw.com; Jeffrey.Mispagel@lw.com; Keith.Simon@lw.com; Justin.Kirschner@lw.com; Kelsey.Zottnick@lw.com; Larry.Hong@lw.com; Alexandra.Zablocki@lw.com; Nacif.Taousse@lw.com; Stearn@RLF.com; Merchant@RLF.com
**Subject:** RE: Friday's hearing

**\*\*\* EXTERNAL EMAIL \*\*\***

Ben,

A-7474

As discussed, the court can give us July 13 starting at 1pm ET.  We will file our reply brief by July 7.  Haviland Hughes confirms it consents as well.  We can take care of adjusting the schedule.  Let me know of any issues, otherwise we'll get this done.

Thanks,
Hugh

**Hugh Murtagh**

**LATHAM & WATKINS** LLP
1271 Avenue of the Americas | New York, NY 10020
D: +1.212.906.1648 | C: +1.646.637.8095

---

**From:** McCallen, Benjamin <BMcCallen@willkie.com>
**Sent:** Monday, June 21, 2021 2:41 PM
**To:** Murtagh, Hugh (NY) <Hugh.Murtagh@lw.com>; DiSanto, Philip <PDiSanto@willkie.com>; namer@morrisnichols.com; MHarvey@morrisnichols.com; RDehney@morrisnichols.com; Choi, Richard <rchoi1@willkie.com>; Polizzano, Michelle <MPolizzano@willkie.com>; Powell, Wesley <wpowell@willkie.com>; bwaldin@EimerStahl.com; DiSanto, Philip <PDiSanto@willkie.com>; Freimuth, Matthew <mfreimuth@willkie.com>; Feldman, Matthew <mfeldman@willkie.com>
**Cc:** Simon, Keith (NY) <Keith.Simon@lw.com>; Harris, Christopher (NY) <CHRISTOPHER.HARRIS@lw.com>; Marks, Betsy (BN) <Betsy.Marks@lw.com>; Mispagel, Jeffrey (NY) <Jeffrey.Mispagel@lw.com>; Simon, Keith (NY) <Keith.Simon@lw.com>; Kirschner, Justin (NY) <Justin.Kirschner@lw.com>; Zottnick, Kelsey (CH) <Kelsey.Zottnick@lw.com>; Hong, Larry (NY) <Larry.Hong@lw.com>; Zablocki, Alexandra (NY) <Alexandra.Zablocki@lw.com>; Taousse, Nacif (NY) <Nacif.Taousse@lw.com>; Stearn@RLF.com; Merchant@RLF.com
**Subject:** RE: Friday's hearing

Hugh,
The end of next week likely would not work for me, as I have to fly to Phoenix next week for a hearing in another matter.  Otherwise, this is fine with us.  For the reply brief, assuming we are looking at something after July 4th, can we do 5 business days?

**Benjamin P. McCallen**
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue | New York, NY 10019-6099
Direct: +1 212 728 8182 | Fax: +1 212 728 9182
bmccallen@willkie.com | vCard | www.willkie.com bio

---

**From:** Hugh.Murtagh@lw.com <Hugh.Murtagh@lw.com>
**Sent:** Monday, June 21, 2021 2:09 PM
**To:** McCallen, Benjamin <BMcCallen@willkie.com>; DiSanto, Philip <PDiSanto@willkie.com>; namer@morrisnichols.com; MHarvey@morrisnichols.com; RDehney@morrisnichols.com; Choi, Richard <rchoi1@willkie.com>; Polizzano, Michelle <MPolizzano@willkie.com>; Powell, Wesley <wpowell@willkie.com>; bwaldin@EimerStahl.com; DiSanto, Philip <PDiSanto@willkie.com>
**Cc:** Keith.Simon@lw.com; CHRISTOPHER.HARRIS@lw.com; Betsy.Marks@lw.com; Jeffrey.Mispagel@lw.com; Keith.Simon@lw.com; Justin.Kirschner@lw.com; Kelsey.Zottnick@lw.com; Larry.Hong@lw.com; Alexandra.Zablocki@lw.com; Nacif.Taousse@lw.com; Stearn@RLF.com; Merchant@RLF.com
**Subject:** RE: Friday's hearing

*** EXTERNAL EMAIL ***

A-7475

Ben, thanks—and adding the full crews for visibility.

We think this make sense.  We would propose to contact chambers for the next available time starting with latter half of next week.  If we get a date late next week, we would file the reply 3 days ahead of the hearing; if it gets pushed past that, we would file reply 5 days ahead of the hearing.  (Judge Dorsey may be out the full week after July 4.)  If this works for you we will confirm Haviland Hughes has no objection, and then reach out to chambers for a date.  If the first date is well beyond mid-July, we will get back in touch with you before agreeing to anything.


**Hugh Murtagh**

**LATHAM & WATKINS** LLP
1271 Avenue of the Americas | New York, NY 10020
D: +1.212.906.1648 | C: +1.646.637.8095

---

**From:** McCallen, Benjamin <BMcCallen@wil_____lkie.com>
**Sent:** Monday, June 21, 2021 12:04 PM
**To:** Murtagh, Hugh (NY) <Hugh.Murtagh@lw.com>
**Subject:** Friday's hearing

Hugh,

Following up on our conversation from Friday, I wanted to make a proposal relating to Friday's hearing  Happy to discuss via phone with you or the larger team if helpful.

We would agree to adjourn the Unsubstantiated Claims Objection hearing, which means you don't have to file your reply tomorrow, Welch does not have to take the stand and the Debtors can focus their time and attention this week on other matters.  We can contact chambers and get a new hearing date for some time in mid-July, and re-set your reply date (we will want it well before 3 days in advance of the hearing, but we can figure that out once we have a hearing date).

All we ask in exchange is that the Debtors agree to withdraw their objection to producing documents relating to our pre-petition, non-admin claims on the basis of the Unsubstantiated Claims Objection.  As a practical matter, what that means is that, consistent with the schedule ordered by the judge last week, we will serve you any remaining discovery requests by Wednesday, the Debtors will respond to those RFPs by July 2 (as they will for all other parties), and then engage with us in good faith on the scope of our requests, and produce documents consistent with the Court order.  In the meantime, hopefully we make progress in mediation.  If not, then all other rights reserved -- we can have the claims objection heard in a few weeks and if the Court grants it, you reserve the right to make any arguments you want about limiting other discovery, estimation, etc., in light of that ruling.


**Benjamin P. McCallen**
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue | New York, NY 10019-6099
Direct: +1 212 728 8182 | Fax: +1 212 728 9182
bmccallen@willkie.com | vCard | www.willkie.com bio

---

**Important Notice:**  This email message is intended to be received only by persons entitled to receive the confidential information it may contain.  Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged.  Please do not read, copy, forward or store this message unless you are an intended recipient of it.  If you have

received this message in error, please forward it back.  Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

**Important Notice:**  This email message is intended to be received only by persons entitled to receive the confidential information it may contain.  Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged.  Please do not read, copy, forward or store this message unless you are an intended recipient of it.  If you have received this message in error, please forward it back.  Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

**Important Notice:**  This email message is intended to be received only by persons entitled to receive the confidential information it may contain.  Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged.  Please do not read, copy, forward or store this message unless you are an intended recipient of it.  If you have received this message in error, please forward it back.  Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

**Important Notice:**  This email message is intended to be received only by persons entitled to receive the confidential information it may contain.  Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged.  Please do not read, copy, forward or store this message unless you are an intended recipient of it.  If you have received this message in error, please forward it back.  Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

A-7477

| **From:** | Hugh.Murtagh@lw.com |
|---|---|
| **Sent:** | Thursday, July 1, 2021 12:32 PM |
| **To:** | PDiSanto@willkie.com; Amer, Nader; Harvey, Matthew; Dehney, Robert; rchoi1@willkie.com; MPolizzano@willkie.com; wpowell@willkie.com; bwaldin@EimerStahl.com; PDiSanto@willkie.com; mfreimuth@willkie.com; mfeldman@willkie.com; haviland@havilandhughes.com; catherine@havilandhughes.com; platt@havilandhughes.com; wgouldsbury@ciardilaw.com; dastin@ciardilaw.com |
| **Cc:** | Keith.Simon@lw.com; CHRISTOPHER.HARRIS@lw.com; Betsy.Marks@lw.com; Jeffrey.Mispagel@lw.com; Keith.Simon@lw.com; Justin.Kirschner@lw.com; Kelsey.Zottnick@lw.com; Larry.Hong@lw.com; Alexandra.Zablocki@lw.com; Nacif.Taousse@lw.com; Stearn@RLF.com; Merchant@RLF.com; Annemarie.Reilly@lw.com |
| **Subject:** | [EXT] Unsubstantiated Claims Objection -- July 23 |

All,

Circling back to confirm that all parties have agreed July 23 works for the unsubstantiated claims objection hearing.  As discussed earlier, we will file our reply brief no later than July 9.  Please let us know of any issues.

Best,
Hugh

**Hugh Murtagh**

**LATHAM & WATKINS LLP**
1271 Avenue of the Americas | New York, NY 10020
D: +1.212.906.1648 | C: +1.646.637.8095

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.

A-7478

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | )  Chapter 11 |
|  | ) |
| MALLINCKRODT., *et al.*, | )  Case No. 20-12522 (JTD) |
|  | ) |
| Debtors.[1] | )  (Jointly Administered) |
|  | ) |
|  | )  Re: D.I. 2165 |

## JOINT DEBTORS AND ATTESTOR/HUMANA
## EXHIBIT & WITNESS LIST FOR JULY 23, 2021 HEARING

| Exhibit No. | Document Description |
|---|---|
| 1. | List of 62 Non-Defendant Debtors showing how they are defined in the *Debtors' Omnibus Reply in Support of First Omnibus Objection to Unsubstantiated Claims (Substantive)* [Docket. No. 3177] (the "***Reply***") (appended to Reply as Exhibit A) |
| 2. | Transcript of Video Hearing Before the Honorable John T. Dorsey, United States Bankruptcy Judge, conducted Jun. 2, 2021, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) (appended to Reply as Exhibit B) |
| 3. | Transcript of Video Hearing Before the Honorable John T. Dorsey, United States Bankruptcy Judge, conducted Jun. 29, 2021, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) (appended to Reply as Exhibit C) |
| 4. | *Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions*, dated Oct. 12, 2020, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) [Docket No. 128] |
| 5. | *Amended Verified Statement Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure of Acthar Plaintiffs' Counsel*, dated Feb. 24, 2021, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) [Docket No. 1508] |
| 6. | *Debtors' Omnibus Objection to Class Proofs of Claim*, dated Apr. 30, 2021, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) [Docket No. 2164] |
| 7. | *Order Granting the Debtors' Motion for Injunctive Relief Pursuant to 11 U.S.C. § 105*, dated Nov. 25, 2020, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD), Adv. Pro. No. 20-50850 (JTD) [Adv. Docket No. 170] |

1   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.   The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

| Exhibit No. | Document Description |
|---|---|
| 8. | *Order Granting the Debtors' Supplemental Motion for Injunctive Relief Pursuant to 11 U.S.C. § 105*, dated Dec. 4, 2020, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD), Adv. Pro. No. 20-50850 (JTD) [Adv. Docket No. 180] |
| 9. | *Complaint*, dated Apr. 6, 2017, *City of Rockford v. Mallinckrodt ARD Inc., et al.*, No. 3:17-cv-50107 (IDJ) (LAJ) (N.D. Ill.) [Docket No. 1] (appended to Reply as Exhibit D) |
| 10. | *Second Amended Class Action Complaint*, dated Dec. 8, 2017, *City of Rockford v. Mallinckrodt ARD Inc., et al.*, No. 3:17-cv-50107 (IDJ) (LAJ) (N.D. Ill.) [Docket No. 98] |
| 11. | *Order & Memorandum Opinion and Order*, dated Jan. 25, 2019, *City of Rockford v. Mallinckrodt ARD Inc., et al.*, No. 3:17-cv-50107 (IDJ) (LAJ) (N.D. Ill.) [Docket Nos. 177 & 178] (appended to Reply as Exhibit E) |
| 12. | *City of Rockford v. Mallinckrodt ARD Inc.*, 360 F. Supp. 3d 730, 776-77 (N.D. Ill. 2019), *reconsideration denied*, No. 17 C 50107, 2019 WL 2763181 (N.D. Ill. May 3, 2019) (appended to Reply as Exhibit F) |
| 13. | *Mallinckrodt's Motion to Transfer Venue*, dated Jan. 27, 2021, *City of Rockford v. Mallinckrodt ARD Inc., et al.*, No. 3:17-cv-50107 (IDJ) (LAJ) (N.D. Ill.) [Docket No. 533] (appended to Reply as Exhibit G) |
| 14. | *Notice to Defend & Civil Action Complaint*, dated May 25, 2018, *Int'l Union of Operating Eng'rs Local 542 v. Mallinckrodt ARD, Inc., et al.*, Case No. 2018-14059 (Pa. Ct. Com. Pl.) [Docket No. 1] |
| 15. | *Notice to Defend & Amended Civil Action Complaint*, dated Aug. 27, 2018, *Int'l Union of Operating Eng'rs Local 542 v. Mallinckrodt ARD, Inc., et al.*, Case No. 2018-14059 (Pa. Ct. Com. Pl.) [Docket No. 79] |
| 16. | *Mallinckrodt Defendants' Notice of Removal*, dated Jan. 8, 2021, *Int'l Union of Operating Eng'rs Local 542 v. Mallinckrodt ARD Inc., et al.*, No. 2:21-cv-00114-BMS (E.D. Pa.) [Docket No. 1] (appended to Reply as Exhibit I) |
| 17. | *Order & Memorandum*, dated Mar. 10, 2021, *Int'l Union of Operating Eng'rs Local 542 v. Mallinckrodt ARD Inc., et al.*, No. 2:21-cv-00114-BMS (E.D. Pa.) [Docket Nos. 16 & 17] (appended to Reply as Exhibit J) |
| 18. | *Order*, dated June 23, 2021, *Int'l Union of Operating Eng'rs Local 542 v. Mallinckrodt ARD Inc., et al.*, C.A. No. 21-647 (MN) (D. Del.) [Docket No. 36] |
| 19. | *Complaint*, dated May 21, 2019, *Acument Glob. Techs., Inc. v. Mallinckrodt ARD Inc., et al.*, Case No. CT-2275-19 (Tenn. Cir. Ct.) |
| 20. | *Order Motions to Dismiss*, dated Feb. 21, 2020, *Acument Glob. Techs., Inc. v. Mallinckrodt ARD Inc., et al.*, Case No. CT-2275-19 (Tenn. Cir. Ct.) (appended to Reply as Exhibit K) |

| Exhibit No. | Document Description |
|---|---|
| 21. | *Mallinckrodt Defendants' Notice of Removal*, dated Jan. 8, 2021, *Acument Glob. Techs., Inc. v. Mallinckrodt ARD Inc., et al.*, Case No. 2:21-cv-02024-JTF-TMP (W.D. Tenn.) (appended to Reply as <u>Exhibit L</u>) |
| 22. | *Mallinckrodt's Motion to Transfer Venue*, dated Jan. 28, 2021, *Acument Glob. Techs., Inc. v. Mallinckrodt ARD Inc., et al.*, Case No. 2:21-cv-02024-JTF-TMP (W.D. Tenn.) [Docket No. 7] (appended to Reply as <u>Exhibit M</u>) |
| 23. | *Civil Class Action Complaint*, Jul. 12, 2019, *Steamfitters Local Union No. 420 v. Mallinckrodt ARD LLC, et al.*, Case No. 2:19-cv-03047-BMS (E.D. Pa.) [Docket No. 1] |
| 24. | *Mallinckrodt's Motion to Transfer Venue*, dated Jan. 27, 2021, *Steamfitters Local Union No. 420 v. Mallinckrodt ARD LLC, et al.*, Case No. 2:19-cv-03047-BMS (E.D. Pa.) [Docket No. 90] (appended to Reply as <u>Exhibit N</u>) |
| 25. | *Class Action Complaint*, dated Nov. 22, 2019, *United Association of Plumbers & Pipefitters Local 322 of S. N.J. v. Mallinckrodt ARD, LLC, et al.*, Case No. CAM-L-004696-19, Transaction ID LCV20192163842 (N.J. Supp. Ct. Law Div.) (appended to Reply as <u>Exhibit O</u>) |
| 26. | *Amended Complaint*, Feb. 20, 2020, *United Association of Plumbers & Pipefitters Local 322 of S. N.J. v. Mallinckrodt ARD, LLC, et al.*, Case No. 1:20-cv-00188-RBK-KMW (D.N.J.) [Docket No. 40] |
| 27. | *Order & Opinion*, dated Aug. 18, 2020, *United Association of Plumbers & Pipefitters Local 322 of S. N.J. v. Mallinckrodt ARD, LLC, et al.*, Case No. 1:20-cv-00188-RBK-KMW (D.N.J.) [Docket Nos. 76 & 77] (appended to Reply as <u>Exhibit P</u>) |
| 28. | *Notice of Motion to Transfer Venue Pursuant to 28 U.S.C. § 1412*, dated Jan. 27, 2021, *United Association of Plumbers & Pipefitters Local 322 of S. N.J. v. Mallinckrodt ARD, LLC, et al.*, Case No. 1:20-cv-00188-RBK-KMW (D.N.J.) [Docket No. 90] (appended to Reply as <u>Exhibit Q</u>) |
| 29. | *Complaint*, dated Aug. 8, 2019, *Humana Inc. v. Mallinckrodt ARD LLC, et al.*, Case No. 2:19-cv-06926-DSF-MRW (C.D. Cal.) [Docket No. 1] (appended to Reply as <u>Exhibit R</u>) |
| 30. | *Second Amended Complaint*, dated Apr. 24, 2020, *Humana Inc. v. Mallinckrodt ARD LLC, et al.*, Case No. 2:19-cv-06926-DSF-MRW (C.D. Cal.) [Docket No. 60] |
| 31. | *Humana Inc. v. Mallinckrodt ARD LLC*, Case No. 2:19-cv-06926-DSF-MRW, 2020 WL 5640553 (C.D. Cal. Aug. 14, 2020) (appended to Reply as <u>Exhibit S</u>) |
| 32. | *Humana Inc. v. Mallinckrodt ARD LLC*, Case No. 2:19-cv-06926-DSF-MRW, 2020 WL 3041309 (C.D. Cal. March 9, 2020) (appended to Reply as <u>Exhibit T</u>) |

A-7481

| Exhibit No. | Document Description |
|---|---|
| 33. | *Order Granting Defendant's Motion to Transfer*, dated Jun. 28, 2021, *Humana Inc. v. Mallinckrodt ARD LLC, et al.*, Case No. 2:19-cv-06926-DSF-MRW (C.D. Cal.) [Docket No. 99] (appended to Reply as <u>Exhibit U</u>) |
| 34. | Proof of Claim No. 3396, filed by Humana, Inc. against Debtor Mallinckrodt ARD LLC[2] |
| 35. | Proof of Claim No. 4132, filed by United HealthCare Services, Inc., on behalf of itself, its affiliates, its subsidiaries, and its parents that either administer health plans, sponsor health plans, or offer fully insured health insurance plans, against Debtor IMC Exploration Company[3] |
| 36. | Proof of Claim No. 5737, filed by OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC, on behalf of themselves and their pharmacy subsidiaries, against Debtor Mallinckrodt Critical Care Finance LLC[4] |
| 37. | Proof of Claim No. 4373, filed by City of Rockford, Illinois against Debtor Infacare Pharmaceutical Corporation[5] [SUPPRESSED] |
| 38. | Proof of Claim No. 6047, filed by Acument Global Technologies, Inc. against Debtor IMC Exploration Company[6] [SUPPRESSED] |
| 39. | *Acthar Plaintiffs' Motion to Compel Discovery*, dated May 20, 2021, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) [Docket No. 2487] |
| 40. | *Order Authorizing Intercompany Restructuring Transactions*, dated Nov. 25, 2020, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) [Docket No. 633] |
| 41. | Form 8-k of Assertio Therapeutics, Inc., dated Feb. 7, 2020 (https://sec.report/Document/0001104659-20-012450/) |
| 42. | Document Bates-numbered MNK05586900 (Slide deck titled "Meeting of the Board of Directors of Mallinckrodt plc" and dated July 16, 2015) (appended to Reply as <u>Exhibit V</u>) [SEALED] |
| 43. | Document Bates-numbered MNK0431963 (Slide deck regarding "ARD Contracting Entities" (undated)) (appended to Reply as <u>Exhibit W</u>) [SEALED] |

---

[2]   Humana, Inc. filed proofs of claim, each substantially similar to Exhibit No. 34, against each of the Debtors.

[3]   United HealthCare Services, Inc. filed proofs of claim, each substantially similar to Exhibit No. 35, against each of the Debtors.

[4]   OptumRx Group Holdings, Inc. and OptumRx Holdings, LLC filed proofs of claim, each substantially similar to Exhibit No. 36, against each of the Debtors.

[5]   City of Rockford, Illinois filed proofs of claim, each substantially similar to Exhibit No. 37, against the Debtors.

[6]   Acument Global Technologies, Inc. filed proofs of claim, each substantially similar to Exhibit No. 38, against each of the Debtors.

A-7482

| Exhibit No. | Document Description |
|---|---|
| 44. | Document Bates-numbered MNK05503705 (Email chain with subject "MNK – Acthar IP Sale – Executed documents" dated Dec. 11-12, 2014) (appended to Reply as <u>Exhibit X</u>) [SEALED] |
| 45. | Document Bates-numbered MNK01443823 (Email chain with subject "MPIL Board Meeting – S&T Update" dated Mar. 4, 2016) [SEALED] |
| 46. | Document Bates-numbered MNK01577675 (Email chain with subject "Risks Associated with Acthar Price Increase" dated Dec. 4-5, 2015) [SEALED] |
| 47. | Document Bates-numbered MNK01444020 (Email chain with subject "ARD Strat Plan and QBR" dated Mar. 8-9, 2016) (appended to Reply as <u>Exhibit Y</u>) [SEALED] |
| 48. | Document Bates-numbered MNK03183310 (Materials from Nov. 3, 2016 Special Board Meeting of Mallinckrodt Pharmaceuticals Limited (UK)) [SEALED] |
| 49. | *Stipulation and Agreement Permitting Third Party Payors to File Consolidated Proofs of Claim under a Single Case Number*, dated Jan. 26, 2021, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) [Docket No. 1292-1] |
| 50. | Transcript of Videotaped Deposition of Stephen Welch, conducted June 11, 2021, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) (appended to Reply as <u>Exhibit Y</u>) ("***Welch Dep. Tr.***") [SEALED] |
| 51. | *Attestor Limited and Humana Inc.'s Notice of Deposition of Debtors Pursuant to Fed. R. Civ. P. 30(b)(6) and Fed. R. Bankr. P. 7030*, dated May 12, 2021, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) [Docket No. 2284] (<u>Exhibit 1</u> to Welch Dep. Tr.) |
| 52. | Document Bates-numbered MNK_ACTH_00000046 (Chart depicting corporate structure dated as of September 25, 2020) (<u>Exhibit 2</u> to Welch Dep. Tr.) [SEALED] |
| 53. | *Debtors' First Omnibus Objection to Unsubstantiated Claims (Substantive)*, dated Apr. 30, 2021, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) [Docket No. 2165] (<u>Exhibit 3</u> to Welch Dep. Tr.) |
| 54. | Document Bates-numbered MNK_ACTH_00000018-0020 (Legal entity summary dated as of Oct. 11, 2020) (<u>Exhibit 5</u> to Welch Dep. Tr.) [SEALED] |
| 55. | Document Bates-numbered MNK_ACTH_00001700-1704 (Slide deck titled "Mallinckrodt Project Apollo" and dated Jan. 26, 2019) (<u>Exhibit 6</u> to Welch Dep. Tr.) [SEALED] |
| 56. | Document Bates-numbered MNK_ACTH_00001589-1617 (Slide deck titled "Mallinckrodt Project Gemini – Phase I" and dated Oct. 22, 2018) (<u>Exhibit 7</u> to Welch Dep. Tr.) [SEALED] |

| Exhibit No. | Document Description |
|:---:|:---|
| 57. | Document Bates-numbered MNK_ACTH_00001618-1633 (Slide deck titled "Mallinckrodt Project Gemini – Phase II" and dated Dec. 28, 2018) (Exhibit 8 to Welch Dep. Tr.) [SEALED] |
| 58. | Document Bates-numbered MNK_ACTH_00001634-1645 (Slide deck titled "Mallinckrodt Project Gemini – Phase III" and dated Jan. 25, 2019) (Exhibit 9 to Welch Dep. Tr.) [SEALED] |
| 59. | Document Bates-numbered MNK_ACTH_00001646-1651 (Slide deck titled "Mallinckrodt Project Gemini – Phase IV" and dated Mar. 20, 2019) (Exhibit 10 to Welch Dep. Tr.) [SEALED] |
| 60. | Document Bates-numbered MNK_ACTH_00001432-1487 ("Collaboration Agreement Between Mallinckrodt Pharmaceuticals Limited and Mallinckrodt Pharmaceuticals Ireland Limited") (Exhibit 11 to Welch Dep. Tr.) [SEALED] |
| 61. | Document Bates-numbered MNK_ACTH_00001488-1491 ("First Amendment to Collaboration Agreement" dated as of Feb. 28, 2018) (Exhibit 12 to Welch Dep. Tr.) [SEALED] |
| 62. | Document Bates-numbered MNK_ACTH_00001558-1588 (Slide deck titled "Project Easter" and dated Sept. 29, 2017) (Exhibit 13 to Welch Dep. Tr.) [SEALED] |
| 63. | Document Bates-numbered MNK_ACTH_00001682-1699 (Slide deck titled "Sonorant Separation Step Plan" and dated Jul. 10, 2020) (Exhibit 14 to Welch Dep. Tr.) [SEALED] |
| 64. | Document Bates-numbered MNK_ACTH_00001039 (Excel spreadsheet titled "Mallinckrodt plc and Debtor & Non-Debtor Subsidiaries – Intercompany Trade – Unaudited principal balances") (Exhibit 15 to Welch Dep. Tr.) [SEALED] |
| 65. | *Motion of the Debtors for Interim and Final Orders (A) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (B) Authorizing Continuation of Existing Deposit Practices, (C) Waiving Certain U.S. Trustee Guidelines, (D) Authorizing Continuation of Intercompany Transactions, and (E) Granting Superpriority Status to Postpetition Intercompany Claims*, dated Oct. 12, 2020, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) [Docket No. 23] (Exhibit 16 to Welch Dep. Tr.) |
| 66. | Document Bates-numbered MNK_OCC&UCC_01556960-6969 (Email chain with subject "MPIL IP slides" dated Feb. 22, 2017 together with slide deck titled "Mallinckrodt Pharmaceuticals: Acthar Enterprise Steerco Update") (Exhibit 17 to Welch Dep. Tr.) [SEALED] |
| 67. | *Motion of Attestor Limited and Humana Inc. for Entry of an Order Allowing and Compelling Payment of Administrative Claims Pursuant to Section 503(b) of the Bankruptcy Code*, dated Apr. 30, 2021, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) [Docket No. 2159] |

A-7484

| Exhibit No. | Document Description |
|---|---|
| 68. | *Joint Plan of Reorganization of Mallinckrodt plc and Its Debtor Affiliates under Chapter 11 of the Bankruptcy Code*, dated Jun. 8, 2021, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) [Docket No. 2767] |
| 69. | Settlement Agreement appended as Exhibit 1 to *Joint Notice of Partial Settlement and Stipulation of Dismissal*, filed Sept. 20, 2019, *United States ex rel. Strunck. v. Mallinckrodt ARD LLC*, Case No. 2:12-cv-00175-BMS (E.D. Pa.) [Docket No. 74-1] (appended to Reply as <u>Exhibit AA</u>) |
| 70. | Department of Health and Human Services Office of Inspector General ("**OIG**"), Publication of OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70,623, 70,624 (Nov. 22, 2005) |
| 71. | *Motion of the Debtors for an Order Granting Leave from Local Rule 3007-1(f) to Permit the Filing of Substantive Omnibus Objections and Granting Related Relief*, dated May 1, 2021, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) [Docket No. 2167] |
| 72. | *Motion of Attestor Limited and Humana Inc. for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 502(c) (I) Authorizing Estimation of Humana's Acthar-Related Claims and (II) Allowing Humana's Acthar-Related Claims for All Purposes in These Bankruptcy Cases*, dated Apr. 30, 2021, *In re Mallinckrodt plc, et al.*, Case No. 20-12522 (JTD) [Docket No. 2157] |
| 73. | Email chain titled "6/22 Discovery Conference" and dated Jun. 20-21, 2021 (final email sent by B. McCallen on Jun. 21, 2021 at 10:58 a.m.) |
| 74. | Document Bates-numbered MNK_OCC&UCC_00542484 (5/18/2016 Mallinckrodt Pharmaceuticals Executive Committee Meeting - DEMPE Governance Update Presentation) |
| 75. | Document Bates-numbered MNK_OCC&UCC_00262641 (10/5/2017 ARD Leadership Team Meeting) |
| 76. | 2/25/2020 Mallinckrodt Form 8-K |
| 77. | 12/25/2020 Mallinckrodt plc Form 10-K |
| 78. | 2/25/2020 Mallinckrodt Entities Support Agreement |
| 79. | 3/16/2020 Mallinckrodt Form 8-K |
| 80. | 4/7/2020 Mallinckrodt Form 8-K |
| 81. | Document Bates-numbered MNK_ACTH_00000980 (8/6/2020 Master Cash Management Agreement) |
| 82. | Document Bates-numbered MNK_ACTH_00001705 (12/1/2020 Mallinckrodt Branded IP Restructuring Presentation) |
| 83. | 3/10/2021 Mallinckrodt plc Form 10-K |
| 84. | 4/2/2021 Mallinckrodt Organization Charts, Exhibit D to Motion for Substantive Consolidation |
| 85. | Proof of Claim No. 3133 - Humana, Inc. |
| 86. | Document Bates-numbered MNK_ACTH_00000190 (Mallinckrodt Pharmaceuticals (MPIL) Organizational Chart) |

A-7485

| Exhibit No. | Document Description |
|---|---|
| 87. | Document Bates-numbered MNK04531963 (ARD Contracting Entities Slides) |
| 88. | 05/01/2021 Declaration of Randall S. Eisenberg in Support of Debtors Motion for Scheduling Order and Objections to Claims [Dkt. 2166] (Ex. 4 to Welch Depo. Tr. [6/11]) |

| Debtors' Witness |
|---|
| Stephen A. Welch, Chief Transformation Officer |

| Acthar Insurance Claimants' Witness |
|---|
| Stephen A. Welch, Chief Transformation Officer |

The Debtors and Attestor/Humana each reserve the right to designate additional exhibits and/or witnesses for their case-in-chief.  Both parties further reserve the right to introduce additional cross-examination and/or rebuttal exhibits at the July 23, 2021 hearing based upon evidence introduced by any other parties at the hearing.

**A-7486**